**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC,** *et al.*, | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING**
**DEBTORS TO PAY (A) CRITICAL VENDOR CLAIMS, (B) LIEN**
**CLAIMS, AND (C) 503(B)(9) CLAIMS; AND (II) GRANTING RELATED RELIEF**

EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 10:00 A.M. (CENTRAL TIME) ON MAY 7, 2024.

IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

A HEARING WILL BE CONDUCTED ON THIS MATTER ON MAY 7, 2024 AT 10:00 A.M. (CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.

PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

<u>Background</u>

1. On May 6, 2024, (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

2. Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

3. The Debtors own and operate the largest private physician-owned for-profit healthcare network in the United States. Headquartered in Dallas, Texas, the Debtors' operations include 31 hospitals across eight states, approximately 400 facility locations, 4,500 primary and specialty care physicians, 3,600 staffed beds, and a company-wide workforce of nearly 30,000 employees. The Debtors provide care to more than two million patients annually.

4.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.[2]

## Jurisdiction

5.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

6.      By this Motion, pursuant to sections 363(b), 503(b)(9) and 105(a) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Bankruptcy Local Rule 9013-1, the Debtors request (i) authority, but not direction, to pay in the ordinary course of business, based on their business judgment, prepetition amounts owed to (a) Critical Vendors (as defined below), (b) Lien Claimants (as defined below), and (c) certain vendors that have delivered goods to the Debtors in the ordinary course of business within twenty (20) days before the Petition Date and whose prepetition claims are thus entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claimants**" and, together with the Critical Vendors and the Lien Claimants (each as defined below), the "**Vendors**" and the Vendors' prepetition claims, the "**Vendor Claims**"); and (ii) related relief.  Pursuant to this Motion, the Debtors request authority to pay (x) upon entry of the Proposed Interim Order (as defined below), Vendor Claims in an aggregate amount not to exceed $25.0 million and (y) upon entry of the

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

Proposed Final Order (as defined below), Vendor Claims in an aggregate amount not to exceed $130.0 million, inclusive of amounts paid under the Proposed Interim Order, in each case as they become due in the ordinary course of business and only on such terms and conditions as are appropriate, in the Debtors' business judgment, to minimize any disruptions to the Debtors' businesses.

7.     Proposed forms of order granting the relief requested herein on an interim and final basis are annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and **Exhibit B** (the "**Proposed Final Order**"), respectively.

### Overview of the Debtors' Vendors and Related Claims

8.     The Debtors' vendors and suppliers are a critical component of the Debtors' ability to manage safe medical facilities and provide vital medical care to patients.  The Debtors' hospitals, medical centers, urgent care centers, and specialist medical care providers require a steady supply of goods and services from their Vendors to provide essential healthcare services and to maintain safe medical facilities.  Any disruption in the provision of these critical goods and services would have a far-reaching and adverse economic and operational impact on the Debtors' businesses and could jeopardize the well-being of the Debtors' patients.

9.     The Debtors work with numerous providers of goods and services, including distributors of medical supplies and highly specialized medical equipment, and in many cases, the ability to find replacement vendors for these goods and services would be difficult, if not impossible.  Even where alternative vendors may exist, the time and costs associated with switching from one vendor to another could irreparably harm the Debtors' business and ultimately harm the quality of the Debtors' patient care.  In addition, suppliers of certain goods utilized by or provided to the Debtors may have delivered goods within the twenty (20) days immediately preceding the Petition Date, giving rise to claims that are accorded administrative priority under

section 503(b)(9) of the Bankruptcy Code.  In other cases, these goods and services may give rise to mechanic's, possessory, or other liens.

10.     As set out more fully in the First Day Declaration, the Debtors have dealt with an onslaught of negative economic trends and operational challenges that have placed severe limitations on the Debtors' liquidity.  In an effort to manage these limitations, the Debtors were forced to manage payments to Vendors that were critical to their operations, incurring a significant build of outstanding payables to Vendors as a result.  It is imperative that the Debtors have the ability to address outstanding payables to critical Vendors to preserve their relationships with such Vendors and to maintain continued access to the medical equipment and supplies needed for the care of the Debtors' patients.  Without access to such critical medical equipment and supplies, the Debtors will be at risk of Vendors halting their supply of goods and services needed for the Debtors to deliver medical treatment, which would put patients at risk.

11.     Accordingly, the Debtors request authorization to pay certain outstanding prepetition claims of the Critical Vendors, Lien Claimants, and the 503(b)(9) Claimants, subject to the limitations set forth in the Proposed Interim Order and Proposed Final Order, and related relief.

12.     The following chart summarizes the relief requested in the Motion with respect to Vendor Claims the Debtors seek authority to pay:

| Category | Description of Services Provided | Estimated Interim Amount[3] | Estimated Final Amount |
|---|---|---|---|
| Critical Vendors[4] | Specialized suppliers of goods and services that are critical to maintain the Debtors' day-to-day operations, or which are sole or limited-source providers of goods and services necessary for the uninterrupted operations of the Debtors' business. | $19.2 million | $100.0 million |
| Lien Claimants | Suppliers, shippers, and warehousemen of goods utilized by or provided to the Debtors that may assert mechanic's, possessory, or other similar liens, absent payment. | $2.0 million | $10.0 million |
| § 503(b)(9) Claimants | Suppliers that provided goods to the Debtors that were received within the twenty days prior to the Petition Date. | $3.8 million | $20.0 million |
| Total: | | $25.0 million | $130.0 million |

**A.  Critical Vendors**

13.     The Debtors are operators of hospitals and medical centers that provide healthcare and patient services across the United States, including imaging, surgery, pharmacology, cancer treatment, radiology, and urgent care.  The Debtors' ability to provide continuity of care to their patients depends on, among other things, their relationships with vendors

---

[3]  The estimated interim amount is based on the Debtors' estimate of prepetition amounts that are presently due and owing or are expected to become due and owing within the first 30 days following the Petition Date.

[4]  For the avoidance of doubt, the Critical Vendor Claims amounts do not include amounts owed to such Vendors that are subject to a valid lien and/or entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code (as such amounts are encapsulated in the Lien Claims or 503(b)(9) Claims, respectively). Additionally, the Critical Vendor Claims proposed to be paid pursuant to the Proposed Interim Order and Proposed Final Order do not include claims of creditors whose prepetition claims are addressed in any other first-day motion filed contemporaneously herewith.

that supply goods and services that are critical to delivering such care.  Indeed, the Debtors' ability to continue operating successfully fundamentally depends on the Debtors' ability to effectively manage the process by which they treat their patients, from the initial point of scheduling appointments, to providing care to their patients, through the process by which patients and payors are billed and pay for the medical services provided by the Debtors.  To operate and maintain their medical facilities and ensure patient care and safety, the Debtors rely on a steady flow of goods and services, including medical supplies, medical equipment, and regular maintenance services, such as waste management and HVAC.

14.    In light of these considerations, and to continue operating their business in the ordinary course, the Debtors, with the assistance of their advisors, spent significant time and effort leading up to the Petition Date reviewing and analyzing their books and records, consulting operation managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practices to identify the vendors that supply the products and services most vital to the Debtors' go-forward operations.  Without vendors that provide such critical goods and services, the Debtors will not be able to effectively operate and serve patients, which would materially harm the Debtors' business, to the detriment of all stakeholders in these chapter 11 cases, as well as risk harm to the Debtors' patients.  To that end, the Debtors identified the Critical Vendors pursuant to the following criteria:

- The Debtors first identified all vendors who supply goods and services used in the Debtors' operation of hospitals and medical centers.  Of these vendors, the Debtors then analyzed whether the failure to pay the prepetition claims of such vendors would, in the Debtors' business judgment, result in a substantial risk that such vendors may refuse to provide goods or services to the Debtors postpetition; and

- The Debtors then identified which of the vendors:

  (a) are sole source or limited source suppliers of goods and services necessary for operations to continue undisrupted;

(b) provide essential goods and services for which it would be impossible or prohibitively costly, impractical, disruptive or imprudent to find timely alternative sources of supply that can provide requisite volumes of similar goods or services on equal (or better) terms and in a reasonable time;

(c) have prepetition claims that would be exceeded by the costs to the Debtors to replace such vendor (including pricing, transition expenses, professional fees, and lost sales or future revenue);

(d) if not paid, would present an unacceptable risk to the Debtors' operations or patients' medical care;

(e) are currently refusing or are able or likely to refuse to supply the Debtors with goods or services without payment up front; and/or

(f) cannot be compelled by an agreement with the Debtors to continue performing on prepetition terms.

15.     As a result of this analysis, the Debtors identified the universe and type of vendors whose support is essential to the Debtors' ability to preserve and enhance value through the seamless transition of their operations into chapter 11 and ensure that these chapter 11 cases do not negatively impact patient care (each, a "**Critical Vendor**" and, collectively, the "**Critical Vendors**").  For the avoidance of doubt, the Debtors, in their sole discretion, make the determination as to whether a vendor is a Critical Vendor on a case-by-case basis.  Jeopardizing the Debtors' relationships with any of the Critical Vendors and attempting to procure the products and services that Critical Vendors provide from replacement vendors, if even available, would impose a severe strain on the Debtors' business operations and would likely result in substantially increased costs and significant loss of revenue due to delays in procurement.  Even a temporary interruption of the provision of the goods and services provided by the Critical Vendors would impede the Debtors' operations, and the cumulative impact of such events could have a catastrophic adverse effect on patient care and the Debtors' operations and, in turn, these chapter 11 cases.  Such harm would far outweigh the cost of payment of the Critical Vendor Claims.

16.     The below table summarizes the significant categories of Critical Vendors that the Debtors request authority to pay on an interim and final basis and includes estimates of prepetition amounts outstanding for such Critical Vendors (all such amounts, "**Critical Vendor Claims**").   In addition to these categories of vendors listed below, the Debtors utilize certain service providers in the ordinary course of business to manage or otherwise support their operations.

| Category | Estimated Interim Amount | Estimated Final Amount[5] |
|:---:|:---:|:---:|
| Patient Care and Safety Vendors | $14.7 million | $76.0 million |
| Revenue Cycle Management Vendors | $2.3 million | $12.0 million |
| IT and Critical Administrative Services Providers | $2.2 million | $12.0 million |
| **Total:** | $19.2 million | $100.0 million |

1.     **Patient Care and Safety Vendors**

17.     As healthcare providers, the Debtors operate in one of the most heavily regulated industries in the country.   To operate and maintain their hospitals and medical centers, the Debtors rely on a constant flow of supplies and services, including medical equipment, medical supplies, medication, and mission-critical services that support regulatory compliance, audits and operations (the "**Patient Care and Safety Vendors**").   The Debtors' ability to successfully operate depends on, among other things, their relationships with the Patient Care and Safety Vendors. In some cases, local, state, and/or federal law require the Debtors maintain contracts

---

[5]     Amounts of Critical Vendor Claims the Debtors seek authority to pay on a final basis are inclusive of Critical Vendor Claims paid on an interim basis.

with certain Patient Care and Safety Vendors, including those needed to comply with regulations applicable to medical centers and pharmacies.

18.     In the ordinary course of business, the Debtors incur obligations to their Patient Care and Safety Vendors for goods and services—the payment of which is necessary to ensure the health and safety of the Debtors' patients as well as environmental and regulatory compliance of the Debtors.  A disruption in the provision of such goods and services would jeopardize the Debtors' ability to safely operate their medical centers and maintain high standards of patient care and safety.  The regulations and requirements to which the Debtors are subject can only be fulfilled through uninterrupted access to the essential goods and services provided by the Patient Care and Safety Vendors.

19.     Without the ability to continue payment of Patient Care and Safety Vendors' claims, the Debtors risk harming the going-concern value of their business, the health and welfare of their patients, the integrity of their facilities, compliance with regulatory laws, and the quality of medical care provided.

20.     In many instances, the Patient Care and Safety Vendors are the only vendors able to produce or deliver the goods or services sufficient to meet the Debtors' operational needs. If certain Patient Care and Safety Vendors refuse to provide goods and services to the Debtors after the Petition Date on account of unpaid prepetition claims, the Debtors would be left scrambling to procure new vendors.  This process could take several months, resulting in a detrimental impact to the health of the Debtors' patients, and general operational stability and, in some cases, there may be no true replacement.  Accordingly, the Debtors request authority to satisfy certain of the prepetition claims of these Patient Care and Safety Vendors.

### 2.     Revenue Cycle Management Vendors

21.     The Debtors also require the services of certain vendors that provide revenue cycle management services (the "**RCM Vendors**") to effectively operate their businesses. Revenue cycle management is the process by which healthcare providers track patient care episodes from initial registration and appointment scheduling through the final payment by patients and payors (such as insurance providers, Medicare, or Medicaid) of a balance for medical services provided.  The services provided by the RCM Vendors include collecting information from patients, such as insurance coverage, coding medical procedures and diagnoses, determining the appropriate billable charges for medical services provided, collecting patient treatment history, reviewing insurance information and submitting claims to insurance companies, collecting and processing payments from patients, and collecting payments from third-party payors.

22.     Revenue cycle management is directly tied to the Debtors' ability to generate revenue—without the RCM Vendors to help manage this process, the Debtors would be unable to bill and collect payments for services provided to patients.   The Debtors do not have the technology or personnel necessary in-house to manage this complex process without the services provided by the RCM Vendors.  Further, the RCM Vendors would be impossible to replace without causing significant disruption to the business—many of the RCM Vendors have longstanding relationships with the Debtors, have systems that are ingrained with the Debtors' technology and software, and have a deep understanding of the Debtors' business and how it operates.  Even where alternative vendors may exist, the time and costs associated with transitioning from an RCM Vendor to a new provider would likely be significant and detrimental to the Debtors' estates.

23.     If the RCM Vendors are not paid prepetition amounts, they may refuse to continue providing services to the Debtors, endangering a critical mechanism of generating revenue, and irrevocably damaging the Debtors' relationships with the various third parties

involved in the revenue management cycle process, including insurers, physicians, patients, and other healthcare partners.  Accordingly, the Debtors request authority to satisfy certain of the prepetition claims of these RCM Vendors.

> **3.**     **Information and Technology and Critical Administrative Services Providers**

24.     The Debtors also rely on certain vendors to provide accounting and payment services, administrative services, and specialized information technology infrastructure necessary for the administration of the Debtors' day-to-day operational activities, including certain finance, medical operations, and billing support functions (the "**IT and Critical Administrative Services Providers**").

25.     Even a short interruption in the provision of any of these services would have potentially disastrous effects.  The services supplied by the IT and Critical Administrative Services Providers have been highly integrated into the Debtors' business operations and, in some instances, are designed specifically for use by the Debtors.  Even where alternative vendors may exist, the time and costs associated with transitioning from an IT and Critical Administrative Services Provider to a new provider would likely be significant and detrimental to the Debtors' estates due to the extensive development timeline required to produce replacement technologies.

26.     If the IT and Critical Administrative Services Providers are not paid prepetition amounts, they may refuse to continue to providing services to the Debtors, destabilizing the Debtors' day-to-day operations.  Accordingly, the Debtors request authority to satisfy certain of the prepetition claims of these IT and Critical Administrative Service Providers.

## B.  Lien Claimants

27.     The Debtors routinely do business with a number of vendors that may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered (each, a "**Lien**

Claimant" and, collectively, the "**Lien Claimants**").[6]  These Lien Claimants perform various services for the Debtors, including the installation and repair of certain equipment in the Debtors' facilities, hospital maintenance, repair, and renovation projects, improvement of the Debtors' real property and facilities, logistics services, including shipping, warehousing, and manufacturing component parts necessary for the Debtors' operations and specialized medical equipment, and informational technology services.

28.     The Debtors' medical facilities require specialized maintenance and repair services provided by third parties.  Repairing medical equipment, an essential part of the Debtors' operations, also requires the work of specialized third-party servicers.  Such specialized maintenance and repairs ensure the uninterrupted operations of the Debtors' facilities and that the Debtors continue to provide patient care in accordance with their standards of service and to meet regulatory and safety requirements for patients and employees.

29.     Additionally, the Debtors undertake development, maintenance, and renovation projects across their facilities that rely on mechanics, electricians, and other skilled labor to undertake such projects.  Failure to pay the Lien Claimants could lead to an inability to obtain skilled labor, labor disputes, work stoppages, and cause disputes with contractors and subcontractors.

30.     Further, the Debtors work with certain warehouses to store various types of medical and patient care supplies.  The Debtors also partner with certain shippers to conduct deliveries of medical equipment and supplies.  Possible loss of long-term relationships with the

---

[6]     Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, might be excluded from the automatic stay.  Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection."  11 U.S.C. § 546(b)(1)(A).

warehousemen, shippers, and certain other vendors could result in significant risk to the patients being treated in the Debtors' facilities and may cause reputational, financial, and operational damage to the Debtors' business.

31.     Under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens on the goods in their possession, or on property they improved, as applicable, to secure payment of the charges or expenses incurred in connection with these prepetition obligations (each, a "**Lien Claim**" and, collectively, the "**Lien Claims**").  In the event these claims remain unpaid, the Lien Claimants could attempt to assert liens, exercise self-help remedies, or otherwise impede the Debtors' use of property until their claims are satisfied and their liens redeemed.  The Lien Claimants' possession and retention of the Debtors' goods and supplies, or the enforcement of a mechanic's lien, would disrupt the Debtors' operations.  The cost of such disruption to the Debtors' estates in many cases would very likely be greater than the applicable Lien Claims.  Pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

32.     Disputes caused by non-payment of the Lien Claims would affect the Debtors' ability to progress their ongoing hospital maintenance, repair, and renovation projects due to work stoppages that would result in public safety, patient care, and regulatory consequences, including the degradation of unfinished structures, noncompliance with building codes that could lead to cessation of operations if unremedied, and lapses in maintenance.  Additionally, continuation of hospital maintenance and repair projects will support the Debtors' asset sales and ongoing hospital marketing and sale process.

33.     Accordingly, the Debtors seek authority, but not direction, to pay the Lien Claims that the Debtors believe have created, or could give rise to, a lien against the Debtors'

property, regardless of whether the applicable Lien Claimants have already perfected their interests, in an amount not to exceed $2.0 million on an interim basis, and in an amount not to exceed $10.0 million on a final basis.

### C. 503(b)(9) Claimants

34.     The Debtors may have received certain goods from vendors within the 20-day period immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claims**").  Failure to pay the 503(b)(9) Claimants on account of their 503(b)(9) Claims at the outset of these chapter 11 cases—which, due to their administrative expense priority status, must be paid in full upon the effective date of a chapter 11 plan at the latest—could result in the 503(b)(9) Claimants refusing to do business with the Debtors moving forward, which would have an adverse effect on the Debtors' ability to continue operations without disruption.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Instead, the Debtors obtain much of their medical supplies, pharmaceuticals, and equipment from such claimants on an order-by-order or as needed basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders, or refuse to ship goods that have already been manufactured, without payment of its 503(b)(9) Claims.  Such refusal could negatively affect the Debtors' estates as the Debtors' operations depend on the steady flow of vital medical equipment and supplies that are necessary to provide patient care services.

35.     In light of these consequences, payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations.  The Debtors do not seek to accelerate or modify existing payment terms with respect to 503(b)(9) Claims (if any).  Rather, the Debtors seek authority to pay the applicable 503(b)(9) Claims as they come due and in the ordinary course of business.  Accordingly, the Debtors seek authority, but not direction, to pay the 503(b)(9) Claims

in an amount not to exceed $3.8 million on an interim basis, and in an amount not to exceed $20.0 million on a final basis.

**Postpetition Continuation of Customary Trade Terms**

36.     In return for paying the Vendor Claims, the Debtors may require the Vendors to provide trade terms on the same terms or better terms as compared to those in place in the twenty-four (24) months prior to the Petition Date (the "**Customary Trade Terms**").  The Debtors further seek authority to condition payment of the Vendor Claims upon such Vendors' entry into an agreement, substantially in the form annexed hereto as **Exhibit C** (each, a "**Trade Agreement**").  Such a Trade Agreement, once agreed to and accepted by a Vendor, shall be a legally binding, contractual arrangement between the Debtors and such Vendor, governing the commercial trade relationship as provided therein.

37.     If a Vendor accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide the applicable goods and services to the Debtors on Customary Trade Terms, then, subject to such Vendor's right to file an objection with the Bankruptcy Court within fourteen (14) days of a notice of non-performance, and subject to any Trade Agreement executed between the Debtors and such Vendor: (i) such payment by the Debtors to such Vendor may be deemed to be an improper postpetition transfer on account of a prepetition claim and, therefore, immediately recoverable by the Debtors in cash upon written request; (ii) upon recovery by the Debtors of such payment, any prepetition Vendor Claim of such Vendor shall be reinstated as if the payment by the Debtors had not been made in the first instance; and (iii) if there exists an outstanding postpetition balance due from the Debtors to such Vendor, then the Debtors may elect to recharacterize and apply any payment made by the Debtors to such Vendor pursuant to the relief requested by the Motion to such outstanding postpetition balance, and such Vendor will be required to repay to the Debtors such paid amounts exceeding the

postpetition obligations then outstanding from the Debtors to such Vendor without the right of any

setoff, claims, provisions for payment of any claims, or otherwise.  Certain of the Vendors may

possess Lien Claims on the Debtors' assets arising from Vendor Claims.  The Debtors propose

that, as a further condition to receiving payment of a Vendor Claim, a Vendor must agree to take

all necessary actions to remove any lien at such Vendor's sole expense.

**Relief Requested Should Be Granted**

38.     Ample reason exists to authorize the Debtors to pay prepetition amounts

owed to the Vendors as set out herein and related relief, including, among other things, that

(i) failure to pay Vendor Claims may cause the Vendors to cease providing goods and services

required for the Debtors' continued operations; (ii) payment of the Vendor Claims is critical to the

Debtors' ability to continue operating successfully and ensuring patient care and safety; and

(iii) the Court has authority to grant the requested relief under sections 363(b), 503(b)(9), and

105(a) of the Bankruptcy Code.

**A.      Payment of Critical Vendor Claims Is Warranted and Should Be Approved**

39.     Payment of Critical Vendor Claims is critical to the protection of the

Debtors' operations.  The Court may grant the relief requested herein pursuant to section 363(b)

of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use

property of the estate outside of the ordinary course of business pursuant to section 363(b) of the

Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*,

*Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 434–35 (5th Cir. 2016) (noting that

section 363 "requires that a sale of the estate's assets be supported by an articulated business

justification, good business judgment, or sound business reasons") (internal quotation marks and

17

citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted).

40.    In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 491–93 & n.6 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re CEI Roofing*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).  Moreover, Bankruptcy Rule 6003 itself implies that the payment of

prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of the Debtors' estates.

41. Further, courts have noted that there are instances in which debtors may fulfill their fiduciary duties only "by the preplan satisfaction of a prepetition claim." *In re CoServ*, 273 B.R. at 497. The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duties when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to the "sole suppliers of a given product." *Id.* at 497–98. Courts in the Fifth Circuit, including the Southern District of Texas, have followed *CoServ*'s three-part test to determine whether the prepetition claim of a critical vendor may be paid by a debtor outside of the chapter 11 plan process on a postpetition basis.

42. First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim. *Id.* at 498; *see also In re Mirant Corp.*, 296 B.R. 427, 429–30 (Bankr. N.D. Tex. July 16, 2023). Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

43. Courts in this district and others have granted authority for debtors to pay similar obligations as those sought to be paid hereunder as a routine matter in similar cases. *See,*

*e.g.*, *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex. Nov. 14, 2023) (Docket No. 224); *In re Envision Healthcare Corp.,* No. 23-90342 (CML) (Bankr. S.D. Tex. June 27, 2023) (Docket No. 453); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. June 1, 2023) (Docket No. 84); *In re Serta Simmons Bedding, LLC*, No. 23-90020 (DRJ) (Bankr. S.D. Tex. Feb. 26, 2023) (Docket No. 369); *In re Core Sci., Inc.*, No. 22-90341 (DRJ) (Bankr. S.D. Tex. Jan. 23, 2023) (Docket No. 333); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. June 8, 2022) (Docket No. 464).  Similar relief is also appropriate here.

44.     As described above, payment of Critical Vendor Claims is necessary for the Debtors to continue operating their business, maintain operational safety, and provide high-quality medical care to patients.  Such payments will ensure that the Debtors have access to necessary goods and services to avoid the Debtors being forced to halt operations while they search for substitute vendors and service providers, to the extent even available.  Any disruption to the provision of goods and services provided by the Critical Vendors could jeopardize the Debtors' ability to provide care for their patients and maintain safe medical facilities, which would decrease the value of the Debtors' business, impair stakeholder recoveries, and put patients at risk at the outset of these chapter 11 cases.  Consequently, payment of the Critical Vendor Claims is necessary and appropriate to preserve the value of the Debtors' estates and to ensure the safety of their operations, both for the benefit of all stakeholders and the public at large.

45.     For the foregoing reasons, satisfying the Critical Vendor Claims is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases.  The Debtors respectfully submit that the Court should authorize the Debtors to satisfy the Critical Vendor Claims as set forth herein.

**B.       Payment of Lien Claims Is Necessary to Ensure Continuation of Debtors' Operations**

46.       The Debtors have a valid business purpose for paying the Lien Claimants. Absent payment of the Lien Claimants, certain Lien Claimants could be unwilling to release goods in their possession over which they may assert liens, or may assert liens over property they improved.  Failure to satisfy such claims could have an adverse effect on the Debtors' operations to the extent Lien Claimants attempt to assert liens, exercise "self-help" remedies, including repossessing or placing liens on goods in the Debtors possession or otherwise attempt to impede the Debtors' use of property to the detriment of the Debtors' estates and their economic stakeholders.  Further, any interruption in the essential services provided by the Lien Claimants, such as shipping, warehousing, and the manufacturing and repair of specialized medical equipment would impair the Debtors' operations, and more critically, standards of care.

47.       Further, the Lien Claims are secured claims to the extent they have validly perfected security interests.  As such, they are entitled to the full value of their secured claims under any chapter 11 plan.  Authorization to pay the Lien Claims as a result of this Motion impacts only the timing of their payment, not whether they are paid at all.  Allowing Debtors to pay the Lien Claims earlier rather than later ultimately does not impact the recovery of the Debtors' stakeholders, but does avoid potential disruptions to the Debtors' business and liens being placed upon Debtors' property, creating complications in the chapter 11 cases.

48.       Courts in this district and in other jurisdictions regularly authorize chapter 11 debtors to pay prepetition claims to lien claimants.  *See, e.g.*, *In re Envision Healthcare Corp.*, No. 23-90342 (CML) (Bankr. S.D. Tex. June 27, 2023) (Docket No. 453); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. June 1, 2023) (Docket No. 84); *In re Serta Simmons Bedding, LLC*, No. 23-90020 (DRJ) (Bankr. S.D. Tex. Feb. 26, 2023) (Docket No. 369); *In re Core*

*Sci., Inc.*, No. 22-90341 (DRJ) (Bankr. S.D. Tex. Jan. 23, 2023) (Docket No. 333); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. June 8, 2022) (Docket No. 464).

**C.      Payment of 503(b)(9) Claims Is Warranted and Should Be Approved**

49.      Section 503(b)(9) of the Bankruptcy Code provides that, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9).  To confirm any chapter 11 plan filed in these cases, the Debtors will be required to pay in full all claims entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to administrative expense priority).

50.      Instead of paying the 503(b)(9) Claims on the effective date of a chapter 11 plan, the Debtors seek authority, but not direction, to pay such 503(b)(9) Claims during the pendency of these chapter 11 cases in their sole discretion.  Thus, payment of the 503(b)(9) Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code pursuant to the Proposed Interim Order and the Proposed Final Order will effect only a change in the timing of such payments, but not the amounts or priority thereof that the 503(b)(9) Claimants will be entitled to from the Debtors, and so no other creditor or party in interest in these chapter 11 cases will be unfairly prejudiced.

51.      The Debtors' ongoing ability to obtain certain goods, including medical equipment and supplies, is essential to their ability to preserve and enhance value for all parties in interest in these chapter 11 cases.  Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases, the Debtors could be denied access to the medical equipment and other supplies

necessary to maintain the Debtors' operations, maximize the value of the Debtors' estates, and provide care to patients.

52.     Courts in this district and in other jurisdictions regularly authorize chapter 11 debtors to pay administrative expense claims, such as 503(b)(9) Claims, as they come due during the course of a chapter 11 case.  *See, e.g.*, *In re Envision Healthcare Corp.*, No. 23-90342 (CML) (Bankr. S.D. Tex. June 27, 2023) (Docket No. 453); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. June 1, 2023) (Docket No. 84); *In re Serta Simmons Bedding, LLC*, No. 23-90020 (DRJ) (Bankr. S.D. Tex. Feb. 26, 2023) (Docket No. 369); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. July 8, 2022) (Docket No. 464).

**D.     Applicable Financial Institutions Should Be Authorized to Receive, Process, Honor, and Pay Checks Issued and Transfers Requested to Pay Vendor Claims**

53.     The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Vendor Claims owing to Vendors to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment.  The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of prepetition Vendor Claims owing to Vendors dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

**Debtors Have Satisfied Bankruptcy Rule 6003(b)**

54.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first 21 days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  The relief requested is essential to avoid the

immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11. Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**Debtors' Compliance with**
**Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

55.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**Reservation of Rights**

56.     Nothing contained herein is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors; (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim; (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law; (iv) a waiver of the obligation of any party in interest to file a proof of claim; (v) an agreement or obligation to pay any claims; (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (vii) an admission as to the validity of any liens satisfied pursuant to this Motion; or (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought

herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

### **Notice**

57.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  May 6, 2024
      Houston, Texas

_/s/  Clifford W. Carlson_
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
       Clifford.Carlson@weil.com
       Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (_pro hac vice_ pending)
Candace M. Arthur (_pro hac vice_ pending)
David J. Cohen (_pro hac vice_ pending)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
       Candace.Arthur@weil.com
       DavidJ.Cohen@weil.com

_Proposed Attorneys for Debtors_
_and Debtors in Possession_

**<u>Certificate of Service</u>**

I hereby certify that on May 6, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


        */s/  Clifford W. Carlson*
Clifford W. Carlson

## Exhibit A

**Proposed Interim Order**