**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM LLC**, *et al.*, | § | Case No. 24-90213 (CML) |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**DECLARATION OF JOHN R. CASTELLANO IN SUPPORT
OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST-DAY PLEADINGS**

I, John R. Castellano, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1.     I am the Chief Restructuring Officer of each of the Debtors, including Steward Health Care Holdings LLC, a limited liability company organized under the laws of Delaware ("**SHC Holdings**" and, together with the above-captioned debtors and debtors in possession, collectively, the "**Debtors**" and, the Debtors together with the Debtors' direct and indirect non-debtor subsidiaries, the "**Company**" or "**Steward**").   Prior to becoming Chief Restructuring Officer, I advised the Company in my capacity as Managing Director at AlixPartners, LLP, an affiliate of AP Services, LLC (collectively, "**AlixPartners**") beginning in October 2023.   In these capacities, I am familiar with the Debtors' day-to-day operations, books and records, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases.

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward.   The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

2.      I hold a bachelor's degree in Accounting from DePaul University and a master's degree in Management, Finance, and Strategy from the Kellogg School of Management at Northwestern University.  I have over 28 years of financial restructuring and bankruptcy-related experience and over 25 years of experience with AlixPartners.  I have served as a Managing Director in AlixPartners' Turnaround & Restructuring Group since 2007.  Prior to joining AlixPartners, I worked at Ernst & Young LLP in its Assurance practice as an auditor, and in its Consulting practice focusing on restructuring advisory services.  I have served as Chief Restructuring Officer (or in an equivalent role) in numerous large-scale corporate restructurings, including: *In re Aearo Technologies LLC*, No. 22-02890 (JJG) (Bankr. S.D. Ind. 2022); *In re Footprint Power Salem Harbor Development LP*, No. 22-10239 (MFW) (Bankr. D. Del. 2022); *In re Alpha Latam Management, LLC*, No. 21-11109 (JKS) (Bankr. D. Del. 2021); *In re Lonestar Resources US Inc.*, No. 20-34805 (DRJ) (Bankr. S.D. Tex. 2020); *In re McDermott International, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. 2020); and *In re Aegerion Pharmaceuticals, Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. 2019).

3.      AlixPartners specializes in designing and implementing business turnarounds, assisting companies with the administration of the bankruptcy process, and providing interim crisis management, among other things.  AlixPartners provides these services for companies throughout the financial services industries and has an intimate understanding of the economic, regulatory, operational, strategic, and financial factors that drive these businesses. AlixPartners' prior experience includes a range of activities and services targeted at restructuring, stabilizing, and improving a company's financial position.  These services have historically included: (i) providing executive leadership to financially distressed companies; (ii) developing or validating forecasts, business plans, and related assessments of a business's strategic position;

(iii) monitoring and managing cash, cash flow, and supplier relationships; (iv) assessing and recommending cost reduction strategies; and (v) designing and negotiating financial restructuring packages.

4.       Except as otherwise indicated, the facts set forth in this declaration (this "**Declaration**") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Company's operations and financial condition, my own reasonable inquiry, and/or my discussions with the Company's other officers, directors, and restructuring advisors, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), restructuring investment banker Lazard Frères & Co. LLC ("**Lazard**"), Stewardship Health and Northern Massachusetts and Florida hospitals investment banker Leerink Partners LLC ("**Leerink**"), hospital banker Cain Brothers ("**Cain**"), and AlixPartners (collectively, the "**Advisors**").  I am over the age of 18 and I am authorized to submit this Declaration on behalf of the Debtors.  If called to testify, I would testify competently to the facts set forth in this Declaration.

5.       On May 6, 2024 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").  The Debtors have filed various motions and pleadings seeking certain "first day" relief (collectively, the "**First Day Motions**") to minimize any disruption that filing these chapter 11 cases may have on their operations.  I submit this Declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in

support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

6.      This Declaration is organized into four sections:

- **Part I** provides a general overview of the Company's history and current business operations;

- **Part II** summarizes the Debtors' prepetition corporate and capital structure;

- **Part III** describes the circumstances leading to the commencement of these chapter 11 cases; and

- **Part IV** provides a summary of the evidentiary support for the First Day Motions.

**Preliminary Statement**

7.      Steward is the largest private, physician-owned health care network in the United States, providing care to more than two million patients annually, and employing a workforce of nearly 30,000.  Since its inception, Steward has become a national, integrated health care network across 10 states comprised of 31 hospitals and over 400 facility locations (including physician practice offices, ambulatory surgical centres, and diagnostic imaging centres) with over 4,500 primary and specialty care physicians, all committed to serving patients in underinsured and underserved communities.

8.      Although Steward has faced financial headwinds in recent months, patient care is and has always has been Steward's first priority.  Consistent with Steward's unwavering commitment to its patients and the communities it serves, the Debtors are entering into these cases to stabilize their operations and with a debtor-in-possession financing facility that contemplates a new-money loan from an affiliate of Medical Properties Trust, Inc. ("**MPT**") (the "**Junior DIP Facility**"), $75 million proposed to be made available during the interim period (and up to an additional $225 million subject to the satisfaction of certain conditions acceptable to MPT) that

will allow Steward to continue to provide the highest levels of care to its patients in the face of challenges that have impacted its operating model.  Importantly, ***Steward has secured financing to fund the ongoing operations of its hospitals and keep Steward's hospitals and other facilities open to ensure patients have access to critical care.***  This financing will provide Steward the financial resources to allow it to stabilize its operations and continue its strategic restructuring and sale process, including in the short-term, finalizing a stalking horse agreement for the sale of Stewardship Health, the Company's highly valued managed-care business.

9.     Unfortunately, health care systems in the United States are navigating a historically challenging operating environment.  Despite the strength of its nationwide network of hospitals and physicians, as described herein, in the wake of the COVID-19 pandemic, Steward has dealt with a number of operational challenges and negative market trends that have eroded its earnings and liquidity over the last several years, including patient mix and low and lagging reimbursement rates, as well as declines in patient visits and revenue, the continued movement of inpatient services to outpatient settings (resulting in lower margins), a tightening labor market and sharp increases in labor costs, inflationary pressures, and more recently, regulatory and political pressures.  Certain of Steward's hospitals, including those in Northern Massachusetts, have suffered more significant financial stress than others on account of lagging and lower Medicaid reimbursement rates when compared to patient mix, putting pressure on the entire Steward system.

10.     In recent months, the combination of these forces exacerbated Steward's liquidity issues, resulting in pressure from vendors and creditors, limiting access to supplies and equipment, further reducing revenues and creating a snowball effect that resulted in significant trade claims and the Debtors needing to seek a series of emergency bridge loans and other financial concessions from its existing secured lenders and its landlord, MPT, to fund operations.  In the

face of such challenges, the Debtors also began the pursuit of various strategic transactions under the oversight of a special committee (the "**Transformation Committee**") of the board of managers (the "**Board**") of SHC Holdings (comprised of myself as well as independent and disinterested managers with restructuring experience, William Transier and Alan Carr), including a marketing process for Stewardship Health and the Debtors' hospital portfolio. The Transformation Committee has the sole and exclusive authority to, among other things, oversee the administration of these chapter 11 cases, investigate and prosecute any claims held by the Company against insiders of the Company (as well as avoidance actions), and approve transactions on behalf of the Board.

11.     Although the Debtors have been able to obtain significant interest from third-parties in purchasing hospitals and operations at attractive levels, recurring liquidity shortfalls necessitated the Company seeking the relief of an in-court process. As a result, the Debtors have commenced these chapter 11 cases to secure new-money financing under the Junior DIP Facility from MPT that will address the Company's liquidity concerns, allow Steward to continue to operate its hospitals in the ordinary course and preserve the value of its unique national network of talented physicians and healthcare workers for the benefit of all of its stakeholders. With access to the Junior DIP Facility, Steward's patients, physicians, employees, regulators, and suppliers can all be assured that Steward's operations are stable and that Steward hospitals will continue to deliver the highest quality of patient care.

12.     In addition, Steward intends to use the chapter 11 cases to continue its strategic market solicitation strategy that it commenced prior to the Petition Date to seek out buyers and investors that will continue to operate Steward's hospitals and value-based care network for the benefit of the patients and the mostly underserved, underinsured communities Steward serves,

maximize recoveries for Steward's stakeholders, and preserve Steward's workforce of nearly 30,000 employees, 3,250 affiliate providers, 400 independent physicians, and 450 physician groups, including nearly 4,500 dedicated physicians and 300 physician assistants, 9,100 nurses and nurse practitioners, and 9,200 other skilled health care workers.

13.     The prepetition strategic marketing process already has yielded significant interest in Steward's operations.  Steward, led by its independent healthcare investment bankers, Leerink and Cain, is engaged in active discussions with numerous bidders interested in continuing to operate Steward's hospitals and value-based care business.  Indeed, Steward:

- has executed a letter of intent and is in advanced discussions with Collaborative Care Holdings, LLC, an affiliate of UnitedHealth Group Incorporated ("**United**") to act as a stalking horse purchaser for the Stewardship Health business;

- has received indications of interest from multiple potential buyers for its Southern Massachusetts, Arizona, and Texas hospital operations;

- is in discussions with various third parties interested in operating the Company's hospitals in Northern Massachusetts, as well as with state officials and regulators to facilitate the transition of such hospitals to new operators;

- has generated interest in the Debtors' hospitals in Ohio, Pennsylvania, Arkansas, and Louisiana; and

- has launched a market solicitation process for the Debtors' hospitals in Florida to explore a sale or reorganization around such hospital operations.

14.     The Debtors' strategic transaction strategy will be the foundation of these chapter 11 cases and will be critical to maximizing recoveries for creditors through value-maximizing sale or reorganization transactions intended to benefit all stakeholders, including Steward's patients, vendors, physicians, employees, and regulators.   The Debtors

anticipate filing a motion seeking approval of proposed bidding procedures in the coming days, which propose a timeline for their postpetition marketing process.

15.    Although the Debtors have secured a financing facility that contemplates $75 million of committed financing during the interim period and up to $225 million of additional new-money financing (subject to the satisfaction of certain conditions acceptable to MPT), the Debtors must move expeditiously through these chapter 11 cases to consummate a series of value-maximizing transactions.   The Junior DIP Facility sets forth milestones by which the Debtors must accomplish various objectives to ensure these chapter 11 cases proceed at pace, including, but not limited to the following:

| DIP Financing Milestones | |
|---|---|
| File Bidding Procedures Motion | May 13, 2024 |
| Entry of Final DIP Order | June 3, 2024 |
| *Hospital Sale Timeline* | |
| First Round Hospitals:[2] Bid Deadline | June 25, 2024 |
| First Round Hospitals: Auction | June 28, 2024 |
| First Round Hospitals: Sale Hearing | July 2, 2024 |
| Second Round Hospitals:[3] Bid Deadline | July 26, 2024 |
| Second Round Hospitals: Auction | July 30, 2024 |
| Second Round Hospitals: Sale Hearing | August 2, 2024 |

16.    Time is of the essence in these chapter 11 cases.  Although Steward's physicians and other uniquely talented healthcare providers, as well as Steward's critical suppliers and other key stakeholders have been supportive of the Company, it is crucial that Steward moves swiftly through these chapter 11 cases to preserve their commitment to the Debtors and allow the Debtors to preserve the value of their estates.  The proposed Junior DIP Financing is projected to

---

[2]    "**First Round Hospitals**" refers to all of the Debtors' hospitals, other than those in Florida.

[3]    "**Second Round Hospitals**" refers to the Debtors' hospitals in Florida.

allow the Debtors to operate in the ordinary course, and the Debtors intend to use such financing and the sale proceeds from the marketing process to ultimately pursue a chapter 11 plan that will maximize distributions for creditors, while simultaneously exploring a reorganization with a rationalized footprint of hospitals. The Debtors believe that all constituents—including lenders, landlords, vendors, patients, and employees—will benefit significantly from this chapter 11 proceeding.

## I.   BACKGROUND

### A.   Steward's History

17.     Steward was formed in 2010, by renowned cardiac surgeon Dr. Ralph de la Torre, following the acquisition of six (6) hospitals in Massachusetts from Caritas Christi Health Care ("**Caritas**"), a struggling hospital system run by the Roman Catholic Archdiocese of Boston that was experiencing financial distress. Over the next decade, Steward strategically expanded its footprint through a series of transactions designed to broaden its national reach and expand its model and philosophy of value-based care, including:

- In early 2017, the Company acquired seven (7) hospital facilities from Community Health Systems in Ohio, Pennsylvania, and Florida in a single transaction.

- Also in 2017, the Company merged with IASIS Healthcare LLC, adding 18 hospitals in Arizona, Arkansas, Colorado, Louisiana, Texas, and Utah to its healthcare network.

- In 2021, Steward acquired another five (5) hospitals in South Florida from Tenet Healthcare.

18.     Today, Steward operates one of the largest accountable care organizations (an "**ACO**") in the United States, including facilities and operations in Massachusetts, New

Hampshire, Texas, Arkansas, Louisiana, Ohio, Pennsylvania, Florida, Utah, and Arizona.  The

geographical spread of Steward's hospitals is reflected in the following graphic:



### B. Value-Based Care Model

19.    Steward is one of the healthcare systems that helped forge the concept of

value-based care in the United States, and is a pioneer in risk-bearing, fully integrated care.

Steward's value-based care model is designed to create financial incentivizes to maximize clinical

quality and outcomes for patients by having Steward, as provider of care, assume the risk of

coordinating all care and healthcare choices.  This model both enhances the quality of care and

reduces cost, improving outcomes for Steward's patient population, most of whom are

underinsured and live in underserved communities.  Steward's integrated model is designed to

create a seamless experience for patients, increase efficiency without sacrificing quality, reduce

redundancy, and optimize the use of Steward's extensive resources.

 

20.     Value-based care models, as opposed to "fee for service" models,[4] incentivize health care providers to deliver high *quality* (rather than high *quantity*) health care to their patients.  Specifically, providers in a value-based health care model are rewarded for positive health outcomes for their patients and controlled overall healthcare costs, as determined through certain predefined quality and cost targets, incentivizing providers to keep their patients well.  With more than 14 years of data and experience, Steward is optimally positioned to understand its patients' health status, apply best-in-class technology to reduce total medical expenses, and deliver industry-leading health outcomes and patient experience.  Additionally, the Company's approach focuses on "total care"—it does not only employ doctors and nurses, but also social workers, pharmacists, specially trained medical technicians, and other health care workers.

21.     In support of its value-based system, Steward focuses on three primary principles.  *First,* "right site-ing" health care to local, high-quality lower cost providers when appropriate, such as sending patients to walk-in clinics instead of emergency departments for routine checks.  *Second*, "right sizing" care to decrease overlapping or redundant services and provide targeted, effective care to patients (e.g., by having one centralized emergency room in a

---

[4]     Unlike the Debtors' value-based care system, fee-for-service systems reimburse providers for each service they provide to patients regardless of outcome, thereby incentivizing providers to deliver excessive treatments, as their payment is tied to quantity of care rather than quality.

hospital that all providers can use). *Third*, employing strategic partners to supplement Steward's services to provide tertiary and quaternary care when needed. Together, these principles allow Steward to leverage its expansive health care network to deliver targeted, effective and quality care to its patients efficiently, thereby lowering overall healthcare costs.

22.     To that end, the Company has also increased the number of affiliate healthcare providers and employed advanced practice providers, including nurse practitioners and physician assistants over time, to more efficiently provide high-quality value-based primary and specialist care. Specifically, between 2022 and 2023, Steward added approximately 550 physicians and physician assistants and approximately 100 nurse practitioners to its network.

23.     Another critical element in the Company's value-based care model is its best-in-class information reporting capabilities, which enable the Company to make timely, informed decisions designed to optimize hospital resources and drive better outcomes for its patients. The Company's robust information technology platform uses external and internal variables to track and solve challenges relating to patient volume, staff management, patient length of stay, and supply chain needs. The Company's extensive information reporting improves patient care and cost efficiency across Steward's health care platform.

### C.     Operations and Key Assets

24.     The Debtors' operations are comprised of two primary business lines: (1) *Steward Health*, the Company's hospital operations, and (2) *Stewardship Health*, the Company's risk-based payor contracting network and related primary care practices. Each business line is served by the Company's network of employed, contracted, and affiliated physicians, including *Steward Medical Group*, the Company's multi-specialty physician group that services specialist providers to Steward Health and primary care providers to Stewardship Health. As of the Petition Date, the Debtors have nearly 30,000 employees, including nearly 1,800

12

employed physicians and 300 physician assistants, 9,100 employed nurses and nurse practitioners, 9,200 other skilled health care worker, and have approximately 3,250 affiliate providers, including approximately 900 affiliate primary care providers and 2,350 affiliate specialty providers.

25.     ***Steward Health***.  Steward Health consists of Steward's hospital operations, including the Company's 31 acute care hospital campuses ("**Steward Hospital Management**" or "**SHM**") and approximately 2,350 of the Company's specialist providers ("**Steward Specialty Group**" and together with Steward Hospital Management, "**Steward Health**").  SHM has invested heavily in its facilities, technology, and programs to produce the best-in-class quality, expense management, and predictive analytics to drive clinical excellence and operational efficiency.  In recognition of the excellence of its services, SHM has received the nation's top awards in quality and safety, including recognition in 2021 by the American College of Cardiology as one of the best health systems in the United States for cardiovascular care.[5]

26.     Steward Specialty Group houses the Company's multi-specialty physician group practice, including medical specialties and surgical specialties, and has a growing number of affiliated skilled nursing facilities, ambulatory surgery centres, urgent care units, imaging and diagnostic centres, and laboratories.  Steward Specialty Group complements SHM's hospital operations by providing hospitalists and certain "in-hospital" specialists.  This collaborative approach between the Company's hospitals and specialists allows the Company to better serve its communities by providing a comprehensive suite of health care options to deliver best-in-class care.

---

[5]     *See* Steward Health Care Recognized by the American College of Cardiology in the "Best Hospitals" Issue of U.S. News & World Report, available at https://www.steward.org/newsroom/2021-10-18/steward-health-care-recognized-american-college-cardiology-best-hospitals-issue.

27.     ***Stewardship Health***.  Stewardship Health is among the largest and best performing ACOs in the United States and is at the heart of the Company's value-based system. ACOs are an alternative payment model in which physicians and hospitals assume responsibility for the total cost of care for a population of patients.  If the ACO meets certain targets for quality of care and keeps healthcare costs below certain predetermined benchmarks, then the ACO is eligible to share in the implied savings.  If, on the other hand, the ACO exceeds total cost of care, then the ACO may be required to repay a portion of total cost of care above the applicable benchmark.

28.     Stewardship Health manages a portfolio of risk-based contracts with local health plans and government entities, including Blue Cross Blue Shield of Massachusetts and Medicaid,[6] and through a management services arrangement with Brighton Marine, Inc. (a non-profit organization), administers the US Family Health Plan, a Tricare Prime insurance option funded by the United States Department of Defense for active duty military family members, National Guard, Reserves and retired uniformed services beneficiaries and their families.[7] Additionally, Stewardship Health has risk-based contracts with certain third-party insurance providers, under which the Company is liable for cost of medical care for third-party payor members.  In total, Stewardship Health serves over 800,000 patients annually, with approximately 3,250 affiliate providers, including 900 primary care providers, and 2,350 specialist providers

---

[6]   As further described below, since 2022, the Company's Medicare value-based business has been jointly managed with CareMax, Inc. ("**CareMax**").

[7]   Brighton Marine delivered a letter to Steward, dated April 26, 2024, purportedly terminating the parties' contract effective May 31, 2024.  Steward has informed Brighton Marine that its attempted termination is unfounded and the purported notice is invalid and void.  Steward continues to operate under the parties' management services agreement and further informed Brighton Marine that the agreement remains in full force and effect.

serving patients in Arkansas, Arizona, Florida, Louisiana, Ohio, Pennsylvania, Massachusetts, New Hampshire, Rhode Island, and Texas.

29.     Stewardship Health's mission is to improve the health of patients, enhance the experience of care for individuals, reduce per capita cost of health care, and retain physicians. As with all ACOs, Stewardship Health's success rests on its ability to provide targeted, high-quality care and reduce excessive services that do not improve outcomes for patients. Stewardship Health achieves this mission by applying rigorous population health analytics, tech-enabled chronic care management programs, practice performance improvement tools, and risk adjustment strategies to achieve superior health outcomes and measurable reductions in total medical expenses.   Stewardship Health also leverages the Company's expansive network to decrease costs through coordinated care, expanded patient access, improved purchasing power, and economies of scale.

## II.     CORPORATE AND CAPITAL STRUCTURE

### A.     Corporate Governance & Management

30.     A chart summarizing the Debtors' corporate organization structure, as of the date hereof, is attached hereto as **Exhibit B**.  As set forth therein, each of the Debtors is either a direct or indirect subsidiary of SHC Holdings.  Non-Debtors Steward Health Care Investors LLC owns 90.1% of the equity interests in SHC Holdings and MPT Sycamore Opco LLC (an affiliate of MPT) owns a passive, non-voting 9.9% equity interest in SHC Holdings.

31.     The current Board of SHC Holdings is comprised of the following members, shown below alongside their respective positions:

| Name | Position |
|------|----------|
| Ralph de la Torre, M.D. | Director, Chairman of the Board & CEO |
| Mark Rich | Director & President |
| Rubén José King-Shaw, Jr. | Director & Chief Strategy Officer |

| Name | Position |
|------|----------|
| Michael G. Callum, M.D. | Director & EVP for Physician Services |
| Hon. John Boehner | Director |
| Sister Vimala Vadakumpadan | Director |
| Carlos M. Hernandez | Director |
| James J. Karam | Director |
| William Transier | Director (Transformation Committee Member) |
| Alan Carr | Director (Transformation Committee Member) |

32.     In December 2023, the Board established the Transformation Committee, which is comprised of myself, William Transier and Alan Carr.  The Transformation Committee has full, sole, and exclusive authority of the Board to pursue, oversee, negotiate, and approve transactions, as well as oversee the administration of these chapter 11 cases.  In addition, the Company has launched an independent investigation of certain claims or causes of action that may be held by the Company.  The investigation is being led by a sub-committee of the Transformation Committee comprised of Williams Transier and Alan Carr.  The sub-committee, with the assistance of Weil and the Company's other professionals, has sole authority to investigate, prosecute, and settle avoidance actions and causes of action against the Company's insiders.

**B.     Prepetition Capital Structure**

33.     As of the Petition Date, the Debtors had approximately $1.2 billion in aggregate principal amount of funded debt obligations outstanding, and approximately $6.6 billion in long-term lease obligations.  The table below summarizes the Debtors' prepetition capital structure.

| Prepetition Indebtedness | Principal Amount Outstanding | All-in Interest Rate[8] | Maturity |
|---|---|---|---|
| **Secured Debt** | | | |
| ABL First Out | $49.3 mm | ABR + 6.50% | 8/4/2027 |
| ABL Facility | $247.3mm | ABR + 9.00% | 8/4/2027 |
| FILO Facility | $305.5mm | ABR + 12.75% | 12/31/2027 |
| Bridge Facility | $274.5mm[9] | SOFR + 10.75% | 6/30/2024 |
| MPT Facility | $216.7mm | Various[10] | 1/1/2028[11] |
| MPT Stewardship Note | $82.5mm[12] | SOFR + 15.00% | 6/30/2024 |
| **Total Secured Debt** | $1.2 billion | | |
| **Select Unsecured Liabilities** | | | |
| Est. MPT Lease Obligations | $6.6 billion[13][14] | N/A | 10/31/41 (lease end) |
| Investor Note | $363.3mm | 4.0% | 2/2029 |
| MAAPP Loans | $32.2mm | 4.0% | Various |
| Est. Trade Payables | $979.4mm | N/A | N/A |
| **Total Select Unsecured Liabilities** | $8.0 billion | | |
| **Total Secured Debt and Select Unsecured Liabilities** | **$9.2 billion** | | |

34.  ***Prepetition Intercreditor Agreement***.  The priority of the liens of the Prepetition Lenders (as defined below) is set forth in that certain *Amended and Restated*

---

[8]   The default interest rates under the credit documents are as follows: (i) ABL/FILO Facility – applicable rate + 2%; (ii) Bridge Facility – applicable rate + 2%; (iii) MPT Facility – Interest Rate + 5%; and (iv) MPT Stewardship Note – Floating Interest Rate + 5%.

[9]   Includes 1.85x minimum MOIC due at maturity and upon certain defaults.

[10]   Increased by 4.0% if PIK.

[11]   As of the Petition Date, there are seven (7) outstanding tranches under the MPT Facility, all of which mature on January 1, 2028, except Tranche 4, which matures on October 31, 2031.

[12]   Includes 1.25x minimum MOIC due at maturity and upon certain defaults.

[13]   Amount represents (i) contractually deferred rent; (ii) other unpaid additional amounts; and (iii) future, undiscounted rent due under the Master Leases through October 31, 2041.  Includes average rent escalators ranging from 2.5% to 3.5% annually.  Amount is approximate, unaudited, and does not include all amounts payable under the Master Leases.

[14]   Undiscounted future rents are presented for illustrative purposes only and do not represent balance sheet lease liabilities under generally accepted accounting principles.

*Intercreditor Agreement*, dated as of February 21, 2024 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition Intercreditor Agreement**"), by and among, *inter alios*, the ABL/FILO Representation (as defined therein), the Bridge Representative (as defined therein), the MPT Lenders (as defined therein), MPT Sycamore Opco, LLC, SHC and certain of SHC's subsidiaries and affiliates, as summarized below:

| Collateral and Lien Priority[15] | | |
|---|---|---|
| **Collateral** | **Description** | **Lien Priority** |
| ABL/FILO Priority Collateral | • Accounts, account receivables and health-care insurance receivables (subject to certain exceptions)<br>• Facility permits<br>• Inventory and goods (other than equipment)<br>• Assets[16] and equity interests[17] of the Debtors that own the Stewardship business<br>• Certain designated equipment (subject to a $110 million cap)<br>• Proceeds of the foregoing, insurance, books and records and other assets relating to the above | • <u>First Priority</u>: ABL/FILO Facility<br>• <u>Second Priority</u>: Bridge Facility<br>• <u>Third Priority</u>: MPT[18] |
| ABL/FILO Exclusive Collateral | • Assets of any ABL/FILO Loan Party that are not MPT Collateral (e.g., generally, assets of a ABL/FILO Loan Party that has not pledged its assets to MPT)[19]<br>• Equity interests of SHC | • <u>First Priority</u>: ABL/FILO Facility<br>• <u>Second Priority</u>: Bridge Facility |
| MPT Priority Collateral | • All MPT Collateral, excluding the Prepetition ABL/FILO Priority Collateral | • <u>First Priority</u>: MPT<br>• <u>Second Priority</u>: ABL/FILO Facility and Bridge Facility |

---

[15]  Capitalized terms used but not defined in this table shall have the meanings ascribed to them in the Prepetition Intercreditor Agreement.

[16]  Including the assets of (i) Steward Health Care Network, Inc., (ii) Steward Physician Contracting, Inc., (iii) Steward Emergency Physicians, Inc., (iv) Steward Medicaid Care Network, Inc., (v) Steward Operations Holdings LLC, (vi) Stewardship Health, Inc., (vii) Stewardship Health Medical Group, Inc. and (viii) Stewardship Services Inc.

[17]  Including the Equity Interests in (i) Steward Physician Contracting, Inc., (ii) Steward Health Care Network, Inc., (iii) Steward Health Care Network ACO Texas, Inc., (iv) Steward Medicaid Care Network, Inc., (v) Steward Accountable Care Organization, Inc., (vi) Steward Healthcare Management Services, LLC, (vii) Altus ACE, LLC, (viii) Stewardship Health, Inc., (ix) Stewardship Health Medical Group, Inc. and (x) Stewardship Services Inc.

[18]  MPT's lien on the assets and equity interests of the Debtors that own the Stewardship business is subject to a cap equal to the sum of (i) $180 million and (ii) the outstanding principal amount of the Prepetition Stewardship Note multiplied by 2.5.

[19]  MPT Collateral includes all assets of any MPT Credit Party, in which a lien is granted, or purported to be granted, to any MPT Party as security for any MPT Obligations and all proceeds and products thereof.

| MPT Exclusive Collateral | • Real property and fixtures subject to MPT liens and all proceeds and products thereof<br>• Assets of any MPT Credit Party that are not ABL/FILO Collateral[20] | • First Priority: MPT |
|---|---|---|
| FILO Bridge Exclusive Collateral | • Rights to receive proceeds in connection with the sale, assignment, transfer or other disposition of the Excess Properties[21] | • First Priority: FILO Bridge Lenders<br>• Second Priority: FILO Lenders |

       (i)      *Funded Debt Obligations*[22]

35.      ***ABL/FILO Facility***. On August 4, 2023, Steward Health Care System LLC ("**SHC**"), as borrower, and certain other Debtor affiliates of SHC from time to time party thereto (together with SHC, collectively, the "**Prepetition ABL/FILO Loan Parties**"), entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition ABL/FILO Credit Agreement**") with Sound Point Agency LLC, as administrative agent (the "**Prepetition ABL/FILO Administrative Agent**"), Chamberlain Commercial Funding (Cayman) L.P., as collateral agent (the "**Prepetition Collateral Agent**"), Brigade Agency Services LLC, as FILO agent (the "**Prepetition FILO Agent**" and, together with the Prepetition ABL/FILO Administrative Agent and the Prepetition Collateral Agent, the "**Prepetition ABL/FILO Agents**"), and the lenders parties thereto from time to time (the "**Prepetition ABL/FILO Lenders**" and, together with the Prepetition ABL/FILO Agents and any other Secured Parties (as defined in the Prepetition ABL/FILO Credit Agreement),

---

[20] ABL/FILO Collateral includes all assets (including certain designated equipment subject to a $110 million cap) of any Prepetition ABL/FILO Loan Party, in which a lien is granted, or purported to be granted to any Prepetition ABL/FILO Secured Party as security for any ABL/FILO Obligation.

[21] Excess Properties are certain MPT-owned properties that the Debtors lease, which are listed in that certain *Excess Property Disposition Agreement*, dated as of February 21, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by among SHC, the lessor entities party thereto, the lessee entities party thereto and the Prepetition Bridge Agent.

[22] The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

the "**Prepetition ABL/FILO Secured Parties**"), providing for (a) a senior secured revolving credit facility in an original aggregate principal amount of $300 million (the "**ABL Facility**" and the lenders thereunder, the "**ABL Lenders**") and (b) a senior secured term loan facility in an aggregate original principal amount of $200 million (the "**FILO Facility**" and the lenders thereunder, the "**FILO Lenders**" and the FILO Facility, together with the ABL Facility, the "**ABL/FILO Facility**").  Pursuant to the Prepetition ABL/FILO Credit Agreement, the ABL Facility has payment priority over the FILO Facility.  SHC's obligations under the ABL/FILO Facility are guaranteed by the other Prepetition ABL/FILO Loan Parties.

36.     On October 16, 2023, SHC borrowed an additional $30 million of term loans under the FILO Facility pursuant to the second amendment to the Prepetition ABL/FILO Credit Agreement.  On November 17, 2023, SHC borrowed a further $70 million of term loans under the FILO Facility pursuant to the third amendment to the Prepetition ABL/FILO Credit Agreement.  On December 18, 2023, SHC executed the *Forbearance Agreement*, by and among the Prepetition ABL/FILO Loan Parties party thereto and the Consenting Lenders (as defined therein), pursuant to which SHC paid a consent fee in an amount equal to 1.50% of the then outstanding loans under the Prepetition ABL/FILO Credit Agreement in kind to the Consenting Lenders.  On January 2, 2024, SHC executed the *Second Forbearance Agreement*, by and among the Prepetition ABL/FILO Loan Parties party thereto and the Consenting Lenders.   On February 21, 2024, SHC executed the *Third Forbearance Agreement*, the fourth amendment to the Prepetition ABL/FILO Credit Agreement, and the second amendment to the Agreement Among Lenders (defined herein), by and among the Prepetition ABL/FILO Loan Parties party thereto and the Consenting Lenders, pursuant to which SHC paid a consent fee (x) in an amount equal to 1.50% of the then outstanding loans under the ABL Facility to the Consenting Lenders who held Loans

(as defined therein) under the ABL Facility and (y) in an amount equal to 1.00% of the then outstanding loans under the FILO Facility to the Consenting Lenders who held loans under the FILO Facility, in each case, paid in kind.  As of the Petition Date, including all outstanding and accrued interest, approximately $607.8 million of obligations under the ABL/FILO Facility are outstanding.

37.     Pursuant to that certain *Pledge and Security Agreement*, dated as of August 4, 2023 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition ABL/FILO Security Agreement**"), by and among the Prepetition ABL/FILO Loan Parties from time to time party thereto and the Prepetition Collateral Agent, and subject to that certain *Agreement Among Lenders*, dated as of August 4, 2023 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement Among Lenders**"), by and among the Prepetition ABL/FILO Lenders party thereto, the obligations of the Prepetition ABL/FILO Loan Parties under the ABL/FILO Facility are secured by (a) a first priority lien on the ABL/FILO Priority Collateral (as defined in the Prepetition Intercreditor Agreement) and (b) a second priority lien on the MPT Priority Collateral (as defined in the Prepetition Intercreditor Agreement), other than with respect to the MPT Exclusive Collateral (as defined in the Prepetition Intercreditor Agreement).  The obligations owed by the Prepetition ABL/FILO Loan Parties to the FILO Lenders under the FILO Facility are secured by a second priority lien on the FILO Bridge Exclusive Collateral (as defined in the Prepetition Intercreditor Agreement).  The Agreement Among Lenders provides, among other things, that solely as between the ABL Lenders and the FILO Lenders, proceeds from Collateral (as defined therein) will be applied to pay obligations under the ABL Facility prior to paying the corresponding categories of obligations under the FILO Facility.

38.     ***Bridge Facility***.  On February 21, 2024, Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc., Stewardship Health Medical Group, Inc., and Stewardship Services Inc., collectively, as borrower (the "**Prepetition Bridge Borrower**"), together with certain Debtor affiliates of the Prepetition Bridge Borrower (together with the Prepetition Bridge Borrower, collectively, the "**Prepetition Bridge Loan Parties**") entered into that certain *Credit Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Prepetition Bridge Credit Agreement**") with certain of the FILO Lenders and the Prepetition MPT Secured Party (as defined below) (collectively, the "**Prepetition Bridge Lenders**") and Brigade Agency Services LLC, as administrative agent and collateral agent (in such capacities, the "**Prepetition Bridge Agent**").  The Prepetition Bridge Credit Agreement provides for a $150 million delayed draw term facility (the "**Bridge Facility**") with commitments to be funded equally between the participating FILO Lenders and the Prepetition MPT Secured Party.  As of the Petition Date, including all outstanding and accrued interest and the MOIC Amount (as defined below), approximately $274.5 million of obligations are outstanding under the Bridge Facility.  Under the Bridge Facility, the Prepetition Bridge Loan Parties are required to pay an amount to the Prepetition Bridge Lenders equal to (a) 0.85x the aggregate amount of commitments (excluding, for the avoidance of doubt, interest that is paid in kind, capitalized and added to the principal amount of the Bridge Facility pursuant to the terms of the Prepetition Bridge Credit Agreement) under the Bridge Facility on February 21, 2024 (which was $150 million) less (b) the amount of cash interest previously received by the Prepetition Bridge Lenders on or prior to such date of payment (the "**MOIC Amount**") upon the occurrence of (i) the maturity date, the payment in full of the obligations under the Bridge Facility, an event of default

under the Bridge Facility and/or the acceleration of loans under the Bridge Facility and (ii) subject to the application of proceeds provisions in the Bridge Facility, any other repayment or prepayment of loans under the Bridge Facility (the events in clauses (i) and (ii), a "**MOIC Event**").

39.     In connection with the Bridge Facility, pursuant to that certain *Pledge and Security Agreement*, dated as of February 21, 2024 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among the Prepetition Bridge Loan Parties party thereto from time to time and the Prepetition Bridge Agent, the Prepetition Bridge Loan Parties' obligations under the Bridge Facility are secured by (a) a second priority lien on the ABL/FILO Priority Collateral and (b) a second priority lien on the MPT Priority Collateral, other than with respect to the MPT Exclusive Collateral. The obligations owed by the Prepetition Bridge Loan Parties to the Prepetition Bridge Lenders that are also FILO Lenders under the FILO Facility are secured by a first priority lien on the FILO Bridge Exclusive Collateral.

40.     ***Prepetition TRS Note and Prepetition Stewardship Note***.   On June 30, 2020, SHC executed that certain *Second Amended and Restated Promissory Note* (the "**Original Prepetition TRS Note**") with MPT TRS Lender-Steward, LLC (the "**Prepetition MPT Secured Party**" and together with the Prepetition ABL/FILO Lenders and the Prepetition Bridge Lenders, the "**Prepetition Lenders**"), providing for a term loan in the original amount of $85.6 million (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**MPT Facility**").   On April 12, 2022, SHC and the Prepetition MPT Secured Party executed the second amendment to the Original Prepetition TRS Note to provide an additional $150 million loan under the MPT Facility.   On December 6, 2022, SHC and the Prepetition MPT Secured Party executed the third amendment to the Original Prepetition TRS Note to provide an additional $28 million loan under the MPT Facility.   On January 31, 2023, SHC and the Prepetition

MPT Secured Party executed the fourth amendment to the Original Prepetition TRS Note to provide an additional $50 million loan under the MPT Facility.  On April 30, 2023, SHC and the Prepetition MPT Secured Party executed the fifth amendment to the Original Prepetition TRS Note to make certain modifications to the MPT Facility.  On July 3, 2023, SHC and the Prepetition MPT Secured Party executed the sixth amendment to the Original Prepetition TRS Note to provide an additional $40 million under the MPT Facility.  On January 22, 2024, SHC and the Prepetition MPT Secured Party executed the *Third Amended and Restated Promissory Note* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition TRS Note**") which amended and restated the Original Prepetition TRS Note and, among other things, evidenced all amounts then outstanding under the MPT Facility and provided that all interest under the MPT Facility would be payable in kind or in cash, at the election of SHC. The obligations of SHC under the MPT Facility are guaranteed by certain Debtor affiliates of SHC (together with SHC, collectively, the "**Prepetition TRS Note Parties**").  As of the Petition Date, approximately $218.4 million of obligations, including all outstanding and accrued interest, are outstanding with respect to the MPT Facility.

41.     On January 2, 2024, Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., and Steward Medicaid Care Networks, Inc. (together with other subsidiaries of SHC party thereto as supplemented from time to time, collectively, the "**Prepetition Stewardship Borrowers**") executed that certain *Promissory Note* with the Prepetition MPT Secured Party (the "**Original Prepetition Stewardship Note**") providing for an emergency term loan in the original principal amount of $60 million (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**MPT Stewardship Note**").  The obligations of the Prepetition Stewardship

24

Borrowers are guaranteed by SHC and certain Debtor subsidiaries of SHC (the "**Prepetition Stewardship Note Parties**" and, together with the Prepetition TRS Note Parties without duplication, collectively, the "**Prepetition MPT Loan Parties**").   On February 2, 2024, the Prepetition Stewardship Borrowers and the Prepetition MPT Secured Party executed the *First Amendment to Promissory Note (Tranche 2)* to provide an additional $20 million emergency loan under the MPT Stewardship Note (the "**Interim Bridge Funding**").   On February 21, 2024, SHC and the Prepetition Bridge Borrower used the proceeds of the Bridge Facility to refinance the Interim Bridge Funding.   On April 25, 2024, the Prepetition Stewardship Borrowers, SHC, certain other Debtor subsidiaries of SHC, and the Prepetition MPT Secured Party executed the *Amended and Restated Promissory Note* (as may be amended, restated, restated and amended, supplemented or otherwise modified from time to time, the "**Prepetition Stewardship Note**" and, together with the ABL/FILO Facility, the Bridge Facility and the MPT Facility, the "**Prepetition Credit Facilities**"), which amended and restated the Original Prepetition Stewardship Note and evidenced all amounts then outstanding under the Original Prepetition Stewardship Note and also provided for an additional $6 million of emergency term loans made under the MPT Stewardship Note.   The Prepetition Stewardship Borrowers shall be required under the Prepetition Stewardship Note to pay an amount sufficient for the MPT Secured Party to achieve a 1.25 to 1.00 multiple of invested capital on the aggregate original principal amount of the MPT Stewardship Note (excluding any interest paid in kind, capitalized and added to the principal amount of the MPT Stewardship Note) upon the occurrence of the maturity date, an event of default under the Prepetition Stewardship Note, any prepayment of the Prepetition Stewardship Note in accordance with the terms thereof and/or the acceleration of the MPT Stewardship Note.   As of the Petition Date, approximately

$82.5 million of obligations, including all outstanding and accrued interest and the MOIC, are outstanding with respect to the MPT Stewardship Note.

42. Pursuant to that certain *Second Amended and Restated Security Agreement*, dated as of January 2, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition MPT Security Agreement**"), by and among the Prepetition MPT Loan Parties party thereto from time to time, the other Debtor subsidiaries and affiliates of SHC party thereto and the Secured Parties (as defined therein) and that certain *Second Amended and Restated Pledge Agreement*, dated as of January 2, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among certain Prepetition MPT Loan Parties party thereto, the other Debtor subsidiaries and affiliates of SHC party thereto and the Pledgees (as defined therein), the Prepetition MPT Loan Parties' obligations under the MPT Facility, the MPT Stewardship Note, and the MPT Guarantees (as defined below) are secured by (a) a first priority lien on the MPT Priority Collateral and (b) a third priority lien on the ABL/FILO Priority Collateral, other than with respect to the ABL/FILO Exclusive Collateral (as defined in the Prepetition Intercreditor Agreement).

(ii)  *Other Obligations*

43. ***MPT Lease Obligations***.  Certain of the Debtors lease, as tenants, 36 facilities[23] from affiliates of MPT, a publicly traded real estate investment trust that owns and leases healthcare facilities, pursuant to those certain (i) *Second Amended and Restated Master Lease Agreement*, dated as of March 14, 2022 (as amended, restated, amended and restated, the "**Master Lease I**"), by and among the lessors and lessees party thereto, and (ii) *Master Lease*

---

[23]   Subsidiaries of SHC lease (i) 28 facilities pursuant to Master Lease I and (ii) 8 facilities pursuant to Master Lease II.

*Agreement*, dated as of March 14, 2022, by and among the lessors and lessees party thereto (as amended, restated, amended and restated, the "**Master Lease II**" and, together with the Master Lease I, the "**Master Leases**").  The Debtors conduct substantially all of their hospital operations on the properties subject to the Master Leases, which provide that each Master Lease is a non-severable, true operating lease.  In 2016, the Debtors recapitalized their business through a transaction with affiliates of MPT, whereby the Debtors (i) sold and leased-back five (5) of its hospital facilities (pursuant to the original *Master Lease Agreement*, dated as of October 3, 2016, by and among certain affiliates of the Debtors as tenants and certain affiliates of MPT as landlords), (ii) obtained a mortgage loan for four (4) of its hospital facilities located in Massachusetts (pursuant to that certain *Real Estate Loan Agreement*, dated as of October 3, 2016, by and among certain affiliates of the Debtors as borrowers and certain affiliates of MPT as lenders (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Mortgage Loan Agreement**")) to MPT for approximately $1.2 billion, and (iii) received a $50 million equity investment from an affiliate of MPT.

44.     On May 1, 2017, MPT acquired a portfolio of eight (8) hospitals located in Florida, Ohio and Pennsylvania and leased such hospitals to the Debtors.  On September 29, 2017, (i) MPT acquired from IASIS Healthcare LLC ("**IASIS**") an additional portfolio of ten (10) acute care hospitals and one (1) behavioral health facility, along with ancillary land and buildings, located in Arizona, Arkansas, Louisiana, Texas, and Utah and leased such hospitals to the Debtors, together with an additional four (4) hospitals which MPT owned and leased to IASIS prior to the transaction, and (ii) the Debtors obtained a $700 million mortgage loan from MPT for two (2) additional hospitals located in Utah, which the Debtors acquired via merger with IASIS and which were made subject to the Mortgage Loan Agreement.  In connection with the IASIS merger, MPT

made a $100 million equity investment in the Debtors, the proceeds of which were used to fund the merger.  In 2018, all of the hospitals subject to the Mortgage Loan Agreement, except for the two (2) mortgaged hospitals in Utah, were sold to/leased-back from MPT.

45.     On May 11, 2020, the management group of Steward physicians bought Cerberus Capital's majority ownership of Steward by issuing to Cerberus a $350 million convertible note, and in January 2021, Steward Health Care Investors LLC borrowed $335 million from MPT to buy-out the Cerberus Capital note.  In July 2020, the two (2) hospitals in Utah subject to the Mortgage Loan Agreement were sold to/leased-back from a joint venture, of which MPT is the majority owner, with the joint venture assuming the Mortgage Loan Agreement.  From 2018 through 2021, the size of the Debtors' portfolio fluctuated via smaller acquisitions and dispositions.  On August 1, 2021, MPT acquired an additional portfolio of five (5) hospitals located in Florida and leased such hospitals to the Debtors.  In April of 2022, two (2) additional hospitals were acquired by MPT and leased to the Debtors.  On May 1, 2023, Steward sold the operations of all of its Utah hospitals to CommonSpirit Health.  The Debtors pay approximately $341.0 million annually in lease payments to MPT.  Certain of the obligations under the Master Leases and related documentation are secured by the same collateral securing the MPT Facility and the MPT Stewardship Note.

46.     Beginning in December 2023, the Debtors entered into agreements with MPT to defer past-due rent payments under Master Lease I and pursuant to which, MPT agreed to forbear from exercising remedies.  As of the Petition Date, the Debtors owe MPT $3.5 million in delinquent property taxes under Master Lease II and approximately $166.4 million in deferred and

unpaid rent and $19.0 million[24] in additional amounts due under Master Lease I.  All of the Debtors

obligations under the Master Leases and are guaranteed by various guaranty agreements (as

modified, amended, or restated from time to time, collectively, the "**MPT Guarantees**").

47.      ***MAAPP Loans***.  In April 2020, Debtors Steward Carney Hospital, Inc.,

Steward Norwood Hospital, Inc., Steward Sharon Regional Health System, Inc., The Medical

Center of Southeast Texas, LP, Brim Healthcare of Texas, LLC, Steward HH, Inc., Steward

NSMC, Inc., Steward PGH, Inc., and Steward CGH, Inc. borrowed approximately $448.9 million

in unsecured Medicare Accelerated Advance Payment Program loans ("**MAAPP Loans**").[25]  The

MAAPP Loans are repaid by Centers for Medicare and Medicaid Services ("**CMS**") automatically

recouping a percentage of Medicare payments otherwise owed to the medical provider.   In

December 2022, the $46.5 million outstanding balance on the MAAPP Loans was converted to

various amortizing loans with a 4% interest rate and terms between three (3) and five (5) years that

continue to be repaid by recoupment.[26]  As of the Petition Date, the Debtors owe approximately

$32.2 million on account of the MAAPP Loans.

48.      ***Steward Health Care Investors Guaranty***.  Debtor SHC Holdings is also

guarantor under that certain *Secured Promissory Note*, dated as of February 3, 2022 (as amended,

restated, amended and restated, supplemented, refinanced or otherwise modified from time to time,

---

[24]   Deferred balances exclude amounts due related to unreimbursed capital expenditures and any liens related to the
      properties that are still being quantified.

[25]   The Coronavirus Aid, Relief, and Economic Security Act, also known as the CARES Act, provided for the
      expansion of the Medicare Accelerated Advance Payment Program during the COVID-19 pandemic.  Payments
      received under MAAPP are advances for future services that must be repaid.  At the end of the 29-month period
      of a MAAPP loan, Medicare will issue a letter for full repayment of any remaining balance.  If payment is not
      then received with 30 days, interest will accrue at the annual percentage rate of 4% from the date the letter was
      issued and will be assessed for each 30-day period that the balance remains unpaid.

[26]   As of the Petition Date, CMS does not recoup a percentage of Medicare payments from borrower Steward
      Norwood Hospital, Inc., given its Medicare receivables are generally insufficient to cover the loan repayment due
      to the Norwood hospital being non-operational.

the "**Investor Note**"), made by Steward Health Care Investors LLC ("**Steward Investors**") in favor of Cayman TRS Holding, an affiliate of MPT (the "**MPT Noteholder**") in an original principal amount of $363.3 million.  As of the Petition Date, including all outstanding and accrued interest, approximately $397.9 million of obligations are outstanding under the Investor Note. Steward Investors owns an approximately 90.1% interest in SHC Holdings and such equity interest in SHC Holdings was pledged by Steward Investors to the MPT Noteholder under the Investor Note.  Prior to the Petition Date, MPT Noteholder agreed to a forbearance in favor of Steward Investors.

## III.   EVENTS PRECEDING THESE CHAPTER 11 CASES

### A.   Growth Into One of the Largest ACOs in the Country

49.    In 2010, in partnership with Dr. de la Torre, Cerberus Capital acquired select assets—namely six (6) hospitals—from Massachusetts non-profit Caritas, and rebranded this existing enterprise into Steward.  Steward began as a Massachusetts-based network of hospitals with a mission to provide affordable top-quality value-based care in the communities where its patients live.  Following its inception, Steward began methodically expanding its operations through strategic transactions through the acquisition of diverse healthcare business segments and services, while staying true to its mission.

50.    From 2013 to 2014, the Company acquired several acute care hospitals and ambulatory surgery centres and launched a system-wide electronic ICU program.  Following successful growth in Steward's early years, the Company was determined to bring its value-based care model to more markets across the country:

- in 2017, Steward merged with IASIS, which resulted in the acquisition of 18 hospitals, including seven (7) hospital facilities acquired in Utah, and five (5) insurance plans; and

- in 2021, the Company acquired five (5) hospitals in South Florida from Tenet Healthcare.

51.     From 2017 to 2021, the number of Steward's operating hospitals grew by 30, equal to a 300% growth.  Although Steward's accelerated growth strategy brought many benefits, it has also presented challenges, particularly with respect to each of the 2017 acquisitions, given that this was the Company's first attempt at large-scale growth and integration.  As just one example, although the facilities acquired in Utah were high performing and profitable, the Company was confronted with a highly competitive market that was largely controlled by an existing vertically-integrated hospital operator that controlled a majority of market share, and after careful consideration, the Utah properties were ultimately sold in May 2023.  As another example, the Company experienced material unforeseen costs associated with certain acquisitions, including material information and technology integration issues that touched on all parts of the business, as discussed further below.

### B.     Industry and Operational Challenges

52.     The Company also faced significant external challenges that ultimately led Steward to suffer financial difficulties and commence these chapter 11 cases.  **First**, like many hospital operators, the COVID-19 pandemic (i) caused a sharp decline in elective patient visits while simultaneously accelerating the switch of services from higher-margin inpatient settings to lower-margin outpatient settings, which resulted in a significant and ongoing decline in net patient revenue, and (ii) required a significant increase in fixed costs, driving significant reductions in earnings and liquidity.[27]  **Second**, the healthcare labor market has substantially tightened in the wake of the COVID-19 pandemic, leading to materially higher labor costs for the Company while

---

[27]   Nationally, from 2019 to 2023, Steward's cost of supplies increased by 22% while the cost of medications increased by 15% over the same time period.

inflationary pressures have also strained the Company's cash position.  The cost of labor has increased by over 24% from 2019 through 2023 nationally.  ***Third***, certain operational challenges in revenue cycle management and lagging, industry-wide reimbursement rates have resulted in lower net patient revenues and thus lower collections.

53.  ***COVID-19 Pandemic***.  COVID-19 caused an onslaught of negative macroeconomic trends and operational challenges to the Company's clinical enterprise that depressed its earnings and eroded its liquidity.  The Company's emergency medical clinicians and anaesthesiologists experienced sharp, overwhelming, and localized surges of COVID-19 patients early in the pandemic.  These surges were characterized by high patient mortality rates, unclear clinical protocols, and unknown infection risk, all putting unsustainable stress on the clinical teams and support staff.  Simultaneously, the Company lost approximately 10% of patient visits—and associated revenue—from the end of 2019 to the end of 2020 as the country and the states implemented various shelter-in-place policies in 2020 and 2021.  In 2020, the COVID-19 pandemic contributed to a decrease of approximately $1.4 billion in revenues and approximately $618 million of earnings before interest, taxes, depreciation, amortization, and rent ("**EBITDAR**") compared to 2019.  COVID-19 continued to have an impact on revenue in 2021—from 2019 to 2021, revenue decreased by approximately $580 million, and EBITDAR decreased by $221 million.  The Company's total patient visits sharply declined in the wake of the COVID-19 pandemic.  Although patient visits have rebounded in part, total patient days and discharges have failed to fully recover and remain below 2019 levels, in part due to fears of hospitals prompting patients to seek outpatient rather than inpatient treatment.

54.  ***Labor Costs and Inflationary Pressures.***  The COVID-19 pandemic left in its wake a nationwide health care labor shortage directly affecting the healthcare services sector.

This has created significant upward pressure on clinician wages and salaries, along with the general inflationary pressure increasing the cost of equipment and other supplies necessary to run Steward's medical centers.  Consistent with Steward's ongoing commitment to high quality patient care and to ensuring access to services, Steward has increased clinician wages to retain employees and remain competitive with the post-COVID "new normal."  Clinician wages and premium labor spend to ensure all facilities were adequately staffed totalled approximately $3.4 billion in 2022 as compared to $2.9 billion in total spend in 2019.  Although overall inflationary pressures have eased, the market for clinician services continues to be extremely competitive as the nationwide clinician shortage continues.

55.    ***Reimbursement and Volume Trends***.  In recent years, industry-wide reimbursement rates have not kept pace with increasing hospital costs due to inflation. Historically, approximately 69% of Steward's gross patient service revenue has been attributable to government program healthcare coverage.  Steward thus relies significantly on non-negotiable government reimbursement payments and other governmental funding to fund operations.  During 2023, these government-funded programs provided reimbursement rates between 13-20%, as compared to approximately 30% for non-government programs.  As a result, any decrease or delay in the amount or frequency of such payments and funding has a direct, adverse impact on Steward's financial position.

56.    In addition, the Debtors experienced working capital challenges resulting from the Company's acquisition of the South Florida facilities.  In the summer of 2022, the Company's South Florida facilities transitioned to a different revenue cycle management platform— however the implementation of this transition was challenging as technical issues in the new platform led to a severe backup in billing and accounts receivable collections.  Upon

identifying the issue, the Company engaged outside advisors to identify and remediate the issues and redirected substantial resources from other areas of the business to the Miami market, which caused a strain on the entire enterprise, thus causing a backlog of claims across the Company's system.

### C.   Prepetition Initiatives

57.   In response to the challenges described above, the Board and the Company's management team proactively sought to address the Company's capital structure and liquidity challenges through various cost reduction initiatives and asset sales, including but not limited to:

- divesting several non-core or unprofitable assets, including to bolster the Company's financial position and focus the Company's operations on their core businesses, including:

  o  in November 2022, the Company sold its Medicare value-based businesses to CareMax;

  o  in May 2023, the Company sold its hospital operations in Utah;

  o  in December 2023, the Company sold its clinical and anatomic pathology laboratories in Ohio and Pennsylvania and a medical office laboratory in Massachusetts; and

- between August and October of 2023, the Company reduced its workforce by 514 full-time employees, resulting in $34.9 million in salary savings in 2024.

58.   However, these efforts were not sufficient to overcome the industry and operational challenges facing the Company, which manifested throughout 2023 when the Company suffered severe liquidity issues.  Recurring liquidity shortfalls meant the Company could not meet its trade obligations for goods provided and services rendered in the ordinary course. This situation grew more dire throughout 2023 when vendors and service providers no longer continued to service the Company, forcing the Company to find alternative suppliers in many instances impacting costs and efficiencies.  In many instances the Company had to agree to

payment plans with vendors in order to ensure continued service only to miss scheduled payments and ultimately be put on hold with such vendors.[28]

59.    The Company's vendor situation exacerbated to the point where as of the Petition Date, the Company has approximately $979.4 million outstanding in trade obligations, of which approximately 70% are over 120 days past due.  In effort to manage its vendor situation while also simultaneously preserving liquidity, the Company engaged AlixPartners in October 2023 to assist the Company in, among other things, providing liquidity management advisory services, sustaining vendor relationships, and supporting the Company's management team and its advisors.  Additionally, in November 2023, the Company engaged Lazard to assist the Company regarding potential strategic and financing alternatives to address its capital structure and engage with its stakeholders.  As the situation with the Company's vendors impacted operations, its borrowing base began to decline which further impacted the Company's working capital position. In December 2023, the Debtors defaulted under the ABL/FILO Credit Facility for failure to make mandatory repayments with respect to certain asset sale proceeds and failure to comply with certain financial reporting and information obligations, and began to face a worsening liquidity crisis.  In response, in late December 2023 and early January 2024, William Transier and Alan Carr, respectively, were appointed as independent managers to the Board, and the Board established the Transformation Committee to oversee the Company's strategic transaction and restructuring efforts.

---

[28]    In August 2023, the Company entered into the Prepetition ABL/FILO Credit Agreement; however, the ABL/FILO Facility only provided the Company with $500 million of proceeds, most of which was used to pay down the Company's then-existing asset based lending credit facility.  The additional $100 million of proceeds that the Company received under the FILO Facility between October and November 2023 was used immediately to pay vendors, leaving the Company with no incremental liquidity under the ABL/FILO Facility.  As a result, the Company was left without any incremental revolver capacity despite having just borrowed $600 million in the aggregate under the ABL/FILO Facility, causing an untenable strain on vendor relationships.

60.     In addition to these measures, in late-2023 the Company engaged Leerink to initiate outreach to third parties to solicit interested investors in Stewardship Health to allow the Company to de-leverage its capital structure and position the Company for long-term success by focusing on its core hospital and specialist-provider operations.  Additionally, in January 2024, the Company retained Weil as restructuring counsel and also engaged Cain to conduct a comprehensive marketing process for the sale of the Company's hospitals in Southern Massachusetts, Arizona, Ohio, Pennsylvania, Louisiana, and Arkansas.  Furthermore, in February 2024, the Company enlisted Leerink to market its hospitals in Northern Massachusetts, and from March 2024 to April 2024, the Debtors expanded the scope of Cain and Leerink's hospital marketing efforts to encompass Steward's entire hospital portfolio, including all of the Texas and Florida hospitals.

61.     To allow operations to continue in the ordinary course while the Debtors advanced their market solicitation process, beginning in December 2023, the Debtors, through Lazard, solicited offers for interim bridge financing from numerous third parties, in addition to the ABL Lenders, FILO Lenders, and MPT.  After executing confidentiality agreements with potential lenders and providing diligence and engaging in discussions, no third parties expressed an interest in providing out-of-court financing.  As a result, the Debtors ultimately secured emergency financing from MPT (in the form of the $60 million Original Prepetition Stewardship Note in January 2024 and $6 million in April 2024) and the Prepetition Bridge Lenders (in the form of the $150 million Bridge Loan in February 2024).  In connection with each financing, the Debtors secured forbearance agreements from MPT and the Prepetition ABL/FILO Lenders and concessions from the MPT lessors with respect to the Master Leases.  In connection with such

forbearance agreements, the Company agreed to a number of milestones to progress the Stewardship and hospital sale processes.

62.     This financing along with the accommodations from MPT provided the Debtors' runway to negotiate and execute a letter of intent with an affiliate of United and negotiate the terms of the proposed debtor-in-possession financing.   With MPT and the Prepetition ABL/FILO Lenders unwilling to extend further capital to the Company out-of-court, the Company's only option was to seek protections of the Court, secure debtor-in-possession financing and advance its market solicitation process in court, including finalizing a stalking horse agreement with Optum for Stewardship Health.

63.     The Debtors intend to use the proposed new-money financing under the Junior DIP Facility to advance their marketing process to maximize recoveries for stakeholders while stabilizing their operations and ensuring that all patient, vendor, and employee obligations are met without interruption, and critical services are provided to the communities in which they operate.

## IV.   FIRST DAY MOTIONS

64.     Contemporaneously herewith, the Debtors have filed the First Day Motions as set forth in **Exhibit A** attached hereto, to facilitate a smooth transition into these chapter 11 cases and minimize disruption to the Debtors' operations.

65.     I have reviewed and am familiar with the content of each of the First Day Motions and have consulted with the Debtors' Advisors to ensure that I understand each First Day Motion and the relief requested therein.   To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

66.     Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions, including approval of the Junior DIP Facility, is (i) necessary to stabilize operations, ensure continued patient care and enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption; (ii) critical to the Debtors' achieving a successful restructuring; and (iii) in the best interest of the Debtors' estates and their stakeholders.  I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' patients, business operations, and their estates will suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

## Conclusion

67.     The above describes the Company's businesses and capital structure, the factors that precipitated the commencement of these chapter 11 cases, and the critical need for the Debtors to commence these chapter 11 cases.  The Debtors' ultimate goal in these chapter 11 cases is to stabilize its operations to ensure the continued medical care to its patients and effectuate a sale process to maximize value for stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 6, 2024

John R. Castellano
Chief Restructuring Officer