**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC,** *et al.,* | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO (A) OBTAIN JUNIOR LIEN POSTPETITION
FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT LIENS
AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS;
(II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION
SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 10:00 A.M. (CENTRAL TIME) ON MAY 7, 2024.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON MAY 7, 2024 AT 10:00 A.M. (CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.**

**PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY.   YOU MAY ACCESS THE FACILITY AT 832-917-1510.   ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER.  JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS.   TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE.  SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Steward Health Care System LLC ("**SHC**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement

1.     By this Motion, the Debtors seek authorization to obtain junior lien postpetition financing ("**Junior DIP Financing**") and approval of their entry into a multiple draw junior lien debtor-in-possession credit facility (the "**DIP Facility**"), provided by MPT TRS Lender-Steward, LLC (the "**DIP Lender**" or "**DIP Secured Party**"), an affiliate of Medical Properties Trust ("**MPT**").   The DIP Facility is a multiple draw term loan consisting of (i) $300 million of new money (the "**New Money DIP Loans**"), of which $75 million is proposed to be made available upon in the first 30 days of the cases (and the remainder subject to satisfaction of certain conditions acceptable to MPT), and (ii) subject to entry of a Final Order, a roll-up of all

of the obligations under the Prepetition Stewardship Note (the "**DIP Roll-Up Loans**," and such mechanic, the "**DIP Roll-Up**").  Notably, the DIP Facility is a junior credit facility and the Debtors do not seek to prime any of their Prepetition Secured Lenders.

2.      The DIP Facility is the result of a competitive financing solicitation process and arms' length negotiations that allowed the Debtors to obtain critical junior postpetition financing on reasonable and market terms in connection with commencing these chapter 11 cases. The DIP Facility will allow the Debtors to stabilize operations and continue to provide the highest level of patient care, while pursuing their strategic restructuring and sale process to maximize value for all stakeholders.

3.      By this Motion, the Debtors also seek authority to use the cash collateral of their prepetition secured lenders ("**Cash Collateral**") to fund operations in the ordinary course. Although the Debtors do not yet have the consent from their prepetition ABL Lenders and FILO Lenders to use Cash Collateral, the Debtors are in ongoing discussions regarding adequate protection and a consensual cash collateral order.[2]  However, even if the Debtors and lenders cannot agree on terms of an order, the Debtors should still be authorized to use Cash Collateral for at least five reasons:

- *First*, because the Debtors will continue to pursue their going-concern marketing process for the sale of their assets under which they stand to recover greater proceeds than would be available in the alternatives, including a wind-down or liquidation, the Debtors' Prepetition Secured Lenders will not experience any diminution in value that would entitle them to adequate protection.  Moreover, granting the Debtors authority to use Cash Collateral will avoid costly wind-down costs and impairment to accounts receivable that are likely to exceed the disbursements reflected in the DIP Budget.  Accordingly, the Prepetition Secured Lenders are not entitled to adequate protection because there is no diminution in value by allowing the Debtors' to use Cash Collateral.  *See Matter of Continental*

---

[2]      The Debtors' other prepetition secured creditor is an affiliate of the DIP Lender, and has consented to the use of cash collateral.

*Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral.").

- *Second*, to the extent the Prepetition Secured Liens are entitled to adequate protection, the Debtors' Prepetition Secured Lenders are adequately protected because the use of their Cash Collateral is necessary to preserve the going concern value of the Debtors' assets, as it will allow the Debtors to continue their going concern critical healthcare operations and prepetition value-maximizing marketing process and avoid a value-destructive liquidation that would result in tens of thousands of jobs being lost and critical health care facilities in dozens of communities being forced to close. The Prepetition Secured Lenders' collateral will derive significant value alone from the continuation of the Debtors' going-concern operation and sale process, as opposed to a liquidation.

- *Third*, the value of the Prepetition Secured Lenders' collateral will not decline, including in advance of a final hearing on the Motion. Rather, the use of Cash Collateral will allow the Debtors to stabilize their operations, perform more surgeries and provide more services that will generate additional revenue accounts receivable. In fact, the Debtors' DIP Budget reflects that the Debtors' accounts receivable balance will actually increase during the first 30 days of the chapter 11 cases. Accordingly, the lenders will not experience diminution in value from the use of their Cash Collateral.

- *Fourth*, the Prepetition Secured Lenders are adequately protected by a significant equity cushion. The obligations owed to the ABL Lenders and FILO Lenders are secured by certain current assets, including accounts receivable and inventory that, as stated in the Castellano Declaration, as of the Petition Date, this collateral alone (which is at most a small portion of the Debtors' collateral value) has a value of approximately $924 million, which is $47 million more than the total obligations owed under the ABL/FILO Facility and Bridge Facility. The Prepetition Secured Lenders' collateral also includes Stewardship Health, the Debtors' valuable physician practice and contracting network, as well as assets related to the Debtors' hospital operations. Based on the Debtors' prepetition marketing process, the Debtors expect to derive significant proceeds from the sale of these assets that alone is likely to provide value well in excess of the obligations of the ABL/FILO Facility and Bridge Facility. When such value is considered together with the value of the Prepetition Secured Lenders' other collateral, it is beyond dispute that they are protected by an equity cushion well above 20%.

- And, *fifth*, the Prepetition Secured Lenders are adequately protected by the proposed junior DIP financing. The infusion of new money junior in the

capital structure will allow the Debtors to stabilize their business and continue to run their going-concern sale process, thereby, generating additional value for the benefit of the Prepetition Secured Lenders, without impairing the priority of the Prepetition Secured Lenders' liens.

4.     The Debtors should be authorized to enter into the DIP Facility.  Further, as described herein, the DIP Facility contains terms that are the most favorable available to the Debtors, are reasonable and market under the circumstances, and along with access to Cash Collateral, provide the Debtors with the urgent liquidity to (a) stabilize the Debtors' hospital operations, ensure continued patient care, and avoid immediate and irreparable harm, (b) pay their employees who are essential to providing care to the Debtors' patients, (c) pay ordinary course operating expenses necessary to support their operations, and (d) provide a path forward for these chapter 11 cases to allow the Debtors to maximize the value of their assets and continue to provide critical care to their patients and the communities they serve.  Further, the DIP Facility was market tested and evaluated by the Debtors' committee of independent directors formed to lead and oversee the Debtors' restructuring efforts (the "**Transformation Committee**").

5.     In support of the Motion, the Debtors submit the following declarations, filed contemporaneously herewith and incorporated herein by reference (collectively, the "**DIP Declarations**"):

- *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* (the "**First Day Declaration**");

- *Declaration of Tyler W. Cowan in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Cowan Declaration**");[3]

---

[3]     Additional information regarding the DIP Facility is set forth in the Cowan Declaration.

- *Declaration of John R. Castellano in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Castellano Declaration**").[4]

## Background

6.      On May 6, 2024, (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

7.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

8.      The Debtors own and operate the largest private physician-owned for-profit healthcare network in the United States. Headquartered in Dallas, Texas, the Debtors' operations include 31 hospitals across eight states, approximately 400 facility locations, 4,500 primary and specialty care physicians, 3,600 staffed beds, and a company-wide workforce of nearly 30,000 employees. The Debtors' provide care to more than two million patients annually.

---

[4]      The Debtors reserve the right to file one or more supplemental declarations in advance of interim and final hearings on the Motion.

9.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declaration.[5]

### Jurisdiction

10.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

11.    By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, 506 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i) and 9013-1, the Debtors request that the Court:

- authorizing the Borrower (as defined below) to obtain postpetition financing ("**Junior DIP Financing**") pursuant to a secured, superpriority, debtor in possession multiple draw junior lien term loan facility (the "**DIP Facility**") subject to the terms and conditions set forth in the Interim Order[6] and that certain Term Sheet for Proposed Debtor-in-Possession Financing attached hereto in substantially final form as **Exhibit C** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Term Sheet**") by and among Steward Health Care System LLC, as borrower (in such capacity, the "**Borrower**"), the DIP Guarantors (as defined below), and the DIP Lender, consisting of (i) new money term loans (the "**New Money DIP Term Loans**") in an aggregate principal amount of up to $300,000,000, of which an aggregate $75,000,000 is committed by the DIP Lender and will be available (a) $40,000,000 upon entry of this Interim Order (the "**Initial Draw**"), (b) $20,000,000 on May 24, 2024, and (c) $15,000,000 on May 31, 2024 (the foregoing draws in clauses (b) and (c), the "**Subsequent Interim Draws**") and the remainder, which remains uncommitted by the DIP Lender, may be available upon the entry of the Final Order (subject to certain conditions in the DIP Lender's sole and absolute discretion), and

---

[5]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Declarations, the Interim Order, or the DIP Term Sheet (as defined herein), as applicable.

[6]   The form of proposed Interim Order, including the stipulations contained herein and the proposed form of adequate protection provided in paragraphs 13-15 represents a proposal by the Debtors regarding the consensual use of cash collateral of the Prepetition Secured Parties.  To the extent that any such parties do not consent to the use of cash collateral, the Debtors reserve all rights to modify, among other things, the stipulations and form of adequate protection proposed therein.

(ii)  DIP Roll-Up Loans in an amount equal to the amounts outstanding under the Prepetition Stewardship Note in accordance with the DIP Term Sheet (the loans to be made available under the foregoing clauses (i) and (ii), the "**DIP Loans**" and the commitments therefor, the "**DIP Commitments**");

- authorizing the Borrower to incur, and the other Debtors to jointly and severally guarantee (such Debtors, in this capacity, the "**DIP Guarantors**" and, together with the Borrower, the "**DIP Loan Parties**") the DIP Loans and all extensions of credit, financial accommodations, reimbursement obligations, fees and premiums, costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (as defined below) (collectively, the "**DIP Obligations**");

- authorizing the DIP Loan Parties to execute, deliver and perform under the DIP Term Sheet and all other documents and instruments required to be delivered in connection with the DIP Facility, including any definitive documentation for the DIP Facility as contemplated in the DIP Term Sheet (in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof, together with the DIP Term Sheet, the "**DIP Documents**");

- subject to the Carve-Out (as defined below) and otherwise solely to the extent set forth herein, granting to the DIP Secured Party, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code;

- granting to the DIP Secured Party, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the DIP Collateral (as defined below), on the terms described herein;

- authorizing the DIP Lender to take all actions reasonably required to implement the terms of the Interim Order; authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral (as defined below) solely in accordance with the DIP Orders and the DIP Documents;

- authorizing the Debtors to pay the DIP Obligations as they become due and payable in accordance with the DIP Documents;

- subject to the restrictions set forth in the DIP Documents and the DIP Orders, authorizing the Debtors to use the collateral of the Prepetition Secured Parties (the "**Prepetition Collateral**") and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "**Diminution in Value**");

- vacating and modifying the automatic stay to the extent necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents;

- waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order; and

- scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facility and use of Cash Collateral on the terms of a proposed order to be posted to the docket prior to the Final Hearing.

12.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Interim Order**").  A proposed form of order granting the relief requested herein on a final basis (the "**Final Order**," and together with the Interim Order, the "**DIP Orders**") will be filed with the Court in advance of the Final Hearing.

## Summary of Terms of DIP Facility and Use of Cash Collateral

13.     In accordance with Bankruptcy Rules 4001(b)-(d) and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Procedures**"), as incorporated by Bankruptcy Local Rule 1075-1, the below chart summarizes the significant terms of the Interim Order and the DIP Term Sheet.[7]

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| **DIP Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Steward Health Care System LLC (the "**Borrower**") | DIP Term Sheet, "Obligors" |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | All other Debtors in these chapter 11 cases | DIP Term Sheet, "Obligors" |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | MPT TRS Lender-Steward, LLC | DIP Term Sheet, "DIP Lender" |

---

[7]     The following summary of the terms of the DIP Facility is subject entirely to the express terms of the DIP Term Sheet.  If there are any inconsistencies between the summary below and the DIP Term Sheet, then the DIP Term Sheet shall control.

[8]     Capitalized terms used but not defined in this table shall have the meanings ascribed in the DIP Term Sheet.

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| **DIP Facility and Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility consists of (i) $75,000,000 of committed New Money DIP Loans (a) $40,000,000 of which will be available upon entry of this Interim Order, (b) $20,000,000 of which will be available on May 24, 2024, and (c) $15,000,000 of which will be available on May 31, 2024, in each case subject to conditions set forth in the DIP Term Sheet, (ii) up to an additional uncommitted $225 million of conditional subsequent draws will be available subject to the conditions set forth in the DIP Term Sheet and (iii) DIP Roll-Up Loans in an amount equal to the amounts outstanding under the Prepetition Stewardship Note in accordance with the DIP Term Sheet. | DIP Term Sheet, "DIP Facility"; "DIP Draws" |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The initial DIP Budget is attached hereto as **Exhibit B**. | **Exhibit B** |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>New Money DIP Loans</u>: 1-month Term SOFR (subject to a 2.0% floor) <u>plus</u> 10.0% per annum, payable monthly in kind.<br><br><u>DIP Roll-Up Loans</u>: 1-month Term SOFR (subject to a 2.0% floor) <u>plus</u> 15.0% per annum, payable monthly in kind. | DIP Term Sheet, "DIP Facility Interest Rate" |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Upfront Premium</u>: 3.0% of the aggregate amount of the New Money DIP Loans actually funded, payable in kind on the date such New Money DIP Loans are funded.<br><br><u>Exit Premium</u>: 3.0% of the principal amount of New Money DIP Loans (not payable in connection with a successful credit bid) actually prepaid, in the case of any partial prepayment, or repaid on the Maturity Date, payable on the date of such prepayment or repayment. | DIP Term Sheet, "Premiums" |
| **Maturity Date; Duration for Use of DIP Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | The earliest of (i) November 30, 2024, (ii) the acceleration of the loans and the termination of unused commitments under the DIP Facility upon and during the continuance of an Event of Default and (iii) the date of dismissal of the Chapter 11 Case, the appointment of a chapter 11 trustee or an examiner, conversion of the Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code, or the effective date of a plan in the Chapter 11 Case. | DIP Term Sheet, "Tenor of DIP Facility" |
| **Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B) | No mandatory prepayments are required under the DIP Facility.<br>Voluntary prepayments of the DIP Facility will be permitted at any time, without premium or penalty. | DIP Term Sheet, "Prepayments" |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B) | The conditions to the Initial Draw include (i) delivery of the initial Approved Budget, (ii) entry of the Interim Order, and (iii) other usual and customary conditions for financings of this type.<br>The conditions to each Subsequent Interim Draws include (i) no conversion of the Chapter 11 Cases into chapter 7 liquidation provisions and (ii) the making of such Subsequent Interim Draws not violating any requirement of law and not being enjoined. | DIP Term Sheet, "Conditions Precedent to Initial Draw"; "Conditions Precedent to Subsequent Interim Draws" |

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | | |
| **Superpriority Expense Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve-Out and the priorities set forth in the Prepetition Intercreditor Agreement, the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "**DIP Superpriority Claims**") against the DIP Loan Parties on a joint and several basis. | Interim Order ¶ 5 |
| **Collateral and Priority**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | The DIP Facility is secured by a perfected security interest in and lien on any Collateral (other than the "Excluded Assets" as defined in the Interim Order (the "**DIP Collateral**").<br><br>All amounts owing by the Borrower under the DIP Facility in respect thereof shall: (x) with respect to the ABL/FILO Priority Collateral and MPT Exclusive Collateral (each as defined in the Prepetition Intercreditor Agreement) at all times have the priority set forth for, and be *pari passu* with the "MPT Obligations" under and as defined under the Prepetition Intercreditor Agreement and (y) with respect to the MPT Priority Collateral, shall be junior only to the MPT Obligations, the ABL/FILO Obligations, and the Bridge Obligations (and other permitted liens); ; provided that the portion of the DIP Facility relating to the Prepetition Stewardship Note shall continue to have a lien which is pari passu with the other "MPT Obligations" as pertains to the MPT Priority Collateral. | DIP Term Sheet, "Security", "Priority" |
| **Covenants**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Customary covenants for debtor-in-possession financings of this type, including certain covenants with respect to sales of the Facilities.  For example:<br>• The Debtors and the DIP Lender will reasonably cooperate in marketing efforts for the sale of the Facilities in one or more sale transactions.<br>• At the DIP Lender's election, the Debtors will permit the DIP Lender and its affiliates to discuss and negotiate directly with any potential buyer regarding the treatment of any Master Lease or leases pertaining to the real estate underlying the applicable Facility or Facilities.<br>• In connection with the marketing process, the Debtors will consider in good faith transition services agreements with the potential buyers of the Facilities pending receipt of regulatory approvals. | DIP Term Sheet, "Covenants" |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Customary events of default for debtor-in-possession financings of this type (in each case, with materiality thresholds, exceptions and cure and grace period to be agreed), including: (i) failure to make a payment required by the DIP Term Sheet, DIP Orders, and/or DIP Documents, (ii) failure to operate within the Approved Budget (subject to the Permitted Variance), (iii) failure to comply with the milestones, (iv) violation of covenants, (v) breach of representations or warranties, (vi) disclosure of undisclosed secured or priority liabilities (or other claims that could be asserted against the Borrower, the other Debtors or the Facilities) with respect to debt for borrowed money in excess of an amount to be acceptable to the DIP Lender in its sole and absolute discretion, | DIP Term Sheet, "Events of Default" |

| MATERIAL TERMS[8] | Location |
|---|---|
| | (vii) judgment defaults, (viii) ERISA, (ix) environmental, (x) change of control, (xi) loss of material permits, licenses, tariff and regulatory approvals, (xii) actual or asserted invalidity or impairment of any loan documentation, (xiii) filing or conversion to chapter 7 liquidation proceedings, (xiv) breach or failure to satisfy any requirement in connection with the sale of the Facilities as contemplated under the orders and other definitive documentation relating thereto, and (xv) other events of default which are customary for financing of this type. | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | (i) On or prior to May 10, 2024, the Debtors' investment bankers shall have delivered the confidential information memorandum relating to the Facilities in Florida to each potential bidder that has signed a non-disclosure agreement with respect thereto;<br><br>(ii) on or prior to the date that is 7 days after the Petition Date, the Debtors shall have filed a motion with the Bankruptcy Court seeking entry of an order in form and substance acceptable to the DIP Lender in its sole and absolute discretion establishing procedures for the sale of the Facilities, which shall provide that (x) the Debtors shall execute a stalking horse purchase agreement with respect to each Priority Facility no later than the date listed opposite such Priority Facility on Annex II to the DIP Term Sheet for each such Priority Facility, (y) with respect to the Facilities (other than an Facilities located in Florida), (A) the bid deadline shall be no later than June 25, 2024, (B) the auction shall be held on or prior to June 28, 2024, (C) the sale hearing shall be held on or prior to July 2, 2024, and (D) the consummation of the sale by a date to be reasonably acceptable to the DIP Lender (taking into account regulatory approvals) and (z) with respect to the Facilities located in Florida, (A) the bid deadline shall be no later than July 26, 2024, (B) the auction shall be held on or prior to July 30, 2024, (C) the sale hearing shall be held on or prior to August 2, 2024, and (D) the consummation of the sale by a date to be reasonably acceptable to the DIP Lender (taking into account regulatory approvals);<br><br>(iii) on or prior to the date that is 7 days after the Petition Date, the Debtors shall have filed a motion with the Bankruptcy Court seeking entry of an order in form and substance reasonably acceptable to the DIP Lender establishing procedures for the sale of Stewardship, which shall provide for certain milestones acceptable to the DIP Lender, following consultation with the ABL and FILO Lenders;<br><br>(iv) on or prior to May 17, 2024, the Debtors and the DIP Lender shall have executed the Definitive Documentation, including a credit agreement consistent with the terms provided in the DIP Term Sheet; | DIP Term Sheet, "Milestones" |

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | (v) on or prior to the date that is 28 days after the Petition Date, the Bankruptcy Court shall have entered the Final Order in form and substance reasonably acceptable to the Borrower and acceptable to the DIP Lender in its sole and absolute discretion;<br><br>(vi) on or prior to a date reasonably satisfactory to the DIP Lender, the execution of a stalking horse agreement (including seller disclosure schedules) for the managed care business of the Debtors ("Stewardship") in form and substance acceptable to the DIP Lender in its sole and absolute discretion. | |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | Equal to the sum of:<br><br>(i) all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717;<br><br>(ii) all unpaid reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code<br><br>(iii) Allowed Professional Fees incurred by the Debtor Professionals and the Committee Professionals at any time before or on the first Business Day following the Carve-Out Trigger Date, and any monthly, restructuring, sale, success or other transaction fees payable to a Debtor Professional, whether allowed by the Court prior to or after delivery of a Carve-Out Notice;<br><br>(iv) the fees and expenses of any patient care ombudsman appointed in these Chapter 11 Cases; and<br><br>(v) Allowed Professional Fees of Professional Persons incurred after the first Business Day following the Carve-Out Trigger Date in an aggregate amount not to exceed $5,000,000. | Interim Order ¶ 4 |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>DIP Proceeds</u>: To be used in accordance with the Budget.<br><br><u>Cash Collateral</u>: in accordance with this Interim Order, the DIP Documents and Approved Budget (subject to Permitted Variances) | DIP Term Sheet, "Use of Proceeds"<br><br>Interim Order ¶ 11 |
| **Parties with an Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties and the DIP Lender | Interim Order ¶ F |
| **Liens, Cash Payments or Adequate Protection Provided** | <u>Adequate Protection.</u> The Prepetition Secured Parties are granted the following adequate protection (collectively, the "**Adequate Protection Obligations**") of their interests in the Prepetition Collateral (including Cash Collateral), in each case, to the extent that the applicable Prepetition Secured Obligations are | Interim Order ¶ 13 |

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| **for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv) | outstanding:<br><br>(i) <u>ABL/FILO Adequate Protection Liens</u>: a valid, perfected replacement security interest in and lien solely to the extent of any Prepetition ABL/FILO Secured Parties' Diminution in Value upon all of the DIP Collateral (the "**ABL/FILO Adequate Protection Liens**");<br><br>(ii) <u>Prepetition ABL/FILO Secured Parties' Section 507(b) Claim</u>: an allowed superpriority administrative expense claim against the DIP Loan Parties solely to the extent of any of the Prepetition ABL/FILO Secured Parties' Diminution in Value (the "**ABL/FILO 507(b) Claim**");<br><br>(iii) <u>Prepetition ABL/FILO Secured Parties' Fees and Expenses</u>: cash payment of all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the ABL/FILO Advisors (collectively, the "**ABL/FILO Adequate Protection Fees and Expenses**");<br><br>(iv) <u>Bridge Adequate Protection Liens</u>: a valid, perfected replacement security interest in and lien solely to the extent of any Prepetition Bridge Secured Parties' Diminution in Value upon all of the DIP Collateral (the "**Bridge Adequate Protection Liens**");<br><br>(v) <u>Prepetition Bridge Secured Parties' Section 507(b) Claim</u>: an allowed superpriority administrative expense claim against the DIP Loan Parties solely to the extent of any Prepetition Bridge Secured Parties' Diminution in Value (the "**Bridge 507(b) Claim**");<br><br>(vi) <u>MPT Adequate Protection Liens</u>: a valid, perfected replacement security interest in and lien on account of the Prepetition MPT Secured Party's Diminution in Value upon all of the DIP Collateral (the "**MPT Adequate Protection Liens**" and, together with the ABL/FILO Adequate Protection Liens and the Bridge Adequate Protection Liens, the "**Adequate Protection Liens**");<br><br>(vii) <u>Prepetition MPT Secured Party's Section 507(b) Claim</u>: an allowed superpriority administrative expense claim against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition MPT Secured Party's Diminution in Value (the "**MPT 507(b) Claim**" and, together with the ABL/FILO 507(b) Claim and the Bridge 507(b) Claim, the "**507(b) Claims**"), and<br><br>(viii) <u>Prepetition MPT Secured Party's Fees and Expenses</u>: cash payment of all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the MPT Advisors (collectively, the "**MPT Adequate Protection Fees and Expenses**" and, together with the ABL/FILO Adequate Protection Fees and Expenses and the Bridge Adequate Protection Fees and Expenses, the "**Adequate Protection Fees and Expenses**").<br><br>(ix) <u>Payment of PIK Interest to Prepetition ABL/FILO Secured Parties and Prepetition Bridge Secured Parties</u>: payment by the Debtors to (i) the Prepetition ABL/FILO Secured | |

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | Parties interest at the default contract rate, and (ii) the Prepetition Bridge Secured Parties payment-in-kind interest at the default contract rate. | |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulations of fact by the Debtors, including (i) those related to the validity and enforceability of certain of the Debtors' Prepetition Secured Obligations, and (ii) that if a disposition of any Facility (as defined in the DIP Term Sheet) results in the applicable MPT Lessors receiving less than the Adjusted Lease Base (as defined below) in either cash or an equivalent amount in the event of assumption and/or assignment of a lease or entry into a new lease, the amount of such insufficiency shall be an allowed secured claim of the applicable MPT Lessors against the same collateral securing the DIP Lien of a priority immediately junior to those obligations. | Interim Order ¶ G |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Order, the DIP Lender will receive a lien on the proceeds of Avoidance Actions, but not Avoidance Actions themselves. | Interim Order ¶ 6(a) |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon all parties in interest unless a committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter before the end of the Challenge Period asserting a Challenge. The "**Challenge Period**" means: (i) the earlier of (w) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of reorganization, (x) as to the Creditors' Committee only, 60 calendar days after the appointment of the Creditors' Committee, (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period, the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 60 calendar days after entry of the Interim Order, or (B) the date that is 30 calendar days after their appointment, and (z) for all other parties in interest, 60 calendar days after entry of the Interim Order; and (ii) any such later date as (x) has been agreed to in writing by the Prepetition MPT Secured Party with respect to the Prepetition MPT Obligations, the Master Leases, or the Prepetition MPT Liens, or (y) has been ordered by the Court for cause upon a motion filed and served within any applicable period. | Interim Order ¶ 19 |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Upon the occurrence and during the continuation of an Event of Default that has not been waived by the DIP Lender and following delivery of a Termination Notice on not less than ten (10) business days' notice (such ten (10) business day period, the "**DIP Remedies Notice Period**") to the Remedies Notice Parties, the DIP Lender may, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Lender to, unless the Court orders otherwise (provided that during the DIP Remedies Notice Period, the Debtors, the Creditors' Committee | Interim Order ¶¶ 7(b), (c); 33 |

15

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing and, if so, the appropriate relief therefor and, or to obtain non-consensual use of Cash Collateral and provided further that if a request for such hearing is made prior to the end of the DIP Remedies Notice Period, then the DIP Remedies Notice Period shall be continued until the Court hears and rules with respect thereto): (a) immediately terminate and/or revoke the Debtors' right under the Interim Order and any other DIP Documents to use any Cash Collateral (subject to the Carve-Out, Professional Fees Escrow Account, and related provisions); (b) terminate the DIP Facility and any DIP Document as to any future liability or obligation of the DIP Secured Party but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; and (d) invoke the right to charge interest at the default rate under the DIP Documents.<br><br>Following an Event of Default and the delivery of the Termination Notice, but prior to exercising the remedies set forth in this sentence below or any other remedies (other than those set forth in the above paragraph), the DIP Lender shall be required to file a Stay Relief Motion on not less than ten (10) business days' written notice to the Remedies Notice Parties (which may run concurrently with the DIP Remedies Notice Period) for a further order of the Court fashioning any appropriate remedy, including modifying the automatic stay in the Chapter 11 Cases to permit the DIP Lender to, subject to the Prepetition Intercreditor Agreements and the Carve-Out and related provisions, exercise any rights or remedies permitted under the Interim Order, the DIP Documents or applicable law.   Until such time that the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility to the extent drawn prior to the occurrence of an Event of Default and Cash Collateral to fund operations in accordance with the Approved Budget (including Permitted Variances) and the terms of the DIP Documents. | |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit**<br>Bankruptcy Rule 4001(c)(1)(B)(v) | The Interim Order does not provide for a waiver of any entity's authority or right to file a plan, request the use of cash collateral, or request authority to obtain credit; however, the Definitive Documentation may provide that the foregoing actions may constitute an Event of Default under certain circumstances which could terminate the Debtors' access to the DIP Facility and use of Cash Collateral. | N/A |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the** | The DIP Liens and certain of the Adequate Protection Liens granted and created under the Interim Order shall constitute valid, automatically perfected and unavoidable security interests and liens, with the priorities set forth in the Interim Order, effective as of the date of the Interim Order, without the necessity of executing | Interim Order ¶ 16 |

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| **Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | deposit account control agreements or creating, filing, recording, or serving any financing statements, mortgages, or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the DIP Liens granted to the DIP Lender or Adequate Protection Liens granted to the MPT Prepetition Secured Parties under the Interim Order. | |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective as of entry of the Interim Order, the Debtors waive and release, *inter alia*, (i) the Prepetition Released Parties, and (ii) the DIP Released Parties, in each case, subject to the terms and provisions of the Interim Order. | Interim Order ¶ G.20 |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless each Indemnified Party from and against any and all claims, damages, losses, liabilities and expenses (including all reasonable and documented fees, out-of-pocket expenses and disbursements of their specified legal counsel, specified financial advisors or other specified professionals retained by the DIP Lender that may be incurred by or asserted or awarded against any Indemnified Party (including in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case, arising out of or in connection with or by reason of the DIP Facility, the Definitive Documentation or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, or any actions of the Debtors, with exceptions for fraud, gross negligence or willful misconduct. | DIP Term Sheet, "Indemnification" |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to the entry and terms of the Final Order, except to the extent of the Carve-Out and the Professional Fee Escrow, without the prior written consent of the Prepetition MPT Secured Party or the DIP Lender,  no costs or expenses of administration of these cases or any Successor Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or Prepetition Collateral (in each case, including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, and nothing contained in the Interim Order shall be deemed to be a consent by the Prepetition MPT Secured Party or the DIP Lender to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise. | Interim Order ¶ 8 |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | Subject to the terms of the Final Order, (a) in no event shall the DIP Lender or the Prepetition MPT Secured Party be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition MPT Secured Obligations, or the Prepetition Collateral, as applicable, and (b) in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition MPT Secured Party. | Interim Order ¶ 9 |

17

**Statement Regarding Significant Provisions**

14.     Pursuant to paragraph 23 of the Complex Case Procedures, the DIP Term

Sheet and/or the Interim Order contain the following provisions ("**Significant Provisions**"):

| DIP Facility Term | Relief Requested |
|---|---|
| **Sale or Plan Confirmation Milestones** Complex Case Procedures ¶ 8(a) | The DIP Term Sheet, attached hereto as **Exhibit C**, requires the Debtors to comply with the sale milestones identified above.<br><br>**Justification**: These milestones are appropriate given the amount of funding the DIP Lender is willing to make available to the Debtors to fund these chapter 11 cases. The Debtors believe that the DIP Lender would not have otherwise provided the DIP Loans. |
| **Cross-Collateralization** Complex Case Procedures ¶ 8(b) | The Interim Order does not provide for cross collateralization. |
| **DIP Roll-up** Complex Case Procedures ¶ 8(c) | The DIP Term Sheet provides for DIP Roll-Up Loans in an amount equal to the amount outstanding under the Prepetition Stewardship Note.<br><br>DIP Term Sheet, "DIP Facility"<br><br>**Justification**: The DIP Roll-Up is a key feature of the DIP Facility and was required by the DIP Lender as a condition to their commitment to provide the DIP Facility. The Debtors and the DIP Lender engaged in arm's length negotiations and agreed to the DIP Roll-Up as consideration for, among other things, the DIP Lender's commitment to fund the DIP Facility. The DIP Roll-Up will only be approved upon entry of a Final Order, and only contemplates a ratio of significantly less than 1:1 (in fact, approximately 0.25:1). Moreover, the DIP Roll-Up is being consummated on a junior basis to the Debtors other prepetition secured debt. Without the DIP Roll-Up, the Debtors would not have access to the necessary postpetition financing offered by the DIP Facility. |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions** Complex Case Procedures ¶ 8(d) | Subject to entry of the Final Order, the DIP Lender will receive a lien on the proceeds of Avoidance Actions. *See* Interim Order ¶ 6.a.<br><br>**Justification**: The Debtors submit that granting DIP Liens on proceeds and property recovered in respect of Avoidance Actions is appropriate because the DIP Facility and use of Cash Collateral provide the Debtors with new money to fund the Debtors' sale process and ensure the Debtors are able to maximize value for their estates. Moreover, the liens were required by the DIP Lender as a condition to extending credit. The Debtors respectfully submit that granting liens on proceeds of Avoidance Proceeds is appropriate under these circumstances because it is subject to a final order and will allow parties in interest the opportunity to object. |
| **Default Provisions and Remedies** | Events of Default under the DIP Term Sheet are described above. |

| DIP Facility Term | Relief Requested |
|---|---|
| Complex Case Procedures ¶ 8(e) | The DIP Term Sheet and Interim Order provide for certain remedies upon Events of Default, including (i) the right to terminate or revoke the Debtors' right to use Cash Collateral, (ii) the right to terminate the DIP Facility, (iii) the right to accelerate the DIP Obligations, and (iv) the right to charge default interest.  Interim Order ¶ 7(a).<br><br>**Justification**:  The customary Events of Default contemplated are typical.  In addition, the DIP Lender must provide ten (10) business days prior written notice prior to exercising its rights under the DIP Documents and file the Stay Relief Motion) seeking emergency relief from the automatic stay.  Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of the Event of Default (as defined in the DIP Term Sheet) or Cash Collateral to fund operations in accordance with the DIP Term Sheet. Therefore, the Interim Order does not provide for the automatic lifting of the stay upon an Event of Default.  Interim Order ¶ 7(b). |
| **Releases of Claim Against Lender or Others** Complex Case Procedures ¶ 8(f) | Effective as of the date of entry of the Interim Order, each of the Debtors releases the DIP Released Parties, from any and all liability to the Debtors and from any and all claims arising out of or related to the DIP Facility, the DIP Documents, the New Money DIP Term Loans, the DIP Roll Up Loans, the negotiation thereof and the transactions and agreements reflected thereby arising at any time on or prior to the date of the Interim Order; provided that the foregoing release shall not release (i) any claims against or liabilities of a DIP Released Party that a court of competent jurisdiction determines has resulted from such DIP Released Party's bad faith, fraud, gross negligence, or willful misconduct or (ii) DIP Lender from honoring its obligations to the Debtors under the DIP Documents.<br><br>Effective as of the date of entry of the Final Order, each of the Debtors releases the Prepetition Released Parties and the DIP Released Parties, from any and all liability to the and from any and all claims and liabilities arising out of or related to the Prepetition MPT Loan Documents, the DIP Facility, the DIP Documents, the New Money DIP Term Loans, the DIP Roll Up Loans, the negotiation thereof and the transactions and agreements reflected thereby, arising at any time on or prior to the date of the Interim Order, including, without limitation, any lender or noteholder liability claims, any subordination claims, any recharacterization claims, or any claims arising under any non-disclosure or confidentiality agreement; provided that the release shall not release (i) any claims against or liabilities of a Released Party that a court of competent jurisdiction determines has resulted from such Released Party's bad faith, fraud, gross negligence, or willful misconduct or (ii) DIP Lender or the Prepetition Secured Parties from honoring their obligations to the Debtors under the DIP Documents and the Prepetition Loan Documents.<br><br>Interim Order ¶ G.20.<br><br>**Justification**. The releases are appropriate because (i) the Debtors are being provided consideration in the form of the DIP Facility and certain Prepetition MPT Secured Parties' consent to the Debtors' use of Cash |

| DIP Facility Term | Relief Requested |
|---|---|
| | Collateral, which is essential to the Debtors' ability to maximize value for their estates, and (ii) the release complies with the requirements of paragraph 8 of the Complex Case Procedures because the release is subject to the Challenge Period. |
| **Limitations on the Use of Cash Collateral**<br>Complex Case<br>Procedures ¶ 8(g) | Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the DIP Lender and certain Prepetition Secured Parties (e.g., for investigations and litigation against such parties).  *See* Interim Order ¶ 20.<br><br>**Justification**. These limitations are usual and customary. The Debtors, having engaged in arm's length negotiations with the DIP Lender and certain Prepetition Secured Parties, agreed to limit the Debtors' use of Cash Collateral as consideration for, among other things, the provision of new money within the broader context the Debtors' value-maximizing restructuring process. The limitation is reasonable given the facts and circumstances of these Chapter 11 Cases. |
| **Priming Liens**<br>Complex Case Procedures ¶ 8(h) | N/A |
| **Other Material Terms**<br>Complex Case Procedures ¶ 8(i) | Subject to entry of the Final Order and approval of the Debtors' bidding procedures, the Debtors agree:<br><br>• to the extent such transaction is the highest or best available, to consent to and will seek court approval of a disposition of any Facility free and clear of all liens, claims and encumbrances that contemplates, provides for or otherwise results in the payment of net proceeds in cash or other consideration acceptable to the MPT Lessors in their sole and absolute discretion in an amount less than the sum of (x) the lease base applicable to such Facility under the applicable Master Lease plus (y) the aggregate amount of any deferred and unpaid rent accrued in respect of such Facility under the applicable Master Lease as of the applicable time of determination plus (z) in any case, without duplication of any amounts described under the foregoing sub-clauses (x) and (y), all other pre- or post-petition unpaid insurance, Impositions (as such term is defined in the applicable Master Lease and, for the avoidance of doubt, including mechanics liens), and unreimbursed capital expenditures, in each case accrued and outstanding relating to such hospital (such sum, the "Adjusted Lease Base"), it being understood that all amounts up to the Adjusted Lease Base shall be for the benefit of and paid to the applicable MPT Lessors and any amount in excess of the Adjusted Lease Base shall be for the benefit of the applicable Debtor's estate and that any allocation under such sale or disposition will be consistent with the foregoing; and<br><br>• if the Debtors receive no qualified bids for a Facility by the applicable bid deadline or a sale of a Facility does not close by the applicable deadline to consummate such sale, the applicable MPT Lessor shall have the right, but not the obligation, to appoint an interim replacement operator for such Facility and the Debtors will cooperate with such appointment |

| DIP Facility Term | Relief Requested |
|---|---|
| | and implementation to orderly transition such Facility to the operator.<br><br>**Justification**. These terms are material inducements for the DIP Lender to provide the DIP Facility and agree to the milestones that allow the Debtors to run their value-maximizing sale process. |

## Background

**A.      Prepetition Capital Structure**

15.      As of the Petition Date, the Debtors had approximately $1.2 billion in aggregate principal amount of funded debt obligations outstanding, and approximately $6.6 billion in long-term lease obligations.   The table below summarizes the Debtors' prepetition capital structure.

| Prepetition Indebtedness | Principal Amount Outstanding | All-in Interest Rate[9] | Maturity | |
|---|---|---|---|---|
| **Secured Debt** | | | | |
| ABL First Out | $49.3 mm | ABR + 6.50% | 8/4/2027 | |
| ABL Facility | $247.3mm | ABR + 9.00% | 8/4/2027 | |
| FILO Facility | $305.5mm | ABR + 12.75% | 12/31/2027 | |
| Bridge Facility | $274.5mm[10] | SOFR + 10.75% | 6/30/2024 | |
| MPT Facility | $216.7mm | Various[11] | 1/1/2028[12] | |
| MPT Stewardship Note | $82.5mm[13] | SOFR + 15.00% | 6/30/2024 | |
| **Total Secured Debt** | **$1.2bn** | | | |
| **Select Unsecured Liabilities** | | | | |
| Est. MPT Lease Obligations | $6.6 billion[14], [15] | N/A | 10/31/41 (lease end) | |
| Investor Note | $363.3mm | 4.0% | 2/2029 | |
| MAAPP Loans | $32.2mm | 4.0% | Various | |
| Est. Trade Payables | $979.4mm | N/A | N/A | |
| **Total Select Unsecured Liabilities** | **$8.0bn** | | | |
| **Total Secured Debt and Select Unsecured Liabilities** | **$9.2bn** | | | |

---

[9]   The default interest rates under the credit documents are as follows: (i) ABL/FILO Facility – applicable rate + 2%; (ii) Bridge Facility – applicable rate + 2%; (iii) MPT Facility – Interest Rate + 5%; and (iv) MPT Stewardship Note – Floating Interest Rate + 5%.

[10]   Includes 1.85x minimum MOIC due at maturity and upon certain defaults.

[11]   Increased by 4.0% if PIK.

[12]   As of the Petition Date, there are seven (7) outstanding tranches under the MPT Facility, all of which mature on January 1, 2028, except Tranche 4, which matures on October 31, 2031.

[13]   Includes 1.25x minimum MOIC due at maturity and upon certain defaults.

[14]   Amount represents (i) contractually deferred rent; (ii) other unpaid additional amounts; and (iii) future, undiscounted rent due under the Master Leases through October 31, 2041. Includes average rent escalators ranging from 2.5% to 3.5% annually. Amount is approximate, unaudited, and does not include all amounts payable under the Master Leases.

[15]   Undiscounted future rents are presented for illustrative purposes only and do not represent balance sheet lease liabilities under generally accepted accounting principles.

16.   ***Prepetition Intercreditor Agreement***.   The priority of the liens of the Prepetition Secured Lenders is set forth in that certain *Amended and Restated Intercreditor Agreement*, dated as of February 21, 2024 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition Intercreditor Agreement**"),[16] by and among, *inter alios*, the ABL/FILO Representation (as defined therein), the Bridge Representative (as defined therein), the MPT Lenders (as defined therein), MPT Sycamore Opco, LLC, SHC and certain of SHC's subsidiaries and affiliates, as summarized below:

| Collateral and Lien Priority[17] | | |
|---|---|---|
| **Collateral** | **Description** | **Lien Priority** |
| ABL/FILO Priority Collateral | <ul><li>Accounts, account receivables and health-care insurance receivables (subject to certain exceptions)</li><li>Facility permits</li><li>Inventory and goods (other than equipment)</li><li>Assets[18] and equity interests[19] of the Debtors that own the Stewardship business</li><li>Certain designated equipment (subject to a $110 million cap)</li><li>Proceeds of the foregoing,  insurance, books and records and other assets relating to the above</li></ul> | <ul><li>First Priority: ABL/FILO Facility</li><li>Second Priority: Bridge Facility</li><li>Third Priority: MPT[20]</li></ul> |
| ABL/FILO Exclusive Collateral | <ul><li>Assets of any ABL/FILO Loan Party that are not MPT Collateral (e.g., generally, assets of a ABL/FILO Loan Party that has not pledged its assets to MPT)[21]</li><li>Equity interests of SHC</li></ul> | <ul><li>First Priority: ABL/FILO Facility</li><li>Second Priority: Bridge Facility</li></ul> |

---

[16]   A copy of the Prepetition Intercreditor Agreement is attached hereto as **Exhibit D**.

[17]   Capitalized terms used but not defined in this table shall have the meanings ascribed to them in the Prepetition Intercreditor Agreement.

[18]   Including the assets of (i) Steward Health Care Network, Inc., (ii) Steward Physician Contracting, Inc., (iii) Steward Emergency Physicians, Inc., (iv) Steward Medicaid Care Network, Inc., (v) Steward Operations Holdings LLC, (vi) Stewardship Health, Inc., (vii) Stewardship Health Medical Group, Inc. and (viii) Stewardship Services Inc.

[19]   Including the Equity Interests in (i) Steward Physician Contracting, Inc., (ii) Steward Health Care Network, Inc., (iii) Steward Health Care Network ACO Texas, Inc., (iv) Steward Medicaid Care Network, Inc., (v) Steward Accountable Care Organization, Inc., (vi) Steward Healthcare Management Services, LLC, (vii) Altus ACE, LLC, (viii) Stewardship Health, Inc., (ix) Stewardship Health Medical Group, Inc. and (x) Stewardship Services Inc.

[20]   MPT's lien on the assets and equity interests of the Debtors that own the Stewardship business is subject to a cap equal to the sum of (i) $180 million and (ii) the outstanding principal amount of the Prepetition Stewardship Note multiplied by 2.5.

[21]   MPT Collateral includes all assets of any MPT Credit Party, in which a lien is granted, or purported to be granted to any MPT Party as security for any MPT Obligations and all proceeds and products thereof.

| Collateral and Lien Priority[17] | | |
|---|---|---|
| MPT Priority Collateral | • All MPT Collateral, excluding the Prepetition ABL/FILO Priority Collateral | • <u>First Priority</u>: MPT<br>• <u>Second Priority</u>: ABL/FILO Facility and Bridge Facility |
| MPT Exclusive Collateral | • Real property and fixtures subject to MPT liens and all proceeds and products thereof<br>• Assets of any MPT Credit Party that are not ABL/FILO Collateral[22] | • <u>First Priority</u>: MPT |
| FILO Bridge Exclusive Collateral | • Rights to receive proceeds in connection with the sale, assignment, transfer or other disposition of the Excess Properties[23] | • <u>First Priority</u>: FILO Bridge Lenders<br>• <u>Second Priority</u>: FILO Lenders |

(i)     *Funded Debt Obligations*[24]

17.     ***ABL/FILO Facility***.  On August 4, 2023, SHC, as borrower, and certain other Debtor affiliates of SHC from time to time party thereto (together with SHC, collectively, the "**Prepetition ABL/FILO Loan Parties**"), entered into that certain *Credit Agreement* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition ABL/FILO Credit Agreement**") with Sound Point Agency LLC, as administrative agent (the "**Prepetition ABL/FILO Administrative Agent**"), Chamberlain Commercial Funding (Cayman) L.P., as collateral agent (the "**Prepetition Collateral Agent**"), Brigade Agency Services LLC, as FILO agent (the "**Prepetition FILO Agent**" and, together with the Prepetition ABL/FILO Administrative Agent and the Prepetition Collateral Agent, the "**Prepetition ABL/FILO Agents**"), and the lenders parties thereto from time to time (the "**Prepetition ABL/FILO Lenders**" and, together with the Prepetition ABL/FILO Agents and

---

[22]   ABL/FILO Collateral includes all assets (including certain designated equipment subject to a $110 million cap) of any Prepetition ABL/FILO Loan Party, in which a lien is granted, or purported to be granted to any Prepetition ABL/FILO Secured Party as security for any ABL/FILO Obligation.

[23]   Excess Properties are certain MPT-owned properties that the Debtors lease, which are listed in that certain *Excess Property Disposition Agreement*, dated as of February 21, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among SHC, the lessor entities party thereto, the lessee entities party thereto and the Prepetition Bridge Agent.

[24]   The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

any other Secured Parties (as defined in the Prepetition ABL/FILO Credit Agreement), the "**Prepetition ABL/FILO Secured Parties**"), providing for (a) a senior secured revolving credit facility in an original aggregate principal amount of $300 million (the "**ABL Facility**" and the lenders thereunder, the "**ABL Lenders**") and (b) a senior secured term loan facility in an aggregate original principal amount of $200 million (the "**FILO Facility**" and the lenders thereunder, the "**FILO Lenders**" and the FILO Facility, together with the ABL Facility, the "**ABL/FILO Facility**").   Pursuant to the Prepetition ABL/FILO Credit Agreement, the ABL Facility has payment priority over the FILO Facility.   SHC's obligations under the ABL/FILO Facility are guaranteed by the other Prepetition ABL/FILO Loan Parties.

18.     On October 16, 2023, SHC borrowed an additional $30 million of term loans under the FILO Facility pursuant to the second amendment to the Prepetition ABL/FILO Credit Agreement.   On November 17, 2023, SHC borrowed a further $70 million of term loans under the FILO Facility pursuant to the third amendment to the Prepetition ABL/FILO Credit Agreement.   On December 18, 2023, SHC executed the *Forbearance Agreement*, by and among the Prepetition ABL/FILO Loan Parties party thereto and the Consenting Lenders (as defined therein), pursuant to which SHC paid a consent fee in an amount equal to 1.50% of the then outstanding loans under the Prepetition ABL/FILO Credit Agreement in kind to the Consenting Lenders.   On January 2, 2024, SHC executed the *Second Forbearance Agreement*, by and among the Prepetition ABL/FILO Loan Parties party thereto and the Consenting Lenders.   On February 21, 2024, SHC executed the *Third Forbearance Agreement*, the fourth amendment to the Prepetition ABL/FILO Credit Agreement, and the second amendment to the Agreement Among Lenders (defined herein), by and among the Prepetition ABL/FILO Loan Parties party thereto and the Consenting Lenders, pursuant to which SHC paid a consent fee (x) in an amount equal to 1.50%

of the then outstanding loans under the ABL Facility to the Consenting Lenders who held Loans (as defined therein) under the ABL Facility and (y) in an amount equal to 1.00% of the then outstanding loans under the FILO Facility to the Consenting Lenders who held loans under the FILO Facility, in each case, paid in kind.  As of the Petition Date, including all outstanding and accrued interest, approximately $607.8 million of obligations under the ABL/FILO Facility are outstanding.

19.    Pursuant to that certain *Pledge and Security Agreement*, dated as of August 4, 2023 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition ABL/FILO Security Agreement**"), by and among the Prepetition ABL/FILO Loan Parties from time to time party thereto and the Prepetition Collateral Agent, and subject to that certain *Agreement Among Lenders*, dated as of August 4, 2023 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement Among Lenders**"),[25] by and among the Prepetition ABL/FILO Lenders party thereto, the obligations of the Prepetition ABL/FILO Loan Parties under the ABL/FILO Facility are secured by (a) a first priority lien on the ABL/FILO Priority Collateral (as defined in the Prepetition Intercreditor Agreement) and (b) a second priority lien on the MPT Priority Collateral (as defined in the Prepetition Intercreditor Agreement), other than with respect to the MPT Exclusive Collateral (as defined in the Prepetition Intercreditor Agreement).  The obligations owed by the Prepetition ABL/FILO Loan Parties to the FILO Lenders under the FILO Facility are secured by a second priority lien on the FILO Bridge Exclusive Collateral (as defined in the Prepetition Intercreditor Agreement).  The Agreement Among Lenders provides, among other things, that solely as between the ABL Lenders and the FILO Lenders, proceeds from

---

[25]    A copy of the Agreement Among Lenders is attached hereto as **Exhibit E**.

Collateral (as defined therein) will be applied to pay obligations under the ABL Facility prior to paying the corresponding categories of obligations under the FILO Facility.

20.     ***Bridge Facility***.  On February 21, 2024, Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc., Stewardship Health Medical Group, Inc., and Stewardship Services Inc., collectively, as borrower (the "**Prepetition Bridge Borrower**"), together with certain Debtor affiliates of the Prepetition Bridge Borrower (together with the Prepetition Bridge Borrower, collectively, the "**Prepetition Bridge Loan Parties**") entered into that certain *Credit Agreement* (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Prepetition Bridge Credit Agreement**") with certain of the FILO Lenders and the Prepetition MPT Secured Party (as defined below) (collectively, the "**Prepetition Bridge Lenders**") and Brigade Agency Services LLC, as administrative agent and collateral agent (in such capacities, the "**Prepetition Bridge Agent**" and together with the Prepetition Bridge Lenders, the "**Prepetition Bridge Secured Parties**').  The Prepetition Bridge Credit Agreement provides for a $150 million delayed draw term facility (the "**Bridge Facility**") with commitments to be funded equally between the participating FILO Lenders and the Prepetition MPT Secured Party.  As of the Petition Date, including all outstanding and accrued interest and the MOIC Amount (as defined below), approximately $274.5 million of obligations are outstanding under the Bridge Facility.  Under the Bridge Facility, the Prepetition Bridge Loan Parties are required to pay an amount to the Prepetition Bridge Lenders equal to (a) 0.85x the aggregate amount of commitments (excluding, for the avoidance of doubt, interest that is paid in kind, capitalized and added to the principal amount of the Bridge Facility pursuant to the terms of the Prepetition Bridge Credit Agreement) under the Bridge Facility on February 21, 2024 (which

was $150 million) less (b) the amount of cash interest previously received by the Prepetition Bridge

Lenders on or prior to such date of payment (the "**MOIC Amount**") upon the occurrence of (i) the

maturity date, the payment in full of the obligations under the Bridge Facility, an event of default

under the Bridge Facility and/or the acceleration of loans under the Bridge Facility and (ii) subject

to the application of proceeds provisions in the Bridge Facility, any other repayment or prepayment

of loans under the Bridge Facility (the events in clauses (i) and (ii), a "**MOIC Event**").

21.     In connection with the Bridge Facility, pursuant to that certain *Pledge and

Security Agreement*, dated as of February 21, 2024 (as may be amended, restated, amended and

restated, supplemented or otherwise modified from time to time), by and among the Prepetition

Bridge Loan Parties party thereto from time to time and the Prepetition Bridge Agent, the

Prepetition Bridge Loan Parties' obligations under the Bridge Facility are secured by (a) a second

priority lien on the ABL/FILO Priority Collateral and (b) a second priority lien on the MPT Priority

Collateral, other than with respect to the MPT Exclusive Collateral. The obligations owed by the

Prepetition Bridge Loan Parties to the Prepetition Bridge Lenders that are also FILO Lenders under

the FILO Facility are secured by a first priority lien on the FILO Bridge Exclusive Collateral.

22.     ***Prepetition TRS Note and Prepetition Stewardship Note***.   On June 30,

2020, SHC executed that certain *Second Amended and Restated Promissory Note* (the "**Original

Prepetition TRS Note**") with MPT TRS Lender-Steward, LLC (the "**Prepetition MPT Secured

Party**" and together with the Prepetition ABL/FILO Lenders and the Prepetition Bridge Lenders,

the "**Prepetition Secured Lenders**"; the Prepetition ABL/FILO Secured Parties, the Prepetition

Bridge Secured Parties, and the Prepetition MPT Secured Party, collectively, the "**Prepetition

Secured Parties**"), providing for a term loan in the original amount of $85.6 million (as may be

amended, restated, amended and restated, supplemented, or otherwise modified from time to time,

the "**MPT Facility**").  On April 12, 2022, SHC and the Prepetition MPT Secured Party executed the second amendment to the Original Prepetition TRS Note to provide an additional $150 million loan under the MPT Facility.  On December 6, 2022, SHC and the Prepetition MPT Secured Party executed the third amendment to the Original Prepetition TRS Note to provide an additional $28 million loan under the MPT Facility.  On January 31, 2023, SHC and the Prepetition MPT Secured Party executed the fourth amendment to the Original Prepetition TRS Note to provide an additional $50 million loan under the MPT Facility.   On April 30, 2023, SHC and the Prepetition MPT Secured Party executed the fifth amendment to the Original Prepetition TRS Note to make certain modifications to the MPT Facility.  On July 3, 2023, SHC and the Prepetiition MPT Secured Party executed the sixth amendment to the Original Prepetition TRS Note to provide an additional $40 million under the MPT Facility. On January 22, 2024, SHC and the Prepetition MPT Secured Party executed the *Third Amended and Restated Promissory Note* (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition TRS Note**") which amended and restated the Original Prepetition TRS Note and, among other things, evidenced all amounts then outstanding under the MPT Facility and provided that all interest under the MPT Facility would be payable in kind or in cash, at the election of SHC.  The obligations of SHC under the MPT Facility are guaranteed by certain Debtor affiliates of SHC (together with SHC, collectively, the "**Prepetition TRS Note Parties**").  As of the Petition Date, approximately $218.4 million of obligations, including all outstanding and accrued interest, are outstanding with respect to the MPT Facility.

   23. On January 2, 2024, Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., and Steward Medicaid Care Networks, Inc (together with other subsidiaries of SHC party thereto as supplemented from time

to time, collectively, the "**Prepetition Stewardship Borrowers**") executed that certain *Promissory Note* with the Prepetition MPT Secured Party (the "**Original Prepetition Stewardship Note**") providing for an emergency term loan in the original principal amount of $60 million (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**MPT Stewardship Note**").  The obligations of the Prepetition Stewardship Borrowers are guaranteed by SHC and certain Debtor subsidiaries of SHC (the "**Prepetition Stewardship Note Parties**" and, together with the Prepetition TRS Note Parties without duplication, collectively, the "**Prepetition MPT Loan Parties**").  On February 2, 2024, the Prepetition Stewardship Borrowers and the Prepetition MPT Secured Party executed the *First Amendment to Promissory Note (Tranche 2)* to provide an additional $20 million emergency loan under the MPT Stewardship Note (the "**Interim Bridge Funding**").  On February 21, 2024, SHC and the Prepetition Bridge Borrower used the proceeds of the Bridge Facility to refinance the Interim Bridge Funding.  On April 25, 2024, the Prepetition Stewardship Borrowers, SHC, certain other Debtor subsidiaries of SHC, and the Prepetition MPT Secured Party executed the *Amended and Restated Promissory Note* (as may be amended, restated, restated and amended, supplemented or otherwise modified from time to time, the "**Prepetition Stewardship Note**" and, together with the ABL/FILO Facility, the Bridge Facility and the MPT Facility, the "**Prepetition Credit Facilities**"), which amended and restated the Original Prepetition Stewardship Note and evidenced all amounts then outstanding under the Original Prepetition Stewardship Note and also provided for an additional $6 million of emergency term loans made under the MPT Stewardship Note.  The Prepetition Stewardship Borrowers shall be required under the Prepetition Stewardship Note to pay an amount sufficient for the MPT Secured Party to achieve a 1.25 to 1.00 multiple of invested capital on the aggregate original principal amount of the MPT Stewardship Note (excluding any

interest paid in kind, capitalized and added to the principal amount of the MPT Stewardship Note) upon the occurrence of the maturity date, an event of default under the Prepetition Stewardship Note, any prepayment of the Prepetition Stewardship Note in accordance with the terms thereof and/or the acceleration of the MPT Stewardship Note.  As of the Petition Date, approximately $82.5 million of obligations, including all outstanding and accrued interest and the MOIC, are outstanding with respect to the MPT Stewardship Note.

24.    Pursuant to that certain *Second Amended and Restated Security Agreement*, dated as of January 2, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition MPT Security Agreement**"), by and among the Prepetition MPT Loan Parties party thereto from time to time, the other Debtor subsidiaries and affiliates of SHC party thereto and the Secured Parties (as defined therein) and that certain *Second Amended and Restated Pledge Agreement*, dated as of January 2, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among certain Prepetition MPT Loan Parties party thereto, the other Debtor subsidiaries and affiliates of SHC party thereto and the Pledgees (as defined therein), the Prepetition MPT Loan Parties' obligations under the MPT Facility, the MPT Stewardship Note and the MPT Guarantees (as defined below) are secured by (a) a first priority lien on the MPT Priority Collateral  and (b) a third priority lien on the ABL/FILO Priority Collateral, other than with respect to the ABL/FILO Exclusive Collateral (as defined in the Prepetition Intercreditor Agreement).

*(ii)*     *Other Obligations*

25.     ***MPT Lease Obligations***.   Certain of the Debtors lease, as tenants, 36 facilities[26] from affiliates of MPT, a publicly traded real estate investment trust that owns and leases healthcare facilities, pursuant to those certain (i) *Second Amended and Restated Master Lease Agreement*, dated as of March 14, 2022 (as amended, restated, amended and restated, the "**Master Lease I**"), by and among the lessors and lessees party thereto, and (ii) *Master Lease Agreement*, dated as of March 14, 2022, by and among the lessors and lessees party thereto (as amended, restated, amended and restated, the "**Master Lease II**" and, together with the Master Lease I, the "**Master Leases**").

26.     Beginning in December 2023, the Debtors entered into agreements with MPT to defer past-due rent payments under Master Lease I and pursuant to which, MPT agreed to forbear from exercising remedies.  As of the Petition Date, the Debtors owe MPT $3.5 million in delinquent property taxes under Master Lease II and approximately $166.4 million in deferred and unpaid rent and $19.0 million in additional amounts due under Master Lease I.   All of the Debtors obligations under the Master Leases are guaranteed by various guaranty agreements (as modified, amended, or restated from time to time, collectively, the "**MPT Guarantees**").

**B.     Immediate Need for Junior DIP Financing and Access to Cash Collateral**

27.     As detailed in the Castellano Declaration, the Debtors require immediate access to liquidity in these chapter 11 cases to, among other things, stabilize their operations, including their hospital operations, continue delivering critical patient care, maintain business relationships with affiliated physician networks, vendors, suppliers and payors, make payroll to approximately 30,000 employees (including but not limited to primary care providers, physicians,

---

[26]     Subsidiaries of SHC lease (i) 28 facilities pursuant to Master Lease I and (ii) 8 facilities pursuant to Master Lease II.

nurses, and other critical hospital staff), satisfy other working capital and operational needs, and fund the expenses of these chapter 11 cases.  The Debtors have *de minimis* cash on hand as of the Petition Date (approximately $12.8 million), all of which is subject to liens and thus constitutes Cash Collateral.  Accordingly, the Debtors require access to both the DIP Facility and Cash Collateral to ensure that they are able to continue operating during these chapter 11 cases, continue delivering patient care, and preserve the value of their estates for the benefit of all parties in interest.

28.     Approval of the DIP Facility will send a positive message to patients, regulators, physicians, employees, vendors, and other stakeholders that these chapter 11 cases are sufficiently funded.  The commitment of the DIP Facility, and the approval thereof, assures the Debtors' stakeholders that the Debtors' operations are stable and that the Debtors are entering these chapter 11 cases with sufficient liquidity and financial flexibility to continue their operations as a viable going concern, and have the ability to run sale processes that will maximize value and ensure that the Debtors' hospitals and providers can continue to serve the Debtors' patients and the communities in which they are located.

29.     Authority to use Cash Collateral and entry into the DIP Facility will provide the Debtors with the necessary funds to operate their enterprise and continue paying their obligations as they come due.  The Debtors' DIP Budget, which is attached hereto as **Exhibit B** shows that in addition to the use of Cash Collateral, the Debtors require access to Cash Collateral and the DIP Facility to fund their going concern operations and the administration of these chapter 11 cases.

C.     **Efforts to Obtain Postpetition Financing**

30.     As set forth in the Cowan Declaration, beginning in December 2023, with the assistance of the Debtors' management team and advisors, Lazard launched a broad process to

solicit proposals for bridge financing to provide the Debtors with additional runway to consummate its strategic sale processes and explore potential capital structure solutions. In connection with this process, Lazard contacted fourteen (14) third parties, in addition to the Debtors' prepetition secured lenders (namely, the ABL Lenders, the FILO Lenders, and MPT), to gauge their interest in providing a proposal to the Debtors for incremental financing. Out of the fourteen (14) third parties contacted, eight (8) executed non-disclosure agreements and were provided with diligence information, including access to a virtual dataroom, marketing materials and diligence sessions. Despite the Debtors' best efforts, however, this process did not result in any indicative term sheets or proposals from third parties, and the Debtors ultimately secured the $150 million Bridge Facility, which was jointly provided by MPT and the FILO Lenders in three tranches from February to March 2024.

31.     As a condition to funding the final $37.5 million tranche of the Bridge Facility in March 2024, the FILO Lenders insisted that the Debtors and MPT agree to the terms of a future DIP financing facility to be jointly provided by MPT and the FILO Lenders, to the extent the Debtors may need to file for chapter 11 in the near future. The Debtors engaged in hard-fought negotiations with the FILO Lenders and MPT regarding such DIP financing proposal, but had limited leverage given the need to secure emergency bridge financing to avert a precipitous freefall chapter 11 filing and ensure continued patient care. As a result, the Debtors, MPT, and the FILO Lenders executed a term sheet that contemplated a $300 million DIP facility on terms that included expensive economics, onerous covenants and milestones from the Debtors' perspective, and a roll-up of nearly all of the Debtors' prepetition debt upon the initial draw (the "**FILO DIP Term Sheet**").

32.     The liquidity provided by the Prepetition Stewardship Note and the Bridge Facility was critical to support ongoing operations to allow the Debtors to advance their strategic asset sale process prior to the Petition Date.  Although the Debtors attempted to consummate value-maximizing asset sales out-of-court prior to the Petition Date, as a result of, among other things, the anticipated timeline to secure regulatory approval  consummate transactions (including the sale of Stewardship Health), the Debtors required additional liquidity to bridge to closing.  However, the Debtors' Prepetition Secured Lenders were unwilling to extend further financing unless the Debtors commenced these chapter 11 cases.  With no source of immediate additional funding available on an out-of-court basis, the Debtors' only option was to seek the protections of the Bankruptcy Court, secure debtor-in-possession financing, stabilize their operations, and progress their sale and restructuring efforts in-court.

33.     Prior to commencing any DIP financing solicitation process, the Debtors recognized that it would be difficult to secure third-party financing from lenders outside of the Debtors' capital structure because all of the Debtors' material assets are encumbered by existing liens under their prepetition debt, and the Prepetition Secured Lenders under the ABL/FILO Facility as well as the FILO Lenders under the Bridge Facility indicated that they would not consent to a "priming" DIP financing provided by a third party, among other considerations.[27]  In light of this, to obtain third-party DIP financing, the Debtors would likely have to engage in a protracted and costly priming fight or valuation dispute with their Prepetition Secured Lenders at the outset of these chapter 11 cases.

34.     Notwithstanding these concerns, beginning in March 2024, Lazard, with the assistance of the Debtors' management team and advisors, re-launched the prior bridge financing

---

[27] Weil NTD: Lazard to confirm they asked.

process to solicit potential proposals for DIP financing. The Debtors' primary strategic considerations with respect to the financing included the following (among others):

(i)     ***Adequate Sizing*** – adequate sizing to (i) fund the Debtors' contemplated DIP Budget, (ii) maintain sufficient liquidity levels for operating the Debtors' business, and (iii) provide sufficient runaway for the Debtors to complete an orderly sale process;

(ii)    ***Competitive Pricing*** – competitive pricing and terms, including interest rate, nature of interest payments (i.e., paid-in-kind vs. cash), and fees; and

(iii)   ***Operational and Financial Flexibility*** – limited financial covenants and reasonable case controls, including milestones.

35.     In parallel with pursuing DIP financing from the Debtors' existing lenders (including MPT), Lazard also explored potential interest from nine (9) potential third-party financing sources, including the eight (8) third parties that were under NDA in connection with the prepetition bridge financing process. To maximize competition and solicit proposals from a wide range of prospective lenders, notwithstanding the likely objection of the Debtors' secured lenders and the prospect of a difficult and costly "priming fight," Lazard marketed various forms of secured DIP financing proposals, including those with the ability to prime some or all of the Debtors' prepetition secured lenders and those junior to certain or all of the existing prepetition secured lenders.

36.     No potential third-party lender, however, was willing to provide the Debtors with a DIP financing proposal, in light of a number of factors, including, among others, (a) the lack of unencumbered collateral and (b) the unwillingness to provide either (i) unsecured or junior secured financing with administrative priority, or (ii) a non-consensual priming loan. As a result, obtaining DIP financing from a party outside the Debtors' current capital structure was not achievable.

37.     Contemporaneously with its solicitation of third-party lenders, the Debtors solicited and received DIP financing proposals from multiple parties within the Debtors' capital structure, including the FILO Lenders, the ABL Lenders, and MPT.

38.     As discussed above, in March 2024, the Debtors executed the FILO DIP Term Sheet, which contemplated a new money DIP facility junior to the existing ABL Loans.  In negotiating the definitive documentation in respect of the FILO DIP Term Sheet, the FILO Lenders began to waver on their willingness to provide financing and indicated they would only be willing to fund their share of the contemplated DIP facility if, among other things, the Debtors committed to running a truncated sale process, slashed their budget for critical operating expenses, reduced the DIP facility size, and began closing certain hospitals.  Given the FILO Lenders' position and unwillingness to advance negotiations or fund a value-maximizing process, it became clear to the Debtors that the FILO DIP Term Sheet was no longer actionable, and all parties thereto (including MPT, the FILO Lenders, and the Debtors) did not proceed with the proposal.

39.     Subsequently, the Debtors received a proposal from MPT for a junior postpetition financing.  The Debtors also received a priming DIP loan proposal from the ABL Lenders that was not intended to fund the entire cost of these chapter 11 cases, but rather serve as a short-term loan to bridge to a more comprehensive financing solution, yet contemplated rolling up all of the ABL Facility on a priming basis upon the initial draw, and included expensive terms as well as onerous milestones, covenants, and events of default.  On the other hand, the proposed DIP Facility from MPT contemplates up to $300 million of funding on a junior basis ($75 million of which is committed upon entry of the Interim Order) on more favorable economic terms with less restrictive covenants.  Recognizing that a junior postpetition financing from MPT was the Debtors' best alternative to achieve a value-maximizing restructuring, the Debtors advanced

discussions with MPT, and after arm's length and good-faith negotiations, the Debtors, in consultation with their advisors, ultimately determined that the DIP Facility was the best DIP financing alternative available to the Debtors.

**Terms of the DIP Facility Are Reasonable Under the Circumstances**

40.     The DIP Facility, taken as a whole, is reasonable under the facts and circumstances and is the Debtors' best option.   As set forth in the Cowan Declaration, the obligations, interest rate, fees, milestones, and other material terms under the DIP Facility are fair and reasonable under the circumstances, considering, among other things, the Debtors' other alternatives, the rates and fees of the Debtors' Prepetition Secured Obligations (including those secured by junior liens), the nature and extent of the collateral securing the DIP Facility, the relevant risks for the DIP Lender associated with lending on a junior basis in the postpetition financing context (both in general and in this case in particular), and market terms for companies facing similar situations.

**Junior DIP Financing and Use of Cash Collateral Should Be Approved**

41.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.   As set forth in the Cowan Declaration, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)–(b), 503(b)(1).  Having determined that postpetition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the DIP Lender to secure the DIP Facility on the terms described herein.

For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) and (d) for authority to enter into the Junior DIP Financing.

**A.      Entering Junior DIP Financing Is a Sound Exercise of Business Judgment**

42.      If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See, e.g.*, *In re Estrada*, No. 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basis business judgment consistent with their fiduciary duties."); *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

43.      The Fifth Circuit has described the business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification and the decision furthers the interests of the Debtor and other parties in interest. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the Bankruptcy Code); *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (same).   Courts

generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor.  *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.   Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 882-84 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

44.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, and after careful evaluation of alternatives.  Given the nature of the Debtors' prepetition capital structure and absence of unencumbered assets, the DIP Lender surfaced as the best financing source that could commit to a facility, and enable the Debtors to stabilize their operations at the outset of these chapter 11 cases (which no lender solicited was willing to support).  The Debtors negotiated the DIP Term Sheet with the DIP Lender in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of these chapter 11 cases, pursue their value-maximizing sale strategy, and ensure continued patient care.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.     Debtors Should Be Authorized to Obtain DIP Facility on a Secured and Superpriority Basis**

45.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

46.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, Courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40.  However, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986).

47.     First, as stated above, the Debtors contacted nine (9) potential third-party lenders to seek proposals for postpetition financing, which parties signed non-disclosure

agreements and conducted diligence; however, no party was willing to extend the Debtors financing on an administrative expense or unsecured basis. The Court should, therefore, authorize the Debtors to provide the DIP Lender with (i) superpriority administrative expense status for any DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code, (ii) a valid, binding, continuing, enforceable and fully-perfected first priority senior security interest in and lien on the Debtors' unencumbered property pursuant to section 364(c)(2) of the Bankruptcy Code (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**") but including, following entry of the Final Order, the proceeds of Avoidance Actions), and (iii) junior liens on all property subject to valid, perfected and non-avoidable liens in existence as of the Petition Date or perfected subsequent to the Petition Date, as permitted by Section 546(b) of the Bankruptcy Code, pursuant to section 364(c)(3) of the Bankruptcy Code.

48.     Second, the DIP Facility is necessary to preserve the Debtors' estates. The Debtors require access to the DIP Facility to ensure they have sufficient liquidity to operate their hospitals and other operations and administer their estates in the ordinary course during these chapter 11 cases. The Debtors currently have limited cash on hand, and without access to the DIP Facility, the Debtors operating cash flow is not sufficient to fund ongoing operations and expenses, including administrative costs associated with these chapter 11 cases.

49.     Third, the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances. As stated, the DIP Facility represents the most favorable source of DIP financing and is designed to provide the Debtors with sufficient liquidity to prosecute their sale and restructuring process and these chapter 11 cases.

**C.** **Debtors Should Be Authorized to Obtain Postpetition Financing by Liens *Pari Passu* to the Liens Securing the Prepetition MPT Obligations**

50.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected. *See* 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d). "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien.'" *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11 (quoting *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992)). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

51.     Here, the Debtors do not seek authority to prime any liens held by the Prepetition Secured Parties. Instead, the Junior DIP Financing will be secured by liens that are junior to the liens held by the ABL Lenders, the FILO Lenders, and the Bridge Lenders and equal with the liens held by the Prepetition MPT Secured Party on certain collateral. The Prepetition

MPT Secured Party (i.e., the DIP Lender) has consented to such equal priority in connection with providing the DIP Facility.  Accordingly, the Debtors should be authorized to obtain postpetition financing secured by liens as set forth above.

**D.      Use of Cash Collateral is Warranted and Should Be Approved**

52.      As set forth above, the Debtors require use of Cash Collateral to stabilize their operations, ensure continued patient care, and satisfy working capital obligations.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

53.      A bankruptcy court should, whenever possible, resolve issues in ways that allow a debtor to continue its business as a going concern.  Courts have recognized that "[a] debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to rebuild. Without the availability of cash to meet daily operating expenses . . . the congressional policy favoring rehabilitation over economic failure would be frustrated." *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and

possible misuse of economic resources."); *In re MFM Delaware, Inc.*, No. 13-11359 (PJW), 2013 WL 2434211, at *2 (Bankr. D. Del. May 28, 2013) ("The Debtors' need to use cash collateral on an interim basis . . . is immediate and critical to enable the Debtors to continue operations and to administer and preserve the value of their estates.").

54.    Here, the Debtors require immediate access to liquidity in these chapter 11 cases to, among other things, stabilize their operations (including their hospital operations), continue delivering critical patient care, maintain business relationships with affiliated physician networks, vendors, suppliers and payors, make payroll to approximately 30,000 employees (including but not limited to primary care providers, physicians, nurses, and other critical hospital staff), satisfy other working capital and operational needs, and fund the expenses of these chapter 11 cases.  In the context of the size and scope of their operation, the Debtors have *de minimis* cash on hand as of the Petition Date (approximately $12.8 million), all of which is subject to liens and thus constitutes Cash Collateral.  As a result, in addition to the debtor-in-possession financing, the Debtors require immediate use of Cash Collateral to fund and stabilize their operations, including to pay wages to tens of thousands of employees (including physicians and other medical personnel) and make payments to vendors and suppliers who provide critical goods and services that are necessary for the Debtors to operate their hospitals and other health care facilities as well as their physician practices.  Without immediate access to the Cash Collateral, the Debtors will lose their ability to stabilize their operations, retain employees, and pay for critical supplies and services, creating a far-reaching and adverse impact not only on the Debtors' operations but also the Debtors' patients and communities at large.

55.    In addition, as further described in the First Day Declaration, the Debtors are pursuing a value-maximizing sale process for their assets, including Stewardship Health, the

Debtors' highly valued managed-care business, and their hospital portfolio. Prior to the Petition Date, the Debtors received multiple indications of interests for their hospital assets and have executed a letter of intent for the sale of Stewardship Health to an affiliate of UnitedHealth Group ("**United**") and are working towards a stalking horse purchase agreement with United. Stabilizing the Debtors' operations with the use of Cash Collateral is critical to preserving the Debtors' going concern value, and monetizing such value in the Debtors' sale process for the benefit of all of the Debtors' stakeholders, including the ABL Lenders and FILO Lenders. Without immediate access to Cash Collateral to stabilize and continue the Debtors' operations in the ordinary course, the parties that have expressed interest in the Debtors' assets will almost certainly discontinue discussions with the Debtors. In fact, absent authority to use Cash Collateral, the Debtors would face a likely liquidation, which will (i) eliminate value, (ii) deprive millions of patients of access to the Debtors' healthcare services, and (iii) result in the loss of tens of thousands of jobs as well as critical healthcare facilities for dozens of communities across the United States.

56.     Accordingly, the Debtors require access to both the DIP Facility and Cash Collateral to ensure that they are able to operate their health care facilities during these chapter 11 cases, continue delivering patient care, and preserve the value of their estates for the benefit of all parties in interest. The commitment of the DIP Facility in combination with the use of Cash Collateral assures the Debtors' stakeholders, including patients and regulators, that the Debtors' operations are stable and that the Debtors are entering these chapter 11 cases with liquidity and financial flexibility to continue their operations as a going concern, and that the Debtors have the ability to run sale and restructuring processes that will maximize value, and the Debtors' hospitals and health care providers can continue to serve the Debtors' patients and the communities in which they are located.

E.      **Prepetition Secured Parties are Adequately Protected**

57.     Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Further, section 362(d)(1) provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See* 11 U.S.C. § 362(d)(1).

58.     The Bankruptcy Code does not expressly define "adequate protection" or proscribe a particular form that it must take; what constitutes adequate protection must be decided on a case-by-case basis.  *See, e.g.*, *In re Las Torres Dev. LLC*, 413 B.R. 687, 696–97 (Bankr. S.D. Tex. 2009) (noting that the "Fifth Circuit has aptly noted that the Code contains no specific, definitive definition of adequate protection"); *Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1286 (5th Cir. 1986) (adequate protection is determined by "circumstances of the case"); *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396–97 (10th Cir. 1987) (adequate protection is to be "is to be decided flexibly on the proverbial 'case-by-case' basis"); *Martin v. United States (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985) (same); *see also* 11 U.S.C. § 361 (providing a non-exhaustive list of examples of adequate protection, including (i) a lump sum or periodic cash payments; (ii) replacement liens; and (iii) administrative priority claims).

59.     The purpose of adequate protection is to "protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the stay."  *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1389 (5th. Cir. 1986); *see also In re Geijsel*, 480 B.R. 238, 265 & n.19 (Bankr. N.D. Tex. 2012) ("The purpose of adequate protection payments is to adequately protect creditors from the diminution of value in a creditor's

collateral."); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012 (same); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988).

60.     Thus, to justify the provision of adequate protection, a secured creditor must assert that the applicable collateral is subject to an actual diminution in value following the petition date.  However, where a debtor pursues a going concern sale, the key inquiry to determine whether there has been any diminution in the value of the collateral is to compare it to the value of the collateral under liquidation.  *See ESL Invs., L.P. v. Sears Holdings Corp. Debtor-Appellee (In re Sears Holdings Corp.*), 51 F.4th 53, 61 (2d Cir. 2022) (holding that secured creditors had not experienced any diminution in value where the debtors pursued a going concern sale, as such valuation was compared to what would have been obtained in a liquidation).  Without a showing of diminution of value, a secured creditor cannot assert its entitlement to adequate protection.

61.     As an initial matter, MPT (including in its capacity as a Bridge Lender) has consented to the use of Cash Collateral in connection with providing the DIP Facility and, therefore, the Debtors need not demonstrate that their interests are adequately protected.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

62.     As for the ABL Lenders and FILO Lenders, their collateral is not expected to experience any diminution in value in the Interim Period.  If the Debtors were to commence wind-down procedures immediately, they would incur substantial shut-down costs and impairment

to accounts receivables, all of which are avoided by pursuing the Debtors' going concern sale process.  These avoided costs would, on a net basis, considering asset values, be substantially more than the funds disbursed under the DIP Budget in connection with the sale process on a net basis considering asset values alone.  Moreover, under section 506(c) of the Bankruptcy Code, the wind-down costs could be surcharged against the Prepetition Secured Lenders as "reasonable, necessary costs and expenses of preserving, or disposing of" their collateral.  *See* 11 U.S.C. § 506(c); *see also Sw. Sec., FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 701 (5th Cir. 2015) (affirming a decision of the bankruptcy court surcharging a secured creditor for the cost of preserving the creditor's collateral before the property was abandoned).  Accordingly, the ABL Lenders and the FILO Lenders are not entitled to adequate protection because their collateral will not suffer any diminution in value.  Indeed, if the Debtors were forced to liquidate, the Prepetition Secured Lenders likely would foot the bill for disposing of their collateral.  ,

63.     Nonetheless, the Debtors have offered an attractive adequate protection package that includes adequate protection payments (including payment of PIK interest and professional fees) and adequate protection liens and claims, and the Debtors are in an active dialogue with the agent to the ABL Lenders and FILO Lenders regarding adequate protection.[28] But as set forth below, even without the adequate protection package offered by the Debtors, the ABL Lenders' and FILO Lenders' interests are already adequately protected because (i) both groups of lenders are oversecured and benefit from a substantial equity cushion from the diminution in value of such lenders' collateral, if any, and (ii) the use of Cash Collateral is necessary to preserve the Debtors' going concern and maximize value of such lenders' collateral,

---

[28]     To the extent that the Debtors are able to reach an agreement with the ABL Lenders, including the Administrative Agent, with respect to the use of Cash Collateral, the Debtors submit that under the Prepetition Intercreditor Agreement and Agreement Among Lenders, the FILO Lenders will be deemed to consent to the use of Cash Collateral as well.

while the alternative would be a value-destructive liquidation, which case law has established also serves as adequate protection.

        a.        **The ABL Lenders and FILO Lenders Are Adequately Protected by a Substantial Equity Cushion**

64.      The ABL Lenders and FILO Lenders (including in their capacity as the Bridge Lenders) are adequately protected by a substantial equity cushion.  Courts consistently hold that a 20% equity cushion, without anything more, constitutes adequate protection of a secured creditor's interest.  *See*, *e.g.*, *R&J Contractor Services, LLC v. Vancamp*, 652 B.R. 237, 244 (Bankr. D. Md. 2023) (collecting cases and stating that a 20% equity cushion is sufficient); *In re Las Torres Dev., LLC*, 413 B.R. at 697 (stating that "case law is clear that an equity cushion of 20% or more constitutes adequate protection"); *In re Knight Energy Corp.*, Nos. 09–32163–11, 09–32165–11, 2009 WL 1851739, at *3 (Bankr. N.D. Tex. June 26, 2009) (applying the 20% equity cushion test to determine the sufficiency of adequate protection); *see also In re Mendoza*, 111 F.3d 1264, 1272 (5th Cir. 1997) (Justice, J., concurring in part) (stating that courts generally hold that an equity cushion of 20% constitutes adequate protection).

65.      As of the Petition Date, the total amount of obligations owed under the ABL/FILO Facility and the Bridge Facility (in the aggregate) is approximately $882.3 million (including approximately $137.3 million of which is owed to MPT under the Bridge Facility).[29] The collateral securing the ABL/FILO Facility and the Bridge Facility includes, among other things, (i) accounts, account receivables and health-care insurance receivables (subject to certain exceptions), (ii) inventories and goods ((i) and (ii) together, the "**Current Assets**"), and (iii) the Debtors' assets related to the Stewardship Health business.

---

[29] This amount includes a $127.5 million MOIC for the Bridge Facility.

66.     As of the Petition Date, the Debtors have various accounts, account receivables, health-care insurance receivables, inventories, and goods eligible for the borrowing base under the Prepetition ABL/FILO Credit Agreement (collectively, the "**Borrowing Base Assets**") that are worth approximately $456 million.  In addition to the Borrowing Base Assets, the Current Assets also include proceeds from certain real property sales, receivables that are aged over 180 days, collections on receivables from self-pay patients, and the value of the Debtors' fixtures, furniture, and equipment (the "**Non-Borrowing Base Assets**").  The Non-Borrowing Base Assets, although not included in the contractual borrowing base calculation in the Prepetition ABL/FILO Credit Agreement, is worth, in the aggregate, approximately $468 million.  Therefore, as of the Petition Date, the Current Assets are worth, in the aggregate, approximately $924 million. Accordingly, based on the value of the Current Assets alone, the ABL and FILO Lenders have an equity cushion of approximately $47 million, without even accounting for (i) any value for Stewardship Health and the Debtors' hospitals, which are the Debtors' core assets, or (ii) the Debtors' ability to surcharge such collateral under section 506(c) of the Bankruptcy Code.

67.     Further, the prepetition marketing process for Stewardship Health and the Debtors' hospitals and the indications of interests received for those assets to date suggest that significant proceeds will be derived from the Debtors' sale process, which when combined with the Current Assets, is well in excess of the 20% threshold that courts have consistently held sufficiently protects the value of collateral securing pre-petition debt.

68.     Moreover, the Debtors do not expect the prepetition lenders' collateral to experience any diminution in value following the commencement of these chapter 11 cases.  As set forth in the Castellano Declaration, access to the DIP Facility and Cash Collateral will allow the Debtors to stabilize their operations and generate additional revenue.  As reflected in the DIP

Budget, the value of the Accounts Receivable will be relatively flat in book value over the 30 days following the Petition Date.

69.     Accordingly, the Prepetition Secured Parties' interests are adequately protected against the Debtors' proposed use of Cash Collateral by a substantial equity cushion.

**b.     Use of Cash Collateral is Necessary to Preserve Going Concern Value and Maximizes Value for All Stakeholders**

70.     In addition to the substantial equity cushion, the Prepetition Secured Lenders are also adequately protected because the proposed use of Cash Collateral will maximize the value of the Debtors' assets, including the Prepetition Secured Parties' collateral.  Courts have consistently held that preservation of a debtor's going-concern value serves as adequate protection to nonconsenting lenders when a lack of access to financing and cash collateral would cause substantial loss, "not only to the going concern value of the debtors, but to the collateral of all the secured creditors."  *See* Hr'g Tr. 131–32, *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 3, 2015) (Docket No. 245); *see also, e.g.*, *In re Borden Dairy Company*, 20-10010-CSS, Dkt. No. 73 (Bankr. D. Del. Jan. 10, 2020) (over the objections of secured lenders, court granting debtors' use of cash collateral in order to continue operating as a going concern and, if production stopped, irreparable harm would inure to the entire company; however, court conditioned relief on lenders being provided with adequate protection in the form of a replacement lien); *In re Hubbard Power & Light*, 202 B.R. 680, 684-85 (Bankr. E.D.N.Y. 1996) (holding that secured creditor were adequately protected for priming loan by anticipated increase in value of the debtor's property due to use of loan proceeds, by comparing value of debtor's primary asset prior to use of loan proceeds for clean up versus value following clean up and resumption of debtor's business operations); *In re 495 Cent. Park Ave.*, 136 B.R. at 631-32 ("[t]o determine whether [a secured creditor] is adequately protected, the court must consider whether the value of the debtor's

property will increase as a result of the renovations funded by the proposed financing."); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used for reasonable and necessary operating expenses of the collateral); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) ("[creditors'] secured position can only be enhanced by the continued operation of the [debtors.]"); *In re Aqua Assocs.*, 123 B.R. at 192, 198-99 (Bankr. E.D. Pa. 1982) (holding secured creditor adequately protected for priming loan based on small equity cushion and increase in going concern value versus liquidation value).

71.     In the context of a debtor selling its assets, courts have found prepetition lenders are adequately protected, even without an equity cushion, when access to a DIP facility would provide the debtor with additional liquidity to pursue a value-maximizing sale process and thereby preserve the debtor's going-concern value and satisfy the claims of prepetition lenders. Hr'g Tr. 15–18, *In re Aeropostale, Inc.*, No. 16-11275 (CSS), (Bankr. S.D.N.Y. May 5, 2016) (Docket No. 113) (finding that secured lenders were adequately protected where liquidity was anticipated to increase slightly, allowing the debtors to pursue a sale of their assets, as opposed to forcing an immediate liquidation); *see also In re Yellowstone Mtn. Club, LLC*, No. 08-61570, 2008 WL 5875547 at *9, *17 (Bankr. D. Mont. Dec. 17, 2008) (considering adequate protection in terms of "maintain[ing] the debtors' going concern value" and finding that a postpetition financing would provide a "net economic benefit" because it would be used to finance operation of the debtor's business rather than allowing it to "go dark" while it pursued a sale).

72.     The use of Cash Collateral is necessary to preserve the Debtors' estates and allow the Debtors to maximize the value of their assets.  As mentioned above, the Debtors made substantial progress in their marketing process prior to the Petition Date and expect to realize

significant proceeds.   However, the Debtors will only be able to consummate these value-maximizing transactions if they are able to use the Cash Collateral.   Without access to Cash Collateral, the Debtors will be unable to continue operating the businesses and will be forced to liquidate immediately, resulting in the value of their assets (including the Prepetition Secured Lenders' collateral) being destroyed, tens of thousands of jobs being lost, and dozens of communities being left without critical healthcare facilities.

73.     The DIP Facility and the associated use of Cash Collateral is the best option available to the Debtors to fund these chapter 11 cases, and the only option with reasonable terms. Although the FILO Lenders executed the FILO DIP Term Sheet, when it came time to negotiate definitive documentation, the FILO Lenders proposed a different financing construct, one that would have required a truncated sale process, the Debtors being unable to have sufficient funding for critical expenditures, and the Debtors being required to start the process of closing certain hospitals.  On the other hand, the DIP Facility offered by MPT in combination with the use of Cash Collateral preserves the Debtors' going concern value for the benefit of all stakeholders, including the Prepetition Secured Lenders.   Accordingly, the Debtors' use of Cash Collateral is reasonable, appropriate, and permissible under the Bankruptcy Code.

**F.     The DIP Roll-Up Should Be Approved upon Entry of the Final Order**

74.     As noted above, the DIP Facility provides for a roll-up of approximately $82.5 million of obligations under the Debtors' Prepetition Stewardship Note, and only upon entry of the Final Order.  The Debtors respectfully submit that the proposed DIP Roll-Up is fair and appropriate under the circumstances of these chapter 11 cases and generally consistent with other market precedent.  The DIP Roll-Up is a material component of the structure of the DIP Facility required by the DIP Lender as a condition to its commitment to provide postpetition financing and their consent to the Debtors' use of Cash Collateral.   Indeed, no lender offered the Debtors

postpetition financing without a roll-up component and only the DIP Lender offered a non-priming roll-up.

75.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "Doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

76.     Roll-ups of prepetition debt are a common feature in debtor-in-possession financing where, as here, they are necessary to induce prospective postpetition lenders to advance debtor-in-possession financing.  The ratio of DIP Roll-Up Loans to the New Money DIP Loans (approximately 1.10:1.00 on the $75 million committed amount) is far more advantageous to the Debtors when compared with ratios that have been approved in other cases..  *See, e.g.*, *In re Noble House Home Furnishings LLC*, No. 23-90773 (CML) (Bankr. S.D. Tex. Oct. 4, 2023) (Docket No. 130) (approving a roll-up with a 5.8:1 ratio); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023) (Docket No. 323) (approving a roll-up with a 3:1 ratio); *In re*

*MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. June 13, 2023) (Docket No. 434) (approving a roll-up with a 4.3:1 ratio); *In re Mountain Express Oil Co.*, No. 23-90147 (DRJ) (Bankr. S.D. Tex. April 25, 2023) (Docket No. 332) (approving a roll-up with a 4.5:1 ratio); *In re Amerimark Interactive, LLC*, No. 23-10438 (TMH) (Bankr. D. Del. April 13, 2023) (Docket No. 52) (approving a roll-up with a 3:1 ratio); *In re Phoenix Services Topco LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) (Docket No. 73) (same).

77.     Here, the proposed DIP Roll-Up is justified under the circumstances.  The DIP Roll-Up is a material component of the structure of the DIP Facility required by the DIP Lender as a condition to its commitment to provide postpetition financing and their consent to the Debtors' use of Cash Collateral.  The Debtors and the DIP Lender engaged in arm's length negotiations and ultimately agreed to the DIP Roll-Up as consideration for, among other things, the Debtors' continued use of Cash Collateral and the extension of additional funding through the DIP Facility (including $75 million of commitments upon entry of the Interim Order).  Without the additional protections and compensation offered by the DIP Roll-Up, the DIP Lender would not have provided the DIP Facility.  The Debtors request this urgent funding for the benefit of all stakeholders.

### G.     Debtors Should Be Authorized to Pay Interest and Other Amounts Required by DIP Documents

78.     As described herein, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Lender as a condition to providing financing.  As set forth in the Cowan Declaration, taken as a whole, the terms of the DIP Documents, including the fees imposed thereunder, are market and reasonable under the facts and circumstances and are the Debtors' best available option to maintain their ongoing business operations and to fund their chapter 11 cases.  Accordingly, authorization to pay the fees is warranted.

**H.      The Carve-Out Is Appropriate**

79.      The DIP Facility subjects the DIP Lender's security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve-Out (as defined in the Interim Order).  Without the Carve-Out, the Debtors' estates or other parties in interest could be harmed because the services professionals might otherwise provide in these chapter 11 cases could be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on Carve-Outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced"). Additionally, the Carve-Out protects against the prospect of administrative insolvency during the pendency of the chapter 11 cases by ensuring that assets are available to pay U.S. Trustee fees and professional fees of the Debtors and any statutory committee.  Accordingly, the Debtors submit that the Carve-Out is reasonable and appropriate under the circumstances.

**I.      DIP Lender Should Be Deemed Good Faith Lender under Section 364(e)**

80.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights with respect to liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

81.     As explained herein and in the Cowan Declaration, negotiations of the DIP Facility were conducted in good faith and at arm's length.  The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and therefore entitled to all of the protections afforded by that section.

**J.     Modification of Automatic Stay Is Warranted**

82.     The relief requested herein contemplates a modification of the Automatic Stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (b) permit the DIP Secured Party to exercise rights and remedies under certain circumstances.  These provisions were part of the quid pro quo for the Debtors' ability to obtain the DIP Facility and use Cash Collateral as provided therein and in the Interim Order.  Moreover, following an event of default under the DIP Documents and the delivery of Termination Notice (as defined in the DIP Documents), but prior to exercising certain remedies, the DIP Secured Party is required to file a stay relief motion seeking emergency relief from the automatic stay.  Until the stay relief motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Facility to the extent drawn prior to the occurrence of an event of default and Cash Collateral to fund operations in accordance with the DIP Budget and the terms of the DIP Documents.  Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order are reasonable and should be approved.

83.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Diamond Sports Group, LLC*, No. 23-90116 (CL) (Bankr. S.D. Tex. February 26, 2024) (Docket No. 1834) (modifying

automatic stay as necessary to effectuate the terms of the order); *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex. November 14, 2023) (Docket No. 225) (same); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023) (Docket No. 323) (same); *In re Instant Brands Acquisition Holdings Inc.*, No. 23-90715 (DRJ) (Bankr. S.D. Tex. July 13, 2023) (Docket No. 257) (same).

**K.      Debtors Require Immediate Access to Cash Collateral and DIP Facility**

84.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See In re Ames Dep't Stores*, 115 B.R. at 36.

85.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly.  The Debtors have an immediate need to access the DIP Facility and for continued access to Cash Collateral, and any inability to do so would put patients at risk and destroy the value of the Debtors' estates by preventing them from being able to make disbursements necessary to operate in the ordinary course.  Access to the DIP Facility and Cash Collateral would provide assurances to patients, regulators, employees, vendors, and other stakeholders that the Debtors have the financial wherewithal to continue operating during the pendency of these chapter 11 cases.  Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avoid value-destruction that would lead to immediate and irreparable harm to the Debtors' estates.

**L.**     **Cause Exists to Authorize the Banks to Honor Checks and Electronic Fund Transfers**

86.     The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to DIP Facility obligations, to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment. The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of the DIP financing obligations dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

**M.**     **Request for Final Hearing**

87.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order. The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

**Debtors Have Satisfied Bankruptcy Rule 6003(b)**

88.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first twenty-one (21) days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm. As described herein, and in the First Day Declaration, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11. Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**Debtors' Compliance with**
**Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

89.     To implement the foregoing successfully, the Debtors request that the Court

find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances,

and waive the 14-day stay of an order authorizing the use, sale, or lease of property under

Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid

immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding

that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a

waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice

requirements and such stay apply.

## Reservation of Rights

90.     Nothing contained herein is intended to be or shall be deemed as (i) an

implication or admission as to the validity of any claim against the Debtors, (ii) a waiver or

limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or

validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the

Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of

any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a

waiver of any claims or causes of action which may exist against any creditor or interest holder,

(vii) an admission as to the validity of any liens satisfied pursuant to this Motion, or (viii) an

approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy

under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein,

any payment made pursuant to the Court's order is not intended to be and should not be construed

as an admission to the validity of any claim or a waiver of the Debtors' or any other party in

interest's rights to dispute such claim subsequently.

## <u>Notice</u>

91.    Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

[*Remainder of page intentionally left blank.*]

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  May 6, 2024
       Houston, Texas

                          */s/ Clifford W. Carlson*
                          WEIL, GOTSHAL & MANGES LLP
                          Gabriel A. Morgan (24125891)
                          Clifford W. Carlson (24090024)
                          Stephanie N. Morrison (24126930)
                          700 Louisiana Street, Suite 3700
                          Houston, Texas 77002
                          Telephone:  (713) 546-5000
                          Facsimile:  (713) 224-9511
                          Email:   Gabriel.Morgan@weil.com
                                   Clifford.Carlson@weil.com
                                   Stephanie.Morrison@weil.com

                          -and-

                          WEIL, GOTSHAL & MANGES LLP
                          Ray C. Schrock (*pro hac vice* pending)
                          Candace M. Arthur (*pro hac vice* pending)
                          David J. Cohen (*pro hac vice* pending)
                          767 Fifth Avenue
                          New York, New York 10153
                          Telephone:  (212) 310-8000
                          Facsimile:  (212) 310-8007
                          Email:   Ray.Schrock@weil.com
                                 Candace.Arthur@weil.com
                                 DavidJ.Cohen@weil.com

                          *Proposed Attorneys for Debtors*
                          *and Debtors in Possession*

## Certificate of Service

I hereby certify that on May 6, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' claims, noticing, and solicitation agent.


*/s/  Clifford W. Carlson*
*Clifford W. Carlson*