IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| STEWARD HEALTH CARE SYSTEM LLC, *et al.*, | § § § | Case No. 24-90213(CML) |
|  | § | (Jointly Administered) |
| Debtors.[1] | § § § |  |

<u>DECLARATION OF JOHN R. CASTELLANO IN SUPPORT
OF EMERGENCY MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN JUNIOR LIEN
POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT
LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS;
(II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION
SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF</u>

I, John R. Castellano, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Chief Restructuring Officer of each of the Debtors, including Steward Health Care Holdings LLC, a limited liability company organized under the laws of Delaware ("**SHC Holdings**" and, together with the above-captioned debtors and debtors in possession, collectively, the "**Debtors**" and, the Debtors together with the Debtors' direct and indirect non-debtor subsidiaries, the "**Company**" or "**Steward**"). Prior to becoming Chief Restructuring Officer, I advised the Company in my capacity as Managing Director at AlixPartners, LLP, an affiliate of AP Services, LLC (collectively, "**AlixPartners**") beginning in October 2023. In these capacities, I am familiar with the Debtors' day-to-day operations, books and records, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases.

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

2. I hold a bachelor's degree in Accounting from DePaul University and a master's degree in Management, Finance, and Strategy from the Kellogg School of Management at Northwestern University. I have over 28 years of financial restructuring and bankruptcy-related experience and over 25 years of experience with AlixPartners. I have served as a Managing Director in AlixPartners' Turnaround & Restructuring Group since 2007. Prior to joining AlixPartners, I worked at Ernst & Young LLP in its Assurance practice as an auditor, and in its Consulting practice focusing on restructuring advisory services. I have served as Chief Restructuring Officer (or in an equivalent role) in numerous large-scale corporate restructurings, including: *In re Aearo Technologies LLC*, No. 22-02890 (JJG) (Bankr. S.D. Ind. 2022); *In re Footprint Power Salem Harbor Development LP*, No. 22-10239 (MFW) (Bankr. D. Del. 2022); *In re Alpha Latam Management, LLC*, No. 21-11109 (JKS) (Bankr. D. Del. 2021); *In re Lonestar Resources US Inc.*, No. 20-34805 (DRJ) (Bankr. S.D. Tex. 2020); *In re McDermott International, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. 2020); and *In re Aegerion Pharmaceuticals, Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. 2019).

3. AlixPartners specializes in designing and implementing business turnarounds, assisting companies with the administration of the bankruptcy process, and providing interim crisis management, among other things. AlixPartners provides these services for companies throughout the financial services industries and has an intimate understanding of the economic, regulatory, operational, strategic, and financial factors that drive these businesses. AlixPartners' prior experience includes a range of activities and services targeted at restructuring, stabilizing, and improving a company's financial position. These services have historically included: (i) providing executive leadership to financially distressed companies; (ii) developing or validating forecasts, business plans, and related assessments of a business's strategic position; (iii) monitoring and managing cash, cash flow, and supplier

relationships; (iv) assessing and recommending cost reduction strategies; and (v) designing and negotiating financial restructuring packages.

4. Except as otherwise indicated, the facts set forth in this declaration (this "**Declaration**") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Company's operations and financial condition, my own reasonable inquiry, and/or my discussions with the Company's other officers, directors, and restructuring advisors, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), restructuring investment banker Lazard Frères & Co. LLC ("**Lazard**"), Stewardship Health and Northern Massachusetts and Florida hospitals investment banker Leerink Partners LLC ("**Leerink**"), hospital banker Cain Brothers ("**Cain**"), and AlixPartners (collectively, the "**Advisors**"). I am over the age of 18 and I am authorized to submit this Declaration on behalf of the Debtors. If called to testify, I would testify competently to the facts set forth in this Declaration.

5. On May 6, 2024 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"). I submit this Declaration in further support of the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final*

3

*Hearing; and (V) Granting Related Relief* (the "**DIP Motion**"), filed contemporaneously herewith.[2]

**Debtors' Immediate Need for Junior DIP Financing and Use of Cash Collateral**

6. As described in more detail in my First Day Declaration (filed contemporaneously herewith), the Debtors require immediate access to liquidity in these chapter 11 cases to, among other things, stabilize their operations (including their hospital operations), continue delivering critical patient care, maintain business relationships with affiliated physician networks, vendors, suppliers and payors, make payroll to approximately 30,000 employees (including but not limited to primary care providers, physicians, nurses, and other critical hospital staff), satisfy other working capital and operational needs, and fund the expenses of these chapter 11 cases. The Debtors have *de minimis* cash on hand as of the Petition Date (approximately $12.8 million), all of which is subject to liens and thus constitutes Cash Collateral. As a result, in addition to the Junior DIP Financing, the Debtors require immediate use of Cash Collateral to fund and stabilize their operations, including to pay wages to tens of thousands of employees (including physicians and other medical personnel) and make payments to vendors and suppliers who provide critical goods and services that are necessary for the Debtors to operate their hospitals, other healthcare facilities and their managed care program. Without immediate access to the Cash Collateral, the Debtors will lose their ability to stabilize their operations, retain employees, and pay for critical supplies and services, creating a far-reaching and adverse impact not only on the Debtors' businesses but also the Debtors' patients and communities at large.

7. Also, as further described in the First Day Declaration, the Debtors are pursuing a value-maximizing sale process for their assets, including Stewardship Health, the Debtors' highly valued managed-care business, and their hospital portfolio. Prior to the

---

[2] Capitalized terms used but not defined herein shall have the meanings assigned to them in the Motion.

Petition Date, the Debtors received multiple indications of interests for their hospital assets and have executed a letter of intent for the sale of Stewardship Health to an affiliate of UnitedHealth Group. Stabilizing the Debtors' operation with the use of Cash Collateral is critical to preserving the Debtors' going concern value, and monetizing and maximizing such value through the Debtors' sale process for the benefit of all of the Debtors' stakeholders. Without immediate access to Cash Collateral to stabilize and continue the Debtors' operations in the ordinary course, the parties that have expressed interest in the Debtors' assets will likely discontinue discussions with the Debtors. In fact, absent authority to use Cash Collateral, the Debtors would face a likely liquidation, which would (i) destroy value, (ii) deprive millions of patients of access to the Debtors' healthcare services, and (iii) result in the loss of tens of thousands of jobs as well as critical healthcare facilities for dozens of communities across the United States.

8. Accordingly, the Debtors require access to both the DIP Facility and Cash Collateral to ensure that they are able to continue operating during these chapter 11 cases, continue delivering patient care, and preserve the value of their estates for the benefit of all parties in interest. The commitment of the DIP Facility in combination with the use of Cash Collateral, and the approval thereof, assures the Debtors' stakeholders that the Debtors' operations are stable and that the Debtors are entering these chapter 11 cases with sufficient liquidity and financial flexibility to continue their operations as a viable going concern, and have the ability to run sale processes that will maximize value, and ensure that the Debtors' hospitals and providers can continue to serve the Debtors' patients and the communities in which they are located.

9. Further, without the Debtors' access to Cash Collateral, it is likely the sales processes the Debtors are currently conducting would effectively become forced liquidation sales where potential buyers would consider the sales process as an opportunity to

acquire assets at substantially less than fair value. Without the ability to continue their operations, there would be a significant diminution in the value of the Debtors' assets as well as reputational harm. Forcing a rushed sales process would vastly undercut the true value of the Debtors' assets, and minimize the potential recovery for the Debtors' estates and creditors.

10. Authority to use Cash Collateral and entry into the DIP Facility will provide the Debtors with the necessary funds to operate their enterprise and continue paying their obligations as they come due. Prior to the Petition Date, the Debtors, in consultation with their advisors, reviewed and analyzed the Debtors' projected cash needs and prepared the DIP Budget. The DIP Budget illustrates the Debtor's cash flow and funding requirements over the next 13 week period. Further, the Debtors and their advisors continued to update the DIP Budget leading up to the Petition Date to account for changes in the Debtors' funding needs resulting from, among other things, the estimated timing of the commencement of these chapter 11 cases. The DIP Budget reflects the Debtors' need for Junior DIP Financing and access to Cash Collateral to adequately fund the next 13 week period.

11. Attached hereto as **Exhibit A** is a copy of the DIP Budget. The Debtors' DIP Budget shows that, in addition to Cash Collateral, the Debtors will need $75 million over the next 30 days (the "**Interim Period**")) and therefore need access to both Cash Collateral and the DIP Facility to fund their operations and administer these chapter 11 cases. The DIP Budget projects the Debtors' funding requirements over the identified period. The DIP Facility provides for $75 million of committed financing available (i) $40 million upon entry of the Interim DIP Order, (ii) $20 million on May 24, 2024, and (iii) $15 million on May 31, 2024.

**The ABL Lenders and the FILO Lenders Are Adequately Protected By a Substantial Equity Cushion**

12. As of the Petition Date, the total amount of obligations owed under the ABL/FILO Facility and the Bridge Facility (in the aggregate) is approximately $882.3 million

6

(including approximately $137.3 million of which is owed to MPT under the Bridge Facility).[3] The collateral securing the ABL/FILO Facility, and the Bridge Facility includes, among other things, (i) accounts, account receivables and health-care insurance receivables (subject to certain exceptions) ("**Accounts Receivable**"), (ii) inventories and goods ((i) and (ii) together, the "**Current Assets**"), and (iii) the assets related to the Stewardship Health. Attached hereto as **Exhibit B** is summary of the Current Assets.

13. As of the Petition Date, the Debtors have various accounts, account receivables, health-care insurance receivables, inventories, and goods eligible for the borrowing base under the ABL/FILO Credit Agreement (collectively, the "**Borrowing Base Assets**") that are worth approximately $456 million.

14. In addition to the Borrowing Base Assets, the Current Assets also includes receivables and other assets, including certain other pledged collateral (including proceeds of excess property sales), that are not included in the borrowing base (the "**Non-Borrowing Base Assets**"). In addition to the proceeds from excess property sales, the Non-Borrowing Base Assets also includes the Debtors' collections on receivables that are aged over 180 days, collections on receivables from self-pay patients (e.g., not insurance payments), and the value of the Debtors' FF&E. The Non-Borrowing Base Assets, although ineligible for the borrowing base, is worth, in the aggregate, approximately $468 million. Therefore, as of the Petition Date, the Current Assets are worth, in the aggregate, approximately $924 million. Accordingly, the ABL and FILO Lenders have an equity cushion based on the Current Assets alone that is approximately $47 million, without even accounting for any value for Stewardship Health and the Debtors' hospitals, which are the Debtors' core assets.

---

[3] This amount includes a $127.5 million MOIC for the Bridge Facility.

15. If the Debtors were to commence wind down proceedings immediately, they would incur substantial shutdown costs and impairment to collections of their accounts and receivables, all of which would be avoided by having access to Cash Collateral and the DIP Facility. These avoided costs would be substantially more than the funds necessary to maintain the Debtor's collateral. On this basis alone I believe the ABL and FILO Lenders are adequately protected and will not suffer diminution in value before a final hearing on the Junior DIP Financing.

16. Moreover, I do not expect the Prepetition Secured Lenders' collateral to experience any diminution in value during the Interim Period. Access to the DIP Facility and Cash Collateral will allow the Debtors to stabilize their operations and generate additional revenue. As reflected in the DIP Budget, I believe the value of the Accounts Receivable will in fact be relatively flat in book value over the 30 days following the Petition Date.

17. Further, based on the prepetition marketing process for Stewardship Health and the Debtors' hospitals, I believe those assets have significant value. Accordingly, as of the Petition Date, I believe the collateral and other asset value exceeds the amounts owed to ABL Lenders and FILO Lenders by an equity cushion that is in excess of 20% and such equity cushion will not diminish during the Interim Period, and therefore the value of the ABL Lenders and FILO Lenders' collateral is protected as of the Petition Date.

### Use of Cash Collateral is Necessary to Preserve Going Concern Value and Maximizes Value for All Stakeholders

18. Use of Cash Collateral is necessary to preserve the Debtors' going concern and maximize value of the Debtors' assets, including the Prepetition Secured Parties' collateral. As set forth in the First Day Declaration, the Debtors have already executed a letter of intent for the Stewardship Health and are working towards a stalking horse asset purchase agreement. The Debtors also have received multiple indications of interest to purchase various hospital assets. The indications of interests for Stewardship Health and the hospital assets

8

suggest that significant proceeds will be derived from the Debtors' sale process, which when combined with the Current Assets, is well in excess of the 20% threshold that courts have consistently held sufficiently protects the value of collateral securing pre-petition debt. If the Debtors are not allowed to use Cash Collateral, I believe the value to be derived from the Debtors' sale process will not come to fruition, resulting in substantial harm to the Debtors' estates. Accordingly, I believe the Prepetition Secured Parties' interests are sufficiently protected because use of their Cash Collateral is necessary to preserve the Debtors' going concern value for the benefit of the lenders.

## Conclusion

19. Based on my experience and participation in the Debtors' day-to-day operations over the last 6 months, it is apparent that access to the DIP Facility and use of Cash Collateral, including during the Interim Period, is a critical to the prosecution of the Debtors' chapter 11 cases and the sale process, and provides the necessary liquidity for the Debtors to maintain operations in the ordinary course. Further, I believe allowing the Debtors access to Cash Collateral is in the best interests of the Debtors and their estates as it will enable the Debtors to facilitate their going-concern sale process that will maximize value for all stakeholders. Moreover, as set forth above, I believe the Prepetition Secured Parties' interests are adequately protected.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 6, 2024  /s/ John R. Castellano
New York, New York  John R. Castellano
Chief Restructuring Officer
Steward Health Care Systems LLC