*EXECUTION VERSION*

CREDIT AGREEMENT

dated as of

February 21, 2024

among

STEWARD HEALTH CARE NETWORK, INC.,
STEWARD EMERGENCY PHYSICIANS, INC.,
STEWARD PHYSICIAN CONTRACTING, INC.,
STEWARD MEDICAID CARE NETWORK, INC.,
STEWARDSHIP HEALTH, INC.,
STEWARDSHIP HEALTH MEDICAL GROUP, INC.,
and
STEWARDSHIP SERVICES INC.,
collectively, as the Borrower,

THE OTHER LOAN PARTIES PARTY HERETO,

THE LENDERS PARTY HERETO

BRIGADE AGENCY SERVICES LLC,
as Administrative Agent

and

BRIGADE AGENCY SERVICES LLC,
as Collateral Agent

WEIL:\99557430\21\76000.0003

# TABLE OF CONTENTS

Page

ARTICLE I

Definitions

SECTION 1.01.    Defined Terms ..................................................................................................1
SECTION 1.02.    [Reserved] .......................................................................................................29
SECTION 1.03.    Terms Generally...............................................................................................29
SECTION 1.04.    Accounting Terms; GAAP................................................................................29
SECTION 1.05.    Borrower; Joint and Several Liability ...............................................................30
SECTION 1.06.    Payment or Performance ..................................................................................31
SECTION 1.07.    Rates.................................................................................................................31

ARTICLE II

The Credits

SECTION 2.01.    Commitments....................................................................................................31
SECTION 2.02.    Loans and Borrowings......................................................................................32
SECTION 2.03.    Requests for Borrowings...................................................................................32
SECTION 2.04.    [Reserved] .......................................................................................................33
SECTION 2.05.    [Reserved] .......................................................................................................33
SECTION 2.06.    [Reserved] .......................................................................................................33
SECTION 2.07.    Funding of Borrowings .....................................................................................33
SECTION 2.08.    Interest Periods.................................................................................................33
SECTION 2.09.    Termination and Reduction of Commitments....................................................33
SECTION 2.10.    Repayment of Loans; Evidence of Debt ...........................................................34
SECTION 2.11.    Prepayment of Loans .......................................................................................34
SECTION 2.12.    Fees..................................................................................................................37
SECTION 2.13.    Interest..............................................................................................................37
SECTION 2.14.    [Reserved] .......................................................................................................38
SECTION 2.15.    Increased Costs ................................................................................................38
SECTION 2.16.    Break Funding Payments .................................................................................39
SECTION 2.17.    Taxes.................................................................................................................40
SECTION 2.18.    Payments Generally; Allocation of Proceeds; Sharing of Set-offs ..................43
SECTION 2.19.    Mitigation Obligations; Replacement of Lenders.............................................44
SECTION 2.20.    Defaulting Lenders...........................................................................................45
SECTION 2.21.    Returned Payments ...........................................................................................45
SECTION 2.22.    [Reserved] .......................................................................................................46
SECTION 2.23.    Benchmark Replacement Setting ......................................................................46

ii

**Debtors' Exhibit No. 6**
**Page 2 of 339**

# ARTICLE III

## Representations and Warranties

SECTION 3.01.    Organization; Powers ........................................................................47
SECTION 3.02.    Authorization; Enforceability ...............................................................47
SECTION 3.03.    Governmental Approvals; No Conflicts ..................................................47
SECTION 3.04.    Financial Condition; No Material Adverse Change...................................47
SECTION 3.05.    Properties .........................................................................................48
SECTION 3.06.    Litigation and Environmental Matters ...................................................48
SECTION 3.07.    Compliance with Laws and Agreements .................................................49
SECTION 3.08.    Investment Company Status .................................................................49
SECTION 3.09.    Taxes ...............................................................................................49
SECTION 3.10.    ERISA ..............................................................................................49
SECTION 3.11.    Disclosure ........................................................................................49
SECTION 3.12.    Solvency ..........................................................................................49
SECTION 3.13.    Insurance ..........................................................................................50
SECTION 3.14.    Capitalization and Subsidiaries .............................................................50
SECTION 3.15.    Security Interest in Collateral ...............................................................50
SECTION 3.16.    Employment Matters ...........................................................................50
SECTION 3.17.    Affiliate Transactions; Excluded Subsidiaries ..........................................50
SECTION 3.18.    Common Enterprise .............................................................................51
SECTION 3.19.    Government Reimbursement Programs .....................................................51
SECTION 3.20.    Accounts ...........................................................................................53
SECTION 3.21.    Reimbursement; Nongovernmental Payors ...............................................53
SECTION 3.22.    Healthcare Permits and Accreditations ....................................................54
SECTION 3.23.    Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions; Beneficial Ownership.........................................................................54
SECTION 3.24.    Affected Financial Institutions ...............................................................55
SECTION 3.25.    Federal Reserve Regulations..................................................................55
SECTION 3.26.    Malta Matters.....................................................................................55
SECTION 3.27.    Regulatory Matters...............................................................................55

# ARTICLE IV

## Conditions

SECTION 4.01.    Effective Date ....................................................................................56
SECTION 4.02.    Delayed Draw Date...............................................................................57

# ARTICLE V

## Affirmative Covenants

SECTION 5.01.    Financial Statements and Other Information ..............................................59
SECTION 5.02.    Notices of Material Events.....................................................................60

iii

SECTION 5.03.    Existence; Conduct of Business ......................................................................61
SECTION 5.04.    Payment of Obligations...................................................................................62
SECTION 5.05.    Maintenance of Properties ..............................................................................62
SECTION 5.06.    Books and Records; Inspection Rights.............................................................62
SECTION 5.07.    Compliance with Laws ....................................................................................63
SECTION 5.08.    Use of Proceeds...............................................................................................63
SECTION 5.09.    Insurance .........................................................................................................63
SECTION 5.10.    Casualty and Condemnation ...........................................................................63
SECTION 5.11.    [Reserved] ........................................................................................................64
SECTION 5.12.    Additional Collateral; Further Assurances.......................................................64
SECTION 5.13.    [Reserved] ........................................................................................................65
SECTION 5.14.    USA PATRIOT Act; Beneficial Ownership......................................................65
SECTION 5.15.    Compliance with Environmental Laws; Environmental Reports .................65
SECTION 5.16.    Compliance with Milestones............................................................................66
SECTION 5.17.    Fourth Amendment Covenants.........................................................................66

## ARTICLE VI

### Negative Covenants

SECTION 6.01.    Indebtedness.....................................................................................................66
SECTION 6.02.    Liens .................................................................................................................67
SECTION 6.03.    Fundamental Changes ......................................................................................67
SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions.......................67
SECTION 6.05.    Asset Sales .......................................................................................................67
SECTION 6.06.    Sale and Leaseback Transactions.....................................................................68
SECTION 6.07.    Swap Agreements.............................................................................................68
SECTION 6.08.    Restricted Payments; Certain Payments of Indebtedness .............................68
SECTION 6.09.    Transactions with Affiliates .............................................................................68
SECTION 6.10.    Restrictive Agreements ....................................................................................68
SECTION 6.11.    Amendment of Material Documents.................................................................69
SECTION 6.12.    [Reserved] ........................................................................................................69
SECTION 6.13.    Permitted Activities of Holdings .....................................................................69
SECTION 6.14.    Transfer of Funds.............................................................................................69
SECTION 6.15.    Permitted Activities of Excluded Subsidiaries ...............................................69

## ARTICLE VII

### Events of Default

## ARTICLE VIII

### AGENTS

iv

**Debtors' Exhibit No. 6**
**Page 4 of 339**

## ARTICLE IX

### Miscellaneous

SECTION 9.01.   Notices .................................................................................................82
SECTION 9.02.   Waivers; Amendments ...................................................................84
SECTION 9.03.   Expenses; Indemnity; Damage Waiver........................................87
SECTION 9.04.   Successors and Assigns ..................................................................88
SECTION 9.05.   Survival .............................................................................................91
SECTION 9.06.   Counterparts; Integration; Effectiveness....................................92
SECTION 9.07.   Severability ......................................................................................92
SECTION 9.08.   Right of Setoff.................................................................................92
SECTION 9.09.   Governing Law; Jurisdiction; Consent to Service of Process....92
SECTION 9.10.   WAIVER OF JURY TRIAL.............................................................93
SECTION 9.11.   Headings ...........................................................................................93
SECTION 9.12.   Confidentiality .................................................................................93
SECTION 9.13.   Several Obligations; Nonreliance; Violation of Law.................94
SECTION 9.14.   USA Patriot Act ..............................................................................94
SECTION 9.15.   Disclosure .........................................................................................94
SECTION 9.16.   Appointment for Perfection ..........................................................94
SECTION 9.17.   Interest Rate Limitation .................................................................95
SECTION 9.18.   Intercreditor Arrangements ..........................................................95
SECTION 9.19.   Acknowledgment and Consent to Bail-In of Affected Financial Institutions...............96
SECTION 9.20.   Acknowledgment Regarding any Supported QFCs ...................96
SECTION 9.21.   Intercreditor Agreement ................................................................97
SECTION 9.22.   Cashless Rollovers ..........................................................................97
SECTION 9.23.   No Advisory or Fiduciary Responsibility ...................................97
SECTION 9.24.   Advertisement ..................................................................................98
SECTION 9.25.   MPT Lenders. ...................................................................................98

## ARTICLE X

### Loan Guaranty

SECTION 10.01.   Guaranty...........................................................................................98
SECTION 10.02.   Guaranty of Payment .....................................................................99
SECTION 10.03.   No Discharge or Diminishment of Loan Guaranty ...................99
SECTION 10.04.   Defenses Waived .............................................................................99
SECTION 10.05.   Rights of Subrogation ..................................................................100
SECTION 10.06.   Reinstatement; Stay of Acceleration..........................................100
SECTION 10.07.   Information .....................................................................................100
SECTION 10.08.   Termination ....................................................................................100
SECTION 10.09.   [Reserved] .......................................................................................101
SECTION 10.10.   Maximum Liability .......................................................................101
SECTION 10.11.   Contribution ...................................................................................101

v

**Debtors' Exhibit No. 6**
**Page 5 of 339**

SECTION 10.12.   Liability Cumulative ................................................................................................102

vi

WEIL:\99557430\21\76000.0003

SCHEDULES:

Commitment Schedule
Schedule 1.01(B) – Excluded Subsidiaries
Schedule 3.03 – Government Approvals
Schedule 3.05 – Properties
Schedule 3.13 – Insurance
Schedule 3.14 – Capitalization and Subsidiaries
Schedule 3.17 – Affiliate Transactions
Schedule 4.01 – Post-Closing Covenants


EXHIBITS:

Exhibit A –  [Reserved]
Exhibit B –  [Reserved]
Exhibit C – [Reserved]
Exhibit D – [Reserved]
Exhibit E – Joinder Agreement
Exhibit F-1 – Form of U.S. Tax Certificate (for Non-U.S. Lenders That Are Not Partnerships)
Exhibit F-2 – Form of U.S. Tax Certificate (for Non-U.S. Lenders That are Partnerships)
Exhibit G – Form of Borrowing Request
Exhibit H  – Form of Perfection Certificate

i

WEIL:\99557430\21\76000.0003

THIS CREDIT AGREEMENT dated as of February 21, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, this "Agreement") among Steward Health Care Network, Inc., a Delaware corporation, Steward Emergency Physicians, Inc., a Massachusetts corporation, Steward Physician Contracting, Inc., a Massachusetts corporation, Steward Medicaid Care Network, Inc., a Delaware corporation, Stewardship Health, Inc., a Delaware corporation, Stewardship Health Medical Group, Inc., a Massachusetts corporation, and Stewardship Services Inc., a Delaware corporation (each, a "Borrower" and, collectively, jointly and severally, the "Borrower"), the other Loan Parties party hereto, the Lenders party hereto,  Brigade Agency Services LLC, as administrative agent for the Lenders party hereto (in such capacity, the "Administrative Agent"), Brigade Agency Services LLC, as collateral agent for the Lenders party hereto (in such capacity, the "Collateral Agent" and, together with the Administrative Agent, the "Agent" and each, an "Agent").

## RECITALS

The Loan Parties have requested that Lenders make available to the Borrower the financing facilities as described herein.  The Lenders are willing to extend such credit to the Borrower under the terms and conditions herein set forth.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the Loan Parties, the Lenders, the Administrative Agent and the Collateral Agent hereby agree as follows:

## ARTICLE I

### Definitions

SECTION 1.01.    Defined Terms.  Capitalized terms used but not defined in this Agreement shall have the meanings ascribed to such terms in the Existing ABL/FILO Credit Agreement. As used in this Agreement, the following terms have the meanings specified below:

"2021 FICA Deferral" has the meaning assigned to such term in Section 5.04.

"ABL/FILO Borrower" means Steward Health Care System LLC, a Delaware limited liability company.

"ABL/FILO Forbearance" has the meaning assigned to such term in the definition of "Existing ABL/FILO Credit Agreement".

"Account" has the meaning assigned to such term in the Security Agreement.

"Accreditations" means, collectively, all accreditations, approvals or other rights issued by any healthcare accrediting agency including the Joint Commission, Accreditation Commission for Health Care, National Quality Forum and Community Health Accreditation Program.

"Activities" has the meaning assigned to such term in Article VIII.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation *plus* (b) the SOFR Adjustment; provided, that if Adjusted Term SOFR

as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"<u>Administrative Agent</u>" has the meaning assigned to such term in the preamble to this Agreement.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affected Financial Institutions</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Agent</u>" has the meaning assigned to such term in the preamble to this Agreement.

"<u>Agent Parties</u>" has the meaning assigned to such term in <u>Section 9.01(d)(ii)</u>.

"<u>Agent's Group</u>" has the meaning assigned to such term in <u>Article VIII</u>.

"<u>Aggregate Delayed Draw Loan Exposure</u>" means, at any time, the aggregate Delayed Draw Loan Exposure of all the Lenders.

"<u>Aggregate Effective Date Loan Exposure</u>" means, at any time, the aggregate Effective Date Loan Exposure of all the Lenders.

"<u>Aggregate Exposure</u>" means, at any time, collectively, the Aggregate Effective Date Loan Exposure and the Aggregate Delayed Draw Loan Exposure.

"<u>Agreement</u>" has the meaning assigned to such term in the preamble hereto.

"<u>Anti-Corruption Laws</u>" means any and all laws, rules, and regulations of any jurisdiction concerning or relating to the prohibition or prevention of bribery or corruption, including but not limited to the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the UK Bribery Act 2010, as amended.

"<u>Anti-Money Laundering Laws</u>" means any and all laws, rules, and regulations of any jurisdiction concerning or relating to the prohibition or prevention of money laundering or terrorism financing, including but not limited to the U.S. Bank Secrecy Act, as amended by the USA PATRIOT Act.

"<u>Applicable Percentage</u>" means, with respect to any Lender, a percentage equal to a fraction the numerator of which is the sum of such Lender's outstanding Loans and unfunded Commitments and the denominator of which is the aggregate amount of Loans and unfunded Commitments of all Lenders (or, if the Commitments have terminated or expired and no Loans are then outstanding, the Applicable Percentages shall be determined based upon such Lender's Applicable Percentage immediately prior to the termination or expiration of all Commitments and the repayment or prepayment of all Loans); provided, that in accordance with <u>Section 2.20</u>, so long as any Lender shall be a Defaulting Lender, such

2

**Debtors' Exhibit No. 6**
**Page 9 of 339**

Defaulting Lender's Effective Date Loan Commitment and Delayed Draw Loan Commitment shall be disregarded in the calculations above.

"<u>Applicable Rate</u>" means 10.75% per annum.

"<u>Approved Fund</u>" has the meaning assigned to such term in <u>Section 9.04(b)</u>.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by <u>Section 9.04</u>) and accepted by the Administrative Agent, substantially in the form of Exhibit A to the Existing ABL/FILO Credit Agreement or any other form approved by the Administrative Agent.

"<u>Authorized Officer</u>" means, as applied to any Person, the principal executive officers, managing members or general partners of such Person including any individual holding the position of chairman of the board (if an officer), chief executive officer, chief financial officer, president or one of its vice presidents (or the equivalent thereof).

"<u>Available Tenor</u>" means, as of any date of determination with respect to any then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to <u>Section 2.23(d)</u>.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means:

(a)     with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule; and

(b)     with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bankruptcy Event</u>" means, with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment; <u>provided</u> that a Bankruptcy Event  shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof; <u>provided</u>, <u>further</u>, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such

WEIL:\99557430\21\76000.0003

Person (or such Governmental Authority or instrumentality), to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"<u>Benchmark</u>" means, initially, the Term SOFR Reference Rate or the then-current Benchmark; <u>provided</u>, that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to <u>Section 2.23(a)</u>.

"<u>Benchmark Replacement</u>" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; <u>provided</u>, that if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"<u>Benchmark Replacement Adjustment</u>" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"<u>Benchmark Replacement Date</u>" means the earliest to occur of the following events with respect to any then-current Benchmark:

(a)     in the case of <u>clause (a)</u> or <u>(b)</u> of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof; or

(b)     in the case of <u>clause (c)</u> of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; <u>provided</u>, that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such <u>clause (c)</u> and even in any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of <u>clause (a)</u> or <u>(b)</u> with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

4

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to any then-current Benchmark:

(a)        a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority with jurisdiction over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than ninety (90) days after such statement or publication, the date of such statement or publication).

"Benchmark Unavailability Period" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.23 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.23.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

5

"<u>Benefit Plan</u>" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"<u>BHC Act Affiliate</u>" of a party means an "affiliate" (as such term is defined under, and in accordance with, 12 U.S.C. 1841(k)) of such party.

"<u>Blue Cross Blue Shield of Massachusetts</u>" means Blue Cross Blue Shield of Massachusetts, an independent licensee of the Blue Cross and Blue Shield Association.

"<u>Board</u>" means the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" has the meaning assigned to such term in the preamble to this Agreement.

"<u>Borrowing</u>" means Loans made or continued on the same date and as to which a single Interest Period is in effect.

"<u>Borrowing Request</u>" means a request by the Borrower for a Borrowing in the form of <u>Exhibit G</u> hereto or such other form requested by the Borrower which is acceptable to the Administrative Agent in its sole discretion.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; <u>provided</u>, that when used in connection with a Term SOFR Loan, the term "<u>Business Day</u>" shall also exclude any day which is not a U.S. Government Securities Business Day.

"<u>Capital Lease Obligations</u>" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP; <u>provided</u> that (i) any lease that would be characterized as an operating lease in accordance with GAAP on December 31, 2018 (whether or not such lease was in effect on such date) shall be accounted for as an operating lease (and not a capital lease) for purposes of this Agreement  regardless of any change in GAAP following December 31, 2018 that would otherwise require such lease to be characterized or recharacterized (on a prospective or retroactive basis or otherwise) as a capital lease, (ii) notwithstanding anything to the contrary contained herein, any payment with respect to items treated as operating leases as of August 4, 2023 and rent adjustments including principal and interest related to leases, sale leasebacks, failed sale leasebacks and deferred rent in accordance with Accounting Standards Codification (ASC) 842 shall not be treated as Capital Lease Obligations for purposes of this Agreement and (iii) notwithstanding anything to the contrary herein, obligations under the MPT Lease Documents shall not constitute Capital Lease Obligations.

"<u>CARES Act</u>" has the meaning assigned to such term in <u>Section 5.04</u>.

"<u>CFC</u>" means a "controlled foreign corporation" within the meaning of Section 957 of the Code that is owned (within the meaning of Section 958(a) of the Code) by a "United States shareholder" (as defined in Section 951(b) of the Code).

6

"CHAMPUS" means, collectively, the Civilian Health and Medical Program of the Uniformed Services, a program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Departments of Defense, Health and Human Services and Transportation, and all laws, rules, regulations, manuals, orders, guidelines or requirements pertaining to such program including (a) all federal statutes (whether set forth in 10 C.F.R. §§ 1071-1106 or elsewhere) affecting such program; and (b) all rules, regulations (including 32 C.F.R. § 199), manuals, orders and administrative, reimbursement and other guidelines of all governmental authorities promulgated in connection with such program (whether or not having the force of law), in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Change in Control" means (a) (i) prior to an IPO, the Permitted Holders shall cease to own, directly or indirectly, beneficially or of record, at least a majority of the outstanding voting Equity Interests of the Borrower on a fully diluted basis or shall fail to have the right to elect or designate for election at least a majority of the board of directors of the Borrower, and (ii) and after an IPO, the acquisition or ownership, directly or indirectly, beneficially or of record by any Person or group (with the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof) other than the Permitted Holders of Equity Interests representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower; (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither (i) nominated by the board of directors of the Borrower or the Permitted Holders nor (ii) appointed by directors so nominated; (c) the Borrower shall cease to own, free and clear of all Liens 100% of the outstanding voting Equity Interests of the Loan Parties owned by it on August 4, 2023 on a fully diluted basis (other than as a result of a transaction permitted by this Agreement); or (d) Holdings shall cease to own, directly or indirectly, beneficially or of record, all of the outstanding Equity Interests of the Borrower on a fully diluted basis (other than as a result of the consummation of the Stewardship Sale).

"Change in Law" means (a) the adoption of any law, rule, regulation or treaty (including any rules or regulations issued under or implementing any existing law) after the date of this Agreement, (b) any change in any law, rule, regulation or treaty or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Charges" has the meaning assigned to such term in Section 9.17.

"Class" means (a) with respect to any Loan, whether such Loan is an Effective Date Loan or a Delayed Draw Loan and (b) with respect to any Commitment, whether such Commitment is an Effective Date Loan Commitment or a Delayed Draw Loan Commitment.

"Cleanup" means all actions required to: (a) clean up, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (b) prevent the Release of Hazardous Materials so that

7

Debtors' Exhibit No. 6
Page 14 of 339

they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial monitoring and care; or (d) respond to any request by a Governmental Authority for information or documents in any way relating to cleanup, removal, treatment or remediation or potential cleanup, removal, treatment or remediation of Hazardous Materials in the indoor or outdoor environment.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Collateral Agent, on behalf of itself and the Lenders and the other holders of the Secured Obligations, to secure the Secured Obligations.

"Collateral Agent" has the meaning assigned to such term in the preamble to this Agreement.

"Collateral Documents" means, collectively, the Security Agreement and any other documents pursuant to which a Person grants a Lien upon any real or personal property as security for payment of the Secured Obligations.

"Commitment" means, collectively, the Effective Date Loan Commitment and the Delayed Draw Loan Commitment.

"Commitment Schedule" means the Schedule attached hereto identified as such.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §§ 1 et seq.), as amended from time to time, and any successor statute.

"Communications" has the meaning assigned to such term in Section 9.01(d)(ii).

"Conforming Changes" means with respect to either the use or administration of Adjusted Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or "Interest Payment Date" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.16 and other technical, administrative or operational matters) that the Administrative Agent, following consultation with the Borrower, decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent, following consultation with the Borrower, decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

8

Debtors' Exhibit No. 6
Page 15 of 339

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b), (ii) a "covered bank" as that term is defined in, and interpreted in accordance with 12 C.F.R. § 47.3(b), or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Liabilities" has the meaning assigned to such term in Section 9.19.

"Covered Party" has the meaning assigned to such term in Section 9.20(a).

"COVID-19 Stimulus Program" means the CARES Act; the Paycheck Protection Program and Health Care Enhancement Act, P.L. 116-139, 134 Stat. 620; the Consolidated Appropriations Act of 2021, P.L. 116-260, 134 Stat. 1182; the American Rescue Plan Act of 2021, P.L. 117-2, 134 Stat. 1182; and related legislation, regulations, and guidance.

"Credit Party" means the Administrative Agent, the Collateral Agent or any Lender.

"Declining Lender" has the meaning assigned to such term in Section 2.11(e).

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" has the meaning assigned to such term in Section 2.13(d).

"Default Right" has the meaning assigned to such term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans or (ii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent  to funding (specifically identified and including the particular Default, if any) has not been satisfied, (b) has notified the Borrower or any Credit Party in writing, or has made a public statement, to the effect that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent to funding a Loan under this Agreement (specifically identified and including the particular Default, if any) cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) has or has a parent that has become the subject of (i) a Bankruptcy Event or (ii) a Bail-In Action.

"Delayed Draw Date" means the first date on which the conditions set forth in Section 4.02 are satisfied (or waived in accordance with Section 9.02).

"Delayed Draw Loan Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make Delayed Draw Loans on the Delayed Draw Date, as such commitments may be increased or decreased, as the case may be, pursuant to (a) Section 2.09 and (b) assignments by or to such Lender pursuant to Section 9.04. The initial amount of each Lender's Delayed Draw Loan Commitment is

9

**Debtors' Exhibit No. 6**
**Page 16 of 339**

set forth on the Commitment Schedule. The aggregate amount of the Lenders' Delayed Draw Loan Commitments as of the Effective Date is $75,000,000.

"Delayed Draw Loan Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Delayed Draw Loans.

"Delayed Draw Loans" means the term loans made by the Lenders pursuant to the Delayed Draw Loan Commitment.

"DIP Financing" has the meaning assigned to such term in Section 9.22.

"DIP Lenders" has the meaning assigned to such term in Section 9.22.

"Divided LLC" means any LLC which has been formed upon the consummation of an LLC Division.

"Document" has the meaning assigned to such term in the Security Agreement.

"dollars" or "$" refers to lawful money of the United States of America.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country (or, to the extent that the United Kingdom is not an EEA Member Country, the United Kingdom), which is subject to the supervision of a Resolution Authority, (b) any entity established in an EEA Member Country (or, to the extent that the United Kingdom is not an EEA Member Country, the United Kingdom), which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country (or, to the extent that the United Kingdom is not an EEA Member Country, the United Kingdom), which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means February 21, 2024.

"Effective Date Loan Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make Effective Date Loans on the Effective Date. The initial amount of each Lender's Effective Date Loan Commitment is set forth on the Commitment Schedule. The aggregate amount of the Lenders' Effective Date Loan Commitments as of the Effective Date is $75,000,000.

"Effective Date Loan Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Effective Date Loans.

"Effective Date Loans" means the term loans made by the Lenders pursuant to the Effective Date Loan Commitment.

"Electronic System" means any electronic system, including e-mail, e-fax, Intralinks®, ClearPar®, Debt Domain, Syndtrak and any other Internet or extranet-based site, whether such electronic

10

system is owned, operated or hosted by the Administrative Agent and any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"Environmental Laws" means all applicable laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating to the environment, preservation or reclamation of natural resources, or the management, Release or threatened Release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise, known or unknown (including any liability for damages, costs of environmental investigations or remediation, fines, penalties or indemnities), of the Borrower or Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests"  means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with a Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of a failure to satisfy the "minimum funding standards" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by any Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA.

"Erroneous Payment" has the meaning assigned to such term in paragraph (q)(i) of Article VIII.

11

"Erroneous Payment Deficiency Assignment" has the meaning assigned to such term in paragraph (q)(iv) of Article VIII.

"Erroneous Payment Impacted Class" has the meaning assigned to such term in paragraph (q)(iv) of Article VIII.

"Erroneous Payment Return Deficiency" has the meaning assigned to such term in paragraph (q)(iv) of Article VIII.

"Erroneous Payment Subrogation Rights" has the meaning assigned to such term in paragraph (q)(vi) of Article VIII.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excess Property Disposition Agreement" means the Excess Property Disposition Agreement, dated as of the Effective Date, by and among Steward Health Care System LLC, the lessor entities listed on Schedule 1-A attached thereto, and the lessee entities listed on Schedule 1-B attached thereto, and the Administrative Agent, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in a manner that is not adverse to the Administrative Agent or any of the FILO Bridge Lenders (unless the Administrative Agent and the Required Lenders (calculated without taking into account the MPT Lenders) have consented thereto).

"Excluded Subsidiary" means any now existing or hereafter acquired direct or indirect Subsidiary of a Loan Party as designated by the Borrower from time to time with notice to the Administrative Agent, if (a) such Subsidiary is identified on Schedule 1.01(B) of the Existing ABL/FILO Credit Agreement (as supplemented, as applicable, by Schedule 1.01(B) hereto), (b) such Subsidiary is not wholly-owned by a Loan Party and the Loan Parties own in aggregate less than 80% (other than with respect to certain Subsidiaries identified on Schedule 3.14 of the Existing ABL/FILO Credit Agreement (as supplemented, as applicable, by Schedule 3.14 hereto) that are Loan Parties as of the Effective Date) of the voting stock of such Subsidiary, (c) such Subsidiary is a (1) a Foreign Subsidiary, (2) a FSHCO, or (3) a direct or indirect Subsidiary of a Foreign Subsidiary or a FSHCO, (d) such Subsidiary is a Non-Profit Subsidiary, (e) such Subsidiary is prohibited by applicable law from being, or otherwise requires the consent of any Governmental Authority (which has not been obtained after the Loan Parties have used commercially reasonable efforts to obtain such consent) having jurisdiction over it to be, joined as a Loan Party hereunder or under any other Loan Document, (f) such Subsidiary is a regulated insurance company, or (g) such Subsidiary is a Healthchoice Entity and not required to become a Loan Party pursuant to Section 5.12(b). Notwithstanding anything to the contrary herein, no Subsidiary of a Loan Party shall constitute an Excluded Subsidiary hereunder unless it also constitutes an Excluded Subsidiary under and as defined in the Existing ABL/FILO Credit Agreement.

"Excluded Taxes" means, with respect to any payment made by any Loan Party under any Loan Document, any of the following Taxes imposed on or with respect to a Recipient: (a) Taxes imposed on (or measured by) net income (however denominated) and franchise Taxes (i) imposed by the jurisdiction under the laws of which such Recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or (ii) that are Other Connection Taxes, (b) any branch profits Taxes (i) imposed by the United States of America or any similar Taxes imposed by any other jurisdiction in which such Loan Party is organized or located or (ii) that are Other

WEIL:\99557430\21\76000.0003

Debtors' Exhibit No. 6
Page 19 of 339

Connection Taxes, (c) in the case of any Recipient (other than an assignee pursuant to a request by such Loan Party under <u>Section 2.19(b)</u>), any U.S. Federal withholding Taxes resulting from any law in effect on the date such Lender (or Recipient) becomes a party to this Agreement (or designates a new lending office), except to the extent that such Lender (or Recipient) (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding Taxes pursuant to <u>Section 2.17</u>, (d) Taxes attributable to such Lender's (or Recipient's) failure to comply with <u>Section 2.17(f)</u> and (e) any Taxes imposed under FATCA.

"<u>Existing ABL Agent</u>" means the "Administrative Agent" under and as defined in the Existing ABL/FILO Credit Agreement.

"<u>Existing ABL/FILO Credit Agreement</u>" means that certain Credit Agreement, dated as of August 4, 2023, by and among Steward Health Care System LLC, as the borrower, the other affiliates and subsidiaries of the borrower party thereto, the lenders party thereto, Sound Point Agency LLC, as administrative agent, and Chamberlain Commercial Funding (Cayman) L.P., as the collateral agent, and Brigade Agency Services LLC, as the Existing FILO Agent, as it may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, including by that certain Forbearance Agreement, dated as of December 18, 2023, that certain Second Forbearance Agreement, dated as of January 2, 2024, and that certain Third Forbearance Agreement, dated as of the Effective Date (the "<u>ABL/FILO Forbearance</u>"). Notwithstanding anything to the contrary herein, to the extent that the Existing ABL/FILO Credit Agreement or the ABL/FILO Forbearance is terminated or is otherwise no longer extant, references herein to the "Existing ABL/FILO Credit Agreement" or the ABL/FILO Forbearance shall be references to the Existing ABL/FILO Credit Agreement or the ABL/FILO Forbearance, as applicable, as in effect immediately prior to such termination.

"<u>Existing ABL/FILO Loan Documents</u>" means the "Loan Documents" under and as defined in the Existing ABL/FILO Credit Agreement.

"<u>Existing FILO Agent</u>" means the "FILO Agent" under and as defined in the Existing ABL/FILO Credit Agreement.

"<u>Existing FILO Lenders</u>" means the "FILO Lenders" under and as defined in the Existing ABL/FILO Credit Agreement.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any applicable intergovernmental agreements entered into in connection with the implementation of such Sections of the Code.

"<u>Federal Funds Effective Rate</u>" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank on the Business Day next succeeding such day; <u>provided</u> that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) of the quotations for the day for such transactions received by the Administrative Agent from three depository institutions of recognized standing selected by it; <u>provided</u> that, if the Federal

WEIL:\99557430\21\76000.0003

Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Fee Letter" means that certain Administrative Agent Fee Letter, dated as of the Effective Date, by and between the Borrower and the Administrative Agent, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

"FILO Bridge Exclusive Collateral" has the meaning assigned to such term in the Security Agreement.

"FILO Bridge Lender" means any Lender that is not an MPT Lender.

"FILO Bridge Obligations Payment Date" has the meaning assigned to such term in the Intercreditor Agreement.

"Financial Officer" means the chief executive officer, chief financial officer, principal accounting officer, treasurer or controller of a Loan Party; provided that if a Loan Party does not have any chief financial officer, principal accounting officer, treasurer or controller, then a "financial officer" shall be deemed to include, in the case of such Loan Party, any Authorized Officer who performs a similar function to any of the foregoing.

"Floor" means a rate of interest equal to 2.50%.

"Foreign Subsidiary" means any direct or indirect Subsidiary of any Loan Party that is not a Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia.

"FSHCO" means any direct or indirect Subsidiary of any Loan Party, substantially all of the assets of which Subsidiary consist (directly or indirectly through disregarded entities or partnerships) of cash and cash equivalents and Equity Interests (including, for this purpose, any debt or other instrument treated as equity for U.S. federal income tax purposes (as reasonably determined by the Borrower)) in one or more CFCs and/or one or more other FSHCOs.

"GAAP" means generally accepted accounting principles in the United States of America.

"Government Reimbursement Program" means Medicare, Medicaid, TRICARE, CHAMPUS, and any other programs for Government Receivables (as defined in the Existing ABL/FILO Credit Agreement).

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Governmental Authorization" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply

14

funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or indemnity obligations entered into in connection with any acquisition or disposition of assets permitted under this Agreement. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"Guaranteed Obligations" has the meaning assigned to such term in Section 10.01.

"guarantor" has the meaning assigned to such term in the definition of "Guarantee".

"Hazardous Materials"  means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, per- and polyfluoroalkyl substances, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Healthcare Permits" means, collectively, all licenses, leases, powers, permits, franchises, certificates, authorizations, approvals, consents, variances, exemptions, determinations of need, certifications, orders and other rights necessary for and relating to the provision of healthcare services provided by the Loan Parties and their Subsidiaries.

"Healthchoice" means Health Choice Management Co., a Delaware corporation.

"Healthchoice Entities" means Healthchoice and any Subsidiary of the Borrower that primarily receives services from or primarily provides services to Healthchoice.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, Aug. 21, 1996, 110 Stat. 1936 and regulations promulgated thereunder, as amended from time to time.

"Holdings" means Steward Health Care Holdings LLC, a Delaware limited liability company.

"Immaterial Subsidiary" means any Subsidiary of a Loan Party designated by the Borrower to the Administrative Agent in writing that had (a) total consolidated EBITDA of less than 5% of the total consolidated EBITDA of the Borrower and its Subsidiaries during the most recent four fiscal quarter period and (b) total consolidated assets of less than 5% of the total consolidated assets of the Borrower and its Subsidiaries as of the last day of such period; provided that at the time of such designation, (i) the aggregate total consolidated EBITDA of all Immaterial Subsidiaries shall not exceed 7.5% of the total consolidated EBITDA of the Borrower and its Subsidiaries during the most recent four fiscal quarter period and (ii) the aggregate total consolidated assets of all Immaterial Subsidiaries shall not exceed 7.5% of the total consolidated assets of the Borrower and its Subsidiaries as of the last day of such period. Notwithstanding anything to the contrary herein, no Subsidiary of a Loan Party shall constitute an

15

Immaterial Subsidiary hereunder unless it also constitutes an Immaterial Subsidiary under and as defined in the Existing ABL/FILO Credit Agreement.

"Incentive Payments" means all quality, efficiency and surplus incentive payments or settlements or medical management funding payments payable to a Loan Party during an applicable settlement performance year by health plans for attainment of certain healthcare quality and cost savings measures.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding trade payables and other accounts payable in each case, incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed; provided that if such Person has not assumed such obligations, then the amount of Indebtedness of such Person for purposes of this clause (f) shall be equal to the lesser of the amount of the obligations of the holder of such obligations and the fair market value of the assets of such Person which secure such obligations, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations of such Person under any liquidated earn-out and (l) any other Off-Balance Sheet Liability of such Person.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor; provided that payments in connection with the CMS Accelerated and Advance Payment Program shall not be considered Indebtedness for all purposes under this Agreement, it being understood and agreed that the proceeds of such payments shall only be used for working capital purposes.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Ineligible Assignee" means Cerberus Capital Management and its Affiliates and their respective managed funds and accounts.

"Initial Lenders" means the Lenders listed on the Commitment Schedule as of the date of this Agreement.

"Intercompany Subordination Agreement" means that certain Amended and Restated Master Intercompany Subordinated Note, dated as of the Effective Date, by and among the Administrative Agent, the Existing FILO Agent, the Existing ABL Agent, the MPT Parties and the Loan Parties party thereto, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

16

**Debtors' Exhibit No. 6**
**Page 23 of 339**

"<u>Intercreditor Agreement</u>" means that certain Amended and Restated Intercreditor Agreement, dated as of the Effective Date, by and among the Administrative Agent, the Existing ABL Agent, the MPT Parties and the Loan Parties party thereto, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

"<u>Interest Payment Date</u>" means the last day of the Interest Period applicable to the Borrowing of which such Loan is a part of and the applicable Maturity Date.

"<u>Interest Period</u>" means the period commencing on the date of such Term SOFR Borrowing and ending on the numerically corresponding day in the calendar month that is three months thereafter; <u>provided</u> that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless, in the case of a Term SOFR Borrowing only, such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period pertaining to a Term SOFR Borrowing that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and, in the case of a Borrowing, thereafter shall be the effective date of the most recent continuation of such Borrowing.

"<u>IPO</u>" means the first public offering by the Borrower (or an Affiliate of, or successor to, the Borrower formed for the purpose of issuing capital stock) of its capital stock after August 4, 2023 pursuant to a registration statement that has been declared effective by the United States Securities and Exchange Commission.

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>Joinder Agreement</u>" means a Joinder Agreement in substantially the form of <u>Exhibit E</u>.

"<u>Lenders</u>" means the Persons listed on the <u>Commitment Schedule</u> and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, deed to secure debt, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities

"<u>LLC</u>" means any limited liability company.

"<u>LLC Division</u>" means the statutory division of any LLC into two or more LLCs pursuant to Section 18-217 of the Delaware Limited Liability Company Act or a comparable provision of any other applicable law.

"<u>Loan Documents</u>" means this Agreement, any promissory notes issued pursuant to this Agreement, the Loan Guaranty, the Fee Letter, the Collateral Documents, the Intercreditor Agreement, the Excess Property Disposition Agreement and all other agreements, instruments, documents and certificates identified in <u>Section 4.01</u> executed and delivered to, or in favor of, the Administrative Agent, the Collateral Agent or any Lenders and including all other pledges, powers of attorney, consents,

17

assignments, contracts, notices and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Administrative Agent, the Collateral Agent or any Lender in connection with this Agreement or the transactions contemplated hereby.  Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"<u>Loan Guarantor</u>" means Holdings, each ABL/FILO Borrower (other than with respect to its own primary obligations), each domestic Subsidiary of the ABL/FILO Borrower (other than any Immaterial Subsidiary) on the Effective Date and any other wholly-owned direct or indirect Subsidiary of the ABL/FILO Borrower who becomes a party to this Agreement pursuant to a Joinder Agreement in accordance with <u>Section 5.12</u>.

"<u>Loan Guaranty</u>" means <u>Article X</u> of this Agreement.

"<u>Loan Parties</u>" means the Borrower and the Loan Guarantors and their successors and assigns which, for the avoidance doubt shall not include the Permitted Holders.

"<u>Loans</u>" means the loans and advances made by the Lenders pursuant to this Agreement, including the Effective Date Loans and the Delayed Draw Loans.

"<u>Malta Matters</u>" has the meaning assigned to such term in <u>Section 3.26</u>.

"<u>Malta Representation Breach</u>" means if any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in, or in connection with, <u>Section 3.26</u> of this Agreement shall prove to have been materially incorrect when made or deemed made.

"<u>Management Equityholders</u>" means (i) the Management Members, (ii) any Person established by any such Management Member, any of its Affiliates, any of its subsidiaries or any direct or indirect parent thereof or any Person described in the succeeding <u>clauses (iii)</u> and <u>(iv)</u> of this definition of "Management Equityholders", as applicable, to hold an investment in the Borrower or any direct or indirect parent entity thereof in connection with such Person's estate or tax planning, (iii) any spouse, former spouse, current or former qualified domestic partner, siblings, parents or grandparents or any descendant (including adopted children and step-children), father-in-law, mother-in-law, daughter-in-law, son-in-law, or spouse, former spouse, or current or former qualified domestic partner of the foregoing, of any such Management Member, any of its Affiliates, any of its subsidiaries or any direct or indirect parent thereof (or by any vehicle described in <u>clause (ii)</u> of this definition of "Management Equityholders") in connection with such Person's estate or tax planning, and (iv) any Person who acquires an investment in the Borrower or any direct or indirect parent thereof by will or by the laws of intestate succession as a result of the death of any such Management Member, any of its Affiliates, any of its subsidiaries or any direct or indirect parent thereof or of any Person described in <u>clause (iii)</u> of this definition of "Management Equityholders".

"<u>Management Members</u>" means, as of August 4, 2023, the current equityholders and shareholders of the ABL/FILO Borrower (or any direct or indirect parent thereof) and the then-current and former officers, directors, employees of the ABL/FILO Borrower (or any direct or indirect parent thereof).

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, assets, operations, or financial condition, of the Loan Parties taken as a whole, (b) the ability of the Loan Parties, taken as a whole, to perform any of their obligations under the Loan Documents to which any Loan Party is a party, (c) the validity, perfection or priority of the Liens on any material part of the Collateral created or

18

**Debtors' Exhibit No. 6**
**Page 25 of 339**

purportedly created under the Collateral Documents, or (d) the rights available to the Administrative Agent, the Collateral Agent or the Lenders under any of the Loan Documents.

"<u>Material Indebtedness</u>" means (i) Indebtedness (other than the Loans and Obligations hereunder) or other obligations in respect of one or more Swap Agreements (but not the MPT Documents or the ABL/FILO Credit Agreement), of any one or more of the Borrower and its Subsidiaries in an aggregate principal amount exceeding $10,000,000, (ii) Indebtedness and other obligations owing under the MPT Documents and (iii) Indebtedness and other obligations owing under the ABL/FILO Credit Agreement. For purposes of determining Material Indebtedness, the "obligations" of the Borrower or any Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party or such Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"<u>Material Subsidiary</u>" means any Subsidiary that is not an Immaterial Subsidiary.

"<u>Maturity Date</u>" means the earlier to occur of (a) June 30, 2024 and (b) the date on which the Stewardship Sale is consummated.

"<u>Maximum Liability</u>" has the meaning assigned to such term in <u>Section 10.10</u>.

"<u>Maximum Rate</u>" has the meaning assigned to such term in <u>Section 9.17</u>.

"<u>Medicaid</u>" means the medical assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq.) and any statutes succeeding thereto.

"<u>Medicaid Regulations</u>" means, collectively, (a) all federal statutes (whether set forth in Title XIX of the Social Security Act or elsewhere) affecting Medicaid and any statutes succeeding thereto; (b) all applicable provisions of all federal rules, regulations, manuals and orders and administrative, reimbursement and other guidelines having the force of law of all Governmental Authorities promulgated pursuant to or in connection with the statutes described in <u>clause (a)</u> above; (c) all state statues and plans for medical assistance enacted in connection with the statutes and provisions described in <u>clauses (a)</u> and <u>(b)</u> above; and (d) all applicable provisions of all rules, regulations, manuals and orders and administrative, reimbursement and other guidelines having the force of all Governmental Authorities promulgated pursuant to or in connection with the statutes described in <u>clause (c)</u> above and all state administrative, reimbursement and other guidelines of all Governmental Authorities having the force of law promulgated pursuant to or in connection with the statutes described in <u>clause (b)</u> above, in each case as may be amended, supplemented or otherwise modified from time to time.

"<u>Medicare</u>" means the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§ 1995 et seq.) and any statutes succeeding thereto.

"<u>Medicare Regulations</u>" means, collectively, all federal statutes (whether set forth in Title XVIII of the Social Security Act or elsewhere) affecting the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act and any statutes succeeding thereto; together with all applicable provisions of all rules, regulations, manuals and orders and administrative, reimbursement and other guidelines having the force of law of all Governmental Authorities promulgated pursuant to or in connection with any of the foregoing having the force of law, as each may be amended, supplemented or otherwise modified from time to time.

"<u>MOIC Amount</u>" means, as of any date of determination, the product of (a) 0.85 <u>multiplied by</u> (b) the aggregate amount of the Commitments as of the Effective Date, less cash interest previously received

19

by the Lenders (for the avoidance of doubt, excluding any interest capitalized and added to the principal amount of the Loans).

"MOIC Event" means any of the following: (a) the occurrence of the Maturity Date, (b) the occurrence of the Termination Date, (c) the occurrence of an Event of Default or (d) the acceleration of the Loans in accordance with Article VII, by operation of law, or otherwise.

"Mortgages" means any mortgage, deed of trust, deed to secure debt, or other agreement which conveys or evidences a Lien in favor of the MPT Parties, on real property of a Loan Party, including any amendment, modification or supplement thereto.

"MPT Collateral" has the meaning assigned to such term in the Intercreditor Agreement.

"MPT Credit Agreement" means, collectively, any credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument entered into from time to time evidencing or governing the terms of any Indebtedness or other financial accommodation made by and among one or more MPT Parties, as the lender (or the equivalent) and one or more Loan Parties or their Subsidiaries, as the borrower thereunder.  Any reference to the MPT Credit Agreement hereunder shall be deemed a reference to any MPT Credit Agreement then extant.

"MPT Documents" means the MPT Credit Agreement, the MPT Guarantee, the MPT Lease Documents, the MPT Forbearance Agreement and any agreements, certificates, instruments or other documents executed in connection therewith.

"MPT Exclusive Collateral" has the meaning assigned to such term in the Intercreditor Agreement.

"MPT Forbearance Agreement" has the meaning assigned to such term in the ABL/FILO Forbearance.

"MPT Guarantee" means any Guarantees by any Loan Party of Indebtedness of a joint venture formed by the ABL/FILO Borrower or any of its Subsidiaries and one or more MPT Parties or their Affiliates owing to any MPT Party or any of their Affiliates (as the same may be amended, restated, supplemented, replaced or otherwise modified from time to time).

"MPT Lease Documents" means, collectively (a) the MPT Master Lease Agreement and (b) any other lease agreement (including a master lease agreement), financing agreement or other agreement or instrument evidencing or governing the terms of any real property, equipment or fixture lease agreement or other financial accommodation with respect to such types of property made by one or more MPT Parties, as the lessor (or the equivalent) and one or more Loan Parties or their Subsidiaries, as the lessee (or the equivalent).

"MPT Lender" means MPT TRS Lender-Steward, LLC, a Delaware limited liability company, and any of its Affiliates that is a Lender hereunder.

"MPT Lender Loans" means any Loans owing to an MPT Lender.

"MPT Lender Obligations" means any Obligations owing to an MPT Lender.

"MPT Master Lease Agreement" means, collectively, that certain (i) Second Amended and Restated Master Lease Agreement (Master Lease I) dated March 14, 2022, by and among MPT of

20

**Debtors' Exhibit No. 6**
**Page 27 of 339**

Hillside-Steward, LLC, MPT of Melbourne-Steward, LLC, MPT of Rockledge-Steward, LLC, MPT of Sebastian-Steward, LLC, MPT of Sharon-Steward, LLC, MPT of Warren-Steward, LLC, MPT of Youngstown-Steward, LLC, MPT of Mesa, LLC, MPT of West Monroe, LLC, MPT of Port Arthur, LLC, MPT of West Valley City, LLC, MPT of Hope-Steward, LLC, MPT of Odessa-Steward, LLC, MPT of Phoenix-Steward, LLC, MPT of Phoenix Behavioral-Steward, LLC, MPT of Salt Lake City-Steward, LLC, MPT of San Antonio-Steward, LLC, MPT of Tempe-Steward, LLC, MPT of Texarkana-Steward, LLC, MPT of Maricopa RE - Steward, LLC, MPT of Odessa RE - Steward, LLC, MPT of Ogden RE - Steward, LLC, MPT of Phoenix RE - Steward, LLC, MPT of Port Arthur RE - Steward, LLC, MPT of San Antonio RE - Steward, LLC, MPT of Lehi-Steward, LLC, MPT of Norwood-Steward, LLC, MPT of Houston-Steward, LLC, MPT of Houston RE-Steward, LLC, MPT of Big Spring-Steward, LLC, MPT of Florence, LLC, MPT of Coral Gables-Steward, LLC, MPT of Lauderdale Lakes-Steward, LLC, MPT of Hialeah-Steward, LLC, MPT of Hialeah Palmetto-Steward, LLC, MPT of Miami-Steward, LLC, MPT of West Jordan-Steward Property, LLC and MPT of Layton-Steward Property, LLC and the Original Master Lease I Operators (as such agreement may be further amended, restated, supplemented, replaced or otherwise modified from time to time), and (ii) Master Lease Agreement (Master Lease II) dated March 14, 2022, by and among MPT of Brighton-Steward, LLC, MPT of Brockton-Steward, LLC, MPT of Fall River-Steward, LLC, MPT of Methuen-Steward, LLC, MPT of Taunton-Steward, LLC, MPT of Ayer-Steward, LLC, MPT of Haverhill-Steward, LLC, and MPT of Dorchester-Steward, LLC, and the Original Master Lease II Operators (as such agreement may be further amended, restated, supplemented, replaced or otherwise modified from time to time).

"MPT Obligations" has the meaning assigned to such term in the Intercreditor Agreement.

"MPT Obligations Payment Date" has the meaning assigned to such term in the Intercreditor Agreement.

"MPT Parties" means, collectively, MPT of Brighton-Steward, LLC, MPT of Brockton-Steward, LLC, MPT of Fall River-Steward, LLC, MPT of Methuen-Steward, LLC, MPT of Taunton-Steward, LLC, MPT of Ayer-Steward, LLC, MPT of Haverhill-Steward, LLC, MPT of Dorchester-Steward, LLC, MPT of Hillside-Steward, LLC, MPT of Melbourne-Steward, LLC, MPT of Rockledge-Steward, LLC, MPT of Sebastian-Steward, LLC, MPT of Sharon-Steward, LLC, MPT of Warren-Steward, LLC, MPT of Youngstown-Steward, LLC, MPT of Mesa, LLC, MPT of West Monroe, LLC, MPT of Port Arthur, LLC, MPT of Hope-Steward, LLC, MPT of Odessa-Steward, LLC, MPT of Phoenix-Steward, LLC, MPT of Phoenix Behavioral-Steward, LLC, MPT of San Antonio-Steward, LLC, MPT of Tempe-Steward, LLC, MPT of Texarkana-Steward, LLC, MPT of Maricopa RE - Steward, LLC, MPT of Ogden RE - Steward, LLC, MPT of Phoenix RE - Steward, LLC, MPT of Port Arthur RE - Steward, LLC, MPT of San Antonio RE - Steward, LLC, MPT of Norwood-Steward, LLC, MPT of Houston-Steward, LLC, MPT of Houston RE-Steward, LLC, MPT of Big Spring-Steward, LLC, MPT of Florence, LLC, MPT of Coral Gables-Steward, LLC, MPT of Lauderdale Lakes-Steward, LLC, MPT of Hialeah-Steward, LLC, MPT of Hialeah Palmetto-Steward, LLC, MPT of Miami-Steward, LLC, MPT of Mesa Superstition-Steward, LLC, MPT of Coral Terrace-Steward, LLC and MPT TRS Lender-Steward, LLC, any other holders from time to time of MPT Obligations, any affiliates of the foregoing that enter into or join as a party to the MPT Lease Documents or the MPT Credit Agreement, and their respective successors and assigns.

"MPT Priority Collateral" has the meaning assigned to such term in the Intercreditor Agreement.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash

payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable and documented fees and out-of-pocket expenses paid to third parties (other than Affiliates) directly in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made (or to establish an escrow for the future payment thereof) as a result of such event to repay Indebtedness (other than Loans) secured by a priority Lien on such asset or otherwise subject to mandatory prepayment as a result of such event (excluding any Taxes)), (iii) [reserved] and (iv) (x) the pro rata portion of any proceeds or payment in respect of such event received by or on account of the assets or equity of any Subsidiary or Excluded Subsidiary that is not wholly-owned by a Loan Party (a "Non-Wholly Owned Subsidiary") attributable to the Equity Interests not owned by a Loan Party and (y) the amount of any unpaid distributions (or reasonable estimates thereof) from the historical earnings of any such Non-Wholly Owned Subsidiary or its assets and disposition of any asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the aggregate amount of liabilities (or reasonable estimated amount thereof) associated with the assets disposed that were not assume by the acquiror; provided that, for the avoidance of doubt and notwithstanding anything to the contrary herein, Net Proceeds shall not be calculated net of any Taxes.

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(d).

"Non-Paying Guarantor" has the meaning assigned to such term in Section 10.11.

"Non-Profit Subsidiary" means any subsidiary that is organized as a non-profit corporation and does not distribute its surplus funds to its equity-holders.

"Non-U.S. Lender" means a Lender that is not a U.S. Person.

"Non-Wholly Owned Subsidiary" has the meaning assigned to such term in the definition of "Net Proceeds".

"Obligated Party" has the meaning assigned to such term in Section 10.02.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, the MOIC Amount, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to the Lenders or to any Lender, the Administrative Agent, the Collateral Agent or any indemnified party arising under the Loan Documents (including interest and other obligations accruing or incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding or which would have accrued but for such bankruptcy, insolvency or similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person (other than operating leases).

22

"Original Master Lease I Operators" means Steward Hillside Rehabilitation Hospital, Inc., Steward Trumbull Memorial Hospital, Inc., Steward Northside Medical Center, Inc., Steward Medical Group, Inc., SHC Youngstown Ohio PSC LLC, Steward Sharon Regional Health System, Inc., Steward Sebastian River Medical Center, Inc., Brevard SHC Holdings LLC, Steward Rockledge Hospital, Inc., Steward Florida ASC LLC, Steward Melbourne Hospital, Inc., Mountain Vista Medical Center, LP, IASIS Glenwood Regional Medical Center, LP, The Medical Center Of Southeast Texas, LP, Jordan Valley Medical Center, LP, St. Luke's Medical Center, LP, St. Luke's Behavioral Hospital, LP, Brim Holding Company, Inc., Odessa Regional Hospital, LP, Southwest General Hospital, LP, Salt Lake Regional Medical Center, LP, Mesa General Hospital, LP, IASIS Healthcare Holdings, Inc., IASIS Finance Texas Holdings, LLC, Seaboard Development LLC, Seaboard Development Port Arthur LLC, Brim Healthcare Of Texas, LLC, IASIS Management Company, Beaumont Hospital Holdings, Inc., Steward Norwood Hospital, Inc., SJ Medical Center, LLC, Steward Texas Hospital Holdings LLC, Permian Premier Health Services, Inc., Davis Hospital & Medical Center, LP, Steward CGH, Inc., Steward NSMC, Inc., Steward HH, Inc., and Steward PGH, Inc.,

"Original Master Lease II Operators" means Steward St. Elizabeth's Medical Center of Boston, Inc., Steward Good Samaritan Medical Center, Inc., Steward Holy Family Hospital, Inc., Steward St. Anne's Hospital Corporation, Morton Hospital, A Steward Family Hospital, Inc., Nashoba Valley Medical Center, a Steward Family Hospital, Inc., and Steward Carney Hospital, Inc.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Taxes (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan Document).

"Other Parties" has the meaning assigned to such term in Section 3.26.

"Other Taxes" means any present or future stamp, court, documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, or from the registration, receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment under Section 2.19(b)).

"parent" has the meaning assigned to such term in the definition of "subsidiary".

"Participant" has the meaning assigned to such term in Section 9.04(c).

"Participant Register" has the meaning assigned to such term in Section 9.04(c).

"Paying Guarantor" has the meaning assigned to such term in Section 10.11.

"Payment Recipient" has the meaning assigned to such term in paragraph (q)(i) of Article VIII.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Perfection Certificate" means the Information Certificate substantially in the form of Exhibit H hereto.

WEIL:\99557430\21\76000.0003

"<u>Periodic Term SOFR Determination Day</u>" has the meaning specified in the definition of "Term SOFR".

"<u>Permitted Encumbrances</u>" has the meaning assigned to such term in the Existing ABL/FILO Credit Agreement.

"<u>Permitted Holders</u>" means any Management Equityholders and their Affiliates.

"<u>Permitted Lien</u>" has the meaning assigned to such term in <u>Section 6.02</u>.

"<u>Permitted Prior Liens</u>" means (a) any Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Collateral Agent pursuant to applicable law, (b) any Liens permitted under Section 6.02(c), (d), (e), (k) or (m) of the Existing ABL/FILO Credit Agreement, (c) any Liens on MPT Priority Collateral subject to the Intercreditor Agreement and (d) any Liens on MPT Exclusive Collateral; <u>provided</u> that, notwithstanding anything to the contrary herein and for the avoidance of doubt, no Permitted Prior Liens shall be permitted to exist with respect to the Loan Parties' rights to, and interest in, the FILO Bridge Exclusive Collateral.

"<u>Permitted REAs</u>" means the easements, covenants, conditions, restrictions and rights of way permitted under the applicable MPT Documents with respect to the property subject thereto  so long as, in each case, such easements, covenants, conditions, restrictions and rights of way do not materially interfere with the use thereof by such Loan Party or such Subsidiary in the operation of its business.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Plan</u>" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>primary obligor</u>" has the meaning assigned to such term in the definition of "Guarantee".

"<u>PTE</u>" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"<u>QFC</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"<u>QFC Credit Support</u>" has the meaning assigned to such term in <u>Section 9.20</u>.

"<u>Recipient</u>" means, as applicable, (a) the Administrative Agent and (b) any Lender.

"<u>Register</u>" has the meaning assigned to such term in <u>paragraph (ii)</u> of the definition of "Approved Fund" in <u>Section 9.04(b)</u>.

"<u>Regulatory Matters</u>" has the meaning assigned to such term in <u>Section 3.27</u>.

"<u>Regulatory Representation Breach</u>" means if any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in, or in connection with, <u>Section 3.27</u> of this Agreement shall prove to have been or, as of any time of determination to be, incorrect or untrue.

24

"Rejection Notice" has the meaning assigned to such term in Section 2.11(e).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water or property.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Relevant Transaction" has the meaning assigned to such term in Section 2.11(d)(i).

"Required Lenders" means, at any time, Lenders (other than (i) Defaulting Lenders and (ii) solely with respect to the last paragraph of Article VII of this Agreement, MPT Lenders) having Aggregate Exposure and unused Commitments representing more than 50% of the sum of the Aggregate Exposure and the unused Commitments.

"Requirement of Law" means, as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any Loan Party or any Subsidiary thereof, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in any Loan Party or any option, warrant or other right to acquire any such Equity Interests in any Loan Party.

"Sanctioned Country" means, at any time, a country, region or territory which is the subject or target of any comprehensive Sanctions (at the time of this Agreement, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea, Kherson and Zaporizhzhia regions of Ukraine, Cuba, Iran, North Korea, and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by any Sanctions Authority, including without limitation the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, (b) any Person organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clause (a) or (b), or (d) any Person otherwise the target of any Sanctions.

"Sanctions" means any and all economic or financial sanctions or trade embargoes imposed, administered or enforced by any Sanctions Authority.

25

**Debtors' Exhibit No. 6**
**Page 32 of 339**

"<u>Sanctions Authority</u>" means the United States (including the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including His Majesty's Treasury), the European Union and any of its member states, the United Nations and any other relevant Governmental Authority.

"<u>Secured Obligations</u>" means all Obligations.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders and each co-agent or subagent appointed by the Administrative Agent or the Collateral Agent from time to time pursuant to <u>Article VIII</u>.

"<u>Security Agreement</u>" means that certain Pledge and Security Agreement, dated as the Effective Date, between the Loan Parties and the Collateral Agent, for the benefit of the Administrative Agent and the Lenders, and any other pledge or security agreement entered into after the date of this Agreement by any other Loan Party (as required by this Agreement or any other Loan Document) or any other Person, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

"<u>SOFR</u>" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Adjustment</u>" means a percentage per annum equal to 0.11448%.

"<u>SOFR Administrator</u>" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"<u>Specified Default</u>" means any Default arising under (a) <u>clauses (b)</u>, <u>(h)</u>, <u>(i)</u> or <u>(k)</u> of <u>Article VII</u> or (b) <u>clause (c)</u> of <u>Article VII</u> as a result of a breach of <u>Section 5.01(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(d)</u> or <u>(f)</u>, <u>Section 5.02(a)</u>, <u>(b)</u>, or <u>(c)</u>, <u>5.03</u>, <u>5.06</u>, <u>5.07</u> or <u>5.08</u>.

"<u>Specified Domestic Parties</u>" has the meaning assigned to such term in <u>Section 3.26</u>.

"<u>Specified MPT Loan</u>" has the meaning assigned to such term in <u>Section 2.01(a)(i)</u>.

"<u>Specified MPT Loan Payoff Letter</u>" means that certain payoff letter, dated on or about the Effective Date, sent by the MPT Lenders to one or more of the Borrowers in connection with the repayment in full of the Specified MPT Loan.

"<u>Stewardship End Date</u>" means the earlier of (i) the date on which the Stewardship Sale is consummated in accordance with the Purchase Agreement (as defined in the ABL/FILO Forbearance) for the Stewardship Sale and (ii) the date on which such Purchase Agreement is otherwise terminated or is no longer in full force and effect.

"<u>Stewardship Sale</u>" means the sale of the managed care business of Stewardship Health Inc., a Delaware limited liability company, and its subsidiaries.

"<u>Stewardship Signing</u>" means the date on which the definitive Purchase Agreement (as defined in the ABL/FILO Forbearance) for the Stewardship Sale is executed.

WEIL:\99557430\21\76000.0003

**Debtors' Exhibit No. 6**
**Page 33 of 339**

"<u>Subordinated Indebtedness</u>" of a Person means any Indebtedness of such Person the payment of which is subordinated to payment of the Secured Obligations to the written satisfaction of the Administrative Agent in its reasonable discretion.

"<u>subsidiary</u>" means, with respect to any Person (the "<u>parent</u>") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held.

"<u>Subsidiary</u>" means any direct or indirect subsidiary (other than an Excluded Subsidiary) of the ABL/FILO Borrower or a Loan Party, as applicable.

"<u>Supported QFC</u>" has the meaning assigned to such term in <u>Section 9.20</u>.

"<u>Swap Agreement</u>" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; <u>provided</u> that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"<u>Taxes</u>" means any present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term SOFR</u>" means the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "<u>Periodic Term SOFR Determination Day</u>") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; <u>provided</u>, <u>however</u>, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first (1st) preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"<u>Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent).

"<u>Term SOFR Borrowing</u>" means, as to any Borrowing, the Term SOFR Loans comprising such Borrowing.

"<u>Term SOFR Loan</u>" means a Loan that bears interest at a rate based on the Adjusted Term SOFR.

27

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Termination Date" means the date on which all Obligations (other than contingent indemnification obligations and other contingent obligations not yet accrued and payable) have been paid in full and all Commitments have terminated or expired.

"Third Party Payor" means any Government Reimbursement Program and any quasi-public agency, Blue Cross Blue Shield of Massachusetts and any managed care plans and organizations, including health maintenance organizations and preferred provider organizations and private commercial insurance companies and any similar third party arrangements, plans or programs for payment or reimbursement in connection with health care services, products or supplies.

"Transactions" means the execution, delivery and performance by the Borrower of this Agreement and the other Loan Documents, the borrowing of Loans and other credit extensions, and the use of the proceeds thereof.

"TRICARE" means, collectively, a program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Departments of Defense, Health and Human Services and Transportation, which program was formerly known as CHAMPUS, and all laws, rules, regulations, manuals, orders and administrative, reimbursement and other guidelines of all governmental authorities promulgated in connection with such program (whether or not having the force of law), in each case as the same may be amended, supplemented or otherwise modified from time to time.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regimes" has the meaning assigned to such term in Section 9.20.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

28

Debtors' Exhibit No. 6
Page 35 of 339

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means the Borrower and the Administrative Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02.    [Reserved].

SECTION 1.03.    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities.  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented, waived or otherwise modified (subject to any restrictions on such amendments, restatements, amendments and restatements, supplements, waivers or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, restated, amended and restated, supplemented, waived or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04.    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect

WEIL:\99557430\21\76000.0003

from time to time; provided that if after the date hereof there occurs any change in GAAP or in the application thereof on the operation of any provision hereof and the Borrower notifies the Administrative Agent that the Borrower request an amendment to any provision hereof to eliminate the effect of such change in GAAP or in the application thereof  (or if the Administrative Agent notifies the Borrower that the Administrative Agent or the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.   Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Financial Accounting Standards Board Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Financial Accounting Standards Board Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

SECTION 1.05.      Borrower; Joint and Several Liability.

(a)      The Borrower (solely for purposes of this Section 1.05 (other than clause (d) below), each, a "Borrower" and, collectively, the "Borrowers") accepts joint and several liability hereunder with respect to all Obligations in consideration of the financial accommodation provided or to be provided by the Administrative Agent and the Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each Borrower to accept joint and several liability for the obligations of each other such person.

(b)      Each Borrower shall be jointly and severally liable for the Obligations, regardless of which Borrower actually receives or is allocated the Loans hereunder or the amount of the Obligations received or the manner in which the Administrative Agent or any Lender accounts for the Obligations on its books and records.  Each Borrower's obligations with respect to the Loans made or allocated to it, and each Borrower's obligations arising as a result of the joint and several liability of such Borrower hereunder, with respect to the Loans made to and other Obligations owing by the Borrowers hereunder, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each Borrower.

(c)      Upon the occurrence and during the continuation of any Event of Default, the Administrative Agent and the Lenders may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of, the Obligations, without first proceeding against any other Borrower or any other person, or against any security or collateral for the Obligations.   Each Borrower waives all suretyship defenses and consents and agrees that the Administrative Agent and the Lenders shall be under no obligation to marshal any assets in favor of any Borrower or against or in payment of any or all of the Obligations.

(d)      Each Borrower hereby appoints each other Borrower as the administrative borrower hereunder, and the Borrower shall act under this Agreement and the other Loan Documents as the agent, attorney-in-fact and legal representative of each other Borrower for all purposes, including

WEIL:\99557430\21\76000.0003

receiving account statements, giving and receiving all notices and consents hereunder or under any other Loan Documents, taking all other actions (including in respect of compliance with covenants and certificates) and communications to such Borrower from the Administrative Agent or any Lender.  The Administrative Agent and the Lenders may rely, and shall be fully protected in relying, on any certificate, report, information or any notice or communication made or given by the Borrower, whether in its own name or on behalf of another Borrower, and neither the Administrative Agent nor any Lender shall have any obligation to make any inquiry or request any confirmation from or on behalf of any Borrower as to the binding effect on it of any such notice or request.

SECTION 1.06.   Payment or Performance.   When the payment of any obligation or the performance of any action, covenant, duty or obligation under any Loan Document is stated to be due or performance required on a day which is not a Business Day (other than as described in the definition of "Interest Period"), the date of such payment or performance shall extend to the immediately succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be.

SECTION 1.07.   Rates.   Neither Agent warrants or accepts responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Adjusted Term SOFR, Term SOFR or SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Adjusted Term SOFR, Term SOFR or SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of Adjusted Term SOFR, Term SOFR or SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Adjusted Term SOFR, Term SOFR, SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

ARTICLE II

The Credits

SECTION 2.01.   Commitments.   In each case, subject to the terms and conditions set forth herein:

(a)   On the Effective Date, each Lender having an Effective Date Loan Commitment, severally and not jointly, agrees to make Effective Date Loans to the Borrower in an aggregate principal amount equal to its Effective Date Loan Commitment.  Upon a Lender's funding of an Effective Date Loan on the Effective Date, such Lender's Effective Date Loan Commitment shall be permanently reduced to zero and shall terminate on and as of the Effective Date.

31

**Debtors' Exhibit No. 6**
**Page 38 of 339**

(i)      Notwithstanding anything to the contrary herein, on and as of the Effective Date, automatically and without further action by any Person, $20,000,000 of the Tranche 2 Loans (under and as defined in that certain First Amendment to Promissory Note (Tranche 2), the "Specified MPT Loan"), dated as of February 2, 2024, by and among the Borrower and the MPT Lenders, to that certain Promissory Note, dated as of January 2, 2024, by and among the Borrower and the MPT Lenders (the "MPT Promissory Note")) funded by the MPT Lenders to the Borrower pursuant to the MPT Promissory Note shall be deemed to be (x) repaid under the MPT Promissory Note and (y) funded as Effective Date Loans hereunder in satisfaction of the MPT Lenders' obligations with respect to $20,000,000 of its Effective Date Loan Commitments pursuant to Section 2.01(a) above, and shall constitute, and form a single Class of Loans with the Effective Date Loans for all purposes hereunder and each MPT Lender shall become a Lender for all purposes hereunder with respect to such Effective Date Loans.

(b)      On the Delayed Draw Date, each Lender having a Delayed Draw Loan Commitment, severally and not jointly, agrees to make Delayed Draw Loans to the Borrower in an aggregate principal amount equal to its Delayed Draw Loan Commitment. Upon a Lender's funding of a Delayed Draw Loan on the Delayed Draw Date, such Lender's Delayed Draw Loan Commitment shall be permanently reduced to zero and shall terminate on and as of the Delayed Draw Date. Once made on the Delayed Draw Date, the Delayed Draw Loans made pursuant to this Section 2.01(b) shall constitute the same Class of Loans and, to the extent possible, be fungible for all purposes (including tax purposes) with, and be treated for all purposes as, the Loans outstanding on the Delayed Draw Date immediately prior to the making of the Delayed Draw Loans pursuant to this Section 2.01(b).

(c)      Amounts repaid or prepaid in respect of the Loans may not be reborrowed.

SECTION 2.02.      Loans and Borrowings.

(a)      Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided, that any exercise of such option shall not affect such Lender's obligation to make such Loan and the obligation of the Borrower to repay such Loan in each case in accordance with the terms of this Agreement.

(b)      At the commencement of each Interest Period for any Term SOFR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $500,000 and not less than $1,000,000; provided that that no more than two Term SOFR Borrowings may be outstanding at any one time.

SECTION 2.03.      Requests for Borrowings.

(a)      To request a Borrowing of a Loan, the Borrower shall notify the Administrative Agent of such request in writing (delivered by hand, e-mail or facsimile) substantially in the form attached as Exhibit G hereto and signed by the Borrower not later than 12:00 p.m., New York time, three Business Days (or such later date or time as the Administrative Agent may agree in its sole discretion) before the date of the proposed Borrowing.  Each such written Borrowing Request shall specify the following information:

(i)      the aggregate amount of the requested Borrowing and a breakdown of the separate wires comprising such Borrowing;

(ii)      the date of such Borrowing, which shall be a Business Day;

32

(iii)    a certification that the conditions specified in Section 4.02 have been satisfied; and

(iv)    the location and number of the account of the Borrower or any other designated account(s) to which such funds are to be disbursed.

(b)    Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04.    [Reserved].

SECTION 2.05.    [Reserved].

SECTION 2.06.    [Reserved].

SECTION 2.07.    Funding of Borrowings.  (a) Each Lender shall make each Loan to be made by such Lender hereunder on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York time, to the account of the Administrative Agent for any Loan in an amount equal to such Lender's Effective Date Loan Commitment or Delayed Draw Loan Commitment, as applicable.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received by the Administrative Agent, in like funds, to the account(s) specified by the Borrower in the relevant Borrowing Request.

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent, such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.07 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to the Loans.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

SECTION 2.08.    Interest Periods.  Each Borrowing shall have an initial Interest Period of three months.  Thereafter, at the end of such initial Interest Period and each subsequent Interest Period, such Borrowing shall be automatically continued as a Term SOFR Borrowing with an Interest Period of three months.

SECTION 2.09.    Termination and Reduction of Commitments.

(a)    The Effective Date Loan Commitments shall terminate on the Effective Date and the Delayed Draw Loan Commitments shall terminate on the Delayed Draw Date.

WEIL:\99557430\21\76000.0003

(b)     The Borrower may not reduce or terminate the Delayed Draw Loan Commitments except pursuant to the funding of the Delayed Draw Loans on the Delayed Draw Date in accordance with <u>Section 2.01(b)</u>.

SECTION 2.10.     <u>Repayment of Loans; Evidence of Debt</u>.     (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then-unpaid principal amount of each Loan on the Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to <u>paragraph (b)</u> or <u>(c)</u> of this Section shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; <u>provided</u>, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement; <u>provided</u>, <u>further</u>, that if the accounts maintained pursuant to <u>paragraph (b)</u> or <u>(c)</u> of this Section are inconsistent with the Register, the Register shall prevail.

(e)     Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to <u>Section 9.04</u>) be represented by one or more promissory notes in such form payable to such Lender and its registered assigns.

SECTION 2.11.     <u>Prepayment of Loans</u>.

(a)     The Borrower shall have the right at any time and from time to time to prepay any Loan, in whole or in part, subject to prior notice in accordance with <u>paragraph (c)</u> of this <u>Section 2.11</u>.

(b)     [Reserved].

(c)     The Borrower shall notify the Administrative Agent in writing of any prepayment under <u>paragraph (a)</u> of this <u>Section 2.11</u> not later than 11:00 a.m., New York time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Loan or portion thereof to be prepaid; <u>provided</u> that a written notice of prepayment delivered by the Borrower may state that such notice is conditioned upon the occurrence of an asset sale, in which case such notice may be revoked by the Borrower by written notice to the Administrative Agent on or prior to the specified prepayment date if such condition is not satisfied. Promptly following receipt of any such notice relating to a Loan, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Loan shall be in an aggregate amount

34

that is an integral multiple of $500,000 and not less than $1,000,000.  Each prepayment of a Loan shall be applied ratably among the applicable Lenders of such Loan, subject to Section 2.11(d).

(d)

(i)       Subject to Section 2.11(d)(ii) below, if the Loan Parties or any of their respective Subsidiaries sell, transfer, lease or otherwise dispose of any assets of any Loan Party or any of its Subsidiaries (I) pursuant to Sections 6.05(f), (k), (l), (r) or (s) of the Existing ABL/FILO Credit Agreement, (II) in connection with any Stewardship Sale or (III) that are not permitted by Section 6.05 (any such transaction or series of related transactions being a "Relevant Transaction") that, in each case of clauses (I), (II) and (III), results in the receipt of Net Proceeds, (A) on the date of receipt of any Net Proceeds, the Loan Parties and their respective Subsidiaries shall immediately deposit such Net Proceeds into a "blocked" Deposit Account subject to an Account Control Agreement (as defined in the Security Agreement (as defined in the Existing ABL/FILO Credit Agreement)), (B) the Borrower shall give written notice to the Administrative Agent promptly, and in any event within one (1) calendar day after the date of receipt of such Net Proceeds, and (C) within one Business Day of the receipt of such Net Proceeds, the Loan Parties and their respective Subsidiaries shall apply an amount equal to one hundred percent (100%) of such Net Proceeds to the payment of Obligations hereunder as follows: first, to prepay the Loans, and second, to pay any other Obligation owing by any Loan Party.

(ii)      If the Loan Parties or any of their respective Subsidiaries receive any (or the Net Proceeds of any) FILO Bridge Exclusive Collateral which is in the form of cash or cash equivalents or the Loan Parties or any of their respective Subsidiaries or the MPT Parties sell, transfer, lease or otherwise dispose of any assets of any Loan Party or any MPT Party that constitute FILO Bridge Exclusive Collateral that, in any such case, results in the receipt of Net Proceeds by the Loan Parties or any of their respective Subsidiaries, (A) on the date of receipt of any such FILO Bridge Exclusive Collateral in the form of cash or cash equivalents or Net Proceeds, as applicable, the Loan Parties and their respective Subsidiaries shall immediately deposit such FILO Bridge Exclusive Collateral or Net Proceeds into a "blocked" Deposit Account subject to an Account Control Agreement (as defined in the Security Agreement), (B) the Borrower shall give written notice to the Bridge Agent promptly, and in any event within one (1) calendar day after the date of receipt of such FILO Bridge Exclusive Collateral or Net Proceeds, and (C) within one Business Day of the receipt of such FILO Bridge Exclusive Collateral or Net Proceeds, the Loan Parties and their respective Subsidiaries shall apply an amount equal to one hundred percent (100%) of such FILO Bridge Exclusive Collateral or Net Proceeds to the payment of Obligations hereunder (other than MPT Lender Obligations) as follows: first, to prepay the Loans (other than the MPT Lender Loans), second, to pay any other Obligation (other than the MOIC Amount) owing by any Loan Party to the FILO Bridge Lenders, third, to pay the FILO Term Loans under as and defined in the Existing ABL/FILO Credit Agreement (other than any such FILO Terms Loans owing to the Affiliated Lenders (as defined in the Existing ABL/FILO Credit Agreement)) in accordance with Section 2.11(d)(iii) of the Existing ABL/FILO Credit Agreement, fourth, to prepay the MPT Lender Loans, and fifth, to pay the MOIC Amount, and sixth,  to pay any other Obligation owing by any Loan Party to the MPT Lenders. For the avoidance of doubt, this Section 2.11(d)(ii) shall not apply to, and will not require any Loan Party or any Subsidiary to prepay Obligations hereunder with, any FILO Bridge Exclusive Collateral received or held by any Loan Party or any Subsidiary that is not in the form of cash or cash equivalents.

35

**Debtors' Exhibit No. 6**
**Page 42 of 339**

(iii)    Notwithstanding anything herein to the contrary, the MOIC Amount is fully due, earned and payable on the Effective Date, non-creditable thereafter and non-refundable following the payment thereof; provided that the MOIC Amount shall be paid after (1) 100% of the aggregate outstanding principal amount of the Loans plus (2) all interest capitalized and added to the principal amount of the Loans plus (3) all accrued and unpaid interest on the Loans (including any interest that has not been capitalized and added to the principal amount of the Loans) has been paid in full.

(e)    Each Lender may reject all or part of its applicable share of any mandatory prepayment of Loans required to be made pursuant to this Section 2.11 by providing written notice (each, a "Rejection Notice") to the Administrative Agent no later than 11:00 a.m., New York City time, (2) Business Days prior to the date of such prepayment as set forth in the applicable notice of prepayment (any such Lender, a "Declining Lender"); provided that, if a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above, such failure will be deemed an acceptance by such Lender of the total amount of such mandatory prepayment of Loans.  The Borrower shall prepay the applicable Loans by 2:00 p.m., New York City time on the prepayment date set forth in the applicable notice of prepayment.

(f)    Upon the occurrence of any MOIC Event, the Borrower shall pay, repay or prepay the Loans in an amount equal to 100% of the aggregate outstanding principal amount of the Loans (not including any interest capitalized and added to the principal amount of the Loans on or prior to the date of the applicable MOIC Event) plus the greater of (1) (i) all interest capitalized and added to the principal amount of the Loans on or prior to such date plus (ii) all accrued and unpaid interest on the Loans as of such date (including any interest that has not been capitalized and added to the principal amount of the Loans on or prior to such date) and (2) the MOIC Amount (less any MOIC Amount previously paid).  Notwithstanding anything herein to the contrary, if in connection with any MOIC Event or otherwise all or any portion of any Commitment is terminated or all or any portion of any Loan is paid or prepaid (or is required to be paid or prepaid) pursuant to Section 2.11, Article VII or otherwise for any reason, including, but not limited to, any voluntary or mandatory prepayment, including in connection with any Change of Control or any refinancing, in each case, whether in whole or in part, voluntary or involuntary, and whether before or after (v) the occurrence of an Event of Default, (w) the commencement of any bankruptcy, (x) the acceleration of the Obligations pursuant to the terms of this Agreement for any reason (whether or not such acceleration occurs automatically), including acceleration as a result of any Event of Default, including, without limitation, the commencement of a bankruptcy, (y) the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in any bankruptcy, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any bankruptcy to the Administrative Agent, for the account of the Lenders in full or partial satisfaction of the Obligations, or (z) the termination of this Agreement for any reason, then the Administrative Agent shall be paid, for the benefit of each Lender, as an inducement for entering into this Agreement and making (or permitting, as applicable) the Loans and the Commitments (and not as a penalty), an amount equal to the Obligations, including the MOIC Amount (less any MOIC Amount previously paid), which MOIC Amount (less any MOIC Amount previously paid) shall be fully earned, and due and payable, on the date of such payment, repayment or prepayment, or on the date such payment, repayment or prepayment is required to be made under the terms of this Agreement, as applicable, and non-refundable when made. The parties hereto further acknowledge and agree that the MOIC Amount is not intended to act as a penalty or to punish the Borrower for any such payment, repayment or prepayment or termination.  Any payment, prepayment or repayment, whether voluntary or involuntary, of the Loans and/or any termination, whether voluntary or involuntary, of the Commitments upon the occurrence of any MOIC Event or otherwise shall be accompanied by all accrued interest on the principal amount prepaid or repaid

36

(inclusive of paid in-kind interest) or, if greater, the MOIC Amount (less any MOIC Amount previously paid), pursuant to this Section 2.11(f).  Without limiting the generality of the foregoing and notwithstanding anything to the contrary in this Agreement or any other Loan Document, it is understood and agreed that if the Obligations are accelerated as a result of the occurrence and continuance of any Event of Default (including by operation of law or otherwise), the MOIC Amount (less any MOIC Amount previously paid) determined as of the date of acceleration, will also be due and payable and will be treated and deemed as though the applicable Loans were prepaid and/or the Commitments were terminated as of such date and shall constitute part of the Obligations for all purposes herein.  The MOIC Amount (less any MOIC Amount previously paid) shall also be payable in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means.  THE BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE MOIC AMOUNT PAYABLE IN CONNECTION WITH ANY SUCH ACCELERATION.  The Borrower expressly agrees that (i) the MOIC Amount is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the MOIC Amount shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay the MOIC Amount, (iv) the agreement to pay the MOIC Amount is a material inducement to the Lenders to enter into this Agreement and to make (or to permit, as applicable) the Loans and the Commitments hereunder, and (v) the MOIC Amount represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Lenders or profits lost by the Lenders as a result of such MOIC Event.

(g)     Notwithstanding anything to the contrary in this Section 2.11, no prepayments of Loans shall be required pursuant to this Section 2.11 (except pursuant to Section 2.11(d)(ii), Section 2.11(d)(iii) or Section 2.11(f)) until the ABL/FILO Obligations Payment Date (as defined in the Intercreditor Agreement)) has occurred, other than with declined or rejected proceeds pursuant to Section 2.11 of the Existing ABL/FILO Credit Agreement, which shall be applied as a mandatory prepayment hereunder in accordance with the relevant terms of this Section 2.11; provided, that, notwithstanding anything to the contrary set forth herein, the notices and applications of such mandatory prepayment shall be made reasonably promptly following the date such Net Cash Proceeds are deemed declined or rejected proceeds pursuant to Section 2.11 of the Existing ABL/FILO Credit Agreement.

SECTION 2.12.     Fees.

(a)     [Reserved].

(b)     [Reserved].

(c)     The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times set forth in the Fee Letter.

(d)     All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent and, in the case of fees payable to the Lenders, distributed by the Administrative Agent to the Lenders.  Fees paid shall not be refundable under any circumstances.

SECTION 2.13.     Interest.

37

**Debtors' Exhibit No. 6**
**Page 44 of 339**

(a) The Loans shall bear interest at the Adjusted Term SOFR for the Interest Period in effect for such Borrowing *plus* the Applicable Rate.

(b)     All accrued and unpaid interest shall be paid in-kind and capitalized on the due date therefor by adding the full amount thereof to the then-outstanding principal balance of the Loans, after which such amounts shall constitute part of the principal of the Loans for all purposes of this Agreement and the other Loan Documents, and shall bear interest in accordance with this Agreement.

(c)     [Reserved].

(d)     Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default or a Malta Representation Breach (and for so long as it continues), the Loans and other Obligations shall bear interest at rates that are two percent (2.00%) per annum in excess of the rates otherwise payable under this Agreement (the "Default Rate"); provided, however, that in the case of any Event of Default specified in clause (h) or (i) of Article VII, such default rates shall apply immediately and automatically without the need for any election or action of any kind on the part of any Agent or any Lender.

(e)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Commitments; provided, that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(f)     All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed.  The Adjusted Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(g)     Adjusted Term SOFR Conforming Changes.  In connection with the use or administration of Adjusted Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Adjusted Term SOFR.

SECTION 2.14.     [Reserved].

SECTION 2.15.     Increased Costs.  (a) If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by any Lender;

(ii)     impose on any Lender or any interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation therein; or

38

**Debtors' Exhibit No. 6**
**Page 45 of 339**

(iii)      subject any Recipient to any Taxes (other than Indemnified Taxes and Excluded Taxes) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender or such other Recipient hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)      If any Lender determines (which determination shall be made in good faith (and not on an arbitrary or capricious basis) and consistent with similarly situated customers of the applicable Lender under agreements having provisions similar to this Section 2.15 after consideration of such factors as such Lender then reasonably determines to be relevant) that any Change in Law regarding capital and liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital and liquidity or on the capital and liquidity of such Lender's holding company, if any, as a consequence of this Agreement and the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)      A certificate of a Lender setting forth in reasonable detail the calculation of the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)      Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.16.      Break Funding Payments. In the event of (a) the payment of any principal of any Term SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Term SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, continue or prepay any Term SOFR Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any Term SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19, then, in any such event, the Borrower shall compensate each Lender for the actual loss, cost and expense attributable to such event.  In the case of a Term SOFR Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of

39

**Debtors' Exhibit No. 6**
**Page 46 of 339**

such Term SOFR Loan had such event not occurred, at the Adjusted Term SOFR that would have been applicable to such Term SOFR Loan, for the period from the date of such event to the last day of the then-current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Term SOFR Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the applicable market arising from the liquidation or redeployment of funds or from any fees payable.  A certificate of any Lender setting forth in reasonable detail the calculations of any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2.17.    Taxes.

(a)    Withholding of Taxes; Gross-Up.  Each payment by any Loan Party under any Loan Document shall be made without withholding for any Taxes, unless such withholding is required by applicable law.  If any Withholding Agent determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Withholding Agent may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law.  If such Taxes are Indemnified Taxes, then the amount payable by such Loan Party shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section 2.17), the applicable Recipient receives the amount it would have received had no such withholding been made.

(b)    Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.17, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)    Indemnification by the Borrower.  The Loan Parties shall jointly and severally indemnify each Recipient for any Indemnified Taxes that are paid or payable by such Recipient in connection with any Loan Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The indemnity under this Section 2.17(d) shall be paid within 10 days after the Recipient delivers to the Borrower a certificate stating the nature and amount of any Indemnified Taxes so paid or payable by such Recipient and describing the basis for the indemnification claim.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.  Such Recipient shall deliver a copy of such certificate to the Administrative Agent.

(e)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent for any Taxes (but, in the case of any Indemnified Taxes, only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so) attributable to such Lender that are paid or payable by the Administrative Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted

40

Debtors' Exhibit No. 6
Page 47 of 339

by the relevant Governmental Authority.  The indemnity under this Section 2.17(e) shall be paid within 10 days after the Administrative Agent delivers to the applicable Lender a certificate stating the amount of Taxes so paid or payable by the Administrative Agent.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.

(f)    Status of Lenders.  (i) Any Lender that is entitled to an exemption from, or reduction of, any applicable withholding Tax with respect to any payments under any Loan Document shall deliver to the Borrower and the Administrative Agent at the time or times reasonably requested by the Borrower or the Administrative Agent such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without, or at a reduced rate of, withholding.  In addition, any Lender, if requested by the Borrower or the Administrative Agent shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to any withholding (including backup withholding) or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.17(f)(ii)(A) through (F) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. If any form or certification previously delivered pursuant to this Section expires or becomes obsolete or inaccurate in any respect with respect to a Lender, such Lender shall promptly (and in any event within 10 days after such expiration, obsolescence or inaccuracy) notify the Borrower and the Administrative Agent in writing of such expiration, obsolescence or inaccuracy and update the form or certification if it is legally eligible to do so.

(ii)    Without limiting the generality of the foregoing, if the Borrower is a U.S. Person, any Lender shall, if it is legally eligible to do so, deliver to the Borrower and the Administrative Agent (in such number of copies reasonably requested by the Borrower and the Administrative Agent) on or prior to the date on which such Lender becomes a party hereto, duly completed and executed copies of whichever of the following is applicable:

(A)    in the case of a Lender that is a U.S. Person, IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (1) with respect to payments of interest under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (2) with respect to any other applicable payments under this Agreement, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(C)    in the case of a Non-U.S. Lender for whom payments under this Agreement constitute income that is effectively connected with such Lender's conduct of a trade or business in the United States, IRS Form W-8ECI;

(D)    in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code both (1) IRS Form W-8BEN or W-8BEN-E, as applicable, and (2) a tax certificate substantially in the form of

41

Exhibit F-1 to the effect that such Lender is not (a) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (b) a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (c) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (d) conducting a trade or business in the United States with which the relevant interest payments are effectively connected;

      (E)      in the case of a Non-U.S. Lender that is not the beneficial owner of payments made under this Agreement (including a partnership or a participating Lender) (1) an IRS Form W-8IMY on behalf of itself and (2) the relevant forms prescribed in clauses (A), (B), (C), (D) and (F) of this paragraph (f)(ii) that would be required of each such beneficial owner or partner of such partnership if such beneficial owner or partner were a Lender; provided, however, that if the Lender is a partnership and one or more of its partners are claiming the exemption for portfolio interest under Section 881(c) of the Code, such Lender may provide a tax certificate substantially in the form of Exhibit F-2 on behalf of such partners; or

      (F)      any other form prescribed by law as a basis for claiming exemption from, or a reduction of, U.S. Federal withholding Tax together with such supplementary documentation necessary to enable the Borrower or the Administrative Agent to determine the amount of Tax (if any) required by law to be withheld.

      (iii)      If a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Withholding Agent, at the time or times prescribed by law and at such time or times reasonably requested by the Withholding Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Withholding Agent as may be necessary for the Withholding Agent to comply with its obligations under FATCA, to determine that such Lender has or has not complied with such Lender's obligations under FATCA and, as necessary, to determine the amount to deduct and withhold from such payment.   Solely for purposes of this Section 2.17(f)(iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

      (g)      Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including additional amounts paid pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made or additional amounts paid under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid by such indemnified party pursuant to the previous sentence (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.17(g), in no event will any indemnified party be required to pay any amount to any indemnifying party pursuant to this Section 2.17(g) if such payment would place such indemnified party in a less favorable position (on a net after-Tax basis) than such indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.

42

Debtors' Exhibit No. 6
Page 49 of 339

This Section 2.17(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the indemnifying party or any other Person.

(h)    Defined Terms.  For purposes of Section 2.17, the term "applicable law" includes FATCA.

(i)    Survival.  Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Recipient, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.18.    Payments Generally; Allocation of Proceeds; Sharing of Set-offs.  (a) Except as expressly set forth herein or in any other Loan Document, the Borrower shall make each payment required to be made hereunder (whether of principal, interest, or fees, or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to 3:00 p.m., New York time, on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices indicated in Section 9.01 or as otherwise directed by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  All payments hereunder shall be made in dollars.

(b)    Subject to the Intercreditor Agreement, any proceeds of Collateral received by the Administrative Agent (i) not constituting either (A) a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower in accordance with the Loan Documents) or (B) a mandatory prepayment (which shall be applied in accordance with Section 2.11) or (ii) after an Event of Default has occurred and is continuing and the Administrative Agent so elects or the Required Lenders so direct, such funds (except with respect to proceeds of FILO Bridge Exclusive Collateral) shall be applied ratably first, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Administrative Agent from the Borrower, second, to pay any fees or expense reimbursements then due to the Lenders from the Borrower, third, to pay interest then due and payable hereunder, fourth, to pay the principal of the Loans, fifth, to pay the MOIC Amount, and sixth, to the payment of any other Secured Obligation due to the Administrative Agent, the Collateral Agent or any Lender by the Borrower. Subject to the Intercreditor Agreement, after an Event of Default has occurred and is continuing and the Administrative Agent so elects or the Required Lenders (calculated without taking into account the MPT Lenders) so direct, any proceeds of FILO Bridge Exclusive Collateral received by the Administrative Agent shall be applied ratably first, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Administrative Agent from the Borrower, second, to pay any fees or expense reimbursements then due to the FILO Bridge Lenders from the Borrower, third, to pay interest then due and payable to the FILO Bridge Lenders hereunder, fourth, to pay the principal of the Loans owing to the FILO Bridge Lenders, fifth, to pay the MOIC Amount to the FILO Bridge Lenders, and sixth, to the payment of any other Secured Obligation due to the Administrative Agent, the Collateral Agent or any FILO Bridge Lender by the Borrower.

(c)    [Reserved].

43

Debtors' Exhibit No. 6
Page 50 of 339

(d)     If, except as otherwise expressly provided herein, any Lender shall, by exercising any right of set-off or counterclaim or otherwise against any Loan Party, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other similarly situated Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by all such Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered,  such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Borrower and the other Loan Parties consent to the foregoing and agree, to the extent they may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower, or any other Loan Party, rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower or such other Loan Party in the amount of such participation.

(e)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent, for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f)     If any Lender shall fail to make any payment required to be made by it hereunder, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by Administrative Agent for the account of such Lender to satisfy such Lender's obligations hereunder until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender hereunder; application of amounts pursuant to <u>clauses (i)</u> and/or <u>(ii)</u> above shall be made in such order as may be determined by the Administrative Agent in its sole discretion.

SECTION 2.19.     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under <u>Section 2.15</u>, or if the Borrower is required to pay any additional amount or make an indemnity payment to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.17</u>, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 2.15</u> or <u>2.17</u>, as the case may be, in the future and (ii) would not subject such Lender to any

44

WEIL:\99557430\21\76000.0003

unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender (i) requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount or make an indemnity payment to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or (ii) becomes a Defaulting Lender, then, in each case, the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) such assignment shall be in compliance with Section 9.04(b), (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each Lender agrees that, if pursuant to this Section 2.19 it is required to assign and delegate all of its interests, rights and obligations under this Agreement, and such interests, rights and obligations under this Agreement are so assigned pursuant to this Section 2.19, it shall execute and deliver to the Administrative Agent an Assignment and Assumption to evidence such assignment; provided, however, that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid (and such Lender agrees that it shall be deemed to have executed and delivered such document if it fails to do so).

SECTION 2.20.    Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then, for so long as such Lender is a Defaulting Lender, such Defaulting Lender shall not have the right to vote on any issue on which voting is required (other than to the extent expressly provided in Section 9.02(b)) and the Commitments of such Defaulting Lender shall not be included in determining whether the Required Lenders or the MPT Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 9.02) or under any other Loan Document; provided, that, except as otherwise provided in Section 9.02, this Section 2.20 shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of such Lender or each Lender directly affected thereby.

SECTION 2.21.    Returned Payments.  If after receipt of any payment which is applied to the payment of all or any part of the Obligations, the Administrative Agent or any Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Administrative Agent or such Lender. The provisions of this Section 2.21 shall be and remain effective notwithstanding any contrary action which may have been taken by the Administrative Agent or any Lender in reliance upon such payment or application of proceeds.  The provisions of this Section 2.21 shall survive the termination of this Agreement.

45

**Debtors' Exhibit No. 6**
**Page 52 of 339**

SECTION 2.22.    [Reserved].

SECTION 2.23.    Benchmark Replacement Setting.

(a)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the applicable then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as both the Administrative Agent have not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.23(a) will occur prior to the applicable Benchmark Transition Start Date.

(b)    Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will collectively have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement, and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.23(d) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.23, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.23.

(d)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the applicable then-current Benchmark is a term rate and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then such Agent may modify the definition of "Interest Period" or "Interest Payment Date" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" or "Interest Payment Date" (or any similar or

46

Debtors' Exhibit No. 6
Page 53 of 339

analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

## ARTICLE III

### Representations and Warranties

Each Loan Party represents and warrants to the Lenders that:

SECTION 3.01.  <u>Organization; Powers</u>.  Each Loan Party and its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted.  Each Loan Party and its Subsidiaries is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.02.  <u>Authorization; Enforceability</u>.  The Transactions are within each Loan Party's organizational powers and have been duly authorized by all necessary organizational actions, and, if required, actions by equity holders of the Loan Parties. The Loan Documents to which each Loan Party is a party have been duly executed and delivered by such Loan Party and constitute a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03.  <u>Governmental Approvals; No Conflicts</u>.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) for filings and recordings necessary to perfect Liens created pursuant to the Loan Documents and (iii) for the consents, approvals, registrations, filings and other actions set forth of Schedule 3.03 of the Existing ABL/FILO Credit Agreement (as supplemented, as applicable, by <u>Schedule 3.03</u> hereto), (b) will not violate any Requirement of Law applicable to any Loan Party or any of its Subsidiaries except (in the case of this <u>clause (b)</u>) as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and (c) will not violate or result in a default under any agreement or instrument binding upon any Loan Party or any of its Subsidiaries or the assets of any Loan Party or any of its Subsidiaries, or give rise to a right thereunder to require any payment to be made by any Loan Party or any of its Subsidiaries except  (in the case of this <u>clause (c)</u>) as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  The execution and delivery by each Loan Party of the Loan Documents to which it is a party, the performance of its obligations thereunder and the Borrowings hereunder, will not result in the creation or imposition of any Lien on any asset of any Loan Party or any of its Subsidiaries, except Liens created pursuant to the Loan Documents.

SECTION 3.04.  <u>Financial Condition; No Material Adverse Change.</u>

(a)      The Borrower has heretofore furnished to the Lenders the consolidated balance sheet and statements of income, stockholders equity and cash flows of (i) the ABL/FILO Borrower and its Subsidiaries as of and for the fiscal year ending December 31, 2022, and (ii) the ABL/FILO Borrower and its Subsidiaries as of and for the fiscal quarter ending March 31, 2023 and as of and for the fiscal month ending April 30, 2023.  Such financial statements of the Borrower present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated

47

Debtors' Exhibit No. 6
Page 54 of 339

Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)     Since December 31, 2022, no event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

SECTION 3.05.     Properties.   (a) As of the date of this Agreement, Schedule 3.05 of the Existing ABL/FILO Credit Agreement (as supplemented by Schedule 3.05 hereto) sets forth the address of each parcel of real property that is owned or leased by each Loan Party.  (i) Each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, (ii) there is no default by any Loan Party or any Subsidiary party to such lease or sublease, and (iii) to the knowledge of the Loan Parties, no default by any party to any such lease or sublease exists except where the foregoing, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties and its Subsidiaries has good and marketable title to, or valid leasehold interests in, all of its Collateral, free of all Liens (other than Permitted Liens), and each of the Loan Parties and its Subsidiaries has good and marketable title to, or valid leasehold interests in, all of its real and personal property, free in all material respects of all Liens (other than Permitted Liens).

(b)     Each Loan Party and its Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property material to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on Schedule 3.05 of the Existing ABL/FILO Credit Agreement (as supplemented by Schedule 3.05 hereto).  Except as set forth on Schedule 3.05 of the Existing ABL/FILO Credit Agreement (as supplemented by Schedule 3.05 hereto), each Loan Party's rights thereto are not subject to any material licensing agreement or similar arrangement.  To the knowledge of the Loan Parties the use thereof by each Loan Party and its Subsidiaries does not infringe upon the rights of any other Person except where such infringement, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.06.     Litigation and Environmental Matters.   (a) There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any of its Subsidiaries or its Excluded Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect or (ii) that involve this Agreement or the Transactions.

(b)     No Loan Party nor any of its Subsidiaries has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability, except for matters that could not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.  No Loan Party nor any of its Subsidiaries (1) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law or (2) has any material Environmental Liability, except in either case of clause (1) or (2), other than matters that could not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)     There has been no Release or threatened Release or any handling, management, generation, treatment, storage or disposal of Hazardous Materials on, at, under or from any property presently or formerly owned, leased or operated by any of the Loan Parties that has resulted in, or is reasonably likely to result in, an Environmental Liability that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

48

SECTION 3.07.   <u>Compliance with Laws and Agreements</u>.   Each Loan Party and its Subsidiaries is in compliance with all Requirements of Law applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where, in each case, the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.   No Default has occurred and is continuing.   Each Loan Party, and their respective Subsidiaries and, to the knowledge of each Loan Party, any of the Affiliates or respective officers, directors, brokers or agents of such Loan Party, Subsidiary or Affiliate is in compliance with Anti- Money Laundering Laws.

SECTION 3.08.   <u>Investment Company Status</u>.   No Loan Party or any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.   <u>Taxes</u>.   Each Loan Party and its Subsidiaries has timely filed or caused to be filed all federal, state and other material Tax returns and reports required to have been filed and has paid or caused to be paid all federal, state and other material Taxes required to have been paid by it, except (i) Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves or (ii) returns and reports, the failure of which to file, and Taxes, the failure of which to pay, could not reasonably be expected to have a Material Adverse Effect (it being agreed that the failure to remit the 2021 FICA Deferral shall not constitute a Default or Event of Default under this <u>Section 3.09</u>. No tax liens (other than Permitted Encumbrances) have been filed and no claims are being asserted with respect to any such taxes.

SECTION 3.10.   <u>ERISA</u>.   No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to have a Material Adverse Effect.

SECTION 3.11.   <u>Disclosure</u>.   Each Loan Party has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.   None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished), when taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect; <u>provided</u> that with respect to projected financial information, (a) each Loan Party represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date, and (b) it is understood and agreed that uncertainty is inherent in any forecasts or projections and no assurances can be given by the Borrower of the future achievement of such performance.

SECTION 3.12.   <u>Solvency</u>.   Immediately after the consummation of the transactions to occur on the Effective Date, (i) the fair value of the assets of the Loan Parties, taken as a whole, at a fair valuation, will exceed their debts and liabilities, subordinated, contingent or otherwise; and (ii) the present fair saleable value of the property of the Loan Parties, taken as a whole, will be greater than the amount that will be required to pay the probable liability of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured.

49

SECTION 3.13.    Insurance.  Schedule 3.13 of the Existing ABL/FILO Credit Agreement (as supplemented, as applicable, by Schedule 3.13 hereto) sets forth a description of all insurance maintained by or on behalf of the Loan Parties and the Subsidiaries as of the Effective Date.  As of the Effective Date, all premiums due and payable in respect of such insurance have been paid.  The Borrower and the other Loan Parties believe that the insurance maintained by or on behalf of the Borrower and its Subsidiaries complies with Section 5.09.  Subject to Schedule 4.01, all liability and property insurance policies (unless otherwise agreed to by the Administrative Agent) name the Collateral Agent as additional insured, lender loss payee or loss payee, as applicable.

SECTION 3.14.    Capitalization and Subsidiaries.  Schedule 3.14 of the Existing ABL/FILO Credit Agreement (as supplemented, as applicable, by Schedule 3.14 hereto) sets forth, as of the Effective Date, (a) a correct and complete list of the name and relationship to Holdings of each and all of Holdings' Material Subsidiaries, (b) a true and complete listing of each class of each Loan Party's authorized Equity Interests and (c) the type of entity of Holdings and each of its Material Subsidiaries.  All of the issued and outstanding Equity Interests of a Subsidiary or an Excluded Subsidiary owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued, and are fully paid and non-assessable.

SECTION 3.15.    Security Interest in Collateral.  The provisions of the Collateral Documents create legal and valid Liens on all of the Collateral in favor of the Collateral Agent, for the benefit of the Administrative Agent and the Lenders and the other holders of the Secured Obligations, and, (i) when financing statements are filed in the offices specified in the Security Agreement and (ii) when the Collateral Agent takes possession or control of the Collateral in which a security interest may be perfected only by possession or control under the UCC, such Liens shall constitute perfected and continuing Liens on the Collateral, securing the Secured Obligations to the extent that a security interest in such Collateral may be perfected by filing, possession or control under the UCC, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except for Permitted Prior Liens. For the avoidance of doubt, the Collateral does not include, and no representation or warranty is made pursuant to this Section 3.15 with respect to, any asset or property that is not owned by a Loan Party.

SECTION 3.16.    Employment Matters.  As of the Effective Date, there are no strikes, lockouts or slowdowns pending against any Loan Party or any Subsidiary.  The hours worked by and payments made to employees of the Loan Parties and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  All payments due from any Loan Party or any Subsidiary, or for which any claim may be made against any Loan Party or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Loan Party or such Subsidiary except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 3.17.    Affiliate Transactions; Excluded Subsidiaries.   (a) Except as set forth on Schedule 3.17 of the Existing ABL/FILO Credit Agreement (as supplemented by Schedule 3.17 hereto) or as not otherwise prohibited under this Agreement, as of the date of this Agreement, (i) there are no existing or proposed agreements, arrangements, understandings, or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, other interest holders, or Affiliates (other than Subsidiaries) of any Loan Party or any members of their respective immediate families and (ii) none of the foregoing Persons are directly or indirectly indebted to or have any direct or

WEIL:\99557430\21\76000.0003

indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party.

(b)     Except as otherwise permitted in this Agreement, no Excluded Subsidiary (i) has any direct or indirect ownership, partnership, or voting interest in any Loan Party or any Subsidiary or (ii) has directly or indirectly established, owns, leases, manages, operates, controls, or participates in any manner (including, without limitation, by providing grant or other funding, or guarantees) in the existence, ownership, leasing, management, operation or control of any business that offers services in competition with core business of and services provided by the Loan Parties, other than (A) any Non-Profit Subsidiary, for so long as such entity is a Non-Profit Subsidiary, (B) any other Excluded Subsidiary that does not conduct any competitive business or operations (directly or indirectly, whether through ownership, lease, management, operation, control or participation (including, without limitation, by providing grant or other funding, or guarantees)) within a 50 mile radius of any location in which any Loan Party conducts any of its core businesses or services and (C) Steward PET Imaging, LLC, a Massachusetts limited liability company, so long as it provides substantially the same services (and no other services, other than those reasonably incidental thereto) as it does on the Effective Date.

SECTION 3.18.     Common Enterprise.   The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party.   Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrower hereunder, both in their separate capacities and as members of the group of companies.   Each Loan Party has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, in furtherance of its direct and/or indirect business interests, will be of direct and/or indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.19.     Government Reimbursement Programs.   (a) Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the medical facilities and practices operated by the Loan Parties and their Subsidiaries are (i) qualified for participation in, and have current and valid provider contracts with, the Government Reimbursement Programs and/or their fiscal intermediaries or paying agents and are in compliance with the conditions of participation or requirements applicable with respect to such participation and (ii) eligible for payment under the Government Reimbursement Programs for services rendered to qualified beneficiaries and are in compliance with the conditions of participation and conditions of payment in all Government Reimbursement Programs in which they participate or have participated, except for the fact that medical facilities (A) newly developed by Loan Parties or their Subsidiaries may from time to time be awaiting an initial Medicare certification and/or initial Medicare or Medicaid provider number in accordance with normal business practice because of standard waiting times between the proper timely filing of the relevant documents therefor and the receipt of such certification and/or provider number and (B) acquired by the Loan Parties or their Subsidiaries may from time to time be awaiting a Medicare certification and/or Medicare or Medicaid provider number issued in the name of such Loan Party or Subsidiary in accordance with normal business practice because of standard waiting times between the proper timely filing of the relevant documents therefor and the receipt of such provider number.

(b)     Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there is no pending or, to the Loan Parties' knowledge, threatened litigation, proceeding or investigation by any government agency with oversight responsibility for any of

WEIL:\99557430\21\76000.0003

the Government Reimbursement Programs with respect to (i) any Loan Party's or any Subsidiary's qualification or right to participate in any Government Reimbursement Program in which it participates or has participated, (ii) the compliance or non-compliance by any Loan Party or any Subsidiary with the terms or provisions of any Government Reimbursement Program in which it participates or has participated, or (iii) the right of any Loan Party to receive or retain amounts received or due or to become due from any Government Reimbursement Program in which it participates or has participated.

(c)     No Loan Party nor any Subsidiary, has been or is excluded from participation in any federal or state health care program or listed on the General Services Administration or the Department of Health and Human Services Office of Inspector General excluded individuals and entities listings, nor has any of them received written notice of an impending exclusion or listing, nor has any of them committed any act that would reasonably be expected to result in exclusion or listing with respect to any such program that is, in each case, individually or in the aggregate, material to the business of the Loan Parties.  To the knowledge of any Loan Party, no employee is excluded from participation in any federal or state health care program or listed on the General Services Administration or the Department of Health and Human Services Office of Inspector General excluded individuals and entities listings, nor, to the knowledge of any Loan Party, has any such employee received notice of an impending exclusion or listing, nor, to the knowledge of any Loan Party, has any such employee committed any act that would reasonably be expected to result in exclusion or listing, except to the extent that employing or contracting with any of them could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)     No Loan Party nor any Subsidiary nor any of their respective officers or directors, on behalf of any Loan Party, has committed any act, or received written notice alleging performance or omission of an act, that would constitute violation of any federal statute applicable to Government Reimbursement Programs or the regulations promulgated pursuant to such statutes or related state or local statutes or regulations, except as could not be reasonably likely, individually or in the aggregate, to have a Material Adverse Effect, including but not limited to the following:

(i)     (A)     knowingly and willfully making or causing to be made a false statement or representation of a material fact in any applications for any benefit or payment; (B) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (C) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; and (D) knowingly and willfully soliciting, receiving, offering or paying any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (x) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid or other applicable government payers, or (y) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service or item for which payment may be made in whole or in part by Medicare, Medicaid or other applicable government payers,

(ii)     knowingly and willfully presented or caused to be presented a claim for a medical or other item or service that was not provided as claimed, or was for a medical or other item or service and the Person knew or should have known the claim was false or fraudulent, or

52

(iii)      in violation of 42 U.S.C. § 1395nn, presented or caused to be presented a claim to any individual, third party payor or other entity for a designated health service furnished pursuant to a referral by a physician if the physician (or an immediate family member) had a financial relationship with the Borrower or any of its Subsidiaries for which there was no permissible exception.

(e)      Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, none of the Loan Parties nor any of their Subsidiaries, nor any of their respective officers or directors, on behalf of the Loan Parties or any of their Subsidiaries, has violated the federal False Claims Act, 31 U.S.C. §§ 3729 et seq., including, but not limited to, by (i) knowingly and willfully presenting or causing to be presented a false or fraudulent claim for payment or approval, (ii) knowingly and willfully making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim or (iii) conspiring to defraud the government by knowingly and willfully getting a false or fraudulent claim paid.

(f)      Each of the Loan Parties and each of their Subsidiaries that is a covered entity (each, a "Covered Entity") within the meaning of the regulations implementing the Administrative Simplification title of HIPAA is in compliance with applicable provisions of HIPAA, except to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  To the knowledge of any Loan Party or any Subsidiary, the use and disclosure by each Covered Entity of "protected health information," as defined by HIPAA, has been in conformance with applicable notices of privacy practices and the privacy rule, except where the failure to be in conformance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(g)      To the knowledge of any Loan Party, none of the Loan Parties nor any of their Subsidiaries have violated 18 U.S.C. § 1347 including, but not limited to, knowingly and willfully executing or attempting to execute a scheme or artifice by means of false or fraudulent pretenses (i) to defraud any health care benefit program, or (ii) to obtain any money or property owned by, or under the custody or control of, any health benefit program.

SECTION 3.20.      Accounts.  The Accounts of the Loan Parties and their Subsidiaries represent sales actually made in the ordinary course of business, and are, in all material respects, current and, to the knowledge of the Loan Parties, fully collectible net of reserves shown on the financial statements delivered to Administrative Agent pursuant to Section 5.01 (which reserves are adequate and were calculated on a basis consistent with GAAP and past practices). The Accounts have, in all material respects, been appropriately adjusted to reflect current reimbursement policies of Government Reimbursement Programs and other Third Party Payors. The Accounts, adjusted as set forth above, relating to Third Party Payors, do not exceed in any material respects amounts the Loan Parties or their Subsidiaries reasonably believe they are entitled to receive, under any capitalization arrangement, fee schedule, discount formula, cost based reimbursement or other adjustment or limitation to the usual charges of the Loan Parties and their Subsidiaries.

SECTION 3.21.      Reimbursement; Nongovernmental Payors.  With respect to Government Reimbursement Programs and contracts with Third Party Payors, (i) no notice of any offsets against future reimbursement has been received by any Loan Party or any Subsidiary, nor to the knowledge of any Loan Party, is there any reasonable basis therefor, except with respect to offsets in the ordinary course of business that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (ii) there are no pending appeals, adjustments, challenges, audits, litigation, notices of intent to reopen or open completed payments and/or cost reports, except such adjustments made

WEIL:\99557430\21\76000.0003

**Debtors' Exhibit No. 6**
**Page 60 of 339**

in the ordinary course of business that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 3.22.    Healthcare Permits and Accreditations.  Without limiting or being limited by any other provision of any Loan Document:

(a)    Healthcare Permits.  Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Loan Party and each of its Subsidiaries holds and is in compliance with all Healthcare Permits necessary or required by applicable Governmental Authority for the operation of the business of such Loan Party or Subsidiary. Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there are no pending or, to the knowledge of any Loan Party or any Subsidiary or any of their respective officers or directors, threatened suits or proceedings that could reasonably be expected to result in the suspension, revocation, restriction, amendment or nonrenewal of any Healthcare Permit, and no event which (whether with notice or lapse of time or both) could reasonably be expected to result in a suspension, revocation, restriction, amendment or nonrenewal of any Healthcare Permit has occurred. Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Loan Party and its Subsidiaries is in compliance with the terms of its Healthcare Permits.

(b)    Accreditations.  Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Loan Party and its Subsidiaries holds all Accreditations necessary or required by applicable Governmental Authority for the operation of the business of such Loan Party or Subsidiary (including accreditation by the appropriate Governmental Authorities and industry accreditation agencies and accreditation and certifications necessary to receive payment and to participate under any Government Reimbursement Programs in which the Loan Party or Subsidiaries participates, and any Third Party Payor and other payor programs relevant to any Loan Party or Subsidiary.  Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there are no pending or, to the knowledge of any Loan Party, threatened suits or proceedings that could reasonably be expected to result in the suspension, revocation, restriction, amendment or nonrenewal of any Accreditations, and no event which (whether with notice or lapse of time or both) could reasonably be expected to result in a suspension, revocation, restriction, amendment or nonrenewal of any Accreditation has occurred. Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Loan Party is in compliance with the terms of its Accreditations.

SECTION 3.23.    Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions; Beneficial Ownership.

(a)    Each Loan Party has implemented and maintains in effect policies and procedures designed to promote and achieve compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions, and such Loan Party, its Subsidiaries and their respective directors, officers and  employees and, to the knowledge of such Loan Party,  agents, are and have been, in the past five (5) years, in compliance with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.  None of any Loan Party or any of its Subsidiaries or any of their respective directors or officers or to the knowledge of any such Loan Party, employees or agents that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Loan Party will use any part of the proceeds of any Borrowing, or conduct the Transaction or any other transaction contemplated by this Agreement or the other Loan Documents, in any manner that would

54

Debtors' Exhibit No. 6
Page 61 of 339

constitute or give rise to a violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by any party hereto.

(b)      As of the Effective Date and as of the date of any update required pursuant to Section 5.01(n), the information in the Beneficial Ownership Certification is true and correct in all respects.

SECTION 3.24.      <u>Affected Financial Institutions</u>.  No Loan Party is an Affected Financial Institution.

SECTION 3.25.      <u>Federal Reserve Regulations</u>.  No part of the proceeds of any Loan has been used or will be used, whether directly or indirectly, for any purpose that entails a violation of Regulations T, U or X of the Board of Governors of the Federal Reserve System of the United States of America.

SECTION 3.26.      <u>Malta Matters</u>.  In connection with operations, activity and/or conduct occurring or arising in Malta or involving the government of Malta (the foregoing, collectively, the "<u>Malta Matters</u>"), (i) no assessment of or agreement to pay any fine, penalty, settlement amount or other payment has occurred (whether as a result of a judicial order, a settlement or otherwise) and (ii) no investigation, litigation, administrative process or proceeding by any Governmental Authority has been commenced or threatened in writing, in each case specified in the foregoing <u>clauses (i)</u> and <u>(ii)</u>, in respect of or against (x) Holdings, any controlled Affiliate of Holdings, or any then-current Management Member or Permitted Holder of any of the foregoing (the foregoing collectively, the "<u>Specified Domestic Parties</u>") or (y) to the knowledge after due inquiry of any Specified Domestic Party, any other current or former Affiliate of Holdings, the Borrower or any Loan Party, or any former management member or Permitted Holder of any of the foregoing (the foregoing collectively, the "<u>Other Parties</u>"); <u>provided</u>, <u>however</u>, that the foregoing shall not apply to de minimis fines, taxes or other payments or proceedings arising in the ordinary course of business that are, in each case, unrelated to any Anti-Corruption Laws.

SECTION 3.27.      <u>Regulatory Matters</u>.  In connection with operations, activity and/or conduct occurring or arising in connection with, or that are the subject of or involving any inquiry or action by a Governmental Authority arising out of or in connection with the COVID-19 Stimulus Program or the use of the proceeds or benefits thereof (such inquiries and actions, together with the Malta Matters, the "<u>Regulatory Matters</u>"), (i) no assessment of or agreement to pay any fine, penalty, settlement amount or other payment has occurred (whether as a result of a judicial order, a settlement or otherwise), (ii) no litigation or request or demand for repayment has been commenced or threatened and (iii) no settlement demand has been made, no exposure analysis has been prepared, no indictment has been issued and no demand for recovery or repayment has been made, in each case specified in the foregoing clauses (i)-(iii), in respect of or against (x) any Specified Domestic Party or (y) to the knowledge after due inquiry of any Specified Domestic Party, any Other Party.  The Regulatory Matters do not affect or relate to the operations, activity and/or conduct of the managed care activity of any of the Loan Parties.  The Loan Parties have at all times complied with the COVID-19 Stimulus Program and applicable laws and regulations relating to the Public Health and Social Services Emergency Fund, including with respect to provider relief funds.  The representations and warranties of the Loan Parties contained in this Section 3.27 are made by the Loan Parties as of February 21, 2024 and on an ongoing basis thereafter.

WEIL:\99557430\21\76000.0003

ARTICLE IV

Conditions

SECTION 4.01.    Effective Date.  The obligations of the Lenders to make Loans hereunder on the Effective Date shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)    Credit Agreement and Loan Documents.    The Administrative Agent (or its counsel) shall have received (i) from each party hereto either (A) a counterpart of this Agreement signed on behalf of such party or (B) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (ii) subject to Schedule 4.01, duly executed copies of the Security Agreement, the Fee Letter, the other Loan Documents and such other certificates, documents, instruments and agreements as the Initial Lenders shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including any insurance certificates and promissory notes requested by a Lender reasonably in advance of the Effective Date pursuant to Section 2.10 payable to each such requesting Lender and its registered assigns, and (iii) an opinion of Weil, Gotshal & Manges LLP and McDermott Will & Emery, each counsel to the Loan Parties, addressed to the Administrative Agent and the Lenders, in each case, in form and substance acceptable to the Administrative Agent and the Lenders.

(b)    Forbearance.  The ABL/FILO Forbearance (and the amendments to the Existing ABL/FILO Credit Agreement contemplated thereby) and the MPT Forbearance Agreement  shall have become, or concurrently with the occurrence of the Effective Date shall become, effective, in each case, in form and substance acceptable to the Administrative Agent and the Lenders.

(c)    Secretary Certificates; Certified Certificate of Incorporation; Good Standing Certificates.  The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Effective Date and executed by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the Financial Officers and any Authorized Officers of such Loan Party authorized to sign the Loan Documents to which it is a party, and (C) either (x) confirm that there has been no change to the certificate or articles of incorporation or organization and/or the by-laws or operating, management or partnership agreement, as applicable, of such Loan Party last delivered to the Existing ABL Agent pursuant to the Existing ABL/FILO Credit Agreement or (y) attaching the certificate or articles of incorporation or organization of such Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by-laws or operating, management or partnership agreement, and (ii) a good standing certificate for each Loan Party from its jurisdiction of organization.

(d)    Closing Certificate.  The Administrative Agent shall have received a certificate, signed by a Financial Officer of the Borrower, on the Effective Date (i) stating that no Default or Event of Default has occurred and is continuing hereunder and (ii) stating that the representations and warranties contained in Article III are true and correct in all material respects as of such date (it being understood that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects after giving effect to any such qualification therein).

56

(e)    <u>Fees</u>.  The Lenders, the Administrative Agent and the Collateral Agent, as applicable, shall have received all fees and expenses required to be paid on the Effective Date, including such fees set forth in the Fee Letter, which in the case of expenses, for which invoices have been presented at least one Business Day prior to the Effective Date (including the reasonable fees and expenses of legal counsel).

(f)    <u>Perfection Certificate</u>.  The Administrative Agent shall have received a Perfection Certificate with respect to the Loan Parties dated the Effective Date and duly executed by a Financial Officer of the Borrower.

(g)    <u>Solvency Certificate</u>.  The Administrative Agent and the Lenders shall have received a solvency certificate from a Financial Officer of the Borrower.

(h)    <u>Governmental Authorizations and Consents</u>.  Each Loan Party shall have obtained all Governmental Authorizations and all consents (other than the Governmental Authorizations and consents set forth on <u>Schedule 3.03</u>) of other Persons, in each case that are necessary in connection with the execution, delivery and performance of the Loan Documents, and the borrowings of Loans and other credit extensions hereunder and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to Lenders.

(i)    <u>KYC</u>.  Each of the Administrative Agent and the Lenders shall have received (a) all documentation and other information required by Governmental Authorities under applicable Anti-Money Laundering Laws and "know-your-customer" rules and regulations, including, without limitation, as required by the USA PATRIOT Act, and (b) if the Borrower qualified as a "legal entity customer" under the Beneficial Ownership Regulation, a certification in relation to the Borrower regarding individual beneficial ownership to the extent required by the Beneficial Ownership Regulation.

(j)    <u>Filings, Registrations and Recordings</u>.  Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Collateral Agent, for the benefit of the Administrative Agent and the Lenders and the other holders of the Secured Obligations, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than Permitted Prior Liens), shall be in proper form for filing, registration or recordation.

(k)    <u>Borrowing Request</u>.  The Administrative Agent shall have received a Borrowing Request in respect of the Borrowing of Loans to be made on the Effective Date.

(l)    <u>Material Adverse Effect</u>. No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since December 31, 2022.

(m)    <u>Other Documents</u>. Each of (i) the Intercreditor Agreement, (ii) the Intercompany Subordination Agreement, (iii) the Excess Property Disposition Agreement and (iv) the Specified MPT Loan Payoff Letter shall have become, or concurrently with the occurrence of the Effective Date shall become, effective, in each case, in form and substance acceptable to the Administrative Agent and the Lenders.

SECTION 4.02.    <u>Delayed Draw Date</u>.  The obligations of the Lenders to make Loans hereunder on the Delayed Draw Date shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 9.02</u>):

57

**Debtors' Exhibit No. 6**
**Page 64 of 339**

(a)      The Effective Date shall have occurred.

(b)      The representations and warranties of the Loan Parties set forth in this Agreement shall be true and correct in all material respects (it being understood that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects after giving effect to any such qualification therein)) with the same effect as though made on and as of the date of such Borrowing (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

(c)      At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(d)      In the case of a Borrowing of Loans, the Administrative Agent shall have received a Borrowing Request as required by Section 2.03.

(e)      In the case of a Borrowing of Loans, the proceeds of such Loans shall be used in accordance with Section 5.08.

(f)      The Stewardship Signing shall have occurred.

(g)      The Stewardship End Date shall not have occurred.

(h)      The Administrative Agent shall have received a certificate, signed by a Financial Officer of the Borrower, on the Delayed Draw Date, certifying as to clauses (b), (c), (f), (g) and (k) of this Section 4.02.

(i)      The Lenders, the Administrative Agent and the Collateral Agent, as applicable, shall have received all fees and expenses required to be paid at the time of such Borrowing, including any fees set forth in the Fee Letter, which in the case of expenses, for which invoices have been presented at least one Business Day prior to the time of such Borrowing (including the reasonable fees and expenses of legal counsel).

(j)      The Administrative Agent and the Lenders shall have received a solvency certificate from a Financial Officer of the Borrower.

(k)      No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since December 31, 2022.

The Borrowing of Loans on the Delayed Draw Date shall be deemed to constitute a representation and warranty by the Borrower and each other Loan Party on the date thereof as to the matters specified in paragraphs (a) through (k) of this Section.

## ARTICLE V

### Affirmative Covenants

Until the Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lenders that:

58

**Debtors' Exhibit No. 6**
**Page 65 of 339**

SECTION 5.01.    Financial Statements and Other Information.  The Loan Parties will furnish to the Administrative Agent (for further distribution to the Lenders):

(a)    within 120 days after the end of each fiscal year of the ABL/FILO Borrower (or, in the case of the fiscal year ending December 31, 2023, June 30, 2024), such financial statements as required under, and delivered to the Existing ABL Agent and the Existing FILO Agent pursuant to, Section 5.01(a) of the Existing ABL/FILO Credit Agreement;

(b)    (i) within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the ABL/FILO Borrower and (ii) within 60 days after the fourth fiscal quarter of each fiscal year of the Borrower, such financial statements, certificates, schedules, reports and other items as required under, and delivered to the Existing ABL Agent and the Existing FILO Agent pursuant to, Section 5.01(b) of the Existing ABL/FILO Credit Agreement;

(c)    within thirty-five (35) days after the end of each calendar month of each fiscal year of the ABL/FILO Borrower (commencing with the calendar month ending January 31, 2024), such financial statements, certificates, schedules, reports and other items as required under, and delivered to the Existing ABL Agent and the Existing FILO Agent pursuant to, Section 5.01(c) of the Existing ABL/FILO Credit Agreement;

(d)    concurrently with any delivery of financial statements under clause (a) through (c) above, a copy of the certificate of a Financial Officer of the ABL/FILO Borrower required under, and delivered to the Existing ABL Agent and the Existing FILO Agent pursuant to, Section 5.01(d) of the Existing ABL/FILO Credit Agreement;

(e)    concurrently with any delivery of financial statements under clause (a) above, use commercially reasonable efforts (without additional cost to the Borrower) to obtain a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default (which certificate shall not be so required if such accounting firm refuses to deliver the same, and, if so delivered, may be limited to the extent required by accounting rules or guidelines or such accounting firm);

(f)    as soon as available but in any event no later than 90 days after the end of each fiscal year of the ABL/FILO Borrower, a copy of the projections required under, and delivered to the Existing ABL Agent and the Existing FILO Agent pursuant to, Section 5.01(f) of the Existing ABL/FILO Credit Agreement;

(g)    as soon as available but in any event within 25 days of the end of each calendar month, as of the period then ended, a copy of the borrowing base certificate and supporting information in connection therewith required under, and delivered to the Existing ABL Agent and the Existing FILO Agent pursuant to, Section 5.01(g) of the Existing ABL/FILO Credit Agreement;

(h)    [reserved];

(i)    promptly following any request therefor, copies of all annual IRS Form 1120 tax returns filed by any Loan Party with the IRS;

(j)    [reserved];

(k)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the ABL/FILO Borrower or any Subsidiary

59

thereof with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, as the case may be;

(l)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the ABL/FILO Borrower or any Subsidiary thereof, or compliance with the terms of this Agreement, as the Administrative Agent or any Lender (pursuant to a request through the Administrative Agent) may reasonably request;

(m)    [reserved]; and

(n)    promptly after any Authorized Officer of any Loan Party obtains knowledge of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in such certification.

SECTION 5.02.    Notices of Material Events.    The Loan Parties will furnish to the Administrative Agent (for further distribution to the Lenders) (but in any event within any time period that may be specified below) written notice of the following:

(a)    promptly, but in any event no later than three Business Days after any Authorized Officer of any Loan Party obtains knowledge of the occurrence of any Default;

(b)    receipt of any written notice of any governmental investigation, assertion of violation of law or of assessment of any fine or of any litigation, administrative process or proceeding commenced or threatened in writing against any Loan Party that (i) (x) could reasonably be expected to have a Material Adverse Effect, (y) asserts damages, or assesses a fine, against any Loan Party in excess of $20,000,000 in the aggregate, or (z) could reasonably be expected to result in liability in excess of $20,000,000 in the aggregate, (ii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iii) alleges criminal misconduct by any Loan Party or any Management Member of Permitted Holder, or (iv) seeks injunctive or other equitable remedies under any Environmental Laws, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, provided, that the Loan Parties shall have no obligation to disclose any materials or information to the extent such disclosure would result in the waiver of attorney-client privilege so long as a reasonably detailed general description of the applicable materials or information being withheld is furnished in a manner that would not give rise to the applicable waiver of attorney-client privilege;

(c)    within two (2) Business Days after any Authorized Officer of any Loan Party obtains knowledge (i) that any medical facility or practice has had a Healthcare Permit, Accreditation, or qualification to participate in Government Reimbursement Programs revoked, suspended, or non-renewed, which such revocation, suspension or non-renewal could reasonably be expected to have a Material Adverse Effect, (ii) of an investigation or proceeding described in Section 3.19(b), or (iii) of any violation described in Section 3.19 that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(d)    any Lien (other than any Permitted Lien) or claim in an amount exceeding $7,500,000 made or asserted against any of the Collateral;

(e)    any loss, damage, or destruction to the Collateral in the amount of $7,500,000 or more, whether or not covered by insurance;

WEIL:\99557430\21\76000.0003

(f)        within five (5) Business Days of receipt thereof, any and all default notices received under or with respect to any leased location or public warehouse where Collateral having a value in excess of $7,500,000 is located;

(g)        [reserved];

(h)        the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the ABL/FILO Borrower and its Subsidiaries in an aggregate amount exceeding $7,500,000;

(i)        any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect;

(j)        all amendments to and all notices of default received pursuant to the MPT Documents and/or the Existing ABL/FILO Credit Agreement, together with a copy of each such amendment or notice; and

(k)        in connection with any Regulatory Matter, (i) no later than one (1) Business Day after the assessment of or agreement to pay any fine, penalty, settlement amount or other payment has occurred (whether as a result of a judicial order, a settlement or otherwise), (ii) no later than three (3) Business Days after the receipt of any communication, notice or additional information (written or unwritten) relating to any investigation, litigation, administrative process or proceeding by any Governmental Authority commenced or threatened, and (iii) no later than (1) Business Day after any settlement demand has been made, any exposure analysis has been prepared, any indictment has been issued or any demand for recovery or repayment has been made, in each case specified in the foregoing clauses (i)-(iii), in respect of or against any Specified Domestic Parties or, to the knowledge after due inquiry of any Specified Domestic Party, any Other Parties, the Borrower shall inform the Administrative Agent of any such event and furnish the Administrative Agent with any information relating thereto (and, in the case of any unwritten communication, notice or additional information, a written summary thereof); provided, however, that (x) the Loan Parties shall have no obligation to disclose any such information to the extent such disclosure would result in the waiver of attorney-client privilege so long as a reasonably detailed description of such information being withheld is furnished to the Administrative Agent in a manner that would not give rise to the applicable waiver of attorney-client privilege and (y) with respect to the Malta Matters, the foregoing shall not apply to de minimis fines, taxes or other payments or proceedings arising in the ordinary course of business that are, in each case, unrelated to any Anti-Corruption Laws.

Each notice delivered under this Section 5.02 shall be accompanied by a statement of a Financial Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.        Existence; Conduct of Business.  Each Loan Party will, and will cause each Material Subsidiary to, (a) do or cause to be done all things necessary to (i) preserve, renew and keep in full force and effect its legal existence and maintain all requisite authority necessary to conduct its business in each jurisdiction in which its business is conducted and (ii) except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, preserve, renew and keep in full force and effect the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03, and (b) carry on and conduct its business in substantially the same manner

61

and in substantially the same fields of enterprise as it is presently conducted or fields of enterprise reasonably related, complimentary, ancillary or incidental thereto.

SECTION 5.04.    Payment of Obligations.    Each Loan Party will, and will cause each Subsidiary to, pay or discharge all Material Indebtedness and all other material payment liabilities and obligations, including Taxes, before the same shall become delinquent or in default, except where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings and (ii) such Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP or (b) the failure to make payment could not reasonably be expected to result in a Material Adverse Effect; provided, however, that each Loan Party will, and will cause each Subsidiary to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions; provided, further, that the failure to remit the applicable employment taxes deferred under Section 2302 of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") until December 31, 2021, which was effectively extended administratively to the next Business Day, Monday, January 3, 2022 (the "2021 FICA Deferral") shall not constitute a Default or Event of Default under this Section 5.04.

SECTION 5.05.    Maintenance of Properties.    Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where failure to maintain such property in good working order and condition could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 5.06.    Books and Records; Inspection Rights.    Each Loan Party will, and will cause each Subsidiary to, (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Administrative Agent or any Lender (including employees of the Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by the Administrative Agent), upon reasonable prior notice, to visit and inspect its properties, conduct at the Loan Party's premises, field examinations of the Loan Party's assets, liabilities, books and records, including examining and making extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times during normal business hours and intervals as the Administrative Agent may reasonably request by so as not to materially interfere with normal operations of the Loan Parties' business; provided, that unless an Event of Default has occurred and is continuing (i) only the Administrative Agent on behalf of the Required Lenders may exercise the rights of the Administrative Agent and the Lenders under this Section 5.06 and (ii) the Administrative Agent shall not exercise such rights more than two times in any calendar year each of which shall be at the Borrower's expense. So long as no Event of Default has occurred and is continuing, the Administrative Agent on behalf of the Required Lenders shall give the Loan Parties the opportunity to participate in any discussions with the Loan Parties' independent public accountants.  The Loan Parties acknowledge that the Administrative Agent, after exercising its rights of inspection, may prepare and distribute to the Lenders certain reports pertaining to the Loan Parties' assets for internal use by the Administrative Agent and the Lenders.  In the case of all inspections, including any such visits and inspections during the continuation of an Event of Default or otherwise, the Administrative Agent shall treat all records and data containing Protected Health Information, as defined under HIPAA, all Personal Information, as defined under Massachusetts General Laws Chapter 93H and the regulations promulgated thereunder at 201 C.M.R. 17.00, and all financial and other personal data regarding patients, private and secure in a manner that assures the Loan Parties' compliance with applicable laws and regulations, including HIPAA.  The Loan Parties shall have no obligation to disclose materials that are protected by attorney-client privilege and any contracts, agreements or instruments entered into with a third party that

62

**Debtors' Exhibit No. 6**
**Page 69 of 339**

is not an Affiliate to the extent that such disclosure would violate any confidentiality obligations of such Loan Party.

SECTION 5.07.   Compliance with Laws.   Each Loan Party will, and will cause each Subsidiary to, comply (i) in all respects with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions, and (ii) with all other Requirements of Law (including, without limitation, HIPAA Medicare Regulations and Medicaid Regulations) applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.   Each Loan Party will maintain in effect and enforce policies and procedures designed to promote and achieve compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

SECTION 5.08.   Use of Proceeds.   (a) The proceeds of Loans will be used to finance the working capital needs and general corporate purposes of the Borrower and the other Loan Parties; provided, that no part of the proceeds of any Loan hereunder will be used, whether directly or indirectly, for the purpose, whether immediate, incidental or ultimate, of (x) buying or carrying margin stock within the meaning of Regulation U promulgated by the Board of Governors of the Federal Reserve System or (y) making any Restricted Payments or the repayment of any Indebtedness (it being understood and agreed that (1) the "cashless roll" of the Specified MPT Loan contemplated by Section 2.01(a)(i) and (2) payments in satisfaction of amounts due to vendors consistent with the Approved Budget (as defined in the Existing ABL/FILO Credit Agreement) shall be permitted hereunder).

(b)   No Loan Party shall use, and each Loan Party shall procure that its Subsidiaries and its and their respective directors, officers, employees and agents shall not use, any part of the proceeds of any Borrowing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Laws, (ii) to fund, finance or facilitate any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (iii) in any manner that would constitute or give rise to a violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by any party hereto.

SECTION 5.09.   Insurance.   Each Loan Party will, and will cause each Subsidiary to, maintain with financially sound and reputable carriers (a) insurance in such amounts (with no greater risk retention) and against such risks and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Collateral Documents.   Subject to Schedule 4.01 and the Intercreditor Agreement, all property and liability insurance policies (unless otherwise agreed to by the Administrative Agent) will name the Collateral Agent as additional insured, lender loss payee or loss payee, as appropriate. The Borrower will furnish to the Lenders, upon written request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

SECTION 5.10.   Casualty and Condemnation.   The Borrower will (a) furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any Collateral having a value in excess of $10,000,000 or the commencement of any action or proceeding for the taking of any Collateral having a value in excess of $10,000,000 under power of eminent domain or by condemnation or similar proceeding and (b) ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

WEIL:\99557430\21\76000.0003

SECTION 5.11.    [Reserved].

SECTION 5.12.    Additional Collateral; Further Assurances.  (a) Subject to applicable law, the Borrower and other Loan Parties (i) will cause each of its domestic Material Subsidiaries formed or acquired (or, in the case of any subsidiary of a Loan Party that is an Excluded Subsidiary, which no longer qualifies as an Excluded Subsidiary) or (ii) in the Administrative Agent's reasonable discretion, may cause any other Subsidiary of a Loan Party after the date of this Agreement in accordance with the terms of this Agreement to become a Loan Guarantor by executing a Joinder Agreement. Upon execution and delivery thereof, each such Person (1) shall automatically become a Loan Guarantor and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (2) will grant Liens to the Collateral Agent, for the benefit of the Administrative Agent and the Lenders and the other holders of the Secured Obligations, in any property of such Loan Guarantor which constitutes Collateral.  For the avoidance of doubt, no Subsidiary shall be required to become a Loan Guarantor under this Agreement pursuant to this Section 5.12(a) if such Subsidiary is not and will not concurrently become a Loan Guarantor (as such term is defined under the Existing ABL/FILO Credit Agreement) under the Existing ABL/FILO Credit Agreement pursuant to Section 5.12(a) thereof if then extant.

(b)    Notwithstanding the foregoing, no Healthchoice Entity, nor any other entity listed on Schedule 5.12(b) to the Existing ABL/FILO Credit Agreement, shall be required to become a Loan Party to the extent that the Administrative Agent and the Borrower reasonably determine that either (i) the cost of obtaining a Loan Guaranty from such Healthchoice Entity is excessive in relation to the benefit to the Secured Parties afforded thereby, (ii) the provision of such Loan Guaranty would result in materially adverse tax consequences to the Borrower or its Subsidiaries, or (iii) the provision of such Loan Guaranty would result in the failure of such Healthchoice Entity to satisfy any financial condition requirements of any applicable Governmental Authority; provided, that any Healthchoice Entity that provides a Guarantee to a third party in respect of any other Indebtedness for borrowed money owed by the Borrower or any of its Subsidiaries to such third party shall be required to become a Loan Party hereunder; provided, further that no such Healthchoice Entity will be required to become a Loan Party under this Agreement pursuant to this Section 5.12(b) if such Healthchoice Entity is not and will not concurrently become a Loan Party (as such term is defined under the Existing ABL/FILO Credit Agreement) under the Existing ABL/FILO Credit Agreement pursuant to Section 5.12(b) thereof if then extant.

(c)    Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to the Administrative Agent such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements and other documents and such other actions or deliveries of the type required by Section 4.01, as applicable), which the Administrative Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all at the expense of the Loan Parties.

(d)    If any material assets of a type constituting Collateral are acquired by the Borrower or any other Loan Party after the Effective Date (other than any (x) assets constituting Collateral under the Security Agreement that become subject to the Lien in favor of the Collateral Agent upon acquisition thereof or (y) assets constituting MPT Exclusive Collateral), the Borrower will, to the extent required by the Security Agreement or this Agreement, (i) notify the Administrative Agent thereof and, if requested by the Administrative Agent or the Required Lenders, cause such assets to be subjected to a Lien securing the Secured Obligations (but subject to the limitations contained in this Section 5.12)

64

**Debtors' Exhibit No. 6**
**Page 71 of 339**

and (ii) take, and cause each Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.  Nothing in this Section 5.12 shall require any Loan Party to grant a Lien pursuant to any Loan Document with respect to any property or assets in which such Loan Party acquires ownership right to the extent that the Administrative Agent determines, in its reasonable judgment, that the cost of granting such a Lien outweighs the benefits to the Administrative Agent, the Lenders and the other holders of the Secured Obligations.  Notwithstanding the foregoing or anything in this Agreement or any other Loan Document to the contrary, the Administrative Agent, Collateral Agent and each Lender hereby acknowledge, confirm and agree that (i) "Collateral" shall, for all purposes of this Agreement and the other Loan Documents, exclude the MPT Exclusive Collateral, (ii) the FILO Bridge Exclusive Collateral shall, for all purposes of this Agreement and the other Loan Documents, be solely for the benefit of the FILO Bridge Lenders and, after the FILO Bridge Obligations Payment Date, the Existing FILO Lenders, (iii) no Loan Party shall be required to take any action described in this clause (d) or otherwise with respect to any MPT Exclusive Collateral and (iv) no MPT Lender shall be permitted to take any action or otherwise with respect to any FILO Bridge Exclusive Collateral.

SECTION 5.13.    [Reserved].

SECTION 5.14.    USA PATRIOT Act; Beneficial Ownership.    Each Loan Party shall, promptly following a written request by the Administrative Agent (on behalf of itself or any Lender), provide (a) all documentation and other information that the Administrative Agent reasonably requests in order to comply with its ongoing obligations under applicable Anti-Money Laundering Laws and "know your customer" rules and regulations, including the USA PATRIOT Act and (b) to the extent such Loan Party then qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, (i) a Beneficial Ownership Certification or (ii) confirmation that the most recently delivered Beneficial Ownership Certification is still correct, in each case, to the extent such Beneficial Ownership Certification is required for the Administrative Agent or such Lender to satisfy the requirements of the Beneficial Ownership Regulation.

SECTION 5.15.    Compliance with Environmental Laws; Environmental Reports.

(a)    Each Loan Party shall, and shall cause each of its Subsidiaries to, (i) comply and to use commercially reasonable efforts to cause all lessees and other persons occupying any of its real property to comply, with all Environmental Laws; (ii) obtain and maintain in full force and effect in all material respects all material permits required under Environmental Laws and applicable to its operations; and (iii) conduct all Cleanup required by any Governmental Authority or under any applicable Environmental Laws, and in accordance with, the requirements of any Governmental Authority and applicable Environmental Laws, except in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)    Each Loan Party shall, and shall cause each of its Subsidiaries to, (i) do or cause to be done all things necessary to prevent any Release or threatened Release of Hazardous Materials in, on, under, at, to or from any of its real properties except for such Releases, individually or in the aggregate, that could not reasonably be expected to give rise to an Environmental Liability that could have a Material Adverse Effect, and (ii) use, store, handle and manage any Hazardous Materials in, on, or under or from any of its real properties in compliance with applicable Environmental Laws except as such failure to comply could not, individually or in the aggregate, reasonably be expected to give rise to an Environmental Liability that could have a Material Adverse Effect.

WEIL:\99557430\21\76000.0003

**Debtors' Exhibit No. 6**
**Page 72 of 339**

(c)        Each Loan Party shall, and shall cause each of its Subsidiaries to, at the sole cost and expense of Loan Parties or such Subsidiary, as applicable, (i) to Cleanup any Release of Hazardous Materials on, at, under, from or onto any of its real property as required pursuant to Environmental Law or the requirements of any Governmental Authority, that, individually or in the aggregate, could reasonably be expected to give rise to an Environmental Liability that could have a Material Adverse Effect; (ii) to address any environmental conditions at any of its real properties that could reasonably be likely to give rise to an Environmental Liability, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect and address any violations of Environmental Laws relating to any of its real property, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, pursuant to any reasonable written request of the Administrative Agent and share with the Administrative Agent all material data, information and reports generated or prepared in connection therewith; (iii) to keep any its real property free and clear of all Liens and other encumbrances pursuant to any Environmental Law, whether due to any act or omission of any Loan Parties or any other person, to the extent that the failure to do so could reasonably be expected to have a Material Adverse Effect; and (iv) to promptly notify the Administrative Agent in writing of: (1) any Release or threatened Release of Hazardous Materials in, on, under, at, from or migrating to any of its real property, (2) the receipt by any Loan Party of any written notice of violation from any Governmental Authority under Environmental Laws or any non-compliance with (whether known to a Governmental Authority or not) any Environmental Law at any of its real property, (3) any Lien pursuant to Environmental Law imposed on any of its real property, (4) any Cleanup required to be undertaken pursuant to Environmental Law, and (5) any written notice or other written communication received by any Loan Party or any Subsidiary from any person or Governmental Authority relating to any liability or potential liability of any Loan Party or Subsidiary pursuant to any Environmental Law, that in the case of subclauses (1) through (5) could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 5.16.    Compliance with Milestones. Each Loan Party shall, and shall cause each of its Subsidiaries to, satisfy each of the milestones specified in the ABL/FILO Forbearance by the deadlines stated therein (as such deadlines may be extended in accordance with the terms of the ABL/FILO Forbearance).

SECTION 5.17.    Fourth Amendment Covenants. Each Loan Party shall, and shall cause each of its Subsidiaries to, comply with the covenants contained in Section 5.17 of the Existing ABL/FILO Credit Agreement.

ARTICLE VI

Negative Covenants

Until the occurrence of the Termination Date, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lenders that:

SECTION 6.01.    Indebtedness. No Loan Party will, nor will it permit any Subsidiary to, create, incur or suffer to exist any Indebtedness, except:

(a)        the Secured Obligations and the "Secured Obligations" (as defined in the Existing ABL/FILO Credit Agreement); and

(b)        Indebtedness permitted pursuant to Section 6.01 of the Existing ABL/FILO Credit Agreement.

66

SECTION 6.02.     Liens.  No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except (each of the following, a "Permitted Lien"):

(a)     Liens created pursuant to any Loan Document or any Loan Document (as defined in the Existing ABL/FILO Credit Agreement); and

(b)     Liens permitted pursuant to Section 6.02 of the Existing ABL/FILO Credit Agreement.

SECTION 6.03.     Fundamental Changes.   (a) No Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing (i) any Subsidiary of any Loan Party may merge into or consolidate with a Loan Party (other than the Borrower or the ABL/FILO Borrower) in a transaction in which such Loan Party is the surviving corporation, (ii) any Loan Party (other than the Borrower or the ABL/FILO Borrower) may merge into or consolidate with any other Loan Party in a transaction in which the surviving entity is a Loan Party, (iii) any Subsidiary that is not a Loan Party may (A) merge into another Subsidiary that is not a Loan Party or (B) be consolidated, amalgamated or reorganized with or into another Subsidiary that is not a Loan Party, (iv) any Subsidiary that is not a Loan Party may liquidate or dissolve if the Loan Party which owns such Subsidiary determines in good faith that such liquidation or dissolution is in the best interests of such Loan Party and is not materially disadvantageous to the Lenders and (v) any Loan Party (other than the Borrower or the ABL/FILO Borrower) may dissolve or liquidate so long as the assets of such dissolving or liquidating Loan Party are contributed to another Loan Party; provided, that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04.

(b)     No Loan Party will, nor will it permit any Subsidiary to, engage in any business other than businesses of the type conducted by the ABL/FILO Borrower and its Subsidiaries on the date hereof and businesses reasonably related, complimentary, ancillary or incidental thereto.

SECTION 6.04.     Investments, Loans, Advances, Guarantees and Acquisitions.  No Loan Party will, nor will it permit any Subsidiary to, form any subsidiary after the Effective Date, or purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party or a wholly owned Subsidiary prior to such merger) any evidences of indebtedness or Equity Interest of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except Investments permitted pursuant to Section 6.04 of the Existing ABL/FILO Credit Agreement.

SECTION 6.05.     Asset Sales.  No Loan Party will, nor will it permit any Subsidiary to, sell, transfer, lease, abandon or otherwise dispose (including any of the foregoing to a Divided LLC pursuant to an LLC Division) of any asset, including any Equity Interest owned by it, nor will any Loan Party permit any Subsidiary to issue any additional Equity Interest in such Subsidiary or another Subsidiary to any Person in such Subsidiary (other than to another Loan Party or another Subsidiary in compliance with Section 6.04), except sales, leases, transfers, abandonments and dispositions permitted pursuant to Section 6.05 of the Existing ABL/FILO Credit Agreement.

WEIL:\99557430\21\76000.0003

SECTION 6.06.    Sale and Leaseback Transactions.  No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for (a) any sale or transfer permitted by Section 6.05; (b) any sale or transfer of fixed or capital assets by any Loan Party or any Subsidiary that is made for cash consideration in an amount not less than the fair market value of such fixed or capital asset; provided that the aggregate value of the fixed or capital assets subject to all such sales or transfers described in this clause (b) shall not exceed $5,000,000 from and after August 4, 2023; (c) the sale and leaseback transaction contemplated by, and in accordance with, the MPT Lease Documents; and (d) any other sale and leaseback transaction existing on August 4, 2023 and described on Schedule 6.06 to the Existing ABL/FILO Credit Agreement.

SECTION 6.07.    Swap Agreements.  No Loan Party will, nor will it permit any Subsidiary to, enter into any Swap Agreement, except (a) Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which any Loan Party or any Subsidiary has actual or potential exposure (other than those in respect of Equity Interests of any Loan Party or any of its Subsidiaries), and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of any Loan Party or any Subsidiary.

SECTION 6.08.    Restricted Payments; Certain Payments of Indebtedness.  (a) No Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except for any Restricted Payment permitted pursuant to Section 6.08(a) of the Existing ABL/FILO Credit Agreement.

(b)    No Loan Party will, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness for borrowed money, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Indebtedness, except for (i) any such payment or distribution under or with respect to the Existing ABL/FILO Credit Agreement to the extent required thereunder and permitted under the Intercreditor Agreement and (ii) any such payment or distribution permitted pursuant to Section 6.08(b) of the Existing ABL/FILO Credit Agreement.

SECTION 6.09.    Transactions with Affiliates.  No Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except any transaction permitted pursuant to Section 6.09 of the Existing ABL/FILO Credit Agreement.

SECTION 6.10.    Restrictive Agreements.  No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement (other than this Agreement and the other Loan Documents) or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that the foregoing shall not apply to any prohibition, restriction, condition, provision or negative

68

Debtors' Exhibit No. 6
Page 75 of 339

pledge in the Existing ABL/FILO Credit Agreement or permitted pursuant to Section 6.10 of the Existing ABL/FILO Credit Agreement.

SECTION 6.11.    Amendment of Material Documents.  No Loan Party will, nor will it permit any Subsidiary to, amend, modify or waive (a) any agreement relating to any Subordinated Indebtedness (other than in accordance with the subordination provisions with respect thereto), (b) its certificate of incorporation, by-laws, operating, management or partnership agreement or other organizational documents, in each case, to the extent any such amendment, modification or waiver would be materially adverse to the Lenders or (c) any MPT Document in a manner which is materially adverse to the holders of the Secured Obligations (it being understood and agreed that any amendment, modification or waiver of any MPT Document that results in the shortening of the average weighted maturity of the scheduled maturity date of such Indebtedness shall be deemed to be materially adverse to the holders of the Secured Obligations).

SECTION 6.12.    [Reserved].

SECTION 6.13.    Permitted Activities of Holdings. The Borrower will not permit Holdings to (a) engage in any material business or (b) own any material assets other than the Equity Interests of its Subsidiaries.

SECTION 6.14.    Transfer of Funds.  The Loan Parties shall not (and shall not permit any of their respective Subsidiaries to) transfer any funds in a manner not permitted by Section 6.16 of the Existing ABL/FILO Credit Agreement.

SECTION 6.15.    Permitted Activities of Excluded Subsidiaries.  The Loan Parties shall not permit any Excluded Subsidiary to (i) have any direct or indirect ownership, partnership, or voting interest in any Loan Party or any Subsidiary to the extent such Excluded Subsidiary would have Control over any Loan Party or any Subsidiary or (ii) directly or indirectly establish, own, lease, manage, operate, control, or participate in any manner (including, without limitation, by providing grant or other funding, or guarantees) in the existence, ownership, leasing, management, operation or control of any business that offers services in competition with core business of and services provided by the Loan Parties, other than (A) any Non-Profit Subsidiary, for so long as such entity is a Non-Profit Subsidiary, (B) any other Excluded Subsidiary that does not conduct any competitive business or operations (directly or indirectly, whether through ownership, lease, management, operation, control or participation (including, without limitation, by providing grant or other funding, or guarantees)) within a 50 mile radius of any location in which any Loan Party conducts any of its core business or services and (C) Steward PET Imaging, LLC, a Massachusetts limited liability company, so long as it provides substantially the same services (and no other services, other than those reasonably incidental thereto) as it does on August 4, 2023.

ARTICLE VII

Events of Default

If any of the following events (each, an "Event of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement,

69

when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five Business Days;

(c)     except with respect to any Malta Representation Breach, any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in, or in connection with, this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been materially incorrect when made or deemed made;

(d)     any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a), 5.03 (with respect to a Loan Party's existence), 5.08, 5.14, 5.16, 5.17 or in Article VI of this Agreement or Article VII of the Security Agreement;

(e)     any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement, any other Loan Document, the Existing ABL/FILO Credit Agreement or any other Existing ABL/FILO Loan Document (other than those which constitute a default under another Section of this Article VII and the "Specified Default" under and as defined in the ABL/FILO Forbearance as in effect on the Effective Date), and such failure shall continue unremedied for a period of (i) 5 Business Days after the earlier of any Loan Party's knowledge of such breach or written notice thereof from the Administrative Agent (which written notice will be given at the request of any Lender) if such breach relates to terms or provisions of Section 5.01, 5.02 (other than Section 5.02(a) or 5.01(k)), 5.03, 5.04, 5.06, 5.07, 5.09, or 5.10 of this Agreement, (ii) three (3) Business Days after the earlier of any Loan Party's knowledge of such breach or written notice thereof from the Administrative Agent (which written notice will be given at the request of any Lender) if such breach relates to terms or provisions of Section 5.01(g), (iii) thirty (30) days after the earlier of any Loan Party's knowledge of such breach or written notice thereof from the Administrative Agent (which written notice will be given at the request of any Lender) if such breach relates to terms or provisions of any other Section of this Agreement or any other Loan Document or (iv) days set forth in the Existing ABL/FILO Credit Agreement with respect to those which constitute a default under the Existing ABL/FILO Credit Agreement or any other Existing ABL/FILO Loan Document;

(f)     any Loan Party or any Material Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to the expiration of any applicable grace periods);

(g)     after the expiration of all grace periods relating thereto, any event or condition occurs that results in any Material Indebtedness of any Loan Party or any Material Subsidiary of any Loan Party becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(h)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of a Loan Party or any Material Subsidiary of any Loan Party or its debts, or of a substantial part of its assets, under any Federal, state or

WEIL:\99557430\21\76000.0003

foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or any Material Subsidiary of any Loan Party or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i) any Loan Party or any Material Subsidiary of any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article VII, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Loan Party or Material Subsidiary of any Loan Party or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j) any Loan Party or any Material Subsidiary of any Loan Party shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k) (i) one or more judgments for the payment of money in an aggregate amount in excess of $15,000,000 (to the extent not covered by insurance) shall be rendered against any Loan Party, any Material Subsidiary of any Loan Party or any combination thereof and the same shall remain unsatisfied or undischarged for a period of 45 consecutive days after the entry thereof during which execution shall not be effectively stayed or bonded pending appeal, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or any Material Subsidiary of any Loan Party to enforce any such judgment; or (ii) any Loan Party or any Material Subsidiary of any Loan Party shall fail within 45 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(l) an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(m) a Change in Control shall occur;

(n) the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken by any Loan Party to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or any Loan Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty to which it is a party, or any Loan Guarantor shall deny that it has any further liability under the Loan Guaranty to which it is a party, or shall give notice to such effect;

(o) except as permitted by the terms of any Collateral Document, or this Agreement, (i) any Collateral Document shall for any reason fail to create a valid security interest in any Collateral having a value, individually or in the aggregate, in excess of $10,000,000 purported to be covered thereby, or (ii) any Lien on any Collateral having a value, individually or in the aggregate, in excess of $10,000,000 securing any Secured Obligation shall cease to be a perfected, first priority Lien (other than Permitted Prior Liens), in each case for any reason other than as a result of any action taken by the Administrative Agent or the failure of the Administrative Agent to take any action solely within its control;

WEIL:\99557430\21\76000.0003

(p)  any Collateral Document shall fail to remain in full force or effect or any action shall be taken by any Loan Party or by any Person acting on behalf of any Loan Party to discontinue or to assert the invalidity or unenforceability of any Collateral Document;

(q)  any Loan Party or any Subsidiary of any Loan Party (i) is required or agrees to pay a fine, penalty, settlement amount or other payment (whether as a result of a judicial order, a settlement or otherwise) which, individually or in the aggregate, equals or exceeds $15,000,000 in connection with any Malta Matter, (ii)  is required or agrees to pay a fine, penalty, settlement amount or other payment (whether as a result of a judicial order, a settlement or otherwise) which, individually or in the aggregate, equals or exceeds $20,000,000 in connection with any violation or alleged violation of the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the federal Physician Self-Referral Law (42 U.S.C. § 1395nn and § 1395(q)), the federal civil False Claims Act (31 U.S.C. §§ 3729 et seq.), HIPAA, or any other applicable health care law, (iii) receives notice that it will be excluded or debarred from participation in a Government Reimbursement Program or (iv) suffers the loss of a material Governmental Authorization or Healthcare Permit as a result of, or in connection with, any Malta Matter;

(r)  any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms against any Loan Party (or any Loan Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms);

(s)  any Regulatory Representation Breach has occurred; or

(t)  any Loan Party, any Subsidiary of any Loan Party, any MPT Party or any of its Affiliates or any other Person that is party to the Excess Property Disposition Agreement or the Intercreditor Agreement fails to comply with the Excess Property Disposition Agreement or the Intercreditor Agreement, as applicable, or the Excess Property Disposition Agreement or the Intercreditor Agreement (i) terminates or is no longer in full force or effect or (ii) is amended, restated amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in a manner that is adverse to the Administrative Agent or any of the FILO Bridge Lenders, unless, in the case of clause (i) and (ii), the Administrative Agent and the Required Lenders (calculated without taking into account the MPT Lenders) have consented thereto.

then, and in every such event (other than an event described in <u>clauses (h)</u> or <u>(i)</u> of this <u>Article VII</u>), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders or the MPT Lenders shall, by written notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, whereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties; and in case of any event described in <u>clauses (h)</u> or <u>(i)</u> of this <u>Article VII</u>, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of each Loan Party and its Subsidiaries accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.  Upon the occurrence and the continuance of an Event of Default, the Administrative Agent may, and at the request of the Required Lenders or the MPT Lenders shall, exercise

72

any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under the UCC.

## ARTICLE VIII

## AGENTS

(a)     Each of the Lenders hereby irrevocably appoints the Administrative Agent and the Collateral Agent, in each case, as its agent and authorizes such Agent to take such actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any of such provisions.

(b)     As to any matters not expressly provided for by this Agreement and the other Loan Documents (including enforcement or collection), neither the Administrative Agent nor the Collateral Agent shall be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or, if applicable, the MPT Lenders), and such instructions shall be binding upon all Lenders; provided, however, that neither Administrative Agent nor the Collateral Agent shall be required to take any action that (i) such Agent, in good faith believes exposes it to personal liability unless such Agent receives an indemnification satisfactory to it from the Lenders with respect to such action or (ii) is contrary to this Agreement or applicable law.  Each of the Administrative Agent and the Collateral Agent agrees to give to each Lender prompt notice of each notice given to it by any Loan Party pursuant to the terms of this Agreement or the other Loan Documents.

(c)     The financial institution serving as the Administrative Agent or Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent or the Collateral Agent, as applicable, and such financial institution and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Loan Parties or any Subsidiary of a Loan Party or other Affiliate thereof as if it were not the Administrative Agent or the Collateral Agent, as applicable, hereunder.

(d)     None of the Administrative Agent or the Collateral Agent shall have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (i) none of the Administrative Agent or the Collateral Agent, as applicable, shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (ii) none of the Administrative Agent or the Collateral Agent, as applicable, shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that such Agent is required to exercise in writing as directed by the Required Lenders (or, if applicable, the MPT Lenders), and (iii) except as expressly set forth in the Loan Documents, neither the Administrative Agent nor the Collateral Agent, as applicable, shall have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of its Subsidiaries that is communicated to or obtained by the financial institution serving as Administrative Agent or Collateral Agent or any of their respective Affiliates in any capacity.  Neither the Administrative Agent nor the Collateral Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or, if applicable, the MPT Lenders) or in the absence of its own gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by the

73

**Debtors' Exhibit No. 6**
**Page 80 of 339**

Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral, or (vi) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the such Agent.

(e)     Each of the Administrative Agent and the Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each of the Administrative Agent and the Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. Each of the Administrative Agent and the Collateral Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(f)     Each of the Administrative Agent and the Collateral Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent or the Collateral Agent, as applicable. Each of the Administrative Agent, the Collateral Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each of the Administrative Agent, the Collateral Agent and any such sub-agent, and shall apply to their respective activities in connection with the credit facilities provided for herein as well as activities as Administrative Agent or Collateral Agent, as applicable. No Agent shall be responsible for the negligence or misconduct of the other Agent, or any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

(g)     Subject to the appointment and acceptance of a successor Agent, as provided in this paragraph, such Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation of the Administrative Agent or the Collateral Agent, the Required Lenders shall have the right to (i) appoint any Lender (subject to such Lender's consent in its sole discretion) as successor Administrative Agent or Collateral Agent, as applicable, or (ii) appoint any Person other than a Lender, as a successor Administrative Agent or Collateral Agent, as applicable; <u>provided</u> that no consent of the Borrower or any other Person shall be required. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent or Collateral Agent, as applicable, gives notice of its resignation, then the retiring Administrative Agent or Collateral Agent, as applicable, may, on behalf of the Lenders and in consultation with the Borrower, appoint a successor Administrative Agent or Collateral Agent, as applicable. Upon the acceptance of its appointment as Administrative Agent or Collateral Agent, as applicable, hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent or Collateral Agent, as applicable, and the retiring Administrative Agent or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent or Collateral Agent, as applicable, shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative

WEIL:\99557430\21\76000.0003

Agent's or the Collateral Agent's, as applicable, resignation hereunder, the provisions of this Article VIII, Section 2.17(d) and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent or Collateral Agent, as applicable, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent or Collateral Agent, as applicable.

        (h)     The Lenders irrevocably agree: (i) that any Lien on any property granted to or held by the Collateral Agent under any Loan Document shall be automatically released (A) upon termination of the Commitments of all the Lenders and payment in full of all Obligations (other than contingent indemnification obligations not yet accrued and payable), (B) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer expressly permitted hereunder or under any other Loan Document to a person other than a Loan Party, or (C) subject to Section 9.02, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders; (ii) to release or subordinate any Lien on any property granted to or held by the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by the Existing ABL/FILO Credit Agreement or this Agreement; and (iii) that any Loan Guarantor shall be automatically released from its obligations under the Loan Guaranty in Article X if in the case of any Loan Guarantor, such Person ceases to be a Subsidiary as a result of a transaction permitted under the Existing ABL/FILO Credit Agreement.

        (i)     Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's and/or Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Guarantor from its obligations under the Loan Guaranty in Article X pursuant to this Article VIII. In each case as specified in this Article VIII, the Administrative Agent or the Collateral Agent will promptly (and each Lender irrevocably authorizes each of the Administrative Agent and the Collateral Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Loan Party from its obligations under any of the Loan Documents, in each case in accordance with the terms of the Loan Documents and this Article.

        (j)     Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder. Except for documents expressly required by any Loan Document to be transmitted by the Administrative Agent or the Collateral Agent, in each case, to the Lenders, the Administrative Agent or the Collateral Agent, in each case, shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of any Loan Party that may come into the possession of the Administrative Agent, the Collateral Agent or any Affiliate thereof or any employee or agent of any of the foregoing.

        (k)     [Reserved].

WEIL:\99557430\21\76000.0003

(l)     Each Lender agrees to indemnify the Administrative Agent, the Collateral Agent and, in each case, each of its Affiliates, and each of their respective directors, officers, employees, agents and advisors (to the extent not reimbursed by the Borrower), from and against such Lender's aggregate portion of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements (including fees, expenses and disbursements of financial and legal advisors) of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against, the Administrative Agent or the Collateral Agent or any of its Affiliates, directors, officers, employees, agents and advisors in any way relating to or arising out of this Agreement or the other Loan Documents or any action taken or omitted by the Administrative Agent or the Collateral Agent under this Agreement or the other Loan Documents; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's, or such Affiliate's gross negligence or willful misconduct. Without limiting the foregoing, each Lender agrees to reimburse the Administrative Agent and the Collateral Agent, as applicable, promptly upon demand for its ratable share of any out-of-pocket expenses (including fees, expenses and disbursements of financial and legal advisors) incurred by the Administrative Agent or the Collateral Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of its rights or responsibilities under, this Agreement or the other Loan Documents, to the extent that the Administrative Agent or the Collateral Agent is not reimbursed for such expenses by the Borrower or another Loan Party.

(m)     The Collateral Agent shall not have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such, as explicitly set forth herein or in the other Loan Documents or as an agent or sub-agent appointed by the Administrative Agent pursuant to the terms of the Loan Documents.

(n)     Any Person serving as Administrative Agent or Collateral Agent, as applicable, hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent or the Collateral Agent, as applicable, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as Administrative Agent or Collateral Agent, as applicable, hereunder in its individual capacity.  Each Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though such Agent were not an Agent hereunder and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, the Administrative Agent or the Collateral Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that neither the Administrative Agent nor the Collateral Agent shall be under any obligation to provide such information to them. With respect to its Loans, the Administrative Agent or the Collateral Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent or Collateral Agent, as applicable, and the terms "Lender" and "Lenders" include each Agent in its individual capacity.

(o)     Each Lender understands that the Person serving as Administrative Agent or Collateral Agent, in each case, acting in its individual capacity, and its Affiliates (collectively, the "Agent's Group") are engaged in a wide range of financial services and businesses (including investment management, financing, securities trading and research) (such services and businesses are collectively referred to in this Section as "Activities") and may engage in the Activities with or on behalf of one or

WEIL:\99557430\21\76000.0003

more of the Loan Parties or their respective Affiliates. Furthermore, the Agent's Group may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of others (including the Loan Parties and their Affiliates and including holding, for its own account or on behalf of others, equity, debt and similar positions in the Borrower, another Loan Party or their respective Affiliates), including trading in or holding long, short or derivative positions in securities, loans or other financial products of one or more of the Loan Parties or their Affiliates. Each Lender understands and agrees that in engaging in the Activities, the Agent's Group may receive or otherwise obtain information concerning the Loan Parties or their Affiliates (including information concerning the ability of the Loan Parties to perform their respective Obligations hereunder and under the other Loan Documents) which information may not be available to any of the Lenders that are not members of the Agent's Group.  None of the Administrative Agent, the Collateral Agent, nor any member of the Agent's Group shall have any duty to disclose to any Lender or use on behalf of the Lenders, and shall not be liable for the failure to so disclose or use, any information whatsoever about or derived from the Activities or otherwise (including any information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of any Loan Party) or to account for any revenue or profits obtained in connection with the Activities, except that such Agent shall deliver or otherwise make available to each Lender such documents as are expressly required by any Loan Document to be transmitted by such Agent to the Lenders.

(p)    Each Lender further understands that there may be situations where members of the Agent's Group or their respective customers (including the Loan Parties and their Affiliates) either now have or may in the future have interests or take actions that may conflict with the interests of any one or more of the Lenders (including the interests of the Lenders hereunder and under the other Loan Documents).  Each Lender agrees that no member of the Agent's Group is or shall be required to restrict its activities as a result of the Person serving as Administrative Agent or Collateral Agent, as applicable, being a member of the Agent's Group, and that each member of the Agent's Group may undertake any Activities without further consultation with or notification to any Lender. None of (i) this Agreement nor any other Loan Document, (ii) the receipt by the Agent's Group of information (including Information) concerning the Loan Parties or their Affiliates (including information concerning the ability of the Loan Parties to perform their respective Obligations hereunder and under the other Loan Documents) nor (iii) any other matter shall give rise to any fiduciary, equitable or contractual duties (including without limitation any duty of trust or confidence) owing by the Administrative Agent, the Collateral Agent, or any member of the Agent's Group to any Lender including any such duty that would prevent or restrict the Agent's Group from acting on behalf of customers (including the Loan Parties or their Affiliates) or for its own account.

(q)    (i)    If the Administrative Agent or the Collateral Agent, as applicable, (x) notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient (and each of their respective successors and assigns), a "Payment Recipient") that the Administrative Agent or the Collateral Agent, in each case, has determined in its sole discretion (whether or not after receipt of any notice under the immediately succeeding paragraph) that any funds (as set forth in such notice from the Administrative Agent or the Collateral Agent, as applicable) received by such Payment Recipient from the Administrative Agent, the Collateral Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent or the Collateral Agent, as applicable, pending its return or repayment as

77

**Debtors' Exhibit No. 6**
**Page 84 of 339**

contemplated below in this Article VIII and held in trust for the benefit of the Administrative Agent or the Collateral Agent, as applicable, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter (or such later date as the Administrative Agent or the Collateral Agent, as applicable, may, in its sole discretion, specify in writing), return to the Administrative Agent or the Collateral Agent, as applicable, the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent or the Collateral Agent, as applicable, in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent or the Collateral Agent, as applicable, in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent or the Collateral Agent, as applicable, to any Payment Recipient under this paragraph shall be conclusive, absent manifest error.

(ii) Without limiting immediately preceding paragraph, each Lender, Secured Party or any Person who has received funds on behalf of a Lender or Secured Party (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the applicable Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by such Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by such Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case: (i) it acknowledges and agrees that (A) in the case of immediately preceding clauses (x) or (y), an error and mistake shall be presumed to have been made (absent written confirmation from such Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and (ii) such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify such Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying such Agent pursuant to this paragraph. For the avoidance of doubt, the failure to deliver a notice to the applicable Agent pursuant to this paragraph shall not have any effect on a Payment Recipient's obligations pursuant to the immediately preceding paragraph or on whether or not an Erroneous Payment has been made.

(iii) Each Lender and Secured Party hereby authorizes the Administrative Agent and the Collateral Agent, as applicable, to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent or the Collateral Agent, as applicable, to such Lender or Secured Party under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent or the Collateral Agent, as applicable, has demanded to be returned under immediately preceding paragraphs.

(iv) In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent or the Collateral Agent, as applicable, for any reason,

78

after demand therefor in accordance with immediately preceding clause (q)(i), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the applicable Agent's notice to such Lender at any time, then effective immediately (with the consideration therefor being acknowledged by the parties hereto), (A) such Lender shall be deemed to have assigned its Loans (but not its Commitments) of the relevant Class with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the applicable Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") (on a cashless basis and such amount calculated at par plus any accrued and unpaid interest (with the assignment fee to be waived by the applicable Agent in such instance)), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to an Electronic System as to which the applicable Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any notes evidencing such Loans to the Borrower or the applicable Agent (but the failure of such Person to deliver any such notes shall not affect the effectiveness of the foregoing assignment), (B) the applicable Agent as the assignee Lender shall be deemed to have acquired the Erroneous Payment Deficiency Assignment, (C) upon such deemed acquisition, the applicable Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender, (D) the applicable Agent and the Borrower shall each be deemed to have waived any consents required under this Agreement to any such Erroneous Payment Deficiency Assignment, and (E) the applicable Agent will reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.

(v)     Subject to Section 9.04 (but excluding, in all events, any assignment consent or approval requirements of any Person other than the assignment, consent or approval requirements of the Borrower), the Administrative Agent or the Collateral Agent, as applicable, may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the applicable Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). In addition, an Erroneous Payment Return Deficiency owing by the applicable Lender (x) shall be reduced by the proceeds of prepayments or repayments of principal and interest, or other distribution in respect of principal and interest, received by the Administrative Agent or the Collateral Agent, as applicable, on or with respect to any such Loans acquired from such Lender pursuant to an Erroneous Payment Deficiency Assignment (to the extent that any such Loans are then owned by the Administrative Agent or the Collateral Agent, as applicable) and (y) may, in the sole discretion of the applicable Agent, be reduced by any amount specified by the applicable Agent in writing to the applicable Lender from time to time.

Debtors' Exhibit No. 6
Page 86 of 339

(vi)     The parties hereto agree that (x) irrespective of whether the Administrative Agent or the Collateral Agent, as the case may be, may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, such Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender or Secured Party, as the case may be) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") (provided that the Loan Parties' Secured Obligations under the Loan Documents in respect of the Erroneous Payment Subrogation Rights shall not be duplicative of such Secured Obligations in respect of Loans that have been assigned to such Agent under an Erroneous Payment Deficiency Assignment) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party, except, in each case of the immediately preceding clauses (x) and (y), to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by such Agent from or on behalf of the Borrower or any other Loan Party for the purpose of making such Erroneous Payment; provided that nothing in this Article VIII shall be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower or any other Loan Party relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by such Agent.

(vii)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent or the Collateral Agent, as applicable, for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

(r)     In the case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent and the Collateral Agent, as applicable, (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise: (i) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the applicable Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the applicable Agent and their respective agents and counsel and all other amounts due the Lenders and the applicable Agent under Section 9.03(c)) allowed in such judicial proceeding; and (ii) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, interim receiver, receiver and manager, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the applicable Agent and, in the event that the applicable Agent shall consent to the making of such payments directly to the Lenders, to pay to the applicable Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the applicable Agent under Section 9.03(c).

80

(s)      Nothing contained herein shall be deemed to authorize any Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize such Agent to vote in respect of the claim of any Lender in any such proceeding.

(t)      Each party's obligations, agreements and waivers under the foregoing shall survive the resignation or replacement of the Administrative Agent or the Collateral Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Secured Obligations (or any portion thereof) under any Loan Document.

(u)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the Collateral Agent and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the applicable Agent, in its sole discretion, and such Lender.

(v)      In addition, unless either (1) sub-clause (i) in the immediately preceding clause (u) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (u), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a

81

Debtors' Exhibit No. 6
Page 88 of 339

Lender party hereto, for the benefit of, the Administrative Agent and its respective Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that none of the Administrative Agent or any of its respective Affiliates is a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

ARTICLE IX

Miscellaneous

SECTION 9.01.    Notices.    (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

> (i)    if to any Loan Party, to the Borrower at:
>
> c/o Steward Health Care System LLC
> 1900 N Pearl St #2400
> Dallas, Texas 75021
> Attention: Mark Rich
> Telephone No.: 469-341-8823
> Facsimile No.: 469-341-8994
>
> with a copy (which shall not constitute notice) to:
>
> Steward Health Care System LLC
> 1900 N Pearl St #2400
> Dallas, Texas 75021
> Attention: Nathalie Hibble, Esq.
> Telephone No.: 617-419-4714
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> Attn: Justin D. Lee
> Email: Justin.D.Lee@weil.com
> Telephone No.: 212-310-8397
> Facsimile No.: 212-310-8007
>
> (ii)    if to the Administrative Agent
>
> Brigade Agency Services LLC
> 399 Park Avenue, 16th Floor
> New York, NY 10022
> Attn: Jeff Frusciante
> Email: brigadeagencyservices@brigadecapital.com
>
> with a copy (which shall not constitute notice) to:

82

> Milbank LLP
> 55 Hudson Yards
> New York, NY 10001
> Attn: Adam Moses, Michael Price and Spencer Pepper
> Email: amoses@milbank.com, mprice@milbank.com and spepper@milbank.com

(iii)    if to the Collateral Agent:

> Brigade Agency Services LLC
> 399 Park Avenue, 16th Floor
> New York, NY 10022
> Attn: Jeff Frusciante
> Email: brigadeagencyservices@brigadecapital.com

with a copy (which shall not constitute notice) to:

> Milbank LLP
> 55 Hudson Yards
> New York, NY 10001
> Attn: Adam Moses, Michael Price and Spencer Pepper
> Email: amoses@milbank.com, mprice@milbank.com and spepper@milbank.com

(iv)    if to any other Lender, to it at its address or facsimile number set forth in its Administrative Questionnaire.

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received or (ii) sent by facsimile shall be deemed to have been given when sent; provided that if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the applicable Agent; provided that the foregoing shall not apply to notices pursuant to Article II or to compliance and no Default certificates delivered pursuant to Section 5.01(d) unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment); provided that if not given during the normal business hours of the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (a)(i) of notification that such notice or communication is available and identifying the website address therefor.

83

(c)      Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)      Electronic Systems.

(i)      Each Loan Party agrees that the Administrative Agent may, but shall not be obligated to, make Communications (as defined below) available to the Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak, ClearPar or a substantially similar Electronic System.

(ii)      Any Electronic System used by the Administrative Agent is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of such Electronic Systems and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or any Electronic System. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's, any other Loan Party's or the Administrative Agent's transmission of communications through an Electronic System. "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through an Electronic System.

SECTION 9.02.    Waivers; Amendments.   (a) No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)      Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Administrative Agent and the Required Lenders or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, with the consent of the Required Lenders; provided that no such agreement that purports to waive, amend or modify this Agreement or any other Loan Document shall:

84

WEIL:\99557430\21\76000.0003

(1)      extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in <u>Section 4.01</u> or <u>4.02</u>, or the waiver of any Default, Event of Default, mandatory prepayment or mandatory reduction of any Commitments, shall not constitute such an extension or increase);

(2)      reduce or forgive the principal amount of any Loan or reduce the rate of interest thereon, or reduce or forgive any interest (other than default interest) or fees or MOIC Amount payable hereunder to any Lender, without the written consent of such Lender (it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans or any obligation of the Borrower to pay interest at the Default Rate, any Default or Event of Default, mandatory prepayment or mandatory reduction of any Commitments shall not constitute such a reduction or forgiveness);

(3)      postpone any scheduled date of payment of the principal amount of any Loan, or any date for the payment of any interest, fees, MOIC Amount or other Obligations payable hereunder to any Lender, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment of any Lender, without the written consent of such Lender (it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans or any obligation of the Borrower to pay interest at the Default Rate, any Default or Event of Default, mandatory prepayment or mandatory reduction of any Commitments shall not constitute such a postponement of any date scheduled for the payment of principal or interest or fees or MOIC Amount or other Obligations);

(4)      change <u>Section 2.18(b)</u> or <u>(d)</u> in a manner that would alter the manner in which payments are shared, without the written consent of each directly and adversely affected Lender;

(5)      change any of the provisions of this <u>Section 9.02</u> or the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each directly and adversely affected Lender;

(6)      release any Loan Party from its obligations under this Agreement, including the Loan Guaranty, or other Loan Document to which such Loan Party is a party (other than any Loan Party which ceases to be a Subsidiary as a result of a transaction permitted under <u>Section 6.05</u> and the Intercreditor Agreement), without the written consent of each directly and adversely affected Lender;

(7)      except as expressly permitted by (i) this Agreement, (ii) any Collateral Document or (iii) the Intercreditor Agreement, release all or substantially all of the Collateral (other than the FILO Bridge Exclusive Collateral), without the written consent of each directly and adversely affected Lender;

(8)      except as expressly permitted by (i) this Agreement, (ii) any Collateral Document or (iii) the Intercreditor Agreement, subordinate the Liens securing any of the Obligations on all or any portion of the Collateral (other than the FILO Bridge Exclusive Collateral) to the Liens securing any other Indebtedness or other obligations or

85

Debtors' Exhibit No. 6
Page 92 of 339

subordinate the Obligations in contractual right of payment to any other Indebtedness or other obligations, in each case, without the written consent of each directly and adversely affected Lender;

provided further that (x) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent (it being understood that any change to Section 2.20 shall require the consent of the Administrative Agent) and (y) notwithstanding anything in this Section 9.02 or the definition of "Required Lenders" to the contrary, for purposes of determining whether the Required Lenders have consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of Article V or Article VI of this Agreement or any departure by any Loan Party or any of its Subsidiaries therefrom, an MPT Lender shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by FILO Bridge Lenders; provided further that such MPT Lender shall have the right to approve any amendment, modification, waiver or consent of the type described in the immediately foregoing proviso in each case to the extent that such MPT Lender is affected thereby in any material and disproportionate respect as compared to other Lenders that are not MPT Lenders; provided further that, in furtherance of the foregoing, each MPT Lender agrees to execute and deliver any ballot or other instrument reasonably requested by Administrative Agent to evidence the voting of its interest as a Lender in accordance with the foregoing provisions.  The Administrative Agent may also amend the Commitment Schedule to reflect assignments entered into pursuant to Section 9.04.

(c)       No Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (i) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender, (ii) the date scheduled for any payment of principal (including final maturity) of the loans of any Defaulting Lender may not be postponed without the consent of such Lender, and (iii) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms materially and adversely affects any Defaulting Lender to a greater extent than other affected Lenders shall require the consent of such Defaulting Lender.

(d)       If, in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender affected thereby" or "each directly and adversely affected Lender", the consent of the Required Lenders is obtained, but the consent of other necessary Lenders is not obtained (any such Lender whose consent is necessary but not obtained being referred to herein as a "Non-Consenting Lender"), then the Borrower may elect to replace a Non-Consenting Lender as a Lender party to this Agreement; provided that concurrently with such replacement, (i) another bank or other entity which is reasonably satisfactory to the Borrower and the Agent shall agree, as of such date, to purchase for cash the Loans and other Obligations due to the Non-Consenting Lender pursuant to an Assignment and Assumption and to become a Lender for all purposes under this Agreement and to assume all obligations of the Non-Consenting Lender to be terminated as of such date and to comply with the requirements of clause (b) of Section 9.04, and (ii) the Borrower shall pay to such Non-Consenting Lender in same day funds on the day of such replacement (1) all interest, fees and other amounts then accrued but unpaid to such Non-Consenting Lender by the Borrower hereunder to and including the date of termination, including without limitation payments due to such Non-Consenting Lender under Sections 2.15 and 2.17, and (2) an amount, if any, equal to the payment which would have been due to such Lender on the day of such replacement under Section 2.16 had the Loans of such Non-Consenting Lender been prepaid on such date rather than sold to the replacement Lender. Each Lender agrees that, if pursuant to

86

Debtors' Exhibit No. 6
Page 93 of 339

this Section 9.02(d) it is required to assign and delegate all of its interests, rights and obligations under this Agreement, and such interests, rights and obligations under this Agreement are so assigned pursuant to this Section 9.02(d), it shall execute and deliver to the Administrative Agent an Assignment and Assumption to evidence such assignment; provided, however, that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid (and such Lender agrees that it shall be deemed to have executed and delivered such document if it fails to do so).

(e)     Upon request by the Administrative Agent at any time, the applicable Lenders will confirm in writing the Administrative Agent's authority, to the extent permitted hereby, to release its interest in particular types or items of property, or to release any Loan Guarantor from its obligations under its Loan Guaranty and each other Loan Document pursuant to this Section 9.02.  In each case as specified in this Section 9.02, the Administrative Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents in such item, or to release such Loan Guarantor from its obligations under its Loan Guaranty and each other applicable Loan Document, in each case in accordance with the terms of the Loan Documents and this Section 9.02.

SECTION 9.03.     Expenses; Indemnity; Damage Waiver.  (a) The Loan Parties shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, including the reasonable and documented fees, charges and disbursements of counsel for the Administrative Agent in connection with the preparation and administration of the Loan Documents or any amendments, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated); provided, that the fees, charges and disbursements of counsel in this clause (i) shall be limited to one special counsel and one local counsel in each applicable jurisdiction for the Administrative Agent, (ii) [reserved] and (iii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent, the Collateral Agent or any Lender, in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during  any workout, restructuring or negotiations in respect of such Loans; provided, that the fees, charges and disbursements of counsel in this clause (iii) shall be limited to one special counsel and one local counsel in each applicable jurisdiction for the Administrative Agent and the Collateral Agent, taken as a whole, and one special counsel and one local counsel in each applicable jurisdiction for the Lenders, taken as a whole.

(b)     The Loan Parties shall indemnify the Administrative Agent, the Collateral Agent, each Lender and each Related Party of any of the foregoing Persons, including, for the avoidance of doubt, Milbank LLP and Baker Donelson (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee (subject to any limitations set forth in this Agreement or any other Loan Document), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Loan Parties or any of their Subsidiaries, or any other Environmental Liability related in any way to the Loan Parties or any of their Subsidiaries, except for such Environmental Liability that is caused by the gross negligence or willful negligence of any Indemnitee or its agent or representative, (iv) the failure of

WEIL:\99557430\21\76000.0003

the Loan Parties to deliver to the Administrative Agent the required receipts or other required documentary evidence with respect to a payment made by the Loan Parties for Taxes pursuant to Section 2.17, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee.    WITHOUT LIMITATION OF THE FOREGOING, IT IS THE INTENTION OF THE LOAN PARTIES AND THE LOAN PARTIES AGREE THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF SUCH (AND/OR ANY OTHER) INDEMNITEE.    This Section 9.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)    To the extent that the Loan Parties fail to pay any amount required to be paid by any of them to the Administrative Agent or the Collateral Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or the Collateral Agent, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, penalty, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or the Collateral Agent.

(d)    To the extent permitted by applicable law, no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet) or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)    All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

SECTION 9.04.    Successors and Assigns.    (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (other than an Ineligible Assignee, a Loan Party or any of their

respective Affiliates) all or a portion of its rights and obligations under this Agreement by executing an Assignment and Assumption agreement substantially in the form of Exhibit A to the Existing ABL/FILO Credit Agreement or any other form approved by the Administrative Agent (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent of:

(A)      the Borrower (not to be unreasonably withheld, conditioned or delayed); provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received written notice thereof; provided further that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee; and

(B)      the Administrative Agent (not to be unreasonably withheld, conditioned or delayed).

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless each of the Borrower and the Agent otherwise consent; provided that no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing;

(B)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500;

(D)      the assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the other Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws; and

(E)      no Lender may assign any of its right or obligations under this Agreement (including any of its Commitments or Loans owing to it) to a Defaulting Lender, any Loan Party or any Affiliate of any Loan Party.

For the purposes of this Section 9.04(b), the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of

89

its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(i)      Subject to acceptance and recording thereof pursuant to this paragraph (b) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03 solely with respect to facts and circumstances occurring prior to the effective date of such assignment).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(ii)      The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest thereon) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, each Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(iii)      Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender, an assignee and, to the extent required under this Section 9.04(b), the Borrower, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this paragraph (b) of this Section and any written consent to such assignment required by this paragraph (b) of this Section, the Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to Section 2.07(b), 2.18(d) or 9.03(c), such Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)      Any Lender may, without the consent of the Borrower or any other Loan Party or any Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged; (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (C) the Loan Parties, each Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a

WEIL:\99557430\21\76000.0003

participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant.  Each Loan Party agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the requirements and limitations therein, including the requirements under Section 2.17(f) (it being understood that the documentation required under Section 2.17(f) shall be delivered to the participating Lender only until such time when a Participant claims a benefit under Section 2.17 and at such time, Participant shall deliver such documentation to the Borrower and the Administrative Agent)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 2.18 and 2.19 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.15 or 2.17, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Notwithstanding anything herein to the contrary, no Loan Party, no Ineligible Assignee and no Affiliate of any Loan Party shall be permitted to be a Participant.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Loan Parties, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b)(1) of the proposed United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. Any participation in such Commitments, Loans or other Obligations may be effected only by the registration of such participation on the Participant Register.

(d)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 9.05.      Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Collateral Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued

WEIL:\99557430\21\76000.0003

**Debtors' Exhibit No. 6**
**Page 98 of 339**

interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid.  The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06.    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreement, including with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.  SUBJECT TO THE FOREGOING, THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

SECTION 9.07.    Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08.    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower or any Loan Guarantor against any of and all the Secured Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The applicable Lender shall promptly notify the Borrower and the Administrative Agent of such set-off or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender under this Section 9.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process.  (a) The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by

92

WEIL:\99557430\21\76000.0003

and construed in accordance with the internal laws (and not the law of conflicts) of the State of New York, but giving effect to federal laws applicable to national banks.

(b)     Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, submits to the exclusive jurisdiction of any state or federal court located in the Borough of Manhattan in the City of New York (or any appellate court therefrom) in connection with any suit, action or proceeding arising out of or relating to any of the Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that any party hereto may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any other party hereto or its properties in the courts of any jurisdiction.

(c)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10.   WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11.   Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12.   Confidentiality.  Each of the Administrative Agent, the Collateral Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the

93

Debtors' Exhibit No. 6
Page 100 of 339

extent required by Requirement of Law or by any subpoena or similar legal process (provided that in each case of clauses (b) and (c) herein, the Person disclosing such Information shall give prompt notice to the Borrower to the extent not prohibited from providing such notice), (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 9.12, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in (other than an Ineligible Assignee) any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the prior written consent of the Borrower (not to be unreasonably withheld or delayed), (h) to holders of Equity Interests in the Borrower, or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent, the Collateral Agent or any Lender on a non-confidential basis from a source other than the Loan Parties and their Affiliates. For the purposes of this Section 9.12, "Information" means all information received from the Loan Parties and their Affiliates relating to the Loan Parties and their Affiliates or their business, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the Loan Parties and their Affiliates. Any Person required to maintain the confidentiality of Information as provided in this Section 9.12 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 9.13.    Several Obligations; Nonreliance; Violation of Law.    The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder. Each Lender hereby represents that it is not relying on or looking to any margin stock for the repayment of the Borrowings provided for herein.  Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Loan Parties in violation of any Requirement of Law.

SECTION 9.14.    USA Patriot Act.  Each Lender that is subject to the requirements of the USA PATRIOT Act and the Beneficial Ownership Regulation hereby notifies each Loan Party that pursuant to the requirements of the USA PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act and the Beneficial Ownership Regulation.

SECTION 9.15.    Disclosure.  Each Loan Party and each Lender hereby acknowledges and agrees that the Administrative Agent and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

SECTION 9.16.    Appointment for Perfection.  Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of the Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession.  Should any Lender (other than the Administrative Agent) obtain possession of any such Collateral, such Lender shall notify the Administrative Agent thereof and, promptly upon the Administrative Agent's request therefor, shall deliver such Collateral to the Administrative Agent or the Collateral Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

WEIL:\99557430\21\76000.0003

SECTION 9.17.    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 9.17 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.18.    Intercreditor Arrangements.    (a) It is the intention and agreement of the parties hereto that this Agreement constitute the "Bridge Agreement" under the Intercreditor Agreement, and that the Administrative Agent constitute the "Bridge Representative" under the Intercreditor Agreement.  Each Lender irrevocably authorizes the Administrative Agent to execute and deliver any document, instrument or amendment that is required or recommendable (if any) for the purpose of evidencing the foregoing agreements.  Each Lender agrees to the terms of the Intercreditor Agreement.

(b)    Notwithstanding anything herein to the contrary, the lien and security interest granted to the Administrative Agent pursuant to this Agreement or any other Loan Document and any representation made in connection therewith and the exercise of any right or remedy by the Administrative Agent hereunder or under any other Loan Document are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement, this Agreement and any other Loan Document, the terms of the Intercreditor Agreement shall govern and control.  Without limiting the generality of the foregoing, and notwithstanding anything herein to the contrary, all rights and remedies of the Administrative Agent (and the Lenders) with respect to the MPT Priority Collateral shall be subject to the terms of the Intercreditor Agreement, and until the MPT Obligations Payment Date, any obligation of the Borrower and any other Loan Party hereunder or under any other Loan Document with respect to the delivery or control of any MPT Priority Collateral, the novation of any lien on any certificate of title, bill of lading or other document, the giving of any notice to any bailee or other Person, the provision of voting rights or the obtaining of any consent of any Person, in each case in connection with any MPT Priority Collateral, shall be deemed to be satisfied if the Borrower or such other Loan Party, as applicable, complies with the requirements of the similar provision of the applicable MPT Document. Until the MPT Obligations Payment Date, the delivery of any MPT Priority Collateral to the MPT Parties pursuant to the MPT Documents shall satisfy any delivery requirement hereunder or under any other Loan Document.  Without limiting the generality of the foregoing, and notwithstanding anything herein to the contrary, all rights and remedies of the Administrative Agent (and the Lenders) with respect to the FILO Bridge Exclusive Collateral shall be subject to the terms of the Intercreditor Agreement, and until the FILO Bridge Obligations Payment Date, any obligation of the Borrower and any other Loan Party hereunder or under any other Loan Document with respect to the delivery or control of any FILO Bridge Exclusive Collateral, the novation of any lien on any certificate of title, bill of lading or other document, the giving of any notice to any bailee or other Person, the provision of voting rights or the obtaining of any consent of any Person, in each case in connection with any FILO Bridge Exclusive Collateral, shall be deemed to be satisfied if the Borrower or such other Loan Party, as applicable, complies with the requirements of the similar provision of the applicable Loan Document. Until the FILO Bridge Obligations Payment Date, the delivery of any FILO Bridge Exclusive Collateral to the Administrative Agent pursuant to the Loan Documents shall satisfy any delivery requirement hereunder or under any other Loan Document.

WEIL:\99557430\21\76000.0003

SECTION 9.19.    <u>Acknowledgment and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured (all such liabilities, the "<u>Covered Liabilities</u>"), may be subject to the Write-Down and Conversion Powers and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such Covered Liability arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such Covered Liability, including, if applicable:

(i)    A reduction in full or in part or cancellation of any such Covered Liability;

(ii)    A conversion of all, or a portion of, such Covered Liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such Covered Liability under this Agreement or any other Loan Document; or

(iii)    The variation of the terms of such Covered Liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

SECTION 9.20.    <u>Acknowledgment Regarding any Supported QFCs</u>.

To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.

(b)    In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default

96

Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

(c)     Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

SECTION 9.21.     Intercreditor Agreement.  Each Loan Party hereby agrees:

(a)     except as provided in clause (b) below, if the Administrative Agent, the Collateral Agent, any Lender or any MPT Party shall enforce its rights or remedies in violation of the terms of the Intercreditor Agreement, no Loan Party shall be entitled to use such violation as a defense to any action by the Administrative Agent, the Collateral Agent, any Lender or any MPT Party, nor to assert such violation as a counterclaim or basis for set off or recoupment against the Administrative Agent, the Collateral Agent, any Lender or any MPT Party;

(b)     if the Administrative Agent, Collateral Agent, any Lender or any MPT Party, contrary to the Intercreditor Agreement, commences or participates in any action or proceeding against any Loan Party or the Collateral (as defined in the Intercreditor Agreement), such Loan Party may interpose as a defense or dilatory plea the making of the Intercreditor Agreement, and the Administrative Agent, Collateral Agent, any Lender or any MPT Party, as applicable, may intervene and interpose such defense or plea in its or their name or in the name of such Loan Party; and

(c)     the Intercreditor Agreement, which the Loan Parties expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of a Bankruptcy Event.

SECTION 9.22.     Cashless Rollovers.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, if an Event of Default has occurred pursuant to clause (h) or (i) of Article VII and one or more Lenders hereunder (the "DIP Lenders") have agreed to provide "debtor-in-possession" financing ("DIP Financing") to one or more Loan Parties or their respective Subsidiaries, then with the written consent of the Required Lenders hereunder, the Loans and/or Commitments of the DIP Lenders may be converted into, or otherwise deemed to be, loans and/or commitments made under the DIP Financing by way of "cashless roll" and, to the extent so effected, such "cashless roll" shall be deemed to comply with any requirement hereunder or any other Loan Document that such payment in respect of such Loans and/or Commitments of the DIP Lenders be made "in Dollars", "in immediately available funds", "in Cash" or any other similar requirement.

SECTION 9.23.     No Advisory or Fiduciary Responsibility.  In connection herewith and with any other Loan Document (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees that: (i) (A) the arranging and other services regarding this Agreement provided by the Lenders are arm's-length commercial transactions between such Loan Party and its Affiliates, on the one hand, and the Lenders and their Affiliates, on the other hand, (B) such Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) such Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; and (ii) each of the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of such Loan Party and its Affiliates, and no Lender or any of its Affiliates has any obligation to disclose any of such interests to such Loan Party or its Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives

WEIL:\99557430\21\76000.0003

and releases any claims that it may have against each of the Lenders and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.24.    <u>Advertisement</u>.  Each Lender and each Loan Party hereby authorizes the Administrative Agent to publish the name of such Lender and Loan Party, the existence of the financing arrangements referenced under this Agreement, the primary purpose and/or structure of those arrangements, the amount of credit extended under each facility, the title and role of each party to this Agreement, and the total amount of the financing evidenced hereby in any "tombstone", comparable advertisement or press release which Administrative Agent elects to submit for publication.  In addition, each Lender and each Loan Party agrees that Administrative Agent may provide lending industry trade organizations with information necessary and customary for inclusion in league table measurements after the Closing Date; provided, that  with respect to any of the foregoing, the Borrower shall have provided its written consent and, if so provided, the Administrative Agent shall provide the Borrower with an opportunity to review and confer with Administrative Agent regarding the contents of any such tombstone, advertisement or information, as applicable, prior to its submission for publication and, following such review period, Administrative Agent may, from time to time, publish such information in any media form desired by Administrative Agent, until such time that Borrower shall have requested Administrative Agent cease any such further publication.  Notwithstanding for foregoing, the Administrative Agent agrees that for any such publication arising out of this Section 9.24 shall also include the name of each FILO Lender unless such FILO Lender has otherwise communicated to the Administrative Agent.

SECTION 9.25.    <u>MPT Lenders.</u>

(a)    Each MPT Lender agrees to notify the Administrative Agent promptly (and in any event within 5 Business Days) if it acquires any Person who is also a Lender, and each Lender agrees to notify the Administrative Agent promptly (and in any event within 5 Business Days) if it becomes an MPT Lender.

ARTICLE X

Loan Guaranty

SECTION 10.01.    <u>Guaranty</u>.  Each Loan Guarantor hereby agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to the Lenders, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all reasonable and documented out-of-pocket costs and expenses, including, without limitation, all court costs and reasonable and documented out-of-pocket attorneys' and paralegals' fees (including reasonable and documented allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent, the Collateral Agent and the Lenders (subject to any limitations set forth in this Agreement) in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, the Borrower, any Loan Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "<u>Guaranteed Obligations</u>"). Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.  This Loan Guaranty is a

98

Debtors' Exhibit No. 6
Page 105 of 339

continuing guarantee and shall apply to all Guaranteed Obligations whenever arising until all of the Guaranteed Obligations shall have been paid in full.

SECTION 10.02.    Guaranty of Payment.  This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Guarantor waives any right to require the Administrative Agent or any Lender to sue the Borrower, any Loan Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 10.03.    No Discharge or Diminishment of Loan Guaranty.  (a) Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, the Administrative Agent, any Lender or any other person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)    Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other Person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent or any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the payment in full of the Guaranteed Obligations).

SECTION 10.04.    Defenses Waived.  To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower or any Loan Guarantor, or notice of acceptance of this Agreement by Administrative Agent or any Lender and any and all notices and demands of every kind which may be required to be given by any statute, rule or law, or any defense based on any cause, including the negligence of the Administrative Agent or any Lender in administering this Agreement or the other Loan Documents (including, but not limited to, the failure to perfect any

99

Debtors' Exhibit No. 6
Page 106 of 339

security interest in any Collateral), or taking or failing to take any action in connection therewith, or any defense based on any invalidity or irregularity or, in whole or in part, of any one or more provisions of this Agreement and the other Loan Documents, or any defense based on any representations and warranties made by such Loan Guarantor or by the Borrower in this Agreement or in any of the other Loan Documents other than the payment in full of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person. Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder. The Administrative Agent may, at its election, foreclose on any Collateral held by it (or the Collateral Agent) by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations (other than contingent indemnification obligations not yet due and payable) have been fully paid. To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

SECTION 10.05. Rights of Subrogation. No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification, that it has against any Obligated Party, or any collateral, until all of the Guaranteed Obligations (other than contingent indemnification obligations not yet due and payable) have been fully paid.

SECTION 10.06. Reinstatement; Stay of Acceleration. If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Administrative Agent and the Lenders are in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Administrative Agent.

SECTION 10.07. Information. Each Loan Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that neither the Administrative Agent nor any Lender shall have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 10.08. Termination. Each of the Lenders may continue to make loans or extend credit to the Borrower based on this Loan Guaranty until five days after it receives written notice of termination from any Loan Guarantor. Notwithstanding receipt of any such notice, each Loan Guarantor will continue to be liable to the Lenders for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and

100

amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations (including contingent indemnification obligations not yet due and payable and any other obligations which, by their terms, are to survive the termination of this Agreement).

SECTION 10.09.   [Reserved].

SECTION 10.10.   Maximum Liability.  The provisions of this Loan Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Loan Guarantor under this Loan Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Loan Guarantor's liability under this Loan Guaranty, then, notwithstanding any other provision of this Loan Guaranty to the contrary, the amount of such liability shall, without any further action by the Loan Guarantors or the Administrative Agent or any Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Loan Guarantor's "Maximum Liability").  This Section with respect to the Maximum Liability of each Loan Guarantor is intended solely to preserve the rights of the Administrative Agent and the Lenders to the maximum extent not subject to avoidance under applicable law, and no Loan Guarantor nor any other Person shall have any right or claim under this Section 10.10 with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Loan Guarantor hereunder shall not be rendered voidable under applicable law.  Each Loan Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Loan Guarantor without impairing this Loan Guaranty or affecting the rights and remedies of the Administrative Agent or the Lenders hereunder; provided, that nothing in this sentence shall be construed to increase any Loan Guarantor's obligations hereunder beyond its Maximum Liability.

SECTION 10.11.   Contribution.  In the event any Loan Guarantor shall make any payment or payments under this Loan Guaranty (a "Paying Guarantor") or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Loan Guaranty, each other Loan Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Article X, each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Borrower after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Loan Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Loan Guarantor, the aggregate amount of all monies received by such Loan Guarantors from the Borrower after the date hereof (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Loan Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Loan Guarantor's Maximum Liability).  Each of the Loan Guarantors covenants and agrees that its right to receive any contribution under this Loan Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full of the Guaranteed Obligations (other than contingent indemnification obligations not yet due and payable).  This provision is for the benefit of all of the Administrative Agent, the Lenders and the Loan Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

101

**Debtors' Exhibit No. 6**
**Page 108 of 339**

SECTION 10.12.   <u>Liability Cumulative</u>.  The liability of each Loan Party as a Loan Guarantor under this <u>Article X</u> is in addition to and shall be cumulative with all liabilities of each Loan Party to the Administrative Agent and the Lenders under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

[SIGNATURE PAGES FOLLOW]

102

WEIL:\99557430\21\76000.0003

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

**BORROWER:**

**STEWARD HEALTH CARE NETWORK, INC.**
**STEWARD EMERGENCY PHYSICIANS, INC.**
**STEWARD PHYSICIAN CONTRACTING, INC.**
**STEWARD MEDICAID CARE NETWORK, INC.**
**STEWARDSHIP HEALTH, INC.**
**STEWARDSHIP HEALTH MEDICAL GROUP, INC.**
**STEWARDSHIP SERVICES INC.**

By: _____
Name: Mark Rich
Title:   Authorized Person

[Signature Page to FILO/MPT Credit Agreement]

**LOAN GUARANTORS:**

STEWARD HEALTH CARE HOLDINGS LLC
STEWARD HEALTH CARE SYSTEM LLC
STEWARD OPERATIONS HOLDINGS LLC
STEWARD MEDICAL GROUP, INC.
STEWARD CARNEY HOSPITAL, INC.
STEWARD HOLY FAMILY HOSPITAL, INC.
STEWARD NORWOOD HOSPITAL, INC.
STEWARD GOOD SAMARITAN MEDICAL
CENTER, INC.
STEWARD ST. ANNE'S HOSPITAL
CORPORATION
STEWARD ST. ELIZABETH'S MEDICAL CENTER
OF BOSTON, INC.
NASHOBA VALLEY MEDICAL CENTER, A
STEWARD FAMILY HOSPITAL, INC.
MORTON HOSPITAL, A STEWARD FAMILY
HOSPITAL, INC.
STEWARD MELBOURNE HOSPITAL, INC.
STEWARD ROCKLEDGE HOSPITAL, INC.
STEWARD SEBASTIAN RIVER MEDICAL
CENTER, INC.
STEWARD TEXAS HOSPITAL HOLDINGS LLC
STEWARD TRUMBULL MEMORIAL HOSPITAL,
INC.
STEWARD HILLSIDE REHABILITATION
HOSPITAL, INC.
STEWARD SHARON REGIONAL HEALTH
SYSTEM, INC.
SHC YOUNGSTOWN OHIO PSC LLC
STEWARD PGH, INC.
STEWARD HH, INC.
STEWARD CGH, INC.
STEWARD NSMC, INC.


By: _____
Name: Mark Rich
Title:  Authorized Person


[Signature Page to FILO/MPT Credit Agreement]

BEAUMONT HOSPITAL HOLDINGS, INC.
BRIM HOLDING COMPANY, INC.
IASIS HEALTHCARE HOLDINGS, INC.
IASIS MANAGEMENT COMPANY
PERMIAN PREMIER HEALTH SERVICES, INC.
IASIS GLENWOOD REGIONAL MEDICAL
CENTER, LP
MESA GENERAL HOSPITAL, LP
MOUNTAIN VISTA MEDICAL CENTER, LP
ODESSA REGIONAL HOSPITAL, LP
ST. LUKE'S BEHAVIORAL HOSPITAL, LP
ST. LUKE'S MEDICAL CENTER, LP
THE MEDICAL CENTER OF SOUTHEAST TEXAS,
LP
BRIM HEALTHCARE OF TEXAS, LLC
SEABOARD DEVELOPMENT PORT ARTHUR LLC
SJ MEDICAL CENTER, LLC
IASIS FINANCE TEXAS HOLDINGS, LLC
STEWARD HOSPITAL HOLDINGS LLC
STEWARD MEDICAL HOLDINGS LLC
STEWARD OHIO HOLDINGS LLC
STEWARD FLORIDA HOLDINGS LLC
STEWARD PENNSYLVANIA HOLDINGS LLC
IASIS HEALTHCARE CORPORATION
IASIS HEALTHCARE LLC
IASIS FINANCE, INC.
DAVIS HOSPITAL HOLDINGS, INC.
JORDAN VALLEY HOSPITAL HOLDINGS, INC.
STEWARD FLORIDA ALF LLC
BILTMORE SURGERY CENTER HOLDINGS, INC.
BILTMORE SURGERY CENTER, INC.
DAVIS SURGICAL CENTER HOLDINGS, INC.
IASIS CAPITAL CORPORATION
IASIS FINANCE II LLC
IASIS FINANCE III LLC
ARIZONA DIAGNOSTIC & SURGICAL CENTER,
INC.
CHOICE CARE CLINIC OF LOUISIANA, INC.
CHOICE CARE CLINIC OF UTAH, INC.
CHOICE CARE CLINIC III, INC.
PERMIAN BASIN CLINICAL SERVICES, INC.

By: _____
Name: Mark Rich
Title:  Authorized Person

[Signature Page to FILO/MPT Credit Agreement]

STEWARD IMAGING & RADIOLOGY HOLDINGS LLC
PP TRANSITION LP
TNC TRANSITION LP
MT TRANSITION LP
IASIS TRANSCO, INC.
INDIGENT CARE SERVICES OF NORTHEAST LOUISIANA, INC.
PODIATRIC PHYSICIANS MANAGEMENT OF ARIZONA, INC.
STEWARD FALL RIVER MANAGEMENT CARE SERVICES LLC
SHC YOUNGSTOWN OHIO LABORATORY SERVICES COMPANY LLC
SHC YOUNGSTOWN OHIO OUTPATIENT SERVICES LLC
STEWARD GOOD SAMARITAN OCCUPATIONAL HEALTH SERVICES, INC.
STEWARD GOOD SAMARITAN RADIATION ONCOLOGY CENTER, INC.
STEWARD NEW ENGLAND INITIATIVES, INC.
STEWARD ST. ELIZABETH'S REALTY CORP.
STEWARD VALLEY REGIONAL VENTURES, INC.
QUINCY MEDICAL CENTER, A STEWARD FAMILY HOSPITAL, INC.
RIVERWOODS ASC HOLDCO LLC
GLENWOOD SPECIALTY IMAGING, LLC
NEW ENGLAND SINAI HOSPITAL, A STEWARD FAMILY HOSPITAL, INC.
ODESSA FERTILITY LAB, INC.
PHYSICIAN GROUP OF ARIZONA, INC.
PHYSICIAN GROUP OF ARKANSAS, INC.
PHYSICIAN GROUP OF FLORIDA, INC.
PHYSICIAN GROUP OF LOUISIANA, INC.
PP TRANSITION, INC.
UTAH TRANSCRIPTION SERVICES, INC.
CHOICE CARE CLINIC I, INC.
CHOICE CARE CLINIC II, INC.
MOUNTAIN POINT HOLDINGS, LLC
HERITAGE TECHNOLOGIES, L.L.C.

By: _____
Name: Mark Rich
Title:  Authorized Person

[Signature Page to FILO/MPT Credit Agreement]

ADMINISTRATIVE AGENT:

BRIGADE AGENCY SERVICES LLC

By:

Name: Patrick Criscillo
Title: Authorized Signatory

[Signature Page to FILO/MPT Credit Agreement]

COLLATERAL AGENT:

BRIGADE AGENCY SERVICES LLC

By: _____

Name: Patrick Criscillo
Title: Authorized Signatory

[Signature Page to FILO/MPT Credit Agreement]

LENDERS:

BIG RIVER GROUP FUND SPC LLC
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

Name: Patrick Criscillo
Title: Chief Financial Officer

BRIGADE BADGER FUND, LLC
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

Name: Patrick Criscillo
Title: Chief Financial Officer

BRIGADE DIVERSIFIED CREDIT CIT
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

Name: Patrick Criscillo
Title: Chief Financial Officer

BRIGADE CREDIT FUND II LTD.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

Name: Patrick Criscillo
Title: Chief Financial Officer

BRIGADE HIGH YIELD FUND LTD.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

Name: Patrick Criscillo
Title: Chief Financial Officer

[Signature Page to FILO/MPT Credit Agreement]

LENDERS (CONT'D):

BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

_____
Name: Patrick Criscillo
Title: Chief Financial Officer

BRIGADE LOAN FUND LTD.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

_____
Name: Patrick Criscillo
Title: Chief Financial Officer

BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

_____
Name: Patrick Criscillo
Title: Chief Financial Officer

BRIGADE-SIERRABRAVO FUND LP
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

_____
Name: Patrick Criscillo
Title: Chief Financial Officer

CITY OF PHOENIX EMPLOYEES'
RETIREMENT PLAN
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

_____
Name: Patrick Criscillo
Title: Chief Financial Officer

[Signature Page to FILO/MPT Credit Agreement]

LENDERS (CONT'D):

FEDEX CORPORATION EMPLOYEES'
PENSION TRUST
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

Name: Patrick Criscillo
Title: Chief Financial Officer

FUTURE DIRECTIONS CREDIT
OPPORTUNITIES FUND
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

Name: Patrick Criscillo
Title: Chief Financial Officer

JPMORGAN CHASE RETIREMENT PLAN
BRIGADE BANK LOAN
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

Name: Patrick Criscillo
Title: Chief Financial Officer

LOS ANGELES COUNTY EMPLOYEES
RETIREMENT ASSOCIATION
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

Name: Patrick Criscillo
Title: Chief Financial Officer

SC CREDIT OPPORTUNITIES MANDATE, LLC
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

Name: Patrick Criscillo
Title: Chief Financial Officer

[Signature Page to FILO/MPT Credit Agreement]

LENDERS (CONT'D):

WHITEHAWK FINANCE LLC
By: WHITEHAWK CAPITAL PARTNERS, LP, as
Investment Manager

By: _____

Name: Robert Louzan
Title: Managing Partner

[Signature Page to FILO/MPT Credit Agreement]

LENDERS (CONT'D):

OWL CREEK INVESTMENTS I, LLC
By: OWL CREEK ASSET MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Kevin Dibble
Title:  General Counsel

[Signature Page to FILO/MPT Credit Agreement]

FILO LENDERS (CONT'D):

MIDOCEAN TACTICAL CREDIT FUND III LP
By: TACTICAL CREDIT FUND III GP, LP
By: ULTRAMAR CREDIT HOLDINGS LTD., its
General Partner


By: _____
Name: Damion Brown
Title: Managing Director

ABBOTT LABORATORIES ANNUITY
RETIREMENT TRUST


By: _____
MIDOCEAN CREDIT FUND MANAGEMENT
LP (Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

ABBOTT ABBVIE MULTIPLE EMPLOYER
PENSION PLAN TRUST


By: _____
MIDOCEAN CREDIT FUND MANAGEMENT
LP (Investment Advisor to above)
Name: Damion Brown
Title: Managing Director


MIDOCEAN MULTI ASSET CREDIT FUND, LP
By: MIDOCEAN MULTI ASSET CREDIT FUND
GP, LLC, its General Partner


By: _____
Name: Damion Brown
Title: Managing Director


[Signature Page to FILO/MPT Credit Agreement]

**LENDERS (CONT'D):**

For and on behalf of **OneIM Fund I LP**
acting by its investment manager, One Investment
Management Ltd.


By: _____
Name: Munish Varma
Title:  Authorized Signatory

[Signature Page to FILO/MPT Credit Agreement]

MPT TRS LENDER-STEWARD, LLC

By: MPT Development Services, Inc.
Its: Sole Member

By: _____
Name: R. Steven Hamner
Title: Executive Vice President and CFO

[Signature Page to FILO/MPT Credit Agreement]

**COMMITMENT SCHEDULE**

**EFFECTIVE DATE LOAN COMMITMENTS**

| Lender | Effective Date Loan Commitment |
|---|---|
| MPT TRS Lender-Steward, LLC | $37,500,000.00 |
| WhiteHawk Finance LLC | $12,124,269.61 |
| Owl Creek Investments I, LLC | $8,118,217.86 |
| OneIM Fund I LP | $8,764,607.68 |
| MidOcean Tactical Credit Fund III, LP | $1,592,419.66 |
| Abbott Laboratories Annuity Retirement Trust | $397,667.78 |
| Abbott – AbbVie Multiple Employer Pension Plan Trust | $226,810.52 |
| MidOcean Multi Asset Credit Fund LP | $31,223.92 |
| Big River Group Fund SPC LLC | $63,197.20 |
| Brigade Badger Fund, LLC | $439,258.03 |
| Brigade Diversified Credit CIT | $163,863.11 |
| Brigade Credit Fund II Ltd. | $905,618.43 |
| Brigade High Yield Fund Ltd. | $241,548.21 |
| Brigade Leveraged Capital Structures Fund Ltd. | $1,368,731.52 |
| Brigade Loan Fund Ltd. | $405,786.00 |
| Brigade Opportunistic Credit LBG Fund Ltd. | $1,253,952.42 |
| Brigade-SierraBravo Fund LP | $286,260.85 |
| City of Phoenix Employees' Retirement Plan | $64,695.95 |
| FedEx Corporation Employees' Pension Trust | $295,752.92 |
| Future Directions Credit Opportunities Fund | $104,287.88 |
| JPMorgan Chase Retirement Plan Brigade Bank Loan | $87,302.07 |

| Lender | Effective Date Loan Commitment |
|---|---|
| Los Angeles County Employees Retirement Association | $386,552.07 |
| SC CREDIT OPPORTUNITIES MANDATE LLC | $177,976.31 |
| **Total** | $75,000,000 |

**DELAYED DRAW LOAN COMMITMENT<sup>S</sup>**

| Lender | Delayed Draw Loan Commitment |
|---|---|
| MPT TRS Lender-Steward, LLC | $37,500,000.00 |
| WhiteHawk Finance LLC | $12,124,269.62 |
| Owl Creek Investments I, LLC | $8,118,217.86 |
| OneIM Fund I LP | $8,764,607.68 |
| MidOcean Tactical Credit Fund III, LP | $1,592,419.66 |
| Abbott Laboratories Annuity Retirement Trust | $397,667.78 |
| Abbott – AbbVie Multiple Employer Pension Plan Trust | $226,810.52 |
| MidOcean Multi Asset Credit Fund LP | $31,223.91 |
| Big River Group Fund SPC LLC | $63,197.21 |
| Brigade Badger Fund, LLC | $439,258.04 |
| Brigade Diversified Credit CIT | $163,863.10 |
| Brigade Credit Fund II Ltd. | $905,618.42 |
| Brigade High Yield Fund Ltd. | $241,548.20 |
| Brigade Leveraged Capital Structures Fund Ltd. | $1,368,731.56 |
| Brigade Loan Fund Ltd. | $405,785.99 |
| Brigade Opportunistic Credit LBG Fund Ltd. | $1,253,952.42 |
| Brigade-SierraBravo Fund LP | $286,260.85 |
| City of Phoenix Employees' Retirement Plan | $64,695.95 |

| Lender | Delayed Draw Loan Commitment |
|---|---|
| FedEx Corporation Employees' Pension Trust | $295,752.92 |
| Future Directions Credit Opportunities Fund | $104,287.87 |
| JPMorgan Chase Retirement Plan Brigade Bank Loan | $87,302.06 |
| Los Angeles County Employees Retirement Association | $386,552.06 |
| SC CREDIT OPPORTUNITIES MANDATE LLC | $177,976.32 |
| **Total** | $75,000,000 |

SCHEDULE 1.01(B)

<u>**Excluded Subsidiaries**</u>

Schedule 1.01(B) of the Existing ABL/FILO Credit Agreement is incorporated by reference, subject to the removal of Curator MD Risk Retention Group, Inc., which has been dissolved.

**SCHEDULE 3.03**

**Governmental Approvals**

N/A.

WEIL:\99561357\7\76000.0003

**SCHEDULE 3.05**

Schedule 3.05 to the Existing ABL/FILO Credit Agreement is hereby incorporated and subject to the below updates on the owned and leased real property with respect to certain Loan Parties as specified below.

**Properties**

**Owned and Leased Real Property**

| Loan Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| IASIS Glenwood Regional Medical Center, LP | 1117 Cheniere Drew Road, West Monroe, LA | Owned (Building) | N/A |
| | 1117 Cheniere Drew Road, West Monroe, LA | Leased (Ground) | Southern State Properties, LLC |
| | 128 Ridgedale Drive, West Monroe, LA | Leased | BMC Properties, L.L.C. |
| | 1275 Glenwood Drive West Monroe, LA | Leased | ARHC OCWMNLA01, LLC |
| | 3995 Sterlington Road, Monroe, LA | Leased | Star Properties of Monroe, L.L.C. |
| | See Exhibit A-8 of Master Lease I | Leased | MPT of West Monroe, LLC |
| Odessa Regional Hospital, LP | 1315 E. 5th Street, Units 149, 151, & 157, Odessa, TX | Leased | A-Z Storage |
| | 420 East 6th Street, Lots 4-6 Block 54, Odessa, TX | Leased | Carla Kay Massingill |
| | 420 East 6th Street, Odessa, TX | Leased | ARHC ORODSTX001, LLC |
| | 4911 Andrews Highway, Suite B, Midland, TX | Leased | VT & Ranjani Reddy |
| | 5050 Tanglewood Lane, Suite 1609, Odessa, TX | Leased | Odessa Ventures, LLC |
| | 605 East 4th Street, Parking Lot, Odessa, TX | Leased | ARHC NDODSTX01, LLC |
| | 704 E. 8th Street, Warehouse, Odessa TX | Leased | Caldera I Bobcat, LLC |
| | 7101 East Ridge Road, Odessa, TX | Leased | LEECO Energy & Investments, Inc. |

| Loan Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | See Exhibit A-10 in Master Lease I | Leased | MPT of Odessa-Steward, LLC |
| Permian Premier Health Services, Inc. | 1292 Liberty Street Beaumont, TX | Leased | SEMTA West End Medical Properties, LTD |
| | 1315 St. Joseph Parkway Suite 806, 1507, & 1507ST Houston, TX | Leased | HCP MOB Houston TX, LLC |
| | 137 North LHS Drive, Lumberton, TX | Leased | Altus Lumberton Realty, LP |
| | 2234 Nederland Avenue, 1st Floor, Port Neches, TX | Leased | John Lee, DO |
| | 318 North Alleghaney, Suite 201, Odessa, TX | Leased | Ector County Hospital District d/b/a Medical Center Health System |
| | 427 W. 20th Street Suite 302 & 303 Houston, TX | Leased | 427 W 20th Street, LLC |
| | 1411 North Main Street, Andrews, TX | Leased | Andrews County Hospital District |
| | 1701 North Loop 250 West, Midland, TX | Leased | Alpha Temps, Ltd. |
| | 2000 Crawford Street Suite 1750 Houston, TX | Leased | 2000 Crawford Property, LLC |
| | 2010 Dowlen Road Beaumont, TX | Leased | SETMA West End Medical Plaza Properties, LTD |
| | 2162 Texas Avenue, Bridge, TX | Leased | Wesley Palmer, DO |
| | 2301 South Gregg Street, Big Spring, TX | Leased | GC JAL Investments, LLC & GC MJL Investments, LLC |
| | 2900 & 2900 Calder, Beaumont, TX | Leased | Gulf Coast Partners GP, LLC |
| | 3570 College Street, Suite 200, Beaumont, TX | Leased | Southeast Texas Medical Associates, LP |
| | 400 South Ike Avenue, Monahans, TX | Leased | Ward Memorial Hospital |
| | 408 N Hancock, Odessa, TX | Leased | Kevin Lynch, D.O. |

| Loan Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 4911 Andrews Highway, Suite 1, Midland, TX | Leased | VT Reddy and Rajani Reddy |
| | 520 South Twin Highway, Nederland, TX | Leased | Christopher A Bell, DO |
| | 600 East Interstate 20 Stanton, TX | Leased | Martin County Hospital District |
| | 601 N. Adams Odessa, TX | Leased | Madhava Agusala, MD & Vasanta Agusala, MD |
| | 602 East 7th Street, Odessa, TX | Leased | Vasantha Agusala |
| | 605 East 4th Street, Odessa, TX | Leased | ARHC NCODSTX01, LLC |
| | 610 Strickland Drive Suite 170, Orange TX | Leased | Southeast Texas Medical Associates, LLP |
| | 6909 Brisbane Court, Suite 300, Sugarland, TX | Leased | OZ Healthcare, PLLC |
| | 7390 Barlite Boulevard, Suite 205, San Antonio, TX | Leased | Healthcare Realty Services, Inc. |
| | 7430 Barlite Boulevard, Suite 109, San Antonio, TX | Leased | MMay Properties, LP |
| | 7500 Barlite Boulevard, Suite 311, & 313, San Antonio, TX | Leased | Ridgeline Capital Partners, LLC |
| | 980 E. 87th Street, Suite D & E, Odessa, TX | Leased | C&D Rentals, Inc. |
| SHC Youngstown Ohio Laboratory Services Company LLC | 811 Southwestern Run, Poland, OH | Leased | Southwestern Development Company |
| | 945 Boardman-Canfield Road, Suite 1, Youngstown, OH | Leased (assignment to Quest) | 945 Parkside, LTD |
| SHC Youngstown Ohio PSC LLC | See Exhibit A-2 (revised effective 1/13/24) of Master Lease I | Leased | MPT of Youngstown-Steward, LLC |
| Steward Good Samaritan | 1 Compass Way #108 East Bridgewater, MA | Leased | Equity Industrial Southeast, LLC |

| Loan Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| Medical Center, Inc. | 1 Pearl Street, Suites 100, 200 (and storage), 1000, 1300, 1400, 1500, 1700, 1800, 1900, 2000, 2100, 2200, 2400, 2500, 2600 & 2800, Brockton, MA | Leased | HTA – Pearl Street Medical Center, LLC |
| | 1 Washington Place (aka 15 Roche Brothers Way), (1st & 2nd Floor) North Easton, MA | Leased | WashMass, LLC |
| | 3 Washington Place, (2nd Floor), North Easton, MA | Leased | 3WP MOB, LLC |
| | 63 Main Street, Brockton, MA | Leased | Brockton Neighborhood Health Center |
| | 818 Oak Street, Brockton, MA | Leased | HTA - Good Sam MOB, LLC |
| | 830 Oak Street, Brockton, MA | Leased | HTA - Good Sam MOB, LLC |
| | 909 Sumner Street, Stoughton, MA (First Floor) | Leased | CuraHealth Property, LLC |
| | See Exhibit A-2 of Master Lease II | Leased | MPT of Brockton-Steward, LLC |
| Steward Medical Group, Inc. | 1 Washington Place (aka 15 Roche Brothers Way), North Easton, MA | Leased | WashMass, LLC |
| | 1 Washington Street, Suite 800, Taunton, MA | Leased | Mill River Professional Center, LLC |
| | 104 Liberty Street, Hanson, MA | Leased | Ward Endowment & Partners at Hanson MOB, LLC |
| | 106 Route 44, Raynham, MA | Leased | 106 State Highway, LLC |
| | 119 Longwood Avenue, Rockledge, FL | Leased | Harrison Medical Supplies, LLC |
| | 119 Massachusetts Avenue Lunenburg, MA | Leased | John H. Walker |

| Loan Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 12920 US Highway 1, Sebastian, FL | Leased | Fountain Towers, LLC |
| | 13000 U.S. Highway 1, Suite 5, Sebastian, FL | Leased | Kirk Maes, M.D. |
| | 1317 West Point Drive, Cocoa, FL | Leased | West Point Medical Real Estate Group, LLC |
| | 1345 Providence Highway, Norwood, MA | Leased | Norwood Park Realty, LLC |
| | 1350 Belmont Street Suite 102 & 130A Brockton, MA | Leased | VKA Properties Realty Trust |
| | 13836 & 13840 U.S. Highway 1, Sebastian, FL | Leased | James and Cathy Spoto Charitable Remainder Unitrust |
| | 1405 East Market Street, Warren, OH | Leased | Pedro Ballester, MD |
| | 14-22 Keewaydin Drive, Salem, NH | Leased | 14-22 Keewaydin Drive, LLC |
| | 1440 South Canfield Niles Road, Austintown, OH | Leased | DCMD Holdings, Inc. |
| | 14430 US Highway 1, Suite 101, 102 & 104, Sebastian, FL | Leased | Sebastian North Point, LLC |
| | 1450 South Canfield Niles Road, Austintown, OH | Leased | DCMD Holdings, LLC |
| | 150 North Sykes Creek Parkway, Suite 101 & 300, Merritt Island, FL | Leased | Sykes Creek Limited Partnership |
| | 1552 North Road Southeast, Suite 101-102, Warren, OH | Leased | Phoenix Holdings of Trumbull County, LLC |
| | 1715 37th Place, Vero Beach, FL | Leased | HCD Properties, LLC |
| | 18 Main Street, Unit 104, Townshend, MA | Leased | FEDEQ NL004, LLC |
| | 1800 Main Road, Suite 1816, Tiverton, RI | Leased | Stonebridge Commons, LLC |

WEIL:\99561357\7\76000.0003

| Loan Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 203 Plymouth Avenue, Suite 702, Fall River, MA | Leased | Prima Care, PC |
| | 203 Turnpike Street, Suite 300A, North Andover, MA | Leased | 203 Turnpike Street Realty, LLC |
| | 2111 Washington Blvd Easton, PA | Leased | Foot Maniacs, LLC |
| | 226 Harvard Avenue, Allston, MA | Leased | Asana Partners Fund II REIT 21, LLC |
| | 2307 West Broward, Suite 101 & 200, Fort Lauderdale, FL | Leased | AW Riverbend, LLC & RMC Riverbend, LLC |
| | 2395 Garden Way, Suite 101 & 102, Hermitage, PA | Leased | Hudson Holding Company |
| | 240 North Wickham Road, Suite 102, 104, 108, 110, 202, 204, 300, 304,309, & 311, Melbourne, FL | Leased | AW Wuesthoff Medical Arts, LLC |
| | 2404 North Courtenay Parkway, Suite D, Merritt Island, FL | Leased | John W. Knappman, Jr., M.D. and Gregory A. Kirk, M.D. |
| | 2425 Garden Way, Suite 100 & 101, Hermitage, PA | Leased | GMR Heritage Garden Way, LLC |
| | 25 Marston Street, Unit 404, Lawrence, MA | Leased | Millers River Development, LLC |
| | 250 Hampton Street Auburn, MA | Leased | Grove Medical Associates, P.C. |
| | 2601 South West 37th Avenue, Suite 607 & 901, Miami, FL | Leased | Healthcare Realty Services, Inc. |
| | 277 Pleasant Street, Suite 101, Fall River, MA | Leased | Prima Care, PC |
| | 289 Pleasant Street, Suite 601, Fall River, MA | Leased | Prima Care, PC |
| | 29 Crafts Street, #400, Newton, MA | Leased | Chatham Investment Trust of Newton |
| | 2999 Presidential Blvd., Hermitage PA | Leased | J2K2 LLC |

| Loan Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 3 Washington Place, Easton, MA | Leased | 3WP MOB, LLC |
| | 3001 North West 49th Avenue, Suite 104 & 303, Lauderdale Lakes, FL | Leased | HTA-AW Florida Medical Center East, LLC |
| | 312 Bedford Street, Whitman, MA | Leased | Midade LLC |
| | 324 Massachusetts Avenue, Unit 1, Lunenburg, MA | Leased | A & D Crossroads, Inc. |
| | 3540 North Pine Island Road, Suite 100 & 101, Sunrise, FL | Leased | Pine Island Associates, LLC |
| | 3745 11th Circle, Suite 101, 103, 105 & 106, Vero Beach, FL | Leased | Gibbflin, LLC |
| | 401 N. Bedford Street East Bridgewater, MA | Leased | Glenstone Capital, LLC |
| | 45 Stiles Street, Suite 101, Salem, NH | Leased | William H. Edwards, MD PC |
| | 461 Gypsy Lane, Suite 8, Youngstown, OH | Leased | Gander Properties, LTD |
| | 497 Main Street, Unit B, Groton, MA | Leased | Jupiter 30 Realty, LLC |
| | 511 West Grove Street, Unit 201, Middleboro, MA | Leased | Bernard Chapman, MD |
| | 5151 Babcock Street Northeast, Palm Bay, FL | Leased | Florida Health Care Plan, Inc. |
| | 5170 Belmont Avenue, Youngstown, OH | Leased | CMR Real Estate of Youngstown, LLC |
| | 531 Faunce Corner Road, North Dartmouth, MA | Leased | Dartmouth Specialty Building 2013, LLC |
| | 535 Faunce Road, North Dartmouth, MA | Leased | North Dartmouth 2005 LLC |
| | 537 Faunce Road, North Dartmouth, MA | Leased | North Dartmouth Oncology 2008 LLC |
| | 55 Hall Avenue, Hubbard, OH | Leased | How-Aud LLC |
| | 572 East McNab Road, Suite 101 & | Leased | McNab Associates, LLC |

| Loan Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 200, Pompano Beach, FL | | |
| | 6 Lexington Street, Waltham, MA | Leased | Waltham Realty Trust |
| | 60 Brigham Street, New Bedford, MA | Leased | New Bedford OB/GYN Realty LLC |
| | 60 East Street, Suite 1400, Methuen, MA | Leased | Perin Thavaseelan, MD |
| | 60 East Street, Suite 1100, Methuen, MA | Leased | The Practice-OB/GYN, PC |
| | 62 Brown Street, Suites 200, 405, 503, Haverhill, MA | Leased | Echo-TPI Haverhill, LLC |
| | 62 Strawbridge Avenue, Sharon, PA | Leased | BD Land Co., LP |
| | 63 Pleasant Street, Watertown, MA (First Floor) | Leased | 63 Pleasant Street, LLC |
| | 67 Coddington Street, Suite 104, Quincy, MA | Leased | B&E Realty, LLC |
| | 675 Paramount Street, Suite 203-1B, Raynham, MA | Leased | Paramount MOB, LLC |
| | 7100 West 20th Avenue, Suite 107, 205, 214, & 504, Hialeah, FL | Leased | HTA-AW Palmetto, LLC |
| | 72 Washington Street, Suites, 1400- 1700, & 2700, Taunton, MA | Leased | RockyKnoll Estates, Inc. |
| | 7264 Warren-Sharon Road, Brookfield Center, OH | Leased | David L. D'Amore |
| | 756 Memorial Parkway, Phillipsburg, NJ | Leased | 756 Memorial Parkway, LLC |
| | 774 Boylston Street, Chestnut Hill, MA | Leased | Chestnut Equity Partners II, LLC |
| | 7750 Bay Street, Suite 5, Sebastian, FL | Leased | Farhat Khawaja; Mussarrat Khawaja |
| | 7754 Bay Street, Suite 6 & 7, Roseland, FL | Leased | Sobia Khawaja; Sabeen Khawaja; Farhan Khawaja |
| | 7764 Bay Street, Suite 10, Roseland, FL | Leased | Mussarrat Khawaja & Mahmooda Khawaja |

| Loan Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 777 East 25th Street, Suite 420, Hialeah, FL | Leased | VREC II – Hialeah, LLC |
| | 788 Boston Road, Groton, MA | Leased | RFC MFC 788 Boston Road, LLC |
| | 7-9 Galen Street, Watertown, MA | Leased | RMR OPFCP, LP |
| | 7970 North Wickham Road, Melbourne, FL | Leased | CVS EGL Wickham Melbourne FL, LLC |
| | 8000 Ron Beatty Boulevard, Suite A3, Sebastian, FL | Leased | GB Investment Ventures, LLC |
| | 8055 Spyglass Hill Road, Suite 102, Melbourne, FL | Leased | MEG General, Inc. |
| | 8075 Spyglass Hill Road, Suite 101, Melbourne, FL | Leased | Spyglass Hill Property, LLC |
| | 816 U.S. Highway 1, Sebastian, FL | Leased | Sunshine Global Medical Group, LLC |
| | 822 Boylston Street, Suite 100, Brookline, MA | Leased | Chestnut Equity Partners I, LLC |
| | 840 37th Place, Vero Beach, FL | Leased | 820 Medical Building, LLC |
| | 8700 East Market Street, Suite 4, Howland, OH | Leased | Hunters Square, LLC |
| | 900 Worcester Road, Wellesley, MA | Leased | Wellesley Sports Group, LLC |
| | 91 Washington Street, Suite 301, Taunton, MA | Leased | Landis Apartments, LLC |
| | 9400 West 12th Avenue, Bay 4 Miami, FL | Leased | 1295 Shore, LLC |
| Steward NSMC, Inc., d/b/a Florida Medical Center | 10230 West State Road 84, Building A, Davie, FL | Leased | Broward Business Center, LLC |
| | 4850 West Oakland Park Boulevard, Suite 125, 219, 242, 243, & 244 Lauderdale Lakes, FL | Leased | Bluescape Altera FMC, LLC |
| | See Exhibit A-24 of Master Lease I | Leased | MPT of Lauderdale Lakes-Steward, LLC |

| Loan Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| Steward PGH, Inc. | 7100 West 20th Avenue, Suite TG0006, Hialeah, FL | Leased | HTA-AW Palmetto, LLC |
| | 7150 West 20th Avenue, Hialeah, FL | Leased | HTA-AW Palmetto, LLC |
| | See Exhibit A-30 of Master Lease I | Leased | MPT of Hialeah Palmetto-Steward, LLC |
| Steward Sharon Regional Health System, Inc. | East State Street, Sharon, PA | Leased | City of Sharon |
| | 2715 Wilmington Road, New Castle, PA | Leased | ForChun Properties, LLC |
| | 880 West Liberty Street, Suite B, Hubbard, OH | Leased | West Liberty, LLC |
| | See Exhibit A-4 of Master Lease I | Leased | MPT of Sharon-Steward, LLC |

WEIL:\99561357\7\76000.0003

**SCHEDULE 3.13**

**<u>Insurance</u>**

1. Schedule 3.13(a)—General Liability
2. Schedule 3.13(b)—Aviation
3. Schedule 3.13(c)—Pollution
4. Schedule 3.13(d)—Property
5. Schedule 3.13(e)—D&O, EPL, Fiduciary, Employed Lawyers
6. Schedule 3.13(f)—Casualty – WC & Auto
7. Schedule 3.13(g)—Medical Malpractice
8. Schedule 3.13(h)—Cyber

WEIL:\99561357\7\76000.0003

Schedule 3.13(a)

Schedule 3.13(a) of the Existing ABL/FILO Credit Agreement is hereby incorporated by reference and supplemented by the attached.

| Policy Term | Coverage | Carrier | Policy Number | Limits | Retention |
|---|---|---|---|---|---|
| | **Steward Health Care Workers' Compensation, TX Non-Subscriber, Automobile Liability**<br>**Policy Period: 1/1/2024 - Various** | | | | |
| 1/1/2024-5/1/2024 | Excess Workers' Compensation (Massachusetts) / Employer's Liability | The Hartford | 08 XWE S65202 | Excess WC - Specific Part 1 Statutory Each Accident (BI)<br>Statutory Each Employee (for Disease)<br><br>Excess WC - Specific Part 2 $1,000,000 Each Accident (BI by Accident)<br>$1,000,000 Each Employee (for Disease)<br>$1,000,000 Aggregate (Part One and Part Two Combined) | Self-Insured Retention: $750,000 Each Accident  Indemnity, Medical And Allocated Claim Expense |
| 1/1/2024-5/1/2024 | Workers' Compensation / Employer's Liability | The Hartford | 08 WN S65200 | WC - Coverage A&C (Part I) Statutory<br>WC - Coverage B (Part 2) $1,000,000 Each Accident (BI by Accident)<br>$1,000,000 Policy Limit (BI by Disease)<br>$1,000,000 Each Employee (BI by Disease)<br>States in Program: AR, AZ, FL, ID, LA, NH, OH, PA, TN, UT | Deductible: $750,000 Per Loss Event Indemnity, Medical And Allocated Claim Expense |
| 1/1/2024-1/1/2025 | Texas Non-Subscriber | Crum & Forster | CF098263-2 | CSL: $25,000,000 – Any one occurrence<br>CSL: $10,000,000 – Any one employee<br>Policy Aggregate:  None<br>Coverage A:  Employee Benefits (subject to CSL)<br>Bodily Injury by Accident - Maximum Any One Occurrence $25,000,000<br><br>Bodily Injury by Occupational Sickness or Disease or Cumulative Trauma - Maximum Any One Employee $10,000,000<br>Coverage B - Employers' Liability - (subject to the CSL)<br>Bodily Injury by Accident - Maximum Any One Occurrence $25,000,000<br><br>Bodily Injury by Occupational Sickness or Disease or Cumulative Trauma - Maximum Any One Employee $10,000,000<br>Maximum Coverage Period: 156 weeks | SIR: $250,000 |
| 1/1/2023-5/1/2024 | Auto Liability and/or Physical Damage | The Hartford | BAC: 08 AB S65203<br><br>APD: 08 AB S65203 | 01 Auto Liability $2,000,000 Combined Single Limit<br>05 Personal Injury Protection Statutory Each Accident<br>02 Medical Payments $5,000 Per Person<br>02 Uninsured Motorist $1,000,000 Each Accident<br>02 Underinsured Motorist $1,000,000 Each Accident | PD Deductible:<br>$1,000 Collision<br>$1,000 Comprehensive |

| Steward Health Care Medical Professional Coverage Policy Period: 1/1/2024- 1/1/2025 | | | | | |
|---|---|---|---|---|---|
| **Policy Term** | **Coverage** | **Carrier** | **Policy Number** | **Limits** | **Retention** |
| 1/1/2024 - 1/1/2025 | PRIMARY Professional Liability / General Liability - Claims Made | TRACO International Group S. DE R.L. | HL3610124 | PL: $5M Each Claim for all insureds combined , subj to sublimit of $1M each claim / $3M agg for each  individual insured.<br><br>GL: $5.0M Each Claim for all insureds combined<br><br>Policy Aggregate: $80M for all Coverage for all Insureds combined | N/A |
| 1/1/2024 - 1/1/2025 | Excess Professional Liability /Umbrella Liability - Claims Made | TRACO International Group S. DE R.L. and Direct Insurers per schedule below | EX 3610124 (TRACO) and policy numbers per below schedule | EXCESS PL (Coverage A) :<br>$100M Each Claim<br>$100M Aggregate<br><br>UMBRELLA (Coverage B)<br>$100M Each Claim<br>$100M Aggregate<br><br>Maintenance Retention: 250,000<br><br>Limits as outlined in policy<br>$79M part of $95M issued by TRACO<br>$16M part of $95M issued by direct insurers<br>$5M xs $95M issued by direct insurer | Excess of Underlying :<br><u>Coverage A - PL</u><br>PL INDEMNITY ONLY - $10M each and every BUFFER excess $10M each claim / $80M combined PL&GL agg <span style="color:red">EXCEPT $20M each claim / NO Aggregate for 5 South Florida entities</span><br><br><u>Coverage B - ALL OTHER:</u><br>GL $5.0M each claim / $80M combined PL & GL agg<br><br>AUTO LIAB: $2M Each Acc<br><br>EMPLOYERS LIAB: $1M / $1M / $1M<br><br>AVIATION PREMISES LIAB and NONOWNED AIRCRAFT LIAB: $10M each occ<br><br>(Note: as respects insurance/reinsurance: INDEMNITY ONLY, EXPENSES EXCLUDED; TRACO policy can continue to insure expenses but will not be recognized by re/insurers who are obligated solely to the extent of indemnity) |
| 1/1/2024 - 1/1/2025 | Physicians Professional Liability Modified Claims Made | TRACO International Group S. DE R.L. | TL3610124 | PL: Limits as Scheduled | |

| Policy Period | Excess Layer | Reinsurer/Direct Insurance | Participation % | Certificate # | Limits xs INDEMNITY only - HPL SIR 10M each and every BUFFER xs HPL 10M each claim / 80M agg (excl SO FLORIDA), xs HPL SIR 20M each and every (SO FLORIDA) xs GL SIR 5.0M each claim and $80M agg (shared with HPL) xs Auto Liability - $2M CSL each acc xs Employers Liability - $1M/$1M/$1M xs $750k SIR xs Aviation Liability - $10M each and every |
|---|---|---|---|---|---|
| 1/1/2024 - 1/1/2025 | 1A | Endurance American Insurance Co | 25.000% | HSR10014852004 | Lead $20M xs Primary Underlying |
| | 1B | Allied World Assurance Company, Ltd. (AWAC) | 32.500% | C075736/003 | Lead $20M xs Primary Underlying |
| | 1C | Homesite Insurance Company of Florida (Bowhead) | 30.000% | XHP-135637491-02 | Lead $20M xs Primary Underlying |
| | 1D | Bridgeway Insurance Company (Munich Re) | 12.500% | 8S-A7-PX-0002010-00 | Lead $20M xs Primary Underlying |
| | 2A | 2023 Lloyd's Underwriter Syndicate No. AAL 2012 (50%) / ASL 1955 (50%), London, England (Arch) | 50.000% | B0509FINPH2450030 | $20M xs $20M xs Underlying |
| | 2B | Scottsdale Insurance Company (Propraxis) | 25.000% | HPS0000632 | $20M xs $20M xs Underlying |
| | 2C | Homesite Insurance Company of Florida (Bowhead) | 12.500% | XHP-140867545-01 | $20M xs $20M xs Underlying |
| | 2D | Lloyd's Underwriter Syndicate No. 1084 CSL (Chaucer) | 12.500% | B0509FINPH2450030 | $20M xs $20M xs Underlying |
| | 3A | Ascot Underwriting BermudaSyndicate 1414 at Lloyd's | 50.000% | UA24LC125Z8X | $20M xs $40M xs Underlying |
| | 3B | Scottsdale Insurance Company (Propraxis) | 25.000% | HPS0000638 | $20M xs $40M xs Underlying |
| | 3C | Arcadian Risk Capital Ltd. | 25.000% | ARCGL142512024 | $20M xs $40M xs Underlying |
| | 4 | The Medical Protective Company (MedPro) | 100.000% | RE0151-2024A | $15M xs $60M xs Underlying |
| | 5A | TDC Specialty Insurance Company | 25.000% | HPX-00180-24-02 | $20M xs $75M xs Underlying |
| | 5B | Endurance American Insurance Co (Sompo) | 25.000% | HSR10014851904 | $20M xs $75M xs Underlying |
| | 5C | Transverse Specialty Insurance Company | 25.000% | PPX0000012 | $20M xs $75M xs Underlying |
| | 5D | Lloyd's Underwriter Syndicate No. 1084 (Chaucer) | 12.500% | B0509FINPH2450029 | $20M xs $75M xs Underlying |
| | 5E | Vantage Risk Ltd | 12.500% | P02HC000050990 | $20M xs $75M xs Underlying |
| | 6 | Capitol Specialty Insurance Corporation | 100.000% | HX20221006-03 | $5M xs $95M xs Underlying |
| | 1p | Magna Carta | 25.000% | MCEN211138 | Lead $20M xs Primary Underlying - Punitive Dan |
| | 3p | Ascot Underwriting BermudaSyndicate 1414 at Lloyd's | 50.000% | UB24RG381P4X | $20M xs $40M xs Underlying - Punitive Damage |
| | 3p | Arcadian Risk Capital Ltd. | 25.000% | ARCGL142512024 | $20M xs $40M xs Underlying - Punitive Damage |
| | 4p | Berkshire Hathaway International Insurance Limited | 100.000% | 1225629 | $15M xs $60M xs Underlying - Punitive Damage |
| | 5p | Magna Carta | 25.000% | MCEN211203 | $20M xs $75M xs Underlying - Punitive Damage |

*1/1/2024 - 1/1/2025 EXCESS LIABILITY INSURANCE & REINSURANCE*

Schedule 3.13(b)

See attached.

WEIL:\99561357\7\76000.0003

# CERTIFICATE OF INSURANCE

This certificate is given as a matter of information only and confers no rights upon the certificate addressee.

Date: August 25, 2023

This is to certify to:

Chamberlain Commercial Funding (Cayman) L.P.,
an exempted limited partnership registered in the
Cayman Islands, as Collateral Agent
375 Park Avenue
33rd Floor
New York, NY 10152

That the following policy has been issued to:

Management Health Services, LLC and Steward Health Care System LLC
1900 N PEARL STREET
DALLAS, TX 75201

Policy No. 9020523 issued by one or more member companies of Global Aerospace Pool through Global Aerospace, Inc.

Policy Period: from October 31, 2022 to October 31, 2025 Policy Territory: Worldwide

## AIRCRAFT LIABILITY
### Single Limit Bodily Injury and Property Damage Including Passengers
### (All expressed limits are "Each Occurrence" unless otherwise indicated)

| Registration Number | Year, Make & Model | Liability Limit | Third Party War Liability |
|---|---|---|---|
| N610SN | 2008 DASSAULT FALCON 2000LX | $300,000,000 | $300,000,000 Each Occurrence |
| N610SW | 2016 BOMBARDIER GLOBAL 6000 | $300,000,000 | $300,000,000 Each Occurrence |

As respects liability coverage for bodily injury and property damage arising out of the ownership, maintenance, or use of aircraft described in this certificate, the definition of Insured has been amended to include (a) the certificate addressee, while actually using the aircraft within the scope of the permission of the Named Insured; and (b) the certificate addressee, but only with respect to his, her, or its liability because of acts or omissions of the Named Insured. However, no such person or organization is an Insured if he, she, or it, or any of his, her, or its agents or employees is engaged in the manufacture, maintenance, repair, or sale of aircraft, aircraft engines, components or accessories, or in the operation of any airport, hangar, flying school, flight service, or aircraft or piloting service, as respects any occurrence arising out of such activity.

The Company agrees to give 30 days notice (10 if cancelled for non-payment of premium) to the certificate addressee in the event the policy is cancelled by the Company.

Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate may be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies. This certificate does not amend, extend or otherwise alter the coverages afforded by the policies described herein. Limits may have been reduced by paid claims.

GLOBAL AEROSPACE, INC.
BY:



GLOBAL AEROSPACE

ACZ001 (September 1, 2009)

Page 1 of 1

Certificate No. ACZ0100111006

## CERTIFICATE OF INSURANCE

This certificate is given as a matter of information only and confers no rights upon the certificate addressee.

Date: August 25, 2023

| This is to certify to: | That the following policy has been issued to: |
|---|---|
| Chamberlain Commercial Funding (Cayman) L.P., an exempted limited partnership registered in the Cayman Islands, as Collateral Agent 375 Park Avenue 33rd Floor New York, NY 10152 | STEWARD HEALTH CARE SYSTEM, LLC 1900 N PEARL STREET DALLAS, TX 75201 |

Policy No. 12001131 issued by one or more member companies of Global Aerospace Pool through Global Aerospace, Inc.

Policy Period: from July 01, 2023 to July 01, 2024

### AVIATION OPERATIONS LIABILITY

| Coverages | Limits of Liability |
|---|---|
| Each Occurrence Limit | $10,000,000 |
|     Damage to Premises Rented to You Limit | $200,000 |
|     Medical Expense Limit (Any One Person) | $50,000 |
| Personal and Advertising Injury Aggregate Limit | $10,000,000 |
| General Aggregate Limit (Other than | |
|     Products-Completed Operations and Hangarkeepers) | Not Applicable |
| Products-Completed Operations Aggregate Limit | $10,000,000 |
| Hangarkeepers' Each Accident Limit | $1,500,000 |
| Hangarkeepers' Each Aircraft Limit | $1,500,000 |

The WHO IS AN INSURED section of the policy has been amended to include the certificate addressee as an insured, but only with respect to liability for injury, damage or loss to which the insurance afforded by the policy applies caused by the Named Insured's acts or omissions.

The Company agrees to give 30 days notice (10 if cancelled for non-payment of premium) to the certificate addressee in the event the policy is cancelled by the Company.

Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate may be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies. This certificate does not amend, extend or otherwise alter the coverages afforded by the policies described herein. Limits may have been reduced by paid claims.

GLOBAL AEROSPACE, INC.
BY:



GLOBAL AEROSPACE

**Debtors' Exhibit No. 6**
**Page 146 of 339**

Schedule 3.13(c)

See attached.

WEIL:\99561357\7\76000.0003

 **ACORD**®

# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
2/6/2024

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | certificates@rrsins.com | | |
|---|---|---|---|---|
| Richards Robinson Sheppard | PHONE (A/C, No, Ext): 617-284-5260 | | FAX (A/C, No): | |
| An Optisure Risk Partner | | | | |
| 152 Conant Street, Suite 304 | E-MAIL ADDRESS: certificates@rrsins.com | | | |
| Beverly MA 01915 | INSURER(S) AFFORDING COVERAGE | | | NAIC # |
| | INSURER A : Ironshore Specialty Insurance | | | |
| INSURED | INSURER B : | | | |
| Steward Health Care System LLC    32107 | INSURER C : | | | |
| Attn: Scott Kenyon, Vice President, CREF | INSURER D : | | | |
| 1900 N. Pearl Street | INSURER E : | | | |
| Dallas TX 75201 | INSURER F : | | | |

**COVERAGES**          **CERTIFICATE NUMBER:** 664373032          **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **COMMERCIAL GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ **UMBRELLA LIAB** ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ **EXCESS LIAB** ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | | | | | | ☐ PER STATUTE ☐ OTHER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBEREXCLUDED? (Mandatory in NH) N / A | | | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | Site Pollution Legal Liab | | | ISPILLSB89RJ001 | 4/29/2021 | 4/29/2024 | Each Incident Aggregate | $2,000,000. $4,000,000. |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Additional Insured: Chamberlain Commercial Funding (Cayman) L.P., an exempted limited partnership registered in the Cayman Islands, as Collateral Agent

SITE POLLUTION INCIDENT LEGAL LIABILITY SELECT (SPILLS)· ALL
Form:   IE.COV.SPILLS.HC.001 (1111) Healthcare Coverage Form

COVERAGES, COVERAGE SECTION LIMITS & DEDUCTIBLES:
Policy Aggregate Limit:  $4,000,000.

See Attached...

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Chamberlain Commercial Funding (Cayman) L.P., 375 Park Avenue, 33rd Floor New York NY 10152 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE  *CIRRia* |

© 1988-2015 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: 32107

LOC #: _____



# ADDITIONAL REMARKS SCHEDULE

Page ___1___ of ___1___

| AGENCY | NAMED INSURED |
|---|---|
| Richards Robinson Sheppard | Steward Health Care System LLC |
| **POLICY NUMBER** | Attn: Scott Kenyon, Vice President, CREF |
| | 1900 N. Pearl Street |
| | Dallas TX 75201 |

| CARRIER | NAIC CODE |
|---|---|
| | |

| | EFFECTIVE DATE: |
|---|---|

**ADDITIONAL REMARKS**

**THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,**

**FORM NUMBER:** ____25____  **FORM TITLE:** CERTIFICATE OF LIABILITY INSURANCE

Third Party Claims for Bodily Injury, Property Damage or Remediation Expenses
Each Incident Limit $2,000,000.
Coverage Aggregate Limit $4,000,000.
Deductible-Each Incident $50,000.

First Party Remediation Expenses
Each Incident Limit $2,000,000.
Coverage Aggregate Limit $4,000,000.
Deductible-Each Incident $50,000.

Emergency Response Expenses
Each Incident Limit $2,000,000.
Coverage Aggregate Limit $4,000,000.
Deductible-Each Incident $50,000.

Business Interruption
Deductible-Each Incident - 5 Days
Coverage Aggregate Limit 365 Days, $2,000,000 Limit

Disinfection Event Expenses
Each Incident Limit $250,000.
Coverage Aggregate Limit $1,000,000.
Deductible-Each Incident $50,000.

Evacuation Expenses
Each Incident Limit $250,000.
Coverage Aggregate Limit $1,000,000.
Deductible-Each Incident $50,000.

SITE POLLUTION INCIDENT LEGAL LIABILITY SELECT (SPILLS) - ALL


Certificate Holder Information

Chamberlain Commercial Funding (Cayman) L.P., an exempted limited partnership registered in the Cayman Islands, as  Collateral Agent
375 Park Avenue, 33rd Floor
New York, NY 10152

Re: Asset Based Lending Agreement
30 Day Notice of Cancellation Except 10 Days Non-Payment of Premium

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

Schedule 3.13(d)

See attached.

**ACORD®**

# EVIDENCE OF PROPERTY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 2/6/2024 |

THIS EVIDENCE OF PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.

| AGENCY | PHONE (A/C, No, Ext): 617-284-5260 | COMPANY |
|---|---|---|
| Optisure Risk Partners<br>40 Stark Street<br>Manchester, NH 03101 | | National Fire & Marine Insurance Company<br>Berkshire |
| FAX (A/C, No): | E-MAIL ADDRESS: certificates@rrsins.com | |

| CODE: | SUB CODE: |
|---|---|

| AGENCY CUSTOMER ID #: | |
|---|---|

| INSURED | LOAN NUMBER | POLICY NUMBER |
|---|---|---|
| Steward Health Care System LLC<br>1900 N. Pearl Street<br>Suite 2400<br>Dallas TX 75201 | | 42-PRP-311914-04- Various |

| EFFECTIVE DATE | EXPIRATION DATE | CONTINUED UNTIL TERMINATED IF CHECKED |
|---|---|---|
| 11/01/2023 | 11/01/2024 | |

THIS REPLACES PRIOR EVIDENCE DATED:

## PROPERTY INFORMATION

**LOCATION/DESCRIPTION**
Re: Asset Based Lending Agreement

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

## COVERAGE INFORMATION

PERILS INSURED | BASIC | BROAD | X SPECIAL

| COVERAGE / PERILS / FORMS | AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|---|
| Loss Limit, subject to the policy terms, conditions, sublimits and deductibles- Refer to Policy for Complete List | $850,000,000 | SEE REMARKS |
| Leasehold Interest | $10,000,000 | 1,000,000 |
| Scheduled Ancillary Location, BI Coverage for Lessors of Medical Offices Sublimit: $2,500,000. | $10,000,000 | 1,000,000 |
| Earth Movement, Per Occurrence/Annual Aggregate | $150,000,000 | 1,000,000 |
| Excluding: CA, Pacific Northwest/New Madrid Counties, Alaska, Hawaii | | |
| Flood, Per Occurrence/Annual Aggregate Except; | $150,000,000 | 1,000,000 |
| Flood in High Hazard Flood Zones Per Occurrence/Annual Aggregate | $60,000,000 | SEE REMARKS |
| Flood in Moderate Hazard Flood Zones Per Occurrence/Annual Aggregate | $60,000,000 | SEE REMARKS |
| Equipment Breakdown Limit:, HSB, Property Damage Included | $250,000,000 | 100,000 |
| Terrorism, Lloyds,Property Damage and BI, Any One Occurrence/ Annual Aggregate | $250,000,000 | |
| Form: Special, Valuation;  Replacement Cost,  Real and Business Personal Property , ALS Time Element | | |
| Co Insurance ; NIL , All Risk of Direct Physical Loss or Damage Per Policy Provisions | | |
| Named Windstorm: $850,000,000 Except Tier 1 Counties $150,000,000 as defined within policy. | | 1,000,000 |
| Notice of Cancellation: 90 days except 10 Days Non-Payment of Premium | | |

## REMARKS (Including Special Conditions)

Deductibles:(Refer to Policies for a Complete Listing)
AOP, $1,000,000.  Water Damage: $1,000,000.
Named Windstorm Deductible: 1,000,000. Per Occurrence for all locations involved in loss or damage except:
Named Windstorm for Locations in Tier 1 Counties from TX to VA Not Inc FL (3%, per unit at each loc; Min $1,000,000.)
Named Windstorm for locations in the State of FL (5%, per unit at each loc; Min $1,000,000.)
Flood in High Hazard Flood Zones $500K/$500K/$500K Min $1,000,000. /Flood in Moderate Hazard Flood Zones $1,000,000.
Flood From NWS, Locations in Tier 1 Counties from TX to VA Not Inc FL (3%, per unit at each loc; Min $1,000,000.)
Flood From NWS, State of FL (5%, per unit at each loc; Min $1,000,000.)
See Attached...

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

## ADDITIONAL INTEREST

| NAME AND ADDRESS | | ADDITIONAL INSURED | LENDER'S LOSS PAYABLE | LOSS PAYEE |
|---|---|---|---|---|
| | | MORTGAGEE | X Lenders Loss Payable | |
| Chamberlain Commercial Funding (Cayman) L.P.,<br>375 Park Avenue, 33rd Floor<br>New York, NY 10152 | | LOAN # | | |
| | | AUTHORIZED REPRESENTATIVE | | |

ACORD 27 (2016/03)

© 1993-2015 ACORD CORPORATION.  All rights reserved.

The ACORD name and logo are registered marks of ACORD

**Debtors' Exhibit No. 6**

AGENCY CUSTOMER ID: _____

LOC #: _____

 **ADDITIONAL REMARKS SCHEDULE**   Page  1  of  1

| AGENCY | NAMED INSURED |
|---|---|
| Optisure Risk Partners | Steward Health Care System LLC |
| **POLICY NUMBER** | 1900 N. Pearl Street |
| 42-PRP-311914-04- Various | Suite 2400 |
|  | Dallas TX 75201 |
| **CARRIER**    **NAIC CODE** |  |
| National Fire & Marine Insurance Company | **EFFECTIVE DATE:** 11/01/2023 |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

**FORM NUMBER:** ___27___    **FORM TITLE:** EVIDENCE OF PROPERTY INSURANCE

REMARKS:

Lender's Loss Payable Clause
Chamberlain Commercial Funding (Cayman) L.P., as Collateral Agent

Complete Certificate Holder Information
Chamberlain Commercial Funding (Cayman) L.P., an exempted limited partnership registered in the Cayman Islands,
as Collateral Agent
375 Park Avenue, 33rd Floor
New York, NY 10152

Re: Asset Based Lending Agreement

30 Day Notice of Cancellation Except 10 Days Non-Payment of Premium

The ACORD name and logo are registered marks of ACORD

**Debtors' Exhibit No. 6**
**Page 152 of 339**

Schedule 3.13(d) to the Existing ABL/FILO Credit Agreement is hereby incorporated and subject to the below updates on the owned and leased real property with respect to certain Loan Parties as specified below.

**Properties**

**Owned and Leased Real Property**

| Entity | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| IASIS Glenwood Regional Medical Center, LP | 1117 Cheniere Drew Road, West Monroe, LA | Owned (Building) | |
| | 1117 Cheniere Drew Road, West Monroe, LA | Leased (Ground) | Southern State Properties, LLC |
| | 128 Ridgedale Drive, West Monroe, LA | Leased | BMC Properties, L.L.C. |
| | 1275 Glenwood Drive West Monroe, LA | Leased | ARHC OCWMNLA01, LLC |
| | 3995 Sterlington Road, Monroe, LA | Leased | Star Properties of Monroe, L.L.C. |
| | See Exhibit A-8 of Master Lease I | Leased | MPT of West Monroe, LLC |
| Odessa Regional Hospital, LP | 1315 E. 5th Street, Units 149, 151, & 157, Odessa, TX | Leased | A-Z Storage |
| | 420 East 6th Street, Lots 4-6 Block 54, Odessa, TX | Leased | Carla Kay Massingill |
| | 420 East 6th Street, Odessa, TX | Leased | ARHC ORODSTX001, LLC |
| | 4911 Andrews Highway, Suite B, Midland, TX | Leased | VT & Ranjani Reddy |
| | 5050 Tanglewood Lane, Suite 1609, Odessa, TX | Leased | Odessa Ventures, LLC |
| | 605 East 4th Street, Parking Lot, Odessa, TX | Leased | ARHC NDODSTX01, LLC |
| | 704 E. 8th Street, Warehouse, Odessa TX | Leased | Caldera I Bobcat, LLC |
| | 7101 East Ridge Road, Odessa, TX | Leased | LEECO Energy & Investments, Inc. |
| | See Exhibit A-10 in Master Lease I | Leased | MPT of Odessa-Steward, LLC |

WEIL:\99561357\7\76000.0003

| Entity | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| Permian Premier Health Services, Inc. | 1292 Liberty Street Beaumont, TX | Leased | SEMTA West End Medical Properties, LTD |
| | 1315 St. Joseph Parkway Suite 806, 1507, & 1507ST Houston, TX | Leased | HCP MOB Houston TX, LLC |
| | 137 North LHS Drive, Lumberton, TX | Leased | Altus Lumberton Realty, LP |
| | 2234 Nederland Avenue, 1st Floor, Port Neches, TX | Leased | John Lee, DO |
| | 318 North Alleghaney, Suite 201, Odessa, TX | Leased | Ector County Hospital District d/b/a Medical Center Health System |
| | 427 W. 20th Street Suite 302 & 303 Houston, TX | Leased | 427 W 20th Street, LLC |
| | 1411 North Main Street, Andrews, TX | Leased | Andrews County Hospital District |
| | 1701 North Loop 250 West, Midland, TX | Leased | Alpha Temps, Ltd. |
| | 2000 Crawford Street Suite 1750 Houston, TX | Leased | 2000 Crawford Property, LLC |
| | 2010 Dowlen Road Beaumont, TX | Leased | SETMA West End Medical Plaza Properties, LTD |
| | 2162 Texas Avenue, Bridge, TX | Leased | Wesley Palmer, DO |
| | 2301 South Gregg Street, Big Spring, TX | Leased | GC JAL Investments, LLC & GC MJL Investments, LLC |
| | 2900 & 2900 Calder, Beaumont, TX | Leased | Gulf Coast Partners GP, LLC |
| | 3570 College Street, Suite 200, Beaumont, TX | Leased | Southeast Texas Medical Associates, LP |
| | 400 South Ike Avenue, Monahans, TX | Leased | Ward Memorial Hospital |
| | 408 N Hancock, Odessa, TX | Leased | Kevin Lynch, D.O. |
| | 4911 Andrews Highway, Suite 1, Midland, TX | Leased | VT Reddy and Rajani Reddy |

| Entity | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 520 South Twin Highway, Nederland, TX | Leased | Christopher A Bell, DO |
| | 600 East Interstate 20 Stanton, TX | Leased | Martin County Hospital District |
| | 601 N. Adams Odessa, TX | Leased | Madhava Agusala, MD & Vasanta Agusala, MD |
| | 602 East 7th Street, Odessa, TX | Leased | Vasantha Agusala |
| | 605 East 4th Street, Odessa, TX | Leased | ARHC NCODSTX01, LLC |
| | 610 Strickland Drive Suite 170, Orange TX | Leased | Southeast Texas Medical Associates, LLP |
| | 6909 Brisbane Court, Suite 300, Sugarland, TX | Leased | OZ Healthcare, PLLC |
| | 7390 Barlite Boulevard, Suite 205, San Antonio, TX | Leased | Healthcare Realty Services, Inc. |
| | 7430 Barlite Boulevard, Suite 109, San Antonio, TX | Leased | MMay Properties, LP |
| | 7500 Barlite Boulevard, Suite 311, & 313, San Antonio, TX | Leased | Ridgeline Capital Partners, LLC |
| | 980 E. 87th Street, Suite D & E, Odessa, TX | Leased | C&D Rentals, Inc. |
| SHC Youngstown Ohio Laboratory Services Company LLC | 811 Southwestern Run, Poland, OH | Leased | Southwestern Development Company |
| | 945 Boardman-Canfield Road, Suite 1, Youngstown, OH | Leased (assignment to Quest) | 945 Parkside, LTD |
| SHC Youngstown Ohio PSC LLC | See Exhibit A-2 (revised effective 1/13/24) of Master Lease I | Leased | MPT of Youngstown-Steward, LLC |
| Steward Good Samaritan | 1 Compass Way #108 East Bridgewater, MA | Leased | Equity Industrial Southeast, LLC |

| Entity | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| Medical Center, Inc. | 1 Pearl Street, Suites 100, 200 (and storage), 1000, 1300, 1400, 1500, 1700, 1800, 1900, 2000, 2100, 2200, 2400, 2500, 2600 & 2800, Brockton, MA | Leased | HTA – Pearl Street Medical Center, LLC |
| | 1 Washington Place (aka 15 Roche Brothers Way), (1st & 2nd Floor) North Easton, MA | Leased | WashMass, LLC |
| | 3 Washington Place, (2nd Floor), North Easton, MA | Leased | 3WP MOB, LLC |
| | 63 Main Street, Brockton, MA | Leased | Brockton Neighborhood Health Center |
| | 818 Oak Street, Brockton, MA | Leased | HTA - Good Sam MOB, LLC |
| | 830 Oak Street, Brockton, MA | Leased | HTA - Good Sam MOB, LLC |
| | 909 Sumner Street, Stoughton, MA (First Floor) | Leased | CuraHealth Property, LLC |
| | See Exhibit A-2 of Master Lease II | Leased | MPT of Brockton-Steward, LLC |
| Steward Medical Group, Inc. | 1 Washington Place (aka 15 Roche Brothers Way), North Easton, MA | Leased | WashMass, LLC |
| | 1 Washington Street, Suite 800, Taunton, MA | Leased | Mill River Professional Center, LLC |
| | 104 Liberty Street, Hanson, MA | Leased | Ward Endowment & Partners at Hanson MOB, LLC |
| | 106 Route 44, Raynham, MA | Leased | 106 State Highway, LLC |
| | 119 Longwood Avenue, Rockledge, FL | Leased | Harrison Medical Supplies, LLC |
| | 119 Massachusetts Avenue Lunenburg, MA | Leased | John H. Walker |

| Entity | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 12920 US Highway 1, Sebastian, FL | Leased | Fountain Towers, LLC |
| | 13000 U.S. Highway 1, Suite 5, Sebastian, FL | Leased | Kirk Maes, M.D. |
| | 1317 West Point Drive, Cocoa, FL | Leased | West Point Medical Real Estate Group, LLC |
| | 1345 Providence Highway, Norwood, MA | Leased | Norwood Park Realty, LLC |
| | 1350 Belmont Street Suite 102 & 130A Brockton, MA | Leased | VKA Properties Realty Trust |
| | 13836 & 13840 U.S. Highway 1, Sebastian, FL | Leased | James and Cathy Spoto Charitable Remainder Unitrust |
| | 1405 East Market Street, Warren, OH | Leased | Pedro Ballester, MD |
| | 14-22 Keewaydin Drive, Salem, NH | Leased | 14-22 Keewaydin Drive, LLC |
| | 1440 South Canfield Niles Road, Austintown, OH | Leased | DCMD Holdings, Inc. |
| | 14430 US Highway 1, Suite 101, 102 & 104, Sebastian, FL | Leased | Sebastian North Point, LLC |
| | 1450 South Canfield Niles Road, Austintown, OH | Leased | DCMD Holdings, LLC |
| | 150 North Sykes Creek Parkway, Suite 101 & 300, Merritt Island, FL | Leased | Sykes Creek Limited Partnership |
| | 1552 North Road Southeast, Suite 101-102, Warren, OH | Leased | Phoenix Holdings of Trumbull County, LLC |
| | 1715 37th Place, Vero Beach, FL | Leased | HCD Properties, LLC |
| | 18 Main Street, Unit 104, Townshend, MA | Leased | FEDEQ NL004, LLC |
| | 1800 Main Road, Suite 1816, Tiverton, RI | Leased | Stonebridge Commons, LLC |

WEIL:\99561357\7\76000.0003

| Entity | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 203 Plymouth Avenue, Suite 702, Fall River, MA | Leased | Prima Care, PC |
| | 203 Turnpike Street, Suite 300A, North Andover, MA | Leased | 203 Turnpike Street Realty, LLC |
| | 2111 Washington Blvd Easton, PA | Leased | Foot Maniacs, LLC |
| | 226 Harvard Avenue, Allston, MA | Leased | Asana Partners Fund II REIT 21, LLC |
| | 2307 West Broward, Suite 101 & 200, Fort Lauderdale, FL | Leased | AW Riverbend, LLC & RMC Riverbend, LLC |
| | 2395 Garden Way, Suite 101 & 102, Hermitage, PA | Leased | Hudson Holding Company |
| | 240 North Wickham Road, Suite 102, 104, 108, 110, 202, 204, 300, 304,309, & 311, Melbourne, FL | Leased | AW Wuesthoff Medical Arts, LLC |
| | 2404 North Courtenay Parkway, Suite D, Merritt Island, FL | Leased | John W. Knappman, Jr., M.D. and Gregory A. Kirk, M.D. |
| | 2425 Garden Way, Suite 100 & 101, Hermitage, PA | Leased | GMR Heritage Garden Way, LLC |
| | 25 Marston Street, Unit 404, Lawrence, MA | Leased | Millers River Development, LLC |
| | 250 Hampton Street Auburn, MA | Leased | Grove Medical Associates, P.C. |
| | 2601 South West 37th Avenue, Suite 607 & 901, Miami, FL | Leased | Healthcare Realty Services, Inc. |
| | 277 Pleasant Street, Suite 101, Fall River, MA | Leased | Prima Care, PC |
| | 289 Pleasant Street, Suite 601, Fall River, MA | Leased | Prima Care, PC |
| | 29 Crafts Street, #400, Newton, MA | Leased | Chatham Investment Trust of Newton |
| | 2999 Presidential Blvd., Hermitage PA | Leased | J2K2 LLC |

| Entity | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 3 Washington Place, Easton, MA | Leased | 3WP MOB, LLC |
| | 3001 North West 49th Avenue, Suite 104 & 303, Lauderdale Lakes, FL | Leased | HTA-AW Florida Medical Center East, LLC |
| | 312 Bedford Street, Whitman, MA | Leased | Midade LLC |
| | 324 Massachusetts Avenue, Unit 1, Lunenburg, MA | Leased | A & D Crossroads, Inc. |
| | 3540 North Pine Island Road, Suite 100 & 101, Sunrise, FL | Leased | Pine Island Associates, LLC |
| | 3745 11th Circle, Suite 101, 103, 105 & 106, Vero Beach, FL | Leased | Gibbflin, LLC |
| | 401 N. Bedford Street East Bridgewater, MA | Leased | Glenstone Capital, LLC |
| | 45 Stiles Street, Suite 101, Salem, NH | Leased | William H. Edwards, MD PC |
| | 461 Gypsy Lane, Suite 8, Youngstown, OH | Leased | Gander Properties, LTD |
| | 497 Main Street, Unit B, Groton, MA | Leased | Jupiter 30 Realty, LLC |
| | 511 West Grove Street, Unit 201, Middleboro, MA | Leased | Bernard Chapman, MD |
| | 5151 Babcock Street Northeast, Palm Bay, FL | Leased | Florida Health Care Plan, Inc. |
| | 5170 Belmont Avenue, Youngstown, OH | Leased | CMR Real Estate of Youngstown, LLC |
| | 531 Faunce Corner Road, North Dartmouth, MA | Leased | Dartmouth Specialty Building 2013, LLC |
| | 535 Faunce Road, North Dartmouth, MA | Leased | North Dartmouth 2005 LLC |
| | 537 Faunce Road, North Dartmouth, MA | Leased | North Dartmouth Oncology 2008 LLC |
| | 55 Hall Avenue, Hubbard, OH | Leased | How-Aud LLC |
| | 572 East McNab Road, Suite 101 & | Leased | McNab Associates, LLC |

| Entity | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 200, Pompano Beach, FL | | |
| | 6 Lexington Street, Waltham, MA | Leased | Waltham Realty Trust |
| | 60 Brigham Street, New Bedford, MA | Leased | New Bedford OB/GYN Realty LLC |
| | 60 East Street, Suite 1400, Methuen, MA | Leased | Perin Thavaseelan, MD |
| | 60 East Street, Suite 1100, Methuen, MA | Leased | The Practice-OB/GYN, PC |
| | 62 Brown Street, Suites 200, 405, 503, Haverhill, MA | Leased | Echo-TPI Haverhill, LLC |
| | 62 Strawbridge Avenue, Sharon, PA | Leased | BD Land Co., LP |
| | 63 Pleasant Street, Watertown, MA (First Floor) | Leased | 63 Pleasant Street, LLC |
| | 67 Coddington Street, Suite 104, Quincy, MA | Leased | B&E Realty, LLC |
| | 675 Paramount Street, Suite 203-1B, Raynham, MA | Leased | Paramount MOB, LLC |
| | 7100 West 20th Avenue, Suite 107, 205, 214, & 504, Hialeah, FL | Leased | HTA-AW Palmetto, LLC |
| | 72 Washington Street, Suites, 1400- 1700, & 2700, Taunton, MA | Leased | RockyKnoll Estates, Inc. |
| | 7264 Warren-Sharon Road, Brookfield Center, OH | Leased | David L. D'Amore |
| | 756 Memorial Parkway, Phillipsburg, NJ | Leased | 756 Memorial Parkway, LLC |
| | 774 Boylston Street, Chestnut Hill, MA | Leased | Chestnut Equity Partners II, LLC |
| | 7750 Bay Street, Suite 5, Sebastian, FL | Leased | Farhat Khawaja; Mussarrat Khawaja |
| | 7754 Bay Street, Suite 6 & 7, Roseland, FL | Leased | Sobia Khawaja; Sabeen Khawaja; Farhan Khawaja |
| | 7764 Bay Street, Suite 10, Roseland, FL | Leased | Mussarrat Khawaja & Mahmooda Khawaja |

| Entity | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 777 East 25th Street, Suite 420, Hialeah, FL | Leased | VREC II – Hialeah, LLC |
| | 788 Boston Road, Groton, MA | Leased | RFC MFC 788 Boston Road, LLC |
| | 7-9 Galen Street, Watertown, MA | Leased | RMR OPFCP, LP |
| | 7970 North Wickham Road, Melbourne, FL | Leased | CVS EGL Wickham Melbourne FL, LLC |
| | 8000 Ron Beatty Boulevard, Suite A3, Sebastian, FL | Leased | GB Investment Ventures, LLC |
| | 8055 Spyglass Hill Road, Suite 102, Melbourne, FL | Leased | MEG General, Inc. |
| | 8075 Spyglass Hill Road, Suite 101, Melbourne, FL | Leased | Spyglass Hill Property, LLC |
| | 816 U.S. Highway 1, Sebastian, FL | Leased | Sunshine Global Medical Group, LLC |
| | 822 Boylston Street, Suite 100, Brookline, MA | Leased | Chestnut Equity Partners I, LLC |
| | 840 37th Place, Vero Beach, FL | Leased | 820 Medical Building, LLC |
| | 8700 East Market Street, Suite 4, Howland, OH | Leased | Hunters Square, LLC |
| | 900 Worcester Road, Wellesley, MA | Leased | Wellesley Sports Group, LLC |
| | 91 Washington Street, Suite 301, Taunton, MA | Leased | Landis Apartments, LLC |
| | 9400 West 12th Avenue, Bay 4 Miami, FL | Leased | 1295 Shore, LLC |
| Steward NSMC, Inc., d/b/a Florida Medical Center | 10230 West State Road 84, Building A, Davie, FL | Leased | Broward Business Center, LLC |
| | 4850 West Oakland Park Boulevard, Suite 125, 219, 242, 243, & 244 Lauderdale Lakes, FL | Leased | Bluescape Altera FMC, LLC |
| | See Exhibit A-24 of Master Lease I | Leased | MPT of Lauderdale Lakes-Steward, LLC |

WEIL:\99561357\7\76000.0003

| Entity | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| Steward PGH, Inc. | 7100 West 20th Avenue, Suite TG0006, Hialeah, FL | Leased | HTA-AW Palmetto, LLC |
| | 7150 West 20th Avenue, Hialeah, FL | Leased | HTA-AW Palmetto, LLC |
| | See Exhibit A-30 of Master Lease I | Leased | MPT of Hialeah Palmetto-Steward, LLC |
| Steward Sharon Regional Health System, Inc. | East State Street, Sharon, PA | Leased | City of Sharon |
| | 2715 Wilmington Road, New Castle, PA | Leased | ForChun Properties, LLC |
| | 880 West Liberty Street, Suite B, Hubbard, OH | Leased | West Liberty, LLC |
| | See Exhibit A-4 of Master Lease I | Leased | MPT of Sharon-Steward, LLC |

WEIL:\99561357\7\76000.0003

Schedule 3.13(d) to the Existing ABL/FILO Credit Agreement is hereby incorporated and subject to the below updates to the list of Loan Parties with respect to the specified Loan Party below.

| # | Loan Party | Jurisdiction | Borrower / Guarantor |
|---|---|---|---|
| 1. | Steward Emergency Physicians, Inc. | MA | Borrower |
| 2. | Steward Health Care Network, Inc. | DE | Borrower |
| 3. | Steward Physician Contracting, Inc. | MA | Borrower |
| 4. | Stewardship Health, Inc. | DE | Borrower |
| 5. | Stewardship Health Medical Group Inc. | MA | Borrower |
| 6. | Stewardship Services Inc. | DE | Borrower |

| | | |
|---|---|---|
| | **Insured:** Steward Health Care System LLC | |
| | | |
| | **Term:** All Policies Effective 11 01 23 to 11 01 24 | |
| | **Policy #:** See Below | |
| | **Policy Type:** Property | |
| | **Carrier:** See Below | |
| | | |
| | c/o  AmWins Brokerage of New Jersey | |
| | 105 Fieldcrest Avenue, Suite 200 | |
| | Edison, NJ 08837 | |
| | | |
| **Layer** | **Carrier** | |
| Primary $50m | National Fire & Marine Ins Co | 42-PRP-311914-04 |
| Primary $50m | Allied World Assurance Co (US), Inc | 0313-1256-1A |
| Primary $50m | Lloyds of London (Aegis Lead) | B1230AP11858A23 |
| Primary $50m | Starr Surplus Lines Ins Co | SLSTPTY11909223 |
| Primary $50m | Columbia Casualty Company (CNA) | PSR 7034863359 |
| Primary $100m | Lexington Ins Co | 062502699 |
| Primary $100m | Everest Indemnity Insurance Co | CA3P006982-231 |
| Primary $100m | Lloyds of London (2623/623 Beazley) | W33C1F230201 |
| $50M XS $50M | United Specialty Ins Co (VRU) | VTX-CN-0003668-03 |
| $50M XS $50M | Lloyds (VRU) binding Authority | VRN-CN-0003668-03 |
| $50M XS $50M | Lloyds (VRU) syndicate 2357 | VNB-CN-0003668-03 |
| $50M XS $50M | Velocity Specialty Ins Co | VSI-CN-0003668-03 |
| $50M XS $50M | Scottsdale Ins Co (Paragon) | BXS0003918 |
| $50M XS $50M | Lloyds of London (Channel) | B1230AP11858B23 |
| $50M XS $50M | Lancashire Insurance Co. (UK) Ltd., LIRMA L0205 | B1230AP11858D23 |
| $50M XS $50M | Lloyds of London (TAL) | B1230AP11858C23 |
| $50M XS $50M | EASIC (Sompo) | ESP30012713602 |
| $50M XS $50M | AXIS Surplus Ins Co | EAF657409-23 |
| $50M XS $50M | Ironshore Specialty Ins Co | 1000491540-03 |
| $50M XS $50M | Swiss Re Corporate Solutions Capacity Ins Corporation | ESP 2005825-00 |
| $100M XS $50M | Lloyds of London CNP | B1230AP11858K23 |
| $100M XS $50M | Argo Re Ltd | B1230AP11858L23 |
| $100M XS $50M | Fireman's Fund Indemnity Corporation (Allianz) | USP00197123 |
| $50M XS $100M | StarStone Specialty (CORE) | O84495231CSP |
| $50M XS $100M | Lloyds of London (WBC) | B1230AP11858J23 |
| $50M XS $100M | Lloyds of London (Convex/Ark) | B1230AP11858G23 |
| $50M XS $100M | Houston Casualty Company (AGR) | B1230AP11858I23 |
| $50M XS $100M | Lloyds of London (IGO) | B1230AP11858H23 |
| $50M XS $100M | Lloyds of London (TAL) | B1230AP11858E23 |
| $50M XS $100M | Evanston Ins Co (MKL) | MKLV1XPR000771 |
| $50M XS $100M | Aspen Specialty Insurance Company | PX00U5523 |
| $50M XS $100M | Kinsale Ins Co | 0100266610-0 |
| $50M XS $100M | Crum & Forster Specialty Ins Co | PPP-911792 |
| $450M XS $400M | Chubb Bermuda International, a division of Chubb European SE | B1230AP11858M23 |
| $250m- Boiler | Hartford Steam Boiler Inspection Company | FBP2372998 |
| $250m- Terrorism | Lloyds of London (Mosaic) | PWT0027523AA |

Schedule 3.13(e)

Schedule 3.13(e) to the Existing ABL/FILO Credit Agreement is hereby incorporated and subject to one update that the D&O policy has been extended to March 1, 2025.

WEIL:\99561357\7\76000.0003

Schedule 3.13(f)

See attached.

WEIL:\99561357\7\76000.0003

| Steward Health Care Workers' Compensation, TX Non-Subscriber, Automobile Liability |||||| |
| Policy Period: 1/1/2024 - Various |||||| |

| Policy Term | Coverage | Carrier | Policy Number | Limits | Retention |
|---|---|---|---|---|---|
| 1/1/2024-5/1/2024 | Excess Workers' Compensation (Massachusetts) / Employer's Liability | The Hartford | 08 XWE S65202 | Excess WC - Specific Part 1 Statutory Each Accident (BI) Statutory Each Employee (for Disease) <br><br> Excess WC - Specific Part 2 $1,000,000 Each Accident (BI by Accident) $1,000,000 Each Employee (for Disease) $1,000,000 Aggregate (Part One and Part Two Combined) | Self-Insured Retention: $750,000 Each Accident  Indemnity, Medical And Allocated Claim Expense |
| 1/1/2024-5/1/2024 | Workers' Compensation / Employer's Liability | The Hartford | 08 WN S65200 | WC - Coverage A&C (Part I) Statutory WC - Coverage B (Part 2) $1,000,000 Each Accident (BI by Accident) $1,000,000 Policy Limit (BI by Disease) $1,000,000 Each Employee (BI by Disease) States in Program: AR, AZ, FL, ID, LA, NH, OH, PA, TN, UT | Deductible: $750,000 Per Loss Event Indemnity, Medical And Allocated Claim Expense |
| 1/1/2024-1/1/2025 | Texas Non-Subscriber | Crum & Forster | CF098263-2 | CSL: $25,000,000 – Any one occurrence CSL: $10,000,000 – Any one employee Policy Aggregate:  None Coverage A:  Employee Benefits (subject to CSL) Bodily Injury by Accident - Maximum Any One Occurrence $25,000,000 <br><br> Bodily Injury by Occupational Sickness or Disease or Cumulative Trauma - Maximum Any One Employee $10,000,000 Coverage B - Employers' Liability - (subject to the CSL) Bodily Injury by Accident - Maximum Any One Occurrence $25,000,000 <br><br> Bodily Injury by Occupational Sickness or Disease or Cumulative Trauma - Maximum Any One Employee $10,000,000 Maximum Coverage Period: 156 weeks | SIR: $250,000 |
| 1/1/2023-5/1/2024 | Auto Liability and/or Physical Damage | The Hartford | BAC: 08 AB S65203 <br><br> APD: 08 AB S65203 | 01 Auto Liability $2,000,000 Combined Single Limit 05 Personal Injury Protection Statutory Each Accident 02 Medical Payments $5,000 Per Person 02 Uninsured Motorist $1,000,000 Each Accident 02 Underinsured Motorist $1,000,000 Each Accident | PD Deductible: $1,000 Collision $1,000 Comprehensive |

Schedule 3.13(g)

See attached.

WEIL:\99561357\7\76000.0003

| Steward Health Care Medical Professional Coverage<br>Policy Period: 1/1/2024- 1/1/2025 | | | | | |
|---|---|---|---|---|---|
| **Policy Term** | **Coverage** | **Carrier** | **Policy Number** | **Limits** | **Retention** |
| 1/1/2024 - 1/1/2025 | PRIMARY Professional Liability / General Liability - Claims Made | TRACO International Group S. DE R.L. | HL3610124 | PL: $5M Each Claim for all insureds combined , subj to sublimit of $1M each claim / $3M agg for each  individual insured.<br><br>GL: $5.0M Each Claim for all insureds combined<br><br>Policy Aggregate: $80M for all Coverage for all Insureds combined | N/A |
| 1/1/2024 - 1/1/2025 | Excess Professional Liability /Umbrella Liability - Claims Made | TRACO International Group S. DE R.L. and Direct Insurers per schedule below | EX 3610124 (TRACO) and policy numbers per below schedule | EXCESS PL (Coverage A) :<br>$100M Each Claim<br>$100M Aggregate<br><br>UMBRELLA (Coverage B)<br>$100M Each Claim<br>$100M Aggregate<br><br>Maintenance Retention: 250,000<br><br>Limits as outlined in policy<br>$79M part of $95M issued by TRACO<br>$16M part of $95M issued by direct insurers<br>$5M xs $95M issued by direct insurer | Excess of Underlying :<br><u>Coverage A  -  PL</u><br>PL INDEMNITY ONLY - $10M each and every BUFFER excess $10M each claim / $80M combined PL&GL agg <span style="color:red">EXCEPT $20M each claim / NO Aggregate for 5 South Florida entities</span><br><br><u>Coverage B - ALL OTHER:</u><br>GL $5.0M each claim / $80M combined PL & GL agg<br><br>AUTO LIAB: $2M Each Acc<br><br>EMPLOYERS LIAB: $1M / $1M / $1M<br><br>AVIATION PREMISES LIAB and NONOWNED AIRCRAFT LIAB: $10M each occ<br><br>(Note: as respects insurance/reinsurance: INDEMNITY ONLY, EXPENSES EXCLUDED; TRACO policy can continue to insure expenses but will not be recognized by re/insurers who are obligated solely to the extent of indemnity) |
| 1/1/2024 - 1/1/2025 | Physicians Professional Liability Modified Claims Made | TRACO International Group S. DE R.L. | TL3610124 | PL: Limits as Scheduled | |

| Policy Period | Excess Layer | Reinsurer/Direct Insurance | Participation % | Certificate # | Limits xs INDEMNITY only - HPL SIR 10M each and every BUFFER xs HPL 10M each claim / 80M agg (excl SO FLORIDA), xs HPL SIR 20M each and every (SO FLORIDA) xs GL SIR 5.0M each claim and $80M agg (shared with HPL) xs Auto Liability - $2M CSL each acc xs Employers Liability - $1M/$1M/$1M xs $750k SIR xs  Aviation Liability - $10M each and every |
|---|---|---|---|---|---|
| 1/1/2024 - 1/1/2025 | 1A | Endurance American Insurance Co | 25.000% | HSR10014852004 | Lead $20M xs Primary Underlying |
| | 1B | Allied World Assurance Company, Ltd. (AWAC) | 32.500% | C075736/003 | Lead $20M xs Primary Underlying |
| | 1C | Homesite Insurance Company of Florida (Bowhead) | 30.000% | XHP-135637491-02 | Lead $20M xs Primary Underlying |
| | 1D | Bridgeway Insurance Company (Munich Re) | 12.500% | 8S-A7-PX-0002010-00 | Lead $20M xs Primary Underlying |
| | 2A | 2023 Lloyd's Underwriter Syndicate No. AAL 2012 (50%) / ASL 1955 (50%), London, England (Arch) | 50.000% | B0509FINPH2450030 | $20M xs $20M xs Underlying |
| | 2B | Scottsdale Insurance Company (Propraxis) | 25.000% | HPS0000632 | $20M xs $20M xs Underlying |
| | 2C | Homesite Insurance Company of Florida (Bowhead) | 12.500% | XHP-140867545-01 | $20M xs $20M xs Underlying |
| | 2D | Lloyd's Underwriter Syndicate No. 1084 CSL (Chaucer) | 12.500% | B0509FINPH2450030 | $20M xs $20M xs Underlying |
| | 3A | Ascot Underwriting BermudaSyndicate 1414 at Lloyd's | 50.000% | UA24LC125Z8X | $20M xs $ 40M xs Underlying |
| | 3B | Scottsdale Insurance Company (Propraxis) | 25.000% | HPS0000638 | $20M xs $ 40M xs Underlying |
| | 3C | Arcadian Risk Capital Ltd. | 25.000% | ARCGL142512024 | $20M xs $ 40M xs Underlying |
| | 4 | The Medical Protective Company (MedPro) | 100.000% | RE0151-2024A | $15M xs $60M xs Underlying |
| | 5A | TDC Specialty Insurance Company | 25.000% | HPX-00180-24-02 | $20M xs $75M xs Underlying |
| | 5B | Endurance American Insurance Co (Sompo) | 25.000% | HSR10014851904 | $20M xs $75M xs Underlying |
| | 5C | Transverse Specialty Insurance Company | 25.000% | PPX0000012 | $20M xs $75M xs Underlying |
| | 5D | Lloyd's Underwriter Syndicate No. 1084 (Chaucer) | 12.500% | B0509FINPH2450029 | $20M xs $75M xs Underlying |
| | 5E | Vantage Risk Ltd | 12.500% | P02HC00050090 | $20M xs $75M xs Underlying |
| | 6 | Capitol Specialty Insurance Corporation | 100.000% | HX20221006-03 | $5M xs $95M xs Underlying |
| | 1p | Magna Carta | 25.000% | MCEN211138 | Lead $20M xs Primary Underlying - Punitive Dam |
| | 3p | Ascot Underwriting BermudaSyndicate 1414 at Lloyd's | 50.000% | UB24RG381P4X | $20M xs $ 40M xs Underlying - Punitive Damage |
| | 3p | Arcadian Risk Capital Ltd. | 25.000% | ARCGL142512024 | $20M xs $ 40M xs Underlying - Punitive Damage |
| | 4p | Berkshire Hathaway International Insurance Limited | 100.000% | 1225629 | $15M xs $60M xs Underlying - Punitive Damage |
| | 5p | Magna Carta | 25.000% | MCEN211203 | $20M xs $75M xs Underlying - Punitive Damage |

The title row above the table reads: **1/1/2024 - 1/1/2025 EXCESS LIABILITY INSURANCE & REINSURANCE**

**Debtors' Exhibit No. 6**
**Page 170 of 339**

Schedule 3.13(h)

N/A.

WEIL:\99561357\7\76000.0003

**SCHEDULE 3.14**

Schedule 3.14 to the Existing ABL/FILO Credit Agreement is hereby incorporated and subject to the below updates with respect to that certain Loan Parties as specified below.

**Capitalization and Subsidiaries**

| Name of Owner | Name of Issuer | Percentage of Issuer's Outstanding Shares or Other Interests Owned | Class of Stock | Number of Shares or Other Interests |
|---|---|---|---|---|
| Stewardship Health, Inc. | Steward Health Care Network, Inc. | 100% | Common | 1 |
| Stewardship Health, Inc. | Stewardship Health Medical Group, Inc. | 100% | Percentage Ownership Interest | N/A |
| Stewardship Operations Holdings LLC | Stewardship Health, Inc. | 100% | Common | 1,000 |
| IASIS Health Corporation | St Luke's Behavioral Hospital, LP | 99% | Percentage Ownership Interest | N/A |
| IASIS Health Corporation | St. Luke's Medical Center, LP | 99% | Percentage Ownership Interest | N/A |
| Stewardship Health, Inc. | Stewardship Services Inc. | 100% | Common | 1,000 |

**SCHEDULE 3.17**

**Affiliate Transactions**

N/A

WEIL:\99561357\7\76000.0003

**SCHEDULE 4.01**

**Post-Closing Covenants**

1. Within thirty (30) days after the Effective Date (or such later date as agreed to by the Administrative Agent in its sole discretion), the Loan Parties shall deliver, or shall cause to be delivered, to the Administrative Agent, insurance certificates and endorsements naming the Collateral Agent as lender loss payee and additional insured, in each case in form and substance reasonably satisfactory to the Administrative Agent.

2. Within thirty (30) days after the Effective Date (or such later date as agreed to by the Administrative Agent in its sole discretion), the Loan Parties shall deliver, or shall cause to be delivered, to the Administrative Agent, a fully executed Account Control Agreement over the "blocked" Deposit Account described in Section 2.11(d)(i) and (ii) of the Credit Agreement, in which the Loan Parties and their respective Subsidiaries intend as of the Effective Date to deposit (or cause to be deposited) the proceeds from the dispositions described therein, in form and substance reasonably satisfactory to the Administrative Agent.

3. Within thirty (30) days after the Effective Date (or such later date as agreed to by the Administrative Agent in its sole discretion), the Loan Parties shall deliver, or shall cause to be delivered to the Existing ABL Agent, the original Intercompany Subordination Agreement and the original signatures of each of the parties to the Intercompany Subordination Agreement and the original allonge thereto.

**EXHIBIT E**
**FORM OF JOINDER AGREEMENT**

[_____]. 202[__]

Reference is made to that certain Credit Agreement, dated as of February 21, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Steward Health Care Network, Inc., a Delaware corporation, Steward Emergency Physicians, Inc., a Massachusetts corporation, Steward Physician Contracting, Inc., a Massachusetts corporation, Steward Medicaid Care Network, Inc., a Delaware corporation, Stewardship Health, Inc., a Delaware corporation, Stewardship Health Medical Group, Inc., a Massachusetts corporation, and Stewardship Services Inc., a Delaware corporation (each, a "Borrower" and, collectively, jointly and severally, the "Borrower"), the other Loan Parties party thereto from time to time, the Lenders party thereto from time to time (the "Lenders"), Brigade Agency Services LLC, as administrative agent for the Lenders (in such capacity, the "Administrative Agent") and Brigade Agency Services LLC, as the collateral agent for the Secured Parties (in such capacity, the "Collateral Agent"). Capitalized terms used but not defined herein have the meaning set forth in the Credit Agreement.

Pursuant to Section 5.12 of the Credit Agreement, the undersigned (the "Incoming Loan Guarantor") is required to become a Loan Guarantor under and in accordance with the terms of the Credit Agreement.

By its execution of this Joinder Agreement and delivery of any other documentation required by the Administrative Agent contemplated hereby, the Incoming Loan Guarantor hereby shall be a Loan Guarantor and Grantor under the Credit Agreement and each of the other Loan Documents, including the Security Agreement, with the same force and effect as if originally named therein as a Loan Guarantor or Grantor, as applicable, and agrees to be bound by, and to comply with, all terms and provisions of the Loan Documents applicable to it as a Loan Guarantor and Grantor thereunder.

Without limiting the generality of the foregoing, the undersigned hereby pledges and grants a security interest in all of its present and after-acquired personal property to and in favor of the Collateral Agent to the extent and in the manner contemplated by Article II of the Security Agreement.

The Incoming Loan Guarantor represents and warrants, solely in respect of itself, that each of the representations and warranties set forth in Article III is true and correct in all material respects as of the date hereof (it being understood that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects after giving effect to any such qualification therein)) with the same effect as though made on and as of the date hereof (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

The Incoming Loan Guarantor shall execute and deliver to the Administrative Agent or the Collateral Agent, as applicable, such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements and other documents and such other actions or deliveries of the type required by Section 4.01 of the Credit Agreement, as applicable), which the Administrative Agent or the Collateral Agent, as applicable, reasonably requests to carry out the terms and conditions of this Joinder Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created hereby and by the Collateral Documents, all at the expense of the Loan Parties.

Attached as Schedules [__] through [__] hereto are supplements to the schedules to the Credit Agreement as well as the Exhibits to the Security Agreement pertaining to the Incoming Loan Guarantor. For purposes of Section 9.01 of the Credit Agreement, all notices, requests and other communications to

the Incoming Loan Guarantor made under or in connection with the Credit Agreement shall be given at the address set forth on Schedule [___] hereto.

      For the avoidance of doubt, the provisions of Sections 9.09 and 9.10 of the Credit Agreement, which sections are hereby incorporated herein by reference (with the same force and effect as though fully set forth herein), apply to this Joinder Agreement.

[<em>Remainder of page intentionally left blank</em>]

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of this ____ day of ___, 202[__].

[•], as Loan Guarantor

By: _____
Name:
Title:

ACCEPTED AND AGREED:

BRIGADE AGENCY SERVICES LLC,
as Administrative Agent

By: _____
    Name:
    Title:

BRIGADE AGENCY SERVICES LLC,
as Collateral Agent

By: _____
    Name:
    Title:

**SCHEDULE [___]**

Joined Party Notice Details

[*Incoming Loan Guarantor to provide*]

**EXHIBIT F-1**

**Form Of U.S. Tax Certificate**
**(For Non-U.S. [Lenders][Participants]¹ That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Credit Agreement, dated as of February 21, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time and in effect as of the date hereof, the "Credit Agreement"), by and among Steward Health Care Network, Inc., a Delaware corporation, Steward Emergency Physicians, Inc., a Massachusetts corporation, Steward Physician Contracting, Inc., a Massachusetts corporation, Steward Medicaid Care Network, Inc., a Delaware corporation, Stewardship Health, Inc., a Delaware corporation, Stewardship Health Medical Group, Inc., a Massachusetts corporation, and Stewardship Services Inc., a Delaware corporation (each, a "Borrower" and, collectively, jointly and severally, the "Borrower"), the other Loan Parties party thereto from time to time, the Lenders party thereto from time to time (the "Lenders"), Brigade Agency Services LLC, as administrative agent for the Lenders (in such capacity, the "Administrative Agent") and Brigade Agency Services LLC, as the collateral agent for the Secured Parties (as defined therein) (in such capacity, the "Collateral Agent").

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the [Loan(s) (as well as any note(s) evidencing such Loan(s))][participation] in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a 10 percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (v) no interest payments in connection with any Loan Document are effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished [the Administrative Agent and the Borrower][its participating Lender] with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform [the Borrower and the Administrative Agent][such Lender] in writing and (2) the undersigned shall have at all times furnished [the Borrower and the Administrative Agent][such Lender] with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER OR PARTICIPANT]

By:_____
     Name:
     Title:

Date: _____, 202[  ]

_____

¹ This form can be used by Lenders and Participants. Select the appropriate bracketed phrases.

**EXHIBIT F-2**

**Form of U.S. Tax Certificate**
**(For Non-U.S. [Lenders][Participants] [2]  That Are Partnerships For U.S. Federal Income Tax**
**Purposes)**

Reference is hereby made to the Credit Agreement, dated as of February 21, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time and in effect as of the date hereof, the "Credit Agreement"), by and among Steward Health Care Network, Inc., a Delaware corporation, Steward Emergency Physicians, Inc., a Massachusetts corporation, Steward Physician Contracting, Inc., a Massachusetts corporation, Steward Medicaid Care Network, Inc., a Delaware corporation, Stewardship Health, Inc., a Delaware corporation, Stewardship Health Medical Group, Inc., a Massachusetts corporation, and Stewardship Services Inc., a Delaware corporation (each, a "Borrower" and, collectively, jointly and severally, the "Borrower"), the other Loan Parties party thereto from time to time, the Lenders party thereto from time to time (the "Lenders"), Brigade Agency Services LLC, as administrative agent for the Lenders (in such capacity, the "Administrative Agent") and Brigade Agency Services LLC, as the collateral agent for the Secured Parties (as defined therein) (in such capacity, the "Collateral Agent").

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the [Loan(s) (as well as any note(s) evidencing such Loan(s))][participation] in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such [Loan(s) (as well as any note(s) evidencing such Loan(s))][participation], (iii) with respect to [the extension of credit pursuant to this Credit Agreement or any other Loan Document][such participation], neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a 10 percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code and (vi) no interest payments in connection with any Loan Document are effectively connected with (1) the undersigned's conduct of a U.S. trade or business or (2) the conduct of a U.S. trade or business by any of its direct or indirect partners/members.

The undersigned has furnished [the Administrative Agent and the Borrower][its participating Lender] with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W- 8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W- 8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided in this certificate changes, the undersigned shall promptly so inform [the Borrower and the Administrative Agent][such Lender] in writing and (2) the undersigned shall have at all times furnished [the Borrower and the Administrative Agent][such Lender] with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

---

[2] This form can be used by Lenders and Participants.  Select the appropriate bracketed phrases.

WEIL:\99559631\8\76000.0003

[NAME OF LENDER OR PARTICIPANT]

By: _____
Name:
Title:

Date: _____ __, 202[ ]

WEIL:\99559631\8\76000.0003

EXHIBIT G

FORM OF BORROWING REQUEST

Brigade Agency Services LLC
399 Park Avenue, 16th Floor
New York, NY 10022
Attn: Jeff Frusciante
Email: JF@brigadecapital.com

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of February 21, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Steward Health Care Network, Inc., a Delaware corporation, Steward Emergency Physicians, Inc., a Massachusetts corporation, Steward Physician Contracting, Inc., a Massachusetts corporation, Steward Medicaid Care Network, Inc., a Delaware corporation, Stewardship Health, Inc., a Delaware corporation, Stewardship Health Medical Group, Inc., a Massachusetts corporation, and Stewardship Services Inc., a Delaware corporation (each, a "Borrower" and, collectively, jointly and severally, the "Borrower"), the other Loan Parties party thereto from time to time, the Lenders party thereto from time to time (the "Lenders"), Brigade Agency Services LLC, as administrative agent for the Lenders (in such capacity, the "Administrative Agent") and Brigade Agency Services LLC, as the collateral agent for the Secured Parties (in such capacity, the "Collateral Agent"). Capitalized terms used but not defined herein have the meaning set forth in the Credit Agreement. This notice constitutes a Borrowing Request pursuant to Section 2.03 of the Credit Agreement.

1.    The date of the Borrowing will be _____, 2024 (the "Borrowing Date").

2.    The aggregate principal amount of the Borrowing will be $[    ]. The proceeds of the Borrower shall be [sent to the following account[s]:]/[as set forth in the funds flow memorandum on file with the Administrative Agent.]

*[Borrower to complete account details]*

3.    [The representations and warranties of the Loan Parties set forth in the Credit Agreement are true and correct in all material respects (it being understood that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects after giving effect to any such qualification therein) with the same effect as though made on and as of the date hereof and the Borrowing Date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).][3]

4.    [At the time of and immediately after giving effect to the requested Borrowing, no Default or Event of Default shall have occurred and be continuing.][4]

---

[3] Included as required under Section 4.02 of the Credit Agreement.
[4] Included as required under Section 4.02 of the Credit Agreement.

**Debtors' Exhibit No. 6**
**Page 182 of 339**

5.      The proceeds of the requested Borrowing shall be used in accordance with <u>Section 5.08</u> of the Credit Agreement.

[*Signature Page Follows*]

WEIL:\99559631\8\76000.0003

IN WITNESS WHEREOF, the undersigned has executed this Borrowing Request as of the date written above.

STEWARD HEALTH CARE NETWORK, INC.
STEWARD EMERGENCY PHYSICIANS, INC.
STEWARD PHYSICIAN CONTRACTING, INC.
STEWARD MEDICAID CARE NETWORK, INC.
STEWARDSHIP HEALTH, INC.
STEWARDSHIP HEALTH MEDICAL GROUP, INC.
STEWARDSHIP SERVICES INC.

By: _____
    Name:
    Title:

EXHIBIT H

FORM OF PERFECTION CERTIFICATE

See attached.

WEIL:\99559631\8\76000.0003

EXECUTION VERSION

## INFORMATION CERTIFICATE

February 21, 2024

Sound Point Agency LLC                          Brigade Agency Services LLC
Attn:  Morgan Dean                              Attn:  Matt Perkal
E-mail:  mdean@soundpointcap.com                E-mail: mp@brigadecapital.com

Ladies and Gentlemen:

Reference is hereby made to the Credit Agreement of even date herewith (as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "Credit Agreement"; capitalized terms used in this information certificate and not otherwise defined in this information certificate shall have the meanings assigned thereto in the Credit Agreement) by and among the Lenders party thereto, Brigade Agency Services LLC, as administrative agent for the Lenders (in such capacity, the "Administrative Agent"), Brigade Agency Services LLC, as the collateral agent for the Secured Parties (in such capacity, the "Collateral Agent", and together with the Administrative Agent, collectively, the "Agents"), Steward Health Care Network, Inc., a Delaware corporation, Steward Emergency Physicians, Inc., a Massachusetts corporation, Steward Physician Contracting, Inc., a Massachusetts corporation, Steward Medicaid Care Network, Inc., a Delaware corporation, Stewardship Health, Inc., a Delaware corporation, Stewardship Health Medical Group, Inc., a Massachusetts corporation, and Stewardship Services Inc., a Delaware corporation (each, a "Borrower" and, collectively, jointly and severally, the "Borrower") and each of the entities listed as a guarantor on Exhibit A hereto, as guarantors (individually, each a "Guarantor" and collectively, "Guarantors"). To induce the Agents and the Lenders to enter into the Credit Agreement and related loan documents ("Loan Documents") and fund the Loans provided for thereunder, the Borrower is delivering this information certificate pursuant to Section 4.01(f) of the Credit Agreement and is providing the following information regarding the Borrower and each of the Guarantors (collectively referred to herein as "Credit Parties" and each, a "Credit Party").  Each Credit Party represents and warrants to the Agents that the information provided in this information certificate is true and correct in all material respects as of the Effective Date.

### A.   IDENTIFICATION AND ORGANIZATION MATTERS

1.      The information set forth set forth on Exhibit A attached hereto for each Credit Party is true, accurate and correct as of the date hereof.  Credit Parties' organizational structure is as set forth on Exhibit B attached hereto.

### B.   LEGAL AUTHORITY MATTERS

2.      The officers of each Credit Party and their respective titles are:

| Credit Party | Title | Name |
|---|---|---|
| Steward Health Care System LLC | CEO<br>Treasurer<br>Secretary<br>Assistant Secretary | Ralph de la Torre<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Health Care Holdings LLC | | |
| Arizona Diagnostic & Surgical Center, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Ralph de la Torre<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Beaumont Hospital Holdings, Inc. | | |
| Biltmore Surgery Center Holdings, Inc. | | |
| Biltmore Surgery Center, Inc. | | |
| Brim Healthcare of Texas, LLC | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Thomas D Gilbert<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Brim Holding Company, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Ralph de la Torre<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Choice Care Clinic I, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Amy Guay<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Choice Care Clinic II, Inc. | | |
| Choice Care Clinic III, Inc. | | |
| Choice Care Clinic of Louisiana, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Ralph de la Torre<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Choice Care Clinic of Utah, Inc. | | |
| Davis Surgical Center Holdings, Inc. | | |
| Glenwood Specialty Imaging, LLC | | |
| Davis Hospital Holdings, Inc. | President<br>Treasurer | Ralph de la Torre<br>Mark Rich |

2

| Credit Party | Title | Name |
|---|---|---|
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| | Vice President | Michael E. Jensen |
| | Vice President | Jared Spackman |
| Heritage Technologies, L.L.C. | President | Amy Guay |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| IASIS Capital Corporation | President | Ralph de la Torre |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| IASIS Finance II LLC | President | Ralph de la Torre |
| IASIS Finance III LLC | Treasurer | Mark Rich |
| IASIS Finance Texas Holdings, LLC | Secretary | Herbert Holtz |
| IASIS Finance, Inc. | Assistant Secretary | Nathalie Hibble |
| IASIS Glenwood Regional Medical Center, LP | President | Jeremy M Tinnerello |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| IASIS Healthcare Corporation | President | Ralph de la Torre |
| IASIS Healthcare Holdings, Inc. | Treasurer | Mark Rich |
| IASIS Healthcare LLC | Secretary | Herbert Holtz |
| IASIS Management Company | Assistant Secretary | Nathalie Hibble |
| IASIS Transco, Inc. | | |
| Indigent Care Services of Northeast Louisiana, Inc. | | |
| Jordan Valley Hospital Holdings, Inc. | President | Jon Butterfield |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Mesa General Hospital, LP | President | Ralph de la Torre |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Morton Hospital, A Steward Family Hospital, Inc. | President | Heidi Taylor |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Mountain Point Holdings, LLC | President | Ralph de la Torre |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Mountain Vista Medical Center, LP | President | Robert Damon Brown |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| MT Transition LP | President | Ralph de la Torre |
| | Treasurer | Mark Rich |

3

| Credit Party | Title | Name |
|---|---|---|
| | Secretary<br>Assistant Secretary | Herbert Holtz<br>Nathalie Hibble |
| Nashoba Valley Medical Center, A Steward Family Hospital, Inc. | Interim Hospital President<br>Treasurer<br>Secretary<br>Assistant Secretary | Salvatore Perla<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| New England Sinai Hospital, A Steward Family Hospital, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Justine DeFronzo<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Odessa Fertility Lab, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Ralph de la Torre<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Odessa Regional Hospital, LP<br><br>Permian Basin Clinical Services, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Stacey L. Brown<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Permian Premier Health Services, Inc.<br>Physician Group of Arizona, Inc.<br>Physician Group of Arkansas, Inc.<br>Physician Group of Florida, Inc.<br>Physician Group of Louisiana, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Amy Guay<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Podiatric Physicians Management of Arizona, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Michael Callum<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| PP Transition LP<br><br>PP Transition, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Ralph de la Torre<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Quincy Medical Center, A Steward Family Hospital, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Michael Callum<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Riverwoods ASC Holdco LLC<br><br>Seaboard Development Port Arthur LLC | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Ralph de la Torre<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| SHC Youngstown Ohio Laboratory Services Company LLC | - | Member managed |
| SHC Youngstown Ohio Outpatient Services LLC | - | Member managed |

4

**Debtors' Exhibit No. 6**
**Page 189 of 339**

| Credit Party | Title | Name |
|---|---|---|
| SHC Youngstown Ohio PSC LLC | - | Member managed |
| SJ Medical Center, LLC | Hospital President<br>Treasurer<br>Secretary<br>Assistant Secretary | Michael Kleplin<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| St. Luke's Behavioral Hospital, LP | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Phil Sheridan<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| St. Luke's Medical Center, LP | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Brent Cope<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Carney Hospital, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Stan McLaren<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward CGH, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Jose L. Molliner<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Emergency Physicians, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Amy Guay<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Fall River Management Care Services LLC | - | Member managed |
| Steward Florida ALF LLC | - | Member managed |
| Steward Florida Holdings LLC | - | Member managed |
| Steward Good Samaritan Medical Center, Inc.<br>Steward Good Samaritan Occupational Health Services, Inc.<br>Steward Good Samaritan Radiation Oncology Center, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Matthew Hesketh<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Health Care Network, Inc. | President and CEO<br>Treasurer<br>Secretary<br>Assistant Secretary | Joseph M. Weinstein MD<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward HH, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Luis Allende Ruiz<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Hillside Rehabilitation Hospital, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Jeffrey Koontz<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |

5

| Credit Party | Title | Name |
|---|---|---|
| Steward Holy Family Hospital, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Craig Jesioloswsiki<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Hospital Holdings LLC | - | Member managed |
| Steward Imaging & Radiology Holdings LLC | - | Member managed |
| Steward Medicaid Care Network, Inc. | Treasurer<br>Secretary<br>Assistant Secretary | Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Medical Group, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Amy Guay<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Medical Holdings LLC | - | Member managed |
| Steward Melbourne Hospital, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Aaron Gicca<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward New England Initiatives, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Ralph de la Torre<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Norwood Hospital, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Salvatore Perla<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward NSMC, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Contreras, Alejandro<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Ohio Holdings LLC | - | Member managed |
| Steward Operations Holdings LLC | - | Member managed |
| Steward Pennsylvania Holdings LLC | - | Member managed |
| Steward PGH, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Alejandro Contreras<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Physician Contracting, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Amy Guay<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |
| Steward Rockledge Hospital, Inc. | President<br>Treasurer<br>Secretary<br>Assistant Secretary | Thomas Bowden<br>Mark Rich<br>Herbert Holtz<br>Nathalie Hibble |

6

| Credit Party | Title | Name |
|---|---|---|
| Steward Sebastian River Medical Center, Inc. | President | Ronald Bierman |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Steward Sharon Regional Health System, Inc. | Hospital President | Robert Rogalski |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Steward St. Anne's Hospital Corporation | President | Michael Bushell |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Steward St. Elizabeth's Medical Center of Boston, Inc. | President | Paul Smith |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Steward St. Elizabeth's Realty Corp. | President | Ralph de la Torre |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Steward Texas Hospital Holdings LLC | President | Stacey L. Brown |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Steward Trumbull Memorial Hospital, Inc. | President | Cindy Russo |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Steward Valley Regional Ventures, Inc. | President | Ralph de la Torre |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| Stewardship Health, Inc. Stewardship Health Medical Group, Inc. | President | Michael Callum, M.D. |
| | Treasurer | Mark Rich |
| Stewardship Services Inc. | President | Joseph Weinstein, M.D. |
| | Treasurer | Mark Rich |
| | Assistant Secretary | Nathalie Hibble |
| The Medical Center of Southeast Texas, LP | President | Josh Snow |
| | Hospital Board President | Josh Snow |
| | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |
| TNC Transition LP | President | Ralph de la Torre |
| Utah Transcription Services, Inc. | Treasurer | Mark Rich |
| | Secretary | Herbert Holtz |
| | Assistant Secretary | Nathalie Hibble |

7

3.      The members of the Board of Directors or Management Board of each Credit Party (or, if such Credit Party is a limited partnership, the general partner or, if such Credit Party is a limited liability company, the managers, managing member or member) are:

| Credit Party | Board of Directors / General Partner / Managers |
|---|---|
| Arizona Diagnostic & Surgical Center, Inc. | Michael Callum Ralph de la Torre |
| Beaumont Hospital Holdings, Inc. | |
| Biltmore Surgery Center Holdings, Inc. | |
| Biltmore Surgery Center, Inc. | |
| Brim Healthcare of Texas, LLC | Brim Holding Company, Inc. |
| Brim Holding Company, Inc. | Callum,  Michael de la Torre, MD Ralph Gilbert,  Thomas D. Hall,  Roger Paolucci,  Michael Simmons,  Tom Strayhorn,  Shelly D. |
| Choice Care Clinic I, Inc. | Alampur, MD,  Sudhir |
| Choice Care Clinic II, Inc. | Anwar, MD Syed |
| Choice Care Clinic III, Inc. | Bell,  Chris Kuna, MD Kalyan Leonard,  Stacey Lynch, MD Kevin Miller, DO Jason R. Watkins,  Winston |
| Choice Care Clinic of Louisiana, Inc. | Michael Callum Ralph de la Torre |
| Choice Care Clinic of Utah, Inc. | |
| Davis Hospital Holdings, Inc. | |
| Davis Surgical Center Holdings, Inc. | |
| Glenwood Specialty Imaging, LLC | IASIS Healthcare LLC |
| Heritage Technologies, L.L.C. | IASIS Healthcare LLC Richard Dinsdale, MD |
| IASIS Capital Corporation | Michael Callum Ralph de la Torre |
| IASIS Finance II LLC | IASIS Healthcare LLC |
| IASIS Finance III LLC | IASIS Healthcare LLC |
| IASIS Finance Texas Holdings, LLC | IASIS Finance, Inc. |
| IASIS Finance, Inc. | Michael Callum Ralph de la Torre |
| IASIS Glenwood Regional Medical Center, LP | IASIS Healthcare Holdings, Inc. |
| IASIS Healthcare Corporation | Michael Callum Ralph de la Torre |
| IASIS Healthcare Holdings, Inc. | Michael Callum Ralph de la Torre |
| IASIS Healthcare LLC | IASIS Healthcare Corporation |
| IASIS Management Company | Michael Callum Ralph de la Torre |
| IASIS Transco, Inc. | |
| Indigent Care Services of Northeast Louisiana, Inc. | |

8

| Credit Party | Board of Directors / General Partner / Managers |
|---|---|
| Jordan Valley Hospital Holdings, Inc. | Michael Callum |
| Mesa General Hospital, LP | IASIS Healthcare Holdings, Inc. |
| Morton Hospital, A Steward Family Hospital, Inc. | Allcock,  Zulmira<br>Bahhady, MD Imad<br>Gomes,  Terrence<br>Roberts,  Michele<br>Stecker, DO Brett<br>Taylor,  Heidi<br>Trucchi Condon,  Ann<br>Hoye, MD James P. |
| Mountain Point Holdings, LLC | Seaboard Development LLC |
| Mountain Vista Medical Center, LP | IASIS Healthcare Holdings, Inc. |
| MT Transition LP | IASIS Healthcare Holdings, Inc. |
| Nashoba Valley Medical Center, A Steward Family Hospital, Inc. | Crowley,  Julie<br>Fetterhoff,  Melissa<br>Perla,  Salvatore<br>Pinard,  Matthew<br>Pontbriand,  Robert |
| New England Sinai Hospital, A Steward Family Hospital, Inc. | DeFronzo,  Justine<br>Thornton,  Erika<br>Vasudhev,  Shreekant<br>Cramer,  Stephen D. |
| Odessa Fertility Lab, Inc. | Michael Callum<br>Ralph de la Torre |
| Odessa Regional Hospital, LP | IASIS Healthcare Holdings, Inc. |
| Permian Basin Clinical Services, Inc. | Odessa Regional Hospital, LP |
| Permian Premier Health Services, Inc. | Joseph Weinstein, M.D.<br>Michael Callum, M.D.<br>Octavio Diaz, M.D. |
| Physician Group of Arizona, Inc. | Michael Callum<br>Ralph de la Torre<br>Amy Guay |
| Physician Group of Arkansas, Inc. | Michael Callum<br>Amy Guay |
| Physician Group of Florida, Inc. | Michael Callum<br>Ralph de la Torre<br>Amy Guay |
| Physician Group of Louisiana, Inc. | Michael Callum<br>Ralph de la Torre |
| Podiatric Physicians Management of Arizona, Inc. | Michael Callum |
| PP Transition LP | IASIS Healthcare Holdings, Inc. |
| PP Transition, Inc. | Michael Callum |
| Quincy Medical Center, A Steward Family Hospital, Inc. | Ralph de la Torre |
| Riverwoods ASC Holdco LLC | IASIS Healthcare LLC |
| Seaboard Development Port Arthur LLC | IASIS Healthcare LLC |
| SHC Youngstown Ohio Laboratory Services Company LLC | Steward Ohio Holdings LLC |

9

WEIL:\99571730\6\76000.0003

| Credit Party | Board of Directors / General Partner / Managers |
|---|---|
| SHC Youngstown Ohio Outpatient Services LLC | Steward Ohio Holdings LLC |
| SHC Youngstown Ohio PSC LLC | Steward Ohio Holdings LLC |
| SJ Medical Center, LLC | IASIS Healthcare LLC |
| St. Luke's Behavioral Hospital, LP | IASIS Healthcare Holdings, Inc. |
| St. Luke's Medical Center, LP | IASIS Healthcare Holdings, Inc. |
| Steward Carney Hospital, Inc. | Bane,  Richard<br>Dickerson, II Bishop William E.<br>Hsu,  Lily S<br>McLaren,  Stan<br>Motley,  J. Keith<br>Mui,  Kenneth |
| Steward CGH, Inc. | Abril,  Alexis<br>Beauperthuy,  Gilbert<br>de la Rosa,  Marcos<br>Fernandez,  Juan A<br>Lago,  Vincente<br>Milian,  Natalie<br>Minoso y de Cal,  Oscar<br>Molliner,  Jose L.<br>Penalver,  Manuel<br>Villalobos, Jose |
| Steward Emergency Physicians, Inc. | Michael Callum<br>Ralph de la Torre |
| Steward Fall River Management Care Services LLC | Steward Operations Holdings LLC |
| Steward Florida ALF LLC | Steward Florida Holdings LLC |
| Steward Florida Holdings LLC | Steward Health Care System LLC |
| Steward Good Samaritan Medical Center, Inc. | Ciccolo, Jr. Joseph<br>Hesketh,  Matthew<br>McArdle, MD Richard B.<br>Shaw Ni, MD,  Glen<br>Tierney,  Vanessa<br>Vicente,  Adelino<br>Waldron,  Mary<br>Ciccolo, Jr. Joseph |
| Steward Good Samaritan Occupational Health Services, Inc. | Hesketh,  Matthew<br>Karam,  James J. |
| Steward Good Samaritan Radiation Oncology Center, Inc. | Crowe, MD John M. |
| Steward Health Care Holdings LLC | Alan Carr<br>Boehner, John A.<br>Callum,  Michael<br>de la Torre, MD Ralph<br>Hernandez,  Carlos M.<br>Karam,  James J.<br>King-Shaw, Jr. Ruben<br>Mark Rich<br>Vadakumpadan,  Sr. Vimala |

10

| Credit Party | Board of Directors / General Partner / Managers |
|---|---|
| | William Transier |
| Steward Health Care Network, Inc. | Mark Rich |
| Steward Health Care System LLC | Steward Health Care Holdings LLC |
| Steward HH, Inc. | Abad, Miguel<br>Abreu, Raphael<br>Arencibia, Carlos<br>Casals - Munoz, Vivian<br>Diaz-Rangel, Luis<br>Lopez De Mendoza, Victor<br>Mederos, Raul<br>Stein, Ragnier<br>Tundidor, Jesus |
| Steward Hillside Rehabilitation Hospital, Inc. | Abell, Kenneth<br>Gold, Ned<br>Koontz, Jeffrey<br>Myer, Elizabeth<br>Pisegna, Susan |
| Steward Holy Family Hospital, Inc. | Ansari, Essam<br>Armano, Robert A.<br>Edwards, MD William H.<br>Heartquist, Allison<br>Hoerner, MD Thomas E.<br>Jesiolowski, Craig<br>Ormond, Ann M.<br>Stankiewicz, Esq. Anthony K.<br>Veasey, Susan<br>Yeghiazarians, MD Vartan<br>Bonanno, Esq. Maria |
| Steward Hospital Holdings LLC | Steward Health Care System LLC |
| Steward Imaging & Radiology Holdings LLC | Steward Health Care System LLC |
| Steward Medicaid Care Network, Inc. | August, Joseph<br>Brown, Daniel<br>Fogel, MD Martin<br>Herman, Andrew<br>Jesiolowski, Craig<br>Jugo, Sr. Glorina<br>Mandell, MD Mark<br>McLaren, Stan<br>Trejo, MD Edgardo<br>Weinstein, MD Joseph M.<br>Williams, Frederica |
| Steward Medical Group, Inc. | Michael Callum, M.D. |
| Steward Medical Holdings LLC | Steward Health Care System LLC |
| Steward Melbourne Hospital, Inc. | Brown, Richard L.<br>Eavenson, Trizia Ginarella<br>Ferguson, Shaun<br>Gicca, Aaron<br>Kershaw, Janice |

11

WEIL:\99571730\6\76000.0003

| Credit Party | Board of Directors / General Partner / Managers |
|---|---|
| | Mills,  Melvin<br>Roman,  George<br>Saracino,  Anthony<br>Wasselle, MD Joseph<br>Weiss,  Michael |
| Steward New England Initiatives, Inc. | de la Torre, MD Ralph<br>Karam,  James J. |
| Steward Norwood Hospital, Inc. | Kurland,  Alan<br>Adcock, MD Lori<br>Cheema, MD Waqar<br>Guyon,  Robert<br>Jacobs,  Joan<br>Lorusso,  Gerard<br>Perla,  Salvatore<br>Usevich,  George<br>Vaughn,  Richard |
| Steward NSMC, Inc. | Isaacson, Louis<br>Adams, James A (Tony)<br>Dauer, Edward<br>Martinez, Eduardo<br>Mendez, Oscar<br>Mond, David<br>Stillwell, Steven<br>Innocent, M.D., Alain<br>Contreras, Alejandro |
| Steward Ohio Holdings LLC | Steward Health Care System LLC |
| Steward Operations Holdings LLC | Steward Health Care System LLC |
| Steward Pennsylvania Holdings LLC | Steward Health Care System LLC |
| Steward PGH, Inc. | Contreras,  Alejandro<br>De La Cruz,  Yioset<br>Fernandez - Bombino,  Julio<br>Ferreira, Christopher<br>Gonzalez,  Jamie<br>Jaraki, Abdul-Rahman<br>King, Christopher<br>Labrada,  Ariol<br>Llanes,  Armando<br>Lopez,  Michael<br>Ravelo, Jorge<br>Rey - Martinez,  Luis<br>Salom,  Emery<br>Roldan,  Eneida |
| Steward Physician Contracting, Inc. | Guay,  Amy<br>Guyon,  Robert |
| Steward Rockledge Hospital, Inc. | Aziz,  Nabil<br>Bowden,  Thomas<br>Brown,  Richard L.<br>Eavenson,  Trizia Ginarella |

12

WEIL:\99571730\6\76000.0003

| Credit Party | Board of Directors / General Partner / Managers |
|---|---|
| | Ferguson,  Shaun<br>Gicca,  Aaron<br>Kershaw,  Janice<br>Mills, Melvin<br>Roman,  George<br>Wasselle, MD Joseph<br>Weiss,  Michael |
| Steward Sebastian River Medical Center, Inc. | Bierman,  Ronald<br>Cordner,  Harold<br>Davis,  Wesley<br>Domkowski, MD Patrick<br>Finley, Jr.,  Joseph<br>Goodman, M.D.,  Lindsay<br>Mathes,  Mark Dean<br>Nall,  Katherine<br>Prieto, MD E. Luis<br>Tolle,  Theresa<br>Van De Voorde,  Rene |
| Steward Sharon Regional Health System, Inc. | Burt,  Tony<br>D'Auria, DO Charles E.<br>Epstein,  James P.<br>Feeney,  James E.<br>Mikolich, MD Brandon<br>Odem,  Mary<br>Palumbo,  Angela M.<br>Rogalski,  Robert<br>Wilt,  Rod<br>D'Amore, MD David<br>Sed,  Karen Winner<br>Nijhawan,  Sheetal |
| Steward St. Anne's Hospital Corporation | Abraham,  Daniel<br>Bushell,  Michael<br>Champagne,  Karen<br>Guyon,  Robert<br>Jugo,  Sr. Glorina<br>Karam,  James J.<br>Katz, MD Jerry<br>LaFrance,  R. Christian<br>Mancini,  Mary Louise<br>Mello,  Carole Marie<br>O'Donnell,  Gregory<br>Sabra,  James P.<br>Vadakumpadan,  Sr. Vimala<br>Yates-Berg,  Dale |
| Steward St. Elizabeth's Medical Center of Boston, Inc. | Flanagan, Esq. John<br>Kelly,  Kevin<br>Madias, MD Nicolaos<br>Montes,  Catalina |

13

| Credit Party | Board of Directors / General Partner / Managers |
|---|---|
|  | Shanahan, Michael<br>Smith, Paul<br>Haughey, Christopher |
| Steward St. Elizabeth's Realty Corp. | de la Torre, MD Ralph<br>Karam, James J. |
| Steward Texas Hospital Holdings LLC | IASIS Healthcare LLC |
| Steward Trumbull Memorial Hospital, Inc. | Awaida, MD Amy<br>Capers, Dante<br>Grahn, PhD Lance<br>Guarnieri, John<br>Jones, Benjamin<br>Russo, Cindy<br>Sheth, Sanjay Y<br>Slyk, PhrD Michael<br>Woods, John T. |
| Steward Valley Regional Ventures, Inc. | Karam, James J. |
| Stewardship Health, Inc. | Mark Rich<br>Michael Callum, M.D. |
| Stewardship Health Medical Group, Inc. | Mark Rich<br>Michael Callum, M.D.<br>Mark Girard, M.D. |
| The Medical Center of Southeast Texas, LP | IASIS Healthcare Holdings, Inc. |
| TNC Transition LP | IASIS Healthcare Holdings, Inc. |
| Utah Transcription Services, Inc. | Michael Callum<br>Ralph de la Torre |
| Stewardship Services, Inc. | Michael Callum, M.D.<br>Mark Girard, M.D. |

4.    Set forth below are the agreements of the Credit Parties with any such Affiliates:

| Credit Party | Affiliates | Agreements with Affiliates |
|---|---|---|
| Steward St. Anne's Hospital Corporation | Milliken Associates Limited Partnership | Indenture of Lease between Milliken Associates Limited Partnership, as lessor, and Steward St. Anne's Hospital Corporation, successor in interest to St. Anne's Hospital Corporation, as tenant, for approximately 5,018 square feet of space located on the first and third floor of the building located at 222 Milliken Place, Fall River, Massachusetts, dated March 8, 2006, as amended, modified, supplemented, extended, renewed, restated, amended and restated or replaced |

14

| Credit Party | Affiliates | Agreements with Affiliates |
|---|---|---|
| | | from time to time prior to the date hereof. |
| Steward St. Anne's Hospital Corporation | Milliken Associates Limited Partnership | Indenture of Lease between Milliken Associates Limited Partnership, as lessor, and Steward St. Anne's Hospital Corporation, successor in interest to St. Anne's Hospital Corporation, as tenant, for approximately 3,485 square feet of space located on the first floor of the building located at 222 Milliken Place, Fall River, Massachusetts, dated as of September 29, 1997, as amended, modified, supplemented, extended, renewed, restated, amended and restated or replaced from time to time prior to the date hereof. |
| Steward St. Anne's Hospital Corporation | Milliken Associates Limited Partnership | Indenture of Lease between Milliken Associates Limited Partnership, as lessor, and Steward St. Anne's Hospital Corporation, successor in interest to St. Anne's Hospital Corporation, as tenant, for approximately 4,325 square feet of space located on the fourth floor of the building located at 222 Milliken Place, Fall River, Massachusetts, dated March 24, 2002, as amended, modified, supplemented, extended, renewed, restated, amended and restated or replaced from time to time prior to the date hereof. |
| Steward St. Anne's Hospital Corporation | The Friends of Saint Anne's, Inc. | Lease between Steward St. Anne's Hospital Corporation, as lessor, and The Friends of Saint Anne's, Inc., as tenant, for approximately 629 square feet of space located on the first floor of the building located at 795 Middle Street, Fall River, Massachusetts, dated March 31, 2011, as amended, modified, supplemented, extended, renewed, restated, amended and |

15

| Credit Party | Affiliates | Agreements with Affiliates |
|---|---|---|
| | | restated or replaced from time to time prior to the date hereof. |
| SJ Medical Center, LLC | NorthStar Anesthesia, P.A. | Agreement for Anesthesiology Department Coverage, effective as of September 1, 2013, by and between SJ Medical Center, LLC and NorthStar Anesthesia, P.A., as amended, modified, supplemented, extended, renewed, restated, amended and restated or replaced from time to time prior to the date hereof. |
| Brim Healthcare of Texas, LLC | NorthStar Anesthesia, P.A. | Agreement for Anesthesiology Department Coverage, entered into as of December 1, 2014, by and between Brim Healthcare of Texas, LLC and NorthStar Anesthesia, P.A., as amended, modified, supplemented, extended, renewed, restated, amended and restated or replaced from time to time prior to the date hereof. |
| Steward Health Care Holdings LLC | - | Second Amended and Restated Limited Liability Company Agreement of Steward Health Care Holdings LLC, dated as of February 4, 2022, as amended, modified, supplemented, extended, renewed, restated, amended and restated or replaced from time to time prior to the date hereof. |
| Steward Health Care System LLC | Management Health Services LLC | Management Services Agreement between Steward Health Care System LLC and Management Health Services LLC, dated as of April 1, 2014, as amended, modified, supplemented, extended, renewed, restated, amended and restated or replaced from time to time prior to the date hereof. |
| Steward Health Care System LLC | Steward Health Care International Investors LLC | Management Services Agreement dated May 12, 2020 between Steward Health Care System LLC and Steward Health Care International Investors LLC, as amended, modified, |

16

| Credit Party | Affiliates | Agreements with Affiliates |
|---|---|---|
| | | supplemented, extended, renewed, restated, amended and restated or replaced from time to time prior to the date hereof. |

5.      A list of all of the material contracts to which any Credit Party is a party or by which such Credit Party is bound is set forth below.  For purposes of this Item 5, the list of "material contracts" should include any long term or significant service or customer agreements, long term or significant supply agreements, real estate leases, agreements pursuant to which intellectual property is licensed or other material licensing agreements, employment agreements, collective bargaining agreements, management and consulting agreements the termination of which would be reasonably expected to result in a Material Adverse Effect: **None**

6.      Except as set forth below, the execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby will not violate, conflict with or cause a breach of, or result in the creation of a Lien under, any of the agreements identified in Item 5, any Credit Party's Organizational Documents or applicable law: **None**

7.      The following consents shall have been obtained on or prior to the Closing Date in connection with the execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby: **None**

8.      Each Credit Party's fiscal year ends on December 31st of each year.

9.      The authorized equity securities of each Credit Party, and the identity of the holders of issued equity securities with the percentage of their fully-diluted ownership of such Credit Party, are as set forth on the Capitalization Schedule attached hereto as <u>Exhibit C</u>.  There are no preemptive or other outstanding rights, warrants, options, conversion rights or similar agreements or understandings.

10.      A brief description of each Credit Party's pension plans is:

**On December 15, 2015, Steward entered into an Agreement of Merger and a Participation Agreement whereby it merged the Norwood, Good Samaritan, Morton, and Caritas Plan defined benefit plans (collectively, the "Legacy Plans") into the Nurses and Local 813 IBT Retirement Fund (the "Plan"), a tax-qualified multi-employer defined benefit plan pursuant to Section 3(37)(A) of the Employee Income Security Act of 1974, as amended ("ERISA") and U.S. Department of Labor Regulation 2510.337, which was established on January 1, 1962, and includes more than 160 contributing employers (the "Merger").**

**As a result of the Merger, the Legacy Plans were terminated and the related assets and obligations were transferred to and assumed by the Plan and Steward became a contributing employer to the Plan.**

**At this time, there are no underfunded obligations of the Plan.**

11.      During the 5 year period preceding the Closing Date no Credit Party has been party to any merger, consolidation, stock acquisition or purchase of all or a substantial portion of the assets of any Person, except:

Please see below the relevant transactions entered into by the Credit Parties in the last 5 years:

17

WEIL:\99571730\6\76000.0003

(a)   SJMC Physician Services, Inc. merged into Permian Premier Health Services, Inc. on 8/20/19.

(b)   Texarkana Regional Healthcare Network, Inc. merged into Permian Premier Health Services, Inc. on 8/20/19.

(c)   SJ Medical Center, LLC utilized the name St. Joseph Medical Center as an assumed name under which its business or professional service was to be conducted pursuant to a filing on 4/6/22.

(d)   Permian Premier Health Services, Inc. utilized the name Scenic Mountain Medical Group as an assumed name under which its business or professional service was to be conducted pursuant to a filing on 5/14/19.

(e)   Asset purchase agreement dated June 16, 2021 between, *inter alia*, Tenet Healthcare Corporation and Steward CGH, Inc., for the purchase of hospital assets and other businesses incident thereto.

(f)   Agreement for purchase and sale dated February 11, 2022 between Variety Children's Hospital, Inc. and Steward CHG, Inc. for the purchase of 5959 NW 7th Street, 5960 NW 7th Street, 5990 NW 7th Street, 630 NW 59th Court, 6000, 6020, and 6030 NW 7th Street, Miami, FL 33126.

(g)   Asset purchase agreement dated February 23, 2022 between Mountain Vista Medical Center, LP and VHS of Phoenix, Inc. for the purchase of assets primarily used in the business of a licensed general acute care hospital located at 5750 Baseline Road, Mesa, Arizona.

**C.   NATURE OF OPERATIONS AND LOCATIONS**

12.   The following is a brief description of each Credit Party's business:

| Credit Party | Business Description |
|---|---|
| Arizona Diagnostic & Surgical Center, Inc. | Engaged in business related to healthcare services |
| Beaumont Hospital Holdings, Inc. | Engaged in business related to healthcare services |
| Biltmore Surgery Center Holdings, Inc. | Engaged in business related to healthcare services |
| Biltmore Surgery Center, Inc. | Engaged in business related to healthcare services |
| Brim Healthcare of Texas, LLC | Hospital or ancillary facility |
| Brim Holding Company, Inc. | Hospital or ancillary facility |
| Choice Care Clinic I, Inc. | Engaged in business related to healthcare services |
| Choice Care Clinic II, Inc. | Engaged in business related to healthcare services |
| Choice Care Clinic III, Inc. | Engaged in business related to healthcare services |
| Choice Care Clinic of Louisiana, Inc. | Engaged in business related to healthcare services |
| Choice Care Clinic of Utah, Inc. | Engaged in business related to healthcare services |
| Davis Hospital Holdings, Inc. | Engaged in business related to healthcare services |
| Davis Surgical Center Holdings, Inc. | Engaged in business related to healthcare services |

18

| Credit Party | Business Description |
|---|---|
| Glenwood Specialty Imaging, LLC | Engaged in business related to healthcare services |
| Heritage Technologies, L.L.C. | Engaged in business related to healthcare services |
| IASIS Capital Corporation | Engaged in business related to healthcare services |
| IASIS Finance II LLC | Engaged in business related to healthcare services |
| IASIS Finance III LLC | Engaged in business related to healthcare services |
| IASIS Finance Texas Holdings, LLC | Engaged in business related to healthcare services |
| IASIS Finance, Inc. | Engaged in business related to healthcare services |
| IASIS Glenwood Regional Medical Center, LP | Hospital or ancillary facility |
| IASIS Healthcare Corporation | Engaged in business related to healthcare services |
| IASIS Healthcare Holdings, Inc. | Engaged in business related to healthcare services |
| IASIS Healthcare LLC | Engaged in business related to healthcare services |
| IASIS Management Company | Engaged in business related to healthcare services |
| IASIS Transco, Inc. | Engaged in business related to healthcare services |
| Indigent Care Services of Northeast Louisiana, Inc. | Engaged in business related to healthcare services |
| Jordan Valley Hospital Holdings, Inc. | Engaged in business related to healthcare services |
| Mesa General Hospital, LP | Engaged in business related to healthcare services |
| Morton Hospital, A Steward Family Hospital, Inc. | Hospital or ancillary facility |
| Mountain Point Holdings, LLC | Engaged in business related to healthcare services |
| Mountain Vista Medical Center, LP | Hospital or ancillary facility |
| MT Transition LP | Engaged in business related to healthcare services |
| Nashoba Valley Medical Center, A Steward Family Hospital, Inc. | Hospital or ancillary facility |
| New England Sinai Hospital, A Steward Family Hospital, Inc. | Hospital or ancillary facility |
| Odessa Fertility Lab, Inc. | Engaged in business related to healthcare services |
| Odessa Regional Hospital, LP | Hospital or ancillary facility |
| Permian Basin Clinical Services, Inc. | Engaged in business related to healthcare services |
| Permian Premier Health Services, Inc. | Engaged in business related to healthcare services |
| Physician Group of Arizona, Inc. | Engaged in business related to healthcare services |
| Physician Group of Arkansas, Inc. | Engaged in business related to healthcare services |
| Physician Group of Florida, Inc. | Engaged in business related to healthcare services |
| Physician Group of Louisiana, Inc. | Engaged in business related to healthcare services |
| Podiatric Physicians Management of Arizona, Inc. | Engaged in business related to healthcare services |
| PP Transition LP | Engaged in business related to healthcare services |
| PP Transition, Inc. | Engaged in business related to healthcare services |

WEIL:\99571730\6\76000.0003

| Credit Party | Business Description |
|---|---|
| Quincy Medical Center, A Steward Family Hospital, Inc. | Engaged in business related to healthcare services |
| Riverwoods ASC Holdco LLC | Engaged in business related to healthcare services |
| Seaboard Development Port Arthur LLC | Engaged in business related to healthcare services |
| SHC Youngstown Ohio Laboratory Services Company LLC | Engaged in business related to healthcare services |
| SHC Youngstown Ohio Outpatient Services LLC | Engaged in business related to healthcare services |
| SHC Youngstown Ohio PSC LLC | Engaged in business related to healthcare services |
| SJ Medical Center, LLC | Hospital or ancillary facility |
| St. Luke's Behavioral Hospital, LP | Hospital or ancillary facility |
| St. Luke's Medical Center, LP | Hospital or ancillary facility |
| Steward Carney Hospital, Inc. | Hospital or ancillary facility |
| Steward CGH, Inc. | Hospital or ancillary facility |
| Steward Emergency Physicians, Inc. | Engaged in business related to healthcare services |
| Steward Fall River Management Care Services LLC | Engaged in business related to healthcare services |
| Steward Florida ALF LLC | Engaged in business related to healthcare services |
| Steward Florida Holdings LLC | Engaged in business related to healthcare services |
| Steward Good Samaritan Medical Center, Inc. | Hospital or ancillary facility |
| Steward Good Samaritan Occupational Health Services, Inc. | Engaged in business related to healthcare services |
| Steward Good Samaritan Radiation Oncology Center, Inc. | Engaged in business related to healthcare services |
| Steward Health Care Holdings LLC | Engaged in business related to healthcare services |
| Steward Health Care Network, Inc. | Engaged in business related to healthcare services |
| Steward Health Care System LLC | Engaged in business related to healthcare services |
| Steward HH, Inc. | Hospital or ancillary facility |
| Steward Hillside Rehabilitation Hospital, Inc. | Hospital or ancillary facility |
| Steward Holy Family Hospital, Inc. | Hospital or ancillary facility |
| Steward Hospital Holdings LLC | Engaged in business related to healthcare services |
| Steward Imaging & Radiology Holdings LLC | Engaged in business related to healthcare services |
| Steward Medicaid Care Network, Inc. | Engaged in business related to healthcare services |
| Steward Medical Group, Inc. | Engaged in business related to healthcare services |
| Steward Medical Holdings LLC | Engaged in business related to healthcare services |

20

| Credit Party | Business Description |
|---|---|
| Steward Melbourne Hospital, Inc. | Hospital or ancillary facility |
| Steward New England Initiatives, Inc. | Engaged in business related to healthcare services |
| Steward Norwood Hospital, Inc. | Hospital or ancillary facility |
| Steward NSMC, Inc. | Hospital or ancillary facility |
| Steward Ohio Holdings LLC | Engaged in business related to healthcare services |
| Steward Operations Holdings LLC | Engaged in business related to healthcare services |
| Steward Pennsylvania Holdings LLC | Engaged in business related to healthcare services |
| Steward PGH, Inc. | Hospital or ancillary facility |
| Steward Physician Contracting, Inc. | Engaged in business related to healthcare services |
| Steward Rockledge Hospital, Inc. | Hospital or ancillary facility |
| Steward Sebastian River Medical Center, Inc. | Hospital or ancillary facility |
| Steward Sharon Regional Health System, Inc. | Hospital or ancillary facility |
| Steward St. Anne's Hospital Corporation | Hospital or ancillary facility |
| Steward St. Elizabeth's Medical Center of Boston, Inc. | Hospital or ancillary facility |
| Steward St. Elizabeth's Realty Corp. | Engaged in business related to healthcare services |
| Steward Texas Hospital Holdings LLC | Hospital or ancillary facility |
| Steward Trumbull Memorial Hospital, Inc. | Hospital or ancillary facility |
| Steward Valley Regional Ventures, Inc. | Engaged in business related to healthcare services |
| Stewardship Health, Inc. | Engaged in business related to healthcare services |
| Stewardship Health Medical Group, Inc. | Engaged in business related to healthcare services |
| The Medical Center of Southeast Texas, LP | Hospital or ancillary facility |
| TNC Transition LP | Engaged in business related to healthcare services |
| Utah Transcription Services, Inc. | Engaged in business related to healthcare services |
| Stewardship Services Inc. | Engaged in business related to healthcare services |

13.     Each location at which any Credit Party conducts operations or maintains any books, records, inventory, prescription lists, equipment or other assets is set forth in the table below, including for each such location a street address, the approximate size, an indication of whether the location is owned by the applicable Credit Party, leased by the applicable Credit Party (and, if so, the name and address of the owner of the location) or operated by a third party, such as a warehouseman or processor

WEIL:\99571730\6\76000.0003

(and, if so, the name and address of such third party). In addition, the legal descriptions for any leased or owned real estate at which any Credit Party maintains any equipment are set forth below.

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| Beaumont Hospital Holdings, Inc. | 2799 61st Street Port Arthur, TX 77640 | Owned | - |
| | See Exhibit A-21 and Schedule 1-D of Master Lease I[1] | Leased | MPT of Port Arthur RE-Steward, LLC |
| Brim Healthcare of Texas, LLC | 1000 Pine Street, Texarkana, TX | Leased | PI WRMC, LLC |
| | 5506–5508–5514–5518 Summerhill Rd Texarkana, TX | Leased | Medwell Properties, LLC |
| Brim Holding Company, Inc. | 116 South Hazel Hope, AR | Leased | Ford Ward |
| | 302 Bill Clinton Drive, Hope, AR | Leased | G&E HC REIT II Hope MOB, LLC |
| | See Exhibit A-20 of Master Lease I | Leased | MPT of Hope-Steward, LLC |
| Heritage Technologies, L.L.C. | 20928 East Heritage Loop Road, Suite 106, 107, Queen Creek, AZ | Leased | Cornerstone SPE, LLC |
| | 10238 East Hampton Avenue, Suite 506 & 508, Mesa, AZ | Leased | HCPI/Utah II, LLC |
| | 2181 East Pecos Road, Suite 1, Chandler, AZ | Leased | Santan Health Services, LLC |
| IASIS Finance Texas Holdings, LLC | 1002 Texas Boulevard, Texarkana, TX | Leased | WRMC MOB Texarkana, LLC |
| | See Exhibit A-21 and Schedule 1-D of Master Lease I | Leased | MPT of Port Arthur RE-Steward, LLC |
| IASIS Glenwood Regional Medical Center, LP | 1117 Cheniere Drew Road, West Monroe, LA | Owned (Building) | - |
| | 1117 Cheniere Drew Road, West Monroe, LA | Leased (Ground) | Southern State Properties, LLC |
| | 128 Ridgedale Drive, West Monroe, LA | Leased | BMC Properties, L.L.C. |

---

[1] References to "Master Lease I" refer to the Second Amended and Restated Master Lease Agreement dated March 14, 2022, which contains legal descriptions of the real property.

WEIL:\99571730\6\76000.0003

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 1275 Glenwood Drive West Monroe, LA | Leased | ARHC OCWMNLA01, LLC |
| | 3995 Sterlington Road, Monroe, LA | Leased | Star Properties of Monroe, L.L.C. |
| | See Exhibit A-8 of Master Lease I | Leased | MPT of West Monroe, LLC |
| IASIS Healthcare, LLC | 5656 South Power Road, Suite 126 Gilbert, AZ | Leased | Little San Juan Ranch, LLC |
| IASIS Healthcare Holdings, Inc. | See Exhibit A-21 and Schedule 1-D of Master Lease I | Leased | MPT of Port Arthur-RE Steward, LLC |
| IASIS Management Company | See Exhibit A-21 and Schedule 1-D of Master Lease I | Leased | MPT of Maricopa RE-Steward, LLC |
| Mesa General Hospital, LP | See Exhibit A-21 and Schedule 1-D of Master Lease I | Leased | MPT of Maricopa RE-Steward, LLC |
| Morton Hospital, A Steward Family Hospital, Inc. | 49 Grove Street, Taunton, MA | Owned | - |
| | 511 West Grove Street, Unit 104, 208, 303, Middleborough, MA | Owned | - |
| | 72 Washington Street, Suites 1000, 1001, & 2200, Taunton, MA | Leased | RockyKnoll Estates, Inc. |
| | 91 Washington, Suite 203 & 304, Taunton, MA | Leased | Landis Apartments, LLC |
| | 2005-2007 Bay Street, Suite Medical Records 1, Medical Records 2, Suites B 100, B 110, B200, B210, 100,102, 104, 105, 201, 202, 203, 204A, 204B, and 206, Taunton, MA | Leased | HTA - Morton MOB, LLC |
| | See Exhibit A-5 of Master Lease II[2] | Leased | MPT of Taunton-Steward, LLC |

---

2 References to "Master Lease II" refer to the Master Lease Agreement dated March 14, 2022, which contains legal descriptions of the real property.

23

WEIL:\99571730\6\76000.0003

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| Mountain Vista Medical Center, LP | 10238 East Hampton Avenue, Suite 200, 309 & 411 Mesa, AZ | Leased | HCPI/Utah II, LLC |
| | See Exhibit A-12 of Master Lease I | Leased | MPT of Mesa, LLC |
| | See Exhibit A-25 of Master Lease I | Leased | MPT of Florence, LLC |
| | See Exhibit A-32 of Master Lease I | Leased | MPT of Mesa Superstition-Steward, LLC |
| Nashoba Valley Medical Center, A Steward Family Hospital, Inc. | 190 Groton Road, Units 110 & 230, Ayer, MA | Owned | - |
| | 190 Groton Road, Units 130, 140-150, 160, 170, 200, 220, 250, 260, & 270, Ayer, MA | Leased | HTA - Nashoba MOB 1, LLC |
| | 198 Groton Road, Ayer, MA | Leased | HTA - Nashoba MOB 2, LLC |
| | See Exhibit A-6 in Master Lease II | Leased | MPT of Ayer-Steward, LLC |
| New England Sinai Hospital, A Steward Family Hospital, Inc. | 143 & 150 York Street, Stoughton, MA | Leased | HCII-150 York Street, LLC |
| Odessa Regional Hospital, LP | 1315 E. 5th Street, Units 149, 151, & 157, Odessa, TX | Leased | A-Z Storage |
| | 420 East 6th Street, Lots 4-6 Block 54, Odessa, TX | Leased | Carla Kay Massingill |
| | 420 East 6th Street, Odessa, TX | Leased | ARHC ORODSTX001, LLC |
| | 4911 Andrews Highway, Suite B, Midland, TX | Leased | VT & Ranjani Reddy |
| | 5050 Tanglewood Lane, Suite 1609, Odessa, TX | Leased | Odessa Ventures, LLC |
| | 605 East 4th Street, Parking Lot, Odessa, TX | Leased | ARHC NDODSTX01, LLC |

24

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 704 E. 8th Street, Warehouse, Odessa TX | Leased | Caldera I Bobcat, LLC |
| | 7101 East Ridge Road, Odessa, TX | Leased | LEECO Energy & Investments, Inc. |
| | See Exhibit A-10 in Master Lease I | Leased | MPT of Odessa-Steward, LLC |
| Permian Premier Health Services, Inc. | 1292 Liberty Street Beaumont, TX | Leased | SEMTA West End Medical Properties, LTD |
| | 1315 St. Joseph Parkway Suite 806, 1507, & 1507ST Houston, TX | Leased | HCP MOB Houston TX, LLC |
| | 137 North LHS Drive, Lumberton, TX | Leased | Altus Lumberton Realty, LP |
| | 2234 Nederland Avenue, 1st Floor, Port Neches, TX | Leased | John Lee, DO |
| | 318 North Alleghaney, Suite 201, Odessa, TX | Leased | Ector County Hospital District d/b/a Medical Center Health System |
| | 427 W. 20th Street Suite 302 & 303 Houston, TX | Leased | 427 W 20th Street, LLC |
| | 1411 North Main Street, Andrews, TX | Leased | Andrews County Hospital District |
| | 1701 North Loop 250 West, Midland, TX | Leased | Alpha Temps, Ltd. |
| | 2000 Crawford Street Suite 1750 Houston, TX | Leased | 2000 Crawford Property, LLC |
| | 2010 Dowlen Road Beaumont, TX | Leased | SETMA West End Medical Plaza Properties, LTD |
| | 2162 Texas Avenue, Bridge, TX | Leased | Wesley Palmer, DO |
| | 2301 South Gregg Street, Big Spring, TX | Leased | GC JAL Investments, LLC & GC MJL Investments, LLC |
| | 2900 & 2900 Calder, Beaumont, TX | Leased | Gulf Coast Partners GP, LLC |
| | 3570 College Street, Suite 200, Beaumont, TX | Leased | Southeast Texas Medical Associates, LP |

25

WEIL:\99571730\6\76000.0003

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 400 South Ike Avenue, Monahans, TX | Leased | Ward Memorial Hospital |
| | 408 N Hancock, Odessa, TX | Leased | Kevin Lynch, D.O. |
| | 4911 Andrews Highway, Suite 1, Midland, TX | Leased | VT Reddy and Rajani Reddy |
| | 520 South Twin Highway, Nederland, TX | Leased | Christopher A Bell, DO |
| | 600 East Interstate 20 Stanton, TX | Leased | Martin County Hospital District |
| | 601 N. Adams Odessa, TX | Leased | Madhava Agusala, MD & Vasanta Agusala, MD |
| | 602 East 7th Street, Odessa, TX | Leased | Vasantha Agusala |
| | 605 East 4th Street, Odessa, TX | Leased | ARHC NCODSTX01, LLC |
| | 610 Strickland Drive Suite 170, Orange TX | Leased | Southeast Texas Medical Associates, LLP |
| | 6909 Brisbane Court, Suite 300, Sugarland, TX | Leased | OZ Healthcare, PLLC |
| | 7390 Barlite Boulevard, Suite 205, San Antonio, TX | Leased | Healthcare Realty Services, Inc. |
| | 7430 Barlite Boulevard, Suite 109, San Antonio, TX | Leased | MMay Properties, LP |
| | 7500 Barlite Boulevard, Suite 311, & 313, San Antonio, TX | Leased | Ridgeline Capital Partners, LLC |
| | 980 E. 87th Street, Suite D & E, Odessa, TX | Leased | C&D Rentals, Inc. |
| Physician Group of Arizona, Inc. | 10238 East Hampton Avenue, Suite 301, 304 & 305, Mesa, AZ | Leased | HCPI/UTAH II, LLC |
| | 1331 North 7th Street, Suite 190, Phoenix AZ | Leased | VTR Papago Medical Park, LLC |
| | 1537 South Higley Road, Gilbert, AZ | Leased | Dana Schuchardt |

26

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 16100 North 71st Street, Suite 100, Scottsdale, AZ | Leased | Development Services of America, Inc. |
| | 1855 North Stapley Drive, Mesa, AZ | Leased | North Stapley, LLC |
| | 2122 E. Highland Avenue, Suite 300, Phoenix, AZ | Leased | Town & Country Offices, LLC |
| | 2222 East Highland Avenue, Suite 318, Phoenix, AZ | Leased | Welltower OM Group, LLC |
| | 3385 North Hunt Highway, Suite 123 & 125, Florence, AZ | Leased | Evergreen-Hunt & Merrill Ranch, LLC |
| Seaboard Development Port Arthur LLC | See Exhibit A-21 and Schedule 1-D of Master Lease I | Leased | MPT of Port Arthur RE-Steward, LLC |
| SHC Youngstown Ohio Laboratory Services Company LLC | 811 Southwestern Run, Poland, OH | Leased | Southwestern Development Company |
| SHC Youngstown Ohio PSC LLC | See Exhibit A-2 (revised effective 1/13/24) of Master Lease I | Leased | MPT of Youngstown-Steward, LLC |
| SJ Medical Center, LLC | 1315 St. Joseph Parkway, Suite 1707 Houston, TX | Leased | HCP MOB Houston TX, LLC |
| | 2610 N. Sam Houston Pkwy West Houston, TX | Leased | SL West Houston IMRT, LLC |
| | 5274 State Highway 60 South, Suite 2, Bay City, TX | Leased | Bay City Cardiology Associates, PA |
| | 9079 Katy Freeway Suite B & D Houston, TX | Leased | Robert Horry Sports & Medicine, LLC |
| | 9150 Main Street Suite A3, B3, & C Houston, TX | Leased | SL Med Center IMRT, LLC |
| | See Exhibit A-16 of Master Lease I | Leased | MPT of Houston-Steward, LLC |

WEIL:\99571730\6\76000.0003

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| St. Luke's Behavioral Hospital, LP | See Exhibit A-18 of Master Lease I | Leased | MPT of Phoenix Behavioral-Steward, LLC |
| St. Luke's Medical Center, LP | 1492 South Mill Avenue, Suite 113 & 114 Tempe, AZ | Leased | SPT Ivey Tempe MOB, LLC |
| | See Exhibit A-17 of Master Lease I | Leased | MPT of Phoenix-Steward, LLC |
| St. Luke's Medical Center, LP., d/b/a Tempe St. Luke's Medical Center | 1492 South Mill Avenue, Suite 101, 103, 108, & 201, Tempe, AZ | Leased | SPT Ivey Tempe MOB, LLC |
| | See Exhibit A-19 of Master Lease I | Leased | MPT of Tempe-Steward, LLC |
| Steward Carney Hospital, Inc. | 2110 Dorchester Avenue, Boston, MA | Leased | HTA - Carney MOB, LLC |
| | See Exhibit A-1 in Master Lease II | Leased | MPT of Dorchester-Steward, LLC |
| Steward CGH, Inc. | 2601 South West 37th Avenue, Suite 100A, Coral Gables, FL | Leased | Healthcare Realty Services, Inc. |
| | 4408 South West 74th Avenue, Miami, FL | Leased | 4420 SW 74th Ave, LLC |
| | 8665 Bird Road, Miami, FL | Leased | Bird and 87th Avenue Village, LLC |
| | See Exhibit A-23 of Master Lease I | Leased | MPT of Coral Gables-Steward, LLC |
| | See Exhibit A-33 of Master Lease I | Leased | MPT of Coral Terrace-Steward LLC |
| Steward Florida ALF LLC | 1700 - 1710 Wuesthoff Drive, Melbourne, FL | Leased | S&S ALF, LLC |
| Steward Good Samaritan Medical Center, Inc. | 1 Compass Way #108 East Bridgewater, MA | Leased | Equity Industrial Southeast, LLC |
| | 1 Pearl Street, Suites 100, 200 (and storage), 1000, 1300, 1400, 1500, 1700, 1800, 1900, 2000, 2100, 2200, 2400, 2500, 2600 & 2800, Brockton, MA | Leased | HTA – Pearl Street Medical Center, LLC |
| | 1 Washington Place (aka 15 Roche | Leased | WashMass, LLC |

WEIL:\99571730\6\76000.0003

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | Brothers Way), (1st & 2nd Floor) North Easton, MA | | |
| | 3 Washington Place, (2nd Floor), North Easton, MA | Leased | 3WP MOB, LLC |
| | 63 Main Street, Brockton, MA | Leased | Brockton Neighborhood Health Center |
| | 818 Oak Street, Brockton, MA | Leased | HTA - Good Sam MOB, LLC |
| | 830 Oak Street, Brockton, MA | Leased | HTA - Good Sam MOB, LLC |
| | 909 Sumner Street, Stoughton, MA (First Floor) | Leased | CuraHealth Property, LLC |
| | See Exhibit A-2 of Master Lease II | Leased | MPT of Brockton-Steward, LLC |
| Steward Health Care Network, Inc. | 3 Cherry Street, Newburyport, MA | Leased | KL Nominee Trust |
| | 89A Street, Needham, MA | Leased | MCFP – Needham, LLC |
| Steward Health Care System, LLC | 9 Benson Road, Stoughton, MA | Owned | - |
| | 100 Huntington Ave., #2-110 Boston, MA | Leased | Copley Place Associates, LLC |
| | 1011 Galatyn Parkway Building D Richardson, TX | Leased | Richardson Office, LLC |
| | 117 Seaboard Lane D-200 Franklin, TN | Leased | SCG Dover Centre, LLC |
| | 1900 N. Pearl Street, 2300, 2400 & 2500 Dallas, TX | Leased | STRS Ohio TX Real Estate Investments, Inc, |
| | 2375 North Glenville Drive Building B Richardson, TX | Leased | Richardson Office, LLC |
| | 30 Perwal Street Westwood, MA | Leased | 333 Brazilian Ave, LLC |
| | 77 Warren Street Brighton, MA | Leased | Brighton Marine Health Center, Inc. |
| Steward HH, Inc. | See Exhibit A-29 of Master Lease I | Leased | MPT of Hialeah-Steward, LLC |

29

WEIL:\99571730\6\76000.0003

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| Steward Hillside Rehabilitation Hospital, Inc. | 1450 South Canfield Niles Road, Austintown, OH | Leased | Community Medical Partners Real Estate, LLC |
| | See Exhibit A-1 of Master Lease I | Leased | MPT of Hillside-Steward, LLC |
| Steward Holy Family Hospital, Inc. | 380R Merrimack Street, Suites 1A, & 3A, Methuen, MA | Leased | ARY, LLC |
| | 60 East Street, Units 1200, 1500, 2100, 2200, 2300, 2400 and 3100, Methuen, MA | Leased | HTA - Holy Family MOB, LLC |
| | See Exhibit A-4 of Master Lease II | Leased | MPT of Haverhill-Steward, LLC |
| | See Exhibit A-3 of Master Lease II | Leased | MPT of Methuen-Steward, LLC |
| Steward Hospital Holdings LLC | 825 Washington Street, Suites 120A, 220, 240, 290 325, 340 & 365 Norwood, MA | Leased | Thor 825 Washington, LLC |
| Steward Medical Group, Inc. | 1 Washington Place (aka 15 Roche Brothers Way), North Easton, MA | Leased | WashMass, LLC |
| | 1 Washington Street, Suite 800, Taunton, MA | Leased | Mill River Professional Center, LLC |
| | 104 Liberty Street, Hanson, MA | Leased | Ward Endowment & Partners at Hanson MOB, LLC |
| | 106 Route 44, Raynham, MA | Leased | 106 State Highway, LLC |
| | 119 Longwood Avenue, Rockledge, FL | Leased | Harrison Medical Supplies, LLC |
| | 119 Massachusetts Avenue Lunenburg, MA | Leased | John H. Walker |
| | 12920 US Highway 1, Sebastian, FL | Leased | Fountain Towers, LLC |
| | 13000 U.S. Highway 1, Suite 5, Sebastian, FL | Leased | Kirk Maes, M.D. |

30

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 1317 West Point Drive, Cocoa, FL | Leased | West Point Medical Real Estate Group, LLC |
| | 1345 Providence Highway, Norwood, MA | Leased | Norwood Park Realty, LLC |
| | 1350 Belmont Street Suite 102 & 130A Brockton, MA | Leased | VKA Properties Realty Trust |
| | 13836 & 13840 U.S. Highway 1, Sebastian, FL | Leased | James and Cathy Spoto Charitable Remainder Unitrust |
| | 1405 East Market Street, Warren, OH | Leased | Pedro Ballester, MD |
| | 14-22 Keewaydin Drive, Salem, NH | Leased | 14-22 Keewaydin Drive, LLC |
| | 1440 South Canfield Niles Road, Austintown, OH | Leased | DCMD Holdings, Inc. |
| | 14430 US Highway 1, Suite 101, 102 & 104, Sebastian, FL | Leased | Sebastian North Point, LLC |
| | 1450 South Canfield Niles Road, Austintown, OH | Leased | DCMD Holdings, LLC |
| | 150 North Sykes Creek Parkway, Suite 101 & 300, Merritt Island, FL | Leased | Sykes Creek Limited Partnership |
| | 1552 North Road Southeast, Suite 101-102, Warren, OH | Leased | Phoenix Holdings of Trumbull County, LLC |
| | 1715 37th Place, Vero Beach, FL | Leased | HCD Properties, LLC |
| | 18 Main Street, Unit 104, Townshend, MA | Leased | FEDEQ NL004, LLC |
| | 1800 Main Road, Suite 1816, Tiverton, RI | Leased | Stonebridge Commons, LLC |
| | 203 Plymouth Avenue, Suite 702, Fall River, MA | Leased | Prima Care, PC |
| | 203 Turnpike Street, Suite 300A, North Andover, MA | Leased | 203 Turnpike Street Realty, LLC |

31

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 2111 Washington Blvd Easton, PA | Leased | Foot Maniacs, LLC |
| | 226 Harvard Avenue, Allston, MA | Leased | Asana Partners Fund II REIT 21, LLC |
| | 2307 West Broward, Suite 101 & 200, Fort Lauderdale, FL | Leased | AW Riverbend, LLC & RMC Riverbend, LLC |
| | 2395 Garden Way, Suite 101 & 102, Hermitage, PA | Leased | Hudson Holding Company |
| | 240 North Wickham Road, Suite 102, 104, 108, 110, 202, 204, 300, 304,309, & 311, Melbourne, FL | Leased | AW Wuesthoff Medical Arts, LLC |
| | 2404 North Courtenay Parkway, Suite D, Merritt Island, FL | Leased | John W. Knappman, Jr., M.D. and Gregory A. Kirk, M.D. |
| | 2425 Garden Way, Suite 100 & 101, Hermitage, PA | Leased | GMR Heritage Garden Way, LLC |
| | 25 Marston Street, Unit 404, Lawrence, MA | Leased | Millers River Development, LLC |
| | 250 Hampton Street Auburn, MA | Leased | Grove Medical Associates, P.C. |
| | 2601 South West 37th Avenue, Suite 607 & 901, Miami, FL | Leased | Healthcare Realty Services, Inc. |
| | 277 Pleasant Street, Suite 101, Fall River, MA | Leased | Prima Care, PC |
| | 289 Pleasant Street, Suite 601, Fall River, MA | Leased | Prima Care, PC |
| | 29 Crafts Street, #400, Newton, MA | Leased | Chatham Investment Trust of Newton |
| | 2999 Presidential Blvd., Hermitage PA | Leased | J2K2 LLC |
| | 3 Washington Place, Easton, MA | Leased | 3WP MOB, LLC |
| | 3001 North West 49th Avenue, Suite 104 & 303, Lauderdale Lakes, FL | Leased | HTA-AW Florida Medical Center East, LLC |

32

WEIL:\99571730\6\76000.0003

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 312 Bedford Street, Whitman, MA | Leased | Midade LLC |
| | 324 Massachusetts Avenue, Unit 1, Lunenburg, MA | Leased | A & D Crossroads, Inc. |
| | 3540 North Pine Island Road, Suite 100 & 101, Sunrise, FL | Leased | Pine Island Associates, LLC |
| | 3745 11th Circle, Suite 101, 103, 105 & 106, Vero Beach, FL | Leased | Gibbflin, LLC |
| | 3905 North West 107th Street, Suite 409, Doral, FL | Leased (expiring 2/28/24) | B&JCM Doral Development, LLC |
| | 401 N. Bedford Street East Bridgewater, MA | Leased | Glenstone Capital, LLC |
| | 45 Stiles Street, Suite 101, Salem, NH | Leased | William H. Edwards, MD PC |
| | 461 Gypsy Lane, Suite 8, Youngstown, OH | Leased | Gander Properties, LTD |
| | 497 Main Street, Unit B, Groton, MA | Leased | Jupiter 30 Realty, LLC |
| | 511 West Grove Street, Unit 201, Middleboro, MA | Leased | Bernard Chapman, MD |
| | 5151 Babcock Street Northeast, Palm Bay, FL | Leased | Florida Health Care Plan, Inc. |
| | 5170 Belmont Avenue, Youngstown, OH | Leased | CMR Real Estate of Youngstown, LLC |
| | 531 Faunce Corner Road, North Dartmouth, MA | Leased | Dartmouth Specialty Building 2013, LLC |
| | 535 Faunce Road, North Dartmouth, MA | Leased | North Dartmouth 2005 LLC |
| | 537 Faunce Road, North Dartmouth, MA | Leased | North Dartmouth Oncology 2008 LLC |
| | 55 Hall Avenue, Hubbard, OH | Leased | How-Aud LLC |
| | 572 East McNab Road, Suite 101 & 200, Pompano Beach, FL | Leased | McNab Associates, LLC |

33

WEIL:\99571730\6\76000.0003

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 6 Lexington Street, Waltham, MA | Leased | Waltham Realty Trust |
| | 60 Brigham Street, New Bedford, MA | Leased | New Bedford OB/GYN Realty LLC |
| | 60 East Street, Suite 1400, Methuen, MA | Leased | Perin Thavaseelan, MD |
| | 60 East Street, Suite 1100, Methuen, MA | Leased | The Practice-OB/GYN, PC |
| | 62 Brown Street, Suites 200, 405, 503, Haverhill, MA | Leased | Echo-TPI Haverhill, LLC |
| | 62 Strawbridge Avenue, Sharon, PA | Leased | BD Land Co., LP |
| | 63 Pleasant Street, Watertown, MA (First Floor) | Leased | 63 Pleasant Street, LLC |
| | 67 Coddington Street, Suite 104, Quincy, MA | Leased | B&E Realty, LLC |
| | 675 Paramount Street, Suite 203-1B, Raynham, MA | Leased | Paramount MOB, LLC |
| | 7100 West 20th Avenue, Suite 107, 205, 214, & 504, Hialeah, FL | Leased | HTA-AW Palmetto, LLC |
| | 72 Washington Street, Suites, 1400- 1700, & 2700, Taunton, MA | Leased | RockyKnoll Estates, Inc. |
| | 7264 Warren-Sharon Road, Brookfield Center, OH | Leased | David L. D'Amore |
| | 756 Memorial Parkway, Phillipsburg, NJ | Leased | 756 Memorial Parkway, LLC |
| | 774 Boylston Street, Chestnut Hill, MA | Leased | Chestnut Equity Partners II, LLC |
| | 7750 Bay Street, Suite 5, Sebastian, FL | Leased | Farhat Khawaja; Mussarrat Khawaja |
| | 7754 Bay Street, Suite 6 & 7, Roseland, FL | Leased | Sobia Khawaja; Sabeen Khawaja; Farhan Khawaja |
| | 7764 Bay Street, Suite 10, Roseland, FL | Leased | Mussarrat Khawaja & Mahmooda Khawaja |
| | 777 East 25th Street, Suite 420, Hialeah, FL | Leased | VREC II – Hialeah, LLC |

34

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 788 Boston Road, Groton, MA | Leased | RFC MFC 788 Boston Road, LLC |
| | 7-9 Galen Street, Watertown, MA | Leased | RMR OPFCP, LP |
| | 7970 North Wickham Road, Melbourne, FL | Leased | CVS EGL Wickham Melbourne FL, LLC |
| | 8000 Ron Beatty Boulevard, Suite A3, Sebastian, FL | Leased | GB Investment Ventures, LLC |
| | 8055 Spyglass Hill Road, Suite 102, Melbourne, FL | Leased | MEG General, Inc. |
| | 8075 Spyglass Hill Road, Suite 101, Melbourne, FL | Leased | Spyglass Hill Property, LLC |
| | 816 U.S. Highway 1, Sebastian, FL | Leased | Sunshine Global Medical Group, LLC |
| | 822 Boylston Street, Suite 100, Brookline, MA | Leased | Chestnut Equity Partners I, LLC |
| | 840 37th Place, Vero Beach, FL | Leased | 820 Medical Building, LLC |
| | 8700 East Market Street, Suite 4, Howland, OH | Leased | Hunters Square, LLC |
| | 900 Worcester Road, Wellesley, MA | Leased | Wellesley Sports Group, LLC |
| | 91 Washington Street, Suite 301, Taunton, MA | Leased | Landis Apartments, LLC |
| | 9400 West 12th Avenue, Bay 4 Miami, FL | Leased | 1295 Shore, LLC |
| Steward Melbourne Hospital, Inc. | 240 North Wickham Road, Suite 200, 207, 209, 211, & 302, Melbourne, FL | Leased | AW Wuesthoff Medical Arts, LLC |
| | See Exhibit A-6 of Master Lease I | Leased | MPT of Melbourne-Steward, LLC |
| Steward New England Initiatives, Inc. | 866A Washington Street, Norwood, MA (First Floor) | Leased | RAMA Shopping Center, Inc. |
| | 16 Chestnut Street (aka 15 Payson Road), | Leased | Foxtrot Master Tenant, LLC |

35

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| Steward Norwood Hospital, Inc. | 1St Floor, Foxborough, MA | | |
| | 70 Walnut Street, Foxboro, MA | Leased | HTA - Norwood MOB, LLC |
| | 70 Walnut Street, Cancer Center, Foxboro, MA | Leased | HTA – Norwood MOB, LLC |
| | 1343 Providence Highway, Norwood, MA | Leased | Norwood Park Realty, LLC |
| | See Exhibit A-22 of Master Lease I | Leased | MPT of Norwood-Steward, LLC |
| Steward NSMC, Inc. | 9400 West 12th Avenue, Bay 3 & 4, Miami, FL | Leased | 1295 Shore, LLC |
| | See Exhibit A-31 of Master Lease I | Leased | MPT of Miami-Steward, LLC |
| Steward NSMC, Inc., d/b/a Florida Medical Center | 10230 West State Road 84, Building A, Davie, FL | Leased | Broward Business Center, LLC |
| | 4850 West Oakland Park Boulevard, Suite 125, 219, 242, 243, & 244 Lauderdale Lakes, FL | Leased | Bluescape Altera FMC, LLC |
| | See Exhibit A-24 of Master Lease I | Leased | MPT of Lauderdale Lakes-Steward, LLC |
| Steward PGH, Inc. | 7100 West 20th Avenue, Suite TG0006, Hialeah, FL | Leased | HTA-AW Palmetto, LLC |
| | 7150 West 20th Avenue, Hialeah, FL | Leased | HTA-AW Palmetto, LLC |
| | See Exhibit A-30 of Master Lease I | Leased | MPT of Hialeah Palmetto-Steward, LLC |
| Steward Rockledge Hospital, Inc. | 1257 Florida Avenue, Suite B, Rockledge, FL | Leased | Amany Aziz Wassef and Nabil W. Aziz as Co-Trustees of the Amany Aziz Wassef February 18, 2004 Trust |
| | 2400 North Courtenay Parkway, Suite 100, Merritt Island, FL | Leased | Complete Care Holding, LLC |
| | 5600 Porada Drive, Suite 104, Viera, FL | Leased | Roppa Holdings, LLC |

36

WEIL:\99571730\6\76000.0003

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 6300 North Wickham Road, Melbourne, FL | Leased | Dr. Badolato, PA |
| | 6800 Spyglass Court, Melbourne, FL | Leased | Broadstone MED Florida, LLC |
| | 6963 North Wickham Road, Melbourne, FL | Leased | 12 Grands, LLC |
| | 830 Executive Lane, Suite 130, Rockledge, FL | Leased | R&Z Investments, LLC |
| | See Exhibit A-7 of Master Lease I | Leased | MPT of Rockledge-Steward, LLC |
| Steward Sebastian River Medical Center, Inc. | 7935 Bay Street, Suite 7935, Sebastian, FL | Leased | Sawmill Ridge Properties, Inc. |
| | See Exhibit A-3 of Master Lease I | Leased | MPT of Sebastian-Steward, LLC |
| Steward Sharon Regional Health System, Inc. | East State Street, Sharon, PA | Leased | City of Sharon |
| | 2715 Wilmington Road, New Castle, PA | Leased | ForChun Properties, LLC |
| | 880 West Liberty Street, Suite B, Hubbard, OH | Leased | West Liberty, LLC |
| | See Exhibit A-4 of Master Lease I | Leased | MPT of Sharon-Steward, LLC |
| Steward St. Anne's Hospital Corporation | 85 Park Street, Fall River, MA | Owned | - |
| | 901 South Main Street, Fall River, MA | Owned | - |
| | 119 Coggeshall Street, New Bedford, MA | Leased | Coggeshall-New Bedford LLC |
| | 222 Milliken Boulevard, Fall River, MA (1st, 3rd & 4th Floor) | Leased | Milliken Associates Limited Partnership |
| | 277 Pleasant Street, Suite 103, Fall River, MA | Leased | Prima Care, PC |
| | 440 Swansea Mall Drive, 2nd Floor, Swansea, MA | Leased | 440 Swansea Stolley, LLC |
| | 537 Faunce Corner Road, Dartmouth, MA | Leased | North Dartmouth Oncology Realty 2008, LLC |
| | 738 Washington Street, Attleboro, MA | Leased | The SNESC Real Estate Group, LLC |

37

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| | 851 Middle Street, Fall River, MA | Leased | HTA - St. Annes MOB 2, LLC |
| | See Exhibit A-7 of Master Lease II | Leased | MPT of Fall River - Steward, LLC |
| | See Exhibit A-8 of Master Lease II | Leased | MPT of Fall River - Steward, LLC |
| Steward St. Elizabeth's Medical Center of Boston, Inc. | 11 Nevins Street, Brighton, MA | Leased | HTA - St. Elizabeth's MOB 1, LLC |
| | 15 Guest Street, Boston, MA | Leased | Brighton Landing Condominium |
| | 280 Washington Street, Suite 100, 101, 102, 201, 202, 204, 205, 206, 208, 210, 212, 300, 301, 304, 304A, 305, 306, 308, 309 and 310, Brighton, MA | Leased | HTA - St. Elizabeth's MOB 2, LLC |
| | 326 Washington Street, Brighton, MA | Leased | Brighton Lodger No. 2199 of the Benevolent and Protective Order of Elks of the United States of America |
| | See Exhibit A-9 of Master Lease II | Leased | MPT of Brighton-Steward, LLC |
| Steward St. Elizabeth's Realty Corp. | 888 Washington Street, 1st & 3rd Floor, Dedham, MA | Leased | Washington 850 LLC |
| Steward Texas Hospital Holdings, LLC, d/b/a Scenic Mountain Medical Center | 1501 W.11th Place, Big Spring, TX | Leased | Texas Healthcare Holdings II, LLC |
| | See Exhibit A-26 in Master Lease I | Leased | MPT of Big Spring-Steward, LLC |
| Steward Trumbull Memorial Hospital, Inc. | 60 Marwood Circle, Suite B, Boardman, OH | Leased | Donald A. DeChellis, DDS |
| | See Exhibit A-5 of Master Lease I | Leased | MPT of Warren-Steward, LLC |
| Steward Valley Regional Ventures, Inc. | 138 Haverhill Street, Units B and C, Andover, MA | Owned | - |
| The Medical Center of | 2501 Jimmy Johnson Boulevard | Leased | Regional Professional Building, L.P. |

38

WEIL:\99571730\6\76000.0003

| Credit Party | Address | Owned/Leased/Operated by Third Party | Name and Address of Owner (if leased) or Third-Party Operator (if operated by a third party) |
|---|---|---|---|
| Southeast Texas, LP | Suite 110, 120, 130, & 200, Port Arthur, TX | | |
| | 6025 Metropolitan, Beaumont, TX | Leased | GMR Beaumont, LLC |
| | See Exhibit A-14 of Master Lease I | Leased | MPT of Port-Arthur, LLC |

14.     The addresses of any locations not specified in Item 13 where any Credit Party has maintained inventory, prescription lists, books, records, equipment or other assets during the 4 month period preceding the Closing Date are:

| Credit Party | Address | Owned/Leased |
|---|---|---|
| Steward Health Care System LLC and Subsidiaries | 4175 Freidrich Ln, Suite 100, Austin, TX 78744 | Leased |
| | 1 Federal Street Boston, MA 02110 | Leased |

### D.     FINANCING MATTERS

15.     No Credit Party has any material indebtedness for borrowed money ("Debt") or any contingent obligations which would become Debt if they were non-contingent, except as set forth on the Debt Schedule attached hereto as Exhibit D.

16.     Any current creditors of any Credit Party that will be refinanced in connection with the funding of the Loans and any letters of credit currently outstanding on behalf of any Credit Party (together with an indication of whether any such letters of credit will be replaced or collateralized on the Closing Date) are as follows:

**Please see below a list of the letters of credit currently outstanding, which are all cash collateralized**:

| LC Number | LC Amount / Currency | Beneficiary | Collateral Amount (USD or Securities) | Expiration Date |
|---|---|---|---|---|
| 69611025 | $500,000.00 | MCPF-NEEDHAM LLC | $525,000.00 | 7/19/2023 |
| 10000000007648 | $2,000,000.00 | UNITEDHEALTH CARE INSURANCE COMPANY | $2,100,000.00 | 1/29/2025 |
| 69610019 | $1,532,567.00 | ACE AMERICAN INSURANCE COMPANY | $2,577,927.45 | 5/16/2024 |

39

**Debtors' Exhibit No. 6**
**Page 224 of 339**

| | | U.S. DEPARTMENT OF EDUCATION | $255,150.00 | |
|---|---|---|---|---|
| 69610113 | $243,000.00 | | | 5/26/2024 |
| 69612470 | $585,975.00 | RMR OPFCP LP | $615,273.75 | 2/27/2024 |
| 69615957 | $343,229.00 | COPLEY PLACE ASSOCIATES, LLC | $360,390.45 | 4/2/2024 |
| 10000000007640 | $9,075,000.00 | HARTFORD FIRE INSURANCE COMPANY | $9,528,750.00 | 1/14/2025 |
| | | **Total Amount** | $15,962,491.65 | |

17.     Each Credit Party's assets are owned free and clear of any consensual Liens, except for the consensual Liens set forth on the Lien Schedule attached hereto as <u>Exhibit E</u>. Please refer to lien searches.

18.     No Credit Party has made any loans to, or otherwise made any Investments in, any other Persons which are material in nature, except as follows: **None**

19.     No Credit Party is obligated to pay any sponsor, management, consulting or similar professional advisory fees, except for fees paid to the following entities: **The Credit Parties engage various consultants, advisors and other intermediaries in the ordinary course of business and have payment obligations for such services. These contracts are generally confidential in nature**.

20.     Any broker's or similar fees which will be owing in connection with the consummation of the transactions contemplated by the Loan Documents are: **None**

E.     **LITIGATION AND DISPUTES**

21.     Any actions, suits, judgments or proceedings pending against, or, to Borrowers' knowledge, threatened against or affecting, any Credit Party before any court or arbitrator or any governmental body, agency or official which could reasonably be expected to result in liability in an amount exceeding $5,000,000, are described on the Litigation Schedule attached hereto as <u>Exhibit F</u>. **Please note that the insurance will not cover any matters listed in the Litigation Schedule.**

22.     Any strikes or other labor disputes pending or, to Borrowers' knowledge, threatened, against any Credit Party are: **None**

F.     **REGULATORY MATTERS**

23.     Any notices of non-compliance received by any Credit Party from any governmental authority during the 5 year period preceding the Closing Date with respect to:  (i) any Environmental Laws, (ii) securities laws or regulations, (iii) tax laws or regulations, (iv) healthcare, health and safety laws or regulations or laws and regulations related to the corporate practice of medicine, and

40

(v) ERISA, that could be reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect[3]:

(a) Immediate Jeopardy received by Brim Healthcare of Texas, LLC (d/b/a Wadley Regional Medical Center) in Texarkana, TX.

(b) Immediate Jeopardy received by IASIS Glenwood Regional Medical Center, LP in Monroe, LA.

(c) Immediate Jeopardy received by Steward St. Elizabeth's Medical Center of Boston, Inc. in MA, which has been corrected.

(d) Immediate Jeopardy received by Steward Holy Family Hospital, Inc. in MA, which has been corrected.

### G.    SPECIAL COLLATERAL

24.    All of the financial institutions at which any Credit Party maintains any deposit accounts, investment accounts, securities accounts or similar accounts, together with the account number and a description for each such account, are:

| Account Number | Name of Institution | Legal Entity / Account Name | Description of Deposit Account |
|---|---|---|---|
| 4451258096 | Bank of America | Beaumont Hospital Holdings, Inc. | SOT[4] |
| 4427100233 | Bank of America | Brim Healthcare Of Texas, LLC | SOT |
| 3359482232 | Bank of America | Brim Healthcare Of Texas, LLC D/B/A Wadley Regional Medical Center | ZBA[5] |
| 4451258148 | Bank of America | Brim Healthcare Of Texas, LLC D/B/A Wadley Regional Medical Center | SOT - Government Deposit |
| 4451262956 | Bank of America | Brim Holding Company Inc. | Checking Account |
| 4427615456 | Bank of America | Brim Holding Company, Inc. | SOT |

---

3 This disclosure is overinclusive; the inclusion of any matter in this disclosure is not intended to imply that such matter could reasonably be expected to result in a Material Adverse Effect; no party will use the fact of inclusion of such matter in this disclosure in any dispute or controversy as to whether such matter could reasonably be expected to result in a Material Adverse Effect.

4 SOT means "Standing Order Transfer"

5 ZBA means "Zero Balance Account"

WEIL:\99571730\6\76000.0003

| Account Number | Name of Institution | Legal Entity / Account Name | Description of Deposit Account |
|---|---|---|---|
| 4451258122 | Bank of America | Brim Holding Company, Inc. | SOT - Government Deposit |
| 4427167548 | Bank of America | Davis Hospital Holdings, Inc. | SOT |
| 4427136281 | Bank of America | Glenwood Specialty Imaging, Llc | SOT |
| 4427807989 | Bank of America | IASIS Finance II LLC | Deposit Account |
| 4426309679 | Bank of America | IASIS Glenwood Regional Medical Center, LP | SOT |
| 4451434043 | Bank of America | IASIS Glenwood Regional Medical Center, LP | SOT - Government Deposit |
| 3751376255 | Bank of America | IASIS Healthcare Corporation | SOT |
| 3299975534 | Bank of America | IASIS Healthcare Corporation | CDA[6] |
| 3299976185 | Bank of America | IASIS Healthcare Corporation | ZBA |
| 3359873034 | Bank of America | IASIS Healthcare Corporation | ZBA |
| 3359873042 | Bank of America | IASIS Healthcare Corporation | ZBA |
| 3751374956 | Bank of America | IASIS Healthcare Corporation | Master |
| 4427165485 | Bank of America | IASIS Healthcare Corporation | Deposit Account |
| 3359481077 | Bank of America | Indigent Care Services Of Northeast Louisiana | ZBA |
| 4637730422 | Bank of America | Morton Hospital, A Steward Family Hospital, Inc. | SOT |
| 4637730448 | Bank of America | Morton Hospital, A Steward Family Hospital, Inc. | SOT - Government Deposit |
| 4426323448 | Bank of America | Mountain Vista Medical Center, Lp | SOT |
| 4451434056 | Bank of America | Mountain Vista Medical Center, Lp | SOT - Government Deposit |
| 4636054918 | Bank of America | Nashoba Valley Medical Center, A Steward Family Hospital, Inc. | SOT |
| 4640416678 | Bank of America | Nashoba Valley Medical Center, A | SOT - Government Deposit |

---

[6] CDA means "Controlled Disbursement Account"

WEIL:\99571730\6\76000.0003

| Account Number | Name of Institution | Legal Entity / Account Name | Description of Deposit Account |
|---|---|---|---|
| | | Steward Family Hospital, Inc. | |
| 4640419905 | Bank of America | New England Sinai Hospital, A Steward Family Hospital, Inc. | Deposit Account |
| 4640540395 | Bank of America | New England Sinai Hospital, A Steward Family Hospital, Inc. | SOT - Government Deposit |
| 4640419882 | Bank of America | New England Sinai Hospital, A Steward Family Hospital, Inc. | SOT |
| 4640419895 | Bank of America | New England Sinai Hospital, A Steward Family Hospital, Inc. | SOT - Government Deposit |
| 4427804539 | Bank of America | Odessa Fertility Lab, Inc. | SOT |
| 4451434001 | Bank of America | Odessa Fertility Lab, Inc. | SOT - Government Deposit |
| 3751376213 | Bank of America | Odessa Regional Hospital LP | SOT |
| 4451258067 | Bank of America | Odessa Regional Hospital LP | SOT |
| 3299054223 | Bank of America | Permian Basin Clinical Services Inc. | ZBA |
| 4451258070 | Bank of America | Permian Premier Health Services, Inc. | SOT |
| 4451334392 | Bank of America | Permian Premier Health Services, Inc. | SOT |
| 4451258119 | Bank of America | Physician Group Of Arkansas, Inc. | SOT |
| 4637729899 | Bank of America | Quincy Medical Center, A Steward Family Hospital, Inc. | SOT |
| 4451258106 | Bank of America | S J Medical Center LLC | SOT |
| 4451434027 | Bank of America | S J Medical Center LLC | SOT - Government Deposit |
| 4640513733 | Bank of America | SHC Youngstown Ohio Laboratory Services Company Llc | SOT |
| 4640514282 | Bank of America | SHC Youngstown Ohio Outpatient Services LLC | SOT |
| 4427168576 | Bank of America | SJ Medical Center LLC | SOT |
| 3751376226 | Bank of America | St. Luke's Behavioral Hospital, LP | SOT |

43

| Account Number | Name of Institution | Legal Entity / Account Name | Description of Deposit Account |
|---|---|---|---|
| 3751377021 | Bank of America | St. Luke's Behavioral Hospital, LP | SOT - Government Deposit |
| 3751376239 | Bank of America | St. Luke's Medical Center, LP | SOT - Government Deposit |
| 4625513253 | Bank of America | Steward Carney Hospital, Inc. | SOT |
| 4640417169 | Bank of America | Steward Carney Hospital, Inc. | SOT - Government Deposit |
| 4451454832 | Bank of America | Steward CGH, Inc. | SOT - Government Deposit |
| 4451454845 | Bank of America | Steward CGH, Inc. | SOT |
| 4638147988 | Bank of America | Steward Emergency Physicians, Inc. | ZBA |
| 4640506575 | Bank of America | Steward Florida ALF LLC | SOT |
| 4640513801 | Bank of America | Steward Florida ALF LLC | Checking Account |
| 4625513266 | Bank of America | Steward Good Samaritan Medical Center, Inc. | SOT |
| 4640417392 | Bank of America | Steward Good Samaritan Medical Center, Inc. | SOT - Government Deposit |
| 4625513774 | Bank of America | Steward Good Samaritan Radiation Oncology Center, Inc. | Deposit Account |
| 4625510780 | Bank of America | Steward Health Care Network, Inc. | SOT |
| 2220017304 | Bank of America | Steward Health Care System LLC | ZBA |
| 2220017312 | Bank of America | Steward Health Care System LLC | ZBA |
| 2220080705 | Bank of America | Steward Health Care System LLC | ZBA |
| 2220081913 | Bank of America | Steward Health Care System LLC | ZBA |
| 4451407203 | Bank of America | Steward Health Care System LLC | SOT |
| 4625510243 | Bank of America | Steward Health Care System LLC | ZBA |
| 4625510748 | Bank of America | Steward Health Care System LLC | SOT |
| 4625513237 | Bank of America | Steward Health Care System LLC | Master |
| 4625513732 | Bank of America | Steward Health Care System LLC | SOT |

44

WEIL:\99571730\6\76000.0003

| Account Number | Name of Institution | Legal Entity / Account Name | Description of Deposit Account |
|---|---|---|---|
| 4634429707 | Bank of America | Steward Health Care System LLC | ZBA |
| 4638146484 | Bank of America | Steward Health Care System LLC | CDA |
| 4.66014E+11 | Bank of America | Steward Health Care System LLC | DIP Funding Account |
| 4451825513 | Bank of America | Steward Health Care System LLC | Cash Collateral |
| 4451454858 | Bank of America | Steward HH, Inc. | SOT - Government Deposit |
| 4451454861 | Bank of America | Steward HH, Inc. | SOT |
| 4640506711 | Bank of America | Steward Hillside Rehabilitation Hospital, Inc. | SOT |
| 4640506724 | Bank of America | Steward Hillside Rehabilitation Hospital, Inc. | SOT - Government Deposit |
| 4625510256 | Bank of America | Steward Holy Family Hospital, Inc. | SOT |
| 4640416801 | Bank of America | Steward Holy Family Hospital, Inc. | SOT - Government Deposit |
| 4640498308 | Bank of America | Steward Medicaid Care Network, Inc. | SOT - Government Deposit |
| 4640535452 | Bank of America | Steward Medical Group Inc. | Checking Account |
| 4640539500 | Bank of America | Steward Medical Group, Inc. | ZBA |
| 4634429684 | Bank of America | Steward Medical Group, Inc. | ZBA |
| 4634432202 | Bank of America | Steward Medical Group, Inc. | ZBA |
| 4634432215 | Bank of America | Steward Medical Group, Inc. | Deposit Account |
| 4634435047 | Bank of America | Steward Medical Group, Inc. | SOT |
| 4638152562 | Bank of America | Steward Medical Group, Inc. | ZBA |
| 4638152575 | Bank of America | Steward Medical Group, Inc. | ZBA |
| 4640427748 | Bank of America | Steward Medical Group, Inc. | ZBA |
| 4640506698 | Bank of America | Steward Melbourne Hospital, Inc. | SOT |
| 4640506708 | Bank of America | Steward Melbourne Hospital, Inc. | SOT - Government Deposit |
| 4625510269 | Bank of America | Steward Norwood Hospital, Inc | SOT |

45

WEIL:\99571730\6\76000.0003

| Account Number | Name of Institution | Legal Entity / Account Name | Description of Deposit Account |
|---|---|---|---|
| 4640417143 | Bank of America | Steward Norwood Hospital, Inc. | SOT - Government Deposit |
| 4451454874 | Bank of America | Steward NSMC, Inc. | SOT - Government Deposit |
| 4451454887 | Bank of America | Steward NSM, Inc. | SOT |
| 4451454816 | Bank of America | Steward PGH, Inc. | SOT - Government Deposit |
| 4451454829 | Bank of America | Steward PGH, Inc. | SOT |
| 4640506591 | Bank of America | Steward Rockledge Hospital, Inc. | SOT |
| 4640506601 | Bank of America | Steward Rockledge Hospital, Inc. | SOT - Government Deposit |
| 4640506614 | Bank of America | Steward Sebastian River Medical Center, Inc. | SOT |
| 4640506627 | Bank of America | Steward Sebastian River Medical Center, Inc. | SOT - Government Deposit |
| 4640506630 | Bank of America | Steward Sharon Regional Health System, Inc. | SOT |
| 4640506643 | Bank of America | Steward Sharon Regional Health System, Inc. | SOT - Government Deposit |
| 4625513282 | Bank of America | Steward St. Anne's Hospital Corporation | SOT |
| 4638557895 | Bank of America | Steward St. Anne's Hospital Corporation | ZBA |
| 4640417208 | Bank of America | Steward St. Anne's Hospital Corporation | SOT - Government Deposit |
| 4625513240 | Bank of America | Steward St. Elizabeth's Medical Center Of Boston, Inc. | SOT |
| 4640417130 | Bank of America | Steward St. Elizabeth's Medical Center Of Boston, Inc. | SOT - Government Deposit |
| 4451332886 | Bank of America | Steward Texas Hospital Holdings Llc | SOT |
| 4451434030 | Bank of America | Steward Texas Hospital Holdings Llc D/B/A Scenic Mountain Medical Center | SOT - Government Deposit |
| 4640506656 | Bank of America | Steward Trumbull Memorial Hospital, Inc. | SOT |
| 4640506669 | Bank of America | Steward Trumbull Memorial Hospital, Inc. | SOT - Government Deposit |

46

| Account Number | Name of Institution | Legal Entity / Account Name | Description of Deposit Account |
|---|---|---|---|
| 4451258083 | Bank of America | The Medical Center Of Southeast Texas, LP | SOT |
| 3751377102 | Bank of America | The Medical Center Of Southeast Texas, LP D/B/A Park Place Medical Ctr | SOT - Government Deposit |
| 3751376190 | Bank of America | The Medical Center Of Southeast Texas, LP | SOT |
| 1600080731 | Bank of the Ozarks | Brim Holding Company, Inc. D/B/A Wadley Regional Medical Center at Hope | Deposit Account |
| xxx67917 | First Republic Bank / First Republic Securities | Steward Health Care Holdings | Checking Account |
| 473359 | Guaranty Trust Bank | Brim Healthcare Of Texas, LLC D/B/A Wadley Regional Medical Center | Deposit Account |
| 8899993297 | M&T | Steward Carney Hospital, Inc. | Joint Government Account |
| 8899993313 | M&T | Steward Good Samaritan Medical Center, Inc. | Joint Government Account |
| 8899993289 | M&T | Steward Holy Family Hospital, Inc. | Joint Government Account |
| 8899993305 | M&T | Steward Norwood Hospital, Inc. | Joint Government Account |
| 8899993271 | M&T | Steward St. Anne's Hospital Corporation | Joint Government Account |
| 8899993263 | M&T | Steward St. Elizabeth's Medical Center Of Boston, Inc. | Joint Government Account |
| 20736253 | Origin Bank | IASIS Glenwood Regional Medical Center Lp | Business Non-Interest Checking |
| 130126802193 | US Bank | Heritage Technologies Llc | ZBA |
| 153911852546 | US Bank | Permian Premier Health Services, Inc. | ZBA |
| 130126802201 | US Bank | Physician Group Of Arizona, Inc. | ZBA |
| 130126802391 | US Bank | Physician Group Of Arkansas, Inc. | ZBA |
| 130126802243 | US Bank | Physician Group Of Louisiana Inc. | ZBA |

47

WEIL:\99571730\6\76000.0003

| Account Number | Name of Institution | Legal Entity / Account Name | Description of Deposit Account |
|---|---|---|---|
| 153911725346 | US Bank | SHC Youngstown Ohio Outpatient Services LLC | ZBA |
| 130113753482 | US Bank | Steward Medical Group, Inc. | ZBA |
| 130119038110 | US Bank | Steward Medical Group, Inc. | ZBA |
| 130124071478 | US Bank | Steward Medical Group, Inc. | ZBA |
| 130124071791 | US Bank | Steward Sharon Regional Health System, Inc. | ZBA |
| 130113753474 | US Bank | Steward St. Elizabeth's Medical Center Of Boston, Inc. | ZBA |
| 130130974210 | US Bank | Steward Health Care System, LLC | Master |
| 4451873332 | Bank of America | Steward Health Care System LLC | Payroll Deposit |
| 8899993339 | M&T | Nashoba Valley Medical Center, A Steward Family Hospital, Inc. | Joint Government Account |
| 8899993370 | M&T | Morton Hospital, A Steward Family Hospital, Inc. | Joint Government Account |
| 8899993362 | M&T | Quincy Medical Center, A Steward Family Hospital, Inc. | Joint Government Account |
| 4451864231 | Bank of America | Steward Health Care System, LLC | Utilities Escrow |

25.    All of the items of intellectual property owned by or licensed to any Credit Party, together with the registration or application number for each such item of intellectual property (if registered

48

or if an application for registration has been submitted), are: **Please refer to the information provided in Exhibit G with respect to Credit Parties only.**[7]

26.     No Credit Party has any chattel paper (whether tangible or electronic) or instruments as of the date hereof, except: **None**

27.     No Credit Party owns any assets that are of a type in which a lien may be registered, recorded or filed under, or notice thereof given under, any federal statute or regulation, except for the intellectual property identified in Item 26 above and except: **None**

28.     No Credit Party has any letter of credit rights, any interests in commercial tort claims or any documents of title, except:

(a)   *Steward Health Care LLC and IASIS Healthcare LLC (as "Plaintiffs") v. Cerner Corporation (as "Defendant"), Chancery Court for Davis County, Tennessee Case No. 19-0625-IV*

On May 16, 2019, Steward Health Care LLC ("Steward") filed a Complaint in Davidson County, Tennessee, against Defendant, arising out of, inter alia, the parties' business agreement.  In its operative Second Amended Complaint, which added the original party to the contract with Cerner, IASIS Healthcare, LLC ("IASIS"), as a co-plaintiff, Plaintiffs alleged various claims against Defendant, including (i) fraud in the inducement to enter into the parties' business agreement; (ii) negligent misrepresentation; (iii) violation of the Tennessee Consumer Protection Act; (iv) breach of contract; (v) breach of warranty; and (vi) gross negligence.  Steward currently calculates its damages associated with these claims as being in excess of $200 million. Defendant denied the allegations and filed its operative Answer to the Second Amended Complaint on December 15, 2020 along with amended Counterclaims against Plaintiffs, alleging (i) breach of contract against Steward; (ii) quantum meruit against Steward; (iii) breach of the duty of good faith, fair dealing, and reasonableness against IASIS; (iv) breach of the duty of good faith, fair dealing, and reasonableness against Steward; (v) fraud against Steward; and (vi) fraudulent inducement of Amendment 12 to the business agreement against Steward. The Counterclaims assert damages in excess of $42 million dollars plus the returns of amounts Defendant previously credited to Steward as part of Amendment 12 (approximately $10 million) and prejudgment interest.  Steward denied the material allegations in the counterclaim and filed its Answer to Cerner's Amended Counterclaims on January 14, 2021.  The case is pending in Chancery Court for Davidson County. No trial date has been set.

(b)   *Steward Medical Group, Inc. (as "Plaintiff"), v. Jamie Barber et. al. (as "Defendants"), Suffolk Superior Court of the Commonwealth of Massachusetts, Civil Action No. 23-1593-BLS1*

In the fall of 2022, a Suffolk County jury awarded Plaintiff $16.4 million. The jury found Compass Medical, P.C., a now-defunct multi-specialty physician group, liable for three distinct frauds, including an $11.6 million "Meaningful Use" fraud, which occurred during Compass's ten-year affiliation with SMG. This action seeks to hold its former President, Jamie Barber, and CFO, Catherine Robinson, liable for their role in the "Meaningful use" fraud.  It also asserts a tortious interference claim against Mr. Barber and Dr. Bruce Weinstein related to failure to provide contractually required data to Plaintiff. Plaintiff filed a motion for real estate attachment and preliminary injunction which is pending. Defendants all opposed those motions and have moved to dismiss the amended complaint. Those motions are likewise pending.  Plaintiff's claim is in excess of $11M.

---

[7] Note that the IP list which has been provided as Exhibit G also includes non-Credit Party information. Please refer to the information with respect to the Credit Parties only.

WEIL:\99571730\6\76000.0003

(c)    *Steward Health Care System LLC (as "Plaintiff") v. AYA Healthcare, Inc. (as "Defendant"), Suffolk Superior Court, Civil Action No. 2184-CV-00513-BLS2*

On March 8, 2021, Plaintiff filed a Complaint and sought a Preliminary Injunction in Massachusetts Superior Court, Suffolk County, against Defendant, arising out of, inter alia, the parties' service agreement.  On March 8, 2021, the Court entered an Order for Preliminary Injunction against Defendant, effective through April 4, 2021.  In its Complaint, Plaintiff alleged various claims against Defendant, including (i) breach of the parties' agreement; (ii) breach of the implied covenant of good faith and fair dealing; (iii) violation of M.G.L, Ch. 93 A; (iv) declaratory judgment; and (v) unjust enrichment.  Discovery is ongoing, and Plaintiff is currently in the process of calculating its damages associated with these claims, but its damages total millions of dollars and, if Plaintiff prevails on its M.G.L. Ch. 93 A claim, its recovery of damages would potentially be trebled. Defendant denied the allegations and filed its Answer on April 6, 2021, along with a Counterclaim against Plaintiff, alleging (i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; (iii) intentional misrepresentation; (iv) unjust enrichment; (v) promissory estoppel; and (vi) violation of M.G.L. Ch. 93A. Defendant is seeking damages of approximately $40 million, plus interest. Plaintiff and the Counter-Defendants filed an answer and affirmative defenses to Defendant's amended Counterclaim on December 16, 2021, denying the material allegations.  The case is pending in the Massachusetts Superior Court. Plaintiff expresses no opinion as to the outcome of the litigation.

## H.    CONTACT INFORMATION

29.    Legal Counsel for Credit Parties is as follows:

| | |
|---|---|
| Name of the Firm: | Weil, Gotshal & Manges LLP |
| Address: | 767 Fifth Avenue, New York, NY 10153-0119 |
| Partner Handling Relationship: | Justin D. Lee |
| Telephone No.: | +1 212 310 8397 |
| E-Mail: | Justin.D.Lee@weil.com |

30.    Insurance information contact for Credit Parties: **The Credit Parties have various insurance brokers which are managed internally by David Friend.**

## I.    KNOW YOUR CUSTOMER

31.    Each Credit Party's completed and executed IRS Form W9 is attached hereto as Exhibit H.

[SIGNATURE PAGE FOLLOWS]

WEIL:\99571730\6\76000.0003

The Agents and Lenders shall be entitled to rely upon the foregoing in all respects and the undersigned are duly authorized to execute and deliver this Information Certificate.

Very truly yours,

**BORROWER:**

**STEWARD HEALTH CARE NETWORK, INC.**
**STEWARD EMERGENCY PHYSICIANS, INC.**
**STEWARD PHYSICIAN CONTRACTING, INC.**
**STEWARD MEDICAID CARE NETWORK, INC.**
**STEWARDSHIP HEALTH, INC.**
**STEWARDSHIP HEALTH MEDICAL GROUP, INC.**
**STEWARDSHIP SERVICES INC.**

By: _____
Name: Mark Rich
Title:   Authorized Person

[Signature Page to Perfection Certificate]

**GUARANTORS:**

STEWARD HEALTH CARE HOLDINGS LLC
STEWARD HEALTH CARE SYSTEM LLC
STEWARD OPERATIONS HOLDINGS LLC
STEWARD MEDICAL GROUP, INC.
STEWARD CARNEY HOSPITAL, INC.
STEWARD HOLY FAMILY HOSPITAL, INC.
STEWARD NORWOOD HOSPITAL, INC.
STEWARD GOOD SAMARITAN MEDICAL
CENTER, INC.
STEWARD ST. ANNE'S HOSPITAL
CORPORATION
STEWARD ST. ELIZABETH'S MEDICAL CENTER
OF BOSTON, INC.
NASHOBA VALLEY MEDICAL CENTER, A
STEWARD FAMILY HOSPITAL, INC.
MORTON HOSPITAL, A STEWARD FAMILY
HOSPITAL, INC.
STEWARD MELBOURNE HOSPITAL, INC.
STEWARD ROCKLEDGE HOSPITAL, INC.
STEWARD SEBASTIAN RIVER MEDICAL
CENTER, INC.
STEWARD TEXAS HOSPITAL HOLDINGS LLC
STEWARD TRUMBULL MEMORIAL HOSPITAL,
INC.
STEWARD HILLSIDE REHABILITATION
HOSPITAL, INC.
STEWARD SHARON REGIONAL HEALTH
SYSTEM, INC.
SHC YOUNGSTOWN OHIO PSC LLC
STEWARD PGH, INC.
STEWARD HH, INC.
STEWARD CGH, INC.
STEWARD NSMC, INC.

By: _____
Name: Mark Rich
Title:   Authorized Person

[Signature Page to Perfection Certificate]

**BEAUMONT HOSPITAL HOLDINGS, INC.**
**BRIM HOLDING COMPANY, INC.**
**IASIS HEALTHCARE HOLDINGS, INC.**
**IASIS MANAGEMENT COMPANY**
**PERMIAN PREMIER HEALTH SERVICES, INC.**
**IASIS GLENWOOD REGIONAL MEDICAL**
**CENTER, LP**
**MESA GENERAL HOSPITAL, LP**
**MOUNTAIN VISTA MEDICAL CENTER, LP**
**ODESSA REGIONAL HOSPITAL, LP**
**ST. LUKE'S BEHAVIORAL HOSPITAL, LP**
**ST. LUKE'S MEDICAL CENTER, LP**
**THE MEDICAL CENTER OF SOUTHEAST TEXAS,**
**LP**
**BRIM HEALTHCARE OF TEXAS, LLC**
**SEABOARD DEVELOPMENT PORT ARTHUR LLC**
**SJ MEDICAL CENTER, LLC**
**IASIS FINANCE TEXAS HOLDINGS, LLC**
**STEWARD HOSPITAL HOLDINGS LLC**
**STEWARD MEDICAL HOLDINGS LLC**
**STEWARD OHIO HOLDINGS LLC**
**STEWARD FLORIDA HOLDINGS LLC**
**STEWARD PENNSYLVANIA HOLDINGS LLC**
**IASIS HEALTHCARE CORPORATION**
**IASIS HEALTHCARE LLC**
**IASIS FINANCE, INC.**
**DAVIS HOSPITAL HOLDINGS, INC.**
**JORDAN VALLEY HOSPITAL HOLDINGS, INC.**
**STEWARD FLORIDA ALF LLC**
**BILTMORE SURGERY CENTER HOLDINGS, INC.**
**BILTMORE SURGERY CENTER, INC.**
**DAVIS SURGICAL CENTER HOLDINGS, INC.**
**IASIS CAPITAL CORPORATION**
**IASIS FINANCE II LLC**
**IASIS FINANCE III LLC**
**ARIZONA DIAGNOSTIC & SURGICAL CENTER,**
**INC.**
**CHOICE CARE CLINIC OF LOUISIANA, INC.**
**CHOICE CARE CLINIC OF UTAH, INC.**
**CHOICE CARE CLINIC III, INC.**
**PERMIAN BASIN CLINICAL SERVICES, INC.**

By: _____
Name: Mark Rich
Title:  Authorized Person

[Signature Page to Perfection Certificate]

STEWARD IMAGING & RADIOLOGY HOLDINGS LLC
PP TRANSITION LP
TNC TRANSITION LP
MT TRANSITION LP
IASIS TRANSCO, INC.
INDIGENT CARE SERVICES OF NORTHEAST LOUISIANA, INC.
PODIATRIC PHYSICIANS MANAGEMENT OF ARIZONA, INC.
STEWARD FALL RIVER MANAGEMENT CARE SERVICES LLC
SHC YOUNGSTOWN OHIO LABORATORY SERVICES COMPANY LLC
SHC YOUNGSTOWN OHIO OUTPATIENT SERVICES LLC
STEWARD GOOD SAMARITAN OCCUPATIONAL HEALTH SERVICES, INC.
STEWARD GOOD SAMARITAN RADIATION ONCOLOGY CENTER, INC.
STEWARD NEW ENGLAND INITIATIVES, INC.
STEWARD ST. ELIZABETH'S REALTY CORP.
STEWARD VALLEY REGIONAL VENTURES, INC.
QUINCY MEDICAL CENTER, A STEWARD FAMILY HOSPITAL, INC.
RIVERWOODS ASC HOLDCO LLC
GLENWOOD SPECIALTY IMAGING, LLC
NEW ENGLAND SINAI HOSPITAL, A STEWARD FAMILY HOSPITAL, INC.
ODESSA FERTILITY LAB, INC.
PHYSICIAN GROUP OF ARIZONA, INC.
PHYSICIAN GROUP OF ARKANSAS, INC.
PHYSICIAN GROUP OF FLORIDA, INC.
PHYSICIAN GROUP OF LOUISIANA, INC.
PP TRANSITION, INC.
UTAH TRANSCRIPTION SERVICES, INC.
CHOICE CARE CLINIC I, INC.
CHOICE CARE CLINIC II, INC.
MOUNTAIN POINT HOLDINGS, LLC
HERITAGE TECHNOLOGIES, L.L.C.

By: _____
Name: Mark Rich
Title:  Authorized Person

[Signature Page to Perfection Certificate]

**EXHIBIT A**

**CREDIT PARTY IDENTIFICATION INFORMATION**

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| Steward Health Care System LLC | DE | Borrower | For-profit LLC | 4801236 | 27-2473240 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Arizona Diagnostic & Surgical Center, Inc. | DE | Guarantor | For-profit corporation | 3119515 | 62-1799439 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Beaumont Hospital Holdings, Inc. | DE | Guarantor | For-profit corporation | 3106505 | 62-1796501 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | Mid-Jefferson Hospital: **[TX assumed name – Expired: 7/14/2021]** <br><br> Mid-Jefferson Hospital: Jefferson Co **[TX assumed name - Expired: 7/18 2021]** <br><br> Park Place Medical Center: **[TX assumed name – Expired: 7/14/2021]** <br><br> Park Place Medical Center: Jefferson Co **[TX assumed name - Expired: 7/18 2021]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| Biltmore Surgery Center Holdings, Inc. | DE | Guarantor | For-profit corporation | 3105819 | 62-1796499 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Biltmore Surgery Center, Inc. | AZ | Guarantor | For-profit corporation | 07878512 | 86-0837176 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Brim Healthcare of Texas, LLC | DE | Guarantor | For profit LLC | 4642116 | 26-4178850 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | Doctors Hospital of Texarkana: **[TX assumed name – Active]**<br><br>Doctors Regional Medical Center of Texarkana: **[TX assumed name – Active]**<br><br>Four States Medical Center: **[TX assumed name – Active]**<br><br>Texarkana Medical Center: **[TX assumed name – Active]**<br><br>The Medical Center of Texarkana: **[TX assumed name – Active]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Wadley Regional Medical Center: **[TX assumed name – Active]**<br><br>Wadley Regional Medical Center; Bowie CO: **[TX assumed name – Active]** |
| Brim Holding Company, Inc. | DE | Guarantor | For-profit corporation | 3814558 | 20-1249189 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | Wadley Regional Medical Center at Hope: **[AR assumed name – Active]**<br><br>Wadley Rural Health Clinic at Hope: **[AR assumed name – Active]** |
| Choice Care Clinic I, Inc. | TX | Guarantor | Non-Profit 5.01(a) corporation | 800731236 | 20-5936914 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Choice Care Clinic II, Inc. | TX | Guarantor | Non-Profit 5.01(a) corporation | 800677032 | 20-5815195 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Choice Care Clinic III, Inc. | TX | Guarantor | Non-Profit 5.01(a) corporation | 801573549 | 45-5454036 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| Choice Care Clinic of Louisiana, Inc. | DE | Guarantor | For-profit corporation | 5080687 | 45-4067134 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | Glenwood Urgent Care: **[LA assumed name – Expired: 4/05/2022]** |
| Choice Care Clinic of Utah, Inc. | DE | Guarantor | For-profit corporation | 5094835 | 45-4317705 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Davis Hospital Holdings, Inc. | DE | Guarantor | For-profit corporation | 3095682 | 62-1795217 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Davis Surgical Center Holdings, Inc. | DE | Guarantor | For-profit corporation | 3105817 | 62-1796493 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Glenwood Specialty Imaging, LLC | DE | Guarantor | For profit LLC | 4091932 | 20-4166415 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Heritage Technologies, L.L.C. | AZ | Guarantor | For profit LLC | L07612504 | 86-0805100 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | Desert Grove Family Medical: **[AZ assumed name - Active]** Next Generation Health Services: **[Expired: 8/29/2018]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Steward Medical Group of Arizona/Desert Grove [**Expired: 1/8/2023**] |
| IASIS Capital Corporation | DE | Guarantor | For-profit corporation | 3809048 | 20-1278389 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| IASIS Finance II LLC | DE | Guarantor | For profit LLC | 5398599 | 46-3646796 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| IASIS Finance III LLC | DE | Guarantor | For profit LLC | 5398603 | 38-3915345 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| IASIS Finance Texas Holdings, LLC | DE | Guarantor | For profit LLC | 3822938 | 20-1311933 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| IASIS Finance, Inc. | DE | Guarantor | For-profit corporation | 3115468 | 62-1797792 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |

WEIL:\99571730\6\76000.0003

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| IASIS Glenwood Regional Medical Center, LP | DE | Guarantor | Limited partnership | 4193002 | 20-5249827 | IASIS Glenwood Regional Medical Center, LP 503 McMillan Rd. West Monroe, LA 71291 | Glenwood Regional Medical Center: **[LA/ Ouachita Parish - Active]**<br><br>Glenwood Surgery Center, a Campus of Glenwood Regional Medical Center: **[LA/ Ouachita Parish - Active]**<br><br>SeniorAdvantage at Glenwood Regional Medical Center: **[LA/ Ouachita Parish - Active]**<br><br>Glenwood Behavioral Health: **[LA/ Ouachita Parish – Expired 7/12/2020]**<br><br>Glenwood Medical Group: **[LA/ Ouachita Parish – Expired 11/3/2019]**<br><br>Rhythms of Life: **[LA/ Ouachita Parish – Expired 7/12/2020]**<br><br>Surgical Weight Loss Center of Louisiana: **[LA/ Ouachita Parish – Expired 7/12/2020]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| IASIS Healthcare Corporation | DE | Guarantor | For-profit corporation | 2439854 | 76-0450619 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None.<br><br>Ignite Merger Sub, Inc[8.] – None. |
| IASIS Healthcare Holdings, Inc. | DE | Guarantor | For-profit corporation | 3101395 | 62-1798194 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | SPORTSMEDUTAH: **[UT assumed name – Active]**<br><br>Scheduling Solutions: **[UT  assumed name – Expired: 5/27/2021]**<br><br>Utah Mental Healthcare: **[UT assumed name – Expired: 1/13/2021]**<br><br>Utah's Health System: **[UT assumed name – Expired: 5/2/2019]**<br><br>Utah's Healthcare System: **[UT assumed name – Expired: 5/2/2019]** |
| IASIS Healthcare LLC | DE | Guarantor | For profit LLC | 3801993 | 20-1150104 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |

---

[8] Ignite Merger Sub, Inc. merged into IASIS Healthcare Corporation on September 29, 2017.

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| IASIS Management Company | DE | Guarantor | For-profit corporation | 3105765 | 62-1797795 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| IASIS Transco, Inc. | DE | Guarantor | For-profit corporation | 3124235 | 62-1801016 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Indigent Care Services of Northeast Louisiana, Inc. | DE | Guarantor | For-profit corporation | 3105824 | 62-1796513 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Jordan Valley Hospital Holdings, Inc. | DE | Guarantor | For-profit corporation | 3095679 | 62-1795215 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Mesa General Hospital, LP | DE | Guarantor | Limited partnership | 3102001 | 62-1795590 | Mesa General Hospital, LP 1900 N Pearl St. #2400 Dallas, TX 75201 | None |
| Morton Hospital, A Steward Family Hospital, Inc. | DE | Guarantor | For-profit corporation | 4960548 | 45-1209304 | Morton Hospital, A Steward Family Hospital, Inc. 88 Washington St. Taunton, MA 02780 | Morton Hospital: **[MA assumed name – Active]** |
| Mountain Point Holdings, LLC | DE | Guarantor | For profit LLC | 5402422 | 81-1072595 | Mountain Point Holdings, LLC | None |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | 3000 N Triumph Blvd. Lehi, UT 84043 | |
| Mountain Vista Medical Center, LP | DE | Guarantor | Limited partnership | 3863963 | 20-2066363 | Mountain Vista Medical Center, LP 1301 S Crimson Rd. Mesa, AZ 85209 | Florence Hospital, A Campus of Mountain Vista Medical Center: **[AZ assumed name – Active]** Mountain Vista Medical Center: **[AZ assumed name – Active]**<br><br>Steward Emergency Center, An Extension of Mountain Vista Medical Center: **[AZ assumed name – Active]**<br><br>Comprehensive Orthopaedic and Spine Center: **[AZ assumed name – Expired: 3/22/2022]**<br><br>Comprehensive Orthopedic and Spine Center: **[AZ assumed name – Expired: 4/2/2020]**<br><br>Senior Emergent Care at Mountain Vista: **[AZ assumed name – Expired: 3/22/2022]**<br><br>SeniorAdvantage at Mountain Vista Medical |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Center: **[AZ assumed name – Expired: 10/30/2022]** <br><br> Urological Surgery Center of Arizona: **[AZ assumed name – Expired: 11/17/2020]** <br><br> [Steward Mesa Hospital: **[Maricopa County, AZ registration only (no state filing): 04/29/22. This is not being used]** <br><br> MVMC Merger Sub, LLC |
| MT Transition LP | DE | Guarantor | Limited partnership | 3102047 | 62-1795584 | MT Transition LP 1900 N Pearl St. #2400 Dallas, TX 75201 | None |
| Nashoba Valley Medical Center,A Steward Family Hospital, Inc. | DE | Guarantor | For-profit corporation | 4907038 | 27-4157855 | Nashoba Valley Medical Center, A Steward Family Hospital, Inc. 200 Groton Rd. Ayer, MA 01432 | Nashoba Valley Medical Center: **[Ayer, MA assumed name - Active]** |
| New England Sinai Hospital, A Steward Family Hospital, Inc. | DE | Guarantor | For-profit corporation | 5132104 | 90-0812115 | New England Sinai Hospital, A Steward Family Hospital, Inc. 150 York St. Stoughton, MA 02072 | New England Sinai Hospital: **[Stoughton, MA assumed name- Active]** <br><br> New England Sinai Hospital Adult Day Health Center: **[Stoughton, MA** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | assumed name– **Active]** |
| | | | | | | | New England Sinai Hospital Transitional Care Unit: **[Stoughton, MA assumed name– Active]** |
| Odessa Fertility Lab, Inc. | DE | Guarantor | For-profit corporation | 3105821 | 62-1796497 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Odessa Regional Hospital, LP | DE | Guarantor | Limited partnership | 3102066 | 62-1795574 | Odessa Regional Hospital, LP 520 East Sixth St. Odessa, TX 79761 | Odessa Regional Medical Center: **[TX and Ector Co assumed names – Active]** <br><br> Odessa Regional Medical Center South Campus: **[TX assumed name – Active]** <br><br> Odessa Regional Hospital: **[TX and Ector Co DBAs – Expired: 10/27/2020]** <br><br> Surgical Weight Loss Center at Odessa Regional Medical Center: **[TX and Ector Co DBAs – Expired: 4/12/2020]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Surgical Weight Loss Center at Odessa Regional Hospital: **[TX and Ector Co DBAs – Expired: 04/12/2021]**<br><br>Pediatric After Hours Clinic at Odessa Regional Medical Center: **[TX and Ector Co DBAs – Expired: 3/5/2019]** |
| Permian Basin Clinical Services, Inc. | TX | Guarantor | Non-Profit 5.01(a) corporation | 800682334 | 86-1175133 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Permian Premier Health Services, Inc. | TX | Guarantor | Non-Profit 5.01(a) corporation | 0134016101 | 13-4334288 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | Regional Perinatal Center: **[TX and Ector Co assumed names – Active]**<br><br>Scenic Mountain Medical Group: **[TX assumed name – Active]**<br><br>Steward Medical Group of Texas: **[TX and Ector Co assumed names – Active]**<br><br>Southeast Texas Physician Group: **[TX and Jefferson Co assumed names –** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | **Active but no longer used]**<br><br>Southeast Texas Physicians Group: **[TX and Ector Co assumed names - Active but no longer used]**<br><br>Southeast Texas Physicians: **[TX and Ector Co assumed names - Active but no longer used]**<br><br>Barlite Cardiology Clinic: **[TX and Bexar Co DBA - Expired: 10/27/2020]**<br><br>Lone Star Diabetes and Endocrinology: **[TX and Ector Co DBA - Expired: 11/22/2021]**<br><br>Odessa IVF: **[TX and Ector Co assumed name - Expired: 5/24/2023 and is no longer used]**<br><br>ORMC Complete Care: **[TX and Ector Co assumed name - Expired: 10/21/2019]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | ORMC Courtesy Health Screening: **[TX and Ector Co assumed names - Expired: 11/19/2022]**<br><br>Permian Basin Kidney Center: **[TX and Ector Co assumed names - Expired: 1/13/2021]**<br><br>Permian Premier Women's Health Services: **[TX and Ector Co assumed names - Expired: 10/22/2022]**<br><br>Port Arthur Medical Clinic-Orange: **[TX and Orange Co assumed names - Expired: 11/16/2020]**<br><br>Premier Family Associates of Orange: **[TX and Ector Co assumed names - Expired: 12/19/2022]**<br><br>Premier Surgical Associates of Southeast Texas: **[TX and Ector Co assumed names - Expired: 10/17/2022]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | South San Antonio Surgical Associates: **[TX and Ector Co assumed names - Expired: 1/27/2020]**<br><br>South West Texas Maternal Fetal Medicine Center: **[TX and Ector Co assumed names - Expired: 6/8/2021]**<br><br>Southwest Physicians Group: **[TX and Ector Co DBA - Expired: 8/12/2021]**<br><br>West Loop Family Practice: **[TX and Ector Co DBA Expired: 12/23/2020]**<br><br>SJMC Physician Services, Inc. [9] – Steward Medical Group of Texas/SJMC **[TX DBA filed in 2017 has not yet expired but is not used]**<br><br>Texarkana Regional Healthcare Network, |

[9] SJMC Physician Services, Inc, and Texarkana Regional Healthcare Network, Inc. merged into Permian Premier Health Services, Inc. 08.19.2019

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Inc. [10] **[There are unexpired DBAs but none are being used]** |
| Physician Group of Arizona, Inc. | DE | Guarantor | For-profit corporation | 4510879 | 26-2055034 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | Fetal Diagnostic Center: **[AZ assumed name - Active]**<br><br>Phoenix Heart Center: **[AZ assumed name- Active]**<br><br>Steward Medical Group of Arizona: **[AZ assumed name- Active]**<br><br>Steward Medical Group Primary Care: **[AZ assumed name - Active]**<br><br>Steward Medical Group Women's Health Associates: **[AZ assumed name- Active]**<br><br>Steward Orthopedic and Sports Medicine Center: **[AZ assumed name - Active]**<br><br>Physician Group of Arizona Primary Care: |

---

[10] SJMC Physician Services, Inc, and Texarkana Regional Healthcare Network, Inc. merged into Permian Premier Health Services, Inc. 08.19.2019

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | **[AZ DBA - Expired: 10/16/2020]**<br><br>Physician Group of Arizona Radiology: **[AZ DBA - Expired: 2/11/2019]**<br><br>Physician Group of Arizona Surgical Specialists: **[AZ DBA Expired: 7/8/2021]**<br><br>Scottsdale Multi-Specialty Clinic: **[AZ DBA Expired: 3/8/2022]**<br><br>Sonoran Pain Management: **[AZ DBA Expired: 3/27/2019]**<br><br>St. Luke's Psychiatric Specialists: **[AZ DBA Expired: 12/10/2018]**<br><br>Surgical Weight Loss Solutions at Tempe St. Luke's: **[AZ DBA Expired: 4/7/2019]**<br><br>Tempe Surgical Specialists: **[AZ DBA Expired: 8/27/2020]**<br><br>The Arizona Institute of Hand and Wrist |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Disorders: **[AZ DBA Expired: 8/5/2018]**<br><br>Valley Vein Center – **[AZ DBA Expired: 9/24/2022]** |
| Physician Group of Arkansas, Inc. | DE | Guarantor | For-profit corporation | 5170860 | 45-5503617 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | Family Medicine Specialists: **[AR assumed name – Active]**<br><br>Steward Medical Group of Arkansas: **[AR assumed name – Active]** |
| Physician Group of Florida, Inc. | DE | Guarantor | For-profit corporation | 3124410 | 62-1801013 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | **[No active assumed names or expired DBAs after 2017]** |
| Physician Group of Louisiana, Inc. | DE | Guarantor | For-profit corporation | 4690908 | 27-0345822 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | Glenwood Cardiovascular & Thoracic Surgery: **[LA & Ouachita Parish DBA – Active]**<br><br>Glenwood Foot & Ankle: **[LA & Ouachita Parish DBA – Active]**<br><br>Glenwood General Surgery: **[LA & Ouachita Parish DBA – Active]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Glenwood Heart & Vascular: **[LA & Ouachita Parish DBA – Active]** |
| | | | | | | | Glenwood Psychiatry: **[LA & Ouachita Parish DBA – Active]** |
| | | | | | | | Glenwood Pulmonary Specialists: **[LA & Ouachita Parish DBA – Active]** |
| | | | | | | | Glenwood Urology: **[LA & Ouachita Parish DBA – Active]** |
| | | | | | | | Steward Medical Group of Louisiana: **[LA & Ouachita Parish DBA – Active]** |
| | | | | | | | Glenwood Internal Medicine & Pediatrics: **[LA & Ouachita Parish DBA – Active but not used]** |
| | | | | | | | Glenwood Family Medicine: **[LA & Ouachita Parish DBA – Active but not used]** |
| | | | | | | | Glenwood Internal Medicine and Pediatrics: **[LA &** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | **Ouachita Parish DBA – Active but not used]** |
| | | | | | | | Glenwood Medical Clinic Internal Medicine & Pediatric Pediatrics: **[LA & Ouachita Parish DBA – Active but not used]** |
| | | | | | | | Glenwood Medicine Clinic: **[LA & Ouachita Parish DBA – Active but not used]** |
| | | | | | | | Glenwood Neurology Specialists: **[LA & Ouachita Parish DBA – Active but not used]** |
| | | | | | | | Glenwood Stat Care: **[LA & Ouachita Parish DBA – Active but not used]** |
| | | | | | | | Glenwood Brain and Spine: **[LA & Ouachita Parish DBA – Expired: 4/5/2022]** |
| | | | | | | | Glenwood Ear, Nose & Throat: **[LA & Ouachita Parish DBA - Expired 1/25/2023]** |
| | | | | | | | Glenwood Family Medicine: **[LA &** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Ouachita Parish DBA – Expired: 7/6/2022]<br><br>Glenwood Gastroenterology: [LA & Ouachita Parish DBA - Expired 1/25/2023]<br><br>Glenwood Internal Medicine: [LA & Ouachita Parish DBA – Expired: 1/25/2023]<br><br>Glenwood Medical Group at North Monroe: [LA & Ouachita Parish DBA – Expired: 8/16/2020]<br><br>Glenwood Medical Group at Sterlington: [LA & Ouachita Parish DBA – Expired: 6/21/2020]<br><br>Glenwood Neurology & Sleep Medicine: [LA & Ouachita Parish DBA – Expired: 1/25/2023]<br><br>Glenwood Pediatric Care: [LA & Ouachita Parish DBA – Expired: 9/27/2022] |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Glenwood Pulmonary & Internal Medicine: **[LA & Ouachita Parish DBA – Expired: 12/6/2022]**<br><br>Glenwood Surgery Associates: **[LA & Ouachita Parish DBA – Expired: 11/28/2021]**<br><br>Glenwood Urgent Care: **[LA & Ouachita Parish DBA – Expired: 6/22/2021]** |
| Podiatric Physicians Management of Arizona, Inc. | AZ | Guarantor | For-profit LLC | 07960318 | 86-0846514 | 1620 S Stapley Dr, Ste 132, Mesa, Arizona, 85204 | None |
| PP Transition LP | DE | Guarantor | Limited partnership | 3102056 | 62-1795583 | PP Transition LP 1900 N Pearl St. #2400 Dallas, TX 75201 | None |
| PP Transition, Inc. | DE | Guarantor | For-profit corporation | 3115470 | 62-1797790 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Quincy Medical Center, A Steward Family Hospital, Inc. | DE | Guarantor | For-profit corporation | 4991552 | 45-2465238 | Quincy Medical Center, A Steward Family Hospital, Inc. 1900 N Pearl St. #2400 Dallas, TX 75201 | None |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| Riverwoods ASC Holdco LLC | DE | Guarantor | For profit LLC | 6172802 | 38-4016363 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Seaboard Development Port Arthur LLC | DE | Guarantor | For profit LLC | 5142225 | 80-0808748 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| SHC Youngstown Ohio Laboratory Services Company LLC | DE | Guarantor | For profit LLC | 6363744 | 82-1003734 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| SHC Youngstown Ohio Outpatient Services LLC | DE | Guarantor | For profit LLC | 6363789 | 82-1003850 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| SHC Youngstown Ohio PSC LLC | DE | Guarantor | For profit LLC | 6358966 | 82-0970767 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| SJ Medical Center, LLC | TX | Guarantor | For profit LLC | 800666207 | 20-4835578 | SJ Medical Center, LLC 1401 St. Joseph Pkwy. Houston, TX 77002 | St. Joseph Cancer Center: **[TX and Harris Co assumed names – Active]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | St. Joseph Medical Center: **[TX assumed name – Active]** <br><br> St. Joseph Medical Center in The Heights: **[TX and Harris Co assumed names – Expired: 8/23/2022]** <br><br> Surgical Weight Loss Solutions at St. Joseph Medical Center: **[TX and Harris Co assumed names – Expired: 7/28/2021]** <br><br> St. Joseph Medical Center (assumed name) **see above** |
| St. Luke's Behavioral Hospital, LP | DE | Guarantor | Limited partnership | 3102009 | 62-1795588 | St. Luke's Behavioral Hospital, LP 1800 E. Van Buren St. Phoenix, AZ 85006 | St. Luke's Behavioral Health Center: **[AZ assumed name – Active]** <br><br> Northwest Outpatient Clinic: **[AZ assumed name – Expired: 8/27/2020]** |
| St. Luke's Medical Center, LP | DE | Guarantor | Limited partnership | 3102018 | 62-1795587 | St. Luke's Medical Center, LP 1900 N Pearl St. #2400 Dallas, TX 75201 | St. Luke's Medical Center, A Steward Family Hospital: **[AZ assumed name – Active]** <br><br> Tempe St. Luke's Hospital, A Campus of |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | St. Luke's Medical Center: **[AZ assumed name – Active]**<br><br>Amputation Prevention Program: **[AZ assumed name – Expired: 3/15/2018]**<br><br>Arizona Regional Credentialing Center: **[AZ assumed name – Expired: 6/28/2018]**<br><br>Center for Sinus Care Innovation at Tempe St. Luke's Hospital : **[AZ assumed name – Expired: 9/30/2018]**<br><br>Integrative Spine Institute at St. Luke's Medical Center: **[AZ assumed name – Expired: 9/30/2018]**<br><br>SeniorAdvantage at St. Luke's Medical Center : **[AZ assumed name – Expired: 1/24/2019]**<br><br>St. Luke's Medical Center: **[AZ assumed name – Expired: 1/24/2019]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Women's Care Center Clinic: **[AZ assumed name – Expired: 3/9/2019]**<br><br>Advanced Sinus Surgery at Tempe St. Luke's Hospital: **[AZ assumed name – Expired: 4/28/2020]**<br><br>Acute Rehabilitation Hospital at St. Luke's Medical Center: **[AZ assumed name – Expired: 11/1/2020]**<br><br>Center for Orthopedic Innovation at St. Luke's Medical Center: **[AZ assumed name – Expired: 11/1/2020]**<br><br>Dr. Tafur Generations Program: **[AZ assumed name – Expired: 12/16/2020]**<br><br>Motion Academy: **[AZ assumed name – Expired: 2/28/2021]**<br><br>Grossman Burn Center at St. Luke's Medical Center: **[AZ assumed name – Expired: 5/24/2021]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | St. Luke's Behavioral Health, on the Campus of St. Luke's Medical Center: **[AZ assumed name – Expired: 7/05/2022]**<br><br>The Pain Center at Tempe St. Luke's Hospital: **[AZ assumed name – Expired: 7/28/2022]**<br><br>St. Luke's Medical Center Sports Medicine: **[AZ assumed name – Expired: 9/18/2022]**<br><br>SL2 Program, Saving Limbs, Saving Lives: **[AZ assumed name – Expired: 11/13/2022]** |
| Steward Carney Hospital, Inc. | DE | Guarantor | For-profit corporation | 4811748 | 27-2473755 | Steward Carney Hospital, Inc. 2100 Dorchester Ave. Dorchester, MA 02124 | Carney Hospital – Dorchester: **[MA DBA – Active]** |
| Steward CGH, Inc. | DE | Guarantor | For-profit corporation | 5470419 | 86-2608394 | Steward CGH, Inc. 3100 Douglas Road Coral Gables, FL 33134 | Coral Gables Hospital North Campus: **[FL fictitious name – Active]**<br><br>Steward Coral Gables Hospital: **[FL fictitious name – Active]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Steward Coral Gables Hospital Emergency Center: **[FL fictitious name – Active]** |
| Steward Emergency Physicians, Inc. | MA | Guarantor | Non-profit corporation | 273676242 | 27-3676242 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Fall River Management Care Services LLC | DE | Guarantor | For-profit LLC | 4849308 | 27-3074966 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Florida ALF LLC | DE | Guarantor | For profit LLC | 6330355 | 82-0625232 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Florida Holdings LLC | DE | Guarantor | For profit LLC | 6317612 | 81-5437399 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Good Samaritan Medical Center, Inc. | DE | Guarantor | For-profit corporation | 4811744 | 27-2473728 | Steward Good Samaritan Medical Center, Inc. 235 North Pearl St. Brockton, MA 02301 | Good Samaritan Medical Center: **[Brockton MA DBA – Active]**  Good Samaritan Medical Center, A Steward Family |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Hospital Women's Imaging and Surgery Center: **[North Easton MA DBA – Active]** <br><br> Good Samaritan Medical Center, A Steward Family Hospital. Center for Wound Care and Hyperbaric Medic: **[Stoughton, MA DBA – Active]** <br><br> Good Samaritan Medical Center, East Bridgewater MRI: **[East Bridgewater, MA DBA – Active]** <br><br> Norcap Lodge: **[Foxborough, MA DBA – Active]** |
| Steward Good Samaritan Occupational Health Services, Inc. | DE | Guarantor | For-profit corporation | 4849309 | 27-3075262 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Good Samaritan Radiation Oncology Center, Inc. | DE | Guarantor | For-profit corporation | 4849898 | 27-3075381 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |

WEIL:\99571730\6\76000.0003

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| Steward Health Care Holdings LLC | DE | Guarantor | For-profit LLC | 4997570 | 90-0736306 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Health Care Network, Inc. | DE | Guarantor | For-profit corporation | 4849317 | 27-3075212 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward HH, Inc. | DE | Guarantor | For-profit corporation | 5470516 | 86-2669849 | Steward HH, Inc. 651 E 25th Street Hialeah, FL 33013 | Steward Hialeah Hospital: [FL fictitious name – Active] |
| Steward Hillside Rehabilitation Hospital, Inc. | DE | Guarantor | For-profit corporation | 6317619 | 81-5446091 | Steward Hillside Rehabilitation Hospital, Inc. 8747 Squires Ln NE Warren, OH 44484 | Elm Road Rehabilitation Services, A Service of Hillside Rehabilitation Hospital: [OH DBA- Active] |
| Steward Holy Family Hospital, Inc. | DE | Guarantor | For-profit corporation | 4811743 | 27-2473701 | Steward Holy Family Hospital, Inc. 140 Lincoln Ave. Haverhill, MA 01830 | Andover Surgery Center: [Andover, MA DBA – Active] Holy Family Hospital: [Methuen MA DBA - Active] Steward Holy Family Hospital Haverhill: [Haverhill, MA DBA – Active] Holy Family Hospital at Merrimack Valley, a |

WEIL:\99571730\6\76000.0003

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Steward Family Hospital (Haverhill): **[Haverhill, MA DBA – Expired: 5/5/2020]**<br><br>Holy Family Women's Health Center: **[Lawrence, MA DBA – Expired: 2/19/2020]** |
| Steward Hospital Holdings LLC | DE | Guarantor | For-profit LLC | 4811736 | 27-2473450 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Imaging & Radiology Holdings LLC | DE | Guarantor | For-profit LLC | 4817028 | 27-2473484 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Medicaid Care Network, Inc. | DE | Guarantor | For-profit corporation | 6179770 | 81-4107389 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Medical Group, Inc. | MA | Guarantor | Taxable non-profit corporation | 272777455 | 27-2777455 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | See Supplementary Exhibit A(1) |
| Steward Medical Holdings LLC | DE | Guarantor | For-profit LLC | 4849306 | 27-3074900 | Steward Health Care System LLC 1900 N Pearl St #2400 | None |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | Dallas, Texas 75201 | |
| Steward Melbourne Hospital, Inc. | DE | Guarantor | For-profit corporation | 6311578 | 81-5354550 | Steward Melbourne Hospital, Inc. 250 N Wickham Rd. Melbourne, FL 32935 | Melbourne Regional Medical Center: **[FL fictitious name – Active]** |
| Steward New England Initiatives, Inc. | DE | Guarantor | For-profit corporation | 4849310 | 27-3075043 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Norwood Hospital, Inc. | DE | Guarantor | For-profit corporation | 4811747 | 27-2473602 | Steward Norwood Hospital, Inc. 800 Washington St. Norwood, MA 02062 | Norwood Hospital: **[Norwood, MA - business certificate – Active]** |
| Steward NSMC, Inc. | DE | Guarantor | For-profit corporation | 5470668 | 86-2695690 | Steward NSMC, Inc. 1100 NW 95th Street Miami, FL 33150 | Steward Florida Medical Center - A Campus of North Shore: **[FL fictitious name – Active]** Steward North Shore Medical Center: **[FL fictitious name – Active]** |
| Steward Ohio Holdings LLC | DE | Guarantor | For profit LLC | 6317615 | 81-5446526 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| Steward Operations Holdings LLC | DE | Guarantor | For-profit LLC | 4817025 | 27-2490041 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Pennsylvania Holdings LLC | DE | Guarantor | For profit LLC | 6317617 | 81-5446402 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward PGH, Inc. | DE | Guarantor | For-profit corporation | 5470336 | 86-2724926 | Steward PGH, Inc. 2001 W 68 Street Hialeah, FL 33016 | Diagnostic Service (RADS) at Steward Palmetto General: **[FL fictitious name – Active]**<br><br>RADS-Imaging Center: **[FL fictitious name – Active]**<br><br>Rehab Center at Steward Palmetto General Hospital: **[FL fictitious name – Active]**<br><br>Steward Palmetto General Hospital: **[FL fictitious name – Active]**<br><br>The Just for Women Diagnostic Center: **[FL fictitious name – Active]** |

WEIL:\99571730\6\76000.0003

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Sunrise Medical Group: **[FL fictitious name – Active]** |
| Steward Physician Contracting, Inc. | MA | Guarantor | Taxable non-profit corporation | 001033287 | 27-3676310 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Rockledge Hospital, Inc. | DE | Guarantor | For-profit corporation | 6317622 | 81-5437018 | Steward Rockledge Hospital, Inc. 110 Longwood Ave. Rockledge, FL 32955 | Rockledge Regional Medical Center: **[FL fictitious name – Active]** <br><br> Steward Health System at Port St. John: **[FL fictitious name – Active]** <br><br> Steward Medical Center at Merritt Island: **[FL fictitious name – Active]** <br><br> Steward Pain Management Center: **[FL fictitious name – Active]** <br><br> Steward Rehabilitation Services: **[FL fictitious name – Active]** <br><br> Steward Wound Care and Hyperbaric Center at Rockledge: **[FL** |

WEIL:\99571730\6\76000.0003

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | fictitious name – Active] |
| | | | | | | | Steward Pain Management Center of Suntree: **[FL fictitious name – Active but not used]** |
| Steward Sebastian River Medical Center, Inc. | DE | Guarantor | For-profit corporation | 6317623 | 81-5437273 | Steward Sebastian River Medical Center, Inc 13695 US Highway 1 Sebastian, FL 32958 | Center for Wound Care & Hyberbaric Medicine: **[FL fictitious name – Active]**<br><br>Sebastian River Medical Center: **[FL fictitious name – Active]**<br><br>Sebastian River Medical Center Sleep Disorders Center: **[FL fictitious name – Active]** |
| Steward Sharon Regional Health System, Inc. | DE | Guarantor | For-profit corporation | 6317624 | 81-5457135 | Steward Sharon Regional Health System, Inc. 740 East State St. Sharon, PA 16146 | See Supplementary Exhibit A(2) |
| Steward St. Anne's Hospital Corporation | DE | Guarantor | For-profit corporation | 4811745 | 27-2473637 | Steward St. Anne's Hospital Corporation 795 Middle St. Fall River, MA 02721 | Saint Anne's Hospital Diagnostic Imaging Services: **[New Bedford, MA DBA – Active]**<br><br>Saint Anne's Hospital: **[Fall River, MA DBA - Active]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Saint Anne's Hospital Ambulatory Care Center: **[Dartmouth, MA DBA – Active]** <br><br> Saint Anne's Hospital Diagnostic Imaging Center: **[Fall River, MA – Active]** <br><br> Saint Anne's Hospital Pain Management Center: **[Swansea, MA -Active]** <br><br> Saint Anne's Hospital Regional Cancer Care Center: **[Dartmouth, MA – Active]** <br><br> Saint Anne's Hospital Rehabilitation Services: **[Fall River, MA – Active]** <br><br> Saint Anne's Hospital Southern New England Surgery Center: **[Attleboro, MA – Active]** |
| Steward St. Elizabeth's Medical Center of Boston, Inc. | DE | Guarantor | For-profit corporation | 4811740 | 27-2473667 | Steward St. Elizabeth's Medical Center of Boston, Inc. 736 Cambridge St. | St. Elizabeth's Medical Center of Boston – **[Boston, MA DBA – Active]** |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | Brighton, MA 02135 | |
| Steward St. Elizabeth's Realty Corp. | DE | Guarantor | For-profit corporation | 4849312 | 27-3075169 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Steward Texas Hospital Holdings LLC | DE | Guarantor | For profit LLC | 7200036 | 83-2900290 | Scenic Mountain Medical Center 1601 W 11th Place Big Springs, TX 79720 | Scenic Mountain Medical Center, a Steward Family Hospital: **[TX assumed name - Active]** |
| Steward Trumbull Memorial Hospital, Inc. | DE | Guarantor | For-profit corporation | 6317636 | 81-5457243 | Steward Trumbull Memorial Hospital, Inc. 1350 East Market St. Warren, OH 44482 | Trumbull Regional Medical Center: **[OH DBA - Active]**<br><br>Steward Northside Medical Center, Inc.[11] |
| Steward Valley Regional Ventures, Inc. | DE | Guarantor | For-profit corporation | 4849311 | 27-3075090 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| The Medical Center of Southeast Texas, LP | DE | Guarantor | Limited partnership | 3661750 | 27-0060569 | The Medical Center of Southeast Texas, LP 2555 Jimmy Johnson Blvd. Port Arthur, TX 77640 | Mid-Jefferson Hospital: **[TX assumed name- Active]**<br><br>Park Place Medical Center: **[TX assumed name- Active]** |

---

[11] This entity merged with and into Steward Trumbull Memorial Hospital, Inc., effective September 20, 2018. No DBA information on file.

WEIL:\99571730\6\76000.0003

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | | The Bayou Grille at MCSETX: **[TX and Jefferson Co DBAs – Active]**<br><br>The Medical Center of Southeast Texas: **[TX and Jefferson Co DBAs – Active]**<br><br>The Medical Center of Southeast Texas Beaumont Campus: **[TX and Jefferson Co DBAs – Active]**<br><br>The Medical Center of Southeast Texas Victory Campus: **[TX and Jefferson Co DBAs – Active]** |
| TNC Transition LP | DE | Guarantor | Limited partnership | 3102058 | 62-1795580 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Utah Transcription Services, Inc. | DE | Guarantor | For-profit corporation | 3095959 | 62-1795212 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None |
| Stewardship Health, Inc. | DE | Borrower | For-profit Corporation | 2692037 | 93-4645903 | Steward Health Care System LLC 1900 N Pearl St #2400 | None. |

| Credit Party | Jurisdiction | Borrower / Guarantor | Type of Entity / State of Formation | State Org. ID Number | Federal Tax ID Number | Place of Business / Address of Project | Other Names Used in Past 5 Years. |
|---|---|---|---|---|---|---|---|
| | | | | | | Dallas, Texas 75201 | |
| Stewardship Health Medical Group, Inc. | MA | Borrower | Non-profit corporation IV. | 001733057 | 93-4834210 | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None. |
| Stewardship Services Inc. | DE | Borrower | For-profit Corporation | 3105831 | Not Available | Steward Health Care System LLC 1900 N Pearl St #2400 Dallas, Texas 75201 | None. |

WEIL:\99571730\6\76000.0003

**SUPPLEMENTARY EXHIBIT A(1)**

**Steward Medical Group, Inc.**

**Entity Name:** Steward Medical Group, Inc.

| Name | Name Type | Jurisdiction/County | Start Date | Expiration Date | Status |
|------|-----------|---------------------|------------|-----------------|--------|
| ACTIVE dbas | | | | | |
| Bangor Family Practice | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Barefoot Bay Internal Medicine | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Bethlehem Area Pediatric Associates | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Blue Valley Family Practice | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Brevard Cardiology Group | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Brevard Vascular Associates | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Brighton Obstetrics & Gynecology | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Coastal Cardiovascular Associates | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Coastal Gynecology | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Coastal Joint and Sports Medicine Associates | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| East Pulmonary Family Care | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| East Stroudsburg Family Medicine | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| George M. Joseph, M.D. & Associates | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| GI Associates of Brevard | Fictitious name | Florida | 8/28/2017 | 8/28/2022 | Active |
| Heart Rhythm Associates | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Hillcrest OB/GYN Associates | d/b/a name | New Jersey | 4/13/2017 | 4/13/2022 | Active |
| Indian River Walk In Care | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Internal Medicine Associates of Brevard | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| John W. Knappman, M.D. | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Joseph Medical Group of Forks Township | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |

| Name | Name Type | Jurisdiction/County | Start Date | Expiration Date | Status |
|------|-----------|---------------------|------------|-----------------|--------|
| Monroe County Women's Health Center | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Monroe Pulmonary and Internal Medicine Associates | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Neurology Associates of Melbourne | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| North End Internal Medicine | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Northampton General Surgery at Nazareth Road | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Northampton Internal Medicine at Spring Garden | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Orthopaedic Associates of Brevard | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Partners in Women's Health | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Portland Medical Group | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Priority Group Internal Medicine | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Riverside Pulmonary and Internal Medicine | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Sebastian Family Walk In Care | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Sebastian River Medical Group | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Sharon Regional Medial Group Breast Care | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medial Group Pulmonology | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medical Group Bariatrics | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medical Group Cardiology Specialists | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |

| Name | Name Type | Jurisdiction/County | Start Date | Expiration Date | Status |
|---|---|---|---|---|---|
| Sharon Regional Medical Group Cardiothoracic Surgery | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medical Group Family Medicine | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medical Group Gastroenterology | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medical Group Internal Medicine | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medical Group Orthopedics and Sports Medicine | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medical Group Surgical Specialists | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medical Group Urology | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medical Group Vascular Specialists | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Sharon Regional Medical Group Women's Care | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Steward Bariatric & General Surgery | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Cardiology Associates | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Cardiothoracic Specialists | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Cardiothoracic Specialists | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Steward Center for Inflammatory Bowel Disease Gastroenterology Specialists | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |

WEIL:\99571730\6\76000.0003

| Name | Name Type | Jurisdiction/County | Start Date | Expiration Date | Status |
|---|---|---|---|---|---|
| Steward Coastal Gynecology Specialists | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Ear Nose and Throat Specialists | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Family Medicine and OB, Belmont | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Steward Family Medicine, Hubbard | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Steward Family Medicine, Merritt Island | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Family Medicine, Middlefield | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Steward Family Medicine, Sharon | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Steward Family Medicine, Viera | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Gastroenterology Associates | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Gastroenterology Associates | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Steward General and Vascular Surgery | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Heart and Vascular Surgery | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Steward Heart Rhythm Associates | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Internal Medical, Barefoot Bay | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Internal Medicine | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Steward Internal Medicine, Sebastian | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |

| Name | Name Type | Jurisdiction/County | Start Date | Expiration Date | Status |
|---|---|---|---|---|---|
| Steward Internal Medicine, Sarno Rd | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Internal Medicine, VIera | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Medical Specialists | Assumed Name | Florida | 8/24/2018 | 12/31/2023 | Active |
| Steward Orthopedic & Sports Medicine Center - Vero Beach | Assumed Name | Florida | 8/24/2018 | 12/31/2023 | Active |
| Steward Orthopedic and Sports Medicine Center, Sebastian | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Orthopedic and Sports Medicine Center, Viera | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Orthopedic and Sports Medicine, PSJ | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Plastic & Reconstructive Surgery | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Steward Primary Care, Austintown | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Steward Primary Care, Brookfield | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Steward Primary Care, Cocoa | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Primary Care, Cortland | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Steward Primary Care, Hermitage | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Steward Primary Care, Northside | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Steward Primary Care, Sebastian | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |

| Name | Name Type | Jurisdiction/County | Start Date | Expiration Date | Status |
|---|---|---|---|---|---|
| Steward Primary Care, Vero Beach | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Pulmonary Associates | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Steward Pulmonology Associates | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Specialty Care | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Steward Specialty Care | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Steward Surgical & Weight Loss Specialists | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Steward Surgical Associates, Liberty | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Steward Surgical Specialists | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Thoracic Surgery | Fictitious name | Florida | 3/11/2019 | 12/31/2024 | Active |
| Steward Urology Associates | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Vascular Specialists | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Womens Health Associates | Fictitious name | Florida | 1/16/2019 | 12/31/2024 | Active |
| Steward Women's Health Associates | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Stewart Cardiology Associates | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Stewart Family Medicine | Assumed Name | Ohio | 8/30/2018 | 8/30/2023 | Active |
| Sullivan Trail Family Care | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Surgical Associates of Brevard | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Thoracic Surgery of Indian River | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Twin Rivers Surgical | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Urology Associates of Brevard | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |

| Name | Name Type | Jurisdiction/County | Start Date | Expiration Date | Status |
|---|---|---|---|---|---|
| Urology Specialists of Brevard | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Vero Family Medicine | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Viera Internal Medicine | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Walk-in Care at Park Plaza | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| West Point Medical Group | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Wilson Area Internal Medicine | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Active |
| Women's Primary Care & Ob/Gyn | Assumed Name | Pennsylvania | 9/5/2018 | 1/1/2050 | Active |
| Wuesthoff Physicians - Internal Medicine | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| Wuesthoff Physicians Family Medicine | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Active |
| **INACTIVE and/or EXPIRED DBAS** | | | | | |
| Advanced Surgical Associates | Fictitious name | Florida | 9/27/2017 | 7/27/2022 | Inactive |
| Anthony Ware Orthopaedics | Fictitious name | Florida | 9/27/2018 | 12/31/2023 | Inactive |
| Baytree Medical Associates | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Brevard Pulmonary Specialists | Fictitious name | Florida | 8/29/2017 | 12/31/2022 | Inactive |
| Cardiology Associates of Brevard | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Cardiothoracic Surgeons of Easton | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| Coastal Neurosurgery & Spine | Fictitious name | Florida | 9/27/2017 | 12/31/2022 | Inactive |
| Coastal Orthopedis | Fictitious name | Florida | 9/27/2017 | 12/31/2022 | Inactive |
| Coral Reef Gastroenterology | Fictitious name | Florida | 9/27/2017 | 12/31/2022 | Inactive |
| David P. SIMS, M.D. | Fictitious name | Florida | 9/27/2017 | 12/31/2022 | Inactive |
| Easton Area Oncology Associates | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |

| Name | Name Type | Jurisdiction/County | Start Date | Expiration Date | Status |
|---|---|---|---|---|---|
| Easton Community Care Center | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| Easton Dermatology and Aesthetics Center | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| Easton Endocrinology Associates | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| Easton Gastroenterology Associates | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| Easton Internal Medical Associates | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| Easton Internal Medicine and Geriatrics | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| Easton Medical Associates | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| Easton Medical Group | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| Easton Primary Care | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| Easton Surgical Associates | d/b/a name | Pennsylvania | 4/12/2017 | 1/1/2050 | Inactive |
| First Care Family Physicians | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Guillermo Sanabria, M.D. | Fictitious name | Florida | 9/27/2017 | 12/31/2022 | Inactive |
| Internal Medicine Associates of South Brevard | Fictitious name | Florida | 9/27/2017 | 12/31/2022 | Inactive |
| Kirk E. Maes, M.D. | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Neurology Associates of Brevard | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Neurology Associates of Rockledge | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Orthoviera | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Osler Geriatrics | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Riverside Vascular & Interventional Radiology | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Sebastian River Medical Group - Physical Therapy | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |

| Name | Name Type | Jurisdiction/County | Start Date | Expiration Date | Status |
|---|---|---|---|---|---|
| Sebastian River Medical Group Coastal Neurology | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Steward Medical Specialists | Fictitious name | Florida/ Indian River County | 8/10/2018 | 12/31/2023 | Inactive |
| Steward Orthopedic & Sports Medicine Center - Vero Beach | Fictitious name | Florida/ Indian River County | 8/24/2018 | 8/24/2023 | Inactive |
| Wuesthoff OB/GYN | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |
| Wuesthoff Physician Network | Fictitious name | Florida | 9/27/2017 | 9/27/2022 | Inactive |

**SUPPLEMENTARY EXHIBIT A(2)**

**Steward Sharon Regional Health System, Inc.**

WEIL:\99571730\6\76000.0003

**Entity Name:** Steward Sharon Regional Health System, Inc.

| Name | Name Type | Jurisdiction/County | Start Date | Expiration Date | Status |
|------|-----------|---------------------|------------|-----------------|--------|
| Center for Wound Care & Hyberbaric Medicine | d/b/a name | Pennsylvania | -- | -- | Active |
| Sharon Regional Health System | d/b/a name | Pennsylvania | 3/31/2017 | -- | Active |
| Sharon Regional Health System Transitional Care Unit | d/b/a name | Pennsylvania | 3/31/2017 | -- | Active |
| Sharon Regional Lab Cancer | d/b/a name | Pennsylvania | -- | -- | Active |
| Sharon Regional Lab Mercer | d/b/a name | Pennsylvania | -- | -- | Active |
| Sharon Regional Lab Services | d/b/a name | Pennsylvania | -- | -- | Active |
| Sharon Regional Lab Wound | d/b/a name | Pennsylvania | -- | -- | Active |
| Sharon Regional Medical Center | d/b/a name | Pennsylvania | 10/31/2017 | -- | Active |
| Sharon Regional Medical Center – Behavioral Health Services | d/b/a name | Pennsylvania | 5/16/2018 | -- | Active |
| Sharon Regional Medical Center - Kite strings / Pathfinders | Assumed Name | Pennsylvania | 4/21/2022 | -- | Active |
| Sharon Regional Medical Center – Kite Strings / Pathfinders | d/b/a name | Pennsylvania | 5/16/2018 | -- | Active |
| Sharon Regional Medical Center - Pathfinders / Passages | Assumed Name | Pennsylvania | 4/21/2022 | -- | Active |
| Sharon Regional Medical Center – Pathfinders Passages | d/b/a name | Pennsylvania | 5/16/2018 | -- | Active |
| Sharon Regional Medical Center Transitional Care Unit | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Behavioral Health Services & Rehab Center of Sharon Regional | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Breast Care Center of Sharon Regional | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Cancer Care Center of Sharon Regional | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Diabetes Center of Sharon Regional | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Diagnostic & Imaging Center, Hermitage | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Diagnostic & Specialty Center, Hubbard | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Family Medicine Center, Mercer | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Health and Vascular of Sharon Regional | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Heart & Vascular Center | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Outpatient Rehab Center of Sharon Regional | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Sleep Medicine Center of Sharon Regional | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Sports Medicine of Sharon Regional | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Women's Center | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward WorkMED | d/b/a name | Pennsylvania | -- | -- | Active |
| Steward Wound Care Center of Sharon Regional | d/b/a name | Pennsylvania | -- | -- | Active |

**EXHIBIT B**

**Organizational Chart**

[*Legal Organizational Chart on file with Brigade Agency Services LLC*]

WEIL:\99571730\6\76000.0003

**EXHIBIT C**

**CAPITALIZATION SCHEDULE**

| Name of Owner | Name of Issuer | Percentage of Issuer's Outstanding Shares or Other Interests Owned | Class of Stock | Number of Shares or Other Interests |
|---|---|---|---|---|
| IASIS Healthcare LLC | Arizona Diagnostic & Surgical Center, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Beaumont Hospital Holdings, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Biltmore Surgery Center Holdings, Inc. | 100% | Common | 100.0000 |
| Biltmore Surgery Center Holdings, Inc. | Biltmore Surgery Center, Inc. | 100% | Common | 100.0000 |
| Brim Holding Company, Inc. | Brim Healthcare of Texas, LLC | 76.3117% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | Brim Holding Company, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare Holdings, Inc. | Choice Care Clinic I, Inc. | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Holdings, Inc. | Choice Care Clinic II, Inc. | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Holdings, Inc. | Choice Care Clinic III, Inc. | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | Choice Care Clinic of Louisiana, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Choice Care Clinic of Utah, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Davis Hospital Holdings, Inc. | 100% | Common | 100.0000 |

| Name of Owner | Name of Issuer | Percentage of Issuer's Outstanding Shares or Other Interests Owned | Class of Stock | Number of Shares or Other Interests |
|---|---|---|---|---|
| IASIS Healthcare LLC | Davis Surgical Center Holdings, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Glenwood Specialty Imaging, LLC | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | Heritage Technologies, LLC | 70% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | IASIS Capital Corporation | 100% | Common | 1,000.0000 |
| IASIS Healthcare LLC | IASIS Finance II LLC | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | IASIS Finance III LLC | 100% | Percentage Ownership Interest | N/A |
| IASIS Finance, Inc. | IASIS Finance Texas Holdings, LLC | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | IASIS Finance, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | IASIS Glenwood Regional Medical Center, LP | 99% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Holdings, Inc. | IASIS Glenwood Regional Medical Center, LP | 1% | Percentage Ownership Interest | N/A |
| Steward Health Care System LLC | IASIS Healthcare Corporation | 100% | Common | 14,616,005.0000 |
| IASIS Healthcare LLC | IASIS Healthcare Holdings, Inc. | 100% | Common | 100.0000 |

WEIL:\99571730\6\76000.0003

| Name of Owner | Name of Issuer | Percentage of Issuer's Outstanding Shares or Other Interests Owned | Class of Stock | Number of Shares or Other Interests |
|---|---|---|---|---|
| IASIS Healthcare Corporation | IASIS Healthcare LLC | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | IASIS Management Company | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | IASIS Transco, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Indigent Care Services of Northeast Louisiana, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Jordan Valley Hospital Holdings, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Mesa General Hospital, LP | 99% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Holdings, Inc. | Mesa General Hospital, LP | 1% | Percentage Ownership Interest | N/A |
| Steward Medical Holdings LLC | Morton Hospital, A Steward Family Hospital, Inc. | 100% | Common | 100.0000 |
| Seaboard Development LLC | Mountain Point Holdings, LLC | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | Mountain Vista Medical Center, LP | 98.89% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Holdings, Inc. | Mountain Vista Medical Center, LP | 1.11% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Corporation | MT Transition LP | 99% | Percentage Ownership Interest | N/A |

WEIL:\99571730\6\76000.0003

| Name of Owner | Name of Issuer | Percentage of Issuer's Outstanding Shares or Other Interests Owned | Class of Stock | Number of Shares or Other Interests |
|---|---|---|---|---|
| IASIS Healthcare Holdings, Inc. | MT Transition LP | 1% | Percentage Ownership Interest | N/A |
| Steward Medical Holdings LLC | Nashoba Valley Medical Center, A Steward Family Hospital, Inc. | 100% | Common | 100.0000 |
| Steward Medical Holdings LLC | New England Sinai Hospital, A Steward Family Hospital, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Odessa Fertility Lab, Inc. | 100% | Common | 100.0000 |
| Steward Health Care OZ Fund, Inc. | Odessa Regional Hospital, LP | 42.5375% | Percentage Ownership Interest | 6684.00 |
| IASIS Healthcare LLC | Odessa Regional Hospital, LP | 45.1595% | Percentage Ownership Interest | 7096.00 |
| IASIS Healthcare Holdings, Inc. | Odessa Regional Hospital, LP | .85% | Percentage Ownership Interest | N/A |
| Odessa Regional Hospital, LP | Permian Basin Clinical Services, Inc. | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Holdings, Inc. | Permian Premier Health Services, Inc. | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | Physician Group of Arizona, Inc. | 100% | Common | 100.0000 |
| Brim Holding Company, Inc. | Physician Group of Arkansas, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Physician Group of Florida, Inc. | 100% | Common | 100.0000 |

| Name of Owner | Name of Issuer | Percentage of Issuer's Outstanding Shares or Other Interests Owned | Class of Stock | Number of Shares or Other Interests |
|---|---|---|---|---|
| IASIS Healthcare LLC | Physician Group of Louisiana, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare Corporation | PP Transition LP | 99% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Holdings, Inc. | PP Transition LP | 1% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | PP Transition, Inc. | 100% | Common | 100.0000 |
| Steward Medical Holdings LLC | Quincy Medical Center, A Steward Family Hospital, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Riverwoods ASC Holdco LLC | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | Seaboard Development Port Arthur LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Ohio Holdings LLC | SHC Youngstown Ohio Laboratory Services Company LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Ohio Holdings LLC | SHC Youngstown Ohio Outpatient Services LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Ohio Holdings LLC | SHC Youngstown Ohio PSC LLC | 100% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | SJ Medical Center, LLC | 79.78% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Corporation | St. Luke's Behavioral Hospital, LP | 99% | Percentage Ownership Interest | N/A |

WEIL:\99571730\6\76000.0003

| Name of Owner | Name of Issuer | Percentage of Issuer's Outstanding Shares or Other Interests Owned | Class of Stock | Number of Shares or Other Interests |
|---|---|---|---|---|
| IASIS Healthcare Holdings, Inc. | St. Luke's Behavioral Hospital, LP | 1% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Corporation | St. Luke's Medical Center, LP | 99% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Holdings, Inc. | St. Luke's Medical Center, LP | 1% | Percentage Ownership Interest | N/A |
| Steward Hospital Holdings LLC | Steward Carney Hospital, Inc. | 100% | Common | 1 |
| Steward Florida Holdings LLC | Steward CGH, Inc. | 100% | Common | 100.0000 |
| Steward Medical Group, Inc. | Steward Emergency Physicians, Inc. | 100% | Percentage Ownership Interest | N/A |
| Steward Operations Holdings LLC | Steward Fall River Management Care Services LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Florida Holdings LLC | Steward Florida ALF LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Health Care System LLC | Steward Florida Holdings LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Hospital Holdings LLC | Steward Good Samaritan Medical Center, Inc. | 100% | Common | 1.0000 |
| Steward Operations Holdings LLC | Steward Good Samaritan Occupational Health Services, Inc. | 100% | Common | 1.0000 |
| Steward Operations Holdings LLC | Steward Good Samaritan Radiation Oncology Center, Inc. | 100% | Common | 1.0000 |

WEIL:\99571730\6\76000.0003

| Name of Owner | Name of Issuer | Percentage of Issuer's Outstanding Shares or Other Interests Owned | Class of Stock | Number of Shares or Other Interests |
|---|---|---|---|---|
| Stewardship Health, Inc. | Steward Health Care Network, Inc. | 100% | Common | 1.0000 |
| Stewardship Health, Inc. | Stewardship Health Medical Group, Inc. | 100% | Percentage Ownership Interest | N/A |
| Stewardship Operations Holdings LLC | Stewardship Health, Inc. | 100% | Common | 1,000.0000 |
| Steward Health Care Holdings LLC | Steward Health Care System LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Florida Holdings LLC | Steward HH, Inc. | 100% | Common | 100.0000 |
| Steward Ohio Holdings LLC | Steward Hillside Rehabilitation Hospital, Inc. | 100% | Common | 100.0000 |
| Steward Hospital Holdings LLC | Steward Holy Family Hospital, Inc. | 100% | Common | 1.0000 |
| Steward Health Care System LLC | Steward Hospital Holdings LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Health Care System LLC | Steward Imaging & Radiology Holdings LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Health Care Network, Inc. | Steward Medicaid Care Network, Inc. | 100% | Percentage Ownership Interest | N/A |
| Steward Health Care System LLC | Steward Medical Group, Inc. | 100% | Percentage Ownership Interest | N/A |
| Steward Health Care System LLC | Steward Medical Holdings LLC | 100% | Percentage Ownership Interest | N/A |

| Name of Owner | Name of Issuer | Percentage of Issuer's Outstanding Shares or Other Interests Owned | Class of Stock | Number of Shares or Other Interests |
|---|---|---|---|---|
| Steward Florida Holdings LLC | Steward Melbourne Hospital, Inc. | 100% | Common | 100.0000 |
| Steward Operations Holdings LLC | Steward New England Initiatives, Inc. | 100% | Common | 1.0000 |
| Steward Hospital Holdings LLC | Steward Norwood Hospital, Inc. | 100% | Common | 1.0000 |
| Steward Florida Holdings LLC | Steward NSMC, Inc. | 100% | Common | 100.0000 |
| Steward Health Care System LLC | Steward Ohio Holdings LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Health Care System LLC | Steward Operations Holdings LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Health Care System LLC | Steward Pennsylvania Holdings LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Florida Holdings LLC | Steward PGH, Inc. | 100% | Common | 100.0000 |
| Steward Medical Group, Inc. | Steward Physician Contracting, Inc | 100% | Percentage Ownership Interest | N/A |
| Steward Florida Holdings LLC | Steward Rockledge Hospital, Inc. | 100% | Common | 100.0000 |
| Steward Florida Holdings LLC | Steward Sebastian River Medical Center, Inc. | 100% | Common | 100.0000 |
| Steward Pennsylvania Holdings LLC | Steward Sharon Regional Health System, Inc. | 100% | Common | 100.0000 |
| Steward Hospital Holdings LLC | Steward St. Anne's Hospital Corporation | 100% | Common | 1.0000 |

WEIL:\99571730\6\76000.0003

| Name of Owner | Name of Issuer | Percentage of Issuer's Outstanding Shares or Other Interests Owned | Class of Stock | Number of Shares or Other Interests |
|---|---|---|---|---|
| Steward Hospital Holdings LLC | Steward St. Elizabeth's Medical Center of Boston, Inc. | 100% | Common | 1.0000 |
| Steward Operations Holdings LLC | Steward St. Elizabeth's Realty Corp. | 100% | Common | 1.0000 |
| IASIS Healthcare LLC | Steward Texas Hospital Holdings LLC | 100% | Percentage Ownership Interest | N/A |
| Steward Ohio Holdings LLC | Steward Trumbull Memorial Hospital, Inc. | 100% | Common | 100.0000 |
| Steward Operations Holdings LLC | Steward Valley Regional Ventures, Inc. | 100% | Common | 1.0000 |
| Beaumont Hospital Holdings, Inc. | The Medical Center of Southeast Texas, LP | 87.3988% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Holdings, Inc. | The Medical Center of Southeast Texas, LP | 0.93045% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Corporation | TNC Transition LP | 99% | Percentage Ownership Interest | N/A |
| IASIS Healthcare Holdings, Inc. | TNC Transition LP | 1% | Percentage Ownership Interest | N/A |
| IASIS Healthcare LLC | Utah Transcription Services, Inc. | 100% | Common | 100.0000 |
| IASIS Healthcare LLC | Podiatric Physicians Management of Arizona, Inc. | 80% | Common | 800.0000 |
| Stewardship Health, Inc. | Stewardship Services Inc. | 100% | Common | 1,000.0000 |

**EXHIBIT D**

**DEBT SCHEDULE**

| | |
|---|---|
| 1. | Credit Agreement, dated as of August 4, 2023, by and among Steward Health Care System LLC, as the borrower, the other affiliates and subsidiaries of the borrower party thereto, the lenders party thereto, Sound Point Agency LLC, as administrative agent, Chamberlain Commercial Funding (Cayman) L.P., as the collateral agent, and Brigade Agency Services LLC, as the FILO agent (as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time) |
| 2. | Indebtedness under the MPT Credit Agreement, including: <br><br> • Indebtedness under that certain Third Amended and Restated Promissory Note (TRS Loan), dated as of January 22, 2024, by and between Steward Health Care System LLC, as the borrower and MPT TRS Lender-Steward, LLC (as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time)(inclusive of all tranches and as defined therein) in an outstanding principal amount equal to $ 212,267,621.53. <br><br> • Indebtedness under that certain Promissory Note, dated as of January 2, 2024, by and among Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc. and Steward Medicaid Care Network, Inc., collectively as the borrower and MPT TRS Lender-Steward, LLC (as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time, including by that First Amendment to Promissory Note (Tranche 2)  dated as of February 2, 2024)(inclusive of all tranches and as defined therein) in an outstanding principal amount equal to $ 64,389,507.33. |

3.

**Steward Health Care**

**Medicare Accelerated Advance Payment Program Loans**

| Hospital | | Loan Conversion Date | Final Payment Date | Loan Conversion Amount | Interest Rate |
|---|---|---|---|---|---|
| Carney | CAH | 11/2/2022 | Sep25 | 1,498,283 | 4% |
| Good Samaritan | CGS | 11/4/2022 | Jun23 | 0.00 | 4% |
| Holy Family | HFH | 11/1/2022 | Apr23 | 0.00 | 4% |
| NORWOOD | CNH | 11/2/2022 | Sep27 | 16,687,786 | 4% |
| Sharon | SRH | 10/27/2022 | Sep27 | 1,897,684 | 4% |
| MedCtrSETX | SET | 11/7/2022 | Sep27 | 1,586,764 | 4% |
| Wadley | WRM+WRH | 11/18/2022 | Oct24 | 300,502 | 4% |
| Scenic MTN | SSM | 10/28/2022 | Sep23 | 0.00 | 4% |
| NorthShore | NOS | 10/26/2022 | Sep27 | 4,939,471 | 4% |
| Palmetto | PGH | 10/26/2022 | Sep27 | 2,070,216 | 4% |
| Fl Med Ctr | FMC | 10/26/2022 | Sep27 | 0.00 | 4% |
| Coral Gables | CGH | 11/2/2022 | Sep27 | 3,267,259 | 4% |
| | | | | 34,210,303 | |

WEIL:\99571730\6\76000.0003

**EXHIBIT E**

**LIEN SCHEDULE**

[*Lien search results on file with Brigade Agency Services LLC*]

WEIL:\99571730\6\76000.0003

**EXHIBIT F**

**LITIGATION SCHEDULE**

1.  *Steward Health Care System LLC v. AYA Healthcare, Inc.; Suffolk County Superior Court (Mass.); Case No. 21-0513*

    This dispute arose because Aya ceased providing its contractually obligated staffing services to Steward during the pandemic.  Steward brought an action against Aya in search of a temporary restraining order and for breach of contract and related claims.  Aya in turn claims it was not paid for certain services.  This case is ongoing.  No trial date has been set.

2.  *Steward Health Care System LLC vs. CHSPSC LLC; Suffolk County Superior Court (Mass.), Case No. 1884CV03399*

    *CHS/Community Health Systems, Inc., and CHSPSC, LLC, v. Steward Health Care System LLC; In the Court of Chancery of the State of Delaware, C.A. No. 2019-0165-JRS*

    This case, in which Steward recently prevailed, arose from disputes over two transition services agreements executed in conjunction with an asset purchase agreement for eight hospitals.  Steward alleged in essence that a variety of services called for under the agreements were not properly provided; defendant alleged in essence that it was not paid for certain services provided under the agreement.  On November 1, 2023, a judge in Boston ruled that Steward should recover a net amount of approximately $3 million.  (More specifically, the judge ruled that Steward should recover approximately $10 million plus statutory interest on certain of its claims; but this must be offset by the judge's ruling in the defendant's favor on claims for approximately $7.4 million plus statutory interest and attorney's fees).  The matter remains on this list in the event of an appeal.

    CHS filed an action in Chancery Court in Delaware seeking recovery of certain claims which arise under the Asset Purchase Agreement (APA) between SHCS and CHS, including allegedly failing and refusing to pay CHS all cost report settlements received by the Company for time periods prior to closing of the APA, failing to indemnify CHS for a settlement payment made by CHS, intentionally misrepresenting to CHS that CHS owed SHCS for AP invoices, which CHS contends it paid to SHCS, and failing to pay for certain utilities that are allegedly SHSC's responsibility post-closing of the APA.  The Company denies CHS's claims and intends to defend against them vigorously.  Likewise, the Company has asserted counterclaims alleging multitudes of breaches by CHS of the APA and seeking damages of several million dollars.  The trial in this matter is scheduled for May 13-17, 2024.

3.  *Steward Health Care System LLC et al. v. Cerner Corporation; Chancery Court for Davidson County, Tennessee; Case No. 19-0625-IV*

    Steward brought this case against Cerner for gross negligence, breach of warranty, and related claims, alleging Cerner intentionally misrepresented itself in order to induce Steward to enter into a contract for an electronic health record and a billing system.  Cerner filed Counterclaims against Steward, alleging breach of contract and related claims. The matter is ongoing.

4.    *Steward Health Care System LLC et al. v. Tenet Business Services Corporation, C.A. No. 2022-0289-SG (Del. Ch. 2022)*

*Tenet Healthcare Corp. et al. v. Steward Health Care System LLC et al., C.A. No. 2022-0774-SG (Del. Ch. 2022)*

On March 25, 2022, Steward Health Care System LLC and several of its affiliates (collectively, "Steward") initiated a declaratory judgment, breach of contract, and injunctive action for contract performance against Tenet Healthcare Corporation and several of its affiliates ("Tenet") under the parties' June 16, 2021 Asset Purchase Agreement ("APA").   The parties filed cross-motions for summary judgment relating to the allocation of moneys under the Florida Direct Payment Program ("DPP") and recoupments of moneys under the Medicare Accelerated and Advanced Payment Program ("AAPP"). The Court issued its written opinion on the parties' competing cross-motions concerning DPP and AAPP issues on August 18, 2023 (the "August 18 Opinion").  In the August 18 Opinion, the Court granted Tenet's cross-motion for summary judgment on the DPP issue, ruling that, "after certain deductions, [Tenet is] entitled to approximately 10/12ths of the DPP Distributions for the period in question."  The Court declined to rule in either party's favor on the AAPP issue, but it determined that there is no dispute that Tenet owes Steward AAPP recoupments in an amount to be finally determined.

Tenet filed a motion for the Court to enter partial final judgment in its favor on the DPP issue in the amount of $27,702,819.13 under Delaware Rule of Civil Procedure 54(b) ("Rule 54(b) Motion").  Steward opposed Tenet's Rule 54(b) motion on the basis that the DPP issue cannot be severed from the parties' remaining disputes to be resolved at trial and that judgment should only enter after all disputes have been adjudicated.  The Court heard argument on the Rule 54(b) Motion on October 12, 2023 and denied Tenet's motion.  Accordingly, no final judgment has entered on the DPP issue. The matter has now been set for trial on February 7 and 8, 2024, to resolve the remaining issues, including the AAPP amounts owed by Tenet to Steward.

On August 30, 2022, Tenet filed a petition in the Delaware Court of Chancery to confirm an arbitration award in the amount of $20,325,075 against Steward relating to a purchase price adjustment under the net working capital provision of the APA.  In response to Tenet's petition to confirm, Steward moved to modify the arbitration award to account for set-offs or, in the alternative, to stay the confirmation proceeding, pending resolution of the parties' other litigation.  The Court denied Steward's motion and, on May 15, 2023, entered judgment against Steward.  Steward has appealed the denial of its motion and escrowed $23,779,662 with the Delaware court as security for staying enforcement of the judgment pending the outcome of its appeal.  The Delaware Supreme Court heard oral argument on Steward's appeal in November 29, 2023 and denied the appeal.  An amount to cover that judgment had previously been placed in escrow with the court by Steward.

5.    *Conifer Revenue Cycle Solutions, LLC v. Steward Health Care System LLC, CASE NO. 01-22-0002-5628, AAA Arbitration, Dallas, Texas*

This breach of contract action between Steward and Conifer Revenue Cycle Solutions, LLC ("Conifer"), a subsidiary of Tenet Health Care Corporation ("Tenet"), arises out of a August 1, 2021 transaction in which Steward and certain of its affiliates acquired five Miami-area hospitals from Tenet and certain of its affiliates pursuant to an Asset Purchase Agreement ("APA").  As part of this transaction, Conifer agreed to provide revenue cycle services for Steward under the Revenue

Cycle Master Services Agreement ("MSA").   On June 15, 2022, Conifer filed a Demand for Arbitration against Steward, seeking $19,385,426 in unpaid fees under the MSA.   Steward denies owing any money to Conifer.   Steward, on the other hand, has brought counterclaims against Conifer for deficient performance under the MSA, resulting in millions of dollars in losses.   The final hearing, at a confidential arbitration in Dallas, is scheduled for April 2024.

6.      *ProLink Healthcare, LLC vs. Steward Health Care System LLC.* Civil Action No. 2384CV02825. Suffolk Superior Court (Boston).

ProLink is a company that provides temporary staffing to hospitals.   It has sued, claiming unpaid fees.   The case was filed in December, and no response is due to the complaint until February.   Steward is evaluating the matter and has reserved all rights and defenses.

7.      *Jane Doe, Individually and on behalf of all others similarly situated v. Steward Health Care System LLC; Suffolk Superiro Court (Boston); C.A. No. 2384CV00174-BLS1*

A proposed class action has been filed against Steward Health Care System LLC based on its alleged use of pixel technology/tracking software on its public facing websites. The Amended Complaint alleges that, when a user enters information in the search bar or schedules an appointment, the pixel technology/tracking software simultaneously redirects the information to Meta/Facebook and Google. The Amended Complaint asserts claims for violations of the Massachusetts Wiretap Act, various privacy statutes, and breach of fiduciary duty. Virtually every hospital in the United States has utilized the same technology/software and are facing similar class action lawsuits. The case against Steward is currently pending in Massachusetts state court. Steward has filed a motion to dismiss the Amended Complaint in its entirety and the Court has not yet scheduled a hearing. Steward intends to vigorously defend the case.

**EXHIBIT G**

**IP LIST**

*[See attached]*

PATENTS

| Country | Title | App. No Reg. No. | App. Date Reg. Date | Inventors | Owner | Status | Security Interest |
|---------|-------|------------------|---------------------|-----------|-------|--------|-------------------|
| US | Method for diagnosis and documentation of healthcare information | 14670172 11710554 | Mar-26- 2015 Jul-25-2023 | Ralph De La Torre Justine M. Carr | STEWARD HEALTH CARE SYSTEM LLC | Patented | None |
| EP | Method for treating ischemic tissue | EP1625858 EP1625858 | Oct-18- 1996 Dec-31- 2008 | ISNER JEFFREY M | STEWARD RESEARCH & SPECIALTY PROJECTS ST ELIZABETHS MEDICAL CENTER OF BOSTON | Granted in Germany, France and the United Kingdom | None |
| US | Prediction, visualization, and control of drug delivery by multiple infusion pumps | 15310313 10758672 | Nov-10- 2016 Sep-1-2020 | Michael Parker, Robert A. Peterfreund, Mark A. Lovich, Nathaniel M. Sims | STEWARD ST. ELIZABETH'S MEDICAL CENTER OF BOSTON, INC. and The General Hospital Corporation | Patented | None |
| US | PREDICTION, VISUALIZATION, AND CONTROL OF DRUG DELIVERY BY INFUSION PUMPS | 14360226 9764087 | May-22- 2014 Sep-19- 2017 | Robert A. Peterfreund Michael Parker Nathaniel M. Sims Mark A. Lovich Harold J. DeMonaco | Steward St. Elizabeth's Medical Center Of Boston, Inc. and Mark A. Lovich | Patented | None |

WEIL:\99957173\6\76000.0003

| Country | Title | App. No<br>Reg. No. | App. Date<br>Reg. Date | Inventors | Owner | Status | Security<br>Interest |
|---------|-------|---------------------|------------------------|-----------|-------|--------|----------------------|
| US | Method for diagnosis and documentation of healthcare information | 18207299<br>N/A | Jun-8-2023<br>N/A | Ralph De La Torre<br>Justine M. Carr | STEWARD HEALTH CARE SYSTEM LLC | Pending | N/A |

WEIL:\99571730\6\76000.0003

**TRADEMARKS**

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| US | Health CHOICE<br><br>RN: 5874536<br>SN: 86823583 | Registered<br>Filed: November 17, 2015<br>Registered: October 1, 2019 | Int'l. Class 36:<br>Managed care insurance services and healthcare insurance administration services, namely, insurance administration in the field of Medicaid, integrated acute care and behavioral health and related governmental or private programs | Health Choice Integrated Care, LLC<br>1300 South Yale Street<br>Flagstaff, AZ 86001 | None |
| US | HEALTH CHOICE INTEGRATED CARE<br><br>RN: 5874535<br>SN: 86823560 | Registered<br>Filed: November 17, 2015<br>Registered: October 1, 2019 | Int'l. Class 36:<br>Managed care insurance services and healthcare insurance administration services, namely, insurance administration in the field of Medicaid, integrated acute care and behavioral health and related governmental or private programs | Health Choice Integrated Care, LLC<br>1300 South Yale Street<br>Flagstaff, AZ 86001 | None |
| Arizona | STEWARD MEDICAL GROUP OF ARIZONA/DESERT GROVE<br>RN: AZ 9045303 | ARIZONA -<br>Registered Last Status Received:<br>Registered, January 8, 2018<br>Registered: January 8, 2018 | Int'l Class: 35<br>(Int'l Class: 35)<br>any lawful business or activity under the laws of this state | HERITAGE TECHNOLOGIES, L.L.C. 117 Seaboard Ln Suite Bldg E<br>Franklin, TN 37067 | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---------|------------------------------------------------|--------|---------------------|------------------|-------------------|
| Arizona | DESERT GROVE FAMILY MEDICAL RN: AZ 9230528 | ARIZONA - Registered Last Status Received: Registered, July 1, 2021 Registered: July 1, 2021 | Int'l Class: 45 (Int'l Class: 45) any lawful business or activity under the laws of this state | HERITAGE TECHNOLOGIES, L.L.C. 1900 N. PEARL STREET, SUITE 2400 DALLAS, TX 75201 | None |
| Arizona | NEXT GENERATION HEALTH SERVICES RN: AZ 178102 | ARIZONA - Registered Last Status Received: Registered, July 18, 2002 Registered: July 18, 1997 Expired: July 18, 2012 | Int'l Class: 35 (Int'l Class: 35) administrative, management and consulting services | HERITAGE TECHNOLOGIES, L.L.C. 7 EAST PALO VERDE, #9 GILBERT, AZ 85296 AZ | None |
| Arizona | NGHS BILLING AND COLLECTION RN: AZ 178101 | ARIZONA - Registered Last Status Received: Registered, July 18, 1997 Registered: July 18, 1997 Expired: July 18, 2007 | Int'l Class: 35 (Int'l Class: 35) administrative, management and consulting services | HERITAGE TECHNOLOGIES, L.L.C. 7 EAST PALO VERDE, #9 GILBERT, AZ 85296 AZ | None |

WEIL:\99571730\6\76000.0003

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| Arizona | NGHS VALUATION SERVICES RN: AZ 229563 | ARIZONA - Registered Last Status Received: Registered, April 20, 2000 Registered: April 20, 2000 Expired: April 20, 2010 | Int'l Class: 35 (Int'l Class: 35) business valuation services | HERITAGE TECHNOLOGIES, LLC 7 E. PALO VERDE, SUITE 9 GILBERT, AZ 85296 AZ | None |
| Arizona | FLORENCE HOSPITAL, A CAMPUS OF MOUNTAIN VISTA MEDICAL CENTER RN: AZ 9084220 | ARIZONA - Registered Last Status Received: Registered, November 15, 2018 Registered: November 15, 2018 | Int'l Class: 35 (Int'l Class: 35) any & all lawful purposes permitted by the state of arizona | MOUNTAIN VISTA MEDICAL CENTER, L.P. 1900 N. PEARL STREET SUITE 2400 DALLAS, TX 75201 | None |
| Arizona | SENIOR EMERGENT CARE AT MOUNTAIN VISTA RN: AZ 664223 | ARIZONA - Registered Last Status Received: Registered, March 22, 2017 Registered: March 22, 2017 | Int'l Class: 35 (Int'l Class: 35) any lawful business or activity under the laws of this state. | MOUNTAIN VISTA MEDICAL CENTER, LP 117 SEABOARD LANE BLDG E FRANKLIN, TN 37067 | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| Arizona | <u>COMPREHENSIVE ORTHOPAEDIC AND SPINE CENTER</u> RN: AZ 664911 | ARIZONA - Registered Last Status Received: Registered, March 21, 2017 Registered: March 21, 2017 | Int'l Class: 44 (Int'l Class: 44) any lawful business or activity under the laws of this state. | MOUNTAIN VISTA MEDICAL CENTER, LP 117 SEABOARD LANE, BLDG E FRANKLIN, TN 37067 | None |
| Arizona | <u>SeniorAdvantage at Mountain Vista Medical Center</u> RN: AZ 9038657 | ARIZONA - Registered Last Status Received: Registered, November 1, 2017 Registered: November 1, 2017 | Int'l Class: 45 (Int'l Class: 45) Any lawful business or activity under the laws of this state | Mountain Vista Medical Center, LP 3800 N Central Ave Suite Ste 460 Phoenix, AZ 85012 | None |
| Texas | <u>COMPLETECARE</u> **COMPLETECARE** RN: TX 801437509 | TEXAS - Registered Last Status Received: Registered, August 10, 2011 Registered: August 10, 2011 | Int'l Class: 44 (Int'l Class: 44) health care clinic offering diagnostic and treatment for minor health care needs | PERMIAN PREMIER HEALTH SERVICES, INC. 520 EAST 6TH STREET ODESSA, TX 79761 TX | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---------|-----------------------------------------------|--------|---------------------|------------------|-------------------|
| Arizona | EAST VALLEY WOMEN'S MEDICAL GROUP RN: AZ 599669 | ARIZONA - Registered Last Status Received: Registered, June 4, 2014 Registered: June 4, 2014 | Int'l Class: 44 (Int'l Class: 44) healthcare services | PHYSICIAN GROUP OF ARIZONA, INC 117 SEABOARD LANE BUILDING E FRANKLIN, TN 37067 DE | None |
| Arizona | EAST VALLEY BRAIN AND SPINE SPECIALISTS RN: AZ 661719 | ARIZONA - Registered Last Status Received: Registered, February 9, 2017 Registered: February 9, 2017 | Int'l Class: 44 (Int'l Class: 44) any lawful business or activity under the laws of this state | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABOARD LANE BLDG E FRANKLIN, TN 37067 DE | None |
| Arizona | EAST VALLEY WOMEN'S MIDWIFERY GROUP RN: AZ 605755 | ARIZONA - Registered Last Status Received: Registered, September 14, 2014 Registered: September 14, 2014 | Int'l Class: 44 (Int'l Class: 44) healthcare services | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABOARD LANE BLDG E FRANKLIN, TN 37067 DE | None |

WEIL:\99571730\6\76000.0003

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| Arizona | PHYSICIAN GROUP OF ARIZONA SURGICAL SPECIALISTS RN: AZ 649069 | ARIZONA - Registered Last Status Received: Registered, July 7, 2016 Registered: July 7, 2016 | Int'l Class: 35 (Int'l Class: 35) any lawful business or activity under the laws of this state | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABOARD LANE BLDG E FRANKLIN, TN 37067 DE | None |
| Arizona | SCOTTSDALE MULTI-SPECIALTY CLINIC RN: AZ 663442 | ARIZONA - Registered Last Status Received: Registered, March 8, 2017 Registered: March 8, 2017 | Int'l Class: 35 (Int'l Class: 35) any lawful business or activity under the laws of this state | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABOARD LANE BLDG E FRANKLIN, TX 37067 DE | None |
| Arizona | EAST VALLEY RHEUMATOLOGY & OSTEOPOROSIS AT HEDLEY ORTHOPAEDIC INSTITUTE RN: AZ 643972 | ARIZONA - Registered Last Status Received: Registered, April 7, 2016 Registered: April 7, 2016 | Int'l Class: 35 (Int'l Class: 35) any lawful business or activity under the laws of this state | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABOARD LANE BUILDING E FRANKLIN, TN 37067 DE | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| Arizona | IASIS HEALTHCARE MULTI SPECIALTY CLINIC RN: AZ 637356 | ARIZONA - Registered Last Status Received: Registered, January 19, 2016 Registered: January 19, 2016 | Int'l Class: 35, 44 (Int'l Class: 35, 44) any lawful business or activity under the laws of this state | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABOARD LANE BUILDING E FRANKLIN, TN 37067 DE | None |
| Arizona | IASIS MULTI SPECIALTY CLINIC RN: AZ 637354 | ARIZONA - Registered Last Status Received: Registered, January 19, 2016 Registered: January 19, 2016 | Int'l Class: 35, 44 (Int'l Class: 35, 44) any lawful business or activity under the laws of the state | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABOARD LANE BUILDING E FRANKLIN, TN 37067 DE | None |
| Arizona | PHYSICIAN GROUP OF ARIZONA PRIMARY CARE RN: AZ 632796 | ARIZONA - Registered Last Status Received: Registered, October 15, 2015 Registered: October 15, 2015 | Int'l Class: 35 (Int'l Class: 35) any lawful business or activity under the laws of this state | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABOARD LANE BUILDING E FRANKLIN, TN 37067 DE | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| Arizona | PEAK SPORTS MEDICINE AND REHABILITATION RN: AZ 661734 | ARIZONA - Registered Last Status Received: Registered, February 9, 2017 Registered: February 9, 2017 | Int'l Class: 44 (Int'l Class: 44) any lawful business or activity under the laws of this state | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABOARD LANE FRANKLIN, TN 37067 DE | None |
| Arizona | Steward Medical Group of Arizona RN: AZ 9043096 | ARIZONA - Registered Last Status Received: Registered, December 14, 2017 Registered: December 14, 2017 | Int'l Class: 35 (Int'l Class: 35) Any lawful business or activity under the laws of this state | Physician Group of Arizona, Inc. 117 Seaboard Ln Bldg E Franklin, TN 37067 DE | None |
| Arizona | FETAL DIAGNOSTIC CENTER RN: AZ 655635 | ARIZONA - Registered Last Status Received: Registered, October 30, 2016 Registered: October 30, 2016 | Int'l Class: 35 (Int'l Class: 35) any lawful business or activity under the laws of this state | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABORD LANE BLDG E FRANKLIN, TN 37067 DE | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| Arizona | GOLDEN APPLE MEDICINE RN: AZ 646361 | ARIZONA - Registered Last Status Received: Registered, May 30, 2016 Registered: May 30, 2016 | Int'l Class: 35 (Int'l Class: 35) any lawful business or activity under the laws of this state | PHYSICIAN GROUP OF ARIZONA, INC. 117 SEABORD LN BLDG E FRANKLIN, TN 37067 DE | None |
| Arizona | Steward Medical Group Primary Care RN: AZ 9063133 | ARIZONA - Registered Last Status Received: Registered, May 24, 2018 Registered: May 24, 2018 | Int'l Class: 42 (Int'l Class: 42) Any and all lawful purposes permitted by the State of AZ | Physician Group of Arizona, Inc. 1900 N Pearl St Dallas, AZ 75201 DE | None |
| Arizona | Steward Medical Group Women's Health Associates RN: AZ 9063063 | ARIZONA - Registered Last Status Received: Registered, May 24, 2018 Registered: May 24, 2018 | Int'l Class: 45 (Int'l Class: 45) Any and all lawful purposes permitted by the State of AZ | Physician Group of Arizona, Inc. 1900 N Pearl St Dallas, TX 75201 DE | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---------|----------------------------------------------|--------|--------------------|------------------|------------------|
| Arizona | <u>Steward Orthopedic and Sports Medicine Center</u> RN: AZ 9070321 | ARIZONA - Registered Last Status Received: Registered, July 26, 2018 Registered: July 26, 2018 | Int'l Class: 35 (Int'l Class: 35) Any & all lawful purposes permitted by the State of Arizona | Physician Group of Arizona, Inc. 1900 N. Pearl Street, Suite 2400 Dallas, TX 75201 DE | None |
| Texas | <u>VIPSENIORS</u> RN: TX 050982 | TEXAS - Registered Last Status Received: Registered, April 3, 1991 Registered: April 3, 1991 EXPIRED | Int'l Class: 42 (Int'l Class: 42) southwest general hospital's senior citizens health information program; offers educational seminars, screenings, discounts, physician referral, and community referral | SOUTHWEST GENERAL HOSPITAL SAN ANTONIO, TX None TX | None |
| Texas | <u>SAFEWORKS INDUSTRIAL MEDICINE PROGRAM</u> RN: TX 050979 | TEXAS - Registered Last Status Received: Registered, April 3, 1991 Registered: April 3, 1991 EXPIRED | Int'l Class: 42 (Int'l Class: 42) industrial medicine program namely, a work-related injury program | SOUTHWEST GENERAL HOSPITAL. SAN ANTONIO, TX None TX | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| Texas | ST. LUKE'S EPISCOPAL HOSPITAL RN: TX 4820617 | TEXAS - Registered Last Status Received: Registered, January 23, 2014 Registered: February 16, 1988 | Int'l Class: 35 (Int'l Class: 35) advertising and business | ST. LUKE'S MEDICAL CENTER 6720 BERTNER HOUSTON, TX 77030 TX | None |
| Arizona | St. Luke's Medical Center, A Steward Family Hospital RN: AZ 9096728 | ARIZONA - Registered Last Status Received: Registered, February 28, 2019 Registered: February 28, 2019 | Int'l Class: 35 (Int'l Class: 35) Any & all lawful purposes permitted by the State of Arizona. | St. Luke's Medical Center LP 1900 N. Pearl St. #2500 Dallas, TX 75201 | None |
| Arizona | ACUTE REHABILITATION HOSPITAL AT ST. LUKE'S MEDICAL CENTER RN: AZ 633871 | ARIZONA - Registered Last Status Received: Registered, November 11, 2015 Registered: November 11, 2015 | Int'l Class: 44 (Int'l Class: 44) any lawful business or activity under the laws of this state | ST. LUKE'S MEDICAL CENTER, LP 117 SEABOARD LANE BUILDING E FRANKLIN, TN 37067 | None |
| Arizona | CENTER FOR ORTHOPEDIC | ARIZONA - Registered | Int'l Class: 44 (Int'l Class: 44) | ST. LUKE'S MEDICAL | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | <u>INNOVATION AT ST. LUKE'S MEDICAL CENTER</u> RN: AZ 633872 | Last Status Received: Registered, November 11, 2015 Registered: November 11, 2015 | any lawful business or activity under the laws of this state | CENTER, LP 117 SEABOARD LANE BUILDING E FRANKLIN, TN 37067 | |
| Arizona | <u>SL2 Program, Saving Limbs, Saving Lives</u> RN: AZ 9039824 | ARIZONA - Registered Last Status Received: Registered, November 13, 2017 Registered: November 13, 2017 | Int'l Class: 45 (Int'l Class: 45) Any lawful business or activity under the laws of this state | St. Luke's Medical Center, LP 117 Seaboard Ln Suite Bldg E Franklin, TN 37067 | None |
| US | <u>S and Design</u> RN: 4321430 SN: 85204762 | Registered, October 14, 2019 Office Status: Section 8 & 15- Accepted and Acknowledged Int'l Class: 41,44 First Use: November 6, 2010 Filed: December 23, 2010 Registered: April 16, 2013 | Int'l Class: 41, 44 (Int'l Class: 41) Medical educational services, namely, providing continuing medical education classes for physicians and other healthcare providers; Providing training in the field of medicine for allied medical professionals; Educational services, namely, providing classroom training in the field of medicine for the certification of allied medical | Steward Health Care System LLC (Delaware Limited Liability Company) 500 Boylston Street, BOSTON, Massachusetts 02116 United States of America | None |

**Debtors' Exhibit No. 6**
**Page 320 of 339**

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | | Register Type: Principal Register | professionals; Providing special emphasis classes for patients, namely, providing classes in the field of medicine and self-care (Int'l Class: 44)<br><br>Hospital, medical and healthcare services; Managed healthcare services; Home health care services; Health care services, namely, health care services provided through an integrated delivery system of hospitals, physicians, clinics, outpatient centers, home health agencies, nursing homes, and other allied healthcare providers and service organizations providing medical, healthcare, and health and wellness information; Providing health care information by telephone; providing a web site featuring information regarding healthcare, wellness, health services; Hospice services; Charitable services, namely, providing medical services to low income or needy persons residing in underserved communities; Social, support and community wellness services, namely, providing free blood pressure, | | |

WEIL:\99571730\6\76000.0003

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | | | HIV/AIDS, obesity management, disease management, dietary, nutritional and hepatitis screenings at health fairs; Children's medical clinics; Leasing and rental of medical equipment and supplies and consultation and advice in connection therewith | | |
| US | S and Design<br><br>RN: 4321431<br>SN: 85204779 | Registered, May 24, 2019<br>Office Status: Section 8 & 15- Accepted and Acknowledged Int'l Class: 41,44<br>First Use: November 6, 2010<br>Filed: December 23, 2010<br>Registered: April 16, 2013<br>Register Type: Principal Register | Int'l Class: 41, 44<br>(Int'l Class: 41)<br>Medical educational services, namely, providing continuing medical education classes for physicians and other healthcare providers; Providing training in the field of medicine for allied medical professionals; Educational services, namely, providing classroom training in the field of medicine for the certification of allied medical professionals; Providing special emphasis classes for patients, namely, providing classes in the field of medicine and self-care (Int'l Class: 44)<br>Hospital, medical and healthcare services; Managed healthcare | Steward Health Care System LLC (Delaware Limited Liability Company) 800 Boylston Street, BOSTON, Massachusetts 02116 United States of America | None |

WEIL:\99571730\6\76000.0003

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | | | services; Home health care services; Health care services, namely, health care services provided through an integrated delivery system of hospitals, physicians, clinics, outpatient centers, home health agencies, nursing homes, and other allied healthcare providers and service organizations providing medical, healthcare, and health and wellness information; Providing health care information by telephone; providing a web site featuring information regarding healthcare, wellness, health services; Hospice services; Charitable services, namely, providing medical services to low income or needy persons residing in underserved communities; Social, support and community wellness services, namely, providing free blood pressure, HIV/AIDS, obesity management, disease management, dietary, nutritional and hepatitis screenings at health fairs; Children's medical clinics; Leasing and rental of medical equipment and supplies and | | |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | | | consultation and advice in connection therewith | | |
| US | S STEWARD and Design  RN: 4254631 SN: 85288011 | Registered, February 19, 2018 Office Status: Section 8 & 15- Accepted and Acknowledged Int'l Class: 41,42,44 First Use: November 6, 2010 Filed: April 6, 2011 Registered: December 4, 2012 Register Type: Principal Register | Int'l Class: 41, 42, 44 (Int'l Class: 41) Medical educational services, namely, providing continuing medical education classes for physicians and other healthcare providers; Providing training in the field of medicine for allied medical professionals; Educational services, namely, providing classroom training in the field of medicine for the certification of allied medical professionals; Providing special emphasis classes for patients, namely, providing classes in the field of medicine and self-care (Int'l Class: 42) medical research services (Int'l Class: 44) Hospital, medical and healthcare services; Managed healthcare services; Home health care services; Health care services, namely, health care services provided through an integrated delivery system of hospitals, | Steward Health Care System LLC (Delaware Limited Liability Company) 111 Huntington Avenue, Suite 1800, BOSTON, Massachusetts 02199 United States of America | None |

WEIL:\99571730\6\76000.0003

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | | | physicians, clinics, outpatient centers, home health agencies, nursing homes, and other allied healthcare providers and service organizations providing medical, healthcare, and health and wellness information; Providing health care information by telephone; providing a web site featuring information regarding healthcare, wellness, health services; Hospice services; Charitable services, namely, providing medical services to low income or needy persons residing in underserved communities; Social, support and community wellness services, namely, providing free blood pressure, HIV/AIDS, obesity management, disease management, dietary, nutritional and hepatitis screenings at health fairs; Children's medical clinics; Leasing and rental of medical equipment and supplies and consultation and advice in connection therewith | | |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| US | S STEWARD and Design  RN: 4254632 SN: 85288053 | Registered, February 19, 2018 Office Status: Section 8 & 15- Accepted and Acknowledged Int'l Class: 41,42,44 First Use: November 6, 2010 Filed: April 6, 2011 Registered: December 4, 2012 Register Type: Principal Register | Int'l Class: 41, 42, 44 (Int'l Class: 41) Medical educational services, namely, providing continuing medical education classes for physicians and other healthcare providers; Providing training in the field of medicine for allied medical professionals; Educational services, namely, providing classroom training in the field of medicine for the certification of allied medical professionals; Providing special emphasis classes for patients, namely, providing classes in the field of medicine and self-care (Int'l Class: 42) medical research services (Int'l Class: 44) Hospital, medical and healthcare services; Managed healthcare services; Home health care services; Health care services, namely, health care services provided through an integrated delivery system of hospitals, physicians, clinics, outpatient centers, home health agencies, nursing homes, and other allied healthcare providers and service | Steward Health Care System LLC (Delaware Limited Liability Company) 500 Boylston Street, 5th Floor, BOSTON, Massachusetts 02116 United States of America | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | | | organizations providing medical, healthcare, and health and wellness information; Providing health care information by telephone; providing a web site featuring information regarding healthcare, wellness, health services; Hospice services; Charitable services, namely, providing medical services to low income or needy persons residing in underserved communities; Social, support and community wellness services, namely, providing free blood pressure, HIV/AIDS, obesity management, disease management, dietary, nutritional and hepatitis screenings at health fairs; Children's medical clinics; Leasing and rental of medical equipment and supplies and consultation and advice in connection therewith | | |
| US | S STEWARD COMMUNITY CARE (Stylized) | Registered, April 12, 2019 Office Status: Section 8 & 15- Accepted and | Int'l Class: 36 (Int'l Class: 36) Offering health care insurance plans, namely, underwriting, administration, and financial | Steward Health Care System LLC (Delaware Limited Liability Company) 500 Boylston Street, | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | <br>RN: 4302762<br>SN: 85605692 | Acknowledged Int'l Class: 36<br>First Use: March 1, 2012<br>Filed: April 23, 2012<br>Registered: March 12, 2013<br>Register Type: Principal Register | administration of health care insurance plans and defined contribution health care insurance plans | 5th Floor, BOSTON, Massachusetts 02116 United States of America | |
| US | S STEWARD COMMUNITY CHOICE (Stylized)<br><br>RN: 4302763<br>SN: 85605702 | Registered, April 12, 2019<br>Office Status: Section 8 & 15- Accepted and Acknowledged Int'l Class: 36<br>First Use: March 1, 2012<br>Filed: April 23, 2012<br>Registered: March 12, 2013<br>Register Type: Principal Register | Int'l Class: 36<br>(Int'l Class: 36)<br>Offering health care insurance plans, namely, underwriting, administration, and financial administration of health care insurance plans and defined contribution health care insurance plans | Steward Health Care System LLC (Delaware Limited Liability Company) 500 Boylston Street, 5th Floor, BOSTON, Massachusetts 02116 United States of America | None |
| US | STEWARD RN: 4183816<br>SN: 85126566 | Registered, November 29, 2017 Office Status: Section 8 & 15- | Int'l Class: 41, 42, 44<br>(Int'l Class: 41)<br>medical educational services, namely, providing continuing | Steward Health Care System LLC (Delaware Limited Liability Company) | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | | Accepted and Acknowledged<br>Int'l Class: 41,42,44<br>First Use: November 6, 2010<br>Filed: September 10, 2010<br>Registered: July 31, 2012<br>Register Type: Principal Register | medical education classes for physicians and other health care providers; providing training in the field of medicine for allied medical professionals; providing certificate-granting programs in the nature of classes in the field of medicine for allied medical professionals; providing special emphasis classes for patients, namely, providing classes in the field of medicine and self-care (Int'l Class: 42)<br><br>medical research services (Int'l Class: 44)<br><br>hospital, medical and healthcare services; managed healthcare services; home health care services; healthcare services provided through an integrated delivery system of hospitals, physicians, clinics, outpatient centers, home health agencies, nursing homes, and other allied healthcare providers and service organizations providing medical, healthcare, and health and wellness information; providing healthcare information by telephone; providing a web site featuring information regarding | 500 Boylston Street, BOSTON,<br><br>Massachusetts 02116<br>United States of America | |

**Debtors' Exhibit No. 6**
**Page 329 of 339**

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | | | healthcare, wellness, health services; hospice services; charitable services, namely, providing medical services to low income or needy person; philanthropic services in the area of donations of healthcare and/or medicine; social and support services and community wellness services, namely, providing free health screenings at health fairs; children's medical clinics; leasing and rental of medical equipment and supplies and consultation and advice in connection therewith | | |
| Canada | STEWARD RN: TMA878029 AN: 1514946 | Canada Registered Last Status Received: Registered, May 15, 2014 Office Status: Registered Filed: February 11, 2011 Registered: May 15, 2014 Expiration Date: May 15, 2029 | Int'l Class: 35, 41, 42, 44 (Int'l Class: 35, 41, 42, 44) Services: Medical educational services, namely, providing continuing medical education classes for physicians and other health care providers; providing training in the field of medicine for allied medical professionals; providing certificate-granting programs and classes in the field of medicine for allied medical professionals; providing special emphasis classes for patients, | Steward Health Care System LLC 299 Park Avenue New York, New York 10171, United States of America | None |

WEIL:\99571730\6\76000.0003

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---------|-----------------------------------------------|--------|---------------------|------------------|-------------------|
|  |  |  | namely, providing classes in the field of medicine and self-care; medical research services; hospitals providing healthcare services; management and administration of healthcare and home care services; healthcare services provided through an integrated delivery system of hospitals, physicians, clinics, outpatient centers, home health agencies, nursing homes, and other allied healthcare providers and service organizations providing medical, healthcare, and health and wellness information; providing healthcare information by telephone; providing a web site featuring information regarding healthcare, wellness, health services; hospice services; charitable services, namely, providing medical services to low income or needy person; philanthropic services providing healthcare and medicine; social and support services and community wellness services, namely, providing free health screenings at health fairs; children's medical clinics; leasing |  |  |

**Debtors' Exhibit No. 6**
**Page 331 of 339**

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | | | and rental of medical equipment and supplies and consultation and advice in connection therewith. | | |
| US | <u>WUESTHOFF HEALTH SYSTEM</u> RN: 3078850 SN: 78499587 Disclaimer: HEALTH SYSTEM | Renewed, November 26, 2015 Office Status: Registered and Renewed Int'l Class: 44 First Use: July, 1996 Filed: October 14, 2004 Registered: April 11, 2006 Last Renewal: April 11, 2016 Register Type: Principal Register - Sec. 2(F) | Int'l Class: 44 (Int'l Class: 44) Hospital and health care services, namely, preventive, diagnostic, therapeutic and surgical services, obstetric and gynecology services, home health care services, mental health care services, and physical rehabilitation services | Steward Health Care System, LLC (Delaware) 111 HUNTINGTON AVENUE, SUITE 1800, BOSTON, MASSACHUSETTS 02199 United States of America | None |
| US | <u>WUESTHOFF HEALTH SYSTEM</u> and Design  RN: 3078851 | Renewed, November 26, 2015 Office Status: Registered and Renewed Int'l Class: 44 First Use: July, 1996 Filed: October 14, | Int'l Class: 44 (Int'l Class: 44) Hospital and health care services, namely, preventive, diagnostic, therapeutic and surgical services, obstetric and gynecology services, home health care services, mental health care | Steward Health Care System, LLC (Delaware) 111 HUNTINGTON AVENUE, SUITE 1800, BOSTON, MASSACHUSETTS | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | SN: 78499592 Disclaimer: HEALTH SYSTEM | 2004 Registered: April 11, 2006 Last Renewal: April 11, 2016 Register Type: Principal Register | services, and physical rehabilitation services | 02199 United States of America | |
| US | CURATOR MD RRG SN: 88947521 | Allowed Filed: June 4, 2020 Allowed: February 23, 2021 | Int'l. Class 35: Business risk management in the field of professional liability Int'l. Class 36: Professional liability insurance underwriting and administration; Insurance services, namely, underwriting, issuance, managing, and administration of medical liability insurance specially prepared for, and provided to, hospitals, clinics and physicians to cover their medical professional liability exposure; Insurance services, namely, underwriting insurance and reinsurance policies for medical liability insurance | CURATOR MD RISK RETENTION GROUP, INC. 2325 E. CAMELBACK ROAD, SUITE 600 PHOENIX, ARIZONA 85016 | None |
| US | CURATOR MD RISK RETENTION GROUP | Allowed Filed: June 4, 2020 | Int'l. Class 35: Business risk management in the field of professional liability | | None |

**Debtors' Exhibit No. 6**
**Page 333 of 339**

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---------|------------------------------------------------|--------|---------------------|-------------------|-------------------|
| | SN: 88947523 | Allowed: February 23, 2021 | Int'l. Class 36: Professional liability insurance underwriting and administration; Insurance services, namely, underwriting, issuance, managing, and administration of medical liability insurance specially prepared for, and provided to, hospitals, clinics and physicians to cover their medical professional liability exposure; Insurance services, namely, underwriting insurance and reinsurance policies for medical liability insurance | CURATOR MD RISK RETENTION GROUP, INC. 2325 E. CAMELBACK ROAD, SUITE 600 PHOENIX, ARIZONA 85016 | |
| Massachusetts | NESH and Design  RN: MA 61726 | MASSACHUSETTS - Renewed Last Status Received: Renewed, July 15, 2012 Registered: July 15, 2002 | Int'l Class: 42 (Int'l Class: 42) hospital and related health care services and all services incident thereto | NEW ENGLAND SINAI HOSPITAL YORK STREET STOUGHTON, MA 02072 MA | None |
| Arizona | East Valley Rheumatology & Osteoporosis at | ARIZONA - Registered Last Status | Int'l Class: 35 (Int'l Class: 35) | PHYSICIAN GROUP OF ARIZONA, INC. | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | Steward Orthopedic & Sports Medicine Center RN: AZ 9074382 | Received: Registered, August 27, 2018 Registered: August 27, 2018 | Any and all lawful purposes permitted by the State of AZ | 1900 N Pearl St Suite 2400 Dallas, TX 75201 DE | |
| Arizona | FETAL DIAGNOSTIC CENTER RN: AZ 9329174 | ARIZONA - Registered Last Status Received: Registered, April 14, 2023 Registered: April 14, 2023 | Int'l Class: 35 (Int'l Class: 35) Any and all lawful purposes permitted by the state of AZ | PHYSICIAN GROUP OF ARIZONA, INC. 1900 N PEARL ST. SUITE 2400 DALLAS, TX 75201 DE | None |
| Arizona | STEWARD MEDICAL GROUP OF ARIZONA RN: AZ 9329074 | ARIZONA - Registered Last Status Received: Registered, April 13, 2023 Registered: April 13, 2023 | Int'l Class: 35 (Int'l Class: 35) Any and all lawful purposes permitted by the state of Arizona | PHYSICIAN GROUP OF ARIZONA, INC. 1900 N PEARL ST. SUITE 2400 DALLAS, TX 75201 DE | None |
| Arizona | PHOENIX HEART CENTER RN: AZ 9329070 | ARIZONA - Registered Last Status Received: | Int'l Class: 35 (Int'l Class: 35) Any and all lawful purposes permitted by the state of Arizona | PHYSICIAN GROUP OF ARIZONA, INC. 1900 N PEARL ST. | None |

| Country | Trademark, Application and Registration Number | Status | Full Goods/Services | Owner Information | Security Interest |
|---|---|---|---|---|---|
| | | Registered, April 13, 2023<br>Registered: April 13, 2023 | | SUITE 2400<br>DALLAS, TX 75201<br>DE | |

**COPYRIGHTS**

| Title of Work | Registration No. | Copyright Claimant |
|---|---|---|
| Abdominal epilepsy annotated bibliography, 1944-1978 / by A. Majid Pathan | TX0000312407 | A. Majid Pathan (series: Southwest General Hospital Medical Library publication ; no. 1) |
| Caritas assessment system: phase I | TX6521753 | Steward Health Care System LLC |
| Caritas assessment system: phase II | TX6521751 | Steward Health Care System LLC |
| Caritas assessment system: phase III | TX6521752 | Steward Health Care System LLC |
| LifeSource : a health education center | TXu628032 | Texarkana Memorial Hospital, Inc. (TX) (dba Wadley Regional Medical Center) |
| LifeSource : a health education center | TXu616142 | Texarkana Memorial Hospital, Inc. (TX) (dba Wadley Regional Medical Center) |
| LifeSource, a health education center quality assurance manual | TXu627974 | Texarkana Memorial Hospital, Inc. (TX) (dba Wadley Regional Medical Center) |
| Massachusetts risk management survey | PA689284 | Steward Health Care System, LLC |
| Micronutrients website (micronutrients.net) | Unknown | Heritage Technologies, LLC |
| Multidisciplinary plans for care of the patient | TXu642168 | Steward St. Elizabeth's Medical Center of Boston, Inc. |
| Nursing clinical career ladders : New England Sinai Hospital and Rehabilitation Center. | TXu000757434 | New England Sinai Hospital and Rehabilitation Center (Stroughton, MA)<br><br>(released – V9940D278) |
| The stork exchange: month 3 | TX1705163 | Jordan Valley Medical Center, LP<br><br>Security Lien held by:<br>CitiBank, NA |
| The Norwood Hospital calendar: health tips for...Serial Publication Year: 1981 | TX 953-073 | Steward Norwood Hospital, Inc.<br><br>Assignment from Caritas Norwood Hospital, Inc. to Steward Norwood Hospital, Inc.; recorded 3/24/2011; V3601D288 P1-9 |

| Title of Work | Registration No. | Copyright Claimant |
|---|---|---|
| The Norwood Hospital calendar: health tips for...Serial Publication Year: 1982. | | Steward Norwood Hospital, Inc.<br><br>Assignment from Caritas Norwood Hospital, Inc. to Steward Norwood Hospital, Inc.; recorded 3/24/2011; V3601D288 P1-9 |

**EXHIBIT H**

**IRS FORM W-9**

*[W-9s of Credit Parties on file with Brigade Agency Services LLC]*

WEIL:\99571730\6\76000.0003