### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |
| | § | |

### EMERGENCY MOTION OF DEBTORS FOR ENTRY
### OF AN ORDER (I) APPROVING (A) GLOBAL BIDDING
### PROCEDURES FOR SALES OF THE DEBTORS' ASSETS, (B) FORM AND
### MANNER OF NOTICE OF SALES, AUCTIONS, AND SALE HEARINGS, AND
### (C) ASSUMPTION AND ASSIGNMENT PROCEDURES AND FORM AND
### MANNER OF NOTICE OF ASSUMPTION AND ASSIGNMENT; (II) AUTHORIZING
### DESIGNATION OF STALKING HORSE BIDDERS; (III) SCHEDULING
### <u>AUCTIONS AND SALE HEARINGS; AND (IV) GRANTING RELATED RELIEF</u>

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 1:00 P.M. (CENTRAL TIME) ON JUNE 3, 2024.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, OR BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST RESPOND IN WRITING.  UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ BY NO LATER THAN 4:00 P.M. (CENTRAL TIME) ON MAY 30, 2024.  IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK BY NO LATER THAN 4:00 P.M. (CENTRAL TIME) ON MAY 30, 2024.  OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 3, 2024 AT 1:00 P.M. (CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.**

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

> **YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY.  YOU MAY ACCESS THE FACILITY AT 832-917-1510.  ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER.  JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS.  TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE.  SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Steward Health Care System LLC ("**SHC**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

<u>**Preliminary Statement**</u>

1.     The foundation of these chapter 11 cases is the continuation of the Debtors' prepetition strategic sale process and dual-path reorganization efforts to implement, among other things, value-maximizing going concern transactions that will preserve the Debtors' operations for the benefit of the communities they serve, including their patients, employees, physicians, and suppliers.   The Debtors have secured a credit facility for new-money debtor-in-possession financing (the "**DIP Facility**") and agreed use of cash collateral to continue operating in the ordinary course of business while pursuing going concern sale or reorganization transactions that will provide significant recoveries to creditors and ensure the preservation of the Debtors' critical health care operations.

2.      Prior to the Petition Date, overseen by a special committee (the "**Transformation Committee**") of the board of managers (the "**Board**") of Steward Health Care Holdings LLC (comprised of John R. Castellano, the Debtors' Chief Restructuring Officer, as well as independent and disinterested managers with considerable restructuring experience, William Transier and Alan Carr), and assisted by independent investment banks, Leerink Partners LLC ("**Leerink Partners**") and Cain Brothers ("**Cain**") (the Debtors' proposed healthcare investment bankers in these chapter 11 cases), the Debtors commenced a strategic process to market substantially all of their material assets (the "**Assets**"), including (a) assets related to *Stewardship Health*, the Debtors' risk-based payor contracting network and related primary care practices (collectively, "**Stewardship Health**," and such assets, the "**Stewardship Assets**"), and (b) the Debtors' hospital operations in Massachusetts, Arizona, Ohio, Pennsylvania, Arkansas, Louisiana, Texas, and Florida (the **"Hospitals"**).[2] The Transformation Committee has the sole and exclusive authority to, among other things, oversee the administration of these chapter 11 cases and approve transactions on behalf of the Board, including sale and restructuring transactions.

3.      Prior to the Petition Date, Cain and Leerink Partners conducted a broad market outreach with respect to Stewardship Health and the Hospitals, contacting over 250 potential bidders in the aggregate.  The market solicitation process has yielded significant interest in the Debtors' assets and the Debtors are engaged in active discussions with numerous bidders interested in continuing to operate the Debtors' hospitals and value-based care business.  Indeed, as of the date hereof, the Debtors:

- have executed a letter of intent and are in advanced discussions with Collaborative Care Holdings, LLC, an affiliate of UnitedHealth Group Incorporated ("**United**") to act as a stalking horse purchaser for the Stewardship

---

[2]   A complete list of the Debtors' Hospitals available for sale pursuant to the Global Bidding Procedures is annexed to the Global Bidding Procedures as **Schedule 1**.

Health business (and other buyers remain interested in placing Bids on these assets);

- have received attractive indications of interest from multiple potential buyers for its Southern Massachusetts and Arizona hospital operations;

- are in discussions with various third-parties interested in purchasing and operating the Debtors' hospitals in Northern Massachusetts, as well as with state officials and regulators to facilitate the transition of such hospitals to new operators;

- have generated interest in the Debtors' hospitals in Arkansas, Louisiana, Ohio, Pennsylvania, and Texas;

- have launched a market solicitation process for the Debtors' hospitals in Florida to explore a sale or reorganization around such hospital operations; and

- are exploring potential sales of other assets for marketing in the near term.

4.     To continue the momentum of the prepetition marketing process and ensure the preservation of the jobs of the Debtors' workforce of approximately 30,000 individuals, in consultation with a number of the Debtors' key stakeholders, the Debtors have developed global bidding and auction procedures to govern the sale of the Stewardship Assets, the Debtors' Hospitals, and certain other assets in the Debtors' discretion (collectively, the "**Other Assets**" of the Debtors) attached as **Exhibit 1** to the Bidding Procedures Order (as defined herein) (the "**Global Bidding Procedures**").

5.     Under the Global Bidding Procedures, parties may submit bids (including stalking horse bids) for: (a) the Stewardship Assets; (b) one or more of the Debtors' Hospitals, in any combination; and/or (c) the Debtors' Other Assets. The Global Bidding Procedures are deliberately flexible, aimed at preserving operations and jobs and generating the greatest level of interest and the highest or best value for all of the Debtors' Assets while complying with the milestones under the DIP Facility.  The Global Bidding Procedures are designed to continue to promote a competitive and robust bidding process, while allowing the Debtors to implement sale

4

transactions on an expedited basis.  At the same time, the Global Bidding Procedures are uniform, providing clarity to the bidding and auction process by establishing global dates for submitting bids, conducting auctions, and approving sales.

6.      A summary of the proposed bidding timeline for the Debtors' assets is outlined below:

| Proposed Date[3] | Stewardship Health | First Round Hospitals[4] | Second Round Hospitals[5] | Other Assets |
|---|---|---|---|---|
| **Bid Deadline** | June 24, 2024 | June 24, 2024 | July 26, 2024 | July 26, 2024 |
| **Auction** | June 27, 2024 | June 27, 2024 | July 30, 2024 | July 30, 2024 |
| **Sale Hearing** | July 2, 2024 | July 2, 2024 | August 5, 2024 | August 5, 2024 |

7.      The Debtors are confident that the Debtors' postpetition market solicitation process and bidding procedures will ensure continued patient care, facilitate the sale of the Assets in the highest or otherwise best transactions, preserve as many jobs as possible for the Debtors' dedicated employees and maximize recoveries for creditors.

## Background

8.      On May 6, 2024, (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[3]    Or such earlier or later date designated by the Debtors after consultation with the Consultation Parties.

[4]    "**First Round Hospitals**" refers to all of the Debtors' Hospitals except for those in Florida.

[5]    "**Second Round Hospitals**" refers to the Debtors' Hospitals in Florida.

No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

9.      These cases are jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

10.     The Debtors own and operate the largest private physician-owned for-profit healthcare network in the United States.  Headquartered in Dallas, Texas, the Debtors' operations include 31 hospitals across eight states, approximately 400 facility locations, 4,500 primary and specialty care physicians, 3,600 staffed beds, and a company-wide workforce of nearly 30,000 employees.  The Debtors' provide care to more than two million patients annually.

11.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* (Docket No. 38) (the "**First Day Declaration**"), and incorporated herein by reference.[6]

**Jurisdiction**

12.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[6]     The Debtors intend to file declarations in support of this Motion at least seven (7) days in advance of the hearing on this Motion.

## **Relief Requested**

13.     By this Motion, pursuant to sections 105(a), 363, 365, and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014, and Bankruptcy Local Rules 2002-1 and 9013-1, the Debtors request entry of:

(a)     the "**Bidding Procedures Order**," substantially in the form annexed hereto as **Exhibit A**,[7]

    (i)     authorizing and approving the Global Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 1**, in connection with the sale of the Assets (each transaction, a "**Sale Transaction**");

    (ii)     authorizing the Debtors to designate one or more stalking horse bidders (each, a "**Stalking Horse Bidder**" and, each such bidder's bid, a "**Stalking Horse Bid**") and offer each such Stalking Horse Bidder certain bid protections (collectively, the "**Stalking Horse Bid Protections**");

    (iii)     scheduling auctions for the Assets (each, an "**Auction**");

    (iv)     scheduling one or more hearings (each, a "**Sale Hearing**") to consider approval of the proposed Sale Transactions;

    (v)     authorizing and approving (1) notice of Auctions, sales of the Assets, and the Sale Hearings, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "**Sale Notice**"); and (2) notice to each non-Debtor counterparty (each, a "**Contract Counterparty**") to an executory contract or unexpired lease of non-residential real property of the Debtors (each, a "**Contract**") regarding the potential assumption and assignment of such Contracts and the Debtors' calculations of the amount necessary to cure any monetary defaults under such Contracts (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "**Cure Notice**");

    (vi)     authorizing and approving procedures for the assumption and assignment of certain Contracts in connection with the Sale Transactions, as applicable (collectively, the "**Assigned Contracts**") and determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and

    (vii)     granting related relief;

---

[7]     Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bidding Procedures Order, the Global Bidding Procedures, and/or the First Day Declaration, as applicable.

(b)     orders (each, a "**Sale Order**") authorizing and approving the following:

    (i)     the sale of Assets free and clear of all liens, claims, interests, and encumbrances, except certain permitted encumbrances as determined by the Debtors and any purchaser of the Assets, with liens to attach to the proceeds of the applicable Sale Transactions;[8] and

    (ii)     the assumption and assignment of executory contracts and/or unexpired leases of the Debtors that are to be assumed and assigned as part of the applicable Sale Transactions; and

(c)     granting related relief.

### Prepetition Marketing and Sale Process

14.     Since January, all of the Debtors' sale efforts (including with respect to Stewardship Health and the Debtors' Hospitals) have been overseen and managed by the Transformation Committee comprised of John R. Castellano, the Debtors' Chief Restructuring Officer, as well as William Transier and Alan Carr—independent and disinterested managers with considerable restructuring experience—advised by the Debtors' experienced restructuring professionals and healthcare investment bankers.  The Transformation Committee has the sole and exclusive authority to, among other things, oversee the administration of these chapter 11 cases and approve transactions on behalf of the Board, including all sale and restructuring transactions. With the assistance of the Transformation Committee and the Debtors' other advisors, including their two industry-leading healthcare investment bankers, the Debtors ran a prepetition marketing and sale process that was designed to maximize market participation with the goal of achieving the highest or best offers for the Debtors' assets.  With this goal in mind, the Debtors encouraged bids from all interested parties and did not exclude any parties from the process, nor preclude any potential transaction structure.

---

[8]     A proposed form of Sale Order is annexed hereto as **Exhibit B**.

15.     Yet notwithstanding that there are experienced professionals overseeing and leading the process, certain parties, including the Commonwealth of Massachusetts, have elected to lodge completely unsubstantiated criticisms about the Debtors' sale process (*see* Docket No. 61).   Although frustration with the Debtors' financial circumstances and the need to commence these chapter 11 cases is understandable, filing unfounded and unsubstantiated pleadings at a time when a team of experienced and independent professionals and directors have been and are continuing to run a process (and who have managed similar processes across multiple venues in a myriad of complex chapter 11 cases) that will benefit all stakeholders, is neither appropriate nor will it be tolerated by the Debtors.   As described below, and as will be demonstrated by declarations and any other evidence in support of this Motion, the Debtors and their advisors have been squarely focused on, and will continue to be focused on maximizing value and delivering positive outcomes for their constituents, including the Debtors' patients, employees, vendors, communities, and creditors, through the pursuit of value-maximizing sale and restructuring transactions.

## A.  *Prepetition Sale Process for Stewardship Health*

16.     The Debtors' pursuit of going concern sale transactions began in the fourth quarter of 2023.  At that time, following extensive discussions with management and the Debtors' advisors, including Leerink Partners, Lazard Frères & Co. ("**Lazard**"), the Debtors' proposed restructuring investment banker, and AlixPartners LLP ("**Alix**"), the Debtors' financial advisor, the Debtors began exploring strategic alternatives to unlock value with respect to Stewardship Health.  Beginning in December 2023, Leerink Partners initiated a marketing process for the sale of Stewardship Health, contacting approximately 40 potential buyers.

17.     In connection with the solicitation, the Debtors and their advisors prepared, among other things, comprehensive marketing materials and an electronic data room to provide potential investors and bidders with adequate information upon which to make a proposal for Stewardship Health.  The Debtors received a number of indications of interest (the "**Stewardship IOIs**") for Stewardship Health which the Debtors evaluated, analyzing, among other considerations:   (i) the structure of the proposed transaction; (ii) the form and amount of consideration offered; (iii) the assets to be acquired and the liabilities to be assumed; and (iv) execution risk, including with respect to any conditions placed on the bid and funding ability. The Debtors met regularly with their advisors and the Transformation Committee and consulted with their key stakeholders before and after the Stewardship IOIs were submitted.

18.     After extensive deliberations with their advisors, the Transformation Committee, and the Debtors' stakeholders, and after lengthy engagement and several rounds of negotiations with bidders, the Debtors identified United as the leading bidder and engaged with United regarding a letter of intent, which the Debtors and United executed on March 19, 2024. The Debtors then engaged with United on a dual path pursuing both an out of court or in court stalking horse purchase agreement with respect to the Stewardship Assets.   In the midst of negotiating such agreement, the Debtors commenced these chapter 11 cases to secure the DIP Facility and continue to negotiations regarding a stalking horse purchase agreement postpetition. The Debtors hope to be able to announce a stalking horse agreement in the near-term with respect to Stewardship Health that will provide for a floor value and maximize the value of the Stewardship Assets for the benefit of the Debtors' estates.

**B.  *Prepetition Sale Process for the Hospitals***

19.    Soon after launching the prepetition marketing process for Stewardship Health, in January 2024, with the assistance of Cain, the Debtors commenced a robust prepetition marketing process for certain of the Hospitals with the goal of continuing critical operations at the Debtors' core Hospitals while maximizing value by selling certain non-core Hospitals, including the Debtors' Hospitals in Arizona, Arkansas, Louisiana, Ohio, Pennsylvania, and Southern Massachusetts.  In February 2024, Leerink Partners initiated a marketing effort for the sale of the Debtors' Hospitals in Northern Massachusetts.  In March 2024, Cain began to market the Debtors' Hospitals in Texas and in April 2024, Leerink Partners initiated a marketing effort for the sale of the Debtors' Hospitals in Florida.

20.    As part of this prepetition process, Cain contacted 179 potential buyers and Leerink Partners contacted 80 potential buyers, including for-profit and not-for-profit organizations, that were considered likely participants in a sale process of the Hospitals within their respective marketing scopes, and provided such parties with marketing materials.  Prior to the Petition Date, the Debtors received numerous indications of interest for their Hospitals and met regularly with their advisors and the Transformation Committee and consulted with certain of their key stakeholders on a regular basis.  The Debtors expect that additional parties will become aware of the sale of the Hospitals through the chapter 11 process, thus driving more interest in the Hospitals.

<u>**Need for a Timely Sale Process**</u>

21.    Appreciating their limited prepetition liquidity and the milestones that likely would govern the postpetition sale process under the Debtors' DIP Facility, the Debtors accomplished as much as possible prior to the commencement of these cases.  With advanced

discussions towards a Stalking Horse Bid for the Stewardship Assets, and months of prepetition marketing under their belt, the Debtors are prepared to execute the remaining portion of their sale process, which will include a postpetition marketing campaign led by Leerink Partners and Cain, consistent with the terms of the Global Bidding Procedures.

22.     It cannot be overemphasized that time is of the essence.   Given the significant costs associated with the ongoing operations of the Debtors' businesses and the Debtors' current financial circumstances, the Debtors and DIP Lender have agreed to milestones (the "**Milestones**")[9] for the sale process.  Specifically, the Debtors and the DIP Lender have agreed to the following sale process Milestones:

| Milestones[10] | | |
|---|---|---|
| *Milestone* | *First Round Hospitals* | *Second Round Hospitals* |
| Bid Deadline | June 25, 2024 | July 26, 2024 |
| Auction | June 28, 2024 | July 30, 2024 |
| Sale Hearing | July 2, 2024 | August 2, 2024 |

23.     Access to the DIP Facility is critical to the Debtors' ability to continue their operations and manage their bankruptcy estates through the conclusion of the sale process.  Failure to adhere to the Milestones could jeopardize the Debtors' access to cash under the DIP Facility and, in turn, compromise the Debtors' chapter 11 strategy and ability to maximize recoveries for

---

[9]     In the event of any inconsistencies between the provisions of the DIP Documents and the general description of the Milestones in this Motion, the DIP Documents shall control.

[10]    The DIP Facility also contemplates milestones for (i) the execution of a stalking horse agreement for Stewardship Health on or prior to a date reasonably satisfactory to the DIP Lender, (ii) the execution of a stalking horse agreement on or prior to May 31, 2024 with respect to Mountain Vista Medical Center, Steward Emergency Center, Florence Hospital, Tempe St. Luke's Hospital, Southeast Texas (Port Arthur), and St. Joseph Medical Center, (iii) the execution of a stalking horse agreement on or prior to June 30, 2024 with respect to Melbourne Regional Medical Center, Rockledge Regional Medical Center, and Sebastian River Medical Center, and (iv) the consummation of the Hospital sales by a date reasonably acceptable to the DIP Lender (taking into account regulatory approvals).

creditors. In light of the foregoing, the Debtors believe that the proposed timeline is both reasonable and necessary under the circumstances of these chapter 11 cases.

<u>**Designation of Stalking Horse Bidders**</u>

24.     Based on the progress achieved thus far in the Debtors' marketing process, and on the advice and counsel of the Debtors' advisors, the Debtors have determined, in their reasonable business judgment, that having the flexibility to designate Stalking Horse Bidders for the Stewardship Assets, the Hospitals and the Other Assets will enhance the Debtors' ability to maximize value of the Debtors' Assets and is in the best interests of their estates.

25.     Accordingly, as set forth in further detail in the Global Bidding Procedures, the Debtors request authority to enter into asset purchase agreements with Stalking Horse Bidders (each such agreement, a "**Stalking Horse Agreement**"), pursuant to which the Debtors would provide Stalking Horse Bidders with certain bid protections (the "**Stalking Horse Bid Protections**") where the Debtors determine, in the exercise of their reasonable business judgment, that setting a floor for the Stewardship Assets, the Hospitals and the Other Assets is in the best interests of their estates and creditors. Specifically, the Debtors propose to offer each Stalking Horse Bidder a break-up fee in an amount that shall not exceed three percent (3%) of the purchase price (including the value of assumed liabilities) in the applicable Stalking Horse Bid and expense reimbursement subject to a cap to be agreed upon by the Debtors (after consultation with the Consultation Parties), and the applicable Stalking Horse Bidder (collectively, a "**Termination Payment**") subject to notice and an opportunity for parties in interest to object. In accordance with the noticing procedures outlined below (the "**Noticing Procedures**"), upon the designation of a Stalking Horse Bidder, the Debtors either will include in the Sale Notice the material terms of the applicable Stalking Horse Agreement, and shall file with the Court, serve on the Sale Notice

Parties (as identified and defined herein), and cause to be published on the website maintained by Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.ra.kroll.com/Steward (the "**Kroll Website**"), an addendum to the Sale Notice containing such information (each, a "**Notice of Stalking Horse Bidder**").

26.     Parties in interest who wish to object to the provision of Stalking Horse Bid Protections will be afforded an opportunity to file with the Court and serve on the applicable Objection Notice Parties (as identified and defined in the Global Bidding Procedures), an objection (each, a "**Stalking Horse Objection**") within three (3) calendar days after service of the Sale Notice or relevant Notice of Stalking Horse Bidder, as applicable.  If a timely Stalking Horse Objection is filed, the proposed Stalking Horse Bid Protections will not be approved until either the Stalking Horse Objection is resolved or it has been approved upon further order of the Court. Under the Global Bidding Procedures, in the absence of a Stalking Horse Objection, the Debtors' entry into the applicable Stalking Horse Agreement and provision of the Stalking Horse Bid Protections, including the Termination Payment, will be made effective through entry of a Court order, which the Debtors may obtain upon notice of presentment.

27.     Given the urgency of the Debtors' need to maximize value for creditors through timely and efficient Sale Transactions, the ability to designate Stalking Horse Bidders and offer such bidders Stalking Horse Bid Protections is justified and appropriate.

**Global Bidding Procedures**

**A.  Overview**

28.     The Global Bidding Procedures are designed to promote a competitive and expedient sale process.  The Global Bidding Procedures describe, among other things, procedures

14

for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auctions (if any), the selection and approval of the ultimately successful bidder, and the deadlines with respect to the foregoing Global Bidding Procedures.  If approved, the Global Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for the Assets on a schedule consistent with the Debtors' chapter 11 strategy.  As the Global Bidding Procedures are attached to the Bidding Procedures Order, they are not herein restated in their entirety.

### B.  Key Dates and Deadlines

29.    Consistent with the Milestones and the Debtors' need to consummate a sales of their Assets as quickly and efficiently as possible, the Debtors propose the following key dates and deadlines for the sale process:[11]

| Deadline | Stewardship Health & First Round Hospitals | Second Round Hospitals & Other Assets |
|---|---|---|
| **Cure Notice Deadline** | Five (5) Business Days after Entry of Bidding Procedures Order | July 3, 2024 |
| **Cure Objection Deadline** | 10 Days after Service of Initial Cure Notice | July 13, 2024* |
| **Bid Deadline** | June 24, 2024* | July 26, 2024* |
| **Qualified Bid and Baseline Bid Designation Date** | June 26, 2024* | July 29, 2024* |
| **Auction** | June 27, 2024* | July 30, 2024* |

---

[11]    The Debtors will have the ability to alter the Global Bidding Procedures based on the exigencies of a given situation if the Debtors determine, in their business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties (as defined in the Global Bidding Procedures), that it is reasonable to do so.

| Deadline | Stewardship Health & First Round Hospitals | Second Round Hospitals & Other Assets |
|---|---|---|
| **Notice of Auction Results Deadline (*if Auction held*)** | June 30, 2024* | August 1, 2024* |
| **Adequate Assurance Objection Deadline and Sale Objection Deadline[12]** | July 1, 2024* | August 4, 2024* |
| **Sale Hearing** | July 2, 2024* | August 5, 2024* |

*Or such earlier or later date designated by the Debtors after consultation with the Consultation Parties*

30.     The time periods set forth in the Global Bidding Procedures are reasonable. Under the proposed timelines, subject to the identification of a Stalking Horse Bidder, there will be at least 48 days between the filing of this Motion and the deadlines to object to the Sale Transactions. Additionally, the deadlines for the submission of any and all bids on the applicable Assets are as follows (each, a "**Bid Deadline**"):[13]

| Assets | Bid Deadline |
|---|---|
| Stewardship Assets | June 24, 2024 at 5:00 p.m. (prevailing Central Time) |
| First Round Hospitals | June 24, 2024 at 5:00 p.m. (prevailing Central Time) |
| Second Round Hospitals | July 26, 2024 at 5:00 p.m. (prevailing Central Time) |
| Other Assets | July 26, 2024 at 5:00 p.m. (prevailing Central Time) |

31.     The Bid Deadlines will provide parties with sufficient time to formulate bids to purchase any Assets.  The Debtors' Assets were marketed (in certain cases, extensively) prior to the Petition Date, and for a number of markets, information regarding the Assets has been

---

[12]    To the extent the Debtors designate a Stalking Horse Bidder and serve the applicable Notice of Stalking Horse Bidder on the Sale Notice Parties (each as defined herein), the Adequate Assurance Objection Deadline and the Sale Objection Deadline shall be the earlier of (i) 21 days following service of the Notice of Stalking Horse Bidder and (ii) the dates here listed.

[13]    Or such earlier or later date designated by the Debtors after consultation with the Consultation Parties.

made available in an electronic data room during the process.  With respect to the assets with the earliest Bid Deadlines, including the Stewardship Assets and certain of the Hospitals, many parties that may have an interest in bidding on such assets at the applicable Auction likely have already begun conducting diligence and evaluating the Assets and will not be bidding in a vacuum.  In addition, (i) potential bidders who have not previously conducted diligence on the Assets will have immediate access to, subject to the execution of an appropriate confidentiality agreement, information regarding the Assets, and (ii) for those Assets which have not been marketed extensively prior to the Petition Date, including the Second Round Hospitals and certain Other Assets of the Debtors, the bid deadline is not for another 72 days (nearly two-and-a-half (2.5) months after the date hereof).

### C.  Treatment of MPT Property

32.     The Debtors conduct substantially all of their hospital operations on real property owned by MPT Operating Partnership, L.P. or one or more of its affiliates (as applicable, individually or collectively, "**MPT Lessor**") subject to certain master lease agreements, which provide that such leases are true operating leases and are not severable as to any particular property absent the consent of the applicable MPT Lessor(s).  Importantly, the Global Bidding Procedures provide flexibility for potential bidders to indicate the proposed treatment of such real property in their bid.  To avoid any ambiguity, the Debtors intend to solicit Bids for the Debtors' operations separately from real estate.

### D.  Notice Procedures

33.     The Debtors request that the Court approve the form and matter of the Sale Notice and the Cure Notice (collectively, the "**Notices**"), each attached to the proposed Bidding Procedures Order.  The Debtors submit that service of the Notices as set forth below (the "**Notice**

**Procedures**") is proper and sufficient to provide notice of the applicable Auctions, the deadlines to object to the Sale Transactions, the assumption and assignment of contracts and leases in connection therewith, and the Sale Hearings to all known and unknown parties.

34.     The Debtors propose that within seven (7) days after entry of the Bidding Procedures Order, the Debtors shall file on the docket and serve the Sale Notice, the Bidding Procedures Order, and the Global Bidding Procedures, by first-class mail, postage prepaid; *provided* that to the extent email addresses are available for any of the foregoing parties, such parties may be served by email, upon the following parties (collectively, the "**Sale Notice Parties**"):

(a)     all entities that have, to the best of the Debtors' management and advisors' knowledge, expressed written interest in consummating the applicable Sale Transaction with respect to the applicable Assets within the past twelve (12) months;

(b)     all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the applicable Assets;

(c)     counsel to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "**Creditors' Committee**");

(d)     counsel to the DIP Lender, Prepetition MPT Secured Party, and MPT Lessors, KTBS Law LLP, 1801 Century Park E #2600, Los Angeles, California 90067 (Attn: Thomas E. Patterson, Esq. and Sasha M. Gurvitz, Esq.);

(e)     counsel to the ABL Lenders, Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (Attn:  Kristopher M. Hansen, Esq., Christopher Guhin, Esq.);

(f)     counsel to Siemens Financial Services, Inc., Otterbourg P.C., 230 Park Avenue, New York, New York 10169 (Attn: Andrew Kramer, Esq.);

(g)     counsel to the FILO Lenders, Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Dennis Dunne, Esq., Michael Price, Esq., Andrew Harmeyer, Esq., Brian Kinney, Esq.);

(h)     counsel to any applicable Stalking Horse Bidder; and

(i)     the U.S. Trustee.

35.     The Notice Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the deadlines to object to any Sale Transaction, the Bid Deadlines, and the time and location of the Auctions and the Sale Hearings.  Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances, and comply with the requirements of Bankruptcy Rule 2002.

### Assumption and Assignment Procedures

36.     The Assumption and Assignment Procedures set forth in the Bidding Procedures Order will, among other things, govern the Debtors' provision of notice to all Contract Counterparties of Cure Costs in connection with the transfer of Contracts as part of the Sale Transactions.  In accordance with the timelines set forth in paragraph 29 (above), the Debtors will file the Cure Notices with the Court and serve the Cure Notices on the Contract Counterparties, which will be specified in the applicable Cure Notice.

37.     Objections, if any, to any proposed Cure Costs set forth on the Cure Notice (each, a "**Cure Objection**") or to the provision of adequate assurance of future performance (each, an "**Adequate Assurance Objection**," and together with the Cure Objections, the "**Contract Objections**") must: (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; and (v) be filed with the Court and served on the Objection Notice Parties.

38.     If (a) the Debtors identify (i) additional contracts or leases to be assumed and assigned to a Successful Bidder or (ii) modifications that need to be made to a proposed Cure Cost previously stated in the Cure Notice, or (b) a Successful Bidder designates any additional contracts or leases not previously included on the Cure Notice for assumption and assignment, the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the applicable Sale Transaction, file with the Court and serve by first class mail on the applicable Contract Counterparty a supplemental Cure Notice (each, a "**Supplemental Cure Notice**").  As soon as reasonably practicable after filing a Supplemental Cure Notice, the Debtors will post a copy of the Supplemental Cure Notice on the Kroll Website.  Any Cure Objection with respect to Cure Costs set forth in a Supplemental Cure Notice must be filed within seven (7) days of filing of such Supplemental Cure Notice.

39.     The Debtors request that any party failing to file a timely Contract Objection be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code and be forever barred from asserting any objection with respect to the treatment of such executory contract and/or unexpired lease.

### Relief Requested Should Be Granted

**A.     The Global Bidding Procedures Are Fair and Reasonable**

40.     The Global Bidding Procedures are reasonable and appropriate and should be approved as proposed.  Section 363 of the Bankruptcy Code permits the sale of all or some of a debtor's assets.  Moreover, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In essence, the Court may enter an order that safeguards the value of the debtor's estate if doing so is consistent with the Bankruptcy Code.  *See, e.g.*, *Chinichian v. Campolongo (In re*

*Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Tr., Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

41.     To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate, and, therefore, are appropriate in the context of bankruptcy sales. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 603 (5th Cir. 2011) (affirming the bankruptcy court's approval of bid procedures designed to maximize the value of the debtor's estate); *In re Bigler, LP*, 443 B.R. 101, 115 (Bankr. S.D. Tex. 2010) (providing that the two goals for a sale of the debtors' assets are "maximizing value for the estate and preserving the integrity of the judicial process"); *In re Monitor Dynamics, Inc.*, 2010 Bankr. LEXIS 4170, at *3 (Bankr. W.D. Tex. Aug. 3, 2010) (in approving bid procedures and bid protections, finding that they "represent the method for maximizing value for the benefit of the Debtor's estate").

42.     The Global Bidding Procedures provide for an orderly, uniform, and competitive process through which interested parties may submit offers to purchase the Debtors' assets.  The Debtors, with the assistance of their advisors, have structured the Global Bidding Procedures to promote active bidding by interested parties and to reach the highest or otherwise best offers reasonably available for the Debtors' Assets.  Additionally, the Global Bidding Procedures will allow the Debtors to conduct Auctions in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely

consummate the Sale Transactions.  The Global Bidding Procedures provide the Debtors with an adequate opportunity to consider competing bids and to select the highest or otherwise best offers for the potential completion of the Sale Transactions.

43.      Moreover, an orderly and expeditious sale process is critical to preserve and realize the Debtors' value and maximize recoveries for the Debtors' stakeholders.  In formulating the Global Bidding Procedures, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential bidders with the need to quickly and efficiently run a sale process in parallel with a solicitation process.  Accordingly, the Global Bidding Procedures should be approved.

**B.   Stalking Horse Bid Protections Are Reasonable and Appropriate**

44.      The Debtors have agreed to provide standard bid protections to any Stalking Horse Bidders, primarily in the form of break-up fees of three percent (3%) of the purchase price (including non-cash consideration) and capped expense reimbursements.  Bid protections such as the Stalking Horse Bid Protections have become commonplace in connection with sales under chapter 11.   Moreover, approval of bid protections as administrative expense claims or superpriority administrative expense claims has become a recognized practice in chapter 11 cases because such it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.  Accordingly, the Debtors shall be able to grant the Stalking Horse Bid Protections administrative expense claim or superpriority administrative expense claim status as determined in their sole discretion.

45.      The Debtors believe that granting Stalking Horse Bid Protections to a Stalking Horse Bidder is fair and reasonable under the circumstances.  Courts have acknowledged

that the approval of break-up fees and expenses in connection with substantial sales in bankruptcy is warranted to compensate an unsuccessful acquirer whose initial offer served as the basis and catalyst for higher or better offers.  *See ASARCO*, 650 F.3d at 602 n.9 (5th Cir. 2011) (noting that the break-up fees "provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders" (quotation omitted)); *Official Comm. of Unsecured Creditors of Walker Cty. Hosp. Corp. v. Walker Cty. Hosp. Dist. (In re Walker Cty. Hosp. Corp.)*, 3 F.4th 229, 231 n.2 (5th Cir. 2021) (same).

46.    To warrant court approval of such break-up fees and expenses, the Fifth Circuit in *ASARCO* required a showing that the requested fees and expenses must be supported by a sound business justification.  *ASARCO*, 650 F.3d at 602–03 (favoring business judgment standard governing use of assets outside of the ordinary course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders).

47.    Here, the Stalking Horse Bid Protections satisfy the foregoing tests because they are: (i) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code and thus are allowed administrative expense priority; (ii) commensurate to the real and substantial benefit conferred upon the Debtors' estates by having one or more stalking horse bidders; (iii) reasonable and appropriate, in light of comparable transactions, to the commitments to be made and the efforts to be expended by one or more stalking horse bidders; (iv) necessary to induce stalking horse bidders to continue to pursue sale transactions; and (v) subject to all parties-in-interests' rights to object and be heard with respect to approval of the applicable stalking horse bid protections.

48.    First, the Stalking Horse Bid Protections will only be provided after good faith, arms' length negotiations with the Debtors, acting in the interest of their estates, consistent

with their fiduciary duties and after consultation with the Consultation Parties. Parties in interest will be given notice and an opportunity to object if they do not believe that the Stalking Horse Bid Protections are in the best interests of the Debtors' estates.

49.     Second, the Debtors are proposing bid protections that promote the interests of the Debtors' estates to maximize value. The Termination Payments promote more competitive bidding for the Debtors' assets by inducing stalking horse bidders to hold their offers open as a minimum bid on which other bidders and the Debtors can rely. In doing so, a stalking horse bidder lays the foundation for the Debtors' sale process and serves as a catalyst for other Qualified Bids. Accordingly, the Termination Payments are appropriate and any stalking horse bidder is entitled to be compensated for the risk it is assuming and the substantial value it is conferring on the Debtors' estates.

50.     Third, the Stalking Horse Bid Protections are reasonable in view of the substantial benefits the Debtors would receive from having Stalking Horse Bids serve as the floor for potential bidders, which would confirm that the Debtors receive the highest and best offer for their Assets. Moreover, Stalking Horse Bids will provide the Debtors with an opportunity to move forward with transactions that have a high likelihood of consummation with a contractually committed party at a fair and reasonable purchase price. Accordingly, the Stalking Horse Bid Protections will not deter bidding, are reasonable, and maximize the value of the Debtors' estates. The Stalking Horse Bid Protections enable the Debtors to secure an adequate floor price for the Debtors' Assets, thereby ensuring that competing bids will be materially higher or otherwise better than the bid reflected in the applicable Stalking Horse Agreement, providing a clear benefit to the Debtors' estates.

51.     The Stalking Horse Bid Protections, consisting of break-up fees of up to three percent (3%) of the purchase price and expense reimbursements subject to a cap to be agreed upon with the applicable Stalking Horse Bidder, fall within the range of stalking horse bid protections approved in this and other Districts.  *See, e.g.*, *In re AppHarvest Products, LLC*, No. 23-90745 (DRJ) (Bankr. S.D. Tex. Aug. 25, 2023) (Docket No. 298) (approving break-up fee equal to 3% of the purchase price and expense reimbursements not to exceed $500,000); *In re Instant Brands Acquisition Holdings Inc.*, No. 23-90716 (DRJ) (Bankr. S.D. Tex. July 12, 2023) (Docket No. 253) (same); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023) (Docket No. 321) (approving a break-up fee equal to up to 3% of the purchase price and expense reimbursements to be mutually agreed among the Debtors and the applicable stalking horse bidder); *In re Agilon Energy*, No. 21-32156 (MI) (Bankr S.D. Tex. Dec. 17, 2021) (Docket No. 406) (approving break-up fee equal to 5% of the purchase price); *In re Eagle Pipe, LLC*, No. 20-34879 (MI) (Bankr. S.D. Tex. Oct. 30, 2020) (Docket No. 97) (approving break-up fee equal to 4% of the purchase price); *In re Geokinetics Inc.*, No. 18-33410 (DRJ) (Bankr. S.D. Tex. July 2, 2018) (Docket No. 110) (approving break-up fee equal to 5% percent of the purchase price and expense reimbursement not to exceed 4.7% of the purchase price); and *In re Neighbors Legacy Holdings, Inc.*, No. 18-33836 (MI) (Bankr. S.D. Tex. August 8, 2018) (Docket No. 203) (approving combined break-up fee and expense reimbursement equal to 5% of the purchase price); *In re Verity Health System of California, Inc.*, No. 18-20141 (ER) (Bankr. C.D. Cal. Oct. 30, 2018) (Docket No. 714) (approving break-up fee equal to 4% of the cash purchase price and up to $2,350,000 for expense reimbursements).

52.     Further, the Debtors should be able to grant any Stalking Horse Bid Protections administrative expense status or superpriority administrative expense status pursuant to section 364(c)(1) of the Bankruptcy Code.  Section 364(c)(1) states:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt— (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title.

11 U.S.C. 364(c)(1).  Section 101(12) further defines "debt" to mean "liability on a claim" and section 101(5) defines "claim" to mean any "right to payment," including a contingent right of payment. 11 U.S.C. 101(5), (12).  Nothing in section 364(c)(1) or the foregoing definitions limits superiority status to funded debt or suggests that a contingent claim for expense reimbursement cannot be a superpriority administrative expense claim.  *See* Hr'g Tr. at 105:5-18, *In re Exide Holdings, Inc.*, No. 20-11157 (CSS) (Bankr. D. Del. June 18, 2020) (Court: "[I]f the trustee is unable to obtain unsecured credit allowable under Section 503(b)(1) of this title as an admin expense, the court, after noticing and a hearing, may authorize the obtaining of credit or the incurring of debt with priority over...all admin expenses.  By entering into this transaction, the debtors are agreeing to pay an amount of money in the future to the Stalking Horse Bidder in the event certain circumstances don't occur.  So by definition they are obtaining credit[.]"); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 25, 2019) (Docket No. 177) (explaining the statutory basis in the Bankruptcy Code for affording superpriority status to bid protections).  Courts in this district have routinely granted stalking horse bid protections with superpriority administrative expense claim status.  *See In re Strike, LLC*, No. 21-90054 (DRJ) (Bankr. S.D. Tex. Dec. 23, 2021) (Docket No. 279) (holding that reimbursable expenses in the stalking horse agreement constituted superpriority administrative expenses); *In re Agilon Energy*

26

*Holdings II, LLC*, No. 21-32156 (MI) (Bankr. S.D. Tex. Dec. 17, 2021) (Docket No. 406) (holding that to the extent earned and payable, the stalking horse bid protections were allowed superpriority administrative expense claims); *In re Basic Energy Services, Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. Aug 25, 2021) (Docket No. 179) (same).

53.     For all of the foregoing reasons, the Debtors believe that granting the proposed Stalking Horse Bid Protections will maximize the value realized for the benefit of the Debtors' estates, their creditors, and other parties-in-interest.

**C.  Assumption and Assignment of the Assigned Contracts Should be Approved**

54.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g., Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (applying a business judgment standard to debtor's determination to assume an unexpired lease); *COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 383 (2d Cir. 2008) (explaining that the business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage"); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard. . . .").  Accordingly, any assumption of the Assigned Contracts is an exercise of the Debtors' sound business judgment because the transfer of such contracts or leases is necessary to the Debtors' ability to obtain the best value for their businesses or assets.  Moreover, the Assigned Contracts will be assumed and assigned in

accordance with the Assumption and Assignment Procedures approved by the Court pursuant to the Bidding Procedures Order, which will be reviewed by the Debtors' key stakeholders. Accordingly, the Debtors' assumption of the Assigned Contracts is an exercise of sound business judgment and should be approved.

55.     Further, the consummation of the Sale Transactions, which will involve the assignment of the Assigned Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code and applicable non-bankruptcy law.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtors propose to file with the Court and serve on each Contract Counterparty, the Cure Notice indicating the Debtors' calculation of the Cure Cost for each such contract.  The Contract Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder, including the proposed Cure Costs.

56.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."   11 U.S.C. § 365(f)(2)(B).  The meaning of "adequate assurance of future performance" depends on the the facts and circumstances of the case.  *See In re Bourbon Saloon, Inc.*, 647 Fed. App'x. 342, 346 (5th Cir. 2016) ("A bankruptcy court's determination of adequate assurance of future performance and the ability to cure under § 365 is a fact-specific question.") (citing *In re Tex. Health Enters. Inc.*, 72 Fed. App'x 122, 126 (5th Cir. 2003)).

57.     As set forth in the Global Bidding Procedures, for a bid to qualify as a "Qualified Bid," a Potential Bidder must include with its bid Adequate Assurance Information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Assigned Contracts.  The Debtors will provide Adequate Assurance Information for any Stalking Horse Bidder or Successful Bidder to all counterparties to the Assigned Contracts which such bidder seeks to acquire and counterparties will have an opportunity to file a Contract Objection in advance of the applicable Sale Hearing.  Based on the foregoing, the Debtors' assumption and assignment of the Assigned Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

58.     In addition, to facilitate the assumption and assignment of the Assigned Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the Assigned Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code.[14]

59.     The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice, and provide certainty to all parties-in-interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtors request that the Court approve the Assumption and Assignment Procedures.

---

[14]   Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease[.]"  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

### D.  Sale of the Debtors' Businesses and Assets

> I.   *The Sale Transactions Should be Approved as an Exercise of the Debtors'*
> *Sound Business Judgment*

60.     Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing.  Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate "some articulated business justification," as established by the Second Circuit in *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983), which decision has been adopted in this circuit.  *See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also ASARCO*, 650 F.3d at 601; *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex. Mar. 21, 2014); *West v. Flores (In re St. Marie Clinic PA)*, No. 10-70802, 2013 WL 5221055, at *9 (Bankr. S.D. Tex. Sept. 17, 2013); *In re Particle Drilling Techs., Inc.*, No. 09-33744, 2009 WL 2382030, at *2 (Bankr. S.D. Tex. July 29, 2009); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).

61.     Once the Debtors articulate a valid business justification, "the business judgment rule . . . 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995);

*see also Integrated Res.*, 147 B.R. at 656; *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions.").

62.    The Debtors have a sound business justification for selling the Debtors' businesses and assets pursuant to a competitive-bidding process consistent with the Global Bidding Procedures.  Based upon an analysis of the Debtors' ongoing business, the Debtors' concluded that a sale of the Debtors' businesses and assets pursuant to a competitive-bidding process, would likely be the best way to maximize recoveries for creditors in connection with the Debtors' chapter 11 cases.

63.    Subject to the Debtors pivoting to a reorganization for certain assets, the Debtors submit that Successful Bids resulting from the Global Bidding Procedures will constitute the highest or best offer for the Debtors' applicable business or assets.  As such, the Debtors' determination to sell their businesses and assets pursuant to a competitive-bidding process as provided for in the Global Bidding Procedures is a valid and sound exercise of the Debtors' business judgment.  The Debtors believe that they have proposed a fair process for obtaining the highest and best offer for their businesses and assets pursuant to a sale transaction or chapter 11 plan process for the benefit of the Debtors' estates and their creditors.  The fairness and reasonableness of the consideration to be received by the Debtors will be demonstrated by a "market check" through the process outlined in the Global Bidding Procedures.

II.    *Adequate and Reasonable Notice of the Sale Transactions Will Be Provided*

64.    As set forth above, the Sale Notice (a) informs interested parties of the deadlines for objecting to the applicable Sale Transaction, and (b) otherwise includes all information relevant to parties interested in, or affected by, the applicable Sale Transaction.

Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bidding Procedures Order, after notice and a hearing, before it is served and, as such, the Debtors are confident that the Sale Notice will be properly vetted by the time of service thereof.

III.    *The Sale Transactions Should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code*

65.    Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  As section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f).  *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied.").  The Debtors believe that they will be able to demonstrate at the applicable Sale Hearing that they have satisfied one or more of these conditions.

66.    Additionally, the Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply.  *See In re Ditech Holding Corp.*, 606 B.R. 544, 591 (Bankr. S.D.N.Y. 2019) ("[P]lan sales can be free and clear of claims without invoking section 363(f)."); *In re Trans World Airlines, Inc.*, No. 01–0056 (PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("[B]ankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct

32

such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

67.     The Debtors believe that one or more of the tests of section 363(f) will be satisfied with respect to the transfer of the Debtors' businesses and assets pursuant to the applicable Sale Transaction.  For example, certain of the Debtors' creditors may ultimately consent to the sale free and clear under section 363(f)(2).  In the event such creditors do not consent, a sale free and clear may proceed pursuant to section 363(f)(5) of the Bankruptcy Code because such creditors may be paid from the proceeds of the sale and the Debtors will establish at the applicable Sale Hearing that such creditors can be compelled to accept a monetary satisfaction of its claims.

> IV.     *The Sale Transactions Have Been Proposed in Good Faith and Without Collusion, and Each Successful Bidder Will Be a "Good Faith Buyer"*

68.     Pursuant to section 363(m) of the Bankruptcy Code, a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *O'Dwyer v. O'Dwyer* (*In re O'Dwyer*), 611 F. App'x 195, 200 (5th Cir. 2015); *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014) (finding that a good faith purchaser is "one who purchases the assets for value, in good faith, and without notice of adverse claims") (quoting *Hardage v. Herring Nat'l Bank*, 837 F.2d 1319, 1323 (5th Cir. 1988)); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse), Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007); *see also In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders).

69.     In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith.  An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *Bleaufontaine, Inc. v. Roland International (In re Bleaufontaine, Inc.)*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

70.     The Debtors submit that Successful Bidders arising from the Auctions, will be a "good faith" purchaser within the meaning of section 363(m) and the terms of a purchase agreement with any successful bidder will be negotiated at arms'-length and in good faith without any collusion or fraud. [15]   The Global Bidding Procedures are designed to produce a fair, transparent, and competitive bidding process.  All parties in interest will have an opportunity to evaluate and object, if necessary, to any particular party's conduct or the satisfaction of the requirements of section 363(m) of the Bankruptcy Code.   Accordingly, the Debtors will be prepared to show, at the Sale Hearing, that the applicable Successful Bidders are entitled to the full protections of section 363(m) and will seek a finding that any Successful Bidder is a good faith purchaser and is entitled to the full protections of the Bankruptcy Code.

---

[15]   Section 363(m) provides that:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

**Basis for Emergency Relief**

71.     The Debtors respectfully request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1(i).  The relief requested in the Motion is critical to preserving the Debtors' ability to receive the highest or otherwise best value for the Debtors' Assets for the benefit of the Debtors' estates.  Accordingly, the Debtors respectfully request that the Court approve the relief requested in the Motion on an emergency basis.

**Debtors' Compliance with
Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

72.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**Reservation of Rights**

73.     Nothing contained herein is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder,

(vii) an admission as to the validity of any liens satisfied pursuant to this Motion, (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code, or (ix) an implication or admission of consent, or modification or waiver of any rights, including consent rights, of any non-debtor party with respect to any Sale Transaction.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

**<u>Notice</u>**

74.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  May 15, 2024
       Houston, Texas

                     */s/  Clifford W. Carlson*
                     WEIL, GOTSHAL & MANGES LLP
                     Gabriel A. Morgan (24125891)
                     Clifford W. Carlson (24090024)
                     Stephanie N. Morrison (24126930)
                     700 Louisiana Street, Suite 3700
                     Houston, Texas 77002
                     Telephone:  (713) 546-5000
                     Facsimile:  (713) 224-9511
                     Email:   Gabriel.Morgan@weil.com
                                Clifford.Carlson@weil.com
                                Stephanie.Morrison@weil.com

                     -and-

                     WEIL, GOTSHAL & MANGES LLP
                     Ray C. Schrock (admitted *pro hac vice*)
                     Candace M. Arthur (admitted *pro hac vice*)
                     David J. Cohen (admitted *pro hac vice*)
                     767 Fifth Avenue
                     New York, New York 10153
                     Telephone:  (212) 310-8000
                     Facsimile:  (212) 310-8007
                     Email:   Ray.Schrock@weil.com
                                Candace.Arthur@weil.com
                                DavidJ.Cohen@weil.com

                     *Proposed Attorneys for Debtors*
                     *and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on May 15, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' claims, noticing, and solicitation agent.


                                        */s/  Clifford W. Carlson*

## Exhibit A

**Bidding Procedures Order**