**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:**<br><br>**STEWARD HEALTH CARE SYSTEM, LLC, *et al*.,**<br><br>**Debtors.** | **Chapter 11**<br><br>**Case No: 24-90213 (CML)**<br><br>**Jointly Administered** |

**RESPONSE AND LIMITED OBJECTION OF THE ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE, TO THE DEBTORS' EMERGENCY MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING (A) GLOBAL BIDDING PROCEDURES FOR SALES OF DEBTORS' ASSETS, (B) FORM AND MANNER OF NOTICE OF SALES, AUCTIONS, AND SALE HEARINGS, AND (C) ASSUMPTION AND ASSIGNMENT PROCEDURES AND FORM AND MANNER OF NOTICE OF ASSUMPTION AND ASSIGNMENT; (II) AUTHORIZING DESIGNATION OF STALKING HORSE BIDDERS; (III) SCHEDULING AUCTIONS AND SALE HEARING; AND (IV) GRANTING RELATED RELIEF [ECF NO. 28] [RELATED TO DOCKET NO. 81]**

The Roman Catholic Archbishop of Boston, A Corporation Sole hereby objects – on the limited basis set forth below - to the *Debtors' Emergency Motion of Debtors for Entry of an Order (I) Approval (A) Global Bidding Procedures for Sales of Debtor's Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* [ECF NO. 28] (the "*Procedures Motion*"), and in support of this objection states as follows:

# BACKGROUND

## A. The Caritas Hospitals.

1. Care for the sick, the dying and the poor is a ministry deeply rooted in the history of the Roman Catholic Church. Indeed, it has been a principal contribution of the Church's role in society since the Middle Ages. In the United States this role has been institutionalized and expanded across the country.

2. Consistent with this long-standing tradition, prior to the commencement of the above-captioned case, Caritas Christi, Inc., a Massachusetts non-profit corporation ("*Caritas*") established in 1985 by the Roman Catholic Archbishop of Boston, a corporation sole ("*RCAB*"), operated the following Catholic-sponsored acute care hospitals in Massachusetts (collectively, the "*Caritas Hospitals*" or the "*Hospitals*"):

- Caritas St. Elizabeth's Medical Center ("*St. Elizabeth's"*), located in Brighton, Massachusetts;
- Caritas Holy Family Hospital ("*Holy Family*"), located at two campuses in Haverhill and Methuen, Massachusetts;
- Caritas Good Samaritan Medical Center ("*Good Samaritan*"), located in Brockton, Massachusetts;
- Caritas Norwood Hospital ("*Norwood*"), located in Norwood, Massachusetts;
- Caritas Carney Hospital ("*Carney*"), located in Dorchester, Massachusetts; and
- St. Anne's Hospital ("*St. Anne's"*), located in Fall River, Massachusetts.

3. According to the Commonwealth of Massachusetts the Caritas Hospitals:

> [p]lay a critical role in addressing the health care needs of Massachusetts patients, including inpatient medical and surgical capacity, inpatient behavioral health capacity, maternal and newborn health services, emergency department services, health care services in the South Shore region, and health care services for Medicaid (known in Massachusetts as "*MassHealth*") and Medicare patients.

*See* Informational Brief of the Commonwealth of Massachusetts [ECF No. 61], p.5.

**B. Steward's Acquisition of the Caritas Hospitals.**

4. Prior to their acquisition by Steward Health Care System, LLC and Steward Hospital Holdings, LLC (collectively "*Steward*") in 2010, the Caritas Hospitals struggled financially and became significantly and increasingly capital constrained. Among other things, the Caritas Hospitals had aging facilities, substantially-underfunded pension plans covering approximately 13,000 current and former employees, and more than $40 million in annual debt service obligations.

5. Simply put, a significant capital investment was required to enable the Caritas Hospitals to survive and continue their mission of providing community-based health care services, including services to the indigent, in accordance with the moral, ethical and social teachings of the Roman Catholic Church.

6. Based on these considerations, Caritas concluded that the only way the Caritas Hospitals could continue to carry out their mission and maintain their uniquely Catholic identity would be to find a strategic partner who could supply the capital necessary to meet the hospitals' needs.

7. Following a multi-year search to identify an appropriate strategic partner, Caritas, ultimately determined that a sale to Steward, a for-profit entity (then owned by the private equity firm, Cerberus Capital Management, LP), as the best available option (the "*Transaction*") that would allow the Hospitals to continue to operate as Catholic health care facilities.

**C. The Stewardship Agreement.**

8. Under applicable corporate governance law, however, the Transaction required the approval of both RCAB and the Holy See, who in turn, conditioned their approval on the Hospitals continuing to operate as Catholic health care facilities in accordance with the moral,

ethical and social teachings of the Roman Catholic Church as expressed in the *Ethical and Religious Directives for Catholic Health Care Services, Fifth Edition*.

9. Ultimately, Steward, as part of the Transaction, entered into a Stewardship Agreement (the "*Agreement*") with RCAB[1]. The goal of the Agreement was to ensure that the Caritas Hospitals continued to maintain their Catholic identity and to operate as Catholic health care facilities in accordance with Catholic norms.

10. In the Agreement[2], Steward, among other things, expressly acknowledged that the names of the Hospitals as well as other symbols used by the Hospitals were traditionally associated with the Roman Catholic Church and for a long period of time integrally related to the identities of the Hospitals and their associated activities.[3] *See* Agreement, § 2.3. In the Agreement, Steward further acknowledged that the Hospitals used Catholic religious items and symbols in their chapels and in other locations in their facilities. *Id*. at § 2.3.

11. Of relevance to the Procedures Motion, the Agreement also expressly recognized that for regulatory or financial reasons, Steward might be compelled to sell the Caritas Hospitals. *Id*. at § 6.2(d).

---

[1] A copy of the Agreement is attached as Exhibit A.

[2] The following is a summary of the Agreement. In the event there is a conflict between the summary and the Agreement, the terms of the Agreement control. In addition, capitalized words not otherwise defined have the meanings ascribed to them in the Agreement.

[3] By way of example, in the Agreement Steward acknowledged and agreed that the following names were "integrally related" to the Hospitals' Catholic identity:

- Caritas
- Christi
- Caritas Christi
- Catholic
- Hospital Names
  - Good Samaritan Medical Center
  - Holy Family Hospital
  - Saint Anne's Hospital
  - St. Elizabeth's Medical Center

*See* Agreement, §2.4.

- The name of any Pope or saint, or any name that is otherwise traditionally associated with the Roman Catholic Church.

12. Under the Agreement, in the event of such a sale, merger, or other transfer of any of the Caritas Hospitals, either RCAB or Steward has the right to terminate the Agreement. Alternatively, if neither RCAB or Steward terminates the Agreement, "Steward, as a condition closing such sale, merger or other transfer, shall cause the transferee to accept the obligations under this Agreement with respect to. . . [the] Hospital[s] in a form of agreement reasonably satisfactory to RCAB and to which RCAB is a named party." *Id*.

13. Pursuant to section 6.3 of the Agreement, in turn, if the Agreement is terminated as a result of a sale, merger or other transfer, Steward is required to:

- cause the Hospitals to remove, pursuant to a 18-month transition schedule, all symbols of Catholic identity (e.g. interior signage, trade and service marks associated with Catholic identity in both paper and electronic form) cease using the Restricted Names;

- promptly cause the Hospitals to return the Religious Items[4] to RCAB (or the person or entity when contributed them); and

- make a $25 million dollar contribution to a Massachusetts public charity designated by RCAB and that is subject to the jurisdiction of the Massachusetts Attorney General.

*See* Agreement, §§ 6.3, 6.4.

**RESPONSE AND LIMITED OBJECTION**

14. In the Procedures Motion, Steward seeks approval of "Global Bidding Procedures" on an emergency basis. Among other things, Steward seeks to schedule a blind auction for the Caritas Hospitals on June 24, 2024 and authority to enter into "Stalking Horse Agreements" for the Hospitals prior to the auction.

15. Notably, the Motion does not include a proposed asset purchase agreement for the Hospitals. Nor does it contain any discussion of Steward's rights and obligations under the

[4] For the avoidance of doubt, the Religious Items are not property of these estates and should not be part of Steward's proposed sale.

Stewardship Agreement. Wholly omitted from the Motion is whether Steward intends to terminate the Agreement or whether it intends on complying with the Agreements' sale, merger, and transfer provisions. Similarly, the Motion is silent on whether the Stewardship Agreement was made available to prospective purchasers and whether prospective purchasers are aware of the Agreement's restrictions on the transfer of Restricted Names and Religious Items. Nor does the motion address whether Steward is seeking to sell the Religious Items or whether Steward has carved out the Religious Items from its proposed sale.

16. In short, the Procedures Motion should not be approved until Steward addresses these fundamental, gating issues concerning its proposed sale of the Caritas Hospitals.

17. The Procedures Motion, moreover, is woefully short of any evidence that the proposed auction procedures represent an adequate, much less robust, responsible effort to identify an appropriate purchasers for Steward's hospitals. Despite the knowledge that its hospitals, including the Caritas Hospitals, have suffered from severe financial distress for years, Steward apparently only began the effort to locate buyers for its hospitals in January of 2024. In fact, the Procedures Motion contains only *two* paragraphs describing the efforts Steward made to find buyers for its hospitals and fails to provide any but the most cursory details of that effort.

18. The Procedures Motion nevertheless suggests that a blind auction of its hospitals, with initial bids due June 24, 2024, represents a reasonable sale process. Such a sale process is based on the fundamentally flawed premise that a marketing period of less than six (6) months for operating hospitals in multiple states provides sufficient time to locate suitable buyers. The diligence necessary to present a reasonable bid for even one operating hospital, even just considering the regulatory overlay, cannot take less than six (6) months.

19. Under the circumstances, the Procedures Motion should be denied until Steward has demonstrated that it made, at a minimum, a reasonable effort to identify appropriate purchasers for its hospitals with sufficient resources to meet the health care needs of Steward's patients and the communities in which Steward operates.

**RESERVATION OF RIGHTS**

20. RCAB hereby reserves all of its rights and remedies under the Stewardship Agreement and applicable law as well as to assert other and further objections to the procedures Motion and any sale of the Caritas Hospitals or the Religious Items.

Dated: May 30, 2024

MORRISSEY, WILSON & ZAFIROPOULOS, LLP

/s/ Francis C. Morrissey
Francis C. Morrissey *(pro hac vice motion pending)*
45 Braintree Hill Office Park, Suite 304
Braintree, Massachusetts 02184
Tel: (781) 353-5501
Email: fcm@mwzllp.com

and

MURPHY & KING, PC

/s/ D. Ethan Jeffery
D. Ethan Jeffery *(pro hac vice motion pending)*
28 State Street, Suite 3101
Boston, MA 02109
Tel: (617) 423-0400
Email: ejeffery@murphyking.com

***COUNSEL TO***
***ROMAN CATHOLIC ARCHBISHOP OF BOSTON, A CORPORATION SOLE***

**EXHIBIT A**



EXHIBIT A

**STEWARDSHIP AGREEMENT**

This **STEWARDSHIP AGREEMENT** (the "Agreement") is made and entered into as of this 30th day of April, 2010 by and between Steward Health Care System LLC ("SHCS") and Steward Hospital Holdings LLC, each a Delaware limited liability company (SHCS and Steward Hospital Holdings LLC collectively referred to herein as "Steward") and Roman Catholic Archbishop of Boston, a Corporation Sole ("RCAB"). (For purposes of this Agreement, Steward and RCAB each may be referred to individually as a "Party," and together as the "Parties.")

**RECITALS:**

A. **WHEREAS,** SHCS is a party to that certain Asset Purchase Agreement dated March 19, 2010 (the "Purchase Agreement") with, among other persons, Caritas Christi, Inc., a Massachusetts non-profit corporation ("Caritas"), pursuant to which Caritas has agreed to sell and transfer to SCHS (or its designated subsidiaries) substantially all of the assets constituting: Caritas Carney Hospital, a hospital located in Dorchester, Massachusetts; Caritas Good Samaritan Medical Center, a hospital located in Brockton, Massachusetts; Caritas Holy Family Hospital, a hospital located in Methuen, Massachusetts; Caritas Norwood Hospital, a hospital located in Norwood, Massachusetts; Saint Anne's Hospital, a hospital located in Fall River, Massachusetts; and Caritas St. Elizabeth's Medical Center, a hospital located in Brighton, Massachusetts (each individually, a "Hospital" and collectively, together with any other Catholic-sponsored acute care hospital located within the Archdiocese of Boston that may, during the term of this Agreement, be acquired by SCHS, or the assets and operations of which may be acquired by SCHS, referred to herein as the "Hospitals"); and

B. **WHEREAS,** the continued operation of the Hospitals as Catholic health care providers, from a sacramental, social and moral perspective, under the terms of this Agreement

was a primary consideration of the Caritas Board of Governors' decision to transfer ownership of the assets and operations of the Hospitals to SCHS; and

C. **WHEREAS,** the Catholic health care ministry: is rooted in a commitment to promote and defend human dignity; requires that particular attention be given to the health care needs of the poor, the uninsured and the underinsured; seeks to contribute to the common good; exercises responsible stewardship of available health care resources; and does not provide medical procedures that are judged morally wrong by the teaching authority of the Catholic Church; and

D. **WHEREAS,** the Hospitals currently operate as Catholic health care facilities pursuant to the moral, ethical and social teachings of the Roman Catholic Church as expressed in the *Ethical and Religious Directives for Catholic Health Care Services, Fifth Edition* (the "Directives"); and

F. **WHEREAS,** the alienation under canon law of the assets of Caritas and its affiliates contemplated by the Purchase Agreement (the "Transaction") requires the approval of RCAB and the Holy See; and

E. **WHEREAS,** Steward desires, and the RCAB has agreed, that upon completion of the Transaction, the Hospitals will continue to be operated as Catholic health care providers, in each case in accordance with the terms and conditions of this Agreement; and

F. **WHEREAS,** the Parties wish to enter into this Agreement in order to memorialize all of their rights, duties and obligations with respect to Steward's operation of the Hospitals as Catholic health care providers from and after the closing of the Transaction.

**NOW, THEREFORE,** in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and intending to be legally bound, the Parties hereby agree as follows:

SECTION 1

CATHOLIC IDENTITY

1.1 Ethical and Religious Directives. Care for the sick, the dying and the poor is a ministry deeply rooted in the history and ministry of the Catholic Church. It has been a principal contribution of the Church's role in society since the Middle Ages. In the United States, this historic role has been institutionalized and expanded across the country. The Catholic identity of a health care system, therefore, binds the system to the wider life of the Church historically, theologically, morally and socially. Catholic health care is understood as a direct extension of the healing ministry of Christ as found in the gospels. The ministry has been, and must continually be, adapted to the conditions of modern science and modern medicine, but this adaptation must be carried out in accordance with the theological tradition of the Church and with the specific theological-moral directives embodied in the Directives. The Directives find their ultimate interpretation in the teaching authority of RCAB. In brief, the Catholic identity of the Caritas system is to be found in its adherence to the Directives and the Catholic theological tradition as interpreted by RCAB. Consistent with these sources of religion and moral principles, and subject to the terms and conditions of this Agreement, so long as this Agreement is in effect, all Hospitals will be operated in accordance with the moral, ethical and social teachings of the Roman Catholic Church as expressed in the Directives and as interpreted solely and exclusively by RCAB. If the Directives are subsequently amended or replaced, such amended or replaced Directives will be provided by RCAB to Steward and, thereafter, will operate as the successor to

the Directives, currently appended as **Schedule 1.1** to this Agreement, and be deemed the "Directives" hereunder.

SECTION 2

SACRAMENTAL DIMENSION OF CATHOLIC IDENTITY

2.1 Pastoral Care. So long as this Agreement is in effect, Steward will cause each of the Hospitals to maintain a Pastoral Care Director position and a properly staffed (as is presently the case) Pastoral Care Department. In each case, so long as this Agreement is in effect, the funding of the Pastoral Care Director and the Pastoral Care Department of each Hospital shall be at levels no lower than those in effect during Caritas's Fiscal Year ended September 30, 2009 ("FY09"). The services of the Pastoral Care Departments will be available to the Hospitals' patients, family members, health care professionals, and employees of all faiths, and will be offered throughout the continuum of care provided by the Hospitals. Catholic Chaplains appointed by Caritas will be approved by RCAB, and all such Chaplains who are priests will also be granted ecclesiastical faculties by RCAB.

2.2 Chapels. So long as this Agreement is in effect, Steward will maintain the existing chapels (including, without limitation, payment of the compensation of the respective Catholic Chaplains) at each of the Hospitals as places of Catholic worship; provided, however, that such chapels are to function also as a locus for ecumenical and interreligious services to benefit staff, patients and families. Such chapels shall be maintained in at least their current condition, wear and tear only excepted. In each case, so long as this Agreement is in effect, the funding of the operations of such existing chapels (including, without limitation, payment of the compensation of the respective Catholic Chaplains) shall be at levels no lower than those in effect during

FY09. The chapels will be operated under the supervision and oversight of the Pastoral Care Director of each Hospital.

2.3 Catholic Symbols, Religious Items. Steward will, so long as this Agreement is in effect, maintain appropriate signage and other symbols of Catholic identity, both within and on the external walls of each Hospital, and will maintain appropriate insurance for the religious items located in each of the Hospitals (the "Religious Items"). Within 30 days following the execution of this Agreement, Steward shall provide to RCAB a true and correct listing of all Religious Items and such listing shall be appended as **Schedule 2.3** to this Agreement.

2.4 Names. Steward acknowledges and agrees that the certain names and words have been for a long period of time integrally related to the identity and operations of the Hospitals and their associated activities. Set forth on **Schedule 2.4** to this Agreement are those names and words which the Parties hereby agree are symbols of Catholic identity (the "Restricted Names") and, therefore, the use thereof shall be governed by this Agreement. Subject to the terms of this Agreement, so long as this Agreement remains in effect, Steward will have the right to continue to operate the Hospitals and their respective services under names which include any of the Restricted Names. Upon termination of this Agreement pursuant to Section 6.2, all such use by the Hospital(s) and their respective services of the Restricted Names shall be caused thereafter to cease pursuant to Section 6.3.

SECTION 3

SOCIAL DIMENSION OF CATHOLIC IDENTITY

3.1 Community Benefit. So long as Steward owns and operates the Hospitals, it will cause the Hospitals to continue to provide community benefit programs and services to improve access to health care services in their respective communities and to improve the health status of the elderly, poor, immigrant, and other at-risk populations in such communities. Such programs and services shall include the provision of free care, mission and pastoral care programs, and community benefit programs consistent with those in place as of the date of this Agreement as described in **Schedule 3.1** to this Agreement. In each case, so long as this Agreement is in effect, the funding of such programs and services shall be at levels no lower than those in effect during FY09. Steward will also, so long as this Agreement is in effect, cause the Hospitals to continue the Caritas tradition of just labor relations and public advocacy on matters relating to improving access to, and the quality of, health care services.

SECTION 4

MORAL DIMENSION OF CATHOLIC IDENTITY AND OBSERVANCE OF THE DIRECTIVES

4.1 Observance of the Directives. Except to the extent otherwise expressly set forth in this Agreement, so long as this Agreement is in effect, the Hospitals shall comply in all respects with and observe the Directives as interpreted by RCAB as set forth herein. So long as this Agreement is in effect, no Hospital or any of its services shall operate under, or use any, of the Restricted Names unless it complies in all respects with and observes the Directives as interpreted solely by RCAB as set forth herein.

4.2 RCAB Representative. RCAB or his designee (the "RCAB Representative") shall be charged with overseeing observance by each Hospital of the Directives under the terms of this Agreement. The Parties agree that any fiduciary duties that the RCAB Representative (if one is designated) may have shall be in favor solely of RCAB, and that for this reason the RCAB Representative (if one is designated) shall not be an officer, employee, representative or agent of Steward or any of the Hospitals.

4.3 Vice President for Mission. Steward will, so long as this Agreement is in effect, maintain the position of Vice President for Mission as a member of its senior management team, with competitive salary and benefits (as is presently the case). The Vice President for Mission shall comply with applicable Steward policies and procedures, including HIPAA. Prior to hiring a person for such position, Steward must obtain the prior written approval of the candidate by RCAB or the RCAB Representative (if one is designated) or any other RCAB designee. In the event that RCAB concludes that the employment of the Vice President for Mission should be terminated by Steward for any bona fide reason, as determined by RCAB in his sole discretion, RCAB or the RCAB Representative (if one is designated) or any other RCAB designee shall so notify Steward in writing (a "Removal Notice"), in which event the individual shall be promptly removed from such position and an interim candidate shall be employed by Steward as promptly as possible, subject to the prior written approval of the candidate by RCAB or the RCAB Representative (if one is designated) or any other RCAB designee. If such appointment cannot be made within 30 calendar days following the date the Removal Notice is given, one shall be designated by RCAB and such individual shall be employed as such by Steward. A new full-time appointment shall be made by Steward as promptly thereafter as possible, subject to the prior written approval of the candidate by RCAB or the RCAB Representative (if one is

designated) or any other RCAB designee. Any individual proposed for such position by Steward shall be deemed to have been approved by RCAB without the need for any further action unless RCAB or the RCAB Representative (if one is designated) or any other RCAB designee provides Steward with written notice objecting to the proposed candidate not later than 60 calendar days after having received notice thereof. Any Removal Notice by RCAB will require at least 30 days' advance written notice to Steward, and a discussion between RCAB or the RCAB representative (if one is designated) or any other RCAB designee, and the Chief Executive Officer ("CEO") of Steward as to the reasons for such removal. RCAB hereby agrees that James Corbett is approved to serve as the Vice President for Mission at Steward subject to the foregoing.

4.4 Ethics Committees. Steward will, so long as this Agreement is in effect: (a) cause each of the Hospitals to maintain an ethics committee which will have responsibility for the day-to-day monitoring of such Hospital's observance of the Directives and other ethics-related matters (individually, a "Hospital Ethics Committee," and collectively, the "Hospital Ethics Committees"); and (b) maintain a system-wide ethics committee which will have responsibility for overseeing the activities of each of the Hospital Ethics Committees (the "System-Wide Ethics Committee"). One ethicist (who shall be employed and compensated by RCAB) with direct training and experience in field of medical ethics (the "Ethicist") will, after consultation with the Vice President for Mission, be appointed solely by RCAB (who shall consider in good faith any nominations for such position provided by the Vice President for Mission) and shall report directly to RCAB. Only RCAB may remove the Ethicist, in which case a replacement will be appointed as set forth in the preceding sentence. The System-Wide Ethics Committee shall consist of the RCAB Representative (if one is designated) or any other RCAB

designee, the Ethicist and the Vice President for Mission. The Ethicist, the Vice President for Mission and such other individuals as shall be designated by the Vice President for Mission shall serve on each Hospital Ethics Committee. The RCAB Representative (if one is designated) or any other RCAB designee shall be provided all information and reports that are provided to members of each Hospital Ethics Committee and the Hospital-Wide Ethics Committee. Prior notice of the meetings of each such committee shall be given to the Ethicist and the RCAB Representative (if one is designated) or any other RCAB designee, and the RCAB Representative (if one is designated) or any other RCAB designee shall be permitted the right to attend, observe, and participate at any such meeting. In addition to the foregoing, so long as this Agreement is in effect, Steward shall reimburse RCAB on a monthly basis for RCAB's out-of-pocket cost of compensation (at prevailing market rates) and benefits for the Ethicist and one full-time administrative assistant to be utilized in connection with the exercise of RCAB's monitoring obligations contemplated by this Agreement.

4.5 Monitoring. Subject to patient and employee privacy requirements, physician-patient privileges and other Legal Requirements (as defined in Section 4.7(b)), the RCAB Representative (if one is designated) or any other RCAB designee will be given such access to the Hospitals' personnel and facilities as is reasonably necessary in order for the RCAB Representative (if one is designated) or any other RCAB designee to carry out his or her responsibilities hereunder. In particular, the Vice President for Mission shall meet and confer with the RCAB Representative (if one is designated) or any other RCAB designee from time to time as reasonably requested and, in any event, not less often than annually in order to review and discuss the Hospitals' observance of the Directives and their efforts to ensure that the

Directives' aspirations, mandates and prohibitions are appropriately integrated into the Hospitals' operations.

4.6 Observance Issues. If, in the opinion of the RCAB or the RCAB Representative (if one is designated) or any other RCAB designee, there should exist an issue with respect to the observance of the Directives by any Hospital, the RCAB Representative (if one is designated) or any other RCAB designee shall discuss the issue with the Vice President for Mission and the CEO of Steward. RCAB's resolution of the issue will be final and binding on the Hospitals, and Steward and the Hospitals shall implement such resolution in accordance with this Agreement.

4.7 Civil Law Compliance.

(a) Steward and the Hospitals are heavily-regulated entities that must comply with a myriad of applicable Legal Requirements (as defined herein). In the event that a Hospital or any of its services is obligated pursuant to a Legal Requirement to take action, to refrain from taking action, or to otherwise engage in conduct that, in the opinion of RCAB in its sole discretion, is inconsistent with the Directives, RCAB understands and agrees that the Hospital and such services will need to comply with such Legal Requirement. If RCAB seeks to challenge the Legal Requirement, Steward, to the extent permitted by patient and employee privacy requirements, physician-patient privileges and Legal Requirements, will reasonably cooperate with the RCAB and its representatives, in order to provide RCAB or its representatives with information relevant to such challenge. Steward acknowledges and agrees that RCAB, under the terms of this Agreement and because of its interest in maintaining Catholic identity of the Hospitals as contemplated by this Agreement, has standing to bring such a challenge. If, a result of compliance with a Legal Requirement, RCAB, in its sole discretion, determines that one or

more of the Hospitals is not in compliance with the Directives, RCAB may terminate this Agreement pursuant to Section 6.2(b). Steward may only terminate this Agreement pursuant to Section 6.2(c).

(b) For purposes of this Agreement, the following terms shall have the following meanings: (a) "Legal Requirement" means: (i) any federal, state, local, municipal statute or law (including common law), ordinance, rule, regulation, code, treaty, state hospital licensure and Joint Commission requirements; and (ii) any decree, injunction, order, ruling, opinion, assessment, mandate, or writ of any Governmental Authority; and (b) "Governmental Authority" means any federal, state, or local government, legislature, governmental entity, regulatory, administrative authority, certification or licensure authority, agency or commission or any court, tribunal, judicial or arbitral body.

SECTION 5

RESOLUTION OF CERTAIN DISPUTES

5.1 Senior Leadership Meeting/Consultation. Prior to terminating this Agreement in accordance with its terms, representatives of Steward and RCAB will meet within 15 days of any written request for such a meeting given by a Party to the other Party in a good-faith attempt to resolve to each Party's satisfaction the reasons advanced for such termination. Such representatives will include the CEO of Steward and the RCAB Representative (if one is designated) or any other RCAB designee and such other representatives of Steward and RCAB as they may respectively choose. Notwithstanding any other provision of this Agreement to the contrary, the interpretation of the Directives shall, at all times, be subject to the sole discretion of RCAB.

5.2 Termination. If the dispute is not resolved through the process described above, the Parties may exercise, to the extent permitted hereby, the termination provisions contained in this Agreement.

SECTION 6

TERM AND TERMINATION

6.1 Term. The term of this Agreement shall become effective as of the Closing Date of the Transaction (and only if such Closing occurs pursuant to the terms of the Purchase Agreement), and shall continue thereafter in full force and effect unless and until terminated in accordance with Section 6.2 below.

6.2 Termination.

(a) This Agreement may be terminated at any time by mutual written consent of Steward and RCAB.

(b) This Agreement may be terminated by RCAB upon not less than 30 days prior written notice by RCAB to Steward if, in the judgment of RCAB, one or more of the Hospitals (or any of its or their respective services), directly or indirectly, is being operated in a manner, or is participating in activities or an enterprise, inconsistent with the Directives, as interpreted by RCAB in his sole discretion. Notwithstanding the foregoing, RCAB will give Steward 90 days written notice of non-compliance, and an opportunity to cure such non-compliance. If such non-compliance is not cured within 90 days to the satisfaction of RCAB, this Agreement will be terminated in accordance with its terms. In the event of such termination, unless such termination by RCAB is based upon non-compliance due to a Legal

Requirement as set forth in Section 4.7(a), above, Steward will pay the Termination Contribution as contemplated by Section 6.4 below.

(c) This Agreement may be terminated by Steward upon not less than 30 days prior written notice by Steward to RCAB if it determines, in its sole discretion, that observance of any of Directives, as interpreted by RCAB in his sole discretion, would be materially burdensome to Steward or any of the Hospitals and Steward is required to comply with such interpretation under the terms of this Agreement; provided, however, that Steward will promptly relinquish, and cause the Hospitals and all of their respective services to relinquish, all rights to hold the Hospitals and such services out to the public as Catholic health care providers (in each case as more particularly provided in Section 6.3 below), and pay the Termination Contribution as contemplated in Section 6.4 below. Steward also acknowledges and agrees that, during the term of this Agreement: (i) Steward Hospital Holdings LLC, an entity controlled by Steward, will hold all of the interests in the Hospitals and will not hold any interest in any entity not subject to the Directives pursuant to the terms of this Agreement; and (ii) no entity controlling, controlled by, or under common control of SCHS will operate any enterprise within the Archdiocese of Boston using any of the Restricted Names. Termination of this Agreement pursuant to this Section 6.2 and the payment, if applicable, of the Termination Contribution (and any other payment obligations hereunder) as provided in this Agreement, shall be the sole remedies in law or equity for any breach of the terms of this Agreement by Steward.

(d) In the event of the sale, merger or other transfer of any Hospital (or any substantial portion of its assets or operations) by Steward, either RCAB or Steward may terminate this Agreement with respect to such Hospital and its respective services in its sole

discretion. In such a case, Steward will pay one-sixth of the Termination Contribution set forth in Section 6.4 below (i.e., $4,166,666) with respect to each such Hospital so sold, merged or otherwise transferred within 30 days of the effective date of the sale, merger or other transfer. If neither RCAB or Steward terminates this Agreement with respect to such Hospital, Steward, as a condition of closing such sale, merger or other transfer, shall cause the transferee to accept the obligations under this Agreement with respect to such Hospital in a form of agreement reasonably satisfactory to RCAB and to which RCAB is a named party. In any event, all of the provisions of this Agreement as they apply to any Hospital (or its assets and operations) not sold, merged or otherwise transferred shall, as to the remaining Hospitals and their respective services, continue in full force and effect.

(e) This Agreement may be terminated at any time by RCAB, in its sole discretion and without giving any reason therefor, by giving written notice of such termination to Steward and expressly referencing its reliance upon this Section 6.3(e).

6.3 Effect of Termination. If this Agreement is terminated in whole or in relevant part (with respect to one or more Hospitals) pursuant to Section 6.2 above, Steward shall:

(a) cause the Hospital(s) and their respective services to remove, pursuant to a 18-month transition schedule, all symbols of Catholic identity (e.g., interior and exterior signage; trade and service marks associated with Catholic identity in both paper and electronic form) and cease to use any of the Restricted Names; and

(b) promptly cause the Hospital(s) and their respective services to remove the Religious Items within 30 days and return them to the person or entity who contributed to them, as noted on **Schedule 2.3**, or, if the contributor is unknown or no longer in existence, to RCAB.

Other than Section 6.3(a) and (b), the representations, warranties, covenants and agreements contained in this Agreement shall terminate upon the termination of this Agreement for any reason (subject to the payment of any amounts pursuant to Section 6.4, if applicable and any other payment obligations hereunder), and thereafter no Party hereto shall make any claim whatsoever for any breach of any such representation, warranty or covenant.

6.4 Termination Contribution. In the event that RCAB or Steward terminates this Agreement pursuant to Section 6.2(b) (except *only* if RCAB terminates this Agreement expressly based upon non-compliance with a Legal Requirement as set forth in Section 4.7(a)), (c) or (d), Steward shall pay and make a $25 million contribution or, to the extent any partial payments have previously been made in accordance with the second sentence of Section 6.2(d), a contribution equal to $25 million minus the aggregate amount of any such partial payments (the "Termination Contribution") (or a portion thereof, pursuant to Section 6.2(d)) to a public charity that is designated solely by RCAB and is subject to the jurisdiction of the Massachusetts Attorney General.

6.5 Except to the extent otherwise set forth in Section 7 below, any and all rights and obligations of the Parties under this Agreement shall terminate and cease to exist effective as of the date on which this Agreement is terminated in its entirety.

SECTION 7

GENERAL PROVISIONS

7.1 Notice. Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given if given in writing: (a) on the date tendered by personal delivery; (b) on the date received by facsimile or other electronic means; (c) on the

date tendered for delivery by nationally-recognized overnight courier; (d) on the date tendered for delivery by United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, in any event addressed as follows; or (e) on the next business day if send by means of Federal Express or another nationally recognized overnight courier service:

If to Steward, to:

Caritas Christi
77 Warren Street
Boston, Massachusetts 02135
Attention: Ralph de la Torre, M.D.
Telecopier: (617) 779-6422
Ralph.delaTorre@caritaschristi.org

with copies to:

Caritas Christi
77 Warren Street
Boston, Massachusetts 02135
Attention: Joseph C. Maher, Jr., Esq.

joseph.maher@caritaschristi.org
Telecopier: (617) 779-6422

McDermott Will & Emery LLP
28 State Street
Boston, Massachusetts 02109
Attention: Christopher M. Jedrey, Esq.
Telecopier: (617) 535-3800
cjedrey@mwe.com

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Attention: Marc Weingarten, Esq.
David Rosewater, Esq.
Telecopier: (212) 593-5955
Marc.Weingarten@srz.com
David.Rosewater@srz.com

If to RCAB, to:

Roman Catholic Archbishop of Boston
66 Brooks Drive
Braintree, MA 02184-3839
Attention: James P. McDonough, Chancellor

Facsimile: (617) 779-4571
E-Mail: JPM@rcab.org

With a copy to:

Roman Catholic Archbishop of Boston
66 Brooks Drive
Braintree, MA 02184-3839
Attention: F. Beirne Lovely, Jr., General Counsel
Facsimile: (617) 746-5686
E-Mail: Beirne_Lovely@rcab.org

or to such other address or number, and to the attention of such other person, as any Party may designate in writing in conformity with this Section.

7.2 Amendment. No modification, waiver, amendment, discharge, or change of this Agreement will be valid unless in writing and signed by the Party against whom enforcement of such modification, waiver, amendment, discharge or change is sought.

7.3 Successor and Assigns. All of the terms and provisions of this Agreement will be binding upon and will inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties. Subject to Section 6.2(d) above, no Party may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other Party.

7.4 Severability. If any one or more of the provisions of this Agreement should be ruled wholly or partly invalid or unenforceable by a court or other government body of competent jurisdiction, then: (a) the validity and enforceability of all provisions of this Agreement not ruled to be invalid or unenforceable will be unaffected; (b) the effect of the ruling will be limited to the jurisdiction of the court or other government body making ruling; (c) the provision(s) held wholly or partly invalid or unenforceable will be deemed amended, and shall

be reformed to the minimum extent necessary to render them valid and enforceable in conformity with the Parties' intent as manifested herein; and (d) if the ruling and/or the controlling principle of law or equity leading to the ruling, is subsequently overruled, modified, or amended by legislative, judicial, or administrative action, the provision(s) in question as originally set forth in this Agreement will be deemed valid and enforceable to the maximum extent permitted by the new controlling principle of law or equity. This severability clause shall apply only if the integrity of this entire Agreement can otherwise be preserved.

7.5 Third Party Beneficiaries; Scope of Agreement. None of the provisions of this Agreement are intended by the Parties, nor shall they be construed or interpreted, to confer any right, benefit, claim, duty or obligation on any person or entity that is not a Party to this Agreement. The Parties acknowledge and agree that Steward intends to operate the Hospitals and their respective services as part of an integrated health care system that includes entities other than the Hospitals. Notwithstanding any other provision of this Agreement to the contrary, in no event shall the Directives apply or be construed to apply to, or be binding upon any person or entity other than the Hospitals and their respective services.

7.6 Headings; Use of Terms. All headings in this Agreement are for reference purposes only and are not intended to affect in any way the meaning or interpretation of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require.

7.7 Counterparts. This Agreement may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. This Agreement, and any executed counterpart of a signature page to

this Agreement, may be transmitted by fax or e-mail, and delivery of an executed counterpart of a signature page to this Agreement by fax or e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

7.8 Waiver. The waiver by any Party of a breach or violation of any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach of such provision or any other provision of this Agreement.

7.9 Construction. This Agreement will not be construed more strictly against any Party hereto by virtue of the fact that this Agreement may have been drafted or prepared by such Party or its counsel, it being recognized that all of the Parties hereto have contributed substantially and materially to its preparation and that this Agreement has been the subject of and is the product of negotiations between the Parties.

7.10 Entire Agreement. This Agreement, the schedules, and the documents referred to herein, contain the entire understanding between the Parties with respect to the subject matter hereof and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the Parties on the subject matter hereof.

7.11 Governing Law; Venue. This Agreement shall be governed by and construed and enforced in accordance with the laws of The Commonwealth of Massachusetts.

7.12 Joint and Several Liability. The obligations of Steward Hospital Holdings LLC and SCHS under this Agreement shall be joint and several.

7.13 Survival. The following provisions of this Agreement shall expressly survive its termination: Section 2.4, Section 6.3 and Sections 7.1 through 7.13, inclusive.

IN WITNESS WHEREOF, the undersigned duly authorized representatives of the Parties have executed this Agreement as of the date above.

STEWARD HEALTH CARE SYSTEM LLC

By: Ralph de la Torre
Name:
Title: Authorized Signatory

STEWARD HOSPITAL HOLDINGS LLC

By: Ralph de la Torre
Name:
Title: Authorized Signatory

ROMAN CATHOLIC ARCHBISHOP OF BOSTON

By: + Seán O'Malley
Name: Seán Cardinal O'Malley, O.F.M., Cap.
Title: Archbishop of Boston

Schedule 1.1

Ethical and Religious Directives for Catholic Health Care Services

## *Fifth Edition*

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS




1 Preamble

3 General Introduction

4 PART ONE
The Social Responsibility of Catholic Health Care Services

6 PART TWO
The Pastoral and Spiritual Responsibility of Catholic Health Care

8 PART THREE
The Professional-Patient Relationship

10 PART FOUR
Issues in Care for the Beginning of Life

12 PART FIVE
Issues in Care for the Seriously Ill and Dying

14 PART SIX
Forming New Partnerships with Health Care Organizations and Providers

16 Conclusion

17 Index


ealth care in the United States is marked by extraordinary change. Not only is there continuing change in clinical practice due to technological advances, but the health care system in the United States is being challenged by both institutional and social factors as well. At the same time, there are a number of developments within the Catholic Church affecting the ecclesial mission of health care. Among these are significant changes in religious orders and congregations, the increased involvement of lay men and women, a heightened awareness of the Church's social role in the world, and developments in moral theology since the Second Vatican Council. A contemporary understanding of the Catholic health care ministry must take into account the new challenges presented by transitions both in the Church and in American society.

Throughout the centuries, with the aid of other sciences, a body of moral principles has emerged that expresses the Church's teaching on medical and moral matters and has proven to be pertinent and applicable to the ever-changing circumstances of health care and its delivery. In response to today's challenges, these same moral principles of Catholic teaching provide the rationale and direction for this revision of the *Ethical and Religious Directives for Catholic Health Care Services.*

This fifth edition of the *Ethical and Religious Directives for Catholic Health Care Services* was developed by the Committee on Doctrine of the United States Conference of Catholic Bishops (USCCB) and approved as the national code by the full body of the USCCB at its November 2009 General Meeting. This edition of the *Directives*, which replaces all previous editions, is recommended for implementation by the diocesan bishop and is authorized for publication by the undersigned.

Msgr. David J. Malloy, STD
General Secretary, USCCB

Excerpts from *The Documents of Vatican II*, ed. Walter M. Abbott, SJ, copyright © 1966 by America Press are used with permission. All rights reserved.

Scripture texts used in this work are taken from the *New American Bible*, copyright © 1991, 1986, and 1970 by the Confraternity of Christian Doctrine, Washington, D.C., 20017 and are used by permission of the copyright owner. All rights reserved.

ISBN 978-1-60137-102-7

First printing, March 2010

Copyright © 2009, United States Conference of Catholic Bishops, Washington, D.C. All rights reserved. No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the copyright holder.

These Directives presuppose our statement *Health and Health Care* published in 1981.[1] There we presented the theological principles that guide the Church's vision of health care, called for all Catholics to share in the healing mission of the Church, expressed our full commitment to the health care ministry, and offered encouragement to all those who are involved in it. Now, with American health care facing even more dramatic changes, we reaffirm the Church's commitment to health care ministry and the distinctive Catholic identity of the Church's institutional health care services.[2] The purpose of these *Ethical and Religious Directives* then is twofold: first, to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person; second, to provide authoritative guidance on certain moral issues that face Catholic health care today.

The *Ethical and Religious Directives* are concerned primarily with institutionally based Catholic health care services. They address the sponsors, trustees, administrators, chaplains, physicians, health care personnel, and patients or residents of these institutions and services. Since they express the Church's moral teaching, these Directives also will be helpful to Catholic professionals engaged in health care services in other settings. The moral teachings that we profess here flow principally from the natural law, understood in the light of the revelation Christ has entrusted to his Church. From this source the Church has derived its understanding of the nature of the human person, of human acts, and of the goals that shape human activity.

The Directives have been refined through an extensive process of consultation with bishops, theologians, sponsors, administrators, physicians, and other health care providers. While providing standards and guidance, the Directives do not cover in detail all of the complex issues that confront Catholic health care today. Moreover, the Directives will be reviewed periodically by the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops), in the light of authoritative church teaching, in order to address new insights from theological and medical research or new requirements of public policy.

The Directives begin with a general introduction that presents a theological basis for the Catholic health care ministry. Each of the six parts that follow is divided into two sections. The first section is in expository form; it serves as an introduction and provides the context in

1. United States Conference of Catholic Bishops, *Health and Health Care: A Pastoral Letter of the American Catholic Bishops* (Washington, DC: United States Conference of Catholic Bishops, 1981).
2. Health care services under Catholic auspices are carried out in a variety of institutional settings (e.g., hospitals, clinics, outpatient facilities, urgent care centers, hospices, nursing homes, and parishes). Depending on the context, these Directives will employ the terms "institution" and/or "services" in order to encompass the variety of settings in which Catholic health care is provided.

which concrete issues can be discussed from the perspective of the Catholic faith. The second section is in prescriptive form; the directives promote and protect the truths of the Catholic faith as those truths are brought to bear on concrete issues in health care.

## General Introduction

The Church has always sought to embody our Savior's concern for the sick. The gospel accounts of Jesus' ministry draw special attention to his acts of healing: he cleansed a man with leprosy (Mt 8:1-4; Mk 1:40-42); he gave sight to two people who were blind (Mt 20:29-34; Mk 10:46-52); he enabled one who was mute to speak (Lk 11:14); he cured a woman who was hemorrhaging (Mt 9:20-22; Mk 5:25-34); and he brought a young girl back to life (Mt 9:18, 23-25; Mk 5:35-42). Indeed, the Gospels are replete with examples of how the Lord cured every kind of ailment and disease (Mt 9:35). In the account of Matthew, Jesus' mission fulfilled the prophecy of Isaiah: "He took away our infirmities and bore our diseases" (Mt 8:17; cf. Is 53:4).

Jesus' healing mission went further than caring only for physical affliction. He touched people at the deepest level of their existence; he sought their physical, mental, and spiritual healing (Jn 6:35, 11:25-27). He "came so that they might have life and have it more abundantly" (Jn 10:10).

The mystery of Christ casts light on every facet of Catholic health care: to see Christian love as the animating principle of health care; to see healing and compassion as a continuation of Christ's mission; to see suffering as a participation in the redemptive power of Christ's passion, death, and resurrection; and to see death, transformed by the resurrection, as an opportunity for a final act of communion with Christ.

For the Christian, our encounter with suffering and death can take on a positive and distinctive meaning through the redemptive power of Jesus' suffering and death. As St. Paul says, we are "always carrying about in the body the dying of Jesus, so that the life of Jesus may also be manifested in our body" (2 Cor 4:10). This truth does not lessen the pain and fear, but gives confidence and grace for bearing suffering rather than being overwhelmed by it. Catholic health care ministry bears witness to the truth that, for those who are in Christ, suffering and death are the birth pangs of the new creation. "God himself will always be with them [as their God]. He will wipe every tear from their eyes, and there shall be no more death or mourning, wailing or pain, [for] the old order has passed away" (Rev 21:3-4).

In faithful imitation of Jesus Christ, the Church has served the sick, suffering, and dying in various ways throughout history. The zealous service of individuals and communities has provided shelter for the traveler; infirmaries for the sick; and homes for children, adults, and the elderly.[3] In the United States, the many religious communities as well as dioceses that sponsor and staff this country's Catholic health care institutions and services have established an effective Catholic presence in health care. Modeling their efforts on the gospel parable of the Good Samaritan, these communities of women and men have exemplified authentic neighborliness to those in need (Lk 10:25-37). The Church seeks to ensure that the service offered in the past will be continued into the future.

While many religious communities continue their commitment to the health care ministry, lay Catholics increasingly have stepped forward to collaborate in this ministry. Inspired by the example of Christ and mandated by the Second Vatican Council, lay faithful are invited to a broader and more intense field of ministries than in the past.[4] By virtue of their Baptism, lay faithful are called to participate actively in the Church's life and mission.[5] Their participation and leadership in the health care ministry, through new forms of sponsorship and governance of institutional Catholic health care, are essential for the Church to continue her ministry of healing and compassion. They are joined in the Church's health care mission by many men and women who are not Catholic.

Catholic health care expresses the healing ministry of Christ in a specific way within the local church. Here the diocesan bishop exercises responsibilities that are rooted in his office as pastor, teacher, and priest. As the center of unity in the diocese and coordinator of ministries in the local church, the diocesan bishop fosters the mission of Catholic health care in a way that promotes collaboration among health care leaders, providers,

3. *Health and Health Care*, p. 5.
4. Second Vatican Ecumenical Council, *Decree on the Apostolate of the Laity* (*Apostolicam Actuositatem*) (1965), no. 1.
5. Pope John Paul II, Post-Synodal Apostolic Exhortation *On the Vocation and the Mission of the Lay Faithful in the Church and in the World* (*Christifideles Laici*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 29.

medical professionals, theologians, and other specialists. As pastor, the diocesan bishop is in a unique position to encourage the faithful to greater responsibility in the healing ministry of the Church. As teacher, the diocesan bishop ensures the moral and religious identity of the health care ministry in whatever setting it is carried out in the diocese. As priest, the diocesan bishop oversees the sacramental care of the sick. These responsibilities will require that Catholic health care providers and the diocesan bishop engage in ongoing communication on ethical and pastoral matters that require his attention.

In a time of new medical discoveries, rapid technological developments, and social change, what is new can either be an opportunity for genuine advancement in human culture, or it can lead to policies and actions that are contrary to the true dignity and vocation of the human person. In consultation with medical professionals, church leaders review these developments, judge them according to the principles of right reason and the ultimate standard of revealed truth, and offer authoritative teaching and guidance about the moral and pastoral responsibilities entailed by the Christian faith.[6] While the Church cannot furnish a ready answer to every moral dilemma, there are many questions about which she provides normative guidance and direction. In the absence of a determination by the magisterium, but never contrary to church teaching, the guidance of approved authors can offer appropriate guidance for ethical decision making.

Created in God's image and likeness, the human family shares in the dominion that Christ manifested in his healing ministry. This sharing involves a stewardship over all material creation (Gn 1:26) that should neither abuse nor squander nature's resources. Through science the human race comes to understand God's wonderful work; and through technology it must conserve, protect, and perfect nature in harmony with God's purposes. Health care professionals pursue a special vocation to share in carrying forth God's life-giving and healing work.

The dialogue between medical science and Christian faith has for its primary purpose the common good of all human persons. It presupposes that science and faith do not contradict each other. Both are grounded in respect for truth and freedom. As new knowledge and new technologies expand, each person must form a correct conscience based on the moral norms for proper health care.

## PART ONE

## The Social Responsibility of Catholic Health Care Services

### *Introduction*

Their embrace of Christ's healing mission has led institutionally based Catholic health care services in the United States to become an integral part of the nation's health care system. Today, this complex health care system confronts a range of economic, technological, social, and moral challenges. The response of Catholic health care institutions and services to these challenges is guided by normative principles that inform the Church's healing ministry.

First, Catholic health care ministry is rooted in a commitment to promote and defend human dignity; this is the foundation of its concern to respect the sacredness of every human life from the moment of conception until death. The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care.[7]

Second, the biblical mandate to care for the poor requires us to express this in concrete action at all levels of Catholic health care. This mandate prompts us to work to ensure that our country's health care delivery system provides adequate health care for the poor. In Catholic institutions, particular attention should be given to the health care needs of the poor, the uninsured, and the underinsured.[8]

---

6. As examples, see Congregation for the Doctrine of the Faith, *Declaration on Procured Abortion* (1974); Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* (1980); Congregation for the Doctrine of the Faith, *Instruction on Respect for Human Life in Its Origin and on the Dignity of Procreation: Replies to Certain Questions of the Day* (*Donum Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1987).
7. Pope John XXIII, Encyclical Letter *Peace on Earth* (*Pacem in Terris*) (Washington, DC: United States Conference of Catholic Bishops, 1963), no. 11; *Health and Health Care*, pp. 5, 17-18; *Catechism of the Catholic Church*, 2nd ed. (Washington, DC: Libreria Editrice Vaticana–United States Conference of Catholic Bishops, 2000), no. 2211.
8. Pope John Paul II, *On Social Concern, Encyclical Letter on the Occasion of the Twentieth Anniversary of "Populorum Progressio"* (*Sollicitudo Rei Socialis*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

Third, Catholic health care ministry seeks to contribute to the common good. The common good is realized when economic, political, and social conditions ensure protection for the fundamental rights of all individuals and enable all to fulfill their common purpose and reach their common goals.[9]

Fourth, Catholic health care ministry exercises responsible stewardship of available health care resources. A just health care system will be concerned both with promoting equity of care—to assure that the right of each person to basic health care is respected—and with promoting the good health of all in the community. The responsible stewardship of health care resources can be accomplished best in dialogue with people from all levels of society, in accordance with the principle of subsidiarity and with respect for the moral principles that guide institutions and persons.

Fifth, within a pluralistic society, Catholic health care services will encounter requests for medical procedures contrary to the moral teachings of the Church. Catholic health care does not offend the rights of individual conscience by refusing to provide or permit medical procedures that are judged morally wrong by the teaching authority of the Church.

## *Directives*

1. A Catholic institutional health care service is a community that provides health care to those in need of it. This service must be animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church.

2. Catholic health care should be marked by a spirit of mutual respect among caregivers that disposes them to deal with those it serves and their families with the compassion of Christ, sensitive to their vulnerability at a time of special need.

3. In accord with its mission, Catholic health care should distinguish itself by service to and advocacy for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable to discrimination: the poor; the uninsured and the underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees. In particular, the person with mental or physical disabilities, regardless of the cause or severity, must be treated as a unique person of incomparable worth, with the same right to life and to adequate health care as all other persons.

4. A Catholic health care institution, especially a teaching hospital, will promote medical research consistent with its mission of providing health care and with concern for the responsible stewardship of health care resources. Such medical research must adhere to Catholic moral principles.

5. Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel.

6. A Catholic health care organization should be a responsible steward of the health care resources available to it. Collaboration with other health care providers, in ways that do not compromise Catholic social and moral teaching, can be an effective means of such stewardship.[10]

7. A Catholic health care institution must treat its employees respectfully and justly. This responsibility includes: equal employment opportunities for anyone qualified for the task, irrespective of a person's race, sex, age, national origin, or disability; a workplace that promotes employee participation; a work environment that ensures employee safety and well-being; just compensation and benefits; and recognition of the rights of employees to organize and bargain collectively without prejudice to the common good.

8. Catholic health care institutions have a unique relationship to both the Church and the wider community they serve. Because of the ecclesial nature of this relationship, the relevant requirements of

---

9. United States Conference of Catholic Bishops, *Economic Justice for All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* (Washington, DC: United States Conference of Catholic Bishops, 1986), no. 80.

10. The duty of responsible stewardship demands responsible collaboration. But in collaborative efforts, Catholic institutionally based health care services must be attentive to occasions when the policies and practices of other institutions are not compatible with the Church's authoritative moral teaching. At such times, Catholic health care institutions should determine whether or to what degree collaboration would be morally permissible. To make that judgment, the governing boards of Catholic institutions should adhere to the moral principles on cooperation. See Part Six.

canon law will be observed with regard to the foundation of a new Catholic health care institution; the substantial revision of the mission of an institution; and the sale, sponsorship transfer, or closure of an existing institution.

9. Employees of a Catholic health care institution must respect and uphold the religious mission of the institution and adhere to these Directives. They should maintain professional standards and promote the institution's commitment to human dignity and the common good.

PART TWO

# The Pastoral and Spiritual Responsibility of Catholic Health Care

## *Introduction*

he dignity of human life flows from creation in the image of God (Gn 1:26), from redemption by Jesus Christ (Eph 1:10; 1 Tm 2:4-6), and from our common destiny to share a life with God beyond all corruption (1 Cor 15:42-57). Catholic health care has the responsibility to treat those in need in a way that respects the human dignity and eternal destiny of all. The words of Christ have provided inspiration for Catholic health care: "I was ill and you cared for me" (Mt 25:36). The care provided assists those in need to experience their own dignity and value, especially when these are obscured by the burdens of illness or the anxiety of imminent death.

Since a Catholic health care institution is a community of healing and compassion, the care offered is not limited to the treatment of a disease or bodily ailment but embraces the physical, psychological, social, and spiritual dimensions of the human person. The medical expertise offered through Catholic health care is combined with other forms of care to promote health and relieve human suffering. For this reason, Catholic health care extends to the spiritual nature of the person. "Without health of the spirit, high technology focused strictly on the body offers limited hope for healing the whole person."[11] Directed to spiritual needs that are often appreciated more deeply during times of illness, pastoral care is an integral part of Catholic health care. Pastoral care encompasses the full range of spiritual services, including a listening presence; help in dealing with powerlessness, pain, and alienation; and assistance in recognizing and responding to God's will with greater joy and peace. It should be acknowledged, of course, that technological advances in medicine have reduced the length of hospital stays dramatically. It follows, therefore, that the pastoral care of patients, especially administration of the sacraments, will be provided more often than not at the parish level, both before and after one's hospitalization. For this reason, it is essential that there be very cordial and cooperative relationships between the personnel of pastoral care departments and the local clergy and ministers of care.

Priests, deacons, religious, and laity exercise diverse but complementary roles in this pastoral care. Since many areas of pastoral care call upon the creative response of these pastoral caregivers to the particular needs of patients or residents, the following directives address only a limited number of specific pastoral activities.

## *Directives*

10. A Catholic health care organization should provide pastoral care to minister to the religious and spiritual needs of all those it serves. Pastoral care personnel—clergy, religious, and lay alike—should have appropriate professional preparation, including an understanding of these Directives.

11. Pastoral care personnel should work in close collaboration with local parishes and community clergy. Appropriate pastoral services and/or referrals should be available to all in keeping with their religious beliefs or affiliation.

12. For Catholic patients or residents, provision for the sacraments is an especially important part of Catholic health care ministry. Every effort should be made to have priests assigned to hospitals and health care institutions to celebrate the Eucharist and provide the sacraments to patients and staff.

---

11. *Health and Health Care*, p. 12.

13. Particular care should be taken to provide and to publicize opportunities for patients or residents to receive the sacrament of Penance.

14. Properly prepared lay Catholics can be appointed to serve as extraordinary ministers of Holy Communion, in accordance with canon law and the policies of the local diocese. They should assist pastoral care personnel—clergy, religious, and laity—by providing supportive visits, advising patients regarding the availability of priests for the sacrament of Penance, and distributing Holy Communion to the faithful who request it.

15. Responsive to a patient's desires and condition, all involved in pastoral care should facilitate the availability of priests to provide the sacrament of Anointing of the Sick, recognizing that through this sacrament Christ provides grace and support to those who are seriously ill or weakened by advanced age. Normally, the sacrament is celebrated when the sick person is fully conscious. It may be conferred upon the sick who have lost consciousness or the use of reason, if there is reason to believe that they would have asked for the sacrament while in control of their faculties.

16. All Catholics who are capable of receiving Communion should receive Viaticum when they are in danger of death, while still in full possession of their faculties.[12]

17. Except in cases of emergency (i.e., danger of death), any request for Baptism made by adults or for infants should be referred to the chaplain of the institution. Newly born infants in danger of death, including those miscarried, should be baptized if this is possible.[13] In case of emergency, if a priest or a deacon is not available, anyone can validly baptize.[14] In the case of emergency Baptism, the chaplain or the director of pastoral care is to be notified.

18. When a Catholic who has been baptized but not yet confirmed is in danger of death, any priest may confirm the person.[15]

19. A record of the conferral of Baptism or Confirmation should be sent to the parish in which the institution is located and posted in its baptism/confirmation registers.

20. Catholic discipline generally reserves the reception of the sacraments to Catholics. In accord with canon 844, §3, Catholic ministers may administer the sacraments of Eucharist, Penance, and Anointing of the Sick to members of the oriental churches that do not have full communion with the Catholic Church, or of other churches that in the judgment of the Holy See are in the same condition as the oriental churches, if such persons ask for the sacraments on their own and are properly disposed.

With regard to other Christians not in full communion with the Catholic Church, when the danger of death or other grave necessity is present, the four conditions of canon 844, §4, also must be present, namely, they cannot approach a minister of their own community; they ask for the sacraments on their own; they manifest Catholic faith in these sacraments; and they are properly disposed. The diocesan bishop has the responsibility to oversee this pastoral practice.

21. The appointment of priests and deacons to the pastoral care staff of a Catholic institution must have the explicit approval or confirmation of the local bishop in collaboration with the administration of the institution. The appointment of the director of the pastoral care staff should be made in consultation with the diocesan bishop.

22. For the sake of appropriate ecumenical and interfaith relations, a diocesan policy should be developed with regard to the appointment of non-Catholic members to the pastoral care staff of a Catholic health care institution. The director of pastoral care at a Catholic institution should be a Catholic; any exception to this norm should be approved by the diocesan bishop.

---

12. Cf. *Code of Canon Law*, cc. 921-923.
13. Cf. ibid., c. 867, § 2, and c. 871.
14. To confer Baptism in an emergency, one must have the proper intention (to do what the Church intends by Baptism) and pour water on the head of the person to be baptized, meanwhile pronouncing the words: "I baptize you in the name of the Father, and of the Son, and of the Holy Spirit."
15. Cf. c. 883, 3°.

PART THREE

# [illegible]

## *Introduction*

person in need of health care and the professional health care provider who accepts that person as a patient enter into a relationship that requires, among other things, mutual respect, trust, honesty, and appropriate confidentiality. The resulting free exchange of information must avoid manipulation, intimidation, or condescension. Such a relationship enables the patient to disclose personal information needed for effective care and permits the health care provider to use his or her professional competence most effectively to maintain or restore the patient's health. Neither the health care professional nor the patient acts independently of the other; both participate in the healing process.

Today, a patient often receives health care from a team of providers, especially in the setting of the modern acute-care hospital. But the resulting multiplication of relationships does not alter the personal character of the interaction between health care providers and the patient. The relationship of the person seeking health care and the professionals providing that care is an important part of the foundation on which diagnosis and care are provided. Diagnosis and care, therefore, entail a series of decisions with ethical as well as medical dimensions. The health care professional has the knowledge and experience to pursue the goals of healing, the maintenance of health, and the compassionate care of the dying, taking into account the patient's convictions and spiritual needs, and the moral responsibilities of all concerned. The person in need of health care depends on the skill of the health care provider to assist in preserving life and promoting health of body, mind, and spirit. The patient, in turn, has a responsibility to use these physical and mental resources in the service of moral and spiritual goals to the best of his or her ability.

When the health care professional and the patient use institutional Catholic health care, they also accept its public commitment to the Church's understanding of and witness to the dignity of the human person. The Church's moral teaching on health care nurtures a truly interpersonal professional-patient relationship. This professional-patient relationship is never separated, then, from the Catholic identity of the health care institution. The faith that inspires Catholic health care guides medical decisions in ways that fully respect the dignity of the person and the relationship with the health care professional.

## *Directives*

23. The inherent dignity of the human person must be respected and protected regardless of the nature of the person's health problem or social status. The respect for human dignity extends to all persons who are served by Catholic health care.

24. In compliance with federal law, a Catholic health care institution will make available to patients information about their rights, under the laws of their state, to make an advance directive for their medical treatment. The institution, however, will not honor an advance directive that is contrary to Catholic teaching. If the advance directive conflicts with Catholic teaching, an explanation should be provided as to why the directive cannot be honored.

25. Each person may identify in advance a representative to make health care decisions as his or her surrogate in the event that the person loses the capacity to make health care decisions. Decisions by the designated surrogate should be faithful to Catholic moral principles and to the person's intentions and values, or if the person's intentions are unknown, to the person's best interests. In the event that an advance directive is not executed, those who are in a position to know best the patient's wishes—usually family members and loved ones—should participate in the treatment decisions for the person who has lost the capacity to make health care decisions.

26. The free and informed consent of the person or the person's surrogate is required for medical treatments and procedures, except in an emergency situation when consent cannot be obtained and there is no indication that the patient would refuse consent to the treatment.

27. Free and informed consent requires that the person or the person's surrogate receive all reasonable information about the essential nature of the proposed treatment and its benefits; its risks, side-effects, consequences, and cost; and any reasonable and morally legitimate alternatives, including no treatment at all.

28. Each person or the person's surrogate should have access to medical and moral information and counseling so as to be able to form his or her conscience. The free and informed health care decision of the person or the person's surrogate is to be followed so long as it does not contradict Catholic principles.

29. All persons served by Catholic health care have the right and duty to protect and preserve their bodily and functional integrity.[16] The functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available.[17]

30. The transplantation of organs from living donors is morally permissible when such a donation will not sacrifice or seriously impair any essential bodily function and the anticipated benefit to the recipient is proportionate to the harm done to the donor. Furthermore, the freedom of the prospective donor must be respected, and economic advantages should not accrue to the donor.

31. No one should be the subject of medical or genetic experimentation, even if it is therapeutic, unless the person or surrogate first has given free and informed consent. In instances of nontherapeutic experimentation, the surrogate can give this consent only if the experiment entails no significant risk to the person's well-being. Moreover, the greater the person's incompetency and vulnerability, the greater the reasons must be to perform any medical experimentation, especially nontherapeutic.

32. While every person is obliged to use ordinary means to preserve his or her health, no person should be obliged to submit to a health care procedure that the person has judged, with a free and informed conscience, not to provide a reasonable hope of benefit without imposing excessive risks and burdens on the patient or excessive expense to family or community.[18]

33. The well-being of the whole person must be taken into account in deciding about any therapeutic intervention or use of technology. Therapeutic procedures that are likely to cause harm or undesirable side-effects can be justified only by a proportionate benefit to the patient.

34. Health care providers are to respect each person's privacy and confidentiality regarding information related to the person's diagnosis, treatment, and care.

35. Health care professionals should be educated to recognize the symptoms of abuse and violence and are obliged to report cases of abuse to the proper authorities in accordance with local statutes.

36. Compassionate and understanding care should be given to a person who is the victim of sexual assault. Health care providers should cooperate with law enforcement officials and offer the person psychological and spiritual support as well as accurate medical information. A female who has been raped should be able to defend herself against a potential conception from the sexual assault. If, after appropriate testing, there is no evidence that conception has occurred already, she may be treated with medications that would prevent ovulation, sperm capacitation, or fertilization. It is not permissible, however, to initiate or to recommend treatments that have as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum.[19]

37. An ethics committee or some alternate form of ethical consultation should be available to assist by advising on particular ethical situations, by offering educational opportunities, and by reviewing and recommending policies. To these ends, there should be appropriate standards for medical ethical consultation within a particular diocese that will respect the diocesan bishop's pastoral responsibility as well as assist members of ethics committees to be familiar with Catholic medical ethics and, in particular, these Directives.

---

16. For example, while the donation of a kidney represents loss of biological integrity, such a donation does not compromise functional integrity since human beings are capable of functioning with only one kidney.
17. Cf. directive 53.
18. *Declaration on Euthanasia*, Part IV; cf. also directives 56-57.
19. It is recommended that a sexually assaulted woman be advised of the ethical restrictions that prevent Catholic hospitals from using abortifacient procedures; cf. Pennsylvania Catholic Conference, "Guidelines for Catholic Hospitals Treating Victims of Sexual Assault," *Origins* 22 (1993): 810.

PART FOUR

# Issues in Care for the Beginning of Life

## *Introduction*

The Church's commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning, and with the dignity of marriage and of the marriage act by which human life is transmitted. The Church cannot approve medical practices that undermine the biological, psychological, and moral bonds on which the strength of marriage and the family depends.

Catholic health care ministry witnesses to the sanctity of life "from the moment of conception until death."[20] The Church's defense of life encompasses the unborn and the care of women and their children during and after pregnancy. The Church's commitment to life is seen in its willingness to collaborate with others to alleviate the causes of the high infant mortality rate and to provide adequate health care to mothers and their children before and after birth.

The Church has the deepest respect for the family, for the marriage covenant, and for the love that binds a married couple together. This includes respect for the marriage act by which husband and wife express their love and cooperate with God in the creation of a new human being. The Second Vatican Council affirms:

> This love is an eminently human one. . . . It involves the good of the whole person. . . . The actions within marriage by which the couple are united intimately and chastely are noble and worthy ones. Expressed in a manner which is truly human, these actions signify and promote that mutual self-giving by which spouses enrich each other with a joyful and a thankful will.[21]

> Marriage and conjugal love are by their nature ordained toward the begetting and educating of children. Children are really the supreme gift of marriage and contribute very substantially to the welfare of their parents. . . . Parents should regard as their proper mission the task of transmitting human life and educating those to whom it has been transmitted. . . . They are thereby cooperators with the love of God the Creator, and are, so to speak, the interpreters of that love.[22]

For legitimate reasons of responsible parenthood, married couples may limit the number of their children by natural means. The Church cannot approve contraceptive interventions that "either in anticipation of the marital act, or in its accomplishment or in the development of its natural consequences, have the purpose, whether as an end or a means, to render procreation impossible."[23] Such interventions violate "the inseparable connection, willed by God . . . between the two meanings of the conjugal act: the unitive and procreative meaning."[24]

With the advance of the biological and medical sciences, society has at its disposal new technologies for responding to the problem of infertility. While we rejoice in the potential for good inherent in many of these technologies, we cannot assume that what is technically possible is always morally right. Reproductive technologies that substitute for the marriage act are not consistent with human dignity. Just as the marriage act is joined naturally to procreation, so procreation is joined naturally to the marriage act. As Pope John XXIII observed:

> The transmission of human life is entrusted by nature to a personal and conscious act and as such is subject to all the holy laws of God: the immutable and inviolable laws which must be recognized and observed. For this reason, one cannot use means and follow methods which could be licit in the transmission of the life of plants and animals.[25]

---

20. Pope John Paul II, "Address of October 29, 1983, to the 35th General Assembly of the World Medical Association," *Acta Apostolicae Sedis* 76 (1984): 390.
21. Second Vatican Ecumenical Council, *Pastoral Constitution on the Church in the Modern World* (*Gaudium et Spes*) (1965), no. 49.
22. Ibid., no. 50.
23. Pope Paul VI, Encyclical Letter *On the Regulation of Birth* (*Humanae Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1968), no. 14.
24. Ibid., no. 12.
25. Pope John XXIII, Encyclical Letter *Mater et Magistra* (1961), no. 193, quoted in Congregation for the Doctrine of the Faith, *Donum Vitae*, no. 4.

Because the moral law is rooted in the whole of human nature, human persons, through intelligent reflection on their own spiritual destiny, can discover and cooperate in the plan of the Creator.[26]

## *Directives*

38. When the marital act of sexual intercourse is not able to attain its procreative purpose, assistance that does not separate the unitive and procreative ends of the act, and does not substitute for the marital act itself, may be used to help married couples conceive.[27]

39. Those techniques of assisted conception that respect the unitive and procreative meanings of sexual intercourse and do not involve the destruction of human embryos, or their deliberate generation in such numbers that it is clearly envisaged that all cannot implant and some are simply being used to maximize the chances of others implanting, may be used as therapies for infertility.

40. Heterologous fertilization (that is, any technique used to achieve conception by the use of gametes coming from at least one donor other than the spouses) is prohibited because it is contrary to the covenant of marriage, the unity of the spouses, and the dignity proper to parents and the child.[28]

41. Homologous artificial fertilization (that is, any technique used to achieve conception using the gametes of the two spouses joined in marriage) is prohibited when it separates procreation from the marital act in its unitive significance (e.g., any technique used to achieve extracorporeal conception).[29]

42. Because of the dignity of the child and of marriage, and because of the uniqueness of the mother-child relationship, participation in contracts or arrangements for surrogate motherhood is not permitted. Moreover, the commercialization of such surrogacy denigrates the dignity of women, especially the poor.[30]

43. A Catholic health care institution that provides treatment for infertility should offer not only technical assistance to infertile couples but also should help couples pursue other solutions (e.g., counseling, adoption).

44. A Catholic health care institution should provide prenatal, obstetric, and postnatal services for mothers and their children in a manner consonant with its mission.

45. Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo. Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation. In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers.

46. Catholic health care providers should be ready to offer compassionate physical, psychological, moral, and spiritual care to those persons who have suffered from the trauma of abortion.

47. Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

---

26. Pope John Paul II, Encyclical Letter *The Splendor of Truth* (*Veritatis Splendor*) (Washington, DC: United States Conference of Catholic Bishops, 1993), no. 50.
27. "Homologous artificial insemination within marriage cannot be admitted except for those cases in which the technical means is not a substitute for the conjugal act but serves to facilitate and to help so that the act attains its natural purpose" (*Donum Vitae*, Part II, B, no. 6; cf. also Part I, nos. 1, 6).
28. Ibid., Part II, A, no. 2.
29. "Artificial insemination as a substitute for the conjugal act is prohibited by reason of the voluntarily achieved dissociation of the two meanings of the conjugal act. Masturbation, through which the sperm is normally obtained, is another sign of this dissociation: even when it is done for the purpose of procreation, the act remains deprived of its unitive meaning: 'It lacks the sexual relationship called for by the moral order, namely, the relationship which realizes "the full sense of mutual self-giving and human procreation in the context of true love"'" (*Donum Vitae*, Part II, B, no. 6).
30. Ibid., Part II, A, no. 3.

48. In case of extrauterine pregnancy, no intervention is morally licit which constitutes a direct abortion.[31]

49. For a proportionate reason, labor may be induced after the fetus is viable.

50. Prenatal diagnosis is permitted when the procedure does not threaten the life or physical integrity of the unborn child or the mother and does not subject them to disproportionate risks; when the diagnosis can provide information to guide preventative care for the mother or pre- or postnatal care for the child; and when the parents, or at least the mother, give free and informed consent. Prenatal diagnosis is not permitted when undertaken with the intention of aborting an unborn child with a serious defect.[32]

51. Nontherapeutic experiments on a living embryo or fetus are not permitted, even with the consent of the parents. Therapeutic experiments are permitted for a proportionate reason with the free and informed consent of the parents or, if the father cannot be contacted, at least of the mother. Medical research that will not harm the life or physical integrity of an unborn child is permitted with parental consent.[33]

52. Catholic health institutions may not promote or condone contraceptive practices but should provide, for married couples and the medical staff who counsel them, instruction both about the Church's teaching on responsible parenthood and in methods of natural family planning.

53. Direct sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available.[34]

54. Genetic counseling may be provided in order to promote responsible parenthood and to prepare for the proper treatment and care of children with genetic defects, in accordance with Catholic moral teaching and the intrinsic rights and obligations of married couples regarding the transmission of life.

## PART FIVE

### Introduction

Christ's redemption and saving grace embrace the whole person, especially in his or her illness, suffering, and death.[35] The Catholic health care ministry faces the reality of death with the confidence of faith. In the face of death—for many, a time when hope seems lost—the Church witnesses to her belief that God has created each person for eternal life.[36]

Above all, as a witness to its faith, a Catholic health care institution will be a community of respect, love, and support to patients or residents and their families as they face the reality of death. What is hardest to face is the process of dying itself, especially the dependency, the helplessness, and the pain that so often accompany terminal illness. One of the primary purposes of medicine in caring for the dying is the relief of pain and the suffering caused by it. Effective management of pain in all its forms is critical in the appropriate care of the dying.

The truth that life is a precious gift from God has profound implications for the question of stewardship over human life. We are not the owners of our lives and, hence, do not have absolute power over life. We have a duty to preserve our life and to use it for the glory of God, but the duty to preserve life is not absolute, for we may reject life-prolonging procedures that are insufficiently beneficial or excessively burdensome. Suicide and euthanasia are never morally acceptable options.

The task of medicine is to care even when it cannot cure. Physicians and their patients must evaluate the use of the technology at their disposal. Reflection on the innate dignity of human life in all its dimensions and on the purpose of medical care is indispensable for formulating a true moral judgment about the use of technology to maintain life. The use of life-sustaining technology is judged in light of the Christian meaning of life, suffer-

31. Cf. directive 45.
32. *Donum Vitae*, Part I, no. 2.
33. Cf. ibid., no. 4. (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.
34. Cf. Congregation for the Doctrine of the Faith, "Responses on Uterine Isolation and Related Matters," July 31, 1993, *Origins* 24 (1994): 211-212.
35. Pope John Paul II, Apostolic Letter *On the Christian Meaning of Human Suffering* (*Salvifici Doloris*) (Washington, DC: United States Conference of Catholic Bishops, 1984), nos. 25-27.
36. United States Conference of Catholic Bishops, *Order of Christian Funerals* (Collegeville, Minn.: The Liturgical Press, 1989), no. 1.

ing, and death. In this way two extremes are avoided: on the one hand, an insistence on useless or burdensome technology even when a patient may legitimately wish to forgo it and, on the other hand, the withdrawal of technology with the intention of causing death.[37]

The Church's teaching authority has addressed the moral issues concerning medically assisted nutrition and hydration. We are guided on this issue by Catholic teaching against euthanasia, which is "an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated."[38] While medically assisted nutrition and hydration are not morally obligatory in certain cases, these forms of basic care should in principle be provided to all patients who need them, including patients diagnosed as being in a "persistent vegetative state" (PVS), because even the most severely debilitated and helpless patient retains the full dignity of a human person and must receive ordinary and proportionate care.

## *Directives*

55. Catholic health care institutions offering care to persons in danger of death from illness, accident, advanced age, or similar condition should provide them with appropriate opportunities to prepare for death. Persons in danger of death should be provided with whatever information is necessary to help them understand their condition and have the opportunity to discuss their condition with their family members and care providers. They should also be offered the appropriate medical information that would make it possible to address the morally legitimate choices available to them. They should be provided the spiritual support as well as the opportunity to receive the sacraments in order to prepare well for death.

56. A person has a moral obligation to use ordinary or proportionate means of preserving his or her life. Proportionate means are those that in the judgment of the patient offer a reasonable hope of benefit and do not entail an excessive burden or impose excessive expense on the family or the community.[39]

57. A person may forgo extraordinary or disproportionate means of preserving life. Disproportionate means are those that in the patient's judgment do not offer a reasonable hope of benefit or entail an excessive burden, or impose excessive expense on the family or the community.

58. In principle, there is an obligation to provide patients with food and water, including medically assisted nutrition and hydration for those who cannot take food orally. This obligation extends to patients in chronic and presumably irreversible conditions (e.g., the "persistent vegetative state") who can reasonably be expected to live indefinitely if given such care.[40] Medically assisted nutrition and hydration become morally optional when they cannot reasonably be expected to prolong life or when they would be "excessively burdensome for the patient or [would] cause significant physical discomfort, for example resulting from complications in the use of the means employed."[41] For instance, as a patient draws close to inevitable death from an underlying progressive and fatal condition, certain measures to provide nutrition and hydration may become excessively burdensome and therefore not obligatory in light of their very limited ability to prolong life or provide comfort.

59. The free and informed judgment made by a competent adult patient concerning the use or withdrawal of life-sustaining procedures should always be respected and normally complied with, unless it is contrary to Catholic moral teaching.

60. Euthanasia is an action or omission that of itself or by intention causes death in order to alleviate suffering. Catholic health care institutions may never

37. See *Declaration on Euthanasia*.
38. Ibid., Part II.
39. Ibid., Part IV; Pope John Paul II, Encyclical Letter *On the Value and Inviolability of Human Life* (*Evangelium Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1995), no. 65.
40. See Pope John Paul II, Address to the Participants in the International Congress on "Life-Sustaining Treatments and Vegetative State: Scientific Advances and Ethical Dilemmas" (March 20, 2004), no. 4, where he emphasized that "the administration of water and food, even when provided by artificial means, always represents a *natural means* of preserving life, not a *medical act*." See also Congregation for the Doctrine of the Faith, "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration" (August 1, 2007).
41. Congregation for the Doctrine of the Faith, Commentary on "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration."

condone or participate in euthanasia or assisted suicide in any way. Dying patients who request euthanasia should receive loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death.[42]

61. Patients should be kept as free of pain as possible so that they may die comfortably and with dignity, and in the place where they wish to die. Since a person has the right to prepare for his or her death while fully conscious, he or she should not be deprived of consciousness without a compelling reason. Medicines capable of alleviating or suppressing pain may be given to a dying person, even if this therapy may indirectly shorten the person's life so long as the intent is not to hasten death. Patients experiencing suffering that cannot be alleviated should be helped to appreciate the Christian understanding of redemptive suffering.

62. The determination of death should be made by the physician or competent medical authority in accordance with responsible and commonly accepted scientific criteria.

63. Catholic health care institutions should encourage and provide the means whereby those who wish to do so may arrange for the donation of their organs and bodily tissue, for ethically legitimate purposes, so that they may be used for donation and research after death.

64. Such organs should not be removed until it has been medically determined that the patient has died. In order to prevent any conflict of interest, the physician who determines death should not be a member of the transplant team.

65. The use of tissue or organs from an infant may be permitted after death has been determined and with the informed consent of the parents or guardians.

66. Catholic health care institutions should not make use of human tissue obtained by direct abortions even for research and therapeutic purposes.[43]

PART SIX

# Forming New Partnerships with Health Care Organizations and Providers

## *Introduction*

Until recently, most health care providers enjoyed a degree of independence from one another. In ever-increasing ways, Catholic health care providers have become involved with other health care organizations and providers. For instance, many Catholic health care systems and institutions share in the joint purchase of technology and services with other local facilities or physicians' groups. Another phenomenon is the growing number of Catholic health care systems and institutions joining or co-sponsoring integrated delivery networks or managed care organizations in order to contract with insurers and other health care payers. In some instances, Catholic health care systems sponsor a health care plan or health maintenance organization. In many dioceses, new partnerships will result in a decrease in the number of health care providers, at times leaving the Catholic institution as the sole provider of health care services. At whatever level, new partnerships forge a variety of interwoven relationships: between the various institutional partners, between health care providers and the community, between physicians and health care services, and between health care services and payers.

On the one hand, new partnerships can be viewed as opportunities for Catholic health care institutions and services to witness to their religious and ethical commitments and so influence the healing profession. For example, new partnerships can help to implement the Church's social teaching. New partnerships can be opportunities to realign the local delivery system in order to provide a continuum of health care to the community; they can witness to a responsible stewardship of

42. See *Declaration on Euthanasia*, Part IV.
43. *Donum Vitae*, Part I, no. 4.

limited health care resources; and they can be opportunities to provide to poor and vulnerable persons a more equitable access to basic care.

On the other hand, new partnerships can pose serious challenges to the viability of the identity of Catholic health care institutions and services, and their ability to implement these Directives in a consistent way, especially when partnerships are formed with those who do not share Catholic moral principles. The risk of scandal cannot be underestimated when partnerships are not built upon common values and moral principles. Partnership opportunities for some Catholic health care providers may even threaten the continued existence of other Catholic institutions and services, particularly when partnerships are driven by financial considerations alone. Because of the potential dangers involved in the new partnerships that are emerging, an increased collaboration among Catholic-sponsored health care institutions is essential and should be sought before other forms of partnerships.

The significant challenges that new partnerships may pose, however, do not necessarily preclude their possibility on moral grounds. The potential dangers require that new partnerships undergo systematic and objective moral analysis, which takes into account the various factors that often pressure institutions and services into new partnerships that can diminish the autonomy and ministry of the Catholic partner. The following directives are offered to assist institutionally based Catholic health care services in this process of analysis. To this end, the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops) has established the Ad Hoc Committee on Health Care Issues and the Church as a resource for bishops and health care leaders.

This new edition of the *Ethical and Religious Directives* omits the appendix concerning cooperation, which was contained in the 1995 edition. Experience has shown that the brief articulation of the principles of cooperation that was presented there did not sufficiently forestall certain possible misinterpretations and in practice gave rise to problems in concrete applications of the principles. Reliable theological experts should be consulted in interpreting and applying the principles governing cooperation, with the proviso that, as a rule, Catholic partners should avoid entering into partnerships that would involve them in cooperation with the wrongdoing of other providers.

## *Directives*

67. Decisions that may lead to serious consequences for the identity or reputation of Catholic health care services, or entail the high risk of scandal, should be made in consultation with the diocesan bishop or his health care liaison.

68. Any partnership that will affect the mission or religious and ethical identity of Catholic health care institutional services must respect church teaching and discipline. Diocesan bishops and other church authorities should be involved as such partnerships are developed, and the diocesan bishop should give the appropriate authorization before they are completed. The diocesan bishop's approval is required for partnerships sponsored by institutions subject to his governing authority; for partnerships sponsored by religious institutes of pontifical right, his *nihil obstat* should be obtained.

69. If a Catholic health care organization is considering entering into an arrangement with another organization that may be involved in activities judged morally wrong by the Church, participation in such activities must be limited to what is in accord with the moral principles governing cooperation.

70. Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization.[44]

44. While there are many acts of varying moral gravity that can be identified as intrinsically evil, in the context of contemporary health care the most pressing concerns are currently abortion, euthanasia, assisted suicide, and direct sterilization. See Pope John Paul II's *Ad Limina* Address to the bishops of Texas, Oklahoma, and Arkansas (Region X), in *Origins* 28 (1998): 283. See also "Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" (*Quaecumqu Sterilizatio*), March 13, 1975, *Origins* 6 (1976): 33-35: "Any cooperation institutionally approved or tolerated in actions which are in themselves, that is, by their nature and condition, directed to a contraceptive end . . . is absolutely forbidden. For the official approbation of direct sterilization and, *a fortiori*, its management and execution in accord with hospital regulations, is a matter which, in the objective order, is by its very nature (or intrinsically) evil." This directive supersedes the "Commentary on the Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" published by the National Conference of Catholic Bishops on September 15, 1977, in *Origins* 7 (1977): 399-400.

71. The possibility of scandal must be considered when applying the principles governing cooperation.[45] Cooperation, which in all other respects is morally licit, may need to be refused because of the scandal that might be caused. Scandal can sometimes be avoided by an appropriate explanation of what is in fact being done at the health care facility under Catholic auspices. The diocesan bishop has final responsibility for assessing and addressing issues of scandal, considering not only the circumstances in his local diocese but also the regional and national implications of his decision.[46]

72. The Catholic partner in an arrangement has the responsibility periodically to assess whether the binding agreement is being observed and implemented in a way that is consistent with Catholic teaching.

## [illegible]

Sickness speaks to us of our limitations and human frailty. It can take the form of infirmity resulting from the simple passing of years or injury from the exuberance of youthful energy. It can be temporary or chronic, debilitating, and even terminal. Yet the follower of Jesus faces illness and the consequences of the human condition aware that our Lord always shows compassion toward the infirm.

Jesus not only taught his disciples to be compassionate, but he also told them who should be the special object of their compassion. The parable of the feast with its humble guests was preceded by the instruction: "When you hold a banquet, invite the poor, the crippled, the lame, the blind" (Lk 14:13). These were people whom Jesus healed and loved.

Catholic health care is a response to the challenge of Jesus to go and do likewise. Catholic health care services rejoice in the challenge to be Christ's healing compassion in the world and see their ministry not only as an effort to restore and preserve health but also as a spiritual service and a sign of that final healing that will one day bring about the new creation that is the ultimate fruit of Jesus' ministry and God's love for us.

---

45. See *Catechism of the Catholic Church*: "Scandal is an attitude or behavior which leads another to do evil" (no. 2284); "Anyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged" (no. 2287).

46. See "The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry," *Origins* 26 (1997): 703.

Abortion **9, 11-12, 14-16**
Abuse, physical **9**
Advance medical directive **8-9**
Artificial insemination **10-11**
- assistance to marital act **10, 11**
- by donor **11**
- by husband **11**

Bishop, role of **3-4, 7, 9, 15-16**

Common good **3-6**
Confidentiality **8, 9**
Consent **8-9, 11-12, 14**
Contraception **10-12**
Cooperation, principles governing **5, 11, 15**

Death
- Christian meaning of **3, 12-13**
- danger of **6, 7, 10, 11, 12-13**
- determination of **14**

Dignity, respect for human **2, 4, 6, 8, 10-11, 12-14**
Embryo(s)
- destruction of human **11**
- experimentation on human **12**
- multiplication of human **11**

Employment **5-6**
Ethics committees **9**
Euthanasia **12-14, 15**
Experimentation **9**
- on living human embryos and fetuses **12**
- on noncompetents **9**
- therapeutic and nontherapeutic **9, 12**

Extrauterine pregnancy **12**

Genetic counseling **12**

Identity, Catholic **1-2, 3-4, 8, 15**
Infertility **10, 11**
Integrity
- biological **9**
- bodily **9**
- functional **9**
- physical **12**
- principle of **9**

Labor, induced **12**
Laity, role of **1, 3, 7**

Magisterium **4, 5, 13**
Marriage, Christian vision of **10**
Masturbation **11**

Natural family planning **10, 12**
Non-Catholics
- administration of sacraments to **7**
- appointment of **3-4, 7**
- provision of pastoral care to **6**

Nutrition and hydration, medically assisted **13**

Organ donation **9, 14**

Pain management **12, 14**
Partnerships **5, 14-16**
Pastoral care **6-7**
- director of **7**

Poor, care for the **4, 5, 11, 15, 16**
Prenatal diagnosis **12**
Priests
- appointment of **7**
- role of **6-7**

Proportionate/disproportionate means **9, 11, 12, 13**

Rape **9**
Religious, role of **1, 3, 6, 7**
Reproductive technology **10**
Research, medical **2, 5, 12, 14**
Responsible parenthood **10, 12**
Right(s) **4-5**
- of conscience **5**
- of married couples **12**
- to health care **5**
- to life **5**
- to make an advance directive **8**
- to organize and bargain collectively **5**
- to prepare for death **14**
- to preserve bodily and functional integrity **9**

Sacraments
- administration of 6-7
- Anointing of the Sick 7
- Baptism 3, 7
- Confirmation 7
- Eucharist (and Viaticum) 6-7
- Penance 6-7
- record of 7
- to non-Catholics 7

Scandal 11, 15, 16

Sponsors 2, 3, 5-6, 14-15

Sterilization 12, 15

Stewardship 4, 5, 12, 14

Suffering, Christian meaning of 3, 12-13, 14

Suicide 12, 13-14
- physician-assisted 15

Surrogacy
- in decision making 8-9
- in motherhood 11

Tissue, use of human 14

Withdrawal of life-sustaining procedures 13-14

his revised edition reaffirms the ethical standards of behavior in health care from the Church's teaching about the dignity of the human person, and it provides guidance and direction on moral issues that Catholic health care providers face today.

Also available as a brochure, No. 7-101, and in e-book format, No. 7-103.

## [illegible]

Dignity of the Human Person
No. 7-069, 76 pp.

On Embryonic Stem Cell Research
No. 7-044, 8-panel brochure, package of 25

Health and Health Care
No. 830-4, 20 pp.

Declaration on Euthanasia
No. 704-9, 12 pp.

Nutrition and Hydration: Moral and Pastoral Reflections
No. 516-X, 16 pp.

To order these resources or to obtain a catalog of other USCCB titles, visit *www.usccbpublishing.org* or call toll-free 800-235-8722. In the Washington metropolitan area or from outside the United States, call 202-722-8716. Para pedidos en español o catálogos, visite el sitio Web *www.usccbpublishing.org* o llame al número gratuito 800-235-8722 y presione 4 para hablar con un representante del servicio al cliente en español.




Publication No. 7-102
USCCB Publishing
Washington, D.C.
ISBN 978-1-60137-102-7

Schedule 2.4
List of Restricted Names

1. Caritas
2. Christi
3. Caritas Christi
4. Catholic
5. Hospital Names
    a. Good Samaritan Medical Center
    b. Holy Family Hospital
    c. Saint Anne's Hospital
    d. St. Elizabeth's Medical Center
6. The name of any Pope or saint, or any name that is otherwise traditionally associated with the Roman Catholic Church

Schedule 3.1

Community Benefit Programs

As filed with the Commonwealth of Massachusetts

http://www.cbsys.ago.state.ma.us/healthcare/hccbar.asp?
section=15&head2=Community+Benefits&head3=Hospital+and+HMO+Reports&cbsys_app_ctx=browse_reports&