**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN NEW POSTPETITION FINANCING, (B) USE CASH COLLATERAL,
AND (C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN
PREPETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 1:00 P.M. (CENTRAL TIME) ON JUNE 13, 2024.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, OR BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ BY NO LATER THAN 1:00 P.M. (CENTRAL TIME) ON JUNE 13, 2024. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK BY NO LATER THAN 1:00 P.M. (CENTRAL TIME) ON JUNE 13, 2024. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 13, 2024 AT 1:00 P.M. (CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

> AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN
> FACILITY.    YOU  MAY  ACCESS  THE  FACILITY  AT  832-917-1510.    ONCE
> CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM
> NUMBER.  JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO
> COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM.
> CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK
> ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ."
> CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER
> YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.
>
> HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE
> OF  BOTH  ELECTRONIC  AND  IN-PERSON  HEARINGS.    TO  MAKE  YOUR
> APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE
> LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED
> FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.

Steward Health Care System LLC ("**SHC**") and its debtor affiliates, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"),

respectfully represent as follows in support of this motion (the "**Motion**"):

<u>**Preliminary Statement**</u>

1. By this Motion, the Debtors seek authorization to obtain $225 million of

postpetition financing (the "**FILO DIP Financing**") under a new debtor-in-possession multiple

draw term loan credit facility (the "**FILO DIP Facility**") provided by the Debtors' prepetition

FILO Lenders pursuant to that certain *Term Sheet for Proposed Debtor-in-Possession Financing*

annexed hereto as <u>**Exhibit C**</u> (the "**FILO DIP Term Sheet**").  The FILO DIP Facility, which

provides comprehensive financing for these chapter 11 cases and will stabilize and strengthen the

Debtors' operations, is a multiple draw term loan consisting of (i) $225 million of new money

loans, of which $75 million will be made available upon entry of the Interim Order, and (ii) a roll-

up of $150 million of obligations under the Debtors' prepetition FILO Facility (the "**Roll-Up**")

upon entry of a Final Order.[2]

---

[2]    As described herein, additional FILO Loans may be rolled up to the extent the Debtors' agree to any roll-up of
       the Debtors' prepetition ABL Loans, to the extent provided in the FILO DIP Term Sheet.

2.      The FILO DIP Facility is being provided on a junior basis relative to the Debtors' prepetition ABL Loans, and is the product of a highly competitive process led by the Debtors' independent investment banker, Lazard, and overseen by the Debtors' independent and experienced Transformation Committee, who authorized the Debtors' entry into the FILO DIP Term Sheet after consideration of numerous competitive DIP financing proposals and determining that securing the $225 million commitment offered by the FILO Lenders provides the best terms and the most certain path to ensuring comprehensive financing will be made available during the chapter 11 cases to stabilize the Debtors' operations and allow the Debtors to continue their going-concern sale efforts for the benefit of all of their stakeholders, including the Debtors' employees, skilled health care workers, and patients.  The FILO DIP Financing and continued use of Cash Collateral will provide Steward with sufficient funding to run their sale process, operations, and these chapter 11 cases.

3.      As the Court is aware, prior to the Petition Date, the Debtors, led by Lazard, launched a broad marketing process to obtain financing to fund these chapter 11 cases.  Despite extensive negotiations with each of the Debtors' prepetition lender groups (the ABL Lenders, the FILO Lenders, and MPT), as well as outreach to third-party capital providers in an attempt to secure postpetition financing to fund these chapter 11 cases, the Debtors only secured a commitment from MPT TRS Lender-Steward, LLC (the "**Junior DIP Lender**"), an affiliate of Medical Properties Trust, Inc. ("**MPT**"), to provide $75 million in junior lien financing (the "**Junior DIP Financing**").  Accordingly, following interim approval of the Junior DIP Financing, the Debtors continued their marketing efforts in pursuit of additional DIP financing. The Debtors, led by Lazard, have conducted a comprehensive process that targeted each of the

Debtors' prepetition lenders (the ABL Lenders, the FILO Lenders, and MPT) and numerous capital providers outside of the Debtors' capital structure.

4.      Importantly, the Debtors utilized the relief granted by the Court pursuant to the DIP Commitment Fee Order (as defined below), including the ability to grant a commitment fee of up to 3% and expense reimbursement, to advance negotiations with a number of third-party lenders and create competitive tensions with the Debtors' existing lenders.  Indeed, within only a few days of entry of the DIP Commitment Fee Order, the Debtors received and were evaluating four (4) DIP financing proposals, including a joint proposal by the ABL Lenders and MPT (the "**ABL/MPT Proposal**"), a proposal led by the FILO Lenders (the "**FILO Proposal**"), and two proposals from third-party lenders.[3]  The receipt of numerous proposals and the granting of a 2% commitment fee to a third-party lender for a priming DIP loan[4] created a competitive dynamic that the Debtors previously sorely lacked and that allowed the Debtors to negotiate attractive terms from the FILO DIP Lenders, including reasonable and market fees and interest rate, limited milestones, an extended maturity date, and a reasonable roll-up of the obligations under the prepetition FILO Facility, all without the risk of a non-consensual priming fight with the Debtors' senior secured lenders.  As a result, the Debtors are confident they have secured DIP financing on the best terms available under the circumstances and that such financing will afford the Debtors the runway and flexibility to maximize value through their strategic sale process and these chapter 11 cases.  The Debtors have also received the Creditors' Committee's support of the FILO DIP Financing.

---

[3]     In addition, another third-party lender withdrew its proposal shortly after the entry of the DIP Commitment Fee Order.

[4]     As described in more detail herein, on June 7, 2024, the Debtors executed a term sheet with a third-party lender (the "**Third-Party Lender**"), pursuant to which, the Third-Party Lender committed to provide $225 million in senior secured DIP financing to the Debtors, and the Debtors granted the Third-Party Lender a 2% commitment fee.

5.       By proceeding with the FILO DIP Facility, which does not non-consensually prime the existing ABL Facility, rather than a priming proposal from a third party, the Debtors have obtained the consent of the FILO Lenders and avoided the need to non-consensually prime the ABL Lenders and the FILO Lenders, which could have led to an expensive and protracted priming dispute with such parties.

6.       As of the time of filing this Motion, the Debtors are working cooperatively with the ABL Lenders and MPT to obtain their affirmative support and express consent to the FILO DIP Facility and the continued use of Cash Collateral.  To the extent such express consent is not obtained, the Debtors submit that (i) MPT is deemed to consent to such priming liens pursuant to the terms of that certain *Debtor-in-Possession Credit Agreement*, dated May 28, 2024 (the "**Junior DIP Credit Agreement**"), [5] by and among the Debtors and MPT, and, (ii) recognizing that the parties reserve rights with respect to additional DIP financing, the ABL Lenders and MPT have effectively consented to the continued use of their Cash Collateral pursuant to the Junior DIP Order, which was entered by the Court on a final basis on June 3, 2024.  The Debtors are engaging in active discussions with such lenders with the goal of proceeding with seeking approval of the FILO DIP Facility and continued use of Cash Collateral on an uncontested basis.  However, to the extent that the ABL Lenders and MPT do not expressly consent, and are not found to have deemed to consent to the FILO DIP Financing and continued use of Cash Collateral, the Debtors are prepared to demonstrate that each of the ABL Lenders' and MPT's interests are adequately protected based on the following:

- The FILO DIP Facility will enhance the value of the prepetition lenders' collateral and avoid a value destructive liquidation that would jeopardize the Debtors' reorganization efforts and minimize returns to creditors, including the prepetition lenders;

---

[5]     A copy of the Junior DIP Credit Agreement is filed at Docket No. 563-1.

- The Debtors propose to provide the Prepetition Secured Lenders with additional adequate protection on superior terms to those that were already agreed in connection with the Junior DIP Facility, including in the form of payment of cash interest to the ABL Lenders and professional fees, as well as superpriority replacement liens and claims to the extent of any applicable Prepetition Secured Parties' diminution in value and superpriority adequate protection claims; and

- The ABL Lenders benefit from a substantial equity cushion in excess of 20% (which alone is sufficient to demonstrate adequate protection).

7.     To the extent the ABL Lenders or MPT assert the Debtors should have accepted the ABL/MPT Proposal, in addition to containing less favorable terms than the FILO DIP Facility (including priming the FILO Lenders, more expensive economics, and a larger roll-up), the ABL/MPT Proposal was not actionable as it was conditioned on reaching a global resolution regarding the allocation of hospital asset sale proceeds between the Debtors' operations and MPT's real property on terms negotiated exclusively between the ABL Lenders (who only represent the first $300 million of the Debtors' $9 billion of liabilities) and MPT (who is incentivized to drive as much value as possible to its owned real property, and not the Debtors' estates).  While the Debtors appreciate the need to resolve this important issue, such a resolution cannot be achieved if the Debtors and other key stakeholders are excluded.  Accordingly, the Debtors intend to file a motion to seek the appointment of a mediator to mediate amongst the Debtors, the Prepetition Secured Parties (including MPT), and the Creditors' Committee to attempt to resolve this allocation issue with all necessary parties involved.

8.     The Debtors believe the FILO DIP Financing presents the best financing option available to fund these chapter 11 cases and to allow the Debtors to continue their efforts to maximize value through their sale processes, while maintaining quality of patient care.  For those reasons and the reasons sets forth herein, the Debtors respectfully request approval of the Motion.

**Background**

9.      On May 6, 2024, (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").   The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On May 16, 2024, the U.S. Trustee appointed the Official Committee of Unsecured Creditors pursuant to section 1102 of the Bankruptcy Code (the **Creditors' Committee**").   No trustee or examiner has been appointed in these chapter 11 cases.

10.      The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

11.      The Debtors own and operate the largest private physician-owned for-profit healthcare network in the United States.   Headquartered in Dallas, Texas, the Debtors' operations include 31 hospitals across eight states, approximately 400 facility locations, 4,500 primary and specialty care physicians, 3,600 staffed beds, and a company-wide workforce of nearly 30,000 employees.   The Debtors provide care to more than two million patients annually.

12.      Additional information regarding the Debtors' business, prepetition capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First-*

*Day Pleadings* (Docket No. 38) (the "**First Day Declaration**"), filed on the Petition Date and incorporated herein by reference.[6]

<u>**Entry of Junior DIP Order and DIP Commitment Fee Order**</u>

13.     On June 3, 2024, the Court entered the *Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing on a Final Basis, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection To Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 625) (the "**Junior DIP Order**"), approving the Junior DIP Financing and the Debtors' use of Cash Collateral on a final basis.  On the same day, the Court also entered the *Order (I) Authorizing Debtors to Incur and Pay Commitment Fee and Expense Reimbursement to Potential Lenders in Connection with Postpetition Financing and (II) Granting Related Relief* (Docket No. 635) (the "**DIP Commitment Fee Order**"), approving, among other things, (i) a single commitment fee of up to 3% in cash of the total new DIP financing committed by a prospective lender if the Court ultimately approves an alternative DIP financing with another party and the terms of such new DIP financing are materially consistent with or more favorable to the Debtors compared to the baseline terms set forth in <u>Exhibit A</u> to the DIP Commitment Fee Order, and (ii) expense reimbursement up to $750,000 in the aggregate and $250,000 per potential lender.

14.     On June 4, 2024, the Debtors executed a fee letter with counsel to the Third-Party Lender to provide reimbursement of up to $250,000 of fees and expenses incurred in connection with potential DIP financing, and on June 6, 2024, the Debtors executed a fee letter

---

[6]   Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declaration, the FILO DIP Declarations (as defined below), or the FILO DIP Term Sheet, as applicable.

with counsel to JMB Capital Partners Lending, LLC to provide reimbursement of up to $100,000 of fees and expenses incurred in connection with potential DIP financing. On June 7, 2024, the Debtors executed a term sheet with the Third-Party Lender pursuant to which the Third-Party Lender committed to provide $225 million in senior secured DIP financing to the Debtors. Under the Third-Party Lender term sheet and consistent with the DIP Commitment Fee Order, the Debtors granted the Third-Party Lender a 2% commitment fee, which would step up to 3% if not terminated prior to 11:59 p.m. ET on June 9, 2024. The Creditors' Committee supported the Debtors' entry into the Third-Party Lender term sheet. On June 9, 2024, the Debtors terminated the Third-Party Lender term sheet, and entered into the FILO DIP Term Sheet, also with the support of the Creditors' Committee.

## Jurisdiction

15.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

16.     By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, 506 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i) and 9013-1, the Debtors request that the Court:

- authorize the Borrower (as defined below) to obtain FILO DIP Financing pursuant to the FILO DIP Facility subject to the terms and conditions set forth in the Interim Order (as defined below) and the FILO DIP Term Sheet by and among Steward Health Care System LLC, as borrower (in such capacity, the "**Borrower**"), the DIP Guarantors (as defined below), and the lenders listed on the signature pages to the FILO DIP Term Sheet or their designated affiliates (the "**FILO DIP Lenders**" and, together with the DIP Agent (as defined in the FILO DIP Term Sheet), the "**FILO DIP Secured Parties**"), consisting of (i) new money term loans (the "**New Money DIP Loans**") in an aggregate principal amount of up to $225,000,000, of which $75,000,000 will be made available upon entry of the Interim Order (the

"**Initial Draw**"), and (ii) a rollup of the FILO Term Loans (as defined in the Prepetition ABL/FILO Credit Agreement (as defined below)) in an amount equal to the Rollup Amount (as defined in and in accordance with the FILO DIP Term Sheet) (the "**DIP Roll-Up Loans**") (the loans to be made available under the foregoing clauses (i) and (ii), the "**FILO DIP Loans**" and the commitments therefor, the "**FILO DIP Commitments**");

- authorize the Borrower to incur, and the other Debtors to jointly and severally guarantee (such Debtors, in this capacity, the "**DIP Guarantors**" and, together with the Borrower, the "**FILO DIP Loan Parties**") the FILO DIP Loans and all extensions of credit, financial accommodations, reimbursement obligations, fees and premiums, costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the FILO DIP Documents (as defined below) (collectively, the "**FILO DIP Obligations**");

- authorize the FILO DIP Loan Parties to execute, deliver and perform under the FILO DIP Term Sheet and all other documents and instruments required to be delivered in connection with the FILO DIP Facility, including any definitive documentation for the FILO DIP Facility as contemplated in the FILO DIP Term Sheet (in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof, together with the FILO DIP Term Sheet, the "**FILO DIP Documents**");

- subject to the Carve-Out (as defined below), and otherwise solely to the extent set forth in the Interim Order, grant to the FILO DIP Secured Parties allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code;

- grant to the FILO DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the FILO DIP Collateral (as defined below), on the terms described herein;

- authorize the FILO DIP Lenders to take all actions reasonably required to implement the terms of the Interim Order;

- unless consented to by the FILO DIP Lenders, the DIP Lender (as defined in the Junior DIP Order) (the "**Junior DIP Lender**" or the "**Junior DIP Secured Party**"), the Prepetition ABL/FILO Administrative Agent (as defined in the Junior DIP Order), and the Prepetition MPT Secured Party (as defined in the Junior DIP Order), as applicable, waive (a) the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral (each as defined below) pursuant to section 506(c) of the Bankruptcy Code and

10

(b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

- unless consented to by the FILO DIP Lenders, the Junior DIP Lender, the Prepetition ABL/FILO Administrative Agent, and the Prepetition MPT Secured Party, as applicable, waive the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to the Prepetition Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties (as defined below);

- authorize the Debtors to use proceeds of the FILO DIP Facility in accordance with the DIP Orders and the FILO DIP Documents;

- authorize the Debtors to pay the FILO DIP Obligations as they become due and payable in accordance with the FILO DIP Documents;

- subject to the restrictions set forth in the FILO DIP Documents and the Interim Order, continue the authorization for the Debtors to use Prepetition Collateral and Cash Collateral, and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "**Diminution in Value**"), in each case, on the terms approved under the Junior DIP Order, as amended by the Interim Order;

- vacate and modify the automatic stay to the extent necessary to permit the Debtors, the FILO DIP Lenders, the Junior DIP Lender, the ABL Lenders (as defined in the Junior DIP Order), and the FILO Lenders (as defined in the Junior DIP Order) to implement and effectuate the terms and provisions of the DIP Orders and the FILO DIP Documents;

- waive any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order;

- schedule a final hearing (the "**Final Hearing**") to consider final approval of the FILO DIP Facility and use of Cash Collateral on the terms of a proposed order to be filed with the Court prior to the Final Hearing; and

- grant related relief.

17.    In support of the Motion, the Debtors submit the following declarations, each incorporated herein by reference (collectively, the "**FILO DIP Declarations**"):

- *Declaration of John R. Castellano in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Castellano Declaration**"); and

- *Declaration of Tyler W. Cowan in Support of Emergency Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Cowan Declaration**").[7]

18.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Interim Order**").  A proposed form of order granting the relief requested herein on a final basis (the "**Final Order**," and together with the Interim Order, the "**DIP Orders**") will be filed with the Court in advance of the Final Hearing.

### Summary of Terms of FILO DIP Facility and Use of Cash Collateral

19.     In accordance with Bankruptcy Rules 4001(b)-(d) and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Procedures**"), as incorporated by Bankruptcy Local Rule 1075-1, the below chart summarizes the significant terms of the Interim Order and the FILO DIP Term Sheet, attached hereto as **Exhibit C**.

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| **DIP Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Steward Health Care System LLC (the "**Borrower**"). | FILO DIP Term Sheet, "Obligors" |

---

[7]     The Debtors reserve the right to file one or more supplemental declarations in advance of the Final Hearing on the Motion.

[8]     The following summary of the terms of the FILO DIP Financing is subject entirely to the express terms of the FILO DIP Term Sheet.  If there are any inconsistencies between the summary below and the FILO DIP Term Sheet, then the FILO DIP Term Sheet shall control.  Capitalized terms used but not defined in this table shall have the meanings ascribed in the FILO DIP Term Sheet.

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | All other Debtors in these chapter 11 cases. | FILO DIP Term Sheet, "Obligors" |
| **FILO DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The FILO DIP Lenders:<br>• WhiteHawk Finance LLC<br>• Owl Creek Investments I, LLC<br>• OneIM Fund I LP<br>• MidOcean Credit Fund Management<br>• Brigade Capital Management, LP<br>A financial institution designated by the Required DIP Lenders will act as sole administrative and collateral agent (the "**FILO DIP Agent**") | FILO DIP Term Sheet, "DIP Facility"; Annex III |
| **DIP Facility and Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | The FILO DIP Facility consists of:<br>• New Money DIP Loans:  in an aggregate principal amount of $225 million, of which (i) $75 million will be available within one business day of the entry of this Interim Order, and (ii) the remainder will be available in draws not to exceed $50 million per draw; provided, that the total of all draws shall not exceed $150 million until such time the Debtors have executed a binding asset purchase agreement for the purchase of the Stewardship Assets (as defined in the Bidding Procedures Order).<br>• DIP Roll-Up Loans: upon the entry of the Final Order, a rollup of $150 million of the FILO Obligations (the "**DIP Roll-Up Loans**"); provided, that if the Debtors agree to "roll up" any ABL Obligations, then if the ratio of the amount of rolled up ABL Obligations to the amount of ABL Obligations outstanding prior to such rollup (the "**ABL Rollup Ratio**") is greater than the ratio of $150 million to the amount of FILO Obligations outstanding prior to the rollup of the FILO Obligations under the FILO DIP Term Sheet (the "**FILO Rollup Ratio**"), the amount of FILO Obligations to be rolled up shall be increased to the extent necessary for the FILO Rollup Ratio to be equal to the ABL Rollup Ratio. | FILO DIP Term Sheet, "DIP Facility"; "DIP Draws" |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Budget is attached hereto as **Exhibit B**. | Exhibit B |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | • New Money DIP Loans: Adjusted Term SOFR (as defined in the Existing ABL/FILO Credit Agreement) plus 10.00%[9] per annum, payable monthly in cash in arrears on the first day of each month. | FILO DIP Term Sheet, "DIP Facility Interest Rate" |

---

[9]  The FILO DIP Term Sheet provides that, if the Debtors elect for the FILO DIP Loans to be senior to the Prepetition ABL/FILO Obligations (the "**Priming Election**"), then the interest rate applicable to the New Money DIP Term Loans is Adjusted Term SOFR plus 8.00% per annum.  However, the Debtors are not electing to do so.

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | • <u>DIP Roll-Up Loans</u>: Adjusted Term SOFR plus 10.75% per annum, payable in cash. | |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | • <u>Upfront Commitment Premium</u>: 4.00% of the aggregate amount of the New Money DIP Loans committed to be made under the FILO DIP Facility as of the Closing Date (but, excluding, for the avoidance of doubt, any DIP Roll-Up Loans), which shall be earned, due and payable in kind on the Closing Date.<br>• <u>Exit Premium</u>: 2.00% of the principal amount of New Money DIP Loans (but not any DIP Roll-Up Loans) (which exit premium will not be payable in connection with a successful credit bid of the New Money DIP Term Loans) outstanding under the FILO DIP Facility on the Maturity Date or prepaid on the date of mandatory or voluntary prepayment, which shall be payable in cash on the Maturity Date or the prepayment date, as applicable.<br>• <u>Out-of-Pocket Expenses</u>: The Borrower will pay all fees and expenses, including reasonable and documented out-of-pocket legal and other professional fees and expenses (including of any financial advisors to be retained by the FILO DIP Agent and any FILO DIP Lenders), of the FILO DIP Agent and any FILO DIP Lenders in a manner set forth in the DIP Orders and consistent with the Junior Final DIP Order. | FILO DIP Term Sheet,<br><br>"Premiums", "Out-of-Pocket Expenses of DIP Secured Parties" |
| **Maturity Date; Duration for Use of DIP Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | The earliest of (i) December 31, 2024, (ii) the date 28 days after execution of the FILO DIP Term Sheet if on such date the Definitive Documentation has not been entered into, (iii) the date 35 days after the Closing Date, if the Final Order has not been entered by the Court, (iv) the acceleration of the loans and the termination of unused commitments under the FILO DIP Facility upon and during the continuance of an Event of Default, and (v) the date of dismissal of any Chapter 11 Case, the appointment of a chapter 11 trustee or an examiner (only to the extent such examiner is granted powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code and such powers entitle the examiner to control or dispose of Collateral without the FILO DIP Agent's consent), conversion of the Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code, or the effective date of a plan in any Chapter 11 Case. | FILO DIP Term Sheet,<br><br>"Tenor of DIP Facility" |
| **Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B) | • <u>Mandatory Prepayments</u>: Required from any proceeds received (or entitled to be received) by the Debtors from (i) any asset sales, including a Stewardship sale, or monetization of any assets, (ii) the sale of any Hospitals (as defined in the Bidding Procedures Order) or (iii) the proceeds of any new indebtedness or financing, absent the prior written consent of the Required DIP Lenders; <u>provided</u>, that no mandatory prepayments shall be required from any proceeds received (or entitled to be received) by the Debtors from the monetization of accounts receivable from sold, re-tenanted, or transitioned hospitals until the Aggregate Borrowing Base (as defined in the ABL/FILO Credit Agreement) has declined by greater than $150 million as compared to the Aggregate Borrowing Base as of June 30, 2024. | FILO DIP Term Sheet,<br><br>"Mandatory Prepayments" |

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | • <u>Voluntary Prepayments</u>: permitted at any time, subject to payment of any penalty or premium set forth in the FILO DIP Term Sheet. | |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B) | The conditions to the Initial Draw include: (i) entry of the Interim Order, (ii) the Bidding Procedures Order remaining in full force and effect, (iii) no event of default under the FILO DIP Facility or the Junior DIP Facility, (iv) the accuracy of the representations and warranties set forth in the FILO DIP Term Sheet, (v) the Debtors not having paid or incurred any fee or premium in connection with any debtor-in-possession financing other than (1) any fee or premium in connection with the FILO DIP Facility or, to the extent already paid or incurred as of the Effective Date, the Junior DIP Facility or (2) the 2.00% commitment fee agreed to by the Debtors on June 7, 2024 to the Third-Party Lender, and (vi) other usual and customary conditions for financings of this type. | FILO DIP Term Sheet,<br>"Conditions Precedent to Initial Draw" |
| **Superpriority Expense Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve-Out and the priorities set forth in the Priorities Annex, the DIP Obligations shall constitute allowed superpriority administrative expense claims (the "**FILO DIP Superpriority Claims**") against the FILO DIP Loan Parties on a joint and several basis. | Interim Order ¶ 5 |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | The FILO DIP Facility is secured by a perfected security interest in and lien on substantially all of the Debtor's tangible and intangible assets.<br><br>Subject to the Carve-Out, the FILO DIP Liens shall have the priority as set forth in Annex II[10] to the FILO DIP Term Sheet. | FILO DIP Term Sheet,<br>"Security"; "Priority" |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Covenants (including reporting covenants) substantially similar to (and no less favorable to the Debtors than those) set forth in the Junior DIP Credit Agreement; provided, that the Definitive Documentation shall include a covenant that the Debtors shall include a covenant that the Debtors shall take all reasonable measures to promptly sell hospitals, sell Stewardship and implement a plan to transition any unsold hospitals.<br><br>In addition, the Debtors shall provide such other reasonable information and informational conference calls to the FILO DIP Agent and its counsel as the FILO DIP Agent shall from time to time reasonably request with respect to antitrust matters relating to the Debtors and their assets or the informational requests of any governmental bodies in connection therewith. | FILO DIP Term Sheet,<br>"Covenants"; "Reporting and Access" |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B) | Events of default substantially similar to (and no less favorable to the Debtors than) those set forth in the Junior DIP Credit Agreement; <u>provided</u>, that the Definitive Documentation shall include an event of default in the event that any Debtor directly or indirectly seeks to pursue or pursues (i) any challenge seeking to invalidate, reduce or otherwise impair any of the obligations under the FILO DIP Facility, any Secured Obligations (as defined in the FILO DIP Term Sheet), obligations under the Bridge Facility | FILO DIP Term Sheet,<br>"Events of Default" |

---

[10]   If the Priming Election is made, subject to the Carve-Out, the DIP Liens shall have the priority as set forth in <u>Annex I</u> to the FILO DIP Term Sheet.

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | (including, without limitation, any claims based on a multiple on invested capital) or any of the liens or security interests securing any such obligations or (ii) any claim or cause of action against the FILO DIP Agent, any FILO DIP Lender, any Prepetition Secured Party (as defined in the FILO DIP Term Sheet), any Bridge Lender or any of their respective Lender Related Parties (as defined in the FILO DIP Term Sheet), each in their capacity as such. | |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | • Entry of the Interim Order on or before the date that is five (5) business days after the execution of the FILO DIP Term Sheet.<br><br>• Entry of the Final Order on or before the date that is thirty-five (35) calendar days after the Closing Date.<br><br>• Within 10 business days after the Bid Deadline (as may be modified or extended from time to time in accordance with the Bidding Procedures Order), delivery of a proposed transition plan for the First Round Hospitals (as defined in the Bidding Procedures Order) to the extent no Qualified Bid is received by the applicable Bid Deadline.<br><br>• Entry into binding asset purchase agreement for Stewardship business by no later than July 31, 2024.<br><br>• No later than 10 business days after the conclusion of the Auctions (as may be modified or extended from time to time in accordance with the Bidding Procedures Order) for the applicable First Round Hospital (as defined in the Bidding Procedures Order), (a) entry into either (1) binding asset purchase agreements, (2) transition agreements, (3) handover plans or (4) an agreement with the applicable lessor to fund the working capital obligations for each First Round Hospital or (b) delivery of a plan for the closure of such Hospital.<br><br>• Entry into binding asset purchase agreements for the Second Round Hospitals (as defined in the Bidding Procedures Order) no later than September 30, 2024. | FILO DIP Term Sheet, "Milestones"; Exhibit A |
| **Carve-Out** Bankruptcy Rule 4001(b)(1)(B)(iii) | Equal to the sum of:<br><br>(i)   all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest at the statutory rate pursuant to 31 U.S.C. § 3717;<br><br>(ii)  all unpaid reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code;<br><br>(iii) Allowed Professional Fees incurred by the Debtor Professionals and the Committee Professionals at any time before or on the first Business Day following the Carve-Out Trigger Date, and any monthly, restructuring, sale, success or other transaction fees payable to the Debtor Professionals | Interim Order ¶ 4 |

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | and the Committee Professionals, whether allowed by the Court prior to or after delivery of a Carve-Out Notice;[11]<br><br>(iv) the fees and expenses of any PCOs and PCOs Professionals appointed in these Chapter 11 Cases; and<br><br>(v) Allowed Professional Fees of Professional Persons incurred after the first Business Day following the Carve-Out Trigger Date in an aggregate amount not to exceed $5,000,000. | |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | • <u>DIP Proceeds</u>: To be used in accordance with the Approved Budget.<br>• <u>Cash Collateral</u>: Pursuant to the terms of the Junior DIP Order, the Debtors were authorized to use all Cash Collateral in accordance with the Junior DIP Order.  The Debtors shall continue to be authorized, subject to the terms and conditions of the proposed Interim Order and the FILO DIP Documents, to use all Cash Collateral. | FILO DIP Term Sheet,"Use of Proceeds"<br>Interim Order ¶ 11 |
| **Parties with an Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Secured Parties, the Junior DIP Lender, and the FILO DIP Secured Parties. | Interim Order ¶ G |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iv) | <u>Adequate Protection.</u>   The Prepetition Secured Parties were granted Adequate Protection as set forth in paragraph 13 of the Junior DIP Order. Such Adequate Protection remains in full force and effect (except as modified by paragraph 13(a) in the proposed Interim Order) subject to the priming provisions of the proposed Interim Order, and shall be calculated taking into account any priming effected by the proposed Interim Order as applicable.<br>(a) <u>Payment of Interest to Prepetition ABL/FILO Secured Parties.</u> In lieu of the requirements of paragraph 13(i) of the Junior DIP Order, the Debtors shall pay to the Prepetition ABL/FILO Secured Parties interest in respect of the Prepetition ABL/FILO Obligations at the (i) the prime rate plus 10.75% in cash plus (ii) an additional margin of 2% (i.e., the default margin), to be paid in kind, capitalized, and added to the outstanding principal of the Prepetition ABL/FILO Obligations, in each case, when due as set forth in the ABL/FILO Credit Agreement.<br>(b) <u>Prepetition Bridge Secured Parties' Fees and Expenses.</u> The DIP Loan Parties shall currently pay, in cash, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of Milbank, as counsel to the Prepetition Bridge Secured Parties, Houlihan, as financial advisor to the Prepetition Bridge Secured Parties, Mintz, as regulatory counsel to the Prepetition Bridge Secured Parties, Porter Hedges LLP, as local Texas counsel to the Prepetition Bridge | Interim Order ¶ 13 |

---

[11]   For the avoidance of doubt, the Allowed Professional Fees include the fees and expenses of any PCOs and PCOs Professionals.

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | Secured Parties, and one local counsel in each other applicable jurisdiction (collectively, the "Bridge Adequate Protection Fees and Expenses"), subject to the review procedures set forth in paragraph 17 of the Junior DIP Order. "Adequate Protection Fees and Expenses" shall mean, in the Interim Order and the Junior DIP Order, collectively, the ABL/FILO Adequate Protection Fees and Expenses, the Bridge Adequate Protection Fees and Expenses, and the MPT Adequate Protection Fees and Expenses.<br><br>(c)  Reservation of Rights. Notwithstanding anything to the contrary in the proposed Interim Order, if it is later established by a final order of the Court or another court of competent jurisdiction that any of the Prepetition Secured Parties are undersecured, then the Court may order any appropriate relief, including ordering that any amounts paid as adequate protection hereunder (including any amounts paid in kind) shall instead be recharacterized and applied to the principal balance of the applicable Prepetition Secured Obligations, and all rights and arguments of the Debtors, the Creditors' Committee and the Prepetition Secured Parties in connection therewith are expressly preserved. | |
| **Determination Regarding Prepetition Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulations of fact by the Debtors, including (i) those related to the validity and enforceability of the Debtors' Prepetition ABL/FILO Obligations, subject to the terms of the Interim Order, and (ii) certain releases for the FILO DIP Secured Parties (solely in such capacity). | Interim Order ¶ H |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi) | The FILO DIP Lenders shall have liens on proceeds of Avoidance Actions. | Interim Order ¶ 6 |
| **Effect of Debtors' Stipulations on Third Parties**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon all parties in interest unless the Creditors' Committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter before the end of the Challenge Period asserting a Challenge.<br><br>The "**Challenge Period**" means: (i) the earlier of (w) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of reorganization, (x) as to the Creditors' Committee only, the later of August 24, 2024, or, only if the Creditors' Committee files a motion for standing to assert a Challenge prior to August 24, 2024, forty-five (45) calendar days following the filing of such motion, (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) July 6, 2024, or (B) the date that is 30 calendar days after their appointment, and (z) for all other parties in interest, July 6, 2024; and (ii) any such later date as (x) has been agreed to in writing (which may be by email) by the Prepetition ABL/FILO Administrative Agent and the | Interim Order ¶ 18 |

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | Prepetition FILO Agent with respect to the Prepetition ABL/FILO Obligations or the Prepetition ABL/FILO Liens, or (y) has been ordered by the Court for cause upon a motion filed and served within any applicable period. | |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Upon the occurrence and during the continuation of an Event of Default that has not been waived by the FILO DIP Agent and following delivery of written notice (a "**Termination Notice**") (including by e-mail) on not less than five (5) business days' notice (such five (5) business day period, the "**DIP Remedies Notice Period**") to the Debtors, counsel to the Debtors, Prepetition Agents, the Prepetition MPT Secured Party, the First Out Tranche A Lender, the Junior DIP Lender, the Creditors' Committee, and the U.S. Trustee (the "**Remedies Notice Parties**"), the FILO DIP Agent may, without further notice, to the extent necessary to permit the FILO DIP Agent to, unless the Court orders otherwise: (a) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other FILO DIP Documents to use any Cash Collateral (subject to the Carve-Out, Professional Fees Escrow Account, and related provisions); (b) terminate the FILO DIP Facility and any FILO DIP Document as to any future liability or obligation of the FILO DIP Secured Parties but without affecting any of the FILO DIP Obligations or the FILO DIP Liens securing such FILO DIP Obligations; (c) declare all FILO DIP Obligations to be immediately due and payable; and (d) invoke the right to charge interest at the default rate under the FILO DIP Documents from the date of such default. Upon delivery of such Termination Notice by the FILO DIP Agent, without further notice or order of the Court, the FILO DIP Secured Parties', the Junior DIP Lender's, the Prepetition MPT Secured Party's, and the Prepetition ABL/FILO Administrative Agent's consent to use Cash Collateral and the Debtors' ability to incur additional FILO DIP Obligations hereunder will, subject to the expiration of the DIP Remedies Notice Period and unless otherwise ordered by the Court, automatically terminate and the FILO DIP Secured Parties will have no obligation to provide any FILO DIP Loans or other financial accommodations (other than for amounts necessary to fund the Professional Fees Escrow Account and Carve-Out). The Debtors shall continue to have the right to use the proceeds of the FILO DIP Loans to fund operations and administrative expenses in accordance with the terms of this Interim Order and the Approved Budget (including any Permitted Variances).

Following an Event of Default and delivery of the Termination Notice, but prior to exercising the remedies set forth in this sentence below or any other remedies (other than those set forth in paragraph 7(a)), the FILO DIP Secured Parties shall be required to file a motion with the Court seeking emergency relief (the "**Stay Relief Motion**") on not less than five (5) business days' written notice to the Remedies Notice Parties (which may run concurrently with the DIP Remedies Notice Period) for a further order of the Court fashioning any appropriate remedy, including modifying the automatic stay in the chapter 11 cases to permit the FILO DIP Secured Parties to, subject to the Intercreditor | Interim Order ¶¶ 7(d); 7(e) |

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | Agreements, and the Carve-Out and related provisions, exercise any rights or remedies permitted under this Interim Order, the FILO DIP Documents or applicable law. Until such time that the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the FILO DIP Facility to the extent drawn prior to the occurrence of an Event of Default and Cash Collateral to fund operations in accordance with the Approved Budget (including Permitted Variances) and the terms of the FILO DIP Documents. | |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit** Bankruptcy Rule 4001(c)(1)(B)(v) | The Interim Order does not provide for a waiver of any entity's authority or right to file a plan, request the use of cash collateral, or request authority to obtain credit; however, the Definitive Documentation may provide that the foregoing actions may constitute an Event of Default under certain circumstances which could terminate the Debtors' access to the FILO DIP Facility and use of Cash Collateral. | N/A |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | The FILO DIP Liens granted and created under the Interim Order shall constitute valid, automatically perfected and unavoidable security interests and liens, with the priorities set forth in the Interim Order, effective as of the date of the Interim Order, without the necessity of executing deposit account control agreements or creating, filing, recording, or serving any financing statements, mortgages, or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the FILO DIP Liens granted to the FILO DIP Secured Parties under the Interim Order. | Interim Order ¶ 15 |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Effective as of entry of the Interim Order, the Debtors waive and release, inter alia, the DIP Released Parties, in each case, subject to the terms and provisions of the Interim Order. | Interim Order ¶ H.1 |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless each Indemnified Party from and against any and all claims, damages, losses, liabilities and expenses (including all reasonable and documented fees, out-of-pocket expenses and disbursements of their specified legal counsel, specified financial advisors or other specified professionals retained by the FILO DIP Lenders that may be incurred by or asserted or awarded against any Indemnified Party (including in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case, arising out of or in connection with or by reason of the FILO DIP Facility, the Definitive Documentation or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the FILO DIP | FILO DIP Term Sheet, "Indemnification" |

| MATERIAL TERMS[8] | | Location |
|---|---|---|
| | Facility, or any actions of the Debtors, with exceptions for fraud, gross negligence or willful misconduct. | |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final Order, except to the extent of the Carve-Out and the Professional Fees Escrow Account, without the prior written consent of the FILO DIP Agent, no costs or expenses of administration of these cases or any Successor Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the FILO DIP Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, and nothing contained in the Interim Order shall be deemed to be a consent by the FILO DIP Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.  For the avoidance of doubt, paragraph 8 of the Junior DIP Order remains in full force and effect in addition to the foregoing provisions. | Interim Order ¶ 8 |
| **Section 552(b) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B) | Subject to entry of the Final Order, in no event shall the FILO DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the FILO DIP Collateral or the FILO DIP Obligations; *provided*, that, the FILO DIP Secured Parties shall seek recourse first from all other FILO DIP Collateral prior to proceeding against Avoidance Proceeds. For the avoidance of doubt, paragraph 9 of the Junior DIP Order remains in full force and effect in addition to the foregoing. | Interim Order ¶ 9 |

## Statement Regarding Significant Provisions

20.     Pursuant to paragraph 8 of the Complex Case Procedures, the FILO DIP

Term Sheet and/or the Interim Order contain the following provisions ("**Significant Provisions**"):

| DIP Facility Term | Relief Requested |
|---|---|
| **Sale or Plan Confirmation Milestones**<br>Complex Case Procedures ¶ 8(a) | The FILO DIP Term Sheet, attached hereto as **Exhibit C**, requires the Debtors to comply with the milestones identified above.<br><br>**Justification**: These milestones are appropriate given the amount of funding the FILO DIP Lenders are willing to make available to the Debtors to fund these chapter 11 cases. The Debtors believe that the FILO DIP Lenders would not have otherwise provided the FILO DIP Loans without these proposed milestones. |
| **Cross-Collateralization**<br>Complex Case Procedures ¶ 8(b) | The Interim Order does not provide for cross collateralization. |
| **DIP Roll-up**<br>Complex Case Procedures ¶ 8(c) | Upon entry of the Final Order, an amount of Prepetition ABL/FILO Obligations on account of FILO Term Loans (as defined in the Prepetition ABL/FILO Credit Agreement) (the "**FILO Obligations**") equal to $150 million (the "**Rollup Amount**") shall be deemed rolled up and converted into an equivalent principal amount of DIP Roll-Up Loans, subject to the provisions of paragraph 18 of the Interim Order; provided |

| DIP Facility Term | Relief Requested |
|---|---|
| | that, if the Debtors agree to roll up any "Tranche A Obligations" (as such term is defined in the Prepetition ABL/FILO Credit Agreement), then, if the ratio of the amount of rolled up Tranche A Obligations to the aggregate amount of Tranche A Obligations prior to giving effect to any roll up (the "**ABL Rollup Ratio**") is greater than 1:2, the Rollup Amount will be increased to the extent necessary for the ratio of the amount of rolled up FILO Obligations to the aggregate amount of FILO Obligations prior to giving effect to any roll up to be equal to the ABL Rollup Ratio.<br><br>Interim Order ¶ 2(b), FILO DIP Term Sheet, "DIP Facility"<br><br>Justification: The Roll-Up is a key feature of the FILO DIP Facility and was required by the FILO DIP Lenders as a condition to their commitment to provide the FILO DIP Facility. The Debtors and the FILO DIP Lenders engaged in arm's length negotiations and agreed to the Roll-Up as consideration for, among other things, the FILO DIP Lenders' commitment to fund the FILO DIP Facility. Without the Roll-Up, the Debtors would not have access to the necessary postpetition financing offered by the FILO DIP Facility or any other means of financing the chapter 11 cases on a consensual basis. |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions**<br>Complex Case Procedures ¶ 8(d) | The FILO DIP Secured Parties will receive a lien on the proceeds of Avoidance Actions.<br><br>Interim Order ¶¶ 5, 6(d).<br><br>Justification:  The Debtors submit that granting FILO DIP Liens on proceeds and property recovered in respect of Avoidance Actions is appropriate because the FILO DIP Facility and use of Cash Collateral provide the Debtors with new money to fund the Debtors' sale process and ensure the Debtors are able to maximize value for their estates.  Moreover, the liens were required by the FILO DIP Lenders as a condition to extending credit. |
| **Default Provisions and Remedies**<br>Complex Case Procedures ¶ 8(e) | Events of Default under the FILO DIP Term Sheet are described above.<br><br>The FILO DIP Term Sheet and Interim Order provide for certain remedies upon Events of Default (as defined in the FILO DIP Term Sheet), including (i) the right to terminate or revoke the Debtors' right to use Cash Collateral, (ii) the right to terminate the FILO DIP Facility and any FILO DIP Document, (iii) the right to accelerate the FILO DIP Obligations, and (iv) the right to charge default interest.<br><br>Interim Order ¶ 7(d).<br><br>Justification: The customary Events of Default contemplated are typical.  In addition, the FILO DIP Lenders must provide at least five (5) business days prior written notice prior to exercising its rights under the FILO DIP Documents and file a Stay Relief Motion seeking emergency relief from the automatic stay.  Until such time as the Stay Relief Motion has been adjudicated by the Court, the Debtors may use the proceeds of the FILO DIP Facility (to the extent drawn prior to the occurrence of the Event of Default) or Cash Collateral to fund operations in accordance with the FILO DIP Term Sheet.  Therefore, the Interim Order does not provide for the automatic lifting of the stay upon an Event of Default.  Interim Order ¶¶ 7(d), 7(e). |
| **Releases of Claim Against Lender or Others**<br>Complex Case Procedures ¶ 8(f) | Without limiting the stipulations set forth in the Junior DIP Order, which remain in full force and effect in accordance with their terms, effective as of the date of entry of the Interim Order, each of the Debtors releases the DIP Released Parties, from any and all liability to the Debtors and from any and all claims arising out of or related to the FILO DIP Facility, the FILO DIP Documents, the New Money DIP Loans, the DIP Roll-Up Loans, the negotiation thereof and the transactions and agreements reflected thereby |

| DIP Facility Term | Relief Requested |
|---|---|
| | arising at any time on or prior to the date of the Interim Order; provided that the foregoing release shall not release (i) any claims against or liabilities of a DIP Released Party that a court of competent jurisdiction determines has resulted from such DIP Released Party's bad faith, fraud, gross negligence, or willful misconduct or (ii) FILO DIP Secured Parties from honoring its obligations to the Debtors under the FILO DIP Documents.<br><br>Interim Order ¶ H.1.<br><br>**Justification**. The releases are appropriate because (i) the Debtors are being provided consideration in the form of the FILO DIP Facility, which is essential to the Debtors' ability to maximize value for their estates, and (ii) the release complies with the requirements of paragraph 8 of the Complex Case Procedures because the release is subject to the Challenge Period. |
| **Limitations on the Use of Cash Collateral**<br>Complex Case Procedures ¶ 8(g) | Cash Collateral may not be used for certain enumerated purposes that are contrary to the rights and interests of the FILO DIP Lenders, certain Prepetition Secured Parties, and the MPT Lessors (e.g., for investigations and litigation against such parties).<br><br>*See* Interim Order ¶ 19.<br><br>**Justification**. These limitations are usual and customary. The Debtors, having engaged in arm's length negotiations with the FILO DIP Lenders and certain Prepetition Secured Parties, agreed to limit the Debtors' use of Cash Collateral as consideration for, among other things, the provision of new money within the broader context the Debtors' value-maximizing restructuring process. The limitation is reasonable given the facts and circumstances of these chapter 11 cases. |
| **Priming Liens**<br>Complex Case Procedures ¶ 8(h) | Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected priming security interest (subject and subordinate to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the FILO DIP Loan Parties of the same nature, scope, and type as the Prepetition ABL/FILO Priority Collateral and the Unencumbered Property (as defined in paragraph 6(a) of the Junior DIP Order), regardless of where located (the "**DIP Priming Liens**"), subject to and solely to the extent of the priorities set forth in the Priorities Annex.<br>Interim Order ¶ 6(a).<br><br>**Justification**. It is appropriate to provide priming liens to the FILO DIP Lenders to secure the FILO DIP Obligations because FILO Lenders and MPT (the only party with liens that are being primed) have consented to such liens and/or are adequately protected. |
| **Other Material Terms**<br>Complex Case Procedures ¶ 8(i) | All fees and expenses, including reasonable and documented out-of-pocket legal and other professional fees, of the FILO DIP Lenders incurred by the FILO DIP Lenders in connection with the FILO DIP Facility are to be paid by the Borrower, without the need for the filing of any applications with the Court on a current basis.<br><br>As consideration for the FILO DIP Lenders' commitment to provide the FILO DIP Facility, the Borrower shall pay an upfront commitment premium of 4.00% of the aggregate amount of the New Money DIP Loans committed to be made under the FILO DIP Facility as of the Closing Date (but, excluding, for the avoidance of doubt, any DIP |

| DIP Facility Term | Relief Requested |
|---|---|
| | Roll-Up Loans), which premium shall be earned, due and payable in kind on the Closing Date. |
| | As consideration for the FILO DIP Lenders' commitment to provide the FILO DIP Facility, the Borrower shall pay an exit premium payable in cash to the FILO DIP Lenders equal to 2.00% of the principal amount of New Money DIP Loans (but not any DIP Roll-Up Loans) (which exit premium shall not be payable in connection with a successful credit bid of such New Money DIP Loans) outstanding under the FILO DIP Facility on the Maturity Date, or in the case of a mandatory or voluntary prepayment (whether in full or in part), the principal amount of the New Money DIP Loans prepaid on the date of such prepayment. |
| | FILO DIP Term Sheet, "Premiums" |
| | **Justification**. These terms are material inducements for the FILO DIP Lenders to provide the FILO DIP Facility. |

## **Background**

### A.    **Debtors' Capital Structure**

21.    The table below summarizes the Debtors' secured debt obligations (including the Junior DIP Facility, but excluding the FILO DIP Facility) as of the date hereof.  A description of the Debtors' prepetition capital structure is summarized in more detail in the First Day Declaration and incorporated herein by reference.

| Secured Debt Obligations | Principal Amount Outstanding | All-in Interest Rate[12] | Maturity |
|---|---|---|---|
| ABL First Out Loans | $50.7mm | ABR + 6.50% | 8/4/2027 |
| ABL Facility | $254.6mm | ABR + 9.00% | 8/4/2027 |
| FILO Facility | $311.0mm | ABR + 12.75% | 12/31/2027 |
| Bridge Facility | $274.5mm[13] | SOFR + 10.75% | 6/30/2024 |

---

[12]    The default interest rates under the credit documents are as follows: (i) ABL/FILO Facility – applicable rate + 2%; (ii) Bridge Facility – applicable rate + 2%; (iii) MPT Facility – Floating Interest Rate + 5%; and (iv) Junior DIP Facility – applicable rate + 2%.

[13]    Includes 1.85x minimum MOIC due at maturity and upon certain defaults.

| Secured Debt Obligations | Principal Amount Outstanding | All-in Interest Rate[12] | Maturity |
|---|---|---|---|
| MPT Facility | $220.3mm | Various[14] | 1/1/2028[15] |
| Junior DIP Facility | $162.5mm[16] | DIP New Money Loans: SOFR + 10.00% DIP Rollup Loans: SOFR + 15.00% | 11/30/2024[17] |
| **Total Secured Debt** | **$1.3bn** | | |

---

[14]   Increased by 4.0% if PIK.

[15]   As of the Petition Date, there were seven (7) outstanding tranches under the MPT Facility, all of which mature on January 1, 2028, except Tranche 4, which matures on October 31, 2031.

[16]   Includes $75mm New Money DIP Loans drawn under the Junior DIP Facility and the rolled-up prepetition MPT Stewardship Note (including 1.25x minimum MOIC due at maturity and upon certain defaults).

[17]   The earliest of (i) November 30, 2024, (ii) the acceleration of the Junior DIP Facility and the termination of unused commitments under the Junior DIP Facility upon and during the continuance of an event of default and (iii) the date of dismissal of these chapter 11 cases, the appointment of a chapter 11 trustee or an examiner, conversion of these chapter 11 cases into cases under chapter 7 of the Bankruptcy Code, or the effective date of a plan in the chapter 11 cases.

22.     The priority of the liens of the Prepetition Secured Lenders, the Junior DIP

Lender, and the proposed FILO DIP Lenders are summarized below:

| Collateral and Lien Priority[18] | | |
|---|---|---|
| **Collateral** | **Description** | **Lien Priority** |
| ABL/FILO Priority Collateral | • Accounts, account receivables and health-care insurance receivables (subject to certain exceptions)<br>• Facility permits<br>• Inventory and goods (other than equipment)<br>• Assets[19] and equity interests[20] of the Debtors that own the Stewardship business<br>• Certain designated equipment (subject to a $110 million cap)<br>• Proceeds of the foregoing, insurance, books and records and other assets relating to the above | • <u>First Priority</u>: ABL/FILO Facility and the DIP Roll-Up Loans<br>• <u>Second Priority</u>: New Money DIP Term Loans<br>• <u>Third Priority</u>: Bridge Facility<br>• <u>Fourth Priority</u>: MPT, Junior DIP Facility[21] |
| ABL/FILO Exclusive Collateral | • Assets of any ABL/FILO Loan Party that are not MPT Collateral (e.g., generally, assets of a ABL/FILO Loan Party that has not pledged its assets to MPT)[22]<br>• Equity interests of SHC | • <u>First Priority</u>: ABL/FILO Facility and the DIP Roll-Up Loans<br>• <u>Second Priority</u>: New Money DIP Term Loans<br>• <u>Third Priority</u>: Bridge Facility |

---

[18]   Capitalized terms used but not defined in this table shall have the meanings ascribed to them in the Prepetition Intercreditor Agreement.

[19]   Including the assets of (i) Steward Health Care Network, Inc., (ii) Steward Physician Contracting, Inc., (iii) Steward Emergency Physicians, Inc., (iv) Steward Medicaid Care Network, Inc., (v) Steward Operations Holdings LLC, (vi) Stewardship Health, Inc., (vii) Stewardship Health Medical Group, Inc. and (viii) Stewardship Services Inc.

[20]   Including the Equity Interests in (i) Steward Physician Contracting, Inc., (ii) Steward Health Care Network, Inc., (iii) Steward Medicaid Care Network, Inc., (iv) Steward Accountable Care Organization, Inc., (v) Steward Accountable Care Organization, Inc., (vi) Steward Healthcare Management Services, LLC, (vii) Altus ACE, LLC, (viii) Stewardship Health, Inc., (ix) Stewardship Health Medical Group, Inc. and (x) Stewardship Services Inc.

[21]   MPT's lien on the assets and equity interests of the Debtors that own the Stewardship business is subject to a cap equal to the sum of (i) $180 million and (ii) the outstanding principal amount of the Prepetition Stewardship Note multiplied by 2.5.

[22]   MPT Collateral includes all assets of any MPT Credit Party, in which a lien is granted, or purported to be granted to any MPT Party as security for any MPT Obligations and all proceeds and products thereof.

| Collateral and Lien Priority[18] | | |
|---|---|---|
| MPT Priority Collateral | • All MPT Collateral, excluding the Prepetition ABL/FILO Priority Collateral | • <u>First Priority</u>: MPT<br>• <u>Second Priority</u>: ABL/FILO Facility, Bridge Facility and the FILO DIP Liens securing the Roll-Up<br>• <u>Third Priority</u>: New Money DIP Loans under Junior DIP Facility<br>• <u>Fourth Priority</u>: New Money DIP Term Loans |
| MPT Exclusive Collateral | • Real property and fixtures subject to MPT liens and all proceeds and products thereof<br>• Assets of any MPT Credit Party that are not ABL/FILO Collateral[23] | • <u>First Priority</u>: MPT, Junior DIP Facility |
| FILO Bridge Exclusive Collateral | • Rights to receive proceeds in connection with the sale, assignment, transfer or other disposition of the Excess Properties[24] | • <u>First Priority</u>: FILO Bridge Lenders<br>• <u>Second Priority</u>: FILO Lenders<br>• <u>Third Priority</u>: New Money DIP Term Loans |

**B.     Immediate Need for FILO DIP Financing and Access to Cash Collateral**

23.     Although the Debtors were able to obtain interim financing under the Junior DIP Facility, such financing does not provide a comprehensive funding solution for these chapter 11 cases.  Indeed, the interim financing of $75 million only addressed the Debtors' cash needs during the Debtors' transition into these chapter 11 cases.  The Debtors have only $39 million of cash on hand as of the date hereof, and anticipate having only approximately $20 million of cash on hand by the end of this week.  The Debtors' DIP Budget, which is attached hereto as **Exhibit B**, reflects that the Debtors require an additional $225 million to continue their healthcare operations

---

[23]   ABL/FILO Collateral includes all assets (including certain designated equipment subject to a $110 million cap) of any Prepetition ABL/FILO Loan Party, in which a lien is granted, or purported to be granted to any Prepetition ABL/FILO Secured Party as security for any ABL/FILO Obligation.

[24]   Excess Properties are certain MPT-owned properties that the Debtors lease, which are listed in that certain *Excess Property Disposition Agreement*, dated as of February 21, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among SHC, the lessor entities party thereto, the lessee entities party thereto and the Prepetition Bridge Agent.

and fund the cost of these chapter 11 cases, including approximately $75 million of which is needed on an interim basis to address the Debtors' obligations over the next 30 days.

24.     Immediate access to the FILO DIP Financing is necessary for the Debtors to continue their operations, including (i) operating their hospitals and delivering critical patient care, (ii) maintaining business relationships with affiliated physician networks, vendors, suppliers and payors, (iii) continuing to make payroll to approximately 30,000 employees (including, but not limited to, primary care providers, physicians, nurses, and other critical hospital staff), and (iv) satisfying other working capital and operational needs, as well as fund the expenses of these chapter 11 cases.

25.     The commitment of the FILO DIP Facility, and the approval thereof, will assure the Debtors' stakeholders that the Debtors have secured a holistic financing solution that will allow the Debtors to preserve the going-concern value of the Debtors' operations, safely operate their hospitals, and complete their sale process in a manner that will maximize value for creditors and best ensure that the Debtors' hospitals and providers can continue to serve the Debtors' patients and the communities in which they are located.

**C.      Efforts to Obtain Postpetition Financing**

26.     As further described in the Cowan Declaration, in March 2024, the Debtors launched a broad marketing process to solicit debtor-in-possession financing to fund these chapter 11 cases.  The Debtors, through their investment banker Lazard, solicited proposals from third parties as well as parties within the Debtors' capital structure, including the ABL Lenders, the FILO Lenders, and MPT.  With no third parties interested in providing DIP financing at the time, the Debtors engaged with the ABL Lenders, the FILO Lenders, and MPT to attempt to reach an agreement on reasonable terms of financing, either in- or out-of-court.  Despite the Debtors' best efforts to reach consensus among the lender groups on the provision of financing, the ABL Lenders

did not provide a binding financing commitment, and although the FILO Lenders and MPT entered into a DIP financing term sheet, the parties ultimately could not come to an agreement to finalize such DIP financing in advance of the Petition Date.

27.     Faced with diminishing liquidity and the absence of a long-term financing proposal, on May 6, 2024, the Debtors entered into a term sheet with MPT, pursuant to which MPT agreed to provide the Debtors with the Junior DIP Financing.  On June 3, 2024, the Court entered the Junior DIP Order.  The interim draw of $75 million under the Junior DIP Financing was crucial to allow the Debtors to stabilize their health care operations and ensure continued patient care during the initial days of these chapter 11 cases.  However, the funding of any amounts in excess of $75 million is subject to MPT's discretion, and the Junior DIP Credit Agreement provides that MPT has no commitment to fund any additional amounts.

28.     As a result of this uncertainty, following the Court's interim approval of the Junior DIP Financing on May 7, 2024, the Debtors, through Lazard and overseen by the Debtors' independent Transformation Committee, relaunched a market solicitation process seeking commitments for additional financing that would provide a comprehensive funding solution for these chapter 11 cases.  As further described in Cowan Declaration, prior to the Petition Date, Lazard contacted nine (9) third parties to gauge their interest in providing DIP financing to the Debtors.  At the time, no such parties were interested, in large part, due to the expectation that the Debtors' existing secured lenders would provide DIP financing, among other factors. However, despite the Debtors' repeated efforts and extensive discussions with each lender group, none of the Prepetition Secured Lenders were willing to provide a comprehensive postpetition financing proposal, and MPT was only willing to commit $75 million.

29.     Consequently, following the Petition Date, Lazard contacted the nine (9) third parties involved in the prepetition DIP financing marketing process as well as ten (10) additional third parties to solicit their interest in providing comprehensive DIP financing to funds these chapter 11 cases.  Fifteen (15) parties signed a non-disclosure agreement (or were already under NDA) and each received an informational memorandum and related diligence materials. Similar to the prepetition marketing process, the Debtors' primary considerations with respect to the financing included: (1) a firm commitment of sufficient additional funding to fund the Debtors' operation and provide liquidity and runway for an orderly sale process; (2) competitive pricing and terms; and (3) reasonable milestones that will allow the Debtors to maximize the value of the assets being marketed.

30.     Through this process, the Debtors received multiple proposals from third parties willing to provide the Debtors with superpriority DIP financing.  Such prospective lenders, however, were initially reluctant to fully engage in the financing process out of fear that they would expend significant resources only to have the secured lenders step in at the last minute and provide financing.  To address these legitimate concerns, on May 31, 2024, the Debtors filed the emergency motion seeking authority to provide expense reimbursement and pay a commitment fee to a prospective lender (Docket No. 551), which was approved on June 3, 2024.

31.     Obtaining the relief under the DIP Commitment Fee Order instantly paid dividends for the Debtors' DIP financing process and created a competitive dynamic that the Debtors sorely needed.  Within a day or two of entry of the DIP Commitment Fee Order, the Debtors received a comprehensive DIP proposal from the FILO Lenders, a joint proposal from the ABL Lenders and MPT, and additional proposals from third-party lenders.  The Debtors subsequently engaged each of the parties in arm's-length and good-faith negotiations in an effort

30

to drive competition to secure the best financing terms possible.  Further, the Debtors set forth a deadline of Thursday, June 6, 2024 for all parties to submit fully committed, executable term sheets.  As of June 7, 2024, a proposal from the FILO Lenders was not yet actionable (and neither was the ABL/MPT Proposal), and to lock in a $225 million commitment from the Third-Party Lender (who indicated it would walk away from the process), which had proposed the best financing terms at the time, albeit on a non-consensual priming basis, the Debtors executed the Third-Party Lender term sheet and committed to a 2% commitment fee, while they continued negotiations with their existing lenders.

32.     Armed with committed financing from the Third-Party Lender, and following robust negotiations, the Debtors were able to obtain material concessions from the FILO DIP Lenders, including, a limited roll-up, better economics, and a longer maturity date, and the Debtors, in consultation with their advisors, ultimately determined that the FILO DIP Financing provided by the FILO Lenders is the best DIP financing available to the Debtors, including because it eliminated the risks associated with a non-consensual priming fight with the Debtors' senior lenders.

33.     As compared to the third-party proposals and the FILO DIP Financing, the ABL/MPT Proposal, among other factors, (i) included more expensive economics, (ii) more restrictive covenants and milestones, and (iii) was conditioned upon a settlement among the Debtors, the ABL Lenders and MPT as to the allocation of value between the Debtors' hospital operations and MPT's underlying real property, which was reached without the involvement of the Debtors or any other party in interest.

34.     Separately, each of the third-party proposals required priming of the liens held by all of the Debtors' existing secured lenders, putting the Debtors at risk of a costly litigation

with such lenders, which would force the Debtors to divert considerable time and resources away from focusing on their sale process and administering these chapter 11 cases.  Accordingly, on June 9, 2024, following consideration of each of the proposals, the Transformation Committee approved the Debtors' entry into the FILO DIP Term Sheet.

### Terms of the FILO DIP Facility Are Reasonable Under the Circumstances

35.     As set forth in the Cowan Declaration, the obligations, interest rate, fees, roll-up, and milestones under the FILO DIP Financing are reasonable under the circumstances and are generally consistent with market terms for companies facing similar circumstances.  The Debtors' competitive DIP financing process allowed the Debtors to negotiate several key concessions from the FILO DIP Lenders, including the provision of financing that does not non-consensually prime the ABL Lenders, a limited roll-up, higher interim draw, more reasonable milestones, a longer maturity date, and lower fees in the aggregate.  For the reasons set forth herein and in the Cowan Declaration, the FILO DIP Financing is the best financing option available to the Debtors to fund these chapter 11 cases and minimizes the risk of a heavily contested DIP motion.  Accordingly, the FILO DIP Lenders have acted in good faith and have agreed to provide the FILO DIP Financing to the Debtors on terms that are fair and reasonable under the circumstances.

### FILO DIP Financing and Continued Use of Cash Collateral Should Be Approved

36.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  As set forth in the Cowan Declaration, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the

Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)–(b), 503(b)(1).  Having determined that postpetition

financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, and after

weighing a number of competitive proposals, the Debtors negotiated with the FILO DIP Lenders

to secure the FILO DIP Facility on the terms described herein.  For these reasons, as discussed

further below, the Debtors satisfy the necessary conditions under sections 364(c) and (d) for

authority to enter into the FILO DIP Financing.

**A.      Entering Into the FILO DIP Facility Is a Sound Exercise of Business Judgment**

37.      If an agreement to obtain secured credit does not run afoul of the provisions

of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in

acting in accordance with their sound business judgment in obtaining such credit.  *See, e.g.*, *In re*

*Estrada*, No. 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In

determining whether to approve a motion to obtain credit, courts generally permit debtors in

possession to exercise their basis business judgment consistent with their fiduciary duties."); *In re*

*N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21) (order

approving postpetition financing on an interim basis as exercise of debtors' business judgment);

*In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost

always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't*

*Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's

discretion under section 364 is to be utilized on grounds that permit reasonable business judgment

to be exercised so long as the financing agreement does not contain terms that leverage the

bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit

a party-in-interest.").

38.      The Fifth Circuit has described the business judgment standard as a flexible

one, which will be satisfied if a debtor articulates a business justification and the decision furthers

the interests of the debtor and other parties in interest.  *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the Bankruptcy Code); *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (same).  Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor.  *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.  Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 882-84 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

39.     The Debtors' decision to move forward with the FILO DIP Facility is a sound exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, overseen by the Debtors' independent Transformation Committee, and after careful evaluation of alternatives.  Given the nature of the Debtors' capital structure and absence of unencumbered assets, the FILO DIP Lenders surfaced as the best financing source to provide additional DIP financing that will enable the Debtors to continue to stabilize their operations and pursue their value-maximizing sale strategy without the need for a costly priming dispute that would ensue with a third-party priming DIP financing.  The Debtors negotiated the FILO DIP Term Sheet with the FILO DIP Lenders in good faith, at arm's length,

and with the assistance of their advisors and the support of the Creditors' Committee, and the

Debtors believe that they have obtained the best financing available.  Accordingly, the Court

should authorize the Debtors' entry into the FILO DIP Documents as a reasonable exercise of the

Debtors' business judgment.

**B.      Debtors Should Be Authorized to Obtain the FILO DIP Facility on a Secured and Superpriority Basis**

40.      The Debtors satisfy the requirements for relief under section 364 of the

Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under

certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

41.      To satisfy the requirements of section 364(c) of the Bankruptcy Code,

Courts will consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured

credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits

the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair,

reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re*

*Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr.

S.D.N.Y. May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't*

*Stores, Inc.*, 115 B.R. at 40.  However, "[s]ection 364(d)(1) does not require that a debtor seek

credit from every possible source, but a debtor must show that it made a reasonable effort to obtain post-petition financing from other potential lenders on less onerous terms and that such financing was unavailable. *In re Harborwalk, LP*, 2010 WL 346298, at *2 (Bankr. S.D. Tex. Jan. 29, 2010).

42.     *First*, as stated above and in the Cowan Declaration, the Debtors contacted nineteen (19) third-party lenders to seek proposals for postpetition financing; however, no party was willing to extend the Debtors financing on an administrative expense or unsecured basis.  The Court should, therefore, authorize the Debtors to provide the FILO DIP Lenders with (i) superpriority administrative expense status for any FILO DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code, and (ii) a valid, binding, continuing, enforceable and fully-perfected senior security interest in and lien on assets of the Debtors in accordance with the priorities set forth in <u>Exhibit 2</u> to the Interim Order, as permitted by section 546(b) of the Bankruptcy Code, pursuant to section 364(c)(3) and section 364(d), as applicable, of the Bankruptcy Code.

43.     *Second*, the FILO DIP Facility is necessary to preserve the Debtors' estates. The Debtors require access to the FILO DIP Facility to ensure they have sufficient liquidity to operate their healthcare facilities, including ensuring continued patient care, and administer their estates in the ordinary course during these chapter 11 cases.  The Debtors will have approximately $20 million of cash on hand the week ending June 14, 2024, and cash flows from operations will be insufficient for the Debtors to satisfy their working capital obligations in absence of the FILO DIP Facility.

44.     *Third*, the terms of the FILO DIP Facility are fair, reasonable, and adequate under the circumstances.  As stated above and in the Cowan Declaration, the FILO DIP Facility represents the most favorable source of DIP financing available and is designed to provide the

Debtors with sufficient liquidity to prosecute their sale and restructuring process and these chapter 11 cases.

**C.      Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Liens Senior to the Liens of MPT and Continue to use the Cash Collateral of the Prepetition Secured Parties**

        45.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).  Similar to section 364(c) of the Bankruptcy Code, "[s]ection 364(d) 'does not require that debtors seek alternative financing from every possible lender.  However, the debtor must make an effort to obtain credit without priming a senior lien.'"  *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11.  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

        46.    Moreover, for the reasons set forth herein, the Debtors require the continued use of Cash Collateral (as well as access to the FILO DIP Facility) to continue their operations,

including their critical hospital operations.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

47.     The Court should authorize the Debtors to enter into the secured priming FILO DIP Facility and continue the use of Cash Collateral.  The Debtors submit that (i) MPT is deemed to consent to the FILO DIP Facility priming its liens under the terms of the Junior DIP Credit Agreement, and (ii) the ABL Lenders and MPT previously consented to the use of Cash Collateral under the terms of the Junior DIP Order, which are preserved in the proposed Interim Order.  Further, even if the ABL Lenders and MPT disagree with the Debtors' position or do not expressly consent, the Debtors submit that the ABL Lenders and MPT are adequately protected because (i) the Debtors are unable to secure executable financing necessary to carry out their value-maximizing sale process without priming MPT, and continuing to use the Prepetition Secured Lenders' Cash Collateral, and, therefore, in the absence of the FILO DIP Facility or another actionable DIP loan, the Debtors would forced to liquidate, which would destroy the value of the lenders' collateral, (ii) there is a significant equity cushion in excess of 20% with respect to the ABL Lenders, and (iii) the Interim Order and Junior DIP Order provide adequate protection, including in the form of adequate protection payments (including payment of cash interest on the

Prepetition ABL/FILO Obligations, and professional fees) and superpriority administrative clams and liens.

> **a.    MPT has Consented to Priming of its Liens and the Prepetition Secured Lenders have Consented to the Continued Use of their Cash Collateral**

48.    Under section 364(d)(1)(B), the Debtors may incur "priming" liens under the FILO DIP Facility if either (a) their existing secured lenders have consented or (b) the existing secured lenders' interests in collateral are adequately protected.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

49.    As an initial matter, the FILO Lenders, including in their capacity as Bridge Lenders, have expressly consented to the FILO DIP Liens and use of their Cash Collateral. Additionally, the Debtors submit that MPT is deemed to consent to the Debtors priming their liens under the terms of the Junior DIP Credit Agreement, which provides that the Debtors are permitted to incur incremental debtor-in-possession financing, subject to certain conditions, and that such "Incremental Equivalent Debt" may be secured by Liens on the Collateral that are senior to, *pari passu* with or junior to the Liens securing the Obligations (each as defined in the Junior DIP Credit Agreement).[25]  The FILO DIP Financing satisfies all conditions, including that the Incremental Equivalent Debt cannot exceed the "Incremental Amount" of $225 million.  The priming liens

---

[25]    *See* Junior DIP Credit Agreement § 6.01 (stating that the "No Loan Party will . . . create, incur, or suffer to exist any Indebtedness, except . . . any Incremental Equivalent Debt[.]" "Incremental Equivalent Debt" is defined, in part, as "any debtor-in-possession financing incurred by the Borrower or any of the other Loan Parties; provided that at the time of incurrence thereof: (a) the aggregate initial principal amount of all Incremental Equivalent Debt . . . on any date such Indebtedness is incurred shall not exceed the Incremental Amount as of such date; (b) there shall be no obligor in respect of any such Incremental Equivalent Debt that is not a Loan Party hereunder; (c) the Incremental Equivalent Debt may be secured by Liens on the Collateral that are senior to, *pari passu* with or junior to the Liens securing the Obligations . . . and (d) such Incremental Equivalent Debt shall not contain any representations, covenants and events of default that are materially less favorable to the Borrower than the representations, covenants and events of default contained in this Junior DIP Credit Agreement . . .").

provided under the FILO DIP Facility are senior to the liens of MPT, and therefore fall within the bounds of allowed Incremental Equivalent Debt.  Accordingly, MPT has consented to the incurrence of the FILO DIP Facility and the priming of their DIP liens.  Further, as set forth above, the FILO DIP Liens do not prime the liens of the ABL Lenders.  Accordingly, the liens granted pursuant to the FILO DIP Facility comply with section 364 of the Bankruptcy Code.

50.     With respect to use of Cash Collateral, each of the Prepetition Secured Parties already has consented to the use of their Cash Collateral under the Junior DIP Order. Specifically, the Junior DIP Order provides that "the Prepetition Secured Parties have consented or are deemed to have consented to the use of Prepetition Collateral, including Cash Collateral" on the terms set forth in the order.[26]  The Junior DIP Order permits the ABL Lenders and MPT to terminate (or attempt to terminate) the Debtors' consensual use of Cash Collateral upon the occurrence of a Cash Collateral Termination Event (as defined in the Junior DIP Order).[27] However, no Cash Collateral Termination Event has occurred, and the Debtors have not received a notice from the Prepetition ABL/FILO Administrative Agent or MPT stating that the secured lenders intend to terminate their consent to use of Cash Collateral.  Accordingly, the ABL Lenders and MPT should be deemed to have consented to the Debtors' continued use of Cash Collateral.

51.     As such, the Debtors submit that the Prepetition Secured Lenders have consented to (or are deemed to consent to) the continued use of Cash Collateral as well as the liens securing the FILO DIP Facility (to the extent such consent is required), the Debtors need not demonstrate that their secured lenders' interests are adequately protected.

---

[26]     *See* Junior DIP Order, at 24.

[27]     *See* Junior DIP Order, at 45-48.

**b.     The Prepetition Secured Parties are Adequately Protected**

52.     Nonetheless, out of an abundance of caution, the Debtors are prepared to demonstrate that the ABL Lenders and MPT are adequately protected.  Although the Bankruptcy Code does not expressly define adequate protection, "it suggests a broad and flexible definition" and "confers upon 'the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved.'"  *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631 (citation omitted); *see also In re Las Torres Dev. LLC*, 413 B.R. 687, 696–97 (Bankr. S.D. Tex. 2009) (noting that the "Fifth Circuit has aptly noted that the Code contains no specific, definitive definition of adequate protection") (citing *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir.1987)); *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396–97 (10th Cir. 1987) (stating adequate protection "is to be decided flexibly on the proverbial 'case-by-case' basis"); *Martin v. United States (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985) (same); *see also* 11 U.S.C. § 361 (providing a non-exhaustive list of examples of adequate protection, including (i) a lump sum or periodic cash payments; (ii) replacement liens; and (iii) administrative priority claims).

53.     The purpose of adequate protection is to "protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the stay."  *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1389 (5th. Cir. 1986); *see also In re Geijsel*, 480 B.R. 238, 265 & n.19 (Bankr. N.D. Tex. 2012) ("The purpose of adequate protection payments is to adequately protect creditors from the diminution of value in a creditor's collateral."); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case . . . but its

focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988).

54.     The Debtors have offered a robust adequate protection package that includes adequate protection payments (including payment of cash interest on any outstanding obligations under the ABL/FILO Facility, and payment of professional fees of all Prepetition Secured Lenders). This package is superior than the one the Prepetition Secured Lenders already consented to under the Junior DIP Facility. However, even without this adequate protection package, the ABL Lenders' and MPT's interests are adequately protected because (i) there is no alternative non-priming DIP financing available that is actionable in the current circumstances, (ii) the FILO DIP Financing will enable the Debtors to enhance and realize the value of their collateral by allowing the Debtors to complete a successful sale process resulting in greater returns for the Prepetition Secured Parties (rather than the alternative given the absence of any alternative actionable non-priming proposals, a value-destructive liquidation), and (iii) the ABL Lenders are oversecured and benefit from an equity cushion well in excess of 20%.

(i)     *The FILO DIP Facility Will Preserve and Enhance the Value of the Prepetition Secured Parties' Collateral*

55.     The Prepetition Secured Lenders are adequately protected because the FILO DIP Financing will preserve and maximize the value of the Debtors' assets, including the collateral securing their secured claims. Courts have consistently held that the preservation or enhancement of value of a secured creditor's collateral as a result of postpetition financing constitutes adequate protection from any diminution in value caused by such postpetition financing. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631 (Bankr. S.D.N.Y. 1992) ("[T]o determine whether [a secured creditor] is adequately protected, the court must consider whether the value of the debtor's property will increase as a result of the renovations funded by the proposed financing."); *In re Hubbard*

*Power & Light,* 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) (holding that county's lien on debtor's property would be protected as substantial portion of postpetition loan funds would go to cleaning up environmental damage on the property and given that the property was worthless until remediated, postpetition financing would increase value of property and adequately protect prepetition lenders); *In re Aqua Assocs.*, 123 B.R. 192, 198 (Bankr. E.D. Pa. 1991) (holding that the "most important questions" to be answered in determining whether the proposed adequate protection was sufficient to grant a priming lien under section 364(d) are "(1) [i]s the Debtor's Plan . . . feasible? and (2) [i]s the consummation of the loan likely to increase the value of the Debtor's estate and thereby enhance the value of the Mortgagee's security?").

56.     Thus, for purposes of determining the sufficiency of adequate protection, the Court should evaluate the difference between the value of the Prepetition Secured Lenders' collateral with and without the FILO DIP Financing. *See 495 Cent. Park Ave.,* 136 B.R. at 631 ("[T]here is no question that the property would be improved by the proposed renovations and that an increase in value will result.  In effect, a substitution occurs in that the money spent for improvements will be transferred into value. This value will serve as adequate protection for [the prepetition secured lender]."); Hr'g. Tr. 190:4–16, *In re Binder & Binder – The National Social Security Disability Advocates (NY)*, LLC, No. 14-23728 (RDD) (Bankr. S.D.N.Y. Feb. 24, 2015) (Docket No. 213) ("[I]f the Court is satisfied that simply maintaining the collateral and/or improving it and thus realizing it will, in fact, occur, that in and of itself, without any other additional collateral or adequate protecting being offered, is sufficient for adequate protection purposes."); Hr'g Tr. 15–18, *In re Aeropostale, Inc.*, No. 16-11275 (CSS), (Bankr. S.D.N.Y. May 5, 2016) (Docket No. 113) (finding that secured lenders were adequately protected where liquidity was anticipated to increase slightly, allowing the debtors to pursue a sale of their assets, as opposed

43

to forcing an immediate liquidation); *see also In re Yellowstone Mtn. Club, LLC*, 2008 WL 5875547 at *9, *17 (Bankr. D. Mont. Dec. 17, 2008) (approving priming loan that would maximize the going-concern value of the debtor, rather than allow the debtors to "go dark," for the benefit of the creditors and maximize the overall return to the lender); *In re Campbell Sod, Inc.*, 378 B.R. 647 (Bankr. D. Kan. 2007) (applying a "holistic" approach to find an existing lender was adequately protected under section 364(d) where use of the loan proceeds to purchase and develop sod crop was more likely to increase than decrease value of collateral and the debtors were likely to fail without an infusion of capital); *In re Ledgemere Land Corp.*, 125 B.R. 58, 62 (Bankr. D. Mass. 1991) (approving priming loan because "the chance of a decline in the value of the property is more than offset by the likelihood of enhancement in value due to the [d]ebtor's construction and marketing plans").  For a court to find that a secured creditor is adequately protected under similar facts, it looks to see if "projections grounded on a firm evidentiary basis" support the claim that the claim that non-consensually primes debt improves the primed creditors' position.  *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996).

57.     Here, the Prepetition Secured Parties' interests in their collateral are adequately protected because the FILO DIP Financing allows the Debtors to realize the going-concern value of their operations, which significantly exceeds the Debtors' value in a forced liquidation or any other alternative.  Without access to the FILO DIP Facility and use of the Cash Collateral, the Debtors would be forced to liquidate, resulting in a piecemeal fire sale of the Debtors' assets, which would undoubtedly destroy the value of the Prepetition Secured Parties' collateral.  In contrast, if the Debtors obtain access the FILO DIP Facility, the Prepetition Secured Parties' collateral will significantly increase in value from the proceeds of the Debtors' competitive and robust going-concern sale process.  Additionally, the ABL Lenders are adequately protected

by the proposed FILO DIP Financing because the infusion of new money junior to the ABL Loans will allow the Debtors to stabilize their business and continue to run their going concern sale process, thereby, generating additional value for the benefit of the ABL Lenders, without impairing the priority of the ABL Lenders' liens.

58.     The FILO DIP Facility will allow the Debtors to enhance the value of the Prepetition Secured Parties' collateral and creates less risk for the Debtors as compared to ABL/MPT Proposal because the FILO DIP Facility contains superior economic terms, including a smaller roll-up of prepetition loans, and less restrictive covenants and milestones that allow the Debtors the flexibility to maximize value through their sale process.  Moreover, the FILO DIP Facility is actionable as it is not conditioned on an agreement as to an allocation of value between the Debtors and MPT.

59.     Moreover, it is important for courts to undertake a "qualitative assessment of the credit transaction in light of readily-available alternatives before granting *any* § 364 motion."  *In re Aqua Assocs.*, 123 B.R. at 196.  Under sections 364(c) and 364(d), "[o]btaining credit should be permitted not only because it is not available elsewhere . . . but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason."  *Id.*; *see also In re Snowshoe Co.*, 789 F.2d at 1088 (holding that a debtor did not need to consider an existing lender's suggested conditional offer for additional financing because the conditional factors at issue were still in dispute).  Accordingly, "credit should not be approved when it is sought for the primary benefit of a party other than the debtor[.]" *In re Aqua Assocs.*, 123 B.R. at 196.

60.     The ABL/MPT Proposal is premised on a settlement on the allocation of value between the Debtors' hospital operations and MPT's real estate.  As discussed above, the

proposed allocation arrangement was reached without the Debtors' involvement. The Debtors appreciate the need to resolve the allocation issue, but they need to be part of the discussions. Under these facts and circumstances, based on a qualitative assessment, the Debtors determined the ABL/MPT Proposal was not actionable, and the best actionable financing option available was the FILO DIP Financing.

        (ii)    *The ABL Lenders Are Adequately Protected by a Substantial Equity Cushion*

61.    The ABL Lenders are also adequately protected because they benefit from a substantial equity cushion. Generally, a sufficient "cushion" of collateral value in excess of the debt can itself constitute adequate protection. *Mendoza v. Temple–Inland Mortgage Corp. (Matter of Mendoza)*, 111 F.3d 1264, 1272 (5th Cir.1997) (stating most courts engage in an analysis of the property's 'equity cushion'—the value of the property after deducting the claim of the creditor"). Although the presence of an equity cushion is not required for a creditor's interest to be adequately protected, it is generally considered *prima facie* evidence of adequate protection. *In re Triplett*, 87 B.R. 25, 27 (Bankr. W.D. Tex. 1988) (stating that although the presence of an equity cushion is sufficient to provide adequate protection, it is not required in connection with a debtor's request to use cash collateral); *Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.)*, 490 B.R. 470, 478 (S.D.N.Y. 2013) ("It is well-settled that the existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection.").

62.    The amount of equity cushion sufficient to adequately protect a creditor's interest is determined on a case-by-case basis and is within the discretion of the court. *The Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir.1994). However, courts have "almost uniformly held that an equity cushion of 20% or more constitutes adequate protection . . . [and] has almost as uniformly held that an equity

cushion under 11% is insufficient to constitute adequate protection." *In re James River Assoc.*, 148 B.R. 790, 796 (E.D. Va. 1992). Moreover, courts have found creditors with equity cushions between 11% to 20% to be adequately protected. *See, e.g.*, *In re Carson*, 34 B.R. 502 (D.Ka. 1983) (finding an 11% equity cushion constituted adequate protection); *Rogers Development Corp.*, 2 B.R. 679 (Bankr. E.D. Va.1980) (holding that an equity cushion of 15% to 20% constituted adequate protection for a creditor). As of the date hereof, the total amount of obligations owed to the ABL Lenders are currently owed is approximately $305.3 million. Accordingly, for there to be a 20% equity cushion with respect to the ABL Lenders, the value of the collateral must exceed approximately $366 million.

63. The collateral securing the ABL/FILO Facility includes, among other things, (i) accounts, account receivables and health-care insurance receivables (subject to certain exceptions) ("**Accounts Receivable**"), (ii) inventories and goods ((i) and (ii) together, the "**Current Assets**"), (iii) the assets related to the Stewardship Health, and (iv) the Debtors' hospital assets.

64. As set forth in the Castellano Declaration, as of the date hereof, the Debtors Current Assets have value of approximately $834 million, including (i) various accounts, account receivables, healthcare insurance receivables, inventories, and goods eligible for the borrowing base under the ABL/FILO Credit Agreement that are worth approximately $423 million and (ii) receivables and other assets, including certain other pledged collateral (including anticipated proceeds of excess property sales), that are not included in the borrowing base worth, in the aggregate, approximately $410 million. Accordingly, without accounting for any value for Stewardship Health and the Debtors' hospitals, which are the Debtors' core assets, the collateral

value of the Current Assets covers all amounts owing to the ABL Lenders by hundreds of millions of dollars and well in excess of a 20% equity cushion.

65.     Therefore, the Debtors submit that continuing to use Cash Collateral and granting the priming liens is reasonable, appropriate, and permissible under the Bankruptcy Code, and the requirement of section 364(d) of the Bankruptcy Code—that all Prepetition Secured Parties consent or are adequately protected—is satisfied.  Accordingly, the Debtors should be authorized to obtain the proposed FILO DIP Facility on the terms set forth in the FILO DIP Documents and continue to use Cash Collateral.

**D.     The Roll-Up Should Be Approved upon Entry of the Final Order**

66.     As noted above, the FILO DIP Facility provides for a roll-up of $150 million of obligations under the FILO Facility upon entry of the Final Order approving the FILO DIP Financing and, if a percentage of the obligations under the ABL Facility are rolled-up, an additional amount of the obligations under the FILO Facility based on equivalent percentage of the ABL Roll-Up will also be rolled-up (the "**Roll-Up**").  The Debtors respectfully submit that the Roll-Up is fair and appropriate under the circumstances of these chapter 11 cases.  This provision was required by the FILO DIP Lenders as a condition to the overall benefits provided by the Debtors' DIP financing as a whole, and the Debtors submit that such a roll-up will not unduly advantage any party.  In particular, pursuant to the Final Order, the Court has the ability to unwind, after notice and a hearing, the Roll-Up in the event there is a timely and successful Challenge to the FILO Lenders' claims or liens.

67.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-

48

concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "Doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

68.     Roll-ups of prepetition debt are a common feature in debtor-in-possession financing where, as here, they are necessary to induce prospective postpetition lenders to advance debtor-in-possession financing.  The importance of roll-ups and refinancings in DIP facilities has been repeatedly recognized by courts in this district which have authorized the roll-up of prepetition obligations in interim orders.  *See, e.g.*, *In re Genesis Care Pty Ltd*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. June 2, 2023) (Docket No. 89) (interim order authorizing the debtors to incur $90 million of new money loans and a roll-up of $270 million of prepetition indebtedness); *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023) (Docket No. 98) (interim order authorizing the roll-up of $190 million of prepetition indebtedness and $100 million of new money loans); *In re Oasis Petroleum Inc.*, No. 20-34771 (MI) (Bankr. S.D. Tex. Sept. 30, 2023) (Docket No. 73) (interim order authorizing the roll-up of $240 million of prepetition indebtedness and $120 million of new money loans); *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. July 23, 2019) (Docket No. 255) (interim order authorizing the roll-up of $87.5 million of prepetition indebtedness and $35 million of new money loans).

69. Furthermore, the amount of the Roll-Up relative to the new money to be provided under the FILO DIP Facility (a ratio of 0.67:1) is far more advantageous to the Debtors when compared with ratios that have been approved in other cases, including those in this district. *See, e.g.*, *In re Noble House Home Furnishings LLC*, No. 23-90773 (CML) (Bankr. S.D. Tex. Oct. 4, 2023) (Docket No. 130) (approving a roll-up with a 5.8:1 ratio); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023) (Docket No. 323) (approving a roll-up with a 3:1 ratio); *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. June 13, 2023) (Docket No. 434) (approving a roll-up with a 4.3:1 ratio); *In re Mountain Express Oil Co.*, No. 23-90147 (DRJ) (Bankr. S.D. Tex. April 25, 2023) (Docket No. 332) (approving a roll-up with a 4.5:1 ratio); *In re Amerimark Interactive, LLC*, No. 23-10438 (TMH) (Bankr. D. Del. April 13, 2023) (Docket No. 52) (approving a roll-up with a 3:1 ratio); *In re Phoenix Services Topco LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) (Docket No. 73) (same).

70. Here, the proposed Roll-Up is justified under the circumstances. The Roll-Up is a material component of the structure of the FILO DIP Facility required by the FILO DIP Lenders as a condition to their commitment to provide postpetition financing and their consent to the Debtors' use of Cash Collateral. The Debtors and the FILO DIP Lenders engaged in arm's length negotiations, which resulted in a significant reduction in the size of the roll-up as compared to what the FILO Lenders initially proposed, and ultimately agreed to the Roll-Up (only upon entry of a final order and junior in payment priority to the ABL Lenders) as consideration for, among other things, the Debtors' continued use of Cash Collateral and the commitment of the FILO DIP Lenders to extend $225 million of funding. Without the additional protections and compensation offered by the Roll-Up, the FILO DIP Lenders indicated they are not committed to funding the

FILO DIP Facility.  Accordingly, the Debtors request the Roll-Up be approved to allow the Debtors to access this urgent funding for the benefit of all stakeholders.

**E.      Debtors Should Be Authorized to Pay Fees and Interests Required by FILO DIP Documents**

71.      As described herein, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the FILO DIP Lenders and FILO DIP Agent as a condition to providing financing.  As set forth in the Cowan Declaration, taken as a whole, the terms of the FILO DIP Documents, including the interests and fees imposed thereunder, are market and reasonable under the facts and circumstances and are the Debtors' best available option to maintain their ongoing business operations and to fund their chapter 11 cases.  Accordingly, authorization to pay the fees is warranted.

**F.      The Carve-Out Is Appropriate**

72.      The FILO DIP Facility subjects the FILO DIP Lenders' security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve-Out (as defined in the Interim Order).  Without the Carve-Out, the Debtors' estates or other parties in interest could be harmed because the services professionals might otherwise provide in these chapter 11 cases could be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced").  Additionally, the Carve-Out protects against the prospect of administrative insolvency during the pendency of the chapter 11 cases by ensuring that assets are available to pay U.S. Trustee fees, professional fees of the Debtors and the Creditors' Committee, and the fees of the patient care ombudsmen appointed in these chapter 11 cases.  The terms of the Carve-Out are

the same as those approved in connection with the Junior DIP Facility.  Accordingly, the Debtors

submit that the Carve-Out is reasonable and appropriate under the circumstances.

**G.      FILO DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e)**

73.      Section 364(e) of the Bankruptcy Code protects a good faith lender's right

to collect on loans extended to a debtor, and its rights with respect to liens securing those loans,

even if the authority of the debtor to obtain such loans or grant such liens is later reversed or

modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this
> section [364 of the Bankruptcy Code] to obtain credit or incur debt,
> or of a grant under this section of a priority or a lien, does not affect
> the validity of any debt so incurred, or any priority or lien so granted,
> to an entity that extended such credit in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such
> priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

74.      As explained herein and in the Cowan Declaration, negotiations of the FILO

DIP Facility were conducted in good faith and at arm's length.  The proceeds of the FILO DIP

Facility will be used only for purposes that are permissible under the Bankruptcy Code.

Accordingly, the Court should find that the FILO DIP Lenders are "good faith" lenders within the

meaning of section 364(e) of the Bankruptcy Code, and therefore entitled to all of the protections

afforded by that section.

**H.      Modification of Automatic Stay Is Warranted**

75.      The relief requested herein contemplates a modification of the automatic

stay (if applicable) to (a) permit the Debtors to grant the security interests, liens, and superpriority

claims described above and to perform such acts as may be requested to assure the perfection and

priority of such security interests and liens, and (b) permit the FILO DIP Lenders to exercise rights

and remedies under certain circumstances.  These provisions were part of the *quid pro quo* for the Debtors' ability to obtain the FILO DIP Facility and use Cash Collateral as provided therein and in the Interim Order.  Moreover, following an event of default under the FILO DIP Documents and the delivery of a Termination Notice (as defined in the FILO DIP Documents), but prior to exercising certain remedies, the FILO DIP Lenders are required to file a stay relief motion seeking emergency relief from the automatic stay.  Until the stay relief motion has been adjudicated by the Court, the Debtors may use the proceeds of the FILO DIP Facility to the extent drawn prior to the occurrence of an event of default and Cash Collateral to fund operations in accordance with the DIP Budget and the terms of the FILO DIP Documents.  Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order are reasonable and should be approved.

76.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Diamond Sports Group, LLC*, No. 23-90116 (CL) (Bankr. S.D. Tex. February 26, 2024) (Docket No. 1834) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex. November 14, 2023) (Docket No. 225) (same); *In re Genesis Care Pty Ltd.*, No. 23-90614 (DRJ) (Bankr. S.D. Tex. July 19, 2023) (Docket No. 323) (same); *In re Instant Brands Acquisition Holdings Inc.*, No. 23-90715 (DRJ) (Bankr. S.D. Tex. July 13, 2023) (Docket No. 257) (same).

## I.     Debtors Require Immediate Access to Cash Collateral and FILO DIP Facility

77.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R.

Bankr. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.   *See In re Ames Dep't Stores*, 115 B.R. at 36.

78.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly.   The Debtors have an immediate need to access the FILO DIP Facility and for continued access to Cash Collateral, and any inability to do so would put patients at risk and destroy the value of the Debtors' estates by preventing them from being able to make disbursements necessary to operate in the ordinary course.   Access to the FILO DIP Facility and Cash Collateral would provide assurances to patients, regulators, employees, vendors, and other stakeholders that the Debtors have the financial wherewithal to continue operating during the pendency of these chapter 11 cases.   Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avoid value-destruction that would lead to immediate and irreparable harm to the Debtors' estates.

**J.     Cause Exists to Authorize the Banks to Honor Checks and Electronic Fund Transfers**

79.     The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to FILO DIP Facility obligations, to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment.   The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of the DIP financing obligations dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

**K.      Request for Final Hearing**

80.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order.  The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## Basis for Emergency Relief

81.     The Debtors respectfully request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1(i).  The relief requested in the Motion the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to continue its operations, including its critical hospital operations, and its value-maximizing sale strategy for the benefit of the Debtors' estates.  Accordingly, the Debtors respectfully request that the Court approve the relief requested in the Motion on an emergency basis.

## Debtors' Compliance with
## Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

82.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a

waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### **Reservation of Rights**

83.     Nothing contained herein is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vii) an admission as to the validity of any liens satisfied pursuant to this Motion, or (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

### **Notice**

84.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

*[Remainder of page intentionally left blank.]*

WHEREFORE the Debtors respectfully request entry of the proposed Interim Order and proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  June 11, 2024
       Houston, Texas

                                              */s/  Clifford W. Carlson*
                                              WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
           Clifford.Carlson@weil.com
           Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
           Candace.Arthur@weil.com
           DavidJ.Cohen@weil.com


*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on June 11, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' claims, noticing, and solicitation agent.


   */s/ Clifford W. Carlson*
*Clifford W. Carlson*