## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

## EMERGENCY MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING (A) FUNDING FROM THE COMMONWEALTH OF MASSACHUSETTS FOR THE PLANNED TRANSITION AND SALE OF MASSACHUSETTS HOSPITALS, (B) THE CLOSURE OF CARNEY HOSPITAL AND NASHOBA VALLEY MEDICAL CENTER, AND (C) PROCEDURES RELATED TO FACILITY CLOSURES; AND (II) GRANTING RELATED RELIEF

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 1:00 P.M. (CENTRAL TIME) ON JULY 31, 2024.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 31, 2024 AT 1:00 P.M. (CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or "**Steward**"), respectfully represent as follows in support of this motion (the "**Motion**"):

<u>**Preliminary Statement**</u>

1. The Debtors are pleased to report that, in connection with their robust marketing process to sell their hospital operations in Massachusetts, they have received binding bids from high-quality local operators to acquire a large majority of their Massachusetts hospitals, as well as a commitment from the Commonwealth of Massachusetts (the "**Commonwealth**") to provide approximately $30 million of funding support for the hospitals' operations as they are transitioned to new operators in the near-term.

2. From the outset of these chapter 11 cases, the Debtors have remained steadfast in their goal of doing everything within their power to keep their thirty-one (31) hospitals open. To that end, the Debtors commenced these chapter 11 cases to raise debtor-in-possession financing to allow them to continue to provide high quality care to their patients and continue their

prepetition sale process with the aim of selling their hospitals to new operators that can continue to serve the Debtors' patients and communities, and with closure of any hospitals only to be employed as a last resort.

3.        Overseen by the Debtors' independent Transformation Committee, the Debtors (i) successfully secured $300 million of debtor-in-possession financing commitments, and (ii) through their independent investment bankers Leerink Partners and Cain Brothers, contacted more than 200 prospective hospital buyers and signed non-disclosure agreements ("**NDAs**") with more than 100 potential bidders (including 34 NDAs related to the Massachusetts hospitals). Through these efforts, the Debtors have obtained significant interest from prospective buyers in acquiring a number of their hospitals, including in Massachusetts where the Debtors are in active discussions with reputable bidders to sell and transition the operation of Saint Elizabeth's Medical Center, Saint Anne's Hospital, Good Samaritan Medical Center, Holy Family Hospital – Haverhill, and Holy Family Hospital – Methuen, and Morton Hospital (the "**Massachusetts Going Concern Hospitals**") to such parties.

4.        In support of the Debtors' efforts to transition such hospitals and ensure continuity of patient care, the Commonwealth has agreed to assist the Massachusetts Going Concern Hospitals with approximately $30 million of funding pursuant to a payment agreement, a form of which is being negotiated with the Commonwealth.  The Commonwealth's proposed form of agreement is annexed as **<u>Exhibit A</u>** hereto (the "**Payment Agreement**") and is subject to negotiation by the Debtors in consultation with their lenders and the official committee of unsecured creditors (the "**Creditors' Committee**").[2]  Further, the Debtors understand that the

---

[2]    The Debtors are continuing to negotiate the terms of the Payment Agreement with the Commonwealth and consult with their key constituents regarding the same.  The Debtors hope to be able to present a substantially final form of Payment Agreement at the hearing on the Motion.

Commonwealth is working with certain bidders to provide financial support to allow such bidders to acquire and assume responsibility for operating the Massachusetts Going Concern Hospitals, which would save thousands of jobs and allow these hospitals to continue providing quality health care in the communities they serve.

5.     The advance payments to be made by the Commonwealth will support the sale and orderly transition of the Massachusetts Going Concern Hospitals to new operators and help neutralize the operating losses the Debtors have been incurring operating the Massachusetts Going Concern Hospitals.   In the first five months of 2024 alone, the Debtors incurred approximately $63 million in EBITDA losses at the Massachusetts Going Concern Hospitals.  The Debtors, and by extension their lenders, have been funding these operating losses year to date.  But the Debtors have insufficient liquidity to continue funding the losses of these hospitals, and continuing to do so past July 31, 2024 is not approved under the Debtors' postpetition financing budget—a key fact that all parties are aware of.   Accordingly, the Debtors plan to work expeditiously with the bidders to finalize a sale and transition of the Massachusetts Going Concern Hospitals to new operators (including negotiating and executing binding purchase agreements with bidders, obtaining Bankruptcy Court approval, and satisfying all closing conditions, including securing necessary regulatory approvals).[3]  The Debtors understand that the Commonwealth does not intend to seek repayment or recoupment of the advanced payments contemplated by the Payment Agreement (unless certain conditions occur), and are proceeding with seeking approval of the Payment Agreement based on that understanding.

---

[3]     The Payments under the Payment Agreement are conditioned on the Debtors promptly signing and obtaining court approval of asset purchase agreements.

6.     Armed with advanced payments from the Commonwealth, the Debtors are focused on (a) consummating sale transactions that will allow the operations at these hospitals to continue as a going concern, and (b) securing the cooperation of MPT and Macquarie (the landlords of the Debtors' hospitals in Massachusetts) to facilitate the sale or lease of the real property underlying such hospitals.  The Debtors' sale process in Massachusetts has resulted in bids for the total hospital enterprise (*i.e.*, inclusive of real estate and operations) that are significantly less than the value of the real estate implied by the rent obligations under the Debtors' Massachusetts master lease.[4]  Because MPT's and Macquarie's investment in such real estate is substantially impaired, the Debtors have asked MPT and Macquarie to agree to certain concessions to allow the Debtors to transition the Massachusetts Going Concern Hospitals to new operators.  The Debtors have allowed for substantial engagement with the bidders to facilitate such a transition, but have not received consent from MPT and Macquarie to transition such hospitals to date.  Absent MPT and Macquarie stepping away from their investment in Massachusetts, the Debtors cannot facilitate a consensual and efficient sale and transfer of the hospitals to new operators to ensure continuity of patient care.

7.     The Debtors, with the assistance of the Honorable Judge Isgur, have expended significant efforts trying to mediate and facilitate a resolution of these issues.[5]  To date, the parties have not reached a resolution.  The Debtors are optimistic that MPT and Macquarie will

---

[4]   Given the onerous terms of the Debtors' Massachusetts lease, contemporaneously herewith, the Debtors have filed the *Emergency Motion of Debtors for Order (I) Authorizing Rejection of Master Lease II Agreements Effective As of the Rejection Date in Connection with Planned Transition and Sale of Massachusetts Hospitals to New Operators, and (II) Granting Related Relief*, which seeks to reject the master lease that governs the real property underlying the Debtors' hospitals in Massachusetts.

[5]   The Debtors would like to remind all parties involved in the mediation of the confidentiality obligations thereunder.  The Debtors and other parties involved in the mediation have expressed concerns about the Commonwealth's public statements regarding confidential mediation information.  The Debtors reserve all rights with respect thereto.

do the right thing and facilitate the transition of the Massachusetts Going Concern Hospitals to ensure continuity of patient care.  However, to the extent MPT and Macquarie do not, the Debtors reserve all of their powers and rights, including under the Bankruptcy Code, to facilitate the sale of the underlying real property to buyers without MPT and Macquarie's consent.[6]

8.    Despite the Debtors' extensive marketing efforts and the positive developments with respect to the Massachusetts Going Concern Hospitals, two hospitals in Massachusetts (Carney Hospital and Nashoba Valley Medical Center) received little interest from bidders (the "**Closing Massachusetts Hospitals**").  These two hospitals operate at a significant loss and serve a limited patient population, and ultimately no actionable bids from qualified bidders have been received for these hospitals.

|  | **Hospital** | **City** | **State** | **Bid Deadline** | **Est. # of Employees** | **Est. # of Current Patients** | **YTD EBITDA Through May 2024[7]** |
|---|---|---|---|---|---|---|---|
| 1. | Carney Hospital | Dorchester | MA | July 15, 2024 | 903 | 49 | ($14,741,000) |
| 2. | Nashoba Valley Medical Center | Ayer | MA | July 15, 2024 | 562 | 31 | ($2,269,000) |
| | **TOTAL YEAR-TO-DATE EBITDA LOSS** | | | | | | **($17,010,000)** |

---

[6]    The Creditors' Committee's investigation of the nature of Master Lease II, including whether such lease is a true lease, whether such lease is severable, and the treatment of any claims arising under such lease is ongoing.  The Debtors understand that the Committee may assert a Challenge (as such term is defined in the *Final Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying The Automatic Stay; and (IV) Granting Related Relief* (Docket No.  625) (the "**Final MPT DIP Order**") and the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538) (the "**Final FILO DIP Order**" and together with the Final MPT DIP Order, the "**Final DIP Orders**")) with respect to these issues.  The Committee has made clear to the Debtors that it will vigorously oppose any release granted to MPT absent advancement of its investigation and a broader consensual resolution.

[7]    EBITDA represents net earnings before interest, depreciation and amortization, but includes real property rent expense and shared services expenses for information technologies, revenue management, and other shared services.

9.     The Debtors explored other alternatives for keeping the Closing Massachusetts Hospitals open, including seeking interim funding from MPT and the Commonwealth.  However, no one party has agreed to provide funding to continue the operations of such hospitals (either to the Debtors or to new operators).  Given the mounting losses at such hospitals and the absence of a qualified bidder or actionable alternative, the Debtors have made the difficult decision, following consultation with public officials, the patient care ombudsman appointed in these cases with respect to the Closing Massachusetts Hospitals, the Creditors' Committee, MPT, Macquarie, and the Debtors' lenders, among other parties, that it is necessary, appropriate, and in the best interests of their estates for the Debtors to seek approval of a safe and expeditious closing process for the Closing Massachusetts Hospitals.

10.     The Debtors understand that the Commonwealth intends to work cooperatively with the Debtors to effectuate a safe closure of the Closing Massachusetts Hospitals in accordance with the closure plans detailed herein.  Further, to the extent any additional closures become necessary in these chapter 11 cases, the Debtors are seeking approval of the procedures set forth in **Exhibit 1** to the Proposed Order (as defined herein) (the "**Facility Closure Procedures**") to allow the Debtors to close additional facilities in a timely manner that ensures public health and safety, should it become necessary to do so.

11.     The Debtors, in consultation with such parties, have carefully considered— and continue to consider—the impact of the closure of the Closing Massachusetts Hospitals and on the Debtors' patient population, employees, vendors, creditors, and other constituencies.  In connection therewith, the Debtors have developed (and in connection with any potential facility closures in the future, will develop) closure plans (the "**Closure Plans**") for, among other things: (i) the safe transfer and discharge of patients; (ii) the protection, transfer, and storage of medical

records; (iii) the disposition of personal property, including pharmaceuticals, hazardous materials, and medical waste at such hospitals; (iv) rejection of executory contracts related to such hospitals; (v) abandonment of certain surplus, burdensome, or non-core assets, if any, at such hospitals; and (vi) assisting in the transition of affected employees and healthcare professionals. A summary of the Closure Plans for the Closing Massachusetts Hospitals is detailed herein. When taken together, these safeguards ensure that the Debtors proceed in a manner that preserves the value of the Debtors' estates while protecting patient care.

12. Although the Debtors hoped to keep all of their hospitals in Massachusetts operating, entry into the Payment Agreement to transition its six (6) operating hospitals to new operators, closing the Closing Massachusetts Hospitals, and authorizing Facility Closure Procedures will allow the Debtors to preserve resources for the benefit of the Debtors' patients, employees, and creditors and promote patient safety as a whole. The Debtors have consulted with the ABL Lenders and the FILO Lenders who are supportive of the Debtors' request for authority to close the Closing Massachusetts Hospitals and the Debtors' obtaining approval of the Facility Closure Procedures. In addition, the Debtors have consulted with the Creditors' Committee who support the Debtors' request for approval of the Facility Closure Procedures. The Commonwealth also does not object to the Debtors' proposal to close Carney Hospital and Nashoba Valley Medical Center, and the Debtors expect the Commonwealth to work with the Debtors to allow such closures to occur on an expedited and safe basis. Further, the Debtors are closely coordinating with the patient care ombudsmen and will coordinate with the unions in Massachusetts regarding the closure of the Closing Massachusetts Hospitals.

13. Accordingly, the Debtors respectfully request that the Court grant an emergency hearing on this Motion and grant the relief requested herein.

## Background

**A.    Filing of the Debtors' Chapter 11 Cases.**

14.    On May 6, 2024 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.    On May 16, 2024, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

16.    On May 20, 2024, the U.S. Trustee appointed (i) Suzanne Koenig as the patient care ombudsman covering Massachusetts, Ohio, Pennsylvania, and Miami-Dade Florida (Docket No. 311); and (ii) Susan Nielson Goodman as the patient care ombudsman covering Arizona, Arkansas, Central/North Florida, Louisiana, and Texas (Docket No. 312) (together, the "**Patient Care Ombudsmen**").

17.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

18.    The Debtors own and operate the largest private physician-owned for-profit healthcare network in the United States.  Headquartered in Dallas, Texas, the Debtors' operations include 31 hospitals across eight states, approximately 400 facility locations, 4,500 primary and

specialty care physicians, 3,600 staffed beds, and a company-wide workforce of nearly 30,000 employees.  The Debtors provide care to more than two million patients annually.

19.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* (Docket No. 38) (the "**First Day Declaration**").

**B.     Marketing Process and Efforts to Identify New Operators.**

20.     In January 2024, with the assistance of Cain Brothers, a division of KeyBanc Capital Markets Inc. ("**Cain Brothers**"), the Debtors commenced a robust prepetition marketing process for certain of their hospitals in Arizona, Arkansas, Louisiana, Ohio, Pennsylvania, and Southern Massachusetts.  In February 2024, Leerink Partners LLC ("**Leerink Partners**") initiated a marketing effort for the sale of the Debtors' Hospitals in Northern Massachusetts.  In March 2024, Cain began to market the Debtors' Hospitals in Texas and, in April 2024, Leerink Partners initiated a marketing effort for the sale of the Debtors' Hospitals in Florida.

21.     As part of this prepetition process, Cain Brothers contacted approximately 175 potential buyers and Leerink Partners contacted approximately 52 potential buyers, including for-profit and not-for-profit organizations that were considered likely participants in a sale process of the hospitals within their respective marketing scopes, and provided such parties with marketing materials.  Prior to the Petition Date, the Debtors received numerous indications of interest for their hospitals and met regularly with their advisors and the Transformation Committee and consulted with certain of their key stakeholders on a regular basis.

22.     On May 15, 2024, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and*

*Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 281) (the "**Bidding Procedures Motion**").[8] On June 3, 2024, the Court approved the proposed Global Bidding Procedures sought in the Bidding Procedures Motion.[9]

23. After the Petition Date, (a) Cain Brothers resolicited all of the parties it had contacted prepetition, as well as eighteen (18) additional potential bidders to make all such parties aware of the Debtors' chapter 11 filing and the proposed Global Bidding Procedures, including the proposed Bid Deadlines, and (b) Leerink Partners (i) resolicited all of the parties that it had contacted as part of its initial marketing outreach to make those parties aware of the Debtors' chapter 11 filing and proposed Global Bidding Procedures, including the Bid Deadline for the Northern Massachusetts Hospitals, (ii) solicited interest from additional potentially interested parties following the Petition Date, and, (iii) together with Cain Brothers, engaged with the Commonwealth regarding securing buyers to continue operating the Debtors' hospitals in Massachusetts with the support of the Commonwealth.

24. The Global Bidding Procedures originally provided for a Bid Deadline of June 24, 2024 for the Debtors' hospitals in Massachusetts. Notwithstanding the significant operating losses at the Debtors' hospitals in Massachusetts, in an effort to facilitate the sale and transition of the hospitals in Massachusetts to new operators, the Debtors extended the Bid

---

[8] Capitalized terms used but not otherwise defined herein shall have such meanings set forth in the Bidding Procedures Motion, the *Notice of Extension of Certain Deadlines and Dates under the Bidding Procedures Order* (Docket No. 895) (the "**Deadline Extension Notice**"), or the First Day Declaration, as applicable.

[9] *See Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment of Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 626).

Deadlines for such hospitals from June 24, 2024 to July 15, 2024 to afford bidders and operators more time to consider the opportunity. *See* Deadline Extension Notice at 2. However, no actionable bids have been received for the Closing Massachusetts Hospitals, either before or after the applicable Bid Deadline, despite Leerink Partners having contacted over forty (40) parties to solicit their interest in acquiring the Closing Massachusetts Hospitals.

25.    A summary of the Debtors' hospital marketing efforts with respect to the Closing Massachusetts Hospitals is below:

|  | Hospital | Sale Process Launch Date | Original Bid Deadline | Final Bid Deadline | Parties Contacted | Signed NDAs[10] |
|---|---|---|---|---|---|---|
| 1. | Carney Hospital | February 25, 2024 | June 24, 2024 | July 15, 2024 | 44 | 20 |
| 2. | Nashoba Valley Medical Center | February 25, 2024 | June 24, 2024 | July 15, 2024 | 42 | 20 |

26.    In an effort to keep the Closing Massachusetts Hospitals open, in addition to the Commonwealth, the Debtors (i) engaged in discussions with MPT and Macquarie in an effort to have such parties fund the operations of the Closing Massachusetts Hospitals, and (ii) explored whether such parties would be willing to assume responsibility for operating such hospitals, but without success.

## **Jurisdiction**

27.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[10]    Leerink marketed the Northern Massachusetts hospitals on a regional basis and, accordingly, the total number of NDAs signed with respect to the Closing Hospitals reflect the total amount for the Northern Massachusetts region.

## Relief Requested

28.     By this Motion, pursuant to sections 105, 363, 554, and 1108 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Bankruptcy Local Rules 9013-1(b) and 9014, the Debtors request (a) approval of the Payment Agreement; (b) authority to close Carney Hospital and Nashoba Valley Medical Center; (c) approval of the Facility Closure Procedures; and (d) related relief.

29.     A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit B** (the "**Proposed Order**").

30.     In support of this Motion, the Debtors submit the following, filed contemporaneously herewith:

- *Declaration of John R. Castellano in Support of Emergency Motions of Debtors for Entry of Orders (I) Approving (A) Funding From the Commonwealth of Massachusetts for the Planned Transition and Sale of Massachusetts Hospitals, (B) the Closure of Carney Hospital and Nashoba Valley Medical Center, and (C) Procedures Related to Facility Closures; and (II) Authorizing Rejection of Master Lease II Agreements in Connection with Planned Transition and Sale of Massachusetts Hospitals to New Operators* (the "**Castellano Declaration**");

- *Declaration of Dr. Octavio Diaz in Support of Emergency Motion of Debtors for Entry of an Order (I) Approving (A) Funding From the Commonwealth of Massachusetts for the Planned Transition and Sale of Massachusetts Hospitals, (B) the Closure of Carney Hospital and Nashoba Valley Medical Center, and (C) Procedures Related to Facility Closures; and (II) Granting Related Relief* (the "**Dr. Diaz Declaration**");

- *Declaration of James Moloney in Support of Emergency Motions of Debtors for Entry of Orders (I) Approving (A) Funding From the Commonwealth of Massachusetts for the Planned Transition and Sale of Massachusetts Hospitals, (B) the Closure of Carney Hospital and Nashoba Valley Medical Center, and (C) Procedures Related to Facility Closures; and (II) Authorizing Rejection of Master Lease II Agreements in Connection with Planned Transition and Sale of Massachusetts Hospitals to New Operators* (the "**Moloney Declaration**"); and

- *Declaration of Toby King in Support of Emergency Motions of Debtors for Entry of Orders (I) Approving (A) Funding From the Commonwealth of Massachusetts for the Planned Transition and Sale of Massachusetts Hospitals,*

*(B) the Closure of Carney Hospital and Nashoba Valley Medical Center, and (C) Procedures Related to Facility Closures; and (II) Authorizing Rejection of Master Lease II Agreements in Connection with Planned Transition and Sale of Massachusetts Hospitals to New Operators* (the "**King Declaration**").

## **Proposed Hospital Closures**

31.     Despite the Debtors' extensive marketing efforts, as set forth in the King Declaration, the Debtors have not received any actionable bids for the Closing Massachusetts Hospitals or been able to secure a buyer or new operator for the Closing Massachusetts Hospitals. The Debtors have also engaged with various parties to see if they would be willing to fund the Closing Massachusetts Hospitals. However, no party has agreed to fund the Closing Massachusetts Hospitals. Given that the Closing Massachusetts Hospitals incur significant losses and there is no prospective operator for such hospitals, the Debtors propose to close the Closing Massachusetts Hospitals. Further, the Debtors do not expect the Commonwealth to object to the expedited and safe closure of such hospitals.

32.     The following reflects the Debtors' proposed Closure Plans with respect to the Closing Massachusetts Hospitals:

| Facility Name | Carney Hospital | Nashoba Valley Medical Center |
|---|---|---|
| **Facility Address** | 2100 Dorchester Ave. Dorchester, MA 02124 | 200 Groton Road Ayer, MA 01432 |
| **Proposed Closure Date[11]** | • **August 31, 2024** <br>    o Debtors will adjust the date for cessation of clinical operations at each Facility if necessary to ensure safe patient care. | |
| **Timeline for Closure** | • **Prior to filing of Motion**: <br>    o Form Command Center working group to oversee the safe and orderly closure of the hospitals. <br> • **Contemporaneous with filing of Motion**: <br>    o Deliver WARN Act notifications to substantially all employees. <br>    o File the Closure Plans with the appropriate regulatory authorities. <br> • **30 days prior to Closure**: <br>    o Send notification letter with proposed closure plan to MA DPH. | |

---

[11]     The Debtors propose to close such Closing Hospitals no later than the date of closure proposed herein (any such date, the "**Proposed Closure Date**").

|  | |
|---|---|
|  | <ul><li>o   Send copy of notification letter to hospital PFAC, hospital staff, labor unions, MA General Court, elected officials, the Joint Commission, HPC, AGO, CHIA, EOLWD, and community groups.</li><li>o   Notify CMS regional office, Medicaid, and commercial payors.</li><li>o   Notify federal and state regulatory authorities including DEA, CLIA, DPH Drug Control Program and ACGME.</li></ul><ul><li>**15 days prior to closure**:<ul><li>o   Post notice of closure at all entrances.</li><li>o   Cease elective inpatient admissions.</li></ul></li><li>**8 days prior to closure**:<ul><li>o   State holds public hearing.</li></ul></li><li>**5 days prior to closure**:<ul><li>o   State issues determination that hospitals may close.</li></ul></li><li>**1 day prior to closure**:<ul><li>o   Cease EMS Services and close Emergency Department plus ancillary support services for Emergency Department.</li><li>o   Discharge or transfer all remaining inpatients.</li><li>o   Close all ambulatory services (ambulatory services will remain open according to staffing and scheduling needs until this time).</li></ul></li><li>**Ongoing**:  Discharge patients in the ordinary course, identify appropriate alternative locations for any patients who will need ongoing care and arrange for transfer.  Participate in any required public hearings.</li><li>**Proposed Closure Date**:  Upon completion of emergency department closure.[12]<ul><li>o   Submit 855A Application to MAC to voluntarily terminate Medicare enrollment.</li></ul></li></ul> |
| **Plan for Employees** | <ul><li>The Debtors intend to provide WARN Act notices to substantially all non-unionized employees of Carney Hospital and Nashoba Valley Medical Center and, with respect to unionized employees, the Debtors intend to provide WARN Act notices to each of the relevant union representatives, contemporaneously with the filing of this Motion.</li><li>Employees who are employed by St. Elizabeth's Medical Center and who work at Carney Hospital and are unionized may have bumping rights into St. Elizabeth's Medical Center and may also have bid rights to open positions in all other Massachusetts hospitals that have existing employees represented by the relevant union.  The Debtors intend to work with the relevant unions and employees to assist in the facilitation of such bumping rights in accordance with the terms of the relevant collective bargaining agreements.</li><li>The Debtors also intend to attempt to assist employees in finding job placement elsewhere, including by scheduling job fairs at the Debtors' other hospitals in Massachusetts and notifying the Massachusetts Department of Labor and Department of Unemployment Assistance.</li><li>With regard to any unionized employees at the Closing Massachusetts Hospitals, the Debtors intend to provide appropriate notice and engage in</li></ul> |

---

[12]   The Debtors will adjust the proposed Closure Date in consultation with the applicable state regulatory authorities and patient care ombudsman if necessary to provide safe patient care.

| | |
|---|---|
| | effects bargaining with the relevant labor unions upon such union's request, as well as discuss shutdown plans with such unions. |
| **Plan for Transfer/Discharge of Patients** | • The majority of currently-admitted patients will be discharged in the ordinary course and, if necessary, provided with information and assistance to make follow-up appointments with replacement providers.  Inpatients will be notified of the anticipated closure and will be transferred, along with their medical record information, to a hospital in the area or a hospital of their choice.  The Debtors will complete the transfer or discharge of acute care patients prior to closure. |
| **Plan for Protection, Transfer, and Storage of Medical Records** | • The Debtors intend to contract with a medical records custodian to ensure records are properly stored and patients can access their medical records after the closure.  The Debtors will send written notification of how to locate patient records to all practitioners currently on the active staff of the respective hospitals.  The transfer and discharge of all patients shall be conducted in a manner that ensures the protection of patient health, privacy, and safety. |
| **Plan for the Disposition of Personal Property, Including Pharmaceuticals, Hazardous Materials, and Medical Waste** | • The Debtors will manage and dispose of pharmaceuticals, hazardous materials, and medical waste in accordance with state and federal guidelines.  Medications, radioactive materials, chemicals, medical waste, infectious materials and other hazardous materials will be identified, secured and inventoried, then destroyed, disposed of, returned to vendors, or transferred to other providers as appropriate.  Each hospital has hired vendors to manage the disposal of medical waste and infectious materials.  After termination of services, the Debtors will also retain an outside vendor to decontaminate hot rooms. |
| **Communications Plan** | • The Debtors are developing a comprehensive approach to keep patients, employees, government agencies, area hospitals and the community at large informed of the closure.  In particular, the Debtors intend to contact area hospitals and outpatient practices to inform them of the proposed closure and to discuss procedures for the transfer of patients.  In addition, the Debtors will notify the fire department and the appropriate government agencies of the proposed closure.  The Debtors will place public notices in local newspapers regarding the location of patient medical records, and provide written notice to all active physicians as to how to locate patient records. |

## Facility Closure Procedures

33.     Beyond the Closing Massachusetts Hospitals, the Debtors have not made a determination to close any additional hospitals, clinics, or other medical facilities (collectively, the "**Facilities**") at this time and are expending all efforts to facilitate the sale or transition of such Facilities to new operators.  The Debtors are maintaining a competitive bidding process, and are in active discussions with bidders, MPT, the ABL and FILO Lenders, the Creditors' Committee,

and the Patient Care Ombudsmen with respect to all options available to maintain the operations of the Debtors' Facilities (including other Facilities that operate at a loss).

34.     However, in the event the Debtors determine in their business judgment that it is necessary to close additional Facilities, the Debtors are seeking approval of the procedures (summarized below) to provide for a streamlined process for Court approval of such facility closures, including rejecting executory contracts and abandoning certain assets in connection therewith.

35.     The proposed Facility Closure Procedures provide for the following:

a.     <u>Notice</u>.  The Debtors shall file with this Court and serve on the Notice Parties (as defined below) a notice (the "**Facility Closure Notice**") substantially in the form annexed as **<u>Exhibit 2</u>** to the Facility Closure Procedures to close the identified Facilities.  The Facility Closure Notice shall set forth, among other things:  (i) the Facilities to be closed; (ii) the timeline(s) for closure of such Facilities, including the proposed closure date for such Facilities (the "**Facility Closure Date**") and how patients can obtain their medical records; (iii) the plan for the treatment of employees, including with respect to any terminations; (iv) the plan for the transfer and discharge of patients at such Facilities; (v) the plan for the protection, transfer, and storage of medical records at such Facilities; (vi) the plan for the disposition of personal property at such Facilities, provided that the disposition of pharmaceuticals, hazardous materials, medical waste, and other products or materials the disposition of which is otherwise regulated shall be undertaken in accordance with applicable law and regulations; (vii) a schedule setting forth any executory contracts to be rejected by the Debtors in connection with the closure of such Facilities (which may be supplemented by the Debtors as needed) (the "**Rejected Contracts**"); (viii) the deadlines and procedures for filing objections to the Facility Closure Notice; (ix) a communications plan compliant with applicable law and regulations to keep patients, employees, government agencies, and the community at large informed of the closure (the "**Facility Closure**") and how patients can obtain medical records; and (x) a proposed order approving the closure of the applicable Facility and the rejection of executory contracts and abandonment of property in connection therewith (the "**Facility Closure Order**").   The Debtors will consult with the Creditors' Committee before filing any Facility Closure Notice and will close the identified Facilities in a manner that ensures patient health and safety and promotes the preservation of records.

b.   Rejection of Executory Contracts.  The Debtors will indicate in the Facility Closure Notice whether they seek to reject any executory contracts in connection with the closure or transition of the identified Facilities pursuant to section 365 of the Bankruptcy Code, and shall set forth, among other things (i) the title of the Rejected Contract; (ii) the names of the counterparties to such Rejected Contract; (iii) a description of the Rejected Contract; and (iv) the proposed effective date of the rejection for the Rejected Contract (the "**Rejection Date**").  The Facility Closure Order will also provide for the rejection of the Rejected Contracts identified in the Notice.  The Debtors reserve the right to reject additional contracts or leases pursuant to the *Order (I) Approving Procedures for Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property; (II) Amendments to Certain Unexpired Leases of Nonresidential Real Property; (III) Abandonment of Property in Connection Therewith; and (IV) Granting Related Relief* (Docket No. 1551) or a separate motion approved by the Court.

c.   Abandonment.  The Debtors will specify in the Facility Closure Notice whether they intend to abandon any personal property, including inventory, furniture, fixtures, equipment, and/or other material at the Facilities as of the Facility Closure Date, provided that the disposition of pharmaceuticals, hazardous materials, medical waste and other products or materials the disposition of which is otherwise regulated shall be disposed of in accordance with applicable law or regulations.  Any such property of the Debtors remaining after the Facility Closure Date shall be deemed abandoned without further notice or order of the Court, free and clear of all liens, claims, interests, or other encumbrances.  Any landlord or other designee shall be free to dispose of any such items without notice or liability to any party.  The Debtors reserve the right to sell or abandon additional assets pursuant to the *Order (I) Establishing Procedures for Sales, Transfers, and Abandonment of De Minimis Assets; and (II) Granting Related Relief* (Docket No. 1665) or a separate motion approved by the Court.  The landlords' rights, if any, to file claims for the costs of disposal of such property are fully reserved, as are the rights of all parties in interest to object to such claims.

With respect to any personal property that is leased to the Debtors by a third party or owned by a third party, such third party shall contact the Debtors and remove or cause to be removed such personal property from the Facilities to be closed prior to the Facility Closure Date.  For the avoidance of doubt, if any such personal property remains on such facilities' premises after the Facility Closure Date, any and all such property may be abandoned and disposed of as set forth above.

d.   Service of Notice.  The Debtors will cause the Notice to be served by overnight mail or email upon (i) the applicable regulatory authorities and their outside counsel, if known; (ii) Attorneys General in whose states

closures are being noticed and their counsel, if known; (iii) counsel to the ABL Lenders; (iv) counsel to the FILO Lenders; (v) counsel to MPT; (vi) the United States Trustee; (vii) counsel to the Creditors' Committee; (viii) the Patient Care Ombudsmen, and (ix) any other parties otherwise entitled to notice under the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules (collectively, the "**Notice Parties**").

e.      Objection Procedures.  Parties objecting to a proposed Facility Closure, the rejection of executory contracts in connection therewith, or abandonment of property in connection therewith, must file and serve a written objection (an "**Objection**") so that the Objection is filed with the Court and is actually received by (i) the Debtors c/o Steward Health Care System LLC, 1900 N. Pearl Street, Suite 2400, Dallas, TX 75201 (Attn: Legal Department); (ii) counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, Esq. (ray.schrock@weil.com), Candace M. Arthur, Esq. (candace.arthur@weil.com), and David J. Cohen, Esq. (davidj.cohen@weil.com)); 700 Louisiana Street, Suite 1700, Houston, Texas 77002-2755 (Attn: Clifford W. Carlson, Esq. (clifford.carlson@weil.com) and Stephanie N. Morrison, Esq. (stephanie.morrison@weil.com)); and (iii) the Notice Parties, no later than three (3) business days after the date the Debtors service the Notice (the "**Objection Deadline**").  Each Objection must state with specificity the legal and factual grounds for objection to the proposed Facility Closure, the rejection of executory contracts in connection therewith, or abandonment of property in connection therewith.

f.      Event of No Objection.If no Objection is filed and served by the Objection Deadline, the Debtors shall submit the proposed Facility Closure Order to the Court after the Objection Deadline, and the Court may enter such order without a hearing.  Any Facility Closure Order shall set forth the Facility Closure Date and Rejection Date.

g.      Unresolved Objections.  If an Objection is timely filed and not withdrawn or resolved (an "**Unresolved Objection**"), the Debtors shall file a notice for a hearing for the Court to consider the Unresolved Objection (i) at the next scheduled hearing after the Objection Deadline, subject to the Court's schedule, or (ii) a hearing date set by the Debtors, subject to the Court's schedule.  If the Unresolved Objection is overruled or withdrawn, the effective date of the Facility Closure (and abandonment of property in connection therewith) and the rejection of the Rejected Contracts shall be (i) the Facility Closure Date and Rejection Date, respectively; (ii) such other date to which the Debtors and the party that filed the Unresolved Objection have agreed; or (iii) such other date as determined by the Court. If an Objection is filed for fewer than all of the Facilities included on the Notice, the Debtors may proceed with submitting a proposed Facility Closure Order in accordance with the above procedures for the remaining

Facilities on the Notice.  If an Objection is filed for the rejection of one or more Rejected Contracts (a "**Rejection Objection**"), but there are otherwise no Unresolved Objections to the Facility Closure (or abandonment of property in connection therewith), the Debtors may proceed with submitting a proposed Facility Closure Order, and the Debtors shall set a hearing on the Rejection Objection within a reasonable time period to be agreed upon between the Debtors and the party that filed the Rejection Objection.

h.   Deadline to File Proofs of Claim.  Claims arising out of a Facility Closure, rejection of executory contracts in connection therewith, or abandonment of property in connection therewith, must be filed on or before the later of (i) the deadline for filing proofs of claims established by this Court in these chapter 11 cases; and (ii) thirty (30) days after entry of the applicable Facility Closure Order or order resolving a Rejection Objection.  If a proof of claim is not timely filed, such claimant shall not be treated as a creditor with respect to such claims for voting on any chapter 11 plan in these chapter 11 cases and shall be forever barred from asserting such claim and from participating in any distributions made in connection with these chapter 11 cases.

## **Payment Agreement**

36.   To support the operations of the Massachusetts Going Concern Hospitals while the Debtors finalize and implement sale transactions, the Debtors propose entering into the Payment Agreement, which contemplates that the Commonwealth will pay approximately $30 million to support continued hospital operations in August 2024 at the Massachusetts Going Concern Hospitals while the parties work towards consummating sale transactions.[13] Notwithstanding the current terms of the Payment Agreement, the Debtors understand that the Commonwealth does not intend to seek repayment or recoupment of the Payments (as defined in the Payment Agreement), unless certain events described below occur, and are only proceeding with seeking approval of the Payment Agreement based on that understanding.

---

[13]   In the event that the closing date for the respective Massachusetts Going Concern Hospitals is extended beyond August 31, 2024, the Debtors intend to seek additional funding for such hospitals.

37.     The proposed terms of the Payment Agreement (based on the Commonwealth's last counter-proposal to the Debtors) include the following:[14]

a.     The Commonwealth shall make $30,000,000.00 in Payments to the Debtors' hospitals in Massachusetts and Steward Medicaid Care Network, Inc. (the "**Steward ACO**") in two tranches:

i.     The first tranche ("**Tranche 1**") will be paid on or about August 1, 2024, in the aggregate amount of $11.3 million, consisting of (1) ACO 2021 Shared Savings, (2) Health Equity Incentive, and (3) Safety Net Provider Payments.

ii.     The second tranche ("**Tranche 2**") will be paid on or about August 15, 2024, in the aggregate amount of $18.7 million, consisting of (1) ACO 2021 Shared Savings, (2) Health Equity Incentive, and (3) Safety Net Provider Payments.

b.     Tranche 1 is conditioned on: (1) execution of purchase agreements to acquire certain of the Massachusetts Going Concern Hospitals (and their underlying real property) before July 31, 2024; (2) delivery of a draft transition services agreement to the advisors to the Commonwealth for such hospitals; and (3) compliance with all requirements in the Payment Agreement.

c.     Tranche 2 is conditioned on: (1) the issuance of one or more order of the Bankruptcy Court approving the sales of certain of the Massachusetts Going Concern Hospitals; (2) compliance with closure processes for Carney Hospital and Nashoba Valley Medical Center; and (3) compliance with all requirements in the Payment Agreement.

d.     The Payments are also subject to the following conditions:

i.     The Payments shall remain unencumbered and be used solely for the purposes of Hospital working capital, patient care and employee salaries in the Commonwealth.

ii.     The Payments shall not be used to refinance or pay down any pre-existing debt, pay any amounts due to any lenders, agents, or attorneys or their professional fees, pay any amounts in non-hospital executive compensation, pay any amount due to any landlord or any amount due for rent on real property under that certain Master Lease Agreement (Master Lease II), dated as of March 14, 2022, or make

---

[14]     Capitalized terms used in this paragraph 37 but not defined herein shall have the meanings ascribed to them in the Payment Agreement.  Please refer to **Exhibit A** hereto for the proposed Payment Agreement in its entirety.

any adequate protection payments to any secured creditor under the Bankruptcy Code.

iii.    The Payments shall be held in a segregated account at a financial institution selected by the Hospitals and shall not be subject to any pre-existing or future security agreements.

iv.    The Payments shall not serve as collateral for any pre-existing debt or new debt incurred, shall not be considered "cash collateral" under Section 363 of the Bankruptcy Code, and shall remain unencumbered.

v.    The Payments shall not be used for closure costs for the Massachusetts Closing Hospitals.

e.    Without notice and without further order of the Bankruptcy Court, EOHHS shall have a right following five (5) business days' notice and an opportunity to cure, to immediately terminate the Payment Agreement, if any of the following events occur without the prior written consent of EOHHS:

i.    A Hospital's Bankruptcy Proceeding is converted to a Chapter 7 proceeding, is dismissed, or a motion for appointment of a Chapter 11 trustee is filed, and such actions are not brought or supported by EOHHS; or

ii.    The Hospitals do not obtain from the Bankruptcy Court an order approving the Payment Agreement by July 31, 2024; or

iii.    The Hospitals violate any terms or conditions in this Agreement.

f.    In the event of the termination or breach of the Payment Agreement, the Debtors shall be jointly and severally liable for the repayment, in full, of the Payments received and  EOHHS may, in its sole discretion, and without further notice:

i.    Recoup the Payments against 100% of the amounts payable (1) by EOHHS to the Hospitals for adjudicated to pay claims, (2) any supplemental payments payable by EOHHS to the Hospitals, and (3) any other payment obligations otherwise owed by EOHHS to the Hospitals or the Steward ACO; or

ii.    Require the Hospitals and Steward Health Care System, jointly and severally, to make a single lump sum payment and the Hospitals and the Steward Health Care System, jointly and severally, shall make such payment via wire transfer of good funds to EOHHS equaling the full amount of the Payments received under this Agreement within three (3) business days of such demand.

<u>**Relief Requested Should Be Granted**</u>

A.   **The Court May Authorize Entry into the Payment Agreement, Implementation of the Facility Closure Procedures, and the Closing of the Closing Massachusetts Hospitals Pursuant to Sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.**

38.   The Court may authorize the closure of the Closing Massachusetts Hospitals, implementation of the Facility Closure Procedures, and entry into the Payment Agreement pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 434–35 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation marks and citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale . . . ."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation and quotation marks omitted). The Debtors

must be able to "use" their property in a manner that permits them to stop mounting losses from their hospital operations and to retain value for the benefit of the Debtors' estates.  Moreover, the Debtors must use their property in a manner that protects the patients in their care, who are best served by the orderly implementation of the hospital closures.

39.     In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value . . . .'"*In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

40.     Section 1108 of the Bankruptcy Code grants a debtor in possession the *right* to operate its businesses, providing that the trustee (or debtor in possession) "*may* operate the debtor's business." 11 U.S.C. § 1108 (emphasis added).  But, in its use of the permissive "may," the statute "clearly indicates that a trustee is not required to operate the debtor's business . . . ."  *In re Thrifty Liquors, Inc.*, 26 B.R. 26, 28 (Bankr. D. Mass. 1982).  Indeed, section 1108 "necessarily implies the lesser authority to modify the operation of the business on such grounds as he deems appropriate under the circumstances."  *Id.*  Thus, a debtor is not required to operate its business "if such operations will reduce the value of the debtor's assets or if the debtor's business is moribund." 7 Collier on Bankruptcy ¶ 1108.13 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009).

Indeed, in such circumstances "continued operation of a business that ought to be closed down and liquidated may be a breach of the fiduciary duties of a trustee or debtor in possession." *Id.*

41.     Bankruptcy courts have authorized the closure of hospitals pursuant to the authority provided in section 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code. *See, e.g.*, *In re Verity System of California, Inc.*, No. 2:18-bk-20151-ER (Bankr. C.D. Cal. Jan. 9, 2020) (Docket No. 3934) (authorizing the closure of a hospital pursuant to sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code); *In re Saint Vincents Catholic Med. Ctrs. of New York*, No. 10-11963-CGM (Bankr. S.D.N.Y. May 14, 2010) (Docket No. 276) (authorizing the implementation of a plan of closure pursuant to sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code); *In re Gardens Reg'l Hosp. and Med. Ctr., Inc.*, No. 16-17463 (Bankr. C.D. Cal. Jan. 20, 2017) (Docket No. 633) (authorizing the closure of a hospital pursuant to section 363(b) of the Bankruptcy Code).  Similar relief is also appropriate here.

**B.     Implementing the Facility Closure Procedures and Closing the Closing Massachusetts Hospitals Constitutes an Exercise of the Debtors' Sound Business Judgment.**

42.     Absent a third party's willingness to fund the operating losses of the Closing Massachusetts Hospitals, implementing the Facility Closure Procedures and ceasing to operate the Closing Massachusetts Hospitals is the Debtors' only viable option that will stem such hospitals' substantial cash losses, preserve value for the Debtors' stakeholders, and allow the Debtors to continue to operate their remaining hospitals.

43.     The Debtors have the ability, in an exercise of their business judgment, to determine whether to cease operations at certain hospitals, particularly where there is no other reasonable viable solution to keep such hospital open. *See In re R.H. Macy & Co., Inc.*, 170 B.R. 69, 74 (Bankr. S.D.N.Y. 1994) ("The debtor's duty to maximize estate assets may require the cessation of operations at one … location. *Cf. United States v. Whiting Pools, Inc.*, 462 U.S. 198,

203, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983) ("Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if 'sold for scrap.'") (citation omitted)); Memorandum of Decision, *In re Verity Health Sys. of Cal., Inc.*, No. 2:18-bk-20151ER (Bankr. C.D. Cal. Jan. 9, 2020) (Docket No. 3933), at 7 ("Since it is not feasible for the Debtors to continue St. Vincent's operations, implementation of the Closure Plan is necessary to sustain public health and welfare.  Public safety would be jeopardized if the Debtors allowed St. Vincent to remain open while lacking sufficient funds to support its operations."); *In re Gardens Reg'l Hosp. and Med. Ctr., Inc.*, No. 16-17463-ER (Bankr. C.D. Cal. Jan. 20, 2017), at ¶ 3 ("Public health and safety would be jeopardized if the Debtor continued to admit new patients when it lacks funds to adequately sustain operations.  In fact, the Board would be acting in violation of its fiduciary duties to the community if it attempted to continue operating the hospital despite the lack of sufficient cash to sustain operations."); *In re Saint Vincents Cath. Med. Ctrs. of New York*, 429 B.R. 139, 151 (Bankr. S.D.N.Y. 2010) ("The Debtors correctly point out that the power to operate the debtor's business pursuant to 11 U.S.C. § 1108 also allows the debtor to modify or cease operations of the debtor if it is appropriate under the circumstances.").

44.     Courts have granted similar relief under similar circumstances.   For example, in *Verity*, the court recognized the following facts:

> No buyer has presented a realistic bid to purchase St. Vincent as a stand-alone hospital . . . . St. Vincent is generating substantial operating losses . . . . If the Debtors do not implement the Closure Plan rapidly, they will lack sufficient funds to conduct an orderly closure of St. Vincent. . . . The Debtors lack sufficient funds to continue to subsidize St. Vincent's operating losses.  Absent the closure of St. Vincent, the Debtors will be unable to continue operating their other hospitals.

> . . . the Court notes that the Debtors do not have the ability to borrow under any debtor-in-possession financing facility.  The Debtors' cases are being financed by a consensual cash collateral stipulation executed between the Debtors and the principal secured creditors . . . [and] the Debtors' ability to use cash collateral terminates on January 31, 2020.

*In re Verity Health Sys. of Cal., Inc.*, Case No. 2:18-bk-20151-ER (Bankr. C.D. Cal. Jan. 9,

2020) (Docket No. 3933), at 7.  As a result, the court concluded that "[t]he Debtors' decision to

close St. Vincent constitute[d] a 'use' of estate property within the meaning of section 363(b)"

and "[t]he Debtors have articulated a sufficient business justification for closing St. Vincent."

*Id.*

> 45.     Similarly, in *Gardens*, the court recognized the following facts:

> The Debtor's existing operations do not generate sufficient cash flow to keep the hospital open.  To maintain operations, the Debtor would be required to obtain additional debtor-in-possession [] financing.  No lenders will extend credit to the Debtor unless the credit is secured by a lien senior in priority to the liens of the Debtor's pre-petition secured creditors.  Under the circumstances, the Court lacks the statutory authority to authorize the Debtor to obtain additional credit priming the liens of the secured creditors.

> *In re Gardens Reg'l Hosp. and Med. Ctr., Inc.*, Case No. 16-17463 (ER) (Bankr.

C.D. Cal. Jan. 20, 2017) (Docket No. 633), at ¶ 1.  Given the foregoing, the court concluded that

"[t]he closing of the hospital constitutes use of estate property, outside the ordinary course of

business, within the meaning of Bankruptcy Code § 363(b).  The Debtor's decision to close the

hospital is a proper exercise of the Debtor's business judgment."  *Id.*  Indeed, the court recognized

that, under these circumstances, the debtors' very duty is to close the hospital:

> In view of the lack of funds to continue operations, and the inability to the Debtor to obtain additional credit, the vote by the Debtor's Board of Directors to [] seek closure of the hospital was entirely consistent with the Board's fiduciary duties, imposed under state law, to uphold the hospital's mission of sustaining public health and welfare.  Public health and safety would be jeopardized if the Debtor continued to admit new patients when it lacks funds to adequately sustain operations.  In fact, the Board would be acting in violation of its fiduciary duties to the community if it attempted to continue operating the hospital despite the lack of sufficient cash to sustain operations.

*Id.* at ¶ 3

> 46.     The court in *Saint Vincents* stated that it was "bound" to allow the closure:

> The Court finds that the process of winding down the Hospital has been done in a procedurally proper manner. The Debtors have been open at all hearings and in all their papers about their dire financial condition. The efforts to save St. Vincent's Hospital have been widely reported in the media and documented in court papers. The Court is saddened by the closing of this historic Hospital that has provided so many services to so many people for more than 150 years. However, the Court is bound to perform its basic function as providing an efficient forum 'to convert the bankrupt's estate into cash and distribute it among creditors.'(citation omitted)

*Saint Vincents*, 429 B.R. at 152.

47.     Given the substantial operating losses at the Closing Massachusetts Hospitals and there being no viable bidder, operator, or third-party funding source for such hospitals despite the Debtors' extensive marketing and solicitation efforts, the Debtors unfortunately have no choice but to begin to close such hospitals. Although the Debtors have access to DIP financing to fund their remaining operations, such financing is subject to a budget that contemplates the Debtors no longer fund the losses at the Closing Massachusetts Hospitals and the Debtors' other hospitals that operate at a loss past August 1, 2024.

48.     Further, the Debtors believe that the Facility Closure Procedures represent the most efficient and appropriate means of effecting the wind-down of any hospital that is suffering substantial losses while ensuring an orderly and safe discharge or transition of the Debtors' patients to an alternative provider. The Closure Plans for the Closing Massachusetts Hospitals are carefully crafted to effectuate an orderly, funded wind-down that, first and foremost, protects patient safety. In particular, the Closure Plans specify, among other things, the plan for (i) the transfer or discharge of patients, (ii) the protection, transfer, and storage of medical records, and (iii) the disposition of personal property, including pharmaceuticals, hazardous materials, and medical waste at such hospital. Such Closure Plans minimize the disruption to patient care and the communities in which the Closing Massachusetts Hospitals are located.

49.     Further, the Debtors engaged in discussions with the Commonwealth regarding the safe closure of the Closing Massachusetts Hospitals on the timelines set forth in the Closure Plans contained herein, and do not expect the Commonwealth to object to such closing plans.  Courts have approved expedited timelines for hospital closures in other similar cases.  *See, e.g.*, *In re Verity Health Sys. of California, Inc.*, No. 2:18-bk-20151-ER, 2020 WL 223909, at *4 (Bankr. C.D. Cal. Jan. 9, 2020) (approving expedited regulatory timeline over the objection of union); *In re Saint Vincents Cath. Med. Ctrs. of New York*, 429 B.R. 139 (Bankr. S.D.N.Y. 2010) (*appeal dismissed* 2010 WL 4456975 (S.D.N.Y. Oct. 26, 2010) (approving expeditious closing timeline over the objection of a party in interest) (citation omitted).

50.     The Debtors would only determine that additional facilities should be subject to the Facility Closure Procedures (if any) after a comprehensive analysis of those facilities' viability and ability to be sold to a qualified bidder during the sales process, as well as an exploration of all alternatives (including third-party funding) in consultation with the Debtors' secured lenders, MPT, the Creditors' Committee, the Patient Care Ombudsmen, and the applicable regulatory authorities.

51.     Implementing the closure of the Closing Massachusetts Hospitals and having the Facility Closure Procedures available will allow the Debtors to avoid the continued operating losses that are harmful to the Debtors and their estates, and an expedited closure will allow the Debtors to focus on stabilizing and selling their remaining operations while ensuring patient welfare.  Any interruption or delay in the Debtors' ability to efficiently close facilities identified by the Debtors for closure during these chapter 11 cases could have serious negative consequences for the Debtors' estates.  Thus, it is important that the Court permit the Debtors flexibility to act in the most expeditious and efficient manner possible.  The Debtors believe that

there is sufficient business justification for the Facility Closure Procedures and the closing of the Closing Massachusetts Hospitals.

52.     Here, the Debtors have determined in their business judgment that it is prudent to close the Closing Massachusetts Hospitals and establish streamlined procedures for ceasing operations at facilities that are no longer viable.  These procedures provide for an expeditious process for notifying the Bankruptcy Court and parties in interest of their intent to close any additional facilities, and begin the process of closing such facilities in a safe manner that promotes patient safety.  The Debtors are seeking to close the Closing Massachusetts Hospitals, and may seek to close additional facilities on a shorter timeline than is contemplated under applicable state regulations, in coordination with state regulators in order to promote patient safety given the constraints the Debtors are facing under their DIP Budget.  Any delay in effectuating the closure of the Closing Massachusetts Hospitals would prejudice estate stakeholders and risk the execution of a safe and orderly closure process.  The Debtors are working in coordination with state regulators to ensure that closures are safely executed.  For the foregoing reasons, authorizing the Debtors to establish the Facility Closure Procedures and close the Closing Massachusetts Hospitals is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases.

**C.     Approval of the Closing of the Closing Massachusetts Hospitals and Facility Closures on Shortened and Limited Notice Is Appropriate.**

53.     The notice and hearing requirements contained in section 363(b)(1) of the Bankruptcy Code are satisfied if appropriate notice and an opportunity for a hearing are given in light of the particular circumstances of a proposed transaction.  *See* 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" to mean such notice and opportunity for a hearing "as [are] appropriate in the particular circumstances").  Courts have noted that "[t]he notice requirements

of bankruptcy law are 'founded in fundamental notions of procedural due process.'" *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus., Inc.)*, 467 B.R. 694, 706 (S.D.N.Y. 2012) (citations omitted).   Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (internal quotation marks and citations omitted).

54.    Bankruptcy Rules 2002(a)(2) and 2002(i) require that a minimum of twenty-one (21) days' notice of the proposed use of property outside the ordinary course of business be provided by mail to "the debtor, the trustee, all creditors and indenture trustees" and any committee appointed under section 1102 of the Bankruptcy Code, unless a debtor shows "cause."   *See* Fed. R. Bankr. P. 2002(a)(2) and (i).   Once the debtor shows "cause," however, Bankruptcy Rule 2002(a)(2) authorizes this Court to shorten the generally applicable 21-day notice period and direct a method of giving notice other than by mail.   *See* Fed. R. Bankr. P. 2002(a)(2). Moreover, this Court is authorized to limit notice of the proposed use of property outside of the ordinary course of a debtor's business, even without a prior showing of cause, to any official committee appointed under section 1102 of the Bankruptcy Code and any creditor or equity holder requesting notice.   *See* Fed. R. Bankr. P. 2002(i).

55.    In addition, the sale, use, or transfer of property outside the ordinary course of business may be authorized without an actual hearing, if no party in interest timely requests such a hearing.   *See* 11 U.S.C. § 102(1)(B)(i) (notwithstanding the statutory requirement for "notice and a hearing," the Bankruptcy Code "authorizes an act without an actual hearing if such notice is given properly and if such a hearing is not requested timely by a party in interest").

56.    The Facility Closure Procedures comply with the notice requirements of the Bankruptcy Code, as well as due process, by providing the Notice Parties with an opportunity to

present objections to the Facility Closures, including the rejection of executory contracts and abandonment of assets in connection therewith.  Cause exists to shorten the notice period for closure of the Closing Massachusetts Hospitals as well as in connection with the Facility Closure Procedures.  The Debtors have expended a significant amount of estate resources to fund the net operating losses of the Closing Massachusetts Hospitals as these facilities incurred EBITDA losses of approximately $17 million during the first five months of 2024.  The continued funding of these losses is not sustainable for the Debtors' estates.  In addition, it is imperative that the Debtors have the ability to close the facilities expeditiously following announcement of such closure given the potential for disruption to patient care during the closing and transition process, as a result of employee flight, among other things.

57.     Based on the foregoing, sufficient cause exists to implement facility closures on shortened notice, and the Facility Closure Procedures will improve the efficiency of the Facility Closures and maximize the value of the Debtors' estates.

**D.      Facility Closure Procedures Provide Interested Parties with Reasonable and Sufficient Notice and Opportunity to Object and Be Heard with Regards to the Rejection of Executory Contracts.**

58.     The Facility Closure Procedures comply with the procedural requirements for the rejection of executory contracts under the Bankruptcy Rules.  "A proceeding to assume, reject, or assign an executory contract or unexpired lease . . . is governed by Rule 9014."  Fed. R. Bankr. P. 6006(a).  Bankruptcy Rule 9014 provides that:  "In a contested matter . . . , not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought." Fed. R. Bankr. P. 9014(a). The notice and hearing requirements for contested matters under Bankruptcy Rule 9014 are satisfied if appropriate notice and an opportunity for hearing are given in light of the particular circumstances.  *See* 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" or similar phrase

to mean such notice and an opportunity for hearing "as [are] appropriate in the particular circumstances."). The Facility Closure Procedures provide for notice to executory contract counterparties and an opportunity to be heard at a hearing, and thus satisfy the requirements of Bankruptcy Rules 6006(a) and 9014.

59. Under Bankruptcy Rule 6006(e), a debtor may join requests for authority to assume or reject multiple executory contracts in one motion, subject to Bankruptcy Rule 6006(f). *See* Fed. R. Bankr. P. 6006(e). Bankruptcy Rule 6006(f) sets forth six requirements that motions to assume or reject multiple executory contracts must satisfy, all of which are procedural in nature. A motion to assume or reject multiple executory contracts that are not between the same parties shall:

> a.  state in a conspicuous place that parties receiving the omnibus motion should locate their names and their contracts or leases listed in the motion;
>
> b.  list parties alphabetically and identify the corresponding contract or lease;
>
> c.  specify the terms, including the curing of defaults, for each requested assumption or assignment;
>
> d.  specify the terms, including the identity of each assignee and the adequate assurance of future performance by each assignee, for each requested assignment;
>
> e.  be numbered consecutively with other omnibus motions to assume, assign, or reject executory contracts or unexpired leases; and
>
> f.  be limited to no more than 100 executory contracts or unexpired leases.

Fed. R. Bankr. P. 6006(f).

60. The Facility Closure Procedures satisfy Bankruptcy Rule 6006(f). The clear purpose of Bankruptcy Rule 6006(f) is to protect the due process rights of counterparties to the Debtors' leases and executory contracts. Counterparties must be able to locate their executory contracts and readily determine whether their executory contracts are being assumed or rejected.

The Debtors will comply with all applicable procedural requirements of Bankruptcy Rule 6006(f) when serving the Notices.

61.     Given the number of executory contracts to which the Debtors are a party, obtaining separate Court approval of each rejection would impose unnecessary administrative burdens on the Debtors and the Court, and would result in costs to the Debtors' estates that would diminish the economic benefits of such rejection.  The Debtors, therefore, request approval of the Facility Closure Procedures as the most efficient and cost-effective way for the Debtors to eliminate the costs in connection with rejecting the executory contracts.

**E.     Abandonment of the Abandoned Assets Should Be Approved.**

62.     Although the Debtors will remove equipment and other items at any facility undergoing a Facility Closure if feasible and of value to the Debtors' ongoing operations, and will dispose of regulated materials (including medical waste) and transfer, store and make available patient medical records, as required by applicable law, the Debtors also request authority to abandon certain surplus, burdensome, or non-core assets—which will include any personal property remaining at any hospital on the applicable Facility Closure Date that the Debtors determine is not necessary for their restructuring and too difficult to remove or expensive to store, such that the economic benefits of removing or storing such remaining property would by outweighed by the attendant costs (the "**Abandoned Assets**").  Any landlord or other designee will be free to sell or dispose of the Abandoned Assets after the Facility Closure Date without notice or liability to any party.  The Abandoned Assets will primarily consist of medical equipment, fixtures, furniture, and other office equipment.  To the best of the Debtors' knowledge, the abandonment of the Abandoned Assets would not be in violation of any state or local statutes or regulations reasonably designed to protect the public health or safety.Accordingly,

abandonment of the Abandoned Assets as of the applicable Facility Closure Date should be approved.

63.     Under section 554(a) of the Bankruptcy Code, a debtor, after notice and a hearing, is authorized to "abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a).The right to abandon property is virtually unfettered, unless (a) abandonment of the property will contravene laws designed to protect public health and safety or (b) the property poses an imminent threat to the public's welfare. *See Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.*, *(In re Midlantic Nat'l Bank)*, 474 U.S. 494, 501 (1986).  Neither of these limitations is relevant under the instant facts.

64.     The proposed abandonment procedures are necessary for the efficient administration of the Debtors' estates because they provide the Debtors with a streamlined mechanism by which they can: (a) stop the accrual of expenses associated with retaining Abandoned Assets; (b) avoid the often difficult and expensive process of locating buyers for assets that are damaged or in premises that the Debtors no longer use; and (c) minimize any distraction that may result from the challenges involved in attempting to sell illiquid assets that are of inconsequential value to the Debtors' estates.

65.     For the foregoing reasons, the abandonment of the Abandoned Assets is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases and should be authorized by the Court.

**F.     Section 554(a) of the Bankruptcy Code Preempts State Regulatory Timing Requirements To the Extent Such Requirements Are Not Waived.**

66.     The Closure Plans for the Closing Massachusetts Hospitals and the Facility Closure Procedures are consistent with the objectives of state regulations governing the sale and

closure of hospitals related to patient health, privacy and safety.  The Closure Plans ensure the safe transfer or discharge of patients; the protection, transfer, and storage of medical records; and the proper disposition of pharmaceuticals, and hazardous and medical waste.  These plans and procedures will protect the health, wellbeing, and safety of the Debtors' patients and the communities the Debtors serve in a manner consistent with applicable substantive state and federal laws, regulations, and guidelines.

67.     The Closure Plans for the Closing Massachusetts Hospitals and the Facility Closure Procedures, however, provide for a more expedited process than state regulations provide for to avert immediate and irreparable harm to the Debtors' estates.  As detailed further in the Castellano Declaration and the Dr. Diaz Declaration, the Debtors must be permitted to move expeditiously to implement the Closure Plans and the Facility Closure Procedures to stem substantial cash losses, which must be abated as soon as possible to prevent further hospital closures, patient harm, and harm to the Debtors' stakeholders.  Under these circumstances, Section 554(a) permits abandonment pursuant to the Facility Closure Procedures.  11 U.S.C. § 554(a); *see In re Shore Co*., 134 B.R. 572, 575 (Bankr. E.D. Tex. 1991).  Significantly, the Commonwealth is aware of this Motion, has agreed to work with the Debtors to ensure safe closures of hospitals and the abandonment of property as set forth herein.  The Debtors believe that the abandonment process described herein does not implicate safety concerns.

68.     The Debtors recognize that under current Supreme Court law, as generally applied to property subject to environmental damage, a debtor's ability to abandon property of the estate is not unlimited.  In particular, the Supreme Court held in *Midlantic Nat'l Bank v. N.J. Dept. of Env't Protection*, 474 U.S. 494, 507 (1986), that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health

or safety from identified hazards."   Further, a Bankruptcy Court does not have the power to authorize an abandonment "without formulating conditions that will adequately protect the public's health and safety."*Id.*

69.     This exception, however, does not cover time limits for hospital closures exceeding 30 or 60 days, as applicable, when a shorter duration safeguards patient health and safety.   "The abandonment power is not to be fettered by laws or regulations not reasonably calculated to protect the public health or safety from *imminent and identifiable harm*."   *Id.* at 507 n.9 (emphasis added); *see also Matter of Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1185 (5th Cir. 1986).   "[T]he party opposing abandonment under Midlantic has the burden to prove that . . . the property [in question] creates an imminent and identifiable harm to the public which will be aggravated by the abandonment."   *United States Sec. & Exch. Comm'n v. Heartland Grp. Ventures*, LLC, 2023 WL 10554515, at *4 (N.D. Tex. Aug. 15, 2023) (quoting *In re St. Lawrence Corp.*, 239 B.R. 720, 726-27 (Bankr. D.N.J. 1999), aff'd, 248 B.R. 734 (D.N.J. 2000)).

70.     Any opposition to the closing of the Closing Massachusetts Hospitals or the Facility Closure Procedures on the basis of the duration of notice procedure could not meet this burden, for at least two reasons.   First, the state timing requirements—at least insofar as they seek to require hospitals to remain open and fully functional for periods longer than 30 or 60 days (as provided for under the Facility Closure Procedures)—are not required "to protect public health or safety."   For abandonment to be harmful to public health and safety, it must be demonstrated to pose a harm to public health that is both imminent and identifiable.   *Heartland*, 2023 WL 10554515, at 4 (N.D. Tex. Aug. 15, 2023).   Speculative harm, or the mere belief or fear of a future problem, does not constitute imminent harm to the public.   *See Midlantic*, 474 U.S. at 507 n.9 (specifying that the exception does not "encompass a speculative or indeterminate future violations

of such laws that may stem from abandonment"); *Heartland*, 2023 WL 10554515, at *4 ("[B]elief and fear of a future problem does not present evidence of an imminent harm to the public . . . ."). Indeed, cases find that when all known environmental harms have been addressed by the Debtors and only speculative harms remain, no *Midlantic* issue exists. *See Heartland*, 2023 WL 10554515, at *4 (N.D. Tex. Aug. 15, 2023).

71.   Here, the shortened timelines provided for in the Closure Plans for the Closing Massachusetts Hospitals plainly do not undermine public health or safety.  Rather, the Debtors believe that the 30 day period will provide ample time to implement all other state law requirements to safely close the hospitals.  In these circumstances, requiring hospitals to remain fully functional and operational for 60, 90 or 120 days would be *detrimental* to the patient welfare at the closing hospitals.  For one thing, it could lead to impractical and unsustainable operational challenges—including severe and dangerous staffing shortages.  It is likely that doctors, nurses, other healthcare providers and essential employees will migrate to other healthcare opportunities well before the end of the extended period.  Requiring hospitals to remain fully operational in the face of dwindling healthcare and operational staffing increases, rather than mitigates, the risks to the public health.  Rather than protecting health and safety, forcing the Debtors to continue to operate closing hospitals beyond the time contemplated by the Closure Plans risks imperiling patient health and safety, especially in light of the robust protections provided for in the Closure Plans—plans that were otherwise carefully formulated to follow state requirements as closely as possible.

72.   Second, *Midlantic* left open that Section 554 may preempt "certain state laws imposing conditions on abandonment [that] may be so onerous as to interfere with the bankruptcy adjudication itself." *Midlantic*, 474 U.S. at 507.  Indeed, that is how courts have

understood this important limit on the *Midlantic* exception to abandonment: "[a] bankruptcy court has some discretion if precluding abandonment would be so onerous as to interfere with the bankruptcy adjudication itself."  *In re ATP Oil & Gas Corp.*, 2013 WL 3157567, at *4.  In such cases, "the bankruptcy court is free to formulate conditions short of full compliance with state law that will adequately protect the public's health and safety."  *Atkinson*, 248 B.R. at 736 n.6.

73.    73.    These are the precise circumstances here.  The conditions proposed by the Debtors in the Closure Plans for the Closing Massachusetts Hospitals and the Facility Closure Procedures more than adequately protect patients and the interests of public health and safety.  Indeed, the Debtors have a detailed plan to address everything from patient discharge and transfer, patient confidentiality and medical records, and the disposition of medical waste.  At the same time, requiring the Closing Massachusetts Hospitals to remain operational for longer periods —thus prolonging the drain on the Debtors' estates without any commensurate or measurable public health benefit—are exactly the onerous state regulations that must yield to federal bankruptcy law.

**G.    Entry Into the Payment Agreement is an Exercise of the Debtors' Sound Business Judgment and Should Be Approved.**

74.    The Debtors are pleased the Commonwealth is willing to advance payments pursuant to the Payment Agreement that would allow for the continued operations of the Massachusetts Going Concern Hospitals while the Debtors work to advance sale transactions to alternative operators.  The Debtors believe that entering into the Payment Agreement is in the best interests of the Debtors' stakeholders—including their employees and patients.  The Payment Agreement will allow the Debtors to continue their operations at the Massachusetts Going Concern Hospitals.

75.     For the foregoing reasons, entry into the Payment Agreement is a sound exercise of the Debtors' business judgment and necessary, appropriate, in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases, and should be authorized by the Court.

## Basis for Emergency Relief

76.     The Debtors respectfully request emergency consideration of this Motion in accordance with Bankruptcy Local Rule 9013-1(i).  The relief requested in the Motion is critical to the Debtors' ability to preserve value for the Debtors' estates.  Accordingly, the Debtors respectfully request that the Court approve the relief requested in the Motion on an emergency basis.

## Debtors' Compliance with
## Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)

77.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## Reservation of Rights

78.     Nothing contained herein is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or

validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vii) an admission as to the validity of any liens satisfied pursuant to this Motion, (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code, (ix) an implication or admission of consent, or modification or waiver of any rights, including consent rights, of any non-debtor party with respect to any sale transaction, (x) a waiver of any of the Creditors' Committee's Challenge rights, as set forth in the Final DIP Orders, (xi) a waiver of any claims of the Debtors.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## **Notice**

79.    Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:   July 26, 2024
             Houston, Texas

/s/  *Clifford W. Carlson*
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email: Gabriel.Morgan@weil.com
Clifford.Carlson@weil.com
Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted pro hac vice)
Candace M. Arthur (admitted pro hac vice)
David J. Cohen (admitted pro hac vice)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: Ray.Schrock@weil.com
          Candace.Arthur@weil.com
          DavidJ.Cohen@weil.com

*Attorneys for Debtors and Debtors in Possession*

## **Certificate of Service**

I hereby certify that on July 26, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Clifford W. Carlson*
Clifford W. Carlson