**IN AND FOR THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

In re:

STEWARD HEALTH CARE SYSTEM, LLC,
et al.,

       Debtors.

_____/

Case No. 24-90213 (CML)
Chapter 11

(Jointly Administered)

### <u>NOTICE OF FILING</u>

Bird and 87th Avenue Village, LLC ("Bird and 87th") by and through undersigned counsel, hereby files **Exhibit A** and **Exhibit B** to the *Limited Objection to Debtors' Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale* [ECF No. 1921]

Dated August 9, 2024.

Respectfully submitted,

**DGIM Law, PLLC**
*Counsel for Bird and 87th*
2875 NE 191st Street, Suite 705
Aventura, FL 33180
Phone: (305) 763-8708

*/s/  Daniel Y. Gielchinsky*
Daniel Y. Gielchinsky, Esq.
Florida Bar No. 0097646
Email:  dan@dgimlaw.com
Jonathan E. Groth, Esq.
Florida Bar No. 102648
Email:  jonathan@dgimlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that a copy of the foregoing Motion was served via CM/ECF Notification was served via CM/ECF Notification to all parties registered to receive electronic notice on August 9, 2024.

<u>*/s/ Daniel Y. Gielchinsky*</u>
Daniel Y. Gielchinsky, Esq.

**<u>EXHIBIT "A"</u>**

# SHOPPING CENTER LEASE

## BIRD AND 87TH AVENUE VILLAGE, LLC
### LANDLORD

**and**

## CORAL GABLES HOSPITAL, INC.
### TENANT

**BIRD 87 VILLAGE SHOPPING CENTER**

## TABLE OF CONTENTS

**ARTICLE**

|  |  |  |
|---|---|---|
|  | Lease Summary |  |
| I | Basic Lease Provisions |  |
| II | Rent |  |
| III | Construction of Leased Premises |  |
| IV | Conduct of Business by Tenant |  |
| V | Security Deposit |  |
| VI | Alterations; Construction Liens, Signs, Awnings, Canopies |  |
| VII | Repairs and Maintenance of Leased Premises |  |
| VIII | Insurance and Indemnity |  |
| IX | Utilities |  |
| X | Subordination and Attornment |  |
| XI | Assignment and Subletting |  |
| XII | Governmental Regulations; Environmental |  |
| XIII | Advertising, Etc. |  |
| XIV | Destruction of the Leased Premises |  |
| XV | Eminent Domain |  |
| XVI | Default of Tenant |  |
| XVII | Access by Landlord |  |
| XVIII | Tenant's Property |  |
| XIX | Holding Over Successors |  |
| XX | Quiet Enjoyment |  |
| XXI | Option |  |
| XXII | Miscellaneous |  |

EXHIBITS

|  |  |  |
|---|---|---|
| "A" | Site Plan and Legal Description |  |
| "B" | Tenant's Work |  |
| "C" | Heating and Air Conditioning Maintenance Provision |  |
| "D" | Sign Criteria |  |
| "E" | Rules and Regulations |  |
| "F" | Tenant Exclusives, Restricted and Prohibited Uses |  |
| "G" | Form Subordination and Non-Disturbance Agreement |  |
| "H" | Form Recognition and Non-Disturbance Agreement |  |

NOTICE OF LIABILITY UNDER SECTION 713.10 OF THE FLORIDA STATUTES

# LEASE AGREEMENT

**THIS LEASE,** dated this ___10___ day of ___JULY___, 2018 ("Effective Date"), by and between Bird and 87th Avenue Village, LLC, herein called "Landlord," and Coral Gables Hospital, Inc., herein called "Tenant."

## LEASE SUMMARY

| | | |
|---|---|---|
| a) | Shopping Center: | Bird 87 Village Shopping Center<br>8611 SW 40th Street<br>Miami, FL 33165 |
| b) | Landlord's Mailing Address: | c/o Horizon Properties<br>18610 NW 87th Avenue, Suite 204<br>Hialeah, FL 33015 |
| c) | Tenant's Mailing Address: | 1445 Ross Avenue, Suite 1400<br>Dallas, TX 75202 |
| d) | Tenant's Telephone Numbers: | (_____) _____ |
| e) | Tenant's Name (including state of formation or incorporation): | Coral Gables Hospital, Inc.<br>State of Florida – FEIN#: 59-2243206 |
| f) | Tenant's Trade Name: | Coral Gables Hospital |
| g) | Guarantor(s) Name: | N/A |
| h) | Initial Term: | Ten (10) years |
| i) | Commencement Date of Term: | Upon the Effective Date of this Lease |
| j) | Expiration Date of Term: | Ten (10) years from the Rent Commencement Date |
| k) | Delivery Date: | Upon Delivery of the Leased Premises to Tenant |
| l) | Rent Commencement Date: | The earlier of: (i) the date Tenant received a building permit for Tenant improvements or (ii) Ninety (90) Days from the Effective Date |
| m) | Leased Premises: | The building located at 8665 Bird Road containing approximately 16,685 rentable square feet |
| n) | Estimated GLA in Premises: | Approximately <u>16,685</u> square feet |

o) Minimum Annual Base Rent:

| Term | Monthly | Annually | PSF |
|---|---|---|---|
| Year 1 | $55,616.67 | $667,400.00 | $40.00 |
| Years 2-10 | Annual two percent (2%) increases above the previous Year's Minimum Annual Base Rent | | |

| | | |
|---|---|---|
| p) | Tenant Improvements: | Per Exhibit B, Landlord to deliver the space in "as is" condition. |
| q) | Consumer Price Index: | N/A |
| r) | Security Deposit: | N/A |
| s) | Options: | Four (4) – Five (5) Year Renewal Options |
| t) | Minimum Rent Option Term: | Annual two percent (2%) increases above the previous year's Minimum Annual Base Rent |
| u) | Estimated Monthly Operating Costs: | $5.90 per square foot annually (adjusted annually based on actual expenses). |
| v) | Permitted Use: | For the operation of a 24-hour free standing emergency department, medical and administrative offices for emergency and urgent medical care and/or surgical care on a 24-hour basis, and/or diagnostic center, medical purpose or urgent care for use during normal operating hours for such purpose, or any other medical purpose and administrative offices may be related to Tenant's operations (both at the Premises and otehrwise) (the "Permitted Use"). Landlord agrees that it will not execute or consent to any additional Restrictions that would prohibit or restrict Tenant's Permitted Use. In no event shall Tenant violate any tenant exclusives as stated on Exhibit F, attached hereto.<br><br>Landlord agrees that Tenant shall be entitled to construct ambulance drop off area on the east side of building with cover and other improvements that may be required by applicable law for the operation of an emergency department any exterior improvements must be approved by Landlord,unless required by applicable, in which event Tenant shall notify Landlord of such requirements and reasonably cooperate with the Landlord for the location of such improvements and Tenant shall be entitled to exclusive use of such area without payment of any additional rent or charges. Tenant shall have access twenty-four hours per day, 365/366 days per year to the Leased Premises and the parking facilities. Tenant shall have the right to install a generator and other improvements that may be required by applicable law for the operation of an emergency department at the Premises, at Tenant's expense and at Tenant's |

risk. Tenant shall be solely responsible for maintaining the generator in good working condition and repair at all times.

w)   Broker:                  Horizon Properties of Miami, Inc. and EWM Realty International

x)   Signage:                Subject to municipal and Landlord approval as required herein, Tenant shall be allowed to install maximum signage allowed under applicable code.  Tenant shall bear all costs that are incurred in connection with the signage.  As it relates to the pylon signage,  Tenant shall install said sign on the panel shown on Exhibit D-1.

**CONFIDENTIALITY:**      All written and oral information and materials disclosed or provided by the Landlord to the Tenant under this Lease Agreement is Confidential Information regardless of whether it was provided before or after the date of this Lease Agreement or how it was provided to the Tenant. All items stated in this Lease Agreement are confidential and shall not be shared with any person, tenant in occupancy or the like, without prior written approval from Landlord.  The Tenant will not use the Confidential Information for any purpose which might be directly or indirectly detrimental to the Landlord or any of his affiliates or subsidiaries. Notwithstanding the foregoing any such information may be disclosed to the extent it is now, or hereafter becomes, through no act or failure to act on the part of the receiving party, generally known or available to the public, is hereafter rightfully furnished to the receiving party by a third party, without restriction as to use or disclosure; is information which the receiving party can document was independently developed by the receiving party; or is required to be disclosed pursuant to law, provided that to the extent permitted by law the receiving party gives the disclosing party reasonable notice of such required disclosure and an opportunity to undertake legal and other procedures (at disclosing party's sole cost and expense) to prevent such disclosure.

THE FOREGOING LEASE SUMMARY IS AN INTEGRAL PART OF THIS LEASE AGREEMENT; HOWEVER, IN THE EVENT OF ANY CONFLICT BETWEEN THE LEASE SUMMARY AND THE TERMS AND CONDITIONS SET FORTH BELOW, THE LEASE SUMMARY SHALL CONTROL.

ARTICLE I

BASIC LEASE PROVISIONS

**SECTION 1.01  Leased Premises.**

a)    Tenant acknowledges Landlord is the Ground Lessee  under that certain Ground Lease ("Ground Lease") between Landlord and Hecht Bird Road Property, Ltd. ("Owner"). Thusly the terms of this Lease shall be subject and subordinate to the terms of the Ground Lease between Landlord and Owner, subject to the terms of any SNDA between Tenant and the lessor under the Ground Lease.  Landlord further represents and Tenant acknowledges that this Lease is a partial sublease of the Ground Lease. Notwithstanding the foregoing, the Tenant is not entitled to any rights or remedies that the Landlord may have as Ground Lessee under the Ground Lease, nor will the terms of the Ground Lease expand the rights, duties, obligations or terms of Tenant under this Lease.  Within thirty (30) days of the effective date of this Lease, the Landlord will provide Tenant with a Subordination and Non-Disturbance Agreement substantially in the form attached hereto in Exhibit "G" from Landlord's lender and a Recognition and Non-Disturbance Agreement substantially in the form attached hereto in Exhibit "H" from Owner.

b)    In consideration of the rents, covenants and agreements hereafter reserved and contained on the part of Tenant to be observed and performed, the Landlord demises and leases to Tenant, and Tenant rents from Landlord, those certain premises now existing or hereafter to be erected in the Shopping Center which premises are identified in Sections (m) and (n) of the Lease Summary (hereinafter referred to as the " Leased Premises").  The boundaries and location of the building of which the Leased Premises are a part (hereinafter referred to as the "Building") and the Leased Premises are outlined on the Site Plan of the Shopping Center, which is marked **Exhibit "A"** attached hereto and made a part hereof.  Dimensions for all purposes shall be measured from the center line of interior walls or from the exterior face of exterior walls.  The Leased Premises are located on real property described in **Exhibit "A"** attached hereto and made a part hereof.  The exterior walls of the roof of, and the area beneath, the Leased Premises are not demised hereunder, and the use thereof together with the right to install, maintain, use, repair and replace pipes, ducts, conduits, wires and structural elements leading through the Leased Premises in locations which will not materially interfere with Tenant's use thereof and serving other parts of the Shopping Center are hereby reserved unto Landlord.

**SECTION 1.02  Shopping Center.**  The term "Shopping Center" shall include (I) the parcel(s) of land and improvements as generally depicted on **Exhibit "A**, whether owned in fee or ground leased by Landlord or made available for use by any reciprocal operating or easement agreement or other similar agreement; and (ii) any other parcel(s) of land, together with the improvements thereon, and an easement or right of way, at any time designated by Landlord to be part of the Shopping Center; and (iii) any plant, retention pond or basin, or other off-side utility systems or other facility serving any portion of the Shopping Center, whether or not such plant or facility is located in the Shopping Center or on the other parcel(s) of land, including the facilities connection any such plant or facility to the Shopping Center.

**SECTION 1.03  Use and Control of Common Areas.**

All areas within the exterior boundaries of the Shopping Center which are not now or hereafter held for lease or occupation by the Landlord, or used by other persons entitled to occupy floor space in the Shopping Center, including, without limitation, all automobile parking areas, driveways, entrance and exits thereto, and other facilities furnished by Landlord in or near the Shopping Center, including employee parking areas, access roads, driveways, loading docks, package pick-up stations, pedestrian sidewalks and ramps, landscaped areas, exterior stairways, first-aid stations, comfort stations and other areas and improvements provided by Landlord shall be hereinafter referred to as "Common Areas" with the exception of the loading area for Sedano's which shall not be included in the Common Area.  **Exhibit "A"** sets forth the general layout of the Shopping Center and shall not be deemed to be a warranty, representation or agreement on the part of Landlord that the Shopping Center will be exactly as indicated on the diagram.  Landlord may increase, reduce or change the number, dimensions or locations of the walks, buildings and other Common Areas (in any number whatsoever), and reserves the right to make alterations or additions to, and to build additional stories on the Building, as well as to add buildings adjoining the existing buildings or elsewhere in the Shopping Center. The use and occupation by Tenant of the Leased Premises shall include the non-exclusive use in common with others entitled thereto of the Common Areas, as such Common Areas now exist or may hereafter be constructed, or other facilities as may be designated from time to time by Landlord, subject however to the terms and conditions of this Lease and to reasonable rules and regulations for the use thereof as prescribed from time to time by Landlord. The Common Areas shall at all times be subject to the exclusive control and management of Landlord excluding the US Century Bank parcel.  Landlord shall  construct, maintain and operate lighting facilities on all said areas and improvements in such a manner to keep the Common Areas lit at all times, to police the same, from time to time. Landlord shall have the right, but not the obligation, to change the area, level, location and arrangement of parking areas and other facilities hereinabove referred to; to restrict parking by tenants, including, but not limited to, their officers, agents and employees, to employee parking areas; and to enforce parking charges (by operation of meters or otherwise), with appropriate provisions for free parking ticket validating, or otherwise in lieu thereof, and to apply the net proceeds from such charges, after deduction of costs applicable thereto, to reduce the cost of maintaining the parking facilities.

Landlord shall have the right to close all, or any portion of, Common Areas or facilities to such extent as may, in the opinion of Landlord's counsel, be legally sufficient to prevent a dedication thereof or the accrual of any rights to any person or the public therein, to close temporarily all, or any portion of, the parking areas or facilities, to discourage non-customer parking; and to perform such other acts in and to the Common Areas and improvements as, in the use of good business judgment, Landlord determines advisable, with a view to the improvement of the convenience and use thereof by tenants, their officers, agents, employees and customers.  Landlord shall keep the Common Areas clean and in good repair and available for the purposes for which they are intended. Landlord shall have the full right and authority to employ all personnel and to make all reasonable rules and regulations pertaining to, and necessary for, the proper operation and maintenance of the Common Areas and facilities.

Notwithstanding the foregoing or anything to the contrary in this Lease, in no event shall the Common Areas or Shopping Center be modified in any way such that parking is less than four (4) spaces per 1,000 feet of rentable area in the Shopping Center. The location of the parking spaces covered by this Lease, and/or the driveways and ingress and egress to and from the Leased Premises to public streets as shown on the Site Plan,  shall not be materially modified or shall any building and/or kiosks be installed or constructed that materially and adversely affect access to or the visibility of the Leased Premises, and provided further that the size of the Leased Premises, the visibility thereof, the location in relation to other portions of the Shopping Center, and reasonable access thereto shall not be materially impaired.

**SECTION 1.04  Commencement and Length of Term.**

The initial term of this Lease shall be for the period set forth in Section (h) of the Lease Summary ("Initial Term"), shall commence on the date set forth in Section (l) of the Lease Summary, and shall continue until the Expiration Date as set forth in Section (j) of the Lease Summary, unless otherwise terminated or extended by the terms of this Lease, plus the period from the Commencement Date to the first day of the month, following the Commencement date, unless the Commencement Date occurs on the first day of a calendar month, in which event the Term shall commence on the Commencement Date.  The Initial Term and any

- 3 -

extensions or renewals thereof, as provided herein, are sometimes collectively referred to as the "Term". In the event the Shopping Center, or the Building, or the Leased Premises is not fully constructed on the Effective Date (hereinafter defined), the Commencement Date shall mean the earliest to occur of (a) the one hundred eighty (180) days after Landlord has delivered the Leased Premises to Tenant in accordance with Landlord's Work as described in **Exhibit "B"** and shall have notified Tenant that the Leased Premises are ready for commencement of Tenant's Work (as defined in Exhibit "B"), or (b) date upon which Tenant opens for business in the Leased Premises; provided if Landlord fails to deliver the Leased Premises to Tenant in accordance with Landlord's Work as described in **Exhibit "B"** on or before the date that is 180 days after the Effective Date, Tenant may terminate this Lease by written notice toe Landlord. Landlord and Tenant agree, upon demand of the other, to execute an agreement, in recordable form, setting forth the Commencement and Expiration Dates as soon as the Commencement Date is determined.

**SECTION 1.05   Permits.** Once Landlord has approved the plans for Tenant's Work, Tenant shall promptly apply for applicable governmental approval for the operation of a Free Standing Emergency Department (FSED) at the Leased Premises and the permits required for the construction of Tenant's Work and use commercially reasonable efforts to obtain such approvals and permits. Landlord represents to Tenant that to the best of Landlord's knowledge the underlying zoning of the Shopping Center permits Tenant's anticipated use of the Leased Premises as a FSED . Landlord shall cooperate with Tenant  in seeking to obtain the required approvals and will execute the necessary documents as the owner of the premises to facilitate Tenants attempts to apply for and obtain required  governmental approvals. Tenant shall have eight (8) months following the effective date of the Lease and Landlord's written approval of Tenant's Work to obtain (a) zoning and use approval for the Leased Premises as a FSED, including but not limited to confirmation that the existing zoning allows for Tenant's anticipated use, (b) DERM approval of the proposed facility and (c) either EQCB approval of the proposed use or a variance / waiver  allowing for the proposed use  including the installation of an on site generator and decontamination tank if required (hereinafter collectively referred to as the Approvals).  If despite Tenant's commercially reasonable  efforts (Landlord acknowledges that at Landlord's request Tenant has engaged Lydecker LLP d/b/a Lydecker Diaz  to represent Tenant in obtaining the Approvals  ), Tenant has not obtained the Approvals as set forth above, within eight (8) months after the Effective Date, Tenant  may at any time within thirty (30) days after the earlier of (x) Tenant's determination based on the advice of counsel that obtaining all of the Approvals is not likely within such eight (8)month period, or (y) such eight (8) month period and prior to obtaining such Approvals  terminate this Lease by written notice to Landlord, (or within thirty 30) days after disapproval of either (a) (b) or (c)). If Tenant does not timely terminate this Lease as per the terms of this section, then Tenant shall be deemed to have satisfied or waived the contingency.  Notwithstanding the foregoing, in the event Tenant provides notice of termination pursuant to this section within the time period provided herein, Landlord shall be granted an additional one hundred twenty (120) days upon Landlord's receipt of the termination notice to obtain the  Approvals.  Landlord agrees to give Tenant written notice of Landlord's receipt of Tenant's termination notice.  Should Landlord fail to so notify Tenant of Landlord's intent to exercise Landlord's right to attempt to obtain the Approvals, within ten (10) business days after Landlord's receipt of Tenant's termination notice, then this Lease shall be deemed terminated.  Upon such termination, this Lease shall be null and void and of no further force or effect.  If Landlord does not obtain the  Approvals  during the time period that provided herein, this Lease shall be deemed terminated and of no force or effect, except for those matters which specifically survive the termination of this Lease.  If Landlord shall undertake such efforts to obtain the  Approvals , as set forth in this section, the Tenant shall fully cooperate with the Landlord on such efforts and Tenant shall agree to reimburse the Landlord for all third party costs, fees and expenses incurred by Landlord in such efforts. Tenant shall not be required to reimburse the Landlord for any third party costs, fees and expenses in excess of $15,000.00 as part of its efforts to secure the Approvals.  Nothing in this section shall delay or release Tenant of its obligations to pay Rent under this Lease, prior to the date that the Lease is fully terminated; provided if Landlord exercised the right to seek the Approvals  Rent shall be abated during the period of Landlord's efforts to seek the Approvals.

**SECTION 1.06   Excuse of Landlord's Performance.**

Intentionally Deleted.

**SECTION 1.07   Obligations of Tenant Before Lease Term Begins.**

If the Delivery Date shall be earlier than the Commencement Date of Term, Tenant shall observe and perform all of its obligations under this Lease (except its obligations to operate and to pay Minimum Annual Base Rent and its Pro Rata Share of the Shopping Center Operating Costs provided for in Section 2.05) from the Delivery Date until the Commencement Date in the same manner as though the Lease Term began when the Leased Premises were delivered to Tenant.

**SECTION 1.08   Obligations of Landlord Before Leased Premises Become Vacant.**

Intentionally Deleted.

## ARTICLE II

## RENT

**SECTION 2.01   Minimum Annual Base Rent.**

(a)      Tenant agrees to pay Landlord, subject to adjustment (if any) as herein provided, as fixed minimum rent the sum or sums set forth in Section (o) of the Lease Summary ("Minimum Annual Base Rent").  The Minimum Annual Base Rent during the Term of this Lease shall be payable by Tenant in equal monthly installments, on or before the first day of each month in advance, at the office of Landlord as set forth in Section (b) of the Lease Summary, or at such other place designated in writing by Landlord, without notice or demand, and without any deduction, counterclaim, or set-off whatsoever, except as expressly set forth herein. The first month's Minimum Annual Base Rent shall include, in addition to 1/12 of such Rent, Rent for the fractional month (if any) between the Rent Commencement Date and the first day of the month following the Rent Commencement Date.

(b)      Tenant's obligation to pay Minimum Annual Base Rent (hereinafter defined) shall begin on the Rent Commencement Date (Section (l) of the Lease Summary).  Should the Term of this Lease and Tenant's obligation to pay Minimum Annual Base Rent commence on a day other than the first day of a month, then the Term of this Lease shall continue in full force and effect for the period from the Commencement Date hereof to the first day of the calendar month next succeeding, plus the period of the Term set forth in Section 1.03 hereof; provided, however, that Tenant shall pay the Minimum Annual Base Rent for the fractional month on a per diem basis (calculated on the basis of a thirty day month) and same shall be payable on Rent Commencement Date, and thereafter the Minimum Annual Base Rent shall be paid in equal monthly installments on the first day of each and every month in advance.  All other monthly payments hereunder shall likewise be calculated and paid on such per diem basis for any fractional month.

(c)      In the event that at any time any personal or corporate check of Tenant should be returned marked "insufficient funds" or should not be promptly paid by the drawee bank for any other reason, Landlord may, without prejudice to any other right or remedy accruing to Landlord under this Lease, require that all future rental payments are to be made on or before the due date by cashier's check or money order.

**SECTION 2.02  Lease Year.**

For the purposes of this Lease, the first Lease Year shall be deemed to begin on the Rent Commencement Date and to end twelve (12) months thereafter; provided, if said first twelve (12) months' period does not end on the last day of a calendar month, the first Lease Year shall be extended to the end of said month, and each succeeding twelve (12) month period thereafter shall be deemed a Lease Year.

**SECTION 2.03  Cost of Living Increase.**

Intentionally Deleted.

**SECTION 2.04  Sales and Other Taxes.**

Tenant shall also pay, as additional Rent, all sales, use or excise tax imposed, levied or assessed against the Rent or any other charge or payment required herein by any Governmental Authority having jurisdiction there over, even though the taxing statute or ordinance may purport to impose such tax against Landlord.  The payment of such tax shall be made by Tenant on a monthly basis, concurrently with payment of the Minimum Annual Base Rent.

**SECTION 2.05  Tenant to Bear Pro Rata Share of Shopping Center Operating Costs.**

(a)　　In each Lease Year or partial Lease Year, Tenant will pay to Landlord, in addition to the rentals specified in this ARTICLE II, as further additional Rent, a proportion of the Shopping Center's Operating Costs (hereinafter defined), calculated by multiplying the total Operating Costs by a fraction, the numerator of which shall be the number of square feet contained in the Leased Premises and the denominator of which shall be the aggregate number of square feet of leasable building space in the Shopping Center (which is 92,981 square feet as of the Effective Date, and Landlord has no current plans to reduce such square footage of the Shopping Center) ("Pro Rata Share").  Such payments shall be made as provided under Section (u) of the Lease Summary and, thereafter, it will continue as provided under this Section.  Tenant shall pay its Pro Rata Share of Operating Costs for any fractional month on a per diem basis (calculated on the basis of a thirty (30) day month) and the same shall be payable on the same day on which Minimum Annual Base Rent is due hereunder.

(b)　　"Shopping Center Operating Costs" as used herein means the total cost and expense incurred in operating, managing, maintaining, and repairing the Shopping Center buildings, improvements and Common Areas, excluding only items of expense commonly known and designated as capital improvements and debt service and excluding roof replacement and roof membrane replacement, replacement of roof drains, outside walls, concrete floors except to the extent of modifications by Tenant, foundations and structural portions, both interior and exterior, of the Leased Premises.  Shopping Center Operating Costs shall specifically include the following items without limitation:  (I) property management, (ii) gardening, landscaping and irrigation, (iii) repairs to, and painting, sealing and striping of the parking areas, (iv) lighting and other utilities serving the Common Areas, (v) sanitary control, removal of trash, rubbish, garbage and other refuse from the Common Areas, but not from any Leased Premises, (vi) depreciation on machinery and equipment owned by Landlord and used in such maintenance, or the rental charges for such machinery and equipment, and the cost of personnel to implement such services, (vii) the cost of personnel to direct parking and to police the common facilities, including watchmen and security personnel (including payroll and applicable payroll taxes, worker's compensation insurance and fringe benefits), (viii) Landlord's insurance premiums on, or in respect of, the Shopping Center, including, but not limited to, public liability, property damage, all risk perils, rent and flood insurance, if carried by Landlord, and (ix) all ad valorem and real estate taxes, assessments (special or general) for public betterments or improvements, water and sewer charges and all other charges or levies of every kind or nature whatsoever, general and special, extraordinary as well as ordinary, foreseen and unforeseen, and each and every installment thereof, levied or assessed by any lawful authority against the land, buildings and all other improvements and betterments which are now or which hereafter become a part of the Shopping Center.  The following items to be excluded from Shopping Center Operating Costs:

　i.　　ground lease rent;

　ii.　　capital expenses for improvements and/or equipment;

　iii.　　costs for which Landlord is reimbursed by its insurance carrier or any Tenant's insurance carrier (but not excluding any reasonable deductibles not to exceed 3% of the replacement cost of the building for any wind loss);

　iv.　　costs incurred with respect to the installation of improvements for the exclusive use of any Tenant or other occupant in the Shopping Center, or costs otherwise incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space for Tenants or other occupants of the Shopping Center (including, without limitation, permit, license and inspection costs);

　v.　　depreciation and amortization;

　vi.　　marketing costs (including attorneys' fees, space planners' fees, real estate brokers' commissions, marketing and advertising expenses) incurred in connection with negotiation and preparation of letters, deal memos, letters of intent, leases, subleases, assignments or other transactions with present or prospective Tenants or other occupants of the Shopping Center;

　vii.　　expenses in connection with services or other benefits which are not provided to Tenant or for which Tenant is charged directly, but which are provided to another Tenant or occupant of the Shopping Center without direct charge;

　viii.　　costs or expenses resulting from the violation of this Lease by Landlord, or the violation of other Tenants of the provisions of their leases (excepting, however, the cost of any reasonable insurance deductible permitted by this Lease, if such violation results in an insured loss);

　ix.　　overhead and profit increment paid to Landlord or to subsidiaries or affiliates of Landlord for goods or services in the Shopping Center to the extent same exceeds the costs of such services rendered by unaffiliated third parties on a competitive basis;

　x.　　interest, principal, points and fees on debts, or amortization on any mortgage (first or otherwise) or other debt instrument encumbering the Shopping Center or the real property on which it is situated;

　xi.　　compensation paid to clerks, attendants or other persons in commercial concessions in the Shopping Center operated by Landlord;

　xii.　　advertising and promotional expenditures (including, without limitation, the costs of signs in or on the Shopping Center which identify Landlord or another Tenant and any fees for merchants association or marketing fund);

　xiii.　　tax penalties incurred as a result of Landlord's negligence, inability or unwillingness to make payments and/or file any income tax or informational returns when due;

　xiv.　　costs for which Landlord is reimbursed pursuant to any warranty or rebate;

　xv.　　costs arising from the negligence or fault of: other Tenants; Landlord or Landlord's agents; or, any vendors, contractors or providers of materials or services selected, hired or engaged by Landlord or Landlord's agents (including, without limitation, the selection of building materials);

　xvi.　　Landlord's charitable or political contributions;

　xvii.　　costs of repairing or correcting defects, latent or otherwise, in the initial design or construction of the Shopping Center including items warranted by Landlord or costs of correcting defects, latent or otherwise, warranted by contractors or other vendors;

xviii.    costs to acquire any sculpture, painting or other object of art;

xix.    costs arising from claims, disputes or potential disputes in connection with potential or actual claims, litigation or arbitration pertaining to either Landlord, or the Shopping Center or the land on which it is situated (including, without limitation, attorneys' fees, settlements, judgments or payments in lieu thereof);

xx.    costs associated with the operation of the business of the ownership or entity which constitutes Landlord or of which Landlord is a subsidiary, parent or partner, as distinguished from the costs of Shopping Center operations, including but not limited to partnership accounting and legal matters; costs of defending any lawsuits with any mortgagee, except as the actions of Tenant may be in issue; costs of selling, syndicating, financing, mortgaging or refinancing any of Landlord's interest in the Shopping Center; costs of any disputes with employees not engaged in Shopping Center operations; disputes of Landlord with Shopping Center management; or outside fees paid in connection with disputes with other Tenants;

xxi.    Any reserves, other than reserves for capital expenditures approved by Tenant;

xxii.    costs and expenses of electrical consumption of other Tenants in the Shopping Center (excepting Common Areas);

xxiii.    sums paid to any affiliate of Landlord for any goods or services to the extent that such sums exceed the reasonable and customary charge for such goods or services from third parties unaffiliated with Landlord;

xxiv.    wages and costs of personnel supervising the manager of the Shopping Center; or,

xxv.    wages and costs of personnel that furnish services to the Shopping Center and other properties owned by Landlord or its affiliates, unless such wages and costs are equitably apportioned between the Shopping Center and such other properties.

(c)    Landlord shall have the right, but not the obligation, if permitted by law, to make installment payments of any assessments levied against the Shopping Center and, in such event, Tenant's taxes shall be computed upon the installments and interest thereon paid by Landlord in each Lease Year. Landlord shall have the sole, absolute and unrestricted right, but not the obligation, to contest the validity or amount of any tax by appropriate proceedings; provided if the assessed value of the Shopping Center increases by more than 10% in any year or more than 15% in any two-year period, Landlord shall engage a property tax consulting service to review the proposed assessed value and determine if the proposed reassessment is in line with other properties in the area and the value of the Shopping Center, and if recommended by such tax consultant, Landlord shall protest the assessed value of the Shopping Center and the reasonable and customary costs of the tax protest shall be included in the definition of Taxes for such year and paid by the tenants. If Landlord shall institute any such contest on its own volition, it shall have the sole, absolute and unrestricted right to settle any contest, proceeding or action upon whatever terms Landlord may, in its sole discretion, determine. In the event Landlord receives any refund of such taxes Landlord shall credit such proportion of such refund as shall be allocable to payments of taxes actually made by Tenant (less costs, expenses and attorneys' fees) against the next succeeding payments of taxes due from Tenant.

(d)    Landlord shall estimate the Shopping Center Operating Costs for each Lease Year and Tenant shall pay one-twelfth (1/12) thereof monthly in advance, together with the payment of Minimum Annual Base Rent. Within one hundred twenty days (120) after the end of each Lease Year, Landlord shall furnish Tenant a statement of the actual Shopping Center Operating Costs and there shall be an adjustment between Landlord and Tenant, with payment to or repayment by Landlord, as the case may require, to the end that Landlord shall receive the entire amount of Tenant's annual share for such period, or, at Landlord's option any overpayment by Tenant shall be credited on account of the next succeeding payment or payments by Tenant of such Operating Costs. In the event there is a shortage for the Tenant's share of Operating Expenses, Landlord shall provide Tenant with written notice thereof and Tenant shall remit payment to Landlord within thirty (30) days of said notice. Tenant may, after giving Landlord 30 days prior written notice thereof, inspect or have an independent, nationally or regionally recognized firm of certified public accountants or a real estate consulting (such as CBRE, Jones Lang LaSalle, or Cushman and Wakefield) ("Audit Consultant"), said Audit Consultant shall not be compensated on a contingency basis, audit Landlord's records relating to Shopping Center Operating Costs for the immediately preceding calendar year. Said Audit consultant shall sign a confidentiality agreement. Tenant's audit or inspection shall be conducted only at Landlord's onsite property management office during business hours reasonably designated by Landlord. Tenant shall pay the cost of such audit or inspection, unless the annual statement for the time period in question is determined to be in error by more than 5% and, as a result thereof, Tenant paid to Landlord 5% more than the actual Shopping Center Operating Costs due for such time period, in which case Landlord shall pay the audit cost. Tenant shall complete its review within 60 days and shall notify Landlord of its results. The audit right shall only pertain to the previous calendar year.

(e)    In addition and notwithstanding the terms and provisions of this Lease, for each calendar year subsequent to the first calendar year, Tenant's share of "Controllable Expenses" (as defined below) will not exceed "Tenant's Maximum Share" (as defined below) for such calendar year. For the purposes hereof, "Tenant's Maximum Share" means (a) for the second calendar year, 105% of Controllable Expenses for the prior year. For the purposes of this Section, "Controllable Expenses" means all Shopping Center Operating Costs, other than Taxes, Insurance and utilities and waste removal to the extent of any debris resulting from a casualty or waste removal charges associated with a new bulk pick up contract with a waste provider.

## SECTION 2.06  Additional Rent.

All sums of money or charges required to be paid by Tenant under this Lease other than Minimum Annual Base Rent ("Additional Rent"), whether or not the same be paid at the time provided in this Lease, shall nevertheless, if not paid when due, be collectible as Additional Rent with the next installment of Minimum Annual Base Rent thereafter falling due hereunder, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charges as the same becomes due and payable hereunder, or limit any other remedy of Landlord. The terms Minimum Annual Base Rent and Additional Rent may sometimes be referred to herein collectively as "Rent".

## SECTION 2.07  Past Due Rent and Additional Rent.

If Tenant shall fail to pay, when the same is due and payable, any Rent or any Additional Rent, or amounts or charges of the character described in Section 2.06 hereof, such unpaid amounts shall bear interest from the due date thereof to the date of payment at the Default Rate (hereinafter defined). If any rental payment provided for in Section 2.01 above is not received by Landlord within five (5) days after said rental payment is due, Tenant shall pay to Landlord a late charge of five (5%) percent of such late rental payment for the purpose of defraying the expenses incident to handling and administering the late rental payment provided, however, Tenant shall not be assessed with the foregoing late charge with respect to the first (1st) late payment in any consecutive twelve (12) month period unless and until Tenant fails to make such payment to Landlord within five (5) days after written notice from Landlord that it failed to receive such amounts within the time period set forth above. .

## ARTICLE III

## CONSTRUCTION OF LEASED PREMISES

## SECTION 3.01  Landlord's Work.

Notwithstanding anything to the contrary contained or implied in this Lease, Tenant acknowledges and agrees that it will accept possession of the Leased Premises in an "as is, where is" condition in the broadest sense of the term, and that no

representations, warranties, or inducements, with respect to any condition of the Leased Premises have been made by Landlord, or its designated representatives, to Tenant, or its designated representatives. In furtherance of the foregoing, Tenant hereby acknowledges and agrees that no promises to decorate, alter, repair or improve the Leased Premises, either before or after the execution of this Lease have been made to Tenant, or its designated representatives, by Landlord, or its designated representatives.

### SECTION 3.02  Tenant's Work.

On the Delivery Date Tenant agrees to accept possession of the Leased Premises and proceed with due diligence, at its own cost and expense, to perform all other work which is necessary to prepare the Leased Premises for opening and operation for business with the public, in accordance with, and as more particularly described in, **Exhibit "B"** annexed hereto ("Tenant's Work"). Within sixty (60) days after Lease Execution, Tenant shall furnish Landlord, in advance of Tenant's commencement of Tenant's Work, for Landlord's written approval, plans and specifications showing a layout, fixturing plans, interior finish, store front and any work or equipment to be done or installed by Tenant affecting any structural, mechanical or electrical part of the Leased Premises or the Building containing same; provided Landlord shall not be entitled to object to or disapprove any items required by law.  Landlord agrees it will not unreasonably withhold such approval, it being the purpose of this requirement that Tenant's Leased Premises be fixtured and laid out so as not to be a detriment to the other tenants in the Shopping Center and that Tenant's Work shall not be detrimental to Landlord's building.

### SECTION 3.03  Acceptance by Tenant.

(a)      If Landlord's Work has been completed at the time this Lease is executed, Tenant certifies that it has inspected the Leased Premises and accepts same in its existing condition; in such event, Landlord shall not be required to perform any repair work, alterations, or remodeling of the Leased Premises as a condition of this Lease or otherwise.
(b)

### SECTION 3.04  Changes and Additions to Building and Shopping Center.

Subject to the limitations in Section 1.04, Landlord hereby reserves the right at any time to perform maintenance operations and to make repairs and alterations on the Building.  Subject to the limitations in Section 1.04, Landlord also reserves the right to construct other buildings or improvements, including, but not limited to, structures for motor vehicle parking and the enclosing and air conditioning of sidewalks in the Shopping Center, to make alterations thereof or additions thereto, and to build additional stories on any such building or buildings and to build adjoining same; providing, however, such repairs and alterations shall not materially interfere with Tenant's intended use of the Leased Premises.  Tenant agrees to cooperate with Landlord, permitting Landlord to accomplish any such maintenance, repairs, alterations, additions or construction.  Temporary, partial obstruction of access to Leased Premises caused by such construction shall not be a default of Landlord.

### SECTION 3.05  No Right to Relocate.

The purpose of the Site Plan attached hereto as Exhibit "A" is to show the approximate location of the Leased Premises.  .  Landlord shall have no right to relocate the Leased Premises.

### ARTICLE IV

### CONDUCT OF BUSINESS BY TENANT

### SECTION 4.01  Use of Leased Premises.

Tenant shall use the Leased Premises solely for the purpose of conducting business as provided in Section (v) of the Lease Summary and for no other purpose, except as may be first approved by Landlord in writing.  Tenant shall occupy the Leased Premises without delay upon the Delivery Date and shall conduct continuously in the Leased Premises the business above stated.  Tenant will not use or permit, or suffer the use of the Leased Premises for any business or purpose other than that stated above.  Tenant shall not perform any acts or carry on any practices which may damage the Shopping Center building or improvements or be a nuisance to, or disturb the quiet enjoyment of, other tenants in the Shopping Center or their customers, employees or invitees or which will result in the increase of casualty insurance premiums.  Tenant shall not commit or suffer to be committed any waste upon the Leased Premises or any other part of the Shopping Center or any act or thing which may adversely affect Landlord's interest in the Leased Premises or the Shopping Center.  Landlord represents and warrants that, (b) none of the use restrictions on Exhibit F limit in any way the right of Tenant to use the Leased Premises for the Permitted Use, and (c) Tenant's use of the Leased Premises for the Permitted Use is permitted by each of the Leases in the Shopping Center, any and all restrictions of record and applicable law.  At all times, subject to emergency repairs, Landlord shall maintain and insure open access to and from the ambulance drive and drop off for the Leased Premises to and from SW 87 Avenue, and SW 40th Street.

### SECTION 4.02  Operation of Business.

Tenant shall open for business and operate one hundred (100%) percent of the Leased Premises for one day. Tenant may operate during such days and hours as Tenant may determine, without the imposition of minimum or maximum hours of operation by Landlord and Tenant shall have access to the Leased Premises, and may operate, up to twenty-four (24) hours per day, seven (7) days per week, three hundred sixty-five (365) days per year subject to government regulations.  Notwithstanding the foregoing, after opening for one day Tenant shall have not have obligation to operate within the Leased Premises and cessation of use or abandonment shall not, so long as Tenant is not otherwise in default, be a default by Tenant under this Lease. If Tenant closes its business at the Leased Premises for more than ninety (90) days during the Term other than for a "Permitted Temporary Closure," Landlord shall then have the onetime right (the "Recapture Right") to terminate this Lease within ninety (90) days after the Tenant's closure for 90 days, pursuant to this Paragraph.  For purposes of this Lease, a "Permitted Temporary Closure" means any temporary cessation of Tenant's business at the Leased Premises caused by or as a result of (i) any damage to the Leased Premises, the Shopping Center or any portion thereof to such an extent that the Leased Premises are then unsuitable for the operation of Tenant's business, (ii) any remodeling of the Leased Premises otherwise permitted under this Lease, (iii) any changes in regulation requiring Tenant to remodel or change operations, or (iv) loss of physician coverage at the Leased Premises.  Landlord shall exercise the Recapture Right by delivering not less than thirty (30) days prior written notice to Tenant (the "Landlord Recapture Notice") of its election thereof; provided if Tenant recommences operations within such thirty (30) day period Landlord's Recapture Notice shall be null and void.

### SECTION 4.03  Exclusive.

Notwithstanding the foregoing, except for the current permitted uses under the existing tenant leases, Landlord shall not permit or approve the use or occupancy of any other portion of the Shopping Center that is owned or controlled by Landlord or any of its affiliates either on the date hereof or hereafter to another business that provides services associated with Tenant's Permitted Use;

which includes but is not limited to urgent care, urgent medical care and immediate medical care ("*Tenant's Exclusive*"); and any expansion of the Pastuer Medical premises will be subject to Tenant's Exclusive. Landlord recognizes that Tenant's Exclusive is reasonable and necessary for the protection of Tenant's operations and the Tenant's legitimate business interests and goodwill with the public. Landlord acknowledges that any breach or violation of Tenant's Exclusive will cause substantial damages and irreparable harm to Tenant for which there may be no adequate remedy at law. Thus, in addition to any other remedies available at law, Tenant will be entitled to temporary and/or permanent injunctive relief to enforce the provisions of this Lease without the necessity of proving actual damages or posting bond or other security. With respect to each and every breach or violation or threatened breach or violation by Landlord of any provision of this Section, Tenant, in addition to all other remedies available to it at law or in equity (including, without limitation, specific performance of the provisions hereof), shall be entitled to seek to enjoin the commencement or continuance thereof and may, with notice to breaching party, apply to any court of competent jurisdiction for entry of equitable relief, including, without limitation, an immediate restraining order or injunction.

## ARTICLE V

### Security Deposit

Intentionally Deleted.

## ARTICLE VI

### ALTERATIONS; CONSTRUCTION LIENS, SIGNS, AWNINGS, AND CANOPIES

### SECTION 6.01  Installation by Tenant.

(a)       Tenant shall not make or cause to be made to the Leased Premises any alterations, additions or improvements, install or cause to be installed any exterior signs, exterior lighting, plumbing fixtures, shades, or awnings or make any changes to the store front, without first obtaining Landlord's written approval and consent, which consent shall not be unreasonably withheld or delayed. However, Landlord's consent shall not be required for (1) any alteration that is required by applicable law, regulation or rule applicable to the Premises or Tenant's business conducted in the Leased Premises, however Tenant shall advise Landlord of such requirements and shall reasonably coordinate with Landlord for the construction of such improvements, or (2)any interior alteration satisfies all of the following criteria (a "**Cosmetic Alteration**"): (a) does not involve a modification to the exterior or structural portion of the building, (b) or exceed $25,000.00 in aggregate costs in a calendar year; provided the cost of interior painting, floor coverings and wall coverings shall be not be included in such threshold number and shall not be subject to Landlord approval. Tenant shall present to Landlord with a description of the work or if required by law, plans and specifications for such work, at the time approval is sought, and simultaneously demonstrate to Landlord that the proposed alterations comply with local zoning and building codes.

(b)       All construction work done by Tenant within the Leased Premises shall be performed in a good and workmanlike manner, in compliance with all Applicable Laws (hereinafter defined), Tenant will use its commercially reasonable effort and in such manner as to cause a minimum of interference with other construction in progress (if any) and with the transaction of business in the Shopping Center. Without limitation on the generality of the foregoing, Landlord shall have the right to require that such work be performed in accordance with other rules and regulations which Landlord may, from time to time, reasonably prescribe. Tenant agrees to indemnify Landlord and hold it harmless against any loss, liability or damage resulting from such work. Tenant agrees that all roof venting, opening, sealing, waterproofing or any altering of the roof shall be performed by Landlord's roofing contractor at Tenant's expense and that, when completed, Tenant shall furnish to Landlord a statement from Tenant that, to the extent Landlord's approval was required, that all such alterations approved by Landlord have been completed in accordance with the plans and specifications previously approved by Landlord.

### SECTION 6.02  Removal of Alterations.

All alterations, decorations, additions and improvements made by Tenant, or made by Landlord on Tenant's behalf by agreement under this Lease, shall remain the property of Tenant for the Term of this Lease, or any extension or renewal thereof. Such alterations, decorations, additions and improvements shall not be removed from the Leased Premises without prior consent in writing from Landlord, except to the extent replaced with items of similar function and utility of newer or better quality. Upon expiration of this Lease, including any renewal Term thereof, Tenant shall have no obligation to remove any such alterations, decorations, additions and improvements, and restore the Leased Premises as provided in Section 7.02 hereof. If Tenant fails to remove such alterations, decorations, addition and improvements and restore the Leased Premises, then such alterations, decorations, additions and improvements shall become the property of Landlord and in such event, should Landlord so elect, Landlord may restore the Leased Premises to its original condition for which cost, with allowance for ordinary wear and tear, Tenant shall be responsible and shall pay promptly upon demand.

### SECTION 6.03  Tenant Shall Discharge All Liens.

Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, to any contractor, subcontractor, laborer, materialman or vendor for the performance of any labor or services for the alteration, addition, repair, or demolition of or to the Leased Premises or any part thereof. All persons are hereby put upon notice that Tenant shall never, under any circumstances have the power to subject the interest of the Landlord in the Leased Premises to any mechanic's liens or materialmen's liens or any liens in connection with material or labor furnished to the Leased Premises, including any lien for architects' fees or engineers' fees; and all persons dealing with Tenant are hereby put upon notice that they must look wholly to the interest of the Tenant in the Leased Premises and not to that of Landlord. Tenant shall strictly comply with the Construction Lien Law of the State of Florida as set forth in Florida Statutes Section 713, including, but not limited to, giving written notice to all persons performing services or furnishing materials on its behalf of the terms and conditions of this Section 6.03. In the event that a mechanic's claim of lien is filed against the property in connection with any work performed by or on behalf of Tenant (except work for which Landlord is responsible), Tenant shall satisfy such claim or shall transfer same to security, within the earlier of (x) fifteen(15) days from the date of filing, or (y) the date such lien claimant commences an action with respect to such lien. In the event that Tenant fails to satisfy or transfer such claim within said period, Landlord may do so and thereafter charge Tenant, as Additional Rent, all costs incurred by Landlord in connection with satisfaction or transfer of such claim, including attorneys' fees and interest thereon at the Default Rate. Further, Tenant agrees to defend, indemnify and save Landlord harmless from and against any damage or loss incurred by Landlord as a result of any such mechanic's claim of lien. If so requested by Landlord, Tenant shall execute a short form or memorandum of this Lease, which may, in Landlord's discretion, be recorded in the Public Records for the purpose of protecting Landlord's estate from mechanics' claims of lien, as provided in Florida Statutes Section 713.10. Landlord has the right to record the memorandum without execution by Tenant in the event Tenant fails to execute the memorandum within seven (7) days of request. The security deposit paid by Tenant may be used by Landlord for the satisfaction or transfer of any mechanics' claim of lien as provided in this Section. This Section 6.03 shall survive the termination of the Lease.

- 8 -

**SECTION 6.04  Signs, Awnings and Canopies.**

(a)        Except as may be required by law for operation of Tenant's business for the Permitted Use, or as otherwise approved as part of Tenant's Work, Tenant will not place or permit to be placed or maintained on any exterior door, wall or window of the Leased Premises any signs, awnings, canopy, advertising matter or other thing of any kind; will not place or maintain any decoration, letter or advertising matter on the glass of any window or door; and will not place or maintain any illuminated sign in the window display area of the Leased Premises, without first obtaining Landlord's written approval and consent which may be arbitrarily withheld; provided, however, (1) Tenant shall be entitled to install and maintain Tenant's identification signs on or near the entry doors of the Premises, and (2) subject to the approval of all applicable governmental authorities, and compliance with all applicable laws, and all recorded covenants, conditions and restrictions affecting the Shopping Center, Tenant shall have the right to continue to maintain the existing graphics and/or signs on the interior windows of the Premises (**"Window Graphics"**) displaying content relating to Tenant's Permitted Use .

(b)        Tenant shall, at its cost and expense, promptly erect a sign in accordance with the specifications as outlined in **Exhibit "D"** within the area designated by Landlord. Tenant further agrees that such signs, awning, canopy, decoration, lettering, advertising matter or other thing as may be approved in writing by Landlord shall be maintained in good condition and repair at all times and shall conform to the criteria established from time to time by Landlord for the Shopping Center in the reasonable exercise of its sole discretion. Tenant agrees to have erected and/or installed and fully operative on or before the Commencement Date of this Lease all signs in accordance with Landlord's sign criteria. Tenant, upon vacation of the Leased Premises, or the removal or alteration of its sign for any reason, shall be responsible for the repair, painting, and/or replacement of the Building fascia surface where signs are attached.

## ARTICLE VII

## REPAIRS AND MAINTENANCE OF LEASED PREMISES

**SECTION 7.01  Responsibility of Landlord.**

(a)        Landlord agrees to repair and maintain in good order and condition and in compliance with applicable law the roof and roof membrane, roof drains, outside walls, concrete floors except to the extent of modifications by Tenant, foundations and structural portions, exterior of the Leased Premises, unless such improvements have been constructed by Tenant, and the Common Areas provided Tenant shall give Landlord notice of the necessity of such repairs.  The following items are excepted from the preceding covenant, however:  (i) repair or replacement of broken plate or window glass (except in case of damage by fire or other casualty covered by Landlord's fire and extended coverage policy); (ii) doors, door closure devices, window and door frames, moldings, locks and hardware; (iii) repair of damage caused directly or indirectly by the negligence or willful acts of Tenant, its employees, agents, contractors, customers, invitees; and (iv) interior repainting and redecoration.  Notwithstanding the foregoing but subject to Section 8.07, if the necessity for such repairs shall have arisen from or shall have been caused by the negligence or willful acts of Tenant, its agents, concessionaires, officers, employees, licensees, invitees or contractors, Landlord may make or cause the same repairs to be made, but shall not be obligated to do so, and Tenant agrees to pay to Landlord promptly upon Landlord's demand, as Additional Rent, the cost of such repairs, if made, with interest thereon at the Default Rate, as hereinafter defined.  In the event Landlord elects not to make such repairs caused by Tenant's negligence or willful acts, Landlord may require Tenant to make such repairs at Tenant's sole cost and expense.  Tenant waives the provision of any law, now or hereafter in effect, or any right under common law, permitting it to make repairs at Landlord's expense.

(b)        Except as hereinabove provided in Subparagraph (a), Landlord shall not be obligated or required to make any other repairs, and all other portions of the Leased Premises including, but not limited to, all electrical, plumbing and other mechanical installations, shall be kept in good repair and condition by Tenant, reasonable wear and tear and damage from fire and other casualty excepted.  At the end of the Term of this Lease, Tenant shall deliver the Leased Premises to Landlord in good repair and condition, reasonable wear and tear and damage from fire and other casualty excepted.

(c)        Subject to Section 8.07, unless caused by the gross negligence or intentional acts of Landlord or that of its contractors, agents or any of their employees, neither Landlord nor Landlord's agents or servants shall be liable for (i) any damages caused, directly or indirectly, by any breakage, leakage, out of order or defective condition of the electric wiring, air conditioning or heating pipes and equipment, closets, plumbing, appliances, sprinklers, windows, other equipment or other facilities serving the Leased Premises, or (ii) any damages caused by, or growing out of, any defect in the Shopping Center or any part thereof, or in any building attached, or adjacent thereto or a part thereof, or in the Leased Premises or a part thereof; or caused by, or growing out of, fire, rain, wind or other cause; provided Landlord shall have its obligations under Section Xiv and XV with respect to restoration following casualty or condemnation events.

**SECTION 7.02  Responsibilities of Tenant.**

(a)        Without limiting the generality of the foregoing Section 7.01(b), Tenant agrees to repair and maintain in good order and condition the non-structural interior portion of the Leased Premises, including the store fronts, elevator, show windows, doors, windows, plate and window glass, and floor covering, plumbing (including free flow up to the connection to the main sewer line) and backflow repairs and/or certifications, heating, air conditioning, electrical and sewage system, facilities and appliances, interior walls, ceiling and  fixtures, including exterior mechanical equipment, exterior utility facilities and exterior electrical equipment serving the Demised Premises .  Tenant agrees, with respect to the heating and air conditioning system, to comply with the terms of the "Heating and Air Conditioning Maintenance Provision" which is attached hereto as **Exhibit "C"** and made a part of the Lease by reference.

(b)        Tenant will not install any equipment which exceeds the capacity of the utility lines leading into the Leased Premises or the Building of which the Leased Premises constitute a portion.

(c)        Tenant, its employees, or agents, shall not mark, paint, drill or in any way deface any walls, ceilings, partitions, floors, wood, stone or ironwork without Landlord's written consent.

(d)        Tenant shall comply with the requirements of all laws, orders, ordinances and regulations of all governmental authorities and will not permit any waste of property and will take good care of the Leased Premises at all times.

(e)        If Tenant refuses or neglects to repair properly as required hereunder and to the reasonable satisfaction of Landlord as soon as reasonably possible after written demand, Landlord may make such repairs without liability to Tenant for any loss or damage that may accrue to Tenant's merchandise, fixtures, or other property, or to Tenant's business by reason thereof, and, upon completion thereof, Tenant shall pay Landlord's cost for making such repairs, plus ten  percent (10%) of overhead, upon presentation of bill therefore, as Additional Rent.  Said bill shall include interest at the Default Rate on said cost from the date of completion of repairs by Landlord.  In the event Landlord shall undertake any maintenance or repair in the course of which it shall be determined that such maintenance or repair work was made necessary by the negligence or willful act of Tenant, or any of its

employees or agents, or that the maintenance or repair is, under the terms of this Lease, the responsibility of Tenant, subject to Section 8.07 Tenant shall pay Landlord's costs therefore plus overhead and interest as above provided in this Section.

(f)    .    At the expiration of the tenancy hereby created, Tenant shall surrender the Leased Premises in good condition and repair, normal wear and tear and damage by unavoidable casualty excepted, and shall surrender one key for each lock for the Leased Premises to Landlord.  Tenant shall remove all its trade fixtures, leased equipment and any alterations or improvements which Landlord requests to be removed before surrendering the Leased Premises as aforesaid and shall repair any damage to the Leased Premises caused thereby.  Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the Term of the Lease.

(g)    Tenant shall, at its own expense, perform all pest control, janitorial and cleaning services within the Leased Premises in order to keep same in a neat, clean and orderly condition.

(h)    Tenant shall, during the term of this Lease and any renewals thereof, maintain and pay for a service contract with a local pest control company at Tenant's premises shall be exterminated on a regular basis but in no event shall said extermination take place less than once each month.  Should Landlord, at Landlord's sole discretion, direct Tenant to exterminate its Premises more than once each month, Tenant shall do so, at Tenant's sole cost and to Landlord's sole satisfaction.

(i)    Tenant shall give Landlord prompt written notice (and telephonic notice in the case of an emergency) of any fire or damage occurring on or to the Leased Premises.

**SECTION 7.03  Rules and Regulations.**

**Exhibit "E"** sets forth the rules and regulations applicable to each Tenant occupying space in the Shopping Center. Landlord reserves the right to, from time to time, adopt and promulgate amendments to such rules and regulations.  Notice of such additional rules and regulations and amendments and supplements, if any, shall be given to Tenant.  Tenant agrees thereupon to comply with and observe all such rules and regulations, and amendments thereto and supplements thereof, provided the same shall apply uniformly to all tenants of the Shopping Center.  Tenant's failure to keep and observe these rules and regulations shall constitute a breach of the terms of this Lease as if such rules and regulations were contained herein as covenants.

## ARTICLE VIII

## INSURANCE AND INDEMNITY

**SECTION 8.01  Liability Insurance.**

Tenant shall, during the entire Term hereof at its own cost and expense, keep in full force and effect comprehensive public liability insurance on an occurrence basis with minimum limits of not less than One Million ($1,000,000.00) Dollars per person and Two Million ($2,000,000.00) Dollars per accident with respect to personal injury and death and Five Hundred Thousand ($500,000.00) Dollars with respect to property damage, insuring against all claims, demands or actions arising out of or in connection with Tenant's use or occupancy of the Leased Premises, or by the condition of the Leased Premises.  The policy shall name Landlord, any person, firms or corporations designated by Landlord, and Tenant as additional insureds (as their interests may appear), and shall contain a clause that the insurer will not cancel or change the insurance without first giving Landlord thirty (30) days prior written notice.  The insurance shall be written by a company authorized to do business in the State of Florida, with a Best Guide's rating, or ratings reasonably acceptable to Landlord.  A copy of the policy or a certificate of insurance shall be delivered to Landlord prior to the commencement of the Term of this Lease and annually thereafter at least thirty (30) days prior to the expiration of any policy term.  Nothing herein shall be considered to limit the liability of Tenant under this Lease.

**SECTION 8.02  Plate Glass Insurance.**

The replacement of any plate glass damaged or broken from any cause whatsoever in and about the Leased Premises shall be Tenant's responsibility.  Tenant shall, during the entire Term hereof, keep in full force and effect a policy of plate glass insurance covering all the plate glass of the Leased Premises, in amounts satisfactory to Landlord.  The policy shall name Landlord and any person, form or corporation designated by Landlord and Tenant, as insured and shall contain a clause that the insurer will not cancel or change the insurance without first giving Landlord thirty (30) days prior written notice.  The insurance shall be written by a company approved by Landlord, and a copy of the policy or a certificate of insurance shall be delivered to Landlord prior to the commencement of the Term of this Lease.·

**SECTION 8.03  Fire and Extended Coverage Insurance.**

Tenant shall, at all times during the Term hereof and at its cost and expense, maintain in effect policies of insurance covering its fixtures and equipment and goods and inventory held for sale located in the Leased Premises, in an amount not less than ninety percent (90%) of their actual cash value, providing protection against any peril included within the standard classification of "Fire and Extended Coverage," together with insurance against sprinkler damage, vandalism, malicious mischief and business interruption insurance.  The proceeds of such insurance, so long as this Lease remains in effect, shall be used to repair or replace the fixtures and equipment so insured.

Landlord shall, at all times during the Term hereof and at its cost and expense, maintain in effect policies of insurance covering fire, extended coverage, vandalism, malicious theft, special extended coverage, and such other risks as are included in standard extended coverage endorsements, in such amounts as shall be deemed appropriate by Landlord, but in no effect less than ninety (90%) percent of insurable value, insuring the building, improvements and Common Areas in the Shopping Center.  Landlord shall be allowed to maintain such coverage under blanket policies covering other properties, with deductibles in such amounts as Landlord may determine in its sole discretion.  Each such policy shall be written by a company licensed to do business in Florida and rated A-VIII or better by AM Best Insurance Guides.

**SECTION 8.04**  Notwithstanding anything to the contrary in the Lease: (i) the insurance required to be provided by Tenant may be provided under one or more so-called "blanket policies" of insurance carried and maintained by Tenant or its affiliates; and (ii) as an alternative to, or in connection with, maintaining insurance, Tenant shall be entitled to satisfy the insurance requirements set forth in the Lease by obtaining insurance through an industry captive insurance company, through Tenet Healthcare Corporation or an entity that is owned or controlled (directly or indirectly) by Tenet Healthcare Corporation or through other arrangements with insurers, subject to the other terms of this paragraph.  The policy limits of any blanket or other coverages maintained by or on behalf of Tenant under this paragraph must equal or exceed the policy amounts required under the Lease.  Further, Tenant may only satisfy the insurance requirements set forth in the Lease by obtaining insurance through an industry captive insurance company, through Tenet Healthcare Corporation or an entity that is owned or controlled (directly or indirectly) by Tenet Healthcare Corporation or through other arrangements with insurers, if (a) Tenant is owned or controlled (directly or indirectly) by Tenet Healthcare Corporation,

or (b) Tenant (or its parent or captive insurer [optional alternative: all affiliates of Tenant participating in the risk pool of the captive insurer have]) has a net equity book value that equals or exceeds Fifty Million Dollars ($50,000,000.00). If Tenant exercises its right to satisfy its insurance requirements through coverages provided by a captive insurance company, then Tenant's captive insurance company shall not be required to meet any state or third party rating standards or other qualifications set forth in the Lease. Without limiting the generality of the foregoing, Landlord acknowledges and agrees that Tenant may place its general liability insurance with an industry captive insurance company affiliated with Tenant or with an entity that is owned or controlled (directly or indirectly) by Tenet Healthcare Corporation and such placement shall satisfy the requirement set forth in the Lease to maintain general liability insurance. All references herein to "Tenet Healthcare Corporation" shall include its successors and assigns by merger, sale or other combination with or transfer of interests or assets to another entity.

**SECTION 8.05  Increase in Fire Insurance Premium.**

In the event Tenant's occupation and use of the Leased Premises causes any increase of premium for the fire, boiler and/or casualty rates on the Leased Premises, or any part thereof, above the rate for the least hazardous type of occupancy legally permitted in the Leased Premises, Tenant shall pay the additional premium on the fire, boiler and/or casualty insurance policies by reason thereof. Tenant also shall pay in such event, any additional premium on the Rent insurance policy that may be carried by Landlord for its protection against Rent loss through fire or other casualty. Bills for such additional premiums shall be rendered by Landlord to Tenant at such times as Landlord may elect and shall be due from, and payable by, Tenant when rendered, and the amount thereof shall be deemed to be Additional Rent.

**SECTION 8.06  Indemnification.**

Tenant shall indemnify, defend and hold Landlord and each partner, stockholder or employee of Landlord harmless from and against any and all claims, actions, losses, damages, liability and expenses (including, but not limited to, attorney's and other professional fees) of whatever nature in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in, upon or at the Leased Premises; the occupancy or use by Tenant of the Leased Premises or any part thereof; or occasioned wholly or in part by any act, negligence, or omission of Tenant, its agents, contractors, employees, servants, licensees, or concessionaires, whether occurring in or about the Leased Premises or outside the Leased Premises but within the Shopping Center (except to the extent any of the foregoing are due to Landlord's negligence or the breach of any of its obligations hereunder). In the event Landlord shall be made a party to any litigation commenced by or against Tenant, then Tenant shall protect and hold Landlord harmless and shall pay all costs, expenses and reasonable attorneys' fees incurred or paid by Landlord in connection with such litigation. Notwithstanding anything to the contrary as may be contained hereinabove, Landlord shall indemnify and hold Tenant harmless from all suits, actions, damages, liability, expenses, and associated fees and costs, attorneys' and otherwise, as a result of Landlord's use of the Common Areas, except to the extent such damage or destruction to person(s) or property, loss of life, loss of income or other such occurrence shall be as a result of any act or acts of Tenant, its affiliates, associates, employees, contractors, agents or invitees regardless of whether such act or acts as contemplated herein shall have been occasioned by commission or omission.

Landlord shall not be responsible or liable to Tenant, or to those claiming by, through or under Tenant, for any loss or damage which may be occasioned by or through the acts or omissions of persons occupying space adjoining, adjacent to or in connection with the Leased Premises, or any part thereof, or any other part of the Shopping Center, or otherwise, or for any loss or damage resulting to Tenant, or those claiming by, through or under Tenant, or its or their property, from the breaking, bursting, stoppage or leaking of electrical cable and wires, and water, gas, sewer or steam pipes. To the maximum extent permitted by law, Tenant agrees to use and occupy the Leased Premises, and to use such other portions of the Shopping enter as Tenant is herein given the right to use, at Tenant's own risk. Landlord shall, however, be responsible for any up to and only to the extent it is an insurable claim covered by Landlord's insurance less deductible payments, which covers damage resulting from any stoppage, breakage, backup, overflow or spillage from water, sewer or other drain lines serving any portion of the Shopping Center other than water, sewer and drain lines serving only the Leased Premises.

**SECTION 8.07  Waiver of Subrogation.**

Landlord and Tenant hereby releases the other, to the extent of its insurance coverage, from any and all liability for any loss or damage caused by fire, any of the extended coverage casualties, or any other casualty insured against, even if such fire or other casualty shall be brought about by the fault or negligence of the other party, or any persons claiming under such other party; provided, however, this release shall be in force and effect only with respect to loss or damage occurring during such time as the releaser's policies of fire and extended coverage insurance shall contain a clause to the effect that this release shall not affect such policies or the right of the releaser to recover thereunder. Landlord and Tenant agree that their respective fire and extended coverage insurance policies shall include such a clause so long as the same is obtainable and is includable without extra cost, or, if such extra cost is chargeable therefore, so long as the other party pays such extra cost. If extra cost is chargeable therefore, each party will advise the other thereof and of the amount thereof, and the other party, at its election, may pay the same but shall not be obligated to do so. Any insurance policy procured by Tenant which does not name Landlord as a named insured shall, if obtainable, contain an express waiver of any right of subrogation by the insurance company against Landlord. All public liability and property damage policies shall contain an endorsement that Landlord, although named as an insured, shall nevertheless be entitled to recover damages caused by the negligence of Tenant.

ARTICLE IX

UTILITIES

Tenant shall be solely responsible and promptly pay all charges backflow repairs and/or certifications for water, gas, electricity, sewer, trash removal, or any other utility used or consumed in the Leased Premises. If any such charges are not paid when due, Landlord may, at its option, pay the same, and any amount so paid by Landlord shall thereupon become due to Landlord from Tenant as Additional Rent. Should Landlord elect to supply the water, gas, electricity, trash removal or any other utility used or consumed in the Leased Premises, Tenant agrees to purchase and pay for the same as Additional Rent at the applicable rates filed by Landlord with the proper regulatory authority. In no event shall Landlord be liable in damages or otherwise (I) if any utility shall become unavailable from any public utility company, public authority or any other person or entity (including Landlord) supplying or distributing such utility, or (ii) for any interruption in any utility service (including, without limitation, any heating, ventilation or air conditioning) caused by the making of any necessary repairs or improvements, or by any cause beyond Landlord's reasonable control, and the same shall not constitute a termination of this Lease or an eviction of Tenant. Tenant shall also be required prior to taking possession of the Leased Premises to pay to the appropriate Governmental Authority or to Landlord, if Landlord has been required to pay such charges by any private or Governmental Authority having jurisdiction there over, any and all water or sewer connection or meter charges of any kind whatsoever (if any) however designated or characterized and regardless of the use to which such charges are put for the Leased Premises. Landlord, at its sole discretion, reserves and shall at all times, have the right to alter the utilities, including, but not limited to, heating, ventilating and air conditioning systems and equipment serving the Shopping

Center, and Tenant agrees to execute and deliver to Landlord without delay such documentation as may be required to effect such alteration. Tenant shall not be required to operate its business at the Leased Premises for any period that the Leased Premises are untenantable by reason of such unavailability, malfunction, failure, interruption or curtailment of utility services unless any of same are caused, in whole or in part, by the negligence, acts or omissions of Tenant or Tenant's agents, employees or contractors. Notwithstanding anything contained herein to the contrary, as a result of the acts or omissions of Landlord or Landlord's agents, contractors, or any of their employees any utility service to the Leased Premises becomes unavailable, and remains unavailable for four (4) consecutive days or five out of seven days after notice thereof by Tenant to Landlord, and if such unavailability causes the Premises to become untenantable, then commencing on the fifth or seventh day, as applicable, after such notice rent and other sums payable under this Lease will abate for so long as the Leased Premises remain untenantable for such reasons.

## ARTICLE X

## SUBORDINATION AND ATTORNMENT

### SECTION 10.01  Subordination.

Tenant agrees that this Lease, and the interest of Tenant therein, shall be made subject and subordinated, at all times, to all covenants, restrictions, easements and other encumbrances now or hereafter affecting the fee title of the Shopping Center; to all ground and underlying leases; and to any mortgage in any amounts and all advances made, and to be made thereon, which may now or hereafter be placed against or affect any or all of the land and/or any or all of the buildings and improvements, including the Leased Premises, now or at any time hereafter constituting a part of the Shopping Center, and/or any ground or underlying leases covering the same, and to all renewals, modifications, consolidations, participations, replacements and extensions of any of the foregoing. The term "Mortgages" as used herein shall be deemed to include trust indentures and deeds of trust. The aforesaid provisions shall be self-operative and no further instrument of subordination shall be necessary unless required by any such ground or underlying lessors or mortgages. Should Landlord or any ground or underlying lessor or mortgagees desire confirmation of such subordination, then Tenant, within twenty (20) days following written request therefore, agrees to execute and deliver, without charge, any and all documents (in the form acceptable to Landlord and such ground or underlying lessors or mortgagees) subordinating this Lease and Tenant's rights hereunder. However, should any such ground or underlying lessors or any mortgagees request that this Lease be made superior, rather than subordinate, to any such ground or underlying lease and/or mortgage, then Tenant, within twenty (20) days following Landlord's written request therefore, agrees to execute and deliver, without charge, any and all documents (in the form acceptable to Landlord and such ground or underlying lessors or mortgagees) effectuating such priority. Notwithstanding any provision in this Article or the Lease to the contrary, Tenant's agreement that this Lease is subordinate to any Mortgage, and Tenant's agreement to attorn to Landlord's mortgagee, is expressly conditioned upon the delivery to Tenant of a subordination, non-disturbance and attornment agreement ("Mortgage SNDA") in such form as Landlord's mortgagee may reasonably require, that is reasonably acceptable to Tenant and Landlord's mortgagee and executed by Landlord and Landlord's mortgagee and acknowledged by Tenant, and the provides so long as no event of Default by Tenant shall exist under this Lease. . Landlord agrees that on all future mortgages it will use its best efforts to require that all such mortgages shall contain language that requires the lender to make available proceeds of a casualty insurance for the restoration of the building of which the Leased Premises are a part.

### SECTION 10.02  Attornment.

In the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Leased Premises or in the event a deed is given in lieu of foreclosure of any such mortgage, if requested to do so, Tenant shall attorn to the purchaser or grantee in lieu of foreclosure upon any such foreclosure or sale and recognize such purchaser or grantee in lieu of foreclosure as Landlord under this Lease.

### SECTION 10.03  Attorney-in-Fact.

Tenant, upon request of any party in interest, shall execute promptly such instruments or certificates to carry out the intent of Sections 10.01 and 10.02 above as shall be requested by Landlord. Tenant hereby irrevocably appoints Landlord as attorney-in-fact for Tenant with full power and authority to execute and deliver any such instruments or certificates in the name of Tenant. If twenty (20) days after the date of a written request by Landlord has elapsed and Tenant has not executed such instrument or certificate satisfying the requirements of Section 10.01, Landlord may, at its option, cancel this Lease without incurring any liability on account thereof, and the Term hereby granted is expressly limited accordingly.

### SECTION 10.04  Notice to Mortgagee.

Tenant agrees to give any mortgagee, by registered mail, a copy of any notice of default served upon Landlord, providing that prior to such notice Tenant has been notified in writing (by way of Notice of Assignment of Rents and Leases, or otherwise) of the addresses of such mortgagee. Tenant further agrees that, if Landlord shall have failed to cure such default within the time provided for in this Lease, then the mortgagee shall have an additional thirty (30) days within which to cure such default; or, if such default cannot be cured within that time, then if such default does not impair Tenant's ability to operate for the Permitted Use such additional reasonable time as may be necessary for such default to be cured. If within such thirty (30) days any Mortgagee has commenced and is diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings as necessary to affect such cure), this Lease shall not be terminated while such remedies are being so diligently pursued.

## ARTICLE XI

## ASSIGNMENT AND SUBLETTING

### SECTION 11.01  Consent Required.

(a)     Tenant may not assign, or in any manner transfer or grant, or suffer any encumbrance of Tenant's interest in, this Lease in whole or in part; sublet all or any portion of the Leased Premises; nor grant a license concession or other right of occupancy of any portion of the Leased Premises, without the prior written consent of Landlord in each instance, which consent shall not be unreasonably withheld (subject, however, to the provisions of Section 16.05 hereof). The consent by Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. If this Lease is assigned, or if the Leased Premises or any part thereof be underlet or occupied by any party other than Tenant, Landlord may collect Rent from the assignee, subtenant or occupant, and apply the net amount collected to the Rent herein reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of this covenant, or an acceptance of the assignee, subtenant or occupant as Tenant, or a release of Tenant from the further performance by Tenant of the covenants on the part of Tenant herein contained. This prohibition against assignment or subletting shall be construed to include prohibition against any assignment or subleasing by operation of law, legal process, receivership, bankruptcy or otherwise, whether voluntary or involuntary. Notwithstanding any assignment or sublease, Tenant shall remain fully liable on this Lease and shall not be released from performing any of the terms, covenants and conditions of this Lease.

- 12 -

The parties recognize that this Lease and the Leased Premises are unique, and that this Lease and the Leased Premises derive value from the remainder of the Building and the Shopping Center as a whole, and that the nature and character of the operations within and management of the Leased Premises are important to the success of the Building and the Shopping Center. Accordingly, and without limiting the generality of the foregoing, it shall be deemed reasonable for the Landlord to withhold its consent to any transfer where any or all of the following conditions are not satisfied:

(i) the net assets of the assignee, licensee, sublessee or other transferee or permittee (collectively "transferee") immediately prior to the transfer shall not be less than the greater of the net assets of Tenant immediately prior to the transfer or the net assets of Tenant at the time of the signing of this Lease;

(ii) such transfer shall not adversely affect the quality and type of business operation which Tenant has conducted heretofore and such use shall not violate any exclusive uses granted to any other tenant within the Shopping Center and no use shall be employed in connection with the Leased Premises other than the Permitted Use set forth in this Lease;

(iii) such transferee shall possess qualifications for the Tenant business substantially equivalent to those of Tenant and shall have demonstrated recognized experience in successfully operating such a business, including, without limitation, experience in successfully operating a similar quality business in similar shopping centers;

(iv) such transferee shall assume in writing, in a form acceptable to Landlord, all of Tenant's obligations hereunder and Tenant shall provide Landlord with a copy of such assumption/transfer document;

(v) there shall be no Event of Default (hereinafter defined) which shall have occurred and is continuing at the time of the request for the consent to the assignment;

(vi) Tenant and any intervening assignor to which the Leased Premises were initially leased shall continue to remain primarily liable under this Lease for the performance of all terms, including, but not limited to, payment of Rent due under this Lease and Tenant shall guaranty the Lease if Landlord so requests;

(vii) Tenant's guarantor, if any, shall continue to remain liable under the terms of the Guaranty of this Lease and, if Landlord deems it necessary, such guarantor shall execute such documents necessary to insure the continuation of its guaranty;

(viii) Landlord shall receive upon execution of its consent any due but unpaid Rent;

(ix) each of Landlord's mortgagees (if any) shall have consented in writing to such transfer if required;

(x) Landlord shall be provided with at least fifteen (15) business days' written notice prior to any transfer; and

(xi) Tenant will not sublet or assign to any existing Shopping Center tenant, or to a person or entity with whom Landlord has negotiated for space in the Shopping Center within the preceding six (6) months.

At least fifteen (15) days prior to any assignment or subletting, Tenant must provide the following items to Landlord in writing: (i) the name and address of the proposed assignee or subtenant; (ii) the nature of the proposed assignee's or subtenant's business it will operate from the Leased Premises; (iii) the terms of the proposed assignment or sublease; (iv) reasonable financial information so that Landlord can run a credit and background check and evaluate the proposed assignee or subtenant; (v) a resume of proposed assignee's business experience; and (vi) in the event of an assignment, the written assumption by assignee of all of Tenant's obligations hereunder. Landlord shall, within thirty (30) days after receiving the information under this Section, give notice to Tenant to permit or deny the proposed assignment or sublease. If Landlord denies consent, it shall explain the reasons for the denial.

(b) Tenant shall have the obligation to pay a reasonable administrative fee of not less than $1,000.00 in connection with such assignment.

**SECTION 11.02 Omitted**
**SECTION 11.03 Permitted Transfer.**

Notwithstanding the forgoing, no consent of Landlord is required for Tenant to assign or otherwise transfer (by operation of law or otherwise) this Lease or any of its rights hereunder (each being a "Permitted Transfer"): (a) to any person, corporation, partnership or other entity which acquires all or substantially all of the business or assets of Tenant or stock in Tenant; or (b) to any affiliate (as defined below) or person, corporation, partnership or other entity which controls, is controlled by or is under common control with Tenant or any Guarantor of this Lease; or (c) to any affiliate (within the meaning of such term as set forth in Rule 501 of Regulation D under the Federal Securities Act of 1933) of Tenant; (d) a sublease or license agreement to a physician or physician practice group providing services at the Leased Premises; or (e) an entity that acquires a group of urgent care centers or emergency centers from Tenant or its affiliates, and after such acquisition, operates at least eight (8) or more outpatient medical facilities (such as emergency departments, urgent care centers and/or imaging facilities). Tenant and Tenant's transferee or assignee shall provide notice of any transfer or assignment within 5 days before the date of such transfer or assignment. For the purposes of this Lease an "affiliate" of Tenant shall mean (i) any corporation, limited liability company, partnership or other entity under the control of Tenant; or (ii) any corporation, limited liability company, partnership or other entity under the control of Tenant's parent company or its successors. Notwithstanding any assignment or transfer of this Lease or Tenant's rights hereunder, Tenant shall remain fully liable under this Lease for the performance of all terms, covenants and provisions of this Lease. Further, a Permitted Transfer under this provision is further expressly conditioned upon the use by any transferee complying with the Permitted Use.

**SECTION 11.04 Assignment by Landlord.**

In the event of the transfer and assignment by Landlord of its interest in this Lease and in the Building to a person expressly assuming Landlord's obligations under this Lease, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of Landlord for performance of such obligations. Any security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to such successor in interest, and Landlord shall thereby be discharged of any further obligation relating thereto. Notwithstanding anything contained herein to the contrary, no rent or other sums shall be payable to Landlord by Tenant until Landlord has provided to Tenant an IRS Form W-9 "Request for Taxpayer Identification Number and Certification" and a "Stark II Inquiry Form" (collectively, the "Required Tenant Information"). If there is a change in ownership of the Landlord entity or an assignment of the Landlord's interest in this

Lease, Landlord agrees to provide reasonable evidence of such change to Tenant together with updated Required Tenant Information prior to having Tenant re-direct payments to the new Landlord.

## ARTICLE XII

## GOVERNMENTAL REGULATIONS; ENVIRONMENTAL

**SECTION 12.01 Governmental Regulations.**

Tenant shall, at Tenant's sole cost and expense, comply with all laws, orders, ordinances, regulations and other applicable requirements of all Governmental Authorities ("Applicable Laws"), now in force, or which may hereafter be in force, pertaining to, or affecting the condition, use or occupancy of the Leased Premises. Notwithstanding the foregoing, after the issuance of the initial Certificate of Occupancy for the Leased Premises (or if no such certificate is customarily issued in the jurisdiction, then upon the building full completion of Landlord's Work and Tenant's Work), Tenant's obligation shall be subject to the condition that there shall be no obligation on Tenant's part to comply with any Applicable Laws which require any capital improvements in or to the Leased Premises or the Building, unless the same are made necessary by any act or work performed by Tenant or by the particular nature of Tenant's business or the particular manner of Tenant's use of the Leased Premises. Tenant shall indemnify, defend and save Landlord harmless from all costs, losses, expenses or damages resulting from Tenant's failure to perform its obligations under this Section 12.01.

**SECTION 12.02 Tenant's Covenants Regarding Hazardous Substances.**

(a)      Tenant shall not cause or permit any Hazardous Substances, as defined below, to be brought upon or kept or used in or about the Leased Premises, the Building, or the Shopping Center by Tenant, its agents, employees, contractors, or invitees, unless (I) such Hazardous Substances are necessary for Tenant's business (and such business is a Permitted Use under this Lease) and (ii) Tenant first obtains the written consent of Landlord. Notwithstanding the foregoing, Landlord consents to Tenant's use of small quantities of products typically used in the ordinary course of operating for the Permitted Use. Without limiting the generality of the foregoing, Landlord acknowledges that the following Hazardous Substances, among others, are required for Tenant's business operations: x-ray and imaging equipment, medical waste, bleach, cidex, hibiclens, metrocide, hydrogen peroxide, formaldehyde, and the operation of x-ray and imaging equipment. All hazardous substances mentioned above shall be stored and handled pursuant to all applicable Environmental Laws and the right to use the same shall not remove or dismiss any obligations of Tenant to indemnify Landlord.

(b)      Tenant shall at all times and in all respects comply with all local, state and federal laws, ordinances, regulations and orders (collectively "Hazardous Substances Laws") relating to industrial hygiene, environmental protection, or the use, analysis, generation, manufacture, storage, disposal or transportation of any Hazardous Substances.

(c)      Tenant shall at its own expense procure, maintain in effect, and comply with all conditions of any and all permits, licenses, and other governmental and regulatory approvals required for Tenant's use of the Leased Premises, including, without limitation, discharge of (appropriately treated) materials or wastes into or through any sanitary sewer serving the Leased Premises, the Building, or the Shopping Center. Except as discharged into the sanitary sewer in strict accordance and conformity with all applicable Hazardous Substances Laws, Tenant shall cause any and all Hazardous Substances removed from the Leased Premises or from the Shopping Center (if at Tenant's direction), to be removed and transported solely by duly licensed haulers to duly licensed facilities for final disposal of such materials and wastes. Tenant shall in all respects handle, treat, deal with, and manage any and all Hazardous Substances in, on, under, or about the Leased Premises, the Building or the Shopping Center in total conformity with all applicable Hazardous Substances Law and prudent industry practices regarding management of such Hazardous Substances. Upon expiration, or earlier termination, of the Term of the Lease, Tenant shall cause such Hazardous Substances, if any (except such Hazardous Substances located in the Leased Premises prior to the Delivery Date), located in the Leased Premises and the Shopping Center (if Tenant caused such Hazardous Substances to be located on the Shopping Center), to be transported for use, storage, or disposal in accordance and compliance with all applicable Hazardous Substances Laws; provided, however, that Tenant shall not take any remedial action in response to the presence of any Hazardous Substances in or about the Leased Premises, the Building, or the Shopping Center, nor enter into any settlement agreement, consent decree, or other compromise in respect to any claims relating to any Hazardous Substances in any way connected with the Leased Premises, the Building, or the Shopping Center, without first notifying Landlord of Tenant's intention to do so and affording Landlord ample opportunity to appear, intervene, or otherwise appropriately assert and protect Landlord's interest with respect thereto; provided the foregoing shall not apply to operational directives, such as rules and regulations relating to disposal of Hazardous Substances or the operation of imaging equipment.

(d)      If at any time Tenant shall become aware, or have reasonable cause to believe, that any Hazardous Substance has come to be located on or beneath the Land upon which the Building is located, Tenant shall, promptly upon discovering such presence or suspected presence of the Hazard Substance, give written notice of that condition to Landlord. In addition, Tenant shall promptly notify Landlord in writing of (i) any enforcement, clean-up, completed, or threatened pursuant to any Hazardous Substances Laws, (ii) any claim made or threatened by any person against Landlord, the Leased Premises, the Building, or the Shopping Center relating to damage, contribution, cost recovery, compensation, loss or injury resulting from or claimed to result from any Hazardous Substances and (iii) any reports made to any local, state, or federal environmental agency arising out of or in connection with any Hazardous Substances in or removed from the Leased Premises, the Building, or the Shopping Center, including any complaints, notices, warnings, or assorted violations in connection therewith. Tenant shall also supply to Landlord as promptly as possible, and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings, or assorted violations relating in any way to the Leased Premises, the Building, the Shopping Center, or Tenant's use thereof. Tenant shall promptly deliver to Landlord copies of hazardous waste manifests reflecting the legal and proper disposal of all Hazardous Substances removed from the Premises or the Shopping Center.(e)      As used herein, "Hazardous Substances or Substances" means any hazardous or toxic substances, materials or wastes, including, but not limited to, those substances, materials, and wastes listed in the United States Department of Transportation Hazardous Materials Tables (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR Part 302) and amendments thereto, or such substances, materials and wastes which are or become regulated under any applicable local, state or federal law, including, without limitation, any material, waste or substance which is (I) petroleum, (ii) asbestos, (iii) polychlorinated biphenyl, (iv) defined as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. § 1251, et seq. (33 U.S.C. § 1321), (v) listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. § 1317), (vi) defined as a "hazardous waste" pursuant to Section 7004 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq. (42 U.S.C. § 6903), or (vii) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, et seq. (42 U.S.C. § 9601).

(f)      Tenant shall indemnify, defend (by counsel acceptable to Landlord), protect and hold harmless Landlord, and each of Landlord's partners, directors, officers, employees, agents, attorneys, successors and assigns, from and against any and all claims, liabilities, penalties, fines, judgments, forfeitures, losses, damages for the loss or restriction on use of rentable or usable space or of any amenity of the Leased Premises, the Building or the Shopping Center, costs, or expenses (including reasonable attorneys' fees, consultant fees, and expert fees) for the death of or injury of any person or damage to any property whatsoever,

arising from or caused in whole or in part, directly or indirectly, by (i) the presence in, on, under, or about the Leased Premises, the Building or the Shopping Center, or any discharge or release in or from the Leased Premises or the Real Property by Tenant, its agents, contractors or their employees, of any Hazardous Substances or Tenant's use, analysis, storage, transportation, disposal, release, threatened release, discharge or generation of Hazardous Substances to, in, on, under, about, or from the Leased Premises, the Building, or the Shopping, or (ii) Tenant's failure to comply with any Hazardous Substances Law.  Tenant's obligations under this Section 12.02(f) shall include, without limitation, and whether foreseeable or unforeseeable, any and all costs incurred in connection with any investigation of site conditions, and any and all costs of any required or necessary repair, cleanup, detoxification, or decontamination of the Leased Premises, the Building, or the Shopping Center (including, without limitation, the soil and ground water on or under the land upon which the Shopping Center is located) as required by Hazardous Substances Law, and the preparation and implementation of any closure, remedial action, or other required plans in connection therewith.  Tenant's obligations under this Section 12.02(f) shall survive the expiration or earlier termination of the Term of the Lease.  For purposes of the release and indemnity provisions hereof, any actions or omissions of Tenant, or by employees, agents, assignees, contractors, or subcontractors of Tenant or other acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful, or unlawful), shall be strictly attributable to Tenant.

## ARTICLE XIII

## ADVERTISING, ETC.

### SECTION 13.01  Solicitation of Business.

Tenant and Tenant's employees and agents shall not solicit business in the parking or other Common Areas, nor shall Tenant distribute any handbills or other advertising matter on automobiles parked in the parking area or in other Common Areas.

### SECTION 13.02  Advertised Name and Address.

Tenant may use as its advertised business address the name of the Shopping Center.  Tenant shall not use the name of the Shopping Center for any purpose other than as the address of the business to be conducted by Tenant in the Leased Premises, and Tenant shall not acquire any property right in or to any name which contains the name of the Shopping Center or a part thereof. Any permitted use by Tenant of the name of the Shopping Center during the Term of the Lease shall not permit Tenant to use, and Tenant shall not use, such name of the Shopping Center either after the termination of this Lease or at any other location.  Tenant shall not use the name of Landlord in any advertisement, or otherwise. Landlord acknowledges that the primary advertising of Tenant shall be in connection with the Hospital and shall reference the Hospital.

### SECTION 13.03  Letters and Marks.

Tenant may use in its advertising and promotional activities for its business in the Leased Premises such references to the name of the Shopping Center as such identifying lettering, marks or symbols referring to the Shopping Center in its address for the Leased Premises.  Any reference to the name of the Shopping Center must be done so in a tasteful manner and subject to Landlord's consent; provided use of the name of the Shopping Center as part of its address shall not require Landlord's approval.  Landlord acknowledges that the primary advertising of Tenant shall be in connection with the Hospital and shall reference the Hospital.

## ARTICLE XIV

## DESTRUCTION OF THE LEASED PREMISES

### SECTION 14.01  Total or Partial Destruction.

If the Leased Premises or any other portion of the protected area depicted in the site plan of the Shopping Center contained in Exhibit "A" herein (whether or not the Leased Premises are damaged) shall be damaged by fire, the elements, unavoidable accident or other casualty, in whole or in part (including appropriate ingress, egress access and parking), Landlord shall at its own expense cause such damage, except to Tenant's equipment and trade fixtures, to be repaired, and the Rent and other charges shall be proportionably abated to the extent Tenant is unable to use the Leased Premises for the Permitted Use.  If by reason of such occurrence at the Shopping Center, the Leased Premises (whether or not the Leased Premises are damaged) shall be rendered untenable for the Permitted Use only in part, Landlord shall at its own expense cause the damage, except to Tenant's equipment and trade fixtures, to be repaired, (which shall specifically include the obligation of Landlord to rebuild the Building (other than Tenant's Work) and Landlord shall repair and restore the parking areas and ingress, egress and access points, and the Minimum Annual Base Rent and all Additional Rent meanwhile shall be abated proportionably as to the portion of the Leased Premises that Tenant is unable to use for the Permitted Use; provided, however, if such damages (i) be as a result of a risk which is not covered by Landlord's insurance or exceeds the proceeds from such insurance, or (ii) the Building, whether the Leased Premises is damaged or not, or all of the buildings which then comprise the Shopping Center should be damaged to the extent of fifty (50%) percent or more of the then monetary value thereof, or (iii) if any or all of the buildings or Common Areas of the Shopping Center are damaged, whether or not the Leased Premises are damaged to such an extent that the Shopping Center cannot, in the reasonable judgment of Landlord, be operated as an integral unit and Landlord elects to terminate all other Lease similarly situated, or (iv) such damage shall occur during the last two (2) years of the Term of this Lease (or of any renewal Term) and Tenant does not exercise a then remaining renewal option, then in any of such events, Landlord shall have the right, to be exercised by notice to Tenant within thirty (30) days after the settlement of Landlord's insurance claims, to elect not to repair such damage and to cancel and terminate this Lease effective as of a date stipulated in Landlord's notice, which shall not be earlier than thirty (30) days nor later than sixty (60) days after the giving of such notice. If any or all of the Shopping Center protected area are damaged, whether or not the Leased Premises are damaged, to such an extent that the Shopping Center cannot be operated as an integral unit or if the Leased Premises cannot be reasonably operated for the Permitted Use, or if as a result of damage or destruction Tenant will not be able to reopen within 320 days (meaning that both Landlord shall have restored the Building and Common Areas and Tenant ability to restore Tenant's Work), then Tenant may terminate this Lease buy written notice to Landlord within 30 days after the date of the casualty. Upon the giving of such notice to or by Tenant, the Term of this Lease shall expire by lapse of time upon the third (3rd) day after such notice is given, and Tenant shall vacate the Leased Premises and surrender the same to Landlord. Whenever the Minimum Annual Base Rent and additional sums shall be abated pursuant to this Section 14.01, such abatement shall continue until the date which shall be the sooner to occur of (i) one hundred twenty (120) days after notice by Landlord to Tenant that Landlord has restored the Building and the Leased Premises have been substantially repaired and restored, or (ii) the date Tenant's business operations are restored in the entire Leased Premises. Unless this Lease is terminated by Landlord or Tenant, Tenant shall repair and refixture the interior of the Leased Premises in a manner and to at least a condition equal to that existing prior to its destruction or casualty. If the Shopping Center and Leased Premises are damaged and not restored by Landlord (as required by this Lease) within 320 days after the date of the casualty, or if the rent and other sums payable under this Lease will not be abated during the period of restoration, then Tenant may terminate this Lease by written notice to Landlord. If this Lease is terminated as a result of a casualty, Landlord shall retain all insurance proceeds for insurance obtained by Landlord and Tenant shall retain any insurance proceeds from insurance on Tenant's improvements, leasehold improvements, fixtures, furnishings and equipment carried by Tenant

**SECTION 14.02  Reconstruction of Improvements.**

In the event of any reconstruction of the Leased Premises or the Shopping Center under this Section, said reconstruction shall be in substantial conformity with the provision of Exhibit "B;" provided in all events Landlord shall restore the Building (but not Tenant's Work) to the condition that existed immediately prior to the casualty event in accordance with applicable laws and codes. Tenant, at its sole cost and expense, shall promptly upon completion of Landlord's restoration obligations in the preceding sentences commence its restoration work and shall be responsible for the repair and restoration of all items set forth as "Tenant's Work" in **Exhibit "B"** and the replacement of its stock in trade fixtures, furniture, furnishings and equipment. Tenant shall commence the installation of fixtures, equipment, and merchandise hereof promptly upon delivery to it of possession of the Leased Premises and shall diligently prosecute such installation to completion.

## ARTICLE XV

## EMINENT DOMAIN

**SECTION 15.01  Total Condemnation.**

If the whole of the Leased Premises or if any or all of the Shopping Center or Common Areas are taken, whether or not the Leased Premises are taken, to such an extent that the Shopping Center cannot be operated as an integral unit or if the Leased Premises cannot be reasonably operated for the Permitted Use as a result of eminent domain for any public or quasi-public use or purpose, then the Term of this Lease shall cease and terminate as of the date of title vesting in such proceeding and all rentals and other charges shall be paid up to that date and Tenant shall have no claim against Landlord for the value of any unexpired Term of this Lease.

**SECTION 15.02  Partial Condemnation.**

If any part of the Leased Premises or if any or all of the Shopping Center or a material portion of the Common Areas are taken, whether or not the Leased Premises are taken, to such an extent that the Shopping Center cannot be operated as an integral unit or if the Leased Premises cannot be reasonably operated for the Permitted Use shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, and in the event that such partial taking or condemnation shall, in the opinion of Landlord or Tenant, render the Leased Premises unsuitable for the business of Tenant, then Landlord and Tenant shall each have the right to terminate this Lease by notice given to the other within sixty (60) days after the date of title vesting in such proceeding, and Tenant shall have no claim against Landlord for the value of any unexpired Term of this Lease. In the event of a partial taking or condemnation which is not extensive enough to render the Leased Premises unsuitable for the business of Tenant, then Landlord shall promptly restore the Leased Premises (exclusive of Tenant's equipment and trade fixtures) and Shopping Center including the Common Areas to a condition comparable to its condition at the time of such condemnation less the portion lost in the taking and the building of which the Leased Premises forms a part to the extent necessary to constitute the portion of the Building not so taken as a complete architectural unit; provided that Landlord shall not in any event be required to spend for such repair, restoration or alteration work an amount in excess of the respective amounts received by Landlord as damages for the taking of such part of the Leased Premises and of the Building of which the same forms a part. As used herein, the amount "received by Landlord" shall mean that portion of the award or damages in condemnation received by Landlord from the condemning authority which is free and clear of all prior claims or collections by the holders of any mortgages or deeds of trust or any ground or underlying lessors, and this Lease shall continue in full force and effect except that the Minimum Annual Base Rent shall be reduced in proportion to the portion of the Leased Premises lost in the taking. If more than twenty (20%) percent of the floor area of the Buildings in the Shopping Center shall be taken as aforesaid (whether or not the Leased Premises shall be affected by the taking), Landlord or Tenant shall have the right to terminate this Lease by notice to the other given within sixty (60) days after the date of title vesting in such proceeding and Tenant shall have no claim against Landlord for the value of the unexpired Term of this Lease. If the Leased Premises and Shopping Center are not restored within 320 days of the date of the taking, then Tenant may terminate this Lease by written notice to Landlord.

**SECTION 15.03  Landlord's Damages.**

Except as provided in Section 15.04 in the event of any condemnation or taking as hereinabove provided, whether whole or partial, Tenant shall not be entitled to any part of the award, as damages or otherwise, for such condemnation and Landlord is to receive the full amount of such award, Tenant hereby expressly waiving any right or claim to any part thereof.

**SECTION 15.04  Tenant's Damages.**

Although all damages in the event of any condemnation are to belong to Landlord whether such damages are awarded as compensation for diminution in value of the Leasehold or the fee of the Leased Premises, Tenant shall have the right to claim and recover from the condemning authority, but not from Landlord, such compensation as may be separately awarded or recoverable by Tenant in Tenant's own right on account of any damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in removing Tenant's merchandise, furniture, fixtures, leasehold improvements and equipment and for the unamortized value of Tenant's leasehold improvements. Each party agrees to execute and deliver to the other all instruments that may be required to effectuate the provisions of Section 15.03 and this Section 15.04.   Notwithstanding the foregoing, the language contained in the Ground Lease shall control over any contradictory language contained herein.

**SECTION 15.05  Sale Under Threat of Condemnation.**

A sale by Landlord to any authority having the power of eminent domain, either under threat of condemnation or while condemnation proceedings are pending, shall be deemed a taking under the power of eminent domain for all purposes under this Article.

## ARTICLE XVI

## DEFAULT OF TENANT

**SECTION 16.01  Events of Default.**

Upon the happening of one or more of the events as expressed below in (I) to (viii), inclusive (individually and collectively, "Event of Default"), Landlord shall have any and all rights and remedies hereinafter set forth:

(i)       In the event Tenant should fail to pay any (A) monthly installment of Minimum Annual Base Rent or monthly estimated payments of Shopping Center Operating Costs, as and when the same become due and payable and such failure shall continue for ten (10) days after written notice provided Landlord shall only be obligated to provide such notice twice in any twelve month period, or (B) any Additional Rent when due and such failure shall continue for fifteen (15) days after written notice.

(ii)      In the event a petition in bankruptcy (including Chapter VII and Chapter XI bankruptcy proceedings or any other reorganization proceedings under the Bankruptcy Code or any successor statute) is filed by Tenant, or is filed against Tenant, and such petition is not dismissed within sixty (60) days from the filing thereof, or in the event Tenant is adjudged bankrupt.

(iii)      In the event an assignment for the benefit of creditors is made by Tenant.

(iv)      In the event of an appointment by any court of a receiver or other court officer of Tenant's property and such receivership is not dismissed within thirty (30) days from such appointment.

(v)      (vii)      In the event an execution or other legal process is levied upon the goods, furniture, effects or other property of Tenant brought on the Leased Premises, or upon the interest of Tenant in this Lease, and the same is not satisfied or dismissed within forty five (45) days from this levy.

(viii)      If Tenant is a corporation, Tenant's corporate status shall continuously be in good standing and active and current with the state of its incorporation and the state in which the Center is located at the time of execution of the Lease and at all times thereafter, and Tenant shall keep its corporate status active and current throughout the term of the Lease or any extensions or renewals. Tenant shall annually file with Landlord a current copy of the Certificate of Good Standing under Seal. Failure of Tenant to keep its corporate status active and current shall constitute a default under the terms of the Lease.

(ix)      In the event Tenant fails to keep, observe or perform any of the other terms, conditions or covenants on the part of Tenant herein to be kept, observed and performed for more than thirty (30) days after written notice thereof is given by Landlord to Tenant specifying the nature of such default, or if the default so specified shall be of such a nature that the same cannot reasonably be cured or remedied within said thirty (30) day period, if Tenant shall not in good faith have commenced the curing or remedying of such default within such thirty (30) day period and shall not thereafter continuously and diligently proceed therewith to completion.

**SECTION 16.02  Remedies of Landlord.**

(a)      Upon the occurrence of any Event of Default, Landlord shall have the option without further notice or demand to:

(i)      Sue for rents as they become due;

(ii)      Terminate this Lease, resume possession of the Leased Premises by summary proceedings, or otherwise, in accordance with Florida law (together with all additions, alterations, fixtures and improvements thereto) for its own account and recover immediately from Tenant any and all sums and damages for violation of Tenant's obligations hereunder in existence or due at the time of termination and damages for Tenant's default in an amount equal to the net present value difference between the Rent for which provision is made in this Lease and fair rental value of the Leased Premises for the remainder of the Lease Term, together with all other charges, rental payments, costs and expenses herein agreed to be paid by Tenant, all costs and expenses of Landlord in connection with any attempts to re-lease or re-let the Leased Premises (including, but not limited to, broker's fees, advertising costs and cleaning expenses) the costs of recovering the Leased Premises, and the costs of repairs and renovations reasonably necessary in connection with any re-leasing or re-letting;

(iii)      Resume possession and re-lease or re-rent the Leased Premises for the remainder of the Lease Term for the account of Tenant and recover from Tenant at the end of the Lease Term or at the time each payment of Rent becomes due under this Lease, as Landlord may elect, the difference between the Rent for which provision is made in this Lease and the Rent received on the re-leasing or re-renting, if any, together with all costs and expenses of Landlord in connection with such re-leasing or re-rental and collection of Rent and the cost of all repairs or renovations reasonably necessary in connection with the re-leasing or re-rental, and if this option is exercised, Landlord shall, in addition, be entitled to recover from Tenant immediately any other damages occasioned by or resulting from the abandonment or a breach or default other than a default in the payment of Rent; or

(iv)      Accelerate the whole or any part of Rent, Additional Rent and Operating Costs for the entire unexpired balance of the Term, as well as all other charges, payments, costs and expenses to be paid by Tenant hereunder, including but not limited to damages for violation of Tenant's obligations hereunder in existence at the time of acceleration so that all sums due and payable under this Lease will be treated as payable in advance on the date of acceleration and this Lease will remain in effect. For the purpose of determining the amounts due upon acceleration, Rent, Additional Rent and Tenant's Pro Rata Share of Operating Costs shall be treated as fixed at the levels in effect on the date of acceleration for the remaining Term of this Lease; but to the extent required by law, the total amount so accelerated will be reduced to present value and Landlord shall account to Tenant for any excess amounts received.

Landlord shall use commercially reasonable efforts to mitigate any damages from a Tenant default. .

(b)      Notwithstanding the foregoing, with respect to re-lease or re-renting the Leased Premises, Landlord and Tenant agree that Landlord shall only be required to use the same efforts Landlord then uses to lease other properties Landlord owns or manages (or if the Leased Premises is then managed for Landlord, then Landlord shall instruct such manager to use the same efforts such manager then uses to lease other space or properties which it owns or manages); provided, however, that Landlord (or its manager) shall not be required to give any preference or priority to the showing or leasing of the Leased Premises over any other space that Landlord (or its manager) may be leasing or have available and may place a suitable prospective tenant in any such available space regardless of when such alternative space becomes available; provided, further, that Landlord shall not be required to observe any instruction given by Tenant about such re-letting or accept any tenant unless such offered tenant has a creditworthiness acceptable to Landlord, leases the entire Leased Premises, agrees to use the Leased Premises in a manner consistent with the Lease, and leases the Leased Premises at the same or greater Rent, for no more than the current Term and on the same terms and conditions of this Lease without the expenditure by Landlord for tenant improvements or broker's commissions.

(c)      In the event Landlord has secured the right by law to dispossess Tenant of the Leased Premises, and should Tenant fail to remove its property therefrom within ten (10) days of notice from Landlord, Landlord shall have the right to remove all or any part of Tenant's property from the Leased Premises and any property removed may be stored in any public warehouse or elsewhere at the cost of, and for the account of Tenant and Landlord shall not be responsible for the care or safekeeping thereof, and Tenant hereby waives any and all loss, destruction and/or damage or injury which may be occasioned by any of the aforesaid acts.

(d)      No such re-entry or taking possession of the Leased Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease unless a written notice of such intention is given to Tenant. Notwithstanding any such reletting without termination, Landlord may, at all times thereafter, elect to terminate this Lease for such previous default or breach. Any such re-entry shall be allowed by Tenant without hindrance, and Landlord shall not be liable in damages for any such re-entry, or guilty of trespass or forcible entry.

(e)      Any Rent which may be due Landlord, whether by acceleration or otherwise, as herein provided in this Article, shall include Minimum Annual Base Rent, Percentage Rent (if applicable), and any other costs and expenses denominated as Additional

Rent in this Lease.

(f)     In the event that Tenant fails to completely fulfill or perform any of its monetary or non-monetary duties and obligations set forth herein and such failure continues beyond the applicable notice and cure periods set forth herein, Landlord may, in its sole discretion, perform or cause to be performed any and all such duties and obligations.  If Landlord expends any sums of money in the performance of any of the monetary or non-monetary duties and obligations of Tenant set forth herein, any such sums of money expended by Landlord shall become additional amounts of rental due under this Lease and shall be paid by Tenant immediately upon demand, together with interest at the Default Rate from the date of such demand to the date of payment by Tenant.

(g)     In the event that Tenant fails to completely fulfill or perform any of its monetary or non-monetary duties and obligations set forth herein, during the term of this Lease including any extensions, renewals or assignments, Landlord may, in its sole discretion revoke any Exclusive rights that Tenant may have and declare them null and void.

(g)     .

### SECTION 16.03 Survival of Tenant's Obligations.

No expiration or termination of the Term of this Lease pursuant to Section 16.02 hereof or by operation of law or otherwise (except as expressly provided herein), and no repossession of the Leased Premises pursuant to Section 16.02 hereof or otherwise, shall relieve Tenant of its liability and obligations hereunder, all of which shall survive any such expiration, termination or repossession.

### SECTION 16.04 Lien for Rent.

Landlord waives any contractual or statutory lien for rent.

### SECTION 16.05 Trustee's Rights in Bankruptcy.

In the event that Tenant becomes the subject debtor in a case pending under the United States Bankruptcy Code, Landlord's right to terminate this Lease pursuant to Section 16.02 shall be subject to the rights of the Trustee in Bankruptcy to assume or assign this Lease.  The Trustee shall not have the right to assume or assign this Lease unless the Trustee: (I) promptly cures all defaults under this Lease; (ii) compensates Landlord for monetary damages incurred as a result of such default; and (iii) provides adequate assurances of future performance.

(a)     Landlord and Tenant hereby agree in advance that the phrase "adequate assurances of future performance" as used in this Article shall mean that all of the following minimum criteria must be met: (I) the Trustee may pay to Landlord, at the time the next payment of Minimum Annual Base Rent is due under this Lease, in addition thereto, an amount equal to the next three (3) payments of Minimum Annual Base Rent due under this Lease, said amount to be held by Landlord in escrow until either the Trustee or Tenant defaults under this Lease, whereupon Landlord shall have the right to draw and apply such escrow funds, or until the expiration of this Lease, whereupon such escrow funds shall be promptly returned to the Trustee or Tenant; (ii) Tenant or the Trustee must agree to pay to Landlord, at any time Landlord is authorized to and does draw and apply the escrow funds, an amount necessary to restore such escrow account to the original level required hereunder; (iii) the Trustee must agree that Tenant's business shall be conducted in a first class manner and that no liquidation sales, auctions, or other non-first class business operations or activities shall be conducted on the Leased Premises; (iv) the Trustee must agree that the assumption or assignment of this Lease will not violate or adversely affect the rights of any other tenants in the Shopping Center; and (v) the Trustee must agree that the use of the Leased Premises as stated in this Lease will remain unchanged.

(b)     In the event Tenant is unable to: (I) cure its defaults; (ii) reimburse Landlord for its monetary damages; (iii) pay the Minimum Annual Base Rent or Additional Rent required of Tenant under this Lease, on time as herein provided; or (iv) meet the criteria and obligation imposed by this Article, then Tenant agrees in advance that it has not met its burden to provide adequate assurances of future performance and this Lease may be terminated by Landlord as otherwise provided in this Lease.

### SECTION 16.06 Waiver.

No failure by Landlord or Tenant to insist upon the strict performance of any term hereof, or to exercise any right, power or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or of any such term.  The waiver by Landlord or Tenant of any breach of any term, condition or covenant herein contained shall not be effective unless in writing and signed by Landlord or Tenant, as the case may be, and shall not be a waiver of any other term, condition or covenant herein contained.  The consent or approval by Landlord to or of any act by Tenant requiring Landlord's consent or approval shall not be deemed to waive or render unnecessary Landlord's consent to or approval of any subsequent similar act by Tenant.  No re-entry by Landlord hereunder shall bar the recovery of rents or damages for the breach of any terms, conditions or covenants on the part of Tenant herein contained.  The receipt of Rent after the occurrence of any Event of Default on the part of Tenant, or the delay on the part of Landlord to enforce any right hereunder, shall not be deemed a waiver of forfeiture, or a waiver of the right of Landlord to annul this Lease or to re-enter the Leased Premises or to re-let same.

### SECTION 16.07 Expenses of Enforcement.

In the event any payment due Landlord under this Lease shall not be paid within five days of the due date, Tenant agrees to pay interest on the amount which is delinquent at the lesser of (x) highest rate permitted under the laws of the state in which the Shopping Center is located, or (y) ten percent (10%) per annum ("Default Rate"), for such delinquent payment until made.  In the event any check, bank draft, order for payment or negotiable instrument given to Landlord for any payment under this Lease shall be dishonored for any reason whatsoever not attributable to Landlord, Landlord shall be entitled to make an administrative charge to Tenant of One Hundred ($100.00) Dollars.  Tenant recognizes and agrees that the charge which Landlord is entitled to make upon the conditions stated in this Section 16.07 represent, at the time of this Lease is made, a fair and reasonable estimate and liquidation of the costs of Landlord in the administration of the Shopping Center resulting to Landlord from the events described which costs are not contemplated or included in any other rental or charges provided to be paid by Tenant to Landlord in this Lease.  Any charges becoming due under this Section of this Lease shall be added and become due with the next ensuing monthly payment of Minimum Annual Base Rent and shall be collectible as a part thereof.  With respect to any default or failure to perform on the part of Tenant, or any other dispute between Tenant and Landlord arising out of this Lease, Landlord shall be entitled to recover all costs incurred, including reasonable attorneys' fees, which shall include, but not be limited to, such fees incurred prior to institution of litigation and in bankruptcy or other administrative or judicial proceeding, and such costs, expenses and attorneys' fees incurred by or on behalf of Landlord shall constitute Additional Rent hereunder, and shall be paid upon written demand thereof.

### SECTION 16.08 Tenant's Waiver of Statutory Rights.

In the event of any termination of the Term of this Lease or any repossession of the Leased Premises, pursuant to Section 16.01 hereof, Tenant, insofar as permitted by law, hereby waives any notice of re-entry or of the institution of legal proceedings to that end, and any right of redemption, re-entry or repossession.

- 18 -

**SECTION 16.9  Remedies Cumulative.**

Each right, power and remedy of Landlord provided for in this Lease shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Lease or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Landlord of any one or more of the rights, powers or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by Landlord of any or all such other rights, powers or remedies.

**SECTION 16.10  Acceptance of Surrender.**

No surrender to Landlord of this Lease, or of the Leased Premises or any part thereof or of any interest therein, shall be valid or effective unless agreed to and accepted in writing by Landlord, and no act of Landlord other than such a written agreement and acceptance by Landlord shall constitute an acceptance of any such surrender.

**SECTION 16.11  Tenant's Remedies.**

In the event of any violation of this Lease by Landlord, Tenant's exclusive remedy shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon Rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such violation with particularity, and Landlord shall thereupon have thirty (30) days in which to cure any such violation, or in which to commence to cure and thereafter diligently pursue a cure of such violation. Unless and until Landlord fails to so cure any violation with particularity, and Landlord shall thereupon have thirty (30) days in which to cure any such violation, or in which to commence to cure and thereafter diligently pursue a cure of such violation. Unless and until Landlord fails to so cure any violation after such notice, Tenant shall not have any remedy or cause of action by reason thereof. Upon the expiration of the cure period (a) Tenant may exercise self-help rights to cure such default and Tenant shall offset any reasonable third party costs incurred by Tenant against the Minimum Rent and Shopping Center Operating Costs payable under this Lease, and/or (b) shall be an action for injunctive relief, specific performance, declaratory relief. Landlord agrees that Tenant may pursue injunctive relief or specific performance without a showing of actual damages. Unless and until Landlord fails to so cure any default as required hereunder after such notice, Tenant shall not have any remedy or cause of action by reason thereof. All obligations of Landlord hereunder will be construed as covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Shopping Center and not thereafter.

# ARTICLE XVII

# ACCESS BY LANDLORD

**SECTION 17.01  Right of Entry.**

Landlord and Landlord's agent shall have the right to enter the Leased Premises at all reasonable time upon reasonable prior notice (except in an emergency) and subject to the right of privacy of Tenant's patients, to examine the same, and to show them to Prospective purchasers of the Building, and to make such repairs, or alterations, improvements or additions as Landlord may deem necessary or desirable; provided in making repairs Landlord shall use commercially reasonable efforts to mitigate any interference with Tenant's operations. Landlord shall be allowed to take all material into and upon the Leased Premises that may be required therefore without the same constituting an eviction of Tenant in whole or in part, and the Rent reserved shall in no way abate while said repairs, alterations, improvements or additions are being made unless Tenant is prevented from operating in the Leased Premises for the Permitted Use in whole or in part, in which event Rent shall be proportionately abated during said period. During the six (6) months prior to the expiration of the Term of this Lease or any renewal Term, Landlord may exhibit the Leased Premises to prospective tenants or purchasers, and place upon the Leased Premises the usual notices "To Let" or "For Sale" which notices Tenant shall permit to remain thereon without molestation. If Tenant shall not be personally present to open and permit an entry into the Leased Premises, at any time, when for any reason an entry therein shall be necessary or permissible, Landlord or Landlord's agents may enter the same without in any manner affecting the obligations and covenants of this Lease. Nothing herein contained, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever, for the care, maintenance or repair of the Building or any part thereof, except as otherwise herein specifically provided.

**SECTION 17.02  Roof and Walls.**

Landlord shall have the exclusive right to use all or any part of the roof of the Leased Premises for any purpose; to erect additional stories or other structures over all or any part of the Leased Premises; to erect in connection with the construction thereof temporary scaffolds and other aids to construction on the exterior of the Leased Premises, provided that access to the Leased Premises shall not be denied; and to install, maintain, use, repair and replace within the Leased Premises pipes, ducts, conduits, wires and all other mechanical equipment serving other parts of the Shopping Center, the same to be in locations within the Leased Premises as will not unreasonably deny Tenant's use thereof. Landlord may make any use it desires of the side or rear walls of the Leased Premises, provided that such use shall not encroach on the interior of the Leased Premises. Tenant agrees to give Landlord access to the Leased Premises for the purposes of this Section 17.02.

# ARTICLE XVIII

# TENANT'S PROPERTY

**SECTION 18.01  Taxes on Leasehold or Personal Property.**

Tenant shall be responsible for and shall pay before delinquent all municipal, county or state taxes assessed during the Term of this Lease against any leasehold interest or personal property of any kind, owned by or placed in, upon or about the Leased Premises by Tenant.

**SECTION 18.02  Loss and Damage.**

Landlord shall not be responsible for any damage to property of Tenant or of others located in the Leased Premises nor for the loss of or damage to any property of Tenant or of others by theft or otherwise, except to the extent caused by the gross negligence or willful acts of Landlord, its agents, contractor or their employees. Landlord shall be not liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain, or leaks from any pipes, appliances or plumbing works or from the roof, street or subsurface or from any other place or by dampness or by any other cause of whatsoever nature, except to the extent caused by the gross negligence or willful acts of Landlord, its agents, contractor or their employees. Landlord shall not be liable for any such damage caused by other tenants or persons in the Leased Premises, occupants of adjacent property, of the Shopping Center, or the public, or caused by operations in construction of any private, public or quasi-

public work. Landlord shall not be liable for any defect, latent or otherwise, in the Leased Premises or in the Building of which they form a part, except that if Tenant shall give notice to Landlord within a period of one (I) year from the date Tenant takes possession of the Leased Premises of the existence of any such latent defect, then provided such defect shall not have resulted from any act, alteration or improvement made by Tenant, Landlord shall repair such defect. All property of Tenant kept or stored on the Leased Premises shall be so kept or stored at the risk of Tenant only and Tenant shall hold Landlord harmless from any and all claims arising out of damage to same, including subrogation claims by Tenant's insurance carriers.

**SECTION 18.03  Notice by Tenant.**

Tenant shall give prompt notice to Landlord in case of fire or accidents in the Leased Premises or in the Building of which the Leased Premises are a part or of defects therein or in any fixtures or equipment.

**ARTICLE XIX**

**HOLDING OVER; SUCCESSORS**

**SECTION 19.01  Holding Over.**

In the event Tenant remains in possession of the Leased Premises after the expiration of the tenancy created hereunder, and without the execution of a new lease, Tenant, at the option of Landlord, shall be deemed to be occupying the Leased Premises as a Tenant from month-to-month, at a monthly rent equal to 125% of the Minimum Annual Base Rent payable during the last month of the Lease Term for the first two months and 150% thereafter. In addition to the Minimum Annual Base Rent Tenant agrees to pay monthly (a) one-twelfth (1/12th) of the average percentage rent payable hereunder, if any, for the last three (3) Lease Years, and (b) the monthly Shopping Center's Operating Costs payable for such month, such tenancy to be subject to all the other conditions, provisions and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy.

**SECTION 19.02  Successors.**

All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors, and permitted assigns of the said parties; and if there shall be more than one Tenant, they shall be bound jointly and severally by the terms, covenants and agreements herein. No rights, however, shall inure to the benefits of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing as provided in Section 11.01 hereof. Nothing contained in this Lease shall in any manner restrict Landlord's right to assign or encumber this Lease and, in the event Landlord sells or transfers its interest in the Shopping Center and the purchaser or transferee assumes Landlord's obligations and covenants, Landlord shall thereupon be relieved of all further obligations hereunder.

**ARTICLE XX**

**QUIET ENJOYMENT**

Upon payment by Tenant of the Rents herein provided, and upon the observance and performance of all the covenants, terms and conditions on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Leased Premises for the Term hereby demised without hindrance or interruption by Landlord or any other person or persons lawfully or equitably claiming by, through or under Landlord, subject, nevertheless, to the terms and conditions of this Lease.

**ARTICLE XXI**

**OPTION**

If and only if, no Event of Default shall then exits beyond the applicable notice and cure periods, then the Tenant, by giving Landlord written notice not less than one hundred eighty  (180) days nor more than one year prior to the expiration of the initial lease term, shall have the right to renew this lease for Four (4) terms of Five (5) years upon the same terms, covenants and conditions as the initial term of this lease. The first extended Term will commence from the date of the expiration of the initial Term and successive extended Terms will commence from the expiration of the prior extended Term. All of the terms, covenants and conditions of this Lease will apply during the extended Term with the exception of (a) for the Minimum Annual Base Rent during extended Terms will be adjusted, commencing on the first day of each year of the renewal period ("Adjustment Date"), as set forth in Section (t) of the Lease Summary, (b) there shall be no further option to extend the Term of this Lease, and (c) Landlord shall have no obligation to improve the Leased Premises.  In the event Tenant does not give timely notice of exercising its right to renew this Lease, all succeeding renewals shall terminate.

**ARTICLE XXII**

**MISCELLANEOUS**

**SECTION 22.01  Accord and Satisfaction.**

No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying the check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided in the Lease or by law.

**SECTION 22.02  Entire Agreement; Modification.**

This Lease and the Exhibits, and Amendment(s), if any, attached hereto and forming a part hereof, set forth all covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Leased Premises and there are no covenants, promises, conditions or understandings, either oral or written, between them other than as herein set forth.  No provision of this Lease may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successors in interest.

**SECTION 22.03  No Partnership.**

Landlord does not, in any way or for any purpose, become a partner of Tenant in the conduct of its business, or otherwise, or joint venture or a member of a joint enterprise with Tenant.  The provisions of this Lease relating to the percentage of Rent payable hereunder are included solely for the purpose of providing a method whereby the Rent is to be measured and ascertained.

**SECTION 22.04  Force Majeure.**

In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any terms, conditions or covenants required hereunder by reason of an Act of God, strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under the Terms of this Lease, then performance on any such act shall be extended for a period of such delay. Notwithstanding the foregoing, the provisions of this Section 22.04 shall not operate to excuse Tenant from the prompt payment of Minimum Annual Base Rent, Percentage Rent (if any), Additional Rent or any other payments required by the Terms of this Lease.

### SECTION 22.05 Notices.

Any notice, consent, approval or other communication given pursuant to the provisions of this Agreement shall (except where otherwise permitted by this Agreement) be in writing and shall be (I) delivered by hand, (ii) three (3) days after mailing if mailed by certified mail or registered mail, return receipt requested, postage prepaid, or (iii) delivered by a nationally recognized overnight courier, U.S. Post Office Express Mail, or similar overnight courier which delivers only upon signed receipt of the addressee, and addressed as described in Sections (b) and (c) of the Lease Summary, as the case may be. The time of the giving of any notice shall be the time of receipt thereof by the addressee or any agent of the addressee, except that in the event the addressee or such agent of the addressee shall refuse to receive any notice given by registered mail or certified mail as above provided or there shall be no person available at the time of the delivery thereof to receive such notice, the time of the giving of such notice shall be the time of such refusal or the time of such delivery, as the case may be. Any party hereto may, by giving five (5) days written notice to the other party hereto, designate any other address in substitution of the foregoing address to which notice shall be given.

### SECTION 22.06 Captions and Section Numbers.

The captions, section numbers, article numbers and index appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such sections or articles of this Lease nor in any way affect this Lease.

### SECTION 22.07 Defined Terms; Use of Pronoun.

The term "Tenant" shall be deemed and taken to mean each and every person mentioned as a Tenant herein be the same, one or more. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, or a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or Tenant and to either corporations, associations, partnerships, or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

The term "Landlord" shall mean only the owner, for the time being of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Leased Term upon each new owner for the duration of such owner's ownership. Notwithstanding any other provision hereof, Landlord shall not have any personal liability hereunder as provide in Section 22.13.

### SECTION 22.08 Binding Effect.

This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the parties hereto.

### SECTION 22.09 Brokers Commission.

Each of the parties represents and warrants that it has dealt with no broker or brokers in connection with the execution of this Lease, except as set forth in Section (w) of the Lease Summary, and each of the parties agrees to indemnify the other against, and hold it harmless from, all liabilities arising from any claim for brokerage commissions or finder's fees resulting from the indemnitor's acts (including, without limitation, the cost of counsel fees in connection therewith) except as set forth in Section (w) of the Lease Summary.

### SECTION 22.10 Partial Invalidity.

If any term, covenant or condition of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

### SECTION 22.11 Effectiveness of Lease.

The submission of this Lease for examination does not constitute a reservation of or option for the Leased Premises and this Lease becomes effective as a lease only upon execution and delivery thereof by Landlord to Tenant, and the receipt of the full security deposit, and if paid by check, subject to clearance.

### SECTION 22.12 Recording.

Landlord agrees to execute a memorandum of lease in recordable form on Tenant's request

### SECTION 22.13 Liability of Landlord.

Anything contained in this Lease at law or in equity to the contrary notwithstanding, Tenant expressly acknowledges and agrees that there shall at no time be or be construed as being any personal liability by or on the part of Landlord under or in respect of this Lease or in any way related thereto or the Leased Premises; it being further acknowledged and agreed that Tenant is accepting this Lease and the estate created hereby upon and subject to the understanding that it shall not enforce or seek to enforce any claim or judgment or any other matter, for money or otherwise, personally or directly against any officer, director, stockholder, partner, principal (disclosed or undisclosed), representative or agent of Landlord, but will look solely to Landlord's interest in the Shopping Center and the proceeds from any sale or other transfer for the satisfaction of any and all claims, remedies or judgments (or other judicial process) in favor of Tenant requiring the payment of money by Landlord in the event of any breach by Landlord of any of the terms, covenants or agreements to be performed by Landlord under this Lease or otherwise, subject, however, to the prior rights of any ground or underlying lessors or the holders of the mortgages covering the Shopping Center, and no other assets of Landlord shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claims; such exculpation of

personal liability as herein set forth to be absolute, unconditional and without exception of any kind.

### SECTION 22.14  Time of the Essence.

Time is of the essence in this Lease and each and all of its provisions in which performance is a factor.  Any period measured in "days" shall mean consecutive calendar days, except that the expiration of any time period incurred in days that expires on a Saturday, Sunday or legal holiday, automatically will be extended to the next day which is not a Saturday, Sunday or legal holiday.

### SECTION 22.15  Estoppel Information.

When the Commencement Date is determined, Tenant agrees, upon request of Landlord, to execute and deliver to Landlord, without charge and within twenty (20) days following request therefore, a written declaration in form satisfactory to Landlord: (i) ratifying this Lease; (ii) confirming the commencement and expiration dates of the Term of this Lease; (iii) certifying that Tenant is in occupancy of the Leased Premises, the date Tenant commenced operating Tenant's business therein and that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended, except by such writings as shall be stated; (iv) that, to Tenant's knowledge, all conditions under this Lease to be performed by Landlord has been satisfied, except such as shall be stated; (v) that, to Tenant's knowledge, there are no defenses or offsets against the enforcement of this Lease by Landlord, or stating those claimed by Tenant; (vi) reciting the amount of advance rental, if any, paid by Tenant and the date to which rental has been paid; and (vii) reciting the amount of security deposited with Landlord, if any.  Tenant agrees to execute and deliver similar declarations at any time and from time to time and within twenty (20) days following request therefore by Landlord or by any mortgage lenders or ground or underlying lessor and or purchasers of the Shopping Center, and each of such parties shall be entitled to rely upon such written declaration made by Tenant.  Tenant's failure or refusal to execute the declaration required hereunder within twenty (20) days following the request therefore will constitute a default hereunder and Landlord shall have such rights and remedies against Tenant as is available to Landlord for Tenant's default.

### SECTION 22.16  Consent.

Except as otherwise provided in this Lease, the consent of Landlord shall not be unreasonably withheld or delayed.  In each instance in this Lease in which the consent of either party is required, such consent shall deem to have been given if not received within ten (10) days of the request therefore.

### SECTION 22.17  Litigation.

Should either party employ an attorney or attorneys to enforce any of the provisions hereof, or to protect its interests in any matter arising under this Agreement, or to recover damages for the breach of this Agreement, the party prevailing in any final judgment shall be entitled to the payment by the other party of all reasonable costs, charges and expenses, including attorneys' fees at trial and at all appellate levels, if any, expended or incurred in connection therewith by the prevailing party.

### SECTION 22.18  Waiver of Jury Trial.

The parties hereto waive trial by jury in connection with proceedings or counterclaims brought by either of the parties hereto against the other.

### SECTION 22.19  Interpretation.

It is agreed that in the construction and interpretation of the Terms of this Lease, the rule of construction that a document is to be construed most strictly against the party who prepared the same shall not be applied, it being agreed that both parties hereto have participated in the preparation of the final form of this Lease.

### SECTION 22.20  Choice of Law.

This Lease shall be governed by the laws of the State of Florida.

### SECTION 22.21  Radon Gas.

The following notice is given pursuant to Section 404.056 of the Florida Statutes:  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who were exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county public health unit.

### SECTION 22.22  Counterparts.

This Lease may be executed in multiple copies, each of which shall be deemed an original, and all of such copies shall together constitute one and the same instrument.

### SECTION 22.23  Acceptance of Funds by Landlord.

No receipt of money by Landlord from Tenant after the termination of this Lease or after the service of any notice or after the commencement of any suit, or after final judgment for possession of the Leased Premises shall reinstate, continue or extend the Term of this Lease or affect any such notice, demand or suit.

### SECTION 22.24  Tenant's Authority.

Tenant and Landlord each hereby represents and warrants to the other that it is a duly formed and existing entity qualified to do business in the state in which the Project is located and that it has full right and authority to execute and deliver this Lease and that each person signing on behalf of it is authorized to do so.  Each party confirms that it is not in violation of any executive order or similar governmental regulation or law, which prohibits terrorism or transactions with suspected or confirmed terrorists or terrorist entities or with persons or organizations that are associated with, or that provide any form of support to, terrorists.  Each party further confirms that it will comply throughout the Term of this Lease, with all governmental laws, rules or regulations governing transactions or business dealings with any suspected or confirmed terrorists or terrorist entities, as identified from time to time by the U.S. Treasury Department's Office of Foreign Assets Control or any other applicable governmental entity.

### SECTION 22.25  Joint and Several Liability.

If more than one party is defined as Tenant in this Lease, all of the duties, obligations, promises, covenants and agreements

contained in this Lease to be paid and performed by Tenant will be the joint and several obligations of all parties defined as Tenant. Each party defined as Tenant agrees that Landlord in its sole discretion may (I) institute or bring suit against each such party, jointly and severally, or against any one or more of such parties, (ii) compromise or settle with any one or more of such parties for such consideration as Landlord may deem proper and (iii) release one or more of such parties from liability hereunder, and that no such action by Landlord will impair or affect Landlord's right to collect costs, expenses, losses or damage incurred or suffered by Landlord from the other parties defined as Tenant, or any of such parties, not so sued, compromised, settled with or released.

### SECTION 22.26  Governmental Authority.

*Governmental Authority* means the County in which the Leased Premises are located, the Government of the United States of America, the State of Florida, and each and every agency, division, commission, subdivision and instrumentality of the foregoing, any or all of which have jurisdiction over the Leased Premises or any part thereof except that if reference is made to a single governing authority, such term shall include only the single Governmental Authority specified.

### SECTION 22.27  Effective Date of Lease.

Except as otherwise provided herein, all of the Terms and provisions of this Lease shall be effective as of the date upon which this Lease has been fully executed by both Landlord and Tenant (the "Effective Date").

### SECTION 22.28  Attachments.

Exhibits A, B, C, D, E, F as well as any Addendums which are attached to this Lease are a part of this Lease and are incorporated herein as if fully set forth herein.

### SECTION 22.29  Tenant in Good Standing

In order for Landlord to observe that Tenant is maintaining a status as a tenant in good standing, Landlord reserves the right to investigate Tenant's credit within the first three years of this Lease.

### SECTION 22.30  HIPPA

(a)        Landlord acknowledges and agrees that from time to time during the Term, Landlord, its representatives or assigns may be exposed to, or have access to, Protected Health Information ("PHI"), as defined by Health Insurance Portability and Accountability Act of 1996, 45 CFR Parts 160 and 164.  Landlord agrees that it will not use or disclose PHI for any purpose unless required by a court of competent jurisdiction or by any governmental authority.

(b)        Landlord shall preserve any "Confidential Information" of or pertaining to Tenant and shall not, without first obtaining Tenant's prior written consent, disclose to any person or organization, or use for its own benefit, any Confidential Information of or pertaining to Tenant during and after the Lease Term, unless such Confidential Information is required to be disclosed by a court of competent jurisdiction or by any governmental authority.  As used herein, the term "Confidential Information" shall mean any business, financial, personal or technical information relating to the business or other activities of Tenant that Landlord obtains in connection with this Lease.

### SECTION 22.31  SHOPPING CENTER RESTRICTIONS.

In no event shall any other portion of the Shopping Center be used for a massage parlor (but this shall not prohibit the operation of a first-class day spa or similar operation by another tenant in the Center), topless club, "strip joint," exotic or erotic dance clubs; an establishment selling or exhibiting pornographic materials; any adult bookstore or other similar establishment where minors are not permitted; any establishment selling or exhibiting paraphernalia for use with illicit drugs; any so-called "head shop"; or any adult bookstore, adult video store or adult movie theater, except that this restriction shall not preclude the sale or rental of adult books or videos in the Center as an incidental part of the business of a bona fide book store (such as a Borders or Barnes & Noble) or video sales or rental store (such as a Blockbuster) (or book or video department of a store).

**IN WITNESS WHEREOF**, Landlord and Tenant have signed and sealed this Lease as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

Print Name _____ Lourdes Lopez

Print Name _____ Inmaculada Guerra-Vera

**LANDLORD:**
Bird and 87th Avenue Village, LLC,
A Florida limited liability

By: _____
Print Name: Agustin Herran
Title: Managing Member

Print Name _____ Wilma H. Medio

Print Name _____ Henry Capote

**TENANT:**
Coral Gables Hospital, Inc.,
A Florida corporation

By: _____
Print Name: Maria C Jimenez
Title: CEO

- 24 -

EXHIBIT "A"

SITE PLAN



Initials



**EXHIBIT "B"**

**LANDLORD'S WORK**

Landlord to deliver space to Tenant in "AS-IS" condition.

**TENANT'S WORK**

I.     **TENANT'S WORK**

A.     <u>Architectural</u>:

   1.     Interior partitions including doors and windows;

   2.     Any wall and floor finishes.

B.     <u>Electrical</u>:

   1.     Any and all electrical work required by Tenant which is not Landlord's obligation;

   2.     Telephone installation.

C.     <u>Signs</u>:  Tenant shall pay for all signs (including, exit lights according to Code) and the installation thereof, subject to the provisions of the Lease and **Exhibit "D"**.

D.     <u>Utilities</u>:  All service deposits shall be made at Tenant's expense; Tenant will pay all utility charges associated with the Leased Premises following delivery of the Leased Premises by Landlord during and after construction of the Leased Premises.

E.     <u>Fixtures</u>:  Tenant shall furnish and install (unless specifically provided for otherwise herein) all of Tenant's fixtures, soffits and special hung or furred ceilings.

F.     Other work Tenant shall provide all other work except as specifically mentioned otherwise herein.

G.     <u>Plans</u>: Tenant will furnish two (2) complete sets of plans with specifications (if not already attached to this Lease) for Landlord's approval.  Such approval to be given within seven (7) days following receipt of same by Landlord. Any resulting delays shall extend Tenant's construction time by a like number of days.  Landlord shall return one (1) initialed set of plans and specifications to Tenant.

H.     <u>Removal of Debris</u>: Tenant will require any contractor or sub-contractor to remove and dispose of all debris and rubbish caused by the Work on a daily basis and upon completion of the project, to remove all temporary structures, debris and rubbish of whatever kind remaining on any part of the Shopping Center constructed by Tenant or Tenant's contractor or Landlord's contractor.

I.     <u>Insurance</u>: Tenant and/or Tenant's contractors and sub-contractors shall be required to provide, in addition to the insurance required to be maintained by Tenant, the following types of insurance and the following minimum amounts naming Landlord and any other persons having an interest in the whole Shopping Center as additional insureds as their interest may appear, issued by companies approved by Landlord.

   (a)     Workmen's Compensation coverage with limits of at least $500,000.00 for the employer's liability coverage thereunder.

   (b)     Builders Risk-Completed Value fire and extended coverage covering damage to the construction and improvements to be made by Tenant in an amount at least equal to the estimated completed cost of said construction and improvements with 100% coinsurance protection.

   (c)     Automobile Liability coverage with bodily injury limits of at least $500,000.00 per person, $1,000,000.00 per accident and $500,000.00 accident for property damage.

   (d)     Payment and performance bonds for 100% of the value of Work to be accomplished.  All bonds shall be dual or multiple obligee bonds, inuring to the benefit of Landlord, Tenant, and other persons as Landlord shall require.

Original or duplicate policies for all of the foregoing insurance shall be delivered to Landlord before Tenant's Work is started and before any contractor's equipment is moved to any part of the whole Shopping Center.  In all other respects the insurance coverage above mentioned shall comply with the provision of Article VIII of this Lease.

J.     All work done by Tenant to be by licensed contractors.  Landlord may post notice of non-responsibility for Tenant's Work.

II.     **GENERAL**

A.     All plans, diagrams, schedules, specifications and other data to be furnished by Tenant under this **Exhibit "B"** must be submitted to Landlord complete, sufficient to obtain a building permit, and ready for Landlord's consideration and final approval within thirty (30) days after the execution of this Lease.

B.     Tenant shall secure Landlord's written approval of all designs, plans and specifications, for work to be performed by Tenant before beginning the Work and shall secure all necessary licenses and permits to be used in performing the Work.  Tenant's finished work shall be subject to Landlord's approval and acceptance, which shall not be unreasonably withheld, and as designated or installed by Landlord, which shall be a condition to any reimbursement hereinafter provided.

C.     All work undertaken by Tenant shall be at Tenant's expense, shall not damage the Building or any part thereof, completed in a good and workmanlike manner and shall be in compliance with all Applicable Laws.

**EXHIBIT "B"**
**CONTINUED**

D.    Tenant agrees that all roof penetrations, venting, opening, sealing, waterproofing or any altering of the roof shall be performed by Landlord's roofing contractor at Tenant's expense and that, when completed, Tenant shall furnish to Landlord a certificate from Landlord's roofing contractor that all such alterations approved by Landlord have been completed in accordance with the plans and specifications previously approved by Landlord.

Initial

| LL | T |
|----|---|
|    |   |

**EXHIBIT "C"**

**HEATING AND AIR CONDITIONING MAINTENANCE PROVISION**

Tenant at its sole cost, shall maintain the air conditioning (includes heating) unit(s) for the Leased Premises in good condition and repair throughout the Term of this Lease.

As a part of its air conditioning maintenance obligation, Tenant shall enter into an annual contract with an air conditioning repair firm, fully licensed to repair air conditioning units in the state wherein the Shopping Center is located, which firm shall:

(1)     Regularly service the air conditioning unit(s) on the Leased Premises on a monthly basis, changing belts, filters, and other parts as required.

(2)     Perform emergency and extraordinary repairs on the air conditioning unit(s).

(3)     Keep a detailed record of all services performed on the Leased Premises and prepare a yearly service report to be furnished to Tenant at the end of each calendar year.

Tenant shall furnish to Landlord, at the end of each calendar year, a copy of said yearly service report. Not later than thirty (30) days after written request by Landlord, Tenant shall furnish to Landlord a copy of the air conditioning maintenance contract described above, and proof that the annual premium for the maintenance contract has been paid. Nothing stated hereinabove shall limit Tenant's obligation to maintain the air conditioning unit(s) in good condition and repair throughout the Term of this Lease.

Initial

| LL | T |
|----|----|


**EXHIBIT "D"**

**SIGN CRITERIA**

**TENANT SPECIFICATIONS**

It is advantageous to both Landlord and Tenant to have sign control to preserve uniformity, quality and character thereby maintaining aesthetic harmony throughout the Shopping Center.  Therefore, prior to erecting any sign as required by the Lease, Tenant shall conform to the following specifications:

1.    SIGN SPECIFICATIONS

A.    Each retail store sign is to be internally illuminated channel letter sign on a raceway made of .040 inch anodized aluminum.  Face is to be 3/16 inch clear acrylic face with inside face in colors of Tenant's choice.

B.    Sign Size - All signs are to be rectangular and twenty-four inches (24") high.  Length of sign to be a maximum of 70% of store frontage.

2.    APPROVAL

A.    General Storefront Criteria - Landlord shall have the specific right of approval of size, color and design of Tenant's storefront sign and Tenant hereby agrees that this approval should be absolute so as to preserve the dignity and decor of the Shopping Center.

B.    The shop drawings (elevation and cross-section) to scale showing dimensions for Tenant's sign must be submitted to Landlord in duplicate for approval and no work is to commence until said approval is received by Tenant from Landlord. Information as to location, size, color, shall be supplied with drawings.  Landlord approval shall not relieve Tenant from the duty of conformity with any and all governmental laws, regulations and inspections.

3.    LOCATION AND PROJECTION OF TENANT'S SIGN

A.    The sign shall not project more than four (4) inches from the wall surface designated for the mounting of signs.

B.    Signs will be hung on the fascia of the soffit.

4.    ERECTION AND REMOVAL OF TENANT'S SIGN

A.    All work shall be done in a workmanlike manner by a certified sign builder.

B.    Any damages to fascia shall be repaired by Tenant at Tenant's expense and to Landlord's satisfaction and approval.

C.    All signs must bear the UL label and comply with governmental laws, codes and regulations.

D.    Tenant's sign company must carry adequate insurance to cover any accident or damage.

E.    No painting of any type will be permitted on fascia.

F.    Transformers must be located behind the fascia wall above the canopy area.

G.    Upon vacating the Leased Premises, Tenant shall remove sign and restore fascia to original condition at Tenant's expense, and to the satisfaction and approval of Landlord.

Initial

| LL | T |
|----|---|

**EXHIBIT "E"**

**RULES AND REGULATIONS**

(a)     Tenant agrees as follows:

1.     Except for ambulance drop off which shall not be restricted in the ambulance drop off area, All loading or unloading of goods shall be done only at such time, in the areas, and through the entrances, designated for such purposes by Landlord.

2.     Except for US Postal Service and national courier services, the delivery or shipping of merchandise, supplies and fixtures to and from the Leased Premises shall be subject to such rules and regulations as in the judgment of Landlord are necessary for the proper operation of the Leased Premises or Shopping Center. Trailers or trucks shall not be permitted to remain parked overnight in any area of the Shopping Center, whether loaded, unloaded or partially loaded or unloaded.

3.     Except as otherwise provided in the Lease: All garbage and refuse shall be deposited in the kind of container specified by Landlord, and shall be placed outside of the Leased Premises prepared for collection in the manner and at the times and places specified by Landlord and in accordance with all governmental regulations. If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use same at Tenant's cost. Tenant shall not burn garbage, refuse or rubbish within the confines of the Shopping Center. Tenant shall pay the cost of removal of any of Tenant's refuse or rubbish.

4.     No radio or television aerial or other similar device shall be installed without first obtaining in each instance Landlord's consent in writing. No aerial shall be erected on the roof or exterior walls of the Leased Premises, or on the grounds, without in each instance, the written consent of Landlord. Any aerial so installed without such written consent may be removed by Landlord at any time and Landlord shall not be liable for such removal. Tenant may install, maintain and operate, at Tenant's sole cost and expense, a mast mounted satellite dish antenna (the "Dish") and related equipment, including cables from the exterior of the Premises to equipment inside the Premises necessary for the operation of the Dish and a television in the Tenant's waiting area. Tenant may locate the Dish at or relocate the Dish to a location on or about the Premises for purposes of adequate reception subject to applicable law, codes and regulations. Tenant will ensure that the Dish, and each part of it, will be installed in accordance with all local building rules of construction and occupancy codes and shall repair all damage to the Premises (including but not limited to the roof of the Premises) caused solely as a result of the installation, use and removal of the Dish. Any roof penetrations caused by Tenant shall not invalidate roof warranties; roof penetrations shall be performed by Landlord's roof contractor, at Tenant's expense. Tenant shall be responsible for the insurance, maintenance, repair and damage caused by the Dish (whether to the building or property of others or to persons). Tenant's Dish and the obligations associated with the Dish shall not constitute a nuisance or unreasonably interfere with the operations of other Tenants of the Shopping Center or with the normal use of the area surrounding the building(s) by occupants thereof. Tenant shall comply with all laws, ordinances and regulations concerning the operation of the Dish. If requested by Landlord at the termination or expiration of the Lease, Tenant will remove the Dish at Tenant's sole cost and expense and return those portions of the property and/or building affected by the installation and existence of such Dish to the condition that existed as prior to the installation of the Dish, normal wear and tear excepted.

5.     No loud speakers, televisions, phonographs, radios or other devices shall be used in a manner so as to be heard or seen outside of the Leased Premises without prior written consent of Landlord.

6.     The outside areas immediately adjoining the Leased Premises shall be kept clean and free from dirt and rubbish by Tenant to the satisfaction of Landlord and Tenant shall not place or permit any obstruction or merchandise in such areas, nor conduct any business therein.

7.     Tenant and Tenant's employees shall park their cars in those portions of the parking areas designated for those purposes by Landlord, which shall be well lit and reasonable proximity to the Leased Premises. Tenant shall furnish Landlord with State automobile license numbers assigned to Tenant's employees within ten (10) days after written request from Landlord . In the event that Tenant or its employees fail to park their cars in designated parking areas as aforesaid, then Landlord at its option shall charge Tenant Ten ($10.00) Dollars per day or partial day per car parked in any area other than those designated, as and for agreed and liquidated damages.

8.     The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expenses of any breakage, stoppage, or damage resulting from a violation of this Provision shall be borne by Tenant, who shall, or whose employees, agents or invitees shall have caused same.

9.     Tenant shall comply with all governmental rules and regulations regarding this type of business, including, but not limited to, rules and regulations of city, county, state, and federal department of health and all other agencies which govern the preparation and sale of food. Tenant shall at all times, during the initial term of this Lease and renewals thereof, maintain a rating of least satisfactory as determined by said departments and agencies.

10.     Except as may be otherwise limited by applicable law related to Tenant's Permitted Use, Tenant shall, during the initial term of this Lease and any renewals thereof, maintain and pay for a service contract with a local pest control company at Tenant's premises shall be exterminated on a regular basis but in no event shall said extermination take place less than once each month. .

11.     Tenant shall, at all times during the initial term of this Lease and any renewals thereof, keep its Premises clean and in good order. If Tenant fails to do so, in Landlord's sole judgment, Tenant shall be considered to be in default of this Lease and Landlord shall have all rights and   remedies available to it as set forth herein.

12.     Tenant shall not permit any objectionable odor to emanate from its Premises. Tenant agrees that should Landlord receive any complaints regarding odors, or should Landlord object to odors, Tenant shall have

three (3) days from the date of Landlord's notice to fully, completely and permanently remedy and cure the objections.  If Tenant does not, in Landlord's sole judgment, effectively remedy the problem, Landlord shall have all rights and remedies available to it as set forth herein.

(b)      Landlord reserves the right from time to time to suspend, amend or supplement the foregoing rules and regulations, adopt and promulgate additional rules and regulations applicable to the Leased Premises so long as such rules are adopted and enforced in a uniform and nondiscriminatory manner.   Notice of such rules and regulations and amendments and supplements thereto, if any, shall be given to Tenant. No rules and regulations shall diminish Tenant's rights under the Lease.

(c)      Tenant agrees to comply with all rules and regulations upon notice to Tenant from Landlord, provided that such rules and regulations shall be reasonable and shall apply uniformly to all tenants of the Shopping Center.

Initial

| LL | T |
|----|----|
|    |    |

**EXHIBIT "F"**

TENANT EXCLUSIVES AND SHOPPING CENTER PROHIBITIONS
BIRD 87 VILLAGE SHOPPING CENTER

**NOTE: for purposes of this Exhibit, all references to "Tenant" shall mean the applicable tenant listed in the left margin below and not to Coral Gables Hospital, Inc.**

OFFICE DEPOT

RESTRICTED USES (restrictions upon the use of the Premises): The use of the Leased Premises and the Shopping Center is subject to the exclusives set forth in this Exhibit "H" for as long as the applicable lease tenant or assignee remains in effect. The Leased Premises herein is subject to the exclusives set forth herein. Tenant agrees that it shall not cause the Landlord to become in default or breach any of the exclusive or restrictive covenants provided to the tenants identified in Exhibit "H", as a result of its business operations on the Leased Premises. Tenant acknowledges that if it causes the Landlord to be in default of the exclusives or restrictions set forth in Exhibit "H" that it shall immediately cease and desist such activity and its failure to do so shall be deemed a breach of the Lease

PROHIBITED USES (restrictions upon the use of the rest of the Shopping Center): Subject to the rights of certain Occupants of the Shopping Center as provided below, the following restrictions shall apply to the use and occupancy of the Shopping Center:

1.       Landlord shall not permit any other tenant or occupant of the Shopping Center, other than Tenant, to:  (i) use more than the lesser of five percent (5%) of its floor area, or one thousand (1,000) square feet of floor area (in the aggregate), for the sale, leasing, distribution or display of office or school supplies, office furniture, office machines and other office or school related equipment and accessories (including the sale, resale or remanufacturing of ink and/or toner, either separately, new or into used cartridges), computers, computer hardware, software and related equipment; cellular telephones and telecommunications equipment and related devices (including personal digital assistants ["PDA" and the like), or "copy/print services" (as hereinafter defined) or (ii) be primarily engaged in the sale, leasing, distribution or display of any of the items set forth in (i) above. Notwithstanding the foregoing, cellular telephone stores occupying not more than 1,500 square feet shall be permitted. No portion of any real property adjacent to or within one (1) mile of the Shopping Center which is now or may subsequently be acquired or leased by Landlord (or a related entity or affiliate of Landlord), shall be leased or occupied by or conveyed to any other party for a use in violation of this paragraph. "Copy/print services" is herein defined as a facility or center (whether in-store or free standing) providing any one or more of the following products and/or services: (a) photocopying and facsimile and printing services, such as reproduction and printing services including full, self, coin and color copying, graphic design, desktop publishing, scanning, faxing and imaging services and binding, collating and finishing of documents; (b) mail services, including mailbox rental or mailing; or (c) shipping, labeling and packaging services. The restrictions of the foregoing paragraph shall not be applicable to Sedano's or an affiliated entity, so long as Sedano's or its affiliate is operating primarily as a grocery store in the Shopping Center.

2.       No portion of the Shopping Center shall be used or occupied for any of the following purposes: theater; movie theater; auditorium, meeting hall, reading room, a library occupying in excess of 2,000 square feet or other place of assembly; automobile sales or repairs; bowling alley, pool hall or skating rink; bar serving alcoholic beverages (except as an incident to a full kitchen restaurant operation); funeral parlor; massage parlor (other than a day spa or physical therapy facility); hotel or lodging facilities; gun range; off track betting establishment (except incidental sales of state lottery tickets); a so-called "flea market" or other operation selling used goods (except excluding antiques, estate merchandise, "upscale merchandise" or consignment merchandise); any business or use which emits offensive odors, fumes, dust or vapor, or constitutes a public or private nuisance, or emits loud noise or sounds which are objectionable, or which creates a fire, explosive or other hazard; manufacturing facility; warehouse (except incidental to a retail operation); adult book store or similar store selling or exhibiting pornographic materials as a substantial part of its business; night club, discotheque or dance hall.

3.       The following shall be prohibited at any location in the Shopping Center within four hundred feet (400') of the closest demising wall of the Premises:  any sports or entertainment facility (including, without limitation, a gymnasium, health club, racquet club, physical fitness facility).

4.       The following shall be prohibited at any location in the Shopping Center within two hundred feet (200') of the closest demising wall of the Premises:  restaurant; amusement center, arcade, virtual reality, laser tag or game room; or school (including, without limitation, trade school or class sessions, but excepting incidental customer training in the use of computer hardware or software sold by Tenant or by any other Occupant of the Shopping Center permitted to engage in such sales); provided, however, that up to two (2) restaurants with no table service, each occupying not more than 3,000 square feet, shall be permitted if located at least seventy five feet (75') from the closest demising wall of the Premises.

5.       Landlord covenants and agrees that no portion of the Shopping Center shall be used for offices excepting (i) offices incidental to retail uses, and (ii) offices providing services to the general public and customarily found in similar shopping centers (e.g., banking for finance

services, real estate or securities brokerage services, financial or tax planning services, accounting, insurance or legal services, optical, medical or dental services or travel agencies).

6.    The Prohibited Uses set forth above shall be subject to the rights of Occupants under leases in effect as of the Effective Date of this Lease for as long as such leases remain in effect without any expansion or relocation (except as may be otherwise permitted in such leases), provided such leases do not require the corresponding tenants to be bound by the Prohibited Uses set forth.   Notwithstanding the foregoing, Prohibited Uses shall be specifically applicable to (i) Walgreens and any successor Occupant of its premises and (ii) the bank located on the Out Parcel and any successor Occupant of its premises.

**US CENTURY BANK**

Landlord agrees not to lease any space at the shopping center where the Premises are located to another financial institution (including without limitation banks and credit unions), except for leases to mortgage companies (i.e., companies which offer residential mortgage services but do not receive deposits) and financial service companies not engaging in banking (e.g., tax preparation consultants).  Tenant shall remain the exclusive financial institution at the shopping center (including any outparcels thereof) through the Initial Term and all renewal terms.

**SEDANO'S**

The TENANT shall occupy the premises for the operation of a supermarket together with a coffee shop, bakery, fish market, meat market, delicatessen, barbecue meats, produce department, food by the pound, automated teller machines, sale of lottery tickets, and/or cash dispensers, a place to make keys, and a shoe repair place, and the sale of items commonly sold by supermarkets in the Dade County area, and for the operation of a pharmacy and discount store including but not limited to photo development and finishing, lottery tickets, money orders, moneygrams, pre-paid telephone cards, beepers and accessories, perfumes, prescription optical and optometrist services, etc., and the sale of items commonly sold by pharmacy and discount stores in the Dade County area.  The LANDLORD agrees not to lease any space within the shopping center in which those premises are located to any TENANT which would engage in the sale of any of the above described items.

No portion of the Sedano's space shall be leased, used or occupied as (1) a restaurant or take-out food operation featuring the sale of chicken as a primary business (i.e. twenty-five percent (25%) or more of its sales) or (2) a Latin theme restaurant (excluding Taco Bell or a sit down Mexican restaurant); provided, however that, so long as there is a Sedano's grocery store or its successor, being operated on the Sedano's space the immediately preceding restrictions shall not prohibit the use within the Sedano's grocery store, or its successor, of (I) an in-store, non-franchised cafeteria, which (a) is owned and operated by Sedano's or its successor, (b) is not visible to the exterior (and has no exterior signage), (c) shall be substantially similar, in appearance, menu and operation to the now existing Sedano's grocery stores in Miami-Dade County, Florida and (II) the sale of food "by the pound" as is typically sold in a majority of the now existing Sedano's grocery stores in Miami-Dade County, Florida.

The LANDLORD further covenants that in the shopping center there shall not be a movie house, theater or discotheque, and agrees not to lease any space in the shopping center for that purpose.  And further agrees that no banquet hall be located in the shopping center.  The LANDLORD further covenants not to authorize and to discourage any street vendors from pedaling their wares within the shopping center.

**SMOOTHIE KING**

So long as Tenant is operating under the Permitted Use clause, Landlord agrees that it will not lease space to another tenant in the Shipping Center who sells: a) smoothies drinks or blended beverages, b) fruit, yogurt, protein, or ice cream based drinks, and c) vitamins, diet supplements, sports nutrition, products, except for any lease signed prior to the execution of Tenant's Lease and provided in writing to Tenant prior to execution of lease.  This Exclusive shall exclude Sedano's Supermarket.

**MEGA DISCOUNT LIQUORS #5**

Sub-Tenant shall have the exclusive right to operate a liquor store for the sale of alcoholic beverages for off-site consumption, within the Shopping Center.  Notwithstanding the foregoing, such exclusive right to operate a liquor store shall not restrict the grocery store from selling beer and wine under its Beer and Wine Beverage Licenses or should the exclusive rights set forth herein apply to Walgreens, U.S. Century Bank or Office Depot their successors and/or assigns.  Sub-Landlord agrees that it shall not amend or modify either the Walgreens, U.S. Century Bank or Office Depot leases to grant additional rights extending beyond the current rights held by each of such sub-tenants pursuant to their respective leases with the Sub-Landlord to operate a liquor store in any part of their respective premises.

**PASTEUR MEDICAL**

Initial

| LL | T |
| --- | --- |

## NOTICE OF NO LIABILITY UNDER SECTION 713.10
## OF THE FLORIDA STATUTES

**THIS MEMORANDUM OF LEASE** is made this ___ day of _____, 2018, by and between Bird and 87th Avenue Village, LLC, A Florida limited liability, ("Landlord") and Coral Gables, Hospital, Inc., A Florida corporation, ("Tenant").

## W I T N E S S E T H:

**WHEREAS**, Tenant and Landlord entered into that certain Lease dated _____, 2018 (the "Lease"), with respect to the lease for the premises known as 8665 Bird Road, Miami, FL 33165 located in the Bird 87 Village Shopping Center, located in Miami Dade County, Florida, as more particularly described on Exhibit "A" attached hereto and made a part hereof; and

**WHEREAS**, Landlord and Tenant desire to provide notice of the Lease and to summarize certain provisions thereof.

**NOW, THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby acknowledge the following:

1.  The Lease, among its provisions, contains the following:

    Nothing contained in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied, to any contractor, subcontractor, laborer, materialman or vendor for the performance of any labor or services for the alteration, addition, repair, or demolition of or to the Premises or any part thereof. All persons are hereby put upon notice that Tenant shall never, under any circumstances have the power to subject the interest of the Landlord in the Premises to any mechanic's liens or materialman's liens or any liens in connection with material or labor furnished to the Premises, including any lien for architects' fees or engineers' fees; and all persons dealing with Tenant are hereby put upon notice that they must look wholly to the interest of the Tenant in the Premises and not to that of Landlord.

2.  Nothing herein shall be construed as amending or altering the terms of the Lease. In the event of a conflict with the terms of the Lease and this Memorandum, the terms of the Lease shall control.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Memorandum of Lease as of the day and date first above written.

**WITNESSES:**

_____

Print Name: _____

_____

Print Name: _____

_____

Print Name: _____

_____

Print Name: _____

**LANDLORD:**
Bird and 87th Avenue Village, LLC,
A Florida limited liability

By: _____
        Agustin Herran
Title:  Managing Member

**TENANT:**
Coral Gables Hospital, Inc.,
A Florida corporation

By: _____
Print Name:
Title:

**EXHIBIT "G"**

**Form Subordination and Non-Disturbance Agreement**

**EXHIBIT "H"**

**Form Subordination and Non-Disturbance Agreement**

**For Loan**

This Instrument Prepared By:

Law Offices of Machado & Herran, P.A.
8500 S.W. 8th Street, Suite 238
Miami, Florida 33144
Attention: Jose Luis Machado

Upon Recordation Return to:

Law Offices of Machado & Herran, P.A.
8500 S.W. 8th Street, Suite 238
Miami, Florida 33144
Attention: Jose Luis Machado

## SUBORDINATION, NON DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON DISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") executed this ___ day of May, 2018, between TOTAL BANK, a Florida banking corporation ("Mortgagee") and CORAL GABLES HOSPITAL, INC., a Florida corporation ("Tenant").

WITNESSETH:

WHEREAS, BIRD AND 87TH AVENUE VILLAGE, LLC, a Florida limited liability company ("Landlord") and Tenant are parties to that certain lease (the "Lease") dated May ___, 2018 relating to certain premises located in 8665 Bird Road, Miami, Florida (the "Premises"), said Premises being more particularly described in the Lease and being situated on a portion of the real property described in **EXHIBIT A** attached hereto and made a part hereof; and

WHEREAS, Mortgagee has made a mortgage loan to Landlord secured by a Leasehold Mortgage and Security Agreement dated June 16, 2009 recorded in Official Records Book 26907, Page 3147, as amended by that certain Leasehold Mortgage Modification Agreement dated October 20, 2011, recorded in Official Records Book 27868, Page 396, all of the Public Records of Miami-Dade County, Florida. ("Mortgage") covering the Premises;

NOW, THEREFORE, it is mutually agreed as follows:

1.      To the extent that Tenant's rights and entitlements under the Lease are not diminished or otherwise affected, and except as provided in this Agreement, the Lease is and shall be subject and subordinate to the lien of the Mortgage and to all renewals, modifications, consolidations, replacements and extensions of the Mortgage.

2.      In the event of a foreclosure of the Mortgage or should Mortgagee obtain title by deed in lieu thereof, or otherwise, Mortgagee, for itself, its successors or assigns (which shall include any persons acquiring title by voluntary deed, assignment or other disposition or transfer in lieu of foreclosure), agrees that Tenant may continue its occupancy of the Premises in accordance with the terms and provisions of the Lease, so long as Tenant is not in material default under the Lease beyond any applicable notice and cure period. Mortgagee agrees not to name Tenant as a party defendant in any foreclosure action.

3.      Tenant agrees to attorn to: (a) Mortgagee when in possession of the Premises; (b) a receiver appointed in an action or proceeding to foreclose the Mortgage or otherwise; or (c) to any party acquiring title to the Premises as a result of foreclosure of the Mortgage or deed in lieu thereof. Tenant further covenants and agrees to execute and deliver, upon request of Mortgagee, or its assigns, an appropriate agreement of attornment, in form and content reasonably acceptable to Tenant and Mortgagee (but which shall not amend the terms of the Lease or otherwise diminish Tenant's rights thereunder) with any subsequent titleholder of the Premises.

4.      So long as the Mortgage on the Premises remains outstanding and unsatisfied, Tenant will use commercially reasonable efforts to deliver to Mortgagee a copy of all notices of default given to Landlord by Tenant. At any time before the rights of Landlord shall have been forfeited or adversely

affected because of any default under the Lease as therein provided, Mortgagee shall have the right (but not the obligation) to cure such default within the same period of time as is allowed Landlord under the Lease.

5.     If Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall be bound to Tenant under all the terms, covenants and conditions of the Lease, and Tenant shall, from and after Mortgagee's succession to the interest of Landlord under the Lease, have the same remedies against Mortgagee for the breach of an agreement contained in the Lease that Tenant might have had under the Lease against Landlord if Mortgagee had not succeeded to the interest of Landlord; provided further, however, that Mortgagee shall not be:

(a)     liable for any warranty, act or omission of any prior landlord (including Landlord), except those of a continuing nature; or

(b)     subject to any offsets or defense which Tenant might have against any prior landlord (including Landlord), except (i) offsets specifically provided for in the Lease, or (ii) those which arose out of such Landlord's default under the Lease and accrued after Tenant has notified Mortgagee and given Mortgagee an opportunity to cure as provided in Paragraph 4 above; or

(c)     bound by any rent or additional charges which Tenant might have paid for more than the current month to any prior landlord (including Landlord); or

(d)     bound by any amendment or modification of the Lease or any collateral agreement made without Mortgagee's consent which would (i) reduce fixed minimum rent, or (ii) reduce any other monetary obligation of Tenant under the Lease.

6.     Mortgagee consents to the application and disposition of casualty proceeds and condemnation awards in accordance with the Lease.

7.     This Agreement shall be binding upon and inure to the benefit of the heirs, successors and assigns (which shall include any persons acquiring title by voluntary deed, assignment or other disposition or transfer in lieu of foreclosure) of the parties.

8.     Any notices under this Agreement may be delivered by hand or sent by commercial delivery services or United States Postal Service express mail, in either case for overnight delivery with proof of service, or sent by certified mail, return receipt requested, to the following addresses:

|              |                          |
|--------------|--------------------------|
| To Tenant:   | Coral Gables Hospital, Inc. |
|              | 1445 Ross Avenue, Suite 1400 |
|              | Dallas, TX 75202 |
|              | Attention: _____ |
|              |                          |
| To Mortgagee: | TOTAL BANK |
|              | 2720 Coral Way |
|              | Miami, Florida 33145 |
|              | Attention: _____ |

The notice shall be deemed to have been given on the date it was actually received.

9.     This Agreement may be executed and delivered in counterparts for the convenience of the parties.

Signatures Appear on Subsequent Pages

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date indicated below their respective signatures.

Signed, sealed and delivered
in the presence of:

Witnesses or Attest (as to Mortgagee):          **MORTGAGEE:**

                                                TOTAL BANK
                                                a Florida banking corporation

Sign: _____
Print Name:                                     By: _____
                                                Print Name: _____
                                                Print Title: _____
Sign: _____          Date: _____
Print Name:


STATE OF FLORIDA                    )
                                    )   ss.:
COUNTY OF MIAMI-DADE                )
The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by
_____, as _____
of TOTAL BANK, a Florida banking corporation, on behalf of the corporation.  He/She is
personally known to me or has produced _____ as identification.


                                    Notary: _____
                                    Print Name: _____
NOTARY SEAL                         Notary Public, State of [State]
                                    My commission expires: [Enter COMMISSION
                                    EXPIRE DATE]

Witnesses or Attest (as to Tenant):

**TENANT:**

**CORAL GABLES HOSPITAL, INC.,** a Florida corporation

Sign: _____

Print Name:

By:_____

Print Name:_____

Print Title: _____

Date:_____

Sign: _____

Print Name:


STATE OF TEXAS   )
         ) ss.:
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of CORAL GABLES HOSPITAL, INC., a Florida banking corporation, on behalf of the corporation.  He/She is personally known to me or has produced _____ as identification.


Notary: _____

Print Name: _____

NOTARY SEAL     Notary Public, State of [State]

My commission expires: [Enter COMMISSION EXPIRE DATE]


EXHIBIT "A"

LEGAL DESCRIPTION


COMMENCE AT THE SOUTHWEST CORNER OF THE SW 1/4 OF SAID SECTION 15; THENCE RUN SOUTH 89°55'46" EAST, ALONG THE SOUTH LINE OF THE SW 1/4 OF SAID SECTION 15; FOR A DISTANCE OF 187.27 FEET TO A POINT; THENCE RUN NORTH 00°13'42" EAST FOR A DISTANCE OF 53.50 FEET TO A POINT OF INTERSECTION WITH THE NORTH LINE OF THE SOUTH 53.50 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE NORTHERLY RIGHT-OF-WAY LINE OF S.W. 40th STREET (STATE ROAD 976) AS DESCRIBED IN F.D.O.T. RIGHT-OF-WAY MAP, SECTION 87044-2501 AND THE POINT OF BEGINNNG OF THE PARCEL OF LAND HEREINAFTER TO BE DESCRIBED; THENCE RUN SOUTH 89°55'46" EAST; ALONG SAID NORTH LINE OF THE SOUTH 53.50 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE NORTHERLY RIGHT-OF-WAY LINE OF S.W. 40th STREET (STATE ROAD 976) AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP, FOR DISTANCE OF 196.08 FEET TO A POINT; THENCE RUN SOUTH 87°55'30" EAST FOR A DISTANCE 100.06 FEET TO A POINT OF INTERSECTION WITH SAID NORTH LINE OF THE SOUTH 50.00 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE NORTHERLY RIGHT-OF-WAY LINE OF S.W. 40th STREET (STATE ROAD 976) AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP; THENCE RUN SOUTH 89°55'46" EAST, ALONG SAID NORTH LINE OF THE SOUTH 50.00 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE NORTHERLY RIGHT-OF-WAY LINE OF S.W. 40th STREET (STATE ROAD 976) AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP, FOR A DISTANCE OF 118.07 FEET TO A POINT ON THE WEST LINE OF TRACT "A" OF HECHT SUBDIVISION ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 113, AT PAGE 5, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA, THENCE RUN NORTH 00°04'14" EAST ALONG THE WEST

LINE OF SAID TRACT "A", FOR A DISTANCE OF 248.00 FEET TO A POINT ON THE NORTH LINE OF SAID TRACT "A", THENCE RUN SOUTH 89°55'46" EAST ALONG THE NORTH LINE OF SAID TRACT "A" OF HECHT SUBDIVISION ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 113, AT PAGE 5, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA, FOR A DISTANCE OF 149.48 FEET TO A POINT ON THE WESTERLY LINE OF THE PARCEL OF LAND CONVEYED BY R. A. CORWIN AND WIFE TO HARLAN L. BOWLES AND WIFE BY DEED DATED FEBRUARY 23, 1939, AND RECORDED IN DEED BOOK 1948, AT PAGE 394, THENCE RUN NORTH 02°15'46" EAST ALONG THE WESTERLY LINE OF SAID PARCEL OF LAND AS CONVEYED BY R. A. CORWIN AND WIFE TO HARLAN L. BOWLES AND WIFE, FOR A DISTANCE OF 337.31 FEET TO A POINT ON THE SOUTH RIGHT-OF-WAY LINE OF S.W. 38th STREET; THENCE RUN NORTH 89°58'17" WEST ALONG A LINE 25.00 FEET SOUTH AND PARALLEL TO THE NORTH LINE OF THE SW 1/4, SW 1/4 OF SECTION 15, TOWNSHIP 54 SOUTH, RANGE 40 EAST, FOR A DISTANCE OF 678.26 FEET TO A POINT OF TANGENCY, AND THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHEAST; SAID CURVE HAVING A RADIUS OF 25.00 FEET AND A CENTRAL ANGLE OF 87°32'52"; THENCE ALONG SAID CURVE SOUTHWESTERLY FOR AN ARC DISTANCE OF 38.20 FEET TO A POINT OF TANGENCY WITH THE EAST LINE OF THE WEST 35.00 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE EASTERLY RIGHT-OF-WAY LINE OF (S.W. 87th AVENUE) STATE ROAD 973 AS DESCRIBED IN F.D.O.T. RIGHT-OF-WAY MAP, SECTION 87502-2615; THENCE RUN SOUTH 02°28'51" WEST ALONG THE EAST LINE OF THE WEST 35.00 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE EASTERLY RIGHT-OF-WAY LINE OF (S.W. 87th AVENUE) STATE ROAD 973 AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP, FOR A DISTANCE 70.62 TO A POINT; THENCE RUN SOUTH 00°11'25" WEST ALONG THE EASTERLY RIGHT-OF-WAY LINE OF (S.W. 87th AVENUE) STATE ROAD 973 AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP, FOR A DISTANCE OF 200.16 FEET TO A POINT OF INTERSECTION WITH THE EAST LINE OF THE WEST 43.00 FEET OF THE SW 1/4 OF SAID SECTION 15; THENCE RUN SOUTH 02°28'51" WEST ALONG THE EASTERLY RIGHT-OF-WAY LINE OF (S.W. 87th AVENUE) STATE ROAD 973 AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP AND SAID EAST LINE OF THE WEST 43.00 FEET OF THE SW 1/4 OF SAID SECTION 15, FOR A DISTANCE OF 104.99 FEET TO A POINT ON THE NORTH LINE OF THE WEST 185.00 OF THE SOUTH 235.00 FEET OF THE SW 1/4, SW 1/4, SW 1/4 OF SAID SECTION 15; THENCE RUN SOUTH 89°55'46" EAST ALONG SAID NORTH LINE OF THE WEST 185.00 FEET OF THE SOUTH 235.00 FEET OF THE SW 1/4, SW 1/4 OF SAID SECTION 15, FOR A DISTANCE OF 142.13 FEET TO A POINT ON THE EAST LINE OF THE WEST 185.00 FEET OF THE SOUTH 235.00 FEET OF THE SW 1/4, SW 1/4, SW 1/4 OF SAID SECTION 15; THENCE RUN SOUTH 02°28'51" WEST ALONG SAID EAST LINE OF THE WEST 185.00 FEET OF THE SOUTH 235.00 FEET OF THE SW 1/4, SW 1/4, SW 1/4 OF SAID SECTION 15, FOR A DISTANCE OF 181.66 FEET TO THE POINT OF BEGINNING.

**For Ground Lease**

This Instrument Prepared By:

Jose Luis Machado, Esq.
Law Offices of Machado & Herran, P.A.
8500 S.W. 8th Street, Suite 238
Miami, Florida 33144

Upon Recordation Return to:

Jose Luis Machado, Esq.
Law Offices of Machado & Herran, P.A.
8500 S.W. 8th Street, Suite 238
Miami, Florida 33144

## RECOGNITION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS AGREEMENT is made and entered into this ___ day of _____, 2018, by and between HECHT BIRD ROAD PROPERTY, LTD, a Florida limited partnership ("Prime Landlord"), BIRD AND 87th AVENUE VILLAGE, LLC, a Florida limited partnership ("Landlord") and CORAL GABLES HOSPITAL, INC., a Florida corporation ("Tenant").

A.     By the terms of a Ground Lease dated as of April 3, 2006, ("Prime Lease"), Prime Landlord leased to Landlord the land in Miami-Dade County, Florida upon which a retail Shopping Center is located as more particularly described on Exhibit A hereto (the "Property").

B.     Landlord has entered into a Lease dated May ____, 2018 ("Sublease") with Tenant for a portion of the Property or the improvements located thereon (the "Premises").

C.     The parties desire to provide for a consent by Prime Landlord to the Sublease and for a recognition, non-disturbance and attornment agreement all as hereinafter set forth.

In consideration of the Premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, it is hereby agreed as follows:

1.     Prime Landlord hereby consents to the Sublease.

2.     (a)     Provided Tenant is not in default (after expiration of any applicable cure period following written notice) in the payment of rent or other sums payable by Tenant under the terms of the Sublease or under any other provision of the Sublease:

(i)     The right of possession of Tenant to the Premises shall not be affected or disturbed by any termination of the Prime Lease or by Prime Landlord in the exercise of any of its rights and remedies under the Prime Lease; and

(ii)     In the event Prime Landlord terminates the Prime Lease or Landlord's right to possession thereunder, or in the event the Prime Lease shall terminate or expire for any reason before any of the dates provided for in the Sublease for the termination of the initial term, or any extension thereof, Tenant agrees to continue under the same terms and conditions of the Sublease and to attorn to the Prime Landlord, its successors or assigns, to the same extent and with the same force as if Prime Landlord were Landlord under the Sublease, said attornment to be self-operative without the execution of any further instruments. Prime Landlord shall thereupon (1) be entitled, but not obligated, to exercise the claims, rights, powers, privileges, options and remedies of Landlord under the Sublease **including**, without limitation, the right of Landlord to terminate the Lease following a destruction or eminent domain proceeding to the Premises or Shopping Center as set forth in Articles XIV and XIV of the Lease, and shall be further entitled to the benefits of, and to receive rents and enforce obligations to be performed by Tenant under the Sublease as though Prime Landlord were named herein as Landlord, and (2) be bound to Tenant under the terms of the Sublease and to the extent permitted by law be obligated to perform all of the obligations of Landlord under the Sublease.

(b)     Prime Landlord shall not, by virtue of this Agreement, be or become subject to any liability or obligation to Tenant under the Sublease or otherwise, until Prime Landlord shall have terminated the Prime Lease or Landlord's right to possession thereunder or the Prime Lease shall have otherwise terminated or expired while the Sublease is in force and effect, and then only to the extent of liabilities or obligations accruing subsequent to the date of such termination.

(c)     Tenant shall not pay an installment of rent or any part thereof more than thirty (30) days prior to the due date of such installment, and Prime Landlord shall not be bound by, and shall be entitled to recover from Tenant as rent under the Sublease, any payment of rent or additional rent made by Tenant to Landlord for more than one (1) month in advance.

(d)     In the event the Sublease shall, immediately prior to the surrender, expiration, or termination by Prime Landlord of the Prime Lease, be in full force and effect, then in any of such events and upon written notice from Prime Landlord that the rentals under the Sublease should be paid to Prime Landlord, Tenant shall thereafter pay to Prime Landlord all rentals and other monies due and to become due to Landlord under the Sublease.

I-41

3.       In case any lease or tenancy shall come into existence between Prime Landlord and Tenant pursuant to the provisions of this Agreement, the provisions of Section 4 hereof shall apply to any liability imposed upon Prime Landlord, by reason of such lease or tenancy.

4.       The term "Prime Landlord" as used in this Agreement means only the fee simple owner for the time being of the Property, so that in the event of any sale or transfer of an interest therein, the party hereto designated as Prime Landlord shall be and thereby is entirely freed and relieved of all covenants and obligations of the Prime Landlord hereunder and any such purchaser or transferee shall, however, be bound hereby as successor Prime Landlord.

5.       This Agreement shall inure to the benefit of and shall be binding upon Tenant and Prime Landlord, and their respective heirs, personal representatives, successors and assigns.  This Agreement shall be governed by and construed according to the laws of the State of Florida.

6.       Any notices under this Agreement may be delivered by hand or sent by commercial delivery services or United States Postal Service express mail, in either case for overnight delivery with proof of service, or sent by certified mail, return receipt requested to the following addresses:

| | |
|---|---|
| To Tenant: | Coral Gables Hospital, Inc.<br>1445 Ross Avenue, Suite 1400<br>Dallas, TX 75202<br>Attn::_____ |
| To Landlord: | Bird and 87th Avenue Village, LLC<br>8500 S.W. 8th Street, Suite 228<br>Miami, Florida 33144<br>Attn:  Agustin Herran |
| To Prime Landlord: | Hecht Bird Road Properties, Ltd.<br>1 Grove Isle Drive, Apartment 1509<br>Coconut Grove, Florida 33133<br>Attn:  Ms. Isabelle Amdur |

[Signatures appear on the following page]

Prime Landlord and Tenant have executed this Agreement the day and year first above written.

WITNESSES:                                    PRIME LANDLORD:

                                              **HECHT BIRD ROAD PROPERTY, LTD,** a Florida
_____                   limited partnership

_____                   By:_____
                                              Name:
                                              Title:


WITNESSES:                                    LANDLORD:

                                              **BIRD AND 87th AVENUE VILLAGE, LLC**
_____

_____                   By:_____
                                              Name:
                                              Title:


WITNESSES:                                    TENANT:

                                              **CORAL GABLES HOSPITAL, INC.**
_____
                                              By:_____
_____                   Name:
                                              Title:

STATE OF _____ )
                              ) SS:
COUNTY OF _____ )

        I HEREBY CERTIFY that on this day before me, an officer duly authorized in the state and county named above to take acknowledgments, personally appeared _____ as _____ of HECHT BIRD ROAD PROPERTY, LTD, a Florida limited partnership, to me known to be the person who signed the foregoing instrument as such officer and he/she acknowledged that the execution thereof was his/her free act and deed as such officer for the use and purposes therein expressed and that the instrument is the act and deed of said partnership.

        WITNESS my hand and official seal this ___ day of _____ , 2018.

                                        _____

                                        Notary Public
                                        State of Florida
                                        My Commission expires: _____

 

STATE OF TEXAS            )
                              ) SS:
COUNTY OF _____ )

        I HEREBY CERTIFY that on this day before me, an officer duly authorized in the state and county named above to take acknowledgments, personally appeared _____ as _____ of CORAL GABLES HOSPITAL, INC., a Florida corporation, to me known to be the person who signed the foregoing instrument as such officer and he/she acknowledged that the execution thereof was his/her free act and deed as such officer for the use and purposes therein expressed and that the instrument is the act and deed of said corporation.

        WITNESS my hand and official seal this ___ day of _____ , 2018.

                                          _____

                                         Notary Public
                                         State of Florida
                                         My Commission expires: _____

STATE OF FLORIDA        )
                        ) SS:
COUNTY OF MIAMI-DADE    )

I HEREBY CERTIFY that on this day before me, an officer duly authorized in the state and county named above to take acknowledgments, personally appeared _____ as _____ of BIRD AND 87TH AVENUE VILLAGE, LLC, a Florida limited liability company, to me known to be the person who signed the foregoing instrument as such officer and he/she acknowledged that the execution thereof was his/her free act and deed as such officer for the use and purposes therein expressed and that the instrument is the act and deed of said company.

WITNESS my hand and official seal this ___ day of _____ , 2018.

_____
Notary Public
State of Florida
My Commission expires: _____

Exhibit "A"

Legal Description

COMMENCE AT THE SOUTHWEST CORNER OF THE SW 1/4 OF SAID SECTION 15; THENCE RUN SOUTH 89°55'46" EAST, ALONG THE SOUTH LINE OF THE SW 1/4 OF SAID SECTION 15; FOR A DISTANCE OF 187.27 FEET TO A POINT; THENCE RUN NORTH 00°13'42" EAST FOR A DISTANCE OF 53.50 FEET TO A POINT OF INTERSECTION WITH THE NORTH LINE OF THE SOUTH 53.50 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE NORTHERLY RIGHT-OF-WAY LINE OF S.W. 40th STREET (STATE ROAD 976) AS DESCRIBED IN F.D.O.T. RIGHT-OF-WAY MAP, SECTION 87044-2501 AND THE POINT OF BEGINNING OF THE PARCEL OF LAND HEREINAFTER TO BE DESCRIBED; THENCE RUN SOUTH 89°55'46" EAST; ALONG SAID NORTH LINE OF THE SOUTH 53.50 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE NORTHERLY RIGHT-OF-WAY LINE OF S.W. 40th STREET (STATE ROAD 976) AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP, FOR DISTANCE OF 196.08 FEET TO A POINT; THENCE RUN SOUTH 87°55'30" EAST FOR A DISTANCE 100.06 FEET TO A POINT OF INTERSECTION WITH SAID NORTH LINE OF THE SOUTH 50.00 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE NORTHERLY RIGHT-OF-WAY MAP; THENCE RUN SOUTH 89°55'46" EAST, ALONG SAID NORTH LINE OF THE SOUTH 50.00 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE NORTHERLY RIGHT-OF-WAY LINE OF S.W. 40th STREET (STATE ROAD 976) AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP, FOR A DISTANCE OF 118.07 FEET TO A POINT ON THE WEST LINE OF TRACT "A" OF HECHT SUBDIVISION ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 113, AT PAGE 5, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA, THENCE RUN NORTH 00°04'14" EAST ALONG THE WEST

LINE OF SAID TRACT "A", FOR A DISTANCE OF 248.00 FEET TO A POINT ON THE NORTH LINE OF SAID TRACT "A", THENCE RUN SOUTH 89°55'46" EAST ALONG THE NORTH LINE OF SAID TRACT "A" OF HECHT SUBDIVISION ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 113, AT PAGE 5, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA, FOR A DISTANCE OF 149.48 FEET TO A POINT ON THE WESTERLY LINE OF THE PARCEL OF LAND CONVEYED BY R. A. CORWIN AND WIFE TO HARLAN L. BOWLES AND WIFE BY DEED DATED FEBRUARY 23, 1939, AND RECORDED IN DEED BOOK 1948, AT PAGE 394, THENCE RUN NORTH 02°15'46" EAST ALONG THE WESTERLY LINE OF SAID PARCEL OF LAND AS CONVEYED BY R. A. CORWIN AND WIFE TO HARLAN L. BOWLES AND WIFE, FOR A DISTANCE OF 337.31 FEET TO A POINT ON THE SOUTH RIGHT-OF-WAY LINE OF S.W. 38th STREET; THENCE RUN NORTH 89°58'17" WEST ALONG A LINE 25.00 FEET SOUTH AND PARALLEL TO THE NORTH LINE OF THE SW 1/4, SW 1/4 OF SECTION 15, TOWNSHIP 54 SOUTH, RANGE 40 EAST, FOR A DISTANCE OF 678.26 FEET TO A POINT OF TANGENCY, AND THE BEGINNING OF A CURVE CONCAVE TO THE SOUTHEAST; SAID CURVE HAVING A RADIUS OF 25.00 FEET AND A CENTRAL ANGLE OF 87°32'52"; THENCE ALONG SAID CURVE SOUTHWESTERLY FOR AN ARC DISTANCE OF 38.20 FEET TO A POINT OF TANGENCY WITH THE EAST LINE OF THE WEST 35.00 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE EASTERLY RIGHT-OF-WAY LINE OF (S.W. 87th AVENUE) STATE ROAD 973 AS DESCRIBED IN F.D.O.T. RIGHT-OF-WAY MAP, SECTION 87502-2615; THENCE RUN SOUTH 02°28'51" WEST ALONG THE EAST LINE OF THE WEST 35.00 FEET OF THE SW 1/4 OF SAID SECTION 15, ALSO BEING THE EASTERLY RIGHT-OF-WAY LINE OF (S.W. 87th AVENUE) STATE ROAD 973 AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP, FOR A DISTANCE 70.62 TO A POINT; THENCE RUN SOUTH 00°11'25" WEST ALONG THE EASTERLY RIGHT-OF-WAY LINE OF (S.W. 87th AVENUE) STATE ROAD 973 AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP, FOR A DISTANCE OF 200.16 FEET TO A POINT OF INTERSECTION WITH THE EAST LINE OF THE WEST 43.00 FEET OF THE SW 1/4 OF SAID SECTION 15; THENCE RUN SOUTH 02°28'51" WEST ALONG THE EASTERLY RIGHT-OF-WAY LINE OF (S.W. 87th AVENUE) STATE ROAD 973 AS RECORDED IN SAID F.D.O.T. RIGHT-OF-WAY MAP AND SAID EAST LINE OF THE WEST 43.00 FEET OF THE SW 1/4 OF SAID SECTION 15, FOR A DISTANCE OF 104.99 FEET TO A POINT ON THE NORTH LINE OF THE WEST 185.00 OF THE SOUTH 235.00 FEET OF THE SW 1/4, SW 1/4, SW 1/4 OF SAID SECTION 15; THENCE RUN SOUTH 89°55'46" EAST ALONG SAID NORTH LINE OF THE WEST 185.00 FEET OF THE SOUTH 235.00 FEET OF THE SW 1/4, SW 1/4, SW 1/4 OF SAID SECTION 15, FOR A DISTANCE OF 142.13 FEET TO A POINT ON THE EAST LINE OF THE WEST 185.00 FEET OF THE SOUTH 235.00 FEET OF THE SW 1/4, SW 1/4, SW 1/4 OF SAID SECTION 15; THENCE RUN SOUTH 02°28'51" WEST ALONG SAID EAST LINE OF THE WEST 185.00 FEET OF THE SOUTH 235.00 FEET OF THE SW 1/4, SW 1/4, SW 1/4 OF SAID SECTION 15, FOR A DISTANCE OF 181.66 FEET TO THE POINT OF BEGINNING.

**EXHIBIT "B"**

**Bird & 87th Avenue Village, LLC**
c/o Horizon Properties
18610 N.W. 87 Avenue, Suite 204
Hialeah, FL 33015
(305) 364-9945
(305) 364-9980

Steward CGH, Inc.
c/o Steward Health Care System, LLC
ATTN: Corp Real Estate & Facilities
1900 N. Pearl Street
Suite 2300
Dallas, TX 75201

**Invoice**

| | |
|---|---|
| **Account** | bird87 87-hosp Coral Gables Hospital, Inc. |
| **Prop Name** | Bird & 87th Avenue Village, LLC |
| **Assigned Spaces** | 8665 |
| **Date** | 08/02/2024 |
| **Payment** | $ _____ |

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | **Balance Forward** | | | 0.00 |
| 10/01/2018 | Rent (10/2018) | 32,293.55 | 0.00 | 32,293.55 |
| 10/01/2018 | Estimated CAM (10/2018) | 4,763.30 | 0.00 | 37,056.85 |
| 10/01/2018 | Sales Tax | 2,519.87 | 0.00 | 39,576.72 |
| 11/01/2018 | Rent (11/2018) | 55,616.67 | 0.00 | 95,193.39 |
| 11/01/2018 | Estimated CAM (11/2018) | 8,203.46 | 0.00 | 103,396.85 |
| 11/01/2018 | Sales Tax | 4,339.77 | 0.00 | 107,736.62 |
| 11/21/2018 | Chk# 011797292 | 0.00 | 39,576.72 | 68,159.90 |
| 11/21/2018 | Chk# 011797293 | 0.00 | 68,159.90 | 0.00 |
| 12/01/2018 | Chk# 011810360 | 0.00 | 68,159.90 | -68,159.90 |
| 12/01/2018 | Estimated CAM (12/2018) | 8,203.46 | 0.00 | -59,956.44 |
| 12/01/2018 | Rent (12/2018) | 55,616.67 | 0.00 | -4,339.77 |
| 12/01/2018 | Sales Tax | 4,339.77 | 0.00 | 0.00 |
| 01/01/2019 | Base Rent (01/2019) | 55,616.67 | 0.00 | 55,616.67 |
| 01/01/2019 | Estimated CAM (01/2019) | 8,203.46 | 0.00 | 63,820.13 |
| 01/01/2019 | Sales Tax | 4,275.95 | 0.00 | 68,096.08 |
| 01/02/2019 | Chk# 011824368 | 0.00 | 68,159.90 | -63.82 |
| 02/01/2019 | Chk# 011859856 | 0.00 | 68,159.90 | -68,223.72 |
| 02/01/2019 | Base Rent (02/2019) | 55,616.67 | 0.00 | -12,607.05 |
| 02/01/2019 | Estimated CAM (02/2019) | 8,203.46 | 0.00 | -4,403.59 |
| 02/01/2019 | Sales Tax | 4,275.95 | 0.00 | -127.64 |
| 03/01/2019 | CAM Reconciliation (10/2018 - 12/2018) | 381.68 | 0.00 | 254.04 |
| 03/01/2019 | 6.70% Tax applied to Ctrl 318220 | 25.57 | 0.00 | 279.61 |
| 03/01/2019 | Base Rent (03/2019) | 55,616.67 | 0.00 | 55,896.28 |
| 03/01/2019 | Estimated CAM (03/2019) | 8,203.46 | 0.00 | 64,099.74 |
| 03/01/2019 | Sales Tax | 4,277.66 | 0.00 | 68,377.40 |
| 03/06/2019 | Chk# 011888044 | 0.00 | 68,159.90 | 217.50 |
| 04/01/2019 | Base Rent (04/2019) | 55,616.67 | 0.00 | 55,834.17 |
| 04/01/2019 | Estimated CAM (04/2019) | 8,203.46 | 0.00 | 64,037.63 |
| 04/01/2019 | Sales Tax | 4,275.95 | 0.00 | 68,313.58 |
| 04/03/2019 | Chk# 011912451 | 0.00 | 68,159.90 | 153.68 |
| 04/08/2019 | Chk# 01191596 | 0.00 | 407.25 | -253.57 |
| 05/01/2019 | Chk# 011937066 | 0.00 | 68,159.90 | -68,413.47 |
| 05/01/2019 | Base Rent (05/2019) | 55,616.67 | 0.00 | -12,796.80 |
| 05/01/2019 | Estimated CAM (05/2019) | 8,203.46 | 0.00 | -4,593.34 |
| 05/01/2019 | Sales Tax | 4,275.95 | 0.00 | -317.39 |
| 06/01/2019 | Base Rent (06/2019) | 55,616.67 | 0.00 | 55,299.28 |
| 06/01/2019 | Estimated CAM (06/2019) | 8,203.46 | 0.00 | 63,502.74 |
| 06/01/2019 | Sales Tax | 4,275.95 | 0.00 | 67,778.69 |
| 06/10/2019 | Chk# 011971579 | 0.00 | 68,159.90 | -381.21 |
| 07/01/2019 | Base Rent (07/2019) | 55,616.67 | 0.00 | 55,235.46 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 74,114.58 | -1,843.64 | 60.00 | 88,671.59 | 161,002.53 |

**Bird & 87th Avenue Village, LLC**
c/o Horizon Properties
18610 N.W. 87 Avenue, Suite 204
Hialeah, FL 33015
(305) 364-9945
(305) 364-9980

**Invoice**

| | |
|---|---|
| **Account** | bird87 87-hosp Coral Gables Hospital, Inc. |
| **Prop Name** | Bird & 87th Avenue Village, LLC |
| **Assigned Spaces** | 8665 |

Steward CGH, Inc.
c/o Steward Health Care System, LLC
ATTN: Corp Real Estate & Facilities
1900 N. Pearl Street
Suite 2300
Dallas, TX 75201

| | |
|---|---|
| **Date** | 08/02/2024 |
| **Payment** | $ _____ |

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | **Balance Forward** | | | 0.00 |
| 07/01/2019 | Estimated CAM (07/2019) | 8,203.46 | 0.00 | 63,438.92 |
| 07/01/2019 | Sales Tax | 4,275.95 | 0.00 | 67,714.87 |
| 07/05/2019 | Chk# 011996701 | 0.00 | 68,159.90 | -445.03 |
| 08/01/2019 | Base Rent (08/2019) | 55,616.67 | 0.00 | 55,171.64 |
| 08/01/2019 | Estimated CAM (08/2019) | 8,203.46 | 0.00 | 63,375.10 |
| 08/01/2019 | Sales Tax | 4,275.95 | 0.00 | 67,651.05 |
| 08/05/2019 | Chk# 012019950 | 0.00 | 68,159.90 | -508.85 |
| 09/01/2019 | Base Rent (09/2019) | 55,616.67 | 0.00 | 55,107.82 |
| 09/01/2019 | Estimated CAM (09/2019) | 8,203.46 | 0.00 | 63,311.28 |
| 09/01/2019 | Sales Tax | 4,275.95 | 0.00 | 67,587.23 |
| 09/09/2019 | Chk# 012047658 | 0.00 | 68,159.90 | -572.67 |
| 10/01/2019 | Chk# 012071231 | 0.00 | 68,159.90 | -68,732.57 |
| 10/01/2019 | Base Rent (10/2019) | 55,616.67 | 0.00 | -13,115.90 |
| 10/01/2019 | Estimated CAM (10/2019) | 8,203.46 | 0.00 | -4,912.44 |
| 10/01/2019 | Sales Tax | 4,275.95 | 0.00 | -636.49 |
| 11/01/2019 | Chk# 012095583 | 0.00 | 68,159.90 | -68,796.39 |
| 11/01/2019 | Base Rent (11/2019) | 56,729.00 | 0.00 | -12,067.39 |
| 11/01/2019 | Estimated CAM (11/2019) | 8,203.46 | 0.00 | -3,863.93 |
| 11/01/2019 | Sales Tax | 4,350.47 | 0.00 | 486.54 |
| 11/07/2019 | Chk# 012101881 | 0.00 | 486.54 | 0.00 |
| 12/01/2019 | Base Rent (12/2019) | 56,729.00 | 0.00 | 56,729.00 |
| 12/01/2019 | Estimated CAM (12/2019) | 8,203.46 | 0.00 | 64,932.46 |
| 12/01/2019 | Sales Tax | 4,350.47 | 0.00 | 69,282.93 |
| 12/06/2019 | Chk# 012121967 | 0.00 | 69,282.93 | 0.00 |
| 01/01/2020 | Base Rent (01/2020) | 56,729.00 | 0.00 | 56,729.00 |
| 01/01/2020 | Estimated CAM (01/2020) | 8,203.46 | 0.00 | 64,932.46 |
| 01/01/2020 | Sales Tax | 4,220.61 | 0.00 | 69,153.07 |
| 01/02/2020 | Chk# 012143994 | 0.00 | 69,282.93 | -129.86 |
| 02/01/2020 | Base Rent (02/2020) | 56,729.00 | 0.00 | 56,599.14 |
| 02/01/2020 | Estimated CAM (02/2020) | 8,203.46 | 0.00 | 64,802.60 |
| 02/01/2020 | Sales Tax | 4,220.61 | 0.00 | 69,023.21 |
| 02/01/2020 | CAM Reconciliation (01/2019 - 12/2019) | 14,732.36 | 0.00 | 83,755.57 |
| 02/01/2020 | Tax on charge 358383 | 957.60 | 0.00 | 84,713.17 |
| 02/03/2020 | Chk# 012168368 | 0.00 | 69,153.07 | 15,560.10 |
| 03/01/2020 | Base Rent (03/2020) | 56,729.00 | 0.00 | 72,289.10 |
| 03/01/2020 | Estimated CAM (03/2020) | 9,431.16 | 0.00 | 81,720.26 |
| 03/01/2020 | Sales Tax | 4,300.41 | 0.00 | 86,020.67 |
| 03/09/2020 | Chk# 012194994 | 0.00 | 15,689.96 | 70,330.71 |
| 03/09/2020 | Chk# 012194993 | 0.00 | 69,153.07 | 1,177.64 |
| 03/23/2020 | Chk# 012207084 | 0.00 | 70,460.57 | -69,282.93 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 74,114.58 | -1,843.64 | 60.00 | 88,671.59 | 161,002.53 |

**Bird & 87th Avenue Village, LLC**
c/o Horizon Properties
18610 N.W. 87 Avenue, Suite 204
Hialeah, FL 33015
(305) 364-9945
(305) 364-9980

| | **Invoice** |
|---|---|
| **Account** | bird87 87-hosp Coral Gables Hospital, Inc. |
| **Prop Name** | Bird & 87th Avenue Village, LLC |
| **Assigned Spaces** | 8665 |

Steward CGH, Inc.
c/o Steward Health Care System, LLC
ATTN: Corp Real Estate & Facilities
1900 N. Pearl Street
Suite 2300
Dallas, TX 75201

| | |
|---|---|
| **Date** | 08/02/2024 |
| **Payment** | $ _____ |

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | **Balance Forward** | | | 0.00 |
| 04/01/2020 | Base Rent (04/2020) | 56,729.00 | 0.00 | -12,553.93 |
| 04/01/2020 | Estimated CAM (04/2020) | 9,431.16 | 0.00 | -3,122.77 |
| 04/01/2020 | Sales Tax | 4,300.41 | 0.00 | 1,177.64 |
| 04/06/2020 | Chk# 012217499 | 0.00 | 1,177.64 | 0.00 |
| 04/27/2020 | Chk# 012231315 | 0.00 | 70,460.57 | -70,460.57 |
| 05/01/2020 | Base Rent (05/2020) | 56,729.00 | 0.00 | -13,731.57 |
| 05/01/2020 | Estimated CAM (05/2020) | 9,431.16 | 0.00 | -4,300.41 |
| 05/01/2020 | Sales Tax | 4,300.41 | 0.00 | 0.00 |
| 06/01/2020 | Chk# 012252009 | 0.00 | 70,460.57 | -70,460.57 |
| 06/01/2020 | Base Rent (06/2020) | 56,729.00 | 0.00 | -13,731.57 |
| 06/01/2020 | Estimated CAM (06/2020) | 9,431.16 | 0.00 | -4,300.41 |
| 06/01/2020 | Sales Tax | 4,300.41 | 0.00 | 0.00 |
| 06/30/2020 | Chk# 012271344 | 0.00 | 70,460.57 | -70,460.57 |
| 07/01/2020 | Base Rent (07/2020) | 56,729.00 | 0.00 | -13,731.57 |
| 07/01/2020 | Estimated CAM (07/2020) | 9,431.16 | 0.00 | -4,300.41 |
| 07/01/2020 | Sales Tax | 4,300.41 | 0.00 | 0.00 |
| 07/31/2020 | Chk# 012290018 | 0.00 | 70,460.57 | -70,460.57 |
| 08/01/2020 | Base Rent (08/2020) | 56,729.00 | 0.00 | -13,731.57 |
| 08/01/2020 | Estimated CAM (08/2020) | 9,431.16 | 0.00 | -4,300.41 |
| 08/01/2020 | Sales Tax | 4,300.41 | 0.00 | 0.00 |
| 09/01/2020 | Base Rent (09/2020) | 56,729.00 | 0.00 | 56,729.00 |
| 09/01/2020 | Estimated CAM (09/2020) | 9,431.16 | 0.00 | 66,160.16 |
| 09/01/2020 | Sales Tax | 4,300.41 | 0.00 | 70,460.57 |
| 09/03/2020 | Chk# 012308766 | 0.00 | 70,460.57 | 0.00 |
| 09/25/2020 | Chk# 012323187 | 0.00 | 70,460.67 | -70,460.67 |
| 10/01/2020 | Base Rent (10/2020) | 56,729.00 | 0.00 | -13,731.67 |
| 10/01/2020 | Estimated CAM (10/2020) | 9,431.16 | 0.00 | -4,300.51 |
| 10/01/2020 | Sales Tax | 4,300.41 | 0.00 | -0.10 |
| 11/01/2020 | Base Rent (11/2020) | 57,863.58 | 0.00 | 57,863.48 |
| 11/01/2020 | Estimated CAM (11/2020) | 9,431.16 | 0.00 | 67,294.64 |
| 11/01/2020 | Sales Tax | 4,374.16 | 0.00 | 71,668.80 |
| 11/03/2020 | Chk# 012346691 | 0.00 | 70,460.47 | 1,208.33 |
| 11/13/2020 | Chk# 012352817 | 0.00 | 1,208.33 | 0.00 |
| 12/01/2020 | Base Rent (12/2020) | 57,863.58 | 0.00 | 57,863.58 |
| 12/01/2020 | Estimated CAM (12/2020) | 9,431.16 | 0.00 | 67,294.74 |
| 12/01/2020 | Sales Tax | 4,374.16 | 0.00 | 71,668.90 |
| 12/02/2020 | Chk# 012361453 | 0.00 | 70,460.47 | 1,208.43 |
| 12/14/2020 | S012369293 | 0.00 | 1,208.43 | 0.00 |
| 01/01/2021 | Base Rent (01/2021) | 57,863.58 | 0.00 | 57,863.58 |
| 01/01/2021 | Estimated CAM (01/2021) | 9,431.16 | 0.00 | 67,294.74 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 74,114.58 | -1,843.64 | 60.00 | 88,671.59 | 161,002.53 |

**Bird & 87th Avenue Village, LLC**
c/o Horizon Properties
18610 N.W. 87 Avenue, Suite 204
Hialeah, FL 33015
(305) 364-9945
(305) 364-9980

| | |
|---|---|
| **Invoice** | |
| **Account** | bird87 87-hosp Coral Gables Hospital, Inc. |
| **Prop Name** | Bird & 87th Avenue Village, LLC |
| **Assigned Spaces** | 8665 |

Steward CGH, Inc.
c/o Steward Health Care System, LLC
ATTN: Corp Real Estate & Facilities
1900 N. Pearl Street
Suite 2300
Dallas, TX 75201

| | |
|---|---|
| **Date** | 08/02/2024 |
| **Payment** | $ _____ |

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | **Balance Forward** | | | 0.00 |
| 01/01/2021 | Sales Tax | 4,374.16 | 0.00 | 71,668.90 |
| 01/11/2021 | Chk# 0012383707 | 0.00 | 71,668.90 | 0.00 |
| 02/01/2021 | Base Rent (02/2021) | 57,863.58 | 0.00 | 57,863.58 |
| 02/01/2021 | Estimated CAM (02/2021) | 9,431.16 | 0.00 | 67,294.74 |
| 02/01/2021 | Sales Tax | 4,374.16 | 0.00 | 71,668.90 |
| 02/01/2021 | CAM Reconciliation (01/2020 - 12/2020) | -756.86 | 0.00 | 70,912.04 |
| 02/01/2021 | Tax on charge 396776 | -49.20 | 0.00 | 70,862.84 |
| 02/05/2021 | Chk# 012401294 | 0.00 | 71,668.90 | -806.06 |
| 03/01/2021 | Base Rent (03/2021) | 57,863.58 | 0.00 | 57,057.52 |
| 03/01/2021 | Estimated CAM (03/2021) | 9,431.16 | 0.00 | 66,488.68 |
| 03/01/2021 | Sales Tax | 4,374.16 | 0.00 | 70,862.84 |
| 03/29/2021 | Chk# 012429807 | 0.00 | 71,668.90 | -806.06 |
| 04/01/2021 | Base Rent (04/2021) | 57,863.58 | 0.00 | 57,057.52 |
| 04/01/2021 | Estimated CAM (04/2021) | 9,431.16 | 0.00 | 66,488.68 |
| 04/01/2021 | Sales Tax | 4,374.16 | 0.00 | 70,862.84 |
| 04/07/2021 | Chk# 012435955 | 0.00 | 71,668.90 | -806.06 |
| 05/01/2021 | Base Rent (05/2021) | 57,863.58 | 0.00 | 57,057.52 |
| 05/01/2021 | Estimated CAM (05/2021) | 9,431.16 | 0.00 | 66,488.68 |
| 05/01/2021 | Sales Tax | 4,374.16 | 0.00 | 70,862.84 |
| 05/14/2021 | Chk# 012457064 | 0.00 | 70,862.84 | 0.00 |
| 05/28/2021 | Chk# 012467051 | 0.00 | 71,668.90 | -71,668.90 |
| 06/01/2021 | Base Rent (06/2021) | 57,863.58 | 0.00 | -13,805.32 |
| 06/01/2021 | Estimated CAM (06/2021) | 9,431.16 | 0.00 | -4,374.16 |
| 06/01/2021 | Sales Tax | 4,374.16 | 0.00 | 0.00 |
| 06/28/2021 | Chk# 012481173 | 0.00 | 71,668.90 | -71,668.90 |
| 07/01/2021 | Base Rent (07/2021) | 57,863.58 | 0.00 | -13,805.32 |
| 07/01/2021 | Estimated CAM (07/2021) | 9,431.16 | 0.00 | -4,374.16 |
| 07/01/2021 | Sales Tax | 4,374.16 | 0.00 | 0.00 |
| 07/26/2021 | Chk# 012498612 | 0.00 | 71,668.90 | -71,668.90 |
| 08/01/2021 | Base Rent (08/2021) | 57,863.58 | 0.00 | -13,805.32 |
| 08/01/2021 | Estimated CAM (08/2021) | 9,431.16 | 0.00 | -4,374.16 |
| 08/01/2021 | Sales Tax | 4,374.16 | 0.00 | 0.00 |
| 09/01/2021 | Base Rent (09/2021) | 57,863.58 | 0.00 | 57,863.58 |
| 09/01/2021 | Estimated CAM (09/2021) | 9,431.16 | 0.00 | 67,294.74 |
| 09/01/2021 | Sales Tax | 4,374.16 | 0.00 | 71,668.90 |
| 09/20/2021 | Chk# 10078 | 0.00 | 71,668.90 | 0.00 |
| 09/27/2021 | Chk# 000011040 | 0.00 | 71,668.90 | -71,668.90 |
| 10/01/2021 | Base Rent (10/2021) | 57,863.58 | 0.00 | -13,805.32 |
| 10/01/2021 | Estimated CAM (10/2021) | 9,431.16 | 0.00 | -4,374.16 |
| 10/01/2021 | Sales Tax | 4,374.16 | 0.00 | 0.00 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 74,114.58 | -1,843.64 | 60.00 | 88,671.59 | 161,002.53 |

**Bird & 87th Avenue Village, LLC**
c/o Horizon Properties
18610 N.W. 87 Avenue, Suite 204
Hialeah, FL 33015
(305) 364-9945
(305) 364-9980

Steward CGH, Inc.
c/o Steward Health Care System, LLC
ATTN: Corp Real Estate & Facilities
1900 N. Pearl Street
Suite 2300
Dallas, TX 75201

**Invoice**

| | |
|---|---|
| **Account** | bird87 87-hosp Coral Gables Hospital, Inc. |
| **Prop Name** | Bird & 87th Avenue Village, LLC |
| **Assigned Spaces** | 8665 |
| **Date** | 08/02/2024 |
| **Payment** | $ _____ |

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | **Balance Forward** | | | 0.00 |
| 11/01/2021 | Base Rent (11/2021) | 59,020.86 | 0.00 | 59,020.86 |
| 11/01/2021 | Estimated CAM (11/2021) | 9,431.16 | 0.00 | 68,452.02 |
| 11/01/2021 | Sales Tax | 4,449.38 | 0.00 | 72,901.40 |
| 11/09/2021 | Chk# 13436 | 0.00 | 71,668.90 | 1,232.50 |
| 11/18/2021 | Chk# 14804 | 0.00 | 74,133.89 | -72,901.39 |
| 12/01/2021 | Base Rent (12/2021) | 59,020.86 | 0.00 | -13,880.53 |
| 12/01/2021 | Estimated CAM (12/2021) | 9,431.16 | 0.00 | -4,449.37 |
| 12/01/2021 | Sales Tax | 4,449.38 | 0.00 | 0.01 |
| 12/01/2021 | Sales Tax Adjustment | -0.01 | 0.00 | 0.00 |
| 01/01/2022 | Base Rent (01/2022) | 59,020.86 | 0.00 | 59,020.86 |
| 01/01/2022 | Estimated CAM (01/2022) | 9,431.16 | 0.00 | 68,452.02 |
| 01/01/2022 | Sales Tax | 4,449.38 | 0.00 | 72,901.40 |
| 01/14/2022 | Chk# 18204 | 0.00 | 72,901.40 | 0.00 |
| 01/31/2022 | CAM Reconciliation (01/2021 - 12/2021) | -3,173.10 | 0.00 | -3,173.10 |
| 01/31/2022 | Tax on charge 438042 | -206.25 | 0.00 | -3,379.35 |
| 02/01/2022 | Base Rent (02/2022) | 59,020.86 | 0.00 | 55,641.51 |
| 02/01/2022 | Estimated CAM (02/2022) | 9,431.16 | 0.00 | 65,072.67 |
| 02/01/2022 | Sales Tax | 4,449.38 | 0.00 | 69,522.05 |
| 03/01/2022 | Chk# 20512 | 0.00 | 72,901.40 | -3,379.35 |
| 03/01/2022 | Base Rent (03/2022) | 59,020.86 | 0.00 | 55,641.51 |
| 03/01/2022 | Estimated CAM (03/2022) | 9,431.16 | 0.00 | 65,072.67 |
| 03/01/2022 | Sales Tax | 4,449.38 | 0.00 | 69,522.05 |
| 03/07/2022 | Chk# 21440 | 0.00 | 72,901.40 | -3,379.35 |
| 03/31/2022 | Chk# 22347 - PREPAID APRIL | 0.00 | 72,901.40 | -76,280.75 |
| 04/01/2022 | Base Rent (04/2022) | 59,020.86 | 0.00 | -17,259.89 |
| 04/01/2022 | Estimated CAM (04/2022) | 9,431.16 | 0.00 | -7,828.73 |
| 04/01/2022 | Sales Tax | 4,449.38 | 0.00 | -3,379.35 |
| 05/01/2022 | Base Rent (05/2022) | 59,020.86 | 0.00 | 55,641.51 |
| 05/01/2022 | Estimated CAM (05/2022) | 9,431.16 | 0.00 | 65,072.67 |
| 05/01/2022 | Sales Tax | 4,449.38 | 0.00 | 69,522.05 |
| 05/13/2022 | Chk# 26228 | 0.00 | 72,901.40 | -3,379.35 |
| 06/01/2022 | Base Rent (06/2022) | 59,020.86 | 0.00 | 55,641.51 |
| 06/01/2022 | Estimated CAM (06/2022) | 9,431.16 | 0.00 | 65,072.67 |
| 06/01/2022 | Sales Tax | 4,449.38 | 0.00 | 69,522.05 |
| 06/13/2022 | Chk# 27405 | 0.00 | 72,901.40 | -3,379.35 |
| 07/01/2022 | Base Rent (07/2022) | 59,020.86 | 0.00 | 55,641.51 |
| 07/01/2022 | Estimated CAM (07/2022) | 9,431.16 | 0.00 | 65,072.67 |
| 07/01/2022 | Sales Tax | 4,449.38 | 0.00 | 69,522.05 |
| 07/11/2022 | Chk# 29792 | 0.00 | 72,901.40 | -3,379.35 |
| 07/28/2022 | Chk# 31111 | 0.00 | 72,901.40 | -76,280.75 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 74,114.58 | -1,843.64 | 60.00 | 88,671.59 | 161,002.53 |

**Bird & 87th Avenue Village, LLC**
c/o Horizon Properties
18610 N.W. 87 Avenue, Suite 204
Hialeah, FL 33015
(305) 364-9945
(305) 364-9980

Steward CGH, Inc.
c/o Steward Health Care System, LLC
ATTN: Corp Real Estate & Facilities
1900 N. Pearl Street
Suite 2300
Dallas, TX 75201

| | **Invoice** |
|---|---|
| **Account** | bird87 87-hosp Coral Gables Hospital, Inc. |
| **Prop Name** | Bird & 87th Avenue Village, LLC |
| **Assigned Spaces** | 8665 |
| | |
| **Date** | 08/02/2024 |
| **Payment** | $ _____ |

| Date | Description | Charges | Payments | Balance |
|---|---|---:|---:|---:|
| | **Balance Forward** | | | 0.00 |
| 08/01/2022 | Base Rent (08/2022) | 59,020.86 | 0.00 | -17,259.89 |
| 08/01/2022 | Estimated CAM (08/2022) | 9,431.16 | 0.00 | -7,828.73 |
| 08/01/2022 | Sales Tax | 4,449.38 | 0.00 | -3,379.35 |
| 08/25/2022 | Chk# 32793 - PREPAID SEPT | 0.00 | 72,901.40 | -76,280.75 |
| 09/01/2022 | Base Rent (09/2022) | 59,020.86 | 0.00 | -17,259.89 |
| 09/01/2022 | Estimated CAM (09/2022) | 9,431.16 | 0.00 | -7,828.73 |
| 09/01/2022 | Sales Tax | 4,449.38 | 0.00 | -3,379.35 |
| 09/29/2022 | Chk# 34190 | 0.00 | 72,901.40 | -76,280.75 |
| 10/01/2022 | Base Rent (10/2022) | 59,020.86 | 0.00 | -17,259.89 |
| 10/01/2022 | Estimated CAM (10/2022) | 9,431.16 | 0.00 | -7,828.73 |
| 10/01/2022 | Sales Tax | 4,449.38 | 0.00 | -3,379.35 |
| 10/05/2022 | MDC Uniform Civil Violation Fine | 1,500.00 | 0.00 | -1,879.35 |
| 11/01/2022 | Base Rent (11/2022) | 60,201.27 | 0.00 | 58,321.92 |
| 11/01/2022 | Estimated CAM (11/2022) | 9,431.16 | 0.00 | 67,753.08 |
| 11/01/2022 | Sales Tax | 4,526.11 | 0.00 | 72,279.19 |
| 11/07/2022 | Chk# 3052858 - SHORT PAID | 0.00 | 64,118.37 | 8,160.82 |
| 12/01/2022 | Base Rent (12/2022) | 60,201.27 | 0.00 | 68,362.09 |
| 12/01/2022 | Estimated CAM (12/2022) | 9,431.16 | 0.00 | 77,793.25 |
| 12/01/2022 | Sales Tax | 4,526.11 | 0.00 | 82,319.36 |
| 12/07/2022 | Chk# 3056096 - SHORT PAID | 0.00 | 64,118.37 | 18,200.99 |
| 01/01/2023 | Base Rent (01/2023) | 60,201.27 | 0.00 | 78,402.26 |
| 01/01/2023 | Estimated CAM (01/2023) | 9,431.16 | 0.00 | 87,833.42 |
| 01/01/2023 | Sales Tax | 4,526.11 | 0.00 | 92,359.53 |
| 01/04/2023 | Chk# 3059376 -  SHORT PAID | 0.00 | 64,118.37 | 28,241.16 |
| 01/29/2023 | CAM Reconciliation (01/2022 - 12/2022) | 6,755.52 | 0.00 | 34,996.68 |
| 01/29/2023 | Tax on charge 481485 | 439.11 | 0.00 | 35,435.79 |
| 02/01/2023 | Base Rent (02/2023) | 60,201.27 | 0.00 | 95,637.06 |
| 02/01/2023 | Estimated CAM (02/2023) | 9,431.16 | 0.00 | 105,068.22 |
| 02/01/2023 | Sales Tax | 4,526.11 | 0.00 | 109,594.33 |
| 02/01/2023 | Estimated CAM (02/2023) | 9,994.12 | 0.00 | 119,588.45 |
| 02/01/2023 | Reversed Estimated CAM (02/2023) | -9,431.16 | 0.00 | 110,157.29 |
| 02/01/2023 | Tax on charge 481636 | 649.62 | 0.00 | 110,806.91 |
| 02/01/2023 | Tax on charge 481637 | -613.03 | 0.00 | 110,193.88 |
| 02/13/2023 | Chk# 3062757 | 0.00 | 64,118.37 | 46,075.51 |
| 02/23/2023 | Chk# 3064589 | 0.00 | 174,838.62 | -128,763.11 |
| 03/01/2023 | Base Rent (03/2023) | 60,201.27 | 0.00 | -68,561.84 |
| 03/01/2023 | Estimated CAM (03/2023) | 9,994.12 | 0.00 | -58,567.72 |
| 03/01/2023 | Sales Tax | 4,562.70 | 0.00 | -54,005.02 |
| 03/13/2023 | Chk# 3065151 | 0.00 | 46,075.71 | -100,080.73 |
| 04/01/2023 | Base Rent (04/2023) | 60,201.27 | 0.00 | -39,879.46 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 74,114.58 | -1,843.64 | 60.00 | 88,671.59 | 161,002.53 |

**Bird & 87th Avenue Village, LLC**
c/o Horizon Properties
18610 N.W. 87 Avenue, Suite 204
Hialeah, FL 33015
(305) 364-9945
(305) 364-9980

| | **Invoice** |
|---|---|
| **Account** | bird87 87-hosp Coral Gables Hospital, Inc. |
| **Prop Name** | Bird & 87th Avenue Village, LLC |
| **Assigned Spaces** | 8665 |

Steward CGH, Inc.
c/o Steward Health Care System, LLC
ATTN: Corp Real Estate & Facilities
1900 N. Pearl Street
Suite 2300
Dallas, TX 75201

| | |
|---|---|
| **Date** | 08/02/2024 |
| **Payment** | $ _____ |

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | **Balance Forward** | | | 0.00 |
| 04/01/2023 | Estimated CAM (04/2023) | 9,994.12 | 0.00 | -29,885.34 |
| 04/01/2023 | Sales Tax | 4,562.70 | 0.00 | -25,322.64 |
| 04/10/2023 | Chk# 3068856 | 0.00 | 74,758.09 | -100,080.73 |
| 05/01/2023 | Base Rent (05/2023) | 60,201.27 | 0.00 | -39,879.46 |
| 05/01/2023 | Estimated CAM (05/2023) | 9,994.12 | 0.00 | -29,885.34 |
| 05/01/2023 | Sales Tax | 4,562.70 | 0.00 | -25,322.64 |
| 05/09/2023 | Chk# 3071303 | 0.00 | 74,758.09 | -100,080.73 |
| 06/01/2023 | Base Rent (06/2023) | 60,201.27 | 0.00 | -39,879.46 |
| 06/01/2023 | Estimated CAM (06/2023) | 9,994.12 | 0.00 | -29,885.34 |
| 06/01/2023 | Sales Tax | 4,562.70 | 0.00 | -25,322.64 |
| 06/06/2023 | Chk# 3075722 | 0.00 | 74,758.09 | -100,080.73 |
| 07/01/2023 | Base Rent (07/2023) | 60,201.27 | 0.00 | -39,879.46 |
| 07/01/2023 | Estimated CAM (07/2023) | 9,994.12 | 0.00 | -29,885.34 |
| 07/01/2023 | Sales Tax | 4,562.70 | 0.00 | -25,322.64 |
| 08/01/2023 | Base Rent (08/2023) | 60,201.27 | 0.00 | 34,878.63 |
| 08/01/2023 | Estimated CAM (08/2023) | 9,994.12 | 0.00 | 44,872.75 |
| 08/01/2023 | Sales Tax | 4,562.70 | 0.00 | 49,435.45 |
| 08/15/2023 | Chk# 3079655 | 0.00 | 74,758.09 | -25,322.64 |
| 09/01/2023 | Base Rent (09/2023) | 60,201.27 | 0.00 | 34,878.63 |
| 09/01/2023 | Estimated CAM (09/2023) | 9,994.12 | 0.00 | 44,872.75 |
| 09/01/2023 | Sales Tax | 4,562.70 | 0.00 | 49,435.45 |
| 09/21/2023 | Chk# 3081994 | 0.00 | 74,758.09 | -25,322.64 |
| 10/01/2023 | Base Rent (10/2023) | 60,201.27 | 0.00 | 34,878.63 |
| 10/01/2023 | Estimated CAM (10/2023) | 9,994.12 | 0.00 | 44,872.75 |
| 10/01/2023 | Sales Tax | 4,562.70 | 0.00 | 49,435.45 |
| 10/24/2023 | Chk# 3083868 | 0.00 | 74,758.09 | -25,322.64 |
| 11/01/2023 | Base Rent (11/2023) | 61,405.30 | 0.00 | 36,082.66 |
| 11/01/2023 | Estimated CAM (11/2023) | 9,994.12 | 0.00 | 46,076.78 |
| 11/01/2023 | Sales Tax | 4,640.96 | 0.00 | 50,717.74 |
| 11/27/2023 | Late Fee, 5% of $71,399.42 | 3,569.97 | 0.00 | 54,287.71 |
| 11/30/2023 | Chk# 3085564 - RENT INCREASE SHORT PAID | 0.00 | 74,758.09 | -20,470.38 |
| 12/01/2023 | Base Rent (12/2023) | 61,405.30 | 0.00 | 40,934.92 |
| 12/01/2023 | Estimated CAM (12/2023) | 9,994.12 | 0.00 | 50,929.04 |
| 12/01/2023 | Sales Tax | 3,926.97 | 0.00 | 54,856.01 |
| 12/11/2023 | Late Fee, 5% of $71,399.42 | 3,569.97 | 0.00 | 58,425.98 |
| 01/01/2024 | Base Rent (01/2024) | 61,405.30 | 0.00 | 119,831.28 |
| 01/01/2024 | Estimated CAM (01/2024) | 9,994.12 | 0.00 | 129,825.40 |
| 01/01/2024 | Sales Tax | 3,926.97 | 0.00 | 133,752.37 |
| 01/04/2024 | Chk# 3088022 | 0.00 | 149,516.18 | -15,763.81 |
| 02/01/2024 | Base Rent (02/2024) | 61,405.30 | 0.00 | 45,641.49 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 74,114.58 | -1,843.64 | 60.00 | 88,671.59 | 161,002.53 |

**Bird & 87th Avenue Village, LLC**
c/o Horizon Properties
18610 N.W. 87 Avenue, Suite 204
Hialeah, FL 33015
(305) 364-9945
(305) 364-9980

**Invoice**

| | |
|---|---|
| **Account** | bird87 87-hosp Coral Gables Hospital, Inc. |
| **Prop Name** | Bird & 87th Avenue Village, LLC |
| **Assigned Spaces** | 8665 |

Steward CGH, Inc.
c/o Steward Health Care System, LLC
ATTN: Corp Real Estate & Facilities
1900 N. Pearl Street
Suite 2300
Dallas, TX 75201

| | |
|---|---|
| **Date** | 08/02/2024 |
| **Payment** | $ |

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | **Balance Forward** | | | 0.00 |
| 02/01/2024 | Estimated CAM (02/2024) | 9,994.12 | 0.00 | 55,635.61 |
| 02/01/2024 | Sales Tax | 3,926.97 | 0.00 | 59,562.58 |
| 02/01/2024 | Estimated CAM (02/2024) | 12,340.54 | 0.00 | 71,903.12 |
| 02/01/2024 | Reversed Estimated CAM (02/2024) | -9,994.12 | 0.00 | 61,909.00 |
| 02/01/2024 | Tax on charge 528841 | 678.73 | 0.00 | 62,587.73 |
| 02/01/2024 | Tax on charge 528842 | -549.68 | 0.00 | 62,038.05 |
| 02/04/2024 | CAM Reconciliation (01/2023 - 12/2023) | 28,720.00 | 0.00 | 90,758.05 |
| 02/04/2024 | Tax on charge 528815 | 1,579.60 | 0.00 | 92,337.65 |
| 02/12/2024 | Late Fee, 5% of $73,745.84 | 3,687.29 | 0.00 | 96,024.94 |
| 02/16/2024 | Chk# 3091904 | 0.00 | 74,758.09 | 21,266.85 |
| 02/28/2024 | Attorney's Fees | 415.68 | 0.00 | 21,682.53 |
| 03/01/2024 | Base Rent (03/2024) | 61,405.30 | 0.00 | 83,087.83 |
| 03/01/2024 | Estimated CAM (03/2024) | 12,340.54 | 0.00 | 95,428.37 |
| 03/01/2024 | Sales Tax | 4,056.02 | 0.00 | 99,484.39 |
| 03/05/2024 | Chk# 3093463 | 0.00 | 21,266.85 | 78,217.54 |
| 03/11/2024 | Late Fee, 5% of $73745.84 | 3,687.29 | 0.00 | 81,904.83 |
| 03/29/2024 | Attorney's Fees | 529.22 | 0.00 | 82,434.05 |
| 03/31/2024 | Chk# 3096641 | 0.00 | 149,516.18 | -67,082.13 |
| 04/01/2024 | Base Rent (04/2024) | 61,405.30 | 0.00 | -5,676.83 |
| 04/01/2024 | Estimated CAM (04/2024) | 12,340.54 | 0.00 | 6,663.71 |
| 04/01/2024 | Sales Tax | 4,056.02 | 0.00 | 10,719.73 |
| 04/29/2024 | Attorney's Fees | 150.00 | 0.00 | 10,869.73 |
| 05/01/2024 | Base Rent (05/2024) | 61,405.30 | 0.00 | 72,275.03 |
| 05/01/2024 | Estimated CAM (05/2024) | 12,340.54 | 0.00 | 84,615.57 |
| 05/01/2024 | Sales Tax | 4,056.02 | 0.00 | 88,671.59 |
| 05/30/2024 | Attorney's Fees | 60.00 | 0.00 | 88,731.59 |
| 06/01/2024 | Base Rent (06/2024) | 61,405.30 | 0.00 | 150,136.89 |
| 06/01/2024 | Estimated CAM (06/2024) | 12,340.54 | 0.00 | 162,477.43 |
| 06/01/2024 | Sales Tax | 2,212.38 | 0.00 | 164,689.81 |
| 06/05/2024 | Chk# 3101196 | 0.00 | 77,801.86 | 86,887.95 |
| 07/01/2024 | Base Rent (07/2024) | 61,405.30 | 0.00 | 148,293.25 |
| 07/01/2024 | Estimated CAM (07/2024) | 12,340.54 | 0.00 | 160,633.79 |
| 07/01/2024 | Sales Tax | 2,212.38 | 0.00 | 162,846.17 |
| 07/03/2024 | Chk# 3103343 | 0.00 | 77,801.86 | 85,044.31 |
| 08/01/2024 | Base Rent (08/2024) | 61,405.30 | 0.00 | 146,449.61 |
| 08/01/2024 | Estimated CAM (08/2024) | 12,340.54 | 0.00 | 158,790.15 |
| 08/01/2024 | Sales Tax | 2,212.38 | 0.00 | 161,002.53 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 74,114.58 | -1,843.64 | 60.00 | 88,671.59 | 161,002.53 |