**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| STEWARD HEALTH CARE SYSTEM, LLC, *et al.*,[1] | Case No. 24-90213 |
| | (Jointly Administered) |
| Debtors. | Re Docket No. 2026 |

**PRELIMINARY OBJECTION AND RESPONSE OF MPT AND MASTER LEASE I**
**LESSORS TO DEBTORS' MOTION TO REJECT MASTER LEASE I**

Medical Properties Trust, Inc. and certain affiliates, including the lessors under Master Lease I (collectively, "**MPT**"), respectfully file this preliminary objection and response to the *Motion of Debtors for Order (I) Authorizing Rejection of Master Lease I Agreements Effective as of August 11, 2024 in Connection with Planned Sales of Master Lease I Hospitals to New Operators, and (II) Granting Related Relief* [Dkt. 2026] (the "**Motion**" or "**MLI Rejection Motion**")[2] filed by the Debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**" or "**Cases**").

## Introduction

1.      If the Debtors want to reject Master Lease I, MPT will not stand in the way.  The Debtors, however, need to abide by the law governing rejection.  First, consistent with Section 365(d)(4), they need to be prepared to surrender the properties "immediately" on the date of rejection.  Second, under Section 365(d)(3), the Debtors have to pay current rent in full until

---

[1]      A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

[2]      Capitalized terms used but not defined herein shall have the meaning ascribed in the MLI Rejection Motion.  References to "Sections," where not otherwise specified, are to sections of the Bankruptcy Code.

their rejection is effective.  It is frivolous for the Debtors to claim that they can continue to operate their businesses in MPT's property, generate revenue for the benefit of the estate and secured lenders, but not pay any rent.  Any order granting the MLI Rejection Motion must instead condition rejection on surrender and on payment of rent and all other lease obligations until surrender.

2.       Importantly, the Debtors' surrender of the relevant hospitals, as required by law given their decision to reject, does not mean that the hospitals have to close and stop serving patients and communities.  MPT is ready and willing to help find replacement operators for as many hospitals as possible and to facilitate a safe and orderly transition to those interim operators.  The Debtors, on the other hand, have made clear that they are no longer capable of operating hospitals in a safe and appropriate manner.  Since the Petition Date, the Debtors' hospitals have faced severe maintenance and other challenges, including a "catastrophic failure" of HVAC in an Arizona facility (Dkt. 1932), a "bat infestation" in a Florida facility (Dkt. 1653 at 14), and adverse licensure findings in Louisiana (Dkt. 1655 at 3, 8).  In Arizona in particular, the State had to suspend the relevant facility's license given the dangerously high temperatures.[3]  To make the situation worse, the Debtors do not have liquidity for further capital expenditures, ensuring that the condition of the facilities will not improve.

3.       In the face of these developments, MPT is prepared to look for solutions, on a hospital-by-hospital basis, to avoid closures (wherever possible) that would otherwise result from the Debtors' choice to reject the master lease.  MPT believes that interim operators for various

---

[3] Order of Summary Suspension of Health Care Institution License Pursuant to A.R.S. § 41-1092.11(B); Notice of Intent to Revoke Health Care Institution License; and Notice of Hearing and Appointment of Administrative Law Judge, *In re Matter of St. Luke's Behavioral Hospital*, No. 2025-BMFL-0059-DHS (Ariz. Dept. Health Servs. Dir. Aug. 13, 2024), available at https://hsapps.azdhs.gov/ls/sod/Facility.aspx?FacId=MED0233.

hospitals could be identified in a short time and that certain state authorities would support transitions to interim operators as an alternative to closures.

4.      To be clear, MPT tried to avoid this situation.  Prior to Steward's filing the MLI Rejection Motion, MPT advised Steward that pursuing rejection at this stage—and ceasing to pay rent on Master Lease I—would be a serious mistake, because it would replace a consensual (albeit difficult) transition process with a contentious process that would confuse bidders and increase the likelihood of unnecessary closures.  The Debtors went ahead anyway, over MPT's repeated objection.  The purpose of this preliminary response is to make clear that MPT will stand on its right to require surrender of the properties in connection with rejection, as well as its right to require payment of rent prior to surrender.

5.      MPT reserves all rights to supplement this response by September 3, 2024 (the objection deadline for the MLI Rejection Motion) and otherwise reserves all rights and objections to the relief sought by the Debtors.

## Factual Background

**A.      The Debtors enter these cases with MPT's support and an agreement to market MPT's real estate in parallel with the Debtors' assets.**

6.      The history of these cases  provides critical context for the Debtors' decision to seek rejection of their master lease on 23 hospitals.  TheDebtors operate substantially all of their hospital businesses on real property and improvements owned by affiliates of MPT.  Their Massachusetts hospital operations are governed by Master Lease II with the MLII Lessors.[4]  The

---

[4]      **"Master Lease II"** refers to that certain Master Lease Agreement (Master Lease II), dated March 14, 2022. The **"MLII Lessors"** are indirect wholly owned subsidiaries of Silver Holdco JV, LLC, which is a joint venture 50% owned by affiliates of Macquarie Asset Management and 50% owned by affiliates of MPT.  The MLII Lessors are:  MPT of Brighton-Steward, LLC, MPT of Brockton-Steward, LLC, MPT of Fall River-Steward, LLC, MPT of Methuen-Steward, LLC, MPT of Taunton-Steward, LLC, MPT of Ayer-Steward, LLC, MPT of Haverhill-Steward, LLC, and MPT of Dorchester-Steward, LLC.

Motion addresses Master Lease I with the MLI Lessors,[5] which governs the Debtors' hospital operations in Florida, Texas, Arkansas, Louisiana, Arizona, Ohio, and Pennsylvania and one hospital, currently under repair following catastrophic storm damage, in Massachusetts.

7.     Master Lease I contains the customary terms for a large-scale commercial lease covering multiple facilities.  When amended and restated in 2022, it was for a term of nearly 25 years (inclusive of extensions) with rent fixed at inception, subject to inflation escalators.  Master Lease I art. II (Leased Property; Term), § 3.1(a).  At expiration, MPT is free to re-lease the property to a third party, and Steward must "vacate and surrender the Leased Property to Lessor."  *Id.* § 9.1(f).

8.     Master Lease I also gives MPT rights in respect of the Debtors' personal property following a termination or default.  After termination, any of the Debtors' personal property remaining on the properties for 15 days "shall be considered abandoned . . . and may be appropriated, sold, destroyed, or otherwise disposed of by Lessor . . . without any payment to Lessee."  Master Lease I § 6.2.  MPT also has the option, thirty days after any major, uncured default, to purchase all of the personal property in the hospitals at a price determined by a third-party appraisal.  *Id.* § 34.1.

---

[5] "**Master Lease I**" refers to that certain Second Amended and Restated Master Lease Agreement (Master Lease I), dated March 14, 2022 with the affiliates of MPT party thereto (together with Master Lease II, the "**Master Leases**").  The "**MLI Lessors**" are wholly owned subsidiaries of MPT Operating Partnership, L.P.  The MLI Lessors are:  MPT of Hillside-Steward, LLC, MPT of Melbourne-Steward, LLC, MPT of Rockledge-Steward, LLC, MPT of Sebastian-Steward, LLC, MPT of Sharon-Steward, LLC, MPT of Warren-Steward, LLC, MPT of Youngstown-Steward, LLC, MPT of Mesa, LLC, MPT of West Monroe, LLC, MPT of Port Arthur, LLC, MPT of Hope-Steward, LLC, MPT of Odessa-Steward, LLC, MPT of Phoenix-Steward, LLC, MPT of Phoenix Behavioral-Steward, LLC, MPT of San Antonio-Steward, LLC, MPT of Tempe-Steward, LLC, MPT of Texarkana-Steward, LLC, MPT of Maricopa RE-Steward, LLC, MPT of Odessa RE-Steward, LLC, MPT of Ogden RE-Steward, LLC, MPT of Phoenix RE-Steward, LLC, MPT of Port Arthur RE-Steward, LLC, MPT of San Antonio RE-Steward, LLC, MPT of Norwood-Steward, LLC, MPT of Houston-Steward, LLC, MPT of Houston RE-Steward, LLC, MPT of Florence, LLC, MPT of Big Spring-Steward, LLC, LLC, MPT of Miami-Steward, LLC, MPT of Lauderdale Lakes-Steward, LLC, MPT of Coral Gables-Steward, LLC, MPT of Hialeah-Steward, LLC, and MPT of Hialeah Palmetto-Steward, LLC.

9.      Master Lease I's Statement of Intent recites that it "constitutes one unitary, indivisible, non-severable true lease of all the Leased Property" for "one economic unit," and that the lease's terms "would have been substantially different had separate leases . . . been acceptable to Lessor."  The lease also provides that "Lessee has only the right to possession and use of the Lease Property as lessee of Lessor"—*i.e.*, the Debtors have no right to occupy, purchase, or dispose of the hospitals except to the extent granted to them by the Master Leases. Master Lease I ¶ 6.1.

10.      At the outset of these cases, instead of insisting on assumption or rejection of the master leases, MPT chose to support the Debtors in exchange for certain protections for its real estate.  *First*, it committed $75 million in junior DIP funding that provided "urgent liquidity" allowing the Debtors to "stabilize [their] operations."  MPT DIP Motion (Dkt. 16) ¶ 4.  In connection with the MPT DIP Credit Agreement,[6] MPT also agreed to defer approximately one-half of all lease payments under Master Lease I as long as the Debtors made the remaining lease payments on time, with nonpayment defined as a default allowing MPT to accelerate all loan obligations.  §§ 5.01(o) (remaining payment under Master Lease I), 5.04 ("Payment of Obligations"), art. VII ("Events of Default").

11.      The Debtors also stipulated that "each master lease is a valid, unexpired nonresidential real property lease[]," and "enforceable in accordance with its terms as a true, unitary, indivisible lease . . . and not subject to avoidance, recharacterization, subordination, severance (absent the consent of the applicable MPT Lessor), or other challenge."  MPT DIP

---

[6] The **MPT DIP Credit Agreement**" refers to that certain Debtor-in-Possession Credit Agreement dated as of May 28, 2024 among Steward Health Care System LLC, as the Borrower, and the other loan parties party thereto, and MPT TRS Lender-Steward, LLC, as the Sole Lender, a copy of which is attached as Exhibit 1 to the Final MPT DIP Order.  Dkt. 625 at 80–196.

Order (Dkt. 625) ¶ G.22.  That stipulation is "binding" on all parties unless the Creditors'
Committee obtains a final and nonappealable order sustaining a challenge.  *Id.* ¶ G.18.

12.     *Second*, MPT worked with the Debtors and the other parties to develop the Global
Bidding Procedures governing the sale of the Debtors' assets.  The Court-approved procedures
committed the Debtors to working alongside MPT in marketing their personal property in
parallel with MPT's real estate, with every bid required to "indicate the proposed treatment of
[MPT's] real property and proposed terms of an agreement with MPT Lessor."  Global Bidding
Procedures at 13.  Critically, the procedures did *not* provide the Debtors with any authority to
sell MPT's real estate; rather, the order approving the procedures stated that "nothing in the
Global Bidding Procedures, this Order, and/or the determination of any Bid as a Qualified Bid,
shall waive, alter, or modify any rights of the MPT Lessor to approve or enter into any
agreement with respect to real property owned by the MPT Lessor."  Global Bidding Procedures
Order (Dkt. 626) ¶ 41.  MPT was, accordingly, authorized to "discuss and negotiate directly with
any Potential Bidder" with respect to its real estate, subject to certain reporting requirements.
Global Bidding Procedures at 11.  The Debtors' motion to approve the procedures predicted that
they could secure approved sales for *all of their hospitals* by August 5, 2024.  Global Bidding
Procedures Motion (Dkt. 281) ¶ 6.

**B.     The Debtors delay the sale process.**

13.     The Debtors so far have not closed a single hospital sale, for reasons that have
become increasingly clear:  The Debtors are not satisfied with the prices they have obtained for
their operations and, absent the bidders' willingness to increase their bids, want to take a share of
the purchase price or lease value that MPT would receive for its real estate.  Indeed, the MLI
Rejection Motion states that the Debtors have executed purchase agreements for "a number of
their hospitals," MLI Rejection Motion ¶ 2 — but those agreements have not been presented to

the Court for approval.  Indeed, the Debtors told the Court at a July 31 hearing that they are "holding" on bids to "deal with allocation issues with MPT."  July 31 Hr'g Tr. at 11.  At the same hearing, counsel for the FILO Lenders told the Court that they were "never going to accept APAs" between the Debtors and buyers unless MPT would "come to an agreement on allocation" on terms they accept.  July 31, 2024 Hr'g Tr. at 48.

14.     The Debtors have sought to cast blame on MPT for delaying the sale process. MLI Rejection Motion ¶ 2.  According to the Debtors, MPT has "imposed daunting requirements on potential hospital buyers," *i.e.* that they "obtain MPT's consent to sever the applicable Master Lease and enter into an agreement with MPT to acquire or lease the underlying real property." *Id.* ¶ 4.  In other words, MPT has insisted that potential buyers who wish to operate on MPT's property enter into an agreement with MPT either to acquire or to lease its real estate — exactly as contemplated by the Global Bidding Procedures.

15.     While the Debtors continue to delay sales and to initiate wide-ranging litigation, conditions at their facilities have suffered.  The Court heard numerous reports from Massachusetts regarding the threats to patient safety resulting from the Debtors' operation of the hospitals there.  But those concerns are not limited to Massachusetts.  The Patient Care Ombudsman (the "**PCO**") for certain non-Massachusetts hospitals has reported chronic staffing and supply challenges across the Debtors' hospital system, as well as maintenance challenges that have resulted in severe environment-of-care issues and, in some cases, imperiled the Debtors' licenses.[7]  The State of Arizona recently ordered the Debtors to transfer all inpatients

---

[7]  *E.g.*, Dkt. 1652 at 6–7 (reporting a "protracted period of challenging vendor relationships" that halted procedures and "several rooms out of service" at an Arizona facility); Dkt. 1655 at 3, 8 (reporting adverse licensure findings at two Louisiana facilities); Dkt. 1653 at 14 (reporting "[i]nconsistent building temperatures" caused by "chronically non-functional" equipment and other "operational challenges and frustrations [staff] viewed as created by Steward" at Central Florida hospital); *id.* at 28 (noting HVAC issues and a "well-publicized bat infestation" at yet another Florida facility).

from a facility there due to a "catastrophic failure" of its air conditioning (shortly following a state health finding that shut down its kitchen), Dkt. 1932, and the State later suspended the facility's license amid news reports of 99-degree temperatures.[8]  Most recently, the Commonwealth of Pennsylvania indicated that it believes the Debtors have neglected Sharon Hospital and breached their commitments there.  Dkt. 2112.

16.     Across its entire system, the Debtors' inability to maintain the facilities in adequate operating condition endangers patient care, threatens licensure, and harms MPT by degrading the physical assets the Debtors lease from MPT.  And since the Debtors do not have the capacity for further capital investment in their hospitals, due to their liquidity problems and the extraordinary expenses associated with these cases, the Debtors have no obvious path to remedy the situation.

**C.     The Debtors move to reject their Massachusetts leases.**

17.     On July 26, the Debtors moved to reject Master Lease II.  In their rejection motion, the Debtors professed that rejection would "realize cost-savings immediately" and "eliminat[e] approximately $10 million a month in rent payments."  MLII Rejection Motion ¶¶ 25, 28.[9]  As the MLII Lessors explained in their MLII Objection,[10] that logic is flawed: Section 365(d) forbids a lessee from both remaining on leased real estate and ceasing rent payments.  The Debtors, accordingly, have to pay rent and other lease obligations until they

---

[8]  Order of Summary Suspension of Health Care Institution License Pursuant to A.R.S. § 41-1092.11(B); Notice of Intent to Revoke Health Care Institution License; and Notice of Hearing and Appointment of Administrative Law Judge, *In re Matter of St. Luke's Behavioral Hospital*, No. 2025-BMFL-0059-DHS (Ariz. Dept. Health Servs. Dir. Aug. 13, 2024), available at https://hsapps.azdhs.gov/ls/sod/Facility.aspx?FacId=MED0233.

[9]  The "**MLII Rejection Motion**" refers to the *Emergency Motion of Debtors for Order (I) Authorizing Rejection of Master Lease II Agreements Effective as of the Rejection Date in Connection with Planned Transition and Sale of Massachusetts Hospitals to New Operators, and (II) Granting Related Relief* [Dkt. 1712].

[10]  The "**MLII Objection**" refers to the *Objection of MPT and Master Lease II Lessors to Emergency Motion to Reject Master Lease II; and Cross-Motion to Condition Relief on Provision of Adequate Protection* [Dkt. 1760].

vacate, both under Section 365(d) and under the provisions of the Code governing administrative expenses and adequate protection.

18.     Nevertheless, recognizing that there was no better path forward at that juncture for the Massachusetts hospitals, the MLII Lessors consented to rejection, while deferring a judicial determination on *when* rejection would be effective and thus for what period the Debtors have to pay rent under Section 365(d)(3).  The Rejection Order reflected that compromise.  *See* Rejection Order (Dkt. 1782) ¶¶ 1, 7.

**D.     The FILO Lenders require the Debtors to stop paying rent and move to reject Master Lease I.**

19.     As to Master Lease I hospitals, the Debtors have continued to push sale deadlines, resulting in increased costs to fund the estates and their professionals with respect to the administration of those assets.  Recently, the Debtors pushed back bid deadlines so that certain hospitals—including "First Round Hospitals" that were supposed to be sold by July 2, *see* Global Bidding Procedures Motion (Dkt. 281) ¶ 6—will not be sold until September 10 at the earliest. Dkt. 1933, 1934.  These delays have exacerbated an ongoing liquidity crisis:  Most recently, the Debtors filed notices of closure for two Ohio facilities because the Debtors lack liquidity to fund even short-term losses.  *See* Dkt. 2097, 2101.

20.     The Debtors' strategies have become increasingly aggressive and untethered to the parties' legal rights.  On August 6, the Debtors sent MPT a draft amendment to the FILO DIP agreement—a document that, although styled as a "waiver," required the Debtors to agree to new, case-altering milestones and commitments.  MPT promptly conveyed that it did not consent

to these terms.  Two days later, the Debtors sent MPT a letter, which, among other things, attached a copy of the executed FILO DIP Amendment.[11]

21.     The FILO DIP Amendment, which was not submitted to the Court for approval, purported to impose new "Funding Milestones," which include:

> 6. The Loan Parties shall make no payment of rent under the Master Leases, unless the Bankruptcy Court orders otherwise.
>
> . . . .
>
> 8. The Loan Parties will file a motion with the Bankruptcy Court to reject Master Lease I by August 8, 2024, and the hearing regarding such rejection motion shall conclude by August 30, 2024.

The FILO DIP Amendment also required the Debtors to demand "enterprise bids" from potential buyers for the combined value of hospital real estate and operations (even though the Debtors do not own the real estate) and to file a lawsuit asking the Court to allocate value between estate and non-estate assets.  *Id.* § 2.

22.     The Debtors acknowledge that moving to reject Master Lease I is an effort to divert value from MPT to the Debtors and their secured lenders.  The Motion asserts that rejection will "maximize the value of their estates" and "result in significant cost-savings" "by, among other things," eliminating their obligation to pay rent.  MLI Rejection Mot. ¶¶ 27, 29 (emphasis added).  The Debtors also acknowledge, however, that "the requested rejection is in furtherance of facilitating the *continued* operations and sale of the Master Lease I hospitals."  *Id.* at ¶ 7 (emphasis added).  In other words, the Debtors want to occupy the hospitals rent-free pending sales, so money that would otherwise go to rent is available to secured lenders and estate professionals.

---

[11]    The "**FILO DIP Amendment**" refers to the *Limited Waiver No. 1 to Debtor-in-Possession Credit Agreement*, dated as of August 7, 2024.

23.     Consistent with that scheme, the Debtors did not pay any rent when it came due under both Master Leases in August; and they have informed MPT that they have no intention of paying rent in the foreseeable future.  Nonetheless, the Debtors have continued to occupy and use MPT's premises and have taken no steps to surrender the premises, as required for any rejection.

<u>**Objection to MLI Rejection Motion**</u>

**A.     This Court should condition rejection on immediate surrender and on payment of rent prior to surrender.**

24.     The Debtors' proposal to reject Master Lease I, without surrendering the properties and without paying rent pending surrender, is not authorized by law.  Under Section 365, rejection requires surrender.  And, for as long as the Debtors are operating in MPT's properties, the statute requires payment of rent and other obligations.

25.     "Interpreting the Bankruptcy Code begins with analyzing the text." *In re Burts Constr., Inc.*, 648 B.R. 185, 190 (Bankr. S.D. Tex. 2023).  Here, Section 365(d)(3) provides that, within 60 days of the petition date, "[t]he trustee shall timely perform all the obligations of the debtor . . . under any unexpired lease of nonresidential real property."  The Debtors are then required to assume or reject such leases within 120 days (subject to a maximum 90-day extension) or the lease will be "deemed rejected" with the debtors required to "immediately surrender" the premises.  11 U.S.C. § 365(d)(4).  The Fifth Circuit has faithfully applied this language, holding that, upon a debtor's rejection under Section 365(d)(4), "the lease was breached and [the debtor] was required to surrender the premises." *Eastover Bank for Sav. v. Sowashee Venture* (*In re Austin Dev. Co.*), 19 F.3d 1077, 1084 (5th Cir. 1994).

26.     As courts have recognized, Section 365(d) requires debtors either to pay rent or to hand over the keys and surrender.  For example, in *In re Simbaki, Ltd.*, 2015 WL 1593888

(Bankr. S.D. Tex. Apr. 3, 2015), the court ordered a debtor to make rent payments on its restaurant locations as they came due, and "[i]f not made, the leases will be deemed rejected and the automatic stay will be terminated" so that the landlords could reclaim possession. *Id.* at *7. Judge Isgur explained that this result was required by Section 365(d)(3), which "prohibited the Court from extending [the debtor's] time for performance." *Id.*; *accord*, *e.g.*, *In re Borbidge*, 66 B.R. 998, 1004 (Bankr. E.D. Pa. 1986) (under § 365(d)(3), "for the stay to remain in effect, all rentals falling due under the lease since . . . the order of relief . . . must be paid").

27. Equity does not allow a bankruptcy court to override Section 365(d)'s clear text. "[A] bankruptcy court may not contravene specific statutory provisions." *Law v. Siegel*, 571 U.S. 415, 421 (2014); *accord Brown v. Viegelahn* (*In re Brown*), 960 F.3d 711, 716 (5th Cir. 2020) (§105(a) "cannot 'override explicit mandates' of the Code" (citation omitted)). Here, Section 365(d) expressly dictates the Debtors' postpetition lease obligations, and equity cannot override that mandate. *In re CEC Ent., Inc.*, 625 B.R. 344, 351 (Bankr. S.D. Tex. 2020) (Isgur, J.) ("Section 365(d)(3) unambiguously requires that debtors timely perform obligations under commercial leases. . . . As such, the Bankruptcy Code does not permit this Court to equitably alter . . . rent obligations.").[12]

28. The Debtors do not ground their requested relief on the Bankruptcy Code, but instead on the assertion that it is "necessary and unavoidable" that they "liberate themselves from Master Lease I" in order to "finalize and consummate sales of the Debtors' remaining hospitals."

---

[12] Numerous courts have concluded there is no equitable authority to alter a debtor's lease obligations under Section 365(d). *E.g.*, *In re Caldor, Inc.-NY*, 217 B.R. 116, 119 (Bankr. S.D.N.Y. 1998) (no "equitable powers to avoid the express language" of § 365(d)(3)); *In re Thomas*, 2013 WL 1912632, at *7 n.16 (Bankr. D. Colo. May 9, 2013) (court could not "contradict" § 365(d)(3) even if "equitable factors strongly favor the Debtors"); *In re Fla. Lifestyle Apparel, Inc.*, 221 B.R. 897, 901 (Bankr. M.D. Fla. 1997) ("This Court is not in a position to rewrite Section 365(d)(3) or invoke Section 105(a) in an effort to obtain a more equitable result when Section 365(d)(3) clearly mandates this decision.").

MLI Rejection Motion ¶¶ 5–6.  But liberation from Master Lease I (whatever that means) does not liberate the Debtors from the Bankruptcy Code.  Section 365(a) makes clear that their only *statutory* options are to assume or to reject, and Section 365(d) makes clear that rejection means surrender.  Any third path that leads to a sale of MPT's real estate requires MPT's agreement (as the Global Bidding Procedures Order acknowledges, Dkt. 626 ¶ 41).  Here, MPT agreed to a sale alternative so long as the Debtors were paying rent and moving with a consensual process.  The MLI Rejection Motion, however, leaves cooperation behind in favor of a legally impossible alternative under which the Debtors neither surrender nor pay rent.  The Court cannot sanction that result.  Any order approving rejection of Master Lease I should make such rejection conditional on:  (a) surrender of all premises on an immediate basis consistent with public health requirements; and (b) payment of rent and other obligations in full until the premises are surrendered.

29.     The Court has the authority to order immediate surrender upon rejection.  Although some courts have required landlords to pursue state-law remedies following rejection, "[t]he majority and far more persuasive view" is that "the bankruptcy court has the authority to order a debtor out of the leased premises" rather than force the landlords "to pursue remedies under state law."  *In re Peach Auto Painting & Collision, Inc.*, 2001 WL 1002419, at *2 (Bankr. M.D. Ga. Mar. 29, 2001).[13]  Here, given the public health considerations at issue, the Debtors should not only be required to surrender the premises, given their decision to reject the master

---

[13] *Accord, e.g.*, *In re Elm Inn, Inc.*, 942 F.2d 630, 633–34 (9th Cir. 1991) ("[T]he plain language and purpose of section 365(d)(4), the necessarily preemptive force of the Bankruptcy Code, and the broad equitable powers of bankruptcy judges all weigh in favor of granting a surrender order to a lessor who, under the terms of the provision, clearly deserves one."); *In re U.S. Fax, Inc.*, 114 B.R. 70, 73 (E.D. Pa. 1990) ("[T]he language and legislative history of section 365(d)(4) demonstrate that Congress did not intend for creditors to pursue state-law remedies and that requiring creditors to pursue such remedies would frustrate the statute's purpose."); *In re The Deli Den, LLC*, 425 B.R. 725, 727 (Bankr. S.D. Fla. 2010) (ordering debtor "to surrender the leasehold and vacate the premises"); *In re Damianopoulos*, 93 B.R. 3, 6 (Bankr. N.D.N.Y. 1988) (ordering surrender).

lease, but they should also be encouraged to cooperate with MPT as MPT tries to identify interim operators that can keep the hospitals open and operating pending longer-term solutions.

**B.     Adequate protection of MPT's property also requires immediate surrender and payment of rent prior to surrender.**

30.     Section 363(e) provides an alternative and independent basis to require the Debtors to surrender the premises and to pay rent pending surrender.  That statute provides that "at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  Numerous courts, including the Fifth Circuit, have recognized that a lessor is entitled to adequate protection under Section 363(e) for a debtor's continued use of its property.  *See In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986); *In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001) ("[R]ecent cases assume that lessors of real property have a right to adequate protection . . . ." (citation omitted)).

31.     A recent case demonstrates that both adequate protection and Section 365(d)(3) require debtor-lessees to vacate and to pay rent until they vacate.  In *In re Payam, Inc.*, 642 B.R. 365 (Bankr. S.D.N.Y. 2022), the debtor's landlord obtained a warrant of eviction against it for nonpayment of rent shortly before it filed for bankruptcy, and after the filing, the landlord moved to lift the stay to enforce the warrant for lack of adequate protection.  *Id.* at 366.  Chief Judge Glenn explained that the debtor "had no realistic ability to cure [its] substantial prepetition defaults" and, in light of its continuing failure to pay rent, the landlord was entitled to enforce its warrant:  "[T]he Debtor was obligated by section 365(d)(3) of the Bankruptcy Code to 'timely perform all the obligations of the debtor' including those arising under an unexpired lease. . . .

14

Additionally, to avoid having the automatic stay lifted, the Debtor was required to provide the Landlord with 'adequate protection.'  It did not do so here."  *Id.* at 371.

32.     Here, each day the Debtors remain in the facilities without paying their lease obligations, MPT suffers mounting and incalculable losses.  For as long as the Debtors remain in the hospitals without paying, MPT cannot realize any income from the assets.  And the value and utility of the hospitals depreciates with time and use, and with the Debtors' failure to maintain the assets.  MPT, moreover, will also be forced to shoulder an array of actual, current, and ongoing costs.  Specifically, if the Debtors do not pay real property taxes as the lease requires them to, the Debtors' properties will be subject to foreclosure — as well as penalties — unless *MPT pays*.  Likewise, if the Debtors do not defend MPT for conditions that the Debtors cause — from encroachments to slip-and-falls — MPT will again be forced to pay for the Debtors' liabilities.  In addition, the Debtors continue to expose MPT to repair expenses by deferring necessary maintenance.

33.     The Debtors cannot continue to occupy the properties under conditions that impose massive, ongoing costs on their landlords, in addition to the risks being created for patients.  As discussed above, public health authorities, as well as the PCO, have raised increasing concerns:  The PCO in particular has reported enormous staff attrition, supply shortages, and equipment shutdowns across the Debtors' network, in addition to licensing issues due to maintenance and upkeep failures.

34.     Given these circumstances, in light of the Debtors' decision to reject the master lease and thus to vacate the premises upon rejection, MPT will seek to identify qualified, licensed operators — who are capable of acting on an emergency basis — to assume

responsibility for hospital operations after the Debtors have surrendered the premises as they are required to do given their decision to reject.

**C.      Retroactive rejection is not permissible.**

35.     The Debtors' Motion "respectfully submit[s] that it is appropriate to deem the Debtors' rejection . . . effective *nunc pro tunc*" to August 11, MLI Rejection Mot. ¶ 30 — which is, not coincidentally, the day before their August lease obligations became due.

36.     There is no basis for retroactive rejection.  Although courts sometimes allow retroactive rejection when the Debtors have *already surrendered* the relevant property, *e.g.*, *In re Amber's Stores, Inc.*, 193 B.R. 819, 827 (Bankr. N.D. Tex. 1996), courts do not allow debtors to backdate rejection when they are still occupying the landlord's premises.  For example, in *In re Cafeteria Operators, L.P.*, 299 B.R. 384 (Bankr. N.D. Tex. 2003), the debtors moved to reject their leases on several restaurants, some occupied and some not.  As to properties the debtors had vacated, the court allowed "rejection retroactive to *the later of* 1) the date Debtors' Motions were filed or 2) *the date the leased space was vacated.*"  *Id.* at 394 (emphasis added).  As to the properties the debtors still occupied as of the rejection motion, the court *denied* retroactive rejection altogether.  *Id.*  Similarly, *In re Romacorp, Inc.*, 2006 WL 6544088 (Bankr. N.D. Tex. Feb. 2, 2006), the court denied retroactive rejection outright because the debtor failed to vacate the premises and kept personal property there.  *Id.* at *6.  "[R]etroactive rejection," it held, "is permissible no earlier than the time the lessee vacates the premises."  *Id.* at *5.

**D.      The Master Lease I ancillary agreements are not executory contracts capable of rejection.**

37.     The Debtors also ask the Court to allow them to reject a host of ancillary agreements executed with the MLI Lessors at the same time as Master Lease I, listed in Schedule 1 of the Motion.  But those agreements are not executory contracts that can be rejected

under Section 365 and are not integrated with Master Lease I, which contains an entire-agreement clause (§ 39.5).  If debtors could reject documents like guaranties, security agreements, and recorded instruments, all debtors would.  That is not the law.

38.     The only types of contracts that a debtor may reject under Section 365(a) are "any executory contract or unexpired lease."  A contract is executory if "at the time of the bankruptcy filing" "performance remains due to some extent on both sides," and those remaining obligations are "material."  *RPD Holdings, L.L.C. v. Tech. Pharma. Servs.* (*In re Provider Meds, L.L.C.*), 907 F.3d 845, 851 (5th Cir. 2018) (citation omitted).  A contract also cannot be rejected if it is a security agreement.  *In re Cox*, 179 B.R. 495, 498 (Bankr. N.D. Tex. 1995); *accord*, *e.g.*, *In re Keblish*, 180 B.R. 176, 177 (Bankr. E.D. Tex. 1995).

39.     The Debtors concede that some or most of the agreements sought to be rejected are not, themselves, executory contracts capable of being rejected.  MLI Rejection Mot. ¶ 23.  To take one example, the assignments of rents executed at the same time as Master Lease I are security agreements, as they assign to MPT the Debtors' right to any subtenant rents as security for Master Lease I and various other agreements and loans, with recourse only if the Debtors default.  *E.g.*, Amended and Restated Assignment of Rents and Leases, dated as of May 31, 2022, by and among MPT of Hillside-Steward, LLC, et al., and Steward Rockledge Hospital, Inc. §§ 3.1 (Debtors retain subtenant rents unless in default), 6.1–6.2 (assignment secures Master Lease I and Obligation Documents).  They also are not executory because they create no obligations for the MLI Lessors, only "rights and remedies."  *Id*. § 7.1; *see In re Howard*, 109 B.R. 382, 384 (Bankr. E.D. Mo. 1989) (assignment of contract proceeds guaranteeing loan was not executory).

40.     The one agreement that the Debtors argue *is* executory, the Amended and Restated Environmental Agreement, *is not*.  As the Debtors point out (MLI Rejection Motion ¶ 23), MPT's only obligation under this agreement is to give Steward notice of any third-party claims.  These "immaterial, *de minimis*, remote and contingent obligations" are "merely designed to implement the various indemnifications of the Debtors" and are therefore not "independent obligations" of the MLI Lessors rendering the agreement executory.  *In re Chateaugay Corp.*, 102 B.R. 335, 347–48 (Bankr. S.D.N.Y. 1989) (duty to give notice to indemnitor did not render indemnity agreement executory).

41.     The Debtors further argue that these various agreements are part of an integrated contract and can therefore be rejected together even though they are not, themselves, executory.  MLI Rejection Motion ¶¶ 22–23.  But the agreements address different obligations, have different forms of consideration, are among different parties, terminate at different times, and in some cases choose different laws and forums and/or contain integration clauses.  *In re AbitibiBowater Inc.*, 418 B.R. 815, 824 (Bankr. D. Del. 2009) (agreements were separate, in part, because they had different subjects, parties, termination dates, and choices of law and forum, and one contained an integration clause).  Even if they were one agreement, moreover, rejecting a contract that contains executory and nonexecutory portions does not impact the nonexecutory parts of the agreement.  *E.g.*, *In re Land Res., LLC*, 2009 WL 10742971 at *4 (Bankr. M.D. Fla. Aug. 24, 2009) (fully performed portion of a rejected contract was non-executory and was unaffected by rejection); *In re DMR Fin. Servs., Inc.*, 274 B.R. 465, 472 (Bankr. E.D. Mich. 2002) (rejection cannot rescind completed performance under executory contract).

42.     In sum, even if the Debtors are allowed to reject Master Lease I, there is no authority for the rejection of non-rejectable, non-executory contracts and security agreements.

As the Debtors intend to submit supplemental briefing on this point, MPT reserves the right to amend, modify, restate, and supplement the arguments above.

## **Conclusion**

43.     The Debtors have moved to reject Master Lease I, but in doing so have ignored the text of Section 365 and the considerable case law interpreting it.  If the Debtors reject Master Lease I, under that statute and those cases, they must live with the consequences:  surrender of the premises, and payment of rent and other lease obligations prior to such surrender.

44.     MPT reserves all rights to supplement this preliminary objection and response.

Dated:  August 25, 2024
Houston, Texas

*/s/ Paul E. Heath*

**VINSON & ELKINS LLP**

Paul E. Heath (TX 09355050)
Matthew D. Struble (TX 24102544)
Kiran Vakamudi (TX 24106540)
845 Texas Avenue, Suite 4700
Houston, TX  77002
Tel:  (713) 758-2222
Email:  pheath@velaw.com
          mstruble@velaw.com
          kvakamudi@velaw.com

**KTBS LAW LLP**

Thomas E. Patterson (*admitted pro hac vice*)
Sasha M. Gurvitz (*admitted pro hac vice*)
Nir Maoz (*admitted pro hac vice*)
1801 Century Park East, 26th Floor
Los Angeles, CA  90067
Tel:  (310) 407-4000
Email: tpatterson@ktbslaw.com
          sgurvitz@ktbslaw.com
          nmaoz@ktbslaw.com

**WACHTELL, LIPTON, ROSEN & KATZ**

Emil A. Kleinhaus (admitted *pro hac vice*)
Angela K. Herring (admitted *pro hac vice*)
Michael H. Cassel (admitted *pro hac vice*)
51 W. 52nd Street
New York, NY  10019
Tel:  (212) 403-1332
Email: eakleinhaus@wlrk.com
          akherring@wlrk.com
          mhcassel@wlrk.com

**ATTORNEYS FOR MEDICAL PROPERTIES TRUST, INC. AND CERTAIN AFFILIATES, INCLUDING THE MLI LESSORS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 25, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Kiran Vakamudi*