## Exhibit A

**Material Terms of the Stalking Horse Bid**

## Material Terms of the Stalking Horse Bid

*The following chart contains a summary of certain material terms of the Stalking Horse Agreement. The summary set forth below does not contain all of the terms of the Stalking Horse Agreement and should not be used or relied upon as a substitute for the full terms and conditions set forth in the Stalking Horse Agreement. The summary of the Stalking Horse Agreement contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.*

| **MATERIAL TERMS OF THE STALKING HORSE BID** ||
|---|---|
| **Stalking Horse APA Parties** | <u>Seller</u>: Brim Healthcare of Texas, LLC, a Delaware limited liability company<br><br><u>Buyer</u>: CHRISTUS Health Ark-La-Tex, a Texas nonprofit corporation |
| **Purchase Price** *(Section 1.6)* | $4,500,000 plus (i) Purchased Working Capital (if positive), minus (ii) Purchased Working Capital (if negative). |
| **Escrow Deposit** *(Section 12.2)* | $675,000 good faith deposit. |
| **Financing** *(Section 4.5)* | Buyer has, and at the Closing will have, sufficient funds available to pay the Estimated Purchase Price (and any other amounts to be paid by Buyer, including all Cure Costs and any expenses incurred by Buyer in connection with the Contemplated Transactions), and to perform its obligations under this Stalking Horse Agreement and the other Transaction Documents. |
| **Stalking Horse Bid Protections** *(Section 9.1; Section 9.3)* | <u>Break-Up Fee</u>: $260,000.<br><br><u>Expense Reimbursement Amount</u>: all reasonable, out-of-pocket and documented costs and expenses up to $135,000.<br><br>The Break-Up Fee and Expense Reimbursement Amount are treated as super-priority administrative claims in the Chapter 11 Cases and payable in the event that (1) Buyer is not the winning bidder at the Auction or (2) Seller exercises its fiduciary out, terminates the Stalking Horse Agreement and consummates a Competing Bid within twelve (12) months of the date of such termination, in each case, in accordance with the Stalking Horse Agreement. |
| **Termination** *(Section 12.1; Section 12.3)* | <u>Mutual Consent</u>. By the mutual written consent of Buyer and Seller.<br><br><u>Mutual Termination Rights</u>: |

| | |
|---|---|
| | (i)  Either party may terminate if the Closing does not occur by the End Date (November 30, 2024).<br><br>(ii) Either party may terminate upon the other party's uncured breach of the Stalking Horse Agreement.<br><br>(iii) Either party may terminate if Buyer is neither selected as the winning bidder nor named the "Back-Up Bidder" at the Auction.<br><br>(iv) Either party may terminate if any Governmental Authority issues or enters any Order, has enacted any Law or taken any other action which, in any such case, permanently restrains, enjoins or otherwise prohibits the consummation of all or any of the contemplated transactions.<br><br>(v) Either party may terminate if the FTC or DOJ issues a "Request for Additional Information or Documentary Material" or "Civil Investigative Demand" to either the Seller or Buyer (or their respective affiliates) in connection with the contemplated transactions.<br><br>Seller Termination Rights: Seller may terminate if:<br><br>(i) Its board of directors determines that its continued performance under the Stalking Horse Agreement would be inconsistent with its fiduciary duties under applicable law; permanently restrains, enjoins or otherwise prohibits the consummation of all or any of the contemplated transactions.<br><br>Buyer Termination Rights. Buyer may terminate if:<br><br>(i)  The Bankruptcy Court enters a Final Order dismissing the Chapter 11 Cases or converts the Chapter 11 Cases to chapter 7 cases; appoints a trustee or receiver; or if Seller files a stand-alone plan of reorganization or liquidation that does not contemplate consummation of the contemplated transactions.<br><br>Liability Cap.  The maximum aggregate Liability of Seller shall not exceed an amount equal to the amount of the Purchase Price and the maximum aggregate Liability of Buyer shall not exceed an amount equal to the amount of the Purchase Price. |
| **Purchased Assets / Excluded Assets**<br>*(Section 1.1; Section 1.2)* | Buyer agrees to purchase substantially all of the assets related to the business (the "**Purchased Assets**"), including: (i) leasehold title to the Leased Real Property; (ii) all Personal Property; (ii) all Inventory, including all prepaid Inventory (shipped and unshipped) and any rights to rebates, refunds or discounts due with respect to the Inventory; (iii) to the extent assignable or transferable under applicable Law, all Prepaid Expenses (but only to the extent such Prepaid Expenses are specifically listed and included in the calculation of Net Working Capital); (iv) originals, or where not available, copies (including in electronic format), of all medical records, patient files, and other written accounts of the medical history of the patients of the Business exclusively maintained in connection with the Business; (v) Books and Records; (vi) the Assumed Contracts; (vii) all Permits and Approvals issued or granted by, or filed with or delivered to, any Governmental Authority and all accreditations |

2

| | |
|---|---|
| | that are used or held for use in, have been obtained by or issued to or on behalf of Seller; (vii) all Transferred Intellectual Property, including the Trademarks and Domain Names set forth on Schedule 1.1(j); (viii) all Transferred Information Technology Systems, Software, hardware or data processing equipment, data processing system manuals and licensed Software materials that are exclusively used or held for use in, or otherwise exclusively relating to, the Business, and in the case of tangible assets, located at a Facility or, in the case of Software, manuals and materials in electronic format, and other intangible assets, residing on hardware located at a Facility; (ix) any claims, causes of action or rights against third parties directly and exclusively related to the Purchased Assets (including, warranties, indemnities, rebates and guarantees) Avoidance Actions (1) against any Transferred Employees or (2) arising under any Assumed Contract that is actually assumed and assigned to the Buyer under Section 365 of the Bankruptcy Code (the "**Acquired Avoidance Actions**"), contractual or otherwise, arising before or after the Effective Time, (collectively, the "**Assumed Third-Party Claims**"); (x) all Credentialing and Medical Staff Records; (xi) Seller's goodwill exclusively associated with, or exclusively relating to the Business and any other Purchased Assets; (xii) all insurance proceeds arising in connection with any Purchased Assets including recoveries received by Seller from carriers that have not been applied to any applicable Purchased Assets (including to repair or replace such Purchased Assets); (xiii) all telephone numbers and facsimile numbers used exclusively in the operation of the Facilities; (xiv) all of Seller's rights under applicable law, contract or otherwise to receive any refund or credit from LPPF in the event that any distributions LPPF receives from Seller's estate on account of such LPPF Claims, whether pursuant to a Chapter 11 plan or otherwise, result in an overpayment of the LPPF Claims, other than as provided for in Section 6.7; (xv) any Governmental Authority intergovernmental transfer payments with respect to Medicaid Supplemental Payments made by Buyer pursuant to Section 6.7; and (xvii) to the extent not included in any of the foregoing, but excluding any assets outside the Restricted Area (1) any assets included in the determination of Purchased Working Capital, (2) any assets (other than the Excluded Assets) purchased or otherwise acquired by Seller since the Balance Sheet Date that are not reflected on the Reference Balance Sheet but that are exclusively used or held for use in, or otherwise exclusively relating to, the Business, and (3) all other assets (other than the Excluded Assets) whether or not scheduled or described herein that are owned, leased or used by Seller and exclusively used or held for use in, or otherwise relating to, the Business within the Restricted Area. |
| | The Purchased Assets do not include, among other things, any of the following assets, properties, rights, and interests (collectively, the "**Excluded Assets**"): (i) bank accounts and all cash and cash equivalents, (ii) all accounts receivables, (iii) insurance policies, (iv) company benefit plans, (v) organizational documents, or (vi) Excluded Contracts. |
| **Assumed Liabilities** *(Section 1.3)* | At Closing, Buyer shall only assume the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"): (i) all Liabilities with respect to Assumed Contracts solely to the extent based on circumstances first arising as of or after the Effective Time, other than the Assumed Cure Costs; (ii) all Liabilities arising out of the use, ownership or operation of the Business, the Purchased Assets or the Facilities first arising as of or after the Effective Time; |

3

| | |
|---|---|
| | (iii) all Liabilities for any Taxes specifically allocated to Buyer pursuant to the Stalking Horse Agreement; (iv) all Liabilities arising as of or after the Effective Time as custodian of the medical records, patient files, and other written accounts of the medical history of the patients of the Business; (v) Assumed Paid Time Off and Additional Assumed Employee Obligations; (vi) all Liabilities as set forth on Schedule 1.3(f); and (vii) the Assumed Cure Costs.<br><br>All Liabilities other than Assumed Liabilities shall be Excluded Liabilities and Buyer shall not be responsible to pay, perform, discharge or assume any Excluded Liability. |
| **Treatment of Employees** *(Section 6.1)* | Within 15 Business Days after the Execution Date, Buyer shall make offers of employment to such number of employees (both full and part-time employees) as are in the aggregate at least equal to sixty percent (60%) of full-time Seller Employees, Permian Employees, and Permian Clinicians who are eligible for rehire by Buyer Employer in accordance with Buyer Eligibility Requirements. Buyer must honor seniority level of all employees hired by Buyer for purposes of eligibility, vesting and prospective benefit accrual. Buyer will also assume accrued PTO for all hired employees. |
| **Representations and Warranties** *(Section 3; Section 4; Section 5)* | The Parties make customary representations and warranties ("**R&Ws**") for a transaction of this nature, as qualified by their respective disclosure schedules. No representations, warranties or covenants of any party will survive Closing, except for any covenant that by its terms is to be performed (in whole or in part) by a party following the Closing. |
| **Buyer Closing Conditions** *(Section 7)* | Seller's continued accuracy of representations and warranties (except where such inaccuracy would not cause an MAE) and material performance and compliance with pre-Closing covenants.<br><br>The Parties have executed and delivered the closing deliverables required pursuant to the Stalking Horse Agreement.<br><br>The Bankruptcy Court has entered Sale Order (and such order is a Final Order).<br><br>Certain specified Governmental Approvals have been obtained, and no Governmental Orders have been issued which would restrain or prohibit the closing of the transaction. |
| **Seller Closing Conditions** *(Section 8)* | Buyer's continued accuracy of representations and warranties (except where such inaccuracy would not cause an MAE) and material performance and compliance with pre-Closing covenants.<br><br>The Parties have executed and delivered the closing deliverables required pursuant to the Stalking Horse Agreement.<br><br>The Bankruptcy Court has entered Sale Order (and such order is not subject to any stay). Certain specified Governmental Approvals have been obtained, and no Governmental Orders have been issued which would restrain or prohibit the Closing of the transaction. |

|  | Buyer is not subject to any adverse change including, but not limited to, receivership or dissolution, any assignment made for the benefit of creditors, admission in writing of Buyer's inability to pay its debts as they mature or the filing of a petition in voluntary bankruptcy. |
|---|---|
| **Specific Performance** *(Section 10)* | The Parties each have the right to seek specific performance for breaches or threatened breaches and to enforce the terms of the Stalking Horse Agreement. Accordingly, the Parties agree that the non-breaching party shall be entitled (in addition to any other equitable remedy) to obtain, without proof of actual damages, (i) a decree or other Order of specific performance and (ii) an injunction restraining such breach or threatened breach. |
| **Assumed Contracts** *(Section 1.1(h))* | To the extent assignable or transferable under applicable Law, Buyer will assume all of the interests of Seller in (A) the Transferred Executory Contracts and (B) all non-executory Contracts listed on Schedule 1.1(h)(i), which schedule may be updated by Buyer, to add or remove non-executory Contracts, upon written notice to Seller until the Designation Deadline. |

## Exhibit B

**Proposed Order**