## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC, _et al._,** | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |

## EMERGENCY MOTION OF DEBTORS REQUESTING ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING (A) GLOBAL SETTLEMENT WITH MEDICAL PROPERTIES TRUST AND (B) INTERIM MANAGEMENT PROCEDURES, AND (II) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. INTERIM RELIEF IS REQUESTED NOT LATER THAN SEPTEMBER 10, 2024. FINAL RELIEF WILL BE REQUESTED AT A HEARING TO BE SCHEDULED.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**AN INTERIM HEARING BE CONDUCTED ON THIS MATTER ON SEPTEMBER 10, 2024 AT 1:30 P.M. (CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION. AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

**Preliminary Statement**

1. By this Motion, the Debtors request interim and final approval of a global settlement (the "**Global Settlement**") with Medical Properties Trust, Inc. (together with its affiliates, "**MPT**") (each of the Debtors and MPT, a "**Party**" and collectively, the "**Settlement Parties**").[2]

2. Following intense and good-faith negotiations over several months in mediation overseen by the Honorable Marvin Isgur, the Debtors and MPT are finalizing an agreement on the terms of the Global Settlement, with near-final terms between the parties set forth on the term sheet attached as **Exhibit A** (the "**Settlement Term Sheet**").[3] The Global Settlement resolves numerous disputes amongst the Settlement Parties, including regarding the disposition and allocation of value of the Debtors' hospitals in Pennsylvania, Ohio, Louisiana, Arkansas, Arizona, Texas, and Florida (the "**Master Lease I Hospitals**") and the Creditors' Committee's Challenges (as such term is defined in the MPT DIP Order).

3. The Debtors are pleased to report that the Global Settlement, if approved, provides (i) a path to keep nearly all of the Master Lease I Hospitals open for the benefit of the Debtors' patients, communities, and workforce of approximately 10,250, (ii) the Debtors with

---

[2] The Debtors and MPT are in active discussions with the official committee of unsecured creditors (the "**Creditors' Committee**"), the FILO Secured Parties, and the ABL Lenders (collectively with the FILO Secured Parties, the "**Lenders**") regarding their support for the Global Settlement.

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Settlement Term Sheet. As noted, the Settlement Term Sheet remains subject to continued negotiation, and the Debtors are working hard to finalize the Settlement Term Sheet with MPT, as well as finalize the support of the Creditors' Committee and Lenders.

$395 million in net sale proceeds from the consummation of the sale of the Space Coast Hospitals,[4] (iii) for MPT's commitment to facilitate the transition and sale of all of the remaining open Master Lease I Hospitals, including the Debtors' hospitals in Ohio that were at risk of imminent closure (collectively, the "**Specified MLI Hospitals**")[5] with funding support from MPT and new interim managers, (iv) that MPT waive all of its claims against and interests in the Debtors (including billions of dollars of lease and debt claims), including temporarily waiving all rent and other current rent obligations to MPT (which shall be released on the Settlement Effective Date), and (v) the Debtors with access to sufficient funding and sale proceeds necessary to stabilize these chapter 11 cases and allow the Debtors to prosecute a value maximizing chapter 11 plan.

4. As the Court is aware, the Debtors' sales process has been complicated by the fact that, although the Debtors own the licenses to operate their hospitals as well as all related operating assets, including equipment, inventory, contracts, and accounts, all but one of the Debtors' hospitals are subject to master leases with MPT (*i.e.*, "Master Lease I"[6] and "Master Lease II"[7]). As outlined in the Mediation Motion (as defined below) and prior briefing, the Debtors and MPT have a number of disputes, including the appropriate allocation of value between the Debtors' hospital operations and real property purportedly owned by MPT and the proper framework for allocating sale proceeds (the "**Allocation Dispute**"), the process for soliciting bids and negotiating sale transactions with buyers, and how to resolve potential challenges the

---

[4]   "**Space Coast Hospitals**" means the Melbourne Regional Medical Center, the Rockledge Regional Medical Center, and the Sebastian River Medical Center.

[5]   The Specified MLI Hospitals excludes Sharon Regional Medical Center in Sharon, Pennsylvania, which the Commonwealth of Pennsylvania has agreed to fund, and St. Luke's Behavioral Facility in Arizona (the "**Behavioral Facility**").

[6]   "**Master Lease I**" means that certain *Second Amended and Restated Master Lease Agreement*, dated as of March 14, 2022, as amended and/or restated.

[7]   "**Master Lease II**" means that certain *Master Lease Agreement*, dated as of March 14, 2022, as amended and/or restated.

Creditors' Committee may have with respect to (i) the Master Leases, including relating to recharacterization of such leases as financings, (ii) MPT's claims against the estates, and (iii) potential causes of action the estates could bring against MPT arising from various postpetition conduct.  These disputes have challenged the Debtors' ability to ultimately finalize and consummate the sale of hospitals.

5.      Moreover, absent a global deal with MPT, the Debtors do not have the liquidity to continue funding the Debtors' sale process and operating the Debtors' hospitals, many of which are incurring losses.  Both MPT and the Lenders have made it clear that they are not willing to provide any additional financing without a resolution to the allocation issue and a clear path towards a resolution of these chapter 11 cases.  Therefore, absent a consensual resolution with MPT, the estates' only alternative is to pursue litigation against MPT, a path that would be costly, have no guarantee of success, and come with substantial risks to the Debtors' ability to negotiate and consummate sales of the Debtors' hospitals for the benefit of the Debtors' estates, their employees and patients.

6.      Fortunately, as a result of the Settlement Parties' extensive negotiations overseen by the Judge Isgur over countless mediation sessions over the past several months, and subject to finalizing the documentation, the parties have reached the Global Settlement on the following key terms (as more fully set forth in the Settlement Term Sheet):[8]

- MPT shall designate an interim manager for each Specified MLI Hospital (each, an "**Interim Manager**"), who shall agree to be bound by interim management procedures set forth in the Interim Proposed Order and manage the applicable Specified MLI Hospital until it is transferred or conveyed to

---

[8]   The following summary of the terms of the Settlement Term Sheet is subject entirely to the express terms of the Settlement Term Sheet.  If there are any inconsistencies between the summary below and the Settlement Term Sheet, then the Settlement Term Sheet shall control.

a Designated Operator (as defined below), which may be the same party as the Interim Manager;[9]

- all of the Specified MLI Hospitals will be conveyed or otherwise transferred to an operator ("**Designated Operators**") designated by MPT (the "**MLI Hospital Sale**"), and the Debtors and MPT will use commercially reasonably efforts to implement the MLI Hospital Sale by October 1, 2024, and parties in interest will receive notice of the proposed transfers or conveyances and will have an opportunity to object thereto;

- effective as of September 11, 2024 (the "**Funding Commencement Time**"), the Interim Managers will assume responsibility for the costs of operating the Specified MLI Hospitals on the terms outlined in the Settlement Term Sheet[10] with MPT agreeing to fund certain initial expenses (including payroll);[11]

- upon entry of the MPT Settlement Order, the Debtors shall not be required to pay any rent or other obligations under Master Lease I and Master Lease II;

- no later than October 31, 2024, the real property underlying the Space Coast Hospitals shall be deemed transferred or conveyed to the Debtors and upon consummation of the sale of the Space Coast Hospitals to Orlando Health, the Debtors and their estates will retain $395 million of the net sale proceeds, with the balance paid to MPT;

- all of MPT's claims against the Debtors' estates (up to approximately $7.5 billion in the aggregate, consisting of approximately $83.4 million in MPT DIP Claims, $448.1 million in MPT Prepetition Secured Claims, $403.4 million in MPT HoldCo Claims, and $6.6 billion in future lease obligations), will be waived;

- on the Settlement Effective Date, (a) MPT shall be deemed to release and discharge any and all claims they may have against the Debtors, the ABL Lenders, the FILO Secured Parties, and the Creditors' Committee and (b) the Debtors, the ABL Lenders, the FILO Secured Parties, and the

---

[9]   As of the time of filing this Motion, MPT is still finalizing the selection of the Interim Managers.

[10]   Each Interim Manager will also be the beneficiary of any receivables generated by the applicable Specified MLI Hospital for services provided to patients after the Funding Commencement Time.

[11]   The Debtors are in discussions with MPT and the proposed Interim Managers regarding the timing of providing initial funding (*i.e.*, upon entry of the Proposed Interim Order or upon entry of an order granting the relief in the Motion on a final basis).  As of the filing this Motion, MPT and the proposed Interim Managers have not committed to provide funding upon entry of a Proposed Interim Order.

Creditors' Committee shall be deemed to release and discharge any and all claims they may have against MPT.

7.　　In addition to receiving $395 million in net sale proceeds from the sale of the Space Coast Hospitals, the Debtors will retain all accounts receivables that will have accrued on or before September 10, 2024 related to the MLI Hospitals (which were over $500 million as of July 31, 2024).

8.　　As further discussed below, entry into and implementation of the Global Settlement is in the best interests of the Debtors and their estates and satisfies the requirements under Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code.  Here, the agreement in principle underlying the Global Settlement provides substantial benefits to the Debtors and their estates, including (i) $395 million in proceeds from the sale of the Space Coast Hospitals, (ii) significant cost savings in operating expenses that the Debtors would otherwise continue to incur, as well as MPT waiving all rent, (iii) the waiver and release of all of MPT's up to approximately $7.5 billion of claims against the Debtors' estates, and (iv) avoiding substantial costs and risks associated with pursuing litigation against MPT, without any guarantee of success.

9.　　Here, beyond the release of MPT, the only cost to the estate is the transfer or conveyance of the Debtors' interests in the Specified MLI Hospitals, many of which are operating at loss, for which the Debtors have had challenges monetizing such assets absent a consensual resolution with MPT in connection with its related real property interests.  Accordingly, the benefits received by the Debtors and their estates pursuant to the Global Settlement are extensive and well above the lowest point in the range of reasonable litigation outcomes.

10.　　Moreover, the Global Settlement allows for the Specified MLI Hospitals to remain open, and together with the sale of the Debtors' hospitals in Massachusetts and the funding anticipated from the Commonwealth of Pennsylvania, gives the Debtors the opportunity to save

up to approximately 30,000 jobs, and paves the way for the Debtors to negotiate and implement a value maximizing chapter 11 plan.

11.     Therefore, in light of these considerable benefits to the Debtors' estates, the Global Settlement should be approved.

## Relief Requested

12.     By this Motion, pursuant to sections 363(b), 554, and 105 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Debtors request entry of an order (i) approving the Debtors' entry into and consummation of the Global Settlement, (ii) authorizing the Debtors' transfer or conveyance free and clear of certain liens, claims, and encumbrances or abandonment of the Specified MLI Hospitals to MPT or its Designated Operator, and (iii) granting related relief.

13.     A proposed interim order granting the relief requested herein is attached hereto as **Exhibit B** (the "**Proposed Interim Order**").  The Debtors will schedule a hearing to consider the Motion on a final basis and intend to file a proposed final order.

14.     In support of the Motion, the Debtors submit the *Declaration of John R. Castellano in Support of Emergency Motion of Debtors Requesting Entry of Interim and Final Order (I) Approving (A) Global Settlement with Medical Properties Trust and (B) Interim Management Procedures, and (II) Granting Related Relief* (the "**Castellano Declaration**"), filed contemporaneously herewith.

7

## Background

### A. Debtors' Chapter 11 Cases

15.     On May 6, 2024, (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

16.     On May 16, 2024, the U.S. Trustee for Region 7 (the "**U.S. Trustee**") appointed the Creditors' Committee.  No trustee or examiner has been appointed in these chapter 11 cases.

17.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

### B. Master Leases

18.     Certain of the Debtors lease, as tenants, thirty (30)[12] hospital facilities from affiliates of MPT pursuant to Master Lease I and Master Lease II.  On July 31, 2024, the Court entered an order authorizing the rejection of Master Lease II (Docket No. 1782), subject to further briefing on the effect of such rejection and the effective date thereof.  On August 16, 2024, the Debtors filed a motion to reject Master Lease I (Docket No. 2026) (together with Docket No. 1782, the "**Master Lease Rejections**"), which remains pending with the Court as of the date hereof.  The Debtors conduct substantially all of their hospital operations on the properties subject to the Master Leases.

---

[12]   This includes Carney Hospital and Nashoba Valley Medical Center, each of which are located in Massachusetts and have been closed.

C.      **Debtors' Sale Process**

19.      On June 3, 2024, the Court entered the Bidding Procedures Order[13] approving, among other things, the Global Bidding Procedures to govern the sale and auction of the Debtors' assets, including the Debtors' hospitals.  The Global Bidding Procedures provide the Debtors with flexibility to solicit proposals, negotiate transactions, hold auctions, and consummate sale transactions for the highest or otherwise best value, all while protecting the due process rights of parties-in-interest in these chapter 11 cases and ensuring a full and fair opportunity to review and consider all potential transactions.

20.      Pursuant to the Global Bidding Procedures, the Debtors promptly established consecutive bid deadlines for hospitals in various geographic locations, including in Arkansas, Louisiana, Ohio, Pennsylvania, Arizona, Massachusetts, Texas, and Florida.

21.      The Debtors' sale and marketing process has been successful, in that it has culminated in the approval of the sale of Stewardship Health,[14] the Debtors' highly-valued managed-care business for an aggregate purchase price of $245 million, and the designation of Orlando Health as the successful bidder for the Space Coast Hospitals for a purchase price of $460 million (based on a $439 million headline cash purchase price plus adjustments for certain working capital items, and assuming certain JV interests are acquired at closing),[15] as well as executed asset

---

[13]   *Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 626) (the "**Bidding Procedures Order**" and the global bidding procedures attached thereto as Exhibit 1, the "**Global Bidding Procedures**").

[14]   *Order (I) Authorizing and Approving (A) the Asset Purchase Agreement with Brady Health Buyer, LLC (B) the Sale of Stewardship Health Assets Free and Clear of Liens and Liabilities and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (Docket No. 2135).

[15]   *See* Notice of Successful Space Coast Bidder.

purchase agreements for other hospitals subject to Master Lease I, including in Louisiana and Arkansas.[16]   In parallel, the Debtors have signed and obtained Court approval of purchase agreements for the sales of six of the Debtors' hospitals in Massachusetts.[17]

22.     Unfortunately, the sales process for certain of the Debtors' hospitals were unable to proceed as expeditiously as desired as the Debtors were faced with issues relating to allocation of value between the Debtors and MPT, among other disputes.

### D.     Allocation Dispute and Mediation

23.     A major impediment to the sale of certain of the Debtors' hospitals has been the disagreement between the Debtors and MPT regarding allocation of value as between the Debtors' hospital operations and MPT's real property.   The Debtors sought,[18] and the Court entered,[19] an order directing the Debtors, MPT, and certain other of the Debtors' creditors to commence mediation with the Honorable Marvin Isgur in an effort to resolve the allocation issues consensually for the benefit of all parties in interest.

24.     The Debtors and MPT were unable to agree upon—and instead actively disputed—the proper and appropriate allocation of value as between the real property and hospital

---

[16]   *See Notice of (I) Cancellation of Certain Auctions and Sale Hearings, (II) Designation of Successful Bids, (III) Proposed Sale Orders, and (IV) Scheduling of Sale Hearing With Respect to (A) Wadley Regional Medical Center at Hope and (B) Glenwood Regional Medical Center* (Docket No. 1645).

[17]   *See Notice of (I) Designation of Successful Bids; (II) Proposed Sale Orders; (III) Scheduling of Sale Hearing With Respect to (A) Holy Family Methuen Hospital, (B) Holy Family Haverhill Hospital, (C) Saint Anne's Hospital, and (D) Morton Hospital; and (IV) Reservation of Rights to Seek Approval of Sale of St. Elizabeth's Medical Center and Good Samaritan Medical Center at Sale Hearing* (Docket No. 2242); *Notice of Designation of Successful Bid and Proposed Sale Order for St. Elizabeth's Medical Center and Good Samaritan Medical Center* (Docket No. 2260).

[18]   *See Emergency Motion of Debtors Requesting Entry of an Order Directing Mediation of Disputes Relating to Allocation of Sale Proceeds and Related Issues with Medical Properties Trust* (Docket No. 776) (the "**Mediation Motion**").

[19]   *See Order Regarding Mediation of Disputes Relating to Allocation of Sale Proceeds and Related Issues with Medical Properties Trust* (Docket No. 829).

operations with respect to the hospitals for which bids have been received, almost without exception.

25.     On August 16, 2024, the Debtors filed a motion to reject Master Lease I and, on August 19, 2024, the Debtors commenced an adversary proceeding against MPT seeking a declaratory judgment allocating the amount of value attributable to the Debtors' hospital operations, on one hand, and MPT's real estate, on the other (the "**Adversary Proceeding**").[20] The Adversary Proceeding has not advanced beyond the filing of the complaint.

### E.     Additional Claims Against MPT

26.     The Creditors' Committee also investigated, and believes that the Debtors' estates have colorable claims against MPT, including, but not limited to (i) recharacterize the Master Leases as "disguised financings," (ii) avoid certain liens and preferential payments granted or made to MPT prior to the Petition Date, and (iii) equitably subordinate MPT's claims arising from prepetition conduct.  The Debtors understand that the Creditors' Committee believes it has a strong basis to assert such claims on behalf of the Debtors' estates based on its ongoing investigation.  The Debtors also reserved their rights with respect to potential claims and causes of action against MPT.

### F.     Mediation of Disputes & Entry into Global Settlement

27.     After extensive arm's-length negotiations, the parties were able to reach an agreement as to the principal terms of the Global Settlement, as set forth in the Settlement Term Sheet.

---

[20]     *See Adversary Complaint* (Docket No. 2031).

## Jurisdiction

28.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested Should Be Granted

29.     By this Motion, the Debtors seek the Court's approval of (i) the Debtors' entry into and consummation of the Global Settlement pursuant to Rule 9019 of the Bankruptcy Rules, (ii) the transfer or conveyance of the Debtors' interests in the Specified MLI Hospitals to MPT or its Designated Operator pursuant to section 363(b) and/or section 554 of the Bankruptcy Code, and (iii) other related relief.

### A.     The Global Settlement is Fair, Reasonable, and in the Best Interests of the Debtors' Estates

30.     Bankruptcy Rule 9019(a) provides that "[o]n motion by the [debtors in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  Further, pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interests of the estate.  *See In re Age Refin. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within the discretion of the bankruptcy court." *See U.S. v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984).  Settlements are considered a "normal part of the process of reorganization" and "a desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

12

31.     The Fifth Circuit sets forth a three-factor balancing test under which bankruptcy courts are to analyze proposed settlements.  *Id.*  The factors the Court considers are: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise."  *See Age Refin. Inc.*, 801 F.3d at 540 (internal citations omitted).

32.     Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views*."  Id.*, *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995).  Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540 (citations omitted); *Foster Mortg. Corp.*, 68 F.3d at 918.

33.     Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement.  *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993). Instead, the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

34.     The Debtors bear the burden of establishing that the balance of the above factors leads to a fair and equitable compromise vis-à-vis the Global Settlement. *In re Allied Props.*, LLC, 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007) (citing *In re Lawrence & Erausquin, Inc.*, 124 B.R. 37, 38 (Bankr. N.D. Ohio 1990)); *see also In re GHR Cos., Inc.*, 50 B.R. 925, 931 (Bankr. D. Mass. 1985). "The burden is not high"; rather, the Debtors "need only show

that [their] decision falls within the 'range of reasonable litigation alternatives.'" *In re Allied Props.*, LLC, 2007 WL 1849017, at *4 (emphasis added) (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also Cook v. Waldron*, 2006 WL 1007489 at *4 (S.D. Tex. Apr. 18, 2006).

35.     Here, weighing the foregoing factors demonstrates that the Global Settlement is reasonable and supports finding that the Debtors' entry into the Global Settlement is in the best interest of creditors and other stakeholders.

36.     *First*, the Debtors believe that the likelihood of success of litigating against MPT all of the issues and disputes underlying the Adversary Proceeding, the Master Lease Rejections, the claims that are subject of the Creditors' Committee's investigation, and other potential claims and causes of action against MPT is uncertain.  Specifically, although the Debtors believe that they have strong arguments that could result in the Debtors prevailing in the Adversary Proceeding and on the Master Lease Rejections, such result is not guaranteed.  Moreover, even if the Debtors were to prevail in the litigation (e.g., obtain a favorable ruling on allocation of value to the Debtors' hospital operations in the Adversary Proceeding), there is significant risk that the Debtors will not have sufficient liquidity to pursue such litigation to judgment, or that doing so will otherwise jeopardize the Debtors' sale process and drive prospective buyers and operators away before the Debtors obtain such favorable judgment.  For example, a condition to closing the sale of the Space Coast Hospitals (which are the Debtors' most valuable hospitals) is that the Debtors, Orlando Health, and MPT must reach an agreement on the Allocation Dispute.  *See* Docket No. 2109.  Similarly, although the Debtors understand that the Creditors' Committee's investigation may yield favorable results resulting in the commencement of litigation against MPT, the Debtors believe that such litigation involves complex legal issues that are not guaranteed to

result in a favorable outcome for the Debtors' estates.  Moreover, each of the Adversary Proceeding, the Master Lease Rejections, the Creditors' Committee's potential claims against MPT, and other potential claims against MPT could entail significant discovery, extensive briefing, and preparation for trial and other evidentiary hearings, and may take months or years to complete.  The Debtors estimate that it could cost the Debtors estates potentially tens of millions of dollars in litigation expenses if these issues were fully litigated to judgment, with no guarantee of success.

37.     In addition, absent entry into and consummation of the Global Settlement Agreement, the Debtors would be obligated to continue funding operating expenses at the Specified MLI Hospitals.  However, the Debtors do not have the liquidity to continue funding the operations of such hospitals (or the funding to complete the sale process, which has been significantly delayed).  Therefore, failure to reach a settlement with MPT could result in adverse consequences for the Debtors' estates, including potential further hospital closures and substantial closure costs.  Accordingly, the certainty of outcome realized by entry into and consummation of the Global Settlement provides significant benefits to the Debtors and their estates.

38.     *Second*, the Global Settlement is the product of hard fought negotiations between the Debtors, MPT, the Lenders (in particular the FILO Secured Parties), and the UCC, each of which were represented by independent, sophisticated counsel.  The Settlement Parties have already expended a significant amount of time and resources investigating and litigating disputes in these chapter 11 cases, including the Allocation Dispute, the Creditors' Committee's and Transformation Committee's investigations of claims against MPT, and the Master Lease Rejections.  The Settlement Parties have also exchanged a number of proposals and counter-

proposals and engaged in extensive Mediation overseen by Judge Isgur through multiple sessions over approximately 12 weeks, which ultimately led to the terms of the Global Settlement.

39.     *Third*, the Global Settlement is reasonable and in the best interests of the Debtors' estates.  The Global Settlement, if approved, affords the Debtors and their estates with numerous benefits, including: (i) providing the Debtors' estates with a guaranteed $395 million in proceeds from the sale of the Space Coast Hospitals to Orlando Health, (ii) securing ongoing funding for the operation and transition of the Specified MLI Hospitals to MPT or its Designated Operator(s), (iii) facilitating the transition of the Specified MLI Hospitals to new operators, (iv) avoiding the incurrence of ongoing operating losses associated with the Specified MLI Hospitals, (v) resolving protracted, expensive, and uncertain litigation with MPT, and (vi) the waiver and release of all of MPT's claims against the Debtors' estates (which total up to approximately $7.5 billion).

40.     The Global Settlement represents a major milestone in the Debtors' chapter 11 cases, and lays the groundwork for the Debtors to propose and negotiate a value maximizing chapter 11 plan.

41.     Most importantly, the Global Settlement provides an opportunity for nearly all of the MLI Hospitals (including the Ohio hospitals, which were on the verge of closing) to remain open and continue to deliver high-quality patient care in the communities in which they are located and preserve over 10,000 jobs.

42.     Accordingly, the Global Settlement should be approved.

**B.     Approval of Interim Management Procedures is in the Best Interests of the Debtors' Estates and Should Be Approved**

43.     The appointment of Interim Managers pursuant to the interim management procedures set forth in the Interim Proposed Order (the "**Interim Management Procedures**") is

16

in the best interests of the Debtors, their estates, and their creditors and should be approved by the Court.

44.     *First*, appointment of Interim Managers is a condition to the overall Global Settlement, which, as described above, provides immense economic benefits to the Debtors and their estates.  For example, absent the Debtors' agreement to appoint Interim Managers, such Interim Managers would be unwilling to fund the operating expenses at the Specified MLI Hospitals until they are transferred or conveyed to Designated Operators.  As described above, the Debtors do not have the liquidity to continue funding the operations of such hospitals, and only had approximately $21 million of cash on hand as of the week ending September 6, 2024.  In connection with the Global Settlement, the Interim Managers will agree to fund the Specified MLI Hospital operations in accordance with the Settlement Term Sheet.  Furthermore, to the extent the Interim Managers do not fund such amounts in the first instance, MPT has agreed to pay accrued payroll as of September 11, 2024 (approximately $27 million) and fund an account for hospital-level expenses with $5 million.  Accordingly, absent the Debtors' agreement to appoint Interim Managers until they are transferred or conveyed to Designated Operators, the Debtors' could be forced to consider potential further hospital closures to the detriment of the Debtors, their estates, their creditors, and the employees, patients, and communities served by the hospitals.

45.     *Second*, each Interim Manager will agree to be bound by the Interim Management Procedures.  The Interim Management Procedures will require that each Interim Manager agree to comply with the terms of the applicable hospital license and applicable law, and each Interim Manager will indemnify the Debtors for any breach of the Interim Management Agreement, including by failing to comply with the hospital license and applicable law.  Moreover,

the Debtors, as the license holder, have the ability to intervene in such operations if an issue arises relating to the health and welfare of the patients served by Specified MLI Hospital.

46.     In addition, the Debtors request the Court order that each Interim Manager shall have no successor liability as a consequence of operating the Specified MLI Hospitals. Importantly, each Interim Manager will serve only in a temporary role until the applicable Specified MLI Hospital is transferred or conveyed to a Designated Operator (which may be the Interim Manager).  Absent a court order providing that each Interim Manager shall have no successor liability, it may be difficult—or impossible—to locate an Interim Manager who is willing to serve in such capacity, and the Debtors would not receive the significant economic benefits provided by the Global Settlement as described herein.

47.     Accordingly, the Debtors submit that the appointment of Interim Managers pursuant to the Interim Management Procedures is in the best interests of the Debtors, their estates, and their creditors should be authorized by the Court.  Moreover, because it is a condition of the Global Settlement, which is in the best interests of the Debtors, their estates, and their creditors, the Debtors submit that the Court should order that Interim Managers shall have no successor liability.

**C.     Transfer or Conveyance of the Specified MLI Hospitals under the Global Settlement is a Sound Exercise of the Debtors' Business Judgement and Should be Approved**

48.     As described herein and as set forth more fully in the Settlement Term Sheet, the Debtors propose to transfer or convey the Specified MLI Hospitals to Designated Operators on an "as is, where is" basis and free and clear of certain claims, interests, and encumbrances.  Each proposed transfer or conveyance will be subject to the notice procedures set forth herein, which will provide parties in interest with notice and an opportunity to object to the proposed transfer or conveyance and the terms thereof.  Accordingly, the Debtors submit that the

transfer or conveyance of the Specified MLI Hospitals to Designated Operators pursuant to the Global Settlement is a sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their estates, and their creditors, and should be approved by the Court.

> **a.** ***The Transfer or Conveyance of the Specified MLI Hospitals Should be Approved as an Exercise of the Debtors Sound Business Judgment***

49.     Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing.  The Fifth Circuit recognizes that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so.  *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (quoting *In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); *In re ASARCO LLC*, 441 B.R. 813, 830 (Bankr. S.D. Tex. 2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

50.     Once the Debtors articulate a good business reason, "the business judgment rule . . . 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995); *see also Integrated Res.*, 147 B.R. at 656; *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions.").

51.     Importantly, the Global Settlement brings finality and stability to the Debtors' workforce and vendors that have been waiting for the results of the sale process.  The Debtors have a sound business justification for transferring or conveying the Specified MLI Hospitals pursuant to the Global Settlement.  *First*, the Debtors believe they are receiving material value for the Debtors' interests in the Specified MLI Hospitals because of the previously enumerated benefits received by the Debtors' estates pursuant to the Global Settlement.  Many of the Debtors' hospitals operate at significant losses, placing a heavy burden on the Debtors' estates.  Indeed, based on the Debtors' sale process, even if the Debtors had funding to continue operating the Specified MLI Hospitals and pursuing the sale process, the Debtors may only realize limited proceeds from the sale of such hospitals given the dispute with MPT.

52.     The Global Settlement maximizes the value of the Debtors' interests in such hospitals by (i) obtaining $395 million of net proceeds from the Space Coast Hospitals, (ii) eliminating substantial costs of operating and transitioning the Specified MLI Hospitals, and (iii) the release of all of MPT's claims against the Debtors' estates.  Thus, the Debtors submit that the significant economic benefits realized by the Debtors pursuant to the Global Settlement is the highest and best use for the Debtors' interests in the Specified MLI Hospitals and demonstrates that entry into the Global Settlement reflects a prudent exercise of the Debtors' business judgment.

53.     *Second*, entry into the Global Settlement is substantially better than any other alternative available to the Debtors.  Absent the Global Settlement, the Debtors will continue to be mired in litigation, further jeopardizing successful and expeditious sales of the Debtors' hospitals while the Debtors' continue to incur operating losses and litigation expenses for which the Debtors' otherwise have no financing.   At this time, the Debtors simply do not have any alternative source of funding option available to operate and transition each of the Specified MLI

Hospitals to new operators.  Moreover, absent entry into the Global Settlement, the Debtors would be forced to proceed with hospital closures to stop the immense cash burn, including hospitals in Ohio.  Entry into the Global Settlement allows for nearly all of the Specified MLl Hospitals to remain open and operational.

54.     Accordingly, the Debtors submit that the transfer or conveyance of the Specified MLI Hospitals pursuant to the Global Settlement is clearly the highest and best use for such estate assets and is a sound exercise of the Debtors' business judgment.

      **b.**   ***The Court Should Approve the Procedures for Approval of Transfer or Conveyance of Specified MLI Hospitals to Designated Operators***

55.     The Debtors request approval of the following procedures to govern the transfer or conveyance of the Specified MLI Hospitals to Designated Operators and submit that such procedures are in the best interests of the Debtors, their estates, and their creditors:

(a)    Upon MPT's determination to transfer or convey a Specified MLI Hospital to a Designated Operator pursuant to an MLI Hospital Sale and agreement between the Debtors and such Designated Operator on the documentation necessary to effectuate such transfer or conveyance, the Debtors shall file with the Court and serve a notice on all interested parties (a "**MLI Hospital Sale Notice**") setting forth, among other things, (i) the identity of the Designated Operator, (ii) a copy of the agreement transferring or conveying the Specified MLI Hospital to the Designated Operator, and (iii) a proposed form of order approving such transfer or conveyance to the Designated Operator (a "**MLI Hospital Sale Order**").

(b)    Each MLI Hospital Sale Order shall provide, among other things, (i) that the applicable Designated Operator is acquiring the applicable Specified MLI Hospital free and clear of all liens and claims of the ABL Lenders and FILO Lenders, but not liens and claims on account of purchase money security interests and capital leases of equipment and other personal property, (ii) that the applicable Designated Operator is purchasing the applicable Specified MLI Hospital in good faith within the meaning of section 363(m) of the Bankruptcy Code, (iii) the other findings of fact and conclusions of law included in Annex 1 to the Proposed Interim Order.

(c)    Parties objecting to a proposed MLI Hospital Sale must file and serve on the Debtors and each of the other Settlement Parties a written objection (an "**Objection**") no later than five (5) days from the date the Debtors serve

the MLI Hospital Sale Notice (the "**Objection Deadline**").  Each Objection must state with specificity the legal and factual grounds for objection to the proposed MLI Hospital Sale.

(d)     If no Objection is filed and served by the Objection Deadline, the Debtors may submit the proposed MLI Hospital Sale Order to the Court and the Court may enter such order without a hearing.

(e)     If an Objection is timely filed and not withdrawn or resolved (an "**Unresolved Objection**"), the Debtors shall file a notice scheduling an emergency hearing for the Court to consider the Unresolved Objection, subject to the Court's schedule.

56.     The foregoing procedures are designed to provide adequate notice and due process to parties in interest that may be affected by the proposed transfers or conveyances while also balancing the need for expediency necessary to ensure each Specified MLI Hospital remains operational and funded.  Accordingly, the Debtors submit that the proposed procedures are in the best interests of the Debtors, their estates, and their creditors and should be approved by the Court.

c.     ***Adequate and Reasonable Notice of the Transfer or Conveyance of the Specified MLI Hospitals are Provided***

57.     This Motion (i) informs interested parties of the deadlines for objecting to the Global Settlement, and (ii) otherwise includes all information relevant to parties interest in, or affected by, the Global Settlement.  Notice of this Motion will be provided to any party entitled to notice pursuant to Bankruptcy Rule 2002 and 6004 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d), and cause to be published on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  Accordingly, reasonable and adequate notice of the transfer or conveyance of the Specified MLI Hospitals and the Global Settlement will be provided to all interested parties.

58.     Moreover, adequate notice was provided to parties in interest pursuant to the *Notice of Sale, Global Bidding Procedures, Auction, and Sale Hearing* (Docket No. 689), which provided notice of the potential sale of each of the Specified MLI Hospitals pursuant to the

Global Bidding Procedures.  Because the transfer or conveyance of the Specified MLI Hospitals is consistent with the sales process established by the Global Bidding Procedures, the Debtors submit that the notice provided pursuant to and as contemplated by this Motion, in conjunction with the notice provided pursuant to the sale notice, provides adequate notice of the transfer or conveyance of the Specified MLI Hospitals.

####     d.   *The Transfer or Conveyance of the Specified MLI Hospitals Should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code*

59.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  As section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f).  *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied.").  The Debtors believe that they will be able to demonstrate at the hearing that they have satisfied one or more of these conditions.

60.     Additionally, the Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply.  *See In re Ditech Holding Corp.*, 606 B.R. 544, 591 (Bankr. S.D.N.Y. 2019) ("[P]lan sales can be free and clear of claims without invoking section 363(f)."); *In re Trans World Airlines, Inc.*, No. 01–0056 (PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("[B]ankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re*

23

*White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

61.      The Debtors believe that one or more of the tests of section 363(f) will be satisfied with respect to the transfer or conveyance of the Specified MLI Hospitals.  For example, the Debtors believe that the Lenders will ultimately consent to the transfer or conveyance of the Specified MLI Hospitals free and clear under section 363(f)(2).  Furthermore, the Debtors understand that the Lenders will consent to the Debtors' accounts receivable for services rendered after the Funding Commencement Time being held in trust for the Designated Operators.  In the event such creditors do not consent, a transfer or conveyance free and clear may proceed pursuant to section 363(f)(5) of the Bankruptcy Code because such creditors may be paid from the proceeds of the transaction and the Debtors will establish at the hearing that such creditors can be compelled to accept a monetary satisfaction of its claims.

> **e.   *The Global Settlement Has Been Proposed in Good Faith Without Collusion, and MPT and its Designated Operators Will Be a "Good Faith Buyer"***

62.      Pursuant to section 363(m) of the Bankruptcy Code, a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *O'Dwyer v. O'Dwyer* (*In re O'Dwyer*), 611 F. App'x 195, 200 (5th Cir. 2015); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse), Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *see also In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders).

63.     In other words, a party would have to show fraud or collusion between the transferee and the debtor-in-possession or trustee or other bidders in order to demonstrate a lack of good faith.  An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 521 (5th Cir. 2014) (quoting *Bleaufontaine, Inc. v. Roland International (In re Bleaufontaine, Inc.)*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981)).

64.     MPT and its Designated Operators should be considered "good faith" purchasers within the meaning of section 363(m) of the Bankruptcy Code, as terms of the Global Settlement were negotiated at arms-length and in good faith without any collusion or fraud.[21]  The consideration provided by MPT for the ability to designate the Designated Operators for the Specified MLI Hospitals reflects the fair market value of such assets.  Accordingly, each Designated Operator will be a good-faith purchaser of the Specified MLI Hospitals under the Global Settlement and is entitled to the full protections of the Bankruptcy Code.

**D.     Abandonment of the Closed Hospitals and Behavioral Facility (and, only if Necessary, the Other Specified MLI Hospitals) Should Be Approved**

65.     The Debtors seek authority to abandon their interests in the Closed Hospitals[22] and Behavioral Facility to MPT on an "as is, where is" basis, free and clear of certain liens, claims, and encumbrances, and without any further liability to the Debtors.  Moreover, if the

---

[21]   Section 363(m) provides that, "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."  11 U.S.C. § 363(m).

[22]   "**Closed Hospitals**" means Coral Gables Hospital North, Northside Regional Medical Center, Wadley Regional Medical Center New Development, Texas Vista Medical Center, St. Luke's Medical Center, and Ogden Underdeveloped Land.

transfer or conveyance of the Specified MLI Hospitals is not effectuated, the Debtors request authority to abandon the other Specified MLI Hospitals free and clear of certain liens, claims, and encumbrances.  In each instance, MPT or a Designated Operator, as applicable, shall be deemed to accept title and ownership of such abandoned hospitals at the times set forth in the Settlement Term Sheet.

66.     Section 554(a) of the Bankruptcy Code authorizes a debtor in possession, after notice and a hearing, to "abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).   The right to abandon property is virtually unfettered, unless (a) abandonment of the property will contravene laws designed to protect public health and safety or (b) the property poses an imminent threat to the public's welfare. *See Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.*, *(In re Midlantic Nat'l Bank)*, 474 U.S. 494, 501 (1986).  Neither of these limitations is relevant under the instant facts.

67.     The Debtors have determined that the proposed abandonment of the Closed Hospitals, Behavioral Facility, and, potentially, certain of the Specified MLI Hospitals (including the Behavioral Facility) to MPT is necessary to the extent the transfer or conveyance of such hospitals is not effectuated because such abandonment will allow the Debtors to (i) stop the accrual of administrative expenses associated with retaining such hospitals and (ii) given the limited resources of the Debtors' estates, ensure continuity of patient care and the ability to transition the hospitals to an alternative operator.  Further, it is the Debtors' understanding that the proposed abandonment of such hospitals will not conflict with laws designed to protect public health and safety.  The proposed abandonment will also not pose an imminent threat to public welfare because, pursuant to the terms of the Global Settlement, the abandonment is proposed primarily

for the Closed Hospitals and Behavioral Facility, and with respect to an abandonment of any other Specified MLI Hospital, abandonment will be done in connection with MPT contracting with a new operator, and MPT will be deemed to accept title and ownership of the abandoned Specified MLI Hospitals immediately upon abandonment.

68.     For the foregoing reasons, the ability to abandon is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these chapter 11 cases and should be authorized by the Court.

### Reservation of Rights

69.     Nothing contained herein is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vii) an admission as to the validity of any liens satisfied pursuant to this Motion, or (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

70.     To the extent an agreement cannot be reached as to the documentation of the Global Settlement, or such Global Settlement is not effectuated pursuant to its terms, nothing herein shall be deemed an admission as to any of the matters asserted herein, or a waiver of any

claim, right or defense of any Settlement Party, including with respect to any Challenge that could be asserted by the Creditors' Committee.

### **Emergency Consideration is Requested**

71.     The Debtors seek relief on an emergency basis.   The Debtors require immediate access to funding for its hospital operations, and pursuant to the Global Settlement, MPT will assume all operating liabilities effective as of September 11, 2024 at 12:01 a.m. (Eastern Time).  The Debtors seek to enter into and consummate the Global Settlement as soon as possible to maximize benefits for the Debtors and their estates.   The Debtors believe that emergency consideration of this Motion is necessary and appropriate.

### **Notice**

72.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  September 10, 2024
       Houston, Texas


_/s/  Clifford W. Carlson_

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
       Clifford.Carlson@weil.com
       Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
       Candace.Arthur@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

-and-

WEIL, GOTSHAL & MANGES LLP
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:   DavidJ.Cohen@weil.com

## <u>Certificate of Service</u>

I hereby certify that on September 10, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

_/s/  Clifford W. Carlson_____
Clifford W. Carlson