IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| STEWARD HEALTH CARE SYSTEM LLC, *et al.*, | § § § § | Case No. 24-90213(CML) |
| | § | (Jointly Administered) |
| Debtors.[1] | § § § | |

**DECLARATION OF JOHN R.
CASTELLANO IN SUPPORT OF EMERGENCY
MOTION OF DEBTORS REQUESTING ENTRY OF
INTERIM AND FINAL ORDERS (I) APPROVING (A) GLOBAL
SETTLEMENT WITH MEDICAL PROPERTIES TRUST AND (B) INTERIM
MANAGEMENT PROCEDURES, AND (II) GRANTING RELATED RELIEF**

I, John R. Castellano, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer of Steward Health Care System LLC ("**SHC**") and each of its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with the Debtors' direct and indirect non-debtor subsidiaries, the "**Company**" or "**Steward**"). Prior to becoming the Debtors' Chief Restructuring Officer, beginning in October 2023, I advised the Company in my capacity as Managing Director at AlixPartners, LLP, an affiliate of AP Services, LLC (collectively, "**AlixPartners**"). In these capacities, I am familiar with the Debtors' day-to-day operations, books and records, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases.

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

2. I submit this Declaration (this "**Declaration**") in support of the *Emergency Motion of Debtors Requesting Entry of Interim and Final Orders (I) Approving (A) Global Settlement with Medical Properties Trust and (B) Interim Management Procedures, and (II) Granting Related Relief*, filed contemporaneously herewith (the "**Global Settlement Motion**").[2]

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Company's operations and financial condition, my own reasonable inquiry, and/or my discussions with the Company's other officers, directors, and restructuring advisors, including professionals at Weil, Gotshal & Manges LLP, AlixPartners, Lazard Frères & Co. LLC, Leerink Partners LLC, and Cain Brothers, a division of KeyBanc Capital Markets. I am over the age of 18 and I am authorized to submit this Declaration on behalf of the Debtors. If called to testify, I would testify competently to the facts set forth in this Declaration.

4. I am familiar with Medical Properties Trust, Inc. and certain of its affiliates (collectively, "**MPT**"), the disputes and litigation between the Debtors, MPT, the Lenders, and the Committee, and the contemplated global settlement (the "**Global Settlement**"). I believe that the Global Settlement, including the transition and transfer or conveyance of the Specified MLI Hospitals thereunder, is in the best interests of the Debtors', their creditors, and their estates.

---

[2] Capitalized terms used but not defined herein shall have the meanings assigned to them in the Global Settlement Motion and the First Day Declaration (as defined below), as applicable.

**Qualifications and Professional Background**

5.  I hold a bachelor's degree in Accounting from DePaul University and a master's degree in Management, Finance, and Strategy from the Kellogg School of Management at Northwestern University. I have over 28 years of financial restructuring and bankruptcy related experience and over 26 years of experience with AlixPartners. I have served as a Managing Director in AlixPartners' Turnaround & Restructuring Group since 2007. Prior to joining AlixPartners, I worked at Ernst & Young LLP in its Assurance practice as an auditor, and in its Consulting practice focusing on restructuring advisory services. I have served as Chief Restructuring Officer (or in an equivalent role) in numerous largescale corporate restructurings, including: *In re Aearo Technologies LLC*, No. 22-02890 (JJG) (Bankr. S.D. Ind. 2022); *In re Footprint Power Salem Harbor Development LP*, No. 22-10239 (MFW) (Bankr. D. Del. 2022); *In re Alpha Latam Management, LLC*, No. 21-11109 (JKS) (Bankr. D. Del. 2021); *In re Lonestar Resources US Inc.*, No. 20-34805 (DRJ) (Bankr. S.D. Tex. 2020); *In re McDermott International, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. 2020); and *In re Aegerion Pharmaceuticals, Inc.*, No. 19-11632 (MG) (Bankr. S.D.N.Y. 2019).

6.  AlixPartners specializes in designing and implementing business turnarounds, assisting companies with the administration of the bankruptcy process, and providing interim crisis management, among other things. AlixPartners provides these services for companies throughout the financial services industries and has an intimate understanding of the economic, regulatory, operational, strategic, and financial factors that drive these businesses. AlixPartners' prior experience includes a range of activities and services targeted at restructuring, stabilizing, and improving a company's financial position. These services have historically included: (i) providing executive leadership to financially distressed companies; (ii) developing or validating forecasts, business plans, and related assessments of a business's strategic position; (iii) monitoring and managing cash, cash flow, and supplier

relationships; (iv) assessing and recommending cost reduction strategies; and (v) designing and negotiating financial restructuring packages.

7. On May 6, 2024, I submitted the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* (Docket No. 38) (the "**First Day Declaration**"). Information about my qualifications and professional background may be found in the First Day Declaration and are incorporated herein by reference.

## Facts Relevant to the Motion

A.   **MPT's Claims**

8. As of the date hereof, the aggregate amount of MPT's potential claims (the "**MPT Claims**") against the Debtors' estates total up to approximately $7.5 billion. The MPT Claims consist of approximately:

- $83.4 million in connection with that certain secured, superpriority, debtor in possession junior lien multiple draw term loan facility pursuant to that certain *Debtor-in-Possession Credit Agreement*, dated May 28, 2024, by and among, *inter alios*, SHC, as borrower, the other Debtors jointly and severally, as guarantors, and the MPT DIP Lender (the "**MPT Claims**");

- $448.1 million[3] in connection with: (i) that certain prepetition term loan facility pursuant to that certain *Second Amended and Restated Promissory Note*, dated June 30, 2023 between SHC and the Prepetition MPT Secured Party (the "**MPT Facility Claims**"), (ii) that certain prepetition term loan the term loans borrowed under the that certain *Promissory Note*, dated January 2, 2024 by and among the Prepetition Stewardship Borrowers and the Prepetition MPT Secured Party (the "**MPT Stewardship Note Claims**"); and (iii) that certain prepetition bridge facility pursuant to that certain *Credit Agreement* among certain of the FILO Lenders and the Prepetition MPT Secured Party and Brigade Agency Services LLC, as administrative agent and collateral agent (the "**MPT Bridge Claims**" and together with the MPT Facility Claims, MPT Stewardship Note Claims, the "**MPT Prepetition Secured Claims**");

- $403.4 million in connection with guaranty of SHC Holdings under that certain *Secured Promissory Note*, dated February 3, 2022 made by Steward

---

[3]   Includes 1.85x minimum MOIC on MPT Bridge Claims and 1.25x minimum MOIC on MPT Stewardship Note Claims; total claim is approximately $367.8 million with the exclusion of MOIC.

4

Investors in favor of the MPT Noteholder (the "**MPT HoldCo Claims**"); and

- $6.6 billion in future rent and other obligations[4] in connection with the facilities leased under Master Lease I or Master Lease II (the "**MPT Lease Claims**").

### B. Disputes with MPT

9. A major impediment to the sale of certain of the Debtors' hospitals has been the disagreement between the Debtors and MPT regarding allocation of value as between the Debtors' hospital operations and MPT's real property, among other disputes. The Debtors and MPT were unable to agree upon—and instead actively disputed—the proper and appropriate allocation of value as between the real property and hospital operations with respect to the hospitals for which bids have been received, almost without exception.

10. Accordingly, I understand that on August 19, 2024, the Debtors commenced an adversary proceeding against MPT seeking a declaratory judgment allocating the amount of value attributable to the Debtors' hospital operations, on one hand, and MPT's real estate, on the other (the "**Adversary Proceeding**"). I also understand that the Debtors have filed motions to reject their master leases with MPT.

11. I also understand that the Committee investigated and believes that the Debtors' estates have colorable claims against MPT, including, but not limited, to (i) recharacterize the Master Leases as "disguised financings," (ii) avoid certain liens and preferential payments granted or made to MPT prior to the Petition Date, and (iii) equitably subordinate MPT's claims arising from prepetition conduct. I understand that the Creditors' Committee believes it has a strong basis to assert such claims on behalf of the Debtors' estates.

---

[4] Amount represents (i) contractually deferred rent; (ii) other unpaid additional amounts; and (iii) future, undiscounted rent due under the Master Leases through October 31, 2041. Includes average rent escalators ranging from 2.5% to 3.5% annually. Amount is approximate, unaudited, and does not include all amounts payable under the Master Leases. Undiscounted future rents do not represent balance sheet lease liabilities under generally accepted accounting principles.

5

**The Global Settlement is Fair, Reasonable,
and in the Best Interest of the Debtors' Estates**

12. After extensive arm's-length negotiations, the Debtors and MPT have reached an agreement as to the principal terms of the Global Settlement, as set forth in the Settlement Term Sheet.

13. It is my belief that the Global Settlement is fair and reasonable and supports finding that the Debtors' entry into the Global Settlement is in the best interest of the Debtors, their estates, their creditors, and other stakeholders.

14. It is my understanding that the likelihood of success of litigating against MPT all of the issues and disputes underlying the Adversary Proceeding, the Master Lease Rejections, the claims that are subject of the Creditors' Committee's investigation, and other potential claims and causes of action against MPT is uncertain. Specifically, although the Debtors believe that they have strong arguments that could result in the Debtors prevailing in the Adversary Proceeding and on the Master Lease Rejections, such result is not guaranteed. Moreover, even if the Debtors were to prevail in litigation (e.g., obtain a favorable ruling on allocation of value to the Debtors' hospital operations in the Adversary Proceeding), there is significant risk that the Debtors will not have sufficient liquidity to pursue such litigation to judgment, or that doing so will otherwise jeopardize the Debtors' sale process and drive prospective buyers and operators away before the Debtors obtain such favorable judgment. For example, a condition to closing the sale of the Space Coast Hospitals (which are the Debtors' most valuable hospitals) is that the Debtors, Orlando Health, and MPT must reach an agreement on the Allocation Dispute. Similarly, although the Debtors understand that the Committee's investigation may yield favorable results resulting in the commencement of litigation against MPT, I understand that the Debtors believe that such litigation involves complex legal issues that are not guaranteed to result in a favorable outcome. Moreover, each of the Adversary Proceeding, the Master Lease Rejections, the Creditors' Committee's potential claims against

6

MPT, and other potential claims against MPT could entail significant discovery, extensive briefing, and preparation for trial and other evidentiary hearings, and may take several months or years to complete. I have been advised by Counsel that it could cost the Debtors' estates potentially tens of millions of dollars in litigation expenses if these issues were fully litigated to judgment, with no guarantee of success.

15.     In addition, absent entry into and consummation of the Global Settlement Agreement, the Debtors would be obligated to continue funding operating expenses at the Specified MLI Hospitals. However, the Debtors do not have the liquidity to continue funding the operations of such hospitals (or the funding to complete the sale process, which has been significantly delayed). Therefore, I believe that failure to reach a settlement with MPT could result in adverse consequences for the Debtors' estates, including potential further hospital closures and incurring substantial closure costs. Accordingly, I believe the certainty of outcome realized by entry into and consummation of the Global Settlement provides significant benefits to the Debtors and their estates.

16.     I believe the Global Settlement is the product of hard fought negotiations between the Debtors, MPT, the Lenders (in particular the FILO Secured Parties), and the UCC, each of which were represented by independent, sophisticated counsel. The parties have already expended a significant amount of time and resources investigating and litigating disputes in these chapter 11 cases, including the Allocation Dispute, the Committee and Transformation Committee's investigations of claims against MPT, and the Master Lease Rejections. The parties have also exchanged a number of proposals and counter-proposals and engaged in extensive Mediation overseen by Honorable Judge Isgur through multiple sessions over approximately 12 weeks, which ultimately led to the terms of the Global Settlement.

17.     I believe the Global Settlement, if approved, affords the Debtors and their estates with numerous benefits, including: (i) providing the Debtors' estates with $395

million in proceeds from the consummation of the sale of the Space Coast Hospitals, (ii) securing ongoing funding for the operation and transition of the Specified MLI Hospitals to Designated Operator(s), (iii) facilitating the transition of the Specified MLI Hospitals to new operators, (iv) avoiding the incurrence of ongoing operating losses associated with the Specified MLI Hospitals, (v) resolving protracted, expensive, and uncertain litigation with MPT, and (vi) the waiver and release of all of MPT's claims against the Debtors' estates (which I understand total up to approximately $7.5 billion).

18. Further, the Global Settlement provides an opportunity for nearly all of the MLI Hospitals (including the Debtors' hospitals in Ohio that were at risk of imminent closure) to remain open and continue to deliver high-quality patient care in the communities in which they are located and preserve over 10,000 jobs.

19. Accordingly, I believe the Global Settlement is fair, reasonable, and in the best interest of the Debtors and their estates and should be approved.

### Approval of Interim Management Procedures Is in the Best Interests of the Debtors' Estates

20. I believe the appointment of Interim Managers pursuant to the Interim Management Procedures is in the best interests of the Debtors, their estates, and their creditors. First, appointment of Interim Managers is a condition to the overall Global Settlement, which, as described above, provides significant economic benefits to the Debtors' and their estates. For example, absent the Debtors' agreement to appoint Interim Managers, such Interim Managers would be unwilling to fund the operating expenses at the Specified MLI Hospitals until they are transferred to Designated Operators. As described above, the Debtors do not have the liquidity to continue funding the operations of such hospitals, and only had approximately $21 million of cash on hand as of the week ending September 6, 2024. In connection with the Global Settlement, I understand the Interim Managers will agree to fund the Specified Ml1 Hospital operations in accordance with the Settlement Term Sheet. Further,

8

to the extent the Interim Managers do not fund such amounts in the first instenace, MPT has agreed to pay accrued payroll as of September 11, 2024 (approximately $27 million) and fund an account for hospital-level expenses with $5 million. Accordingly, absent the Debtors' agreement to appoint Interim Managers until they are transferred to Designated Operators, I believe the Debtors would be forced to consider potential further hospital closures to the detriment of the Debtors, their estates, their creditors, and the employees, patients, and communities served by the hospitals.

21. Second, each Interim Manager will agree to be bound by the Interim Management Procedures. The Interim Management Procedures will require that each Interim Manager agrees to comply with the terms of the applicable hospital license and applicable law, and each Interim Manager will indemnify the Debtors for any breach of the Interim Management Procedures, including by failing to comply with the hospital license and applicable law. Moreover, the Debtors, as license holder, have the ability to intervene in such operations if an issue arises relating to the health and welfare of the patients served by Specified MLI Hospital.

### Transfer of the Specified MLI Hospitals Under the Global Settlement Is a Sound Exercise of the Debtors' Business Judgment

22. The Global Settlement brings finality and stability to the Debtors' workforce and vendors that have been waiting for the results of the sale process. The Debtors have a sound business justification for transferring or conveying the Specified MLI Hospitals pursuant to the Global Settlement. First, I believe the Debtors are receiving material value for the Debtors' interests in the Specified MLI Hospitals because of the previously enumerated benefits received by the Debtors' estates pursuant to the Global Settlement. Many of the Debtors' hospitals operate at significant losses, placing a heavy burden on the Debtors' estates. As evidenced by the Debtors' sale process to date, I believe that even if the Debtors had funding

9

to continue operating the Specified MLI Hospitals and pursuing the sales process, the Debtors risk only realizing limited proceeds from the sale of such hospitals given the dispute with MPT.

23. I believe the Global Settlement maximizes the value of the Debtors' interests in such hospitals by (i) obtaining $395 million of net proceeds from the Space Coast Hospitals, (ii) eliminating substantial costs of operating and transitioning the Specified MLI Hospitals, and (iii) the release of all of the MPT Claims against the Debtors' estates. Thus, I believe that the significant economic benefits realized by the Debtors pursuant to the Global Settlement is the highest and best use for the Debtors' interests in the Specified MLI Hospitals and demonstrates that entry into the Global Settlement reflects a prudent exercise of the Debtors' business judgment.

24. Second, I believe entry into the Global Settlement is substantially better than any other alternative available to the Debtors. Absent the Global Settlement, I believe the Debtors will continue to be mired in litigation, further jeopardizing successful and expeditious sales of the Debtors' hospitals while the Debtors' continue to incur operating losses and litigation expenses for which the Debtors have no financing. At this time, the Debtors simply do not have any alternative source of funding option available to operate and transition each of the Specified MLI Hospitals to new operators. Moreover, absent entry into the Global Settlement, the Debtors would be forced to proceed with hospital closures to stop the immense cash burn, including hospitals in Ohio. Entry into the Global Settlement allows for nearly all of the Specified MLI Hospitals to remain open and operational.

25. Accordingly, I believe the transfer of the Specified MLI Hospitals pursuant to the Global Settlement is clearly the highest and best use for such estate assets and is a sound exercise of the Debtors' business judgment.

### Abandonment of the Closed Hospitals and Behavioral Facility
### (and, only if Necessary, the Specified MLI Hospitals) Should Be Approved

26. I believe that the proposed abandonment is appropriate to the extent the transfer or conveyance of the Closed Hospitals, Behavioral Facility, and, potentially, certain of the MLI Hospitals (including the Behavioural Facility) is not effectuated because such abandonment will allow the Debtors to (i) stop the accrual of administrative expenses associated with retaining such hospitals and (ii) given the limited resources of the Debtors' estates, ensure continuity of patient care and the ability to transition the hospitals to an alternative operator. Further, I understand that the proposed abandonment of such hospitals will not conflict with laws designed to protect public health and safety. I believe the proposed abandonment will also not pose an imminent threat to public welfare because, pursuant to the terms of the Global Settlement, the abandonment is proposed primarily for the Closed Hospitals and Behavioral Facility, and with respect to an abandonment of any other MLI Hospital, abandonment will be done in connection with MPT contracting with a new operator, and MPT will be deemed to accept title and ownership of the abandoned Specified MLI Hospitals immediately upon abandonment.

### Procedures for Approval of Transfer of Specified MLI Hospitals
### to Designated Operators Are in the Best Interests of the Debtors' Estates

27. I believe the contemplated procedures to govern the transfer or conveyance of the Specified MLI Hospitals to Designated Operators are in the best interests of the Debtors, their estates, and their creditors because they are designed to provide adequate notice and due process to parties in interest that may be affected by the proposed transfers or conveyances while also balancing the need for expediency necessary to ensure each Specified MLI Hospital remains operational and funded.

**Interim Managers Should Have No Successor Liability**

28.     It is my understanding that each Interim Manager will serve only in a temporary role until the applicable Specified MLI Hospital is transferred or conveyed to a Designated Operator (which may by the Interim Manager).  Absent a court order providing that each Interim Manager shall have no successor liability, I understand it may be difficult—or impossible—to locate an Interim Manager who is willing to serve in such capacity, and the Debtors would not receive the significant economic benefits provided be the Global Settlement as described herein.

I declare under penalty of perjury that the foregoing is true and correct. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 10, 2024  
Dallas, Texas

*/s/ John R. Castellano*  
John R. Castellano  
Chief Restructuring Officer  
Steward Health Care System LLC