United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 10, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |

### ORDER (I) AUTHORIZING AND
### APPROVING (A) THE SALE OF MELBOURNE REGIONAL
### MEDICAL CENTER, ROCKLEDGE REGIONAL MEDICAL
### CENTER, AND SEBASTIAN RIVER MEDICAL CENTER FREE AND CLEAR
### OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) THE
### ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
### AND UNEXPIRED LEASES, AND (C) THE SEVERANCE OF REAL PROPERTY
### FROM AN UNEXPIRED LEASE; AND (II) GRANTING RELATED RELIEF

Upon the *Emergency Motion of Debtors for Entry of Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief*, dated May 15, 2024 (Docket No. 281) (the "**Motion**"),[2] filed by the above-referenced debtors and debtors in possession (collectively, the "**Debtors**") seeking, among other things, entry of an order (this "**Order**") (i) authorizing the sale of the Purchased Assets (as defined in the APA) free and clear of all Liens, Claims, Encumbrances, and Interests (as defined in paragraph 10 herein) and

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the APA (as defined herein), as applicable.

assumption of Assumed Liabilities (as defined in the APA), except as otherwise provided in that certain *Asset Purchase Agreement*, dated as of August 14, 2024 (together with all other agreements, documents, instruments, deliverable thereunder or attached thereto or referenced therein, and as may be amended, modified, or supplemented, the "**APA**") by and among one or more Debtors and Orlando Health, Inc. and Orlando Health Medical Group, Inc. (collectively, the "**Buyer**", and such sale, the "**Sale Transaction**"), with all Liens, Claims, Encumbrances, and Interests to attach to the proceeds of the Sale Transaction as set forth in this Order, (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases and certain non-executory contracts, including those identified on Schedules 1.1(h)(ii) and 1.5(b)(i) of the APA, as such schedules and sections of the APA may be modified or amended in accordance with the APA and this Order (the "**Assigned Contracts**"); and (iii) granting related relief, all as more fully set forth in the Motion; and upon consideration of the *Declaration of James Moloney in Support of Emergency Motion of Debtors for Entry of Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 425); the *Declaration of Toby King in Support of Emergency Motion of Debtors for Entry of Order (I Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 426), and the *Declaration of Toby King in Support of*

*(I) Sale of Space Coast Hospitals Free and Clear of Liens and Liabilities and (II) Granting Related Relief* (Docket No. 2393) (collectively, the "**Sale Declarations**"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. § 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary; and the Court having entered the *Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 626) (the "**Bidding Procedures Order**"); and the Debtors having filed and served the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Sale* (Docket No 1643); and the Debtors having filed and served the *Notice of Designation of Stalking Horse Bidder for Certain of the Debtors' Florida Hospitals* (Docket No. 1991) (the "**Notice of Stalking Horse Bidder**"); and the Court having entered the *Order Approving Stalking Horse Bid Protections for Orlando Health* (Docket No. 2141) (the "**Stalking Horse Bid Protections Order**"); and the Debtors having determined that the highest or otherwise best offer for the Purchased Assets was made by the Buyer pursuant to the APA (such offer, the "**Successful Bid**"); and the Debtors having filed and served the *Notice of (I) Designation of Orlando Health as Successful Bidder and (II) September 10, 2024 Sale Hearing with Respect to Space Coast*

*Hospitals* (Docket No. 2240) naming the Buyer the Successful Bidder for the Purchased Assets; and the real property buyer ("**Real Property Buyer**"), and real property sellers (collectively, "**Real Property Sellers**") intending to enter into a Real Property Purchase and Sale Agreement prior to the Closing Date (the "**PSA**") with respect to the purchase and sale of the real property and improvements more specifically described therein (the "**Real Property**" and such transaction, the "**Real Property Transaction**"); and MPT Operating Partnership, L.P. and its applicable affiliates (the "**MPT Lessors**") and the Debtors may agree, conditioned upon the Closing of the Sale Transaction and the Real Property Transaction, to sever and release the Real Property from that certain *Second Amended and Restated Master Lease Agreement (Master Lease I)*, dated as of March 14, 2022 ("**Master Lease I**") and the other Obligation Documents (as defined in Master Lease I) (collectively, the "**Severance**") pursuant to an amendment to Master Lease I as contemplated by the APA (together with all other agreements, documents, instruments, deliverable thereunder or attached thereto or referenced therein, and as may be amended, modified, or supplemented, the "**Severance Amendment**"); and upon the Buyer and one or more Debtors having agreed to the terms of the APA with respect to the Sale Transaction; and the Court having conducted a hearing on September 10, 2024 (the "**Sale Hearing**") to consider the relief requested in the Motion as set forth in this Order; and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Sale Transaction, the APA, the Severance, the Severance Amendment, and all relief set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and the Court having reviewed and considered: (i) the Motion; (ii) the APA; (iii) the Global Bidding Procedures; (iv) the Bidding Procedures Order; (v) the record of the Bidding Procedures Hearing; (vi) the Sale Declarations;

(vii) all objections filed with the Court; and (viii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and the Court having determined that the legal and factual basis set forth in the Motion establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates, and the Debtors having demonstrated good, sufficient and sound business justifications for the relief granted herein; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary, it is HEREBY FOUND AND DETERMINED THAT:

A. **Findings and Conclusions.** The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction.** The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334. Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Purchased Assets pursuant to 28 U.S.C. § 1334(e), as such Purchased Assets are property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein. This is a core proceeding within the meaning of 28 U.S.C. § 157(b), and as such, this Court has the authority to enter a final order.

C. **Venue.** Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D. **Statutory Predicates.** The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Bankruptcy Rules, and the Complex Case Procedures.

E. **Global Bidding Procedures.** On June 3, 2024, the Court entered the Bidding Procedures Order which, among other things: (i) approved the Global Bidding Procedures (as defined in the Motion); (ii) authorized the Debtors to designate one or more stalking horse bidders (each, a "**Stalking Horse Bidder**" and, each such bidder's bid, a "**Stalking Horse Bid**") and offer each such Stalking Horse Bidder certain bid protections as set forth in the Global Bidding Procedures (collectively, the "**Stalking Horse Bid Protections**"); (iii) scheduled Auctions of the Assets (each as defined in the Motion); (iv) scheduled Sale Hearings to consider the sale of the applicable Assets; (v) authorized and approved (1) notice of Auctions, sales of the Assets, and the Sale Hearings, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u> (the "**Sale Notice**"), and (2) notice to each non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired non-residential real property lease of the Debtors that the Debtors propose to assume and assign to a particular Successful Bidder setting forth the Debtors' calculations of the amount necessary to cure any monetary defaults under such Assigned Contract (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "**Cure Notice**"); (vi) authorized and approved procedures for the assumption and assignment of the Assigned Contracts and determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and (vii) granted related relief. The Global Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Purchased Assets. The Debtors conducted

the sale process of the Purchased Assets without collusion and in accordance with the Global Bidding Procedures.

F.      **Designation of Stalking Horse Bidder.**  On August 14, 2024, the Debtors filed and served the Notice of Stalking Horse Bidder, which designated Buyer as the Stalking Horse Bidder for the Purchased Assets and set forth the Stalking Horse Bid Protections for Buyer consisting of (a) a break-up fee of $13.7 million ("**Break-up Fee**") and (b) reimbursement of reasonable, out-of-pocket and documented expenses up to an aggregate amount of $6.5 million ("**Expense Reimbursement**," and together with the Break-up Fee, the "**Bid Protections**").  On August 22, 2024, the Court entered the Stalking Horse Bid Protections Order, approving the Stalking Horse Bid Protections.

G.      **Notice and Opportunity to Object.**  As evidenced by the certificates of service previously filed with the Court (Docket Nos. 774, 858, 1035, 1129, 1161, 1180, 1565, 1575, 1603, 1614, 1870, 2039, 2041, and 2339), and as demonstrated by the evidence presented at the Sale Hearing, the Debtors have provided proper, timely, adequate, and sufficient notice of, and fair and reasonable opportunity to object and be heard with respect to, the Motion, the Stalking Horse Bidder, the Stalking Horse Bid Protections, the contracts to be potentially assumed and assigned in connection with the Sale Transaction, including the Assigned Contracts, the Sale Hearing, the Sale Transaction, and the deadlines related thereto was provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9014 and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Junior DIP Lender, Prepetition MPT Secured Party, and MPT Lessors, KTBS Law LLP, 1801 Century Park E #2600, Los Angeles, California 90067 (Attn: Thomas E.

7

Patterson, Esq. and Sasha M. Gurvitz, Esq.); (c) counsel to the ABL Lenders, Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (Attn:  Kristopher M. Hansen, Esq., Christopher Guhin, Esq., Jeff Lowenthal, Esq., and Brian Kelly, Esq.); (d) counsel to Siemens Financial Services, Inc., Otterbourg P.C., 230 Park Avenue, New York, New York 10169 (Attn: Andrew Kramer, Esq.); (e) counsel to the FILO DIP Lenders and the FILO Lenders, Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Dennis Dunne, Esq., Michael Price, Esq., Andrew Harmeyer, Esq., and Brian Kinney, Esq.); (f) counsel to the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "**Committee**"), Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Brad M. Kahn, Esq., Sarah Link Schultz, Esq., Iain Wood, Esq., and Erica D. McGrady, Esq.); (g) counsel to the Buyer, Hogan Lovells US LLP, 390 Madison Avenue, New York, New York 10017 (Attn: Erin Brady, Esq., Todd Schwartz, Esq., and Jennifer Lee, Esq.); (h) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (i) all entities known to have asserted any Lien, Claim, Encumbrance, or Interest (as defined herein) in or against the Purchased Assets; (j) all entities that have, to the best of the Debtors' management and advisors' knowledge, expressed written interest in consummating the Sale Transaction with respect to the Purchased Assets within the past twelve (12) months; (k) all other known parties with any interest in the Purchased Assets; (l) all known creditors of the Debtors, including contract counterparties; (m) the Securities and Exchange Commission; (n) the Internal Revenue Service; (o) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules; (p) all state attorneys' general in states where the Purchased Assets are located; (q) municipalities in which the Purchased Assets are or will be located as at Closing (as defined below); (r) all affected federal, state, and local regulatory and taxing authorities; (s) those parties entitled to notice pursuant to Local Rule 9013-1(d); and

(t) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002. With respect to entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice (as defined below) in the *Boston Globe*, *Houston Chronicle*, and *New York Times*, and on June 19, 2024, in the *Arizona Republic*, *Florida Today*, *Indian River Press Journal*, *Miami Herald*, *Midland Reporter-Telegram*, *South Florida Sun Sentinel*, *Texarkana Gazette*, and *Youngstown Vindicator* on June 20, 2024, and in the *Monroe News-Star* on June 23, 2024, and on the website maintained by Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.ra.kroll.com/Steward on June 5, 2024, as evidenced by the *Certificate of Publication* at Docket No. 1161, was, and is deemed, sufficient and reasonably calculated under the circumstances to reach such entities. The notices described above and in the Motion and Bidding Procedures Order were good, sufficient, and appropriate under the circumstances and reasonably calculated to reach and apprise all known and unknown holders of the Liens, Claims, Encumbrances, and Interests, and no other or further notice of the Motion, the Stalking Horse Bidder, the Stalking Horse Bid Protections, the Sale Transaction, the Sale Hearing, the potential assumption and assignment of the Assigned Contracts, or the related Cure Costs is, or shall be, required.

H.    Service and publication of the Sale Notice (as defined below) was provided to all parties in interest, including those with an alleged approval or consent right or anti-assignment provision (including a provision that purports to give termination rights to a contract counterparty on account of the sale, disposition, transfer, or closure by the Debtors of the Debtors'

property or assets) contained in an Assigned Contract ("**Consent Rights**") with a reasonable and adequate opportunity to object.

I.     The Sale Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>, provided all interested parties with timely and proper notice of the Sale Transaction, Bid Deadline, and Sale Hearing.  A reasonable opportunity to object and/or to be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code and the Bankruptcy Rules.  Accordingly, no further notice of the Motion or the Sale Hearing is necessary or required.

J.     The Debtors served the Cure Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u>, and the Supplemental Cure Notices (as defined in the Motion) on all parties required to receive such notice under the Bidding Procedures Order, and such parties have been afforded a reasonable and fair opportunity to file an objection to the assumption and/or assignment of any Assigned Contracts, including any proposed Cure Costs set forth on the Cure Notice (each, a "**Cure Objection**") and to the provision of adequate assurance of future performance by the Buyer (each, an "**Adequate Assurance Objection**", and together with a Cure Objection, a "**Contract Objection**").

K.     The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Global Bidding Procedures, the assumption and/or assignment of the Assigned Contracts, the Sale Hearing, the Sale Transaction, the Cure Costs, the deadlines to submit Contract Objections, the deadline to submit objections to the Sale Transaction, and all other deadlines related thereto is or shall be required.

L.      **Assets Property of the Estate.**  The Purchased Assets sought to be sold and assigned by the Debtors to the Buyer pursuant to the APA are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

M.      **Sufficiency of Marketing.**  As demonstrated by the Motion, the Sale Declarations, and the evidence set forth at the Sale Hearing, the Debtors and their professionals adequately marketed the Purchased Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion and the Global Bidding Procedures and conducted a fair and open sale process.  The sale process and the Global Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Purchased Assets.  The process conducted by the Debtors pursuant to the Bidding Procedures Order resulted in the Sale Transaction, which is the highest or otherwise best value for the Purchased Assets, and there was no other transaction available or presented that would have yielded a higher or better result for the Purchased Assets.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective Bidders have been afforded a reasonable and fair opportunity to bid for the Purchased Assets, or file a Contract Objection and/or assert an objection to the Sale Transaction.  The marketing process undertaken by the Debtors and their professionals and each of their respective agents and other representatives with respect to the Purchased Assets has been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all of the Debtors' stakeholders in all respects.

N.      **Highest or Otherwise Best Offer.**  Pursuant to the APA and as further described below, the Buyer has offered to purchase the Purchased Assets from one or more Debtors

in exchange for (i) $439,424,000 in cash, as adjusted pursuant to Section 1.6 of the APA and (ii) the assumption of the Assumed Liabilities (as defined in the APA).

O.     The Debtors determined, in a valid and sound exercise of their business judgment and following consultation with their financial and legal advisors and a robust and extensive marketing process, that the total consideration (including non-cash consideration and other benefits presented by the Buyer's bid) to be provided by the Buyer for the Purchased Assets is the highest or otherwise best bid.  Therefore, the Buyer's bid was designated the Successful Bid for the Purchased Assets.  Consummating the Sale Transaction will yield greater value to the Debtors' estates than would have been provided by any other available alternative transaction.  The Global Bidding Procedures and the Bidding Procedures Order have been complied with in all respects by the Debtors and the Buyer and afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer for the Purchased Assets.

P.     The Debtors have demonstrated that (i) the Successful Bid as reflected in the APA is the highest or otherwise best offer for the Purchased Assets, (ii) the APA, and the closing of the transactions contemplated thereunder, presents the best opportunity to realize the maximum value of the Purchased Assets, and (iii) the Debtors' entry into the APA and consummation of the Sale Transaction (the "**Closing**", and the date of such Closing, the "**Closing Date**") is a sound exercise of the Debtors' business judgment.

Q.      **Real Property and Severance**.  Subject solely to any Challenge,[3] the Real Property Seller holds title to the Real Property sought to be sold and conveyed by the Real Property Seller to the Real Property Buyer pursuant to the PSA.  The Buyer would not have entered into the APA or purchased the Purchased Assets from the Debtors without the Real Property Buyer entering into the PSA and purchasing the Real Property, including because the Real Property is necessary to support the value of the Purchased Assets.  Similarly, the Buyer would not have entered into the APA or purchased the Purchased Assets from the Debtors without the ability to ensure an appropriate allocation of Purchase Price between the Purchased Assets and the Real Property.  The Closing of the Sale Transaction is contingent on the consummation of the Real Property Transaction and the Severance.  Accordingly, the Real Property Transaction and the Severance are integral to and inextricably intertwined with the Sale Transaction.

R.      **APA.**  On August 14, 2024, the Debtors filed the Notice of Stalking Horse Bidder with a copy of the APA attached thereto as <u>Exhibit C</u>.  A copy of the APA is attached hereto as **<u>Exhibit 1</u>**.

S.      **Business Justification; Fiduciary Duties.**  The Debtors have demonstrated that entry into and consummation of the transactions contemplated by the APA constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, and creditors, and all parties in interest.  The Court finds that the Debtors

---

[3]   "**Challenge**" shall have the meaning ascribed to it in the *Final Order (i) Authorizing the Debtors to (a) Obtain Junior Lien Postpetition Financing, (b) Use Cash Collateral, and (c) Grant Liens and Provide Superpriority Administrative Expense Claims; (ii) Granting Adequate Protection to Certain Prepetition Secured Parties; (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief (Docket No. 625) and the Final Order (i) Authorizing the Debtors to (a) Obtain New Postpetition Financing, (b) Use Cash Collateral, and (c) Grant Liens and Provide Superpriority Administrative Expense Claims; (ii) Granting Adequate Protection to Certain Prepetition Secured Parties; (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief* (Docket No. 1538) (the "**FILO DIP Order**").

have articulated good and sufficient business reasons justifying the sale of the Purchased Assets to the Buyer pursuant to the terms and conditions set forth in the APA.

T.      The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Buyer in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, subject to the requirements applicable to any Disputed Contracts (as defined and described below).   The Assigned Contracts being assigned to the Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates.

U.      The Debtors' decision to enter into the APA and consummate the Sale Transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, managers, and officers.   Because the entry into and consummation of the APA constitutes the exercise by the Debtors of sound business judgment, the Debtors, and their respective current members, managers, officers, directors, employees, advisors, professionals or agents (in each case, solely in their capacity as such), shall have or incur no liability to the estates or any holder of a Claim against or Interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale Transaction contemplated thereunder, other than liability arising out of or relating to any willful misconduct or fraud, in each case as determined by a court of competent jurisdiction.

V.      The Debtors have demonstrated that it is an exercise of their sound business judgment to enter into the Severance Amendment, as applicable, to effectuate the Severance in connection with the consummation of the Sale Transaction and the Real Property Transaction, and

entering into such Severance Amendment is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The Severance and the Real Property Transaction are an integral part of and are inextricably intertwined with the Sale Transaction.

W.     **Corporate Authority.**  Upon entry of this Order, the Debtors (i) have the corporate or other organizational power and authority necessary to execute the APA and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the Sale Transaction, and (iii) have taken or are deemed to have taken all corporate or other organizational action necessary to authorize and approve the APA and any actions required to be performed by the Debtors to consummate the Sale Transaction.  Upon the entry of this Order, no further consents or approvals of the Debtors are required for the Debtors to consummate the Sale Transaction.

X.     **Arm's-Length Sale and Buyer's Good Faith.**  The APA was negotiated and is undertaken by the Debtors and the Buyer at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.   The Buyer (i) recognizes that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets, (ii) complied with the Bidding Procedures Order in all respects, and (iii) willingly subjected its bid to the competitive Global Bidding Procedures with respect to the Purchased Assets.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Sale Transaction or the APA to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) of the Bankruptcy Code.  The APA was not controlled by an agreement between potential bidders within the meaning of section 363(n) of the Bankruptcy Code.  All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with

the Sale Transaction have been disclosed, and the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  As a result of the foregoing, the Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and any other applicable bankruptcy or non-bankruptcy law with respect to the Sale Transaction, and as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion thereof is reversed or modified on appeal.

Y.     **Insider Status.**  The Buyer is not an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code

Z.     **No Fraudulent Transfer.**  The total consideration provided by the Buyer pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The APA was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Buyer has entered into the APA or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

AA.     **Free and Clear Transfer Required by Buyer**.  The Buyer would not have entered into the APA and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, their creditors, their employees, and other parties in interest, if the sale of the Purchased Assets  was not free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA

or in this Order) or if the Buyer would be liable for such Liens, Claims, Encumbrances, and Interests, including, without limitation and as applicable, liabilities that are not expressly assumed by the Buyer as set forth in the APA or pursuant to this Order.  In closing the Sale Transaction, the Buyer shall be deemed to have materially relied on the findings and decrees in this Order.

BB.     The transfer of the Purchased Assets and the Sale Transaction is a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Purchased Assets free and clear of the Liens, Claims, Encumbrances, and Interests, except for Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA of this Order.

CC.     **Satisfaction of Section 363(f) Standards.**  The Debtors are authorized to sell the Purchased Assets free and clear of the Liens, Claims, Encumbrances, and Interests, other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA or this Order (with such Liens, Claims, Encumbrances, and Interests attaching to the proceeds ultimately attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, and Interests with the same nature, validity, priority, extent, perfection, and force and effect that the Liens, Claims, Encumbrances, and Interests encumbered such Purchased Assets immediately prior to the entry of this Order) because, with respect to each creditor or other person or entity asserting a Lien, Claim, Encumbrance, or Interest, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Each creditor or other person or entity asserting a Lien, Claim, Encumbrance, or Interest in the Purchased Assets (i) has, subject to the terms and conditions of this Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien, Claim, Encumbrance, or Interest, or (iii) otherwise falls within the

17

provisions of section 363(f) of the Bankruptcy Code.  Those holders of the Liens, Claims, Encumbrances, and Interests who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Motion are deemed to have consented to the Motion and Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.

DD.  **No Successor Liability.**  Neither the Buyer nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and, except as provided in paragraph 23 of this Order, neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates except to the extent explicitly provided in the APA.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the APA, neither the Buyer nor any of its affiliates shall (a) be liable for any claims that may be asserted against the Debtors or any of their predecessors or affiliates (including, subject to and except to the extent specifically set forth with respect to the United States in paragraphs 23 and 46 of this Order, (i) claims relating to any Payor Agreement for services rendered by or amounts paid to the Debtors prior to Closing, (ii) claims relating to any advanced or accelerated payments made by CMS or any other United States Governmental Authority to the Debtors prior to Closing, and (iii) claims or actions or proceedings brought under or related to Medicare/Medicaid statutes or regulations or the statutes and regulations applicable to other United States governmental health care reimbursement programs including enforcement actions and administrative agency rulings or interpretations) or (b) be subject to successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer liability, labor law, de facto merger, mere continuation, or substantial continuation, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or

18

unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, claims or defenses (including, other than to the extent provided in paragraph 23 of this order, rights of recoupment) relating to the Payor Agreements for services rendered or amounts paid to the Debtors prior to Closing (subject to paragraph 23 of this Order), any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing.  The Buyer is not, and the consummation of the Sale Transaction will not render the Buyer, a mere continuation, and the Buyer is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there is no continuity or common identity between the Buyer and the Debtors.  Accordingly, the Sale Transaction does not amount to a consolidation, merger, or de facto merger of the Buyer with or into any of the Debtors or their estates and the Buyer is not, and shall not be deemed to be, a successor to any of the Debtors or their estates as a result of the consummation of the Sale Transaction.

EE.     **Assigned Contracts.**  Each and every provision of the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.  All counterparties of the Assigned Contracts for which the deadline to file a Contract Objection has passed as of the date of this Order, and that did not timely file an objection to the assumption and assignment of the Assigned Contract(s) to which they are a counterparty, are deemed to consent to the assumption and assignment by the Debtors of their Assigned Contract to the Buyer, and the Buyer shall enjoy all of the rights and benefits under each such Assigned

Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-Debtor party's consent to the assumption or assignment thereof.  All counterparties of the Assigned Contracts for which the deadline to file a Contract Objection has not passed as of the date of entry of this Order, and that did not or do not timely file such an objection prior to the applicable deadline, shall be deemed to consent to the assumption and assignment by the Debtors of their Assigned Contract to the Buyer effective as of the Closing Date, and the Buyer shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-Debtor party's consent to the assumption or assignment thereof.  If a Cure Objection timely filed with respect to an Assigned Contract cannot be resolved by the parties prior to the Closing of the Transaction, the Debtors may assume and assign the applicable Contract(s) or Lease(s) pending resolution of the Cure Objection in accordance with and subject to paragraphs 32-33 of this Order and Section 1.5 of the APA.  Upon the assignment of the Assigned Contracts to the Buyer in accordance with the terms of the APA, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in the Assigned Contracts prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their affiliates, predecessors, successors, or assigns, shall have no further liability or obligation under the Assigned Contracts.  To the extent any Assigned Contract (other than a Medicare Provider Agreement, as defined in paragraph 23 below, which will be transferred to the Buyer in accordance with paragraph 23 of this Order) is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of the APA and, other than with respect to Assumed Liabilities, the Buyer shall not have any liability or

obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that arose or otherwise occurred in the period prior to the Closing Date and (ii) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) against the Debtors with respect to such Assigned Contract, that relate to any acts or omissions that arose or otherwise occurred prior to the Closing Date.

FF. **Cure Costs and Adequate Assurance.** Cure Costs will be paid by the Buyer in accordance with the terms of the APA. The Buyer has demonstrated adequate assurance of future performance of each Assigned Contract within the meaning of section 365 of the Bankruptcy Code that is assumed by the Buyer or any of its permitted assignees to which such Assigned Contract is assumed and assigned by the Debtors, including by providing the Adequate Assurance Information (as defined in the Bidding Procedures Order) and a promise to perform the Debtors' obligations under such Assigned Contract for periods first arising at or after the Closing (as defined in the APA). The Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Assigned Contracts that are assumed. The Buyer's payment of Cure Costs in accordance with the terms of the APA and promise under the APA to perform the obligations under the Assigned Contracts first arising as of the Closing, after the Closing Date, shall constitute adequate assurance of future performance under such Assigned Contracts. Subject to paragraphs 32-33 of this Order and the requirements applicable to any Disputed Contracts, as set forth in Section 1.5 of the APA, any objections to the Cure Costs, to the extent not otherwise resolved, are hereby overruled. To the extent that any counterparty failed to timely object to its Cure Cost or to raise any other alleged claim, default or breach of contract for the pre-assignment period, such counterparty is deemed to have consented to such Cure Cost and

to the assignment of its respective Assigned Contract(s) to the Buyer and to have waived any other defaults, claims or breaches.  The Court finds that with respect to all Assigned Contracts, the payment of the Cure Costs as provided in the APA is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code.  Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, of each Assigned Contract to be assumed and assigned to the Buyer as of Closing.

GG.   **MPT Sale Transaction**.  The APA provides that the Buyer is not required to consummate the Sale Transaction if the Existing MPT Lease Severance Agreement (as defined in the APA) and the MPT Purchase Agreement (as defined in the APA) are not consummated on or prior to the Closing Date (such conditions, the "**MPT Conditions**").  The Buyer would not have entered into the APA and would not consummate the Sale Transaction absent the existence and satisfaction of the MPT Conditions.

HH.   **Assets Assignable.**   Subject to the treatment of Medicare Provider Agreements in paragraph 23 of this Order, each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, have been or will be satisfied or are otherwise unenforceable under sections 363 or 365 of the Bankruptcy Code, as applicable.

II.   **Time is of the Essence.**  Time is of the essence in consummating the Sale Transaction and each of the transactions contemplated thereby.  In order to maximize the value of the Purchased Assets, it is essential that the Sale Transaction and each of the transactions contemplated thereby occur within the time constraints set forth in the APA.  Good and sufficient

reasons for approval of the APA, the Severance, and the Severance Amendment have been articulated by the Debtors.  Upon the entry of this Order, the Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, and the Debtors and the MPT Lessors, may close the Sale Transaction and Severance, respectively and each of the transactions contemplated by the APA and Severance Amendment, as applicable, any time after entry of this Order and subject to the terms and conditions of the APA and Severance Amendment, as applicable.

JJ.    **No Sub Rosa Plan.**  The APA and the Sale Transaction do not constitute a *sub rosa* chapter 11 plan.  The APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for the Debtors.

KK.    **Final Order; Immediate Effect.**   This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1.    **Objections Overruled.**  All objections, if any, with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with herein are hereby overruled on the merits, with prejudice.  All objections to the entry of this Order or to the relief granted herein that were not timely filed are hereby forever barred.

2.    **Approval of Sale Transaction.**  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Motion is granted, the relief requested therein with respect to the Sale

Transaction is granted and approved in its entirety, and the APA is hereby approved.  The Debtors have satisfied all requirements of sections 363(b) and 363(f) of the Bankruptcy Code, and all other requirements and standards applicable to a sale outside the ordinary course of business, free and clear of the Liens, Claims, Encumbrances, and Interests.

3.      Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized to take any and all reasonable actions necessary to consummate the Sale Transaction, including the sale, transfer, and assignment of all of the Debtors' right, title, and interest in, to, and under the Purchased Assets to the Buyer free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA) in accordance with the terms of the APA and the terms of this Order.  The relevant Debtors, as well as their directors, managers, officers, employees, and agents, are authorized to execute, deliver, and perform their obligations under and comply with the terms of the APA and to consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the APA and this Order.  For the avoidance of doubt, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Buyer in accordance with the APA and this Order.

4.      The relevant Debtors, their affiliates, and their respective directors, managers, officers, employees, and agents, are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional notices, assumptions, conveyances, releases, acquittances, instruments and documents that may be reasonably necessary or desirable to implement the APA, including the transfer and, as applicable, the assignment of all the

Purchased Assets, the assumption of the Assumed Liabilities, and the assumption and assignment of all the Assigned Contracts, and to take all further actions as may be necessary or appropriate to the performance of the obligations contemplated by the APA without further order of this Court.

5.     The Debtors are further authorized, but not directed, to pay, without further order of the Court, whether before, at or after Closing, any expenses or costs required to be paid to consummate the Sale Transaction or for the Debtors to perform their obligations solely in accordance with the APA.

6.     **Reserved**.

7.     **Approval of Severance Amendment.**  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to enter into the Severance Amendment, as applicable, subject to any closing conditions set forth therein, and the Severance Amendment is hereby approved.   The Debtors have satisfied all requirements of the Bankruptcy Code in connection with entry into and approval of the Severance Amendment.  For the avoidance of doubt, the MPT Lessors' agreement to the Severance does not constitute an agreement to any additional or further severance of Master Lease I (or any other lease), shall not prejudice the MPT Lessors, the Debtors, the Committee, or any other party in any litigation or transaction with respect to Master Lease I (or any other lease), and shall not bind the MPT Lessors, the Debtors, the Committee, or any other party with respect to any transaction other than the Real Property Transaction contemplated by the PSA and the Severance, subject to any Challenge and the ability of the Court to fashion any appropriate remedy following a successful Challenge; provided, however, that any such remedy shall be limited to the recovery of proceeds of the Real Property Transaction and shall not result in any claim against the Buyer for recovery or claw back of any

property conveyed to the Buyer under the transactions contemplated under the APA and this Order, including the Real Property Transaction.

8.  Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the parties are authorized to take any and all reasonable actions necessary to consummate the Severance.

9.  **Sale and Transfer of Assets Free and Clear.**  Pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, the Debtors are authorized to transfer, and upon the Closing shall transfer to the Buyer, all of the Debtors' right, title, and interest in and to, and possession of, the Purchased Assets, which shall be immediately vested in the Buyer, and such title to the Purchased Assets shall be transferred to the Buyer free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA), including:

(a)  liens (including, without limitation, mechanics', materialmens', and other consensual and non-consensual liens and statutory liens) mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, property interests, pledges, judgments, demands, encumbrances, easements, and servitudes;

(b)  interests, obligations, liabilities, causes of action, demands, guaranties, options, restrictions, and contractual or other commitments;

(c)  rights, including, without limitation, rights of first refusal, rights of offset (except for offsets exercised prior to the Petition Date), contract rights, rights of recoupment and recovery;

(d)  decrees of any court or foreign or domestic government entity (to the extent permitted by law);

(e)  charges or restrictions of any kind or nature, including, without limitation, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership of the Purchased Assets, including, without limitation, consent of any Person to assign or transfer any of the Purchased Assets;

(f)     except to the extent provided in paragraph 23 of this Order with respect to Medicare Provider Agreements, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or any of the Debtors' predecessors or affiliates;

(g)     claims (as that term is defined in the Bankruptcy Code), including claims for reimbursement, contribution claims, derivative, vicarious, transferee, or successor liability claims (including without limitation any "successor employer" claims under the Consolidated Omnibus Budget Reconciliation Act of 1985), indemnity claims, exoneration claims, alter-ego claims, product liability claims, employee retirement or benefit plan claims, severance claims, retiree healthcare or life insurance claims, environmental claims (to the fullest extent allowed by applicable law), state, federal, local and any other tax claims, reclamation claims, and pending, contingent or otherwise unasserted litigation claims, including in all cases claims that may be secured or entitled to priority under the Bankruptcy Code;

(h)     except to the extent provided with respect to the United States in paragraphs 23 or 46 of this Order, claims and defenses (including rights of recoupment) against the Debtors relating to the Payor Agreements for services rendered or amounts paid to the Debtors prior to Closing;

(i)     matters of any kind or nature whatsoever, whether at law or in equity and whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or nonmaterial, disputed or undisputed, whether arising prior to or during the Debtors' bankruptcy cases, and whether imposed by agreement, understanding, law, equity, or otherwise;

10.     in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing (each, a "**Lien, Claim, Encumbrance, or Interest**," and collectively, the "**Liens, Claims, Encumbrance, and Interests**"). Except to the extent an Assumed Liability or as otherwise

expressly provided in the APA, the Liens, Claims, Encumbrances, and Interests shall attach to the proceeds ultimately attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, and Interests with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, Encumbrances, and Interests encumbered such Purchased Assets immediately prior to the entry of this Order, subject to any Claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

11.     Notwithstanding anything to the contrary set forth in the APA or this Order, (i) no claims and/or causes of action under chapter 5 of the Bankruptcy Code are being purchased by, or transferred to, the Buyer, (ii) no claims and/or causes of action that the Debtors may have, if any, against the Debtors' current and former insiders, affiliates, directors, officers, members, employees (except Transferred Employees), partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, whether under the Bankruptcy Code, state or federal law, or otherwise, are being purchased by, or transferred to, the Buyer, and (iii) no claims and/or causes of action against counterparties to the Debtors' contracts or leases (other than any claims and/or causes of action against counterparties to the Assigned Contracts assumed and assigned to the Buyer in accordance with the APA) are being purchased by, or transferred to, the Buyer, and all such claims and/or causes of action in clauses (i) through (iii) herein are preserved for the benefit of the Debtors' estates.  For the avoidance of doubt, no claims and/or causes of action against Medical Properties Trust, Inc. and each of its non-Debtor affiliates and subsidiaries (collectively, "**MPT**"), the Prepetition Secured Parties (as defined in the FILO DIP Order), or any of their respective affiliates are being purchased by, or transferred to, the Buyer.

12.     With regard to the forms of, timing, and other terms and provisions concerning the consideration to be provided by the Buyer to the Debtors as set forth in the APA, the Buyer is directed to comply with its respective obligations thereunder, and the Debtors, and their respective successors and assigns, including any liquidating trustee appointed in connection with these chapter 11 cases, are hereby authorized to enforce all such provisions.  As further set forth in paragraph 40 hereof, the Court shall retain exclusive jurisdiction with respect to any and all issues, disputes, controversies, causes of action, and/or claims with respect to, or arising under, such provisions, including, without limitation, the enforcement thereof.

13.     **Real Property Transaction.**  Subject to any Challenge and the ability of the Court to fashion any appropriate remedy following a successful Challenge, which remedy, as set forth in paragraph 51 herein, shall not permit the recovery (as a subsequent transferee or otherwise) from the Buyer of any transfer of the Real Property contemplated in the APA or this Order, upon the consummation of the Sale Transaction, the Severance, and the Real Property Transaction, neither the Debtors' estates nor any parties claiming by or through the Debtors' estates shall have any claim to, interest in, or setoff or other rights with respect to the Real Property and the proceeds of the Real Property Transaction.

14.     **Binding Effect of Order.**  This Order and the APA shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case of any of the Debtors if any of these chapter 11 cases is converted from a case under chapter 11 to a case under chapter 7, all counterparties to Assigned Contracts, all Recording Officers, any holders of the Liens, Claims, Encumbrances, and Interests in, against, or on all or any portion of the Purchased Assets (whether

29

known or unknown), the Buyer and all successors and assigns of the Buyer, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the APA shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Order, including the rights granted to the Buyer hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.  To the extent of any conflict between this Order and the APA, the terms of this Order shall control.

15.     **No Material Modifications.**  The APA and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented in accordance with the terms thereof and this Order without further order of this Court and following prior notice to and consultation with the Committee, the ABL Lenders, the FILO Lenders and the FILO DIP Lenders; *provided*, *however*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates as determined in the good faith judgment of the Debtors in consultation with the Committee, the ABL Lenders, the FILO Lenders and the FILO DIP Lenders, and the Real Property Seller.  For the avoidance of doubt, all other modifications, amendments, or supplements that the Debtors determine, in their good faith judgment, will have a material adverse effect on the Debtors' estates or their creditors shall require Court approval.

16.     **No Bulk Sales.**  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction, the Motion, and this Order.

17.     **Valid Transfer.**  Effective upon the Closing, the transfer to the Buyer of the Debtors' right, title, and interest in the Purchased Assets pursuant to the APA shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' right, title, and interest in the Purchased Assets, and vests with or will vest in the Buyer all right, title, and interest of the Debtors in the Purchased Assets, free and clear of the Liens, Claims, Encumbrances, and Interests, other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA.

18.     **Good Faith Buyer.**  The Sale Transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Buyer has acted without collusion in undertaking the Sale Transaction contemplated by the APA.  The Severance contemplated by the Severance Amendment (if applicable) and the Real Property Transaction contemplated by the PSA are integral to and inextricably intertwined with the Sale Transaction.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction and to enter into the Severance Amendment (if applicable) shall not affect the validity of the sale of the Purchased Assets to the Buyer (including the assumption and assignment by the Debtors of any of the Assigned Contracts), the sale of the Real Property to the Real Property Buyer, or the Severance, unless such authorization is duly stayed pending such appeal.  The Buyer is a purchaser in good faith of the Purchased Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

19.     **No Avoidance.**  The APA and the transactions contemplated thereby, including the Sale Transaction, cannot be avoided under section 363(n) of the Bankruptcy Code, including as a result of a successful Challenge.  None of the Debtors, the Buyer or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or

equivalent) or any of their respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors or assigns have engaged in any conduct that would cause or permit the APA or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code and no party is entitled to damages or other recovery in connection therewith under section 363(n) of the Bankruptcy Code.

20.     **Reserved**.

21.     **Governmental Authorization to Effectuate Sale and Assignments.** Except as otherwise specifically provided in this Order, each and every federal, state, and governmental agency or department, and any other person or entity, is hereby directed to accept (i) any and all documents and instruments in connection with or necessary to consummate the Sale Transaction, subject to the payment of any filing or other fee imposed under non-bankruptcy law, and (ii) this Order as sufficient evidence of the transfer of right, title, and interest in, to, and under the Purchased Assets.  Except as otherwise provided in this Order, to the greatest extent available under applicable law upon the Closing, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing.  To the extent any license or permit necessary for the operation of the Purchased Assets is determined not to be an executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Buyer shall apply for and obtain any necessary license or permit promptly after the Closing Date, and, to the extent practicable, such license or permit of the Debtors shall remain in place for the Buyer's benefit until

32

a new license or permit is obtained (or, in the case of licenses or permits of Debtors of which the assignment to Buyer is pending as of the Closing Date (whether pursuant to a notice period that has not expired as of the Closing Date or a required consent from an applicable governmental authority that has not been received as of the Closing Date), shall transfer to Buyer upon the expiration of such notice period or the receipt of such consent), provided, that, the foregoing shall not apply to any Medicare Provider Agreement, the transfer of which is governed by paragraph 23 of this Order.  No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.  For the avoidance of doubt, the Sale Transaction authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

22.    **Reserved**.

23.    **Medicare Provider Agreements**.  Notwithstanding anything to the contrary in this Order of the APA, the following provisions apply to the Debtors' Medicare provider agreements with the Centers for Medicare & Medicaid Services (collectively, with its applicable regional offices, Medicare Administrative Contractors, and other contractors or agents auditing or administering the Medicare program, "**CMS**") for each Hospital (collectively, the "**Medicare Provider Agreements**"):

a.  Neither this Order nor the APA authorize any sale or transfer of any Medicare Provider Agreement of the Debtors, and the Medicare Provider Agreements are not among the Purchased Assets to be conveyed in the APA.  No transfer of any Medicare Provider Agreement to the Buyer may be consummated other than through CMS's assignment of such Medicare Provider Agreement through a regulatory "change of ownership" ("**CHOW**"), pursuant to 42 C.F.R. §§ 489.18 and 424.550 and applicable provisions of the Medicare Program Integrity Manual and State Operation Manual.

33

b. The Buyer may, but shall not be obligated to, apply to CMS for recognition of a CHOW pursuant to 42 C.F.R. §§ 489.18 and 424.550, and applicable provisions of the Medicare Program Integrity Manual ("**PIM**") State Operation Manual ("**SOM**"), including but not limited to the procedures for such application in Chapter 10 of the PIM and Chapter 3 of the SOM.

c. If CMS determines that, pursuant to applicable Medicare law, the Buyer is qualified to serve as a Medicare Part A Provider and satisfies the requirements for recognition of a CHOW, CMS shall automatically assign the Medicare Provider Agreements to the Buyer and the Buyer will assume the Medicare Provider Agreements subject to the limitation on successor liability for the pre-Closing Date period as set forth in paragraph 23(d) of this Order.

d. To satisfy the requirement under 42 C.F.R. § 489.18 that the Buyer assume all financial obligations associated with each Medicare Provider Agreement, CMS shall accept from the Buyer, payable by the Buyer on or before five (5) business days following assignment of the Medicare Provider Agreements, (i) $72,894.68 as payment of determined pre-transfer liabilities (the "**Outstanding Amount**") and (ii) $210,199.60 to be placed into escrow with CMS by the Buyer (the "**Additional Overpayment Escrow**") and used for payment of any overpayments or liabilities due to CMS, whether known or unknown, arising from or in connection with the Medicare Provider Agreements during the period on or before the Effective Time (as defined in the APA) (the "**Pre-Closing Date Period**") and for which the Buyer would be liable under 42 C.F.R. § 489.18 and *United States v. Vernon Home Health*, 21 F.3d 693 (5th Cir. 1994) (collectively, the "**Pre-Closing Obligations**"). In addition, CMS shall be entitled to hold any underpayments owed by CMS under the Medicare Provider Agreements for the Pre-Closing Date Period (but, for avoidance of doubt, not underpayments owed by CMS to Buyer under any non-Debtor government Payor Agreements to which Buyer is party) (the "**Pre-Closing Date Underpayments**") and apply the value of such Pre-Closing Date Underpayments to the Pre-Closing Obligations. Payment of the Outstanding Amount and application of funds from the Additional Overpayment Escrow and the Pre-Closing Date Underpayments constitute the sole remedy against the Buyer for satisfaction of any Pre-Closing Obligations, and CMS will seek no payment from the Buyer beyond the Outstanding Amount, Additional Overpayment Escrow, and Pre-Closing Date Underpayments for the Pre-Closing Obligations.

e. Upon CMS's completion of audits of open cost reports relating to the Pre-Closing Date Period (the "**Unaudited Cost Year Reports**") and of any Reopened Cost Year Reports (as defined below), CMS shall first apply the amounts in the Additional Overpayment Escrow to any determined liabilities associated with such audits and then recoup any remaining determined liabilities from Pre-Closing Underpayments. If after such application, any amounts remain in the Additional Overpayments Escrow or there are any remaining Pre-Closing Underpayments, (i) any Buyer Escrowed Amounts shall be released to, and constitute property of, the Buyer, and (ii) any Pre-Closing Date Underpayments shall be released to the Buyer, which shall be deemed held in trust for, and paid over to, the Debtors within five (5) days

of receipt from CMS. CMS shall complete the audits of the Unaudited Cost Year Reports, the Debtors' Final Cost Report (as defined below), and any Reopened Cost Year Report (as defined below) by the later of (i) 9 months from the Closing Date and (ii) 30 days after issuance of the SSI DSH adjustment tables for the applicable cost year, but in no event more than one year from the Closing Date.

f.   As between the Debtors and the Buyers, and notwithstanding anything to the contrary in this Order or the APA, Buyer's payment of the Outstanding Amount and Additional Overpayment Escrow pursuant to this paragraph 23 shall be deemed to be, and shall be treated as, Assumed Cure Costs for purposes of Section 1.6 of the APA; *provided*, that, for the avoidance of doubt, if any Buyer Escrowed Amounts are repaid to the Buyer pursuant to paragraph 23(e) of this Order, such repaid amounts shall result in a corresponding reduction of the Assumed Cure Costs for purposes of calculating the Purchase Price in accordance with Section 1.6 of the APA. If such reduction results in a lower Purchase Price, Buyer shall promptly pay to the Sellers the difference.

g.   If the Buyer fails to promptly pay all or any part of the Outstanding Amount or Additional Overpayment Escrow, CMS shall have the right to recoup all Pre-Closing Obligations from payments otherwise due to the Buyer at any time after CMS's assignment of the applicable Medicare Provider Agreement to the Buyer.

h.   Within 150 days after the Closing Date, the Debtors shall file a terminating cost report for each Hospital for all services provided through the Closing Date (the "**Debtors' Final Cost Reports**").

i.   Payment of the Outstanding Amount and Additional Overpayment Escrow, along with the application of any Pre-Closing Underpayments, fully satisfies and constitutes a release of the Buyer, its Affiliates, successors and assigns of the Pre-Closing Obligations.

j.   Notwithstanding any other provision hereof, CMS may reopen and audit any of the Debtors' pre-Closing Date Medicare cost reports (the "**Reopened Cost Year Reports**") in the ordinary course for purposes of calculating any amounts due under the Medicare Provider Agreements for the Pre-Closing Date Period. However, CMS shall not seek any further payments for the Reopened Cost Year Reports, other than from the Additional Overpayment Escrow and application of the Pre-Closing Underpayments. Nothing in this Order will preclude CMS from exercising its rights under applicable law to reopen any cost year report to adjust payment rates for any fiscal periods as part of adjustments in federal payment rates applicable to all similarly situated providers participating in Medicare. Notwithstanding anything contained herein to the contrary, the Buyer and the Debtors shall retain all rights under applicable non-bankruptcy law to appeal the Debtors' pre-Closing Date Medicare cost reports and to continue ongoing appeals or make claims against CMS consistent with the rights each would have in the ordinary course (e.g., meaning in the case of the Buyer, the rights of any party accepting assignment of a Medicare Provider Agreement pursuant to a CHOW).

35

k.   Nothing in this Order waives or abrogates whatever rights, if any, CMS may have to recoup or offset against payments otherwise payable to any Buyer in connection with the Hospitals for periods after the Effective Time; *provided*, *however*, that such offsets, recoupments, demands, fines or penalties do not arise out of or relate to the Pre-Closing Date Obligations.

l.   On and after the Closing Date, nothing in this Order shall relieve or be construed to relieve the Buyer from complying with all procedures, rules, and regulations of the Medicare program, and all plans of correction or other regulatory actions required by CMS, including those arising from pre-Closing Date actions or inactions of the Debtors.

m.   Except as set forth in this paragraph 23, nothing in this Order shall affect any right or obligation of CMS with respect to the regulatory assignment of the Medicare Provider Agreements and CMS will process the assignment of the Medicare Provider Agreements in the ordinary course upon approval of any CHOW application submitted by the Buyer.

n.   Nothing in this order releases, relates to, affects or concerns any other claims against the Debtor that may be filed by the United States or any other federal entity other than with respect to the Medicare Provider Agreements as set forth in this paragraph 23, nor does it affect the rights of any such federal entity.  Further, nothing in this Order shall bar the United States and its agencies from asserting any rights of setoff or recoupment that they may have or may acquire against any amounts now due, or which may become due, to the Debtors or their estates from any federal agency except as otherwise provided for in this Order. All of the Debtors' rights and defenses thereto are preserved.

o.   The terms set forth in this paragraph regarding the Medicare Provider Agreements are subject to final approval by the United States. In the event the United States does not render such final approval within four (4) days of the date of entry of this Order (or such later date consented to by the Debtors), the Debtors and the United States shall notify the Court, and the Court shall hold a hearing on September 17, 2024 at 10:00 a.m. (Central Time) (or such later date agreed to by the Debtors, United States and Buyer and subject to the Court's availability) to resolve the United States' objections (the "**CMS Objection**") to the sale of the Debtors' Medicare Provider Agreements free and clear of claims and Medicare obligations. Notwithstanding entry of this Order or anything contrary in the APA, if (1) the United States fails to render final approval of this paragraph 23 and (2) prior to the End Date, the Court does not overrule the CMS Objection or otherwise find that Buyer, its Affiliates or its successors or assigns will not be subject to liability for any Pre-Closing Obligations arising out of the Medicare Provider Agreements and NPIs, Buyer shall be entitled to terminate the APA pursuant to Section 12.1(b) of the APA.

36

24.     **Accounts Receivable**.  Notwithstanding anything to the contrary in this Order, nothing set forth in this Order shall be deemed to limit, impair or affect in any way (i) the Debtors' right, title, and interest in the Debtors' cash and patient accounts receivable, payor/contractor accounts receivable, Medicare reimbursements or adjustments (except as set forth in paragraph 23 of this Order) and all other accounts receivable (collectively, the "**Accounts Receivable**") for services rendered or goods sold prior to Closing, which cash and Accounts Receivable remain property of the Debtors as Excluded Assets and shall be reimbursed to Debtors if received by Buyer, as and to the extent provided in the APA, or (ii) the Debtors' ability to complete any remaining billing for services rendered or goods sold prior to Closing under the Debtors' Medicare numbers or other Medicare Provider Agreements; provided, however, that nothing in this Order or the APA shall obligate CMS to pay any amounts due under any Medicare Provider Agreement to any party other than the Medicare provider eligible to receive payment under such agreement.  Buyer shall provide the Debtors (or Debtors' billing agent) with reasonable access to pre-Closing documents or data as may be necessary in order for the Debtors to facilitate billing and collecting for services furnished to Medicare beneficiaries by the Debtors.

25.     **Authorization to Assign.**  Notwithstanding any provision of any contract governing the Purchased Assets, including any Assigned Contract to be assumed and assigned to the Buyer as of the Closing (or such other date as provided in the APA or this Order) pursuant to (a) section 365(f) of the Bankruptcy Code, or (b) applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Purchased Assets, including any Assigned Contract to be assumed and assigned to the Buyer as of the Closing pursuant to section 365(f) of the Bankruptcy Code, at the Closing, the Debtors are authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (i) assign the Purchased Assets to the Buyer and

(ii) assume and assign the Assigned Contracts to the Buyer, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, in each case, as provided in this Order, the APA, or as otherwise provided by a separate order of this Court.

(a)     There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assignment of the Purchased Assets or the assumption and assignment of the Assigned Contracts.

(b)     The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts that are to be assumed and assigned to the Buyer as of Closing (or as otherwise provided in the Bidding Procedures Order or the APA).  Notwithstanding the foregoing, unless required by the Buyer under the APA for the Debtors to assume and assign any Assigned Contract, no Debtor shall be required by the Court to assume and assign any Assigned Contract, and, if no such assumption and assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required with respect to any such Assigned Contract.

(c)     The Debtors' assumption and assignment of the Assigned Contracts is subject to the consummation of the Sale Transaction with the Buyer. Subject to the requirements applicable to any Disputed Contracts, as set forth in paragraphs 32-33 of this Order and Section 1.5 of the APA, to the extent that a Contract Objection by a counterparty to any Assigned Contract is not resolved prior to the Closing, the Buyer, may, without any further approval of the Court or notice to any party, elect to (i) not have the Debtors assume and assign such Assigned Contract to it, (ii) have the Debtors postpone the assumption of such Assigned Contract until the resolution of such Contract Objection, or (iii) to the extent the Contract Objection is only a Cure Objection, have the Debtors assume and assign such Assigned Contract to it at Closing subject to the requirements and procedures in Section 1.5(g)(ii)(A) of the APA; provided, however, that the Debtors, the Buyer, and the relevant non-Debtor counterparty under each Assigned Contract shall have authority to compromise, settle, or otherwise resolve any objections without further order of, or notice to, this Court.

26.     **Assigned Contracts**.  As of the Closing (or such other date as provided in the APA or this Order), subject to the provisions of this Order and in accordance with the APA, the Buyer shall succeed to the entirety of the Debtors' rights and obligations in the Assigned Contracts.

(a)    Upon Closing, (i) or as soon as reasonably practicable thereafter, all defaults and claims (monetary and non-monetary) under the Assigned Contracts shall be deemed cured and satisfied in full through and upon the payment of the Cure Costs as agreed between the Debtors and the applicable non-Debtor counterparty (which consent shall be deemed where a non-Debtor counterparty fails to object to the Cure Costs set forth in the Cure Notice), or as determined by the Court (if applicable), (ii) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Liabilities, the Buyer with respect to amounts first arising or accruing during, or attributable to, the period before Closing with respect to the Assigned Contracts, and (iii) any and all persons or entities shall be forever barred and estopped from asserting a Claim against the Debtors, their estates, the Buyer, or the Purchased Assets that any additional amounts are due or defaults exist under the Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing (other than Claims against the Buyer with respect to the Assumed Liabilities).  The Buyer's promise, and any payment by the Debtors, pursuant to the terms of the APA to pay the Cure Costs and the Buyer's promise to perform the Debtors' obligations under the Assigned Contracts for the period on or after the Closing shall constitute adequate assurance of Buyer's future performance under the Assigned Contracts being assigned to it as of the Closing within the meaning of sections 365(b)(l)(C) and (f)(2)(A)-(B) of the Bankruptcy Code.

(b)    Upon assumption of those Assigned Contracts to be assumed by the Debtors and assigned to the Buyer as of the Closing, such Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in such Assigned Contract or other restrictions prohibiting assignment or transfer.  To the extent any Assigned Contract is assumed and assigned to the Buyer under this Order, such assumption and assignment will not take effect until the Closing or as otherwise set forth in the APA.  Furthermore, other than the Assigned Contracts, no other contract shall be deemed assumed by the Debtors and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code.  The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of such Assigned Contract.

(c)    With Buyer's consent, the Debtors may assume and assign to the Buyer an Assigned Contract in part and to one or more other successful bidders in part so long as such buyers have cured any monetary defaults under such Assigned Contract and have each provided adequate assurance of future performance.

(d)    All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Buyer, and shall not charge the Debtors or the Buyer for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

27.    Notwithstanding the foregoing, the Debtors or the Buyer may amend the list of Assigned Contracts to add or remove any Assigned Contract to or from such list in accordance with the terms of this Order and the APA.  To the extent the Debtors or the Buyer amend the list of Assigned Contracts to add a new Assigned Contract in accordance with the terms of the APA, including after receipt of an Assumption Notice (as defined in the APA) (an "**Additional Assigned Contract**"), the Debtors shall file a notice with the Court and serve such notice on the applicable counterparty.  Such notice shall provide the applicable counterparty with ten (10) days to object to the assumption and assignment of the Additional Assigned Contract by filing an objection in accordance with the terms of the Bidding Procedures Order and serving such objection on the Debtors and the Buyer; provided, that, if any such objection to an Additional Assigned Contract remains unresolved as of the expiration of the waiting period provided for in Section 1.5(h)(iii), the Debtors shall not reject the Additional Assigned Contract until the objection is resolved.  The Debtors, the Buyer, and the applicable counterparty to an Additional Assigned Contract shall have authority to compromise, settle, or otherwise resolve any properly filed Contract Objections without further order of the Court unless such compromise, settlement, or other resolution would result in the responsibility of any of the Debtor's estate for the payment of Cure Costs to such applicable counterparty in excess of $1,000,000, in which case the compromise, settlement, or other resolution must be either (i) with the consent of the Committee, the Prepetition ABL/FILO Agent (acting at the direction of the Required Revolving Lenders), the FILO Lenders and the FILO DIP Lenders or (ii) with further order of the Court.

28.     Subject to Section 1.5 of the APA, if no Contract Objection has been filed, or if a Contract Objection has been properly filed but has been resolved by the parties or determined by the Court prior to the Closing Date, this Order shall serve as approval of the assumption and assignment of the applicable Additional Assigned Contract to the Buyer without need for a further notice or order.  If a Contract Objection has been properly filed with respect to an Additional Assigned Contract and is not resolved by the parties or determined by the Court prior to the Closing Date, the Debtors' assumption and assignment of such Additional Assigned Contract shall be subject to the requirements applicable to Disputed Contracts set forth in paragraphs 32-33 of this Order and Section 1.5 of the APA.

29.     All Cure Costs that have not been waived shall be determined in accordance with the Bidding Procedures Order or this Order and paid by the Buyer in accordance with the terms of the APA.  Subject to the requirements applicable to any Disputed Contracts, as set forth in paragraphs 32-33 of this Order and Section 1.5 of the APA, the assumption and payment of the Cure Costs shall be in full satisfaction and cure of any and all defaults or other claims under the Assigned Contracts and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code.  Upon the assumption by a Debtor and the assignment to the Buyer of any Assigned Contract, and the payment of any applicable Cure Costs, each non-Debtor counterparty to such Assigned Contract is forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or the Buyer, their respective affiliates, estates, successors, or assigns, or the property of any of them, any default or other claim with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing, and (ii) exercising any rights or remedies against any Debtor or the Buyer based on an asserted default or other claim that occurred on, prior to, or as a result of, the Closing, including the type of default

specified in section 365(b)(1)(A) of the Bankruptcy Code.  The Buyer has provided adequate assurance of future performance under the Assigned Contracts within the meaning of sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code.  Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, of each of the Assigned Contracts.

30.     To the extent a non-Debtor counterparty to an Assigned Contract fails to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined and any such non-Debtor counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time.  Consistent with the Bidding Procedures Order, the non-Debtor counterparty to an Assigned Contract is forever bound by the applicable Cure Cost and, upon payment of such Cure Cost as provided herein and in the APA, is hereby enjoined from taking any action against the Buyer and the Debtors and their estates (or any successor thereto) with respect to any claim for cure under such Assigned Contract on account of claims or defaults first arising or accruing during, or attributable or related to, the period before Closing.  To the extent no timely Contract Objection has been filed and served on the Objection Notice Parties (as defined in the Motion) with respect to an Assigned Contract, the non-Debtor counterparty to such Assigned Contract is deemed to have consented to the assumption and assignment of such Assigned Contract to the Buyer.

31.     Without limiting the foregoing, each person or entity who holds a Consent Right will be (i) forever barred from objecting to the transfer, sale, assumption, and assignment of the Debtors' right, title, and interest in, to and under the Purchased Assets to be sold or the Assigned Contracts to be assumed and assigned in connection with the Sale Transaction, free and clear of the Liens, Claims, Encumbrances, and Interests, including any Consent Rights (other than

Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA), (ii) deemed to consent to and approve the transfer, sale, and/or assumption and assignment of the Debtors' right, title, and interest in, to and under such Purchased Assets free and clear of Liens, Claims, Encumbrances, and Interests, including any Consent Rights (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA); and (iii) deemed to waive any termination right arising from the sale, disposition, transfer or closure by the Debtors of the Debtors' property or assets.

32.     **Contract Objections.**   If a non-Debtor counterparty to any Assigned Contract files a Contract Objection to the assumption and assignment of such Assigned Contract to the Buyer, then such contract shall be deemed a "**Disputed Contract**."  The Debtors shall be authorized to resolve or settle any Contract Objection to the assumption and assignment of Disputed Contracts in accordance with the terms of the APA and this Order, including with respect to Cure Costs and/or adequate assurance of future performance under the Assigned Contracts without need for any further order or action from this Court. Once any objection to a Disputed Contract is resolved, the Disputed Contract shall be subject to the terms of this Order, including without limitations paragraphs 25-26, in all respects.

33.     **Assignment of Disputed Contracts**.  At Buyer's sole and express written election, any Disputed Contract that is the subject of an unresolved Cure Objection may be assumed and assigned prior to the resolution of such Cure Objection, so long as the Buyer (i) pays any undisputed Cure Costs on or before the Closing Date and (ii) appropriately reserves funding for the disputed portion of the Cure Costs pending resolution of the dispute. For the avoidance of doubt, nothing in this Order shall require Buyer to take an assignment of or pay or reserve Cure Costs relating to a Disputed Contract subject to an unresolved Cure Objection, and as provided in

the APA, the Buyer may elect to delay assumption and assignment of the Disputed Contract pending resolution of the pending objection or remove such Disputed Contract from the Assumed Executory Contract and Lease Schedule (as defined in the APA) at any time.

34.     **Adequate Assurance**.  The Buyer has provided adequate assurance of future performance under the Assigned Contracts within the meaning of sections 365(b) and 365(f)(2)(B) of the Bankruptcy Code.  Any objections by counterparties to Assigned Contracts on the basis of adequate assurance of future performance that have not been withdrawn, waived or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment of the Assigned Contracts to the Buyer have been satisfied.

35.     **No Successor Liability.**  The Buyer has given substantial consideration under the APA, which consideration shall constitute valid, valuable, and sufficient consideration for the absolution from any potential claims of successor liability of the Buyer to the greatest extent allowed by applicable law and neither the Buyer nor any of its affiliates shall be deemed to: (a) be a legal successor, or otherwise deemed to be a successor, to any of the Debtors under any theory of law or equity; (b) have, *de facto* or otherwise, merged with or into any or all of the Debtors or their estates; (c) deemed to be an alter ego of or have a common identity with any of the Debtors; (d) have a continuity of enterprise with the Debtors; or (e) be a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or any business, enterprise, or operation of the Debtors, including with respect to clause (a) through (e) of this paragraph, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, products liability or other law, doctrine rule or regulation

(including any filing requirements under any such laws, rules or regulations) with respect to the Debtors' liability under such law, doctrine, rule or regulation.  Upon the Closing, to the maximum extent available under applicable law, the Buyer's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims and other types of transferee liability of any nature whatsoever, whether known or unknown and whether asserted or unasserted at the time of Closing (other than, to the extent applicable, any Assumed Liabilities, Permitted Encumbrances, or as otherwise expressly provided in the APA), and the Purchased Assets shall not be subject to any Liens, Claims, Encumbrances, and Interests arising under or in connection with any Excluded Asset or Excluded Liability, except as set forth in paragraph 23 of this Order.  The operations of the Buyer and its affiliates shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets.

36.     **MPT Sale Transaction**.  As provided in the APA, Buyer shall not be required to consummate the Sale Transaction if the MPT Conditions are not met on or prior to the Closing Date.  Buyer shall have no liability for, and shall not be subject to any actual, consequential, punitive or other damages (including forfeiture of its Good Faith Deposit (as defined in the APA)) or any other penalty on account of the failure to satisfy the MPT Conditions.

37.     **Buyer's Right to Setoff**: Following the Closing, in accordance with and subject to the conditions of Section 13.17 of the APA, Buyer is authorized to set off any amount to which it is entitled from any Debtor pursuant to Section 1.9(e) or Section 1.13 (Proration) of the APA (following final determination of each in accordance with the terms of the APA) against amounts payable by Buyer pursuant to the Transition Services Agreement (as defined in the APA).

38. **Release of Escrow Deposit.** The Debtors have the authority to instruct the Escrow Agent to release the Good Faith Deposit to the Debtors at, and conditional upon, the occurrence of the Closing, in accordance with the APA.

39. **Surrender of Possession.** Any and all Purchased Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Buyer free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA), with such Liens, Claims, Encumbrances, and Interests attaching to the proceeds ultimately attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, and Interests with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, Encumbrances, and Interests encumbered such Purchased Assets immediately prior to the entry of this Order, and shall be delivered to the Buyer and deemed delivered at the time of Closing (or such other time as provided in the APA), with such costs of delivery allocated in accordance with the APA.

40. **Retention of Jurisdiction.** The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order, the APA, the Sale Transaction, the Severance, the Bidding Procedures Order, the PSA, and the Real Property Transaction; provided that the United States' rights to challenge the Court's jurisdiction under applicable law are preserved.

41. **Immediate Effect.** Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Buyer are free to close the Sale Transaction under the APA at any time pursuant

to the terms thereof.  Notwithstanding the foregoing, and in accordance with the APA, nothing in this Order shall require Buyer to consummate the Sale Transaction if the Order is subject to a pending appeal or otherwise is not a Final Order (as defined in the APA).

42.     **Failure to Specify Provisions.**  The failure to specifically reference any particular provisions of the APA, Severance Amendment, Transition Services Agreement or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA, Severance Amendment (if applicable), Transition Services Agreement and other related documents be authorized and approved in their entirety.

43.     **Release of Liens, Claims, Encumbrances, and Interests.**  Effective upon the Closing Date, this Order (i) is and shall be effective as a determination that all Liens, Claims, Encumbrances, or Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA) of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date have been unconditionally released, discharged, and terminated (with such Liens, Claims, Encumbrances, or Interests attaching to the proceeds ultimately attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, or Interests with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, liens or liabilities encumbered the Purchased Assets immediately prior to the entry of this Order) and that the conveyances described herein have been effected, and (ii) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release

47

any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Buyer (all such entities being referred to as "**Recording Officers**"), and all recorded claims, encumbrances, liens or liabilities (other than the Assumed Liabilities and as otherwise provided in the APA) against the Purchased Assets shall be deemed stricken from such entities records, official and otherwise.  Effective as of the Closing, all Recording Officers are authorized and specifically directed to strike recorded encumbrances, claims, liens, pledges, and other interests against the Purchased Assets recorded prior to the date of this Order.  Effective as of the Closing, a certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, claims, liens, pledges, and other interests against the Purchased Assets recorded prior to the date of the Closing.  All Recording Officers are hereby directed to accept for filing, whether by the Debtors or Buyer, any and all of the documents and instruments necessary, advisable or appropriate to consummate the transactions contemplated by the APA, subject to the payment of any filing or other fee imposed under non-bankruptcy law.

44. **Approval to Release Liens, Claims, Encumbrances, or Interests.**  The provisions of this Order authorizing the sale and transfer of the Purchased Assets free and clear of Liens, Claims, Encumbrances, and Interests (other than any Permitted Liens and Assumed Liabilities expressly assumed under, or expressly permitted by, the APA) shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate or implement the provisions of this Order.  For the avoidance of doubt, on or after the Closing Date, all entities, including without limitation all trustees or collateral agents, are authorized and directed to file and/or execute lien releases, including financing statement terminations, mortgage releases

or other documents or agreements evidencing release of Liens, Claims, Encumbrances, or Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA).  If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing Liens, Claims, Encumbrances or Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA) shall not have delivered to the Debtors before the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims, Encumbrances, and Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA) that the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.  The Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of Liens, Claims, Encumbrances, and Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA).  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

45.     **No Effect on Governmental Regulatory Authority**.  Nothing in this Order or the APA authorizes the transfer or assignment of any federal governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any

obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.  For the avoidance of doubt, the matters preserved by this paragraph are subject to all rights and defenses available under applicable law.

46.    Nothing in this Order or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("**Governmental Unit**") that is not a Claim; (ii) any Claim of a Governmental Unit first arising on or after the Closing Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations first arising after the Closing Date that any entity would be subject to as the owner or operator of property after the Closing Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors and, to the extent provided in this Order, Buyer (including, for the avoidance of doubt, as provided for in paragraph 9 hereof).  Further, nothing in this Order shall enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.  Notwithstanding anything else in this paragraph 46, any successor liability of the Buyer under the Medicare Provider Agreements shall be limited to those amounts provided in paragraph 23(d) of this Order.

47.    **The United States**.  Notwithstanding any provision to the contrary in this Order, the APA, or any other documents relating to the sale of the Purchased Assets, nothing shall: (1) authorize the assumption, sale, assignment or other transfer to the Buyer of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, (v) leases, (vi) licenses, (vii) permits, (viii) registrations, (ix) authorizations, (x) approvals or (xi) agreements, including without limitation any agreements between any Debtor and the United States Department of Veterans Affairs or the

50

United States Department of Labor, (collectively, "**Federal Interests**"), without compliance by the Debtors and Buyer with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts, or to require the federal government to novate, approve or otherwise consent to the assumption, sale, assignment or other transfer of, any Federal Interests; (3) waive, alter or otherwise limit the United States' property rights, including but not limited to, inventory, patents, intellectual property, licenses, and data; (4) other than as set forth in paragraph 23 of this Order, affect the setoff or recoupment rights of the United States; (5) authorize the transfer or assignment of any Federal Interests, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements, obligations and approvals under non-bankruptcy law; (6) release, nullify, preclude or enjoin the enforcement of any police or regulatory liability to the United States that the Buyer would be subject to in connection with its operation of property after the Closing Date; (7) confer exclusive jurisdiction to the Bankruptcy Court with respect to the Federal Interests, except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code) or other applicable law, or divest any tribunal of any jurisdiction it may have under police for regulatory law to interpret this Order or to adjudicate any defense asserted under the Sale Documents; or (8) expand the scope of 11 U.S.C.§ 525.

48. **United States Investigations.**  Nothing in this Order shall affect the obligations, if any, of the Debtors and their officers and directors under Federal law, if any,  to (i) preserve     any     and     all     records     and     documents that     are     subject to pending investigations, litigation, governmental subpoena, document preservation letter, or other investigative request from a governmental agency relating to any of the Debtors' former or current directors and officers (the "**Investigations**"), or (ii) not destroy, alter, or remove, or permit the destruction, alteration or removal of, such records and documents relating to the Investigations.

49.     Subject to the remainder of this paragraph 49, any and all records or documents that are subject to the Investigations which are transferred to the Buyer in any sale shall be maintained by the Buyer.  Prior to Closing, if requested by the Buyer, the Debtors shall inform the Buyer in writing of those categories of records and documents that are Purchased Assets and are at the time of Closing subject to the Investigations, if any, and the Buyer shall not intentionally destroy, alter, or remove, or permit the destruction, alteration or removal of, such records and documents  until such time as the Buyer is informed by the United States in writing that the Investigations have concluded, except upon an order entered following a motion filed in the Bankruptcy Court or another court with proper jurisdiction, with notice to the United States. Nothing in this Order shall affect the obligations, if any, of the Debtors, and their officers and directors, not to destroy, alter, or remove, or permit the destruction, alteration or removal of, records and documents relating to the Investigations that the Debtors do not transfer.

50.     The provisions of this Order regarding retention of documents relating to the Investigations shall be binding on the Debtors, as well as the bankruptcy estates, and shall survive dismissal or conversion to another chapter of any or all of the Bankruptcy Cases, appointment of any trustee, liquidating trustee, or other fiduciary with custody over assets of the estate.

51.     **Matters Related to Real Property**.  For the avoidance of doubt, nothing in this Order or the APA shall prejudice the rights of the Committee with respect to any Challenge, including but not limited to with respect to Master Lease I (or any other lease).  Notwithstanding anything to the contrary in this Order or the APA, all rights of the Committee with respect to a Challenge regarding Master Lease I (or any other lease), including but not limited to whether Master Lease I (or any other lease) is a true lease, whether Master Lease I (or any other lease) is a

unitary lease, or the nature, validity, extent, or priority of any claims in respect of Master Lease I (or any other lease), and any remedies associated with a successful Challenge regarding Master Lease I (or any other lease) are expressly preserved.  Further, nothing in this Order shall enlarge, expand, or otherwise modify the Committee's rights to any Challenge or in any way impair MPT's defenses, objections or responses to any Challenge.

52.     For the avoidance of doubt, nothing in this Order or the APA shall constitute a determination with respect to allocation of value (a) between the Debtors and the Real Property Seller or (b) between and among the Debtors or their creditors.

53.     Buyer shall have no liability on account of, any claims or causes of action that may be brought as part of a Challenge.  Under no circumstances shall (1) any remedy fashioned in a successful Challenge disturb Buyer's enjoyment of, or otherwise void, avoid, or unwind its acquisition of, the Real Property or (2) Buyer's acquisition of the Real Property, or to otherwise consummate the transactions contemplated by the APA, form any basis from which to hold Buyer liable for monetary damages to the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates, any trustee appointed in a chapter 7 case of any of the Debtors if any of these chapter 11 cases is converted from a case under chapter 11 to a case under chapter 7, any liquidating trustee or similar fiduciary appointed under a confirmed plan of reorganization or liquidation, or any other third party, on account of any Challenge.

54.     **Segregated Proceeds**.  Notwithstanding anything to the contrary in the APA, on the Closing Date, all Net Proceeds (as defined in the FILO DIP Credit Agreement[4] but

---

[4]     Capitalized terms used in this paragraph and paragraph 55 but not otherwise defined in this Order shall have the meaning ascribed to them in the FILO DIP Order.

which shall, notwithstanding anything to the contrary contained therein or in the FILO DIP Order, be net of any fees payable to the Debtors' professionals related to the Sale Transaction (not already paid or reserved for by the Debtors in the Professional Fee Escrow Account), which the Debtors shall be entitled to reserve for out of the Sale Transaction proceeds)[5] of the Sale Transaction up to $395 million (after giving effect to all purchase price adjustments set forth in the APA) shall be deposited by the Debtors into an interest-bearing segregated bank account (such account, the "**Proceeds Account**", and such proceeds (including any interest thereon), the "**Segregated Proceeds**").  The Debtors shall exclude from the Segregated Proceeds and Proceeds Account the amount reasonably determined by the Debtors (in consultation with the FILO DIP Agent and the Prepetition Agents (Prepetition ABL/FILO Agent, acting at the direction of the Required Revolving Lenders)) and the Buyer to be necessary (1) to satisfy post-Closing purchase price adjustments payable by the Debtors or (2) to satisfy other post-Closing money obligations not assumed by the Buyer, payable by the Debtors, and solely to the extent of the type set forth in clause (b) of the definition of Net Proceeds (as defined in the FILO DIP Credit Agreement), in each case as expressly required by the APA and only to the extent such adjustments or other obligations are not expected to be funded out of the escrowed sale proceeds (such amounts, the "**Reserved Amounts**"); provided that (i) the Reserved Amounts shall be held in a separate interest-bearing segregated bank account and shall not be used for any purpose other than to pay amounts expressly required under the APA or, upon expiration of the period indicated in (ii) below, to fund the Proceeds Account and (ii) any Reserved Amounts that are not used by the Debtors to satisfy post-Closing purchase price adjustments or to satisfy other post-Closing money obligations

---

[5]   For the avoidance of doubt, nothing in this paragraph shall in any way limit the Carve Out or expand the definition of Net Proceeds.

expressly required by the APA within twelve (12) months of the Closing Date shall be treated as Segregated Proceeds hereunder.  Solely to the extent (1) the global settlement contemplated between, among others, the Debtors and MPT provides that MPT is solely responsible for satisfying all or any portion of the Reserved Amounts, (2) Buyer consents to MPT's assumption of such obligation (not to be unreasonably withheld), and (3) the Court approves any such proposed global settlement, the preceding sentence shall have no force and effect and the Debtors shall not be required to exclude any of the Reserved Amounts from the Segregated Proceeds and Proceeds Account. The Debtors shall hold such Segregated Proceeds in the Proceeds Account until such funds are released in accordance with the terms and conditions set forth herein.  The Proceeds Account and the Segregated Proceeds constitute Prepetition ABL/FILO Priority Collateral and shall be subject to the Prepetition Liens, the Adequate Protection Liens and the FILO DIP Liens and Junior DIP Liens, with the priorities set forth in the FILO DIP Order for Prepetition ABL/FILO Priority Collateral.  The Debtors shall not be permitted to use or otherwise access any Segregated Proceeds without the express written consent of the FILO DIP Agent and the Prepetition Agents (Prepetition ABL/FILO Agent, acting at the direction of the Required Revolving Lenders) unless the Debtors obtain an order of the Court determining that, as of the Closing Date, the Debtors could have sold the Purchased Assets free and clear of the liens of the Prepetition Secured Parties under section 363(f) of the Bankruptcy Code without the consent of the Prepetition Agents (such order, a "**363(f) Order**"); provided, however, that the Debtors may on or following the Closing Date (A) pay any Segregated Proceeds in accordance with paragraph 54 hereof and paragraph 13(c) of the FILO DIP Order and/or (B) upon agreement between the Debtors and the Prepetition ABL/FILO Administrative Agent acting at the direction of the Required Revolving Lenders, and subject to the terms of the FILO DIP Order, otherwise prepay the Prepetition ABL/FILO Obligations, in each

case with any remaining amounts to remain in the Proceeds Account as Segregated Proceeds hereunder.

55.     If the Court does not enter the 363(f) Order on or before the date that is twenty (20) Business Days after the Closing Date (or such later date as agreed to by the Prepetition Agents) (the **"363(f) Order Deadline"**), all Segregated Proceeds remaining in the Proceeds Account shall be paid to (a) until the repayment in full in cash of the ABL Obligations (as defined in the FILO DIP Credit Agreement) (an "**ABL Discharge**"), the Prepetition ABL/FILO Administrative Agent for application in accordance with the Prepetition ABL/FILO Loan Documents and the FILO DIP Documents (notwithstanding any waiver of section 2.11 of the FILO DIP Credit Agreement and notwithstanding anything to the contrary in section 6.08 of the FILO DIP Credit Agreement), and (b) after the occurrence of the ABL Discharge and until the repayment in full in cash of all Prepetition ABL/FILO Obligations and FILO DIP Obligations (an "**ABL/FILO Discharge**"), the FILO DIP Agent for application in accordance with the Prepetition ABL/FILO Loan Documents and the FILO DIP Documents (notwithstanding anything to the contrary in section 6.08 of the FILO DIP Credit Agreement).  If the Court does enter the 363(f) Order on or before the 363(f) Order Deadline, the Debtors shall be authorized to use all remaining Segregated Proceeds as "Cash Collateral" subject to, and in accordance with, the terms of the FILO DIP Documents (including, without limitation, section 2.11 of the FILO DIP Credit Agreement) and section 363(a) of the Bankruptcy Code; provided, that the rights of the Prepetition Secured Parties to seek adequate protection with respect to any such use are expressly preserved. In connection with a 363(f) Order, the entry of this Order and the fact that the Purchased Assets have already been sold shall not be a basis for a finding that the Debtors could have sold the Purchased Assets free and clear of the liens of the Prepetition Secured Parties under section 363(f)

of the Bankruptcy Code.  All other arguments of the Debtors, the Prepetition Secured Parties and other parties-in-interest with respect to section 363(f) of the Bankruptcy Code are reserved.

56.     The Prepetition Agents and the Debtors agree to work in good faith with one another with respect to a briefing and hearing schedule with respect to the Court's consideration of the 363(f) Order in advance of Closing (or such other time acceptable to the parties).

57.     Nothing in paragraphs 54-56 herein shall affect or otherwise alter the Court's ruling that the sale of the Purchased Assets to the Buyer hereunder is free and clear of the liens of the Prepetition Secured Parties.

58.     Nothing in this Order shall affect any party's rights, claims, defenses, or arguments with respect to any sales other than the Sale Transaction.

59.     **MPT Settlement.** Nothing in this Order shall bar, restrict or otherwise prevent Buyer from objecting to any settlement with MPT, or any other party, to the extent such settlement would alter the terms of the APA or this Order without its consent.

60.     **Satisfaction of Conditions Precedent.**  Neither the Buyer nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the APA to each of their respective obligations to close the Sale Transaction have been satisfied or waived in accordance with the terms of the APA.  Neither the Debtors nor the MPT Lessors shall have an obligation to consummate the Severance (if applicable) until it is documented, approved by the Court and all conditions precedent in the Severance Amendment to each of their respective obligations to consummate the Severance have been satisfied or waived in accordance with the terms of the Severance Amendment.

61.  **Chubb**.  Notwithstanding anything to the contrary in the Motion, the Bidding Procedures Order, the Global Bidding Procedures, the Assumption and Assignment Procedures, the APA, any Cure Notice(s) and/or Supplemental Cure Notice(s) (or any list of contracts proposed to be assumed and assigned or any list of proposed Cure Costs), this Order, or any documents relating to any of the foregoing, (a) none of the insurance policies that have been issued by ACE American Insurance Company, ACE Property and Casualty Insurance Company, Pacific Employers Insurance Company, Westchester Fire Insurance Company, Insurance Company of North America, Indemnity Insurance Company of North America, Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, Western Fire Insurance Company, Federal Insurance Company, Executive Risk Indemnity Inc., Pacific Indemnity Company, Chubb National Insurance Company, any of their U.S.-based affiliates, and/or any predecessors of any of the foregoing (collectively, the "**Chubb Companies**") to, or that provide coverage to, any of the Debtors at any time and all agreements, documents or instruments relating thereto (collectively, the "**Chubb Insurance Contracts**"), and/or, except as set forth in this paragraph, none of the rights, proceeds, benefits, claims, rights to payments and/or recoveries under such Chubb Insurance Contracts shall be sold, assigned, or otherwise transferred to the Buyer in connection with the Sale Transaction nor shall be deemed to be either Assigned Contracts nor a portion of any of the Purchased Assets; (b) nothing shall alter, amend or otherwise modify the terms or conditions of the Chubb Insurance Contracts; and (c) for the avoidance of doubt, the Buyer shall not be deemed to be an insured under any of the Chubb Insurance Contracts; provided, however, that, to the extent any claim with respect to the Business or any Purchased Assets arises that is covered or may be covered by one or more of the Chubb Insurance Contracts, the Debtors, their representatives or successors by virtue of these chapter 11 cases (including any post-

confirmation trustee but excluding the Buyer) may pursue such claim (and shall pursue such claims if requested by Buyer), and the Debtors or any of their representatives or successors (including post-confirmation trustee but excluding the Buyer) shall turn over to the Buyer any recovered insurance proceeds to which the Buyer is entitled to under the APA (each, a "**Proceed Turnover**"); provided, further, however, that the Chubb Companies shall not have any duty to effectuate a Proceed Turnover or liability related to a Proceed Turnover; *provided, further, however,* that nothing shall alter, expand or nullify any person's or entity's right to assert and/or receive payment on any claim under the Chubb Insurance Contracts in accordance with and subject to the terms and conditions thereof and applicable non-bankruptcy law.

62.     **GHX**.  Nothing in this Order constitutes an assumption, assumption and assignment, or other disposition of any contracts between Global Healthcare Exchange, LLC (together with its successors and assigns, "**GHX**") and the Debtors, including, but not limited to, the United States Purchaser User Agreement, dated September 12, 2005 (as amended October 9, 2023) and the Master Solution Agreement dated October 1, 2021 (collectively, the "**GHX Agreements**").  All rights of the Debtors and GHX pursuant to the GHX Agreements and sections 365 and 503 of the Bankruptcy Code are reserved, including, but not limited to, the treatment of the GHX Agreements in these Bankruptcy Cases and any amounts owing to GHX under the GHX Agreements.

63.     **Cigna**.  Notwithstanding anything in this Order or any notice related thereto to the contrary, neither the Cigna Contracts, as identified in the *Objection of Cigna to the Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Sale* (Docket No. 1703) (the "**Cigna Objection**"), nor the Cigna Listings (as defined in the Cigna Objection) shall be assumed and assigned pursuant to this Order,

and the Cigna Objection is hereby adjourned.  If the Debtors and the Buyer seek to have any or all of the of the Cigna Contracts and/or Cigna Listings assumed and assigned as part of the Sale Transaction under this Order, the assumption, assignment and cure issues related to such assumption and assignment shall be resolved by agreement (email shall suffice) between Cigna (as defined in the Cigna Objection), the Debtors and the Buyer without further order of the Court or, if no agreement can be reached, by further order of the Court.

64.    **Sodexo**.  Notwithstanding anything in this Order or the APA to the contrary, unless otherwise agreed to in writing collectively by and among Sodexo Operations, LLC and its affiliates ("**Sodexo**"), the Buyer, and the Debtors, "Excluded Assets," as defined in the APA, shall include all "Sodexo Property"[6] and "Sodexo Proprietary Materials."[7]  At any time from and after the Closing of the Sale Transaction (the "**Account Exit Date**"), unless otherwise agreed to in writing collectively by and among Sodexo, the Buyer, and the Debtors, Sodexo shall be entitled to pick up and recover all Sodexo Property and Sodexo Proprietary Materials under the Sodexo Contract[8] solely with respect to the Hospitals, and the Debtors and Buyer shall reasonably cooperate with Sodexo to ensure compliance with this provision.  Sodexo agrees to provide the Buyer with a schedule reasonably describing the Sodexo Property and the Sodexo Proprietary Materials within seven (7) days of the entry of this Order. To the extent necessary, Sodexo is hereby permitted to remove all Sodexo Property and Sodexo Proprietary Materials from the

---

[6]  "**Sodexo Property**" means, collectively, (i) the purchases of personal property that Sodexo is required to make under the Sodexo Contract (as defined below) and (ii) the personal property of Sodexo brought on site to perform its contractual duties.

[7]  "**Sodexo Proprietary Materials**" means the confidential and proprietary property and trade secrets utilized by Sodexo in the performance of its contractual duties, such as software (both owned and licensed), menus, recipes, signage, management guidelines and procedures, operating manuals and other items identified in the Sodexo Contract.

[8]  "**Sodexo Contract**" means that certain Managed Service Agreement entered into as of January 1, 2017 by and between Sodexo Operations, LLC and Debtor Steward Health Care System, LLC as amended from time to time.

Hospitals on or after the Account Exit Date and/or destroy or disable the Debtors' and/or Buyer's access to Sodexo's Proprietary Materials as of each Account Exit Date; provided that any cost of such removal of all Sodexo Property and Sodexo Proprietary Materials shall not be borne by the Buyer.  All of Sodexo's and the Debtors' respective rights and remedies with respect to the Sodexo Contract and any Sodexo Property or Sodexo Proprietary Materials after the Account Exit Date are hereby reserved.

65.     The Debtors and/or the Buyer shall provide Sodexo with not less than two (2) business days' advance written notice of the date of any Closing.

66.     Notwithstanding anything in this Order or the APA to the contrary, unless otherwise agreed in writing collectively by and among Sodexo, the Buyer, and the Debtors prior to the Account Exit Date, nothing in any Transition Services Agreement entered into by and between the Debtors and Buyer shall affect or attempt in any way to make available to the Buyer or Buyer Guarantor any of the Sodexo Property or Sodexo Proprietary Materials or any services provided under the Sodexo Contract without Sodexo's express written consent.

67.     The Debtors and the Buyer acknowledge and agree that the Sodexo Contract is a multi-hospital Contract that is an Excluded Contract and Excluded Asset under the terms of the APA.

68.     **Werfen**.  Notwithstanding anything herein or in the APA, unless otherwise agreed to in writing collectively by and among Werfen USA LLC or Immucor, Inc. (collectively, "**Werfen**"), the Buyer, and the Debtors, the sale transaction shall exclude all property owned by Werfen (the "**Werfen Equipment**") under that certain Echo Advantage Plus Agreement No. 9979 dated as of January 2, 2024 (the "**Werfen Equipment Lease**"). Prior to the Closing Date, the Debtors, the Buyer, and Werfen shall use commercially reasonable efforts to reach agreement

61

regarding the removal, disposition, use, or retention of Werfen Equipment (including any assignment and assumption of the respective Werfen contracts to new operators).  If the Debtors, the Buyer, and Werfen do not reach a consensual agreement with regards to the removal, disposition, use, or retention of Werfen Equipment prior to the Closing Date, (i) the Debtors and the Buyer shall provide notice and a reasonable opportunity for Werfen to reclaim, move, pick-up or sell the Werfen Equipment; provided that the cost of any such removal or retrieval of the Werfen Equipment shall not be borne by the Buyer, (ii) upon the earlier of (A) the date of removal, disposition, use, or retention of Werfen Equipment (including any assignment and assumption of the respective Werfen contracts to new operators) or (B) entry of an order by the Bankruptcy Court authorizing rejection of the Werfen Equipment Lease, the Debtors shall be released from payment and other obligations under the Werfen Equipment Lease, provided, that in the case of clause (ii)(A) hereof, the Debtors shall be released from payment and other obligations under the Werfen Equipment Lease solely with respect to the removed, disposed, used, or retained Werfen Equipment, and (iii) all rights of the Debtors and Werfen under applicable law are preserved in connection with the rejection, assumption and/or assumption and assignment of all contracts governing the Debtors' lease and use of the Werfen Equipment, including but not limited to, the Werfen Equipment Lease.

69.     **ASIC**.  Nothing in this Order or any asset purchase agreement authorized by this Sale Order authorizes the transfer, assignment or modification of (i) any surety bond ("**ASIC Bond**") issued by Atlantic Specialty Insurance Company ("**ASIC**") for the obligations of any Debtor; (ii) any indemnity agreement issued by any Debtor to ASIC ("**ASIC Indemnity Agreement**") or (iii) any cash collateral granted to ASIC under the ASIC Indemnity Agreement.

The Debtor and ASIC reserve all rights with respect to any ASIC Bond, any ASIC Indemnity Agreement or any cash collateral granted under the ASIC Indemnity Agreement.

70.     **Intuitive**.  Notwithstanding anything herein or in the APA to the contrary, unless otherwise agreed to in writing collectively by and among Intuitive Surgical, Inc. ("**Intuitive**"), the Buyer, and the Debtors, nothing in this Order authorizes the Debtors to assume or assign to the Buyer (i) that certain Lease Agreement between Intuitive and Easton Hospital, dated June 25, 2019, which was assigned to Seller, Debtor Sebastian River Medical Center, pursuant to a certain Assignment and Assumption Agreement, dated February 18, 2020 (the "**Intuitive Lease**"), with respect to a certain Intuitive-manufactured da Vinci® Xi™ robotic surgical system and related equipment (the "**System**"), or (ii) that certain Master Sales, Use, License and Service Agreement, between Intuitive and Debtor Steward Health Care System LLC, dated as of September 29, 2017 (the "**MSULSA**"), as it pertains to and is incorporated by reference into the Intuitive Lease, which MSULSA contains a non-exclusive license of Intuitive's copyrighted and patented intellectual property embedded in the System and related equipment. Unless otherwise agreed upon among the Buyer, Intuitive, and the Debtors, this Order does not authorize the Debtors to transfer to the Buyer or otherwise dispose of the System, the Intuitive Lease or the MSULSA.  In the event that the Debtors, the Buyer and Intuitive do not reach an agreement for the Buyer's use or acquisition of the System prior to the Closing Date, the Debtors shall surrender the System to Intuitive on or before the Closing Date and any cost of such surrender of the System shall not be borne by the Buyer.  All rights, claims, and defenses of the Debtors and Intuitive under applicable law with respect to any proposed rejection, assumption or assumption and assignment of the Intuitive Lease or the MSULSA are expressly preserved.

71.     **Post Road**.  Notwithstanding anything in the Sale Order or in the APA, and unless otherwise agreed upon in writing by the Buyer, the Debtors, and Post Road Equipment Finance SPV, LLC ("**Post Road**"), the Sale Transaction shall exclude all property leased by Post Road (collectively the "**Post Road Equipment**") under Equipment Schedules Nos. 041, 042, 043, 044, and 045 to that certain Master Lease Agreement No 23770-90000 dated March 12, 2012 (with each such Equipment Schedule and the Master Lease Agreement referred to herein as a "**Post Road Equipment Lease**").  The Debtors, the Buyer, and Post Road agree that each shall use commercially reasonable efforts to reach agreement regarding the removal, disposition, use, or retention of Post Road Equipment (including any assignment and assumption of one or more of the Post Road Equipment Leases to Buyer or other operator) prior to Closing.  If the Debtors, the Buyer, and Post Road do not reach a consensual agreement with regards to the removal, disposition, use, or retention of Post Road Equipment leased under a Post Road Equipment Lease, then (i) the Debtors and the Buyer shall provide written notice and a reasonable opportunity for Post Road to reclaim, move, retrieve or sell the applicable Post Road Equipment; provided that the cost of any such removal or retrieval of Post Road Equipment shall not be borne by the Buyer, (ii) Post Road shall use commercial reasonable efforts to sell, re-lease, or otherwise dispose of the Post Road Equipment, (iii) to the extent any Post Road Equipment is disposed, as of the date of disposition of the applicable Post Road Equipment, the Debtors shall be released from all payment and other obligations under the applicable Post Road Equipment Lease solely with respect to the applicable disposed Post Road Equipment, and (iv) all rights of the Debtors and Post Road under applicable law are preserved in connection with the rejection, assumption and/or assumption and assignment of all contracts governing the Debtors' lease and use of the Post Road Equipment, including but not limited to, the Post Road Equipment Leases.

72.    **Dext Capital**.  Notwithstanding anything in the Sale Order or in the APA, and unless otherwise agreed upon in writing by the Buyer, the Debtors, and Dext Capital, LLC ("**Dext Capital**"), the Sale Transaction shall exclude any equipment owned by Dext Capital (collectively the "**Dext Capital Equipment**") as set forth under Equipment Schedules Nos. 046 and 047 to that certain Master Lease Agreement No 23770-90000 dated March 12, 2012 and Equipment Lease Schedule No. 100-0002325-001 to that certain Master Lease Agreement No. 0002325 (with each such Equipment Schedule and the Master Lease Agreement referred to herein as a "**Dext Capital Equipment Lease**").  The Debtors, the Buyer, and Dext Capital agree that each shall use commercially reasonable efforts to reach an agreement regarding the removal, disposition, use, or retention of Dext Capital Equipment (including any assignment and assumption of one or more of the Dext Capital Equipment Leases to Buyer or other operator).  If the Debtors, the Buyer, and Dext Capital do not reach a consensual agreement with regards to the removal, disposition, use, or retention of Dext Capital Equipment leased under a Dext Capital Equipment Lease, then (i) the Debtors and the Buyer shall provide written notice and a reasonable opportunity for Dext Capital to reclaim, move, retrieve or sell the applicable Dext Capital Equipment; provided that the cost of any such removal or retrieval of any Dext Capital Equipment shall not be borne by the Buyer, (ii) Dext Capital shall use commercially reasonable efforts to sell, re-lease, or otherwise dispose of the Dext Capital Equipment, and (iii) to the extent any Dext Capital Equipment is disposed, as of the date of disposition of the applicable Dext Capital Equipment, the Debtors shall be released from all post-disposition payment and other obligations under the applicable Dext Capital Equipment Lease schedule solely with respect to the applicable disposed Dext Capital Equipment (the **"Released Obligations"),** with Released Obligations being measured in a manner that is acceptable to the Debtors and Dext Capital and to the extent the parties cannot reach an agreement,

the Court shall determine the calculation of such Released Obligations at a subsequent hearing on a date and time to be agreed by the parties and (iv) notwithstanding anything in the preceding sentence (iii), all rights of the Debtors and Dext Capital under applicable law are preserved in connection with the rejection, assumption and/or assumption and assignment of all contracts governing the Debtors' lease and use of the Dext Capital Equipment, including but not limited to, the Dext Capital Equipment Leases, this preservation of rights includes specifically any applicable rejection damages or administrative claim arising from the Dext Capital Leases or Dext Capital Equipment.

73.    **PeakCM**.  For the avoidance of doubt, nothing in this Order shall subordinate or otherwise impair any valid, perfected, enforceable, and non-avoidable lien held by PeakCM, LLC in property of the Debtors or MPT; *provided, however*, that all parties' rights to object to the priority, validity, amount and extent of any such liens are fully preserved.

74.    **Provisions Non-Severable**.  The provisions of this Order are non-severable and mutually dependent.

Signed:  September 10, 2024

Christopher Lopez
United States Bankruptcy Judge

## **Exhibit 1**

Asset Purchase Agreement

**ASSET PURCHASE AGREEMENT**

BY AND AMONG

**STEWARD MELBOURNE HOSPITAL, INC.**

**STEWARD ROCKLEDGE HOSPITAL, INC.,** and

**STEWARD SEBASTIAN RIVER MEDICAL CENTER, INC.**

AS SELLERS

AND

**ORLANDO HEALTH, INC.,** and

**ORLANDO HEALTH MEDICAL GROUP, INC.**

AS BUYER PARTIES

**Dated as of August 14, 2024**

**TABLE OF CONTENTS**

1.   SALE OF ASSETS AND CERTAIN RELATED MATTERS. .................................................. 1
    1.1    Sale of Purchased Assets ............................................................................................ 1
    1.2    Excluded Assets .......................................................................................................... 4
    1.3    Assumed Liabilities ..................................................................................................... 7
    1.4    Excluded Liabilities ..................................................................................................... 8
    1.5    Designated Contracts; Cure Costs ............................................................................... 8
    1.6    Purchase Price; Adjustments ..................................................................................... 11
    1.7    Delivery of Estimated Closing Statement ................................................................. 12
    1.8    Closing Date Payments .............................................................................................. 13
    1.9    Post-Closing Adjustment to Purchase Price. ............................................................ 13
    1.10   Withholding Rights .................................................................................................... 15
    1.11   Physical Inventory ..................................................................................................... 15
    1.12   Transferred Interests .................................................................................................. 16
    1.13   Proration .................................................................................................................... 16

2.   CLOSING. ............................................................................................................................ 16
    2.1    Closing ....................................................................................................................... 16
    2.2    Deliveries of Sellers at the Closing .......................................................................... 17
    2.3    Deliveries of Buyer at the Closing ............................................................................ 18
    2.4    Additional Acts .......................................................................................................... 18

3.   REPRESENTATIONS AND WARRANTIES OF SELLERS. ............................................ 18
    3.1    Organization; Capacity .............................................................................................. 19
    3.2    Authority; Non-contravention; Binding Agreement ................................................. 19
    3.3    Title to Assets and Condition of Assets .................................................................... 20
    3.4    Transferred Interests .................................................................................................. 20
    3.5    Financial Information. ................................................................................................ 20
    3.6    Permits and Approvals ............................................................................................... 21
    3.7    Statutory Funds .......................................................................................................... 22
    3.8    Accreditation .............................................................................................................. 22
    3.9    Government Program Participation; Private Programs; Reimbursement ................... 22
    3.10   Third-Party Payor Cost Reports ................................................................................ 24
    3.11   Compliance with Laws ............................................................................................... 24
    3.12   HIPAA, Information Privacy and Security Compliance. ........................................... 26
    3.13   Compliance Program .................................................................................................. 27
    3.14   Medical Staff Matters ................................................................................................ 27
    3.15   Experimental Procedures ........................................................................................... 28
    3.16   Intellectual Property .................................................................................................. 28
    3.17   Contracts .................................................................................................................... 28
    3.18   Inventory .................................................................................................................... 29
    3.19   Leased Real Property. ................................................................................................ 29
    3.20   Insurance .................................................................................................................... 31
    3.21   Employee Benefit Plans ............................................................................................. 32
    3.22   Employee Matters ...................................................................................................... 33
    3.23   Litigation .................................................................................................................... 35
    3.24   Taxes .......................................................................................................................... 35
    3.25   Environmental Matters ............................................................................................... 36
    3.26   Absence of Changes ................................................................................................... 37

i

| 3.27 | Brokers and Finders | 37 |
| 3.28 | No Other Representations or Warranties | 37 |

| 4. | REPRESENTATIONS AND WARRANTIES OF BUYER. | 38 |
| 4.1 | Organization; Capacity | 38 |
| 4.2 | Authority; Non-contravention; Binding Agreement. | 38 |
| 4.3 | Litigation | 39 |
| 4.4 | Brokers and Finders | 39 |
| 4.5 | Financing; Solvency | 39 |
| 4.6 | Representations of Sellers | 39 |

| 5. | PRE-CLOSING COVENANTS OF SELLERS AND BUYER. | 39 |
| 5.1 | Access to Premises; Information | 39 |
| 5.2 | Conduct of Business | 40 |
| 5.3 | Consents to Assignment. | 42 |
| 5.4 | Regulatory Approvals | 43 |
| 5.5 | Antitrust Approvals. | 44 |
| 5.6 | [Reserved]. | 46 |
| 5.7 | Additional Financial Information | 46 |
| 5.8 | Closing Conditions | 46 |
| 5.9 | Insurance Ratings. | 46 |
| 5.10 | Bulk Sales Laws. | 47 |
| 5.11 | Social Media Accounts | 47 |
| 5.12 | Confidentiality | 47 |
| 5.13 | Casualty | 48 |
| 5.14 | Credentialing and Medical Staff Transition Activities | 48 |

| 6. | ADDITIONAL AGREEMENTS. | 48 |
| 6.1 | Seller Employees | 48 |
| 6.2 | Post-Closing Access to Information; Communication with Governmental Authorities | 51 |
| 6.3 | Confidentiality; Non-Competition; Non-Solicitation | 52 |
| 6.4 | Transition Patients | 55 |
| 6.5 | Cost Reports; Termination of Sellers' Medicare Participation in Periodic Interim Payments. | 56 |
| 6.6 | CMS Reporting. | 57 |
| 6.7 | Waiver Program Payments | 58 |
| 6.8 | License to Use Billing Information. | 58 |
| 6.9 | Use of Controlled Substance Permits | 59 |
| 6.10 | Medical Staff. | 59 |
| 6.11 | Cooperation on Compliance Matters | 59 |
| 6.12 | Seller Employee Confirmation | 59 |
| 6.13 | Leased Real Property Confirmation | 60 |
| 6.14 | Transition Services Agreement | 60 |
| 6.15 | Professional Services Agreement | 60 |
| 6.16 | Changes to Leased Real Property | 60 |
| 6.17 | MPT Purchase Agreement | 60 |
| 6.18 | Post-Closing Receipt of Assets or Excluded Assets. | 60 |
| 6.19 | Closing Financials. | 61 |

ii

| | | |
|---|---|---|
| 7. | CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER | 61 |
| | 7.1 Representations and Warranties | 61 |
| | 7.2 Performance | 62 |
| | 7.3 Pre-Closing Confirmations. | 62 |
| | 7.4 No Restraints. | 62 |
| | 7.5 Closing Documents | 62 |
| | 7.6 Sale Order | 62 |
| | 7.7 Existing MPT Lease Severance Agreement | 62 |
| | 7.8 MPT Purchase Agreement | 62 |
| 8. | CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS. | 62 |
| | 8.1 Representations and Warranties | 62 |
| | 8.2 Performance | 62 |
| | 8.3 No Restraints. | 63 |
| | 8.4 Pre-Closing Confirmations | 63 |
| | 8.5 Closing Documents | 63 |
| | 8.6 Adverse Change | 63 |
| | 8.7 MPT Real Property | 63 |
| | 8.8 Sale Order | 63 |
| 9. | BANKRUPTCY PROVISIONS. | 63 |
| | 9.1 Approval of Break-Up Fee; Expense Reimbursement and Modified Bid Procedures | 63 |
| | 9.2 Competing Transaction | 64 |
| | 9.3 Payment of Termination Payment | 64 |
| | 9.4 Bankruptcy Court Filings. | 65 |
| | 9.5 Back-up Bidder | 66 |
| 10. | SPECIFIC PERFORMANCE. | 67 |
| 11. | TAX MATTERS | 67 |
| | 11.1 Allocation of Purchase Price. | 67 |
| | 11.2 Tax Returns. | 67 |
| | 11.3 Apportionment of Taxes | 68 |
| | 11.4 Cooperation | 69 |
| | 11.5 Tax Proceedings | 69 |
| | 11.6 Transfer Taxes | 69 |
| | 11.7 Post-Closing Actions | 69 |
| 12. | TERMINATION; GOOD FAITH DEPOSIT. | 69 |
| | 12.1 Termination. | 69 |
| | 12.2 Good Faith Deposit; Expense Reimbursement | 71 |
| | 12.3 Effect of Termination | 71 |
| 13. | GENERAL. | 72 |
| | 13.1 Notice | 72 |
| | 13.2 Choice of Law; Venue | 73 |
| | 13.3 Benefit; Assignment; Delegation | 74 |
| | 13.4 Waiver of Jury Trial | 74 |
| | 13.5 Legal Advice and Reliance | 74 |

13.6    No Survival .............................................................................................. 74
13.7    Reproduction of Documents ...................................................................... 74
13.8    Cost of Transaction; Legal Fees and Cost of Disputes ............................ 74
13.9    Waiver of Breach ...................................................................................... 75
13.10   Severability ............................................................................................... 75
13.11   No Inferences; Sophisticated Parties ....................................................... 75
13.12   Divisions and Headings of this Agreement .............................................. 75
13.13   No Third-Party Beneficiaries.................................................................... 75
13.14   Entire Agreement; Amendment ................................................................ 75
13.15   Multiple Counterparts ............................................................................... 76
13.16   Other Owners of Purchased Assets ........................................................... 76
13.17   Right of Set Off......................................................................................... 76
13.18   Non-Recourse ............................................................................................ 76
13.19   Interpretation............................................................................................. 76

### LIST OF EXHIBITS

Exhibit A           Facilities
Exhibit B           [Intentionally omitted]
Exhibit C           Working Capital
Exhibit D           Retained Employees
Exhibit E           Form of Lease Assignment
Exhibit F           Form of Bill of Sale
Exhibit G           Form of Assignment and Assumption Agreement
Exhibit H           Form of Power of Attorney
Exhibit I           Form of Transition Services Agreement
Exhibit J           Form of Employee Contract Assignment and Assumption Agreement
Exhibit K           Form of Assignment of Transferred Interests
Exhibit L           Sale Order

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into effective as of August 14, 2024, by and among (i) **Steward Melbourne Hospital, Inc.,** a Delaware corporation, **Steward Rockledge Hospital, Inc.,** a Delaware corporation, **Steward Sebastian River Medical Center, Inc.,** a Delaware corporation (the "**Sellers**" and each individually a "**Seller**"), (ii) **Orlando Health, Inc.,** a Florida corporation ("**Buyer**") and (iii) **Orlando Health Medical Group, Inc.,** a Florida corporation ("**Clinic**" and, collectively with Buyer, the "**Buyer Parties**"). The Sellers and the Buyer Parties are collectively referred to herein as the "**Parties**" and each individually a "**Party**". The capitalized terms used herein shall have the meanings ascribed to them in Annex A unless the context indicates otherwise.

## W I T N E S S E T H

**WHEREAS**, Sellers and certain Seller Affiliates are debtors-in-possession (the "**Debtors**") under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") and, on May 6, 2024, voluntary petitions for relief under chapter 11 of the Bankruptcy Code were filed in the United States Bankruptcy Court for the Southern District of Texas (such court, the "**Bankruptcy Court**"; and such cases, "**Chapter 11 Cases**").

**WHEREAS**, Sellers lease certain real property, and operate the Facilities;

**WHEREAS**, in reliance upon the representations, warranties and covenants of Buyer set forth in this Agreement, Sellers desire to sell the Purchased Assets (including, with respect to any Purchased Assets currently owned by SMG (as defined below), by causing SMG to transfer such Purchased Assets to the applicable Buyer Party) to the Buyer Parties and assign the Assumed Liabilities (including, with respect to any Assumed Liabilities that are in the name of SMG, by causing SMG to assign such Assumed Liabilities to the applicable Buyer Party) to the Buyer Parties, subject to the terms and conditions and for the consideration set forth in this Agreement;

**WHEREAS**, in reliance upon the representations, warranties and covenants of Sellers set forth in this Agreement, the Buyer Parties desire to acquire the Purchased Assets from the Seller Parties and assume the Assumed Liabilities from the Sellers, subject to the terms and conditions and for the consideration set forth in this Agreement; and

**WHEREAS**, in connection with such sale of the Purchased Assets and assumption of the Assumed Liabilities, Buyer intends to enter into a real estate purchase agreement with MPT with respect to the MPT Real Property in substantially the form acceptable to Buyer and MPT (the "**MPT Purchase Agreement**") conditioned upon the Closing and effective upon the Effective Time;

**NOW, THEREFORE**, for and in consideration of the mutual premises, the agreements, covenants, representations and warranties set forth in this Agreement, and other good and valuable consideration, the receipt and adequacy of which are acknowledged and agreed, the Parties agree as follows:

1. **SALE OF ASSETS AND CERTAIN RELATED MATTERS.**

**1.1    Sale of Purchased Assets**.  On the terms and subject to the conditions set forth in this Agreement, at the Closing and effective as of the Effective Time, (a) each Seller shall sell, assign, convey, transfer, and deliver to Buyer, and Buyer shall purchase, acquire, and accept, all of such Seller's right, title and interest to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), and (b) solely to the extent provided in Section 1.1(b), Section 1.1(c), and Section 1.1(h),

the Sellers shall cause Steward Medical Group, Inc. ("**SMG**") to sell, assign, convey, transfer, and deliver to Clinic, and Clinic shall purchase, acquire, and accept, all of SMG's right, title and interest to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances). "**Purchased Assets**" means all assets, properties, rights, and interests of every description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, owned or leased by (x) a Seller and exclusively, except as specifically noted below in this Section 1.1, used or held for use in the operation of, or otherwise, except as specifically noted below in this Section 1.1, exclusively relating to, the Business or (y) SMG solely to the extent set forth in Section 1.1(b), Section 1.1(c), Section 1.1(h) and Section 1.1(j) (in each case other than the Excluded Assets), including the following items (in each case other than the Excluded Assets):

(a)     [Reserved]

(b)     leasehold title to the Leased Real Property, excluding the MPT Real Property, and all other interests of (i) the Sellers in all Tenant Leases and Third-Party Leases, excluding the Existing MPT Lease, and (ii) SMG in the SMG Leases;

(c)     (i) all Personal Property and (ii) all buildings, structures, improvements, furnishings, furniture, and fixtures located on the MPT Real Property;

(d)     all Inventory, including all prepaid Inventory (shipped and unshipped) and any rights to rebates, refunds or discounts due with respect to the Inventory;

(e)     to the extent assignable or transferable under applicable Law, all Prepaid Expenses (but only to the extent such Prepaid Expenses are included in the calculation of Net Working Capital);

(f)     originals, or where not available, copies (including in electronic format), of all medical records, patient files, and other written accounts of the medical history of the patients of the Business exclusively maintained in connection with the Business, to the extent transferable by applicable Law; provided, that Sellers and the Seller Affiliates may retain copies of any such records that they are required by applicable Law to retain;

(g)     the Books and Records; provided, that Sellers and the Seller Affiliates may retain copies of any such Books and Records that they are required by applicable Law to retain;

(h)     to the extent assignable or transferable under applicable Law,  (i) all of the interests of Sellers in (A) the Transferred Executory Contracts and (B) all non-executory Contracts (other than those listed on Schedule 1.1(h)(i)), which schedule may be updated by Buyer, to add or remove non-executory Contracts, upon written notice to Sellers until the Designation Deadline, and (ii) all of SMG's interests in the Contracts listed on Schedule 1.1(h)(ii) (collectively, the "**Assumed Contracts**");

(i)     to the extent assignable or transferable under applicable Law, all Permits and Approvals issued or granted by, or filed with or delivered to, any Governmental Authority and all accreditations that are used or held for use in, have been obtained by or issued to or on behalf of Sellers (including any such Permits, Approvals or accreditations that are pending), and, in each case exclusively used or held for use in, or otherwise exclusively relating to, the Business or the Purchased Assets;

(j)     to the extent assignable or transferable under applicable Law, all Transferred Intellectual Property, including the Trademarks, Domain Names set forth on Schedule 1.1(j);

2

(k)     all Transferred Information Technology Systems, Software, hardware or data processing equipment, data processing system manuals and licensed Software materials that are (A) in the case of tangible assets, located at a Facility or, in the case of Software, manuals and materials in electronic format, and other intangible assets, residing on hardware located at a Facility (B) exclusively used or exclusively held for use in, or otherwise exclusively relating to, the Business and (C) transferable;

(l)     to the extent assignable or transferable under applicable Law, any claims, causes of action or rights against third parties directly and exclusively related to the Purchased Assets (including, warranties, indemnities, rebates and guarantees and Avoidance Actions (1) against any Transferred Employees or (2) arising under any Assumed Contract that is actually assumed and assigned to the Buyer under Section 365 of the Bankruptcy Code (the "**Acquired Avoidance Actions**")) (collectively, the "**Assumed Third-Party Claims**");

(m)     to the extent assignable or transferable under applicable Law, Sellers' Government Program provider agreements that exclusively relate to the operation of the Business and provider numbers and related national provider identifiers ("**NPIs**");

(n)     all Credentialing and Medical Staff Records;

(o)     Sellers' goodwill exclusively associated with, or exclusively relating to the Business and any other Purchased Assets;

(p)     all insurance proceeds arising in connection with damage to any Purchased Assets including recoveries with respect to any such Purchased Assets prior to the Effective Time and received by Sellers from carriers that have not been applied to any applicable Purchased Assets (including to repair or replace such Purchased Assets) and that do not exclusively relate to an Excluded Asset or Excluded Liability;

(q)     all telephone numbers and facsimile numbers used exclusively in the operation of the Facilities;

(r)     the NSI JV Interests, including any receivable owed by the issuer of the NSI JV Interests to any Seller or any Seller Affiliate (excluding, for the avoidance of doubt, any distributions payable to any Seller or any Seller Affiliate as set forth in Section 1.2(r)), any Contracts between Neuroskeletal Imaging LLC, on the one hand, and any Seller or any Seller Affiliate, on the other hand, and any claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Sellers and Seller Affiliates against the issuer of the NSI JV Interests (or any Subsidiary thereof) and any payments, awards or other proceeds resulting therefrom; provided that Buyer may, in its sole discretion, exclude the NSI JV Interests pursuant to Section 1.12; and

(s)     to the extent not included in any of the foregoing, but excluding any assets outside the Restricted Area, (i) any assets included in the determination of Purchased Working Capital, (ii) any assets (other than the Excluded Assets) purchased or otherwise acquired by the Sellers or any Seller Affiliate since the Balance Sheet Date that are not reflected on the Reference Balance Sheet but that are exclusively used or held for use in, or otherwise exclusively relating to, the Business within the Restricted Area, and (iii) all other assets (other than the Excluded Assets) whether or not scheduled or described herein that are owned, leased or used by a Seller or any Seller Affiliate and exclusively used or held for use in, or otherwise relating to, the Business within the Restricted Area.

3

**1.2**      **Excluded Assets**.  Notwithstanding anything herein to the contrary, the Purchased Assets do not include, and Sellers shall not transfer (or cause any Seller Affiliate to transfer) to Buyer any of the following assets, properties, rights, and interests, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, of Sellers and any Seller Affiliates and such assets, properties, rights, and interests are not intended to be a part of and are excluded from the Purchased Assets (collectively, the "**Excluded Assets**"):

(a)      any bank account of Sellers or any Seller Affiliate, and all cash and cash equivalents, securities (other than, if not previously sold or committed to be sold to a third-party on or before Closing pursuant to a Transfer Obligation, the Transferred Interests), investments, endorsements, charitable contributions, deferred gifts, endowment funds and other similar charitable interests, bond funds and other funds created by bond indentures and research rights (but only to the extent not a Purchased Asset pursuant to Section 1.1(e) or Section 1.1(p)), any trustee held bond reserve funds, and funds held to fund, or relating to, Excluded Liabilities;

(b)      all accounts receivable (including but not limited to, all patient and non-patient accounts receivable, whether billed or unbilled, recorded or unrecorded from any source), including notes receivable and other rights to receive payment for goods or services provided by Sellers or any Seller Affiliate, whether or not in connection with their respective businesses (including the Business prior to the Effective Time), including any accounts receivable that have been charged off as bad debt, any receivables related to recoveries associated with Medicare bad debt with respect to services provided in time periods prior to the Effective Time and any intercompany receivables between Sellers on the one hand, and Steward or any Affiliate of Steward on the other hand;

(c)      all Insurance Policies, and all related premiums and refunds relating thereto (other than those described in Section 1.1(p));

(d)      all Plans and assets relating thereto;

(e)      all organizational documents, corporate records, stock books, proprietary manuals, other proprietary materials of, or other records relating to the corporate organization of, and any Tax Returns of or with respect to (including any records or working papers), Sellers or any Seller Affiliate, except in connection with such records of any entity whose interests are Transferred Interests;

(f)      rights that accrue or will accrue to Sellers or any Seller Affiliate under this Agreement or the other Transaction Documents;

(g)      other than Books and Records referred to in Section 1.1(g), any records that (i) are required by applicable Law or by Order of the Bankruptcy Court which Sellers or any Seller Affiliate is required to retain or (ii) Sellers or any Seller Affiliate reasonably believes will facilitate the preparation of filing of Tax Returns and the substantiation thereof; provided, however, that Buyer may, upon written request provided to Sellers at least five (5) Business Days prior to Closing and at its sole expense, obtain copies of any or all such records related to the Purchased Assets or Assumed Liabilities or to the extent necessary to comply with its obligations in Section 6.1;

(h)      the Excluded Contracts, including any Contracts that (i) relate to the Excluded Liabilities or the Excluded Assets, (ii) do not exclusively relate to the operation of the Business, the Purchased Assets or the Facilities, (iii) are multi-hospital Contracts in which one or more of Sellers' or any of its Affiliates' other hospitals or health facilities participate that is not a Facility, (iv) are system-wide or regional Contracts of Steward or any of its Affiliates which are accessible to the Business by virtue of the

4

Business being owned by Steward or any of its Affiliates, or (v) those Contracts set forth on <u>Schedule 1.2(h)</u>;

(i)      (A) all claims, rights or interests of Sellers or any Seller Affiliate to refunds, rebates, abatements, prepayments, or other recoveries in relation to Taxes (including any provider tax payments in any applicable state and any refundable Tax credits payable regardless of Tax Liability) related to (1) the Business, Facilities or the Purchased Assets for periods (and portions thereof) ending immediately prior to the Effective Time or (2) any income Tax Return or Group Tax Return and (B) all other Tax assets (including any Tax attributes) of Sellers or any Seller Affiliate, in each case together with any interest due thereon or penalty rebate arising therefrom;

(j)      the portions of Inventory, Prepaid Expenses and other Purchased Assets disposed of, or expended, as the case may be, by Sellers or any Seller Affiliate after the date of this Agreement and prior to the Effective Time in the ordinary course of business;

(k)      assets owned and provided by vendors of services or goods to the Business;

(l)      all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat Laws;

(m)      the rights of Sellers and any Seller Affiliate under this Agreement;

(n)      all rights to receipts (i) relating to the Sellers' Cost Reports with respect to time periods prior to the Effective Time pursuant to the auditing and settlement of the Sellers' Cost Reports, including settlements and retroactive adjustments (collectively, "**Cost Report Settlements**"), (ii) that result from Sellers' or any of their Affiliate's pursuit of one or more appeals and other risk settlements with respect to time periods prior to the Effective Time, or (iii) relating to amounts earned, accrued or paid by Sellers or any Seller Affiliates with respect to meaningful use attestations, or for which the requirements for attestation have been substantially met with respect to time periods prior to the Effective Time;

(o)      Sellers' or any of its Affiliate's assets held in connection with any self-funded insurance programs and reserves, if any, and any assets and Liabilities under medical malpractice risk pools and workers' compensation and employee retirement programs;

(p)      any (i) Permits or Approvals exclusively used or held for use in, or otherwise exclusively relating to, the Business or the Purchased Assets, but that are not assignable to Buyer pursuant to applicable Laws or by Order of the Bankruptcy Court, and (ii) accreditations exclusively used or held for use in, or otherwise exclusively relating to, the Business or the Purchased Assets, but that are not assignable to Buyer pursuant to the requirements of applicable accreditation organizations;

(q)      any claims or causes of action of Sellers or Seller Affiliates against third parties to the extent that such claims or causes of action (i) relate to the Excluded Assets or the Excluded Liabilities or (ii) arise in connection with the Chapter 11 Cases or any other claims or causes of actions that are not Assumed Third-Party Claims, including, without limitation, any Avoidance Actions (other than the Acquired Avoidance Actions);

(r)      in the event the Buyer subsequently decides to exclude the NSI JV Interests in accordance with <u>Section 1.12</u>, any claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Sellers and Seller Affiliates against the issuer of any NSI JV Interests (or any Subsidiary thereof) and any payments, awards or other proceeds resulting therefrom; <u>provided</u> <u>that</u>, notwithstanding the foregoing or anything herein to the contrary, any distributions paid or payable to a

5

Seller or Seller Affiliate related to the ownership of the NSI JV Interests prior to the Closing shall be an Excluded Asset whether or not Buyer acquires the NSI JV Interests;

(s)     all Medicare Accelerated and Advance Payments, COVID-19 Funds and any provider relief funds under the CARES Act or similar legislation that are intended to compensate Steward, any Affiliate of Steward, or Sellers for costs incurred or lost revenue with respect to time periods prior to the Effective Time;

(t)     all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, including but not limited to peer-review privilege;

(u)     all documents, records, correspondence, work papers and other documents relating to the Sellers' Cost Reports, Cost Report Settlements or other Excluded Assets; provided, however, that Buyer may, upon written required provided to Sellers at least five (5) Business Days prior to Closing, and at its sole expense, obtain copies of any or all such records to the extent necessary to comply with its obligations in Section 6.1;

(v)     any (i) Trademarks not exclusively used or held for use in, or otherwise exclusively relating to, the Business, (ii) Trademarks or Domain Names that contain the name "Steward Health Care System," "Steward Health," "IASIS," or "Steward" (as well as all abbreviations, variations or derivations thereof, including any world-wide web address containing "iasis" or "steward"), any promotional material, educational material, signage, stationery, supplies or other items of inventory bearing such names or Trademark, or any marks, trade dress, logos, or symbols or abbreviations, variations or derivations thereof, and any URLs, sites, blogs or pages hosted on the system websites of Sellers or the Seller Affiliates, including all content embodied within the foregoing, (iii) any Intellectual Property made available to Buyer or its Affiliates following the Closing pursuant to the Transition Services Agreement, or (iv) any other Intellectual Property not exclusively used or held for use in, or otherwise exclusively related to the Business;

(w)     any (i) Information Technology Systems, Software, hardware or data processing equipment, data processing system manuals and licensed Software materials that are not (A) in the case of tangible assets, located at a Facility or, in the case of Software, manuals and materials in electronic format, and other intangible assets, residing on hardware located at a Facility or (B) exclusively used or held for use in, or otherwise exclusively relating to, the Business or (C) transferable or (ii) proprietary Software, data processing programs or source code of Sellers or any Seller Affiliates;

(x)     any proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses of Sellers or any Seller Affiliates, including those set forth on Schedule 1.2(x);

(y)     any pharmaceuticals that cannot, by applicable Law, be sold by Sellers to Buyer;

(z)     any medical staff-related records or information not among the Credentialing and Medical Staff Records;

(aa)     any Prepaid Expenses or other current asset line items not included in the definition of Purchased Working Capital;

(bb)     the Existing MPT Lease;

6

(cc)     any master agreements or similar contracts, including Payor Agreements, that relate, in whole or in part, to the provision of services, or that involve the rights or privileges of Steward or any of its Affiliates, that are not exclusively used or held for use in the Business;

(dd)     Contracts and fee-sharebacks made available through participation in a group purchasing organization;

(ee)     all Medicaid payments for time periods prior to the Effective Time, including any supplemental Medicaid payments that are unrelated to specific patient visits;

(ff)     all rights and interest associated with all indebtedness or debt-like items of Steward, any Affiliate of Steward, including Sellers;

(gg)     any assets or operations of (i) Stewardship Health, Inc. and its Subsidiaries, including Stewardship Health Medical Group, Inc. or (ii) except as specifically included as a Purchased Asset, SMG;

(hh)     all Personal Information that is nontransferable under applicable Law or under the privacy policies or notices of Sellers in effect at the time of collection of such Personal Information;

(ii)     any asset located outside the Restricted Area; and

(jj)     any other assets, properties, rights, or interests of any description, of whatever kind and nature, whether real, personal or mixed, tangible or intangible, that are located at the Facilities and that (i) are specifically identified on Schedule 1.2(jj) or (ii) a Seller is required to retain by applicable Law or Order of the Bankruptcy Court.

At any time at least ten (10) days prior to the Closing Date, Buyer may, in its sole discretion and by written notice to Sellers, designate any of the Purchased Assets as additional Excluded Assets, provided that Buyer shall cooperate with Seller after the Effective Time in connection with the removal thereof and Buyer shall otherwise be solely responsible for the removal of any such Excluded Assets so designated at Buyer's sole cost and expense.  Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Purchased Assets as Excluded Assets pursuant to the operation of this section.

1.3     **Assumed Liabilities**.  On the terms and subject to the conditions set forth in this Agreement, Buyer shall assume at the Closing and effective as of the Effective Time only the following Liabilities of the Seller Parties (collectively, the "**Assumed Liabilities**"):

(a)     subject to Section 1.3(g), all Liabilities with respect to Assumed Contracts solely to the extent based on circumstances first arising after the Effective Time;

(b)     all Liabilities arising out of the use, ownership or operation of the Business, the Purchased Assets or the Facilities first arising after the Effective Time;

(c)     all Liabilities for any Taxes specifically allocated to Buyer pursuant to this Agreement, including any Transfer Taxes allocated to Buyer pursuant to Section 13.8;

(d)     all Liabilities arising after the Effective Time as the custodian of the medical records, patient files, and other written accounts of the medical history of the patients of the Business;

(e)     Assumed Paid Time Off and Additional Assumed Employee Liabilities;

(f)     all Liabilities as set forth on Schedule 1.3(f); and

(g)     all Cure Costs required to cure defaults under the Assumed Contracts (the "**Assumed Cure Costs**").

Buyer shall, and shall cause its Affiliates to, pay, perform and discharge all Assumed Liabilities which any of them is obligated to pay, perform or discharge when such Assumed Liabilities become due and payable.

**1.4     Excluded Liabilities**.  Other than the Assumed Liabilities, Buyer Parties shall not be responsible to pay, perform, discharge or assume, and none of Buyer Parties or their Affiliates shall be or become liable for, and none of the Purchased Assets shall be or become subject to, any Liabilities of Sellers or the Seller Affiliates related to the ownership or operation of the Business, Facilities or the Purchased Assets on or prior to the Effective Time, including (a) except Assumed Paid Time Off and Additional Assumed Employee Liabilities, Liabilities of any kind or nature whatsoever, whether currently existing or hereafter arising, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter relating to or arising out of (i) any current or former employee, officer, director or other service provider of any of the Sellers or any of the Seller Affiliates (including, without limitation, Seller Employees), who are not Transferred Employees whenever such Liabilities arise, (ii) any Transferred Employees, whether existing on the Closing Date or arising thereafter as a result of any act, omission, condition or circumstance taking place prior to the Closing Date, and (iii) the Plans and any Controlled Group Liabilities whenever such Liabilities arise; (b) all Cure Costs, if any, other than the Assumed Cure Costs; (c) any other Liabilities, whether existing on the Closing Date or arising thereafter as a result of any act, omission, condition or circumstances taking place prior to the Closing, or arising with respect to any real property formerly leased by Sellers prior to the Closing; (d) any other Liabilities of Sellers or the Seller Affiliates related to any acts or omissions by Sellers or Seller Affiliates whether known or unknown, fixed, contingent, recorded or unrecorded, currently existing or hereafter arising or otherwise that are not Assumed Liabilities (all Liabilities that are not Assumed Liabilities being referred to collectively herein as the "**Excluded Liabilities**").

**1.5     Designated Contracts; Cure Costs**.

(a)     **Service of Available Contract Schedule and Cure Notices.**  In accordance with the Bidding Procedures Order, the Seller Parties have (i) filed with the Bankruptcy Court a list setting forth each Executory Contract and Lease held by the Seller Parties and the proposed amount of the Cure Costs associated with each Executory Contract and Lease (such list, the "**Available Contract Schedule**", is included as Schedule 1.5(a) hereof) and (ii) served written notice (the "**Cure Notice**") on the non-Seller counterparty to each Executory Contract or Lease, which notice included the Executory Contracts and Leases set forth on the Available Contract Schedule and proposed Cure Costs.

(b)     Contents of Assumed Executory Contract and Lease Schedule.

(i)     Schedule 1.5(b)(i) (the "**Assumed Executory Contract and Lease Schedule**") sets forth each Executory Contract or Lease that, as of the date of this Agreement, Buyer wishes to have assumed by Seller and assigned to it on the Closing Date pursuant to Section 365 of the Bankruptcy Code (each such Executory Contract or Lease, a "**Transferred Executory Contract**").

(ii)     Each Executory Contract or Lease listed on the Available Contract Schedule that is not also listed on the Assumed Executory Contract and Lease Schedule will be deemed to

8

be an Excluded Contract under this Agreement; provided, that Buyer may amend the Assumed Executory Contract and Lease Schedule in accordance with the provisions set forth in this Section 1.5.

(iii)    The Assumed Executory Contract and Lease Schedule includes only Executory Contracts and Leases. To the extent a Contract that is not an Executory Contract or Lease is inadvertently or erroneously included on the Assumed Executory Contract and Lease Schedule, such Contract shall not be treated as an Executory Contract or Lease for purposes of this Section 1.5, Buyer shall not be responsible for any Cure Costs with respect to such Contract, and such Contract will be transferred to Buyer pursuant to this Agreement as a Purchased Asset.

(c)    **Buyer's Right to Modify Assumed Executory Contract and Lease Schedule**. The Seller Parties shall not reject any Contract set forth on the Available Contract Schedule, or any Undisclosed Contract, prior to the Closing Date; provided that following the Closing Date, the Seller Parties shall not be prohibited from rejecting any Contracts set forth on the Available Contract Schedule to the extent such Contracts are not included on the Assumed Executory Contract and Lease Schedule on the Closing Date. From the date of this Agreement until the earlier of (i) the date such Executory Contract or Lease is rejected pursuant to Section 365 of the Bankruptcy Code or (ii) 90 days following Closing, Buyer may amend the Assumed Executory Contract and Lease Schedule to add any Executory Contract or Lease by delivering written notice to the Seller (such notice, an "**Assumption Notice**"); provided that, the Seller Parties shall have no obligation to maintain any Contract on the Available Contract Schedule that is not a Transferred Executory Contract as of Closing after Closing.

(d)    **Preparation of the Final Assumed Executory Contract and Lease Schedule** Buyer shall deliver to Sellers in writing a final Assumed Executory Contract and Lease Schedule no later than ten (10) days before the anticipated Closing Date (the "**Designation Deadline**").  Upon receipt of the final Assumed Executory Contract and Lease Schedule, Sellers shall promptly file with the Bankruptcy Court a notice (the "**Notice of Final Assumption and Assignment Schedule**") notifying the Court and contract counterparties to the Transferred Executory Contracts listed therein of the assumption by the Seller Parties and assignment to Buyer of their respective Contracts, but such notice shall not be a condition to Closing or the assumption and assignment of the Transferred Executory Contracts pursuant to the Sale Order. Notwithstanding the foregoing, an Executory Contract shall not be a Transferred Executory Contract hereunder, and shall not be assumed by the Seller Parties and assigned to Buyer, if such Executory Contract is validly terminated by the other party thereto, or terminates or expires in accordance with its own terms, prior to the later of (i) the Closing Date and (ii) the date such contract is to be assumed by the Seller Parties and assigned to Buyer pursuant to this Section 1.5.

(e)    **Procedures for Post-Closing Amendments to Assumed Executory Contract and Lease Schedule**. If following the Closing, in accordance with Section 1.5(c), Sellers receive an Assumption Notice with respect to one or more Executory Contracts or Leases that the Seller Parties have not yet rejected, the following procedures shall apply:

(i)    to the extent the non-Debtor counterparty to any Executory Contract or Lease subject to a post-Closing Assumption Notice did not timely object to the Cure Notice, (A) Sellers shall promptly file (or cause to be filed) with the Bankruptcy Court, and serve upon the non-Debtor counterparty, an amended Notice of Final Assumption and Assignment Schedule clearly reflecting the addition of such Executory Contract or Lease and (B) the relevant Executory Contract or Lease shall be assumed by the Seller Parties and assigned to Buyer effective as of the date the amended Notice of Final Assumption and Assignment Schedule listing such Executory Contract or Lease was filed;

9

(ii)　　to the extent the non-Debtor counterparty to any Executory Contract or Lease subject to a post-Closing Assumption Notice timely objected to the Cure Notice, and such objection remains outstanding as of the date Sellers receive the applicable Assumption Notice, (a) Sellers shall promptly file (or cause to be filed) with the Court, and serve upon the non-Debtor counterparty, an amended Notice of Final Assumption and Assignment Schedule clearly reflecting the addition of such Executory Contract or Lease, (b) the transfer of the applicable Executory Contract or Lease will not occur until the Bankruptcy Court rules on the pending objection or the objection is resolved in a manner mutually acceptable to Buyer, Sellers and the non-Debtor party counterparty (with an effective assumption and assignment date to be agreed to by the Buyer, Sellers and non-Debtor counterparty or ordered by the Bankruptcy Court), and (c) until such Executory Contract or Lease is assumed by the applicable Seller Party and assigned to Buyer, Buyer may at any time remove such Executory Contract or Lease from the Assumed Executory Contract and Lease Schedule if Buyer, in its sole discretion, determines it cannot reach an acceptable resolution to a pending objection (including without limitation after an adverse-to-Buyers/Sellers ruling of the Bankruptcy Court), and in such case Buyer shall not be responsible for payment of any Cure Costs relating to such removed contract.

(f)　　[Reserved]

(g)　　**Assignment Effective Date; Procedures for Transferred Executory Contracts Subject to Pending Objection at Closing**.

(i)　　Subject to <u>Section 1.5(g)(ii)</u>, unless the Bankruptcy Court orders otherwise, each Executory Contract or Lease included on the Notice of Final Assumption and Assignment Schedule filed on the Closing Date shall be deemed to have been assigned to Buyer Parties as of the Closing Date.

(ii)　　In the event that any Contract set forth on the Assumed Executory Contract and Lease Schedule is, as of the Closing Date, subject to a pending objection to the assumption and assignment or assignment, as applicable, of such Contract or to proposed Cure Costs, the following procedures will apply:

(A) with respect to objections received to proposed Cure Costs, subject to <u>Section 1.5(g)(ii)(B)</u>, Buyer shall on the Closing Date (x) pay such non-Seller counterparty an amount equal to the undisputed portion of Cure Costs payable with respect to such Transferred Executory Contract and (y) appropriately reserve funding for the disputed portion of such Cure Costs pending resolution of such cure objection, and, in such event, Sellers shall assume and assign such Transferred Executory Contract to Buyer at the Closing. Upon either the consensual resolution or final determination by the Bankruptcy Court of such cure objection, Buyer shall promptly pay to such non-Seller counterparty any remaining Cure Costs owing to such non-Seller counterparty with respect to such Transferred Executory Contract and Lease; provided, that

(B) after good faith consultation with Sellers, Buyer may elect, by written notice to the Sellers, for the transfer of the applicable Transferred Executory Contract not to occur until the Bankruptcy Court rules on the pending objection or the objection is resolved in a manner mutually acceptable to Buyer, the applicable Seller Party and the non-Debtor counterparty (with an effective assumption and assignment date to be agreed to by the Buyer,

10

Sellers and non-Debtor counterparty or ordered by the Bankruptcy Court) and in which case, until such Transferred Executory Contract is assumed by the applicable Seller Party and assigned to Buyer, Buyer may at any time remove such Transferred Executory Contract from the Assumed Executory Contract and Lease Schedule if Buyer determines it cannot reach an acceptable resolution to a pending objection (including without limitation after an adverse-to-Buyers/Sellers ruling of the Bankruptcy Court), and in such case Buyer shall not be responsible for payment of any Cure Costs relating to such removed contract.

(h)     **Procedures for Undisclosed Contracts**. If, prior to the Closing, the Seller Parties become aware that they are party to an Executory Contract or Lease that is not listed on the Available Contract Schedule and has not yet been rejected (each, an "**Undisclosed Contract**"), the following procedures shall apply:

(i)     promptly upon the discovery of an Undisclosed Contract (but in no event later than five (5) Business Days following the discovery thereof), Sellers shall (a) notify Buyer in writing of the existence of the Undisclosed Contract, providing therewith a copy of such Undisclosed Contract and the Cure Cost (if any) in respect thereof and (b) file with the Bankruptcy Court and serve upon the affected non-Debtor counterparty an amended Cure Notice (if before Closing) or Notice of Final Assumption and Assignment Schedule (if post-Closing);

(ii)     if Buyer has not yet delivered the final Assumed Executory Contract and Lease Schedule pursuant to Section 1.5(d), Buyer shall have the right to add such Undisclosed Contract to the Assumed Executory Contract and Lease Schedule in accordance with Section 1.5(d);

(iii)     if Buyer has delivered the final Assumed Executory Contract and Lease Schedule pursuant to Section 1.5(d), or if Closing has occurred, the applicable Seller Party shall not reject the Undisclosed Contract for a waiting period of at least fifteen (15) days after delivery of the notice required in Section 1.5(h)(i). During that waiting period (or after to the extent the Undisclosed Contract is not yet rejected), Buyer shall have the right to amend the Assumed Executory Contract and Lease Schedule by delivering to Sellers an Assumption Notice pursuant to Section 1.5(c), after which the assumption and assignment of such Undisclosed Contract shall be governed by Section 1.5(e); and

(iv)     if a non-Debtor counterparty to an Undisclosed Contract timely objects to the amended Cure Notice or amended Notice of Final Assumption and Assignment Schedule, as applicable, the resolution of such objection and the assumption and assignment of the Undisclosed Contract shall be governed by (A) in the case of a pre-Closing objection to the amended Cure Notice, by Section 1.5(g) or (B) in the case of an post-Closing objection to the amended Notice of Final Assumption and Assignment Schedule, by Section 1.5(e).

(i)     **Payment and Disbursement of Cure Costs**.  Buyer shall be solely responsible and shall pay for all Assumed Cure Costs associated with any Transferred Executory Contract. Except as otherwise agreed between Buyer and Sellers, Buyer shall be responsible for disbursing Assumed Cure Costs to non-Seller contract counterparties.

1.6     **Purchase Price; Adjustments**.  Subject to the terms and conditions hereof, the aggregate consideration to be paid by Buyer for the Purchased Assets (the "**Purchase Price**") shall be an amount equal to:

11

(a)     Four hundred thirty-nine million four hundred twenty-four thousand and 00/100 Dollars ($439,424,000.00) (the "**TEV**") in cash, adjusted as follows:

(i)     plus the amount, if a positive number, of Purchased Working Capital (the resulting amount from the foregoing, as finally adjusted pursuant to Section 1.9);

(ii)     minus the amount, if a negative number, of Purchased Working Capital (the resulting amount from the foregoing, as finally adjusted pursuant to Section 1.9);

(iii)     minus the amount, if a positive number, by which the Assumed Cure Cost exceeds the Target Assumed Cure Cost;

(iv)     plus the amount, if the Assumed Cure Cost is less than the Target Assumed Cure Cost, by which the Assumed Cure Cost is less than the Target Assumed Cure Cost;

(v)     minus the amount of the Additional Assumed Employee Obligations;

(vi)     minus any amount payable by Buyer to MPT in cash in connection with the consummation of the sale and purchase of the MPT Real Property and other transactions contemplated under the MPT Purchase Agreement, as shall be agreed among MPT, Sellers and Buyer (provided, that Buyer shall be deemed to have consented if the TEV allocated to the MPT Real Property is in an amount less than the Maximum Allocation Value);

(vii)     plus six million four hundred seven thousand and 00/100 Dollars ($6,407,000.00) but only if the NSI JV Interests are conveyed to Buyer at the Closing in accordance with Section 1.12 (which amount shall be adjusted accordingly in the event there should be a change in the amount of the outstanding debt of Neuroskeletal Imaging, LLC as of the Closing Date from $2,182,000.00);

(viii)     minus (A) the cost of removal of the Monetary Liens set forth on Schedule 1.6(a)(viii) and such other Monetary Liens that arise prior to the Closing Date, in each case to the extent not fully paid off or released prior to the Closing, and (B) the amount of unpaid real estate taxes on the MPT Real Property through the Closing Date; and

(b)     Buyer's assumption of the Assumed Liabilities.

The Purchase Price to be paid by Buyer at the Closing shall be based on the Estimated Working Capital (as contemplated by Section 1.7) and shall be subject to adjustment after the Closing pursuant to Section 1.9.

**1.7     Delivery of Estimated Closing Statement**.  Sellers shall prepare and deliver to Buyer, not more than ten (10) Business Days (but at least five (5) Business Days) prior to the Closing Date, a written statement (the "**Estimated Closing Statement**") setting forth Sellers' (a) reasonable estimate of the Purchased Working Capital as of the Closing Date (the "**Estimated Working Capital**"), calculated using the same accounting principles, methodologies, policies, and practices used in the example calculation of Net Working Capital as of the Balance Sheet Date set forth on Part 2 of Exhibit C, and (b) a calculation of the Purchase Price payable at Closing in accordance with Section 1.6(a) as if such Estimated Working Capital were the actual amount of Purchased Working Capital (the Purchase Price as so estimated, the "**Estimated Purchase Price**").  Sellers will consider any potential adjustments to the Estimated Closing Statement or the Estimated Purchase Price raised in good faith by Buyer in writing prior to the Closing, and Sellers will make any corresponding changes to the Estimated Closing Statement or the Estimated Purchase

12

Price that Sellers, in their sole discretion, deem appropriate based on Buyer's proposed adjustments. The Estimated Closing Statement shall be delivered to Buyer together with reasonable supporting underlying documentation used in the preparation thereof.

**1.8    Closing Date Payments**.

(a)    At the Closing, Buyer shall pay, by wire transfer of immediately available funds to the bank account designated by Sellers in the Estimated Closing Statement, an amount equal to (i) the Estimated Purchase Price, <u>minus</u> (ii) the Good Faith Deposit, which Good Faith Deposit shall be disbursed by the Escrow Holder (as defined below) to Sellers as partial payment of the Purchase Price.

(b)    To the extent that MPT, Sellers and Buyer have not agreed to, and the Bankruptcy Court has not otherwise ruled upon, the allocation of the TEV between the Purchased Assets, on the one hand, and the MPT Real Property, on the other hand, as of or prior to Closing, then Buyer, if and to the extent directed by MPT and Sellers in writing, shall pay at the Closing, by wire transfer of immediately available funds, an amount equal to (i) the Estimated Purchase Price, calculated without any reduction for the amounts contemplated by Section 1.6(a)(vi), minus (ii) the Good Faith Deposit, to a third party escrow agent selected by Sellers and MPT, and the Good Faith Deposit shall be disbursed by the Escrow Holder to the same escrow agent; provided that, Buyer's obligation to fund the amounts contemplated under this provision into escrow shall be conditioned on an agreement between Sellers and MPT at, or prior to, Closing that: (x) at Closing, Buyer will have submitted its proposed allocation to Sellers and MPT in a manner that complies with the Maximum Allocation Value for the MPT Real Property ("**Buyer's Proposed Allocation**"); and (y) if, by the date which is the earlier of (A) December 31, 2024, and (B) 90 days from the date of this Agreement, Sellers and MPT have not agreed to an allocation of the TEV that complies with the Maximum Allocation Value with respect to the MPT Real Property, then Buyer's Proposed Allocation shall be final and binding on Buyer, Sellers, and MPT.

**1.9    Post-Closing Adjustment to Purchase Price**.

(a)    Not more than sixty (60) days after the Closing Date, Buyer shall prepare and deliver to Sellers a written statement (the "**Closing Statement**") setting forth Buyer's calculation of (i) the actual amount of the Purchased Working Capital, calculated using the same accounting principles, methodologies, policies, and practices used in the example calculation of Net Working Capital as of the Balance Sheet Date set forth on Part 2 of Exhibit C, and (ii) the Purchase Price in accordance with Section 1.6(a) resulting from such actual amount of Purchased Working Capital. If Buyer does not deliver the Closing Statement to Sellers within sixty (60) days after the Closing Date, then, at the election of Sellers (acting within their sole discretion), either (A) Sellers may prepare and present the Closing Statement to Buyer within an additional thirty (30) days thereafter or (B) Sellers may notify Buyer that the Estimated Closing Statement will be deemed to be the final Closing Statement in accordance with this Section 1.9. If Sellers elect to prepare the Closing Statement in accordance with the immediately preceding sentence, then all subsequent references in Section 1.9(b) and (c) to Buyer, on the one hand, and Sellers, on the other hand, will be deemed to be references to Sellers, on the one hand, and Buyer, on the other hand, respectively. The Closing Statement shall become Final and Binding on the Final Resolution Date.

(b)    During the thirty (30) days after delivery of the Closing Statement by Buyer, Buyer will provide Sellers and its accountants reasonable access, during normal business hours and upon reasonable prior written notice, (i) to review the financial books and records of Buyer to the extent related to the Closing Statement, including any of Buyer's accountants' work papers related to the calculation of amounts in the Closing Statement (subject to the execution of any access letters that such accountants may reasonably require in connection with the review of such work papers), and (ii) to the employees and other

Representatives of Buyer who were responsible for the preparation of the Closing Statement to respond to questions relating to the preparation of the Closing Statement and the calculation of the items thereon, in each case solely to allow Sellers to determine the accuracy of Buyer's calculation of the items set forth on the Closing Statement.  Any information shared with Sellers or its accountants will be subject to <u>Section 5.12</u>, and Buyer shall not have any obligation to provide information or access to information, materials or Persons if doing so could reasonably be expected to result in the waiver of any attorney-client privilege or the disclosure of any Trade Secrets or violate any Law or the terms of any applicable Contract to which Buyer or any of its Affiliates is a party.  If Sellers disagrees with any of Buyer's calculations set forth in the Closing Statement by Buyer, Sellers may, within thirty (30) days after delivery of the Closing Statement, deliver a written notice of its disagreement (a "<u>**Post-Closing Notice of Disagreement**</u>") to Buyer disagreeing with such calculations; <u>provided</u>, <u>however</u>, that such Post-Closing Notice of Disagreement shall include only objections based on whether (A) the amounts set forth on the Closing Statement were prepared in a manner consistent with the provisions of this Agreement or (B) there were mathematical errors in the computation of any amount set forth on the Closing Statement.  Such Post-Closing Notice of Disagreement shall specify those items or amounts with which Sellers disagree, and shall set forth Sellers' calculation, based on such objections, of the Purchased Working Capital, and the Purchase Price resulting therefrom.  To the extent not set forth in such Post-Closing Notice of Disagreement, Sellers shall be deemed to have agreed with Buyer's calculation of all items and amounts contained in the Closing Statement.  If Buyer does not receive a Post-Closing Notice of Disagreement from Sellers within such thirty (30) day period, then the Closing Statement and the amounts set forth in the Closing Statement shall become Final and Binding.

(c)     If a Post-Closing Notice of Disagreement is received by Buyer on or prior to the thirtieth (30th) day following Buyer's delivery of the Closing Statement, then Buyer and Sellers shall, during the thirty (30) days following Buyer's receipt of such Post-Closing Notice of Disagreement, seek to resolve any differences that they may have with respect to the matters specified in such Post-Closing Notice of Disagreement; <u>provided</u>, <u>however</u>, that any discussions relating thereto shall be governed by Rule 408 of the Federal Rules of Evidence and any applicable similar state rule(s), and evidence of such discussions shall not be admissible in any future Proceedings between Buyer and Sellers.  If Buyer and Sellers are not able to resolve their differences during such thirty (30)-day period, then at the end of such period, Buyer and Sellers shall promptly mutually engage and submit for Final and Binding resolution any and all matters related to such Post-Closing Notice of Disagreement that remain in dispute to Grant Thornton LLP, or if Grant Thornton LLP is unable or unwilling to be engaged, then to a mutually agreeable independent accounting firm of recognized national standing (the "<u>**Accounting Firm**</u>").  Each of Buyer and Sellers shall make readily available to the Accounting Firm all relevant financial books and records, including any accountants' work papers (subject to the execution of any access letters that such accountants may require in connection with the review of such work papers) relating to the Closing Statement or the Post-Closing Notice of Disagreement.  Buyer and Sellers shall enter into a customary engagement letter with the Accounting Firm, which engagement letter shall explicitly provide that, in resolving the amounts in dispute, the Accounting Firm shall (i) consider only those items or amounts disputed by Sellers in the Post-Closing Notice of Disagreement that remain in dispute; (ii) not assign a value to any item or amount in dispute greater than the greatest value for such item or amount assigned by Sellers, on the one hand, or Buyer on the other hand, or less than the smallest value for such item or amount assigned by Sellers, on the one hand, or Buyer, on the other hand; and (iii) not be bound by any arbitration rules or procedures in connection with the resolution of the dispute under this <u>Section 1.9</u>.  The Accounting Firm's determination will be based solely upon information presented by Buyer and Sellers, and not on the basis of independent review.  Buyer and Sellers shall cause the Accounting Firm to deliver to Buyer and Sellers as promptly as practicable (but in any event within fifteen (15) days of its retention) a written report setting forth its determination of the amounts in dispute.  Absent manifest error, the written report prepared by the Accounting Firm shall be Final and Binding and judgment upon the determination set forth in such written report may be entered in any court of competent jurisdiction of the United States.

14

(d)     Buyer and Sellers shall each be responsible for the fees and expenses of the Accounting Firm pro rata, as between Buyer, on the one hand, and Sellers, on the other hand, in proportion to the relative difference between the positions taken by Buyer and Sellers compared to the determination of the Accounting Firm.  All other fees and expenses incurred in connection with the dispute resolution process set forth in this Section 1.9, including fees and expenses of attorneys and accountants, shall be borne and paid by the Party incurring such expense.

(e)     If the Purchase Price as finally determined pursuant to this Section 1.9 is less than the Estimated Purchase Price (the absolute value of such difference, the "**Closing Payment Shortfall Amount**"), then within five (5) Business Days after the Final Resolution Date, Sellers shall pay, or cause to be paid to Buyer, via wire transfer of immediately available funds to an account designated in writing by Buyer, an amount equal to the Closing Payment Shortfall Amount; provided, that if any portion of the Purchase Price deposited into escrow in accordance with Section 1.8(b) remains in escrow as of the date the Purchase Price is finally determined, such payment shall be released (and Sellers and Buyer shall cause the applicable escrow agent to release) the amount of such payment from the escrow.

(f)     If the Purchase Price as finally determined pursuant to this Section 1.9 is greater than the Estimated Purchase Price, then within five (5) Business Days after the Final Resolution Date, Buyer shall pay, or cause to be paid, to Sellers an amount equal to the amount of such excess via wire transfer of immediately available funds to an account designated in writing by Sellers.

(g)     If the Purchase Price as finally determined pursuant to this Section 1.9 is equal to the Estimated Purchase Price, there will be no adjustment to the Purchase Price pursuant to this Section 1.9.

(h)     Any payments made pursuant to this Section 1.9 shall be treated as an adjustment to the Purchase Price by the Parties for Tax purposes unless otherwise required by applicable Law.

**1.10     Withholding Rights**.  Without limiting any other provision of this Agreement, Buyer shall be entitled to deduct and withhold from any consideration otherwise payable to any other Person pursuant to this Agreement or any other Transaction Document such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code or any other provision of applicable Tax Law; provided, however, that if Buyer reasonably determines that an amount is required to be deducted and withheld with respect to any amounts payable to the Sellers by Buyer following the Closing, Buyer shall provide Sellers with advance written notice (and in any event no less than five (5) Business Days in advance of deducting or withholding such amounts) of its intent to deduct and withhold and shall cooperate with Sellers in good faith to obtain reduction of or relief from such deduction or withholding as permitted under applicable Tax Law.  To the extent that such amounts are so withheld and timely remitted to the appropriate Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the applicable Person in respect of which such deduction and withholding was made.

**1.11     Physical Inventory**.

(a)     Within the three (3)-day period preceding the Closing Date, Sellers will perform and complete (or procure from a third party, if requested by Buyer, the performance and completion of) a physical count of Inventory to verify the levels and amounts of the Inventory.  Sellers will give Buyer not less than ten (10) days' prior written notice of such physical count of Inventory.  Representatives of Buyer will be permitted to observe such physical count of Inventory and will be permitted to make test counts of Inventory and receive copies of the records related to such physical count of Inventory.  In connection with such physical count of Inventory, Sellers and Buyer (each acting reasonably) shall jointly determine if any items of Inventory are unusable or obsolete, which unusable or obsolete items of Inventory shall be

excluded from the calculation of the value of the Inventory calculated pursuant to this <u>Section 1.11</u>.  Prior to the Closing Date, Sellers shall remove items of Inventory from the Hospitals and the other Facilities that, based upon such physical count of Inventory, have been determined by the Parties to be unusable or obsolete.  The value of the Inventory shall be determined as set forth in <u>Part 1</u> of <u>Exhibit C</u> and Sellers shall prepare the schedule setting forth such Inventory and the corresponding value thereof and deliver to Buyer as soon as practicable.

(b)    The Parties acknowledge that the results of the physical count of Inventory to be taken pursuant to this <u>Section 1.11</u> may not be available until after the Closing Date.  Accordingly, the Parties agree that, if the results of such physical count of Inventory are not available as of the Closing Date, then, for purposes of determining the Estimated Working Capital, Inventory shall be calculated as set forth in <u>Part 1</u> of <u>Exhibit C</u>.

(c)    The cost of conducting the physical count of Inventory by a third party shall be borne one-half by Sellers and one-half by Buyer.

**1.12    Transferred Interests**.  As of the date hereof, the Sellers' Affiliate, BHMA is the owner of the NSI JV Interests, which NSI JV Interests are subject to a Transfer Obligation.  The Parties agree that, to the extent that the NSI JV Interests have not been transferred pursuant to, or committed to be sold to a third-party as of Closing pursuant to, the Transfer Obligations, then no later than ten (10) days following the Execution Date (the "**NSI Election Date**"), Buyer may, at Buyer's sole discretion, elect whether to acquire such NSI JV Interests, in which case Sellers shall cause BHMA to transfer the NSI JV Interests to Buyer at Closing; <u>provided</u>, <u>that</u> if Buyer fails to notify Sellers by the NSI Election Deadline, then the NSI JV Interests shall not be a Transferred Interest.

**1.13    Proration**.  Not more than ninety (90) days after the Closing Date, Seller and Buyer will determine, as of the Effective Time and relating to the Purchased Assets, an amount equal to (i) all amounts that were paid by Seller or any Seller Affiliates prior to the Effective Time and that relate, in whole or in part, to periods ending after the Effective Time; <u>minus</u> (ii) all amounts as of the Effective Time that are to be paid by Buyer after the Effective Time and that relate, in whole or in part, to periods prior to the Effective Time (other than any Assumed Paid Time Off or Cure Costs); and <u>minus</u> (iii) any amounts that will become due and payable after the Effective Time and that relate, in whole or in part, to periods prior to the Effective Time (other than any Assumed Liabilities or Cure Costs), in each case, including all utilities servicing any of the Purchased Assets, including water, sewer, telephone, electricity and gas service, in each case to the extent not reflected as Prepaid Expenses in the Purchased Working Capital, as adjusted by <u>Section 1.9</u> (collectively, such amount the "**Proration Amount**").  Any such amounts that are not available to be prorated on the Closing Date shall be similarly prorated as of the Effective Time as soon as practicable thereafter.  If the Parties cannot mutually agree to a Proration Amount within ninety (90) days after the Closing Date, then the Parties shall promptly mutually engage and submit for Final and Binding resolution of such amount to the Accounting Firm and the dispute resolution processes set forth <u>Section 1.9(c)</u> shall apply *mutatis mutandis*.

2.    **CLOSING.**

**2.1    Closing**.  Subject to the terms and conditions of this Agreement, the consummation of the Contemplated Transactions (the "**Closing**") shall take place electronically (a) as soon as practicable after the conditions set forth in <u>Section 7</u> and <u>Section 8</u> (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) have been satisfied or waived, but in no event later than the End Date, or (b) on such other date as the Parties may mutually designate in writing (the "**Closing Date**").  Unless otherwise agreed in writing by the Parties, the Closing

16

shall be effective for financial and accounting purposes as of 12:01 a.m. local time on the day following the Closing Date (the "**Effective Time**").  For the avoidance of doubt, all calculations of all components of Purchased Working Capital shall not consider the effects of the consummation of the Contemplated Transactions.

      **2.2**     **Deliveries of Sellers at the Closing**.  At the Closing and unless otherwise waived in writing by Buyer, Sellers shall deliver to the applicable Buyer Party, or shall cause the appropriate Person to deliver to Buyer Parties, the following:

      (a)     with respect to the Leases (other than the Existing MPT Lease), an assignment and assumption of such Leases, substantially in the form attached hereto as <u>Exhibit E</u> (the "**Lease Assignment**"), duly executed by the applicable Seller Party;

      (b)     a bill of sale, substantially in the form attached hereto as <u>Exhibit F</u> (the "**Bill of Sale**"), duly executed by the applicable Seller Party;

      (c)     an assignment and assumption agreement, substantially in the form attached hereto as <u>Exhibit G</u> (the "**Assignment and Assumption Agreement**"), duly executed by the applicable Seller Party;

      (d)     one or more power of attorneys, substantially in the form attached hereto as <u>Exhibit H</u> (each a "**Power of Attorney**"), duly executed by Sellers, authorizing Buyer to utilize Sellers' federal and state controlled substances permits and pharmacy licenses to the extent permitted by applicable Law;

      (e)     a transition services agreement, substantially in the form attached hereto as <u>Exhibit I</u> (the "**Transition Services Agreement**"), duly executed by Sellers or the Seller Affiliates, as applicable;

      (f)     a certificate, dated as of the Closing Date, of Sellers certifying that the conditions set forth in <u>Section 7.1</u>, and <u>Section 7.2</u> have been satisfied;

      (g)     an IRS Form W-9; and

      (h)     an employee contract assignment and assumption agreement, substantially in the form attached hereto as <u>Exhibit J</u>, duly executed by SMG (the "**Employee Contract Assignment and Assumption Agreement**");

      (i)     if the NSI JV interests are being conveyed to Buyer at the Closing in accordance with Section 1.12, an assignment of the NSI JV Interests, substantially in the form attached hereto as <u>Exhibit K</u>, duly executed by the applicable Seller or, subject to <u>Section 1.12</u>, BHMA (an "**Assignment of Transferred Interests**"); provided that if there are no Transferred Interests being conveyed, this <u>Section 2.1(j)</u> shall be deemed to have been waived; and

      (j)     copies of resolutions duly adopted by the board of directors of each Seller or the applicable committees thereof, authorizing and approving Seller's performance of the Contemplated Transactions and the execution and delivery of this Agreement and the other Transaction Documents, certified as true and in full force and effect as of the Closing Date by an appropriate officer of the applicable Seller.

**2.3** **Deliveries of Buyer at the Closing**. At the Closing and unless otherwise waived in writing by Sellers, the applicable Buyer Parties shall deliver to Sellers the following:

(a) (1) evidence of the wire transfers provided for in <u>Section 1.8</u>;

(b) the Lease Assignment, duly executed by the applicable Buyer Party;

(c) the Bill of Sale, duly executed by the applicable Buyer Party;

(d) the Assignment and Assumption Agreement, duly executed by the applicable Buyer Party;

(e) the Transition Services Agreement, duly executed by Buyer;

(f) the Employee Contract Assignment and Assumption Agreement, duly executed by the Clinic;

(g) copies of resolutions duly adopted by the board of directors of each Buyer Party, authorizing and approving Buyer's performance of the Contemplated Transactions and the execution and delivery of this Agreement and the other Transaction Documents, certified as true and in full force and effect as of the Closing Date by an appropriate officer of the applicable Buyer Party;

(h) a certificate, dated, as of the Closing Date, of Buyer certifying that the conditions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.6</u> have been satisfied;

(i) certificates of incumbency for the respective officers of the Buyer Party executing this Agreement and the other Transaction Documents, dated as of the Closing Date; and

(j) a certificate of existence or good standing of each Buyer Party from its jurisdiction of formation or organization dated within ten (10) days prior to the Closing.

**2.4** **Additional Acts**. From time to time after the Effective Time, Sellers and Buyer shall execute, acknowledge and deliver all such further reasonable documents, conveyances, notices, assumptions, releases and acquittances and such other reasonable instruments, and shall take such further reasonable actions, as may be reasonably necessary or appropriate to effectuate this Agreement and consummate the Contemplated Transactions, including to assure fully to Buyer Parties all of the properties, rights, titles, interests, estates, remedies, powers and privileges relating to the Purchased Assets intended to be conveyed to Buyer Parties under this Agreement and the other Transaction Documents and to assure fully to Sellers the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement and the other Transaction Documents, and to confirm, consummate or otherwise make effective the Contemplated Transactions.

3. **REPRESENTATIONS AND WARRANTIES OF SELLERS.**

Sellers hereby represent and warrant to Buyer that the statements contained in this <u>Section 3</u> are true and correct as of the date of this Agreement and as of the Closing Date (except in the case of representations and warranties that are made as of a specified date, in which case such representations and warranties will be true and correct as of such specified date); *provided*, *however*, that notwithstanding anything to the contrary in this Agreement, the statements contained in this <u>Section 3</u> are only made with respect to Sellers, the Business, the Facilities, the Purchased Assets and the Assumed Liabilities, as applicable, and nothing in this <u>Section 3</u> shall be construed to pertain to any assets, liabilities, entities or

18

businesses (including of Steward and its Affiliates but excluding Sellers) other than the Business, the Facilities, the Purchased Assets or the Assumed Liabilities, as applicable.

**3.1     Organization; Capacity**.  Each Seller Party is a corporation, limited liability company or other entity, as applicable, duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of formation or organization, which entity type and jurisdiction for each Seller are as set forth on Schedule 3.1.  Each Seller Party is duly authorized, qualified to do business and in good standing under all applicable Laws of any jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such authorization or qualification, except as would not reasonably be expected to have a Material Adverse Effect.  Except for such authorizations as may be required by the Bankruptcy Court, the execution and delivery by each Seller of this Agreement and each Seller or, as applicable SMG, the other Transaction Documents to which it is or will become a party, as applicable, the performance by each Seller of its obligations under this Agreement and each Seller or, as applicable SMG, under the other Transaction Documents to which it is or will become a party and the consummation by such Seller, or, as applicable SMG, of the Contemplated Transactions to which it is a party have been authorized and approved by all necessary corporate, limited liability company or other similar actions, as applicable, on the part of such Seller, none of which actions has been modified or rescinded and all of which actions remain in full force and effect.

**3.2     Authority; Non-contravention; Binding Agreement**.

(a)     Except as set forth on Schedule 3.2(a) and for such authorizations required by the Bankruptcy Court, the execution, delivery and performance by each Seller of this Agreement and the other Transaction Documents to which it is a party or will become a party, and the consummation by each Seller of the Contemplated Transactions, as applicable:

(i)     are within such Seller's corporate, limited liability company or other similar powers and are not and will not be in contravention or violation of the terms of the organizational or governing documents of such Seller;

(ii)     do not and will not require any Approval of, filing or registration with, the issuance of any Permit by, or any other action to be taken by, any Governmental Authority to be made or sought by such Seller excluding any filings required under the HSR Act or other Antitrust Law;

(iii)     do not and will not require any Approval or other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both), or give rise to a right of first refusal, first offer, modification, termination, cancellation, acceleration or augmentation of any obligation, or loss of a material benefit under, require notice or consent under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) upon, any of the Purchased Assets under (1) any Material Contract, or Permit or Approval applicable to any of the Purchased Assets or (2) any Order or Law applicable to any of the Purchased Assets or to which such Seller may be subject, except in each case of clauses (ii) and (iii)(1) above, as would not reasonably be expected to have a Material Adverse Effect; and

(b)     This Agreement and the other Transaction Documents to which each Seller is or will become a party are and will constitute the valid and legally binding obligations of such Seller and, assuming the due authorization and execution hereof and thereof by the Buyer Parties, are and will be enforceable against it in accordance with the respective terms hereof and thereof, except as enforceability

may be restricted, limited or delayed by applicable Laws or an Order of the Bankruptcy Court affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.3**     **Title to Assets and Condition of Assets**.

(a)     The Purchased Assets are owned by the Seller Parties.  The Seller Parties hold good and marketable title to all of the Purchased Assets. At the Closing, subject to Section 5.3 and Buyer's payment of the Assumed Cure Costs in accordance with Section 1.5, the Sellers will convey (or cause SMG to convey) to Buyer, and Buyer will acquire, good and marketable title to, or valid and subsisting leasehold interests in or rights to use, the Purchased Assets, free and clear of all Encumbrances, other than the Permitted Encumbrances.

(b)     There are no outstanding rights (including any right of first refusal or right of first offer), options, or Contracts giving any Person any current or future right to require a Seller (or, as applicable, SMG) to sell or transfer to such Person or to any third party any interest in any of the Purchased Assets.  To the Knowledge of Sellers, there are no facts or conditions affecting the Purchased Assets that could, individually or in the aggregate, interfere in any material respect with the use, occupancy or operation of the Purchased Assets as currently used, occupied or operated.

**3.4**     **Transferred Interests**.

(a)     Subject to Section 1.12, Schedule 3.4(a) sets forth an accurate and complete list of all equity, membership or similar interests or any interest convertible into or exchangeable therefor held by Sellers or any Seller Affiliate in any Person, in each case that exclusively relates to the Business (the "**Transferred Interests**").  Subject to Section 1.12, other than the NSI JV Interests, the Purchased Assets do not include any ownership interests, partnership interests, membership interests or capital stock held by such Seller or Seller Affiliate in any Person. Schedule 3.4(a) identifies as to the Transferred Interests: (i) the name of the entity, type of organization of the entity (e.g., corporation, limited partnership, limited liability company, etc.) and the state of such entity's organization; (ii) the type of interest to be transferred (e.g., membership, partnership, stock, etc.); and (iii) the ownership percentage of such interest held by such Seller or Seller Affiliate as compared to the total outstanding interests in such entity.

(b)     Subject to Section 1.12 and except as set forth on Schedule 3.4(a), Sellers or its Affiliates own and holds good and beneficial interest in and to the Transferred Interests, free and clear of all Encumbrances, other than Permitted Encumbrances.  Except for the Transfer Obligation and this Agreement, there are no binding agreements, arrangements, warrants, preemptive rights, options, puts or other outstanding commitments or rights, to which any Seller or its Affiliates is a party relating to the issuance, sale, purchase, redemption, conversion, exchange, registration, voting or transfer of any of the Transferred Interests.  The Transferred Interests have been duly authorized and are validly issued, fully paid and non-assessable.

**3.5**     **Financial Information**.

(a)     Schedule 3.5(a) contains the following financial statements and financial information of the Business (collectively, the "**Historical Financial Information**"):

(i)     unaudited consolidated balance sheets and income statements of the Business (including the accompanying consolidating schedules of balance sheet information and income statement information) as of, and for the twelve (12) month period ended December 31, 2022 and December 31, 2023;

(ii)      an unaudited consolidated balance sheet of the Business (including the accompanying consolidating schedules of balance sheet information) as of the Balance Sheet Date (the "**Reference Balance Sheet**"); and

(iii)      an unaudited consolidated income statement of the Business (including the accompanying consolidating schedules of income statement information) for the five (5) -month period ended on the Balance Sheet Date.

(b)      The Historical Financial Information is true, correct and complete in all material respects and fairly presents in all material respects the consolidated financial position of the Business as of the respective dates thereof and the consolidated results of the operations of the Business and changes in financial position for the respective periods covered thereby.  The consolidated financial statements included in the Historical Financial Information have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated (subject, in the case of the unaudited Historical Financial Information, to the absence of notes and normal year-end audit adjustments, the effect of which is not material, individually or in the aggregate), and are based on the Books and Records of Sellers.  Except as set forth on Schedule 3.5(b), Sellers have not changed in any material respect any accounting policy or methodology during the periods presented in the Historical Financial Information (including the accounting policies and methodologies for determining the obsolescence of Inventory or in calculating reserves).

**3.6**      **Permits and Approvals**.  Each Facility is duly licensed in accordance with applicable Law by the appropriate Governmental Authority as set forth on Schedule 3.6, which sets forth the type of licensed facility, the license number, and, for each Hospital, the number of licensed beds at such Hospital. The pharmacies, laboratories, and all other ancillary departments or services located at any Facility or owned or operated by Sellers for the benefit of any Facility that are required to be separately licensed are duly licensed by the appropriate Governmental Authority.  Schedule 3.6 sets forth an accurate and complete list of all material Permits and Approvals issued by any Governmental Authority owned or held by Sellers with respect to the Facilities, including the dates of issuance and expiration dates for each such Permit or Approval. The Permits and Approvals set forth on Schedule 3.6 constitute all material Permits and Approvals necessary for Sellers to own and operate the Facilities and the Purchased Assets and to carry on the Business as currently operated.  Sellers have provided accurate and complete copies to Buyer of each Permit and Approval set forth on Schedule 3.6.  To the Knowledge of Sellers, each of the Physicians and other licensed or certified professional providers who provide services to the Business (each, a "**Practitioner**", and collectively, the "**Practitioners**") is in possession of all Permits and Governmental Authority Approvals necessary for his or her performance of such services.  Sellers, the Facilities and the Practitioners, as applicable, are, and at all times in the past three (3) years from the date hereof have been, in compliance in all material respects with the terms of such Permits and Governmental Authority Approvals.  There are no provisions in, or agreements relating to, any such Permits or Approvals that preclude or limit Sellers from operating the Facilities and the Purchased Assets and carrying on the Business as currently conducted.  There is no pending or, to the Knowledge of Sellers, threatened, Proceeding by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify, or refuse to renew any material Permit or Approval held by any Facility, or to the Knowledge of Sellers, any Practitioner , and all such Permits and Governmental Authority Approvals are as of the date hereof, and as of the Closing Date shall be, unrestricted, in good standing, in full force and effect and not subject to meritorious challenge. To the Knowledge of the Sellers, no event has occurred and no facts exist with respect to any such Permits or Approvals that allow, or after notice or the lapse of time or both, would reasonably be expected to allow the suspension, revocation, or termination of any such Permits or Approvals, or would reasonably be expected to result in any other impairment in the rights of any holder thereof.  Sellers or Facility have not received in the past three (3) years from the date hereof any notice or communication from any Governmental Authority regarding any violation of any Permits or Approvals (other than any surveys or

21

deficiency reports for which Sellers have submitted a plan of correction that has been accepted or approved by the applicable Governmental Authority).  Sellers have delivered to Buyer accurate and complete copies of all survey reports, deficiency notices, plans of correction, and related correspondence received by Sellers or any Facility in the past three (3) years from the date hereof in connection with the Permits and Governmental Authority Approvals relating to the Business.  The representations and warranties in this Section 3.6 shall not include Environmental Permits, which are addressed exclusively in Section 3.25.

3.7     **Statutory Funds**.  Neither Sellers nor any of their predecessors have received any loans, grants, loan guarantees, donations, monies, or other financial assistance pursuant to the Hill-Burton Act program, the Health Professions Educational Assistance Act, the Nurse Training Act, the National Health Planning and Resources Development Act, or the Community Mental Health Centers Act, as amended, or similar Laws relating to healthcare facilities, which remain unpaid or which impose any restrictions on the Facilities or the Purchased Assets.  All material Taxes payable by Sellers relating to the Facilities that were deferred pursuant to Section 2302 of the CARES Act have been properly accrued for and reflected in the Historical Financial Information.  To the extent that Sellers deferred such Taxes, they have been paid in full as of the Effective Time.

3.8     **Accreditation**.  Schedule 3.8 sets forth an accurate and complete list of all accreditations and certifications held by Sellers and the Facilities.  All such accreditations and certifications are effective, unrestricted and in good standing as of the date hereof.  To the Knowledge of Sellers, no event has occurred or other fact exists with respect to such accreditations and certifications that allows, or after notice or the lapse of time or both, would reasonably be expected to result in, revocation or termination of any such accreditations or certifications, or would result in any other material impairment in the rights of any holder thereof.  There is no pending or, to the Knowledge of Sellers, threatened, Proceeding by any accrediting body to revoke, cancel, rescind, suspend, restrict, modify, or not renew any such accreditation or certifications.  Each Hospital is duly accredited, without any unresolved requests for corrective action, conditions or non-conformities, by The Joint Commission ("**Joint Commission**") through the periods set forth on Schedule 3.8.  Since the date of the most recent Joint Commission survey for each Hospital, neither Sellers nor the applicable Hospital have made any changes in policy or operations that would cause such Hospital to lose such accreditations.  Sellers have delivered to Buyer a copy of each Hospital's Joint Commission accreditation report and any reports, documents, and material correspondence relating thereto for the period of three (3) years.

3.9     **Government Program Participation; Private Programs; Reimbursement**.

(a)     The Facilities are certified for participation in the Government Programs identified on Schedule 3.9(a)(i) and have current and valid Payor Agreements with such Government Programs from which Sellers presently receives payments on account of services provided by the Facilities or the Practitioners who have reassigned their right to bill to Sellers, and Sellers are party to, or are otherwise entitled to bill under, current Payor Agreements with certain private non-governmental payors or programs, including any private insurance payor or program, self-insured employer, or other third-party payor (each, a "**Private Program**"), under which Sellers directly or indirectly receives payments, each as set forth on Schedule 3.9(a)(ii).  Pursuant to the terms of the Clean Room Black Box Agreement, Sellers have made available accurate and complete copies of all Payor Agreements to Buyer involving aggregate annual consideration in excess of $1,000,000 (collectively, the "**Material Payor Agreements**").  The Facilities are in compliance in all material respects with the conditions of participation or conditions of coverage, as applicable, in such Government Programs and Private Programs and with the terms, conditions, and provisions of the Material Payor Agreements.  The Material Payor Agreements are each in full force and effect, and to the Knowledge of Sellers, no events or facts exist that would cause any Material Payor Agreement to be revoked, suspended, terminated, restricted or withdrawn.  Sellers have not in the last two

(2) years from the date hereof received written notice from any Government Program or Private Program to the effect that it intends to cease payment to Sellers under or Sellers' participation in such Government Program or Material Payor Agreement or materially alter its business relationship with Sellers (whether as a result of the Contemplated Transactions or otherwise).  In the past three (3) years from the date hereof, no Government Program or Private Program with respect to a Material Payor Agreement (i) has indicated in writing its intent to cancel or otherwise substantially modify its relationship with Sellers, or (ii) has advised Sellers in writing of any material problem or dispute.  Sellers possesses all Permits and Approvals necessary for reimbursement of the Facilities by the Government Programs and Private Programs.  All billing practices of Sellers with respect to all Government Programs and Private Programs with which Sellers have a Material Payor Agreement have been, in the past two (2) years from the date hereof, conducted in compliance, in all material respects, with all applicable Laws and the policies and billing guidelines of such Government Programs or Private Programs with which Sellers have a Material Payor Agreement.  Neither Sellers nor the Facilities have, in the past two (2) years from the date hereof, billed or received any payment or reimbursement in excess of amounts allowed by applicable Law or the billing guidelines of any Private Programs with which Sellers have a Material Payor Agreement or Government Programs, except for overpayments received in the ordinary course of business which overpayments once identified are refunded in the ordinary course or routine audit adjustments.  There is no Proceeding, survey, or other action pending, or, to the Knowledge of Sellers, threatened against Sellers or Facility, involving any Government Program or Private Program with which Sellers have a Material Payor Agreement, including the Facilities' participation in and the reimbursement received by Sellers and the Facilities from the Government Programs or any such Private Program, and to the Knowledge of Sellers, no event has occurred that would reasonably be expected to result, directly or indirectly, in any such Proceedings, surveys or actions.  All Medicare or Medicaid surveys in the last two (2) years for which the Facilities have received a report containing any Form 2567 deficiency or request for material corrective action are set forth on Schedule 3.9(a)(iii).  The Facilities have timely reconciled each deficiency, Form 2567 finding, or request for corrective action and no circumstances exist that would reasonably result in any additional deficiency, Form 2567, request for corrective action under any state licensure requirement, accreditation, or Government Program or Private Program (with which Seller has any Material Payor Agreement) requirement.  Neither Sellers nor, to the Knowledge of Sellers, any of the Seller Employees or Practitioners, nor to the Knowledge of Sellers, any former employee or current or former officer or director of Sellers, has in the past three (3) years from the date hereof, committed a violation of any Law relating to payments and reimbursements under any Government Program or any Private Program.  Schedule 3.9(a)(iii) contains a list of all NPIs and all provider numbers under the Government Programs issued to and held by Sellers and the Facilities, all of which are in full force and effect.

(b)     Except as set forth on Schedule 3.9(b), for the three (3) fiscal years or calendars years, as applicable, immediately preceding the date hereof, with respect to applicable reporting periods, Sellers have implemented and used a certified health information technology as required for CMS Reporting, and, have timely filed all reports, data, and other information including quality, performance and use of certified health information technology, required to be filed with CMS (or public or private data registry) as required by CMS Reporting and/or Government Programs, or has filed and received from CMS a hardship exception or other special exception from CMS Reporting.  All reports, data and other information submitted by Sellers in support of its attestations and reporting under CMS Reporting and/or Government Programs are accurate and correct, in all material respects.  Sellers and any managing Seller Employee, or, to the Knowledge of Sellers, any other managing employee or officer or director of Sellers have not, in the past three (3) years from the date hereof, knowingly and willfully made or knowingly and willfully caused to be made a false statement or representation of a material fact in any report, data, and other information supporting Sellers' attestations and reporting under Sellers' CMS Reporting or other filings for CMS Program Payments and/or Government Programs.

**3.10    Third-Party Payor Cost Reports**.  Sellers have timely filed all required Cost Reports relating to the Business for the past three (3) fiscal years from the date hereof, and copies of all such Cost Reports have been provided to Buyer.  All Cost Reports relating to the Business filed by or on behalf of Sellers accurately reflect, in all material respects, the information required to be included therein, and such Cost Reports do not claim, and neither Sellers nor the Facilities have received, reimbursement in any amount in excess of the amounts allowed by applicable Law or any applicable agreement, except for overpayments received in the ordinary course of business not in excess of $250,000, which overpayments once identified are refunded in the ordinary course.  Schedule 3.10 indicates which of such Cost Reports have not been audited and finally settled and includes a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes in respect of such Cost Reports.

**3.11    Compliance with Laws**.  Except for Environmental Laws (which are addressed exclusively in Section 3.25):

(a)    (i) Except as set forth in Schedule 3.11(a) or a letter that specifically makes reference to this Section 3.11(a) delivered prior to the date of this Agreement by Sellers counsel to Buyer counsel, each Seller has, to the Knowledge of Sellers, operated in the past three (3) years from the date hereof, and is operating, the Business, the Facilities, and its properties in compliance in all material respects with all applicable Laws, and (ii) no Seller has, in the past three (3) years from the date hereof, (A) received notice, correspondence or other written communication of any actual or alleged material violation of, or material Liability under, any such Laws, or to the effect that Sellers or any Representative of, or any Person acting on behalf of, Sellers, is or could potentially be under investigation or inquiry with respect to any such actual or alleged material violation of any such Law, applicable to Sellers in connection with the Business, or (B) incurred any actual obligation to undertake, or to bear all or any portion of the cost of, any material remedial action with respect to a violation of such Laws.

(b)    Except as set forth in Schedule 3.11(b) or a letter that specifically makes reference to this Section 3.11(b) delivered prior to the date of this Agreement by Sellers counsel to Buyer counsel no event has occurred in the past three (3) years from the date hereof, and no condition exists, that would reasonably be expected to (with or without notice or lapse of time) constitute or result directly or indirectly in (i) a material violation by Sellers of, or a failure on the part of Sellers to comply with, in any material respects, any applicable Law relating to the operation and conduct of the Business or any of Sellers' properties or Facilities or (ii) any obligation on the part of Sellers to undertake, or to bear all or any portion of the cost of, any material remedial action with respect to a violation of such Laws.

(c)    Neither Sellers, the Facilities, SMG, nor to the Knowledge of Sellers, any Practitioner employed or engaged by the Seller Parties as an employee or independent contractor, any other Seller Employee or any other officer, director, employee or independent contractor of Sellers or the Facilities, has been convicted of, charged with or, to the Knowledge of Sellers, investigated for, or has engaged in conduct in the past three (3) years from the date hereof that would constitute, an offense related to Medicare or any other Government Program, or convicted of, charged with or, to the Knowledge of Sellers, investigated for, or engaged in conduct that would constitute a violation of any Law related to Fraud, theft, embezzlement, breach of fiduciary duty, kickbacks, referrals, bribes, obstruction of an investigation or controlled substances.  Neither Sellers, the Facilities, SMG, nor to the Knowledge of Sellers, any Practitioner employed or engaged by the Seller Parties as an employee or independent contractor, any direct or indirect owner of Sellers, any other Seller Employee or any other officer, director or independent contractor of Sellers or the Facilities (whether an individual or entity), has been excluded or otherwise precluded from participating in any Government Program, subject to sanction pursuant to 42

24

U.S.C. § 1320a-7a or § 1320a-8, or been convicted of a crime described at 42 U.S.C. § 1320a-7b, nor are any such exclusions, sanctions or charges pending or, to the Knowledge of Sellers, threatened.

(d)     Except as set forth in <u>Schedule 3.11(d)</u> or a letter that specifically makes reference to this <u>Section 3.11(d)</u> delivered prior to the date of this Agreement by Sellers counsel to Buyer counsel, Sellers, the Facilities, and the Business have been in the past three (3) years from the date hereof, and are presently, in compliance in all material respects with all applicable Healthcare Laws.

(e)     Except as set forth in a letter that specifically makes reference to this <u>Section 3.11(d)</u> delivered prior to the date of this Agreement by Sellers counsel to Buyer counsel, no Seller is a party to any Contract (including any joint venture or consulting agreement) with any Referral Source to provide services, lease space, lease equipment or engage in any other venture or activity related to Sellers, the Facilities, the Business, or the Purchased Assets that is not in compliance in all material respects with applicable Healthcare Law.

(f)     No Seller has received, in the past three (3) years from the date hereof, any notification, correspondence, or any other written communication, including notification of any pending or threatened Proceeding or other action from any Governmental Authority, Private Program or patient, of any potential or actual material non-compliance by, or material Liability of, Sellers, the Facilities or the Purchased Assets under any Healthcare Law.

(g)     Sellers have, in the past three (3) years from the date hereof, timely filed all material reports, data, and other information required to be filed with such Governmental Authorities regarding the Facilities and the Purchased Assets.  To the Knowledge of Sellers, no such report has been inaccurate, incomplete or misleading in any material respect.

(h)     Sellers, and to the Knowledge of Sellers, their Representatives, employees and direct and indirect owners have complied during the past six (6) years from the date hereof in all material respects with the U.S. Foreign Corrupt Practices Act of 1977, as amended, the Corruption of Foreign Public Officials Act, the OECD Anti-Bribery Convention and other applicable Laws regarding the use of funds for political activity or commercial bribery.  Sellers have not, and to the Knowledge of Sellers, no Representative employees and direct and indirect owners thereof has, for or on behalf of Sellers, at any time during the past six (6) years from the date hereof, (i) made or caused to be made or provided, directly or indirectly, any unlawful payment to any foreign government official, political party, or candidate for political office for the purpose of influencing a decision, inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority in order to assist the Seller Parties to obtain or retain business for, or direct business to the Seller Parties subject to applicable exceptions and affirmative defenses, (ii) accepted or received any unlawful payments, or (iii) violated any export restrictions, anti-boycott regulations, embargo regulations or other similar applicable U.S. or foreign Laws.  To the Knowledge of Sellers, none of Sellers' Representatives employees and direct and indirect owners, is a "specially designated national" or blocked Person under U.S. sanctions administered by OFAC. Sellers have not during the past six (6) years from the date hereof engaged in any business with any Person or in any country that it is prohibited for a U.S. Person to engage in any business with or under applicable Law or under applicable U.S. sanctions administered by U.S. Department of the Treasury.  Neither Sellers or any of their direct or indirect owners is a Person with whom U.S. Persons are restricted from doing business under regulations of OFAC (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive Order (including Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001), or the United and Strengthening America by Providing Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56, or any other governmental action.

(i)        All billing and collection practices of, and claims submitted by a Seller relating to the Business in the past three (3) years from the date hereof with respect to all Government Programs and Private Programs have been in compliance, in all material respects, with all applicable Laws with respect to such Government Programs, and with the applicable, published billing policies of such Private Programs, except for overpayments received in the ordinary course of business which overpayments once they have been identified are refunded in the ordinary course and routine audit adjustments.  No Seller has submitted in the past three (3) years from the date hereof any claims that are cause for civil penalties under, or mandatory or permissive exclusion from, any Government Program or Private Program.  Sellers have maintained in the past three (3) years from the date hereof its billing records in compliance, in all material respects, with applicable Laws or published third party payor policy supporting the provision of services billed under such Government Programs and Private Programs.

(j)        The Sellers are in compliance, in all material respects, with all applicable Laws regarding the selection, deselection, and credentialing and supervision of their Physicians and other Practitioners, including verification of licensing status and eligibility for reimbursement under Government Programs.

(k)        To the Knowledge of Sellers, each Seller Employee, and each Practitioner, is duly licensed to provide such services, is in compliance, in all material respects, with all Laws relating to such professional licensure and meets, in all material respects, the qualifications to provide such professional services under applicable Laws.

**3.12    HIPAA, Information Privacy and Security Compliance**.

(a)        During the three (3)-year period prior to the date of this Agreement, with respect to the Purchased Assets, the Sellers and the Facilities (i) have been in material compliance with HIPAA and (ii) have been in material compliance with all other applicable Information Privacy or Security Laws and Privacy Requirements.  To the extent required by HIPAA, the Sellers' and the Facilities' respective workforces (as such term is defined in 45 C.F.R. § 160.103) have received training provided to Seller Employees in the ordinary course of business with respect to compliance with HIPAA.

(b)        During the three (3)-year period prior to the date of this Agreement, with respect to the Purchased Assets and to the extent required by HIPAA, each Seller has entered into business associate agreements with third parties acting as a business associate (as defined in 45 C.F.R. § 160.103) of such Seller.  To the Knowledge of the Sellers, with respect to the Purchased Assets, for the last three (3) years from the date hereof, each Seller (i) has not received a written notice of investigation from any Governmental Authority for a violation of applicable Information Privacy or Security Law or Privacy Requirement nor written notice litigation against Sellers by any Person for a violation of applicable Information Privacy or Security Law or Privacy Requirement; or (ii) except as set forth on Schedule 3.12(b), to the Knowledge of the Sellers, there has not been any Security Incident that required notice to any Person or Governmental Authority under applicable Information Privacy or Security Law.  During the three (3)-year period prior to the date of this Agreement, to the Knowledge of the Sellers, no breach has occurred with respect to any Unsecured Protected Health Information (as such terms are defined in 45 C.F.R. § 164.402) maintained by or for Sellers or the Facilities.

(c)        During the three (3)-year period prior to the date of this Agreement, with respect to the Purchased Assets, Sellers have completed a periodic security "risk analysis" as described and to the extent required by 45 C.F.R. § 164.308(a)(1)(ii)(A). During the three (3)-year period prior to the date of this Agreement, with respect to the Purchased Assets, Sellers or Sellers' third-party service provider(s) has (i) tested its information security program (collectively, "**Information Security Reviews**"), (ii) remediated

26

any high or critical exceptions and vulnerabilities identified in such Information Security Reviews, and (iii) installed Software security patches to sufficiently address all material identified technical information security vulnerabilities.

(d)     During the three (3)-year period prior to the date of this Agreement, Sellers have maintained a commercially reasonable and appropriate information security program that includes safeguards to identify risks, monitor, and protect the security, confidentiality, and integrity of the Sellers' Information Technology Systems (including Personal Information in Sellers' possession and control). The information security program includes incident response and notification procedures that comply in all material respects with applicable Information Privacy or Security Laws in the case of any breach of security compromising Sellers' Information Technology Systems (including Personal Information in Sellers' possession and control). To the Knowledge of Sellers, the Sellers' Information Technology Systems do not contain any Malicious Code.

**3.13    Compliance Program**.  Sellers have provided to Buyer an accurate and complete copy of each Seller's current compliance program materials, including all program descriptions, compliance officer and committee descriptions, ethics and risk area policy materials, training and education materials, auditing and monitoring protocols, reporting mechanisms and disciplinary policies.  Sellers and the Facilities have conducted their operations in the past three (3) years from the date hereof in accordance with their respective compliance programs.  In the past three (3)  years from the date hereof, except as set forth on Schedule 3.13, Sellers (a) have not been a party to a Corporate Integrity Agreement with the OIG; (b) have no self-disclosures pending before CMS, the OIG, the Justice Department or any other Governmental Authority; (c) have no reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (d) have not, to the Knowledge of Sellers, been the subject of any Government Program investigation conducted by any federal or state enforcement agency; (e) have not, to the Knowledge of Seller, been a defendant in any qui tam/False Claims Act litigation in the past two (2) years from the date hereof; (f) have not been served with or received any search warrant, subpoena, civil investigation demand, contact letter from any federal or state enforcement agency (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to the Business); or (g) have not received any complaints through Sellers' compliance "hotline" from Seller Employees, independent contractors, vendors, Physicians, patients, or any other Persons that could reasonably be considered to indicate that Sellers have materially violated, or are currently in material violation of, any applicable Law.  For purposes of this Agreement, the term "compliance program" refers to the applicable compliance programs that are, in all material respects, of the type described in guidance published by the OIG in 63 Fed. Reg. 8987 (February 23, 1998), 70 Fed. Reg. 4858 (January 31, 2005), and the OIG General Compliance Program Guidance published in November 2023.

**3.14    Medical Staff Matters**.  Sellers have made available (or will make available to Buyer prior to Closing) to Buyer true, correct and complete copies of the by-laws and rules and regulations of the medical staffs of the Facilities, as well as a list of all current members of each Facility's medical staff. Except as set forth on Schedule 3.14 or a letter that specifically makes reference to this Section 3.14, in the past two (2) years from the date hereof, there have been no (a) pending, or to the Knowledge of Sellers, threatened material adverse actions with respect to any medical staff member of any of the Facilities or any applicant thereto, including any material adverse actions for which a medical staff member or applicant has requested a judicial review hearing that has not been scheduled or that has been scheduled but has not been completed, or (b) pending, or to the Knowledge of Sellers, threatened material disputes with applicants, medical staff members or health professional affiliates, and all appeal periods in respect of any medical staff member or applicant against whom an adverse action has been taken have expired.  No medical staff members of the Facilities have resigned or had their privileges revoked or suspended since the Balance Sheet Date.

**3.15** **Experimental Procedures**.  During the past three (3) years from the date hereof, Sellers and the Facilities have not performed or permitted the performance of any experimental or research procedure or study involving patients in the Facilities that were not authorized and/or conducted in all material respects in accordance with the policies and procedures of the Facilities that comply with applicable Laws, including applicable U.S. Food and Drug Administration regulations.

**3.16** **Intellectual Property**.

(a)     Schedule 3.16(a) sets forth an accurate and complete list of the following Owned Intellectual Property as of the date of this Agreement: (i) issued Patents and applications therefor; (ii) registered Trademarks and applications therefor, and unregistered Trademarks that are material to the operation of the Business; (iii) registered Copyrights and applications therefor; (iv) Domain Names (including social media accounts exclusively used or held for use in the Business), (v) the business names exclusively related to the Business, and (vi) material proprietary Software, including for each item listed, as applicable, the owner, the jurisdiction, the application/serial number, the registration number, the filing date, and the issuance/registration date.  To the Knowledge of Sellers, all of the foregoing registered Owned Intellectual Property is valid, subsisting and enforceable. None of the registered Owned Intellectual Property has been canceled, expired or abandoned, nor is any registered Owned Intellectual Property involved in any interference, reexamination, cancellation, or opposition Proceeding.

(b)     Except as set forth on Schedule 3.16(b), the Seller Parties solely and exclusively owns all right, title and interest, free and clear of all Encumbrances, other than Permitted Encumbrances, in all Owned Intellectual Property.

(c)     To the Knowledge of Sellers, neither Sellers nor any Seller Affiliate in connection with the Business, nor the operation of the Business, as applicable, is or has in the past three (3) years from the date hereof infringed upon, misappropriated or violated any Intellectual Property of any other Person. Except as set forth on Schedule 3.16(c), in the past three (3) years from the date hereof, neither Sellers nor any Seller Affiliate have received any written claim (or notice of any related action) in connection with the Business, or any Transferred Intellectual Property infringes, misappropriates, or otherwise violates any Intellectual Property rights of any Person.

(d)     Except as set forth on Schedule 3.16(d), (i) to the Knowledge of Sellers, no Person is infringing, misappropriating, diluting or otherwise violating any Owned Intellectual Property, and (ii) Sellers have not in the past three (3) years from the date hereof made any claims with respect to infringement or misappropriation of any Owned Intellectual Property against any Person.

(e)     Sellers have taken reasonable steps in accordance with procedures customarily used in Sellers' industry to protect and maintain the confidentiality of all material Trade Secrets included in the Owned Intellectual Property.  During the past six (6) years from the date hereof, no Person has asserted in writing, any right, title, interest or other claim in, or the right to receive any royalties or other consideration with respect to, any material Owned Intellectual Property.

**3.17** **Contracts**.

(a)     Schedule 3.17(a) sets forth an accurate and complete list (including a description of any oral Contract) of each of the following Contracts to which a Seller Party is bound and that exclusively relates to the Business or the Purchased Assets (collectively, the "**Material Contracts**"):

(i)     all Material Payor Agreements;

28

(ii)     all employment agreements with any Physician or Practitioner, excluding any offer letter in the ordinary course of business that does not include any severance, change in control, retention or similar payments or benefits;

(iii)     all independent contractor or consulting agreements with any Physician or Practitioner;

(iv)     all Contracts with any Referral Source;

(v)     all Intellectual Property Contracts involving aggregate annual consideration in excess of $150,000 (other than Standard Software related Contracts and nonexclusive licenses that are merely incidental to the transaction contemplated in such Contract);

(vi)     all Third-Party Leases;

(vii)     all Tenant Leases; and

(viii)     except as otherwise disclosed on Schedule 3.17(a), all Contracts involving aggregate annual consideration in excess of $250,000.

(b)     Each Material Contract is valid and binding on the applicable Seller Party in accordance with its terms and is in full force and effect.  Each Seller Party has properly paid all amounts owed by such Seller Party that are due, as applicable, and otherwise performed all obligations required to be performed by such Seller Party under each Material Contract, and such Seller Party has not received any notice of termination, cancellation, material breach or material default under any Material Contract.  No event has occurred that, with the passage of time or the giving of notice or both, would reasonably be expected to result in a default, breach or event of non-compliance by a Seller Party under any Material Contract, or would reasonably be expected to result in the termination thereof, or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder, except as set forth on Schedule 3.17(b).  To the Knowledge of Sellers, no other party to any Material Contract is in breach thereof or default thereunder.  A true, correct and complete copy of each written Material Contract and an accurate written description setting forth the terms and conditions of each oral Material Contract has been delivered to Buyer prior to Closing.

**3.18     Inventory**.  All of the Inventory existing on the date hereof will exist on the Closing Date, except for Inventory exhausted or added in the ordinary course of business between the date hereof and the Closing Date.  Except to the extent of reserves reflected in the Reference Balance Sheet, all of the Inventory on hand consists of items of a quality usable or saleable in the ordinary course of business in all material respects.

**3.19     Leased Real Property**.

(a)     Schedule 3.19(a) sets forth an accurate and complete list of each Facility, including the name, physical address and brief description of each Facility.  The Facilities comprise all healthcare facilities currently or used in the operation of the Hospitals.

(b)     Schedule 3.19(b) sets forth an accurate and complete list of the physical addresses of all of the material Leased Real Property and identifies each Tenant Lease under which such Leased Real Property is occupied or used by a Seller, including the date of and legal name of each of the parties to such Tenant Lease.  Except as set forth on Schedule 3.19(b) with respect to each Leased Real Property: (i) the applicable Tenant Lease is legal, valid, binding and in full force and effect assuming the due execution of

29

the landlord thereto; (ii) the execution, delivery and performance by Sellers of this Agreement, and the consummation of the Contemplated Transactions, including the assignment of the Sellers' interest in each Tenant Lease, do not or shall not (as the case may be) require the consent of any other party to such Tenant Lease, will not result in a material breach of or default under such Tenant Lease, and will not otherwise cause such Tenant Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (iii) there are no ongoing material disputes or lawsuits with respect to such Tenant Lease; (iv) none of the Sellers, any Seller Affiliate or to the Knowledge of Sellers, any other party to such Tenant Lease is in material breach or default under such Tenant Lease, and no event has occurred or circumstance exists that, with the delivery of notice, the passage of time or both, would constitute such a material breach or default, or permit the termination, modification or acceleration of rent under such Tenant Lease; (v) no security deposit or portion thereof deposited with respect to such Tenant Lease has been applied in respect of a breach or default under such Tenant Lease that has not been re-deposited in full; and (vi) there are no Encumbrances on the estate or interest created by such Tenant Lease other than Permitted Encumbrances.  A Seller holds, and at the Closing a Seller will assign to Buyer, valid leasehold title to all of the Leased Real Property listed on Schedule 3.19(b) (other than the MPT Real Property, which will be the subject of the MPT Purchase Agreement), free and clear of all Encumbrances other than Permitted Encumbrances.

(c)        Schedule 3.19(c) sets forth an accurate and complete list and rent roll of all existing Third-Party Leases, including the following information with respect to each: (i) the physical address and premises covered; (ii) the effective date and any amendments thereto; (iii) the legal name of the tenant, licensee or occupant; (iv) its term; (v) the rents and other charges payable thereunder; (vi) the rents or other charges in arrears or prepaid thereunder, if any, and the period for which any such rents and other charges are in arrears or have been prepaid; and (vii) the nature and amount of the security deposits thereunder, if any.

(d)        Except as set forth on Schedule 3.19(d), with respect to each material Third-Party Lease: (i) such Third-Party Lease is legal, valid, binding and in full force and effect assuming the due execution of such lease by the counterparty; (ii) the execution, delivery and performance by Sellers of this Agreement, and the consummation of the Contemplated Transactions, including the assignment of the applicable Seller's interest in each Third-Party Lease do not or shall not (as the case may be) require the consent of any other party to such Third-Party Lease, will not result in a material breach of or default under such Third-Party Lease, and will not otherwise cause such Third-Party Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (iii) there are no ongoing material disputes or lawsuits with respect to such Third-Party Lease; (iv) neither Sellers nor, to the Knowledge of Sellers, any other party to such Third-Party Lease is in material breach or default under such Third-Party Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material breach or default, or permit the termination, modification or acceleration of rent under such Third-Party Lease; (v) no security deposit or portion thereof deposited with respect to such Third-Party Lease has been applied in respect of a breach or default under such Third-Party Lease that has not been re-deposited in full; and (vi) there are no Encumbrances on the estate or interest created by such Third-Party Lease other than Permitted Encumbrances.

(e)        Sellers have made available to Buyer accurate and complete copies of the Tenant Leases and the Third-Party Leases (except for the Existing MPT Lease), in each case, as amended or otherwise modified and in effect, together with all extension notices related thereto.

(f)        Sellers have not received written notice from any Governmental Authority of, and there is not: (i) any pending or, to the Knowledge of Sellers, threatened, condemnation Proceedings affecting the Leased Real Property or any part thereof; (ii) to the Knowledge of the Sellers, any violation

30

of any Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Leased Real Property or any part thereof, which have not heretofore been cured; or (iii) any pending or, to the Knowledge of Sellers, threatened, injunction, decree, Order, writ or judgment outstanding, nor any claims, litigation, administrative actions or similar Proceedings against Sellers, any Seller Parties, or any Leased Real Property relating to the ownership, lease, use or occupancy of such Leased Real Property or any portion thereof which is reasonably likely to result in a material change in the condition of any Leased Real Property or any part thereof or in any material respect prevent or limit the present operation of the improvements on the Leased Real Property or any part thereof.

(g)     Except as set forth on Schedule 3.19(g), as of the Closing Date, there will be no incomplete construction projects affecting the Leased Real Property and all completed construction projects will be fully paid for.

(h)     To the Knowledge of Sellers, there is no pending or contemplated special assessment or reassessment of any parcel included in the Leased Real Property that would result in a material increase in the real property Taxes or in the rent, additional rent or other sums and charges payable by a Seller or any Seller Affiliate under the Tenant Leases.

(i)     No brokerage or leasing commissions or other compensation are due or payable by a Seller or any Seller Affiliate to any Person, firm, corporation or other entity with respect to, or on account of, any Tenant Lease, any Third-Party Lease or any extensions or renewals thereof.

(j)     Except as set forth on Schedule 3.19(j), Sellers have not received any notice that the improvements which are a part of the Leased Real Property, as designed and constructed, do not comply with all Laws applicable thereto, including the Americans with Disabilities Act, as amended, and Section 504 of the Rehabilitation Act of 1973.

(k)     The existing water, sewer, gas and electricity lines, storm sewer and other utility systems on the Leased Real Property are adequate to serve the utility needs of the Leased Real Property and the Business as currently operated.

(l)     The Leased Real Property comprises all of the real property utilized by Sellers in connection with the Business.

**3.20     Insurance**.  Schedule 3.20 sets forth an accurate and complete list of all insurance policies or self-insurance funds maintained by Sellers as of the date of this Agreement covering the Business or the Purchased Assets (collectively, the "**Insurance Policies**"), indicating with respect to each such policy or fund, the type of insurance, policy number, remaining term, identity of the insurer and whether such policies are on an occurrence or claims made basis.  All premiums due on the Insurance Policies have either been paid or, if due and payable on or prior to the Closing Date, will be paid prior to the Closing Date in accordance with the payment terms of each Insurance Policy.  The Insurance Policies do not provide for any retrospective premium adjustment or other experience-based Liability on the part of Sellers (except with respect to workers' compensation policies).  All of the Insurance Policies are in full force and effect and have not been subject to any lapse in coverage.  There are no claims pending under any of the Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights.  Sellers have not (i) received any written notice from any insurer canceling or materially amending any of the Insurance Policies, and, to the Knowledge of Sellers, no such cancellation or amendment is threatened, (ii) received any written notice from any insurer alleging Sellers' breach of any of the Insurance Policies, or (iii) failed to present any material claim which is still outstanding to the carrier of any of the Insurance Policies.

3.21 **Employee Benefit Plans**.

(a)       Schedule 3.21(a) contains a true and complete list of each material Plan as of the date of this Agreement. The term "**Plan**" means any of the following agreements, plans, programs, policies, arrangements, commitments or other Contracts: (i) employee benefit plans within the meaning of Section 3(3) of ERISA (whether or not subject to ERISA) and (ii) any employment, severance, termination or similar Contract and any other employee benefit plan, program, policy, or arrangement providing for compensation, bonuses, commission, profit-sharing, stock option or other stock- or equity-linked benefits or rights, incentive, deferred compensation, vacation or paid-time-off benefits, insurance (including any self-insured arrangements), welfare, death, life, dental, vision, health or medical benefits, employee assistance, disability or sick leave benefits, workers' compensation, supplemental unemployment benefits, retention, transaction, change of control payments, savings, pension, retirement, post-employment or retirement benefits or other compensation plan, program, policy, agreement, program, arrangement or commitment, in each case, whether written or unwritten, formal or informal (i), which any Seller currently sponsors, maintains, contributes to, or has an obligation to contribute to, (ii) which any Seller Affiliate currently sponsors, maintains, contributes to, or has an obligation to contribute to and in which any Seller Employee participates or (iii) to which Seller or any member of the ERISA Controlled Group has or would reasonably be expected to have any direct or indirect present or future Liabilities or obligations, whether voluntary, contingent or otherwise.  No Plan or other benefit arrangement covers any current or former employee officer, director or other service provider outside of the United States, and, with respect to the Business, the Sellers have never been obligated to contribute to any such plan.

(b)       With respect to each material Plan, the Sellers have provided an accurate and complete copy of the following documents to Buyer: (i) the current plan document, or if not written, a summary of the material terms thereof; (ii) Form 5500 annual report with accompanying schedules and attachments filed with the IRS for the last three (3) years, (iii) the most recently received determination, opinion or advisory letter, if any, issued by the IRS for each Plan that is intended to be Tax-qualified under Section 401(a) of the Code, and (iv) all material notices to or from the IRS, the Department of Labor, the Pension Benefit Guaranty Corporation or any other applicable Governmental Authority in respect of any such Plan for the past three (3) years.

(c)       Except as set forth on Schedule 3.21(c)(1), neither any Seller nor any member of the ERISA Controlled Group has ever sponsored, maintained, contributed to, participated in (or been obligated to contribute to), or otherwise had any Liability (contingent or otherwise) with respect to (i) a "multiemployer plan" (as defined in Sections 4001(a)(3) or 3(37)(A) of ERISA); (ii) a pension plan subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code or that provides or provided any benefit guaranteed by the Pension Benefit Guaranty Corporation; or (iii) a "multiple employer plan" (as defined in Section 413(c) of the Code) or a multiple employer welfare plan (as defined in Section 3(40) of ERISA).  Neither any Seller nor any member of the ERISA Controlled Group has incurred any Controlled Group Liability that has not been satisfied in full, nor do any circumstances exist that could reasonably be expected to result in any Controlled Group Liability becoming a Liability of the Buyer or any of its Affiliates.  Except as set forth on Schedule 3.21(c)(2), no material Plan provides for post-employment health benefits to any Seller Employee or former employee of the Business, except as required by COBRA or similar state Law.  No event has occurred or is reasonably expected to occur that has resulted in or would subject Sellers or Buyer to a Tax under Section 4971 of the Code or the Purchased Assets to a lien under Section 430(k) of the Code.

(d)       Except as set forth on Schedule 3.21(a), there are no material Proceedings pending or, to the Knowledge of Sellers, threatened, against Sellers or a Seller with respect to any Plan that would reasonably be expected to result in a Liability to the Business, other than routine claims for benefits in the

ordinary course of business. Each Plan has been operated and administered in compliance in all material respects with its terms and all applicable Laws, including ERISA and the Code.

(e)      Except as set forth on Schedule 3.21(e), neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions, either alone or in combination with another event (whether contingent or otherwise) will (i) entitle any Seller Employee or any other current or former employee, officer, director or other service provider of the Business, to any material payment or benefit; (ii) increase the amount or value of any payment, compensation or benefits due to any Seller Employee or any other current or former employee, officer, director or other service provider of the Business; or (iii) accelerate the vesting, funding or time of payment or delivery of any compensation, equity award or other material payment or benefit to any Seller Employee or any other current or former employee, officer, director or other service provider of the Business; or (iv) result in any "parachute payment" within the meaning of Section 280G of the Code or any similar foreign, state or local Laws to any Seller Employee or any other current or former employee, officer, director or other service provider of the Business.  No Seller Employee or any other current or former employee, officer, director or other service provider of the Business is entitled to receive any additional payment (including any Tax gross-up or other payment) any Seller or any Seller Affiliate as a result of the imposition of the excise taxes required by section 4999 of the Code or any Taxes required by section 409A of the Code.

3.22    **Employee Matters**.

(a)      Schedule 3.22(a) sets forth an accurate and complete list of all Seller Employees as of the date hereof and each employee whose contract is being assigned to Buyer pursuant to the Employee Contract Assignment and Assumption Agreement (collectively, the "**Scheduled Employees**"), their annual salary or wage rates (including whether paid on a salary, hourly or commission basis), current incentive opportunities and accrued and unused Paid Time Off, recognized date of hire, job title, status as part-time or full-time, name of employer, work location, whether classified as exempt or non-exempt for wage and hour purposes, visa status (if applicable), and whether such Scheduled Employees are active or on a leave of absence (and, if so, the type of leave and estimated date of return); *provided, however*, such list shall not include any names.  Since July 1, 2021, each Seller has properly classified individuals providing services to such Seller as independent contractors or employees and as exempt or non-exempt from the application of state and federal wage and hour Laws for all purposes, as the case may be, and have properly reported all compensation paid to such service providers for all purposes and no Proceeding has been initiated or threatened against any Seller with respect to any of the foregoing.  Except as set forth on Schedule 3.17(a) and excluding offer letters in the ordinary course of business and consulting or independent contractor agreements that can be terminated for convenience, Sellers are not a party to any oral or written (i) employment agreement (including severance or change of control agreements), (ii) consulting agreement, or (iii) independent contractor agreement with any Person, in each case that provides for annual compensation that has exceeded, or is expected to exceed $200,000.  No Scheduled Employee or other service provider of any Seller who is of the director level or above has informed any Seller in writing of any plan to terminate employment with or services for any Seller, and to the Knowledge of Sellers, no such Person has any plans to terminate employment with or services for any Seller.

(b)      Since January 1, 2021, to the Knowledge of Sellers neither Sellers nor the Seller Parties, as applicable, are delinquent in payments to any of the Scheduled Employees or independent contractors providing services at the Facilities for any wages, salaries, commissions, bonuses, fees or other direct compensation for any services performed for any of them or any other amounts required to be reimbursed to such Seller Employees or independent contractors providing services at the Facilities (including Paid Time Off and other benefits) or in the payment to the appropriate Governmental Authority of all required Taxes, insurance, Social Security and withholding thereon.  As of the Effective Time, neither

the Sellers nor any Seller Party, as applicable, will have any Liability to any of the Scheduled Employees, independent contractors, or to any Governmental Authority for any such matters that are not properly reflected on the Reference Balance Sheet.

(c)     Sellers and the Seller Parties (with respect to any Scheduled Employees) who are a party to the Employee Contract Assignment and Assumption Agreement (each an "**Employing Seller Party**" and, collectively, the "**Employing Seller Parties**") are not party to or bound by any collective bargaining agreement except as provided in Section 6.1(c).  There is no pending or threatened in writing, employee strike or work stoppage at any of the Facilities, and none has occurred since July 1, 2020.  No union representation question exists respecting the Scheduled Employees, no demand has been made for recognition by a labor organization by or with respect to any Scheduled Employees, no union organizing activities by or with respect to any Scheduled Employees are taking place, and none of the Scheduled Employees is represented by any labor union or organization.  Except as provided in Section 6.1(c), no collective bargaining agreement exists, has existed or is currently being negotiated by the Seller Parties with respect to the Scheduled Employees.  There is no, and except as would not reasonably be expected to have a Material Adverse Effect, since July 1, 2021 have been no, unfair labor practice charge against Sellers pending before the National Labor Relations Board or, to the Knowledge of Sellers, threatened, against or involving the Business or the Facilities.  Except as would not reasonably be expected to have a Material Adverse Effect, the Seller Parties with respect to the Scheduled Employees are in material compliance with all Laws and Contracts to which the Seller Parties are a party respecting employment and employment practices, labor relations, terms and conditions of employment, and wages and hours with respect to the Scheduled Employees.  There are no pending or threatened, complaints, charges, audits or investigations related to any of the Facilities regarding Scheduled Employees or, to the Knowledge of the Sellers, independent contractors with respect to work performed on behalf of the Business before any Governmental Authority regarding an alleged violation of Laws related to employment and employment practices, labor relations, terms and conditions of employment, classification of workforce, wages and hours, claims, unemployment compensation claims or workers' compensation claims.  Sellers and any Employing Seller Parties are not a party to or otherwise bound by any consent decree with or citation from any Governmental Authority relating to any Scheduled Employees or employee practices of Sellers pursuant to which outstanding obligations will be owed after the date of this Agreement.

(d)     To the Knowledge of Sellers, each Scheduled Employee is legally authorized to work in the jurisdiction in which they perform services to Sellers and the Seller Parties.  With respect to the Seller Employees, the Sellers are in material compliance with the terms and provisions of the Immigration Reform Control Act of 1986.  Sellers have obtained and retained a complete and accurate copy of each Seller Employee's Form I-9 (Employment Eligibility Verification Form) and all other records or documents required to be prepared, procured or retained pursuant to the Immigration Act. Since July 1, 2021, Sellers have not been cited, fined, served with a Notice of Intent to Fine or with a Cease and Desist Order (as such terms are defined in the Immigration Act) at any of the Facilities, nor has any Proceeding been initiated or threatened against Sellers in connection with the Business, by reason of any actual or alleged failure to comply with the Immigration Act.

(e)     To the Knowledge of Sellers, no sexual harassment, or other discrimination, retaliation or policy violation allegation has been alleged against any Seller Employee or independent contractor providing services at the Facilities that works or provides services in a supervisory or managerial capacity except as would not reasonably be expected to have a Material Adverse Effect.

(f)     As of the date hereof, Sellers are in material compliance with the WARN Act as it relates to the current and former Seller Employees.  Sellers have not had any transaction, plant closing, mass layoff, relocation, furlough, separation from position, reduction in hours or pay, or other termination

34

of any Scheduled Employee under the WARN Act.  No furlough or termination prior to the Closing will or would reasonably be expected to trigger any notice or other obligations under the WARN Act.

**3.23**     **Litigation**.  Except for the Chapter 11 Cases and as set forth on <u>Schedule 3.23</u>, there is no Proceeding or Order pending or, to the Knowledge of Sellers, threatened against any Seller, any Scheduled Employee or any Practitioner with respect to the Business or the Purchased Assets relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities in which an adverse determination would reasonably be expected to have a Material Adverse Effect.  Except for the Chapter 11 Cases, there are no unsatisfied judgments, penalties or awards against, relating to or affecting the Business or the Purchased Assets involving amounts in excess of $250,000.

**3.24**     **Taxes**.  Except as set forth on <u>Schedule 3.24</u>:

(a)     Sellers have timely filed all material Tax Returns with respect to the Purchased Assets (all of which are true, complete and correct in all material respects).  All material Taxes due and owing by Sellers (whether or not shown on any Tax Return) with respect to the Purchased Assets have been timely paid, other than with respect to any Taxes the payment of which was precluded by reason of the Chapter 11 Cases.  Sellers have not waived any statute of limitations in respect of Taxes relating to the Purchased Assets or agreed to any extension of time with respect to a Tax assessment or deficiency relating to the Purchased Assets.  Sellers are not currently the beneficiary of any extension of time within which to file any Tax Return relating to the Purchased Assets.

(b)     Sellers have withheld and timely paid all material amounts of Taxes relating to the Purchased Assets or the Business required to have been withheld and paid in connection with amounts paid or owing to any Seller Employee, and any current or former employee, officer, director, independent contractor, creditor, or other third party.

(c)     There are no Tax Encumbrances (other than Permitted Encumbrances) on any of the Purchased Assets.

(d)     No deficiencies for Taxes relating to the Purchased Assets or the Business have been claimed, proposed or assessed by any Governmental Authority.  There are no pending or threatened Proceedings for or relating to any Liability in respect of Taxes relating to the Purchased Assets or the Business.

(e)     Sellers are not a party to any Tax allocation or sharing agreement relating to the Purchased Assets or the Business, or has no Liability with respect to any such agreement, in each case except for (i) any such agreements that will not be binding on Buyer after the Closing or (ii) any such agreement the primary purpose of which is not related to Taxes.

(f)     There is no Contract relating to the Purchased Assets or the Business to which Sellers are a party that requires Sellers to pay a Tax gross-up or reimbursement payment to any Person except for (i) any such Contracts that will not be binding on a Buyer Party after the Closing or (ii) any such Contract the primary purpose of which is not related to Taxes.

(g)     Other than the Transferred Interests, none of the Purchased Assets is an interest in a joint venture, partnership or other arrangement that is treated as a partnership for income Tax purposes.

(h)     Sellers have not entered into any "reportable transaction" as defined in Section 6707A(c)(i) of the Code and Treasury Regulation Section 1.6011-4(b).

(i)        Sellers have (i) timely paid all material amounts of sales and use Taxes relating to the Purchased Assets or the Business required to be paid under all applicable Laws, (ii) properly collected and remitted all amounts of sales Taxes relating to the Purchased Assets or the Business required under all applicable Laws, and (iii) for all sales relating to the Purchased Assets or the Business that are exempt from sales Taxes and that were made without charging or remitting sales or similar Taxes, received and retained any appropriate Tax exemption certificates and other documentation qualifying such sale as exempt.

**3.25     Environmental Matters**.  Except as set forth on Schedule 3.25:

(a)        Sellers, with respect to the Purchased Assets, are, in compliance in all material respects with, and the Leased Real Property and all improvements on the Leased Real Property are in compliance in all material respects with, all applicable Environmental Laws.

(b)        Sellers have not received written notice of any material violation of or material Liability under any applicable Environmental Law with respect to any of the Purchased Assets or the Leased Real Property.  There are no pending or, to the Knowledge of Sellers, threatened, Proceedings or Orders relating to any material violation of or material Liability under any Environmental Law with respect to any of the Purchased Assets or the Leased Real Property.

(c)        There has been no Release of any Hazardous Materials by Sellers, or to the Knowledge of any Seller, any other Person on or at the Leased Real Property, in the case of each of the foregoing in a manner that could reasonably be expected to result in any material Liability or any material investigative, remedial or corrective action obligation under Environmental Law, except as would not reasonably be expected to result in material liability under Environmental Laws.

(d)        Sellers hold all material Environmental Permits required under any applicable Environmental Law with respect to the Facilities and the Leased Real Property.  There are no Proceedings pending or, to the Knowledge of Sellers, threatened, that seek the revocation, cancellation, suspension or adverse modification of any such Environmental Permit.  Sellers with respect to the Purchased Assets and the Leased Real Property are in compliance in all material respects with such Environmental Permits.  To the Knowledge of Sellers there are no facts, conditions or circumstances that would reasonably be expected to result in termination, revocation, cancellation, non-renewal or material adverse modification of any such Environmental Permits.

(e)        To the Knowledge of the Sellers, the Leased Real Property contains no underground storage tanks and no Person has used any portion of the Leased Real Property as a dump or landfill.

(f)        The Sellers have made available to Buyer all material environmental audits, reports and assessments concerning the Facilities, the Leased Real Property or the Business that are in the possession of a Seller and have been prepared in the past two (2) years prior to the date hereof.

(g)        To the Knowledge of the Sellers, no toxic mold, legionella bacteria, PCBs, lead-based paint, or asbestos-containing materials are present on or in the Leased Real Property or the improvements thereto, except in compliance in all material respects with applicable Environmental Laws.

The representations and warranties in this Section 3.25 are the sole and exclusive representations and warranties in this Agreement with respect to environmental matters (including Environmental Laws, Environmental Permits and Hazardous Materials).

**3.26**   **Absence of Changes**.  Other than as a result of the Chapter 11 Cases, since the Balance Sheet Date, Sellers have conducted the Business in the ordinary course of business and there has not occurred any change in the operation of the Business or any event or development that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.  Since the Balance Sheet Date, Sellers have not taken any action that, if taken after the date of this Agreement, would constitute a breach of any of the covenants set forth in Section 5.2.

**3.27**   **Brokers and Finders**.  Except as set forth on Schedule 3.27, there are no claims for brokerage commissions, finders' fees, financial advisors' fees or similar compensation in connection with the Contemplated Transactions based on any Contract to which Sellers or Steward is a party or that is otherwise binding upon Sellers or Steward, and no Person is entitled to any fee or commission or like payment in respect thereof.

**3.28**   **No Other Representations or Warranties**.

(a)   Except for the representations and warranties expressly set forth in this Section 3 (as qualified by the applicable Schedules), neither Sellers nor any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, on behalf of Sellers or any Seller Party, including any representation or warranty regarding Sellers or any other Person, any Purchased Assets, any Facility, any Liabilities of Sellers, including any Assumed Liabilities, the Business, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and Sellers hereby disclaims all other representations and warranties of any kind whatsoever, express or implied, written or oral, at law or in equity, whether made by or on behalf of Sellers or any other Person, including any of their respective Representatives.  Except for the representations and warranties expressly set forth in this Section 3 (as qualified by the applicable Schedules), Sellers hereby (a) disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets, the Facilities and the Business, and (b) disclaims all Liability and responsibility for all projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) to Buyer or any of Buyer's Affiliates or any Representatives of Buyer or any of Buyer's Affiliates (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any Representative of Sellers), including omissions therefrom.  Without limiting the foregoing, Sellers do not make any representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, to Buyer or any of its Affiliates or any Representatives of Buyer or any of its Affiliates regarding the probable success, profitability or value of the Purchased Assets, the Facilities or the Business.  The disclosure of any matter or item in any Schedule or other schedule hereto shall not be deemed to constitute an acknowledgment by Sellers that in and of itself, any such matter is required to be disclosed or is material.

(b)   Except as expressly set forth in Section 3 hereof, the Purchased Assets transferred to Buyer will be sold by Sellers and purchased by Buyer in their physical condition at the Effective Time, "AS IS, WHERE IS AND WITH ALL FAULTS AND NON-COMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, with respect to the Leased Real Property, and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the Personal Property and Inventory, any and all of which warranties (both express and implied) Sellers hereby disclaim.  All of the Leased Real Property, Personal Property and Inventory shall be further subject to normal wear and tear and normal and customary use in the ordinary course of business up to the Effective Time.

4.      **REPRESENTATIONS AND WARRANTIES OF BUYER.**

Each Buyer Party hereby represents and warrants to Sellers that the statements contained in this Section 4 are true and correct as of the date of this Agreement and will be true and correct as of the Closing Date (except in the case of representations and warranties that are made as of a specified date, in which case such representations and warranties will be true and correct as of such specified date).

**4.1      Organization; Capacity**.  Each Buyer is a non-profit corporation, duly organized, validly existing and in good standing under the Laws of the State of Florida.  Each Buyer Party is duly authorized, qualified and in good standing under all applicable Laws of any jurisdictions (foreign and domestic) in which the character or location of the assets owned or leased by it or the nature of the business conducted by it requires such authorization or qualification, except as would not reasonably be expected to have a Material Adverse Effect.  Each Buyer Party has the requisite power and authority to enter into the Transaction Documents to which it is or will become a party, as applicable, and to perform its obligations hereunder and thereunder.  Except for such authorizations as may be required by the Bankruptcy Court, the execution and delivery by each Buyer Party of this Agreement and the other Transaction Documents to which it is a party or will become a party, the performance by such Buyer Party of its obligations under this Agreement and the other Transaction Documents to which it is a party or will become a party and the consummation by such Buyer Party of the Contemplated Transactions and the Transaction Documents to which it is a party or will become a party, as applicable, have been, or will be, duly and validly authorized and approved by all necessary action, as applicable, on the part of such Buyer Party, none of which actions has been modified or rescinded and all of which actions remain in full force and effect.

**4.2      Authority; Non-contravention; Binding Agreement**.

(a)      Except for such authorizations required by the Bankruptcy Court, the execution, delivery and performance by each Buyer Party of this Agreement and the other Transaction Documents to which it is a party or will become a party, and the consummation by each Buyer Party of the Contemplated Transactions and its obligations under the Transaction Documents, as applicable:

(i)      are within such Buyer Party's corporate powers and are not, and will not be, in contravention or violation of the terms of such Buyer Party's organizational or governing documents;

(ii)      do not and will not require any Approval of, filing or registration with, the issuance of any Permit by, or any other action to be taken by, any Governmental Authority to be made or sought by such Buyer Party, excluding filings required under the HSR Act or other Antitrust Law; and

(iii)      do not and will not require any Approval or other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both) or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation, or loss of a material benefit under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) upon, any of the Purchased Assets under any Contract, Permit, Order or Law to which such Buyer Party may be subject.

(b)      This Agreement and the other Transaction Documents to which each Buyer is or will become a party are and will constitute the valid and legally binding obligations of such Buyer Party, and, assuming the due authorization and execution by Sellers hereof and thereof, are and will be enforceable against them in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

38

**4.3**    **Litigation**.  There is no Proceeding or Order pending or, to the Knowledge of Buyer, threatened against or affecting any Buyer Party or any of its Affiliates or any of its respective properties or rights in which an adverse determination would reasonably be expected to have the effect of preventing, rendering illegal or otherwise delaying the Contemplated Transactions.

**4.4**    **Brokers and Finders**.  There are no claims for brokerage commissions, finders' fees, financial advisors' fees or similar compensation in connection with the Contemplated Transactions based on any Contract to which any Buyer is a party or that is otherwise binding upon any Buyer, and no Person is entitled to any fee or commission or like payment in respect thereof.

**4.5**    **Financing; Solvency**.

(a)    Buyer has, and at the Closing will have, sufficient funds available to pay the Estimated Purchase Price, any other amounts to be paid by Buyer hereunder including, all Assumed Cure Costs and any expenses incurred by Buyer in connection with the Contemplated Transactions, and to perform its obligations under this Agreement and the other Transaction Documents.

(b)    Buyer is not insolvent nor will be rendered insolvent as a result of any of the Contemplated Transactions.  For purposes hereof, the term "solvent" means that: (i) the fair salable value of Buyer's tangible assets is in excess of the total amount of its Liabilities (including for purposes of this definition all Liabilities, whether or not reflected on a balance sheet prepared in accordance with GAAP, and whether direct or indirect, fixed or contingent, secured or unsecured, and disputed or undisputed); (ii) Buyer is able to pay its debts or obligations in the ordinary course as they mature; and (iii) Buyer has capital sufficient to carry on their businesses and all businesses in which they are about to engage.

**4.6**    **Representations of Sellers**.  Buyer hereby acknowledges and agrees (a) the only representations and warranties made by Sellers are the representations and warranties expressly set forth in Section 3 (as modified by the Schedules) and Buyer has not relied upon, and will not rely upon, any other express or implied representations, warranties or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or on behalf of Sellers, or any Seller Parties, any Representatives of Sellers or any Seller Affiliate or any other Person, including any projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or through Sellers' bankers, or management presentations, data rooms (electronic or otherwise) or other due diligence information, other than those representations and warranties expressly set forth in Section 3 of this Agreement, and that Buyer will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information and (b) any claims Buyer may have for breach of any representation or warranty shall be based solely on the representations and warranties of Sellers expressly set forth in Section 3 (as qualified by the applicable Schedules), subject to the exclusive remedies set forth herein. Except as otherwise expressly set forth in this Agreement, Buyer acknowledges and agrees that the Business, the Purchased Assets and the Assumed Liabilities are being transferred on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in Section 3 (as qualified by the applicable Schedules) without any other representations or warranties of any nature whatsoever.

5.    **PRE-CLOSING COVENANTS OF SELLERS AND BUYER.**

**5.1**    **Access to Premises; Information**.  From the date of this Agreement until the earlier of the Effective Time or the valid termination of this Agreement in accordance with <u>Section 12</u> herein, to the extent permitted by applicable Law, Sellers shall, and shall cause its Affiliates to, upon no less than forty-eight (48) hours prior notice from Buyer (provided that Sellers may, in their sole discretion, waive such

notice period), allow Buyer, its Affiliates and its and their respective authorized Representatives reasonable access to, and the right to reasonably inspect, all the Facilities and all the Purchased Assets, and will furnish Buyer with reasonable, additional financial and operating data and other information relating to the Business or the Purchased Assets as Buyer may from time to time reasonably request.  Sellers will provide Buyer's and its Affiliates' Representatives reasonable access, upon reasonable prior notice and during normal business hours, to the Seller Employees and the officers and agents of Sellers who have responsibility for the operation of the Business and the Facilities.  Buyer's and its Affiliates' right of access and inspection shall be made in such a manner as not to unreasonably interfere with the normal business operations of the Business.  In no event shall Buyer, its Affiliates or any of its or their respective Representatives conduct any environmental investigation at any Leased Real Property or Facility (which consists of any sampling, testing or other intrusive or invasive indoor or outdoor investigation of soil, subsurface strata, surface water, groundwater, sediments, ambient air, indoor air, or any building material) at or in connection with any such Leased Real Property or Facility without the prior written consent of Sellers and MPT, with respect to any MPT Real Property (which consent Sellers and MPT, as applicable, may withhold for any reason or no reason); provided, however, that Buyer, its Affiliates and any of its or their respective Representatives shall be permitted to undertake and complete a Phase I Environmental Site Assessment for any Leased Real Property or Facility prior to the Closing Date.  Notwithstanding anything in this Agreement to the contrary, in no event shall Sellers or the Seller Affiliates be obligated to provide any access or information in violation of any applicable Law or an Order of the Bankruptcy Court.

5.2     **Conduct of Business**.  Buyer acknowledges that Sellers and Seller Parties are operating the Business in the context of the Chapter 11 Cases.  From the date of this Agreement until the earlier of Effective Time or the valid termination of this Agreement in accordance with Section 12 herein, except (a) as required by applicable Law, by Order of the Bankruptcy Court, (b) to the extent required in connection with the Chapter 11 Cases, or (c) as consented to by Buyer in writing, Sellers will use commercially reasonable efforts to, and will cause the Seller Parties to use commercially reasonable efforts to:  (i) conduct the Business in the ordinary course of business; (ii) preserve intact its legal existence and business organization; (iii) keep and maintain the Purchased Assets and the Facilities, as applicable, in good repair and normal operating condition, ordinary wear and tear excepted; and (iv) preserve the goodwill and present business relationships (contractual or otherwise) with all customers, suppliers, resellers, the Seller Employees, licensors, distributors and others having material business relationships with it, in each case with respect to the Business, subject to ordinary course terminations.  Without limiting the foregoing, and as an extension thereof, except as set forth on Schedule 5.2 or as required by applicable Law, by Order of the Bankruptcy Court or to the extent required in connection with the Chapter 11 Cases, Sellers will not and will cause the Seller Parties not to, with respect to rights that relate solely to the Business, from the date of this Agreement until the Effective Time or the valid termination of this Agreement in accordance with Section 12 herein, directly or indirectly, do, agree or commit to do, or take any action, or fail or omit to take any action that would result in, any of the following without the prior written consent of Buyer (not to be unreasonably withheld, conditioned or delayed):

(i)     sell, lease, license, assign, convey, distribute or otherwise transfer or dispose of any of the Purchased Assets, or its interest in the MPT Property, except dispositions of Inventory in the ordinary course of business;

(ii)     grant any license or sublicense of any rights under or with respect to the Transferred Intellectual Property;

(iii)     mortgage, pledge or subject to any Encumbrance any portion of the Purchased Assets, or its interest in the MPT Property, other than Permitted Encumbrances;

40

(iv)     enter into, amend, modify, accelerate or terminate, as applicable, any material Business Contract, Approval or Permit issued by a Governmental Authority;

(v)     (A) enter into any Contract that if entered into prior to the date hereof would be a material Business Contract except in the ordinary course of business or (B) modify, amend, extend or supplement in any material respect, transfer or terminate any Business Contract or waive or release or assign any material rights or claims thereto or thereunder except in the ordinary course of business;

(vi)     initiate, waive, release, desist, assign, conciliate, settle or compromise any rights or claims, or any litigation or arbitration solely related to the Business or the Purchased Assets;

(vii)     modify or alter in any material manner the lines of business and operations of the Business;

(viii)     except as required by any Contract existing as of the date of this Agreement, (A) increase the compensation or benefits payable or to become payable to any Physician or other Referral Source of Sellers, any Seller Employee, or any other service provider of the Business; (B) grant or increase any rights to change in control, severance or termination payments or benefits to, or enter into any change in control, retention, employment, consulting or severance agreement with, any Seller Employee or any other service provider of the Business; (C) grant any equity based or long-term incentive award; (D) hire, terminate (other than termination for cause) or promote any Physician or other Referral Source of Sellers, any Seller Employee, or any other service provider of the Business, other than in the ordinary course of business or to fill a vacancy; (E) loan or advance money or other property to any Physician or other Referral Source of Sellers, any Seller Employee, or any other service provider of the Business; or (F) establish, adopt, enter into, amend, modify or terminate any Plan, except to the extent required by applicable Laws; or (G) negotiate, modify, extend, enter into or amend any CBA, works council agreement, voluntary recognition or similar agreement or other Contract with any employee representative body, except to the extent required by applicable Law;

(ix)     make any change in the financial accounting policies, practices, principles, methods or procedures (including with respect to reserves, revenue recognition, inventory control, prepayment of expenses, timing for payments or accounts payable and collection of accounts receivable, accrual of other expenses or deferral revenue and acceptance of customer orders) of the Business, other than as required by GAAP or by applicable Laws;

(x)     make or enter into any commitment to make any capital expenditure or acquire any assets solely related to the Business or the Purchased Assets in excess of $250,000;

(xi)     fail to keep in force the Insurance Policies;

(xii)     make any changes to the operation of the Business, including (A) cessation of any portion of the Business' operations, or (B) complete or partial closure of any of the Facilities or locations or any change in the hours of operation of all or any portion of the Business unless required by applicable Laws;

(xiii)     (A) make (except in the ordinary course of business) or change any election concerning Taxes relating solely to the Purchased Assets or the Business; (B) enter into any

41

closing agreement or settle any material Tax claim or assessment relating solely to the Purchased Assets or the Business; (C) consent to any extension or waiver of the limitation period applicable to any material Tax Proceeding or assessment relating solely to the Purchased Assets or the Business; or (D) omit to take any action relating to the filing of any material Tax Return or the payment of any material Tax in each case, relating to the Purchased Assets or the Business, except in each case of clauses (A) through (D), to the extent any such action or omission would not reasonably be expected to result in additional Taxes payable by Buyer after the Closing Date;

(xiv)    (A) amend the organizational documents of the Joint Venture in a manner adverse to Buyer; (B) split, adjust, combine, subdivide or reclassify any equity interests in the Joint Venture; (C) issue, sell or dispose of or grant any equity interests or any securities convertible into, exchangeable for, or evidencing the right to purchase, obtain, or subscribe for (including upon conversion, exchange or exercise) any equity interests in the Joint Venture, or any rights, warrants or options to purchase any equity interests or other interests or other securities or rights convertible into, exchangeable or exercisable for, evidencing the right to subscribe for, any equity interests in the Joint Venture; (D) declare, authorize, set aside for payment or pay any dividend on, or make any other distribution or similar payments on or with respect to, any of the Joint Venture's capital stock, (E) redeem, purchase or otherwise acquire any of the Joint Venture's outstanding equity interests, or any rights or options to acquire any of the Joint Venture's equity interests; (F) create any Encumbrance on any equity interests in the Joint Venture or (G) create any subsidiary of the Joint Venture; or

(xv)    enter into any Contract or agreement to do any of the foregoing or take any action or fail to take any action that would result in any of the foregoing.

Notwithstanding any provision to the contrary contained in this Agreement, neither Section 5.1 nor this Section 5.2 shall be construed to prohibit Sellers or any Seller Affiliate from engaging in any act which Sellers or any Seller Affiliate reasonably believe is necessary (i) to avoid or mitigate any reasonable risk to patient safety or (ii) to comply with the requirements of any Governmental Authority, provided further that nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers prior to the Closing Date. Subject to applicable Law, Sellers shall give Buyer prompt (but in no event later than 5 days) written notice subsequent to taking any act described in any of Subsections (i) or (ii) of the immediately preceding sentence.  Prior to the Closing Date, Sellers shall exercise complete control and supervision over its business, assets and operations (including the Business, Purchased Assets and the Facilities).

**5.3**    **Consents to Assignment**.

(a)    To the extent that any Person's consent is required or any notice is required to be delivered to any Person for the consummation of the transactions contemplated under this Agreement by Sellers which consent has not been obtained or notice has not been delivered prior to or at Closing, including but not limited to a Person's consent or any notice under any Assumed Contract or Permit, subject to applicable federal bankruptcy Law or any other similar Law, Sellers shall use commercially reasonable efforts to obtain any such required consent(s) or deliver any such notice(s) as promptly as possible to assign the Assumed Contracts set forth on Schedule 1.1(h).  Buyer shall to the extent permitted by Law reasonably cooperate with Sellers as reasonably requested to obtain any such consents or deliver any such notices. Notwithstanding anything in this Agreement to the contrary, neither Sellers nor any Seller Affiliates shall be required to compensate any third party, commence or participate in any Proceeding or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to remain primarily, secondarily or contingently liable for any Assumed Liability) to any third party to obtain any third party consent.

(b)     Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Assumed Contract if an attempted assignment thereof without the consent of another party thereto would constitute a breach thereof or in any material way adversely affect the rights of a Seller thereunder (or the rights of Buyer thereunder following the Effective Time), unless such consent is obtained; provided, however, that to the extent permitted by the Sale Order, Buyer and Sellers may treat the failure of a non-Seller counterparty to a Transferred Executory Contract or Lease to timely object to the Cure Notice as such party's consent to assignment thereof.  If such consent is not obtained, or if an attempted assignment would be ineffective or would materially and adversely affect the rights of Sellers thereunder (or the rights of Buyer thereunder following the Effective Time), then Sellers shall, upon the request of Buyer, cooperate in any reasonable arrangement (including a sublease) designed to provide for Buyer the benefits under any such Assumed Contract; provided that Sellers will not be required to participate in any litigation that is not at Buyer's sole cost and expense.  For each Tenant Lease with respect to which the landlord does not consent to either an assignment or sublease on or prior to the Closing Date but such consent is required, Sellers shall continue to use commercially reasonable efforts (and Buyer shall continue to reasonably cooperate with Sellers) to obtain the applicable landlord consent to an assignment.  Sellers agree to keep Buyer reasonably informed about the process of obtaining such consents upon Buyer's reasonable request.  At Buyer's written request, any Assumed Contract will be assigned to Buyer notwithstanding the failure to obtain any consent thereto.  To the extent Buyer cannot receive the benefit of an Assumed Contract due to the failure or inability to obtain the necessary consent from the counterparty to such Assumed Contract, then, at Buyer's option, such Contract shall be deemed an Excluded Contract, and all Liabilities with respect to such Contract shall be Excluded Liabilities.  In addition to the foregoing, for each Tenant Lease with respect to which the landlord does not consent to the release on or prior to the Closing Date of any guaranties or letters of credits provided by Sellers or any Seller Affiliate to such landlord, Buyer and Sellers shall continue to reasonably cooperate to obtain the release of same.

(c)     After the Closing, to the extent requested by Sellers, Buyer shall use commercially reasonable efforts to cooperate with Sellers to obtain the release of any Encumbrances and other security interests over the properties and assets of Sellers and Seller Affiliates securing any obligations with respect to the Business or the Purchased Assets; provided that nothing in this Section 5.3(c) shall require Buyer to incur any costs in connection with the foregoing.

**5.4     Regulatory Approvals**.

(a)     As promptly as practicable after the date of this Agreement and no later than five (5) Business Days after the Execution Date and subject to the terms of Section 5.5, (i) Buyer, at its sole cost and expense, shall (and shall cause its Affiliates to) take any and all steps to make all required filings and promptly obtain all material Approvals, Permits and Orders with respect to the Contemplated Transactions, excluding those filings and Approvals, Permits and Orders with respect to the Contemplated Transactions arising from Antitrust Laws with respect to the Contemplated Transactions (the "**Regulatory Approvals**"), necessary for Buyer's operation of the Business following the Effective Time, and (ii) Sellers, at their sole cost and expense, shall (and shall cause its Affiliates to) take any and all steps to make all required filings and promptly obtain all Regulatory Approvals necessary for Sellers to transfer the Purchased Assets to Buyer (for the foregoing (i) and (ii), other than any required Approvals of the Bankruptcy Court, which are governed exclusively by Section 9).  Notwithstanding the foregoing, Buyer and Sellers agree to act in good faith and use commercially reasonable efforts to cooperate with each other and to provide, to the extent not prohibited by Law, such information and communications to each other or to any Governmental Authority as may be reasonably requested in order to obtain the material Regulatory Approvals contemplated above or otherwise necessary to consummate the Contemplated Transactions.  Between the date of this Agreement and the Closing Date and subject to the terms of Section 5.5, (i) Buyer, at its sole cost and expense, shall

43

(and shall cause its Affiliates to) use commercially reasonable efforts to promptly obtain all material Regulatory Approvals necessary for Buyer's operation of the Business following the Effective Time and (ii) Sellers, at their sole cost and expense, shall (and shall cause their Affiliates to) use commercially reasonable efforts to promptly obtain all Regulatory Approvals necessary for Sellers to transfer the Purchased Assets to Buyer (for the foregoing clauses (i) and (ii), other than any required Approvals of the Bankruptcy Court, which are governed exclusively by <u>Section 9</u>).

(b)     Unless prohibited by applicable Law, between the date hereof and the Closing Date, (A) to the extent reasonably practicable, no Party shall participate in any substantive discussions or attend any meeting (whether in person or via telephone) where substantive issues are discussed with any Governmental Authority with respect to the Regulatory Approvals, without providing reasonable advance notice of such conversation or meeting to the other Parties and providing such other Parties an opportunity to attend or participate, (B) Sellers and Buyer will, and will cause their respective counsel to, supply to each other copies of all material correspondence, filings or written communications by such Party or its Affiliates with any Governmental Authority or staff members thereof, with respect to the Regulatory Approvals, and (C) Buyer and Sellers agree that they each shall have the right to review and approve (not to be unreasonably withheld, conditioned or delayed) all material filings submitted to any Governmental Authority by the other in connection with the Regulatory Approvals, <u>provided</u> that, materials proposed to be submitted in relation to such Governmental Authority communication may be redacted (1) to remove references concerning the valuation of the Business; (2) as necessary to comply with contractual arrangements, applicable Law or by Order of the Bankruptcy Court; and (3) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns.  In no event shall either Party be obligated to share with the other Party or any other Person communications, correspondence or filings made by such Party or any Affiliate thereof in the ordinary course of business in connection with routine examinations of such Party or any Affiliates thereof, including any domestic or foreign regulator that has jurisdiction over such Party or any of its Affiliates, but whose consent is not required in connection with the Contemplated Transactions, or any other confidential or sensitive information related to such Party or its Affiliates that relates to strategic planning or business development initiatives of such Party or any of its Affiliates.

(c)     Buyer shall not, and shall not permit any of its Affiliates to, take any action (including acquiring or agreeing to acquire by merging or consolidating with, or by purchasing the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquiring or agreeing to acquire any assets) with regard to the Regulatory Approvals that would reasonably be expected to have the effect of (i) delaying, impairing or impeding the receipt of, or increasing the risk of not receiving, any required Regulatory Approvals, (ii) delaying, impairing or impeding the expiration or termination of any applicable waiting period with respect to any Regulatory Approvals (and shall not, without the consent of Sellers, withdraw or refile any filing or restart the waiting period on any Governmental Authority's review, or enter into a timing agreement with a Governmental Authority), (iii) increasing the risk of any Governmental Authority entering an Order prohibiting the consummation of the Contemplated Transactions or (iv) otherwise delaying the consummation of the Contemplated Transactions.

(d)     Actions or agreements required of Buyer pursuant to this <u>Section 5.4(a)</u> shall under no circumstances be considered a Material Adverse Effect.

**5.5     Antitrust Approvals.**

(a)     As promptly as practicable after Execution Date (and, for any required filings under the HSR Act, no later than five (5) Business Days after the Execution Date), Buyer and Sellers shall each use commercially reasonable efforts, and shall cooperate with each other, to make an appropriate filing of the Notification and Report Forms relating to the Contemplated Transactions as required by the HSR

Act, (the "**Antitrust Approvals**"). Buyer and Sellers shall each (A) respond as promptly as practicable to any inquiries or requests received from any Governmental Authority pursuant to the HSR Act or other Antitrust Laws, and (B) use commercially reasonable efforts to obtain all approvals, consents, clearances, or the expiration or termination of all Antitrust Approvals at the earliest possible date.

(b)     Further, and without limiting the generality of the rest of this Section 5.5(b), each of the Parties shall cooperate in all respects with each other to prepare any filing or submission made with any Governmental Authority regarding any Antitrust Approval in connection with the Contemplated Transactions and regarding any investigation or other inquiry by any Governmental Authority in connection with Antitrust Laws and the Contemplated Transactions, which shall include (i) furnishing to the other such necessary information and reasonable assistance as the other Parties may reasonably request in connection with the foregoing, (ii) informing the other Parties of any substantive communication with any Governmental Authority regarding the Contemplated Transactions, and, if in writing, furnish them with copies of such communications, and (iii) providing counsel for the other Parties with copies of all filings made by such Party, all substantive correspondence between such Party (and its Affiliates or advisors) with any Governmental Authority and other information supplied by such Party and such Party's Affiliates or advisors to a Governmental Authority or received from such a Governmental Authority in connection with Antitrust Laws and the Contemplated Transactions; provided, however, that materials related to the Antitrust Approvals may be restricted to outside counsel and redacted as necessary to (i) comply with contractual arrangements, (ii) remove references concerning the valuation of the Purchased Assets or other bidders for the Purchased Assets, and (iii) preserve legal privilege. Each Party hereto shall, subject to applicable Law, permit counsel for the other Parties to review in advance, and consider in good faith the views of the other Parties in connection with, any proposed communication to any Governmental Authority regarding an Antitrust Approval in connection with the Contemplated Transactions. The Parties agree not to participate, or to permit their Affiliates or advisors to participate, in any substantive meeting or discussion, either in person or by telephone or video conference, with any Governmental Authority regarding an Antitrust Approval in connection with the Contemplated Transactions unless it consults with the other Parties in advance and, to the extent not prohibited by such Governmental Authority, gives the other Parties the opportunity to attend and participate. If an appropriate filing of the Notification and Report Forms relating to the Contemplated Transactions is required by the HSR Act, and if reasonably requested by at least two (2) Business Days prior to the scheduled end of any waiting period under the HSR Act, Buyer will withdraw and refile under the HSR Act pursuant to HSR rules 803.12(a) and (c). None of the Parties, without the other Party's prior written consent, shall (i) enter into any timing, settlement or similar agreement, or otherwise agree or commit to any arrangement, that would have the effect of extending, suspending, lengthening or otherwise tolling the expiration or termination of the waiting period applicable to the Contemplated Transactions under the HSR Act or any Antitrust Laws, or (ii) otherwise agree or commit to any arrangement, that would bind or commit the Parties not to consummate the Contemplated Transactions (or that would otherwise prevent or prohibit the Parties from consummating the Contemplated Transactions).

(c)     Further, and without limiting the generality of the rest of this Section 5.5, Buyer shall, and shall cause its Affiliates to, use commercially reasonable efforts to, take any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Law or other Law that may be asserted by any Governmental Authority pursuant to any Antitrust Law or private party with respect to this Agreement so as to make effective as promptly as practicable the Contemplated Transactions and to avoid any suit or Proceeding, which would otherwise have the effect of preventing or delaying the Closing beyond the End Date. Notwithstanding the foregoing, Buyer will not be required, and will not be required to cause its Affiliates, to (i) contest, defend and appeal any threatened or pending litigation or preliminary or permanent injunction or other Order that would adversely affect the ability of any Party hereto to consummate, or otherwise delay the consummation of, the Contemplated Transaction; or (ii) agree to take

any other action as may be required by a Governmental Authority, including agree to any provisions requiring prior approvals of future transactions as requested by any Governmental Authority, in order to (A) obtain all necessary consents, approvals and authorizations as soon as reasonably possible, and in any event before the End Date, (B) avoid the entry of, or to have vacated, lifted, dissolved, reversed or overturned any decree, judgment, injunction or other Order, whether temporary, preliminary or permanent, that is in effect in any Proceeding and that prohibits, prevents or restricts consummation of the Contemplated Transactions, or (C) effect the expiration or termination of any waiting period, which would otherwise have the effect of preventing or delaying the Closing beyond the End Date.  At the request of Buyer, Sellers shall agree to take any action with respect to Sellers in the two preceding sentences; provided, that any such action is conditioned upon (and shall not be completed prior to) the consummation of the Contemplated Transactions.  Buyer will not be required, and Buyer will not be required to cause its Affiliates with respect to the Antitrust Approvals to (i) propose, negotiate, offer to commit to and effect (and if such offer is accepted, committing to and effecting), by order, consent decree, hold separate orders or otherwise, the sale, divestiture, license, hold and separate, causes a third party to acquire or otherwise dispose of any assets, properties, products, product lines, services, businesses or rights of Buyer or its Affiliates or, effective as of the Closing, Sellers or any interest or interests therein, (ii) create, terminate, amend or modify any Contract, contractual rights, obligations or other business arrangements or relationship of Buyer or its Affiliates or, effective as of the Closing, Sellers, (iii) consent to any material condition or concession requested by any Governmental Authority under Antitrust Law, (iv) accept any material limitation on or material condition on the manner in which any of Buyer or its Affiliates conduct their business, (v) pay any amounts required or requested by any Governmental Authority under Antitrust Law (other than immaterial amounts or amounts required under this Agreement), (vi) accept any material capital expenditure commitments required for the Business following Closing and (vii) otherwise take or commit to take any operational restriction or action that limits its freedom of action with respect to, or its ability to retain, any of the assets, properties, licenses, products, product lines, services or businesses of Buyer or its Affiliates, or effective as of the Closing, Sellers or any interest or interests therein, in order to avoid the entry of, or to effect the dissolution of, any Order in any Proceeding, or any impediment under any Antitrust Law, which would otherwise have the effect of preventing the consummation of the Contemplated Transactions.

     **5.6**    **[Reserved]**.

     **5.7**    **Additional Financial Information**.  Within thirty-five (35) days following the end of each calendar month between the date of this Agreement and the Closing Date, Sellers will deliver to Buyer copies of the unaudited balance sheets and the related unaudited statements of operations relating to the Business for each month then ended.  Such financial statements shall be prepared from and in accordance with the Books and Records of Sellers, shall fairly present in all material respects the financial position and results of operations of the Business as of the date and for the period indicated, and shall be prepared in accordance with GAAP, consistently applied, except that such financial statements need not include required footnote disclosures, nor reflect normal year-end adjustments or adjustments that may be required as a result of the Contemplated Transactions.

     **5.8**    **Closing Conditions**.  Between the date of this Agreement and the Closing Date, Sellers and Buyer will use their commercially reasonable efforts to cause the conditions specified in Section 7 and Section 8 over which Sellers or any of its Affiliates, or Buyer or any of its Affiliates, as applicable, have control to be satisfied as soon as reasonably practicable.

     **5.9**    **Insurance Ratings**.  Sellers will take all action reasonably requested by Buyer to enable Buyer to succeed to the Workmen's Compensation and Unemployment Insurance ratings of the Facilities

and other ratings for insurance or other purposes established by Sellers for the Facilities.  Buyer shall not be obligated to succeed to any such rating, except as it may elect to do so.

5.10    **Bulk Sales Laws**.  Buyer and Sellers hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

5.11    **Social Media Accounts**.  At Closing, Sellers shall transfer, convey and deliver to Buyer, and Buyer shall acquire and accept from Sellers exclusive access rights and permissions, including the username and password for all social media accounts exclusively relating to the Facilities or the Business and owned or operated by Sellers or its Affiliates as set forth on Schedule 3.16(a).

5.12    **Confidentiality**.

(a)     It is understood by the Parties that the Confidentiality Agreement will survive the execution and delivery of this Agreement.  The terms of the Confidentiality Agreement are hereby incorporated by reference and shall continue in full force and effect until the Closing (irrespective of any termination of the Confidentiality Agreement pursuant thereto), at which time such Confidentiality Agreement shall terminate, provided that, notwithstanding the foregoing, all obligations under such Confidentiality Agreement with respect to Confidential Information that belongs to a Seller Affiliate and that is not the exclusive property of the Business shall remain in full force and effect in accordance with the terms thereof. In the event of a conflict or inconsistency between the terms of this Agreement and the Confidentiality Agreement, the terms of this Agreement will govern.

(b)     Unless the prior written consent of the other Parties is obtained, except as otherwise required by applicable Laws, or in connection with the seeking of any Approval or Permit contemplated by this Agreement or any consent to the assignment of, or notice under, any of the Assumed Contracts or as reasonably necessary to satisfy any of the Parties' conditions or pre-Closing covenants, each of the Parties shall keep confidential and not disclose, and cause its Affiliates, its Representatives and its Affiliates' Representatives to keep confidential and not disclose the terms and status of this Agreement and the other Transaction Documents, the Contemplated Transactions and the identity of the other Parties. Notwithstanding the foregoing, each of the Parties shall have the right to communicate and discuss with, and provide to, its respective Representatives, any information regarding the terms and status of this Agreement and the other Transaction Documents and the Contemplated Transactions, provided that each Party shall be responsible for any breach of this Section 5.12 by such Party's Representatives, as if it were the Party that breached them.

(c)     Unless otherwise required by applicable Laws (based upon reasonable advice of counsel) or this Agreement or in connection with the enforcement of a Party's rights hereunder (in which case the disclosing Party will use its commercially reasonable efforts to notify the non-disclosing Party of such disclosure), no Party shall make any public release or announcements in respect of this Agreement (including any of the terms of this Agreement and the Transaction Documents) or the Contemplated Transactions or the transactions contemplated by the Transaction Documents or otherwise communicate with any news media in connection therewith without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed).  To the extent that any press releases or public announcements are to be issued or made following the Closing relating to the Contemplated Transactions, the timing and content of such press releases and public announcements shall be mutually agreed between each Party hereto.

(d)     Any Party may disclose Confidential Information received from any other Party in an action or Proceeding brought by a Party in pursuit of its rights or in exercise of its remedies hereunder.

5.13     **Casualty**.  If any part of the Purchased Assets, or its interest in the MPT Property, is damaged, lost or destroyed (whether by fire, theft, vandalism or other cause or casualty), in whole or in part, prior to the Effective Time (such damaged, lost or destroyed assets, the "**Damaged Assets**"), Buyer may, in its absolute and sole discretion, (a) reduce the Purchase Price by the greater of (i) the fair market value of the Damaged Assets (such value to be determined as of the date immediately prior to such damage, loss or destruction) or (ii) the estimated cost to replace or restore the Damaged Assets, (b) require Sellers to transfer the proceeds (or the right to the proceeds) of the applicable Insurance Policies covering the Damaged Assets (including the business interruption Insurance Policy covering the Business) to Buyer at the Closing, plus an amount equal to any deductibles paid or incurred by Sellers, or (c) if the fair market value of the Damaged Assets is greater than twenty-five percent (25%) of the TEV, terminate this Agreement.  Any reduction in the TEV pursuant to this Section 5.13 shall be determined by the Accounting Firm.  Until the Effective Time, Sellers will bear all risk of loss with respect to the Damaged Assets.

5.14     **Credentialing and Medical Staff Transition Activities.**  Prior to the Closing, to the extent required by the Health Care Quality Improvement Act, 42 U.S.C. §11101, *et. seq*, Sellers shall report to the applicable licensing board any final, non-appealable "professional review action" (as defined in the Healthcare Quality Improvement Act) that occurs prior to the Closing.  Prior to the Closing, Sellers shall use commercially reasonable efforts to cooperate with Buyer in appropriately transitioning any pending professional review Proceeding.  Prior to the Closing, to the extent permitted under applicable Laws, and without any requirement that Sellers act in a manner that voids or violates any peer review or similar privilege or applicable Facility medical staff by-laws, policies and procedures, Sellers shall also use commercially reasonable efforts to cooperate with Buyer and with any member of the medical staff of any Facility regarding any reasonably needed access and/or transfer of information or copies of documents comprising Credentialing and Medical Staff Records as may be reasonably requested in connection with new or adopted credentialing transition activities.

6.     **ADDITIONAL AGREEMENTS.**

6.1     **Seller Employees**

(a)     As of the Effective Time and, with respect to any Employee on Leave (as defined below), upon the date such Employee on Leave becomes a Transferred Employee (such time, the "**Employee Effective Time**"), Sellers shall terminate or direct the Seller Parties to terminate all Seller Employees. Buyer or one of its Affiliates ("**Buyer Employer**"), subject to Buyer Employer's standard hiring practices and policies (including but not limited to background checks, drug screens and a general prohibition against hiring employees who were previously released for cause from employment with Buyer, Buyer Employer or their Affiliates) (collectively, the "**Buyer Eligibility Requirements**"), shall, (i) no later than five (5) days prior to the Closing Date, make offers of employment to all Seller Employees who work at the Business on an active basis and are eligible for hire by Buyer Employer and (ii) as of the date within five (5) days following written notice from Sellers that an Employee on Leave has reported back to work at the Business on an active basis within one hundred eighty (180) days after the Closing Date (or such longer time as is required by applicable Law), make offers of employment to each such Seller Employee with respect to the operation of the Business who is on short-term or long-term disability or on leave of absence pursuant to Seller's or a Seller Party's policies, the Family and Medical Leave Act of 1993 or other similar Law as of the Effective Time (each, an "**Employee on Leave**") that has so reported back to work on an active basis.  Sellers and each relevant Seller Party shall retain all Liabilities for any severance or separation benefits owed to any Seller Employee, but Buyer shall reimburse Sellers for all Liabilities for

any severance or separation benefits owed to any Seller Employee who both (i) receives an offer of employment that does not comply with this Section 6.1 (or who Buyer Employer otherwise fails to make an offer in violation of this Section 6.1) and (ii) does not become a Transferred Employee. The term "**Transferred Employee**" as used in this Agreement means a Seller Employee who accepts employment with Buyer Employer as of the Effective Time (and with respect to any Employee on Leave, as of the date such Employee on Leave so reports to work with Buyer Employer in accordance with this Section 6.1(a)). Notwithstanding the foregoing or anything in this Agreement to the contrary, (i) no Scheduled Employee who is employed by SMG and whose Contract is assigned to a Buyer Party pursuant to the Employee Contract Assignment and Assumption Agreement shall be deemed a Transferred Employee and (ii) the Parties agree that the Seller Parties shall assign to Clinic the employment agreements and offer letters relating to the physicians and advanced practice providers set forth on Schedule 6.1(a) at Closing.

(b)     During the period commencing on the Closing Date and ending on the day that is one hundred eighty (180) days following the Closing Date, each Transferred Employee will be retained by Buyer Employer, subject to Buyer Employer's standard policies and conditions of employment and subject to Buyer Employer's reasonable business judgment. As of the Employee Effective Time for a period of the earlier of twelve (12) months following the Closing Date (or such longer period as may be required by applicable Law) or such Transferred Employee's termination of employment, each Transferred Employee shall be entitled to receive from the Buyer Employer (i) at least the same base salary, base wages, and cash incentive compensation opportunities as were provided to such Transferred Employee immediately prior to the Closing Date by Sellers or a Seller Party (excluding any change in control, retention, transaction-based or similar compensation), and (ii) other employee benefits as provided to similarly-situated employees of the Buyer Employer.

(c)     Effective as of the Closing Date, solely to the extent included in Purchased Working Capital, Buyer Employer shall assume any and all Liabilities of Sellers for accrued and unpaid wages, salary or bonuses, accrued and unused vacation, sick days and paid time off, in each case, as of the Closing Date with respect to any Transferred Employee. To the extent earned in accordance with the terms and conditions of the applicable Buyer Employer bonus plan, Buyer Employer shall pay the applicable Transferred Employees the unpaid portion of any Transferred Employee's bonus for the calendar year in which the Closing Date occurs at the same time such bonuses are paid by the Buyer Employer in the ordinary course of business consistent with past practices.

(d)     Buyer shall deliver offers of employment to employees represented by a union or other labor organization ("**Union Represented Employees**") in accordance with Section 6.1(a) and Section 6.1(b), or alternatively negotiate in good faith with the applicable union or other labor organization to deem such offers of employment to have been made to the Union Represented Employees.

(e)     The Parties shall, and shall cause their respective Affiliates to, mutually cooperate in undertaking all reasonably necessary or legally required provision of information to, or consultations, discussions, or negotiations with, employee representative bodies (including any works councils) that represent any Union Represented Employees or Transferred Employees.

(f)     Effective as of the Employee Effective Time, Buyer Employer agrees to recognize each Transferred Employee's date of hire by Seller or a Seller Party, as applicable, as the anniversary date of record with Buyer Employer and to honor that seniority for purposes of eligibility, vesting and, for severance and Paid Time Off, level of benefits on or after the Employee Effective Time under Buyer Employer employee benefit plans and policies in which Transferred Employees are eligible to participate, to the same extent such service was credited under a similar Plan, but excluding any defined benefit pension plan within the meaning of Section 3(35) of ERISA and any retirement plan intended to be qualified under

49

Section 401 (including any 401(k) plan) and excluding any service crediting that would result in a duplication of benefits. Effective as of the Employee Effective Time, Buyer Employer will use commercially reasonable efforts to (i) waive the customary waiting periods for the Transferred Employees and their eligible spouses and dependents under any employee benefit plan, program or arrangement of Buyer Employer in which such Transferred Employee is eligible to participate ("**Buyer Plan**") providing group health benefits, and (ii) subject to each Transferred Employee's election of coverage, provide for participation in such plans as of the Employee Effective Time for each Transferred Employee who is in an eligible class as defined under the such plans. To the extent lawful and subject to the approval of any applicable insurer, Buyer Employer shall use commercially reasonable efforts to (i) honor each Transferred Employee's prior service credit under Plans for purposes of satisfying pre-existing condition limitations in Buyer Plans providing group health benefits, and (ii) with respect to the applicable calendar year in which the Closing occurs, recognize any out-of-pocket expenses (including deductibles, co-pays, and out of pocket maximums) incurred by each Transferred Employee and his or her eligible dependents under any Plans that are group health plans prior to the Closing Date for purposes of determining deductibles, co-pays and out-of-pocket maximums under Buyer Plans providing group health benefits on and after the Closing Date. For purposes of eligibility to participate in Buyer Employer's retirement plans, Buyer Employer shall honor prior length of service for each Transferred Employee that meets the eligibility requirements under Buyer Employer's retirement plans, but Buyer Employer will not make any contributions to Buyer Employer's retirement plans for the Transferred Employees with respect to prior service.

(g)     Subject to the terms and conditions of Buyer Employer's applicable benefit plans, to the extent such Liability is included in Purchased Working Capital, for each Seller Employee (other than any Seller Employee who is a Physician) who becomes a Transferred Employee, Buyer Employer shall carry over, and give credit for, the earned but unused Paid Time Off of such Transferred Employee as of immediately prior to the Employee Effective Time (the aggregate number of hours of Paid Time Off assumed by Buyer Employer for all Transferred Employees pursuant to this Section 6.1(g), the "**Assumed Paid Time Off**"). Seller shall retain any Liabilities for all earned but unused Paid Time Off of all Seller Employees other than the Assumed Paid Time Off.

(h)     Prior to the Effective Time, Seller shall be solely responsible for complying with the WARN Act and any and all obligations under other applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to the Seller Employees and other employees of Seller as a result of any action by Seller or the Seller Parties on or prior to the Effective Time, or following the Effective Time with respect to any Seller Employee who does not become a Transferred Employee for any reason other than Buyer's failure to comply with this Section 6.1. Following the Effective Time, Buyer Employer shall be solely responsible for complying with the WARN Act and any and all obligations under other applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Transferred Employees as a result of any action by Buyer Employer following the Effective Time.

(i)     For so long as the Sellers, the Seller Parties or Seller Affiliates, as applicable, maintain a group health plan, Sellers shall be solely responsible for any and all obligations arising under COBRA with respect to each "M&A qualified beneficiary" (as defined in Treasury Regulations Section 54.4980B-9) in connection with the transactions contemplated by this Agreement.

(j)     As of the Employee Effective Time, Seller shall pay, or have taken all necessary action to cause to be paid, to the Transferred Employees all wages, bonuses, benefits and other compensation (other than Assumed Paid Time Off) payable to or earned by the Transferred Employees as of such date on account of such Transferred Employee's termination of employment with Sellers or a Seller

50

Party.  As of the Employee Effective Time, Seller shall (i) discontinue participation of the Transferred Employees in all applicable Plans, (ii) waive any allocation conditions on employer contributions with respect to the Transferred Employees under the Section 401(k) plan of Sellers or any Seller Party for the plan year in which the Closing Date occurs, (iii) with respect to cash-based incentive and bonus plans, provide that Transferred Employees will be entitled to prorated incentives and bonuses, based on target levels of performance for the plan year (or other applicable period upon which incentives and bonuses are determined) that includes the Closing Date, (iv) make, pay, grant or credit all contributions, incentives, bonuses, accruals and/or other benefits required (or otherwise committed) under the Plans on behalf of eligible Transferred Employees for periods on or prior to the Closing Date, (v) take such actions as are necessary to make, or cause such Plans to make distributions available under the Plans to such Transferred Employees to the extent required or permitted by, and in accordance with, such Plans and applicable Laws, as determined by Sellers, and (vi) take all steps reasonably necessary to effectuate the preceding, including ensuring that any necessary amendments to the Plans are timely adopted.

(k)      The Parties agree that Buyer's determination of any Seller Employee satisfaction of Buyer Eligibility Requirements will take place (i) at the same time and pursuant to the same procedures, whether such Seller Employee is a full time employee, part-time employee or employee on approved leave of absence pursuant to Seller's or Seller Parties' policies, on leave pursuant to the Family and Medical Leave Act of 1993 or other similar local Law, temporary leave of absence, military leave, or paid time off and (ii) without a review by Buyer of any Seller Employee's personnel records or other employment or health records maintained by Seller or any Seller Party.

(l)      Notwithstanding any provision herein to the contrary, no term of this Agreement shall be deemed to (i) create any Contract with any Seller Employee, Transferred Employee or other Person; (ii) give any Seller Employee, Transferred Employee or other Person the right to be retained in the employment of Buyer Employer or any of its Affiliates; (iii) interfere with Buyer Employer's right to terminate the employment of any Transferred Employee at any time; or (iv) obligate Buyer Employer or any of its Affiliates to adopt, enter into or maintain any employee benefit plan or other compensatory plan, program or arrangement at any time.  Nothing in this Agreement shall diminish Buyer Employer's right to change or terminate its policies regarding employment matters at any time or from time to time.  The representations, warranties, covenants and agreements contained herein are for the sole benefit of the Parties, and neither the Seller Employees, the Transferred Employees nor any other Person is intended to be or shall be construed as beneficiaries hereof.

**6.2      Post-Closing Access to Information; Communication with Governmental Authorities**.

(a)      Buyer and Sellers acknowledge that prior to the end of the Post-Closing Period, Buyer and Sellers may need access to information, documents or computer data in the control or possession of the other, including for the purpose of satisfying their obligations in connection with the Chapter 11 Cases, and Sellers may need access to records that are a part of the Purchased Assets for purposes of concluding the Contemplated Transactions and for audits, investigations, compliance with applicable Law or an Order of the Bankruptcy Court and requests from Governmental Authorities, and the prosecution or defense of claims made by third parties.  Accordingly, Buyer agrees that, except to the extent necessary to comply with any applicable Law or an Order of the Bankruptcy Court, it will timely make available to Sellers and their respective Representatives the Books and Records and such information, documents and computer data as may be available relating to the Purchased Assets and the Business in respect of periods prior to the Effective Time and will permit Sellers (or their Representatives) to make copies of such Books and Records, information, documents and computer data.  Sellers agree that Sellers will timely make available to Buyer and its Representatives such information, documents and computer data relating to the Purchased Assets and the Business in respect of periods prior to the Effective Time as may be in the

possession of Sellers or any Seller Affiliate and will permit Buyer (or its Representatives) to make copies of such documents and information.  Notwithstanding the foregoing, all disclosures of information shall be consistent with the Clean Room Black Box Agreement, all common interest agreements, joint defense agreements, and any other confidentiality or nondisclosure agreements entered into among the Parties.  The Parties agree that the cost of compliance with this provision shall be governed by the Transition Services Agreement.

(b)       Following the Effective Time, Buyer shall assume all legal responsibility for, and shall preserve, the Books and Records (including, but not limited to, patient records) for the greater of: (i) seven (7) years from the date of such record; (ii) as may be required by applicable Law, including but not limited to, the statute of limitations governing the time period afforded to bring professional liability claims in Florida or as is necessary to administer the Chapter 11 Cases; or (iii) such longer period as may be required in connection with any known or threatened investigation or Proceeding, including any professional liability claims.  Thereafter, Buyer may dispose of such Books and Records only after Buyer has given Sellers ninety (90) days' prior written notice of such impending disposition and the opportunity of Sellers to remove and retain such Books and Records as permitted by applicable Law.

(c)       Buyer shall cooperate with Sellers, on a timely basis and as reasonably requested by Sellers, in connection with the provision of all data of the Business and other information required by Sellers for reporting to the Joint Commission for the remainder of the quarterly period in which the Closing has occurred.

(d)       To the maximum extent permitted by applicable Law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities, including documents relating to the operations of the Business or ownership of any of the Purchased Assets prior to the Effective Time, then to the extent allowable by applicable Law, prior to any disclosure of such documents, Buyer shall notify Sellers and provide Sellers with the opportunity to object to, such request or demand.

(e)       To the extent practicable under the circumstances after the Effective Time, neither Sellers nor Buyer will agree to participate in any substantive call, meeting or conference with any Governmental Authority, or any member of the staff of any Governmental Authority, in respect of any filing, Proceeding, investigation (including any settlement of the investigation), litigation, or other inquiry related to the Contemplated Transactions, provided that such responding Party (1) provides reasonable advance notice of such meeting to the other Party and (2) provides such other Party an opportunity to attend or participate and, where permitted, allow the other Party to participate.

**6.3     Confidentiality; Non-Competition; Non-Solicitation**.  In further consideration for the payment of the Purchase Price and to protect the value of the Purchased Assets purchased by Buyer (including the goodwill inherent in the Business as of the Effective Time), and as a material inducement to Buyer and Sellers to enter into and perform their respective obligations under this Agreement, effective as of the Effective Time, Sellers and Buyer agree as follows:

(a)       Sellers shall not use for itself or any other Person, or disclose to any other Person, and shall hold in confidence, and shall cause its Affiliates, and shall use its commercially reasonable efforts to cause its and their Representatives, not to use for themselves or any other Person, or disclose to any other Person, any Confidential Information included in or related to the Purchased Assets and the Business, except to the extent such use or disclosure is (i) approved in writing in advance by Buyer, (ii) expressly permitted or required pursuant to the terms of this Agreement, or (iii) required by applicable Law or any Order, including as required under the Chapter 11 Cases (in which event, to the extent legally permissible,

52

Sellers shall inform Buyer in writing in advance of any such required disclosure, which notification shall include the nature of the legal requirement and, if known, the extent of the required disclosure, and shall cooperate with Buyer in all reasonable respects in obtaining a protective order or other protection or reasonable assurance that confidential treatment will be afforded in respect of such required disclosure (at the sole cost and expense of Buyer) and shall limit such disclosure to the extent reasonably possible while still complying with such requirements).  Sellers shall use commercially reasonable efforts to safeguard Confidential Information included in or related to the Purchased Assets and the Business and to protect it against disclosure, misuse, espionage, loss and theft.

(b)        Buyer shall not use for itself or any other Person, or disclose to any other Person, and shall hold in confidence, and shall cause its Affiliates, and shall use its commercially reasonable efforts to cause its and their Representatives, not to use for themselves or any other Person, or disclose to any other Person any Confidential Information exclusively included in or related to the Excluded Assets, except to the extent such use or disclosure is (i) approved in writing in advance by Sellers, (ii)  expressly permitted or required pursuant to the terms of this Agreement, or (iii) required by applicable Law or any Order (in which event, to the extent legally permissible, Buyer shall inform Sellers in advance of any such required disclosure, which notification shall include the nature of the legal requirement and, if known, the extent of the required disclosure, and shall cooperate with Sellers in all reasonable respects in obtaining a protective order or other protection or reasonable assurance that confidential treatment will be afforded in respect of such required disclosure (at the sole cost and expense of Sellers) and shall limit such disclosure to the extent reasonably possible while still complying with such requirements).  Buyer shall use commercially reasonable efforts to safeguard Confidential Information included in the Excluded Assets and to protect it against disclosure, misuse, espionage, loss and theft.

(c)        Sellers acknowledge that Sellers have become, and following the date of this Agreement shall continue to be, familiar with Confidential Information included in the Purchased Assets. Therefore, during the Restricted Period, Sellers shall not (and shall not take any steps to, or prepare to), and shall cause the Seller Parties not to, directly or indirectly, in any capacity, (i) engage in or assist others in engaging in a Restricted Business within the Restricted Area, (ii) have an interest in any Person, in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant, that engages directly or indirectly in a Restricted Business within the Restricted Area; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Business (including any existing or former client, customer, supplier or licensor of Sellers and any Person that, to the Knowledge of Sellers, becomes a client, customer, supplier or licensor of the Business after the Closing), or any other Person that has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship.  Notwithstanding the foregoing or anything in this Section 6.3(c) to the contrary, the restrictions set forth in this Section 6.3(c) shall not apply to the existing operations of Stewardship Health, Inc., Stewardship Health Medical Group, Inc., or their Subsidiaries, or, if applicable, to any continued ownership of the NSI JV Interests by a Seller Affiliate if the Buyer elects to exclude the NSI JV Interests pursuant to Section 1.12 hereunder.

(d)        During the Restricted Period, Sellers shall not, and shall cause its Affiliates not to, directly or indirectly, in any capacity, encourage, induce, solicit or attempt to encourage, induce or solicit (i) any officer, director, manager, employee or independent contractor of Buyer Employer or any of Buyer Employer's Affiliates (x) who provides services to the Business or (y) who have been introduced to Sellers and Seller Affiliates through the negotiation of this Agreement and the Contemplated Transactions or (ii) any Transferred Employee to leave the employ of Buyer Employer or any of Buyer Employer's Affiliates or terminate or diminish any relationship with Buyer Employer or any of Buyer Employer's Affiliates; provided that the foregoing shall not apply to (A) any direct or indirect general solicitation by Sellers or any Seller Affiliate that is not directed specifically to any such Person or (B) any such Person whose

employment has been terminated by such Person or by any Buyer Employer or any of Buyer Employer's Affiliates for a period of six (6) months or more.

(e)     Except as otherwise contemplated by the Confidentiality Agreement (in which case the Confidentiality Agreement will govern), from the date of this Agreement until the earlier of the Effective Time or the date of termination of this Agreement, Buyer will, and will cause its respective Affiliates not to, directly or indirectly, in any capacity, encourage, induce, solicit or attempt to encourage, induce or solicit (i) any officer, director, manager, employee or independent contractor of Sellers or any Seller Affiliate (other than the Transferred Employees) who has been introduced to Buyer and its Affiliates through the negotiation of this Agreement and the Contemplated Transactions, (ii) any Retained Employee or (iii) any Physician or other provider employee in the Restricted Area of Sellers or any Seller Parties to leave the employ of Sellers or any Seller Parties or terminate or diminish any relationship with Sellers or any Seller Parties; underline provided that the foregoing shall not apply to (A) any direct or indirect general solicitation that is not directed specifically to any such Person, or (B) any such Person whose employment has been terminated by such Person or by Sellers or any Seller Affiliate for a period of six (6) months or more.

(f)     Sellers and Buyer each recognizes that the covenants in this Section 6.3, and the territorial, time and other limitations with respect thereto, are reasonable and properly required for the adequate protection of Sellers and Buyer and the acquisition of the Purchased Assets by Buyer, including the Confidential Information (whether included in the Purchased Assets or Excluded Assets), and agree and acknowledge that such limitations are reasonable with respect to Buyer's and Sellers' activities, business and public purpose.  Sellers and Buyer acknowledge and represent that: (i) sufficient consideration has been given by each Party to the other as it relates to the covenants set forth in this Section 6.3; (ii) the restrictions and agreements in this Section 6.3 are reasonable in all respects and necessary for the protection of either (A) Buyer and its Affiliates, the Confidential Information included in the Purchased Assets and the goodwill primarily associated with the Business or (B) Sellers or the Seller Affiliates and the Confidential Information included in the Excluded Assets, as the case may be, and that in each case, without such protection, Buyer's or Sellers' (as the case may be) competitive advantage would be materially adversely affected; and (iii) the agreements in this Section 6.3 are an essential inducement to Buyer and Sellers to enter into this Agreement and they are in addition to, rather than in lieu of, any similar or related covenants to which Buyer or Sellers is party or by which it is bound.  Sellers and Buyer agree and acknowledge that the violation of the covenants or agreements in this Section 6.3 would cause irreparable injury to Buyer and its Affiliates or Sellers or Seller Affiliates, as the case may be, and that monetary damages and any other remedies at law for any violation or threatened violation thereof would be inadequate, and that, in addition to whatever other remedies may be available at law or in equity, Buyer and its Affiliates or Sellers or Seller Affiliates, as the case may be, shall be entitled to temporary and permanent injunctive or other equitable relief without the necessity of proving actual damages or posting a bond or other security.

(g)     It is the intention of each Party that the provisions of this Section 6.3 shall be enforced to the fullest extent permissible under the Law and the public policies of the State of Delaware and of any other jurisdiction in which enforcement may be sought, but that the unenforceability (or the modification to conform with such Laws or public policies) of any provisions hereof shall not render unenforceable or impair the remainder of this Agreement.  Accordingly, if any term or provision of this Section 6.3 shall be determined to be illegal, invalid or unenforceable, either in whole or in part, this Agreement shall be deemed amended to delete or modify, as necessary, the offending provisions and to alter the balance of this Agreement in order to render the same valid and enforceable to the fullest extent permissible as aforesaid, with the maximum period, scope or geographical area permitted under applicable Law being substituted for the period, scope or geographical area hereunder.

**6.4**     **Transition Patients**.  To compensate Sellers for services rendered and medicine, drugs and supplies provided by the Hospitals up to the Effective Time with respect to patients who are admitted to the Hospitals prior to the Effective Time and whose care is reimbursed by any Government Program or Private Program but who are not discharged until after the Effective Time (such patients being referred to herein as the "**Transition Patients**" and services rendered to them being referred to herein as the "**Transition Patient Services**"), the Parties shall take the following actions:

(a)     To the extent required by applicable Law, or to the extent the applicable Government Program or Private Program will accept a cut-off billing, Sellers shall prepare the cut-off billings for the period prior to the Effective Time ("**Interim Billing**") for each Transition Patient for which Interim Billing is required or permitted, and shall send such Interim Billing to the applicable Transition Patient, Government Program or Private Program.  Sellers shall be entitled to all amounts received by Sellers pursuant to any such Interim Billings.

(b)     For Transition Patients for whom Interim Billing is not accepted by the applicable Government Program or Private Program (the "**Non-Interim Billing Transition Patients**"), as soon as practicable after the Closing Date, Sellers shall deliver to Buyer a statement specifying the Non-Interim Billing Transition Patients and the expected reimbursement for each such Non-Interim Billing Transition Patient.  Such statement shall also identify which Non-Interim Billing Transition Patients (i) are receiving medical care that is paid for, in whole or in part, by a Government Program or Private Program that pays on a diagnostic related group ("**DRG**"), case rate, or other similar basis and for whom the applicable Facility is paid on a per-claim basis (the "**DRG Transition Patients**") and/or (ii) are receiving medical care that is paid for on a non-DRG basis ("**Non-DRG Transition Patients**").  Buyer shall be responsible for submitting such billings to the applicable Government Program or Private Program for the entire portion of each of the Non-Interim Billing Transition Patients' respective stays.

(c)     For Transition Patient Services provided to a DRG Transition Patient, upon receipt of payment, Sellers shall be entitled to an amount equal to (i) the total DRG payment received by Buyer and Sellers (including disproportionate share, uncompensated care, low volume adjustment, indirect medical education, outlier, and capital payments and any deposits, deductibles, copayments paid, whether received by Buyer or Sellers), multiplied by a fraction, the numerator of which shall be the number of days prior to the Effective Time that the DRG Transition Patient was an inpatient at the applicable Hospital and the denominator of which shall be the total number of days that such DRG Transition Patient was an inpatient at such Hospital minus (ii) any deposits, deductibles or co-payments paid by or on behalf of the applicable DRG Transition Patient to Sellers or any of Seller's Affiliates prior to the Effective Time.  Buyer will make such payments to Sellers within ten (10) Business Days after receipt of such payment.

(d)     For Transition Patient Services provided to a Non-DRG Transition Patient, Sellers shall be entitled to an amount equal to (i) the total payments received by Buyer and Sellers for such Non-DRG Transition Patient (including any deposits, deductibles, or copayments, whether received by Buyer or Sellers), multiplied by a fraction, the numerator of which shall be the total number of days prior to the Effective Time on which the applicable Hospital provided Transition Patient Services to such Non-DRG Transition Patient and the denominator of which shall be the total number of days with respect to such Non-DRG Transition Patient's stay at the applicable Hospital minus (ii) any deposits, deductibles or co-payments paid by or on behalf of the applicable Non-DRG Transition Patient to Sellers or any Seller Parties prior to the Effective Time. Buyer will make such payments to Sellers within ten (10) Business Days after receipt of such payment.

(e)     In addition to the other payments contemplated by this Section 6.4 (or elsewhere in this Agreement), (i) if Sellers or Seller Parties receives any amount from patients, Government Programs

55

or Private Programs which relates to services rendered by the Facilities after the Effective Time, Sellers or Seller Parties will remit such amount within ten (10) Business Days accompanied by copies of remittances and other supporting documentation as reasonably requested by Buyer; and (ii) if Buyer receives any amount from patients, Government Programs or Private Programs which relates to services rendered by the Facilities prior to the Effective Time, Buyer will remit such amount to Sellers within ten (10) Business Days of receiving such amount accompanied by copies of remittances and other supporting documentation as reasonably requested by Sellers.

(f)     Notwithstanding anything to the contrary in this Agreement, neither Buyer nor Sellers shall be entitled to withhold any of the respective payments due and owing under this <u>Section 6.4</u> by means of setoff against any amount owed by any other Party.

**6.5     Cost Reports; Termination of Sellers' Medicare Participation in Periodic Interim Payments.**

(a)     Sellers, at their own cost and expense, will timely prepare and file all Cost Reports relating to the Facilities and the Business for periods ending prior to the Effective Time or required as a result of the consummation of the Contemplated Transactions (collectively, the "**Seller Cost Reports**"). Buyer shall make available, in a timely and reasonable manner, to Sellers any information and records that are in Buyer's possession and that are reasonably necessary for Seller to prepare the Seller Cost Reports. Buyer shall forward to Sellers any and all correspondence relating to the Seller Cost Reports within ten (10) Business Days after receipt by Buyer.  Buyer shall remit to Sellers any Cost Report Settlements promptly (but no later than ten (10) Business Days) after receipt by Buyer, and shall forward to Sellers any demand for payments relating to the Seller Cost Reports within ten (10) Business Days after receipt by Buyer. Sellers shall retain all Liabilities and obligations associated with the Seller Cost Reports and all rights related to the Cost Report Settlements.  Such rights shall include the right to appeal any Medicare determinations relating to Cost Report Settlements.  Sellers shall retain the originals of the Seller Cost Reports, correspondence, work papers, and other documents relating to the Seller Cost Reports and the Cost Report Settlements.  Sellers shall use commercially reasonable efforts to timely and accurately respond to all audit and other supplemental information requests related to the Seller Cost Reports.

(b)     Upon Buyer's written request, Sellers shall terminate the Hospitals' participation in any periodic interim payment program with Medicare effective as of the Closing Date. If Buyer receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating solely to periods prior to the Effective Time, Buyer shall pay Sellers an amount equal to such Medicare Interim Payment(s) received by Buyer within ten (10) days after receipt.  If Buyer receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating to the period commencing prior to and ending after the Effective Time, Buyer shall pay Sellers within ten (10) days after receipt an amount equal to the Medicare Interim Payment(s) actually received by Buyer for such period multiplied by a fraction, the numerator of which shall be the total number of days prior to the Effective Time and the denominator of which shall be the total number of days attributable to such Medicare Interim Payment(s).  If Sellers receive any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating solely to periods on or after the Effective Time, Sellers shall pay Buyer within ten (10) days after receipt an amount equal to such Medicare Interim Payment(s) received by Sellers.  If Sellers receive any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating to the periods commencing prior to and ending after the Effective Time, Sellers shall pay Buyer within ten (10) days after receipt an amount equal to the Medicare Interim Payment(s) actually received by Sellers for such period multiplied by a fraction, the numerator of which shall be the total number of days after the Effective Time and the denominator of which shall be the total number of days attributable to such Medicare Interim Payment(s).  It is the intent

of the Parties that Buyer and Sellers shall receive all third-party payments applicable to the period of time that the Hospitals are owned by the respective Parties.

(c)     If Sellers receive any amount from patients, third-party payors, group purchasing organizations or suppliers which, under the terms of this Agreement, belongs to Buyer, Sellers shall remit within ten (10) Business Days the full amount so received to Buyer.  If Buyer receives any amount from patients, third-party payors, group purchasing organizations or suppliers which, under the terms of this Agreement, belongs to Sellers, Buyer shall remit within ten (10) Business Days the full amount so received to Sellers.

(d)     Subject to applicable Laws, Sellers will reasonably cooperate with Buyer in providing pre-Closing patient data and any documents Buyer reasonably believes are necessary or appropriate for Buyer to file with respect to Medicaid disproportionate share hospital surveys, to the extent applicable in the jurisdiction of the Business for the fiscal periods prior to and after the Effective Time.

(e)     Notwithstanding anything to the contrary in this Agreement, neither Buyer nor Sellers shall be entitled to recover any of the respective payments due and owing under this <u>Section 6.5</u> by means of setoff against any amount owed by any other Party.

**6.6     CMS Reporting.**

(a)     Following the Effective Time, Buyer will cooperate with Sellers in all reasonable respects in providing, in a timely and reasonable manner, documents or data that Sellers reasonably believe are necessary or appropriate for Sellers to file with respect to CMS Reporting for all CMS Program Performance Periods ending prior to the Effective Time. Buyer shall forward to Sellers any and all correspondence from CMS relating to applicable CMS Reporting for such CMS Program Performance Periods within ten (10) Business Days after receipt by Buyer.

(b)     Following the Effective Time but prior to the end of the Post-Closing Period, Sellers shall (i) cooperate with Buyer in all reasonable respects in providing, in a timely and reasonable manner, pre-Closing documents or data that Buyer reasonably believes are necessary or appropriate for Buyer to file with respect to CMS Reporting for CMS Program Performance Periods in which the Effective Time occurs, and (ii) Sellers shall forward to Buyer any and all correspondence from CMS relating to CMS Reporting for such CMS Program Performance Periods within ten (10) Business Days after receipt by Sellers.

(c)     [Intentionally omitted]

(d)     [Intentionally omitted]

(e)     With respect to non-claims-based payments arising under CMS Program Payments for the CMS Program Performance Period in which the Effective Time occurs, the Parties shall share any CMS Program Payments for such CMS Program Performance Period on a pro rata basis (based upon, with respect to Buyer, the number of days during such CMS Program Performance Period that immediately follow the Effective Time divided by the total number of days in such CMS Program Performance Period, and with respect to Sellers, the number of days during such CMS Program Performance Period that immediately precede the Effective Time divided by the total number of days in such CMS Program Performance Period).  If Buyer receives any such CMS Program Payments, Buyer shall remit Sellers' pro rata share of such CMS Program Payments within ten (10) Business Days after receipt by Buyer.  If Sellers receives any such CMS Program Payments, Sellers shall remit Buyer's pro rata share of such CMS Program

Payments to Buyer within ten (10) Business Days after receipt by Sellers. To the extent Buyer or one of its Affiliates is required to refund or repay any portion of any CMS Program Payments, Sellers will pay to Buyer an amount equal to Sellers' pro rata portion of the required refund or repayment within ten (10) Business Days after notice to Sellers of such amount due.

(f)     Notwithstanding anything to the contrary in this Agreement neither Buyer nor Sellers shall be entitled to recover any of the respective payments due and owing under this Section 6.6 by means of setoff against any amount owed by any other Party.

6.7     **Waiver Program Payments**. Buyer and Sellers shall prorate any payments received by the Facilities after the Effective Time under Medicaid waiver or Medicaid supplemental payment programs as follows:

(a)     Any such amounts that correspond to Federal Fiscal Years or state fiscal years, as applicable, ending prior to the Effective Time will be paid to Sellers;

(b)     Any such amounts that correspond to Federal Fiscal Years or state fiscal years, as applicable, beginning on or after the Effective Time will be paid to Buyer; and

(c)     Any such amounts that correspond to the Federal Fiscal Year or state fiscal year, as applicable, during which the Effective Time occurs will be allocated between Buyer and Sellers on a pro rata basis (based upon the number of days during such year that Sellers operate the Facilities and the number of days during such year that Buyer operates the Facilities).

6.8     **License to Use Billing Information**. Following the Effective Time but, with respect to Sellers, only until the end of the Post-Closing Period and, to the extent allowed by applicable Law, Sellers grant Buyer and its Affiliates a license to use billing identification information of the Sellers (which information shall include such Seller's name, Medicare and related Medicaid and TRICARE provider numbers, federal employer identification number, and such other information as may be reasonably necessary, for purposes of submitting claims to Medicare, Medicaid and TRICARE for services provided at the Facilities by Buyer or any of its Affiliates after the Effective Time). To the extent allowed by applicable Law, each such license shall be effective (a) for purposes of Medicare, until CMS and the applicable CMS Medicare administrative contractor approve Buyer's or its Affiliate's Medicare change of ownership application and issue a tie-in notice and approval letter acknowledging that Buyer (or its Affiliate) may be reimbursed for claims submitted using Buyer's (or such Affiliate's) billing identification information; and (b) for purposes of Medicaid and any other Government Programs, until the applicable Medicaid program(s) or program agent(s) approves Buyer's (or its Affiliate's) provider enrollment application and/or approves assignment of the applicable provider Contract and issues the appropriate notice acknowledging that Buyer (or its Affiliate) may be reimbursed by the applicable Medicaid or other Government Program for claims submitted using Buyer's (or its Affiliate's) identification information. So long as such license remains in effect, Sellers (or its Affiliates) shall not act to: (i) terminate any of their billing identification information except as required by applicable Law; (ii) close any accounts used by Sellers prior to the Effective Time for purposes of receiving reimbursement; or (iii) cancel any electronic funds transfer agreements with respect to Medicare, Medicaid, TRICARE or any other Government Program. All accounts receivable and monies collected in the name of Buyer and/or its Affiliates or the Facilities for services provided by Buyer (and/or its Affiliates) after the Effective Time shall belong to Buyer (and/or its Affiliates). Buyer shall, and shall cause each of its Affiliates to, indemnify, defend and hold harmless Sellers and their Affiliates against, and reimburse Sellers and their Affiliates for, all Liabilities incurred by Sellers and any Seller Affiliate in connection with Sellers' obligations under this Section 6.8.

**6.9     Use of Controlled Substance Permits**.  To the extent permitted by applicable Law, Buyer shall have the right, only until the end of the Post-Closing Period, to operate under the licenses and registrations of the Sellers relating to controlled substances and the operations of pharmacies and laboratories, until Buyer is able to obtain such licenses and registrations for itself or to transfer such licenses or registrations to itself. In furtherance thereof, the Sellers shall execute and deliver to the Buyer at or prior to the Closing limited powers of attorney substantially in the form of Exhibit H hereto.

**6.10     Medical Staff**.  To ensure continuity of care in the community, Buyer agrees that the operations of each Hospital's medical staff will be substantially unchanged as a result of the consummation of the Contemplated Transactions, including each Hospital's medical staff members in good standing as of the Effective Time will maintain, to the extent consistent with criteria adopted at other Buyer or Buyer Affiliate facilities, medical staff privileges without change in medical staff status (e.g., active, courtesy) at each respective Hospital as of the Effective Time and each Hospital's medical staff officers in place immediately prior to the Effective Time will remain, to the extent consistent with criteria adopted at other Buyer or Buyer Affiliate facilities, in their same positions as of the Effective Time, *provided* that Buyer shall not be obligated to continue to maintain any Physicians and other Practitioners whose medical staff membership and/or clinical privileges have been terminated or not renewed by a Buyer or Buyer Affiliate facility.  As of and after the Effective Time, each Hospital's medical staff will be subject to each Hospital's medical staff by-laws then in effect to the extent consistent with applicable Law.

**6.11     Cooperation on Compliance Matters**.  Following the Effective Time but only until the end of the Post-Closing Period, if any compliance matter is identified by a Party, whether through internal audit or otherwise, for which another Party hereto may bear financial responsibility (a "**Compliance Matter**"), then such Party shall provide prompt written notice to such other Party.  Because any such Compliance Matter may impact Buyer and Sellers, the Parties acknowledge that both Buyer and Sellers shall have a common interest in fully resolving all such Compliance Matters and cooperating in good faith to do so.  To the extent necessary to preserve attorney client privilege and work product doctrine relating to the investigation or resolution of any Compliance Matter, the Parties agree that a common interest privilege shall exist with respect to any communications relating to the investigation and resolution of the Compliance Matter and, to the extent necessary and requested by any Party or its counsel, the Parties and their respective counsel shall enter into a written agreement to memorialize this common interest privilege existing among them relating to the Compliance Matter.  The Parties will thereafter cooperate reasonably with each other in any internal investigations or audits and shall make available to the other, as reasonably requested, any and all relevant information and, further, shall provide personnel as may be reasonably necessary and appropriate for purposes of analyzing and resolving such Compliance Matter.  In order to ensure the accuracy of any report of any Compliance Matter to a third party, except as otherwise required by applicable Law, the Parties agree that neither shall make any such report or disclosure to, or in respect of, any federally-funded or state-funded health care program, including Medicare, Medicaid, and TRICARE, or private third party payor or any other Governmental Authority with regulatory oversight with respect to any Compliance Matter which might give rise to Liability of the other Party without at least thirty (30) days' prior written notice to, and participation and approval of the report by, such other Party.  All Parties agree to cooperate fully and in good faith as necessary in the resolution of all Compliance Matters, and, subject to Section 9, Buyer and Sellers shall each bear its own expenses in connection therewith.

**6.12     Seller Employee Confirmation**.  The Parties acknowledge and agree that Buyer may wish to retain employees who primarily provide services to the Business but are not employed by a Seller Party. Within thirty (30) days of the date of this Agreement, the Parties agree to work in good faith to finalize Schedule A attached hereto to identify such employees and agree on whether such employees shall transfer to Buyer at Closing.

**6.13    Leased Real Property Confirmation**.  Within thirty (30) days of the date of this Agreement, the Parties agree to work in good faith to finalize Schedule B attached hereto.  The Parties acknowledge and agree that it is the intent of the Parties that Buyer shall assume all Tenant Leases and Third-Party Leases used by any physicians that are party to the physician agreements set forth on the Assumed Executory Contract and Lease Schedule.

**6.14    Transition Services Agreement**.  Notwithstanding that the form of the Transition Services Agreement shall be attached hereto as Exhibit I, the Parties agree to work collaboratively to finalize the schedules to such Transition Services Agreement within thirty (30) days of the date of this Agreement.

**6.15    Professional Services Agreement**.  Sellers agree that, in the event the Parties desire to close the transactions contemplated hereunder but the Buyer Parties have not completed the credentialing process for the physicians, SMG and, if needed, the Sellers, shall enter into one or more professional services agreements with Buyer Parties, in substantially the form of agreements as provided to Buyer prior to the date of this Agreement and with such changes as shall reasonably be agreed to by the Parties and SMG, to provide the services of such physicians to the Buyer Parties until Closing.

**6.16    Changes to Leased Real Property**.  In connection with the Leased Real Property, the Seller Parties shall not consent to or approve (to the extent it has the right to consent or approve) and shall use their commercially reasonable efforts in line with the lease agreements (provided that such efforts shall not require the Seller Parties to incur any expenses, unless Buyer agrees to fund the same) to cause any landlord or sublandlord or tenant or subtenant not to make any alteration or Encumbrance to such Seller Party's right, title and interest in and to the Leased Real Property between the date of this Agreement and the Closing Date, except as contemplated by the MPT Purchase Agreement.

**6.17    MPT Purchase Agreement**.

(a)    Following the date of this Agreement, Buyer and its Affiliates shall use their commercially reasonable efforts to negotiate and enter into the MPT Purchase Agreement and consummate the transactions contemplated by the MPT Purchase Agreement and all other documents related thereto. Promptly, but in any event within five (5) days, after the MPT Purchase Agreement is executed by all applicable parties thereto, Buyer shall provide to Sellers a true, correct, and complete copy of the fully executed MPT Purchase Agreement.

(b)    Sellers shall deliver at the closing under the MPT Purchase Agreement such customary affidavits, declarations or disclosure documents in form reasonably acceptable to Sellers, duly executed by Sellers (or any of them) or their Affiliates, that are required to be delivered by Sellers or their Affiliates (as applicable) to the Title Company (i) to effect the severance of the MPT Real Property from the Existing MPT Lease and (ii) to issue a title insurance policy to Buyer, in each case in connection with the consummation of the transaction contemplated in the MPT Purchase Agreement.

**6.18    Post-Closing Receipt of Assets or Excluded Assets.**

(a)    In addition to any misdirected payments referenced in Section 6.6 to which Sellers are entitled, any asset or any Liability, all other remittances and all mail and other communications that is an Excluded Asset or an Excluded Liability (i) pursuant to the terms of this Agreement or (ii) absent such agreement, as finally determined by the Bankruptcy Court pursuant to Section 13.2, and which comes into the possession, custody or control of Buyer (or its respective successors-in-interest, assigns or Affiliates) shall as promptly as reasonably practicable following receipt be transferred, assigned or conveyed by Buyer (and its respective successors-in-interest, assigns and Affiliates) to Sellers at Sellers' sole cost and expense.

Until such transfer, assignment and conveyance, Buyer and its respective successors-in-interest, assigns and Affiliates, shall not have any right, title or interest in or obligation or responsibility with respect to such asset or Liability except that Buyer shall hold such asset in trust for the benefit of Sellers.  Buyer and its respective successors-in-interest, assigns and Affiliates, shall have neither the right to offset amounts payable to Sellers under this Section 6.18(a) against, nor the right to contest its obligation to transfer, assign and convey to Sellers because of, outstanding claims, Liabilities or obligations asserted by Buyer against Sellers including but not limited to pursuant to the Purchase Price adjustment of Section 1.9.

(b)     In addition to any misdirected payments referenced in Section 6.7 to which Buyer is entitled, any asset or any Liability, all other remittances and all mail and other communications that is an Purchased Asset or an Assumed Liability (i) pursuant to the terms of this Agreement or (ii) absent such agreement, as finally determined by the Bankruptcy Court pursuant to Section 13.2, and which comes into the possession, custody or control of Sellers (or their successors-in-interest, assigns or Affiliates) shall within ten (10) Business Days following receipt be transferred, assigned or conveyed by Sellers (and their successors-in-interest, assigns and Affiliates) to Buyer at Buyer's cost.  Until such transfer, assignment and conveyance, Sellers and their successors-in-interest, assigns and Affiliates shall not have any right, title or interest in or obligation or responsibility with respect to such asset or Liability except that Sellers shall hold such asset in trust for the benefit of Buyer.  Sellers and Seller Affiliates and their respective successors-in-interest and assigns shall have neither the right to offset amounts payable to Buyer under this Section 6.18(b) against, nor the right to contest its obligation to transfer, assign and convey to Buyer because of, outstanding claims, Liabilities or obligations asserted by Sellers against Buyer including but not limited to pursuant to the Purchase Price adjustment of Section 1.9.

**6.19     Closing Financials**.  Buyer shall cause the chief financial officer(s) of the Facilities to complete the standardized closing of Sellers' financial records for the Business through the Closing Date including, without limitation, the closing of general ledger account reconciliations in form and substance consistent with past practice (collectively, the "**Closing Financials**").  Buyer shall cause the chief financial officer(s) of the Facilities to use his or her good faith efforts to complete the Closing Financials by no later than the date which is thirty-five (35) days after the Closing Date.  Sellers shall reimburse Buyer for all reasonable, out-of-pocket and documented expenses of Buyer associated with the preparation of the Closing Financials. Such reimbursement shall occur no later than the date which is thirty (30) days after Buyer provides a written statement to Sellers which details such charges and expenses.

7.     **CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**

The obligations of Buyer to consummate the Contemplated Transactions and to perform their obligations in connection with the Closing are subject to the satisfaction, at or prior to the Closing, of each of the following conditions unless waived in writing by Buyer:

**7.1     Representations and Warranties**.  Each of the representations and warranties of Sellers contained in this Agreement shall be true and correct in all respects (without giving duplicative effect to any limitation or qualification as to Material Adverse Effect, materiality or similar phrases set forth therein) on and as of the date of this Agreement and on and as of the Closing Date (except to the extent that such representations and warranties address matters as of particular dates, in which case, such representations and warranties shall be true and correct in all material respects on and as of such dates) except for all purposes of Section 7.1 where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

**7.2     Performance**.  Sellers shall have performed and complied with, in each case in all material respects, all covenants contained in this Agreement that are required to be performed or complied with by Sellers at or prior to the Closing.

**7.3     Pre-Closing Confirmations.**    The Parties shall have obtained from the applicable Governmental Authorities, (a) the Approvals set forth on Schedule 7.3(a) effective as of the Effective Time, and (b) any applicable waiting period (and any extension thereof) under the HSR Act applicable to the Contemplated Transactions shall have expired or been terminated.

**7.4     No Restraints**.  No Governmental Authority shall have issued an Order that is then in effect restraining or prohibiting the consummation of the Contemplated Transactions.

**7.5     Closing Documents**. Sellers shall have executed and delivered to Buyer all of the items required to be delivered by Sellers as contemplated by Section 2.2.

**7.6     Sale Order**.  The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order.

**7.7     Existing MPT Lease Severance Agreement**. Except to the extent the severance of the Existing MPT Lease from the MPT Real Property is otherwise addressed by Order of the Bankruptcy Court (which Order may be the Sale Order), the Existing MPT Lease Severance Agreement shall have become effective concurrently with the Effective Time and shall not have been modified, terminated, revoked or rescinded on or prior to the Closing Date and shall be in full force and effect at the Effective Time.

**7.8     MPT Purchase Agreement**. MPT (or Sellers or any of their Affiliates if it were to be finally determined by the Bankruptcy Court that the Sellers or any of their Affiliates have ownership title to the MPT Real Property) and Buyer shall have entered into the MPT Purchase Agreement and consummated the transactions contemplated by the MPT Purchase Agreement effective concurrently with, or prior to, the Effective Time and the MPT Purchase Agreement shall be in full force and effect at the Effective Time; provided that, if the provisions of Section 1.8(b) have become applicable, Buyer's payment obligations thereunder shall not be specified therein and instead shall be reflected in the instrument contemplated by Section 1.8(b).

8.     **CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS.**

The obligation of Sellers to consummate the Contemplated Transactions and to perform their obligations in connection with the Closing are subject to the satisfaction, at or prior to the Closing, of each of the following conditions unless waived in writing by Sellers:

**8.1     Representations and Warranties**.  Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all respects (without giving duplicative effect to any limitation or qualification as to Buyer Material Adverse Effect, materiality or similar phrases set forth therein) on and as of the date of this Agreement and on and as of the Closing Date (except to the extent that such representations and warranties address matters as of particular dates, in which case, such representations and warranties shall be true and correct in all material respects on and as of such dates) except (for all purposes of this Section 8.1) where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, have a Buyer Material Adverse Effect.

**8.2     Performance**.  Buyer shall have performed and complied with, in each case in all material respects, all covenants contained in this Agreement that are required to be performed or complied with by Buyer at or prior to the Closing.

**8.3     No Restraints**.  No Governmental Authority shall have issued an Order that is then in effect restraining or prohibiting the consummation of the Contemplated Transactions.

**8.4     Pre-Closing Confirmations**.  (a) The Parties shall have obtained from the applicable Governmental Authorities, the Approvals set forth on Schedule 7.3(a) effective as of the Effective Time and (b) any applicable waiting period (and any extension thereof) under the HSR Act applicable to the Contemplated Transactions shall have expired or been terminated.

**8.5     Closing Documents**.  Buyer shall have executed and delivered to Sellers all of the items required to be delivered by Buyer as contemplated by Section 2.3.

**8.6     Adverse Change**.  Buyer shall not (a) be in receivership or dissolution, (b) have made any assignment for the benefit of creditors, (c) have admitted in writing its inability to pay its debts as they mature, (d) have been adjudicated bankrupt or (e) have filed a petition in voluntary bankruptcy, a petition or answer seeking reorganization, or an arrangement with creditors under the federal bankruptcy Law or any other similar Law.

**8.7     MPT Real Property**.

(a)     Except to the extent the severance of the Existing MPT Lease from the MPT Real Property is otherwise addressed by Order of the Bankruptcy Court (which Order may be the Sale Order), the Existing MPT Lease Severance Agreement shall have become effective concurrently with the Effective Time and shall not have been modified, terminated, revoked or rescinded on or prior to the Closing Date and shall be in full force and effect at the Effective Time.

(b)     MPT (or Sellers or any of their Affiliates if it were to be finally determined by the Bankruptcy Court that Sellers or any of their Affiliates have ownership title to the MPT Real Property) and Buyer shall have entered into the MPT Purchase Agreement and (i) the allocation of the TEV (as adjusted in accordance with this Agreement) to MPT as reflected therein shall be acceptable to Buyer and Sellers (provided, that Buyer shall be deemed to have consented if the value allocated to the MPT Real Property is in amount less than the Maximum Allocation Value), or (ii) the provisions of Section 1.8(b) shall have become applicable.

**8.8     Sale Order**.  The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall not be subject to any stay.

9.     **BANKRUPTCY PROVISIONS.**

**9.1     Approval of Break-Up Fee; Expense Reimbursement and Modified Bid Procedures**.

(a)     In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay Buyer, in accordance with the terms hereof and the Bidding Procedures Order, a break-up fee in an amount equal to (a) $13,700,000 (the "**Break-Up Fee**") plus (b) the amount of the reasonable, out-of-pocket and documented expenses of Buyer incurred in connection with the Contemplated Transactions up to an aggregate amount of $6,500,000 (such expense reimbursement, the "**Expense Reimbursement Amount**" and, together with the Break-Up Fee, the "**Termination Payment**" or the "**Bid Protections**").  The obligations of Sellers to pay the Expense Reimbursement Amount and the Break-Up Fee as provided in this Section 9.1 shall, pursuant to the Bidding Procedures Order, be (i) entitled to superpriority administrative expense status with priority over any and all administrative expenses of the

kind specified in Sections 503(b)(1) and 507(a) of the Bankruptcy Code in Seller's Chapter 11 Cases, subject only to the superiority claims set forth in the DIP Financing Orders, and (ii) if triggered by, shall be payable in accordance with <u>Section 9.3</u> free and clear of all liens (including those arising under the DIP Financing Orders).

(b)        Within one (1) Business Day of Sellers' acceptance of this Agreement as a Stalking Horse Bidder (as defined in the Bidding Procedures Order), in accordance with the Bidding Procedures Order, Sellers will file with the Bankruptcy Court and serve on all necessary parties a notice setting forth the terms of the Bid Protections.  Such notice also shall notify all parties that Sellers will not further extend any of the dates or deadlines as it relates to the Purchased Assets set forth in that certain Notice of Certain Dates and Deadlines Under the Bidding Procedures Order (Docket No. 1933) without the express written consent of the Buyer (not to be unreasonably withheld); provided, that Buyer shall be deemed to consent to an extension of the Bid Deadline of up to (5) Business Days following the date the Bankruptcy Court approves the Bid Protections if such approval occurs after August 21, 2024 (the "**Modified Bid Procedures**").

(c)        If no objection to the notice required under Section 9.1(b) is filed within three (3) Business Days after Sellers' filing and service of such notice, the Sellers shall within one (1) Business Day file with the Bankruptcy Court a proposed Order expressly approving (i) the amount and priority of Termination Payment, including its superpriority administrative priority status subject to the DIP Financing Orders and (ii) the Modified Bid Procedures, including without limitation that Sellers may not further extend any of the dates or deadlines set forth in <u>Section 9.1(b)</u> without the express written consent of the Buyer.  If the Bid Protections and Modified Bid Procedures are not approved by the Bankruptcy Court by August 22, 2024, Buyer shall be permitted to revoke the terms of this Agreement and submit a revised form of purchase agreement for purposes of participating in the Auction.

**9.2**    **Competing Transaction**.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of Competing Bids.  From the date hereof and until the conclusion of the Auction for the Purchased Assets, Sellers and Seller Parties are permitted to and to cause its Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid.  In addition, to the extent expressly required by the Bankruptcy Code and binding legal precedent, Sellers and Seller Parties may respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order or other applicable Law, including supplying information relating to the Business, the Purchased Assets to prospective purchasers.

**9.3**    **Payment of Termination Payment**.  In the event that (1) Buyer is not the winning bidder at the Auction or (2) Sellers otherwise terminate this Agreement pursuant to <u>Section 12.1(e)</u> and consummate a Competing Bid within twelve (12) months of such termination and where no material breach by Buyer of this Agreement has occurred, Sellers shall pay the Termination Payment to Buyer by wire transfer of immediately available funds, to the account specified by Buyer to Sellers in writing, no later than the closing of the Competing Bid (or, if such Competing Bid is comprised of more than one transaction, the closing and funding of the first such transaction, but only to the extent there are net proceeds from such transaction available to pay the Termination Payment, otherwise any remaining portion of the Termination Payment would be paid from the closing and funding of the following such transaction(s) to the extent of available net proceeds, provided that the Termination Payment shall be paid in full no later than the closing and funding of the final such transaction regardless of whether the total proceeds of a Competing Bid are sufficient to satisfy the Termination Payment) reflected in a Competing Bid regardless of whether the proceeds of the Competing Bid are sufficient to pay the Termination Payment in full, and Seller and Buyer

agree that the Termination Payment is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Buyer for the time and effort associated with initial due diligence and negotiation of this Agreement and the opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated herein.

9.4     **Bankruptcy Court Filings.**

(a)     Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer in accordance with the Bidding Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  Buyer shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets and/or the Transferred Interests hereunder; provided, however, if, in accordance with Section 1.8(b) of this Agreement or otherwise, the Sellers and MPT, or their respective affiliates, engage in motion practice, litigation or other proceedings in the Bankruptcy Court, or in mediation, with respect to the MPT Real Property and the allocation of the TEV, Sellers agree Buyer shall have the right to and standing to participate in such proceedings as a full party in interest, including but not limited to presenting valuation or other testimony with respect to the allocation of TEV between the MPT Real Property and the Purchased Assets hereunder.  In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Sellers and Buyer shall use their respective commercially reasonable efforts to defend such appeal.

(b)     The Sale Order shall approve this Agreement and the Contemplated Transactions, and shall contain the following provisions in terms acceptable to Buyer (such consent not to be unreasonably withheld except with respect to Section 9.1(b)(iii), Section 9.1(b)(iv), and Section 9.4(b)(ix)) (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Sale Order):

(i)     that Sellers may sell, transfer and assign the Purchased Assets and assume and assign the Assumed Contracts to Buyer pursuant to this Agreement and applicable law;

(ii)     upon payment of the Purchase Price to Sellers by Buyer, the transfers of the Purchased Assets by Sellers to Buyer (A) will vest Buyer with all right, title and interest of Sellers in and to the Purchased Assets, free and clear of all Encumbrances (except for the Assumed Liabilities and Permitted Encumbrances) with same attaching to the sale proceeds in the same validity, extent, and priority as immediately prior to any such sale, and (B) will constitute transfers for reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Avoidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or any similar state or federal law), under Delaware law;

(iii)     to the extent the Sellers and MPT reach consensual agreement on allocation of the TEV between the Purchased Assets and under the MPT Purchase Agreement, such allocation must be acceptable to Buyer (provided, that Buyer shall be deemed to have accepted if the value allocated to the MPT Real Property is an amount less than the Maximum Allocation Value);

(iv)     a determination that, to the extent the Sellers and MPT do not reach consensual agreement on allocation of the TEV between the Purchased Assets under this Agreement and the MPT Purchase Agreement, Buyer shall have standing to participate in any motion practice, litigation

65

or other proceedings in the Bankruptcy Court or in mediation, with respect to the MPT Real Property as a full party in interest, including but not limited to presenting valuation or other testimony with respect to the allocation of TEV between the MPT Real Property and the Purchased Assets hereunder;

(v)    the transactions contemplated by this Agreement are undertaken by Buyer and Sellers at arm's length, without collusion and in good faith, including within the meaning of Delaware law, and such Parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(vi)    a determination that selling the Purchased Assets free and clear of all Encumbrances (except for the Assumed Liabilities and Permitted Encumbrances) is in the best interest of Sellers' estate;

(vii)    a determination that the failure of any duly noticed non-Seller counterparty to an Executory Contract or Lease to timely object to the assumption and assignment of its Executory Contract or Lease with Sellers constitutes (A) a waiver of the non-Seller counterparty's right to contest the proposed Cure Amount set forth in the Cure Notice served upon it; and (B) the non-Seller counterparty's consent to the assignment of its Executory Contract or Lease with Sellers to Buyer;

(viii)    authorization for Buyer to freely own and operate the Purchased Assets; and

(ix)    either (i) that the Government Program provider agreements are statutory entitlement assets that are sold free and clear of all claims and Encumbrances, and Buyer will not be subject to successor liability or similar liability for any claims, defenses, rights of recoupment, or causes of action of any kind or character against Sellers, Sellers' estate, or otherwise, whether known or unknown, including without limitation any successor liability or similar liability with respect to NPIs and provider numbers under the Government Programs (i.e., Medicare, Medicaid) issued to and held by Sellers and the Facilities, unless expressly assumed as an Assumed Liability pursuant to this Agreement or (ii) if agreed to by the applicable Governmental Authority, the Government Program provider agreements are Executory Contracts, the assumption of which shall in all respects be subject to payment by Buyer to the applicable Governmental Authority in the amount that is agreed to by Sellers and the applicable Governmental Authority, and which amount shall be deemed an Assumed Cure Cost, and the payment of which shall be in exchange for the full satisfaction, discharge, and release of the Buyer of all claims and liabilities, whether known or unknown, that the applicable Governmental Authority has or may have against the Buyer (including against the Buyer as a successor to Sellers or otherwise against Buyer on Sellers' behalf) relating to the Government Program provider agreements on or before the Closing Date.

**9.5    Back-up Bidder**.  Sellers and Buyer agree that, in the event that Buyer is not the winning bidder at the auction for the Purchased Assets undertaken pursuant to the Bidding Procedures Order (the "**Auction**"), if and only if (a) Buyer submits the second highest or second best bid at the Auction and is named the "Back-Up Bidder" at the Auction, in each case, as determined by Sellers, and (b) Sellers give notice to Buyer on or before the Back-Up Termination Date, stating that Sellers and Seller Parties (i) failed to consummate the sale with the winning bidder, and (ii) have terminated the definitive agreement with the winning bidder, Buyer shall promptly consummate the Contemplated Transactions upon the terms and conditions as set forth herein, including the Purchase Price, as the same may be increased by Buyer at the Auction.  If Buyer is otherwise entitled to the return of its Good Faith Deposit pursuant to the terms of this Agreement, then the Good Faith Deposit shall be paid to Buyer within five (5) Business Days of the Back-Up Termination Date.

10. **SPECIFIC PERFORMANCE.**

(a)     The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each Party agrees that, in the event of any breach or threatened breach by any other Party of any covenant or obligation contained in this Agreement, the non-breaching Party shall be entitled (in addition to any other equitable remedy that may be available to it) to obtain, without proof of actual damages, (i) a decree or other Order of specific performance to enforce the observance and performance of such covenant or obligation, and (ii) an injunction restraining such breach or threatened breach.

(b)     Each Party acknowledges and agrees that (i) it will not oppose any equitable relief or equitable remedy referred to in this Section 10 on the grounds that any other remedy is available at law or in equity, and (ii) no Party will be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any equitable relief or equitable remedy referred to in this Section 10 (and it hereby irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument).

11. **TAX MATTERS.**

**11.1    Allocation of Purchase Price**.  The Parties agree that Sellers and Buyer shall negotiate in good faith to agree upon an allocation ("**Allocation**") of an amount totaling the sum of the (a) Purchase Price, (b) Assumed Liabilities and (c) all other capitalized costs under this Agreement, among the Purchased Assets and, to the extent applicable, the assets of any entity whose interests are Transferred Interests (or any Subsidiary thereof), in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any other relevant provisions of the Code or any similar provisions of state or local Law, as appropriate).  If Buyer and Sellers cannot agree, then they shall each be entitled to adopt their own positions.  If Buyer and Sellers agree on a final Allocation, Buyer and Sellers shall report and file all Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with such Allocation; provided, however, that neither Party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim or similar Proceedings in connection with such Allocation.

**11.2    Tax Returns**.

(a)     Sellers shall prepare and file or cause to be prepared and filed on a timely basis and in a manner consistent with Seller's past practices (including reporting positions, elections, and accounting methods, except as otherwise required by a change in applicable Law after the date of this Agreement), all Tax Returns required to be filed with respect to the Purchased Assets and the Business, or by any entity whose interests are Transferred Interests (or any Subsidiary thereof) if such entity is controlled by Sellers or any Seller Affiliate as of the date of this Agreement, for all taxable periods ending on or prior to the Closing Date.  Sellers shall deliver or cause to be delivered a copy of such Tax Returns prepared by Seller that are filed after the Effective Time to Buyer prior to the due date for filing of any such Tax Return for Buyer's review and comment.  For the avoidance of doubt, Sellers or any Seller Affiliate (i) shall be solely responsible for all Taxes payable with respect to any such Tax Return, (ii) shall have sole control over the preparation and filing of, and Buyer shall not be entitled to review and comment on, any income Tax Returns of Sellers or any Seller Affiliate and any Group Tax Returns, in each case for any taxable period (or portion thereof), and (iii) shall be entitled to all refunds, rebates or other recoveries with respect to Taxes in relation to any Group Tax Return.

67

(b)      Buyer shall prepare and file or cause to be prepared and filed on a timely basis all Tax Returns required to be filed with respect to the Purchased Assets and the Business, or by any entity whose interests are Transferred Interests (or any Subsidiary thereof) if such entity is controlled by Buyer or any Affiliate of Buyer after the Closing, for all taxable periods beginning prior to the Closing Date and ending after the Closing Date (a "**Straddle Period**").  Buyer shall prepare all such Tax Returns in a manner consistent with Sellers' past practices, including reporting positions, elections, and accounting methods, except as otherwise required by a change in applicable Law after the date of this Agreement. Buyer shall deliver or cause to be delivered a copy of such Tax Returns prepared by Buyer at least thirty (30) days prior to the due date of any such Tax Return for Sellers' review and shall not file such Tax Returns without Sellers' written approval.  Sellers shall be responsible for and shall pay any Taxes arising or resulting from or in connection with the ownership of the Purchased Assets and the operation of the Business for all taxable periods (or portions thereof) ending before the Effective Time.  Buyer shall be responsible for and shall pay any Taxes arising or resulting from or in connection with the ownership of the Purchased Assets and operation of the Business for all taxable periods (or portions thereof) commencing after the Effective Time. Neither Sellers nor Buyer shall consent, without the prior written consent of the other Party, to any change in the treatment of any item with respect to the Purchased Assets or the Business that would affect any Tax Liability for which the other Party is responsible. The Parties shall cooperate to apportion any Taxes with respect to the Purchased Assets or the Business for any Straddle Periods (including by providing reasonable supporting documentation with respect to such amounts). Any disputes between the Parties under this Section 11.2 will be resolved by the Accounting Firm in accordance with procedures similar to those set forth in Section 1.9(c) and (d).

**11.3**      **Apportionment of Taxes**.  In order to apportion appropriately any Taxes relating to a Straddle Period, the Parties shall, to the extent required or permitted under applicable Laws, treat the day before the day in which the Effective Time occurs as the last day of the taxable year or period for all Tax purposes.  With respect to Taxes for a Straddle Period, the portion of any Taxes that are allocable to the portion of the Straddle Period ending on the day before the day in which the Effective Time occurs shall be: (i) in the case of Taxes that are imposed on a periodic basis (including real property Taxes, personal property Taxes, and any other similar Taxes or obligations (but excluding, for the avoidance of doubt, any Transfer Taxes)), deemed to be the amount of such Taxes for the entire period, multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on (and including) the day before the day in which the Effective Time occurs and the denominator of which is the number of days in the entire relevant Straddle Period; and (ii) in the case of Taxes not described in (i) (such as (A) Taxes that are based upon or measured by income or receipts or imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible) and (B) payroll and similar Taxes), deemed equal to the amount that would be payable if the taxable year or period ended at the end of day before the day in which the Effective Time occurs.  Sellers shall timely file (or cause to be timely filed) all applicable filings, reports and returns with respect to such Taxes apportioned to it, as provided by applicable Law. Buyer shall be responsible for the payment of Taxes and related costs allocable to the portion of the Straddle Period commencing after the Effective Time and shall be responsible for timely filing (or causing to be timely filed) all applicable filings, reports and returns with respect to such Taxes, as provided by applicable Law.

(a)      To the maximum extent permitted by applicable Law, all deductions relating to, arising as a result of, or in connection with the Contemplated Transactions and paid by Sellers (or any Seller Affiliate) shall be claimed as deductions in Pre-Closing Tax Periods on the U.S. federal (and applicable state and local) income Tax Returns of Sellers (or Seller Affiliate) or entity whose interests are Transferred Interests (or Subsidiary thereof), as applicable.

(b)      With respect to each entity (if any) whose interests are Transferred Interests and that is treated as a partnership for U.S. federal (or applicable state and local) income Tax purposes, all tax items (other than any extraordinary items allocated under Treas. Reg. § 1.706-4(e)) that are attributable to the Transferred Interests (or any Subsidiary thereof) for such entity's taxable period that includes the Closing Date shall be allocated between Sellers and Buyer by applying the interim closing method, using the calendar day convention, in accordance with Section 706 and the Treasury Regulations thereunder (and any similar provision of state or local Law).

**11.4      Cooperation**.  Following the Closing, each Party shall cooperate with the other Party in connection with the preparation of any Tax Returns, the defense of any Proceeding related to Taxes, or any other matters with respect to Taxes, and shall make available to the other Party, as reasonably requested, all information, records or documents relating to Taxes with respect to the Purchased Assets or the Business for all periods, and shall preserve or cause to be preserved all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof.

**11.5      Tax Proceedings**.  After the Effective Time, with respect to any Proceeding relating to Taxes for any taxable period (or portion thereof) with respect to the Purchased Assets or the Business, or in relation to any entity whose interests are Transferred Interests (or any Subsidiary thereof), for which Sellers or any Seller Affiliate could be liable under applicable Law or under this Agreement (collectively, a "**Tax Proceeding**"), Buyer shall promptly inform Sellers of such Tax Proceeding and such Tax Proceeding shall be controlled by Sellers. To the extent that such Tax Proceeding could adversely affect Buyer, Sellers (a) shall keep Buyer reasonably informed regarding any material developments in such Tax Proceeding and (b) shall not consent to the entry of any judgment or enter into any settlement of any such Tax Proceeding without the prior written consent of Buyer, which shall not be unreasonably withheld, conditioned or delayed.

**11.6      Transfer Taxes**.  All Transfer Taxes incurred in connection with the Contemplated Transactions shall be paid fifty percent (50%) by Buyer and fifty percent (50%) Sellers in accordance with Section 13.8 when due, and all necessary Tax Returns and other documentation with respect to such Transfer Taxes shall be prepared and filed by the Party that is required by Law to file such Tax Returns.

**11.7      Post-Closing Actions**.  Except with Sellers' consent, neither Buyer nor any Affiliate of Buyer shall (or shall cause or permit any entity whose interests are Transferred Interests (or any Subsidiary thereof) to) with respect to any Tax Returned referred to in Section 11.2(a) or (b) above, (a) make or change any election or amend, refile or otherwise modify any Tax Return, (b) voluntarily approach a Governmental Authority regarding any Taxes or Tax Returns, enter into any closing agreement, settle any Tax claim or assessment or surrender any right to claim a refund of Taxes, (c) extend or waive any statute of limitations or other period for the assessment or collection of Taxes or (d) otherwise take any action relating to Taxes that is outside the ordinary course of business, in each case that could create or increase Taxes borne by Sellers or any Seller Affiliate under applicable Law or under this Agreement or reduce any amount that Sellers or any Seller Affiliate would otherwise be entitled to receive under applicable Law or this Agreement.

12.      **TERMINATION; GOOD FAITH DEPOSIT.**

**12.1      Termination**.  Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated and the Contemplated Transactions may be abandoned at any time prior to the Closing as follows:

(a)       by mutual written consent of Buyer and Sellers, expressly and in writing, by means of a document signed by the duly authorized representatives of the Parties;

(b)       by either Buyer or Sellers upon delivery of written notice to the other if the Closing has not occurred on or before 5:00 p.m., Central Time, on the date that is seventy (70) days after the date hereof (the "**End Date**"); provided, that such date may be extended by thirty (30) days by either Buyer or Sellers if the conditions set forth in Sections 7.3, 7.4, 8.3 and 8.4 shall not have been satisfied as of the close of business on the Business Day immediately prior to the End Date (but for purposes of Sections 7.4 and 8.3, only for any Order or Proceeding related to the Antitrust Approvals), but all other conditions set forth in Section 7 and Section 8 shall have been satisfied or, with respect to those conditions to be satisfied at the Closing, shall be capable of being satisfied on the date the Closing should occur pursuant to Section 2.1, except to the extent the satisfaction of such conditions at such time has been (to the extent permitted by law) waived by the applicable Party for purposes of the extension; provided, further, that neither Buyer nor Sellers will be entitled to terminate this Agreement pursuant to this Section 12.1(b) if such Person's material breach of, or material failure to fulfill any obligation under, this Agreement or any other Transaction Document has been the principal cause of the failure of the conditions contained in Section 7 or Section 8 (as the case may be) to be satisfied on or prior to such time on the End Date;

(c)       by Buyer upon delivery of written notice to Sellers, if there has been a breach of any Sellers' representation or warranty or Sellers' failure to perform any covenant or agreement set forth in this Agreement or in any other Transaction Document, which breach (i) would give rise to the failure of a condition set forth in Section 7 to be satisfied and (ii) either (A) cannot be cured by the End Date, or (B) if capable of being cured, shall not have been cured by the earlier of (1) thirty (30) days following receipt of written notice from Buyer of such breach or (2) the date that is three (3) days prior to the End Date, provided, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 12.1(c) if Buyer is then in material breach or violation of its representations, warranties, covenants or agreements contained in this Agreement;

(d)       by Sellers upon delivery of written notice to Buyer, if there has been a breach of any Buyer's representation or warranty or Buyer's failure to perform any covenant or agreement set forth this Agreement or in any other Transaction Document, which breach (i) would give rise to the failure of a condition set forth in Section 8 to be satisfied and (ii) either (A) cannot be cured prior to the End Date, or (B) if capable of being cured, shall not have been cured by the earlier of (1) thirty (30) days following receipt of written notice from Sellers of such breach or (2) the date that is three (3) days prior to the End Date, provided, that Sellers shall not have the right to terminate this Agreement pursuant to this Section 12.1(d) if Sellers are then in material breach or violation of its representations, warranties, covenants or agreements contained in this Agreement;

(e)       by Sellers if the board of directors (or other equivalent governing body) of Sellers determines in good faith after consultation with outside counsel that its continued performance under this Agreement or any other Transaction Document would be inconsistent with its fiduciary duties under applicable Law;

(f)       by either Sellers or Buyer if Buyer is not selected as the winning bidder or named the "Back-Up Bidder" at the Auction;

(g)       by either Buyer or Sellers upon delivery of written notice to the other if any Governmental Authority shall have issued or entered any Order, enacted, promulgated or enforced any Law or taken any other action which, in any such case, permanently restrains, enjoins or otherwise prohibits or makes illegal the consummation of all or any of the Contemplated Transactions and such Order or Law has

become final and non-appealable; provided, however, that (i) the right to terminate this Agreement pursuant to this Section 12.1(f) shall not be available to any Party whose failure to fulfill any obligations under this Agreement shall have been the primary cause of, or shall have primarily resulted in, such Order or Law, or (ii) the Party seeking to terminate this Agreement under this Section 12.1(f) shall have used its commercially reasonable efforts to cause any such Order or Law to be lifted or vacated to ameliorate the effects thereof;

(h)     by Sellers if the Federal Trade Commission or Department of Justice issues a "Request for Additional Information or Documentary Material" to either the Sellers or Buyer (or their respective Affiliates) in connection with the Contemplated Transactions; and

(i)     by Buyer, if (i) the Bankruptcy Court enters a Final Order (x) dismissing the Chapter 11 Cases or converting the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code, or (y) appointing a trustee, receiver or other Person responsible for operation or administration of Sellers or its business or assets, or a responsible officer for any of Sellers, or an examiner with enlarged powers relating to the operation or administration of Sellers or its business or assets; or (ii) if Sellers file any stand-alone plan of reorganization or liquidation, in each case, that does not contemplate consummation of the transactions memorialized in this Agreement (or announces support of any such plan filed by any other party).

**12.2     Good Faith Deposit; Expense Reimbursement**.

(a)     Within one (1) Business Day of the execution and delivery of this Agreement, Buyer shall provide a good faith deposit towards the Purchase Price in the amount of $43,942,400 (the "**Good Faith Deposit**"); provided that if Buyer elects to acquire the NSI JV Interests prior to the NSI Election Date in accordance with Section 1.12, Buyer shall provide an additional contribution to the Good Faith Deposit in an amount equal to $640,700.00 within two (2) Business Days after the expiration of the NSI Election Date. The Good Faith Deposit shall be deposited by wire transfer of immediately available funds to, and be maintained in, a segregated account maintained by Acquiom Clearinghouse LLC (the "**Escrow Holder**"). The Good Faith Deposit shall be credited against the Purchase Price in accordance with Section 1.8 at the Closing if Buyer is the winning bidder for the Purchased Assets. If Sellers terminate this Agreement pursuant to Section 12.1(b) (if Sellers are not in material breach of this Agreement) or Section 12.1(d), the Good Faith Deposit shall be forfeited by Buyer and Sellers shall be entitled to unilaterally instruct the Escrow Holder to release the Good Faith Deposit to Sellers (the "**Buyer Termination Fee**"). If this Agreement is terminated pursuant to any of Sections 12.1(a), except as set forth above, 12.1(b), 12.1(c), 12.1(e), 12.1(f), 12.1(h), or 12.1(i) (if terminated by Buyer), then Buyer and Sellers shall jointly instruct the Escrow Holder to release the Good Faith Deposit to Buyer from the Escrow Holder and the Good Faith Deposit shall be paid to Buyer within five (5) Business Days of the date of termination of this Agreement.

(b)     If this Agreement is validly terminated pursuant to Section 12.1(c) or Section 12.1(e) (for any reason other than the circumstances set forth in Section 9.3), Sellers shall pay to Buyer the Expense Reimbursement Amount no later than five (5) Business Days following the effective date of such termination.

**12.3     Effect of Termination**.

(a)     In the event of any termination of this Agreement by either Buyer or Sellers as provided in Section 12.1, this Agreement shall forthwith become void, and there shall be no Liability on the part of any Party or any of its Affiliates to any other Person resulting from, arising out of, relating to,

or in connection with this Agreement or any other Transaction Document, except that (i) nothing in this Agreement or any other Transaction Document will relieve any Party from any willful and intentional breach of this Agreement prior to such termination or for Fraud, (ii) application of and Liability associated with the Good Faith Deposit in <u>Section 12.2</u> shall survive any termination of this Agreement, and (iii) <u>Section 5.12</u> (*Confidentiality*), <u>Section 9.3</u> (*Payment of Termination Payment*), <u>Section 12.2(b)</u> (*Expense Reimbursement*), this <u>Section 12.3</u> (*Effect of Termination*), and <u>Section 13</u> (*General*) shall survive any termination of this Agreement and each Party shall be entitled to all remedies available at law or in equity (including specific performance) in connection with any past or future breach of any such provision.

(b)     In the event of a termination of this Agreement pursuant to this <u>Section 12</u>, notwithstanding anything in this Agreement or in any other Transaction Document to the contrary, (i) except in the event of Fraud, and except for the payment of the Good Faith Deposit pursuant to <u>Section 12.3(a)</u>, the maximum aggregate Liability of Sellers, on the one hand, and Buyer, on the other hand, under this Agreement shall not exceed an amount equal to the amount of the Good Faith Deposit plus, with respect to the Liability of Sellers, the Expense Reimbursement Amount; and (ii) in no event shall any Party have any Liability under this Agreement (including under this <u>Section 12</u>) for any consequential, special, incidental, indirect, multiplied, exemplary or punitive damages, lost profits or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of this Agreement).

(c)     As soon as practicable following a termination of this Agreement for any reason, but in no event more than thirty (30) days after such termination, Buyer and Sellers shall, to the extent practicable, withdraw all filings, applications and other submissions relating to the transactions contemplated by this Agreement filed or submitted by or on behalf of such Party to any Governmental Authority or other Person.

13.     **GENERAL.**

**13.1     Notice**.  Any notice, demand or other communication required, permitted or desired to be given hereunder must be in writing and shall be deemed effectively given (a) when personally delivered, (b) one (1) Business Day after being sent by the addressee if sent by a nationally recognized overnight courier, (c) on the date transmitted via electronic mail with a delivery receipt requested, if sent on a Business Day between 9:00 AM and 9:00 PM in the time zone of the recipient, or if sent outside of such hours, on the next Business Day at 9:00 AM in the time zone of the recipient or (d) on the fifth (5th) day after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, in each case, addressed as follows:

|  |  |
|---|---|
| If to Sellers: | c/o Steward Health Care System LLC<br>1900 N Pearl St #2400<br>Dallas, Texas 75201<br>Attention:  Jeffrey Morales<br>Email: Jeffrey.Morales@steward.org; |
| With simultaneous copy (which<br>shall not constitute notice) to: | McDermott Will & Emery LLP<br>200 Clarendon Street, Floor 58<br>Boston, MA 02116<br>Attention: Charles Buck<br>Email: cbuck@mwe.com |

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Ray C. Schrock, Candace M. Arthur,
David J. Cohen, Mariel E. Cruz
Email: ray.schrock@weil.com;
candace.arthur@weil.com; davidj.cohen@weil.com;
mariel.cruz@weil.com

If to Buyer:

Orlando Health, Inc. 1414 Kuhl Avenue MP 2
Orlando, FL 32806
Attention: Ryan Zika, General Counsel
Email: ryan.zika@orlandohealth.com

With simultaneous copy (which
shall not constitute notice) to:

Hogan Lovells US LLP
855 Main St, Suite 200
Redwood City, CA 94063
Attention: Todd Schwartz, Christine Pallares, Erin
Brady
Email: todd.schwartz@hoganlovells.com;
christine.pallares@hoganlovells.com;
erin.brady@hoganlovells.com

or to such other address, and to the attention of such other Person or officer as any Party may designate.

**13.2    Choice of Law; Venue**.

(a)    The Parties agree that all disagreements, disputes or claims arising out of or relating to this Agreement or the Contemplated Transactions shall be governed by and construed in accordance with the applicable Laws of the State of Delaware without giving effect to any choice or conflicts of law provision or rule thereof that would result in the application of the applicable Laws of any other jurisdiction other than the applicable Laws of the United States of America, where applicable.

(b)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claim which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.1; provided, however, upon the closing of the Chapter 11 Cases, the Parties agree to unconditionally and hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware sitting in Wilmington, Delaware (or if such court declines to exercise such jurisdiction in any appropriate state or federal court in the State of Delaware sitting in Wilmington, Delaware) over any action, arbitration, charge, claim, complaint, demand, dispute, litigation or Proceeding arising from or relating to this Agreement (a "**Claim**"), and the Parties hereto hereby irrevocably agree that all Claims shall be heard and determined in such court.  The Parties hereby irrevocably waive, to the fullest extent permitted

73

by applicable Law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. The Parties hereto agree that a final judgment with respect to any such Claim shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

**13.3    Benefit; Assignment; Delegation.**   Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and permitted assigns and delegates.   No Party may assign any of its rights hereunder or delegate any of its duties hereunder without the prior written consent of the other Parties; provided, however, that Buyer, without the prior consent of the other Parties, may assign any of its respective rights hereunder or delegate any of its duties hereunder to its Affiliates (as applicable), or, for collateral security purposes, to Persons providing financing to Buyer or its Affiliates, but in such event, Buyer shall be required to remain obligated hereunder in the same manner as if such assignment or delegation had not been effected.

**13.4    Waiver of Jury Trial**.   EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

**13.5    Legal Advice and Reliance**.   Except as expressly provided in this Agreement, none of the Parties (nor any of the Parties' respective Representatives) has made or is making any representations to any other Party (or to any other Party's Representatives) concerning the consequences of the Contemplated Transactions under applicable Laws, including Tax-related Laws or under the Laws governing the Government Programs.   Except for the representations and warranties made in this Agreement, each Party has relied solely upon the Tax, Government Program and other advice of its own Representatives engaged by such Party and not on any such advice provided by any other Party.

**13.6    No Survival**.   Except (i) as set forth in Section 11.1 and Section 12.3 and (ii) for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing (which covenants shall survive the Effective Time in accordance with their terms), none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Effective Time.

**13.7    Reproduction of Documents**.   This Agreement and the other Transaction Documents, including (a) consents, waivers and modifications which may hereafter be executed, (b) the documents delivered at the Closing, and (c) financial statements, certificates and other information previously or hereafter furnished to Sellers or to Buyer, may, subject to the provisions of Section 5.12 and Section 6.3(a), be reproduced by Sellers and by Buyer by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process, and Sellers and Buyer may destroy any original documents so reproduced. Sellers and Buyer agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative Proceeding (whether or not the original is in existence and whether or not such reproduction was made by Sellers or Buyer in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**13.8    Cost of Transaction; Legal Fees and Cost of Disputes**. Except as otherwise provided herein, the Parties agree that, whether or not the Contemplated Transactions shall be consummated: (a) Sellers will pay (i) the fees, expenses and disbursements of Sellers and their respective Representatives incurred in connection with the subject matter hereof and any amendments hereto and (ii) fifty percent

(50%) of any Transfer Taxes, and (b) Buyer will pay (i) the fees, expenses and disbursements of Buyer and its Representatives incurred in connection with the subject matter hereof and any amendments hereto; (ii) the fees, expenses and disbursements in connection with the commitments, title policy, surveys and any environmental investigations conducted by Buyer in respect of the MPT Real Property; (iii) the fees incurred in connection with the HSR filing contemplated by Section 5.5; (iv) fifty percent (50%) of any Transfer Taxes and (v) the Assumed Cure Costs.

**13.9    Waiver of Breach**.  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or other provision hereof.

**13.10    Severability**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of Buyer or Sellers under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and (d) upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order than the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**13.11    No Inferences; Sophisticated Parties**.  Each Party acknowledges and agrees to the following: (a) all of the Parties are sophisticated and represented by experienced healthcare and transactional counsel in the negotiation and preparation of this Agreement; (b) this Agreement is the result of lengthy and extensive negotiations between the Parties and an equal amount of drafting by all Parties; (c) this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; and (d) no inference in favor of, or against, any Party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such Party.

**13.12    Divisions and Headings of this Agreement**.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**13.13    No Third-Party Beneficiaries**.  The terms and provisions of this Agreement are intended solely for the benefit of Buyer and the Sellers, and such parties' respective permitted successors, assigns, or delegates, and it is not the intention of the Parties to confer, and, except as set forth in Section 13.18, this Agreement shall not confer, third-party beneficiary rights upon any other Person, including any employee or member of the medical staff of any Hospital.

**13.14    Entire Agreement; Amendment**.  This Agreement (inclusive of Exhibits and Schedules), together with the other Transaction Documents and the Confidentiality Agreement and any other agreement which specifically references this Section 13.14, represent the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior or contemporaneous oral or written understandings, negotiations, letters of intent or agreements between the Parties.  This Section 13.14 shall be deemed a "merger" clause under Delaware Law, and this Agreement (together with the other Transaction Documents and the Confidentiality Agreement) is intended as a complete integration of the agreement of the Parties. No modifications of, amendments to, or waivers of any rights or duties under this Agreement shall be valid or enforceable unless and until made in writing and signed by all Parties.

75

**13.15    Multiple Counterparts**.  This Agreement may be executed in any number of counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  The facsimile signature of any Party or other Person to this Agreement or any other Transaction Document or a PDF copy of the signature of any Party or other Person to this Agreement or any other Transaction Document delivered by electronic mail for purposes of execution or otherwise, is to be considered to have the same binding effect as the delivery of an original signature on an original contract.

**13.16    Other Owners of Purchased Assets**.  The Parties acknowledge that certain Purchased Assets may be owned by one or more Seller Parties rather than Sellers.  Notwithstanding the foregoing, and for purposes of all representations, warranties, covenants and agreements contained herein, each Seller agree that it has the legal capacity to cause, and it shall cause, any Seller Affiliate that owns any Purchased Assets to meet all of Sellers' obligations under this Agreement with respect to such Purchased Assets.  Each Seller hereby waives any defense to a claim made by Buyer under this Agreement based on the failure of any Person who owns the Purchased Assets to be a Party.

**13.17    Right of Set Off**.  Following the Closing, upon notice to the Sellers specifying in reasonable detail the basis therefor and a reasonable opportunity to cure, Buyer may set off any amount to which it is entitled from any Seller pursuant to Section 1.9(e) or Section 1.13 (Proration) (following final determination of each in accordance with the terms of this Agreement) against amounts payable by Buyer pursuant to any Transition Services Agreement. Neither the exercise of, nor the failure to exercise, such right of setoff will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies that maybe available to it.

**13.18    Non-Recourse**.  All claims, obligations, Liabilities, actions or causes of action (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their successors and assigns ("**Contracting Parties**").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other representative of, and any lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other representative of, and any lender to, any of the foregoing ("**Nonparty Affiliates**"), shall have any Liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or other Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, causes of action, obligations and other Liabilities against any such Nonparty Affiliates. It is expressly agreed that the Nonparty Affiliates to whom this Section 13.18 applies shall be third-party beneficiaries of this Section 13.18.  For the avoidance of doubt, nothing in this Section 13.18 shall limit the recourse of Buyer in respect of Fraud.

**13.19    Interpretation**.

In this Agreement, unless the context otherwise requires:

(a)    references to this Agreement are references to this Agreement and to the Exhibits and Schedules attached or delivered with respect hereto or expressly incorporated herein by reference; each

Schedule is hereby incorporated by reference into this Agreement and will be considered a part hereof as if set forth herein in full;

(b)      references to "Sections" are references to sections of this Agreement;

(c)      references to any Party shall include references to its respective successors and permitted assigns and delegates;

(d)      the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement;

(e)      references to any agreement (including this Agreement) are references to that agreement as amended, consolidated, supplemented, novated or replaced in accordance with the terms and conditions therein from time to time;

(f)      unless the context requires otherwise, references to any Law are references to that Law as of the date of this Agreement, and shall also refer to all rules and regulations promulgated thereunder;

(g)      the word "including" (and all derivations thereof) means "including, without limitation," and any lists or examples following the word "including" or the phrase "including, without limitation," are intended to be nonexclusive examples solely for the purpose of illustration and without the intention of limiting the text preceding such lists or examples;

(h)      references to time are references to Central Standard Time or Central Daylight Time (as in effect on the applicable day) unless otherwise specified herein;

(i)      the gender of all words herein include the masculine, feminine and neuter, and the number of all words herein include the singular and plural;

(j)      the provisions of this Agreement shall be interpreted in such a manner so as not to inequitably benefit or burden any Party through "double counting" of assets or Liabilities or failing to recognize benefits that may result from any matters that impose Liabilities, Losses or burdens on any Party, including in connection with (i) the determination of the adjustments contemplated by Section 1.9; and (ii) the calculation of Losses;

(k)      the terms "date hereof," "date of this Agreement," and similar terms shall mean the date set forth in the preamble to this Agreement;

(l)      the phrases "Sellers have delivered," "Sellers have provided," "Sellers have made available" and phrases of similar import shall mean that, Sellers or their Representatives have made the document or information in question available to Buyer and its employees and Representatives at least three (3) Business Days prior to the date hereof by posting a copy thereof to the virtual data rooms titled "Golden Sun - FL" hosted by DFin by Donnelley Financial Solutions;

(m)      references to the "ordinary course of business" shall mean the ordinary course of business consistent with past practice; and

(n)      references to "day" shall mean calendar day, unless otherwise specified herein.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**SELLERS:**

Steward Melbourne Hospital, Inc.

By: _____

Name:  John Castellano

Title:    Chief Restructuring Officer

Steward Rockledge Hospital, Inc.

By: _____

Name:  John Castellano

Title:    Chief Restructuring Officer

Steward Sebastian River Medical Center, Inc.

By: _____

Name:  John Castellano

Title:    Chief Restructuring Officer

*Signature Page to Asset Purchase Agreement*

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

BUYER:                                  Orlando Health, Inc., a Florida corporation

                                        By: _____
                                        Name:  Daniel Mihalic
                                        Title:  VP, Growth Execution and Optimization

CLINIC:                                 Orlando Health Medical Group, Inc., Florida corporation

                                        By: _____
                                        Name: Daniel Mihalic
                                        Title: VP, Growth Execution and Optimization

*Signature Page to Asset Purchase Agreement*

## ANNEX A – DEFINITIONS

"**Accounting Firm**" is defined in Section 1.9c).

"**Acquired Avoidance Actions**" is defined in Section 1.1(l).

"**Additional Assumed Employee Obligations**" means all accrued payroll of the Business relating to the last payroll period to begin before Closing to the extent the same remains unpaid as of Closing.

"**Affiliate**" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and any successors or assigns of such Person, *provided, that*, with respect to any Seller, for all purposes herein, "Affiliate" shall mean Steward Health Care System LLC and each of its direct and indirect Subsidiaries. For purposes of this definition, "control" means possession, directly or indirectly, of the power to direct, or cause the direction of, the management and policies of a Person whether through ownership of voting securities, by Contract or otherwise.

"**Agreement**" is defined in the preamble to this Agreement.

"**Allocation**" is defined in Section 11.1.

"**Antitrust Laws**" means any Laws that are designed or intended to preserve and protect competition, prohibit, restrict or regulate actions having the purpose or effect of monopolization, attempted monopolization, or restraint of trade, including the HSR Act, the Sherman Antitrust Act of 1890, the Clayton Antitrust Act of 1914, and the Federal Trade Commission Act of 1914, in each case, as amended.

"**Approval**" means any approval, action, authorization, consent, accreditation, notice, qualification, ratification or registration, or any extension, modification, amendment or waiver, exemption, release, variance of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Authority, Private Program or other Person, in each case, in connection with the operation of the Business or the consummation of the Contemplated Transactions, as applicable.

"**Assignment and Assumption Agreement**" is defined in Section 2.2(c).

"**Assumed Contracts**" is defined in Section 1.1(h).

"**Assumed Cure Costs**" is defined in Section 1.3(g).

"**Assumed Executory Contract and Lease Schedule**" is defined in Section 1.5(b)(i).

"**Assumed Liabilities**" is defined in Section 1.3.

"**Assumed Paid Time Off**" is defined in Section 6.1(g).

"**Assumed Third-Party Claims**" is defined in Section 1.1(l).

"**Auction**" is defined in Section 9.5.

"**Available Contract Schedule**" is defined in Section 1.5(a).

"**Avoidance Action**" means any claim, right or cause of action of any Seller for avoidance, recovery, subordination, disallowance or other relief arising under Chapter 5 of the Bankruptcy Code or applicable state fraudulent conveyance, fraudulent transfer, recharacterization or similar Laws.

"**Back-Up Termination Date**" means the first to occur of (a) consummation of the transaction with the winning bidder at the Auction, (b) Buyer's receipt of notice from Sellers of the release by Sellers of Buyer's obligations under 9.4(a), and November 30, 2024.

"**Balance Sheet Date**" means May 31, 2024.

"**Bankruptcy Code**" is defined in the Recitals.

"**Bankruptcy Court**" is defined in the Recitals.

"**BHMA**" means Brevard HMA Holdings, LLC.

"**Bid Protections**" is defined in Section 9.1.

"**Bidding Procedures Order**" means the Order (a) approving (i) the Global Bidding Procedures for Sales of the Debtors' Assets, (ii) the Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (iii) the Assumption and Assignment of Procedures and Form and Manner of Notice of Assumption and Assignment; (b) authorizing the Designation of Stalking Horse Bidders; (c) scheduling the Auctions and Sale Hearings; and (d) granting the Related Relief, (Docket No. 626), dated June 3, 2024, entered by the Bankruptcy Court.

"**Bill of Sale**" is defined in Section 2.2(b).

"**Books and Records**" means originals, or where not available, copies (including in electronic format), of all files, documents, instruments, papers, books and records maintained in connection with the Business or the Purchased Assets, including equipment records, construction plans and specifications, medical and administrative libraries, documents, catalogs, books, records, files, and operating manuals, computer files, computer discs, electronic mails and any other data and software storage media, jonals, deeds, title policies, books and records relating to books of account, ledgers and general financial accounting and operational records, personnel records, machinery and equipment maintenance files, patient and customer lists, price lists, distribution lists, supplier lists, quality control records and procedures, customer and patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, marketing plans, internal financial statements and marketing and promotional surveys, pricing and cost information, material and research and other records of every kind (whether written, electronic or otherwise embodied), in each case, to the extent such books and records are located at the Facilities or are exclusively used or held for use in, or otherwise exclusively relate to, the Business.

"**Break-Up Fee**" is defined in Section 9.1.

"**Business**" means the operation of the Facilities by Sellers and all services provided by, or pursuant to Contracts with, Sellers and the Seller Parties at the Facilities, in each case as currently conducted by Sellers or a Seller Party, including, to the extent they are conveyed at Closing pursuant to this Agreement, the business of owning the Transferred Interests.

"**Business Contracts**" means (i) the Payor Agreements and (ii) all other Contracts (excluding the Leases) of the Sellers and the Seller Parties that exclusively relate to the operation of the Business or the Facilities, including all Employee Obligations and Physician employment agreements.

"**Business Day**" means any day except Saturday, Sunday and any day which is a legal holiday in New York, New York.

"**Buyer**" is defined in the preamble to this Agreement.

"**Buyer Eligibility Requirements**" is defined in Section 6.1(a).

"**Buyer Employer**" is defined in Section 6.1(a).

"**Buyer Material Adverse Effect**" means any change, fact, circumstance, occurrence, event, effect or condition that, individually or in the aggregate with all other changes, facts, circumstances, occurrences, events, effects or conditions, directly or indirectly, results in, or would reasonably be expected to result in, a material adverse effect on the ability of Buyer to consummate the Contemplated Transactions.

"**Buyer Proposed Allocation**" is defined in Section 1.8(b).

"**Buyer Termination Fee**" is defined in Section 12.2.

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act, P.L. 116–136, and the rules and regulations promulgated thereunder.

"**Chapter 11 Cases**" is defined in the Recitals.

"**Claim**" is defined in Section 13.2(b).

"**Clean Room Black Box Agreement**" means that certain Clean Room Black Box Agreement dated June 20, 2024, by and between Steward Health Care Holdings, LLC and Orlando Health, Inc.

"**Closing**" is defined in Section 2.1.

"**Closing Date**" is defined in Section 2.1.

"**Closing Financials**" is defined in Section 6.19.

"**Closing Payment Shortfall Amount**" is defined in Section 1.9(e).

"**Closing Statement**" is defined in Section 1.9a).

"**CMS**" means the Centers for Medicare & Medicaid Services.

"**CMS Program Payments**" means payments or discounts that are not based directly on the submission of claims for services delivered and are received through participation in a Government Program implemented by CMS through a Contract with CMS or as a participant through a Contract with a CMS contractor, including Medicare accountable care organizations, episode-based payment initiatives and other Medicare innovation models as implemented by CMS as authorized pursuant to Laws identified in CMS Reporting.

"**CMS Program Performance Period**" means the period of time applicable to a CMS Program Payment or CMS Reporting requirement.

"**CMS Reporting**" means any quality, performance reporting through use of certified electronic health record technology and other electronic reporting requirements, applicable to the Business and in all cases implemented by CMS pursuant, but not limited, to the Social Security Act, the Patient Protection and Affordable Care Act of 2010 (or any replacement or successor Law), the Health Care and Education Reconciliation Act of 2010, the Pathway for Sustainable Growth Reform (SGR) Act of 2013, the Protecting Access to Medicare Act of 2014, the Improving Medicare Post-Acute Care Transformation Act of 2014 (IMPACT), American Taxpayer Relief Act of 2012 (ATRA), Balanced Budget Act of 1997 (BBA), the Medicare, Medicaid and SCHIP (State Children's Health Insurance Program) Balanced Budget Refinement Act of 1999 (BBRA), the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), the 21st Century Cures Act, HIPAA, the Medicare Access & CHIP Reauthorization Act of 2015 (MACRA) (Pub L. 114-10, enacted April 16, 2015), amending Title XVIII of the Social Security Act and/or the Bipartisan Balanced Budget Act of 2018, each of which may be amended from time to time by a Balanced Budget Act of the United States Congress, and each as applicable at such time as healthcare services are rendered.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, the Public Health Service Act, codified as 42 USC §§ 300bb-1 through 300bb-8, and any similar state or federal continuation of coverage Laws.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Collective Bargaining Agreement**" means the Collective Bargaining Agreement between Rockledge Regional Medical Center and the Florida Nurses Association, Local 713 that governs to the terms of employment for registered professional nurses and staff nurses employed by Seller Affiliate at the Rockledge Facility, as modified by a Memorandum of Agreement to modify and continue the CBA from May 1, 2024 to April 30, 2027.

"**Company Data**" means all confidential data, information, and data compilations contained in the Information Technology Systems or any databases of Sellers or any Seller Party, that are exclusively used by, or are necessary to, the Business.

"**Competing Bid**" means the sale, transfer, other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, foreclosure or other transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of any or all of the Purchased Assets or the Business, which, for the avoidance of doubt, may be in a single transaction or a series of transactions, with one or more Persons other than Buyer that Seller has determined in its good faith business judgment, after consultation with its outside financial advisors and outside legal counsel, would, if consummated, reasonably be expected to result in the highest or otherwise best overall transaction for any Seller, taking into account all terms thereof, including (i) the likelihood and timing of consummation, and (ii) all material legal, financial (including the financing terms of any such proposal), conditionality, regulatory, and other aspects of such proposal.

"**Compliance Matter**" is defined in Section 6.11.

"**Confidential Information**" means all information (whether or not specifically identified as confidential), in any form or medium that relates to Sellers or any Seller Parties and their respective businesses (including the Business), including: (a) internal business information related to the business of

Annex A

Sellers or the Seller Parties (including the Business) (including, information relating to strategic plans and practices, business, accounting, financial or marketing plans, practices or programs, training practices and programs, salaries, bonuses, incentive plans and other compensation and benefits information and accounting and business methods); (b) identities of, individual requirements of, specific contractual arrangements with, and information about, Sellers, their Affiliates, and its respective businesses (including the Business); (c) any confidential or proprietary information of any third party that Sellers or the Seller Parties has a duty to maintain confidentiality of, or use only for certain limited purposes; (d) industry research compiled by, or on behalf of Sellers, any Seller Affiliate, or any of its respective businesses (including the Business), including, identities of potential target companies, management teams, and transaction sources identified by, or on behalf of, Sellers or any Seller Affiliate; (e) compilations of data and analyses, processes, methods, track and performance records, data and data bases relating thereto; and (f) information related to the Transferred Intellectual Property and updates of any of the foregoing; provided that Confidential Information shall not include any information (x) that has become generally known to and widely available for use within the industry other than as a result of the acts or omissions of Sellers or Buyer, as applicable, or a Person that Sellers or Buyer, as applicable, has any direct control over, or (y) is lawfully acquired by Sellers or Buyer, as applicable, or any of its respective Affiliates or Representatives after the Closing from sources that are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement by and between Steward Health Care System LLC and Orlando Health, Inc. dated as of April 24, 2024.

"**Contemplated Transactions**" means, collectively, the transactions contemplated by, or related to, this Agreement, including (a) the sale and purchase of the Purchased Assets and (b) the execution, delivery and performance of this Agreement and the other Transaction Documents.  For purposes of this Agreement, Contemplated Transactions does not include the transactions contemplated by the MPT Purchase Agreement.

"**Contract**" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense, guaranty, indenture, occupancy or other agreement or arrangement of any kind (and all amendments, side letters, modifications and supplements thereto).

"**Controlled Group Liability**" means any and all Liabilities (a) under Title IV of ERISA, (b) under Section 302 or 4068(a) of ERISA, (c) under Section 430(k) or 4971 of the Code and (d) for violation of the continuation coverage requirements of Sections 601 et seq. of ERISA and Section 4980B of the Code or the group health requirements of Sections 701 et seq. of ERISA and Sections 9801 et seq. of the Code, in the case of each of the foregoing clauses (a) through (d), with respect to any Seller or any member of the ERISA Controlled Group.

"**Copyrights**" means all rights protected by copyright law, and rights in registered and unregistered works of authorship (whether or not copyrightable) whether published or unpublished including all product manuals, marketing brochures, training materials and website content, all rights to copy, distribute, modify, publicly perform and publicly display such works; rights to compilations, collective works and derivative works of any of the foregoing; and registrations and applications for registration for any of the foregoing and any renewals or extensions thereof.

"**Cost Report**" means any cost report (including all forms, worksheets, schedules and other attachments related thereto) required to be filed in respect of the Business or the Facilities pursuant to a Government Program or any Private Cost-Based Programs.

"**Cost Report Settlements**" is defined in Section 1.2(m).

Annex A

"**COVID-19**" means the novel coronavirus disease, COVID-19 virus (SARS-COV-2 and all related strains and sequences) or mutations (or antigenic shifts or drifts) thereof or a disease or public health emergency resulting therefrom.

"**COVID-19 Funds**" means all grants, payments, distributions, loans, funds or other relief applied for or provided prior to the Effective Time under the CARES Act, the Paycheck Protection Program Act, or any other program authorized by any Governmental Authority or Government Program in response to COVID-19, including the Paycheck Protection Program, Main Street Loan Program, Provider Relief Fund, Small Rural Hospital Improvement Program, Assistant Secretary for Preparedness and Response or Hospital Preparedness Program Grants, or any other Law or program enacted, adopted or authorized in response to COVID-19; provided, that COVID-19 Funds does not include any Medicare Accelerated and Advance Payments.

"**Credentialing and Medical Staff Records**" means, to the extent any Seller lawfully owns or has control of such records and information and such records and information are not subject to a peer-review or similar privilege or are otherwise non-disclosable by applicable Law, all credentialing records with respect to any Practitioner, all minutes of the meetings of the medical staffs of each Facility and any committees thereof, and all other records directly related to the administrative operations of each Facility's medical staff for the period prior to the Effective Time.

"**Cure Costs**" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by a Seller or Seller Party, and the assignment to Buyer, of the Transferred Executory Contracts and Leases to which such Seller or Seller Party is a party, as determined by the Bankruptcy Court or agreed to by Seller or Seller Party and the non-Seller or Seller Party counterparty to the applicable Transferred Executory Contract or Lease, as applicable.

"**Cure Notice**" is defined in Section 1.5(a).

"**Damaged Assets**" is defined in Section 5.13.

"**DIP Financing**" means (i) debtor-in-possession facility under that certain Debtor-in-Possession Credit Agreement, dated May 28, 2024 (as amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time), by and among Steward, the other Loan Parties (as defined therein) party thereto and MPT; and (ii) debtor-in-possession facility under that certain Debtor-in-Possession Credit Agreement, dated July 10, 2024 (as amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time), by and among SHCS and the other Loan Parties (as defined therein)party thereto, the Lenders (as defined therein) party thereto and Brigade Agency Services LLC, as administrative agent and collateral agent.

"**DIP Financing Orders**" means, collectively, the MPT DIP Financing Order and the FILO DIP Financing Order.

"**Domain Names**" means Internet electronic addresses and uniform resource locators registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the internet, rights in social media accounts and social media pages, and all applications for any of the foregoing.

"**DRG**" is defined in Section 6.4b).

"**DRG Transition Patients**" is defined in Section 6.4(b).

"**Effective Time**" is defined in Section 2.1.

"**Encumbrance**" means any claim, counterclaim, defense, right of recoupment, interest, easement, servitude, assessment, encumbrance, encroachment, defect in title, security interest, bailment (in the nature of a pledge or for purposes of security), mortgage, deed of trust, the grant of a power to confess judgment, conditional sales and title retention, lease, sublease, option, right of first refusal or first offer, lien, hypothecation, pledge, restriction or other similar arrangement or interest in real or personal property, whether imposed by Contract, Law, equity or otherwise.

"**End Date**" is defined in Section 12.1b).

"**Environmental Laws**" means all Laws relating to pollution, protection of the environment, natural resources or human health and safety, including the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. § 9601, *et seq.*, the Clean Air Act, 42 U.S.C. § 7401; and all other Laws relating to the use, treatment, storage, transportation, handling, disposal or Release of Hazardous Materials.

"**Environmental Permits**" means any permit, license, approval, waiver, allowance, variance, registration, certificate or other authorization required under or issued pursuant to any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Controlled Group**" means any entity, corporation or trade or business (whether or not incorporated) that is, or was at the relevant time, required to be aggregated with any Seller or any Seller Affiliate under Section 414 of the Code or Sections 302(d)(3) or 4001 of ERISA.

"**Estimated Closing Statement**" is defined in Section 1.7.

"**Estimated Purchase Price**" is defined in Section 1.7.

"**Estimated Working Capital**" is defined in Section 1.7.

"**Excluded Assets**" is defined in Section 1.2.

"**Excluded Contracts**" means all Contracts other than the Assumed Contracts.

"**Excluded Liabilities**" is defined in Section 1.4.

"**Execution Date**" means the date that is the later of (a) entry of the Sale Order (without such order having become final and non-appealable) and (b) execution of this Agreement by all the Sellers.

"**Executory Contract**" means any executory Business Contract to which a Seller is a party that exclusively relates to the operation of the Business or the Facilities.

"**Exhibits**" means the exhibits to this Agreement.

"**Existing MPT Lease**" means that certain Second Amended and Restated Master Lease Agreement, dated as of March 14, 2022 (as modified, amended, or restated from time to time).

"**Existing MPT Lease Severance Agreement**" means that certain agreement to be entered into, on or prior to the Closing Date, by Sellers (and applicable Seller Affiliates) and MPT (and its applicable

Affiliates), in form and substance acceptable to Sellers, pursuant to which the MPT Real Property shall be severed and released from the Existing MPT Lease.

"**Expense Reimbursement Amount**" is defined in Section 9.1(a).

"**Facility**" or collectively, "**Facilities**" means the Hospitals and Sellers' other healthcare facilities, operations, and businesses associated with or used in the operation of the Hospitals, as set forth on Exhibit A.

"**False Claims Act**" means the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

"**Federal Fiscal Year**" means the fiscal year of the federal government of the United States.

"**FILO DIP Financing Order**" means, that certain *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* located at docket number 1538 in the Chapter 11 Cases.

"**Final and Binding**" means, with respect to any calculation or determination, that such calculation or determination shall have the same preclusive effect on the Parties and all other applicable parties for all purposes as if such calculation or determination had been embodied in a final judgment, no longer subject to appeal, entered by a court of competent jurisdiction.

"**Final Order**" means an Order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect.

"**Final Resolution Date**" means the earliest to occur of (a) if the Closing Statement is not timely received by Sellers in accordance with Section 1.9(a) the date that Sellers notify Buyer in writing that the Estimated Closing Statement shall be deemed to be the final Closing Statement, (b) if a Post-Closing Notice of Disagreement is not received by Buyer in accordance with the time period specified in Section 1.9(b), one (1) Business Day after the required date for Sellers to deliver such Post-Closing Notice of Disagreement, (c) if a Post-Closing Notice of Disagreement is received by Buyer in accordance with the time period specified in Section 1.9(b), then (i) the date Buyer and Sellers resolve in writing all differences they have with respect to the matters specified in such Post-Closing Notice of Disagreement or (ii) the date all disputed matters set forth in such Post-Closing Notice of Disagreement, are finally resolved in writing by the Accounting Firm in accordance with Section 1.9.

"**Fraud**" means, with respect to any Person, actual and intentional common law fraud against another Person as interpreted by Delaware courts applying Delaware common law and as determined by the Bankruptcy Court.

"**FTC**" means the Federal Trade Commission.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect (a) with respect to financial information for periods on or after the Closing Date, as of the date of this

Agreement, and (b) with respect to financial information for periods prior to the Closing Date, as of such applicable time.

"**Good Faith Deposit**" is defined in <u>Section 12.1(a)</u>.

"**Government Programs**" means the Medicare (including Medicare Part D and Medicare Advantage), Medicaid, Medicaid-waiver and CHAMPUS/TRICARE programs, any other similar or successor federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) and any similar state or local health care programs, in each case in which any Facility participates as of the date of this Agreement.

"**Governmental Authority**" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal, special district or other instrumentality of any government, whether federal, state or local, domestic or foreign, and any healthcare self-regulatory organization (including but not limited to Medicare and Medicaid administrative contractors and their state equivalents).

"**Group Tax Return**" means any consolidated, combined, unitary, or similar Tax Returns for any affiliated or other Tax group of which Sellers are or have been a member or of which any direct or indirect owner of Sellers is the common parent.

"**Hazardous Materials**" means any substances, materials, chemicals or wastes which are regulated as "hazardous", "toxic", "pollutants", "contaminants" or words of similar meaning or effect under any Environmental Law, including any petroleum or refined petroleum products, radioactive materials, medical waste, asbestos, per- or polyfluoroalkyl substances or polychlorinated biphenyls.

"**Healthcare Laws**" means all applicable Laws relating to the provision of healthcare and related services, and all such Laws applicable to any Seller Party or the Facilities as currently operated, including, without limitation, the following: Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll (the Medicare Statute), including specifically the Ethics in Patient Reforms Act, as amended, 42 U.S.C. §1395m and the Federal Physician Self-Referral Law, as amended, 42 U.S.C. § 1395nn; Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-5 (the Medicaid statute); the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); the False Claims Act; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51- 58; the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b; the Exclusion Laws, 42 U.S.C. § 1320a-7; Eliminating Kickbacks in Recovery Act, 18 USC 220; Clinical Laboratory Improvement Amendments of 1988; any similar state and local Laws that address the subject matter of the foregoing; any state Law or precedent relating to the corporate practice of the learned or licensed healthcare professions; any state Law concerning the splitting of healthcare professional fees or kickbacks; any state Law concerning healthcare professional self-referrals; any state healthcare professional licensure Laws, qualifications or requirements for the practice of medicine or other learned healthcare professions; any state requirements for business corporations or professional corporations or associations that provide medical services or practice medicine or related learned healthcare profession; any state and federal controlled substance and drug diversion Laws, including, the Federal Controlled Substances Act (21 U.S.C. § 801, et seq.) and the regulations promulgated thereunder; any federal and state Laws governing data integrity and informed consent; and all applicable implementing regulations, rules, ordinances and Orders related to any of the foregoing.

"**HIPAA**" means collectively: (a) the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191), including but not limited to its implementing rules and regulations with respect to privacy, security of health information, and transactions and code sets; (b) the HITECH Act (Title XIII of the American Recovery and Reinvestment Act of 2009); (c) the Omnibus Rule effective March 26, 2013 (78 Fed. Reg. 5566), and other implementing rules regulations at 45 CFR Parts 160 and 164 and related

binding guidance from the United States Department of Health and Human Services and (d) any federal, state and local laws governing the privacy and/or security of individually identifiable information, in each case, as the same may be amended, modified or supplemented from time to time.

"**Historical Financial Information**" is defined in Section 3.5a).

"**HITECH Act**" means the Health Information Technology for Economic and Clinical Health Act, Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Pub. Law No. 111-5 and its implementing regulations, including 42 C.F.R. §§ 412, 413, 422 and 495, as amended by the HIPAA Omnibus Rule, issued on January 25, 2013, effective as of March 26, 2013.

"**Hospitals**" means the hospitals set forth on Exhibit A hereto.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related rules and regulations.

"**Immigration Act**" means the Immigration Reform and Control Act of 1986.

"**Information Privacy or Security Laws**" means all applicable foreign or domestic (federal, state or domestic) Laws applicable to the Purchased Assets concerning privacy, security, integrity, accuracy, transmission, storage, processing, of Personal Information (including protected health information), including to the extent applicable to the Purchased Assets, HIPAA, the HITECH Act, the CAN-SPAM Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, state data breach notification Laws, and state health privacy and information security Laws, the FTC Act 15 U.S.C. §§ 41-58, as amended.

"**Information Security Reviews**" is defined in Section 3.12(c).

"**Information Technology Systems**" means all information technology systems and services related thereto, Software, computers, workstations, databases, data processing system manuals, routers, hubs, switches, networks and other information technology equipment exclusively used or held for use in the Business.

"**Insurance Policies**" is defined in Section 3.20.

"**Intellectual Property**" means any and all intellectual property rights in, arising out of, or associated therewith, throughout the world: Copyrights, Domain Names, Patents, Trademarks and Trade Secrets, inventions (whether patentable or unpatentable and whether or not reduced to practice) and all improvements thereto, and any other related or equivalent proprietary rights now known or hereafter recognized in any jurisdiction worldwide, together with (i) all registrations and applications to register, and all rights to register, any of the foregoing, together with all renewals, extensions, and foreign counterparts of, and other registrations or applications claiming priority to, any of the foregoing, (ii) all royalties, income, and payments now owing or in the future due to the owner of any of the foregoing with respect to any of the foregoing, (iii) all damages and rights to sue and recover damages or other remedies for past, present and future infringement, misappropriation, dilution, or other violation of any of the foregoing, (iv) all data relating to any of the foregoing in any form or medium, and (v) all copies and tangible embodiments of any of the foregoing, in any form or medium.

"**Intellectual Property Contracts**" means all Business Contracts that exclusively relate to the operation of the Business or the Facilities: (a) under which Sellers have granted or agreed to grant to any other Person any license, covenant, release, immunity or other right that applies to any Owned Intellectual

Annex A

Property; or (b) under which any other Person has granted or agreed to grant to Sellers any license, covenant, release, immunity or other right with respect to Intellectual Property rights or technology.

"**Interim Billing**" is defined in <u>Section 6.4a)</u>.

"**Inventory**" means all usable inventory and supplies and other disposables and consumables exclusively used or held for use in the Business, but only to the extent included in the calculation of Net Working Capital.

"**IRS**" means the Internal Revenue Service.

"**Joint Commission**" is defined in <u>Section 3.8</u>.

"**Joint Venture**" means Neuroskeletal Imaging, LLC.

"**Justice Department**" means the United States Department of Justice.

"**Knowledge of Buyer**" means the actual knowledge of Daniel Mihalic, VP, Growth Execution and Optimization, Erick Hawkins, Chief Administrative Officer, and Ryan Zika, General Counsel.

"**Knowledge of Sellers**" means the actual knowledge of Daniel Knell, President of Florida Market, President of Rockledge Regional Medical Center, Ron Gicca, President of Melbourne Regional Medical Center, Ron Bierman, President of Sebastian River Medical Center, Amanda Davidson, Chief Financial Officer of Steward Sebastian River Medical Center, Inc., and Carmen Acker, Chief Financial Officers of Steward Melbourne Hospital, Inc. and Steward Rockledge Hospital, Inc.

"**Law**" means any constitutional provision, statute, law, rule, regulation, code, ordinance, accreditation standard, resolution, Order, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority (and for the avoidance of doubt, includes the Bankruptcy Code and Healthcare Laws).

"**Lease Assignment**" is defined in <u>Section 2.2(a)</u>.

"**Leased Real Property**" means the MPT Real Property subject to the Existing MPT Lease, and all other real property leased, subleased or licensed to, or for which a right to use, possess or occupy has been granted to, Sellers and exclusively relating to a Facility or exclusively used or held for use in, or otherwise exclusively relating to, the Business or to a Seller Party and listed on <u>Schedule B</u>, together with all rights, easements, rights of way, appurtenances and privileges appertaining or relating to such interest in real property and to the benefit of such real property, and all and all plant, buildings, structures, installments, fixtures, betterments, additions and improvements located on such real property.

"**Leases**" means each of the Third-Party Leases and the Tenant Leases.

"**Liability**" means any liability, obligation, deficiency, interest, penalty, fine, claim, demand, judgment, cause of action or other losses (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute, fixed, or contingent, accrued or unaccrued, liquidated or unliquidated, recorded or unrecorded, matured or unmatured, due or to become due or otherwise, and regardless of when asserted.

"**Losses**" means any and all Liabilities, costs, damages or expenses, whether or not arising from or in connection with any (a) claims made by any third parties (including interest, penalties, reasonable

attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing) or (b) any breach of, or inaccuracy in, any of the representations or warranties made by Buyer or Sellers in this Agreement; provided Losses shall not include any lost profits, multiplied damages, diminution of value, consequential damages, indirect damages, special damages, incidental damages, punitive damages or exemplary damages (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity).

"**Malicious Code**" means any virus, trojan horse, worm, ransomware, back door, time bomb, drop dead device or other Software routines designed to permit unauthorized access to, to disable, erase, interfere with the operation of, install itself within or otherwise harm a computer system or network on which such code is stored or installed or damaging or destroying any data or file without the user's consent.

"**Material Adverse Effect**" means any change, fact, circumstance, occurrence, event, effect or condition that, individually or in the aggregate with all other changes, facts, circumstances, occurrences, events, effects or conditions, directly or indirectly, results in, or would reasonably be expected to result in, a material adverse effect on (a) the ability of Sellers to consummate the Contemplated Transactions or (b) the business, condition (financial or otherwise), results of operations, assets or Liabilities of the Business, taken as a whole, except this clause (b) shall exclude any change, fact, circumstance, occurrence, event, effect or condition resulting from (i) changes in general local, domestic, foreign, or international economic, financial, business or political conditions, (ii) changes generally affecting the healthcare industry or markets in which Sellers operates, (iii) losses from operations of the Business that are materially consistent with the historical and projected run rate of the Business, or seasonal fluctuations in the Business consistent with prior fiscal years, (iv) any national or international political event or occurrence, including acts of war, sabotage or terrorism, military actions or the escalation thereof, (v) any changes in applicable Laws or accounting rules or principles, including changes in GAAP, or the interpretation or implementation of any of the foregoing, (vi) any action required by this Agreement, (vii) changes or proposed changes to any reimbursement rates or policies of Governmental Authorities that are generally applicable to hospitals or healthcare facilities, (viii) any natural disaster, calamity, pandemic or epidemic (including the COVID-19 pandemic, including the continuation or worsening of the COVID-19 pandemic and any variation or mutation thereof); (ix) any failure, in and of itself, by the Business to meet any internal projections or forecasts (as distinguished from any change, development, or occurrence giving rise or contributing to such failure); (x) any breach of Buyer's obligations under this Agreement; (xi) the availability or cost of equity, debt or other financing to Buyer, (xii) the entry into this Agreement or the announcement, pendency or consummation of the Contemplated Transactions or (xiii) any change resulting from the filing or pendency of the Chapter 11 Cases, actions taken in connection with the Chapter 11 Cases, or any reasonably anticipated effects of such filing, pendency or actions, or from any action approved by the Bankruptcy Court, provided that, in each case of clauses (i), (ii), (iii), (iv), (v), (vii) or (viii), such change, fact, circumstance, occurrence, event, effect or condition does not affect the Business, in a substantially disproportionate manner relative to other Persons operating in the industry in which the Business participates.

"**Material Contracts**" is defined in Section 3.17(a).

"**Maximum Allocation Value**" means $275,000,000.

"**Medicare Accelerated and Advance Payments**" means the accelerated and advance payments received by Sellers or any of its Affiliates, in each case to the extent relating to the Business, in each case prior to the Effective Time pursuant to the Accelerated Payment Program or the Advance Payment Program implemented by CMS to increase cash flow to healthcare providers as a result of COVID-19.

"**Medicare Interim Payments**" means payments made to the Hospitals on an interim basis under the Medicare program on a bi-weekly pass-thru or interim payment basis.

"**Modified Bid Procedures**" is defined in Section 9.1(b).

"**Monetary Lien**" means any mortgages, security interests, liens, mechanics' liens, or unpaid or past due Tax or assessment liens affecting any of the Leased Real Property and/or the MPT Real Property (excluding, for the avoidance of doubt, any Permitted Encumbrance (as defined herein) or any "permitted encumbrances" or similar term as may be defined in the MPT Real Property Agreement).

"**MPT**" means MPT Operating Partnership, L.P. or one of its Affiliates, or its successor-in-interest with respect to the MPT Real Property.

"**MPT DIP Financing Order**" means, that certain *Final Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* located at docket number 625 in the Chapter 11 Cases.

"**MPT Purchase Agreement**" is defined in the Recitals.

"**MPT Real Property**" means those properties exclusively relating to the Facilities that are currently the subject of the Existing MPT Lease and will be the subject of the MPT Purchase Agreement.

"**Net Working Capital**" has the meaning set forth on Part 1 of Exhibit C.  An example calculation of Net Working Capital as of the Balance Sheet Date, which shall be used as a template for the calculation of Net Working Capital, is attached hereto as Part 2 of Exhibit C.

"**Non-DRG Transition Patients**" is defined in Section 6.4b).

"**Non-Interim Billing Transition Patients**" is defined in Section 6.4b).

"**NPIs**" is defined in Section 1.1m).

"**NSI JV Interests**" means the fifty-one percent (51%) ownership interest in Neuroskeletal Imaging, LLC owned by a Seller Affiliate as of the date hereof.

"**OFAC**" means the Office of Foreign Asset Contract of the Department of Treasury.

"**OIG**" means the Office of the Inspector General of the U.S. Department of Health and Human Services.

"**Order**" means any judgment, order, writ, injunction, decree, decision, determination, award or like action of any Governmental Authority.

"**Owned Intellectual Property**" means any and all Intellectual Property, to the extent exclusively used or held for use in, or otherwise exclusively relating to, the Business, that is owned by Sellers or any Seller Affiliate and that is included in the Transferred Intellectual Property (excluding any Intellectual Property that constitute Excluded Assets).

"**Paid Time Off**" means Seller Employees' accrued vacation, sick, holiday or other paid time off and related Taxes and other payroll obligations.

Annex A

"**Parties**" is defined in the preamble to this Agreement.

"**Patents**" means, with respect to the Business, all patents and patent applications, including all provisional applications, priority and other applications, divisionals, continuations (in whole or in part), extensions, reissues, reexaminations, patent disclosures or equivalents or counterparts of any of the foregoing.

"**Paycheck Protection Program Act**" means the Paycheck Protection Program and Health Care Enhancement Act, P.L. 116-139, and the rules and regulations promulgated thereunder.

"**Payor Agreement**" means any Contract between Sellers and a Government Program or a Private Program under which the Business or Sellers directly or indirectly receive payments for medical services provided to such program's beneficiaries exclusively at the Facilities.

"**Permit**" means any consent, ratification, registration, waiver, authorization, license, permit, grant, franchise, concession, exemption, Order, notice, certificate or clearance issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law, in each case, in connection with the operation of the Business or the consummation of the Contemplated Transactions, as applicable.

"**Permitted Encumbrances**" means any Encumbrances relating to (a) zoning and building laws, ordinances, resolutions and regulations, (b) Taxes, assessments and governmental charges or levies not due and payable on or before the Effective Time, (c) non-exclusive licenses to Intellectual Property (other than the Trademarks) granted in the ordinary course of business, (d) the Leases (other than Leases that are rejected), (e) any matters arising as a result of the acts or omissions of Buyer or any of its Affiliates, agents, employees, contractors or representatives, (f) defects or imperfections of title, exceptions, easements, covenants, rights-of-way, restrictions and other similar charges, defects or encumbrances not materially interfering with the ordinary conduct of the Business none of which individually or in the aggregate would have a Material Adverse Effect on the Business or any of the Leased Real Property, (g) Encumbrances not created by Sellers that affects the underlying fee, lessor, licensor or sublessor interest of any Leased Real Property or real property over which Sellers (with respect to the Business) have easement or other property rights none of which individually or in the aggregate would have a Material Adverse Effect on the Business or any of the Leased Real Property, (h) Encumbrances arising out of, under or in connection with this Agreement or the other Transaction Documents, (i) rights, terms or conditions of any leases, subleases, licenses, sublicenses or occupancy agreements made available to Buyer, (j) Encumbrances related to Specified Debt, which Encumbrances will be removed as of Closing, (k) any other Encumbrance that will be cleared or discharged by the Bankruptcy Court or at Closing, and (l) any Encumbrance arising out of, under or in connection with the Securities Act or any other applicable securities Laws.  No Monetary Lien will be deemed a Permitted Encumbrance except as expressly set forth in this Agreement.

"**Person**" means an individual, association, hospital authority, corporation, limited liability company, partnership, limited liability partnership, trust, Governmental Authority or any other entity or organization.

"**Personal Information**" means any information relating to or reasonably capable of being associated with an identified or identifiable individual (including protected health information), including any personally identifiable data (*e.g.*, name, address, phone number, email address, financial account number, payment card data, government issued identifier, and health or medical information).

"**Personal Property**" means all of the Seller Parties' right, title and interest in tangible personal property exclusively used or held for use in, or otherwise exclusively relating to, the Business, including,

without limitation, all equipment, medical devices, medical and office supplies, diagnostic equipment, computer hardware and data processing equipment, furniture, fixtures, machinery, vehicles, office furnishings, office supplies and equipment, instruments, tools, supplies, leasehold improvements, telephones, telephone numbers, keys, security access cards and other tangible personal property exclusively used or held for use in, or otherwise exclusively relating to, the Business and, to the extent assignable or transferable by Sellers, all rights in all warranties of any manufacturer, vendor, or other Person with respect thereto.

"**Physician**" means a doctor of medicine or osteopathy, a doctor of dental surgery or dental medicine, a doctor of podiatric medicine, a doctor of optometry, or a chiropractor, as defined in section 1861(r) of the Social Security Act.

"**Plan**" is defined in Section 3.21(a).

"**Post-Closing Notice of Disagreement**" is defined in Section 1.9b).

"**Post-Closing Period**" means the period beginning immediately after Closing and ending on the date that is six (6) months following the Closing Date.

"**Power of Attorney**" is defined in Section 2.2(d).

"**Practitioner**" or "**Practitioners**" is defined in Section 3.6.

"**Prepaid Expenses**" means all advance payments, prepayments, prepaid expenses and deposits of Sellers made with respect to the Business, including deposits for leases and utilities, and such other advance payments.

"**Privacy Requirements**" means, with respect to the Business, any and all applicable Laws, and Contracts (including HIPAA "business associate" agreements) relating to the Processing of Personal Data, including, but not limited to: (i) each Law relating to the protection or Processing of Personal Data that is applicable to Sellers or any Seller Parties, including as applicable, but not limited to, HIPAA; HITECH; the Federal Trade Commission Act, 15 U.S.C. § 45, et seq.; the CAN-SPAM Act of 2003, 15 U.S.C. § 7701, et seq.; the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq.; the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g, et seq.; the Children's Online Privacy Protection Act (COPPA) § 6501, et seq.; the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq.; the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-22, et seq.; the Stored Communications Act, 18 U.S.C. §§ 2701-12, et seq.; the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, et seq.; the California Customer Records Act, Cal. Civ. Code §§ 1798.80 to 84; California Online Privacy Protection Act, Cal. Bus. & Prof. Code § 22575, et seq.; and the South Carolina Privacy of Consumer Financial and Health Information Regulation, South Carolina Code § 69-58, et seq.; Massachusetts Gen. Law Ch. 93H, 201 C.M.R. 17.00, et seq.; Nev. Rev. Stat. 603A, et seq.; Cal. Civ. Code § 1798.82, et seq.; N.Y. Gen. Bus. Law § 899-aa, et seq.; N.Y. Gen. Bus. Law § 899-bb, et seq.; 11 NYCRR 420, et seq.; the Illinois Biometric Information Privacy Act, 740 ILCS 14, et seq.; the European Union's Directive on Privacy and Electronic Communications (2002/58/EC); the General Data Protection Regulation (2016/679); Laws requiring notification to any Person or Governmental Authority in the event of a Security Incident; and all implementing regulations and requirements, and other similar Laws; (ii) each Contract relating to the Processing of Personal Data applicable to Sellers or any Seller Parties; and (iii) each applicable rule, code of conduct, or other requirement of self-regulatory bodies and applicable industry standards, including, to the extent applicable, the Payment Card Industry Data Security Standard ("**PCI-DSS**").

"**Private Cost-Based Programs**" means a Private Program that settles on a Cost Report basis.

"**Private Program**" is defined in <u>Section 3.9a)</u>.

"**Proceeding**" means any action, arbitration, charge, claim, complaint, demand, dispute, audit, investigation, litigation, proceeding, search warrant, civil investigative demand, subpoena, qui tam action, suit (whether civil, criminal, administrative, judicial, or investigative) commenced, brought, conducted, or heard by or before any (a) Governmental Authority, (b) Medicare fiscal intermediary or administrative contractor, recovery audit contractor, zone program integrity contractor, unified program integrity contractor or similar Government Program contractor or (c) arbitrator, whether at law or in equity, other than routine billing claims and disputes, routine audits, routine post-payment reviews and scheduled surveys.

"**Processing**" "**Process**" or "**Processed**" means, with respect to Company Data or Information Technology Systems, any collection, access, acquisition, storage, protection, use, recording, maintenance, operation, dissemination, re-use, disposal, disclosure, re-disclosure, destruction, transfer, modification, or any other processing (as defined by Privacy Requirements) of such Company Data or Information Technology Systems.

"**Proration Amount**" is defined in <u>Section 1.13</u>.

"**Protected Health Information**" has the meaning given to it under HIPAA (45 C.F.R. § 160.103) and includes electronic protected health information.

"**Provider Relief Fund**" means the Public Health and Social Services Emergency Fund for provider relief under the CARES Act and Paycheck Protection Program Act.

"**Purchase Price**" is defined in <u>Section 1.6(a)</u>.

"**Purchased Assets**" is defined in <u>Section 1.1</u>.

"**Purchased Working Capital**" has the meaning set forth on <u>Part 1</u> of <u>Exhibit C</u>.

"**Reference Balance Sheet**" is defined in <u>Section 3.5a)ii)</u>.

"**Referral Source**" means any Physician or other Person who is in a position to refer, recommend, arrange for the referral of patients or other health care business to any health care provider or health care facility.

"**Release**" means any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating or disposing into, on to or through the environment (including indoor air) of any Hazardous Materials.

"**Representatives**" means, with respect to any Person, the officers, directors, managers, employees, agents, attorneys, accountants, advisors, bankers, financing sources, and other authorized representatives of such Person.

"**Restricted Area**" means Brevard, Indian River County, Volusia and Seminole Counties, Florida.

"**Restricted Business**" means operating the Business (but excluding tele-medicine or other remote platforms to the extent serving individuals whose primary residence is outside of the Restricted Area).

"**Restricted Period**" means the period beginning as of the Effective Time and ending on the fifth (5th) anniversary of the Effective Time.

"**Retained Employees**" means those employees of Sellers and Seller Parties listed on Exhibit D.

"**Sale Order**" means an Order as set forth on Exhibit L with changes thereto as are reasonably acceptable to Buyer and subject to Section 9.4(b).

"**Schedules**" means the disclosure schedules and any other schedule to this Agreement.

"**Security Incident**" means, with respect to the Business, any unauthorized Processing of Company Data, any unauthorized access to the Information Technology Systems, or any incident that may require notification to any Person, Governmental Authority, or any other entity under Privacy Requirements.

"**Seller Affiliate**" means any Affiliate of any of the Sellers.

"**Seller Cost Reports**" is defined in Section 6.5a).

"**Sellers**" is defined in the preamble to this Agreement.

"**Seller Employees**" means, except for the Retained Employees, each person who is (a) an employee of a Seller whether active or on leave of absence, including any employee who is on an approved leave of absence, (b) an employee of SMG who works exclusively in the Business whether active or on leave of absence, including any employee who is on an approved leave of absence, or (c) solely for purposes of Section 6.1, who otherwise primarily provides services to the Business during the majority of their business time and is set forth on Schedule A.

"**Seller Guarantees**" means, collectively, all letters of credit, guarantees, surety bonds, performance bonds and other financial assurance obligations issued or entered into by or on behalf of (or for the account of) Sellers or any Seller Affiliate (other than exclusively by the Transferred Interests) in connection with the Business, the Facilities or the Purchased Assets.

"**Seller Parties**" means the Sellers and SMG.

"**SMG**" is defined in Section 1.1

"**SMG Leases**" means those leases of SMG set forth on Schedule B.

"**Social Security Act**" means the Social Security Act of 1935 and all regulations promulgated thereunder.

"**Software**" means, with respect to the Business, (a) any and all computer programs and other software, including databases, software interfaces, implementations of algorithms, models, and methodologies, whether in source code, object code or other form, including libraries, subroutines and other components thereof, (b) computerized databases and other computerized compilations and collections of data or information, including all data and information included in such databases, compilations or collections (whether machine readable or otherwise) and rights therein; (c) screens, user interfaces, command structures, report formats, templates, menus, buttons and icons; (d) descriptions, flow-charts, architectures, development tools, and other materials used to design, plan, organize and develop any of the foregoing; and (e) documentation, including development, diagnostic, support, user and training documentation related to any of the foregoing.

Annex A

"**Specified Debt**" means, collectively, indebtedness under (i) that certain Credit Agreement, dated as of February 21, 2024, by and among Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc., Stewardship Health Medical Group, Inc. and Stewardship Services Inc., as the borrowers, certain other Affiliates of Steward Health Care System LLC party thereto, as guarantors, the lenders party thereto and Brigade Agency Services LLC, as administrative agent and as collateral agent, (ii) that certain Credit Agreement, dated as of August 4, 2023, by and among Steward Health Care System LLC, certain Affiliates of Steward Health Care System LLC party thereto, as guarantors, the lenders party thereto, Sound Point Agency LLC, as administrative agent, Chamberlain Commercial Funding (Cayman) L.P., as collateral agent, and Brigade Agency Services LLC, as the FILO Agent, (iii) that certain Third Amended and Restated Promissory Note, dated as of January 22, 2024, by Steward Health Care System LLC in favor of MPT TRS Lender-Steward LLC, (iv) the DIP Financing and (v) the Existing MPT Lease.

"**Standard Software**" means, with respect to the Business, any commercially available, "off the shelf" or "shrink wrapped" Software that is generally, commercially available to the public and is licensed to any Seller Party.

"**Steward**" means Steward Health Care System LLC, a Delaware limited liability company.

"**Straddle Period**" is defined in Section 11.2(b).

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation).

"**Target Assumed Cure Cost**" means $1,061,000.

"**Tax**" or "**Taxes**" means any and all federal, state, local, foreign and other taxes, including net income, gross income, gross receipts, sales, use, ad valorem, hospital, provider, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

"**Tax Proceeding**" is defined in Section 11.5.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Tenant Lease**" means each lease, sublease, license, occupancy agreement or other contractual obligation as set forth on Schedule B, together with any amendments, supplements, exhibits, addenda and modification thereto.

"**Termination Payment**" is defined in Section 9.1.

"**TEV**" is defined in Section 1.6(a)(i).

"**Third-Party Lease**" means each lease, sublease, license, occupancy agreement or other contractual obligation as set forth on Schedule B, together with any amendments, supplements, exhibits, addenda and modification thereto.

"**Title Company**" means First American Title Insurance Company.

"**Trade Secrets**" means, with respect to the Business, trade secrets and confidential and proprietary information, including ideas, research and development information, know-how, formulas, compositions, technical data, designs, drawings, specifications, research records, records of inventions, test information, financial, marketing and business data, customer and supplier lists and information, pricing and cost information, business and marketing plans and proposals that, in each case, derive independent economic value, actual or potential, from not being generally known or readily ascertainable by others.

"**Trademarks**" means, with respect to the Business, trademarks, service marks, trade names (including fictitious, assumed and d/b/a names), brand names and corporate names, slogans, or logos and other source identifiers designations or devices whether registered or unregistered; registrations, renewals, applications for registration of the foregoing; and the goodwill of the business associated with each of the foregoing.

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Lease Assignments, the Power of Attorney, Agreement, and the Transition Services Agreement.

"**Transfer Obligations**" means with respect to the NSI JV Interests, any right or option of Neuroskeletal Imaging, LLC or the owners thereof (other than any Seller Affiliate) to acquire, or otherwise force a sale or redemption of the NSI JV Interests.

"**Transfer Taxes**" means any real or personal property transfer, sales, use, documentary, transfer, value added, stock transfer, stamp or similar Taxes, and any transfer, recording, registration, and other fees or similar amounts, in each case imposed or payable in connection with the Contemplated Transactions (but for purposes of this Agreement excluding any transfer taxes payable in connection with the transaction pursuant to the MPT Purchase Agreement, and excluding income taxes).

"**Transferred Employee**" is defined in Section 6.1(b).

"**Transferred Executory Contract**" is defined in Section 1.5(b)(i).

"**Transferred Information Technology Systems**" means any and all Information Technology Systems that are exclusively used or held for use in, or otherwise exclusively relating to, the Business and that are owned or leased by or licensed to Sellers or any Seller Party, in each case, other than any Information Technology Systems included in the definition of Excluded Assets.

"**Transferred Intellectual Property**" means any and all Owned Intellectual Property, or Intellectual Property licensed to Sellers (i) under a Business Contract, (ii) used exclusively in the operation of the Business or the Facilities, and (iii) excluding any Intellectual Property included in the definition of Excluded Assets.

"**Transferred Interests**" is defined in Section 3.4(a).

"**Transferred Non-Executory Contract**" means each Business Contract that is not an Executory Contract.

"**Transition Patient Services**" is defined in Section 6.4.

"**Transition Patients**" is defined in Section 6.4.

"**Transition Services Agreement**" is defined in Section 2.2(e).

"**Undisclosed Contract**" is defined in Section 1.5(h).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, *et seq*.

DISCLOSURE SCHEDULES

to

ASSET PURCHASE AGREEMENT

by and among

STEWARD MELBOURNE HOSPITAL, INC.

STEWARD ROCKLEDGE HOSPITAL, INC.

STEWARD SEBASTIAN RIVER MEDICAL CENTER, INC.,

AS SELLER

AND

ORLANDO HEALTH, INC., and

ORLANDO HEALTH MEDICAL GROUP, INC.

AS BUYER PARTIES

DATED AS OF AUGUST 14, 2024

The following Disclosure Schedules (the "Schedules") have been prepared and delivered in accordance with that certain Asset Purchase Agreement, dated as of August 14, 2024 (the "**Agreement**"), by and among (i) **Steward Melbourne Hospital, Inc.,** a Delaware corporation, **Steward Rockledge Hospital, Inc.,** a Delaware corporation, **Steward Sebastian River Medical Center, Inc.,** a Delaware corporation (the "**Sellers**" and each individually a "**Seller**"), (ii) **Orlando Health, Inc.,** a Florida corporation ("**Buyer**") and (iii) **Orlando Health Medical Group, Inc.,** a Florida corporation ("**Clinic**" and, collectively with Buyer, the "**Buyer Parties**"). All capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to them in the Agreement.

These Schedules (including all of the individual sections comprising these Schedules) are intended to qualify, limit and supplement the representations and warranties of Sellers contained in the Agreement. Except as otherwise limited herein, all information and disclosures contained in these Schedules are made as of the date hereof, and their accuracy is confirmed only as of such date and not at any time thereafter.

These Schedules are arranged according to the numbered sections contained in Section 3 of the Agreement, and the disclosure in any section of these Schedules shall qualify (a) the corresponding Section of the Agreement and (b) all other Sections of the Agreement to which such disclosure may apply, so long as application to such section is reasonably discernable from such disclosure.

No disclosure in these Schedules relating to any possible breach or violation of any Contract or any Law shall be deemed or construed to constitute an admission by any Party to any third party, or to otherwise imply, that any such breach or violation exists, is reasonably likely to occur or has actually occurred. In no event shall the disclosure of any matter in these Schedules be deemed or construed to expand the scope of Sellers' representations in Section 3 of the Agreement or any Party's obligations, covenants, conditions or agreements contained in the Agreement. Matters reflected in these Schedules may not necessarily be limited to matters required by the Agreement to be reflected in these Schedules. To the extent that any such additional matters are included, they are included for information purposes only.

Any information, matter or document disclosed, incorporated or referenced in, or attached to these Schedules shall not (a) be used as (i) a basis for interpreting the terms "material", "Material Adverse Effect" or other similar terms in the Agreement or to establish a standard of materiality for purposes of the Agreement or otherwise, (ii) an acknowledgement or agreement that any such item or information is "material", (b) represent a determination that such item or matter did not arise in the ordinary course of business, or (c) represent a determination that the consummation of the transactions contemplated by the Agreement requires the consent of any third party.

Headings have been inserted on the sections of these Schedules for convenience of reference only, shall not to any extent have the effect of amending or changing the express description of the sections as set forth in the Agreement, and are not intended to limit the effect, or to expand the scope, of any information or disclosure contained in these Schedules. In addition, all information and disclosures contained in these Schedules shall include all schedules, exhibits, appendices and annexes thereto.

The specification of any dollar amount in the representations or warranties contained in any Schedule is not intended to imply that such amounts, or higher or lower amounts or other items, are or are not material, and no Party shall use the fact of the setting of such amounts in any dispute or controversy as to whether any obligation, item or matter not described herein or included in these Schedules is or is not material for purposes of the Agreement.

The information in these Schedules is being provided solely for the purpose of making disclosures to Buyer and Buyer Guarantor under the Agreement. In disclosing this information, Sellers do not waive

any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein.

**List of Disclosure Schedules Sections**

| Schedule | Header |
|---|---|
| Schedule 1.1(h) | Assumed Contracts |
| Schedule 1.1(j) | Transferred Intellectual Property |
| Schedule 1.2(h) | Excluded Contracts |
| Schedule 1.2(x) | Excluded Proprietary Materials |
| Schedule 1.2(jj) | Other Excluded Assets |
| Schedule 1.3(f) | Other Assumed Liabilities |
| Schedule 1.5 | Designated Contracts; Cure Costs |
| Schedule 1.6(a)(viii) | Monetary Liens |
| Schedule 3.1 | Organization; Capacity |
| Schedule 3.2(a) | Seller Authority; Non-Contravention; Binding Agreement |
| Schedule 3.4(a) | Ownership Interests |
| Schedule 3.5(a) | Historical Financial Information |
| Schedule 3.5(b) | Changes in Accounting Policies |
| Schedule 3.6 | Permits and Approvals |
| Schedule 3.8 | Accreditation |
| Schedule 3.9 | Government Program Participation; Private Programs; Reimbursement |
| Schedule 3.10 | Third-Party Payor Cost Reports |
| Schedule 3.11 | Compliance with Laws |
| Schedule 3.12(b) | HIPAA, Information Privacy and Security Compliance |
| Schedule 3.13 | Compliance Program |
| Schedule 3.14 | Medical Staff Matters |
| Schedule 3.16 | Intellectual Property |
| Schedule 3.17 | Material Contracts |
| Schedule 3.19 | Owned and Leased Real Property |
| Schedule 3.20 | Insurance |
| Schedule 3.21(a) | Employee Benefit Plans |
| Schedule 3.21(c)(1) | Other Employee Benefits Plans |
| Schedule 3.21(c)(2) | Post-Employment Health Benefits |
| Schedule 3.21(e) | Payments in Connection with the Agreement or the Contemplated Transactions |

4

| | |
|---|---|
| Schedule 3.22 | Employee Matters |
| Schedule 3.23 | Litigation |
| Schedule 3.24 | Taxes |
| Schedule 3.25 | Environmental Matters |
| Schedule 3.27 | Seller Brokers and Finders |
| Schedule 5.2 | Conduct of Business |
| Schedule 6.1(a) | SMG Physicians and APPs |
| Schedule 7.3(a) | Governmental Approvals |
| Schedule A | Seller Employees |
| Schedule B | Tenant Leases; Third-Party Leases |

<u>Schedule 1.1(h)</u>

<u>Assumed Contracts</u>

[Omitted.]

<u>Schedule 1.1(j)</u>

<u>Transferred Intellectual Property</u>

[Omitted.]

<u>Schedule 1.2(h)</u>

<u>Excluded Contracts</u>

[Omitted.]

Schedule 1.2(x)

Excluded Proprietary Materials

[Omitted.]

Schedule 1.2(jj)

Other Excluded Assets

[Omitted.]

Schedule 1.3(f)

Other Assumed Liabilities

[Omitted.]

Schedule 1.5

Designated Contracts; Cure Costs

[Omitted.]

Schedule 1.6(a)(viii)

Monetary Liens

[Omitted.]

<u>Schedule 3.1</u>

<u>Organization; Capacity</u>

[Omitted.]

Schedule 3.2(a)

Seller Authority; Non-Contravention; Binding Agreement

[Omitted.]

Schedule 3.4(a)

Ownership Interest

[Omitted.]

<u>Schedule 3.5(a)</u>

<u>Historical Financial Information</u>

[Omitted.]

Schedule 3.5(b)

Changes in Accounting Policies

[Omitted.]

<u>Schedule 3.6</u>

<u>Permits and Approvals</u>

[Omitted.]

Schedule 3.8

Accreditation

[Omitted.]

<u>Schedule 3.9</u>

<u>Government Program Participation; Private Programs; Reimbursement</u>

[Omitted.]

<u>Schedule 3.10</u>

<u>Third-Party Payor Cost Reports</u>

[Omitted.]

Schedule 3.11

Compliance with Laws

[Omitted.]

Schedule 3.12(b)

HIPAA, Information Privacy and Security Compliance

[Omitted.]

Schedule 3.13

Compliance Program

[Omitted.]

<u>Schedule 3.14</u>

<u>Medical Staff Matters</u>

[Omitted.]

Schedule 3.16

Intellectual Property

[Omitted.]

Schedule 3.17

Material Contracts

[Omitted.]

<u>Schedule 3.19</u>

<u>Owned and Leased Real Property</u>

[Omitted.]

Schedule 3.21(a)

Employee Benefit Plans

[Omitted.]

Schedule 3.21(c)(1)

Other Employee Benefits Plans

[Omitted.]

Schedule 3.21(c)(2)

Post-Employment Health Benefits

[Omitted.]

Schedule 3.21(e)

Payments in Connection with the Agreement or the Contemplated Transactions

[Omitted.]

Schedule 3.22

Employee Matters

[Omitted.]

<u>Schedule 3.23</u>

<u>Litigation</u>

[Omitted.]

Schedule 3.24

Taxes

[Omitted.]

Schedule 3.25

Environmental Matters

[Omitted.]

Schedule 3.27

Seller Brokers and Finders

[Omitted.]

Schedule 5.2

Conduct of Business

[Omitted.]

Schedule 6.1(a)

SMG Physicians and APPs

[Omitted.]

<u>Schedule 7.3(a)</u>

<u>Governmental Approvals</u>

[Omitted.]

<u>Schedule A</u>

<u>Seller Employees</u>

None.

Schedule B

Tenant Leases; Third Party Leases

[Omitted.]

---

EXHIBITS

to

ASSET PURCHASE AGREEMENT

by and among

**STEWARD MELBOURNE HOSPITAL, INC.,**

**STEWARD ROCKLEDGE HOSPITAL, INC., and**

**STEWARD SEBASTIAN RIVER MEDICAL CENTER, INC.,**

AS SELLERS

AND

**ORLANDO HEALTH, INC., and**

**ORLANDO HEALTH MEDICAL GROUP, INC.**

AS BUYER PARTIES

DATED AS OF AUGUST 14, 2024

---

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Facilities |
| Exhibit B | [Intentionally omitted] |
| Exhibit C | Working Capital |
| Exhibit D | Retained Employees |
| Exhibit E | Form of Lease Assignment |
| Exhibit F | Form of Bill of Sale |
| Exhibit G | Form of Assignment and Assumption Agreement |
| Exhibit H | Form of Power of Attorney |
| Exhibit I | Form of Transition Services Agreement |
| Exhibit J | Form of Employee Contract Assignment and Assumption Agreement |
| Exhibit K | Form of Assignment of Transferred Interests |
| Exhibit L | Sale Order |

*Exhibit A*

# EXHIBIT A

## FACILITIES

<u>Hospital</u>: Melbourne Regional Medical Center, operated by Steward Melbourne Hospital, Inc. – Main Hospital Campus: 250 N. Wickham Rd., Melbourne, FL

<u>Hospital</u>: Rockledge Regional Medical Center, operated by Steward Rockledge Hospital, Inc. – Main Hospital Campus: 110 Longwood Ave., Rockledge, FL

<u>Hospital</u>: Sebastian River Medical Center, operated by Steward Sebastian River Medical Center, Inc. – Main Hospital Campus: 13695 US Highway 1, Sebastian, FL

<u>Other Facilities</u>:

1. Steward Rehabilitation Services – Melbourne, 240 N Wickham Road, Suite 207, Melbourne, FL 32935

2. Steward Rehabilitation Services – Rockledge, 830 Executive Ln, Ste 130, Rockledge, FL 32955

3. Steward Medical Center at Meritt Island, and Steward Rehabilitation Services and Pain Management Center - 2400 N Courtenay Pkwy, Merritt Is, FL 32953-4127.

4. Steward Rehabilitation Services, 7227 N Us 1, Cocoa, FL 32927

5. Steward Wound Care and Hyperbaric Center at Rockledge, 1257 S Florida Ave, Ste B, Rockledge FL 32955

6. Steward Rehabilitation Services, 2400 N Courtenay Pkwy, Merritt Island, Fl 32953

7. Steward Rehabilitation Services, 6300 N Wickham Rd Ste 116, Melbourne, FL 32940-2023

8. Steward Health Services at Port St. John, 7227 N Us Hwy 1, Cocoa, FL 32927

9. Pain Management Center - Merritt Island 2400 North Courtenay Parkway, Merritt Island, FL 32953

10. Sebastian River Medical Center Wound Center, 8005 Bay Street, Suite 4, Sebastian FL 32958-3284

11. Steward Laboratory Services, 6963 N Wickham Road, Melbourne, FL

*Exhibit B*

**EXHIBIT B**

**[INTENTIONALLY OMITTED]**

*Exhibit C*

**EXHIBIT C**

**WORKING CAPITAL**

**Part 1**
**Defined Terms**

"**Agreed Principles**" means GAAP and the accounting methodologies, principles and procedures used in, and on a basis consistent with, those applied in preparing the May 31, 2024, unaudited consolidated financial statements of the Business. Notwithstanding the foregoing, the Parties agree that (i) Inventory shall be valued at the lower of cost or market on a first-in, first-out basis, and (ii) Prepaid Expenses shall be those directly relating to Assumed Contracts. The amount of Inventory to be included in the Estimated Working Capital shall be the amount set forth on the balance sheet of the Sellers most recently delivered to the Buyer prior to the Closing Date.

"**Purchased Working Capital**" means Net Working Capital as of immediately prior to the Effective Time.

"**Net Working Capital**" means, as of the applicable measurement date,

(a)     the value of Inventory; plus

(b)     the amount of Prepaid Expenses, minus

(c)     the Liability as of immediately prior to the Effective Time for the Assumed Paid Time Off;

provided that Net Working Capital shall not include any Excluded Assets or Excluded Liabilities.  An example calculation of Net Working Capital as of the Balance Sheet Date, which shall be used as a template for the calculation of Net Working Capital, is attached hereto as Part 2 of this Exhibit D.

**Part 2**
**Sample Calculation**

**May 31, 2024**

| | |
|---|---|
| **Inventory** | $14,201 |
| **Prepaid Expenses** | 2,061 |
| **Assumed Paid Time Off** | 2,460 |
| **Purchased Working Capital** | **$13,802** |

*Exhibit D*

## EXHIBIT D

## RETAINED EMPLOYEES

None.

*Exhibit E*

# EXHIBIT E

# LEASE ASSIGNMENTS

*Exhibit E-1*

**EXHIBIT E-1**
**FORM OF**
**ASSIGNMENT AND ASSUMPTION OF LEASES**
**(ASSIGNOR AS LESSOR)**


*[Attached]*

*Exhibit E-1*

## ASSIGNMENT AND ASSUMPTION OF LEASES
### (Assignor as Lessor)

**THIS ASSIGNMENT AND ASSUMPTION OF LEASES** (this "<u>Agreement</u>") is dated as of [●], 2024 and effective as of the Effective Time by and between [●], a [●] ("<u>Assignor</u>"), and [●], a [●] ("<u>Assignee</u>")[1]. Assignor and Assignee may be referred to in this Agreement individually as a "<u>Party</u>" and, collectively, as the "<u>Parties</u>".

## RECITALS:

**A.**     Assignor is the landlord, lessor, sublessor, licensor or other grantor under the leases, subleases, licenses, or other occupancy agreements described on the attached <u>Schedule A</u> (collectively, the "<u>Lessor Leases</u>").

**B.**     As of the Effective Time, Assignor is conveying to Assignee certain assets and interests owned or held by Assignor, as more particularly described in and as contemplated by that certain Asset Purchase Agreement, dated as of August 14, 2024, by and among Assignor and Assignee (as amended, modified or supplemented from time to time, the "<u>Purchase Agreement</u>").

**C.**     Capitalized terms used but not otherwise defined in this Agreement shall have the same meanings ascribed to such terms in the Purchase Agreement.

**D.**     Pursuant to the Purchase Agreement, Assignor has agreed to assign to Assignee all of Assignor's rights under the Lessor Leases.

**E.**     Pursuant to the Purchase Agreement, Assignee has agreed to assume and perform all obligations of Assignor arising under the Lessor Leases from and after the Effective Time.

**F.**     Pursuant to Section 365 of the Bankruptcy Code and the Order (I) Authorizing and Approving (A) the Sale of Melbourne Regional Medical Center, Rockledge Regional Medical Center, and Sebastian River Medical Center Free and Clear of Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief (Docket No. [●]) issued by the United States Bankruptcy Court for the Southern District of Texas, Assignor is authorized to assign to Assignee, and Assignee wishes to assume from Assignor, the Lessor Leases.

## AGREEMENT:

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

**1.**     **ASSIGNMENT**.   Assignor hereby irrevocably grants, sells, assigns, transfers, conveys and delivers over unto Assignee, its successors and assigns, all of Assignor's estate, right, title and interest under, in and to the Lessor Leases, together with all rights, privileges, claims and tenant security deposits relating to the Lessor Leases.

---

*Exhibit E-1*

2.    **ASSUMPTION**.  Assignee hereby acquires, assumes, receives and accepts, as of the Effective Time, the foregoing assignment and expressly assumes and agrees to pay, perform and/or discharge all obligations of Assignor which arise under the Lessor Leases, from and after the Effective Time, to the extent required under section 365 of the Bankruptcy Code.

3.    **EXCLUDED LIABILITIES**.  The Excluded Liabilities are expressly excluded from the obligations being assumed by Assignee under this Agreement.

4.    **THIRD PARTY RIGHTS**.  Assignee's assumption of the Lessor Leases from Assignor, to the extent provided herein, shall not enlarge the rights of any third party under the Lessor Leases; nor shall it prevent Assignee, with respect to any party other than Assignor, from contesting or disputing any liability, or the terms and provisions of the Lessor Leases.

5.    **BINDING EFFECT**.  This Agreement and the covenants and agreements herein contained shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

6.    **NO MODIFICATION OF PURCHASE AGREEMENT**.  This Agreement is delivered pursuant to the Purchase Agreement (including, without limitation, any surviving representations, warranties, covenants, and agreements contained therein) and is subject in all respects to the provisions thereof and is not meant to alter, enlarge or otherwise modify the provisions of the Purchase Agreement. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

7.    **SOLE REMEDY**.  The sole and exclusive remedy of Assignee and Assignor with respect to any breach of this Agreement shall be as set forth in the Purchase Agreement.

8.    **GOVERNING LAW.**  The provisions of Sections 10 (Specific Performance), 13.1 (Notice), 13.2 (Choice of Law; Venue), and 13.4 (Waiver of Jury Trial) of the Purchase Agreement, are hereby incorporated herein by reference and shall apply *mutatis mutandis*, to this Agreement.

9.    **SEVERABILITY.**  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Governmental Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

10.    **MODIFICATION**.  This Agreement may be modified or supplemented only by written agreement of the Parties hereto.

11.    **COUNTERPARTS**. This Agreement may be executed in any number of counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one

and the same instrument. The facsimile signature of any Party to this Agreement or a PDF copy of the signature of any Party to this Agreement delivered by electronic mail for purposes of execution or otherwise, is to be considered to have the same binding effect as the delivery of an original signature on an original contract.

[SIGNATURE PAGES FOLLOW]

*Exhibit E-1*

     **IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement effective as of the Effective Time.

**ASSIGNOR:**

_____,

a _____

By:_____
Printed Name: _____
Its: _____

[Signature Page to Assignment and Assumption of Lease (Assignor as Landlord)]

*Exhibit E-1*

      **IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement effective as of the Effective Time.

**ASSIGNEE:**

_____,

a _____

By:_____

Printed Name: _____

Its: _____

[Signature Page to Assignment and Assumption of Lease (Assignor as Landlord)]

*Exhibit E-1*

## SCHEDULE A

### Lessor Leases

1. [TBD][2]

_____

*Exhibit E-2*

**EXHIBIT E-2**

**FORM OF**
**ASSIGNMENT AND ASSUMPTION OF LEASES**
(Assignor as Tenant)

***[Attached]***

*Exhibit E-2*

## ASSIGNMENT AND ASSUMPTION OF LEASES
(Assignor as Tenant)

This **ASSIGNMENT AND ASSUMPTION OF LEASES** (this "Agreement") is dated as of [●], 2024 and effective as of the Effective Time by and between [●], a [●] ("Assignor"), and [●], a [●] ("Assignee")[3]. Assignor and Assignee may be referred to in this Agreement individually as a "Party" and, collectively, as the "Parties".

### RECITALS:

**A.**    Assignor is the tenant, lessee, sublessee, licensee or grantee under the leases, subleases, licenses or other occupancy agreements described on the attached Schedule A (collectively, the "Tenant Leases").

**B.**    As of the Effective Time, Assignor is conveying to Assignee certain assets and interests owned or held by Assignor, as more particularly described in and as contemplated by that certain Asset Purchase Agreement, dated as of August 14, 2024, by and among Assignor and Assignee (as amended, modified or supplemented from time to time, the "Purchase Agreement").

**C.**    Capitalized terms used but not otherwise defined in this Agreement shall have the same meanings ascribed to such terms in the Purchase Agreement.

**D.**    Pursuant to the Purchase Agreement, Assignor has agreed to assign to Assignee all of Assignor's rights under the Tenant Leases.

**E.**    Pursuant to the Purchase Agreement, Assignee has agreed to assume and perform all obligations of Assignor arising under the Tenant Leases from and after the Effective Time.

**F.**    Pursuant to Section 365 of the Bankruptcy Code and the Order (I) Authorizing and Approving (A) the Sale of Melbourne Regional Medical Center, Rockledge Regional Medical Center, and Sebastian River Medical Center Free and Clear of Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief (Docket No. [•]) issued by the United States Bankruptcy Court for the Southern District of Texas, Assignor is authorized to assign to Assignee, and Assignee wishes to assume from Assignor, the Lessor Leases.

### AGREEMENT:

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

**1.    ASSIGNMENT**.    Assignor hereby irrevocably grants, sells, assigns, transfers, conveys and delivers over unto Assignee, its successors and assigns, all of Assignor's estate, right, title and interest under, in and to the Tenant Leases, together with all rights, privileges, claims and tenant security deposits relating to the Tenant Leases.

_____

**2.** **ASSUMPTION**.  Assignee hereby acquires, assumes, receives and accepts, as of the Effective Time, the forgoing assignment and expressly assumes and agrees to pay, perform and/or discharge all obligations of Assignor which arise under the Tenant Leases from and after the Effective Time, to the extent required under section 365 of the Bankruptcy Code.

**3.** **EXCLUDED LIABILITIES**.  The Excluded Liabilities are expressly excluded from the obligations being assumed by Assignee under this Agreement.

**4.** **THIRD PARTY RIGHTS**.  Assignee's assumption of the Tenant Leases from Assignor, to the extent provided herein, shall not enlarge the rights of any third party under the Tenant Leases; nor shall it prevent Assignee, with respect to any party other than Assignor, from contesting or disputing any liability, or the terms and provisions of the Tenant Leases.

**5.** **BINDING EFFECT**.  This Agreement and the covenants and agreements herein contained shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

**6.** **NO MODIFICATION OF PURCHASE AGREEMENT**.  This Agreement is delivered pursuant to the Purchase Agreement (including, without limitation, any surviving representations, warranties, covenants, and agreements contained therein) and is subject in all respects to the provisions thereof and is not meant to alter, enlarge or otherwise modify the provisions of the Purchase Agreement. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.

**7.** **SOLE REMEDY**.  The sole and exclusive remedy of Assignee and Assignor with respect to any breach of this Agreement shall be as set forth in the Purchase Agreement.

**8.** **GOVERNING LAW.**  The provisions of Sections 10 (Specific Performance), 13.1 (Notice), 13.2 (Choice of Law; Venue), and 13.4 (Waiver of Jury Trial) of the Purchase Agreement, are hereby incorporated herein by reference and shall apply *mutatis mutandis*, to this Agreement.

**9.** **MODIFICATION**.  This Agreement may be modified or supplemented only by written agreement of the Parties hereto.

**10.** **SEVERABILITY.**  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Governmental Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

**11.** **COUNTERPARTS**. This Agreement may be executed in any number of counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one

*Exhibit E-2*

and the same instrument. The facsimile signature of any Party to this Agreement or a PDF copy of the signature of any Party to this Agreement delivered by electronic mail for purposes of execution or otherwise, is to be considered to have the same binding effect as the delivery of an original signature on an original contract.

[SIGNATURE PAGES FOLLOW]

*Exhibit E-2*

    **IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement effective as of the Effective Time.

                                            **ASSIGNOR:**

                                          _____,

                                          a _____

                                          By:_____

                                          Printed Name: _____

                                          Its: _____

[Schedule A to Assignment and Assumption of Lease (Assignor as Tenant)]

*Exhibit E-2*

     **IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement effective as of the Effective Time.

                    **ASSIGNEE:**

                    _____,
                    a _____

                    By:_____
                    Printed Name: _____
                    Its: _____

[Schedule A to Assignment and Assumption of Lease (Assignor as Tenant)]

*Exhibit E-2*

## SCHEDULE A

### Tenant Leases

1. [TBD][4]

_____

*Exhibit E-2*

IN WITNESS WHEREOF, each of the undersigned has caused this Assignment to be duly executed as of the day and year first above written and effective as of the Effective Time.

**ASSIGNEE:**

[●]

By: _____

Name: _____

Title: _____

*Exhibit F*

# EXHIBIT F

# BILL OF SALE

*Exhibit F*

## BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale") is made and entered into as of [●], 2024, effective as of the Effective Time, by and between [●], a [●] ("Grantor") and [●], a [●] ("Grantee")[5]. Grantor and Grantee may be referred to in this Bill of Sale individually as a "Party" and, collectively, as the "Parties".

## RECITALS

WHEREAS, Grantor and Grantee are parties to that certain Asset Purchase Agreement dated as of August 14, 2024 (as may be amended, supplemented or modified from time to time, the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, Grantor has agreed to convey to Grantee, and Grantee has agreed to acquire from Grantor, good and marketable title to the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances, upon the terms and conditions in the Purchase Agreement; and

WHEREAS, capitalized terms used but not otherwise defined in this Bill of Sale shall have the same meanings ascribed to such terms in the Purchase Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agree as follows:

## AGREEMENT

**1.**     Transfer of Personal Property.  Effective as of the Effective Time, Grantor hereby sells, assigns, transfers, conveys and delivers to Grantee good and marketable title to all of Grantor's Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances, and Grantee hereby acquires, assumes, receives and accepts such Purchased Assets in accordance with the terms and conditions in the Purchase Agreement.  Notwithstanding anything to the contrary in this Bill of Sale, Grantor expressly does not sell, assign, transfer, convey or deliver, and shall retain, the Excluded Assets and Excluded Liabilities.

**2.**     Conflict with the Purchase Agreement.  This Bill of Sale is subject to and controlled by the terms of the Purchase Agreement, including all of the representations, warranties, covenants and agreements set forth in the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Except as expressly set forth in this Bill of Sale or in the Purchase Agreement, Grantor and Grantee do not make any other covenant, representation or warranty regarding the Purchased Assets.

**3.**     Sole Remedy.  The sole and exclusive remedy of Grantee and Grantor with respect to any breach of this Bill of Sale shall be as set forth in the Purchase Agreement.

———————————————

*Exhibit F*

    **4.**   <u>Miscellaneous</u>.  The terms and provisions of Sections 13.1 (Notice), 13.2 (Choice of Law; Venue), 13.3 (Benefit; Assignment; Delegation), 13.4 (Waiver of Jury Trial), 13.9 (Waiver of Breach), 13.10 (Severability), 13.11 (No Inferences; Sophisticated Parties), 13.12 (Divisions and Headings of this Agreement), 13.13 (No Third-Party Beneficiaries), 13.14 (Entire Agreement; Amendment), 13.15 (Multiple Counterparts) and 13.19 (Interpretation) of the Purchase Agreement are hereby incorporated herein by reference and apply, *mutatis mutandis*, to this Bill of Sale.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

*Exhibit F*

IN WITNESS WHEREOF, each of the undersigned has caused this Bill of Sale to be duly executed as of the day and year first above written and effective as of the Effective Time.

**GRANTOR:**

[●]

By: _____

Name: _____

Title: _____

[Signature Page to Bill of Sale]

IN WITNESS WHEREOF, each of the undersigned has caused this Bill of Sale to be duly executed as of the day and year first above written and effective as of the Effective Time.

**GRANTEE:**

[●]

By: _____

Name: _____

Title: _____

[Signature Page to Bill of Sale]

*Exhibit G*

# EXHIBIT G

## ASSIGNMENT AND ASSUMPTION

*Exhibit G*

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made and entered into as of [●], 2024, effective as of the Effective Time, by and between [●], a [●] ("Assignor") and [●], a [●] ("Assignee")[6]. Assignor and Assignee may be referred to in this Assignment individually as a "Party" and, collectively, as the "Parties".

## RECITALS

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement, dated as of August 14, 2024 (as may be amended, supplemented or modified from time to time, the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, Assignor has agreed to sell, assign, transfer, convey and deliver to Assignee, and Assignee has agreed to purchase from Assignor, all of Assignor's right, title and interest under, in and to the Assumed Contracts to which Assignor is a party, free and clear of all Encumbrances (other than Permitted Encumbrances, and Assignee has agreed to assume, discharge and perform when due the Assumed Liabilities, upon the terms and conditions in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, Assignee has agreed to accept and assume the Assumed Liabilities, including without limitation, all Liabilities arising under the Assumed Contracts;

WHEREAS, capitalized terms used but not otherwise defined in this Assignment shall have the same meanings ascribed to such terms in the Purchase Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

## AGREEMENT

**1.**      Assignment.  Effective as of the Effective Time and on the terms and conditions of the Purchase Agreement, Assignor hereby sells, assigns, transfers, conveys and delivers to Assignee all of Assignor's right, title and interest, free and clear of all Encumbrances (other than Permitted Encumbrances) under, in and to the Assumed Contracts and any Purchased Assets not conveyed by any other Transaction Document.

**2.**      Recordation and Further Actions. Assignor hereby authorizes the officials of relevant legal, regulatory, or other relevant entities or agencies in any applicable jurisdictions to record and register this Assignment upon request by Assignee. Following the date hereof, at Assignee's request, Assignor shall take such steps and actions, and provide such cooperation and assistance to Assignee and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may

*Exhibit G*

be necessary to effect, evidence, or perfect the assignment of the Assumed Contacts and, as applicable, Purchased Assets, to Assignee, or any assignee or successor thereto.

**3.**     Assumption.  Assignee hereby acquires, assumes, receives and accepts and agrees to be bound by, as of the Effective Time and on the terms and conditions of the Purchase Agreement, (a) the Assumed Contracts and any Purchased Assets not conveyed by any other Transaction Document (other than the Tenant Leases and Third-Party Leases, which are being conveyed to Assignee pursuant to separate instruments), and (b) the Assumed Liabilities. Notwithstanding anything to the contrary in this Assignment, Excluded Liabilities are expressly excluded from the obligations being assumed by Assignee under this Assignment and Assignor shall retain such Excluded Liabilities.

**4.**     Conflict with the Purchase Agreement.  This Assignment is subject to and controlled by the terms of the Purchase Agreement, including all of the representations, warranties, covenants and agreements set forth in the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement or the survival thereof.  Except as expressly set forth in this Assignment or in the Purchase Agreement, Assignor and Assignee do not make any other covenant, representation or warranty regarding the Assumed Contracts, other Purchased Assets not conveyed by any other Transaction Document or the Assumed Liabilities.

**5.**     Sole Remedy.  The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

**6.**     Miscellaneous.  The terms and provisions of Sections 13.1 (Notice), 13.2 (Choice of Law; Venue), 13.3 (Benefit; Assignment; Delegation), 13.4 (Waiver of Jury Trial), 13.9 (Waiver of Breach), 13.10 (Severability), 13.11 (No Inferences; Sophisticated Parties), 13.12 (Divisions and Headings of this Agreement), 13.13 (No Third-Party Beneficiaries), 13.14 (Entire Agreement; Amendment), 13.15 (Multiple Counterparts) and 13.19 (Interpretation) of the Purchase Agreement are hereby incorporated herein by reference and apply, *mutatis mutandis*, to this Assignment.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

*Exhibit G*

      IN WITNESS WHEREOF, each of the undersigned has caused this Assignment to be duly executed as of the day and year first above written and effective as of the Effective Time.

**ASSIGNOR:**

[●]

By: _____
Name: _____
Title: _____

[Signature Page to Assignment and Assumption Agreement]

# EXHIBIT H

# POWER OF ATTORNEY

*Exhibit H*

## AUTHORIZATION AND LIMITED POWER OF ATTORNEY FOR USE OF DEA REGISTRATION[/PHARMACY LICENSE][7]

THIS AUTHORIZATION AND LIMITED POWER OF ATTORNEY FOR USE OF DEA REGISTRATION[/ PHARMACY LICENSE] (this "Limited Power of Attorney") is made and entered into as of [●], 2024, effective as of the Effective Time, by and between [●], a [●] ("Buyer"), and [●], a [●] ("Seller")[8].  Through this Limited Power of Attorney, Seller authorizes Buyer to use Seller's Federal Drug Enforcement Administration ("DEA") registration numbers[, pharmacy licenses] and any other registrations required under the laws of the United States or the [State] / [Commonwealth] of [_____] (collectively, the "Registrations and Licenses") so that Buyer may utilize the privileges and benefits of said Registrations and Licenses for the limited purposes of ordering, storing, distributing, dispensing, prescribing and handling controlled substances[, and otherwise continuing pharmacy operations] (collectively, "Controlled Substance and Pharmacy Activities") at the pharmacies and locations set forth on Schedule A (collectively, the "Locations"), the assets of which Buyer is acquiring from Seller pursuant to that certain Asset Purchase  Agreement, dated as of August 14, 2024, by and among Buyer, Seller and other parties thereto (the "Purchase Agreement").  Capitalized terms used but not defined in this Limited Power of Attorney have the respective meanings for such terms that are set forth in the Purchase Agreement.

Seller hereby makes, constitutes and appoints Buyer, and its designated pharmacist-in-charge, as its true and lawful attorney-in-fact in Seller's name, place and stead to carry out and perform the purposes and terms of this Limited Power of Attorney, based upon the following terms and covenants:

1.  Buyer is hereby allowed to engage in and carry out the Controlled Substance and Pharmacy Activities at the Locations under and utilizing Seller's Registrations and Licenses as an agent of Seller, beginning as of the Effective Time and ending as of the earlier date of Buyer's obtaining its own Registrations and Licenses for the Locations (collectively, the "Buyer's Registrations and Licenses") or forty-five (45) days after the Effective Time (the "Outside Date"), unless despite Buyer's good faith efforts and as a result of delays by an applicable Governmental Authority, Buyer has not obtained Buyer's Registrations and Licenses as of the Outside Date, in which case this Limited Power of Attorney shall automatically extend for additional one (1) month periods (each an "Extension Month") until all of such Buyer's Registrations and Licenses are obtained.  Any such Extension Month shall immediately expire upon Buyer's receipt of all of Buyer's Registrations and Licenses.

2.  Without limitation, the Controlled Substance and Pharmacy Activities shall include, and Seller hereby makes, constitutes and appoints Buyer its true and lawful attorney-in-fact in Seller's name, place and stead to execute applications for books of official order forms and to sign such order forms in requisition for Schedules I, II, III, IV and V controlled substances, in accordance with Section 308 of the Controlled Substances Act (21 U.S.C. Section 828) and part 1305 of Title 21 of the

*Exhibit H*

      Code of Federal Regulations, as is necessary for the treatment of patients at the Locations from and after the Effective Time, and the Seller ratifies and confirms all that Buyer must lawfully do or cause to be done by virtue of these terms and covenants.

**3.**      Seller recognizes that it remains legally responsible for Seller's Registrations and Licenses, during the period in which this Limited Power of Attorney is in effect. Therefore, Seller grants this Limited Power of Attorney based upon the following covenants and warranties of Buyer: (a) Buyer shall follow and abide by and comply with all federal and state Laws governing the regulation of controlled substances and pharmacy practice at all times while utilizing this Limited Power of Attorney; and (b) Buyer, or its designee, shall make application for and pursue Buyer's Registrations and Licenses, as soon as practicable after the Effective Time.

**4.**      Subject to, and except as required by, applicable Laws and requests of the relevant Governmental Authorities, during the period from the Effective Time until Buyer obtains Buyer's Registrations and Licenses, Seller shall not take any action (or fail to take any action) that would reasonably be expected to result in the termination of the operation of the existing Controlled Substance and Pharmacy Activities under the existing Registrations and Licenses, nor submit any inventories or return any of the Registrations and Licenses to any Governmental Authority until after Buyer's receipt of all of Buyer's Registrations and Licenses.

**5.**      Buyer agrees to indemnify, defend and hold harmless Seller, its Affiliates, and its and their respective Representatives, managers, equity holders, members, principals, successors, heirs, and assigns (collectively, "<u>Indemnitees</u>") from and against any Losses, incurred by Indemnitees related to Buyer's use of Seller's Registrations and Licenses.

**6.**      This Limited Power of Attorney may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement, binding on all of the parties hereto.

**7.**      This Limited Power of Attorney, and applicable and related provisions of the Purchase Agreement, constitutes the entire agreement of the parties hereto with respect to use of Seller's Registrations and Licenses.  Any alteration or modification of the provisions of this Limited Power of Attorney shall not be effective unless reduced to writing or executed by the parties hereto.  This Limited Power of Attorney is governed by and shall be construed under the laws of the State of Delaware.  The terms and provisions of this Limited Power of Attorney are severable, and should any clause or provision hereof be unenforceable or be declared invalid for any reason whatsoever, this Limited Power of Attorney shall be construed and read as if such invalid or unenforceable clause or provision were omitted.

      [Remainder of Page Intentionally Left Blank; Signature Pages Follow]

*Exhibit H*

This Limited Power of Attorney is made effective as of the Effective Time.

**BUYER:**

[●]

By: _____
Name: _____
Title:_____

[Signature Page to Limited Power of Attorney]

*Exhibit H*

**SELLER:**

[●]

By: _____

Name: _____

Title:_____

[Signature Page to Limited Power of Attorney]

*Exhibit H*

**Acknowledged By:**

By: _____

Name: _____

Title: Pharmacist-in-Charge_____

[Signature Page to Limited Power of Attorney]

*Exhibit H*

**WITNESSES:**

1. _____
   Name:_____

2. _____
   Name:_____

[Signature Page to Limited Power of Attorney]

*Exhibit H*

## SCHEDULE A
### Registrations and Licenses

| Registration/License Type | Entity Name/Address | Registration/License Number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*Exhibit I*

# EXHIBIT I

## FORM OF TRANSITION SERVICES AGREEMENT

**TRANSITION SERVICES AGREEMENT**

BY AND [BETWEEN][AMONG][1]

STEWARD MELBOURNE HOSPITAL, INC.

AS VENDOR

AND

[ORLANDO HEALTH INC.]

AS AUTHORIZED USER[S]

**Dated as of [●], 2024**

TABLE OF CONTENTS[2]

SECTION 1 - SERVICE BUNDLES ...................................................................................4

    1.1      Transition Services Generally..............................................................................4
    1.2      Service Bundle Performance Levels.....................................................................5
    1.3      Supported Software Applications .........................................................................5
    1.4      Data Integrity and Information Security Measures...............................................5
    1.5      Facility-Based Applications .................................................................................6
    1.6      Excluded Applications .........................................................................................6
    1.7      Scope of Service Bundles ....................................................................................7
    1.8      Electronic Mail System Access; Electronic Records; Website and
               Domain Names....................................................................................................7
    1.9      Implementation and Conversion Support .............................................................7
    1.10    License to Policies and Procedures Manuals .......................................................8

SECTION 2 - TERM ......................................................................................................8

    2.1      Term....................................................................................................................8
    2.2      Termination.........................................................................................................8

SECTION 3 - OUTSOURCING .......................................................................................9

SECTION 4 - FEES, EXPENSES, TAXES .......................................................................9

    4.1      Service Fee ..........................................................................................................9
    4.2      Expenses ...........................................................................................................10
    4.3      Taxes ................................................................................................................10
    4.4      Initial Payment for Service Bundles ..................................................................10
    4.5      Late Payments ...................................................................................................11
    4.6      Right to Set Off .................................................................................................11

SECTION 5 - USE OF SUPPORTED SOFTWARE APPLICATIONS..................................11

    5.1      Rights in Supported Software Applications.........................................................11
    5.2      Supported Software Applications Use License.....................................................11
    5.3      Discontinuation of Supported Software Applications ...........................................12
    5.4      Updates; Upgrades ............................................................................................12
    5.5      Third Party Supplier Agreements ......................................................................12

SECTION 6 - BOOKS AND RECORDS...........................................................................12

    6.1      Availability to Secretary and Others..................................................................12
    6.2      Right to Inspect ................................................................................................13

SECTION 7 - INDEMNITY; INSURANCE.......................................................................13

    7.1      Mutual Indemnity..............................................................................................13
    7.2      Insurance ..........................................................................................................13

SECTION 8 - WARRANTIES AND LIMITATIONS OF LIABILITY ..................................14

    8.1      Vendor's Efforts................................................................................................14

| | | |
|---|---|---|
| 8.2 | Performance | 14 |
| 8.3 | Infringement | 14 |
| 8.4 | DISCLAIMER | 14 |
| 8.5 | Limitation of Liability | 15 |
| 8.6 | Mitigation | 16 |

**SECTION 9 - CONFIDENTIALITY** .................................................................16

| | | |
|---|---|---|
| 9.1 | Definition | 16 |
| 9.2 | Obligation to Observe Confidentiality | 16 |
| 9.3 | Protection | 16 |
| 9.4 | Exceptions | 16 |
| 9.5 | Return of Confidential Information | 16 |
| 9.6 | Availability of Equitable Remedies | 17 |
| 9.7 | Reasonable Assistance | 17 |
| 9.8 | HIPAA Compliance | 17 |

**SECTION 10 - INDEPENDENT CONTRACTOR** .........................................17

**SECTION 11 - MISCELLANEOUS** ..............................................................17

| | | |
|---|---|---|
| 11.1 | Force Majeure and Manner of Service | 17 |
| 11.2 | Survival | 18 |
| 11.3 | Entirety of Agreement | 18 |
| 11.4 | Benefit/Assignment | 18 |
| 11.5 | Incorporation of Provisions of Purchase Agreement | 18 |

SCHEDULES

| | | |
|---|---|---|
| *Schedule 1.1* | - | Scope of Service Bundles and Services Fee |
| *Schedule 1.1(a)* | - | IT Services Bundle |
| *Schedule 1.1(c)* | - | Revenue Cycle Services Bundle |
| *Schedule 1.3* | - | Supported Software Applications |
| *Schedule 1.4(c)* | - | Authorized User Information Security Requirements |
| *Schedule 1.6* | - | Excluded Applications |
| *Schedule 1.9* | - | Implementation Support Fee and Conversion Support Fee |
| *Schedule 7.2* | - | Insurance Requirements |
| *Schedule 9.8* | - | Business Associate Agreement |

\\4151-9324-4754  v6

**TRANSITION SERVICES AGREEMENT**

A.     THIS TRANSITION SERVICES AGREEMENT (this "<u>Agreement</u>") is made and entered into as of [_____] [__], 2024 (the "<u>Effective Date</u>") by and [among/between] [], a [●][3] (as providing Service Bundles hereunder, collectively, "<u>Vendor</u>"), and [Orlando Health, Inc.], a [●] corporation (collectively with its subsidiaries and Affiliates receiving Service Bundles hereunder, [each an] "<u>Authorized User</u>"[, and collectively, the "<u>Authorized Users</u>"[4]]). Vendor and [each] Authorized User is referred to herein individually as a "<u>Party</u>" and together, the "<u>Parties</u>." All capitalized terms used but not defined herein shall have the respective meanings ascribed in the Purchase Agreement (as defined below).

**R E C I T A L S**

B.     Vendor, Authorized User[s] [and certain of their Affiliates] are party to that certain Asset Purchase Agreement, dated as of August 14, 2024 (the "<u>Purchase Agreement</u>"), pursuant to which, among other things, Authorized User[s] are purchasing the Purchased Assets (as defined in the Purchase Agreement) from Vendor.

C.     Vendor, directly and through certain Affiliates and/or third party vendors (such third party vendors, "<u>Subcontractors</u>") provides a variety of services that are used by the Business.

D.     In furtherance of the transactions contemplated by the Purchase Agreement, to assist the orderly transition of the Business, Vendor will provide or arrange for the provision of, directly and/or through its Subcontractors, certain transition services to Authorized User[s] in accordance with the terms and conditions of this Agreement.

E.     In connection with preparing for the Service Bundles (as hereinafter defined) to be provided hereunder after the Effective Date, Vendor provided certain services to Authorized User[s] as set forth on **Schedule 1.1** prior to the Effective Date, and, in connection therewith, Authorized User[s] shall pay Vendor the fees set forth on **Schedule 1.9** as part of the Actual Transition Services Amount (as hereinafter defined).

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

<u>**SECTION 1- SERVICE BUNDLES**</u>

1.1     <u>Transition Services Generally</u>.

(a)     Vendor shall provide, or cause to be provided, the Service Bundles (as hereinafter defined) in connection with [each] Authorized User's operation of the Business during the Term (as hereinafter defined).  For purposes of this Agreement, a "<u>Service Bundle</u>"

shall mean those certain groups of related service specifically set forth on each schedule attached to **Schedule 1.1** (as such exhibit may be amended or supplemented in accordance with this Agreement), which services shall be provided either directly or through outsourcing arrangements as provided in Sections 1.3, Section 3 and other applicable provisions of this Agreement and subject to the terms and conditions hereof. For the avoidance of doubt, nothing in this Agreement or the Purchase Agreement shall preclude or restrict Vendor from providing Service Bundles to itself, its other businesses or to any third party.

(b)     Vendor represents, warrants and agrees that the Service Bundle shall be provided in good faith, in accordance with applicable Law and, except as expressly provided in this Agreement and **Schedule 1.1**, in a manner consistent with, and with the same standard of care, as Vendor historically provided to the Business. Vendor may change its standards and procedures for performing the Service Bundles from time to time as strictly necessary to comply with the requirements of the applicable Supported Software Application (as hereinafter defined) or as may be required by changes of applicable Law or Vendor's outsourcing arrangements (to the extent practicable and not a result of Vendor discretion); *provided, that* any change in Vendor's standards and procedures shall, to the extent reasonably practicable, be implemented in a manner that ensures continuity and consistency of the Service Bundles provided and shall not impair the standard, performance, functionality and overall quality of the Service Bundles provided at the time such changes are implemented; and *provided*, *further*, that no material changes will be implemented by Vendor until it has furnished Authorized User[s] with prior written notice thereof. If a new or updated version (an "Application Update") of any Supported Software Application (as hereinafter defined) is made available to Vendor, then Vendor shall promptly provide written notice of such Application Update to Authorized User[s] and shall only be required to implement such Application Update for the Business to the extent such Application Update is required by Law, or is otherwise mutually agreed in writing by Vendor and Authorized User[s]. If an Application Update is required by Law or otherwise is mutually agreed in writing by Vendor and Authorized User[s] to implement such Application Update for the Business, then Vendor and Authorized User[s] shall mutually agree upon the costs related thereto, which costs shall be borne solely by Authorized User[s].

1.2     **Service Bundle Performance Levels**.  If there is a disruption of a Service Bundle to the Business, then Vendor shall use the same level of diligence and care to restore such affected Service Bundle as it would use to restore services to similarly-situated businesses owned by Vendor or its Affiliates under similar circumstances.

1.3     **Supported Software Applications**.  **Schedule 1.3** sets forth a list of the software applications not included in the Transferred Intellectual Property (as defined in the Purchase Agreement), but which are used in connection with the operation of the Business for which Vendor will provide support pursuant to this Agreement (collectively, the "Supported Software Applications"), either directly or through outsourcing arrangements in accordance with the provisions of this Agreement.

1.4     Data Integrity and Information Security Measures.

(a)     Vendor shall only Process Personal Information under this Agreement to the extent strictly necessary to provide the Service Bundles, and at all times in compliance with this Agreement and Information Privacy or Security Laws. Vendor shall limit access to Personal

Information to Workforce (as defined by 45 CFR 160.103) who have a need to access or otherwise Process Personal Information for purposes of performing the Service Bundles and are subject to Vendor policies and procedures regarding or are otherwise obligated to maintain the privacy, security and confidentiality of such Personal Information. Vendor shall not disclose any Personal Information to any third party without Authorized User[s'] express prior written permission, and only where such third party is bound by contractual obligations to maintain the privacy, security and confidentiality of such information at least as restrictive as those set forth herein. Vendor will not use, sell, lease, disclose, publish, access, transfer, loan, modify, de-identify, or otherwise perform any activity with Personal Information except as needed to carry out its obligations under this Agreement and Vendor shall in all cases retain full responsibility for the disclosure of Personal Information to any third party. Vendor agrees and acknowledges that Personal Information and customer data will be stored in the United States, will not be transferred outside of the United States and neither Vendor nor Vendor's Third Party Suppliers will access Personal Information or customer data from a location outside the United Sates.

(b)      Vendor shall implement and maintain at least the same technical and organizational safeguards as it has historically maintained in similarly-situated businesses owned by Vendor or its Affiliates designed to protect Personal Information in connection with the Service Bundles against any unauthorized access to, use, disclosure, modification or destruction of any Personal Information in the Vendor's possession or control, or processed by or on behalf of the Vendor (a "Security Incident"). As provided in the Business Associate Agreement (the "BAA") set forth in *Schedule 9.8* Vendor will notify Authorized User[s] in writing after it has confirmed there has been a Security Incident.

(c)      In connection with the Service Bundles, Vendor and [each] Authorized User agrees to comply with the information security requirements set forth on *Schedule 1.4(c)*.

1.5     **Facility-Based Applications**. Pursuant to and in accordance with the terms of the Purchase Agreement, Seller will convey to Authorized User[s] certain software applications that are among the Transferred Information Technology Systems. Vendor will not provide support for such software applications under this Agreement unless specifically listed in *Schedule 1.3*, other than those software applications Vendor has programmed directly and supporting corporate services in place prior to the Closing.

1.6     **Excluded Applications**. [Each] Authorized User acknowledges that (a) certain of the software applications used in connection with the operation of the Business will not be conveyed to [such] Authorized User pursuant to the terms of the Purchase Agreement (collectively, the "Excluded Applications"), a non-exclusive list of which is set forth on *Schedule 1.6*, and (b) Vendor will not provide support to any of the Excluded Applications pursuant to this Agreement. [Each] Authorized User covenants and agrees that it shall discontinue the use of the Excluded Applications from the Effective Date or as agreed to in *Schedule 1.6* until such time as [such] Authorized User has entered into separate license agreements with applicable vendors that permit [such] Authorized User to use the Excluded Applications independent of Vendor's license agreement with such vendors. Notwithstanding the foregoing, no item included on *Schedule 1.3* as a Supported Application will be added to *Schedule 1.6* as an Excluded Application following the execution of this Agreement.

\\4151-9324-4754  v6

1.7     **Scope of Service Bundles**.  Vendor shall perform each Service Bundle for the benefit of [each] Authorized User in its operation of the Business. [Each] Authorized User shall exercise ultimate control over the operation of the Business. By entering into this Agreement, Authorized User[s] [[are] / [is]] not delegating any powers, duties or responsibilities required to be exercised or performed by Authorized User[s] under applicable Law. The Service Bundles shall not include (i) the exercise of business judgment or general management by Vendor for, or on behalf of, Authorized User[s], or (ii) any legal, accounting or other financial advice by Vendor for, or on behalf of, Authorized User[s] and no attorney-client or other advisory or fiduciary relationship will be formed between Vendor and Authorized User[s]. Authorized User[s] shall receive and use the Service Bundles solely for [its] own account. The Parties agree that if Authorized User[s] determines in [its] sole discretion at any time during the period prior to Closing that a particular Service Bundle set forth in *Schedule 1.1* is no longer desirable, Authorized User[s] may provide advance written notice to Vendor of [its] intent to remove the Service Bundle from *Schedule 1.1* pursuant to Section 2.2(a) and this Agreement and *Schedule 1.1* will thereafter be deemed amended only to the extent required to remove such Service Bundle.

1.8     **Electronic Mail System Access; Electronic Records; Website and Domain Names**.  As of the day following the Effective Date, [each] Authorized User shall transition [such] Authorized User's employees, Representatives (as defined in the Purchase Agreement) and agents to its own electronic mail system. For a period of sixty (60) days after the Effective Date, Vendor shall cause [each] Authorized User's employees, agents and Representatives who have "steward.org" e-mail addresses as of the Effective Date (collectively, "Authorized User Personnel") to remain connected to Vendor's electronic mail system and to continue having the ability to fully access historical e-mails. During such sixty (60)-day period from the Effective Date, Authorized User[s] and Authorized User Personnel may utilize such continued access to Vendor's electronic mail system to access and retain such electronic records that do not contain Vendor Confidential Information and that were transferred to Authorized User[s] pursuant to the Purchase Agreement; provided, however, that Vendor will not be required to provide support for such transfer other than provision of access as described above.

1.9     **Implementation and Conversion Support**.  Authorized User shall make a one-time payment to Vendor, in accordance with Section 4.4, in consideration of services provided by or on behalf of Vendor during the period between the date of the Purchase Agreement and the Effective Date to assist and support Authorized Users in the separation of Authorized Users' systems from Vendor's systems to enable Authorized Users to begin receiving the Service Bundles on the Effective Date (the "Implementation Support"). The fee for the Implementation Support shall be calculated as follows: (i) for services provided directly by Vendor, for the hourly fee set forth on *Schedule 1.9*, and (ii) for services provided through a Subcontractor, on a direct pass-through basis, with no markup (the "Implementation Support Fee"). Commencing on the Effective Date and continuing during the Term (as hereinafter defined), at Authorized Users' reasonable request, Vendor shall provide (or introduce Authorized Users to a third party service provider which can provide) to Authorized Users certain services which are not Service Bundles hereunder but which are reasonably necessary for Authorized Users' transition from Vendor's systems to new systems (any such services, the "Conversion Support").  Any Conversion Support shall be billed at the hourly fee set forth in *Schedule 1.9* (the "Conversion Support Fee"), and Authorized Users shall pay to Vendor any Conversion Support Fees in accordance with Section 4 for Conversion Support provided directly by Vendor. For the avoidance of doubt,

\\4151-9324-4754  v6

nothing in this Section 1.9 shall require Vendor to assist or support Authorized Users in the conversion, retention or extraction of e-mail records.

 1.10 **License to Policies and Procedures Manuals**.  Vendor hereby grants Authorized User[s] a limited, non-exclusive license and right to access the policy and procedure manuals that have been in use by the Business (the "Manuals") in the ordinary course in connection with the Business, for the Term of this Agreement. Authorized User[s] accept[s] the Manuals in their present condition on an AS IS, WHERE IS BASIS, without recourse against Vendor arising, in and of itself, out of the access thereto.

## SECTION 2 - TERM

 2.1 **Term**.  The term of this Agreement shall commence on the Effective Date and shall continue until six (6) months from the Effective Date, unless sooner terminated in accordance with the provisions hereof (the "Initial Term"). Upon expiration of the Initial Term, this Agreement may, upon at least sixty (60) days prior written notice from Authorized User[s], extend for one (1) additional six (6) month period, during which period the Service Fee (as hereinafter defined) for each Service, and the Conversion Support Fee, shall be subject to a cost increase of five percent (5%) (a "Term Extension", and together with the Initial Term, the "Term"). Notwithstanding anything in this Agreement to the contrary, Authorized User[s] acknowledge[s] that Vendor's ability to make available third party applications to Authorized User[s] is limited by the terms of Vendor's Third-Party Supplier (as hereinafter defined) agreements, and that in no event shall Vendor be required to provide Service Bundles with respect to such third party applications beyond the term and scope permitted in Vendor's agreements for such third party applications; *provided*, *however*, that Vendor will, upon request of Authorized User[s], reasonably assist Authorized User[s] in obtaining any licenses necessary for Authorized User[s] to continue to receive the Service Bundles contemplated hereunder to the extent provided in Section 5.2. As used in this Agreement, "Third-Party Supplier" means any Person, Governmental Authority, or other form of business organization recognized under applicable Law that supplies products, software, or services to Vendor and/or any of its Affiliates.

 2.2 Termination.

  (a) **Termination For Cause**.  Either Party may terminate this Agreement upon prior written notice to the other Party if (i) the other Party commits a material breach of this Agreement and, to the extent such breach is curable, fails to cure such breach within thirty (30) days after written notice of such breach is provided by the nonbreaching Party to the breaching Party, or (ii)  the performance of a Service Bundle is hindered or otherwise made impracticable or impossible, including but not limited to, a material increase in cost, change in Law or change in how a third-party vendor provides or supports such Service Bundle. For the avoidance of doubt, "material breach" shall not include Vendor becoming insolvent or admitting in writing its insolvency or inability to pay its debts as they become due; making or proposing an assignment for the benefit of creditors; convening or proposing to convene a meeting of its creditors or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; proposing any such moratorium, extension or composition; commencing any liquidation or insolvency proceeding under any Law in any jurisdiction for the relief of debtors; or if any

receiver, trustee, liquidator or custodian is appointed to take possession of any substantial portion of the breaching Party's assets, so long as Vendor is able to continue performing hereunder.

(b)    **Effect of Termination**.  Termination of this Agreement in whole or in part, for cause, shall be without prejudice to any other remedy otherwise available to the Parties.

## SECTION 3 - OUTSOURCING

Notwithstanding anything contained in this Agreement to the contrary, it is expressly understood that Vendor has contracted, and may in the future contract, with Third-Party Suppliers for the provision of data processing services, including, without limitation, the Service Bundles, for the use and benefit of Vendor and Authorized User[s]. If Vendor determines to provide any Service Bundle directly or through outsourcing arrangements Vendor shall (a) obtain Authorized User[s]' prior written consent (such consent not to be unreasonably withheld, delayed or conditioned) to enter into any of such outsourcing arrangement to the extent such outsourcing arrangement (i) diminishes the quality of such Services or (ii) results in a material increase in the cost of such Service Bundle, and (b) Vendor shall in all cases retain responsibility for the provision to the Authorized User[s] of any of such Service Bundle to be performed under any outsourcing arrangement. Vendor does not guarantee the availability of any outsourced Service Bundle, although in the event of a disruption in any such Service Bundle, Vendor will use commercially reasonable efforts to procure an alternative provider or provide such Service Bundle directly. Also, if the Service Bundles are not provided consistent with the service levels and other requirements of this Agreement as a result of any non-performance by any outsourced provider under any outsourcing arrangement, Vendor shall exercise all of its rights and remedies against such non-performing provider to remedy such non-performance to the same extent that Vendor would pursue such rights and remedies for any similarly-situated businesses owned by Vendor or its Affiliates in addition to Vendor's other obligations under this Agreement. If Vendor's costs to provide a Service Bundle under this Agreement are increased as a result of changes in any outsourcing arrangement or Vendor's decision to provide directly any Service Bundles previously provided through an outsourcing arrangement, Authorized User[s] acknowledge that the Service Fee provided for in Section 4.1 will increase on a pass-through basis; *provided*, *however*, that Vendor shall notify Authorized User[s] in writing of any fee increase as soon as practicable, and that any such fee increase shall be implemented in a manner consistent with, and on substantially the same terms and conditions as, similar fee increases implemented at similarly-situated businesses owned by Vendor or its Affiliates.

## SECTION 4 - FEES, EXPENSES, TAXES

4.1    **Service Fee**.  Authorized User[s] shall pay to Vendor service fees for the Service Bundles hereunder in the amounts and on the payment terms provided in *Schedule 1.1* (the "Service Fee" and together with the Implementation Support Fee and the Conversion Support Fee collectively as the "Fees").  Vendor will invoice Authorized User[s] by [the 15th day of each month for the upcoming month's Fees.  Authorized User[s] shall remit payment in full to Vendor no later than the date which is five (5) days after receipt of each such invoice.]  If the Effective Date is other than the first day of any calendar month, Authorized User[s] shall pay Vendor a prorated Service Fee for the first and last partial calendar month of this Agreement (such proration shall not apply to the Vendor Expenses (as defined in *Schedule 1.1*)). The Parties agree that the Fees and all other fees and expenses payable hereunder have been or will be negotiated

at arm's length. For any Service Bundle provided hereunder which is discontinued, Vendor will retain the prorated portion of any prepaid, unused Service Fee for such discontinued Service Bundle, and Authorized User[s] will continue to pay all fees for such discontinued Service Bundle. If any additional Service Bundles or any other services provided hereunder would result in fees and expenses in addition to those set forth on ***Schedule 1.1*** greater than $50,000, then Vendor shall notify in advance Authorized User[s] in writing of any such fee increase and thereafter Authorized User[s] can choose whether or not to accept such Service Bundle and the corresponding increase in the Service Fee (and Vendor will not be required to provide such Service Bundle until Authorized User[s] have accepted such corresponding increase in the Service Fee).

4.2    **Expenses**.  Authorized User[s] shall reimburse Vendor on the same payment terms as are specified in Section 4.1 for all sums paid that are reasonable, properly documented and necessary out-of-pocket expenses incurred by Vendor or its contracting parties (including Vendor's Affiliates) on behalf of [any] Authorized User in connection with this Agreement, as more particularly described in ***Schedule 1.1***, but excluding payments made to employees of Vendor except as included in the calculation of any Fees. For such time as any employees of Vendor or any of its Affiliates are providing the Service Bundle  to Authorized User[s] under this Agreement, (a) such employees will remain employees of Vendor or such Affiliate, as applicable, and shall not be deemed to be employees of Authorized User[s] for any purpose, and (b) Vendor or such Affiliate, as applicable, shall be solely responsible for the payment and provision of all wages, bonuses and commissions, employee benefits, including severance and worker's compensation, and the withholding and payment of applicable Taxes (as defined in the Purchase Agreement) relating to such employment.

4.3    **Taxes**.  All sales, use, transfer, value-added, excise, consumption, gross receipts, goods or services, or similar tax, levy or charge (including any payments in lieu thereof) however levied or assessed, associated with the Service Bundles, Fees or any other transaction contemplated by this Agreement, including any such amounts included in an invoice hereunder, shall be passed through to Authorized User[s] in addition to the Service Fees. Each Party shall provide the other Party such information as reasonably requested from time to time, and reasonably cooperate with the other Party, in connection with the reporting of such taxes and any assessment, audit, or other proceeding related thereto.

4.4    **Initial Payment for Service Bundles**.  Upon submission of a detailed invoice to Authorized User[s] no less than five (5) days prior to the Closing, Authorized User[s] shall pay, on the Effective Date, to Vendor the "Estimated Transition Services Amount", which is Vendor's estimate of the Fees (inclusive of the Vendor Expenses (i) incurred by Vendor prior to the Effective Date in order to provide the Service Bundles as set forth in Recital D; (ii) during the first month of the Term, and (iii) the Implementation Support Fee. Within five (5) days after Vendor determines the actual Service Fee, inclusive of the Vendor Expenses (a) incurred by Vendor prior to the Effective Date in order to provide the Service Bundles and (b) during the first month of the Term (the "Actual Transition Services Amount"), Vendor shall invoice Authorized User[s] for the amount that the Actual Transition Services Amount exceeds the Estimated Transition Services Amount, if any, and Authorized User[s] shall provide to Vendor within five (5) days after the invoice date a payment representing the amount by which the Actual Transition Services Amount exceeds the Estimated Transition Services Amount; *provided*, *however*, that if the Estimated Transition Services Amount exceeds the Actual

\\4151-9324-4754  v6

Transition Services Amount, then Vendor shall provide to Authorized User[s] a credit on the upcoming month's Services Fees representing the amount by which the Estimated Transition Services Amount exceeds the Actual Transition Services Amount within five (5) days after such determination.

4.5 **Late Payments**. If Authorized User[s] fail[s] to make any payment to Vendor when due under this Agreement, interest shall accrue on the amount due from the date such payment is due until it is paid at a per annum rate equal to the prime rate reported by the Wall Street Journal in its "Money Rates" or successor section on the date such payment is due plus five percent (5%) (or the maximum rate allowed by Law, whichever is less). In addition, if any late payment is not fully paid by Authorized User[s] within thirty (30) days of the applicable due date, Vendor may terminate this Agreement immediately by providing written notice thereof to Authorized User[s]. Authorized User[s] shall reimburse Vendor for any and all costs and expenses (including reasonable attorneys' fees and properly documented out-of-pocket expenses) incurred by Vendor in enforcing its rights to collect payments when due from Authorized User[s] under this Agreement.

4.6 **Right to Set Off**. Vendor, and any assignee or successor of Vendor pursuant to Section 11.4, expressly acknowledges and agrees that, pursuant to and subject to the terms of Section [13.17] of the Purchase Agreement, Authorized User[s] has a right to set off any amounts owed to Authorized User[s] under Section [1.9(e)] or Section [1.13] of the Purchase Agreement against any amounts owed by Authorized User[s] to Vendor pursuant to this Agreement, including but not limited to any Fees and expenses pursuant to this Section 4.

## SECTION 5 - USE OF SUPPORTED SOFTWARE APPLICATIONS

5.1 **Rights in Supported Software Applications**. Authorized User[s] shall obtain no rights in the Supported Software Applications other than the non-exclusive usage rights as specifically granted in this Agreement. Authorized User[s] shall receive no title to or proprietary interest in the Supported Software Applications as a result of this Agreement, including, without limitation, any systems, programs, operating instructions or other documentation relating to the Supported Software Applications.

5.2 **Supported Software Applications Use License**. Vendor hereby grants to Authorized User[s] a non-exclusive, worldwide license to access, use, display and execute the Supported Software Applications subject to the terms, conditions and limitations of this Agreement to the extent Vendor has the right to grant such license pursuant to the terms of the underlying license agreement. Such license shall expire contemporaneously with the earlier of the expiration or termination of Vendor's obligations with respect to such Supported Software Application pursuant to this Agreement or the underlying license agreement. Authorized User[s] shall not copy, decompile or otherwise reverse engineer the Supported Software Applications. Upon termination or expiration of this Agreement or the earlier termination by Authorized User[s] of Vendor's provision of the Supported Software Applications, Authorized User[s'] access pursuant to this Agreement to the Supported Software Applications shall be discontinued and Authorized User[s] shall return all related documentation to Vendor. Notwithstanding the foregoing, Authorized User[s] shall be permitted to destroy such related documentation after the termination or expiration of this Agreement. Vendor hereby agrees to use commercially reasonable efforts to cooperate with Authorized User[s'] efforts to obtain

\\4151-9324-4754  v6

renewal or replacement licenses, in Authorized User[s'] names and at Authorized User[s'] sole cost and expense, for any Supported Software Applications requiring license renewal. For the avoidance of doubt, nothing in this Agreement or the provision of any Service Bundle hereunder shall be deemed an assignment, novation or other transfer of any license agreement to which Vendor is a party that relate to centralized or other supported applications made available by Vendor to other businesses owned or operated by Vendor or its Affiliates. As a result, Authorized User[s] acknowledge[s] that following the end of the Term, to the extent Authorized User[s] desires to continue using such applications, [it] shall be solely responsible for obtaining [its] own license or other access to such applications from the appropriate third parties.

5.3     **Discontinuation of Supported Software Applications**.  On the date which is sixty (60) days after the termination or expiration of this Agreement: (i) Authorized User[s] shall discontinue use of the Supported Software Applications; and (ii) Vendor shall discontinue providing the Service Bundles to Authorized User[s] with respect to the Supported Software Applications.

5.4     **Updates; Upgrades**.  Vendor will perform all mandated, security, error corrections and regulatory updates as part of the Service Bundles, including security patches and error corrections, in each case, in the same manner as Vendor provides such updates to similarly-situated businesses owned by Vendor or its Affiliates. Authorized User[s] shall pay additional costs and expenses associated with such updates for the Supported Software Applications, which costs and expenses shall be shared equally among all other uses of such Supported Software Applications and Authorized User[s] shall be solely responsible for their proportionate share of such costs and expenses.

5.5     **Third Party Supplier Agreements**.  If any Third-Party Supplier agreement affecting a particular Service Bundle or Supported Software Application will expire during the Term, Vendor shall use commercially reasonable efforts to renew the term of such agreement at cost to Authorized User[s]; *provided, however*, that notwithstanding the foregoing, Vendor shall not be required, as part of the Service Bundles or otherwise, to: (a) take, or omit to take, any action that would cause Vendor to violate applicable Law, including any Healthcare Law, or the terms of any agreement between Vendor and a Third-Party Supplier in respect of any Service Bundle or Supported Software Applications; or (b) provide or make available any Service Bundle or Supported Software Applications beyond the date when a Vendor agreement with the applicable Third-Party Supplier has expired (and may not be renewed) or has otherwise terminated.

## SECTION 6- BOOKS AND RECORDS

6.1     **Availability to Secretary and Others**.  If required by applicable Law, the Parties agree that, if Vendor continues business operations until the expiration of four (4) years after the Effective Date, Vendor will make available to the Secretary of the United States Department of Health and Human Services (the "Secretary") and the United States Comptroller General, and their duly authorized Representatives, this Agreement and all books, documents and records necessary to certify the nature and extent of the costs of the goods and services provided under this Agreement.  No attorney-client, accountant-client or other legal privilege shall be deemed to have been waived by the Parties by virtue of this provision.

\\4151-9324-4754  v6

6.2     **Right to Inspect**.  Authorized User[s] shall have the right, at its sole cost and expense, during normal business hours and with reasonable advance written notice, to review and photocopy Vendor's books and records that pertain directly and exclusively to the accounts of Authorized User[s], the fees payable to Vendor under this Agreement or any Service Bundle provided by Vendor hereunder. Authorized User[s] specifically agree[s] that all such information shall be "<u>Confidential Information</u>" (as hereinafter defined) and shall be treated as provided in <u>Section 9</u>.

## SECTION 7- INDEMNITY; INSURANCE

7.1     **Mutual Indemnity**.  Subject to the limitations set forth in <u>Section 8.5</u>, each Party ("<u>Indemnitor</u>") shall indemnify and hold harmless each other Party and its Affiliates, and its and their respective Representatives, managers, shareholders, members, principals, successors, heirs and assigns (collectively, the "<u>Indemnitees</u>", and each individually, an "<u>Indemnitee</u>") against any and all Liabilities arising out of or related to any third-party claim for bodily injury, death or property damage (other than intellectual property infringement claims) arising from or in connection with this Agreement to the extent that such injury or damage was caused by any gross negligence or willful misconduct of the Indemnitor, including any settlement amounts, any damages finally awarded attributable to such claim and any reasonable attorneys' fees and costs incurred by Indemnitee in assisting Indemnitor in defending against such claim; *provided*, *however*, that Indemnitee gives Indemnitor: (a) written notice within a reasonable time after Indemnitee is served with legal process in an action asserting such claim, *provided*, *however*, that the failure or delay to notify Indemnitor shall not relieve Indemnitor from any liability that it may have to Indemnitee hereunder so long as the failure or delay shall not have prejudiced the defense of such claim; and (b) reasonable assistance in defending the claim.  If Indemnitor elects not to defend any such claim, Indemnitee shall have the option but not the duty to reasonably settle or defend the claim at its cost, and Indemnitor shall indemnify Indemnitee for such settlement or any damages finally awarded against Indemnitee attributable to such claim, reasonable and properly documented costs and expenses (including costs of investigation, expert fees, and legal fees and expenses), and interest on such recoverable funds advanced.

7.2     <u>Insurance</u>.

(a)     During the Term, the Parties shall cause to be maintained continuously in force and effect policies of insurance covering acts and omissions at or involving the Business (including each Party's obligations under this Agreement) occurring while this Agreement is in effect consistent with the insurance requirements set forth on ***Schedule 7.2***[5]. The Parties agree to furnish certificates of insurance and self-insurance and such other evidence of coverage as the other Party may reasonably request, from time to time, to confirm that all such coverages remain in full force and effect. If the coverage is on a "claims made" basis, each Party agrees that prior to the effective date of termination of current insurance coverage, such Party shall either procure a replacement policy thereafter or tail coverage to assure coverage for all acts and omissions occurring during the Term. Coverage shall include a retroactive reporting date coinciding with the Effective Date. Each Party shall notify the other Party, or ensure that the issuer of each such coverage notifies, the other Party not fewer than thirty (30) days in advance of any termination,

cancellation, or reduction in limits, or other material adverse change to any such policy; *provided, however*, that no such cancellation or material modification shall affect such Party's obligation to maintain the insurance coverage required by this Agreement.

(b)      All insurance provided for under the foregoing provisions of this Section 7.2 must be effected by policies issued by insurance companies with at least an "A" rating from A.M. Best Company and properly licensed and qualified to do business in the State of Florida or through a self insurance captive. Each Party shall be named as an additional insured on the comprehensive general liability insurance policies described in this Section 7.2 and ***Schedule 7.2***. All such policies of insurance shall provide for waiver of subrogation against the other Party.

## SECTION 8- WARRANTIES AND LIMITATIONS OF LIABILITY

8.1      **Vendor's Efforts**.  Vendor, in the provision of the Service Bundles, shall perform and provide each such Service Bundle in good faith and consistent with the historical manner services are provided to similarly situated businesses owned by Vendor or its Affiliates and with substantially the same standard of care as historically provided to such businesses.

8.2      **Performance**.  During the Term, the Vendor shall provide the Service Bundles and the Supported Software Applications in a manner that is consistent with the manner provided by Vendor to the Business prior to the Effective Date. However, should the Service Bundles or Supported Software Applications not perform consistent with this paragraph, Authorized User[s] shall notify Vendor promptly upon becoming aware and Vendor will exercise all commercially reasonable efforts to correct such non-performance at no additional cost to Authorized User[s]. If such efforts are not acceptable to Authorized User[s], then representatives of both Vendor and Authorized User[s] shall meet and mutually develop in good faith a plan reasonably acceptable to both Parties to correct such non-performance.

8.3      **Infringement**.  If the use of any Supported Software Application is held by a court of competent jurisdiction to infringe or constitute the wrongful use of any third party's proprietary rights and Authorized User[s'] right to use the Supported Software Application is enjoined, or if Vendor in the reasonable exercise of its discretion instructs Authorized User[s] to cease using the Supported Software Application in order to mitigate potential Liabilities arising from a third party's claim that use of the Supported Software Application infringes on its rights, Authorized User[s] shall immediately cease using the Supported Software Application. In such event, Vendor shall use commercially reasonable efforts to enforce any contractual rights Vendor has against the third party licensor of the Supported Software Application to either replace or modify the infringing Supported Software Application with suitable non-infringing software or to procure the right of Authorized User[s] and Vendor to use the Supported Software Application.

8.4      DISCLAIMER.  **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, VENDOR DOES NOT MAKE AND EXPRESSLY DISCLAIMS ALL WARRANTIES OF ANY KIND WITH RESPECT TO THE SERVICE BUNDLES AND THE SUPPORTED SOFTWARE APPLICATIONS, WHETHER WRITTEN OR ORAL, EXPRESS, IMPLIED OR STATUTORY, AT LAW OR IN EQUITY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.   THE WARRANTIES AND**

\\4151-9324-4754  v6

**OBLIGATIONS OF VENDOR SET FORTH IN THIS AGREEMENT AND VENDOR'S LIABILITY HEREUNDER IS EXPRESSLY CONDITIONED UPON AUTHORIZED USER[S'] COMPLIANCE WITH ALL PROVISIONS OF THIS AGREEMENT. VENDOR DOES NOT MAKE ANY WARRANTIES WITH RESPECT TO ANY EQUIPMENT OR THIRD PARTY SOFTWARE.**

8.5    **Limitation of Liability**.  EXCEPT IN THE CASE OF A DATA BREACH OF PERSONAL INFORMATION OR A BREACH OF THE BUSINESS ASSOCIATE AGREEMENT, NO PARTY SHALL HAVE ANY LIABILITY TO ANY OTHER PARTY FOR MULTIPLIED DAMAGES, DIMINUTION OF VALUE, CONSEQUENTIAL DAMAGES, INDIRECT DAMAGES, SPECIAL DAMAGES, INCIDENTAL DAMAGES, PUNITIVE DAMAGES OR EXEMPLARY DAMAGES (INCLUDING LOSS OF REVENUE, INCOME, PROFITS, DATA OR USE, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY) INCURRED BY THE OTHER PARTY OR ITS AFFILIATES OR ANY THIRD PARTY (EVEN IF ANY SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN UNLESS ARISING OUT OF SUCH PARTY'S OR ITS AFFILIATES' WILLFUL MISCONDUCT (I.E., THE WILLFUL MISCONDUCT OF ANY PARTY'S UNAFFILIATED THIRD-PARTY CONTRACTORS WILL NOT BE IMPUTED TO SUCH PARTY). EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 7, A DATA BREACH OF PERSONAL INFORMATION OR A BREACH OF THE BUSINESS ASSOCIATE AGREEMENT, ANY LIABILITY OF THE PARTIES UNDER THIS AGREEMENT AND ALL SCHEDULES (AS DEFINED IN THE PURCHASE AGREEMENT), EXHIBITS (AS DEFINED IN THE PURCHASE AGREEMENT), ADDENDA AND ATTACHMENTS HERETO SHALL IN NO EVENT EXCEED (I) FOR ANY INDIVIDUAL CLAIM THE AGGREGATE AMOUNT OF FEES PAID HEREUNDER TO VENDOR BY AUTHORIZED USER[S] ATTRIBUTABLE TO SUCH SERVICE BUNDLE FOR THE CALENDAR MONTH DURING WHICH THE APPLICABLE CLAIM AROSE AND (II) IN THE AGGREGATE FOR ALL CLAIMS, THE AMOUNT OF FEES (SET FORTH IN ***SCHEDULES 1.1 AND 1.9***) PAYABLE HEREUNDER TO VENDOR BY AUTHORIZED USER[S] ATTRIBUTABLE TO SUCH SERVICE BUNDLE FOR A TWO (2) MONTH PERIOD. VENDOR'S LIABILITY UNDER THE BUSINESS ASSOCIATE AGREEMENT (INCLUDING A BREACH OF THE BUSINESS ASSOCIATE AGREEMENT AND VENDOR'S INDEMNIFICATION OBLIGATIONS UNDER THE BUSINESS ASSOCIATE AGREEMENT) OR FOR A DATA BREACH OF PERSONAL INFORMATION SHALL IN NO EVENT EXCEED IN THE AGGREGATE FIVE TIMES (5X) THE AMOUNT OF FEES SET FORTH IN ***SCHEDULE 1.1*** PAYABLE HEREUNDER TO VENDOR BY AUTHORIZED USER[S] FOR A TWO (2) MONTH PERIOD. NO PARTY MAY BRING A CLAIM MORE THAN TWELVE (12) MONTHS AFTER THE PARTY KNOWS OR SHOULD HAVE KNOWN AFTER REASONABLE INQUIRY THE FACTS GIVING RISE TO THE CLAIM. THE SOLE AND EXCLUSIVE REMEDY OF AUTHORIZED USER[S] FOR ANY CLAIM AGAINST VENDOR AND VENDOR FOR ANY CLAIM AGAINST AUTHORIZED USER ARISING OUT OF OR RELATING TO THIS AGREEMENT AND/OR THE TRANSACTIONS CONTEMPLATED HEREIN ARE SET FORTH IN SECTION 7.1, THIS SECTION 8 AND SECTION 9.6. THIS SECTION 8.5 APPLIES TO ALL LIABILITIES UNDER THIS AGREEMENT, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, INCLUDING WITHOUT

LIMITATION CONTRACT OR TORT (INCLUDING PRODUCTS LIABILITY, STRICT LIABILITY, NEGLIGENCE AND MISREPRESENTATION), AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY STATED HEREIN. THE PARTIES AGREE THAT THIS <u>SECTION 8.5</u> REFLECTS A REASONABLE ALLOCATION OF RISK, AND NEITHER PARTY WOULD ENTER INTO THIS AGREEMENT WITHOUT THESE LIMITATIONS ON LIABILITY.

8.6    **Mitigation**.  Each Party shall adopt such reasonable measures as it deems necessary or appropriate to limit their exposure with respect to the potential Liabilities and damages set forth in <u>Section 8.5</u>.

## SECTION 9 - CONFIDENTIALITY

9.1    **Definition**.  "<u>Confidential Information</u>" is defined as all data, information and materials, regardless of medium, furnished by one Party to the other Party or accessed by either Party in connection with this Agreement, including without limitation the identity of patients, the content of any medical records, financial and tax information, information regarding Medicare and Medicaid claims submission and reimbursements, the object and source codes for the Supported Software Applications, the documentation, and such other information constituting the Supported Software Applications.

9.2    **Obligation to Observe Confidentiality**.  The Party receiving the Confidential Information (the "<u>Receiving Party</u>") from the Party who owns or holds in confidence such Confidential Information (the "<u>Owning Party</u>") may use the Confidential Information solely for the purpose of performing its obligations or enforcing its rights under this Agreement or, in the case of Authorized User[s], in connection with Authorized User[s'] operation of the Business.

9.3    **Protection**.  The Receiving Party shall not disclose any of the Confidential Information except to those of its Representatives having a need to know for the purpose of performing their obligations or enforcing their rights under this Agreement.  Each Party shall take appropriate action, by instruction to or agreement with its Affiliates, Representatives, outsourced providers, and subcontractors, to maintain the confidentiality of the Confidential Information.  The Receiving Party shall promptly notify the Owning Party if the Receiving Party learns of an unauthorized release of Confidential Information.

9.4    **Exceptions**.  The Receiving Party shall have no obligation with respect to: (a) Confidential Information made available to the general public without restriction by the Owning Party or by an authorized third party; (b) Confidential Information known to the Receiving Party independently of disclosures by the Owning Party under this Agreement; (c) Confidential Information independently developed by the Receiving Party without reference to or use of the Owning Party's Confidential Information; or (d) Confidential Information that the Receiving Party may be required to disclose pursuant to subpoena or other lawful process; *provided*, *however*, that the Receiving Party notifies the Owning Party in a timely manner to allow the Owning Party to appear and protect its interests.

9.5    **Return of Confidential Information**.  Upon the termination or expiration of this Agreement, each Party shall (a) immediately cease to use the other Party's Confidential Information, (b) return or destroy, at the election of the Owning Party, such Confidential

\\4151-9324-4754  v6

Information and all copies thereof within ten (10) days of the termination or expiration, unless otherwise provided in this Agreement, and (c) upon request, certify in writing to the other Party that it has complied with its obligations set forth in this <u>Section 9</u>, unless otherwise provided in this Agreement. Confidential Information that cannot be destroyed will be maintained in accordance with each Parties' policies and procedures for protecting confidential information, which in all instances require that such information be maintained in accordance with applicable Law and the terms and conditions of this <u>Section 9</u>.

9.6    **Availability of Equitable Remedies**.  The Parties acknowledge that monetary remedies may be inadequate to protect rights in Confidential Information and that, in addition to legal remedies otherwise available, injunctive relief is an appropriate judicial remedy to protect such rights and in the event of a breach or threatened breach of this <u>Section 9</u>, the non-breaching Party will be entitled to seek and obtain injunctive or other equitable relief, without posting bond or proving damages.

9.7    **Reasonable Assistance**.  Each Party agrees to provide reasonable assistance and cooperation upon the reasonable request of the other Party in connection with any dispute or litigation with third parties to protect the requesting Party's Confidential Information; *provided*, *however*, that the Party seeking such assistance and cooperation shall reimburse the other Party for its reasonable out-of-pocket expenses, including reasonable attorneys' fees.

9.8    **HIPAA Compliance**.  The Parties agree and acknowledge that each Authorized User is a "Covered Entity" and that Vendor is a "Business Associate" of such Authorized User for purposes described in this Agreement, as such terms are defined by the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations.  In the event of any conflict between the terms of this Agreement and the terms of the Business Associate Agreement set forth on ***Schedule 9.8*** (the "<u>Business Associate Agreement</u>"), the terms of such Business Associate Agreement shall prevail.

## SECTION 10 - INDEPENDENT CONTRACTOR

In the performance of this Agreement, Vendor and each of its outsourced providers is acting as an independent contractor and shall have the exclusive control of the manner and means of performing the work contracted for hereunder.  Personnel supplied by Vendor or its outsourced providers hereunder, whether or not located on Authorized User[s'] premises, are not Authorized User[s'] employees or agents and shall not hold themselves out as such, and Vendor or such outsourced provider, as applicable, assumes full responsibility for its acts and for compliance with any applicable employment Laws and payment of all employment taxes with respect to such personnel. Nothing contained in this Agreement shall be construed to create a joint venture, partnership or relationships of trust or agency between the Parties.

## SECTION 11 - MISCELLANEOUS

11.1    **Force Majeure and Manner of Service**.  If any Party's performance is prevented, hindered or delayed by reason of any cause(s) beyond such Party's reasonable control which cannot be overcome by reasonable diligence, including without limitation, war, labor disputes, civil disorders, governmental acts, epidemics, pandemics, quarantines, embargoes, fires, earthquakes, storms, hurricanes, power failures, equipment or supply chain failures (e.g.

replacement of supply chain equipment), transmission failures, or acts of God, such Party shall be excused from performance to the extent that it is prevented, hindered or delayed thereby, during the continuance of such cause(s); and such Party's obligations hereunder shall be excused so long as and to the extent that such cause(s) prevent or delay performance. Vendor further shall not be responsible for delays in connection with the Service Bundles that are attributable to unforeseeable causes beyond its reasonable control, including limitations upon the availability of telephone transmission facilities or failures of equipment outside the control of Vendor.

11.2    **Survival**.  Termination or expiration of this Agreement shall not affect the rights and obligations of the Parties hereunder for any of their respective acts or omissions prior to or on the date of such termination or expiration. After the Term, only Sections 2.2(c), 2.2(d), 4–9, and 11.2–11.5 shall continue to be in full force and effect.

11.3    **Entirety of Agreement**.  This Agreement (including all Schedules, Exhibits, and addenda attached hereto), and the other documents and instruments specifically provided for herein and therein contain the entire understanding between the Parties concerning the subject matter of this Agreement and such other documents and instruments and, except as expressly provided for herein or therein, supersede all prior understandings and agreements, whether oral or written, between them with respect to the subject matter hereof and thereof. There are no representations, warranties, agreements, arrangements or understandings, oral or written, among the Parties hereto relating to the subject matter of this Agreement and such other documents and instruments which are not fully expressed herein or therein.

11.4    **Benefit/Assignment**.  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective legal Representatives, successors, and assigns. No Party may assign this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed and any attempted assignment without the required consents shall be void; *provided*, *however*, that either Party, without the prior written consent of the other Party, may assign its rights and delegate its duties hereunder to one or more of its Affiliates or to a successor entity as part of a merger, acquisition, internal reorganization or other change of control (but in such event, the assigning or delegating Party shall be required to remain obligated hereunder in the same manner as if such assignment or delegation had not been effected). Authorized User[s] shall be jointly and severally liable for all of Authorized User[s'] obligations under this Agreement.

11.5    **Incorporation of Provisions of Purchase Agreement**.  Sections 13.1 (Notice), 13.2 (Choice of Law; Venue), 13.4 (Waiver of Jury Trial), 13.9 (Waiver of Breach), 13.10 (Severability), 13.11 (No Inferences; Sophisticated Parties), 13.12 (Divisions and Headings of this Agreement), 13.13 (No Third-Party Beneficiaries), 13.14 (Entire Agreement; Amendment), 13.15 (Multiple Counterparts) and 13.19 (Interpretation) of the Purchase Agreement are incorporated herein by reference, *mutatis mutandis*.

**[SIGNATURES ON FOLLOWING PAGE; REMAINDER OF PAGE IS BLANK]**

\\4151-9324-4754  v6

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date.

**VENDOR:**                                        [●]

By:_____

Name:_____

Title:_____

\\4151-9324-4754  v6

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date.

**AUTHORIZED USER[S]:**                    [●]

By:_____

Name:_____

Title:_____

*Schedule 1.1*

## *Scope of Service Bundles and Services Fee*

[Omitted.]

***Schedule 1.1(a)***

**_IT Services Bundle_**[1]

[Omitted.]

Schedule 1.1(c)

### ***Hospital RCM Fees***

[Omitted.]

*Schedule 1.4(c)*

<u>*Authorized User Information Security Requirements*</u>

[Omitted.]

*Appendix 1 to Schedule 1.4(c)*

## *Vendor Security Rider*

[Omitted.]

### Schedule 1.9

### *Implementation Support Fee*

[Omitted.]

### Schedule 9.8

### Business Associate Agreement

[Omitted.]

*Exhibit J*

# EXHIBIT J

# EMPLOYEE CONTRACT ASSIGNMENT

*Exhibit J*

## EMPLOYEE CONTRACT ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS EMPLOYEE CONTRACT ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made and entered into as of [●], 2024, effective as of the Effective Time, by and between [●], a [●] ("Assignor") and [●], a [●] ("Assignee"). Assignor and Assignee may be referred to in this Assignment individually as a "Party" and, collectively, as the "Parties".

## RECITALS

WHEREAS, Assignor is party to those certain [physician] employment agreements and [advanced practice provider] employment agreements and/or offer letters, as applicable, listed on Schedule A attached hereto (collectively the "Employment Agreements"), which may be updated from time to time;

WHEREAS, [Assignor,] Assignee [and certain of their Affiliates] are parties to that certain Asset Purchase Agreement, dated as of August 14, 2024 (as may be amended, supplemented or modified from time to time, the "Purchase Agreement");

WHEREAS, pursuant to the Purchase Agreement, Assignor will assign to Assignee all of Assignor's right, title and interest under, in and to (a) the Employment Agreements and (b) the Assumed Liabilities arising under the Employment Agreements;

WHEREAS, pursuant to the Purchase Agreement, Assignee has agreed to accept and assume the Employment Agreements, including without limitation, all Assumed Liabilities arising under the Employment Agreements;

WHEREAS, capitalized terms used but not otherwise defined in this Assignment shall have the same meanings ascribed to such terms in the Purchase Agreement; and

WHEREAS, pursuant to that certain [Order (I) Authorizing and Approving (A) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief] (Docket No. [•]) issued by the United States Bankruptcy Court for the Southern District of Texas], Assignor is authorized to assign to Assignee, and Assignee wishes to assume from Assignor, the Employment Agreements.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

## AGREEMENT

1.      Assignment.  Effective as of the Effective Time and on the terms and conditions of the Purchase Agreement, Assignor hereby sells, assigns, transfers, conveys and delivers to Assignee all of Assignor's right, title and interest, free and clear of all Encumbrances (other than Permitted Encumbrances) under, in and to (a) the Employment Agreements and (b) the Assumed Liabilities arising under the Employment Agreements.

*Exhibit J*

2.        Assumption.  Assignee hereby acquires, assumes, receives and accepts, as of the Effective Time and on the terms and conditions of the Purchase Agreement, (a) the Employment Agreements and (b) the Assumed Liabilities arising under the Employment Agreements. Notwithstanding anything to the contrary in this Assignment, Excluded Liabilities are expressly excluded from the obligations being assumed by Assignee under this Assignment and Assignor shall retain such Excluded Liabilities.

3.        Conflict with the Purchase Agreement.  This Assignment is subject to and controlled by the terms of the Purchase Agreement, including all of the representations, warranties, covenants and agreements set forth in the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall it, extend, amplify, or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement or the survival thereof.  Except as expressly set forth in this Assignment or in the Purchase Agreement, Assignor and Assignee do not make any other covenant, representation or warranty regarding the Employment Agreements or the Assumed Liabilities.

4.        Sole Remedy.  The sole and exclusive remedy of the Assignee and Assignor with respect to any breach of this Assignment shall be as set forth in the Purchase Agreement.

5.        Miscellaneous.  The terms and provisions of Sections 13.1 (Notice), 13.2 (Choice of Law; Venue), 13.3 (Benefit; Assignment; Delegation), 13.4 (Waiver of Jury Trial), 13.9 (Waiver of Breach), 13.10 (Severability), 13.11 (No Inferences; Sophisticated Parties), 13.12 (Divisions and Headings of this Agreement), 13.13 (No Third-Party Beneficiaries), 13.14 (Entire Agreement; Amendment), 13.15 (Multiple Counterparts) and 13.19 (Interpretation) of the Purchase Agreement are hereby incorporated herein by reference and apply, *mutatis mutandis*, to this Assignment.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

*Exhibit J*

IN WITNESS WHEREOF, each of the undersigned has caused this Assignment to be duly executed as of the day and year first above written and effective as of the Effective Time.

**ASSIGNOR:**

[●]

By: _____
Name: _____
Title: _____

[Signature Page to Employee Contract Assignment and Assumption Agreement]

*Exhibit J*

**ASSIGNEE:**

[●]


By: _____
Name: _____
Title: _____

[Signature Page to Employee Contract Assignment and Assumption Agreement]

*Exhibit J*

## <u>SCHEDULE A</u>

**Employment Agreements**

[Omitted.]

[Schedule A to Employee Contract Assignment and Assumption Agreement]

# EXHIBIT K

## ASSIGNMENT FOR TRANSFERRED INTERESTS

*Exhibit K*

## <u>IRREVOCABLE ASSIGNMENT</u>

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, the undersigned, [●], a [●] ("<u>Transferor</u>"), being the holder of [●] (collectively, the "<u>Interests</u>") of NeuroSkeletal Imaging, LLC (f/k/a NeuroSkeletal Institute of Melbourne) (the "<u>Company</u>"), does hereby irrevocably sell, assign, convey and transfer the Interests to [●], a [●].  The Interests are hereby conveyed subject to the terms of that certain [insert name of joint venture governing document and date]. Upon the effectiveness of the foregoing transfer, Transferor shall not hold any equity interest in the Company.  Further, the undersigned does hereby irrevocably constitute and appoint the Company or any individual designated by the Company as Transferor's attorney-in-fact to convey, assign and transfer the Interests on the books of the Company with full power of substitution in the premises.

Dated:_____

**TRANSFEROR**

[●]

By: _____
Name: [●]
Its:　　[●]

*Exhibit L*

**EXHIBIT L**

**SALE ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC**, *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |

## ORDER (I) AUTHORIZING AND APPROVING (A) THE SALE OF MELBOURNE REGIONAL MEDICAL CENTER, ROCKLEDGE REGIONAL MEDICAL CENTER, AND SEBASTIAN RIVER MEDICAL CENTER FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) THE SEVERANCE OF REAL PROPERTY FROM AN UNEXPIRED LEASE; AND (II) GRANTING RELATED RELIEF

Upon the *Emergency Motion of Debtors for Entry of Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief*, dated May 15, 2024 (Docket No. 281) (the "**Motion**"),[2] filed by the above-referenced debtors and debtors in possession (collectively, the "**Debtors**") seeking, among other things, entry of an order (this "**Order**") (i) authorizing the sale of the Purchased Assets (as defined in the APA) free and clear of all Liens, Claims, Encumbrances, and Interests (as defined in paragraph 9 herein) and

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the APA (as defined herein), as applicable.

assumption of Assumed Liabilities (as defined in the APA), except as otherwise provided in that certain *Asset Purchase Agreement*, dated as of [●], 224 (together with all other agreements, documents, instruments, deliverable thereunder or attached thereto or referenced therein, and as may be amended, modified, or supplemented, the "**APA**") by and among one or more Debtors and Orlando Health, Inc. and Orlando Health Medical Group, Inc. (collectively, the "**Buyer**", and such sale, the "**Sale Transaction**"), with all Liens, Claims, Encumbrances, and Interests to attach to the proceeds of the Sale Transaction as set forth in this Order, (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases and certain non-executory contracts, including those identified on Schedules 1.1(h)(ii) and 1.5(b)(i) of the APA, as such schedules and sections of the APA may be modified or amended in accordance with the APA and this Order (the "**Assigned Contracts**"); and (iii) granting related relief, all as more fully set forth in the Motion; and upon consideration of the *Declaration of James Moloney in Support of Emergency Motion of Debtors for Entry of Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 425); the *Declaration of Toby King in Support of Emergency Motion of Debtors for Entry of Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 426), and the *[Declaration of Toby King in Support of Sale of Assets Free and*

*Clear of Liens, Claims, Encumbrances, and Interests and Granting Related Relief]* (Docket No. [●]) (collectively, the "**Sale Declarations**"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. § 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary; and the Court having entered the *Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 626) (the "**Bidding Procedures Order**"); and the Debtors having filed and served the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Sale* (Docket No 1643); and the Debtors having filed and served the [*Notice of Designation of Stalking Horse Bidder for Certain of the Debtors' Florida Hospitals* (Docket No. [●]) (the "**Notice of Stalking Horse Bidder**")]; and the Court having entered the [Stalking Horse Bid Protections Order (Docket No. [●]) (the "**Stalking Horse Bid Protections Order**")]; [and the Debtors having held an Auction for the Purchased Assets on [●], 2024;] and the Debtors having determined that the highest or otherwise best offer for the Purchased Assets was made by the Buyer pursuant to the APA (such offer, the "**Successful Bid**"); and the Debtors having filed and served the *[Notice of Successful Bidder]* (Docket No. [●]) naming the Buyer the Successful Bidder for the Purchased Assets; [and [●]

3

("**Real Property Buyer**"), and [●] (collectively, "**Real Property Sellers**") intending to enter into a Real Property Purchase and Sale Agreement prior to the Closing Date (the "**PSA**") with respect to the purchase and sale of the real property and improvements more specifically described therein (the "**Real Property**" and such transaction, the "**Real Property Transaction**"); and MPT Operating Partnership, L.P. and its applicable affiliates (the "**MPT Lessors**") having agreed, conditioned upon the Closing of the Sale Transaction and the Real Property Transaction, to sever and release the Real Property from that certain *Second Amended and Restated Master Lease Agreement (Master Lease I)*, dated as of March 14, 2022 ("**Master Lease I**") and the other Obligation Documents (as defined in Master Lease I) (collectively, the "**Severance**") pursuant to an amendment to Master Lease I as contemplated by the APA (together with all other agreements, documents, instruments, deliverable thereunder or attached thereto or referenced therein, and as may be amended, modified, or supplemented, the "**Severance Amendment**");] and upon the Buyer and one or more Debtors having agreed to the terms of the APA with respect to the Sale Transaction; and the Court having conducted a hearing on [●], 2024 (the "**Sale Hearing**") to consider the relief requested in the Motion as set forth in this Order; and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Sale Transaction, the APA, the Severance, the Severance Amendment, and all relief set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and the Court having reviewed and considered: (i) the Motion; (ii) the APA; (iii) the Global Bidding Procedures; (iv) the Bidding Procedures Order; (v) the record of the Bidding Procedures Hearing; (vi) the Sale Declarations; (vii) all objections filed with the Court; and (viii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and the

4

Court having determined that the legal and factual basis set forth in the Motion establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates, and the Debtors having demonstrated good, sufficient and sound business justifications for the relief granted herein; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary, it is HEREBY FOUND AND DETERMINED THAT:

      A.    **Findings and Conclusions.**  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

      B.    **Jurisdiction.**  The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334.  Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Purchased Assets pursuant to 28 U.S.C. § 1334(e), as such Purchased Assets are property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b), and as such, this Court has the authority to enter a final order.

      C.    **Venue.**  Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D.      **Statutory Predicates.**  The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Bankruptcy Rules, and the Complex Case Procedures.

E.      **Global Bidding Procedures.**  On June 3, 2024, the Court entered the Bidding Procedures Order which, among other things: (i) approved the Global Bidding Procedures (as defined in the Motion); (ii) authorized the Debtors to designate one or more stalking horse bidders (each, a "**Stalking Horse Bidder**" and, each such bidder's bid, a "**Stalking Horse Bid**") and offer each such Stalking Horse Bidder certain bid protections as set forth in the Global Bidding Procedures (collectively, the "**Stalking Horse Bid Protections**"); (iii) scheduled Auctions of the Assets (each as defined in the Motion); (iv) scheduled Sale Hearings to consider the sale of the applicable Assets; (v) authorized and approved (1) notice of Auctions, sales of the Assets, and the Sale Hearings, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u> (the "**Sale Notice**"), and (2) notice to each non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired non-residential real property lease of the Debtors that the Debtors propose to assume and assign to a particular Successful Bidder setting forth the Debtors' calculations of the amount necessary to cure any monetary defaults under such Assigned Contract (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "**Cure Notice**"); (vi) authorized and approved procedures for the assumption and assignment of the Assigned Contracts and determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and (vii) granted related relief. The Global Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Purchased Assets.  The Debtors conducted

the sale process of the Purchased Assets without collusion and in accordance with the Global Bidding Procedures.

        F.      **Designation of Stalking Horse Bidder.**  On August [●], 2024, the Debtors filed and served the Notice of Stalking Horse Bidder, which designated Buyer as the Stalking Horse Bidder for the Purchased Assets and set forth the Stalking Horse Bid Protections for Buyer consisting of (a) a break-up fee of $[13.8 million] "**Break-up Fee**") and (b) reimbursement of reasonable, out-of-pocket and documented expenses up to an aggregate amount of $[8 million] ("**Expense Reimbursement**," and together with the Break-up Fee, the "**Bid Protections**").  No timely objections were filed and served to the Notice of Stalking Horse Bidder or the Stalking Horse Bid Protections for Buyer in accordance with the Global Bidding Procedures.  On August [●], 2024, the Court entered the Stalking Horse Bid Protections Order, approving the Stalking Horse Bid Protections.

        G.      **Notice and Opportunity to Object.**  As evidenced by the certificates of service previously filed with the Court (Docket Nos. 774, 858, 1035, 1129, 1161, 1180, 1035, 1565, 1575, 1603, and 1614), and as demonstrated by the evidence presented at the Sale Hearing, the Debtors have provided proper, timely, adequate, and sufficient notice of, and fair and reasonable opportunity to object and be heard with respect to, the Motion, the Stalking Horse Bidder, the Stalking Horse Bid Protections, the contracts to be potentially assumed and assigned in connection with the Sale Transaction, including the Assigned Contracts, [the Auction], the Sale Hearing, the Sale Transaction, and the deadlines related thereto was provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9014 and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable: (a) the Office of the United States Trustee for the Southern District

of Texas; (b) counsel to the Junior DIP Lender, Prepetition MPT Secured Party, and MPT Lessors, KTBS Law LLP, 1801 Century Park E #2600, Los Angeles, California 90067 (Attn: Thomas E. Patterson, Esq. and Sasha M. Gurvitz, Esq.); (c) counsel to the ABL Lenders, Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (Attn:  Kristopher M. Hansen, Esq., Christopher Guhin, Esq., Jeff Lowenthal, Esq., and Brian Kelly, Esq.); (d) counsel to Siemens Financial Services, Inc., Otterbourg P.C., 230 Park Avenue, New York, New York 10169 (Attn: Andrew Kramer, Esq.); (e) counsel to the FILO DIP Lenders and the FILO Lenders, Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Dennis Dunne, Esq., Michael Price, Esq., Andrew Harmeyer, Esq., and Brian Kinney, Esq.); (f) counsel to the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "**Committee**"), Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Brad M. Kahn, Esq., Sarah Link Schultz, Esq., Iain Wood, Esq., and Erica D. McGrady, Esq.); (g) counsel to the Buyer, Hogan Lovells US LLP, 390 Madison Avenue, New York, New York 10017 (Attn: Erin Brady, Esq., Todd Schwartz, Esq., and Jennifer Lee, Esq.); (h) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (i) all entities known to have asserted any Lien, Claim, Encumbrance, or Interest (as defined herein) in or against the Purchased Assets; (j) all entities that have, to the best of the Debtors' management and advisors' knowledge, expressed written interest in consummating the Sale Transaction with respect to the Purchased Assets within the past twelve (12) months; (k) all other known parties with any interest in the Purchased Assets; (l) all known creditors of the Debtors, including contract counterparties; (m) the Securities and Exchange Commission; (n) the Internal Revenue Service; (o) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules; (p) all state attorneys' general in states where the Purchased Assets are located; (q) municipalities in which the Purchased Assets are or

will be located as at Closing (as defined below); (r) all affected federal, state, and local regulatory and taxing authorities; (s) those parties entitled to notice pursuant to Local Rule 9013-1(d); and (t) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002.  With respect to entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice (as defined below) in the *Boston Globe*, *Houston Chronicle*, and *New York Times*, and on June 19, 2024, in the *Arizona Republic*, *Florida Today*, *Indian River Press Journal*, *Miami Herald*, *Midland Reporter-Telegram*, *South Florida Sun Sentinel*, *Texarkana Gazette*, and *Youngstown Vindicator* on June 20, 2024, and in the *Monroe News-Star* on June 23, 2024, and on the website maintained by Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.ra.kroll.com/Steward on June 5, 2024, as evidenced by the *Certificate of Publication* at Docket No. 1161, was, and is deemed, sufficient and reasonably calculated under the circumstances to reach such entities.  The notices described above and in the Motion and Bidding Procedures Order were good, sufficient, and appropriate under the circumstances and reasonably calculated to reach and apprise all known and unknown holders of the Liens, Claims, Encumbrances, and Interests, and no other or further notice of the Motion, the Stalking Horse Bidder, the Stalking Horse Bid Protections, [the Auction], the Sale Transaction, the Sale Hearing, the potential assumption and assignment of the Assigned Contracts, or the related Cure Costs is, or shall be, required.

H.      Service and publication of the Sale Notice (as defined below) was provided to all parties in interest, including those with an alleged approval or consent right or anti-assignment provision (including a provision that purports to give termination rights to a contract counterparty on account of the sale, disposition, transfer, or closure by the Debtors of the Debtors'

9

property or assets) contained in an Assigned Contract ("**Consent Rights**") with a reasonable and adequate opportunity to object.

I.    The Sale Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>, provided all interested parties with timely and proper notice of the Sale Transaction, Bid Deadline, [Auction], and Sale Hearing.  A reasonable opportunity to object and/or to be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code and the Bankruptcy Rules.  Accordingly, no further notice of the Motion or the Sale Hearing is necessary or required.

J.    The Debtors served the Cure Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u>, and the Supplemental Cure Notices (as defined in the Motion) on all parties required to receive such notice under the Bidding Procedures Order, and such parties have been afforded a reasonable and fair opportunity to file an objection to the assumption and/or assignment of any Assigned Contracts, including any proposed Cure Costs set forth on the Cure Notice (each, a "**Cure Objection**") and to the provision of adequate assurance of future performance by the Buyer (each, an "**Adequate Assurance Objection**", and together with a Cure Objection, a "**Contract Objection**").

K.    The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Global Bidding Procedures, the assumption and/or assignment of the Assigned Contracts, the Auction, the Sale Hearing, the Sale Transaction, the Cure Costs, the deadlines to submit Contract Objections, the deadline to submit objections to the Sale Transaction, and all other deadlines related thereto is or shall be required.

L.     **Assets Property of the Estate.**  The Purchased Assets sought to be sold and assigned by the Debtors to the Buyer pursuant to the APA are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

M.     **Sufficiency of Marketing.**  As demonstrated by the Motion, the Sale Declarations, and the evidence set forth at the Sale Hearing, the Debtors and their professionals adequately marketed the Purchased Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion and the Global Bidding Procedures and conducted a fair and open sale process.  The sale process and the Global Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Purchased Assets.  The process conducted by the Debtors pursuant to the Bidding Procedures Order resulted in the Sale Transaction, which is the highest or otherwise best value for the Purchased Assets, and there was no other transaction available or presented that would have yielded a higher or better result for the Purchased Assets.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective Bidders have been afforded a reasonable and fair opportunity to bid for the Purchased Assets, or file a Contract Objection and/or assert an objection to the Sale Transaction.  The marketing process undertaken by the Debtors and their professionals and each of their respective agents and other representatives with respect to the Purchased Assets has been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all of the Debtors' stakeholders in all respects.

N.     **Highest or Otherwise Best Offer.**  Pursuant to the APA and as further described below, the Buyer has offered to purchase the Purchased Assets from one or more Debtors

in exchange for (i) $[●] in cash, as adjusted pursuant to Section 1.6 of the APA and (ii) the assumption of the Assumed Liabilities (as defined in the APA).

      O.     The Debtors determined, in a valid and sound exercise of their business judgment and following consultation with their financial and legal advisors and a robust and extensive marketing process, that the total consideration (including non-cash consideration and other benefits presented by the Buyer's bid) to be provided by the Buyer for the Purchased Assets is the highest or otherwise best bid. Therefore, the Buyer's bid was designated the Successful Bid for the Purchased Assets. Consummating the Sale Transaction will yield greater value to the Debtors' estates than would have been provided by any other available alternative transaction. The Global Bidding Procedures and the Bidding Procedures Order have been complied with in all respects by the Debtors and the Buyer and afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer for the Purchased Assets.

      P.     The Debtors have demonstrated that (i) the Successful Bid as reflected in the APA is the highest or otherwise best offer for the Purchased Assets, (ii) the APA, and the closing of the transactions contemplated thereunder, presents the best opportunity to realize the maximum value of the Purchased Assets, and (iii) the Debtors' entry into the APA and consummation of the Sale Transaction (the "**Closing**", and the date of such Closing, the "**Closing Date**") is a sound exercise of the Debtors' business judgment.

Q.     **Real Property and Severance**.  Subject solely to any Challenge,[3] the Real Property Seller holds title to the Real Property sought to be sold and conveyed by the Real Property Seller to the Real Property Buyer pursuant to the PSA.  The Buyer would not have entered into the APA or purchased the Purchased Assets from the Debtors without the Real Property Buyer entering into the PSA and purchasing the Real Property, including because the Real Property is necessary to support the value of the Purchased Assets.  Similarly, the Buyer would not have entered into the APA or purchased the Purchased Assets from the Debtors without the ability to ensure an appropriate allocation of Purchase Price between the Purchased Assets and the Real Property.  The Closing of the Sale Transaction is contingent on the consummation of the Real Property Transaction and the Severance.  Accordingly, the Real Property Transaction and the Severance are integral to and inextricably intertwined with the Sale Transaction.

R.     **APA.**  On [●], 2024, the Debtors filed the Notice of Stalking Horse Bidder with a copy of the APA attached thereto as Exhibit C.  A copy of the APA is attached hereto as **Exhibit 1**.

S.     **Business Justification; Fiduciary Duties.**  The Debtors have demonstrated that entry into and consummation of the transactions contemplated by the APA constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, and creditors, and all parties in interest.  The Court finds that the Debtors

---

[3]    "**Challenge**" shall have the meaning ascribed to it in the *Final Order (i) Authorizing the Debtors to (a) Obtain Junior Lien Postpetition Financing, (b) Use Cash Collateral, and (c) Grant Liens and Provide Superpriority Administrative Expense Claims; (ii) Granting Adequate Protection to Certain Prepetition Secured Parties; (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief (Docket No. 625)* and the *Final Order (i) Authorizing the Debtors to (a) Obtain New Postpetition Financing, (b) Use Cash Collateral, and (c) Grant Liens and Provide Superpriority Administrative Expense Claims; (ii) Granting Adequate Protection to Certain Prepetition Secured Parties; (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief* (Docket No. 1538) (the "**FILO DIP Order**").

have articulated good and sufficient business reasons justifying the sale of the Purchased Assets to the Buyer pursuant to the terms and conditions set forth in the APA.

T.     The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Buyer in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, subject to the requirements applicable to any Disputed Contracts (as defined and described below).   The Assigned Contracts being assigned to the Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates.

U.     The Debtors' decision to enter into the APA and consummate the Sale Transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, managers, and officers.   Because the entry into and consummation of the APA constitutes the exercise by the Debtors of sound business judgment, the Debtors, and their respective current members, managers, officers, directors, employees, advisors, professionals or agents (in each case, solely in their capacity as such), shall have or incur no liability to the estates or any holder of a Claim against or Interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any willful misconduct or fraud, in each case as determined by a court of competent jurisdiction.

V.     The Debtors have demonstrated that it is an exercise of their sound business judgment to enter into the Severance Amendment to effectuate the Severance in connection with the consummation of the Sale Transaction and the Real Property Transaction, and entering into

such Severance Amendment is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The Severance and the Real Property Transaction are an integral part of and are inextricably intertwined with the Sale Transaction.

        W.    **Corporate Authority.**  Upon entry of this Order, the Debtors (i) have the corporate or other organizational power and authority necessary to execute the APA and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the Sale Transaction, and (iii) have taken or are deemed to have taken all corporate or other organizational action necessary to authorize and approve the APA and any actions required to be performed by the Debtors to consummate the Sale Transaction.  Upon the entry of this Order, no further consents or approvals of the Debtors are required for the Debtors to consummate the Sale Transaction.

        X.    **Arm's-Length Sale and Buyer's Good Faith.**  The APA was negotiated and is undertaken by the Debtors and the Buyer at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.   The Buyer (i) recognizes that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets, (ii) complied with the Bidding Procedures Order in all respects, and (iii) willingly subjected its bid to the competitive Global Bidding Procedures with respect to the Purchased Assets.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Sale Transaction or the APA to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) of the Bankruptcy Code.  The APA was not controlled by an agreement between potential bidders within the meaning of section 363(n) of the Bankruptcy Code.  All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with

the Sale Transaction have been disclosed, and the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  As a result of the foregoing, the Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and any other applicable bankruptcy or non-bankruptcy law with respect to the Sale Transaction, and as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion thereof is reversed or modified on appeal.

Y.     **Insider Status.**  The Buyer is not an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code

Z.     **No Fraudulent Transfer.**  The total consideration provided by the Buyer pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The APA was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor the Buyer has entered into the APA or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

AA.     **Free and Clear Transfer Required by Buyer.**  The Buyer would not have entered into the APA and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, their creditors, their employees, and other parties in interest, if the sale of the Purchased Assets, including the Payor Agreements for the Governmental Programs (each, a "**Government Provider Agreement**"), was not free and clear of the Liens, Claims,

16

Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA) or if the Buyer would be liable for such Liens, Claims, Encumbrances, and Interests, including, without limitation and as applicable, liabilities that are not expressly assumed by the Buyer as set forth in the APA or pursuant to this Order.  In closing the Sale Transaction, the Buyer shall be deemed to have materially relied on findings and decrees in this Order, including, without limitation, (i) the finding that there has not been, and will not be, a cessation of business of the Facilities at any time prior to Closing, and Government Provider Agreements are, therefore, in full force and effect and (ii) the transfer of the Government Provider Agreements are free and clear of Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities and as otherwise provided in the APA).

BB.     The transfer of the Purchased Assets and the Sale Transaction is a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Purchased Assets free and clear of the Liens, Claims, Encumbrances, and Interests, except for Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA.

CC.     **Satisfaction of Section 363(f) Standards.**  The Debtors are authorized to sell the Purchased Assets free and clear of the Liens, Claims, Encumbrances, and Interests, other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA (with such Liens, Claims, Encumbrances, and Interests attaching to the proceeds ultimately attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, and Interests with the same nature, validity, priority, extent, perfection, and force and effect that the Liens, Claims, Encumbrances, and Interests encumbered such Purchased Assets immediately prior to the entry of this Order) because, with respect to each creditor or other person or entity asserting a Lien, Claim, Encumbrance, or Interest, including but not limited to CMS or any Governmental Authority (as

17

defined in the APA), one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Each creditor or other person or entity asserting a Lien, Claim, Encumbrance, or Interest in the Purchased Assets, including but not limited to CMS or any Governmental Authority, (i) has, subject to the terms and conditions of this Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien, Claim, Encumbrance, or Interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of the Liens, Claims, Encumbrances, and Interests who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Motion are deemed to have consented to the Motion and Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.

DD.    **No Successor Liability.** Neither the Buyer nor any of their affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Buyer nor any of their affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates except to the extent explicitly provided in the APA. Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the APA, neither the Buyer nor any of their affiliates shall (a) be liable for any claims or defenses (including rights of recoupment) that may be asserted against the Debtors or any of their predecessors or affiliates (including (i) claims or defenses (including rights of recoupment) that may be asserted against the Debtors relating to the Government Provider Agreements for services rendered or amounts paid to the Debtors prior to Closing, (ii) claims or defenses (including rights of recoupment) that may be asserted against the Debtors relating to any advanced or accelerated payments made by CMS or any other Governmental Authority to the Debtors prior to

Closing, and (iii) claims, defenses (including rights of recoupment), actions or proceedings against the Debtors brought under or related to Medicare/Medicaid statutes or regulations or the statutes and regulations applicable to other governmental health care reimbursement programs including enforcement actions and administrative agency rulings or interpretations), or (b) be subject to successor liability or similar liability (including to the United States, State of Florida or otherwise) for any claims, defenses, rights of recoupment, or causes of action of any kind or character against the Debtors, the Debtors' estates or otherwise, whether known or unknown, including without limitation any successor liability or similar liability with respect to NPIs (as defined in the APA) and provider numbers under the Government Programs (as defined in the APA) issued to and held by Debtors and the Facilities, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer liability, labor law, de facto merger, mere continuation, or substantial continuation, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, claims or defenses (including rights of recoupment) that may be asserted against the Debtors relating to the Government Provider Agreements for services rendered or amounts paid to the Debtors prior to Closing, any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing.  The Buyer is not, and the consummation of the Sale Transaction will not render the Buyer, a mere continuation, and the Buyer is not holding itself out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there is no continuity or common identity between the Buyer

and the Debtors.  Accordingly, the Sale Transaction does not amount to a consolidation, merger, or de facto merger of the Buyer with or into any of the Debtors or their estates and the Buyer is not, and shall not be deemed to be, a successor to any of the Debtors or their estates as a result of the consummation of the Sale Transaction.

                      EE.    **Assigned Contracts.**  Each and every provision of the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.  All counterparties of the Assigned Contracts for which the deadline to file a Contract Objection has passed as of the date of this Order, and that did not timely file an objection to the assumption and assignment of the Assigned Contract(s) to which they are a counterparty, are deemed to consent to the assumption and assignment by the Debtors of their Assigned Contract to the Buyer, and the Buyer shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-Debtor party's consent to the assumption or assignment thereof.  All counterparties of the Assigned Contracts for which the deadline to file a Contract Objection has not passed as of the date of entry of this Order, and that did not or do not timely file such an objection prior to the applicable deadline, shall be deemed to consent to the assumption and assignment by the Debtors of their Assigned Contract to the Buyer effective as of the Closing Date, and the Buyer shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-Debtor party's consent to the assumption or assignment thereof.  If a Cure Objection timely filed with respect to an Assigned Contract cannot be resolved by the parties prior to the Closing of the Transaction, the Debtors may

assume and assign the applicable Contract(s) or Lease(s) pending resolution of the Cure Objection in accordance with and subject to paragraphs 30-31 of this Order and Section 1.5 of the APA.  Upon the assignment of the Assigned Contracts to the Buyer in accordance with the terms of the APA, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in the Assigned Contracts prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their affiliates, predecessors, successors, or assigns, shall have no further liability or obligation under the Assigned Contracts.  To the extent any Assigned Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the Buyer in accordance with the terms of the APA and, other than with respect to Assumed Liabilities, the Buyer shall not have any liability or obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that arose or otherwise occurred in the period prior to the Closing Date and (ii) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) against the Debtors with respect to such Assigned Contract, that relate to any acts or omissions that arose or otherwise occurred prior to the Closing Date.

FF.    **Government Provider Agreements**.  Without limiting the generality of anything else in this Order, (i) The Government Provider Agreements are not executory contracts within section 365 of the Bankruptcy Code because, among other reasons, the parties thereto do not have any material performance obligations under such agreements, as distinct from their obligations under applicable statutes and regulations.  Accordingly, the

Debtors need not satisfy the requirements of section 365 in order to assign the Government Provider Agreements to the Buyer in accordance with the APA.

(ii) The transfer of the Government Provider Agreements does not violate the federal Anti-Assignment Act.

(iii) The Sale Transaction constitutes a "change of ownership" within the meaning of 42 C.F.R. § 489.18(a) (a "**CHOW**"), and any so-called "successor liability" under 42 C.F.R. § 489.18(d) as a result of the CHOW is subject to limitation by operation of applicable provisions of the Bankruptcy Code, as set forth in this Order.

(iv) The Government Provider Agreements may be assigned to the Buyer free and clear of any alleged claims or defenses of CMS (including rights of recoupment) against the Debtors arising prior to Closing because (x) the Debtors' rights in the Government Provider Agreement are property that may be sold pursuant to section 363 of the Bankruptcy Code, (y) such alleged claims of CMS are in bona fide dispute, and (z) CMS could be compelled in a legal or equitable proceeding to accept a money satisfaction of such alleged claims.

(v) As of the date of this Order, there has been no cessation of business of the Facilities. Accordingly, 42 C.F.R. §§ 489.52(b)(3) and 413.79(h) do not apply and have not resulted in the termination of the Government Provider Agreements, which are in full force and effect and not subject to pending actions of termination.

(vi) As of the Closing, there shall be deemed not to have been any cessation of business of the Facilities. Accordingly, 42 C.F.R. §§ §§ 489.52(b)(3) and 413.79(h) shall be deemed not to apply and not to have resulted in the termination of the Government

Provider Agreements, which shall be deemed to be in full force in effect and not subject to pending actions of termination.

GG.     **Cure Costs and Adequate Assurance.**  Cure Costs will be paid by the Buyer in accordance with the terms of the APA.  The Buyer has demonstrated adequate assurance of future performance of each Assigned Contract within the meaning of section 365 of the Bankruptcy Code that is assumed by the Buyer or any of its permitted assignees to which such Assigned Contract is assumed and assigned by the Debtors, including by providing the Adequate Assurance Information (as defined in the Bidding Procedures Order) and a promise to perform the Debtors' obligations under such Assigned Contract for periods first arising at or after the Closing (as defined in the APA).  The Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Assigned Contracts that are assumed.  The Buyer's payment of Cure Costs in accordance with the terms of the APA and promise under the APA to perform the obligations under the Assigned Contracts first arising as of the Closing, after the Closing Date, shall constitute adequate assurance of future performance under such Assigned Contracts.   Subject to paragraphs 30-31 of this Order and the requirements applicable to any Disputed Contracts, as set forth in Section 1.5 of the APA, any objections to the Cure Costs, to the extent not otherwise resolved, are hereby overruled.  To the extent that any counterparty failed to timely object to its Cure Cost or to raise any other alleged claim, default or breach of contract for the pre-assignment period, such counterparty is deemed to have consented to such Cure Cost and to the assignment of its respective Assigned Contract(s) to the Buyer and to have waived any other defaults, claims or breaches.  The Court finds that with respect to all Assigned Contracts, the payment of the Cure Costs as provided in the APA is reasonable and appropriate and is deemed to

fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, of each Assigned Contract to be assumed and assigned to the Buyer as of Closing.

HH. **MPT Sale Transaction**. The APA provides that the Buyer is not required to consummate the Sale Transaction if the Existing MPT Lease Severance Agreement (as defined in the APA) and the MPT Purchase Agreement (as defined in the APA) are not consummated on or prior to the Closing Date (such conditions, the "**MPT Conditions**"). The Buyer would not have entered into the APA and would not consummate the Sale Transaction absent the MPT Conditions.

II. **Assets Assignable.** Each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, have been or will be satisfied or are otherwise unenforceable under sections 363 or 365 of the Bankruptcy Code, as applicable.

JJ. **Time is of the Essence.** Time is of the essence in consummating the Sale Transaction and each of the transactions contemplated thereby. In order to maximize the value of the Purchased Assets, it is essential that the Sale Transaction and each of the transactions contemplated thereby occur within the time constraints set forth in the APA. Good and sufficient reasons for approval of the APA, the Severance, and the Severance Amendment have been articulated by the Debtors. Upon the entry of this Order, the Debtors and the Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, and the Debtors and the MPT Lessors, may close the Sale Transaction and Severance, respectively and each of the transactions contemplated by the APA and Severance Amendment, as applicable, any time after entry of this

Order and subject to the terms and conditions of the APA and Severance Amendment, as applicable.

KK.     **No Sub Rosa Plan.**  The APA and the Sale Transaction do not constitute a *sub rosa* chapter 11 plan.  The APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for the Debtors.

LL.     **Final Order; Immediate Effect.**   This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein.

### IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.     **Objections Overruled.**  All objections, if any, with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with herein are hereby overruled on the merits, with prejudice.  All objections to the entry of this Order or to the relief granted herein that were not timely filed are hereby forever barred.

2.     **Approval of Sale Transaction.**  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Motion is granted, the relief requested therein with respect to the Sale Transaction is granted and approved in its entirety, and the APA is hereby approved.  The Debtors have satisfied all requirements of sections 363(b) and 363(f) of the Bankruptcy Code, and all other requirements and standards applicable to a sale outside the ordinary course of business, free and clear of the Liens, Claims, Encumbrances, and Interests.

3.     Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized to take any and all reasonable actions necessary to consummate the Sale Transaction, including the sale, transfer, and assignment of all of the Debtors' right, title, and interest in, to, and under the Purchased Assets to the Buyer free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA) in accordance with the terms of the APA and the terms of this Order.  The relevant Debtors, as well as their directors, managers, officers, employees, and agents, are authorized to execute, deliver, and perform their obligations under and comply with the terms of the APA and to consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the APA and this Order.  For the avoidance of doubt, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Buyer in accordance with the APA and this Order.

4.     The relevant Debtors, their affiliates, and their respective directors, managers, officers, employees, and agents, are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional notices, assumptions, conveyances, releases, acquittances, instruments and documents that may be reasonably necessary or desirable to implement the APA, including the transfer and, as applicable, the assignment of all the Purchased Assets, the assumption of the Assumed Liabilities, and the assumption and assignment of all the Assigned Contracts, and to take all further actions as may be necessary or appropriate to the performance of the obligations contemplated by the APA without further order of this Court.

5.       The Debtors are further authorized, but not directed, to pay, without further order of the Court, whether before, at or after Closing, any expenses or costs required to be paid to consummate the Sale Transaction or for the Debtors to perform their obligations solely in accordance with the APA.

6.       Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA subject to the payment of any filing or other fee imposed under non-bankruptcy law.

7.       **Approval of Severance Amendment.**  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to enter into the Severance Amendment, subject to any closing conditions set forth therein, and the Severance Amendment is hereby approved.  The Debtors have satisfied all requirements of the Bankruptcy Code in connection with entry into and approval of the Severance Amendment.  For the avoidance of doubt, the MPT Lessors' agreement to the Severance does not constitute an agreement to any additional or further severance of Master Lease I (or any other lease), shall not prejudice the MPT Lessors, the Debtors, the Committee, or any other party in any litigation or transaction with respect to Master Lease I (or any other lease) other than with respect to the Real Property Transaction and the Severance, and shall not bind the MPT Lessors, the Debtors, the Committee, or any other party with respect to any transaction other than the Real Property Transaction contemplated by the PSA and the Severance.

8.      Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the parties are authorized to take any and all reasonable actions necessary to consummate the Severance.

9.      **Sale and Transfer of Assets Free and Clear.**  Pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, the Debtors are authorized to transfer, and upon the Closing shall transfer to the Buyer, all of the Debtors' right, title, and interest in and to, and possession of, the Purchased Assets, which shall be immediately vested in the Buyer, and such title to the Purchased Assets shall be transferred to the Buyer free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA), including:

(a)    liens (including, without limitation, mechanics', materialmens', and other consensual and non-consensual liens and statutory liens) mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, property interests, pledges, judgments, demands, encumbrances, easements, and servitudes;

(b)    interests, obligations, liabilities, causes of action, demands, guaranties, options, restrictions, and contractual or other commitments;

(c)    rights, including, without limitation, rights of first refusal, rights of offset (except for offsets exercised prior to the Petition Date), contract rights, rights of recoupment and recovery;

(d)    decrees of any court or foreign or domestic government entity (to the extent permitted by law);

(e)    charges or restrictions of any kind or nature, including, without limitation, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership of the Purchased Assets, including, without limitation, consent of any Person to assign or transfer any of the Purchased Assets;

(f)    debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or any of the Debtors' predecessors or affiliates;

(g)      claims (as that term is defined in the Bankruptcy Code), including claims for reimbursement, contribution claims, derivative, vicarious, transferee, or successor liability claims (including without limitation with respect to NPIs and provider numbers under the Government Provider Agreements issued to and held by Debtors and the Facilities or any "successor employer" claims under the Consolidated Omnibus Budget Reconciliation Act of 1985), indemnity claims, exoneration claims, alter-ego claims, product liability claims, employee retirement or benefit plan claims, severance claims, retiree healthcare or life insurance claims, environmental claims (to the fullest extent allowed by applicable law), state, federal, local and any other tax claims, reclamation claims, and pending, contingent or otherwise unasserted litigation claims, including in all cases claims that may be secured or entitled to priority under the Bankruptcy Code;

(h)      claims and defenses (including rights of recoupment) against the Debtors relating to the Government Provider Agreements for services rendered or amounts paid to the Debtors prior to Closing, claims relating to any advanced or accelerated payments made by CMS or any other Governmental Authority to the Debtors prior to Closing, and claims or actions or proceedings brought under or related to Medicare/Medicaid statutes or regulations or the statutes and regulations applicable to other governmental health care reimbursement programs including enforcement actions and administrative agency rulings or interpretations;

(i)      matters of any kind or nature whatsoever, whether at law or in equity and whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or nonmaterial, disputed or undisputed, whether arising prior to or during the Debtors' bankruptcy cases, and whether imposed by agreement, understanding, law, equity, or otherwise;

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing (each, a "**Lien, Claim, Encumbrance, or Interest**," and collectively, the "**Liens, Claims, Encumbrance, and**

29

**Interests**").  Except to the extent an Assumed Liability or as otherwise expressly provided in the APA, the Liens, Claims, Encumbrances, and Interests shall attach to the proceeds ultimately attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, and Interests with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, Encumbrances, and Interests encumbered such Purchased Assets immediately prior to the entry of this Order, subject to any Claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

10.    Other than as expressly set forth in the APA, (i) no claims and/or causes of action under chapter 5 of the Bankruptcy Code are being purchased by, or transferred to, the Buyer, (ii) no claims and/or causes of action that the Debtors may have, if any, against the Debtors' current and former insiders, affiliates, directors, officers, members, employees (except Transferred Employees), partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, whether under the Bankruptcy Code, state or federal law, or otherwise, are being purchased by, or transferred to, the Buyer, and (iii) no claims and/or causes of actions against counterparties to the Debtors' contracts or leases (other than any claims and/or causes of actions against counterparties to the Assigned Contracts assumed and assigned to the Buyer in accordance with the APA) are being purchased by, or transferred to, the Buyer, and all such claims and/or causes of action in clauses (i) through (iii) herein are preserved for the benefit of the Debtors' estates.  For the avoidance of doubt, no claims and/or causes of action against the MPT Lessors, the Prepetition Secured Parties, or any of their respective affiliates are being purchased by, or transferred to, the Buyer.

30

11.     With regard to the forms of, timing, and other terms and provisions concerning the consideration to be provided by the Buyer to the Debtors as set forth in the APA, the Buyer is directed to comply with its respective obligations thereunder, and the Debtors, and their respective successors and assigns, including any liquidating trustee appointed in connection with these chapter 11 cases, are hereby authorized to enforce all such provisions.  As further set forth in paragraph [38] hereof, the Court shall retain exclusive jurisdiction with respect to any and all issues, disputes, controversies, causes of action, and/or claims with respect to, or arising under, such provisions, including, without limitation, the enforcement thereof.

12.     **Real Property Transaction.**  Subject to any Challenge and the ability of the Court to fashion any appropriate remedy following a successful Challenge, upon the consummation of the Sale Transaction, the Severance, and the Real Property Transaction, neither the Debtors' estates nor any parties claiming by or through the Debtors' estates shall have any claim to, interest in, or setoff or other rights with respect to the Real Property and the proceeds of the Real Property Transaction.

13.     **Binding Effect of Order.**  This Order and the APA shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case of any of the Debtors if any of these Chapter 11 Cases is converted from a case under chapter 11 to a case under chapter 7, all counterparties to Assumed Contracts, all Recording Officers, any holders of the Liens, Claims, Encumbrances, and Interests in, against, or on all or any portion of the Purchased Assets (whether known or unknown), the Buyer and all successors and assigns of the Buyer, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners,

"responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the APA shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Order, including the rights granted to the Buyer hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.  To the extent of any conflict between this Order and the APA, the terms of this Order shall control.

14.     **No Material Modifications.**   The APA and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented in accordance with the terms thereof without further order of this Court and following prior notice to and consultation with the FILO Lenders and the FILO DIP Lenders; *provided*, *however*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates as determined in the good faith judgment of the Debtors in consultation with the Committee, the FILO Lenders and the FILO DIP Lenders, and the Real Property Seller.  For the avoidance of doubt, all other modifications, amendments, or supplements that the Debtors determine, in their good faith judgment, will have a material adverse effect on the Debtors' estates or their creditors shall require Court approval.

15.     **No Bulk Sales.**  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction, the Motion, and this Order.

16.     **Valid Transfer.**  Effective upon the Closing, the transfer to the Buyer of the Debtors' right, title, and interest in the Purchased Assets pursuant to the APA shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' right, title, and interest in the Purchased Assets, and vests with or will vest in the Buyer all right, title, and interest of the

Debtors in the Purchased Assets, free and clear of the Liens, Claims, Encumbrances, and Interests, other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA.

17.     **Good Faith Buyer.**  The Sale Transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Buyer has acted without collusion in undertaking the Sale Transaction contemplated by the APA.  The Severance contemplated by the Severance Amendment and the Real Property Transaction contemplated by the PSA are integral to and inextricably intertwined with the Sale Transaction.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction and to enter into the Severance Amendment shall not affect the validity of the sale of the Purchased Assets to the Buyer (including the assumption and assignment by the Debtors of any of the Assigned Contracts), the sale of the Real Property to the Real Property Buyer, or the Severance, unless such authorization is duly stayed pending such appeal.  The Buyer is a purchaser in good faith of the Purchased Assets and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

18.     **No Avoidance.**  The APA and the transactions contemplated thereby, including the Sale Transaction, cannot be avoided under section 363(n) of the Bankruptcy Code, including as a result of a successful Challenge.  None of the Debtors, the Buyer or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors or assigns have engaged in any conduct that would cause or permit the APA or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of

the Bankruptcy Code and no party is entitled to damages or other recovery in connection therewith under section 363(n) of the Bankruptcy Code.

19. **Governmental Authorization to Effectuate Sale and Assignments.** Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby directed to accept (i) any and all documents and instruments in connection with or necessary to consummate the Sale Transaction and (ii) this Order as sufficient evidence of the transfer of right, title, and interest in, to, and under the Purchased Assets, including the Government Provider Agreements.  Except as otherwise provided in this Order, to the greatest extent available under applicable law upon the Closing, the Buyer shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing.  To the extent any license or permit necessary for the operation of the Purchased Assets is determined not to be an executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Buyer shall apply for and obtain any necessary license or permit promptly after the Closing Date, and, to the extent practicable, such license or permit of the Debtors shall remain in place for the Buyer's benefit until a new license or permit is obtained (or, in the case of licenses or permits of Debtors of which the assignment to Buyer is pending as of the Closing Date (whether pursuant to a notice period that has not expired as of the Closing Date or a required consent from an applicable governmental authority that has not been received as of the Closing Date), shall transfer to Buyer upon the expiration of such notice period or the receipt of such consent).  No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the

Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.  For the avoidance of doubt, the Sale Transaction authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

20.     No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.  For the avoidance of doubt, the Sale Transaction authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

21.     **Government Provider Agreements**.  CMS, its applicable Regional Offices ("**RO**"), its Medicare Administrative Contractors ("**MACs**"), and their respective agents, contractors, and designees shall treat, and shall be deemed to have treated, the Sale Transaction as a CHOW for all Medicare purposes.  CMS, RO, MACs, and their respective agents, contractors, and designees shall give effect to the Sale Transaction in all regards and shall take all steps necessary and convenient to so effecting the Sale Transaction.

22.     **Accounts Receivable**.  Notwithstanding anything to the contrary in this Order, nothing set forth in this Order shall be deemed to limit, impair or affect in any way (i) the Debtors' right, title, and interest in the Debtors' cash and patient accounts receivable, payor/contractor accounts receivable, Medicare reimbursements or adjustments and all other accounts receivable (collectively, the "**Accounts Receivable**") for services rendered or goods sold

35

prior to Closing, which cash and Accounts Receivable remain property of the Debtors as Excluded Assets and shall be reimbursed to Debtors if received by Buyer, as and to the extent provided in the APA, or (ii) the Debtors' ability to complete any remaining billing for services rendered or goods sold prior to Closing under the Debtors' Medicare numbers or Government Provider Agreements.  Buyer shall provide the Debtors (or Debtors' billing agent) with reasonable access to pre-Closing documents or data as may be necessary in order for the Debtors to facilitate billing and collecting for services furnished to Medicare beneficiaries by the Debtors.

23.    **Authorization to Assign.**  Notwithstanding any provision of any contract governing the Purchased Assets, including any Assigned Contract to be assumed and assigned to the Buyer as of the Closing (or such other date as provided in the APA or this Order) pursuant to (a) section 365(f) of the Bankruptcy Code, or (b) applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Purchased Assets, including any Assigned Contract to be assumed and assigned to the Buyer as of the Closing pursuant to section 365(f) of the Bankruptcy Code, at the Closing, the Debtors are authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (i) assign the Purchased Assets to the Buyer and (ii) assume and assign the Assigned Contracts to the Buyer, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, in each case, as provided in this Order, the APA, or as otherwise provided by a separate order of this Court.

(a)    There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assignment of the Purchased Assets or the assumption and assignment of the Assigned Contracts.

(b)    The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts that are to be assumed and assigned to the Buyer as of Closing (or as otherwise provided in the Bidding Procedures Order or the APA).  Notwithstanding the foregoing, unless required by the Buyer under the APA for the Debtors to assume and assign any Assigned Contract, no Debtor shall be required by the Court to

assume and assign any Assigned Contract, and, if no such assumption and assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required with respect to any such Assigned Contract.

(c)     The Debtors' assumption and assignment of the Assigned Contracts is subject to the consummation of the Sale Transaction with the Buyer. Subject to the requirements applicable to any Disputed Contracts, as set forth in paragraphs 30-31 of this Order and Section 1.5 of the APA, to the extent that a Contract Objection by a counterparty to any Assigned Contract is not resolved prior to the Closing, the Buyer, may, without any further approval of the Court or notice to any party, elect to (i) not have the Debtors assume and assign such Assigned Contract to it, (ii) have the Debtors postpone the assumption of such Assigned Contract until the resolution of such Contract Objection, or (iii) to the extent the Contract Objection is only a Cure Objection, have the Debtors assume and assign such Assigned Contract to it at Closing subject to the requirements and procedures in Section 1.5(g)(ii)(A) of the APA; provided, however, that the Debtors, the Buyer, and the relevant non-Debtor counterparty under each Assigned Contract shall have authority to compromise, settle, or otherwise resolve any objections without further order of, or notice to, this Court.

24.     **Assigned Contracts**.  As of the Closing (or such other date as provided in the APA or this Order), subject to the provisions of this Order and in accordance with the APA, the Buyer shall succeed to the entirety of the Debtors' rights and obligations in the Assigned Contracts.

(a)     Upon Closing, (i) or as soon as reasonably practicable thereafter, all defaults and claims (monetary and non-monetary) under the Assigned Contracts shall be deemed cured and satisfied in full through and upon the payment of the Cure Costs as agreed between the Debtors and the applicable non-Debtor counterparty (which consent shall be deemed where a non-Debtor counterparty fails to object to the Cure Costs set forth in the Cure Notice), or as determined by the Court (if applicable), (ii) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Liabilities, the Buyer with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assigned Contracts, and (iii) any and all persons or entities shall be forever barred and estopped from asserting a Claim against the Debtors, their estates, the Buyer, or the Purchased Assets that any additional amounts are due or defaults exist under the Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing (other than Claims against the Buyer with respect to the Assumed Liabilities).  The

Buyer's promise, and any payment by the Debtors, pursuant to the terms of the APA to pay the Cure Costs and the Buyer's promise to perform the Debtors' obligations under the Assigned Contracts for the period on or after the Closing shall constitute adequate assurance of Buyer's future performance under the Assigned Contracts being assigned to it as of the Closing within the meaning of sections 365(b)(l)(C) and (f)(2)(A)-(B) of the Bankruptcy Code.

(b) Upon assumption of those Assigned Contracts to be assumed by the Debtors and assigned to the Buyer as of the Closing, such Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in such Assigned Contract or other restrictions prohibiting assignment or transfer.  To the extent any Assigned Contract is assumed and assigned to the Buyer under this Order, such assumption and assignment will not take effect until the Closing or as otherwise set forth in the APA.  Furthermore, other than the Assigned Contracts, no other contract shall be deemed assumed by the Debtors and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code.  The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of such Assigned Contract.

(c) With Buyer's consent, the Debtors may assume and assign to the Buyer an Assigned Contract in part and to one or more other successful bidders in part so long as such buyers have cured any monetary defaults under such Assigned Contract and have each provided adequate assurance of future performance.

(d) All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Buyer, and shall not charge the Debtors or the Buyer for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

25.    Notwithstanding the foregoing, the Debtors or the Buyer may amend the list of Assigned Contracts to add or remove any Assigned Contract to or from such list in accordance with the terms of this Order and the APA.  To the extent the Debtors or the Buyer amend the list of Assigned Contracts to add a new Assigned Contract in accordance with the terms of the APA, including after receipt of an Assumption Notice (as defined in the APA) (an "**Additional Assigned**

Contract"), the Debtors shall file a notice with the Court and serve such notice on the applicable counterparty.  [The Debtors, the Buyer, and the applicable counterparty to an Additional Assumed Contract shall have authority to compromise, settle, or otherwise resolve any properly filed Contract Objections without further order of the Court unless such compromise, settlement, or other resolution would result in the responsibility of any of the Debtor's estate for the payment of Cure Costs [in excess of $[●]], in which case the compromise, settlement, or other resolution must be either (i) with the consent of the FILO Lenders and the FILO DIP Lenders or (ii) with further order of the Court.]

26.     Subject to Section 1.5 of the APA, if no Contract Objection has been filed, or if a Contract Objection has been properly filed but has been resolved by the parties or determined by the Court prior to the Closing Date, this Order shall serve as approval of the assumption and assignment of the applicable Additional Assumed Contract to the Buyer without need for a further notice or order.  If a Contract Objection has been properly filed with respect to an Additional Assigned Contract and is not resolved by the parties or determined by the Court prior to the Closing Date, the Debtors' assumption and assignment of such Additional Assigned Contract shall be subject to the requirements applicable to Disputed Contracts set forth in paragraphs 30-31 of this Order and Section 1.5 of the APA.

27.     All Cure Costs that have not been waived shall be determined in accordance with the Bidding Procedures Order or this Order and paid by the Buyer in accordance with the terms of the APA.  Subject to the requirements applicable to any Disputed Contracts, as set forth in paragraphs [30-31] of this Order and Section 1.5 of the APA, the assumption and payment of the Cure Costs shall be in full satisfaction and cure of any and all defaults or other claims under the Assigned Contracts and is deemed to fully satisfy the Debtors' obligations under sections

365(b) and 365(f) of the Bankruptcy Code.  Upon the assumption by a Debtor and the assignment to the Buyer of any Assigned Contract, and the payment of any applicable Cure Costs, each non-Debtor counterparty to such Assigned Contract is forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or the Buyer, their respective affiliates, estates, successors, or assigns, or the property of any of them, any default or other claim with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing, and (ii) exercising any rights or remedies against any Debtor or the Buyer based on an asserted default or other claim that occurred on, prior to, or as a result of, the Closing, including the type of default specified in section 365(b)(1)(A) of the Bankruptcy Code.  The Buyer has provided adequate assurance of future performance under the Assigned Contracts within the meaning of sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code.  Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, of each of the Assigned Contracts.

28.     To the extent a non-Debtor counterparty to an Assigned Contract fails to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined and any such non-Debtor counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time.  Consistent with the Bidding Procedures Order, the non-Debtor counterparty to an Assigned Contract is forever bound by the applicable Cure Cost and, upon payment of such Cure Cost as provided herein and in the APA, is hereby enjoined from taking any action against the Buyer and the Debtors and their estates (or any successor thereto) with respect to any claim for cure under such Assigned Contract on account of claims or defaults first arising or accruing during, or attributable or related to, the period before

Closing.  To the extent no timely Contract Objection has been filed and served on the Objection Notice Parties (as defined in the Motion) with respect to an Assigned Contract, the non-Debtor counterparty to such Assigned Contract is deemed to have consented to the assumption and assignment of such Assigned Contract to the Buyer.

29.     Without limiting the foregoing, each person or entity who holds a Consent Right will be (i) forever barred from objecting to the transfer, sale, assumption, and assignment of the Debtors' right, title, and interest in, to and under the Purchased Assets to be sold or the Assigned Contracts to be assumed and assigned in connection with the Sale Transaction, free and clear of the Liens, Claims, Encumbrances, and Interests, including any Consent Rights (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA), (ii) deemed to consent to and approve the transfer, sale, and/or assumption and assignment of the Debtors' right, title, and interest in, to and under such Purchased Assets free and clear of Liens, Claims, Encumbrances, and Interests, including any Consent Rights (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA); and (iii) deemed to waive any termination right arising from the sale, disposition, transfer or closure by the Debtors of the Debtors' property or assets.

30.     **Contract Objections.**  If a non-Debtor counterparty to any Assigned Contract files a Contract Objection to the assumption and assignment of such Assigned Contract to the Buyer, then such contract shall be deemed a "**Disputed Contract**."  The Debtors shall be authorized to resolve or settle any Contract Objection to the assumption and assignment of Disputed Contracts in accordance with the terms of the APA and this Order, including with respect to Cure Costs and/or adequate assurance of future performance under the Assigned Contracts without need for any further order or action from this Court. Once any objection to a Disputed

Contract is resolved, the Disputed Contract shall be subject to the terms of this Order, including without limitations paragraphs 23-24, in all respects.

31.     **Assignment of Disputed Contracts**.  At Buyer's sole and express written election, any Disputed Contract that is the subject of an unresolved Cure Objection may be assumed and assigned prior to the resolution of such Cure Objection, so long as the Buyer (i) pays any undisputed Cure Costs on or before the Closing Date and (ii) appropriately reserves funding for the disputed portion of the Cure Costs pending resolution of the dispute. For the avoidance of doubt, nothing in this Order shall require Buyer to take an assignment of or pay or reserve Cure Costs relating to a Disputed Contract subject to an unresolved Cure Objection, and as provided in the APA, the Buyer may elect to delay assumption and assignment of the Disputed Contract pending resolution of the pending objection or remove such Disputed Contract from the Assumed Executory Contract and Lease Schedule (as defined in the APA) at any time.

32.     **Adequate Assurance**.  The Buyer has provided adequate assurance of future performance under the Assumed Contracts within the meaning of sections 365(b) and 365(f)(2)(B) of the Bankruptcy Code.  Any objections by counterparties to Assumed Contracts on the basis of adequate assurance of future performance that have not been withdrawn, waived or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice.   All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment of the Assumed Contracts to the Buyer have been satisfied.

33.     **No Successor Liability.**  The Buyer has given substantial consideration under the APA, which consideration shall constitute valid, valuable, and sufficient consideration for the absolution from any potential claims of successor liability of the Buyer to the greatest extent

allowed by applicable law and neither the Buyer nor any of its affiliates shall be deemed to: (a) be a legal successor, or otherwise deemed to be a successor, to any of the Debtors under any theory of law or equity; (b) have, *de facto* or otherwise, merged with or into any or all of the Debtors or their estates; (c) deemed to be an alter ego of or have a common identity with any of the Debtors; (d) have a continuity of enterprise with the Debtors; or (e) be a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or any business, enterprise, or operation of the Debtors, including with respect to clause (a) through (e) of this paragraph, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, products liability or other law, doctrine rule or regulation (including any filing requirements under any such laws, rules or regulations) with respect to the Debtors' liability under such law, doctrine, rule or regulation.  Upon the Closing, to the maximum extent available under applicable law, the Buyer's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims and other types of transferee liability of any nature whatsoever, whether known or unknown and whether asserted or unasserted at the time of Closing (other than, to the extent applicable, any Assumed Liabilities, Permitted Encumbrances, or as otherwise expressly provided in the APA), and the Purchased Assets shall not be subject to any Liens, Claims, Encumbrances, and Interests arising under or in connection with any Excluded Asset or Excluded Liability.  The operations of the Buyer and its affiliates shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets.

34.   **MPT Sale Transaction**.  As provided in the APA, Buyer shall not be required to consummate the Sale Transaction if the MPT Conditions are not met on or prior to the Closing Date.  Buyer shall have no liability for, and shall not be subject to any actual,

43

consequential, punitive or other damages (including forfeiture of its Good Faith Deposit (as defined in the APA)) or any other penalty on account of the failure to satisfy the MPT Conditions.

35.     **Buyer's Right to Setoff**: Following the Closing, in accordance with and subject to the conditions of Section 13.17 of the APA, Buyer is authorized to set off any amount to which it is entitled from any Debtor pursuant to Section 1.9(e) or Section 1.13 (Proration) of the APA (following final determination of each in accordance with the terms of the APA) against amounts payable by Buyer pursuant to the Transition Services Agreement (as defined in the APA).

36.     **Release of Escrow Deposit.**  The Debtors have the authority to instruct the Escrow Agent to release the Good Faith Deposit to the Debtors at, and conditional upon, the occurrence of the Closing, in accordance with the APA.

37.     **Surrender of Possession.**  Any and all Purchased Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Buyer free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA), with such Liens, Claims, Encumbrances, and Interests attaching to the proceeds ultimately attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, and Interests with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, Encumbrances, and Interests encumbered such Purchased Assets immediately prior to the entry of this Order, and shall be delivered to the Buyer and deemed delivered at the time of Closing (or such other time as provided in the APA), with such costs of delivery allocated in accordance with the APA.

38.     **Retention of Jurisdiction.**  The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement

of this Order, the APA, the Sale Transaction, the Severance, the Bidding Procedures Order, the PSA, and the Real Property Transaction.

39. **Immediate Effect.** Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Buyer are free to close the Sale Transaction under the APA at any time pursuant to the terms thereof. Notwithstanding the foregoing, and in accordance with the APA, nothing in this Order shall require Buyer to consummate the Sale Transaction if the Order is subject to a pending appeal or otherwise is not a Final Order (as defined in the APA).

40. **Failure to Specify Provisions.** The failure to specifically reference any particular provisions of the APA, Severance Amendment, Transition Services Agreement or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA, Severance Amendment, Transition Services Agreement and other related documents be authorized and approved in their entirety.

41. **Release of Liens, Claims, Encumbrances, and Interests.** Effective upon the Closing Date, this Order (i) is and shall be effective as a determination that all Liens, Claims, Encumbrances, or Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA) of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date have been unconditionally released, discharged, and terminated (with such Liens, Claims, Encumbrances, or Interests attaching to the proceeds ultimately attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, or Interests with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, liens or liabilities encumbered the Purchased Assets immediately prior to

45

the entry of this Order) and that the conveyances described herein have been effected, and (ii) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Buyer (all such entities being referred to as "**Recording Officers**"), and all recorded claims, encumbrances, liens or liabilities (other than the Assumed Liabilities and as otherwise provided in the APA) against the Purchased Assets shall be deemed stricken from such entities records, official and otherwise.  Effective as of the Closing, all Recording Officers are authorized and specifically directed to strike recorded encumbrances, claims, liens, pledges, and other interests against the Purchased Assets recorded prior to the date of this Order.  Effective as of the Closing, a certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, claims, liens, pledges, and other interests against the Purchased Assets recorded prior to the date of the Closing.  All Recording Officers are hereby directed to accept for filing, whether by the Debtors or Buyer, any and all of the documents and instruments necessary, advisable or appropriate to consummate the transactions contemplated by the APA, subject to the payment of any filing or other fee imposed under non-bankruptcy law.

42.    **Approval to Release Liens, Claims, Encumbrances, or Interests.**  The provisions of this Order authorizing the sale and transfer of the Purchased Assets free and clear of Liens, Claims, Encumbrances, and Interests (other than any Permitted Liens and Assumed

46

Liabilities expressly assumed under, or expressly permitted by, the APA) shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate or implement the provisions of this Order.  For the avoidance of doubt, on or after the Closing Date, all entities, including without limitation all trustees or collateral agents, are authorized and directed to file and/or execute lien releases, including financing statement terminations, mortgage releases or other documents or agreements evidencing release of Liens, Claims, Encumbrances, or Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA).  If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing Liens, Claims, Encumbrances or Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the APA) shall not have delivered to the Debtors before the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims, Encumbrances, and Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the APA) that the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.  The Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of Liens, Claims, Encumbrances, and Interests in or against the Purchased Assets (other than Assumed

Liabilities, Permitted Encumbrances, and as otherwise provided in the APA). This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

43. **No Effect on Governmental Regulatory Authority**. Other than with respect to the Government Provider Agreements, nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order. For the avoidance of doubt, the matters preserved by this paragraph are subject to all rights and defenses available under applicable law.

44. Except as provided herein, nothing in this Order or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("**Governmental Unit**") that is not a Claim; (ii) any Claim of a Governmental Unit first arising on or after the Closing Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations first arising after the Closing Date that any entity would be subject to as the owner or operator of property after the Closing Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors and, to the extent provided in this Order, Buyer (including, for the avoidance of doubt, as provided for in paragraph 9 hereof). Further, nothing in this Order shall enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

45. **Matters Related to Real Property**. For the avoidance of doubt, nothing in this Order or the APA shall constitute a determination with respect to allocation of value (a) between the Debtors and the MPT Lessors or (b) between and among the Debtors or their creditors with respect to the proceeds of the Sale Transaction.

46. For the avoidance of doubt, nothing in this Order, the APA or the Severance Amendment shall prejudice the rights of the Committee with respect to any Challenge, including but not limited to with respect to Master Lease I (or any other lease). Notwithstanding anything to the contrary in this Order, the APA or the Severance Amendment, all rights of the Committee with respect to a Challenge regarding Master Lease I (or any other lease), including but not limited to whether Master Lease I (or any other lease) is a true lease, whether Master Lease I (or any other lease) is a unitary lease, or the nature, validity, extent, or priority of any claims in respect of Master Lease I (or any other lease), and any remedies associated with a successful Challenge regarding Master Lease I (or any other lease) are expressly preserved. Further, nothing in this Order shall enlarge, expand, or otherwise modify the Committee's rights to any Challenge or in any way impair MPT's defenses, objections or responses to any Challenge.

47. Buyer shall have no liability on account of, any claims or causes of action that may be brought as part of a Challenge. Under no circumstances shall (1) any remedy fashioned in a successful Challenge disturb Buyer's enjoyment of, or otherwise void, avoid, or unwind its acquisition of, the Real Property or (2) Buyer's acquisition of the Real Property, or to otherwise consummate the transactions contemplated by the APA, form any basis from which to hold Buyer liable for monetary damages to the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates, any trustee appointed in a chapter 7 case of any of the Debtors if any of

these Chapter 11 Cases is converted from a case under chapter 11 to a case under chapter 7, any liquidating trustee or similar fiduciary appointed under a confirmed plan of reorganization or liquidation, or any other third party, on account of any Challenge.

48.     **Escrow of Sale Transaction Proceeds**.  Notwithstanding any other order of the Court or anything to the contrary herein, and in accordance with Section 1.8 of the APA, in the event the issue relating to the allocation of the Escrowed Sales Proceeds as between the Purchased Assets, on one hand, and MPT Lessors' real property relating to the Purchased Assets, on the other hand, remains unresolved at Closing (the "**Allocation Issue**"), the proceeds of the Sale Transaction, net of applicable Closing payments and the Good Faith Deposit, payable by the Sellers under the APA, less a reasonable reserve for post-closing purchase price adjustments or other monetary obligations (the "**Escrowed Sales Proceeds**"), shall be deposited into an unencumbered and segregated escrow account with a third party escrow agent selected by the Debtors and MPT Lessors (the "**Sales Proceeds Escrow Account**").  The Debtors, MPT Lessors, and Buyer shall collaborate in good faith to submit briefing to the Court as soon as reasonably practicable to provide adequate time to allow the Court to rule on the Allocation Issue. Recognizing that the Buyer would not have entered into the APA or purchased the Purchased Assets from the Debtors without the ability to ensure an appropriate allocation of Purchase Price between the Purchased Assets and the Real Property, and subject to the terms and conditions of the APA, Buyer shall have standing to fully participate in any motion practice, litigation, mediation, or other proceedings relating to the Allocation Issue.  Following entry of an order by the Court fully and finally determining the Allocation Issue (the "**Allocation Order**"), the Escrowed Sales Proceeds shall be released to the Debtors and/or MPT Lessors in accordance with the terms of the Allocation Order.  Under no circumstances shall the Buyer, on account of the

50

resolution of the Allocation Issue or otherwise, be responsible for paying any amount in excess of the Purchase Price as consideration for the Real Property Transaction and the Sale Transaction. For the avoidance of doubt, nothing herein shall be construed as a waiver of, or to override, the MPT Conditions.  [Subject to and in accordance with the terms and conditions of the APA, including Section 1.8 thereof, if, by the date which is the earlier of (A) December 31, 2024, and (B) ninety (90) days from the date of the APA, the Debtors and MPT have not resolved the Allocation Issue in a manner that complies with the Maximum Allocation Value (as defined in the APA) with respect to the Real Property, then Buyer's Proposed Allocation (as defined in the APA) shall be final and binding on Buyer, the Debtors, and MPT.]

49.     Following the release of the Escrowed Sale Proceeds to the Debtors and/or MPT Lessors in accordance with paragraph 48 hereof, the Debtors shall apply the Net Proceeds (as defined in the FILO DIP Credit Agreement)[4] of the Sale Transaction that are ultimately attributable to the Purchased Assets as determined by the Allocation Order in accordance with the terms of the FILO DIP Documents and the FILO DIP Order.

50.     Nothing in this Order shall affect any party's rights, claims, defenses, or arguments with respect to any sales other than the Sale Transaction.

51.     **Satisfaction of Conditions Precedent.**  Neither the Buyer nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the APA to each of their respective obligations to close the Sale Transaction have been satisfied or waived in accordance with the terms of the APA.  Neither the Debtors nor the MPT Lessors shall have an obligation to consummate the Severance until all conditions precedent in the Severance

---

[4]     Capitalized terms used in this paragraph but not otherwise defined in this Order shall have the meanings ascribed to them in the FILO DIP Order.

Amendment to each of their respective obligations to consummate the Severance have been satisfied or waived in accordance with the terms of the Severance Amendment.

52.     **CommonSpirit**.  Notwithstanding anything to the contrary in this Order or the agreements for each Sale Transaction approved by this Order, this Order shall not be deemed an assumption and assignment of any contracts that were previously assigned (the "**Assigned CommonSpirit Contracts**") to Catholic Health Initiatives Colorado ("**CHIC**"), CommonSpirit Health ("**CSH**"), and/or Centura Health Corporation ("**Centura**", together with CSH and CHIC, "**CommonSpirit**") in connection with that certain Asset Purchase Agreement dated February 15, 2023 by and among Davis Hospital & Medical Center, LP; IASIS Healthcare LLC; Jordan Valley Medical Center, LP; Physician Group of Utah, Inc.; Salt Lake Regional Medical Center, LP; Salt Lake Regional Physicians, Inc.; Seaboard Development LLC; Southridge Plaza Holdings, Inc.; and Steward Medical Group, Inc. as Sellers, Steward Health Care System LLC as the Seller Representative and the Seller Guarantor, CHIC as Buyer, and CSH as Buyer Guarantor. CommonSpirit reserves all of its rights and remedies with respect to the Assigned CommonSpirit Contracts under the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules, all applicable contracts, and applicable state and Federal laws, including, but not limited to, their rights to file any objections, motions, or adversary proceedings as may be appropriate.

53.     **Provisions Non-Severable.**  The provisions of this Order are non-severable and mutually dependent.

Dated: _____, 2024
          Houston, Texas

                                   _____
                                   UNITED STATES BANKRUPTCY JUDGE

52

## **Exhibit 1**

Asset Purchase Agreement

[To be attached.]