

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 18, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

### FINAL ORDER APPROVING (I) GLOBAL SETTLEMENT WITH
### MEDICAL PROPERTIES TRUST, PREPETITION ABL/FILO SECURED PARTIES,
### FILO SECURED PARTIES, AND CREDITORS' COMMITTEE, (II) INTERIM
### MANAGEMENT PROCEDURES, AND (III) GRANTING RELATED RELIEF

Upon the emergency motion, dated September 10, 2024 (Docket No. 2418)

(the "**Motion**"),[2] of Steward Health Care System LLC and its debtor affiliates, as debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for

entry of an order, pursuant to sections 105, 363(b), 365, and 554 of the Bankruptcy Code,

Bankruptcy Rules 2002, 6004, 6006, 6007, 9014, and 9019, and Bankruptcy Local Rule 9013-1,

(i) approving the Debtors' entry into and consummation of the Global Settlement, (ii) authorizing

the Debtors' conveyance, transfer or abandonment free and clear of all liens, claims, and

encumbrances or interests of the Specified MLI Hospitals, the Behavioral Facility, and the Closed

Hospitals to MPT or the applicable Designated Operators, as applicable, in accordance with the

terms and conditions set forth herein and in the Settlement Term Sheet, (iii) approving interim

management procedures, and (iv) granting related relief, all as more fully set forth in the Motion;

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims
and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter
11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion or the Settlement Term Sheet, as applicable.

and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion and the hearing thereof having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon the hearings held on the Motion; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled; and this Court having entered an interim order approving the Motion on September 11, 2024 (Docket No. 2483) (the "**Interim Order**"); and upon consideration of the Castellano Declaration and all evidence presented at the hearings held on the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates and is in the best interests of the Debtors, their respective estates, creditors, and all parties in interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, and the Debtors having demonstrated good, sufficient and sound business justifications for the relief granted herein, it is

**HEREBY FOUND AND DETERMINED THAT**:

A.     **Findings and Conclusions.**  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     **Jurisdiction.**  This Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334.  Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Debtors' right, title and interest in and to the Specified MLI Hospitals, the Closed Hospitals, the Space Coast Hospitals, the Behavioral Facility, the Sharon Hospital, and the Wadley Hospital pursuant to 28 U.S.C. § 1334(e), as property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein. This is a core proceeding within the meaning of 28 U.S.C. § 157(b), and as such, this Court has the authority to enter a final order.

C.     **Venue.**  Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D.     **Statutory Predicates.**  The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, 365 and 554 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, 6007, 9014, and 9019, Bankruptcy Local Rule 9013-1, and the Complex Case Procedures.

E.     **Business Justification; Fiduciary Duties.**  The Debtors have demonstrated that entry into and consummation of the Global Settlement constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, and creditors, and all parties in interest.  The Court finds that the Debtors have articulated good and sufficient business reasons justifying the entry into and consummation of the Global Settlement.

The Debtors' decision to enter into and consummate the Global Settlement constitute a proper exercise of the fiduciary duties of the Debtors and their directors, managers, and officers.

F.      **Corporate Authority.**   The Debtors (i) have the corporate or other organizational power and authority necessary to fully perform under the Global Settlement and execute, deliver, implement and fully perform any and all other obligations, instruments, documents, and papers, and take any and all actions, in each case contemplated thereby, (ii) have all of the power and authority necessary to consummate the Global Settlement, and (iii) have taken or are deemed to have taken all corporate or other organizational action necessary to authorize and approve the Global Settlement and any actions required to be performed by the Debtors to consummate such transactions.  Upon the entry of this Order, no further consents or approvals of the Debtors are required for the Debtors or their estates to consummate the Global Settlement.

G.      **Arm's-Length and Good Faith.**   The Global Settlement was negotiated and is undertaken by the Debtors, MPT, the Designated Operators, the Interim Managers, the Prepetition ABL/FILO Secured Parties, the FILO Secured Parties and the Creditors' Committee at arm's length, without collusion or fraud, and in good faith.

H.      **Insider Status.**   None of MPT, the Designated Operators and the Interim Managers shall become, as a result of their performance of their obligations under the Global Settlement, an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

I.      **No Fraudulent Transfer.**   The total consideration provided by MPT and the Designated Operators pursuant to the Settlement Term Sheet and the Global Settlement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform

Fraudulent Conveyance Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  The Settlement Term Sheet was not entered into, and the Global Settlement is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  None of the Debtors, MPT and the Designated Operators have entered into the Settlement Term Sheet or is consummating the Global Settlement with any fraudulent or otherwise improper purpose.

J.     **No Avoidance.**  The Global Settlement cannot be avoided.  None of the Parties or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors or assigns have engaged in any conduct that would cause or permit the consummation of the Global Settlement to be avoided, or costs or damages to be imposed.

K.     **No Successor Liability.**  None of MPT, the Interim Managers nor any of their affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and none of MPT, the Interim Managers, nor any of their affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates except to the extent explicitly provided in the Settlement Term Sheet and this Order.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Settlement Term Sheet, none of MPT, the Interim Managers nor any of their affiliates shall (a) be liable for any claims or defenses (including rights of recoupment) that may be asserted against the Debtors, the Debtors' estates or any of their predecessors or affiliates, or (b) be subject to successor

liability or similar liability (including, without limitation, to the United States, any state thereof or otherwise) for any claims, defenses, rights of recoupment, or causes of action of any kind or character against the Debtors, the Debtors' estates or otherwise, whether known or unknown, and none of MPT, the Interim Managers nor any of their affiliates shall have any successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer liability, labor law, de facto merger, mere continuation, or substantial continuation, whether known or unknown, whether now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, claims or defenses (including rights of recoupment) that may be asserted against the Debtors, the Debtors' estates or otherwise (including, without limitation, any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Specified MLI Hospitals, the Closed Hospitals, the Space Coast Hospitals, the Behavioral Facility, the Sharon Hospital, and the Wadley Hospital). None of MPT, the Interim Managers nor any of their affiliates is, and the consummation of the Global Settlement, will not render MPT, the Interim Managers or any of their affiliates, a mere continuation, and none of MPT, the Interim Managers or any of their affiliates is holding itself out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there is no continuity or common identity between MPT, the Interim Managers or any of their affiliates, on the one hand, and any of the Debtors or their estates, on the other hand. Accordingly, the Global Settlement does not amount to a consolidation, merger, or de facto merger of MPT, the Interim Managers or any of their affiliates with or into any of the Debtors or their estates and none of MPT, the Interim Managers or any of

their affiliates is, or shall be deemed to be, a successor to any of the Debtors or their estates as a result of the consummation of Global Settlement.

L.     **No Sub Rosa Plan.**  The Settlement Term Sheet and the Global Settlement contemplated thereby do not constitute a *sub rosa* chapter 11 plan.  The Settlement Term Sheet and the Global Settlement do not impermissibly restructure the rights of the Debtors' creditors nor do they impermissibly dictate a chapter 11 plan for the Debtors.

M.     **Time is of the Essence.**  Time is of the essence in consummating the Global Settlement.  In order to maximize the value of the Debtors' right, title and interest in and to the Specified MLI Hospitals, the Behavioral Facility, the Closed Hospitals, the Sharon Hospital, the Wadley Hospital and the Space Coast Hospitals, it is essential that the Global Settlement occur within the time constraints set forth herein and in the Settlement Term Sheet.  Good and sufficient reasons for approval of the Settlement Term Sheet and the Global Settlement have been articulated by the Debtors.  Upon the entry of this Order, the Parties, the Designated Operators and the Interim Managers may consummate the Global Settlement any time after entry of this Order and subject to the terms and conditions set forth herein and in the Settlement Term Sheet.

N.     **Final Order; Immediate Effect.**  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein.

### IT IS HEREBY ORDERED THAT:

1.     The Motion is granted on a final basis.

2.      **Approval of Global Settlement**.   The Global Settlement is approved pursuant to sections 105(a), 363, 365 and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 6007, 9014, and 9019, and Bankruptcy Local Rule 9013-1.   Each of the Parties, as well as their directors, managers, officers, employees, and agents, is authorized (a) to fully perform under the Settlement Term Sheet, annexed hereto as **Exhibit A**, and (b) to execute, deliver, implement and fully perform any and all other obligations, instruments, documents, and papers, and to take any and all actions, in each case under this clause (b), reasonably necessary or appropriate to consummate the Global Settlement.   This Order and the Global Settlement are enforceable and binding on the Debtors, the Debtors' estates, the Prepetition ABL/FILO Secured Parties, the FILO Secured Parties, MPT, the Creditors' Committee and all other parties in interest, including, without limitation, the Designated Operators, the Interim Managers, any subsequently appointed chapter 11 or chapter 7 trustee, any other estate representative, and all recording officers each in accordance with the terms thereof.

3.      **Interim Funding**.   On September 11, 2024, the Interim Managers (as defined below) and/or MPT funded an aggregate amount equal to $9,133,456.12 into the Payroll Escrow Account.   Upon entry of this Order, MPT or the Designated Operators, as applicable, shall fund to the Debtors any remaining amounts payable by MPT or the Designated Operators with respect to payroll as of the Funding Commencement Time pursuant to the Settlement Term Sheet.

4.      **Interim Management Procedures**.   The Debtors are hereby authorized to enter into interim management arrangements with interim managers (the "**Interim Managers**") on the terms annexed hereto as **Exhibit B** or such other terms acceptable to the Debtors and MPT, as well as the FILO Secured Parties and the Creditors' Committee (such consent not to be

unreasonably withheld), and the Interim Manager (the "**Interim Management Procedures**").[3] Prior to commencing services at a Specified MLI Hospital, each Interim Manager shall execute an acknowledgment agreeing to be bound by the terms of the Interim Management Procedures by executing the acknowledgement substantially in the form annexed hereto as **Exhibit C** or executing an agreement on terms acceptable to the Debtors and MPT, as well as the FILO Secured Parties and the Creditors' Committee (such consent not to be unreasonably withheld).

5.     **No Successor Liability**.  MPT and the Interim Managers of the Specified MLI Hospitals are not, and shall not be deemed, successors to the Debtors or their estates by reason of any theory of law or equity, and other than as provided in the Settlement Term Sheet and, with respect to any Interim Manager, the applicable Interim Management Procedures, none of MPT and the Interim Managers shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates.

6.     Upon each designation of an "Interim Manager" for a Specified MLI Hospital in Florida, the Debtors will submit the documentation required under the Health Care Licensing Application AHCA, Form 3130-8001 and Health Care Licensing Addendum, Form 3110-1024 in connection with the engagement of such manager.

7.     **Space Coast Conveyance**.  Effective upon the earlier of (i) the Settlement Effective Date and (ii) if this Order has not been stayed, vacated or modified without consent of MPT, the date on which the sale of the Space Coast Hospitals is expected to close (but immediately prior to such closing) (such earlier date, the "**Conveyance Date**"), either the real property underlying the Space Coast Hospitals (or, at the Debtors' election, the equity interests of a special

---

[3]   For clarity, prior to the consummation of an MLI Hospital Sale, actions taken by a Designated Operator in connection with the Global Settlement are taken solely in its capacity as an Interim Manager.

purpose entity that owns or special purpose entities that own only the real property underlying the Space Coast Hospitals) (the "**Space Coast Real Property**") shall be deemed conveyed to the Debtors (or, if the Debtors elect in writing, directly to Orlando Health) on (with respect to MPT) an "as is, where is" basis and without representations or warranties of any kind, nature, or description by MPT.  This Order shall be proof of conveyance of the Space Coast Real Property to the Debtors (or, if the Debtors elect in writing, directly to Orlando Health) effective immediately as of the Conveyance Date and all recording officers are authorized to accept this Order as such proof.  MPT shall deliver such other documents as may be reasonably necessary in recordable form to record the transfer of title to the Debtors or its designee.  The Debtors are authorized to transfer, and upon the closing of the sale of the Space Coast Hospitals to Orlando Health, Inc. and Orlando Health Medical Group, Inc. (collectively, "**Orlando Health**") pursuant to the *Order (I) Authorizing and  Approving (A) the Sale of Melbourne Regional  Medical Center, Rockledge Regional Medical  Center, and Sebastian River Medical Center Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) the  Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) the Severance of Real Property From an Unexpired Lease; and (II) Granting Related Relief* (Docket No. 2445) (the "**Space Coast Sale Order**") shall transfer, to Orlando Health, all of the Debtors' right, title, and interest in and to, and possession of, the Space Coast Real Property free and clear of any Liens,[4] Claims, Encumbrances, and Interests (other than any assumed liabilities, permitted encumbrances, and as otherwise expressly provided in the PSA). Within five (5) business days of entry of this Order, the Debtors shall serve a notice (the "**Free and Clear Notice**") on all known holders of any such Liens, Claims, Encumbrances, and Interests

---

[4]   Capitalized terms that are used in paragraph 7 but not otherwise defined herein shall have the meanings ascribed to such terms in the Space Coast Sale Order.

in the Space Coast Real Property setting forth the relevant free and clear provisions of this Order and the PSA and notifying such holders of the Objection Deadline (as defined below), which notice shall in form be reasonably acceptable to Orlando Health.  Any party objecting to the sale of the Space Coast Real Property free and clear of any such Liens, Claims, Encumbrances, and Interests (other than assumed liabilities, permitted encumbrances, and as otherwise expressly provided in the PSA) must file and serve on the Debtors and Buyer a written objection (the "**Free and Clear Objection**") no later than five (5) business days from the date the Debtors serve the Free and Clear Notice on such party (the "**Objection Deadline**"), which period the Court determines to afford due process under the circumstances of this case.  Any such Free and Clear Objection must state with specificity the legal and factual grounds for objection.  Any party that does not file a Free and Clear Objection on or before the Objection Deadline, including all holders of Liens, Claims, Encumbrances, and Interests in the Space Coast Real Property and any other interested party, shall be deemed to have consented to the sale of the Space Coast Real Property free and clear of Liens, Claims, Encumbrances, and Interests pursuant to section 363(f)(2) of the Bankruptcy Code, and upon closing, the Space Coast Real Property shall be deemed to be transferred free and clear of any such Liens, Claims, Encumbrances, and Interests in accordance with the terms of this Order and the PSA.  If a Free and Clear Objection is timely filed and not withdrawn or resolved (an "**Unresolved Objection**"), the Debtors shall file a notice scheduling an emergency hearing for the Court to consider the Unresolved Objection, subject to the Court's schedule.

8.     **MLI Hospital Sales**.   The following procedures shall apply to the conveyance of the Specified MLI Hospitals to Designated Operators:

(a)     Upon MPT's determination for a Specified MLI Hospital to be conveyed or transferred to a Designated Operator (a "**MLI Hospital Sale**") and agreement between the Debtors and such Designated Operator on the documentation necessary to effectuate such conveyance, the Debtors shall

promptly file with the Court and serve a notice on the Master Service List (a "**MLI Hospital Sale Notice**") setting forth, among other things, (i) the identity of the Designated Operator, (ii) a copy of the agreement conveying the Specified MLI Hospital to the Designated Operator, and (iii) a proposed form of order approving such conveyance to the Designated Operator (a "**MLI Hospital Sale Order**").

(b)     Each proposed MLI Hospital Sale Order shall provide, among other things, that (i) the applicable Designated Operator is acquiring the applicable Specified MLI Hospital free and clear of all liens and claims (including the liens and claims of the Prepetition ABL/FILO Secured Parties and FILO Secured Parties, but not liens and claims on account of purchase money security interests and capital leases of equipment and other personal property) and without any successor liability, (ii) the applicable Designated Operator is purchasing the applicable Specified MLI Hospital in good faith within the meaning of section 363(m) of the Bankruptcy Code and (iii) the transaction cannot be avoided.

(c)     Parties objecting to a proposed MLI Hospital Sale must file and serve a written objection on the Debtors and each of the other Settlement Parties (an "**Objection**") no later than five (5) days from the date the Debtors serve the MLI Hospital Sale Notice (the "**Objection Deadline**"). Each Objection must state with specificity the legal and factual grounds for objection to the proposed MLI Hospital Sale.

(d)     If no Objection is filed and served by the Objection Deadline, the Debtors may submit the proposed MLI Hospital Sale Order to the Court and the Court may enter such order without a hearing.

(e)     If an Objection is timely filed and not withdrawn or resolved (an "**Unresolved Objection**"), the Debtors shall file a notice scheduling an emergency hearing for the Court to consider the Unresolved Objection, subject to the Court's schedule.

9.     **Assumption and Assignment Procedures**. At any time prior to December 16, 2024 or such later date as agreed between the Debtors and the applicable Designated Operator (the "**Designation Deadline**"), the applicable Designated Operator (or MPT on its behalf) may designate Facility Contracts to be assumed and assigned to such Designated Operator (the "**Transferred Contracts**"). Promptly after such designation, the applicable Designated Operator (or MPT on its behalf) shall provide the adequate assurance information for such

12

Designated Operator (the "**Adequate Assurance Information**").  Promptly after receipt of such Adequate Assurance Information, the Debtors shall, at the applicable Designated Operator's expense to the extent set forth in the Settlement Term Sheet, (i) file a notice of assumption and assignment, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "**Cure Notice**"), identifying (X) the Transferred  Contracts and (Y) the Debtors' calculations of the amount necessary to cure any monetary defaults under each Transferred Contract (the "**Cure Costs**"), and (ii) shall serve such Cure Notice (if applicable) and the Adequate Insurance Information on each applicable non-Debtor counterparty (the "**Assumption Notice**").  To the extent that the counterparty to such Transferred Contract was previously served with a Cure Notice in accordance with the Debtors' Bidding Procedures Order, then the procedures therein governing such counterparty's ability to object (as opposed to the procedures set forth herein) to the applicable Cure Costs shall govern.

10.     Each non-Debtor counterparty shall have seven (7) days from the date the Debtors serve the Assumption Notice (the "**Contract Objection Deadline**") to serve on the Debtors and the applicable Designated Operator a written objection (a "**Contract Objection**") to the assumption and assignment of a Transferred Contract.  Each Contract Objection must state with specificity the legal and factual grounds for the objection.  Each non-Debtor counterparty that fails to file a Contract Objection by the Contract Objection Deadline shall be deemed to consent to the assumption and assignment by the Debtors of its Transferred Contract to the applicable Designated Operator, and the Designated Operator, upon payment by it of the applicable Cure Costs (or such other amount as agreed by the applicable Designated Operator and the applicable non-Debtor counterparty), shall enjoy all the rights and benefits under such Transferred Contract

as of the applicable date of assumption and assignment without the necessity of obtaining such non-Debtor party's consent to the assumption or assignment thereof.

11.     If a Contract Objection is filed by the Contract Objection Deadline, then the Transferred Contract subject of the Contract Objection shall be deemed a "**Disputed Contract**." The applicable Designated Operator shall be authorized to resolve or settle any Contract Objection to the assumption and assignment of Disputed Contracts in accordance with the terms of this Order, including with respect to Cure Costs and/or adequate assurance of future performance under the applicable Disputed Contract(s), without need for any further order or action from this Court; *provided*, *however*, that the applicable Designated Operator shall provide the Debtors with written notice of such resolution, copying the authorized representative of the non-Debtor counterparty to the Disputed Contract, within five (5) Business Days of such resolution.  At the applicable Designated Operator's express sole and express written election, any Disputed Contract that is the subject of an unresolved Contract Objection asserted solely with respect to the amount of Cure Costs may be assumed and assigned prior to the resolution of such Contract Objection, so long as the applicable Designated Operator (i) pays any undisputed Cure Costs and (ii) appropriately reserves funding for the disputed portion of the Cure Costs pending resolution of the dispute.  For the avoidance of doubt, subject in all respects to payment requirements with respect to the Facility Contracts as set forth in the Settlement Term Sheet, nothing in this Order shall require any Designated Operator to take an assignment of, or pay or reserve Cure Costs relating to, a Disputed Contract subject to an unresolved Contract Objection, and the applicable Designated Operator may elect to delay assumption and assignment of the Disputed Contract pending resolution of the pending objection or decline that such Disputed Contract be assumed and assigned.

12.     If no Contract Objection has been filed, or a Contract Objection has been properly filed but has been resolved by the Designated Operator and the applicable non-Debtor counterparty or determined by the Court, this Order shall serve as approval of the assumption and assignment of the applicable Transferred Contract to the applicable Designated Operator without need for a further notice or order.  Upon the assignment of any Transferred Contract to the applicable Designated Operator in accordance with the terms of this Order, (i) such Transferred Contract shall be deemed valid and binding, in full force and effect in accordance with its terms, subject to the provisions of this Order, and shall be assigned and transferred to the Designated Operator, notwithstanding any provision in such Transferred Contract prohibiting or otherwise restricting assignment or transfer, (ii) the Debtors, their estates, or any of their affiliates, predecessors, successors, or assigns, shall have no further liability or obligation under such Transferred Contract and (iii) each non-Debtor counterparty to such Transferred Contract is forever barred, estopped, and permanently enjoined from (A) asserting against the Debtors or the applicable Designated Operator, their respective affiliates, estates, successors, or assigns, or the property of any of them, any default or other claim with respect to amounts first arising or accruing during, or attributable or related to, the period before such assignment, and (ii) exercising any rights or remedies against any Debtor or the applicable Designated Operator based on an asserted default that occurred on, prior to, or as a result of, such assignment, including the type of default specified in section 365(b)(1)(A) of the Bankruptcy Code.

13.     All counterparties to the Transferred Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the applicable Designated Operator, and shall not charge the Debtors or the applicable Designated Operator for, any instruments, applications, consents, or other documents which may be required or requested by

any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Global Settlement.

14.      The Debtors shall have no obligation to (i) make payments under any Facility Contract that are not funded by the applicable Designated Operator, and nothing contained in this Order or the Settlement Term Sheet shall limit the Debtors' rights to seek to reject any Facility Contract, or (ii) extend or renew any Facility Contracts, in the case of (i) or (ii), unless the applicable Designated Operator pays to the applicable non-Debtor counterparty in a timely fashion as they become due and payable all go-forward expenses to be incurred under such Facility Contract prior to such Designated Operator consenting to rejection thereof.

15.      **Abandonment**.  The Debtors are authorized to abandon their interests in the Closed Hospitals (and to the extent provided for under the Settlement Term Sheet, the Specified MLI Hospitals, the Behavioral Hospital, and Sharon Hospital) to MPT on an "as-is, where is" basis free and clear of all liens, claims, encumbrances and interests of any party (other than purchase money security interests and capital leases, in each case of equipment and other personal property); *provided* that nothing in this Order abrogates the Debtors' obligations under the *Order (I) Approving Procedures Related to Facility Closures on a Final Basis, and (II) Granting Related Relief* (Docket No. 2146) or any non-Debtor's obligations to comply with state and federal law and regulations as applicable and any abandonment of personal property pursuant to this paragraph shall comply with the procedures set forth in Exhibit 1 of such order.  For the avoidance of doubt, no additional approvals from the Court or any party are required to close any of the Closed Hospitals.

16.      **Binding Effect of Order.**  This Order and the Global Settlement are binding in all respects on the Debtors, the Debtors' estates, the Prepetition ABL/FILO Secured Parties, the

FILO Secured Parties, MPT, the Creditors' Committee and all other parties in interest, including, without limitation, all creditors of, and holders of equity interests in, the Debtors, any subsequently appointed chapter 11 or chapter 7 trustee, any other estate representative, all recording officers and all successors and assigns to any of the foregoing, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the Settlement Term Sheet shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Order, including the rights granted to and obligations of MPT and the Designated Operators hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest. Upon entry of this Order, the Global Settlement authorized herein shall be of full force and effect regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business. To the extent of any conflict between the express terms of this Order and the Settlement Term Sheet, the terms of this Order shall control. To the extent of any conflict between this Order and the Settlement Term Sheet, on the one hand, and any previous order of the Court relating to conveyance or transfer of any Specified MLI Hospital, the Behavioral Facility, any Closed Hospital, the Sharon Hospital or the Wadley Hospital, on the other hand, this Order and the Settlement Term Sheet shall control. Notwithstanding any previous order of the Court, the Settlement Term Sheet shall determine the agreed allocation of sale consideration between the Debtors and MPT in connection with the sale of the Space Coast Hospitals.

17.     **Releases**.  Each of the releases set forth in the Settlement Term Sheet (the "**Releases**") is integral to the Global Settlement, is critical to the implementation of the Global Settlement, is supported by fair and reasonable consideration, is in the best interests of the Debtors and the Debtors' estates, and accordingly, is hereby approved and shall be binding on the parties in all respects upon the occurrence of the Settlement Effective Date in accordance with the terms set forth in the Settlement Term Sheet.

18.     **Release by MPT Releasing Parties**.  On the Settlement Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each of the MPT Releasing Parties agrees that (i) all amounts and other obligations under the MPT DIP Facility and the MPT Facility owing by the Debtors to the MPT Releasing Parties (including, for the avoidance of doubt, all Obligations (as defined in the MPT DIP Credit Agreement)), are hereby discharged and cancelled in full, (ii) all amounts and other obligations owing by SHC Holdings under the Investor Note are hereby discharged and cancelled in full, (iii)(x) the MPT DIP Credit Agreement and the other Loan Documents (as defined in the MPT DIP Credit Agreement) and (y) the MPT Note and the other Obligations Documents (as defined in the MPT Note) and Security Documents (as defined in the MPT Note), to the extent related to the MPT Note, are, in each case, hereby terminated and of no further force and effect, (iv) Sections 7 and  8 of the Investor Note are hereby terminated and of no further force and effect, (v) all security interests, liens and pledges granted (x) in respect of the MPT DIP Facility and the MPT Facility by the Debtors and (y) by Steward Health Care Investors LLC on the equity interests of SHC Holdings in respect of the Investor Note are hereby released and discharged and (vi) all guarantees (x) by the Debtors in respect of the MPT DIP Facility and the MPT Facility and (y) by SHC Holdings in respect of the Investor Note are hereby released and discharged; *provided* that, except as expressly set forth herein, the obligations

18

of non-Debtor affiliates of the Debtors under the Investor Note are unchanged.  The MPT Releasing Parties hereby authorize the Debtors and/or their designees to file and/or deliver, on behalf of the MPT Releasing Parties, all UCC-3 termination statements, intellectual property terminations, and any other terminations, certificates or other documents as may be necessary or desirable to evidence or effectuate the foregoing discharges, releases and terminations. Each of the MPT Releasing Parties further agrees to execute and deliver, all other instruments, documents and agreements (including returning any physical collateral) and to take or forbear from taking, as the case may be, any actions that are required or reasonably requested by the Debtors to evidence the foregoing discharges, releases and terminations, in each case, promptly following the request by any Debtor therefor.   For the avoidance of doubt, if any Debtor that is a guarantor of any obligation to MPT of another Debtor (a "**Guarantor**") makes or is deemed to make a payment or other transfer in full or partial satisfaction of such obligation by reason of this Order or the Settlement Term Sheet, such Guarantor will retain a claim against such Debtor as a result of such payment or other transfer, and nothing herein or in the Settlement Term Sheet will be deemed to release such claim of such Guarantor against such Debtor.

19.     **Release of MPT Claims**.  Upon the Settlement Effective Date, any and all MPT Claims shall be deemed to be released and waived with prejudice (other than those claims expressly preserved by the final proviso of the first paragraph under "Release by MPT Releasing Parties" in the Settlement Term Sheet, which, for the avoidance of doubt, are not released or waived).

20.     **Termination of Master Lease I**.  Upon entry of the Interim Order, Master Lease I was deemed, and is hereby deemed on a final basis, to be terminated, without any liability to any party as a result of such termination, with any claims relating to such master lease being

released on the Settlement Effective Date; *provided* that the Debtors shall be entitled to continue to access and use the Specified MLI Hospitals, the Space Coast Hospitals, the Behavioral Facility, the Closed Hospitals, the Sharon Hospital, and the Wadley Hospital in a manner consistent with the terms of the Global Settlement; *provided*, *further*, that MPT shall not have any claim against the Debtors with respect to such access and use.  Upon request of the other party, the Debtors and MPT, as applicable, shall execute and deliver such other customary documents as may be reasonably necessary in recordable form to evidence the termination of Master Lease I.

21.     **Tolling of Challenge Period**.  To the extent the Settlement Effective Date does not occur, nothing herein or in the Settlement Term Sheet shall be deemed a waiver of any Claims or Causes of Action on behalf of the Debtors' estates or on behalf of any other Party (including MPT).  The Creditors' Committee's period to institute a "Challenge" (as defined in the MPT DIP Order) with respect to MPT shall be deemed tolled pending the occurrence of the Settlement Effective Date, and, to the extent the Settlement Parties determine the Settlement Effective Date will not occur, the Creditors' Committee or, to the extent applicable, its successor, shall have not less than 30 days from the date of such determination to initiate a Challenge.

22.     **Stay of Litigation**.  Upon entry of the Interim Order, all discovery and litigation among MPT, the Debtors, the Creditors' Committee, the Prepetition ABL/FILO Secured Parties, and the FILO Secured Parties was stayed and, pursuant to this Order, shall remain stayed; provided that if MPT, an Interim Manager or a Designated Operator fails to materially comply with the terms of the Settlement Term Sheet or this Order (and does not reasonably promptly cure such non-compliance within 14 days of written notice from the Debtors or the Creditors' Committee to MPT of the particular alleged material breach), the Debtors shall consent to the

Creditor Committee's standing to bring a Challenge; *provided* that the Debtors shall retain standing to settle any Challenge and MPT reserves all rights to object to standing.

23. **FILO DIP Facility**. The Debtors, the FILO Secured Parties, and the Creditors' Committee shall work in good faith to agree on a new budget that can serve as the new "Approved Budget" consistent with the milestones agreed to by and between the Debtors, the FILO Secured Parties, and the Creditors' Committee (the "**Budget Milestones**"). Upon entry of this Order, so long as the Budget Milestones have been met, each of the FILO Secured Parties shall be deemed to have waived through October 31, 2024 (i) the asserted events of default under the FILO DIP Credit Agreement[5] and the FILO DIP Order enumerated in that certain Reservation of Rights of FILO DIP Secured Parties letter, dated as of September 2, 2024 and (ii) any other defaults or events of default under the FILO DIP Credit Agreement and the FILO DIP Order relating to, or arising out of, a Budget Event (as defined in the FILO DIP Credit Agreement) that occurred or is alleged to have occurred prior to the date of this Order (the "**Waiver**"); *provided* the FILO Secured Parties shall not seek to exercise remedies with respect to their collateral, including Inventory and FF&E, in a manner that would reasonably be expected to prevent or impair the use, sale, transfer, conveyance or abandonment of such collateral by (or for the benefit of) or to MPT, an Interim Manager, or a Designated Operator, as applicable, to the extent provided under the terms of the Settlement Term Sheet; *provided*, *further*, that nothing in this paragraph shall in any way abrogate or limit the consents and obligations of the Prepetition ABL/FILO Secured Parties and the FILO Secured Parties set forth in the Settlement Term Sheet. Upon satisfaction of the Budget

---

[5]     The "**FILO DIP Credit Agreement**" means that certain *Debtor-in-Possession Credit Agreement*, dated July 10, 2024, by and among, *inter alios*, Steward Health Care System LLC as borrower, the other Debtors jointly and severally, as guarantors, and the FILO DIP Secured Parties (as defined in the FILO DIP Order), as may be further amended, modified, or amended and restated from time to time in accordance with its terms.

Milestones, the Waiver shall become permanent. The FILO DIP Secured Parties, the Debtors, and all other parties in interest reserve all rights under the FILO DIP Credit Agreement and FILO DIP Order with respect to any future defaults or events of default.  Nothing herein shall be deemed an admission by the Debtors or any other party in interest that any default or event of default has occurred or exists under the FILO DIP Credit Agreement or the FILO DIP Order, and the Debtors' and all other parties in interest's rights to contest whether any such default or event of default has occurred or exists are fully preserved.

          24.    **Accounts Receivable**.  Upon the sale, transfer, abandonment, or closure of any of the Debtors' hospitals, all accounts receivable held by or owed to any of the Debtors relating to services provided by or at such hospital on or prior to the date of such sale transfer, abandonment or closure (and expressly excluding any Go-Forward Receivables), and all proceeds thereof, shall automatically, with no further action of any party, be deemed to be transferred and assigned to a newly created, direct subsidiary of Steward Health Care System, LLC with no liabilities (such subsidiary, "**A/R Co**").  A/R Co shall be deemed to be a Loan Party and a Guarantor (or other similar term) under and as defined in the FILO DIP Order, the FILO DIP Documents, the Prepetition ABL/FILO Loan Documents (as defined in the MPT DIP Order), the Prepetition Bridge Credit Agreement and any loan document in favor of MPT.  Such accounts receivable shall (i) constitute Prepetition ABL/FILO Priority Collateral for purposes of the FILO DIP Order, (ii) be deemed to be subject to valid, effective, perfected, and enforceable liens of the Prepetition ABL/FILO Secured Parties and the FILO Secured Parties having the priorities set forth in the FILO DIP Order with respect to Prepetition ABL/FILO Priority Collateral, and (iii) be deemed "ABL/FILO Priority Collateral" under the Prepetition Intercreditor Agreement and "Collateral" subject to the terms and priorities set forth in the Agreement Among Lenders (as defined in the

FILO DIP Order).  Such deemed transfer shall not (i) affect the validity, perfection, enforceability, or priority of any lien attached or attaching to such accounts receivable or proceeds thereof, (ii) affect the validity of any such accounts receivable, or (iii) be subject to avoidance or any other claim or challenge under the Bankruptcy Code or applicable law or regulation by any person or entity, including, without limitation, in connection with any successor cases.

     25. **Advances; Go-Forward Receivables**.  Any funding advanced to the Debtors (including, without limitation, any funds in the Payroll Escrow Account or, the Expense Escrow Account or the Sale Proceeds Escrow Account) pursuant to the Global Settlement shall be used solely for the specified purposes for which such funds were advanced absent the consent of MPT and the applicable Designated Operator, shall not be part of the Debtors' estates (other than to the extent of the Debtors' rights in respect of such escrow accounts hereunder), and shall not be subject to any other liens, claims, interests and encumbrances against the Debtors.  Except as otherwise set forth in the Settlement Term Sheet with respect to the Expense Escrow Account, to the extent any such advanced amounts are in excess of the amounts required to be paid (as determined by prompt reconciliation), such excess shall be credited by the Debtors against future amounts payable by the applicable Designated Operator to the Debtors.  The applicable Designated Operator shall be the beneficiary of any and all patient service and other revenue of any kind and related accounts receivable and receipts generated by the Specified MLI Hospitals for services provided after the Funding Commencement Time (collectively, the "**Go-Forward Receivables**"), and the Debtors shall turn over to the applicable Designated Operator any collections actually received on account of the Go-Forward Receivables (which collections are deemed to be held in trust by the Debtors for MPT or the applicable Designated Operator and shall not be subject to any other liens, claims, interests and encumbrances against the Debtors).  For the avoidance of doubt,

all patient service and other revenue of any kind and related accounts receivable and receipts generated by the Specified MLI Hospitals for services provided before the Funding Commencement Time and owned by the Debtors (the "**Debtor Retained Receivables**") shall remain property of the Debtors.  The applicable Designated Operator shall turn over to the Debtors any collections actually received on account of the Debtor Retained Receivables (which such collections are deemed to be held in trust by the applicable Designated Operator for the Debtors). The Debtors and the Designated Operator shall remit collections received on account of the Go-Forward Receivables or the Debtor Retained Receivables, as applicable, on a weekly basis no later than five (5) business days after the Friday of each calendar week.  With respect to any patient that is admitted prior to the Funding Commencement Time and discharged after the Funding Commencement Time, the Debtors and the applicable Designated Operator shall work cooperatively to reconcile when services were rendered in a fashion consistent with customary market practice or otherwise agreed between the Debtors and an Interim Manager pursuant to the applicable Interim Management Procedures.  For the avoidance of doubt, to the extent the MLI Hospital Transition is not consummated by the Target Transition Date, the applicable Interim Manager shall continue to provide funding for operating expenses for the applicable Specified MLI Hospitals pursuant to the terms and conditions of the Settlement Term Sheet.

26.     **Objections Overruled**.   Any objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled are hereby overruled on the merits and denied with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein, including, without limitation, the Releases.

27. **Failure to Specify Provisions.** The failure to specifically reference any particular provisions of the Settlement Term Sheet or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Settlement Term Sheet and other related documents be authorized and approved in their entirety.

28. With respect to the Arizona Interim Manager (i) Go-Forward Receivables shall include, without limitation, Arizona Health Care Cost Containment System ("**AHCCCS**") supplemental payments (including but not limited to AHCCCS HEALTHII and AHCCCS GME payments), related to services provided by the Specified MLI Hospitals in Arizona, regardless of the applicable dates of service, and (ii) any agreement conveying a Specified MLI Hospital to Arizona Interim Manager and MLI Hospital Sale Order in respect of same shall be acceptable to Arizona Interim Manager.

29. All rights of each Governmental Unit (as defined in 11 U.S.C § 101(27)) under any applicable police and regulatory statutes or regulations, and all rights and defenses of the Debtors, the Designated Operators, the Interim Managers, MPT and all other parties with respect thereto, are hereby preserved.

30. For the avoidance of doubt, nothing in this Order authorizes the Debtors or any other party to unilaterally modify any terms of a collective bargaining agreement; *provided* that the Debtors reserve the right to seek any relief regarding any collective bargaining agreements pursuant to section 1113 of the Bankruptcy Code, including rejection and/or modification of such agreements, and all parties reserve the right to object to any such relief.

31. For the avoidance of doubt, nothing in this Order authorizes the Debtors, the Interim Manager or any Designated Operator to unilaterally modify any terms of the Collective Bargaining Agreement with 1199SEIU (the "**1199SEIU CBA**"), *provided* that the Debtors reserve

the right to seek any relief regarding the 1199SEIU CBA pursuant to section 1113 of the Bankruptcy Code, including rejection and/or modification of such agreement, and 1199SEIU reserves all of its rights to object to any such relief.  For the further avoidance of doubt, (i) nothing in this Order shall relieve the Debtors or any Designated Operator of any obligation under section 365(b) to satisfy all cure amounts that may be owed and (ii) nothing herein shall constitute a waiver or release of any rights that 1199SEIU may have under applicable federal or state labor and employment law.

32.     The Debtors shall request that any proposal to acquire one or more Specified MLI Hospital(s) include the following information: (i) whether the potential Designated Operator intends to hire all of the employees of each Specified MLI Hospital it seeks to acquire, (ii) whether it intends to assume liability for accrued paid time off (including, but not limited to, vacation, holiday, sick and personal time) with respect to those employees, and (iii) whether it intends to assume each collective bargaining agreement covering employees of each Specified MLI Hospital it seeks to acquire.

33.     Nothing in this Order is intended to, nor shall it be deemed to, preclude the National Labor Relations Board or any other court from finding that any Designated Operator, following consummation of the applicable MLI Hospital Transition, is subject to a successor collective bargaining obligation under the National Labor Relations Act.  All parties' rights with respect to any such finding and any collective bargaining agreement are fully reserved.

34.     For the avoidance of doubt, nothing in this Order shall affect the Debtors' obligations under section 365(d)(3) of the Bankruptcy Code with respect to the Amended and Restated Lease Agreement dated May 29, 2018, as amended, supplemented and restated, between

Regional Professional Building, L.P. (as landlord) and Debtor The Medical Center of Southeast Texas, LP (as tenant).

35.     For the avoidance of doubt, nothing in this Order shall affect the Debtors' obligations under section 365(d)(5) of the Bankruptcy Code, if any, including with respect to (i) the Dext Capital Agreements (as defined in the Dext Capital Objection (Docket No. 2543)), (ii) the Stonebriar Leases (as defined in the Stonebriar Objection (Docket No. 2555)), (iii) the Cintas Agreement (as defined in the Cintas Objection (Docket No. 2591)), (iv) Novo Health Services, LLC, (v) Post Road Equipment Finance SPV, LLC, or (vi) Intuitive Surgical, Inc.   For the avoidance of doubt, nothing in this Order shall affect the Debtors' postpetition obligations under the Cigna Contracts (as defined in the Cigna Objection (Docket No. 2554)).   For the avoidance of doubt, nothing in this Order shall relieve the Debtors' obligations under section 365 of the Bankruptcy Code, if any, with respect to HHS and Twin Eagle, and HHS and Twin Eagle reserve any rights under sections 365 and 503 of the Bankruptcy Code.

36.     For the avoidance of doubt, nothing herein shall release any cause of action (not predicated on successor liability arising from the terms or implementation of the Global Settlement), including a cause of action arising out of conduct that preceded the Petition Date, that may be asserted under applicable law by a non-party to the Global Settlement and is not, and is not required to be, asserted derivatively on behalf of the Debtors or another party to the Global Settlement, including any such cause of action against MPT, any Interim Manager, or any other person or entity.

37.     Notice of the Motion is adequate under Bankruptcy Rule 6004(a).

38.     Notwithstanding the provisions of Bankruptcy Rule 6004(h) or 6006(d), this Order shall be immediately effective and enforceable upon its entry.

39.     The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Order.

40.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order and the Settlement Term Sheet.

Signed:  September 18, 2024

_____
Christopher Lopez
United States Bankruptcy Judge

**Exhibit A**

**Settlement Term Sheet**

*In re Steward Health Care System LLC, et al.*
*Case No. 24-90213*

**SETTLEMENT TERM SHEET**

This term sheet (this "**Term Sheet**") outlines the terms of the global settlement among Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession (collectively, together with their estates, the "**Debtors**")[1] in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), the Prepetition ABL/FILO Secured Parties, the FILO Secured Parties, the Creditors' Committee and MPT (collectively, the "**Parties**") as to the matters specified herein (the "**MPT Settlement**") to be approved by the MPT Settlement Order.  Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* (Docket No. 38) or **Annex 1** hereto, as applicable.

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

1

| | |
|---|---|
| | **SETTLEMENT TERM SHEET** |
| **Specified MLI Hospital Transition** | No later than the Funding Commencement Date, MPT shall designate (in its sole discretion) an operator (each a "**Designated Operator**") for each MLI Hospital (other than the Space Coast Hospital, the Behavioral Facility, the Closed Hospitals, Sharon Hospital and Wadley Hospital) (collectively, the "**Specified MLI Hospitals**"; the Specified MLI Hospitals are set forth on <u>**Annex 2**</u> attached hereto), each of which Designated Operators shall agree in writing by the Funding Commencement Date to be bound by and adhere to the interim management procedures to be attached as an exhibit to the MPT Settlement Order (the "**Interim Management Procedures**").  The Debtors shall seek and obtain authority, in accordance with the MPT Settlement Order (and any separate order contemplated thereby, which shall be in form and substance reasonably acceptable to the Debtors and MPT), to convey or otherwise transfer their interests in each of the Specified MLI Hospitals (including any inventory, FF&E or other personal property and licenses located therein or related thereto, but excluding (x) any Debtor Retained Receivables (which shall be retained by the Debtors subject to the account receivable transfer provisions of the MPT Settlement Order), (y) any fee, leasehold or other possessory interest in the real property in such Specified MLI Hospitals or in any improvements thereon or fixtures located thereon or therein (which shall be terminated as set forth herein)), and (z) the Excess Properties (as defined in the Excess Property Disposition Agreement) to the applicable Designated Operator, without successor liability and free and clear of all liens, claims, interests and encumbrances (other than purchase money security interests and capital leases, in each case of equipment and other personal property), on an "as is, where is" basis, as promptly as practicable, and subject to entry by the applicable Designated Operator into documentation reasonably acceptable to the Debtors and the applicable Designated Operator (which, for the avoidance of doubt, shall not require any Designated Operator to assume any liabilities beyond those expressly contemplated herein) and obtaining any required regulatory approvals as may be necessary to give effect to the foregoing (the "**MLI Hospital Transition**"). In connection with the MLI Hospital Transition with any Specified MLI Hospital, the applicable Designated Operator shall assume the Accrued PTO with respect to such Specified MLI Hospital.<br><br>The Debtors and MPT shall cooperate with one another in conveying or transferring each Specified MLI Hospitals to the applicable Designated Operator as promptly as practicable following satisfaction of the conditions to the MLI Hospital Transition for such Specified MLI Hospital. Each of MPT and the Debtors shall use commercially reasonable efforts to complete the MLI Hospital Transition (including any regulatory approval) with respect to each Specified MLI Hospital by October 1, 2024 (the "**Target Transition Date**").<br><br>MPT shall notify the Debtors on or prior to October 20, 2024, if MPT expects that the conveyance or transfer of the Debtors' interest in any Specified MLI Hospital(s) to a Designated Operator in accordance with the terms of this Term Sheet will not occur on or prior to October 30, 2024 (such notice, a "**Non-Transition Notice**"). If MPT delivers a Non-Transition Notice, MPT and the Debtors shall promptly consult with each other in order to determine the appropriate course of action with respect to the applicable Specified MLI Hospital(s). Unless the Debtors, the FILO Secured Parties, the Creditors' Committee and MPT agree otherwise, if the Debtors' interest in any Specified MLI Hospital has not been conveyed or transferred to a Designated Operator in accordance with the terms of this Term Sheet on or prior to October 30, 2024, the Debtors shall promptly convey or abandon their interests in such Specified MLI Hospital to MPT on |

| **SETTLEMENT TERM SHEET** |
| --- |

an "as-is, where is" basis after removing any hazardous materials, medical records and medical equipment (with the reasonable costs of such removal (the "**Closing Removal Costs**") borne by MPT) and MPT shall assume, to the extent not otherwise paid, the Accrued PTO and other closing costs (including WARN liabilities) with respect to such Specified MLI Hospital (the "**Closing Assumed Costs**" and together with the Closing Removal Costs, the "**Closing Costs**").

From and after the Funding Commencement Date and prior to the applicable MLI Hospital Transition Closing Date, the Debtors and the Designated Operators shall adhere to the Interim Management Procedures.

The Debtors, MPT and the Designated Operators shall each be responsible for paying their own costs and expenses (the "**Transition Costs**") associated with negotiating, agreeing to or implementing the MLI Hospital Transition; provided, however, that: (a) if a contract is to be assumed and assigned to a Designated Operator, such Designated Operator shall be required pay any applicable cure costs and other expenses incurred by the Debtors to effectuate such assumption and assignment (as set forth below); (b) if, after the date on which the MPT Settlement Order is entered, a Designated Operator (or MPT on behalf of such Designated Operator) requests that the Debtors take specific actions (beyond those required of the Debtors by the MPT Settlement Order) in connection with seeking relief from the Bankruptcy Court to effectuate the conveyance or transfer of the Specified MLI Hospitals or related contracts/operating assets to such Designated Operator, such Designated Operator shall reimburse the Debtors for the reasonable and documented out-of-pocket expenses of counsel and, to the extent requested by the applicable Designated Operator, other advisors (excluding investment bankers) incurred by the Debtor in connection with such actions (it being understood that neither MPT nor any Designated Operator shall have any obligation to reimburse the Debtors for (A) any expenses incurred by the Debtors in connection with the negotiation of, entrance into or approval of the MPT Settlement, including approval of any separate order approving conveyances to the Designated Operators if such order is contemplated by the MPT Settlement Order, or (B) any expenses incurred by the Debtors on or prior to the date on which the final MPT Settlement Order is entered); and (c) if MPT requests that the Debtors convey or transfer assets associated with acute care hospitals in Arizona to the potential buyer separately identified and agreed by MPT and the Debtors , MPT (or the Designated Operator for such hospital) shall pay Professional Fee Claims of Cain Brothers in connection with such conveyance or transfer in an amount not to exceed $1 million per hospital (it being understood that neither MPT nor any Designated Operator shall have any obligation to reimburse the Debtors for any Professional Fee Claims of any investment banker or other financial advisor except as expressly set forth in this clause (c)).   The FILO Secured Parties reserve all rights with respect to whether investment banker fees are payable in connection with the MLI Hospital Transition (but not against MPT or the Designated Operators).

The Debtors (in consultation with the Creditors' Committee, the FILO Secured Parties and the Prepetition ABL/FILO Administrative Agent, acting at the direction of Required Revolving Lenders) and MPT shall (and MPT shall cause its applicable Designated Operator to) cooperate in good faith to negotiate and enter into any necessary agreements, obtain any necessary consents or approvals, execute all necessary documents or instruments (e.g., bills of sale) and prepare and file such regulatory filings (e.g., CMS CHOW) as are necessary to give effect to the Specified MLI Hospital Transition with

| | |
|---|---|
| | **SETTLEMENT TERM SHEET** |

| | |
|---|---|
| | respect to each Specified MLI Hospital promptly after the date hereof.  At all times from and after the identification of any Designated Operator, each of MPT and such Designated Operator may request that the Debtors seek relief from the Bankruptcy Court to effectuate the conveyance or transfer of the applicable Specified MLI Hospital or related contracts/operating assets to such Designated Operator and, subject to the reimbursement provisions herein with respect to Transition Costs, the Debtors shall use commercially reasonable efforts to obtain such relief. |
| | MPT shall be entitled to lease Excess Properties (as defined in the Excess Property Disposition Agreement) to Designated Operators to the extent such property is integral to the applicable Specified MLI Hospitals; provided (1) such Designated Operators shall not unreasonably prevent, condition, or hinder any sale of such property (including pursuant to the Excess Property Disposition Agreement and paragraph 27 of the final DIP order entered at Docket No. 1538, each of which shall remain in full force and effect notwithstanding anything to the contrary herein) and (2) such lease shall either (x) terminate with respect to such Excess Property on the date of the sale of such property or (y) be acceptable to the FILO Secured Parties. |
| | All Parties will comply with all federal and state healthcare regulations and obligations with respect to the transactions contemplated by the MPT Settlement. |
| **Operations Funding** | Effective as of September 11, 2024 at 12:01 a.m. (ET) (the "**Funding Commencement Time**", and such date, the "**Funding Commencement Date**"), following entry of the MPT Settlement Order with the terms set forth herein, the applicable Designated Operator shall assume, in accordance with the terms of this item entitled "Operations Funding" (i) full responsibility for paying all go-forward hospital-level operating disbursements and expenses of the Specified MLI Hospitals incurred after the Funding Commencement Time, (ii) accrued and unpaid paid time off obligations of employees of the Specified MLI Hospitals (not to exceed, with respect to any Specified MLI Hospital, the amount listed with respect to such Specified MLI Hospital on **Annex 3** hereto) (the "**Accrued PTO**") and (iii) accrued and unpaid regular bi-weekly hospital-level payroll liabilities of employees of the Specified MLI Hospitals (including, without limitation, SMG physicians for the Specified MLI Hospitals) that are not past due as of the Funding Commencement Time, regardless of whether such payroll liabilities arose prior to or after the Funding Commencement Time (the "**Accrued Payroll**"). Notwithstanding anything to the contrary set forth herein, nothing herein shall commit MPT or any Designated Operator to assume any obligation to pay for any historical employee liabilities other than the Accrued Payroll and the Accrued PTO, including any other employment obligations that were accrued historically (*e.g.*, quarterly 401(k) contributions, medical insurance claims, severance, etc.), even if not past due. |
| | On the Funding Commencement Date, MPT and/or the Designated Operators shall fund into an escrow account (the "**Payroll Escrow Account**") the amount of the regular bi-weekly hospital-level payroll of employees of the Specified MLI Hospitals (including, without limitation, SMG physicians for the Specified MLI Hospitals) that is either (a) due and payable on September 13, 2024 and not past due on the Funding Commencement Date or (b) otherwise due and unpaid and not past due on the Funding Commencement Date. The total amount is estimated to be approximately $25.0 million. The applicable Designated Operator shall continue to fund into the Payroll Escrow Account or directly to the payroll processing company (to the extent not already funded thereto pursuant to |

| | |
|---|---|
| | **SETTLEMENT TERM SHEET** |

| | |
|---|---|
| | the preceding sentence) the regular bi-weekly hospital-level payroll of employees of each Specified MLI Hospital to be paid through the Debtors' payroll systems as such payroll becomes due and payable (at least three days in advance of any payment of such payroll to such employees) until all go-forward employees of such Specified MLI Hospital are switched over to such Designated Operator's payroll systems.  Amounts in the Payroll Escrow Account shall be applied solely to pay the regular bi-weekly hospital-level payroll of employees of each Specified MLI Hospital to be paid through the Debtors' payroll systems as such payroll becomes due and payable (including the Accrued Payroll).

On the Funding Commencement Date, MPT shall deposit into a separate escrow account (the "**Expense Escrow Account**") a one-time payment of $5 million. Within one (1) business day of the date on which, with respect to each Specified MLI Hospital, (i) either (A) the Debtors and the applicable Designated Operator have entered into a Transition Services Agreement or (B) all corporate-level services provided by the Debtors with respect to such Specified MLI Hospital have been terminated and (ii) all Operator Expenses incurred by the Debtors (as opposed to such Designated Operator) with respect to such Specified MLI Hospital pursuant to the interim arrangement described in the immediately following paragraph have been paid, the escrow agent shall return any and all funds remaining in the Expense Escrow Account to MPT.

For any go-forward non-payroll hospital-level expenses of the Specified MLI Hospitals incurred by the Debtors after the Funding Commencement Date that are either (x) normal and ordinary course for operating a hospital or (y) directed or approved by the applicable Designated Operator or the hospital-level employees at the applicable Specified MLI Hospital (the expenses described in clauses (x) and (y), "**Operator Expenses**"), the applicable Designated Operator shall wire the appropriate amounts either (1) into the Expense Escrow Account within one (1) business day of payment of any such expense by the Debtors (including from the Escrow Account) to the applicable vendor or (2) to the applicable vendor directly to cover the cost of the expense in accordance with such vendor's ordinary course payment terms. The Debtors' centralized ordering of ordinary course hospital-level services and inventory with respect to each Specified MLI Hospital shall continue until terminated by the applicable Designated Operator (by delivery, at any time, of not less than 7 days' advance notice thereof to the Debtors) with respect to such Specified MLI Hospital. The scope and expense of any such service or inventory ordering may not be increased with respect to any Specified MLI Hospital without consent of the applicable Designated Operator. No Designated Operator may be charged for expenses attributable to any Specified MLI Hospital other than the Specified MLI Hospital operated by such Designated Operator. For the avoidance of doubt, any expense that in amount or nature is outside the ordinary course of business with respect to the applicable Specified MLI Hospital shall not constitute an Operator Expense and shall not be assumed by the applicable Designated Operator, absent consent of the applicable Designated Operator. The Debtors shall cooperate with each Designated Operator to facilitate direct payment of the above-described expenses to the applicable vendors by such Designated Operators. Prior to return to MPT as set forth above, amounts in the Expense Escrow Account shall be applied solely to pay Operator Expenses as they become due and payable. The Debtors shall not be responsible for any Operator Expenses except to the extent funded from the Expense Escrow Account. |

| **SETTLEMENT TERM SHEET** |
|---|

None of the Debtors' restructuring expenses or C-suite expenses will be funded with the funds provided pursuant to the foregoing. The Debtors' corporate-level expenses, to the extent incurrence thereof is expressly requested by a Designated Operator, shall be reimbursed by such Designated Operator in accordance with the terms of the applicable Transition Services Agreement; provided that until a Transition Services Agreement is entered into between the Debtors and any Designated Operator, such Designated Operator shall promptly reimburse the Debtors for corporate-level operating support services (*e.g.*, RCM, IT, facilities, accounting, and treasury), to the extent such Designated Operator requests the Debtors to provide such services, in accordance with historical practices and in an amount not to exceed, with respect to any Specified MLI Hospital, the amount per week set forth with respect to such Specified MLI Hospital on the schedule attached hereto as **Annex 4**.  The applicable Designated Operator may terminate the Debtors' provision of any such services at any time so long as doing so does not impact the health and safety of patients at the applicable Specified MLI Hospital. The pricing of such services shall be based on the actual costs of the Debtors to provide such services to the applicable Designated Operator with respect to the applicable Specified MLI Hospital.  The scope and expense of any such service may not be increased with respect to any Specified MLI Hospital without consent of the applicable Designated Operator.  Any disputes regarding the reimbursement of such expenses shall be submitted first to mediation, and if such mediation is not promptly successful, promptly to the Court.

Any funding advanced to the Debtors (including, without limitation, any funds in the Payroll Escrow Account, the Expense Escrow Account or the Sale Proceeds Escrow Account) shall be shall be used solely for the specified purposes for which such funds were advanced absent the consent of MPT and the applicable Designated Operator, shall not be part of the Debtors' estates (other than to the extent of the Debtors' rights in respect of such escrow accounts hereunder), and shall not be subject to any other liens, claims, interests and encumbrances against the Debtors. Except as otherwise set forth herein with respect to the Expense Escrow Account, to the extent any such advanced amounts are in excess of the amounts required to be paid (as determined by prompt reconciliation), such excess shall be credited by the Debtors against future amounts payable by the applicable Designated Operator to the Debtors.

The applicable Designated Operator shall be the beneficiary of any and all patient service and other revenue of any kind and related accounts receivable and receipts generated by the Specified MLI Hospitals for services provided after the Funding Commencement Time (collectively, the "**Go-Forward Receivables**"), and the Debtors shall turnover to the applicable Designated Operator any collections actually received on account of the Go-Forward Receivables (which collections shall be deemed by the MPT Settlement Order to be held in trust by the Debtors for MPT or the applicable Designated Operator and shall not be subject to any other liens, claims, interests and encumbrances against the Debtors). The Debtors will remit collections received on account of the Go-Forward Receivables on a weekly basis no later than five (5) business days after the Friday of each calendar week.  For the avoidance of doubt, collections received for the week ending September 20 will be remitted no later than September 27.  For the avoidance of doubt, all patient service and other revenue of any kind and related accounts receivable and receipts generated by the Specified MLI Hospitals for services provided before the Funding Commencement Time and owned by the Debtors (the "**Debtor Retained Receivables**") shall remain property of the Debtors. With respect to any patient that is

| | |
|---|---|
| | **SETTLEMENT TERM SHEET** |

| | |
|---|---|
| | admitted prior to the Funding Commencement Time and discharged after the Funding Commencement Time, the Debtors and the applicable Designated Operator shall work cooperatively to reconcile when services were rendered in a fashion consistent with customary market practice.<br><br>For the avoidance of doubt, to the extent the MLI Hospital Transition is not consummated by the Target Transition Date, the Designated Operator shall continue to provide funding for operating expenses for the Specified MLI Hospitals pursuant to the terms and conditions herein.<br><br>Upon the closing of a sale of the Space Coast Hospitals as contemplated under the terms of this Term Sheet, the Debtors shall deposit $5 million solely from the proceeds of such sale otherwise payable to MPT under the terms of this Term Sheet into a separate escrow account (the "**Sale Proceeds Escrow Account**"). Such amount shall be held in the Sale Proceeds Escrow Account until the date that is 30 days following the date on which all Specified MLI Hospitals are either (A) conveyed or transferred to MPT or a Designated Operator or (B) abandoned to MPT in accordance with the terms of this Term Sheet (the "**Sale Proceeds Escrow Release Date**"). The funds in the Sale Proceeds Escrow Account shall be used solely to satisfy undisputed or judicially determined liabilities of any Designated Operator owed to (or on behalf of) the Debtors that are past due (with MPT then subrogated to the Debtors' claim in respect of such amount against the applicable Designated Operator).  Recourse under this provision is only to these escrowed amounts and not to MPT.  Upon the occurrence of the Sale Proceeds Escrow Release Date, all unused funds remaining in the Sale Proceeds Escrow Account shall be promptly delivered to MPT. |
| **Assignment of Executory Contracts** | The Debtors and MPT shall cooperate in good faith to assume and assign any executory contracts (including, without limitation, any payor agreements and any processor agreements related to the Medicare or Medicaid programs) or unexpired lease designated by the applicable Designated Operator (or MPT on its behalf) exclusively related to Specified MLI Hospital(s) and related operations being acquired by the Designated Operator (the "**Facility Contracts**"), subject to the payment by the Designated Operator of applicable cure costs and other expenses (including, without limitation, reasonable and documented out-of-pocket fees and expenses of counsel) incurred by the Debtors in assuming and assigning such Facility Contracts.<br><br>At any time on or prior to the date that is ninety (90) days following entry of the MPT Settlement Order (the "**Designation Deadline**"), the applicable Designated Operator (or MPT on its behalf) may designate any Facility Contract to be assumed and assigned to such Designated Operator.  Promptly after such designation, the applicable Designated Operator (or MPT on its behalf) shall provide the adequate assurance information for such Designated Operator, and the Debtors shall serve, at such Designated Operator's expense, such adequate assurance information to the relevant Facility Contract counterparty. The MPT Settlement Order will outline procedures with respect to the assumption and assignment of Facility Contracts. The Debtors shall have no obligation, after entry of the MPT Settlement Order, to (i) make payments under any Facility Contract that are not funded by such Designated Operator, and nothing contained herein shall limit the Debtors' rights to seek to reject any Facility Contract, or (ii) extend or renew any Facility Contracts, in the case of (i) or (ii), unless the applicable Designated Operator pays to the applicable non-Debtor counterparty in a timely fashion as they |

| **SETTLEMENT TERM SHEET** | |
|---|---|
| | become due and payable all go-forward expenses to be incurred under such Facility Contract prior to such Designated Counterparty consenting to rejection thereof. |
| **Transition Services Agreements** | The Debtors (in consultation with the Creditors' Committee, the FILO Secured Parties and the Prepetition ABL/FILO Administrative Agent, acting at the direction of Required Revolving Lenders) and MPT or the applicable Designated Operator shall negotiate the terms of a transition services agreement for any Specified MLI Hospital for services after the applicable MLI Hospital Transition Closing Date (a "**Transition Services Agreement**") if requested by MPT or the applicable Designated Operator as promptly as practicable.  The pricing for services under the Transition Services Agreement shall be based on the actual costs of the Debtors to provide such services to MPT or the applicable Designated Operator with respect to the Specified MLI Hospitals, including both direct costs and indirect costs attributable to facilitating transition services related to the operation of the Specified MLI Hospitals.  For the avoidance of doubt, MPT or the applicable Designated Operator shall not be required to enter into a Transition Services Agreement.  To the extent MPT or the applicable Designated Operator determines not to enter into a Transition Services Agreement with the Debtors with respect to any Specified MLI Hospital, the Debtors shall be under no obligation to provide services of any type to MPT or the applicable Designated Operator following the applicable MLI Hospital Transition Closing Date.  Any disputes regarding the negotiation of, entrance into and performance under a Transition Services Agreement shall be submitted first to mediation, and if such mediation is not promptly successful, promptly to the Court. |
| **Space Coast Hospitals** | Effective upon the earlier of (i) the Settlement Effective Date and (ii) if the MPT Settlement Order shall have become a final order and not been stayed, vacated or modified without consent of MPT, the date on which the sale of the Space Coast Hospitals is expected to close (but immediately prior to such closing) (such earlier date, the "**Conveyance Date**"), either the real property underlying the Space Coast Hospitals (or, at the Debtors' election, the equity interests of the special purpose entity that owns the real property underlying the Space Coast Hospitals) (the "**Space Coast Real Property**") shall be deemed conveyed to the Debtors (or, if the Debtors elect in writing, directly to Orlando Health) on (with respect to MPT) an "as is, where is" basis and without representations or warranties of any kind, nature, or description by MPT.  The MPT Settlement Order shall provide for the foregoing and shall be proof of conveyance of the Space Coast Real Property to the Debtors (or, if the Debtors elect in writing, directly to Orlando Health) effective immediately as of the Conveyance Date and MPT shall deliver such other documents as may be reasonably necessary in recordable form to record the transfer of title to the Debtors or its designee.  The Debtors shall be solely responsible for the payment of any transfer taxes associated with such conveyance.  The Debtors and MPT, in consultation with the Creditors' Committee, the Prepetition ABL/FILO Administrative Agent (acting at the direction of Required Revolving Lenders), and the FILO Secured Parties, shall work in good faith (i) to prepare additional documentation to facilitate the conveyance of the Space Coast Real Property to the Debtors in a tax efficient manner and (ii) to take all actions necessary to consummate the sale of the Space Coast Hospitals to Orlando Health, Inc. and Orlando Health Medical Group, Inc. (collectively, "**Orlando Health**"), including MPT negotiating a reasonable purchase and sale agreement with Orlando Health consistent with the above. |

| **SETTLEMENT TERM SHEET** |
| --- |
| Upon the consummation of the sale of the Space Coast Hospitals by the Debtors to Orlando Health or any other buyer,[2] the Debtors shall retain $395,000,000[3] of the sale proceeds in cash (after giving effect to all purchase price adjustments set forth in the applicable purchase agreement), and promptly transfer to MPT any and all proceeds in excess thereof after paying or reserving for otherwise unsatisfied mechanics' and materialmens' liens and other closing and post-closing payment obligations of the Sellers under the Space Coast APA; provided that (i) to the extent that any portion of such excess amount is determinable and not disputed, promptly transfer such amount to MPT, (ii) to the extent that any portion of such excess amount is not reasonably determinable or disputed, the Debtors shall establish a reasonable reserve for such indeterminable or disputed payment obligations and promptly deliver the remainder of such excess amount to MPT (it being understood that (A) MPT shall return a portion of such excess amount (but not more than the amount received from the Debtors in respect of the sale of the Space Coast Hospitals) to the extent that the Debtors' related payment obligations (including, without limitation, related purchase price adjustments or post-closing payment obligations) exceed the amount of such reserve (if any) and (B) any portion of such reserve which is not applied by the Debtors to such payment obligations shall be promptly transferred to MPT) and (iii) the Debtors shall comply, at MPT's expense, with the reasonable instructions of MPT in connection with the resolution of the amount of any purchase price adjustments or post-closing payment obligations in respect of any such sale.  The Debtors' current expectation of the amount of such excess proceeds was provided to representatives of MPT on September 10, 2024. <br><br> Notwithstanding the foregoing, all Professional Fee Claims relating to the Space Coast Hospitals and the conveyance thereof (either by MPT to the Debtors or by the Debtors to Orlando Health or any other buyer), as well as any income taxes payable by the Debtors relating to such conveyances (excluding any prorated income tax due under the Space Coast APA), shall be borne solely by the Debtors and paid from the $395,000,000 retained by the Debtors.  The Debtors and MPT shall share any transfer tax liability of the Debtors associated with the sale of the Space Coast Real Property to Orlando Health on a 50/50 basis. <br><br> The MPT Settlement Order shall provide, if the Space Coast APA is validly terminated for any reason, MPT shall have an option to purchase the Space Coast Hospitals (or for a buyer designated by MPT in its sole discretion to purchase the Space Coast Hospitals) from the Debtors for a cash purchase price of $395,000,000 on the closing date of such purchase, without any purchase price adjustments thereto, which option shall be exercisable by MPT in its sole discretion so long as MPT or its designee executes a binding purchase agreement within forty-five (45) days following the valid termination, if any, of the Space Coast APA, and consummates such acquisition within thirty (30) |

---

[2]   The right of MPT to receive the proceeds of the sale to another buyer in excess of $395,000,000 shall only be to the extent the Debtors enter into a definitive agreement with such buyer within twelve (12) months after the valid termination of the Space Coast APA and consummate such sale within eighteen (18) months after valid termination of the Space Coast APA.

[3]   For the avoidance of doubt, MPT shall not have any obligation to make any payment to the Debtors if the proceeds of any sale of the Space Coast Hospitals are insufficient to provide for the receipt by the Debtors of such amount.

| **SETTLEMENT TERM SHEET** | |
|---|---|
| | days thereafter. The Debtors shall reasonably cooperate with MPT's exercise and consummation of such option. |
| **Behavioral Facility** | The Debtors and MPT shall use good faith efforts to agree on a resolution with respect to the Behavioral Facility as promptly as practicable.  To the extent that the Debtors determine that they must close the Behavioral Facility, the Debtors shall convey or abandon their interests in the Behavioral Facility to MPT on an "as-is, where is" basis after removing any hazardous materials, medical records and medical equipment.  MPT shall not have any obligation to reimburse the Debtors with respect to any costs or expenses incurred by the Debtors with respect to the Behavioral Facility. |
| **Closed Hospitals** | Promptly following the entry of the MPT Settlement Order, the Debtors shall convey or abandon their interests in the Closed Hospitals on an "as-is, where is" basis after removing any hazardous materials, medical records and medical equipment.  MPT shall not have any obligation to reimburse the Debtors with respect to any costs or expenses incurred by the Debtors with respect to the Closed Hospitals. |
| **Sharon Hospital** | The Debtors and MPT shall use good faith efforts to agree on a resolution with respect to the Sharon Hospital as promptly as practicable. |
| **Wadley Hospital** | The Debtors and MPT agree to use commercially reasonable efforts to consummate the sale of Wadley Hospital pursuant to the purchase agreement (and related agreements) filed with the Bankruptcy Court seeking approval to sell such hospital. |
| **M&M Liens** | The Debtors shall have no obligation to satisfy and remove any mechanic's and materialmen's liens on the Specified MLI Hospitals and underlying real estate. |
| **FILO/MPT Put Option** | On the Settlement Effective Date, the FILO Secured Parties shall waive and relinquish any right to the FILO Put Option (as defined in the Prepetition Intercreditor Agreement). |
| **Release by MPT Releasing Parties** | Upon the Settlement Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, Macquarie, MPT and each of its affiliates and subsidiaries (including, without limitation, the MPT Lessors and any entities owned jointly by Macquarie and MPT Silver Holdco, LLC and their subsidiaries (including the MLII Lessors (as defined in Dkt. 2388-1)) (together with their successors and assigns, the "**MLII JV Entities**")) (collectively, the "**MPT Releasing Parties**"), shall be deemed to irrevocably and  unconditionally release and discharge (i) the Debtors, (ii) the Prepetition ABL/FILO Secured Parties, (iii) the FILO Secured Parties, (iv) the Creditors' Committee, and (v) with respect to each of the foregoing in clauses (i) through (iv), all of their respective Related Parties (collectively, the "**Non-MPT Released Parties**") from any and all Claims (including all of the MPT Claims), Interests, liens, security interests, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors or the Estates, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' business, the  Chapter 11 Cases, the |

| | |
|---|---|
| | **SETTLEMENT TERM SHEET** |
| | purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the business or contractual arrangements between the Debtors and any Non-MPT Released Party, any other transaction involving the restructuring of Claims or interests before or during the Chapter 11 Cases, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Settlement Effective Date; *provided* that the foregoing shall not release any (a) obligations under the MPT Settlement, (b) Claim or Cause of Action related to the Norwood Insurance (as defined below), or (c) obligations under the Excess Property Disposition Agreement.<br><br>For the avoidance of doubt, nothing herein shall constitute a release by the MPT Releasing Parties of any Claims or Causes of Action against any persons or entities other than the Non-MPT Released Parties. |
| **Release of MPT Released Parties** | Upon the Settlement Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (i) the Debtors, (ii) the Prepetition ABL/FILO Secured Parties, (iii) the FILO Secured Parties, and (iv) the Creditors' Committee shall be deemed to irrevocably and unconditionally release and discharge the MPT Releasing Parties and all of their respective Related Parties (excluding, for the avoidance of doubt, the Debtors and their Related Parties, in their capacities as such) (collectively, the "**MPT Released Parties**") from any and all Claims, Interests, liens, security interests, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors or the Estates, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' business, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the business or contractual arrangements between the Debtors and any MPT Released Party, any other transaction involving the restructuring of Claims or interests before or during the Chapter 11 Cases, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Settlement Effective Date; *provided* that the foregoing shall not release any (a) obligations under the MPT Settlement, (b) Claim or Cause of Action related to the Norwood Insurance (as defined below), or (c) obligations under the Excess Property Disposition Agreement.<br><br>For the avoidance of doubt, nothing herein shall constitute a release by the Debtors' estates or the Creditors' Committee of any Claims or Causes of Action against any persons or entities other than the MPT Released Parties. |
| **MPT Obligations** | Upon the entry of the interim MPT Settlement Order, MPT on behalf of itself and the MPT Releasing Parties (i) agrees (and shall cause its subsidiaries and affiliates, including, without limitation, the MLII JV Entities to agree) that the Debtors shall not be required to pay any rent or other obligations under Master Lease I and Master Lease II (and any ancillary agreements related thereto), whether or not yet accrued or due and owing, and that MPT and its Related Parties shall forbear (pending the Settlement |

11

| | |
|---|---|
| **SETTLEMENT TERM SHEET** | |
| | Effective Date) with respect to all existing Claims thereunder (except as expressly excluded from the release set forth above), (ii) agrees to forbear (pending the Settlement Effective Date) with respect to any default and the right to any exercise of remedies under Master Lease I and Master Lease II (and any ancillary agreements related thereto) and any other lease as to which any Debtor is the lessee, (iii) agrees to forbear (pending the Settlement Effective Date) with respect to any default under the MPT DIP Credit Agreement, (iv) agrees to forbear (pending the Settlement Effective Date) with respect to the right to the continued payment of or performance under the MPT DIP Credit Agreement or DIP Orders, including the current payment of MPT's professional fees and expenses, and (v) consents (pending the Settlement Effective Date) to the continued use of cash collateral by the Debtors.<br><br>For the avoidance of doubt, if the Settlement Effective Date has not occurred, nothing herein shall prevent any of the Parties from taking appropriate action to protect their respective rights in connection with any proposed chapter 11 plan of any of the Debtors or other proposed resolution of any of the Debtors' chapter 11 cases.<br><br>Upon the Settlement Effective Date, any and all MPT Claims shall be deemed to be released and waived with prejudice (and MPT consents to the Debtors submitting and obtaining an order of the Bankruptcy Court approving the release and waiver the MPT Claims).<br><br>Upon the entry of the interim MPT Settlement Order, Master Lease I shall be deemed to be terminated, without any liability to any party as a result of such termination, with any claims relating to such master lease being released on the Settlement Effective Date; provided that the Debtors shall be entitled to continue to access and use the Specified MLI Hospitals, Space Coast Hospitals the Behavioral Facility, the Closed Hospitals, the Sharon Hospital, and the Wadley Hospital in a manner consistent with the terms of the MPT Settlement; provided further that MPT shall not have any Claim against the Debtors with respect to such access and use.<br><br>For the avoidance of doubt, nothing herein is intended to limit the scope of the releases set forth in the Bankruptcy Court orders approving the sales of the Massachusetts Going Concern Hospitals (the "**MA Sale Orders**"). |
| **MPT Settlement Order** | The Debtors shall promptly file a settlement motion under Bankruptcy Rule 9019 ("**9019 Motion**") and obtain an interim MPT Settlement Order in form and substance reasonably acceptable to the Debtors, MPT, the Creditors' Committee, the Prepetition ABL/FILO Administrative Agent and the FILO Secured Parties by no later than September 11, 2024, and a final MPT Settlement Order in form and substance reasonably acceptable to the Debtors, MPT, the Creditors' Committee, the Prepetition ABL/FILO Administrative Agent and the FILO Secured Parties by no later than September 17, 2024<br><br>The form of interim order filed with the Bankruptcy Court following the interim hearing is reasonably acceptable to the Parties as an interim MPT Settlement Order. The Prepetition ABL/FILO Secured Parties, the FILO Secured Parties and the Creditors' Committee shall have expressly consented to the MPT Settlement (absent agreement of MPT to waive this requirement). |
| **Cooperation** | The Parties shall cooperate in good faith to (i) obtain approval of the MPT Settlement Order, (ii) implement the transactions contained in this Term Sheet, including, at the |

| **SETTLEMENT TERM SHEET** | |
|---|---|
| | applicable Designated Operator's expense, to the extent set forth above with respect to Transition Costs, with respect to the assignment and transfer of any licenses, permits and other intangible assets exclusively related to the Specified MLI Hospitals, the Behavioral Facility or Closed Hospitals if requested by MPT or the applicable Designated Operator and (iii) structure the transactions contained in this Term Sheet in a tax efficient manner. To the extent requested by MPT or the applicable Designated Operator, the Debtors shall, at MPT's or the applicable Designated Operator's, as applicable, expense, use commercially reasonable efforts to permit MPT or such Designated Operator, as applicable, to submit claims for the applicable Specified MLI Hospitals under the applicable Debtors' Medicare and Medicaid provider numbers pending the issuance of the applicable tie-in notice in favor of such Designated Operator. |
| **Stay of Discovery and Litigation** | Upon execution of this Term Sheet or the filing of a motion by the Debtors (with the consent of MPT) seeking entry of the MPT Settlement Order, all discovery and litigation among MPT, the Debtors, the Creditors' Committee, the Prepetition ABL/FILO Secured Parties, and the FILO Secured Parties shall be immediately stayed, with such stay to cease if the interim MPT Settlement Order is not entered by 11:59 p.m. prevailing Central time on September 13, 2024 in accordance with the terms hereof; provided, that if MPT, an Interim Manager or a Designated Operator fails to materially comply with the terms of this Term Sheet or the MPT Settlement Order (and does not reasonably promptly cure such non-compliance within 14 days of written notice from the Debtors or the Creditors' Committee to MPT of the particular alleged material breach), the Debtors will consent to the Creditor Committee's standing to bring a Challenge; provided that the Debtors shall retain standing to settle any Challenge and MPT reserves all rights to object to standing. |
| **Retention of Jurisdiction** | The MPT Settlement Order shall provide for a broad retention of jurisdiction by the Bankruptcy Court. |
| **Norwood** | The Debtors' and MPT's respective entitlements with respect to the Norwood insurance policies and related proceeds (the "**Norwood Insurance**") shall be unaffected by the MPT Settlement. |
| **Fiduciary Obligations** | Notwithstanding anything to the contrary herein, prior to the entry of the MPT Settlement Order, nothing herein requires the Debtors or any of their directors, members, or officers, each in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with its or their fiduciary obligations under applicable law. |
| **Use of ABL/FILO Collateral** | The Prepetition ABL/FILO Secured Parties and the FILO Secured Parties consent to the use, sale transfer, or abandonment of their collateral, including Inventory and FF&E, to the extent provided under the terms of this Term Sheet. |

**Annex 1**

**Definitions**

| DEFINED TERMS | |
|---|---|
| **"ABL Obligations"** | Means all "Obligations," as that term is defined in the Prepetition ABL/FILO Credit Agreement, with respect to "Tranche A Loans," as that term is defined in the Prepetition ABL/FILO Credit Agreement. |
| **"Behavioral Facility"** | Means St. Luke's Behavioral Facility. |
| **"Bidding Procedures Order"** | Means the *Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 626). |
| **"Cause of Action"** | Means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).   Causes of Action also includes:  (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or interests; (c) any claim or causes of action pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim. |
| **"Claim"** | Has the meaning ascribed to it in section 101(5) of the Bankruptcy Code. |
| **"Closed Hospitals"** | Means Norwood Hospital, Coral Gables Hospital North, Northside Regional Medical Center, Wadley Regional Medical Center Development, Texas Vista Medical Center, St. Luke's Medical Center, and Ogden Underdeveloped Land. |
| **"Creditors' Committee"** | Means the official committee of unsecured creditors appointed in these Chapter 11 Cases by the U.S. Trustee for the Southern District of Texas on May 16, 2024. |
| **"DIP Orders"** | Means collectively the FILO DIP Order and the MPT DIP Order. |

| DEFINED TERMS | |
|---|---|
| **"Excess Property Disposition Agreement"** | Means that certain *Excess Property Disposition Agreement* dated as of February 21, 2024. |
| **"FILO DIP Agent"** | Has the meaning ascribed to it in the FILO DIP Order. |
| **"FILO DIP Order"** | Means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538) approved by the Bankruptcy Court. |
| **"FILO Secured Parties"** | Collectively, (i) the "FILO Secured Parties," as that term is defined in the Prepetition Intercreditor Agreement, (ii) the "FILO Bridge Secured Parties," as that term is defined in the Prepetition Intercreditor Agreement, and (iii) the "FILO DIP Secured Parties," as that term is defined in the FILO DIP Order. |
| **"Final Order"** | Means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rule applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order. |
| **"Interest"** | Means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor). |
| **"Macquarie"** | Means MIP V Hopkins, LLC. |
| **"Massachusetts Going Concern Hospitals"** | Means Saint Elizabeth's Medical Center, Saint Anne's Hospital, Good Samaritan Medical Center, Holy Family Hospital – Haverhill, Holy Family – Methuen, and Morton Hospital. |
| **"Master Lease I"** | Means that certain *Second Amended and Restated Master Lease Agreement*, dated as of March 14, 2022 (as amended, restated, amended and restated), by and among the lessors and lessees party thereto. |
| **"Master Lease II"** | Means that certain *Master Lease Agreement*, dated as of March 14, 2022 (as amended, restated, amended and restated), by and among the lessors and lessees party thereto. |
| **"MLI Hospitals"** | Means the Debtors' hospitals and related clinics and facilities in Pennsylvania, Ohio, Louisiana, Arkansas, Arizona, Texas, and Florida leased under Master Lease I. |

| **DEFINED TERMS** | |
|---|---|
| **"MLI Hospital Transition Closing Date"** | Means, with respect to any Specified MLI Hospital, the first date on which (i) the Debtors' interest in such Specified MLI Hospital has been conveyed or transferred to a Designated Operator in accordance with the terms of this Term Sheet and (ii) the applicable Designated Operator is not past due (after giving effect to any applicable payment terms) with respect to any undisputed or judicially determined payment obligations owed to (or on behalf of) the Debtors arising prior to the date of conveyance or transfer of the Debtors' interest in such Specified MLI Hospital. For the avoidance of doubt, to the extent a dispute arises, the Bankruptcy Court shall retain jurisdiction to determine if the conditions for the MLI Hospital Transition Closing Date have occurred. |
| **"MPT"** | Means, collectively, Medical Properties Trust, Inc. and its affiliates and subsidiaries, including the MPT Lessors and MPT Lender. |
| **"MPT Claims"** | Means any and all Claims held by MPT (or any transferee) against any of the Debtors, including, without limitation, the MPT DIP Claims, MPT Bridge Claims, MPT Prepetition Secured Claims, MPT Lease Claims, and MPT HoldCo Claims. |
| **"MPT DIP Claims"** | Means all Claims held by the MPT DIP Lender or any of its transferees on account of, arising under or relating to the MPT DIP Credit Agreement, the MPT DIP Facility or the MPT DIP Order, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts under the DIP Documents (as defined in the MPT DIP Order), which for the avoidance of doubt shall include all "DIP Obligations" as defined in the MPT DIP Order. |
| **"MPT DIP Credit Agreement"** | Means that certain *Debtor-in-Possession Credit Agreement*, dated May 28, 2024, by and among, *inter alios*, Steward Health Care System LLC as borrower, the other Debtors jointly and severally, as guarantors, and the MPT DIP Lender, as may be further amended, modified, or amended and restated from time to time in accordance with its terms. |
| **"MPT DIP Facility"** | Means that certain secured, superpriority, debtor in possession junior lien multiple draw term loan facility, consisting of up to $300 million of new money term loans provided pursuant to the MPT DIP Credit Agreement. |
| **"MPT DIP Lender"** | Means MPT TRS Lender-Steward, LLC, a Delaware limited liability company, in its capacity as lender under the MPT DIP Facility. |
| **"MPT DIP Order"** | Means the *Final Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying The Automatic Stay; and (IV) Granting Related Relief* (Docket No. 625) approved by the Bankruptcy Court. |
| **"MPT Facility"** | Means that certain *Second Amended and Restated Promissory Note*, dated as of June 30, 2020, by and between Steward Health Care System LLC and MPT TRS Lender- |

| DEFINED TERMS | |
|---|---|
| | Steward, LLC (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time). |
| **"MPT Facility Claims"** | Means obligations of certain Debtors on account of the term loans borrowed under the MPT Facility, including approximately $224 million in principal amount of term loans provided by the MPT Lender (as defined in the MPT DIP Order), plus accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto. |
| **"MPT HoldCo Claims"** | Means the guaranty obligations of SHC Holdings on account of the Investor Note, including approximately $397.9 million of obligations and all outstanding and accrued interest. |
| **"MPT Lease Claims"** | Means rent or any other obligations of any of the Debtors, as tenants, on account of the facilities leased from affiliates of MPT pursuant to Master Lease I and Master Lease II or any other lease, including without limitation any Claims arising from the termination or rejection of such leases, regardless of whether such Claims are held by MPT, the MLII JV Entities or otherwise. |
| **"MPT Lender"** | Means MPT TRS Lender-Steward, LLC, a Delaware limited liability company, in its capacity as lender under the MPT Facility. |
| **"MPT Lessors"** | Means the lessors under each of Master Lease I and Master Lease II. |
| **"MPT Prepetition Secured Claims"** | Means collectively, MPT Facility Claims, MPT Stewardship Note Claims, and MPT Bridge Claims. |
| **"MPT Settlement Order"** | Means the order entered by the Bankruptcy Court approving the MPT Settlement. |
| **"MPT Stewardship Note Claims"** | Means all obligations of certain Debtors on account of the term loans borrowed under the MPT Stewardship Note, including approximately $82.5 million in principal amount of term loans provided by the MPT Lender, plus accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto. |
| "Person" | Means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity (as defined in section 101(15) of the Bankruptcy Code). |
| **"Prepetition ABL/FILO Administrative Agent"** | Has the meaning ascribed to it in the MPT DIP Order. |

| DEFINED TERMS | |
|---|---|
| **"Prepetition ABL/FILO Credit Agreement"** | Means that certain Credit Agreement, dated August 4, 2023 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time), by and among Steward Health Care System LLC, as borrower, the other affiliates of the borrower party thereto, the lenders party thereto, Sound Point Agency LLC, as administrative agent, Chamberlain Commercial Funding (Cayman) L.P., as the collateral agent, and Brigade Agency Services LLC, as the prepetition FILO agent. |
| **"Prepetition ABL/FILO Secured Parties"** | Has the meaning ascribed to it in the MPT DIP Order. |
| "**Prepetition Intercreditor Agreement**" | Means that certain Amended and Restated Intercreditor Agreement, dated as of February 21, 2024 (as amended, supplemented, restated or otherwise modified from time to time) by and among the Prepetition ABL/FILO Administrative Agent, the Prepetition Bridge Agent, the MPT Parties (as defined in the Prepetition Intercreditor Agreement), and the Prepetition Loan Parties party thereto. |
| "**Professional Fee Claim**" | A Claim for professional services rendered or costs incurred by professional persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases. |
| **"Related Parties"** | Means a Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, managed accounts or funds, and all of their respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, each in their capacity as such. |
| **"Required Revolving Lenders"** | Has the meaning ascribed to it in the Prepetition ABL/FILO Credit Agreement. |
| **"Settlement Effective Date"** | Means the first date on which each of the following has occurred: (1) the Space Coast Real Property has been conveyed to the Debtors or, if the Debtors elect in writing, directly to Orlando Health (which, if such conveyance has not previously occurred, shall happen automatically (subject to appropriate language in the final MPT Settlement Order) pursuant to the terms of the MPT Settlement Order upon satisfaction of the other conditions to the occurrence of the Settlement Effective Date) or the Debtors receive $395 million from the sale of the Space Coast Hospitals, (2) the MPT Settlement Order has been entered, has become a final order and has not been stayed, vacated or modified without consent of the Debtors and MPT, (3) with respect to each Specified MLI Hospital, either (a) the MLI Hospital Transition Closing Date shall have occurred or (b) in the case of any Specified MLI Hospital as to which the Debtors' interest in such Specified MLI Hospital has not been conveyed or transferred to a Designated Operator in accordance with the terms of this Term Sheet on or prior to October 30, 2024, MPT or a Designated Operator shall have |

| DEFINED TERMS | |
|---|---|
| | irrevocably assumed Accrued PTO and all responsibility for funding the Closing Costs of the applicable Specified MLI Hospital and shall not be past due (after giving effect to any applicable payment terms) with respect any undisputed or judicially determined payment obligations with respect thereto as of the date proposed to be the Settlement Effective Date.  For the avoidance of doubt, to the extent a dispute arises, the Bankruptcy Court shall retain jurisdiction to determine if the conditions for the Settlement Effective Date have occurred. |
| **"Sharon Hospital"** | Means Sharon Regional Medical Center. |
| **"Space Coast APA"** | Means that certain *Asset Purchase Agreement*, by and among Steward Melbourne Hospital, Inc., Steward Rockledge Hospital, Inc., and Steward Sebastian River Medical Center, Inc., as sellers, and Orlando Health, Inc. and Orlando Health Medical Group, Inc., as buyers, dated August 14, 2024. |
| **"Space Coast Hospitals"** | Means Melbourne Regional Medical Center, the Rockledge Regional Medical Center, and the Sebastian River Medical Center. |
| **"Wadley Hospital"** | Means Wadley Regional Medical Center at Hope |

**Annex 2**

**Specified MLI Hospitals**

| Hospital | Market |
|---|---|
| Tempe St. Luke's Hospital | Arizona |
| Mountain Vista Medical Center | Arizona |
| Florence Hospital | Arizona |
| Coral Gables Hospital | Southern Florida |
| Hialeah Hospital | Southern Florida |
| Florida Medical Center | Southern Florida |
| North Shore Medical Center | Southern Florida |
| Palmetto General Hospital | Southern Florida |
| Scenic Mountain Medical Center | Texas |
| Odessa Regional Medical Center | Texas |
| Medical Center of Southeast TX (Port Arthur) | Texas |
| St. Joseph's Medical Center | Texas |
| Glenwood Regional Medical Center | Louisiana |
| Trumbull Regional Medical Center | Ohio |
| Hillside Rehabilitation Hospital | Ohio |

## **Annex 3**

**Specified MLI Hospital PTO Obligations**

**PTO by Hospitals** [1]

| Hospital | Market | PTO Balance (in USD thousands) |
|---|---|---|
| Tempe St. Luke's Hospital | Arizona | $ 603.7 |
| Mountain Vista Medical Center | Arizona | 1,701.9 |
| Florence Hospital | Arizona | 154.6 |
| Coral Gables Hospital | Southern Florida | 1,346.9 |
| Hialeah Hospital | Southern Florida | 1,662.7 |
| Florida Medical Center | Southern Florida | 2,080.5 |
| North Shore Medical Center | Southern Florida | 1,953.2 |
| Palmetto General Hospital | Southern Florida | 4,759.8 |
| Scenic Mountain Medical Center | Texas | 549.1 |
| Odessa Regional Medical Center | Texas | 1,648.2 |
| Medical Center of Southeast TX (Port Arthur) | Texas | 1,261.1 |
| St. Joseph's Medical Center | Texas | 2,995.1 |
| Glenwood Regional Medical Center | Louisiana | 1,521.4 |
| Trumbull Regional Medical Center | Ohio | 2,234.7 |
| Hillside Rehabilitation Hospital | Ohio | 502.8 |
| **TOTAL** | | $ **24,975.7** |

**Note**

1)  Analysis includes accrued PTO for hospital employees and SMG specialists at the respective hospitals

**<u>Annex 4</u>**

**Maximum Reimbursement Amount**

Annex 4
Estimated Weekly Support Services Costs

*(in thousands $USD)*

*Est. Weekly Operating Supporting Service Costs*

| Region | Facilities Operations | Finance | Information Systems | Other | Revenue Operations | Total |
|---|---|---|---|---|---|---|
| Florence Hospital | $ 3.9 | $ 2.6 | $ 12.6 | $ 2.7 | $ 9.1 | $ 31.0 |
| Mountain Vista Medical Center | 39.5 | 26.0 | 127.6 | 27.5 | 92.4 | 312.9 |
| Tempe St. Luke's Hospital | 14.5 | 9.6 | 47.0 | 10.1 | 34.0 | 115.3 |
| **Arizona** | **$ 57.9** | **$ 38.2** | **$ 187.2** | **$ 40.3** | **$ 135.5** | **$ 459.1** |
| | | | | | | |
| Odessa Regional Medical Center | $ 28.7 | $ 17.5 | $ 85.7 | $ 18.5 | $ 62.1 | $ 212.4 |
| Scenic Mountain Medical Center | 10.6 | 6.4 | 31.6 | 6.8 | 22.9 | 78.3 |
| **West Texas** | **$ 39.2** | **$ 23.9** | **$ 117.3** | **$ 25.3** | **$ 85.0** | **$ 290.7** |
| | | | | | | |
| St. Joseph's Medical Center | $ 56.9 | $ 34.7 | $ 170.1 | $ 36.6 | $ 123.2 | $ 421.6 |
| Southeast Texas (Port Arthur) | 32.7 | 19.9 | 97.7 | 21.0 | 70.7 | 242.0 |
| **St. Joe's / Port Arthur** | **$ 89.6** | **$ 54.6** | **$ 267.8** | **$ 57.7** | **$ 193.9** | **$ 663.6** |
| | | | | | | |
| Hillside Rehabilitation Hospital | $ 6.1 | $ 2.8 | $ 13.8 | $ 3.0 | $ 10.0 | $ 35.7 |
| Trumbull Regional Medical Center | 28.2 | 13.1 | 64.4 | 13.9 | 46.6 | 166.1 |
| **Ohio** | **$ 34.2** | **$ 15.9** | **$ 78.2** | **$ 16.8** | **$ 56.6** | **$ 201.8** |
| | | | | | | |
| North Shore Medical Center | $ 23.8 | $ 18.6 | $ 91.5 | $ 19.7 | $ 66.2 | $ 219.9 |
| Coral Gables Hospital | 15.0 | 11.8 | 57.8 | 12.4 | 41.9 | 138.9 |
| Hialeah Hospital | 18.8 | 14.7 | 72.1 | 15.5 | 52.2 | 173.2 |
| Palmetto General Hospital | 36.6 | 28.6 | 140.5 | 30.2 | 101.7 | 337.6 |
| Florida Medical Center | 19.6 | 15.4 | 75.4 | 16.2 | 54.6 | 181.3 |
| **South Florida** | **$ 113.8** | **$ 89.1** | **$ 437.2** | **$ 94.1** | **$ 316.5** | **$ 1,050.8** |
| | | | | | | |
| Glenwood Regional Medical Center | $ 36.2 | $ 22.1 | $ 108.2 | $ 23.3 | $ 78.3 | $ 268.1 |
| **Louisiana** | **$ 36.2** | **$ 22.1** | **$ 108.2** | **$ 23.3** | **$ 78.3** | **$ 268.1** |

*Note*
Based on average expenses incurred between May 2024 through July 2024 per the Debtors' books and records. Costs may vary from TSA services and costs that will be incurred when the hospitals are conveyed to the new operator.

**<u>Exhibit B</u>**

**Interim Management Procedures**

## INTERIM MANAGEMENT PROCEDURES

THIS ANNEX (this "Annex") sets forth the terms pursuant to which Steward Health Care System, LLC, a Delaware limited liability company ("Steward Health") and _____, a _____ (the "Operator" and together with Steward Health, "Steward") and _____, a _____ ("Manager") shall facilitate a transition of certain management services from the Operator to Manager. Steward Health, Operator, and Manager may be referred to herein individually as a "Party," and collectively as the "Parties." Any capitalized term appearing herein which is not defined shall have the same definition as ascribed in Schedule I hereto.

**A.** WHEREAS, on May 6, 2024, Steward Health Care System and its debtor affiliates filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court");

**B.** WHEREAS, Steward Health is operating its businesses and managing its properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

**C.** WHEREAS, Steward Health and Operator, as a Debtor in the Chapter 11 Cases, have continued in the possession of their assets and in the management and operations of the facilities (each, a "Facility" and together the "Facilities") at such other locations where the Facility services are provided (collectively, the "Facility Premises") pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**D.** WHEREAS, on September [11], 2024, the Bankruptcy Court entered an order approving a global settlement in connection with the Chapter 11 Cases (the "Settlement Order");

**E.** WHEREAS, pursuant to the Settlement Order, [MPT] has designated Manager to replace Operator as the operator of the Facilities, effective as of [_____], 2024 (the "Transition Date");

**F.** WHEREAS, in connection with the terms of this Annex, Manager shall make certain required filings and take any and all steps to obtain certain Approvals from Governmental Authorities regarding the operation of the Facilities following the Closing (the "Closing Date");

**G.** WHEREAS, until the Closing Date (in which case Manager shall have obtained certain material Approvals from Governmental Authorities), Manager desires to provide certain management services, billing and collections services, and administration support, on behalf of Operator, and Operator desires to avail itself of such interim services, upon the terms and conditions set forth in this Annex; and

**H.** WHEREAS, Manager has the qualifications and expertise necessary to provide those interim services described in this Annex.

TERMS OF ANNEX

1.      Term; Termination. The term of this Annex (such time period, the "Interim Management Period") shall commence as of the Transition Date and shall continue until the earlier of the consummation of the transactions contemplated by a definitive agreement between Operator and Manager (the "Definitive Agreement"), for the sale of substantially all of Operator's assets in connection with the Facilities (a "Sale") or automatically upon the entry of an order by the Bankruptcy Court terminating this Annex.

2.      Acknowledgements and Covenants.

2.1.      The Parties acknowledge that, during the Interim Management Period, Operator shall continue to hold all licenses, certificates and accreditations of the Facilities, and in that capacity, and during such period, shall retain ultimate statutory and regulatory control, authority and responsibility for the Facilities and shall retain ultimate oversight of Manager. Notwithstanding anything to the contrary in this Annex, during the Interim Management Period, Steward shall provide the shared corporate services to the Facilities that Steward provided to the Facilities immediately prior to the Transition Date, except as set forth in the Settlement Term Sheet or as may be mutually agreed by Steward and Manager after the Transition Date.  From and after the closing of a Sale pursuant to the terms set forth in the Definitive Agreement ("Closing"), certain of such shared corporate services would be provided by Steward and/or Operator to Manager pursuant to the terms of a mutually agreed transition services agreement (the "TSA").

2.2.      During the Interim Management Period, Operator will (a) assign an individual to oversee the operation of the Facilities and serve as the "Responsible Officer" of Operator, as required by CMS and applicable state laws and regulations, and (b) maintain proper oversight of the operation of the Facilities by a board of directors or committee thereof, including the Transformation Committee of Steward (collectively, the "Board").  Operational decisions will remain subject to approval by the Board, including but not limited to maintaining quality patient care, establishing policies for the facility, and maintaining legal responsibility for the conduct of the Facility.  The Manager will report to the Responsible Officer and to the applicable governing body of each Facility on a monthly basis.

2.3.      As promptly as practicable after the Transition Date, Manager, at its sole cost and expense, shall (and shall cause its Affiliates to) take any and all steps to make all required filings and promptly obtain all material Approvals, Permits and Orders necessary for Manager's ownership and operation of the Business on and after the Closing.

3.      Appointment of Manager.

3.1.      In accordance with and to the extent permitted under applicable federal, state and local laws (including, but not limited to Facility's licensure laws and privacy and confidentiality laws) and all applicable federal health care program laws, regulations and guidance, including, but not limited to, those pertaining to Medicare and Medicaid ("Applicable Law"), during the Interim Management Period, Operator hereby appoints Manager as the sole and exclusive provider of the Services (defined below) and hereby grants to Manager the exclusive right to manage the Facilities and Facility Premises, including each Facility's pharmacy on behalf of Operator, under those applicable licenses and permits of operator ("Operator Permits") as a licensed healthcare facility, including without limitation, the right to undertake those certain

2

management responsibilities and permitted activities described in <u>Section 4</u> below.  Manager hereby accepts such appointment for all purposes with respect to Operator's rights, duties, and responsibilities under the Operator Permits for each Facility, to the fullest extent permitted by Applicable Law, and agrees, to the fullest extent permitted by Applicable Law, to provide management services, billing and collections services, and administrative support to the Facilities and Facility Premises on behalf of Operator as further outlined in <u>Section 4</u> below (the "<u>Services</u>").

       **3.2.**    Upon the end of the Interim Management Period, Manager's Services provided to the Facilities under the Operator Permits shall terminate and, thereafter, so long as the Closing has then occurred, Manager (and/or its or their designee and/or Affiliate) will be operating the Facilities as permitted by the Approvals.

       (a)    During the Interim Management Period, to the extent allowable by Applicable Law, Manager shall submit, on Operator's behalf, claims for services rendered by the Facilities to various governmental and non-governmental entities, patients, and other third parties pursuant to Operator's Payor Agreements (defined below) and the Medicare, Medicaid, and other similar provider numbers of the Facilities (collectively, "<u>Operator's Billing Credentials</u>").  The Parties acknowledge and agree that as all billing and collecting shall be under Operator's Billing Credentials, payments shall be made in Operator's name and deposited in Operator's bank accounts, and during the Interim Management Period, Operator's bank accounts and lockboxes shall remain under Operator's name.  In addition to the other payments contemplated by this Annex, (i) if Steward or its Affiliates receives any amount from patients, Government Programs or Private Programs which relates to services rendered by the Facilities after the Transition Date, Steward or its Affiliate will remit such amount to Manager within ten (10) Business Days after receiving such amount; and (ii) if Manager receives any amount from patients, Government Programs or Private Programs which relates to services rendered by the Facilities prior to the Transition Date, Manager will remit such amount to Steward within ten (10) Business Days of receiving such amount. With respect to any patient that is admitted prior to the Transition Date and discharged after the Transition Date, Manager and Operator shall work cooperatively to reconcile when services were rendered in a fashion consistent with customary market practice.

       **3.3.**    Notwithstanding anything to the contrary in this Annex, the Parties acknowledge and agree that Manager's ability to bill and collect under Operator's Billing Credentials for services rendered by the Facilities during the Interim Management Period that are payable by Medicare shall continue after the expiration or earlier termination of this Annex, so long as the Closing has then occurred, until such time as the processing of the transfer of Operator's Medicare provider agreements to Manager has been completed, as evidenced by the issuance of the provider "tie-in notice" in the name of Manager (the "<u>Tie-In Notice</u>").  Manager shall indemnify and hold Operator harmless for any and all costs or Liabilities incurred by Operator as a result of Manager's use of Operator's Billing Credentials or any breach of the terms and conditions of Operator's Billing Credentials during the period of such use by Manager.  Each Party shall have the right to audit by an independent and competent auditor, at the requesting Party's sole expense, the bank records and remittance advices of the other Party with respect to claims submitted and payments made in connection with this <u>Section 3.3</u>.  Thereafter, upon the findings of such auditor that there has either been an overpayment or underpayment of funds due, the Party owing funds shall, within five (5) Business Days, make payment of such funds to the Party to whom they are owed (it being understood, that for this purpose, claims for services rendered by

the Facilities during the Interim Management Period shall be for the benefit and burden of Manager, and claims for services rendered by the Facilities prior to the Interim Management Period shall be for the benefit and burden of Operator).

4.    <u>Management Responsibility</u>.

4.1.    During the Interim Management Period, Manager shall, subject to all applicable legal and regulatory requirements and Operator's ultimate oversight and control, have responsibility for the management of the Facilities, and agree to assume and discharge all of Manager's responsibilities, duties, Liabilities, payments, and obligations in connection with properly maintaining the Facilities in full compliance with all regulations and standards required of a licensed healthcare facility so licensed.  In furtherance thereof, Manager's Services shall include, but not be limited to, the following duties:

(a)    Managing the operations of the Facilities as licensed healthcare facilities in compliance with all Applicable Law, Medicare and Medicaid provider agreements, Payor Agreements, [State] requirements for maintenance of the Operator Permits in good standing, Medicare conditions of participation and requirements for payment with respect to Government Programs, and the requirements for maintenance of the Facilities' accreditations;

(b)    Managing the Facilities' employees and other non-clinical and clinical personnel (i) deemed necessary by Operator for the operation of the Facility as a licensed healthcare facility, or (ii) required by law so as to meet all applicable labor laws and regulations, and consistent with Operator's obligations as a debtor-in-possession and Orders of the Bankruptcy Court;

(c)    Licensing to Operator possession of the Facility Premises for the sole purpose of Operator operating each of the Facilities as a licensed healthcare facility; provided, that the underlying leasehold interest in the Facility Premises will remain at all times with Manager, and nothing herein is intended to or should be construed to confer upon Operator any ownership, leasehold or other interest in the Facility Premises;

(d)    Maintaining and repairing, as needed, the Facility Premises so as to ensure material compliance with all Applicable Law;

(e)    Providing security services reasonably necessary to prevent unlawful entry or Damage (as defined below) to the Facility Premises;

(f)    Providing all necessary bookkeeping, accounting and recordkeeping procedures and controls for the operation of the Facilities, which shall be maintained on an accrual basis in accordance with generally accepted accounting principles consistently applied.

(g)    Affording the Responsible Officer or his or her designee access, during normal business hours, to the Facility Premises, the books and records at the Facility Premises or in Manager's possession, the Facility employees and any other personnel of Manager or otherwise who are providing services associated with the operation of the Facilities, and such other access and assistance as reasonably requested by the Responsible Officer;

4

(h)     Providing access, during normal business hours, to the Facilities, the Facility Premises, the Facilities' books and records, electronic health records, financial information systems, operating systems, laboratory systems, the Facilities' employees and any other personnel of Manager or otherwise who are providing services associated with the operation of the Facilities, to Operator, Operator's directors, officers and representatives, and Operator's successors in interest, including, but not limited to, any plan administrator, debtor representative, liquidating trustee, oversight or advisory committee, or similar representatives appointed or approved by the Bankruptcy Court for the purpose of administering Operator's affairs, pursuing litigation and adversary proceedings, *provided, however*, that such access does not unreasonably disrupt the Facilities' operations;

(i)     Maintaining all licenses, permits, consents, approvals, accreditations, and certifications currently held by Operator or required by Applicable Law in good standing, in active status, and in compliance with all Applicable Law, including the timely payment of all applicable fees to support or renew these approvals;

(j)     Obtaining and maintaining all insurance coverages for the Facilities that a prudent hospital operator or owner would maintain, including directors and officers insurance with no less coverage than that which was maintained for directors and officers immediately prior to the Transition Date;

(k)     Opening and forwarding all mail relating to the financial or business affairs of Operator to the notice address below;

(l)     Periodically reporting to Operator (or its designee) upon request of Operator, either in person or telephonically, the condition of the Facilities and the Facility Premises;

(m)     Subject to Section 4.1(b), providing all other staffing and employment necessary and sufficient for the operation of the Facilities, including (i) coordinating with the Board and the organized medical staff of each of the Facilities (each as established by Operator) on the appropriateness and quality of medical care and all medical staff issues requiring Board oversight, (ii) overseeing staffing and employment, including the hiring and firing, of all of the Facilities' employees, (iii) establishing staffing schedules, wage structures and personnel policies for all employees and the administration of the same, and (iv) maintain, at Manager's sole expense, workers' compensation insurance for all employees of Manager engaged on or with respect to the Facilities, including the retention or employment of such employees, consultants or agents as may be necessary to satisfy its obligations under this Annex;

(n)     As further outlined in Section 3.3 above, and subject to the last sentence of Section 3.2(a), and further subject to the terms of Section 5.6(d) of the Definitive Agreement, undertaking, managing, and administering: (i) the timely payment of all Facilities' expenses and accounts payable incurred on or after the commencement of the Interim Management Period; (ii) the timely billing of fees for all services, goods and other items provided at the Facility Premises on or after the commencement of the Interim Management Period; and (iii) the collection of accounts receivable pertaining to services and items provided after the commencement of the Interim Management Period.  In connection therewith, Manager shall take such actions on behalf

5

of Operator and under Operator's provider numbers, including, without limitation, Operator's provider numbers issued by Medicare, Medicaid, or their fiscal intermediaries or paying agents;

(o)      As further outlined in <u>Section 3.3</u> above, and subject to the last sentence of <u>Section 3.2(a)</u>, and further subject to Section 5.6(d) of the Definitive Agreement, collecting all revenues, remittances, reimbursements, contributions and other amounts received by Operator, including, but not limited to, cash, accounts, notes, or other accounts receivable, disproportionate share payments, quality assurance fee payments, whether payable by Medicare, Medicaid, or any other commercial or governmental payor, or any health maintenance organization or any other managed care program or any private pay patients (collectively, the "<u>Facility Revenues</u>");

(p)      Maintaining in good repair the Facilities and all furniture, furnishings, equipment, improvements and other property located therein which need repair or replacement in the ordinary course of operations of the Facilities, in order to maintain standards of operation at least equivalent to those prevailing prior to the Transition Date. All expenditures by Manager under this Annex shall be for its own account and not for the account of Operator and such sum shall not be subject to repayment by Operator; and

(q)      Performing such other duties and activities as are reasonably necessary for Manager to fulfill its responsibilities under this Annex.

**4.2.**   <u>Permitted Manager Activities</u>.   During the Interim Management Period, Manager may do any of the following, in consultation with Operator and subject to the requirements of applicable local, state, and federal law, and further subject to any requisite consent of Operator's creditors, which activities may be performed by Manager at Manager's sole cost and expense:

(a)      Make alterations, improvements, and repairs to the interior or exterior of the Facility Premises, including structural alterations, improvements, and repairs;

(b)      Remove and dispose of furniture, fixtures, equipment (other than equipment owned by equipment lessors), and supplies at the Facility Premises;

(c)      Move into and install furniture, fixtures, equipment, and supplies at the Facility Premises;

(d)      If applicable, prepare the Facility for a name change resulting from the Closing, except that no such name change may take effect, and no signage reflecting such change shall be installed, until after the Closing; and

(e)      Perform, or permit to be performed, any other activities at the Facility Premises that are not inconsistent with operating the Facilities under Applicable Law or the Operator Permits.

4.3.    Prohibited Manager Activities.

    **(a)**    Notwithstanding anything to the contrary in this Annex, Manager shall have no authority to take and shall not, without the Operator's prior written consent, take any action with respect to any excluded assets or excluded liabilities of Operator or its Affiliates under the Definitive Agreement.

    **(b)**    Manager's authority to manage and operate the Facilities is limited to those actions that Manager is expressly required or permitted to do hereunder.

    **(c)**    Except as contemplated by any transition plan agreed to by the Parties or otherwise agreed to by Operator, Manager shall not take any actions or follow any course of conduct that will or may cause any Facility to lose its Medicare or Medicaid certification(s), its license(s) or its provider number(s) under the terms of Applicable Law.

    **(d)**    Manager shall not commit any act or omission that would or could cause the termination of any of the provider agreements with Medicare or Payor Agreements related to any Facility.

4.4.    Operator's Ultimate Control.  Notwithstanding anything to the contrary in this Section 4 or in this Annex more generally, Operator, as holder of the Operator Permits, shall remain ultimately responsible for the operation of the Facilities, and may, at any time and from time-to-time during the Interim Management Period, take any action necessary or appropriate to ensure Operator's compliance with Applicable Law, even if such action requires Operator to intervene in Manager's performance of Manager's duties or permitted activities pursuant to this Section 4.

**5.**    Continued Responsibility of Operator.

5.1.    During the Interim Management Period, Operator shall maintain, and shall not take or voluntarily permit any actions which may adversely affect, Operator's corporate existence and its full rights as the licensee under the Operator Permits.  In addition, during the Interim Management Period, Operator and its officers shall reasonably cooperate with Manager in Manager's provision of the Services consistent with this Annex.

5.2.    Notwithstanding the statutory and regulatory authority and responsibility of Operator for the continued management of the Facilities during the Interim Management Period, the Parties recognize and acknowledge that under this Annex, Manager shall, subject to the ultimate oversight by and approval of Operator, be responsible for the day-to-day operation and maintenance of the Facilities as licensed healthcare facilities.  In the event that any violation or alleged violation of or non-compliance with any statute or regulation applicable to the operation or maintenance of the Facilities as licensed healthcare facilities certified by the Medicare and Medicaid programs occurs during the Interim Management Period, then without regard to legal or statutory fault on the part of Manager or of Operator, Manager shall immediately notify Operator of such violation or alleged violation or non-compliance and take reasonable efforts to avoid or minimize any related adverse consequences.  Manager shall be responsible for the costs of any penalty, fine or remediation identified during the Interim Management Period arising out of or relating to any act, omission, event or occurrence connected with the operation of the Facilities

during the Interim Management Period, including, without limitation, the cost of engaging third party consultants or experts to help address or resolve the violation, alleged violation or non-compliance, and shall indemnify and hold Operator harmless for the same in accordance with Section 9.  Operator retains the right to join Manager in contesting said violations upon providing Manager with notice of its intent to do so.

    **5.3.** Operator agrees to execute and deliver to Manager such documents as they may reasonably request to maintain the hospital license active and in good standing with the state in which the Facilities are located and the other licenses necessary or appropriate to maintain the Facilities as licensed healthcare facilities (except as contemplated by any transition plan agreed to by the Parties).

   **6.** <u>Government Program Participation</u>.

    **6.1.** Manager represents and warrants to Operator that Manager and its Affiliates have not in the past conducted business in such a manner as to cause Manager or its Affiliates to be suspended, excluded or debarred under the Medicare or Medicaid programs, or by any governmental entity, nor has Manager or its Affiliates ever been charged with or convicted of a criminal offense related to health care, or listed by a federal agency as debarred, excluded or otherwise ineligible for federal health care program participation.

    **6.2.** Operator represents and warrants to Manager that Operator has not in the past been listed by a federal agency as debarred, excluded or otherwise ineligible for federal health care program participation.

   **7.** <u>Covenants of Operator</u>.  Operator hereby covenants, warrants and agrees as follows:

    **7.1.** Operator agrees that Manager, during the Interim Management Period, will serve as Operator's agent with regard to billing and collecting under Operator's provider agreements with Medicare, Medicaid or any other third party payer programs (the "<u>Payor Agreements</u>") entered into in connection with the Facilities.  Claims shall be submitted in Operator's name, and Manager may open mail addressed to Operator, endorse remittances and deposit them directly into Operator's account, as set forth herein.

    **7.2.** During the Interim Management Period, Operator shall use its best efforts to not take any action to voluntarily surrender or terminate any material Operator Permit or Payor Agreement.

   **8.** <u>Governmental Access to Records</u>.  Manager agrees that during the Interim Management Period, and for at least five (5) years after the end of the Interim Management Period, Manager shall, upon written request, make available to Operator, the Secretary of the United States Department of Health and Human Services, the Comptroller General of the United States, or their respective duly-authorized representatives, all material documents related to the Services, including such books, documents, and records as may be necessary to certify the nature and extent of the cost of the Services.

9.      Exculpation; Indemnification; Insurance.

9.1.    Except as provided in Section 9.2, Manager will bear the risk of all Damage, loss, cost and expense associated in any way with the operations of the Facility Premises during the Interim Management Period.

9.2.    Operator and its bankruptcy estates, Affiliates, members, officers, directors, employees, attorneys, accountants, consultants, agents, representatives, successors, and assigns, including the Responsible Officer (collectively "Operator Indemnified Parties") shall have no Liability in contract, tort, or otherwise unless and until there is a finding (as determined in accordance with Section 12.6 below) in a final, non-appealable judgment that any Damages (as defined below) result solely from an Operator Indemnified Party's gross negligence or willful misconduct during the Interim Management Period.

9.3.    Manager shall promptly and fully keep and hold Operator Indemnified Parties forever harmless from, and shall indemnify and defend Operator Indemnified Parties from and against, without regard to materiality, any and all obligations, judgments, fines, civil money penalties, sanctions, awards, Liabilities, losses, penalties, claims, costs, demands, damages, expenses, liens, and encumbrances, including investigation costs, time spent in depositions and reasonable attorneys' fees and expenses (collectively, "Damages"), whether civil or criminal, direct, indirect or consequential and no matter how arising, in any way related to, connected with, arising or resulting from, or under this Annex, Manager's performance of the Services, or the operation or management of the Facilities or Operator's assets during the Interim Management Period.

9.4.    Insurance.   Manager shall maintain during the term of this Annex comprehensive general liability, property and casualty, professional liability, cyber insurance, worker's compensation, employment liability, automobile, and other insurance with at least the same coverage and amount maintained by Operator with respect to the Facilities immediately prior to the Transition Date.  Manager shall name Operator as an additional insured on Manager's insurance policies relating to the Facilities during the Interim Management Period.

10.    Funding.  Manager shall fund the expenses incurred by Steward in accordance with that certain Settlement Term Sheet, dated September [●], 2024, by and among the Debtors, MPT (as such terms are defined therein) and the other parties thereto.

11.    HIPAA Compliance.  Manager agrees to take such steps as are necessary to ensure compliance with the Health Insurance Portability and Accountability Act of 1996 (Pub L. No. 104-191), including but not limited to its implementing rules and regulations with respect to privacy, security of health information, and transactions and code sets; the HITECH Act (Title XIII of the American Recovery and Reinvestment Act of 2009); the Omnibus Rule effective March 26, 2013 (78 Fed. Reg. 5566), and other implementing rules regulations at 45 CFR Parts 160 and 164 and related binding guidance from the United States Department of Health and Human Services and any federal, state and local laws governing the privacy and/or security of individually identifiable information, in each case, as the same may be amended, modified or supplemented from time to time (collectively, "HIPAA") and other applicable federal and state privacy laws and regulations (collectively, the "Information Privacy or Security Laws") with respect to any Facility and its

operations, and Operator agrees not to take or voluntarily permit any actions which violate Information Privacy or Security Laws with respect to any Facility or its operations.  Toward this end, Manager and Operator agree to be bound by that certain Business Associate Agreement, attached hereto as <u>Exhibit A</u>.

   **12.** <u>Notices and Demands</u>.  Any notice, demand or other communication required, permitted or desired to be given hereunder must be in writing and shall be deemed effectively given (a) when personally delivered, (b) one (1) Business Day after being sent by the addressee if sent by a nationally recognized overnight courier, (c) on the date transmitted via electronic mail with a delivery receipt requested, if sent on a Business Day between 9:00 AM and 9:00 PM in the time zone of the recipient, or if sent outside of such hours, on the next Business Day at 9:00 AM in the time zone of the recipient; *provided*, *however*, if notice is given via electronic mail, a physical copy of such notice must also be provided by prompt notice by United States mail or overnight courier, or (d) on the fifth (5th) day after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, in each case, addressed as follows:

|  |  |
|---|---|
| If to Steward: | Steward Health Care System, LLC |
|  | 1900 N Pearl Street #2400 |
|  | Dallas, TX  75201 |
|  | Mark Rich, President |
|  |  |
| If to Operator: | [Operator Addresses] |
|  |  |
| With copies to: | McDermott Will & Emery LLP |
| (which copy shall not | 200 Clarendon Street, Floor 58 |
| constitute notice) | Boston, MA 02116-5021 |
|  | Charles R. Buck |
|  |  |
|  |  |
| If to Manager: | [Manager Address] |
|  |  |
| With copies to: | [Manager Counsel] |
| (which copy shall not |  |
| constitute notice) |  |

or to such other address, and to the attention of such other Person or officer as any Party may designate.

*[Remainder of page left blank intentionally]*

<u>SCHEDULE I</u>

DEFINITIONS

"<u>**Affiliate**</u>" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and any successors or assigns of such Person, *provided,* that, with respect to the Operator, for all purposes herein, "Affiliate" shall mean Steward Health Care System LLC and each of its direct and indirect Subsidiaries.  For purposes of this definition, "control" means possession, directly or indirectly, of the power to direct, or cause the direction of, the management and policies of a Person whether through ownership of voting securities, by Contract or otherwise.

"<u>**Approval**</u>" means any approval, action, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Authority, Private Program or other Person, in each case, in connection with the operation of the Business or the terms of this Annex, as applicable.

"<u>**Business**</u>" means the operation of the Facilities by the Operator and all services provided by, or pursuant to Contracts with, the Operator at the Facilities, in each case as currently conducted by Operator.

"<u>**Business Day**</u>" means any day except Saturday, Sunday and any day which is a legal holiday in New York, New York.

"<u>**Contract**</u>" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense, guaranty, indenture, occupancy or other agreement or arrangement of any kind (and all amendments, side letters, modifications and supplements thereto).

"<u>**Government Programs**</u>" means the Medicare (including Medicare Part D and Medicare Advantage), Medicaid, Medicaid-waiver and CHAMPUS/TRICARE programs, any other similar or successor federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) and any similar state or local health care programs, in each case in which any Facility participates as of the Transition Date.

"<u>**Governmental Authority**</u>" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal, special district or other instrumentality of any government, whether federal, state or local, domestic or foreign, and any healthcare self-regulatory organization.

"<u>**Law**</u>" means any constitutional provision, statute, law, rule, regulation, code, ordinance, accreditation standard, resolution, Order, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority (and for the avoidance of doubt, includes the Bankruptcy Code).

"**Liability**" means any liability, obligation, deficiency, interest, penalty, fine, claim, demand, judgment, cause of action or other losses (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute, fixed, or contingent, accrued or unaccrued, liquidated or unliquidated, recorded or unrecorded, due or to become due or otherwise, and regardless of when asserted.

"**Order**" means any judgment, order, writ, injunction, decree, determination, or award of any Governmental Authority.

"**Permit**" means any consent, ratification, registration, waiver, authorization, license, permit, grant, franchise, concession, exemption, Order, notice, certificate or clearance issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law, in each case, in connection with the operation of the Business or the terms of this Annex, as applicable.

"**Person**" means an individual, association, hospital authority, corporation, limited liability company, partnership, limited liability partnership, trust, Governmental Authority or any other entity or organization.

"**Private Program**" means any private non-governmental payor or program, including any private insurance payor or program, self-insured employer, or other third-party payor.

"**Proceeding**" means any action, arbitration, charge, claim, complaint, demand, dispute, audit, litigation, proceeding, search warrant, civil investigative demand, subpoena, qui tam action, suit (whether civil, criminal, administrative, judicial, or investigative) commenced, brought, conducted, or heard by or before any (a) Governmental Authority, (b) Medicare fiscal intermediary or administrative contractor, recovery audit contractor, zone program integrity contractor, unified program integrity contractor or similar Government Program contractor or (c) arbitrator, whether at law or in equity, other than routine billing claims and disputes, routine audits, routine post-payment reviews and scheduled surveys.

"**Representatives**" means, with respect to any Person, the officers, directors, managers, employees, agents, attorneys, accountants, advisors, bankers, financing sources, and other authorized representatives of such Person.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such

business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation).

"**Tax**" or "**Taxes**" means any and all federal, state, local, foreign and other taxes, including net income, gross income, gross receipts, sales, use, ad valorem, hospital, provider, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

<u>EXHIBIT A</u>

BUSINESS ASSOCIATE AGREEMENT

[See attached.]

## BUSINESS ASSOCIATE AGREEMENT

THIS HIPAA BUSINESS ASSOCIATE AGREEMENT ("BAA")sets forth the terms pursuant to which Steward Health Care System LLC, a Delaware limited liability company (collectively with its subsidiaries and Affiliates providing Services hereunder, "Covered Entity"), and _____, a _____, with its subsidiaries and Affiliates receiving Services hereunder (collectively, "Business Associate") (collectively referred to as "the Parties") agree to be bound.

Business Associate and Covered Entity have entered into one or more agreements (collectively, the "Agreement") in which Covered Entity agreed to provide certain services to Business Associate, which services may involve Covered Entity's receipt, use, disclosure, maintenance, or creation of Protected Health Information on behalf of Business Associate.

The Parties desire to comply with the Privacy Rule and the Security Rule.

## TERMS OF THE BAA

1.    **Definitions**.  Terms used, but not otherwise defined, in this BAA shall have the same meaning as those terms in the Privacy Rule and Security Rule.

a.    **Breach**.  "Breach" shall have the same meaning as the term "breach" in 45 CFR 164.402.

b.    **Designated Record Set**.  "Designated Record Set" shall have the same meaning as the term "designated record set" in 45 CFR 164.501.

c.    **Electronic Protected Health Information or Electronic PHI**.  "Electronic Protected Health Information" or "Electronic PHI" shall mean Protected Health Information that is transmitted in or maintained by electronic media.

d.    **Individual**.  "Individual" shall have the same meaning as the term "individual" in 45 CFR 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR 164.502(g).

e.    **Privacy Rule**.  "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, Subparts A and E, as amended from time to time.

f.    **Protected Health Information or PHI**.  "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" in 45 CFR 160.103, limited to the information created or received by Covered Entity from or on behalf of Business Associate.

g.    **Required By Law**.  "Required By Law" shall have the same meaning as the term "required by law" in 45 CFR 164.103.

h. **Secretary**. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

i. **Security Incident**. "Security Incident" shall mean the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system. An attempted unauthorized access means any attempted unauthorized access that prompts Covered Entity to investigate the attempt, or review or change its current security measures and shall not include trivial attempts to breach the system operations such as pings and port scans, which the Parties deem reported by virtue of this BAA.

j. **Security Rule**. "Security Rule" shall mean the Security Standards for the Protection of Electronic PHI at 45 CFR Part 160, and Part 164, Subparts A and C.

k. **Unsecured PHI**. "Unsecured PHI" shall have the same meaning as the term "unsecured protected health information" in 45 CFR 164.402.

2. **Obligations of Covered Entity**.

a. **Regulatory Compliance**. Covered Entity agrees that it shall comply with relevant portions of the Privacy Rule and the Security Rule as those regulations apply directly to Covered Entity.

b. **Use of Protected Health Information**. Covered Entity shall not use and shall ensure that its directors, officers, employees, contractors and agents do not use PHI in any manner other than as permitted or required by the Agreement, this BAA or as Required By Law.

c. **Safeguards Against Misuse of Information**. Covered Entity agrees that it will implement appropriate safeguards to prevent the use or disclosure of PHI other than pursuant to the terms and conditions of this BAA. Covered Entity agrees that it will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic PHI that it creates, maintains, or transmits on behalf of Business Associate. Covered Entity agrees to comply with the applicable requirements of Part 164, Subpart C of the Security Rule.

d. **Mitigation**. Covered Entity agrees to mitigate, to the extent practicable, any harmful effect that is known to Covered Entity of a use or disclosure of PHI by Covered Entity in violation of the requirements of this BAA, including any Breach.

e. **Reporting Breaches**. In all cases of suspected or actual breaches of this BAA, Covered Entity shall maintain evidence demonstrating that all notifications below were made without unreasonable delay. Covered Entity shall report to Business Associate:

i. Without delay, but in no event later than five (5) business days of having actual knowledge of or a reasonable belief of a disclosure of PHI by Covered Entity, its employees, representatives, agents, or subcontractor that is not specifically permitted by this BAA;

ii.     Without delay, but in no event later than five (5) business days of having actual knowledge of or a reasonable belief of any Security Incident; and

iii.    Promptly by telephone following the first day on which Covered Entity becomes aware of a Breach of Unsecured PHI. Covered Entity shall provide a full written report to Business Associate's Privacy Officer no later than five (5) business days after providing verbal notice. Covered Entity shall include the following information in the written report, to the extent known: (A) detailed information about the Breach, and immediate remedial action to stop the Breach; (B) names and contact information of the Individual(s) whose PHI has been, or is reasonably believed to have been, subject to the Breach; and (C) such other information as Business Associate may request.

f.    **Agreements by Third Parties**. In accordance with 45 CFR §§ 164.308(b)(2) and 164.502(e)(1)(ii), Covered Entity shall enter into a written agreement with any agent or subcontractor that will create, receive, maintain, or transmit PHI and/or Electronic PHI on behalf of Covered Entity pursuant to which such agent or subcontractor agrees to: (1) be bound by restrictions, terms and conditions that are at least as restrictive as those that apply to Covered Entity pursuant to this BAA with respect to such PHI, and (2) implement reasonable and appropriate safeguards to protect such information.

g.    **Access to Information**. In the event that Covered Entity maintains PHI in a Designated Record Set, Covered Entity shall, within ten (10) business days of a request by Business Associate for access to PHI about an Individual, make available to Business Associate such PHI for so long as such information is maintained. If Covered Entity uses or maintains PHI electronically in a Designated Record Set and if the Individual requests an electronic copy of such information, Covered Entity must provide Business Associate, or the Individual or person properly designated by the Individual, as directed by Business Associate, access to the PHI in the electronic form and format requested by the Individual, if it is readily producible in such form and format; or, if not, in a readable electronic form and format. In the event any Individual requests access to PHI directly from Covered Entity, Covered Entity shall within two (2) business days forward such request to Business Associate. Any denials of access to the PHI requested shall be the responsibility of Business Associate.

h.    **Availability of PHI for Amendment**. In the event that Covered Entity maintains PHI in a Designated Record Set, Covered Entity shall, within ten (10) business days of receipt of a request from Business Associate for the amendment of an Individual's PHI, provide such information to Business Associate for amendment and incorporate any such amendments in the PHI as required by 45 CFR 164.526.

i.    **Accounting of Disclosures**. Covered Entity agrees to implement an appropriate record keeping process to document such disclosures of PHI as would be required for Business Associate to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR 164.528. Within thirty (30) calendar days of notice by Business Associate to Covered Entity that it has received a request for an accounting of disclosures of PHI regarding an Individual, Covered Entity shall make available to Business Associate such information as is in Covered Entity's possession and is required for Business Associate to make

the accounting required by 45 CFR 164.528. At a minimum, Covered Entity shall provide Business Associate with the following information: (i) the date of the disclosure; (ii) the name of the entity or person who received the PHI, and if known, the address of such entity or person; (iii) a brief description of the PHI disclosed; and (iv) a brief statement of the purpose of such disclosure which includes an explanation of the basis for such disclosure. In the event the request for an accounting is delivered directly to Covered Entity, Covered Entity shall, within two (2) business days, forward such request to Business Associate. It shall be Business Associate's responsibility to prepare and deliver any such accounting requested.

j.      **Access and Inspection**. Covered Entity agrees to make its internal practices, books, and records, including policies and procedures, relating to the use and disclosure of PHI received from, or created or received by Covered Entity on behalf of, Business Associate available to the Secretary, in a time and manner designated by the Secretary, for purposes of the Secretary determining Business Associate's and Covered Entity's compliance with the Privacy Rule.

k.      **Delegated Obligations**. To the extent Covered Entity is delegated to carry out Business Associate's obligations under the Privacy Rule, Covered Entity shall comply with the requirements of the Privacy Rule that apply to Business Associate in the performance of such delegated obligations.

**3.      Permitted Uses and Disclosures**.

a.      **Use or Disclosure of PHI**. Except as otherwise limited in this BAA, Covered Entity may use or disclose PHI to perform functions activities, or services for, or on behalf of, Business Associate as specified in the Agreement, provided that such use or disclosure would not violate the Privacy Rule if done by Business Associate.

b.      **Use for Business Purposes**. Except as otherwise limited in this BAA, Covered Entity may use PHI (i) for Covered Entity's proper management and administrative services; or (ii) to carry out the legal responsibilities of Covered Entity.

c.      **Disclosure for Business Purposes**. Except as otherwise limited in this BAA, Covered Entity may disclose PHI for Covered Entity's proper management and administrative services, provided that (i) such disclosures are Required By Law; or (ii) prior to making any such disclosure, Covered Entity obtains (A) reasonable assurances from the third party that such PHI will be held confidential and used or further disclosed only as Required By Law or for the purposes for which it was disclosed to such third party; and (B) the third party agrees to immediately notify Covered Entity of any breaches of the confidentiality of the PHI, to the extent it has obtained knowledge of such breach.

d.      **Data Aggregation**. Except as otherwise limited in this BAA, Covered Entity may use PHI to provide Data Aggregation services to Business Associate as permitted by 45 CFR 164.504(e)(2)(i)(B) and if so requested by Business Associate.

**4.      Obligations of Business Associate**.

a.      **Notifications to Covered Entity**. To the extent that a limitation, revocation, or restriction may affect Covered Entity's use or disclosure of PHI, Business Associate shall notify

Covered Entity of (i) any limitations in its notice of privacy practices in accordance with 45 CFR 164.520; (ii) any changes in, or revocation of permission by an Individual to use or disclose PHI; or (iii) any restriction to the use or disclosure of PHI that Business Associate has agreed to in accordance with 45 CFR 164.522.

      b.    **Requests**.  Business Associate shall not request Covered Entity to use or disclose PHI in any manner that would not be permissible under the Privacy Rule if done by Business Associate.

      c.    **Minimum Necessary PHI**.  When Business Associate discloses PHI to Covered Entity, Business Associate shall provide the minimum amount of PHI necessary for the accomplishment of Covered Entity's purpose.

**5.**    **Term and Termination**.

      a.    **Term**.  This BAA shall terminate when all of the PHI provided by Business Associate to Covered Entity, or created or received by Covered Entity on behalf of Business Associate, is destroyed or returned to Business Associate, or, if it is infeasible to return or destroy the PHI, until protections are extended to such information, in accordance with the termination provisions in this Section 5.

      b.    **Effect of Termination**.  Upon termination of the Agreement and this BAA, Covered Entity shall maintain no copies of the PHI and shall return or destroy all PHI that it maintains in any form.  This provision applies to PHI that is in the possession of subcontractors or agents of Covered Entity.  In the event that Covered Entity determines that returning or destroying the PHI is infeasible, Covered Entity shall provide to Business Associate notification of the conditions that make return or destruction infeasible.  Covered Entity shall extend the protections of this BAA to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Covered Entity maintains such PHI.  This section shall survive termination of the Agreement and this BAA.

**<u>Exhibit C</u>**

**Interim Manager Acknowledgment**

## INTERIM MANAGER ACKNOWLEDGEMENT

### SEPTEMBER [_], 2024

This certificate (this "**Certificate**") is hereby delivered pursuant to that certain order (Docket No. [___]) (the "**Settlement Order**") entered by the United States Bankruptcy Court for the Southern District of Texas on September [_], 2024 in the chapter 11 cases of Steward Health Care System LLC and its debtor affiliates (collectively, the "**Debtors**") (Lead Case No. 24-90213) (collectively, the "**Chapter 11 Cases**") approving a global settlement among the Debtors and MPT (each as defined in such Settlement Order) regarding certain disputes arising among such parties in connection with the Chapter 11 Cases. All capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to them in the Settlement Order.

The undersigned, solely in such person's capacity as an authorized officer of [Buyer] (the "**Buyer**"), hereby certifies to the Debtors, as of the date hereof, in the name and on behalf of Buyer as follows:

1. Buyer hereby acknowledges that it has been designated by MPT as the Interim Manager as defined in the Settlement Order in respect of the hospitals listed on Exhibit A hereto (the "**Facilities**") and accepts such designation;

2. Buyer hereby agrees to comply with all terms and conditions set forth in the Interim Management Procedures attached as Exhibit B of the Settlement Order, including the obligation to fund the Debtors' Facilities, solely in accordance with the terms of the Settlement Term Sheet beginning on the date hereof and ending on the effective date of the Conveyance Agreement (defined below), subject to such adjustments as is provided in the Settlement Order or otherwise agreed following the date hereof between the Debtors and the Buyer;

3. Buyer hereby agrees, at its sole cost and expense, to make all required filings and take any and all steps to promptly obtain the regulatory approvals from governmental authorities (the "**Regulatory Approvals**") necessary for Buyer's ownership and operation of the Facilities; and

4. Buyer hereby agrees to deliver to the Debtors, no more than three (3) business days after Buyer obtains those certain material Regulatory Approvals as will be identified in the Conveyance Agreement (as defined below),  a conveyance document, duly executed by Buyer, in form annexed to the MLI Hospital Sale Notice (as defined in the Settlement Order) or as otherwise mutually agreed between Buyer and the Debtors (such duly executed agreement, the "**Conveyance Agreement**"), pursuant to which Buyer shall acquire the Facilities and certain assets exclusively related thereto and assume certain liabilities of the business of the Debtors related to such Facilities.

IN WITNESS WHEREOF, the undersigned, being the representative of the Buyer, has executed this Certificate as of the date first written above.

**[BUYER]**


By: _____
Name:
Title:

## Exhibit A

**Facilities**