### Exhibit A

**Sale Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC**, *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |

ORDER (I) AUTHORIZING AND APPROVING (A) THE
SALE OF ST. JOSEPH MEDICAL CENTER, MEDICAL CENTER
OF SOUTHEAST TEXAS, AND SOUTH FLORIDA HOSPITALS FREE
AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS,
AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (II) GRANTING RELATED RELIEF

Upon the *Emergency Motion of Debtors for Entry of Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief*, dated May 15, 2024 (Docket No. 281) (the "**Motion**"),[2] filed by the above-referenced debtors and debtors in possession (collectively, the "**Debtors**") seeking, among other things, entry of an order (this "**Order**") (i) authorizing the sale of the Purchased Assets (as defined in each of the BSAAs) free and clear of all Liens, Claims, Encumbrances, and Interests (as defined herein) and assumption of Assumed Liabilities (as defined in each of the BSAAs), except as otherwise provided in:

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion, the BSAAs, the Settlement Motion, or the Settlement Order (each as defined herein), as applicable.

- that certain *Bill of Sale, Assumption and Assignment Agreement* (together with all other agreements, documents, instruments, deliverable thereunder or attached thereto or referenced therein, and as may be amended, modified, supplemented, the "**St. Joseph BSAA**") by and among one or more Debtors and HSA St Joseph LLC (the "**St. Joseph HSA Buyer**"), and such sale, as contemplated by the St. Joseph BSAA, this Order and the Global Settlement, the "**St. Joseph Sale Transaction**");

- that certain *Bill of Sale, Assumption and Assignment Agreement* (together with all other agreements, documents, instruments, deliverable thereunder or attached thereto or referenced therein, and as may be amended, modified, supplemented, the "**Port Arthur BSAA**") by and among one or more Debtors and HAS Port Arthur LLC (the "**Port Arthur HSA Buyer**"), and such sale, as contemplated by the Port Arthur BSAA, this Order and the Global Settlement, the "**Port Arthur Sale Transaction**");

- that certain *Bill of Sale, Assumption and Assignment Agreement* (together with all other agreements, documents, instruments, deliverable thereunder or attached thereto or referenced therein, and as may be amended, modified, supplemented, the "**Florida BSAA**")[3] by and among one or more Debtors and Healthcare System of America-Florida LLC (the "**Florida HSA Buyer**")[4], and such sale, as contemplated by the Florida BSAA, this Order and the Global Settlement, the "**Florida Sale Transaction**");[5]

with all Liens, Claims, Encumbrances, and Interests to attach to the proceeds of the Sale Transactions as set forth in this Order, (ii) authorizing the assumption and assignment of certain executory contracts and certain non-executory contracts (the "**Assigned Contracts**"); and (iii) granting related relief, all as more fully set forth in the Motion; and upon the *Emergency Motion of Debtors Requesting Entry of Interim and Final Orders (I) Approving (A) Global Settlement with Medical Properties Trust and (B) Interim Management Procedures, And (II) Granting Related Relief* (Docket No. 2418) (the "**Settlement Motion**"), and upon consideration of the *Declaration of James Moloney in Support of Emergency Motion of Debtors for Entry of Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets,*

---

[3]   Together with the St. Joseph BSAA and Port Arthur BSAA, the "**BSAAs**" and each, a "**BSAA**."

[4]   Together with the St. Joseph HSA Buyer and Port Arthur HSA Buyer, the "**Buyers**" each, a "**Buyer**."

[5]   Together with the St. Joseph Sale Transaction and Port Arthur Sale Transaction, the "**Sale Transactions**" and each, a "**Sale Transaction**."

*(B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 425); the *Declaration of Toby King in Support of Emergency Motion of Debtors for Entry of Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 426); and the *Declaration of John R. Castellano in Support of Emergency Motion of Debtors Requesting Entry of Interim and Final Orders (I) Approving (A) Global Settlement with Medical Properties Trust and (B) Interim Management Procedures, and (II) Granting Related Relief* (Docket No. 2419) (collectively, the "**Sale Declarations**"); and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. § 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary; and the Court having entered the *Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and*

*(IV) Granting Related Relief* (Docket No. 626) (the "**Bidding Procedures Order**"); and the Debtors having entered into the Global Settlement with MPT, the Prepetition ABL/FILO Secured Parties, the FILO Secured Parties, and the Creditors' Committee providing for, among other things, the transition of the Specified MLI Hospitals to new operators; and the Court having entered the *Final Order Approving (I) Global Settlement with Medical Properties Trust, Prepetition ABL/FILO Secured Parties, FILO Secured Parties, and Creditors' Committee, (II) Interim Management Procedures, and (III) Granting Related Relief* (Docket No. 2610) (the "**Settlement Order**") approving the Global Settlement and procedures for the conveyance of the Specified MLI Hospitals to Designated Operators; and the Buyers having served as the Interim Manager for the Purchased Assets in accordance with the Interim Management Procedures and the Settlement Order; and MPT having designated the Buyers as the Designated Operators for the Purchased Assets in accordance with the Global Settlement; and the Debtors having determined that the Global Settlement would maximize the value of their assets, including the Purchased Assets; and the Debtors having filed and served the *Notice of (I) Designation of Healthcare Systems of America as Designated Operator for St. Joseph Medical Center, Medical Center of Southeast Texas, and South Florida Hospitals* (Docket No. [_]) (the "**MLI Hospital Sale Notice**") naming the Designated Operators as the Buyers for the Purchased Assets in accordance with the Global Settlement; and upon the Buyers and one or more Debtors having agreed to the terms of each of the BSAAs with respect to the Sale Transactions; and the Court having conducted a hearing to consider the relief requested in the Motion, as modified pursuant to the Global Settlement, as set forth in this Order; and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Global Settlement, the Sale Transactions, the BSAAs, and all relief set forth herein; and all objections, if any, to the relief requested having been withdrawn,

resolved, or overruled on the merits; and upon the record of the sale hearing and all of the proceedings had before this Court; and the Court having determined that the legal and factual basis set forth in the Motion, as modified pursuant to the Global Settlement, establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates; and the Court having found that proper and adequate notice of the Motion, the MLI Hospital Sale, and the Sale Transactions and hearing thereon has been given and that no other or further notice is necessary, it is **HEREBY FOUND AND DETERMINED THAT**:

A. **Findings and Conclusions.** The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction.** The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of Texas, dated May 24, 2012. Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Purchased Assets pursuant to 28 U.S.C. § 1334(e), as such Purchased Assets are property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein. This is a core proceeding within the meaning of 28 U.S.C. § 157(b), and as such, this Court has the authority to enter a final order.

C.    **Venue.**  Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D.    **Statutory Predicates.**  The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9007, 9008, and 9014 of the Bankruptcy Rules, and the Complex Case Procedures.

E.    **Global Bidding Procedures.**  On June 3, 2024, the Court entered the Bidding Procedures Order, among other things, (i) approving the Global Bidding Procedures (as defined in the Motion); (ii) authorizing the Debtors to designate one or more stalking horse bidders and offer each such stalking horse bidder certain bid protections as set forth in the Global Bidding Procedures; (iii) scheduling Auctions of the Assets (each as defined in the Motion), (iv) scheduling Sale Hearings to consider the sale of the applicable Assets, (v) authorizing and approving (1) notice of Auctions, sales of the Assets, and the Sale Hearings, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "**Sale Notice**"); and (2) notice to each non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired non-residential real property lease of the Debtors that the Debtors propose to assume and assign to a particular successful bidder setting forth the Debtors' calculations of the amount necessary to cure any monetary defaults under such Assigned Contract (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "**Cure Notice**"); (iv) authorizing and approving procedures for the assumption and assignment of the Assigned Contracts and determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and (v) granting related relief.  The Global Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the

Purchased Assets. The Debtors conducted the sale process of the Purchased Assets without collusion and in accordance with the Global Bidding Procedures.

        F.    **Notice and Opportunity to Object.** As evidenced by the certificates of service previously filed with the Court (Docket Nos. 774, 858, 1035, 1129, 1161, 1648, 1891, 2612, 2622,2747, 2749, and [ ]), and as demonstrated by the evidence presented at the sale hearing, proper, timely, adequate, and sufficient notice of the Motion, the contracts to be potentially assumed and assigned in connection with the Sale Transactions, including the Assigned Contracts, the sale hearing, the Sale Transactions, and the deadlines related thereto was provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9014 and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Junior DIP Lender, Prepetition MPT Secured Party, and MPT Lessors, KTBS Law LLP, 1801 Century Park E #2600, Los Angeles, California 90067 (Attn: Thomas E. Patterson, Esq. and Sasha M. Gurvitz, Esq.); (c) counsel to the ABL Lenders, Paul Hastings LLP, 200 Park Avenue, New York, New York 10166 (Attn: Kristopher M. Hansen, Esq., Christopher Guhin, Esq., Jeff Lowenthal, Esq., and Brian Kelly, Esq.); (d) counsel to Siemens Financial Services, Inc., Otterbourg P.C., 230 Park Avenue, New York, New York 10169 (Attn: Andrew Kramer, Esq.); (e) counsel to the FILO DIP Lenders and the FILO Lenders, Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Dennis Dunne, Esq., Michael Price, Esq., Andrew Harmeyer, Esq., and Brian Kinney, Esq.); (f) counsel to the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "**Committee**"), Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Brad M. Kahn, Esq., Sarah Link Schultz, Esq., Iain Wood, Esq., and Erica D. McGrady, Esq.); (g)

counsel to the Buyers, Carmody & MacDonald P.C., 120 S. Central Ave Suite 1800, St. Louis, Missouri 63105 (Attn: Thomas Riske, Esq.); (h) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (i) all entities known to have asserted any Lien, Claim, Encumbrance or Interest in or against the Purchased Assets; (j) all entities that have, to the best of the Debtors' management and advisors' knowledge, expressed written interest in consummating each Sale Transaction with respect to the Purchased Assets within the past twelve (12) months; (k) all other known parties with any interest in the Purchased Assets; (l) all known creditors of the Debtors, including contract counterparties; (m) the Securities and Exchange Commission; (n) the Internal Revenue Service; (o) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules; (p) all state attorneys' general in states where the Purchased Assets are located; (q) all affected federal, state, and local regulatory and taxing authorities; (r) those parties entitled to notice pursuant to Local Rule 9013-1(d); and (s) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002.  With respect to entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice (as defined below) in the *Boston Globe*, *Houston* Chronicle, and *New York Times*, and on June 19, 2024, in the *Arizona Republic*, *Florida Today*, *Indian River Press Journal*, *Miami Herald*, *Midland Reporter-Telegram*, *South Florida Sun Sentinel*, *Texarkana Gazette*, and *Youngstown Vindicator* on June 20, 2024, and in the *Monroe News-Star* on June 23, 2024, and on the website maintained by Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.ra.kroll.com/Steward on June 5, 2024, as evidenced by the *Certificate of Publication* (Docket No. 1161), was, and is deemed, sufficient and reasonably calculated under the circumstances to reach such entities.  The notices described above and in the Motion and

Bidding Procedures Order were good, sufficient, and appropriate under the circumstances and reasonably calculated to reach and apprise all known and unknown holders of the Liens, Claims, Encumbrances, and Interests, and no other or further notice of the Motion, the Sale Transactions, the sale hearing, the potential assumption and assignment of the Assigned Contracts, or the related Cure Costs is, or shall be, required.

G.     Service and publication of the Sale Notice (as defined below) was provided to all parties in interest, including those with alleged approval or consent right or anti-assignment provision (including a provision that purports to give termination rights to a contract counterparty on account of the sale, disposition, transfer, or closure by the Debtors of the Debtors' property or assets) contained in an Assigned Contract ("**Consent Rights**") with a reasonable and adequate opportunity to object.

H.     The Sale Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>, and MLI Hospital Sale Notice provided all interested parties with timely and proper notice of the Sale Transactions, Bid Deadline, and sale hearing.  A reasonable opportunity to object and/or to be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code and the Bankruptcy Rules. Accordingly, no further notice of the Motion, the MLI Hospital Sale, the Sale Transactions, or the sale hearing is necessary or required.

I.     The Debtors served the Cure Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u>, and the Supplemental Cure Notices (as defined in the Motion) on all parties required to receive such notice under the Bidding Procedures Order, and such parties have been afforded a reasonable and fair opportunity to file an objection to the assumption and/or assignment of any Assigned Contracts, including any proposed Cure Costs set

forth on the Cure Notice (each, a "**Cure Objection**") and to the provision of adequate assurance of future performance by the Buyers (each, an "**Adequate Assurance Objection**", and together with a Cure Objection, a "**Contract Objection**").

J.      The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Global Bidding Procedures, the assumption and/or assignment of the Assigned Contracts, the sale hearing, the Sale Transactions, the Cure Costs, the deadlines to submit Contract Objections, the deadline to submit objections to the Sale Transactions, and all other deadlines related thereto is or shall be required.

K.      **Assets Property of the Estate.**  The Purchased Assets sought to be sold and assigned by the Debtors to the applicable Buyer pursuant to each of the BSAAs are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

L.      **Sufficiency of Marketing.**  As demonstrated by the Motion, the Sale Declarations, and the evidence set forth at the sale hearing, the Debtors and their professionals adequately marketed the Purchased Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion and the Global Bidding Procedures and conducted a fair and open sale process.  The sale process and the Global Bidding Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Purchased Assets, and the process conducted by the Debtors pursuant to the Bidding Procedures Order obtained the highest or otherwise best value for the Purchased Assets under the Global Settlement, and there was no other transaction available or presented that would have yielded a higher or better result for the Purchased Assets.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective Bidders have been

afforded a reasonable and fair opportunity to bid for the Purchased Assets, or file a Contract Objection and/or an objection to the Sale Transaction. The marketing process undertaken by the Debtors and their professionals and each of their respective agents and other representatives with respect to the Purchased Assets has been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all of the Debtors' stakeholders in all respects.

M.  **Highest or Otherwise Best Offer.**  Following consultation with their financial and legal advisors and a robust and extensive marketing process, the Debtors determined in a valid and sound exercise of their business judgment in the best interests of their estates that the transactions contemplated by the BSAAs, entered into in connection with the Global Settlement, represented the highest or otherwise best offer available. Therefore, each of the Buyers was designated the Designated Operator in connection with the Global Settlement and Settlement Order for the applicable Purchased Assets. The Global Bidding Procedures and the Settlement Order have been complied with in all respects by the Debtors and the Buyers and afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer for the Purchased Assets.

N.  The Debtors have demonstrated that the (i) MLI Hospital Sale as reflected in the BSAAs, is the highest or otherwise best offer for the Purchased Assets, and (ii) the BSAAs and the closing thereon presents the best opportunity to realize the maximum value of the Purchased Assets, and (iii) the Debtors' entry into the BSAAs and consummation of the Sale Transactions (the "**Closing**," and the date of such Closing, the "**Closing Date**") is a sound exercise of the Debtors' business judgment.

O.  **Interim Manager Costs**. On September 11, 2024, (i) the St. Joseph HSA Buyer and the Debtors entered into that certain *Interim Management Agreement*, (ii) the Port

Arthur HSA Buyer and the Debtors entered into that certain *Interim Management Agreement,* and (iii) the Florida HSA Buyer and the Debtors entered into that certain *Interim Management Agreement* (each, an "**Interim Management Agreement**" and collectively, the "**Interim Management Agreements**"), pursuant to which each Buyer agreed to comply with all terms and conditions set forth in the Interim Management Procedures.  The Interim Management Procedures require the Buyers to fund certain costs and expenses of operating the Purchased Assets during the Interim Management Period (as defined in the Interim Management Procedures) (the "**Interim Manager Costs**").

        P.      **BSAAs.**  On October 3, 2024, the Debtors filed the MLI Hospital Sale Notice.  A copy of the St. Joseph BSAA is attached hereto as **Exhibit 1**.  A copy of the Port Arthur BSAA is attached hereto as **Exhibit 2**.  A copy of the Florida BSAA is attached hereto as **Exhibit 3**.

        Q.      **MPT Real Property**.  Upon entry of the Settlement Order, Master Lease I (as defined therein) was deemed terminated.  Each Buyer or one or more of its affiliates has entered into a new lease with MPT with respect to the applicable MPT Real Property,[6] dated September 11, 2024.

        R.      **Business Justification; Fiduciary Duties.**  The Debtors have demonstrated that entry into and consummation of the transactions contemplated by the BSAAs constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, and creditors, and all parties in interest.  The Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Purchased Assets

---

[6]   "**MPT Real Property**" means those properties underlying the Purchased Assets that were subject to Master Lease I.

to the applicable Buyer pursuant to the terms and conditions set forth in each of the applicable BSAAs.

S.       The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the applicable Buyer in connection with the consummation of the Sale Transactions, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, subject to the requirements applicable to any Disputed Contracts (as defined and described below).  The Assigned Contracts being assigned to the applicable Buyer are an integral part of each applicable Sale Transaction and, accordingly, their assumption and assignment is reasonable and an enhancement to the value of the Debtors' estates.

T.       The Debtors' decision to enter into the BSAAs and consummate the Sale Transactions constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, managers, and officers.  Because the entry into and consummation of the BSAAs constitutes the exercise by the Debtors of sound business judgment, the Debtors, and their respective current members, managers, officers, directors, employees, advisors, professionals or agents (in each case, solely in their capacity as such), shall have or incur no liability to the estates or any holder of a Claim against or Interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the BSAAs or the consummation of each Sale Transaction contemplated thereunder, other than liability arising out of or relating to any willful misconduct or fraud, in each case as determined by a court of competent jurisdiction; *provided*, however, that nothing in this paragraph shall amend, modify or supersede the releases set forth in the Global Settlement.

U.     **Corporate Authority.**  Upon entry of this Order, the Debtors (i) have the corporate or other organizational power and authority necessary to execute the BSAAs and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the Sale Transactions, and (iii) have taken all corporate or other organizational action necessary to authorize and approve the BSAAs and any actions required to be performed by the Debtors to consummate the Sale Transaction.  Upon the entry of this Order, no further consents or approvals of the Debtors are required for the Debtors to consummate the Sale Transaction.

V.     **Arm's-Length Sale and Buyer's Good Faith.**  Each of the BSAAs was negotiated and is undertaken by the Debtors and the applicable Buyer at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  The Buyers (i) recognize that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets, (ii) complied with the Bidding Procedures Order in all respects, and (iii) willingly subjected its bid to the competitive Global Bidding Procedures with respect to the Purchased Assets.  Neither the Debtors nor any of the Buyers have engaged in any conduct that would cause or permit the Sale Transactions or the BSAAs to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) of the Bankruptcy Code.  None of the BSAAs was controlled by an agreement between potential bidders within the meaning of section 363(n) of the Bankruptcy Code.  All payments to be made by the applicable Buyer and other agreements or arrangements entered into by the applicable Buyer in connection with the Sale Transactions have been disclosed, and none of the Buyers has violated section 363(n) of the Bankruptcy Code by any action or inaction.  As a result of the foregoing, each of the Buyer is a "good faith" Buyer within the meaning of section 363(m) of the Bankruptcy Code and any other applicable bankruptcy or non-bankruptcy law with

respect to each of the Sale Transactions, and as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion thereof is reversed or modified on appeal.

W.      **Insider Status.** None of the Buyers is an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

X.      **No Fraudulent Transfer.**  The total consideration provided by the Buyers pursuant to the BSAAs constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law.  None of the BSAA was entered into, and none of the Sale Transactions is being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtors nor any of the Buyers has entered into the applicable BSAA or is consummating the applicable Sale Transaction with any fraudulent or otherwise improper purpose.

Y.      **Free and Clear Transfer Required by Buyers**.  None of the Buyers would have entered into the BSAAs and would not consummate the Sale Transactions, thus adversely affecting the Debtors, their estates, their creditors, their employees, and other parties in interest, if the sale of the Purchased Assets was not free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA) or if the Buyers would be liable for such Liens, Claims, Encumbrances, and Interests, including, without limitation and as applicable, liabilities that are not expressly assumed by the Buyers as set forth in the applicable BSAA or pursuant to this Order.  In closing the Sale

Transactions, the Buyers shall be deemed to have materially relied on findings and decrees in this Order.

Z.     The transfer of the Purchased Assets and the Sale Transactions is a legal, valid, and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Purchased Assets free and clear of the Liens, Claims, Encumbrances, and Interests, except for Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA.

AA.     **Satisfaction of Section 363(f) Standards.**  The Debtors are authorized to sell the Purchased Assets free and clear of the Liens, Claims, Encumbrances, and Interests, other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA (with any such Liens, Claims, Encumbrances, or Interests attaching to the proceeds attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, and Interests with the same nature, validity, priority, extent, perfection, and force and effect that the Liens, Claims, and Interests encumbered such Purchased Assets immediately prior to the entry of this Order) because, with respect to each creditor or other person or entity asserting a Lien, Claim, Encumbrance, or Interest, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Each creditor or other person or entity asserting a Lien, Claim, Encumbrance, or Interest in the Purchased Assets, (i) has, subject to the terms and conditions of this Order, consented to the Sale Transactions or is deemed to have consented to the Sale Transactions, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien, Claim, Encumbrance, or Interest, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Those holders of the Liens, Claims, Encumbrances, and Interests who did not object (or who ultimately withdrew their objections, if

any) to the Sale Transactions or the Motion are deemed to have consented to the Motion and each Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.

BB. **No Successor Liability.**  None of the Buyers nor any of their affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and none of the Buyers nor any of their affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates except to the extent explicitly provided in in this Order, including paragraph 17 of this Order, or the applicable BSAA.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the applicable BSAA, none of the Buyers nor any of their affiliates shall (a) be liable for any claims or defenses (including rights of recoupment) that may be asserted against the Debtors or any of their predecessors or affiliates (including, subject to paragraph 17 of this Order, claims or defenses (including rights of recoupment) relating to any Payor Agreement for services rendered by or amounts paid to the Debtors prior to Closing), or (b) be subject to successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer liability, labor law, de facto merger, mere continuation, or substantial continuation, whether known or unknown as of Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, claims or defenses (including, other than as provided in paragraph 17 of this Order, rights of recoupment) that may be asserted against the Debtors relating to the Payor Agreements for services rendered or amounts paid to the Debtors prior to Closing (subject to paragraph 17 of this Order), any taxes arising, accruing, or payable under, out of, in connection with, or in any way

relating to the operation of any of the Purchased Assets prior to the Closing.  None of the Buyers is, and the consummation of the Sale Transactions will not render any of the Buyers, a mere continuation, and none of the Buyers is holding itself out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there is no continuity or common identity between any of the Buyers and the Debtors.  Accordingly, the Sale Transactions do not amount to a consolidation, merger, or de facto merger of the Buyers with or into any of the Debtors or their estates and the Buyers are not, and shall not be deemed to be, a successor to any of the Debtors or their estates as a result of the consummation of the Sale Transactions.

                CC.    **Assigned Contracts.**  Each and every provision of the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.  All counterparties of the Assigned Contracts that did not or do not timely file an objection to the assumption and assignment of the Assigned Contract(s) to which they are a counterparty are deemed to consent to the assumption and assignment by the Debtors of their Assigned Contract to the applicable Buyer, and each Buyer shall enjoy all of the rights and benefits under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-Debtor party's consent to the assumption or assignment thereof.  All counterparties of the Assigned Contracts for which the deadline to file a Contract Objection has not passed as of the date of entry of this Order, and that did not or do not timely file such an objection prior to the applicable deadline, shall be deemed to consent to the assumption and assignment by the Debtors of their Assigned Contract to the applicable Buyer effective as of the Closing Date, and the applicable Buyer shall enjoy all of the rights and benefits under each such

Assigned Contract as of the applicable date of assumption and assignment without the necessity of obtaining such non-Debtor party's consent to the assumption or assignment thereof.  If a Cure Objection timely filed with respect to an Assigned Contract cannot be resolved by the parties prior to the Closing of the applicable Sale Transaction, the Debtors may assume and assign the applicable Contract(s) or Lease(s) pending resolution of the Cure Objection in accordance with and subject to paragraphs 26-27 of this Order.  Upon the assignment of the Assigned Contracts to the applicable Buyer in accordance with the terms of the applicable BSAA, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the applicable Buyer, notwithstanding any provision in the Assigned Contracts prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their affiliates, predecessors, successors, or assigns, shall have no further liability or obligation under the Assigned Contracts.  To the extent any Assigned Contract (other than the Medicare Provider Agreement, which will be transferred to the applicable Buyers in accordance with paragraph 17 hereof) is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to the applicable Buyers in accordance with the terms of the applicable BSAA and, other than with respect to Assumed Liabilities, none of the Buyers shall have any liability or obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date and (ii) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Assigned Contract, that relate to any acts or omissions that arose or occurred prior to the Closing Date.

DD.    **Cure Costs and Adequate Assurance.**  Pursuant to the BSAAs, the Cure Costs will be paid by the applicable Buyer in accordance with the terms of the applicable BSAA. The Buyers have demonstrated adequate assurance of future performance of each Assigned Contract within the meaning of section 365 of the Bankruptcy Code that is assumed by the applicable Buyer or any of its permitted assignees to which such Assigned Contract is assumed and assigned by the Debtors, including by providing the Adequate Assurance Information (as defined in the Bidding Procedures Order) and a promise to perform the Debtors' obligations under such Assigned Contract as of the Closing (as defined in each applicable BSAA).  The Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Assigned Contracts that are assumed.  The applicable Buyer's payment of Cure Costs in accordance with the terms of the applicable BSAA and promise under the applicable BSAA to perform the obligations under the Assigned Contracts as of the Closing, after the Closing Date, shall constitute adequate assurance of future performance under such Assigned Contracts.  Subject to paragraphs 26-27 of this Order and the requirements applicable to any Disputed Contracts, any objections to the Cure Costs, to the extent not otherwise resolved, are hereby overruled.  To the extent that any counterparty failed to timely object to its Cure Cost or to raise any other alleged claim, default or breach of contract, such counterparty is deemed to have consented to such Cure Cost and to the assignment of its respective Assigned Contract(s) to the applicable Buyer and to have waived any other claims, defaults or breaches.  The Court finds that with respect to all Assigned Contracts, the payment of the Cure Costs as provided in each applicable BSAA is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code.  Accordingly, all of the requirements of sections 365(b)

and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the applicable Buyer, of each Assigned Contract to be assumed and assigned to the applicable Buyer as of Closing.

EE.    **Assets Assignable.**  Subject to paragraph 17 hereof (solely with respect to the Medicare Provider Agreements), each and every provision of the documents governing the Purchased Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Purchased Assets, if any, have been or will be satisfied or are otherwise unenforceable under sections 363 or 365 of the Bankruptcy Code, as applicable.

FF.    **Time of the Essence.**  Time is of the essence in consummating the Sale Transactions and each of the transactions contemplated thereby.  In order to maximize the value of the Purchased Assets, it is essential that the Sale Transactions and each of the transactions contemplated thereby occur within the time constraints set forth in each of the BSAAs and in accordance with the Settlement Order.  Good and sufficient reasons for approval of each of the BSAAs have been articulated by the Debtors.  Upon the entry of this Order, the Debtors and the Buyers, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the Sale Transactions and each of the transactions contemplated by the applicable BSAA at any time after entry of this Order and subject to the terms and conditions of the applicable BSAA.

GG.    **No Sub Rosa Plan.**  The BSAAs and the Sale Transactions do not constitute a *sub rosa* chapter 11 plan.  None of the BSAAs impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for the Debtors.

HH.    **Final Order; Immediate Effect.**  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and

6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein.

### IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.     **Objections Overruled.**  All objections, if any, with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with herein are hereby overruled on the merits, with prejudice.  All objections to the entry of this Order or to the relief granted herein that were not timely filed are hereby forever barred.

2.     **Approval of Sale Transaction.**  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Motion is granted, the relief requested therein with respect to the Sale Transactions is granted and approved in its entirety, and each of the BSAAs is hereby approved. The Debtors have satisfied all requirements of sections 363(b) and 363(f) of the Bankruptcy Code, and all other requirements and standards applicable to a sale outside the ordinary course of business, free and clear of the Liens, Claims, Encumbrances, and Interests.

3.     Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized to take any and all reasonable actions necessary to consummate the Sale Transactions, including the sale, transfer, and assignment of all of the Debtors' right, title, and interest in, to, and under the Purchased Assets to the applicable Buyer free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA) in accordance with the terms of the applicable BSAA and the terms of this Order and the Settlement Order.  The relevant

Debtors, as well as their directors, managers, officers, employees, and agents, are authorized to execute, deliver, and perform their obligations under and comply with the terms of the BSAAs and to consummate the Sale Transactions, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transactions and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the BSAAs and this Order and the Settlement Order. For the avoidance of doubt, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the applicable Buyer in accordance with the BSAAs and this Order and the Settlement Order.

4.    The relevant Debtors, their affiliates, and their respective directors, managers, officers, employees, and agents, are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional notices, assumptions, conveyances, releases, acquittances, instruments and documents that may be reasonably necessary or desirable to implement the BSAAs, including the transfer and, as applicable, the assignment of all the Purchased Assets, the assumption of the Assumed Liabilities, and the assumption and assignment of all the Assigned Contracts, and to take all further actions as may be necessary or appropriate to the performance of the obligations contemplated by the BSAAs without further order of this Court.

5.    The Debtors are further authorized, but not directed, to pay, without further order of the Court, whether before, at or after Closing, any expenses or costs required to be paid to consummate each Sale Transaction or for the Debtors to perform their obligations solely in accordance with the applicable BSAA.

6.    **Sale and Transfer of Assets Free and Clear.** Pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, the Debtors are authorized to transfer, and

upon the Closing shall transfer to the applicable Buyer all of the Debtors' right, title, and interest in and to, and possession of, the Purchased Assets, which shall be immediately vested in the applicable Buyer, and, to the extent provided in the applicable BSAA, such title to the Purchased Assets shall be transferred to the applicable Buyer free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA), including:

(a)   liens (including, without limitation, mechanics', materialmens', and other consensual and non-consensual liens and statutory liens) mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, property interests, pledges, judgments, demands, encumbrances, easements, and servitudes;

(b)   interests, obligations, liabilities, causes of action, demands, guaranties, options, restrictions, and contractual or other commitments;

(c)   rights, including, without limitation, rights of first refusal, rights of offset (except for offsets exercised prior to the Petition Date), contract rights, rights of recoupment and recovery;

(d)   decrees of any court or foreign or domestic government entity (to the extent permitted by law);

(e)   charges or restrictions of any kind or nature, including, without limitation, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership of the Purchased Assets, including, without limitation, consent of any Person to assign or transfer any of the Purchased Assets;

(f)   except as otherwise provided in paragraph 17 of this Order with respect to Medicare Provider Agreements, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or any of the Debtors' predecessors or affiliates;

(g)   claims (as that term is defined in the Bankruptcy Code), including claims for reimbursement, contribution claims, derivative, vicarious, transferee, or successor liability claims (including without limitation any "successor employer" claims under the Consolidated Omnibus Budget Reconciliation Act of 1985), indemnity claims, exoneration claims, alter-ego claims, product liability claims, employee retirement or benefit plan claims, severance claims, retiree healthcare or life insurance claims, environmental

claims (to the fullest extent allowed by applicable law), state, federal, local and any other tax claims, reclamation claims, and pending, contingent or otherwise unasserted litigation claims, including in all cases claims that may be secured or entitled to priority under the Bankruptcy Code;

(h)      subject to paragraph 17 of this Order, claims and defenses (including rights of recoupment) against the Debtors relating to the Payor Agreements for services rendered or amounts paid to the Debtors prior to Closing; and

(i)      matters of any kind or nature whatsoever, whether at law or in equity and whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or nonmaterial, disputed or undisputed, whether arising prior to or during the Debtors' bankruptcy cases, and whether imposed by agreement, understanding, law, equity, or otherwise;

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing (each, a "**Lien, Claim, Encumbrance, or Interest**," and collectively, the "**Liens, Claims, Encumbrance, and Interests**").  Except to the extent an Assumed Liability or as otherwise provided in the applicable BSAA, the Liens, Claims, Encumbrances, and Interests shall attach to the proceeds attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, and Interests with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, Encumbrances, and Interests encumbered such Purchased Assets immediately prior to the entry of this Order, subject to any Claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

7.     Notwithstanding anything to the contrary in the BSAAs, (i) no claims and/or causes of action under chapter 5 of the Bankruptcy Code are being purchased by, or transferred to, the Buyers, (ii) no claims and/or causes of action that the Debtors may have, if any, against the Debtors' current and former insiders, affiliates, directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, whether under the Bankruptcy Code, state or federal law, or otherwise, are being purchased by, or transferred to, the Buyers, and (iii) no claims and/or causes of action against counterparties to the Debtors' contracts or leases (other than any claims and/or causes of action against counterparties to the Assigned Contracts assumed and assigned to the applicable Buyer in accordance with the applicable BSAA) are being purchased by, or transferred to, the Buyers, and all such claims and/or causes of action in clauses (i) through (iii) herein are preserved for the benefit of the Debtors' estates.  For the avoidance of doubt, no claims and/or causes of action against the MPT Lessors, the Prepetition Secured Parties, or any of their respective affiliates are being purchased by, or transferred to, the Buyers.

8.     With regard to the forms of, timing, and other terms and provisions concerning the consideration to be provided by the Buyers to the Debtors as set forth in the BSAAs and may be amended by this Order, each Buyer is directed to comply with their respective obligations thereunder, and the Debtors, and their respective successors and assigns, including any liquidating trustee appointed in connection with these chapter 11 cases, are hereby authorized to enforce all such provisions. As further set forth in paragraph 32 hereof, the Court shall retain exclusive jurisdiction with respect to any and all issues, disputes, controversies, causes of action,

and/or claims with respect to, or arising under, such provisions, including, without limitation, the enforcement thereof.

9. **Real Property Transaction.** Upon the consummation of the Sale Transactions, neither the Debtors' estates nor any parties claiming by or through the Debtors' estates (including, for the avoidance of doubt, the FILO DIP Lenders, the Junior DIP Lender, and the Prepetition Secured Parties (each as defined in the Final DIP Order)) shall have any ownership claim to, or ownership interest in, the MPT Real Property. For the avoidance of doubt, each Buyer's rights with respect to any MPT Real Property shall be governed by agreements separate from the BSAAs or this Order among the Buyers and MPT or its affiliates; *provided* that, unless and until the releases set forth in the Settlement Order become effective, nothing in this Order or the BSAAs shall prejudice the rights of the Committee with respect to any Challenge (as defined below), any rights or defenses of MPT with respect to any Challenge or the ability of the Court to fashion any appropriate remedy following a successful Challenge; provided further that, no such Challenge shall seek to require the Buyers to deliver the MPT Real Property back to the Debtors or the MPT Lessors or seek to terminate the Buyers' new lease with MPT.

10. **Binding Effect of Order.** This Order and each BSAA shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case of any of the Debtors if any of these chapter 11 cases is converted from a case under chapter 11 to a case under chapter 7, all counterparties to Assigned Contracts, all Recording Officers, any holders of the Liens, Claims, Encumbrances, and Interests in, against, or on all or any portion of the Purchased Assets (whether known or unknown), each Buyer and all successors and assigns of each Buyer, notwithstanding

the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries or similar estate representatives in these chapter 11 cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the BSAAs shall not be subject to rejection or avoidance under any circumstances.  If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Order, including the rights granted to the Buyers hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest.  To the extent of any conflict between this Order and the BSAAs, the terms of this Order shall control.

11.     **No Material Modifications.**  Each of the BSAAs and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented in accordance with the terms thereof, this Order and the Bidding Procedures Order without further order of this Court and following prior notice to and consultation with the Committee, the FILO Lenders and the FILO DIP Lenders; *provided*, *however*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates as determined in the good faith judgment of the Debtors in consultation with the Committee, the FILO Lenders and the FILO DIP Lenders, and the Junior DIP Lender. For the avoidance of doubt, all other modifications, amendments, or supplements that have a material adverse effect on the Debtors' estates or their creditors shall require Court approval.

12.     **No Bulk Sales.**  No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transactions, the Motion, and this Order.

13.     **Valid Transfer.**  Effective upon the Closing, the transfer to the applicable Buyer of the Debtors' right, title, and interest in the Purchased Assets pursuant to the applicable

BSAA shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtors' right, title, and interest in the Purchased Assets, and vests with or will vest in the applicable Buyer all right, title, and interest of the Debtors in the Purchased Assets, free and clear of the Liens, Claims, Encumbrances, and Interests, other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA.

14. **Good Faith Buyer.** The Sale Transactions contemplated by each applicable BSAA are undertaken by the applicable Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and each of the Buyers has acted without collusion in undertaking each Sale Transaction contemplated by the applicable BSAA. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate each of the Sale Transactions shall not affect the validity of the sale of the Purchased Assets to the applicable Buyer (including the assumption and assignment by the Debtors of any of the Assigned Contracts), unless such authorization is duly stayed pending such appeal. Each of the Buyers is a purchaser in good faith of the Purchased Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

15. The BSAAs and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code. None of the Debtors, the Buyers, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective current and former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors or assigns have engaged in any conduct that would cause or permit the BSAAs or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of

the Bankruptcy Code and no party is entitled to damages or other recovery in connection therewith under section 363(n) of the Bankruptcy Code.

16.     **Governmental Authorization to Effectuate Sale and Assignments.** Except as otherwise specifically provided in this Order, each and every federal, state, and governmental agency or department, and any other person or entity, is hereby directed to accept (i) any and all documents and instruments in connection with or necessary to consummate the Sale Transactions, subject to the payment of any filing fee or other fee imposed under non-bankruptcy law; and (ii) this Order as sufficient evidence of the transfer of right, title, and interest in, to, and under the Purchased Assets.  Except as otherwise provided in this Order, to the greatest extent available under applicable law upon the Closing, the Buyers shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the applicable Buyer as of the Closing.  To the extent any license or permit necessary for the operation of the Purchased Assets is determined not to be an executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Buyers shall apply for and obtain any necessary license or permit promptly after the Closing Date, and, to the extent practicable, such license or permit of the Debtors shall remain in place for the Buyers' benefit until a new license or permit is obtained (or, in the case of licenses or permits of Debtors of which the assignment to the applicable Buyer is pending as of the Closing Date (whether pursuant to a notice period that has not expired as of the Closing Date or a required consent from an applicable governmental authority that has not been received as of the Closing Date), shall transfer to the applicable Buyer upon the expiration of such notice period or the receipt of such

consent; provided, however, that the foregoing shall not apply to any Medicare Provider Agreement, the transfer of which is governed by paragraph 17 of this Order).  No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the Purchased Assets sold, transferred, or conveyed to the applicable Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the applicable Sale Transaction.  For the avoidance of doubt, the Sale Transactions authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

17.  **Medicare Provider Agreements**.  Notwithstanding anything to the contrary in this Order of the BSAAs, the following provisions apply to the Debtors' Medicare Provider Agreements with the Centers for Medicare & Medicaid Services (together with its applicable regional offices, and Medicare Administrative Contractors, and other contractors or agents auditing or administering the Medicare program, collectively, "**CMS**") for each Hospital (the "**Medicare Provider Agreements**"):

a.  Neither this Order nor the BSAAs authorize any sale or transfer of any Medicare Provider Agreement of the Debtors, and the Medicare Provider Agreements are not among the Purchased Assets to be conveyed in the BSAAs.

b.  The Buyers may, but shall not be obligated to, apply to the CMS for recognition of a "change of ownership" ("**CHOW**") pursuant to 42 C.F.R. §§ 489.18 and 424.550, and applicable provisions of the Medicare Program Integrity Manual ("**PIM**") and State Operation Manual ("**SOM**"), including but not limited to the procedures for such application in Chapter 10 of the PIM and Chapter 3 of the SOM.

c.  If CMS determines that, pursuant to applicable Medicare law, the Buyers are qualified to serve as a Medicare Part A Provider and satisfies the requirements for recognition of a CHOW, CMS shall automatically assign the applicable Medicare Provider Agreements to the applicable Buyer.

d.  To satisfy the requirement under 42 C.F.R. § 489.18 that the Buyers assume all financial obligations associated with the Medicare Provider Agreements, CMS shall accept from the Buyers, payable by the applicable Buyer on or before five (5) business days following assignment of the Medicare Provider Agreements, (i)

$12,587,473.63 as payment of determined pre-transfer liabilities (the "**Outstanding Amount**") and (ii) $1,323,325.00 to be placed into escrow by CMS (the "**Additional Overpayment Escrow**") to be used for payment of any overpayments or liabilities due to CMS, whether known or unknown, arising from or in connection with the Medicare Provider Agreements during the period on or before the Closing Date (the "**Pre-Closing Date Period**") including for which the applicable Buyer would be liable under 42 C.F.R. § 489.18 and *United States v. Vernon Home Health*, 21 F.3d 693 (5th Cir. 1994) (collectively, the "**Pre-Closing Obligations**"). In addition, CMS shall be entitled to hold any underpayments owed by CMS under the Medicare Provider Agreements for the Pre-Closing Date Period (the "**Pre-Closing Date Underpayments**") and apply the value of such Pre-Closing Date Underpayments to the Pre-Closing Obligations. Payment of the Outstanding Amount and application of funds from the Additional Overpayment Escrow and the Pre-Closing Date Underpayments constitute the sole remedy against the applicable Buyer for satisfaction of any Pre-Closing Obligations, and CMS will seek no payment from the Buyers beyond the Outstanding Amount, Additional Overpayment Escrow, and Pre-Closing Date Underpayments for the Pre-Closing Obligations.

e. If the applicable Buyer fails to pay promptly all or any part of the Outstanding Amount or Additional Overpayment Escrow, CMS shall have the right to recoup all Pre-Closing Obligations from payments otherwise due to the Buyers at any time after CMS's assignment of the applicable Medicare Provider Agreements to the Buyer.

f. Upon CMS's completion of audits of open cost reports relating to the Pre-Closing Date Period (the "**Unaudited Cost Year Reports**") and of any Reopened Cost Year Reports (as defined below), CMS shall first apply the amounts in the Additional Overpayment Escrow to any determined liabilities associated with such audits and then recoup any remaining determined liabilities from Pre-Closing Underpayments. If after such application, any amounts remain in the Additional Overpayments Escrow or there are any remaining Pre-Closing Underpayments, (i) any amounts remaining in the Additional Overpayment Escrow shall be released to, and constitute property of, the applicable Buyer, and (ii) any Pre-Closing Date Underpayments shall be released to the applicable Buyer, which shall be deemed held in trust for, and paid over to, the Debtors within five (5) days of receipt from CMS. CMS shall complete the audits of the Unaudited Cost Year Reports, the Debtors' Final Cost Reports (as defined below), and any Reopened Cost Year Report (as defined below) by the later of (i) 9 months from the Closing Date and (ii) 30 days after issuance of the SSI DSH adjustment tables for the applicable cost year, but in no event more than one year from the Closing Date.

g. Within 150 days after the Closing Date, the Debtors shall file a terminating cost report for the Hospital for all services provided through the Closing Date (the "**Debtors' Final Cost Reports**").

h. Payment of the Outstanding Amount and Additional Overpayment Escrow, along with the application of any Pre-Closing Underpayments, fully satisfies and constitutes a release of the Buyers of the Pre-Closing Obligations.

i. Notwithstanding any other provision hereof, CMS may reopen and audit the Debtors' pre-Closing Date Medicare cost reports (the "**Reopened Cost Year Reports**") in the ordinary course for purposes of calculating any amounts due under the applicable Medicare Provider Agreement for the Pre-Closing Date Period. However, CMS shall not seek any further payments for the Reopened Cost Year Reports, other than from the Additional Overpayment Escrow and application of the Pre-Closing Underpayments.  Nothing in this Order will preclude CMS from exercising its rights under applicable law to reopen any cost year report to adjust payment rates for any fiscal periods as part of adjustments in federal payment rates applicable to all similarly situated providers participating in Medicare. Notwithstanding anything contained herein to the contrary, the applicable Buyer and the Debtors shall retain all rights under applicable non-bankruptcy law to appeal the Debtors' pre-Closing Date Medicare cost reports and to continue ongoing appeals or make claims against CMS consistent with the rights each would have in the ordinary course (e.g., meaning in the case of the Buyers, the rights of any party accepting assignment of the applicable Medicare Provider Agreement pursuant to a CHOW).

j. Nothing in this Order waives or abrogates whatever rights, if any, CMS may have to recoup or offset against payments otherwise payable to any Buyer in connection with the Hospitals for periods after the Closing Date; *provided*, *however*, that such offsets, recoupments, demands, fines or penalties do not arise out of or relate to the Pre-Closing Date Obligations.

k. On and after the Closing Date, nothing in this Order shall relieve or be construed to relieve the Buyers from complying with all procedures, rules, and regulations of the Medicare program, and all plans of correction or other regulatory actions required by CMS, including those arising from pre-Closing Date actions or inactions of the Debtors.

l. Except as set forth in this paragraph 17, nothing in this Order shall affect any right or obligation of CMS with respect to the regulatory assignment of the Medicare Provider Agreements, and CMS will process the assignment of the Medicare Provider Agreements in the ordinary course upon approval of any CHOW application submitted by the Buyers.

m. Nothing in this Order releases, relates to, or concerns any other claims that may be filed by the United States or any other federal entity other than with respect to the Medicare Provider Agreements as set forth in this paragraph 17, nor does it affect the rights and claims of any such federal entity.  Further, nothing in this Order shall bar the United States and its agencies from asserting any rights of setoff or recoupment that they may have or may acquire against any amounts now due, or which may become due, to the Debtors or their estates from any federal agency

33

except as otherwise provided for in this Order. All of the Debtors' rights and defenses thereto are preserved.

n.   The terms set forth in this paragraph regarding the Medicare Provider Agreements are subject to final approval by the United States. In the event the United States does not render such final approval within seven (7) days of the date of entry of this Order (or such later date consented to by the Debtors), the Debtors and the United States shall notify the Court, and the Court shall hold an emergency hearing to resolve the United States' objections to the sale of the Debtors' Medicare Provider Agreements free and clear of claims and Medicare obligations.

18.   **Accounts Receivable**.   Notwithstanding anything to the contrary in this Order and subject to the Settlement Order, nothing set forth in this Order shall be deemed to limit, impair or affect in any way (i) the Debtors' right, title, and interest in the Debtors' cash and patient accounts receivable, payor/contractor accounts receivable, Medicare reimbursements or adjustments (except as set forth in paragraph 17 of this Order) and all other accounts receivable (collectively, the "**Accounts Receivable**") for services rendered or goods sold prior to the Funding Commencement Time (as defined in the Settlement Order), which cash and Accounts Receivable remain property of the Debtors as Excluded Assets and shall be reimbursed to Debtors if received by the applicable Buyer, as and to the extent provided in the applicable BSAA, or (ii) the Debtors' ability to complete any remaining billing for services rendered or goods sold prior to Closing under the Debtors' Medicare numbers or other Payor Agreements; *provided, however*, that nothing in this Order or the BSAAs shall obligate CMS to pay any amounts due under any Medicare Provider Agreement to any party other than the Medicare provider eligible to receive payment under such agreement.   Each Buyer shall provide the Debtors (or Debtors' billing agent) with reasonable access to pre-Closing documents or data as may be necessary in order for the Debtors to facilitate billing and collecting for services furnished to Medicare beneficiaries by the Debtors.

19.   **Authorization to Assign.**   Notwithstanding any provision of any contract governing the Purchased Assets, including any Assigned Contract to be assumed and assigned to

the applicable Buyer as of the Closing pursuant to section 365(f) of the Bankruptcy Code or applicable non–bankruptcy law that prohibits, restricts, or conditions the assignment of the Purchased Assets, including any Assigned Contract, at the Closing, the Debtors are authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (i) assign the Purchased Assets to the applicable Buyer and (ii) assume and assign the Assigned Contracts to the applicable Buyer as of the Closing, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, in each case, as provided in this Order, the BSAAs, the Bidding Procedures Order, the Settlement Order, or as otherwise provided by a separate order of this Court.

(a)     There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyers or the Debtors as a result of the assignment of the Purchased Assets or the assumption and assignment of the Assigned Contracts.

(b)     The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts that are to be assumed and assigned to the applicable Buyer as of Closing (or as otherwise provided in the Bidding Procedures Order, the Settlement Order or the BSAAs). Notwithstanding the foregoing, unless required by a Buyer under the applicable BSAA for the Debtors to assume and assign any Assigned Contract, no Debtor shall be required by the Court to assume and assign any Assigned Contract, and, if no such assumption and assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required with respect to any such Assigned Contract.

(c)     The Debtors' assumption and assignment of the Assigned Contracts is subject to the consummation of the applicable Sale Transaction with the applicable Buyer.  Subject to the requirements applicable to any Disputed Contracts, as set forth in paragraphs 26-27 of this Order and paragraph 11 of the Settlement Order, to the extent that a Contract Objection by a counterparty to any Assigned Contract is not resolved prior to the Closing, the applicable Buyer, may, without any further approval of the Court or notice to any party, elect to (i) not have the Debtors assume and assign such Assigned Contract to it, or (ii) have the Debtors postpone the assumption of such Assigned Contract until the resolution of such Contract Objection; provided, however, that (a) the Debtors, the applicable Buyer, and the relevant non-Debtor counterparty under each Assigned Contract shall have authority to compromise, settle, or otherwise resolve any objections without

further order of, or notice to, this Court; and (b) the payment of all costs and expenses arising under the applicable Contract or Lease pending resolution of the Contract Objection shall be subject to the terms of the Settlement Order and this Order.

20.     **Assigned Contracts**.  As of the Closing, subject to the provisions of this Order and in accordance with the applicable BSAA, the applicable Buyer shall succeed to the entirety of the Debtors' rights and obligations in the Assigned Contracts.

(a)     Upon Closing, (i) or as soon as reasonably practicable thereafter, all defaults (monetary and non-monetary) under the Assigned Contracts shall be deemed cured and satisfied in full through and upon the payment of the Cure Costs as agreed between the applicable Buyer and the applicable non-Debtor counterparty, or as determined by the Court (if applicable), (ii) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Liabilities, the applicable Buyer with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assigned Contracts, and (iii) any and all persons or entities shall be forever barred and estopped from asserting a Claim against the Debtors, their estates, the applicable Buyer, or the Purchased Assets that any additional amounts are due or defaults exist under the Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing (other than Claims against the applicable Buyer with respect to the Assumed Liabilities).  The applicable Buyer and any payment by the applicable Buyer, pursuant to the terms of the applicable BSAA, to pay the Cure Costs and the applicable Buyer's promise to perform the Debtors' obligations under the Assigned Contracts for the period on or after the Closing shall constitute adequate assurance of the applicable Buyer's future performance under the Assigned Contracts being assigned to it as of the Closing within the meaning of sections 365(b)(l)(C) and (f)(2)(A)-(B) of the Bankruptcy Code.

(b)     Upon assumption of those Assigned Contracts to be assumed by the Debtors and assigned to the applicable Buyer as of the Closing, such Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the applicable Buyer, notwithstanding any provision in such Assigned Contract or other restrictions prohibiting assignment or transfer.  To the extent any Assigned Contract is assumed and assigned to the applicable Buyer under this Order, such assumption and assignment will not take effect until the Closing.  Furthermore, other than the Assigned Contracts, no other contract shall be deemed assumed by the Debtors and assigned to the applicable Buyer pursuant to section 365 of the Bankruptcy Code.  The failure of the Debtors or the applicable Buyer to enforce at any time one or more terms or conditions of any Assigned

Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the applicable Buyer's rights to enforce every term and condition of such Assigned Contract.

(c)     With the applicable Buyer's consent, the Debtors may assume and assign to the applicable Buyer an Assigned Contract in part and to one or more other successful bidders in part so long as such buyers have cured any monetary defaults under such Assigned Contract and have each provided adequate assurance of future performance.

(d)     All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the applicable Buyer, and shall not charge the Debtors or the applicable Buyer for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transactions.

21.     Notwithstanding the foregoing, the Debtors may amend the list of Assigned Contracts to add or remove any Assigned Contract to or from such list in accordance with the terms of this Order, the applicable BSAA and the Settlement Order.  To the extent the Debtors amend the list of Assigned Contracts to add a new Assigned Contract in accordance with the terms of this Order, the applicable BSAA, and the Settlement Order (an "**Additional Assigned Contract**"), the Debtors shall file a notice with the Court and serve such notice on the applicable counterparty.  Such notice shall provide the applicable counterparty with the opportunity to object to the assumption and assignment of the Additional Assigned Contract by filing an objection in accordance with the terms of the Settlement Order and serving such objection on the Debtors and the applicable Buyer.  The Debtors, the applicable Buyer, and the applicable counterparty to an Additional Assumed Contract shall have authority to compromise, settle, or otherwise resolve any properly filed Contract Objections without further order of the Court unless such compromise, settlement, or other resolution would result in the responsibility of any Debtor's estate for the payment of Cure Costs.

22.     If no Contract Objection has been filed, or a Contract Objection has been properly filed but has been resolved by the parties or determined by the Court, this Order shall serve as approval of the assumption and assignment of the applicable Additional Assumed Contract to the applicable Buyer without need for a further notice or order.  If a Contract Objection has been properly filed with respect to an Additional Assigned Contract and is not resolved by the parties or determined by the Court, the Debtors' assumption and assignment of such Additional Assigned Contract shall be subject to the requirements applicable to Disputed Contracts set forth in paragraphs 26-27 of this Order and paragraph 11 of the Settlement Order.

23.     All Cure Costs that have not been waived shall be determined in accordance with the Bidding Procedures Order, the Settlement Order, or this Order and paid by the applicable Buyer in accordance with the terms of the applicable BSAA.  Subject to the requirements applicable to any Disputed Contracts, as set forth in paragraphs 26-27 of this Order and paragraph 11 of the Settlement Order, the assumption and payment of the Cure Costs shall be in full satisfaction and cure of any and all defaults under the Assigned Contracts and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code.  Upon the assumption by a Debtor and the assignment to the applicable Buyer of any Assigned Contract, and the payment of any applicable Cure Costs by the applicable Buyer, each non-Debtor counterparty to such Assigned Contract is forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors, the Buyers, their respective affiliates, estates, successors, or assigns, or the property of any of them, any default existing as of the Closing, and (ii) exercising any rights or remedies against any Debtor or the Buyers based on an asserted default that occurred on, prior to, or as a result of, the Closing, including the type of default specified in section 365(b)(1)(A) of the Bankruptcy Code.  The Buyers have provided adequate assurance of future

performance under the Assigned Contracts within the meaning of sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code.  Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the applicable Buyer, of each of the Assigned Contracts.

24.     To the extent a non-Debtor counterparty to an Assigned Contract fails to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined and any such non-Debtor counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time.  Consistent with the Bidding Procedures Order and the Settlement Order, the non-Debtor counterparty to an Assigned Contract is forever bound by the applicable Cure Cost and, upon payment of such Cure Cost as provided herein and in the BSAAs, is hereby enjoined from taking any action against the Buyers, and the Debtors or their estates (or any successor thereto) with respect to any claim for cure under such Assigned Contract.  To the extent no timely Contract Objection has been filed and served on the Debtors and the applicable Buyer with respect to an Assigned Contract, the non-Debtor counterparty to such Assigned Contract is deemed to have consented to the assumption and assignment of such Assigned Contract to the applicable Buyer.

25.     Without limiting the foregoing, each person or entity who holds a Consent Right will be (i) forever barred from objecting to the transfer, sale, assumption, and assignment of the Debtors' right, title, and interest in, to and under the Purchased Assets to be sold or the Assigned Contracts to be assumed and assigned in connection with the applicable Sale Transaction, free and clear of the Liens, Claims, Encumbrances, and Interests, including any Consent Rights (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA), (ii) deemed to consent to and approve the transfer, sale, and/or

assumption and assignment of the Debtors' right, title, and interest in, to and under such Purchased Assets free and clear of the Liens, Claims, Encumbrances, and Interests, including any Consent Rights (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA); and (iii) deemed to waive any termination right arising from the sale, disposition, transfer or closure by the Debtors of the Debtors' property or assets.

26.     **Contract Objections.**   If a non-Debtor counterparty to any Assigned Contract files a Contract Objection to the assumption and assignment of such Assigned Contract to the applicable Buyer, then such contract shall be deemed a "**Disputed Contract**."  The Debtors and the applicable Buyer shall be authorized to resolve or settle any Contract Objection to the assumption and assignment of Disputed Contracts in accordance with the terms of the applicable BSAA, the Settlement Order and this Order, including with respect to Cure Costs and/or adequate assurance of future performance under the Assigned Contracts without need for any further order or action from this Court.  Once any objection to a Disputed Contract is resolved, the Disputed Contract shall be, subject to the terms of this Order, assigned to the applicable Buyer without the need for a further notice or order from this Court.

27.     **Assignment of Disputed Contracts**.  At each Buyer's sole express written election, any Disputed Contract that is the subject of an unresolved Cure Objection may be assumed and assigned prior to the resolution of such Cure Objection, so long as the applicable Buyer (i) pays any undisputed Cure Costs at the time of assumption and assignment of such Disputed Contract and (ii) appropriately reserves funding for the disputed portion of the Cure Costs pending resolution of the dispute.  For the avoidance of doubt, nothing in this Order shall require any Buyer to take an assignment of or pay or reserve Cure Costs relating to a Disputed Contract subject to an unresolved Cure Objection, and the Buyers may elect to delay assumption and

assignment of the Disputed Contract pending resolution of the pending objection or decline that such Disputed Contract be assumed and assigned.  In accordance with the Settlement Order, the Debtors shall have no obligation to (i) make payments under any Facility Contract (as defined in the Settlement Order), including any Disputed Contract, that are not funded by the Buyers, and nothing contained in this Order or the Global Settlement shall limit the Debtors' rights to seek to reject any Facility Contract, or (ii) extend or renew any Facility Contract, in the case of (i) or (ii), unless the applicable Buyer pays to the applicable non-Debtor counterparty in a timely fashion as they become due and payable all go-forward expenses to be incurred under such Disputed Contract prior to the applicable Buyer consenting to rejection thereof.  For the avoidance of doubt, nothing in this Order shall relieve the Debtors' obligations under section 365 of the Bankruptcy Code, if any, with respect to Facility Contracts, and all rights and defenses of the Debtors and counterparties to the Facility Contracts with respect thereto are preserved.

28.    Reserved.

29.    **No Successor Liability.**  The Buyers have given substantial consideration under the BSAAs, which consideration shall constitute valid, valuable, and sufficient consideration for the absolution from any potential claims of successor liability of the Buyers to the greatest extent allowed by applicable law and neither the Buyers nor any of their respective affiliates shall be deemed to: (a) be a legal successor, or otherwise deemed to be a successor, to any of the Debtors under any theory of law or equity; (b) have, *de facto* or otherwise, merged with or into any or all of the Debtors or their estates; (c) deemed to be an alter ego of have a common identity or a continuity of enterprise with any of the Debtors or (d) be a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or any business, enterprise, or operation of the Debtors, including with respect to clause (a) through (e) of this

paragraph, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, products liability or other law, doctrine rule or regulation (including any filing requirements under any such laws, rules or regulations) with respect to the Debtors' liability under such law, doctrine, rule or regulation.  Upon the Closing, to the maximum extent available under applicable law, the Buyers' acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims and other types of transferee liability of any nature whatsoever, whether known or unknown and whether asserted or unasserted at the time of Closing (other than, to the extent applicable, any Assumed Liabilities, Permitted Encumbrances or as otherwise expressly provided in the applicable BSAA), and the Purchased Assets shall not be subject to any Liens, Claims, Encumbrances, and Interests arising under or in connection with any Excluded Asset or Excluded Liability, except as set forth in paragraph 17 of this Order.  The operations of the Buyers and their respective affiliates shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets.

30.    **MPT Real Property Liens**.  Any valid and perfected lien on the MPT Real Property underlying the Purchased Assets remains in full force and effect and is not discharged pursuant this Order.

31.    **Surrender of Possession.**  Any and all Purchased Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the applicable Buyer free and clear of the Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA), with such Liens, Claims, Encumbrances, and Interests attaching to the proceeds attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, and Interests with the same nature, validity, priority, extent, perfection, and force and effect that

such Liens, Claims, Encumbrances, and Interests encumbered the Purchased Assets immediately prior to the entry of this Order, and shall be delivered to the Buyers and deemed delivered at the time of Closing (or such other time as provided in the BSAAs), with such costs of delivery allocated in accordance with the BSAAs.

32.     **Retention of Jurisdiction.**   The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order, the BSAAs, the Sale Transactions, the Bidding Procedures Order, and the Settlement Order; *provided* that the United States' rights to challenge the Court's jurisdiction under applicable law are preserved.

33.     **Immediate Effect.**   Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Buyers are free to close the Sale Transactions under the BSAAs at any time pursuant to the terms thereof.

34.     **Failure to Specify Provisions.**   The failure to specifically reference any particular provisions of the BSAAs or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the BSAAs and other related documents be authorized and approved in their entirety.

35.     **Release of Liens, Claims, Encumbrances, and Interests.**  Effective upon the Closing Date, this Order (i) is and shall be effective as a determination that all Liens, Claims, Encumbrances, or Interests (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA) of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date have been unconditionally released, discharged, and

terminated (with such Liens, Claims, Encumbrances, and Interests attaching to the proceeds attributable to the Purchased Assets encumbered by such Liens, Claims, Encumbrances, and Interests with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, liens or liabilities encumbered the Purchased Assets immediately prior to the entry of this Order) and that the conveyances described herein have been effected, and (ii) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the applicable Buyer (all such entities being referred to as "**Recording Officers**"), and all recorded claims, encumbrances, liens or liabilities (other than the Assumed Liabilities and as otherwise provided in the applicable BSAA) against the Purchased Assets shall be deemed stricken from such entities records, official and otherwise.  Effective as of the Closing, all Recording Officers are authorized and specifically directed to strike recorded encumbrances, claims, liens, pledges, and other interests against the Purchased Assets recorded prior to the date of this Order.  Effective as of the Closing, a certified copy of this Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded encumbrances, claims, liens, pledges, and other interests against the Purchased Assets recorded prior to the date of the Closing.  All Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary, advisable or appropriate to consummate the

transactions contemplated by the applicable BSAA, subject to the payment of any filing or other fee imposed under non-bankruptcy law.

36.    **Approval to Release Liens, Claims, Encumbrances, or Interests**.  The provisions of this Order authorizing the sale and transfer of the Purchased Assets free and clear of Liens, Claims, Encumbrances, and Interests (other than any Permitted Liens and Assumed Liabilities expressly assumed under, or expressly permitted by, the applicable BSAA) shall be self-executing, and neither the Debtors nor the Buyers shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate or implement the provisions of this Order.  For the avoidance of doubt, on or after the Closing Date, all entities, including without limitation all trustees or collateral agents, are authorized and directed to file and/or execute lien releases, including financing statement terminations, mortgage releases or other documents or agreements evidencing release of Liens, Claims, Encumbrances, or Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise expressly provided in the applicable BSAAs).  If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing Liens, Claims, Encumbrances, or Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA) shall not have delivered to the Debtors before the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens, Claims, Encumbrances, and Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA) that the person or entity has

or may assert with respect to the Purchased Assets, the Debtors and the Buyers are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets. The Buyers are hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of Liens, Claims, Encumbrances, and Interests in or against the Purchased Assets (other than Assumed Liabilities, Permitted Encumbrances, and as otherwise provided in the applicable BSAA). This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

37. **No Effect on Governmental Regulatory Authority**. Nothing in this Order or the BSAAs authorizes the transfer or assignment of any federal governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order. For the avoidance of doubt, the matters preserved by this paragraph are subject to all rights and defenses available under applicable law.

38. Nothing in this Order or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("**Governmental Unit**") that is not a Claim; (ii) any Claim of a Governmental Unit first arising on or after the Closing Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations first arising after the Closing Date that any entity would be subject to as the owner or operator of property after the Closing Date; or (iv) any liability to a Governmental Unit

on the part of any Person other than the Debtors and, to the extent provided in this Order, the Buyers (including, for the avoidance of doubt, as provided for in paragraph 6 hereof). Further, nothing in this Order shall enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence. Notwithstanding anything else in this paragraph 38, any successor liability of the Buyers under the Medicare Provider Agreements shall be limited to those amounts provided in paragraph 17 of this Order.

39. Nothing in this Order or the BSAAs shall prejudice the rights of the Committee with respect to any Challenge[7], including but not limited to with respect to Master Lease I (or any other lease), subject to the terms of the Settlement Order and the Global Settlement. Notwithstanding anything to the contrary in this Order or the BSAAs, all rights of the Committee with respect to a Challenge regarding Master Lease I (or any other lease), including but not limited to whether Master Lease I (or any other lease) is a true lease, whether Master Lease I (or any other lease) is a unitary lease, or the nature, validity, extent, or priority of any claims in respect of Master Lease I (or any other lease), and any remedies associated with a successful Challenge regarding Master Lease I (or any other lease) are expressly preserved, subject to the terms of the Settlement Order and the Global Settlement; provided that no such Challenge shall seek to require the Buyers to deliver the MPT Real Property back to the Debtors or the MPT Lessors or seek to terminate any lease between the Buyers and the MPT Lessors. Further, nothing in this Order shall enlarge,

---

[7]    "**Challenge**" shall have the meaning ascribed to it in the *Final Order (i) Authorizing the Debtors to (a) Obtain Junior Lien Postpetition Financing, (b) Use Cash Collateral, and (c) Grant Liens and Provide Superpriority Administrative Expense Claims; (ii) Granting Adequate Protection to Certain Prepetition Secured Parties; (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief* (Docket No. 625) and the *Final Order (i) Authorizing the Debtors to (a) Obtain New Postpetition Financing, (b) Use Cash Collateral, and (c) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief* (Docket No. 1538)

expand, or otherwise modify the Committee's rights to any Challenge or in any way impair MPT's defenses, objections or responses to any Challenge.

40.     Nothing in this Order shall affect any party's rights, claims, defenses, or arguments with respect to any sales or conveyances other than the Sale Transactions.

41.     **Satisfaction of Conditions Precedent.**  Neither the Buyers or the Debtors shall have an obligation to close the Sale Transactions until all conditions precedent in the BSAAs (as modified by this Order) to each of their respective obligations to close the Sale Transactions have been satisfied or waived in accordance with the terms of the applicable BSAA (as may be modified by this Order).

42.     **Cigna.**  Notwithstanding anything in this Order or any notice related thereto to the contrary, neither the Cigna Contracts, as identified in the *Objection of Cigna to the Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Sale* (Docket No. 904), the *Objection of Cigna to the Second Supplemental Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Sale* (Docket No. 1579), and the *Objection of Cigna to the Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection With Sale* (Docket No. 1703) (collectively, the "**Cigna Objections**"), nor the Cigna Listings (as defined in the Cigna Objections) shall be assumed and assigned pursuant to this Order, and the Cigna Objections are hereby adjourned.  If the Debtors and the Buyers seek to have any or all of the of the Cigna Contracts and/or Cigna Listings assumed and assigned as part of the Sale Transactions under this Order, the assumption, assignment and cure issues related to such assumption and assignment shall be resolved by agreement (email shall

suffice) between Cigna (as defined in the Cigna Objection), the Debtors and the Buyers without further order of the Court or, if no agreement can be reached, by further order of the Court.

43.     **Chubb**.   Notwithstanding anything to the contrary in the Motion, the Bidding Procedures Order, the Global Bidding Procedures, the Assumption and Assignment Procedures, the BSAAs, any Cure Notice(s) and/or Supplemental Cure Notice(s) (or any list of contracts proposed to be assumed and assigned or any list of proposed Cure Costs), this Order, or any documents relating to any of the foregoing, (a) none of the insurance policies that have been issued by ACE American Insurance Company, ACE Property and Casualty Insurance Company, Pacific Employers Insurance Company, Westchester Fire Insurance Company, Insurance Company of North America, Indemnity Insurance Company of North America, Westchester Surplus Lines Insurance Company, Illinois Union Insurance Company, Western Fire Insurance Company, Federal Insurance Company, Executive Risk Indemnity Inc., Pacific Indemnity Company, Chubb National Insurance Company, any of their U.S.-based affiliates, and/or any predecessors of any of the foregoing (collectively, the "**Chubb Companies**") to, or that provide coverage to, any of the Debtors at any time and all agreements, documents or instruments relating thereto (collectively, the "**Chubb Insurance Contracts**"), and/or, except as set forth in this paragraph, none of the rights, proceeds, benefits, claims, rights to payments and/or recoveries under such Chubb Insurance Contracts shall be sold, assigned, or otherwise transferred to the Buyers in connection with the Sale Transactions nor shall be deemed to be either Assigned Contracts nor a portion of any of the Purchased Assets; (b) nothing shall alter, amend or otherwise modify the terms or conditions of the Chubb Insurance Contracts; and (c) for the avoidance of doubt, the Buyers shall not be deemed to be an insured under any of the Chubb Insurance Contracts.

44.     **ASIC**.   Nothing in this Order or any BSAA authorized by this Order authorizes the transfer, assignment or modification of (i) any surety bond ("**ASIC Bond**") issued by Atlantic Specialty Insurance Company ("**ASIC**") for the obligations of any Debtor; (ii) any indemnity agreement issued by any Debtor to ASIC ("**ASIC Indemnity Agreement**") or (iii) any cash collateral granted to ASIC under the ASIC Indemnity Agreement. The Debtor and ASIC reserve all rights with respect to any ASIC Bond, any ASIC Indemnity Agreement or any cash collateral granted under the ASIC Indemnity Agreement.

45.     **Werfen.**   Notwithstanding anything herein or in the BSAAs, the Sale Transactions shall exclude all property owned by Werfen USA LLC or Immucor, Inc. (collectively, "**Werfen**" and such equipment, the "**Werfen Equipment**") under that certain *Echo Advantage Plus Agreement No. 9979* dated as of January 2, 2024 (the "**Werfen Equipment Lease**"). Prior to the Closing Date, the Debtors, the Buyers, and Werfen shall use commercially reasonable efforts to reach agreement regarding the removal, disposition, use, or retention of Werfen Equipment (including any assignment and assumption of the respective Werfen contracts to new operators).  If the Debtors, the Buyers, and Werfen do not reach a consensual agreement with regards to the removal, disposition, use, or retention of Werfen Equipment prior to the Closing Date, (i) the Debtors and the Buyers shall provide notice and a reasonable opportunity for Werfen to reclaim, move, pick-up or sell the Werfen Equipment, (ii) upon the earlier of (A) the date of removal, disposition, use, or retention of Werfen Equipment (including any assignment and assumption of the respective Werfen contracts to new operators) or (B) entry of an order by the Court authorizing rejection of the Werfen Equipment Lease, the Debtors shall be released from payment and other obligations under the Werfen Equipment Lease, *provided*, that in the case of clause (ii)(A) hereof, the Debtors shall be released from payment and other obligations under the

Werfen Equipment Lease solely with respect to the removed, disposed, used, or retained Werfen Equipment, and (iii) all rights of the Debtors and Werfen under applicable law are preserved in connection with the rejection, assumption and/or assumption and assignment of all contracts governing the Debtors' lease and use of the Werfen Equipment, including but not limited to, the Werfen Equipment Lease.

46.     **Post Road.**  Notwithstanding anything in this Order or in the BSAAs, and unless otherwise agreed upon in writing by the Buyers, the Debtors, and Post Road Equipment Finance SPV, LLC ("**Post Road**"), the Sale Transactions shall exclude all property leased by Post Road (collectively the "**Post Road Equipment**") under Equipment Schedules Nos. 042, 044, and 045 to that certain Master Lease Agreement No 23770-90000 dated March 12, 2012 (with each such Equipment Schedule and the Master Lease Agreement referred to herein as a "**Post Road Equipment Lease**").  The Debtors, the Buyers, and Post Road agree that each shall use commercially reasonable efforts to reach agreement regarding the removal, disposition, use, or retention of Post Road Equipment (including any assignment and assumption of one or more of the Post Road Equipment Leases to Buyers or other operator).  If the Debtors, the Buyers, and Post Road do not reach a consensual agreement with regards to the removal, disposition, use, or retention of Post Road Equipment leased under a Post Road Equipment Lease, then (i) the Debtors and the Buyers shall provide written notice and a reasonable opportunity for Post Road to reclaim, move, retrieve or sell the applicable Post Road Equipment, (ii) Post Road shall use commercial reasonable efforts to sell, re-lease, or otherwise dispose of the Post Road Equipment, (iii) to the extent any Post Road Equipment is disposed, as of the date of disposition of the applicable Post Road Equipment, the Debtors shall be released from all payment and other obligations under the applicable Post Road Equipment Lease solely with respect to the applicable disposed Post Road

Equipment, and (iv) all rights of the Debtors and Post Road under applicable law are preserved in connection with the rejection, assumption and/or assumption and assignment of all contracts governing the Debtors' lease and use of the Post Road Equipment, including but not limited to, the Post Road Equipment Leases.

47.     **Intuitive.** Notwithstanding anything herein or in the BSAAs to the contrary, unless otherwise agreed to in writing collectively by and among Intuitive Surgical, Inc. ("**Intuitive**"), the Buyers, and the Debtors, nothing in this Order authorizes the Debtors to assume or assign to the Buyers (i) that certain Lease Agreement between Intuitive and certain of the Debtors dated as of November 21, 2019 (the "**Intuitive Lease**"), with respect to a certain Intuitive-manufactured da Vinci® Xi™ robotic surgical system and related equipment (the "**System**"), or (ii) that certain Master Sales, Use, License and Service Agreement, between Intuitive and Debtor Steward Health Care System LLC, dated as of September 29, 2017 (the "**MSULSA**"), as it pertains to and is incorporated by reference into the Intuitive Lease, which MSULSA contains a non-exclusive license of Intuitive's copyrighted and patented intellectual property embedded in the System and related equipment.  Unless otherwise agreed upon among the Buyers, Intuitive, and the Debtors, this Order does not authorize the Debtors to transfer to the Buyers the System, the Intuitive Lease or the MSULSA.  In the event that the Debtors, the Buyers and Intuitive do not reach an agreement for the Buyers' use or acquisition of the System prior to the Designation Deadline (as defined in each applicable BSAA), the Debtors shall surrender the System to Intuitive on or before the Designation Deadline.  All rights, claims, and defenses of the Debtors and Intuitive under applicable law with respect to any proposed rejection, assumption or assumption and assignment of the Intuitive Lease or the MSULSA are expressly preserved.

48.    **CommonSpirit**.  Notwithstanding anything to the contrary in this Order or the agreements for the Sale Transactions approved by this Order, this Order shall not be deemed an assumption and assignment of any contracts that were previously assigned (the "**Assigned Contracts**") to Catholic Health Initiatives Colorado ("**CHIC**"), CommonSpirit Health ("**CSH**"), and/or CommonSpirit Mountain Region, f/k/a, Centura Health Corporation ("**CSMR**", together with CSH and CHIC, "**CommonSpirit**") in connection with that certain *Asset Purchase Agreement* dated February 15, 2023 by and among Davis Hospital & Medical Center, LP; IASIS Healthcare LLC; Jordan Valley Medical Center, LP; Physician Group of Utah, Inc.; Salt Lake Regional Medical Center, LP; Salt Lake Regional Physicians, Inc.; Seaboard Development LLC; Southridge Plaza Holdings, Inc.; and Steward Medical Group, Inc. as Sellers, Steward Health Care System LLC as the Seller Representative and the Seller Guarantor, CHIC as Buyer, and CSH as Buyer Guarantor.  CommonSpirit reserves all of its rights and remedies with respect to the Assigned Contracts under the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules, all applicable contracts, and applicable state and Federal laws, including, but not limited to, their rights to file any objections, motions, or adversary proceedings as may be appropriate.

49.    **GHX**.  Nothing in this Order constitutes an assumption, assumption and assignment, or other disposition of any contracts between Global Healthcare Exchange, LLC (together with its successors and assigns, "**GHX**") and the Debtors, including, but not limited to, the United States Purchaser User Agreement, dated September 12, 2005 (as amended October 9, 2023) and the Master Solution Agreement dated October 1, 2021 (collectively, the "**GHX Agreements**").  All rights of the Debtors and GHX pursuant to the GHX Agreements and sections 365 and 503 of the Bankruptcy Code are reserved, including, but not limited to, the treatment of

the GHX Agreements in these Bankruptcy Cases and any amounts owing to GHX under the GHX Agreements.

50.     **Dext.**   Notwithstanding anything in this Order or in the BSAAs, and unless otherwise agreed upon in writing by the Buyers, the Debtors, and Dext Capital, LLC ("**Dext Capital**"), the Sale Transactions shall exclude any equipment owned or leased by Dext Capital (collectively the "**Dext Capital Equipment**") as set forth under as set forth under Equipment Schedules Nos. 046 and 047 to that certain Master Lease Agreement No 23770-90000 dated March 12, 2012 (with each such Equipment Schedule and the Master Lease Agreement referred to herein as a "**Dext Capital Equipment Lease**"). The Debtors, the Buyers, and Dext Capital agree that each shall use commercially reasonable efforts to reach an agreement regarding the removal, disposition, use, or retention of Dext Capital Equipment (including any assignment and assumption of one or more of the Dext Capital Equipment Leases to Buyer or other operator). If the Debtors, the Buyers, and Dext Capital do not reach a consensual agreement with regards to the removal, disposition, use, or retention of Dext Capital Equipment leased under a Dext Capital Equipment Lease, then (i) the Debtors and the Buyers shall provide written notice and a reasonable opportunity for Dext Capital to reclaim, move, retrieve or sell the applicable Dext Capital Equipment, (ii) Dext Capital shall use commercially reasonable efforts to sell, re-lease, or otherwise dispose of the Dext Capital Equipment, and (iii) to the extent any Dext Capital Equipment is disposed, as of the date of disposition of the applicable Dext Capital Equipment, the Debtors shall be released from all postdisposition payment and other obligations under the applicable Dext Capital Equipment Lease schedule solely with respect to the applicable disposed Dext Capital Equipment (the "**Released Obligations**"), with Released Obligations being measured in a manner that is acceptable to the Debtors and Dext Capital and to the extent the parties cannot reach an agreement, the Court shall

determine the calculation of such Released Obligations at a subsequent hearing on a date and time to be agreed by the parties and (iv) notwithstanding anything in the preceding sentence (iii), all rights of the Debtors and Dext Capital under applicable law are preserved in connection with the rejection, assumption and/or assumption and assignment of all contracts governing the Debtors' lease and use of the Dext Capital Equipment, including but not limited to, the Dext Capital Equipment Leases, this preservation of rights includes specifically any applicable rejection damages or administrative claim arising from the Dext Capital Leases or Dext Capital Equipment.

51.     **Stonebriar**.  Notwithstanding anything herein, any notice related thereto, or in the BSAAs, the Sale Transactions shall exclude all property owned by Stonebriar Commercial Finance LLC ("**Stonebriar**" and such property, the "**Stonebriar Equipment**") and leased under or in connection with that certain Master Lease Schedule 26 (the "**Stonebriar Equipment Lease**") incorporating the terms of the Master Lease Agreement, dated January 17, 2019, between Philips Medical Capital, LLC and certain Debtors.  Prior to the Closing Date, the Debtors, the Buyers, and Stonebriar shall use commercially reasonable efforts to reach agreement regarding the removal, disposition, use, or retention (each an "**Agreed Disposition**") of Stonebriar Equipment (including any assignment and assumption of the Stonebriar Equipment Lease to new operators). If the Debtors, the Buyers, and Stonebriar do not reach a consensual agreement with regards to an Agreed Disposition of any Stonebriar Equipment prior to the Closing Date, the Debtors and the Buyers shall provide notice and a reasonable opportunity for Stonebriar to reclaim, move, pick-up or sell such Stonebriar Equipment. Upon the earlier of (A) the date of the consummation of an Agreed Disposition of Stonebriar Equipment (including the consummation of any assignment and assumption of the Stonebriar Equipment Lease to new operators) or (B) entry of an order by the Bankruptcy Court authorizing rejection of the Stonebriar Equipment Lease, the Debtors shall be

released from payment and other obligations accruing under the Stonebriar Equipment Lease after the effective date thereof; provided, that in the case of clause (A) hereof, the Debtors shall be released from such payment and other obligations under the Stonebriar Equipment Lease solely with respect to the Stonebriar Equipment actually subject to such Agreed Disposition or otherwise reclaimed, moved, picked up, or sold by Stonebriar in accordance with this paragraph. All rights of the Debtors and Stonebriar under applicable law are preserved in connection with the rejection, assumption and/or assumption and assignment of all contracts governing the Debtors' lease and use of the Stonebriar Equipment, including but not limited to, the Stonebriar Equipment Lease.

52. **Texas Taxing Authorities.** For the avoidance of doubt and notwithstanding anything to the contrary in this Order or the BSAAs in connection with the sale of the Purchased Assets, to the extent any of the Debtors' property in Texas subject to any ad valorem prepetition tax claim(s) held by any of the Texas Taxing Authorities[8] is to be sold, the Buyers assume the 2024 tax liability and shall be responsible for paying the ad valorem taxes in full, in the ordinary course of businesses, when due. The Texas Taxing Authorities shall retain their respective liens against the Purchased Assets, as applicable, until paid in full, including any applicable penalties or interest.

53. **The United States**. Notwithstanding any provision to the contrary in this Order, the BSAAs, or any other documents relating to the sale of the Purchased Assets, nothing shall: (1) authorize the assumption, sale, assignment or other transfer to the Buyers of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) property, (v) leases, (vi) licenses, (vii) permits, (viii)

---

[8] The "**Texas Taxing Authorities**" include all taxing authorities represented by Linebarger Goggan Blair & Sampson, Perdue Brandon Fielder Collins & Mott, and McCreary Veselka Bragg & Allen including but not limited to: Bexar County, Dallas County, Ector CAD, Fort Bend County, Jefferson County, Harris County, Fort Bend ISD, Fort Bend County Levee Improvement District #2, Mission Bend Utility District, Alief ISD, City of Houston (where represented by Perdue Brandon), Richardson ISD, Howard County Tax Office, Midland County, Midland CAD, Hardin County, and Bowie CAD.

registrations, (ix) authorizations, (x) approvals or (xi) agreements, including without limitation any agreements between any Debtor and the United States Department of Veterans Affairs or the United States Department of Labor, (collectively, "**Federal Interests**"), without compliance by the Debtors and Buyers with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts, or to require the federal government to novate, approve or otherwise consent to the assumption, sale, assignment or other transfer of, any Federal Interests; (3) waive, alter or otherwise limit the United States' property rights, including but not limited to, inventory, patents, intellectual property, licenses, and data; (4) other than as set forth in paragraph 17 of this Order, affect the setoff or recoupment rights of the United States; (5) authorize the transfer or assignment of any Federal Interests, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements, obligations (except as modified by paragraph 17 of this Order) and approvals under non-bankruptcy law; (6) release, nullify, preclude or enjoin the enforcement of any police or regulatory liability to the United States that the Buyers would be subject to as the owner or operator of property after the Closing Date; (7) confer exclusive jurisdiction to the Bankruptcy Court with respect to the Federal Interests, except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code) or other applicable law, or divest any tribunal of any jurisdiction it may have under police for regulatory law to interpret this Order or to adjudicate any defense asserted under the Sale Documents; or (8) expand the scope of 11 U.S.C.§ 525.

54. **United States Investigations.**  Nothing in this Order shall affect the obligations, if any, of the Debtors and their officers and directors under Federal law, if any,  to (i) preserve any and all records and documents that are subject to pending investigations, litigation, governmental subpoena, document preservation letter, or other investigative request from a

governmental agency relating to any of the Debtors' former or current directors and officers (the "**Investigations**"), or (ii) not destroy, alter, or remove, or permit the destruction, alteration or removal of, such records and documents relating to the Investigations.

55.     Any and all records or documents that are subject to the Investigations which are transferred to the Buyers in any sale shall be maintained by the Buyers, and the Buyers shall not intentionally destroy, alter, or remove, or permit the destruction, alteration or removal of, such records and documents relating to the Investigations, except upon an order entered following a motion filed in the Bankruptcy Court or another court with proper jurisdiction, with notice to the United States. Nothing in this Order shall affect the obligations, if any, of the Debtors, and their officers and directors, not to destroy, alter, or remove, or permit the destruction, alteration or removal of, records and documents relating to the Investigations that the Debtors do not transfer.

56.     The provisions of this Order regarding retention of documents relating to the Investigations shall be binding on the Debtors, as well as the bankruptcy estates, and shall survive dismissal or conversion to another chapter of any or all of the Bankruptcy Cases, appointment of any trustee, liquidating trustee, or other fiduciary with custody over assets of the estate.

57.     **Payor Agreements.**  Notwithstanding anything otherwise set forth in this Order, a counterparty to a Payor Agreement (as defined in the Settlement Order) or Private Program (as defined in the Interim Management Procedures) may continue their ordinary course overpayment recovery of any pre-closing overpayment, including recovering such overpayments from accounts receivable arising from pre-closing services rendered by the Debtors. For the avoidance of doubt, to the extent a counterparty to a Payor Agreement or Private Program has a valid right of setoff, counterclaim, or recoupment against the Debtors with respect to the applicable

Go-Forward Receivables (as defined in the Settlement Order) that arose after the Funding Commencement Time and prior to Closing, the Debtors may offset any undisputed amounts so setoff, counterclaimed or recouped against the Debtors by a counterparty to a Payor Agreement or Private Program against any amounts required to be remitted by the Debtors to the Buyer on account of the Go-Forward Receivables or other amounts due from the Debtors to the Buyer. Nothing herein shall alter or amend the Buyer's obligations under section 3.3 of the Interim Management Procedures (or comparable provision of an applicable Interim Management Agreement) to indemnify and hold the Debtors harmless for any and all costs or Liabilities incurred by the Debtors as a result of Buyer's use of the Operator's Billing Credentials, under section 9.3 of the Interim Management Procedures (or comparable provision of an applicable Interim Management Agreement), or any breach of the terms of the Operator's Billing Credentials, in accordance with the Interim Management Procedures (or comparable provision of an applicable Interim Management Agreement).

58.     **Provisions Non-Severable.**  The provisions of this Order are non-severable and mutually dependent.

Dated: _____, 2024
          Houston, Texas

                                        _____
                                        CHRISTOPHER M. LOPEZ
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

Bill of Sale, Assumption and Assignment Agreement (St. Joseph)

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

   This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), is delivered and entered into as of October [•], 2024 by and among (i) SJ Medical Center, LLC, a Texas limited liability company d/b/a St. Joseph Medical Center ("**Seller**"), (ii) solely for purposes of <u>Section 5.4</u>, the Seller Parties, and (ii) HSA St Joseph LLC, a Texas limited liability company ("**Buyer**", and collectively with Seller and the Seller Parties, the "**Parties**" and each individually a "**Party**").  The capitalized terms used herein shall have the meanings ascribed to them in Annex A unless the context indicates otherwise.

## W I T N E S E T H

   **WHEREAS**, Seller and certain Seller Affiliates (collectively, the "**Debtors**") are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**) and, on May 6, 2024, voluntary petitions for relief under chapter 11 of the Bankruptcy Code were filed in the United States Bankruptcy Court for the Southern District of Texas (such court, the "**Bankruptcy Court**", and such cases, jointly administered under Case No. 24-90213, the "**Chapter 11 Cases**");

   **WHEREAS**, on September 11, 2024, the Bankruptcy Court entered an Interim Order approving a global settlement among the Debtors, MPT, the Prepetition ABL/FILO Secured Parties, the FILO Secured Parties, and the Creditors' Committee (each as defined in the Interim Settlement Order) regarding certain disputes arising among such parties in connection with the Chapter 11 Cases, which Interim Order was entered as Docket No. 2418 (including all exhibits thereto, the "**Interim Settlement Order**");

   **WHEREAS**, on September 11, 2024, (i) MPT designated Buyer as its "Interim Manager" (as defined in the Interim Settlement Order) and (ii) Steward, Seller and Buyer have entered into that certain Interim Management Agreement, dated as of September 11, 2024 (the "**Interim Management Agreement**"), pursuant to which Buyer agreed to provide Seller with certain interim management services and fund the operations of the Facilities in accordance with the Settlement Term Sheet (as defined in the Interim Settlement Order) during the period starting at 12:01 a.m. local time on September 11, 2024 (the "**Transition Time**") until the date hereof (as defined herein);

   **WHEREAS**, on September 18, 2024, the Bankruptcy Court entered a Final Order approving a global settlement among the Debtors, MPT, the Prepetition ABL/FILO Secured Parties, the FILO Secured Parties, and the Creditors' Committee regarding certain disputes arising among such parties in connection with the Chapter 11 Cases, which Final Order was entered as Docket No. 2610 (including all exhibits thereto, the "**Final Settlement Order**" and, collectively with the Interim Settlement Order, the "**Settlement Orders**");

   **WHEREAS**, pursuant to the Settlement Orders, MPT has designated Buyer as the Designated Operator for the Purchased Assets;

   **WHEREAS**, in accordance with the Settlement Orders, Seller desires to sell the Purchased Assets to Buyer and assign the Assumed Liabilities to Buyer, subject to the terms and conditions set forth in this Agreement;

   **WHEREAS**, Buyer desires to acquire the Purchased Assets from Seller and assume the Assumed Liabilities from Seller, subject to the terms and conditions set forth in this Agreement;

   **WHEREAS**, the Bankruptcy Court approved entry into this Agreement and consummation of the Contemplated Transactions pursuant to that certain MLI Hospital Sale Order (as defined in the Settlement Term Sheet attached to the Settlement Orders) concerning the Facilities; and

**WHEREAS**, Buyer has obtained those certain Approvals from the relevant Governmental Authorities required to operate the Business at the Facilities, as set forth on <u>Schedule A-1</u>.

**NOW, THEREFORE**, for and in consideration of the premises, the agreements, covenants, representations and warranties set forth in this Agreement, and other good and valuable consideration, the receipt and adequacy of which are acknowledged and agreed, the Parties agree as follows:

1.      **SALE OF ASSETS AND CERTAIN RELATED MATTERS.**

      **1.1      Sale of Purchased Assets**.  On the terms and subject to the conditions set forth in this Agreement, Seller and each Seller Party hereby sells, assigns, conveys, transfers, and delivers to Buyer, and Buyer hereby purchases, acquires, and accepts, all of Seller's and each Seller Party's right, title and interest to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), provided that in no event shall any Transferred Executory Contract be assigned to Buyer until after any applicable requisite notice period set forth in the Settlement Order has been satisfied.  "**Purchased Assets**" means, in each case other than the Excluded Assets, (i) all assets, properties, rights, and interests of every description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, owned by (x) Seller and exclusively used or held for use in the operation of, or otherwise exclusively relating to, the Business or (y) any of the Seller Parties solely to the extent set forth in <u>Schedule B</u>, (in each case other than the Excluded Assets), in each case, to the extent assignable or transferable under applicable Law, and (ii) all Transferred Executory Contracts.

      **1.2      Excluded Assets**.  Notwithstanding anything herein to the contrary, the assets, properties, rights, and interests of every description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, of Seller and any Seller Affiliates, in each case, set forth on <u>Schedule C</u> are not intended by the Parties to be a part of the Contemplated Transactions and are excluded from the Purchased Assets (collectively, the "**Excluded Assets**").

      **1.3      Assumed Liabilities**.  On the terms and subject to the conditions set forth in this Agreement, Buyer hereby assumes, and agrees to pay, perform and discharge, when they become due and payable,  the following Liabilities of Seller and Seller Parties (collectively, the "**Assumed Liabilities**"):

           (a)      all Liabilities arising out of the use, ownership or operation of the Business, the Purchased Assets or the Facilities first arising after the Transition Time;

           (b)      all Liabilities for (i) Taxes relating to the transfer of the Purchased Assets under this Agreement (including any Transfer Taxes), other than income Taxes of Seller, any Seller Party, or any consolidated, combined, unitary or similar Tax group of which Seller or such Seller Party is a member, (ii) Property Taxes with respect to the Purchased Assets, and (iii) any Tax relating to the Purchased Assets or the Business for which a Governmental Authority asserts in writing personal liability on any officer, director, or employee of Seller or any Affiliate thereof;

           (c)      all Liabilities arising as the custodian of the medical records, patient files, and other written accounts of the medical history of the patients of the Business;

           (d)      all Liabilities related to Seller Employees to the extent assumed under <u>Section 5.4</u>; and

           (e)      all Liabilities as set forth on <u>Schedule D</u>.

All Liabilities of Seller and the Seller Parties not otherwise expressly assumed under this Section 1.3 shall be excluded from the Contemplated Transaction and remain Liabilities of Seller or the Seller Parties, as applicable (collectively, the "**Excluded Liabilities**").

  **1.4**  **Consideration**.  Subject to the terms and conditions hereof, the aggregate consideration (the "**Consideration**") for the Purchased Assets is Buyer's assumption of the Assumed Liabilities.

  **1.5**  **Designated Contracts; Cure Costs**.

    (a)  From time to time on or prior to December 16, 2024 (the "**Designation Deadline**"), Buyer may designate, by written notice to Seller, each Executory Contract it wishes to be assigned to it (each such Executory Contract, a "**Transferred Executory Contract**") in accordance with the procedures set forth in the Settlement Order.

    (b)  All Cure Costs and all fees and expenses actually incurred by Seller, any Seller Party, if applicable and their Affiliates to effect the assumption and assignment of the Transferred Executory Contracts from Seller or, if applicable, Seller Party to Buyer (including any legal expenses and any fees and expenses in connection with the assumption and assignment of Government Program provider numbers) (collectively, the "**Cure Fees and Expenses**") shall be paid by Buyer no later than the time of assignment, and as a condition to Seller's and, if applicable, Seller Party's obligation to assign, such Transferred Executory Contracts. Upon request by Buyer, Seller and, if applicable, the Seller Paties shall promptly (in any event three (3) Business Days following such request) provide Buyer with an invoice for such Cure Fees and Expenses.

    (c)  Notwithstanding any provision to the contrary contained in this Agreement, but subject to Section 1.5(b), in no event shall any Transferred Executory Contract be assigned to Buyer until after any requisite notice period set forth in the Settlement Order has been satisfied.

**2.**  **CLOSING.**

  **2.1**  **Closing**.  The assignment of the Purchased Assets and assumption of the Assumed Liabilities pursuant to this Agreement shall be effective for financial and accounting purposes as of 11:59 p.m. local time on the date hereof (the "**Effective Time**"). The delivery of all Transaction Documents by one Party to any other Party shall be deemed to have occurred simultaneously and none shall be effective unless and until all have occurred.

  **2.2**  **Deliveries of Seller at the Closing**.  Concurrently with the execution of this Agreement, Seller has delivered to Buyer or its designee the following:

    (a)  one or more power of attorneys (each a "**Power of Attorney**"), duly executed by Seller, authorizing Buyer to utilize Seller's federal and state controlled substances permits and pharmacy licenses;

    (b)  a confirmatory trademark assignment agreement (the "**Trademark Assignment Agreement**"), duly executed by Seller;

    (c)  a transition services agreement (the "**Transition Services Agreement**"), duly executed by Seller or the Seller Affiliates, as applicable;

(d)       an employee contract assignment and assumption agreement (the "**Employee Contract Assignment and Assumption Agreement**"), duly executed by Seller and/or each relevant Seller Party;

(e)       an employee lease agreement in a form mutually agreed upon by the Parties (the "**Employee Lease Agreement**"), duly executed by Seller and each relevant Seller Party, pursuant to which Seller and each relevant Seller Party will lease the Seller Employees to Buyer from the Effective Time through the Employee Transition Date;

(f)       a professional leaseback agreement in a form mutually agreed upon by the Parties (the "**Leaseback Agreement**"), duly executed by Seller Party;

(g)       a professional services agreement in a form mutually agreed upon by the Parties (the "**Professional Services Agreement**"), duly executed by Seller Party; and

(h)       a duly executed IRS Form W-9 of Seller (or, if Seller is a disregarded entity, its regarded owner for applicable income tax purposes).

**2.3       Deliveries of Buyer at the Closing**.  Concurrently with the execution of this Agreement, Buyer has delivered to Seller the following:

(b)       the Transition Services Agreement, duly executed by Buyer;

(c)       the Employee Contract Assignment and Assumption Agreement, duly executed by Buyer;

(d)       the Employee Lease Agreement, duly executed by Buyer;

(e)       the Leaseback Agreement, duly executed by Buyer;

(f)       the Professional Services Agreement, duly executed by Buyer; and

(g)       copies of resolutions duly adopted by the board of managers of Buyer, authorizing and approving Buyer's performance of the Contemplated Transactions and the execution and delivery of this Agreement and the other Transaction Documents, certified as true and in full force and effect as of the date hereof by an appropriate officer of Buyer.

**2.4       Additional Acts**.  From time to time after the Effective Time, the Parties shall execute, acknowledge and deliver to the other applicable Parties all such further reasonable documents, conveyances, notices, assumptions, releases and acquittances and such other reasonable instruments, and shall take such further reasonable actions, as may be reasonably necessary or appropriate to effectuate this Agreement and consummate the Contemplated Transactions, including to assure fully to Buyer all of the properties, rights, titles, interests, estates, remedies, powers and privileges relating to the Purchased Assets intended to be conveyed to Buyer under this Agreement and the other Transaction Documents and to assure fully to Seller and each Seller Party the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement and the other Transaction Documents, and to confirm, consummate or otherwise make effective the Contemplated Transactions.

3.       **REPRESENTATIONS AND WARRANTIES OF SELLER.**

Seller hereby represents and warrants to Buyer the following:

**3.1** **Organization; Capacity**.  Seller and each of the Seller Parties is a corporation, limited liability company or other entity, duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation or organization.  Except for such authorizations as may be required by the Bankruptcy Court, the execution and delivery by Seller and each of the Seller Parties of this Agreement and the other Transaction Documents to which it is or will become a party, as applicable, the performance by Seller or such Seller Party of its obligations under this Agreement and the other Transaction Documents to which it is or will become a party and the consummation by Seller or such Seller Party of the Contemplated Transactions to which it is a party have been authorized and approved by all necessary corporate, limited liability company or other similar actions, as applicable, on the part of Seller or such Seller Party, none of which actions has been modified or rescinded and all of which actions remain in full force and effect.

**3.2** **Authority; Non-contravention; Binding Agreement**.

(a) The execution, delivery and performance by Seller and each of the Seller Parties of this Agreement and the other Transaction Documents to which it is a party, and the consummation by Seller and such Seller Party of the Contemplated Transactions, as applicable:

(i) are within Seller's and each Seller Party's corporate, limited liability company or other similar powers and are not and will not be in contravention or violation of the terms of the organizational or governing documents of Seller or such Seller Party;

(ii) except as set forth in Schedule A-2, do not and will not require any Approval of, filing or registration with, the issuance of any Permit by, or any other action to be taken by, any Governmental Authority to be made or sought by Seller or any Seller Party;

(iii) do not and will not require any Approval or other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both), or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation, or loss of a material benefit under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) upon, any of the Purchased Assets under (1) any Contract material to the Business taken as a whole, or Permit or Approval applicable to any of the Purchased Assets or (2) any Order or Law applicable to any of the Purchased Assets or to which Seller may be subject, except in each case of clauses (ii) and (iii)(1) above, as would not reasonably be expected to have a Material Adverse Effect; and

(b) This Agreement and the other Transaction Documents to which Seller or any Seller Party is a party are and will constitute the valid and legally binding obligations of Seller or such Seller Party and, assuming the due authorization and execution thereof by Buyer , are and will be enforceable against them in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable Laws or an Order of the Bankruptcy Court affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.3** **Title to Assets.** Seller is conveying to Buyer, and Buyer is acquiring, good and marketable title to the Purchased Assets, free and clear of all Encumbrances, other than the Permitted Encumbrances.

**3.4** **Litigation**.  Except for the Chapter 11 Cases, there is no Proceeding or Order pending or, to the Knowledge of Seller, threatened against Seller or any Seller Party with respect to the Business or the Purchased Assets, in which an adverse determination would reasonably be expected to have a Material Adverse Effect or would otherwise prohibit the consummation of the Contemplated Transactions.

**3.5** **No Other Representations or Warranties**.

(a)      Except for the representations and warranties expressly set forth in this Section 3, neither Seller nor any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, on behalf of Seller or any Seller Affiliate, including any representation or warranty regarding Seller, any Seller Party, or any other Person, any Purchased Assets, any Facility, any Liabilities of Seller, including any Assumed Liabilities, the Business, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and Seller hereby disclaims all other representations and warranties of any kind whatsoever, express or implied, written or oral, at law or in equity, whether made by or on behalf of Seller, any Seller Party, or any other Person, including any of their respective Representatives.

(b)      Except as expressly set forth in Section 3 hereof, the Purchased Assets transferred to Buyer will be sold by Seller and purchased by Buyer in their physical condition at the Effective Time, "AS IS, WHERE IS AND WITH ALL FAULTS AND NON-COMPLIANCE WITH LAWS" WITH NO WARRANTY OR HABITABILITY OF FITNESS FOR HABITATION, with respect to the Leased Real Property and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the Personal Property and Inventory, any and all of which warranties (both express and implied) Seller hereby disclaims.  All of the Leased Real Property, Personal Property and Inventory shall be further subject to normal wear and tear and normal and customary use in the ordinary course of business up to the Effective Time.  Buyer acknowledges that Buyer has examined, reviewed and inspected all matters which in Buyer's judgment bear upon the Purchased Assets and their value and suitability for Buyer's purposes and, except as affirmatively represented and warranted by Seller, is relying solely on its own examination, review and inspection of the Purchased Assets and Assumed Liabilities.

4.      **REPRESENTATIONS AND WARRANTIES OF BUYER.**

Buyer hereby represents and warrants to Seller that the statements contained in this Section 4 are true and correct as of the date of this Agreement.

**4.1      Organization; Capacity**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas. Buyer is duly authorized, qualified and in good standing under all applicable Laws of any jurisdictions (foreign and domestic) in which the character or location of the assets owned or leased by it or the nature of the business conducted by it requires such authorization or qualification.  Buyer has the requisite power and authority to enter into the Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.  The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is a party, the performance by Buyer of its obligations under this Agreement and the other Transaction Documents to which it is a party and the consummation by Buyer of the Contemplated Transactions and the Transaction Documents to which it is a party, have been duly and validly authorized and approved by all necessary action, as applicable, on the part of Buyer, none of which actions has been modified or rescinded and all of which actions remain in full force and effect.

**4.2      Authority; Non-contravention; Binding Agreement**.

(a)      The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation by Buyer of the Contemplated Transactions and its obligations under the Transaction Documents, as applicable:

(i)      are within Buyer's powers and are not, and will not be, in contravention or violation of the terms of Buyer's organizational or governing documents;

(ii)      do not and will not require any Approval of, filing or registration with, the issuance of any Permit by, or any other action to be taken by, any Governmental Authority to be made or sought by Buyer; and

(iii)      do not and will not require any Approval or other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both) or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation, or loss of a material benefit under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) upon, any material assets of the Buyer under any Contract, Permit, Order or Law to which Buyer may be subject.

(b)      This Agreement and the other Transaction Documents to which Buyer is or will become a party are and will constitute the valid and legally binding obligations of Buyer and, assuming the due authorization and execution thereof by Seller, are and will be enforceable against it in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**4.3      Litigation**.  There is no Proceeding or Order pending or, to the Knowledge of Buyer, threatened against or affecting Buyer, or any of its Affiliates or any of their respective properties or rights that prohibit the consummation of the Contemplated Transactions.

**4.4      Representations of Seller**.  Buyer hereby acknowledges and agrees the only representations and warranties made by Seller are the representations and warranties expressly set forth in Section 3 and Buyer has not relied upon, and will not rely upon, any other express or implied representations, warranties or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or on behalf of Seller, or any Seller Affiliates, any Representatives of Seller or any Seller Affiliate or any other Person, including any projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or through Seller's bankers, or management presentations, data rooms (electronic or otherwise) or other due diligence information, and that Buyer will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information. Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Business, the Purchased Assets and the Assumed Liabilities are being transferred on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in Section 3  without any other representations or warranties of any nature whatsoever.

5.      **COVENANTS OF SELLER AND BUYER.**

**5.1      Bulk Sales Laws**.  Buyer and Seller hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

**5.2      Social Media Accounts**.   Promptly after the Effective Time, Seller shall initiate the respective processes to grant Buyer exclusive access rights and permissions to the social media accounts owned or operated by Seller set forth on <u>Schedule E</u>.  Within forty-five (45) days after the Closing Date, Buyer must remove all marks or content, to the extent not a Purchased Asset, of Seller and its Affiliates from such social media accounts.

**5.3** **Confidentiality**. It is understood by the Parties that the Confidentiality Agreement will survive the execution and delivery of this Agreement and will terminate pursuant to the terms of the Confidentiality Agreement.   To the extent that any press releases or public announcements are to be issued or made relating to the Contemplated Transactions, the timing and content of such press releases and public announcements shall be mutually agreed between each Party hereto.

**5.4** **Seller Employees.**As of the Effective Time, Seller and Buyer shall enter into an Employee Lease Agreement, and each Seller Party and Buyer shall enter into an Employee Lease Agreement, pursuant to which Seller and Seller Party shall continue to employ certain Seller Employees for the benefit of Buyer, pursuant to and in accordance with the Employee Lease Agreement, until the Employee Transition Time. During the term of the Employee Lease Agreement, subject to Buyer's standard hiring practices and policies (including but not limited to background checks, drug screens and a general prohibition against hiring employees who were previously released for cause from employment with Buyer or their Affiliates), Buyer will make offers of employment to substantially all of the persons who are Seller Employees eligible for hire by Buyer, with such offers of employment to be effective on or prior to the Employee Transition Date, provided that with respect to all of the persons who are Seller Employees and are on short-term or long-term disability or on leave of absence pursuant to Seller's or Seller Party's policies, the Family and Medical Leave Act of 1993 or other similar Law as of the Effective Time (each, an "**Employee on Leave**"), such offers of employment shall be made effective as of the date that the person reports back to work at the Business on an active basis within one hundred eighty (180) days after the Effective Time (or such longer time as is required by applicable Law).

(b)      As of the Employee Transition Date or, with respect to any Employee on Leave, upon the date such Employee on Leave becomes a Transferred Employee (such date, in each case, the "**Employee Effective Time**"), Seller and each Seller Party shall terminate all Seller Employees. The term "**Transferred Employee**" as used in this Agreement means a Seller Employee who accepts employment with Buyer as of the Employee Effective Time (and with respect to any Employee on Leave, as of the date such Employee on Leave so reports back for work).

(c)      As of the Employee Effective Time, for each Transferred Employee who is a party to an employment or similar Contract (each, an "**Employee Obligation**"), Buyer shall honor the terms of such Employee Obligations.

(d)      Subject to the requirements of any applicable Collective Bargaining Agreement, for a period of at least twelve (12) months following the date hereof (or such longer period as may be required by applicable Collective Bargaining Agreement and/or Law), each Transferred Employee that is not party to an Employee Obligation shall be entitled to receive from the Buyer (i) at least the same salary and wages as were provided to such employee by Seller or Seller Party immediately prior to the date hereof by Seller or a Seller Party, (ii) employee benefits substantially comparable in the aggregate to the employee benefits provided to each Transferred Employee immediately prior to the date hereof by Seller or Seller Party and (iii) responsibilities consistent with their then-current job title and reporting structure immediately prior to the date hereof.  For each Transferred Employee subject to an Employee Obligation, Buyer shall honor the terms of employment, union or other contracts for those Transferred Employees who have such agreements.  For the avoidance of doubt, nothing contained herein modifies the terms of any Collective Bargaining Agreement.

(e)      Buyer hereby assumes or retains, as the case may be, any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of any Seller Employee, including accrued and unpaid wages or salary, accrued and unused vacation, sick days and paid time off against Seller or a Seller Party, in each case, with respect to any Seller Employee, irrespective of when such claims are made. Buyer shall pay the

applicable Transferred Employees the unpaid portion of any Transferred Employee's bonus for the 2024 calendar year at the same time such bonuses are paid to such Transferred Employee in the ordinary course of business consistent with past practices.

(f)     Buyer hereby assumes each Collective Bargaining Agreement governing the terms and conditions of employment of the employees represented by a union or other labor organization ("**Union Represented Employees**"), hereinafter referred to as the "**Assumed CBAs**." Buyer has delivered offers of employment to Union Represented Employees (i) in accordance with Section 5.4(a) and Section 5.4(d), or alternatively negotiated in good faith with the applicable union or other labor organization to deem such offers of employment to have been made to the Union Represented Employees and (ii) containing the terms and conditions of employment contained in the Assumed CBAs.

(g)     Buyer agrees to recognize each Transferred Employee's date of hire by Seller or a Seller Party, as applicable, as the anniversary date of record with Buyer and to honor that seniority for purposes of eligibility, vesting and prospective benefit accrual on or after the date hereof under Buyer employee benefit plans and policies, but excluding any defined benefit pension plan within the meaning of Section 3(35) of ERISA and any retirement plan intended to be qualified under Section 401 (including any 401(k) plan).  Buyer will waive the customary waiting periods under its welfare and 401(k) plans for the Transferred Employees and their eligible spouses and dependents under any employee benefit plan, program or arrangement of Buyer, and, subject to each Transferred Employee's election of coverage, participation in Buyer's benefit plans shall begin as of the Employee Effective Time for each Transferred Employee who is in an eligible class as defined under the respective Buyer benefit plans.  To the extent lawful and subject to the approval of any applicable insurer, Buyer shall (i) honor the Transferred Employees' prior service credit under Seller's or Seller Party's current welfare plans for purposes of satisfying pre-existing condition limitations in Buyer's welfare benefit plans, and (ii) with respect to the 2024 calendar year, recognize any out-of-pocket expenses (including deductibles, co-pays, and out of pocket maximums) incurred by each of the Transferred Employees and their eligible dependents under any Plans that are welfare benefit plans prior to the date hereof for purposes of determining deductibles, co-pays and out-of-pocket maximums under Buyer's applicable medical and welfare benefit plans on and after the date hereof.  For purposes of eligibility to participate in Buyer's retirement plans, Buyer shall honor prior length of service for each Transferred Employee that meets the eligibility requirements under Buyer's retirement plans, but Buyer will not make any contributions to Buyer's retirement plans for the Transferred Employees with respect to prior service.

(h)     Subject to the terms and conditions of Buyer's applicable benefit plans, for each Seller Employee, Buyer shall carry over, and give credit for (or with respect to any Seller Employee who does not become a Transferred Employee pay to such Seller Employee on the date hereof or, if permitted under applicable Law, promptly after the date hereof), the unused Paid Time Off of such Seller Employee as of immediately prior to the Employee Effective Time (the aggregate number of hours of Paid Time Off assumed by Buyer for all Seller Employees pursuant to this Section 5.4(h), the "**Assumed Paid Time Off**").

(i)     Buyer shall be solely responsible for complying with the WARN Act and any and all obligations under other applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Seller Employees as a result of any action by Buyer following the Transition Time.

(j)     Notwithstanding any provision herein to the contrary, no term of this Agreement shall be deemed to (i) create any Contract with any Transferred Employee; (ii) give any Transferred Employee the right to be retained in the employment of Buyer or any of its Affiliates; (iii) interfere with Buyer's right to terminate the employment of any Transferred Employee at any time; or (iv) obligate Buyer or any of its Affiliates to adopt, enter into or maintain any employee benefit plan or other compensatory

plan, program or arrangement at any time.  Nothing in this Agreement shall diminish Buyer's right to change or terminate its policies regarding employment matters at any time or from time to time.

        **5.5**        **Post-Closing Access to Information; Communication with Governmental Authorities**.

        (a)        Buyer and Seller acknowledge that prior to the end of the Post-Closing Period, Buyer and Seller may need access to information, documents or computer data in the control or possession of the other, including for the purpose of satisfying their obligations in connection with the Chapter 11 Cases, and Seller may need access to records that are a part of the Purchased Assets for purposes of concluding the Contemplated Transactions and for audits, investigations, compliance with applicable Law or an Order of the Bankruptcy Court and requests from Governmental Authorities, and the prosecution or defense of claims made by third parties.  Accordingly, Buyer agrees that, except to the extent necessary to comply with any applicable Law or an Order of the Bankruptcy Court, it will timely make available to Seller and its respective Representatives the Books and Records and such information, documents and computer data as may be available relating to the Purchased Assets and the Business in respect of periods prior to the Effective Time and will permit Seller (or its Representatives) to make copies of such Books and Records, information, documents and computer data.  Seller agrees that Seller will timely make available to Buyer and its Representatives such information, documents and computer data relating to the Purchased Assets and the Business in respect of periods prior to the Effective Time as may be in the possession of Seller or any Seller Party and will permit Buyer (or its Representatives) to make copies of such documents and information.  Notwithstanding the foregoing, all disclosures of information shall be consistent with the Confidentiality Agreement, all common interest agreements, joint defense agreements, and any other confidentiality, clean room or nondisclosure agreements entered into among any of the Parties or their respective Affiliates.  The Parties agree that the cost of compliance with this provision shall be governed by the Transition Services Agreement.

        (b)        Buyer shall assume all legal responsibility for, and shall preserve, the Books and Records (including, but not limited to, patient records) for the greater of: (i) seven (7) years from the date of such record; (ii) as may be required by applicable Law, including but not limited to, the statute of limitations governing the time period afforded to bring professional liability claims in Texas or as is necessary to administer the Chapter 11 Cases; or (iii) such longer period as may be required in connection with any known or threatened investigation or Proceeding, including any professional liability claims.  Thereafter, Buyer may dispose of such Books and Records only after Buyer has given Seller ninety (90) days' prior written notice of such impending disposition and the opportunity of Seller to remove and retain such Books and Records as permitted by applicable Law.

        (c)        Buyer shall cooperate with Seller, on a timely basis and as reasonably requested by Seller, in connection with the provision of all data of the Business and other information required by Seller for reporting to the DNV for the remainder of the quarterly period in which the Contemplated Transactions have occurred.

        (d)        To the maximum extent permitted by applicable Law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities, including documents relating to the operations of the Business or ownership of any of the Purchased Assets prior to the Effective Time, then to the extent allowable by applicable Law, prior to any disclosure of such documents, Buyer shall notify Seller and provide Seller with the opportunity to object to, such request or demand.

        (e)        To the extent practicable under the circumstances, neither Seller nor Buyer, as applicable, will agree to participate in any substantive call, meeting or conference with any Governmental Authority, or any member of the staff of any Governmental Authority, in respect of any filing, Proceeding,

investigation (including any settlement of the investigation), litigation, or other inquiry related to the Contemplated Transactions, provided that such responding Party (1) provides reasonable advance notice of such meeting to any other Party and (2) provides any such other Party an opportunity to attend or participate and, where permitted, allow any other Party to participate.

      **5.6**     **Transition Patients**. To compensate Seller for services rendered and medicine, drugs and supplies provided by the Hospitals up to the Transition Time with respect to patients who are admitted to the Hospitals prior to the Transition Time and whose care is reimbursed by any Government Program or Private Program but who are not discharged until after the Transition Time (such patients being referred to herein as the "**Transition Patients**" and services rendered to them being referred to herein as the "**Transition Patient Services**"), the Parties shall take the following actions:

      (a)     For Transition Patients for whom a cut-off billing for the period prior to the Effective Time ("**Interim Billing**") is not accepted by the applicable Government Program or Private Program (the "**Non-Interim Billing Transition Patients**"), as soon as practicable after the date hereof, Seller shall deliver to Buyer a statement specifying the Non-Interim Billing Transition Patients and the expected reimbursement for each such Non-Interim Billing Transition Patient. Such statement shall also identify which Non-Interim Billing Transition Patients (i) are receiving medical care that is paid for, in whole or in part, by a Government Program or Private Program that pays on a diagnostic related group ("**DRG**"), case rate, or other similar basis and for whom the applicable Facility is paid on a per-claim basis (the "**DRG Transition Patients**") and/or (ii) are receiving medical care that is paid for on a non-DRG basis ("**Non-DRG Transition Patients**"). Buyer shall be responsible for submitting such billings to the applicable Government Program or Private Program for the entire portion of each of the Non-Interim Billing Transition Patients' respective stays.

      (b)     For Transition Patient Services provided to a DRG Transition Patient, upon receipt of payment, Seller shall be entitled to an amount equal to (i) the total DRG payment received by Buyer and Seller (including disproportionate share, uncompensated care, low volume adjustment, indirect medical education, outlier, and capital payments and any deposits, deductibles, copayments paid, whether received by Buyer or Seller), multiplied by a fraction, the numerator of which shall be the number of days prior to the Transition Time that the DRG Transition Patient was an inpatient at the applicable Hospital and the denominator of which shall be the total number of days that such DRG Transition Patient was an inpatient at such Hospital minus (ii) any deposits, deductibles or co-payments paid by or on behalf of the applicable DRG Transition Patient to Seller or any of Seller's Affiliates prior to the Transition Time. Buyer will make such payments to Seller within ten (10) Business Days after receipt of such payment.

      (c)     For Transition Patient Services provided to a Non-DRG Transition Patient, Seller shall be entitled to an amount equal to (i) the total payments received by Buyer and Seller for such Non-DRG Transition Patient (including any deposits, deductibles, or copayments, whether received by Buyer or Seller), multiplied by a fraction, the numerator of which shall be the total number of days prior to the Transition Time on which the applicable Hospital provided Transition Patient Services to such Non-DRG Transition Patient and the denominator of which shall be the total number of days with respect to such Non-DRG Transition Patient's stay at the applicable Hospital minus (ii) any deposits, deductibles or co-payments paid by or on behalf of the applicable Non-DRG Transition Patient to Seller or any of Seller's Affiliates prior to the Transition Time. Buyer will make such payments to Seller within ten (10) Business Days after receipt of such payment.

      (d)     In addition to the other payments contemplated by this Section 5.6 (or elsewhere in this Agreement), (i) if Seller or the Seller Affiliates receives any amount from patients, Government Programs or Private Programs which relates to services rendered by the Facilities after the Transition Time, Seller or Seller Affiliate will remit such amount to Buyer within ten (10) Business Days after receiving

such amount; and (ii) if Buyer receives any amount from patients, Government Programs or Private Programs which relates to services rendered by the Facilities prior to the Transition Time, Buyer will remit such amount to Seller within ten (10) Business Days of receiving such amount.

(e)    Notwithstanding anything to the contrary in this Agreement, neither Buyer nor Seller shall be entitled to withhold any of the respective payments due and owing under this Section 5.6 by means of setoff against any amount owed by any other Party.

**5.7    Cost Reports; Periodic Interim Payments; Disproportionate Share Hospital Surveys and Information.**

(a)    Seller, at its own cost and expense, will timely prepare and file all Cost Reports relating to the Facilities and the Business for periods ending prior to the Effective Time or required as a result of the consummation of the Contemplated Transactions (collectively, the "**Seller Cost Reports**"). Buyer shall make available, in a timely and reasonable manner, to Seller any information and records that are in Buyer's possession and that are reasonably necessary, as determined by Seller in its reasonable discretion, for Seller to prepare the Seller Cost Reports.  Buyer shall forward to Seller any and all correspondence relating to the Seller Cost Reports within ten (10) Business Days after receipt by Buyer. Buyer shall remit to Seller any Cost Report Settlements promptly (but no later than ten (10) Business Days) after receipt by Buyer, and shall forward to Seller any demand for payments relating to the Seller Cost Reports within ten (10) Business Days after receipt by Buyer.  Seller shall retain the right to appeal any Medicare determinations relating to Cost Report Settlements.  To the extent that Seller requires the assistance of Buyer to effectuate its rights hereunder, including but not limited to with respect to any ongoing appeals or litigation in connection with any Excluded Assets involving Government Programs (including those described in subsection (n) of Schedule C) that require involvement of Buyer, Buyer will cooperate therewith as reasonably requested by Seller. Seller shall retain the originals of the Seller Cost Reports, correspondence, work papers, and other documents relating to the Seller Cost Reports and the Cost Report Settlements.  Seller shall use commercially reasonable efforts to timely and accurately respond to all audit and other supplemental information requests related to the Seller Cost Reports.

(b)    Upon Buyer's written request, Seller shall terminate the Hospitals' participation in any periodic interim payment program with Medicare effective as of the date hereof. If Buyer receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating solely to periods prior to the Transition Time, Buyer shall pay Seller an amount equal to such Medicare Interim Payment(s) received by Buyer within ten (10) Business Days after receipt.  If Buyer receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating to the period commencing prior to and ending after the Transition Time, Buyer shall pay Seller within ten (10) Business Days after receipt an amount equal to the Medicare Interim Payment(s) actually received by Buyer for such period multiplied by a fraction, the numerator of which shall be the total number of days prior to the Transition Time and the denominator of which shall be the total number of days attributable to such Medicare Interim Payment(s).  If Seller receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating solely to periods on or after the Transition Time, Seller shall pay Buyer within ten (10) Business Days after receipt of an amount equal to such Medicare Interim Payment(s) received by Seller.  If Seller receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating to the periods commencing prior to and ending after the Transition Time, Seller shall pay Buyer within ten (10) Business Days after receipt an amount equal to the Medicare Interim Payment(s) actually received by Seller for such period multiplied by a fraction, the numerator of which shall be the total number of days after the Transition Time and the denominator of which shall be the total number of days attributable to such Medicare Interim Payment(s).  It is the intent of the Parties that Buyer and Seller shall receive all third-party payments applicable to the period of time that the Hospitals are owned by the respective Parties.

(c)     If Seller receives any amount from patients, third-party payors, group purchasing organizations or suppliers which, under the terms of this Agreement, belongs to Buyer, Seller shall remit within five (5) Business Days the full amount so received to Buyer.  If Buyer receives any amount from patients, third-party payors, group purchasing organizations or suppliers which, under the terms of this Agreement, belongs to Seller, Buyer shall remit within five (5) Business Days the full amount so received to Seller.

(d)     Subject to applicable Laws, Seller will reasonably cooperate with Buyer in providing pre-Effective Time patient data and any documents Buyer reasonably believes are necessary or appropriate for Buyer to file with respect to Medicaid disproportionate share hospital surveys, to the extent applicable in the jurisdiction of the Business for the fiscal periods prior to and after the Effective Time.

(e)     Notwithstanding anything to the contrary in this Agreement, neither Buyer nor Seller shall be entitled to recover any of the respective payments due and owing under this <u>Section 5.7</u> by means of setoff against any amount owed by any other Party.

(f)     After the Effective Time, as reasonably requested by Seller, Buyer will cooperate with Seller in connection with Seller's collection of the accounts receivable that are among the Excluded Assets.

**5.8     CMS Reporting.**

(a)     Buyer will cooperate with Seller in all reasonable respects in providing, in a timely and reasonable manner, documents or data that Seller reasonably believes are necessary or appropriate for Seller to file with respect to CMS Reporting for all CMS Program Performance Periods ending prior to the Effective Time. Buyer shall forward to Seller any and all correspondence from CMS relating to applicable CMS Reporting for such CMS Program Performance Periods within ten (10) Business Days after receipt by Buyer.

(b)     Prior to the end of the Post-Closing Period, Seller shall (i) cooperate with Buyer in all reasonable respects in providing, in a timely and reasonable manner, pre-Effective Time documents or data that Buyer reasonably believes are necessary or appropriate for Buyer to file with respect to CMS Reporting for CMS Program Performance Periods in which the Effective Time occurs, and (ii) Seller shall forward to Buyer any and all correspondence from CMS relating to CMS Reporting for such CMS Program Performance Periods within ten (10) Business Days after receipt by Seller.

(c)     With respect to non-claims-based payments arising under CMS Program Payments for the CMS Program Performance Period in which the Transition Time occurs, the Parties shall share any CMS Program Payments for such CMS Program Performance Period on a pro rata basis (based upon, with respect to Buyer, the number of days during such CMS Program Performance Period that immediately follow the Transition Time divided by the total number of days in such CMS Program Performance Period, and with respect to Seller, the number of days during such CMS Program Performance Period that immediately precede the Transition Time divided by the total number of days in such CMS Program Performance Period).  If Buyer receives any such CMS Program Payments, Buyer shall remit to Seller, Seller's pro rata share of such CMS Program Payments within five (5) Business Days after receipt by Buyer. If Seller receives any such CMS Program Payments, Seller shall remit Buyer's pro rata share of such CMS Program Payments to Buyer within five (5) Business Days after receipt by Seller.  To the extent Buyer or one of its Affiliates is required to refund or repay any portion of any CMS Program Payments, Seller will pay to Buyer an amount equal to Seller's pro rata portion of the required refund or repayment within five (5) Business Days after notice to Seller of such amount due.

(d)      Notwithstanding anything to the contrary in this Agreement neither Buyer nor Seller shall be entitled to recover any of the respective payments due and owing under this <u>Section 5.8</u> by means of setoff against any amount owed by any other Party.

**5.9      Waiver Program Payments**.  Buyer and Seller shall prorate any payments received by the Facilities after the Transition Time under Medicaid waiver or Medicaid supplemental payment programs as follows:

(a)      Any such amounts that correspond to Federal Fiscal Years or state fiscal years, as applicable, ending prior to the Transition Time will be paid to Seller;

(b)      Any such amounts that correspond to Federal Fiscal Years or state fiscal years, as applicable, beginning on or after the Transition Time will be paid to Buyer; and

(c)      Any such amounts that correspond to the Federal Fiscal Year or state fiscal year, as applicable, during which the Transition Time occurs will be allocated between Buyer and Seller on a pro rata basis (based upon the number of days during such year that Seller operates the Facilities and the number of days during such year that Buyer operates the Facilities).

**5.10      License to Use Billing Information**.  Until the end of the Post-Closing Period and, to the extent allowed by applicable Law, Seller grants Buyer and its Affiliates a license to use Seller's billing identification information (which information shall include Seller's name, Medicare and related Medicaid and TRICARE provider numbers, federal employer identification number, and such other information as may be reasonably necessary) ("**Seller's Billing Information**") for purposes of submitting claims to Medicare, Medicaid and TRICARE for services provided at the Facilities by Buyer or any of its Affiliates after the Effective Time.  To the extent allowed by applicable Law, each such license shall be effective (a) for purposes of Medicare, until CMS and the applicable CMS Medicare administrative contractor approve Buyer's or its Affiliate's Medicare change of ownership application and issue a tie-in notice and approval letter acknowledging that Buyer (or its Affiliate) may be reimbursed for claims submitted using Buyer's (or such Affiliate's) billing identification information; and (b) for purposes of Medicaid and any other Government Programs, until the applicable Medicaid program(s) or program agent(s) approves Buyer's (or its Affiliate's) provider enrollment application and/or approves assignment of the applicable provider Contract and issues the appropriate notice acknowledging that Buyer (or its Affiliate) may be reimbursed by the applicable Medicaid or other Government Program for claims submitted using Buyer's (or its Affiliate's) identification information.  So long as such license remains in effect, Seller (or its Affiliates) shall not act to: (i) terminate any of their billing identification information applicable to the Business except as required by applicable Law; (ii) close any accounts used by Seller prior to the Effective Time for purposes of receiving reimbursement; or (iii) cancel any electronic funds transfer agreements with respect to Medicare, Medicaid, TRICARE or any other Government Program applicable to the Business.  All accounts receivable and monies collected in the name of Buyer and/or its Affiliates or the Facilities for services provided by Buyer (and/or its Affiliates) after the Effective Time shall belong to Buyer (and/or its Affiliates). Buyer shall, and shall cause each of its Affiliates to, indemnify, defend and hold harmless Seller and Seller's Affiliates against, and reimburse Seller and Seller's Affiliates for, all Liabilities incurred by Seller and any Seller's Affiliate in connection with Seller's obligations under this <u>Section 5.10</u>.

**5.11      Medical Staff**.  To ensure continuity of care in the community, Buyer agrees that the operations of each Hospital's medical staff will be substantially unchanged as a result of the consummation of the Contemplated Transactions, including each Hospital's medical staff members in good standing as of the Effective Time will maintain, to the extent consistent with criteria adopted at other Buyer or Buyer Affiliate facilities, medical staff privileges without change in medical staff status (e.g., active, courtesy) at each respective Hospital as of the Effective Time and each Hospital's medical staff officers in place

immediately prior to the Effective Time will remain, to the extent consistent with criteria adopted at other Buyer or Buyer Affiliate facilities, in their same positions as of the Effective Time, *provided* that Buyer shall not be obligated to continue to maintain any Physicians and other Practitioners whose medical staff membership and/or clinical privileges have been terminated or not renewed by a Buyer or Buyer Affiliate facility.  As of and after the Effective Time, each Hospital's medical staff will be subject to each Hospital's medical staff by-laws then in effect to the extent consistent with applicable Law.

5.12     **Cooperation on Compliance Matters**.  Until the end of the Post-Closing Period, if any compliance matter is identified by a Party, whether through internal audit or otherwise, for which another Party hereto may bear responsibility or exposure (a "**Compliance Matter**"), then such Party shall provide prompt written notice to such other Party.  Because any such Compliance Matter may impact Buyer and Seller, the Parties acknowledge that both Buyer and Seller shall have a common interest in fully resolving all such Compliance Matters and cooperating in good faith to do so.  To the extent necessary to preserve attorney client privilege and work product doctrine relating to the investigation or resolution of any Compliance Matter, the Parties agree that a common interest privilege shall exist with respect to any communications relating to the investigation and resolution of the Compliance Matter and, to the extent necessary and requested by any Party or its counsel, the Parties and their respective counsel shall enter into a written agreement to memorialize this common interest privilege existing among them relating to the Compliance Matter.  The Parties will thereafter cooperate reasonably with each other in any internal investigations or audits and shall make available to the other, as reasonably requested, any and all relevant information and, further, shall provide personnel as may be reasonably necessary and appropriate for purposes of analyzing and resolving such Compliance Matter.  In order to ensure the accuracy of any report of any Compliance Matter to a third party, the Parties agree that neither shall make any such report or disclosure to, or in respect of, any federally-funded or state-funded health care program, including Medicare, Medicaid, and TRICARE, or private third party payor or any other Governmental Authority with regulatory oversight with respect to any Compliance Matter which might give rise to Liability of the other Party without at least thirty (30) days' prior written notice to, and participation and approval of the report by, such other Party.  All Parties agree to cooperate fully and in good faith as necessary in the resolution of all Compliance Matters, and Buyer and Seller shall each bear its own expenses in connection therewith.

5.13     **Post-Closing Receipt of Assets or Excluded Assets.**

(a)     In addition to any misdirected payments referenced in <u>Section 5.7</u>, <u>Section 5.8</u> or <u>Section 5.9</u> to which Seller is entitled, any asset or any Liability, all other remittances and all mail and other communications that is an Excluded Asset or an Excluded Liability (i) pursuant to the terms of this Agreement or (ii) absent such agreement, as finally determined by the Bankruptcy Court pursuant to <u>Section 8.2</u>, and which comes into the possession, custody or control of Buyer (or its respective successors-in-interest, assigns or Affiliates) shall within five (5) Business Days following receipt be transferred, assigned or conveyed by Buyer (and its respective successors-in-interest, assigns and Affiliates) to Seller at Seller's cost.  Until such transfer, assignment and conveyance, Buyer and its successors-in-interest, assigns and Affiliates, shall not have any right, title or interest in or obligation or responsibility with respect to such asset or Liability except that Buyer shall hold such asset in trust for the benefit of Seller.  Buyer,  and its successors-in-interest, assigns and Affiliates, shall have neither the right to offset amounts payable to Seller under this <u>Section 5.13(a)</u> against, nor the right to contest its obligation to transfer, assign and convey to Seller because of, outstanding claims, Liabilities or obligations asserted by Buyer against Seller.

(b)     In addition to any misdirected payments referenced in <u>Section 5.7</u>, <u>Section 5.8</u> or <u>Section 5.9</u> to which Buyer is entitled, any asset or any Liability, all other remittances and all mail and other communications that is a Purchased Asset or an Assumed Liability (i) pursuant to the terms of this Agreement or (ii) absent such agreement, as finally determined by the Bankruptcy Court pursuant to <u>Section 8.2</u> , and which comes into the possession, custody or control of Seller (or its successors-in-interest, assigns

or Affiliates) shall within five (5) Business Days following receipt be transferred, assigned or conveyed by Seller (and its successors-in-interest, assigns and Affiliates) to Buyer at Buyer's cost.  Until such transfer, assignment and conveyance, Seller and its successors-in-interest, assigns and Affiliates shall not have any right, title or interest in or obligation or responsibility with respect to such asset or Liability except that Seller shall hold such asset in trust for the benefit of Buyer.  Seller or any Seller Affiliates and their respective successors-in-interest and assigns shall have neither the right to offset amounts payable to Buyer under this Section 5.13(b) against, nor the right to contest its obligation to transfer, assign and convey to Buyer because of, outstanding claims, Liabilities or obligations asserted by Seller against Buyer.

**5.14    Closing Financials**.  Buyer shall cause the chief financial officer(s) of the Facilities to complete the standardized closing of Seller's financial records for the Business through the date hereof including, without limitation, the closing of general ledger account reconciliations in form and substance consistent with past practice (collectively, the "**Closing Financials**").  Buyer shall cause the chief financial officer(s) of the Facilities to use his or her good faith efforts to complete the Closing Financials by no later than the date which is thirty five (35) days after the date hereof.  Seller shall reimburse Buyer for all reasonable, out-of-pocket and documented expenses of Buyer associated with the preparation of the Closing Financials.  Such reimbursement shall occur no later than the date which is thirty (30) days after Buyer provides a written statement to Seller which details such charges and expenses.

6.    **SPECIFIC PERFORMANCE.**

(a)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each Party agrees that, in the event of any breach or threatened breach by any other Party of any covenant or obligation contained in this Agreement, the non-breaching Party shall be entitled (in addition to any other equitable remedy that may be available to it) to obtain, without proof of actual damages, (i) a decree or other Order of specific performance to enforce the observance and performance of such covenant or obligation, and (ii) an injunction restraining such breach or threatened breach.

(b)    Each Party acknowledges and agrees that (i) it will not oppose any equitable relief or equitable remedy referred to in this Section 6 on the grounds that any other remedy is available at law or in equity, and (ii) no Party will be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any equitable relief or equitable remedy referred to in this Section 6 (and it hereby irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument).

7.    **TAX MATTERS.**

**7.1    Allocation of Purchase Price**.  If the Settlement Orders (or other document approved by the Bankruptcy Court) or any agreement associated therewith includes any tax treatment or tax reporting provisions relevant to the Contemplated Transactions, the Parties shall (and shall cause their Affiliates to) file all Tax Returns and otherwise report consistent with, and not take any position inconsistent with, such provisions. Subject to the foregoing sentence, if the Parties agree upon an allocation of consideration among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any other relevant provisions of the Code or any similar provisions of state or local Law, as appropriate), the Parties shall (and shall cause their Affiliates to) file all Tax Returns (including IRS Form 8594) and otherwise report consistent with, and not take any position inconsistent with, such agreed allocation, provided that (a) for the avoidance of doubt, the Parties shall not be required to agree to any such allocation, and (b) neither Party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, investigation, examination, claim or similar proceedings in connection with such allocation.

**7.2    Cooperation**.  Following the Effective Time, each Party shall cooperate with the other Party in connection with the preparation of any Tax Returns, the defense of any audit, investigation, examination, claim or similar proceeding related to Taxes, or any other matters with respect to Taxes, shall make available to the other Party, as reasonably requested, all information, records or documents relating to Taxes with respect to the Purchased Assets or the Business for all periods, and shall preserve or cause to be preserved all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof; provided that the obligations of Seller or any Seller Party under this Section 7.2 will cease as of the date upon which Seller or such Seller Party ceases to exist under applicable law.

**7.3    Transfer Taxes**.  All Transfer Taxes shall be paid by Buyer in accordance with <u>Section 8.7</u> when due, and all necessary Tax Returns and other documentation with respect to Transfer Taxes shall be prepared and filed by Buyer. If Seller, any Seller Party, or any of their Affiliates is required to pay any Transfer Tax, Buyer shall promptly reimburse such Seller, Seller Party or Affiliate thereof for such amount.

8.    **GENERAL.**

**8.1    Notice**.  Any notice, demand or other communication required, permitted or desired to be given hereunder must be in writing and shall be deemed effectively given (a) when personally delivered, (b) one (1) Business Day after being sent by the addressee if sent by a nationally recognized overnight courier, (c) on the date transmitted via electronic mail with a delivery receipt requested, if sent on a Business Day between 9:00 AM and 9:00 PM in the time zone of the recipient, or if sent outside of such hours, on the next Business Day at 9:00 AM in the time zone of the recipient; *provided*, *however*, if notice is given via electronic mail, a physical copy of such notice must also be provided by prompt notice by United States mail or overnight courier, or (d) on the fifth (5th) day after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, in each case, addressed as follows:

If to Seller:

c/o Steward Health Care System LLC
1900 N Pearl St #2400
Dallas, Texas 75201
Attention:  Jeffrey Morales
Email: Jeffrey.Morales@steward.org

With simultaneous copy (which
shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Ray C. Schrock, Candace M. Arthur,
David J. Cohen, Mariel E. Cruz

Email: ray.schrock@weil.com;
candace.arthur@weil.com; davidj.cohen@weil.com;
mariel.cruz@weil.com

and

McDermott Will & Emery LLP
200 Clarendon Street, Floor 58
Boston, MA 02116
Attention: Charles Buck
Email: cbuck@mwe.com

|  | If to Buyer: | 505 North Brand Blvd |
|--|--------------|----------------------|
|  |  | Ste 1200 |
|  |  | Glendale, CA 91203 |
|  |  | Attn: Faisal Gill |
|  |  | Email: fgill@amhealthsystems.com |

or to such other address, and to the attention of such other Person or officer as any Party may designate.

**8.2    Choice of Law; Venue**.

(a)     The Parties agree that all disagreements, disputes or claims arising out of or relating to this Agreement or the Contemplated Transactions shall be governed by and construed in accordance with the applicable Laws of the State of Delaware without giving effect to any choice or conflicts of law provision or rule thereof that would result in the application of the applicable Laws of any other jurisdiction other than the applicable Laws of the United States of America, where applicable.

(b)     Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claim (as defined below) which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 8.1</u>; provided, however, upon the closing of the Chapter 11 Cases, the Parties agree to unconditionally and hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware sitting in Wilmington, Delaware (or if such court declines to exercise such jurisdiction in any appropriate state or federal court in the State of Delaware sitting in Wilmington, Delaware) over any action, arbitration, charge, claim, complaint, demand, dispute, litigation or Proceeding arising from or relating to this Agreement (a "**<u>Claim</u>**"), and the Parties hereto hereby irrevocably agree that all Claims shall be heard and determined in such court.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  The Parties hereto agree that a final judgment with respect to any such Claim shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

**8.3    Benefit; Assignment; Delegation.**  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and permitted assigns and delegates.  No Party may assign any of its rights hereunder or delegate any of its duties hereunder without the prior written consent of the other Parties; provided, however, that Buyer and Seller, without the prior consent of the other Parties, may assign any of their respective rights hereunder or delegate any of its duties hereunder to such Party's Affiliates (as applicable), or, for collateral security purposes, to Persons providing financing to such Party or its Affiliates, but in such event, each such Party shall be required to remain obligated hereunder in the same manner as if such assignment or delegation had not been effected.

**8.4    Waiver of Jury Trial**.  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

**8.5     Legal Advice and Reliance**.  Except as expressly provided in this Agreement, none of the Parties (nor any of the Parties' respective Representatives) has made or is making any representations to any other Party (or to any other Party's Representatives) concerning the consequences of the Contemplated Transactions under applicable Laws, including Tax-related Laws or under the Laws governing the Government Programs.  Except for the representations and warranties made in this Agreement, each Party has relied solely upon the Tax, Government Program and other advice of its own Representatives engaged by such Party and not on any such advice provided by any other Party.

**8.6     No Survival**.  Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Effective Time (which covenants shall survive the Effective Time in accordance with their terms), none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Effective Time.

**8.7     Cost of Transaction; Legal Fees and Cost of Disputes**.  Except as otherwise provided herein, the Parties agree that, whether or not the Contemplated Transactions shall be consummated: (a) Seller will pay the fees, expenses and disbursements of Seller and its respective Representatives incurred in connection with the subject matter hereof and any amendments hereto, and (b) Buyer will pay (i) the fees, expenses and disbursements of Buyer and its Representatives incurred in connection with the subject matter hereof and any amendments hereto; (ii) the fees incurred in connection with the HSR filing; and (iii) all Transfer Taxes.

**8.8     Severability**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of Buyer or Seller under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

**8.9     No Inferences; Sophisticated Parties**.  Each Party acknowledges and agrees to the following: (a) all of the Parties are sophisticated and represented by experienced healthcare and transactional counsel in the negotiation and preparation of this Agreement; (b) this Agreement is the result of lengthy and extensive negotiations between the Parties and an equal amount of drafting by all Parties; (c) this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; and (d) no inference in favor of, or against, any Party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such Party.

**8.10     Divisions and Headings of this Agreement**.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**8.11     No Third-Party Beneficiaries**.  The terms and provisions of this Agreement are intended solely for the benefit of Buyer, Seller and the Seller Parties, and such parties' respective permitted successors, assigns, or delegates, and it is not the intention of the Parties to confer, and, this Agreement shall not confer, third-party beneficiary rights upon any other Person, including any employee or member of the medical staff of any Hospital.

  **8.12**  **Entire Agreement; Amendment**.  This Agreement (inclusive of Schedules), together with the other Transaction Documents, the Interim Management Agreement, and the Confidentiality Agreement and any other agreement which specifically references this <u>Section 8.12</u>, represent the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior or contemporaneous oral or written understandings, negotiations, letters of intent or agreements between the Parties.  This <u>Section 8.12</u> shall be deemed a "merger" clause under Delaware Law, and this Agreement (together with the other Transaction Documents and the Confidentiality Agreement) is intended as a complete integration of the agreement of the Parties.  No modifications of, amendments to, or waivers of any rights or duties under this Agreement shall be valid or enforceable unless and until made in writing and signed by all Parties.

  **8.13**  **Multiple Counterparts**.  This Agreement may be executed in any number of counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  The facsimile signature of any Party or other Person to this Agreement or any other Transaction Document or a PDF copy of the signature of any Party or other Person to this Agreement or any other Transaction Document delivered by electronic mail for purposes of execution or otherwise, is to be considered to have the same binding effect as the delivery of an original signature on an original contract.

  **8.14**  **Non-Recourse**.  All claims, obligations, Liabilities, actions or causes of action (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out of or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their successors and assigns ("<u>Contracting Parties</u>").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other representative of, and any lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other representative of, and any lender to, any of the foregoing ("<u>Nonparty Affiliates</u>"), shall have any Liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or other Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, causes of action, obligations and other Liabilities against any such Nonparty Affiliates. It is expressly agreed that the Nonparty Affiliates to whom this <u>Section 8.14</u> applies shall be third-party beneficiaries of this <u>Section 8.14</u>.

  **8.15**  **Interpretation**.

  In this Agreement, unless the context otherwise requires:

    (a)  references to this Agreement are references to this Agreement and to Schedules attached or delivered with respect hereto or expressly incorporated herein by reference; each Schedule is hereby incorporated by reference into this Agreement and will be considered a part hereof as if set forth herein in full;

    (b)  references to "Sections" are references to sections of this Agreement;

    (c)  references to any Party shall include references to its respective successors and permitted assigns;

(d)        the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement;

(e)        references to any agreement (including this Agreement) are references to that agreement as amended, consolidated, supplemented, novated or replaced in accordance with the terms and conditions therein from time to time;

(f)        unless the context requires otherwise, references to any Law are references to that Law as of the date of this Agreement, and shall also refer to all rules and regulations promulgated thereunder;

(g)        the word "including" (and all derivations thereof) means "including, without limitation," and any lists or examples following the word "including" or the phrase "including, without limitation," are intended to be nonexclusive examples solely for the purpose of illustration and without the intention of limiting the text preceding such lists or examples;

(h)        references to time are references to Central Standard Time or Central Daylight Time (as in effect on the applicable day);

(i)        the gender of all words herein include the masculine, feminine and neuter, and the number of all words herein include the singular and plural;

(j)        the provisions of this Agreement shall be interpreted in such a manner so as not to inequitably benefit or burden any Party through "double counting" of assets or Liabilities or failing to recognize benefits that may result from any matters that impose Liabilities or burdens on any Party;;

(k)        the terms "date hereof," "date of this Agreement," and similar terms shall mean the date set forth in the preamble to this Agreement; and

(l)        references to "day" shall mean calendar day, unless otherwise specified herein.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**SELLER:**                    SJ Medical Center, LLC

By: _____
Name: _____
Title: _____

**SELLER PARTIES:**            Permian Premier Health Services, Inc.

By: _____
Name: _____
Title: _____

*Signature Page to Asset Purchase Agreement*

**BUYER:**                                 HSA St Joseph LLC


By: _____
Name: _____
Title: _____

*Signature Page to Asset Purchase Agreement*

## ANNEX A – DEFINITIONS

"**Affiliate**" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and any successors or assigns of such Person, *provided,* that, with respect to any Seller or any Seller Party, for all purposes herein, "Affiliate" shall mean Steward Health Care System LLC and each of its direct and indirect Subsidiaries.  For purposes of this definition, "control" means possession, directly or indirectly, of the power to direct, or cause the direction of, the management and policies of a Person whether through ownership of voting securities, by Contract or otherwise.

"**Agreement**" is defined in the preamble to this Agreement.

"**Approval**" means any approval, action, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Authority, Private Program or other Person, in each case, in connection with the operation of the Business or the consummation of the Contemplated Transactions, as applicable.

"**Assumed Liabilities**" is defined in Section 1.3.

"**Assumed Paid Time Off**" is defined in Section 5.4(h).

"**Avoidance Action**" means any claim, right or cause of action of Seller or any Seller Party for avoidance, recovery, subordination or other relief arising under Chapter 5 of the Bankruptcy Code or applicable state fraudulent conveyance, fraudulent transfer or similar Laws.

"**Bankruptcy Code**" is defined in the Recitals.

"**Bankruptcy Court**" is defined in the Recitals.

"**Books and Records**" means originals, or where not available, copies (including in electronic format), of books and records maintained in connection with the Business or the Purchased Assets, including books and records relating to books of account, ledgers and general financial accounting records, personnel records, machinery and equipment maintenance files, patient and customer lists, price lists, distribution lists, supplier lists, quality control records and procedures, customer and patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, marketing plans, internal financial statements and marketing and promotional surveys, pricing and cost information, material and research, in each case, to the extent such books and records are located at the Facilities or are exclusively used or held for use in, or otherwise exclusively relate to, the Business.

"**Business**" means the operation of the Facilities by Seller and all services provided by, or pursuant to Contracts with, Seller at the Facilities, in each case as currently conducted by Seller.

"**Business Day**" means any day except Saturday, Sunday and any day which is a legal holiday in New York, New York.

"**Buyer**" is defined in the preamble to this Agreement.

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act, P.L. 116–136, and the rules and regulations promulgated thereunder.

"**Chapter 11 Cases**" is defined in the Recitals.

"**Claim**" is defined in Section 8.2(b).

"**Closing Financials**" is defined in Section 5.14.

"**CMS**" means the Centers for Medicare & Medicaid Services.

"**CMS Program Payments**" means payments or discounts that are not based directly on the submission of claims for services delivered and are received through participation in a Government Program implemented by CMS through a Contract with CMS or as a participant through a Contract with a CMS contractor, including Medicare accountable care organizations, episode-based payment initiatives and other Medicare innovation models as implemented by CMS as authorized pursuant to Laws identified in CMS Reporting.

"**CMS Program Performance Period**" means the period of time applicable to a CMS Program Payment or CMS Reporting requirement.

"**CMS Reporting**" means any quality, performance reporting through use of certified electronic health record technology and other electronic reporting requirements, applicable to the Business and in all cases implemented by CMS pursuant, but not limited, to the Social Security Act, the Patient Protection and Affordable Care Act of 2010 (or any replacement or successor Law), the Health Care and Education Reconciliation Act of 2010, the Pathway for Sustainable Growth Reform (SGR) Act of 2013, the Protecting Access to Medicare Act of 2014, the Improving Medicare Post-Acute Care Transformation Act of 2014 (IMPACT), American Taxpayer Relief Act of 2012 (ATRA), Balanced Budget Act of 1997 (BBA), the Medicare, Medicaid and SCHIP (State Children's Health Insurance Program) Balanced Budget Refinement Act of 1999 (BBRA), the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), the 21st Century Cures Act, HIPAA, the Medicare Access & CHIP Reauthorization Act of 2015 (MACRA) (Pub L. 114-10, enacted April 16, 2015), amending Title XVIII of the Social Security Act and/or the Bipartisan Balanced Budget Act of 2018, each of which may be amended from time to time by a Balanced Budget Act of the United States Congress, and each as applicable at such time as healthcare services are rendered.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Collective Bargaining Agreement**" means each collective bargaining agreement governing the terms and conditions of employment of the Seller Employees represented by a union or other labor organization.

"**Compliance Matter**" is defined in Section 5.12.

"**Confidentiality Agreement**" means that certain Non-Disclosure Agreement by and between Steward and American Healthcare Systems Corp. dated as of February 6, 2024.

"**Contemplated Transactions**" means, collectively, the transactions contemplated by this Agreement, including (a) the assignment of the Purchased Assets and assumption of the Assumed Liabilities and (b) the execution, delivery and performance of this Agreement and the other Transaction Documents.

"**Contract**" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense, guaranty, indenture, occupancy or other agreement or arrangement of any kind (and all amendments, side letters, modifications and supplements thereto).

"**Copyrights**" means all copyrights and rights in any other original works of authorship fixed in any tangible medium of expression, whether published or unpublished; rights to compilations, collective works and derivative works of any of the foregoing; and registrations and applications for registration for any of the foregoing and any renewals or extensions thereof.

"**Cost Report**" means any cost report (including all forms, worksheets, schedules and other attachments related thereto) required to be filed in respect of the Business or the Facilities pursuant to a Government Program or any Private Cost-Based Programs.

"**Cost Report Settlements**" is defined in Schedule C.

"**COVID-19**" means the novel coronavirus disease, COVID-19 virus (SARS-COV-2 and all related strains and sequences) or mutations (or antigenic shifts or drifts) thereof or a disease or public health emergency resulting therefrom.

"**COVID-19 Funds**" means all grants, payments, distributions, loans, funds or other relief applied for or provided prior to the Effective Time under the CARES Act, the Paycheck Protection Program Act, or any other program authorized by any Governmental Authority or Government Program in response to COVID-19, including the Paycheck Protection Program, Main Street Loan Program, Provider Relief Fund, Small Rural Hospital Improvement Program, Assistant Secretary for Preparedness and Response or Hospital Preparedness Program Grants, or any other Law or program enacted, adopted or authorized in response to COVID-19; provided, that COVID-19 Funds does not include any Medicare Accelerated and Advance Payments.

"**Credentialing and Medical Staff Records**" means, to the extent Seller lawfully owns or has control of such records and information and such records and information are not subject to a peer-review or similar privilege or are otherwise non-disclosable by applicable Law, all credentialing records with respect to any Practitioner, all minutes of the meetings of the medical staffs of each Facility and any committees thereof, and all other records directly related to the administrative operations of each Facility's medical staff for the period prior to the Effective Time.

"**Cure Costs**" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by Seller or, if applicable, Seller Party, and the assignment to Buyer, of the Transferred Executory Contracts to which Seller or, if applicable, Seller Party is a party, as determined by the Bankruptcy Court or agreed to by Seller, if applicable, Seller Party and the non-Seller counterparty to the applicable Transferred Executory Contract or Lease, as applicable.

"**Designation Deadline**" is defined in Section 1.5(b).

"**DIP Financing**" means (i) debtor-in-possession facility under that certain Debtor-in-Possession Credit Agreement, dated May 28, 2024 (as amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time), by and among Steward, the other Loan Parties (as defined therein) party thereto and MPT; and (ii) debtor-in-possession facility under that certain Debtor-in-Possession Credit Agreement, dated July 10, 2024 (as amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time), by and among Steward, the other Loan

Parties (as defined therein) party thereto, the Lenders (as defined therein) party thereto and Brigade Agency Services LLC, as administrative agent and collateral agent.

"**DNV**" means DNV GL Healthcare USA, Inc.

"**Domain Names**" means Internet electronic addresses and uniform resource locators registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the internet, rights in social media accounts and social media pages, and all applications for any of the foregoing.

"**DRG**" is defined in Section 5.6(a).

"**DRG Transition Patients**" is defined in Section 5.6.

"**Effective Time**" is defined in Section 2.1.

"**Employee Lease Agreement**" is defined in Section 2.2(e).

"**Employee Transition Date**" means November [•], 2024.[1]

"**Encumbrance**" means any easement, servitude, assessment, encumbrance, encroachment, defect in title, security interest, bailment (in the nature of a pledge or for purposes of security), mortgage, deed of trust, the grant of a power to confess judgment, conditional sales and title retention, lease, sublease, option, right of first refusal or first offer, lien, hypothecation, pledge, restriction or other similar arrangement or interest in real or personal property, whether imposed by Contract, Law, equity or otherwise.

"**Excluded Assets**" is defined in Section 1.2.

"**Excluded Liabilities**" is defined in Section 1.4.

"**Executory Contract**" means any executory Contract or Lease to which Seller or any Seller Party is a party or a beneficiary that exclusively relates to the operation of the Business or the Facilities.

"**Facility**" or collectively, "**Facilities**" means the Hospitals and Seller's other healthcare facilities, operations, and businesses associated with or used in the operation of the Hospitals as set forth on Schedule F under the header "Other Facilities".

"**False Claims Act**" means the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

"**Federal Fiscal Year**" means the fiscal year of the federal government of the United States.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect (a) with respect to financial information for periods on or after the date hereof, as of the date of this Agreement, and (b) with respect to financial information for periods prior to the date hereof, as of such applicable time.

---

[1] Note to Draft: To be the date that is one month after the Effective Time.

"**Government Programs**" means the Medicare (including Medicare Part D and Medicare Advantage), Medicaid, Medicaid-waiver and CHAMPUS/TRICARE programs, any other similar or successor federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) and any similar state or local health care programs, in each case in which any Facility participates as of the date of this Agreement.

"**Governmental Authority**" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal, special district or other instrumentality of any government, whether federal, state or local, domestic or foreign, and any healthcare self-regulatory organization.

"**Group Tax Return**" means any consolidated, combined, unitary, or similar Tax Returns for any affiliated or other Tax group of which Seller (or any Seller Party) is or has been a member or of which any direct or indirect owner of Seller (or any Seller Party) is the common parent.

"**HIPAA**" means collectively: (a) the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191), including but not limited to its implementing rules and regulations with respect to privacy, security of health information, and transactions and code sets; (b) the HITECH Act (Title XIII of the American Recovery and Reinvestment Act of 2009); (c) the Omnibus Rule effective March 26, 2013 (78 Fed. Reg. 5566), and other implementing rules regulations at 45 CFR Parts 160 and 164 and related binding guidance from the United States Department of Health and Human Services and (d) any federal, state and local laws governing the privacy and/or security of individually identifiable information, in each case, as the same may be amended, modified or supplemented from time to time.

"**HITECH Act**" means the Health Information Technology for Economic and Clinical Health Act, Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Pub. Law No. 111-5 and its implementing regulations, including 42 C.F.R. §§ 412, 413, 422 and 495, as amended by the HIPAA Omnibus Rule, issued on January 25, 2013, effective as of March 26, 2013.

"**Hospitals**" means the hospitals set forth on Schedule F hereto under the header "Hospitals".

"**Information Technology Systems**" means all information technology systems and services related thereto, Software, computers, workstations, databases, routers, hubs, switches, networks and other information technology equipment exclusively used or held for use in the Business.

"**Intellectual Property**" means any and all intellectual property rights in, arising out of, or associated therewith, throughout the world: Copyrights, Domain Names, Patents, Trademarks and Trade Secrets and any other related proprietary rights now known or hereafter recognized in any jurisdiction worldwide, and the right to sue and recover damages or other remedies for past, present and future infringement, misappropriation, dilution, or other violation thereof.

"**Interim Billing**" is defined in Section 5.6(a).

"**Inventory**" means all usable inventory and supplies exclusively used or held for use in the Business.

"**IRS**" means the Internal Revenue Service.

"**Knowledge of Buyer**" means the actual knowledge of Jonathan Burket or Michael Sarian.

"**Knowledge of Seller**" means the actual knowledge of Mark Rich or Jeffey Morales.

"**Law**" means any constitutional provision, statute, law, rule, regulation, code, ordinance, accreditation standard, resolution, Order, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority (and for the avoidance of doubt, includes the Bankruptcy Code).

"**Leased Real Property**" means all real property leased, subleased or licensed to, or for which a right to use, possess or occupy has been granted to, Seller or any Seller Affiliate in connection with the Business, together with all rights, easements and privileges appertaining or relating to such interest in real property, and all improvements located on such real property.

"**Liability**" means any liability, obligation, deficiency, interest, penalty, fine, claim, demand, judgment, cause of action or other losses (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute, fixed, or contingent, accrued or unaccrued, liquidated or unliquidated, recorded or unrecorded, due or to become due or otherwise, and regardless of when asserted.

"**Material Adverse Effect**" means any change, fact, circumstance, occurrence, event, effect or condition that, individually or in the aggregate with all other changes, facts, circumstances, occurrences, events, effects or conditions, directly or indirectly, results in, or would reasonably be expected to result in, a material adverse effect on (a) the ability of Seller to consummate the Contemplated Transactions or (b) the business, condition (financial or otherwise), results of operations, assets or Liabilities of the Business, taken as a whole, except this clause (b) shall exclude any change, fact, circumstance, occurrence, event, effect or condition resulting from (i) changes in general local, domestic, foreign, or international economic, financial, business or political conditions, (ii) changes generally affecting the healthcare industry or markets in which Seller operates, (iii) losses from operations of the Business that are materially consistent with the historical and projected run rate of the Business, or seasonal fluctuations in the Business consistent with prior fiscal years, (iv) any national or international political event or occurrence, including acts of war, sabotage or terrorism, military actions or the escalation thereof, (v) any changes in applicable Laws or accounting rules or principles, including changes in GAAP, or the interpretation or implementation of any of the foregoing, (vi) any action required by this Agreement, (vii) changes or proposed changes to any reimbursement rates or policies of Governmental Authorities that are generally applicable to hospitals or healthcare facilities, (viii) any natural disaster, calamity, pandemic or epidemic (including the COVID-19 pandemic, including the continuation or worsening of the COVID-19 pandemic and any variation or mutation thereof); (ix) any failure, in and of itself, by the Business to meet any internal projections or forecasts (as distinguished from any change, development, or occurrence giving rise or contributing to such failure); (x) any breach of Buyer's obligations under this Agreement; (xi) the availability or cost of equity, debt or other financing to Buyer, (xii) the entry into this Agreement or the announcement, pendency or consummation of the Contemplated Transactions or (xiii) any change resulting from the filing or pendency of the Chapter 11 Cases, actions taken in connection with the Chapter 11 Cases, or any reasonably anticipated effects of such filing, pendency or actions, or from any action approved by the Bankruptcy Court, provided that, in each case of clauses (i), (ii), (iii), (iv), (v), (vii) or (viii), such change, fact, circumstance, occurrence, event, effect or condition does not affect the Business, in a substantially disproportionate manner relative to other Persons operating in the industry in which the Business participates.

"**Medicare Accelerated and Advance Payments**" means the accelerated and advance payments received by Seller or any of its Affiliates, in each case to the extent relating to the Business, in each case prior to the Effective Time pursuant to the Accelerated Payment Program or the Advance Payment Program implemented by CMS to increase cash flow to healthcare providers as a result of COVID-19.

"**Medicare Interim Payments**" means payments made to the Hospitals on an interim basis under the Medicare program on a bi-weekly pass-thru or interim payment basis.

"**MPT**" means MPT Operating Partnership, L.P., one of its Affiliates, or its successor-in-interest with respect to the MPT Real Property.

"**Non-DRG Transition Patients**" is defined in Section 5.6.

"**Non-Interim Billing Transition Patients**" is defined in Section 5.6.

"**Order**" means any judgment, order, writ, injunction, decree, determination, or award of any Governmental Authority, including the Bankruptcy Court.

"**Owned Real Property**" means all real property owned by Seller and Seller's Affiliates, together with all rights, easements and privileges appertaining or relating to such interest in real property, and all improvements located on such real property.

"**Paid Time Off**" means Seller Employees' accrued vacation, sick, holiday or other paid time off and related Taxes and other payroll obligations.

"**Parties**" is defined in the preamble to this Agreement.

"**Patents**" means, with respect to the Business, all patents and patent applications, including all provisional applications, priority and other applications, divisionals, continuations (in whole or in part), extensions, reissues, reexaminations or equivalents or counterparts of any of the foregoing.

"**Paycheck Protection Program Act**" means the Paycheck Protection Program and Health Care Enhancement Act, P.L. 116-139, and the rules and regulations promulgated thereunder.

"**Payor Agreement**" means any Contract between Seller and a Government Program or a Private Program under which the Business or Seller directly or indirectly receives payments for medical services provided to such program's beneficiaries exclusively at the Facilities.

"**Permit**" means any consent, ratification, registration, waiver, authorization, license, permit, grant, franchise, concession, exemption, order, notice, certificate or clearance issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law, in each case, with respect to Seller or any Seller Party, in connection with the operation of the Business or the consummation of the Contemplated Transactions, as applicable.

"**Permitted Encumbrances**" means any Encumbrances relating to (a) zoning and building laws, ordinances, resolutions and regulations, (b) Taxes, assessments and governmental charges or levies not due and payable on or before the Transition Time, (c) non-exclusive licenses to Intellectual Property granted in the ordinary course of business, (d) mechanic's, material man's and similar Encumbrances imposed or permitted by Law for sums not yet due and payable on or before the Transition Time, (e) any matters arising as a result of the acts or omissions of Buyer or any of its Affiliates, agents, employees, contractors or representatives, (f) Encumbrances incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security, (g) defects or imperfections of title, exceptions, easements, covenants, rights-of-way, restrictions and other similar charges, defects or encumbrances not materially interfering with the ordinary conduct of the Business, (h) Encumbrances not created by Seller that affects the underlying fee, lessor, licensor or sublessor interest of any Leased Real Property or real property over which Seller (with respect to the

Business) has easement or other property rights, (i) Encumbrances incurred in the ordinary course of business securing Liabilities that are not material to the Purchased Assets taken as whole, (j) Encumbrances arising out of, under or in connection with this Agreement or the other Transaction Documents, (k) Encumbrances related to Specified Debt, which Encumbrances will be removed as of Effective Time, (l) any other Encumbrance that will be cleared or discharged by Order of the Bankruptcy Court, (m) rights, terms or conditions of any leases, subleases, licenses, sublicenses or occupancy agreements made available to Buyer and (n) any Encumbrance arising out of, under or in connection with the Securities Act or any other applicable securities Laws.

"**Person**" means an individual, association, hospital authority, corporation, limited liability company, partnership, limited liability partnership, trust, Governmental Authority or any other entity or organization.

"**Personal Information**" means any information relating to or reasonably capable of being associated with an identified or identifiable individual (including protected health information), including any personally identifiable data (*e.g.*, name, address, phone number, email address, financial account number, payment card data, government issued identifier, and health or medical information).

"**Personal Property**" means all of Seller's and any Seller Party's right, title and interest in tangible personal property exclusively used or held for use in, or otherwise exclusively relating to, the Business, including all equipment, medical devices, medical and office supplies, diagnostic equipment, computer hardware and data processing equipment, furniture, fixtures, machinery, vehicles, office furnishings, instruments, leasehold improvements, telephones, telephone numbers, keys, security access cards and other tangible personal property exclusively used or held for use in, or otherwise exclusively relating to, the Business and, to the extent assignable or transferable by Seller or any Seller Party, all rights in all warranties of any manufacturer, vendor, or other Person with respect thereto.

"**Physician**" means a doctor of medicine or osteopathy, a doctor of dental surgery or dental medicine, a doctor of podiatric medicine, a doctor of optometry, or a chiropractor, as defined in section 1861(r) of the Social Security Act.

"**Plan**" means any of the following agreements, plans or other Contracts covering any Seller Employee: (i) employee benefit plans within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and (ii) any employee benefit plan, program, policy or arrangement providing for compensation, bonuses, commission, profit-sharing, stock option or other stock- or equity-linked benefits or rights, incentive, deferred compensation plans, vacation or paid time off benefits, insurance (including any self-insured arrangements), death, life, dental, vision, health or medical benefits, employee assistance, disability or sick leave benefits, workers' compensation, supplemental unemployment benefits, retention, transaction, change of control payments, savings, pension, retirement, post-employment or retirement benefits or other employee compensation plan, program, policy, arrangement, program, arrangement or commitment, in each case, whether written or unwritten, formal or informal, which Seller currently sponsors, or to which Seller has any outstanding present or future obligations with respect to any Seller Employee, whether voluntary, contingent or otherwise.

"**Post-Closing Period**" means the period beginning immediately after the Effective Time and ending on the earlier of the date (i) that is six (6) months following the Effective Time, or (ii) Seller is no longer in existence.

"**Power of Attorney**" is defined in Section 2.2(a).

"**Practitioner**" or "**Practitioners**" means each of the Physicians and other licensed professional providers who provide services to the Business.

"**Prepaid Expenses**" means all prepaid expenses and deposits of Seller made with respect to the Business.

"**Private Cost-Based Programs**" means a Private Program that settles on a Cost Report basis.

"**Private Program**" means any private insurance payor or program, self-insured employer, or other third-party payor.

"**Property Taxes**" means personal property, ad valorem, intangible, real property and other similar non-transactional-based Taxes.

"**Proceeding**" means any action, arbitration, charge, claim, complaint, demand, dispute, audit, litigation, proceeding, search warrant, civil investigative demand, subpoena, qui tam action, suit (whether civil, criminal, administrative, judicial, or investigative) commenced, brought, conducted, or heard by or before any (a) Governmental Authority, (b) Medicare fiscal intermediary or administrative contractor, recovery audit contractor, zone program integrity contractor, unified program integrity contractor or similar Government Program contractor or (c) arbitrator, whether at law or in equity, other than routine billing claims and disputes, routine audits, routine post-payment reviews and scheduled surveys.

"**Provider Relief Fund**" means the Public Health and Social Services Emergency Fund for provider relief under the CARES Act and Paycheck Protection Program Act.

"**Purchased Assets**" is defined in Section 1.1.

"**Representatives**" means, with respect to any Person, the officers, directors, managers, employees, agents, attorneys, accountants, advisors, bankers, financing sources, and other authorized representatives of such Person.

"**Restricted Area**" means Harris County, Texas.

"**Schedules**" means any schedule to this Agreement.

"**Seller**" is defined in the preamble to this Agreement.

"**Seller Affiliate**" means any Affiliate of Seller.

"**Seller Cost Reports**" is defined in Section 5.7(a).

"**Seller Employees**" means each person who is an employee of (i) Seller or any Seller Party whether active or on leave of absence who (a) works exclusively at the Facilities, including any employee who is on an approved leave of absence, or (b) otherwise primarily provides services to the Business during the majority of their business time and (ii) Permian Premier Health Services, Inc. set forth on Schedule G.

"**Seller Party**" or "**Seller Parties**" means Permian Premier Health Services, Inc.

"**Seller's Billing Information**" is defined in Section 5.10.

"**Social Security Act**" means the Social Security Act of 1935 and all regulations promulgated thereunder.

"**Software**" means, with respect to the Business, any and all computer programs and other software, including databases, software interfaces, implementations of algorithms, models, and methodologies, whether in source code, object code or other form, including libraries, subroutines and other components thereof.

"**Specified Debt**" means, collectively, indebtedness under (i) that certain Credit Agreement, dated as of February 21, 2024, by and among Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc., Stewardship Health Medical Group, Inc. and Stewardship Services Inc., as the borrowers, certain other Affiliates of Steward Health Care System LLC party thereto, as guarantors, the lenders party thereto and Brigade Agency Services LLC, as administrative agent and as collateral agent, (ii) that certain Credit Agreement, dated as of August 4, 2023, by and among Steward Health Care System LLC, certain Affiliates of Steward Health Care System LLC party thereto, as guarantors, the lenders party thereto, Sound Point Agency LLC, as administrative agent, Chamberlain Commercial Funding (Cayman) L.P., as collateral agent, and Brigade Agency Services LLC, as the FILO Agent, (iii) that certain Third Amended and Restated Promissory Note, dated as of January 22, 2024, by Steward Health Care System LLC in favor of MPT TRS Lender-Steward LLC and (iv) the DIP Financing.

"**Steward**" means Steward Health Care System LLC, a Delaware limited liability company.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation).

"**Tax**" or "**Taxes**" means any and all federal, state, local, foreign and other taxes, including net income, gross income, gross receipts, sales, use, ad valorem, hospital, provider, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes filed or required to be filed with any Governmental Authority, including any schedule or attachment thereto, and including any amendment thereof.

"**Trade Secrets**" means, with respect to the Business, trade secrets and confidential and proprietary information, including ideas, research and development information, know-how, formulas, compositions, technical data, designs, drawings, specifications, research records, records of inventions, test information, financial, marketing and business data, customer and supplier lists and information, pricing and cost information, business and marketing plans and proposals that, in each case, derive independent economic value, actual or potential, from not being generally known or readily ascertainable by others.

"**Trademarks**" means, with respect to the Business, trademarks, service marks, trade names (including fictitious, assumed and d/b/a names), slogans, or logos; registrations, renewals, applications for registration of the foregoing; and the goodwill of the business associated with each of the foregoing.

"**Transaction Documents**" means this Agreement, the Power of Attorney and the Transition Services Agreement.

"**Transfer Taxes**" means any real or personal property transfer, sales, use, documentary, transfer, value added, stock transfer, stamp or similar Taxes, and any transfer, recording, registration, and other fees or similar amounts, in each case imposed or payable in connection with the Contemplated Transactions.

"**Transferred Employee**" is defined in Section 5.4(b).

"**Transferred Executory Contract**" is defined in Section 1.5(b).

"**Transition Patient Services**" is defined in Section 5.6.

"**Transition Patients**" is defined in Section 5.6.

"**Transition Services Agreement**" is defined in Section 2.2(c).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, *et seq*.

**Schedule A-1**

**Approvals**

1.  Submit new application for licensure pre-closing, but in no case, later than ten (10) days post-Closing for that Texas HHSC Hospital License issued to St Joseph Medical Center (No. 008386, Eff. N/A, Exp. 08/31/2024) for 744 licensed beds.

## Schedule A-2

## Other Approvals

1. Submit Change of Control Questionnaire pre-closing or as soon as possible post-Closing for that Texas HHSC, Radiation Branch Radioactive Materials License issued to SJ Medical Center LLC d/b/a St. Joseph Medical Center (No. L02279, Eff. N/A, Exp. 12/31/2027).

2. Notify the Texas Board of Pharmacy within ten (10) calendar days of a change of ownership and Buyer to submit a new application for that certain Texas Board of Pharmacy Class CS Pharmacy License issued to St. Joseph Medical Center (No. 30701, Eff. N/A, Exp. 03/31/2026).

3. Notify the Texas HHSC, Radiation Branch of a change of ownership within thirty (30) days post-Closing and submit change of ownership application for that Texas HHSC, Radiation Branch, Certificate of X-Ray Registration issued to SJ Medical Center LLC d/b/a St. Joseph Medical Center (No. R00668, Eff. 06/12/2023, Exp. 04/30/2031).

4. Submit a new CMS Form 116 within thirty (30) days post-Closing for that certain CMS CLIA Certificate of Accreditation issued to SJ Medical Center, LLC (No. 45D0052934, Eff. 01/03/2023, Exp. 01/02/2025).

5. With respect to the following, any registrant desiring to transfer business activities to another person or entity shall submit to the DEA local field office notice of the transfer at least fourteen (14) days prior to Closing. Seller, as applicable, and Buyer shall put into place a Power of Attorney for the period between when notice is given, and the date on which Buyer is able to obtain a new DEA Controlled Substances Registration:

   a. DEA Controlled Substances Registration issued to St. Joseph Medical Center (No. FS6632930, Eff. 01/13/2023, Exp. 02/28/2026).

6. Provide pre-Closing notice of change of ownership and submit a new application for registration within thirty (30) days post-Closing for that certain Texas HHSC Certified Mammography Facility Certificate issued to SJ Medical Ctr, L.L.C. d/b/a St Joseph Medical Center (No. 138974, Eff. N/A, Exp. 05/01/2026).

7. Buyer to notify the FCC with respect to the following FCC licenses:

   a. Federal Communications Commission, Radio Station Authorization issued to SJ Medical Center, LLC (No. 0016171225, Call Sign. WQEW218, Eff. 06/13/2016, Exp. 05/01/2026).

   b. Federal Communications Commission, Radio Station Authorization issued to SJ Medical Center, LLC (No. 0016171225, Call Sign. WPUK860, Eff. 03/24/2022, Exp. 03/25/2032).

8. Notify the American College of Radiology of any change in ownership for the following:

   a. Certified Mammography Facility (No. 138974, Eff. N/A, Exp. 05/01/2026).

   b. Ultrasound Registration

9.  Submit notice to DNV at or immediately post-Closing for that certain DNV Accreditation – Medicare Deemed Status (ID No. 10000464941-MSC-CMS-USA, Eff. 12/02/2023, Exp. 12/02/2026).

10. Notify the Joint Commission immediately pre-Closing and update e-App within thirty (30) days post-Closing for that certain Joint Commission Laboratory Accreditation for CLIA No. 45D0052934 (ID No. 9097, Eff. 06/10/2023, Exp. 06/10/2025).

11. Buyer and Seller to submit Form 855-A to CMS within thirty (30) days post-Closing for the following:

   a.  Medicare Part A Enrollment (Acute) (PTAN: 45-0035)

   b.  Medicare Part A Enrollment (Psych) (PTAN: 45-S035)

   c.  Medicare Part A Enrollment (Rehab) (PTAN: 45-T035)

   d.  Medicare Part A Enrollment (SNF) (PTAN: 45-5805)

12. Buyer to provide a change of ownership application and submit Texas Medicaid provider enrollment application to TMHP Provider enrollment within thirty (30) days post-Closing for the following:

   a.  State of Texas Access Reform (STAR) Medicaid Program (Acute) (Provider ID: 181706601).

   b.  State of Texas Access Reform (STAR) Medicaid Program (Psych) (Provider ID: 112761502).

   c.  State of Texas Access Reform (STAR) Medicaid Program (Rehab) (Provider ID: 181706601).

   d.  State of Texas Access Reform (STAR) Medicaid Program (SNF) (Provider ID: 181706601).

13. Approvals relating to the following Environmental Licenses & Permits:

   a.  Texas Commission on Environmental Quality, Notice of Storage Tank Registration.

      i.  One (1) Aboveground Storage Tank located at 1901 Jackson Street, Houston, Texas 77003 (Facility No. 75834, Eff. 07/19/2012, Exp. N/A).

      ii. One (1) Aboveground Storage Tank located at 1401 St Joseph Parkway, Houston, Texas 77002 (Facility No. 75835, Eff. 07/19/2012, Exp. N/A).

   b.  Texas Commission on Environmental Quality, Petroleum Storage Tank Program Delivery Certificate.

      i.  One (1) Underground Storage Tank located at 1819 La Branch St, Houston, Texas 77002 (Facility No. 62545, Eff. N/A, Exp. 07/31/2024).

       ii.  One (1) Underground Storage Tank located at 1401 St Joseph Parkway, Houston, Texas 77002 (Facility No. 62546, Eff. N/A, Exp. 07/31/2024).

      iii.  One (1) Underground Storage Tank located at 1817 Crawford St., Houston, Texas 77002 (Facility No. 62548, Eff. N/A, Exp. 07/31/2024).

      iv.  Texas Commission on Environmental Quality, Petroleum Storage Tank Registration (# 75834) for diesel aboveground storage tank at St. Joseph Medical Center Central, 1901 Jackson Street, Houston, Texas.

c.  Texas Commission on Environmental Quality, Petroleum Storage Tank Registration (# 75835) for diesel aboveground storage tank at St. Joseph Medical Center Central, 1401 St. Joseph Parkway, Houston, Texas.

d.  Texas Commission of Environmental Quality, Notice of Storage Tank Registration, 4,000 gallon diesel underground storage tank, Facility # 0062548, St. Joseph Medical Center, Mary Gibbs Jones Building, 1817 Crawford Street, Houston, Texas.

e.  Texas Commission of Environmental Quality, Petroleum Storage Tank Program, Delivery Certificate, Facility # 0062548, St. Joseph Medical Center, Mary Gibbs Jones Building, 1817 Crawford Street, Houston, Texas, expiration July 31, 2024.

f.  Texas Commission of Environmental Quality, Notice of Storage Tank Registration, 500 gallon diesel underground storage tank, Facility # 0062546, St. Joseph Medical Center, Behavioral Health Building, 1404 St. Joseph Parkway, Houston, Texas.

g.  Texas Commission of Environmental Quality, Petroleum Storage Tank Program, Delivery Certificate, Facility # 0062546, St. Joseph Medical Center, Behavioral Health Building, 1404 St. Jospeh Parkway, Houston, Texas, expiration July 31, 2024.

h.  Texas Commission of Environmental Quality, Notice of Storage Tank Registration, 4,000 gallon diesel underground storage tank, Facility # 0062545, St. Joseph Medical Center, Susan K. Strake Building, 1819 LaBranch Street, Houston, Texas.

i.  Texas Commission of Environmental Quality, Petroleum Storage Tank Program, Delivery Certificate, Facility # 0062545, St. Joseph Medical Center, Susan K. Strake Building, 1819 LaBranch Street, Houston, Texas, expiration July 31, 2024.

**Schedule B**

**Seller Party Purchased Assets**

1.  Physician Employment Agreement, effective March 2, 2020, by and between Permian Premier Health Services, Inc. and [41].
2.  Physician Employment Agreement, effective October 2, 2020, by and between Permian Premier Health Services, Inc. and [83].
3.  Physician Employment Agreement, effective February 18, 2022, by and between Permian Premier Health Services, Inc. and [84], as amended by that certain First Amendment dated January 2, 2023.
4.  Physician Employment Agreement, dated February 17, 2024, by and between Permian Premier Health Services, Inc. and [101]. [Anesthesiology]
5.  Physician Employment Agreement, dated April 1, 2024, by and between Permian Premier Health Services, Inc. and [102], as amended by that First Amendment to Physician Employment Agreement, effective as of April 1, 2024. [Anesthesiology]
6.  Physician Employment Agreement, dated January 16, 2024, by and between Permian Premier Health Services, Inc. and [103]. [Hospitalist]
7.  Physician Employment Agreement, dated December 1, 2021, by and between Permian Premier Health Services, Inc. and [84], as amended by that certain First Amendment to Physician Employment Agreement, effective as of January 1, 2023. [Interventional Cardiology]
8.  Physician Employment Agreement, dated February 17, 2024, by and between Permian Premier Health Services, Inc. and [104]. [Anesthesiology]
9.  Physician Employment Agreement, dated February 17, 2024, by and between Permian Premier Health Services, Inc. and [105]. [Anesthesiology]
10. Physician Employment Agreement, dated January 16, 2024, by and between [Permian Premier Health Services, Inc.] and [29]. [Hospitalist]
11. Physician Employment Agreement, dated January 16, 2024, by and between Permian Premier Health Services, Inc. and [106], as amended by that First Amendment to Physician Employment Agreement, dated as of February 22, 2024, as further amended by that Second Amendment to Physician Employment Agreement, effective as of August 5, 2024. [Pulmonary & Critical Care Medicine]
12. Physician Employment Agreement, dated February 17, 2024, by and between Permian Premier Health Services, Inc. and [107]. [Anesthesiology]
13. Physician Employment Agreement, dated February 17, 2024, by and between Permian Premier Health Services, Inc. and [108]. [Anesthesiology]
14. Physician Employment Agreement, dated January 16, 2024, by and between Permian Premier Health Services, Inc. and [109]. [Hospitalist]
15. Physician Employment Agreement, dated February 17, 2024, by and between Permian Premier Health Services, Inc. and [110]. [Anesthesiology]
16. Per-Diem Agreement, dated January 15, 2024, by and between Permian Premier Health Services, Inc. and [111]. [Anesthesiology]
17. Per-Diem Agreement, dated January 15, 2024, by and between Permian Premier Health Services, Inc. and [112]. [Anesthesiology]
18. Per-Diem Agreement, dated January 10, 2024, by and between Permian Premier Health Services, Inc. and [113]. [Hospitalist]
19. Physician Employment Agreement, dated February 17, 2024, by and between Permian Premier Health Services, Inc. and [114]. [Anesthesiology]
20. Physician Employment Agreement, dated January 16, 2024, by and between Permian Premier Health Services, Inc. and [115]. [Hospitalist]
21. Physician Employment Agreement, dated January 16, 2024, by and between Permian Premier Health Services, Inc. and [116]. [Hospitalist]

22. Per-Diem Agreement, dated January 4, 2024, by and between Permian Premier Health Services, Inc. and [117]. [Hospitalist]

23. Physician Employment Agreement, dated July 31, 2024, by and between Permian Premier Health Services, Inc. and [118]. [Hospitalist]

24. Physician Employment Agreement, dated May 15, 2024, by and between Permian Premier Health Services, Inc. and [4]. [Gastroenterology]

25. Physician Employment Agreement, dated January 16, 2024, by and between Permian Premier Health Services, Inc. and [119]. [Hospitalist]

26. Physician Employment Agreement, dated February 1, 2020, by and between Permian Premier Health Services, Inc. and [41], as amended by that certain Letter Regarding Decrease in Annual Salary, dated March 30, 2020. [Interventional Cardiology]

27. Physician Employment Agreement, dated January 16, 2024, by and between Permian Premier Health Services, Inc. and [120]. [Pulmonary & Critical Care Medicine]

28. Per-Diem Agreement, dated January 19, 2024, by and between Permian Premier Health Services, Inc. and [121]. [Anesthesiology]

29. [SMGT-54800] Standard Form of Office Lease for Professional Building, dated January 21, 2013, by and between 427 W 20th Street, LLC and Permian Premier Health Services, Inc., as amended by that certain First Amendment to Office Lease Heights Medical Tower, LTD, dated February 8, 2018, as further amended by that certain Second Amendment to Office Lease, dated February 2019, as further amended by that certain Third Amendment to Office Lease, dated November 1, 2020, as further amended by that certain Fourth Amendment to Lease Agreement, dated February 17, 2023, as further amended by that certain Fifth Amendment to Lease Agreement, dated February 25, 2024.

30. [SMGT-80138] Lease and Services Agreement, dated March 15, 2024, by and between Honeycomb Clinic, LLC and Permian Premier Health Services, Inc.

31. All Personal Property located within the Steward Medical Group, Inc. practice locations.

**Schedule C**

**Excluded Assets**

For purposes of this Agreement, "**Excluded Assets**" means:

(a)    all Owned Real Property and all Personal Property located threat;

(b)    all Leased Real Property that is not subject to a Transferred Executory Contract and all Personal Property located thereat

(c)    any bank account of Seller or any Seller Affiliate, and all cash and cash equivalents, securities, investments, endorsements, charitable contributions, deferred gifts, endowment funds and other similar charitable interests, bond funds and other funds created by bond indentures and research rights;

(d)    all accounts receivable (including but not limited to, all patient and non-patient accounts receivable, whether billed or unbilled, recorded or unrecorded from any source), including notes receivable and other rights to receive payment for goods or services provided by Seller or any Seller Affiliate, whether or not in connection with their respective businesses (including the Business prior to the Transition Time), including any accounts receivable that have been charged off as bad debt, any receivables related to recoveries associated with Medicare bad debt with respect to services provided in time periods prior to the Transition Time and any intercompany receivables between Seller on the one hand, and Steward or any Affiliate of Steward on the other hand;

(e)    all insurance policies or self-insurance funds maintained by or on behalf of Sellers covering the Business and the Purchased Assets;

(f)    all Plans (other than any Plan that is an Employee Obligation or Assumed CBA) and records relating thereto;

(g)    all organizational documents, corporate records, stock books, proprietary manuals, other proprietary materials of, or other records relating to the corporate organization of, and any Tax Returns of or with respect to (including any records or working papers), Seller or any Seller Affiliate;

(h)    rights that accrue or will accrue to Seller or any Seller Affiliate under this Agreement or the other Transaction Documents;

(i)    any records that (i) are required by applicable Law or by Order of the Bankruptcy Court which Seller or any Seller Affiliate is required to retain in its possession or (ii) Seller or any Seller Affiliate reasonably believes will facilitate the preparation or filing of Tax Returns and the substantiation thereof or the administration of the Chapter 11 Cases;

(j)    all Contracts other than Transferred Executory Contracts;

(k)    (A) all claims, rights or interests of Seller or any Seller Affiliate to refunds, rebates, abatements, prepayments, or other recoveries in relation to Taxes (including any provider tax payments in any applicable state and any refundable Tax credits payable regardless of Tax Liability) related to (1) the Business, Facilities or the Purchased Assets for periods (and portions thereof) ending immediately prior to the Transition Time, (2) any Tax that is not an Assumed Liability or (3) any income Tax Return or Group

Tax Return and (B) all other Tax assets (including any Tax attributes) of Seller or any Seller Affiliate, in each case together with any interest due thereon or penalty rebate arising therefrom;

(l)      [Intentionally omitted];

(m)      all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat Laws;

(n)      all rights to receipts (i) relating to the Seller Cost Reports with respect to time periods prior to the Transition Time pursuant to the auditing and settlement of the Seller Cost Reports, including settlements and retroactive adjustments (collectively, "**Cost Report Settlements**"), (ii) that result from Seller's or any of its Affiliate's pursuit of one or more appeals and other risk settlements with respect to time periods prior to the Transition Time, or (iii) relating to amounts earned, accrued or paid by Seller or any Seller Affiliates with respect to meaningful use attestations, or for which the requirements for attestation have been substantially met with respect to time periods prior to the Transition Time;

(o)      Seller's or any of its Affiliate's assets held in connection with any self-funded insurance programs and reserves, if any, and any assets and Liabilities under medical malpractice risk pools and workers' compensation and employee retirement programs;

(p)      any (i) Permits or Approvals exclusively used or held for use in, or otherwise exclusively relating to, the Business or the Purchased Assets, but that are not assignable to Buyer pursuant to applicable Laws or by Order of the Bankruptcy Court, and (ii) accreditations exclusively used or held for use in, or otherwise exclusively relating to, the Business or the Purchased Assets, but that are not assignable to Buyer pursuant to the requirements of applicable accreditation organizations;

(q)      any claims or causes of action of Seller or Seller Affiliates against third parties (i) other than those that exclusively relate to the Business or (ii) to the extent that such claims or causes of action arise in connection with the Chapter 11 Cases, including, without limitation, all Avoidance Actions;

(r)      any intercompany receivables between Seller or any Seller Party on the one hand, and Seller or Seller Affiliates on the other, and any claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Seller and Seller Affiliates, and any payments, awards or other proceeds resulting therefrom;

(s)      any trustee held bond reserve funds or surety bonds;

(t)      assets held to fund, or relating to, Excluded Liabilities;

(u)      all Medicare Accelerated and Advance Payments, COVID-19 Funds and any provider relief funds under the CARES Act or similar legislation that are intended to compensate Steward, any Affiliate of Steward, or Seller for costs incurred or lost revenue with respect to time periods prior to the Transition Time;

(v)      all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, including but not limited to peer-review privilege;

(w)      all documents, records, correspondence, work papers and other documents relating to the Seller Cost Reports, Cost Report Settlements or other Excluded Assets;

(x)  any (i) Trademarks not exclusively used or held for use in, or otherwise exclusively relating to, the Business, (ii) Trademarks or Domain Names that contain the name "Steward Health Care System," "Steward Health," "IASIS," or "Steward" (as well as all abbreviations, variations or derivations thereof, including any world-wide web address containing "iasis" or "steward"), any promotional material, educational material, signage, stationery, supplies or other items of inventory bearing such names or Trademark, or any marks, trade dress, logos, or symbols or abbreviations, variations or derivations thereof, and any URLs, sites, blogs or pages hosted on the system websites of Seller or the Seller Affiliates, including all content embodied within the foregoing, (iii) any Intellectual Property made available to Buyer or its Affiliates following the Effective Time pursuant to the Transition Services Agreement, or (iv) any other Intellectual Property not exclusively used or held for use in, or otherwise exclusively related to the Business;

(y)  any (i) Information Technology Systems, Software, hardware or data processing equipment, data processing system manuals and licensed Software materials that are not (A) in the case of tangible assets, located at a Facility or, in the case of Software, manuals and materials in electronic format, and other intangible assets, residing on hardware located at a Facility or (B) exclusively used or held for use in, or otherwise exclusively relating to, the Business or (C) transferable or (ii) proprietary Software, data processing programs or source code of Seller or any Seller Affiliates;

(z)  any proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses of Seller or any Seller Affiliates;

(aa)  any pharmaceuticals that cannot, by applicable Law, be sold by Seller to Buyers;

(bb)  any medical staff-related records or information not among the Credentialing and Medical Staff Records;

(cc)  any non-assumable Prepaid Expenses or any other Prepaid Expenses to the extent related to an Excluded Asset;

(dd)  any master agreements or similar contracts, including Payor Agreements, that relate, in whole or in part, to the provision of services, or that involve the rights or privileges of Steward or any of its Affiliates, that are not exclusively used or held for use in the Business;

(ee)  Contracts and fee-sharebacks made available through participation in a group purchasing organization;

(ff)  all Medicaid payments for time periods prior to the Effective Time, including any supplemental Medicaid payments that are unrelated to specific patient visits;

(gg)  all rights and interest associated with all indebtedness or debt-like items of Steward, any Affiliate of Steward, including Seller;

(hh)  all Personal Information that is nontransferable under applicable Law or under the privacy policies or notices of Seller in effect at the time of collection of such Personal Information;

(ii)  any asset located outside the Restricted Area;

(jj)  Seller's goodwill associated with, or relating to the Business and any Purchased Assets; and

(kk)     any other assets, properties, rights, or interests of any description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, that are not exclusively used or held for use in, or otherwise exclusively relating to, the Business or that Seller is required to retain by applicable Law or Order of the Bankruptcy Court.

## **Schedule D**

## **Assumed Liabilities**

None.

## Schedule E

## Social Media Accounts

1. sjmctx.org
2. https://www.facebook.com/sjmctx
3. https://www.youtube.com/playlist?list=PLD7RUGfnUtHo1SdUkXLHmK6d4AqFX9VCw
4. https://twitter.com/sjmctx
5. stjosephmammo.com
6. stjosephemergency.com
7. sjmctx.com
8. sjmctx.net
9. sjmcheights.com
10. houstonquicker.com
11. medicalassociateshouston.com
12. https://www.linkedin.com/company/st.-joseph-medical-center/

**<u>Schedule F</u>**

**<u>Facilities</u>**

<u>Hospital</u>

1.  St. Joseph Medical Center - Main Hospital Campus: 1401 St. Joseph Pkwy, Houston, TX 77002.

**<u>Schedule G</u>**

**<u>Permian Employees</u>**

**[REDACTED]**

**Exhibit 2**

Bill of Sale, Assumption and Assignment Agreement (Port Arthur)

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), is delivered and entered into as of October [•], 2024 by and among (i) The Medical Center of Southeast Texas, LP, a Texas limited partnership ("**Seller**"), (ii) solely for purposes of Section 5.4, the Seller Parties, and (ii) HSA Port Arthur LLC, a Texas limited liability company ("**Buyer**", and collectively with Seller and the Seller Parties, the "**Parties**" and each individually a "**Party**"). The capitalized terms used herein shall have the meanings ascribed to them in Annex A unless the context indicates otherwise.

**W I T N E S E T H**

**WHEREAS**, Seller and certain Seller Affiliates (collectively, the "**Debtors**") are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**) and, on May 6, 2024, voluntary petitions for relief under chapter 11 of the Bankruptcy Code were filed in the United States Bankruptcy Court for the Southern District of Texas (such court, the "**Bankruptcy Court**", and such cases, jointly administered under Case No. 24-90213, the "**Chapter 11 Cases**");

**WHEREAS**, on September 11, 2024, the Bankruptcy Court entered an Interim Order approving a global settlement among the Debtors, MPT, the Prepetition ABL/FILO Secured Parties, the FILO Secured Parties, and the Creditors' Committee (each as defined in the Interim Settlement Order) regarding certain disputes arising among such parties in connection with the Chapter 11 Cases, which Interim Order was entered as Docket No. 2418 (including all exhibits thereto, the "**Interim Settlement Order**");

**WHEREAS**, on September 11, 2024, (i) MPT designated Buyer as its "Interim Manager" (as defined in the Interim Settlement Order) and (ii) Steward, Seller and Buyer have entered into that certain Interim Management Agreement, dated as of September 11, 2024 (the "**Interim Management Agreement**"), pursuant to which Buyer agreed to provide Seller with certain interim management services and fund the operations of the Facilities in accordance with the Settlement Term Sheet (as defined in the Interim Settlement Order) during the period starting at 12:01 a.m. local time on September 11, 2024 (the "**Transition Time**") until the date hereof (as defined herein);

**WHEREAS**, on September 18, 2024, the Bankruptcy Court entered a Final Order approving a global settlement among the Debtors, MPT, the Prepetition ABL/FILO Secured Parties, the FILO Secured Parties, and the Creditors' Committee regarding certain disputes arising among such parties in connection with the Chapter 11 Cases, which Final Order was entered as Docket No. 2610 (including all exhibits thereto, the "**Final Settlement Order**" and, collectively with the Interim Settlement Order, the "**Settlement Orders**");

**WHEREAS**, pursuant to the Settlement Orders, MPT has designated Buyer as the Designated Operator for the Purchased Assets;

**WHEREAS**, in accordance with the Settlement Orders, Seller desires to sell the Purchased Assets to Buyer and assign the Assumed Liabilities to Buyer, subject to the terms and conditions set forth in this Agreement;

**WHEREAS**, Buyer desires to acquire the Purchased Assets from Seller and assume the Assumed Liabilities from Seller, subject to the terms and conditions set forth in this Agreement;

**WHEREAS**, the Bankruptcy Court approved entry into this Agreement and consummation of the Contemplated Transactions pursuant to that certain MLI Hospital Sale Order (as defined in the Settlement Term Sheet attached to the Settlement Orders) concerning the Facilities; and

**WHEREAS**, Buyer has obtained those certain Approvals from the relevant Governmental Authorities required to operate the Business at the Facilities, as set forth on <u>Schedule A-1</u>.

**NOW, THEREFORE**, for and in consideration of the premises, the agreements, covenants, representations and warranties set forth in this Agreement, and other good and valuable consideration, the receipt and adequacy of which are acknowledged and agreed, the Parties agree as follows:

1.      **SALE OF ASSETS AND CERTAIN RELATED MATTERS.**

    **1.1      Sale of Purchased Assets**.  On the terms and subject to the conditions set forth in this Agreement, Seller and each Seller Party hereby sells, assigns, conveys, transfers, and delivers to Buyer, and Buyer hereby purchases, acquires, and accepts, all of Seller's and each Seller Party's right, title and interest to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), provided that in no event shall any Transferred Executory Contract be assigned to Buyer until after any applicable requisite notice period set forth in the Settlement Order has been satisfied.  "**Purchased Assets**" means, in each case other than the Excluded Assets, (i) all assets, properties, rights, and interests of every description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, owned by (x) Seller and exclusively used or held for use in the operation of, or otherwise exclusively relating to, the Business or (y) any of the Seller Parties solely to the extent set forth in <u>Schedule B</u>, (in each case other than the Excluded Assets), in each case, to the extent assignable or transferable under applicable Law, and (ii) all Transferred Executory Contracts.

    **1.2      Excluded Assets**.  Notwithstanding anything herein to the contrary, the assets, properties, rights, and interests of every description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, of Seller and any Seller Affiliates, in each case, set forth on <u>Schedule C</u> are not intended by the Parties to be a part of the Contemplated Transactions and are excluded from the Purchased Assets (collectively, the "**Excluded Assets**").

    **1.3      Assumed Liabilities**.  On the terms and subject to the conditions set forth in this Agreement, Buyer hereby assumes, and agrees to pay, perform and discharge, when they become due and payable, the following Liabilities of Seller and Seller Parties (collectively, the "**Assumed Liabilities**"):

        (a)      all Liabilities arising out of the use, ownership or operation of the Business, the Purchased Assets or the Facilities first arising after the Transition Time;

        (b)      all Liabilities  for (i) Taxes relating to the transfer of the Purchased Assets under this Agreement (including any Transfer Taxes), other than income Taxes of Seller, any Seller Party, or any consolidated, combined, unitary or similar Tax group of which Seller or such Seller Party is a member, (ii) Property Taxes with respect to the Purchased Assets, and (iii) any Tax relating to the Purchased Assets or the Business for which a Governmental Authority asserts in writing personal liability on any officer, director, or employee of Seller or any Affiliate thereof;

        (c)      all Liabilities arising as the custodian of the medical records, patient files, and other written accounts of the medical history of the patients of the Business;

        (d)      all Liabilities related to Seller Employees to the extent assumed under <u>Section 5.4</u>; and

        (e)      all Liabilities as set forth on <u>Schedule D</u>.

All Liabilities of Seller and the Seller Parties not otherwise expressly assumed under this Section 1.3 shall be excluded from the Contemplated Transaction and remain Liabilities of Seller or the Seller Parties, as applicable (collectively, the "**Excluded Liabilities**").

      **1.4**     **Consideration**.  Subject to the terms and conditions hereof, the aggregate consideration (the "**Consideration**") for the Purchased Assets is Buyer's assumption of the Assumed Liabilities.

      **1.5**     **Designated Contracts; Cure Costs**.

      (a)     From time to time on or prior to December 16, 2024 (the "**Designation Deadline**"), Buyer may designate, by written notice to Seller, each Executory Contract it wishes to be assigned to it (each such Executory Contract, a "**Transferred Executory Contract**") in accordance with the procedures set forth in the Settlement Order.

      (b)     All Cure Costs and all fees and expenses actually incurred by Seller, any Seller Party, if applicable and their Affiliates to effect the assumption and assignment of the Transferred Executory Contracts from Seller or, if applicable, Seller Party to Buyer (including any legal expenses and any fees and expenses in connection with the assumption and assignment of Government Program provider numbers) (collectively, the "**Cure Fees and Expenses**") shall be paid by Buyer no later than the time of assignment, and as a condition to Seller's and, if applicable, Seller Party's obligation to assign, such Transferred Executory Contracts. Upon request by Buyer, Seller and, if applicable, the Seller Paties shall promptly (in any event three (3) Business Days following such request) provide Buyer with an invoice for such Cure Fees and Expenses.

      (c)     Notwithstanding any provision to the contrary contained in this Agreement, but subject to Section 1.5(b), in no event shall any Transferred Executory Contract be assigned to Buyer until after any requisite notice period set forth in the Settlement Order has been satisfied.

2.     **CLOSING.**

      **2.1**     **Closing**.  The assignment of the Purchased Assets and assumption of the Assumed Liabilities pursuant to this Agreement shall be effective for financial and accounting purposes as of 11:59 p.m. local time on the date hereof (the "**Effective Time**"). The delivery of all Transaction Documents by one Party to any other Party shall be deemed to have occurred simultaneously and none shall be effective unless and until all have occurred.

      **2.2**     **Deliveries of Seller at the Closing**.  Concurrently with the execution of this Agreement, Seller has delivered to Buyer or its designee the following:

      (a)     one or more power of attorneys (each a "**Power of Attorney**"), duly executed by Seller, authorizing Buyer to utilize Seller's federal and state controlled substances permits and pharmacy licenses;

      (b)     a confirmatory trademark assignment agreement (the "**Trademark Assignment Agreement**"), duly executed by Seller;

      (c)     a transition services agreement (the "**Transition Services Agreement**"), duly executed by Seller or the Seller Affiliates, as applicable;

(d)    an employee contract assignment and assumption agreement (the "**Employee Contract Assignment and Assumption Agreement**"), duly executed by Seller and/or each relevant Seller Party;

(e)    an employee lease agreement in a form mutually agreed upon by the Parties (the "**Employee Lease Agreement**"), duly executed by Seller and each relevant Seller Party, pursuant to which Seller and each relevant Seller Party will lease the Seller Employees to Buyer from the Effective Time through the Employee Transition Date;

(f)    a professional leaseback agreement in a form mutually agreed upon by the Parties (the "**Leaseback Agreement**"), duly executed by each Seller Party;

(g)    a professional services agreement in a form mutually agreed upon by the Parties (the "**Professional Services Agreement**"), duly executed by each Seller Party; and

(h)    a duly executed IRS Form W-9 of Seller (or, if Seller is a disregarded entity, its regarded owner for applicable income tax purposes).

2.3    **Deliveries of Buyer at the Closing**.  Concurrently with the execution of this Agreement, Buyer has delivered to Seller the following:

(b)    the Transition Services Agreement, duly executed by Buyer;

(c)    the Employee Contract Assignment and Assumption Agreement, duly executed by Buyer;

(d)    the Employee Lease Agreement, duly executed by Buyer;

(e)    the Leaseback Agreement, duly executed by Buyer;

(f)    the Professional Services Agreement duly executed by Buyer; and

(g)    copies of resolutions duly adopted by the board of managers of Buyer, authorizing and approving Buyer's performance of the Contemplated Transactions and the execution and delivery of this Agreement and the other Transaction Documents, certified as true and in full force and effect as of the date hereof by an appropriate officer of Buyer.

2.4    **Additional Acts**.  From time to time after the Effective Time, the Parties shall execute, acknowledge and deliver to the other applicable Parties all such further reasonable documents, conveyances, notices, assumptions, releases and acquittances and such other reasonable instruments, and shall take such further reasonable actions, as may be reasonably necessary or appropriate to effectuate this Agreement and consummate the Contemplated Transactions, including to assure fully to Buyer all of the properties, rights, titles, interests, estates, remedies, powers and privileges relating to the Purchased Assets intended to be conveyed to Buyer under this Agreement and the other Transaction Documents and to assure fully to Seller and each Seller Party the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement and the other Transaction Documents, and to confirm, consummate or otherwise make effective the Contemplated Transactions.

3.    **REPRESENTATIONS AND WARRANTIES OF SELLER.**

Seller hereby represents and warrants to Buyer the following:

**3.1    Organization; Capacity**.  Seller and each of the Seller Parties is a corporation, limited liability company or other entity, duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation or organization.  Except for such authorizations as may be required by the Bankruptcy Court, the execution and delivery by Seller and each of the Seller Parties of this Agreement and the other Transaction Documents to which it is or will become a party, as applicable, the performance by Seller or such Seller Party of its obligations under this Agreement and the other Transaction Documents to which it is or will become a party and the consummation by Seller or such Seller Party of the Contemplated Transactions to which it is a party have been authorized and approved by all necessary corporate, limited liability company or other similar actions, as applicable, on the part of Seller or such Seller Party, none of which actions has been modified or rescinded and all of which actions remain in full force and effect.

**3.2    Authority; Non-contravention; Binding Agreement**.

(a)    The execution, delivery and performance by Seller and each of the Seller Parties of this Agreement and the other Transaction Documents to which it is a party, and the consummation by Seller and such Seller Party of the Contemplated Transactions, as applicable:

(i)    are within Seller's and each Seller Party's corporate, limited liability company or other similar powers and are not and will not be in contravention or violation of the terms of the organizational or governing documents of Seller or such Seller Party;

(ii)    except as set forth in Schedule A-2, do not and will not require any Approval of, filing or registration with, the issuance of any Permit by, or any other action to be taken by, any Governmental Authority to be made or sought by Seller or any Seller Party;

(iii)    do not and will not require any Approval or other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both), or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation, or loss of a material benefit under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) upon, any of the Purchased Assets under (1) any Contract material to the Business taken as a whole, or Permit or Approval applicable to any of the Purchased Assets or (2) any Order or Law applicable to any of the Purchased Assets or to which Seller may be subject, except in each case of clauses (ii) and (iii)(1) above, as would not reasonably be expected to have a Material Adverse Effect; and

(b)    This Agreement and the other Transaction Documents to which Seller or any Seller Party is a party are and will constitute the valid and legally binding obligations of Seller or such Seller Party and, assuming the due authorization and execution thereof by Buyer , are and will be enforceable against them in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable Laws or an Order of the Bankruptcy Court affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.3    Title to Assets.**  Seller is conveying to Buyer, and Buyer is acquiring, good and marketable title to the Purchased Assets, free and clear of all Encumbrances, other than the Permitted Encumbrances.

**3.4    Litigation**.  Except for the Chapter 11 Cases, there is no Proceeding or Order pending or, to the Knowledge of Seller, threatened against Seller or any Seller Party with respect to the Business or the Purchased Assets, in which an adverse determination would reasonably be expected to have a Material Adverse Effect or would otherwise prohibit the consummation of the Contemplated Transactions.

**3.5    No Other Representations or Warranties**.

(a)      Except for the representations and warranties expressly set forth in this Section 3, neither Seller nor any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, on behalf of Seller or any Seller Affiliate, including any representation or warranty regarding Seller, any Seller Party, or any other Person, any Purchased Assets, any Facility, any Liabilities of Seller, including any Assumed Liabilities, the Business, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and Seller hereby disclaims all other representations and warranties of any kind whatsoever, express or implied, written or oral, at law or in equity, whether made by or on behalf of Seller, any Seller Party, or any other Person, including any of their respective Representatives.

(b)      Except as expressly set forth in Section 3 hereof, the Purchased Assets transferred to Buyer will be sold by Seller and purchased by Buyer in their physical condition at the Effective Time, "AS IS, WHERE IS AND WITH ALL FAULTS AND NON-COMPLIANCE WITH LAWS" WITH NO WARRANTY OR HABITABILITY OF FITNESS FOR HABITATION, with respect to the Leased Real Property and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the Personal Property and Inventory, any and all of which warranties (both express and implied) Seller hereby disclaims.  All of the Leased Real Property, Personal Property and Inventory shall be further subject to normal wear and tear and normal and customary use in the ordinary course of business up to the Effective Time.  Buyer acknowledges that Buyer has examined, reviewed and inspected all matters which in Buyer's judgment bear upon the Purchased Assets and their value and suitability for Buyer's purposes and, except as affirmatively represented and warranted by Seller, is relying solely on its own examination, review and inspection of the Purchased Assets and Assumed Liabilities.

4.       **REPRESENTATIONS AND WARRANTIES OF BUYER.**

Buyer hereby represents and warrants to Seller that the statements contained in this Section 4 are true and correct as of the date of this Agreement.

**4.1      Organization; Capacity**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas. Buyer is duly authorized, qualified and in good standing under all applicable Laws of any jurisdictions (foreign and domestic) in which the character or location of the assets owned or leased by it or the nature of the business conducted by it requires such authorization or qualification.  Buyer has the requisite power and authority to enter into the Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.  The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is a party, the performance by Buyer of its obligations under this Agreement and the other Transaction Documents to which it is a party and the consummation by Buyer of the Contemplated Transactions and the Transaction Documents to which it is a party, have been duly and validly authorized and approved by all necessary action, as applicable, on the part of Buyer, none of which actions has been modified or rescinded and all of which actions remain in full force and effect.

**4.2      Authority; Non-contravention; Binding Agreement**.

(a)      The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation by Buyer of the Contemplated Transactions and its obligations under the Transaction Documents, as applicable:

(i)      are within Buyer's powers and are not, and will not be, in contravention or violation of the terms of Buyer's organizational or governing documents;

(ii)      do not and will not require any Approval of, filing or registration with, the issuance of any Permit by, or any other action to be taken by, any Governmental Authority to be made or sought by Buyer; and

(iii)      do not and will not require any Approval or other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both) or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation, or loss of a material benefit under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) upon, any material assets of the Buyer under any Contract, Permit, Order or Law to which Buyer may be subject.

(b)      This Agreement and the other Transaction Documents to which Buyer is or will become a party are and will constitute the valid and legally binding obligations of Buyer and, assuming the due authorization and execution thereof by Seller, are and will be enforceable against it in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3      **Litigation**.  There is no Proceeding or Order pending or, to the Knowledge of Buyer, threatened against or affecting Buyer, or any of its Affiliates or any of their respective properties or rights that prohibit the consummation of the Contemplated Transactions.

4.4      **Representations of Seller**.  Buyer hereby acknowledges and agrees the only representations and warranties made by Seller are the representations and warranties expressly set forth in Section 3 and Buyer has not relied upon, and will not rely upon, any other express or implied representations, warranties or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or on behalf of Seller, or any Seller Affiliates, any Representatives of Seller or any Seller Affiliate or any other Person, including any projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or through Seller's bankers, or management presentations, data rooms (electronic or otherwise) or other due diligence information, and that Buyer will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information. Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Business, the Purchased Assets and the Assumed Liabilities are being transferred on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in Section 3  without any other representations or warranties of any nature whatsoever.

5.      **COVENANTS OF SELLER AND BUYER.**

5.1      **Bulk Sales Laws**.  Buyer and Seller hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

5.2      **Social Media Accounts**.  Promptly after the Effective Time, Seller shall initiate the respective processes to grant Buyer exclusive access rights and permissions to the social media accounts owned or operated by Seller set forth on <u>Schedule E</u>.  Within forty-five (45) days after the Closing Date, Buyer must remove all marks or content, to the extent not a Purchased Asset, of Seller and its Affiliates from such social media accounts.

**5.3** **Confidentiality**. It is understood by the Parties that the Confidentiality Agreement will survive the execution and delivery of this Agreement and will terminate pursuant to the terms of the Confidentiality Agreement.   To the extent that any press releases or public announcements are to be issued or made relating to the Contemplated Transactions, the timing and content of such press releases and public announcements shall be mutually agreed between each Party hereto.

**5.4** **Seller Employees**. As of the Effective Time, Seller and Buyer shall enter into an Employee Lease Agreement, and each Seller Party and Buyer shall enter into an Employee Lease Agreement, pursuant to which Seller and Seller Party shall continue to employ certain Seller Employees for the benefit of Buyer, pursuant to and in accordance with the Employee Lease Agreement, until the Employee Transition Time. During the term of the Employee Lease Agreement, subject to Buyer's standard hiring practices and policies (including but not limited to background checks, drug screens and a general prohibition against hiring employees who were previously released for cause from employment with Buyer or their Affiliates), Buyer will make offers of employment to substantially all of the persons who are Seller Employees eligible for hire by Buyer, with such offers of employment to be effective on or prior to the Employee Transition Date, provided that with respect to all of the persons who are Seller Employees and are on short-term or long-term disability or on leave of absence pursuant to Seller's or Seller Party's policies, the Family and Medical Leave Act of 1993 or other similar Law as of the Effective Time (each, an "**Employee on Leave**"), such offers of employment shall be made effective as of the date that the person reports back to work at the Business on an active basis within one hundred eighty (180) days after the Effective Time (or such longer time as is required by applicable Law).

(b) As of the Employee Transition Date or, with respect to any Employee on Leave, upon the date such Employee on Leave becomes a Transferred Employee (such date, in each case, the "**Employee Effective Time**"), Seller and each Seller Party shall terminate all Seller Employees. The term "**Transferred Employee**" as used in this Agreement means a Seller Employee who accepts employment with Buyer as of the Employee Effective Time (and with respect to any Employee on Leave, as of the date such Employee on Leave so reports back for work).

(c) As of the Employee Effective Time, for each Transferred Employee who is a party to an employment or similar Contract (each, an "**Employee Obligation**"), Buyer shall honor the terms of such Employee Obligations.

(d) Subject to the requirements of any applicable Collective Bargaining Agreement, for a period of at least twelve (12) months following the date hereof (or such longer period as may be required by applicable Collective Bargaining Agreement and/or Law), each Transferred Employee that is not party to an Employee Obligation, shall be entitled to receive from the Buyer (i) at least the same salary and wages as were provided to such employee by Seller or Seller Party immediately prior to the date hereof by Seller or a Seller Party, (ii) employee benefits substantially comparable in the aggregate to the employee benefits provided to each Transferred Employee immediately prior to the date hereof  by Seller or Seller Party and (iii) responsibilities consistent with their then-current job title and reporting structure immediately prior to the date hereof.  For each Transferred Employee subject to an Employee Obligation, Buyer shall honor the terms of employment, union or other contracts for those Transferred Employees who have such agreements.  For the avoidance of doubt, nothing contained herein modifies the terms of any Collective Bargaining Agreement.

(e) Buyer hereby assumes or retains, as the case may be, any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of any Seller Employee, including accrued and unpaid wages or salary, accrued and unused vacation, sick days and paid time off against Seller or a Seller Party, in each case, with respect to any Seller Employee, irrespective of when such claims are made. Buyer shall pay the

applicable Transferred Employees the unpaid portion of any Transferred Employee's bonus for the 2024 calendar year at the same time such bonuses are paid to such Transferred Employee in the ordinary course of business consistent with past practices.

(f)     Buyer hereby assumes each Collective Bargaining Agreement governing the terms and conditions of employment of the employees represented by a union or other labor organization ("**Union Represented Employees**"), hereinafter referred to as the "**Assumed CBAs**." Buyer has delivered offers of employment to Union Represented Employees (i) in accordance with Section 5.4(a) and Section 5.4(d), or alternatively negotiated in good faith with the applicable union or other labor organization to deem such offers of employment to have been made to the Union Represented Employees and (ii) containing the terms and conditions of employment contained in the Assumed CBAs.

(g)     Buyer agrees to recognize each Transferred Employee's date of hire by Seller or a Seller Party, as applicable, as the anniversary date of record with Buyer and to honor that seniority for purposes of eligibility, vesting and prospective benefit accrual on or after the date hereof under Buyer employee benefit plans and policies, but excluding any defined benefit pension plan within the meaning of Section 3(35) of ERISA and any retirement plan intended to be qualified under Section 401 (including any 401(k) plan).  Buyer will waive the customary waiting periods under its welfare and 401(k) plans for the Transferred Employees and their eligible spouses and dependents under any employee benefit plan, program or arrangement of Buyer, and, subject to each Transferred Employee's election of coverage, participation in Buyer's benefit plans shall begin as of the Employee Effective Time for each Transferred Employee who is in an eligible class as defined under the respective Buyer benefit plans.  To the extent lawful and subject to the approval of any applicable insurer, Buyer shall (i) honor the Transferred Employees' prior service credit under Seller's or Seller Party's current welfare plans for purposes of satisfying pre-existing condition limitations in Buyer's welfare benefit plans, and (ii) with respect to the 2024 calendar year, recognize any out-of-pocket expenses (including deductibles, co-pays, and out of pocket maximums) incurred by each of the Transferred Employees and their eligible dependents under any Plans that are welfare benefit plans prior to the date hereof for purposes of determining deductibles, co-pays and out-of-pocket maximums under Buyer's applicable medical and welfare benefit plans on and after the date hereof.  For purposes of eligibility to participate in Buyer's retirement plans, Buyer shall honor prior length of service for each Transferred Employee that meets the eligibility requirements under Buyer's retirement plans, but Buyer will not make any contributions to Buyer's retirement plans for the Transferred Employees with respect to prior service.

(h)     Subject to the terms and conditions of Buyer's applicable benefit plans, for each Seller Employee, Buyer shall carry over, and give credit for (or with respect to any Seller Employee who does not become a Transferred Employee pay to such Seller Employee on the date hereof or, if permitted under applicable Law, promptly after the date hereof), the unused Paid Time Off of such Seller Employee as of immediately prior to the Employee Effective Time (the aggregate number of hours of Paid Time Off assumed by Buyer for all Seller Employees pursuant to this Section 5.4(h), the "**Assumed Paid Time Off**").

(i)     Buyer shall be solely responsible for complying with the WARN Act and any and all obligations under other applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Seller Employees as a result of any action by Buyer following the Transition Time.

(j)     Notwithstanding any provision herein to the contrary, no term of this Agreement shall be deemed to (i) create any Contract with any Transferred Employee; (ii) give any Transferred Employee the right to be retained in the employment of Buyer or any of its Affiliates; (iii) interfere with Buyer's right to terminate the employment of any Transferred Employee at any time; or (iv) obligate Buyer or any of its Affiliates to adopt, enter into or maintain any employee benefit plan or other compensatory

plan, program or arrangement at any time.  Nothing in this Agreement shall diminish Buyer's right to change or terminate its policies regarding employment matters at any time or from time to time.

5.5    **Post-Closing Access to Information; Communication with Governmental Authorities**.

(a)    Buyer and Seller acknowledge that prior to the end of the Post-Closing Period, Buyer and Seller may need access to information, documents or computer data in the control or possession of the other, including for the purpose of satisfying their obligations in connection with the Chapter 11 Cases, and Seller may need access to records that are a part of the Purchased Assets for purposes of concluding the Contemplated Transactions and for audits, investigations, compliance with applicable Law or an Order of the Bankruptcy Court and requests from Governmental Authorities, and the prosecution or defense of claims made by third parties.  Accordingly, Buyer agrees that, except to the extent necessary to comply with any applicable Law or an Order of the Bankruptcy Court, it will timely make available to Seller and its respective Representatives the Books and Records and such information, documents and computer data as may be available relating to the Purchased Assets and the Business in respect of periods prior to the Effective Time and will permit Seller (or its Representatives) to make copies of such Books and Records, information, documents and computer data.  Seller agrees that Seller will timely make available to Buyer and its Representatives such information, documents and computer data relating to the Purchased Assets and the Business in respect of periods prior to the Effective Time as may be in the possession of Seller or any Seller Party and will permit Buyer (or its Representatives) to make copies of such documents and information.  Notwithstanding the foregoing, all disclosures of information shall be consistent with the Confidentiality Agreement, all common interest agreements, joint defense agreements, and any other confidentiality, clean room or nondisclosure agreements entered into among any of the Parties or their respective Affiliates.  The Parties agree that the cost of compliance with this provision shall be governed by the Transition Services Agreement.

(b)    Buyer shall assume all legal responsibility for, and shall preserve, the Books and Records (including, but not limited to, patient records) for the greater of: (i) seven (7) years from the date of such record; (ii) as may be required by applicable Law, including but not limited to, the statute of limitations governing the time period afforded to bring professional liability claims in Texas or as is necessary to administer the Chapter 11 Cases; or (iii) such longer period as may be required in connection with any known or threatened investigation or Proceeding, including any professional liability claims.  Thereafter, Buyer may dispose of such Books and Records only after Buyer has given Seller ninety (90) days' prior written notice of such impending disposition and the opportunity of Seller to remove and retain such Books and Records as permitted by applicable Law.

(c)    Buyer shall cooperate with Seller, on a timely basis and as reasonably requested by Seller, in connection with the provision of all data of the Business and other information required by Seller for reporting to the DNV for the remainder of the quarterly period in which the Contemplated Transactions have occurred.

(d)    To the maximum extent permitted by applicable Law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities, including documents relating to the operations of the Business or ownership of any of the Purchased Assets prior to the Effective Time, then to the extent allowable by applicable Law, prior to any disclosure of such documents, Buyer shall notify Seller and provide Seller with the opportunity to object to, such request or demand.

(e)    To the extent practicable under the circumstances, neither Seller nor Buyer, as applicable, will agree to participate in any substantive call, meeting or conference with any Governmental Authority, or any member of the staff of any Governmental Authority, in respect of any filing, Proceeding,

investigation (including any settlement of the investigation), litigation, or other inquiry related to the Contemplated Transactions, provided that such responding Party (1) provides reasonable advance notice of such meeting to any other Party and (2) provides any such other Party an opportunity to attend or participate and, where permitted, allow any other Party to participate.

5.6     **Transition Patients**. To compensate Seller for services rendered and medicine, drugs and supplies provided by the Hospitals up to the Transition Time with respect to patients who are admitted to the Hospitals prior to the Transition Time and whose care is reimbursed by any Government Program or Private Program but who are not discharged until after the Transition Time (such patients being referred to herein as the "**Transition Patients**" and services rendered to them being referred to herein as the "**Transition Patient Services**"), the Parties shall take the following actions:

(a)     For Transition Patients for whom a cut-off billing for the period prior to the Effective Time ("**Interim Billing**") is not accepted by the applicable Government Program or Private Program (the "**Non-Interim Billing Transition Patients**"), as soon as practicable after the date hereof, Seller shall deliver to Buyer a statement specifying the Non-Interim Billing Transition Patients and the expected reimbursement for each such Non-Interim Billing Transition Patient.  Such statement shall also identify which Non-Interim Billing Transition Patients (i) are receiving medical care that is paid for, in whole or in part, by a Government Program or Private Program that pays on a diagnostic related group ("**DRG**"), case rate, or other similar basis and for whom the applicable Facility is paid on a per-claim basis (the "**DRG Transition Patients**") and/or (ii) are receiving medical care that is paid for on a non-DRG basis ("**Non-DRG Transition Patients**").   Buyer shall be responsible for submitting such billings to the applicable Government Program or Private Program for the entire portion of each of the Non-Interim Billing Transition Patients' respective stays.

(b)     For Transition Patient Services provided to a DRG Transition Patient, upon receipt of payment, Seller shall be entitled to an amount equal to (i) the total DRG payment received by Buyer and Seller (including disproportionate share, uncompensated care, low volume adjustment, indirect medical education, outlier, and capital payments and any deposits, deductibles, copayments paid, whether received by Buyer or Seller), multiplied by a fraction, the numerator of which shall be the number of days prior to the Transition Time that the DRG Transition Patient was an inpatient at the applicable Hospital and the denominator of which shall be the total number of days that such DRG Transition Patient was an inpatient at such Hospital minus (ii) any deposits, deductibles or co-payments paid by or on behalf of the applicable DRG Transition Patient to Seller or any of Seller's Affiliates prior to the Transition Time.  Buyer will make such payments to Seller within ten (10) Business Days after receipt of such payment.

(c)     For Transition Patient Services provided to a Non-DRG Transition Patient, Seller shall be entitled to an amount equal to (i) the total payments received by Buyer and Seller for such Non-DRG Transition Patient (including any deposits, deductibles, or copayments, whether received by Buyer or Seller), multiplied by a fraction, the numerator of which shall be the total number of days prior to the Transition Time on which the applicable Hospital provided Transition Patient Services to such Non-DRG Transition Patient and the denominator of which shall be the total number of days with respect to such Non-DRG Transition Patient's stay at the applicable Hospital minus (ii) any deposits, deductibles or co-payments paid by or on behalf of the applicable Non-DRG Transition Patient to Seller or any of Seller's Affiliates prior to the Transition Time. Buyer will make such payments to Seller within ten (10) Business Days after receipt of such payment.

(d)     In addition to the other payments contemplated by this Section 5.6 (or elsewhere in this Agreement), (i) if Seller or the Seller Affiliates receives any amount from patients, Government Programs or Private Programs which relates to services rendered by the Facilities after the Transition Time, Seller or Seller Affiliate will remit such amount to Buyer within ten (10) Business Days after receiving

such amount; and (ii) if Buyer receives any amount from patients, Government Programs or Private Programs which relates to services rendered by the Facilities prior to the Transition Time, Buyer will remit such amount to Seller within ten (10) Business Days of receiving such amount.

(e)     Notwithstanding anything to the contrary in this Agreement, neither Buyer nor Seller shall be entitled to withhold any of the respective payments due and owing under this Section 5.6 by means of setoff against any amount owed by any other Party.

**5.7     Cost Reports; Periodic Interim Payments; Disproportionate Share Hospital Surveys and Information.**

(a)     Seller, at its own cost and expense, will timely prepare and file all Cost Reports relating to the Facilities and the Business for periods ending prior to the Effective Time or required as a result of the consummation of the Contemplated Transactions (collectively, the "**Seller Cost Reports**"). Buyer shall make available, in a timely and reasonable manner, to Seller any information and records that are in Buyer's possession and that are reasonably necessary, as determined by Seller in its reasonable discretion, for Seller to prepare the Seller Cost Reports.  Buyer shall forward to Seller any and all correspondence relating to the Seller Cost Reports within ten (10) Business Days after receipt by Buyer. Buyer shall remit to Seller any Cost Report Settlements promptly (but no later than ten (10) Business Days) after receipt by Buyer, and shall forward to Seller any demand for payments relating to the Seller Cost Reports within ten (10) Business Days after receipt by Buyer.  Seller shall retain the right to appeal any Medicare determinations relating to Cost Report Settlements.  To the extent that Seller requires the assistance of Buyer to effectuate its rights hereunder, including but not limited to with respect to any ongoing appeals or litigation in connection with any Excluded Assets involving Government Programs (including those described in subsection (n) of Schedule C) that require involvement of Buyer, Buyer will cooperate therewith as reasonably requested by Seller. Seller shall retain the originals of the Seller Cost Reports, correspondence, work papers, and other documents relating to the Seller Cost Reports and the Cost Report Settlements.  Seller shall use commercially reasonable efforts to timely and accurately respond to all audit and other supplemental information requests related to the Seller Cost Reports.

(b)     Upon Buyer's written request, Seller shall terminate the Hospitals' participation in any periodic interim payment program with Medicare effective as of the date hereof. If Buyer receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating solely to periods prior to the Transition Time, Buyer shall pay Seller an amount equal to such Medicare Interim Payment(s) received by Buyer within ten (10) Business Days after receipt.  If Buyer receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating to the period commencing prior to and ending after the Transition Time, Buyer shall pay Seller within ten (10) Business Days after receipt an amount equal to the Medicare Interim Payment(s) actually received by Buyer for such period multiplied by a fraction, the numerator of which shall be the total number of days prior to the Transition Time and the denominator of which shall be the total number of days attributable to such Medicare Interim Payment(s).  If Seller receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating solely to periods on or after the Transition Time, Seller shall pay Buyer within ten (10) Business Days after receipt of an amount equal to such Medicare Interim Payment(s) received by Seller.  If Seller receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating to the periods commencing prior to and ending after the Transition Time, Seller shall pay Buyer within ten (10) Business Days after receipt an amount equal to the Medicare Interim Payment(s) actually received by Seller for such period multiplied by a fraction, the numerator of which shall be the total number of days after the Transition Time and the denominator of which shall be the total number of days attributable to such Medicare Interim Payment(s).  It is the intent of the Parties that Buyer and Seller shall receive all third-party payments applicable to the period of time that the Hospitals are owned by the respective Parties.

(c)      If Seller receives any amount from patients, third-party payors, group purchasing organizations or suppliers which, under the terms of this Agreement, belongs to Buyer, Seller shall remit within five (5) Business Days the full amount so received to Buyer.  If Buyer receives any amount from patients, third-party payors, group purchasing organizations or suppliers which, under the terms of this Agreement, belongs to Seller, Buyer shall remit within five (5) Business Days the full amount so received to Seller.

(d)      Subject to applicable Laws, Seller will reasonably cooperate with Buyer in providing pre-Effective Time patient data and any documents Buyer reasonably believes are necessary or appropriate for Buyer to file with respect to Medicaid disproportionate share hospital surveys, to the extent applicable in the jurisdiction of the Business for the fiscal periods prior to and after the Effective Time.

(e)      Notwithstanding anything to the contrary in this Agreement, neither Buyer nor Seller shall be entitled to recover any of the respective payments due and owing under this <u>Section 5.7</u> by means of setoff against any amount owed by any other Party.

(f)      After the Effective Time, as reasonably requested by Seller, Buyer will cooperate with Seller in connection with Seller's collection of the accounts receivable that are among the Excluded Assets.

**5.8      CMS Reporting.**

(a)      Buyer will cooperate with Seller in all reasonable respects in providing, in a timely and reasonable manner, documents or data that Seller reasonably believes are necessary or appropriate for Seller to file with respect to CMS Reporting for all CMS Program Performance Periods ending prior to the Effective Time. Buyer shall forward to Seller any and all correspondence from CMS relating to applicable CMS Reporting for such CMS Program Performance Periods within ten (10) Business Days after receipt by Buyer.

(b)      Prior to the end of the Post-Closing Period, Seller shall (i) cooperate with Buyer in all reasonable respects in providing, in a timely and reasonable manner, pre-Effective Time documents or data that Buyer reasonably believes are necessary or appropriate for Buyer to file with respect to CMS Reporting for CMS Program Performance Periods in which the Effective Time occurs, and (ii) Seller shall forward to Buyer any and all correspondence from CMS relating to CMS Reporting for such CMS Program Performance Periods within ten (10) Business Days after receipt by Seller.

(c)      With respect to non-claims-based payments arising under CMS Program Payments for the CMS Program Performance Period in which the Transition Time occurs, the Parties shall share any CMS Program Payments for such CMS Program Performance Period on a pro rata basis (based upon, with respect to Buyer, the number of days during such CMS Program Performance Period that immediately follow the Transition Time divided by the total number of days in such CMS Program Performance Period, and with respect to Seller, the number of days during such CMS Program Performance Period that immediately precede the Transition Time divided by the total number of days in such CMS Program Performance Period).  If Buyer receives any such CMS Program Payments, Buyer shall remit to Seller, Seller's pro rata share of such CMS Program Payments within five (5) Business Days after receipt by Buyer. If Seller receives any such CMS Program Payments, Seller shall remit Buyer's pro rata share of such CMS Program Payments to Buyer within five (5) Business Days after receipt by Seller.  To the extent Buyer or one of its Affiliates is required to refund or repay any portion of any CMS Program Payments, Seller will pay to Buyer an amount equal to Seller's pro rata portion of the required refund or repayment within five (5) Business Days after notice to Seller of such amount due.

(d)      Notwithstanding anything to the contrary in this Agreement neither Buyer nor Seller shall be entitled to recover any of the respective payments due and owing under this <u>Section 5.8</u> by means of setoff against any amount owed by any other Party.

**5.9      Waiver Program Payments**.  Buyer and Seller shall prorate any payments received by the Facilities after the Transition Time under Medicaid waiver or Medicaid supplemental payment programs as follows:

(a)      Any such amounts that correspond to Federal Fiscal Years or state fiscal years, as applicable, ending prior to the Transition Time will be paid to Seller;

(b)      Any such amounts that correspond to Federal Fiscal Years or state fiscal years, as applicable, beginning on or after the Transition Time will be paid to Buyer; and

(c)      Any such amounts that correspond to the Federal Fiscal Year or state fiscal year, as applicable, during which the Transition Time occurs will be allocated between Buyer and Seller on a pro rata basis (based upon the number of days during such year that Seller operates the Facilities and the number of days during such year that Buyer operates the Facilities).

**5.10      License to Use Billing Information**.  Until the end of the Post-Closing Period and, to the extent allowed by applicable Law, Seller grants Buyer and its Affiliates a license to use Seller's billing identification information (which information shall include Seller's name, Medicare and related Medicaid and TRICARE provider numbers, federal employer identification number, and such other information as may be reasonably necessary) ("**Seller's Billing Information**") for purposes of submitting claims to Medicare, Medicaid and TRICARE for services provided at the Facilities by Buyer or any of its Affiliates after the Effective Time.  To the extent allowed by applicable Law, each such license shall be effective (a) for purposes of Medicare, until CMS and the applicable CMS Medicare administrative contractor approve Buyer's or its Affiliate's Medicare change of ownership application and issue a tie-in notice and approval letter acknowledging that Buyer (or its Affiliate) may be reimbursed for claims submitted using Buyer's (or such Affiliate's) billing identification information; and (b) for purposes of Medicaid and any other Government Programs, until the applicable Medicaid program(s) or program agent(s) approves Buyer's (or its Affiliate's) provider enrollment application and/or approves assignment of the applicable provider Contract and issues the appropriate notice acknowledging that Buyer (or its Affiliate) may be reimbursed by the applicable Medicaid or other Government Program for claims submitted using Buyer's (or its Affiliate's) identification information.  So long as such license remains in effect, Seller (or its Affiliates) shall not act to: (i) terminate any of their billing identification information applicable to the Business except as required by applicable Law; (ii) close any accounts used by Seller prior to the Effective Time for purposes of receiving reimbursement; or (iii) cancel any electronic funds transfer agreements with respect to Medicare, Medicaid, TRICARE or any other Government Program applicable to the Business.  All accounts receivable and monies collected in the name of Buyer and/or its Affiliates or the Facilities for services provided by Buyer (and/or its Affiliates) after the Effective Time shall belong to Buyer (and/or its Affiliates). Buyer shall, and shall cause each of its Affiliates to, indemnify, defend and hold harmless Seller and Seller's Affiliates against, and reimburse Seller and Seller's Affiliates for, all Liabilities incurred by Seller and any Seller's Affiliate in connection with Seller's obligations under this <u>Section 5.10</u>.

**5.11      Medical Staff**.  To ensure continuity of care in the community, Buyer agrees that the operations of each Hospital's medical staff will be substantially unchanged as a result of the consummation of the Contemplated Transactions, including each Hospital's medical staff members in good standing as of the Effective Time will maintain, to the extent consistent with criteria adopted at other Buyer or Buyer Affiliate facilities, medical staff privileges without change in medical staff status (e.g., active, courtesy) at each respective Hospital as of the Effective Time and each Hospital's medical staff officers in place

immediately prior to the Effective Time will remain, to the extent consistent with criteria adopted at other Buyer or Buyer Affiliate facilities, in their same positions as of the Effective Time, *provided* that Buyer shall not be obligated to continue to maintain any Physicians and other Practitioners whose medical staff membership and/or clinical privileges have been terminated or not renewed by a Buyer or Buyer Affiliate facility. As of and after the Effective Time, each Hospital's medical staff will be subject to each Hospital's medical staff by-laws then in effect to the extent consistent with applicable Law.

5.12    **Cooperation on Compliance Matters**. Until the end of the Post-Closing Period, if any compliance matter is identified by a Party, whether through internal audit or otherwise, for which another Party hereto may bear responsibility or exposure (a "**Compliance Matter**"), then such Party shall provide prompt written notice to such other Party. Because any such Compliance Matter may impact Buyer and Seller, the Parties acknowledge that both Buyer and Seller shall have a common interest in fully resolving all such Compliance Matters and cooperating in good faith to do so. To the extent necessary to preserve attorney client privilege and work product doctrine relating to the investigation or resolution of any Compliance Matter, the Parties agree that a common interest privilege shall exist with respect to any communications relating to the investigation and resolution of the Compliance Matter and, to the extent necessary and requested by any Party or its counsel, the Parties and their respective counsel shall enter into a written agreement to memorialize this common interest privilege existing among them relating to the Compliance Matter. The Parties will thereafter cooperate reasonably with each other in any internal investigations or audits and shall make available to the other, as reasonably requested, any and all relevant information and, further, shall provide personnel as may be reasonably necessary and appropriate for purposes of analyzing and resolving such Compliance Matter. In order to ensure the accuracy of any report of any Compliance Matter to a third party, the Parties agree that neither shall make any such report or disclosure to, or in respect of, any federally-funded or state-funded health care program, including Medicare, Medicaid, and TRICARE, or private third party payor or any other Governmental Authority with regulatory oversight with respect to any Compliance Matter which might give rise to Liability of the other Party without at least thirty (30) days' prior written notice to, and participation and approval of the report by, such other Party. All Parties agree to cooperate fully and in good faith as necessary in the resolution of all Compliance Matters, and Buyer and Seller shall each bear its own expenses in connection therewith.

5.13    **Post-Closing Receipt of Assets or Excluded Assets.**

(a)    In addition to any misdirected payments referenced in <u>Section 5.7</u>, <u>Section 5.8</u> or <u>Section 5.9</u> to which Seller is entitled, any asset or any Liability, all other remittances and all mail and other communications that is an Excluded Asset or an Excluded Liability (i) pursuant to the terms of this Agreement or (ii) absent such agreement, as finally determined by the Bankruptcy Court pursuant to <u>Section 8.2</u>, and which comes into the possession, custody or control of Buyer (or its respective successors-in-interest, assigns or Affiliates) shall within five (5) Business Days following receipt be transferred, assigned or conveyed by Buyer (and its respective successors-in-interest, assigns and Affiliates) to Seller at Seller's cost. Until such transfer, assignment and conveyance, Buyer and its successors-in-interest, assigns and Affiliates, shall not have any right, title or interest in or obligation or responsibility with respect to such asset or Liability except that Buyer shall hold such asset in trust for the benefit of Seller. Buyer, and its successors-in-interest, assigns and Affiliates, shall have neither the right to offset amounts payable to Seller under this <u>Section 5.13(a)</u> against, nor the right to contest its obligation to transfer, assign and convey to Seller because of, outstanding claims, Liabilities or obligations asserted by Buyer against Seller.

(b)    In addition to any misdirected payments referenced in <u>Section 5.7</u>, <u>Section 5.8</u> or <u>Section 5.9</u> to which Buyer is entitled, any asset or any Liability, all other remittances and all mail and other communications that is a Purchased Asset or an Assumed Liability (i) pursuant to the terms of this Agreement or (ii) absent such agreement, as finally determined by the Bankruptcy Court pursuant to <u>Section 8.2</u> , and which comes into the possession, custody or control of Seller (or its successors-in-interest, assigns

or Affiliates) shall within five (5) Business Days following receipt be transferred, assigned or conveyed by Seller (and its successors-in-interest, assigns and Affiliates) to Buyer at Buyer's cost. Until such transfer, assignment and conveyance, Seller and its successors-in-interest, assigns and Affiliates shall not have any right, title or interest in or obligation or responsibility with respect to such asset or Liability except that Seller shall hold such asset in trust for the benefit of Buyer. Seller or any Seller Affiliates and their respective successors-in-interest and assigns shall have neither the right to offset amounts payable to Buyer under this Section 5.13(b) against, nor the right to contest its obligation to transfer, assign and convey to Buyer because of, outstanding claims, Liabilities or obligations asserted by Seller against Buyer.

**5.14    Closing Financials**.  Buyer shall cause the chief financial officer(s) of the Facilities to complete the standardized closing of Seller's financial records for the Business through the date hereof including, without limitation, the closing of general ledger account reconciliations in form and substance consistent with past practice (collectively, the "**Closing Financials**").  Buyer shall cause the chief financial officer(s) of the Facilities to use his or her good faith efforts to complete the Closing Financials by no later than the date which is thirty five (35) days after the date hereof.  Seller shall reimburse Buyer for all reasonable, out-of-pocket and documented expenses of Buyer associated with the preparation of the Closing Financials.  Such reimbursement shall occur no later than the date which is thirty (30) days after Buyer provides a written statement to Seller which details such charges and expenses.

6.    **SPECIFIC PERFORMANCE.**

(a)    The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each Party agrees that, in the event of any breach or threatened breach by any other Party of any covenant or obligation contained in this Agreement, the non-breaching Party shall be entitled (in addition to any other equitable remedy that may be available to it) to obtain, without proof of actual damages, (i) a decree or other Order of specific performance to enforce the observance and performance of such covenant or obligation, and (ii) an injunction restraining such breach or threatened breach.

(b)    Each Party acknowledges and agrees that (i) it will not oppose any equitable relief or equitable remedy referred to in this Section 6 on the grounds that any other remedy is available at law or in equity, and (ii) no Party will be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any equitable relief or equitable remedy referred to in this Section 6 (and it hereby irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument).

7.    **TAX MATTERS.**

**7.1    Allocation of Purchase Price**.  If the Settlement Orders (or other document approved by the Bankruptcy Court) or any agreement associated therewith includes any tax treatment or tax reporting provisions relevant to the Contemplated Transactions, the Parties shall (and shall cause their Affiliates to) file all Tax Returns and otherwise report consistent with, and not take any position inconsistent with, such provisions. Subject to the foregoing sentence, if the Parties agree upon an allocation of consideration among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any other relevant provisions of the Code or any similar provisions of state or local Law, as appropriate), the Parties shall (and shall cause their Affiliates to) file all Tax Returns (including IRS Form 8594) and otherwise report consistent with, and not take any position inconsistent with, such agreed allocation, provided that (a) for the avoidance of doubt, the Parties shall not be required to agree to any such allocation, and (b) neither Party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, investigation, examination, claim or similar proceedings in connection with such allocation.

     **7.2**    **Cooperation**.  Following the Effective Time, each Party shall cooperate with the other Party in connection with the preparation of any Tax Returns, the defense of any audit, investigation, examination, claim or similar proceeding related to Taxes, or any other matters with respect to Taxes, shall make available to the other Party, as reasonably requested, all information, records or documents relating to Taxes with respect to the Purchased Assets or the Business for all periods, and shall preserve or cause to be preserved all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof; provided that the obligations of Seller or any Seller Party under this Section 7.2 will cease as of the date upon which Seller or such Seller Party ceases to exist under applicable law.

     **7.3**    **Transfer Taxes**.  All Transfer Taxes shall be paid by Buyer in accordance with <u>Section 8.7</u> when due, and all necessary Tax Returns and other documentation with respect to Transfer Taxes shall be prepared and filed by Buyer. If Seller, any Seller Party, or any of their Affiliates is required to pay any Transfer Tax, Buyer shall promptly reimburse such Seller, Seller Party or Affiliate thereof for such amount.

8.     **GENERAL.**

     **8.1**    **Notice**.  Any notice, demand or other communication required, permitted or desired to be given hereunder must be in writing and shall be deemed effectively given (a) when personally delivered, (b) one (1) Business Day after being sent by the addressee if sent by a nationally recognized overnight courier, (c) on the date transmitted via electronic mail with a delivery receipt requested, if sent on a Business Day between 9:00 AM and 9:00 PM in the time zone of the recipient, or if sent outside of such hours, on the next Business Day at 9:00 AM in the time zone of the recipient; *provided*, *however*, if notice is given via electronic mail, a physical copy of such notice must also be provided by prompt notice by United States mail or overnight courier, or (d) on the fifth (5th) day after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, in each case, addressed as follows:

|  |  |
|---|---|
| If to Seller: | c/o Steward Health Care System LLC<br>1900 N Pearl St #2400<br>Dallas, Texas 75201<br>Attention:  Jeffrey Morales<br>Email: Jeffrey.Morales@steward.org |
| With simultaneous copy (which shall not constitute notice) to: | |
| | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attention: Ray C. Schrock, Candace M. Arthur, David J. Cohen, Mariel E. Cruz<br><br>Email: ray.schrock@weil.com; candace.arthur@weil.com; davidj.cohen@weil.com; mariel.cruz@weil.com |
| and | |
| | McDermott Will & Emery LLP<br>200 Clarendon Street, Floor 58<br>Boston, MA 02116<br>Attention: Charles Buck |

Email: cbuck@mwe.com

If to Buyer:                          505 North Brand Blvd
                                      Ste 1200
                                      Glendale, CA 91203
                                      Attn: Faisal Gill
                                      Email: fgill@amhealthsystems.com

or to such other address, and to the attention of such other Person or officer as any Party may designate.

**8.2    Choice of Law; Venue**.

(a)    The Parties agree that all disagreements, disputes or claims arising out of or relating to this Agreement or the Contemplated Transactions shall be governed by and construed in accordance with the applicable Laws of the State of Delaware without giving effect to any choice or conflicts of law provision or rule thereof that would result in the application of the applicable Laws of any other jurisdiction other than the applicable Laws of the United States of America, where applicable.

(b)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claim (as defined below) which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 8.1</u>; provided, however, upon the closing of the Chapter 11 Cases, the Parties agree to unconditionally and hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware sitting in Wilmington, Delaware (or if such court declines to exercise such jurisdiction in any appropriate state or federal court in the State of Delaware sitting in Wilmington, Delaware) over any action, arbitration, charge, claim, complaint, demand, dispute, litigation or Proceeding arising from or relating to this Agreement (a "<u>**Claim**</u>"), and the Parties hereto hereby irrevocably agree that all Claims shall be heard and determined in such court.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  The Parties hereto agree that a final judgment with respect to any such Claim shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

**8.3    Benefit; Assignment; Delegation.**   Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and permitted assigns and delegates.  No Party may assign any of its rights hereunder or delegate any of its duties hereunder without the prior written consent of the other Parties; provided, however, that Buyer and Seller, without the prior consent of the other Parties, may assign any of their respective rights hereunder or delegate any of its duties hereunder to such Party's Affiliates (as applicable), or, for collateral security purposes, to Persons providing financing to such Party or its Affiliates, but in such event, each such Party shall be required to remain obligated hereunder in the same manner as if such assignment or delegation had not been effected.

**8.4    Waiver of Jury Trial.**   EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

**8.5     Legal Advice and Reliance**.  Except as expressly provided in this Agreement, none of the Parties (nor any of the Parties' respective Representatives) has made or is making any representations to any other Party (or to any other Party's Representatives) concerning the consequences of the Contemplated Transactions under applicable Laws, including Tax-related Laws or under the Laws governing the Government Programs.  Except for the representations and warranties made in this Agreement, each Party has relied solely upon the Tax, Government Program and other advice of its own Representatives engaged by such Party and not on any such advice provided by any other Party.

**8.6     No Survival**.  Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Effective Time (which covenants shall survive the Effective Time in accordance with their terms), none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Effective Time.

**8.7     Cost of Transaction; Legal Fees and Cost of Disputes**.  Except as otherwise provided herein, the Parties agree that, whether or not the Contemplated Transactions shall be consummated: (a) Seller will pay the fees, expenses and disbursements of Seller and its respective Representatives incurred in connection with the subject matter hereof and any amendments hereto, and (b) Buyer will pay (i) the fees, expenses and disbursements of Buyer and its Representatives incurred in connection with the subject matter hereof and any amendments hereto; (ii) the fees incurred in connection with the HSR filing; and (iii) all Transfer Taxes.

**8.8     Severability**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of Buyer or Seller under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

**8.9     No Inferences; Sophisticated Parties**.  Each Party acknowledges and agrees to the following: (a) all of the Parties are sophisticated and represented by experienced healthcare and transactional counsel in the negotiation and preparation of this Agreement; (b) this Agreement is the result of lengthy and extensive negotiations between the Parties and an equal amount of drafting by all Parties; (c) this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; and (d) no inference in favor of, or against, any Party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such Party.

**8.10    Divisions and Headings of this Agreement**.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**8.11    No Third-Party Beneficiaries**.  The terms and provisions of this Agreement are intended solely for the benefit of Buyer, Seller and the Seller Parties, and such parties' respective permitted successors, assigns, or delegates, and it is not the intention of the Parties to confer, and, this Agreement shall not confer, third-party beneficiary rights upon any other Person, including any employee or member of the medical staff of any Hospital.

**8.12    Entire Agreement; Amendment**.  This Agreement (inclusive of Schedules), together with the other Transaction Documents, the Interim Management Agreement, and the Confidentiality Agreement and any other agreement which specifically references this <u>Section 8.12</u>, represent the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior or contemporaneous oral or written understandings, negotiations, letters of intent or agreements between the Parties.  This <u>Section 8.12</u> shall be deemed a "merger" clause under Delaware Law, and this Agreement (together with the other Transaction Documents and the Confidentiality Agreement) is intended as a complete integration of the agreement of the Parties.  No modifications of, amendments to, or waivers of any rights or duties under this Agreement shall be valid or enforceable unless and until made in writing and signed by all Parties.

**8.13    Multiple Counterparts**.  This Agreement may be executed in any number of counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  The facsimile signature of any Party or other Person to this Agreement or any other Transaction Document or a PDF copy of the signature of any Party or other Person to this Agreement or any other Transaction Document delivered by electronic mail for purposes of execution or otherwise, is to be considered to have the same binding effect as the delivery of an original signature on an original contract.

**8.14    Non-Recourse**.  All claims, obligations, Liabilities, actions or causes of action (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their successors and assigns ("<u>Contracting Parties</u>").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other representative of, and any lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other representative of, and any lender to, any of the foregoing ("<u>Nonparty Affiliates</u>"), shall have any Liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or other Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, causes of action, obligations and other Liabilities against any such Nonparty Affiliates. It is expressly agreed that the Nonparty Affiliates to whom this <u>Section 8.14</u> applies shall be third-party beneficiaries of this <u>Section 8.14</u>.

**8.15    Interpretation**.

In this Agreement, unless the context otherwise requires:

(a)    references to this Agreement are references to this Agreement and to Schedules attached or delivered with respect hereto or expressly incorporated herein by reference; each Schedule is hereby incorporated by reference into this Agreement and will be considered a part hereof as if set forth herein in full;

(b)    references to "Sections" are references to sections of this Agreement;

(c)    references to any Party shall include references to its respective successors and permitted assigns;

(d)      the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement;

(e)      references to any agreement (including this Agreement) are references to that agreement as amended, consolidated, supplemented, novated or replaced in accordance with the terms and conditions therein from time to time;

(f)      unless the context requires otherwise, references to any Law are references to that Law as of the date of this Agreement, and shall also refer to all rules and regulations promulgated thereunder;

(g)      the word "including" (and all derivations thereof) means "including, without limitation," and any lists or examples following the word "including" or the phrase "including, without limitation," are intended to be nonexclusive examples solely for the purpose of illustration and without the intention of limiting the text preceding such lists or examples;

(h)      references to time are references to Central Standard Time or Central Daylight Time (as in effect on the applicable day);

(i)      the gender of all words herein include the masculine, feminine and neuter, and the number of all words herein include the singular and plural;

(j)      the provisions of this Agreement shall be interpreted in such a manner so as not to inequitably benefit or burden any Party through "double counting" of assets or Liabilities or failing to recognize benefits that may result from any matters that impose Liabilities or burdens on any Party;;

(k)      the terms "date hereof," "date of this Agreement," and similar terms shall mean the date set forth in the preamble to this Agreement; and

(l)      references to "day" shall mean calendar day, unless otherwise specified herein.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**SELLER:**                                The Medical Center of Southeast Texas, LP

By: _____
Name: _____
Title: _____

**SELLER PARTIES:**                        Steward Medical Group, Inc.

By: _____
Name: _____
Title: _____

Permian Premier Health Services, Inc.

By: _____
Name: _____
Title: _____

*Signature Page to Asset Purchase Agreement*

**BUYER:**                                    HSA Port Arthur LLC


By: _____

Name: _____

Title: _____

*Signature Page to Asset Purchase Agreement*

## ANNEX A – DEFINITIONS

"**Affiliate**" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and any successors or assigns of such Person, *provided,* that, with respect to any Seller or any Seller Party, for all purposes herein, "Affiliate" shall mean Steward Health Care System LLC and each of its direct and indirect Subsidiaries.  For purposes of this definition, "control" means possession, directly or indirectly, of the power to direct, or cause the direction of, the management and policies of a Person whether through ownership of voting securities, by Contract or otherwise.

"**Agreement**" is defined in the preamble to this Agreement.

"**Approval**" means any approval, action, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Authority, Private Program or other Person, in each case, in connection with the operation of the Business or the consummation of the Contemplated Transactions, as applicable.

"**Assumed Liabilities**" is defined in Section 1.3.

"**Assumed Paid Time Off**" is defined in Section 5.4(h).

"**Avoidance Action**" means any claim, right or cause of action of Seller or any Seller Party for avoidance, recovery, subordination or other relief arising under Chapter 5 of the Bankruptcy Code or applicable state fraudulent conveyance, fraudulent transfer or similar Laws.

"**Bankruptcy Code**" is defined in the Recitals.

"**Bankruptcy Court**" is defined in the Recitals.

"**Books and Records**" means originals, or where not available, copies (including in electronic format), of books and records maintained in connection with the Business or the Purchased Assets, including books and records relating to books of account, ledgers and general financial accounting records, personnel records, machinery and equipment maintenance files, patient and customer lists, price lists, distribution lists, supplier lists, quality control records and procedures, customer and patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, marketing plans, internal financial statements and marketing and promotional surveys, pricing and cost information, material and research, in each case, to the extent such books and records are located at the Facilities or are exclusively used or held for use in, or otherwise exclusively relate to, the Business.

"**Business**" means the operation of the Facilities by Seller and all services provided by, or pursuant to Contracts with, Seller at the Facilities, in each case as currently conducted by Seller.

"**Business Day**" means any day except Saturday, Sunday and any day which is a legal holiday in New York, New York.

"**Buyer**" is defined in the preamble to this Agreement.

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act, P.L. 116–136, and the rules and regulations promulgated thereunder.

"**Chapter 11 Cases**" is defined in the Recitals.

"**Claim**" is defined in Section 8.2(b).

"**Closing Financials**" is defined in Section 5.14.

"**CMS**" means the Centers for Medicare & Medicaid Services.

"**CMS Program Payments**" means payments or discounts that are not based directly on the submission of claims for services delivered and are received through participation in a Government Program implemented by CMS through a Contract with CMS or as a participant through a Contract with a CMS contractor, including Medicare accountable care organizations, episode-based payment initiatives and other Medicare innovation models as implemented by CMS as authorized pursuant to Laws identified in CMS Reporting.

"**CMS Program Performance Period**" means the period of time applicable to a CMS Program Payment or CMS Reporting requirement.

"**CMS Reporting**" means any quality, performance reporting through use of certified electronic health record technology and other electronic reporting requirements, applicable to the Business and in all cases implemented by CMS pursuant, but not limited, to the Social Security Act, the Patient Protection and Affordable Care Act of 2010 (or any replacement or successor Law), the Health Care and Education Reconciliation Act of 2010, the Pathway for Sustainable Growth Reform (SGR) Act of 2013, the Protecting Access to Medicare Act of 2014, the Improving Medicare Post-Acute Care Transformation Act of 2014 (IMPACT), American Taxpayer Relief Act of 2012 (ATRA), Balanced Budget Act of 1997 (BBA), the Medicare, Medicaid and SCHIP (State Children's Health Insurance Program) Balanced Budget Refinement Act of 1999 (BBRA), the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), the 21st Century Cures Act, HIPAA, the Medicare Access & CHIP Reauthorization Act of 2015 (MACRA) (Pub L. 114-10, enacted April 16, 2015), amending Title XVIII of the Social Security Act and/or the Bipartisan Balanced Budget Act of 2018, each of which may be amended from time to time by a Balanced Budget Act of the United States Congress, and each as applicable at such time as healthcare services are rendered.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Collective Bargaining Agreement**" means each collective bargaining agreement governing the terms and conditions of employment of the Seller Employees represented by a union or other labor organization.

"**Compliance Matter**" is defined in Section 5.12.

"**Confidentiality Agreement**" means that certain Non-Disclosure Agreement by and between Steward and American Healthcare Systems Corp. dated as of February 6, 2024.

"**Contemplated Transactions**" means, collectively, the transactions contemplated by this Agreement, including (a) the assignment of the Purchased Assets and assumption of the Assumed Liabilities and (b) the execution, delivery and performance of this Agreement and the other Transaction Documents.

"**Contract**" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense, guaranty, indenture, occupancy or other agreement or arrangement of any kind (and all amendments, side letters, modifications and supplements thereto).

"**Copyrights**" means all copyrights and rights in any other original works of authorship fixed in any tangible medium of expression, whether published or unpublished; rights to compilations, collective works and derivative works of any of the foregoing; and registrations and applications for registration for any of the foregoing and any renewals or extensions thereof.

"**Cost Report**" means any cost report (including all forms, worksheets, schedules and other attachments related thereto) required to be filed in respect of the Business or the Facilities pursuant to a Government Program or any Private Cost-Based Programs.

"**Cost Report Settlements**" is defined in Schedule C.

"**COVID-19**" means the novel coronavirus disease, COVID-19 virus (SARS-COV-2 and all related strains and sequences) or mutations (or antigenic shifts or drifts) thereof or a disease or public health emergency resulting therefrom.

"**COVID-19 Funds**" means all grants, payments, distributions, loans, funds or other relief applied for or provided prior to the Effective Time under the CARES Act, the Paycheck Protection Program Act, or any other program authorized by any Governmental Authority or Government Program in response to COVID-19, including the Paycheck Protection Program, Main Street Loan Program, Provider Relief Fund, Small Rural Hospital Improvement Program, Assistant Secretary for Preparedness and Response or Hospital Preparedness Program Grants, or any other Law or program enacted, adopted or authorized in response to COVID-19; provided, that COVID-19 Funds does not include any Medicare Accelerated and Advance Payments.

"**Credentialing and Medical Staff Records**" means, to the extent Seller lawfully owns or has control of such records and information and such records and information are not subject to a peer-review or similar privilege or are otherwise non-disclosable by applicable Law, all credentialing records with respect to any Practitioner, all minutes of the meetings of the medical staffs of each Facility and any committees thereof, and all other records directly related to the administrative operations of each Facility's medical staff for the period prior to the Effective Time.

"**Cure Costs**" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by Seller or, if applicable, Seller Party, and the assignment to Buyer, of the Transferred Executory Contracts to which Seller or, if applicable, Seller Party is a party, as determined by the Bankruptcy Court or agreed to by Seller, if applicable, Seller Party and the non-Seller counterparty to the applicable Transferred Executory Contract or Lease, as applicable.

"**Designation Deadline**" is defined in Section 1.5(b).

"**DIP Financing**" means (i) debtor-in-possession facility under that certain Debtor-in-Possession Credit Agreement, dated May 28, 2024 (as amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time), by and among Steward, the other Loan Parties (as defined therein) party thereto and MPT; and (ii) debtor-in-possession facility under that certain Debtor-in-Possession Credit Agreement, dated July 10, 2024 (as amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time), by and among Steward, the other Loan

Parties (as defined therein) party thereto, the Lenders (as defined therein) party thereto and Brigade Agency Services LLC, as administrative agent and collateral agent.

"**DNV**" means DNV GL Healthcare USA, Inc.

"**Domain Names**" means Internet electronic addresses and uniform resource locators registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the internet, rights in social media accounts and social media pages, and all applications for any of the foregoing.

"**DRG**" is defined in Section 5.6(a).

"**DRG Transition Patients**" is defined in Section 5.6.

"**Effective Time**" is defined in Section 2.1.

"**Employee Lease Agreement**" is defined in Section 2.2(e).

"**Employee Transition Date**" means November [•], 2024.[1]

"**Encumbrance**" means any easement, servitude, assessment, encumbrance, encroachment, defect in title, security interest, bailment (in the nature of a pledge or for purposes of security), mortgage, deed of trust, the grant of a power to confess judgment, conditional sales and title retention, lease, sublease, option, right of first refusal or first offer, lien, hypothecation, pledge, restriction or other similar arrangement or interest in real or personal property, whether imposed by Contract, Law, equity or otherwise.

"**Excluded Assets**" is defined in Section 1.2.

"**Excluded Liabilities**" is defined in Section 1.4.

"**Executory Contract**" means any executory Contract or Lease to which Seller or any Seller Party is a party or a beneficiary that exclusively relates to the operation of the Business or the Facilities.

"**Facility**" or collectively, "**Facilities**" means the Hospitals and Seller's other healthcare facilities, operations, and businesses associated with or used in the operation of the Hospitals as set forth on Schedule F under the header "Other Facilities".

"**False Claims Act**" means the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

"**Federal Fiscal Year**" means the fiscal year of the federal government of the United States.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect (a) with respect to financial information for periods on or after the date hereof, as of the date of this Agreement, and (b) with respect to financial information for periods prior to the date hereof, as of such applicable time.

---

[1] Note to Draft: To be the date that is one month after the Effective Time.

"**Government Programs**" means the Medicare (including Medicare Part D and Medicare Advantage), Medicaid, Medicaid-waiver and CHAMPUS/TRICARE programs, any other similar or successor federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) and any similar state or local health care programs, in each case in which any Facility participates as of the date of this Agreement.

"**Governmental Authority**" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal, special district or other instrumentality of any government, whether federal, state or local, domestic or foreign, and any healthcare self-regulatory organization.

"**Group Tax Return**" means any consolidated, combined, unitary, or similar Tax Returns for any affiliated or other Tax group of which Seller (or any Seller Party) is or has been a member or of which any direct or indirect owner of Seller (or any Seller Party) is the common parent.

"**HIPAA**" means collectively: (a) the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191), including but not limited to its implementing rules and regulations with respect to privacy, security of health information, and transactions and code sets; (b) the HITECH Act (Title XIII of the American Recovery and Reinvestment Act of 2009); (c) the Omnibus Rule effective March 26, 2013 (78 Fed. Reg. 5566), and other implementing rules regulations at 45 CFR Parts 160 and 164 and related binding guidance from the United States Department of Health and Human Services and (d) any federal, state and local laws governing the privacy and/or security of individually identifiable information, in each case, as the same may be amended, modified or supplemented from time to time.

 "**HITECH Act**" means the Health Information Technology for Economic and Clinical Health Act, Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Pub. Law No. 111-5 and its implementing regulations, including 42 C.F.R. §§ 412, 413, 422 and 495, as amended by the HIPAA Omnibus Rule, issued on January 25, 2013, effective as of March 26, 2013.

"**Hospitals**" means the hospitals set forth on Schedule F hereto under the header "Hospitals".

"**Information Technology Systems**" means all information technology systems and services related thereto, Software, computers, workstations, databases, routers, hubs, switches, networks and other information technology equipment exclusively used or held for use in the Business.

"**Intellectual Property**" means any and all intellectual property rights in, arising out of, or associated therewith, throughout the world: Copyrights, Domain Names, Patents, Trademarks and Trade Secrets and any other related proprietary rights now known or hereafter recognized in any jurisdiction worldwide, and the right to sue and recover damages or other remedies for past, present and future infringement, misappropriation, dilution, or other violation thereof.

"**Interim Billing**" is defined in Section 5.6(a).

"**Inventory**" means all usable inventory and supplies exclusively used or held for use in the Business.

"**IRS**" means the Internal Revenue Service.

"**Knowledge of Buyer**" means the actual knowledge of Jonathan Burket or Michael Sarian.

"**Knowledge of Seller**" means the actual knowledge of Mark Rich or Jeffey Morales.

"**Law**" means any constitutional provision, statute, law, rule, regulation, code, ordinance, accreditation standard, resolution, Order, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority (and for the avoidance of doubt, includes the Bankruptcy Code).

"**Leased Real Property**" means all real property leased, subleased or licensed to, or for which a right to use, possess or occupy has been granted to, Seller or any Seller Affiliate in connection with the Business, together with all rights, easements and privileges appertaining or relating to such interest in real property, and all improvements located on such real property.

"**Liability**" means any liability, obligation, deficiency, interest, penalty, fine, claim, demand, judgment, cause of action or other losses (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute, fixed, or contingent, accrued or unaccrued, liquidated or unliquidated, recorded or unrecorded, due or to become due or otherwise, and regardless of when asserted.

"**Material Adverse Effect**" means any change, fact, circumstance, occurrence, event, effect or condition that, individually or in the aggregate with all other changes, facts, circumstances, occurrences, events, effects or conditions, directly or indirectly, results in, or would reasonably be expected to result in, a material adverse effect on (a) the ability of Seller to consummate the Contemplated Transactions or (b) the business, condition (financial or otherwise), results of operations, assets or Liabilities of the Business, taken as a whole, except this clause (b) shall exclude any change, fact, circumstance, occurrence, event, effect or condition resulting from (i) changes in general local, domestic, foreign, or international economic, financial, business or political conditions, (ii) changes generally affecting the healthcare industry or markets in which Seller operates, (iii) losses from operations of the Business that are materially consistent with the historical and projected run rate of the Business, or seasonal fluctuations in the Business consistent with prior fiscal years, (iv) any national or international political event or occurrence, including acts of war, sabotage or terrorism, military actions or the escalation thereof, (v) any changes in applicable Laws or accounting rules or principles, including changes in GAAP, or the interpretation or implementation of any of the foregoing, (vi) any action required by this Agreement, (vii) changes or proposed changes to any reimbursement rates or policies of Governmental Authorities that are generally applicable to hospitals or healthcare facilities, (viii) any natural disaster, calamity, pandemic or epidemic (including the COVID-19 pandemic, including the continuation or worsening of the COVID-19 pandemic and any variation or mutation thereof); (ix) any failure, in and of itself, by the Business to meet any internal projections or forecasts (as distinguished from any change, development, or occurrence giving rise or contributing to such failure); (x) any breach of Buyer's obligations under this Agreement; (xi) the availability or cost of equity, debt or other financing to Buyer, (xii) the entry into this Agreement or the announcement, pendency or consummation of the Contemplated Transactions or (xiii) any change resulting from the filing or pendency of the Chapter 11 Cases, actions taken in connection with the Chapter 11 Cases, or any reasonably anticipated effects of such filing, pendency or actions, or from any action approved by the Bankruptcy Court, provided that, in each case of clauses (i), (ii), (iii), (iv), (v), (vii) or (viii), such change, fact, circumstance, occurrence, event, effect or condition does not affect the Business, in a substantially disproportionate manner relative to other Persons operating in the industry in which the Business participates.

"**Medicare Accelerated and Advance Payments**" means the accelerated and advance payments received by Seller or any of its Affiliates, in each case to the extent relating to the Business, in each case prior to the Effective Time pursuant to the Accelerated Payment Program or the Advance Payment Program implemented by CMS to increase cash flow to healthcare providers as a result of COVID-19.

"**Medicare Interim Payments**" means payments made to the Hospitals on an interim basis under the Medicare program on a bi-weekly pass-thru or interim payment basis.

"**MPT**" means MPT Operating Partnership, L.P., one of its Affiliates, or its successor-in-interest with respect to the MPT Real Property.

"**Non-DRG Transition Patients**" is defined in Section 5.6.

"**Non-Interim Billing Transition Patients**" is defined in Section 5.6.

"**Order**" means any judgment, order, writ, injunction, decree, determination, or award of any Governmental Authority, including the Bankruptcy Court.

"**Owned Real Property**" means all real property owned by Seller and Seller's Affiliates, together with all rights, easements and privileges appertaining or relating to such interest in real property, and all improvements located on such real property.

"**Paid Time Off**" means Seller Employees' accrued vacation, sick, holiday or other paid time off and related Taxes and other payroll obligations.

"**Parties**" is defined in the preamble to this Agreement.

"**Patents**" means, with respect to the Business, all patents and patent applications, including all provisional applications, priority and other applications, divisionals, continuations (in whole or in part), extensions, reissues, reexaminations or equivalents or counterparts of any of the foregoing.

"**Paycheck Protection Program Act**" means the Paycheck Protection Program and Health Care Enhancement Act, P.L. 116-139, and the rules and regulations promulgated thereunder.

"**Payor Agreement**" means any Contract between Seller and a Government Program or a Private Program under which the Business or Seller directly or indirectly receives payments for medical services provided to such program's beneficiaries exclusively at the Facilities.

"**Permit**" means any consent, ratification, registration, waiver, authorization, license, permit, grant, franchise, concession, exemption, order, notice, certificate or clearance issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law, in each case, with respect to Seller or any Seller Party, in connection with the operation of the Business or the consummation of the Contemplated Transactions, as applicable.

"**Permitted Encumbrances**" means any Encumbrances relating to (a) zoning and building laws, ordinances, resolutions and regulations, (b) Taxes, assessments and governmental charges or levies not due and payable on or before the Transition Time, (c) non-exclusive licenses to Intellectual Property granted in the ordinary course of business, (d) mechanic's, material man's and similar Encumbrances imposed or permitted by Law for sums not yet due and payable on or before the Transition Time, (e) any matters arising as a result of the acts or omissions of Buyer or any of its Affiliates, agents, employees, contractors or representatives, (f) Encumbrances incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security, (g) defects or imperfections of title, exceptions, easements, covenants, rights-of-way, restrictions and other similar charges, defects or encumbrances not materially interfering with the ordinary conduct of the Business, (h) Encumbrances not created by Seller that affects the underlying fee, lessor, licensor or sublessor interest of any Leased Real Property or real property over which Seller (with respect to the

Business) has easement or other property rights, (i) Encumbrances incurred in the ordinary course of business securing Liabilities that are not material to the Purchased Assets taken as whole, (j) Encumbrances arising out of, under or in connection with this Agreement or the other Transaction Documents, (k) Encumbrances related to Specified Debt, which Encumbrances will be removed as of Effective Time, (l) any other Encumbrance that will be cleared or discharged by Order of the Bankruptcy Court, (m) rights, terms or conditions of any leases, subleases, licenses, sublicenses or occupancy agreements made available to Buyer and (n) any Encumbrance arising out of, under or in connection with the Securities Act or any other applicable securities Laws.

"**Person**" means an individual, association, hospital authority, corporation, limited liability company, partnership, limited liability partnership, trust, Governmental Authority or any other entity or organization.

"**Personal Information**" means any information relating to or reasonably capable of being associated with an identified or identifiable individual (including protected health information), including any personally identifiable data (*e.g.*, name, address, phone number, email address, financial account number, payment card data, government issued identifier, and health or medical information).

"**Personal Property**" means all of Seller's and any Seller Party's right, title and interest in tangible personal property exclusively used or held for use in, or otherwise exclusively relating to, the Business, including all equipment, medical devices, medical and office supplies, diagnostic equipment, computer hardware and data processing equipment, furniture, fixtures, machinery, vehicles, office furnishings, instruments, leasehold improvements, telephones, telephone numbers, keys, security access cards and other tangible personal property exclusively used or held for use in, or otherwise exclusively relating to, the Business and, to the extent assignable or transferable by Seller or any Seller Party, all rights in all warranties of any manufacturer, vendor, or other Person with respect thereto.

"**Physician**" means a doctor of medicine or osteopathy, a doctor of dental surgery or dental medicine, a doctor of podiatric medicine, a doctor of optometry, or a chiropractor, as defined in section 1861(r) of the Social Security Act.

"**Plan**" means any of the following agreements, plans or other Contracts covering any Seller Employee: (i) employee benefit plans within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and (ii) any employee benefit plan, program, policy or arrangement providing for compensation, bonuses, commission, profit-sharing, stock option or other stock- or equity-linked benefits or rights, incentive, deferred compensation plans, vacation or paid time off benefits, insurance (including any self-insured arrangements), death, life, dental, vision, health or medical benefits, employee assistance, disability or sick leave benefits, workers' compensation, supplemental unemployment benefits, retention, transaction, change of control payments, savings, pension, retirement, post-employment or retirement benefits or other employee compensation plan, program, policy, arrangement, program, arrangement or commitment, in each case, whether written or unwritten, formal or informal, which Seller currently sponsors, or to which Seller has any outstanding present or future obligations with respect to any Seller Employee, whether voluntary, contingent or otherwise.

"**Post-Closing Period**" means the period beginning immediately after the Effective Time and ending on the earlier of the date (i) that is six (6) months following the Effective Time, or (ii) Seller is no longer in existence.

"**Power of Attorney**" is defined in Section 2.2(a).

"**Practitioner**" or "**Practitioners**" means each of the Physicians and other licensed professional providers who provide services to the Business.

"**Prepaid Expenses**" means all prepaid expenses and deposits of Seller made with respect to the Business.

"**Private Cost-Based Programs**" means a Private Program that settles on a Cost Report basis.

"**Private Program**" means any private insurance payor or program, self-insured employer, or other third-party payor.

"**Property Taxes**" means personal property, ad valorem, intangible, real property and other similar non-transactional-based Taxes.

"**Proceeding**" means any action, arbitration, charge, claim, complaint, demand, dispute, audit, litigation, proceeding, search warrant, civil investigative demand, subpoena, qui tam action, suit (whether civil, criminal, administrative, judicial, or investigative) commenced, brought, conducted, or heard by or before any (a) Governmental Authority, (b) Medicare fiscal intermediary or administrative contractor, recovery audit contractor, zone program integrity contractor, unified program integrity contractor or similar Government Program contractor or (c) arbitrator, whether at law or in equity, other than routine billing claims and disputes, routine audits, routine post-payment reviews and scheduled surveys.

"**Provider Relief Fund**" means the Public Health and Social Services Emergency Fund for provider relief under the CARES Act and Paycheck Protection Program Act.

"**Purchased Assets**" is defined in Section 1.1.

"**Representatives**" means, with respect to any Person, the officers, directors, managers, employees, agents, attorneys, accountants, advisors, bankers, financing sources, and other authorized representatives of such Person.

"**Restricted Area**" means Jefferson County, Texas.

"**Schedules**" means any schedule to this Agreement.

"**Seller**" is defined in the preamble to this Agreement.

"**Seller Affiliate**" means any Affiliate of Seller.

"**Seller Cost Reports**" is defined in Section 5.7(a).

"**Seller Employees**" means each person who is an employee of (i) Seller or any Seller Party whether active or on leave of absence who (a) works exclusively at the Facilities, including any employee who is on an approved leave of absence, or (b) otherwise primarily provides services to the Business during the majority of their business time and (ii) Steward Medical Group, Inc. or Permian Premier Health Services, Inc. set forth on Schedule G.

"**Seller Party**" or "**Seller Parties**" means Steward Medical Group, Inc. and Permian Premier Health Services, Inc.

"**Seller's Billing Information**" is defined in Section 5.10.

"**Social Security Act**" means the Social Security Act of 1935 and all regulations promulgated thereunder.

"**Software**" means, with respect to the Business, any and all computer programs and other software, including databases, software interfaces, implementations of algorithms, models, and methodologies, whether in source code, object code or other form, including libraries, subroutines and other components thereof.

"**Specified Debt**" means, collectively, indebtedness under (i) that certain Credit Agreement, dated as of February 21, 2024, by and among Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc., Stewardship Health Medical Group, Inc. and Stewardship Services Inc., as the borrowers, certain other Affiliates of Steward Health Care System LLC party thereto, as guarantors, the lenders party thereto and Brigade Agency Services LLC, as administrative agent and as collateral agent, (ii) that certain Credit Agreement, dated as of August 4, 2023, by and among Steward Health Care System LLC, certain Affiliates of Steward Health Care System LLC party thereto, as guarantors, the lenders party thereto, Sound Point Agency LLC, as administrative agent, Chamberlain Commercial Funding (Cayman) L.P., as collateral agent, and Brigade Agency Services LLC, as the FILO Agent, (iii) that certain Third Amended and Restated Promissory Note, dated as of January 22, 2024, by Steward Health Care System LLC in favor of MPT TRS Lender-Steward LLC and (iv) the DIP Financing.

"**Steward**" means Steward Health Care System LLC, a Delaware limited liability company.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation).

"**Tax**" or "**Taxes**" means any and all federal, state, local, foreign and other taxes, including net income, gross income, gross receipts, sales, use, ad valorem, hospital, provider, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes filed or required to be filed with any Governmental Authority, including any schedule or attachment thereto, and including any amendment thereof.

"**Trade Secrets**" means, with respect to the Business, trade secrets and confidential and proprietary information, including ideas, research and development information, know-how, formulas, compositions, technical data, designs, drawings, specifications, research records, records of inventions, test information, financial, marketing and business data, customer and supplier lists and information, pricing and cost

information, business and marketing plans and proposals that, in each case, derive independent economic value, actual or potential, from not being generally known or readily ascertainable by others.

"**Trademarks**" means, with respect to the Business, trademarks, service marks, trade names (including fictitious, assumed and d/b/a names), slogans, or logos; registrations, renewals, applications for registration of the foregoing; and the goodwill of the business associated with each of the foregoing.

"**Transaction Documents**" means this Agreement, the Power of Attorney and the Transition Services Agreement.

"**Transfer Taxes**" means any real or personal property transfer, sales, use, documentary, transfer, value added, stock transfer, stamp or similar Taxes, and any transfer, recording, registration, and other fees or similar amounts, in each case imposed or payable in connection with the Contemplated Transactions.

"**Transferred Employee**" is defined in Section 5.4(b).

"**Transferred Executory Contract**" is defined in Section 1.5(b).

"**Transition Patient Services**" is defined in Section 5.6.

"**Transition Patients**" is defined in Section 5.6.

"**Transition Services Agreement**" is defined in Section 2.2(c).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, *et seq*.

**Schedule A-1**

**Approvals**

1.   Submit a new application for licensure pre-closing, but in no case, later than ten (10) days post-Closing with respect to:

    a.   Texas Health and Human Services Commission ("Texas HHSC") Hospital License issued to The Medical Center of Southeast Texas (No. 000464, Eff. N/A, Exp. 07/31/2025) for 216 licensed beds.

## Schedule A-2

## Other Approvals

1. Submit a Change of Control Questionnaire pre-closing or as soon as possible post-Closing for the Texas HHSC, Radiation Branch Radioactive Materials License issued to The Medical Center of Southeast Texas LP (No. L01707, Eff. N/A, Exp. 05/31/2024).

2. Notify the Texas Board of Pharmacy within ten (10) calendar days of a change of ownership and submit a new application for the Texas Board of Pharmacy Class CS Pharmacy License issued to The Medical Center of Southeast Texas (No. 30596, Eff. N/A, Exp. 01/31/2026).

3. Notify Texas HHSC, Radiation Branch of a change of ownership within thirty (30) days post-Closing and submit change of ownership application for the Texas HHSC, Radiation Branch Certificate of X-Ray Registration issued to The Medical Center of Southeast Texas LP (No. R03277, Eff. N/A, Exp. 11/30/2031).

4. With respect to the CMS CLIA Certificate of Accreditation issued to Medical Center of Southeast Texas, LP (No. 45D0497776, Eff. 01/03/2023, Exp. 01/02/2025), Buyer to submit new CMS Form 116 within thirty (30) days post-Closing.

5. With respect to the following, any registrant desiring to transfer business activities to another person or entity shall submit to the DEA local field office notice of the transfer at least fourteen (14) days prior to Closing. Seller, as applicable, and Buyer shall put into place a Power of Attorney for the period between when notice is given, and the date on which Buyer is able to obtain a new DEA Controlled Substances Registration:

    a. DEA Controlled Substances Registration issued to The Medical Center of Southeast Texas LP (No. BP8604337, Eff. 11/19/2021, Exp. 11/30/2024).

6. Provide pre-Closing notice of change of ownership, and Buyer to submit new application for registration within thirty (30) days post-Closing with respect to:

    a. Texas HHSC Certificate of Inspection – Mammography System issued to The Medical Center of Southeast Texas LP (No. M00498, Eff. 04/29/2024, Exp. 06/30/2025).

    b. Texas HHSC Certified Mammography Facility Certificate issued to The Medical Center of Southeast Texas, L.P. (No. 100982, Eff. N/A, Exp. 07/18/2026).

7. Notify the FCC with respect to the FCC license:

    a. Federal Communications Commission ("FCC") Radio Station License.

8. With respect to the American College of Radiology Accreditations notify the American College of Radiology of any change in ownership:

    a. Certified Mammography Facility (No. 100982, Eff. N/A, Exp. 07/18/2026).

    b. Ultrasound Radiology Imaging Registration.

9. Submit notice to DNV at or immediately post-Closing for the DNV Accreditation (ID No. 10000344152-MSC-ANAB-USA, Eff. 09/29/2021, Exp. 06/11/2024).

    a. The Medical Center of Southeast Texas located at 2555 Jimmy Johnson Blvd, Port Arthur, Texas 77640.

10. With respect to the Medicare numbers submit Form 855-A to CMS within thirty (30) days post-Closing:

    a. Medicare Part A Enrollment (Acute) (PTAN: 45-0518).

    b. Medicare Part A Enrollment (Psych) (PTAN: 45-S035).

    c. Medicare Part A Enrollment (Rehab) (PTAN: 45-T035).

11. Provide a change of ownership application and submit Texas Medicaid provider enrollment application to TMHP Provider enrollment within thirty (30) days post-Closing:

    a. State of Texas Access Reform (STAR) Medicaid Program (Acute) (Provider ID: 163925401).

    b. State of Texas Access Reform (STAR) Medicaid Program (Psych) (Provider ID: 163925401).

    c. State of Texas Access Reform (STAR) Medicaid Program (Rehab) (Provider ID: 163925401).

12. Approvals relating to the Environmental Licenses & Permits:

    a. Port of Arthur Fire Department ER Permit Number 598155 (for diesel and oxygen aboveground storage tanks), expiration August 14, 2024.

    b. Texas Commission on Environmental Quality Petroleum Storage Tank Registration (#77296) for diesel aboveground storage tank.

**Schedule B**

**Seller Party Purchased Assets**

1. Physician Employment Agreement, effective January 26, 2023, by and between Permian Premier Health Services, Inc. and [14].
2. Physician Employment Agreement, effective June 9, 2020, by and between Permian Premier Health Services, Inc. and [16].
3. Physician Employment Agreement, effective April 26, 2021, by and between Permian Premier Health Services, Inc. and [82].
4. Physician Employment Agreement, effective February 1, 2020, by and between Permian Premier Health Services, Inc. and [10].
5. Offer Letter, dated June 13, 2019, by and between Steward Medical Group, Inc. and [122].
6. Offer Letter, dated December 5, 2018, by and between Steward Medical Group, Inc. and [123].
7. Offer Letter, dated December 14, 2020, by and between Steward Medical Group, Inc. and [124].
8. Offer Letter, dated February 1, 2022, by and between Steward Medical Group, Inc. and [125].
9. SMGT-0523 Amended and Restated Lease, dated January 8, 2024, by and between SETMA West End Medical Plaza Properties, L.T.D and Permian Premier Health Services Inc.
10. All Personal Property located within the Steward Medical Group, Inc. practice locations.

**Schedule C**

**Excluded Assets**

For purposes of this Agreement, "**Excluded Assets**" means:

(a)     all Owned Real Property and all Personal Property located threat;

(b)     all Leased Real Property that is not subject to a Transferred Executory Contract and all Personal Property located thereat

(c)     any bank account of Seller or any Seller Affiliate, and all cash and cash equivalents, securities, investments, endorsements, charitable contributions, deferred gifts, endowment funds and other similar charitable interests, bond funds and other funds created by bond indentures and research rights;

(d)     all accounts receivable (including but not limited to, all patient and non-patient accounts receivable, whether billed or unbilled, recorded or unrecorded from any source), including notes receivable and other rights to receive payment for goods or services provided by Seller or any Seller Affiliate, whether or not in connection with their respective businesses (including the Business prior to the Transition Time), including any accounts receivable that have been charged off as bad debt, any receivables related to recoveries associated with Medicare bad debt with respect to services provided in time periods prior to the Transition Time and any intercompany receivables between Seller on the one hand, and Steward or any Affiliate of Steward on the other hand;

(e)     all insurance policies or self-insurance funds maintained by or on behalf of Seller covering the Business and the Purchased Assets;

(f)     all Plans (other than any Plan that is an Employee Obligation or Assumed CBA) and records relating thereto;

(g)     all organizational documents, corporate records, stock books, proprietary manuals, other proprietary materials of, or other records relating to the corporate organization of, and any Tax Returns of or with respect to (including any records or working papers), Seller or any Seller Affiliate;

(h)     rights that accrue or will accrue to Seller or any Seller Affiliate under this Agreement or the other Transaction Documents;

(i)     any records that (i) are required by applicable Law or by Order of the Bankruptcy Court which Seller or any Seller Affiliate is required to retain in its possession or (ii) Seller or any Seller Affiliate reasonably believes will facilitate the preparation or filing of Tax Returns and the substantiation thereof or the administration of the Chapter 11 Cases;

(j)     all Contracts other than Transferred Executory Contracts;

(k)     (A) all claims, rights or interests of Seller or any Seller Affiliate to refunds, rebates, abatements, prepayments, or other recoveries in relation to Taxes (including any provider tax payments in any applicable state and any refundable Tax credits payable regardless of Tax Liability) related to (1) the Business, Facilities or the Purchased Assets for periods (and portions thereof) ending immediately prior to the Transition Time, (2) any Tax that is not an Assumed Liability or (3) any income Tax Return or Group

Tax Return and (B) all other Tax assets (including any Tax attributes) of Seller or any Seller Affiliate, in each case together with any interest due thereon or penalty rebate arising therefrom;

(l)     [Intentionally omitted];

(m)     all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat Laws;

(n)     all rights to receipts (i) relating to the Seller Cost Reports with respect to time periods prior to the Transition Time pursuant to the auditing and settlement of the Seller Cost Reports, including settlements and retroactive adjustments (collectively, "**Cost Report Settlements**"), (ii) that result from Seller's or any of its Affiliate's pursuit of one or more appeals and other risk settlements with respect to time periods prior to the Transition Time, or (iii) relating to amounts earned, accrued or paid by Seller or any Seller Affiliates with respect to meaningful use attestations, or for which the requirements for attestation have been substantially met with respect to time periods prior to the Transition Time;

(o)     Seller's or any of its Affiliate's assets held in connection with any self-funded insurance programs and reserves, if any, and any assets and Liabilities under medical malpractice risk pools and workers' compensation and employee retirement programs;

(p)     any (i) Permits or Approvals exclusively used or held for use in, or otherwise exclusively relating to, the Business or the Purchased Assets, but that are not assignable to Buyer pursuant to applicable Laws or by Order of the Bankruptcy Court, and (ii) accreditations exclusively used or held for use in, or otherwise exclusively relating to, the Business or the Purchased Assets, but that are not assignable to Buyer pursuant to the requirements of applicable accreditation organizations;

(q)     any claims or causes of action of Seller or Seller Affiliates against third parties (i) other than those that exclusively relate to the Business or (ii) to the extent that such claims or causes of action arise in connection with the Chapter 11 Cases, including, without limitation, all Avoidance Actions;

(r)     any intercompany receivables between Seller or any Seller Party on the one hand, and Seller or Seller Affiliates on the other, and any claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Seller and Seller Affiliates, and any payments, awards or other proceeds resulting therefrom;

(s)     any trustee held bond reserve funds or surety bonds;

(t)     assets held to fund, or relating to, Excluded Liabilities;

(u)     all Medicare Accelerated and Advance Payments, COVID-19 Funds and any provider relief funds under the CARES Act or similar legislation that are intended to compensate Steward, any Affiliate of Steward, or Seller for costs incurred or lost revenue with respect to time periods prior to the Transition Time;

(v)     all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, including but not limited to peer-review privilege;

(w)     all documents, records, correspondence, work papers and other documents relating to the Seller Cost Reports, Cost Report Settlements or other Excluded Assets;

(x)     any (i) Trademarks not exclusively used or held for use in, or otherwise exclusively relating to, the Business, (ii) Trademarks or Domain Names that contain the name "Steward Health Care System," "Steward Health," "IASIS," or "Steward" (as well as all abbreviations, variations or derivations thereof, including any world-wide web address containing "iasis" or "steward"), any promotional material, educational material, signage, stationery, supplies or other items of inventory bearing such names or Trademark, or any marks, trade dress, logos, or symbols or abbreviations, variations or derivations thereof, and any URLs, sites, blogs or pages hosted on the system websites of Seller or the Seller Affiliates, including all content embodied within the foregoing, (iii) any Intellectual Property made available to Buyer or its Affiliates following the Effective Time pursuant to the Transition Services Agreement, or (iv) any other Intellectual Property not exclusively used or held for use in, or otherwise exclusively related to the Business;

(y)     any (i) Information Technology Systems, Software, hardware or data processing equipment, data processing system manuals and licensed Software materials that are not (A) in the case of tangible assets, located at a Facility or, in the case of Software, manuals and materials in electronic format, and other intangible assets, residing on hardware located at a Facility or (B) exclusively used or held for use in, or otherwise exclusively relating to, the Business or (C) transferable or (ii) proprietary Software, data processing programs or source code of Seller or any Seller Affiliates;

(z)     any proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses of Seller or any Seller Affiliates;

(aa)    any pharmaceuticals that cannot, by applicable Law, be sold by Seller to Buyers;

(bb)    any medical staff-related records or information not among the Credentialing and Medical Staff Records;

(cc)    any non-assumable Prepaid Expenses or any other Prepaid Expenses to the extent related to an Excluded Asset;

(dd)    any master agreements or similar contracts, including Payor Agreements, that relate, in whole or in part, to the provision of services, or that involve the rights or privileges of Steward or any of its Affiliates, that are not exclusively used or held for use in the Business;

(ee)    Contracts and fee-sharebacks made available through participation in a group purchasing organization;

(ff)    all Medicaid payments for time periods prior to the Effective Time, including any supplemental Medicaid payments that are unrelated to specific patient visits;

(gg)    all rights and interest associated with all indebtedness or debt-like items of Steward, any Affiliate of Steward, including Seller;

(hh)    all Personal Information that is nontransferable under applicable Law or under the privacy policies or notices of Seller in effect at the time of collection of such Personal Information;

(ii)    any asset located outside the Restricted Area;

(jj)    Seller's goodwill associated with, or relating to the Business and any Purchased Assets; and

(kk)     any other assets, properties, rights, or interests of any description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, that are not exclusively used or held for use in, or otherwise exclusively relating to, the Business or that Seller is required to retain by applicable Law or Order of the Bankruptcy Court.

**Schedule D**

**Assumed Liabilities**

None.

<u>**Schedule E**</u>

<u>**Social Media Accounts**</u>

1. medicalcentersetexas.org
2. https://www.facebook.com/medicalcentersetx
3. https://x.com/MCSETexas

**<u>Schedule F</u>**

**<u>Facilities</u>**

<u>Hospital</u>

1. The Medical Center of Southeast Texas - Main Hospital Campus: The Medical Center of Southeast Texas – Port Arthur – 2555 Jimmy Johnson Blvd., Port Arthur, Texas 77640.

<u>Other Facilities</u>

1. Cancer Center – Med Center: 9150 S. Main Street, #A-3, Houston, TX 77025.
2. Cancer Center – West Houston: 2610 W. Sam Houston Parkway South, Houston, TX 77042.

**Schedule G**

**SMG and Permian Employees**

[**REDACTED**]

**Exhibit 3**

Bill of Sale, Assumption and Assignment Agreement (Florida)

*Seller 10.02.24*

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), is delivered and entered into as of October [•], 2024, by and among (i) Steward CGH, Inc., a Delaware corporation, Steward HH, Inc., a Delaware corporation, Steward NSMC, Inc., a Delaware corporation, and Steward PGH, Inc., a Delaware corporation (each, a "**Seller**" and, together, "**Sellers**"), (ii) solely for purposes of <u>Section 5.4</u>, the Seller Parties, and (iii) Healthcare Systems of America-Florida LLC, a Nevada limited liability company ("**Buyer**" and collectively with Sellers and the Seller Parties, the "**Parties**" and each individually a "**Party**").  The capitalized terms used herein shall have the meanings ascribed to them in Annex A unless the context indicates otherwise.

### W I T N E S E T H

**WHEREAS**, Sellers and certain of Sellers' Affiliates (collectively, the "**Debtors**") are debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") and, on May 6, 2024, voluntary petitions for relief under chapter 11 of the Bankruptcy Code were filed in the United States Bankruptcy Court for the Southern District of Texas (such court, the "**Bankruptcy Court**"; and such cases, jointly administered under Case No. 24-90213, the "**Chapter 11 Cases**");

**WHEREAS**, on September 11, 2024, the Bankruptcy Court entered an Interim Order approving a global settlement among the Debtors, MPT, the Prepetition ABL/FILO Secured Parties, the FILO Secured Parties, and the Creditors' Committee (each as defined in the Interim Settlement Order) regarding certain disputes arising among such parties in connection with the Chapter 11 Cases, which Interim Order was entered as Docket No. 2418 (including all exhibits thereto, the "**Interim Settlement Order**");

**WHEREAS**, on September 11, 2024, (i) MPT designated Buyer as its "Interim Manager" (as defined in the Interim Settlement Order) and (ii) Steward, Sellers and Buyer have entered into that certain Interim Management Agreement, dated as of September 11, 2024 (the "**Interim Management Agreement**"), pursuant to which Buyer agreed to provide Sellers with certain interim management services and fund the operations of the Facilities in accordance with the Settlement Term Sheet (as defined in the Interim Settlement Order) during the period starting at 12:01 a.m. local time on September 11, 2024 (the "**Transition Time**") until the date hereof (as defined herein);

**WHEREAS**, on September 18, 2024, the Bankruptcy Court entered a Final Order approving a global settlement among the Debtors, MPT, the Prepetition ABL/FILO Secured Parties, the FILO Secured Parties, and the Creditors' Committee regarding certain disputes arising among such parties in connection with the Chapter 11 Cases, which Final Order was entered as Docket No. 2610 (including all exhibits thereto, the "**Final Settlement Order**" and, collectively with the Interim Settlement Order, the "**Settlement Orders**");

**WHEREAS**, pursuant to the Settlement Orders, MPT has designated Buyer as the Designated Operator for the Purchased Assets;

**WHEREAS**, in accordance with the Settlement Orders, Sellers desire to sell the Purchased Assets to Buyer and assign the Assumed Liabilities to Buyer, subject to the terms and conditions set forth in this Agreement;

**WHEREAS**, Buyer desires to acquire the Purchased Assets from Sellers and assume the Assumed Liabilities from Sellers, subject to the terms and conditions set forth in this Agreement;

**WHEREAS**, the Bankruptcy Court approved entry into this Agreement and consummation of the Contemplated Transactions pursuant to that certain MLI Hospital Sale Order (as defined in the Settlement Term Sheet attached to the Settlement Orders) concerning the Facilities; and

**WHEREAS**, Buyer has obtained those certain Approvals from the relevant Governmental Authorities required to operate the Business at the Facilities, as set forth on Schedule A-1.

**NOW, THEREFORE**, for and in consideration of the premises, the agreements, covenants, representations and warranties set forth in this Agreement, and other good and valuable consideration, the receipt and adequacy of which are acknowledged and agreed, the Parties agree as follows:

1. **SALE OF ASSETS AND CERTAIN RELATED MATTERS.**

**1.1    Sale of Purchased Assets**.  On the terms and subject to the conditions set forth in this Agreement, each Seller and Seller Party hereby sells, assigns, conveys, transfers, and delivers to Buyer, and Buyer hereby purchases, acquires, and accepts, all of such Seller's and Seller Party's right, title and interest to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances), provided that in no event shall any Transferred Executory Contract be assigned to Buyer until after any applicable requisite notice period set forth in the Settlement Order has been satisfied.  "**Purchased Assets**" means, in each case other than the Excluded Assets, (i) all assets, properties, rights, and interests of every description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, owned by (x) such Seller and exclusively used or held for use in the operation of, or otherwise exclusively relating to, the Business or (y) any of the Seller Parties solely to the extent set forth in Schedule B, (in each case other than the Excluded Assets), in each case, to the extent assignable or transferable under applicable Law, and (ii) all Transferred Executory Contracts.

**1.2    Excluded Assets**.  Notwithstanding anything herein to the contrary, the assets, properties, rights, and interests of every description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, of Sellers and any Seller Affiliates, in each case, set forth on Schedule C are not intended by the Parties to be a part of the Contemplated Transactions and are excluded from the Purchased Assets (collectively, the "**Excluded Assets**").

**1.3    Assumed Liabilities**.  On the terms and subject to the conditions set forth in this Agreement, Buyer hereby assumes, and agrees to pay, perform and discharge, when they become due and payable, the following Liabilities of Sellers and Seller Parties (collectively, the "**Assumed Liabilities**"):

(a)    all Liabilities arising out of the use, ownership or operation of the Business, the Purchased Assets or the Facilities first arising after the Transition Time;

(b)    all Liabilities for (i) Taxes relating to the transfer of the Purchased Assets under this Agreement (including any Transfer Taxes), other than income Taxes of Sellers, any Seller Party, or any consolidated, combined, unitary or similar Tax group of which any Seller or such Seller Party is a member, (ii) Property Taxes with respect to the Purchased Assets, and (iii) any Tax relating to the Purchased Assets or the Business for which a Governmental Authority asserts in writing personal liability on any officer, director, or employee of any Seller or any Affiliate thereof;

(c)    all Liabilities arising as the custodian of the medical records, patient files, and other written accounts of the medical history of the patients of the Business;

(d)    all Liabilities related to Seller Employees to the extent assumed under Section 5.4; and

(e)  all Liabilities as set forth on Schedule D.

All Liabilities of the Sellers and Seller Parties not otherwise expressly assumed under this Section 1.3 shall be excluded from the Contemplated Transaction and remain Liabilities of the Sellers or Seller Parties, as applicable (collectively, the "**Excluded Liabilities**").

      **1.4**    **Consideration**. Subject to the terms and conditions hereof, the aggregate consideration (the "**Consideration**") for the Purchased Assets is Buyer's assumption of the Assumed Liabilities.

      **1.5**    **Designated Contracts; Cure Costs**.

      (a)    From time to time on or prior to December 16, 2024 (the "**Designation Deadline**"), Buyer may designate, by written notice to Sellers, each Executory Contract it wishes to be assigned to it (each such Executory Contract, a "**Transferred Executory Contract**") in accordance with the procedures set forth in the Settlement Order.

      (b)    All Cure Costs and all fees and expenses actually incurred by any Seller, Seller Party, if applicable and their Affiliates to effect the assumption and assignment of the Transferred Executory Contracts from any Seller or, if applicable, Seller Party to Buyer (including any legal expenses and any fees and expenses in connection with the assumption and assignment of Government Program provider numbers) (collectively, the "**Cure Fees and Expenses**") shall be paid by Buyer no later than the time of assignment, and as a condition to Sellers' and, if applicable, Seller Party's obligation to assign, such Transferred Executory Contracts. Upon request by Buyer, Sellers and, if applicable, the Seller Parties shall promptly (in any event three (3) Business Days following such request) provide Buyer with an invoice for such Cure Fees and Expenses.

      (c)    Notwithstanding any provision to the contrary contained in this Agreement, but subject to Section 1.5(b), in no event shall any Transferred Executory Contract be assigned to Buyer until after any requisite notice period set forth in the Settlement Order has been satisfied.

2.    **CLOSING.**

      **2.1**    **Closing**.  The assignment of the Purchased Assets and assumption of the Assumed Liabilities pursuant to this Agreement shall be effective for financial and accounting purposes as of [11:59] p.m. local time on the date hereof (the "**Effective Time**"). The delivery of all Transaction Documents by one Party to any other Party shall be deemed to have occurred simultaneously and none shall be effective unless and until all have occurred.

      **2.2**    **Deliveries of Sellers at the Closing**.  Concurrently with the execution of this Agreement, Sellers have delivered to Buyer or its designee the following:

      (a)    one or more power of attorneys (each a "**Power of Attorney**"), duly executed by each Seller, authorizing Buyer to utilize such Seller's federal and state controlled substances permits and pharmacy licenses; provided, that if the Parties agree to execute such Power of Attorney prior to the execution of this Agreement, such Power of Attorney shall not be effective until the Effective Time;

      (b)    a confirmatory trademark assignment agreement (the "**Trademark Assignment Agreement**"), duly executed by each Seller;

      (c)    a transition services agreement (the "**Transition Services Agreement**"), duly executed by Sellers or the Sellers' Affiliates, as applicable;

(d)      an employee contract assignment and assumption agreement (the "**Employee Contract Assignment and Assumption Agreement**"), duly executed by Seller and/or each relevant Seller Party;

(e)      [a professional leaseback agreement in a form mutually agreed upon by the Parties (the "**Leaseback Agreement**"), duly executed by Seller and/or Seller Party, as applicable;]

(f)      [a professional services agreement (the "**Professional Services Agreement**"), duly executed by each relevant Seller Party;] and

(g)      a duly executed IRS Form W-9 of each Seller (or, if such Seller is a disregarded entity, its regarded owner for applicable income tax purposes).

**2.3      Deliveries of Buyer at the Closing.**   Concurrently with the execution of this Agreement, Buyer has delivered to Sellers the following: the Transition Services Agreement, duly executed by Buyer;

(b)      the Employee Contract Assignment and Assumption Agreement, duly executed by Buyer;

(c)      [the Leaseback Agreement, duly executed by Buyer;]

(d)      [the Professional Services Agreement, duly executed by Buyer]; and

(e)      copies of resolutions duly adopted by the board of managers of Buyer, authorizing and approving Buyer's performance of the Contemplated Transactions and the execution and delivery of this Agreement and the other Transaction Documents, certified as true and in full force and effect as of the date hereof by an appropriate officer of Buyer.

**2.4      Additional Acts**.   From time to time after the Effective Time, the Parties shall execute, acknowledge and deliver to the other applicable Parties all such further reasonable documents, conveyances, notices, assumptions, releases and acquittances and such other reasonable instruments, and shall take such further reasonable actions, as may be reasonably necessary or appropriate to effectuate this Agreement and consummate the Contemplated Transactions, including to assure fully to Buyer all of the properties, rights, titles, interests, estates, remedies, powers and privileges relating to the Purchased Assets intended to be conveyed to Buyer under this Agreement and the other Transaction Documents and to assure fully to Sellers and each Seller Party the assumption of the Assumed Liabilities intended to be assumed by Buyer under this Agreement and the other Transaction Documents, and to confirm, consummate or otherwise make effective the Contemplated Transactions.

3.      **REPRESENTATIONS AND WARRANTIES OF SELLERS.**

Sellers hereby represent and warrant to Buyer the following:

**3.1      Organization; Capacity**.   Each Seller and each of the Seller Parties is a corporation, limited liability company or other entity, duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation or organization.  Except for such authorizations as may be required by the Bankruptcy Court, the execution and delivery by each Seller and each of the Seller Parties of this Agreement and the other Transaction Documents to which it is or will become a party, as applicable, the performance by each Seller or such Seller Party of its obligations under this Agreement and the other Transaction Documents to which it is or will become a party and the consummation by such Seller or such Seller Party of the Contemplated Transactions to which it is a party have been authorized and approved by

all necessary corporate, limited liability company or other similar actions, as applicable, on the part of such Seller or such Seller Party, none of which actions has been modified or rescinded and all of which actions remain in full force and effect.

**3.2**     **Authority; Non-contravention; Binding Agreement**.

(a)     The execution, delivery and performance by each Seller and each of the Seller Parties of this Agreement and the other Transaction Documents to which it is a party, and the consummation by each Seller and each such Seller Party of the Contemplated Transactions, as applicable:

(i)     are within each Seller's and each Seller Party's corporate, limited liability company or other similar powers and are not and will not be in contravention or violation of the terms of the organizational or governing documents of such Seller or such Seller Party;

(ii)     except as set forth in Schedule A-2, do not and will not require any Approval of, filing or registration with, the issuance of any Permit by, or any other action to be taken by, any Governmental Authority to be made or sought by such Seller or any Seller Party;

(iii)     do not and will not require any Approval or other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both), or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation, or loss of a material benefit under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) upon, any of the Purchased Assets under (1) any Contract material to the Business taken as a whole, or Permit or Approval applicable to any of the Purchased Assets or (2) any Order or Law applicable to any of the Purchased Assets or to which Sellers may be subject, except in each case of clauses (ii) and (iii)(1) above, as would not reasonably be expected to have a Material Adverse Effect; and

(b)     This Agreement and the other Transaction Documents to which any Seller or any Seller Party is a party are and will constitute the valid and legally binding obligations of any Seller or any Seller Party and, assuming the due authorization and execution thereof by Buyer , are and will be enforceable against them in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable Laws or an Order of the Bankruptcy Court affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.3**     **Title to Assets.**  Sellers are conveying to Buyer, and Buyer is acquiring, good and marketable title to the Purchased Assets, free and clear of all Encumbrances, other than the Permitted Encumbrances.

**3.4**     **Litigation**.  Except for the Chapter 11 Cases, there is no Proceeding or Order pending or, to the Knowledge of Sellers, threatened against any Seller or any Seller Party with respect to the Business or the Purchased Assets, in which an adverse determination would reasonably be expected to have a Material Adverse Effect or would otherwise prohibit the consummation of the Contemplated Transactions.

**3.5**     **No Other Representations or Warranties**.

(a)     Except for the representations and warranties expressly set forth in this Section 3, neither Sellers nor any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, on behalf of Sellers or any Seller Affiliate, including any representation or warranty regarding Sellers, any Seller Party or any other Person, any Purchased Assets, any Facility, any Liabilities of Sellers, including any Assumed

Liabilities, the Business, any other rights or obligations to be transferred pursuant to the Transaction Documents or any other matter, and Sellers hereby disclaim all other representations and warranties of any kind whatsoever, express or implied, written or oral, at law or in equity, whether made by or on behalf of Sellers, any Seller Party or any other Person, including any of their respective Representatives.

(b)     Except as expressly set forth in <u>Section 3</u> hereof, the Purchased Assets transferred to Buyer will be sold by Sellers and purchased by Buyer in their physical condition at the Effective Time, "AS IS, WHERE IS AND WITH ALL FAULTS AND NON-COMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, with respect to the Leased Real Property and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the Personal Property and Inventory, any and all of which warranties (both express and implied) Sellers hereby disclaim.  All of the Leased Real Property, Personal Property and Inventory shall be further subject to normal wear and tear and normal and customary use in the ordinary course of business up to the Effective Time.  Buyer acknowledges that Buyer has examined, reviewed and inspected all matters which in Buyer's judgment bear upon the Purchased Assets and their value and suitability for Buyer's purposes and, except as affirmatively represented and warranted by Sellers, is relying solely on its own examination, review and inspection of the Purchased Assets and Assumed Liabilities

4.     **REPRESENTATIONS AND WARRANTIES OF BUYER.**

Buyer hereby represents and warrants to Sellers that the statements contained in this <u>Section 4</u> are true and correct as of the date of this Agreement:

**4.1     Organization; Capacity**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Nevada. Buyer is duly authorized, qualified and in good standing under all applicable Laws of any jurisdictions (foreign and domestic) in which the character or location of the assets owned or leased by it or the nature of the business conducted by it requires such authorization or qualification.  Buyer has the requisite power and authority to enter into the Transaction Documents to which it is a party and to perform its obligations hereunder and thereunder.  The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is a party, the performance by Buyer of its obligations under this Agreement and the other Transaction Documents to which it is a party and the consummation by Buyer of the Contemplated Transactions and the Transaction Documents to which it is a party, have been duly and validly authorized and approved by all necessary action, as applicable, on the part of Buyer, none of which actions has been modified or rescinded and all of which actions remain in full force and effect.

**4.2     Authority; Non-contravention; Binding Agreement**.

(a)     The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation by Buyer of the Contemplated Transactions and its obligations under the Transaction Documents, as applicable:

(i)     are within Buyer's powers and are not, and will not be, in contravention or violation of the terms of Buyer's organizational or governing documents;

(ii)     do not and will not require any Approval of, filing or registration with, the issuance of any Permit by, or any other action to be taken by, any Governmental Authority to be made or sought by Buyer; and

(iii)     do not and will not require any Approval or other action under, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both) or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation, or loss of a material benefit under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) upon, any material assets of the Buyer under any Contract, Permit, Order or Law to which Buyer may be subject.

(b)     This Agreement and the other Transaction Documents to which Buyer is or will become a party are and will constitute the valid and legally binding obligations of Buyer and, assuming the due authorization and execution thereof by Sellers, are and will be enforceable against it in accordance with the respective terms hereof and thereof, except as enforceability may be restricted, limited or delayed by applicable Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3     **Litigation**.   There is no Proceeding or Order pending or, to the Knowledge of Buyer, threatened against or affecting Buyer, or any of its Affiliates or any of their respective properties or rights that prohibit the consummation of the Contemplated Transactions.

4.4     **Representations of Sellers**.   Buyer hereby acknowledges and agrees the only representations and warranties made by Sellers are the representations and warranties expressly set forth in Section 3 and Buyer has not relied upon, and will not rely upon, any other express or implied representations, warranties or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or on behalf of Sellers, or any Seller Affiliates, any Representatives of Sellers or any Seller Affiliate or any other Person, including any projections, forecasts, estimates, appraisals, statements, promises, advice, data or information made, communicated or furnished by or through Seller's bankers, or management presentations, data rooms (electronic or otherwise) or other due diligence information, and that Buyer will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, appraisals, statements, promises, advice, data or information. Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Business, the Purchased Assets and the Assumed Liabilities are being transferred on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in Section 3  without any other representations or warranties of any nature whatsoever.

5.     **COVENANTS OF SELLER AND BUYER.**

5.1     **Bulk Sales Laws**.  Buyer and Sellers hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

5.2     **Social Media Accounts**.   Promptly after the Effective Time, each Seller shall initiate the respective processes to grant Buyer exclusive access rights and permissions to the social media accounts owned or operated by such Seller set forth on Schedule E.  Within forty-five (45) days after the Closing Date, Buyer must remove all marks or content, to the extent not a Purchased Asset, of Sellers and its Affiliates from such social media accounts.

5.3     **Confidentiality**.   It is understood by the Parties that the Confidentiality Agreement will survive the execution and delivery of this Agreement and will terminate pursuant to the terms of the Confidentiality Agreement.   To the extent that any press releases or public announcements are to be issued

or made relating to the Contemplated Transactions, the timing and content of such press releases and public announcements shall be mutually agreed between each Party hereto.

**5.4    Seller Employees.** Subject to Buyer's standard hiring practices and policies (including but not limited to background checks, drug screens and a general prohibition against hiring employees who were previously released for cause from employment with Buyer or their Affiliates) (except that Buyer's standard hiring practices and policies shall not apply to any Union Represented Employees, including Union Represented Employees on leave), Buyer (A) has made offers of employment to substantially all of the persons who are (A) Seller Employees eligible for rehire by Buyer and (B) will make, as of the date that the person reports back to work at the Business on an active basis within one hundred eighty (180) days after the Effective Time (or such longer time as is required by applicable Law), to all of the persons who are Seller Employees with respect to the operation of the Business and are on short-term or long-term disability or on leave of absence pursuant to the applicable Seller's or Seller Party's policies, the Family and Medical Leave Act of 1993 or other similar Law as of the Effective Time (each, an "Employee on Leave").

(b)    As of the Effective Time and, with respect to any Employee on Leave (as defined below), upon the date such Employee on Leave becomes a Transferred Employee (such time, the "**Employee Effective Time**"), each Seller and Seller Party shall terminate all Seller Employees. The term "**Transferred Employee**" as used in this Agreement means a Seller Employee who accepts employment with Buyer as of the Effective Time (and with respect to any Employee on Leave, as of the date such Employee on Leave so reports back for work).

(c)    Buyer hereby assumes from each Seller and Seller Party all Employee Obligations (as defined below) with respect to each Transferred Employee.

(d)    Subject to the requirements of any applicable Collective Bargaining Agreement, for a period of at least twelve (12) months following the date hereof (or such longer period as may be required by applicable Collective Bargaining Agreement and/or Law), each Transferred Employee that is not party to an employment union or similar contract (each, an "**Employee Obligation**"), shall be entitled to receive from the Buyer (i) at least the same salary and wages as were provided to such employee by the applicable Seller or Seller Party immediately prior to the date hereof by the applicable Seller or a Seller Party, (ii) employee benefits substantially comparable in the aggregate to the employee benefits provided to each Transferred Employee immediately prior to the date hereof by the applicable Seller or Seller Party and (iii) responsibilities consistent with their then-current job title and reporting structure immediately prior to the date hereof.  For the avoidance of doubt, nothing contained herein modifies the terms of any Collective Bargaining Agreement.

(e)    Buyer hereby assumes or retains, as the case may be, any and all Liabilities (contingent or otherwise) relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of any Seller Employee, including accrued and unpaid wages or salary, accrued and unused vacation, sick days and paid time off against the applicable Seller or Seller Party, in each case, with respect to any Seller Employee, irrespective of when such claims are made. Buyer shall pay the applicable Transferred Employees the unpaid portion of any Transferred Employee's bonus for the 2024 calendar year at the same time such bonuses are paid to such Transferred Employee in the ordinary course of business consistent with past practices.

(f)    Buyer hereby assumes each Collective Bargaining Agreement governing the terms and conditions of employment of the employees represented by a union or other labor organization ("**Union Represented Employees**"), hereinafter referred to as the "**Assumed CBAs**." Buyer has delivered offers of employment to Union Represented Employees (i) in accordance with Section 5.4(a) and Section 5.4(d), or

alternatively negotiated in good faith with the applicable union or other labor organization to deem such offers of employment to have been made to the Union Represented Employees and (ii) containing the terms and conditions of employment contained in the Assumed CBAs.

(g)      Buyer agrees to recognize each Transferred Employee's date of hire by the applicable Seller or a Seller Party, as applicable, as the anniversary date of record with Buyer and to honor that seniority for purposes of eligibility, vesting and prospective benefit accrual on or after the date hereof under Buyer employee benefit plans and policies, but excluding any defined benefit pension plan within the meaning of Section 3(35) of ERISA and any retirement plan intended to be qualified under Section 401 (including any 401(k) plan).  Buyer will waive the customary waiting periods under its welfare and 401(k) plans for the Transferred Employees and their eligible spouses and dependents under any employee benefit plan, program or arrangement of Buyer, and, subject to each Transferred Employee's election of coverage, participation in Buyer's benefit plans shall begin as of the Employee Effective Time for each Transferred Employee who is in an eligible class as defined under the respective Buyer benefit plans.  To the extent lawful and subject to the approval of any applicable insurer, Buyer shall (i) honor the Transferred Employees' prior service credit under the applicable Seller's or Seller Party's current welfare plans for purposes of satisfying pre-existing condition limitations in Buyer's welfare benefit plans, and (ii) with respect to the 2024 calendar year, recognize any out-of-pocket expenses (including deductibles, co-pays, and out of pocket maximums) incurred by each of the Transferred Employees and their eligible dependents under any Plans that are welfare benefit plans prior to the date hereof for purposes of determining deductibles, co-pays and out-of-pocket maximums under Buyer's applicable medical and welfare benefit plans on and after the date hereof.  For purposes of eligibility to participate in Buyer's retirement plans, Buyer shall honor prior length of service for each Transferred Employee that meets the eligibility requirements under Buyer's retirement plans, but Buyer will not make any contributions to Buyer's retirement plans for the Transferred Employees with respect to prior service.

(h)      Subject to the terms and conditions of Buyer's applicable benefit plans, for each Seller Employee, Buyer shall carry over, and give credit for (or with respect to any Seller Employee who does not become a Transferred Employee pay to such Seller Employee on the date hereof or, if permitted under applicable Law, promptly after the date hereof), the unused Paid Time Off of such Seller Employee as of immediately prior to the Employee Effective Time (the aggregate number of hours of Paid Time Off assumed by Buyer for all Seller Employees pursuant to this Section 5.4(h), the "**Assumed Paid Time Off**").

(i)      Buyer shall be solely responsible for complying with the WARN Act and any and all obligations under other applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Seller Employees as a result of any action by Buyer following the Transition Time.

(j)      Notwithstanding any provision herein to the contrary, no term of this Agreement shall be deemed to (i) create any Contract with any Transferred Employee; (ii) give any Transferred Employee the right to be retained in the employment of Buyer or any of its Affiliates; (iii) interfere with Buyer's right to terminate the employment of any Transferred Employee at any time; or (iv) obligate Buyer or any of its Affiliates to adopt, enter into or maintain any employee benefit plan or other compensatory plan, program or arrangement at any time.  Nothing in this Agreement shall diminish Buyer's right to change or terminate its policies regarding employment matters at any time or from time to time.

**5.5      Post-Closing Access to Information; Communication with Governmental Authorities**.

(a)      Buyer and Sellers acknowledge that prior to the end of the Post-Closing Period, Buyer and Sellers may need access to information, documents or computer data in the control or possession of the other, including for the purpose of satisfying their obligations in connection with the Chapter 11

Cases, and Sellers may need access to records that are a part of the Purchased Assets for purposes of concluding the Contemplated Transactions and for audits, investigations, compliance with applicable Law or an Order of the Bankruptcy Court and requests from Governmental Authorities, and the prosecution or defense of claims made by third parties.  Accordingly, Buyer agrees that, except to the extent necessary to comply with any applicable Law or an Order of the Bankruptcy Court, it will timely make available to Sellers and their respective Representatives the Books and Records and such information, documents and computer data as may be available relating to the Purchased Assets and the Business in respect of periods prior to the Effective Time and will permit Sellers (or their Representatives) to make copies of such Books and Records, information, documents and computer data.  Sellers agree that Sellers will timely make available to Buyer and its Representatives such information, documents and computer data relating to the Purchased Assets and the Business in respect of periods prior to the Effective Time as may be in the possession of Seller or any Seller Party and will permit Buyer (or its Representatives) to make copies of such documents and information.  Notwithstanding the foregoing, all disclosures of information shall be consistent with the Confidentiality Agreement, all common interest agreements, joint defense agreements, and any other confidentiality, clean room or nondisclosure agreements entered into among any of the Parties or their respective Affiliates.  The Parties agree that the cost of compliance with this provision shall be governed by the Transition Services Agreement.

(b)     Buyer shall assume all legal responsibility for, and shall preserve, the Books and Records (including, but not limited to, patient records) for the greater of: (i) seven (7) years from the date of such record; (ii) as may be required by applicable Law, including but not limited to, the statute of limitations governing the time period afforded to bring professional liability claims in Florida or as is necessary to administer the Chapter 11 Cases; or (iii) such longer period as may be required in connection with any known or threatened investigation or Proceeding, including any professional liability claims. Thereafter, Buyer may dispose of such Books and Records only after Buyer has given such Seller ninety (90) days' prior written notice of such impending disposition and the opportunity of such Seller to remove and retain such Books and Records as permitted by applicable Law.

(c)     Buyer shall cooperate with Sellers, on a timely basis and as reasonably requested by Sellers, in connection with the provision of all data of the Business and other information required by Sellers for reporting to the Joint Commission for the remainder of the quarterly period in which the Contemplated Transactions have occurred.

(d)     To the maximum extent permitted by applicable Law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities, including documents relating to the operations of the Business or ownership of any of the Purchased Assets prior to the Effective Time, then to the extent allowable by applicable Law, prior to any disclosure of such documents, Buyer shall notify Sellers and provide Sellers with the opportunity to object to, such request or demand.

(e)     To the extent practicable under the circumstances, neither Sellers nor Buyer, as applicable, will agree to participate in any substantive call, meeting or conference with any Governmental Authority, or any member of the staff of any Governmental Authority, in respect of any filing, Proceeding, investigation (including any settlement of the investigation), litigation, or other inquiry related to the Contemplated Transactions, provided that such responding Party (1) provides reasonable advance notice of such meeting to any other Party and (2) provides any such other Party an opportunity to attend or participate and, where permitted, allow any other Party to participate.

**5.6     Transition Patients**. To compensate Sellers for services rendered and medicine, drugs and supplies provided by the Hospitals up to the Transition Time with respect to patients who are admitted to the Hospitals prior to the Transition Time and whose care is reimbursed by any Government Program or

Private Program but who are not discharged until after the Transition Time (such patients being referred to herein as the "**Transition Patients**" and services rendered to them being referred to herein as the "**Transition Patient Services**"), the Parties shall take the following actions:

(a)      For Transition Patients for whom a cut-off billing for the period prior to the Effective Time ("**Interim Billing**") is not accepted by the applicable Government Program or Private Program (the "**Non-Interim Billing Transition Patients**"), as soon as practicable after the date hereof, Sellers shall deliver to Buyer a statement specifying the Non-Interim Billing Transition Patients and the expected reimbursement for each such Non-Interim Billing Transition Patient.  Such statement shall also identify which Non-Interim Billing Transition Patients (i) are receiving medical care that is paid for, in whole or in part, by a Government Program or Private Program that pays on a diagnostic related group ("**DRG**"), case rate, or other similar basis and for whom the applicable Facility is paid on a per-claim basis (the "**DRG Transition Patients**") and/or (ii) are receiving medical care that is paid for on a non-DRG basis ("**Non-DRG Transition Patients**").  Buyer shall be responsible for submitting such billings to the applicable Government Program or Private Program for the entire portion of each of the Non-Interim Billing Transition Patients' respective stays.

(b)      For Transition Patient Services provided to a DRG Transition Patient, upon receipt of payment, Sellers shall be entitled to an amount equal to (i) the total DRG payment received by Buyer and Sellers (including disproportionate share, uncompensated care, low volume adjustment, indirect medical education, outlier, and capital payments and any deposits, deductibles, copayments paid, whether received by Buyer or Sellers), multiplied by a fraction, the numerator of which shall be the number of days prior to the Transition Time that the DRG Transition Patient was an inpatient at the applicable Hospital and the denominator of which shall be the total number of days that such DRG Transition Patient was an inpatient at such Hospital minus (ii) any deposits, deductibles or co-payments paid by or on behalf of the applicable DRG Transition Patient to Sellers or any of Sellers' Affiliates prior to the Transition Time. Buyer will make such payments to Sellers within ten (10) Business Days after receipt of such payment.

(c)      For Transition Patient Services provided to a Non-DRG Transition Patient, Sellers shall be entitled to an amount equal to (i) the total payments received by Buyer and Sellers for such Non-DRG Transition Patient (including any deposits, deductibles, or copayments, whether received by Buyer or Sellers), multiplied by a fraction, the numerator of which shall be the total number of days prior to the Transition Time on which the applicable Hospital provided Transition Patient Services to such Non-DRG Transition Patient and the denominator of which shall be the total number of days with respect to such Non-DRG Transition Patient's stay at the applicable Hospital minus (ii) any deposits, deductibles or co-payments paid by or on behalf of the applicable Non-DRG Transition Patient to Sellers or any of Sellers' Affiliates prior to the Transition Time. Buyer will make such payments to Sellers within ten (10) Business Days after receipt of such payment.

(d)      In addition to the other payments contemplated by this Section 5.6 (or elsewhere in this Agreement), (i) if Sellers or the Sellers' Affiliates receives any amount from patients, Government Programs or Private Programs which relates to services rendered by the Facilities after the Transition Time, Sellers or Sellers' Affiliate will remit such amount to Buyer within ten (10) Business Days after receiving such amount; and (ii) if Buyer receives any amount from patients, Government Programs or Private Programs which relates to services rendered by the Facilities prior to the Transition Time, Buyer will remit such amount to Sellers within ten (10) Business Days of receiving such amount.

(e)      Notwithstanding anything to the contrary in this Agreement, neither Buyer nor Sellers shall be entitled to withhold any of the respective payments due and owing under this Section 5.6 by means of setoff against any amount owed by any other Party.

**5.7    Cost Reports; Periodic Interim Payments; Disproportionate Share Hospital Surveys and Information.**

(a)      Sellers, at their own cost and expense, will timely prepare and file all Cost Reports relating to the Facilities and the Business for periods ending prior to the Effective Time or required as a result of the consummation of the Contemplated Transactions (collectively, the "**Seller Cost Reports**"). Buyer shall make available, in a timely and reasonable manner, to Sellers any information and records that are in Buyer's possession and that are reasonably necessary, as determined by Sellers in its reasonable discretion, for Sellers to prepare the Seller Cost Reports.  Buyer shall forward to Sellers any and all correspondence relating to the Seller Cost Reports within ten (10) Business Days after receipt by Buyer. Buyer shall remit to Sellers any Cost Report Settlements promptly (but no later than ten (10) Business Days) after receipt by Buyer, and shall forward to Sellers any demand for payments relating to the Seller Cost Reports within ten (10) Business Days after receipt by Buyer.  Sellers shall retain the right to appeal any Medicare determinations relating to Cost Report Settlements.  To the extent that Sellers require the assistance of Buyer to effectuate its rights hereunder, including but not limited to with respect to any ongoing appeals or litigation in connection with any Excluded Assets involving Government Programs (including those described in subsection (n) of Schedule C) that require involvement of Buyer, Buyer will cooperate therewith as reasonably requested by Sellers.  Sellers shall retain the originals of the Seller Cost Reports, correspondence, work papers, and other documents relating to the Seller Cost Reports and the Cost Report Settlements.  Sellers shall use commercially reasonable efforts to timely and accurately respond to all audit and other supplemental information requests related to the Seller Cost Reports.

(b)      Upon Buyer's written request, Sellers shall terminate the Hospitals' participation in any periodic interim payment program with Medicare effective as of the date hereof. If Buyer receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating solely to periods prior to the Transition Time, Buyer shall pay Sellers an amount equal to such Medicare Interim Payment(s) received by Buyer within ten (10) Business Days after receipt.  If Buyer receives any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating to the period commencing prior to and ending after the Transition Time, Buyer shall pay Sellers within ten (10) Business Days after receipt an amount equal to the Medicare Interim Payment(s) actually received by Buyer for such period multiplied by a fraction, the numerator of which shall be the total number of days prior to the Transition Time and the denominator of which shall be the total number of days attributable to such Medicare Interim Payment(s).  If Sellers receive any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating solely to periods on or after the Transition Time, Sellers shall pay Buyer within ten (10) Business Days after receipt of an amount equal to such Medicare Interim Payment(s) received by Sellers.  If Sellers receive any Medicare Interim Payments from the Medicare program associated with the operations of the Hospitals relating to the periods commencing prior to and ending after the Transition Time, Sellers shall pay Buyer within ten (10) Business Days after receipt an amount equal to the Medicare Interim Payment(s) actually received by Sellers for such period multiplied by a fraction, the numerator of which shall be the total number of days after the Transition Time and the denominator of which shall be the total number of days attributable to such Medicare Interim Payment(s).  It is the intent of the Parties that Buyer and Sellers shall receive all third-party payments applicable to the period of time that the Hospitals are owned by the respective Parties.

(c)      If Sellers receive any amount from patients, third-party payors, group purchasing organizations or suppliers which, under the terms of this Agreement, belongs to Buyer, Sellers shall remit within five (5) Business Days the full amount so received to Buyer.  If Buyer receives any amount from patients, third-party payors, group purchasing organizations or suppliers which, under the terms of this Agreement, belongs to Sellers, Buyer shall remit within five (5) Business Days the full amount so received to Sellers.

(d)      Subject to applicable Laws, Sellers will reasonably cooperate with Buyer in providing pre-Effective Time patient data and any documents Buyer reasonably believes are necessary or appropriate for Buyer to file with respect to Medicaid disproportionate share hospital surveys, to the extent applicable in the jurisdiction of the Business for the fiscal periods prior to and after the Effective Time.

(e)      Notwithstanding anything to the contrary in this Agreement, neither Buyer nor Sellers shall be entitled to recover any of the respective payments due and owing under this <u>Section 5.7</u> by means of setoff against any amount owed by any other Party.

(f)      After the Effective Time, as reasonably requested by Sellers, Buyer will cooperate with Sellers in connection with Sellers' collection of the accounts receivable that are among the Excluded Assets.

**5.8      CMS Reporting.**

(a)      Buyer will cooperate with Sellers in all reasonable respects in providing, in a timely and reasonable manner, documents or data that Sellers reasonably believe are necessary or appropriate for a Sellers to file with respect to CMS Reporting for all CMS Program Performance Periods ending prior to the Effective Time. Buyer shall forward to Sellers any and all correspondence from CMS relating to applicable CMS Reporting for such CMS Program Performance Periods within ten (10) Business Days after receipt by Buyer.

(b)      Prior to the end of the Post-Closing Period, Sellers shall (i) cooperate with Buyer in all reasonable respects in providing, in a timely and reasonable manner, pre-Effective Time documents or data that Buyer reasonably believes are necessary or appropriate for Buyer to file with respect to CMS Reporting for CMS Program Performance Periods in which the Effective Time occurs, and (ii) Sellers shall forward to Buyer any and all correspondence from CMS relating to CMS Reporting for such CMS Program Performance Periods within ten (10) Business Days after receipt by Sellers.

(c)      With respect to non-claims-based payments arising under CMS Program Payments for the CMS Program Performance Period in which the Transition Time occurs, the Parties shall share any CMS Program Payments for such CMS Program Performance Period on a pro rata basis (based upon, with respect to Buyer, the number of days during such CMS Program Performance Period that immediately follow the Transition Time divided by the total number of days in such CMS Program Performance Period, and with respect to Sellers, the number of days during such CMS Program Performance Period that immediately precede the Transition Time divided by the total number of days in such CMS Program Performance Period).  If Buyer receives any such CMS Program Payments, Buyer shall remit to Sellers, Sellers' pro rata share of such CMS Program Payments within five (5) Business Days after receipt by Buyer. If Sellers receive any such CMS Program Payments, Sellers shall remit Buyer's pro rata share of such CMS Program Payments to Buyer within five (5) Business Days after receipt by Sellers.  To the extent Buyer or one of its Affiliates is required to refund or repay any portion of any CMS Program Payments, Sellers will pay to Buyer an amount equal to Sellers' pro rata portion of the required refund or repayment within five (5) Business Days after notice to Sellers of such amount due.

(d)      Notwithstanding anything to the contrary in this Agreement neither Buyer nor Sellers shall be entitled to recover any of the respective payments due and owing under this <u>Section 5.8</u> by means of setoff against any amount owed by any other Party.

**5.9      Waiver Program Payments**.  Buyer and Sellers shall prorate any payments received by the Facilities after the Transition Time under Medicaid waiver or Medicaid supplemental payment programs as follows:

(a)      Any such amounts that correspond to Federal Fiscal Years or state fiscal years, as applicable, ending prior to the Transition Time will be paid to Sellers;

(b)      Any such amounts that correspond to Federal Fiscal Years or state fiscal years, as applicable, beginning on or after the Transition Time will be paid to Buyer; and

(c)      Any such amounts that correspond to the Federal Fiscal Year or state fiscal year, as applicable, during which the Transition Time occurs will be allocated between Buyer and Sellers on a pro rata basis (based upon the number of days during such year that Sellers operate the Facilities and the number of days during such year that Buyer operates the Facilities).

**5.10      License to Use Billing Information**.  Until the end of the Post-Closing Period, to the extent allowed by applicable Law, Sellers grant Buyer and its Affiliates a license to use Sellers' billing identification information (which information shall include such Seller's name, Medicare and related Medicaid and TRICARE provider numbers, federal employer identification number, and such other information as may be reasonably necessary) ("**Seller's Billing Information**") for purposes of submitting claims to Medicare, Medicaid and TRICARE for services provided at the Facilities by Buyer or any of its Affiliates after the Effective Time.  To the extent allowed by applicable Law, each such license shall be effective (a) for purposes of Medicare, until CMS and the applicable CMS Medicare administrative contractor approve Buyer's or its Affiliate's Medicare change of ownership application and issue a tie-in notice and approval letter acknowledging that Buyer (or its Affiliate) may be reimbursed for claims submitted using Buyer's (or such Affiliate's) billing identification information; and (b) for purposes of Medicaid and any other Government Programs, until the applicable Medicaid program(s) or program agent(s) approves Buyer's (or its Affiliate's) provider enrollment application and/or approves assignment of the applicable provider Contract and issues the appropriate notice acknowledging that Buyer (or its Affiliate) may be reimbursed by the applicable Medicaid or other Government Program for claims submitted using Buyer's (or its Affiliate's) identification information.  So long as such license remains in effect, each Seller (or its Affiliates) shall not act to: (i) terminate any of their billing identification information applicable to the Business except as required by applicable Law; (ii) close any accounts used by such Seller prior to the Effective Time for purposes of receiving reimbursement; or (iii) cancel any electronic funds transfer agreements with respect to Medicare, Medicaid, TRICARE or any other Government Program applicable to the Business.  All accounts receivable and monies collected in the name of Buyer and/or its Affiliates or the Facilities for services provided by Buyer (and/or its Affiliates) after the Effective Time shall belong to Buyer (and/or its Affiliates). Buyer shall, and shall cause each of its Affiliates to, indemnify, defend and hold harmless each Seller and such Sellers' Affiliates against, and reimburse Sellers and Sellers' Affiliates for, all Liabilities incurred by Sellers and any Sellers' Affiliate in connection with Sellers' obligations under this Section 5.10.

**5.11      Medical Staff.**  To ensure continuity of care in the community, Buyer agrees that the operations of each Hospital's medical staff will be substantially unchanged as a result of the consummation of the Contemplated Transactions, including each Hospital's medical staff members in good standing as of the Effective Time will maintain, to the extent consistent with criteria adopted at other Buyer or Buyer Affiliate facilities, medical staff privileges without change in medical staff status (e.g., active, courtesy) at each respective Hospital as of the Effective Time and each Hospital's medical staff officers in place immediately prior to the Effective Time will remain, to the extent consistent with criteria adopted at other Buyer or Buyer Affiliate facilities, in their same positions as of the Effective Time, provided that Buyer shall not be obligated to continue to maintain any Physicians and other Practitioners whose medical staff membership and/or clinical privileges have been terminated or not renewed by a Buyer or Buyer Affiliate facility.  As of and after the Effective Time, each Hospital's medical staff will be subject to each Hospital's medical staff by-laws then in effect to the extent consistent with applicable Law.

    **5.12**    **Cooperation on Compliance Matters**.  Until the end of the Post-Closing Period, if any compliance matter is identified by a Party, whether through internal audit or otherwise, for which another Party hereto may bear responsibility or exposure (a "**Compliance Matter**"), then such Party shall provide prompt written notice to such other Party.  Because any such Compliance Matter may impact Buyer and Sellers, the Parties acknowledge that both Buyer and Sellers shall have a common interest in fully resolving all such Compliance Matters and cooperating in good faith to do so.  To the extent necessary to preserve attorney client privilege and work product doctrine relating to the investigation or resolution of any Compliance Matter, the Parties agree that a common interest privilege shall exist with respect to any communications relating to the investigation and resolution of the Compliance Matter and, to the extent necessary and requested by any Party or its counsel, the Parties and their respective counsel shall enter into a written agreement to memorialize this common interest privilege existing among them relating to the Compliance Matter.  The Parties will thereafter cooperate reasonably with each other in any internal investigations or audits and shall make available to the other, as reasonably requested, any and all relevant information and, further, shall provide personnel as may be reasonably necessary and appropriate for purposes of analyzing and resolving such Compliance Matter.  In order to ensure the accuracy of any report of any Compliance Matter to a third party, the Parties agree that neither shall make any such report or disclosure to, or in respect of, any federally-funded or state-funded health care program, including Medicare, Medicaid, and TRICARE, or private third party payor or any other Governmental Authority with regulatory oversight with respect to any Compliance Matter which might give rise to Liability of the other Party without at least thirty (30) days' prior written notice to, and participation and approval of the report by, such other Party.  All Parties agree to cooperate fully and in good faith as necessary in the resolution of all Compliance Matters, and Buyer and Sellers shall each bear their own expenses in connection therewith.

    **5.13**    **Post-Closing Receipt of Assets or Excluded Assets.**

        (a)    In addition to any misdirected payments referenced in Section 5.7, Section 5.8 or Section 5.9 to which Sellers are entitled, any asset or any Liability, all other remittances and all mail and other communications that is an Excluded Asset or an Excluded Liability (i) pursuant to the terms of this Agreement or (ii) absent such agreement, as finally determined by the Bankruptcy Court pursuant to Section 8.2 , and which comes into the possession, custody or control of Buyer (or its respective successors-in-interest, assigns or Affiliates) shall within five (5) Business Days following receipt be transferred, assigned or conveyed by Buyer (and its respective successors-in-interest, assigns and Affiliates) to Sellers at Sellers' cost.  Until such transfer, assignment and conveyance, Buyer and its successors-in-interest, assigns and Affiliates, shall not have any right, title or interest in or obligation or responsibility with respect to such asset or Liability except that Buyer shall hold such asset in trust for the benefit of Sellers.  Buyer, and its successors-in-interest, assigns and Affiliates, shall have neither the right to offset amounts payable to Sellers under this Section 5.13(a) against, nor the right to contest its obligation to transfer, assign and convey to Sellers because of, outstanding claims, Liabilities or obligations asserted by Buyer against Sellers.

        (b)    In addition to any misdirected payments referenced in Section 5.7, Section 5.8 or Section 5.9 to which Buyer is entitled, any asset or any Liability, all other remittances and all mail and other communications that is an Purchased Asset or an Assumed Liability (i) pursuant to the terms of this Agreement or (ii) absent such agreement, as finally determined by the Bankruptcy Court pursuant to Section 8.2, and which comes into the possession, custody or control of Sellers (or their successors-in-interest, assigns or Affiliates) shall within five (5) Business Days following receipt be transferred, assigned or conveyed by Sellers (and their successors-in-interest, assigns and Affiliates) to Buyer at Buyer's cost.  Until such transfer, assignment and conveyance, Sellers and their successors-in-interest, assigns and Affiliates shall not have any right, title or interest in or obligation or responsibility with respect to such asset or Liability except that Sellers shall hold such asset in trust for the benefit of Buyer.  Sellers or any of Sellers' Affiliates and their respective successors-in-interest and assigns shall have neither the right to offset amounts payable to Buyer under this Section 5.13(b) against, nor the right to contest its obligation to

transfer, assign and convey to Buyer because of, outstanding claims, Liabilities or obligations asserted by Sellers against Buyer.

**5.14** **Closing Financials**.  Buyer shall cause the chief financial officer(s) of the Facilities to complete the standardized closing of Sellers' financial records for the Business through the date hereof including, without limitation, the closing of general ledger account reconciliations in form and substance consistent with past practice (collectively, the "**Closing Financials**").  Buyer shall cause the chief financial officer(s) of the Facilities to use his or her good faith efforts to complete the Closing Financials by no later than the date which is thirty-five (35) days after the date hereof.  Sellers shall reimburse Buyer for all reasonable, out-of-pocket and documented expenses of Buyer associated with the preparation of the Closing Financials.  Such reimbursement shall occur no later than the date which is thirty (30) days after Buyer provides a written statement to Sellers which details such charges and expenses.**SPECIFIC PERFORMANCE.**

(a)     The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each Party agrees that, in the event of any breach or threatened breach by any other Party of any covenant or obligation contained in this Agreement, the non-breaching Party shall be entitled (in addition to any other equitable remedy that may be available to it) to obtain, without proof of actual damages, (i) a decree or other Order of specific performance to enforce the observance and performance of such covenant or obligation, and (ii) an injunction restraining such breach or threatened breach.

(b)     Each Party acknowledges and agrees that (i) it will not oppose any equitable relief or equitable remedy referred to in this Section 6 on the grounds that any other remedy is available at law or in equity, and (ii) no Party will be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any equitable relief or equitable remedy referred to in this Section 6 (and it hereby irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument).

## 7.     TAX MATTERS.

**7.1**     **Allocation of Purchase Price**.  If the Settlement Orders (or other document approved by the Bankruptcy Court) or any agreement associated therewith includes any tax treatment or tax reporting provisions relevant to the Contemplated Transactions, the Parties shall (and shall cause their Affiliates to) file all Tax Returns and otherwise report consistent with, and not take any position inconsistent with, such provisions. Subject to the foregoing sentence, if the Parties agree upon an allocation of consideration among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any other relevant provisions of the Code or any similar provisions of state or local Law, as appropriate), the Parties shall (and shall cause their Affiliates to) file all Tax Returns (including IRS Form 8594) and otherwise report consistent with, and not take any position inconsistent with, such agreed allocation, provided that (a) for the avoidance of doubt, the Parties shall not be required to agree to any such allocation, and (b) neither Party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, investigation, examination, claim or similar proceedings in connection with such allocation.

**7.2**     **Cooperation**.  Following the Effective Time, each Party shall cooperate with the other Party in connection with the preparation of any Tax Returns, the defense of any audit, investigation, examination, claim or similar proceeding related to Taxes, or any other matters with respect to Taxes, shall make available to the other Party, as reasonably requested, all information, records or documents relating to Taxes with respect to the Purchased Assets or the Business for all periods, and shall preserve or cause to be preserved all such information, records and documents at least until the expiration of any applicable

statute of limitations or extensions thereof; provided that the obligations of any Seller or Seller Party under this <u>Section 7.2</u> will cease as of the date upon which such Seller or Seller Party ceases to exist under applicable law.

      **7.3**    **Transfer Taxes**.  All Transfer Taxes shall be paid by Buyer in accordance with <u>Section 8.7</u> when due, and all necessary Tax Returns and other documentation with respect to Transfer Taxes shall be prepared and filed by Buyer. If any Seller, Seller Party, or any of their Affiliates is required to pay any Transfer Tax, Buyer shall promptly reimburse such Seller, Seller Party or Affiliate thereof for such amount.

8.      **GENERAL.**

      **8.1**    **Notice**.  Any notice, demand or other communication required, permitted or desired to be given hereunder must be in writing and shall be deemed effectively given (a) when personally delivered, (b) one (1) Business Day after being sent by the addressee if sent by a nationally recognized overnight courier, (c) on the date transmitted via electronic mail with a delivery receipt requested, if sent on a Business Day between 9:00 AM and 9:00 PM in the time zone of the recipient, or if sent outside of such hours, on the next Business Day at 9:00 AM in the time zone of the recipient; *provided*, *however*, if notice is given via electronic mail, a physical copy of such notice must also be provided by prompt notice by United States mail or overnight courier, or (d) on the fifth (5th) day after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, in each case, addressed as follows:

| | |
|---|---|
| If to any Seller: | c/o Steward Health Care System LLC<br>1900 N Pearl St #2400<br>Dallas, Texas 75201<br>Attention:  Jeffrey Morales<br>Email: Jeffrey.Morales@steward.org |
| With simultaneous copy (which shall not constitute notice) to: | |
| | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attention: Ray C. Schrock, Candace M. Arthur, David J. Cohen, Mariel E. Cruz<br><br>Email: ray.schrock@weil.com; candace.arthur@weil.com; davidj.cohen@weil.com; mariel.cruz@weil.com |
| and | |
| | McDermott Will & Emery LLP<br>200 Clarendon Street, Floor 58<br>Boston, MA 02116<br>Attention: Charles Buck<br>Email: cbuck@mwe.com |
| If to Buyer: | 505 North Brand Blvd<br>Ste 1200<br>Glendale, CA 91203<br>Attn: Faisal Gill |

Email: fgill@amhealthsystems.com

or to such other address, and to the attention of such other Person or officer as any Party may designate.

**8.2    Choice of Law; Venue**.

(a)    The Parties agree that all disagreements, disputes or claims arising out of or relating to this Agreement or the Contemplated Transactions shall be governed by and construed in accordance with the applicable Laws of the State of Delaware without giving effect to any choice or conflicts of law provision or rule thereof that would result in the application of the applicable Laws of any other jurisdiction other than the applicable Laws of the United States of America, where applicable.

(b)    Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claim (as defined below) which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 8.1; provided, however, upon the closing of the Chapter 11 Cases, the Parties agree to unconditionally and hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware sitting in Wilmington, Delaware (or if such court declines to exercise such jurisdiction in any appropriate state or federal court in the State of Delaware sitting in Wilmington, Delaware) over any action, arbitration, charge, claim, complaint, demand, dispute, litigation or Proceeding arising from or relating to this Agreement (a "**Claim**"), and the Parties hereto hereby irrevocably agree that all Claims shall be heard and determined in such court. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. The Parties hereto agree that a final judgment with respect to any such Claim shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

**8.3    Benefit; Assignment; Delegation.**  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and permitted assigns and delegates. No Party may assign any of its rights hereunder or delegate any of its duties hereunder without the prior written consent of the other Parties; provided, however, that Buyer and Sellers, without the prior consent of the other Parties, may assign any of their respective rights hereunder or delegate any of its duties hereunder to such Party's Affiliates (as applicable), or, for collateral security purposes, to Persons providing financing to such Party or its Affiliates, but in such event, each such Party shall be required to remain obligated hereunder in the same manner as if such assignment or delegation had not been effected.

**8.4    Waiver of Jury Trial**. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

**8.5    Legal Advice and Reliance**. Except as expressly provided in this Agreement, none of the Parties (nor any of the Parties' respective Representatives) has made or is making any representations to any other Party (or to any other Party's Representatives) concerning the consequences of the Contemplated Transactions under applicable Laws, including Tax-related Laws or under the Laws governing the Government Programs. Except for the representations and warranties made in this Agreement, each Party

has relied solely upon the Tax, Government Program and other advice of its own Representatives engaged by such Party and not on any such advice provided by any other Party.

      **8.6**    **No Survival**.  Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Effective Time (which covenants shall survive the Effective Time in accordance with their terms), none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Effective Time.

      **8.7**    **Cost of Transaction; Legal Fees and Cost of Disputes**.  Except as otherwise provided herein, the Parties agree that, whether or not the Contemplated Transactions shall be consummated: (a) Sellers will pay the fees, expenses and disbursements of Sellers and its respective Representatives incurred in connection with the subject matter hereof and any amendments hereto, and (b) Buyer will pay (i) the fees, expenses and disbursements of Buyer and its Representatives incurred in connection with the subject matter hereof and any amendments hereto; (ii) the fees incurred in connection with the HSR filing; and (iii) all Transfer Taxes.

      **8.8**    **Severability**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of Buyer or Sellers under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

      **8.9**    **No Inferences; Sophisticated Parties**.  Each Party acknowledges and agrees to the following: (a) all of the Parties are sophisticated and represented by experienced healthcare and transactional counsel in the negotiation and preparation of this Agreement; (b) this Agreement is the result of lengthy and extensive negotiations between the Parties and an equal amount of drafting by all Parties; (c) this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; and (d) no inference in favor of, or against, any Party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such Party.

      **8.10**    **Divisions and Headings of this Agreement**.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

      **8.11**    **No Third-Party Beneficiaries**.  The terms and provisions of this Agreement are intended solely for the benefit of Buyer, Sellers and the Seller Parties, and such parties' respective permitted successors, assigns, or delegates, and it is not the intention of the Parties to confer, and, this Agreement shall not confer, third-party beneficiary rights upon any other Person, including any employee or member of the medical staff of any Hospital.

      **8.12**    **Entire Agreement; Amendment**.  This Agreement (inclusive of Schedules), together with the other Transaction Documents, the Interim Management Agreement, and the Confidentiality Agreement and any other agreement which specifically references this <u>Section 8.12</u>, represent the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior or contemporaneous oral or written understandings, negotiations, letters of intent or agreements between the Parties.  This <u>Section 8.12</u> shall be deemed a "merger" clause under Delaware Law, and this Agreement

(together with the other Transaction Documents and the Confidentiality Agreement) is intended as a complete integration of the agreement of the Parties. No modifications of, amendments to, or waivers of any rights or duties under this Agreement shall be valid or enforceable unless and until made in writing and signed by all Parties.

**8.13    Multiple Counterparts**. This Agreement may be executed in any number of counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. The facsimile signature of any Party or other Person to this Agreement or any other Transaction Document or a PDF copy of the signature of any Party or other Person to this Agreement or any other Transaction Document delivered by electronic mail for purposes of execution or otherwise, is to be considered to have the same binding effect as the delivery of an original signature on an original contract.

**8.14    Non-Recourse** All claims, obligations, Liabilities, actions or causes of action (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their successors and assigns ("Contracting Parties"). No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other representative of, and any lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other representative of, and any lender to, any of the foregoing ("Nonparty Affiliates"), shall have any Liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or other Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, causes of action, obligations and other Liabilities against any such Nonparty Affiliates. It is expressly agreed that the Nonparty Affiliates to whom this <u>Section 8.14</u> applies shall be third-party beneficiaries of this <u>Section 8.14</u>.

**8.15    Interpretation**

In this Agreement, unless the context otherwise requires:

(a)    references to this Agreement are references to this Agreement and to Schedules attached or delivered with respect hereto or expressly incorporated herein by reference; each Schedule is hereby incorporated by reference into this Agreement and will be considered a part hereof as if set forth herein in full;

(b)    references to "Sections" are references to sections of this Agreement;

(c)    references to any Party shall include references to its respective successors and permitted assigns;

(d)    the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement;

(e)     references to any agreement (including this Agreement) are references to that agreement as amended, consolidated, supplemented, novated or replaced in accordance with the terms and conditions therein from time to time;

(f)     unless the context requires otherwise, references to any Law are references to that Law as of the date of this Agreement, and shall also refer to all rules and regulations promulgated thereunder;

(g)     the word "including" (and all derivations thereof) means "including, without limitation," and any lists or examples following the word "including" or the phrase "including, without limitation," are intended to be nonexclusive examples solely for the purpose of illustration and without the intention of limiting the text preceding such lists or examples;

(h)     references to time are references to Central Standard Time or Central Daylight Time (as in effect on the applicable day);

(i)     the gender of all words herein include the masculine, feminine and neuter, and the number of all words herein include the singular and plural;

(j)     the provisions of this Agreement shall be interpreted in such a manner so as not to inequitably benefit or burden any Party through "double counting" of assets or Liabilities or failing to recognize benefits that may result from any matters that impose Liabilities or burdens on any Party;

(k)     the terms "date hereof," "date of this Agreement," and similar terms shall mean the date set forth in the preamble to this Agreement; and

(l)     references to "day" shall mean calendar day, unless otherwise specified herein.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

**SELLERS:**

**STEWARD CGH, INC.**

By: _____
Name:
Title:

**STEWARD HH, INC.**

By: _____
Name:
Title:

**STEWARD NSMC, INC.**

By: _____
Name:
Title:

**STEWARD PGH, INC.**

By: _____
Name:
Title:

**SELLER PARTIES:**                    **STEWARD MEDICAL GROUP, INC.**

By: _____
Name: _____
Title: _____

*Signature Page to Asset Purchase Agreement*

**BUYER:**

**HEALTHCARE SYSTEMS OF AMERICA-FLORIDA LLC**

By: _____
Name:
Title:

## ANNEX A – DEFINITIONS

"**Affiliate**" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and any successors or assigns of such Person, *provided,* that, with respect to any Seller or any Seller Party, for all purposes herein, "Affiliate" shall mean Steward Health Care System LLC and each of its direct and indirect Subsidiaries.  For purposes of this definition, "control" means possession, directly or indirectly, of the power to direct, or cause the direction of, the management and policies of a Person whether through ownership of voting securities, by Contract or otherwise.

"**Agreement**" is defined in the preamble to this Agreement.

"**Approval**" means any approval, action, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Authority, Private Program or other Person, in each case, in connection with the operation of the Business or the consummation of the Contemplated Transactions, as applicable.

"**Assumed Liabilities**" is defined in Section 1.3.

"**Assumed Paid Time Off**" is defined in Section 5.4(h).

"**Avoidance Action**" means any claim, right or cause of action of any Seller or Seller Parties for avoidance, recovery, subordination or other relief arising under Chapter 5 of the Bankruptcy Code or applicable state fraudulent conveyance, fraudulent transfer or similar Laws.

"**Bankruptcy Code**" is defined in the Recitals.

"**Bankruptcy Court**" is defined in the Recitals.

"**Books and Records**" means originals, or where not available, copies (including in electronic format), of books and records maintained in connection with the Business or the Purchased Assets, including books and records relating to books of account, ledgers and general financial accounting records, personnel records, machinery and equipment maintenance files, patient and customer lists, price lists, distribution lists, supplier lists, quality control records and procedures, customer and patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, marketing plans, internal financial statements and marketing and promotional surveys, pricing and cost information, material and research, in each case, to the extent such books and records are located at the Facilities or are exclusively used or held for use in, or otherwise exclusively relate to, the Business.

"**Business**" means the operation of the Facilities by Sellers and all services provided by, or pursuant to Contracts with, Sellers at the Facilities, in each case as currently conducted by Sellers.

"**Business Day**" means any day except Saturday, Sunday and any day which is a legal holiday in New York, New York.

"**Buyer**" is defined in the preamble to this Agreement.

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act, P.L. 116–136, and the rules and regulations promulgated thereunder.

"**Chapter 11 Cases**" is defined in the Recitals.

"**Claim**" is defined in Section 8.2(b).

"**Closing Financials**" is defined in Section 5.14.

"**CMS**" means the Centers for Medicare & Medicaid Services.

"**CMS Program Payments**" means payments or discounts that are not based directly on the submission of claims for services delivered and are received through participation in a Government Program implemented by CMS through a Contract with CMS or as a participant through a Contract with a CMS contractor, including Medicare accountable care organizations, episode-based payment initiatives and other Medicare innovation models as implemented by CMS as authorized pursuant to Laws identified in CMS Reporting.

"**CMS Program Performance Period**" means the period of time applicable to a CMS Program Payment or CMS Reporting requirement.

"**CMS Reporting**" means any quality, performance reporting through use of certified electronic health record technology and other electronic reporting requirements, applicable to the Business and in all cases implemented by CMS pursuant, but not limited, to the Social Security Act, the Patient Protection and Affordable Care Act of 2010 (or any replacement or successor Law), the Health Care and Education Reconciliation Act of 2010, the Pathway for Sustainable Growth Reform (SGR) Act of 2013, the Protecting Access to Medicare Act of 2014, the Improving Medicare Post-Acute Care Transformation Act of 2014 (IMPACT), American Taxpayer Relief Act of 2012 (ATRA), Balanced Budget Act of 1997 (BBA), the Medicare, Medicaid and SCHIP (State Children's Health Insurance Program) Balanced Budget Refinement Act of 1999 (BBRA), the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), the 21st Century Cures Act, HIPAA, the Medicare Access & CHIP Reauthorization Act of 2015 (MACRA) (Pub L. 114-10, enacted April 16, 2015), amending Title XVIII of the Social Security Act and/or the Bipartisan Balanced Budget Act of 2018, each of which may be amended from time to time by a Balanced Budget Act of the United States Congress, and each as applicable at such time as healthcare services are rendered.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Collective Bargaining Agreement**" means each collective bargaining agreement governing the terms and conditions of employment of the Seller Employees represented by a union or other labor organization.

"**Compliance Matter**" is defined in Section 5.12.

"**Confidentiality Agreement**" means that certain Non-Disclosure Agreement, dated February 6, 2024, by and between American Healthcare Systems Corp. and Steward.

"**Contemplated Transactions**" means, collectively, the transactions contemplated by this Agreement, including (a) the assignment of the Purchased Assets and assumption of the Assumed Liabilities and (b) the execution, delivery and performance of this Agreement and the other Transaction Documents.

"**Contract**" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense, guaranty, indenture, occupancy or other agreement or arrangement of any kind (and all amendments, side letters, modifications and supplements thereto).

"**Copyrights**" means all copyrights and rights in any other original works of authorship fixed in any tangible medium of expression, whether published or unpublished; rights to compilations, collective works and derivative works of any of the foregoing; and registrations and applications for registration for any of the foregoing and any renewals or extensions thereof.

"**Cost Report**" means any cost report (including all forms, worksheets, schedules and other attachments related thereto) required to be filed in respect of the Business or the Facilities pursuant to a Government Program or any Private Cost-Based Programs.

"**Cost Report Settlements**" is defined in Schedule C.

"**COVID-19**" means the novel coronavirus disease, COVID-19 virus (SARS-COV-2 and all related strains and sequences) or mutations (or antigenic shifts or drifts) thereof or a disease or public health emergency resulting therefrom.

"**COVID-19 Funds**" means all grants, payments, distributions, loans, funds or other relief applied for or provided prior to the Effective Time under the CARES Act, the Paycheck Protection Program Act, or any other program authorized by any Governmental Authority or Government Program in response to COVID-19, including the Paycheck Protection Program, Main Street Loan Program, Provider Relief Fund, Small Rural Hospital Improvement Program, Assistant Secretary for Preparedness and Response or Hospital Preparedness Program Grants, or any other Law or program enacted, adopted or authorized in response to COVID-19; provided, that COVID-19 Funds does not include any Medicare Accelerated and Advance Payments.

"**Credentialing and Medical Staff Records**" means, to the extent any Seller lawfully owns or has control of such records and information and such records and information are not subject to a peer-review or similar privilege or are otherwise non-disclosable by applicable Law, all credentialing records with respect to any Practitioner, all minutes of the meetings of the medical staffs of each Facility and any committees thereof, and all other records directly related to the administrative operations of each Facility's medical staff for the period prior to the Effective Time.

"**Cure Costs**" means any and all amounts, costs or expenses that must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by any Seller or, if applicable, Seller Party, and the assignment to Buyer, of the Transferred Executory Contracts to which any Seller or, if applicable, Seller Party is a party, as determined by the Bankruptcy Court or agreed to by any Seller, if applicable, Seller Party and the non-Seller counterparty to the applicable Transferred Executory Contract or Lease, as applicable.

"**Designation Deadline**" is defined in Section 1.5(b).

"**DIP Financing**" means (i) debtor-in-possession facility under that certain Debtor-in-Possession Credit Agreement, dated May 28, 2024 (as amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time), by and among Steward, the other Loan Parties (as defined therein) party thereto and MPT; and (ii) debtor-in-possession facility under that certain Debtor-in-Possession Credit Agreement, dated July 10, 2024 (as amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time), by and among Steward, the other Loan

Parties (as defined therein) party thereto, the Lenders (as defined therein) party thereto and Brigade Agency Services LLC, as administrative agent and collateral agent.

"**Domain Names**" means Internet electronic addresses and uniform resource locators registered with or assigned by any domain name registrar, domain name registry or other domain name registration authority as part of an electronic address on the internet, rights in social media accounts and social media pages, and all applications for any of the foregoing.

"**DRG**" is defined in <u>Section 5.6(a)</u>.

"**DRG Transition Patients**" is defined in <u>Section 5.6</u>.

"**Effective Time**" is defined in <u>Section 2.1</u>.

"**Encumbrance**" means any easement, servitude, assessment, encumbrance, encroachment, defect in title, security interest, bailment (in the nature of a pledge or for purposes of security), mortgage, deed of trust, the grant of a power to confess judgment, conditional sales and title retention, lease, sublease, option, right of first refusal or first offer, lien, hypothecation, pledge, restriction or other similar arrangement or interest in real or personal property, whether imposed by Contract, Law, equity or otherwise.

"**Excluded Assets**" is defined in <u>Section 1.2</u>.

"**Excluded Liabilities**" is defined in <u>Section 1.4</u>.

"**Executory Contract**" means any executory Contract or Lease to which any Seller or any Seller Party is a party or a beneficiary that exclusively relates to the operation of the Business or the Facilities.

"**Facility**" or collectively, "**Facilities**" means the Hospitals and Sellers' other healthcare facilities, operations, and businesses associated with or used in the operation of the Hospitals as set forth on <u>Schedule F</u> under the header "Other Facilities".

"**False Claims Act**" means the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended.

"**Federal Fiscal Year**" means the fiscal year of the federal government of the United States.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect (a) with respect to financial information for periods on or after the date hereof, as of the date of this Agreement, and (b) with respect to financial information for periods prior to the date hereof, as of such applicable time.

"**Government Programs**" means the Medicare (including Medicare Part D and Medicare Advantage), Medicaid, Medicaid-waiver and CHAMPUS/TRICARE programs, any other similar or successor federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) and any similar state or local health care programs, in each case in which any Facility participates as of the date of this Agreement.

"**Governmental Authority**" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal, special district or other instrumentality of any government, whether federal, state or local, domestic or foreign, and any healthcare self-regulatory organization.

"**Group Tax Return**" means any consolidated, combined, unitary, or similar Tax Returns for any affiliated or other Tax group of which any Seller (or any Seller Party) is or has been a member or of which any direct or indirect owner of any Seller (or any Seller Party) is the common parent.

"**HIPAA**" means collectively: (a) the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191), including but not limited to its implementing rules and regulations with respect to privacy, security of health information, and transactions and code sets; (b) the HITECH Act (Title XIII of the American Recovery and Reinvestment Act of 2009); (c) the Omnibus Rule effective March 26, 2013 (78 Fed. Reg. 5566), and other implementing rules regulations at 45 CFR Parts 160 and 164 and related binding guidance from the United States Department of Health and Human Services and (d) any federal, state and local laws governing the privacy and/or security of individually identifiable information, in each case, as the same may be amended, modified or supplemented from time to time.

"**HITECH Act**" means the Health Information Technology for Economic and Clinical Health Act, Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Pub. Law No. 111-5 and its implementing regulations, including 42 C.F.R. §§ 412, 413, 422 and 495, as amended by the HIPAA Omnibus Rule, issued on January 25, 2013, effective as of March 26, 2013.

"**Hospitals**" means the hospitals set forth on Schedule F hereto under the header "Hospitals".

"**Information Technology Systems**" means all information technology systems and services related thereto, Software, computers, workstations, databases, routers, hubs, switches, networks and other information technology equipment exclusively used or held for use in the Business.

"**Intellectual Property**" means any and all intellectual property rights in, arising out of, or associated therewith, throughout the world: Copyrights, Domain Names, Patents, Trademarks and Trade Secrets and any other related proprietary rights now known or hereafter recognized in any jurisdiction worldwide, and the right to sue and recover damages or other remedies for past, present and future infringement, misappropriation, dilution, or other violation thereof.

"**Interim Billing**" is defined in Section 5.6(a).

"**Inventory**" means all usable inventory and supplies exclusively used or held for use in the Business.

"**IRS**" means the Internal Revenue Service.

"**Joint Commission**" means the hospital accreditor known as The Joint Commission.

"**Knowledge of Buyer**" means the actual knowledge of Jonathan Burket or Michael Sarian.

"**Knowledge of Sellers**" means the actual knowledge of Mark Rich or Jeffrey Morales.

"**Law**" means any constitutional provision, statute, law, rule, regulation, code, ordinance, accreditation standard, resolution, Order, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority (and for the avoidance of doubt, includes the Bankruptcy Code).

"**Leased Real Property**" means all real property leased, subleased or licensed to, or for which a right to use, possess or occupy has been granted to, any Seller or any Seller Affiliate in connection with the

Business together with all rights, easements and privileges appertaining or relating to such interest in real property, and all improvements located on such real property.

"**Liability**" means any liability, obligation, deficiency, interest, penalty, fine, claim, demand, judgment, cause of action or other losses (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute, fixed, or contingent, accrued or unaccrued, liquidated or unliquidated, recorded or unrecorded, due or to become due or otherwise, and regardless of when asserted.

"**Material Adverse Effect**" means any change, fact, circumstance, occurrence, event, effect or condition that, individually or in the aggregate with all other changes, facts, circumstances, occurrences, events, effects or conditions, directly or indirectly, results in, or would reasonably be expected to result in, a material adverse effect on (a) the ability of Sellers to consummate the Contemplated Transactions or (b) the business, condition (financial or otherwise), results of operations, assets or Liabilities of the Business, taken as a whole, except this clause (b) shall exclude any change, fact, circumstance, occurrence, event, effect or condition resulting from (i) changes in general local, domestic, foreign, or international economic, financial, business or political conditions, (ii) changes generally affecting the healthcare industry or markets in which Sellers operate, (iii) losses from operations of the Business that are materially consistent with the historical and projected run rate of the Business, or seasonal fluctuations in the Business consistent with prior fiscal years, (iv) any national or international political event or occurrence, including acts of war, sabotage or terrorism, military actions or the escalation thereof, (v) any changes in applicable Laws or accounting rules or principles, including changes in GAAP, or the interpretation or implementation of any of the foregoing, (vi) any action required by this Agreement, (vii) changes or proposed changes to any reimbursement rates or policies of Governmental Authorities that are generally applicable to hospitals or healthcare facilities, (viii) any natural disaster, calamity, pandemic or epidemic (including the COVID-19 pandemic, including the continuation or worsening of the COVID-19 pandemic and any variation or mutation thereof); (ix) any failure, in and of itself, by the Business to meet any internal projections or forecasts (as distinguished from any change, development, or occurrence giving rise or contributing to such failure); (x) any breach of Buyer's obligations under this Agreement; (xi) the availability or cost of equity, debt or other financing to Buyer, (xii) the entry into this Agreement or the announcement, pendency or consummation of the Contemplated Transactions or (xiii) any change resulting from the filing or pendency of the Chapter 11 Cases, actions taken in connection with the Chapter 11 Cases, or any reasonably anticipated effects of such filing, pendency or actions, or from any action approved by the Bankruptcy Court, provided that, in each case of clauses (i), (ii), (iii), (iv), (v), (vii) or (viii), such change, fact, circumstance, occurrence, event, effect or condition does not affect the Business, in a substantially disproportionate manner relative to other Persons operating in the industry in which the Business participates.

"**Medicare Accelerated and Advance Payments**" means the accelerated and advance payments received by any Seller or any of their Affiliates, in each case to the extent relating to the Business, in each case prior to the Effective Time pursuant to the Accelerated Payment Program or the Advance Payment Program implemented by CMS to increase cash flow to healthcare providers as a result of COVID-19.

"**Medicare Interim Payments**" means payments made to the Hospitals on an interim basis under the Medicare program on a bi-weekly pass-thru or interim payment basis.

"**MPT**" means MPT Operating Partnership, L.P., one of its Affiliates, or its successor-in-interest with respect to the MPT Real Property.

"**Non-DRG Transition Patients**" is defined in Section 5.6.

"**Non-Interim Billing Transition Patients**" is defined in Section 5.6.

"**Order**" means any judgment, order, writ, injunction, decree, determination, or award of any Governmental Authority, including the Bankruptcy Court.

"**Owned Real Property**" means all real property owned by Sellers and Sellers' Affiliates, together with all rights, easements and privileges appertaining or relating to such interest in real property, and all improvements located on such real property.

"**Paid Time Off**" means Seller Employees' accrued vacation, sick, holiday or other paid time off and related Taxes and other payroll obligations.

"**Parties**" is defined in the preamble to this Agreement.

"**Patents**" means, with respect to the Business, all patents and patent applications, including all provisional applications, priority and other applications, divisionals, continuations (in whole or in part), extensions, reissues, reexaminations or equivalents or counterparts of any of the foregoing.

"**Paycheck Protection Program Act**" means the Paycheck Protection Program and Health Care Enhancement Act, P.L. 116-139, and the rules and regulations promulgated thereunder.

"**Payor Agreement**" means any Contract between any Seller and a Government Program or a Private Program under which the Business or any Seller directly or indirectly receives payments for medical services provided to such program's beneficiaries exclusively at the Facilities.

"**Permit**" means any consent, ratification, registration, waiver, authorization, license, permit, grant, franchise, concession, exemption, order, notice, certificate or clearance issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law, in each case, with respect to any Seller Party in connection with the operation of the Business or the consummation of the Contemplated Transactions, as applicable.

"**Permitted Encumbrances**" means any Encumbrances relating to (a) zoning and building laws, ordinances, resolutions and regulations, (b) Taxes, assessments and governmental charges or levies not due and payable on or before the Transition Time, (c) non-exclusive licenses to Intellectual Property granted in the ordinary course of business, (d) mechanic's, material man's and similar Encumbrances imposed or permitted by Law for sums not yet due and payable on or before the Transition Time, (e) any matters arising as a result of the acts or omissions of Buyer or any of its Affiliates, agents, employees, contractors or representatives, (f) Encumbrances incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security, (g) defects or imperfections of title, exceptions, easements, covenants, rights-of-way, restrictions and other similar charges, defects or encumbrances not materially interfering with the ordinary conduct of the Business, (h) Encumbrances not created by a Seller that affects the underlying fee, lessor, licensor or sublessor interest of any Leased Real Property or real property over which such Seller (with respect to the Business) has easement or other property rights, (i) Encumbrances incurred in the ordinary course of business securing Liabilities that are not material to the Purchased Assets taken as whole, (j) Encumbrances arising out of, under or in connection with this Agreement or the other Transaction Documents, (k) Encumbrances related to Specified Debt, which Encumbrances will be removed as of Effective Time, (l) any other Encumbrance that will be cleared or discharged by Order of the Bankruptcy Court, (m) rights, terms or conditions of any leases, subleases, licenses, sublicenses or occupancy agreements made available to Buyer and (n) any Encumbrance arising out of, under or in connection with the Securities Act or any other applicable securities Laws.

"**Person**" means an individual, association, hospital authority, corporation, limited liability company, partnership, limited liability partnership, trust, Governmental Authority or any other entity or organization.

"**Personal Information**" means any information relating to or reasonably capable of being associated with an identified or identifiable individual (including protected health information), including any personally identifiable data (*e.g.*, name, address, phone number, email address, financial account number, payment card data, government issued identifier, and health or medical information).

"**Personal Property**" means all of Sellers' and each Seller Party's right, title and interest in tangible personal property exclusively used or held for use in, or otherwise exclusively relating to, the Business, including all equipment, medical devices, medical and office supplies, diagnostic equipment, computer hardware and data processing equipment, furniture, fixtures, machinery, vehicles, office furnishings, instruments, leasehold improvements, telephones, telephone numbers, keys, security access cards and other tangible personal property exclusively used or held for use in, or otherwise exclusively relating to, the Business and, to the extent assignable or transferable by such Seller or such Seller Party, all rights in all warranties of any manufacturer, vendor, or other Person with respect thereto.

"**Physician**" means a doctor of medicine or osteopathy, a doctor of dental surgery or dental medicine, a doctor of podiatric medicine, a doctor of optometry, or a chiropractor, as defined in section 1861(r) of the Social Security Act.

"**Plan**" means any of the following agreements, plans or other Contracts covering any Seller Employee: (i) employee benefit plans within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and (ii) any employee benefit plan, program, policy or arrangement providing for compensation, bonuses, commission, profit-sharing, stock option or other stock- or equity-linked benefits or rights, incentive, deferred compensation plans, vacation or paid time off benefits, insurance (including any self-insured arrangements), death, life, dental, vision, health or medical benefits, employee assistance, disability or sick leave benefits, workers' compensation, supplemental unemployment benefits, retention, transaction, change of control payments, savings, pension, retirement, post-employment or retirement benefits or other employee compensation plan, program, policy, arrangement, program, arrangement or commitment, in each case, whether written or unwritten, formal or informal, which any Seller currently sponsors, or to which any Seller has any outstanding present or future obligations with respect to any Seller Employee, whether voluntary, contingent or otherwise.

"**Post-Closing Period**" means the period beginning immediately after the Effective Time and ending on the earlier of the date (i) that is six (6) months following the Effective Time, or (ii) Sellers are no longer in existence.

"**Power of Attorney**" is defined in Section 2.2(a).

"**Practitioner**" or "**Practitioners**" means each of the Physicians and other licensed professional providers who provide services to the Business.

"**Prepaid Expenses**" means all prepaid expenses and deposits of any Seller made with respect to the Business.

"**Private Cost-Based Programs**" means a Private Program that settles on a Cost Report basis.

"**Private Program**" means any private insurance payor or program, self-insured employer, or other third-party payor.

"**Property Taxes**" means personal property, ad valorem, intangible, real property and other similar non-transactional-based Taxes.

"**Proceeding**" means any action, arbitration, charge, claim, complaint, demand, dispute, audit, litigation, proceeding, search warrant, civil investigative demand, subpoena, qui tam action, suit (whether civil, criminal, administrative, judicial, or investigative) commenced, brought, conducted, or heard by or before any (a) Governmental Authority, (b) Medicare fiscal intermediary or administrative contractor, recovery audit contractor, zone program integrity contractor, unified program integrity contractor or similar Government Program contractor or (c) arbitrator, whether at law or in equity, other than routine billing claims and disputes, routine audits, routine post-payment reviews and scheduled surveys.

"**Provider Relief Fund**" means the Public Health and Social Services Emergency Fund for provider relief under the CARES Act and Paycheck Protection Program Act.

"**Purchased Assets**" is defined in Section 1.1.

"**Representatives**" means, with respect to any Person, the officers, directors, managers, employees, agents, attorneys, accountants, advisors, bankers, financing sources, and other authorized representatives of such Person.

"**Restricted Area**" means Miami-Dade and Broward Counties, Florida.

"**Schedules**" means any schedule to this Agreement.

"**Seller**" and "**Sellers**" is defined in the preamble to this Agreement.

"**Seller Affiliate**" means any Affiliate of Sellers.

"**Seller Cost Reports**" is defined in Section 5.7(a).

"**Seller Employee**" means each person who is an employee of (i) any Seller or any Seller Party whether active or on leave of absence who (a) works exclusively at the Facilities, including any employee who is on an approved leave of absence, or (b) otherwise primarily provides services to the Business during the majority of their business time, and (ii) Steward Medical Group, Inc. set forth on Schedule G.

"**Seller Party**" or "**Seller Parties**" means Steward Medical Group, Inc.

"**Seller's Billing Information**" is defined in Section 5.10.

"**Social Security Act**" means the Social Security Act of 1935 and all regulations promulgated thereunder.

"**Software**" means, with respect to the Business, any and all computer programs and other software, including databases, software interfaces, implementations of algorithms, models, and methodologies, whether in source code, object code or other form, including libraries, subroutines and other components thereof.

"**Specified Debt**" means, collectively, indebtedness under (i) that certain Credit Agreement, dated as of February 21, 2024, by and among Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc., Stewardship Health Medical Group, Inc. and Stewardship Services Inc., as the borrowers, certain other

Affiliates of Steward Health Care System LLC party thereto, as guarantors, the lenders party thereto and Brigade Agency Services LLC, as administrative agent and as collateral agent, (ii) that certain Credit Agreement, dated as of August 4, 2023, by and among Steward Health Care System LLC, certain Affiliates of Steward Health Care System LLC party thereto, as guarantors, the lenders party thereto, Sound Point Agency LLC, as administrative agent, Chamberlain Commercial Funding (Cayman) L.P., as collateral agent, and Brigade Agency Services LLC, as the FILO Agent, (iii) that certain Third Amended and Restated Promissory Note, dated as of January 22, 2024, by Steward Health Care System LLC in favor of MPT TRS Lender-Steward LLC and (iv) the DIP Financing.

"**Steward**" means Steward Health Care System LLC, a Delaware limited liability company.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation).

"**Tax**" or "**Taxes**" means any and all federal, state, local, foreign and other taxes, including net income, gross income, gross receipts, sales, use, ad valorem, hospital, provider, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes filed or required to be filed with any Governmental Authority, including any schedule or attachment thereto, and including any amendment thereof.

"**Trade Secrets**" means, with respect to the Business, trade secrets and confidential and proprietary information, including ideas, research and development information, know-how, formulas, compositions, technical data, designs, drawings, specifications, research records, records of inventions, test information, financial, marketing and business data, customer and supplier lists and information, pricing and cost information, business and marketing plans and proposals that, in each case, derive independent economic value, actual or potential, from not being generally known or readily ascertainable by others.

"**Trademarks**" means, with respect to the Business, trademarks, service marks, trade names (including fictitious, assumed and d/b/a names), slogans, or logos; registrations, renewals, applications for registration of the foregoing; and the goodwill of the business associated with each of the foregoing.

"**Transaction Documents**" means this Agreement, the Power of Attorney and the Transition Services Agreement.

"**Transfer Taxes**" means any real or personal property transfer, sales, use, documentary, transfer, value added, stock transfer, stamp or similar Taxes, and any transfer, recording, registration, and other fees or similar amounts, in each case imposed or payable in connection with the Contemplated Transactions.

"**Transferred Employee**" is defined in Section 5.4(b).

"**Transferred Executory Contract**" is defined in Section 1.5(b).

"**Transition Patient Services**" is defined in Section 5.6.

"**Transition Patients**" is defined in Section 5.6.

"**Transition Services Agreement**" is defined in Section 2.2(c).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, *et seq.*

**Schedule A-1**

**Approvals**

Buyer to submit a Hospital Licensure Application (AHCA Form 3130-8001) at least sixty (60) days prior to Closing, and promptly post-Closing, submit a bill of sale or other document signed by the Parties evidencing the effective date of the change of ownership.

1. Florida Agency for Health Care Administration (AHCA) Hospital License issued to Steward CGH, Inc. d/b/a Coral Gables Hospital (No. 4200, Eff. 08/01/2023, Exp. 07/31/2025).

2. Florida AHCA Hospital License issued to Steward HH, Inc. d/b/a Hialeah Hospital (No. 4347, Eff. 08/01/2023, Exp. 07/31/2025).

3. Florida AHCA Hospital License issued to Steward NSMC, Inc. d/b/a North Shore Medical Center, inclusive of Florida Medical Center (No. 4133, Eff. 08/01/2023, Exp. 07/31/2025).

4. Florida AHCA Hospital License issued to Steward PGH, Inc. d/b/a Steward Palmetto General Hospital (No. 4313, Eff. 08/01/2023, Exp. 07/31/2025).

**Schedule A-2**

**Other Approvals**

1.  Submit an application for licensure to Florida AHCA with respect to:

    a.  Florida Agency for Health Care Administration (AHCA) Hospital License issued to Steward CGH, Inc. d/b/a Coral Gables Hospital (No. 4200, Eff. 08/01/2023, Exp. 07/31/2025).

    b.  Florida AHCA Hospital License issued to Steward HH, Inc. d/b/a Hialeah Hospital (No. 4347, Eff. 08/01/2023, Exp. 07/31/2025).

    c.  Florida AHCA Hospital License issued to Steward NSMC, Inc. d/b/a North Shore Medical Center, inclusive of Florida Medical Center (No. 4133, Eff. 08/01/2023, Exp. 07/31/2025).

    d.  Florida AHCA Hospital License issued to Steward PGH, Inc. d/b/a Steward Palmetto General Hospital (No. 4313, Eff. 08/01/2023, Exp. 07/31/2025).

2.  Buyer to submit new application for licensure at least sixty (60) days pre-Closing to provide for processing time with respect to the following Pharmacy Licenses, issued by the Florida Board of Pharmacy:

    a.  Coral Gables Hospital

        i.  Institutional Class III Pharmacy Licenses

            1.  No. PH33558 (Eff. 02/11/2023, Exp. 02/28/2025).

            2.  No. PH34144 (Eff. 02/25/2023, Exp. 02/28/2025).

            3.  No. PH33563, Eff. 04/19/2023, Exp. 02/28/2025).

        ii.  Special Sterile Compounding Pharmacy Licenses

            1.  No. PH33559 (Eff. 02/11/2023, Exp. 02/28/2025).

            2.  No. PH34143, Eff. 02/25/2023, Exp. 02/28/2025).

    b.  Hialeah Hospital

        i.  Institutional Class III Pharmacy License – No. PH33556 (Eff. 02/02/2023, Exp. 02/28/2025).

        ii.  Special Sterile Compounding Pharmacy License – No. PH33555 (Eff. 09/19/2021, Exp. 02/28/2025).

    c.  North Shore Medical Center/Florida Medical Center (where indicated)

        i.  Institutional Class III Pharmacy License

            1.  No. PH33640, Eff. 01/26/2023, Exp. 2/28/2025.

        2.  No. PH33612, Eff. 10/15/2021, Exp. 02/28/2025.

    ii.  Special Sterile Compounding Pharmacy Licenses

        1.  No. PH33639, Eff. 01/26/2023, Exp. 02/28/2025.

        2.  No. PH33608, Eff. 10/15/2021, Exp. 02/28/2025.

        3.  No. PH33612, Eff. 02/01/2023, Exp. 02/28/2025 (*Florida Medical Center*).

    iii.  Schedule II & III Community Pharmacy License – No. PH33610 (Eff. 10/15/2021, Exp. 02/28/2025).

  d.  Palmetto General Hospital

    i.  Institutional Class III Pharmacy License – No. PH33568 (Eff. 02/09/2023, Exp. 02/28/2025).

    ii.  Special Sterile Compounding Pharmacy License – No. PH33569 (Eff. 02/09/2023, Exp. 02/28/2025).

3.  Buyer to submit new application for licensure at least sixty (60) days pre-Closing to provide for processing time with respect to the following Radioactive Materials Licenses, issued by the Florida Department of Health, Bureau of Radiation Control:

  a.  Coral Gables Hospital – No. 4735-1, Eff. 09/11/2023, Exp. 08/30/2026.

  b.  Hialeah Hospital – No. 4737-1, Eff. 06/03/2024, Exp. 09/30/2026.

  c.  North Shore Medical Center/Florida Medical Center

    i.  No. 4736-1, Eff. 07/12/2023, Exp. 09/30/2026.

    ii.  No. 4736-3, Eff. 10/07/2021, Exp. 10/31/2026.

  d.  Palmetto General Hospital

    i.  No. 4738-1, Eff. 09/15/2021, Exp. 09/30/2026.

    ii.  No. 4738-2, Eff. 10/13/2023, Exp. 09/30/2026.

4.  Buyer to submit new application for licensure within thirty (30) days post-Closing with respect to the following Biomedical Waste Permits issued by the Florida Department of Health, Environmental Health Section[1]:

---

[1] **Note to Buyer**: The following permits expired effective 09/30/2024. Renewal is in process and updated versions of permits will be provided upon receipt.

a.  Coral Gables Hospital – No. 13-BID-6703498 (Eff. 10/18/2023, Exp. 09/30/2024).

b.  Hialeah Hospital – No. 13-BID-6709491 (Eff. 10/01/2023, Exp. 09/30/2024).

c.  North Shore Medical Center/Florida Medical Center – No. 13-BID-6703522 (Eff. 06/11/2024, Exp. 09/30/2024).

d.  Palmetto General Hospital – No. 13-64-2368921 (Eff. 12/18/2023, Exp. 09/30/2024).

5.  Buyer to submit new Form CMS 116 within thirty (30) days post-Closing with respect to the following CLIA Certificates of Accreditation issued by CMS:

a.  Coral Gables Hospital

   i.  No. 10D0715108 (Eff. 06/14/2023, Exp. 06/13/2025).

   ii.  No. 10D2172976 (Eff. 09/16/2022, Exp. 09/15/2024).

b.  Hialeah Hospital

   i.  No. 10D0277254 (Eff. 01/03/2023, Exp. 01/02/2025).

c.  North Shore Medical Center/Florida Medical Center

   i.  No. 10D0666638 (Eff. 12/01/2023, Exp. 11/30/2025)

   ii.  No. 10D0284983, Eff. 02/28/2023, Exp. 02/27/2025 (*Florida Medical Center)*

d.  Palmetto General Hospital

   i.  No. 10D0277444 (Eff. 02/28/2023, Exp. 02/27/2025).

6.  Buyer to submit notice to the Florida Department of Health, Bureau of Radiation Control, Radiation Machine Section within thirty (30) days post-Closing.

a.  Coral Gables Hospital

   i.  No. JR 07722000; Exp. 10/28/2024

   ii.  No. JR 02671000; Exp. 10/28/2024

   iii.  No. JR 32382000; Exp. 10/28/2024

   iv.  No. JR 52563000; Exp. 10/28/2024

b.  North Shore Medical Center/Florida Medical Center

   i.  No. JR 09053000; Exp. 10/28/2024

   ii.  No. JR 07334000; Exp. 10/28/2024

c.  [To be provided.]

7. Buyer to provide a change of ownership application and submit Florida Medicaid provider enrollment application to Florida Medicaid Provider enrollment sixty (60) days pre-Closing, but at least in advance of Closing with respect to the following Florida Medicaid provider enrollment numbers:

   a. Coral Gables Hospital – Medicaid Provider ID No. 010960600.

   b. Hialeah Hospital – Medicaid Provider ID No. 010041200.

   c. North Shore Medical Center & Florida Medical Center – Medicaid Provider ID No. 10049800.

   d. Palmetto General Hospital – Medicaid Provider ID No. 010460400.

8. Each of Buyer and Seller to submit Form 855-A to CMS within thirty (30) days post-Closing with respect to the following Medicare provider enrollment numbers:

   a. Coral Gables Hospital – Medicare Part A Enrollment (Acute) (PTAN: 100183).

   b. Hialeah Hospital

      i. Medicare Part A Enrollment (Acute) (PTAN: 100053).

      ii. Medicare Part A Enrollment (Swing Bed) (PTAN: 10U053).

   c. North Shore Medical Center/Florida Medical Center

      i. Medicare Part A Enrollment (Acute) (PTAN: 100029).

      ii. Medicare Part A Enrollment (Swing Bed) (PTAN: 10U029).

      iii. Medicare Part A Enrollment (Acute) (PTAN: 10002900) (*Florida Medical Center*).

   d. Palmetto General Hospital

      i. Medicare Part A Enrollment (Acute) (PTAN: 100187).

9. Parties to notify the Joint Commission immediately pre-Closing and update e-App within thirty (30) days post-Closing with respect to the following Joint Commission Accreditations:

   a. Coral Gables Hospital – Medicare Deemed Status (ID. No. 6952, Eff. 05/14/2022, Exp. 05/14/2025).

      i. Certification in Advanced Total Hip and Total Knee Replacement (Eff. 08/31/2023, Exp. 08/31/2025).

   b. Hialeah Hospital – Medicare Deemed Status (ID. No. 6807, Eff. 07/08/2022, Exp. 07/08/2025).

      i. Certification for Primary Stroke Center (Eff. 04/23/2024, Exp. 04/23/2026).

   c. North Shore Medical Center/Florida Medical Center – Medicare Deemed Status (ID. No. 6855, Hospital Accreditation Eff. 10/23/2021, Exp. 10/23/2024).

      i. Laboratory Accreditation (Eff. 10/01/2022, Exp. 10/01/2024)

  ii. Certification for Thrombectomy - Capable Stroke Center (Eff. 10/07/2023, Exp. 10/07/2026)

 d. Palmetto General Hospital – Medicare Deemed Status (ID. No. 6953, Eff. 10/30/2021, Exp. 10/30/2024).

  i. Certification for Advanced Comprehensive Stroke Center (Eff. 09/01/2022, Exp. 09/01/2025).

10. Parties to provide notice to the DEA fourteen (14) days pre-Closing and enter into a Power of Attorney at Closing. Post-Closing, Buyer to submit new application for DEA Controlled Substances Registration, with respect to the following DEA Controlled Substances Registrations:

 a. Coral Gables Hospital

  i. No. FS0949529, Eff. 11/04/2021, Exp. 02/28/2025.

  ii. No. FS1009085, Eff. 12/03/2021, Exp. 02/28/2025.

 b. Hialeah Hospital – No. FS0945331, Eff. 11/03/2021, Exp. 02/28/2025.

 c. North Shore Medical Center/Florida Medical Center

  i. No. FS0962197, Eff. 11/10/2021, Exp. 02/28/2025.

  ii. No. FS0962173, Eff. 11/10/2021, Exp. 02/28/2025 (*Florida Medical Center*).

 d. Palmetto General Hospital – No. FS0960232, Eff. 11/09/2021, Exp. 02/28/2025.

11. Buyer to notify the American College of Radiology (ACR) of any change in ownership with respect to the following ACR Accreditations:

 a. Coral Gables Hospital

  i. Accreditation for Computed Tomography - Abdomen, Chest, Head/Neck (Exp. 07/14/2025).

  ii. Accreditation for Mammography - Full-Field, Digital (Exp. 11/09/2025).

  iii. Accreditation for Nuclear Medicine - Nuclear, Cardiology, Planar, Planar, Tc-99m/Co-57, Planar, Tl-201, SPECT, Tc-99m (Exp. 05/05/2025).

 b. Hialeah Hospital – None.

 c. North Shore Medical Center/Florida Medical Center

  i. Accreditation for Breast Ultrasound (Exp. 01/22/2027).

  ii. Accreditation for Computed Tomography - Abdomen, Chest, Head/Neck (Exp. 06/28/2026).

      iii. Accreditation for MRI - Body, Head, MRA, (magnetic, resonance, angiography), MSK, (musculoskeletal), SpineMRI (Exp. 06/30/2025).

      iv. Accreditation for Nuclear Medicine - Nuclear, Cardiology, Planar, Planar, Tc-99m/Co-57, SPECT, Tc-99m (Exp. 10/07/2025).

      v. Accreditation for Ultrasound - General, Gynecological, Obstetrical, Pediatric, Vascular (Exp. 01/13/2025).

   d. Palmetto General Hospital

      i. Accreditation for Breast Ultrasound - Breast, Ultrasound, Cyst, Breast, Ultrasound, Solid, Mass, Core, Needle, Biopsy (Exp. 10/27/2024).

      ii. Accreditation for Computed Tomography - Abdomen, Cardiac, Chest, Head/Neck (Exp. 12/12/2024).

      iii. Accreditation for Mammography (Exp. 11/30/2026).

      iv. Accreditation for Nuclear Medicine - Nuclear, Cardiology, Planar, Planar, Tc-99m/Co-57, SPECT, Tc-99m (Exp. 02/14/2025).

      v. Accreditation for Ultrasound – General, Gynecological, Obstetrical, Vascular (Exp. 12/17/2024).

      vi. Accreditation for Ultrasound – General, Gynecological, Obstetrical (Exp. 09/06/2025).

12. Parties to promptly notify the College of American Pathologists (CAP) of any changes to the accredited facility's ownership at least thirty (30) days pre-Closing with respect to the following CAP Accreditations:

   a. Coral Gables Hospital –

      i. CAP Number 1501001 (Exp. 02/23/2025).

      ii. CAP Number 8624920 (Exp. 02/23/2025).

   b. Hialeah Hospital – CAP Number 1494001 (Exp. 08/11/2025).

   c. North Shore Medical Center/Florida Medical Center – None (*see Joint Commission Laboratory Accreditation*).

   d. Palmetto General Hospital – CAP Number 1494401 (Exp. 12/10/2024).

13. Buyer to notify the Federal Communications Commission (FCC) with respect to the following FCC Radio Station Authorization licenses:

   a. Coral Gables Hospital – FRN No. 000173037, Eff. 06/24/2000.

   b. Hialeah Hospital – FRN No. 0024448946, Eff. 04/02/2015, Exp. 04/02/2025.

   c. North Shore Medical Center/Florida Medical Center

        i.   FRN No. 0015285018, Eff. 05/31/2016, Exp. 08/08/2026.

       ii.   FRN No. 0018733618, Eff. 08/07/2019, Exp. 08/28/2029.

      iii.   FRN No. 0031443724, Eff. 10/01/2021, Exp. 10/01/2031.

      iv.   FRN No. 0018733618, Eff. 07/24/2015, Exp. 08/03/2025 (*Florida Medical Center*).

       v.   FRN No. 0024415390, Eff. 04/20/2015, Exp. 04/20/2025 (*Florida Medical Center*).

  d.   Palmetto General Hospital – FRN No. 0010526358, Eff. 10/01/2015, Exp. 10/01/2025.

14.  Approvals relating to the Environmental Licenses & Permits:

  a.   Coral Gables Hospital

       i.   Florida Department of Environmental Protection, Storage Tank Registration Placard

           1.   Facility ID 8629035, Placard No. 693688 (Eff. 06/24/2024, Exp. 06/30/2025).

           2.   Facility ID 9818624, Placard No. 693690 (Eff. 06/24/2024, Exp. 06/30/2025).

       ii.   Miami-Dade County, Certificate of Operation for Elevator[2]

           1.   State Serial # 66694 (Exp. 07/31/2024).

           2.   State Serial # 66696 (Exp. 07/31/2024).

           3.   State Serial # 66697 (Exp. 07/31/2024).

           4.   State Serial # 66698 (Exp. 07/31/2024).

           5.   State Serial # 76564 (Exp. 07/31/2024).

      iii.   Florida Department of Financial Services, Division of State Fire Marshal, Certificate of Operations for Boiler, Nat'l Board # 028834 (Eff. 09/29/2023, Exp. 09/29/2024).

  b.   Hialeah Hospital

       i.   Florida Department of Environmental Protection, Storage Tank Registration Placard, Facility ID 8736546, Placard No. 662902 (Eff. 06/23/2023, Exp. 06/30/2024).[3]

       ii.   Florida Department of Financial Services, Division of State Fire Marshal, Certificate of Operations for Boiler, Nat'l Board # 059683 (Eff. 10/27/2022, Exp. 10/27/2023).

---

[2] **Note to Buyer**: Confirmation of renewal subject to ongoing diligence and Seller diligence responses.
[3] **Note to Buyer**: Renewal of this permit is in process and an updated version will be provided upon receipt.

   c.   North Shore Medical Center/Florida Medical Center

       i.   Florida Department of Financial Services, Division of State Fire Marshal, Certificate of Operations for Boiler

          1.   Nat'l Board # 106016 (Eff. 02/24/2021, Exp. 02/24/2022).

          2.   Nat'l Board # 106021 (Eff. 01/27/2021, Exp. 01/27/2022) (*Florida Medical Center*).

          3.   Nat'l Board # 067945 (Eff. 11/04/2019, Exp. 11/04/2021) (*Florida Medical Center*).

          4.   Nat'l Board # 067946 (Eff. 11/04/2019, Exp. 11/04/2021) (*Florida Medical Center*).

   d.   Palmetto General Hospital

       i.   Florida Department of Environmental Protection, Storage Tank Registration Placard, Facility ID 9046925, Placard No. 669803 (Eff. 09/14/2023, Exp. 06/30/2024).[4]

       ii.   Miami-Dade County, Fats, Oils and Grease Discharge Control Annual Operating Permit, Permit No. GDO-001593-2024/2024 IGT (Eff. 01/01/2024, Exp. 12/31/2024).

       iii.   Miami-Dade County, Industrial Waste 5, Annual Operating Permit, Permit No. IW5-001233-2023/2024 (Eff. 05/01/2023, Exp. 04/30/2024).[5]

       iv.   Miami-Dade County, Air Pollution Annual Operating Permit, Permit No. AP-003158-2024/2025 (SPAP) – GEN (Eff. 07/01/2024, Exp. 06/30/2025).

       v.   Miami Dade County, Certificate of Operation for Elevator

          1.   State Serial # 67463 (Exp. 07/31/2024).

          2.   State Serial # 66471 (Exp. 07/31/2024).

          3.   State Serial # 67460 (Exp. 07/31/2024).

          4.   State Serial # 67461 (Exp. 07/31/2024).

          5.   State Serial # 67462 (Exp. 07/31/2024).

          6.   State Serial # 67466 (Exp. 07/31/2024).

---

[4] **<u>Note to Buyer</u>**: Renewal of this permit is in process and an updated version will be provided upon receipt.

[5] **<u>Note to Buyer</u>**: Renewal of this permit is in process and an updated version will be provided upon receipt.

       7.   State Serial # 74656 (Exp. 07/31/2024).

       8.   State Serial # 74657 (Exp. 07/31/2024)

vi.  Florida Department of Financial Services, Division of State Fire Marshal, Certificate of Operations for Boiler

       1.   Nat'l Board # 046697 (Eff. 01/11/2023, Exp. 01/12/2024).

       2.   Nat'l Board # 046689 (Eff. 01/11/2023, Exp. 01/12/2024).

**Schedule B**

**Seller Party Purchased Assets**

Physician Employment Agreements:

**Coral Gables Hospital**

1. Physician Employment Agreement by and between Steward Medical Group, Inc. and [1] dated September 1, 2022.

2. Physician Employment Agreement by and between Steward Medical Group, Inc. and [2] dated December 31, 2023.

3. Physician Employment Agreement by and between Steward Medical Group, Inc. and [3] dated October 1, 2019, as amended by that certain First Amendment dated December 1, 2022.

**Hialeah Hospital**

1. Physician Employment Agreement by and between Steward Medical Group, Inc. and [4] dated October 31, 2023, as amended by that certain First Amendment dated December 26, 2023.

**North Shore Medical Center and Florida Medical Center**

1. Physician Employment Agreement by and between Steward Medical Group, Inc. and [5] dated July 22, 2019.

2. Physician Employment Agreement by and between Steward Medical Group, Inc. and [6] dated January 3, 2022, as amended by that certain First Amendment dated December 1, 2022, as further amended by that certain Second Amendment dated September 1, 2023.

3. Physician Employment Agreement by and between Steward Medical Group, Inc. and [7] dated October 1, 2022.

4. Physician Employment Agreement by and between Steward Medical Group, Inc. and [8] dated March 19, 2020.

5. Physician Employment Agreement by and between Steward Medical Group, Inc. and [9] dated October 16, 2023.

6. Physician Employment Agreement by and between Steward Medical Group, Inc. and [10] dated July 1, 2021.

7. Physician Employment Agreement by and between Steward Medical Group, Inc. and [11] dated July 29, 2021, as amended by that certain Second Amendment dated February 20, 2024.

8. Physician Employment Agreement by and between Steward Medical Group, Inc. and [12] dated August 15, 2022.

9. Physician Employment Agreement by and between Steward Medical Group, Inc. and [13] dated April 1, 2023.as amended by that certain First Amendment dated June 29, 2023.

10. Physician Employment Agreement by and between Steward Medical Group, Inc. and [14] dated May 28, 2020.

11. Physician Employment Agreement by and between Steward Medical Group, Inc. and [15] dated May 1, 2023.

12. Physician Employment Agreement by and between Steward Medical Group, Inc. and [16] dated March 10, 2021.

**Palmetto General Hospital**

1. Physician Employment Agreement by and between Steward Medical Group, Inc. and [17] dated February 1, 2023.

2. Physician Employment Agreement by and between Steward Medical Group, Inc. and [18] dated November 30, 2023.

3. Physician Employment Agreement by and between Steward Medical Group, Inc. and [19] dated July 17, 2023.

4. Physician Employment Agreement by and between Steward Medical Group, Inc. and [20] dated April 1, 2022.

5. Physician Employment Agreement by and between Steward Medical Group, Inc. and [21] dated October 14, 2019.

Tenant Leases

**Coral Gables Hospital**

1. Lease Agreement Medical Office building, dated December 5, 2013, by and between Healthcare Realty Trust Incorporated, and Steward Medical Group, successor in interest to Tenet Florida Physician Services, L.L.C., PWS Medical P.A. and Miami Urology & Sexual Wellness Institute, P.A., as amended by that Assignment Assumption, and Amendment to Lease Agreement, as amended by that Second Amendment to Least Agreement dated June 1, 2021. [SMGT-80051]

2. Lease Agreement, dated December 13, 2013, between Healthcare Realty Services Incorporated, as agent for Healthcare Realty Trust Incorporated, and Steward Medical Group, successor in interest to Miami Urology & Sexual Wellness Institute, P.A., as amended by that Assignment and Assumption of lease Agreement and First Amendment to Lease Agreement, dated January 26, 2019. [SMGT-80050]

**North Shore Medical Center and Florida Medical Center**

1. Lease, dated October 13, 2015, by and between AW Riverbend, LLC, a Florida LLC. Successor in interest to TNHYIF REIV LIMA, LLC and Steward medical Group, Inc., as successor in interest to Tenet Florida Physician Services IV, LLC. [SMGT-80049]

**Hialeah Hospital**

1. Lease, dated October 13, 2015, by and between AW Riverbend, LLC, a Florida LLC, as successor in interest to TNHYIF REIV LIMA, LLC and Steward Medical Group, Inc., as successor in interest to Tenet Florida Physician Services IV, LLC. [SMGT-80049]

2. Office Lease, dated May 28, 2004, by and between McNab Associates, L.L.C and Steward Medical Group, Inc. as successor in interest to Sunrise Medical Group I, L.L.C., as amended by that, Amendment to Lease dated July 10, 2007, as further amended by that second Amendment to Lease, dated January 1, 2010, and as further amended by that Third Amendment to Lease, dated January 1, 2011, as further amended by that certain Landlord Estoppel dated July 19, 2021. [SMGT-80065]

3. Office Lease, dated April 29, 2005, by and between McNab Associates, L.L.C and Steward Medical Group, Inc. as successor in interest to Sunrise Medical Group I, L.L.C., as amended by that, Amendment to Lease dated July 10, 2007, as further amended by that second Amendment to Lease, dated January 1, 2010, and as further amended by that Third Amendment to Lease, dated January 1, 2011, as further amended by that certain Landlord Estoppel dated July 19, 2021. [SMGT-80069]

**Palmetto General Hospital**

1. Lease Agreement dated as of May 18, 2013, by and between HTA–AW Palmetto, LLC and Steward Medical Group, Inc. as successor-in-interest to Tenet Florida Physicians Services, LLC, as amended by that certain First Amendment dated April 27, 2018, as further amended by that certain Second Amendment dated February 23, 2021, as further amended by that certain Third Amendment dated March 31, 2022. [SMGT-80058]

2. Lease Agreement dated as of April, 20, 2018, by and between HTA–AW Palmetto, LLC and Steward Medical Group, Inc. as successor-in-interest to Tenet Florida Physicians Services, LLC, as amended by that certain First Amendment dated February 1, 2019, as further amended by that certain Second Amendment dated May 31, 2019, as further amended by that certain Third Amendment dated May 16, 2024. [SMGT-80061]

3. Lease Agreement dated as of October 16, 2012, by and between HTA–AW Palmetto, LLC and Steward Medical Group, Inc. as successor-in-interest to Tenet Florida Physicians Services, LLC, as amended by that certain First Amendment dated May 2, 2018, as further amended by that certain Second Amendment dated February 23, 2021, as further amended by that certain Third Amendment dated March 31, 2022. [SMGT-80057]

4. Lease Agreement dated as of May 1, 2013, by and between HTA - AW Palmetto, LLC and Steward Medical Group, Inc. as successor-in-interest to Tenet Florida Physicians Services, LLC, as amended by that certain First Amendment dated July 17, 2018, as further amended by that certain Second Amendment dated March 16, 2021, as further amended by that certain Third Amendment dated March 31, 2022. [SMGT-80060]

Third Party Leases

**Hialeah Hospital**

1. Sublease and Services Agreement dated as of March 29, 2023, by and between Steward Medical Group, Inc. and Urological Consultants of Florida, P.C., as amended by that certain First Amendment dated June 21, 2023. [SMG-80021]

**Palmetto General Hospital**

1. Lease Agreement dated as of March 1, 2024, by and between Steward Medical Group, Inc. and Cardio MDM, LLC. [SMG-80027]

All Personal Property located within the Steward Medical Group, Inc. practice locations.

**Schedule C**

**Excluded Assets**

For purposes of this Agreement, "**Excluded Assets**" means:

        (a)     all Owned Real Property and all Personal Property located thereat;

        (b)     all Leased Real Property that is not subject to a Transferred Executory Contract and all Personal Property located thereat

        (c)     any bank account of Seller or any Seller Affiliate, and all cash and cash equivalents, securities, investments, endorsements, charitable contributions, deferred gifts, endowment funds and other similar charitable interests, bond funds and other funds created by bond indentures and research rights;

        (d)     all accounts receivable (including but not limited to, all patient and non-patient accounts receivable, whether billed or unbilled, recorded or unrecorded from any source), including notes receivable and other rights to receive payment for goods or services provided by Seller or any Seller Affiliate, whether or not in connection with their respective businesses (including the Business prior to the Transition Time), including any accounts receivable that have been charged off as bad debt, any receivables related to recoveries associated with Medicare bad debt with respect to services provided in time periods prior to the Transition Time and any intercompany receivables between Seller on the one hand, and Steward or any Affiliate of Steward on the other hand;

        (e)     all insurance policies or self-insurance funds maintained by or on behalf of Sellers covering the Business and the Purchased Assets;

        (f)     all Plans (other than any Plan that is an Employee Obligation or Assumed CBA) and records relating thereto;

        (g)     all organizational documents, corporate records, stock books, proprietary manuals, other proprietary materials of, or other records relating to the corporate organization of, and any Tax Returns of or with respect to (including any records or working papers), Seller or any Seller Affiliate;

        (h)     rights that accrue or will accrue to Seller or any Seller Affiliate under this Agreement or the other Transaction Documents;

        (i)     any records that (i) are required by applicable Law or by Order of the Bankruptcy Court which Seller or any Seller Affiliate is required to retain in its possession or (ii) Seller or any Seller Affiliate reasonably believes will facilitate the preparation or filing of Tax Returns and the substantiation thereof or the administration of the Chapter 11 Cases;

        (j)     all Contracts other than Transferred Executory Contracts;

        (k)     (A) all claims, rights or interests of Seller or any Seller Affiliate to refunds, rebates, abatements, prepayments, or other recoveries in relation to Taxes (including any provider tax payments in any applicable state and any refundable Tax credits payable regardless of Tax Liability) related to (1) the Business, Facilities or the Purchased Assets for periods (and portions thereof) ending immediately prior to the Transition Time, (2) any Tax that is not an Assumed Liability or (3) any income Tax Return or Group

Tax Return and (B) all other Tax assets (including any Tax attributes) of Seller or any Seller Affiliate, in each case together with any interest due thereon or penalty rebate arising therefrom;

(l)      [Intentionally omitted];

(m)      all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat Laws;

(n)      all rights to receipts (i) relating to the Seller Cost Reports with respect to time periods prior to the Transition Time pursuant to the auditing and settlement of the Seller Cost Reports, including settlements and retroactive adjustments (collectively, "**Cost Report Settlements**"), (ii) that result from Seller's or any of its Affiliate's pursuit of one or more appeals and other risk settlements with respect to time periods prior to the Transition Time, or (iii) relating to amounts earned, accrued or paid by Seller or any Seller Affiliates with respect to meaningful use attestations, or for which the requirements for attestation have been substantially met with respect to time periods prior to the Transition Time;

(o)      Seller's or any of its Affiliate's assets held in connection with any self-funded insurance programs and reserves, if any, and any assets and Liabilities under medical malpractice risk pools and workers' compensation and employee retirement programs;

(p)      any (i) Permits or Approvals exclusively used or held for use in, or otherwise exclusively relating to, the Business or the Purchased Assets, but that are not assignable to Buyer pursuant to applicable Laws or by Order of the Bankruptcy Court, and (ii) accreditations exclusively used or held for use in, or otherwise exclusively relating to, the Business or the Purchased Assets, but that are not assignable to Buyer pursuant to the requirements of applicable accreditation organizations;

(q)      any claims or causes of action of Seller or Seller Affiliates against third parties (i) other than those that exclusively relate to the Business or (ii) to the extent that such claims or causes of action arise in connection with the Chapter 11 Cases, including, without limitation, all Avoidance Actions;

(r)      any intercompany receivables between Seller or any Seller Party on the one hand, and Seller or Seller Affiliates on the other, and any claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Seller and Seller Affiliates, and any payments, awards or other proceeds resulting therefrom;

(s)      any trustee held bond reserve funds or surety bonds;

(t)      assets held to fund, or relating to, Excluded Liabilities;

(u)      all Medicare Accelerated and Advance Payments, COVID-19 Funds and any provider relief funds under the CARES Act or similar legislation that are intended to compensate Steward, any Affiliate of Steward, or Seller for costs incurred or lost revenue with respect to time periods prior to the Transition Time;

(v)      all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, including but not limited to peer-review privilege;

(w)      all documents, records, correspondence, work papers and other documents relating to the Seller Cost Reports, Cost Report Settlements or other Excluded Assets;

(x)     any (i) Trademarks not exclusively used or held for use in, or otherwise exclusively relating to, the Business, (ii) Trademarks or Domain Names that contain the name "Steward Health Care System," "Steward Health," "IASIS," or "Steward" (as well as all abbreviations, variations or derivations thereof, including any world-wide web address containing "iasis" or "steward"), any promotional material, educational material, signage, stationery, supplies or other items of inventory bearing such names or Trademark, or any marks, trade dress, logos, or symbols or abbreviations, variations or derivations thereof, and any URLs, sites, blogs or pages hosted on the system websites of Seller or the Seller Affiliates, including all content embodied within the foregoing, (iii) any Intellectual Property made available to Buyer or its Affiliates following the Effective Time pursuant to the Transition Services Agreement, or (iv) any other Intellectual Property not exclusively used or held for use in, or otherwise exclusively related to the Business;

(y)     any (i) Information Technology Systems, Software, hardware or data processing equipment, data processing system manuals and licensed Software materials that are not (A) in the case of tangible assets, located at a Facility or, in the case of Software, manuals and materials in electronic format, and other intangible assets, residing on hardware located at a Facility or (B) exclusively used or held for use in, or otherwise exclusively relating to, the Business or (C) transferable or (ii) proprietary Software, data processing programs or source code of Seller or any Seller Affiliates;

(z)     any proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses of Seller or any Seller Affiliates;

(aa)    any pharmaceuticals that cannot, by applicable Law, be sold by Seller to Buyers;

(bb)    any medical staff-related records or information not among the Credentialing and Medical Staff Records;

(cc)    any non-assumable Prepaid Expenses or any other Prepaid Expenses to the extent related to an Excluded Asset;

(dd)    any master agreements or similar contracts, including Payor Agreements, that relate, in whole or in part, to the provision of services, or that involve the rights or privileges of Steward or any of its Affiliates, that are not exclusively used or held for use in the Business;

(ee)    Contracts and fee-sharebacks made available through participation in a group purchasing organization;

(ff)    all Medicaid payments for time periods prior to the Effective Time, including any supplemental Medicaid payments that are unrelated to specific patient visits;

(gg)    all rights and interest associated with all indebtedness or debt-like items of Steward, any Affiliate of Steward, including Seller;

(hh)    all Personal Information that is nontransferable under applicable Law or under the privacy policies or notices of Seller in effect at the time of collection of such Personal Information;

(ii)    any asset located outside the Restricted Area;

(jj)    Seller's goodwill associated with, or relating to the Business and any Purchased Assets; and

(kk)    any other assets, properties, rights, or interests of any description, wherever situated and of whatever kind and nature, whether real, personal or mixed, tangible or intangible, that are not exclusively used or held for use in, or otherwise exclusively relating to, the Business or that Seller is required to retain by applicable Law or Order of the Bankruptcy Court.

**<u>Schedule D</u>**

**<u>Assumed Liabilities</u>**

None.

**<u>Schedule E</u>**

**<u>Social Media Accounts</u>**

**<u>Steward CGH, Inc.</u>**

1. Facebook – facebook.com/CoralGablesHospitalFL
2. LinkedIn – linkedin.com/company/coral-gables-hospital
3. Instagram – https://www.instagram.com/coralgableshospital/ (Handle: @coralgableshospital)
4. Twitter  – None.


**<u>Steward HH, Inc.</u>**

1. Facebook – facebook.com/HialeahHospitalFL
2. LinkedIn – linkedin.com/company/hialeah-hospital
3. Instagram – None.
4. Twitter  – None.

**<u>Steward NSMC, Inc.</u>**

a. North Shore Medical Center
   1. Facebook – facebook.com/FloridaMedicalCenterNorthShore
   2. LinkedIn – linkedin.com/company/north-shore-med-center
   3. Instagram – None.
   4. Twitter – None.
b. Florida Medical Center
   1. Facebook – facebook.com/FloridaMedicalCenterNorthShore
   2. LinkedIn – linkedin.com/company/floridamedicalcenter
   3. Instagram – None.
   4. Twitter  – None.


**<u>Steward PGH, Inc.</u>**

1. Facebook – facebook.com/PalmettoGeneralHospital
2. LinkedIn – linkedin.com/company/palmetto-general-hospital1
3. Instagram – None.
4. Twitter  – None.

**Schedule F**

**Facilities**

<u>Hospitals</u>

**Steward CGH, Inc.**

1. Main Hospital Campus – 3100 Douglas Road, Coral Gables, FL, 33134.

**Steward HH, Inc.**

1. Main Hospital Campus – 651 E. 25th Street, Hialeah, FL, 33013.

**Steward NSMC, Inc.**

1. North Shore Medical Center Campus – 1100 NW 95th Street, Miami, FL, 33150.
2. Florida Medical Center Main Hospital Campus – 5000 W. Oakland Park Blvd., Fort Lauderdale, FL, 33313.

**Steward PGH, Inc.**

1. Main Hospital Campus – 2001 W. 68th Street, Hialeah, FL, 33013.z

<u>Other Facilities</u>

**Steward CGH, Inc.**

1. Steward Emergency Center, an extension of Coral Gables Hospital - 8665 Bird Rd., Miami, FL 33155.

**Steward HH, Inc.**

1. None.

**Steward NSMC, Inc.**

1. North Shore Medical Center – None.
2. Florida Medical Center – None.

**Steward PGH, Inc.**

1. Palmetto General Hospital – Rehabilitation Center – 2305 W 68th Street Hialeah, FL 33016.
2. Palmetto General Hospital – Diagnostic Imaging Center- 7160 West 20 Street, Hialeah, FL 33016.

**<u>Schedule G</u>**

**<u>SMG Employees</u>**

**[REDACTED]**