IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE § | |
| § | Chapter 11 |
| STEWARD HEALTH CARE SYSTEM § | |
| LLC, *et. al.*, § | Case No. 24-90213 (CML) |
| § | |
| Debtors. § | (Jointly Administered) |
| | |
| | RE: Docket No. 2519 |

**MASSACHUSETTS NURSES ASSOCIATION'S *EMERGENCY* MOTION FOR ORDER ENFORCING SALE ORDER CONCERNING PURCHASERS LG NEWCORP'S AND LAWRENCE GENERAL HOSPITAL'S UNILATERAL ATTEMPT TO MODIFY COLLECTIVE BARGAINING AGREEMENTS AT HOLY FAMILY METHUEN AND HAVERHILL HOSPITALS IN VIOLATION OF THE SALE ORDER AND APPLICABLE LAW**

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN OCTOBER 18, 2024.**

**IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

Massachusetts Nurses Association ("MNA") files this emergency motion seeking an order enforcing this Court's *Order (I) Authorizing and Approving (A) the Sale of Steward Holy Family Hospital in Methuen and Steward Holy Family Hospital in Haverhill Free and Clear of Liens, Claims, Encumbrances, and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 2519]

(the "Sale Order", attached hereto as **Exhibit A**)[1] and for related relief.  In support, MNA states as follows.

## INTRODUCTION

1. On October 1, 2024, the Debtors closed on the sale of six Massachusetts hospitals, including Steward Holy Family Hospital in Methuen and Steward Holy Family Hospital in Haverhill (collectively, the "Hospitals") to "Lawrence" (comprised of LG Newcorp. and Lawrence General Hospital). As part of the Lawrence transaction, and in accordance with the terms of the asset purchase agreement (the "APA") approved by the Sale Order, at closing, the Debtors assumed and assigned to Lawrence two collective bargaining agreements with MNA, the sole representative of nurses at the Hospitals (the "CBAs", attached hereto as **Exhibit B** (the "Methuen CBA") and **Exhibit C** (the "Merrimack CBA")).

2. Prior to closing, Lawrence spent weeks demanding changes from MNA to the CBAs that continue in effect through November 2026. Those changes focused on significant economic concessions from MNA member nurses that were unacceptable to MNA and well-beyond anything resembling issues of practical alignment (such as changing the name of healthcare insurers given Steward's termination). As a result, no agreement on modification was reached, and the CBAs were assumed and assigned without modification.

3. After the sale closing, and notwithstanding failing to reach agreement on consensual modifications, Lawrence announced unilateral changes to terms and requirements of the CBAs. These purported unilateral changes have a significant financial impact on the nurses who transferred to the Hospitals and violate applicable law, including 11 U.S.C. § 1113 ("Section 1113") and the Sale Order, which provides: "For the avoidance of doubt, ***nothing in***

---

[1] Unless otherwise defined herein, all capitalized terms shall have the same meanings as in the Sale Order.

***this Order or the APA authorizes the Debtor or Buyer to unilaterally modify the terms of the MNA CBAs***, provided, that the Debtors reserve the right to seek any relief regarding the MNA CBAs pursuant to section 1113 of the Bankruptcy Code, and the MNA reserves all of its rights to object to any such relief." Sale Order, at ¶ 69(ii) (emphasis added).[2]

4. Lawrence's actions cannot be excused as inadvertent mistake or transitional hiccups. Rather, they are its most recent attempt to impose significant economic changes on MNA represented nurses. During the multiple negotiation sessions that occurred in September 2024, Lawrence (through its labor counsel) repeatedly threatened to impose changes to the CBAs if not acceded to by MNA, and as negotiations progressed, improperly moved backward in position (*i.e.*, regressive bargaining). Declaration of Dana Simon ("Simon Decl." attached hereto as **Exhibit D**), at ¶¶ 25-29. Lawrence's conduct was improper and counterproductive. It also contrasts with the actions of Lifespan of Massachusetts, Inc. ("Lifespan") and BMC Community Hospital Corporation ("BMC" and referred to with Lifespan as the "Other Purchasers") that purchased the other four Massachusetts hospital facilities and that successfully negotiated with MNA to align their new programs with the CBAs. *Id.*, at ¶¶ 5-6.

5. Unless immediately addressed, Lawrence's improper actions will cause significant economic injury to MNA and its members by reducing benefits while imposing significantly higher costs, including increased deductibles and copays. Lawrence's unilateral changes, unless checked, will result in harm to MNA and in thousands of dollars of damages per year to individual nurses. *See* **Exhibit D-3** - Comparative Chart (attached to the Simon Decl.). Because the MNA nurses may seek healthcare at any time and will receive their first paycheck

---

[2] Lawrence did not request that the Debtors seek relief under Section 1113. Because the CBAs have been assigned to a nondebtor, Section 1113 relief is no longer legally available.

from Lawrence on October 18, 2024, with anticipated lower net pay, emergency relief is warranted.

6. Because the sale has closed and the CBAs have been assigned, Lawrence must perform under the CBAs according to their terms. Lawrence cannot unilaterally impose CBA terms in violation of the Sale Order, the APA and applicable law.[3] Because Lawrence refuses to comply with the Sale Order, CBA and law, and such noncompliance will cause immediate injury to MNA and its members, MNA requests emergency relief from this Court.

## JURISDICTION AND VENUE

7. The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the Sale Order. Sale Order, at ¶ 9 (Court "shall retain exclusive jurisdiction with respect to any and all issues, disputes, controversies, causes of action, and/or claims with respect to, or arising under, such provisions [of the APA], including, without limitation, the enforcement thereof."); ¶ 34 (retaining jurisdiction to "hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of th[e Sale Order], the APA, the Sale Transaction, and the Bidding Procedures Order[.]").

8. This is a core proceeding pursuant to 28 U.S.C. § 157, and the Court may enter a final order consistent with Article III of the United States Constitution.

9. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rule 9013 of the Federal Rules of Bankruptcy Procedure, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas.

---

[3] Lawrence will have an opportunity to pursue negotiations and seek concessions when the CBAs come up for renewal in 2026.

## BACKGROUND

### A. MNA and the CBAs

10. MNA is a labor organization within the meaning of section 2(5) of the National Labor Relations Act, as amended, 29 U.S.C. § 153(5) (the "NLRA"), and is the exclusive representative of the approximately 2,860 bargaining unit employees currently employed (the "MNA Employees"), and those formerly employed, by most Steward hospitals located in Massachusetts, including the Hospitals purchased by Lawrence. *See* Docket No. 514 (the "May 30 MNA ROR").

11. The Debtors and MNA entered into the CBAs in November 2023, which CBAs remain effective through November 2026. *See* **Exhibits B & C.** Under the CBAs, in addition to other benefits, MNA members received set amounts of insurance deductibles, co-pays, and out-of-pocket maximums. *See* **Exhibit B -** Methuen CBA, at Appendix F - "Health and Dental Insurance;" **Exhibit C -** Merrimack CBA, at Appendix B - "Health and Dental Insurance," MNA members also had amounts of life insurance coverage guaranteed, **Exhibit B -** Methuen CBA, at Art. XXVIII, § 2; **Exhibit C -** Merrimack CBA, at Art. XXVII, and MNA members were eligible to participate in a contractual pension plan (for which members' rights vest after five years of service). **Exhibit B -** Methuen CBA, at Art. XXIX; **Exhibit C –** Merrimack CBA, at Art. XXXII.

12. The CBAs obligated the Debtors to require any hospital-buyer to be bound by the terms and provisions of the CBAs. *See* **Exhibit B -** Methuen CBA, at Art. XLIV; **Exhibit C –** Merrimack CBA, at Art. LIII.

B.     **The Bidding Procedures' Boost to Parties that Agreed to Assume the CBAs**

13.    On May 15, 2024, the Debtors filed their Bidding Procedures Motion [Docket No. 281] for the sale of the Hospitals. On May 30, 2024, MNA objected to the Bidding Procedures Motion and reserved its rights under the CBAs and law (including Section 1113). *See* May 30 MNA ROR. The Debtors resolved MNA's objection by allowing MNA to consult with bidders and by agreeing to share portions of bids concerning the CBAs. *See* Docket No. 626 (the "Bidding Procedures Order"), at 12; 48 (allowing MNA discussions with bidders).

14.    The Court entered the Bidding Procedures Order on June 3, 2024. The Bidding Procedures instructed bidders to identify whether or not they would assume the CBAs:

> Each Bid must indicate whether the Potential Bidder intends to hire all of the employees of each Hospital it seeks to acquire and whether it intends to assume liability for accrued paid time off (including, but not limited to, vacation, holiday, sick and personal time) with respect to those employees. Each Bid must also indicate the Potential Bidder's treatment of health, welfare and retirement plans not otherwise incorporated in a CBA in which the employees of each Hospital it seeks to acquire participate. ***Each Bid must also indicate whether the Potential Bidder seeks not to assume each CBA covering employees of each Hospital it seeks to acquire***. To the extent that the Potential Bidder does not intend to assume a CBA or modify such CBA, the Potential Bidder should include an agreement to use good faith efforts to cooperate with the Debtors in ensuring compliance with all applicable law, including the provisions and requirements of sections 1113 and 1114 of the Bankruptcy Code.

Bidding Procedures Order, at 40-41 (emphasis added).

C.     **The Debtors Accept Lawrence's Bid**

15.    Lawrence bid, and as part of its bid, agreed to assume the CBAs. On August 29, 2024, the Debtors filed a motion to sell the Massachusetts hospitals, including the Hospitals to Lawrence. *See* Docket No. 2242 (the "Sale Motion"). The Debtors had not shared Lawrence's

6

bid with MNA in advance. The Sale Motion attached the APA under which Lawrence agreed to purchase the Hospitals. *Id.*

16. MNA objected and reserved its rights as to the Sale Transaction, and stated that the proposed Sale, unless carefully constructed, could "invite the types of abuses Congress sought to prevent by enacting Section 1113." *See* Docket No. 2280 (citing Section 1113). MNA then engaged in discussions with the Debtors concerning the Sale Transaction, and the Debtors assuaged MNA's concerns by stating that the Debtors had, in fact, negotiated for the CBAs to be assumed as a part of the Sale Transaction.

17. Indeed, the APA between Lawrence and the Debtors for the Sale Transaction provided that:

> Effective upon the Effective Time, and except as set forth herein, ***Buyer Employer shall assume each Collective Bargaining Agreement governing the terms and conditions of employment of the employees represented by a union or other labor organization*** ("Union Represented Employees"), hereinafter referred to as the "Assumed CBAs." Seller shall prior to Closing, and in consultation with Buyer, use its reasonable best efforts to ensure that the labor unions will enter into negotiations with Buyer to modify provisions of the Assumed CBAs relating to health insurance/medical plans, retirement plans, overtime and staffing guidelines to ensure alignment with Buyer's existing benefit plans and policies and procedures related to overtime ("Alignment"). For the avoidance of doubt, Seller's reasonable best efforts will include, at the request of Buyer, if negotiations between Buyer and the labor unions have proven unsuccessful in obtaining Alignment to the reasonable satisfaction of Buyer, making a proposal and filing a motion under section 1113 of the Bankruptcy Code; provided, however, that ***nothing herein shall require any motion made under section 1113 to be adjudicated prior to the Effective Time***. For the avoidance of doubt, Seller shall be deemed by Buyer to have used reasonable best efforts and to have satisfied Seller's obligations under this Section 6.1(c) regardless of the outcome of the adjudication of any such motion made under section 1113 of the Bankruptcy Code, so long as Seller has prosecuted the motion

7

under section 1113 of the Bankruptcy Code in good faith and with reasonable diligence.

APA, at § 6.1(d) (emphasis added).

18. Under section 6.1(d) of the APA, Lawrence had the option of (i) having the CBAs assigned to it with consensual modifications reached with MNA, (ii) requesting that the Debtors seek modification of the CBAs pursuant to a Section 1113 process, or (iii) assuming the CBAs as written. Imposing unilateral modifications was not an option, nor could it be under applicable law.

19. MNA agreed to stand down on its objection upon the inclusion of the clarifying language to be provided in the Sale Order as noted above. Docket No. 2323, at 28 (Debtors' reply in support of Sale Transaction representing that language would be included in Sale Order for MNA).

**D. The Court Enters the Sale Order Requiring Lawrence to Assume the CBAs and Retains Jurisdiction to Implement the Sale and Interpret the Sale Order**

20. On September 13, 2024, the Court entered the Sale Order, including clarifying language that the CBAs were intact and that neither "the Debtors [n]or Buyer [could] unilaterally modify any terms of the MNA CBAs" and provided for a later adjudication of a cure amount. Sale Order, at ¶ 69. Further, the Sale Order appended, approved, and incorporated the APA. *Id.*, at *e.g,* ¶¶ 3, 7, 31. The Court found that the "[Sale] Order and the APA shall be binding in all respects upon … the Buyer Parties," which definition included Lawrence. *Id.*, at ¶ 11. Therefore, the Court ordered that section 6.1(d) of the APA, requiring Lawrence to assume the CBAs at the Effective Time, was binding on Lawrence. *Id.*

### E. MNA Negotiated Modifications with the Two Other Massachusetts Buyers, but Did Not Reach Agreement with Lawrence

21. During negotiations, BMC and Lifespan, the Other Purchasers would identify a mechanical reason for proposed changes when seeking a proposed modification relating to the CBAs. Simon Decl., at ¶ 6. For instance, when the Other Purchasers believed that a certain benefit could not be provided exactly as stated in the collective bargaining agreement, they would explain why this was the case and worked with MNA to find a solution. *Id.* Such fixes included temporal transitions to address limitations of their operating existing systems and/or negotiated mitigations for certain changes such as, in one case, a wage increase to offset differences in health plan costs to MNA members. *Id.* The negotiations with the Other Purchasers were not without their frictions, but they were largely collaborative and were respectful of provisions of the sale orders, the collective bargaining agreements, and the stated goal of alignment. *Id.*

22. In contrast to the Other Purchasers, Lawrence demanded major economic concessions well beyond alignment. *See generally*, Simon Decl., at ¶¶ 7, 13-14. More specifically, Lawrence demanded changes that would, for insured MNA members, increase the amount of out-of-pocket maximums, deductibles, and premiums and also, for uninsured members, remove credits. Simon Decl., at ¶ 14 (describing changes in more detail and amounts). Lawrence further demanded that MNA nurses switch to a completely different type of retirement plan, rather than participating in the same pension plan and at the same level as Steward (to which the Other Purchasers agreed). *Id.* All these changes would alter the CBAs, which set these terms for the MNA already. *Id.*, at ¶ 9 (describing CBA provisions).

23. During negotiations, Lawrence rejected numerous counteroffers from MNA, Simon Decl., at ¶¶ 16-28,[4] and, on September 30, 2024, Lawrence sent MNA an improper ultimatum – threatening that, if MNA did not agree to Lawrence's last proposal, Lawrence would revert to its opening offer. Simon Decl., at ¶ 28 (describing September 30, 2024, email from Lawrence to MNA (**Exhibit D-12**)). Lawrence told MNA that, in spite of the APA, Lawrence would change the CBA's terms unilaterally and then "negotiate" with MNA after the alterations had been made. *Id.* So, while MNA was able to reach resolution before the closings of the sales with the Other Purchasers, MNA was unable to reach resolution with Lawrence. Simon Decl., at ¶¶ 5-7.

F. **The Sale Closes and Lawrence Assumes the CBAs, but then Immediately Dishonors the CBAs in Violation of Law and the Sale Order**

24. The Closing Date occurred on October 1, 2024, and the Effective Time occurred at 11:59 p.m. that night. APA, at § 2.1. The Debtor did not file a Section 1113 motion before this date, and the Court did not enter any order rejecting or otherwise affecting the CBAs under Section 1113. Therefore, on the Closing Date, the CBAs remained in effect, and were assumed by Lawrence.[5] *See* APA, at § 6.1(d).

25. Notwithstanding the assumption and assignment without consensual modification, Lawrence appears to have enacted its threatened changes by fiat. Specifically, based upon

---

[4] Further, Lawrence (unlike the other buyers) also did not provide MNA sufficient information to evaluate its proposals. *Id.*

[5] On October 1, 2024, after the Closing, MNA counsel emailed counsel for the Debtors, informing the Debtors that MNA had reached consensual modifications with the other buyers, but not Lawrence, and asked the Debtors to confirm that the CBAs were assumed by Lawrence, and were therefore no longer effective against the Debtors. **Exhibit E.** Debtors' counsel responded that "While we were not in the room and cannot speak to the agreements or understandings between MNA and Lawrence regarding amendment/modification, we agree that Lawrence has assumed the CBA." **Exhibit E.**

10

information and belief, Lawrence has, or is the process of, making the following changes in violation of the terms of the CBAs:

    a. increasing insurance deductibles, co-pays, and out-of-pocket maximums for the MNA nurses, in spite of the amount of deductibles being set in the CBAs;[6]

    b. changing the CBAs (by virtue of altering definitions) to raise the prescriptions' cost to the registered nurses ("RNs") and their families from $15/$30/$45 to now becoming $20/$40/$60 and proposing that the CBAs' mail order prescription contract language also be changed from the current 90-day supply cost of $30/$60/$90 to exactly doubling those costs to $60/$120/$180;[7]

    c. informing MNA that Lawrence will switch insurers to Aetna, but refusing to assure MNA that these insurance terms will be consistent with the CBAs;[8]

    d. modifying staffing levels language in the CBAs [Merrimack CBA, Article LX; Methuen CBA, Article XVIII] by adding language from a separate Lawrence contract into the CBAs;[9]

    e. ceasing payment of the CBAs' required 5% of wages (up to 40 hours in a week and subject to several other limitations) into the pension plan, and instead replacing it with an inferior LGH 403(b) plan (in which nurses get nothing unless they put in their own money and then receive a 50% match);[10] and

    f. announcing that Lawrence will lower life insurance coverage under the CBAs' contractual minimums.[11]

26. Attached hereto is a comparative chart that demonstrates some of the higher costs inflicted on MNA members from Lawrence's unilateral changes. *See* **Exhibit D-3**. Taking only the example of Lawrence's implementation of the annual deductibles, there will be nurses who will suffer an effective $5,000 annual reduction in wages. Simon Decl., at ¶ 10. Taken together, these changes to the CBAs could total tens of thousands of dollars per year for some nurses. *Id.*

---

[6] *See* Simon Decl., at ¶¶ 14, 31.

[7] *Id.*

[8] *Id.*, at ¶¶ 20-21, 31.

[9] *Id.*, at ¶¶ 14; 31.

[10] *Id.*, at ¶ 14.

[11] *See* Simon Decl., at ¶ 14; **Exhibit B** - Methuen CBA, at Art. XXVIII, § 2; **Exhibit C** - Merrimack CBA, at Art. XXVII.

11

27. Another impact is to the nurses' pension plan incorporated into the CBAs, as MNA members' pension rights vest after five years, but Lawrence has informed MNA that it will unilaterally cut off members from reaching that goal in violation of the CBAs. *Id.*, at ¶¶ 9; 17. This list of unilateral changes may not be comprehensive, as MNA continues to discover deviations from the CBA from reports of its members. Simon Decl., at ¶ 31; n. 3.

## ARGUMENT

### A.     The Court's Power to Interpret and Enforce its Sale Order

28. "Orders granting the sale of assets, like the Sale Order issued by the Court in this case, are core proceedings." *In re FormTech Indus., LLC*, 439 B.R. 352, 357 (Bankr. D. Del. 2010) (citing 28 U.S.C. § 157(b)(2)(N) (identifying core proceedings as "orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate[.]")). "Enforcement and interpretation of orders issued in core proceedings are also considered core proceedings within the bankruptcy court's jurisdiction." *Id.* (citing *Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 151 (2009) (holding that "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders.")). Therefore, a court retains jurisdiction to determine what was sold, and what was not, in a bankruptcy sale – and what rights parties that had rights against the debtor have or do not have against a buyer. *Id.*; *see also In re Limetree Bay Servs., LLC*, Case No. 21-32351 (CML), *Order (I) Partially Granting Ocean Point's Motion to Enforce the Sale Order and (II) Partially Denying Port Hamilton Refining & Transportation, LLLP's Motion For An Order Abstaining From Determining U.S. Virgin Islands Property Dispute* [Docket No. 1797] (Bankr. S.D. Tex. Sept. 16, 2024) ("[T]he Bankruptcy Court maintains jurisdiction to construe its own orders. …

Thus, there is no basis for the Bankruptcy Court to mandatorily abstain from construing the Sale Order.") (interpreting sale order as to what was sold and what was not).[12]

### B. The Court should Interpret and Enforce its Sale Order to Require that Lawrence Comply with the CBAs

#### i. The Sale Order is in Effect

29. The Sale Order is in effect. The APA was incorporated by reference into the Sale Order; therefore, its terms are binding on Lawrence, and the Court retained jurisdiction to enforce implementation of the APA and Sale Transaction. Sale Order, at ¶¶ 3, 7, 11, 31.

#### ii. The Sale Order Required the Assumption and Assignment of the CBAs to Lawrence, which Binds Lawrence to the Terms of the CBAs

30. The APA required that, at Closing, the Debtors assume and assign the CBAs to Lawrence. To be effective at Closing/assumption, any modifications had to be obtained pre-Closing either through consent (which MNA reached with the Other Purchasers) or after a properly pursued Section 1113 process. Sale Order, at ¶ 11 (incorporating section 6.1(d) of the APA).

31. Here, no Section 1113 order was sought, and the modifications of the CBAs sought by Lawrence were not agreed upon prior to the Closing Date and Effective Time. As such, the CBAs were assumed by Lawrence without the modifications demanded by Lawrence. *See* APA, at § 6.1(d). Stepping back to the time before the Effective Time, the CBAs were effective against the Debtors because the Debtors had not rejected them under Section 1113. *See In re Family Snacks, Inc.*, 257 B.R. 884, 906 (B.A.P. 8th Cir. 2001) (citing 11 U.S.C. § 1113(f))

---

[12] Part of this power is to grant relief "for contempt of an order," which "is an inherent and well-settled power of all federal courts—including bankruptcy courts." *In re SkyPort Glob. Comm's, Inc.*, 2013 WL 4046397, at *1 (Bankr. S.D. Tex. Aug. 7, 2013); *see also in re Bradley*, 588 F.3d 254, 255 (5th Cir. 2009) (it is "widely recognized" that contempt power extends to bankruptcy) (citing 11 U.S.C. § 105(a)). However, at this time, MNA does not seek a contempt finding, though it reserves the right to later seek such a finding.

("No provision of [chapter 11] shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section."). So, at the Effective Time, under the APA and Sale Order, the CBAs were assumed and assigned to Lawrence by the Debtors.[13]

32. Because Lawrence took assignment of the CBAs, it "accept[ed] both the obligations and the benefits of [these] executory contract[s]." *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000). It is readily accepting the "benefit" of the skilled, dedicated work of the MNA nurses for the Hospitals. It must also, therefore, accept the "burden" of paying the nurses and providing them benefits under the terms of the CBAs.

### iii. Lawrence has Refused to Fulfill its Obligations under the Sale Order

33. Lawrence has refused to fulfill its obligations under the Sale Order by not complying with the CBAs as assumed and assigned to it. The CBAs expire in November 2026 and require that the MNA nurses receive specific benefits at certain levels and according to set conditions. However, Lawrence is not complying with the CBAs, and is seeking to unilaterally pick and choose *parts* of the CBAs to implement the Sale Transaction, ignoring others, and modifying others still. Lawrence attempts by fiat to modify the CBAs to impose the concessions that MNA did not agree to, and for which neither the Debtor nor Lawrence filed a Section 1113 motion. Such modifications are not permitted by law and violate the Sale Order.

34. The Sale Order plainly forbids such actions and as such, this Court can and should provide MNA relief. Even if the Sale Order was not so explicit, this Court has the authority to

---

[13] The Debtors negotiated for Lawrence to assume the CBAs, because, without such assumption the Debtors would be required to pay the MNA nurses, even after the Closing (because the CBAs, as long as the Debtors are a party, cannot be rejected without a Section 1113 order). *See, e.g.*, *In re Colorado Springs Symphony Orchestra Ass'n*, 308 B.R. 508, 516 (Bankr. D. Colo. 2004), *aff'd sub nom. Peters v. Pikes Peak Musicians Ass'n*, 462 F.3d 1265 (10th Cir. 2006) (awarding administrative expenses where "bargaining unit members complied with their obligations under the collective bargaining agreement post-petition… by being ready and willing to perform.").

provide the relief sought by MNA. *See Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013) (to provide relief, a court need not "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated"). A "court is entitled to a degree of flexibility in vindicating its authority against actions that, while not expressly prohibited, nonetheless violate the reasonably understood terms of the order." *Id.* Here, the "reasonably understood terms" and the purpose of the Sale Order are plain – MNA's Section 1113 rights were to be protected, and the CBAs were to be assumed and assigned "as is" unless modified by consent or pursuant to a proper Section 1113 process. Because neither MNA's consent to modify the CBA was provided, nor a Section 1113 process pursued, the CBAs were transferred without modification, and Lawrence cannot act by fiat.

35.     **Protection of MNA's Section 1113 Rights.** The APA and Sale Order preserved MNA's Section 1113 rights, so that the Debtors and their buyers could not "us[e] bankruptcy as a judicial hammer to break the union." *New York Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.)*, 981 F.2d 85, 89 (2d Cir.1992); *see also In re Roth Am.*, 975 F.2d 949, 956 (3d Cir. 1992) (Section 1113 preserves bargaining rights central to American labor law and prevents debtors (and bankruptcy buyers) from using "bankruptcy law as an offensive weapon in labor relations" in dereliction of existing federal labor law and norms). Under Section 1113, a CBA can only be rejected after the debtor confers in "good faith" with the union and the union receives a fair and equitable proposal and all "relevant information as is necessary to evaluate the proposal" that gives the union time to evaluate and request supplemental information and make counterproposals. 11 U.S.C. § 1113(b).

36.     The APA and Sale Order provided that neither "the Debtors [n]or Buyer [could] unilaterally modify any terms of the MNA CBAs," Sale Order, at ¶ 69, and the APA required

that any modification occur through consent or a Section 1113 order. APA, at § 6.1. Lawrence did not provide MNA with reasonable proposals or adequate information (unlike the Other Purchasers). Further, Lawrence, already receiving ample state funding, sought still more financial concessions from MNA, even though Lawrence agreed to assume the CBAs. To permit Lawrence to modify the CBAs in violation of the requirements of law and this Court's Sale Order would be improper as it would undermine the purpose and plan language of Section 1113.

37. ***Assumption, Assignment and Preservation of the CBAs.*** From the outset, the Debtors stated that bids that kept jobs intact would be favored. Bidding Procedures Order, at 40-41. Further, preserving jobs, including unionized jobs, was a critical reason that the Commonwealth of Massachusetts supported the sales of the Massachusetts hospitals. https://www.mass.gov/info-details/steward-health-care-resources-for-employees (Massachusetts is "committed to preserving jobs for health care workers affected by the closure and transition of Steward Hospitals. Steward health care providers and the support staff that keeps the hospital functioning and operational are essential to maintaining the quality and safety of care at all Steward hospitals. Retaining employees who know the hospitals, the facilities, the patients, and the communities will be essential to a smooth transition.") Lawrence's bid included a promise to assume the CBAs. APA, at § 6.1.

38. Lawrence must be held to its bargain and the terms of the Sale Order. Lawrence assumed the CBAs according to their terms and must now comply with those terms. To permit otherwise violates the terms of the Sale Order and law.

## CONCLUSION AND PRAYER

For the above stated reasons, MNA seeks an order enforcing the terms of the Sale Order, requiring Lawrence to perform all terms of the CBAs as assumed, and to provide MNA all other relief as warranted by law and equity.

Dated: October 9, 2024
                                                        Respectfully Submitted,

                                                        /s/ Sam J. Alberts
                                                        By: Sam J. Alberts (admitted *pro hac vice*)
                                                        1900 K Street, NW
                                                        Washington, DC 20006
                                                        Phone: (202) 408-7004
                                                        Facsimile: (202) 496-7756
                                                        sam.alberts@dentons.com

                                                        Casey Doherty
                                                        Texas Bar No. 24078431
                                                        1300 Post Oak Blvd.
                                                        Suite 650
                                                        Houston, TX 77056
                                                        Phone: (713) 658-4600
                                                        Facsimile: (713) 658-4689
                                                        casey.doherty@dentons.com

                                                        Jacob S. Margolies (*pro hac vice* pending)
                                                        4520 Main Street
                                                        Suite 1100
                                                        Kansas City, MO 64111
                                                        Phone:  816-460-2400
                                                        Facsimile:  816-531-7545
                                                        jacob.margolies@dentons.com

                                                        *Attorneys for Massachusetts Nurses Association*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was served on all parties listed on the Court's ECF transmission list through the e-file system for the Southern District on this the 9th day of October 2024. I also mailed and emailed a copy of this motion upon filing to labor counsel for Lawrence at Peter Moser, Hirsh Roberts Weinstein LLP, One Liberty Square, 12th Floor, Boston, MA 02109, pmoser@hrwlawyers.com and to bankruptcy counsel for Lawrence, Douglas Rosner, Goulston & Storrs, One Post Office Square, Boston, MA 02139, drosner@goulstonstorrs.com.


*/s Casey W. Doherty Jr.*
Casey W. Doherty Jr.