**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| STEWARD HEALTH CARE SYSTEM LLC, *et al.*, | § | Case No. 24-90213 (CML) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

**OBJECTION OF LG NEWCORP, INC. AND LAWRENCE GENERAL HOSPITAL TO
THE MASSACHUSETTS NURSES ASSOCIATION'S EMERGENCY MOTION
FOR ORDER ENFORCING SALE ORDER**

LG Newcorp, Inc., a Massachusetts not-for-profit corporation (the "Buyer"), and Lawrence

General Hospital, a Massachusetts not-for-profit corporation ("LGH", and together with the Buyer,

the "LG Parties"), by and through their undersigned counsel, hereby submit this objection (this

"Objection") to the *Massachusetts Nurses Association's Emergency Motion for Order Enforcing Sale*

*Order Concerning Purchasers LG Newcorp's and Lawrence General Hospital's Unilateral Attempt to*

*Modify Collective Bargaining Agreements at Holy Family Methuen and Haverhill Hospitals In*

*Violation of the Sale Order and Applicable Law* [Docket No. 2835] (the "Motion")[2] filed on October

9, 2024.  In support of this Objection, the LG Parties respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      The LG Parties have worked tirelessly to complete the Buyer's acquisition of the

assets of Steward Holy Family Hospitals ("HFH") in Methuen, Massachusetts ("HFH Methuen")

and Haverhill, Massachusetts ("HFH Haverhill"), two of the Debtors' struggling hospitals,

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

[2]     Capitalized terms used but not otherwise defined herein have the meaning given to them in the Motion.

1

including investing significant economic and human resources to diligence, negotiate, document and close the transaction.  The goal all along has been to transition ownership without disruption to patient services and to preserve as many jobs as possible.[3]  It was, and continues to be, a monumental task and it will take several weeks, and possibly months, to complete the transition of the over 1300 employees, the 120 physicians, and the hundreds of vendors and lessors that are employed by, or do business with, the hospitals.[4]

2.     For financial and operational reasons, the Buyer had made it clear in the asset purchase agreement that negotiations would be required with the several unions representing Holy Family employees, with respect to health insurance, retirement, staffing, and overtime.  The Buyer reached agreements with two of the three unions at the hospitals (ATC and 1199SEIU) on these CBA alignment issues, which helped ensure a smooth employment transition and avoid any disruptions in benefits.[5]  Despite the Buyer's same good faith bargaining efforts with the MNA, no similar agreement has yet been reached with the MNA.     The MNA did not even give the discussions a week past the closing of the HFH sale before filing the Motion.[6]  The Motion, although styled as a motion to enforce the Sale Order, asks this Court to adjudicate, on an emergency basis, a post-sale labor disagreement between two non-Debtor parties that should be resolved through normal collective bargaining and pursuant to the grievance and arbitration procedures in the MNA CBAs.  The MNA attempts to manufacture jurisdiction over its Motion by misquoting the Sale Order as somehow ordering how the Debtors and the Buyer are to perform

---

[3]   *See* Declaration of Lisa Crutchfield ("<u>Crutchfield Decl.</u>") attached hereto as **<u>Exhibit A</u>** at ¶ 7.

[4]   *Id*.

[5]   *Id*. at ¶ 15.

[6]   In some respects, the MNA's decision to pursue immediately a public, adversarial path rather than a constructive one is not surprising.  The MNA has filed four objections in the Debtors' bankruptcy cases (three in connection with the sale of the Debtors' Massachusetts hospitals).  *See* Dkt. Nos. 514, 1159, 1757, and 2280.

under the MNA CBAs post-closing.[7]   As explained below, this is a labor dispute involving differing interpretations of the MNA CBAs that has nothing to do with the Sale Order and has no bearing on these chapter 11 cases, the Debtors, the Debtors' property, or claims against the Debtors.

3.     The LG Parties do not dispute that the Buyer has assumed the MNA CBAs.  As a practical matter, however, and as the MNA knows, certain terms in the MNA CBAs are tied to Steward-specific benefit plans that no longer exist or are no longer available to the former Steward employees.  Accordingly, to align those benefits with what the Buyer can currently provide as benefits necessarily requires negotiations between the MNA and the Buyer.  It is premature, a couple of weeks after the closing, to seek judicial intervention over matters that the parties will need to resolve through normal bargaining channels, or, if bargaining fails, through the normal grievance and arbitration procedures in the MNA CBAs.

4.     *As a threshold matter*, there is no emergency.  As the Buyer continues to try to negotiate with the MNA in good faith to resolve remaining open items, primarily concerning insurance coverage, the Buyer is providing MNA-covered employees with the same coverage as LGH employees have, including MNA nurses currently working at LGH.[8]  The Buyer understands that the transition to a new employer and benefits package can raise important questions and concerns for employees.[9]  One of the ways  the Buyer is endeavoring to limit concerns with respect to health insurance transition is deferring employee contributions for healthcare coverage during

---

[7]    *See* Motion at ¶ 20.  Paragraph 69 of the Sale Order says no such thing.  If quoted accurately, it says: "For the avoidance of doubt, nothing in this Order or the APA authorizes the Debtors or Buyer to unilaterally modify any terms of the MNA CBAs."

[8]    Crutchfield Decl. ¶¶ 24, 26.

[9]    *Id*. at ¶ 26.

the October special enrollment period.[10]  To be clear, the Buyer has ensured there is no gap in health coverage due to the unavailability of the Steward self-sponsored plans.  The Buyer is providing the MNA-represented nurses additional choices in healthcare plans on the same terms and conditions currently available to the LGH employees (including the MNA nurses working at LGH), in compliance with the MNA CBAs.[11]

5.      *Second*, the MNA's disagreement over the terms of the benefits the Buyer must provide under the MNA CBAs is a contractual labor dispute, not a Bankruptcy Code or a Sale Order enforcement issue.  By its terms, the restrictions on modifying collective bargaining agreements under the Bankruptcy Code apply to debtors in possession and chapter 11 trustees.[12] The LG Parties are neither.  The Sale Order merely contains avoidance of doubt language that it does not authorize the LG Parties to make unilateral modifications to the MNA CBAs, which they were not permitted to do anyway under the MNA CBAs and have not done here.[13]  With respect to the critical topic of health insurance, the MNA CBAs authorize the Buyer employer to offer additional plan options to CBA employees on the same terms and conditions offered to non-CBA employees, which the Buyer has done.[14]  The  MNA's motion essentially asks this Court to interpret contract language, and as such is a grievance under the MNA CBAs, not a bankruptcy issue.

6.      *Third*, the MNA's dispute is between two non-debtors, the outcome of the parties' bargaining will affect only the benefits the Buyer provides to the MNA-represented nurses on a

---

[10]    *Id.* at ¶¶ 13, 26.

[11]    *Id*. at ¶ 26.

[12]    *See* 11 U.S.C. 1113(a).

[13]    *See* Sale Order ¶ 69(ii).

[14]    Haverhill CBA, Appx. F, ¶ 1 (Health and Dental Insurance), Art. XXVI, § 1; Methuen CBA, Appx. B at p. 80 (Health and Dental Insurance), Art. XXVIII, § 1.

post-sale basis, and there is no impact on the Debtors' estates. The Court should conclude that it does not have subject matter jurisdiction over this dispute, especially when the MNA has failed to meet its burden of showing that there is even "related to" jurisdiction (other than by misquoting the Sale Order). Moreover, even if there were bankruptcy jurisdiction, it is not a core proceeding under 28 U.S.C. § 157(b). The dispute does not invoke a substantive right under the Bankruptcy Code and the matter should be brought under the grievance and arbitration procedures under the MNA CBAs, as the contracts contemplate. At its core, the MNA disagrees with the Buyer over what is required and what is permitted under the MNA CBAs and is trying to short circuit the grievance and arbitration procedures in the MNA CBAs. This Court is not the appropriate forum to adjudicate or mediate this disagreement. As a noncore matter, the Buyer does not consent to entry of a final order since any unresolved disputes over the applicability or interpretation of the MNA CBA provisions is governed by the detailed grievance and arbitration procedures in each of the MNA CBAs.

7.      Lastly, should the Court determine that it has jurisdiction over this dispute, the Court should exercise is discretionary authority to abstain from ruling on the Motion given the tenuous connection to the Debtors' bankruptcy cases, the absence of any impact on recovery for the Debtors' estates, and the availability of other appropriate forums to arbitrate or adjudicate any lingering disputes as necessary.

8.      Accordingly, for all of these reasons, the MNA's Motion should be denied.

## BACKGROUND

### A.      The LG Parties

9.      The Buyer is a Massachusetts not-for-profit corporation sponsored by LGH, also a Massachusetts non-profit. The LG Parties operate three safety net hospitals serving tens of

thousands of patients annually.  Crutchfield Decl. at ¶ 4.  Their mission is to provide quality medical care and related services to people living in the underserved and disadvantaged communities of Lawrence and the greater Merrimack Valley region of Massachusetts.  *Id*.  The LG Parties philosophy of care focuses around six core values: (i) equity; (ii) inclusivity; (iii) quality; (iv) integrity; (v) compassion; and (vi) service.  *Id*.

### B.  The Buyer Purchases HFH

10.     The threatened closure of HFH Methuen and HFH Haverhill posed a grave and imminent threat to healthcare services in the Merrimack Valley area, primarily affecting underserved communities.  *Id*. at ¶ 5.  Consequently, LGH through the Buyer, and with the support of the Commonwealth of Massachusetts, stepped forward to make a bid for the assets of HFH to save the two hospitals.  *Id*.  The purpose was not financial gain, but rather to carry out LGH's mission to provide high quality healthcare for members of the surrounding communities.  *Id*.

11.     After months of negotiations and multiple court hearings, the Debtors accepted the Buyer's bid as the highest and best offer for the assets of HFH, and the Court entered the Sale Order approving the Buyer's bid on September 13, 2024.  *Id*. at ¶ 6.[15]

12.     The HFH sale to the Buyer[16] closed on October 1, 2024.  *Id*.  Pursuant to section 6.1(d) of the APA, "Effective upon the Effective Time, and except as set forth herein, Buyer Employer shall assume each Collective Bargaining Agreement governing the terms and conditions of employment of the employees represented by a union or other labor organization."  APA §

---

[15]   The Court entered an order supplementing the Sale Order on September 30, 2024 to address an additional $5,000,000 in funding from the Commonwealth to finance the purchase of the Debtors' Massachusetts hospitals. [Dkt. No. 2721].

[16]   LGH is a party to the APA solely for the purpose of Sections 1.9(f) (Post-Closing Adjustment to Purchase Price), 4 (Representations and Warranties), 6.3(e) (Non-Solicitation), 6.13(a) (Post-Closing Receipt of Assets or Excluded Assets), 6.14 (Guaranty), and 13 (General).

6.1(d).  The Effective Time occurred at 12:01 a.m. Eastern Time on October 1, 2024.  *See id.* §
2.1.

### C.    The HFH CBAs

13.    At the time of the sale, HFH was party to four CBAs with three unions related to
the operation of the two hospitals: one with the Area Trades Counsel ("ATC"); another with the
1199SEIU United Healthcare Workers East ("1199SEIU"); and two CBAs with the MNA, one
covering nurses at HFH Haverhill and attached hereto as **Exhibit B** (the "Haverhill CBA") and
the other covering nurses at HFH Methuen and attached hereto as **Exhibit C** (the "Methuen CBA",
and together with the Haverhill CBA, the "MNA CBAs").[17]  The MNA CBAs expire on November
1, 2026.  Haverhill CBA, Art. LVI; Methuen CBA, Art. I, § 1.

14.    The Sale Order provides in relevant part that:

> *For the avoidance of doubt, nothing in this Order or the APA
> authorizes the Debtors or Buyer to unilaterally modify any terms of
> the MNA CBAs*, provided, that the Debtors reserve the right to seek
> any relief regarding the MNA CBAs pursuant to section 1113 of the
> Bankruptcy Code, and the MNA reserves all of its rights to object to
> any such relief.

Sale Order ¶ 69(ii) (emphasis added).[18]

### D.    Buyer Negotiates Key Transition Terms with ATC, 1199SEIU, and MNA

15.    The Buyer's bargaining team began negotiations with the ATC, 1199SEIU, and the

---

[17]   The LG Parties note that MNA CBAs attached to the MNA's Motion are unsigned.  The scanned Methuen CBA
that the Buyer received from the Debtors is missing a full scan of the text on page 81 and pages 82 through 83.
Exhibit A has been supplemented with pages 81 through 83 of the unsigned Methuen CBA that the MNA filed.

[18]   The MNA manipulates the applicable language in the Sale Order (emphasized in italics) to say "that neither 'the
Debtors [n]or Buyer [could] unilaterally modify any terms of the MNA CBAs . . . .'"  Motion at ¶ 20.  They do
this to try to argue that they are asking this Court to enforce the Sale Order and thereby manufacture core
jurisdiction where none exists.  The language in the Sale Order clearly means that the Buyer could not point to
the Sale Order as giving it the authority to unilaterally modify the MNA CBAs.  The Sale Order does not dictate
what the Buyer can and cannot do when performing under the MNA CBAs.  Further, bargaining for alignments
and concessions or disagreeing over how to interpret provisions of the MNA CBAs does not equate to unilaterally
modifying the agreements.

MNA during the week of September 9, 2024, as the Sale Order was becoming finalized.  We made specific proposals to align key terms of the union contracts with the new ownership structure, benefits, and economics.  Crutchfield Decl. at ¶ 9.  Specifically, the Buyer spoke with each of the unions separately, through their representatives, about four topics: (1) insurance, (2) retirement, (3) staffing (only applicable to the MNA), and (4) daily overtime (only applicable to the SEIU and ATC).  *Id*.  Each of these topics had been expressly identified by the Buyer in Section 6.1(d) of the APA and in the Sale Order.  The need for negotiations was in part due to economics and sustainability.  The Buyer needed to ensure the financial viability and sustainability of the new system for the long-term benefit both of Merrimack Valley residents and employees.  *Id*.  Another reason for the negotiations was because Steward's health plans would no longer be available, and HFH employees were transitioning on to the Buyer's health insurance plans effective October 1, 2024.  *Id*. at ¶ 12.

16.     Through good faith bargaining and shared understanding, negotiations with the ATC and SEIU culminated in a resolution of issues related to health insurance, retirement plan, and daily overtime.  *Id*. at ¶ 15.  The resolution was memorialized in signed agreements with the ATC and the 1199SEIU, reflected in Memorandum of Agreements dated September 30, 2024, and October 1, 2024, respectively, and signed by the ATC and the 1199SEIU on October 7 and October 2, respectively.  *Id*.  Although the Buyer adopted the same bargaining approach with the MNA, negotiations with MNA have been more difficult and remain ongoing.  *Id*. at ¶ 16.

### E.     Negotiations with the MNA

17.     Over the course of September, the Buyer exchanged one proposal and three counterproposals with the MNA and met with the MNA four times.  *Id*. at ¶¶ 17 & 19.  On September 30, 2024, the Buyer submitted its last counterproposal, which the MNA summarily

rejected; the MNA "resubmitted" its earlier September 28, 2024 proposal.  *See id.* at ¶ 15.  The Buyer's counsel offered to speak further with the MNA on October 1, 2024, but received no response.  *Id.* at ¶ 21.  The Buyer did not hear back until October 7, 2024, when an MNA representative contacted the Buyer's bankruptcy counsel that instead of continuing the current negotiations the MNA intended to file a motion in the Bankruptcy Court to press its position.  *Id.*  Nevertheless, in an effort to continue a negotiating dialogue with the MNA, the Buyer has reached out to the MNA on at least three occasions (including on October 1st, 7th, and 17th), reiterating its offer to speak with the MNA.  *Id.* at ¶ 21.  On October 17th, the Buyer explained that it was following the MNA CBAs, and  the MNA indicated its preference is to resolve the parties' disagreement before the Court.  *Id.* at ¶¶ 22-23.

### F.      Status with the MNA

18.      Before negotiations paused, the parties appeared to be in agreement on the staffing language in the MNA CBAs and the Buyer is continuing to fund the pension contributions in accordance with the MNA CBAs while talks continue around insurance transition issues.  *Id.* at ¶ 29.  To be clear, the Buyer intends to provide the 5% employer pension contributions as and when they become due while the parties continue to work towards an overall memorandum of agreement.  *Id.* at ¶¶ 24, 29.  As part of an overall memorandum of agreement, if reached, it is Buyer's understanding that the parties have also agreed that staffing provisions in the CBAs will remain the same with the MNA's agreement not to file any demands for arbitration concerning staffing issues at HFH for a period of nine (9) months.  *Id.* at ¶ 29.

19.      The issues that remain open are the terms governing the additional health and dental insurance plans and the separate life insurance plans being offered by Buyer.  *Id.*  Both MNA CBAs provide that "The Steward Health Care System DPO and EPO shall be the health insurance

plans for all MNA-represented employees . . . ."  Haverhill CBA, Appx. F, ¶ 1 (Health and Dental Insurance), Art. XXVI, § 1; Methuen CBA, Appx. B at p. 80 (Health and Dental Insurance), § 1, Art. XXVIII, § 1.  These provisions presented a problem.  The only approved plans were Steward-sponsored Exclusive Provider Organization and Dental Plan Organizations (in some cases with third party insurers) that no longer exist or are no longer available to the former HFH employees. *See id.* at ¶¶ 12, 25.   The MNA and the Buyer disagree on how to resolve this void created by the present circumstances and language in the MNA CBAs.

20.     The Buyer proposed some alternative solutions, all of which have been rejected by the MNA as part of the MNA's refusal to consider anything other than the MNA's own selective application of favorable plan terms that Steward previously offered under its own self-sponsored plans (e.g.,  the MNA wishes to selectively apply Steward premium contributions amounts and Steward's zero deductible features) ignoring the fact the Buyer and the Steward plans are different, and attempting to cherry pick the most favorable attributes of the Steward plans and shoehorn them into the Buyer's additional plans.  *See id.* at ¶¶ 23, 28-29.  The MNA's intransigence ignores the language of the MNA CBAs.  The MNA CBAs do provide a path to a reasonable compromise, one which the Buyer is able to provide and allows for parity in healthcare plans between the MNA-represented nurses at HFH and the MNA-represented nurses who work at LGH.  Each MNA CBA provides:

> The Steward Health Care System DPO and EPO shall be the health insurance plans for all MNA-represented employees at the LMA hospitals. If Steward Health Care System offers additional medical plan option(s), eligible bargaining unit members may participate in such other medical plan(s) as may be offered by the hospitals in accordance with the provisions of the plans(s) as amended from time to time on the same terms and conditions offered to employees not covered by a collective bargaining agreement.

Haverhill CBA at Appx. F, ¶ 1 (Health and Dental Insurance), Art. XXVI, § 1; Methuen CBA at Appx. B (Health and Dental Insurance), § 1, Art. XXVIII, § 1.  Pursuant to this provision in the MNA CBAs, the Buyer in good faith has offered to have the MNA-represented employees participate in the additional health plans and on the same terms and conditions that are offered to the LGH nurses who also are represented by the MNA.  Crutchfield Decl.  ¶ 19.  The MNA refuses to consider this alternative or even engage in those types of bargaining discussions to try to arrive at a consensual middle ground.  *See id*. at ¶¶ 23, 28-29.

21.     Meanwhile, all newly onboarded MNA employees have been assigned by default to the Buyer's preferred provider health insurance plan (PPO).  *Id*. at ¶ 26.  Moreover, in compliance with the express language of the MNA CBAs (as quoted above) the Buyer is providing the MNA-represented nurses additional choices in healthcare plans through the special October enrollment period on the same terms and conditions currently available to current LGH employees (including the MNA nurses working at LGH).  *Id*.  For the month of October, the Buyer is also deferring employee contribution premium costs to give employees an opportunity to enroll in their choice of health plan (not only MNA-represented nurses but all of the transitioning HFH employees).  *Id*.

22.     Progress has been made in bargaining with respect to health insurance language that would keep HFH nurses whole throughout the remainder of plan year 2024 regarding health insurance deductibles and out of pocket expenses, and in addition the Buyer recently offered to provide premium cost mitigation through plan year 2025.  *Id*. at ¶ 29.  However, the MNA has indicated that it will not entertain any proposals to transition nurses onto the terms of the new health plans, and is only interested in discussing mechanics to achieve full reimbursement to nurses for all costs incurred.  *Id*.

23.    With respect to life insurance, the two MNA CBAs offer inconsistent and different life insurance offerings.  *Id*.  Before the MNA broke off discussions, the Buyer was working to try to resolve the discrepancies between the two plans and the life insurance offerings of the Buyer. *Id*.  The Buyer views the life insurance as similar to the health insurance CBA interpretation issue that will have to be resolved.  *Id*.

24.    The Buyer remains hopeful that the few remaining unresolved issues can be resolved in due course through ordinary labor bargaining and negotiations.  *Id*. at ¶ 30.  Despite the open issues and the adversarial stance the MNA has taken throughout the negotiating process, the Buyer remains committed to ensuring that all MNA-represented nurses are welcomed and integrated into the Buyer's workforce.  *Id*.

### G.    MNA CBA Grievance and Arbitration Provisions

25.    To the extent an agreement with the MNA cannot be reached, the MNA CBAs contain detailed grievance and arbitration procedures to resolve the interpretation or applicability of the CBA provisions.  *See* Methuen CBA, Art. X, § 4 (defining a "grievance" as "a complaint by a Nurse that the Hospital has interpreted and applied this Agreement in violation of a specific provision hereof and such interpretation and application has adversely affected the Nurses interest under this Agreement"); Haverhill CBA, Art. XLIV.  Likewise, each of the MNA CBAs permit either similarly situated nurses or the MNA on behalf of similarly situated nurses to submit grievances to the Buyer.  *See* Methuen CBA, Art. X, §§ 2, 4 (permitting MNA); Haverhill CBA, Art. XLIV.   If the grievant is not satisfied with the Buyer's response, then it may seek arbitration under the applicable MNA CBA to resolve the grievance with finality.  *See* Methuen CBA, Art. X, § 3 at p.12; Haverhill CBA, Art. XLIV at p. 59.  The purpose of these provisions (and the MNA

CBAs generally) is to narrow and then channel any contract interpretation issues between the parties so that they can be resolved internally, efficiently, and, where possible, amicably.[19]

**OBJECTION**

## I.    There Is No Emergency.

26.    Despite the MNA's hyperbole and untrue allegations concerning the negotiations with the Buyer, there is simply no "emergency" justifying this Court's intervention.  The MNA's basis for the purported emergency is that MNA-covered employees are expected to pay more for the alternative healthcare coverage, which will result in with a reduction in their net pay.  *See* Motion at ¶ 5 ("Because the MNA nurses may seek healthcare at any time and will receive their first paycheck from Lawrence on October 18, 2024, with anticipated lower net pay, emergency relief is warranted.").  As noted above, however, the Buyer is providing the MNA-covered employees with the same benefit and healthcare coverage as LGH employees receive, including current MNA-represented nurses at LGH while negotiations continue.  To the extent that the final agreement after bargaining, or a final resolution after grievance and arbitration, reduces employee healthcare contributions under the additional plans, those amounts can be credited back to the nurses.  Although health insurance is an important employee benefit, the purported "emergency" is grounded in hyperbole, appears to be manufactured for purposes of bargaining leverage, and is

---

[19]    *See* Haverhill CBA, Art I. § 1 at p. 2 ("The intent and purpose of this Agreement is to establish harmonious relationships between the Hospital, its registered nurses, and the Association; to promote and improve that relationship and the economic conditions of all parties to this Agreement, subject to their joint duties to the community and to high standards of patient safety and care; to clarify certain rights and privileges of the parties, together with certain working and operating conditions; and to establish amicable processes for resolving any disputes which may arise. The Association agrees to make every reasonable effort with the Hospital to assure efficient operations, to serve the needs of the community and to meet the highest of professional standards in such service."); Methuen CBA, Art. II at pp. 4-5 ("The intent and purposes of this Agreement are to establish harmonious relationships between the Hospital and its employees who are subject to this Agreement; to promote and improve that relationship and the economic conditions of both, subject to their joint duties to the community and to high standards of patient care; to clarify certain rights and privileges of the parties together with certain working and operating conditions; to ensure that both parties treat each other with dignity and respect; and to establish amicable processes of collective bargaining.").

in any event purely financial in nature and therefore subject to normal resolution and remedial measures available through the MNA CBAs.

## II.     The MNA's Dispute with the Buyer Is a Matter of CBA Interpretation and Does Not Depend on Section 1113 of the Bankruptcy Code or the Sale Order.

27.     The MNA also mischaracterizes its dispute with the Buyer as a "unilateral" CBA modification governed by section 1113 of the Bankruptcy Code or Paragraph 69(ii) of the Sale Order.  Motion at ¶¶ 3, 20, 35, 36.  Neither alleged basis provides support for the Motion.

### A.     Section 1113 of the Bankruptcy Code Does Not Apply to the Buyer.

28.     Section 1113 of the Bankruptcy Code applies to a debtor in possession or a trustee if one has been appointed.  11 U.S.C. § 1113(a) ("The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter . . . may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.").  The LG Parties are neither.  Nor did the LG Parties request that the Debtors reject the MNA CBAs under section 1113, which the MNA recognizes and now seeks to exploit for its own benefit without regard to the financial viability of HFH.  Motion at ¶ 3 n.2 ("Lawrence did not request that the Debtors seek relief under Section 1113. Because the CBAs have been assigned to a nondebtor, Section 1113 relief is no longer legally available.").[20]  The MNA should recognize that section 1113 is a blunt instrument and should not be surprised that the Buyer preferred to use the more sensible and productive course of bargaining for limited modifications or alignments to the terms of the MNA CBAs.  Of course, that assumed, as occurred with the other two unions, that the MNA would bargain in good faith and be open to modifications that reflected the financial situation of the two

---

[20]  The proposed order to the Motion is also problematic to the extent it seeks to require "Lawrence" (an MNA defined term including both the Buyer *and LGH*) to perform under the MNA CBAs.  *See* Proposed Order ¶ 2.  As noted above, only the Buyer assumed the MNA CBAs.

HFH hospitals in transition.  In any event, section 1113 or the Buyer's decision not to have the Debtors use it has no bearing on the MNA's current dispute with the Buyer.

**B.      The Sale Order Has No Applicability to Interpretation of the MNA CBAs.**

29.      The MNA's claim that the dispute is governed by Paragraph 69(ii) of the Sale Order is similarly unavailing.  The actual language of that subparagraph simply clarifies that the Sale Order cannot be read to authorize the Buyer to modify the MNA CBAs unilaterally, which the MNA CBAs already prohibit and the Buyer had no intention of doing.  Indeed, this is why Paragraph 69(ii) of the Sale Order begins with the clause "For the avoidance of doubt".

**C.      The Sale Order Does Not Govern the Buyer's Alleged Post-Sale Conduct.**

30.      The MNA's motion should also be denied because the MNA's dispute with the Buyer is based on the Buyer's post-sale negotiations.  The MNA complains that once the Buyer assumed the CBAs as part of the closing, the Buyer has been violating the MNA CBAs by negotiating post-sale alignment issues.  *See* Motion at ¶¶ 33 ("Lawrence has refused to fulfill its obligations under the Sale Order by not complying with the CBAs as assumed and assigned to it. . . Lawrence is not complying with the CBAs, and is seeking to unilaterally pick and choose *parts* of the CBAs to implement the Sale Transaction, ignoring others, and modifying others still."), 38 ("Lawrence assumed the CBAs according to their terms and must now comply with those terms. To permit otherwise violates the terms of the Sale Order and law.").  However, courts have consistently held that disputes resulting from a buyer's post-sale conduct with unions are not implicated by a bankruptcy sale order and are best resolved before the NLRB (or in this case per the terms of the collective bargaining agreements).[21]  *See, e.g.*, *Erica, Inc. v. Natl Lab. Rels. Bd.*,

---

[21]      The MNA has been certified by the National Labor Relations Board to bargain on behalf of the MNA nurses.  *See* Methuen CBA at Art. I.

200 F. Appx 344, 347 (5th Cir. 2006) ("Bankruptcy courts lack jurisdiction to determine successorship obligations under federal labor law"); *In re CCX, Inc.*, 654 B.R. 680, 702 (D. Del. 2023) ("A bankruptcy court order approving the sale of the debtors assets free and clear cannot shield the purchaser from successor liability arising out of its postsale conduct.") (citing 7 COLLIER BANKRUPTCY PRACTICE GUIDE ¶ 133.10 (2023)); *see also In re Pan Am. Hosp. Corp.*, 364 B.R. 832, 837 (Bankr. S.D. Fla. 2007) ("[T]he NLRB has complete and total independent jurisdiction in the area of labor relations relative to the activities of the purchaser of a business or property in bankruptcy from the date of acquisition of such business forward"). *See also Buy Direct, LLC v. DirectBuy, Inc.*, No. 2:15-CV-344-JVB-JEM, 2024 WL 4103703, at *3 (N.D. Ind. Sept. 6, 2024) ("It is not within a bankruptcy court's power to grant itself exclusive jurisdiction over all disputes related to the purchase agreement or the interpretation of its sale order.").

31.     *In re CCX, Inc.*, 654 B.R. 680 (D. Del. 2023) is particularly instructive.  In *CCX*, the debtor, a steel manufacturer, employed unionized workers that were party to a CBA and sold substantially all of its assets (excluding the CBA) to a buyer in a sale pursuant to section 363(f) of the Bankruptcy Code.  *Id*. at 686.  Once the sale closed, the buyer refused to recognize or bargain with the union, and the union sought relief from the NLRB.  *Id*. at 688–90. The buyer then moved before the bankruptcy court for entry of an order enforcing the sale order and enjoining the union from asserting successor obligations against the buyer as a violation of the sale order, which the bankruptcy court granted.  *Id*. at 690–91.

32.     The District Court reversed the bankruptcy court's order and allowed the NLRB proceedings to continue.  *Id*. at 703.  Following the Fifth Circuit's reasoning in *Erica*, the District Court held that any bargaining obligation the buyer had as a successor to the debtor was dictated by federal labor law and based on the buyer's *post-sale conduct*, not by whether the sale order was

16

free and clear of the CBA as an "interest in property" and NLRA obligations related to the CBA as the bankruptcy court had concluded.  *Id*. at 695.  Whether the debtor had rejected the CBA was irrelevant since it did not address the buyer's obligations (or lack thereof) as a successor.  *Id*. at 702 (relying on *Overstreet v. Apex Linen Holdings*, LLC, 618 F. Supp. 3d 1014, 1027 (D. Nev. 2022)).  The district court noted that the Bankruptcy Code and the NLRA were "capable of coexistence" and the court would not "not read one to override the other."  *Id*. at 703.[22]

33.     Here, the remaining unresolved labor issues under the MNA CBAs warrant a result similar to *CCX*.  The underlying question of whether the Buyer is violating the MNA CBAs or simply following the CBAs and endeavoring to negotiate certain transition effects, relates to the Buyer's post-sale negotiations and conduct and whether the Buyer's or the MNA's interpretation of the MNA CBAs is correct.  These issues are predicated on assumed labor contracts and the Buyer's rights and obligations under those contracts, not whether the Sale Order permits or prohibits something (which it does not).  In fact, the present disagreement has nothing to do with the Debtors, their estates or the Sale Order.

## III.     There Is No Bankruptcy Jurisdiction to Adjudicate the MNA's Dispute Since It Is Between Two Non-Debtors with No Demonstrable Impact on the Debtors' Estates.

34.     Section 28 U.S.C. § 1334 "grants the federal district courts jurisdiction over four types of bankruptcy matters: (1) 'cases under title 11,' (2) 'proceedings arising under title 11,' (3) proceedings 'arising in' a case under title 11, and (4) proceedings 'related to' a case under title 11. *In re U.S. Brass Corp.*, 301 F.3d 296, 303 (5th Cir. 2002) (citing 28 U.S.C. § 1334(a)-(b)). "The

---

[22]    Courts in other jurisdictions have reached the same conclusion, holding that bankruptcy courts do not have jurisdiction to adjudicate labor law successor obligations, and that as a result free and clear sale orders do not shield buyers from successor obligations. *See, e.g.*, *In re Carib-Inn of San Juan Corp.*, 905 F.2d 561 (1st Cir. 1990); *In re Goodman*, 873 F.2d 598 (2d Cir. 1989); *In re Bel Air Chateau Hosp., Inc.*, 611 F.2d 1248 (9th Cir. 1979).  The same reasoning applies here where the union is seeking to enforce a collective bargaining agreement due to alleged post-sale negotiations and conduct.

first category refers to the bankruptcy petition itself." *Id.* at 304.  For the later three categories, the Fifth Circuit has held that "[t]here is no need to distinguish between proceedings 'arising under', 'arising in a case under', or 'related to a case under', title 11" because "[t]hese references operate conjunctively", and "[t]herefore, it is necessary only to determine whether a matter is at least 'related to' the bankruptcy." *Matter of Highland Cap. Mgmt., L.P.*, No. 22-10983, 2023 WL 4842320, at *2 (5th Cir. July 28, 2023) (internal quotations omitted).

> [T]he test for whether a proceeding properly invokes federal "related to" jurisdiction is whether the outcome of the proceeding could conceivably affect the estate being administered in bankruptcy. Certainty is unnecessary; an action is 'related to' bankruptcy if the outcome could alter, positively or negatively, the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate.

*Porretto v. City of Galveston Park Bd. of Trustees*, 113 F.4th 469, 486–87 (5th Cir. 2024) (quoting *In re TXNB Internal Case*, 483 F.3d 292, 298 (5th Cir. 2007)).  Moreover, the party invoking related to jurisdiction must establish that the matter could have a conceivable effect on the bankruptcy estate at the time the matter is brought.  *See Porretto*, 113 F.4th at 488 ("Because Porretto has not clearly identified how her claims, which concern an abandoned property, could impact the bankruptcy estate, we find that the district court did not err in concluding that it could not exercise jurisdiction over Porretto's lawsuit pursuant to § 1334(b)."); *Double Eagle Energy Servs., L.L.C. v. MarkWest Utica EMG, L.L.C.*, 936 F.3d 260, 263–64 (5th Cir. 2019) (holding that the "time-of-filing" rule applies to cases brought pursuant to § 1334(b)).

35.     The MNA has not met its burden of showing how there is "related to" jurisdiction over the dispute.  The MNA relies on retention of jurisdiction paragraphs 9 and 34 of the Sale Order (Motion at ¶ 7), but neither provision retains jurisdiction over interpretation of the MNA

CBAs, and by their terms, they allow a party to challenge the Court's jurisdiction.[23] In any event, to retain jurisdiction, there must be jurisdiction over the matter in the first place. Resolution of whether the Buyer is complying with the terms of the MNA CBAs does not impact the Debtors' estates and does not involve interpretation of the Sale Order (even if one were to consider the MNA's rewrite of ¶ 69). The outcome only affects the future (post-closing) relationship between the Buyer and the MNA. The Buyer did not assume pre-closing liabilities for unfair labor practices or grievances under the MNA CBAs.[24] Accordingly, since the issue governs prospective duties and obligations, there is no impact on the Debtors' estate or their administration in bankruptcy. Courts have ruled that there is no bankruptcy jurisdiction in analogous purported breach of contract actions. *See In re Specialty Hosp. of Washington, LLC*, 580 B.R. 302 (D.D.C. 2018) (holding no bankruptcy jurisdiction over removed breach of lease action by debtor's former landlord against buyer where the claims at issue did not depend on interpretation of the bankruptcy court's sale order, did not relate to administration of the bankruptcy estate, and did not otherwise have any impact on the bankruptcy estate). Somewhat ironically, the MNA's proposed order to the Motion attempts to confer jurisdiction on the Court to adjudicate each and every dispute that may arise between the Buyer and the MNA under the MNA CBAs forever. *See* Proposed Order at ¶ 2 ("Lawrence must perform the CBAs unless otherwise agreed with MNA."). That objective is

---

[23]  Sale Order ¶¶ 34 ("The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order (including, without limitation, paragraph 18 of this Order), the APA, the Sale Transaction, and the Bidding Procedures Order, provided that all parties reserve their rights with respect to challenges to the Court's jurisdiction under applicable non-bankruptcy law."), 9 ("As further set forth in paragraph 34 hereof, the Court shall retain exclusive jurisdiction with respect to any and all issues, disputes, controversies, causes of action, and/or claims with respect to, or arising under, such provisions, including, without limitation, the enforcement thereof.").

[24]  *See* APA §§ 6.1(d) ("Effective upon the Effective Time, and except as set forth herein, Buyer Employer shall assume each Collective Bargaining Agreement governing the terms and conditions of employment of the employees represented by a union or other labor organization"), 1.4(e) (defining "Excluded assets" as including "[a]ll Liabilities arising from or related to any and all unfair labor practices or employee or union grievances that arise out of or relate to incidents or actions of the Seller or any Seller Affiliate or the Seller or any Seller Affiliate's failure to act occurring or commencing prior to the Effective Time.").

inconsistent with the detailed dispute resolution provisions in the MNA CBAs and the constitutional jurisdiction of this Court.  *See* Methuen CBA at Art. X, § 4; Haverhill CBA at XLIV.

### IV.  Even If There Were Bankruptcy Jurisdiction Over the MNA's Dispute, It Would be a Noncore Proceeding, and the Buyer Does not Consent to Entry of a Final Order by the Court.

36.     Even if the Court were to conclude that there is bankruptcy jurisdiction to adjudicate the MNA's dispute, the dispute is non-core and the Buyer does not consent to entry of a final order by the Court.

37.     "Once bankruptcy jurisdiction is established, the bankruptcy court's adjudicative power varies based on whether the particular proceeding is core or non-core." *Highland Cap. Mgmt.,* 2023 WL 4842320, at *3.  For core proceedings, the bankruptcy court may hear, determine, and enter a final judgment, subject to review by the district court.  *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611, 2024 WL 156211, at *16 (Bankr. S.D. Tex. Jan. 14, 2024), *supplemented*, No. 23-90611, 2024 WL 255855 (Bankr. S.D. Tex. Jan. 23, 2024); 28 U.S.C. § 157(b)(1).  "If the proceeding is non-core, and the parties have not consented to final adjudication by the bankruptcy court, the bankruptcy judge may only propose findings of fact and conclusions of law to the district court." *Wesco*, 2024 WL 156211, at *16; 28 U.S.C. § 157(c)(1).  Non-core proceedings "represent the bankruptcy court's power at its lowest ebb."  *Matter of RE Palm Springs II, L.L.C.*, 106 F.4th 406, 412 (5th Cir. 2024).

38.     A proceeding is 'core' "if it invokes the substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *In re OCA, Inc.*, 551 F.3d 359, 367–68 (5th Cir. 2008) (quoting *Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999)).  A noncore claim includes one "not based on any right created by the federal bankruptcy law," but instead is "simply a state contract

action that, had there been no bankruptcy, could have proceeded in state court." *In re OCA, Inc.*, 551 F.3d 359, 368 (5th Cir. 2008) (holding debtor's breach of contract claim against non-debtor dentist noncore).

39.     The MNA's motion does not satisfy the requirements for a core proceeding.  First, there is no substantive right provided by title 11 being invoked here: section 1113 does not apply to the LG Parties.  The MNA maintains that the dispute is core under 28 U.S.C. § 157(b)(2)(N), which provides that a core proceedings include "orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate."  Motion at ¶ 28.  But the dispute does not involve the Sale Order.  Nothing in the Sale Order addresses how the parties will operate under the MNA CBAs post-closing, which the MNA complains of, nor are the contractual rights and obligations under the MNA CBAs created by the Sale Order itself.  *Cf. Palm Springs*, 106 F.4th at 414 (concluding turnover order "based entirely on the Sale Order's purported creation of certain property rights" was "'integral to,' 'inseparable from,' and 'inextricably linked to' the bankruptcy case and, therefore, core").  If anything, the MNA is trying to add language to the Sale Order requiring the LG Parties to perform under the MNA CBAs based only on the MNA's interpretation of the agreements.  *See* Motion at p.13 ("The Court should Interpret and Enforce its Sale Order to Require that Lawrence Comply with the CBAs.").  As noted above, the language in the Sale Order applicable to the MNA CBAs serves only to make clear, for the avoidance of doubt, that the Court is not ruling on any requests to modify the MNA CBAs.  Here, the MNA is asking this Court to adjudicate a disagreement with the Buyer over the MNA CBAs.  That is a noncore matter to be resolved pursuant to the grievance and arbitration procedures in the MNA CBAs.

V.    **If the Parties Are Unable to Resolve Their Disagreement Over Contract Interpretation, the Grievance and Arbitration Procedures in the CBAs Govern the  Resolution.**

40.    If the MNA and the Buyer are not able to resolve the remaining unresolved MNA CBA issues, then the MNA and its members should follow the grievance and arbitration procedures in the assumed MNA CBAs and be held to those procedures.  *See*, *e.g.*, *Pfeiffer v. Dominion Management of Delaware t/a Cashpoint (In re Pfeiffer)*, No. ADV 11-0421, 2011 WL 4005504, at *4 & *9 (Bankr. E.D. Pa. Sept. 8, 2011) (noting how "federal law presumptively favors the enforcement of arbitration agreements" and granting motion to compel arbitration); *In re MicroBilt Corp.*, 484 B.R. 56, 64–66 (Bankr. D.N.J. 2012) (dismissing arbitrable claims where they could not "interfere or affect the distribution of the estate" and "directing the parties to proceed to arbitration before the appropriate tribunals"); *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 (2010) (noting key principle of abitrability is that "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration") (internal quotation omitted).  The grievance procedures govern issues arising in connection with interpretation and enforcement of the MNA CBAs.  *See* Methuen CBA at Art. X, § 4; Haverhill CBA at XLIV.  These procedures also allow the Buyer to address both individual and class wide MNA employee claims in a methodical way with arbitration being a last resort, not the first. Methuen CBA at Art. X, § 4; Haverhill CBA at XLIV, pp. 58–59.  Moreover, the procedures were designed to establish an efficient and "amicable" process for collective bargaining and resolving disputes that affords dignity and respect to everyone involved.  Methuen CBA at Art. II; Haverhill CBA at Art. II, § 1.  The MNA attempts to skirt the carefully designed terms of the MNA CBAs in the hopes of receiving an immediate carte blanche ruling.

**VI.    Even If There Were Bankruptcy Jurisdiction Over the MNA's Dispute, the Bankruptcy Court Should Abstain from Ruling on the Motion.**

41.    To the extent the Court concludes that it does have jurisdiction over the MNA's dispute with the Buyer over what the MNA CBAs require, the Court should exercise its discretion and abstain from ruling on the Motion to permit the exhaustion of the collective bargaining process and any additional administrative procedures.  A bankruptcy court may discretionarily decline to hear a proceeding under 28 U.S.C. § 1334(c)(1).  When doing so, the Court can consider any numbers of factors, including, among others, the effect or lack thereof on the efficient administration of the estate if the court abstains, the extent to which state law issues predominate over bankruptcy issues, the degree of relatedness or remoteness to the main bankruptcy case, the substance rather than the form of an asserted core proceeding, the presence in the proceeding of non-debtor parties, and comity.[25]  All of these factors (and potentially others)[26] support the Court abstaining from ruling on the Motion.

---

[25]    *Youngman v. Shaper (In re Speedcast Int'l Ltd.)*, No. 20-32243, 2022 WL 4281474, at *3–4 (Bankr. S.D. Tex. Sept. 15, 2022) (citing *Hous. Baseball Partners v. Comcast Corp. (In re Hous. Reg'l Sports Network, L.P.)*, 514 B.R. 211, 215 (Bankr. S.D. Tex. 2014)).  Unlike mandatory abstention, discretionary abstention does not require a pending related proceeding.  *See, e.g.*, *In re Windhaven Top Ins. Holdings, LLC*, 636 B.R. 596, 608–09 (Bankr. D. Del. 2021).

[26]    Bankruptcy Courts in the Southern District of Texas have examined as many as 14 factors in deciding whether to exercise permissive abstention with respect to a matter:

   1)   Effect or lack thereof on the efficient administration of the estate if the court remands or abstains;

   2)   Extent to which state law issues predominate over bankruptcy issues;

   3)   Difficult or unsettled nature of applicable law;

   4)   Presence of related proceeding commenced in state court or other non-bankruptcy proceeding;

   5)   Jurisdictional basis other than § 1334;

   6)   Degree of relatedness or remoteness of proceeding to main bankruptcy case;

   7)   The substance rather than the form of an asserted core proceeding;

   8)   The feasibility of severing state law claims from core bankruptcy matters to allow judgment to be entered in state court with enforcement left to the bankruptcy court;

   9)   The burden of the bankruptcy court's docket;

42.     Here, the Motion involves a post-sale contract dispute between non-debtors (the MNA and the Buyer) over two CBAs that have been assumed by the Buyer under the APA.  The outcome of the dispute has no discernable impact on the Debtors' estates, highlighting how the matter is likely non-core.  A Court resolution would now also ignore the very terms of the MNA CBAs that the MNA is trying to enforce – namely, the dispute resolution provisions.  And generally, where Congress has entrusted the resolution of matters in controversy to the expertise of an administrative body (such as the NLRB), the bankruptcy court may decline to exercise jurisdiction and defer to the specialized expertise of that other tribunal.[27]  Accordingly, the Court should abstain from adjudicating this dispute.

[*remainder of page intentionally left blank*]

---

10)  The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

11)  The existence of a right to a jury trial;

12)  The presence in the proceeding of non-debtor parties;

13)  Comity; and

14)  Possibility of prejudice to other parties in the action.

*Speedcast*, 2022 WL 4281474, at *3–4.

[27]  *See Nathanson v. National Labor Relations Board*, 344 U.S. 25, 30 (1952) (holding bankruptcy court should have deferred liquidation of unfair labor practice claim for NLRB to determine the appropriate remedy); *Matter of Gary Aircraft Corp.*, 698 F.2d 775, 783 (5th Cir. 1983) (extending rule to government contracting disputes before the Armed Services Board of Contract Appeals); *see also In re Tucson Yellow Cab Co., Inc.*, 27 B.R. 621, 622 (B.A.P. 9th Cir. 1983) ("In reviewing the provisions of the National Labor Relations Act which empower the NLRB to proceed against those who commit unfair labor practices, we find that the issuance of back pay orders and other monetary awards is an inseparable part of the exclusive authority given the NLRB to prevent any person from engaging in any unfair labor practice . . . affecting commerce" and reversing injunction against NLRB); *In re Dees*, 369 B.R. 676, 680 (Bankr. N.D. Fla. 2007) ("This Court is simply the wrong tool in the jurisdictional toolbox for resolving the isolated tax question presented in the circumstances of this case. Resolving the dispositive question in this Court would be like using an ill-fitting screwdriver: it can be done, but not without expending more resources than necessary. It is more sensible to use the proper jurisdictional tool.").

**WHEREFORE**, the LG Parties respectfully request that the Court: (i) sustain this Objection and deny the Motion or, in the alternative, abstain from hearing the Motion; and (ii) grant to the LG Parties such other and further relief as the Court deems just and appropriate.

Dated: October 18, 2024

Respectfully submitted,

*/s/ Douglas B. Rosner*
**GOULSTON & STORRS PC**
Douglas B. Rosner, Esq. (SD TX ID No. 436339)
Brendan M. Gage, Esq. (admitted *pro hac vice*)
One Post Office Square, 25th Floor
Boston, MA 02109
Telephone: (617) 482-1776
Email:   drosner@goulstonstorrs.com
            bgage@goulstonstorrs.com

*Counsel to the LG Parties*

**<u>Certificate of Service</u>**

I certify that on October 18, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

By: */s/ Douglas B. Rosner*

**GOULSTON & STORRS PC**
Douglas B. Rosner, Esq. (SD TX ID No. 436339)
One Post Office Square, 25th Floor
Boston, MA 02109
Telephone: (617) 482-1776
Email:  drosner@goulstonstorrs.com