EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 1:20-CV-11415-LTS

| | |
|---|---|
| PASCHAL NWAGU, as the Personal Representative of the ESTATE of JOSEPH NWAGU and Individually, and STELLA NWAGU, Plaintiffs | ) ) ) ) ) |
| v. | ) ) |
| RACHEL PERAKSLIS, R.N., LUCY BAYER-ZWIRELLO, M.D., ANNA KESHISHYAN, C.N.M., KATRINA DOHERTY, R.N. (formerly known as KATRINA MARTIN, B.S.N.), LUISA BORGONZI, R.N., STEWARD GOOD SAMARITAN MEDICAL CENTER, INC., STEWARD ST. ELIZABETH'S MEDICAL CENTER OF BOSTON, INC., and UNITED STATES OF AMERICA, Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) |

**SECOND AMENDED COMPLAINT AND JURY CLAIM**

**Parties**

1.  The plaintiff, Paschal Nwagu, the Personal Representative of the Estate of Joseph Nwagu, is an individual residing at 48 Reservoir Street, Brockton, Plymouth County, Massachusetts.

2.  The plaintiff, Stella Nwagu, is an individual residing at 48 Reservoir Street, Brockton, Plymouth County, Massachusetts.

3.  Anika Moore, M.D., is an individual with places of business at Steward Good Samaritan Medical Center, 235 North Pearl Street, Brockton, Plymouth County, Massachusetts and Brockton Neighborhood Health Center, 63 Main Street, Brockton, Plymouth County, Massachusetts. The defendant, United States of America (United States), has been substituted for Dr. Moore under 42 U.S.C. § 233.

4.  Cassandra Etienne, C.N.M., is an individual with places of business at Steward Good Samaritan Medical Center, 235 North Pearl Street, Brockton, Plymouth County, Massachusetts and Brockton Neighborhood Health Center, 63 Main Street, Brockton, Plymouth County, Massachusetts. The defendant, United States of America, has been substituted for Midwife Etienne under 42 U.S.C. § 233.

5.     The defendant, Rachel Perakslis, R.N., is an individual with a place of business at Steward Good Samaritan Medical Center, 235 North Pearl Street, Brockton, Plymouth County, Massachusetts.

6.     The defendant, Lucy Bayer-Zwirello, M.D., is an individual with a place of business at Steward St. Elizabeth's Medical Center, 736 Cambridge Street, Brighton, Suffolk County, Massachusetts.

7.     The defendant, Anna Keshishyan, C.N.M., is an individual with a place of business at Steward St. Elizabeth's Medical Center, 736 Cambridge Street, Brighton, Suffolk County, Massachusetts.

8.     The defendant, Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.), is an individual with a place of business at Steward St. Elizabeth's Medical Center, 736 Cambridge Street, Brighton, Suffolk County, Massachusetts.

9.     The defendant, Luisa Borgonzi, R.N., is an individual with a place of business at Steward St. Elizabeth's Medical Center, 736 Cambridge Street, Brighton, Suffolk County, Massachusetts.

10.    The defendant, Steward Good Samaritan Medical Center, Inc. (Steward Good Samaritan Medical Center), is a foreign for-profit corporation with a place of business at 235 North Pearl Street, Brockton, Plymouth County, Massachusetts.

11.    The defendant, Steward St. Elizabeth's Medical Center of Boston, Inc. (Steward St. Elizabeth's Medical Center), is a foreign for-profit corporation with a place of business at 736 Cambridge Street, Brighton, Suffolk County, Massachusetts.

## Facts

12.    From March of 2018 through early August of 2018, Ana Sofia DeBrito, C.N.M., of Brockton Neighborhood Health Center, as the primary midwife, provided prenatal care to Stella Nwagu.

13.    In March 2018, Ms. Nwagu was seen at Brockton Neighborhood Health Center with "some pains with sudden movement." Midwife DeBrito noted that Ms. Nwagu had a history of caesarian section in August 2017. Despite Ms. Nwagu's complaints of pain of unknown cause, she was noted to have a "normal pregnancy."

14.    On July 12, 2018, Ms. Nwagu was seen at Brockton Neighborhood Health Center with "the same constant pain over [the] caesarian scar as [the] uterus stretche[d]" and new concerns about "round ligament pain with movement." The pain was rated at 5/10. No inquiry into the cause of the pain was made.

15.    On July 27, 2018, Ms. Nwagu's delivery record from Nigeria was received by Brockton Neighborhood Health Center. Ms. Nwagu was noted to have had a low transverse caesarian section for partial placental abruption in August 2017. It was noted that Ms. Nwagu was presently "doing well" and there were "no concerns."

2

16.   On August 10, 2018, Ms. Nwagu was seen at Brockton Neighborhood Health Center with "pelvic pain" rated at 5/10. No inquiry into the cause of the pain was made.

17.   On August 15, 2018, around 12:00-12:15 a.m., Ms. Nwagu, age 32, gestational age 31 weeks and 4 days, was admitted to Steward Good Samaritan Medical Center with painful contractions since the morning of August 14, 2018. Her contractions were initially associated with mild pain, but the pain became intense and contractions were occurring with increased frequency by 11 p.m. on August 14, 2018. On arrival, Ms. Nwagu was "breathing heavily with contractions" and reported severe abdominal pain and "the urge to push."

18.   Cassandra Etienne, C.N.M., was called to the room because it was thought that Ms. Nwagu was "about to deliver." At 12:16 a.m., Ms. Nwagu reported abdominal pain rated at 8/10. Midwife Etienne ordered Terbutaline for delaying preterm labor, Morphine 5 mg IV, Phenergan 25 mg IV, and IVF bolus. At 12:17 a.m., a bedside ultrasound showed transverse fetal presentation.

19.   At 1:58 a.m., Midwife Etienne was informed that Ms. Nwagu received a second dose of Terbutaline at 1:32 a.m. but continued to have contractions every 3-6 minutes, was "very uncomfortable" during contractions, and Morphine did not relieve her pain. Midwife Etienne ordered the third dose of Terbutaline and also ordered Betamethasone. Midwife Etienne spoke with Anika Moore, M.D., the attending/on-call physician, who merely recommended a maternal-fetal medicine consultation solely for purposes of obtaining an authorization to transfer Ms. Nwagu to a tertiary center equipped to provide adequate preterm infant care.

20.   Although Dr. Moore was physically present at Steward Good Samaritan Medical Center and was the attending/on-call physician throughout Ms. Nwagu's admission to Steward Good Samaritan Medical Center, Dr. Moore saw no need to assess Ms. Nwagu in person at any point, review her medical records, or follow-up with Midwife Etienne regarding Ms. Nwagu. Dr. Moore made no entry into Ms. Nwagu's medical records and was not identified as the attending physician in Ms. Nwagu's medical records which instead erroneously identified Midwife Etienne as the "attending physician."

21.   A call for a maternal-fetal medicine consultation was made and there was no response for an hour. At 3:00 a.m., Midwife Etienne spoke with the defendant, Lucy Bayer-Zwirello, M.D. Dr. Bayer-Zwirello accepted Ms. Nwagu's transfer to Steward St. Elizabeth's Medical Center and recommended a plan of care including medications for preterm contractions, without reviewing Ms. Nwagu's medical history and current status, without making a differential diagnosis and identifying associated risks, and without ascertaining that Ms. Nwagu would be assigned an attending physician physically present at Steward St. Elizabeth's Medical Center upon transfer. As part of accepting Ms. Nwagu's transfer, Dr. Bayer-Zwirello spoke with the defendant, Anna Keshishyan, C.N.M., and recommended that the same plan be followed at Steward St. Elizabeth's Medical Center. At 3:09 a.m., Midwife Etienne ordered Magnesium per Dr. Bayer-Zwirello's recommendation.

22. At 3:22 a.m., Ms. Nwagu was evaluated by Midwife Etienne for "preterm labor." Midwife Etienne noted that Terbutaline, IVF, and Morphine had been administered with minimal effect. Midwife Etienne also noted that Ms. Nwagu had a history of a caesarian section in 2017 at 42 weeks for "FTP" (failure to progress in labor) in Nigeria and that her primary midwife was Midwife DeBrito with whom 7 visits had been recorded. There is no indication in the medical records that Midwife Etienne was aware of Ms. Nwagu's prior placental abruption although Brockton Neighborhood Health Center had "received her delivery record from Nigeria" containing this information. The fetal heart rate was 155 with moderate variability and variable decelerations. Midwife Etienne deemed the fetal heart rate to be Category I although variable decelerations were indicative of Category II. Midwife Etienne assessed Ms. Nwagu with "preterm uterine contractions." There is no indication in the medical records that Midwife Etienne considered Ms. Nwagu's risk of uterine rupture or recurrent placental abruption.

23. The fetal heart rate was checked by the defendant, Rachel Perakslis, R.N., approximately every 15-30 minutes from 12:27 a.m. to 4 a.m. Nurse Perakslis noted "difficulty tracing contractions." The tocometer was "adjusted multiple times." From approximately 1 a.m. to 4 a.m., Nurse Perakslis deemed the fetal heart rate to be Category II on 6 out of 9 checks and deemed it to be Category II on the last check at 4 a.m. During the 3 ½ hours of fetal heart rate monitoring from approximately 12:30 a.m. to 4 a.m., Midwife Etienne reviewed fetal heart rate tracings only at 2:30 a.m. and 3:22 a.m. when the fetal heart rate was Category II and the only action taken in response was tocometer adjustment.

24. At 4:30 a.m., Ms. Nwagu left Steward Good Samaritan Medical Center in an ambulance, with Magnesium infusing, and was transported to Steward St. Elizabeth's Medical Center.

25. At 5:15 a.m., Ms. Nwagu was admitted to Steward St. Elizabeth's Medical Center with painful uterine contractions occurring every 3-5 minutes and unchanged in intensity. It was noted that the contractions had been occurring since the mid-day of August 14, 2018. On admission, her abdominal pain was rated at 6/10.

26. Although Dr. Bayer-Zwirello was not physically present at Steward St. Elizabeth's Medical Center and did not assess Ms. Nwagu at any time during her admission to Steward St. Elizabeth's Medical Center, Dr. Bayer-Zwirello was designated as the attending physician for Ms. Nwagu's admission to Steward St. Elizabeth's Medical Center in her medical records. Midwife Keshishyan signed the Steward St. Elizabeth's Medical Center admission record identifying Dr. Bayer-Zwirello as the attending physician assigned to Ms. Nwagu although Midwife Keshishyan was well aware that Dr. Bayer-Zwirello was not physically present at Steward St. Elizabeth's Medical Center and never assessed Ms. Nwagu. Dr. Bayer-Zwirello signed the Steward St. Elizabeth's Medical Center discharge record identifying her as the attending physician assigned to Ms. Nwagu although Dr. Bayer-Zwirello was well aware that she did not act as the attending physician and never assessed Ms. Nwagu.

27. Although Dr. Bayer-Zwirello was not physically present at Steward St. Elizabeth's Medical Center and did not assess Ms. Nwagu at any time during her admission to

4

Steward St. Elizabeth's Medical Center, Midwife Keshishyan followed the plan of care recommended by Dr. Bayer-Zwirello and saw no need to have Ms. Nwagu assessed by an attending physician physically present at Steward St. Elizabeth's Medical Center.

28.     At 6:22 a.m., approximately an hour after admission, Ms. Nwagu was evaluated by Midwife Keshishyan who noted Ms. Nwagu's history of a prior caesarian section for placental abruption in 2017 with two-layer uterine closure. Midwife Keshishyan observed that Ms. Nwagu was in "mild distress" and there were "no other abnormal findings." Although Midwife Keshishyan did note a Category II fetal heart rate tracing with "some episodes of minimal variability," she expressed no concern regarding recurrent Category II fetal heart rate tracings and persistent difficulty performing fetal heart rate monitoring for more than 5 hours since approximately 1 a.m. Ms. Nwagu was assessed with "preterm uterine contractions" at 31 weeks and 4 days. There is no indication in the medical records that Dr. Bayer-Zwirello or Midwife Keshishyan considered Ms. Nwagu's risk of uterine rupture or recurrent placental abruption. Recommendations included admitting to Labor & Delivery, "continuous monitoring," a NICU consult, an anesthesia consult, CBC and T&S laboratory tests, Celestone, and Magnesium.

29.     At approximately 7:00 a.m., Midwife Keshishyan ended her shift and Kathleen Jones-McWilliams, C.N.M., was assigned to Ms. Nwagu. Midwife Jones-McWilliams failed to perform any assessment of Ms. Nwagu until after her delivery.

30.     Fetal heart rate monitoring was initiated at approximately 5:30 a.m., 1 ½ hours after the last fetal heart rate tracing was obtained at Steward Good Samaritan Medical Center and deemed to be Category II. For the next 1 ½ hours, from approximately 5:30 a.m. to 7:00 a.m., there was significant difficulty performing fetal heart rate monitoring and the fetal heart rate was not categorized. During the next hour, from approximately 7:00 a.m. to 8:00 a.m., the defendant, Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.), and the defendant, Luisa Borgonzi, R.N., noted continued difficulty performing fetal heart rate monitoring, with the external fetal monitor being "continually adjusted," and variable decelerations indicative of Category II fetal heart rate tracings on 3 out of 4 checks but expressed no concern. During the 2 ½ hours of fetal heart rate monitoring, Midwife Keshishyan assessed Ms. Nwagu only once, at 6:22 a.m.

31.     At approximately 8:00 a.m., Nurse Borgonzi noted the fetal heart rate first at 200 and then at 70 with prolonged decelerations. Attending physicians were summoned. At approximately 8:10 a.m., a bedside ultrasound showed the fetus as breech, with the head displaced to the left upper quadrant of the abdomen. The fetal heart rate was in the 50-60 range. At 8:12 a.m., Ms. Nwagu arrived at the OR. Caesarian section was performed. The fetus was delivered breech from the upper abdomen. The postoperative diagnosis was spontaneous uterine rupture during labor with the fetus outside the uterus and fetal bradycardia. The placenta was above the fetal head in the left upper quadrant of the abdomen and "was not attached to any structures." There was a lower uterine defect overlying the prior uterine scar. Ms. Nwagu's infant son, Joseph Nwagu, had Apgars 1, 2, and 4.

32. Joseph Nwagu developed seizure activity at 1 hour of life, received Phenobarbital, and was transferred to the Massachusetts General Hospital NICU for further treatment. His brain MRI obtained on August 15, 2018 showed a hypoxia-hypoperfusion injury involving the basal ganglia, thalami, and brain stem. Throughout his admission, his neurologic exam was severely abnormal, with no spontaneous respirations and with ventilator dependence. One of the "seasoned caregivers" noted, "This is one of the worst exams I've ever seen." His brain MRI on August 20, 2018 showed areas of restricted diffusion and signal abnormality involving the bilateral lentiform nuclei, thalami, midbrain, posterior pons, and posterior medulla, as well as a small right parieto-occipital extracranial hematoma. The findings were concerning for a central pattern of hypoxic-ischemic changes. His brain MRI on September 27, 2018 showed expected evolution of the hypoxia-hypoperfusion injury resulting in progressive atrophy of the bilateral basal ganglia, thalami, and brainstem. On October 2, 2018, Ms. Nwagu and her husband, Paschal Nwagu, decided to redirect Joseph Nwagu's care to comfort measures only. Joseph Nwagu died on October 8, 2018 due to hypoxic-ischemic encephalopathy.

33. On August 15, 2018, Ms. Nwagu was at high risk of uterine rupture indicated by her prior caesarian section for placental abruption in August 2017 with a resultant lower uterine scar, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her complaints of constant pain over the caesarian scar, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings. The lower uterine defect and the short interval between Ms. Nwagu's pregnancies substantially increased the probability of uterine rupture. Ms. Nwagu's persistent, increasingly intense uterine contractions increased the risk of uterine rupture even further.

34. On August 15, 2018, Ms. Nwagu was also at high risk of recurrent placental abruption indicated by her prior placental abruption and caesarian section for the placental abruption in August 2017 with a resultant lower uterine scar, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her complaints of constant pain over the caesarian scar, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings. The lower uterine defect and the short interval between Ms. Nwagu's pregnancies substantially increased the probability of a compromised placental attachment to the uterine wall. Ms. Nwagu's persistent, increasingly intense uterine contractions increased the risk of recurrent placental abruption even further.

35. Dr. Moore, Midwife Etienne, Dr. Bayer-Zwirello, Midwife Keshishyan, and Midwife Jones-McWilliams failed to identify the high risk of uterine rupture and recurrent placental abruption and failed to properly manage the risk by facilitating appropriate workup and timely caesarian delivery.

36. Nurse Perakslis, Nurse Doherty f/k/a Martin, and Nurse Borgonzi failed to ascertain fetal wellbeing and failed to communicate lack of fetal reassurance to Dr. Moore, Midwife Etienne, Dr. Bayer-Zwirello, Midwife Keshishyan, and Midwife Jones-McWilliams, thereby materially increasing the risk of faulty decision-making by the latter with regard to timely caesarian delivery.

6

37. At all relevant times, Steward Good Samaritan Medical Center failed to have in place adequate policies and procedures ensuring timely access to up-to-date prenatal records kept by Brockton Neighborhood Health Center and proper communication of an obstetric patient's medical history. Instead, Steward Good Samaritan Medical Center received prenatal record "drop-offs" from Brockton Neighborhood Health Center at certain intervals: first, when prenatal care was initiated; second, at 20 weeks; and third, at full term. Review of prenatal records was not considered as part of the attending physician's responsibilities and prenatal records usually were not included into hospital records. When an obstetric patient was transferred from Steward Good Samaritan Medical Center to a tertiary center, the patient's pertinent past medical conditions were not specified in the transfer records.

38. At all relevant times, Dr. Moore perceived the attending physician's role merely as being "part of the care team" and saw no need to provide any supervision to Midwife Etienne, assess Ms. Nwagu in person, or review her medical records. Dr. Moore remained unaware of Ms. Nwagu's history of partial placental abruption in August 2017, the short interval between her prior pregnancy and her current pregnancy, and her complaints of abdominal/pelvic pain reflected in her prenatal records, failing to recognize these as significant risk factors for uterine rupture and recurrent placental abruption. Although Steward Good Samaritan Medical Center's hospital policy categorized a pregnancy following a prior caesarean section as high-risk, Dr. Moore erroneously categorized Ms. Nwagu's current pregnancy as low-risk.

39. Although Dr. Moore was required to follow Steward Good Samaritan Medical Center's hospital policies and procedures, these were not made available to her and she had no familiarity with any of these. In particular, Dr. Moore was unfamiliar with Steward Good Samaritan Medical Center's hospital policy categorizing a pregnancy following a prior caesarean section as a high-risk pregnancy. Nor was Dr. Moore familiar with Steward Good Samaritan Medical Center's hospital policy requiring the "responsible physician" to complete a "physical assessment" of an obstetric patient before having the patient transferred to a tertiary center.

40. Having failed to categorize Ms. Nwagu's pregnancy as high-risk, Dr. Moore failed to facilitate a maternal-fetal medicine consultation "to ensure … the required level of specialized care" during Ms. Nwagu's labor in accordance with Steward Good Samaritan Medical Center's hospital policy pertaining to high-risk obstetric patients. Instead, Dr. Moore recommended such a consultation solely for purposes of obtaining an authorization to transfer Ms. Nwagu to a tertiary center equipped to provide adequate preterm infant care.

41. Although Midwife Etienne was required to follow Steward Good Samaritan Medical Center's hospital policies and procedures, she was unfamiliar with these. In particular, Midwife Etienne was unfamiliar with Steward Good Samaritan Medical Center's hospital policy categorizing a pregnancy following a prior caesarean section as a high-risk pregnancy. Nor was Midwife Etienne familiar with Steward Good Samaritan Medical Center's hospital policy requiring the "responsible physician" to complete a "physical

assessment" of an obstetric patient before having the patient transferred to a tertiary center.

42. At all relevant times, Steward St. Elizabeth's Medical Center failed to have in place adequate policies and procedures pertaining to "acute transfers" of obstetric patients and related "clinical handoffs." While its hospital policy pertaining to "acute transfers" required that the attending physician perform a "clinical handoff" within 15 minutes of a transfer request, its hospital policy pertaining to "clinical handoff" vaguely described the information that had to be communicated, failing to mandate communication of a pertinent medical history which was crucial to determining the appropriate service level.

43. At all relevant times, Steward St. Elizabeth's Medical Center also failed to have in place adequate policies and procedures relative to admission of high-risk obstetric patients. Its hospital policy pertaining to admission of high-risk obstetric patients failed to define a high-risk pregnancy and merely required a "written order from the referring physician" and "approval of the Perinatologist, Neonatologist, or Nurse Practitioner." Although the policy vaguely indicated that the appropriate service level had to be determined, it failed to specify who was responsible for its determination.

44. As a result, Dr. Bayer-Zwirello authorized Ms. Nwagu's transfer to Steward St. Elizabeth's Medical Center and formulated a care plan for her over the phone without obtaining her highly pertinent medical history and without assessing her in person. Based solely on this phone communication, Dr. Bayer-Zwirello was erroneously identified in medical records as the attending physician relative to Ms. Nwagu's admission to Steward St. Elizabeth's Medical Center while in fact Dr. Bayer-Zwirello did not act as such. No physician assessed Ms. Nwagu upon admission. Midwife Keshishyan failed to recognize Ms. Nwagu's pregnancy as high-risk, saw no need to determine her risk level, saw no need to have her assessed by a physician, and continued to follow the care plan formulated by Dr. Bayer-Zwirello.

45. Although Steward St. Elizabeth's Medical Center's hospital policy pertaining to fetal heart rate monitoring identified factors placing an obstetric patient at high risk, the policy did not indicate who was responsible for categorizing the patient's pregnancy as high-risk.

46. As a result, Nurse Doherty f/k/a Martin did not know who, if anyone, was responsible for categorizing an obstetric patient's pregnancy in light of her risks. Nurse Doherty f/k/a Martin was unaware of Ms. Nwagu's risk category because her risks were not identified and her pregnancy was not categorized in light of her risks.

47. Anika Moore, M.D., deviated as follows from the standard of care of the average qualified obstetrician and gynecologist, taking into account the advances in this profession, with respect to her medical care and treatment of Ms. Nwagu on August 15, 2018:

(a) by failing to adequately familiarize herself with Ms. Nwagu's medical history, including her prior placental abruption in August 2017 and complaints of pain over

the caesarian scar/pelvic pain in July-August of 2018 reflected in Brockton Neighborhood Health Center records;

(b) by failing to adequately familiarize herself with Ms. Nwagu's current status as of August 15, 2018 reflected in Steward Good Samaritan Medical Center records;

(c) by failing to assess Ms. Nwagu in person in accordance with Steward Good Samaritan Medical Center's hospital policy requiring the "responsible physician" to complete a "physical assessment" of an obstetric patient for purposes of transfer to a tertiary center;

(d) by failing to categorize Ms. Nwagu's pregnancy as high-risk in accordance with Steward Good Samaritan Medical Center's hospital policy categorizing a pregnancy following a caesarean section as a high-risk pregnancy;

(e) by failing to identify Ms. Nwagu's high risk of uterine rupture and recurrent placental abruption in light of her prior caesarian section for placental abruption in August 2017, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings;

(f) by failing to inquire into the cause of Ms. Nwagu's preterm labor and severe contraction pain and make an appropriate differential diagnosis, including a uterine defect, uterine rupture, and recurrent placental abruption, in light of her prior caesarean section for placental abruption in August 2017, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings;

(g) by failing to facilitate Ms. Nwagu's timely assessment by a maternal-fetal medicine physician in light of her high-risk labor for purposes of providing "the required level of specialized care" during Ms. Nwagu's labor in accordance with Steward Good Samaritan Medical Center's hospital policy pertaining to high-risk obstetric patients;

(h) by failing to facilitate appropriate workup for a suspected uterine defect, uterine rupture, and recurrent placental abruption, such as a detailed ultrasound with focus on the uterine scar and laboratory testing for placental abruption, including coagulation studies, fetal cell studies such as a Kleihauer-Betke test, and fibrin degradation studies; and

(i) by failing to familiarize herself with Steward Good Samaritan Medical Center's hospital policies and procedures, including its policies pertaining to high-risk pregnancy and transfer to a tertiary center.

48. Cassandra Etienne, C.N.M., deviated as follows from the standard of care of the average qualified labor and delivery midwife, taking into account the advances in this profession, with respect to her medical care and treatment of Ms. Nwagu on August 15, 2018:

9

(a) by failing to adequately familiarize herself with Ms. Nwagu's medical history, including her prior placental abruption in August 2017 and complaints of pain over the caesarian scar/pelvic pain in July-August of 2018 reflected in Brockton Neighborhood Health Center records, and by improperly attributing her prior caesarian section in August 2017 to "FTP," failure to progress in labor;

(b) by failing to facilitate Ms. Nwagu's in-person assessment by Dr. Moore in accordance with Steward Good Samaritan Medical Center's hospital policy requiring the "responsible physician" to complete a "physical assessment" of an obstetric patient for purposes of transfer to a tertiary center;

(c) by failing to categorize Ms. Nwagu's pregnancy as high-risk in accordance with Steward Good Samaritan Medical Center's hospital policy categorizing a pregnancy following a caesarean section as a high-risk pregnancy;

(d) by failing to identify Ms. Nwagu's high risk of uterine rupture and recurrent placental abruption in light of her prior caesarian section for placental abruption in August 2017, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings;

(e) by failing to inquire into the cause of Ms. Nwagu's preterm labor and severe contraction pain and make an appropriate differential diagnosis, including a uterine defect, uterine rupture, and recurrent placental abruption, in light of her prior caesarian section for placental abruption in August 2017, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings;

(f) by failing to facilitate Ms. Nwagu's timely assessment by a maternal-fetal medicine physician in light of her high-risk labor for purposes of providing "the required level of specialized care" during Ms. Nwagu's labor in accordance with Steward Good Samaritan Medical Center's hospital policy pertaining to high-risk obstetric patients and by ineffectively treating her with Terbutaline and Magnesium for approximately 4 ½ hours at Steward Good Samaritan Medical Center without an obstetrician's assessment;

(g) by failing to alert Dr. Moore and Dr. Bayer-Zwirello to Ms. Nwagu's extremely painful preterm contractions not responding to Terbutaline and Magnesium in the context of a history of the prior placental abruption in August 2017 resulting in caesarean section and a less-than-a-year interval between her prior pregnancy and her current pregnancy;

(h) by failing to facilitate appropriate workup for a suspected uterine defect, uterine rupture, and recurrent placental abruption, such as a detailed ultrasound with focus on the uterine scar and laboratory testing for placental abruption, including coagulation

10

studies, fetal cell studies such as a Kleihauer-Betke test, and fibrin degradation studies;

(i) by failing to facilitate fetal evaluation by means other than fetal heart rate monitoring, such as a non-stress test, contraction stress test, biophysical profile, modified biophysical profile, or umbilical artery Doppler velocimetry, in light of recurrent non-reassuring (Category II) fetal heart rate tracings and persistent difficulty performing fetal heart rate monitoring;

(j) by failing to alert Dr. Moore and Dr. Bayer-Zwirello to recurrent non-reassuring (Category II) fetal heart rate tracings and persistent difficulty performing fetal heart rate monitoring; and

(k) by failing to facilitate timely caesarian delivery in the context of a probable uterine rupture and recurrent placental abruption, recurrent non-reassuring (Category II) fetal heart rate tracings, and persistent difficulty performing fetal heart rate monitoring.

49. The defendant, Lucy Bayer-Zwirello, M.D., deviated as follows from the standards of care of the average qualified maternal-fetal medicine physician and the average qualified obstetrician and gynecologist, taking into account the advances in these professions, with respect to her medical care and treatment of Ms. Nwagu on August 15, 2018:

(a) by failing to timely provide or facilitate a maternal-fetal medicine consultation in response to Midwife Etienne's request for it;

(b) by failing to properly accept Ms. Nwagu's transfer, i.e., failing to obtain from Midwife Etienne and communicate to Midwife Keshishyan the necessary information, including Ms. Nwagu's medical history and current status, and failing to ascertain that Ms. Nwagu would be assigned an attending physician physically present at Steward St. Elizabeth's Medical Center upon transfer;

(c) by signing the Steward St. Elizabeth's Medical Center discharge record identifying Dr. Bayer-Zwirello as the attending physician assigned to Ms. Nwagu although Dr. Bayer-Zwirello was well aware that she did not act as the attending physician and never assessed Ms. Nwagu;

(d) by failing to adequately familiarize herself with Ms. Nwagu's medical history, including her prior placental abruption in August 2017 and complaints of pain over the caesarian scar/pelvic pain in July-August of 2018 reflected in Brockton Neighborhood Health Center records;

(e) by failing to adequately familiarize herself with Ms. Nwagu's current status as of August 15, 2018 reflected in Steward Good Samaritan Medical Center records;

(f) by failing to identify Ms. Nwagu's high risk of uterine rupture and recurrent placental abruption in light of her prior caesarian section for placental abruption in August 2017, a less-than-a-year interval between her prior pregnancy and her current

pregnancy, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings;

(g) by failing to inquire into the cause of Ms. Nwagu's preterm labor and severe contraction pain and make an appropriate differential diagnosis, including a uterine defect, uterine rupture, and recurrent placental abruption, in light of her prior caesarian section for placental abruption in August 2017, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings;

(h) by recommending to Midwife Ettienne and Midwife Keshishyan a deficient plan of care, without reviewing Ms. Nwagu's medical history and current status, without making a differential diagnosis and identifying associated risks, and without ascertaining that Ms. Nwagu would be assigned an attending physician physically present at Steward St. Elizabeth's Medical Center upon transfer;

(i) by failing to facilitate appropriate workup for a suspected uterine defect, uterine rupture, and recurrent placental abruption, such as a detailed ultrasound with focus on the uterine scar and laboratory testing for placental abruption, including coagulation studies, fetal cell studies such as a Kleihauer-Betke test, and fibrin degradation studies;

(j) by failing to facilitate fetal evaluation by means other than fetal heart rate monitoring, such as a non-stress test, contraction stress test, biophysical profile, modified biophysical profile, or umbilical artery Doppler velocimetry, in light of recurrent non-reassuring (Category II) fetal heart rate tracings and persistent difficulty performing fetal heart rate monitoring; and

(k) by failing to facilitate timely caesarian delivery in the context of a probable uterine rupture and recurrent placental abruption, recurrent non-reassuring (Category II) fetal heart rate tracings, and persistent difficulty performing fetal heart rate monitoring.

50. The defendant, Anna Keshishyan, C.N.M., deviated as follows from the standard of care of the average qualified labor and delivery midwife, taking into account the advances in this profession, with respect to her medical care and treatment of Ms. Nwagu on August 15, 2018:

(a) by failing to ascertain that Ms. Nwagu was assigned an attending physician physically present at Steward St. Elizabeth's Medical Center upon transfer and facilitate Ms. Nwagu's timely assessment by the attending physician;

(b) by signing the Steward St. Elizabeth's Medical Center admission record identifying Dr. Bayer-Zwirello as the attending physician assigned to Ms. Nwagu although Midwife Keshishyan was well aware that Dr. Bayer-Zwirello was not physically present at Steward St. Elizabeth's Medical Center and never assessed Ms. Nwagu;

(c) by failing to facilitate Ms. Nwagu's timely assessment by a maternal-fetal medicine physician in light of her high-risk labor and by continuing to ineffectively treat her with Magnesium at Steward St. Elizabeth's Medical Center without an obstetrician's assessment;

(d) by failing to alert Dr. Bayer-Zwirello and the attending physician physically present at Steward St. Elizabeth's Medical Center to Ms. Nwagu's extremely painful preterm contractions not responding to Terbutaline and Magnesium in the context of a history of the prior placental abruption in August 2017 resulting in caesarean section and a less-than-a-year interval between her prior pregnancy and her current pregnancy;

(e) by failing to identify Ms. Nwagu's high risk of uterine rupture and recurrent placental abruption in light of her prior caesarian section for placental abruption in August 2017, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings;

(f) by failing to inquire into the cause of Ms. Nwagu's preterm labor and severe contraction pain and make an appropriate differential diagnosis, including a uterine defect, uterine rupture, and recurrent placental abruption, in light of her prior caesarian section for placental abruption in August 2017, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings;

(g) by continuing to ineffectively treat Ms. Nwagu with Magnesium at Steward St. Elizabeth's Medical Center after she had been ineffectively treated with Terbutaline and Magnesium for approximately 4 ½ hours at Steward Good Samaritan Medical Center and then en route from Steward Good Samaritan Medical Center to Steward St. Elizabeth's Medical Center;

(h) by failing to facilitate appropriate workup for a suspected uterine defect, uterine rupture, and recurrent placental abruption, such as a detailed ultrasound with focus on the uterine scar and laboratory testing for placental abruption, including coagulation studies, fetal cell studies such as a Kleihauer-Betke test, and fibrin degradation studies;

(i) by failing to facilitate fetal evaluation by means other than fetal heart rate monitoring, such as a non-stress test, contraction stress test, biophysical profile, modified biophysical profile, or umbilical artery Doppler velocimetry, in light of recurrent non-reassuring (Category II) fetal heart rate tracings and persistent difficulty performing fetal heart rate monitoring; and

(j) by failing to facilitate timely caesarian delivery in the context of a probable uterine rupture and recurrent placental abruption, recurrent non-reassuring (Category II) fetal heart rate tracings, and persistent difficulty performing fetal heart rate monitoring.

13

51. Kathleen Jones-McWilliams, C.N.M., deviated as follows from the standard of care of the average qualified labor and delivery midwife, taking into account the advances in this profession, with respect to her medical care and treatment of Ms. Nwagu on August 15, 2018:

(a) by failing to ascertain that Ms. Nwagu was assigned an attending physician physically present at Steward St. Elizabeth's Medical Center and facilitate Ms. Nwagu's timely assessment by the attending physician;

(b) by failing to assess Ms. Nwagu at any time prior to her delivery;

(c) by failing to facilitate Ms. Nwagu's timely assessment by a maternal-fetal medicine physician in light of her high-risk labor and by continuing to ineffectively treat her with Magnesium at Steward St. Elizabeth's Medical Center without an obstetrician's assessment;

(d) by failing to alert Dr. Bayer-Zwirello and the attending physician physically present at Steward St. Elizabeth's Medical Center to Ms. Nwagu's extremely painful preterm contractions not responding to Terbutaline and Magnesium in the context of a history of the prior placental abruption in August 2017 resulting in caesarean section and a less-than-a-year interval between her prior pregnancy and her current pregnancy;

(e) by failing to identify Ms. Nwagu's high risk of uterine rupture and recurrent placental abruption in light of her prior caesarian section for placental abruption in August 2017, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings;

(f) by failing to inquire into the cause of Ms. Nwagu's preterm labor and severe contraction pain and make an appropriate differential diagnosis, including a uterine defect, uterine rupture, and recurrent placental abruption, in light of her prior caesarian section for placental abruption in August 2017, a less-than-a-year interval between her prior pregnancy and her current pregnancy, her extremely painful preterm contractions not responding to Terbutaline and Magnesium, and recurrent Category II fetal heart rate tracings;

(g) by continuing to ineffectively treat Ms. Nwagu with Magnesium at Steward St. Elizabeth's Medical Center after she had been ineffectively treated with Terbutaline and Magnesium for approximately 4 ½ hours at Steward Good Samaritan Medical Center and then en route from Steward Good Samaritan Medical Center to Steward St. Elizabeth's Medical Center;

(h) by failing to facilitate appropriate workup for a suspected uterine defect, uterine rupture, and recurrent placental abruption, such as a detailed ultrasound with focus on the uterine scar and laboratory testing for placental abruption, including coagulation studies, fetal cell studies such as a Kleihauer-Betke test, and fibrin degradation studies;

14

(i) by failing to facilitate fetal evaluation by means other than fetal heart rate monitoring, such as a non-stress test, contraction stress test, biophysical profile, modified biophysical profile, or umbilical artery Doppler velocimetry, in light of recurrent non-reassuring (Category II) fetal heart rate tracings and persistent difficulty performing fetal heart rate monitoring; and

(j) by failing to facilitate timely caesarian delivery in the context of a probable uterine rupture and recurrent placental abruption, recurrent non-reassuring (Category II) fetal heart rate tracings, and persistent difficulty performing fetal heart rate monitoring.

52. The defendants, Rachel Perakslis, R.N., Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.), and Luisa Borgonzi, R.N., deviated as follows from the standard of care of the average qualified labor and delivery nurse, taking into account the advances in this profession, with respect to their medical care and treatment of Ms. Nwagu on August 15, 2018:

(a) by failing to properly perform fetal heart rate monitoring as evidenced by persistent difficulty performing the monitoring and by failing to alert Dr. Moore, Midwife Etienne, Dr. Bayer-Zwirello, Midwife Keshishyan, and Midwife Jones-McWilliams to recurrent non-reassuring (Category II) fetal heart rate tracings and persistent difficulty performing the monitoring and

(b) by failing to facilitate fetal evaluation by means other than fetal heart rate monitoring, such as a non-stress test, contraction stress test, biophysical profile, modified biophysical profile, or umbilical artery Doppler velocimetry, in light of recurrent non-reassuring (Category II) fetal heart rate tracings and persistent difficulty performing fetal heart rate monitoring.

53. United States has been substituted for Dr. Moore and Midwife Etienne under 42 U.S.C. § 233 relative to their above conduct. Accordingly, the defendant, United States of America, is statutorily liable for the above negligence and medical malpractice on the part of Dr. Moore and Midwife Etienne.

54. At all relevant times, Dr. Moore was affiliated with Steward Good Samaritan Medical Center and was the attending/on-call physician relative to Ms. Nwagu's admission to Steward Good Samaritan Medical Center on August 15, 2018. At all relevant times, Midwife Etienne was affiliated with Steward Good Samaritan Medical Center.

55. At all relevant times, Dr. Moore, Midwife Etienne, and Nurse Perakslis were Steward Good Samaritan Medical Center's agents and/or employees acting in the course of their employment. The defendant, Steward Good Samaritan Medical Center, Inc., is vicariously liable for the above negligence and medical malpractice on the part of its agents and/or employees in the course of their employment.

56. At all relevant times, Dr. Bayer-Zwirello, Midwife Keshishyan, and Midwife Jones-McWilliams were affiliated with Steward St. Elizabeth's Medical Center.

57.  At all relevant times, Dr. Bayer-Zwirello, Midwife Keshishyan, Midwife Jones-McWilliams, Nurse Doherty f/k/a Martin, and Nurse Borgonzi were Steward St. Elizabeth's Medical Center's agents and/or employees acting in the course of their employment.  The defendant, Steward St. Elizabeth's Medical Center of Boston, Inc., is vicariously liable for the above negligence and medical malpractice on the part of its agents and/or employees in the course of their employment.

58.  Furthermore, the defendants, Steward Good Samaritan Medical Center, Inc. and Steward St. Elizabeth's Medical Center of Boston, Inc., by their agents and/or employees, deviated as follows from the standard of care of the average qualified hospital and nursing administrator in charge of medical error prevention in acute care hospitals, taking into account the advances in this profession:

(a)  by failing to ensure adequate physician staffing and to have in place adequate hospital policies and procedures at the Steward Good Samaritan Medical Center Labor & Delivery unit and the Steward St. Elizabeth's Medical Center Labor & Delivery unit on August 15, 2018;

(b)  by failing to have in place adequate policies and procedures ensuring timely access to up-to-date prenatal records kept by Brockton Neighborhood Health Center and proper communication of an obstetric patient's medical history at the Steward Good Samaritan Medical Center Labor & Delivery unit and the Steward St. Elizabeth's Medical Center Labor & Delivery unit on August 15, 2018;

(c)  by failing to have in place adequate policies and procedures ensuring proper communication of an obstetric patient's medical history in connection with the patient's interfacility transfer at the Steward Good Samaritan Medical Center Labor & Delivery unit and the Steward St. Elizabeth's Medical Center Labor & Delivery unit on August 15, 2018;

(d)  by failing to have in place adequate policies and procedures ensuring that the attending physician was properly assigned to an obstetric patient and properly identified in the patient's medical records at the Steward Good Samaritan Medical Center Labor & Delivery unit and the Steward St. Elizabeth's Medical Center Labor & Delivery unit on August 15, 2018;

(e)  by failing to have in place adequate policies and procedures establishing the attending physician's role and responsibilities at the Steward Good Samaritan Medical Center Labor & Delivery unit and the Steward St. Elizabeth's Medical Center Labor & Delivery unit on August 15, 2018;

(f)  by failing to have in place adequate policies and procedures ensuring that an obstetric patient's risk factors were properly identified and high-risk obstetric patients were categorized as such at the Steward Good Samaritan Medical Center Labor & Delivery unit and the Steward St. Elizabeth's Medical Center Labor & Delivery unit on August 15, 2018;

(g) by failing to have in place adequate policies and procedures ensuring that high-risk obstetric patients were timely assessed in person by the attending physician and timely provided with proper specialized care at the Steward Good Samaritan Medical Center Labor & Delivery unit and the Steward St. Elizabeth's Medical Center Labor & Delivery unit on August 15, 2018;

(h) by failing to provide proper guidance, training, and supervision to their agents and/or employees rendering labor and delivery services, including Dr. Moore, Midwife Etienne, Nurse Perakslis, Dr. Bayer-Zwirello, Midwife Keshishyan, Midwife Jones-McWilliams, Nurse Doherty f/k/a Martin, and Nurse Borgonzi at all relevant times; and

(i) by failing to properly educate in medical error prevention their agents and/or employees rendering labor and delivery services, including Dr. Moore, Midwife Etienne, Nurse Perakslis, Dr. Bayer-Zwirello, Midwife Keshishyan, Midwife Jones-McWilliams, Nurse Doherty f/k/a Martin, and Nurse Borgonzi at all relevant times.

59.     The defendants, Steward Good Samaritan Medical Center, Inc. and Steward St. Elizabeth's Medical Center of Boston, Inc.'s pervasive failure to have in place adequate hospital policies and procedures and a proper medical error prevention program at the above Labor & Delivery units is evidenced, *inter alia,* by the fact that Dr. Moore and Dr. Bayer-Zwirello were allowed to routinely render over the phone medical advice regarding high-risk obstetric patients without reviewing pertinent medical records and performing in-person assessment.  Moreover, Dr. Bayer-Zwirello was routinely designated as the attending physician in Steward St. Elizabeth's Medical Center Labor & Delivery records despite not being physically present at its Labor & Delivery unit.

60.     The above deviations from the standards of care materially increased Joseph Nwagu's risk of hypoxic injury.  This risk materialized when Dr. Moore, Midwife Etienne, Dr. Bayer-Zwirello, Midwife Keshishyan, and Midwife Jones-McWilliams failed to facilitate timely caesarian delivery in the context of a probable uterine rupture and recurrent placental abruption, recurrent non-reassuring (Category II) fetal heart rate tracings, and difficulty performing fetal heart rate monitoring.

61.     As a direct and proximate result of the above deviations from the standards of care, Joseph Nwagu suffered preventable fatal hypoxia-hypoperfusion injury and death.

62.     The plaintiffs have complied with the provisions of M.G.L. c. 231, § 60L by giving a written notice of their intent to file a claim to the defendants.

## Count I
### (Negligent Wrongful Death against United States of America)

63.     The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

64.     The above conduct on the part of Dr. Moore and Midwife Etienne constituted negligence and medical malpractice.

65. As a direct and proximate result of the negligence and medical malpractice on the part of Dr. Moore and Midwife Etienne, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

66. The above conduct on the part of Dr. Moore and Midwife Etienne caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

67. United States has been substituted for Dr. Moore and Midwife Etienne under 42 U.S.C. § 233 relative to their above conduct and is statutorily liable for their above conduct.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, United States of America, for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count II
## (Grossly Negligent Wrongful Death against United States of America)

68. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

69. The above conduct on the part of Dr. Moore and Midwife Etienne was malicious, willful, wanton, reckless, or grossly negligent.

70. As a direct and proximate result of the malicious, willful, wanton, reckless, or grossly negligent conduct on the part of Dr. Moore and Midwife Etienne, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

71. The above conduct on the part of Dr. Moore and Midwife Etienne caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

72. United States has been substituted for Dr. Moore and Midwife Etienne under 42 U.S.C. § 233 relative to their above conduct and is statutorily liable for their above conduct.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, United States of America, for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, including punitive damages, together with interest and costs.

## Count III
## (Conscious Pain and Suffering against United States of America)

73. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

74. As a direct and proximate result of the above negligence and medical malpractice on the part of Dr. Moore and Midwife Etienne, Joseph Nwagu was caused to suffer consciously from the time of his birth until his death.

18

75.    The above conduct on the part of Dr. Moore and Midwife Etienne caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

76.    United States has been substituted for Dr. Moore and Midwife Etienne under 42 U.S.C. § 233 relative to their above conduct and is statutorily liable for their above conduct.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, United States of America, for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count IV
### (Loss of Consortium by Paschal Nwagu against United States of America)

77.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

78.    As a direct and proximate result of the above negligence and medical malpractice on the part of Dr. Moore and Midwife Etienne, Paschal Nwagu has suffered the loss of his son, Joseph Nwagu's consortium.

79.    United States has been substituted for Dr. Moore and Midwife Etienne under 42 U.S.C. § 233 relative to their above conduct and is statutorily liable for their above conduct.

WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, United States of America, for damages, together with interest and costs.

## Count V
### (Loss of Consortium by Stella Nwagu against United States of America)

80.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

81.    As a direct and proximate result of the above negligence and medical malpractice on the part of Dr. Moore and Midwife Etienne, Stella Nwagu has suffered the loss of her son, Joseph Nwagu's consortium.

82.    United States has been substituted for Dr. Moore and Midwife Etienne under 42 U.S.C. § 233 relative to their above conduct and is statutorily liable for their above conduct.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, United States of America, for damages, together with interest and costs.

## Count VI
### (Negligent Infliction of Emotional Distress on Paschal Nwagu against United States of America)

83.     The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

84.     As a direct and proximate result of the above negligence and medical malpractice on the part of Dr. Moore and Midwife Etienne, Paschal Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of his son, Joseph Nwagu.

85.     United States has been substituted for Dr. Moore and Midwife Etienne under 42 U.S.C. § 233 relative to their above conduct and is statutorily liable for their above conduct.

        WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, United States of America, for damages, together with interest and costs.

## Count VII
### (Negligent Infliction of Emotional Distress on Stella Nwagu against United States of America)

86.     The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

87.     As a direct and proximate result of the above negligence and medical malpractice on the part of Dr. Moore and Midwife Etienne, Stella Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of her son, Joseph Nwagu.

88.     United States has been substituted for Dr. Moore and Midwife Etienne under 42 U.S.C. § 233 relative to their above conduct and is statutorily liable for their above conduct.

        WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, United States of America, for damages, together with interest and costs.

## Count VIII
### (Negligent Wrongful Death against Rachel Perakslis, R.N.)

89.     The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

90.     Nurse Perakslis's above conduct constituted negligence and medical malpractice.

91.     As a direct and proximate result of the negligence and medical malpractice on the part of Nurse Perakslis, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

92.   Nurse Perakslis's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Rachel Perakslis, R.N., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count IX
### (Grossly Negligent Wrongful Death against Rachel Perakslis, R.N.)

93.   The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

94.   Nurse Perakslis's above conduct was malicious, willful, wanton, reckless, or grossly negligent.

95.   As a direct and proximate result of the malicious, willful, wanton, reckless, or grossly negligent conduct on the part of Nurse Perakslis, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

96.   Nurse Perakslis's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Rachel Perakslis, R.N., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, including punitive damages, together with interest and costs.

## Count X
### (Conscious Pain and Suffering against Rachel Perakslis, R.N.)

97.   The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

98.   As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Perakslis, Joseph Nwagu was caused to suffer consciously from the time of his birth until his death.

99.   Nurse Perakslis's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Rachel Perakslis, R.N., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count XI
### (Loss of Consortium by Paschal Nwagu against Rachel Perakslis, R.N.)

100.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

101.    As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Perakslis, Paschal Nwagu has suffered the loss of his son, Joseph Nwagu's consortium.

        WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Rachel Perakslis, R.N., for damages, together with interest and costs.

## Count XII
### (Loss of Consortium by Stella Nwagu against Rachel Perakslis, R.N.)

102.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

103.    As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Perakslis, Stella Nwagu has suffered the loss of her son, Joseph Nwagu's consortium.

        WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Rachel Perakslis, R.N., for damages, together with interest and costs.

## Count XIII
### (Negligent Infliction of Emotional Distress on Paschal Nwagu against Rachel Perakslis, R.N.)

104.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

105.    As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Perakslis, Paschal Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of his son, Joseph Nwagu.

        WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Rachel Perakslis, R.N., for damages, together with interest and costs.

## Count XIV
### (Negligent Infliction of Emotional Distress on Stella Nwagu against Rachel Perakslis, R.N.)

106.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

107. As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Perakslis, Stella Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of her son, Joseph Nwagu.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Rachel Perakslis, R.N., for damages, together with interest and costs.

## Count XV
### (Negligent Wrongful Death against Lucy Bayer-Zwirello, M.D.)

108. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

109. Dr. Bayer-Zwirello's above conduct constituted negligence and medical malpractice.

110. As a direct and proximate result of the negligence and medical malpractice on the part of Dr. Bayer-Zwirello, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

111. Dr. Bayer-Zwirello's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Lucy Bayer-Zwirello, M.D., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count XVI
### (Grossly Negligent Wrongful Death against Lucy Bayer-Zwirello, M.D.)

112. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

113. Dr. Bayer-Zwirello's above conduct was malicious, willful, wanton, reckless, or grossly negligent.

114. As a direct and proximate result of the malicious, willful, wanton, reckless, or grossly negligent conduct on the part of Dr. Bayer-Zwirello, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

115. Dr. Bayer-Zwirello's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Lucy Bayer-Zwirello, M.D., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, including punitive damages, together with interest and costs.

## Count XVII
## (Conscious Pain and Suffering against Lucy Bayer-Zwirello, M.D.)

116.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

117.    As a direct and proximate result of the above negligence and medical malpractice on the part of Dr. Bayer-Zwirello, Joseph Nwagu was caused to suffer consciously from the time of his birth until his death.

118.    Dr. Bayer-Zwirello's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Lucy Bayer-Zwirello, M.D., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count XVIII
## (Loss of Consortium by Paschal Nwagu against Lucy Bayer-Zwirello, M.D.)

119.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

120.    As a direct and proximate result of the above negligence and medical malpractice on the part of Dr. Bayer-Zwirello, Paschal Nwagu has suffered the loss of his son, Joseph Nwagu's consortium.

WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Lucy Bayer-Zwirello, M.D., for damages, together with interest and costs.

## Count XIX
## (Loss of Consortium by Stella Nwagu against Lucy Bayer-Zwirello, M.D.)

121.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

122.    As a direct and proximate result of the above negligence and medical malpractice on the part of Dr. Bayer-Zwirello, Stella Nwagu has suffered the loss of her son, Joseph Nwagu's consortium.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Lucy Bayer-Zwirello, M.D., for damages, together with interest and costs.

## Count XX
### (Negligent Infliction of Emotional Distress on Paschal Nwagu against Lucy Bayer-Zwirello, M.D.)

123.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

124.    As a direct and proximate result of the above negligence and medical malpractice on the part of Dr. Bayer-Zwirello, Paschal Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of his son, Joseph Nwagu.

WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Lucy Bayer-Zwirello, M.D., for damages, together with interest and costs.

## Count XXI
### (Negligent Infliction of Emotional Distress on Stella Nwagu against Lucy Bayer-Zwirello, M.D.)

125.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

126.    As a direct and proximate result of the above negligence and medical malpractice on the part of Dr. Bayer-Zwirello, Stella Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of her son, Joseph Nwagu.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Lucy Bayer-Zwirello, M.D., for damages, together with interest and costs.

## Count XXII
### (Negligent Wrongful Death against Anna Keshishyan, C.N.M.)

127.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

128.    Midwife Keshishyan's above conduct constituted negligence and medical malpractice.

129.    As a direct and proximate result of the negligence and medical malpractice on the part of Midwife Keshishyan, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

130.    Midwife Keshishyan's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Anna Keshishyan, C.N.M., for

Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count XXIII
### (Grossly Negligent Wrongful Death against Anna Keshishyan, C.N.M.)

131. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

132. Midwife Keshishyan's above conduct was malicious, willful, wanton, reckless, or grossly negligent.

133. As a direct and proximate result of the malicious, willful, wanton, reckless, or grossly negligent conduct on the part of Midwife Keshishyan, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

134. Midwife Keshishyan's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Anna Keshishyan, C.N.M., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, including punitive damages, together with interest and costs.

## Count XXIV
### (Conscious Pain and Suffering against Anna Keshishyan, C.N.M.)

135. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

136. As a direct and proximate result of the above negligence and medical malpractice on the part of Midwife Keshishyan, Joseph Nwagu was caused to suffer consciously from the time of his birth until his death.

137. Midwife Keshishyan's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Anna Keshishyan, C.N.M., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count XXV
### (Loss of Consortium by Paschal Nwagu against Anna Keshishyan, C.N.M.)

138. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

139.    As a direct and proximate result of the above negligence and medical malpractice on the part of Midwife Keshishyan, Paschal Nwagu has suffered the loss of his son, Joseph Nwagu's consortium.

    WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Anna Keshishyan, C.N.M., for damages, together with interest and costs.

## Count XXVI
### (Loss of Consortium by Stella Nwagu against Anna Keshishyan, C.N.M.)

140.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

141.    As a direct and proximate result of the above negligence and medical malpractice on the part of Midwife Keshishyan, Stella Nwagu has suffered the loss of her son, Joseph Nwagu's consortium.

    WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Anna Keshishyan, C.N.M., for damages, together with interest and costs.

## Count XXVII
### (Negligent Infliction of Emotional Distress on Paschal Nwagu against Anna Keshishyan, C.N.M.)

142.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

143.    As a direct and proximate result of the above negligence and medical malpractice on the part of Midwife Keshishyan, Paschal Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of his son, Joseph Nwagu.

    WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Anna Keshishyan, C.N.M., for damages, together with interest and costs.

## Count XXVIII
### (Negligent Infliction of Emotional Distress on Stella Nwagu against Anna Keshishyan, C.N.M.)

144.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

145.    As a direct and proximate result of the above negligence and medical malpractice on the part of Midwife Keshishyan, Stella Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of her son, Joseph Nwagu.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Anna Keshishyan, C.N.M., for damages, together with interest and costs.

## Count XXIX
### (Negligent Wrongful Death against Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.))

146. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

147. Nurse Doherty's above conduct constituted negligence and medical malpractice.

148. As a direct and proximate result of the negligence and medical malpractice on the part of Nurse Doherty, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

149. Nurse Doherty's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.), for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count XXX
### (Grossly Negligent Wrongful Death against Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.))

150. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

151. Nurse Doherty's above conduct was malicious, willful, wanton, reckless, or grossly negligent.

152. As a direct and proximate result of the malicious, willful, wanton, reckless, or grossly negligent conduct on the part of Nurse Doherty, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

153. Nurse Doherty's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.), for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, including punitive damages, together with interest and costs.

## Count XXXI
### (Conscious Pain and Suffering against Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.))

154.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

155.    As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Doherty, Joseph Nwagu was caused to suffer consciously from the time of his birth until his death.

156.    Nurse Doherty's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.), for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count XXXII
### (Loss of Consortium by Paschal Nwagu against Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.))

157.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

158.    As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Doherty, Paschal Nwagu has suffered the loss of his son, Joseph Nwagu's consortium.

WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.), for damages, together with interest and costs.

## Count XXXIII
### (Loss of Consortium by Stella Nwagu against Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.))

159.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

160.    As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Doherty, Stella Nwagu has suffered the loss of her son, Joseph Nwagu's consortium.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.), for damages, together with interest and costs.

## Count XXXIV
### (Negligent Infliction of Emotional Distress on Paschal Nwagu against Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.))

161.  The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

162.  As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Doherty, Paschal Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of his son, Joseph Nwagu.

WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.), for damages, together with interest and costs.

## Count XXXV
### (Negligent Infliction of Emotional Distress on Stella Nwagu against Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.))

163.  The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

164.  As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Doherty, Stella Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of her son, Joseph Nwagu.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Katrina Doherty, R.N. (formerly known as Katrina Martin, B.S.N.), for damages, together with interest and costs.

## Count XXXVI
### (Negligent Wrongful Death against Luisa Borgonzi, R.N.)

165.  The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

166.  Nurse Borgonzi's above conduct constituted negligence and medical malpractice.

167.  As a direct and proximate result of the negligence and medical malpractice on the part of Nurse Borgonzi, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

168.  Nurse Borgonzi's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Luisa Borgonzi, R.N., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count XXXVII
### (Grossly Negligent Wrongful Death against Luisa Borgonzi, R.N.)

169.   The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

170.   Nurse Borgonzi's above conduct was malicious, willful, wanton, reckless, or grossly negligent.

171.   As a direct and proximate result of the malicious, willful, wanton, reckless, or grossly negligent conduct on the part of Nurse Borgonzi, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

172.   Nurse Borgonzi's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Luisa Borgonzi, R.N., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, including punitive damages, together with interest and costs.

## Count XXXVIII
### (Conscious Pain and Suffering against Luisa Borgonzi, R.N.)

173.   The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

174.   As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Borgonzi, Joseph Nwagu was caused to suffer consciously from the time of his birth until his death.

175.   Nurse Borgonzi's above conduct caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Luisa Borgonzi, R.N., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count XXXIX
### (Loss of Consortium by Paschal Nwagu against Luisa Borgonzi, R.N.)

176.   The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

177. As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Borgonzi, Paschal Nwagu has suffered the loss of his son, Joseph Nwagu's consortium.

WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Luisa Borgonzi, R.N., for damages, together with interest and costs.

## Count XL
### (Loss of Consortium by Stella Nwagu against Luisa Borgonzi, R.N.)

178. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

179. As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Borgonzi, Stella Nwagu has suffered the loss of her son, Joseph Nwagu's consortium.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Luisa Borgonzi, R.N., for damages, together with interest and costs.

## Count XLI
### (Negligent Infliction of Emotional Distress on Paschal Nwagu against Luisa Borgonzi, R.N.)

180. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

181. As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Borgonzi, Paschal Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of his son, Joseph Nwagu.

WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Luisa Borgonzi, R.N., for damages, together with interest and costs.

## Count XLII
### (Negligent Infliction of Emotional Distress on Stella Nwagu against Luisa Borgonzi, R.N.)

182. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

183. As a direct and proximate result of the above negligence and medical malpractice on the part of Nurse Borgonzi, Stella Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of her son, Joseph Nwagu.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Luisa Borgonzi, R.N., for damages, together with interest and costs.

## Count XLIII
### (Negligent Wrongful Death against Steward Good Samaritan Medical Center, Inc.)

184. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

185. Steward Good Samaritan Medical Center is vicariously liable for the above negligence and medical malpractice on the part of its agents and/or employees, including Dr. Moore, Midwife Etienne, and Nurse Perakslis.

186. As a direct and proximate result of the negligence and medical malpractice on the part of Steward Good Samaritan Medical Center, by its agents and/or employees, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

187. Steward Good Samaritan Medical Center's above conduct, by its agents and/or employees, caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Steward Good Samaritan Medical Center, Inc., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

## Count XLIV
### (Grossly Negligent Wrongful Death against Steward Good Samaritan Medical Center, Inc.)

188. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

189. Steward Good Samaritan Medical Center is vicariously liable for the above malicious, willful, wanton, reckless, or grossly negligent conduct on the part of its agents and/or employees, including Dr. Moore, Midwife Etienne, and Nurse Perakslis.

190. As a direct and proximate result of the malicious, willful, wanton, reckless, or grossly negligent conduct on the part of Steward Good Samaritan Medical Center, by its agents and/or employees, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

191. Steward Good Samaritan Medical Center's above conduct, by its agents and/or employees, caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Steward Good Samaritan Medical Center, Inc., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, including punitive damages, together with interest and costs.

### Count XLV
### (Conscious Pain and Suffering against Steward Good Samaritan Medical Center, Inc.)

192.　The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

193.　As a direct and proximate result of the above negligence and medical malpractice on the part of Steward Good Samaritan Medical Center, by its agents and/or employees, Joseph Nwagu was caused to suffer consciously from the time of his birth until his death.

194.　Steward Good Samaritan Medical Center's above conduct, by its agents and/or employees, caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

　　　WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Steward Good Samaritan Medical Center, Inc., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

### Count XLVI
### (Loss of Consortium by Paschal Nwagu against Steward Good Samaritan Medical Center, Inc.)

195.　The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

196.　As a direct and proximate result of the above negligence and medical malpractice on the part of Steward Good Samaritan Medical Center, by its agents and/or employees, Paschal Nwagu has suffered the loss of his son, Joseph Nwagu's consortium.

　　　WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Steward Good Samaritan Medical Center, Inc., for damages, together with interest and costs.

### Count XLVII
### (Loss of Consortium by Stella Nwagu against Steward Good Samaritan Medical Center, Inc.)

197.　The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

198.　As a direct and proximate result of the above negligence and medical malpractice on the part of Steward Good Samaritan Medical Center, by its agents and/or employees, Stella Nwagu has suffered the loss of her son, Joseph Nwagu's consortium.

　　　WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Steward Good Samaritan Medical Center, Inc., for damages, together with interest and costs.

## Count XLVIII
### (Negligent Infliction of Emotional Distress on Paschal Nwagu against Steward Good Samaritan Medical Center, Inc.)

199.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

200.    As a direct and proximate result of the above negligence and medical malpractice on the part of Steward Good Samaritan Medical Center, by its agents and/or employees, Paschal Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of his son, Joseph Nwagu.

WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Steward Good Samaritan Medical Center, Inc., for damages, together with interest and costs.

## Count XLIX
### (Negligent Infliction of Emotional Distress on Stella Nwagu against Steward Good Samaritan Medical Center, Inc.)

201.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

202.    As a direct and proximate result of the above negligence and medical malpractice on the part of Steward Good Samaritan Medical Center, by its agents and/or employees, Stella Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of her son, Joseph Nwagu.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Steward Good Samaritan Medical Center, Inc., for damages, together with interest and costs.

## Count L
### (Negligent Wrongful Death against Steward St. Elizabeth's Medical Center of Boston, Inc.)

203.    The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

204.    Steward St. Elizabeth's Medical Center is vicariously liable for the above negligence and medical malpractice on the part of its agents and/or employees, including Dr. Bayer-Zwirello, Midwife Keshishyan, Midwife Jones-McWilliams, Nurse Doherty, and Nurse Borgonzi.

205.    As a direct and proximate result of the negligence and medical malpractice on the part of Steward St. Elizabeth's Medical Center, by its agents and/or employees, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

206.     Steward St. Elizabeth's Medical Center's above conduct, by its agents and/or employees, caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Steward St. Elizabeth's Medical Center of Boston, Inc., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

### Count LI
### (Grossly Negligent Wrongful Death against Steward St. Elizabeth's Medical Center of Boston, Inc.)

207.     The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

208.     Steward St. Elizabeth's Medical Center is vicariously liable for the above malicious, willful, wanton, reckless, or grossly negligent conduct on the part of its agents and/or employees, including Dr. Bayer-Zwirello, Midwife Keshishyan, Midwife Jones-McWilliams, Nurse Doherty, and Nurse Borgonzi.

209.     As a direct and proximate result of the malicious, willful, wanton, reckless, or grossly negligent conduct on the part of Steward St. Elizabeth's Medical Center, by its agents and/or employees, Joseph Nwagu suffered fatal hypoxia-hypoperfusion injury and died.

210.     Steward St. Elizabeth's Medical Center's above conduct, by its agents and/or employees, caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Steward St. Elizabeth's Medical Center of Boston, Inc., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, including punitive damages, together with interest and costs.

### Count LII
### (Conscious Pain and Suffering against Steward St. Elizabeth's Medical Center of Boston, Inc.)

211.     The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

212.     As a direct and proximate result of the above negligence and medical malpractice on the part of Steward St. Elizabeth's Medical Center, by its agents and/or employees, Joseph Nwagu was caused to suffer consciously from the time of his birth until his death.

213.     Steward St. Elizabeth's Medical Center's above conduct, by its agents and/or employees, caused Joseph Nwagu's wrongful death in violation of M.G.L. c. 229, § 2.

WHEREFORE, the plaintiff, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu, demands judgment against the defendant, Steward St. Elizabeth's Medical

Center of Boston, Inc., for Joseph Nwagu's wrongful death and damages under M.G.L. c. 229, § 2, together with interest and costs.

### Count LIII
### (Loss of Consortium by Paschal Nwagu against Steward St. Elizabeth's Medical Center of Boston, Inc.)

214.  The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

215.  As a direct and proximate result of the above negligence and medical malpractice on the part of Steward St. Elizabeth's Medical Center, by its agents and/or employees, Paschal Nwagu has suffered the loss of his son, Joseph Nwagu's consortium.

WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Steward St. Elizabeth's Medical Center of Boston, Inc., for damages, together with interest and costs.

### Count LIV
### (Loss of Consortium by Stella Nwagu against Steward St. Elizabeth's Medical Center of Boston, Inc.)

216.  The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

217.  As a direct and proximate result of the above negligence and medical malpractice on the part of Steward St. Elizabeth's Medical Center, by its agents and/or employees, Stella Nwagu has suffered the loss of her son, Joseph Nwagu's consortium.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Steward St. Elizabeth's Medical Center of Boston, Inc., for damages, together with interest and costs.

### Count LV
### (Negligent Infliction of Emotional Distress on Paschal Nwagu against Steward St. Elizabeth's Medical Center of Boston, Inc.)

218.  The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

219.  As a direct and proximate result of the above negligence and medical malpractice on the part of Steward St. Elizabeth's Medical Center, by its agents and/or employees, Paschal Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of his son, Joseph Nwagu.

WHEREFORE, the plaintiff, Paschal Nwagu, individually, demands judgment against the defendant, Steward St. Elizabeth's Medical Center of Boston, Inc., for damages, together with interest and costs.

### Count LVI
### (Negligent Infliction of Emotional Distress on Stella Nwagu against Steward St. Elizabeth's Medical Center of Boston, Inc.)

220. The plaintiffs repeat and incorporate herein the allegations contained in the previous paragraphs of this Complaint.

221. As a direct and proximate result of the above negligence and medical malpractice on the part of Steward St. Elizabeth's Medical Center of Boston, by its agents and/or employees, Stella Nwagu has suffered severe emotional distress, with physical harm manifested by objective symptomatology, arising from the wrongful death, pain, and suffering of her son, Joseph Nwagu.

WHEREFORE, the plaintiff, Stella Nwagu, demands judgment against the defendant, Steward St. Elizabeth's Medical Center of Boston, Inc., for damages, together with interest and costs.

### THE PLAINTIFFS DEMAND A TRIAL BY JURY AS TO ALL ISSUES.

Respectfully submitted,
Plaintiffs, Paschal Nwagu, as the Personal Representative of the Estate of Joseph Nwagu and individually, and Stella Nwagu,
by their Attorneys,

*/s/ Paul Mitchell*
Paul E. Mitchell, B.B.O. #550491
pmitchell@mitchelldesimone.com
Galina I. Razumovsky, B.B.O. #692588
grazumovsky@mitchelldesimone.com
Mitchell & DeSimone
6 Beacon Street, Suite 900
Boston, MA 02108
(617) 737-8300

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document is being served upon counsel of record via CM/ECF and/or email this  19th  Day of   January    2024.

*/s/ Paul Mitchell*

Paul E. Mitchell