**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**



| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| STEWARD HEALTH CARE SYSTEM, LLC | § | Case No. 24-90213 (CML) |
| *et al.*,[1] | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |
| | § | |

**JOINDER OF NOVO HEALTH SERVICES, LLC**
**IN THE SUBSTANCE OF THE MOTION OF MORRISON MANAGEMENT**
**SPECIALISTS, INC. AND COMPASS GROUP USA, INC., BY AND THROUGH ITS**
**SUBSIDIARY CROTHALL HEALTHCARE, INC., FOR ENTRY OF AN ORDER**
**ENFORCING THE HSA SALE ORDER AND COMPELLING THE HSA BUYERS TO**
**COMPLY WITH THEIR OBLIGATIONS THEREUNDER AND MOTION TO COMPEL**
**TURNOVER OF LINENS IN THE POSSESSION OF HSA**
**(Relates to Docket No. 3731)**

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21-days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**

**Represented parties should act through their attorney.**

Novo Healthcare Services, LLC ("**Novo**") hereby submits this *Joinder of Novo Health*

*Services, LLC in the Substance of the Motion of Morrison Management Specialists, Inc. and*

*Compass Group USA, Inc., by and through its subsidiary Crothall Healthcare, Inc., for Entry of*

*an Order Enforcing the HSA Sale Order and Compelling the HSA Buyers to Comply with Their*

---

[1] A complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these Chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

*Obligations Thereunder and Motion to Compel Turnover of Linens in the Possession of HSA* (the
"**Joinder and Motion**"), seeking an order substantially in the form of the proposed order (the
"**Order**") attached hereto as **Exhibit A**, compelling Healthcare System of America-Florida LLC
("**HSA**") to immediately pay all amounts due and owing to Novo for services rendered since the
Transition Time (as defined herein), and immediately to turn over any and all linens leased
pursuant to the Novo Agreement (as defined herein) back to Novo, and sanction HSA for damages
caused to Novo by their unlawful refusal to return the leased linens, including but not limited to
the replacement cost of the linens and the business interruption caused.  In support of the Joinder
and Motion, Novo states as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Southern District of Texas (the
"**Court**") has jurisdiction to consider the Joinder and Motion pursuant to 28 U.S.C. sections 157
and 1334 and the HSA Sale Order (as defined herein).  This matter is a core proceeding within the
meaning of 28 U.S.C. section 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C.
sections 1408 and 1409.

2.      The statutory and other predicates for relief sought herein are section 105(a) of title
11 of the United States Code, 11 U.S.C. section 101, *et seq.* (the "**Bankruptcy Code**") and this
Court's authority to enforce its orders.

## BACKGROUND

3.      On May 6, 2024 (the "**Petition Date**"), the above-captioned debtors and debtors-
in-possession (the "**Debtors**") filed voluntary petitions for relief under chapter 11 of Bankruptcy
Code in this Court.

4.      As of the Petition Date, Steward Health Care System, LLC ("**Steward**"), one of the Debtors, and Novo were parties to that certain Purchaser Services Agreement (the "**Novo Agreement**") dated November 15, 2021 (as amended), pursuant to which Novo provided laundry and linen services to certain hospitals operated by the Debtors located in Florida, Pennsylvania, and Ohio.  A copy of the Novo Agreement is attached hereto as __Exhibit B__.  Critically, the linens used pursuant to the Novo Agreement are leased to the hospitals, and the linens are owned by Novo.

5.      Among the hospitals Novo serviced were (i) Coral Gables Hospital, (ii) Hialeah Hospital, (iii) Florida Medical Center, (iv) North Shore Medical Center, and (v) Palmetto General Hospital (collectively, the "**Florida Hospitals**")

6.      As of the Petition Date, the Debtors owed approximately $1.8 million for prepetition services rendered pursuant to the Novo Agreement.  None of these amounts have been paid to date.

7.      Novo continued to provide linen and laundry services to the Debtors post-petition, including to the Florida Hospitals.  These services were necessary for the continuing operation of the Florida Hospitals.

8.      As set forth in the *Motion of Morrison Management Specialists, Inc. and Compass Group USA, Inc., by and through its subsidiary Crothall Healthcare, Inc., for Entry of an Order Enforcing the HSA Sale Order and Compelling the HSA Buyers to Comply with Their Obligations Thereunder* (the "**Morrison Motion**") [Docket No. 3731] filed on January 16, 2025, this Court entered the Order *(I) Authorizing and Approving the Sale of St. Joseph Medical Center, Medical Center of Southeast Texas, and South Florida Hospitals Free and Clear of Liens, Claims, Encumbrances, and Interest, and (B) the Assumption and Assignment of Certain Executory*

3

*Contracts and Unexpired Leases; and (II) Granting Related Relief* [Docket No. 3046] (the "**HSA Sale Order**"), approving the sale of the Florida Hospitals to HSA pursuant to the Bill of Sale, Assumption and Assignment Agreement (the "**HSA Sale Agreement**"), by and among certain of the Debtors and HSA.

9.      Upon information and belief, the sale of the Florida Hospitals closed effective October 30, 2024 (the "**Closing Date**").

10.     As further set forth in the Morrison Motion and pursuant to the HSA Sale Order and HSA Sale Agreement, HSA was required to pay, perform, and discharge, when they became due and payable, "all Liabilities arising out of the use, ownership, or operation of the Business, the Purchased Assets or the Facilities first arising after the Transition Time."

11.     From and after September 11, 2024, and through the Closing Date (the "**Transition Time**"), and after the Closing Date, Novo continued to provide essential linen and laundry services to the Florida Hospitals.  As of the date of this Joinder and Motion, HSA owes Novo approximately $629,204.79 for services rendered since the Transition Time.[2]  Copies of invoices detailing the amounts owed by HSA are available upon request by HSA, the Debtors, or any other party in interest.  The unpaid invoices are listed in the spreadsheet attached hereto as **Exhibit C**.[3]

12.     HSA has recently informed Novo that it is switching to a new linen provider and will no longer require Novo's services.  Accordingly, Novo has ceased providing any services to HSA and has repeatedly requested payment from HSA for unpaid invoices.  In addition, Novo has demanded that HSA turn over the linens owned by Novo that are currently in HSA's possession.

---

[2] The amount currently owed by Novo is subject to change, and Novo reserves the right to amend this Joinder and Motion to account for additional amounts owed from HSA.

[3] This Joinder and Motion shall not be construed as a waiver of any administrative expense claims that Novo holds against the Debtors.

13.     To date, HSA has failed to comply with Novo's request for payment.  Further, HSA has failed to turn over the linens and has blocked Novo from entering their property to recover Novo's linens.

## RELIEF REQUESTED

14.     By this Joinder and Motion, Novo hereby requests that this Court enforce the HSA Sale Order and compel HSA to pay all amounts due and owing to Novo as set forth in this Joinder and Motion.

15.     Further, Novo requests that this Court order the immediate turnover of any and all linens owned by Novo currently in the possession of HSA and sanction HSA in the amount that their failure to turn over the linens has damaged Novo, including, but not limited to, the replacement cost of the linens and the costs of the business disruption caused.

## BASIS FOR RELIEF REQUESTED

16.     Novo hereby joins and adopts the arguments set forth in the Basis of Relief Requested section of the Morrison Motion.  For the reasons set forth in the Morrison Motion, HSA must pay all amounts due and owing since the Transition Time to Novo.

17.     As part of the Liabilities arising out of the use, ownership, or operation of the Business, the Purchased Assets or the Facilities first arising after the Transition Time, HSA assumed the terms of the Novo Agreement through their continuing performance of the Novo Agreement.

18.     Pursuant to section 14 of the Novo Agreement, Novo is the owner of its linens and has the legal right to collect is property from HSA.  Upon notice that HSA switched linen providers and no longer required the services of Novo, HSA terminated the Novo Agreement, and as a result, Novo may legally repossess its linens.

19.     HSA has refused to allow Novo to enter the premises and recover its linens, despite Novo's request to do so.

20.     Pursuant to this Court's authority to enforce its orders and section 105(a) of the Bankruptcy Code, this Court may compel HSA to turn over the linens in the possession of HSA to Novo, or in the alternative, sanction HSA in an amount equal to the replacement of the linens.

## RESERVATION OF RIGHTS

21.     Novo reserves the right to amend or supplement this Joinder and Motion prior to or at any hearing on the Joinder and Motion, including without limitation, to add any additional amounts for which HSA may be liable.  Novo further reserves all rights and remedies against HSA available at law or in equity.

## NOTICE

22.     Notice of this Motion will be served on (i) Healthcare System of America-Florida LLC, (ii) counsel for the Debtors, (iii) counsel for the Committee, (iv) the Office of the United States Trustee, and (v) any party entitled to notice pursuant to Bankruptcy Rule 2002.

**WHEREFORE**, for the reasons set forth herein, Novo respectfully requests that the Court (i) enter the Order granting this Joinder and Motion and (ii) grant such other and further relief as this Court deems just and proper.

Dated: January 28, 2025.

Respectfully submitted,

*/s/ Steven T. Holmes*
Steven T. Holmes
State Bar No. 00794918
CAVAZOS HENDRICKS POIROT, P.C.
900 Jackson Street, Suite 570
Dallas, TX  75202
Phone: (214) 573-7305
E-mail: sholmes@chfirm.com

-and-

Kollin G. Bender
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Richmond, Virginia 23218-0500
Telephone:      (804) 771-5610
Facsimile:      (804) 644-0957
Email:          bfalabella@hirschlerlaw.com
                kbender@hirschlerlaw.com

*Attorneys for Novo Healthcare Services, LLC*

## <u>CERTIFICATE OF SERVICE</u>

      I certify that on January 28, 2025, I caused a copy of the foregoing document to be served (a) by regular mail on (i) Healthcare System of America-Florida LLC, (ii) counsel for the Debtors, (iii) counsel for the Committee, (iv) the Office of the United States Trustee for the Southern District of Texas, and (v) any party entitled to notice pursuant to Bankruptcy Rule 2002, and (b) by electronic transmission to all registered ECF users appearing in these cases.

Healthcare System of America-Florida LLC
c/o American Healthcare Systems
Attn: Faisal Gill
505 North Brand Blvd., Suite1200
Glendale, CA 91203

Weil, Gotshal & Manges LLP
Attn: Gabriel A. Morgan
Clifford W. Carlson
Stephanie N. Morrison
700 Louisiana Street - Suite 3700
Houston, TX 77002

Weil, Gotshal & Manges LLP
Attn: Ray C. Schrock
Candace M. Arthur
David J. Cohen
767 Fifth Avenue
New York, NY 10153

Akin Gump Strauss Hauer & Feld LLP
Attn: Ira S. Dizengoff
Brad M. Kahn
Avi E. Luft
One Bryant Park
New York, NY 10036-6745

                        */s/ Steven T. Holmes*
                        Steven T. Holmes

## EXHIBIT A

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---------------------------------------------------------------------

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| STEWARD HEALTH CARE SYSTEM, LLC | § | Case No. 24-90213 (CML) |
| *et al.*,[4] | § | (Jointly Administered) |
| | § | |
| Debtors. | § | |
| | § | |
| | § | |

---------------------------------------------------------------------

**ORDER ENFORCING THE HSA SALE ORDER AND COMPELLING HSA TO
COMPLY WITH THEIR OBLIGATIONS THEREUNDER AND REQUIRING
TURNOVER OF LINENS TO NOVO OR IN THE ALTERNATIVE SANCTIONING
HSA IN AN AMOUNT EQUAL TO THE REPLACEMENT COST OF THE LINENS**

Upon the *Joinder of Novo Health Services, LLC in the Substance of the Motion of Morrison Management Specialists, Inc. and Compass Group USA, Inc., by and through its subsidiary Crothall Healthcare, Inc., for Entry of an Order Enforcing the HSA Sale Order and Compelling the HSA Buyers to Comply with Their Obligations Thereunder and Motion to Compel Turnover of Linens in the Possession of HSA* (the "**Joinder and Motion**")[5] [Docket No. _____] filed by Novo Health Services, Inc. ("**Novo**") on January 28, 2025; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. sections 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. section 157(b)(2); and the Court having found that venue of this proceeding and this Joinder and Motion in this District is proper; and it appearing that sufficient notice of the Joinder and Motion has been given; and the Court having reviewed the Joinder and Motion; and the Court having determined that the legal and factual bases set forth in the Joinder

---

[4] A complete list of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these Chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

[5] Capitalized terms not defined herein shall have the meaning ascribed to them in the Joinder and Motion.

and Motion establish just cause for the relief granted herein; and upon all of the proceedings heard before the Court; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED THAT:**

1.      The Joinder and Motion is granted as set forth herein.

2.      Healthcare System of America-Florida LLC shall pay Novo $629,204.79 by wire transfer, check, or other method agreed to by all the parties within five (5) business days after entry of this Order.

3.      Healthcare System of America-Florida LLC shall turn over any and all linens owned by Novo to Novo within five (5) business days after entry of this Order.

4.      As a sanction for their unlawful withholding of the linens owned by Novo, Healthcare System of America-Florida LLC shall be sanctioned in the amount of $_____.

5.      This Order shall be immediately effective and enforceable upon its entry.

6.      This Court shall retain jurisdiction with respect to all matters arising from or related this Order, including jurisdiction to sanction any party for failure to comply with the terms of this Order.

DATED: _____, 2025

 

 

_____
Honorable Christopher M. Lopez
United States Bankruptcy Judge

## __EXHIBIT B__

**Novo Agreement**

THIS PURCHASER SERVICES AGREEMENT (the "Agreement") is made this 15th day of November, 2021 ("Effective Date"), by and between Steward Health Care System LLC (hereinafter "Steward") and Novo Health Services, LLC (hereinafter "Vendor") (collectively "Parties").This Agreement is entered into in connection with that certain Purchasing Agreement, HPG-42886, dated April 1, 2019 between HealthTrust Purchasing Group, L.P. ("HealthTrust") and Vendor("Purchasing Agreement"). The provisions of the Purchasing Agreement are incorporated into this Agreement.  The terms set forth on Schedule A attached hereto are hereby incorporated herein by this reference and made a part hereof. This Agreement shall be subject to the terms and conditions of the Purchasing Agreement.  In the event of a conflict between the terms of the Purchasing Agreement and this Agreement, the terms of the Purchasing Agreement shall control.  All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such term in the Purchasing Agreement.

| | |
|---|---|
| Facility/Group Name: | Steward Health Care System LLC |
| Address: | 1900 N. Pearl Street, Suite 2400 |
| City, ST, ZIP: | Dallas, TX 75201 |
| Type: | [ X ] Acute Care   [ ] Surgery Center   [ ] Imaging Center   [ ] Other |
| GPOID: | |
| Contact Person & Title: | |
| Contact Phone: | 469-341-8800 |
| Contact Email: | |

For purposes of this Agreement, "Facility(ies)" shall be defined as those Affiliates of Steward that own or operate healthcare facilities and/or providers including, but not limited to, acute care facilities, hospitals, ambulatory surgery centers, imaging centers, alternate site entities, physician practices, rehabilitation facilities, psychiatric centers, clinics or any other kind of healthcare providers, that are designated as "Steward Health Care System LLC" under the heading "Company" on HealthTrust's Participant list, located at https://vendors.healthtrustpg.com/ which includes any Affiliates of Steward Health Care System LLC which provide distribution and/or warehousing services for other Facilities, and Affiliates of Steward. For the purpose of clarity, Steward is not a Purchaser in that Steward does not obtain Products and/or Services hereunder. Steward is a disclosed agent for one or more other Facilities to obtain Products and/or Services. "Purchaser" shall be defined as any Facility obtaining Products and/or Services from Vendor, as listed in any Attachment B. For avoidance of doubt, payment for purchases made by a Purchaser under this Agreement shall be the sole responsibility of such Purchaser; Vendor agrees that Steward shall have no responsibility or obligation for such payments owed by Purchaser or for any other obligations of Purchaser under this Agreement. "Locations" means each location/premises of the Purchaser that receives Services.

Further to the aforesaid, Purchaser and Vendor covenant and agree as follows:

1.  <u>Pricing and Purchaser Facilities.</u> Pricing for Services under this Agreement is contained in each Attachment A herein. Purchasers' Facilities are identified in each Attachment B of this Agreement.

2.  Effective Date. The Effective Date of this Agreement is November 1, 2021. Existing Purchaser Facilities of Vendor will begin purchasing under this Agreement upon the Effective Date. New Purchaser Facilities not currently purchasing Services from Vendor will begin purchasing Services under this agreement no later than March 1  2022. All Purchaser Facilities will be coterminous as identified in Section 3 of this Agreement.

3.  <u>Term</u>.  The term and duration of the Agreement shall be five (5) years from the Effective Date ("Initial Term"). Upon written notice, Parties may extend this Agreement for two (2) one (1) year extension ("Extension Term", collectively the "Term"). If the term of the Purchasing Agreement expires prior to the expiration of the Agreement, the terms of the Agreement shall continue in full force and effect under the Agreement and Purchaser and Vendor shall be bound by the terms thereof without the need for any action and the Purchasing Agreement shall be and is hereby acknowledged, ratified and adopted by Vendor and Purchaser to the fullest extent necessary to render this sentence binding and enforceable by and upon them for the duration of the term of the Agreement. During the Term, Vendor shall be sole provider of services like the Services to Purchaser and its identified Facility(ies) as noted in each Attachment B with the exception that another vendor may provide EVS products and products used in Dietary.

4.  <u>Late Fees.</u> Payment is due within sixty (60) days of invoice date for all undisputed amounts. Subject to the exceptions herein, if any invoice is not paid within sixty (60) days of invoice date, Vendor shall have the right to charge, and the Purchaser shall pay, a late fee equal to one percent (1%) per month (or the maximum allowed by law, whichever is less) of the amount of fees and other charges not paid by a Purchaser when due in accordance with the payment terms stated herein.  Late Payment Fees shall not apply if Purchaser utilizes ACH or other automated payment methods, and late fees specifically do not apply to any invoice or portion thereof that is reasonably in dispute. Vendor

offers Purchaser a one percent (1%) discount for invoices paid within net ten (10) days ("Prompt Pay Discount"). Vendor shall automatically apply any Prompt Pay Discounts as a credit to Purchaser's next invoice.

5. <u>Price Adjustment</u>. Purchaser agrees to pay for the clean linens and services delivered to Purchaser at the rates or prices that appear in any Attachment A. On the anniversary date of the Agreement every other year (i.e. years 2 and 4), Vendor reserves the right to adjust those prices in years three (3) and five (5) of the term at a rate not to exceed the lesser of three percent (3%) or the twelve (12) month increase in the Consumer Price Index for All Urban Consumers, CPI-u, as published by the Bureau of Labor Statistics of the U.S. Department of Labor. The series ID Code for this index is CUUR0000SA0. **To the extent that Vendor can provide CPI-u information to the Customer, Customer agrees to accept said increase by consent.**

6. <u>Adjustment for Wage and Benefits Changes</u>. After the first (1st) twelve (12) months of the Agreement, if Vendor's costs for employee wages and benefits changes, including, but not limited to, a change in federal, state or local minimum wage rates, a change in employer contributions to social security or payroll taxes (including retroactive changes to such contributions), then Vendor shall give Purchaser written notice of such change and documentation evidencing Vendor's calculation of such change. After such notice and Purchaser's confirmation of the accuracy of such supporting documentation, Vendor and Purchaser shall have sixty (60) days to agree to an adjustment to the pricing set forth herein, which adjustment shall apply to all purchases of services following the date of such agreement by the parties. If the parties cannot agree on appropriate adjustments and Vendor, after deliberation by the parties for said sixty (60) days, demands such an adjustment in writing, either party may terminate the Agreement.. Any such adjustment to the pricing set forth herein shall occur no more than once every twelve (12) months during the term of the Agreement.

7. <u>Adjustments for Utilities and Fuel Changes</u>. The pricing and charges provided in the Agreement have been calculated based on the existing published rates at which Vendor can obtain the necessary transportation fuel, electricity, utility gas service, and water and sewage service. In the event any of the above utility charges increase or decrease at any time during the term of the Agreement by greater than six percent (6%) over the published rate as of the date of the Agreement, then the cost per item charged shall be increased or decreased, upon mutual written consent which will not be reasonably withheld, on the first day of the first month following the date of any such delta by a percentage equal to the percentage of change in Vendor's production costs attributable to the change in utility charges. Vendor will provide all requested documentation to support proposed increase in Utility and Fuel Charges.

8. <u>Adjustments for Cotton Pricing Changes; Replacement Linens</u>. Replacement prices shall be tied to the price per pound of cotton as published in the National Cotton Council's A Index, Monthly Prices (the "Index"). The average of the monthly Index for the three (3) months immediately preceding each anniversary date of the Agreement shall be used to determine the base price per pound of cotton ("Cotton Price") for that Agreement year. Price changes will occur only upon mutual written agreement which will not be reasonably withheld. If the Cotton Price has increased by five percent (5%) from the end of the previous Agreement year, then the parties shall negotiate new prices for all linen services provided by Vendor pursuant to the Agreement. The web address for the Index is: http://www.cotton.org/econ/prices/monthly.cfm.

9. <u>Unreturned Linen Replacement Rate</u>. The Parties each recognize that a certain percentage of textiles will not be returned one-half percent (0.5%) is to be expected. Unreturned textile are textiles shipped to Purchaser but not returned to Vendor. Unreturned textiles can be attributed to theft, abuse, discard into waste stream, textiles not circulating on the shelves of Purchaser, or mysterious disappearance. Purchaser agrees that it shall reimburse Vendor at the acquisition rate of $3.50 per pound for unreturned textiles in excess of the excepted percentage based upon the formula set forth in the attached Attachment F. If Purchaser uses scrubs, the weight of both clean scrubs and soiled returned scrubs shall be excluded from this replacement general linen calculation. During the first quarter following installation, Purchaser's **Soil Factor** shall be determined and as mutually agreed upon thereafter, and Purchaser shall be entitled to observe the determination process. Although the monetary value of the loss during the 1st quarter following installation can be determined, Customer shall not be obligated to pay any such charges for the 1st quarter following installation. Unreturned scrubs provided to Purchaser will be counted for loss and billed back to Facility at Vendor's then current rates. Purchaser and Steward reserves the right to audit actual spend for replacement scrubs as a result of excessive loss and ruin.

10. <u>Deliveries</u>. A window of one hundred twenty (120) minutes will be allowed from the scheduled delivery times set forth in the Agreement or an exhibit thereto. All deliveries outside this window are considered late and Vendor shall use commercially reasonable efforts to avoid late deliveries. The delivery schedule before, during, and after holidays shall be mutually agreed to by the parties. If additional deliveries or redeliveries are required due to no fault of Vendor, the applicable Purchaser will pay Vendor's reasonable special delivery charge or such other special delivery charge as is specified in the Agreement or the exhibits thereto. A delivery schedule will be decided between Vendor and each Purchaser within thirty (30) days of the Effective Date and reported back to Steward and as may be amended between Parties. Vendor will provide Purchaser a monthly report of deliveries made more than two (2) hours outside the agreed delivery time.

11. <u>Reject Rate</u>. <u>Vendor will credit any reasonably rejected linen at the contracted per piece rental rate as contained</u>

herein. Rejection will be based upon Linen Quality Standards (Attachment E) and will not be capped.

12. **Quality and Inspection Guidelines**. Quality, mending and inspection guidelines related to all laundry delivered by Vendor under the Agreement shall be provided by Vendor to the extent expressly provided in the Agreement Attachment D and E. In the event any Purchaser determines that any of Vendor's services purchased from Vendor hereunder do(es) not satisfy the terms of the Agreement, Purchaser may promptly return such linen to Vendor for correction. Vendor shall meet with each Purchaser for the purpose of reviewing performance of Vendor under the Agreement and the needs of Purchaser for such services upon Purchaser's request. Vendor shall meet with Purchaser for the purpose of reviewing performance of Vendor under the Agreement on quarterly basis.

13. **Extra Pick-Ups and Deliveries**. A reasonable number of extra pick-ups and deliveries may be made from time to time by Vendor to service unusual or other non-ordinary needs of a Purchaser. If, from time to time, a Purchaser requests expedited service due to unusual or special needs of such Purchaser, Vendor will make every effort to comply with such requests, provided such requests are reasonable and do not unduly hamper Vendor's ability to service its other Purchasers or increase costs extraordinarily or unreasonably. Vendor reserves the right to charge, as an additional cost for extra pick-ups and deliveries, reasonable extra pick-ups and deliveries charges or such other extra pick-ups and deliveries charge at a rate of three dollars ($3) per mile traveled.

14. **Owner of Laundry and Equipment**. Vendor is and shall be the sole owner of laundry and all carts and exchange carts, equipment, PDA's, Vendor's brand and all other items and procedures used and owned by Vendor in connection with the services provided in the Agreement, and Purchaser for itself and Purchasers hereby waives and disclaims any claim of ownership interest in all such items.

15. **Laundry Carts**. Vendor shall provide Purchasers with laundry and exchange carts for use in collecting soiled laundry or for delivery of clean laundry. Such laundry and exchange carts shall be used exclusively for collecting soiled laundry and for delivery of clean laundry in connection with Vendor's services. Any other use by a Purchaser is strictly prohibited. Vendor shall be responsible for all maintenance and repair for laundry and exchange carts furnished by Vendor; provided, however, that Purchaser and any applicable Purchaser shall be liable for loss, theft or damage to laundry and exchange carts furnished by Vendor beyond reasonable wear and tear, including any loss, theft or damage related to a Purchaser's use of laundry cart for other than appropriate purposes. Purchaser shall provide adequate storage at the dock for linen carts and exchange carts.

16. **Education Sessions**. Vendor shall periodically conduct educational sessions with each Purchaser's personnel for purposes of providing laundry control and cost reduction strategies, service change information, and laundry management review processes to determine laundry inventory levels. Educational sessions will be conducted by Vendor at each Customer location every 3 months ("Quarterly Education Sessions") and will review all relevant Performance Conditions and Quality Guidelines (Attachment D & E) at a minimum.

17. **Performance Review Meetings**. Vendor shall meet with Purchaser each quarter for the purpose of reviewing Vendor's performance under the Agreement and to discuss the needs of each Purchaser for the services provided in the Agreement. Purchasers may request their own meetings with Vendor with such frequency and at times agreed upon by Vendor and Purchaser. Additionally, Vendor will provide a timely, accurate, and fully completed Performance Tool (Attachment G) every month on the first Friday of said month.

18. **Needles, Sharps, or Similar Material**. Each Purchaser shall use commercially reasonable efforts to return soiled laundry to Vendor free of needles, sharps and other similar materials. Vendor, Purchaser, and Purchasers shall work together in good faith to implement procedures designed to prevent inclusion of such materials in returned soiled laundry. In the event that a Purchaser fails to comply with this Section, Vendor shall notify the applicable Purchaser, and if the Purchaser does not cure the problem within thirty (30) days of said notice, Vendor shall meet with Purchaser to recommend remedial actions to resolve the applicable Purchaser's performance deficiencies. In the event that Purchaser fails to return soiled laundry to Vendor free of needles, sharps and other similar materials on three (3) separate occasions per rolling twelve (12) month window, Purchaser shall thereafter reimburse Vendor its costs for each such hazardous materials disposal plus 25%.

19. **Return of Valuables**. Vendor shall use commercially reasonable efforts when feasible, but without liability for any losses related thereto, to return to Purchasers any items or instruments of value found mixed in with soiled laundry.

20. **Vendor will utilize linen utilization software to support Purchaser**. Vendor will provide a comprehensive linen management software program supplied by vendor partner. Vendor will provide to Purchaser a wireless tablet to interface with Windows based software. Wireless tablet will work across Purchaser's guest network to interface with the linen management software. Wireless tablet and associated Vendor software will meet all Purchaser Security and Compliance policies, including but not limited to completion of Purchaser Security Rider and IT Security Risk Assessment. All wireless tablets provided by Vendor to render its linen program will remain the property of Vendor. Vendor will be responsible to repair, maintain, and replace its own wireless tablets, at no additional cost to Purchaser unless caused to the misuse or theft by such Purchaser or its employees or agents. If a Purchaser uses any specialized linen management/production software at any time during the term of the linen program, then such

DocuSign Envelope ID: 060D4617-D19E-4828-B503-566AD31EAF05

Purchaser, at its own cost, will make such software available for use by Vendor and the linen program will incorporate use of that software.

21. Linen Program Costs. Vendor, at its own expense, will provide all materials and supplies that are needed to perform the linen program, including but not limited to: all safety equipment, including all personal protection equipment, sharps containers, and lockout/tagout equipment (if applicable); caps; bags and wraps; office supplies; and other such items.

22. Volume and Frequency. Vendor must provide circulating linen supply that provides ample linen for all usage areas of all Purchasers sufficient to meet the volumes and frequencies expressly provided in the Agreement or the exhibits thereto.

23. Vendor Performance and Performance Failures. Vendor agrees that soiled laundry collected by Vendor and clean laundry shall be returned to the applicable Purchaser within the pick-up and delivery schedule established and published within thirty (30) days of implementation of this Agreement with each Purchaser. If Vendor is unable to provide any of the services provided in the Agreement within the schedule specified and if Vendor and Purchaser are unable to reach resolution regarding a performance failure pursuant to this Section, Vendor shall be in breach of this Agreement. Vendor shall have a corrective action plan developed within five (5) days and review plan and progress weekly for thirty (30) calendar days to cure any deficiencies. Failure to cure will allow Purchaser the right to terminate this agreement without penalty or liability.

24. Reports. Vendor shall also furnish to Purchaser in an agreed-upon format available using Vendors existing systems any additional reports reasonably requested by Purchaser, including Performance Tool as noted in Attachment G, related to the services provided in the Agreement. Any and all reports required of any party under the Agreement may be delivered via E-mail.

25. Training. Vendor agrees to provide and Vendor Personnel provide training to Purchaser employees or physicians related to the services provided by Vendor under the Agreement: (i) the predominant purpose of the training is provide instruction on such services; (ii) the training is not for instruction on how to market such services, or to encourage investment in Vendor; and (iii) the training is not for instruction on how to bill any federal healthcare program.

26. Beneficiaries; Survival. The representations and warranties provided in the Agreement shall run to Purchaser, Purchaser and their successors and permitted assigns, and their applicability during the term of the Agreement shall survive the termination or expiration of the Agreement for a period of three (3) months. There shall be no third-party beneficiaries of the Agreement or exhibits thereto other than any Purchaser(s).

27. Disputes; Settlement Exclusions. The parties agree to use good faith efforts to resolve any dispute that may arise from any dispute summary provided by either party whether directly or through mediation.

28. Potential Conflicts. Vendor agrees to notify Purchaser and any applicable Purchaser if it learns of any potential conflict of interest between Vendor personnel selling services and any such Purchaser's or their employees, representatives or independent contractors (including physicians) involved in the purchasing decision process.

29. Supervisory Employees of Vendor. Purchaser acknowledges that Vendor has invested considerable amounts of time and money in training its Vendor personnel and in the systems, procedures, methods, forms, reports, formulas, computer programs, plans, techniques and other valuable information that are proprietary and unique to Vendor's manner of conducting its business and that Vendor makes such information available to its Vendor personnel on a confidential basis. Therefore, Steward and each Purchaser covenants and agrees not to directly or indirectly solicit or hire personnel of Vendor for the term of the Agreement and for two (2) years thereafter. Vendor agrees as well to not directly or indirectly solicit or hire personnel of Purchaser for the term of the Agreement and for two (2) years thereafter.

30. Laundry Condition. Purchaser acknowledges that the healthcare linen produced and provided by Vendor will be "hygienically clean" as this term is defined by the Center for Disease Control when it is delivered to Purchaser's possession. Should Purchaser require "sterile" linen instead of hygienically clean linen as medically necessary for any or all of its patients, Purchaser may request Vendor to make up specific packs containing hygienically clean linen that Purchaser can then expose to additional processes to sterilize the linen. Purchaser and Vendor will mutually agree on the price for Purchaser specific packs and Vendor will then provide the same. Unless otherwise stated in an Exhibit or attachment to this Agreement, Vendor is responsible for the condition of the Laundry from the time of pickup from a Purchaser until delivery back to a Purchaser and shall be liable for any loss or damage to Laundry that occurs during such time. Vendor shall take all reasonable actions to prevent loss or damage of Laundry in its possession. Otherwise, responsibility for loss or damage to Laundry shall be as designated in an exhibit or attachment to this Agreement.

31. Termination without Cause. Notwithstanding anything to the contrary, in the event of Customer's termination of the Agreement without cause, Customer shall pay an amount calculated at a rate of thirty-five percent (35%) of the average weekly spend during the thirteen (13) weeks prior to notification multiplied by the number of weeks remaining in the Agreement if terminated in the first three (3) years, and twenty-five percent (25%) in the fourth (4th) and fifth

DocuSign Envelope ID: 060D4517-D10F-492B-B603-E66ADD1EAF0F

(5th) years, and zero percent (0%) any years thereafter.  If during the term of the Agreement, Vendor serves notice to terminate the Agreement, Purchaser will not be liable for any early termination fees as noted above in Terms and Conditions.

Read, Acknowledged and Agreed as of the date of and in consideration of the Agreement.

IN WITNESS WHEREOF, Purchaser and Vendor have caused this instrument to be executed and binding.

NOVO HEALTH SERVICES, LLC,
a Delaware limited liability company

By: _Karl Fillip II_

Name: Karl Fillip II

Title: President

11/13/2021

PURCHASER or AGENT:
Steward Health Care System, LLC

By: _____

Name: Sanjay K. Shetty, MD, MBA

Title: President, Steward Health Care System LLC

Acknowledged:

HealthTrust Purchasing Group, L.P.,
By HPG Enterprises, LLC, its general partner

HealthTrust Signee: _Christina Katamay_

HealthTrust Signee Name: Christina Katamay

HealthTrust Signee Title: AVP, Strategic Sourcing

HealthTrust Signature Date: 11/13/2021

<u>Attachment A-1</u>

### PRODUCT AND PRICE SCHEDULE
### For Facilities Identified in Attachment B-1

Pricing contained herein reflects cost per piece for actual clean linen as delivered to each Purchaser's Facility with the exception of Items worn by Purchaser's staff as denoted with an asterisk (*) immediately to the left of the Item Description. Pricing for asterisked items is based on the greater of actual usage multiplied by the price or the price multiplied fifty percent (50%) the Total Inventory committed to each Facility as agreed upon and may be adjusted between Parties. Total Inventory is defined as the total number of each scrub piece injected into a Purchaser's scrub program and is equal to the par level identified by each Purchaser plus surplus level, then multiplied by two (2). For example, par equals one hundred (100) and surplus equals twenty eight (28), then:



To assure an adequate supply of these items used by Purchaser exclusively, Purchaser agrees to maintain a seven-day par level of scrubs in its inventory.

**Rental Pricing Per Piece**

| Code | Description | Price | Unit |
|------|-------------|-------|------|
| HC1000HB | Flat Sheet - Hyperbaric | | Piece |
| HC1000MF | Flat Sheet Microfiber | | Piece |
| HC1000QTN | Flat sheet - Queen Tan | | Piece |
| HC1100 | Draw Sheet - Green | | Piece |
| HC1200HB | Pillowcase - Hyperbaric | | Piece |
| HC1200MF | Pillowcase Microfiber | | Piece |
| HC1200TN | Pillowcase - Tan | | Piece |
| HC2000QTN | Fitted Sheet - Queen Tan | | Piece |
| HC2000S | Fitted Sheet-Spandex | | Piece |
| HC2003CL | Knit Fitted Sheet - Stretcher | | Piece |
| HC2010 | Bath Towel | | Piece |
| HC2040 | Washcloth | | Piece |
| HC2300 | Thermal Blanket White | | Piece |
| HC2350 | Bath Blanket | | Piece |
| HC2350HB | Bath Blanket - Hyperbaric | | Piece |
| HC2500 | Gown - Patient | | Piece |
| HC2500HB | Gown - Patient Hyperbaric L | | Piece |
| HC2520 | Gown - Patient 3X | | Piece |
| HC2520HB | Gown - Patient Hyperbaric 3X | | Piece |
| HC2530 | Gown - Patient 10X | | Piece |
| HC2600 | Gown - IV Tele | | Piece |
| HC2603 | Gown - IV Tele 5X | | Piece |
| HC2605 | Gown - IV Tele 10X | | Piece |
| HC2720 | Gown - Mammography | | Piece |
| HC2730 | Gown - Isolation Barrier | | Piece |
| HC2750SM | Top PJ Lg | | Piece |

| | | | |
|---|---|---|---|
| HC2800 | PJ Pant - Elastic Waist XL | | Piece |
| HC2810 | PJ Pant - Elastic Waist 3X | | Piece |
| HC3000 | Baby Blanket | | Piece |
| HC3100 | Ped Gown - S | | Piece |
| HC3105 | Ped Gown - M | | Piece |
| HC3110 | Ped Gown - L | | Piece |
| HC3400 | Ped PJ Pant - S | | Piece |
| HC3405 | Ped PJ Pant - M | | Piece |
| HC3410 | Ped PJ Pant - L | | Piece |
| HC3815 | Knit Fitted Crib Sheet | | Piece |
| HC39006M | Infant Shirt - 6 Month | | Piece |
| HC4001A | *Scrub Top - 2 PKT Ceil Blue SM - XL | | Piece |
| | *Scrub Top - XX - 4Xl | | Piece |
| HC4010A | *Scrub Pant - Ceil Blue | | Piece |
| HC4050A | *Scrub Warmup- Ceil Blue | | Piece |
| HC4101A | *Scrub Top-2 PKT Misty Green SM - XL | | Piece |
| | *Scrub Patn XX - 4XL | | Piece |
| HC4101HB | *Scrub Top Misty Grn Hyperbric | | Piece |
| HC4110A | *Scrub Pant - Misty Green | | Piece |
| HC4150A | *Scrub Warm Up - Misty Green | | Piece |
| HC4760A | *Labcoat - WH | | Piece |
| HC5300 | OR Towel -Green Non Detect | | Piece |
| HC5400F1 | Circumcision Sheet | | Piece |
| HC6000B | Incontinent Pad bonded | | Piece |
| HC6110 | Adult napkin terry no barrier | | Piece |
| HC6200 | Bib Apron (White) | | Piece |
| HC6270 | Bar Towel | | Piece |
| HC6280 | Pot Holders | | Piece |
| HC6680WM | Microfiber Mop 18 inch | | Piece |
| HC6688MFBL | Microfiber Towel Blue | | Piece |
| HC6800 | Sheet - EMS | | Piece |
| HC6810 | Pillowcase - EMS | | Piece |
| HC6820 | Bath Towel - EMS | | Piece |
| HC6830 | Bath Blanket - EMS | | Piece |
| HC7014 | Plastic Bag - Blue - RDBL43B | | Case |
| HC7019 | Plastic Bag - Purple -IRDPR45C | | Case |
| HC7020 | Barrier Bag | | Piece |
| HC7040 | NOG Poundage | | Pound |
| HC7045 | NOG Scrub Apparel (by piece) | | Piece |
| HC7066BL | Rag Sales - 5# Rag Lab Towels | | 5 lb. bag |
| HC7122PD | Pillow Disposal | | Piece |

DocuSign Envelope ID: 068D4517-D1DF-493B-B603-E66ADD1EAF0E

| | | | |
|---|---|---|---|
| HC7124CH | Sharp Processing Fee | | Sharp |
| HC9101 | NOG Labcoat | | Piece |
| HC9500LG | Cubicle Drape-Large (by Piece) | | Piece |
| HC9500XL | Cubicle Drape-Oversize (by Pc) | | Piece |
| | Tween Gown | | Piece |
| | Sleep Sack | | Piece |
| | Queen Bone Flat | | Piece |
| | Queen Bone Fitted | | Piece |
| | Bone Pillowcase | | Piece |

**PRODUCT AND PRICE SCHEDULE**
**For Facilities Identified in Attachment B-2**

Pricing contained herein reflects cost per piece for actual clean linen as delivered to each Purchaser's Facility with the exception of Items worn by Purchaser's staff as denoted with an asterisk (*) immediately to the left of the Item Description. Pricing for asterisked items is based on the greater of actual usage multiplied by the price or the price multiplied fifty percent (50%) the Total Inventory committed to each Facility as agreed upon and may be adjusted between Parties. Total Inventory is defined as the total number of each scrub piece injected into a Purchaser's scrub program and is equal to the par level identified by each Purchaser plus and surplus level, then multiplied by two (2). For example, par equals one hundred (100) and surplus equals twenty eight (28), then:



To assure an adequate supply of these items used by Purchaser exclusively, Purchaser agrees to maintain a seven-day par level of scrubs in its inventory.

**Rental Pricing Per Piece**

| Description | Price | Unit |
|---|---|---|
| 3 arm yellow gown | | Piece |
| Baby Blanket | | Piece |
| Baby Snap Shirt | | Piece |
| Bath Blankets | | Piece |
| Bath Towels | | Piece |
| Blue Rags Tied | | Piece |
| Blue Stretcher Sheets | | Piece |
| Champagne Bedspread | | Piece |
| Drawsheets | | Piece |
| Fall Risk IV gown | | Piece |
| Fitted Sheet | | Piece |
| Flat Sheets | | Piece |
| Green Stretcher Sheet | | Piece |
| Hand Towel | | Piece |
| Hyperbaric Blanket | | Piece |
| Hyperbaric Flat Sheet | | Piece |
| Hyperbaric Pillowcase | | Piece |
| Hyperbaric Scrub Pant | | Piece |
| Hyperbaric Scrub Top | | Piece |
| Hypo Pack CHS | | Piece |
| Isolation Gown Barrier | | Piece |
| IV gown - fall risk | | Piece |
| IV Gown - plastic snap | | Piece |
| Jade OR Towel - Surgical | | Piece |

| Description | Price | Unit |
|---|---|---|
| Laundry Bags | | Piece |
| Lt Blue surgeon gown | | Piece |
| Mammo Gowns | | Piece |
| Obesity Gown - plastic snap | | Piece |
| Obesity Gown IV plastic snaps | | Piece |
| Pack Transfer Sheet | | Piece |
| Ped Gowns (s,m,l) | | Piece |
| Pillowcases | | Piece |
| Pillows | | Piece |
| Pink Robes | | Piece |
| PJ Pants (m,xl,2xl) | | Piece |
| Scrub Jacket Ceil Blue (xs-3x) | | Piece |
| Scrub jackets Misty Green (xs-3x) | | Piece |
| Scrub Pants Ceil Blue (xs-4x) | | Piece |
| Scrub Pants Misty Green (xs-3x) | | Piece |
| Scrub Top Misty Green (xs-3x) | | Piece |
| Scrub Tops Ceil blue (xs - 4x) | | Piece |
| Surgeon Gown dark blue | | Piece |
| Teen Gown | | Piece |
| Tieside Gowns | | Piece |
| Underpad | | Piece |
| Washcloths | | Piece |
| X-Ray Gown-wraparound | | Piece |

Attachment A-3

**PRODUCT AND PRICE SCHEDULE**
**For Facilities Identified in Attachment B-3**

Pricing contained herein reflects cost per piece for actual clean linen as delivered to each Purchaser's Facility with the exception of Items worn by Purchaser's staff as denoted with an asterisk (*) immediately to the left of the Item Description. Pricing for asterisked items is based on the greater of actual usage multiplied by the price or the price multiplied fifty percent (50%) the Total Inventory committed to each Facility as agreed upon and may be adjusted between Parties. Total Inventory is defined as the total number of each scrub piece injected into a Purchaser's scrub program and is equal to the par level identified by each Purchaser plus and surplus level, then multiplied by two (2). For example, par equals one hundred (100) and surplus equals twenty eight (28), then:



To assure an adequate supply of these items used by Purchaser exclusively, Purchaser agrees to maintain a seven-day par level of scrubs in its inventory.

**Rental Pricing Per Piece**

| Description | Price | Unit |
|---|---|---|
| COG THERAPY PADS – SMALL | ■ | Piece |
| COG THERAPY PADS – LARGE | | Piece |
| DRAW SHEET 54X72 | | Piece |
| BLKT THERM WH 66X90 | | Piece |
| TOWEL B WH 24X48 | | Piece |
| HYPER BARIC PAT GOWN BLU | | Piece |
| GOWN PAT PINK | | Piece |
| GOWN PATIENT BLUE | | Piece |
| COG GOWN NO SHORE MIAMI | | Piece |
| COG SURGICAL GOWN | | Piece |
| GOWN PRECAUTION - ISOLATION | | Piece |
| COG ROBE PAT WHITE | | Piece |
| COG LAB COAT WHT | | Piece |
| COG CURTAIN CUBICLE | | Piece |
| TOWEL OR MGN 18X32 | | Piece |
| COG GOWN ISOLATION | | Piece |
| COG MICRO FIBER MOPS | | Piece |
| PREP CHARGE | | Piece |
| PREP CHARGE SCRUB PANTS | | Piece |
| PREP CHARGE SCRUB TOPS | | Piece |
| HAMPER | | Piece |
| GOWN EXAM AQUA | | Piece |
| JACKET W/UP SMALL | | Piece |
| JACKET W/UP MEDIUM | | Piece |
| JACKET W/UP LARGE | | Piece |
| JACKET W/UP XLARGE | | Piece |
| JACKET W/UP 2XLARGE | | Piece |

| Description | Price | Unit |
|---|---|---|
| BLKT BABY STRIPE | | Piece |
| BLKT BATH WHITE W/BLUE STRIPE | | Piece |
| HYPER BARIC BATH BLANKET | | Piece |
| WASH CL WH 12 x12 | | Piece |
| RAGS BATH TOWEL | | Piece |
| SHIRT SC CBL REV LARGE | | Piece |
| SHIRT SC CBL REV MEDIUM | | Piece |
| SHIRT SC CBL REV SMALL | | Piece |
| SHIRT SC CBL REV XLARGE | | Piece |
| SHIRT SC CBL REV 2XLARGE | | Piece |
| PANTS SC CBL REV LARGE | | Piece |
| PANTS SC CBL REV MEDIUM | | Piece |
| PANTS SC CBL REV SMALL | | Piece |
| PANTS SC CBL REV XLARGE | | Piece |
| PANTS SC CBL REV 2XLARGE | | Piece |
| PANTS SC CBL REV XSMALL | | Piece |
| SHIRT SC CBL REV XSMALL | | Piece |
| DIAPER COT 27 X 27 | | Piece |
| GOWN TEEN AQUA | | Piece |
| GOWN CHILD SMALL | | Piece |
| GOWN CHILD LARGE | | Piece |
| RAGS BLANKET | | Piece |
| RAGS BLUE ORTOWEL | | Piece |
| RAGS WASHCLOTH | | Piece |
| HYPER BARIC PILLOWCASE | | Piece |
| PILLOWCASE WHITE MUSLIN 42X36 | | Piece |
| HYPER BARIC FLAT SHEET | | Piece |
| SHEET WHITE MUSLIN 66X115 | | Piece |
| AMB FLAT SHEET-BLUE | | Piece |
| GOWN PSYCH BLU PRNT | | Piece |
| 10X PAT GOWN BLU/GRY | | Piece |
| GOWN IV GREEN | | Piece |
| SH FIT WH KNIT 36X84 | | Piece |

DocuSign Envelope ID: 060D4517-D10E-492B-B603-E66ADD1EAF0E

| Description | Price | Unit |
|---|---|---|
| PANTS SCRUB 2XLARGE | | Piece |
| PANTS SCRUB 3XLARGE | | Piece |
| PANTS SCRUB 4XLARGE | | Piece |
| PANTS SCRUB 5XLARGE | | Piece |
| PANTS SCRUB LARGE | | Piece |
| PANTS SCRUB MED | | Piece |
| PANTS SCRUB SMALL | | Piece |
| PANTS SCRUB XLARGE | | Piece |
| PANTS SCRUB XSMALL | | Piece |
| SHIRTS SCRUB 2XLARGE | | Piece |
| SHIRTS SCRUB 3XLARGE | | Piece |
| SHIRTS SCRUB 4XLARGE | | Piece |
| SHIRTS SCRUB 5XLARGE | | Piece |
| SHIRTS SCRUB LARGE | | Piece |
| SHIRTS SCRUB MED | | Piece |
| SHIRTS SCRUB SMALL | | Piece |
| SHIRTS SCRUB XLARGE | | Piece |
| SHIRTS SCRUB XSMALL | | Piece |
| SHIRT BABY WH LS | | Piece |
| COG BABY CLOTHES | | Piece |
| COG CUBICLE CURTAIN – FMC | | Piece |
| RED BAG BIO DISPOSAL FEE | | Piece |
| REUSABLE BAGS | | Piece |

- Facilities as identified in Attachment B-3 will also be subjected to the following surcharges
  - Acute care Facilities will incur a one-hundred dollar ($100) weekly surcharge for deliveries
  - Non-acute Facilities will be included in deliveries to the parent Acute care Facility
    - Any deliveries direct to a non-acute Facility will incur a one-hundred dollar ($100) surcharge per delivery occurrence as may be requested in advance by Purchaser

Facilities identified in this schedule are hereby contracted to receive Services under this Agreement for the pricing as ascribed in Attachment A-1. Existing Purchaser Facilities of Vendor will begin purchasing under this Agreement upon the Effective Date. New Purchaser Facilities not currently purchasing Services from Vendor will begin purchasing Services no later than February 15, 2022.

| GPOID | Facility | Address | City | State |
|---------|-----------------|------------------|--------|-------|
| H058295 | Hillside | 8747 Squires Ln NE | Warren | OH |
| H026144 | Sharon Regional | 740 E State St | Sharon | PA |
| H015417 | Trumball | 1350 E Market St | Warren | OH |

Attachment B-2

Facilities identified in this schedule are hereby contracted to receive Services under this Agreement for the pricing as ascribed in Attachment A-2. Facilities in this Exhibit are not currently purchasing Services from Vendor will begin purchasing Services no later than February 1, 2022.

| GPOID | Facility | Address | City | State |
|-------|----------|---------|------|-------|
| H031822 | Palmetto General Hospital | 2001 W 68th St | Hialeah | FL |
| H031823 | Hialeah Hospital | 651 E 25th St | Hialeah | FL |
| H031821 | Florida Medical Center - a Campus | 5000 W Oakland Park Blvd | Lauderdale Lakes | FL |
| H031820 | Coral Gables Hospital | 3100 S Douglas Rd | Coral Gables | FL |
| H031824 | North Shore Medical Center | 1100 NW 95th St | Miami | FL |

Attachment B-3

Facilities identified in this schedule are hereby contracted to receive Services under this Agreement for the pricing as ascribed in Attachment A-3. Facilities in this Exhibit are not currently purchasing Services from Vendor will begin purchasing Services no later than March 1, 2022.

| GPOID | Facility | Address | City | State |
|-------|----------|---------|------|-------|
| H015407 | Melbourne Regional MC | 250 N Wickham Road | Melbourne | FL |
| H015405 | Rockledge Regional Medical Center | 110 Longwood Ave. | Rockledge | FL |
| H019480 | Rockledge Woundcare | 1257 S Florida Ave | Rockledge | FL |
| H000260 | Sebastian River Medical Ctr | 13695 US Highway 1 | Sebastian | FL |
| ??? | Sebastian Woundcare | 8005 Bay St. Suite 2 | Sebastian | FL |

Attachment C

Vendor provides the following products which exceed the specifications as approved by Purchaser. Any other products to be supplied will meet the specifications of Purchaser as of the Effective Date of this Agreement.

| Category | Product Description | Mfg | Better Item Number |
|---|---|---|---|
| Wash Cloths | 12x12 Washcloth 100% cotton 16s hemmed edges .75lb | Medline | HC2040 |
| Bath Towels | 22x44 Bath Towel 86% cotton 14% polyester- 6 lb 16s partial ringspun | Medline | HC2010 |
| Bath Blankets | 70x90 Bath Blanket 80% cotton 20% polyester- 1.7 lb low lint | KSE | HC2350 |
| Pillow Cases | 42x34 Microfiber Pillowcase- 130 gsm / Brushed & Vacuumed | Global | HC1200MF |
| Flat Sheets | 66x115 Microfiber Flat Sheet- 130 gsm / Brushed both sides & Vacuumed | KSE | HC1000MF |
| OR Towels | 18x27 Green OR Towel-Non Detectable- cotton poly blend | Medline | HC5300 |
| Fitted Sheets | 36x86x12 Fitted Spandex Sheet 55% cotton, 41% polyester, 4% spandex- 24oz | KSE | HC2000S |
| IV Gowns | Large IV Gown Green / Paris Pattern / 55% cotton 45% polyester | Superior Uniform | HC2600 |
| Incontinent Pads | 34x36 Incontinent Pad Barrier Fabric- Swift Dry Bonded | ADI | HC6000B |
| Patient Gowns | Large Patient Gown / Paris Pattern / 55% cotton 45% polyester | ADI | HC2500 |
| Baby Blankets | 36x40 Baby Blanket 100% cotton | ADI | HC3000 |
| Thermal Blankets | 70x90 Thermal Blanket cotton poly blend- 2.5 lb snag free | KSE | HC2300 |

DocuSign Envelope ID: 060D4517-D10F-492B-B603-E86ADD1EAF05

<u>Attachment D</u>

## <u>Performance Conditions and Quality Guidelines</u>
Vendor agrees to the following performance conditions and quality guidelines:

<u>Deliveries</u>.  A window of one hundred twenty (120) minutes will be allowed from the scheduled delivery times set forth on the applicable exhibit. All deliveries outside this window are considered late and unsatisfactory. The delivery schedule before, during and after holidays shall be mutually agreed to by the parties.

<u>Reject Rate</u>.  See Section 9 above. Vendor will credit any reject linen at the prevailing per piece rental rate.  Rejection will be based upon Linen Quality Standards (Attachment E) and will not be capped.

<u>Satisfaction Rate</u>. Overall satisfaction rate for Services provided by Vendor under this Agreement shall meet or exceed a ninety-seven percent (97%) satisfaction rate as determined by a mutually agreed to survey submitted to various Facility employees.

<u>Quality and Inspection Guidelines</u>. Quality, mending and inspection guidelines related to all Laundry delivered by Vendor under this Agreement, other than under Section 7 hereof, shall be as set forth in Schedule A hereof.

Vendor will offer to Facility a rebate on unresolved issues measured quarterly.  For every unresolved issue, Vendor will discount the monthly linen cost based on the mutual agreement by Vendor and the Facility between one half of one percent (0.5%) up to a maximum of five percent (5%) during the next quarter.  The monthly measurement will be determined by the Facility's Issue Log.  Vendor will provide these logs to the Facility on a monthly basis.

Vendor agrees to provide clean delivery carts at no cost to Facility, to be utilized in the delivery of clean linens, and will be maintained and serviced in accordance with the state and local guidelines for the Facility.

Vendor agrees to provide soiled linen carts at no cost to Facility, along with bulk carts used for soiled linen.  These soiled linen carts will not be used for clean linen delivery unless they are cleaned to Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") standards after every use.

<u>Extra Pick-ups and Deliveries</u>.  A reasonable number of extra pick-ups and deliveries may be made from time to time by Vendor in order to service unusual or other non-ordinary needs of a Facility. If, from time to time, Facility requests expedited service due to unusual or special need, Vendor will make every effort to comply with such requests, provided such requests are reasonable and do not unduly hamper Vendor's ability to service its other customers or increase costs extraordinarily or unreasonably. Vendor reserves the right to charge an additional cost for reasonable extra pick-ups and deliveries, provided such are not required by Vendor's failure to properly provide Services as required hereunder.

Vendor shall meet with Facilities for the purpose of reviewing performance of Vendor under this Agreement and the needs of each Facility for Services:

☐        Monthly
☒        Quarterly
☐        Upon Facility's request

<u>Fill Rates</u>.  Daily primary scheduled deliveries ("Primary Scheduled Deliveries") are defined as deliveries that are standard scheduled deliveries with the Facility. For Primary Scheduled Deliveries, when measured over thirteen (13) week periods, Vendor is committed to maintaining an overall fill rate equal to or greater than 98% of products reasonably ordered by Purchaser.  If the fill rate falls below the levels outlined below and such shortages have a negative impact on patient care, For clarity where shortage results in Purchaser not being able to fully dress a room with clean linen that meets all Quality Standards per Attachment E, the following penalty levels will apply accordingly:

- 97.00% to 97.99% = One percent (1%) penalty applied as a discount off the next 4 weeks of invoices for the Facility.
- 96.00% to 96.99% = Two percent (2%) penalty applied as a discount off the next 4 weeks of invoices for the Facility.
- 95.99% and less = Three percent (3%) penalty applied as a discount off the next 4 weeks of invoices for the Facility.  An Action Plan must be created to eliminate the shortage and resolve the issue(s).

- If Fill Rate falls below state goal of 98% for two (2) consecutive months, Purchaser reserves exclusive right to serve Vendor with written notice of breach and Vendor will have ten (10) business days to resolve stated shortages.

Performance Reporting.

Vendor will provide monthly analysis and reporting of service utilization (adjusted) by Facility and by cost center and/or department if distributed, to include total usage in pounds and units, units price, total cost, usage per patient day ("PPD"). Reports must be provided to the respective Facility on First Friday of each month. Any updates and/or changes to Purchaser's census information will be provided on a monthly basis.

Vendor will provide the following information to each Facility monthly: Clean pounds shipped, soiled pounds returned, soiled to clean ratio, pieces shipped, service evaluation recap, reject linen review and billing review.

Vendor agrees to conduct monthly service evaluation to patient care areas to provide ongoing utilization reports and graphs for specified units including, but not limited to, outcomes of cost reduction efforts.

Vendor will provide on a monthly basis a report for each Facility receiving Services under this Agreement ("Linen Reporting Tool"). A sample of this report is identified in Attachment G of this Agreement. Steward will provide Vendor Services Provider with facility Adjusted Patient Day ("APD") information to help create this report. On a Quarterly basis, Vendor will meet with Steward for a quarterly business review of month over month data for all Facilities.

**Laundry Management Guidelines**

- Main Linen Room PAR levels will be agreed upon and maintained daily at each hospital. These PAR levels will be adjusted monthly, using the most recent twelve (12) month period.

- Departmental usage will be tracked daily. Appropriate PAR levels will be agreed upon, maintained daily and adjusted quarterly or as needed by the Purchaser.

- A Linen Committee will be established per hospital. These committees will meet at least quarterly to discuss usage and conservation efforts. Company will assist in ongoing training for staff at Purchaser's facilities.

- Patient census will be monitored per hospital and department daily. All census information will be provided by Purchaser to Company by the 2nd of each month. Company will provide to Purchaser the soil linen counts on a weekly basis. All poundage information will be provided to Purchaser by Company by the 3rd of each month.

Attachment E

**Linen Quality Standards**

1. <u>Top Sheet, Knitted Sheet, Fitted Sheet, Bath Blankets</u>
   - Holes
     - Isolated pin holes, no larger than a pen tip are acceptable, provided there are no more than 2 per sheet outside the patient area.
   - Stains
     - Light stains, smaller than a dime are acceptable, provided no more than 2 per sheet and outside the patient area.
     - Residue stains from electrodes or any stain that looks like blood are not acceptable.
   - Patches/Mending
     - No patching or mending, except for ripped hems, selvages and bindings.
   - Other
     - No foreign objects, such as tape or electrodes.
     - No odors.
     - No discoloration.
     - Not too thin or worn.
     - No accordion wrinkles.
     - No rough nap.

2. <u>Spread Blanket</u>
   - Holes
     - No holes are acceptable.
     - Patches are acceptable up to 1 inch in size, outside the patient area and no more than 2 patches.
   - Stains
     - No stains are acceptable
   - Other
     - May be downsized to 68"x85" for ER use.
     - No foreign objects, such as tape or electrodes.
     - No odors.
     - No discoloration.
     - Not too thin or worn.
     - No accordion wrinkles.
     - No rough nap.

3. <u>Underpads</u>
   - Holes
     - No holes or tears are acceptable.
   - Stains
     - Light stains, smaller than a dime are acceptable, provided no more than 2 per side.
   - Patches/Mending
     - No patches on bonded underpads.
     - 3-ply underpads can have 2 patches on each side.
   - Other
     - Soaker must be intact.
     - No foreign objects, such as tape or electrodes.
     - No odors.
     - No discoloration.
     - Not too thin or worn.
     - No accordion wrinkles.
     - No rough nap.

4. <u>Pillowcase</u>
   - Holes
     - No holes or tears are acceptable.
   - Stains
     - No stains are acceptable.
   - Patches/Mending
     - No patching or mending is acceptable
   - Other
     - No foreign objects, such as tape or electrodes.
     - No odors.
     - No discoloration.
     - Not too thin or worn.
     - No accordion wrinkles.
     - No rough nap.

5. <u>Bath Towel, Was Cloth, Hand Towels</u>
   - Holes
     - o  No holes or tears are acceptable.
     - o  No more than 2 strings, 1" long.
   - Stains
     - o  Very light stains, smaller than a dime are acceptable, no more than 1.
   - Patches/Mending
     - o  No patching or mending is acceptable.
   - Other
     - o  May be downsized to 68"x85" for ER use.
     - o  No foreign objects, such as tape or electrodes.
     - o  No odors.
     - o  No discoloration.
     - o  Not too thin or worn.
     - o  No accordion wrinkles.
     - o  No rough nap.

6. <u>Gowns</u>
   - Holes
     - o  No holes or tears are acceptable
   - Stains
     - o  Light stains, smaller than a dime are acceptable, provided no more than 2.
   - Patches/Mending
     - o  No patching or mending is acceptable.
   - Other
     - o  All ties and snaps must be on the gown.
     - o  No ties tied together.
     - o  No foreign objects, such as tape or electrodes.
     - o  No odors.
     - o  No discoloration.
     - o  Not too thin or worn.
     - o  No accordion wrinkles.

7. <u>Infant Linen, Crib Pads, Pediatric Linen</u>
   - Holes
     - o  No holes or tears are acceptable.
   - Stains
     - o  Light stains, smaller than a dime are acceptable on baby blankets, no ore than 1.
     - o  No stains on other items.
   - Patches/Mending
     - o  No patching or mending is acceptable.
   - Other
     - o  All ties and snaps must be on the gown.
     - o  No foreign objects, such as tape or electrodes.
     - o  No odors.
     - o  No discoloration.
     - o  Not too thin or worn.
     - o  No accordion wrinkles.
     - o  No rough nap.

8. <u>Scrubs, Labcoate, Pajamas</u>
   - Holes
     - o  Isolated pin holes, no larger than a pen tip are acceptable, provided there are no more than 2 per item.
   - Stains
     - o  Light stains, smaller than a dime are acceptable, provide no more than 2.
   - Patches/Mending
     - o  No mending or sewing, except to repair ripped pockets or seams.
   - Other
     - o  All ties and snaps must be on items.
     - o  No foreign objects, such as tape or electrodes.
     - o  No odors.
     - o  No discoloration.
     - o  Not too thin or worn.

9.  <u>Carts</u>
    - No graffiti or stickers are acceptable.
    - No broken or damaged carts are acceptable.
    - No trash or debris.
    - Wheels must be functional and free of debris.
    - Cart must have a barcode.
    - Cart must be covered.
    - Car cover must have no rips or tears

Attachment F

### Unreturned Linen Reimbursement Calculation

Due to the nature of soiling, the weight of textiles returned to Vendor should exceed the weight of the same clean items shipped. Thus, to measure textile loss, the **Soil Factor** (moisture factor plus trash factor) for Purchaser has to be established. During a one month period, Purchaser's **Soil Factor** at each facility shall be established as follows:

1. All soiled bins returned by Purchaser shall be isolated.

2. Vendor shall weigh each bin of the soil and shall subtract the weight of the empty bin (Tare Weight).  The weight of the contents of each bin (includes soiled linen and trash) shall be recorded.  This shall be known as the **Soil Weight**.  The cumulative soil weight for all bins evaluated during the evaluation period shall be known as the **Total Soil Weight**.

3. The contents of each bin shall be separated into lots (Example-Fitted Sheets, washcloths, bath towels, etc.) The contents of each lot shall be counted.  A separate lot shall be made for trash.   The lots shall then be weighed to determine the **Launderable Soil Weight** of the lot.

4. The items shall be processed or laundered.

5. The weight of each clean lot shall then be determined by weighing the lot following processing or laundering. This shall be known as the **Clean Weight**.  The cumulative clean weight for all lots evaluated during the evaluation period shall be known as the **Total Clean Weight**.

6. The **Total Clean Weight** for all lots shall be **subtracted from** the **Total Soil Weight** (including trash).  This **difference** shall then be **divided by** the **Total Clean Weight** to establish Customer's **Soil Factor**.

7. The **Total Soil Weight** includes trash.  The **total weight of all lots of trash** shall be **divided by** the **Total Clean Weight** to establish **Customer's Trash Factor.**

8. The **Trash Factor** shall then be **subtracted from** the Customer's **Soil Factor** to determine the Customer's **Moisture Factor.**

The **Soil Factor** will be re-calculated annually to adjust for process and inventory improvements.

The Soil Factors so determined shall then be used quarterly to determine Linen Loss as follows:

1. The Actual weight of **Clean Linen Shipped** in the quarter (Total Bin Weights minus Total Tare Weights) shall be **multiplied by** (1 + the calculated **Moisture Factor**) to determine the Total number of **Soiled Linen Pounds Expected.**

2. The Total number of **Soiled Pounds Returned** (Total Bin Weights minus Total Tare Weights) shall be recorded.

3. The expected weight of the trash component in the Soiled Pounds Returned (**Trash Factor multiplied by the Soiled Pounds Returned**) shall be **deducted** from the **Total Soiled Pounds Returned** to yield the **Total Pounds of Soiled Linen Returned.**

4. The total pounds of **Clean Linen Shipped** shall be multiplied by 0.5% to determine the number of pounds of **Ordinary Loss.**

5. The **Total Pounds of Soiled Linen Returned** shall be **deducted** from the **Total Soiled Linen Pounds Expected**, and this **difference** shall be the **Number of Pounds of Linen Deficiency**

6. The pounds of **Ordinary Linen Deficiency** shall be subtracted from the **Number of Pounds of Linen Deficiency** to determine the number of pounds of **Extraordinary Linen Deficiency**

7. **Pounds of Extraordinary Linen Deficiency** shall be **multiplied by $3.50 per pound** (Average depreciated acquisition cost per pound of goods served to Purchaser) to determine the **Replacement Cost of the Linen Deficiency**.

Based upon the following suppositions, here is an example of how the extraordinary linen loss calculation will be made:

**Suppositions:**

1.  Vendor shipped 120,000 pounds of Clean Linen to Purchaser in a 13-week quarter.
2.  Vendor has determined that Purchaser's moisture factor was 8.14%.
3.  Purchaser returned 129,000 pounds of Soiled Linen (after deduction for appropriate trash weight.

**Calculation Example:**

| | |
|---|---|
| Clean Weight Delivered | 120,000 |
| Moisture Factor | 8.14% |
| Expected Soiled Pounds Returned | 129,768 |
| (120,000 x 1.0814) | |
| Actual Soiled Pounds Returned | 129,000 |
| Shortfall Expected Soiled Pounds Returned | 768 |
| Linen Loss Allocation | 600 |
| (120,000 x 0.5%) | |
| Extraordinary Linen Loss | 168 |
| (768 less 600) | |
| Shortfall Charge (per pound) | $3.60 |
| Due Vendor | $604.80 |

Vendor will use commercially reasonable efforts to rectify the difference in clean poundage shipped versus soil poundage returned within two (2) weeks.  In the event of continued difference, piece count will be consulted from Quarterly Education Sessions and if piece counts are equal Customer will not incur any additional fees. If soiled linen received continues to be less than six percent (6%) and piece count remains lower than Quarterly Education Sessions, then the Facility agrees to pay for the difference in missing pounds as charged by Vendor at a rate of three dollar and fifty cents ($3.50) per pound.

Attachment G

## Performance Reporting Tool

The Performance Reporting Tool as contained in Table 1 below shall be provided monthly by Vendor to each Purchaser Facility and to Steward. A quarter over quarter report will be supplied by Vendor at each quarterly business review. Vendor and Steward may change the report format at any time as agreed upon collectively.

### Table 1

Date:

| Hospital | Soil Pounds Received | Clean Pounds Delivered | APD | # / APD | Linen Spend per lb | Linen Spend | $ / APD | Expected Soil/Clean Ratio | Soil / Clean Ratio | Lost Pounds | Linen Losses $5/# | Reject Rate | Rejected Pounds | Cart Exchange Rate | Cart Exchange Spend | Specialty Linen Spend | COG Spend | Scrub Rental Spend | Scrub Losses Spend |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility 1 | 18,217 Lb | 17,063 Lb | 1,420 | 12.02 | $0.5300 | $ 9,043 | $ 6.37 | 107% | 106.76% | 40 | $ 202 | 0.18% | 31 Lb | NA | NA | $ 154 | $ 154 | $ 776 | $ 188 |
| Facility 2 | 154,680 Lb | 145,545 Lb | 9,836 | 14.80 | $0.5300 | $ 77,139 | $ 7.84 | 107% | 106.28% | 1,053 | $ 5,266 | 0.19% | 276 Lb | $ 0.0500 | $ 7,277 | $ 6,803 | $ 6,803 | $11,736 | $ 2,115 |
| Facility 3 | 14,121 Lb | 12,788 Lb | 1,080 | 11.84 | $0.5300 | $ 6,778 | $ 6.28 | 107% | 110.42% | (438) | $ (2,189) | 0.09% | 12 Lb | NA | NA | $ 581 | $ 581 | $ - | $ - |
| Facility 4 | 125,207 Lb | 119,031 Lb | 9,870 | 12.06 | $0.5300 | $ 63,086 | $ 6.39 | 107% | 105.19% | 2,156 | $ 10,781 | 0.06% | 72 Lb | $ 0.0500 | $ 5,952 | $ 3,131 | $ 3,131 | $17,937 | $ 7,203 |
| Facility 5 | 52,273 Lb | 49,692 Lb | 4,200 | 11.83 | $0.5300 | $ 26,337 | $ 6.27 | 107% | 105.19% | 897 | $ 4,487 | 0.26% | 131 Lb | $ 0.0500 | $ 2,485 | $ 1,288 | $ 1,288 | $ 4,456 | $ 2,804 |
| Facility 6 | 42,946 Lb | 36,993 Lb | 4,015 | 9.21 | $0.5300 | $ 19,606 | $ 4.88 | 107% | 116.09% | (3,363) | $(16,817) | 0.08% | 29 Lb | NA | NA | $ 840 | $ 840 | $ 3,851 | $ 1,080 |
| Facility 7 | 116,882 Lb | 114,003 Lb | 8,600 | 13.26 | $0.5300 | $ 60,422 | $ 7.03 | 107% | 102.53% | 5,101 | $ 25,506 | 0.09% | 102 Lb | $ 0.0500 | $ 5,700 | $13,656 | $13,656 | $ 9,988 | $ 3,586 |
| Facility 8 | 114,747 Lb | 112,492 Lb | 9,425 | 11.94 | $0.5300 | $ 59,621 | $ 6.33 | 107% | 102.00% | 5,619 | $ 28,097 | 0.01% | 16 Lb | NA | NA | $ 4,846 | $ 4,846 | $ 9,525 | $ 3,673 |
| Facility 9 | 48,442 Lb | 41,676 Lb | 3,212 | 12.98 | $0.5300 | $ 22,088 | $ 6.88 | 107% | 116.23% | (3,849) | $(19,243) | 0.15% | 64 Lb | NA | NA | $ 1,039 | $ 1,039 | $ 5,794 | $ 1,139 |
| Facility 10 | 19,756 Lb | 17,524 Lb | 1,235 | 14.19 | $0.5300 | $ 9,288 | $ 7.52 | 107% | 112.74% | (1,005) | $ (5,027) | 0.13% | 22 Lb | NA | NA | $ 2,057 | $ 2,057 | $ 1,481 | $ 276 |
| Totals | 707,271 Lb | 666,807 Lb | 52,893 | 12.61 | $0.5300 | $353,408 | $ 6.58 | 107% | 106.07% | 6,212 | 31,062 | 0.11% | 755 | $ 0.0500 | $ 21,414 | $34,394 | $34,394 | $65,544 | $22,063 |

**<u>EXHIBIT C</u>**

**List of Unpaid Invoices**

| Date | Invoice Number | Amount Due | Customer Name |
|------|----------------|-----------:|---------------|
| 9/21/2024 | 538010075 | 3,722.23 | HSA CGH LLC |
| 9/21/2024 | 538010076 | 112.55 | Emergency Center Coral Gables |
| 9/21/2024 | 538010077 | 4,862.90 | HSA FMC LLC |
| 9/21/2024 | 538010078 | 5,031.91 | HSA HH LLC |
| 9/21/2024 | 538010079 | 4,849.42 | HSA NSMC LLC |
| 9/21/2024 | 538010080 | 10,788.39 | HSA PGH LLC |
| 9/28/2024 | 538010158 | 3,298.47 | HSA CGH LLC |
| 9/28/2024 | 538010159 | 166.17 | Emergency Center Coral Gables |
| 9/28/2024 | 538010160 | 4,744.00 | HSA FMC LLC |
| 9/28/2024 | 538010161 | 5,760.80 | HSA HH LLC |
| 9/28/2024 | 538010162 | 4,601.36 | HSA NSMC LLC |
| 9/28/2024 | 538010163 | 12,595.35 | HSA PGH LLC |
| 10/5/2024 | 538010251 | 3,598.57 | HSA CGH LLC |
| 10/5/2024 | 538010252 | 305.46 | Emergency Center Coral Gables |
| 10/5/2024 | 538010253 | 4,543.51 | HSA FMC LLC |
| 10/5/2024 | 538010254 | 5,106.80 | HSA HH LLC |
| 10/5/2024 | 538010255 | 4,578.38 | HSA NSMC LLC |
| 10/5/2024 | 538010256 | 13,663.42 | HSA PGH LLC |
| 10/12/2024 | 538010332 | 3,967.74 | HSA CGH LLC |
| 10/12/2024 | 538010333 | 166.17 | Emergency Center Coral Gables |
| 10/12/2024 | 538010334 | 5,702.76 | HSA FMC LLC |
| 10/12/2024 | 538010335 | 4,770.22 | HSA HH LLC |
| 10/12/2024 | 538010336 | 4,145.86 | HSA NSMC LLC |
| 10/12/2024 | 538010337 | 12,399.93 | HSA PGH LLC |
| 10/19/2024 | 538010413 | 2,314.32 | HSA CGH LLC |
| 10/19/2024 | 538010414 | 253.03 | Emergency Center Coral Gables |
| 10/19/2024 | 538010415 | 4,320.59 | HSA FMC LLC |
| 10/19/2024 | 538010416 | 5,000.80 | HSA HH LLC |
| 10/19/2024 | 538010417 | 4,849.42 | HSA NSMC LLC |
| 10/19/2024 | 538010418 | 11,848.81 | HSA PGH LLC |
| 10/26/2024 | 538010522 | 3,415.57 | HSA CGH LLC |
| 10/26/2024 | 538010523 | 159.53 | Emergency Center Coral Gables |
| 10/26/2024 | 538010524 | 4,952.30 | HSA FMC LLC |
| 10/26/2024 | 538010525 | 5,428.36 | HSA HH LLC |
| 10/26/2024 | 538010526 | 4,600.69 | HSA NSMC LLC |
| 10/26/2024 | 538010527 | 13,053.86 | HSA PGH LLC |
| 11/2/2024 | 538010611 | 3,200.53 | HSA CGH LLC |
| 11/2/2024 | 538010612 | 106.40 | Emergency Center Coral Gables |
| 11/2/2024 | 538010613 | 4,432.84 | HSA FMC LLC |
| 11/2/2024 | 538010614 | 5,280.98 | HSA HH LLC |
| 11/2/2024 | 538010615 | 4,678.00 | HSA NSMC LLC |
| 11/2/2024 | 538010616 | 11,739.62 | HSA PGH LLC |
| 11/2/2024 | 538010691 | (64.70) | HSA HH LLC |
| 11/2/2024 | 538010692 | (63.12) | HSA HH LLC |
| 11/2/2024 | 538010693 | (103.43) | HSA NSMC LLC |
| 11/2/2024 | 538010694 | (82.03) | HSA PGH LLC |

| | | | |
|---|---|---|---|
| 11/9/2024 | 538010708 | 3,255.66 | HSA CGH LLC |
| 11/9/2024 | 538010709 | 266.89 | Emergency Center Coral Gables |
| 11/9/2024 | 538010710 | 4,599.74 | HSA FMC LLC |
| 11/9/2024 | 538010711 | 4,982.82 | HSA HH LLC |
| 11/9/2024 | 538010712 | 4,849.42 | HSA NSMC LLC |
| 11/9/2024 | 538010713 | 11,086.43 | HSA PGH LLC |
| 11/16/2024 | 538010797 | 3,582.73 | HSA CGH LLC |
| 11/16/2024 | 538010798 | 244.13 | Emergency Center Coral Gables |
| 11/16/2024 | 538010799 | 4,299.66 | HSA FMC LLC |
| 11/16/2024 | 538010800 | 4,770.78 | HSA HH LLC |
| 11/16/2024 | 538010801 | 4,421.22 | HSA NSMC LLC |
| 11/16/2024 | 538010802 | 11,071.01 | HSA PGH LLC |
| 11/23/2024 | 538010895 | 3,601.34 | HSA CGH LLC |
| 11/23/2024 | 538010896 | 246.77 | Emergency Center Coral Gables |
| 11/23/2024 | 538010897 | 6,549.50 | HSA FMC LLC |
| 11/23/2024 | 538010898 | 5,878.84 | HSA HH LLC |
| 11/23/2024 | 538010899 | 4,562.68 | HSA NSMC LLC |
| 11/23/2024 | 538010900 | 11,681.77 | HSA PGH LLC |
| 11/30/2024 | 538010982 | 3,101.01 | HSA CGH LLC |
| 11/30/2024 | 538010983 | 133.94 | Emergency Center Coral Gables |
| 11/30/2024 | 538010984 | 3,626.36 | HSA FMC LLC |
| 11/30/2024 | 538010985 | 5,015.32 | HSA HH LLC |
| 11/30/2024 | 538010986 | 4,387.12 | HSA NSMC LLC |
| 11/30/2024 | 538010987 | 10,435.72 | HSA PGH LLC |
| 11/30/2024 | 538011058 | (77.03) | HSA HH LLC |
| 12/7/2024 | 538011064 | 3,489.27 | HSA CGH LLC |
| 12/7/2024 | 538011065 | 286.04 | Emergency Center Coral Gables |
| 12/7/2024 | 538011066 | 4,312.93 | HSA FMC LLC |
| 12/7/2024 | 538011067 | 5,336.70 | HSA HH LLC |
| 12/7/2024 | 538011068 | 3,005.20 | HSA NSMC LLC |
| 12/7/2024 | 538011069 | 11,026.31 | HSA PGH LLC |
| 12/14/2024 | 538011145 | 3,121.17 | HSA CGH LLC |
| 12/14/2024 | 538011146 | 206.29 | Emergency Center Coral Gables |
| 12/14/2024 | 538011147 | 5,208.27 | HSA FMC LLC |
| 12/14/2024 | 538011148 | 5,325.44 | HSA HH LLC |
| 12/14/2024 | 538011149 | 4,664.34 | HSA NSMC LLC |
| 12/14/2024 | 538011150 | 12,496.14 | HSA PGH LLC |
| 12/18/2024 | 538011254 | 1,421.03 | Emergency Center Coral Gables |
| 12/18/2024 | 538011255 | 9,922.08 | HSA FMC LLC |
| 12/18/2024 | 538011256 | 9,801.13 | HSA HH LLC |
| 12/18/2024 | 538011257 | 15,939.38 | HSA NSMC LLC |
| 12/18/2024 | 538011258 | 34,339.86 | HSA PGH LLC |
| 12/18/2024 | 538011259 | 8,016.49 | HSA CGH LLC |
| 12/18/2024 | 538011260 | 1,202.89 | HSA CGH LLC |
| 12/18/2024 | 538011261 | 145.95 | Emergency Center Coral Gables |
| 12/18/2024 | 538011262 | 2,077.96 | HSA FMC LLC |
| 12/18/2024 | 538011263 | 2,262.87 | HSA HH LLC |
| 12/18/2024 | 538011264 | 5,291.67 | HSA PGH LLC |
| 12/18/2024 | 538011265 | 2,320.44 | HSA NSMC LLC |

| Date | Number | Amount | Entity |
|---|---|---|---|
| 12/21/2024 | 538011278 | 3,599.29 | HSA CGH LLC |
| 12/21/2024 | 538011279 | 219.72 | Emergency Center Coral Gables |
| 12/21/2024 | 538011280 | 4,921.78 | HSA FMC LLC |
| 12/21/2024 | 538011281 | 5,677.37 | HSA HH LLC |
| 12/21/2024 | 538011282 | 4,390.17 | HSA NSMC LLC |
| 12/21/2024 | 538011283 | 11,825.21 | HSA PGH LLC |
| 12/28/2024 | 538011369 | 2,749.84 | HSA CGH LLC |
| 12/28/2024 | 538011370 | 240.60 | Emergency Center Coral Gables |
| 12/28/2024 | 538011371 | 3,467.40 | HSA FMC LLC |
| 12/28/2024 | 538011372 | 4,531.68 | HSA HH LLC |
| 12/28/2024 | 538011373 | 3,730.10 | HSA NSMC LLC |
| 12/28/2024 | 538011374 | 9,320.89 | HSA PGH LLC |
| 1/4/2025 | 538011443 | (110.95) | HSA HH LLC |
| 1/4/2025 | 538011444 | (66.59) | HSA NSMC LLC |
| 1/4/2025 | 538011457 | 2,849.07 | HSA CGH LLC |
| 1/4/2025 | 538011458 | 231.19 | Emergency Center Coral Gables |
| 1/4/2025 | 538011459 | 4,084.60 | HSA FMC LLC |
| 1/4/2025 | 538011460 | 4,826.86 | HSA HH LLC |
| 1/4/2025 | 538011461 | 3,525.82 | HSA NSMC LLC |
| 1/4/2025 | 538011462 | 9,310.27 | HSA PGH LLC |
| 1/11/2025 | 538011542 | 144.75 | Emergency Center Coral Gables |
| 1/11/2025 | 538011541 | 2,807.17 | HSA CGH LLC |
| 1/11/2025 | 538011543 | 6,137.78 | HSA FMC LLC |
| 1/11/2025 | 538011544 | 6,091.37 | HSA HH LLC |
| 1/11/2025 | 538011545 | 4,645.19 | HSA NSMC LLC |
| 1/11/2025 | 538011546 | 10,939.27 | HSA PGH LLC |
| 1/18/2025 | 538011621 | 328.31 | Emergency Center Coral Gables |
| 1/18/2025 | 538011620 | 4,181.25 | HSA CGH LLC |
| 1/18/2025 | 538011622 | 6,119.56 | HSA FMC LLC |
| 1/18/2025 | 538011623 | 6,614.15 | HSA HH LLC |
| 1/18/2025 | 538011624 | 5,482.78 | HSA NSMC LLC |
| 1/18/2025 | 538011625 | 15,790.47 | HSA PGH LLC |
| | | **629,204.79** | |