**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| STEWARD HEALTH CARE SYSTEM LLC, | § | Case No. 24-90213 (CML) |
| *et al.*, | § | |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

**BRIGHTON MARINE, INC.'S EMERGENCY MOTION**
**(I) TO COMPEL PAYMENT OF FUNDS HELD IN TRUST;**
**(II) TO COMPEL COMPLIANCE WITH THE TRANSITION SERVICES**
**AGREEMENT; (III) TO PERMIT SET OFF; OR ALTERNATIVELY**
**(IV) FOR CONVERSION TO CHAPTER 7 OF THE BANKRUPTCY CODE**

---

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN MARCH 28, 2025.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

Brighton Marine, Inc. ("BMI") hereby files this motion (the "Motion")[2] for entry of an order, substantially in the form attached hereto, (a) imposing a constructive trust over funds held by the Debtor in the amount of $4,968,579.12; (b) compelling compliance with or enforcing the terms of the MSA and/or TSA by requiring the Debtors to pay unpaid invoices totaling

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2] Capitalized terms not immediately defined herein have the meaning as defined later in this Motion or in the MSA or TSA, as applicable.

$4,968,579.12; (c) permitting BMI to set off the amount of $4,968,579.12 against amounts owing to the Debtors under the TSA; or (d) alternatively, converting the chapter 11 cases to chapter 7.  In support hereof, BMI respectfully represents as follows:

**Preliminary Statement**

1.      Since early last year, BMI has worried that Steward's financial troubles would cause it to divert federal money away from the veterans and military families who were supposed to benefit from those dollars and instead use those funds to pay Steward's own creditors and lenders.  Cloud Decl. ¶8.  Steward assured BMI that the federal money it received from BMI would be "solely utilized as authorized by the [US Family Healthcare] Plan" ("USFHP" or the "Plan").  Cloud Decl. Ex. 2.  And it assured this Court, as late as September 12, 2024, that "the veterans have been and are being taken care of to this day by Steward."  Adv. Proc. Trial Tr. 300:21-301:8; *see also* Adv. Proc. 24-03102 Dkt. No. 126 at 5 (asserting the Plan "is self-funding through capitation payments from the DoD").

2.      But BMI's fears have become reality.  Steward was required to use part of its monthly Capitation Payment from BMI to reimburse the Department of Defense ("DoD") for the costs of pharmaceuticals purchased for Plan beneficiaries.  Three months' worth of DoD invoices ***arising since the commencement of these cases*** have gone unpaid, and remain so today.  Rather than use the Capitation Payment to pay those invoices—which total nearly $5 million over August 2024 through October 2024—Steward used that federal money for other purposes: to pay other creditors, to repay its loan facilities, and to pay some of the hundreds of millions of dollars it has paid its attorneys and advisors in this case, among others.  Steward thus siphoned millions of dollars earmarked to benefit veterans and military families and used that money for its own benefit instead.

3.      Despite repeated demands over the past five months, Steward refuses to pay those DoD invoices and recently asserted it has no obligation to do so.  As Steward's cash-on-hand dwindles to near zero, Steward's DIP lenders have refused to release any cash collateral for the purpose of paying those invoices.[3]  BMI, meanwhile, has continued to receive overdue notices from the DoD for the nearly $5 million in unpaid pharmacy invoices.  Unless Steward fulfills its obligations to pay those invoices using funds that BMI gave Steward for that purpose, BMI will have to pay those invoices a second time—a significant, unnecessary expense that will impair BMI's activities on behalf of America's veterans.

4.      Those veterans should not be left holding the bag because Steward chose to misappropriate federal money.  Accordingly, BMI requests that the Court enter an order (a) imposing a constructive trust over the amount of $4,968,579.12, (b) compelling compliance with or enforcing the Debtors' postpetition obligations under the MSA and/or TSA by requiring the Debtors to pay unpaid invoices totaling $4,968,579.12, or (c) permitting BMI to set off the amount of $4,968,579.12 against any future amounts payable to the Debtors under the TSA. Alternatively, because the Debtors appear to be administratively insolvent—as indicated by their inability to pay ordinary-course operational expenses as they come due, hundreds of millions of dollars in unpaid superpriority DIP loans with no discernible source of repayment, and their gross mismanagement of funds they should have held in trust—BMI requests that the chapter 11 cases be converted to cases under chapter 7.

---

[3] BMI reserves all rights and remedies with respect to the DIP Lenders' interference with the payment of those invoices.

**Jurisdiction**

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This Motion presents a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are §§ 105(a), 553, and 1112(b) of the Bankruptcy Code.

**Relevant Background**

**A.      The MSA**

8.      BMI is one of six non-profit "Designated Providers" authorized by statute to contract with the DoD to administer the USFHP, a managed care plan for eligible veterans and families of active-duty military personnel.  Cloud Decl. ¶¶ 3-4.  For decades, BMI contracted with Debtor Steward Health Care System LLC ("Steward") to manage the Plan.  *See id.* ¶ 5.

9.      As a Designated Provider, BMI was entitled to purchase, for use by Plan beneficiaries, discounted pharmaceuticals and other items sold by the Defense Supply Center, Philadelphia ("DSCP") and the Pharmacy Prime Vendor Program.  *See* MSA § 2.2.3.[4]  BMI, in turn, "appoint[ed] and designate[d] [Steward] as its agent with respect to the ordering and obtaining of Drugs through Prime Vendor Contracts, and to reimburse DSCP for Drugs and other items made available for Enrollees through such Contracts."  MSA, § 2.2.3.  Steward thus had responsibility for paying USFHP pharmacy invoices.

10.     To make those and other payments on behalf of USFHP, Steward received a monthly payment from BMI (the "Capitation Payment").  *See, e.g.*, MSA §§ 7.1, 7.2.  Those

---

[4] The MSA was filed under seal at Adv. Proc. 24-03102 Dkt. No. 14-1.

Capitation Payments come from the DoD, consisting of "amounts received . . . by Brighton Marine in its capacity as a Designated Provider from DoD under [BMI's] DoD Contract."  MSA §7.2. Steward receives those payments so that it can "administer the [USFHP] in a manner consistent with and subject to [BMI's contract with] the DoD [] and to provide or arrange for the provision of all of the health care services that are to be provided under the [USFHP] to Enrollees."  MSA, p. 2.

11.     If—and only if—the Capitation Payment exceeded Plan expenses for a given month, Steward would be entitled to keep any profit.  Cloud Decl. ¶6.  Conversely, if Plan expenses exceeded the amount of the Capitation Payment, the MSA required Steward to fund those expenses nonetheless.  *Id.*; *see also* Adv. Proc. Trial Tr. 189:15-191:20.

## B.     Steward Fails To Pay Three Months of Pharmacy Invoices

12.     In early 2024, BMI grew concerned that Steward's mounting financial difficulties would jeopardize its management of the Plan.  In particular, BMI worried that the Capitation Payment—federal money intended for the benefit of Plan beneficiaries—would be diverted to cover Steward's debts and other expenses, rather than being used to pay Plan expenses as required by the MSA.  Cloud Decl. ¶8.  On April 11, 2024, BMI thus expressed "concern[] that Steward's financial condition is substantially likely to result in Steward electing to use funds provided by the DoD to pay for health care services to USFHP Plan members, to instead satisfy its long list of outstanding debts that are unrelated to USFHP."  Adv. Proc. Dkt. No. 135-160 (JX97; filed under seal).  BMI requested information sufficient to "ensure . . . appropriate use of DoD funds."  *Id.*

13.     The next day, BMI's counsel further explained to Steward's counsel that "BMI is exercising required oversight so that it can ensure that the DoD funds that [Steward] has received will be used to operate the Plan and pay Plan member claims, not used by Steward for other

reasons."  Cloud Decl. Ex. 1 at 1.  "If Steward were to mishandle the DoD's funds," BMI's counsel explained, "BMI's Plan members would be irreparably harmed."  *Id.*; *see also* Adv. Proc. Dkt. No. 135-163 (JX100; filed under seal) (letter from BMI's counsel explaining that BMI cannot "transfer funds it cannot be sure will be used to benefit the Plan's beneficiaries rather than Steward's creditors").

14.     Steward repeatedly promised BMI that the Capitation Payment would go toward Plan expenses.  Cloud Decl. ¶ 11.  "In connection with the April 2024 Monthly Payment," Steward executive Bob Guyon stated, "Steward Healthcare LLC . . . is representing that all of the Monthly Payment will be solely utilized as authorized by the Plan."  Cloud Decl. Ex. 2.  Steward's Chief Accounting Officer later reiterated that assurance, representing "that all of the April 2024 Monthly Payment will be used solely for the purposes of BMI's USFHP Plan."  Cloud Decl. Ex. 3.

15.     On April 26, 2024, BMI gave notice of termination of the MSA.  On May 6, 2024 (the "Petition Date"), the Debtors filed voluntary chapter 11 petitions in this Court.

16.     On May 16, 2024, BMI initiated an adversary proceeding captioned *Brighton Marine, Inc. v. Steward Health Care System LLC et al.*, Adv. Proc. No. 24-03102 (the "Adversary Proceeding"), seeking a declaratory judgment that BMI's prepetition termination of the MSA was valid and injunctive relief preventing the Debtors from interfering with the transition of USFHP to a new manager.

17.     Throughout the pendency of the Adversary Proceeding, the parties continued to perform under the MSA.  BMI continued to make Capitation Payments to Steward, and Steward continued to manage the USFHP.  Steward's counsel, moreover, continued to represent that Plan expenses were being paid and that the Capitation Payment was being used for its intended purpose under the MSA.  "Funds flow from the DoD, to BMI, to Steward, and are used by Steward to

administer the Plan and ensure that beneficiaries receive the necessary medical care and services," Steward explained in briefing.  Adv. Proc. Dkt. No. 62 ¶¶15-16.  "As long as the Plan's costs do not exceed the flow of funds, this structure renders the Plan financially independent from Steward's corporate enterprise . . . . In other words, Steward would only need to rely on its own financial resources if and to the extent the Plan's costs exceeded the amount of funds flowing through to it from DoD.  ***That has not occurred historically, nor is it occurring now***."  *Id.* (citations omitted, emphasis added).[5]

18.     At trial on September 12, 2024, moreover, Steward's counsel offered further assurances that Steward was paying Plan expenses under the MSA.  "[T]he cost of the plan has always been less than the capitation payments," counsel argued.  Adv. Proc. Trial Tr. 300:21-301:8.  "Concerns are completely understandable.  Fears are completely understandable.  But the reality in the record is that the veterans have been and are being taken care of to this day by Steward under the MSA."  *Id.*

19.     But shortly after making those representations to the Court, Steward stopped paying at least some USFHP bills.  In particular, Steward did not pay the following invoices, all issued by DoD for the purchase of pharmaceuticals from DSCP (collectively, the "Unpaid Invoices"):[6]

---

[5] *See also* Adv. Proc. Dkt. No. 100 ¶11 ("The Plan remains financially robust today, and due to the Plan's self-funding structure, its financial success is essentially independent of Steward's own financial status."); Adv. Proc. Dkt. No. 126 at 5 ("The Plan has been consistently profitable since the late 1990s, and is self-funding through capitation payments from the DoD.").

[6] BMI is not presently aware of any other Plan expenses that have gone unpaid but remains concerned that Steward's failure to meet its payment obligations under the MSA may not be limited to these pharmacy invoices.  Indeed, Steward has failed to remit to BMI approximately $50,000 in lease revenue that BMI is entitled to receive from Steward under separate agreements.  Cloud Decl. ¶21 n.3.

| DFAS Invoice No. | Amount | Issue Date | Due Date |
|---|---|---|---|
| Q0X4D | $1,772,774.02 | August 25, 2024 | September 24, 2024 |
| S0VKA | $1,598,756.17 | September 25, 2024 | October 24, 2024 |
| U0WRH | $1,597,048.93 | October 25, 2024 | November 24, 2024 |
| **Total Amount** | **$4,968,579.12** | | |

Cloud Decl. ¶ 14.

20.     Steward failed to make these payments even though BMI continued to make the monthly Capitation Payment in amounts that were more than sufficient to pay those invoices.  On August 12, 2024, BMI paid Steward the monthly Capitation Payment of $12,493,673.17.  Cloud Decl. ¶ 15.  On September 10, 2024, BMI paid Steward the monthly Capitation Payment of $12,453,878.83.  *Id.*  And on October 10, 2024, BMI paid Steward the monthly Capitation Payment of $12,481,112.83.  *Id.*  Rather than use this federal money to benefit Plan beneficiaries, however, Steward instead deposited those Capitation Payments into its general operating account, *see* Adv. Proc. Trial Tr. 188:3-24, and appears to have used that money—which comprised nearly **all** of its ordinary-course revenue during these months—to pay its attorneys, financial advisors, and other expenses.  *See generally* Dkt. No. 2731 (August 2024 operating report); Dkt. No. 3081 (September 2024 operating report); Dkt. No. 3365 (October 2024 operating report).[7]

## C.     The TSA

21.     On October 1, 2024, the Court granted BMI a declaratory judgment, ruling that its prepetition termination of the MSA was valid and that the MSA would terminate on October 31, 2024 (the "Termination Date").  Steward and BMI ultimately agreed, and this Court approved, a one-day extension of the Termination Date to November 1, 2024.  Adv. Proc. Dkt. No. 178.

---

[7] BMI's Capitation Payment accounted for 93.4% of Steward Health Care System LLC's ordinary-course revenue in August, 98.5% in September, and 75.3% in October.

22.     The MSA terminated on November 1, 2024, and the parties entered into a new Transition Services Agreement ("TSA") to govern the transition of Plan management away from Steward.  *See* Dkt. No. 3093-2.

23.     Under the TSA, "Steward will continue to provide or arrange for the provision of all services that are to be provided to Enrollees in accordance with the DoD Contract to the extent Steward provided such services under the [MSA] immediately prior to termination thereof."  TSA, § 1.1.  The TSA also required Steward to "operate Brighton Marine Health Center Pharmacy (the "Pharmacy"), consistent with prior practice and Section 2.2 of the MSA (which for the avoidance of doubt is not incorporated into this Agreement)."  TSA, § 2.2(a).

24.     BMI agreed to pay Steward's costs associated with performing under the TSA, plus a markup of 15%.  TSA, § 3.1(a).

25.     Significantly, the parties discussed pending liabilities under the MSA when negotiating the TSA.  Steward initially demanded that BMI assume those liabilities.  Having lost the ability to monetize the MSA as a result of BMI's victory in the adversary proceeding, Steward explained, it could no longer justify payment of further expenses under the MSA.  Cloud Decl. ¶ 17.  BMI refused, noting that it had **already** provided Steward with the money to pay those expenses through its August, September, and October Capitation Payments.  Cloud Decl. ¶ 18; *see* ¶ 20, *supra*.  Releasing Steward from those payment obligations, BMI explained, would essentially require it to pay the same expenses twice.  Cloud Decl. ¶ 18.  Consequently, although the TSA released Steward from certain obligations arising prior to November 1, 2024, that release specifically **excluded** any Potential Actions "arising under the [MSA] after the date of the commencement of the Chapter 11 Case."  TSA, § 9.6.

26.     The TSA is currently set to expire on May 30, 2025, after which BMI will have full responsibility for managing the Plan.  Cloud Decl. ¶ 16.

**D.     BMI Continues To Demand Payment of the Unpaid Invoices and Steward Refuses**

27.     Throughout November and December 2024 and January 2025, BMI continued to demand payment of the Unpaid Invoices, engaging with Steward's Chief Restructuring Officer, John Castellano, and AlixPartners.  On November 19, 2024, for example, BMI emailed Drew Parchem at AlixPartners requesting an update on payment for the invoices.  Parchem replied that Steward was "still working with the lender group on an approved budget and [doesn't] have the authority to make these payments yet."  Cloud Decl. Ex. 4.

28.     On December 19, 2024, USFHP interim CEO Steve Maddox emailed Castellano, noting the outstanding pharmacy invoices and reminding Castellano that "these monies have already been paid to Steward to pay these pharmacy claims on behalf of BMI."  Cloud Decl. Ex. 5.  Castellano responded by phone on January 14, 2025:  He acknowledged that Steward was obligated to pay the invoices but stated that he nonetheless could not authorize payment because the expenses had not been included in an approved budget.  Cloud Decl. ¶ 20.

29.     On February 25, 2025, BMI's counsel emailed Steward's counsel, reiterating BMI's request that Steward pay the Unpaid Invoices.  Cloud Decl. Ex. 6.  When Steward never responded, BMI's counsel followed up by email on March 4, orally at a hearing in this case on March 7, and then again by email on March 11.  *Id.*  When Steward finally responded, it disclaimed any responsibility for payment of the invoices.  It further explained that "Steward's cash and substantially all of its other assets are subject to perfected liens in favor of its DIP Lenders," adding that Steward "has been obligated to make various payments to its DIP Lenders" and did not "have the flexibility to pay [the] invoices" using cash collateral.  Cloud Decl. Ex. 7.

30.     On March 14, 2025, BMI's counsel spoke with Steward's counsel over the phone, who reiterated that Steward was unable to pay the invoices.  The same day, BMI's counsel also spoke with counsel for the DIP Lenders, who indicated that Steward had essentially no cash-on-hand and who refused to consent to Steward's use of cash collateral to pay the pharmacy invoices.  Cloud Decl. ¶21.

### Argument

31.     Steward does not deny receiving over $35 million in Capitation Payments from BMI between August and October 2024.  It does not dispute that those payments are federal funds intended for the benefit of USFHP beneficiaries and that, under the MSA, it was obligated to use those funds to pay the Unpaid Invoices.  Nor has Steward denied using that money for other things—paying the DIP Lenders, paying its lawyers, and paying its financial advisors, among other expenses.  Consequently, Steward cannot credibly deny that it has, at best, diverted federal money from its intended beneficiaries and, at worst, misappropriated that money by fraudulently accepting the Capitation Payments with no intention of using that money for its intended purpose.

32.     Steward must correct that misconduct.  BMI is entitled to an order that Steward return that money or pay the Unpaid Invoices, under three independent theories.  First, the Court can impose a constructive trust over the assets, which were never part of the bankruptcy estate and should never have been used to pay other debts before USFHP expenses.  Second, the Court can compel Steward's compliance with its obligations under the MSA and the TSA.  Third, the Court can allow BMI to exercise the right of set-off against any amounts that remain to be paid to Steward under the TSA.

33.     To the extent that Steward is otherwise unable to meet its obligations under the MSA and make payment on the Unpaid Invoices, Steward should be declared administratively insolvent and the cases should be converted to chapter 7.

A.     **The Government Funds Provided to the Debtors Constitute Trust Funds That Were Earmarked To Pay Veteran Healthcare Expenses Under the USFHP**

34.     The Court should impose a constructive trust over the amounts reflected in the Unpaid Invoices and order Steward to either pay the Unpaid Invoices or return the money to BMI for payment.  Under Massachusetts law, "courts may impose constructive trusts 'where legal title to the property was obtained by fraud or in violation of a fiduciary relation.'"  *N. Beacon 155 Assocs., LLC v. Mesirow Fin. Interim Mgmt. LLC*, 135 F. Supp. 3d 1, 8 (D. Mass. 2015); *see also In re Southmark Corp.)*, 49 F.3d 1111, 1118 (5th Cir. 1995) (summarizing elements of constructive trust under Texas law).[8]  Constructive trust is thus a "device 'imposed by law because the person holding the title to the property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property.'"  *In re Monnig's Dep't Stores, Inc.*, 929 F.2d 197, 201 (5th Cir. 1991) (quoting  *Omohundro v. Matthews*, 161 Tex. 367, 373 (1960).

35.     Here, Steward wrongfully obtained the property and would be unjustly enriched if allowed to keep it.  Steward accepted BMI's Capitation Payments **knowing** the payments were federal funds earmarked for USFHP expenses.  *See* Adv. Proc. Dkt. No. 62 ¶¶15-16 (Steward acknowledging "[f]unds flow from the DoD, to BMI, to Steward, and are used by Steward to administer the Plan and ensure that beneficiaries receive the necessary medical care and services").  Yet it **chose** not to use the money for that purpose, leaving the pharmacy invoices unpaid, despite

---

[8] Courts look to state law to determine whether a constructive trust has been created.  *See Southmark*, 49 F.3d at 1118.  Here, the MSA is governed by the laws of Massachusetts.  MSA, §14.8.

repeated assertions—to both the Court and BMI—over the course of many months that it operated the Plan at a profit and was able to pay Plan expenses as they came due. *See* ¶¶12-17, *supra*. Indeed, Steward freely admitted during TSA negotiations that it would not pay additional Plan expenses after it lost the ability to monetize the MSA in bankruptcy. *See* ¶25, *supra*. Such misappropriation unquestionably results in "profit by a wrong," *Monnig's Dep't Stores*, 929 F.2d at 201, and would allow Steward to "retain[] the property . . . 'against the fundamental principles of justice or equity and good conscience,'" *Bonina v. Sheppard*, 78 N.E.3d 128, 132 (Mass. App. 2017) (explaining unjust enrichment under Massachusetts law).[9]   Because Steward wrongfully obtained the property, constructive trust is appropriate.

36.   Steward also obtained the property in violation of a fiduciary relationship that continued after the filing of Steward's chapter 11 cases. Under the MSA, Steward was BMI's "*agent* with respect to ordering and obtaining" the pharmaceuticals and "with respect to . . . reimburs[ing]" the DoD for the pharmaceuticals it ordered. MSA, §2.2.3 (emphasis added). As BMI's agent with respect to those activities, Steward had a fiduciary obligation to faithfully make those payments without diverting the money for its own purposes. *See, e.g.*, *UBS Fin. Servs., Inc. v. Aliberti*, 133 N.E.3d 277, 289 (Mass. 2019) (stating that the principal-agent relationship is a traditional, well-recognized relationship giving rise to a fiduciary duty).[10]   For that reason, too, a constructive trust is warranted.

---

[9] To be sure, Steward was free under the MSA to retain any ***surplus*** from each month's capitation payment, but ***only after*** USFHP expenses had been paid in full.  Steward was ***not*** free to use government money to pay ***other*** expenses while USFHP obligations went unsatisfied.

[10] Although §14.1 of the MSA states that the parties are independent contractors and not employees or agents, §2.2.3 is clear that Steward functions as BMI's "agent" with respect to the pharmaceutical prime vendor program.  Where, as here, two provisions of a contract conflict, the more general provision (§14.1) must give way to the more specific (§2.2.3).  *See Noonan v.*

37.     Indeed, courts have recognized constructive trust under similar circumstances.  In *T&B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372 (11th Cir. 1989), the court held that a bank account held in the debtor's name but exclusively funded by the debtor's contract counterparty for the sole purpose of paying the debtor's vendors was not part of the bankruptcy estate.  The parties' contracts "expressly stated the funds [in the account] were to be used to pay the [debtor's vendors]," and the transfers into the account "were meant solely for the [vendors]." *Id*. at 1376.  Similarly, in *In re PHP NJ MSO Inc.*, No. 98-2609, 1999 WL 360199 (Bankr. D. Del. May 7, 1999), a New Jersey state court had previously created a trust over capitation payments to be used for healthcare and plan-management expenses.  Despite continuing to receive the payments, the insolvent recipient had failed to pay millions of health care providers and hospitals. *See id.* at *2-3 (describing trust).  Indeed, Congress expressly considered the circumstances present here when enacting the Bankruptcy Code, explaining that payments by an insurer to a debtor for the purposes of paying a doctor's bill would not become property of the bankruptcy estate, because "the payment ***would actually be held in a constructive trust for the person to whom the bill was owed.***"  H.R. Rep No. 95-595, at 368 (1977).

38.     Funds held in trust (constructive or otherwise) cannot be used to pay the Debtor's other creditors.  *See Southmark*, 49 F.3d at 1117; *In re Reichmann Petroleum Corp.*, 434 B.R. 790, 797-98 (Bankr. S.D. Tex. 2010) (explaining that under §541(d), postpetition revenue generated

---

*Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 332 (D. Mass. 2010) ("Under Massachusetts law, it is well settled that in choosing between two conflicting or inconsistent clauses, the more limited and specific clause prevails over the more encompassing and general clause such that the latter operates as a modification of the former.").

from property held by the debtor in a constructive trust is not considered property of the estate).[11]

Rather, "the sole permissible administrative act of the trustee or debtor-in-possession is to pay over

or endorse over the property to the beneficiary or beneficiaries."  *In re Signal Hill-Liberia Ave.*

*L.P.*, 189 B.R. 648, 651 (Bankr. E.D. Va. 1995).  That is all BMI asks here—that Steward use the

Capitation Payment for its intended purpose: payment of USFHP expenses.  The Court should

impose a constructive trust and order Steward to "pay over" sufficient amounts from the Capitation

Payments to cover the cost of the Unpaid Invoices.

**B.      Alternatively, the Court Should Compel the Debtors to Comply with the Terms of the MSA**

39.      Alternatively, the Court should compel the Debtors to comply with and perform

under the terms of the MSA and/or the TSA, requiring Steward specifically to pay the Unpaid

Invoices.  *See* 11 U.S.C. § 105(a) (authorizing bankruptcy court to "issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title").

40.      Section 1.1 of the MSA required Steward to perform all of BMI's obligations under

the DoD Contract.  MSA, § 1.1.  BMI, moreover, "appoint[ed] and designate[d] [Steward] as its

agent with respect to the ordering and obtaining of Drugs through Prime Vendor Contracts, and to

reimburse DSCP for Drugs and other items made available for Enrollees through such Contracts."

MSA, § 2.2.3.  And BMI agreed to pay Steward a monthly Capitation Payment consisting of

"amounts received . . . by Brighton Marine in its capacity as a Designated Provider from DoD

---

[11] *See also* 11 U.S.C. § 541(d); *In re Horton*, 618 B.R. 22, 27 (Bankr. D.N.M. 2020) (rejecting argument that constructive trust had to be recognized pre-petition, because "a constructive trust arises on the date of the wrongful transfer, not the date a court recognizes it"); *In re Sacred Heart Hosp. of Norristown*, 175 B.R. 543, 550 (Bankr. E.D. Pa. 1994) (noting that the debtor's interest in postpetition receivables did not preclude imposition of constructive trust if neither the debtor nor the estate held an equitable interest in the receivables).

under the DoD Contract."  MSA, § 7.2  Steward thus had a clear, unambiguous, and indeed undisputed obligation to use those funds to "reimburse DSCP" and pay the Unpaid Invoices.

41.     The terms of the TSA reinforce Steward's obligation to pay these pre-termination USFHP expenses under the MSA.  The TSA required Steward to "continue to provide or arrange for the provision of all services that are to be provided to Enrollees *in accordance with the DoD Contract to the extent Steward provided such services under the [MSA] immediately prior to termination thereof*."  TSA, § 1.1 (emphasis added).  Steward, moreover, remained obligated to operate the Pharmacy "consistent with prior practice and with section 2.2 of the [MSA]"— including the obligation to "reimburse DSCP" for discounted pharmaceuticals.  TSA, § 2.2(a).

42.     Any remaining doubt about Steward's obligations is resolved by the parties' course of conduct during the TSA negotiations.  When Steward demanded that BMI accept the pharmacy liabilities as a condition of the TSA, BMI refused, noting that it had already provided Steward with the funds to cover those expenses.  *See* ¶ 25, *supra*.  The TSA itself reflects that exchange, expressly excepting from Steward's release any liability arising under the MSA.  *See* TSA, § 9.6 (stating that the release "does not extend to Potential Actions . . . arising under the [MSA] after the date of the commencement of the Chapter 11 Case").

**C.     Additionally in the Alternative, the Court Should Allow BMI To Set Off the Unpaid Invoices Against Future Payments**

43.     Creditors are permitted to set off postpetition claims against amounts owed to the debtor postpetition.  *In re Alfar Dairy*, 458 F.2d 1258, 1262 (5th Cir. 1972) (allowing set off of postpetition claims); *see also* 11 U.S.C. § 553(a).  Setoff is available where the obligations between a debtor and a creditor are mutual—that is, both obligations are held by the same parties.  *See, e.g.*, *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036 (5th Cir. 1987).

44.     BMI should be allowed to set off any postpetition amounts owed to Steward under the TSA against Steward's postpetition obligation to satisfy the Unpaid Invoices under the MSA. *Alfar Dairy*, 458 F.2d at 1262; *see also In re Ealy,* 392 B.R. 408, 412 (Bankr. E.D. Ark. 2008) (noting "general rule is that, subject to the restriction imposed by section 362, a postpetition claim may be offset against a postpetition debt so long as the claim and debt constitute valid, mutual obligations"); *In re Hill*, 19 B.R. 375, 380 (Bankr. N.D. Tex. 1982) (acknowledging postpetition obligation could be set off against a postpetition claim); *cf. United States v. Maxwell*, 157 F.3d 1099, 1102 (7th Cir. 1998) ("The Bankruptcy Code neither expands nor constricts the common law right of setoff.").[12]  To be clear, BMI seeks only a setoff against the 15% markup applied to Steward's costs under the TSA; it does not seek a setoff against amounts paid under the TSA that are intended to reimburse Plan costs and expenses.

45.     Accordingly, as an additional alternative to the relief requested above, to the extent that BMI owes the Debtors any remaining postpetition payments under the TSA, BMI requests relief to set off such amounts against the amount of the Unpaid Invoices.

**D.     If the Court Denies the Relief Requested Above, the Court Should Convert These Chapter 11 Cases to Chapter 7 Cases.**

46.     This Court can convert a case under chapter 11 to a case under chapter 7 for cause. 11 U.S.C. § 1112(b); *see also Matter of Assadi,* No. 21-50293, 2021 WL 4889196, at *1 (5th Cir. Oct. 19, 2021) (affirming conversion for cause).  Cause includes (1) a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," and (2) "gross mismanagement of the estate."  11 U.S.C. § 1112(b)(4)(A), (B).

---

[12] Section 362(a)(7) does not bar setoff here, as that provision only prohibits "setoff of any debt owing to the debtor ***that arose before the commencement of the case*** under this title against any claim against the debtor."  11 U.S.C. § 362(a)(7) (emphasis added).  BMI instead seeks to set off ***postpetition*** debts.

47.     If the Court cannot otherwise order Steward to pay the Unpaid Invoices, or if the estate lacks sufficient solvency to do so, then cause for conversion exists here.  Indeed, Debtors recently estimated that the estate will have just $300,000 cash on hand by March 28, with tens of millions of dollars in interim fee applications and administrative claims pending.  *See* Dkt. No. 4232.  The bankruptcy process is not a tool for Steward to finance its chapter 11 case on the backs of third parties who continue to hold up their end of their bargains.  Other than paying an unbelievable amount of professional fees, there is no real question regarding whether the Debtors' estates are sufficiently solvent to pay their postpetition obligations:  They are not.

48.     And "gross mismanagement" is the only term that can be applied Steward's dissipation of the estate and misuse of federal funds disbursed by BMI.  With respect to BMI, for example, the Debtors insisted repeatedly that they have operated the Plan at a consistent profit and are able to pay Plan expenses as they come due.  But those representations meant nothing as soon as Steward lost the ability to monetize the contract.  At that point, Steward was content to accept government funds earmarked for veterans and then use them for its own purposes, leaving BMI responsible for debts that BMI itself had already paid.

49.     BMI does not make this request lightly.  But the consequences of Steward's failure to pay the Unpaid Invoices could not be more significant.  BMI will now be responsible for paying nearly $5 million in expenses **after** having given Steward $5 million to pay those invoices.  That is $5 million that BMI will not be able to reinvest in the Plan to offer greater benefits to more beneficiaries.  And that is $5 million that will not go toward BMI's other activities on behalf of America's veterans, including taking homeless veterans off the streets and providing social services and other support to veterans and their families in the Boston area.  *See* Cloud Decl. ¶¶ 22-23.  America's veterans deserve better.  If the Steward estate is administratively insolvent such

that it cannot pay these invoices, the only fair option for America's veterans, for BMI, and for Steward's other creditors is to convert the case to chapter 7 and appoint a chapter 7 trustee for these estates to start taking steps to undo the damage caused by the debtors-in-possession.

50.     Therefore, as an alternative to the other relief requested herein, BMI asserts that there is cause to convert the chapter 11 cases to chapter 7 cases.

### Emergency Consideration Is Warranted

51.     Emergency consideration is appropriate here.  DoD has sent repeated notices to BMI regarding these unpaid invoices, the oldest of which is now nearly six months past due.  In addition to the consequences of BMI having to pay the invoices, each day that passes without resolution of this issue causes BMI to defer investing in its charitable programs.  *See* ¶ 49, *supra*; Cloud Decl. ¶¶ 22-23.  Moreover, given the state of these cases, the Debtors' week-to-week funding, and the Debtors' apparent administrative insolvency, relief is required immediately to ensure the Unpaid Invoices are satisfied from the funds BMI disbursed for that purpose.  Accordingly, BMI respectfully requests emergency relief by March 28, 2025.

### Request for Waiver of Stay

52.     To implement the foregoing successfully, to the extent it applies, BMI seeks a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).  As explained herein, the relief requested in this Motion is immediately necessary to impose a constructive trust over, or otherwise compel the Debtors to pay, $4,968,579.12 of Capitation Payments that were intended to pay for veteran healthcare expenses, cure the Debtors' breach of the MSA, remain in compliance with the terms of the TSA, and to pay ordinary-course postpetition expenses.

**WHEREFORE**, for the foregoing reasons, BMI requests the Court grant this Motion by (i) (a) imposing a constructive trust over funds held by the Debtor in the amount of $4,968,579.12; (b) compelling compliance with or enforcing the terms of the MSA and/or TSA by requiring the Debtors to pay unpaid invoices totaling $4,968,579.12; (c) permitting BMI to set off the amount of $4,968,579.12 against amounts owing to the Debtors under the TSA; or (d) alternatively, converting the chapter 11 cases to chapter 7; and (ii) granting such other and further relief as is necessary or appropriate.

Respectfully submitted this 20th day of March, 2025.

> **GRAY REED**
> By: */s/ Jason S. Brookner*
>     Jason S. Brookner
>     Texas Bar No. 24033684
>     Amber M. Carson
>     Texas Bar No. 24075610
> 1300 Post Oak Blvd., Suite 2000
> Houston, TX 77056
> Telephone:  (713) 986-7000
> Facsimile:  (713) 986-7100
> Email:    jbrookner@grayreed.com
>        acarson@grayreed.com
>
>    - and –
>
> **MOLO LAMKEN LLP**
>     Justin V. Shur (admitted *pro hac vice*)
>     Eric R. Nitz (admitted *pro hac vice*)
>     Jackson A. Myers (admitted *pro hac vice*)
> 600 New Hampshire Ave., NW
> Washington, DC  20037
> Telephone: (202) 556-2000
> Facsimile:  (202) 556-2001
> Email:    jshur@mololamken.com
>        enitz@mololamken.com
>        jmyers@mololamken.com
>
>    - and -

Justin M. Ellis (admitted *pro hac vice*)
Jennifer Schubert (admitted *pro hac vice*)
Catherine Martinez (admitted *pro hac vice*)
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160
Facsimile:  (212) 607-8161
Email:   jellis@mololamken.com
         jschubert@mololamken.com
         cmartinez@mololamken.com

            - and -

**PROSKAUER ROSE LLP**
David M. Hillman (admitted *pro hac vice*)
Elliot R. Stevens (admitted *pro hac vice*)
Eleven Times Square
New York, NY  10036-8299
Telephone: (212) 969-3000
Facsimile:  (212) 969-2900
Email:   dhillman@proskauer.com
         estevens@proskauer.com

            - and –

Charles A. Dale (admitted *pro hac vice*)
One International Place
Boston, MA  02110
Telephone: (617) 526-9600
Email:   cdale@proskauer.com

            - and -

Paul V. Possinger (admitted *pro hac vice*)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL  60602-4342
Telephone:    (312) 962-3570
Email:    pposinger@proskauer.com

**COUNSEL TO BRIGHTON MARINE, INC.**

## Certificate Of Service

I certify that on March 20, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas to all parties authorized to receive electronic notice in this case.

*/s/ Jason S. Brookner*

21