

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| **STEWARD HEALTH CARE SYSTEM LLC**, *et al.*, | § § § | Case No. 24-90213 (CML) |
| | § | (Jointly Administered) |
| Debtors.[1] | § § | Re: Docket No. 4271 |

**DEBTORS' PRELIMINARY OBJECTION TO BRIGHTON MARINE, INC.'S
EMERGENCY MOTION (I) TO COMPEL PAYMENT OF FUNDS
HELD IN TRUST; (II) TO COMPEL COMPLIANCE WITH THE TRANSITION
SERVICES AGREEMENT; (III) TO PERMIT SET OFF; OR ALTERNATIVELY
(IV) FOR CONVERSION TO CHAPTER 7 OF THE BANKRUPTCY CODE**

Steward Health Care System LLC and Stewardship Services, Inc. (collectively, the "**Debtors**"), submit this Preliminary Objection to Plaintiff Brighton Marine, Inc.'s ("**BMI**") request to hear the *Emergency Motion (I) to Compel Payment of Funds Held in Trust; (II) to Compel Compliance with the Transition Services Agreement; (III) to Permit Set Off; or Alternatively (IV) for Conversion to Chapter 7 of the Bankruptcy Code* (D.I. 4271) (the "**Motion**") before the Honorable Christopher M. Lopez, United States Bankruptcy Judge for the Southern District of Texas (the "**Court**"), on an emergency basis and to grant the relief requested thereunder by March 28, 2025.

**PRELIMINARY STATEMENT**

1.     BMI's Motion seeks an order compelling the Debtors to transfer approximately $5 million of estate assets to BMI (or to one of BMI's creditors) through a

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

mandatory injunction (*i.e.*, an order for specific performance of alleged contractual obligations) and a constructive trust.  *See* Motion ¶ 32.  BMI has clearly commenced a proceeding to recover money or property (*i.e.*, $5 million), to determine whether it has an interest in $5 million of estate assets, and to obtain an injunction or other equitable relief not provided for in chapter 11.  The Motion must be dismissed without prejudice to refile it as an adversary proceeding, as required by Federal Rule of Bankruptcy Procedure 7001.[2]

2.      Even if the Motion could proceed (and it cannot), BMI's request for relief on an emergency basis—most surprisingly, its request for the Court to convert these cases into a chapter 7 liquidation within just six business days of the Motion's filing—is entirely unwarranted, improper, and prejudicial to the Debtors and all other parties-in-interest.  BMI has not shown that an emergency exists, nor that BMI would be prejudiced by proceeding on a normal schedule.  The Debtors, on the other hand, which are prosecuting other expedited litigation, negotiating critical financing and the use of cash collateral, and developing a chapter 11 plan in mediation overseen by Judge Isgur, would be severely prejudiced by emergency adjudication.

3.      This is particularly true because the Debtors have been working around the clock for months to monetize assets, stabilize the estates, and secure continued use of cash collateral and financing that is essential to unlock significant value to support recoveries for creditors, including administrative claimants, and to confirm a chapter 11 plan.  BMI's bald assertion that these cases should be converted to a chapter 7 liquidation—which would destroy significant value for all creditors—should not be countenanced.  And even if BMI were to actually

---

[2] The Debtors suspect that BMI is now seeking a constructive trust because it failed to assert an administrative expense claim by the applicable bar date—and therefore its claim, including any asserted right to a constructive trust, is discharged, and BMI is barred, estopped, and enjoined from asserting such claim against the Debtors.  The Debtors reserve all rights to seek enforcement of the Administrative Claims Bar Date Order with respect to BMI's claims.  *See infra* ¶ 39.

attempt to put forth a case to support such relief (it has not), hearing such a critical matter on an emergency basis would be especially inappropriate.

4.      Finally, while the Debtors will respond more fully at the appropriate time, BMI's motion fails on the merits.  BMI's constructive trust claim is premised on the mistaken assumption that the Debtors were required to segregate funds received from BMI into a special account and use them only for certain expenses.  The Debtors were not required to do this, nor were they agents of BMI, especially in holding any such funds.  And BMI's attempt to compel performance of the Management Services Agreement ("**MSA**") it terminated is legally unfounded and overlooks the terms of the replacement Transition Services Agreement ("**TSA**") BMI entered into last fall.  The Motion should be dismissed as procedurally improper, and emergency relief should be denied.  If this Court is nonetheless inclined to hear the Motion on an emergency basis, it should be denied on the merits.

## I.      BMI'S MOTION IS A PROCEEDING THAT MUST BE PURSUED IN AN ADVERSARY PROCEEDING

5.      BMI's Motion should be summarily denied because BMI instituted a proceeding that plainly must be brought in an adversary proceeding.  BMI claims that approximately $5 million of the $35 million in capitation payments BMI transferred months ago to the Debtors' corporate accounts under the now-terminated MSA should be deemed BMI's property, that a constructive trust should be imposed on the Debtors' assets, or that specific performance of the MSA (or the TSA) should be ordered, thus forcing the Debtors to transfer their property to BMI (or BMI's creditor).  This all requires an adversary proceeding.[3]

---

[3] Indeed, other parties seeking similar relief have brought their claims in adversary proceedings.  *See, e.g.*, D.I. 3390 (adversary complaint filed by TRACO International Group S. De R.L.); 3606 (adversary complaint filed by Catholic Health Initiatives Colorado, CommonSpirit Health, and CommonSpirit Mountain Region f/k/a/ Centura Health

6. BMI plainly is seeking to recover money, to determine the extent of an interest in property (*i.e.*, the cash it transferred to the Debtors months ago), and a proceeding to obtain an injunction or other equitable relief. *See* Fed. R. Bankr. P. 7001(1), (2), (7). Indeed, "an action to recognize and apply a constructive trust is a proceeding to 'recover money or property,' to 'determine the validity, priority, or extent of an interest in property' and/or to 'obtain . . . equitable relief,' and must therefore be prosecuted as an adversary proceeding, with its attendant procedural formalities and safeguards as afforded by Part VII of the Federal Rules of Bankruptcy Procedure." *In re Crockett*, 642 B.R. 97, 103 (Bankr. D. Conn. 2022) (quoting *Vanco Trading, Inc. v. Monheit (In re K. Chemical Corp.)*, 188 B.R. 89 (Bankr. D. Conn. 1995)); *see also Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 437 (5th Cir. 1994) (stating that if a claim "seek[s] an equitable interest in property, *such as a constructive trust*, rather than a general unsecured claim, it was incumbent on [the movant] to file an adversary proceeding in the bankruptcy court" (emphasis added)); *In re Vela*, No. 05-51081 (RLJ), 2006 WL 6544155, at *4 (Bankr. N.D. Tex. Mar. 27, 2006) ("A claim of constructive trust, which seeks an equitable interest in property, should be raised in an adversary proceeding." (citation omitted)). The same is true for an action to specifically perform under a contract. *See* Fed. R. Bankr. P. 7001(7) (complainant must commence an adversary proceeding to "obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief").[4]

---

Corporation); 4087 (adversary complaint seeking relief regarding the rabbi trust assets). There is no reason why BMI should not do likewise.

[4] While BMI avoids using the words "specific performance" or "injunctive relief," such phrases are not talismanic. *See Moody Nat'l Bank of Galveston v. GE Life & Annuity Assurance Co.*, 383 F.3d 249, 251 (5th Cir. 2004) ("[A] motion's substance, and not its form, controls."). BMI's request to "compel the Debtors to comply with and perform under the terms of the MSA and/or the TSA" is clearly a request for exactly such relief. *See Thomas v. Hughes*, 27 F.4th 363, 368 (5th Cir. 2022) (explaining that the "nature of a motion is determined by its substance, not its caption," and even though the moving parties' "application did not use the word 'injunction,'" it should be interpreted as such).

7.     BMI's Motion must be brought in an adversary proceeding and therefore it should be denied without prejudice.

## II.     BMI'S REQUEST FOR EMERGENCY RELIEF SHOULD BE DENIED

8.     For relief to be granted on an expedited timeline, cause must be shown. *See* Fed. R. Bankr. P. 9006(c).  Further, "it must appear clearly from the pleadings not only that there is an emergency but also that it is not an emergency of the movant's own making." *In re Villareal*, 160 B.R. 786, 787 (Bankr. N.D. Tex. 1993); *see also Hester v. NCNB Tex. Nat'l Bank (In re Hester)*, 899 F.2d 361, 364 & n.3 (5th Cir. 1990); *In re A.H. Coombs, LLC*, No. 16-25559 (WTT), 2016 WL 7985267, at *6-10 (Bankr. D. Utah Dec. 22, 2016).  A request to expedite should also address the question of prejudice to other parties, and courts will consider the due process rights of affected creditors and interested parties. *See In re Villareal,* 160 B.R. at 788 ("The princip[al] victim whenever the court grants an expedited hearing is the due process rights of affected creditors and parties in interest."); *In re Rosas*, No. 10-52571, 2010 Bankr. LEXIS 2673, at *3-4 (Bankr. W.D. Tex. Aug. 4, 2010).  Courts also consider the breadth of relief requested and are disinclined to grant emergency motions when the relief requested is overly broad. *See In re Caltex Holdings LP*, No. 09-31875, 2010 Bankr. LEXIS 3594, at *5-6 (Bankr. S.D. Tex. Oct. 8, 2010) (rejecting emergency motion implicating a third of the debtor's estate, and concluding that there was "no emergency that justified such substantial relief on such short notice").

9.     BMI's request for emergency relief within just six business days of filing its Motion does not satisfy these standards.  ***First***, BMI's requested timing for emergency relief is prejudicial to the Debtors, which are occupied with numerous time-sensitive matters that are critical to the estates and to all stakeholders.  For example, the Debtors had a major contested evidentiary hearing this week, which took place during the two days before BMI's unilaterally

imposed deadline for emergency relief. *See Notice of March 26 and 27, 2025 Hearing on Debtors'*

*Motion for Turnover and Delivery of Assets Held in the Rabbi Trusts* (D.I. 4280).  Further, the

Debtors are actively engaged in mediation to negotiate a long-term resolution of these chapter 11

cases, including the continued use of cash collateral from their lenders, long-term financing

(including litigation financing), and the terms of a chapter 11 plan that will maximize value for all

creditors.

10.     ***Second***, the emergency relief requested by BMI is extremely broad and

implicates considerations fundamental to the Debtors' estates, their creditors, and all stakeholders.

Among other things, BMI requests conversion of the cases from chapter 11 to a chapter 7

liquidation—a draconian request with far-reaching and devastating implications for the Debtors'

creditors and anyone with an interest in these proceedings.  *See infra* ¶¶ 35-38.  BMI's request to

have the Court consider, let alone grant, such extreme relief on an emergency basis should not be

countenanced.  *See In re Caltex Holdings LP*, 2010 Bankr. LEXIS 3594, at *5-6 (rejecting

overbroad request for emergency relief that implicated a large portion of the estate).

11.     ***Third***, in addition to being prejudicial to the Debtors as explained above,

BMI's request for emergency relief would be an inefficient use of estate and judicial resources.

Indeed, requests of this nature (i) interfere with the Debtors' objective to continue to secure

financing that will support the Debtors' pursuit of litigation and other asset monetization efforts

and thereby maximize value for the Debtors' creditors, and (ii) cause the estates to incur the very

professional fees of which BMI complains.  *See Talon Transaction Techs., Inc. v. StoneEagle*

*Servs., Inc.*, No. 13-00902 (DLH), 2014 WL 9819846 , at *3 (N.D. Tex. Dec. 4, 2014)

("'[E]mergency' motions of this sort . . . abus[e] the litigation process and show[] inadequate

regard for the Court's time and resources and the opposing party's entitlement to a reasonable opportunity to respond.").

12.     ***Finally***, BMI's justification for emergency relief—its desire to invest more Uniformed Services Family Health Plan ("**USFHP**") profits into its charitable efforts now—while laudable, is not an emergency.  It is well-established that monetary harm does not typically constitute an emergency.  *See, e.g.*, *D&O TradeCo Inc. v. Generations Irrevocable Tr.*, No. 24-07961 (SPG), 2024 WL 4875373, at *3 (C.D. Cal. Oct. 11, 2024) ("Due to the fungible nature of money, courts have recognized that monetary harm does not traditionally constitute irreparable injury, let alone warrant *ex parte* emergency relief."); *Randolph v. OSC-Mgmt., Inc.*, No. 16-00825 (SDD), 2017 WL 657350, at *2 (M.D. La. Feb. 17, 2017) ("[T]here is no emergency situation and/or any disputed injury that could not later be solved with monetary damages.").  Notably, BMI does not allege that it has suffered any consequences with the Department of Defense ("**DoD**") due to BMI not yet paying the invoices (s*ee* Motion ¶ 51)—presumably because DoD is well-aware of the situation.[5]  Even if that were not the case, BMI could avoid any negative consequences with DoD simply by paying the invoices while it pursues its alleged claim against the Debtors. That makes any purported emergency a self-made one, which is not a justification for emergent relief.  *See In re Villareal*, 160 B.R. at 787.

13.     The implication in BMI's Motion and the *Declaration of Rosye B. Cloud* (D.I. 4272) (the "**Cloud Declaration**") that BMI is experiencing an emergency because its

---

[5] For example, BMI does not allege that non-payment has prevented it from participating in the federal drug purchasing program.

charitable operations are starved for funds is not correct.[6]  By terminating the MSA through its adversary proceeding, BMI obtained from the Debtors a highly profitable arrangement to administer the USFHP, which previously provided the Debtors with approximately $25-30 million of annual profit.  *See Brighton Marine, Inc. v. Steward Health Care System LLC.*, No. 24-03102 (CML) (Bankr. S.D. Tex.), D.I. 79 (Joint Exhibits 19-35 – USFHP Statements of Operations and Quarterly Reports from 2022 through March 2024); and D.I. 139 (Debtor's Exhibit 155 – USFHP Statement of Operations for June 30, 2024).  BMI's motion incorporates undisputed statements that the USFHP is profitable.  *See, e.g.*, Motion ¶¶ 17-18 & n.5, ¶ 35, ¶ 48; *see also* Cloud Declaration at ¶ 6 (stating that any remainder of the Capitation Payment is retained as profit), and ¶ 13 (citing, without dispute, statements that "the Plan was profitable").  Thus, BMI's suggestion that it is starving for funds overlooks that, since the MSA terminated in October 2024, BMI has been capturing these significant profits itself.

14.    In fact, extrapolating from the average monthly profit Steward earned from the USFHP during the period from Q1 2022 through Q3 2024, BMI has likely earned more than $11 million in profits just since November 2024.  And based on that extrapolated average rate, BMI will continue to earn over $2 million of profit a month from the USFHP going forward.  The Debtors estimated that the MSA would generate between $25 and $30 million in profit annually (*see supra* ¶ 13); the USFHP is thus expected to provide BMI with hundreds of millions of dollars it can invest in charitable operations over the coming years.  BMI is presumably amply capitalized (or ought to be) to *both* invest in its charities *and* pay the approximately $5 million of invoices in

---

[6] *See, e.g.*, Motion ¶ 51 ("[E]ach day that passes without resolution of this issue causes BMI to defer investing in its charitable programs."); Cloud Declaration ¶ 22 ("We have been forced to pause critical program investments in DC and Boston planned for 2025 . . . [which] has had material consequences for BMI's other programs.").

question while it pursues its asserted claim against the Debtors.  BMI's justification for emergency relief is inadequate as a matter of law and inconsistent with the facts.

### III.    BMI'S MOTION FAILS ON THE MERITS

15.    As explained above, BMI's Motion is procedurally improper and should be dismissed for refiling in an adversary proceeding.  The Debtors therefore intend to respond more fully to the merits of BMI's claims at the appropriate juncture and reserve their rights to do so (including to present evidence and submit additional briefing, *see infra* ¶ 39).  This section briefly summarizes why BMI's claims are not only procedurally but substantively flawed.

### *(a)    BMI Has No Entitlement to a Constructive Trust*

16.    BMI claims that Massachusetts law permits the imposition of a constructive trust because the property at issue was obtained by fraud or in violation of a fiduciary relationship. Motion ¶ 34.  Among other things, this is a mistaken characterization of the circumstances by which Steward obtained the funds at issue and the manner in which the funds flowed.

17.    BMI claims that the Debtors "wrongfully obtained" the property at issue and would be unjustly enriched if allowed to keep it.  Motion ¶ 35.  However, BMI does not, and cannot, claim any particular wrongdoing by the Debtors in obtaining the funds.  Instead, BMI repeatedly claims that the Debtors accepted the Capitation Payments "knowing the payments were federal funds *earmarked* for USFHP expenses."  *Id.* (emphasis added); *see also id.* ¶ 2 ("millions of dollars earmarked"), ¶¶ 34-35 ("Funds That Were Earmarked"), ¶ 48 ("government funds earmarked").  BMI's choice of the conspicuously nonlegal term "earmarked" to describe the Debtors' purported obligations concerning the funds is intentional—it reflects the reality that the Debtors were under no obligation, contractual or otherwise, to segregate the Capitation Payments in a special fund and use them exclusively for USFHP expenses, as BMI now suggests.

18.     The reality is that Capitation Payments flowed into the Debtors' general funds.  BMI's Motion admits as much.  *See* Motion ¶ 20 (averring that Steward "deposited th[e] Capitation Payments into its general operating account").   The MSA never included any requirement for the Debtors to deposit the Capitation Payments into a special fund or to segregate them from its general funds, and that was also the parties' longstanding course of performance.

19.     Any claim by BMI that it thought the Capitation Payments were segregated is belied by Ms. Cloud's own description of the arrangement:  "BMI paid the Capitation Payment to Steward for Steward to pay USFHP expenses pursuant to its contractual obligation.  If there was any surplus after Steward paid those Plan expenses, Steward was entitled to retain the remainder of the Capitation Payment as profit. . . . If Plan expenses exceeded the amount of the Capitation Payment, moreover, Steward had to pay those expenses from its own funds."  Cloud Declaration at ¶ 6.  In other words, the Capitation Payments were a set amount paid to Steward to defray the costs of administering the USFHP, and they were fungible with Steward's other funds—as evidenced by the fact that, as Ms. Cloud admits, Steward would dip into its other (non-capitation) funds if USFHP administration costs exceeded the Capitation Payment.  Obviously, Steward's own non-capitation funds—which could have flowed from anywhere within its previously extensive enterprise, and which did *not* flow from BMI—cannot possibly have been "earmarked" for the USFHP in the manner BMI now suggests.

20.     The circumstances here are not akin to a situation where "the sole permissible administrative act" that the recipient may undertake with the funds received is to pay them over to the beneficiary, as in the cases cited by BMI.  *See* Motion ¶ 38; *cf. In re Signal Hill-Liberia Ave. Ltd. P'ship.*, 189 B.R. 648, 651 (Bankr. E.D. Va. 1995); *T&B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) (creating constructive trust where the

payments at issue went into an *exclusive-use segregated account* specifically for the beneficiaries' use). As Ms. Cloud admits, the Debtors could use funds from Capitation Payments as profit, and the Debtors could likewise use their own general (non-capitation) funds to pay USFHP administration expenses. Cloud Declaration ¶ 6. Those are not the acts of a trustee or custodian.

21.     Relatedly, BMI has failed to trace the allegedly wrongfully obtained funds, as it is required to do under Massachusetts law. *See In re Chew*, 496 F.3d 11, 16 n.5 (1st Cir. 2007), citing *Boston Safe Deposit & Tr. Co. v. Seifert*, 1997 WL 64043, at *8 (Mass. Sup. Ct. Jan. 29, 1997) ("[A] constructive trust encumbers the property only to the extent of the funds traceable from the alleged fraud."); *In re Linsey*, 296 B.R. 582, 586 (Bankr. D. Mass. 2003) ("Under the so-called 'traditional approach,' adopted by the First Circuit, in order to obtain a constructive trust over the property of a debtor, a party must . . . be able to trace the wrongfully held property. . . . In the case of commingling [] the claimant bears the further burden of tracing the alleged trust property 'specifically and directly' back to the illegal transfers giving rise to the trust."). Because the capitation payments flowed into the Debtors' general account and were commingled with other funds, as discussed above, BMI will be unable to—and did not even attempt to—establish this element of its constructive trust claim.

22.     Second, BMI claims that "Steward also obtained the property in violation of a fiduciary relationship that continued after the filing of Steward's chapter 11 cases." Motion ¶ 36. BMI claims that Steward was BMI's agent. *Id.* But the MSA made explicit that Steward was *not* BMI's agent: "It is expressly understood and agreed by the parties that, in performing their responsibilities under this Amended Agreement, each party and its employees, agents and servants *will at all times act as independent contractors, not as employees or agents*, of the other." MSA § 14.1 (emphasis added).

11

23.     To escape the plain meaning of Section 14.1, BMI invokes a provision in the MSA that designated Steward as its agent for the limited act of "ordering and obtaining of Drugs through Prime Vendor Contracts." MSA § 2.2.3. The remainder of this provision, however, made clear that this limited agency relationship pertained only to Steward's ability to access the Pharmacy Prime Vendor Program. MSA § 2.2.3. As Ms. Cloud describes in her declaration, this arrangement was necessary because the Pharmacy Prime Vendor Program can be accessed only by "a USFHP designated provider" like BMI—and unlike Steward. Cloud Declaration at ¶ 7. That is also why, as Ms. Cloud further describes, the Defense Finance and Accounting Service would "send an invoice for the [drug] order *to BMI*." *Id.* (emphasis added).

24.     This limited arrangement did not create a general agency relationship between the Debtors and BMI, which would fly in the face of Section 14.1, as discussed above. The payments at issue here do not implicate Steward's ability or inability to access the Pharmacy Prime Vendor Program using BMI's status as a designated provider. BMI does not, for example, allege that Steward did not have BMI's authorization to order the drugs in question, or that Steward abused its access to the Program to order drugs not intended for USFHP beneficiaries.

25.     BMI's claim is simply that Steward failed to pay an amount BMI alleges is owed under the MSA, and the proper way to assert such a claim would have been to file a proof of claim. However, BMI did not assert such a claim by the applicable administrative claims bar date fixed by the Court. On November 14, 2024, the Court entered the *Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claims Bar Date, and (V) Granting Related Relief* (Docket No. 3217) (the "**Administrative Claims Bar Date Order**"), setting the administrative claims bar

date as December 20, 2024 (the "**Administrative Claims Bar Date**") and providing that all proofs

of administrative claim for administrative claims arising on or prior to November 15, 2024, must

be filed so that they are actually received by the Debtors' claims and noticing agent on or before

December 20, 2024.  *See* Administrative Claims Bar Date Order ¶ 5.  The Order further provides

that "[a]ny entity that is required, but fails, to file a Proof of Administrative Claim in accordance

with this Order on or before the Administrative Claims Bar Date shall be forever barred, estopped,

and enjoined from asserting such claim against the Debtors . . . and the Debtors and their property

shall be forever discharged from any and all indebtedness," and that such entity "shall be

prohibited from participating in any distribution in these chapter 11 cases on account of such claim

or receiving further notices regarding such claim or liability with respect to or arising from such

claim."  *Id.* ¶¶ 13-14.  BMI was duly served with a copy of this order.  *See Affidavit of Service*

(D.I. 3255).[7]  However, BMI did not file an administrative proof of claim.

26.     The Debtors obtained relief from the Court pursuant to the Administrative

Claims Bar Date Order to facilitate an orderly administration of the estates and to prevent a deluge

of requests for immediate payment of administrative claims from distracting the Debtors from their

goal of monetizing assets, progressing (and ultimately winding up) these chapter 11 cases, and

delivering distributions to creditors.[8]  The Court determined that the Administrative Claims Bar

Date "is in the best interests of the Debtors and their respective estates and creditors."  *Id.*  BMI's

Motion does not comply with that order, exacerbates the very problem the Debtors sought to avoid,

---

[7] BMI was also served with a copy of the administrative claims bar date motion.  *See Affidavit of Service* (D.I. 3196).

[8] *See generally Emergency Motion of Debtors for Entry of an Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claims Bar Date, and (V) Granting Related Relief* (D.I. 3138); *see also Omnibus Objection of Debtors to Motions for Allowance and Payment of Administrative Expense Claims* (D.I. 3137).

and causes the Debtors to incur additional professional fees responding to an emergency motion that asks for draconian relief.

27.     BMI acknowledges that the disputed invoices were issued between August 25, 2024 and October 25, 2024 (Motion ¶ 19), *i.e.* before the November 15, 2024 cutoff in the Administrative Claims Bar Date Order.  BMI also acknowledges that, in October 2024, it "discussed pending liabilities under the MSA when negotiating the TSA," which included these drug liabilities.  Motion ¶ 25; *see also* Cloud Declaration ¶ 17 ("During negotiations over the TSA, Steward's counsel initially demanded that BMI assume liability for the Unpaid Invoices."). Indeed, during these negotiations, BMI attempted to include a provision whereby the Debtors would make representations and warranties about payment of such MSA costs, but the parties ultimately agreed not to include that provision.  *See infra* ¶ 32.  BMI therefore was well-aware of this claim months before the December 20, 2024 bar date and was required to file a proof of administrative claim by such date.  *See* Administrative Claims Bar Date Order ¶¶ 5, 13-14.  It did not.  BMI's failure to comply with the Administrative Claims Bar Date Order bars any administrative claim regarding the disputed invoices, and BMI is enjoined and estopped from asserting such claim against the Debtors.  BMI should not be permitted to circumvent this mechanism by later characterizing its claim as one for a constructive trust, for specific performance, or for any other relief BMI may seek regarding what is simply an asserted breach of contract claim.[9]

---

[9] Even if BMI's claim were not barred (it is, as discussed above), any such claim to the Debtors' funds would be junior to the valid, perfected lien in favor of the DIP lenders.

      **(b)**      ***The Debtors Cannot Be Compelled to Comply with the Terminated MSA, and BMI's Monetary MSA Claim Is Barred***

      28.      BMI argues that the Court should compel the Debtors to perform under the terms of the MSA (*see* Motion ¶¶ 4, 32, 39-42 & p.20)—an agreement that BMI went to great lengths to terminate.  It is black-letter law that contractual obligations to perform no longer exist after a contract is terminated.  *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991) ("[A]n expired contract has by its own terms released all its parties from their respective obligations."); *N.L.R.B. v. Cone Mills Corp.*, 373 F.2d 595, 598 (4th Cir. 1967) (citing Restatement, Contracts § 386 (1932)) ("It is axiomatic in contract law that parties to an agreement are relieved of their mutual obligations upon termination of the agreement.").[10]

      29.      Apparently recognizing this reality, BMI claims that the still-active *TSA* requires performance of the Debtors' MSA obligations.  *See* Motion ¶ 41.  BMI relies on general language in the TSA that Steward will "continue to provide or arrange for the provision of all services that are to be provided to Enrollees in accordance with the DoD Contract to the extent Steward provided such services under the [MSA] immediately prior to termination thereof."  TSA § 1.1.  It also points to a provision stating that Steward shall operate the Pharmacy "consistent with prior practice and with section 2.2 of the [MSA]."  TSA § 2.2(a).  Neither of these provisions has the effect of converting past, barred MSA claims into current, non-barred TSA claims.

      30.      Interpreting the plain language of these provisions, they are both about setting the *scope* of services the Debtors agreed to provide on a go-forward basis under the TSA.  Section 1.1 states that the go-forward services under the TSA will be "to the extent Steward

---

[10] To the extent BMI is attempting to assert an administrative claim that allegedly arose under the MSA due to nonpayment of the postpetition invoices, such claim was not brought prior to the applicable bar date, as discussed *supra* at ¶¶ 25-27.

provided such services under the [MSA] immediately prior to termination thereof." Thus, Section 1.1 simply establishes that future TSA services will be of the same scope as the past MSA services. Section 2.2 is exactly the same—it provides that the Debtors will operate the pharmacy going forward "consistent with prior practice and with section 2.2 of the [MSA]." That sets the scope of future obligations under the TSA, but it does not bring forward BMI's past, barred claims under the MSA and shoehorn them into the TSA (and thus circumvent the Administrative Claims Bar Date Order, as BMI attempts to do).

31.     If there were any doubt about the plain text of these sections (there is not), the TSA expressly states in multiple places—including Sections 1.1 and 2.2 themselves—that it governs only those obligations arising *after* the Effective Date of November 1, 2024, not obligations arising before that date, such as the invoices here. *See, e.g.*, TSA § 1.1 ("The Parties agree that *only this Agreement will govern their relationship* with respect to the Plan as of the Effective Date, and *no other agreements relating to the Plan (including the Management Agreement) are incorporated* by implication or otherwise into this Agreement."); TSA § 2.2(a) ("Steward shall (or shall cause its affiliates to) operate Brighton Marine Health Center Pharmacy (the 'Pharmacy'), consistent with prior practice and Section 2.2 of the Management Agreement (*which for the avoidance of doubt is not incorporated into this Agreement*)."); TSA § 9.5 ("Notwithstanding anything herein, *Steward has not assumed any liability under this Agreement arising under or in connection with the Management Agreement*."); TSA § 2.3(b) (TSA Plan Budget included only post-Effective Date drug payments to DFAS, not the costs of the pre-Effective Date invoices). Further, Steward expressly did not make representations or warranties in the TSA concerning pre-Effective Date obligations. TSA § 9.7.

32.     BMI also argues that the parties' TSA negotiations suggest they intended to convert past MSA liabilities into current TSA liabilities.  *See* Motion ¶ 42.  At the outset, in light of the unambiguous terms of the TSA discussed above, the parties' negotiating history is irrelevant.  *See* TSA § 9.9 ("This Agreement supersedes all prior agreements and understandings between the Parties as to the subject matter covered hereunder."); *see also Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 723 (1977) ("When the words of a contract are clear they alone determine the meaning of the contract.").  But BMI's argument about the negotiating history is also wrong— it omits what followed the episode BMI cites.  After BMI declined to assume the USFHP liabilities (which specifically included drug liabilities), BMI then proposed inserting into the draft TSA a provision with representations and warranties that would effectively convert such liabilities under the MSA into TSA liabilities—just what it seeks to do now in its Motion, in order to avoid the bar date.  The Debtors rejected such a provision, explaining that it unacceptably shifted risk onto the estates.  BMI accepted the provision's removal, and in subsequent TSA drafts exchanged by the parties, the provision was no longer included.  Thus, even if the negotiating history were relevant— and it is not because the text is unambiguous—it belies BMI's argument by showing that the parties considered, and rejected, a provision in the TSA that would effectively convert MSA liabilities into TSA liabilities.

### (c)     Setoff Is Not Available

33.     As a third alternative form of relief, BMI argues that it should be allowed to set off any postpetition amounts owed to the Debtors under the TSA against the Debtors' alleged postpetition obligation to pay the invoices under the MSA.  *See* Motion ¶¶ 43-45.  Setoff is a remedy in equity, and as such, the application of setoff "is permissive and lies within the equitable discretion" of the Court.  *DuVoisin and Bank of Commerce v. Foster (In re S. Indus. Banking*

17

*Corp.)*, 809 F.2d 329, 332 (6th Cir. 1987) (citing *I.R.S. v. Norton*, 717 F.2d 767, 772 (3d Cir. 1983)); *see also Janvey v. GMAG, L.L.C*, 98 F.4th 127, 135 (5th Cir. 2024) ("Without question . . . setoffs were a recognized part of historical equity practice in federal courts."), *cert. denied sub nom. GMAG, L.L.C. v. Janvey*, No. 24-00679 (DCG), 2025 WL 299530 (U.S. Jan. 27, 2025).  The Court should not exercise its discretion to allow BMI to set off amounts owed to the Debtors under the TSA, because the balance of equities does not tip in BMI's favor.

34.     BMI seeks to set off amounts it undisputedly owes the Debtors for actual services the Debtors provided to BMI under the TSA, which was negotiated to be a cost-neutral obligation for the Debtors, against contested contract claims that the Debtors assert have been discharged through the termination of the MSA and by the terms of the Administrative Claims Bar Date Order.  Thus, BMI's relief would undermine the purpose of the TSA and compel the Debtors to provide free transition services.  This is especially inequitable given the Debtors' liquidity situation.  Unlike BMI, which is and has been earning newfound profits from the USFHP after terminating the MSA (*see supra* ¶¶ 13-14), the Debtors face constrained liquidity and require cash flow to wind down their estates and prosecute a chapter 11 plan for the benefit of all creditors.  As such, the Court should exercise its discretion and deny BMI's requested equitable remedy of setoff.

### *(d)      Conversion from Chapter 11 to Chapter 7 Is Inappropriate*

35.     Pursuant to section 1112(b)(1) of the Bankruptcy Code, "a party in interest may file a motion to dismiss or convert a Chapter 11 case that the Court may grant 'for cause.'" *In re Turkey Leg Hut & Co. LLC*, 665 B.R. 129, 138 (Bankr. S.D. Tex. 2024) (citing 11 U.S.C. § 1112(b)(1).  "When determining 'cause,' the Court must [] consider the totality of the circumstances" and "apply a burden shifting analysis." *Id.*  "Under that analysis, the moving party bears the initial burden to establish 'cause' by a preponderance of the evidence." *Id.* (citing *In re*

*Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994)).  Thus, BMI as the movant bears the initial burden of establishing cause for conversion of these cases by a preponderance of the evidence.

36.    BMI has not only failed to carry that burden, it has provided no support whatsoever that there is cause to convert these cases.  BMI merely contends that if the Debtors "cannot" pay the disputed invoices, "the only fair option" is conversion of these cases to a chapter 7 liquidation.  Motion ¶¶ 49-50.  Contrary to BMI's assertion that chapter 7 would be a "fair option," converting the Debtors' chapter 11 cases to a liquidation would be value-destructive and prejudicial to all creditors.  It is critical that the Debtors be permitted to move forward with monetizing assets, pursuing litigation, and negotiating and prosecuting a chapter 11 plan of liquidation, which will maximize value for creditors, including administrative claimants, and provide the best path for recoveries.  Proceeding with a hasty chapter 7 liquidation at this time— before the Debtors have been able to monetize the estates' remaining assets, including valuable claims and causes of action—would be manifestly detrimental to claimants (including BMI, to the extent they have an allowed claim as they assert).

37.    After engaging in a herculean effort to consummate the sale and transfer of twenty-nine hospitals, the Debtors' physician network, their transition services agreement assets, and the transition of the USFHP in a compressed timeframe, the Debtors have shifted their efforts to the formulation and filing of a proposed chapter 11 plan to bring closure to these cases in an equitable and efficient manner, and to the pursuit of valuable assets, including claims and cause of action.  The Debtors expect that they will be able to secure additional financing and continued use of cash collateral, confirm a chapter 11 plan, and monetize their remaining assets to provide recoveries for creditors, including payment of administrative claims.  In these circumstances, BMI's unsupported request for conversion should be denied.  *See, e.g.*, *In re YC Atlanta Hotel,*

*LLC*, 630 B.R. 348, 365 (Bankr. N.D. Ga. 2021) (where debtor stated it would file a plan and then move toward confirmation within several months, "the Court believes the evidence supports providing Debtor the opportunity," and a request for conversion to chapter 7, "while certainly [the movant's] favored outcome, does not best serve the estate and its other creditors"); *In re Profundity LLC*, No. 23-16720-CLC, 2024 WL 4249715, at *1 (Bankr. S.D. Fla. Apr. 11, 2024) (movant did not satisfy burden of proving cause for chapter 7 conversion, because a plan involving a liquidation of assets is still "rehabilitation" of the debtor); *In re MCC Humble Auto Paint, Inc.*, No. 11-34994-H3-11, 2012 WL 967506, at *5 (S.D. Tex. Mar. 21, 2012) (denying motion for chapter 7 conversion where debtor anticipated realizing more value in the coming months).

38.     BMI's request to short-circuit these efforts and push the Debtors into a value-destructive chapter 7 liquidation—on a barred claim no less—ignores the estates' need for ample time to monetize assets for the benefit of creditors.  Accordingly, BMI's request that the Court convert these chapter 11 cases to a chapter 7 liquidation should be denied.

## **RESERVATION OF RIGHTS**

39.     The Debtors reserve all rights, defenses, and remedies in contract and under applicable law, including but not limited to (a) supplement or add to the legal and factual arguments raised in this Preliminary Objection, on any basis whatsoever, at a future date, and to present evidence in support thereof, and (b) seek enforcement of the Administrative Claims Bar Date Order with respect to BMI's asserted claims.  Nothing herein (i) is intended to, or does, in any manner waive, limit, impair, or restrict the Debtors' ability to protect and preserve their rights, remedies, and interests, including without limitation any claims against BMI; (ii) shall be deemed (A) an agreement or admission by the Debtors as to the validity, categorization, amount, or priority of any claim against any Debtor entity on any grounds, (B) a waiver or impairment of any rights,

20

claims, or defenses of the Debtors or any other party-in-interest to dispute any claim on any grounds; (C) a promise by the Debtors that any claim is payable; or (D) a waiver of the rights or defenses of the Debtors under the Bankruptcy Code or any other law.

## <u>CONCLUSION</u>

40.     For these reasons, the Court should (i) dismiss BMI's Motion as procedurally improper; and (ii) deny BMI's request for emergency relief, or, if the Court decides emergency consideration is warranted, deny the Motion on the merits for the reasons discussed herein.

Dated:  March 28, 2025

Houston, Texas

 /s/  Clifford W. Carlson
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
            Clifford.Carlson@weil.com
            Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Jeffrey D. Saferstein (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Jeffrey.Saferstein@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:   DavidJ.Cohen@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

LATHAM & WATKINS LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864
Email:   Ray.Schrock@lw.com
            Candace.Arthur@lw.com

*Attorneys for Debtors*
*and Debtors in Possession*