> **THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.   ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | |
| | § | |

**DISCLOSURE STATEMENT**
**FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION**
**OF STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:   (305) 374-7159

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
Loren M. Findlay (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864

*Attorneys for Debtors and Debtors in Possession*

April 28, 2025                                                    Houston, Texas

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

**DISCLOSURE STATEMENT, DATED APRIL 28, 2025**

**Solicitation of Votes on the**
**Joint Plan of Liquidation of**

**STEWARD HEALTH CARE SYSTEM LLC, *ET AL.***

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (CENTRAL TIME) ON JULY 1, 2025, UNLESS EXTENDED BY THE DEBTORS.  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS MAY 21, 2025 (THE "VOTING RECORD DATE").**

> **RECOMMENDATION BY THE DEBTORS TO VOTE TO ACCEPT THE PLAN**
>
> The Transformation Committee of the Board of Managers of Steward Health Care Holdings LLC ("**SHC Holdings**"), on behalf each of the governing bodies for each of its debtor affiliates, have unanimously approved the transactions contemplated by the Plan (as defined herein).  The Debtors believe the Plan is in the best interests of the Debtors' estates and all stakeholders.  Accordingly, the Debtors recommend that holders of claims and interests whose votes are being solicited submit ballots to accept the Plan.
>
> Further, holders of 100% of the aggregate outstanding principal amount of the Bridge Facility (as defined herein) have agreed to vote in favor of the Plan.  The FILO Parties also support confirmation of the Plan and recommend that all creditors entitled to vote submit a ballot to accept the Plan.

> **RECOMMENDATION BY THE CREDITORS' COMMITTEE**
> **TO VOTE TO ACCEPT THE PLAN**
>
> The Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), as stated in any Creditors' Committee Position Letter (as defined herein), (i) believes that the Plan is in the best interests of the Debtors' estates and all stakeholders, (ii) supports confirmation of the Plan, and (iii) recommends that all creditors entitled to vote on the Plan submit a ballot to accept the Plan.

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, SUPPLEMENTED, OR MODIFIED FROM TIME TO TIME, THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING VOTES ON THE *JOINT CHAPTER 11 PLAN OF LIQUIDATION OF STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS*, DATED APRIL 28, 2025 (THE "PLAN"),[2] AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.   A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT A.   NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").**

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

ALL HOLDERS OF CLAIMS OR INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  IN PARTICULAR, ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION V (CERTAIN RISK FACTORS AFFECTING DEBTORS) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

UPON CONFIRMATION OF THE PLAN, THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT, WILL BE OFFERED AND SOLD WITHOUT REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR U.S. FEDERAL, STATE, OR LOCAL LAWS IN RELIANCE ON AVAILABLE EXEMPTIONS UNDER THE SECURITIES LAWS OF THE UNITED STATES.  WITH RESPECT TO THE SECURITIES OFFERED AND SOLD PURSUANT TO THE EXEMPTION UNDER SECTION 1145(A) OF THE BANKRUPTCY CODE, SUCH SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE.  IN ADDITION, SUCH SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.  WITH RESPECT TO SECURITIES OFFERED AND SOLD PURSUANT TO THE EXEMPTION UNDER SECTION 4(A)(2) OF THE SECURITIES ACT, SUCH SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OR THE SECURITIES ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES ISSUED UNDER THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

iii

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS AFFECTING DEBTORS" BELOW.  PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS, AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  THE DEBTORS DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS ATTACHED HERETO.  THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT, EXCLUDING THE CREDITORS' COMMITTEE POSITION LETTER.

THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

PLEASE BE ADVISED THAT SECTIONS 12.3, 12.4, 12.5, 12.6, 12.7, 12.8; AND 12.9 OF THE PLAN CONTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND SUCH SECTIONS ARE ANNEXED HERETO AS **EXHIBIT D**.  YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED.

## TABLE OF CONTENTS

Page

I. Introduction ...............................................................................................................1

    A.    **Overview of The Plan** ............................................................................3

        1.    Plan Administration .................................................................. 3

        2.    Litigation Trust ........................................................................ 4

        3.    Litigation Funding .................................................................... 5

        4.    Plan Trust ................................................................................. 7

    B.    **Administrative Expense Claims Consent Program** .........................10

        1.    Administrative Claims Consent Process & Procedures ..................... 11

        2.    Administrative Expense Claim Bar Date Process for Asserting Claim .............. 12

    C.    **Summary of Plan Treatment** ...............................................................12

    D.    **Inquiries** ...............................................................................................15

II. Overview of Debtors' Operations.............................................................................16

    A.    **History & Formation** ...........................................................................16

    B.    **Historical Operations and Key Assets** ................................................17

        1.    Steward Health ........................................................................ 17

        2.    Stewardship Health .................................................................. 17

    C.    **Remaining Operations** .........................................................................18

    D.    **Corporate Governance & Management** ..............................................18

    E.    **Capital Structure** .................................................................................20

        1.    ABL/FILO Facility ................................................................. 22

        2.    Prepetition Bridge Facility ....................................................... 23

        3.    MPT Loans and Obligations .................................................... 23

III. Events Preceding the Commencement of the Chapter 11 Cases .........................24

    A.    **Industry and Operational Challenges**.................................................24

    B.    **Prepetition Initiatives** .........................................................................25

IV. Overview of the Chapter 11 Cases .........................................................................26

    A.    **Overview of Events of Chapter 11 Cases** ..........................................26

    B.    **Commencement of Chapter 11 Cases** ................................................27

    C.    **First/Second Day Pleadings**.................................................................27

    D.    **Other Procedural and Administrative Motions** ...............................28

E.    **Captive Insurance Program** ......................................................................30

F.    **DIP Financing** .............................................................................................32

    1.    MPT DIP Facility ............................................................................ 32

    2.    DIP Commitment Fee ...................................................................... 32

    3.    FILO DIP Facility ........................................................................... 33

G.    **Appointment of Creditors' Committee** ....................................................34

H.    **Appointment of Patient Care Ombudsmen** ............................................35

I.    **Overview of Sale Process** ..........................................................................35

    1.    Prepetition Sale Process .................................................................. 35

    2.    Global Bidding Procedures and Postpetition Sale Process ............... 36

J.    **Stewardship Health Sale** ...........................................................................36

    1.    Stewardship Sale Process ................................................................. 36

        a.    Stewardship IOI with Optum ............................................. 36

        b.    Stewardship Sale with Kinderhook ..................................... 37

K.    **Hospital Sale Process, Key Creditor Disputes & Mediation** ..........................38

    1.    Massachusetts Sale Process ............................................................. 39

    2.    Master Lease I Hospitals Sale Process .............................................. 42

        a.    Overview of Process & Key Disputes ................................. 42

        b.    Space Coast Hospitals ........................................................ 42

        c.    Specified MLI Hospitals Sale Process ................................. 44

        d.    Wadley at Hope Sale Process ............................................. 48

        e.    Glenwood Sale Process ...................................................... 49

        f.    Wadley (Texarkana) Sale Process ....................................... 49

        g.    Sharon Regional Medical Center Sale Process ..................... 50

    3.    TSA / EPDA Settlement .................................................................. 51

    4.    Unexpired Leases ............................................................................ 53

L.    **Hospital Closures** .......................................................................................54

    1.    Closure of Carney and Nashoba ...................................................... 54

    2.    Closure of Norwood Satellite Facilities ............................................ 54

M.    **Monetization of Additional Assets** ..........................................................55

    1.    Overview ......................................................................................... 55

    2.    Accounts Receivables ...................................................................... 55

    3.    JV Interests in Clinics & Other Health Centers ................................. 56

|   | 4. | Stewardship Purchase Price Adjustment | 56 |
|   | 5. | Litigation Claims | 57 |
|   |   | a. | Claims Against Commercial Payors | 57 |
|   |   | b. | Norwood Litigation | 57 |
|   |   | c. | BCBS Antitrust Litigation | 59 |
|   |   | d. | Preference and Avoidance Actions | 60 |
|   |   | e. | Other Potential Claims and Causes of Action | 60 |
| **N.** | **Adversary Proceedings & Other Bankruptcy Litigation** | 61 |
|   | 1. | BMI Adversary Proceeding & BMI Bankruptcy Litigation | 61 |
|   |   | a. | Commencement and Preliminary Injunction Hearing | 61 |
|   |   | b. | Declaratory Judgment Hearing | 62 |
|   |   | c. | October 23, 2024 Status Conference and Transition Services Agreement | 62 |
|   |   | d. | BMI Motion to Compel Payment | 63 |
|   | 2. | MPT Adversary Proceeding | 63 |
|   | 3. | TRACO Adversary Proceeding | 63 |
|   | 4. | Massachusetts Adversary Proceeding | 64 |
|   | 5. | CommonSpirit Adversary Proceeding | 65 |
|   | 6. | Rabbi Trust Litigation | 65 |
|   | 7. | Urban Hospitals Motion to Segregate Proceeds | 69 |
|   | 8. | Sub-Committee Investigations | 69 |
| **O.** | **Investigations** | 71 |
|   | 1. | Government Investigations | 71 |
|   |   | a. | Malta Investigation | 71 |
|   |   | b. | DOJ Investigation | 72 |
|   |   | c. | Boston USAO Investigation | 72 |
|   | 2. | Civil Investigative Demands | 72 |
| **P.** | **Exclusivity** | 72 |
| **Q.** | **Claims Bar Dates** | 73 |
|   | 1. | General/Governmental Bar Date | 73 |
|   | 2. | Administrative Expense Claims Bar Date | 73 |
| **R.** | **Administrative Expense Claims** | 75 |
| **S.** | **PBGC Settlement** | 77 |

| T. | | Plan Settlement | 78 |
| | a. | The Plan Settlement is Equitable | 78 |
| | b. | The Plan Settlement Satisfies Section 1129(a)(9) of the Bankruptcy Code | 80 |
| U. | | Timetable for Chapter 11 Cases | 80 |

**V. Certain Risk Factors Affecting Debtors** ............................................................80

| A. | | Certain Bankruptcy Law Considerations | 81 |
| | 1. | Risk of Non-Confirmation of Plan | 81 |
| | 2. | Non-Consensual Confirmation | 81 |
| | 3. | Risk of Non-Occurrence of Effective Date | 81 |
| | 4. | Risks Related to Possible Objections to Plan | 81 |
| | 5. | Risk of Termination of Plan Settlement | 82 |
| | 6. | Releases, Injunctions, and Exculpation Provisions May Not be Approved | 82 |
| | 7. | Risks Related to Classification of Claims and Interests | 82 |
| | 8. | Alternative Restructuring | 82 |
| | 9. | Factors Affecting the Recoveries of Holders of Allowed Administrative Expense Claims | 82 |
| | 10. | Claims Could Be More than Projected | 83 |
| | 11. | Projected Distributions to Holders of Allowed Claims | 83 |
| | 12. | Administrative Insolvency | 83 |
| | 13. | Conversion to Chapter 7 | 84 |
| | 14. | Dismissal of Chapter 11 Cases | 84 |
| | 15. | Cost of Administering Debtors' Estates | 84 |
| B. | | Additional Factors to Be Considered | 85 |
| | 1. | Debtors Could Withdraw Plan | 85 |
| | 2. | No Duty to Update | 85 |
| | 3. | No Representation Outside Disclosure Statement Are Authorized | 85 |
| | 4. | No Legal or Tax Advice Is Provided | 85 |
| | 5. | No Admission Made | 85 |
| | 6. | Certain Tax Consequences | 85 |
| | 7. | The Debtors are Under Investigation | 85 |
| | 8. | Ongoing Litigation and Other Contingencies Could Affect the Outcome of the Chapter 11 Cases | 86 |
| | 9. | No Waiver of Right to Object or Right to Recover Transfers and Assets | 86 |

| | 10. | Failure to Identify Litigation Claims or Causes of Action | 86 |
| | 11. | The Expected Valuations of the Debtors' Remaining Assets are Inherently Uncertain | 86 |
| | 12. | Objection to Amount or Classification of Claims | 87 |

**VI. Certain U.S. Federal Income Tax Consequences Of The Plan** .......................87

**A.** **Consequences to the Debtors** ...........................................................88

| | 1. | The Wind-Down of the Debtors | 89 |
| | 2. | Cancellation of Debt and the Reduction of Tax Attributes | 89 |

**B.** **Consequences To U.S. Holders of Certain Allowed Claims** ..........90

| | 1. | Treatment of Allowed FILO Bridge Claims and Allowed General Unsecured Claims | 91 |
| | | a. | Gain or Loss With Respect to Allowed FILO Bridge Claims | 92 |
| | | b. | Gain or Loss With Respect to Allowed General Unsecured Claims | 93 |
| | | c. | Tax Basis and Holding Period | 93 |
| | 2. | Timing and Character of Gain or Loss | 93 |
| | 3. | Distributions in Discharge of Accrued Interest or OID | 94 |

**C.** **Tax Treatment of the Trusts and Their Beneficiaries** .....................94

| | 1. | Classification of the Trusts as "Liquidating Trusts" | 94 |
| | 2. | General Tax Reporting by the Trusts and their Beneficiaries | 96 |
| | 3. | Tax Reporting for Plan Trust Assets Allocable to Disputed Claims | 98 |

**D.** **Withholding on Distributions and Information Reporting** ...............99

**VII. Confirmation of Plan** ...........................................................................100

**A.** **Confirmation Hearing** .......................................................................100

**B.** **Objections** ..........................................................................................100

**C.** **Requirements for Confirmation of Plan** ..........................................100

| | 1. | Requirements of Section 1129(a) of Bankruptcy Code | 100 |
| | 2. | Acceptance of Plan | 101 |
| | 3. | Cramdown | 102 |
| | | a. | No Unfair Discrimination | 102 |
| | | b. | Fair and Equitable Test | 102 |
| | 4. | Best Interests Test | 103 |
| | 5. | Feasibility | 103 |

**VIII. Alternatives to Confirmation and Consummation of Plan**...........................................104

    1.    Liquidation under Chapter 7 of Bankruptcy Code.............................................. 104

    2.    FILO Settlement ........................................................................................... 104

**IX. Conclusion**...........................................................................................................105

## EXHIBITS

**EXHIBIT A**   Plan

**EXHIBIT B**   Plan Support Agreement Term Sheet

**EXHIBIT C**   Liquidation Analysis

**EXHIBIT D**   Release, Injunction, and Exculpation Provisions

**EXHIBIT E**   Solicitation and Voting Procedures

**EXHIBIT F**   Debtors' Organizational Structure

## I.  INTRODUCTION[1]

On May 6, 2024 (the "**Petition Date**"), Steward Health Care System LLC ("**SHC**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and, together with the Debtors' direct and indirect non-Debtor subsidiaries, the "**Company**" or "**Steward**") commenced voluntary cases in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") pursuant to chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

The purpose of the Disclosure Statement is to provide creditors of the Debtors with sufficiently detailed information to make an informed decision on whether to vote to accept or reject the Plan.  The Disclosure Statement contains, among other things, a summary of (i) the treatment of Claims against and Interests in the Debtors under the Plan; (ii) the Debtors' business and certain historical events; (iii) key events during these chapter 11 cases; (iv) risk factors affecting the Debtors; and (v) the standard for seeking confirmation of the Plan.

As described in more detail below, faced with a number of financial challenges prior to the Petition Date, the Debtors commenced these chapter 11 cases to raise debtor in possession ("**DIP**") financing to allow them to complete their prepetition sale and marketing process and effectuate the sale of their hospitals and of Stewardship Health, the Company's risk-based payor contracting network and related primary care practices ("**Stewardship Health**").

On May 15, 2024, the Debtors filed a motion seeking approval of bidding procedures (Docket No. 281), which was entered by the Bankruptcy Court on June 3, 2024 (Docket No. 626) (the "**Bidding Procedures Order**").  In accordance with the procedures set forth in the Bidding Procedures Order, and following extensive negotiations with multiple interested buyers, the Debtors entered into binding purchase agreements for certain of their businesses and hospital operations that were approved by the Bankruptcy Court, which included the sales of: (i) Stewardship Health to Brady Buyer, LLC, an affiliate of Kinderhook Industries, LLC ("**Brady**") (Docket No. 2135) for $245 million (subject to certain adjustments), and (ii) twelve of the Debtors' hospitals, including (a) six (6) hospitals in Massachusetts to LGH, Lifespan, and BMC (Docket Nos. 2519, 2520, and 2523, respectively), (b) one (1) hospital in Arkansas to Pafford (Docket No. 2494), (c) three (3) hospitals in Florida to Orlando Health (Docket No. 2445), (d) one (1) hospital in Texarkana, Texas to CHRISTUS (Docket No. 2671), and (e) one (1) hospital in Pennsylvania to Tenor (Docket No. 3688).  The Debtors' ability to consummate the sales of these twelve (12) hospitals was, in large part, facilitated by extensive mediation sessions between the Debtors, FILO Parties, Medical Properties Trust, Inc. (together with its affiliates, "**MPT**"), and the Creditors' Committee, among others, as described more fully herein.  As of the date hereof, each of these sale transactions have closed.

In addition, following extensive mediation, the Debtors reached an agreement on the terms of a global settlement (the "**Global Settlement**") with MPT, the Creditors' Committee, the FILO Secured Parties, and the ABL Lenders (collectively, the "**Global Settlement Parties**") regarding the treatment of sixteen (16) of the Debtors' hospitals subject to Master Lease I (as defined herein), which was approved by the Bankruptcy Court on September 18, 2024 (Docket No. 2610) (the "**Global Settlement Order**").  The Global Settlement enabled the Debtors to immediately appoint interim managers identified by MPT to manage the Debtors' operations at the Specified MLI Hospitals (as defined herein), and ultimately transfer such hospitals to five (5) operators designated by MPT (each, a "**Designated Operator**" and collectively, the "**Designated Operators**").  The Debtors successfully negotiated the documentation with each of the

---

[1]  Capitalized terms used but not defined in the Introduction shall have the meanings ascribed to such terms elsewhere in this Disclosure Statement or the Plan, as applicable.

Designated Operators, and filed and obtained Bankruptcy Court approval to transition sixteen (16) hospitals to the Designated Operators, including (i) one (1) hospital in Louisiana to HSA (Docket No. 2599), (ii) three (3) hospitals in Arizona to HonorHealth (Docket No. 2776), (iii) two (2) hospitals in Texas to Quorum Health (Docket No. 2887); (iii) two (2) hospitals in Ohio to Insight (Docket No. 2939); (iv) two (2) hospitals in Texas and five (5) hospitals in South Florida to HSA (Docket No. 3046), and (v) St. Luke's Behavioral Facility in Arizona (the "**Behavioral Facility**") to College Health (Docket No. 3982).  As of the date hereof, all of the transitions to the Designated Operators contemplated by the Global Settlement have closed.  Following the Global Settlement, the Debtors entered into TSAs (as defined herein) with the purchasers and operators of the hospitals to ensure a smooth transition of services and continuity of patient care.  Thereafter, the Debtors entered into mediation and eventually reached the TSA / EPDA Settlement (as defined herein) with the Creditors' Committee, MPT, certain hospital operators, and the FILO Parties to transfer the TSAs to Quorum Health.  The TSA / EPDA Settlement became effective as of March 12, 2025.[2]

As of the date hereof, the Debtors have used approximately $565 million of the proceeds from their hospital assets and the sale of Stewardship Health to repay the prepetition ABL/FILO Facility in full and partially pay down the FILO DIP Facility, and have made over $89 million in additional mandatory repayments under the FILO DIP Credit Agreement.  Additionally, pursuant to the terms of the Global Settlement, MPT released over $842 million in funded debt and guarantee claims, including their $152 million MPT DIP Facility, as well as all claims under the Master Leases, which had over $6.6 billion in remaining lease obligations, and agreed to allow the Debtors to retain $395 million in sale proceeds on account of the disposition of the Space Coast Hospitals in exchange for (among other things) a release of claims and causes of action that were investigated by the Creditors' Committee.

Following the Global Settlement and comprehensive sale process involving the disposition of substantially all the Debtors' assets, the Debtors engaged in discussions with the FILO Secured Parties and Creditors' Committee regarding a chapter 11 plan that would allow the Debtors to wind-down their affairs, liquidate their remaining assets (including but not limited to, accounts receivable from their prior operations, valuable insurance claims and other estate claims and causes of action), and distribute the proceeds to creditors.

After months of mediation overseen by the Honorable Judge Marvin Isgur among the Debtors, FILO Secured Parties, and Creditors' Committee, on April 28, 2025, the parties reached an agreement on the Plan Support Agreement Term Sheet, attached hereto as **Exhibit B**, and an agreement in settlement of the FILO Secured Parties' requests for relief from the automatic stay to exercise remedies with respect to their collateral and to terminate the Debtors' use of cash collateral (the "**FILO Settlement**"), reflected in the term sheet (the "**FILO Settlement Term Sheet**") attached to the *Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* filed contemporaneously herewith (the "**FILO Settlement Motion**").  The Plan embodies each of these settlements and is supported by both the FILO Secured Parties and the Creditors' Committee, pursuant to the terms and conditions set forth therein.  The FILO Settlement Motion is currently pending before the Bankruptcy Court and the Debtors have requested that such motion be heard on May 28, 2025 (subject to the Bankruptcy Court's availability).  On the earlier of (i) July 8, 2025 (the "**Outside Date**")

---

[2]   A more complete description of the terms of the Global Settlement and the TSA / EPDA Settlement can be found herein at Section IV.K.3.

and (ii) one (1) business day after the date on which the Bankruptcy Court enters an order of any confirmed plan pursuant to section 1129 of the Bankruptcy Code (the "**Litigation Trust Establishment Date**"), the Debtors shall transfer substantially all of the Debtors' assets, including valuable estate claims and causes of action (the "**Litigation Trust Assets**") to a trust (the "**Litigation Trust**").

Subject to the terms and conditions of the FILO Settlement Term Sheet, the FILO Secured Parties (i) consented to up to an 81-day extension of the FILO DIP Facility and authorize the Debtors to continue to use cash collateral so the Debtors can continue to monetize assets and pursue confirmation of the Plan, (ii) agreed to provide an up to $125 million long-term financing commitment that will support the pursuit of substantial asset recoveries (including extremely valuable litigation claims) for the benefit of all creditors of the Debtors' estates, and (iii) agreed to provide up to $21.5 million in funding to the Debtors to support near-term payments to administrative creditors as well as the administration and wind-down of the Debtors' estates ($15 million of which is conditioned on the Debtors confirming a chapter 11 plan). The Debtors believe that continued access to use of cash collateral and the financing provided by the FILO Secured Parties avoids the potential for value-destructive exercise of remedies by the FILO Secured Parties on account of the maturity of the FILO DIP Facility and will allow the Debtors to monetize their assets that will deliver recoveries for administrative and priority creditors and the potential to provide meaningful recoveries for general unsecured claimants.

The Debtors believe that that the Plan provides all holders of Claims, including Allowed Administrative Expense Claims, greater recoveries than any alternative path, including dismissal or conversion of these chapter 11 cases to proceedings under chapter 7 of the Bankruptcy Code. Please refer to Sections I.B and IV.Q.2 of this Disclosure Statement for additional detail regarding the treatment of Administrative Expense Claims under the Plan.

## A.     OVERVIEW OF THE PLAN

The Debtors believe the Plan maximizes value for all stakeholders. The Plan contemplates a liquidation and wind down of the Debtors' estates to provide distributions to creditors in accordance with the absolute priority rule and certain settlements provided for in the Plan, as described herein, in the most efficient and expeditious manner possible.

### 1.     *Plan Administration*

Upon the Confirmation Date, an oversight committee (the "**Plan Administrator Committee**") shall be appointed in accordance with Section 5.10 of the Plan. The Plan Administrator Committee shall consist of three (3) members: (1) William Transier, (2) Alan Carr, and (3) Monica Blacker of Force 10 Partners. The initial chairperson of the Plan Administrator Committee (the "**Committee Chairperson**") will be Monica Blacker. On and after the Confirmation Date and until the Plan Trust Establishment Date (as defined below), the Plan Administrator Committee shall administer the Debtors' estates and act as the successor to and representative of the Debtors and their estates and shall have exclusive governance rights over the Debtors and their estates and be authorized to implement the Plan and any applicable orders of the Bankruptcy Court. Any decisions by the Plan Administrator Committee shall require the affirmative vote of at least two (2) of the three (3) members of the Plan Administrator Committee; *provided that* the Plan Administrator Committee shall not act without the consent of the Committee Chairperson. Upon the Plan Trust Establishment Date, the Plan Trustee shall accede to the rights and obligations of the Plan Administrator Committee.

The Plan Administrator Committee shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the terms of an agreement among the Plan

Administrator Committee and the Debtors, which shall be in form and substance reasonably acceptable to the Creditors' Committee, regarding the administration of the Debtors' estates on and after the Confirmation Date and until the Plan Trust Establishment Date.

### 2. *Litigation Trust*

Under the terms of the FILO Settlement Term Sheet, the Debtors are required to obtain an order of the Bankruptcy Court (the "**FILO Settlement Order**") providing that on the earlier of the Outside Date and one (1) business day following the Confirmation Date, the Plan Administrator Committee shall transfer the Litigation Trust Assets to the Litigation Trust. On the Litigation Trust Establishment Date, a trustee will be appointed (the "**Litigation Trustee**") to carry out the disposition of the Litigation Trust Assets. The Litigation Trustee shall be a party to be identified. The terms of the Litigation Trustee's engagement shall be acceptable to the Debtors, FILO Parties, and the Creditors' Committee. The Debtors and the Creditors' Committee will have the right to consent to the selection of any successor Litigation Trustee (including the terms of such successor Litigation Trustee's engagement), such consent not to be unreasonably withheld, conditioned, or delayed. Pursuant to the FILO Settlement and the Plan, the Litigation Trust will have three beneficiary classes:

1. Class A-1 interests, which shall (i) represent the rights and entitlements of the parties that from time to time extend or are deemed to have extended funding under the Litigation Funding (the "**Litigation Funders**") and their representative (the "**Litigation Funding Agent**"), and (ii) have a distribution and liquidation preference as set forth in the FILO Settlement Term Sheet.

2. Class A-2 interests will be held by the FILO Parties and their successors, which interests shall have a distribution and liquidation preference as set forth in the FILO Settlement Term Sheet (together with the Class A-1 interests, the "**Class A Interests**" or "**Class A Litigation Trust Interests**").[3] The FILO Agent or its designee, acting at the direction of FILO Parties holding Class A-2 interests entitled to a majority in amount of the outstanding Class A-2 Preference, shall be the representative of the Class A-2 interests (the "**Class A-2 Representative**").

3. Class B interests (the "**Class B Interests**" or "**Class B Litigation Trust Interests**" and, collectively, with the Class A Interests, the "**Litigation Trust Interests**"), which will be held by Steward Health Care Holdings LLC on behalf of the Estate. Upon confirmation of the Plan, the Class B Interests will be transferred to the Plan Trust (as defined below). There shall be a single representative of the Class B Interests at any given time (the "**Class B Representative**"), which shall initially be the Transformation Committee, on behalf of the Estate. The terms of the Plan and the Confirmation Order will

---

[3]   The Class A Interests will only be transferable (i) pursuant to an available exemption under the Securities Act, or a registration of such Class A Interests under the Securities Act, and (ii) so long as any proposed transfer would not result in a requirement that the Class A Interests be registered under the Securities Act.

determine the successor Class B Representative on or before the Effective Date of the Plan.  If  the  Chapter 11 Cases are converted to Chapter 7 cases, the Chapter 7 Trustee (or its designee) will be the Class B Representative.[4]

Distributions from the Litigation Trust shall be subject to the following priorities:

1. Fees of the Litigation Funding Agent and the Class A-2 Representative, and indemnification and reasonable and documented expenses of (A) the Litigation Trust (including payments under the TSA, which shall be paid to the Estate), and (B) of the Litigation Funding Agent, the Litigation Funders, the Class A-2 Representative, and the FILO Parties (subject to an aggregate cap).

2. Class A-1 Interests until the Class A-1 Preference, the Upfront Premium, the Variable Component (which survives repayment of the Class A-1 Preference and the FILO Balance) are repaid in full in cash.

3. Class A-2 Interests until the Class A-2 Preference is repaid in full in cash and the FILO Balance is $0.

4. Class B Interests.

Any right to receive Litigation Trust Interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it should be determined that any such Litigation Trust Interests constitute "securities," the exemption provisions of section 4(a)(2) of the Securities Act will be satisfied and the offer and sale of such interests will be exempt from registration under the Securities Act.

3. *Litigation Funding*

Pursuant to, and subject to approval of, the FILO Settlement Order, the FILO Secured Parties have agreed to provide the Debtors and their estates with the use of cash collateral through the Litigation Trust Establishment Date as well as a long-term litigation financing commitment for the purpose of monetizing the Litigation Trust Assets.  On the Litigation Trust Establishment Date, the FILO Parties shall extend funds (solely in accordance with the terms of and limitations contained in the FILO Settlement) to the Litigation Trust (the "**Litigation Funding**") on a delayed draw basis in an aggregate amount of up to $125 million (the "**Initial Commitment Amount**") (which is inclusive of (a) a budgeted amount of $61 million through June 27, 2025, together with any additional amounts budgeted thereafter under the DIP Budget, which, in each case,  may only be incurred in the form of Secured Interim Advances,[5] and (b) the $6.5 million of Estate Funding), which funded amounts shall be available to pay litigation costs of the Litigation Trust,

---

[4]   The Class B Interests will only be transferrable (i) to any liquidating trust or other similar vehicle formed under and following a confirmed plan or otherwise formed pursuant to applicable law or (ii) (A) pursuant to an available exemption under Securities Act and so long as any proposed transfer would not result in a requirement that the Class B Interests be registered under the Securities Act, or a registration of such Class B Interests under the Securities Act, and (B) if such transfer is to occur prior to the effective date of any confirmed plan, with the consent of the Litigation Trustee (not to be unreasonably withheld, conditioned or delayed) if the purpose of the transfer is to obtain proceeds to pay costs and expenses of the Successor Entity, including taxes.

[5]   "**Secured Interim Advances**" means the aggregate amount of cash collateral used from April 1, 2025, through the Trust Establishment Date, together with interest thereon at the Applicable Rate.

costs of administration of the Litigation Trust, and monetization of the Litigation Trust Assets.  The Litigation Funding is necessary and incidental to the liquidating purpose of the Plan Trust.

The Litigation Funding shall also include an uncommitted accordion of 25% of the Initial Commitment Amount. The Litigation Funders' Class A-1 Preference shall accrete at a rate between 10 and 12%,[6] and such funders shall also be entitled to a variable portion of gross litigation proceeds received that will be calculated in accordance with the terms of the FILO Settlement Term Sheet.

Specifically, the Litigation Funding will be entitled to: (i) an upfront premium (the "**Upfront Premium**"), payable in kind, in an amount equal to $4.25 million; provided that if the Litigation Funding accordion is exercised with the consent of the Litigation Trustee, then the Upfront Premium shall be increased by the same percentage that the commitments under the Litigation Funding are increased, and (ii) 20% of gross litigation proceeds (the "**Variable Component**"), of which: (a) 15% is paid in cash at the time of receipt of such litigation proceeds (the "**Upfront Percentage**"), and (b) 5% is deferred, with the applicable deferred cash being held in escrow (the "**Deferred Portion**"), *provided*, that if the litigation proceeds result from a litigation financed with a contingency fee structure or third-party litigation funding, the total Variable Component shall be limited to the lesser of: (i) the applicable Variable Component; and (ii) the greater of: (a) 30% of such gross litigation proceeds minus the amount of contingency fee, success fee, or third-party litigation funding cost related to such litigation, and (b) 10% of such gross litigation proceeds (the "**Reduced Variable Component**").  In the event the Reduced Variable Component is equal to or less than 15% of such gross litigation proceeds, then all of such Reduced Variable Component shall be treated as the Upfront Percentage.  In the event the Reduced Variable Component is greater than 15% of such gross litigation proceeds, then 15% of such gross litigation proceeds shall be treated as the Upfront Percentage and the remaining portion shall be treated as the Deferred Portion.

If the FILO Balance is repaid in full on or before October 1, 2026, the Deferred Portion shall be paid to the Debtors' estates.  On October 2, 2026, if the FILO Balance has not been paid in full by October 1, 2026, the Deferred Portion shall be disbursed in full to the Litigation Funding Agent.  After repayment of the FILO Balance, the Variable Component shall continue to be entitled to a percentage of the gross litigation proceeds: (i) at 15% if the FILO Balance is repaid in full on or before October 1, 2026, or (ii) at 20% if the FILO Balance is not repaid on or before October 1, 2026, in each case, subject to the Reduced Variable Component adjustment (the "**Post-FILO Repayment Variable Component**"); *provided* that to the extent a plan is confirmed, the Post-FILO Repayment Variable Component shall be paid in two installments, with the first installment being paid in cash upon receipt of the applicable litigation proceeds in an amount equal to 62.5% of the Post-FILO Repayment Variable Component, and the payment of the remaining balance of the Post-FILO Repayment Variable Component being deferred until (and subject to) the satisfaction of allowed administrative and other priority claims pursuant to the Plan, and if a plan has not been confirmed, the Post-FILO Repayment Variable Component shall be paid in full in cash upon receipt of the applicable litigation proceeds.

Separate from the Litigation Funding, the FILO Parties have also agreed to provide (i) a 81-day extension of the maturity date of the FILO DIP Facility (which matured on April 18, 2025), (ii) $21.5 million of funding to the Debtors, which the Debtors intend to use to support administration of the Debtors' estates and near-term accelerated payments to administrative creditors as part of an administrative consent program as well as the administration and wind-down of the Debtors' estates, and

---

[6]    The Class A-1 Preference shall accrete at the Applicable Rate (as defined by the FILO Settlement Term Sheet) and shall not have to be paid in cash; provided that, to the extent the Litigation Funders elect to provide additional funding to support the payment of any accreted amounts  in cash, then such amounts shall be paid in cash.

(iii) additional funding pursuant to a transition services agreement to be entered into between the Estates and Litigation Trust.

    4.    *Plan Trust*

On or prior to the Effective Date of the Plan, all assets that will be retained by the Debtors or the Plan Administrator Committee (each an "**Estate Representative**," along with the Litigation Trustee and the Plan Trustee), as applicable, following the Confirmation Date, including the Class B Litigation Trust Interests, together with any property acquired by the Debtors after the Litigation Trust Establishment Date (collectively, the "**Plan Trust Assets**"), will be transferred to a liquidation trust (the "**Plan Trust**" and the date of establishment of the Plan Trust, the "**Plan Trust Establishment Date**").

On the Plan Trust Establishment Date, all duties, rights, and obligations of the Plan Administrator Committee shall vest in a trustee of the Plan Trust (the "**Plan Trustee**"), appointed in accordance with Section 6.3 of the Plan and the Plan Trust Agreement, to oversee the Plan Trust and act as the successor to the Plan Administrator Committee.  The Plan Administrator Committee shall serve as the initial Plan Trustee.

Upon the Plan Trust Establishment Date, the Plan Trust shall assume all Claims against the Debtors (other than, for the avoidance of doubt, the FILO DIP Claims and FILO Bridge Claims) with the same validity and priority as such Claims had against the Debtors immediately prior to the Plan Trust Establishment Date.  The Plan Trustee shall take any actions necessary to, among other things, (i) effectuate the Plan; (ii) exercise its business judgment to direct and control the Wind Down, including the liquidation, sale and/or abandonment of the Plan Trust Assets (including, for the avoidance of doubt, any Retained Assets) under the Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims; and (iii) resolve all matters related to the Plan Trust Assets and vest such assets in the Plan Trust for the benefit of the Plan Trust Beneficiaries in accordance with the terms of the Plan and the Plan Trust Agreement.

The Plan contemplates distributions on or after the Effective Date as assets are monetized, including from the following sources:

    (i)    Cash available on or after the Effective Date in accordance with the Plan;

    (ii)    proceeds realized from the Class B Litigation Trust Interests;

    (iii)    proceeds realized from the Plan Trust Assets;

    (iv)    proceeds realized from the Retained Assets; and

    (v)    any additional proceeds of the Wind Down, if any.

The Plan contemplates an orderly liquidation of the Debtors' assets, and distributions will be allocated as outlined below (and as set forth in more detail in the Plan).  Distributions to junior classes will only be made if senior classes are satisfied (or adequately reserved for):

    (i)    Each known holder of an Administrative Expense Claim (other than holders of (i) Professional Fee Claims; (ii) FILO DIP Claims; or (iii) asserted Administrative Expense Claims that the Debtors dispute

in their entirety) will be sent a Consent Program Opt-Out Form (as defined herein) pursuant to which the Debtors seek the agreement of such holder to the treatment afforded to such holder under the Administrative Expense Claims Consent Program.  The treatment afforded to such holders of an Administrative Expense Claim (other than holders of (i) Professional Fee Claims; (ii) FILO DIP Claims; or (iii) asserted Administrative Expense Claims that the Debtors dispute in their entirety) under the Plan is only available if such holder agrees to such treatment.  **The failure to timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program shall be deemed to be such holder's consent to accept less than full payment of its Claim as required by Section 1129(a)(9), and such holder shall be bound by the terms of the Administrative Expense Claims Consent Program.**  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.  For the avoidance of doubt, to the extent a holder of an Administrative Expense Claim enters into a Quorum Vendor Fund Agreement (as defined herein) and receives payment through such agreement on account of its Administrative Expense Claim, such Administrative Expense Claim shall not receive the treatment or any payment described in this paragraph.

(ii)    Each holder of an Allowed FILO DIP Claim shall receive on the Litigation Trust Establishment Date  its Pro Rata Share of the Class A Litigation Trust Interests.

(iii)    Each holder of an Allowed Priority Tax Claim shall receive (i) payment in full in Cash, (ii) equal annual Cash payments in an aggregate amount equal to the amount of such holder's Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from the Petition Date, or (iii) such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code.

(iv)    Each holder of an Allowed Other Priority Claim shall receive (i) payment in full in Cash; or (ii) such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired.

(v)    Each holder of an Allowed Other Secured Claim shall receive at the option of the Estate Representative (i) payment in full in Cash in an amount equal to such Claim; (ii) transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or (iii) such other

8

treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

(vi)    Except to the extent released pursuant to the FILO Settlement Order, each holder of an Allowed FILO Bridge Claim shall (i) receive their Pro Rata Share of the Class A Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim (unless previously received), and (ii) retain their Pro Rata Share of their Retained FILO Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto. With respect to any Distribution of Plan Trust Assets to be made by the Plan Trustee, holders of the Allowed Retained FILO Claims shall receive 10% of the Plan Trust Recovery until paid in full.

(vii)    In accordance with the PBGC Settlement,[7] on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests. With respect to any Distribution of Plan Trust Assets to be made by the Plan Trustee, holders of the Allowed PBGC Claims shall receive their Pro Rata Share of 90% of the Plan Trust Recovery until the Allowed Retained FILO Claims are paid in full and 100% of the Plan Trust Recovery after the Allowed Retained FILO Claims are paid in full, to be paid ratably among holders of Allowed PBGC Claims and Allowed General Unsecured Claims.

(viii)    Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, on or prior to the Effective Date, each such holder shall receive its Pro Rata Share of the GUC Plan Trust Interests. With respect to any Distribution of Plan Trust Assets to be made by the Plan Trustee, holders of the Allowed General Unsecured Claims shall receive 90% of the Plan Trust Recovery until the Allowed Retained FILO Claims are paid in full and 100% of the Plan Trust Recovery after the Allowed Retained FILO Claims are paid in full, to be paid ratably among holders of Allowed PBGC Claims and Allowed General Unsecured Claims.

(ix)    On the Effective Date or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, reinstated, or discharged (each without any Plan Distribution) to the extent reasonably determined to be appropriate by the Estate Representative.

Any right to receive Plan Trust Interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Plan Trust Interests constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of such right will be exempt from registration under the Securities Act, all rules and regulations

---

[7]    The Plan provides for a proposed settlement with the Pension Benefit Guaranty Corporation (the "**PBGC**" and, such settlement, the "**PBGC Settlement**"), which is more fully described in Section IV.S hereof.

promulgated thereunder, and all applicable state and local securities laws and regulations.  Any such Plan Trust Interests (and the underlying Claim giving rise thereto) shall not: (a) be voluntarily or involuntarily, directly or indirectly, assigned, conveyed, hypothecated, pledged, or otherwise transferred or traded, except by will, intestate succession or as may otherwise be required by operation of law; (b) be evidenced by a certificate or other instrument; and (c) possess any voting rights with respect to the Plan Trust or otherwise.

The Plan additionally contains certain release, injunction, and exculpation provisions, each of which are attached hereto as **Exhibit D**.  **If you hold a Claim or Interest and do not timely, properly, and affirmatively elect to opt-out of the releases contained in Section 12.6(b) of the Plan, then you shall be deemed to consent to the releases contained in Section 12.6(b).  In addition, if you hold a Medical Liability Claim against the Debtors and do not timely and properly elect to opt-out of the third-party releases contained in Section 12.6(b) of the Plan, then you are electing to release claims against the "Released Parties," including any claims against the Debtors' employed physicians and affiliated physicians related to Medical Liability Claims.**

## B.      ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM

In light of the amount of secured, administrative, and priority claims asserted against the Debtors' estates, as well as the forecasted timeline for the Debtors to monetize and collect on their remaining assets (including significant litigation claims), the Debtors anticipate that there will be a significant executory period between the Confirmation Date of the Plan and the Effective Date of the Plan.  Accordingly, to accelerate cash payments to consenting holders of Allowed Administrative Expense Claims on or reasonably promptly after the Confirmation Date of the Plan and the consummation of the Plan, the Plan provides for a compromise whereby the holders of Allowed Administrative Expense Claims that do not timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program (as defined herein) will: (i) receive a pro-rated portion of a distribution equal to $12.5 million following the Confirmation Date (the "**Settled Administrative Expense Claims Cash Pool**") and (ii) have their Allowed Administrative Expense Claims deemed satisfied in full once the applicable holder has received payment in cash equal to 50% of the applicable Claim (collectively, the "**Administrative Expense Claims Consent Program**").  If the Settled Administrative Expense Claims Cash Pool distribution is less than 50% of a holder's Allowed Administrative Expense Claim, the remainder of the applicable Administrative Expense Claim will be paid in accordance with Section 2.1 of the Plan.

All holders of Allowed Administrative Expense Claims **that do not timely, properly, and affirmatively opt-out** of the Administrative Expense Claims Consent Program by the deadline will be deemed to have agreed to be bound by the terms of the Administrative Expense Claims Consent Program. Regardless of parties' elections with respect to the Administrative Expense Claims Consent Program, any Allowed Administrative Expense Claims accrued after May 21, 2025, will be treated in accordance with Section 2.1 of the Plan.

The timing of the Effective Date and distributions to Holders of Allowed Administrative Expense Claims will depend in part on the level of participation in the Administrative Expense Claims Consent Program.  The Debtors anticipate that the more holders that choose to timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program, the longer it will take for the Debtors to have sufficient cash to satisfy all Allowed Administrative Expense Claims, thus ultimately delaying or even potentially risking the occurrence of the Effective Date.

**The implementation of the Administrative Expense Claims Consent Program is conditioned upon participation in the Administrative Expense Claims Consent Program**.  Specifically, at least 75% (in dollar amount) of the Debtors' estimated Allowed Administrative Expense Claims must participate in

the Administrative Expense Claims Consent Program (the "**Minimum Participation Threshold**").  If Holders of more than 25% (in dollar amount) of the Debtors' estimated Allowed Administrative Expense Claims opt-out of the Administrative Expense Claims Consent Program, and unless such condition is waived by the Debtors and the Creditors' Committee, the Administrative Expense Claims Consent Program will not be consummated.  If the Minimum Participation Threshold is not met or waived by the Debtors and the Creditors' Committee, the Debtors' estates shall retain the Settled Administrative Expense Claims Cash Pool equal to $12.5 million.

In addition, the Administrative Expense Claims Consent Program and any and all distributions contemplated thereby are contingent upon confirmation of the Plan.  The holders of Allowed Administrative Expense Claims will not have the option to receive expedited payment in exchange for a reduction of such holders' Allowed Administrative Expense Claims in the event that the Plan is not confirmed.

1.      *Administrative Claims Consent Process & Procedures*

Within three (3) business days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter, Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**") shall send all known holders of Administrative Expense Claims an opt-out form (the "**Consent Program Opt-Out Form**"), which shall identify the Debtors' proposed Allowed Administrative Expense Claim for such holder.  Unless otherwise agreed to in writing (e-mail being sufficient) by the Debtors and the holder of the applicable Administrative Expense Claim, holders of Administrative Expense Claims will have until July 1, 2025 at 5:00 p.m. (Central Time) (the "**Consent Program Opt-Out Deadline**") to submit an Consent Program Opt-Out Form in either electronic or paper form, in each case following the procedures outlined in the Disclosure Statement Motion[8] (the "**Consent Program Opt-Out Procedures**") and explained in the Consent Program Opt-Out Form.

To the extent a holder of an Allowed Administrative Expense Claim **does not timely, properly, and affirmatively opt-out** of the Administrative Expense Claims Consent Program, such holder shall be deemed to have agreed (i) to be bound by the terms of the Administrative Expense Claims Consent Program, and (ii) that such holder's acceptance of and consent to the Administrative Expense Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Administrative Expense Claim (other than Professional Fee Claims and FILO DIP Claims) as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code.

**For the avoidance of doubt, to the extent a holder of an Administrative Expense Claim enters into a Quorum Vendor Fund Agreement and receives payment through such agreement on account of its Administrative Expense Claim, such Administrative Expense Claim shall not receive the treatment or any payment described in this Section.**

---

[8]     "**Disclosure Statement Motion**" means the *Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Claims Consent Program Opt-Out Procedures; (V) Establishing Notice and Objection Procedures For Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief*, filed contemporaneously herewith.

2.     *Administrative Expense Claim Bar Date Process for Asserting Claim*

Except as otherwise provided in Article II of the Plan and except with respect to Administrative Expense Claims that are Professional Fee Claims, FILO DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Expense Claims must be made in compliance with the Administrative Expense Claims Bar Date Order and the Plan.  Holders of Administrative Expense Claims that are required to, but do not timely request payment on account of Administrative Expense Claims by the applicable Administrative Expense Claims Bar Date, as established by the Administrative Expense Claims Bar Date Order, under the Plan or under the Confirmation Order, as applicable, shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, the Plan Trustee, or their property, and such Administrative Expense Claims shall be deemed satisfied, settled, and released as of the Effective Date.

C.     <u>SUMMARY OF PLAN TREATMENT</u>

The following table summarizes (i) the type of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, and (iii) which Classes are entitled to vote on the Plan.  The following summary table is qualified in its entirety by reference to the full text of the Plan.

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[9] | Approx. Percentage Recovery |
|-------|-------------|----------------------|-----------------------------------|----------------------------|----------------------------|
| 1. | Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, each such holder shall receive: (i) payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the next Plan Distribution Date after such Other Priority Tax Claim becomes an Allowed Other Priority Claim, or as soon as practicable thereafter; or such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired. | Unimpaired (Not entitled to vote because presumed to accept) | $360,000 - $700,000 | 100% |
| 2. | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim in | Unimpaired (Not | $0 - $250,000 | 100% |

---

[9]     The estimated Allowed amount of the Claims in each Class is based on, among other things, the Debtors' books and records, the Debtors' and their advisors' extensive reconciliation efforts and analysis of the merits of each asserted Claim, and is subject to potential litigation and disagreement by the holders of such Claims.

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[9] | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| | | full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim, each such holder shall receive at the option of the Estate Representative: (i) payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the next Plan Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as practicable thereafter, paid from the Plan Trust Net Proceeds; (ii) transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or (iii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | entitled to vote because presumed to accept) | | |
| 3. | FILO Bridge Claims | Except to the extent released pursuant to the FILO Settlement Order, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO Bridge Claims, on the Litigation Trust Establishment Date, each such holder shall (i) receive their Pro Rata Share of the Class A-2 Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim (unless previously received), and (ii) retain their Pro Rata Share of their Retained FILO Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto. | Impaired (Entitled to vote) | Remaining FILO Bridge Claims: $30,394,856 plus Allowed Bridge MOIC Amount<br><br>Retained FILO Claim: $10,000,000 | <100% |
| 4. | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, on or prior to the Effective Date, each such holder shall receive its Pro Rata Share of the GUC Plan Trust Interests. | Impaired (Entitled to vote) | $1,380,000,000 - $2,260,000,000 | 0 - 23.6% |

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[9] | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 5. | PBGC Claims | In accordance with the PBGC Settlement, in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Claims, on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests. For the avoidance of doubt, the PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any Distribution in connection with the Debtors or the Plan. | Impaired (Entitled to vote) | $8,750,000 | 0 - 23.6% |
| 6. | Intercompany Claims | On or prior to the Effective Date or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, reinstated, or discharged (each without any Plan Distribution) to the extent reasonably determined to be appropriate by the Estate Representative. | Impaired (Not entitled to vote because presumed to accept) | N/A | None. |
| 7. | Subordinated Securities Claims | All Subordinated Securities Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Securities Claims will not receive any distribution on account of such Allowed Subordinated Securities Claims. | Impaired (Not entitled to vote because deemed to reject) | N/A | None. |
| 8. | Intercompany Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Intercompany Interests shall be adjusted, reinstated, or discharged at the election of the Estate Representative; *provided* that no Plan Distributions shall be made to holders of an Intercompany Interest on account of such Intercompany Interest under the Plan. | Impaired (Not entitled To vote because presumed to accept) | N/A | None. |
| 9. | Non-Debtor Owned Subsidiary Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Non-Debtor-Owned Subsidiary Interests shall be cancelled and there shall be no distribution to holders of Non-Debtor Owned Subsidiary Interests on account of | Impaired (Not entitled to vote because deemed to reject) | N/A | None. |

14

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[9] | Approx. Percentage Recovery |
|-------|-------------|----------------------|-----------------------------------|----------------------------|----------------------------|
|  |  | such Non-Debtor Owned Subsidiary Interests under the Plan. |  |  |  |
| 10. | Parent Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Parent Interests shall be cancelled and there shall be no distribution to holders of Parent Interests under the Plan. | Impaired (Not entitled to vote because deemed to reject) | N/A | None. |

Pursuant to the Bankruptcy Code, only those holders of claims or interests in classes that are impaired under a plan of reorganization or liquidation and that are not deemed to have rejected the plan are entitled to vote to accept or reject such proposed plan. Classes of claims or interests in which the holders of claims or interests are unimpaired under a proposed plan are deemed to have accepted such proposed plan and are not entitled to vote to accept or reject the plan. Classes of claims or interests in which the holders of claims or interests receive no distribution under a proposed plan are deemed to have rejected such proposed plan and are not entitled to vote to accept or reject the plan.

*Treatment of Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim at the option of the Estate Representative (in consultation with the Creditors' Committee), either: (i) Cash in an amount equal to such Allowed Priority Tax Claim on the latest of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (c) the next Plan Distribution Date after such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (d) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Estate Representative reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**D.    INQUIRIES**

If you have any questions regarding this Disclosure Statement or the packet of materials you have received in connection herewith, please contact Kroll, the Debtors' claims, noticing, and balloting agent

(the "**Claims and Noticing Agent**"), at +1 (888) 505-1257 (U.S. and Canada; toll-free) or +1 (646) 893-5546 (International, toll) or via e-mail message to: stewardinfo@ra.kroll.com.

## II. OVERVIEW OF DEBTORS' OPERATIONS

### A. HISTORY & FORMATION

Steward was formed in 2010 following the acquisition of six (6) hospitals in Massachusetts from Caritas Christi Health Care.  Over the next decade, Steward expanded its footprint and recapitalized its business through a series of transactions that broadened its national reach and expanded its model and philosophy of value-based care, including:

- In 2016, Steward and affiliates of MPT entered into a series of transactions, whereby Steward (i) sold and leased-back five (5) of its hospital facilities (pursuant to the original *Master Lease Agreement*, dated as of October 3, 2016, by and among certain affiliates of the Debtors as tenants and certain affiliates of MPT as landlords); (ii) obtained a mortgage loan for four (4) of its hospital facilities located in Massachusetts (pursuant to that certain *Real Estate Loan Agreement*, dated as of October 3, 2016, by and among certain affiliates of the Debtors as borrowers and certain affiliates of MPT as lenders (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Mortgage Loan Agreement**")) for approximately $1.2 billion; and (iii) received a $50 million equity investment from an affiliate of MPT.

- In early 2017, the Company acquired seven hospital facilities from Community Health Systems in Ohio, Pennsylvania, and Florida in a single transaction.

- Also in 2017, the Company merged with IASIS Healthcare LLC, adding 18 hospitals in Arizona, Arkansas, Colorado, Louisiana, Texas, and Utah to its healthcare network (the "**IASIS Merger**").

- In 2018, all of the hospitals subject to the Mortgage Loan Agreement, except for the two mortgaged hospitals in Utah, were sold to and leased-back from MPT.

- In 2021, Steward acquired another five (5) hospitals in South Florida from Tenet Healthcare.

By 2022, MPT owned the real property underlying all but one of the Debtors' hospitals (including several ancillary facilities and related properties) and leased such property to the Debtors under two master leases: (1) that certain *Master Lease Agreement (Master Lease I)*, dated as of March 14, 2022 (as amended, restated, or modified from time to time, "**Master Lease I**") that relates to the Debtors' hospital operations in Pennsylvania, Ohio, Louisiana, Arkansas, Arizona, Texas, and Florida (the "**Master Lease I Hospitals**"); and (2) that certain *Master Lease Agreement (Master Lease II)*, dated as of March 14, 2022 (as amended, restated, or modified from time to time, "**Master Lease II**" and, together with Master Lease I, the "**Master Leases**") that relates to the Debtors' hospital operations in Massachusetts (the "**Master Lease II Hospitals**").  The Debtors leased the Master Lease II properties from a joint venture owned by MPT and Macquarie.  As described further in Section IV.K, pursuant to the Global Settlement, the Master Leases were terminated and all claims of MPT and Macquarie (solely with respect to Master Lease II) arising under the Master Leases have been waived and are disallowed.

16

Prior to the Petition Date, because certain portions of the properties owned by MPT and leased to the Debtors under Master Lease I were no longer necessary for the Debtors' operations, the Debtors agreed, pursuant to that certain *Excess Property Disposition Agreement* dated as of February 21, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among SHC, the lessor entities party thereto, the lessee entities party thereto and the Prepetition Bridge Agent (the "**EPDA**"), to market and sell such specified properties to third parties (the "**Excess Properties**"), subject to certain terms and conditions set forth in the EPDA.  MPT agreed to pledge the proceeds of such sales to the Debtors, who in turn pledged such proceeds to the FILO Secured Parties.

Three (3) of the Excess Properties were transferred to Orlando Health in connection with the sale of the Space Coast Hospitals.  As described further in Section IV.K.3 hereof, pursuant to the EPDA Settlement (as defined herein), (i) four (4) Excess Properties were transferred to a special purpose vehicle owned by the FILO Secured Parties in exchange for the FILO Secured Parties agreeing to reduce the obligations under the Prepetition Bridge Facility by $12.75 million, and (ii) six (6) of the Excess Properties were retained by MPT in exchange for MPT making a payment to the Debtors of $26.5 million, including $500,000 transferred from the Expense Escrow Account (as defined in the Global Settlement).  The EPDA Settlement closed on March 12, 2025.

## B.  HISTORICAL OPERATIONS AND KEY ASSETS

As of the Petition Date, Steward operated one of the largest accountable care organizations (an "**ACO**")[10] in the United States, including through its hospital operations and Stewardship Health managed care business, and had nearly 30,000 employees, including nearly 1,800 employed physicians and 300 physician assistants, 9,100 employed nurses and nurse practitioners, 9,200 other skilled health care workers, and had approximately 3,250 affiliate providers, including approximately 900 affiliate primary care providers and 2,350 affiliate specialty providers.  The Debtors' operations were historically comprised of two primary business lines: (1) Steward Health, the Company's hospital operations, and (2) Stewardship Health, the Company's risk-based payor contracting network and related primary care practices.  Each business line was served by the Company's network of employed, contracted, and affiliated physicians.

### 1.  *Steward Health*

As of the Petition Date, Steward Health consisted of Steward's hospital operations, including the Company's 31 acute care hospital campuses ("**Steward Hospital Management**") and approximately 2,350 of the Company's specialist providers ("**Steward Specialty Group**" and together with Steward Hospital Management, "**Steward Health**").  Specifically, Steward Specialty Group housed the Company's multi-specialty physician group practice, which included medical specialties and surgical specialties, affiliated skilled nursing facilities, ambulatory surgery centers, urgent care units, imaging and diagnostic centers, and laboratories.

### 2.  *Stewardship Health*

Stewardship Health managed a portfolio of the Debtors' risk-based contracts with local health plans, government entities, and third-party insurance providers.  As of the Petition Date, Stewardship Health

---

[10]  ACOs are an alternative payment model in which physicians and hospitals assume responsibility for the total cost of care for a population of patients.  If the ACO meets certain targets for quality of care and keeps healthcare costs below certain predetermined benchmarks, then the ACO is eligible to share in the implied savings.  If, on the other hand, the ACO exceeds total cost of care, then the ACO may be required to repay a portion of total cost of care above the applicable benchmark.

served over 800,000 patients annually and had approximately 3,250 affiliate providers, including 900 primary care providers, and 2,350 specialist providers serving patients in Arkansas, Arizona, Florida, Louisiana, Ohio, Pennsylvania, Massachusetts, New Hampshire, Rhode Island, and Texas.

As of the Petition Date, Stewardship Health also administered, via a contractual services arrangement with Brighton Marine, Inc. (a non-profit organization) ("**BMI**," and the Debtors' Management and Services Agreement with BMI, the "**BMI MSA**"), the Uniformed Services Family Health Plan (the "**USFHP**"), a Tricare Prime insurance option funded by the United States Department of Defense and overseen by the Defense Health Agency for active-duty military family members, National Guard, Reserves, and retired uniformed services beneficiaries and their families.[11]

### C.      REMAINING OPERATIONS

As of the date hereof, the Debtors have consummated the sale of substantially all of their operating assets.  To that end, Steward is now a nimble organization designed to carry out three primary directives: (i) provide transition services under a limited number of transition services agreements ("**TSAs**")[12] entered into in connection with the sale of Stewardship Health, as well as the transition of the USFHP to BMI; (ii) oversee and execute asset monetization efforts including the prosecution of a number of significant litigation claims; and (iii) to manage and wind down and sale of Ancillary Properties (as defined herein).

Of the nearly 30,000 employees employed by the Debtors as of the Petition Date, only approximately forty (40) remained at Steward as of April 1, 2025.  The Debtors' remaining employees are primarily tasked with providing transition services to BMI and Rural Health Group ("**Rural**"), overseeing asset monetization efforts and the wind-down of the Debtors' estates, and performing various administrative and legal duties including processing payroll and benefits for employees, monitoring ongoing litigation, and ensuring regulatory, tax, and insurance compliance.

The Debtors' remaining assets also include a limited number of properties, clinics, interests in joint ventures, and other miscellaneous assets that the Debtors are actively working to monetize through engagement and negotiations with potential buyers.  A total of ten (10) clinics and other health-care centers continue to be operated by Steward or joint ventures in which the Debtors maintains an interest.  The Debtors anticipate selling or liquidating all of such clinics by the first half of 2025.  The Debtors have also sold or are in the process of marketing their equity interests in various joint ventures, including joint ventures which employ healthcare providers.  Through the monetization of these clinics, healthcare centers, and joint venture interests, the Debtors anticipate receiving approximately $13.5 million, which will be used to pay creditors in accordance with the Plan.

### D.      CORPORATE GOVERNANCE & MANAGEMENT

A chart summarizing the Debtors' corporate organization structure, as of the date hereof, is attached hereto as **Exhibit F**.  As set forth therein, each of the Debtors is either a direct or indirect subsidiary of SHC Holdings.  Non-Debtor Steward Health Care Investors LLC owns 90.1% of the equity interests in SHC

---

[11]      Additional information regarding events relating to BMI are set forth in Section IV.N.1.

[12]      As described in further detail in section IV.K.3 hereto, the Debtors entered into a number of TSAs to provide IT, revenue collection, supply chain procurement, and accounts payable services to purchasers and operators until such purchasers and operators establish their own systems.  In return, the TSA counterparties paid the Debtors a fee for such services.  Following entry of the TSA / EPDA Settlement Order (as defined herein), the Debtors continued to provide limited services under two (2) TSAs.

Holdings and MPT Sycamore Opco LLC (an affiliate of MPT) owns a passive, non-voting 9.9% equity interest in SHC Holdings.

The board of SHC Holdings (the "**Board**") is comprised of the following members, shown below alongside their respective positions:

| Name | Position |
| --- | --- |
| Mark Rich | Director |
| Rubén José King-Shaw, Jr. | Director |
| Hon. John Boehner | Director |
| Sister Vimala Vadakumpadan | Director |
| Carlos M. Hernandez | Director |
| James J. Karam | Director |
| William Transier | Independent Director (Transformation Committee Member) |
| Alan Carr | Independent Director (Transformation Committee Member) |

In December 2023, the Board established the Transformation Committee, which is comprised of William Transier, Alan Carr, and John R. Castellano, the Debtors' Chief Restructuring Officer. The Transformation Committee has full, sole, and exclusive authority of the Board to pursue, oversee, negotiate, and approve transactions, as well as oversee the administration of these chapter 11 cases. In addition, the Debtors conducted an independent investigation into claims or causes of action that may be held by the Debtors. The investigation was led by a sub-committee of the Transformation Committee comprised of William Transier and Alan Carr (the "**Investigation Sub-Committee**"). The Investigation Sub-Committee has sole authority to investigate, prosecute, and settle avoidance actions and causes of action against the Debtors' insiders.

Effective as of October 1, 2024, Dr. Ralph de la Torre, the former Chairman and Chief Executive Officer of SHC Holdings resigned from all positions as an officer, director, manager (or similar) of the Debtors. In addition, on October 15, 2024, Dr. Michael Callum, the former director and Executive Vice President for Physician Services of SHC Holdings resigned from all positions as an officer, director, manager (or similar) of the Debtors.

19

E.   **CAPITAL STRUCTURE**

As of the Petition Date, the Debtors had approximately $1.2 billion in aggregate principal amount of funded debt obligations outstanding, and approximately $6.6 billion in long-term lease obligations.  The table below summarizes the Debtors' prepetition capital structure.[13]

| Prepetition Indebtedness | Principal Amount Outstanding as of the Petition Date | All-in Interest Rate[14] | Maturity |
|---|---|---|---|
| *Funded Secured Debt* | | | |
| ABL First Out Loans | $49.3 mm | ABR + 6.50% | 8/4/2027 |
| ABL Facility (Remainder) | $247.3mm | ABR + 9.00% | 8/4/2027 |
| FILO Facility | $305.5mm | ABR + 12.75% | 12/31/2027 |
| Prepetition Bridge Facility | $274.5mm[15] | SOFR + 10.75% | 6/30/2024 |
| MPT Facility | $216.7mm | Various | 1/1/2028 |
| MPT Stewardship Note | $82.5mm[16] | SOFR + 15.00% | 6/30/2024 |
| **Total Funded Secured Debt** | $1.2 billion | | |
| *Select Liabilities* | | | |
| Est. MPT Lease Obligations | $6.6 billion[17,18] | N/A | 10/31/41 (lease end) |
| MPT Investor Note | $363.3mm | 4.0% | 2/2029 |
| MAAPP Loans | $32.2mm | 4.0% | Various |

---

[13]   As described further herein, pursuant to the Global Settlement Order (Docket No. 2610), certain Claims against the Debtors held by MPT, including certain of the Debtors' lease obligations and secured funded debt obligations, have been released and waived with prejudice.  Additionally, outstanding loans under the ABL/FILO Facility have been repaid in full.

[14]   The default interest rates under the credit documents are as follows: (i) ABL/FILO Facility – applicable rate + 2%; (ii) Prepetition Bridge Facility – applicable rate + 2%; (iii) MPT Facility – Interest Rate + 5%; and (iv) MPT Stewardship Note – Floating Interest Rate + 5%.

[15]   Includes 1.85x minimum MOIC due at maturity and upon certain defaults.

[16]   Includes 1.25x minimum MOIC due at maturity and upon certain defaults.

[17]   Amount represents (i) contractually deferred rent; (ii) other unpaid additional amounts; and (iii) future, undiscounted rent due under the Master Leases through October 31, 2041.  Includes average rent escalators ranging from 2.5% to 3.5% annually.  Amount is approximate, unaudited, and does not include all amounts payable under the Master Leases.

[18]   Undiscounted future rents are presented for illustrative purposes only and do not represent balance sheet lease liabilities under generally accepted accounting principles.

| Prepetition Indebtedness | Principal Amount Outstanding as of the Petition Date | All-in Interest Rate[14] | Maturity |
|---|---|---|---|
| Est. Trade Payables | $979.4mm | N/A | N/A |
| **Total Select Liabilities** | $8.0 billion | | |
| **Total Secured Funded Debt and Select Liabilities** | **$9.2 billion** | | |

As discussed herein, following the Petition Date, the Debtors obtained two separate debtor-in-possession financing facilities, including the MPT DIP Facility[19] and the FILO DIP Facility (the lenders, agent, bridge lenders, and bridge agent thereto, collectively, the "**FILO Parties**"), in an aggregate original principal amount of $300 million in new money loans, plus $225 million of roll-up loans.

As required under the FILO DIP Credit Agreement and the FILO DIP Order, since the Petition Date, the Debtors (i) utilized approximately $565 million of the proceeds from their hospital assets and the sale of Stewardship Health to repay the Loans outstanding under the ABL/FILO Facility in full and partially pay down the FILO DIP Facility, (ii) have made over $89 million in additional mandatory prepayments of the FILO DIP Facility, and (iii) have made over $41 million in mandatory prepayments of the Bridge Facility.

In addition, upon the effective date of the Global Settlement, which occurred no later than November 20, 2024 (see Docket No. 3265), any and all MPT Claims, including under the MPT DIP Facility, Prepetition Bridge Credit Agreement, MPT Facility, MPT Stewardship Note, Master Lease I, Master Lease II, and the Investor Note (each as defined in the Global Settlement Order) have been released and waived with prejudice. The Debtors' remaining funded debt as of April 28, 2025 is as follows:

| Current Indebtedness | Amount Outstanding | All-in Interest Rate[20] | Maturity Date |
|---|---|---|---|
| ***Secured Debt*** | | | |
| FILO DIP Facility | $206,197,079[21] | SOFR + 10.00% | 7/8/2025 |
| Bridge Facility (excluding MOIC Amount) | | SOFR + 10.75% | 6/30/2024 |
|    a.  Remaining Original Principal Amount | $30,394,856 | | |
|    b.  Capitalized Interest | $11,438,905 | | |
| **Total Secured Debt** | **$248,030,840** | | |

---

[19]   Capitalized terms used but not defined in this Section II.E shall have the meanings ascribed to such terms in the FILO DIP Order.

[20]   Subject to an additional 2% default interest rate if an Event of Default (as defined under each facility) has occurred and is continuing.  Reflects $12.75 reduction on account of the Excess Properties received by the FILO Lenders on account of the EPDA Settlement, as described in Section IV.K.3 hereto.

[21]   Excludes any remaining exit premium.

Subject to the Carve-Out (as defined in the FILO DIP Order),[22] the FILO DIP Facility is secured by a perfected security interest in and senior lien upon all of the Debtors' tangible and intangible prepetition and postpetition property, with certain carve-outs, including avoidance actions. The FILO DIP Facility is also secured by a perfected security interest in and lien upon the FILO Bridge Exclusive Collateral (as defined in the FILO DIP Order) that is junior to the lien on the FILO Bridge Exclusive Collateral that secures the Bridge Facility. The Debtors' obligations to the Prepetition Bridge Lenders under the Bridge Facility is secured by substantially all of the assets of the Debtors, subject to the terms of the FILO DIP Order.

1.    *ABL/FILO Facility*[23]

On August 4, 2023, SHC (as borrower) and certain other Debtor affiliates of SHC from time to time party thereto (together with SHC, collectively, the "**Prepetition ABL/FILO Loan Parties**"), entered into that certain Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition ABL/FILO Credit Agreement**") with Sound Point Agency LLC, as administrative agent (the "**Prepetition ABL/FILO Administrative Agent**"), Chamberlain Commercial Funding (Cayman) L.P., as collateral agent (the "**Prepetition Collateral Agent**"), Brigade Agency Services LLC, as FILO agent (the "**Prepetition FILO Agent**" and, together with the Prepetition ABL/FILO Administrative Agent and the Prepetition Collateral Agent, the "**Prepetition ABL/FILO Agents**"), and the lenders parties thereto from time to time (the "**Prepetition ABL/FILO Lenders**" and, together with the Prepetition ABL/FILO Agents and any other Secured Parties (as defined in the Prepetition ABL/FILO Credit Agreement), the "**Prepetition ABL/FILO Secured Parties**"), providing for (a) a senior secured revolving credit facility in an original aggregate principal amount of $300 million (the "**ABL Facility**" and the lenders thereunder, the "**ABL Lenders**") and (b) a senior secured term loan facility in an aggregate original principal amount of $200 million (the "**FILO Facility**" and the lenders thereunder, the "**FILO Lenders**" and the FILO Facility, together with the ABL Facility, the "**ABL/FILO Facility**"). Pursuant to the Prepetition ABL/FILO Credit Agreement, the ABL Facility had payment priority over the FILO Facility. SHC's obligations under the ABL/FILO Facility were guaranteed by the other Prepetition ABL/FILO Loan Parties.

On October 16, 2023, SHC borrowed an additional $30 million of term loans under the FILO Facility pursuant to the second amendment to the Prepetition ABL/FILO Credit Agreement. On November 17, 2023, SHC borrowed a further $70 million of term loans under the FILO Facility pursuant to the third amendment to the Prepetition ABL/FILO Credit Agreement. As of the Petition Date, including all outstanding and accrued interest, approximately $607.8 million of obligations under the ABL/FILO Facility were outstanding.

As discussed in Section IV.F.3, upon entry of the FILO DIP Order, $150 million of the Debtors' obligations under the FILO Facility were deemed "rolled up" and converted into an equivalent principal amount of DIP Roll-Up Loans under the FILO DIP Facility. The remainder of the outstanding loans under the ABL/FILO Facility were repaid in full in October 2024 using proceeds from the sales of the Space Coast Hospitals (as defined herein) and Stewardship Health.

---

[22]    Specifically, the Debtors' remaining funded secured debt is subject and subordinate to payment of the Carve-Out.

[23]    The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

2.      *Prepetition Bridge Facility*

On February 21, 2024, Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc., Stewardship Health Medical Group, Inc., and Stewardship Services Inc., collectively, as borrower (the "**Prepetition Bridge Borrower**"), together with certain Debtor affiliates of the Prepetition Bridge Borrower (together with the Prepetition Bridge Borrower, collectively, the "**Prepetition Bridge Loan Parties**") entered into that certain Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Prepetition Bridge Credit Agreement**") with certain of the FILO Lenders and the Prepetition MPT Secured Party (as defined below) (collectively, the "**Prepetition Bridge Lenders**") and Brigade Agency Services LLC, as administrative agent and collateral agent (in such capacities, the "**Prepetition Bridge Agent**").  The Prepetition Bridge Credit Agreement provided for a $150 million delayed draw term facility (the "**Prepetition Bridge Facility**" or the "**Bridge Facility**") with commitments to be funded equally between the participating FILO Lenders and the Prepetition MPT Secured Party.  Under the Bridge Facility, the Prepetition Bridge Loan Parties contracted to pay an amount to the Prepetition Bridge Lenders equal to (a) 0.85x the aggregate amount of commitments (excluding, for the avoidance of doubt, interest that is paid in kind, capitalized and added to the principal amount of the Bridge Facility pursuant to the terms of the Prepetition Bridge Credit Agreement) under the Bridge Facility on February 21, 2024 (which was $150 million) less (b) the amount of cash interest previously received by the Prepetition Bridge Lenders on or prior to such date of payment (the "**MOIC Amount**") upon the occurrence of (i) the maturity date, the payment in full of the obligations under the Bridge Facility, an event of default under the Bridge Facility and/or the acceleration of loans under the Bridge Facility and (ii) subject to the application of proceeds provisions in the Bridge Facility, any other repayment or prepayment of loans under the Bridge.

As discussed in Section IV.K.2.c hereto, upon the effective date of the Global Settlement, any and all of the claims that MPT had in its capacity as a Prepetition Bridge Lender under the Prepetition Bridge Credit Agreement were deemed released and waived with prejudice.

Under the FILO DIP Order, the Debtors did not stipulate to the allowance of the claims and liens under the Bridge Facility, nor did the Debtors waive the right to surcharge the collateral under the Bridge Facility.

From the outset of the Chapter 11 Cases, certain parties, including the Creditors' Committee, have raised concerns with the allowance and treatment of any claim for the MOIC Amount under the Bridge Facility.  The terms of the Plan and the FILO Settlement Order represent a settlement among the FILO Parties, Creditors' Committee, and the Debtors pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of any disputes with respect to, among other things, the treatment of the MOIC Amount.

3.      *MPT Loans and Obligations*

On June 30, 2020, SHC executed that certain Second Amended and Restated Promissory Note with MPT TRS Lender-Steward, LLC (the "**Prepetition MPT Secured Party**"), providing for a term loan in the original amount of $85.6 million (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended and restated pursuant to that certain *Amended and Restated Promissory Note*, dated January 22, 2024, the "**MPT Facility**").  From April 2022 through January 2024, SHC and the MPT Secured Party executed various amendments pursuant to which MPT provided additional loans to SHC under such note.  As of the Petition Date, approximately $218.4 million of obligations, including all outstanding and accrued interest, were outstanding with respect to the MPT Facility.

23

On January 2, 2024, Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., and Steward Medicaid Care Networks, Inc. (together with other subsidiaries of SHC party thereto as supplemented from time to time, collectively, the "**Prepetition Stewardship Borrowers**") executed that certain Promissory Note with the Prepetition MPT Secured Party (the "**Original Prepetition Stewardship Note**") providing for an emergency term loan in the original principal amount of $60 million (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended and restated pursuant to that Amended and Restated Promissory Note, dated as of April 25, 2024, the "**MPT Stewardship Note**"). The obligations of the Prepetition Stewardship Borrowers were guaranteed by SHC and certain Debtor subsidiaries of SHC. On February 2, 2024, the Prepetition Stewardship Borrowers and the Prepetition MPT Secured Party executed the First Amendment to Promissory Note (Tranche 2) to provide an additional $20 million emergency loan under the MPT Stewardship Note (the "**Interim Bridge Funding**"). On February 21, 2024, SHC and the Prepetition Bridge Borrower used the proceeds of the Bridge Facility to refinance the Interim Bridge Funding. As of the Petition Date, approximately $82.5 million of obligations were outstanding with respect to the MPT Stewardship Note. As described in Section IV.F.1 below, upon entry of the MPT DIP Order (as defined herein), all of the of the Debtors' obligations under the MPT Stewardship Note were deemed "rolled up" and converted into an equivalent principal amount of DIP Roll-Up Loans (as defined in the MPT DIP Order) under the MPT DIP Facility.

As of the Petition Date, Debtor SHC Holdings was also guarantor under that certain Secured Promissory Note, dated as of February 3, 2022 (as amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time, the "**Investor Note**"), made by Steward Health Care Investors LLC ("**Steward Investors**") in favor of Cayman TRS Holding, an affiliate of MPT (the "**MPT Noteholder**") in an original principal amount of $363.3 million. As of the Petition Date, including all outstanding and accrued interest, approximately $397.9 million of obligations were outstanding under the Investor Note. Steward Investors owned an approximately 90.1% interest in SHC Holdings and such equity interest in SHC Holdings was pledged by Steward Investors to the MPT Noteholder under the Investor Note. Prior to the Petition Date, MPT Noteholder agreed to a forbearance in favor of Steward Investors.

As discussed herein, pursuant to the terms of the Global Settlement Order, any and all MPT Claims, including claims arising under the Prepetition Bridge Credit Agreement, Investor Note, MPT Facility, and MPT Stewardship Note, have been deemed to be released and waived with prejudice.

## III. EVENTS PRECEDING THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A. INDUSTRY AND OPERATIONAL CHALLENGES

As mentioned in Section II.A hereto, Steward expanded its operations by 30 hospitals from 2017 to 2021. This accelerated growth strategy presented various challenges. For example, although the facilities Steward acquired in Utah in 2017 were high performing and profitable, the Company was confronted with a highly competitive market that was largely controlled by an existing vertically-integrated hospital operator that controlled a majority of market share. The Utah hospitals were ultimately sold in May 2023 to Catholic Health Initiatives of Colorado, CommonSpirit Health, and Centura Health Corporation (collectively, "**CommonSpirit**"). As another example, the Company experienced material unforeseen costs associated with the acquisition of their South Florida hospitals, including technology integration issues, as discussed further below.

The Company also faced significant external challenges that ultimately led Steward to suffer financial difficulties and commence these chapter 11 cases.  First, like many other hospital operators, the COVID-19 pandemic (i) caused a sharp decline in elective patient visits while simultaneously accelerating the switch of services from higher-margin inpatient settings to lower-margin outpatient settings, which resulted in a significant and ongoing decline in net patient revenue, and (ii) required a significant increase in fixed costs, driving significant reductions in earnings and liquidity.[24]  Second, the healthcare labor market substantially tightened in the wake of the COVID-19 pandemic, leading to materially higher labor costs for the Company while inflationary pressures also strained the Company's cash position.  Third, certain operational challenges in revenue cycle management and lagging, industry-wide reimbursement rates resulted in lower net patient revenues and thus lower collections.  In particular, Steward suffered significant liquidity issues due to the failure of commercial payors to reimburse the Company for services rendered to patients.

## B.       PREPETITION INITIATIVES

In response to the challenges described above, the Board and the Company's management team proactively sought to undertake cost reduction initiatives and asset sales, including, but not limited to, the sale of its Medicare value-business to CareMax in November 2022.  However, recurring liquidity shortfalls meant the Company could not meet its trade obligations for goods provided and services rendered in the ordinary course.  This situation grew dire in 2023, when vendors and service providers no longer continued to service the Company, forcing the Company to enter into payment plans with vendors or find alternative suppliers which, in many instances, impacted costs and efficiencies.[25]  As a direct result, the Company engaged AlixPartners LLP ("**AlixPartners**") in October 2023.

In November 2023, the Company retained Lazard Frères & Co. LLC ("**Lazard**") to assist the Company and explore strategic and financing alternatives.  As Steward's operations became challenged by vendors declining to provide goods and services or otherwise tightening terms, the Company's borrowing base began to decline, and in December 2023, the Company defaulted under the ABL/FILO Facility for failure to make mandatory repayments and comply with certain financial reporting obligations.  In response, the Board established the Transformation Committee to oversee the Company's strategic transaction and restructuring efforts in December 2023.

In late-2023, the Company also engaged Leerink Partners LLC ("**Leerink**") to initiate outreach to third parties to solicit interested investors in Stewardship Health.  Additionally, in January 2024, the Company retained Weil, Gotshal & Manges LLP ("**Weil**") as restructuring counsel and Cain Brothers, a division of KeyBanc Capital Markets Inc. ("**Cain**") to conduct a comprehensive marketing process for the sale of the Company's hospitals in various markets.  The Company expanded the scope of Leerink's retention in February 2024 to market its hospitals in Northern Massachusetts, and from March 2024 to

---

[24]   Nationally, from 2019 to 2023, Steward's cost of supplies increased by 22% while the cost of medications increased by 15% over the same time period.

[25]   In August 2023, the Company entered into the Prepetition ABL/FILO Credit Agreement; however, the ABL/FILO Facility only provided the Company with $500 million of proceeds, most of which was used to pay down the Company's then-existing asset based lending credit facility.  The additional $100 million of proceeds that the Company received under the FILO Facility between October and November 2023 was used immediately to pay vendors, leaving the Company with no incremental liquidity under the ABL/FILO Facility.  As a result, the Company was left without any incremental revolver capacity despite having just borrowed $600 million in the aggregate under the ABL/FILO Facility.

April 2024, expanded the scope of Cain and Leerink's hospital marketing efforts to encompass the remainder of Steward's hospital operations.

To fund operating costs throughout the sale process, the Debtors, through Lazard, secured emergency financing from MPT (in the form of the $60 million Original Prepetition Stewardship Note in January 2024 and $6 million in April 2024) and the Prepetition Bridge Lenders (in the form of the $150 million Bridge Facility in February 2024). Each financing was coupled with forbearance agreements from MPT and the Prepetition ABL/FILO Lenders, as well as other concessions from the MPT with respect to the Master Leases. This financing, along with certain accommodations from MPT, provided the Debtors with a runway to negotiate with a potential acquirer of Stewardship Health and negotiate the terms of the proposed debtor-in-possession financing. However, by May 2024, MPT and the Prepetition ABL/FILO Lenders were unwilling to extend further capital to the Company out-of-court, the Company's only option was to seek the protections of chapter 11 and advance its marketing process under the protection of the Bankruptcy Court.

Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (Docket No. 38).

## IV. OVERVIEW OF THE CHAPTER 11 CASES

### A.      OVERVIEW OF EVENTS OF CHAPTER 11 CASES

The Debtors commenced these chapter 11 cases to secure debtor in possession financing needed to complete the prepetition marketing process of their assets and operations. Following the Petition Date, the Debtors remained focused on their goal to safely transition their 31 hospitals and physician network group to new operators in a manner that maximized value for stakeholders, avoid hospital closures, and ensure continuity of patient care.

The Debtors' hospital sale process was subject to various disputes regarding the allocation of sale proceeds to the owners of the underlying real property.[26] Specifically, MPT challenged the allocation of sale proceeds with respect to the Master Lease I Hospitals, and MPT, Macquarie, and Apollo challenged the allocation of sale proceeds with respect to the Master Lease II Hospitals, and the Creditors' Committee asserted  challenges with respect to MPT's alleged claims and the constitution of its alleged property rights. Potential delays in the sale process resulting from these disputes posed a fundamental threat in light of the Debtors' need to sell hospitals being operated at a loss expeditiously and triage a growing liquidity crisis. As a result, the Debtors, the Creditors' Committee, MPT, and various parties entered into mediation, and the Debtors filed motions to reject both Master Lease I and Master Lease II, and filed an adversary proceeding against MPT. Through the parties' efforts in mediation and the backdrop of potential litigation, the Debtors achieved global settlements resolving the various Master Lease I and Master Lease II disputes, allowing for the transfer of their hospitals.

Through these efforts, the Debtors consummated the sale or transfer of twenty-eight (28) of their hospitals, including transferring sixteen (16) of their hospitals to operators designated by MPT in

---

[26]     The Debtors were leased the Master Lease II properties from a joint venture (the **"MPT-Macquarie JV"**) owned by MPT and Macquarie Group (**"Macquarie"**). Prior to the Petition Date, ACREFI CS U, LLC (**"Apollo"**) made a mortgage loan to the MPT-Macquarie JV secured by, among other collateral, the real property underlying the Master Lease II Hospitals.

accordance with the terms of the Global Settlement Order, and assumed and assigned approximately 9,900 contracts to purchasers and operators. Additional details regarding the sale process and the Global Settlement mediation efforts are set forth in Section IV.K.2.c herein.

The Debtors also entered chapter 11 with a prepetition non-binding indication of interest ("**IOI**") in-hand from Collaborative Care Holdings, LLC ("**Collaborative Care**"), an affiliate of United Health Group (together with its affiliates, "**United**") for the purchase of Stewardship Health for $850 million. However, due to, among other things, antitrust regulatory scrutiny of the transaction, Collaborative Care ultimately withdrew the IOI and did not submit a binding bid. The Debtors continued to solicit interest for Stewardship Health from prospective buyers, and ultimately sold Stewardship Health to Brady Health Buyer, LLC, an affiliate of Kinderhook Industries, LLC, for a headline purchase price of $245 million (subject to certain purchase price adjustments).

As of the date hereof, the Debtors' remaining assets include significant claims and causes of action (as further described in Section IV.M hereto), as well as a limited number properties, clinics, interests in joint ventures, and other miscellaneous assets that the Debtors are actively working to monetize. The proceeds of these remaining assets will be used to pay creditors in accordance with the provisions of the Plan. The Debtors also continue to collect accounts receivables from the operation of their hospitals and Stewardship Health arising prior to the closing dates of the applicable transactions, and estimate that up to approximately $128 million in pre-closing accounts receivable remain outstanding and unpaid.

Additional details on the Debtors' remaining assets can be found in Section IV.M herein. A summary of the outstanding accounts receivables and related litigation assets is set forth below in Section IV.M.2.

## B.    COMMENCEMENT OF CHAPTER 11 CASES

Upon the commencement of these chapter 11 cases, the Debtors obtained various relief from the Bankruptcy Court to maintain their operations in the ordinary course, including approval of debtor-in-possession financing to provide the Debtors with the needed liquidity to continue its prepetition strategic market solicitation strategy to seek out buyers and investors to continue to operate Steward's hospitals and Stewardship Health. The Debtors continue managing certain remaining assets and operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## C.    FIRST/SECOND DAY PLEADINGS

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors filed an application to retain a claims and noticing agent (the "**Claims Agent Application**") and several motions (the "**First Day Motions**") designed to allow the Debtors to meet necessary obligations, fulfill their duties as debtors in possession, stabilize operations, ensure continued patient care, and enable the Debtors to transition into, and operate efficiently in, chapter 11 with minimal disruption. Following a hearing on May 7, 2024, the Bankruptcy Court granted all of the relief requested in the First Day Motions on a final or an interim basis, as applicable, including authorizing the Debtors to, among other things:

- pay prepetition employee obligations and continued employee benefits programs (Docket No. 86);

- file a consolidated creditor matrix and consolidated list of thirty (30) largest unsecured creditors, and redact certain personal identification information (Docket No. 90);

27

- establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service (Docket No. 91);

- pay prepetition refund obligations and honor refund programs (Docket No. 112);

- pay certain prepetition taxes, fees, and assessments (Docket No. 114);

- continue the use of the Debtors' cash management system, bank accounts, and checks (Docket No. 115);

- continue their insurance policies, surety bonds, and letters of credit and satisfy obligations related thereto (Docket No. 116); and

- pay prepetition claims of certain critical vendors and service providers (Docket No. 137).

On June 3, 2024, the Bankruptcy Court entered orders granting certain first-day relief on a final basis, including authority to pay certain vendor claims (Docket No. 612) and continue refunds programs (Docket No. 624). Also on June 3, 2024, the Bankruptcy Court entered the second interim order authorizing the Debtors to continue their insurance policies, to provide the Creditors' Committee and Debtors with additional time to conduct diligence regarding the Debtors' cash management system and TRACO (as defined and described in further detail in Section IV.E below).

On August 23, 2024, the Bankruptcy Court entered an order on a final basis approving the Debtors' continued use of cash management system (Docket No. 2168) and continued use of insurance policies, surety bonds, and letters of credit (Docket No. 2166).

The First Day Motions, Claims Agent Application, and all orders for relief granted in the chapter 11 cases can be viewed free of charge at https://restructuring.ra.kroll.com/Steward.

### D.    OTHER PROCEDURAL AND ADMINISTRATIVE MOTIONS

The Debtors filed various other motions to further facilitate the smooth and efficient administration of the chapter 11 cases and reduce the administrative burdens associated therewith, including:

- <u>SOFAs and Schedules Extension Motion</u>.  The Debtors filed a motion and obtained authority from the Bankruptcy Court to extend the deadline to file (i) the statement of financial affairs ("**SOFAs**") and schedule of assets and liabilities ("**Schedules**") for each of the 167 Debtors to July 9, 2024, and (ii) the 2015.3 Reports for 21 non-Debtor entities until August 7, 2024 (Docket Nos. 11, 92). The Debtors filed the SOFAs and Schedules on July 9, 2024 (Docket Nos. 1192-1526), and subsequently filed amendments to certain Schedules and SOFAs (Docket Nos. 1583, 1584, and 1637).

- <u>Ordinary Course Professionals Motion</u>.  The Debtors filed a motion and obtained authority to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course of their businesses (Docket Nos. 225, 784).

- <u>Retention Applications and Interim Compensation</u>.  The Debtors filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties

under the Bankruptcy Code during the chapter 11 cases.  These professionals include: (i) Weil, as restructuring counsel to the Debtors (Docket No. 209), (ii) AlixPartners, as financial advisor, (Docket No. 210) (iii) Lazard, as restructuring investment banker (Docket No. 211), (iv) Leerink, as healthcare investment banker (Docket No. 212), (v) Cain, as hospital investment banker (Docket No. 213), (vi) McDermott Will & Emery LLP ("**McDermott**"), as special counsel (Docket No. 214), (vii) PwC US Business Advisory LLP ("**PwC**"), as a business and accounting advisory services provider to the Debtors (Docket No. 688), (viii) BDO USA, P.C. ("**BDO**"), as tax accountant (Docket No. 1088), (ix) Latham & Watkins, LLP ("**Latham**") as co-counsel (Docket No. 3617), (x) King & Spalding LLP ("**K&S**") as special litigation counsel for matters related to accounts receivables litigation (Docket No. 3959) and as special litigation counsel to pursue the Debtors' BCBS Claims (as defined herein) (Docket No. 4366), (xi) Togut, Segal & Segal LLP ("**Togut**") as special litigation counsel for matters related to preference litigation (Docket No. 3671), and (xii) Kobre & Kim LLP ("**Kobre & Kim**") as special litigation counsel for certain investigation claims (Docket No. 4445).  The Bankruptcy Court has entered orders authorizing the retention of these professionals (Docket Nos. 673 (Weil), 675 (McDermott), 782 (AlixPartners), 785 (Lazard), 786 (Leerink), 787 (Cain), 1566 (PwC), 1822 (BDO), 4007 (Latham), 3886 (Togut), 4373 (K&S – commercial payor litigation) and 4710 (K&S – BCBS Claims litigation).[27]  In connection with such retentions, the Debtors filed a motion to establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals, which the Bankruptcy Court granted on June 12, 2024 (Docket Nos. 224, 783) (the "**Interim Compensation Order**").

- *De Minimis* Asset Disposition Procedures Motion.  The Debtors filed a motion and obtained authority to establish procedures for the disposition of *de minimis* assets (Docket Nos. 709, 1665) (the "**De Minimis Order**").  The Debtors have filed two quarterly reports of Non-Noticed De Minimis Asset Sales (as defined in the De Minimis Order) consummated in accordance with the terms of the De Minimis Order (Docket Nos. 3313 and 4082).

- Rejection Procedures Motion.  On June 10, 2024, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving Procedures for Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property; (II) Amendments to Certain Unexpired Leases of Nonresidential Real Property; (III) Abandonment of Property in Connection Therewith; and (IV) Granting Related Relief* (Docket No. 753) seeking authority to establish procedures for the rejection of executory contracts and unexpired leases in addition to the abandonment of property in connection therewith (the "**Rejection Procedures**").   As of the Petition Date, the Debtors were party to approximately 270 unexpired leases and approximately 57,000 executory contracts in total.  The Debtors proposed the Rejection Procedures in an effort to streamline the contract and lease rejection process, consistent with applicable law, minimize costs to the Debtors' estates, reduce the burden on the Bankruptcy Court, and provide counterparties with adequate notice and an opportunity to object to any proposed rejections.  An order approving the Rejection Procedures was entered by the Bankruptcy Court on July 10, 2024 (Docket No. 1535).  As of the date hereof, the Debtors have

---

[27]  As of the date hereof, the *Debtors' Application for Entry of an Order Authorizing and Approving the Employment and Retention of Kobre & Kim LLP as Special Litigation Counsel Effective as of February 18, 2025* (Docket No. 4445) are pending entry by the Bankruptcy Court.

rejected a total of 209 unexpired leases and approximately 24,500 executory contracts pursuant to the Rejection Procedures.[28]

- Facility Closure Procedures. On July 26, 2024, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Approving (A) Funding from the Commonwealth of Massachusetts for the Planned Transition and Sale of Massachusetts Hospitals, (B) the Closure of Carney Hospital and Nashoba Valley Medical Center, and (C) Procedures Related to Facility Closures; and (II) Granting Related Relief* (Docket No. 1711) (the "**Closure Procedures Motion**") which sought, among other things, approval of procedures to provide for a streamlined process for Court approval of facility closures, including rejecting executory contracts and abandoning certain assets in connection therewith. On August 22, 2024, the Bankruptcy Court entered the *Order (I) Approving Procedures Related to Facility Closures on a Final Basis and (II) Granting Related Relief* (Docket No. 2146) (the "**Closure Procedures Order**"). The Closure Procedures Order approved the facility closure procedures and the form of facility closure notice (contained therein) on a final basis.

### E.    CAPTIVE INSURANCE PROGRAM

As of the Petition Date, the Debtors obtained professional liability coverage through a wholly-owned non-Debtor subsidiary, TRACO International Group S. de R.L. ("**TRACO**").[29] TRACO is a captive insurance company incorporated and domiciled in Panama. In addition to providing professional liability to the Debtors, TRACO provided comprehensive general liability coverage, excess liability coverage, and certain workers' compensation and employer liability coverages to the Debtors (the "**Captive Insurance Program**"). Certain of the excess liability policies issued by TRACO are subject to reinsurance arrangements.

TRACO also insured certain of the Debtors' employed and affiliated physicians for professional liability coverage.[30] As of the Petition Date, TRACO provided professional liability coverage to approximately 1,400 medical practitioners, including approximately 1,200 physicians who were employed by the Debtors and approximately 200 physicians who were in private practice and were affiliated with the Debtors. TRACO did not provide insurance coverage to any entities or individuals other than the Debtors, non-Debtor affiliates, employed physicians, and affiliated physicians and their employers.

TRACO historically contracted directly with service providers such as third-party administrators, managers, legal advisors, and various consultants (including actuarial consultants, tax advisors, investment managers, compliance officers, and auditors) to manage and administer the various coverages under the Captive Insurance Program. TRACO, through its third-party administrators, also retained defense counsel to defend against claims covered by its policies, including professional liability claims against the Debtors and physicians. The costs of these services were paid directly by SHC on behalf of TRACO and such

---

[28]    As of the date hereof, the Debtors have filed forty nine (49) different notices of rejection of executory contracts and unexpired leases pursuant to the Rejection Procedures. *See* Docket Nos. 2093, 2239, 2265, 2733, 2769, 3037, 3038, 3039, 3077, 3136, 3226, 3297, 3316, 3446, 3447, 3480, 3500, 3501, 3502, 3503, 3513, 3515, 3516, 3517, 3548, 3590, 3595, 3605, 3723, 3912, 4000, 4001, 4002, 4004, 4005, 4006, 4050, 4051, 4142, 4189, 4190, 4208, 4209, 4409, 4410, 4411, 4412, and 4432.

[29]    The Debtors did not renew their professional liability policy for the 2025 policy year following the sale of substantially all of their hospital operations.

[30]    The Debtors and physicians were covered under separate policies.

payments resulted in intercompany payables being owed by TRACO to SHC. In addition, any claim payments covered by the TRACO policies, including payments on account of any judgments and settlements, were paid directly by SHC, and such payments also resulted in intercompany payables owed by TRACO to SHC.

Under the Captive Insurance Program, the Debtors incurred insurance premiums on account of the coverages provided by TRACO. However, the Debtors typically did not pay the insurance premiums to TRACO in cash. Instead, the premiums resulted in intercompany claims between SHC and TRACO.

On August 13, 2024, the Debtors filed the *Supplement to, and Certification of Counsel Regarding, Final Insurance Order and Final Cash Management Order, and Supplement to Statement Provided Under Federal Rule of Bankruptcy Procedure 2015.3* (Docket No. 1956) (the "**Insurance Supplement**"). In the Insurance Supplement, the Debtors disclosed that TRACO had a limited amount of cash on its balance sheet (approximately $3.5 million as of the date of the filing) and that the vast majority of TRACO's other assets were intercompany receivables owed by the Debtors or affiliates of the Debtors.

Since the Petition Date, the Debtors have taken measures to ensure there is funding set aside to cover professional liability claims that may be asserted against physicians covered by the Captive Insurance Program arising out of care rendered after the Petition Date and covered by the TRACO policies (collectively, "**Postpetition Physician Claims**"). With the consent of the Debtors' various stakeholder groups (including the ABL Lenders, the FILO Parties, MPT, and the Creditors' Committee), the Debtors sought and obtained authority under their *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Granting Related Relief* (Docket No. 1538) (the "**FILO DIP Order**") to establish a segregated account (the "**Physician Insurance Account**") to hold funds that will be used exclusively to defend against, and resolve, such Postpetition Physician Claims. The Debtors funded the Physician Insurance Account with $1.25 million per month for the months from the Petition Date through October 2024, when the Debtors had sold or transitioned nearly all of their hospitals. As of the date hereof, there is $7.25 million on deposit in the Physician Insurance Account. Under the Plan, the Plan Trustee will assume responsibility for administering the Postpetition Physician Claims. Upon reconciliation and payment of all Postpetition Physician Claims, any remaining amounts in the Physician Insurance Account will be transferred to the Litigation Trust. *See* Section I.A herein.

As discussed in Section IV.N.3 herein, on December 2, 2024, TRACO filed a motion seeking an order from the Bankruptcy Court compelling the Debtors to pay all premiums due and owing under the Debtors' 2024 professional liability policies in cash (in addition to other relief, including payment of certain prepetition settlement and defense costs covered by TRACO's policies). On January 20, 2025, the Debtors filed the *Debtors' Objection to TRACO's Motion to Compel* (Docket No. 3762), asking the Bankruptcy Court to disallow TRACO's administrative expense claim and deny the remainder of the relief requested in the motion.

As further discussed in Section IV.N.3 herein, TRACO also initiated an adversary proceeding against the Debtors, in which TRACO seeks an order from the Bankruptcy Court, among other things, compelling the Debtors to turn over a portion of the proceeds from the sales of the Debtors' former Odessa and Davis (each as defined herein) hospitals. On February 21, 2025, TRACO filed the TRACO First Amended Complaint (as defined herein) which additionally seeks an order from the Bankruptcy Court to compel the Debtors to turn over certain interest payments made by Prima Care, P.C. pursuant to a note and security agreement between Prima Care and TRACO. On March 21, 2025, the Debtors filed their answer

31

to the TRACO First Amended Complaint, denying all allegations in therein.  The Debtors, in consultation with the Creditors' Committee and the FILO Parties, are planning to engage in mediation with TRACO in May 2025 with respect to these disputes.

### F.    DIP FINANCING

After extensive prepetition marketing and negotiations with the Debtors' existing prepetition secured lenders and potential third-party lenders to obtain postpetition debtor-in-possession financing, the Debtors and their advisors determined that the proposal received from MPT TRS Lender-Steward, LLC, an affiliate of MPT (the "**MPT DIP Lender**") provided terms that were the most favorable available to the Debtors at the time, and entered into chapter 11 with a commitment from the MPT DIP Lender for $75 million in new-money DIP financing, with the ability to fund an additional $225 million, subject to the MPT DIP Lender's discretion.

Given the uncertainty of receiving any additional funds from the MPT DIP Lender under the MPT DIP Facility (as defined herein), immediately following the Petition Date, the Debtors, through Lazard and overseen by the Debtors' Transformation Committee, relaunched a market solicitation process seeking commitments for additional financing that would provide a comprehensive funding solution for their chapter 11 cases.  Ultimately, after a robust and competitive market solicitation, the Debtors received and obtained approval of a commitment from the FILO Parties to provide $225 million in new-money postpetition financing.

1.    *MPT DIP Facility*

Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying The Automatic Stay; and (IV) Granting Related Relief* (Docket No. 46), filed on May 6, 2024, the Debtors requested authority to, among other things, obtain junior lien postpetition financing and approval of their entry into a multiple draw junior lien debtor-in-possession credit facility (the "**MPT DIP Facility**").  The MPT DIP Facility was a multiple draw term loan consisting of (i) $300 million of new money, of which $75 million was made available in the first thirty (30) days of the chapter 11 cases (and the remainder subject to satisfaction of certain conditions acceptable to the MPT DIP Lender), and (ii) subject to entry of a final order, a roll-up of all of the obligations under the MPT Prepetition Stewardship Note.

On June 3, 2024, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying The Automatic Stay; and (IV) Granting Related Relief* (Docket No. 625) (the "**MPT DIP Order**").  No draws beyond the initial $75 million draw were made available to the Debtors.  As discussed herein, all Claims related to the MPT DIP Facility have been waived by the MPT DIP Lender in accordance with the terms of the Global Settlement.

2.    *DIP Commitment Fee*

Following interim approval of the MPT DIP Facility, the Debtors, led by Lazard, commenced a broad marketing process to solicit additional DIP financing from both third parties and the Debtors' existing lenders.  Through this process, several third-party lenders expressed significant interest in providing the Debtors with additional postpetition financing on a priming basis, contingent on receiving compensation

for their efforts and expenses extended in committing to financing that would prime the Debtors' prepetition secured lenders and that would likely be challenged by such lenders.

In light of these circumstances, the Debtors filed and obtained Court approval of the *Emergency Motion of Debtors for Entry of Order (I) Authorizing Debtors to Incur and Pay Commitment Fee and Expense Reimbursement to Potential Lenders in Connection with Postpetition Financing and (II) Granting Related Relief* (Docket Nos. 551, 635) (the "**DIP Commitment Fee Order**") on June 3, 2024. The Debtors utilized the relief granted by the Bankruptcy Court, including the ability to grant a commitment fee of up to 3% and up to $750,000 in the aggregate in reasonable and documented out-of-pocket fees and expenses, to advance negotiations with a number of third-party lenders and create competitive tensions with the Debtors' existing lenders. As a result, within only a few days of entry of the DIP Commitment Fee Order, the Debtors received and were evaluating four (4) DIP financing proposals, including a joint proposal by the ABL Lenders and MPT, a proposal led by the FILO Lenders, and two proposals from third-party lenders. In accordance with the DIP Commitment Fee Order, the Debtors paid a potential third-party lender a 3% commitment fee and a total of $343,296 in expense reimbursement in the aggregate.

    3.    *FILO DIP Facility*[31]

Ultimately, after evaluating all DIP financing proposals received as a result of the competitive process borne out of the relief granted in the DIP Commitment Fee Order, the Debtors and their advisors determined that a proposal from the Debtors' prepetition FILO Lenders (the "**FILO DIP Financing**") represented the best financing proposal available at the time. Accordingly, on June 11, 2024, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying The Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (Docket No. 765) (the "**FILO DIP Motion**").

The FILO DIP Financing is a multiple draw term loan credit facility (the "**FILO DIP Facility**") consisting of (i) $225 million principal of new money loans and (ii) a roll-up of $150 million principal of obligations under the Debtors' prepetition FILO Facility. The new money loans accrue interest a rate equal to the Adjusted Term SOFR (as defined in the ABL/FILO Credit Agreement) plus 10% per annum, payable monthly in cash. The rolled-up loans accrue interest at a rate equal to the Adjusted Term SOFR plus 10.75% per annum, payable in cash. The Bankruptcy Court approved the FILO DIP Motion on an interim basis (Docket No. 839) on June 14, 2024, and on a final basis (Docket No. 1538) on July 10, 2024. The FILO DIP Facility was initially scheduled to mature on December 31, 2024.

On August 7, 2024, the Debtors and the FILO Parties entered into that certain *Limited Waiver No. 1 to Debtor-in-Possession Credit Agreement*, which, among other things, waived certain conditions to funding of term loans under the FILO DIP Credit Agreement.

On September 2, 2024, the FILO Parties sent a letter to the Debtors reserving their rights regarding certain alleged events of default that had occurred under the FILO DIP Credit Agreement and FILO DIP Order, including with respect to the Debtors' variance reporting requirements, the healthcare institute license for the Behavioral Facility (as defined herein), and the sales of the Massachusetts Hospitals (as defined herein) (the "**Reservation of Rights Letter**"). Pursuant to the Global Settlement Order, the FILO

---

[31]    Capitalized terms used but not defined in this Section shall have the meaning ascribed to them in the FILO DIP Order.

Parties waived through October 31, 2024 (i) the asserted events of default enumerated in the Reservation of Rights Letter and (ii) any other defaults or events of default under the FILO DIP Credit Agreement and the FILO DIP Order relating to, or arising out of, a Budget Event (as defined in the FILO DIP Credit Agreement).

On December 31, 2024, the Debtors filed the *Notice of Filing of Amendment to FILO DIP Credit Agreement* (Docket No. 3594), which attached that certain *Limited Waiver No. 2 and Amendment to Debtor-in-Possession Credit Agreement* as Exhibit A thereto (the "**DIP Amendment**"). The DIP Amendment, among other things, (i) extended the maturity date under the FILO DIP Credit Agreement from December 31, 2024 to January 31, 2025, (ii) waived certain alleged defaults and events of default, as well as compliance with certain covenants, under the FILO DIP Credit Agreement, and (iii) formalized an agreement on a new approved budget through the extended maturity date. On January 6, 2025, the Debtors filed a motion seeking authority from the Bankruptcy Court to grant the FILO Parties a "DIP Extension Premium" in exchange for the FILO Parties' agreement to enter into the DIP Amendment (*see* Docket No. 3631) (the "**DIP Extension Premium Motion**"). The DIP Extension Premium contemplated compensating the FILO Parties with an additional claim under the Prepetition Bridge Credit Agreement (or, in certain circumstances, the FILO DIP Credit Agreement) solely to the extent they, in the future, purchase or contribute to the purchase, of certain Excess Properties. The Bankruptcy Court entered an order approving the DIP Extension Premium Motion on January 13, 2025 (Docket No. 3699).[32] The Debtors and the FILO Parties entered into several subsequent amendments to the FILO DIP Credit Agreement, which among other things, provided for further short-term extensions of the maturity date. *See* Docket Nos. 3874, 3909, 3991, 4091, 4232, 4400, 4472, and 4690). The maturity date under FILO DIP Credit Agreement was April 18, 2025. The Debtors and the FILO Parties, with the consent of the Creditors' Committee, have agreed to further extend the maturity date of the FILO DIP Credit Agreement to (a) the date that is the earlier of (x) July 8, 2025 and (y) one (1) business day after the confirmation date of any confirmed plan, subject to certain milestones, as set forth in that certain *Amendment No. 6 to Debtor-in-Possession Credit Agreement*, attached as Exhibit 2 to the FILO Settlement Order (the "**Sixth DIP Amendment**") filed contemporaneously herewith.

## G.     APPOINTMENT OF CREDITORS' COMMITTEE

On May 16, 2024, the United States Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the chapter 11 cases (Docket No. 290). The members of the Creditors' Committee are: (i) Philips North America LLC, (ii) Medline Industries LP, (iii) Cross Country Healthcare, Inc., (iv) Cerner Corporation, (v) Sodexo, Inc., (vi) R1 RCM, Inc., (vii) Creditor Initials: J.D.C., (viii) Pension Benefit Guaranty Corporation, and (ix) 1199SEIU United Healthcare Workers East. The Creditors' Committee retained Akin Gump Strauss Hauer & Feld LLP ("**Akin**"), as counsel, FTI Consulting, Inc. ("**FTI**"), as financial advisor, and Jefferies LLC ("**Jefferies**"), as investment banker. The Bankruptcy Court entered orders authorizing the retention of such professionals by the Creditors' Committee (Docket Nos. 1560 (Akin), 1581 (Jefferies), and 1607 (FTI)).

---

[32]     Pursuant to paragraph 40(f) the TSA / EPDA Settlement Order (as defined herein), upon receipt of the Transferred Properties (as defined in the TSA / EPDA Settlement Order), the FILO Parties irrevocably and forever waived all rights, entitlements, and interests in receipt of the DIP Extension Premium.

## H.     APPOINTMENT OF PATIENT CARE OMBUDSMEN

On May 20, 2024, the United States Trustee for the Southern District of Texas filed the *Notice of Appointment of Patient Care Ombudsman Covering Massachusetts, Ohio, Pennsylvania, and Miami-Dade Florida Locations Under 11 U.S.C. § 333* (Docket No. 311) appointing Suzanne Koenig as the Patient Care Ombudsman for the Debtors' hospitals and healthcare facilities in Massachusetts, Ohio, Pennsylvania, and Miami-Dade Florida (Coral Gables, Hialeah, and Miami), and the *Notice of Appointment of Patient Care Ombudsman Covering Arizona, Arkansas, Central/North Florida Locations, Louisiana, and Texas under 11 U.S.C. § 333* (Docket No. 312) appointing Susan Nielson Goodman as the Patient Care Ombudsman for the Debtors' hospitals and healthcare facilities in Arizona, Arkansas, Central/North Florida (Lauderdale Lakes, Sebastian River, Rockledge, and Melbourne), Louisiana, and Texas.  Ms. Koenig and Ms. Goodman were appointed as patient care ombudsmen to monitor the quality of care provided to the Debtors' patients and file periodic reports with the Bankruptcy Court regarding the same.  Ms. Koenig filed and received authority to retain Greenberg Traurig, LLP as counsel (Docket Nos. 891, 2879) and SAK Management Services, LLC as medical operations advisor (Docket Nos. 892, 2878) and Ms. Goodman filed and received authority to retain Ross, Smith & Binford, PC as counsel (Docket Nos. 409, 2880), and filed an application to retain Kane Russell Coleman Logan PC as counsel in connection with discharging Ms. Goodman's Patient Care Ombudsman duties (Docket No. 4383).

The Patient Care Ombudsmen filed various reports during the pendency of these chapter 11 cases, including by Ms. Goodman at Docket Nos. 1653, 1654, 1655, 1656, 1853, 1932, 1608, 2775, 2968, 3062, 3251, 3553, 4025, and 4286, and by Ms. Koenig at Docket Nos. 1659, 1660 2637, 2709, 3128, 3247, and 3766.  On January 21, 2025, because all of the Debtors' hospitals in Massachusetts, Ohio, Pennsylvania, and Miami-Dade Florida had been either closed or transitioned to new operators, Ms. Koenig filed a final report at Docket No. 3776 her appointment as Patient Care Ombudsman concluded.  On April 15, 2025, the Bankruptcy Court approved the *Stipulation and Agreed Order Terminating and Discharging Suzanne A. Koenig, Patient Care Ombudsman for the Hospital and Facilities Located in Massachusetts, Ohio, and Pennsylvania as Well as the Miami-Dade Florida Locations* (Docket No. 4680), officially terminating and discharging Ms. Koenig's duties as patient care ombudsman.

On March 22, 2025, because all of the Debtors' hospital operations in Arizona, Arkansas, Central/North Florida, Louisiana, and Texas had been transitioned to new operators, Ms. Goodman filed a final report at Docket No. 4286 and her appointment as Patient Care Ombudsman concluded.

## I.     OVERVIEW OF SALE PROCESS[33]

1.     *Prepetition Sale Process*

As discussed above, in late-2023, the Company engaged Leerink to initiate outreach to third parties to solicit interested investors in Stewardship Health to allow the Company to de-leverage its capital structure and position the Company for long-term success by focusing on its core hospital and specialist-provider operations.   Subsequently, in January 2024, the Company engaged Cain to conduct a comprehensive marketing process for the sale of the Company's hospitals in Southern Massachusetts, Arizona, Ohio, Pennsylvania, Louisiana, and Arkansas.  Furthermore, in February 2024, the Company expanded the scope of Leerink's engagement to market its hospitals in Northern Massachusetts, and from March 2024 to April 2024, the Debtors further expanded the scope of Cain and Leerink's hospital marketing

---

[33]    Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to them in the Bidding Procedures Order (as defined herein).

efforts to encompass Steward's entire hospital portfolio, including all of Steward's Texas and Florida hospitals.

2.   *Global Bidding Procedures and Postpetition Sale Process*

The Debtors continued to market their comprehensive sale process of their hospital operations following the Petition Date. On May 15, 2024, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 281), pursuant to which the Debtors sought approval to establish certain procedures with respect to a competitive sale and marketing process for their assets on an accelerated timeline. On June 3, 2024, the Bankruptcy Court entered the Bidding Procedures Order, approving the global bidding procedures contained therein (the "**Global Bidding Procedures**").

The Global Bidding Procedures enabled the Debtors to continue their marketing efforts and continue competitive, independent sale processes for all of the Debtors' hospital operations and Stewardship Health simultaneously. Collectively, Cain contacted more than 200 parties, and Leerink contacted more than 120 parties—including both for-profit operators and not-for-profit hospital owners and systems—to gauge interest in the Debtors' hospital operations, and Leerink engaged 57 parties to gauge interest in Stewardship Health. More than 100 parties contacted by Cain and nearly 50 parties contacted by Leerink executed non-disclosure agreements, were granted access to a virtual data room, and conducted diligence regarding the Debtors' operations.

The Global Bidding Procedures set forth timelines and related deadlines for bidding on and acquiring the Debtors' hospitals and Stewardship Health. Throughout the process, parties' interest in the Debtors' hospital operations and the sale process depended heavily on both negotiations between individual bidders and MPT related to the underlying real property, as well as the outcome of a dispute between the Debtors and MPT regarding the allocation of proceeds from such hospital sales. In light of these circumstances, and to ensure there was enough time for the Debtors to receive the highest or otherwise best offers, the Debtors adjusted the sales process timelines from time to time in accordance with the Global Bidding Procedures.

**J.   STEWARDSHIP HEALTH SALE**

1.   *Stewardship Sale Process*

In December 2023, Leerink commenced a marketing and sale process for Stewardship Health designed to provide a large number of potential purchasers with information concerning the business's assets and operations and allow potential purchasers to submit bids and request further diligence.

a.   *Stewardship IOI with Optum*

As a result of the Debtors' prepetition marketing efforts, four (4) parties submitted non-binding indications of interest ("**IOIs**") for Stewardship Health prior to the Petition Date. Based on a careful evaluation of the IOIs received, the Debtors determined that the IOI submitted by Optum Inc., a subsidiary of United, was the highest and best offer it had received. United, through its subsidiary Collaborative Care, subsequently executed a non-binding letter of intent, dated March 19, 2024, outlining the proposed terms for Collaborative Care's purchase of Stewardship Health, and promptly submitted a premerger notification

under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. Good faith, arms' length negotiations toward definitive documentation commenced and continued following the Petition Date while antitrust regulatory review of the potential transaction with United remained pending. However, United ultimately withdrew its interest and did not submit a binding bid pursuant to the Global Bidding Procedures.

        b.    *Stewardship Sale with Kinderhook*

Following a re-solicitation process conducted by Leerink following the Petition Date, the Debtors received a bid from Brady with a headline value of between $175–215 million, subject to certain purchase price adjustments.[34] The Debtors also received a credit bid from the FILO Parties of $225 million, and reviewed and evaluated both bids with the Transformation Committee. After further negotiations and a competitive bidding process, Brady submitted a revised bid with a headline purchase price of $245 million, subject to purchase price adjustments.

On August 12, 2024, the Debtors filed the *Notice of Designation of Successful Bid and Proposed Sale Order for Stewardship Health* (Docket No. 1953), with an asset purchase agreement by and between Brady and certain of the Debtors attached thereto as <u>Exhibit B</u> (the "**Stewardship APA**"). A hearing was scheduled to consider the sale of Stewardship Health on August 16, 2024. The Debtors received various objections, responses, and reservations in advance of the hearing, including informal responses from the ABL Lenders, FILO Parties, and Creditors' Committee. The Debtors worked with each of the parties that had filed a response, making according changes to the form of sale order contained in the Stewardship APA, and reaching a consensual resolution to virtually all objections in advance of the hearing. On August 16, 2024, the Bankruptcy Court approved the sale of Stewardship Health. On August 22, 2024, the Bankruptcy Court entered the *Order (I) Authorizing and Approving (A) the Asset Purchase Agreement with Brady Health Buyer, LLC (B) the Sale of Stewardship Health Assets Free and Clear of Liens and Liabilities and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (Docket No. 2135) (the "**Stewardship Sale Order**").

The Stewardship APA provided for a number of closing conditions, most notably the rejection of certain contracts related to CareMax, the joint manager of the Debtors' Medicare value business.[35] In the lead-up to closing, the Debtors, Brady, and CareMax worked towards and arrived at a consensual resolution with respect to the CareMax-Steward Contracts. On October 30, 2024, the Bankruptcy Court entered the *Stipulation and Agreed Order Regarding CareMax-Steward Contracts* (Docket No. 3071), authorizing the assignment of certain of the CareMax-Steward Contracts to Brady, and authorizing the rejection of the remainder of the CareMax-Steward Contracts effective as of the closing.

The Stewardship APA also provided that Brady may elect, at its discretion, to exclude all assets related to the USFHP from the Stewardship Health transaction prior to closing. *See* Stewardship APA, at § 1.5(b). Moreover, the Stewardship Sale Order provided that Brady may also elect not to "proceed with the non-consensual assumption and assignment of the [BMI] MSA at the BMI Hearing[.]" *See* Stewardship Sale Order (Docket No. 2028) at ¶ 54. On September 6, 2024, the Debtors filed the *Notice Regarding Further Revised Proposed Stewardship Sale Order* (Docket No. 2387), indicating an election had been

---

[34]   Details regarding such purchase price adjustments are described in greater detail in Section IV.M.5 hereto.

[35]   Prior to entry of the Stewardship APA, on June 22, 2024, the Debtors filed the *Debtors' Motion for Order (I) Authorizing Rejection of Executory Contracts with CareMax and Certain Related Executory Contracts Effective As of June 22, 2024 and (II) Granting Related Relief* (Docket No. 969) which sought to reject forty-one (41) contracts (the "**CareMax-Steward Contracts**"), including various contracts between the Debtors and CareMax, and certain related services agreements between the Debtors and third-parties.

made not to pursue the non-consensual assumption or assignment of the BMI MSA.  On October 25, 2024, Brady exercised its option to pursue a "provider only" transaction under the terms of the Stewardship Sale Order, excluding all assets related to the USFHP from the Stewardship Health transaction.

The Stewardship Health transaction proceeded to close on the target outside date of October 30, 2024 for a headline purchase price of $245 million.  In accordance with the terms of the Stewardship APA, this headline purchase price was subject to various adjustments and subsequent reductions including with respect to net working capital, cure costs paid by the Debtors on behalf of the purchaser, costs related to TSA arrangements, deferred compensation, and retention bonus payments payable by the purchaser to third parties upon the closing of the transaction.  Steward received net proceeds in the approximate amount of $187 million on the date the transaction closed, which comprised of (1) a cash payment of approximately $167 million and (2) a deposit in the net amount of approximately $21 million released from escrow on the closing date.  Approximately $183 million of these proceeds were used for purposes of paying down the FILO DIP Facility or satisfying outstanding FILO Parties' professional fees, while the remainder was used for seller costs attendant to the transaction or reserved for post-closing obligations under the Stewardship APA.

## K.  HOSPITAL SALE PROCESS, KEY CREDITOR DISPUTES & MEDIATION

Simultaneously with the Stewardship Health sale process, the Debtors also advanced the marketing and sale process for their 31 hospitals.  MPT owned the real estate underlying thirty (30) out of thirty-one (31) of the Debtors' hospitals, each of which were subject to either Master Lease I or Master Lease II, and which resulted in disputes between the Debtors, the FILO Parties, and the Creditors' Committee, on hand, and MPT, on the other hand, regarding the allocation of sale proceeds between the value of the real estate and the Debtors' hospital operations.

To address these disputes, on June 11, 2024, the Debtors filed the *Emergency Motion of Debtors Requesting Entry of an Order Directing Mediation of Disputes Relating to Allocation of Sale Proceeds and Related Issues with Medical Properties Trust* (Docket No. 776), which sought to commence mediation with the Honorable Judge Marvin Isgur amongst the Debtors, MPT, Macquarie, Apollo, the Creditors' Committee, the Debtors' secured lenders, regarding, among other things, the appropriate allocation of proceeds obtained from the Sales Process (the "**Allocation Mediation**").  Additionally, the Allocation Mediation sought to resolve potential challenges the Creditors' Committee may have had with respect to (i) the Master Leases, including relating to recharacterization of such leases as financings, (ii) MPT's claims against the estates, and (iii) potential causes of action the estates could bring against MPT arising from various postpetition conduct.

By September 2024, the Debtors concluded countless mediation sessions overseen by the Honorable Judge Marvin Isgur with certain stakeholders to minimize material disputes when possible and obtain certainty with respect to the treatment of certain valuable estate assets.  Given that certain parties had limited interests in certain disputes, the Allocation Mediation was bifurcated based off which Master Lease the hospital sale related.  Disputes between the Debtors, MPT, Macquarie, Apollo, the Commonwealth of Massachusetts, the Creditors' Committee, and the Debtors' secured lenders related to the sale of the Debtors' Massachusetts Hospitals under Master Lease II.  The mediation to resolve the various disputes pertaining to the sale of the Debtors' Master Lease I Hospitals involved the Debtors, MPT, the Creditors' Committee, and the Debtors' secured lenders (the "**Master Lease I Mediation**"), the resolution of which is set forth in the Global Settlement.

38

1.      *Massachusetts Sale Process*

(i)      *Prepetition Sale Process*

Prior to the Petition Date, the Debtors' advisors launched a marketing process for the sale of all the Debtors' Massachusetts hospital operations, with Cain marketing Morton Hospital in Taunton, Massachusetts ("**Morton**"), Saint Anne's Hospital in Fall River, Massachusetts ("**St. Anne's**"), and Good Samaritan Medical Center in Brockton, Massachusetts ("**Good Samaritan**") (collectively, the "**Southern Massachusetts Hospitals**"), and Leerink marketing Holy Family Methuen Hospital in Methuen, Massachusetts ("**Methuen**"), Holy Family Haverhill Hospital in Haverhill, Massachusetts ("**Haverhill**," and together with Methuen, the "**Holy Family Hospitals**,") and St. Elizabeth's Medical Center in Boston, Massachusetts ("**St. Elizabeth's**") (collectively, the "**Northern Massachusetts Hospitals**," and together with the Southern Massachusetts Hospitals, Carney, and Nashoba, the "**Massachusetts Hospitals**").

(ii)      *Postpetition Sale Process and Master Lease II Rejection & Mediation*

Following the Petition Date, significant operating losses at the Massachusetts Hospitals (including on account of the $114 million annual rent obligations payable to the MPT-Macquarie JV under Master Lease II) began to exacerbate the Debtors' growing liquidity crisis.  While the Debtors attempted to triage these losses via the expedited sale of the Massachusetts Hospitals, (i) the Debtors and MPT came to an impasse regarding the allocation of value of the sale proceeds on account of MPT's interest in the underlying real property of the Massachusetts Hospitals, and (ii) bidders were reluctant to submit binding bids until they knew they had the support of the Commonwealth and path for an agreed allocation of value between the Debtors and MPT.  The Debtors filed notices of adjournment (Docket Nos. 1190 and 1721) extending the bid deadlines under the Bidding Procedures Order while liquidity pressures mounted.

Despite the fact that the Massachusetts Hospitals generated significant operating losses, through their extensive marketing efforts, and facilitated by promises of financial support from the Commonwealth, the Debtors obtained binding bids from reputable buyers to acquire six (6) out of the eight (8) Massachusetts Hospitals, Carney and Nashoba being the two exceptions.  However, the Debtors did not receive any bids that provided for a bidder to assume Master Lease II or acquire the underlying real estate at a value that exceeded the "lease base" under Master Lease II.  Rather, the bids received contemplated a purchase price for the total hospital enterprise (i.e., inclusive of real estate and operations) that were significantly less than the value of the real estate implied by the rent obligations and the lease base under Master Lease II.

Eventually, it became apparent that the sale proceeds of the Massachusetts Hospitals would be insufficient to repay the mortgage loan made to MPT by a joint venture owned Apollo and Macquarie in full, which was secured by the real estate underlying Master Lease II properties.  This dynamic entrenched the stalemate between the parties as Apollo and Macquarie sought to reach an agreement with MPT to enable them to transact on the underlying real estate.  Moreover, increased liquidity pressures and an absence of consent by the FILO Secured Parties to use cash collateral for the Debtors' Massachusetts Hospital operations required the Debtors to seek an alternate source of external funding to cover operating losses prior to the closing of the sales of the Massachusetts Hospitals.

As a result of these challenges, the Debtors moved to reject Master Lease II[36] and commenced an adversary proceeding against MPT (Adv. Proc. No. 24-03168) while simultaneously pursuing the

---

[36]   *See Emergency Motion of Debtors for Order (I) Authorizing Rejection of Master Lease II Agreements Effective as of the Rejection Date in Connection with Planned Transition and Sale of Massachusetts Hospitals to New Operators, and (II) Granting Related Relief* (Docket No. 1712), which was approved by the Bankruptcy Court on

Allocation Mediation.  A significant focus of the Allocation Mediation was the allocation of proceeds received in connection with the disposition of the Massachusetts Hospitals as between the Debtors, the MPT-Macquarie JV, and Apollo, the mortgage lender to the MPT-Macquarie JV.  Because the proceeds of the sale of the real estate underlying the Massachusetts Hospitals were insufficient to repay the mortgage loans held by Apollo in full, Apollo and MPT engaged in good-faith and arm's length negotiations to reach a consensual agreement whereby MPT would transfer ownership of such properties to the MPT-Macquarie JV, so that the MPT-Macquarie JV could sell or lease the underlying real estate to the buyers of the Debtors' Massachusetts Hospital operations.[37]  In exchange, the Debtors agreed to release MPT of claims under Master Lease II on the earlier of the closing of the sales of the Massachusetts Hospitals or the entry of the Global Settlement Order.  Upon the closing of each of the Massachusetts Hospitals, Master Lease II would be deemed severed with respect to the properties sold without any further liability to the applicable buyer. As a result of these negotiations and this consensual resolution reached between the parties, the Debtors were able to proceed with the sale process of the Massachusetts Hospitals.

<div align="center">(iii)   <em>Initial Massachusetts Funding Agreement</em></div>

In addition, in response to the unsustainable operating losses the Debtors were incurring in connection with operating the Massachusetts Hospitals, the Debtors and the Commonwealth of Massachusetts (the "**Commonwealth**") entered into a funding agreement whereby the Commonwealth would advance $30 million of funding support for the Massachusetts Hospitals' operations during August 2024 (the "**Funding Agreement**").  The Debtors filed an emergency motion seeking approval of the Funding Agreement on July 26, 2024 (Docket No. 1771).  The Funding Agreement was subsequently approved by the Bankruptcy Court on August 6, 2024 (Docket No. 1855).

<div align="center">(iv)   <em>Massachusetts Sale Transactions and Designation of Successful Bids</em></div>

Through the Allocation Mediation process, the Debtors ultimately received actionable bids for St. Anne's, Morton, the Holy Family Hospitals, St. Elizabeth's, and Good Samaritan on the terms detailed below.

a) *Lifespan*.  Lifespan of Massachusetts, Inc., a Massachusetts not for-profit corporation ("**Lifespan**") submitted a bid of, in the aggregate (for both the Debtors' hospital operations and the underlying real property of Morton and St. Anne's), $175 million ($75 million in Cash and a $100 million note) with $166.8 million being allocated to the underlying real property from Apollo and approximately $8.2 million allocated to the Debtors' hospital operations.

b) *Lawrence General*.  LG Newcorp, Inc. a Massachusetts not-for-profit corporation affiliated with Lawrence General Hospital ("**LGH**") submitted a bid for the Debtors' hospital operations and the underlying real property of the Holy Family Hospitals of

---

July 31, 2024 on the terms set forth in the *Order (I) Authorizing Rejection of Master Lease II Agreements Effective as of the Rejection Date in Connection with Planned Transition and Sale of Massachusetts Hospitals to New Operators, and (II) Granting Related Relief* (Docket No. 1782) (the "**MLII Rejection Order**").  Although the MLII Rejection Order deemed Master Lease II rejected as of the effective date of rejection, it stated that a decision as to effective rejection date would be determined at a later time following further briefing and a hearing.

[37]   Further details regarding the discussions and resolutions reached between MPT and Apollo are contained in *Statement of ACREFI CS U, LLC Regarding The Sale Orders for Certain Massachusetts Hospitals* (Docket No. 2642)

$28 million, with the proceeds being paid for the acquisition of the underlying real property from Apollo, and the Debtors getting the benefit of avoiding a closure of the hospital and LGH assuming a number of the Debtors' liabilities.

c) *Boston Medical Center*. Boston Medical Center ("**BMC**") submitted a bid for the hospital operations of St. Elizabeth's and Good Samaritan (and the real property underlying Good Samaritan) with a headline value of $140 million, $9.5 million of which was allocated to the Debtors hospital operations.

After accounting for purchase price adjustments and the costs to the estates to implement transactions with Lifespan, LGH, and BMC, the Debtors' estates would not receive net proceeds from sales of the Massachusetts Hospitals. However, given the Debtors' liquidity pressures, the Debtors stood to benefit given, among other things, the significant assumption of liabilities by the buyers, the stemming of losses the Debtors would incur by continuing to operate the Massachusetts Hospitals, and the avoidance of hospital closure costs. Therefore, the Debtors filed the *Notice of (I) Designation of Successful Bids; (II) Proposed Sale Orders; (III) Scheduling of Sale Hearing With Respect to (A) Holy Family Methuen Hospital, (B) Holy Family Haverhill Hospital, (C) Saint Anne's Hospital, and (D) Morton Hospital; and (IV) Reservation of Rights to Seek Approval of Sale of St. Elizabeth's Medical Center and Good Samaritan Medical Center at Sale Hearing* (Docket No. 2242), naming Lifespan as the successful bidder for St. Anne's and Morton, LGH as the successful bidder for the Holy Family Hospitals, and reserving the right to seek approval of the sale of the remaining Massachusetts Hospitals. The next day, on August 30, 2024, the Debtors filed the *Notice of Designation of Successful Bid and Proposed Sale Order for St. Elizabeth's Medical Center and Good Samaritan Medical Center* (Docket No. 2260), naming BMC as the successful bidder for St. Elizabeth's and Good Samaritan and setting the hearing to consider the sale of all of the Massachusetts Hospitals on September 4, 2024 (the "**Massachusetts Sale Hearing**").

(v)     *Incremental Funding Agreement*

In connection with the finalization of definitive documentation for each of the Debtors' Massachusetts Hospitals and in recognition of the Debtors' liquidity constraints, the Commonwealth agreed to advance an incremental $42 million in funding to neutralize operating losses at the Massachusetts Hospitals throughout the month of September (the "**Incremental Funding Agreement**"). The Debtors filed an emergency motion seeking approval of the incremental funding advancements on September 2, 2024 (Docket No. 2286), which was entered by the Bankruptcy Court on September 4, 2024 (Docket No. 2345).

(vi)     *Sale Hearing and FF&E Dispute*

The Debtors sought to present a consensual proposed sale order for approval by the Bankruptcy Court in advance of the Massachusetts Sale Hearing. However, the Debtors were unable to resolve an objection from the FILO Parties (Docket No. 2043), who argued that the Debtors could not sell the Massachusetts Hospitals' furniture, fixtures, and equipment ("**FF&E**") free and clear of the FILO Parties' liens (the "**FILO Objection**"), and that the proceeds of the sale of the FF&E should be payable to the FILO Parties and not Apollo as the owner of the underlying real property. On September 4, 2024, in advance of the Massachusetts Sale Hearing, the Debtors filed a formal reply to the FILO Objection (Docket No. 2323).

At the Massachusetts Sale Hearing, the Bankruptcy Court approved the Debtors' entry into the Incremental Funding Agreement and the sale of the Massachusetts Hospitals over the FILO Parties' objection pending the filing of revised proposed sale orders finalizing the changes negotiated with all parties in interest. The Bankruptcy Court further held that $17 million would be withheld from the proceeds of the

41

sales pending resolution of the dispute with the FILO Parties regarding the FF&E, which the Debtors, the FILO Parties, and Apollo would continue to negotiate in advance of the proposed closing date for each of the sale transactions. The Bankruptcy Court subsequently entered an order approving the Incremental Funding Agreement (Docket No. 2345). On September 13, 2024, the Bankruptcy Court entered sale orders approving the sales to LGH (Docket No. 2519), Lifespan (Docket No. 2520), and BMC (Docket No. 2523).

Prior to the proposed closing of each of the sale transactions with BMC, Lifespan, and LGH, a hearing was held on September 29, 2024 to reach a final resolution with respect to the FILO Objection. A resolution was reached at the sale hearing that would allow the Debtors to proceed with the closing of each of the Massachusetts sales, and whereby the Commonwealth would work to attempt to procure and provide an additional $5 million of adequate protection for the FILO Parties. On September 30, the Bankruptcy Court entered the *Emergency Motion of Debtors for Entry of an Order (I) Approving Additional Funding from the Commonwealth of Massachusetts for the Planned Transition and Sale of Massachusetts Hospitals; and (II) Granting Related Relief* (Docket No. 2286), approving the agreement reached by the parties, and approving the Debtors' closing of the sale transactions with Lifespan, LGH, and BMC. The sales of Massachusetts Hospitals to LGH, Lifespan, and BMC each closed on or around October 1, 2024. To date, no additional adequate protection has been provided by the Commonwealth to the FILO Parties.

2.    *Master Lease I Hospitals Sale Process*

a.    *Overview of Process & Key Disputes*

Simultaneous with the marketing and sale process of Stewardship Health and the Massachusetts Hospitals, the Debtors also pursued the sale of their hospitals that were leased under Master Lease I. As discussed herein, the Debtors and MPT disputed the methodology for allocation of sale proceeds between the value of the underlying real property that MPT owned and the value of the Debtors' hospital operations. After months of marketing the Master Lease I Hospitals, the Debtors determined that Master Lease I challenged the sale processes related to the Debtors' hospital operations at the Master Lease I Hospitals, as MPT would require hospital buyers to obtain MPT's consent to sever the applicable Master Lease and enter into an agreement with MPT to acquire or lease the underlying real property. As a result, the Debtors determined the rejection of Master Lease I was necessary to facilitate the sale of such hospitals, and on August 16, 2024, the Debtors filed the *Motion of Debtors for Order (I) Authorizing Rejection of Master Lease I Agreements Effective as of August 11, 2024 in Connection with Planned Sales of Master Lease I Hospitals to New Operators, and (II) Granting Related Relief* (Docket No. 2026), which sought to reject Master Lease I, retroactive to the date of filing the motion.

The disputes regarding the Master Lease I Hospitals were mediated over the course of several months before the Honorable Judge Marvin Isgur in the Master Lease I Mediation. The Master Lease I Mediation culminated in the Global Settlement, as described in Section IV.K.2.c(i) herein.

b.    *Space Coast Hospitals*

(i)    *Stalking Horse Designation*

On August 14, 2024, following a competitive marketing process, the Debtors designated a bid from Orlando Health, Inc. and Orlando Health Medical Group, Inc. (collectively, "**Orlando Health**") as the stalking horse bid for Melbourne Regional Medical Center, Rockledge Regional Medical Center, and Sebastian River Medical Center in Florida (collectively, the "**Space Coast Hospitals**," and the stalking horse bid submitted by Orlando Health, the "**Space Coast Stalking Horse Bid").** That same day, the Debtors filed the *Notice of Designation of Stalking Horse Bidder for Certain of the Debtors' Florida*

*Hospitals* (Docket No. 1991) (the "**Stalking Horse Notice**"), which attached the asset purchase agreement by and between certain of the Debtors and Orlando Health as <u>Exhibit C</u> thereto (the "**Space Coast APA**"). Pursuant to the Stalking Horse Notice, the Debtors sought approval of (i) a break up-fee in an amount equal to $13.7 million and (ii) reasonable, out-of-pocket and documented expenses of Orlando Health incurred in connection with the contemplated sale transaction up to an aggregate amount of $6.5 million (collectively, the "**Bid Protections**").  The Space Coast Stalking Horse Bid provided for a headline purchase price of $439 million for the hospital operations and the underlying real estate owned by MPT (subject to adjustments provided therein).

On August 19, 2024, MPT filed an objection to the proposed Bid Protections, arguing that the Space Coast Stalking Horse Bid did not comply with the Global Bidding Procedures and vitiated MPT's real property rights (Docket No. 2037).  At the August 22, 2024 hearing, the Debtors, Orlando Health, and MPT resolved their disputes regarding the Bid Protections by modifying the proposed sale order and confirming that the transaction required a consensual resolution between MPT, Orlando Health, and the Debtors regarding allocation of the purchase price with respect to the hospital operations and the underlying real estate.

(ii)    *Successful Bidder and Sale Hearing*

After receiving no other Qualified Bids (as defined by the Global Bidding Procedures) by the August 26, 2024 bid deadline, the Debtors determined that the designation of the Space Coast Stalking Horse Bid as the successful bid with respect to the Space Coast Hospitals was in the best interest of the Debtors and their estates.  Accordingly, on August 28, 2024, the Debtors filed the *Notice of (I) Designation of Orlando Health as Successful Bidder and (II) September 10, 2024 Sale Hearing with Respect to Space Coast Hospitals* (Docket No. 2240).

Following the announcement of Orlando Health as the successful bidder with respect to the Space Coast Hospitals, the Debtors worked with each of the parties that had filed an objection, response, or reservation and made according changes to the form of sale order to reach a consensual resolution on virtually all responses in advance of the hearing; however, the issues related to the allocation of the purchase price between the hospital operations and underlying real estate remained unresolved.  On September 10, 2024, the Bankruptcy Court approved the sale of the Space Coast Hospitals and entered the *Order (I) Authorizing and Approving (A) the Sale of Melbourne Regional Medical Center, Rockledge Regional Medical Center, and Sebastian River Medical Center Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) the Severance of Real Property from an Unexpired Lease; and (II) Granting Related Relief (*Docket No. 2445) (the "**Space Coast Sale Order**").  Following approval of the Space Coast Sale Order, the Debtors entered into the Global Settlement with MPT, which resolved, among other things, the purchase price allocation issues by providing the Debtors with $395 million of the net proceeds from the sale of the Space Coast Hospitals.

On October 22, 2024, the Bankruptcy Court entered the *Order (I) Clarifying the Definition of "Space Coast Real Property" Sold Pursuant to the Space Coast Sale Transaction and (II) Granting Related Relief* (Docket No. 2990), which (i) clarified that under the Global Settlement Order, MPT was permitted to convey to the Debtors (and in turn the Debtors were permitted to convey to Orlando Health) the real property underlying the Space Coast Hospitals in addition to certain other ancillary properties (the "**Space Coast Ancillary Properties**") to the Space Coast Hospitals' operations (collectively, the "**Space Coast Real Property**"), (ii) provided for customary sale order provisions regarding the conveyance of the Space Coast Real Property, and (iii) approved the form of real estate purchase and sale agreement and an

43

amendment to the Space Coast APA. In exchange for the Space Coast Ancillary Properties, an additional $3 million in proceeds was generated to pay down the secured claims held by the FILO Secured Parties against the Debtors, which was comprised of: (i) an additional $1 million payable by Orlando Health and (ii) $2 million in proceeds that would otherwise be payable to MPT. Thereafter, on October 23, 2024, the Space Coast Hospitals sale closed, resulting in the Debtors transferring the hospital operations and the Space Coast Real Property to Orlando Health. The Debtors used the proceeds from the sale of the Space Coast Hospitals to repay in full their obligations under the ABL/FILO Facility.

        c.     *Specified MLI Hospitals Sale Process*

        (i)     *Overview of Global Settlement*[38]

Following months of extensive arm's-length negotiations, on September 10, 2024, the Debtors, MPT, and the other Global Settlement Parties reached an agreement on the terms of the Global Settlement, which resolved numerous disputes amongst the Global Settlement Parties, including regarding the disposition and allocation of value of the Master Lease I Hospitals and the Creditors' Committee's potential challenges with respect to MPT's claims and claims the estates could assert against MPT arising from MPT's pre and post-petition conduct. On September 11, 2024, the Bankruptcy Court approved the Global Settlement on an interim basis and entered the *Interim Order Approving (I) Global Settlement with Medical Properties Trust, Prepetition ABL/FILO Secured Parties, FILO Secured Parties, and Creditors' Committee, (II) Interim Management Procedures, and (III) Granting Related Relief* (Docket No. 2483) (the "**Interim Global Settlement Order**"). On September 18, 2024, the Bankruptcy Court entered the Global Settlement Order, which, among other things, approved the Global Settlement on a final basis, authorized the Debtors to enter into interim management arrangements with interim managers designated by MPT (each, an "**Interim Manager**") for certain facilities, and approved procedures for the conveyance of the Master Lease I Hospitals (the "**Specified MLI Hospitals**")[39] to Designated Operators and the assumption and assignment of contracts in connection therewith.

Pursuant to the Global Settlement:

- MPT designated an Interim Manager for each Specified MLI Hospital, who agreed to be bound by interim management procedures set forth in the Interim Global Settlement Order and to manage the applicable Specified MLI Hospital until it was transferred or conveyed to a Designated Operator, which were the same party as the Interim Manager;

- all of the Specified MLI Hospitals were to be conveyed or otherwise transferred to a Designated Operator by October 30, 2024;

- starting September 11, 2024, the Interim Managers assumed responsibility for the costs of operating the Specified MLI Hospitals with MPT having agreed to fund certain initial expenses (including payroll);

- upon entry of the Global Settlement Order, the Debtors were not required to pay any rent or other obligations under Master Lease I and Master Lease II;

---

[38]   Capitalized terms used in this Section but not defined herein shall have the meanings ascribed to them in the Global Settlement.

[39]   The Specified MLI Hospitals exclude Sharon Regional Medical Center in Sharon, Pennsylvania.

- on October 23, 2024, the real property underlying the Space Coast Hospitals was transferred or conveyed to the Debtors and upon consummation of the sale of the Space Coast Hospitals to Orlando Health, the Debtors and their estates retained $395 million of the net sale proceeds, with the balance paid to MPT;

- all of MPT's claims against the Debtors' estates (up to approximately $7.5 billion in the aggregate, consisting of approximately $83.4 million in MPT DIP Claims, $448.1 million in MPT Prepetition Secured Claims, $403.4 million in MPT HoldCo Claims, and $6.6 billion in future lease obligations) were waived;

- upon the Settlement Effective Date, subject to certain limited exceptions, MPT released and discharged any and all claims it may have against the Debtors, the ABL Lenders, the FILO Secured Parties, and the Creditors' Committee, and the Debtors, the ABL Lenders, the FILO Secured Parties, and the Creditors' Committee released and discharged any and all claims they may have against MPT; and

- upon the sale, transfer, abandonment, or closure of any of the Debtors' hospitals, all accounts receivable held by or owed to any of the Debtors relating to services provided by or at such hospital on or prior to the date of such sale, transfer, abandonment, or closure, and all proceeds thereof, were deemed automatically transferred and assigned to a newly created, direct subsidiary of SHCS (such subsidiary, "**A/R Co**").[40]

      (ii)    *Appointment of HonorHealth as Designated Operator of Mountain Vista, Florence, and St. Luke's in Arizona*

Pursuant to the Global Settlement Order, MPT designated HonorHealth ("**HonorHealth**") as the Designated Operator for the Debtors' Mountain Vista Medical Center ("**Mountain Vista**"), Florence Hospital ("**Florence**"), and Tempe St. Luke's Hospital ("**St. Luke's**").

On September 27, 2024, the Debtors filed the *Notice of Designation of HonorHealth as Designated Operator for, and Sale of, Mountain Vista Medical Center, Florence Hospital, and Tempe St. Luke's Hospital* (Docket No. 2698), with a proposed form of sale order attached thereto as Exhibit A (the "**Proposed HonorHealth Sale Order**"). A copy of that certain *Bill of Sale, Assignment and Assumption Agreement* by and among HonorHealth and certain of the Debtors was attached to the Proposed HonorHealth Sale Order as Exhibit 1.

On October 3, 2024, the Bankruptcy Court entered the *Order (I) Authorizing and Approving (A) the Sale of Tempe St. Luke's Hospital, Mountain Vista Medical Center, and Florence Hospital Free and Clear of Liens, Claims, Encumbrances, and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2776), approving the conveyance of Mountain Vista, Florence, and St. Luke's to HonorHealth. That same day, the sale of Mountain Vista, Florence, and St. Luke's to HonorHealth was consummated.

      (iii)    *Appointment of Quorum Health as Designated Operator of Odessa and Scenic Mountain in Texas*

---

[40]  A/R Co is a limited liability company established pursuant to and in accordance with the Delaware Limited Liability Company Act, effective as of December 31, 2024.

On September 26, the Debtors filed the *Notice of Designation of Quorum Health as Designated Operator for, and Sale of, Odessa Regional Medical Center and Scenic Mountain Medical Center* (Docket No. 2697) with a proposed form of sale order attached thereto as Exhibit A (the "**Proposed Quorum Sale Order**"), announcing that MPT had selected certain affiliates of Quorum Health (collectively, "**Quorum Health**") to operate two (2) of the Debtors' hospital operations in Texas. Specifically, the Debtors announced the designation of (i) Odessa Texas Hospital Company, LLC as the operator of Odessa Regional Medical Center ("**Odessa**") and (ii) Big Spring Texas Hospital Company, LLC as the operator of Scenic Mountain Medical Center ("**Scenic Mountain**"). Copies of (i) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among Odessa Texas Hospital Company, LLC and certain of the Debtors and (ii) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among Big Spring Texas Hospital Company, LLC and certain of the Debtors were attached to the Proposed Quorum Sale Order as Exhibit 1 and Exhibit 2, respectively.

The Debtors received various responses to the Proposed Quorum Sale Order, and initially set a hearing to consider the relief requested on October 11, 2024, which was subsequently adjourned to a date to be determined (Docket Nos. 2841, 2773). However, the Debtors worked with each objecting party to resolve all outstanding responses to the Quorum Sale Order, and the *Order (I) Authorizing and Approving (A) the Sale of Odessa Regional Medical Center and Scenic Mountain Medical Center Free and Clear of Liens, Claims, Encumbrances, and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2887) was entered on October 11, 2024 without need for a sale hearing. On October 17, 2024, the relevant bill of sale and assignment and assumption agreements were executed, and the sale of Odessa and Scenic Mountain to Quorum Health was consummated.

        (iv)     *Appointment of HSA as Designated Operator of St. Joseph and Port Arthur in Texas and the South Florida Hospitals*

Pursuant to the Global Settlement Order, MPT designated affiliates of Healthcare Systems of America (together with its affiliates, "**HSA**") as the Designated Operator of the Debtors' St. Joseph Medical Center ("**St. Joseph**"), Medical Center of Southeast Texas ("**Port Arthur**"), and the South Florida Hospitals.[41] Accordingly on October 3, 2024, the Debtors filed the *Notice of Designation of Healthcare Systems of America as Designated Operator for St. Joseph Medical Center, Medical Center of Southeast Texas, and South Florida Hospitals* (Docket No. 2786), with a proposed form of sale order attached thereto as Exhibit A.

Following the objection deadline with respect to the designation of HSA as the Designated Operator of St. Joseph, Port Arthur, and the South Florida Hospitals, the Debtors worked with each of the parties that filed an objection, response, or reservation and made according changes to the form of sale order to reach a consensual resolution on all response except for one outstanding objection from a landlord of Port Arthur, which was resolved at the sale hearing. Following the hearing, the Debtors filed the *Notice of Filing of Further Revised Proposed Order Approving the Sale of St. Joseph Medical Center, Medical Center of Southeast Texas, and South Florida Hospitals to Healthcare Systems of America* (Docket No. 3034).

On October 28, 2024, the Bankruptcy Court entered the *Order (I) Authorizing and Approving (A) the Sale of St. Joseph Medical Center, Medical Center of Southeast Texas, and South Florida Hospitals Free and Clear of Liens, Claims, Encumbrances, and Interests, and (B) the Assumption and Assignment of*

---

[41]    The South Florida Hospitals include: (i) Coral Gables Hospital, (ii) Hialeah Hospital, (iii) North Shore Medical Center, (iv) Florida Medical Center, and (v) Palmetto General Hospital.

*Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 3046) (the "**HSA Sale Order**"), approving the conveyance of St. Joseph, Port Arthur, and the South Florida Hospitals to affiliates of HSA.  Copies of (i) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among HSA St Joseph LLC and certain of the Debtors, (ii) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among HSA Port Arthur LLC and certain of the Debtors, and (iii) that certain *Bill of Sale, Assignment and Assumption Agreement,* by and among Healthcare Systems of America-Florida LLC and certain of the Debtors, in substantially final form, were attached to the HSA Sale Order as Exhibits 1, 2, and 3, respectively.  The sales of St. Joseph, Port Arthur, and the South Florida Hospitals were consummated on October 30, 2024.

<div align="center">(v)      <em>Appointment of Insight as Designated Operator of Hillside and Trumbull in Ohio</em>[42]</div>

On October 4, 2024 the Debtors filed the *Notice of Designation of Insight Health as Designated Operator for Hillside Rehabilitation Hospital and Trumbull Regional Medical Center* (Docket No. 2791) with a proposed form of sale order attached thereto as Exhibit A (the "**Proposed Insight Sale Order**"), announcing that MPT had selected certain affiliates of Insight Health ("**Insight**") to operate two (2) of the Debtors' hospital operations in Ohio.  Specifically, the Debtors announced the designation of (i) Insight Foundation of Hillside as the operator of Hillside and (ii) Insight Foundation of Trumbull as the operator of Trumbull.  Copies of (i) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among Insight Foundation of Hillside and certain of the Debtors and (ii) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among Insight Foundation of Trumbull and certain of the Debtors were attached to the Proposed Insight Sale Order as Exhibit 1 and Exhibit 2, respectively.

The Debtors received one limited objection to the Proposed Insight Sale Order.  However, the Debtors worked with the objecting party to resolve the limited objection prior to the sale hearing, and filed a certificate of counsel seeking approval of the Proposed Insight Sale Order on October 14, 2024 (Docket No. 2912).  An order approving the designation of Insight affiliates as operators of Hillside and Trumbull was entered on October 16, 2024 (Docket No. 2939).

<div align="center">(vi)      <em>Appointment of College Health as Designated Operator of St. Luke's Behavioral Health in Arizona</em></div>

In October 2024 the Debtors reached an agreement with College Medical Center Phoenix LLC ("**College Health**") to act as an Interim Manager with respect to the Behavioral Facility to avoid the closure of the facility and whom had agreed to assume the remediation expenses and operating liabilities of the facility as of October 3, 2024.  On October 22, 2024, the Bankruptcy Court entered the *Order Supplementing Global Settlement Order to Authorize Debtors to Designate Interim Manager for St. Luke's Behavioral Health* (Docket No. 2989), which supplemented the Global Settlement Order to (i) authorize the Debtors' entry into an interim management arrangement with College Health as Interim Manager with

---

[42] Prior to entry into the Global Settlement, because the Debtors did not receive qualified bids for Hillside Rehabilitation Hospital ("**Hillside**") or Trumbull Memorial Hospital ("**Trumbull**") following the applicable bid deadline under the Global Bidding Procedures, on August 21, 2024, the Debtors filed the *Notice of Closure of Trumbull Regional Medical Center and Abandonment of Property in Connection Therewith* (Docket No. 2097). On the same date, the Debtors also filed the *Notice of Closure of Hillside Rehabilitation Hospital and Abandonment of Property in Connection Therewith* (Docket No. 2101) (together, the "**Ohio Closure Notices**"). However, following the filing of the Ohio Closure Notices, the Debtors entered into the Global Settlement, which designated Hillside and Trumbull as "Specified MLI Hospitals" and provided a path for the Debtors to keep Hillside and Trumbull open and operating.

respect to the Behavioral Facility and (ii) allow MPT to designate College Health as a Designated Operator and/or the Behavioral Facility as a Specified MLI Hospital, in accordance with the Interim Management Procedures and the Global Settlement Order.

On February 5, 2025, the Debtors filed the *Notice of Designation of College Health as Designated Operator for St. Luke's Behavioral Health* (Docket No. 3908) with a proposed form of sale order attached thereto as Exhibit A (the "**Proposed Behavioral Health Sale Order**"), announcing that MPT had designated College Health to operate Behavioral Health. A copy of that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among College Health and certain of the Debtors was attached to the Proposed Behavioral Health Sale Order as Exhibit 1.

On February 14, 2025, the Bankruptcy Court approved the sale of the Behavioral Facility and entered the *Order (I) Authorizing and Approving the Sale of St. Luke's Behavioral Health Free and Clear of Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief* (Docket No. 3982). The Behavioral Facility sale closed on March 20, 2025.

> d.     *Wadley at Hope Sale Process*

On July 11, 2024, the Debtors designated a bid from Pafford Health Systems, Inc. ("**Pafford**" and such bid, the "**Pafford Bid**"), which provided for a purchase price of $200,000 for the hospital operations plus the value of inventory and prepaid expenses less assumption of PTO obligations at closing, as the successful bid for Wadley Regional Medical Center in Hope Arkansas ("**Wadley at Hope**"). Accordingly, the Debtors filed the *Notice of (I) Cancellation of Certain Auctions and Sale Hearings, (II) Designation of Successful Bids, (III) Proposed Sale Orders, and (IV) Scheduling of Sale Hearing with Respect to (A) Wadley Regional Medical Center at Hope and (B) Glenwood Regional Medical Center* (Docket No. 1645) (the "**LA/AR Notice of Successful Bids**"), with a substantially final form of an asset purchase agreement by and between Pafford and certain of the Debtors attached thereto as Exhibit A (the "**Wadley at Hope APA**").[43]

Following the announcement of the Pafford Bid as the successful bid for Wadley at Hope, the FILO Secured Parties indicated they intended to object to the allocation of value between MPT and the Debtors with respect to the transaction, and requested that the Debtors adjourn the hearing on the sale of the Wadley at Hope to a later date to allow time for discovery, and ultimately submitted formal and informal discovery requests relating to MPT's involvement in the sale process. The Debtors adjourned the Wadley at Hope sale hearing and subsequently engaged in extensive negotiations with the FILO Secured Parties, MPT, and the Creditors' Committee on the allocation of value and other issues, including multiple mediation sessions with the Honorable Judge Marvin Isgur. As described herein, the Debtors entered into the Global Settlement with MPT regarding the disposition of the hospitals subject to Master Lease I (as defined herein), which included Wadley at Hope.

On September 12, 2024, the Bankruptcy Court approved the sale of Wadley at Hope and entered the *Order (I) Authorizing and Approving (A) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory*

---

[43]     On September 11, 2024, the Debtors filed the *Notice of Filing of Asset Purchase Agreement, Schedules, and Exhibits (Wadley Regional Medical Center at Hope)* (Docket No. 2487), with a final executed Wadley at Hope APA attached thereto as Exhibit B. The Debtors also attached that certain *Assignment and Assumption Agreement*, dated August 20, 2024, pursuant to which the Wadley at Hope APA was assigned from Pafford to Southwest Arkansas Regional Medical Center, LLC, an affiliate of Pafford.

*Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2494).  The Wadley at Hope sale closed on September 20, 2024.

   e.  *Glenwood Sale Process*

  On July 5, 2024, the Debtors designated a bid submitted by AHS South LLC, as buyer, and HSA, as buyer guarantor (the "**HSA Bid**"), which provided for a purchase price of $500,000 for the hospital operations (but with no purchase price adjustment for inventories, prepaid expenses, or assumption of PTO), as a Qualified Bid pursuant to the Global Bidding Procedures, and communicated the same to HSA.  As a result of further negotiations with HSA, on July 11, 2024, the Debtors, designated the HSA Bid as the Successful Bid for Glenwood and filed the LA/AR Notice of Successful Bids, with an asset purchase agreement by and between HSA and certain of the Debtors attached thereto as <u>Exhibit B</u> (the "**Glenwood APA**").

  Following the announcement of the HSA Bid as the Successful Bid for Glenwood, the FILO Secured Parties indicated they intended to object to the sale of the Glenwood and requested the Debtors to adjourn the sale hearings to allow time for discovery.  The Debtors entered into the Global Settlement with MPT regarding the disposition of the hospitals subject to Master Lease I, which included the Glenwood.  Pursuant to the Global Settlement, HSA (i) became the interim manager of Glenwood on September 11, 2024, and (ii) is the "Designated Operator" for Glenwood by MPT.  Upon entry into the Global Settlement, the Debtors engaged with MPT and HSA on the documentation necessary to effectuate the conveyance of Glenwood to HSA, and the parties agreed to proceed with the sale under the existing Glenwood APA, subject to modifications to account for the terms of the Global Settlement.[44]

  On September 17, 2024, the Bankruptcy Court approved the sale of Glenwood and entered the *Order (I) Authorizing and Approving (A) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2599).  The Glenwood sale closed on October 30, 2024.

   f.  *Wadley (Texarkana) Sale Process*

  On August 30, 2024, the Debtors designated CHRISTUS Health Ark-La-Tex ("**CHRISTUS**") as the Stalking Horse Bidder (as defined by the Global Bidding Procedures) for Wadley Regional Medical Center in Texarkana, Texas ("**Wadley Texarkana**") with a bid valued at $4.5 million with purchase price adjustments.  On September 3, 2024, the Debtors filed the *Notice of Designation of Stalking Horse Bidder for Wadley Regional Medical Center (Texarkana)* (Docket No. 2293) announcing the designation of CHRISTUS as the stalking horse bidder for Wadley Texarkana.  The Debtors did not receive any objections to the designation of CHRISTUS as the stalking horse bidder for Wadley Texarkana, and on September 9, 2024, the Bankruptcy Court entered the *Order Approving Stalking Horse Bid Protections for Christus* (Docket No. 2408).  On September 19, 2024, the Debtors filed the *Notice of (I) Designation of Christus Health Ark-La-Tex as Successful Bidder and (II) September 24, 2024 Sale Hearing with Respect to Wadley Regional Medical Center (Texarkana)* (Docket No. 2628), designating CHRISTUS as the Successful

---

[44] On September 16, 2024, the Debtors and HSA entered into that certain *Assignment and Assumption Agreement*, whereby AHS South LLC assigned its rights and obligations as buyer to an affiliate of HSA, HSA Glenwood LLC.  The original guarantor entity, American Healthcare Systems, LLC, continues to serve as buyer guarantor for the Glenwood sale transaction.

Bidder and setting a sale hearing to consider the sale order approving the asset purchase agreement with CHRISTUS on September 24, 2024.

Leading up to the scheduled hearing, the Debtors received a variety of responses, letters, and objections to the proposed sale order, including an objection to the transaction with CHRISTUS from DPN Logistics, LLC (Docket No. 2641) (the "**DPN Objection**") on the basis that the sale of Wadley Texarkana to CHRISTUS would result in a purported healthcare monopoly in the Texarkana region. The Debtors were able to resolve all other formal responses to the sale order in advance of the hearing and filed a formal response to the DPN Objection (Docket No. 2664). At the hearing, the Bankruptcy Court approved the sale of Wadley Texarkana to CHRISTUS over the DPN Objection, and subsequently entered the *Order (I) Authorizing and Approving (A) the Sale of Wadley Regional Medical Center Free and Clear of all Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2671) on September 24, 2024. On October 31, 2024, the sale of Wadley Texarkana to CHRISTUS closed, netting the Debtors a total of $7.1 million in sale proceeds of which approximately $6.4 million was used to pay down the FILO DIP Facility.

g.      *Sharon Regional Medical Center Sale Process*

Despite the Debtors' extensive marketing efforts, the Debtors did not receive any actionable bids for Steward Sharon Regional Health Systems, Inc. in Pennsylvania ("**Sharon Hospital**") by the June 24, 2024 bid deadline. Following the bid deadline, it became clear that the ongoing operating losses the Debtors were incurring in connection with Sharon Hospital were unsustainable. In an effort to keep the hospital operating and continuing to provide high quality care, the Debtors and advisors evaluated all potential alternatives to avoid a closure of the facility, including (i) re-engaging with potential bidders who showed the most interest prior to the bid deadline, and (ii) engaging in extensive discussions with MPT, their lenders, and the Creditors' Committee, and (iii) seeking potential third party funding of the operations.

Following the Bankruptcy Court's interim approval of the Closure Procedures Motion, the Debtors and the Commonwealth of Pennsylvania ("**Pennsylvania**") engaged in discussions to find a viable solution to keep Sharon Hospital open. As a result of those efforts, on August 16, 2024, Meadville Medical Center ("**Meadville**") submitted a letter of intent to the Debtors to acquire Sharon Hospital contingent on financial support to be provided by Pennsylvania to the Debtors. On September 10, 2024, the Debtors and Pennsylvania entered into the *Stipulation Regarding Funding by the Commonwealth of Pennsylvania for the Potential Transition and Sale of Sharon Regional Medical Center* (Docket No. 2422), whereby Pennsylvania agreed to advance $1.5 million per month from September through November 2024 in exchange for the Debtors agreeing to continue operations at Sharon Hospital and not issue a notice to close the facility before December 2, 2024.

On December 4, 2024, a status conference was held to apprise the Bankruptcy Court of ongoing negotiations with Pennsylvania regarding the potential advancement of additional financial support to fund operating losses at Sharon Hospital through the month of December 2024. On December 5, 2024, the Bankruptcy Court entered the *Order on Emergency Motion (A) for Status Conference and (B) Motion for Continuance of Notice Deadline Regarding Sharon Regional Medical Center* (Docket No. 3386), authorizing the Debtors to file a notice of facility closure of Sharon Hospital if Pennsylvania did not provide such additional funding by December 9, 2024.

On December 10, Pennsylvania and MPT filed a *Notice of Filing of Proposed Stipulation and Agreed Order Approving Mediation Between the Commonwealth of Pennsylvania and Medical Properties Trust Inc. (MPT)* (Docket No. 3412). On the same date, the Bankruptcy Court entered the *Stipulation and*

*Agreed Order Approving Mediation Between the Commonwealth of Pennsylvania and Medical Properties Trust, Inc. (MPT) Before the Honorable Marvin Isgur* (Docket No. 3421) (the "**Sharon Mediation Order**"), whereby Pennsylvania and MPT were to engage in mediation regarding an acceptable sales price for which the Sharon Hospital real property can be sold to Meadville, or such other party as designated by Pennsylvania and Meadville, such that the Debtors and Meadville could proceed with a potential sale of Sharon Hospital.  The Sharon Mediation Order authorized the Honorable Judge Marvin Isgur to conduct the mediation between Pennsylvania and MPT and terminate such mediation on the date that the Honorable Judge Marvin Isgur determines that it has concluded.

On December 13, 2024, the mediation terminated following the parties being unable to reach a resolution that would keep the hospital open and operating.  Thus, on December 16, 2024, the Debtors filed the *Notice of Closure of Sharon Regional Medical Center and Abandonment of Property in Connection Therewith* (Docket No. 3461).  On December 27, the Bankruptcy Court entered the *Order (I) Authorizing Debtors to (A) Close Sharon Regional Medical Center and (B) Reject Executory Contracts and Abandon Property in Connection Therewith; and (II) Granting Related Relief* (Docket No. 3570) (the "**Sharon Closure Order**").  The Sharon Closure Order authorized, but did not direct, the Debtors to close Sharon Hospital on a final basis on January 6, 2025, in accordance with the closure plan contained therein.

Following entry of the Sharon Closure Order, the Debtors continued their efforts to locate a potential purchaser with an actionable bid for Sharon Hospital.  Following good faith, arm's-length negotiations and mediations between the Debtors, Tenor Health Foundation Sharon, LLC ("**Tenor**"), the Commonwealth of Pennsylvania, and MPT, on January 10, 2025, the Debtors designated Tenor as the successful bidder for Sharon Hospital and filed the *Notice of (I) Designation of Tenor Health Foundation Sharon, LLC as Successful Bidder and (II) Emergency Sale Hearing on January 10, 2025 with Respect to Sharon Regional Medical Center* (Docket No. 3682).

On January 10, 2025, the Bankruptcy Court entered the *Order (I) Authorizing and Approving (A) the Sale of Sharon Regional Medical Center Free and Clear of Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 3688) and the *Order Compelling Transfer of License Obligations* (Docket No. 3687), approving the sale of Sharon Hospital, and the transfer of the license to operate the Hospital, to Tenor.  The Sharon Hospital sale closed on January 21, 2025.

### 3.     *TSA / EPDA Settlement*

The Debtors entered into a number of TSAs[45] with the purchasers and new operators of their hospitals to ensure the smooth transition of operations and continuity of patient care.  The Debtors provided two primary types of services under the TSAs—information technology services and revenue cycle management—until the applicable operator or purchaser could establish their own systems, processes, and contracts.  Approximately 700 of the Debtors' employees were involved in the provision of transition services under the TSAs to the operators of the Debtors' former hospitals (the "**TSA Employees**").

Following the conclusion of Debtors' primary sale process, during which the Debtors sold a total of twenty-seven (27)  hospitals to twelve (12) different buyers (in addition to the sale of Stewardship

---

[45]     The Debtors entered into a total of 14 TSAs with purchasers and operators of their hospitals, including (i) the TSA with affiliates of BMC; (ii) the TSA with CHRISTUS; (iii) the TSA with HonorHealth; (iv) the TSA with affiliates of Insight; (v) the TSA with LGH, (vi) the TSA with  Lifespan; (vii) the TSA with Orlando Health; (viii) the TSA with an affiliate of Quorum Health, (ix) the TSA with Tenor; (x) four (4) TSAs with affiliates of HSA; and (xi) the TSA with an affiliate of Pafford.

Health), the Debtors began to face challenges associated with the unprecedented act of becoming a "TSA-only" company virtually overnight.  In particular, the Debtors faced liquidity constraints, TSA Employee retention issues, and challenges with engaging certain vendors with historical payables to provide services that were necessary for the Debtors to honor their obligations under the TSAs (the "**TSA Vendors**").  Further, the FILO Parties' approved budget required that the Debtors secure additional revenues under the TSAs to address such concerns.  The Debtors considered a number of potential solutions to these challenges, including negotiating an increase of the monthly TSA baseline fees with the operators or entirely transitioning the TSA services to a new provider.  The Debtors solicited third parties' interest in taking over the TSAs, but were initially unsuccessful with such efforts.  However, in late December 2024, Quorum Health—the operator of two (2) of the Debtors' former hospitals—indicated an interest in providing a comprehensive outsourcing solution for the benefit of all operators.

In parallel with negotiating the terms of a transaction to transfer their hospital TSAs to Quorum Health, beginning on January 21, 2025, the Debtors, MPT, certain hospital operators, the FILO Parties, and the Creditors' Committee engaged in mediation before the Honorable Judge Marvin Isgur to resolve various disputes surrounding the transition of the TSA operations and the disposition of Excess Properties under the EPDA.  Following weeks of negotiations, the parties reached a settlement, and on March 2, 2025, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4081) (the "**TSA / EPDA Settlement Motion**"),[46] which documented the terms of the settlement reached between the various parties (the "**TSA / EPDA Settlement**").

On March 7, 2025, the Bankruptcy Court held a hearing to consider the relief requested in the TSA / EPDA Settlement Motion, among other things.  At the hearing, the Bankruptcy Court approved the transactions contemplated by the TSA / EPDA Settlement Motion, subject to the finalization of certain language in the revised proposed form of order to be filed with the Bankruptcy Court.  On March 11, 2025, the Bankruptcy Court entered the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4167) (the "**TSA / EPDA Settlement Order**").

The key terms of the TSA / EPDA Settlement included:

- As of the closing, the Debtors would sell all of their rights, title, and interest in the Transferred TSAs[47] to an affiliate of Quorum Health (the "**Quorum TSA Sale**") pursuant to the terms of the asset purchase agreement attached as Exhibit 1 of the TSA / EPDA Settlement Order (the "**Quorum Asset Purchase Agreement**").

- Under the Quorum Asset Purchase Agreement, Quorum Health agreed to provide the Debtors with services and access to certain information technology systems and

---

[46]   Capitalized terms used but not defined in this Section IV.K.3 shall have the meanings ascribed to them in the TSA / EPDA Settlement Motion.

[47]   "**Transferred TSAs**" means the Debtors' TSAs with (i) affiliates of BMC; (ii) CHRISTUS; (iii) HonorHealth; (iv) affiliates of Insight; (v) LGH, (vi) Lifespan; (vii) Orlando Health; (viii) an affiliate of Quorum Health, and (ix) Tenor.  The Debtors' TSAs with Rural and BMI were not transferred to Quorum Health.  The Debtors' TSAs

personnel integral to their remaining operations, including with respect to collecting legacy accounts receivables and reconciling claims for the times set forth in the Quorum Asset Purchase Agreement.

- The Debtors and Quorum Health agreed to establish a vendor fund (the "**Vendor Fund**") funded by MPT, BMC, Lifespan, and Orlando Health in accordance with the terms of the escrow agreement attached as <u>Exhibit 2</u> of the TSA / EPDA Settlement Order (the "**Vendor Fund Escrow Agreement**"). The Vendor Fund Escrow Agreement provides that the Debtors and Quorum Health may utilize the funds deposited in Vendor Fund to pay certain TSA Vendors if such TSA Vendor agrees to accept a partial payment in full satisfaction of TSA Vendor's Administrative Expense Claim against the Debtors' estates pursuant to a form stipulation (each such stipulation, a "**Quorum Vendor Fund Agreement**").

- To resolve a number of issues regarding the Excess Properties subject to the EPDA, the Debtors, the FILO Parties and MPT have reached a settlement (the "**EPDA Settlement**") providing that on the closing of the Quorum TSA Sale, MPT will transfer certain of the Excess Properties to the FILO Parties with all use restrictions and floor prices waived. The Debtors and FILO Parties have agreed that the transfer of the transferred Excess Properties to the FILO Parties will result in a reduction of $12.75 million of the Prepetition Bridge Facility (subject to potential adjustments in accordance with the terms of the TSA / EPDA Settlement Order). Further, on the closing, MPT shall pay $26.5 million to the Debtors for the MPT Retained Properties.[48]

On March 12, 2025, the Quorum TSA / EPDA Settlement closed, resulting in the reduction of the principal amount remaining on the Debtors' Prepetition Bridge Facility by approximately $38 million, the reduction of the Debtors' workforce to approximately 40 employees, and the alleviation of a number of burdensome obligations and key liabilities from the Debtors' estates (each as further described in the TSA / EPDA Motion).

4.   *Unexpired Leases*

On September 2, 2024, the Debtors filed a motion seeking approval of an extension of the time to assume or reject unexpired leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code (the "**365(d)(4) Deadline**") (Docket No. 2288). On September 3, 2024, the Bankruptcy Court entered an order extending the 365(d)(4) Deadline to the earlier of (a) December 2, 2024, and (b) the date of the entry of an order confirming a chapter 11 plan (Docket No. 2298). In advance of the Designation Deadline, the Debtors entered into ten (10) consensual extensions of the 365(d)(4) Deadline for certain nonresidential real property leases to afford additional time for the applicable buyers and Designated Operators to identify leases to be assumed and assigned. *See* Docket Nos. 3260, 3261, 3262, 3280, 3282,

---

with HSA were terminated effective as of January 21, 2025, and as of March 2, 2025, the Debtors' TSAs with Pafford had expired.

[48]   "**MPT Retained Properties**" means collectively, (i) the Elm Road Property; (ii) the Miami Excess Property; (iii) Rockledge Residential, Rockledge, FL; (iv) the Youngstown Excess Property; and (v) Las Sendas Development Land, North Mesa, AZ; and (vi) the George W. Strake Building (each as defined and described in the EPDA).

3283, 3290, 3291, 3311,[49] 3335, 3336, and 3355.  The Bankruptcy Court approved each extension stipulation by December 3, 2024.  *See* Docket Nos. 3267, 3268, 3269, 3286, 3287, 3288, 3302, 3306, 3361, and 3376.

As of December 2, 2024, all nonresidential real property leases other than those that have been assumed or those for which an extension of the 365(d)(4) Deadline was granted were deemed rejected pursuant to section 365(d)(4) of the Bankruptcy Code.  In total, the Debtors have rejected 209 unexpired leases since the Petition Date.

## L.   HOSPITAL CLOSURES

### 1.   *Closure of Carney and Nashoba*

As described in the Closure Procedures Motion, despite the Debtors' extensive marketing efforts, the Debtors did not receive any actionable bids for Carney Hospital ("**Carney**") or Nashoba Valley Medical Center ("**Nashoba**").  Given that Carney and Nashoba were incurring significant losses and no party had agreed to fund either hospital, the Debtors sought and obtained approval to close Carney and Nashoba in connection with the Closure Procedures Motion.  *See Order (I) Approving (A) the Closure of Carney Hospital and Nashoba Valley Medical Center on a Final Basis, and (B) Procedures Related to Facility Closures on an Interim Basis; and (II) Granting Related Relief* (Docket No. 1850).  Carney and Nashoba closed their operations on August 31, 2024.  *See Declaration of Octavio J. Diaz Providing a Status Update as Requested By This Court on the Closure of Carney Hospital and Nashoba Valley Medical Center* (Docket No. 2446).

### 2.   *Closure of Norwood Satellite Facilities*

On or about June 29, 2020, a flood caused significant damage to the Norwood Hospital, which has not been in operation since that date.  However, the Debtors continued to operate four (4) satellite facilities under the Norwood license, including cancer therapy, imaging, and physical therapy clinics (collectively, the "**Norwood Clinics**").  On October 7, 2024, the Debtors filed the *Notice of Closure of Norwood Hospital Facilities and Abandonment of Property in Connection Therewith* (Docket No. 2803) (the "**Norwood Closure Notice**"), which sought entry of an order authorizing the Debtors to close Norwood Clinics in accordance with the closure plan contained therein (the "**Closure Plan**").  The Closure Plan provided for a closure date of November 5, 2024, the date the license to operate the Norwood Clinics expired.

Following filing of the Norwood Closure Notice, Lifespan expressed interest in purchasing two (2) of the Norwood Clinics (the "**Sold Clinics**" and the Norwood Clinics that were not sold, the "**Closed Clinics**"), and the parties negotiated a transaction for the sale of the Sold Clinics to Lifespan, which closed on November 6, 2024.

On November 5, 2024, the Bankruptcy Court entered the *Order (I) Authorizing Debtors to (A) Close Norwood Hospitals Facilities and (B) Reject Executory Contracts and Abandon Property in Connection Therewith; and (II) Granting Related Relief* (Docket No. 3124) (the "**Norwood Closure Order**").  The Norwood Closure Order authorized, but did not direct, the Debtors to close the Norwood

---

[49]   This corrected stipulation and agreed order makes certain corrections to the description of the Properties filed at Docket No. 3281 and entered at Docket No. 3284.

Clinics on a final basis in accordance with the Closure Plan.  The Closed Clinics officially closed on November 5, 2024.

M.       **MONETIZATION OF ADDITIONAL ASSETS**

1.        *Overview*

The Debtors continue to pursue efforts to monetize their remaining assets, including their accounts receivable that arose prior to the consummation of their asset sales, the Debtors' interests in certain joint ventures and other health care centers and clinics, and various litigation claims.  The Debtors may hold additional assets, claims, and causes of action not listed.  In addition, the details of the Debtors' BCBS Claims are discussed in Section IV.M.5.c hereto.

| Asset | Estimated Amounts/Claims[50] |
|---|---|
| ***Material Additional Assets*** | |
| Accounts Receivables | $128.0 million |
| JV Interests/Ancillary Properties | $13.5 million |
| Stewardship Purchase Price Adjustment Claim | $26.0 million |
| ***Potential Litigation Claims***[51] | |
| Commercial Payor Claims | $369.7 million |
| Norwood Litigation | $885.0 million[52] |
| Preference Claims | $300.0 million[53] |
| Potential Claims Against Current and/or Former Insiders | > $1.0 billion |

2.        *Accounts Receivables*

Despite having sold all of their hospital assets, the Debtors continue to collect accounts receivable on account of the pre-closing periods of each of the Debtors' hospital sales (as well as Stewardship Health). Due to the nature of payor reimbursement, the insurance claim reconciliation process, and hospital operations as a general matter, operators such as the Debtors are not able to collect all outstanding accounts receivable from a given time period at once, and it may take months—or longer—to collect outstanding

---

[50]   These "Estimated Amounts/Claims" do not represent the Debtors' estimate of the actual fair market value of such assets and claims.

[51]   Except as specified otherwise herein, the "Estimated Amounts/Claims" on account of the Potential Litigation Claims excludes pre- and post-judgment interest, attorney's fees or adverse cost awards, punitive damages, or similar amounts, as applicable.

[52]   Represents the Debtors' estimated amount of their claims on account of the Norwood Claims including treble damages and recoverable fees and costs, as further detailed in Section IV.M.5.a.  The Debtors believe their estimated damages on account the Norwood Claims (excluding treble damages and recoverable fees and costs) are at least $295 – 300 million.

[53]   Represents total gross demands made as of the date hereof upon over 670 parties based on the Debtors' total estimates of potentially preferential and avoidable transfers.

accounts receivable.  Therefore, the Debtors continue to collect aged accounts receivable arising from prior to the closing of the sales of the Debtors' hospital operations, and will continue to collect accounts receivable throughout the calendar year of 2025.  The Debtors also continue to pursue ordinary-course disputes with payors in order to maximize the value of historical claims.

Based on an initial revenue cycle management assessment performed by the Debtors and their professionals, the Debtors estimate there is currently an unreserved receivable balance totaling up to approximately $128 million, a material portion of which is greater than 180 days outstanding and may not be collectible through ordinary course collection efforts.  These amounts do not account for additional sums that may be recovered on account of payor breach of contracts claims and other causes of action related to the ongoing collection of outstanding accounts receivable, which are further described in Section IV.M.5.a hereto.

Included in the $128 million balance of pre-closing accounts receivable are the approximately $55 million in Hospital Directed Payment Program ("**HDPP**") receivables (the "**HDPP Funds**") that the Debtors expect and are entitled to receive from the Florida Agency for Healthcare Administration ("**AHCA**") on account of plan year 4 (October 1, 2023 through September 30, 2024).  On April 24, 2024, HSA filed the *Emergency Motion of Healthcare Systems of America to Enforce the Global Settlement Order and Compel the Debtors to Comply with its Obligations Thereunder* (Docket No. 4718) (the "**HSA HDPP Motion**"), seeking to enjoin the Debtors from obtaining the HDPP Funds.  The HSA HDPP Motion is scheduled to be heard in the Bankruptcy Court on May 1, 2025.  The Debtors disagree with the assertions set forth in the HSA HDPP Motion and object to the relief requested therein, and intend to file a response thereto in advance of the hearing.

3.    *JV Interests in Clinics & Other Health Centers*

As of the date hereof, the Debtors continue to maintain an interest in ten (10) clinics and health centers either directly or via their equity interest in a joint venture with a third party (the "**Ancillary Properties**").  The Ancillary Properties provide supplemental services to hospital systems within their vicinity, including special ambulatory surgical care, imaging services, hospice, and other services.  The Debtors are actively working to liquidate their interest in all of the remaining Ancillary Properties.  Through the disposition of their equity interests in joint ventures related to the Ancillary Properties, the Debtors realized approximately $4.1 million in proceeds as of April 25, 2025.  The Debtors anticipate that they will fully divest from all of their remaining clinics and health centers by Q2 2025, and realize approximately $13.5 million on account of the disposition of their interest in the Ancillary Properties.

4.    *Stewardship Purchase Price Adjustment*

The Stewardship APA contemplates a purchase price adjustment (the "**Purchase Price Adjustment**") based upon the calculations contained in a written notice sent from Brady to the Debtors following the closing date (the "**Stewardship Closing Statement**") setting forth, among other things, final net working capital, the total cure costs actually paid by Brady on behalf of the Debtors, and the final purchase price of Stewardship Health.  Under the terms of the Stewardship APA, any net-positive difference between the final purchase price (as identified and calculated in the Stewardship Closing Statement) and the estimated, headline purchase price for Stewardship Health must be remitted to the Debtors.

On March 13, 2025, the Debtors issued a written notice (the "**Stewardship Dispute Notice**") to Brady disputing certain calculations contained in the Stewardship Closing Statement and asserting that the Debtors are entitled to a Purchase Price Adjustment of approximately $26 million.  As of the date hereof, in accordance with the procedures outlined in the Stewardship APA, the Debtors and Brady are working to

identify a neutral accountant to review the Stewardship Closing Statement and Stewardship Dispute Notice and to provide a report setting forth an independent determination with respect to each disputed item contained in the Stewardship Dispute Notice. The Debtors maintain they are entitled to a total of approximately $26 million in connection with the Stewardship Closing Statement.

      5.     *Litigation Claims*

      a.     *Claims Against Commercial Payors*

In addition to, and separate from, the Debtors' ordinary course collection of accounts receivable described in Section IV.M.2 hereto, the Debtors have retained K&S to investigate, identify, and pursue via dispute resolution, arbitration, and litigation proceedings a multitude of potential claims against large commercial payors in connection with outstanding accounts receivable. K&S is performing an ongoing analysis of, among other things, the viability of a number of causes of action for underpayment and for improperly denied hospital claims. The Debtors currently estimate that the total amount of underpayments and improperly denied claims which may be pursued through dispute resolution, arbitration, and litigation proceedings is approximately $354 million. To date, K&S has reviewed over 3,600 contract documents accounting for approximately $354 million in underpaid or improperly denied claims, issued a total of 33 dispute notices, and initiated approximately $353 million in underpayment disputes, including 5 filed adversary proceedings accounting for approximately $64 million in underpayment claims.

      b.     *Norwood Litigation*

The Debtors hold certain claims and causes of action arising under an insurance policy for property damage and business interruption losses sustained at Norwood (all such claims and potential claims, the "**Norwood Claims**"). The Debtors estimate that they are entitled to basic damages in the approximate amount of at least $295 to $300 million on account of the Norwood Claims.

On June 28, 2020, a weather event in the town of Norwood, Massachusetts produced approximately 5.75 inches of rainfall in 90 minutes, causing catastrophic floodwater and damage throughout Steward's Norwood hospital. The storm caused damage to approximately 369,341 of the Norwood hospital's 399,833 total square feet of space. Under orders from the town of Norwood, Steward was forced to cease all operations at the Norwood hospital.

Steward was insured under an all-risk insurance policy issued by American Guarantee and Liability Insurance Company ("**AGLIC**") for the Norwood hospital that covered business personal property, time element, and medical equipment losses (the "**Steward Norwood Policy**"). On December 4, 2020, Steward filed claims with AGLIC for its losses, including business interruption losses from being unable to continue hospital operations and damage to business personal property such as hospital equipment. The Steward Norwood Policy contains an $850 million total policy limit and an annual aggregate "Flood" sublimit of $150 million, which limits insurable losses caused by any incident falling under what the policy defines as a "Flood" event, specifically, in pertinent part, "[a] general and temporary condition of partial or complete inundation of normally dry land areas or structure(s) caused by [t]he unusual and rapid accumulation or runoff of surface waters, waves, tides, tidal waves, tsunami, the release of water, the rising, overflowing or breaking of boundaries of nature or manmade bodies of water; or the spray therefrom all whether driven by wind or not . . . ." Steward Norwood Policy at § 7.22. MPT, as owners of the building, also had its own commercial property insurance policy covering the Norwood hospital's real estate from Zurich American Insurance Company ("**Zurich**"). Steward and MPT worked with AGLIC and Zurich to seek recovery under their individual policies, and AGLIC made certain payments to Steward of approximately $97 million. However, AGLIC and Zurich would not agree to indemnify Steward or MPT for the full extent of their

claimed insurable losses. The Debtors contend that there are hundreds of millions of dollars of such unreimbursed insurable losses.

As a result, on November 23, 2021, Steward filed an action against both AIGLIC and Zurich (as the parent company largely responsible for managing the claims) in the United States District Court of Massachusetts (the "**MA District Court**") alleging failure of Zurich to indemnify Steward pursuant to the Steward Norwood Policy for the substantial losses incurred (the "**Norwood Insurance Action**"). On January 24, 2022, Steward filed an amended complaint. In the Norwood Insurance Action, Steward has asserted the following claims: (i) a declaratory judgment against AGLIC of the nature and extent of Steward's rights and AGLIC's obligations under the Steward Norwood Policy with respect to Steward's losses resulting from the weather event, and a finding that AGLIC is in breach of those obligations, together with a determination of the nature, manner, extent, and impact of such breaches; (ii) breach of contract against AGLIC for, among other things, failing to pay Steward for all its covered causes of loss under the Steward Norwood Policy; (iii) breach of the implied covenant of good faith and fair dealing against AGLIC for failing to adjust Steward's insurance claim in good faith; (iv) tortious interference with contractual relations against Zurich for knowingly and intentionally interfering with the Steward Norwood Policy, and inducing AGLIC to breach that policy; and (v) unfair or deceptive acts or practices in the conduct of trade or commerce against AGLIC and Zurich. Steward sought damages to be determined at trial for claims (ii) through (iv), and damages, plus multiple damages (e.g., treble damages) and attorney's fees and costs for claim (v). In total the Debtors believe that such claims, including treble damages, are approximately $885 million.

In their answers, Zurich and AGLIC asserted many affirmative defenses to Steward's claims, including: (i) failure to state a claim, (ii) Steward's claims were barred because Defendants fully met their obligations under the terms of the Steward Norwood Policy; (iii) Steward's claims against Zurich were barred because it was not an insured party under the insurance policy issued by Zurich to MPT; (iv) Steward's claims were barred because it did not fulfill conditions precedent to coverage pursuant to the terms of the Steward Norwood Policy; (v) lack of subject matter jurisdiction; (vi) failure to comply with policy reference requirements and Massachusetts General Laws chapter 175 § 99 (which governs the allowable contents of an insurance policy providing coverage for losses from natural events); and (vii) failure to mitigate damages. AGLIC also asserted a counterclaim, seeking a declaration that Steward's total recovery under the Steward Norwood Policy could not exceed the $150 million sublimit applicable to "Flood" under the Steward Norwood Policy.

On April 15, 2022, Steward filed a Motion for Partial Summary Judgment, arguing that AGLIC's coverage position—that the Flood sublimit applied to Steward's entire loss—had no basis in law, fact or the language of the Steward Norwood Policy.

Zurich then filed a Motion for Partial Summary Judgment, to which AGLIC joined, seeking "a declaratory judgment [in its favor] on the purely legal question of whether damage caused to Norwood Hospital by water accumulation on, and infiltration through, a roof or other raised surface falls within the property insurance policy's 'Flood' sublimit."

On November 15, 2022, the MA District Court denied Steward's Motion for Partial Summary Judgment and granted AGLIC's Motion for Partial Summary Judgment, relying on its prior holding in the related case, *Zurich American Insurance Company v. Medical Properties Trust, Inc.*, No. 21-cv-11621, in which the MA District Court held that that "surface water" includes water from artificial surfaces above the ground. Steward appealed the denial.

On appeal, on December 19, 2023, the First Circuit certified as a question of law to the Massachusetts Supreme Judicial Court ("**SJC**") whether rainwater that lands and accumulates on either (i) a building's second-floor outdoor rooftop courtyard or (ii) a building's parapet roof and that subsequently inundates the interior of the building unambiguously constitutes "surface water" under Massachusetts law for the purposes of the insurance policies at issue in the case.

On July 23, 2024, the Massachusetts SJC held that "[r]ainwater that lands and accumulates on either a building's second-floor outdoor rooftop courtyard or a building's parapet roof does not unambiguously constitute 'surface waters' under Massachusetts law for the purposes of the policies at issue in [the] case." *Zurich Am. Ins. Co. v. Med. Props. Tr., Inc.*, No. SJC-13535, 2024 WL 3504060, at *9 (Mass. July 23, 2024). On July 29, 2024, the Massachusetts United States Court of Appeals for the First Circuit, on the basis of the SJC's holding, ruled in favor of both Steward and MPT and reversed the MA District Court's rulings granting AGLIC's and Zurich's Motions for Partial Summary Judgment, and remanded both cases to the MA District Court for further proceedings consistent with the SJC's opinion.

On January 6, 2025, the MA District Court adopted a Scheduling Order[54] setting various deadlines in advance of a trial (the "**Norwood Trial**") and requiring that the parties would confer to propose a date for mediation. Steward, AGLIC, and Zurich participated in mediation in January 2025; however, the parties' participation in mediation did not resolve the matter. As such, the parties are proceeding with litigation on the timeline set forth in the Scheduling Order, with all discovery to be completed in advance of the Norwood Trial by June 10, 2025 and all dispositive motions filed by September 24, 2025. The Norwood Trial will subsequently begin in January 2026.

On April 25, 2025, AGLIC and Zurich filed a motion requesting the MA District Court to extend the deadlines set forth in the Scheduling Order by approximately eleven (11) months.

c.   *BCBS Antitrust Litigation*

Prior to the Petition Date, various healthcare providers (the "**Provider Plaintiffs**") brought several class action lawsuits against the national Blue Cross Blue Shield Association and its various licensees that provide commercial health insurance in their respective territories ("**BCBS**"), consolidated in *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (MDL No. 2406) (N.D. Ala. 2013) (the "**BCBS Provider Antitrust Litigation**"), in which the Provider Plaintiffs alleged that BCBS engaged in anticompetitive conduct throughout the United States that resulted in healthcare providers being reimbursed at levels below those which would prevail in a competitive market. As a result, all healthcare providers who were reimbursed by BCBS during the relevant period suffered economic losses. On October 14, 2024, the Provider Plaintiffs and BCBS filed a settlement agreement providing for a resolution of the BCBS Provider Antitrust Litigation. *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (Docket No. 3192-1) (the "**BCBS Settlement**"). The Bankruptcy Court granted preliminary approval to the BCBS Settlement on December 4, 2024 and scheduled a final fairness hearing for July 29, 2025. *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (Docket No. 3225). Under the terms of the BCBS Settlement, healthcare providers that provided services to BCBS patients from July 24, 2008 to October 4, 2024 are able submit a proof of claim and may receive subsequent payment from a settlement fund with a total value of approximately $2.2 billion (the "**BCBS Fund**"). The BCBS Fund will be allocated among all providers who participate. Providers had until March 4, 2025 to opt-out of the

---

[54]   *Steward Health Care Sys, LLC v. Am. Guar. and Liab. Ins. Co.*, No. 1:21-cv-11902-PBS (D. Mass. Jan. 1, 2025) (No. 79).

BCBS Settlement and, instead, pursue independent litigation against BCBS. The hearing to consider approval of the BCBS Settlement will take place on July 29, 2025.

After undertaking a thorough evaluation of their potential claims against BCBS, along with the likely recovery that Debtors reasonably could expect if they remained in the class, the Debtors determined that pursuing independent litigation against BCBS would be the best course of action for purposes of maximizing the value of the Debtors' estates. As a result, the Debtors opted-out of the BCBS Settlement in a timely manner. On April 23, 2025, the Debtors filed an antitrust case against BCBS, Case No. 5:25-cv-03570 (Docket No. 1) (the "**BCBS Antitrust Complaint**"). The BCBS Antitrust Complaint asserts significant claims that arise from the same factual and legal nexus as those asserted in the BCBS Provider Antitrust Litigation (the "**Debtors' BCBS Claims**"). The Debtors' BCBS Claims will entitle the Debtors to damages in amount to be proven at trial which is anticipated to be multiples of what the Debtors would have obtained had they not opted out of the BCBS Settlement. Moreover, under federal antitrust law the damages awarded at trial will be automatically trebled. The Debtors have retained K&S to bring this independent litigation against BCBS.

      d.    *Preference and Avoidance Actions*

The Debtors have retained Togut to identify, assess, and litigate preference claims, avoidance actions, fraudulent transfer claims, and other claims and causes of action arising under chapter 5 of the Bankruptcy Code. As of the date hereof, Togut has made over 670 demands to certain parties who received distributions of $25,000 or more within the ninety (90) days prior to the Petition Date, asserting a total gross demand of $300 million. As of the date hereof, the Debtors have recovered approximately $915,000 on account of fifteen (15) claims that have been entirely resolved.

On February 20, 2025, Togut filed the *Motion of Debtors for Entry of an Order Establishing Streamlined Procedures for the Prosecution and Resolution of Avoidance Claims* (Docket No. 4014) (the "**Avoidance Actions Motion**"), which requested the Bankruptcy Court to enter an order establishing streamlined procedures to govern the prosecution, mediation, and resolution of adversary proceedings involving certain avoidance causes of action of the Debtors against non-insider, non-affiliate transferees that the Debtors anticipated commencing, and authorizing the Debtors to settle each in accordance with the settlement procedures proposed in the Avoidance Actions Motion. Exhibits 1 and 2 of the proposed order describe the default scheduling order for defendants not opting into the voluntary mediation program and defendants opting into the voluntary mediation program, respectively. On March 20, 2025, the Bankruptcy Court entered the *Order Establishing Streamlined Procedures for the Prosecution and Resolution of Avoidance Claims* (Docket No. 4269). Subsequently, on April 11, 2025, Togut commenced over 150 adversary proceedings seeking, among other things, (i) to recover value on account of avoidable and fraudulent transfers and (ii) to disallow a number of Claims, asserting a total gross demand of over $50 million. As of the date hereof, Togut has initiated discussions with 324 potential preference defendants.

      e.    *Other Potential Claims and Causes of Action*

The Investigation Sub-Committee has evaluated and identified a number of potential claims against various third parties on account of the transactions described in Section IV.N.8 hereto, including, but not limited to, potential claims on account of fraudulent conveyance (and other causes of action arising under chapter 5 of the Bankruptcy Code), breach of fiduciary duty, corporate waste, and unlawful distribution against certain of the Debtors' current and former insiders. The Debtors, acting through the Investigation Sub-Committee, have sought Bankruptcy Court approval to retain Kobre & Kim (Docket No. 4445) to further pursue any such identified claims (the "**Investigation Claims**") against third parties on behalf of

the Debtors' estates.  As of the date hereof, the Debtors estimate that they may assert Investigation Claims in aggregate amounts in excess of $1 billion.

The Debtors are continuing to assess any and all other claims and causes of action that may be available to them, including additional preference claims, fraudulent transfer claims, and other claims arising under chapter 5 of the Bankruptcy Code.

For the avoidance of doubt, the Estate Representative shall retain the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any and all claims or causes of action that are expressly preserved and not released, vested, settled or sold to a third party under any order of the Bankruptcy Court until the Confirmation Date, at which point all such rights (including all proceeds from any such preserved causes of action) shall transfer to the Plan Trust and/or the Litigation Trust, as applicable, in accordance with the terms of the Plan.

## N.  ADVERSARY PROCEEDINGS & OTHER BANKRUPTCY LITIGATION

1. *BMI Adversary Proceeding & BMI Bankruptcy Litigation*

a. *Commencement and Preliminary Injunction Hearing*

On May 16, 2024, BMI initiated an adversary proceeding against Debtor-Defendants SHC and Stewardship Services, Inc. ("**SSI**," and together with SHC, the "**Debtor-Defendants**"), captioned Adv. Proc. No. 24-03102 (the "**BMI Adversary Proceeding**"), seeking, among other things, declaratory relief that a termination notice sent by BMI to the Debtor-Defendants on April 26, 2024 with respect to the BMI MSA (the "**Termination Notice**") was valid and enforceable.[55]

On May 17, 2024, BMI filed a motion for a preliminary injunction against the Debtor-Defendants (Adv. Proc. Docket No. 14) seeking to prevent Steward from allegedly interfering with the transition of the USFHP to another administrator and the exercise of certain of BMI's rights under the BMI MSA, and compelling Steward to assign certain subcontracts to BMI (the "**BMI Preliminary Injunction Motion**"). The Debtors filed an opposition to the BMI Preliminary Injunction Motion on June 10, 2024 (Adv. Proc. Docket No. 62) arguing, among other things, that BMI failed to show (1) a substantial likelihood that it would prevail on the merits that the Debtor-Defendants breached the BMI MSA and (2) harm sufficient to support a preliminary injunction (the "**Opposition**").  The Debtors' Opposition was joined by the Creditors' Committee on June 12, 2024 (Adv. Proc. Docket No. 73).  BMI filed a reply brief in support of the BMI Preliminary Injunction Motion on June 14, 2024 (Adv. Proc. Docket No. 82), responding to the arguments made by the Debtor-Defendants in the Opposition.

On June 17, 2024, at a hearing on the BMI Preliminary Injunction Motion, the Bankruptcy Court raised issues that led BMI to withdraw that Motion during the hearing.  The Bankruptcy Court urged BMI and the Debtor-Defendants to continue discussions aimed at resolving the BMI Adversary Proceeding consensually while proceeding toward a hearing to consider BMI's request for a declaratory judgment in the BMI Complaint.  In response, and pursuant to the *Joint Stipulation and Agreed Order Appointing a Mediator and Governing Mediation Procedures* entered June 27, 2024  (Adv. Proc. Docket No. 105)

---

[55]   A sealed copy of *Brighton Marine, Inc.'s Adversary Complaint for Declaratory Judgment* was filed at Adv. Proc. Docket No. 2 (the "**BMI Complaint**").

(the "**BMI Mediation Order**"), the Debtor-Defendants, the Creditors' Committee, and BMI commenced mediation in an attempt to resolve the BMI Adversary Proceeding.

        b.     *Declaratory Judgment Hearing*

On June 20, 2024, the Debtors filed a formal answer to the BMI Complaint, maintaining that the Termination Notice was invalid, and asserted a counterclaim against BMI on the basis that, among other things, BMI's attempt to compel Steward to transition Plan administration violated the automatic stay set forth in 11 U.S.C. § 362(k) (Adv. Proc. Docket No. 100). In response, BMI filed *Brighton Marine's Reply to Defendant's Counterclaim Complaint* (Adv. Proc. Docket No. 116), answering the allegations and asserting various affirmative defenses to the Debtors' counterclaim. Pursuant to the BMI Mediation Order, the Debtor-Defendants, the Creditors' Committee, and BMI engaged in several mediation sessions overseen by the Honorable Judge Marvin Isgur. However, the parties were unable to reach a consensual resolution. Subsequently, on September 9, 2024, the Debtor-Defendants filed a pre-trial brief (Adv. Proc. Docket No. 126) arguing that (i) BMI failed to establish that it had a right to terminate the BMI MSA; (ii) BMI's Termination Notice was an impermissible post-petition termination of the Debtor-Defendants' rights under an executory contract; and (iii) BMI breached the BMI MSA and violated the automatic stay and the Debtor-Defendants' bankruptcy rights. That same day, BMI filed a pre-trial brief (Adv. Proc. Docket No. 128) arguing that (i) BMI validly terminated the BMI MSA pre-petition; (ii) the Bankruptcy Court had the authority to compel the Debtor-Defendants to assume and assign subcontracts related to the BMI MSA; and (iii) the Debtor-Defendants' counterclaim failed to establish that BMI had breached the BMI MSA or violated the automatic stay. The Bankruptcy Court held a trial on September 12, 2024 to hear the Debtor-Defendants' and BMI's arguments on the merits with respect to BMI's request for declaratory judgment and related relief.

Following the September 12, 2024 hearing, on October 1, 2024, the Bankruptcy Court granted in part and denied in part BMI's request for a declaratory judgment, holding, among other things, that (i) the BMI MSA would validly terminate on October 31, 2024, and (ii) the Debtor-Defendants would not be required to assume and assign to BMI certain subcontracts related to administration of the USFHP. Noting the importance of BMI, Brady, and the Debtor-Defendants coming to an agreement to transition administration of the USFHP to a new operator, the Bankruptcy Court scheduled a status conference for October 23, 2024, to ensure all involved parties coordinate to preserve the uninterrupted care of USFHP beneficiaries. *See* Adv. Proc. Docket No. 170.

        c.     *October 23, 2024 Status Conference and Transition Services Agreement*

On October 23, 2024, the Debtors and BMI attended a status conference (the "**BMI Status Conference**") to provide an update with respect to the transition of the USFHP to a new operator. At the BMI Status Conference, the Debtors and BMI informed the Bankruptcy Court that the parties were negotiating a transition services agreement (the "**BMI TSA**") that would ensure the organized transition of the administration of the USFHP to Brighton Marine. On October 31, 2024, the Debtors and BMI entered into the *Stipulation Between Steward Health Care System LLC and Brighton Marine, Inc.* (Adv. Proc. Docket No. 177) to extend the termination date of the BMI MSA by one day to November 1, 2024 as negotiations between the Debtors and BMI finalized, which was approved by the Bankruptcy Court that same day entered the *Order Approving Stipulation Between Steward Health Care System LLC and Brighton Marine, Inc.* (Adv. Proc. Docket No. 178).

On November 1, 2024, the Debtors filed the *Emergency Motion of Debtors For Entry of an Order Approving Entry Into Transition Services Agreement With Brighton Marine, Inc.* (Docket No. 3093), seeking entry of an order approving the BMI TSA. The Bankruptcy Court entered the *Order Approving*

*Entry Into Transition Services Agreement With Brighton Marine, Inc.* (Docket No. 3123) on November 5, 2024. On January 27, 2025, BMI notified the Debtors that the initial term of the BMI TSA was extended to May 30, 2025 in accordance with its terms.

<div align="center">d.    <em>BMI Motion to Compel Payment</em></div>

On March 20, 2025, BMI filed *Brighton Marine, Inc.'s Emergency Motion (I) To Compel Payment of Funds Held in Trust; (II) To Compel Compliance with the Transition Services Agreement; (III) To Permit Set Off; or Alternatively (IV) For Conversion to Chapter 7 of the Bankruptcy Code* (Docket No. 4271) (the "**BMI Motion**"), seeking an order compelling the Debtors to transfer approximately $5 million of estate assets to BMI (or to one of BMI's creditors) through a mandatory injunction and a constructive trust, or converting the chapter 11 cases to chapter 7. The BMI Motion requested such relief by March 28, 2025 on an emergency basis. On March 28, 2025, the Debtors filed the *Debtors' Preliminary Objection to Brighton Marine, Inc.'s Emergency Motion (I) To Compel Payment of Funds Held in Trust; (II) To Compel Compliance with the Transition Services Agreement; (III) To Permit Set Off; or Alternatively (IV) For Conversion to Chapter 7 of the Bankruptcy Code* (Docket No. 4387) (the "**Preliminary Objection**"). In the Preliminary Objection, the Debtors argued that BMI's Motion should be summarily denied as procedurally improper because it is a proceeding that must be pursued in an adversary proceeding, that BMI's request for emergency relief does not meet the standards to warrant emergency consideration, and even if BMI's Motion could proceed, it fails on the merits. Additionally, the Debtors argued that the BMI Motion was an attempt to circumvent the Administrative Expense Claims Bar Date Order, as BMI failed to assert an administrative expense claim by the applicable bar date.

<div align="center">2.    <em>MPT Adversary Proceeding</em></div>

Pursuant to the Global Bidding Procedures, the Debtors engaged in a robust marketing and sales process to explore all available transactions that would allow them to sell their hospitals to new operators who can continue to serve the Debtors' patients and communities. However, those efforts were complicated by the fact that, while the Debtors owned the licenses to operate their hospitals as well as all related operating assets, including equipment, inventory, contracts, and accounts, 30 out of 31 of the Debtors' hospital locations were subject to master leases with MPT—*i.e.*, Master Lease I and Master Lease II. Accordingly, as bidders proposed acquisition terms to purchase these facilities as ongoing operating hospitals, the Debtors and MPT had competing interests as it related to the value attributed to the Debtors' operating assets versus the value allocated to the real estate owned by MPT or the proposed terms of a new lease with MPT. The Debtors alleged that the sales process was challenged by MPT's involvement.

The Debtors took certain actions in response including, on August 19, 2024, initiating an adversary proceeding against MPT, captioned Adv. Proc. No. 24-03168 (the "**MPT Adversary Proceeding**"), seeking a declaratory judgment as to the amount of value attributable to hospital operations, on one hand, and hospital real estate, on the other. Following the initiation of the MPT Adversary Proceeding, the Debtors entered into the Global Settlement, and the MPT Adversary Proceeding did not advance beyond the filing of the complaint.

<div align="center">3.    <em>TRACO Adversary Proceeding</em></div>

On November 26, 2024, TRACO filed an objection to various stipulations submitted by the Debtors and various motions filed by medical malpractice claimants to lift the automatic stay to permit the claimants to liquidate their claims and collect from the TRACO insurance policies (Docket No. 3289) (the "**TRACO Objection**"). Despite all transactions between the Debtors and TRACO being done on an intercompany basis since 2021, the TRACO Objection alleged the Debtors had not paid any postpetition premiums due

and owing under the 2024 insurance policies.  The TRACO Objection noted that although TRACO had continued to fulfill its obligations to individual physicians, the Debtors' non-payment of funds paid by the covered physicians to TRACO put such coverage at risk.

On December 2, 2024, TRACO filed a motion against the Debtors seeking an order from the Bankruptcy Court compelling the Debtors to, among other things, (i) pay postpetition premiums to TRACO in the amount of $35.5 million, (ii) provide $1.3 million of funding to TRACO to satisfy its prepetition settlement and defense costs relating to litigations against the Debtors' hospitals and doctors and health care providers, and (iii) turn over to TRACO a portion of the proceeds from the Debtors' sales of the Davis and Odessa assets (Docket No. 3341) (the "**TRACO Motion**").  Specifically, the TRACO Motion alleged that TRACO had a 12.36% equity interest in Odessa and 30.18% equity interest in Davis, which provided TRACO with an alternative source of funding if the Debtors failed to provide funding for their obligations under the insurance policies.  According to the TRACO Motion, $72 million of the proceeds from the sale of the Davis assets to CommonSpirit in 2023 (the "**Davis Proceeds**") were allocated to TRACO as a return on its equity investment in the assets.  The TRACO Motion also asserted that TRACO is entitled to an accounting and a portion of the proceeds from the postpetition sale of the Odessa assets (the "**Odessa Proceeds,**" and together with the Davis Proceeds, the "**TRACO Sale Proceeds**").  According to TRACO, the TRACO Sale Proceeds are held in constructive trust for the benefit of TRACO.  The TRACO Motion further stated that TRACO will seek relief from the automatic stay to cancel the Debtors' insurance policies if the Debtors did not pay the postpetition premiums.

On December 6, 2024, TRACO initiated an adversary proceeding against the Debtors, captioned Adv. Proc. No. 24-03261 (the "**TRACO Adversary Proceeding**").  In its adversary complaint filed at Adv. Proc. Docket No. 1 (the "**TRACO Complaint**"), TRACO seeks, among other things, turnover of the TRACO Sale Proceeds.  Subsequently, on February 15, 2025 TRACO filed the *Emergency Motion for an Order Directing Debtors, Committee, and FILO Lenders to Participate In Mediation with TRACO International Group S. De R.L.* (Docket No. 3985), seeking to compel the Debtors and other stakeholders to engage in formal mediation proceedings with TRACO.  On January 31, 2025, the Debtors filed a formal answer to TRACO at Adv. Proc. Docket No. 6, denying the allegations made in the TRACO Complaint.  On February 21, 2025, TRACO filed its *First Amended Complaint* (Adv. Proc. Docket No. 8), which additionally seeks an order from the Bankruptcy Court to compel the Debtors to turn over certain interest payments made by Prima Care, P.C. pursuant to a note and security agreement between Prima Care and TRACO (the "**TRACO First Amended Complaint**").  On March 21, 2025, the Debtors filed their answer to the TRACO First Amended Complaint, denying all allegations in therein.

4.    *Massachusetts Adversary Proceeding*

On December 6, 2024, the Commonwealth filed *The Commonwealth of Massachusetts' Motion for Relief from the Automatic Stay to Allow for the Setoff of Mutual Obligations if and to the Extend that Recoupment is Not Available* (Docket No. 3393) (the "**MA Stay Relief Motion**") seeking, among other things, relief to recoup or set off approximately $5.5 million in prepetition advance payments, approximately $8.0 million in postpetition advancements, approximately $4.5 million in identified or expected overpayments made by the Massachusetts Medicaid Program, and approximately $19.9 million in postpetition unpaid amounts associated with certain Hospital Assessments (as defined in the MA Stay Relief Motion).  Moreover, in the MA Stay Relief Motion, the Commonwealth noted that it had been unable to secure the approximately $8 million in additional funding from an alternative source as contemplated in the Incremental Funding Agreement despite its good faith efforts.

On January 3, 2025, the Debtors and the Commonwealth filed the *Stipulation and Agreed Order Between Debtors and the Commonwealth of Massachusetts Setting Briefing Schedule for the Commonwealth's Motion for Relief From the Automatic Stay to Allow for the Setoff of Mutual Obligations if and to the Extent That Recoupment is Not Available* (Docket No. 3608), setting a briefing schedule with respect to the MA Stay Relief Motion.  On February 14, 2025, the Debtors filed the *Complaint for Declaratory Judgment, Turnover, and Enforcement of Court Order Against the Commonwealth of Massachusetts* (Docket No. 3983) (the "**MA Complaint**") and commenced an adversary proceeding against the Commonwealth at Adv. Proc. No. 25-03053.  In the MA Complaint, the Debtors objected to the relief sought in the MA Stay Relief Motion and sought (i) a declaratory judgment that the Commonwealth is not entitled to recoupment or setoff; (ii) an order compelling the Commonwealth to turnover amounts owed to the Debtors, including approximately $22 million in withheld patient claims, and (3) enforcement of the order approving the Incremental Funding Agreement.

5.    *CommonSpirit Adversary Proceeding*

In connection with the IASIS Merger in 2017, Steward acquired equity interests in Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**").  In 2023, Steward determined to sell certain of its operations located in Utah, including its operations at Jordan Valley and Davis.  To that end, it entered into that certain (i) *Asset Purchase Agreement*, dated as of February 15, 2023, by and among certain Steward entities (collectively, the "**Utah Sellers**") and CommonSpirit, (ii) *Letter Agreement to the Asset Purchase Agreement*, dated as of May 1, 2023, by and among the Utah Sellers and CommonSpirit, and (iii) *Transition Services Agreement*, dated as of May 1, 2023, by and between SHCS and an affiliate of CommonSpirit (collectively, the "**Utah Transaction Documents**").

On January 3, 2025, CommonSpirit initiated an adversary proceeding against the Debtors captioned Adv. Proc. No. 25-03001 (the "**CommonSpirit Adversary Proceeding**").  In their adversary complaint filed at Adv. Proc. Docket No. 1 (the "**CommonSpirit Complaint**"), CommonSpirit seeks, among other relief, an order of specific performance requiring the Debtors to remit funds in the approximate amount of $16.8 million and the creation a constructive trust over such assets on account of alleged breaches of the Utah Transaction Documents.  On January 16, 2025, the Debtors and CommonSpirit filed the *Stipulation and Order Extending Defendants' Time to Answer Plaintiffs' Adversary Complaint* (Adv. Proc. Docket No. 28) extending the Debtors' deadline to respond the CommonSpirit Complaint until March 17, 2025.  On March 14, the Debtors and CommonSpirit filed the *Joint Statement Regarding Scheduling Proposals and Discovery* (Adv. Proc. Docket No. 31), establishing a schedule for the CommonSpirit Adversary Proceeding leading to the commencement of trial at a date to be determined.  On March 17, 2025, the Debtors filed *Steward Health Care System, LLC's Answer to Catholic Health Initiatives Colorado's Complaint* (Adv. Proc. Docket No. 32), denying the allegations raised in the CommonSpirit Complaint and requesting the matter be dismissed with prejudice.  On April 7, 2025, the Debtors filed *Steward Health Care System, LLC's Memorandum of Law in Support of Its Motion for Judgment on the Pleadings* (Adv. Proc. No. 36).  On April 28, 2025, CommonSpirit filed *Plaintiff's Response to Debtors' Motion for Judgment on the Pleadings* (Adv. Proc. No. 40), requesting that the Court deny the Debtors' motion for judgment on the pleadings in its entirety.

6.    *Rabbi Trust Litigation*

(a)    *Nonqualified Deferred Compensation Plans*

The Debtors historically sponsored two "top hat" nonqualified, unfunded, deferred compensation plans: (i) the Steward Health Care Deferred Compensation Plan, administered by NFP Corp. (the "**SHC Plan**") and (ii) the IASIS Healthcare Executive Savings Plan, administered by Principal Life Insurance

65

Company (the "**IASIS Plan**," together with the SHC Plan, the "**Deferred Compensation Plans**").  The SHC Plan was frozen on the Petition Date and no participant deferrals have been made since the Petition Date, while the IASIS Plan was frozen in 2017 and no participant deferrals have been made since 2017.  The deferred amounts were not placed in a separate account.  Instead, the Debtors maintained a "notional" account for each participant that tracks the deferred amounts and credits such account with gains and losses based on hypothetical investments.

The Deferred Compensation Plans were created and maintained for the purpose of providing deferred compensation to a select group of physicians and other select members of management or highly compensated employees (each, a "**Participant**" and collectively, the "**Participants**") of SHC and IASIS Healthcare, LLC ("**IASIS**" and together with SHC, the "**Plan Sponsors**") under Title I of the Employee Retirement Income Security Act of 1974 ("**ERISA**") on an unfunded basis. Specifically, the Deferred Compensation Plans were unfunded, non-tax qualified deferred compensation plans that were intended to (i) comply with the requirements of section 409A of the Internal Revenue Code of 1986, as amended, and (ii) qualify for the exemptions provided under sections 201, 301, and 401 of ERISA, as amended.

Pursuant to the *Order Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, Expenses, and Other Compensation, (B) Maintain Employee Benefits Programs, and (C) Continue to Pay Workforce Obligations, and (II) Granting Relate Relief* (Docket No. 86) (the "**Wages Order**"), the Debtors terminated the Deferred Compensation Plans retroactive to the Petition Date.

### (b)     The Rabbi Trusts

The Debtors maintained two "rabbi trusts" to support the Deferred Compensation Plans.  One rabbi trust was maintained with Matrix Trust Company, as trustee ("**Matrix**"), for the benefit of Participants of the SHC Plan (the "**SHC Trust**") pursuant to that certain *Amended and Restated Rabbi Trust Agreement* (the "**SHC Trust Agreement**").  The assets of the SHC Trust primarily consisted of corporate-owned life insurance contracts on certain current or former employees as a means to fund the Debtors' obligations under the SHC Plan.

The Debtors separately maintained a "rabbi trust" with Delaware Charter Guarantee & Trust Company, conducting business as Principal Trust Company, as trustee ("**Principal Trust**" and together with Matrix, the "**Rabbi Trustees**"), for the benefit of the Participants of the IASIS Plan (the "**IASIS Trust**" and together with the SHC Trust, the "**Rabbi Trusts**") pursuant to that certain *IASIS Healthcare Executive Savings Plan Trust Agreement* (the "**IASIS Trust Agreement**" and together with the SHC Trust Agreement, the "**Rabbi Trust Agreements**").  The assets of the IASIS Trust consisted of mutual funds, cash, and cash equivalents as a means to fund the Debtors' obligations under the IASIS Plan.

Each of the Rabbi Trust Agreements provided that the assets of the two Rabbi Trusts (the "**Rabbi Trust Assets**") were property of the Debtors and that the rights of the Participants to benefits provided by the Deferred Compensation Plans and the Rabbi Trusts do not exceed those of a general creditor of the Plan Sponsors in the event of the Plan Sponsors' bankruptcy.  Specifically, each Rabbi Trust was a "grantor" trust pursuant to which Participants under the Deferred Compensation Plans had no preferred claim on, or any beneficial ownership interest in, any assets of such trusts.

### (c)     Rabbi Trust Motion and Objection

On November 24, 2024, the Debtors filed a motion seeking entry of an order from the Bankruptcy Court, among other things, authorizing and directing the Rabbi Trustees to liquidate the Rabbi Trust Assets

and transfer the proceeds thereof to the Debtors' estates and authorizing the Debtors to exercise their ownership rights over such Rabbi Trust Assets (Docket No. 3277) (the "**Rabbi Trust Motion**").

On December 17, 2024, a group of Participants (the "**Objecting Participants**") filed an objection to the Rabbi Trust Motion (Docket No. 3497) (the "**Rabbi Trust Objection**") and filed a notice regarding their intent to conduct discovery pursuant to Bankruptcy Rule 2004 (Docket No. 3581).  The Rabbi Trust Objection asserted that the Debtors failed to prove the Deferred Compensation Plan were "top hat" plans and the Rabbi Trust Assets were subject to an ERISA statutory trust or a constructive trust and/or the documents governing the Deferred Compensation Plans and Rabbi Trusts must be reformed such that the Rabbi Trust Assets are held by the Debtors in trust for the exclusive benefit of the Participants and the beneficiaries of the Deferred Compensation Plans.  On January 14, 20245, an additional Participant filed a joinder to the Rabbi Trust Objection (Docket No. 3705).

On January 29, 2025, the Bankruptcy Court entered the *Stipulation and Agreed Order Regarding the Liquidation of Certain Trust Assets* (Docket No. 3842) (the "**Rabbi Trust Liquidation Order**"), which, among other things, authorized and directed the Rabbi Trustees to liquidate the Rabbi Trust Assets, with the proceeds thereof to be placed and held in the Segregated Accounts (as defined in the Rabbi Trust Liquidation Order) pending further Bankruptcy Court order or consent by the Participants who filed the Rabbi Trust Objection.  The Rabbi Trust Assets were fully liquidated, and (i) $51,353,852.89 of proceeds were wired to the SHC Account (as defined in the Rabbi Trust Liquidation Order) and (ii) $10,989,245.34 of proceeds were wired to the IASIS Account (as defined in the Rabbi Trust Liquidation Order).  The Rabbi Trust Liquidation Order made clear that nothing in the Rabbi Trust Liquidation Order, nor any actions taken pursuant thereto, was deemed a waiver or limitation of the Debtors, or any other party in interest's, rights under the Bankruptcy Code or any other applicable law

On March 3, 2025, the Objecting Participants filed the *Emergency Motion of Certain Participants for an Order Staying the Contested Matter Relating to the Turnover Motion* (Docket No. 4089) (the "**Motion to Stay**"), the *Complaint for Injunctive, Equitable, and Declaratory Relief and Request for Class Action* (Adv. Proc. No. 25-03066, Docket No. 1) (the "**Rabbi Trust Complaint**"), and the *Motion of Named Plaintiffs for an Order (I) Withdrawing the Reference and (II) Staying the Contested Matter Relating to the Turnover Motion* (Adv. Proc. No. 25-03066, Docket No. 3) (the "**Motion to Withdraw**").  The filing of the Rabbi Trust Complaint created an adversary proceeding.  On March 24, 2025, the Debtors filed the *Debtors' Objection to Motion of Named Plaintiffs for an Order (I) Withdrawing the Reference and (II) Staying the Contested Matter Relating to the Turnover Motion* (Adv. Proc. No. 25-03066, Docket No. 14).  On April 25, 2025, the Debtors filed the *Steward Health Care System, LLC and IASIS Healthcare, LLC's Rule 12(c) Motion for Judgment on the Pleadings* (Adv. Proc. No. 25-03066, Docket No. 17), requesting the Bankruptcy Court to grant judgment on the pleadings in favor of Steward and IASIS on all of the counts in the Rabbi Trust Complaint.

On March 5, 2025, the Debtors filed the *Debtors' Reply to Objection of Certain Participants to Debtors' Motion to Turn Over Trust Assets* (Docket No. 4105), which argued that the Rabbi Trust Objection should be overruled because, among other things, (i) the Deferred Compensation Plans constituted "top hat" plans, (ii) even if the Deferred Compensation Plans did not satisfy the requirements of being a "top hat" plan, the Participants would only have an unsecured claim against the Debtors for violating ERISA because the Deferred Compensation Plans were unfunded, and (iii) the imposition of a constructive trust or reformation of the Deferred Compensation Plans and Rabbi Trust Agreements was inappropriate.

On March 6, 2025, the Debtors filed the *Debtors' Objection to Rabbi Trust Motion Objectors' Motion to Stay* (Docket No. 4144), which argued, among other things, the Motion to Stay should be denied

because (i) the movants could not prove they were likely to succeed on their Motion to Withdraw and (ii) the Debtors would suffer immense harm if the Motion to Stay was granted, and any harm suffered by the movants would be self-inflicted.

On March 7, 2025, the Bankruptcy Court held a hearing on the Motion to Stay.  The Bankruptcy Court denied the Motion to Stay, but rescheduled the trial on the Rabbi Trust Motion from March 11, 2025 to March 26 and March 27, 2025 to allow parties more time to conduct discovery and allow for adequate time to examine witnesses during the trial.

On March 13, 2025, the Objecting Participants filed, in the District Court for the Southern District of Texas (the "**SDTX District Court**"), the *Emergency Motion for an Order Staying Hearing on Turnover Motion* (Case No. 4:25-mc-00461, Docket No. 1) (the "**Emergency Motion to Stay**").  On March 20, 2025, the Debtors filed their *Response in Opposition to Emergency Motion for an Order Staying Hearing on Turnover Motion* (Case No. 4:25-mc-00461, Docket No. 34), and the Objecting Participants filed their *Reply in Support of Emergency Motion for an Order Staying Hearing on Turnover Motion* (Case No. 4:25-mc-00461, Docket No. 37).  The Objecting Participants then filed a *Supplement in Support of Emergency Motion for an Order Staying Hearing on Turnover Motion* (Case No. 4:25-mc-00461, Docket No. 40).  On March 24, 2025, the SDTX District Court issued an order denying the Emergency Motion to Stay (Case No. 4:25-mc-00461, Docket No. 46).

The Bankruptcy Court heard arguments on the Rabbi Trust Motion on March 26 and March 27, 2025.  On April 2, 2025, the Bankruptcy Court issued an oral ruling in favor of the Debtors, holding, among other things, that the Rabbi Trust Assets were property of the Debtors estates, and entered the *Order (I) Directing Trustees to Turn Over and Deliver Trust Assets or Proceeds Thereof to the Debtors; (II) Authorizing the Debtors to Exercise Ownership Rights Over Such Assets; (III) Authorizing Termination of Trusts; and (IV) Granting Related Relief* (Docket No. 4418) (the "**Rabbi Trust Order**").  Following the oral ruling, the Objecting Participants (i) moved orally for an immediate stay pending appeal of the Bankruptcy Court's entry of the Rabbi Trust Order and (ii) argued that the Rabbi Trust Order should be subject to the fourteen (14) day stay required by Bankruptcy Rule 6004(h).  The Bankruptcy Court overruled the Objecting Participants' oral motion for an immediate stay pending appeal, and determined that notwithstanding Bankruptcy Rule 6004(h), that the Rabbi Trust Order would be effective as of April 11, 2025.  Subsequently, the Objecting Participants filed the *Appellant's Emergency Motion to Stay Pending Appeal (Including Motion for Immediate Stay Pending Hearing on the Emergency Motion for Stay Pending Appeal)*, No. 4:25-CV-01584 (S.D. Tex. April 7, 2025) (Docket No. 2) (the "**Second Emergency Motion to Stay**").[56]  On April 11, 2025, the SDTX District Court issued a ruling denying the Second Emergency Motion to Stay.

On April 12, 2025, the Rabbi Trust Order became effective.  Pursuant to the Rabbi Trust Order, the Rabbi Trust Assets were deemed property of the Debtors' estates under section 541 of the Bankruptcy Code and the Debtors were authorized to exercise any and all of their ownership rights over the liquidated Rabbi Trust Assets.  Further, the Bankruptcy Court ordered that the Rabbi Trustees shall transfer the liquidated Rabbi Trust Assets to the Debtors.  Finally, the Rabbi Trust Order held that upon turnover of the liquidated

---

[56]   On April 7, 2025, the Objecting Participants filed the *Emergency Motion Plan Participants' Emergency Motion to Reinstate Rule 6004(h)'s 14-day Administrative Stay* (Docket No. 4436) (the "**Motion to Reinstate**"), seeking relief from the Bankruptcy Court to require that the Rabbi Trust Order be subject to a 14-day stay on account of Bankruptcy Rule 6004(h) notwithstanding language to the contrary in the Rabbi Trust Order.  The Debtors objected to the Motion to Reinstate at Docket No. 4436, arguing that the Objecting Participants' appeal had been docketed and assigned to a judge.  Notwithstanding the Motion to Reinstate, the Rabbi Trust Order became effective on April 12, 2025.

Rabbi Trust Assets to the Debtors (i) Matrix and Principal Trust, as Trustees, shall be deemed to have fulfilled their duties under their respective Rabbi Trust Agreements with respect to the Debtors and their Participants and their beneficiaries in accordance with the terms of the applicable Rabbi Trust Agreement and applicable law, (ii) the Debtors and the Rabbi Trustees are authorized to terminate each of the Rabbi Trusts, (iii) Matrix and Principal Trust, as Rabbi Trustees, shall not be liable to the Debtors, any of the Participants or their beneficiaries, or any of the Debtors' creditors for any actions taken in furtherance of the Rabbi Trust Order, and (iv) Principal Life Insurance Company, as recordkeeper of the IASIS Plan, shall not be liable to the Debtors, any of the Participants or their beneficiaries, or any of the Debtors' creditors for any actions taken in furtherance of the Rabbi Trust Order.

On April 3, 2025, the Objecting Participants filed the *Election to Appeal to District Court* (Docket No. 4422) and notified the Bankruptcy Court that the Objecting Participants had appealed the Rabbi Trust Order to the SDTX District Court. Following the Rabbi Trust Order becoming effective, the Objecting Participants filed a *Statement of Issues on Appeal* (Docket No. 4691) and their *Designation of Record on Appeal* (Docket No. 4692).

7.    *Urban Hospitals Motion to Segregate Proceeds*

On April 18, 2025, Ector County Hospital District d/b/a Medical Center Health System, Hendrick Health, Midland County Hospital District d/b/a Midland Memorial Hospital a/k/a Midland Health, Odessa Regional Medical Center, Scenic Mountain Medical Center, Shannon Medical Center, and United Regional Health Care System (collectively, the "**Urban Hospitals**") filed the *First Emergency Motion to Segregate Proceeds* (Docket No. 4695) (the "**Motion to Segregate**"). In the Motion to Segregate, the Urban Hospitals claimed that certain of the Debtors' hospitals had received approximately $34 million in quality incentive funds (the "**QIF**," and the funds allegedly received by the Debtors, the "**QIF Proceeds**") pursuant to various contracts with certain managed care organizations that are ultimately owed to the Urban Hospitals under the QIF framework, and requested that the Bankruptcy Court create a constructive trust over the QIF Proceeds no later than April 25, 2025. On April 25, 2025, the Debtors filed the *Debtors' Opposition to Urban Hospitals' Emergency Motion to Require Segregation of Proceeds Debtor Received for Benefit of Urban Hospitals* (Docket No. 4727), asking the Bankruptcy Court to deny relief sought in the Motion to Segregate as (i) the Motion to Segregate was procedurally improper and substantively groundless; (ii) movants failed to establish irreparable harm as to the QIF; (iii) movants failed to establish that the balance of the equities favor an injunction; and (iv) movants failed to establish that the public interest favors an injunction. On April 28, 2025, the Urban Hospitals commenced an adversary proceeding (Adv. Proc. No. 25-03312) and filed a complaint (Adv. Proc. Docket No. 1) (the "**Complaint**") seeking, among other things, substantially the same relief requested in the Motion to Segregate.

On April 25, 2025, the Debtors filed *Debtors' Opposition to Urban Hospitals' Emergency Motion to Require Segregation of Proceeds Debtor Received for Benefit of Urban Hospitals* (Docket No. 4727), denying the allegations contained in the Motion to Segregate and requesting that the Bankruptcy Court summarily deny the Motion to Segregate. For the avoidance of doubt, the Debtors additionally deny all of the allegations the Complaint and intend to file an answer to the Complaint.

8.    *Sub-Committee Investigations*

On April 29, 2024, the Transformation Committee created the Investigation Sub-Committee, which instructed Weil to conduct an investigation to identify any potential claims and/or causes of action in favor of the Debtors, including potential claims and/or causes of action against current and former members of the Board, current and former members of the applicable governing bodies of Steward and its subsidiaries, as well as affiliates, equity holders, officers or other insiders of Steward and any of its subsidiaries

69

(the "**Investigation**").  The Investigation included a review of claims based on, among other things, breach of fiduciary duty (including related-party transactions), corporate waste, unlawful distribution, and fraudulent conveyance.

During the Investigation, Weil, among other things: (i) collected and reviewed thousands of the Debtors' documents and email correspondence, including audited and non-audited financial statements; (ii) collected and reviewed thousands of documents and email correspondence from third parties including Cerberus Capital ("**Cerberus**"), MPT, KPMG, PwC, Crowe LLP, E&Y, Deloitte, and Kroll; (iii) reviewed minutes of meetings of the Board and the Audit Committee and accompanying materials; (iv) conducted fourteen (14) interviews; (v) reviewed and analyzed appraisal reports, valuations, and solvency memoranda prepare by third-parties; and (vi) performed substantive legal and factual analysis.  The Investigation Sub-Committee's Investigation focused on the following transactions:

- **2016 Dividend**: In October 2016, the Debtors issued dividends to Cerberus and other shareholders that amounted to over $780 million.

- **May 2020 Transactions**: In May 2020, the Debtors undertook three transactions: (1) Cerberus exchanged its equity in the Debtors for a convertible preferred note for approximately $350 million from Steward Investors; (2) the Debtors sold Steward International (as defined herein) to Manolete Health Holdings ("**Manolete**") (a non-Debtor entity owned by Dr. de La Torre and MPT) for approximately $200 million; and (3) the Debtors entered into a sale-leaseback transaction with MPT for the Jordan Valley and Davis hospitals in Utah wherein MPT paid the Debtors approximately $195 million.

- **2021 Distribution**: In January 2021, the Debtors distributed $111 million to its investors, including, but not limited to, Dr. de la Torre and Steward International.

- **2021 Miami Hospitals Acquisition**: In June 2021, the Debtors and MPT purchased five (5) Miami-area hospitals from Tenet Healthcare Corporation wherein the Debtors paid approximately $200 million to purchase the hospital operations and subsequently leased the underlying real properties from MPT.

- **2022 CareMax Transaction and Share Distribution**: In November 2022, the Debtors sold their value-based care assets to CareMax for $25 million, plus 23.5 million in CareMax shares, which shares were ultimately distributed to certain equity holders and other individuals affiliated with the Debtors.

- **Transactions with Steward International**: Subsequent to the Debtors' sale of Steward International (as defined herein) to Manolete in May 2020, the Debtors and Steward International engaged in several transactions including loans, advancing payment of salaries for employees of Steward International, and other expenses borne by the Debtors.

- **Transactions with Management Health Services ("MHS")**: MHS is a non-debtor affiliate and subsidiary of the Debtors' largest shareholder, Steward Investors.  The relationship between the Debtors and MHS was governed by a master services agreement, which included a services fee and other transactions between the parties

70

including the payment of salaries of MHS employees, loan payments for MHS's airplanes, and other expenses borne by the Debtors.

- **Transactions with TRACO**: as discussed in Section IV.E hereto, TRACO is a non-debtor captive insurance company that is a subsidiary of the Debtors and based in Panama.  TRACO provided malpractice insurance to Steward doctors and other hospital personnel.  Steward Medical Group and SHC have TRACO policies with doctors/employees as the insureds.

The Investigation Sub-Committee believes that the Debtors own valuable estate claims and causes of action related to some or all of the foregoing transactions. The Debtors, acting through the Investigation Sub-Committee, have sought Bankruptcy Court approval to retain Kobre & Kim (Docket No. 4445) to pursue discovery under Bankruptcy Rule 2004 and further pursue such estate claims and causes of action. Following that continued investigation, and as described in Section IV.M.5.e hereto, it is anticipated that Kobre & Kim will commence and prosecute claims and causes of action against various third parties on behalf of the Debtors' estates, as appropriate.

**O.   INVESTIGATIONS**

1.   *Government Investigations*

Non-Debtor Steward Health Care International LTD ("**Steward Malta**") and its non-Debtor parent, Steward Health Care International LLC (together with Steward Malta, "**Steward International**")[57], along with SHC, and SHC's former chief executive officer Dr. Ralph de la Torre (among certain other non-Debtor executives) have been the subject of investigations by the Government of Malta, the U.S. Department of Justice ("**DOJ**"), and the Boston U.S. Attorney's Office (the "**Boston USAO**"), including but not limited to the Concession (defined below) and the financial condition and resulting bankruptcy of Steward (the "**Governmental Investigations**").

During the pendency of these chapter 11 cases, the Debtors, through counsel, have provided cooperation in the Governmental Investigations, including, but not limited to, attending several in person meetings, establishing and attending recurring calls with the DOJ and the Boston USAO, facilitating document collections and productions, as well as conducting relevant interviews.  As of the filing of this Disclosure Statement, the Governmental Investigations are ongoing.[58]

a.   *Malta Investigation*

In March 2015, the Government of Malta solicited proposals for the renovation and operation of three hospitals in Malta, which would be run a public-private partnership with continuous funding from the Government of Malta over the course of thirty (30) years (the "**Concession**").  Vitals Global Healthcare ("**VGH**") was awarded the Concession and began operating it on June 1, 2016.  On February 19, 2018, Steward International took over the Concession from VGH, and Steward International operated the Concession until February 24, 2023, when Maltese courts rescinded the Concession and returned the three

---

[57]   Steward International was a subsidiary of SHC until May 2020.

[58]   Relevant to the DOJ Investigation in particular, on February 10, 2025, President Trump signed an Executive Order pausing all investigations and prosecutions under the U.S. Foreign Corrupt Practices Act ("**FCPA**") for at least 180 days, and directing the Attorney General to review (and potentially alter) the existing guidelines and policies related to the enforcement of the FCPA.

hospitals to the Government of Malta.  In late May 2024, the Maltese Magistrate released a report recommending charges against dozens of individuals in Malta and elsewhere involved in the Concession, alleging bribery, money laundering, conspiracy, and fraud-related crimes.  It has been reported to the Debtors that formal charges have been posited against Dr. de la Torre, as well as certain executives of Steward International (Mr. Armin Ernst and Mr. Miro Boyanov), though, those individuals have not yet appeared in court in Malta.

        b.     *DOJ Investigation*

In April 2023, the Company commenced an internal investigation as a result of the press reports in Malta.  This internal investigation included document collection and review, witness interviews, voluntary self-disclosure of potential issues to the DOJ.  In September 2023, the Company's counsel presented to the DOJ the results of its preliminary review and findings from the internal investigation and also produced approximately 1,000 relevant documents.  In response, on October 10, 2023, the DOJ issued a subpoena seeking all documents concerning the acquisition and operation of the hospital concession in Malta; a list of government officials involved in that process; payments made in relation to the concessions; communications and payments between Steward and certain specified individuals, entities, and national governments; org charts; travel records; communications with Malta's National Audit Office; and financial records relating to operations in Malta (the "**DOJ Investigation")**.  Thereafter, and until President Trump's Executive Order pausing the investigation and enforcement of the FCPA, the Company through its counsel had been working cooperatively with the DOJ to provide the information requested, and had been making productions of documents on a rolling basis.

        c.     *Boston USAO Investigation*

Beginning in February 2024 and continuing through August 2024, the Boston USAO served a series of grand jury subpoenas and requests for information, seeking documents and information related to the use of the Company's funds through a variety of means, including employee compensation, dividends, profit distributions, the retention of certain third-party vendors, and the use of the Company's private planes, among other things.  The Company has been working cooperatively with the Boston USAO to provide the information requested, and has been making productions on a rolling basis.

        2.     *Civil Investigative Demands*

Both prior to and after the Petition Date, the Company received Civil Investigative Demand letters ("**CIDs**") from various state attorney generals (collectively, the "**State AGs**") in certain of the states in which the Debtors operate.  The CIDs generally seek information related to Steward's financial status, compensation of executives, contracts and relationships with vendors, audit documents, and compliance with relevant state regulations.  The Company has been working cooperatively with the State AGs to provide the information requested, and has been making productions on a rolling basis.

### P.    **EXCLUSIVITY**

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a chapter 11 plan (the "**Exclusive Filing Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Filing Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may file a plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Filing Period,

the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

On September 2, 2024, the Debtors filed the *Motion of the Debtors for Order Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* (Docket No. 2287) pursuant to which they sought to extend the Exclusive Filing Period and the Exclusive Solicitation Period to December 2, 2024 and February 3, 2025, respectively.  On September 26, 2024, the Bankruptcy Court entered an order (Docket No. 2693) extending the Exclusive Filing Period to November 4, 2024 and the Exclusive Solicitation Period through January 3, 2025.

On November 4, 2024, the Debtors filed the *Motion of the Debtors for Order Further Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* (Docket No. 3112).   On December 9, 2024, the Bankruptcy Court entered the *Order Further Extending Exclusive Periods Pursuant to Section 1121(D) of the Bankruptcy Code* (Docket No. 3400) extending the Debtors' Exclusive Filing Period to and including December 19, 2024 and the Debtors' Exclusive Solicitation Period to and included February 17, 2025; provided that the Exclusive Filing Period shall be extended to and including January 21, 2025, and the Debtors' Exclusive Solicitation Period shall be extended to and including March 24, 2025, if (i)(a) the Debtors file a notice with the Bankruptcy Court advising the Bankruptcy Court and parties in interest of such extensions and (b) the Creditors' Committee and FILO Parties each consent to such extensions or (ii) the Debtors file a chapter 11 plan on or before December 19, 2024 that is reasonably acceptable to the Creditors' Committee and FILO Parties.

On December 17, 2024, the Debtors filed the *Notice of Extension of Debtors' Exclusive Periods* (Docket No. 3499), noticing that the Creditors' Committee and the FILO Parties had consented to the extension of the Exclusive Filing Period to January 21, 2024 and the Exclusive Solicitation Period to March 24, 2025.  On January 21, 2025 (Docket No. 3769) and February 13, 2025 (Docket No.  3970), the Debtors filed motions further extending the Exclusive Filing Period and the Exclusive Solicitation Period to April 7, 2025 and June 9, 2025, respectively.  On April 7, 2025, the Debtors filed a motion (Docket No. 4439) further extending the Exclusive Filing Period and the Exclusive Solicitation Period to June 23, 2025 and August 25, 2025, respectively.

## Q.    CLAIMS BAR DATES

### 1.    *General/Governmental Bar Date*

On June 17, 2024, the Debtors filed with the Bankruptcy Court a motion (Docket No. 882) seeking authority to establish certain deadlines for filing proofs of claims in the Chapter 11 Cases.   On July 11, 2024, the Bankruptcy Court entered an order, among other things, approving August 23, 2024 at 5:00 p.m. (Central Time) as the deadline for each 'person' (as defined in section 101(41) of the Bankruptcy Code), excluding governmental units) to file Proofs of Claims against the Debtors (the "**General Bar Date**") and November 4, 2024 at 5:00 p.m. (Central Time) for governmental units to file Proofs of Claims against the Debtors (the "**Governmental Bar Date**" and, together with the General Bar Date, the "**Bar Dates**") (Docket No. 1564) (the "**Prepetition Bar Date Order**").

### 2.    *Administrative Expense Claims Bar Date*

On November 14, 2024, the Bankruptcy Court granted the *Emergency Motion of Debtors for Entry of an Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of*

*Administrative Claims, (IV) Approving Notice of the Administrative Claims Bar Date and (V) Granting Related Relief* (Docket No. 3217) (the "**Administrative Expense Claims Bar Date Order**").

The Administrative Expense Claims Bar Date Order established December 20, 2024 as the bar date for filing requests for payment of Administrative Expense Claims arising on or prior to November 15, 2024 (the "**Administrative Expense Claims Bar Date**").  The Administrative Expense Claims Bar Date also set forth certain requirements for filing Administrative Expense Claims, which are identified in paragraph eight of the Administrative Expense Claims Bar Date Order.

The Administrative Expense Claims Bar Date Order exempts the following parties from having to file a proof of Administrative Expense Claim by the Administrative Expense Claims Bar Date:

- any person or entity on account of a postpetition claim that has previously been allowed by order of the Bankruptcy Court and paid by the Debtors;

- any person or entity on account of a claim arising under section 503(b)(9) of the Bankruptcy Code, which claims must have been filed pursuant to the Prepetition Bar Date Order;

- any person or entity on account of a claim that has been paid in full by the Debtors pursuant to the Bankruptcy Code or in accordance with an order of the Bankruptcy Court;

- any person or entity on account of a clam for which a previously filed proof of claim asserts on the face of such proof of claim that such claim is entitled to administrative priority under section 503 of the Bankruptcy Code;

- any Debtor having a claim against another Debtor;

- any current employee of the Debtors as of the date of Administrative Expense Claims Bar Date Order, on account of claims that the Wages Order authorized the Debtors to honor; *provided* that a current employee must submit a proof of Administrative Expense Claim by the Administrative Expense Claims Bar Date for all other claims arising after the Petition Date;

- any current officer, manager, director, employee, advisor, attorney, investment banker, or consultant of the Debtors for claims based on indemnification, contribution, or reimbursement;

- any entity holding a claim for which a separate deadline is fixed by the Bankruptcy Court, including requests for payment under the Interim Compensation Order (Docket No. 783) or the Ordinary Couse Professional Order (Docket No. 784); and

- any patients who were discharged by the Debtors on or after the Petition Date.

Governmental units with respect to taxes are permitted to file a proof of Administrative Expense Claim with respect to such claim on the 90th day (or the 150th day for the Internal Revenue Service (the "**IRS**")) following (i) the filing of the applicable tax return to which such claim relates or (ii) with

respect to any claim relating to a tax for which no tax return is required to be filed, the date on which such tax is incurred.

The Administrative Expense Claims Bar Date Order also (i) provided that through January 21, 2025, the Debtors and other parties in interest shall not be required to respond to any motions, applications, or other requests for allowance and payment of Administrative Expense Claims filed before November 6, 2024, and (ii) stayed or adjourned any hearings relating to the same to a date following January 21, 2025.

## R.        ADMINISTRATIVE EXPENSE CLAIMS[59]

In total, 2,803 Proofs of Administrative Claims were filed with the Bankruptcy Court asserting approximately $102.86 billion in Administrative Expense Claims.  The Debtors have conducted a thorough analysis of all of these filed claims, which is ongoing, to estimate the amount of Administrative Expense Claims that are likely to be valid and Allowed.  Over the last several months, the Debtors held two status conferences (on December 20, 2025 and on February 6, 2025) to apprise the Bankruptcy Court and all parties in interest of their progress.

To date, the Debtors have successfully (i) reconciled 99% of the asserted Administrative Expense Claims based on dollar amount and 98% of the total Administrative Expense Claims likely to be Allowed based on dollar amount, leaving only a fraction remaining to be reconciled; (ii) objected to and had disallowed over $100 billion of asserted Administrative Expense Claims, and (iii) negotiated with a number of administrative expense claimants directly regarding the valid Allowed amount of such holders' Administrative Expense Claims.  Based on the results of the Debtors' thorough review, the Debtors estimate that the total number of Administrative Expense Claims in the aggregate that are likely be Allowed and the responsibility of the Debtors is approximately $127 million, including up to approximately $13 million in 503(b)(9) claims, approximately $103 million of accounts payable claims, and approximately $12 million in other claims (including employee, litigation, regulatory, insurance, tax, and real estate claims).

The Debtors' Administrative Expense Claims reconciliation process is still ongoing.  All amounts described in this Section IV.R are subject to change as the Debtors continue their efforts to finalize their analysis of the asserted Administrative Expense Claims and maximize the value of their estates.  These estimates are based on, among other things, the Debtors' books and records, the Debtors' and their advisors' extensive reconciliation efforts and analysis of the merits of each asserted Administrative Expense Claim, and is subject to potential litigation and disagreement by the holders of such Administrative Expense Claims.  The Debtors' continuing efforts to negotiate, expunge, and/or minimize Asserted Administrative Expense Claims against their estates include, among other things:

1.  Negotiating Administrative Expense Claim Stipulations.  The Debtors have negotiated directly with holders of Administrative Expense Claims (and in particular, with various claimants that filed motions to compel immediate payment) to efficiently confirm an Allowed portion of such claimants' Administrative Expense Claims and avoid further litigation.  As of the date hereof, the Debtors have entered into 18 stipulations with holders of Administrative Expense Claims and have agreed to a total Allowed Administrative Expense Claim amount of $26,254,406 on account of such stipulations.

---

[59]   Capitalized terms used but not otherwise defined in this section and Section IV.R shall have the meanings ascribed to them in the Administrative Expense Claims Bar Date Order.

2. <u>Identifying Claims that Should Be Disallowed</u>. Based on their comprehensive analysis, the Debtors have and continue to identify a substantial amount of Administrative Expense Claims that should be disallowed on account of being (i) duplicate claims; (ii) claims that were amended and/or superseded; (iii) claims against parties other than the Debtors; (iv) claims for goods or services which the Debtors never received; (v) claims with insufficient documentation;, and/or (vi) reclassified as general unsecured claims. As of the date hereof, the Bankruptcy Court has sustained ten (10) omnibus objections expunging over $100 billion in filed Administrative Expense Claims (Docket Nos. 4347, 4348, 4351, 4352, 4353, 4354, 4355, 4356, 4358, 4359, and 4360). On March 21, 2025, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving Omnibus Claims Objections Procedures and Filing of Substantive Omnibus Claims Objections, (II) Waiving the Requirement of Bankruptcy Rule 3007(6), and (III) Granting Related Relief* (Docket No. 4279), seeking approval to object on an omnibus basis to various claims filed on additional grounds, including, but not limited to, satisfied claims, unliquidated claims, and claims that seek recovery of amounts for which the Debtors are not liable.

3. <u>Identifying Claims that are the Designated Operators' Responsibility</u>. The Debtors further anticipate that a number of Administrative Expense Claims will be disallowed because such Administrative Expense Claims are the responsibility of either the purchasers of the Debtors' former hospital operations or the Designated Operators as opposed to the Debtors. In particular, under the terms of the Global Settlement Order, each Designated Operator assumed, among other things, "full responsibility for paying all go-forward hospital-level operating disbursements and expenses of the Specified ML[I] Hospitals incurred" after September 11, 2024. As a result, any Administrative Expense Claims filed against the Debtors for services rendered at any Specified MLI Hospital following September 11, 2024 are the liability of the applicable Designated Operator and not the liability of the Debtors. The Debtors currently estimate a substantial portion of filed Administrative Expense Claims are ultimately the responsibility of the Designated Operators under the Global Settlement Order or were otherwise assumed by the Designated Operators in connection therewith.

4. <u>Utilizing the Vendor Fund Escrow Agreement</u>. Moreover, in connection with the TSA / EPDA Settlement Order, the Debtors entered into the Vendor Fund Escrow Agreement and established the Vendor Fund of approximately $14.8 million funded by MPT, BMC, Lifespan, and Orlando Health. The TSA / EPDA Settlement Order further authorized the Debtors and Quorum Health to resolve and pay certain TSA Vendors immediately on account of their outstanding Administrative Expense Claim pursuant to a Quorum Vendor Fund Agreement if such TSA Vendors agree to partial payment in full satisfaction of their Administrative Expense Claim against the Debtors. Specifically, the Vendor Fund Escrow Agreement contemplates that Quorum Health may offer payment out of the Vendor Fund pursuant to a Quorum Vendor Fund Agreement in the event a TSA Vendor agrees to at least a 60% reduction of their assured Administrative Expense Claim. Pursuant to the relief granted by the TSA / EPDA Settlement Order, the Debtors have secured the release of approximately $1.9 million of Administrative Expense Claims. The Debtors and Quorum Health are continuing to negotiate with a number of TSA Vendors and anticipate executing additional Quorum Vendor Fund Agreements with such parties to release other asserted Administrative Expense Claims against the Debtors' estates.

5.   Utilizing Preference and Avoidance Action Exposure.  Finally, the Debtors anticipate that their work to pursue preference and avoidance actions arising under chapter 5 of the Bankruptcy Code will reduce outstanding Administrative Expense Claims against the Debtors' estates.  Through their retention of Togut and as detailed in Section IV.M.5.d hereof, the Debtors have undertaken a significant effort to monetize preference and avoidance actions on account of distributions made in the ninety (90) day period prior to the Petition Date.  Many parties against which the Debtors hold preference and avoidance actions have asserted Administrative Expense Claims against the Debtors' estates.  The Debtors may utilize such parties' preference exposure to reduce outstanding Administrative Expense Claims against the Debtors' estates.

## S.   PBGC SETTLEMENT

The Plan provides for an additional settlement of certain outstanding issues between the Debtors and PBGC regarding the terms of termination of the Debtors' New England Sinai Hospital Pension Plan (the "**Pension Plan**") and a number of outstanding claims filed by PBGC against the Debtors.  Specifically, PBGC has asserted claims against the Debtors on account of, among other things, (i) unfunded benefit liability in the amount of $4,606,480; (ii) unpaid minimum required contributions in the amount of $813,677; and (iii) flat-rate and variable-rate in the amount of $1,794,915 (the "**PBGC Claims**").  PBGC asserted the PBGC Claims against every Debtor entity jointly and severally.

In an effort to reach a settlement with the PBGC on all outstanding issues, the Debtors' professionals and representatives of the PBGC engaged in a number of discussions to attempt to reach a consensual resolution on the termination of the Pension Plan and the appointment of PBGC as Trustee of the Pension Plan (pursuant to the Agreement for Appointment of Trustee and Termination of Plan), and have agreed to the resolution of all such issues pursuant to the terms of the PBGC Settlement and such trusteeship agreement.  The Debtors and the PBGC have memorialized the terms of the PBGC Settlement in the Plan.

The key components of the PBGC Settlement are set forth in Section 4.5 of the Plan and are summarized below:

i.   The PBGC Claims shall be Allowed, as a prepetition general unsecured claim, in the amount of $8,750,000 (the "**Allowed PBGC Claims**").

ii.   The holders of PBGC Claims will accept the Plan and not opt-out of the third party releases provided thereunder.

iii.   In full settlement, in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Claims, on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests.  With respect to any distribution of Plan Trust Assets to be made by the Plan Trustee, holders of PBGC Claims shall share ratably with holders of General Unsecured Claims in (i) 90% of GUC distributions until the Retained FILO Claims are paid in full and (ii) 100% of GUC distributions after the Retained FILO Claims are paid in full.

iv.   For the avoidance of doubt, the PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any Distribution in connection with the Debtors or the Plan.

The Debtors believe that the PBGC Settlement avoids the costly, time consuming and wasteful litigation that could have arisen out of reconciling and litigating the characterization of the PBGC Claims, and as a result, will increase recoveries to holders of Allowed Claims.  Accordingly, the Debtors believe that the PBGC Settlement balances the risks and provides an equitable solution that is reasonable, fair and efficient.

## T.    PLAN SETTLEMENT

The Plan incorporates the proposed Plan Settlement by and between the Debtors, the Creditors' Committee, and the FILO Secured Parties, which is reflected in the Plan Support Agreement Term Sheet. The Plan Settlement provides that, among other things, (i) on or before the Effective Date, the Plan Trust Assets will be transferred to the Plan Trust, which shall be administered by the Plan Trustee; (ii) the Plan Trust Assets will be liquidated and the proceeds of the Plan Trust Assets will be distributed in accordance with the waterfall detailed in Section I.A hereof; (iii) the estates will retain $15,000,000 to be used in accordance with the terms of the Plan; (iv) subject to satisfying the condition, the Debtors will establish a fund in the amount of $12,500,000 for purposes of paying the holders of Allowed Administrative Expense Claims that do not timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program up to 50% of their Allowed Administrative Expense Claims; and (v) the Plan will leave unaltered and shall not challenge the FILO Settlement Order.  Moreover, the Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order approving the Plan Settlement, including the Bankruptcy Court's findings that the Plan Settlement is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the estates and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.  As a result of the Plan Settlement, each Class of Claims and Interests shall be treated as against a single consolidated estate without regard to the separate legal existence of the Debtors.

The Debtors believe that the Plan Settlement, which is supported by the Creditors' Committee and the FILO Secured Parties, is a fair and equitable resolution of all of these issues and the Debtors' chapter 11 cases, and in the best interests of all creditors.  The Plan further constitutes a motion pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 seeking approval of the Plan Settlement. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such motion and each of the compromises or settlements contained in the Plan.   Furthermore, the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest, and fair and equitable.

### a.    *The Plan Settlement is Equitable*

Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement that is fair, reasonable, and in the best interest of the estate. *See In re Age Refin. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Settlements are considered "a desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).  The factors the Fifth Circuit courts consider in analyzing proposed settlements are: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise." *See Age Refin. Inc.*, 801 F.3d at 540 (internal citations omitted).  Under the rubric of the third factor, the Fifth Circuit

has specified that courts should specifically consider "the paramount interest of creditors with proper deference to their reasonable views," *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995), and the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540 (citations omitted); *see also In re Goodman Networks, Inc.*, No. 22-31641-MVL7, 2024 WL 460478, slip op. at *8 (Bankr. N.D. Tex. Feb. 6, 2024).

In consideration of the legal and economic risks to all parties in interest, the Debtors have determined that the Plan Settlement (including the implementation of the FILO Settlement pursuant to the Plan and Confirmation Order) is a fair resolution of these chapter 11 cases that carries the Debtors' burden under Rule 9019, is fair and equitable, and is consistent with applicable law and the approaches taken by other debtors facing similar circumstances.

The Plan Settlement (including the implementation of the FILO Settlement pursuant to the Plan and Confirmation Order) is the product of arms' length, good faith negotiations between the Debtors, the FILO Parties, and the Creditors' Committee, all mediated and overseen by the Honorable Judge Marvin Isgur. Through the Plan Settlement (including the implementation of the FILO Settlement pursuant to the Plan and Confirmation Order), the Debtors seek to provide stakeholders with certainty as well as maximum distributions. The Debtors and their advisors undertook an extensive analysis of the Debtors' operations and liquidity, the Administrative Proofs of Claim filed with the Bankruptcy Court ahead of the Administrative Expense Claims Bar Date, and carefully analyzed alternatives to Plan confirmation. Given the quantum of Administrative Expense Claims in light of the Bankruptcy Code's requirement that all administrative expense claims be paid in full to confirm a chapter 11 plan, the Administrative Expense Claims Consent Program provides for a compromise and settlement with holders of Allowed Administrative Expense Claims that do not timely, properly, and affirmatively opt-out prior to the Consent Program Opt-Out Deadline to be deemed satisfied in full on account of such claim once they have received payment in cash equal to 50% of the applicable Allowed Administrative Expense Claims. Moreover, the $15,000,000 advance made to the Debtors by the FILO Parties will allow the Debtors to have immediate access to the capital needed to allow the Debtors (i) to expedite an initial distribution to holders of Allowed Administrative Expense Claims that do not timely, properly, and affirmatively opt-out and (ii) to incentivize the holders of Administrative Expense Claims to participate in the Administrative Expense Claims Consent Program for the collective benefit of the Debtors' creditors.

The Debtors do not believe that further mediation—or engaging in value destructive litigation with the Creditors' Committee and the FILO Parties—would produce terms more advantageous to the Debtors' estates than the Plan Settlement (including the implementation of the FILO Settlement pursuant to the Plan and Confirmation Order). The Debtors further believe that the attendant expenses to further mediation and/or litigation would ultimately cost the Debtors' estates more than any incremental value realized. In light of the support of the Creditors' Committee, the expedited payments contemplated by the Administrative Expense Claims Consent Program, and the likelihood that the Administrative Expense Claims Consent Program will reduce the total amount of outstanding Allowed Administrative Expense Claims, the Debtors submit that all factors bearing on the wisdom of the compromise, including the paramount interest of the Debtors' creditors, weigh in favor of the Plan Settlement (including the implementation of the FILO Settlement pursuant to the Plan and Confirmation Order).

As such, the Debtors believe the Plan Settlement will minimize the chance of a value-destructive alternative to confirmation of the Plan, evade the possible delays associated with prolonged litigation, and adequately provide the Debtors with the resources and opportunity to maximize the value of their estates for the benefits of all creditors. Therefore, the Debtors maintain that they carry their burden under Rule

9019 with respect to the Plan Settlement and have concluded that the Plan Settlement is fair, reasonable, and in the best interest of the Debtors and their estates.

   b. *The Plan Settlement Satisfies Section 1129(a)(9) of the Bankruptcy Code*

   The treatment of Administrative Expense Claims under the Plan Settlement and the Administrative Expense Claims Consent Program comports with applicable law and is consistent with approaches adopted by other debtors facing similar circumstances and approved by courts.  Section 1129(a)(9) provides that "[e]xcept to the extent that the holder of a particular claim has agreed to different treatment of such claim," a plan must provide that the holder of a claim under sections 507(a)(2) and 507(a)(3) of the Bankruptcy Code "will receive on account of such claim cash equal to the allowed amount of such claim."  The holders of Administrative Expense Claims will be provided with a Consent Program Opt-Out Form in accordance with the instructions contained therein and the Consent Program Opt-Out Procedures.  The rights of the holders of Administrative Expense Claims to object to the Plan and opt-out of the Administrative Expense Claims Consent Program have been fully preserved.  Moreover, the provisions of this Disclosure Statement have been designed to ensure that the holders of Administrative Expense Claims are fully informed of their rights and make clear that any holder of an Allowed Administrative Expense Claim that **does not timely, properly, and affirmatively opt-out** of the Administrative Expense Claims Consent Program shall be deemed to consent to the Administrative Expense Claims Consent Program and support the Plan.  For the avoidance of doubt, to the extent a holder of an Administrative Expense Claim enters into a Quorum Vendor Fund Agreement and receives payment through such agreement on account of its Administrative Expense Claim, such Administrative Expense Claim shall not receive the treatment or any payment in connection with the Administrative Expense Claims Consent Program.

## U. TIMETABLE FOR CHAPTER 11 CASES

   On the earlier of the Outside Date and one (1) business day following the Confirmation Date, the Litigation Trust will be formed, and, subject to certain exceptions, the Plan Administrator will transfer substantially all of the estates' assets to the Litigation Trust. To the extent the Plan is confirmed prior to the Outside Date, the Litigation Trust will be formed pursuant to the terms of the Plan and the Confirmation Order.  However, if the Plan is not confirmed prior to the Outside Date, the Litigation Trust will be formed pursuant to the terms of the FILO Settlement Order and the FILO Settlement Term Sheet.

   In the event that a plan is not confirmed by August 1, 2025, the FILO Parties may exercise remedies with respect to the Retained Cash, and the Retained Cash shall no longer be available to pay the holders of Administrative Expense Claims or otherwise be utilized by the Debtors' estate.

<div align="center">

**V.**

**CERTAIN RISK FACTORS AFFECTING DEBTORS**

</div>

   Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement, together with the attachments, exhibits, or documents incorporated by reference herein, including the letter from the Creditors' Committee to holders of unsecured claims setting forth, among other things, any Creditors' Committee's recommendation that holders of General Unsecured Claims entitled to vote on the Plan vote to accept the Plan (the "**Creditors' Committee Position Letter**").

   THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, INCLUDING, BUT NOT LIMITED

TO, THE RISK FACTORS SET FORTH BELOW. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. NEW FACTORS, RISKS, AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS, AND UNCERTAINTIES.

### A. **CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

#### 1. *Risk of Non-Confirmation of Plan*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion, that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate re-solicitation of votes. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.

Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all holders of Claims and Interests entitled to vote in favor of the Plan vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation (including under section 1129 of the Bankruptcy Code) are not met. Confirmation of the Plan is also subject to certain conditions as described in Article XI of the Plan. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive, if anything, with respect to their Claims or Interests in a subsequent plan.

#### 2. *Non-Consensual Confirmation*

In the event any Impaired Class of Claims or Interests entitled to vote on the Plan does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the proponent's request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes. Should any Class vote to reject the Plan, these requirements must be satisfied with respect to such rejecting Class. The Debtors believe that the Plan satisfies these requirements.

#### 3. *Risk of Non-Occurrence of Effective Date*

Although the Debtors believe that the Effective Date will occur, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article XI of the Plan, then all distributions contemplated under the Plan to occur on the Effective Date would not be made and the obligations with respect to applicable Claims and Interests would remain unchanged.

#### 4. *Risks Related to Possible Objections to Plan*

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

5.      *Risk of Termination of Plan Settlement*

In the event that the Plan is not confirmed by the Outside Date, as contemplated by the FILO Settlement Order, substantially all of the Debtors' assets will be transferred to the Litigation Trust.  Failure of the Debtors to obtain confirmation of the Plan prior to the Outside Date could result in, among other things, an extended chapter 11 confirmation process or no chapter 11 plan being confirmed at all, which could in turn significantly and detrimentally impact the Debtors' remaining assets and liquidity.

6.      *Releases, Injunctions, and Exculpation Provisions May Not be Approved*

Article XII of the Plan provides for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Exculpated Parties, or the Released Parties, as applicable.  Nothing contained in the terms of the Plan, nor the release of any claims pursuant thereto, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it evidence, indicative of the merits, or a waiver of any Claims against any Non-Released Party.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

7.      *Risks Related to Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

The Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

8.      *Alternative Restructuring*

If the Plan cannot be confirmed or if the Bankruptcy Court otherwise finds that it would be in the best interests of holders of Claims and Interests, the Debtors thereafter will consider all available restructuring alternatives, including filing an alternative chapter 11 plan or converting to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. In addition, provided that the Bankruptcy Court approves the FILO Settlement, the Litigation Trust Assets will be transferred to the Litigation Trust by the Outside Date regardless of whether the Plan is confirmed.  The terms of any alternative restructuring proposal, including any alternative proposal developed following the Outside Date, are uncertain and may be less favorable to holders of Claims and Interests against the Debtors than the terms of the Plan as described in this Disclosure Statement.

9.      *Factors Affecting the Recoveries of Holders of Allowed Administrative Expense Claims*

It is possible that the amount of Allowed Administrative Expense Claims will be higher than the range the Debtors have estimated to date, and thus recoveries could be materially reduced or eliminated.  In

addition, the timing or amount of actual distributions to holders of Allowed Administrative Expense Claims may be affected by many factors, including the level of participation in the Administrative Expense Claims Consent Program, which cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Administrative Expense Claim. The Debtors further cannot guarantee the level of participation, and therefore cannot guarantee the amount of any distributions to the holders of Administrative Expense Claims on account of the Administrative Expense Claims Consent Program, or the timing of subsequent distributions. Moreover, the Administrative Expense Claims Consent Program is conditioned upon the meeting of the Minimum Participation Threshold. If the Minimum Participation Threshold is not met or waived by the Debtors and the Creditors' Committee, the Debtors' estates shall retain the Settled Administrative Expense Claims Cash Pool equal to $12.5 million.

      10.    *Claims Could Be More than Projected*

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to other Classes to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Specifically, the Allowed Administrative Expense Claims may be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in Cash all Administrative Expense Claims, which is a condition to the occurrence of the Effective Date.

      11.    *Projected Distributions to Holders of Allowed Claims*

While the Debtors have endeavored to project what they believe are likely distributions to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that holders will receive the distributions described in the Plan. The projections will necessarily be affected by, among other things, (i) recoveries generated in connection with the liquidation of all of the Debtors' remaining assets; (ii) the outcome of objections to Claims; (iii) the outcome of Causes of Action brought by the Debtors' estates; and (iv) the cost and expenses of such actions, implementing the Plan, and generally administering and winding down the Debtors' Estates.

      12.    *Administrative Insolvency*

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (i.e., allowed Administrative Expense Claims) receive Cash equal to the full allowed amount of such claim, unless such holder agrees to different treatment. To the extent that a Debtor is unable to pay such Claims in full or otherwise agree to treatment with the applicable holder, such Debtor may be unable to confirm a chapter 11 plan. Furthermore, certain factors could also impact the Debtors' administrative solvency, including reconciliation of 503(b)(9) Claims, ongoing litigation, and professional fees, which may also impact the Debtors' ability to confirm a chapter 11 plan. Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to priority under section 507(a) of the Bankruptcy Code (i.e., allowed priority tax claims) receive regular installment payments in Cash of a total value equal to the allowed amount of such claim over a period ending not later than five (5) years after the petition date, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan. Finally, other priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as Cash equal to the full allowed amount of such claim).

To the extent that the Debtors are unable to pay section 507(a)(2) and (a)(3) claims in full or otherwise agree to treatment with the applicable holder, the Debtors may be unable to achieve the Effective Date of the Plan.  Furthermore, certain factors could also impact the Debtors' administrative solvency, including reconciliation of Administrative Expense Claims, ongoing litigation, and professional fees, which may also impact the Debtors' ability to confirm or achieve the Effective Date of the Plan.

13.    *Conversion to Chapter 7*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, the chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would likely result in significantly smaller distributions being made to the Debtors' creditors, including the holders of administrative expense claims under section 503(b) of the Bankruptcy Code, than as provided for in the Plan due in part to, among other things, (i) additional administrative expenses generated by the appointment of a chapter 7 trustee and the liquidation; (ii) the incurrence of other additional Claims, some of which may be entitled to priority (including pursuant to the requirements of section 726 of the Bankruptcy Code); (iii) the possibility that certain claims or causes of action, including claims under chapter 5 of the Bankruptcy Code, may be brought against the Debtors; and (iv) the risk that certain of the Debtors' or the Litigation Trust's remaining assets may be sold, disposed of, or otherwise liquidated in a disorderly fashion over a short period of time, or the Debtors' resources necessary to support the Litigation Trust may become unavailable.  *See* Section 104VIII.1 of this Disclosure Statement, as well as the Liquidation Analysis attached hereto as **Exhibit C**,[60] for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of the holders of Claims and Interests.

14.    *Dismissal of Chapter 11 Cases*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, one or more of the chapter 11 cases may be dismissed by order of the Bankruptcy Court.

15.    *Cost of Administering Debtors' Estates*

Liquidation of the Debtors' remaining assets and the disbursement of the proceeds of such liquidation, as well as the wind-down of the Debtor entities, will require certain administrative costs that may vary based on a variety of factors, including many out of the Debtors' control. Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan, including recoveries of the holders of Allowed Administrative Expense Claims.

---

[60]    The Debtors will file the Liquidation Analysis prior to any hearing to consider the approval and adequacy of the Disclosure Statement.

### B.     ADDITIONAL FACTORS TO BE CONSIDERED

1.     *Debtors Could Withdraw Plan*

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors, including in accordance with Section 14.7 of the Plan.

2.     *No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the Petition Date, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.     *No Representation Outside Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, these chapter 11 cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement or any Creditors' Committee Position Letter should not be relied upon by you in arriving at your decision.

4.     *No Legal or Tax Advice Is Provided*

The contents of this Disclosure Statement should **not** be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.  This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5.     *No Admission Made*

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

6.     *Certain Tax Consequences*

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Section VI hereof.

7.     *The Debtors are Under Investigation*

The Debtors are or may be subject to various investigations, inquiries, requests for information or informal or formal proceedings from federal, state and international authorities related to certain prepetition conduct of certain Debtor entities, as well as certain affiliated non-Debtor entities and former directors and officers of the Debtors.  The Debtors have cooperated with the relevant authorities regarding these investigations and provided documents responsive to the requests, and continue to work with such authorities on investigations related to the businesses and prepetition conduct of certain Debtor and affiliated non-debtor entities.  At this time, it is impossible to estimate the impact of such investigations.

The Debtors continue to be subject to ongoing proceedings, as well as investigations of potential claims, and it is possible that parties (including governmental parties) may commence additional litigation against the Debtors.  In addition, as a result of these investigations, the Debtors could be subject to additional civil or criminal penalties or administrative sanctions, including fines, disgorgement, restitution, compliance orders and suspension of licenses, any of which could adversely affect the Debtors' financial condition and creditor recoveries.

8.      *Ongoing Litigation and Other Contingencies Could Affect the Outcome of the Chapter 11 Cases*

The Plan contemplates that the Estate Representative will collect on certain present and future Claims and Causes of Action and distribute recovered amounts to creditors, including the Claims and Causes of Action described in Section IV.M hereto.  The Debtors cannot predict with certainty the outcome or effect of the resolution of claims arising from such pending and future litigation.  An adverse outcome in any litigation on which distributions under the Plan depend could materially affect the recovery of creditors or the Debtors' ability to confirm the Plan.  Specifically, the occurrence of such contingencies could, among other things, materially affect (i) the amount of distributions to holders of Claims and Interests under the Plan and the Plan Trust Agreement; (ii) result in protracted chapter 11 cases and/or delay the timing of distributions to Plan Trust Beneficiaries; (iii) significantly and detrimentally impact the Debtors' relationships with, among others, vendors, suppliers, and employees; and/or (iv) result in the dismissal of these chapter 11 cases or the conversion of these chapter 11 cases to chapter 7 of the Bankruptcy Code.

9.      *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Estate Representative or any entity as the case may be, to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

10.     *Failure to Identify Litigation Claims or Causes of Action*

No reliance should be placed on the fact that a particular litigation claim or a projected objection to a particular Claim or Cause of Action is, or is not, identified in this Disclosure Statement.  The Estate Representative may seek to investigate, file, and prosecute Claims or Causes of Action and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Causes of Action or objections to such Claims or Interests.

11.     *The Expected Valuations of the Debtors' Remaining Assets are Inherently Uncertain*

The estimated valuations of the Debtors' Assets reflect estimates of future value based on limited information available to the Debtors as of the date of this Disclosure Statement.  The estimated valuations reflect numerous assumptions with respect to future events, including general litigation risks and other matters specific to such assets, many of which are difficult to predict and/or beyond the Debtors' control.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court and that the Effective Date will occur, there can be no assurance that the value realized on account of the Debtors' assets will be consistent with any estimates herein, and actual results may differ materially from any such estimates contained in this Disclosure Statement.  Particularly,

86

realizing the value of the Debtors' assets may take multiple years. Such estimates, by their nature, may fluctuate and/or become subject to greater uncertainty over time. In addition, whether actual financial results, litigation, and any other future developments are ultimately consistent with the Debtors' expectations and assumptions as reflected herein may depend on factors outside of the Debtors' control that could adversely affect the value of such assets.

      12.     *Objection to Amount or Classification of Claims*

The Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimate set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of any Claim whose Claim is or may be subject to an objection may not receive its specified share of the estimated distributions described in this Disclosure Statement.

# VI.

# CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Allowed Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are unimpaired or deemed to reject the Plan or will be paid in full in cash.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the U.S. Treasury regulations thereunder (the "**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances or to a holder that may be subject to special tax rules (*e.g.*, any person who is not a U.S. Holder (as defined below), controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, broker-dealers, mutual funds, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, governmental authorities or agencies, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction or other integrated

87

investment). In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes.

Additionally, this discussion assumes that the various debt and other arrangements to which any of the Debtors is a party (including, prior to the Plan Trust Establishment Date, the Retained FILO Claims) will be respected for U.S. federal income tax purposes in accordance with their form and, except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## A.    CONSEQUENCES TO THE DEBTORS

Each of the Debtors is either a member of an affiliated group of corporations that files a consolidated U.S. federal income tax return with SHC Holdings as the common parent (such group, the "**Steward Group**"), an entity disregarded as separate from its owner for U.S. federal income tax purposes whose activities and operations are reflected on the consolidated U.S. federal income tax return of the Steward Group, or a partnership for U.S. federal income tax purposes in which one or more other Debtors owns a partnership interest.

The Steward Group has changed its fiscal year to an August 31st year end as of August 31, 2024. Accordingly, the Steward Group is currently in the process of filing tax forms necessary to effectuate the change in its U.S. federal taxable year from the calendar year to a fiscal year ending August 31st, using certain automatic change procedures that are available in certain circumstances, effective August 31, 2024 (the "**Taxable Year Change**"). This will result in the Steward Group having a short taxable year for the period beginning January 1, 2024 and ending August 31, 2024 (the "**2024 Short Year**"), with a new taxable year beginning on September 1, 2024 and ending on August 31, 2025 (or such earlier date as the Debtors liquidate for U.S. federal income tax purposes) (the "**2024-2025 Taxable Year**"). The remainder of this discussion assumes that, as the Debtors intend, the Taxable Year Change will be completed. If the Taxable Year Change is not completed, it is expected that the Steward Group's U.S. federal income tax liability as a result of the transactions contemplated by the Plan would be substantially higher than the current projections discussed below.

As a result of losses from operations during the 2024 Short Year, the Debtors currently expect the Steward Group to have a substantial U.S. federal net operating loss ("**NOL**") and substantial disallowed business interest expense carryforwards as of September 1, 2024, as well as certain state NOL carryforwards. For the 2024-2025 Taxable Year, the Steward Group expects to recognize a significant amount of taxable income as a result of, among other things, dispositions of assets, the Global Settlement (*see* Sections IV.K.2.c of this Disclosure Statement) and the transactions contemplated by the Plan (including the deemed transfer of assets to the beneficiaries of the Plan Trust and the Litigation Trust (together, the "**Trusts**") in respect of their Allowed Claims, as discussed below). However, as discussed below, it is also expected that the Steward Group will recognize substantial taxable losses in connection with the wind-down of the Debtors that, in addition to available loss carryovers, could largely or entirely offset the taxable income and gain for the taxable year depending on the circumstances.

1.      *The Wind-Down of the Debtors*

On the Litigation Trust Establishment Date, in accordance with the Plan and the FILO Settlement Order, the Debtors will transfer the Litigation Trust Assets to the Litigation Trust.  On the Plan Trust Establishment Date, in accordance with the Plan, the Debtors will transfer all their then remaining assets (other than any Intercompany Interests and any assets distributed to holders of Allowed Claims on the Plan Trust Establishment Date) to the Plan Trust. The Plan Trust Establishment Date potentially could occur concurrently with or shortly after the Litigation Trust Establishment Date, depending in part on the timing of confirmation of the Plan, or at some later point in time. The transfers of assets to the Trusts are expected to be treated as fully taxable transactions to the Debtors and to result in the constructive liquidation of the Debtors for U.S. federal income tax purposes on the Plan Trust Establishment Date (since the Debtors will have no continuing economic interest in the Trusts).  Accordingly, assuming the Plan Trust Establishment Date occurs on or before August 31, 2025, the Debtors expect the 2024-2025 Taxable Year to be the final taxable year of the Steward Group.

The Debtors have a substantial amount of built-in tax gain in certain assets that will be transferred to the Trusts (based on alternative valuation assumptions within a range of potential recoveries). Thus, the transfers to the Trusts are expected to generate a significant amount of taxable gain to the Debtors. In addition, the Debtors are expected to recognize additional income or gain as a result of the liquidation of certain of the Debtors, such as due to the existence of negative tax basis (also called "excess loss accounts") in the stock of certain members of the Steward Group.  On the other hand, the Debtors are expected to recognize a substantial amount of deductions and losses in connection with the liquidation of the Debtors pursuant to the Plan.  Assuming the Debtors completely liquidate for U.S. federal income tax purposes on or before August 31, 2025, preliminary projections (based on certain valuation and other assumptions) indicate that expected taxable losses could largely or entirely offset the Steward Group's expected taxable income for the 2024-2025 Taxable Year.  If the Debtors were to remain in existence for U.S. federal income tax purposes after the end of the 2024-2025 Taxable Year, the Debtors' income tax liability for the 2024-2025 Taxable Year or subsequent taxable years could be significantly higher than otherwise would be incurred due to a combination of consequences (including the reduction in any end-of-year NOL carryforwards to the extent of excluded cancellation of debt income during the year, as discussed in the next section). In addition, if the Debtors' intended tax treatment of certain transactions related to the Global Settlement is ultimately not sustained, the Debtors' U.S. federal, state and local income tax liability for the 2024-2025 Taxable Year could materially increase. Under current law, any NOL incurred by the Steward Group in a succeeding taxable year cannot be carried back to reduce such tax liability.

As discussed below, the Trusts are intended to qualify as "liquidating trusts" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d) (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity) and the Plan requires that all parties report for U.S. federal income tax purposes consistent therewith. *See* Section C. below, "Tax Treatment of the Trusts and their Beneficiaries." Accordingly, for U.S. federal income tax purposes, the Debtors will treat the transfer of beneficial interests in a Trust with respect to a Class of Claims and the Estate Funding as a first step transfer of the underlying assets to which such beneficial interests relate.

2.      *Cancellation of Debt and the Reduction of Tax Attributes*

In general, absent an applicable exception, a taxpayer must recognize cancellation of debt ("**COD**") income from the satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD income is generally the excess of (a) the "adjusted issue price"

(within the meaning of the Treasury Regulations) of the indebtedness satisfied over (b) the sum of the amount of cash paid, the issue price of any new indebtedness issued, and the fair market value of any other non-cash consideration, given in satisfaction of such indebtedness at the time of the exchange.

However, if the taxpayer is under the jurisdiction of a court in a case under title 11 of the Bankruptcy Code and the cancellation or discharge of debt occurs pursuant to a bankruptcy court order or confirmed plan, any resulting COD income is excluded from gross income. As a consequence of such exclusion, a debtor must reduce certain of its tax attributes by up to the amount of the excluded COD income. Tax attributes are generally reduced in the following order: (a) current year NOLs and NOL carryforwards, (b) general business credit carryovers, (c) current year net capital losses and capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the taxpayer remains subject immediately after the discharge), (e) passive activity loss and credit carryovers, and (f) foreign tax credit carryovers. Alternatively, if advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOLs or other tax attributes. In the absence of contrary guidance, it appears that disallowed business interest expense carryovers under section 163(j) of the Tax Code are not subject to reduction under these rules. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the other members of the tax consolidated group also be reduced. Any reduction in tax attributes in respect of excluded COD income does not occur until after the determination of the debtor's income or loss for the taxable year in which the excluded COD income is incurred.

Any excess excluded COD income over the amount of available tax attributes described above generally will not give rise to U.S. federal income tax. However, if the debtor joins in the filing of a consolidated U.S. federal income tax return and has an excess loss account with respect to its stock, a group member holding such stock may recognize income or gain in respect of such excess loss account to the extent that the debtor's excluded COD income is not applied to reduce tax attributes of the tax consolidated group.

The Debtors expect to incur a substantial amount of excluded COD income and related attribute reduction as a result of the Global Settlement and the transactions contemplated by the Plan. The U.S. federal income tax consequences of such attribute reduction depends on whether the Plan Trust Establishment Date and expected resulting liquidation of the Debtors for U.S. federal income tax purposes occurs on or before August 31, 2025 (*i.e.,* the end of the 2024-2025 Taxable Year). Assuming the liquidation of the Debtors for U.S. federal income tax purposes occurs on or before such date, the resulting tax attribute reduction generally would not occur until after the determination of the tax liability for such taxable year, at which point any reduction in tax attributes would have no practical impact (since the Debtors would no longer exist for U.S. federal income tax purposes after such taxable year). If the Debtors were to remain in existence for U.S. federal income tax purposes after such date (*i.e.,* after the end of the 2024-2025 Taxable Year), the tax attribute reduction resulting from COD transactions during the 2024-2025 Taxable Year (in particular, the Global Settlement) could materially increase the Debtors' income tax liability in subsequent taxable years in connection with the implementation of the Plan.

## B.    CONSEQUENCES TO U.S. HOLDERS OF CERTAIN ALLOWED CLAIMS

This section of the Disclosure Statement discusses the U.S. federal income tax consequences to holders of Allowed FILO Bridge Claims and Allowed General Unsecured Claims who are U.S. Holders (and does not discuss tax consequences for those who are not U.S. Holders). As used herein, the term "**U.S. Holder**" means a beneficial owner of an Allowed FILO Bridge Claim or Allowed General Unsecured Claim that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds any such Claim, the tax treatment of a partner in such partnership generally will depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner-level.  If you are a partnership holding any such Claim or a partner in any such partnership, you are urged to consult your own tax advisor regarding the U.S. federal income and other tax consequences of the Plan.

1.     *Treatment of Allowed FILO Bridge Claims and Allowed General Unsecured Claims*

If not previously effectuated pursuant to the FILO Settlement Order, then in conjunction with and pursuant to the Plan, each holder of an Allowed Remaining FILO Bridge Claim and an Allowed FILO DIP Claim will receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Claim, its Pro Rata Share of the Class A-2 Litigation Trust Interests and, in the case of an Allowed FILO DIP Claim, in respect of the Secured Interim Advances, Class A-1 Litigation Trust Interests.

Pursuant to the Plan (in conjunction with the FILO Settlement Order), each holder of a Retained FILO Claim, an Allowed General Unsecured Claim, or an Allowed PBGC Claim will receive, in full and final satisfaction, settlement, release and discharge of such Allowed Claim, Plan Trust Interests.  Upon establishment of the Plan Trust, the Debtors will transfer to the Plan Trust all of their then remaining assets (including all rights with respect to the Class B Litigation Trust Interests), other than Intercompany Interests and any assets distributed to holders of Claims on the Litigation Trust Establishment Date or Plan Trust Establishment Date.

As discussed below, each holder of an Allowed FILO Bridge Claim, Allowed FILO DIP Claim, Allowed General Unsecured Claim and Allowed PBGC Claim and each FILO Party that provided the Estate Funding generally will be treated for U.S. federal income tax purposes as directly receiving in satisfaction of and exchange for such Allowed Claim or Estate Funding, and thereafter as a direct owner of, an undivided interest in the underlying assets of the Litigation Trust or of the Plan Trust (which itself includes an interest in the Litigation Trust and, thus, an undivided interest in the Litigation Trust Assets), subject to any assets of the Plan Trust allocable to, or held on account of, Disputed Claims being treated as a "disputed ownership fund" or other separate taxable entity for U.S. federal income tax purposes.

The Estate Representative will in good faith value the assets transferred to the Litigation Trust, and the Plan Trustee will in good faith value the assets transferred to the Plan Trust. All parties (including holders of Allowed Claims receiving interests in the Litigation Trust or the Plan Trust) must consistently

91

use such valuations for all U.S. federal income tax purposes. The Estate Representative or Plan Trustee, as applicable, will inform the holders of beneficial interests and other applicable parties of such valuations, as may be relevant from time to time.

For a further discussion of the U.S. federal income tax treatment of receiving and owning a beneficial interest in the Litigation Trust or Plan Trust, *see* Section VI.C below, "Tax Treatment of the Trusts and their Beneficiaries."  The combined trust assets potentially include all A/R Co Assets, certain joint venture interests, rights to certain insurance proceeds and various causes of action (subject to any liabilities and obligations for which the Trusts are responsible under the Plan or applicable trust agreement).

      a.    *Gain or Loss With Respect to Allowed FILO Bridge Claims*

The Debtors expect that U.S. Holders of Allowed FILO Bridge Claims will have a taxable event in connection with the satisfaction of their Allowed Remaining FILO Bridge Claim upon formation of the Litigation Trust and a second taxable event upon the satisfaction of their Retained FILO Claims upon formation of the Plan Trust, unless the two transactions occur concurrently, in which event the Allowed FILO Bridge Claims should be treated as satisfied for the combination of Class A-2 Litigation Trust Interests and Plan Trust Interests.

Although the Plan purports to treat an Allowed Remaining FILO Bridge Claim and a Retained FILO Claim as distinct claims, they actually represent parts of a single Claim – an Allowed FILO Bridge Claim.  The Debtors therefore believe that, for U.S. federal income tax purposes, the holders of Allowed FILO Bridge Claims should be treated, upon the receipt of Class A-2 Litigation Trust Interests for their Allowed Remaining FILO Bridge Claims, as receiving in satisfaction of their Allowed FILO Bridge Claims the combination of (i) the Class A-2 Litigation Trust Interests and (ii) the Retained FILO Claims (which the Debtors expect to treat for U.S. federal income tax purposes as a new debt obligation under the tax rules for debt modifications, unless the Plan Trust Interests are concurrently distributed with respect to such Claims, in which event the Plan Trust Interests should simply be viewed as additional consideration in respect of the Allowed FILO Bridge Claims and the Retained FILO Claims should be disregarded).

Accordingly, the Debtors expect that, on the Litigation Trust Establishment Date, a U.S. Holder of an Allowed FILO Bridge Claim generally should recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value of any other property deemed received by reason of its undivided interest in the assets transferred to the Litigation Trust and the issue price (as determined for U.S. federal income tax purposes) of the Retained FILO Claims (unless such Claims are concurrently satisfied, in which event one would substitute for the Retained FILO Claims the amount of any cash and the fair market value of any other property deemed received by reason of the holder's undivided interest in the assets transferred to the Plan Trust), and (ii) the U.S. Holder's adjusted tax basis in such Allowed Claim, excluding both from the consideration received and a holder's tax basis in its Claim any amounts attributable to a Claim for accrued but unpaid interest and possibly accrued original issue discount ("**OID**").

Unless a holder's Retained FILO Claim is satisfied concurrently with its Remaining FILO Bridge Claim, the Debtors expect that, on the Plan Trust Establishment Date, the holder generally should recognize gain or loss with respect to its Retained FILO Claims in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value of any other property deemed received by reason of the holder's undivided interest in the assets transferred to the Plan Trust (other than any consideration attributable to a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in such Retained FILO Claim (excluding, in the case of any U.S. Holder, any tax basis attributable to accrued but unpaid interest and possibly accrued OID). See Section VI.B.2 below, "Timing

and Character of Gain or Loss."  For a discussion of the accrued but unpaid interest and accrued OID, *see* Section VI.B.3 below ("Distributions in Discharge of Accrued Interest or OID").

Holders of Allowed FILO Bridge Claims are urged to consult their tax advisor with respect to the income tax consequences of the Plan to them.

<blockquote>b.     *Gain or Loss With Respect to Allowed General Unsecured Claims*</blockquote>

In general, a U.S. Holder of an Allowed General Unsecured Claim should recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value of any other property deemed received by reason of the holder's undivided interest in the assets transferred to the Plan Trust (other than any consideration attributable to a Claim for accrued but unpaid interest and possibly accrued OID) and (ii) the U.S. Holder's adjusted tax basis in such Allowed Claim (excluding, in the case of any U.S. Holder, any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* Section VI.B.2 below, "Timing and Character of Gain or Loss."  For a discussion of the accrued but unpaid interest and accrued OID, *see* Section VI.B.3 below ("Distributions in Discharge of Accrued Interest or OID").

<blockquote>c.     *Tax Basis and Holding Period*</blockquote>

A holder should obtain a tax basis in such holder's respective interest in each of the underlying assets of the Litigation Trust and the Plan Trust (including, in the case of holders of Plan Trust Interests, such holders' respective portion of the underlying Litigation Trust Assets treated as directly held by such holders for U.S. federal income tax purposes by reason of the Class B Litigation Trust Interests held by the Plan Trust) equal to the fair market value of such holder's interest in such assets as of the date such assets are treated as having been transferred to the holder. For U.S. federal income tax purposes, such holder's holding period with respect to such assets should begin on the day following such transfer to the holder.

<blockquote>2.     *Timing and Character of Gain or Loss*</blockquote>

In the event of a subsequent disallowance of a Disputed General Unsecured Claim, it is possible that a U.S. Holder of a previously Allowed FILO Bridge Claim or General Unsecured Claim may be considered to receive additional distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed FILO Bridge Claim or Allowed General Unsecured Claim may be deferred until all Disputed General Unsecured Claims that affect the amount distributable to such previously Allowed Claim are Allowed or disallowed. In addition, it is possible that a holder will have additional gain in respect of any such additional distributions received. For additional information regarding tax reporting related to Disputed Claims, see Section VI.C below, "Tax Reporting for Trust Assets Allocable to Disputed Claims."

After the date of establishment of the applicable Trust, a U.S Holder's share of any collections received on the assets of the Litigation Trust or Plan Trust (as applicable) (other than as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable distributions) should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Litigation Trust or Plan Trust, as applicable.

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the

U.S. Holder and how long it has been held, whether such Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction or worthless security deduction with respect to such Claim.

A U.S. Holder that purchased its Allowed FILO Bridge Claim or Allowed General Unsecured Claim from a prior holder at a "market discount" (relative to the principal amount of such Claim at the time of acquisition) may be subject to the market discount rules of the Tax Code unless an exception applies. A U.S. Holder that purchased its Claim from a prior holder would be considered to have purchased such Claim with "market discount" if the U.S. Holder's adjusted tax basis in its Claim immediately after its acquisition is less than the adjusted issue price of such Claim (or, in the case of a Claim issued without OID, the sum of all remaining payments to be made on the Claim, excluding "qualified stated interest") by at least a statutorily defined *de minimis* amount. Under these rules, gain recognized on the taxable disposition of a Claim that is subject to the market discount rules generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued.

3.    *Distributions in Discharge of Accrued Interest or OID*

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income for U.S. federal income tax purposes). Conversely, a U.S. Holder may be entitled to recognize an ordinary loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of an Allowed Claim is allocable first to the principal portion of the Allowed Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remaining portion of the Allowed Claim. *See* Section 8.14 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in income for U.S. federal income tax purposes.

## C.    TAX TREATMENT OF THE TRUSTS AND THEIR BENEFICIARIES

1.    *Classification of the Trusts as "Liquidating Trusts"*

The Litigation Trust and the Plan Trust are intended to qualify as "liquidating trusts" within the meaning of Treasury Regulation section 301.7701-4(d) for U.S. federal income tax purposes (except to the extent that any assets of the Plan Trust allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling

as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Trusts will be structured with the intention of complying with such general criteria, to the extent possible.

Pursuant to the Plan, all parties (including, without limitation, the Debtors, the Litigation Trustee, the Plan Trustee, the Litigation Trust Beneficiaries, and the Plan Trust Beneficiaries) are required to treat the assets transferred to the respective trusts as (i) transferred directly to the holders of Allowed Claims, or providers of Estate Funding, entitled to receive the beneficial interests therein (other than to the extent any assets allocable to, or held on account of, Disputed Claims are treated as held by a disputed ownership fund or other separate taxable entity, and other than to the extent, if any, of the Debtors' interest in such trust), and (ii) immediately thereafter, transferred to the applicable trust(s) by such parties (and, if applicable, the Debtors). Any persons or group of persons will be treated as directly receiving an undivided interest in the assets transferred in accordance with their relative economic interest in the respective trust.

Accordingly, as to the transfer of the assets to the Plan Trust, the parties are required to treat the transfer of assets by the Debtors to the Plan Trust (including the Class B Litigation Trust Interests) as (A) the transfer of such assets and, by reason of the transfer of the Class B Litigation Trust Interests, a respective portion of the underlying assets of the Litigation Trust (in each case, subject to any liabilities and obligations relating to those Assets) by the Debtors directly to holders of Allowed Claims entitled to receive Plan Trust Interests in satisfaction of their Claims, other than to the extent such assets are treated as held by a disputed ownership fund or other separate taxable entity, followed by (B) the transfer of such assets (subject to such liabilities and obligations) by such holders to the Plan Trust in exchange for Plan Trust Interests.

As to the transfer of the Litigation Trust Assets to the Litigation Trust, the parties are required to treat such transfer as follows:

(i)     if the transfer of assets to the Litigation Trust and Plan Trust (and distribution of Litigation Trust Interests and Plan Trust Interests) occur *concurrently*, as (A) the transfer of the Litigation Trust Assets directly to the holders of Allowed Claims entitled to receive Litigation Trust Interests, to the FILO Parties that provided the Estate Funding and, by reason of the Class B Litigation Trust Interests transferred to the Plan Trust, to holders of Allowed Claims entitled to receive Plan Trust Interests (subject to any liabilities and obligations relating to the Litigation Trust Assets) in satisfaction of and in exchange for their Allowed Claims and Estate Funding, other than to the extent any such assets allocable to, or held on account of, Disputed Claims are treated as held by a disputed ownership fund or other separate taxable entity in respect of the Plan Trust, followed by (B) the transfer of such assets (subject to such liabilities and obligations) by such persons to the Litigation Trust (in the case of the holders of Plan Trust Interests, first as a transfer of such assets to the Plan Trust, in accordance with the Plan Trust transfer discussion above, and then from the Plan Trust to the Litigation Trust) in exchange for their Litigation Trust Interests.

(ii)    if the transfer of assets to the Litigation Trust occurs *prior to* (and not concurrently with) the transfer of assets to and distribution of beneficial interests in the Plan Trust, as (A) the transfer of the portion of the Litigation Trust Assets to which the Class A Litigation Trust Interests relate (in the case of the Class A-1 Litigation Trust Interests, to the extent of the Secured Interim Advances and the Estate Funding) directly to the holders of Allowed FILO DIP Claims, the holders of Allowed Remaining FILO Bridge Claims and the FILO Parties that provided the Estate Funding (subject to any liabilities and obligations relating to those assets) in satisfaction of and in exchange for their Allowed Claims and Estate Funding, followed by (B) the transfer of such assets by such persons, and of the remaining Litigation

Trust Assets by the Debtors, to the Litigation Trust in exchange for their beneficial interests in the Litigation Trust. In such event, pursuant to the Plan, the subsequent transfer of the Class B Litigation Trust Interests by the Debtors to the Plan Trust shall be treated as a direct transfer of the applicable portion of the assets of the Litigation Trust underlying such Class B Litigation Trust Interests to the Plan Trust Beneficiaries, followed by the transfer of such assets by the Plan Trust Beneficiaries to the Plan Trust, in accordance with the Plan Trust transfer discussion above.

Accordingly, absent definitive guidance to the contrary, (A) prior to the establishment of the Plan Trust, the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests and the Debtors, as the holders of the Class B Litigation Trust Interests, will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (B) after the establishment of the Plan Trust, (1) the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (2) the holders of the Plan Trust Interests will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of the Litigation Trust Assets; in each case, other than to the extent any assets of the Plan Trust allocable to, or held on account of, Disputed Claims are treated as held by a disputed ownership fund or other separate taxable entity.

No ruling is currently being requested from the IRS concerning the tax status of the Litigation Trust or the Plan Trust as a grantor trust or the identity of any particular party as a grantor with respect to the Litigation Trust or the Plan Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust or the Plan Trust as a grantor trust or the status of any party as a grantor with respect to the Litigation Trust or the Plan Trust (including as a result of the Debtors' retention of an interest in the Litigation Trust until the Plan Trust Establishment Date, if the transfer of assets to and distribution of beneficial interests in each Trust do not occur concurrently, or the receipt of Class A-1 Litigation Trust Interests by the FILO Parties providing funding pursuant to the Litigation Funding Agreement). If the IRS were to successfully challenge such classification or status, the U.S. federal income tax consequences to the Litigation Trust, the Plan Trust and the applicable holders of Claims could vary from those discussed herein (including as a result of the trust potentially being treated for U.S. federal income tax purposes as a partnership or a corporation). Certain U.S. federal income tax consequences of the Plan Trust or any portion thereof being treated as a disputed ownership fund or other separate taxable entity are also discussed below.

2. *General Tax Reporting by the Trusts and their Beneficiaries*

In accordance with the intended treatment of the Trusts as liquidating trusts for U.S. federal income tax purposes, the Plan provides that all parties (including the Debtors, the Litigation Trustee, the Plan Trustee, the Litigation Trust Beneficiaries, and the Plan Trust Beneficiaries) shall report consistently with such treatment for U.S. federal, state and local income tax purposes.  Accordingly, as described above, all parties must (a) treat the Litigation Trust as a grantor trust of which (i) the holders of Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests and (ii) the Debtors (before the transfer of the Plan Trust Interests to holders of Allowed Claims) or the holders of Plan Trust Interests (after such transfer of Plan Trust Interests, by reason of the Plan Trust's beneficial interest in the Litigation Trust) are the owners and grantors, and treat such holders as the direct owners of an undivided interest in the assets transferred to the Litigation Trust, and (b) treat the Plan Trust as a grantor trust of which the Plan Trust Beneficiaries are the owners and grantors, and treat such holders as the direct owners of an undivided interest in the assets

96

transferred to the Plan Trust, in each case for all U.S. federal income tax purposes (other than with respect to any assets allocable to, or held on account of, Disputed Claims treated as held by a disputed ownership fund or other separate taxable entity, as discussed in the Section VI.C. below).

As soon as reasonably practicable after the transfer of assets to the applicable Trust, the Estate Representative or the Plan Trustee (as applicable) will make a good faith valuation of the fair market value of such assets.  All parties to the Litigation Trust and the Plan Trust (including, without limitation, the Debtors, the Litigation Trustee, the Plan Trustee, the Litigation Trust Beneficiaries, and the Plan Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The Litigation Trustee will file tax returns for the Litigation Trust, and the Plan Trustee will file tax returns for the Plan Trust, treating such Trusts as grantor trusts pursuant to Treasury Regulations section 1.671-4(a).  The Litigation Trustee and the Plan Trustee, as applicable, will annually provide to each holder of Litigation Trust Interests or Plan Trust Interests a separate statement regarding the receipts and expenditures of the Litigation Trust or Plan Trust as relevant for U.S. federal income tax purposes.

All taxable income and loss of the Litigation Trust or Plan Trust will be allocated among, and treated as directly earned and incurred by, the holders of Litigation Trust Interests (including, before the transfer of Plan Trust Interests, the Debtors, and after such transfer, the holders of Plan Trust Interests) or Plan Trust Interests, as applicable, with respect to such holder's interest in the assets of the Litigation Trust or Plan Trust (and not as income or loss with respect to its Claims), with the exception of any taxable income and loss allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims.  Allocations of a trust's taxable income among beneficiaries of such trust (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the trust had distributed all its assets (valued at their tax book value, other than any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of beneficial interests in the trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the trust. Similarly, taxable loss of the trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the trust's remaining assets. The tax book value of trust assets for purposes of this paragraph will equal their fair market value on the date the assets are transferred to the trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. The character of any income and the character and ability to use any loss would depend on the particular situation of the holder.

The U.S. federal income tax obligations of a holder of Litigation Trust Interests or Plan Trust Interests are not dependent on the Litigation Trust or Plan Trust distributing any cash or other proceeds, subject to any portion of the assets of the Litigation Trust or Plan Trust being treated as held by a disputed ownership fund or other separate taxable entity. *Thus, a holder of Litigation Trust Interests or Plan Trust Interests may incur a U.S. federal income tax liability with respect to its allocable share of the applicable Trust's income even if such Trust does not make a concurrent distribution to the beneficiary.*  In general, other than in respect of any cash treated as owned by a disputed ownership fund or other separate taxable entity (the subsequent distribution or reallocation of which to holders of previously Allowed Claims still relates to the holders' Allowed Claims), a distribution of cash by either Trust will not be separately taxable

97

to a beneficiary of such Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxable at the time the cash was earned or received by the Trusts).

The Trusts will comply with all applicable governmental withholding requirements.

3.    *Tax Reporting for Plan Trust Assets Allocable to Disputed Claims*

Under IRS guidance, a liquidating trust's income must be treated as subject to tax on a current basis. Such guidance does not provide a specific methodology for accounting for disputed claims, but provides that the requirement to treat income as subject to tax on a current basis applies regardless of whether a reserve is established for disputed claims. Thus, all income or loss of the Litigation Trust and the Plan Trust will be subject to current taxation, notwithstanding the existence of any Disputed Claims or reserve in respect of the Plan Trust. Of particular significance, the Debtors anticipate that, as of the Plan Trust Establishment Date, a substantial portion of the Plan Trust will be allocable to Disputed Claims.

The person (or persons) subjected to current taxation on income or loss attributable to assets that are allocable to, or held on account of, Disputed Claims will depend on the approach adopted by the Plan Trustee. Under one potential approach, subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of an IRS private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), the Plan Trustee may elect to treat any assets of the Plan Trust that are allocable to, or held on account of, Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 or other taxable entity. If a disputed ownership fund election is made, such disputed ownership fund will be subject to tax on a separate entity basis as discussed below, and the Plan Trustee will report consistently with such election for U.S. federal, state and local income tax purposes, to the extent permitted by applicable law. Alternatively, the Plan Trustee may determine to report using such other reasonable alternative treatment (*e.g.*, treatment of all or a portion of the applicable trust as another form of separate taxable entity) that is permissible under applicable law and results in all of the trust's income being subject to tax on a current basis.

If a disputed ownership fund election is made or the Plan Trustee determines to otherwise treat all or part of the trust as a separate taxable entity, such regarded fund or other entity (although still commercially part of the Plan Trust) will be subject to tax annually on a separate entity basis on any net income earned with respect to the assets allocable to the disputed ownership fund or other separate entity, including any income or gain recognized upon the disposition of such assets or the deemed distribution of the assets out of the disputed ownership fund or separate taxable entity to holders of Allowed Claims. In the case of the Plan Trust, amounts subject to current taxation will include income of the Litigation Trust that is allocable to any disputed ownership fund or other separate taxable entity in respect of the Plan Trust, and may result in the Plan Trust incurring tax attributable to Litigation Trust Assets without receiving distributions from the Litigation Trust. The Plan Trust will be responsible for payment from the assets of any respective disputed ownership fund or other separate taxable entity of any taxes imposed on or with respect to such assets, and will be permitted to sell any assets of the disputed ownership fund or other separate taxable entity to the extent necessary to satisfy such tax liability (including any tax liability arising in connection with such sale). All distributions of assets out of a disputed ownership fund to holder(s) of Allowed Claims (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Allowed Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Plan Trustee, and the Plan Trust Beneficiaries) will be required to report for U.S. federal, state and local income tax purposes consistently with the foregoing.

Under another possible approach, income or loss of the Plan Trust (including any income or loss allocable to assets held on account of Disputed Claims) may be allocated entirely to beneficial interests distributed in respect of already Allowed Claims. In such case, the income or loss allocated to such holders may be excessive in relation to such holders' ultimate relative interest in the Trust. In such event, such holder may subsequently have an incremental offsetting amount of income or loss upon the disposition of the underlying assets of the trust or upon the termination of such holder's beneficial interest in the trust, which in the case of any loss may be subject to limitations depending on the character and timing of such loss and thus might not provide an equivalent offsetting tax deduction.

## D.    WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding and information reporting requirements. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a Litigation Trust Beneficiary or Plan Trust Beneficiary that is a not a U.S. person may be subject to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. *A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders of Allowed Claims.*

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

<div align="center">

**VII.**

**CONFIRMATION OF PLAN**

</div>

**A.**     **CONFIRMATION HEARING**

SECTION 1128(A) OF THE BANKRUPTCY CODE REQUIRES THE BANKRUPTCY COURT TO HOLD A CONFIRMATION HEARING UPON APPROPRIATE NOTICE TO ALL REQUIRED PARTIES.  NOTICE OF THE CONFIRMATION HEARING WILL BE PROVIDED TO ALL KNOWN CREDITORS AND EQUITY HOLDERS OR THEIR REPRESENTATIVES.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR THE ANNOUNCEMENT OF THE CONTINUATION DATE MADE AT THE CONFIRMATION HEARING, AT ANY SUBSEQUENT CONTINUED CONFIRMATION HEARING, OR PURSUANT TO A NOTICE FILED ON THE DOCKET FOR THE CHAPTER 11 CASES.

**B.**     **OBJECTIONS**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the chapter 11 cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

<div align="center">

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

</div>

**C.**     **REQUIREMENTS FOR CONFIRMATION OF PLAN**

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (i) accepted by all impaired Classes of Claims and Interests entitled to vote or, if the Plan is rejected or deemed rejected by an impaired Class, at least one impaired Class has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) in the "best interests" of the holders of Claims and Interests impaired under the Plan, and (iii) feasible.

1.     *Requirements of Section 1129(a) of Bankruptcy Code*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied, including whether:

(a)     the Plan complies with the applicable provisions of the Bankruptcy Code;

(b)     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(c)     the Plan has been proposed in good faith and not by any means forbidden by law;

<div align="center">100</div>

(d)    any payment made or promised by the Debtors, for services or for costs and expenses in or in connection with these chapter 11 cases, or in connection with the Plan and incident to these chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    the Debtors have disclosed, to the extent known, the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy;

(f)    with respect to each Class of Claims or Interests, each holder of an Impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(g)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims or Interests either accepted the Plan or is not impaired under the Plan;

(h)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and other priority claims will be paid in full on the Effective Date, or receive such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

(i)    at least one Class that is Impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(j)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation is proposed in the Plan; and

(k)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

The Debtors believe the Plan meets all the applicable requirements of Section 1129 of the Bankruptcy Code.

2.    *Acceptance of Plan*

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of Claims, more than a majority in number of the Allowed Claims in such Class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept

such plan.  Holders of Claims that fail to vote are not counted in determining the thresholds for acceptance of such plan.

      3.    *Cramdown*

If any Impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, at least one Impaired Class has voted to accept the Plan and as to each Impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code.

      a.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority but are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other Classes of Claims and Interests having the same priority.  Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

      b.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**.  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred Cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (ii) has the right to credit bid, subject to section 363(k) of the Bankruptcy Code, the amount of its claim if its property on which it has a lien is sold and retains its lien on the proceeds of the sale, or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**.  Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such equity interest and (b) the value of the equity interest or (ii) the holders

102

of interest that are junior to the interest of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

4.    *Best Interests Test*

As noted above, with respect to each impaired class of claims and interests, confirmation of a plan requires that each such holder either (i) accept such plan or (ii) receive or retain under such plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires the Bankruptcy Court to determine what holders of allowed claims and allowed interests in each impaired class would receive from a liquidation of the relevant Debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from proceeds of the liquidation of the Debtor's assets and properties (after subtracting amounts attributable to the aforesaid claims) is compared with the value offered to such classes of claims and interests under the plan.

The Debtors believe that under the Plan all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit C**.[61]

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

5.    *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation, or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the Plan.  Because the Plan provides for the liquidation of the Debtors, the Bankruptcy Court will find that the Plan is feasible.  Further, the Debtors believe that the

---

[61]    The Debtors will file the Liquidation Analysis prior to any hearing to consider the approval and adequacy of the Disclosure Statement.

Estate Representative will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds for the Estate Representative to liquidate the Plan Trust Assets.

## VIII.

## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) a liquidation under chapter 7 of the Bankruptcy Code or (ii) the preparation and presentation of an alternative chapter 11 plan.

1. *Liquidation under Chapter 7 of Bankruptcy Code*

If no plan can be confirmed, these chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect that the Debtors expect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.[62]

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the chapter 11 cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the chapter 11 cases, and the loss in value attributable to a considerably expeditious liquidation of the Debtors' assets as required by chapter 7.

2. *FILO Settlement*

The Debtors believe creditors are likely to receive inferior recoveries than provided for in the Plan in the event that the Debtors are unable to confirm the Plan. The Administrative Expense Claims Consent Program and any and all distributions contemplated thereby are contingent upon confirmation of the Plan, and the holders of Allowed Administrative Expense Claims will not have the option to receive expedited payment in exchange for a reduction of such holders' Allowed Administrative Expense Claims under any alternative chapter 11 plan.

---

[62]   The Debtors will file the Liquidation Analysis prior to any hearing to consider the approval and adequacy of the Disclosure Statement.

## IX.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urges holders of Impaired Claims in Classes 3, 4, and 5 to vote to accept the Plan.

Dated:   April 28, 2025
         Chicago, Illinois

          Respectfully submitted,

          STEWARD HEALTH CARE SYSTEM LLC

          on behalf of itself and its Debtor Affiliates

By:
Name:   John R. Castellano
Title:   Chief Restructuring Officer

*Signature Page to Disclosure Statement*

**EXHIBIT A**

**Plan**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC**, *et al.*, | § | |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |

JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864

*Attorneys for Debtors and Debtors in Possession*

April 28, 2025
Houston, Texas

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

## Table of Contents

**ARTICLE I.**      **Definitions and Interpretation.** ...................................................................1

    1.1      Definitions. .....................................................................................................1
    1.2      Interpretation; Application of Definitions; Rules of Construction. ..............20
    1.3      Reference to Monetary Figures...................................................................20
    1.4      Controlling Document. ...............................................................................20

**ARTICLE II.**      **Administrative Expense Claims, FILO DIP Claims, Professional Fee Claims, and Priority Tax Claims.** ...............................................................21

    2.1      Administrative Expense Claims...................................................................21
    2.2      FILO DIP Claims. ......................................................................................22
    2.3      Professional Fee Claims.............................................................................22
    2.4      Priority Tax Claims.....................................................................................23

**ARTICLE III.**      **Classification of Claims and Interests.** ...................................................24

    3.1      Classification in General.............................................................................24
    3.2      Summary of Classification of Claims and Interests.....................................24
    3.3      Special Provision Governing Unimpaired Claims........................................24
    3.4      Elimination of Vacant Classes. ...................................................................25
    3.5      Voting Classes; Presumed Acceptance by Non-Voting Classes. ..................25
    3.6      Voting; Presumptions; Solicitation..............................................................25
    3.7      Cramdown. ..................................................................................................25
    3.8      No Waiver. ..................................................................................................25

**ARTICLE IV.**      **Treatment of Claims and Interests.** .........................................................26

    4.1      Class 1:  Other Priority Claims. ..................................................................26
    4.2      Class 2:  Other Secured Claims. ..................................................................26
    4.3      Class 3:  FILO Bridge Claims......................................................................27
    4.4      Class 4:  General Unsecured Claims. ...........................................................27
    4.5      Class 5: PBGC Claims.................................................................................28
    4.6      Class 6:  Intercompany Claims. ...................................................................28
    4.7      Class 7:  Subordinated Securities Claims. ....................................................28
    4.8      Class 8: Intercompany Interests. ..................................................................28
    4.9      Class 9:  Non-Debtor Owned Subsidiary Interests. ......................................29
    4.10      Class 10:  Parent Interests. ..........................................................................29

**ARTICLE V.**      **Means for Implementation.** ......................................................................29

    5.1      Joint Chapter 11 Plan. .................................................................................29
    5.2      Compromise and Settlement of Claims, Interests, and Controversies............29
    5.3      Plan Settlement. ..........................................................................................30
    5.4      Sources of Consideration for Plan Distribution............................................31
    5.5      Implementation. ..........................................................................................31

| 5.6 | Transition Services Agreement | 33 |
| 5.7 | Litigation Funding Agreement | 33 |
| 5.8 | Coordination between the Litigation Trust and the Plan Trust | 34 |
| 5.9 | Corporate Action | 34 |
| 5.10 | Plan Administrator Committee | 35 |
| 5.11 | Governance | 35 |
| 5.12 | Cancellation of Existing Securities, Agreements, and Liens | 35 |
| 5.13 | Merger or Dissolution of Debtors | 36 |
| 5.14 | Preservation of Causes of Action | 36 |
| 5.15 | Effectuating Documents; Further Transactions | 37 |
| 5.16 | Closing of the Chapter 11 Cases | 37 |

**ARTICLE VI.   Plan Trust.** ........................................................................................... **37**

| 6.1 | Establishment of the Plan Trust | 37 |
| 6.2 | Funding of and Transfer of Assets into the Plan Trust | 39 |
| 6.3 | Plan Trustee | 40 |
| 6.4 | Plan Trust Agreement | 42 |
| 6.5 | Fees and Expenses of the Plan Trust | 42 |
| 6.6 | Creation and Maintenance of Trust Accounts | 43 |
| 6.7 | Limitation of Liability | 43 |
| 6.8 | Indemnification | 43 |
| 6.9 | Insurance | 44 |
| 6.10 | Dissolution of the Plan Trust | 44 |
| 6.11 | Records | 44 |
| 6.12 | Section 1145 Exemption; Non-Transferability of Plan Trust Interests | 45 |
| 6.13 | Plan Trust Tax and Other Matters | 45 |

**ARTICLE VII.   Litigation Trust** .................................................................................. **48**

| 7.1 | Establishment of the Litigation Trust | 48 |
| 7.2 | Funding of and Transfer of Assets into the Litigation Trust | 51 |
| 7.3 | Litigation Trustee | 51 |
| 7.4 | Litigation Trust Agreement | 53 |
| 7.5 | Class B Representative | 53 |
| 7.6 | Fees and Expenses of the Litigation Trust | 53 |
| 7.7 | Indemnification | 53 |
| 7.8 | Dissolution of the Litigation Trust | 54 |
| 7.9 | Records | 54 |
| 7.10 | Transferability of Litigation Trust Interests | 54 |
| 7.11 | Litigation Trust Tax and Other Matters | 54 |

**ARTICLE VIII. Distributions.** ...................................................................................... **58**

| 8.1 | Distributions Generally | 58 |
| 8.2 | No Postpetition Interest on Claims | 58 |
| 8.3 | Distribution Record Date | 58 |

8.4    Date of Distributions..................................................................................59
8.5    Reserve on Account of Disputed Claims.....................................................59
8.6    Distributions After Effective Date...............................................................60
8.7    Plan Distributions Made by Plan Trustee. ...................................................60
8.8    Delivery of Distributions. ...........................................................................60
8.9    Unclaimed Property. ...................................................................................60
8.10   Satisfaction of Claims.................................................................................61
8.11   Manner of Payment Under Plan..................................................................61
8.12   Minimum Distribution.................................................................................61
8.13   No Distribution in Excess of Amount of Allowed Claim..............................61
8.14   Allocation of Distributions Between Principal and Interest...........................62
8.15   Setoffs and Recoupments............................................................................62
8.16   Withholding and Reporting Requirements. ..................................................62
8.17   Securities Registration Exemption...............................................................63
8.18   Disbursing Agent. .......................................................................................63

**ARTICLE IX.    Procedures for Resolving Claims..................................................64**

9.1    Allowance of Claims. ..................................................................................64
9.2    Objections to Claims...................................................................................64
9.3    Estimation of Claims. .................................................................................64
9.4    Claim Resolution Procedures Cumulative. ..................................................65
9.5    Adjustment to Claims Register Without Objection. ......................................65
9.6    No Distributions Pending Allowance. ..........................................................65
9.7    Distributions After Allowance......................................................................65
9.8    Elimination of Duplicate Claims. ................................................................66
9.9    Late Filed Claims........................................................................................66
9.10   Amendments to Claims................................................................................66
9.11   Insured Claims. ...........................................................................................66
9.12   Medical Liability Claims Procedures. ..........................................................66

**ARTICLE X.    Executory Contracts and Unexpired Leases. ..................................67**

10.1   Rejection of Executory Contracts and Unexpired Leases. .............................67
10.2   Survival of Indemnification Obligations. .....................................................68
10.3   Determination of Cure Disputes and Deemed Consent..................................68
10.4   Rejection Damages Claims...........................................................................69
10.5   Joint Ventures. ............................................................................................70
10.6   Insurance Policies. ......................................................................................70
10.7   Assignment. ................................................................................................70
10.8   Modifications, Amendments, Supplements, Restatements, or Other Agreements.......71
10.9   Reservation of Rights...................................................................................71

**ARTICLE XI.    Conditions Precedent to Occurrence of Effective Date. ...............72**

11.1   Conditions Precedent to Effective Date.........................................................72
11.2   Waiver of Conditions Precedent. .................................................................72

11.3    Effect of Failure of a Condition. ....................................................................73
11.4    Effect of Vacatur of Confirmation Order. .....................................................73

**ARTICLE XII.   Effect of Confirmation.** ...........................................................**73**

12.1    Binding Effect. ...............................................................................................73
12.2    Vesting of Assets. ...........................................................................................73
12.3    Pre-Confirmation Injunctions and Stays. .......................................................74
12.4    Injunction Against Interference with Plan. .....................................................74
12.5    Plan Injunction. ..............................................................................................75
12.6    Releases. .........................................................................................................76
12.7    Exculpation. ....................................................................................................79
12.8    Waiver of Statutory Limitation on Releases. .................................................80
12.9    Injunction Related to Releases and Exculpation. ...........................................80
12.10   Subordinated Claims. ......................................................................................81
12.11   Retention of Causes of Action and Reservation of Rights. ............................81
12.12   Ipso Facto and Similar Provisions Ineffective. ..............................................81
12.13   Solicitation of Plan. ........................................................................................81
12.14   Corporate and Limited Liability Company Action. ........................................82
12.15   Release of Liens. .............................................................................................82

**ARTICLE XIII. Retention of Jurisdiction.** ........................................................**82**

13.1    Retention of Jurisdiction. ...............................................................................82
13.2    Courts of Competent Jurisdiction. .................................................................85

**ARTICLE XIV. Miscellaneous Provisions.** ........................................................**85**

14.1    Statutory Fees. ................................................................................................85
14.2    Exemption from Certain Transfer Taxes. .......................................................85
14.3    Dissolution of Creditors' Committee. .............................................................86
14.4    Request for Expedited Determination of Taxes of the Debtors. .....................86
14.5    Dates of Actions to Implement Plan. ..............................................................86
14.6    Amendments. ..................................................................................................86
14.7    Revocation or Withdrawal of Plan. ................................................................87
14.8    Notice of Effective Date. ...............................................................................87
14.9    Substantial Consummation. ............................................................................87
14.10   Governing Law. ..............................................................................................87
14.11   Immediate Binding Effect. .............................................................................88
14.12   Waiver of Stay. ...............................................................................................88
14.13   Successors and Assigns. .................................................................................88
14.14   Entire Agreement. ..........................................................................................88
14.15   Severability of Plan Provisions. .....................................................................88
14.16   Additional Documents. ...................................................................................89
14.17   Deemed Acts. ..................................................................................................89
14.18   Computing Time. ............................................................................................89
14.19   Exhibits to Plan. .............................................................................................89

14.20   Notices. ...................................................................................................................89
14.21   Reservation of Rights...........................................................................................91

Each of the debtors in the above-captioned chapter 11 cases (each, a "**Debtor**" and, collectively, the "**Debtors**") proposes the following joint chapter 11 plan of liquidation pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I.           DEFINITIONS AND INTERPRETATION.

### 1.1     *Definitions*.

The following terms shall have the respective meanings specified below:

*2016 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in October 2016 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2020 Transactions* means, individually and/or collectively, (i) the transactions that were entered into and/or occurred in or about May 2020 pursuant to which: (a) Manolete Health, LLC purchased Steward Healthcare International Holdings Ltd. from Steward Health Care System LLC, (b) Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "**Utah JV**") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV, and the Utah JV leased such real properties back to Jordan Valley and Davis, and (c) Cerberus Operations and Advisory Company exchanged its equity in Steward Healthcare Investors LLC for a $350 million convertible note, and (ii) all other transactions related thereto, including any transactions in what was referred to at the time as Project Easter.

*2021 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in January 2021 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2022 Transaction* means the transaction or transactions entered into on or about May 31, 2022 (and certain other dates in 2022) by and among, among others, Sparta Merger Sub I Inc., Sparta Merger Sub II Inc., Sparta Merger Sub III Inc., Sparta Merger Sub I LLC, Sparta Merger Sub II LLC, Sparta Merger Sub III LLC, Sparta Sub Inc., SNCN Holdco Inc., SICN Holdco Inc., Steward Integrated Care Network, Inc., Steward Accountable Care Network, Inc., Steward Health Care Network Inc., Sparta Holding Co. LLC, Steward Health Care System LLC and CareMax, Inc. pursuant to which certain value-based care assets were transferred to Sparta Holding Co. LLC and acquired by CareMax, Inc., and all other transactions related thereto or included therein (including any dividends, distributions, and/or allocations paid, made, and/or issued in 2022 in connection with and/or following such transaction(s), and any subsequent transfer of the proceeds thereof or arising therefrom).

*Administrative Expense Claim* means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under sections 327, 328, 330, 365, 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and

operating the Debtors' businesses and (ii) Professional Fee Claims, but excluding FILO DIP Claims, FILO Bridge Claims, Intercompany Claims, and Priority Tax Claims.

*Administrative Expense Claims Bar Date* means (i) the date fixed by the Administrative Expense Claims Bar Date Order by which any Person (including any Governmental Unit) asserting an Administrative Expense Claim against any Debtor (subject to the exceptions contained therein) must have filed a proof of Administrative Expense Claim with the Bankruptcy Court or application for allowance of such Administrative Expense Claim (as applicable) against any such Debtor or be forever barred from asserting such Administrative Expense Claim,  (ii) the first Business Day that is twenty (20) days following the Confirmation Date with respect to Administrative Expense Claims (other than Professional Fee Claims) held by any Person (including any Governmental Unit) arising prior to the Confirmation Date that are not subject to the Administrative Expense Claims Bar Date Order, or (iii) the first Business Day that is twenty (20) days following the Effective Date, with respect to Administrative Expense Claims (other than Professional Fee Claims) held by any Person (including any Governmental Unit) arising between the Confirmation Date and the Effective Date.

*Administrative Expense Claims Bar Date Order* means the *Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claims Bar Date, and (V) Granting Related Relief* (Docket No. 3217), entered by the Bankruptcy Court on November 14, 2024.

*Administrative Expense Claims Consent Program* means the consent program proposed to certain holders of Administrative Expense Claims with respect to the treatment of such Administrative Expense Claims as set forth in the Confirmation Order and the Plan.

*Administrative Expense Claims Consent Program Condition* means that, in accordance with the terms and conditions of the Administrative Expense Claims Consent Program, holders of more than seventy-five percent (75%) of the aggregate dollar amount of Administrative Expense Claims, in the amounts set forth in the Administrative Expense Claims Consent Program Opt-Out Form, do not opt out of participating in the Administrative Expense Claims Consent Program, which such condition may be waived by the Debtors and the Creditors' Committee.

*Administrative Expense Claims Consent Program Opt-Out Form* means the opt-out form, approved under the Disclosure Statement Order, sent to holders of Administrative Expense Claims pursuant to which holders may opt out of participating in the Administrative Expense Claims Consent Program.

*Affiliate* means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns,

controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Allowed* means, with respect to any Claim against or Interest in a Debtor, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in this Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, (iii) any Claim or Interest expressly Allowed under this Plan, or (iv) any Claim that is listed in the Debtors' Schedules as liquidated, non-contingent, and undisputed; *provided* that the Debtors, the Plan Administrator Committee, and the Plan Trustee, as applicable, will retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to this Plan, except that no such Claims shall be retained against Released Parties other than as expressly set forth in <u>ARTICLE XII</u> of this Plan.

*Allowed Bridge MOIC Amount* means $11,250,000 through March 31, 2026 and increasing by: (i) $1,000,000 on April 1, 2026, (ii) $1,500,000 on May 1, 2026, (iii) $2,000,000 on June 1, 2026, (iv) 2,500,000 on July 1, 2026, (v) $3,000,000 on August 1, 2026, and (vi) $3,750,000 on September 1, 2026 and on the first day of each month thereafter until the FILO Balance (as defined in the FILO Settlement Term Sheet) is paid in full in Cash; *provided* that the Allowed Bridge MOIC Amount shall not exceed 85% of $75,000,000 *minus* any interest paid or accreted on account of the FILO Bridge Claims (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims).

*Asset* means any right, title, and interest of a Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible.

*Available Cash* means Cash on hand (including any amounts invested pending distribution) of the Plan Trust or the Litigation Trust, as applicable, as of the date of determination, net of any amounts reserved in respect of Disputed Claims and any reserves established in the good faith discretion of the Plan Trustee or the Litigation Trustee, as applicable, in consultation with the Creditors' Committee, to provide for payment of any obligations or liabilities of the Plan Trust or Litigation Trust, as applicable, including any Claims assumed by the Plan Trust or the Litigation Trust pursuant to this Plan and any costs or expenses of the Plan Trust or Plan Trustee or the Litigation Trust or Litigation Trustee and any taxes (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes of such fund or separate taxable entity), or to maintain the value of any Assets of the Plan Trust or the Litigation Trust, as applicable.

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

**Ballot** means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

**Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

**Bar Date** means the date fixed by order(s) of the Bankruptcy Court (including the Bar Date Order or otherwise in this Plan or the Confirmation Order) by which any Persons, asserting a Claim against any Debtor must have filed a Proof of Claim or application for allowance of such Claim (as applicable) with the Bankruptcy Court against any such Debtor or be forever barred from asserting such Claim.

**Bar Date Order** means the *Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim; (II) Approving Form and Manner of Notice Thereof; and (III) Granting Related Relief* (Docket No. 1564) as may be modified, supplemented, or amended from time to time.

**Bridge Credit Agreement** means that certain *Credit Agreement*, dated as of February 21, 2024, by and among Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc. and Stewardship Health Medical Group, Inc., as borrowers thereunder, and the other loan parties party thereto, the lenders party thereto and Brigade Agency Services LLC, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

**Bridge MOIC** means the obligations of certain Debtors constituting the MOIC Amount (as defined in the Bridge Credit Agreement) under the Bridge Credit Agreement.

**Business Day** means any calendar day that is not a Saturday, Sunday, or other calendar day on which banks are authorized or required to be closed in New York, New York.

**Cash** means legal tender of the United States of America.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost,

4

account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise.  For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

*Chapter 11 Case* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*Chief Restructuring Officer* means John R. Castellano, in his capacity as Chief Restructuring Officer of each of the Debtors.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code.

*Claims and Noticing Agent* means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors.

*Claims Register* means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

*Class* means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

*Class A Litigation Trust Interests* means, collectively, the Class A-1 Litigation Trust Interests and the Class A-2 Litigation Trust Interests.

*Class A-1 Litigation Trust Interests* shall mean the "Class A-1 interests" as set forth in the FILO Settlement Term Sheet.

*Class A-2 Litigation Trust Interests* shall mean the "Class A-2 interests" as set forth in the FILO Settlement Term Sheet.

*Class A-2 Preference* shall have the meaning set forth in the FILO Settlement Term Sheet.

***Class B Litigation Trust Interests*** shall mean the "Class B interests" as set forth in the FILO Settlement Term Sheet.

***Class B Representative*** means the representative of the Class B Litigation Trust Interests in accordance with the Litigation Trust Agreement, which shall initially be the Plan Administrator Committee.

***Confirmation Date*** means the date on which the Bankruptcy Court enters the Confirmation Order.

***Confirmation Hearing*** means the hearing held by the Bankruptcy Court regarding approval of the Disclosure Statement and confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

***Confirmation Order*** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

***Creditors' Committee*** means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

***Cure Amount*** means the payment of Cash or the distribution of other property (as the applicable parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume or assume and assign such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

***Cure Dispute*** means an unresolved objection regarding assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including objections based on the appropriate Cure Amount or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or any other issue relating to assumption of an executory contract or unexpired lease.

***D&O Policy*** means all directors and officers liability insurance policies (including any runoff policies or tail coverage) issued or providing coverage at any time to any of the Debtors, for current or formers directors', managers', and officers' liability and all agreements, documents, or instruments relating thereto.

***Debtor(s)*** has the meaning set forth in the introductory paragraph of this Plan.

***Debtor Related Parties*** means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, employed and affiliated physicians (solely with respect to Medical Liability Claims asserted against such physicians and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii)

6

with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

*Definitive Documents* means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Plan, including, but not limited to: (i) the Plan; (ii) the Disclosure Statement; (iii) the motion seeking approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (iv) the Disclosure Statement Order; (v) each of the documents comprising the Plan Supplement; (vi) the Confirmation Order; (vii) the Plan Administrator Agreement; (viii) Plan Trust Agreement; and (ix) the Litigation Trust Agreement, each of which shall be in form and substance reasonably acceptable to the Creditors' Committee.

*DIP Orders* means (i) the FILO DIP Order and (i) the MPT DIP Order.

*Disbursing Agent* means the Plan Trustee or such Entity or Entities designated by the Plan Trustee to make or facilitate distributions required by the Plan.

*Disclosure Statement* means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, and which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3018.

*Disclosure Statement Order* means the order entered by the Bankruptcy Court (a) finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code; and (b) authorizing solicitation of the Plan.

*Disputed* means, with respect to a Claim, (i) any Claim that is disputed under ARTICLE IX of this Plan or as to which the Debtors or any party in interest have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed, or (iv) any Claim that is otherwise disputed by any of the Debtors, the Plan Administrator Committee, or the Plan Trustee or any party in interest in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors or any party in interest dispute the amount of an asserted Claim, such Claim shall be deemed Allowed in the amount that is not disputed, if any, and a Disputed Claim as to the balance of such Claim.

*Disputed Claim Reserve* means any Plan Trust Assets allocable to, or held on account of, Disputed Claims, including one or more reserve accounts to be funded, in consultation with the Creditors' Committee, with Cash and/or proceeds of the Plan Trust Assets, as applicable, in accordance with the terms of the Plan, for Disputed Claims.

*Distribution Record Date* means the Effective Date.

*Effective Date* means the date that is the first Business Day on which all conditions to the effectiveness of this Plan set forth in <u>Section 11.1</u> of this Plan have been satisfied or waived in accordance with <u>Section 11.2</u> of this Plan.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*Estate Funding* means $6,500,000 of Cash paid by the Litigation Trust to the Debtors or the Plan Trust on the Litigation Trust Establishment Date to fund the administration of the Chapter 11 Cases after the Litigation Trust Establishment Date, in respect of which the FILO Parties indirectly providing such funding shall receive pursuant hereto, at the direction of the Debtors, Class A-1 Litigation Trust Interests having a liquidation preference (along with a proportionate interest in all other rights and obligations therein) equal to the amount of the Estate Funding; *provided* that, for the avoidance of doubt, the Estate Funding shall not otherwise be required to be repaid by the Debtors, the Estates, or the Plan Trust.

*Estate Representative* means either (i) the Debtors (prior to the Confirmation Date), (ii) the Plan Administrator Committee (on or after the Confirmation Date until the Plan Trust Establishment Date), or (iii) the Plan Trustee (on or after the Plan Trust Establishment Date), each as applicable.

*Exculpated Parties* means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

*Expense Escrow Account* shall have the meaning set forth in the MPT Settlement Order.

*FILO Bridge Agent* means Brigade Agency Services LLC, in its capacity as agent under the Bridge Credit Agreement.

*FILO Bridge Claims* means all Claims held by a FILO Bridge Lender under the Bridge Credit Agreement and DIP Orders, including, for the avoidance of doubt, the Remaining FILO Bridge Claims and the Retained FILO Claims.

*FILO Bridge Lenders* means all lenders that are not the MPT Bridge Lender under the Bridge Credit Agreement, each in their capacity as lender under the Bridge Credit Agreement.

**FILO DIP Agent** means the "Agent" under the FILO DIP Credit Agreement.

**FILO DIP Claim** means all Claims held by a FILO DIP Lender on account of, arising under the FILO DIP Credit Agreement and FILO DIP Order.

**FILO DIP Credit Agreement** means that certain *Debtor-in-Possession Credit Agreement*, dated as of July 10, 2024, by and among Steward Health Care System LLC, as borrower, the other Debtors jointly and severally, as guarantors, the FILO DIP Lenders, as lenders, and Brigade Agency Services LLC, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

**FILO DIP Lenders** shall have the meaning set forth in the FILO DIP Order.

**FILO DIP Order** means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

**FILO Lenders** shall have the meaning set forth in the FILO DIP Order.

**FILO Parties** means the (i) FILO DIP Lenders, (ii) FILO DIP Agent, (iii) FILO Bridge Lenders, (iv) FILO Bridge Agent, (v) Prepetition FILO Agent, (vi) FILO Lenders, and (vii) the providers of the Litigation Funding (as defined in the FILO Settlement Term Sheet).

**FILO Plan Trust Interests** means the beneficial interests in the Plan Trust granted to the holders of Allowed Retained FILO Claims, which beneficial interests shall entitle such holders to share in the FILO Plan Trust Recovery in accordance with the Plan.

**FILO Plan Trust Recovery** means 10% of the Plan Trust Recovery until Allowed Retained FILO Claims are paid in full, to be paid *pro rata* to the holders of the FILO Plan Trust Interests.

**FILO Settlement Order** means the [●] (Docket No. [●]), entered by the Bankruptcy Court on [●], 2025.

**FILO Settlement Term Sheet** means the term sheet approved by the FILO Settlement Order and annexed hereto as **Exhibit C**.

**Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied

or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

*General Unsecured Claim* means (i) any unsecured Claim against any Debtor that is not (a) an Administrative Expense Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a PBGC Claim; (e) a Retained FILO Claim; (f) an Intercompany Claim, or (g) otherwise entitled to priority under the Bankruptcy Code or any Final Order, and (ii) other than Intercompany Claims, any prepetition claim against a Debtor held by a non-Debtor that is a direct or indirect subsidiary of SHC Holdings.

*Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

*GUC Plan Trust Interests* means the beneficial interests in the Plan Trust granted to holders of Allowed General Unsecured Claims, which beneficial interests shall entitle such holders to share in the GUC Plan Trust Recovery in accordance with the Plan.

*GUC Plan Trust Recovery* means 90% of the Plan Trust Recovery until Allowed Retained FILO Claims are paid in full and 100% of the Plan Trust Recovery after Allowed Retained FILO Claims are paid in full, to be paid *pro rata* to the holders of the GUC Plan Trust Interests and PBGC Plan Trust Interests based on the aggregate amount of Allowed General Unsecured Claims and Allowed PBGC Claims.

*Hospital Debtors* means all Debtors, other than, for the avoidance of doubt, Steward Health Care Holdings LLC and Steward Health Care System LLC, that held or owned a license to operate a hospital at any time during the Chapter 11 Cases.

*Identified Non-Released Parties* means (i) the Persons and Entities listed on **Exhibit B** annexed hereto, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Indemnification Obligations* means each of the Debtors' indemnification obligations in place immediately prior to the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors and officers that are currently employed by, or serving on the board of directors of, any of the Debtors, as of the date immediately prior to the Effective Date, and the attorneys, accountants, investment bankers, and other Professionals that are retained by any of the Debtors as of the date immediately prior to the Effective Date.

*Individual Released Parties* means the individuals listed on **Exhibit A** annexed hereto, each in their capacity as a current or former director, officer, manager, employee, advisor, or consultant of one or more of the Debtors.

*Intercompany Claim* means any pre- or postpetition Claim against a Debtor held by another Debtor or by a controlled non-Debtor direct or indirect subsidiary of SHC Holdings; *provided* that any Claim that TRACO may have against the Debtors shall not be considered an Intercompany Claim.

*Intercompany Interests* means an Interest in a Debtor held by another Debtor.

*Initial Plan Distribution* means the first Plan Distribution that the Estate Representative makes to holders of Allowed Claims.

*Initial Plan Distribution Date* means the date selected by the Estate Representative, which will be no later than a date that is on or as soon as reasonably practicable after the Effective Date, on which the Estate Representative will make the Initial Plan Distribution; *provided* that, prior to the Effective Date, (i) the Estate Representative may distribute the Settled Administrative Expense Claims Cash Pool to holders of Settled Administrative Expense Claims pursuant to Section 2.1 of this Plan, (ii) the Plan Trustee may distribute the Plan Trust Interests in accordance with Section 6.1 of this Plan, (iii) the Litigation Trustee may distribute the Litigation Trust Interests in accordance with Section 7.1 of this Plan, and (iv) the Plan Trustee and Liquidation Trustee may distribute any Available Cash.

*Insured Claim* means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

*Interest* means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

11

**Interim Compensation Procedures Order** means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 783), as may be amended, modified, or supplemented from time to time.

**Investigation Subcommittee** means the subcommittee of the Transformation Committee, consisting of Alan J. Carr and William Transier.

**IRS** means the United States Internal Revenue Service.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Litigation Funding Agreement** means the agreement and all ancillary documents thereto pursuant to which the FILO Parties shall provide financing to the Litigation Trust to fund (i) the cost of administering the Litigation Trust and monetizing the Litigation Trust Assets, (ii) the Secured Interim Advances, and (iii) the Estate Funding, which agreement will be filed as part of the Plan Supplement, and which shall be consistent with the FILO Settlement Term Sheet and otherwise in form and substance mutually agreeable to the Debtors, the Creditors' Committee, and the FILO Parties, with approval not to be unreasonably withheld, conditioned or delayed.

**Litigation Trust** means that certain trust to be established in accordance with ARTICLE VII of this Plan and the FILO Settlement Order to hold the Litigation Trust Assets and make distributions to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement.

**Litigation Trust Agreement** means the agreement evidencing the terms and provisions governing the Litigation Trust, dated as of the Litigation Trust Establishment Date, establishing the terms and conditions of the Litigation Trust, the rights of, and limitations on, the Litigation Trust Interests, and pursuant to which the Litigation Trustee shall manage and administer the Litigation Trust Assets, and which shall be consistent with the FILO Settlement Term Sheet and otherwise in form and substance mutually agreeable to the Debtors, the Creditors' Committee, and the FILO Parties, with approval not to be unreasonably withheld, conditioned or delayed.

**Litigation Trust Assets** means, as of the Litigation Trust Establishment Date, all Assets of the Estates (including the Litigation Trust Causes of Action) identified on Schedule 1 of the FILO Settlement Term Sheet.

**Litigation Trust Beneficiaries** shall mean the holders of the Litigation Trust Interests.

**Litigation Trust Causes of Action** means all Claims and Causes of Action held by the Debtors that are not released or settled under the Plan, the FILO Settlement Order, or the Confirmation Order.

**Litigation Trust Establishment Date** means the date the Litigation Trust is established and the Litigation Trust Assets are transferred thereto in accordance with Section 7.1 of this Plan and the FILO Settlement Order.

**Litigation Trust Expenses** means any and all reasonable fees, costs and expenses incurred by the Litigation Trust or the Litigation Trustee (or any professional or other Person retained by the Litigation Trustee) on or after the Litigation Trust Establishment Date in connection with any of their duties under the Litigation Trust Agreement, including any administrative fees, attorneys' fees and expenses, insurance fees, taxes and escrow expenses.

**Litigation Trust Interests** means, collectively, the Class A Litigation Trust Interests and the Class B Litigation Trust Interests.

**Litigation Trustee** means [●], as trustee for the Litigation Trust.

**Mediator** means the Honorable Marvin Isgur, or in the event the Honorable Marvin Isgur is not available, such other entity or individual reasonably acceptable to the Litigation Trustee and the Estate Representative.

**Medical Liability Claims** means any Claim against any Debtor or any employed or affiliated physician of a Debtor arising out of or related to alleged negligence in connection with the rendering of medical care prior to the Petition Date.

**Medical Liability Claims Procedures** means the procedures pursuant to which a general process and timeline will be established for reconciling and determining the Allowed amount of Medical Liability Claims against the Debtors, which procedures shall be disclosed in the Plan Supplement and shall be in form and substance reasonably acceptable to the Creditors' Committee.

**MPT Bridge Lender** means the MPT Lender (as defined in the Bridge Credit Agreement) under the Bridge Credit Agreement.

**MPT DIP Order** means the *Final Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 625), entered by the Bankruptcy Court on June 3, 2024.

**MPT Settlement Order** means the *Final Order Approving (I) Global Settlement with Medical Properties Trust, Prepetition ABL/FILO Secured Parties, FILO Secured Parties, and Creditors' Committee, (II) Interim Management Procedures, and (III) Granting Related Relief* (Docket No. 2610), entered by the Bankruptcy Court on September 18, 2024.

**Non-Debtor Owned Subsidiary Interests** means Interests in Debtors (other than Parent Interests) that are owned by non-Debtors.

**Other Priority Claim** means any Claim other than an Administrative Expense Claim, a FILO DIP Claim, a FILO Bridge Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

**Other Secured Claim** means any Secured Claim other than an Administrative Expense Claim, a Priority Tax Claim, a FILO DIP Claim, or a FILO Bridge Claim.

*Parent Interests* means Interests in SHC Holdings.

*PBGC* means the Pension Benefit Guaranty Corporation.

*PBGC Claims* means the Claims of the PBGC, which shall be Allowed as prepetition unsecured claims, in the amount of $8,750,000 in accordance with Section 4.5 herein.

*PBGC Plan Trust Interests* means the beneficial interests in the Plan Trust granted to the PBGC, as the holder of the Allowed PBGC Claim, which beneficial interests shall entitle the PBGC to share in the GUC Plan Trust Recovery in accordance with the Plan.

*PBGC Settlement* means the settlement between the Debtors and the PBGC, to which the Creditors' Committee has concurred, the agreed terms of which are incorporated herein (including Section 4.5 hereof) and described in the Disclosure Statement.

*Pension Plan* means the New England Sinai Hospital Pension Plan.

*Person* means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

*Petition Date* means May 6, 2024.

*Physician Insurance Account* shall have the meaning set forth in the FILO DIP Order.

*Plan* means this joint chapter 11 plan, including all exhibits, annexes, supplements, and schedules hereto (including the Plan Supplement), as may be amended, supplemented, or modified from time to time in accordance with the Bankruptcy Code and the terms of this Plan.

*Plan Administrator Agreement* means the agreement setting forth, among other things, the identity, the terms of compensation, and the authority of the Plan Administrator Committee, and the scope of services to be provided by the Plan Administrator Committee, which agreement shall be in form and substance reasonably acceptable to the Creditors' Committee.

*Plan Administrator Committee* means a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

*Plan Distribution* means the payment or distribution of consideration to holders of Allowed Claims under this Plan.

*Plan Distribution Date* means a date or dates, including the Initial Plan Distribution Date, as determined by the Estate Representative, in accordance with the terms of the Plan and Confirmation Order, on which the Plan Trustee makes a Plan Distribution to holders of the Plan Trust Interests on account of Allowed Claims.

*Plan Supplement* means a supplemental appendix to this Plan, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of this

14

Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which may include: (i) the Schedule of Identified Non-Released Parties; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Schedule of Alternative Plan Debtors; (v) the Wind Down Budget; (vi) the Plan Administrator Agreement; (vii) disclosure of the identity of the Plan Trustee; (viii) the Plan Trust Agreement; (ix) disclosure of the identity of the Litigation Trustee; (x) the Litigation Trust Agreement; (xi) the Transition Services Agreement; (xii) the Litigation Funding Agreement; and (xiii) the Medical Liability Claims Procedures.  Through the Effective Date, the Debtors shall have the right to amend any schedules, exhibits, or amendments to any of the documents contained in, and exhibits to, the Plan Supplement, subject to the consent rights of the Creditors' Committee and the FILO Parties herein.

**Plan Support Agreement Term Sheet** means the term sheet attached to the Disclosure Statement as Exhibit B.

**Plan Trust** means that certain trust to be established in accordance with ARTICLE VI of this Plan to hold the Plan Trust Assets and make distributions to holders of Allowed Claims pursuant to the Plan.

**Plan Trust Agreement** means the agreement evidencing the terms and provisions governing the Plan Trust, dated as of the Plan Trust Establishment Date, establishing the terms and conditions of the Plan Trust and pursuant to which the Plan Trustee shall manage and administer the Plan Trust Assets, which shall be in form and substance reasonably acceptable to the Creditors' Committee.

**Plan Trust Assets** means, on the Plan Trust Establishment Date, all Retained Assets and any property acquired by the Debtors after the establishment of the Litigation Trust (including, for the avoidance of doubt, the Class B Litigation Trust Interests), other than Intercompany Interests.

**Plan Trust Beneficiaries** means the holders of the Plan Trust Interests.

**Plan Trust Establishment Date** means the date the Plan Trust is established in accordance with Section 6.1 of this Plan.

**Plan Trust Interests** means, collectively, (i) the GUC Plan Trust Interests, (ii) the PBGC Plan Trust Interests, and (iii) the FILO Plan Trust Interests.

**Plan Trust Net Proceeds** means all Cash proceeds realized from the Plan Trust Assets (net of any taxes, including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes imposed on or with respect to any such fund or other separate taxable entity) after reserving in full for the Wind Down Reserve.

**Plan Trust Recovery** means one hundred percent (100%) of the Plan Trust Net Proceeds after satisfying or reserving in full for all Allowed Other Secured Claims, Administrative Expense Claims (including Professional Fee Claims), Priority Tax Claims, and Other Priority Claims, which reserves shall be determined by the Debtors in consultation with the Creditors'

Committee.

*Plan Trustee* means a Person or Entity who shall serve as trustee of the Plan Trust, as contemplated by <u>Section 6.3</u> of this Plan and the Plan Trust Agreement.

*Plane Sales* means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

*Prepetition FILO Agent* shall have the meaning set forth in the FILO DIP Order.

*Prepetition Transactions* means the (i) 2016 Distribution, (ii) 2020 Transactions, (iii) 2021 Distribution, (iv) 2022 Transaction, and (v) Plane Sales.

*Priority Tax Claim* means any Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Pro Rata Share* means (i) that proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interest in that Class entitled to share in the same recovery as such Class under the Plan, or (ii) that proportion that Allowed Claims in a particular Class bears to the aggregate amount of Allowed Claims in multiple Classes, as applicable.

*Professional* means any Entity retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*Professional Fee Claim* means a Claim for fees and expenses incurred by a Professional on or after the Petition Date through and including the Effective Date under sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code.

*Professional Fees Escrow Account* shall have the meaning ascribed to such term in the DIP Orders.

*Proof of Claim* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

*Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in this Plan will not be a Released Party; *provided further* that,, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

**Releasing Parties** means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

**Reinstate, Reinstated, or Reinstatement** means with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

**Representative** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

**Remaining FILO Bridge Claims** means the FILO Bridge Claims, other than the Retained FILO Claims.

**Retained Assets** means those assets that will be retained by the Debtors following the establishment of the Litigation Trust, including (i) the Class B Litigation Trust Interests, (ii) Intercompany Interests, (iii) Intercompany Claims, (iv) the Physician Insurance Account (and the proceeds thereof), (v) the Professional Fees Escrow Account (solely to the extent of the Debtors' interest in such account), (vi) the Expense Escrow Account (and the proceeds thereof), and (vii) any other asset identified as a "Retained Asset" in the FILO Settlement Term Sheet.

**Retained Causes of Action** means the Causes of Action retained by the Debtors and transferred either to the Plan Trust on the Plan Trust Establishment Date or the Litigation Trust on the Litigation Trust Establishment Date, as listed and described in the Schedule of Retained Causes of Action.

**Retained FILO Claims** means FILO Bridge Claims in principal amount totaling $10,000,000, which shall be unsecured, accrue interest at 7.0% per annum commencing on the Effective Date (provided that such interest shall not have to be paid in cash and shall be paid in kind and capitalized and added to the balance of the Retained FILO Claims on a quarterly basis), and shall be junior in payment priority only to all Secured Claims, Priority Claims, Administrative Expense Claims, and Professional Fee Claims.

**Schedule of Alternative Plan Debtors** means the list of Debtors, if any, who will be decoupled from this Plan in accordance with Section 5.3(c), which list which shall be filed with the Plan Supplement.

**Schedule of Assumed Contracts** means a schedule to be filed as part of the Plan Supplement of executory contracts and unexpired leases to be assumed by the Debtors on the Effective Date pursuant to the Plan, which schedule shall be reasonably acceptable to the Creditors' Committee.

**Schedule of Identified Non-Released Parties** means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

**Schedule of Retained Causes of Action** means a schedule to be filed as part of the Plan Supplement of Causes of Action to be retained by the Debtors and the Plan Trust.

**Schedules** means, collectively, any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors with the Bankruptcy Court and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, supplemented, or otherwise modified from time to time.

**Secured Claim** means a Claim (i) secured by a Lien on any Debtor's interest in property to the extent of the value of such interest as (a) set forth in this Plan, (b) agreed to by the holder of such Claim and the Debtors or the Plan Trustee, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

**Secured Interim Advances** means the aggregate amount of cash collateral used by the Debtors from April 1, 2025 through the Litigation Trust Establishment Date together with interest thereon at the Applicable Rate (as defined in the FILO Settlement Term Sheet); on the Litigation Trust Establishment Date, the Debtors shall repay the FILO DIP Loans with Class A-1 interests having a liquidation preference (along with a proportionate interest in all other rights and obligations therein) equal to the amount of such Secured Interim Advances.

**Security** has the meaning set forth in section 101(49) of the Bankruptcy Code.

18

**Settled Administrative Expense Claims** means Administrative Expense Claims of holders who receive the Administrative Expense Claims Consent Program Opt-Out Form and do not affirmatively opt out on or before the deadline set forth in such form, and therefore, are deemed to have an Allowed Administrative Expense Claim in an amount equal to fifty percent (50%) of the reconciled amount set forth in the Administrative Expense Claims Consent Program Opt-Out Form.

**Settled Administrative Expense Claims Cash Pool** means $12,500,000.

**SHC Holdings** means Steward Health Care Holdings LLC.

**Statutory Fees** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

**Subordinated Securities Claims** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

**TRACO** means TRACO International Group S. DE R.L.

**Transformation Committee** means the special committee of the board of managers of SHC Holdings comprised of Alan J. Carr, John R. Castellano, and William Transier.

**Transition Services Agreement** means that certain agreement between the Debtors and the Litigation Trust pursuant to which the Debtors (and following the Plan Trust Establishment Date, the Plan Trust) provide certain transition services to the Litigation Trust, which shall be consistent with the FILO Settlement Term Sheet and otherwise acceptable to the Debtors, the Creditors' Committee, and the FILO Parties, and filed as part of the Plan Supplement.

**U.S. Trustee** means the United States Trustee for Region 7.

**Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

**Waived Bridge MOIC Claims** means all Claims held by the FILO Bridge Lenders under the Bridge Credit Agreement for the Bridge MOIC other than the Allowed Bridge MOIC Amount.

**Wind Down** means the process to (i) sell, abandon, wind down, dissolve, liquidate, or distribute the Retained Assets and the Plan Trust Assets, (ii) resolve, terminate, or wind down any remaining liabilities of the Estates and the Plan Trust, (iii) reconcile all Claims, and (iv) administer the Plan and make Plan Distributions, in each case in accordance with the Plan.

**Wind Down Budget** means a budget setting forth the estimate of costs and expenses necessary to effectuate the Wind Down through the Wind Down Completion Date, which budget (i) shall be prepared by the Debtors, in consultation with the Creditors' Committee, and (ii) after the Plan Trust Establishment Date, may be amended, modified, or supplemented from time to time by the Plan Trustee in its reasonable discretion.

**Wind Down Completion Date** means the date upon which the Retained Assets and the Plan Trust Assets have been sold, abandoned, dissolved, liquidated, realized, or otherwise disposed of, and all proceeds thereof have been distributed in accordance with the Plan.

**Wind Down Reserve** means a deposit account or other Cash reserve held by the Estate Representative, to be funded, including from the Estate Funding, in accordance with the Wind Down Budget with a cash reserve, which shall be available and used only to satisfy wind down costs of the Debtors, the Plan Administrator Committee, and the Plan Trust and shall not be subject to prepetition Liens or Liens or superpriority Claims granted under the DIP Orders, the Confirmation Order, or the Plan; *provided* that any funds remaining in the Wind Down Reserve on the Wind Down Completion Date shall be distributed by the Plan Trust as Plan Trust Net Proceeds pursuant to the Plan and the Plan Trust Agreement.

### 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively. The words "includes" and "including" are not limiting. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (v) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

### 1.3    *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4    *Controlling Document.*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the

Disclosure Statement, this Plan shall control. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each. If there is any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan. In the event of any inconsistency between this Plan, the Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, or the Confirmation Order, on the one hand, and the FILO Settlement Order or any other instrument or document created or executed pursuant to the FILO Settlement Order, on the other hand, the Confirmation Order shall control; *provided* that any provision of the Confirmation Order that is inconsistent with the FILO Settlement Term Sheet shall require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent).

## ARTICLE II. ADMINISTRATIVE EXPENSE CLAIMS, FILO DIP CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1 *Administrative Expense Claims.*

(a) On, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the next Plan Distribution Date after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, distributions to holders of Allowed Administrative Expense Claims shall have commenced, with each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) to receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b) Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided by Section 2.1 hereof, requests for payment of Administrative Expense Claims, other than requests for payment of Professional Fee Claims, must be filed and served on the Debtors no later than the applicable Administrative Expense Claims Bar Date pursuant to the procedures specified in the Administrative Expense Claims Bar Date Order, the Confirmation Order, the notice of entry of the Confirmation Order, and the notice of Effective Date.

**(c) Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Estate Representative, as applicable, and their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released without consideration as of the Effective Date.**

(d)      The Confirmation Order shall provide that, to the extent the Administrative Expense Claims Consent Program Condition is satisfied or waived in accordance with the Plan, on the first Business Day after the date that is (45) calendar days after the Confirmation Date, or as soon thereafter is reasonably practicable, distributions to holders of Settled Administrative Expense Claims shall have commenced, with each holder of a Settled Administrative Expense Claim set to receive their Pro Rata Share of the Settled Administrative Expense Claims Cash Pool, with the balance of the Settled Administrative Expense Claim paid in Cash in accordance with Section 2.1(a) of the Plan.

## 2.2      *FILO DIP Claims.*

(a)      Except to the extent released pursuant to the FILO Settlement Order, on the Litigation Trust Establishment Date, the FILO DIP Claims shall be deemed Allowed in the full amount outstanding under the FILO DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses provided for thereunder.

(b)      Except to the extent that a holder of an Allowed FILO DIP Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO DIP Claim, on the Litigation Trust Establishment Date, each such holder shall receive its Pro Rata Share of the Class A-2 Litigation Trust Interests and, in respect of the Secured Interim Advances, its Pro Rata Share of the Class A-1 Litigation Trust Interests.

## 2.3      *Professional Fee Claims.*

(a)      All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall file, on or before the date that is thirty (30) calendar days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Confirmation Date. Objections to any Professional Fee Claims must be filed and served no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

(b)      Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Professional Fee Claim is entered; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Estate Representative, (x) first out of the Professional Fees Escrow Account; and (y) if the amount available for distribution pursuant to the foregoing clause (x) is insufficient to remit all distributions required to be made to such holders pursuant to this sentence, from Cash on hand or the Plan Trust Net Proceeds.

(c)      Notwithstanding the foregoing, any Professional Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court, including the Interim Compensation Procedures Order may be paid at the times and in the amounts authorized pursuant to such orders.

(d)      Five (5) Business Days before the Confirmation Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims

incurred in rendering services to the Debtors and the Creditors' Committee, and the Debtors or Litigation Trust shall fund such estimated amounts into the Professional Fees Escrow Account for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Professional Fee Claim does not provide an estimate, the Debtors may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim.  When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in such Professional Fees Escrow Account for purposes of this paragraph shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Litigation Trust without any further action or order of the Bankruptcy Court.

(e)      From and after the Confirmation Date, the Estate Representative and the Litigation Trust, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals after the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(f)      The Estate Representative is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4      *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim at the option of the Estate Representative (in consultation with the Creditors' Committee), either: (i) Cash in an amount equal to such Allowed Priority Tax Claim on the latest of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (c) the next Plan Distribution Date after such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (d) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Estate Representative reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

## ARTICLE III.        CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (i) Impaired and Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject this Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, FILO DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 3 | FILO Bridge Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | PBGC Claims | Impaired | Yes |
| 6 | Intercompany Claims | Impaired | No (Presumed to Accept) |
| 7 | Subordinated Securities Claims | Impaired | No (Deemed to Reject) |
| 8 | Intercompany Interests | Impaired | No (Presumed to Accept ) |
| 9 | Non-Debtor Owned Subsidiary Interests | Impaired | No (Deemed to Reject) |
| 10 | Parent Interests | Impaired | No (Deemed to Reject) |

### 3.3    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Estate Representative in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

24

### 3.4 *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.5 *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims or Interests eligible to vote and no holder of such Claims or Interests, as applicable, votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims or Interests, as applicable, in such Class.

### 3.6 *Voting; Presumptions; Solicitation.*

**(a)** **Acceptance by Certain Impaired Classes.**  Only holders of Claims in Classes 3, 4, and 5 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims or Interests shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims or Interests actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims or Interests actually voting in such Class have voted to accept this Plan.

**(b)** **Presumed Acceptance by Unimpaired Classes.**  Holders of Claims in Classes 1 and 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Additionally, holders of Claims and Interests in Classes 6 and 8 are presumed to accept or deemed to reject the Plan.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

**(c)** **Deemed Rejection by Certain Impaired Classes.**  Holders of Claims and Interests in Classes 7, 9, and 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.7 *Cramdown.*

If any Class entitled to vote on this Plan does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.8 *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other Entity's right to object on any basis to any Claim.

## ARTICLE IV.          TREATMENT OF CLAIMS AND INTERESTS.

### 4.1     *Class 1:  Other Priority Claims.*

**(a)     Treatment:**  Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, each such holder shall receive:

> (i)     payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the next Plan Distribution Date after such Other Priority Tax Claim becomes an Allowed Other Priority Claim, or as soon as practicable thereafter; or

> (ii)    such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired.

**(b)     Impairment and Voting:**  Class 1 is Unimpaired, and holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

### 4.2     *Class 2:  Other Secured Claims.*

**(a)     Treatment:**  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim, each such holder shall receive at the option of the Estate Representative:

> (i)     payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the next Plan Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim,  or as soon as practicable thereafter;

> (ii)    transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or

> (iii)   such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

**(b)     Impairment and Voting:**  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

**4.3     *Class 3:  FILO Bridge Claims*.**

**(a)     Allowance.**

(i)     <u>Remaining FILO Bridge Claims</u>: As of April 28, 2025, the Remaining FILO Bridge Claims shall be deemed Allowed in the principal amount of $41,833,761.53, plus any and all interest, fees, costs, other charges, and expenses provided for under the Bridge Credit Agreement (other than with respect to the Bridge MOIC), *minus* the amount of the Allowed Retained FILO Claims, *plus* the Allowed Bridge MOIC Amount; *provided* that the Waived Bridge MOIC Claim is deemed waived without further notice to, approval of or action by any Person or Entity, and each holder of a Waived Bridge MOIC Claim shall not receive any distribution or retain any property on account of its Waived Bridge MOIC Claim.

(ii)     <u>Retained FILO Claims</u>: On the Litigation Trust Establishment Date, the Retained FILO Claims are Allowed in the aggregate amount of $10,000,000.

**(b)     Treatment**: Except to the extent released pursuant to the FILO Settlement Order, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO Bridge Claims, on the Litigation Trust Establishment Date, each such holder shall (i) receive their Pro Rata Share of the Class A-2 Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim (unless previously received), and (ii) retain their Pro Rata Share of their Retained FILO Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto.

**(c)     Impairment and Voting:**  Class 3 is Impaired, and, thus, holders of Allowed FILO Bridge Claims are entitled to vote to accept or reject the Plan.

**4.4     *Class 4:  General Unsecured Claims*.**

**(a)     Treatment:**  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, on or prior to the Effective Date, each such holder shall receive its Pro Rata Share of the GUC Plan Trust Interests.

**(b)     Impairment and Voting:**  Class 4 is Impaired, and, thus, holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

**4.5**     *Class 5: PBGC Claims*

**(a)     Allowance**:  The PBGC Claims shall be Allowed, as a prepetition unsecured claim, in the amount of $8,750,000.

**(b)     Treatment:**  In accordance with the PBGC Settlement, in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Claims, on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests.  For the avoidance of doubt, the PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any Distribution in connection with the Debtors or this Plan.

**(c)     Impairment and Voting:**  Class 5 is Impaired, and, thus, holders of Allowed PBGC Claims are entitled to vote to accept or reject the Plan.

**4.6**     *Class 6:  Intercompany Claims.*

**(a)     Treatment:**  On or prior to the Effective Date or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, reinstated, or discharged (each without any Plan Distribution) to the extent reasonably determined to be appropriate by the Estate Representative.

**(b)     Impairment and Voting:**  Holders of Class 6 Intercompany Claims are either plan proponents or controlled by plan proponents and therefore are conclusively presumed to accept the Plan.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Intercompany Claims.

**4.7**     *Class 7:  Subordinated Securities Claims.*

**(a)     Treatment:**  All Subordinated Securities Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Securities Claims will not receive any distribution on account of such Allowed Subordinated Securities Claims.

**(b)     Impairment and Voting:**  Class 7 is Impaired.  Holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

**4.8**     *Class 8: Intercompany Interests.*

**(a)     Treatment:**  On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Intercompany Interests shall be adjusted, reinstated, or discharged at the election of the Estate Representative; *provided* that no Plan Distributions shall be made to holders of an Intercompany Interest on account of such Intercompany Interest under the Plan.

28

**(b)      Impairment and Voting:**  Holders of Class 8 Intercompany Interests are plan proponents and are therefore conclusively presumed to have accepted the Plan.  Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

### 4.9      *Class 9:  Non-Debtor Owned Subsidiary Interests.*

**(a)      Treatment:**  On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Non-Debtor Owned Subsidiary Interests shall be cancelled and there shall be no distribution to holders of Non-Debtor Owned Subsidiary Interests on account of such Non-Debtor Owned Subsidiary Interests under the Plan.

**(b)      Impairment and Voting:**  Class 9 is Impaired.  Holders of Non-Debtor Owned Subsidiary Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Non-Debtor Owned Subsidiary Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Non-Debtor Owned Subsidiary Interests.

### 4.10      *Class 10:  Parent Interests.*

**(a)      Treatment:**  On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any members, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Parent Interests shall be cancelled and there shall be no distribution to holders of Parent Interests under the Plan.

**(b)      Impairment and Voting:**  Class 10 is Impaired.  Holders of Parent Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Parent Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Interests.

## ARTICLE V.      MEANS FOR IMPLEMENTATION.

### 5.1      *Joint Chapter 11 Plan.*

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.

### 5.2      *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, and the releases contained in this Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim or Interest and any distribution to be made on account of such Claim or Interest.  This Plan shall be deemed a motion to approve the compromises and settlements

contained in this Plan, including the PBGC Settlement.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, including the PBGC Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of this Plan.

### 5.3    *Plan Settlement.*

(a)    As a proposed compromise and settlement of inter-Estate and inter-creditor issues, including those relating to whether the liability and assets of the Debtors should be substantively consolidated for distribution purposes under the Plan (the "**Plan Settlement**"), the following treatment shall apply if the Plan Settlement is accepted and approved:

>    (i)    all assets and liabilities of the Debtors shall be treated as though they were pooled;

>    (ii)    each Claim filed or to be filed against any Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Debtors;

>    (iii)    all Intercompany Claims shall be adjusted, reinstated, or discharged in accordance with Section 4.6 herein;

>    (iv)    no Plan Distributions shall be made under the Plan on account of any Intercompany Interest or any Non-Debtor Owned Subsidiary Interest to the extent set forth in Sections 4.8 and 4.9 herein;

>    (v)    any Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be treated as eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof by any other Debtor shall be treated as one Claim against a single consolidated Estate; and

>    (vi)    any joint or joint and several liability of any of the Debtors shall be one obligation of the Debtors and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

(b)    The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order approving the Plan Settlement, including the Bankruptcy Court's findings that the Plan Settlement is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the Estates, and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.  As a result of the Plan Settlement, each Class of Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal

existence of the Debtors.  The Plan shall not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan.  The Plan Settlement shall not (other than for purposes related to funding Plan Distributions under the Plan) affect (u) the legal and organizational structure of the Debtors, (v) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (w) any agreements entered into by the Plan Trust on or after the Plan Trust Establishment Date, (x) the Estate Representative's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (y) any Causes of Action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no Plan Settlement, and (z) distributions to the Debtors or the Plan Trust from any insurance policies or the proceeds thereof.

(c)  Notwithstanding the foregoing in this Section 5.3, the Debtors reserve the right to examine the Claims asserted against the various Debtors and to withdraw the Plan with respect to any particular Debtor.  In the event that the Debtors elect to withdraw the Plan with respect to any Entity prior to the Confirmation Date, such Entity shall be listed on the Schedule of Alternative Plan Debtors included in the Plan Supplement and the Debtors may proceed to seek confirmation of this Plan as to the remaining Debtors in accordance with Section 5.3(a) above.

### 5.4    *Sources of Consideration for Plan Distribution.*

The Debtors and Plan Trustee shall fund Cash distributions under this Plan with Cash proceeds available from:  (i) Cash available on or after the Effective Date in accordance with the Plan; (ii) proceeds realized from the Class B Litigation Trust Interests; (iii) proceeds realized from the Plan Trust Assets; (iii) proceeds realized from the Retained Assets; (iv) Cash from the Professional Fees Escrow Account (*provided* that the Cash proceeds of the Professional Fees Escrow Account shall be exclusively used to pay Allowed Professional Fee Claims until paid in full in Cash and any amount remaining thereafter shall be transferred to the Litigation Trust); and (v) any additional proceeds of the Wind Down, if any.

### 5.5    *Implementation.*

(i)  On and after the Plan Trust Establishment Date, the Debtors and the Plan Trust shall use commercially reasonable efforts to liquidate and distribute the value of their respective interests in all of their Assets.

(ii)  On and after the Litigation Trust Establishment Date, the Litigation Trust shall use commercially reasonable efforts to liquidate and distribute the value of its interests in the Litigation Trust Assets, including through either prosecuting, settling, or otherwise monetizing the Litigation Trust Causes of Action, in accordance with the terms of the Litigation Trust Agreement; *provided* that notwithstanding anything else contained in this Plan or the Confirmation Order, nothing in the Plan or the Confirmation Order shall limit the Debtors' ability or authority to settle any Litigation Trust Cause of Action prior to the Litigation Trust Establishment Date.

(iii)    No later than the Effective Date, the Plan Trust (if not previously established) shall be established pursuant to the Plan and the Plan Trust Agreement.

(iv)    No later than one (1) Business Day following the Confirmation Date, the Litigation Trust (if not previously established) shall be established pursuant to the Plan and the Litigation Trust Agreement.

(v)    On the Confirmation Date, the Professional Fees Escrow Account shall be funded with an amount of Cash sufficient to pay all accrued Professional Fee Claims based upon estimates provided by the Professionals, as set forth in Section 2.3 of this Plan.

(vi)    On the Confirmation Date, the Wind Down Reserve shall be established.

(vii)    On the Litigation Trust Establishment Date, the Litigation Trust shall fund the Estate Funding.

(viii)    After the Litigation Trust Establishment Date, the Litigation Trust shall make all payments required under the Transition Services Agreement to the Estate Representative.

(ix)    On or prior to the Effective Date, the Professional Fees Escrow Account shall be funded with an amount of Cash sufficient to pay all outstanding Professional Fee Claims.

(x)    On the Plan Trust Establishment Date, the Physician Insurance Account shall vest in, and be transferred to, the Plan Trust.  The Plan Trustee shall assume responsibility for administering and paying the Covered Claims and Covered Amounts (each as defined in the FILO DIP Order) in accordance with the FILO DIP Order.  Upon payment in full of all Covered Amounts, any amounts remaining in the Physician Insurance Account shall be transferred to the Litigation Trust.

(xi)    On the Plan Trust Establishment Date, the Plan Trust Assets shall transfer to the Plan Trust automatically and without further action of the Bankruptcy Court.

(xii)    On the Litigation Trust Establishment Date, the Litigation Trust Assets shall transfer to the Litigation Trust automatically and without further action of the Bankruptcy Court; *provided* that the Debtors, the FILO Parties, the Litigation Trust, and the Litigation Trustee shall execute all documentation necessary to effectuate such transfer.

(xiii)    On the Litigation Trust Establishment Date, $10,000,000 of FILO Bridge Claims shall automatically convert without any further action by any party into an equal amount of Retained FILO Claims, subject to the terms and conditions of this Plan.

32

(xiv)   Upon the FILO Balance (as defined in the FILO Settlement Term Sheet) being reduced to $0 such that all amounts distributable in respect of Class A Litigation Trust Interests have been distributed, the Plan Trustee may in its sole discretion (so long as the Plan Trust owns all of the Class B Litigation Trust Interests) direct the Litigation Trustee to effectuate the distribution of all remaining Litigation Trust Assets to the Plan Trust on account of the Plan Trust's Class B Litigation Trust Interests, by transfer in kind, merger or otherwise (which assets shall be distributed subject to (a) any outstanding interests in, and obligations and liabilities of, the Litigation Trust, including the right of the holders of the Class A-1 Litigation Trust Interests to receive distributions on account of the Post-FILO Repayment Variable Component (as defined in the FILO Settlement Term Sheet) and (b) any rights of the Class A-2 Representative (as defined in the FILO Settlement Term Sheet) under the FILO Settlement Term Sheet); *provided* that the Plan Trustee has obtained a favorable private letter ruling from the IRS or an opinion of the Plan Trust's tax advisor, in each case from which the Plan Trustee reasonably concludes that such transaction would not have a material adverse tax impact on the Plan Trust.

### 5.6   *Transition Services Agreement*

The Estate Representative shall provide transition services to the Litigation Trust in accordance with the Transition Services Agreement.  The Estate Representative shall be defended, held harmless, and indemnified by the Litigation Trust against any and all liabilities or losses that may be incurred in connection with the rendering of services under the Transition Services Agreement to the Litigation Trust or Litigation Trustee, subject to customary carve outs for fraud, willful misconduct, or gross negligence.

### 5.7   *Litigation Funding Agreement*

On the Litigation Trust Establishment Date, the Litigation Trust shall execute and deliver the Litigation Funding Agreement and such document shall become effective in accordance with its terms.  On the Litigation Trust Establishment Date, the Litigation Funding Agreement shall constitute legal, valid, and binding obligations of the Litigation Trust and be enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order, and the Litigation Trust shall be authorized to incur the obligations under the Litigation Funding Agreement and use the proceeds of such Litigation Funding Agreement, in each case, in accordance with the terms of the Plan, the Confirmation Order, the FILO Settlement Order, and the Litigation Funding Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the Litigation Funding Agreement shall bind the Litigation Trust and each other Entity that enters into such agreement.

### 5.8 *Coordination between the Litigation Trust and the Plan Trust*.

(a)     The Estate Representative shall coordinate with the Litigation Trustee with respect to issues involving overlapping concerns with respect to third parties.  If the Estate Representative and Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a mediation conference with the Mediator; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

(b)     With respect to any such disputes presented to the Bankruptcy Court:

(i)     If the FILO Balance (as defined in the FILO Settlement Term Sheet) is in an Underpayment State (as defined in the FILO Settlement Term Sheet) on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate Representative; *provided* that the Litigation Trustee's business judgment shall not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estates or the Plan Trust (other than with respect to claims under section 502(h) of the Bankruptcy Code) without the consent of the Estate Representative.

(ii)     If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate Representative's business judgment shall be applied to the dispute, subject to challenge by the Litigation Trustee; *provided* that the Estate Representative's business judgment shall not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust without the consent of the Litigation Trustee.

### 5.9 *Corporate Action.*

(a)     Following the Confirmation Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by this Plan or the Confirmation Order (including any action to be undertaken by the Plan Trustee or Litigation Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Confirmation Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the organizational structure of the Debtors, and any other action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

(b)     The authorizations and approvals contemplated by this Section 5.9 shall be effective notwithstanding any requirements under non-bankruptcy law.

(c)     The Confirmation Order shall and shall be deemed, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, to authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

### 5.10     *Plan Administrator Committee*

On and after the Confirmation Date and until the Plan Trust Establishment Date, the Plan Administrator Committee shall have exclusive governance rights of the Estates and be authorized to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Plan Administrator Agreement.  Monica Blacker shall serve as the initial chairperson of the Plan Administrator Committee (the "**Committee Chairperson**").  Any decision by the Plan Administrator Committee shall require the affirmative vote of at least two (2) of the three (3) members of the Plan Administrator Committee; *provided* that the Plan Administrator Committee shall not act without the consent of the Committee Chairperson.  Upon the Plan Trust Establishment Date, the Plan Trustee shall accede to the rights and obligations of the Plan Administrator Committee.

### 5.11     *Governance.*

(a)     On the Confirmation Date, the authority, power and incumbency of the persons then acting as directors, officers, managers, members and other authorized persons of the Debtors shall be terminated and such persons shall be deemed to have resigned.  On the Confirmation Date, the applicable Estate Representative shall serve as the initial director(s) or manager, as applicable, and sole officer of each Debtor after the Confirmation Date until such time as such Debtor goes out of existence, by merger into another Debtor, by dissolution or otherwise.

(b)     The Estate Representative, on behalf of the Debtors, may appoint a manager of any Debtor to serve after the Confirmation Date.  The Estate Representative, on behalf of the Debtors, may elect such additional manager(s) and/or officer(s) of the Debtors as the Estate Representative deems necessary to implement this Plan and the actions contemplated herein.  The Estate Representative, on behalf of the Debtors, shall, after the Confirmation Date, have the power to act by written consent to remove any manager or officer of any Debtor at any time with or without cause.

(c)     As of the Confirmation Date, the governing documents of the Debtors may be amended (and shall be deemed amended) to the extent necessary to carry out the provisions of this Plan.

### 5.12     *Cancellation of Existing Securities, Agreements, and Liens.*

(a)     Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or

effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

**(b)** On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

**(c)** After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

**(d)** Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.13   *Merger or Dissolution of Debtors.*

On or after the Confirmation Date, at the direction of the Estate Representative, any of the Debtors may be merged into SHC Holdings and the Estate Representative may complete the winding up of such Debtors (including SHC Holdings) without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its members, managers, directors, management, or Security holders or any payments to be made in connection therewith, other than the filing of a certificate of dissolution and/or merger with the appropriate governmental authorities, and any such certificate of dissolution and/or merger may be filed by the Estate Representative without need for any authorization, signature or other act of any Person or Entity, including without limitation any holder of any Claim or Interest.  On or after the Confirmation Date, the Estate Representative may engage in any other transaction in furtherance of the Plan. Any such transactions may be effective without any further action by the members, managers, directors, management, or Security holders of the Debtors.

### 5.14   *Preservation of Causes of Action.*

**Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by order of the Bankruptcy Court, the Debtors preserve and reserve any and all Causes of Action, including, for the**

**avoidance of doubt, the Litigation Trust Causes of Action.**  For the avoidance of doubt, any Claim or Cause of Action that is settled or released prior to the Litigation Trust Establishment Date shall not be deemed a Litigation Trust Cause of Action.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order to any Cause of Action or potential Cause of Action against them as any indication that the Debtors, the Plan Administrator Committee, the Plan Trustee, the Plan Trust, the Litigation Trustee, or the Litigation Trust will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the consummation of the Plan or the occurrence of the Effective Date.   Prior to the Effective Date, (i) the Estate Representative, with respect to any Cause of Action that is not a Litigation Trust Asset, and (ii) the Litigation Trustee with respect to any Litigation Trust Cause of Action, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 5.15    *Effectuating Documents; Further Transactions.*

(a)    On and after the Confirmation Date, the Estate Representative is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

(b)    Before, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the Security holders, directors, managers, or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the Security holders, directors, managers, or members of the Debtors, or the need for any approvals, authorizations, actions or consents.

### 5.16    *Closing of the Chapter 11 Cases.*

After the Confirmation Date, the Estate Representative shall be authorized, but not directed, to submit one or more motions for order(s) that close and issue final decrees for any of the Chapter 11 Cases, for any Debtor, in each case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  Furthermore, the Claims and Noticing Agent shall be authorized to destroy all paper/hardcopy records related to the Chapter 11 Cases two (2) years after the Effective Date has occurred.

## ARTICLE VI.    PLAN TRUST.

### 6.1    *Establishment of the Plan Trust.*

On or prior to the Effective Date, the Plan Trust shall be established in accordance

with the Plan Trust Agreement for the purpose of being vested with and liquidating the Plan Trust Assets, reconciling Claims and making distributions to holders of Allowed Claims in accordance with the terms of this Plan and the Plan Trust Agreement.  Upon the Plan Trust Establishment Date, the Plan Trust shall assume all Claims (including, for the avoidance of doubt, all Administrative Expense Claims (including Professional Fee Claims), Other Secured Claims, Priority Tax Claims, and Other Priority Claims) against the Debtors (other than the FILO DIP Claims, FILO Bridge Claims, and Claims for which Plan Trust Interests are distributed) with the same validity and priority as such Claims had against the Debtors immediately prior to the Plan Trust Establishment Date and there shall be no further recourse against the Debtors with respect to such Claims.  For the avoidance of doubt, the Estate Representative may establish the Plan Trust after the Confirmation Date but prior to the Effective Date.  On or following the Plan Trust Establishment Date, the Plan Trustee may distribute the Plan Trust Interests to holders of Allowed Claims and establish the Disputed Claim Reserve in accordance with the Plan.  Subject to and to the extent set forth in this Plan, the Confirmation Order, the Plan Trust Agreement, or any other order of the Bankruptcy Court entered in connection therewith, the Plan Trust and the Plan Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

(i)     perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Plan Trust;

(ii)    establish, maintain and administer trust accounts, which shall be segregated to the extent appropriate in accordance with this Plan;

(iii)   accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle and protect, as applicable, the Plan Trust Assets in accordance with this Plan;

(iv)    except to the extent any Claims have already been Allowed (including pursuant to the terms of this Plan), control and effectuate the Claims reconciliation process with respect to all Claims, including to object to, seek to subordinate, recharacterize, compromise or settle any and all such Claims against the Debtors, including the Disputed Claims, pursuant to the procedures prescribed in this Plan;

(v)     calculate and make distributions to holders of Allowed Claims;

(vi)    administer each Debtor's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(vii)   administer the Plan Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the

Plan Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(viii)   retain, compensate and employ Professionals (including Estate Professionals) to represent the Plan Trust;

(ix)   direct and control the Wind Down, liquidation, sale or abandonment of the Plan Trust Assets, including the Retained Assets, and any other remaining Assets of the Debtors under the Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims;

(x)   exercise such other powers as may be vested in the Plan Trust under the Plan Trust Agreement and this Plan, or as are deemed by the Debtors or the Plan Trustee to be necessary and proper to implement the provisions of the Plan Trust Agreement and effectuate the purpose of the Plan Trust;

(xi)   dissolve the Plan Trust in accordance with the terms of the Plan Trust Agreement;

(xii)   on behalf of each of the Debtors, carry out and implement all provisions of this Plan; and

(xiii)   wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor.

The Plan Trustee shall have the same authority in respect of all taxes and tax returns of the Debtors as if the Plan Trustee were the Debtors.

Notwithstanding anything to the contrary in this Section 6.1, the Plan Trust's primary purpose is liquidating the Plan Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Plan Trust's liquidating purpose and reasonably necessary to conserve and protect the Plan Trust Assets and provide for the orderly liquidation thereof.

### 6.2   *Funding of and Transfer of Assets into the Plan Trust.*

Except as otherwise provided in this Plan or the Confirmation Order, upon the Plan Trust Establishment Date, the Debtors shall transfer the Plan Trust Assets, including, but not limited to the Estate Funding, to the Plan Trust, and all such assets shall vest in the Plan Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the Plan Trustee, in accordance with this Plan and the Plan Trust Agreement. The Plan Trustee shall have the authority to create additional sub-accounts in trust accounts established pursuant to Section 6.6 and sub-trusts within the Plan Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Plan

Trust.  The act of transferring the Plan Trust Assets, as authorized by this Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Plan Trust as if the asset or right was still held by the applicable Debtor. Upon the transfer of the Plan Trust Assets to the Plan Trust, the Debtors shall have no interest in or with respect to the Plan Trust Assets or the Plan Trust. Upon delivery of the Plan Trust Assets to the Plan Trust, the Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Plan Trust Assets or the Plan Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Plan Trust Assets to the Plan Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Plan Trust shall vest in the Plan Trust and its representatives, and the Debtors and the Plan Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Plan Trustee shall agree to accept and hold the Plan Trust Assets in the Plan Trust for the benefit of the Plan Trust Beneficiaries, subject to the terms of the Plan and the Plan Trust Agreement.

### 6.3    *Plan Trustee.*

**(a)    Appointment of Plan Trustee.**  Upon the Plan Trust Establishment Date, the Plan Administrator Committee shall be appointed as the Plan Trustee.  Except as otherwise provided in this Plan, the Plan Trustee (i) shall be the successor to and representative of the Estate of each of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code and (ii) shall be the sole representative of, and shall act for, the Debtors, and shall assume any such outstanding responsibility of the Debtors under the Plan.  The powers, rights and responsibilities of the Plan Trustee shall be as specified in the Plan Trust Agreement and Plan and shall include the authority and responsibility to fulfill the items identified in this Section 6.3 of the Plan.  Other rights and duties of the Plan Trustee and the Plan Trust Beneficiaries shall be as set forth in the Plan Trust Agreement.  The FILO Parties will have the right to consent to any successor Plan Trustee that is not a chapter 7 trustee (including the terms of any such successor's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

**(b)    Functions of the Plan Trustee.**  On and after the Plan Trust Establishment Date, the Plan Trustee and/or the Plan Trust, as applicable, shall carry out the functions set forth in this Section 6.3 and, after the Effective Date, may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the Plan Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)    effectuate the Plan, including the prosecution and any other disposition of all litigation related to any appeals in respect to the approval and/or implementation of the Plan;

40

(ii)     wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt, or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor;

(iii)    exercise its business judgment to direct and control the Wind Down, including the liquidation, sale and/or abandonment of the Plan Trust Assets, including the Retained Assets, under this Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims;

(iv)    marshal, market for sale, and wind down any of the Plan Trust Assets, including the Retained Assets;

(v)     serve as the initial director or manager, as applicable, and sole officer of each Debtor after the Effective Date until such time as such Debtor is merged or dissolved, as applicable, and take any actions necessary to effectuate the terms of the Plan and the Plan Trust Agreement in such capacities;

(vi)    take any actions necessary to (A) resolve all matters related to the Plan Trust Assets and (B) vest such assets in the Plan Trust;

(vii)   open and maintain bank accounts on behalf of or in the name of the Plan Trust;

(viii)  fund the Wind Down Reserve;

(ix)    amend, modify, or supplement the Wind Down Budget;

(x)     determine, from time to time, whether the amounts available in the Wind Down Reserve are in excess of the amount necessary to satisfy the purpose for which such reserve was established and amend, modify, or supplement the Wind Down Budget accordingly.  If the Plan Trustee determines that a surplus exists in the Wind Down Reserve as of the date of such determination, the Plan Trustee may transfer such surplus amount to the Plan Trust for distribution in accordance with the Plan;

(xi)    maintain the books and records and accounts of the Debtors or the Plan Trust;

(xii)   reconcile Claims and calculate and make distributions to holders of Allowed Claims in accordance with the Plan;

(xiii)  administer each Debtor's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of each

41

Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(xiv)   administer the Plan Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Plan Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(xv)   file, prosecute, settle or dispose of any and all objections to asserted Claims;

(xvi)   enter into and consummate any transactions for the purpose of dissolving the Debtors;

(xvii)   make distributions of the Plan Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay the expenses of the Plan Trust, to holders of Allowed Claims, in accordance with the Plan;

(xviii)   purchase and carry all insurance policies reasonably necessary or advisable to pay all associated insurance premiums and costs;

(xix)   invest Cash, as available, and any income earned thereon;

(xx)   take such actions as are necessary or appropriate to close any of the Chapter 11 Cases;

(xxi)   retain, compensate and employ Professionals to represent the Plan Trust or the Plan Trustee, as applicable; and

(xxii)   take any other actions not inconsistent with the provisions hereof that the Plan Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

### 6.4   *Plan Trust Agreement.*

Prior to the Plan Trust Establishment Date, the Debtors shall execute and deliver the Plan Trust Agreement.  The Plan Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Plan Trustee.  Any such indemnification shall be the sole responsibility of the Plan Trust and payable solely from the Plan Trust Assets.

### 6.5   *Fees and Expenses of the Plan Trust.*

From and after the Plan Trust Establishment Date, expenses of the Plan Trust shall be paid from the Plan Trust Assets in the ordinary course of business, in accordance with the Plan and the Plan Trust Agreement.  Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Plan Trustee, on behalf of the Plan Trust, may employ and pay, in

the ordinary course of business, the reasonable fees of any professional (including professionals previously employed by the Debtors) for services or expenses incurred on and after the Effective Date that, in the discretion of the Plan Trustee, are necessary to assist the Plan Trustee in the performance of the Plan Trustee's duties under the Plan and the Plan Trust Agreement, subject to any limitations and procedures established by the Plan Trust Agreement.

### 6.6    *Creation and Maintenance of Trust Accounts.*

On and after the Plan Trust Establishment Date, appropriate trust accounts will be established and maintained in one or more federally insured domestic banks in the name of the Plan Trust.  Cash deposited in the trust accounts will be invested, held and used solely as provided in the Plan Trust Agreement.  The trust accounts will be funded, as applicable, by Cash proceeds obtained through the disposition of Plan Trust Assets or the proceeds of the Plan Trust or Class B Litigation Trust Interests.  Upon obtaining an order of the Bankruptcy Court authorizing final distribution or closure of the Chapter 11 Cases, any funds remaining in the trust accounts shall be distributed in accordance with this Plan and the Plan Trust Agreement, and the trust accounts may be closed.

### 6.7    *Limitation of Liability.*

Neither the Plan Trustee, nor its firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents or agents, and any of such Person's successors and assigns, shall incur any liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with the Plan or Plan Trust Agreement, other than for specific actions or omissions resulting from its willful misconduct, gross negligence or fraud found by a Final Order of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage or expense suffered by the Plan Trust.  The Plan Trustee shall enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee or any other analogous trustee. The Plan Trustee may, in connection with the performance of its functions, in the Plan Trustee's sole and absolute discretion, consult with his, her or its attorneys, accountants, advisors and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are in writing.  Notwithstanding such authority, the Plan Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Plan Trustee or its members unless such determination is based on willful misconduct, gross negligence or fraud. Persons dealing with the Plan Trustee shall look only to the Plan Trust Assets to satisfy any liability incurred by the Plan Trustee to such person in carrying out the terms of the Plan or the Plan Trust Agreement, and the Plan Trustee shall have no personal obligation to satisfy such liability.

### 6.8    *Indemnification.*

In addition to the indemnification provided by the Litigation Trust pursuant to Section 7.7 of this Plan and the Transition Services Agreement, the Plan Trust shall indemnify the Plan Trustee for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses

of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the Plan Trustee (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Plan Trustee in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or the Plan Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct.  In addition to the indemnification provided by the Litigation Trust pursuant to Section 7.7 of this Plan and the Transition Services Agreement, the Plan Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Plan Trustee, from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Plan Trust or the implementation or administration of the Plan if the Plan Trustee acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Plan Trust.  To the extent the Plan Trust indemnifies and holds the Plan Trustee harmless as provided above, the reasonable legal fees and related costs incurred by counsel to the Plan Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as expenses of the Plan Trust.  The costs and expenses incurred in enforcing the right of indemnification in this Section 6.8 shall be paid by the Plan Trust.  This provision shall survive the termination of the Plan Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Plan Trustee.

### 6.9     *Insurance*.

The Plan Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Plan Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties, and obligations of the Plan Trustee, which insurance coverage may, at the sole option of the Plan Trustee, be extended for a reasonable period after the termination of the Plan Trust Agreement.

### 6.10     *Dissolution of the Plan Trust*.

In no event shall the Plan Trust be dissolved later than five (5) years from the Plan Trust Establishment Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Plan Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Plan Trust Assets.

### 6.11     *Records*.

The Plan Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors necessary for the disposition of Plan Trust Assets and objections to Disputed Claims.  Following the Plan Trust Establishment Date, the Plan Trustee

is authorized, pursuant to section 554(a) of the Bankruptcy Code,  without further application to the Bankruptcy Court or notice to any party, to abandon or otherwise destroy documents and records (whether in electronic or paper format), other than any medical records, that the Plan Trustee determines, in its reasonable business judgment, are no longer necessary to the administration of either the Chapter 11 Cases or the Plan, notwithstanding any federal, state, or local law or requirement requiring the retention of the applicable documents or records; *provided* that, prior to abandoning or destroying any records, the Plan Trustee shall notify the Litigation Trustee of its intent to abandon or destroy such records, which notice shall be provided at least five (5) Business Days prior to such intended abandonment or destruction, and offer to transfer such records to the Litigation Trustee, and if the Litigation Trustee elects to retain or receive such records, the Litigation Trustee shall do so at the Litigation Trustee's sole cost and expense (paid in advance), including the cost of any required continued storage until the transfer can be effectuated.

### 6.12   *Section 1145 Exemption; Non-Transferability of Plan Trust Interests.*

Any Plan Trust Interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it should be determined that any such Plan Trust Interests constitute "securities," the offer and sale of such Plan Trust Interests to the Plan Trust Beneficiaries will be exempt to the extent provided in section 1145 of the Bankruptcy Code from registration, without further action by any person, under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations requiring registration for the offer.  Any such Plan Trust Interests (and the underlying Claim giving rise thereto) shall not: (i) be voluntarily or involuntarily, directly or indirectly, assigned, conveyed, hypothecated, pledged, or otherwise transferred or traded, except by will, intestate succession or as may otherwise be required by operation of law; (ii) be evidenced by a certificate or other instrument; and (iii) possess any voting rights with respect to the Plan Trust or otherwise.

### 6.13   *Plan Trust Tax and Other Matters.*

**(a)**   **Tax Treatment.**  The Plan Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 *et seq.* or other separate taxable entity).  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), all parties (including, without limitation, the Debtors, the Plan Trustee, and the Plan Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of Assets by the Debtors to the Plan Trust (including the Class B Litigation Trust Interests) as (i) the transfer of such Assets and, by reason of the transfer of the Class B Litigation Trust Interests, a respective portion of the underlying Assets of the Litigation Trust (in each case, subject to any liabilities and obligations relating to those Assets) by the Debtors directly to the holders of Allowed Claims entitled to receive Plan Trust Interests in satisfaction of their Claims, other than to the extent any Assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets (subject to such

45

liabilities and obligations) by such holders to the Plan Trust in exchange for the beneficial interests in the Plan Trust. Accordingly, absent definitive guidance to the contrary, the Plan Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respect share of Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of Litigation Trust Assets (in each case, other than to the extent any such Assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

**(b)** **Liquidation Purpose of the Plan Trust; No Successor in Interest.** The Plan Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust. Accordingly, the Plan Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Plan Trust Assets, make timely distributions to the Plan Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Plan Trustee shall distribute at least annually to the Plan Trust Beneficiaries any Available Cash. The Plan Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Plan or the Plan Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Plan Trustee expressly for such purpose. Notwithstanding anything in the Plan or Plan Trust Agreement to the contrary, the Plan Trustee shall always act consistently with, and not contrary to, the purpose of the Plan Trust as set forth in the Plan.

**(c)** **Cash Investments.** The right and power of the Plan Trustee to invest the Plan Trust Assets, the proceeds thereof, or any income earned by the Plan Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code. The Plan Trustee may expend the Cash of the Plan Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Assets of the Plan Trust during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Plan Trust) and (iii) to satisfy other respective liabilities incurred by the Plan Trust in accordance with this Plan and the Plan Trust Agreement (including, without limitation, the payment of any taxes).

**(d)** **Tax Reporting and Tax Payments.**

(i) The Plan Trustee shall file tax returns for the Plan Trust treating the Plan Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 6.13(d). The Plan Trustee also shall annually send to each holder of a Plan Trust Interest, a separate statement regarding the receipts and expenditures of the Plan Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to

utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable after the Plan Trust Establishment Date, the Plan Trustee shall make a good faith determination of the fair market value of the Plan Trust Assets as of the Plan Trust Establishment Date.  The Plan Trustee shall inform all parties of such valuation as relevant from time to time.  This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)    Allocations of Plan Trust taxable income among Plan Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Plan Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of Plan Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Plan Trust Assets. The tax book value of Plan Trust Assets for purpose of this paragraph shall equal their fair market value on the date Plan Trust Assets are transferred to the Plan Trust, adjusted in accordance with tax accounting principles prescribed by the United States Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)    The Plan Trust shall be responsible for payment, out of Plan Trust Assets, of any taxes imposed on the Plan Trust or the Plan Trust Assets. More particularly, any taxes imposed on any Disputed Claim Reserve or its assets will be paid out of the assets of the Disputed Claim Reserve (including any Plan Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in any Disputed Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of the Disputed Claim

47

Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)     The Plan Trustee may request an expedited determination of taxes of the Plan Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the Plan Trust, taxes of such fund or other separate taxable entity) and the Debtors, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Plan Trust (or any such disputed ownership fund or other separate taxable entity) or the Debtors for all taxable periods through the dissolution of the Plan Trust.

(vi)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Plan Trustee), the Plan Trustee may elect to treat any Plan Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes. If a "disputed ownership fund" election is made (or all or any portion of the Plan Trust Assets allocable to, or held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the Plan Trustee and Plan Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)   The Plan Trustee, the Litigation Trustee and the Debtors shall each cooperate with the other in connection with the preparation and filing of any tax returns, the provision of any required tax forms, and any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

(viii)  The treatment provided in this Section 6.13, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

**ARTICLE VII.     LITIGATION TRUST**

      **7.1     *Establishment of the Litigation Trust.***

To the extent not previously established pursuant to the FILO Settlement Order, the Confirmation Order shall provide that no later than one (1) Business Days following the

48

Confirmation Date, the Litigation Trust shall be established in accordance with the FILO Settlement Order and the Litigation Trust Agreement for the purpose of being vested with and liquidating the Litigation Trust Assets and making distributions to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement.  Following the Litigation Trust Establishment Date, the Litigation Trustee shall distribute the Litigation Trust Interests to the Litigation Trust Beneficiaries.  In each case, subject in all respects to the FILO Settlement Order and the Litigation Trust Agreement, the Litigation Trust and the Litigation Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

(i)      perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Litigation Trust;

(ii)     establish, maintain, and administer trust accounts;

(iii)    accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Litigation Trust Assets in accordance with the Litigation Trust Agreement;

(iv)     make distributions to holders of Litigation Trust Interests in accordance with the Litigation Trust Agreement;

(v)      administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(vi)     retain, compensate and employ professionals to represent the Litigation Trust;

(vii)    direct and control the pursuit, settlement, liquidation, sale, or abandonment of the Litigation Trust Assets in accordance with the Litigation Trust Agreement and applicable law and as necessary to maximize distributions to Litigation Trust Beneficiaries;

(viii)   exercise such other powers as may be vested in the Litigation Trust under the Litigation Trust Agreement, or as are deemed by the Litigation Trustee to be necessary and proper to implement the provisions of the Litigation Trust Agreement and effectuate the purpose of the Litigation Trust;

(ix)     conduct investigations of the Litigation Trust Causes of Action pursuant to Bankruptcy Rule 2004;

(x)      pursue, prosecute, settle, abandon, or otherwise resolve the Litigation Trust Assets (including any Litigation Trust Causes of

49

Action transferred to the Litigation Trust and including through the commencement, participation, defense, or continuation of legal proceedings in any domestic or foreign jurisdiction) in accordance with the Litigation Trust Agreement;

(xi)     protect and enforce the rights of the Litigation Trust in and to the Litigation Trust Assets by utilizing any foreign judicial proceedings and any applicable foreign bankruptcy, insolvency, moratorium, or similar law; and

(xii)     dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

Notwithstanding anything to the contrary in this Section 7.1, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

For the avoidance of doubt, any Claim or Cause of Action that is settled or released prior to the Litigation Trust Establishment Date, subject to the consent rights of the FILO Parties, shall not be deemed a Litigation Trust Cause of Action, and until the Litigation Trust Establishment Date, the Estate Representative shall retain the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Claim or Cause of Action, subject to the consent rights of the FILO Parties, the Bankruptcy Code, and applicable orders of the Bankruptcy Court. Nothing in this Plan or in the Confirmation Order shall impair the ability or authority of the Estate Representative to settle any such Claim or Cause of Action, subject to the consent rights of the FILO Parties, prior to the Litigation Trust Establishment Date.

Pursuant to Federal Rule of Evidence 502(d), any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) in the possession of the Debtors, any prepetition or postpetition committee or subcommittee of the board of managers (including the Transformation Committee and the Investigation Subcommittee) or equivalent governing body of any of the Debtors or their predecessors, or any of their respective employees, representatives, attorneys or advisors, may be shared with the Plan Administrator Committee, the Plan Trustee, the Litigation Trustee, the Creditors' Committee, or the FILO Parties, or any of their respective representatives, attorneys or advisors on either or both a joint representation or common interest privilege basis without waiver of the relevant underlying privilege.  Similarly, any privileged information in possession of such parties may be shared with the Debtors (including the Transformation Committee and the Investigation Subcommittee), the Estates or any successor thereto, the Plan Trustee, or any of their respective representatives, attorneys or advisors, on either or both a joint representation or common interest privilege basis without waiver of the relevant underlying privilege.  The Litigation Trustee and the Estate Representative shall have the exclusive authority and sole discretion to maintain such privileges and keep the privileged material confidential, or waive such privileges and/or disclose and/or use such privileged information (other than privileged information of the Creditors' Committee and/or FILO Parties shared with the Debtors, the Estates or any successor thereto, or

the Plan Trustee on either or both a joint representation or common interest privilege basis) in litigation of any Claim or Cause of Action that is a Litigation Trust Asset. If the Litigation Trustee or the Estate Representative, any of their employees, professionals, or representatives or any other person inadvertently produces or discloses privileged information to any third party, such production shall not be deemed to destroy or waive any privileges, or be deemed a waiver of any confidentiality protections afforded to such privileged information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Trustee and the Estate Representative of the production and shall demand of all recipients of the inadvertently disclosed privileged information that they return or confirm the destruction of such materials.

### 7.2    *Funding of and Transfer of Assets into the Litigation Trust.*

Upon the Litigation Trust Establishment Date, the Debtors shall transfer the Litigation Trust Assets to the Litigation Trust, and all such assets shall vest in the Litigation Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise) to the fullest extent permitted by law) on such date, to be administered by the Litigation Trustee, in accordance with the Litigation Trust Agreement. The Litigation Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust. The act of transferring the Litigation Trust Assets, as authorized by the Confirmation Order, this Plan and the FILO Settlement Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Litigation Trust as if the asset or right was still held by the applicable Debtor. Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the Estates or their successors shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust other than the Class B Litigation Trust Interests. Upon delivery of the Litigation Trust Assets to the Litigation Trust, the Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trust (other than the Class B Litigation Trust Interests). Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust shall vest in the Litigation Trust and its representatives, and the Debtors and the Litigation Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Litigation Trustee shall agree to accept and hold the Litigation Trust Assets in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, subject to the terms of the Litigation Trust Agreement.

### 7.3    *Litigation Trustee.*

**(a)    Appointment of Litigation Trustee.** Upon the Litigation Trust Establishment Date, the Litigation Trustee, to the extent not previously appointed pursuant to the FILO Settlement Order, shall be appointed. The Litigation Trust shall be administered by the

Litigation Trustee pursuant to the Litigation Trust Agreement. The powers, rights and responsibilities of the Litigation Trustee shall be as specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in this <u>Section 7.3</u> of the Plan.  Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

       **(b)**    **Functions of the Litigation Trustee.**  On and after the Litigation Trust Establishment Date, the Litigation Trustee shall carry out the functions set forth in this <u>Section 7.3</u> and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the FILO Settlement Order or the Litigation Trust Agreement.  Such functions shall include any and all powers and authority to:

        (i)    take any actions necessary to (A) resolve all matters related to the Litigation Trust Assets and (B) vest such assets in the Litigation Trust;

        (ii)    open and maintain bank accounts on behalf of or in the name of the Litigation Trust;

        (iii)    maintain the books and records and accounts of the Litigation Trust and obtain any necessary insurance;

        (iv)    administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

        (v)    fund the Estate Funding;

        (vi)    make distributions of the Litigation Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay the Litigation Trust Expenses, to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement;

        (vii)    invest Cash, as available, and any income earned thereon;

        (viii)    retain, compensate and employ professionals to represent the Litigation Trust or the Litigation Trustee, as applicable; and

        (ix)    take any other actions not inconsistent with the provisions hereof, the FILO Settlement Order, and the Litigation Trust Agreement that the Litigation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

### 7.4   *Litigation Trust Agreement.*

Prior to the Litigation Trust Establishment Date, the Debtors shall execute and deliver the Litigation Trust Agreement.  The Litigation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Litigation Trustee.  Any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets.

### 7.5   *Class B Representative.*

The Litigation Trust shall be administered by the Litigation Trustee pursuant to the Litigation Trust Agreement and the Plan. On the Litigation Trust Establishment Date, the Plan Administrator Committee shall be appointed as the Class B Representative to help oversee the activities of the Litigation Trust in accordance with the Litigation Trust Agreement.  Upon the Plan Trust Establishment Date, the Plan Trustee shall succeed the Plan Administrator Committee as the Class B Representative.  Following the Litigation Trust Establishment Date, the Class B Representative shall be responsible for, among other things, (i) exercising its rights under the Litigation Trust Agreement, and (ii) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the above duties.

### 7.6   *Fees and Expenses of the Litigation Trust.*

**(a)**   From and after the Litigation Trust Establishment Date, Litigation Trust Expenses shall be paid from the Litigation Trust Assets in the ordinary course of business, in accordance with the Litigation Trust Agreement.  Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Litigation Trustee, on behalf of the Litigation Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional (including Professionals previously employed by the Debtors or another party-in-interest) for services rendered or expenses incurred on and after the Litigation Trust Establishment Date that, in the discretion of the Litigation Trustee, are necessary to assist the Litigation Trustee in the performance of the Litigation Trustee's duties under the Litigation Trust Agreement, subject to any limitations and procedures established by the Litigation Trust Agreement.

**(b)**   The Litigation Trustee may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties determined by the Litigation Trustee to have qualifications necessary or desirable to assist in the investigation, prosecution and/or settlement of the Litigation Trust Causes of Action).

### 7.7   *Indemnification.*

The Litigation Trust shall indemnify the Plan Trustee and its Representatives for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred, in each case, without fraud, gross negligence, breach of fiduciary duties, or willful misconduct on the part of the Plan Trustee or its Representatives, as applicable (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Plan Trustee or its Representatives at the request of the Litigation Trustee in connection with the

rendering of services to the Litigation Trust or the Litigation Trustee, including under the Transition Services Agreement.  An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct.  To the extent the Litigation Trust indemnifies and holds the Plan Trustee harmless as provided above, the reasonable legal fees and related costs incurred by counsel to the Plan Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Litigation Trust Expenses.  The costs and expenses incurred in enforcing the right of indemnification in this Section 7.7 shall be paid by the Litigation Trust.  This provision shall survive the termination of the Litigation Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Plan Trustee.

### 7.8     *Dissolution of the Litigation Trust.*

In no event shall the Litigation Trust be dissolved later than five (5) years from the Litigation Trust Establishment Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

### 7.9     *Records.*

The Litigation Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the Litigation Trustee, for the disposition of Litigation Trust Assets, subject to the payment of any required fees, costs, or expenses under the Transition Services Agreement.

### 7.10    *Transferability of Litigation Trust Interests.*

The Litigation Trust Interests shall be transferable solely to the extent provided for, and subject to the conditions set forth, in the Litigation Trust Agreement.

### 7.11    *Litigation Trust Tax and Other Matters.*

**(a)     Tax Treatment.**  The Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes, with the holders of Allowed FILO DIP Claims and Allowed FILO Bridge Claims, in respect of their Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests, and the respective FILO Parties providing litigation funding, in respect of their Class A-1 Litigation Trust Interests, being treated as grantors.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of Assets by the Debtors to the Litigation Trust as follows:

54

(i)    If the transfers of Assets to the Litigation Trust and Plan Trust (and distribution of Litigation Trust Interests and Plan Trust Interests) occur concurrently, as (A) the transfer of Assets directly to the holders of Allowed Claims entitled to receive Litigation Trust Interests, to the FILO Parties that provided the Estate Funding and, by reason of the Class B Litigation Trust Interests transferred to the Plan Trust, to holders of Allowed Claims entitled to receive Plan Trust Interests (subject to any liabilities and obligations relating to the Litigation Trust Assets), in satisfaction of, and in exchange for, their Claims and Estate Funding, other than to the extent any Assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity in respect of the Plan Trust, followed by (B) the transfer of such Assets (subject to such liabilities and obligations) by such persons to the Litigation Trust (in the case of the holders of Plan Trust Interests, first as a transfer of such assets to the Plan Trust and then from the Plan Trust to the Litigation Trust) in exchange for their Litigation Trust Interests.

(ii)   If the transfer of Assets to the Litigation Trust occurs prior to (and not concurrently with) the transfer of Assets to and distribution of beneficial interests in the Plan Trust, as (A) the transfer of the portion of the Litigation Trust Assets to which the Class A Litigation Trust Interests relate (in the case of the Class A-1 Litigation Trust Interests, to the extent of the Secured Interim Advances and the Estate Funding) directly to the holders of Allowed FILO DIP Claims, the holders of Allowed Remaining FILO Bridge Claims and the FILO Parties that provided the Estate Funding (subject to any liabilities and obligations relating to those Assets) in satisfaction of, and in exchange for, their Claims and Estate Funding, followed by (B) the transfer of such Assets by such persons, and of the remaining Litigation Trust Assets by the Debtors, to the Litigation Trust in exchange for their Litigation Trust Interests. In such event, the subsequent transfer of the Class B Litigation Trust Interests by the Debtors to the Plan Trust shall be treated as a direct transfer of the applicable portion of the assets of the Litigation Trust underlying such Class B Litigation Trust Interests to the Plan Trust Beneficiaries, followed by the transfer of such Assets by the Plan Trust Beneficiaries to the Plan Trust, as further described in Section 6.13(a) above.

Accordingly, absent definitive guidance to the contrary, (A) prior to the establishment of the Plan Trust, the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests and the Debtors, as the holders of the Class B Litigation Trust Interests, shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (B) after the establishment of the Plan Trust, (1) the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests

shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (2) the holders of the Plan Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of the Litigation Trust Assets, in each case, other than to the extent any Assets of the Plan Trust allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity.

**(b)** **Liquidation Purpose of the Litigation Trust; No Successor in Interest.** The Litigation Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustees shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Litigation Trustee shall distribute at least annually to the Litigation Trust Beneficiaries any Available Cash.  The Litigation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Litigation Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose. Notwithstanding anything in the Plan or the Litigation Trust Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth in the Plan.

**(c)** **Cash Investments.**  The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code. The Litigation Trustee may expend the Cash of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Assets of the Litigation Trust during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

**(d)** **Tax Reporting and Tax Payments.**

(i)   The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 7.11(d). The Litigation Trustee also shall annually send to each holder of a Litigation Trust Interest, a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to

56

forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable after the Litigation Trust Establishment Date, the Estate Representative, in consultation with the Litigation Trustee, shall make a good faith determination of the fair market value of the Litigation Trust Assets, as of Litigation Trust Establishment Date. The Estate Representative shall inform all parties of such valuation as relevant from time to time.   This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)    Allocations of Litigation Trust taxable income among Litigation Trust Beneficiaries (including holders of Plan Trust Interests, as grantors and deemed owners of their respective portion of the underlying Litigation Trust Assets) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the holders of Litigation Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the United States Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The Litigation Trust shall be responsible for payment, out of Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets.

(v)      The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

(vi)     The Litigation Trustee, the Plan Trustee, and the Debtors shall each cooperate with the other in connection with the preparation and

57

filing of any tax returns, the provision of any required tax forms, and any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

(vii) The treatment provided in this <u>Section 7.11</u>, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

# ARTICLE VIII. DISTRIBUTIONS.

## 8.1 *<u>Distributions Generally</u>*.

On or after the Effective Date, the Plan Trustee (with the assistance of the Disbursing Agent as necessary) shall make all Plan Distributions to holders of Allowed Claims in accordance with the terms of this Plan; *provided* that, for the avoidance of doubt, following the Plan Trust Establishment Date and the Litigation Trust Establishment Date, the Plan Trustee and Litigation Trustee may make distributions of (i) Plan Trust Interests and Litigation Trust Interests, as applicable, and (ii) any Available Cash. The Plan Trust shall make Plan Distributions only in accordance with the terms of the Plan, the Confirmation Order and the Plan Trust Agreement to holders of Allowed Claims, and only to the extent that the Plan Trust has sufficient Plan Trust Assets (or income and/or proceeds realized from Plan Trust Assets) to make such payments in accordance with and to the extent provided for in the Plan, the Confirmation Order and the Plan Trust Agreement. The Estate Representative shall direct the Initial Plan Distribution (including the Plan Distribution of the Plan Trust Interests as set forth in <u>ARTICLE IV</u>) to holders of Allowed Claims no later than the Initial Plan Distribution Date. After the Initial Plan Distribution Date, the Estate Representative shall, from time to time, determine the subsequent Plan Distribution Dates.

## 8.2 *<u>No Postpetition Interest on Claims</u>*.

Unless otherwise provided in this Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

## 8.3 *<u>Distribution Record Date</u>*.

As of the close of business on the Distribution Record Date, the various lists of holders of Claims or Interests in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests after the Distribution Record Date; *provided* that the Plan Trustee shall file a notice on the docket of the anticipated Effective Date at least ten (10) calendar days before the anticipated Effective Date. Neither the Debtors nor the Plan Trustee shall have any obligation to recognize any transfer of a Claim (i) occurring after the close of business on the Distribution Record Date, or (ii) that does not comply with Bankruptcy Rule 3001(e) or otherwise does not comply with the Bankruptcy Code or Bankruptcy Rules. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Plan Trustee shall have any

obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

### 8.4 *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 8.5 *Reserve on Account of Disputed Claims.*

**(a)** From and after the Plan Trust Establishment Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the Allowed amount, or Allowed or disallowed by Final Order, the Plan Trust shall retain, for the benefit of each holder of a Disputed Claim, an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Estate Representative.  Cash held in the Disputed Claim Reserve (including, with respect to Cash, any earnings that have accrued on such Cash, net of any expenses, including any taxes, relating thereto) shall be retained by the Plan Trust for the benefit of holders of Disputed Claims pending determination of their entitlement thereto under the terms of the Plan. Any Cash shall be either (x) held by the Plan Trust in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than 30 days. No payments or Plan Distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

**(b)** Subject to the other provisions of this Plan regarding timing of Plan Distributions, after a Disputed Claim becomes an Allowed Claim, the Plan Trustee shall distribute to the holder thereof the Plan Distributions, if any, to which such holder is then entitled under the Plan and any earnings related to the portion of the Disputed Claim Reserve allocable to such Allowed Claim (net of any expenses, including any taxes, relating thereto), and a Plan Trust Interest in accordance with the Plan, subject to the provisions concerning distributions from the Plan Trust, including the application of any reserves.  The balance of any Cash previously retained but not distributed to a Disputed Claim holder shall be included in future distributions to holders of Claims in the applicable Class.  Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will be paid (i) first from the Disputed Claim Reserve and (ii) if the amount available for Plan Distribution pursuant to the foregoing clause (i) is insufficient to remit Plan Distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent Distribution Date(s) from Plan Trust Assets.

**(c)**    If a Disputed Claim is disallowed, assets treated as held in the Disputed Claim Reserve on account of such Claim shall, at such time as reasonably determined by the Plan Trustee, be treated for U.S. federal income tax purposes as an additional distribution of an undivided interest in the underlying assets with respect to previously Allowed Claims.  For the avoidance of doubt, the Plan Trustee shall not be required to make any Plan Distributions as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed.

**(d)**    Unless otherwise ordered by the Bankruptcy Court, the Disputed Claim Reserve shall not be used for operating expenses, costs, or any purpose other than as set forth in this Section 8.5.

### 8.6    *Distributions After Effective Date.*

Plan Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 8.7    *Plan Distributions Made by Plan Trustee.*

All Plan Distributions shall be made by the Plan Trustee on and after the Effective Date as provided herein; *provided* that, for the avoidance of doubt, following the Plan Trust Establishment Date and the Litigation Trust Establishment Date, the Plan Trustee and Litigation Trustee may make distributions of (i) Plan Trust Interests and Litigation Trust Interests, as applicable, and (ii) any Available Cash.  The Plan Trustee shall not be required to give any bond or surety or other security for the performance of its duties.  The Debtors shall use commercially reasonable efforts to provide the Plan Trustee with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' books and records.  The Debtors shall cooperate in good faith with the applicable Plan Trustee to comply with the withholding and reporting requirements outlined in Section 8.16 of this Plan.

### 8.8    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, the Plan Trustee shall make all Plan Distributions to any holder of an Allowed Claim or its authorized designee or transferee as and when required by this Plan at (a) the address of such holder on the books and records of the Debtors or their agents, (b) at the address in any written notice of address change delivered to the Debtors or the Plan Trustee, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001, or (c) the address of the designee of such holder to the extent practicable. Subject to Section 8.9 of this Plan, in the event that any Plan Distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Plan Trustee has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

### 8.9    *Unclaimed Property.*

**(a)**    Six (6) months from the later of:  (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim or Interest is first Allowed, all Plan Distributions

payable on account of such Claim or Interest that are unclaimed pursuant to Section 8.9(b) shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Plan Trustee or its successor or assigns, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Plan Trustee shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

**(b)**     A Plan Distribution shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check, by ninety (90) calendar days after issuance, negotiated such check, (ii) given notice to the Plan Trustee of an intent to accept a particular Plan Distribution, (iii) responded to the Debtors', Plan Trustee's, or Disbursing Agent's as applicable, request for information necessary to facilitate a particular Plan Distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 8.10     *Satisfaction of Claims.*

Unless otherwise provided in this Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims and shall not exceed the amount of such Allowed Claims.  Notwithstanding anything to the contrary in the Plan, upon the Plan Trust Establishment Date, the Plan Trust shall assume all Claims (including, for the avoidance of doubt, all Administrative Expense Claims (including Professional Fee Claims), Other Secured Claims, Priority Tax Claims, and Other Priority Claims) against the Debtors (other than the FILO DIP Claims and FILO Bridge Claims except the Retained FILO Claims) with the same validity and priority as such Claims had against the Debtors immediately prior to the Plan Trust Establishment Date and there shall be no further recourse against the Debtors with respect to such Claims.

### 8.11     *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Estate Representative, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Estate Representative.  Any wire transfer fees incurred by the Estate Representative in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's Plan Distribution.

### 8.12     *Minimum Distribution.*

The Plan Trustee shall have no obligation to make a Plan Distribution that is less than $100.00 in Cash.

### 8.13     *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

### 8.14 *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan or as otherwise required by law (as determined by the Debtors or Plan Trustee), Plan Distributions with respect to an Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest.

### 8.15 *Setoffs and Recoupments.*

Except as otherwise provided in this Plan, including in all respects Sections 12.6(a), 12.6(b), 12.7, and 12.8, each Debtor or the Plan Trustee on behalf such Debtor, may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim and the Plan Distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that such Debtor or its successors may hold against the holder of such Allowed Claim after the Plan Trust Establishment Date. Notwithstanding the foregoing, neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Trustee, a Debtor, or an Estate or its successor of any claims, rights, or Causes of Action that the Plan Trustee, a Debtor, or an Estate or its successor or assign may possess against the holder of such Claim, except as otherwise provided in this Plan, including in all respects Sections 12.6(a), 12.6(b), 12.7, and 12.8.

### 8.16 *Withholding and Reporting Requirements.*

**(a)      Withholding Rights.**  In connection with this Plan, any Entity issuing any instrument or making any distribution or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to this Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Plan Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any Entity issuing any instrument or making any Plan Distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

**(b)      Forms.**  Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon reasonable request, deliver to the applicable withholding

agent or such other Entity or Estate designated by the Plan Trustee, an appropriate IRS Form W-9 or (if the payee is a foreign person) IRS Form W-8 and/or any other forms or documents, as applicable, requested by the Plan Trustee or the applicable withholding agent to reduce or eliminate any required federal, state, or local withholding.  If such request is made by a withholding agent or such other Entity or Estate designated by the Plan Trustee and the party entitled to receive such property as an issuance or distribution fails to comply with any such request within ninety (90) days after the request is made, the amount of such issuance or distribution shall irrevocably revert to the Plan Trust, as applicable, and any Claim in respect of such distribution under this Plan shall be discharged and forever barred from assertion against any Debtor, Estate, the Plan Trust, and their respective property.

### 8.17 *Securities Registration Exemption*.

Any Plan Trust Interests and Litigation Trust Interests will not, and are not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it should be determined that any such Plan Trust Interests or Litigation Trust Interests constitute "securities," the offer and sale of (i) such Plan Trust Interests to the Plan Trust Beneficiaries will be exempt to the extent provided in section 1145 of the Bankruptcy Code from registration, without further action by any person, under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations requiring registration for the offer or (ii) such Litigation Trust Interests to the Litigation Trust Beneficiaries will be exempt to the extent provided in Section 4(a)(2) of the Securities Act and similar exemptions under state securities laws.  Any such Plan Trust Interests and Litigation Trust Interests shall be subject to the limitations set forth in their respective trust agreements in a manner consistent with this Plan.

### 8.18 *Disbursing Agent*.

(a)     The Plan Trustee shall have the authority to enter into agreements with one or more Disbursing Agents to facilitate the distributions required under the Plan, the Confirmation Order, and the Plan Trust Agreement. The Plan Trustee may pay to the Disbursing Agent all reasonable and documented fees and expenses of the Disbursing Agent without the need for other approvals, authorizations, actions or consents. For the avoidance of doubt, the reasonable and documented fees of the Disbursing Agent will be paid by the Plan Trustee and will not be deducted from distributions to be made under the Plan to holders of Allowed Claims receiving distributions from the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

(b)     From and after the Confirmation Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against the Debtors, the Plan Trust Beneficiaries, and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim, a Plan Trust Beneficiary, or other party in interest shall have or pursue any claim or Cause of

Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making Plan Distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

**(c)**     The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all Plan Distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**(d)**     Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Plan Trust in the ordinary course of business.

## ARTICLE IX.     PROCEDURES FOR RESOLVING CLAIMS.

### 9.1     *Allowance of Claims.*

The Estate Representative shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim.

### 9.2     *Objections to Claims.*

As of the Plan Trust Establishment Date, objections to Claims against the Debtors may be interposed and prosecuted only by the Plan Trustee.  Any objections to Claims shall be served and filed (i) on or before one hundred and eighty (180) days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court; *provided* that the Estate Representative may extend the Claim Objection Deadline for an additional one hundred and eighty (180) days in their sole discretion upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing

### 9.3     *Estimation of Claims.*

The Estate Representative may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to

any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Estate Representative may pursue supplementary proceedings to object to the allowance of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated.

### 9.4 *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan without further notice or Bankruptcy Court approval.  Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Plan Trust Establishment Date, the Plan Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Plan Trust may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.

### 9.5 *Adjustment to Claims Register Without Objection.*

Any Claim or Interest that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Estate Representative upon agreement between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 9.6 *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.  Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or Plan Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 9.7 *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Plan Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan.  On a date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Plan Trustee in the Plan Trustee's sole discretion, the Plan Trustee shall provide to the holder of such Claim the

Plan Distribution (if any) to which such holder is entitled under this Plan, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code. For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, the Plan Trustee shall not be required to make any Plan Distributions on account of Disputed Claims that become Allowed Claims or as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed. Notwithstanding anything contained herein, to the extent that a Disputed Claim becomes an Allowed Claim after the Plan Trust Establishment Date or Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Plan Trust Establishment Date or Effective Date (as applicable).

### 9.8    *Elimination of Duplicate Claims.*

Any Proof of Claim filed against one or more of the Debtors shall be deemed to be a single Claim, and all duplicate Proofs of Claim for the same Claim filed against more than one Debtor shall be deemed disallowed and expunged.

### 9.9    *Late Filed Claims.*

Except as otherwise provided herein or as agreed to by the Debtors or Plan Trustee, (i) any Proof of Claim filed after the Bar Date with respect to such Claim and (ii) any proof of Administrative Expense Claim filed after the applicable Administrative Expense Claims Bar Date with respect to such Administrative Expense Claim, shall be deemed Disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims and such Administrative Expense Claims may not receive any Plan Distributions on account of such Claims and such Administrative Expense Claims, unless such late Proof of Claim or such proof of Administrative Expense Claim, as applicable, has been deemed timely filed by a Final Order.

### 9.10    *Amendments to Claims.*

A Claim may not be filed, amended, or supplemented without the prior written authorization of the Bankruptcy Court or the Plan Trustee, and any such new, amended, or supplemented Claim filed without such written authorization shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

### 9.11    *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

### 9.12    *Medical Liability Claims Procedures.*

All Medical Liability Claims against the Debtors shall be reconciled in accordance

with the Medical Liability Claims Procedures. Following entry of the Confirmation Order, the automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reimposed and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

## ARTICLE X.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 10.1   *Rejection of Executory Contracts and Unexpired Leases.*

(a)      As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are a party shall be deemed rejected except for an executory contract or unexpired lease that: (i) is specifically and expressly designated as a contract or lease to be assumed pursuant to this Plan, including as set forth in the Schedule of Assumed Contracts or Confirmation Order; (ii) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate assumption or rejection motion filed by the Estate Representative on or before the Effective Date; (v) is the subject of a pending Cure Dispute; (vi) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (vii) is a D&O Policy or other insurance policy to which any Debtor or Estate Representative is a beneficiary or an insured. For the avoidance of doubt, the Estate Representative may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Effective Date, whether or not such executory contract or unexpired leases is listed on the Schedule of Assumed Contracts.

(b)      Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Debtors, the Plan Trustee, or the assignee of such executory contract or unexpired lease (as applicable) have provided adequate assurance of future performance under such executory contract or unexpired lease. Each executory contract or unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Debtor in accordance with its terms, except as modified by the provisions of this Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law, and shall be assigned by the Debtors to the Plan Trust pursuant to this Plan on the Effective Date. Notwithstanding anything to the contrary herein, all rights and obligations of the Debtors under or with respect to any executory contracts and unexpired leases to which any of the Debtors are a party shall vest in the Plan Trust on the Plan Trust Establishment Date, whether or not such executory contracts or unexpired leases are otherwise pending assumption, assumption and assignment, or rejection in accordance with Section 10.1(a) of this Plan, and the Plan Trust shall have all rights of the Debtors to assume, assume and assign, or reject such executory contracts and unexpired leases on or prior to the Effective Date.

**(c)**      Assumption of any executory contract or unexpired lease pursuant to this Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the Effective Date.

### 10.2    *Survival of Indemnification Obligations.*

Any and all obligations of the Debtors to indemnify, defend, reimburse, or limit the liability of current and former officers, directors, members, managers, agents, or employees against any Claims or Causes of Action as provided in the Debtors' corporate charters, bylaws, other organizational documents, other agreements, or applicable law shall survive confirmation of the Plan, and shall be assumed by such Debtor solely to the extent necessary to recover and have access to insurance proceeds.  Any indemnification claims arising under the foregoing documents shall be treated as General Unsecured Claims against the Debtors to the extent Allowed. Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, solely for the purposes described in the first sentence of this Section 10.2.

### 10.3    *Determination of Cure Disputes and Deemed Consent.*

Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Estate Representative may otherwise agree.

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts.  At least fourteen (14) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to potentially be assumed or assumed and assigned to the Plan Trust, reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor under such executory

contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or its Estate, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this <u>Section 10.3</u>, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

If there is a Cure Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided* that the Estate Representative may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent a Cure Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Cure Dispute; *provided* that the Debtors or the Plan Trustee reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to the extent such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtors and the Plan Trustee).  The Debtors or the Plan Trustee may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

### 10.4    *<u>Rejection Damages Claims.</u>*

Unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' executory contracts or unexpired leases pursuant to this Plan, must be filed with Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the Effective Date.

Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any distribution in the Chapter

11 Cases on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Plan Trust, the Plan Trustee, or the property for any of the foregoing without the need for any objection by the Plan Trustee or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims, except as otherwise provided by Final Order of the Bankruptcy Court.

### 10.5    *Joint Ventures.*

Notwithstanding anything to the contrary in this Plan, all shareholders' agreements, nominee agreements, call option agreements, and other agreements in respect of joint venture entities to which a Debtor or the Plan Trust is a party are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless otherwise specifically assumed.

### 10.6    *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments related thereto, as of the Effective Date (or on such earlier date as determined by the Estate Representative, in consultation with the Creditors' Committee), shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor and shall continue in full force and effect thereafter in accordance with their respective terms and vest in the Plan Trust. All officers, managers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Policies in effect as of, or purchased on or before, the Effective Date for the full term of such D&O Policies regardless of whether such officers, managers, directors, agents, and/or employees remain in such positions as of the Effective Date, in each case, to the extent set forth in such D&O Policies.  Nothing in the Plan shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Debtors' insurance policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the insurance policies, and thus the rights or obligations thereof, are subject to the Bankruptcy Code and applicable law.  For the avoidance of doubt, the transfer of the rights of the Debtors and the Estates to recover proceeds from D&O Policies to the Litigation Trust and the Plan Trust, as applicable, shall not hinder the ability of any beneficiaries or insureds of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

### 10.7    *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned to the Litigation Trust (subject to the consent of the FILO Parties) or Plan Trust hereunder, if applicable, shall remain in full force

and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

### 10.8 _Modifications, Amendments, Supplements, Restatements, or Other Agreements._

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

### 10.9 _Reservation of Rights._

(a)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors, the Estates, the Plan Trust, or the Plan Trustee or their respective Affiliates has any liability thereunder.

(b)     Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, the Estates, the Plan Trust, or the Plan Trustee under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Estates, the Plan Trust, or the Litigation Trust, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)     If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Estate Representative shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE XI.        CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.

### 11.1    *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)      the Disclosure Statement Order shall have been entered;

(b)      the Litigation Trust Establishment Date has occurred, including the transfer of the Litigation Trust Assets to the Litigation Trust;

(c)      the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(d)      the Confirmation Order shall have been entered by the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction, which Confirmation Order shall be in form and substance reasonably acceptable to the Creditors' Committee;

(e)      all actions, documents, certificates, and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

(f)      all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received; and

(g)      the Professional Fees Escrow Account and the Wind Down Reserve (in accordance with the Wind Down Budget) shall have been fully funded as provided for in this Plan.

### 11.2    *Waiver of Conditions Precedent.*

(a)      Each of the conditions precedent to the occurrence of the Effective Date of the Plan set forth in this ARTICLE XI may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee, not to be unreasonably withheld, without leave of or order of the Bankruptcy Court; *provided* that the condition precedent to the occurrence of the Effective Date of the Plan set forth in Section 11.1(b) may be waived only with the consent of the Debtors, the Creditors' Committee, and the FILO DIP Agent.

(b)      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 11.3    *Effect of Failure of a Condition.*

If the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Entity; *provided* that, notwithstanding the foregoing, all actions authorized to be taken pursuant to the Confirmation Order, FILO Settlement Order, and Section 8.10 hereof, and all terms of the Confirmation Order, FILO Settlement Order, and Section 8.10 shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

### 11.4    *Effect of Vacatur of Confirmation Order.*

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise; *provided* that, notwithstanding the foregoing, all actions authorized to be taken pursuant to the Confirmation Order, FILO Settlement Order, and Section 8.10 hereof, and all terms of the Confirmation Order, FILO Settlement Order, and Section 8.10 shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

## ARTICLE XII.    EFFECT OF CONFIRMATION.

### 12.1    *Binding Effect.*

As of the Confirmation Date, this Plan shall bind (i) the Debtors; (ii) the Plan Administrator Committee; (iii) the Plan Trustee and the Plan Trust; (iv) the Litigation Trustee and the Litigation Trust; (v) all holders of Claims against and Interests in the Debtors and their respective successors and assigns, regardless of whether any such holders were (a) Impaired or Unimpaired under this Plan, (b) presumed to accept or deemed to reject this Plan, (c) failed to vote to accept or reject this Plan, (d) voted to reject this Plan, and/or (e) received any Plan Distribution under the Plan; (vi) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan; (vii) each Entity acquiring property under this Plan and the Confirmation Order; and (viii) any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

### 12.2    *Vesting of Assets.*

Except as otherwise provided in this Plan (including in all respects Sections 12.6(a), 12.6(b), 12.7, and 12.8), the Plan Supplement, or the Confirmation Order, on and after the

Litigation Trust Establishment Date and Plan Trust Establishment Date (as applicable), pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan or the Plan Supplement, shall vest in the Litigation Trust and the Plan Trust (as applicable) free and clear of all Claims, Liens, encumbrances, charges, constructive trusts, and other interests to the extent permitted under applicable law.  Subject to the terms of this Plan and the Litigation Trust Agreement and Plan Trust Agreement, on and after the Plan Trust Establishment Date or Litigation Trust Establishment Date (as applicable), the Plan Trustee or Litigation Trustee (as applicable) may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Plan Trustee may pay the charges that it incurs on behalf of the Estates after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.  In addition, all rights, benefits, and protections provided to the Debtors or their Estates pursuant to the Plan, the Plan Supplement, or the Confirmation Order including, but not limited to, the release, exculpation, and injunction provisions provided in Section ARTICLE XII of the Plan, shall vest in the Litigation Trust and the Plan Trust, as applicable, unless expressly provided otherwise by the Plan or the Confirmation Order.

### 12.3   *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in this Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

As set forth in Section 9.12 of this Plan, following entry of the Confirmation Order, the automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reinstituted and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

### 12.4   *Injunction Against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date.

12.5     ***Plan Injunction.***

(a)     Except as otherwise expressly provided in this Plan, or for distributions required to be paid or delivered pursuant to this Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 12.6(a) or Section 12.6(b) of this Plan, or (ii) subject to exculpation pursuant to Section 12.7 of this Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 12.7 of this Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to this Plan, including pursuant to Section 12.6(a) or Section 12.6(b) of this Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of this Plan.

(b)     Subject in all respects to Section 13.1 of this Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure

Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under this Plan or, with respect to an Exculpated Party, been exculpated under this Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in Section 13.1 of this Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.  For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     By participating in the Plan by voting or by accepting Plan Distributions pursuant to this Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to this Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in this Section 12.5, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

(d)     The injunctions in this Section 12.5 shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

**12.6    _Releases._**

**(a)     Releases by the Debtors and their Estates.  Except as otherwise expressly set forth below in this Section 12.6, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable**

consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or the Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable.  Notwithstanding anything to the contrary in the foregoing, the releases contained in this <u>Section 12.6(a)</u> (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive

Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with **Section 4.6** of this Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on **Exhibit B** of this Plan or the Schedule of Identified Non-Released Parties.

(b)     **Third-Party Releases.**  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the

transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or the Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases contained in this **Section 12.6(b)** (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party.  Nothing contained in this Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)      Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

### 12.7   *Exculpation*.

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of

this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the exculpations in this Section 12.7 shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 12.8   *Waiver of Statutory Limitation on Releases.*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE XII OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 12.6 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 12.9   *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to this Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

### 12.10   *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right, to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 12.11   *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in this Plan, including in all respects Sections 12.6(a), 12.6(b), 12.6(b), 12.7, and 12.8, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. Except as otherwise provided in this Plan, including in all respects Sections 12.6(a), 12.6(b), 12.6(b), 12.7, and 12.8, the Plan Trustee, on behalf of the Debtors, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 12.12   *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, or (iii) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation.

### 12.13   *Solicitation of Plan.*

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer,

issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 12.14   *Corporate and Limited Liability Company Action.*

Upon the Plan Trust Establishment Date or the Effective Date, as applicable, all actions contemplated by the Plan (including any action to be undertaken by the Plan Trust) shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Plan Trust Establishment Date or the Effective Date, as applicable, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, members, managers, or officers of the Debtors, the Plan Trust, or the Plan Trustee. On or (as applicable) before the Effective Date, the authorized officers of the Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan). The authorizations and approvals contemplated by this <u>Section 12.14</u> shall be effective notwithstanding any requirements under non-bankruptcy law.

### 12.15   *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Plan Trust.

## ARTICLE XIII.   RETENTION OF JURISDICTION.

### 13.1   *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to sections 1334 and 157 of title 28 of the United States Code, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)     to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)     to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     to ensure that Plan Distributions to holders of Allowed Claims and Interests are accomplished as provided in this Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under this Plan;

(e)     to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any administrative or priority Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of claims or interests;

(f)     to hear and determine settlements and disputes with respect to any Plan Trust Asset, including any Cause of Actions transferred to the Plan Trust;

(g)     to hear and determine settlements and disputes with respect to any Litigation Trust Asset, including any Cause of Actions transferred to the Litigation Trust;

(h)     to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motions, adversary proceeding, application, contested matter or other litigated matter brought by the Plan Trustee or the Litigation Trustee, including any disputes between the Litigation Trustee and the Estate Representative as set forth in the Litigation Trust Agreement and Section 5.8 of the Plan;

(i)     to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(j)     to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(k)     to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, the Confirmation Order, or any order of the Bankruptcy Court, in such a manner as may be necessary to carry out the purposes and effects thereof;

(l)     to hear and determine all Professional Fee Claims;

(m)      to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(n)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(o)      to hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan;

(p)      to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, Plan Supplement, and Confirmation Order;

(q)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(r)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(s)      to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(t)      to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date or Administrative Expense Claims Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(u)      to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE XII of this Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

(v)      to enforce all orders previously entered by the Bankruptcy Court

(w)      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(x)      to recover all Assets of the Plan Trust, the Litigation Trust, the Debtors and property of the Estates, wherever located;

(y)      to hear and determine all disputes between the Debtors or Plan Trust, on one hand, and the Litigation Trustee, on the other; and

(z)        to enter a final decree closing each of the Chapter 11 Cases;

*provided*, *however*, that (i) any mediation requirements in the FILO Settlement Term Sheet, the Litigation Trust Agreement, the Litigation Funding Agreement, the Transition Services Agreement, the Trustee Engagement Letter (as defined in the FILO Settlement Order), and the DIP Amendment (as defined in the FILO Settlement Order) shall be given full force and effect and (ii) to the extent the Bankruptcy Court lacks, or otherwise abstains from exercising, jurisdiction over any matter relating to the FILO Settlement Term Sheet, the Litigation Trust Agreement, the Litigation Funding Agreement, the Transition Services Agreement, the Trustee Engagement Letter (as defined in the FILO Settlement Order), and the DIP Amendment (as defined in the FILO Settlement Order), then the applicable jurisdictional, forum selection, and dispute resolution clauses in such documents shall govern.

### 13.2    *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.    MISCELLANEOUS PROVISIONS.

### 14.1    *Statutory Fees.*

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Plan Trustee in full on the Effective Date.  As of the Plan Trust Establishment Date, the Plan Trustee shall assume primary responsibility for the payment of all Statutory Fees.  On and after the Plan Trust Establishment Date, the Plan Trustee shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, each Debtor or Plan Trustee, as applicable, shall remain obligated to file post-confirmation quarterly reports and to pay Statutory Fees to the U.S. Trustee until the earliest of that particular Debtor's, or Plan Trustee's (on behalf of a Debtor), as applicable, case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of Statutory Fees.

### 14.2    *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (b) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Confirmation Order), shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, document recording tax, intangibles

or similar tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 14.3    *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee, if any, shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases. The Debtors or the Plan Trust, as applicable, shall not be responsible for paying the fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

### 14.4    *Request for Expedited Determination of Taxes of the Debtors.*

The Debtors, Plan Administrator Committee, and Plan Trustee shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Wind Down Completion Date.

### 14.5    *Dates of Actions to Implement Plan.*

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 14.6    *Amendments.*

(a)    **Plan Modifications.**  This Plan may be amended, supplemented, or otherwise modified by the Debtors (with the consent of the Creditors' Committee, not to be unreasonably withheld, conditioned, or delayed) in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided* that any amendment, supplement, or modification that adversely affects the Litigation Trust shall also require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent) (such consent, not to be unreasonably withheld, conditioned, or delayed).  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, supplemented, or otherwise modified.

(b)    **Certain Technical Amendments.** Prior to the Effective Date, the Debtors (with the consent of the Creditors' Committee, not to be unreasonably withheld, conditioned, or

delayed) may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the treatment of the holders of Claims or Interests under this Plan; *provided* that any adjustment or modification that adversely affects the Litigation Trust shall also require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent) (such consent, not to be unreasonably withheld, conditioned, or delayed).

### 14.7    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date. If this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur on the Effective Date, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, any Debtor or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims, or (iii) constitute an admission, acknowledgement, offering, or undertaking of any sort by any Debtor or any other Entity; *provided* that notwithstanding the foregoing all actions authorized to be taken pursuant to the Confirmation Order and FILO Settlement Order and all terms of the Confirmation Order and FILO Settlement Order shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

### 14.8    *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 14.9    *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 14.10    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that this Plan or the Confirmation Order provides otherwise, the rights, duties, and obligations arising under this Plan and the Confirmation Order shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 14.11   *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Confirmation Date, the terms of this Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Plan Trustee, the Litigation Trustee, the holders of Claims or Interests (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected this Plan), the Released Parties, and each of their respective successors and assigns.

### 14.12   *Waiver of Stay.*

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order.  The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

### 14.13   *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

### 14.14   *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 14.15   *Severability of Plan Provisions.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Trust (as the case may be), and (c) non-severable and mutually dependent.

### 14.16  *Additional Documents.*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Plan Trustee, the Litigation Trustee, and all holders of Claims receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 14.17  *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 14.18  *Computing Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 14.19  *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full in this Plan.

### 14.20  *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

(1) If to the Debtors, to:

**Steward Health Care System LLC**
2811 McKinney Avenue, Suite 300
Dallas, Texas 75204.
Attn: John R. Castellano, Chief Restructuring Officer
Email: JCastellano@alixpartners.com

with a copy (which will not constitute notice) to:

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, New York 10153

Attn:   Jeffrey D. Saferstein
       Jason H. George
Email: jeffrey.saferstein@weil.com
       jason.george@weil.com

-and-

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn:   Clifford W. Carlson
       Stephanie N. Morrison
Email: clifford.carlson@weil.com
       stephanie.morrison@weil.com

-and-

1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Attn:   David J. Cohen
Email: davidj.cohen@weil.com

-and-

**Latham & Watkins LLP**
1271 Avenue of Americas
New York, New York 10020
Attn:   Ray C. Schrock
       Candace M. Arthur
Email: ray.schrock@lw.com
       candace.arthur@lw.com


(2) If to the Creditors' Committee, to:


**Akin Gump Strauss Hauer & Feld LLP**
One Bryant Park
New York, New York 10036
Attn:   Ira S. Dizengoff
       Brad M. Kahn
       Avi E. Luft
Email: idizengoff@akingump.com
       bkahn@akingump.com
       aluft@akingump.com

-and-

2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Attn: Sarah Link Schultz
Email: sschultz@akingump.com


(3) If to the Plan Trustee to:
[●]

(4) If to the Litigation Trustee to:
[●]

(5) If to the FILO Parties to:
Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn:   Mike Price
          Andrew Harmeyer
          Brian Kinney
Email: mprice@milbank.com
          aharmeyer@milbank.com
          bkinney@milbank.com

After the occurrence of the Effective Date, the Debtors and the Plan Trustee have authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. Notwithstanding the foregoing, the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Debtors and the Plan Trustee are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

## 14.21   *Reservation of Rights.*

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

[*Remainder of Page Intentionally Left Blank*]

Dated:  April 28, 2025
         Chicago, Illinois

                                   Respectfully submitted,

                        By:  /s/  _____
                                   Name: John R. Castellano
                                   Title: Chief Restructuring Officer

                                   *On behalf of Steward Health Care System LLC*
                                   *and each of Its Debtor Affiliates*

*Signature Page to Joint Chapter 11 Plan*

## **Exhibit A**

### **Individual Released Parties**

- Alan Carr
- Ann-Marie Driscoll
- Carlos Hernandez
- David Barnhardt
- Eugene (Jay) Sullivan
- Gail Schlesinger
- General H.R. McMaster
- Henry (Nick) Nickells
- Jeffrey Morales
- Jennifer Hunt
- John Boehner
- John Castellano
- Joseph Weinstein
- Katchena Potter
- Mary Beth Taylor
- Nathalie Hibble
- Octavio Diaz
- Patrick Lombardo
- Rich Iannessa
- Sr. Vimala Vadakumpadan
- Susan Brown
- William Transier

## Exhibit B

### Identified Non-Released Parties

- Alessandra Pace
- Armin Ernst
- Brian Carty
- Christopher Dunleavy
- Craig Jesiolowski
- David Chicoine
- David Friend
- David Morales
- Herbert Holtz
- James Karam
- James Lenehan
- Jill Moretto
- John Polanowicz
- Joseph Ciccolo
- Joseph Maher
- Joshua Putter
- Mark Girard
- Mark Rich
- Michael Callum
- Miroslav Boyanov
- Nadine Delicata
- Ralph de la Torre
- Robert Guyon
- Ruben King-Shaw Jr.
- Sanjay Shetty

- 5326 Old Buena Vista Road LLC
- Ad Astra Per Aspera LLC
- CareMax, Inc.
- Cayman TRS Holdings
- Cerberus Capital Management, L.P.
- Cerberus International II Master Fund LP
- Cerberus Partners II LP
- Cerberus Series Four Holdings LLC
- de la Torre Foundation
- de la Torre Family Foundation
- Management Health Services Colombia S.A.S.
- Management Health Services LLC
- Manolete Health Investors LLC
- Manolete Health LLC
- Medical Properties Trust, Inc.
- MPT Sycamore Opco LLC
- Ralph de la Torre Revocable Trust
- RDLT – SHCI Investor LLC
- RDLT – SHCI Manager LLC
- Sagamore Capital Management, LLC
- Santa Clara Holdings LLC
- Sparta Holding Co. LLC
- Steward Health Care International
- Steward Health Care International (Malta) Ltd
- Steward Health Care International Colombia S.A.S.
- Steward Health Care Investors LLC
- Steward Health Care International Investors LLC
- Steward Health Care International Kingdom of Saudi Arabia, S.L.
- Steward Health Care International Ltd
- Steward Health Care International S.L
- Steward Malta Assets Ltd
- Steward Malta Ltd
- Steward Malta Management Ltd
- Steward Malta Personnel Limited
- Steward Management Holdings LLC
- Tenet Healthcare Corporation
- TRACO International Group S. DE R.L.

**<u>Exhibit C</u>**

**FILO Settlement Term Sheet**

## SETTLEMENT AND STAY RELIEF TERM SHEET

### April 28, 2025

This Term Sheet sets forth the material substantive terms pursuant to which the Debtors, the FILO DIP/Bridge Agent and Lenders (the "FILO Parties"), and the Unsecured Creditors Committee ("UCC") will support entry of an order resolving requests for relief from the stay by the FILO Parties.

1. This Term Sheet must be approved by an order of the Bankruptcy Court, pursuant to sections 361, 362, 363 and 105 of the Bankruptcy Code and Bankruptcy Rules 4001(d)(iii), 6004, and 9019 (the "Approval Order"), entered not later than May 28, 2025 (the "Approval Milestone"). In addition, the Debtors shall file a motion seeking the Bankruptcy Court's approval of the Approval Order (the "Approval Motion") by no later than April 28, 2025 (the "Motion Milestone"). If the Debtors do not satisfy either the Motion Milestone or the Approval Milestone, this agreement will be of no further force or effect.[1]

2. All of the Estate (as defined below) assets identified on **Schedule 1** hereto (the "Litigation Trust Assets") will be transferred free and clear (to the fullest extent permissible by applicable law) to the "Litigation Trust," a trust to be created. The Estate assets that are not Litigation Trust Assets shall be retained by the Estate (the "Retained Assets").[2] The terms of the

---

[1] The milestones and other dates and deadlines contained herein may be extended by e-mail agreement amongst counsel to the Debtors, FILO Parties, and UCC.

[2] The Retained Assets shall include, without limitation, (i) the Estate's reversionary interests (if any) in the Professional Fees Escrow Account, the Physician Insurance Account (each as defined in the FILO DIP Order (Docket No. 1538)), the Expense Escrow Account (as defined in the MPT Settlement Order (Docket No. 2610)), and in each case, the amounts deposited therein, and (ii) any equity interests in any Debtor. To the extent that the Estate realizes cash or other value on account of any Retained Assets that comprise, would have comprised or are derived from FILO DIP collateral ("Retained Collateral") (which shall exclude, for the avoidance of doubt, the Class B interests, any proceeds thereof, and any proceeds funded to, advanced to, or authorized to be used by the Estate in accordance with this Term Sheet) the Estate shall promptly turn over such cash or other value to the Litigation Trust for distribution in accordance with the Litigation Trust's distribution waterfall. To the extent that any Retained Collateral is identified that could be monetized for value, the Estate shall use commercially reasonable efforts to monetize such Retained Collateral in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee at the Litigation Trust's sole expense and paid in advance pursuant to the TSA (for the avoidance of doubt, any reasonable and documented costs incurred by the Estate in connection with such agreed upon monetization process shall be charged to the Litigation Trust at the Estate's cost). The Approval Order shall provide that from and after the Trust Establishment Date (as defined below), the Retained Collateral (which includes, for the avoidance of doubt, all proceeds derived therefrom) shall be held in trust exclusively for the benefit of

Litigation Trust will be governed by a trust agreement consistent with this Term Sheet and otherwise mutually agreeable to the parties, with approval not to be unreasonably withheld, conditioned or delayed (the "Litigation Trust Agreement").

3. The Approval Order will provide that the Litigation Trust Assets will be transferred to the Litigation Trust on the earlier of (i) July 8, 2025; and (ii) one (1) business day after the confirmation date of any confirmed plan (the actual date of transfer of the assets is the "Trust Establishment Date"). The Debtors and FILO DIP Lenders will enter into an amendment to the FILO DIP credit agreement providing for an extension of the FILO DIP maturity date through (i) in the first instance, the Motion Milestone, (ii) if the Debtors satisfy the Motion Milestone, the Approval Milestone, and (iii) if the Debtors satisfy the Approval Milestone, through the date by which the Litigation Trust Assets are required to have been transferred to the Litigation Trust pursuant to the immediately preceding sentence. It shall be an Event of Default under the FILO DIP Credit Agreement if the Debtors or UCC materially breach their respective obligations to the FILO Parties under this Term Sheet or the Plan Support Agreement Term Sheet, and such breach is not cured within three business days of the FILO Parties providing written notice of such breach to Debtors' and UCC's counsel.

4. On the Trust Establishment Date, the releases set forth in **Exhibit A** shall go into full force and effect; provided that, for the avoidance of doubt, the release will not include (i) $10 million of principal claims outstanding under the FILO Bridge facility (the "Retained FILO Claim"), which shall, until the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, remain secured by the Retained Cash and any other assets of the Debtors' estates or any successor(s) thereto (collectively, the "Estate") (provided that the negative pledge provisions and other rights and entitlements of the Litigation Trust with respect to the Retained Collateral shall survive and remain unaffected notwithstanding such timely occurrence of the Confirmation Milestone or satisfaction of the Retained FILO Claim); or (ii) the rights or entitlements of the FILO Parties or the Litigation Trust contemplated by this Term Sheet or the Plan Support Agreement Term Sheet (or any further documentation memorializing the same), including, without limitation, the FILO Parties' rights to receive Retained Cash as a paydown on the Class A-

---

the Litigation Trust and shall be subject to a negative pledge by the Estate and not made available (pursuant to subsequent order of the court or otherwise) other than for distribution in accordance with the Litigation Trust's distribution waterfall as contemplated by this footnote 2.

2 Preference pursuant to paragraph 6 of this Term Sheet and the Litigation Trust's rights under the TSA.

5. As a condition precedent to the effectiveness of this Term Sheet, (i) the Debtors shall have made a prepayment of the FILO DIP Loans by April 28, 2025, in the amount of no less than $30.3 million (the "Required Prepayment"), and (ii) the Debtors and the FILO Parties shall have executed an amendment to the FILO DIP Credit Agreement (the "DIP Amendment") approving the budget annexed to the DIP Amendment (the "DIP Budget").

6. The Debtors will hold $15 million (the "Retained Cash") in a third-party escrow account subject to the lien of the Retained FILO Claim. If the Retained Cash is not authorized to be utilized by the Debtors pursuant to an order confirming a chapter 11 plan consistent with the terms of Section 1 of the Plan Support Agreement Term Sheet ("Plan"), which order is entered on or prior to August 1, 2025 (the "Confirmation Milestone"), the Retained Cash will be paid to the FILO Parties as a paydown on the Retained FILO Claim until paid in full in cash and the remainder as a paydown on the Class A-2 Preference. If an order confirming the Plan is entered prior to the Confirmation Milestone, the Debtors may use the Retained Cash for any purposes authorized under the Plan.

7. The Litigation Trust will be governed pursuant to the Litigation Trust Agreement creating and governing the Litigation Trust:

    a. The Litigation Trust will have three beneficiary classes:

        i. Class A-1 interests, which shall (i) represent the rights and entitlements of the parties that from time to time extend or are deemed to have extended funding under the Litigation Funding (the "Litigation Funders") and their representative (the "Litigation Funding Agent") and (ii) have a distribution and liquidation preference as set forth in this Term Sheet.

        ii. Class A-2 interests will be held by the FILO Parties and their successors, which interests shall have a distribution and liquidation preference as set forth in this Term Sheet (together with the Class A-1 interests, the "Class A interests").

        The definitive documentation will provide that the Class A interests will only be transferrable (i) pursuant to an available exemption under the Securities Act of 1933, as amended (the "Securities Act"), or a registration of such Class A

3

interests under the Securities Act, and (ii) so long as any proposed transfer would not result in a requirement that the Class A interests be registered under the Securities Act. Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class A interests would be effectuated, and shall entitle the Litigation Trustee (as defined below) to, in its reasonable discretion at any time the Class A interests are not registered, and other than with respect to a transfer by operation of law, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

The definitive documentation shall also contain customary representations and warranties of each initial holder of the Class A interests to the effect that it is an accredited investor and a qualified institutional buyer, possesses appropriate investment experience, and is acquiring the interests for its own account and not with a view toward distribution. To the extent such representations cannot be made by each FILO Party on the date of issuance, then at any time the Class A interests are not registered, all such Class A interests shall be non-transferable (other than by will, intestate, or operation of law).

The FILO Agent or its designee, acting at the direction of FILO Parties holding Class A-2 interests entitled to a majority in amount of the outstanding Class A-2 Preference, shall be the representative of the Class A-2 interests (the "Class A-2 Representative").

iii. Class B interests will be held by Steward Health Care Holdings LLC, on behalf of the Estate, or by any successor entity that may be established under a confirmed plan (each, a "Successor Entity").

The definitive documentation will provide that the Class B interests will only be transferrable (i) to any liquidating trust

or other similar vehicle formed under and following a confirmed plan or otherwise formed pursuant to applicable law or (ii) (A) pursuant to an available exemption under the Securities Act of 1933, as amended (the "Securities Act") and so long as any proposed transfer would not result in a requirement that the Class B interests be registered under the Securities Act, or a registration of such Class B interests under the Securities Act, and (B) if such transfer is to occur prior to the effective date of any confirmed plan, with the consent of the Litigation Trustee (not to be unreasonably withheld, conditioned or delayed) if the purpose of the transfer is to obtain proceeds to pay costs and expenses of the Successor Entity, including taxes.  Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class B interests would be effectuated, and other than with respect to a transfer by operation of law or pursuant to bankruptcy court order or confirmed plan,  shall entitle the Litigation Trustee to, in its reasonable discretion at any time the Class B interests are not registered, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

There shall be a single representative of the Class B interests at any given time (the "Class B Representative"), which shall initially be the Transformation Committee, on behalf of the Estate.  If a plan is confirmed, the terms of the Plan and the Confirmation Order will determine the successor Class B Representative on or before the Effective Date of the Plan.  If the Chapter 11 Cases are converted to Chapter 7 cases, the Chapter 7 Trustee (or its designee) will be the Class B Representative.

iv. Any right to receive Litigation Trust interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it should be determined that any such Litigation Trust interests constitute "securities," the exemption provisions of section 4(a)(2) of the Securities Act will be satisfied and the offer and sale of such interests will be exempt from registration under the Securities Act.

b. The identity of the trustee of the Litigation Trust (the "<u>Litigation Trustee</u>") shall be a party to be identified. The terms of the Litigation Trustee's engagement shall be acceptable to the Debtors, FILO Parties, and the UCC. The Debtors and the UCC will have the right to consent to the selection of any successor Litigation Trustee (including the terms of such successor Litigation Trustee's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

c. The Litigation Trustee will be a fiduciary and owe fiduciary duties to all Litigation Trust beneficiaries, collectively.

d. Except as specifically set forth in the following subparagraphs, the Litigation Trustee will have exclusive governance authority over the Litigation Trust.

e. With respect to the Litigation Trust Assets set forth on the schedule agreed to contemporaneously herewith among the Debtors, the FILO Parties, and the UCC (the "<u>Threshold Schedule</u>"), the following consents shall be required:

    i. For a settlement proposal or monetization opportunity (each, a "<u>Proposal</u>") for which the Specified Value (as defined below) meets or exceeds the applicable Minimum Thresholds set forth on the Threshold Schedule but that does not meet or exceed the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee may decide, without obtaining the consent of any other party, whether to accept or reject such settlement in its sole judgement consistent with its fiduciary duties, in each case, subject to clauses (iii) – (v) of this paragraph 7.e., including, without limitation, the Minimum Threshold adjustments set forth in such clauses.

    ii. For a Proposal for which the Specified Value exceeds the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee shall accept and implement such Proposal unless the Litigation Trustee reasonably determines based on the advice of outside counsel that accepting and implementing such Proposal is inconsistent with its fiduciary duties.

iii. If the FILO Balance is in an Underpayment State, (a) each Minimum Threshold shall be deemed to be equal to 80% of its stated value set forth in the Threshold Schedule unless and until the FILO Balance is no longer in an Underpayment State and (b) the Litigation Trustee shall be authorized to accept a Proposal that does not meet or exceed the applicable Minimum Thresholds as then in effect without obtaining the consent of any other party if the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal and (ii) provides five (5) business days' written notice (the "Notice Period") to the Class A-2 Representative and the Class B Representative (the "Notice Parties") of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an objection in writing to the Litigation Trustee and the other Notice Party (which objection shall specify in reasonable detail the grounds for the objection) (an "Objection"), and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator.  If a successful resolution is not achieved within three (3) business days of the commencement of such mediation (which period may be extended by the Litigation Trustee in its sole discretion in writing) (the "Mediation Period"), the parties may seek resolution by the Bankruptcy Court on an emergency basis.

iv. If the FILO Balance is not in an Underpayment State, the Litigation Trustee will not accept any Proposal unless (a) the Class A-2 Representative and Class B Representative have authorized such acceptance; (b) the Proposal exceeds the applicable Minimum Thresholds by 20% or more, in which case the consent of no other party shall be required; or (c) the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal, in which case the consent of no other party shall be required, and (ii) provides five (5) business days' written notice to the Notice Parties of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an Objection to the Litigation Trustee and the other Notice Party, and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator.  If a

successful resolution is not achieved within the Mediation Period, the parties may seek resolution by the Bankruptcy Court on an emergency basis.

v. At the FILO Parties' election, the FILO Parties may, on one or more occasions, increase the deemed value of a Specified Value with the effect that it is treated as meeting the applicable Minimum Thresholds by contributing Class A-2 interests having a Class A-2 Preference equal to the difference between the Net Offered Specified Value and the highest applicable Net Minimum Specified Value (each as defined below).

vi. "Specified Value" shall be equal to the gross cash and cash equivalent proceeds of a Proposal.

vii. "Net Minimum Specified Value" is equal to the Minimum Threshold set forth in the Threshold Schedule less the pro forma contingency fee that would be payable in connection with a Proposal equal to such Minimum Threshold.

viii. "Net Offered Specified Value" is equal to the Specified Value less any contingency fee payable to the Trust's counsel, in each case, with respect to the applicable Proposal.

f. With respect to the disposition of Litigation Trust Assets not set forth on the Threshold Schedule, the disposition shall be carried out by the Litigation Trustee, exercising its reasonable business judgment.

g. The Litigation Trustee shall not agree to a contingency fee in excess of 20% of the gross proceeds of a litigation without the written consent of the Class A-2 Representative and the Class B Representative, other than any existing contingency fee arrangements approved by the Bankruptcy Court as of the Trust Establishment Date.

h. The Estate or Class B Representative, as applicable, shall have the right to pay in full or any portion of the FILO Balance, in cash, without any prepayment penalty at any time. Once the FILO Balance has been reduced to $0, (i) the rights granted to the Class A-2 Representative hereunder shall inure to the Class B Representative and the rights of the Class B Representative hereunder shall inure to the Litigation Funding Agent for the benefit of the holders of the Variable Component and (ii) the Class B Representative may replace the Litigation Trustee subject to the

8

terms of the Litigation Trustee's agreement with the Litigation Trust (which agreement shall be consistent with this Term Sheet and otherwise reasonably acceptable to the Debtors, the FILO Parties, and the UCC).

i.  Distributions from the Litigation Trust shall be subject to the following priorities:

    i.  Fees of the Litigation Funding Agent and the Class A-2 Representative (which shall be $50,000 per month for each position), and indemnification and reasonable and documented expenses of (A) the Litigation Trust (including payments owing under the TSA, which shall be paid to the Estate), and (B) the Litigation Funding Agent, the Litigation Funders, the Class A-2 Representative, and the FILO Parties (solely with respect to this clause (B), subject to an aggregate cap not to exceed: (i) $500,000 per month for the initial three-month period commencing on the Trust Establishment Date, (ii) $350,000 per month for the nine-month period following such initial three-month period, and (iii) $220,000 per month[3] thereafter; provided that such cap shall not apply to the FILO Parties before the Trust Establishment Date; provided further that, (i) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) are less than the amount of such monthly cap, the amount of such variance will roll forward and increase such monthly cap in the following months until such variance is used and (ii) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) exceed the amount of such monthly cap, the amount of such variance can be carried forward and satisfied in future months to the extent there is availability under the applicable monthly cap in any such future month).

    ii.  Class A-1 interests until the Class A-1 Preference, the Upfront Premium, and, subject to paragraph 13 of this Term Sheet, the Variable Component (as defined below) (which survives repayment of the Class A-1 Preference and the FILO Balance) are repaid in full in cash.

---

[3] Monthly invoices of the professionals for such parties shall be provided to the Estate with reasonable summaries of activities, which may be redacted for privilege and shall not require time entries to be provided.

    iii.  Class A-2 interests until the Class A-2 Preference is repaid in full in cash and the FILO Balance is $0.

    iv.  Class B interests.

    v.  Notwithstanding anything to the contrary in the immediately preceding clauses (ii) - (iv):

        1.  If the FILO Balance is not in an Underpayment State, 25% of any amount otherwise payable to (i) the holders of the Class A-2 interests, and (ii) on or after December 1, 2025, the Class A-1 interests, shall be used to pay unpaid Deferred Fees and Unestimated Fees (each, as defined in the Plan Support Agreement Term Sheet) on a pro rata basis.

        2.  If the FILO Balance is less than $25 million, any unpaid Unestimated Fees or Deferred Fees will be paid on a pro rata basis from any available proceeds that would otherwise be payable to the holders of Class A-1 interests as Variable Component (provided that such Variable Component shall be payable with the next proceeds received following repayment in full of such unpaid Unestimated Fees and Deferred Fees).

8.  The Estate will coordinate its efforts with the Litigation Trustee with respect to issues involving overlapping concerns among the Estate and the Litigation Trust with respect to third parties.  For example, if the same third party is involved in disputes with both the Estate and the Litigation Trust, the effort will be coordinated between the Estate and the Litigation Trustee. If the Estate and the Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a conference with Judge Isgur, in his capacity as mediator in connection with the subject matter of this Term Sheet; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

    a.  With respect to any such dispute presented to the Bankruptcy Court:

        i.  If the FILO Balance is in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate; *provided*, *however*, that the Litigation Trustee's business judgment will not be considered

by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estate (other than with respect to §502(h) claims).

ii.  If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate's business judgment will be applied to the dispute, subject to challenge by the Litigation Trustee; *provided*, *however*, that the Estate's business judgment will not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust.

b.  Notwithstanding the foregoing, with respect to any constructive trust claims asserted by any third parties with respect to any Litigation Trust Assets or Retained Collateral, as well as any government investigations, the Litigation Trust and the Estate will coordinate efforts to dispute or settle such claims, or to address such investigations, including with respect to funding arrangements for the defense of any such claims or addressing any such investigations.

9.  FILO Parties to agree to use of cash collateral from April 1, 2025, through the Trust Establishment Date in an amount up to $61 million through June 27, 2025 and with additional amounts available for use thereafter, in each case, in accordance with the DIP Budget and the Pre-TED Professional Fee Estimates (as defined in the Plan Support Agreement Term Sheet). The aggregate amount of cash collateral used from April 1, 2025, through the Trust Establishment Date, together with interest thereon at the Applicable Rate, shall be the "Secured Interim Advances." On the Trust Establishment Date, the Debtors shall repay the FILO DIP Loans with Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of such Secured Interim Advances, and on account of such repayment, the amount of FILO DIP Loans outstanding shall be reduced by the amount of such Secured Interim Advances.

10. Funding.

a.  The FILO Parties shall commit, subject to the terms and conditions to be set forth in a commitment letter consistent with this Term Sheet and otherwise acceptable to the FILO Parties and the Debtors (the "Commitment Letter") (which shall be executed within 10 business days after execution of this Term Sheet), to, commencing on

11

the Trust Establishment Date, extend funds (solely from the proceeds of FILO DIP/Bridge Claim[4] repayments received after the FILO DIP Agent's receipt of the Required Prepayment, or Class A interests distributions) to the Litigation Trust (the "Litigation Funding") on a delayed draw basis in an aggregate amount of up to $125 million (the "Initial Commitment Amount") (which is inclusive of (x) a budgeted amount of $61 million through June 27, 2025, together with any additional amounts budgeted thereafter under the DIP Budget, which, in each case,  may only be incurred in the form of Secured Interim Advances, and (y) the $6.5 million of Estate Funding), which funded amounts shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust and monetization of the Litigation Trust Assets, in each case, subject to (i) budgets delivered from time to time to, and which must be reasonably acceptable to, the Litigation Funding Agent (the "Litigation Funding Budget") and (ii) the satisfaction of any conditions to funding under the Commitment Letter and absence of any uncured material breaches of the Litigation Trustee's obligations under the Litigation Trust Agreement.[5]  Requests for funding under the Litigation Funding shall be made solely (a) in compliance with the foregoing terms and (b) by the Litigation Trustee upon at least five business days' written notice to the Litigation Funding Agent, it being understood and agreed that not more than one such funding request shall be made during any 30-day period.  Litigation Funding to include an uncommitted accordion of 25% of the Initial Commitment Amount, on the same terms as the initial tranche (to the extent the accordion becomes committed in the sole and absolute discretion of the FILO Parties, the amount of such commitment together with the Initial Commitment Amount, shall be the "Total Commitment Amount").  The commitments under the Commitment Letter shall automatically terminate upon the earlier to occur of (i) the funding of the then applicable commitment amount (whether the Initial Commitment Amount or the Total Commitment Amount, as the case may be) and (ii) the repayment of the FILO Balance.

b. Further financing to be subject to written consent of (x) the Litigation Trustee; (y) the Class B Representative; and (z) unless the further

---

[4] "FILO DIP/Bridge Claim" refers to the claims outstanding under the FILO DIP/Bridge facilities immediately prior to the Trust Establishment Date.

[5] To the extent that the initial Litigation Funding Budget contemplates disbursements to legal counsel on a current basis and the projected amount of such disbursements is subsequently reduced through contingency fee, success fee, or similar arrangements (the aggregate amount of such reduction as agreed by the Litigation Trustee, the "Contingency Fee Savings"), the Total Commitment Amount shall be reduced by the Contingency Fee Savings.

financing is junior to amounts due or to be due to the FILO Parties and under the Litigation Funding, the Class A-2 interests holders and the Litigation Funding Agent. For the avoidance of doubt, the Litigation Trust shall not incur any debt, obligation for borrowed money or other obligation with payment priority senior to or *pari passu* with the Class A interests or secure any obligation with liens on any Litigation Trust Assets or Retained Collateral, in each case, without the prior written consent of the Class A-2 Representative and Class B Representative and the Litigation Funding Agent.

c. Upon the occurrence of the Trust Establishment Date, the Litigation Trust shall provide $6.5 million to the Estate (or any successor liquidating vehicle) (the "Estate Funding") to fund costs and expenses of the Estate and the Estate's professionals incurred after the Trust Establishment Date and of any successor liquidating vehicle (or representative thereof) established to hold the Class B interests and/or any remaining assets of the Debtors.

d. In respect of the Estate Funding, the FILO Parties indirectly providing such funding shall receive Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of the Estate Funding. The Estate Funding shall not be required to be repaid by the Estate.

11. MOIC Payment: The "MOIC Payment" refers to a payment to which the FILO Bridge lenders are entitled (subject to the occurrence of the Trust Establishment Date) in accordance with the terms set forth below. On the Trust Establishment Date, the MOIC Payment will be allowed on the following terms:

a. The Litigation Trust's MOIC obligation will be $11.25 million through March 31, 2026, increasing by:

   i. $1.0 million on April 1, 2026,
   ii. An additional $1.5 million on May 1, 2026,
   iii. An additional $2.0 million on June 1, 2026,
   iv. An additional $2.5 million on July 1, 2026,
   v. An additional $3.0 million on August 1, 2026, and
   vi. An additional $3.75 million on September 1, 2026 and on the first day of each month thereafter until the FILO Balance is paid in full in cash.

b. The total MOIC Payments will not exceed 85% of $75 million *minus* any interest paid or accreted on account of the claims outstanding

13

under the FILO Bridge facility (the "<u>FILO Bridge Claims</u>") (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims).

12. Class A-2 interests shall, as of the applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the sum of (i) all principal and accrued interest, fees, expenses,[6] and other amounts outstanding under the FILO DIP/Bridge facilities[7] immediately prior to the Trust Establishment Date (for the avoidance of doubt, excluding the Retained FILO Claim), (ii) all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), (iii) the MOIC Payment, and (iv) the "Exit Premium" under the FILO DIP Loans (which shall be calculated as if the FILO DIP Loans were being fully repaid), in each case, as of such date, *less* (y) the (A) aggregate amount, if any, of cash distributions paid on the Class A-2 interests from the Litigation Trust and (B) aggregate amount, if any, of Class A-2 interests otherwise contributed or waived by the FILO Parties, in each case, as of such date (the "<u>Class A-2 Preference</u>").  Prongs (i) and (ii) of the definition of Class A-2 Preference shall accrete at (a) from the Trust Establishment Date through September 30, 2025, a rate equal to 10% per annum, (b) from October 1, 2025 through December 31, 2025, a rate equal to 10.5% per annum, (c) from January 1, 2026 through March 31, 2026, a rate equal to 11% per annum, and (d) a rate equal to 11.25% per annum commencing on April 1, 2026, and increasing by an additional 25bps at the beginning of each quarter thereafter, subject to a maximum of 12% per annum (the immediately preceding clauses (a)-(d), the "<u>Applicable Rate</u>," which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-2 Preference on a monthly basis); provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

---

[6] Milbank to defer (i) 10% of its fees incurred between April 1, 2025, and the Trust Establishment Date, and (ii) any of its fees incurred in excess of the Pre-TED Professional Fee Estimates.  All outstanding Milbank invoices and Houlihan's March 18, 2025 invoice shall be paid as a condition precedent to the effectiveness of this Term Sheet, and thereafter all Milbank and Houlihan fees and expenses that are not subject to deferral shall be paid current in accordance with the FILO DIP Order and Approval Order, as applicable.

[7] FILO DIP/Bridge facilities to be allowed in full pursuant to the Approval Order, subject to the MOIC Payment settlement set forth in this Term Sheet.

13. Litigation Funding will be made available to the Litigation Trust by the FILO Parties on these terms:

   a. The Class A-1 interests shall, as of each applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the aggregate amount of funding extended or deemed to have been extended under the Litigation Funding plus all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), in each case, as of such date, *less* (y) the aggregate amount, if any, of cash distributions paid on the Class A-1 interests from the Litigation Trust as of such date (the "Class A-1 Preference").  The Class A-1 Preference shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-1 Preference on a monthly basis; provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

   b. The Litigation Funding will, in addition to payment of the Class A-1 Preference and the agency fee of the Litigation Funding Agent, as well as indemnification and reimbursement of all reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), be entitled to:

      i. an upfront premium (the "Upfront Premium"), payable in kind, in an amount equal to $4.25 million; provided that if the Litigation Funding accordion is exercised with the consent of the Litigation Trustee, then the Upfront Premium shall be increased by the same percentage that the commitments under the Litigation Funding are increased.

      ii. 20% of gross litigation proceeds (the "Variable Component"), of which (a) 15% (the "Upfront Percentage") is paid in cash at the time of receipt of such litigation proceeds and (b) 5% is deferred, with the applicable deferred cash being held in escrow (the "Deferred Portion"); provided that if the litigation proceeds result from a litigation financed with a contingency fee structure or third-party litigation funding, the total Variable Component shall be limited to the lesser of (A) the

15

applicable Variable Component noted above (subject to clause 13.d below), and (B) the greater of (i) 30% of such gross litigation proceeds minus the amount of contingency fee, success fee, or third-party litigation funding cost related to such litigation and (ii) 10% of such gross litigation proceeds (the "<u>Reduced Variable Component</u>").

In the event the Reduced Variable Component is equal to or less than 15% of such gross litigation proceeds, then all of such Reduced Variable Component shall be treated as the Upfront Percentage. In the event the Reduced Variable Component is greater than 15% of such gross litigation proceeds, then 15% of such gross litigation proceeds shall be treated as the Upfront Percentage and the remaining portion shall be treated as the Deferred Portion.

c. If the FILO Balance is repaid in full in cash on or before October 1, 2026, the escrow holding the Deferred Portion shall be paid to the Estate. On October 2, 2026, if the FILO Balance has not been paid in full in cash by October 1, 2026, the escrow holding the Deferred Portion shall be disbursed in full to the Litigation Funding Agent. Following such time and until repayment of the FILO Balance in full in cash, the Variable Component shall be paid in cash at the time of receipt of litigation proceeds in accordance with the terms of clause 13.b. with no amounts deferred.

d. After repayment of the FILO Balance, the Variable Component shall continue to be entitled to a percentage of the gross litigation proceeds (i) at the Upfront Percentage only (i.e., 15%) if the FILO Balance is repaid in full in cash on or before October 1, 2026, or (ii) at 20% if the FILO Balance is not repaid in full in cash on or before October 1, 2026, in each case, subject to the Reduced Variable Component adjustment described above (the "<u>Post-FILO Repayment Variable Component</u>"); provided that (x) to the extent a Plan is confirmed, the Post-FILO Repayment Variable Component shall be paid in two installments, with the first installment being paid in cash upon receipt of the applicable litigation proceeds in an amount equal to 62.5% of the Post-FILO Repayment Variable Component, and the payment of the remaining balance of the Post-FILO Repayment Variable Component being deferred until (and subject to) the satisfaction of allowed administrative and other priority claims pursuant to the Plan, and (y) if a Plan has not been confirmed, the Post-FILO Repayment Variable Component shall be paid in full in cash upon receipt of the applicable litigation proceeds.

14. "Underpayment State"
14. "FILO Balance" equals on any applicable date of determination: the sum of (a) the outstanding Class A-2 Preference (including all accreted amounts accrued thereon) and fees and expenses of the Class A-2 Representative to the extent payable under this Term Sheet, (b) the outstanding Class A-1 Preference, the Upfront Premium, the agency fee of the Litigation Funding Agent, and outstanding indemnification claims and reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), and (c) any unpaid Variable Component that has been earned (for the avoidance of doubt, (i) other than before October 2, 2026, any Deferred Portion held in escrow and (ii) subject to adjustment, if applicable, in connection with any Post-FILO Repayment Variable Component).

15. The FILO Balance will be in an "Underpayment State" if the aggregate FILO Balance is equal to or greater than

    a. $275 million as of the Trust Establishment Date.
    b. Solely for purposes of paragraph 7.i.v.1., $220 million as of December 1, 2025.
    c. For all purposes other than paragraph 7.i.v.1., $220 million as of December 31, 2025.
    d. $160 million as of April 1, 2026.
    e. $110 million as of July 1, 2026.
    f. $60 million as of September 1, 2026.
    g. $10 million as of December 31, 2026.

16. The Debtors, FILO Parties and UCC to negotiate in good faith and agree prior to entry of the Approval Order on the terms of a transition services agreement pursuant to which the Estate will provide TSA services to the Litigation Trust, including agreement on the scope of services to be provided and pricing at cost (the "TSA"). In advance of each calendar month, the TSA shall provide for the Litigation Trust to advance the Estate's estimated monthly operating expenses, including for payroll and vendors, subject to (i) the initial TSA budget annexed hereto as **Exhibit B**, which may be updated from time to time if approved in writing by the Litigation Trustee and the Class A-2 Representative, and (ii) a reconciliation process with respect to amounts funded in prior months. Payments made by the Litigation Trust to the Estate for any services under the TSA prior to the Estate paying for the budgeted costs of providing such services shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such costs. In addition, the Litigation Trust shall provide, when and to the extent due as evidenced by reasonably detailed evidence thereof delivered by the Estate to the Litigation Trust (the "Tax Package"), up to $4 million in funding to

the Estate for the sole purpose of the Estate paying income taxes for the Debtors' current 2024/2025 income tax year. Payments made by the Litigation Trust to the Estate for such taxes shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such taxes reflected in the Tax Package on a dollar-for-dollar basis. The Estate and its related parties (including employees and advisors) shall be defended, held harmless and indemnified by the Litigation Trust against any and all liabilities or losses that may be incurred in connection with the rendering of services under the TSA to the Litigation Trust or Litigation Trustee, subject to customary carve outs for fraud, willful misconduct, and gross negligence.  All other expenses of the Estate incurred on or after the Trust Establishment Date, including cost of administration of the Estate, must be budgeted and paid from the Retained Cash, Estate Funding, or other Estate (not Litigation Trust) resources.

17. Reporting and Information Sharing.

   a. <u>Regular Conference Calls</u>:  Litigation Trustee to host conference calls on a bi-weekly basis (or more frequently in the Litigation Trustee's discretion) regarding the Litigation Trust Asset monetization process, which calls shall be accessible to the Litigation Funding Agent, the Class A-1 interest holders, the Class A-2 Representative, the Class A-2 interest holders, and the Class B Representative.

   b. <u>Ad Hoc Conference Calls</u>:  In addition to the foregoing, the Litigation Trustee shall make itself reasonably available for conference calls to discuss specific topics reasonably requested in writing by the Litigation Funding Agent, the Class A-2 Representative, or the Class B Representative.

   c. <u>Financial Reporting</u>:  Litigation Trustee shall deliver a written report to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representative on a monthly basis providing, as of the date of the report:

      i. the amount of cash received by the Litigation Trust through the Litigation Trust Asset monetization process (broken down by source), and the application thereof pursuant to paragraph 7(i) hereof;

      ii. the amount of expenses paid by the Litigation Trust (broken down by category and professional firm);

      iii. the FILO Balance;

iv. the amount of the accrued Variable Component and the Deferred Portion then held in escrow; and

v. a reasonably detailed summary of the asset monetization activity undertaken in the immediately preceding month.

d. <u>Preference Actions</u>: Togut shall deliver to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representatives reporting with respect to preference actions, which shall be consistent (with respect to both frequency and format) with the reporting currently required to be delivered to the FILO and UCC counsel under paragraph 5 of the Togut retention order [ECF No. 3886].

e. <u>Confidentiality/Preservation of Privileges</u>: Access to reporting shall be subject to entry into (i) a confidentiality agreement and (ii) a common interest agreement and other protocols to the extent necessary to protect applicable privileges, as reasonably determined by the Litigation Trustee.

18. Each FILO Party agrees that prior to the Trust Establishment Date, it shall not transfer, directly or indirectly, in whole or in part, any FILO DIP/Bridge Claims, option thereon, or right or interest therein, and any purported such transfer shall be void and without effect, in each case, unless the transferee thereof: (a) is a signatory to this Term Sheet as of the date of such transfer; or (b) has signed a joinder to this Term Sheet and the Plan Support Agreement Term Sheet acceding to the obligations of a holder of FILO DIP/Bridge Claims hereunder and thereunder (each, a "<u>Permitted Transferee</u>").  Any transfer of FILO DIP/Bridge Claims occurring prior to the Trust Establishment Date shall require the transferee to assume the transferor's obligations under the Commitment Letter in proportion to the amount of FILO DIP/Bridge Claims so transferred relative to the aggregate amount of all FILO DIP/Bridge Claims outstanding as of the date of such transfer (the "<u>Stapling Requirement</u>").  Notwithstanding anything to the contrary herein, a FILO Party may transfer FILO DIP/Bridge Claims to an entity that is acting in its capacity as a Qualified Marketmaker[8] without the requirement that the Qualified Marketmaker be a signatory to this Term Sheet or execute a joinder; *provided* that any such Qualified

---

[8] "<u>Qualified Marketmaker</u>" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers FILO DIP/Bridge Claims, or enter with customers into long or short positions in FILO DIP/Bridge Claims, in its capacity as a dealer or market maker in such FILO DIP/Bridge Claims and (ii) is in fact regularly in the business of making a market in claims, interests, or securities of issuers or borrowers.

Marketmaker (i) may only subsequently transfer the FILO DIP/Bridge Claims to a transferee that is or becomes a Permitted Transferee at the time of such transfer and to the extent such subsequent transfer complies with the Stapling Requirement and (ii) shall be required to, by the earlier of (x) ten (10) business days after its acquisition of any transferred FILO DIP/Bridge Claims and (y) the Required Joinder Date,[9] either sign a joinder to this Term Sheet or transfer all FILO DIP/Bridge Claims held by such Qualified Marketmaker to one or more Permitted Transferees, in each case, in compliance with the Stapling Requirement.

19. The parties shall negotiate promptly and in good faith to agree on definitive documentation, which shall include the Litigation Trust Agreement (including the funding mechanics with respect to the Class A-1 interests), the Litigation Trustee's engagement letter, the Commitment Letter, the TSA, and the DIP Amendment.  Counsel to the Debtors, the UCC, and the FILO Parties to agree on allocation of drafting responsibility and a detailed work plan and fee estimates.

20. All transactions contemplated herein shall be implemented in a tax-efficient manner and are subject to review by tax professionals.

---

[9] "Required Joinder Date" means the third business day before the expiration of the chapter 11 plan voting deadline, if any, applicable to the FILO Bridge Claims.

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**STEWARD HEALTH CARE SYSTEM LLC,**
**on Behalf of Itself and its Debtor Affiliates**

By: _____

Name:  John Castellano

Title:  Chief Restructuring Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

For and on behalf of **OneIM Fund I LP, as DIP Lender,** acting by its General Partner, OneIM GP LLC, acting by its Manager, GCT Capital LLC

By: _____

Name: Munish Varma

Title: Authorized Signatory

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**BRIGADE AGENCY SERVICES LLC,** as FILO Agent

By: BRIGADE CAPITAL MANAGEMENT, LP, Its Managing Manager

By: _____

Name: Patrick Criscillo

Title: Authorized Signer

*Signature Page to Settlement and Stay Relief Term Sheet*

**BIG RIVER GROUP FUND SPC LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE BADGER FUND, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE DIVERSIFIED CREDIT CIT**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE CREDIT FUND II LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

**BRIGADE HIGH YIELD FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LOAN FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE-SIERRABRAVO FUND LP**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**CITY OF PHOENIX EMPLOYEES'
RETIREMENT PLAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FEDEX CORPORATION EMPLOYEES'
PENSION TRUST**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FUTURE DIRECTIONS CREDIT
OPPORTUNITIES FUND**,
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Settlement and Stay Relief Term Sheet*

**JPMORGAN CHASE RETIREMENT PLAN BRIGADE BANK LOAN**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**SC CREDIT OPPORTUNITIES MANDATE, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**MIDOCEAN CREDIT FUND MANAGEMENT, LP**

By: _____
Name:  Damion Brown
Title:  Managing Director

**MidOcean Tactical Credit Fund III LP**
By: Tactical Credit Fund III GP, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By: _____
Name: Damion Brown
Title: Managing Director

**MidOcean Multi Asset Credit Fund, LP**
By: MidOcean Multi Asset Credit Fund GP, LLC its General Partner

By: _____
Name: Damion Brown
Title: Managing Director

**Abbott Abbvie Multiple Employer Pension Plan Trust**

By: _____
MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*Signature Page to Settlement and Stay Relief Term Sheet*

**Abbott Laboratories Annuity Retirement Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**OWL CREEK INVESTMENTS I, LLC**

By: OWL CREEK ASSET MANAGEMENT, LP
as Investment Manager

By: _____
Name: Kevin Dibble
Title:  General Counsel

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**WHITEHAWK FINANCE LLC**
By: WHITEHAWK CAPITAL PARTNERS, LP, as Investment Manager

By: _____

Name: Robert Louzan
Title: Managing Partner

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**The Official Committee of Unsecured Creditors**, solely in its representative capacity, and not on behalf of any individual member thereof

By: */s/ Brad M. Kahn*
Name:  Brad M. Kahn
Title:  Partner

Akin Gump Strauss Hauer & Feld LLP, in its capacity as counsel to, and authorized signatory for, the Official Committee of Unsecured Creditors of Steward Health Care System, LLC, *et al*.

*Signature Page to Settlement and Stay Relief Term Sheet*

## Schedule 1

### Litigation Trust Assets

1. All cash and cash equivalents, excluding only (a) the Retained Cash[1], (b) all cash held or received on behalf of buyers of the Debtors' hospital and Stewardship operations pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet ("Buyers"), (c) all cash received from Buyers or other third parties for purposes of paying cure costs, (d) cash to fund checks issued in accordance with the DIP Budget and which remain outstanding immediately prior to the Trust Establishment Date, (e) all cash held for subtenant security deposits or rent collected on behalf of Buyers, subtenants, or overlandlords, (f) all cash held in the Professional Fee Escrow Account, the Physician Insurance Account, the Utility Deposit Account, or the Expense Escrow Account, and (g) any funds of the Debtors in the Vendor Fund Escrow Account pursuant to the Vendor Fund Escrow Agreement, entered into as of March 11, 2025, by and among Golden Sun TSA Services, LLC, a Delaware limited liability company; Steward Health Care System LLC, a Delaware limited liability company; MPT Development Services, Inc., a Delaware corporation; Lifespan of Massachusetts, Inc., a Massachusetts nonprofit corporation; BMC Community Hospital Corporation and BMC Community Hospital Corporation II, Massachusetts nonprofit corporations; Orlando Health, Inc., a Florida corporation; and Kroll Restructuring Administration LLC, a Delaware limited liability company.

2. All accounts receivable, excluding only (a) accounts receivable that the Debtors sold to Buyers pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet and (b) any accounts receivable that cannot be transferred to the Litigation Trust or a subsidiary thereof pursuant to applicable law (such accounts receivables described in this clause (b), the "Non-Transferrable A/R"). With respect to any Non-Transferrable A/R, the Estate shall, at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost), (i) use commercially reasonable efforts to collect or otherwise monetize such Non-Transferrable A/R in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (ii) promptly turn over any cash or other value realized on account of such Non-Transferrable A/R to the Litigation Trust.

3. The equity interests in Steward A/R Co, LLC. Promptly upon transfer of the equity interests in Steward A/R Co, LLC to the Litigation Trust, the current

---

[1] Each capitalized term that is used but not defined herein has the meaning ascribed to it in (a) the Term Sheet to which this **Schedule 1** is attached or (b) the mutual releases set forth in **Exhibit A** to the Term Sheet.

manager of Steward A/R Co, LLC, John Castellano, shall submit his resignation as manager and the Litigation Trustee and Steward A/R Co, LLC shall grant Mr. Castellano a release of claims against Mr. Castellano in connection with his services as manager, in form and substance reasonably acceptable to Mr. Castellano, and the Litigation Trust shall appoint his replacement.

4. All Claims[2] and Causes of Action[3] of the Debtors and the Estate, including, without limitation, in each case, to the extent not released pursuant to the mutual releases set forth in **Exhibit A** to the Term Sheet, the following Claims and Causes of Action:

    a. all Claims and Causes of Action asserted by the Debtors in the *Second Amended Complaint and Jury Demand* filed by Steward Health Care System LLC at Docket No. 61 in Civil Action No. 21-cv-11902-PBS in the United States District Court for the District of Massachusetts (the "Norwood Complaint") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the Norwood Complaint;

    b. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against healthcare payors, including, without limitation, the commercial payors identified in **Schedule 1-A** hereto;

    c. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Non-Released Parties, including, without limitation, arising from or relating to the 2016 Distribution, the 2020 Transactions, the 2021 Distribution, the 2022 Distribution, or any Plane

---

[2] "Claim" means a "claim," as defined in section 101(5) of the Bankruptcy Code.

[3] "Cause of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whenever arising, whether in law or equity, whether sounding in tort or contract, whether asserted in arbitration, a court or regulatory proceeding, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including under any state or federal securities laws. Causes of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) Avoidance Actions, and (iii) any claim or defense, including fraud, mistake, duress, or usury and any other defenses set forth in section 558 of the Bankruptcy Code.

Sale,[4] or otherwise arising from or relating to the payment of unlawful dividends, the avoidance of prepetition dividend payments or other distributions, or one or more breaches of fiduciary or other duties;

d.   all Avoidance Actions[5] asserted or assertable by the Debtors or the Estate against the transferees identified in **Schedule 1-B** hereto or any other prepetition vendors of the Debtors;

e.   all Claims and Causes of Action against Blue Cross Blue Shield Association ("BCBS") or any of its independent Affiliates, including, without limitation, arising from or relating to the Claims and Causes of Action asserted in the class action lawsuits against BCBS and its various licensees consolidated in *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (MDL No. 2406) (N.D. Ala. 2013) (the "BCBS Antitrust Litigation") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the BCBS Antitrust Litigation;

f.   all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Commonwealth of Massachusetts, including, without limitation, any Claims or counterclaims of the Debtors or the Estate in connection with *The Commonwealth of Massachusetts' Motion for Relief from the Automatic Stay to Allow for the Setoff of Mutual Obligations if and to the Extent that Recoupment is Not Available* (Docket No. 3393) and the adversary proceeding filed by the Debtors against the Commonwealth of Massachusetts (Docket No. 3983) (Adv. Pro. No. 25-03053);

g.   all Claims and Causes of Action with respect to the escrow account holding the Adjustment Escrow Amount (as defined in the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) the Asset Purchase Agreement with Brady Health Buyer, LLC (B) the Sale of Stewardship Health Assets Free and Clear of Liens and Liabilities and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (Docket No. 2135)) and the funds deposited therein; and

---

[4] "Plane Sales" means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

[5] "Avoidance Actions" means all Claims and Causes of Action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code, and any state law fraudulent transfer claims.

h. all Claims and Causes of Action with respect to the right of certain Debtors to receive reimbursement from Golden Sun TSA Services, LLC in connection with the renewal of that certain Software Licensing Agreement, dated September 9, 2009, by and between IASIS Healthcare LLC and Microsoft Corporation, as amended, under Section 9.7 of the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4192).

5. All rights of the Debtors and the Estate to recover insurance proceeds from the D&O Policies (as defined in the *Motion of Debtors for Order Authorizing the Use of Proceeds of Directors and Officers Liability Insurance Policies for Insureds Defense Costs* (Docket No. 2540)) in connection with any Claim or Cause of Action that is not released pursuant to the mutual releases set forth in **Exhibit A** to the Term Sheet. For the avoidance of doubt, the transfer of the rights of the Debtors and the Estate to recover insurance proceeds from the D&O Insurance shall not hinder the ability of any beneficiaries or insureds of such D&O Insurance to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

6. All of the Debtors' remaining interests in joint ventures and the Meadows Hospital Promissory Note, in each case, unless otherwise directed by the FILO Parties, which shall be transferred to one or more corporate subsidiaries of the Litigation Trust; provided that in the event any transfer of interests in joint ventures triggers any put, call, ROFO or ROFR, or other similar rights of third parties, such interests shall be excluded (the "Excluded Interests") and only the proceeds of sale of such interests will be transferred to the Litigation Trust. The Estate shall, at Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize the Excluded Interests in coordination, and in a manner reasonably agreed upon, with the Litigation Trust, and (b) promptly turn over any cash or other value realized on account of such Excluded Interests to the Litigation Trust.

7. All proceeds, products, offspring, or profits of any employee retention tax credits ("ERTCs") owned by any Debtors, net of any reasonable and documented out-of-pocket expenses of any broker or consultant retained in connection with a sale of such ERTCs (to the extent not paid in advance by the Litigation Trust in accordance with the succeeding sentence).  The Estate shall at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize such ERTCs

in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (b) promptly turn over any cash or other value realized on account of such ERTCs to the Litigation Trust.

8. All proceeds, products, offspring, or profits of any of the foregoing assets and property.

## Schedule 1-A

### Payors

| Column1 |
| --- |
| Aetna Better Health of Florida |
| Aetna Health Management, LLC |
| Aetna Health, Inc. |
| Aetna Network Services LLC |
| Aetna U.S. Healthcare Inc. |
| AmeriGroup Texas, Inc. |
| Arizona Physicians IPA, Inc. |
| AvMed, Inc. |
| BHP of Ohio, Inc. |
| Blue Cross and Blue Shield of Florida, Inc. |
| Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. |
| Blue Cross and Blue Shield of Massachusetts, Inc. |
| Blue Cross and Blue Shield of Texas |
| Boston Medical Center Health Plan, Inc. |
| Caritas Christi |
| Cenpatico Behavioral Health LP |
| Cigna Behavioral health of Texas |
| Cigna Health and Life Insurance Company |
| Cigna HealthCare of Florida, Inc. |
| Cigna HealthCare of Massachusetts, Inc. |
| CIGNA Healthcare of Texas, Inc |
| Community Insurance Company |
| Connecticut General Life Insurance Company |
| Employers Health Insurance Company |
| Evercare of Texas, LLC |
| First Health Group Corp. |
| GHS Property and Casualty Insurance Company |
| Harvard Pilgrim Health Care, Inc. |
| Health Options, Inc. |
| Health Value Management, Inc. |
| Healthease of Florida |
| HealthSpring Life & Health Insurance Company, Inc. |
| Highmark Blue Cross Blue Shield |
| Humana Health Insurance Company of Florida |
| Humana Health Plan of Florida |
| Humana Health Plan of Texas, Inc. |
| Humana Insurance Company |
| Humana Medical Plan, Inc. |
| Leon Health, Inc. |
| Massachusetts Benefit Administrators LLC |
| MetraHealth Inruance Company |
| Metropolitan Life Insurance Company |
| Neighborhood Health Plan of Rhode Island |

| |
|---|
| NovaSys Health, Inc. |
| Oscar Insurance Company of Florida |
| PacifiCare of Arizona, Inc. |
| PacifiCare of Texas, Inc. |
| SelectCare of Texas, LLC |
| Senior Whole Health LLC |
| Simply Healthcare Plans, Inc. |
| Steward Health Care System, LLC |
| Sunshine State Health Plan, Inc. |
| Superior HealthPlan, Inc. |
| Texas HealthSpring, LLC |
| Total Health Plan, Inc, |
| Travelers Insurance Company |
| Tufts Associated Health Maintenance Organization, Inc. |
| Tufts Associated Health Plans, Inc. |
| Tufts Benefit Administrators |
| Tufts Health Plan, Inc. |
| Tufts Insurance Company |
| Tufts Public Plans, Inc. |
| U.S. Behavioral Health Plan, California |
| United Behavioral Health, Inc. |
| United Benefits of Texas, Inc. |
| United Community Plans of Texas, L.L.C. |
| United Health and Life Insurance Company |
| United Healthcare |
| United Healthcare Insurance Company |
| United Healthcare of Arizona, Inc. |
| United Healthcare of New England Inc. |
| United HealthCare of Ohio, Inc. |
| United Healthcare of Texas, Inc. |
| UnitedHealthcare Community Plan of Ohio, Inc. |
| UnitedHealthcare Insurance Company |
| UnitedHealthcare of Arizona, Inc. |
| UnitedHealthcare of Florida, Inc. |
| UnitedHealthcare of New England, Inc. |
| UnitedHealthcare of Ohio, Inc. |
| Universal American Corp. |
| US Behavioral Health |
| Warren Ohio Rehab Hospital Company |
| WellCare of Florida, Inc. |
| WellCare of Texas, Inc. |

**Schedule 1-B**

**Preference Defendants**

**Name of Tranferee**

NORTHWIND PHARMACEUTICALS LLC
DEFOREST KOSCELNIK & BERARDINELLI
TOTAL ORTHOPAEDIC CARE
PROVIDENCE MEDICAL TECHNOLOGY INC
ACUMED LLC
THE PARKER JVMC TRUST
ALL PRO CLEANING SYSTEMS
SPINEOLOGY INC
AEROSEAL LLC
MODULAR DEVICES
GALLOWAY OFFICE SUPPLIES INC
BLENDEN ROTH LAW FIRM PLLC
MEDICAL CONSULTANTS NETWORK INC
COLE SCOTT & KISSANE PA
ENVIRONMENTAL SYSTEMS INC
SI-BONE, INC
Q-CENTRIX LLC
TOTAL SCOPE INC
TREACE MEDICAL CONCEPTS INC
DESIGN BY NATURE CORP
FIRETROL PROTECTION SYSTEMS INC
IMMUCOR INC
LSI SOLUTIONS
INNOVATIVE MEDICAL PRODUCTS INC
HERSHEY CREAMERY COMPANY
HEALTHCARE FINANCIAL INC
LANMOR SERVICES INC
SIGNET ELECTRONIC SYSTEMS INC
TERUMO MEDICAL CORPORATION
FINTHRIVE INC
CARCO GROUP, INC.
MEDISOLV INC
BLOOMBERG INDUSTRY GROUP INC
WHELAN PROPERTY MANAGEMENT
AMERICAN COLLEGE OF RADIOLOGY
SMITH & NEPHEW INC
LABORATORY CORPORATION OF AMERICA
ZIMMER US INC
RICE MCVANEY
MISTY HAZY

WILSON ELSER MOSKOWITZ EDELMAN
COMPLIANT HEALTHCARE
FUJIFILM HEALTHCARE AMERICAS
THE FILTER MAN
BRIGHTER HEALTH NETWORK LLC
NETWORK PROVIDERS INC
CHARTER COMMUNICATIONS
VIRTUAL RADIOLOGY PROFESSIONALS OF NJ
Dext Capital LLC
ZEVETS INDUSTRIES INC
PFEIFFER & SON LTD
PROLACTA BIOSCIENCE INC
STRYKER ORTHOPAEDICS
AGILITI HEALTH INC
STRYKER SALES CORP
OLYMPUS AMERICA INC.
ENVIRONMENTAL HEALTH & ENGINEERING
STRYKER ENDOSCOPY
STRYKER SUSTAINABILITY SOLUTIONS
HEALOGICS WOUND CARE &
MEDTRONIC USA INC
GENCON SERVICE INC
PRORENATA LABS LLC
MAKO SURGICAL CORP
ELEVATE PATIENT FINANCIAL
CONVERGE TECHNOLOGY SOLUTIONS
DJO SURGICAL
LPS ENTERPRISES LLC
INARI MEDICAL INC
Global Healthcare Exchange
BRISTOL LAW PLLC AND CLINICAL
BOSTON SCIENTIFIC CORPORATION
ARC DIALYSIS SOUTH FLORIDA
BROCKTON HOSPITAL INC
GASTROENTEROLOGY AFFILIATES OF
IMAGEFIRST OF NEVADA LLC
LIFENET HEALTH
FAVORITE HEALTHCARE STAFFING INC
STRYKER NEUROVASCULAR
NUVASIVE INC
RYAN LLC

SIEMENS HEALTHCARE DIAGNOSTICS
STRYKER SPINE
CHEM-AQUA INC
HEMOSTASIS LLC
STRYKER CRANIOMAXILLOFACIAL
IRON MOUNTAIN
SMART SOURCE LLC
UTAH HEALTH INFORMATION NETWORK
ALLSTON BRIGHTON COMMUNITY
CATALYST ORTHOSCIENCE LLC
CUBE 3 STUDIO LLC
TAP2RIDE TRANSPORTSATION INC
AIRGAS USA LLC
CORCYM INC
MARSH USA INC
AFSCME OHIO COUNCIL 8
BCM CONTROLS CORPORATION
CHG COMPANIES INC
BECDEL CONTROLS INC
HOLLAND & HART LLP
BROCKTON NEIGHBORHOOD HEALTH CENTER
EDDY MARTINEZ PLUMBING SERVICE INC
FLORIDA BIRTH RELATED NEUROLOGICAL
J & J HEALTH CARE SYSTEMS INC
UMASS CHAN MEDICAL SCHOOL
PENUMBRA INC
NEXTMED PLAIN STATES LLC
QUICKBASE INC
AARON BARLOW PIKE
REMEDI8 LLC
LUMEDX CORPORATION
LUMEDX CORPORATION
TRANSLOGIC CORPORATION
HILL BARTH & KING LLC
EPSTEIN BECKER & GREEN PC
PENRAD TECHNOLOGIES INC
TRI-M MAINTENANCE INC
VMG HEALTH
WELLS PHARMA OF HOUSTON LLC
THOMAS YOUNG ASSOCIATES INC
JAMES W FLETT CO INC

THE MEDICUS FIRM INC
NORTH COAST FIRE PROTECTION INC
HAMILTON MEDICAL INC
QUENCH USA INC
CODE RED CONSULTANTS LLC
ECD SYSTEMS LLC
MEDTOX LABORATORIES INC
A MEDEKO LOCKSMITH SECURITY
DFA DAIRY BRANDS - GARELICK FARMS
CS MEDICAL LLC
ER2
PC INSTITUTE FOR MEDICAL EDUCATION
TENNANT SALES AND SERVICE COMPANY
VICTORY MECHANICAL HOLDING LLC
G21 USA INC
GREGORY WATTS
NATIONAL FIRE ALARM PROTECTION
EARLY BIRD POWER LLC
WAYLAND MULLIKIN
SOUTHFIELD MEDICAL CARE LLC
MICROSURGICAL TECHNOLOGY
NEW ENGLAND REVENUE CYCLE
DRS TUMOR REGISTRY SERVICES
NOVO HEALTH SERVICES FLORIDA LLC
ALLIED UNIVERSAL TECHNOLOGY SERVICE
ALLIED DOOR AND HARDWARE CO INC
CINTAS
SHEAKLEY UNISERVICE INC
RICHARD CELLER LEGAL PA
SOUTHERN LITHO XI LLC
ORTHALIGN INC
GENSET FIRE & SECURITY LLC
BOGGS FIRE EQUIPMENT INC
CROWN HEALTH CARE LAUNDRY
TANDEM THEORY
INDUSTRIAL BURNER SYSTEMS INC
CLAU CLEANING CORPORATION
FEDEX FREIGHT INC
IMAGING PHYSICS LLC
REGIONAL MANAGEMENT ASSOCIATES
PARAGON 28 INC

COMMTANK
DILAGOS PLUMBING SERVICES INC
PROIECTUS SERVICES LLC
EAST END MEDICAL I LLC
PITNEY BOWES GLOBAL FINANCIAL
COMMUNITY BANK OF TEXAS
SONEX HEALTH INC
THE JOINT COMMISSION
HERMAN M EPSTEIN MD
ADVANTECH INC
CENTER POINTE SLEEP ASSOCIATES LLC
PHARMACY ONESOURCE
PITNEY BOWES INC
SMART CARE EQUIPMENT SOLUTIONS
BIOREFERENCE LABORATORIES INC
MDM TRANSPORTATION CONSULTANTS INC
APO PUMPS & COMPRESSORS LLC
TEXAS DEPT OF STATE HEALTH
EDWARD DON & COMPANY
CENTRAL COMMUNICATIONS AND
REMOTE ICU LLC
MEDISTIM USA INC
PLANT PROFESSIONALS INC
CITI PROGRAM
MEDIPRO
Edwards Lifesciences LLC
THE PITNEY BOWES RESERVE ACCOUNT
ALSCO INC
DDK REAALTY TRUST
MICHAEL JISER
MED AIR INC
RED RIVER PHARMACY SVCS
ROSE BROS SEPTIC & DRAINAGE INC
COMPASS CRYOGENICS INC
ALL MEDICAL PERSONNEL LLC
MELISSA ALWORTH DO PA
CALDERA MEDICAL INC
FARID GHEBLEH MD PC
CJ&J LEASING CORPORATION
MUNIR SHAH MD
GREENTEAM PLUMBING LLLC

SIEMENS MEDICAL SOLUTIONS USA
CENTRAL ADMIXTURE PHARMACY
JMG CLEANING SOLUTION LLC
HANNA CAMPBELL & POWELL LLP
CROWN UNIFORM & LINEN SERVICE
EXPERT MEDICAL NAVIGATION
ADVANCE AIR AND HEAT CO INC
D&D LABORATORY LLC
VERATHON INC
JOHNSON OCONNOR FERON &
WB MASON CO INC
MATHESON TRI GAS INC
TLC ENGINEERING SOLUTIONS INC
TIERPOINT LLC
US POSTAL SERVICE
MEDTRONIC SOFAMOR DANEK USA INC
Globus Medical North America
FRESHPOINT SOUTH FLORIDA INC
GLE CONSULTING INC
QUEST DIAGNOSTICS INCORPORATED
HACHEY URBANOSKI LLC
UNITEX TEXTILE RENTAL SERVICES
COTTON COMMERCIAL USA
GLOBAL JET CAPITAL LLC
MILESTONE HEALTHCARE LLC
DUGGAN MECHANICAL SERVICES INC
REPUBLIC SERVICES INC
BAM BAM ENTERPRISES LLC
HUNTON SERVICES
SOUTHEAST TEXAS INPATIENT PHYSICIAN
BIO RAD LABORATORIES
OCEANS BEHAVIORAL HOSPITAL
PALOI ADVISORS LLC
BLUSKY RESTORATION CONTRACTORS LLC
FADI NADDOUR MD
PREMIER DIAGNOSTIC SERVICES INC
CUTT KENDELL & OLSON ATTORNEY
TRAILRUNNER INTERNATIONAL LLC
WINSTON & STRAWN LLP
BOWDITCH & DEWEY LLP
LIFESHARE BLOOD CENTERS

ANGELICA URENA AND LAW OFFICE
NEOGENOMICS LABORATORIES
MERCHANT SERVICE
SAPPHIRE ELEVATOR LLC
CONCUR TECHNOLOGIES INC
NEIGHBORWORKS HOUSING SOLUTIONS
AM SURGICAL
CT CORPORATION SYSTEM
CCMMA TX PLLC
SERPE ANDREWS PLLC
OHIO VALLEY PERFUSION ASSOCIATES
ASAHI INTECC USA INC
VIRTUAL RADIOLOGIC CORPORATION
ROLLS-ROYCE PLC
ECRI
LUBIN & MEYER AS ATTORNEY FOR THE
PADFIELD AND STOUT LLP TRUST
TEXAS HEALTHCARE LINEN LLC
MIDADE LLC
BALDWIN GROUP DBA ROGERS GRAY
OMRAM LLC
PEDIATRIC PROFESSIONAL ASSOC PC
ACCESS TELECARE PLLC
BRIAN T. CARTY
SALTZ MICHELSON ARCHITECTS
PUEBLO MECHANICAL AND CONTROLS LLC
TELERADIOLOGY SOLUTIONS
ALLHEART ELECTRIC COMPANY
MEDICAL BUSINESS ASSOCIATES INC
GORDON & PARTNERS TRUST ACCT
SOUTHWEST MEDICAL IMAGING PA
HOLIDAY CVS LLC
METTEL
STREAMLINE VERIFY LLC
QUALITY HEALTHCARE PARTNERS
CHARLIE WILLIAMS PAINTING
JCB ORTHO LLC
NORTHWIND STRATEGIES LLC
EXECUTIVE MEDICAL PHYSICS ASSOC
EASTSIDE ENTERPRISES INC
BOILER SPECIALISTS INC

TODDS ENVIROSCAPES LLC
MN & COMPANY MEDIA MANAGEMENT INC
HARRY W DONIAS MD LLC
JACOB COHEN MD
IMPERATIVE CARE INC
B2B DELIVERY LLC
MORTON HOSPITAL
MEDIALAB INC
BOWIE COUNTY TEXAS LOCAL PROVIDER PARTIC
MARICE GUZMAN PLLC FBO KELLY
XTANT MEDICAL INC
CC ANESTHESIA SOLUTIONS LLC
HOARTY TREE EXPERTS INC
J A MAYANS MD
ELEVATOR REPAIR SERVICE INC
STUART BREISCH MD
MIDLAND PLASTIC SURGERY CENTER
TSNE MISSION WORKS
TEND HEALTH LLC
PRIDESTAR EMS INC
ARHC NCODSTX01 LLC
PACIFIC PREMIER TRUST COMPANY
UMS MR FUSION SVC OF NE LLC
ALLAN M JORGE MD PA
POPP HUTCHESON PLLC
MERGE HEALTHCARE SOLUTIONS INC
TTG ISOTOPES LLC
ENTECH SALES & SERVICE LLC
KONSULT INC
TANK WIZARDS INC
WEST TEXAS UROLOGY PA
JOHN K DORMAN
BASIN NEUROSURGICAL & SPINE
UMS URS LITHOTRIPSY SERVICES
S R DEME MD PA
AMERICAN ARBITRATION ASSOCIATION
CARDIOVASCULAR DIAGNOSTIC CENTER
VIKRAM PATEL MD PA
VOGELZANG LAW PC
PURCHASING POWER LLC
FUSION ORTHOPEDICS USA LLC

GREATER HAMPSTEAD FAMILY MEDICINE
UMS LITHO SERVICE OF BRISTOL COUNTY
AVASURE LLC
VSI SURGICAL
DMILLER CONSULTING LLC
PINE ISLAND ASSOCIATES LLC
ARIOL LABRADA MD PA
ADVANCED CARDIOVASCULAR
ACCREDITATION COUNCIL FOR GRADUATE
MASS PARK INC
GIANT PEACH CONSTRUCTION LLC
STEINER-ATLANTIC LLC
M DE VERA LANDSCAPING LLC
WINTER ST PARTNERS NEW BEDFORD LLC
SATCOM DIRECT INC
BYRNES MECHANICAL CONTRACTORS INC
SAN ANTONIO MERCHANT SHIPPERS LLC
VTR PAPAGO MEDICAL PARK LLC
ENVELOPE SUPERSTORE
RAMON HECHAVARRIA MD
SOUTH FLORIDA MEDICAL IMAGING PA
UNITED RENTALS NORTH AMERICA INC
GQRC TECHNOLOGIES LLC
SOUTH MIDDLESEX OPPORTUNITY COUNCIL
Associates in Medical Imaging LLC
PRECISION PHYSICS SERVICES LLC
MPX
FW WEBB COMPANY
FUJIFILM SONOSITE INC
JAMES M POTTS MD
MBA MEDICAL INC
EVEXIAS HEALTH SOLUTIONS LLC
DCMD HOLDINGS LLC
SYSTEM4 OF BOSTON
PERMIAN BASIN ANESTHESIA PLLC
JASON R MURPHY
GEROW EQUIPMENT COMPANY
CR HALL COMPANY LTD
MELTWATER NEWS US INC
BERKSHIRE BANK
GEN DIGITAL INC.

AEP SOUTHWESTERN DES

SAMBASIVA R SUKHAVASI MD PA

FARRUKH QURESHI

MILLERS RIVER DEVELOPMENT LLC

WADLEY REGIONAL MEDICAL CENTER

MRUNAL PATEL

REIS LANDSCAPING & GARDENING LLC

SLIPPERY ROCK COMMERCIAL ROOFING

D BAKER LAW GROUP PC

THE PICARD GROUP LLC

COWBOYS STADIUM LP

MERRITT MEDICAL CENTER II

ALDO H MARTINEZ FLEITES MD PA

THE SUFFOLK GROUP LLC

ADVIZEX TECHNOLOGIES LLC

GRANGER MEDICAL INC

WORLD FUEL SERVICES EUROPE LTD AVIATION

ANANIA PLUMBING & HEATING INC

HEALTHCARE FINANCIAL GROUP INC

INNERFACE ARCHITECTURAL SIGNAGE INC

KONSTANTYN SZWAJKUN

SENSO SCIENTIFIC

DAVID J HENDERSON MD

EPREWARD INC

DOCTORS PARK II CONDO ASSOCIATION

CHRISTOPHER J TROIANO MD

SPARKLIGHT BILL PAY

TX ONCOLOGY PA

KARL STORZ ENDOSCOPY

GREER LABORATORIES

MOUNTAIN MEDICAL PHYSICIAN

SMARTRISE HEALTH LLC

PEDIATRIC ECHOCARDIOGRAPHY SERVICES

LINKBIO CORP

CHARLES CROFT MD PA

THE DELTA PATHOLOGY GROUP LLC

HAYSTACKID LLC

ENDOLOGIX LLC

ACCESS CORP

INTEGRITY HEALTHCARE LOCUMS LLC

TAYLOR COMMUNICATIONS

AGILITI SURGICAL INC
INSPIRE MEDICAL SYSTEMS INC
AGILITI SURGICAL EQUIPMENT REPAIR
DONNELLEY FINANCIAL LLC
WM CORPORATE SERVICES INC
FLORIDA DEPARTMENT OF CHILDREN
SERVPRO OF CENTRAL BREVARD
IMAGEFIRST
DIGISONICS INC
FRESH PROVISIONS INC
SYSCO SOUTH FLORIDA INC
ISMAEL MONTANE MD PA
RM ARIZONA HOLDINGS INC
VOYCE INC
RED LABEL SERVICES
CORIN USA LIMITED
AMERICAN RED CROSS
NATIONAL GOVERNMENT SERVICES
SERVICEMASTER BY GILIMORE
HELGESEN HOUTZ & JONES PC
ENGIE RESOURCES
SPECTRUM
IMAGEFIRST OF NEW ENGLAND
UNIVERSAL ELECTRICAL SERVICES INC
TECO/PEOPLES GAS
JAIME E CAMPOS MD PA
TRICARE Management
GREAT-WEST LIFE
GCB INDUSTRIES LLC
NITEEN ANDALKAR
HUNTON TRANE
TLC JANITORIAL INC
BEACONMEDAES LLC
PROLINK HEALTHCARE
ABBOTT LABORATORIES INC.
ABBOTT RAPID DIAGNOSTICS
ABBOTT VASCULAR INC
ACCREDITATION PARTNERS LLC
AMERICAN ACADEMY HOLDINGS LLC
AMN HEALTHCARE LANGUAGE SERVICES
AQUITY SOLUTIONS LLC

BECTON DICKINSON AND COMPANY
BIOMERIEUX
BIOMERIEUX VITEK INC
BLUEVOYANT LLC
CAREFUSION SOLUTIONS LLC
CHANGE HEALTHCARE SOLUTIONS LLC
COLLEGE OF AMERICAN PATHOLOGISTS
DOCTORS BILLING INC
DRFIRST.COM
ELEKTA INC
EXPERIAN HEALTH INC
FORWARD ADVANTAGE INC
GE HEALTHCARE IITS USA
GETINGE USA SALES LLC
GUIDEPOINT SECURITY LLC
HOLOGIC SALES AND SERVICES LLC
IMALOGIX LLC
INSITEONE LLC
INTELLIGENT MEDICAL OBJECTS INC
KORCHEK TECHNOLOGIES LLC
LANDAUER INC
MEDASOURCE
MERATIVE US LP
MICROSOFT CORP
NET HEALTH SYSTEMS INC
Philips Medical Capital
PHILIPS NORTH AMERICA LLC
PRESS GANEY ASSOCIATES LLC
PROVATION SOFTWARE INC
RADIOMETER AMERICA INC
RLDATIX NORTH AMERICA INC
ROCHE DIAGNOSTICS CORPORATION
SAGILITY OPERATIONS INC FKA HGS
SECURITAS HEALTHCARE LLC
SHARECARE HEALTH DATA
SOURCEHOV HEALTHCARE INC
SPOK, INC.
STERICYCLE INC
TRINISYS LLC
TWIAGE SOLUTIONS INC
VARIAN MEDICAL SYSTEMS INC

VIZIENT INC
WERFEN USA LLC
KCD GENERAL CONTRACTORS
MEDLINE/MOZART HOLDING
SODEXO INC & AFFILIATES
1 TEST CORP
A MURPHY INC
ABDOMINAL SURGEONS LTD
ABIOMED INC
ACADIAN AMBULANCE SERVICES INC
ACCESS CIG LLC
ACCLARENT INC
ACUTANE INC STAMPS CONCENTRATION
ADDISON GROUP
ADVANCED STERILIZATION PRODUCTS
AESCULAP INSTRUMENTS
ALGOREX HEALTH TECHNOLOGIES INC
ALTERYX INC
AMERICAN COLLEGE OF SURGEONS
AMERICAN HEART ASSOCIATION INC.
AMERICAN MEDICAL RESPONSE OF
AMERICAN PORTABLE
ANGIODYNAMICS INC
AR CATALDO CORPORATION
ARIZONA GASTRO CARE PLLC
ARM ELECTRICAL SERVICES LLC
ARTHREX INC
ARTHROSURFACE INC
ASSURGENT MEDICAL STAFFING
ATI RESTORATION LLC
ATRICURE
BAYSTATE INTERPRETERS INC
BECKMAN COULTER INC
BIO-RAD LABORATORIES INC
BIOTE MEDICAL LLC
BREAKAWAY COURIER BOSTON INC
BREWSTER AMBULANCE SERVICE
CARDIOVASCULAR SYSTEMS INC
CARRIER CORPORATION
CARRIER RENTAL SYSTEMS
CERAPEDICS INC

COLLECTIVE MEDICAL TECHNOLOGIES INC
CONCORD MEDICAL GROUP OF TEXAS
CONCORD MEDICAL GROUP PLLC
CORDIS US CORP
CORE DIALYSIS SERIES LLC
COVIDIEN SALES LLC
CRA INTERNATIONAL INC
CTL Amedica
CYRACOM LLC
DASSAULT FALCON JET CO
DHHS - UNIFIED STATE LABORATORIES
DIGIRAD IMAGING SOLUTIONS INC
DOVER FLOORS INC
DRUCKER MEDIA INC
DX INC
ELIOT COMMUNITY HUMAN
ELLKAY LLC
EMERGENCHEALTH LLC
EMPOWER ANNUITY INS CO OF AMERICA,
ENCORE FIRE PROTECTION
ERBE USA INC
EVOQUA WATER TECHNOLOGIES LLC
FAGRON STERILE SERVICES LLC
FLEXCARE LLC
FLORIDA PEST CONTROL
FONAR CORPORATION
FX MASSE ASSOCIATES INC
FX SHOULDER USA INC
GASTON ELECTRICAL CO INC
GLENSTONE CAPITAL LLC
GORDON FOOD SERVICE INC
GULF COAST REGIONAL BLOOD CENTER
HARBINGER COMMUNICATIONS INC
HATCH 130 LLC
HEALTHPRO HERITAGE
HIGH DESERT MECHANICAL CORP
HUB INTERNATIONAL NEW ENGLAND LLC PREMI
INO THERAPEUTICS LLC
INSIGHT IMAGING
INTEGRA LIFESCIENCES CORP
Intuitive Surgical Inc.

JACKSON LLOYD SELECT RISK
JAMES CARROLL AS AGENT LABORIE
JANI-KING OF RHODE ISLAND
JENSEN HUGHES INC
JJ FRANK LANDSCAPING INC
JUST PRESS PLAY
KCI USA INC
KICKDRUM TECHNOLOGY GROUP LLC
KNOWTION HEALTH
LAB LOGISTICS LLC
LANTHEUS MEDICAL IMAGING INC.
LEMAITRE VASCULAR INC
LIFE SPINE INC
LIGHTNING BOLT SOLUTIONS
LIMBACH COMPANY LLC
LINCOLN HARRIS CSG
LIVANOVA USA INC
MCT EXPRESS INC
MEDACTA USA INC
MERIT MEDICAL SYSTEMS INC
MESSAGE MANAGEMENT CENTER LLC
MESSER LLC
MICRO-TECH ENDOSCOPY USA INC
MIDLAND PATHOLOGIST P A
MSDSONLINE INC
NEOGENOMICS LABORATORIES INC
NMS LABS
ONEBLOOD INC
ORTHO CLINICAL DIAGNOSTICS
OSSIO INC
OSTEOMED
PARIS HEALTHCARE
PARTNERSOURCE
PENNSYLVANNIA STATESHENANGO
PEPSI COLA COMPANY
PHREESIA INC
PREPMD PROFESSIONALS LLC
PRO HEALTH MEDICAL STAFFING LLC
PROFESSIONAL PIPING INC
PROFICIO SURGICAL ASSISTANTS LLC
PULMONARY CONSULTANTS PC

REAUD MORGAN & QUINN LLP TRUST
RENTOKIL NORTH AMERICA
REPUBLIC SPINE LLC
RESOURCES GLOBAL PROFESSIONALS
RESTORIXHEALTH
REYNOLDS DEWALT
RICHARD WOLF MEDICAL
RICHARDS BRANDT MILLER NELSON
RICOH USA INC
RIDE MOBILE TRANSPORTATION INC
ROOFS INC
SCA PHARMACEUTICALS LLC
SCHINDLER ELEVATOR CORPORATION
SEMPERIS INC
SERVICEHUB CORPORATION
SHOCKWAVE MEDICAL INC
SHRED IT
SIGNATURE AVIATION USA LLC
SILK ROAD MEDICAL INC
SKELETAL DYNAMICS LLC
SOUTH TEXAS BOILER INDUSTRIES
SOUTHWORTH-MILTON INC
SPECIALTYCARE CARDIOVASCULAR
SPINEART USA INC
STAT BIO MEDICAL SALES & SERVICE
STEVEN A CALLAHAN ELECTRICAL
STEWART & STEVENSON
SUNBELT RENTALS
SYSCO ARIZONA INC
SYSCO BOSTON LLC
SYSCO CENTRAL FLORIDA INC
SYSCO EAST TEXAS
SYSCO HOUSTON INC
SYSCO JACKSON LLC
SYSCO WEST TEXAS
SYSMEX AMERICA INC
TAC MED INC
THE FACTOR INC
THE ROMANS GROUP
THERAPEUTIC RESEARCH CENTER
TMHP

TORNIER INC
TOWNE PARK LLC
TRANE US INC
UNUM LIFE INSURANCE COMPANY OF
UROLOGIC SURGEONS OF ARIZONA PLC
US FOODS INC
US MED EQUIP LLC
WASTE CONNECTIONS OF FLORIDA
WEST TECHS CHILL WATER SPECIALIST
WESTPORT LINEN SERVICES INC
WHITMAN PARTNERS INC
WICKER SMITH O'HARA MCCOY & FORD
WLG WL GORE&ASSOC MPD
WOLF & COMPANY PC
WRIGHT MEDICAL TECHNOLOGY INC
3M HEALTH INFORMATION SYSTEMS
ACCLARA SOLUTIONS LLC
CLOUDMED
COGNIZANT TECHNOLOGY SOLUTIONS
CONSENSUS CLOUD SOLUTIONS
DELL FINANCIAL SERVICES
ERGONOMIC GROUP
HEWLETT PACKARD FINANCIAL SERVICES
HP INC
INOVALON PROVIDER INC
INTERLACE HEALTH LLC
IODINE SOFTWARE LLC
JAMS INC
LOGIXHEALTH INC
MRO CORPORATION
PRESIDIO NETWORKED
REVSPRING INC
TEGRIA RCM GROUP US INC.
BREAZEALE SACHSE & WILSON LLP
BRUCE & KELLEY PC
CAPPLIS CONNORS CARROLL & ENNIS
DRAFFIN & TUCKER LLP
FALK WAAS HERNANDEZ ET AL
FOSTER & ELDRIDGE LLP
HALL PRANGLE & SCHOONVELD LLC
HAMEL MARCIN DUNN REARDON & SHEA PC

JULIE SMITH

KIPP AND CHRISTIAN PC

MARSHALL DENNEHEY WARNER

QUINTAIROS PRIETO WOOD & BOYER PA

RESNICK & LOUIS PC

SNOW CHRISTENSEN & MARTINEAU

THE CHECKETT LAW FIRM PLLC

THOMPSON BOWIE & HATCH LLC

TODD & WELD LLP

WILLIS TOWERS WATSON US LLC

WIPFLI LLP

AUDERE INTERNATIONAL LIMITED

EXCELA RECEIVABLES 3 LLC

H RAMOS FARMS

## Exhibit A[1]

**Mutual Releases.**  Except as otherwise expressly set forth below, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Trust Establishment Date, each of (A) the Debtors, (B) the Estates, (C) the Litigation Trust, (D) the Litigation Trustee, (E) the FILO Parties, (F) the Creditors' Committee and each of its members (solely in their official capacity), and (G) each Related Party of each Person or Entity described in any of the immediately preceding clauses (A) through (F) to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law (each, a "**Releasing Party**" and, collectively, the "**Releasing Parties**"), in each case on behalf of themselves and their respective successors, assigns, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through such Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of such Releasing Party), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Trust Establishment Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the FILO Settlement Term Sheet or any other contract, instrument, release, or document created or entered into in connection with the FILO Settlement or any of the other definitive documents related thereto; any other debt or security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors; the subject matter of, or the transactions or events giving rise to, any Claim or Interest; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the Approval Order and the transactions contemplated thereby; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Trust Establishment Date.  Notwithstanding anything to the contrary in the foregoing, these releases (i)  shall not be construed as releasing (a)  any Released Party from Claims or Causes of Action arising from a material misrepresentation or an act or omission constituting actual fraud, willful misconduct, criminal misconduct, or gross negligence of or by such Released Party, in each case as judicially determined by a Final Order, (b) any Claims or Causes of Action arising after the transfer of the Litigation Trust Assets to the Litigation Trust, (c) the Debtors or the Estates from

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Settlement and Stay Relief Term Sheet*, to which this exhibit is attached (the "**FILO Settlement Term Sheet**"), or **Annex 1** attached hereto, as applicable.

1

the Retained FILO Claim (including, without limitation, any liens securing the Retained FILO Claim), (d) any rights or obligations of any party or Entity under the Approval Order, the FILO Settlement Term Sheet, the Plan Support Agreement Term Sheet, any definitive document related to the FILO Settlement or the Plan Support Agreement Term Sheet, or any other document, instrument, or agreement executed to implement the Plan or the transactions contemplated by the FILO Settlement, or (e) any Intercompany Claims; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party.  For the avoidance of doubt, no Person or Entity not (i) expressly identified on the list of Individual Released Parties, or (ii) defined as a Released Party, shall be deemed to be granted a release hereunder, regardless of whether such Person or Entity is specifically identified on <u>Schedule 2</u> hereof.

## Annex 1

## Defined Terms

*2016 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in October 2016 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2020 Transactions* means, individually and/or collectively, (a) the transactions that were entered into and/or occurred in or about May 2020 pursuant to which: (i) Manolete Health, LLC purchased Steward Healthcare International Holdings Ltd. from Steward Health Care System LLC, (ii) Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "**Utah JV**") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV, and the Utah JV leased such real properties back to Jordan Valley and Davis, and (iii) Cerberus Operations and Advisory Company exchanged its equity in Steward Healthcare Investors LLC for a $350 million convertible note, and (b) all other transactions related thereto, including any transactions in what was referred to at the time as Project Easter.

*2021 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in January 2021 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2022 Transaction* means the transaction or transactions entered into on or about May 31, 2022 (and certain other dates in 2022) by and among, among others, Sparta Merger Sub I Inc., Sparta Merger Sub II Inc., Sparta Merger Sub III Inc., Sparta Merger Sub I LLC, Sparta Merger Sub II LLC, Sparta Merger Sub III LLC, Sparta Sub Inc., SNCN Holdco Inc., SICN Holdco Inc., Steward Integrated Care Network, Inc., Steward Accountable Care Network, Inc., Steward Health Care Network Inc., Sparta Holding Co. LLC, Steward Health Care System LLC and CareMax, Inc. pursuant to which certain value-based care assets were transferred to Sparta Holding Co. LLC and acquired by CareMax, Inc., and all other transactions related thereto or included therein (including any dividends, distributions, and/or allocations paid, made, and/or issued in 2022 in connection with and/or following such transaction(s), and any subsequent transfer of the proceeds thereof or arising therefrom).

**Affiliate** means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

**Avoidance Actions** means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

**Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise.  For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or

3

Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

*Chapter 11 Case* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*Chief Restructuring Officer* means John R. Castellano, in his capacity as Chief Restructuring Officer of each of the Debtors.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code.

*Creditors' Committee* means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

*Debtor Related Parties* means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*FILO DIP Order* means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

*FILO Parties* means, collectively, the Prepetition Bridge Agent, the FILO Bridge Lenders, the FILO DIP Secured Parties, the Prepetition FILO Agent, and the FILO Lenders (each as defined in the FILO DIP Order), in each case in their capacities as such, and the Litigation Funding Agent and the providers of the Litigation Funding in their capacities as such.

**FILO Settlement** means the settlement embodied in the FILO Settlement Term Sheet.

**Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired.  However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**Hospital Debtors** means all Debtors, other than, for the avoidance of doubt, Steward Health Care Holdings LLC and Steward Health Care System LLC, that held or owned a license to operate a hospital at any time during the Chapter 11 Cases.

**Identified Non-Released Parties** means (i) the Persons and Entities listed on **Schedule 2** annexed hereto, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions  or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

**Individual Released Parties** means the individuals listed on the **Schedule 1** annexed hereto, each in their capacity as a current or former director, officer, manager, employee, advisor, or consultant of one or more of the Debtors.

**Interest** means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including

any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor.

**Intercompany Claim** means any pre- or postpetition Claim against a Debtor held by another Debtor.

**Investigation Subcommittee** means the subcommittee of the Transformation Committee, consisting of Alan J. Carr and William Transier.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Person** means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

**Petition Date** means May 6, 2024.

**Plan Administrator Committee** means a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

**Plan Support Agreement Term Sheet** means the Plan Support Agreement Term Sheet referred to in the FILO Settlement Term Sheet and executed in connection therewith.

**Plane Sales** means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

**Prepetition Transactions** means the (i) 2016 Distribution, (ii) 2020 Transactions, (iii) 2021 Distribution, (iv) 2022 Transaction, and (v) the Plane Sales.

**Related Parties** means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, and (b) the Litigation Trust and the Litigation Trustee; (iii) each of the following, solely in their capacities as such, (a) the Creditors' Committee and each of its members, and (b) the FILO Parties; and (iv) with respect to each of the foregoing Entities identified in the immediately preceding clauses (ii) or (iii), such Entities' Related Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Released Party.

***Representative*** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

***Transformation Committee*** means the special committee of the board of managers of Steward Health Care Holdings LLC comprised of Alan J. Carr, John R. Castellano, and William Transier.

## **Schedule 1**

### **Individual Released Parties**

- Alan Carr
- Ann-Marie Driscoll
- Carlos Hernandez
- David Barnhardt
- Eugene (Jay) Sullivan
- Gail Schlesinger
- General H.R. McMaster
- Henry (Nick) Nickells
- Jeffrey Morales
- Jennifer Hunt
- John Boehner
- John Castellano
- Joseph Weinstein
- Katchena Potter
- Mary Beth Taylor
- Nathalie Hibble
- Octavio Diaz
- Patrick Lombardo
- Rich Iannessa
- Sr. Vimala Vadakumpadan
- Susan Brown
- William Transier

## Schedule 2

**Identified Non-Released Parties**

- Alessandra Pace
- Armin Ernst
- Brian Carty
- Christopher Dunleavy
- Craig Jesiolowski
- David Chicoine
- David Friend
- David Morales
- Herbert Holtz
- James Karam
- James Lenehan
- Jill Moretto
- John Polanowicz
- Joseph Ciccolo
- Joseph Maher
- Joshua Putter
- Mark Girard
- Mark Rich
- Michael Callum
- Miroslav Boyanov
- Nadine Delicata
- Ralph de la Torre
- Robert Guyon
- Ruben King-Shaw Jr.
- Sanjay Shetty

- 5326 Old Buena Vista Road LLC
- Ad Astra Per Aspera LLC
- CareMax, Inc.
- Cayman TRS Holdings
- Cerberus Capital Management, L.P.
- Cerberus International II Master Fund LP
- Cerberus Partners II LP
- Cerberus Series Four Holdings LLC
- de la Torre Foundation
- de la Torre Family Foundation
- Management Health Services Colombia S.A.S.
- Management Health Services LLC
- Manolete Health Investors LLC
- Manolete Health LLC
- Medical Properties Trust, Inc.
- MPT Sycamore Opco LLC
- Ralph de la Torre Revocable Trust
- RDLT – SHCI Investor LLC
- RDLT – SHCI Manager LLC
- Sagamore Capital Management, LLC
- Santa Clara Holdings LLC
- Sparta Holding Co. LLC
- Steward Health Care International
- Steward Health Care International (Malta) Ltd
- Steward Health Care International Colombia S.A.S.
- Steward Health Care Investors LLC
- Steward Health Care International Investors LLC
- Steward Health Care International Kingdom of Saudi Arabia, S.L.
- Steward Health Care International Ltd
- Steward Health Care International S.L
- Steward Malta Assets Ltd
- Steward Malta Ltd
- Steward Malta Management Ltd
- Steward Malta Personnel Limited
- Steward Management Holdings LLC
- Tenet Healthcare Corporation
- TRACO International Group S. DE R.L.

## Exhibit B

### TSA Budget



# Post-TED TSA Forecast

**($ in thousands)**

| Month Ending / Status | Jul-25 Fcst | Aug-25 Fcst | Sep-25 Fcst | Oct-25 Fcst | Nov-25 Fcst | Dec-25 Fcst | Jan-26 Fcst | Feb-26 Fcst | Mar-26 Fcst | Apr-26 Fcst | May-26 Fcst | Jun-26 Fcst | Jul-26 Fcst | Aug-26 Fcst | Sep-26 Fcst | Oct-26 Fcst | Nov-26 Fcst | Dec-26 Fcst | Total Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Illus. Estate Expenses (Covered by TSA with Litigation Trust)** | | | | | | | | | | | | | | | | | | | |
| Payroll & Payroll Related | $ (481) | $ (350) | $ (350) | $ (250) | $ (250) | $ (250) | $ (100) | $ (100) | $ (100) | $ (100) | $ (100) | $ (100) | $ (50) | $ (50) | $ (50) | $ (50) | $ (50) | $ (50) | $ (2,831) |
| Suppliers & Trade Vendors | (850) | (750) | (650) | (550) | (400) | (350) | (150) | (150) | (150) | - | - | - | - | - | - | - | - | - | (4,000) |
| Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Operating Disbursements | (75) | (75) | (75) | (75) | (75) | (50) | (25) | (25) | (25) | - | - | - | - | - | - | - | - | - | (500) |
| Medical Records | (3,500) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (3,500) |
| U.S. Trustee Fees | (875) | - | - | (129) | - | - | (81) | - | - | (80) | - | - | (60) | - | - | (56) | - | - | (1,281) |
| **Total Illus. TSA Covered Expenses** | **$ (5,781)** | **$ (1,175)** | **$ (1,075)** | **$ (1,004)** | **$ (725)** | **$ (650)** | **$ (356)** | **$ (275)** | **$ (275)** | **$ (180)** | **$ (100)** | **$ (100)** | **$ (110)** | **$ (50)** | **$ (50)** | **$ (106)** | **$ (50)** | **$ (50)** | **$ (12,113)** |

## EXHIBIT B

**Plan Support Agreement Term Sheet**

## PLAN SUPPORT AGREEMENT TERM SHEET

### April 28, 2025

This Term Sheet sets forth the substantive terms pursuant to which the FILO Parties and the Unsecured Creditors Committee ("UCC") will support a plan of liquidation to be filed by the Debtors.

### Support by FILO Lenders

1. The FILO Parties will support, not object to, and not interfere with, and, if they are properly solicited with an approved disclosure statement, will vote for a proposed plan (including not opting out of releases) that:

   a. Leaves unaltered in all material respects the Litigation Trust as set forth in the *Settlement and Stay Relief Term Sheet* (the "FILO Settlement Term Sheet") and is otherwise consistent with the FILO Settlement Term Sheet.

   b. Provides for releases of the FILO Parties, their officers, directors, owners, professionals and agents with respect to acts or omissions through the date of confirmation of the plan by the Bankruptcy Court (the "Confirmation Date") and the plan effective date, in each case, that are consistent in substance with the releases attached to the FILO Settlement Term Sheet.

   c. Provides that administration of the Debtors' estates or any successor(s) thereto (collectively, the "Estate") will transfer to an oversight committee comprised of Alan Carr, William Transier, and Monica Blacker (the "Administrator Committee") on the Confirmation Date. The FILO Parties will have the right to consent to any successor to the Administrator Committee that is not (A) a Chapter 7 trustee or (B) a plan trust overseen by the members of the Administrator Committee (including the terms of any such successor's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

      i. The Administrator Committee shall have exclusive governance rights of the Estate, subject to appropriate Bankruptcy Court approvals.

      ii. The Administrator Committee shall retain independent counsel ("Administrator Counsel"). The Debtors and the

UCC agree to use commercially reasonable efforts to identify and transition work that could be transitioned to Administrator Counsel prior to the Confirmation Date. The FILO Parties shall be kept informed on the progress of selection of Administrator Counsel.

    iii.   The budget for the Administrator Committee's costs and expenses, as well as the budget to administer the Estate following the Confirmation Date (along with the Pre-TED Professional Fee Estimates) shall be acceptable to the UCC and the Debtors (for the avoidance of doubt, subject to the FILO Settlement Term Sheet, including the FILO Parties' budget consent rights).

d.  Repays the balance of the Retained FILO Claim (as defined in the FILO Settlement Term Sheet), after the date on which the Plan becomes effective, by paying such claim:

    i.   With interest at 7% per annum;

    ii.   Junior in priority only to all administrative, other secured and priority claims;

    iii.   Out of 10% of all distributions otherwise payable to the general unsecured creditors.

e.  Is consistent with all of the requirements of paragraphs 3 – 5 of this Term Sheet.

### Support by Unsecured Creditors Committee

2.  The Unsecured Creditors Committee will support a proposed plan that:

a.  Is consistent with all of the requirements of paragraph 1 of this Term Sheet.

b.  Establishes a fund, in an amount to be agreed by the Debtors and the UCC of up to $15,000,000 to be administered as follows:

    i.   The funds will be available to pay administrative claimants up to 50% of their allowed claims pursuant to an

> administrative claims consent program on terms and conditions acceptable to the UCC and the Debtors.
>
> ii. The payments to the administrative claimants will be paid only if so authorized in a confirmed plan.
>
> iii. If a plan is not confirmed by August 1, 2025, the funds will no longer be available to pay administrative claims.

   c. Provides for the Debtors to use up to $2.5 million, as agreed upon by the Debtors and the UCC, of the Retained Cash (as defined in the FILO Settlement Term Sheet) to fund the administration of the Estate after the Confirmation Date.

   d. The proceeds of the Class B interests shall be paid, or the Class B interests distributed, in each case, in accordance with the confirmed Plan; provided that the treatment of, and procedures for liquidating, medical malpractice claims shall be negotiated among the Debtors and the UCC.

   e. Contains releases and exculpations for the UCC, its professionals, and its members (solely in their capacities as UCC members).

### ADDITIONAL AGREMENTS TO FACILITATE CONFIRMATION

3. Through the Trust Establishment Date, the costs and expenses incurred by professionals retained by the Debtors, the UCC, and the FILO Parties listed on the "Pre-TED Professional Fee Estimates" agreed to by each of the Debtors, the UCC, the FILO Parties, and the applicable professionals that have agreed as noted thereon, shall be subject to the following terms.

   a. 10% of all allowed fees incurred between April 1, 2025, and the Trust Establishment Date shall be deferred in accordance with the terms herein (the "Deferred Fees").

   b. With respect to any (i) Estate professional fees or (ii) fees payable to Milbank or Houlihan under the FILO DIP Order, in each case, that are consistent (on an aggregate basis by firm) with the Pre-TED Professional Fee Estimates ("Estimated Fees"), such Estimated Fees (other than Deferred Fees) shall be paid consistently with, as applicable, (i) the existing interim compensation order and fee escrow structure or (ii) the FILO DIP Order.

3

    i.   To the extent that, with respect to any firm, the actual fees incurred in any month are less than the amount set forth in the Pre-TED Professional Fee Estimates for that month, the amount of such variance will roll forward and increase the budgeted amount for such firm in the following month.

    ii.   To the extent that, with respect to any firm, the actual fees incurred in any month exceed the amount set forth in the Pre-TED Professional Fee Estimates for that month, the amount of such variance can be carried forward and satisfied in future months to the extent there is availability in the Pre-TED Professional Fee Estimates for such future months.

c.  The Deferred Fees and any fees in excess of the Pre-TED Professional Fee Estimates that are allowed or otherwise payable under the FILO DIP Order ("Unestimated Fees") shall be payable as follows:

    i.   While the FILO Balance is in an Underpayment State (as defined in the FILO Settlement Term Sheet), the Deferred Fees and Unestimated Fees shall be deferred until paid pursuant to (ii), (iii), or (iv) below.

    ii.   If the FILO Balance is not in an Underpayment State, 25% of any amount otherwise payable to (i) the holders of the Class A-2 interests, and (ii) on and after December 1, 2025, the Class A-1 interests, shall be used to pay unpaid Deferred Fees and Unestimated Fees on a pro rata basis.

    iii.   Upon the effectiveness of any confirmed plan, any unpaid Unestimated Fees or Deferred Fees will be payable from Estate assets pursuant to the terms of the confirmed plan.

    iv.   If the FILO Balance is less than $25 million, any unpaid Unestimated Fees or Deferred Fees will be paid on a pro rata basis from any available proceeds that would otherwise be payable to the holders of Class A-1 interests as Variable Component (provided that such Variable Component shall be payable with the next proceeds received following repayment in full of such unpaid Unestimated Fees and Deferred Fees).

4.  The parties shall negotiate in good faith definitive documentation, including Plan, Disclosure Statement, Disclosure Statement Approval Order, and Plan Confirmation Order.  Counsel to the Debtors, the UCC, and

the FILO Parties to agree on allocation of drafting responsibility and a detailed work plan and fee estimates.

5. All transactions contemplated herein shall be implemented in a tax-efficient manner and are subject to review by tax professionals.   The transactions contemplated herein will be implemented in a manner that is intended to permit the Debtors to completely liquidate for U.S. federal income tax purposes by August 31, 2025, including by permitting all assets and obligations of the Debtors or the Estate to be transferred on or before such date to a trust or other form of bankruptcy remote entity.

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**STEWARD HEALTH CARE SYSTEM LLC,
on Behalf of Itself and its Debtor Affiliates**

By: _____
Name:  John Castellano
Title:  Chief Restructuring Officer

*Signature Page to Plan Support Agreement Term Sheet*

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

For and on behalf of **OneIM Fund I LP, as DIP Lender,** acting by its General Partner, OneIM GP LLC, acting by its Manager, GCT Capital LLC

By: _____
Name: Munish Varma
Title: Authorized Signatory

*Signature Page to Plan Support Agreement Term Sheet*

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**BRIGADE AGENCY SERVICES LLC,** as FILO Agent

By: BRIGADE CAPITAL MANAGEMENT, LP, Its Managing Manager

By: _____
Name: Patrick Criscillo
Title: Authorized Signer

*Signature Page to Plan Support Agreement Term Sheet*

**BIG RIVER GROUP FUND SPC LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE BADGER FUND, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE DIVERSIFIED CREDIT CIT**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE CREDIT FUND II LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Plan Support Agreement Term Sheet*

**BRIGADE HIGH YIELD FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE LOAN FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*Signature Page to Plan Support Agreement Term Sheet*

**BRIGADE-SIERRABRAVO FUND LP**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**CITY OF PHOENIX EMPLOYEES'
RETIREMENT PLAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FEDEX CORPORATION EMPLOYEES'
PENSION TRUST**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FUTURE DIRECTIONS CREDIT
OPPORTUNITIES FUND**,
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*Signature Page to Plan Support Agreement Term Sheet*

**JPMORGAN CHASE RETIREMENT PLAN BRIGADE BANK LOAN**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**SC CREDIT OPPORTUNITIES MANDATE, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*Signature Page to Plan Support Agreement Term Sheet*

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**MIDOCEAN CREDIT FUND MANAGEMENT, LP**

By: _____
Name: Damion Brown
Title: Managing Director

**MidOcean Tactical Credit Fund III LP**
By: Tactical Credit Fund III GP, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By: _____
Name: Damion Brown
Title: Managing Director

**MidOcean Multi Asset Credit Fund, LP**
By: MidOcean Multi Asset Credit Fund GP, LLC
its General Partner

By: _____
Name: Damion Brown
Title: Managing Director

**Abbott Abbvie Multiple Employer Pension Plan Trust**

By: _____
MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

**Abbott Laboratories Annuity Retirement Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*Signature Page to Plan Support Agreement Term Sheet*

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**OWL CREEK INVESTMENTS I, LLC**

By: OWL CREEK ASSET MANAGEMENT, LP
as Investment Manager

By: _____
Name: Kevin Dibble
Title:  General Counsel

*Signature Page to Plan Support Agreement Term Sheet*

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**WHITEHAWK FINANCE LLC**
By: WHITEHAWK CAPITAL PARTNERS, LP, as Investment Manager

By: _____
Name: Robert Louzan
Title: Managing Partner

*Signature Page to Plan Support Agreement Term Sheet*

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**The Official Committee of Unsecured Creditors**, solely in its representative capacity, and not on behalf of any individual member thereof

By: _/s/ Brad M. Kahn_
Name:  Brad M. Kahn
Title:  Partner

Akin Gump Strauss Hauer & Feld LLP, in its capacity as counsel to, and authorized signatory for, the Official Committee of Unsecured Creditors of Steward Health Care System, LLC, _et al_.

**<u>EXHIBIT C</u>**

**Liquidation Analysis**

**(To Come)**

# **EXHIBIT D**

**Release, Exculpation, and Plan Injunction Provisions**

12.3       **Pre-Confirmation Injunction and Stays**.

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

As set forth in Section 9.12 of the Plan, following entry of the Confirmation Order, the automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reinstituted and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

12.4       **Injunction Against Interference with Plan**.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date.

12.5       **Plan Injunction**.

(a)      Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 12.6(a) or Section 12.6(b) of the Plan, or (ii) subject to exculpation pursuant to Section 12.7 of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 12.7 of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such

Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to <u>Section 12.6(a)</u> or <u>Section 12.6(b)</u> of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)     Subject in all respects to <u>Section 13.1</u> of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in <u>Section 13.1</u> of the Plan, shall have jurisdiction

to adjudicate the underlying colorable Claim or Cause of Action.  For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in this <u>Section 12.5</u>, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

(d)     The injunctions in this <u>Section 12.5</u> shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

12.6     **<u>Releases</u>.**

(a)     **Releases by the Debtors and their Estates.   Except as otherwise expressly set forth below in this <u>Section 12.6</u>, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into**

in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 12.6(a) (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with Section 4.6 of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on Exhibit B of the Plan or the Schedule of Identified Non-Released Parties.

(b)     **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or

unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 12.6(b) (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)     Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties

**or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.**

12.7     **Exculpation**.

    To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the exculpations in this Section 12.7 shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

12.8     **Waiver of Statutory Limitation on Releases**.

    EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE XII OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR

CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN <u>SECTION 12.6</u> OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

12.9     **Injunction Related to Releases and Exculpation.**

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

## EXHIBIT E

**Voting Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

## SOLICITATION AND VOTING PROCEDURES

       **PLEASE TAKE NOTICE** that on May 6, 2024, Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") each filed a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On May 16, 2024, the U.S. Trustee appointed an official committee of unsecured creditors. No trustee or examiner has been appointed in these chapter 11 cases. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

       **PLEASE TAKE FURTHER NOTICE** that on [●], 2025, the Court entered the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* (Docket No. [●]) (the "**Disclosure Statement Order**"), which, among other things, (i) authorized the Debtors to solicit votes on the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and its Affiliated Debtors]* (Docket No. [●]) (the "**Plan**") and (ii) conditionally approved the *Disclosure Statement for Joint Plan of Liquidation of Steward Healthcare System LLC and Its Affiliated Debtors* (Docket No. [●]) (the "**Disclosure Statement**").[2]

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Voting Agent (as defined below) at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2]    Capitalized terms not otherwise defined herein have the same meaning as set forth in the Disclosure Statement Order, Plan, or Disclosure Statement, as applicable.

A.      **Parties Entitled to Vote.**

Holders of Claims in Class 3 (FILO Bridge Claims), Class 4 (General Unsecured Claims), and Class 5 (PBGC Claims) are Impaired and entitled to receive distributions under the Plan and, thus, may vote to accept or reject the Plan, subject to certain exceptions discussed below (each, a "**Voting Class**," and collectively, the "**Voting Classes**").

A holder of a Claim in a Voting Class is nonetheless not entitled to vote to the extent that:

(a)  as of the Voting Record Date (as defined below), the outstanding amount of such creditor's Claim is zero ($0.00);

(b)  as of the Voting Record Date, such holders' Claim has been disallowed, expunged, disqualified or suspended;

(c)  such creditor has not timely filed a Proof of Claim in accordance with the *Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim; (II) Approving Form and Manner of Notice Thereof; and (III) Granting Related Relief* (Docket No. 1564) (the "**Bar Date Order**") as of the General Bar Date or the Government Bar Date, as applicable, and the Debtors have not scheduled such creditor's Claim or have scheduled such creditor's Claim in an undetermined amount or as contingent, unliquidated, or disputed or such creditor is not required to file a Proof of Claim pursuant to the Bar Date Order; *provided*, that to the extent that such creditor's deadline to file a Claim arising from any rejection of an Executory Contract or Unexpired Lease to which such creditor is party has not yet occurred, such creditor will be entitled to vote in the amount of $1.00 on account of such Claim; or

(d)  such creditor's Claim is subject to an objection, a request for estimation, or an adversary proceeding as of **June 17, 2025 at 5:00 p.m. (Central Time)**, subject to the procedures set forth below; *provided* that, any such holder shall receive a Ballot and may submit such Ballot on a provisional basis and may elect to opt out of the Third-Party Releases contained in the Plan.  To the extent such holder does not file a Rule 3018 Motion in accordance with the instructions set forth below, the Ballot will not be counted for voting purposes; however, any opt-out election made by such holder on its Ballot with respect to the Third-Party Releases contained in the Plan shall be valid so long as such Ballot is submitted in accordance with the procedures set forth herein.  To the extent such holder files a Rule 3018 Motion in accordance with the instructions set forth below, the extent to which such Ballot shall be counted for voting purposes

2

will be determined by the Court or as otherwise agreed by the Debtors and the holder.

With respect to transfers of Claims required to be filed pursuant to Bankruptcy Rule 3001(e), the transferee shall be entitled to receive a Solicitation Package (as defined below) and, if the holder of such Claim is otherwise entitled to vote with respect to the Plan, cast a Ballot (defined below) on account of such Claim only if: (i) all actions necessary to transfer such Claim are completed by the Voting Record Date; or (ii) the transferee files with the Court, by the Voting Record Date, (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer.  In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote or election on the Plan made by the holder of such Claim as of the Voting Record Date.

Where any portion of a single Claim has been transferred to a transferee and notice of such transfer is required to be filed pursuant to Bankruptcy Rule 3001(e), all holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code, and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that: (a) a Ballot; (b) a group of Ballots within a Voting Class received from a single creditor; or (c) a group of Ballots received from the various holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion.

## B.     Parties Not Entitled to Vote.

Holders of Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) will: (i) receive full recovery of their Allowed Claims under the Plan; or (ii) otherwise receive treatment as to render such holder's Claim Unimpaired (collectively, the "**Unimpaired Classes**").  Pursuant to section 1126(f) of the Bankruptcy Code, the holders of such Claims in these Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote on the Plan.

Holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) are either plan proponents or controlled by plan proponents (the "**Plan Proponent Classes**").  Therefore, they are conclusively presumed to accept the plan and will not be solicited.

Holders of Claims and Interests in Class 7 (Subordinated Securities Claims), Class 9 (Non-Debtor Owned Subsidiary Interests), and Class 10 (Parent Interests) are Impaired and such holders are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, accordingly, are not entitled to vote on the Plan (together with the Unimpaired Classes and the Plan Proponent Classes, the "**Non-Voting Classes**").

## C.     Voting Record Date.

The Court has established **May 21, 2025** as the record date for purposes of determining (i) which holders of Claims in the Voting Classes are entitled to vote on the Plan, and

(ii) which holders of Claims and Interests are entitled to receive a Notice of Non-Voting Status (as defined below) (the "**Voting Record Date**").

**D.      Establishing Claim Amounts for Voting Purposes.**

**FILO Bridge Claims (Class 3)**.  The amount of each FILO Bridge Claim, for voting purposes only, will be established by reference to the list of FILO Bridge Lenders to the Bridge Credit Agreement and those FILO Bridge Lenders' corresponding FILO Bridge Claim amounts as of the Voting Record Date, as reflected on the loan register maintained by the FILO Bridge Agent, which shall be provided by the FILO Bridge Agent to the Debtors and the Voting Agent no later than one (1) Business Day following the Voting Record Date.

**General Unsecured Claims (Class 4)**.  Except as otherwise provided herein and solely to the extent a holder is entitled to vote under these procedures, the amount of each General Unsecured Claim in Class 4, for voting purposes only, shall be established pursuant to the following hierarchy:

(a)      if a Claim has been estimated or otherwise Allowed for voting purposes by order of the Court, such Claim is temporarily Allowed in the amount so estimated or Allowed by this Court;

(b)      if (a) does not apply, but the Claim has been estimated or otherwise Allowed for voting purposes pursuant to a stipulation, settlement, or other agreement in writing reached between the applicable Debtor(s) and the holder of the Claim (whether such stipulation, settlement, or agreement is filed or not), such Claim is temporarily Allowed against such Debtor(s) in the amount set forth in the stipulation, settlement, or other agreement;

(c)      if neither (a) nor (b) applies, then in the liquidated, non-contingent, and undisputed amount set forth on a Proof of Claim timely filed in accordance with the Bar Date Order as of the Voting Record Date; *provided that*, if the amount set forth on a timely-submitted Proof of Claim is wholly unliquidated, contingent, and/or disputed (as determined on the face of the Claim or based on reasonable review by the Debtors and/or the Voting Agent), then the Claim shall be temporarily Allowed for voting purposes in the amount of $1.00;

(d)      if neither (a), (b), nor (c) applies, then in the liquidated, non-contingent, and undisputed amount set forth on the Debtors' Schedules; *provided that*, if the Claim appearing on the Debtors' Schedules is either contingent, unliquidated, and/or disputed, or in a $0.00 amount, then the Claim shall be disallowed for voting purposes, except to the extent that such creditor's deadline to file a Claim arising from any rejection of an Executory Contract or Unexpired Lease to which such creditor is party has not yet occurred; *provided*, that, to the extent such creditor's deadline to file a Claim has not yet occurred, such creditor will be entitled to vote in the amount of $1.00 on account of such Claim;

4

(e)     notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class may be provided with only one Solicitation Package and one Ballot for voting on a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

(f)     if a Proof of Claim has been amended by a later Proof of Claim that is filed on or prior to the Bar Date, the later filed amended Proof of Claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier filed Proof of Claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended claim. Except as otherwise ordered by the Court, any amendments to Proofs of Claim after the Bar Date shall not be considered for purposes of these tabulation rules.

**PBGC Claims (Class 5).**  The amount of PBGC Claims, for voting purposes only, will be $8,750,000.

**General**.

If the Debtors have filed an objection to, a request for estimation of, or an adversary proceeding relating to a Claim, on or before **June 17, 2025 at 5:00 p.m. (Central Time)**, such Claim shall be temporarily disallowed for voting purposes, except as ordered by the Court before the Voting Deadline; *provided*, *however*, that, if the Debtors' objection seeks only to reclassify or reduce the Allowed amount of such Claim, then such Claim is temporarily Allowed for voting purposes in the reduced amount and/or as reclassified (as applicable), except as may be ordered by the Court before or concurrent with, entry of an order confirming the Plan; *provided*, *further*, that if the Debtors' objection seeks only to disallow a Proof of Claim purportedly filed on behalf of a class of claimants, then such Claim is temporarily Allowed for voting purposes only as to the individual that filed such Proof of Claim and not as to the class of claimants on behalf of which such Proof of Claim was filed.

If any holder seeks to challenge the Allowed amount of its Claim for voting purposes, such creditor must file with the Court a motion for an order pursuant to Bankrupty Rule 3018(a) temporarily allowing such Claim for voting purposes in a different amount (a "**Rule 3018(a) Motion**").  Any Rule 3018(a) Motion must be filed with the Court so as to be actually received not later than **June 24, 2025, at  5:00 p.m. (Central Time)**.

Upon the filing of any such Rule 3018(a) Motion, such holder's Provisional Ballot shall be counted in accordance with the above-designated guidelines, unless temporarily Allowed in a different amount by an order of the Court entered prior to or concurrent with entry of an order confirming the Plan.

For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims against one Debtor held by a single holder in a particular Class shall be aggregated as if such holder held one Claim in such Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan.

E.      **Form, Content, and Manner of Notices.**

### Voting Agent

The Debtors have retained Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**") as their claims, noticing, and solicitation agent pursuant to the *Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (Docket No. 29).  Pursuant to the Disclosure Statement Order, Kroll is authorized to assist the Debtors in (i) distributing the Solicitation Packages and, as applicable, the Consent Program Materials, the Notice of Non-Voting Status, or the Release Opt-Out Forms (collectively referred to as the "**Election Packages**"), (ii) receiving, tabulating, and reporting on Consent Program Opt-Out Forms cast to opt out of the Administrative Expense Claims Consent Program by holders of Allowed Administrative Expense Claims, (iii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims, (iv) receiving, tabulating, and reporting on Release Opt-Out Forms cast to opt out of the Third-Party Releases by Non-Voting Classes, (v) responding to inquiries from holders of Claims or Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the Administrative Expense Claims Consent Program by the Consent Program Materials, or the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, or the procedures and requirements to opt out of the Third-Party Releases by the Release Opt-Out Form or the Third-Party Release Opt-Out Election, (vi) soliciting votes on the Plan, and (vii) if necessary or appropriate, contacting creditors and equity holders regarding the Plan, the Ballots, the Solicitation Packages, the Election Packages, and all other related documents and matters related thereto.

### The Solicitation Package

The following materials shall constitute the Solicitation Package:

(a)      the Disclosure Statement Order, as entered by the Court and without attachments;

(b)      the conditionally approved Disclosure Statement with all exhibits thereto, including the Plan;

(c)      the Combined Hearing Notice;

(d)      these Solicitation and Voting Procedures;

(e)      the applicable Ballot customized (where possible and appropriate) for such holder and conforming to Official Bankruptcy Form No. B 314, in the form described below;[3]

---

[3]      Official Bankruptcy Form No. B 314 can be found at http://www.uscourts.gov/forms/bankruptcy-forms, the official website for the United States Bankruptcy Courts.

(f)     for holders of Claims in Class 4, the letter from the Creditors' Committee to holders of unsecured claims setting forth, among other things, the Creditors' Committee's recommendation that holders of General Unsecured Claims vote to accept the Plan (the "**Creditors' Committee Position Letter**"); and

(g)     a postage-prepaid return envelope.

Holders of Claims or Interests in a Non-Voting Class (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) shall only receive the Combined Hearing Notice, the Notice of Non-Voting Status (as defined and described below), and the Release Opt-Out Form (as defined and described below).

### Distribution of the Solicitation Package

The Solicitation Package shall provide the Disclosure Statement, the Plan, and the Disclosure Statement Order in electronic format (on a QR code included in the Combined Hearing Notice) instead of printed hard copies. Only the Ballots and the Combined Hearing Notice will be provided in paper format. Moreover, the Plan and the Disclosure Statement will be available at no charge via the internet at the Online Portal. If service by QR code imposes a hardship for any party entitled to receive a copy of the Plan and the Disclosure Statement (*e.g.*, the party does not own or have access to a smartphone), such party may request a paper copy or a USB flash drive that includes copies of the Plan, Disclosure Statement, and Disclosure Statement Order (without attachments, except the Solicitation and Voting Procedures as annexed as Exhibit 2 thereto) by contacting Kroll by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Upon receipt of such request, in a timely manner, the Debtors will provide such party with a paper copy, or USB flash drive containing, of the Plan and the Disclosure Statement at no cost to the party.

The Debtors shall mail to holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date the Solicitation Packages on or before the date that is three (3) Business Days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter (the "**Solicitation Mailing Deadline**"). The Debtors will also provide complete Solicitation Packages (excluding Ballots) to the U.S. Trustee and all parties in interest required to be notified under Bankruptcy Rule 2002 and Local Rule 2002-1.

The Debtors shall request that the FILO Bridge Agent post to its electronic datasite (i) a non-customized Solicitation Package (not including Ballots) and (ii) information to request customized Ballots from Kroll for FILO Bridge Lenders' as of the Voting Record Date as reflected on the loan register maintained by the FILO Bridge Agent. Such postings to the electronic datasite shall occur within five (5) calendar days of the mailing of the Solicitation Packages.

The Debtors are not required to mail Solicitation Packages to creditors or interest holders (i) who have Claims or Interests that have already been paid in full during the Chapter 11 Cases, (ii) whose prior mailings in these chapter 11 cases were returned as undeliverable and who have not provided a forwarding address by the Voting Record Date, (iii) who hold Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 6 (Intercompany Claims), Class 7 (Subordinated Securities Claims), Class 8 (Intercompany Interests) and Class 9 (Non-Debtor Owned Subsidiary Interests), and/or (iv) who are not otherwise entitled to vote to accept or reject the Plan in accordance with the terms and provisions of these Solicitation and Voting Procedures.

In the event that the United States Postal Service returns any mailings as undeliverable, the Debtors are excused from mailing Solicitation Packages or Notices of Non-Voting Status to addresses from which the Debtors received mailings returned as undeliverable.  For purposes of serving the Solicitation Packages and Notices of Non-Voting Status, the Debtors may rely on the address information for the holders of Claims and Interests as compiled, updated, and maintained by the Voting Agent as of the Voting Record Date.  The Debtors and the Voting Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitation Packages (including Ballots) and will not be required to resend Solicitation Packages or other materials, including Notices of Non-Voting Status, that are returned as undeliverable unless the Debtors are provided with accurate addresses for such parties prior to the Voting Record Date.

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that each holder of a Claim receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against the Debtors.

### Forms of Ballots

Holders of Claims in the Voting Classes that are eligible to vote (as set forth herein) shall receive ballots substantially in the forms attached to the Disclosure Statement Order as **Exhibits 3-5** (the "**Ballots**"), as applicable.[4]  All holders of Claims in the Voting Classes will receive a Ballot that includes an election to opt out of the third party releases in section 12.6(b) of the Plan (the "**Third-Party Releases**").  Holders of Claims in the Voting Classes that properly and timely elect to opt out of the Third-Party Releases will not be a Releasing Party or Released Party under the Plan.

### Notice of Non-Voting Status and Release Opt-Out Forms

Holders of Claims and Interests in the Non-Voting Classes in lieu of a Solicitation Package, will receive (i) the Combined Hearing Notice, (ii) a Notice of Non-Voting Status substantially in the form attached to the Disclosure Statement Order as **Exhibit 6** (the "**Notice of Non-Voting Status**"), and (iii) a Release Opt-Out Form (as defined below); *provided* that, the

---

[4]    Kroll is required to retain all paper copies of Ballots and all solicitation-related correspondence for one (1) year following the Effective Date, whereupon Kroll is authorized to destroy and/or otherwise dispose of all paper copies of Ballots; printed solicitation materials including unused copies of the Solicitation Package; and all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Court in writing within such one (1) year period.

Debtors are not required to serve holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) copies of the Combined Hearing Notice, Notice of Non-Voting Status, Release Opt-Out Form, or any other type of notice in connection with solicitation of the Plan because such Claims and Interests are held by the Debtors or the Debtors' affiliates.

The Notice of Non-Voting Status provides (i) notice of the Court's conditional approval of the Disclosure Statement, (ii) notice of the filing of the Plan and Disclosure Statement, (iii) notice of the holders' non-voting status, and (iv) information about how to obtain copies of the Disclosure Statement and the Plan. In addition, the Notice of Non-Voting Status contains the full text of the release, exculpation, and injunction provisions set forth in Article XII of the Plan and advises such holders in Non-Voting Classes that they will be bound by the Third-Party Releases unless they timely, properly, and affirmatively opt out.

The Debtors shall cause to be mailed a release opt-out form, substantially in the form attached to the Disclosure Statement Order as **Exhibit 7** (the "**Release Opt-Out Form**"), to holders of Claims and Interests in the Non-Voting Classes. For holders of Claims in the Voting Classes, the opt out option shall be on such holder's Ballot.

A holder that properly, timely, and affirmatively elects on the Release Opt-Out Form to opt out of the Third-Party Releases will not be a Releasing Party or Released Party under the Plan. An encrypted opt-out data and audit trail will be created through the electronic submission process and become part of the record of any opt-out election submitted in this manner. Additionally, any holder's electronic signature will be deemed to be legally valid and effective immediately. For the avoidance of doubt, the Voting Agent's online portal at https://restructuring.ra.kroll.com/steward/(the "**Online Portal**") is the sole method for holders of Claims and Interests in the Non-Voting Classes to transmit the Release Opt-Out Form electronically. All Release Opt-Out Forms must be properly completed and returned so as to be **actually received** by the Voting Agent by **July 1, 2025 at 5:00 p.m. (Central Time)** (the "**Release Opt-Out Deadline**") either by (i) delivering the Release Opt-Out Form to the Voting Agent by first-class mail, hand delivery, or overnight courier or (ii) submitting the Release Opt-Out Form by electronic, online transmission through the Online Portal, each in accordance with the instructions included on the Release Opt-Out Form.

F.      **Voting Deadline.**

The Court has established **July 1, 2025 (Central Time)** as the deadline to submit votes to accept or reject the Plan (the "**Voting Deadline**"). The Debtors may extend the Voting Deadline, in their discretion (in consultation with the Creditors' Committee), without further order of the Court. To be counted as a vote to accept or reject the Plan, each Ballot must be properly executed, completed, and timely delivered to the Voting Agent: (i) by first-class mail in the return envelope provided with each Ballot; (ii) by overnight mail; (iii) by hand delivery, or (iv) via E-Ballot through the Online Portal, so that (in each instance) it is **actually received** by the Voting Agent no later than the Voting Deadline.

The Voting Agent is authorized to accept Ballots through the Online Portal. The encrypted Ballot data and audit trail created by such electronic submission will become part of the

record of any Ballot submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

Holders of Claims submitting their Ballots in hard copy to the Voting Agent shall mail or deliver them to the following address:

> Steward Health Care System LLC Ballot Processing
> c/o Kroll Restructuring Administration LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

In all instances, holders should consult their Ballot for specific instructions regarding submission of their votes and any elections. The manner of Ballot submission is at the election and risk of the holders of Claims in the Voting Classes who vote on the Plan. Regardless of the manner of submission, to be counted, Ballots must be **actually, timely, and properly received** by the Voting Agent by the Voting Deadline. The Debtors strongly recommend submitting electronic Ballots through the Online Portal.

## G.    Tabulation Procedures.

### General Rules

The following voting procedures and standard assumptions shall be used in tabulating the Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of the Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules:

(a)    Whenever a holder of Claims casts more than one Ballot voting the same Claims before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline shall be deemed to reflect such creditor's intent, and thus supersede any previously received Ballot. Following the Voting Deadline, no Ballot may be changed or revoked, absent further order of the Court or as directed by the Debtors.

(b)    Whenever a holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but does not indicate either an acceptance or rejection of the Plan, such Ballot will not be counted.

(c)    Whenever a holder of a Claim casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but indicates both an acceptance and a rejection of the Plan, the Ballot will not be counted.

(d)    A holder shall be deemed to have voted the full amount of its Claim in each Class and shall not be entitled to split its vote within a particular Class or between more than one Debtor. Any such holder's Ballot that partially

10

accepts and partially rejects the Plan, between the same or multiple Debtors, will not be counted.

(e)     A Person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims should indicate such capacity when signing, and if so requested by the Debtors or the Voting Agent, must submit proper evidence satisfactory to the Debtors of its authority to so act.

(f)     A holder of Claims against more than one Debtor that casts a single Ballot shall have its votes counted separately with respect to each such Debtor.

(g)     A holder of Claims in more than one Class must use separate Ballots for each Class of Claims.

(h)     The Debtors (in consultation with the Creditors' Committee), unless subject to contrary order of the Court, may waive any defects or irregularities as to any particular irregular Ballot at any time, either before or after the Voting Deadline.

(i)     The following Ballots shall not be counted:

   i.     any Ballot received after the Voting Deadline unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot or waived the late submission;

   ii.    any Ballot that is illegible or contains insufficient information to permit the identification of the voting party;

   iii.   any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

   iv.    any Ballot cast by a Person or Entity that is not entitled to vote, even if such individual or Entity holds a Claim in a Voting Class;

   v.     any unsigned Ballot, provided that E-Ballots submitted on the Online Portal will be deemed to contain a legal, valid signature;

   vi.    any Ballot containing a vote that the Court determines, after notice and a hearing, was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code; or

   vii.   any Ballot transmitted to the Voting Agent by e-mail, facsimile, or other means not specifically approved herein.

**Miscellaneous Rules**

Each holder of Claims that votes to accept or reject the Plan is deemed to have voted the full amount of its Claim therefor.

The Voting Agent may, but is not required to, contact parties who submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies, provided that, neither the Debtors nor Voting Agent is required to contact such parties to provide notification of defects or irregularities with respect to completion or delivery of Ballots, nor will any of them incur any liability for failure to provide such notification. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors, in consultation with the Creditors' Committee, (or the Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived prior to the Voting Deadline) will be invalidated.

The Debtors and/or their Voting Agent, as applicable, in consultation with the Creditors' Committee, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots or Release Opt-Out Forms, which determination will be final and binding on all parties.

The Debtors are authorized to reject any and all Ballots submitted by any holders of Claims not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, in consultation with the Creditors' Committee, be unlawful.

The Debtors (in consultation with the Creditors' Committee) are further authorized to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any holders of Claims. The interpretation (including the Ballot and the respective instructions thereto) by the Debtors in accordance with the foregoing sentence will be final and binding on all parties.

The Debtors or their Voting Agent shall file the Voting Report on or before **July 7, 2025**.

## H.     Combined Hearing Notice.

Within three (3) Business Days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Notice Parties and holders of Claims and Interests in the Non-Voting Classes via e-mail or first-class mail a copy of the Combined Hearing Notice, which sets forth (i) the Voting Deadline, (ii) the Combined Objection Deadline and procedures for filing objections and responses to confirmation of the Plan, (iii) the time, date, and place for the Combined Hearing, and (iv) information about the Plan's release and injunction provisions in compliance with Bankruptcy Rule 2002(c)(3). The Debtors will separately serve holders of Claims in the Voting Classes with the Combined Hearing Notice as part of their Solicitation Packages.

The Debtors may, in their discretion, give supplemental publication notice of the Combined Hearing, no later than twenty-eight (28) days prior to the Combined Hearing, in one or more local or foreign newspapers, trade journals, or similar publications as the Debtors deem appropriate.

**The Debtors (in consultation with the Creditors' Committee) reserve the right and are authorized to make non-substantive or immaterial changes to the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Ballots, the Solicitation and Voting Procedures, the Combined Hearing Notice, the Release Opt-Out Form, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages before their distribution.**

**<u>EXHIBIT F</u>**

**Debtors' Organizational Chart**

Steward
Steward Health Care Investors LLC (DE)
Steward Health Care Holdings LLC (DE)
Steward Health Care System LLC (DE)
Steward Imaging & Radiology Holdings LLC (DE)
Breast Imaging Centers of Florida, LLC (JV) (FL)
Steward Florida Holdings LLC (DE)
Steward Hospital Holdings LLC (DE)
Steward Employer Solutions LLC (DE)
Steward Operations Holdings LLC (DE)
Stewardship Health, Inc. (DE)
Steward Health Care Network, Inc. (DE)
Steward Medical Holdings LLC (DE)
Steward Easton Hospital, Inc. (DE)
Steward Pennsylvania Holdings LLC (DE)
Steward ASC Holdings LLC (DE)
IASIS Healthcare Corporation (DE)
Steward A/R Co, LLC
Steward Ohio Holdings LLC (DE)
TRACO Investment Management LLC (DE)
TRACO International Group S. DE R.L. (Panama)
Steward Medical Group, Inc. (MA)
Apice Health LLC (Panama)
Steward PET Imaging LLC (MA)
Steward CGH, Inc. (DE)
Steward Florida ASC LLC (DE)
Steward NSMC, Inc. (DE)
Steward Carney Hospital, Inc. (DE)
Steward Good Samaritan Medical Center, Inc. (DE)
Steward Fall River Management Care Services LLC (DE)
Steward Valley Regional Ventures, Inc. (DE)
Steward Good Samaritan Occupational Health Services, Inc. (DE)
Steward Special Projects LLC (DE)
Steward Accountable Care Organization, Inc. (DE)
Blackstone Medical Center, Inc. (DE)
Nashoba Valley Medical Center, A Steward Family Hospital, Inc. (DE)
Steward Sharon Regional Health System, Inc. (DE)
Steward TSC Investments LLC (DE)
SHC Youngstown Ohio Laboratory Services Co. LLC (DE)
SHC Youngstown Ohio PSC LLC (DE)
Steward Trumbull Memorial Hospital, Inc. (DE)
NeuroSkeletal Imaging, LLC (JV) (FL)
Brevard SHC Holdings LLC (DE)
Steward FMC, Inc. (DE)
Steward PGH, Inc. (DE)
Steward Norwood Hospital, Inc. (DE)
Steward Holy Family Hospital, Inc. (DE)
Steward Good Samaritan Radiation Oncology Center, Inc. (DE)
Steward St. Elizabeth's Realty Corp. (DE)
Steward Medical Ventures, Inc. (MA)
Stewardship Health Medical Group, Inc. (MA)
Steward Health Care Network ACO Texas, Inc. (TX)
Blackstone Rehabilitation Hospital, Inc. (DE)
New England Sinai Hospital, A Steward Family Hospital, Inc. (DE)
Sharon Regional Diagnostic & Imaging Center, Neshannock LLC (JV) (PA)
SHC Youngstown Ohio Outpatient Services LLC (DE)
Steward Hillside Rehabilitation Hospital, Inc. (DE)
Steward Anesthesiology Physicians of Florida, Inc. (DE)
Steward Sebastian River Medical Center, Inc. (DE)
Steward HH, Inc. (DE)
Steward Rockledge Hospital, Inc. (DE)
Steward Florida ALF LLC (DE)
Steward St. Anne's Hospital Corporation (DE)
Steward Health Care International LLC (DE)
Boston Orthopedic Center, LLC (MA)
Altus ACE, LLC (TX)
Steward Healthcare Management Services LLC (DE)
Morton Hospital, A Steward Family Hospital, Inc. (DE)
Quincy Medical Center, A Steward Family Hospital, Inc. (DE)
Space Coast Propco-Sebastian, LLC (DE)
Space Coast Propco-Melbourne, LLC (DE)
Steward Melbourne Hospital, Inc. (DE)
Space Coast Propco-Rockledge, LLC (DE)
Steward Hospital Holdings Subsidiary One, Inc. (DE)
Steward St. Elizabeth's Medical Center of Boston, Inc. (DE)
Steward New England Initiatives, Inc. (DE)
Stewardship Services Inc. (DE)
Steward Medicaid Care Network, Inc. (DE)
Mesa General Hospital, LP (DE)
MT Transition LP (DE)
IASIS Healthcare LLC (DE)
PP Transition LP (DE)
St. Luke's Behavioral Hospital, LP (DE)
St. Luke's Medical Center, LP (DE)
TNC Transition LP (DE)
Boston Sports Medicine and Research Institute, LLC (MA)
OnSite Care, Inc. (DE)
OnSite Care MSO, LLC (DE)
Steward Anesthesiology Physicians of Pennsylvania, Inc. (DE)
Steward Emergency Physicians of Florida, Inc. (DE)
Steward Emergency Physicians of Pennsylvania, Inc. (MA)
Steward Emergency Physicians Ohio, Inc. (MA)
Steward Emergency Physicians, Inc. (MA)
Steward Medical Group Express Care, Inc. (MA)
Steward Medical Group Pennsylvania Endoscopy LLC (DE)
Steward Pathology Physicians of Massachusetts, Inc. (MA)
Steward Physician Contracting, Inc. (MA)
Steward Radiology Physicians of Florida, Inc. (DE)
Steward Radiology Physicians of Massachusetts, Inc. (MA)
Steward Radiology Physicians of Pennsylvania, Inc. (DE)
Steward Anesthesiology Physicians of Massachusetts, Inc. (MA)
Massachusetts Express Care, PLLC (JV) (MA)
Arizona Diagnostic & Surgical Center, Inc. (DE)
Choice Care Clinic of Louisiana, Inc. (DE)
Choice Care Clinic of Utah, Inc. (DE)
Davis Surgical Center Holdings, Inc. (DE)
Glenwood Specialty Imaging, LLC (DE)
HC Essential Co. (TX)
Health Choice Florida, Inc. (FL)
Health Choice Louisiana, Inc. (LA)
Health Choice Managed Care Solutions LLC (DE)
Health Choice Preferred Louisiana ACO LLC (DE)
IASIS Capital Corporation (DE)
IASIS Finance II LLC (DE)
IASIS Finance III LLC (DE)
IASIS Management Company (DE)
IASIS Transco, Inc. (DE)
Indigent Care Services of Northeast Louisiana, Inc. (DE)
Odessa Fertility Lab, Inc. (DE)
Physician Group of Florida, Inc. (DE)
Physician Group of Louisiana, Inc. (DE)
Physician Group of Utah, Inc. (UT)
PP Transition, Inc. (DE)
Riverwoods ASC Holdco LLC (DE)
Seaboard Development Port Arthur LLC (DE)
Southridge Plaza Holdings, Inc. (DE)
Steward Emergency Physicians of Arizona, Inc. (DE)
Steward Health Care OZ Fund, Inc. (DE)
Steward Health Choice, Inc. (AZ)
Steward Radiology Physicians of Arizona, Inc. (DE)
Salt Lake Regional Physicians, Inc. (DE)
Utah Transcription Services, Inc. (DE)
Heritage Technologies, LLC (JV) (AZ)
Southwest General Hospital, LP (DE)
Biltmore Surgery Center Holdings, Inc. (DE)
Biltmore Surgery Center, Inc. (AZ)
Health Choice Northern Arizona LLC (AZ)
Health Choice Integrated Care, LLC (AZ)
Odessa Regional Hospital, LP (DE)
Permian Basin Clinical Services, Inc. (TX)
IASIS Finance, Inc. (DE)
IASIS Finance Texas Holdings, LLC (DE)
Seaboard Development LLC (UT)
Mountain Point Holdings LLC (DE)
Mountain Vista Medical Center, LP (DE)
Davis Hospital Holdings, Inc. (DE)
Davis Hospital & Medical Center, LP (DE)
Jordan Valley Hospital Holdings, Inc. (DE)
Jordan Valley Medical Center, LP (DE)
Salt Lake Regional Medical Center, LP (DE)
Health Choice Preferred Arizona ACO LLC (DE)
Physician Group of Arizona, Inc. (DE)
Health Choice Preferred Arizona Physician Association LLC (DE)
Health Choice Preferred Utah ACO LLC (DE)
HealthUtah Holdco LLC (UT)
Beaumont Hospital Holdings, Inc. (DE)
The Medical Center of Southeast Texas, LP (DE)
Jefferson County Clinical Services, Inc. (JV) (Non-Profit) (TX)
Downtown Houston Physician Hospital Organization (Non-Profit) (TX)
Steward SA FSED Holdings, Inc. (DE)
Converse Medical Center LLC (TX)
De Zavala Medical Center LLC (TX)
Legacy Trails Medical Center LLC (TX)
Steward West Ventures, Co. (DE)
Health Choice Preferred Accountable Care LLC (DE)
Health Choice Utah Accountable Care LLC (DE)
Brim Physicians Group of Colorado, LLC (CO)
Physician Group of Arkansas, Inc. (DE)
Brim Healthcare of Colorado, LLC D/B/A Pikes Peak Regional Hospital (CO)
Brim Holding Company, Inc. (DE)
NLV Healthcare Development, LP (JV) (DE)
IASIS Healthcare Holdings, Inc. (DE)
Choice Care Clinic I, Inc. (Non-Profit) (TX)
Permian Premier Health Services, Inc. (Non-Profit) (TX)
Choice Care Clinic II, Inc. (Non-Profit) (TX)
Choice Care Clinic III, Inc. (Non-Profit) (TX)
IASIS Glenwood Regional Medical Center, LP (DE)
Northeast Louisiana Cancer Institute, L.L.C. (JV) (LA)
LHCG V, L.L.C. (JV) (LA)
Patient's Choice Hospice & Palliative Care Center of Louisiana, L.L.C. (JV) (LA)
Northeast Louisiana Physician Hospital Organization, Inc. (JV) (LA)
Key
Guarantors
Debtors
Bridge Loan Guarantor
FILO DIP Guarantor
Debtor
Non-Debtor
* All ownership percentages are 100% unless otherwise noted.
**Percentages in red indicate ownership by IASIS Healthcare Holdings, Inc.

