IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC**, *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | Re: Docket No. 4746 |

NOTICE OF FILING (I) LITIGATION TRUST AGREEMENT,
(II) COMMITMENT LETTER AND (III) TRANSITION SERVICES AGREEMENT

**PLEASE TAKE NOTICE THAT**:

1.      On May 6, 2024, Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**"), each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code.

2.      On April 28, 2025, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* (Docket No. 4746) (the "**Motion**"),[2] with a proposed order granting the relief requested therein attached as <u>Exhibit A</u> thereto (the "**Proposed Order**"), and the Settlement Term Sheet, the DIP Amendment, the Cure Notice, and the Litigation Trust Tax and Other Matters attached thereto as <u>Exhibits 1–4</u>.

3.      In connection with the Motion, the Debtors, the FILO Secured Parties, and the Creditors' Committee (collectively, the "**Parties**") negotiated substantially final versions of the following definitive documents (the "**Definitive Documents**"):

- **Exhibit A**: the Litigation Trust Agreement;

- **Exhibit B**: the Commitment Letter; and

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion and Proposed Order, as applicable.

- **<u>Exhibit C</u>**: the Transition Services Agreement.

4.      The Definitive Documents attached hereto as **<u>Exhibits A–C</u>** remain subject to further review, negotiation, and modification.  The Parties reserve all rights to amend, revise, or supplement the Definitive Documents, and any of the documents and designations contained therein.

Dated:  May 25, 2025
        Houston, Texas

 _/s/  Clifford W. Carlson_____

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
         Clifford.Carlson@weil.com
         Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Jeffrey D. Saferstein (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Jeffrey.Saferstein@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:   DavidJ.Cohen@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

LATHAM & WATKINS LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864
Email:   Ray.Schrock@lw.com
         Candace.Arthur@lw.com

*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on May 25, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*<u>/s/ Clifford W. Carlson</u>*
Clifford W. Carlson

## Exhibit A

**Litigation Trust Agreement**

*Filing Version 5/25/2025*

## LITIGATION TRUST AGREEMENT

THE TRUST INTERESTS REPRESENTED BY THIS LITIGATION TRUST AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER APPLICABLE RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN, UNLESS OTHERWISE PROVIDED HEREIN.

## CONTENTS

ARTICLE I DEFINITIONS ................................................................................................2

ARTICLE II ESTABLISHMENT OF THE LITIGATION TRUST ...............................14
    2.1    Establishment of the Litigation Trust and Appointment of the Trustee. .............14
    2.2    Transfer of the Trust Assets. .............................................................................15
    2.3    Funding of the Litigation Trust; Trust Assets. ...................................................15
    2.4    Fees and Expenses. ...........................................................................................15
    2.5    Nature and Purpose of the Litigation Trust. ......................................................17
    2.6    Estate Funding. ................................................................................................17
    2.7    Privileges. ........................................................................................................17
    2.8    Secured Interim Advances ................................................................................18
    2.9    Conditions Precedent .......................................................................................18

ARTICLE III TRUST INTERESTS; TRUST REPRESENTATIVES .........................19
    3.1    Trust Interests. .................................................................................................19
    3.2    Interests Beneficial Only; Standing ..................................................................20
    3.3    Representatives. ................................................................................................20
    3.4    Transferability of Trust Interests .....................................................................21
    3.5    Books and Records Regarding Trust Interests ..................................................22
    3.6    Securities Act; Securities Exchange Act; Investment Company Act ..................22
    3.7    Effect of Death, Incapacity or Bankruptcy .......................................................23
    3.8    Absolute Owners ..............................................................................................23

ARTICLE IV RIGHTS, POWERS AND DUTIES OF TRUSTEE ...............................23
    4.1    Role of the Trustee ...........................................................................................23
    4.2    Fiduciary Duties ...............................................................................................24
    4.3    Variable Component. ........................................................................................24
    4.4    Distributions. ....................................................................................................25
    4.5    Retention of Counsel and Other Professionals .................................................27
    4.6    Management of Trust Assets .............................................................................28
    4.7    Investment of Cash ..........................................................................................28
    4.8    Disposition of Specified Claims. ......................................................................28
    4.9    Additional Powers of the Trustee .....................................................................30
    4.10    Limitations on Power and Authority of the Trustee ..........................................32
    4.11    Trust Records ...................................................................................................33
    4.12    Fiscal Year. ......................................................................................................33
    4.13    Reports; Budgets. .............................................................................................33
    4.14    Notice of Material Decisions; Consultation and Meetings with Trust Beneficiaries ...................................................................................................35
    4.15    Togut Reporting ...............................................................................................35
    4.16    Coordination ....................................................................................................35

ARTICLE V THE TRUSTEE GENERALLY .............................................................36
    5.1    Trustee. ............................................................................................................36
    5.2    Trustee's Compensation and Reimbursement. ...................................................36
    5.3    Resignation and Removal; Incapacitation ........................................................36
    5.4    Effect of Resignation or Removal or Incapacity ...............................................37

| | | | |
|---|---|---|---|
| | 5.5 | Appointment of Successor Trustee | 37 |
| | 5.6 | Confidentiality | 37 |
| **ARTICLE VI** | **LIABILITY AND INDEMNIFICATION** | | 37 |
| | 6.1 | No Further Liability | 37 |
| | 6.2 | Indemnification of the Trustee. | 38 |
| | 6.3 | Indemnification of the Litigation Funding Agent and the Class A-2 Representative. | 38 |
| | 6.4 | Indemnification of the Class A Trust Beneficiaries. | 39 |
| | 6.5 | Litigation Trust Liabilities | 40 |
| **ARTICLE VII** | **TAX MATTERS** | | 41 |
| | 7.1 | Tax Reporting and Payment. | 41 |
| | 7.2 | Withholding of Taxes. | 43 |
| | 7.3 | Foreign Tax Matters | 43 |
| **ARTICLE VIII** | **TERMINATION OF LITIGATION TRUST** | | 44 |
| | 8.1 | Termination | 44 |
| | 8.2 | Continuance of Litigation Trust for Winding Up | 44 |
| **ARTICLE IX** | **AMENDMENT AND WAIVER** | | 44 |
| **ARTICLE X** | **MISCELLANEOUS PROVISIONS** | | 45 |
| | 10.1 | Governing Law | 45 |
| | 10.2 | Jurisdiction | 45 |
| | 10.3 | Severability | 45 |
| | 10.4 | Notices | 45 |
| | 10.5 | Headings | 46 |
| | 10.6 | Entire Agreement | 47 |
| | 10.7 | Successors and Assigns | 47 |
| | 10.8 | Limitations | 47 |
| | 10.9 | Non-Recourse | 47 |
| | 10.10 | Further Assurances | 47 |
| | 10.11 | Counterparts | 47 |
| Schedule 1 | Trust Beneficiaries and Trust Interests | | 50 |
| Schedule 2 | Trust Assets | | 51 |
| Schedule 3 | Specified Claims | | 57 |
| Schedule 4 | Pre-TED Professional Fee Estimates | | 58 |
| Exhibit A | Compensation of Trustee | | 59 |
| Exhibit B | Form of Variance Report | | 60 |
| Exhibit C | Form of Joinder Agreement | | 61 |
| Exhibit D | Litigation Funding Budget | | 62 |
| Exhibit E | Form of Transition Services Agreement | | 63 |
| Exhibit F | Form of Commitment Letter | | 64 |
| Exhibit G | Form of Approval Order | | 65 |

WEIL\100499761\15\76000.0004

**LITIGATION TRUST AGREEMENT**

This LITIGATION TRUST AGREEMENT (this "Agreement") is made this [[●] day of [●]][1], 2025 (the "Effective Date") by Mark Kronfeld of Province Fiduciary Services, LLC, not individually but solely in his capacity as trustee (the "Trustee"), and creates, declares and establishes the Litigation Trust (the "Litigation Trust") as contemplated under the Approval Order (as defined below), which provides for, among other things, the establishment of the Litigation Trust evidenced hereby and the transfer by the Debtors (as defined below) of certain property to the Litigation Trust.

## RECITALS

WHEREAS, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on May 6, 2024 in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), which cases are being jointly administered for procedural purposes only in the cases styled *In re Steward Health Care System LLC, et al.*, Ch 11. Case No. 24-90213 (CML) (collectively, the "Chapter 11 Cases");

WHEREAS, on April 28, 2025, the Debtors, the FILO Parties and the Creditors' Committee (each as defined below) entered into that certain *Settlement and Stay Relief Term Sheet* (the "Term Sheet");

WHEREAS, on [●], 2025, the Bankruptcy Court entered the *Order (I) Approving Settlement With FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* (Docket No. [●]) (the "Approval Order") approving, among other things, the Term Sheet and this Agreement;

WHEREAS, the Approval Order and, to the extent that the Plan is confirmed and the Confirmation Order (each as defined below) remains in full force and effect, the Confirmation Order, provide, among other things, for (a) the creation and establishment of the Litigation Trust for the benefit of the Litigation Funders, the FILO Parties and the Estate (each as defined below), (b) the transfer of the Trust Assets (as defined below) by the Debtors to the Litigation Trust, free and clear of all liens, claims, charges, encumbrances, contractually imposed restrictions, interests, and constructive trusts to the fullest extent permitted by law and (c) the issuance of (i) Class A-1 Trust Interests (as defined below) to the Litigation Funders, (ii) Class A-2 Trust Interests (as defined below) to the FILO Parties and (iii) Class B Trust Interests (as defined below) to Steward Health Care Holdings LLC on behalf of the Estate;

WHEREAS, the Effective Date of this Agreement is the "Trust Establishment Date" under the Approval Order;

WHEREAS, the Litigation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671-679 of the Internal Revenue Code of 1986, as amended (the "IRC") and the U.S. Treasury regulations promulgated thereunder ("Treasury Regulations"), of which holders of the Class A Trust Interests (as defined below) and the Class B Trust Interests are the grantors; and

WHEREAS, the Litigation Trust, via the Trustee, shall have the authority to initiate, file, prosecute, enforce, abandon, monetize, settle, compromise, release, mediate, move, dismiss, withdraw or litigate to judgment the Trust Claims (as defined below), in each case as set forth in and subject to the limitations in

---

[1] Note to Draft: To be the earlier of (i) July 8, 2025 and (ii) one (1) business day after the confirmation date of the Plan.

this Agreement, and the Trustee shall have all powers necessary to implement the provisions of this Agreement and administer the Litigation Trust, in each case as set forth in this Agreement.

NOW, THEREFORE, pursuant to the Approval Order and, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order, in consideration of the promises, the mutual agreements of the parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Trustee hereby declares and agrees as follows:

## ARTICLE I
## DEFINITIONS

For all purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Approval Order, including the Term Sheet attached thereto.

"Administrative Tasks" has the meaning set forth in Section 4.5(b)(i).

"Affiliate Class A Indemnitors" has the meaning ascribed to such term in Section 6.4(d).

"Affiliate Representative Indemnitors" has the meaning ascribed to such term in Section 6.3(c).

"Agreement" has the meaning ascribed to such term in the Preamble.

"Allowed Claims" means, to the extent that the Plan is confirmed and the Confirmation Order remains in full force and effect, all Claims that are "Allowed" pursuant to the Plan.

"Allowed FILO DIP Claims" means all Claims held by a FILO DIP Lender (as defined in the FILO DIP Order) under the FILO DIP Credit Agreement (as defined in the FILO DIP Order) and FILO DIP Order as of the Effective Date, including principal, interest, fees, costs, other charges, and expenses provided for thereunder.

"Allowed Remaining FILO Bridge Claims" means all Claims held by a FILO Bridge Lender (as defined in the FILO DIP Order) under the Prepetition Bridge Credit Agreement (as defined in the FILO DIP Order), other than the Retained FILO Claims, as of the Effective Date, including principal, interest, fees, costs, other charges, and expenses provided for thereunder (other than with respect to the Bridge MOIC, but including the MOIC Payment).

"Applicable Rate" means a rate equal to:

(a)     10.00% per annum from (and including) the Effective Date to (and including) September 30, 2025;

(b)     10.50% per annum from (and including) October 1, 2025 to (and including) December 31, 2025;

(c)     11.00% per annum from (and including) January 1, 2026 to (and including) March 31, 2026;

(d)     11.25% per annum from (and including) April 1, 2026 to (and including) June 30, 2026;

2

   (e)  11.50% per annum from (and including) July 1, 2026 to (and including) September 30, 2026;

   (f)  11.75% per annum from (and including) October 1, 2026 to (and including) December 31, 2026; and

   (g)  12.00% per annum from (and including) and after January 1, 2027.

  "<u>Approval Order</u>" has the meaning ascribed to such term in the Recitals.

  "<u>Available Cash</u>" means, as of any time of determination, the excess of (a) all Cash then held by the Litigation Trust over (b) reserves reasonably determined by the Trustee to be necessary or appropriate, it being understood that such reserves shall not exceed an amount equal to (x) expenses payable in the following quarter expressly set forth in the Litigation Funding Budget (but taking into account, and net of, amounts available to be drawn under the Commitment Letter to pay such amounts), *plus* (y) $1,000,000. For the avoidance of doubt, Available Cash shall be determined in all cases consistent with the liquidating purpose of the Litigation Trust and the intended treatment of the Litigation Trust as a "liquidating trust" under Treasury Regulation section 301.7701-4(d).

  "<u>Avoidance Actions</u>" means all Claims and Causes of Action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code, and any state law fraudulent transfer claims.

  "<u>Bankruptcy Code</u>" has the meaning ascribed to such term in the Recitals.

  "<u>Bankruptcy Court</u>" has the meaning ascribed to such term in the Recitals.

  "<u>Books and Records</u>" has the meaning ascribed to such term in <u>Section 4.11</u>.

  "<u>Bridge MOIC</u>" means the obligations of certain Debtors constituting the MOIC Amount (as defined in the Prepetition Bridge Credit Agreement) under the Prepetition Bridge Credit Agreement.

  "<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which the Federal Reserve Bank of New York is authorized or required by law or executive order to close or be closed.

  "<u>Cash</u>" means the lawful currency of the United States of America and equivalents thereof.

  "<u>Cause</u>" means, with respect to the Trustee, the Trustee's (i) conviction, commission or indictment of a felony or any other crime involving moral turpitude or dishonesty; (ii) commission of any act of fraud, intentional misrepresentation, misappropriation, theft or embezzlement; (iii) willful misconduct or gross negligence in connection with the performance of the Trustee's duties to the Litigation Trust; (iv) violation of any fiduciary duty owed to the Trust Beneficiaries; or (v) material breach of the terms of this Agreement.

  "<u>Cause of Action</u>" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whenever arising, whether in law or equity, whether sounding in tort or contract, whether asserted in arbitration, a court or regulatory proceeding, or otherwise, whether arising under federal or state statutory or common law, or any other

applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including under any state or federal securities laws. Causes of Action also include (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) Avoidance Actions, and (iii) any claim or defense, including fraud, mistake, duress, or usury and any other defenses set forth in section 558 of the Bankruptcy Code.

"Chapter 7" means chapter 7 of the Bankruptcy Code.

"Chapter 11 Cases" has the meaning ascribed to such term in the Recitals.

"Claim" means a "claim," as defined in section 101(5) of the Bankruptcy Code.

"Class A Expenses" means the Litigation Funding Agent Expenses, the Class A-2 Representative Expenses and the Class A Trust Beneficiary Expenses.

"Class A Parties" means the Litigation Funding Agent, the Class A-2 Representative and the Class A Trust Beneficiaries.

"Class A Trust Beneficiaries" means Class A-1 Trust Beneficiaries and Class A-2 Trust Beneficiaries.

"Class A Trust Beneficiary Expenses" has the meaning ascribed to such term in Section 2.4(c).

"Class A Trust Interests" means the Class A-1 Trust Interests and the Class A-2 Trust Interests.

"Class A-1 Preference" means, at the applicable time of determination, an amount equal to (a) the Litigation Funding, *plus* all accreted amounts accrued on the Class A-1 Preference (calculated in accordance with the immediately succeeding sentence) as of such time, *minus* (b) the aggregate amount, if any, of cash distributed to the Class A-1 Trust Beneficiaries by the Litigation Trust on or prior to such time pursuant to Section 4.4(b)(iii) (provided that any amount that was previously distributed to the Class A-1 Trust Beneficiaries by the Litigation Trust on account of the Class A-1 Preference pursuant to Section 4.4(b)(iii) and that the Class A-1 Trust Beneficiaries are required in a Disgorgement Claim to disgorge, turn over or otherwise pay shall not be included in this clause (b) from and after such disgorgement or other repayment until such amount has been repaid by the Litigation Trust to the Class A-1 Trust Beneficiaries as a Beneficiary Indemnified Loss pursuant to Sections 4.4(b)(i) and 6.4(a)). The Class A-1 Preference shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, shall accrete and be added to the balance of the Class A-1 Preference on the last day of each month; provided that, to the extent the Litigation Funders commit to provide additional Litigation Funding in excess of $125,000,000 (without any additional fees or premiums) in amounts equal to and for the specific purpose of covering the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

"Class A-1 Trust Beneficiary" means a holder of Class A-1 Trust Interests.

"Class A-1 Trust Interests" means beneficial interests of the Litigation Trust designated as "Class A-1 Trust Interests" and having the rights and obligations specified with respect to "Class A-1 Trust Interests" in this Agreement.

"Class A-2 Bridge Preference" means, at the applicable time of determination, an amount equal to the sum of (a) the FILO Bridge Balance, *plus* (b) the MOIC Balance.

4

"<u>Class A-2 Bridge Trust Beneficiary</u>" means a holder of Class A-2 Bridge Trust Interests.

"<u>Class A-2 Bridge Trust Interests</u>" means beneficial interests of the Litigation Trust designated as "Class A-2 Bridge Trust Interests" and having the rights and obligations specified with respect to "Class A-2 Bridge Trust Interests" in this Agreement.

"<u>Class A-2 DIP Preference</u>" means, at the applicable time of determination, an amount equal to the sum of (a) the FILO DIP Balance, *plus* (b) the FILO DIP Exit Premium Balance.

"<u>Class A-2 DIP Trust Beneficiary</u>" means a holder of Class A-2 DIP Trust Interests.

"<u>Class A-2 DIP Trust Interests</u>" means beneficial interests of the Litigation Trust designated as "Class A-2 DIP Trust Interests" and having the rights and obligations specified with respect to "Class A-2 DIP Trust Interests" in this Agreement.

"<u>Class A-2 Preference</u>" means, at the applicable time of determination, an amount equal to the sum of (a) the Class A-2 DIP Preference, *plus* (b) the Class A-2 Bridge Preference.

"<u>Class A-2 Representative</u>" has the meaning ascribed to such term in <u>Section 3.3(b)</u>.

"<u>Class A-2 Representative Expenses</u>" has the meaning ascribed to such term in <u>Section 2.4(e)</u>.

"<u>Class A-2 Representative Fees</u>" has the meaning ascribed to such term in <u>Section 2.4(e)</u>.

"<u>Class A-2 Representative Fees and Expenses</u>" has the meaning ascribed to such term in <u>Section 2.4(e)</u>.

"<u>Class A-2 Trust Beneficiary</u>" means a holder of Class A-2 Trust Interests.

"<u>Class A-2 Trust Interests</u>" means the Class A-2 DIP Trust Interests and the Class A-2 Bridge Trust Interests.

"<u>Class B Representative</u>" has the meaning ascribed to such term in <u>Section 3.3(c)</u>.

"<u>Class B Trust Beneficiary</u>" means a holder of Class B Trust Interests.

"<u>Class B Trust Interests</u>" means beneficial interests of the Litigation Trust designated as "Class B Trust Interests" and having the rights and obligations specified with respect to a "Class B Trust Interest" in this Agreement.

"<u>Commitment Letter</u>" means that certain *Funding Commitment Letter* entered into by the Funding Parties (as defined therein), dated as of May [●], 2025.

"<u>Confirmation Order</u>" means, to the extent entered and remaining in full force and effect, the order of the Bankruptcy Court confirming the Plan.

"<u>Contracting Parties</u>" has the meaning ascribed to such term in <u>Section 10.9</u>.

"<u>Creditors' Committee</u>" means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

5

"<u>Debtors</u>" means each of the debtors in the Chapter 11 Cases.

"<u>Deferred Fees</u>" means 10% of all allowed fees or fees payable to the professionals that are listed on the Pre-TED Professional Fee Estimates incurred between April 1, 2025, and the Effective Date.

"<u>Deferred Portion</u>" means 5% of the Trust Litigation Proceeds to be held in escrow (subject to <u>Section 4.3(a)</u>).

"<u>Disgorgement Claim</u>" has the meaning ascribed to such term in <u>Section 6.4(a)</u>.

"<u>Effective Date</u>" has the meaning ascribed to such term in the Preamble.

"<u>Entity</u>" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"<u>Estate</u>" means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code or any successor(s) thereto or any assigns thereof.

"<u>Estate Funding</u>" means payment by the Litigation Trust, upon the occurrence of the Effective Date, of $6,500,000 to the Estate (or, for the avoidance of doubt, any successor liquidating vehicle) to fund costs and expenses of the Estate and the Estate's professionals incurred after the Effective Date and, for the avoidance of doubt, of any successor liquidating vehicle (or representative thereof) established to hold the Class B Trust Interests and any other remaining assets of the Debtors.

"<u>Estate Representative</u>" means either (i) the Debtors (prior to entry of the Confirmation Order), (ii) to the extent that the Plan is confirmed and the Confirmation Order remains in full force and effect, the Plan Administrator Committee (on or after entry of the Confirmation Order until the date the Plan Trust is established in accordance with the Plan), or (iii) to the extent that the Plan is confirmed and the Confirmation Order remains in full force and effect, the trustee of the Plan Trust as contemplated by the Plan (on or after the date the Plan Trust is established in accordance with the Plan), each as applicable.

"<u>FILO Balance</u>" means, at the applicable time of determination, an amount equal to the sum of (a) the outstanding Class A-2 Preference (including all accreted amounts accrued thereon), *plus* (b) the outstanding Class A-2 Representative Fees and Expenses subject to the limitations set forth in <u>Section 2.4(b)</u>, *plus* (c) the outstanding Class A-1 Preference, *plus* (d) the outstanding indemnification obligations of the Litigation Trust with respect to the Litigation Funding Agent and the Class A-2 Representative, *plus* (e) and the outstanding Class A Trust Beneficiary Expenses of the Litigation Funding Agent and Class A-1 Trust Beneficiaries (subject to the limitations set forth in <u>Section 2.4(b)</u>), *plus* (f) the outstanding Litigation Funding Agent Fees and Expenses (subject to the limitations set forth in <u>Section 2.4(b)</u>), *plus* (g) any unpaid Variable Component that has been earned (for the avoidance of doubt, (i) before October 2, 2026, any Deferred Portion held in escrow shall not constitute part of the FILO Balance and (ii) the Variable Component shall be subject to adjustment, if applicable, in connection with any Post-FILO Repayment Variable Component).

"<u>FILO Balance Repayment Date</u>" means the first date that the FILO Balance has been reduced to $0.

"FILO Bridge Balance" means, at the applicable time of determination, an amount equal to (a) the sum of (i) $[●][2], *plus* (ii) all accreted amounts accrued on the FILO Bridge Balance (calculated in accordance with the immediately succeeding sentence) as of such time, *minus* (b) the sum of (i) the amount, if any, of cash distributed to the Class A-2 Bridge Trust Beneficiaries by the Litigation Trust on account of the FILO Bridge Balance on or prior to such time pursuant to Section 4.4(b)(v) (provided that any amount that was previously distributed to the Class A-2 Bridge Trust Beneficiaries by the Litigation Trust on account of the FILO Bridge Balance pursuant to Section 4.4(b)(v) and that the Class A-2 Bridge Trust Beneficiaries are required in a Disgorgement Claim to disgorge, turn over or otherwise pay shall not be included in this clause (i) from and after such disgorgement or other repayment until such amount has been repaid by the Litigation Trust to the Class A-2 Bridge Trust Beneficiaries as a Beneficiary Indemnified Loss pursuant to Sections 4.4(b)(i) and 6.4(a)), *plus* (ii) any FILO Bridge Contributed Amounts. The FILO Bridge Balance shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, shall accrete and be added to the balance of the FILO Bridge Balance on the last day of each month; provided that, to the extent the Litigation Funders commit to provide additional Litigation Funding in excess of $125,000,000 (without any additional fees or premiums) in amounts equal to and for the specific purpose of covering the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

"FILO Bridge Contributed Amounts" means, at the time Class A-2 Bridge Trust Interests are contributed or waived in accordance with this Agreement (including pursuant to Section 4.8(c)), (a) the Class A-2 Bridge Preference of such Class A-2 Bridge Trust Interests, *multiplied by* (b) a fraction (i) the numerator of which is the aggregate FILO Bridge Balance and (ii) the denominator of which is the aggregate Class A-2 Bridge Preference; in each case of the foregoing clauses (a) and (b), determined as of immediately prior to such contribution.

"FILO DIP Balance" means, at the applicable time of determination, an amount equal to (a) the sum of (i) $[●][3], *plus* (ii) all accreted amounts accrued on the FILO DIP Balance (calculated in accordance with the immediately succeeding sentence) as of such time, *minus* (b) the sum of (i) the amount, if any, of cash distributed to the Class A-2 DIP Trust Beneficiaries by the Litigation Trust on account of the FILO DIP Balance pursuant to Section 4.4(b)(iv) on or prior to such time (provided that any amount that was previously distributed to the Class A-2 DIP Trust Beneficiaries by the Litigation Trust on account of the FILO DIP Balance pursuant to Section 4.4(b)(iv) and that the Class A-2 DIP Trust Beneficiaries are required in a Disgorgement Claim to disgorge, turn over or otherwise pay shall not be included in this clause (i) from and after such disgorgement or other repayment until such amount has been repaid by the Litigation Trust to the Class A-2 Bridge Trust Beneficiaries as a Beneficiary Indemnified Loss pursuant to Sections 4.4(b)(i) and 6.4(a)), *plus* (ii) any FILO DIP Contributed Amounts. The FILO DIP Balance shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, shall accrete and be added to the balance of the FILO DIP Balance on the last day of each month; provided that, to the extent the Litigation Funders commit to provide additional Litigation Funding in excess of $125,000,000 (without any additional fees or premiums) in amounts equal to and for the specific purpose of covering the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

---

[2] Note to Draft: To equal all principal and accrued interest, fees, expenses, and other amounts outstanding under the Bridge facility immediately prior to the Effective Date (for the avoidance of doubt, excluding the Retained FILO Claim).

[3] Note to Draft: To equal all principal and accrued interest, fees, expenses, and other amounts outstanding under the DIP facility immediately prior to the Effective Date.

"FILO DIP Budget" means the budget attached as <u>Annex A</u> to the Amendment No. 6 to Debtor-in-Possession Credit Agreement, dated as of April 28, 2025, by and among the Debtors, the FILO DIP Lenders and the FILO DIP Agent (as defined in the FILO DIP Order).

"FILO DIP Contributed Amounts" means, at the time Class A-2 DIP Trust Interests are contributed or waived in accordance with this Agreement (including pursuant to <u>Section 4.8(c)</u>), (a) the Class A-2 DIP Preference of such Class A-2 DIP Trust Interests, *multiplied by* (b) a fraction (i) the numerator of which is the aggregate FILO DIP Balance and (ii) the denominator of which is the aggregate Class A-2 DIP Preference; in each case of the foregoing <u>clauses (a)</u> and <u>(b)</u>, determined as of immediately prior to such contribution.

"FILO DIP Exit Premium Balance" means, at the applicable time of determination, an amount equal to (a) $[●][4], *minus* (b) the sum of (i) the aggregate amount, if any, of cash distributed to the Class A-2 DIP Trust Beneficiaries by the Litigation Trust on account of the FILO DIP Exit Premium Balance pursuant to <u>Section 4.4(b)(iv)</u> on or prior to such time (<u>provided</u> that any amount that was previously distributed to the Class A-2 DIP Trust Beneficiaries by the Litigation Trust on account of the FILO DIP Exit Premium Balance pursuant to <u>Section 4.4(b)(iv)</u> and that the Class A-2 DIP Trust Beneficiaries are required in a Disgorgement Claim to disgorge, turn over or otherwise pay shall not be included in this <u>clause (i)</u> from and after such disgorgement or other repayment until such amount has been repaid by the Litigation Trust to the Class A-2 Bridge Trust Beneficiaries as a Beneficiary Indemnified Loss pursuant to <u>Sections 4.4(b)(i)</u> and <u>6.4(a)</u>), *plus* (ii) any FILO DIP Exit Premium Contributed Amounts.

"FILO DIP Exit Premium Contributed Amounts" means, at the time Class A-2 DIP Trust Interests are contributed or waived in accordance with this Agreement (including pursuant to <u>Section 4.8(c)</u>), (a) the Class A-2 DIP Preference of such Class A-2 DIP Trust Interests, *multiplied by* (b) a fraction (i) the numerator of which is the aggregate FILO DIP Exit Premium Balance and (ii) the denominator of which is the aggregate Class A-2 DIP Preference; in each case of the foregoing <u>clauses (a)</u> and <u>(b)</u>, determined as of immediately prior to such contribution.

"FILO DIP Order" means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

"FILO Parties" means, collectively, as of the time immediately prior to the Effective Date, the (i) FILO DIP Lenders, (ii) FILO DIP Agent, (iii) FILO Bridge Lenders, and (iv) FILO Bridge Agent (each as defined in the FILO DIP Order).

"Force 10" has the meaning ascribed to such term in <u>Section 4.5(a)</u>.

"Governmental Unit" means "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"IRC" has the meaning ascribed to such term in the Recitals.

---

[4] <u>Note to Draft</u>: To equal the "Exit Premium" under the DIP facility (which is to be calculated as if the FILO DIP loans were being fully repaid).

"<u>Litigation Funder</u>" means each Person who has made a commitment to fund amounts to the Litigation Trust pursuant to the Commitment Letter.

"<u>Litigation Funding</u>" means, as of any time of determination, the sum of (i) the Upfront Premium, *plus* (ii) the aggregate amount deemed to have been funded by the Litigation Funders to the Litigation Trust pursuant to the Commitment Letter.

"<u>Litigation Funding Agent</u>" means [Brigade Agency Services LLC].

"<u>Litigation Funding Agent Expenses</u>" has the meaning ascribed to such term in <u>Section 2.4(d)</u>.

"<u>Litigation Funding Agent Fees</u>" has the meaning ascribed to such term in <u>Section 2.4(d)</u>.

"<u>Litigation Funding Agent Fees and Expenses</u>" has the meaning ascribed to such term in <u>Section 2.4(d)</u>.

"<u>Litigation Funding Budget</u>" has the meaning set forth in <u>Section 4.13(b)</u>.

"<u>Litigation Funding Escrow Account</u>" means [●].

"<u>Litigation Trust</u>" has the meaning ascribed to such term in the Preamble.

"<u>Litigation Trust Fees</u>" means (i) the Trustee Fees, (ii) all payments owing from the Litigation Trust to the Estate under the Transition Services Agreement and (iii) subject to the Litigation Funding Budget and the Province Fee Caps, the reasonable and documented expenses of any Trust Professionals.

"<u>Loss</u>" means any and all damages, fines, fees, penalties, deficiencies, losses and expenses (including without limitation interest, court costs, fees of attorneys, accountants and other experts or other expenses of litigation or other proceedings or of any claim, default or assessment).

"<u>Maximum Threshold</u>" means, with respect to a Specified Claim, the value set forth next to such Specified Claim on <u>Schedule 3</u> under the heading "Maximum Threshold".

"<u>Mediation Period</u>" has the meaning ascribed to such term in <u>Section 4.8(a)(ii)</u>.

"<u>Minimum Threshold</u>" means, with respect to a Specified Claim, the value set forth next to such Specified Claim on <u>Schedule 3</u> under the heading "Minimum Threshold"; <u>provided</u> that if at the time of determination the FILO Balance is in an Underpayment State, the Minimum Threshold shall be 80% of the value set forth next to such Specified Claim on <u>Schedule 3</u> under the heading "Minimum Threshold".

"<u>MOIC Balance</u>" means, at the applicable time of determination, an amount equal to (a) the MOIC Payment at such time, *minus* (b) the sum of (i) the amount, if any, of cash distributed to the Class A-2 Bridge Trust Beneficiaries by the Litigation Trust on account of the MOIC Balance on or prior to such time pursuant to <u>Section 4.4(b)(vi)</u> (<u>provided</u> that any amount that was previously distributed to the Class A-2 Bridge Trust Beneficiaries by the Litigation Trust on account of the MOIC Balance pursuant to <u>Section 4.4(b)(vi)</u> and that the Class A-2 Bridge Trust Beneficiaries are required in a Disgorgement Claim to disgorge, turn over or otherwise pay shall not be included in this <u>clause (i)</u> from and after such disgorgement or other repayment until such amount has been repaid by the Litigation Trust to the Class A-2 Bridge Trust Beneficiaries as a Beneficiary Indemnified Loss pursuant to <u>Sections 4.4(b)(i)</u> and <u>6.4(a)</u>), *plus* (ii) any MOIC Contributed Amounts.

9

"MOIC Contributed Amounts" means, at the time Class A-2 Bridge Trust Interests are contributed or waived in accordance with this Agreement (including pursuant to Section 4.8(c)), (a) the Class A-2 Bridge Preference of such Class A-2 Bridge Trust Interests, *multiplied by* (b) a fraction (i) the numerator of which is the aggregate MOIC Balance and (ii) the denominator of which is the aggregate Class A-2 Bridge Preference; in each case of the foregoing clauses (a) and (b), determined as of immediately prior to such contribution.

"MOIC Payment" means, $11,250,000; provided that, until the FILO Balance Repayment Date has occurred, the MOIC Payment shall increase by:

(a)     $1,000,000 on April 1, 2026;

(b)     an additional $1,500,000 on May 1, 2026;

(c)     an additional $2,000,000 on June 1, 2026;

(d)     an additional $2,500,000 on July 1, 2026;

(e)     an additional $3,000,000 on August 1, 2026; and

(f)     an additional $3,750,000 on September 1, 2026 and on the first (1st) calendar day of each month thereafter;

provided further that the aggregate MOIC Payment shall not exceed an amount equal to (1) 85%, *multiplied by* (2) (a) $75,000,000, *minus* (b) the sum of (A) $[●][5] and (B) any amount accreted, or distributed in respect of an accretion, on account of the Class A-2 Bridge Preference; provided that, for the avoidance of doubt, the MOIC Payment shall cease accruing additional amounts upon the FILO Balance Repayment Date.

"Monthly Expense Reimbursement Cap" means:

(a)     [$500,000 per month for the three (3)-month period commencing on the Effective Date and ending on [●][6], 2025;

(b)     $350,000 per month for the nine (9)-month period commencing on [●][7], 2025 and ending on [●][8], 2026; and

(c)     $220,000 for each month thereafter.][9]

Notwithstanding the foregoing, the amounts set forth above in this defined term may be adjusted from time to time in accordance with Section 2.4(b), in which case the Monthly Expense Reimbursement Cap for any month at the applicable time of determination shall be deemed to be the applicable amount set forth above in this defined term as modified to give effect to any such adjustments provided for by Section 2.4(b).

---

[5] Note to Draft: To equal all interest paid or accreted on the Bridge facility as of immediately prior to the Effective Date.

[6] Note to Draft: To be the day before the three-month anniversary of the Effective Date.

[7] Note to Draft: To be the three-month anniversary of the Effective Date.

[8] Note to Draft: To be the day before the one-year anniversary of the Effective Date.

[9] Note to Draft: Subject to reasonable and good faith negotiation regarding increases in the absence of an agreement regarding a revised HL fee agreement.

10

"Net Minimum Specified Value" means, with respect to a Specified Claim, (a) the Specified Claim's Minimum Threshold, *minus* (b) the pro forma contingency fee that would be payable in connection with a Proposal equal to the Specified Claim's Minimum Threshold.

"Net Offered Specified Value" means, with respect to a Proposal, (a) the Specified Value of such Proposal, *minus* (b) any contingency payable to the Litigation Trust's counsel with respect to such Proposal.

"Non-Administrative Tasks" has the meaning set forth in Section 4.5(b)(ii).

"Nonparty Affiliates" has the meaning ascribed to such term in Section 10.9.

"Notice Parties" means the Class A-2 Representative and the Class B Representative.

"Notice Period" has the meaning ascribed to such term in Section 4.8(a)(ii).

"Objection" has the meaning ascribed to such term in Section 4.8(a)(ii).

"Person" means an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Unit, or any other Entity.

"Plan" means the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. 4743), including any exhibits and schedules thereto and as may be modified, amended, or supplemented from time to time, or such other chapter 11 plan confirmed by the Bankruptcy Court, in each case that is consistent with the terms of Section 1 of the Plan Support Agreement Term Sheet entered into on April 28, 2025 by the FILO Parties, the Creditors' Committee and the Debtors.

"Plan Administrator Committee" means, to the extent that the Plan is confirmed and the Confirmation Order remains in full force and effect, a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

"Plan Trust" means, to the extent that the Plan is confirmed and the Confirmation Order remains in full force and effect, the trust to be established in accordance with the Plan to hold the Plan Trust Assets and make distributions to holders of Allowed Claims pursuant to the Plan.

"Plan Trust Assets" means, to the extent that the Plan is confirmed and the Confirmation Order remains in full force and effect, on the date that the Plan Trust is established in accordance with the Plan, all Retained Assets and any property acquired by the Debtors after the Effective Date (including, for the avoidance of doubt, the Class B Trust Interests), other than any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor held by another Debtor.

"Plan Trust Beneficiaries" means, to the extent that the Plan is confirmed and the Confirmation Order remains in full force and effect, the holders of the Plan Trust Interests.

"Plan Trust Interests" means, to the extent that the Plan is confirmed and the Confirmation Order remains in full force and effect, the beneficial interests in the Plan Trust granted to holders of Allowed Claims pursuant to the Plan.

"Post-FILO Repayment Variable Component" has the meaning given to such term in Section 4.3(c).

11

"Pre-TED Professional Fee Estimates" means the estimated costs and expenses of certain professionals retained by the Debtors, the Creditors' Committee, and the FILO Parties set forth on Schedule 4.

"Privilege Transfer Parties" has the meaning ascribed to such term in Section 2.7(a).

"Privileges" has the meaning ascribed to such term in Section 2.7(a).

"Proposal" has the meaning ascribed to such term in Section 4.8(a).

"Province" has the meaning ascribed to such term in Section 4.5(a).

"Province Fee Caps" has the meaning ascribed to such term in Section 4.5(c).

"Reduced Variable Component" means, with respect to any Trust Litigation Proceeds that result from a Claim or Cause of Action financed with a contingency fee structure or third-party litigation funding, the lesser of (A) the applicable Variable Component (subject to Section 4.3(c)) and (B) the greater of (i) 30% of such Trust Litigation Proceeds *minus* the amount of contingency fee, success fee, or third-party litigation funding cost related to such Claim or Cause of Action and (ii) 10% of such Trust Litigation Proceeds.

"Representatives" means the Litigation Funding Agent, the Class A-2 Representative and the Class B Representative.

"Restricted Transferee" has the meaning ascribed to such term in Section 3.4(e).

"Retained Assets" means those assets that will be retained by the Debtors following the Effective Date in accordance with the Approval Order, including but not limited to the Retained Cash (to the extent that the Confirmation Order is entered on or prior to August 1, 2025).

"Retained Cash" means $15,000,000 in cash, held in a third-party escrow account subject to the lien of the Retained FILO Claims.

"Retained Collateral" means, any cash or other value realized by the Estate on account of any Retained Assets that comprise, would have comprised or are derived from FILO DIP Collateral (as defined in the FILO DIP Order), excluding, for the avoidance of doubt, the Class B Trust Interests, any proceeds thereof, and any proceeds funded to, advanced to, or authorized to be used by the Estate in accordance with the Commitment Letter, this Agreement or the Approval Order.

"Retained FILO Claims" means Claims held by the FILO Bridge Lenders under the Prepetition Bridge Credit Agreement in principal amount totaling $10,000,000.

"Secured Interim Advances" has the meaning assigned to it in the Commitment Letter.

"Securities Act" means the Securities Act of 1933, as amended.

"Specified Claims" means the Trust Claims listed on Schedule 3.

"Specified Value" means, with respect to a Proposal, the gross cash and cash equivalent proceeds of such Proposal.

"Term Sheet" has the meaning ascribed to such term in the Recitals.

12

"<u>Termination Date</u>" has the meaning ascribed to such term in <u>Section 8.1</u>.

"<u>Termination Process</u>" has the meaning ascribed to such term in <u>Section 8.1</u>.

"<u>Togut</u>" means Togut, Segal & Segal LLP.

"<u>Transaction Ledger</u>" has the meaning ascribed to such term in <u>Section 3.5</u>.

"<u>Transferred Privileged Information</u>" has the meaning ascribed to such term in <u>Section 2.7(a)</u>.

"<u>Transformation Committee</u>" means the special committee of the board of managers of Steward Health Care Holdings LLC comprising Alan J. Carr, John R. Castellano, and William Transier.

"<u>Transition Services Agreement</u>" means that certain *Transition Services Agreement*, dated as of the Effective Date, by and between the Estate and the Litigation Trust, in the form attached hereto as <u>Exhibit E</u>.

"<u>Treasury Regulations</u>" has the meaning ascribed to such term in the Recitals.

"<u>Trust Assets</u>" means, as of the Effective Date, all property of the Litigation Trust listed on <u>Schedule 2</u> (including stock of corporations to be formed by the Litigation Trust to acquire certain properties listed on <u>Schedule 2</u> hereto), and at any applicable time of determination thereafter, such property and the proceeds, products, offspring or profits of any of the foregoing property, and any other assets held at such time by the Litigation Trust.

"<u>Trust Beneficiaries</u>" means Class A Trust Beneficiaries and Class B Trust Beneficiaries.

"<u>Trust Claims</u>" means the Claims and Causes of Action that constitute Trust Assets.

"<u>Trust Expenses</u>" has the meaning ascribed to such term in <u>Section 2.4(a)</u>.

"<u>Trust Interests</u>" means the Class A Trust Interests and the Class B Trust Interests.

"<u>Trust Litigation Proceeds</u>" means, with respect to a Trust Claim, the gross proceeds received by the Litigation Trust from such Trust Claim.

"<u>Trust Proceeds</u>" has the meaning ascribed to such term in <u>Section 2.3(b)</u>.

"<u>Trust Professionals</u>" has the meaning ascribed to such term in <u>Section 4.5(a)</u>.

"<u>Trust Records</u>" has the meaning ascribed to such term in <u>Section 4.11</u>.

"<u>Trust Register</u>" has the meaning ascribed to such term in <u>Section 3.5</u>.

"<u>Trustee</u>" has the meaning ascribed to such term in the Preamble.

"<u>Trustee Compensation</u>" has the meaning ascribed to such term in <u>Section 5.2(a)</u>.

"<u>Trustee Fees</u>" has the meaning ascribed to such term in <u>Section 5.2(b)</u>.

"<u>Trustee Indemnified Claims</u>" has the meaning ascribed to such term in <u>Section 6.2(a)</u>.

"<u>Trustee Responsibilities</u>" has the meaning ascribed to such term in <u>Section 4.1</u>.

 "<u>Underpayment State</u>" has the meaning ascribed to such term in <u>Section 4.8(d)</u>.

"<u>Unestimated Fees</u>" means any fees in excess of the Pre-TED Professional Fee Estimates that are allowed or otherwise payable under the FILO DIP Order or any other order of the Bankruptcy Court.

"<u>Upfront Percentage</u>" means 15% of the Trust Litigation Proceeds, subject to <u>Section 4.8(a)</u>.

"<u>Upfront Premium</u>" means $4,250,000; <u>provided</u> that if the Funding Parties make an Accordion Election (as defined in the Commitment Letter) with the consent of the Trustee pursuant to the terms of the Commitment Letter, then, upon such Accordion Election, the Upfront Premium shall be increased by the same percentage that the Funding Commitment (as defined in the Commitment Letter) is increased.

"<u>Variable Component</u>" means 20% of the Trust Litigation Proceeds (subject to <u>Section 4.3</u>).

"<u>Variance Report</u>" has the meaning ascribed to such term in <u>Section 4.13(c)</u>.

## ARTICLE II
## ESTABLISHMENT OF THE LITIGATION TRUST

2.1     <u>Establishment of the Litigation Trust and Appointment of the Trustee</u>.

(a)     Pursuant to the Approval Order and, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Confirmation Order, the Trustee hereby establishes and declares a trust for the benefit of the Trust Beneficiaries, which shall be the Litigation Trust, on the terms set forth herein. In connection with the exercise of the Trustee's powers hereunder, the Trustee may use this name or such variation thereof as the Trustee sees fit.

(b)     The Trustee is hereby appointed as trustee of the Litigation Trust effective as of the Effective Date.

(c)     The Trustee agrees to accept and hold the Trust Assets in trust for the Trust Beneficiaries, subject to the provisions of the Approval Order, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order, and this Agreement.

(d)     The Trustee and any successor trustee serving from time to time hereunder shall have all the rights, powers and duties as set forth herein.

(e)     The Trustee is, and any successor trustee serving from time to time hereunder shall be, a "United States person" as such term is defined in section 7701(a)(30) of the IRC.

(f)     The Trustee shall serve without bond. If any bond is required by any law, statute or rule of court, no sureties shall be required thereon.

(g)     For the avoidance of doubt, (i) the Trustee is not and shall not be deemed an officer or director of any of the Trust Beneficiaries or their respective affiliates and (ii) none of the Trust Beneficiaries or their affiliates shall be deemed a fiduciary or agent of the Litigation Trust, and such parties shall owe no duties or obligations to the Litigation Trust; <u>provided</u> that, for the avoidance of doubt, as set forth in <u>Section 4.2</u>, the Trustee shall owe fiduciary duties to all Trust Beneficiaries collectively.

14

(h)      Notwithstanding anything to the contrary herein, the Trustee shall always act consistent with, and not contrary to, the purpose of the Litigation Trust as set forth herein.

2.2      Transfer of the Trust Assets.

(a)      Pursuant to the Approval Order and, to the extent entered and remaining in full force and effect, the Confirmation Order, the Debtors shall have, and shall be deemed automatically to have, with no further action of any party, transferred, assigned and delivered to the Litigation Trust, without recourse, the Trust Assets, including all rights, title and interests related to the Trust Assets, in each case free and clear of all liens, claims, charges, encumbrances, contractually imposed restrictions, constructive trusts and interests to the fullest extent permitted by law and as and to the extent provided in the Approval Order and, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order. The act of transferring the Trust Assets, as authorized by the Approval Order and, to the extent entered and remaining in full force and effect, the Confirmation Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Litigation Trust as if the asset or right was still held by the applicable Debtor.

(b)      For all U.S. federal, state and local income tax purposes, all parties (including, without limitation, the Debtors, the Trustee, each Trust Beneficiary and each Representative) shall treat the transfer of the Trust Assets to the Litigation Trust in accordance with Section 7.1.

2.3      Funding of the Litigation Trust; Trust Assets.

(a)      In accordance with the Approval Order and, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order, the Litigation Trust shall be funded with the Litigation Funding, which upon receipt by the Litigation Trust shall become a Trust Asset.

(b)      All of the proceeds received by the Litigation Trust from the pursuit of any Trust Claims, from any funding of the Litigation Trust or from the Debtors or the Estate pursuant to the Approval Order or the Plan (the "Trust Proceeds") shall be a Trust Asset and held as a part thereof (and title thereto shall be vested in the Litigation Trust).

(c)      Any failure or inability of the Litigation Trust to obtain funding for the Litigation Trust will not affect the enforceability of the Litigation Trust or this Agreement.

2.4      Fees and Expenses.

(a)      Payment of Fees and Expenses. Subject in all respects to the terms of this Agreement, the Trustee shall be authorized to use the Trust Assets to administer the Litigation Trust, including to pay the reasonable, documented, out-of-pocket fees, expenses and costs of the Litigation Trust (collectively, the "Trust Expenses"), including, without limitation:

(i)      the Litigation Trust Fees;

(ii)     the Litigation Funding Agent Fees;

(iii)    the Class A-2 Representative Fees;

(iv)     subject to Section 2.4(b), the Class A Expenses;

15

(v)      the indemnification obligations set forth in <u>Sections 6.2</u> through <u>6.4</u> <u>(subject to the limitations set forth therein)</u>; and

(vi)      up to $4,000,000 in funding to the Estate (or its designee) in accordance with <u>Section 4.4(g)</u>.

All such costs of the Litigation Trust shall be paid by, and solely be the obligation of, the Litigation Trust and be paid by the Litigation Trust from the Trust Assets.

(b)      <u>Expense Cap</u>. Notwithstanding anything to the contrary in this Agreement, in any given month, the Trustee shall not pay the Class A Parties more than the Monthly Expense Reimbursement Cap for such month in the aggregate with respect to the Class A Expenses; <u>provided</u> that (i) to the extent the Class A Expenses incurred by the Class A Parties or otherwise owed to the Class A Parties by the Litigation Trust in any given month are less than the Monthly Expense Reimbursement Cap for such month, the Monthly Expense Reimbursement Cap for the following month shall be increased by the difference between the Monthly Expense Reimbursement Cap for such prior month and such actual Class A Expenses incurred in such prior month and (ii) to the extent the Class A Expenses incurred by the Class A Parties or otherwise owed to the Class A Parties by the Litigation Trust in any given month exceed the Monthly Expense Reimbursement Cap for such month, the difference between such Class A Expenses in such month and the Monthly Expense Reimbursement Cap for such month can be carried forward and satisfied in future months to the extent there is availability under the applicable Monthly Expense Reimbursement Cap in any such future month. Class A Parties must provide to the Estate and the Class B Representative monthly invoices of the professionals for each applicable party in respect to the Class A Expenses with reasonable summaries of activities, which may be redacted for privilege and shall not be required to include time entries.

(c)      <u>Class A Trust Beneficiary Expenses</u>. Subject to <u>Section 2.4(b)</u>, the Litigation Funders and the FILO Parties shall be entitled to reimbursement by the Litigation Trust for actual, reasonable and documented out-of-pocket expenses incurred by such Litigation Funders and the FILO Parties in connection with the Commitment Letter, this Agreement, the Plan and implementation of the settlement described in the Term Sheet and Approval Order (the "<u>Class A Trust Beneficiary Expenses</u>").

(d)      <u>Litigation Funding Agent Fees and Expenses</u>. The Litigation Funding Agent shall be entitled to (i) payment by the Litigation Trust of $50,000 per month (the "<u>Litigation Funding Agent Fees</u>") and (ii) subject to <u>Section 2.4(b)</u>, reimbursement by the Litigation Trust for actual, reasonable and documented out-of-pocket expenses incurred by the Litigation Funding Agent in connection with the performance of the duties of the Litigation Funding Agent under the Commitment Letter and this Agreement (the "<u>Litigation Funding Agent Expenses</u>", and together with the Litigation Funding Agent Fees, the "<u>Litigation Funding Agent Fees and Expenses</u>").

(e)      <u>Class A-2 Representative Fees and Expenses</u>. The Class A-2 Representative shall be entitled to (A) payment by the Litigation Trust of $50,000 per month (the "<u>Class A-2 Representative Fees</u>") and (B) subject to <u>Section 2.4(b)</u>, reimbursement by the Litigation Trust for actual, reasonable and documented out-of-pocket expenses incurred by the Class A-2 Representative in connection with the performance of the duties of the Class A-2 Representative under this Agreement (the "<u>Class A-2 Representative Expenses</u>", and together with the Class A-2 Representative Fees, the "<u>Class A-2 Representative Fees and Expenses</u>") until the FILO Balance Repayment Date.

16

2.5      <u>Nature and Purpose of the Litigation Trust</u>.

(a)      <u>Purpose</u>. The Litigation Trust is organized, declared and established as a trust for the sole benefit of the Trust Beneficiaries pursuant to which the Trustee, subject to the terms and conditions of this Agreement, shall administer the Trust Assets on behalf, and for the benefit, of the Trust Beneficiaries. The Litigation Trust shall serve as a vehicle for monetizing the Trust Assets, which shall include prosecuting all Trust Claims, and distributing the Trust Proceeds in a timely fashion for the benefit of the Trust Beneficiaries consistent with the treatment of the Litigation Trust as a "liquidating trust" under Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or any other business (except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust). The primary purpose of the Litigation Trust is to, in an expeditious and orderly manner, liquidate and convert the Trust Assets (including the Trust Claims) to Cash or other reasonable consideration and make timely distributions to holders of Trust Interests. The Trustee shall be obligated to make continuing reasonable efforts to timely resolve all claims related to or comprising the Trust Claims and not unreasonably prolong the duration of the Litigation Trust. The liquidation of the Trust Claims may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all Trust Claims, in accordance with the Approval Order, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order, and this Agreement.

(b)      <u>Relationship</u>. This Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust. The Litigation Trust is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Trustee or the Trust Beneficiaries for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers. The relationship of the Trust Beneficiaries, on the one hand, to the Trustee, on the other hand, shall be solely that of a beneficiary of a trust and shall not be deemed a principal and agency relationship, and their rights shall be limited to those conferred upon them by the Approval Order, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order, and set forth in this Agreement.

2.6      <u>Estate Funding</u>.

(a)      In accordance with the Approval Order and, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order, on the Effective Date and simultaneously with the creation of the Litigation Trust, the Litigation Trust shall provide the Estate with the Estate Funding.

(b)      In respect of the Estate Funding, the FILO Parties indirectly providing such funding shall receive Class A-1 Trust Interests having a Class A-1 Preference (along with a proportionate interest in all other rights therein) equal to the amount of the Estate Funding. Such Class A-1 Trust Interests shall be transferred to such FILO Parties on behalf of the Debtors. The Estate Funding shall not otherwise be required to be repaid by the Estate.

2.7      <u>Privileges</u>.

(a)      All attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections from disclosure (the "<u>Privileges</u>") held by any of (1) any one or more of the Debtors or (2) any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors (together the "<u>Privilege Transfer</u>

17

Parties") related in any way to the Trust Assets or the analysis or prosecution of any Trust Assets (the "Transferred Privileged Information") are hereby transferred and assigned to, and vested in, the Litigation Trust and its authorized representatives. The Transferred Privileged Information shall include documents and information of all manner, whether oral, written or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the Privileges shall include any right or obligation to preserve or enforce or waive a privilege that arises from any joint defense, common interest or similar agreement involving any of the Privilege Transfer Parties.

        (b)      The foregoing transfer and assignment shall vest the Privileges concerning the Transferred Privileged Information in the Litigation Trust, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Trust Beneficiaries; provided, however, that to the extent that any such Privileges or Transferred Privileged Information relates to both the Trust Assets on one hand and any matter in which the Estate has an interest on the other, such Privileges and Transferred Privileged Information shall vest jointly in the Estate (or its designee) and the Litigation Trust. As relates to any Privileges or Transferred Privileged Information held jointly with the Estate (or its designee), (i) with respect to litigations or proceedings concerning matters in which the Estate has an interest as a potential defendant, the Estate shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Litigation Trust, and (ii) with respect to litigations or proceedings concerning the Trust Assets where the Estate has an interest as a potential defendant, the Litigation Trust shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Estate. The Litigation Trust and Estate agree that they do not intend to provide a general waiver of all Privileges and that each such party will take commercially reasonable steps to avoid a general waiver of the Privileges.

        (c)      Pursuant to, *inter alia*, Federal Rule of Evidence 502(d), no Privileges shall be waived by the transfer and assignment of the Privileges or the production of any Transferred Privileged Information to the Litigation Trust or any of its respective employees, professionals or representatives, or by disclosure of such Transferred Privileged Information between the Privilege Transfer Parties, on the one hand, and the Litigation Trust, on the other hand, or any of their respective employees, professionals or representatives.

        (d)      If a Privilege Transfer Party, the Litigation Trust, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Transferred Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Transferred Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Trust of the production and shall demand of all recipients of the inadvertently disclosed Transferred Privileged Information that they return or confirm the destruction of such materials.

        2.8      Secured Interim Advances. On the Effective Date, the FILO DIP Loans shall be repaid with Class A-1 Trust Interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of the Secured Interim Advances, and on account of such repayment, the amount of FILO DIP Loans outstanding shall be reduced by the amount of such Secured Interim Advances.

        2.9      Conditions Precedent. This Agreement shall be effective automatically upon the Effective Date, provided that each of the following conditions has been satisfied as of the Effective Date:

(a)        the Bankruptcy Court shall have entered the Approval Order in the form attached hereto as <u>Exhibit G</u> or in a form that is otherwise reasonably acceptable to the Debtors, the FILO Parties and the Creditors' Committee;

(b)        the Litigation Funders shall have executed and delivered to the Litigation Trust the Commitment Letter in the form attached hereto as <u>Exhibit F</u> or in a form that is otherwise reasonably acceptable to the Debtors, the FILO Parties and the Creditors' Committee;

(c)        the Litigation Trust shall have executed and delivered to the Estate the Transition Services Agreement in the form attached hereto as <u>Exhibit E</u> or in a form that is otherwise reasonably acceptable to the Debtors, the FILO Parties and the Creditors' Committee; and

(d)        the FILO Parties shall not have not sought to enforce or foreclose on their lien on the Retained Cash on or prior to the Effective Date.

## ARTICLE III
## TRUST INTERESTS; TRUST REPRESENTATIVES

3.1        <u>Trust Interests</u>.

(a)        The Litigation Trust shall initially be authorized to issue two classes of beneficial interests, Class A Trust Interests and Class B Trust Interests, each with the rights and privileges set forth in this Agreement. The Class A Trust Interests shall initially be subdivided into Class A-1 Trust Interests and Class A-2 Trust Interests, each with the rights and privileges set forth in this Agreement. The Class A-2 Trust Interests shall initially be subdivided into Class A-2 DIP Trust Interests and Class A-2 Bridge Trust Interests, each with the rights and privileges set forth in this Agreement.

(b)        As soon as reasonably practicable following the execution of this Agreement, and in accordance with the terms of the Approval Order, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order, and this Agreement, the Litigation Trust shall issue (i) Class A-1 Trust Interests to the Class A-1 Trust Beneficiaries, pro rata in accordance with each Class A-1 Trust Beneficiary's commitment to fund the Litigation Funding pursuant to the Commitment Letter, (ii) Class A-2 DIP Trust Interests to the Class A-2 DIP Trust Beneficiaries, pro rata in accordance with each Class A-2 Trust Beneficiary's entitlement to the Class A-2 DIP Preference, (iii) Class A-2 Bridge Trust Interests to the Class A-2 Bridge Trust Beneficiaries, pro rata in accordance with each Class A-2 Bridge Trust Beneficiary's entitlement to the Class A-2 Bridge Preference, and (iv) Class B Trust Interests to the Class B Trust Beneficiaries, in each case with respect to the foregoing <u>clauses (i)-(iv)</u>, as set forth in <u>Schedule 1</u> attached hereto.

(c)        The issuance of the Class A-1 Trust Interests is in consideration for the Estate Funding, the Secured Interim Advances, and the commitment to fund the remainder of the Litigation Funding. The issuance of the Class A-2 Trust Interests is in satisfaction of Allowed FILO DIP Claims and Allowed Remaining FILO Bridge Claims. The Class B Trust Interests are being issued in respect of the residual value of the Trust Assets in excess of the entitlements represented by the Class A Trust Interests.

(d)        The Trust Beneficiaries shall be entitled to distributions from the Trust Assets as set forth in this Agreement. The beneficial interests in the Litigation Trust will be represented by book entries on the books and records of the Litigation Trust, which shall be maintained by the Trustee as set forth in <u>Section 3.5</u>. The Litigation Trust will not issue any certificate or certificates to evidence any beneficial interests in the Litigation Trust.

19

     3.2    <u>Interests Beneficial Only; Standing</u>. The ownership of the Trust Interests shall not entitle the Trust Beneficiaries to any title in or to the Trust Assets as such (which title shall be vested in the Litigation Trust) or to any right to call for a partition or division of the Trust Assets or to require an accounting.

     3.3    <u>Representatives</u>.

     (a)    <u>Litigation Funding Agent</u>. The Class A-1 Trust Beneficiaries shall be represented by the Litigation Funding Agent. The Litigation Funding Agent shall act at the written direction (email being sufficient) of the Class A-1 Trust Beneficiaries (excluding any Restricted Transferees) holding Class A-1 Trust Interests entitled to a majority of the Class A-1 Preference (excluding the *pro rata* portion of the Class A-1 Preference attributable to Class A-1 Trust Interests then held by any Restricted Transferees). Except for matters which require the consent of the holders of Class A-1 Trust Interests explicitly set forth in this Agreement, the Litigation Funding Agent has authority to engage in all acts necessary or advisable to manage the Class A-1 Trust Interests. The Litigation Funding Agent may be removed and replaced via written consent (email being sufficient) of the Class A-1 Trust Beneficiaries (excluding any Restricted Transferees) holding Class A-1 Trust Interests entitled to a majority of the Class A-1 Preference (excluding the *pro rata* portion of the Class A-1 Preference attributable to Class A-1 Trust Interests then held by any Restricted Transferees).

     (b)    <u>Class A-2 Representative</u>. The Class A-2 Trust Beneficiaries shall be represented by a representative (the "<u>Class A-2 Representative</u>"). Subject to <u>Section 4.8(c)</u>, the Class A-2 Representative shall act at the written direction (email being sufficient) of the Class A-2 Trust Beneficiaries (excluding any Restricted Transferees) holding Class A-2 Trust Interests entitled to a majority of the Class A-2 Preference (excluding the *pro rata* portion of the Class A-2 Preference attributable to Class A-2 Trust Interests then held by any Restricted Transferees), with the holders of Class A-2 DIP Trust Interests and Class A-2 Bridge Trust Interests voting together as a single class. The initial Class A-2 Representative shall be [Brigade Agency Services LLC, a Delaware limited liability company]. Except for matters which require the consent of the holders of Class A-2 Trust Interests explicitly set forth in this Agreement, the Class A-2 Representative has authority to engage in all acts necessary or advisable to manage the Class A-2 Trust Interests. The Class A-2 Representative may be removed and replaced via written consent (email being sufficient) of the Class A-2 Trust Beneficiaries (excluding any Restricted Transferees) holding Class A-2 Trust Interests entitled to a majority of the Class A-2 Preference (excluding the *pro rata* portion of the Class A-2 Preference attributable to Class A-2 Trust Interests then held by any Restricted Transferees), with the holders of Class A-2 DIP Trust Interests and Class A-2 Bridge Trust Interests voting together as a single class.

     (c)    <u>Class B Representative</u>. The Class B Trust Beneficiaries shall be represented by a representative (the "<u>Class B Representative</u>"). The Class B Representative shall be [the Plan Administrator Committee; <u>provided</u> that (i) if the Chapter 11 Cases are converted to cases under Chapter 7, the trustee of such Chapter 7 cases or a designee by such trustee shall be the Class B Representative and (ii) if the Class B Trust Interests are transferred to the Plan Trust, the Plan Trustee (as defined in the Plan) or its designee by the Plan Trustee shall be the Class B Representative][the Transformation Committee; <u>provided</u> that (i) if the Chapter 11 Cases are converted to cases under Chapter 7, the trustee of such Chapter 7 cases or a designee by such trustee shall be the Class B Representative, (ii) if the Plan is confirmed, the Class B Representative shall be determined as set forth in the Plan][10].

     (d)    <u>Repayment of FILO Balance</u>. On the FILO Balance Repayment Date, (i) all of the rights granted to the Class A-2 Representative under this Agreement, other than the rights granted to the

---

[10] <u>Note to Draft</u>: To use latter construct if the Plan has not been confirmed prior to the Effective Date.

WEIL\100499761\15\76000.0004

Class A-2 Representative under <u>Sections 2.4(e)</u> and <u>6.3</u>, shall be assumed by and vested in the Class B Representative and (ii) all of the rights granted to the Class B Representative under this Agreement (other than under <u>Sections 5.5</u> and <u>7.1</u>) shall be assumed by and vested in the Litigation Funding Agent for the benefit of the holders of the Variable Component. The Estate or the Class B Representative shall have the right to pay in full or any portion of the FILO Balance at any time without any prepayment penalty for application in accordance with the order of priorities set forth in <u>Section 4.4(b)</u>.

      3.4      <u>Transferability of Trust Interests</u>.

      (a)      Other than with respect to a transfer by operation of law or pursuant to any bankruptcy court order or Plan, no transfer, assignment, pledge, hypothecation or other disposition of a Trust Interest may be effected until (i) the parties have complied with this <u>Section 3.4</u> and <u>Section 3.6</u> and (ii) the Trustee has determined, in its reasonable discretion based on legal advice or other information, that such disposition would not cause the Litigation Trust to be a publicly traded partnership taxable as a corporation pursuant to Section 7704 of the IRC (determined as if the Litigation Trust were treated as a partnership for U.S. federal income tax purposes). In the event that any such disposition is allowed, the Trustee may add such restrictions upon transfer and other terms and conditions of the disposition as are deemed necessary or appropriate by the Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws. No transfer of Trust Interests shall be valid unless the applicable transferor and transferee have delivered to the Trustee certificates representing that such transfer has been fully effectuated. Notwithstanding anything to the contrary in this Agreement, a transfer described in <u>Section 3.4(c)(i)</u> shall be permitted and shall not be subject to any transfer restrictions set forth in this Agreement, any provision providing that a transfer will be void or voidable, or any requirement to obtain consent of any Person.

      (b)      The Class A Trust Interests may only be resold, pledged or otherwise transferred (i) (A) outside the United States to a non-U.S. person in a transaction meeting the requirements of Rule 903 or Rule 904 of Regulation S under the Securities Act, (B) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if applicable) or (C) in accordance with another exemption from the registration requirements of the Securities Act and (ii) so long as any proposed transfer would not result in a requirement that the Class A Trust Interests be registered under the Securities Act. In connection with any transfer of the Class A Trust Interests, each of the transferor and the transferee shall deliver to the Trustee a certificate of a duly appointed officer certifying that the transfer complies with the foregoing restrictions of this <u>Section 3.4(b)</u> and the transferee shall deliver to the Trustee an executed joinder to this Agreement, in the form attached hereto as <u>Exhibit C</u>.

      (c)      The Class B Trust Interests may only be resold, pledged or otherwise transferred (i) to any liquidating trust or other similar vehicle formed under a Plan or any liquidating trust or other similar vehicle otherwise formed pursuant to applicable law, in each case only if such Class B Trust Interests have not previously been resold, pledged or otherwise transferred, in whole or in part, to a Person other than the Debtors or their affiliates in accordance with this <u>Section 3.4(c)</u> or (ii) (A) (1) with the consent of the Trustee (not to be unreasonably withheld, conditioned or delayed), (2) outside the United States to a non-U.S. person in a transaction meeting the requirements of Rule 903 or Rule 904 of Regulation S under the Securities Act, (3) pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder (if applicable), or (4) in accordance with another exemption from the registration requirements of the Securities Act and (B) so long as any proposed transfer would not result in a requirement that the Class B Trust Interests be registered under the Securities Act. In connection with any transfer of the Class B Trust Interests, each of the transferor and the transferee shall deliver to the Trustee a certificate of a duly appointed officer certifying that the transfer complies with the foregoing restrictions of this <u>Section 3.4(c)</u> and the transferee shall deliver to the Trustee an executed joinder to this Agreement in the form attached hereto as <u>Exhibit C</u>.

21

(d)     The Trustee may, other than with respect to a transfer described in <u>Section 3.4(c)(i)</u> (x) request from any transferor or transferee any additional information or representations and warranties, which representations and warranties may be contained in the certificate required to be delivered to the Trustee pursuant to this <u>Section 3.4</u>, regarding the transfer of Trust Interests that the Trustee deems necessary to determine that such transfer would not constitute a violation of applicable federal and state securities laws and (y) in the event it is determined that the Trust Interests constitute "securities," and at such time the Trust Interests are not registered, and other than with respect to a transfer by operation of law or pursuant to any bankruptcy court order or Plan, obtain an opinion from counsel to the transferee (which opinion shall be accepted by the Trustee) to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

(e)     Notwithstanding anything to the contrary in this Agreement, if the Trustee determines that a contemplated transferee of any Trust Interests or any of its affiliates has interests that are adverse to the interests of the Litigation Trust in connection with any Claim or Cause of Action involving the Litigation Trust or any Trust Assets (such contemplated transferee, a "<u>Restricted Transferee</u>"), then such Restricted Transferee shall have no voting, consent or approval rights set forth in this Agreement, and shall not have any information rights as a Trust Beneficiary under this Agreement (other than information rights with respect to tax matters under <u>Article VII</u>), including but not limited to pursuant to <u>Sections 3.3(a)</u>, <u>3.3(b)</u>, <u>3.3(c)</u>, <u>4.8(c)</u> and <u>4.14</u>. Notwithstanding anything to the contrary herein, creditors receiving Trust Interests under any chapter 11 plan or from a chapter 7 trustee shall not be a Restricted Transferee solely on account of receiving such Trust Interests.

(f)     If any holder of Class A Trust Interests or Class B Trust Interests purports to transfer such interests to any Person in a transaction that would violate the provisions of this <u>Section 3.4</u> or that would violate any applicable federal or state securities law to the extent applicable, such transfer shall be void ab initio and of no effect.

3.5     <u>Books and Records Regarding Trust Interests</u>. The Trustee shall maintain (a) a registry of the Trust Beneficiaries and their respective holdings of Trust Interests (the "<u>Trust Register</u>") and (b) a ledger of all valid transfers of Trust Interests (the "<u>Transaction Ledger</u>"). Any valid transfer of Trust Interests shall be recorded by the Trustee on the books and records of the Litigation Trust. The Trustee shall update the Trust Register, <u>Schedule 1</u> and <u>Schedule 2</u> from time to time so as to accurately reflect the information contained thereon. Other than with respect to the Trustee's bookkeeping and verification obligations as expressly set forth in this <u>Section 3.5</u>, the Litigation Trust shall not be required to bear any costs in connection with the effectuation of any Trust Interests, including that any transferor or transferee of Trust Interests shall be responsible for any costs associated with documenting or processing any transfer. Notwithstanding any other provision of this Agreement, in no event shall the Trustee disclose <u>Schedule 1</u>, the Trust Register or the Transaction Ledger to a Trust Beneficiary, except that the Trustee may disclose a Trust Beneficiary's own Trust Interest holdings to such Trust Beneficiary.

3.6     <u>Securities Act; Securities Exchange Act; Investment Company Act</u>.

(a)     The Trust Interests will not, and are not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law.

(b)     In the event it is determined that any such Trust Interests constitute "securities," the offer and sale of such Trust Interests will be exempt from registration under the Securities Act pursuant to available exemptions under the Securities Act, including <u>Section 4(a)(2)</u>.

22

(c)      Except as provided in Article III, Article IV, Article V and Article IX, the Trust Interests shall not have consent or voting rights or otherwise confer on the Trust Beneficiaries any rights similar to the rights of a shareholder of a corporation in respect of any actions taken or to be taken by the Trustee in connection with the Litigation Trust. Subject to Section 3.4, the Trustee shall not take any action to establish an active trading market with respect to the Trust Interests.

3.7      Effect of Death, Incapacity or Bankruptcy. The death, incapacity or bankruptcy of any Trust Beneficiary during the term of the Litigation Trust shall not by itself (a) operate to terminate the Litigation Trust, (b) entitle the representatives or creditors of such deceased, incapacitated or bankrupt party to an accounting, (c) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Trust Assets or for a partition or division thereof or (d) otherwise affect the rights and obligations of any of the Trust Beneficiaries under this Agreement. Upon the death or incapacity of any Trust Beneficiary during the term of the Litigation Trust, the rights of such Trust Beneficiary may be exercised by the attorney-in-fact, conservator, guardian, executor, administrator or other personal representative of such incapacitated or deceased Trust Beneficiary.

3.8      Absolute Owners. The Trustee shall treat any Trust Beneficiary reflected as the owner of a Trust Interest on the Trust Register as the absolute owner thereof for the purposes of making distributions and payments on account thereof, for federal and state income tax purposes, and for all other purposes whatsoever; provided that, if requested by any such Trust Beneficiary, the Trustee shall be permitted to, and shall use reasonable efforts to, make any applicable distributions or payments payable to such Trust Beneficiary to its selected designee to the extent the distributions or payments to such selected designee do not incur additional costs from the Trust Assets for tax purposes or any other purposes whatsoever.

**ARTICLE IV**
**RIGHTS, POWERS AND DUTIES OF TRUSTEE**

4.1      Role of the Trustee. In furtherance of and consistent with the liquidating purpose of the Litigation Trust, and in accordance with the terms and conditions contained in the Approval Order, to the extent the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order, and this Agreement, the Trustee shall (and shall be authorized to) make commercially reasonable efforts to (i) receive, manage, supervise, and protect the Trust Assets and the Transferred Privileged Information; (ii) investigate, analyze, monetize, prosecute, recover upon, or settle or compromise the Trust Claims, in each case as necessary or appropriate to serve the best interests of the Trust Beneficiaries collectively (and subject in all respects to Section 4.8); (iii) prepare and file all required tax returns and pay all taxes and all other obligations of the Litigation Trust; (iv) liquidate and convert the Trust Assets to Cash and make timely distributions thereof to the Trust Beneficiaries, in each case as necessary or appropriate to serve the best interests of the Trust Beneficiaries collectively; (v) not unduly prolong the existence of the Litigation Trust (which, for the avoidance of doubt and in compliance with any applicable rule against perpetuities, shall terminate as provided for in Section 8.1); (vi) maintain the books, records and accounts of the Litigation Trust, including in accordance with Sections 3.5 and 4.11; and (vii) enforce the Commitment Letter and the Litigation Funding, including with respect to the Estate Funding; and (viii) fulfill all other responsibilities of the Trustee set forth in the Approval Order, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order, this Agreement and all other applicable orders of the Bankruptcy Court or as may be naturally expected to be among the responsibilities of the Trustee (clauses (i)-(viii) collectively, the "Trustee Responsibilities"). For the avoidance of doubt, the Trustee may carry out each of the Trustee Responsibilities with the advice and assistance of the Trust Professionals.

23

4.2     <u>Fiduciary Duties</u>. The Trustee shall be a fiduciary and owe fiduciary duties to all Trust Beneficiaries, collectively. As a fiduciary to all Trust Beneficiaries, collectively, the Trustee shall be entitled to rely on any extensions available to a trustee under 11 U.S.C. § 108 in any judicial, arbitration or administrative proceeding, during or after the pendency of these cases.

4.3     <u>Variable Component</u>. The Class A-1 Trust Beneficiaries shall be entitled to receive the Variable Component as set forth in this <u>Section 4.3</u> in accordance with and subject to the order of priority provided for in <u>Section 4.4</u>.

(a)     The Upfront Percentage portion of the Variable Component shall be paid in Cash at the time of receipt by the Litigation Trust of Trust Litigation Proceeds and Cash in the amount of the Deferred Portion shall be held in escrow by the Trustee in the Litigation Funding Escrow Account; <u>provided</u> that if the Trust Litigation Proceeds result from a Trust Claim financed with a contingency fee structure or third-party litigation funding, the total Variable Component shall be limited to the Reduced Variable Component. In the event the Reduced Variable Component is equal to or less than 15% of such Trust Litigation Proceeds, then all of such Reduced Variable Component shall be treated as the Upfront Percentage. In the event the Reduced Variable Component is greater than 15% of such Trust Litigation Proceeds, then 15% of such Trust Litigation Proceeds shall be treated as the Upfront Percentage and the remaining portion shall be treated as the Deferred Portion.

(b)     If the FILO Balance Repayment Date occurs on or before October 1, 2026, the Deferred Portion shall be disbursed in full from the Litigation Funding Escrow Account to the Estate immediately following the FILO Balance Repayment Date. On October 2, 2026, if the FILO Balance Repayment Date did not occur on or before October 1, 2026, the Deferred Portion shall be disbursed in full from the Litigation Funding Escrow Account to the Litigation Funding Agent. Following such time and until the FILO Balance Repayment Date, the Variable Component shall be paid in Cash at the time of receipt of Trust Litigation Proceeds in accordance with the terms of <u>Section 4.3(a)</u> with no amounts deferred.

(c)     After the FILO Balance Repayment Date, the Variable Component shall continue to be entitled to a percentage of the Trust Litigation Proceeds (i) if the FILO Balance Repayment Date occurred on or before October 1, 2026, at the Upfront Percentage only, or (ii) if the FILO Balance Repayment Date did not occur on or before October 1, 2026, at 20%, in each case, subject to the Reduced Variable Component adjustment described above (the "<u>Post-FILO Repayment Variable Component</u>"); <u>provided</u> that (x) if, at the time Trust Litigation Proceeds are received by the Litigation Trust, the Debtors have confirmed a Plan, then the Post-FILO Repayment Variable Component on account of such Litigation Trust Proceeds received shall be paid in two installments, with the first installment being paid in cash upon receipt of the applicable Trust Litigation Proceeds in an amount equal to 62.5% of the Post-FILO Repayment Variable Component, and the payment of the remaining balance of the Post-FILO Repayment Variable Component being deferred until (and subject to) the satisfaction of allowed administrative and other priority claims pursuant to such Plan, and (y) if, at the time the Trust Litigation Proceeds are received by the Litigation Trust, the Debtors have not yet confirmed a Plan, then the Post-FILO Repayment Variable Component on account of such Trust Litigation proceeds received shall be paid in full in Cash upon receipt of the applicable Trust Litigation Proceeds.

(d)     Notwithstanding anything to the contrary in this <u>Section 4.3</u>, to the extent that the Class A-1 Trust Beneficiaries are required in a Disgorgement Claim to disgorge, turn over or otherwise pay any cash that was previously distributed to such Class A-1 Trust Beneficiary pursuant to this <u>Section 4.3</u> and <u>Section 4.4(b)(ii)</u>, such amount shall be added back to the amount of Variable Component due and payable to such Class A-1 Trust Beneficiaries in respect of its Class A-1 Trust Interests until such amount

24

has been repaid by the Litigation Trust to the Class A-1 Trust Beneficiaries as a Beneficiary Indemnified Loss pursuant to Sections 4.4(b)(i) and 6.4(a)).

4.4     Distributions.

(a)     The Trustee shall, from time to time, distribute Available Cash to the Trust Beneficiaries in accordance with Section 4.4(b) as necessary or appropriate to serve the best interests of the Trust Beneficiaries, collectively, in a manner consistent with the Litigation Trust's liquidating purpose and, in any case, (i) no less frequently than once per quarter and (ii) within three (3) Business Days of any date on which Available Cash exceeds $1,000,000 in the aggregate; provided that the Trustee shall not be required to make distributions more frequently than once per week; provided further that, in all events, promptly (and in no event more than thirty (30) days) following the final disposition of all Trust Assets (other than cash and cash equivalents), whether by enforcement of judgment, settlement, abandonment, or otherwise, the Trustee shall distribute all remaining Trust Assets to the Trust Beneficiaries in accordance with Section 4.4(b); provided further, that notwithstanding anything contained in this Section 4.4(a), to the extent that Available Cash is less than $250,000 in the aggregate, the next quarterly distribution shall not be required and such Available Cash shall be distributed with the next distribution of Trust Assets.

(b)     Subject to Section 4.4(c), distributions of Trust Assets shall be made to Trust Beneficiaries in accordance with the following order of priority, in each case as determined as of immediately prior to such distribution:

(i)     first, 100% to pay the Trust Expenses (including amounts owing under the Transition Services Agreement) until the Trust Expenses have been repaid in full (subject to the Monthly Expense Reimbursement Cap as set forth in Section 2.4(b));

(ii)     second, subject to Section 4.3, 100% to the Class A-1 Trust Beneficiaries *pro rata* based on the aggregate Class A-1 Trust Interests then held by all Class A-1 Trust Beneficiaries until any earned, due and payable Variable Component (which survives repayment of the Class A-1 Preference and the FILO Balance and which shall be subject to potential increases from time to time in accordance with Section 4.3) has been paid in full in cash;

(iii)     third, 100% to the Class A-1 Trust Beneficiaries *pro rata* based on the aggregate Class A-1 Trust Interests then held by all Class A-1 Trust Beneficiaries until the Class A-1 Preference is $0;

(iv)     fourth, 100% to the Class A-2 DIP Trust Beneficiaries *pro rata* based on the aggregate Class A-2 DIP Trust Interests then held by all Class A-2 DIP Trust Beneficiaries until the Class A-2 DIP Preference is $0 (which distributions shall, for the avoidance of doubt, be applied to the FILO DIP Balance and the FILO Exit Premium Balance *pro rata*);

(v)     fifth, 100% to the Class A-2 Bridge Trust Beneficiaries pro rata based on the aggregate Class A-2 Bridge Trust Interests then held by all Class A-2 Bridge Trust Beneficiaries until the FILO Bridge Balance is $0;

(vi)     sixth, 100% to the Class A-2 Bridge Trust Beneficiaries pro rata based on the aggregate Class A-2 Bridge Trust Interests then held by all Class A-2 Bridge Trust Beneficiaries until the MOIC Balance is $0; and

25

(vii)     thereafter, 100% to the Class B Trust Beneficiaries *pro rata* based on the aggregate Class B Trust Interests then held by all Class B Trust Beneficiaries.

(c)     Notwithstanding the foregoing:

(i)     if, prior to December 1, 2025, the FILO Balance is not in an Underpayment State at the time of such distribution, 25% of any amount otherwise payable to the Class A-2 Trust Beneficiaries pursuant to Sections 4.4(b)(iv) through 4.4(b)(vi) shall be used to pay unpaid Deferred Fees and Unestimated Fees on a *pro rata* basis;

(ii)     if, on or after December 1, 2025, the FILO Balance is not in an Underpayment State at the time of such distribution, 25% of any amount otherwise payable to the Class A-1 Trust Beneficiaries or Class A-2 Trust Beneficiaries pursuant to Sections 4.4(b)(ii) through 4.4(b)(vi) shall be used to pay unpaid Deferred Fees and Unestimated Fees on a *pro rata* basis; and

(iii)     if the FILO Balance is less than $25,000,000 at the time of such distribution, any unpaid Unestimated Fees or Deferred Fees will be paid on a *pro rata* basis from any available proceeds that would otherwise be payable to the Class A-1 Trust Beneficiaries pursuant to Section 4.4(b)(ii) as Variable Component (provided that such Variable Component shall be payable with the next proceeds received following repayment in full of such unpaid Unestimated Fees and Deferred Fees).

(d)     The Trustee shall make any Cash distributions to Trust Beneficiaries via check, wire transfer or AHC to the address or bank account of each such Trust Beneficiary as indicated in the Litigation Trust's records as of the applicable distribution date (or applicable record date), all as reasonably determined by the Trustee. If a Trust Beneficiary does not provide the Trustee with requisite bank account information to effectuate a wire transfer or AHC or if any distribution to any Trust Beneficiary is returned as undeliverable, no distribution to such Trust Beneficiary shall be made unless and until the Trustee is notified in writing of the then-current bank account of such Trust Beneficiary, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable to such Trust Beneficiary without interest; provided, however, that such distributions shall be deemed unclaimed property and forfeited at the expiration of six (6) months from the applicable distribution date and the Trustee shall redistribute such property to the other Trust Beneficiaries in a manner otherwise consistent with the terms of this Agreement.

(e)     The Trustee may deduct and withhold taxes from amounts otherwise distributable to any party, as required by this Agreement, any law, regulation, rule, ruling, directive, treaty, or other governmental requirement in accordance with Section 7.2.

(f)     If, in the Trustee's good-faith reasonable judgment, any property constituting Trust Assets (i) has no value to the Litigation Trust or the Trust Beneficiaries and cannot be sold in a commercially reasonable manner or (ii) is unduly burdensome to the Litigation Trust, the Trustee shall have the right to abandon or otherwise dispose of such property after providing ten (10) Business Days' notice of the intent to abandon and opportunity to object to the Representatives. If a Representative objects to the Trustee's abandonment of any Trust Assets, the Trustee shall seek an order of the Bankruptcy Court authorizing such abandonment. Except in the case of fraud, willful misconduct or gross negligence, no Trust Beneficiary shall have a cause of action against the Litigation Trust or the Trustee, arising from or related to the disposition of non-Cash property in accordance with this Section 4.4(f).

26

(g)      The Litigation Trust shall provide, when and to the extent due as evidenced by reasonably detailed evidence thereof delivered by the Estate to the Litigation Trust (the "Tax Package") up to $4,000,000 in funding to the Estate (or its designee) for the sole purpose of the Estate paying income taxes for the Debtors' current 2024/2025 income tax year. Payments made by the Litigation Trust to the Estate (or its designee) for such taxes shall be deemed to be held by the Estate (or its designee) in trust for such purpose and shall not be used for any purpose other than paying such taxes reflected in the Tax Package on a dollar-for-dollar basis.

4.5      Retention of Counsel and Other Professionals.

(a)      The Trustee may, in each case as necessary or appropriate to serve the best interests of the Trust Beneficiaries, collectively, in a manner consistent with the Litigation Trust's liquidating purpose and in accordance with the Litigation Funding Budget, (i) retain or employ professionals, including but not limited to counsel, tax professionals or other advisors or service providers as the Trustee deems reasonable or necessary to aid it in fulfilling its obligations under this Agreement ("Trust Professionals") and (ii) subject to Section 2.3(c) and Section 4.10(c), compensate the Trust Professionals from the Trust Assets pursuant to reasonable or customary fee arrangement the Trustee deems appropriate, including contingency fee arrangements. It is anticipated that the Trustee shall contract for certain financial advisory and trust administration services from Force Ten Partners, LLC ("Force 10") and the Trust Professionals that are affiliates of the Trustee including, but not limited to, Province Fiduciary Services, LLC or Province, LLC (collectively, "Province"), and any such agreements shall be allowable if on reasonable or customary fee arrangement terms and conditions as otherwise provided herein.

(b)      The Trustee shall retain Force 10 for Administrative Tasks, unless (x) the Trustee in good faith determines there is a conflict or (y) the Class A-2 Representative and the Class B Representative consent in writing otherwise, such consent not to be unreasonably withheld, conditioned or delayed. In no event shall Province be retained for Administrative Tasks, unless the Class A-2 Representative and Class B Representative consent in writing to such retention. For Non-Administrative tasks (or any Administrative Tasks not handled by Force 10 in accordance with the prior sentence), the Trustee may use other cost-effective providers consistent with the Trustee's business judgment, subject to the Litigation Funding Budget. For purposes of this Section 4.5(b):

(i)      "Administrative Tasks" shall include:

(A)  court reporting and other routine filings;

(B) setting up bank accounts;

(C) managing the accounts receivable and accounts payable of the Litigation Trust;

(D) processing transfers of Trust Interests;

(E) tax filings;

(F) accounting and bookkeeping;

(G) management and organization of miscellaneous administrative functions of the Litigation Trust; and

27

(H) such other tasks or workstreams agreed by the Class A-2 Representative and the Class B Representative.

(ii)    "<u>Non-Administrative Tasks</u>" shall include, but are not limited to:

(A) tailored support functions for the Trustee, including (1) maintenance of Trustee dashboard to track pending litigation matters and (2) preparation of analytical work product for the Trustee and Trust Beneficiaries;

(B) litigation support (if and when warranted), including non-testifying consulting expert services (on an as needed or when warranted basis) such as (1) modeling and modeling and financial analysis (e.g., valuation, solvency, damages or settlement analysis), (2) asset tracing, forensic accounting and related diligence, (3) screening and preparation of expert witnesses and (4) assisting the Trustee in trial and mediation preparation, depositions and discovery support; and

(C)    director and officer insurance analysis and expertise.

(c)    If the Trustee retains Province, Province's hourly fees will be subject to (i) the Litigation Funding Budget and (ii) the following caps: $250,000 (in the aggregate) for the first three (3) months of such retention; $175,000 (in the aggregate) for the next three (3) months; and $50,000 (in the aggregate) per month thereafter (the "<u>Province Fee Caps</u>"); <u>provided</u> that any increase to the Province Fee Caps shall require the written consent of the Class A-2 Representative and the Class B Representative.

(d)    Without limiting the foregoing, with respect to any material workstreams or projects to be undertaken by Province at the direction of the Trustee, the Trustee shall require the agreement of the Class A-2 Representative in advance on an initial scope and budget for such workstream or project (which may be adjusted from time to time by agreement of those parties). The Class B Representative shall have reasonable consultation and information (but not consent) rights with respect to such agreements.

4.6    <u>Management of Trust Assets</u>. Except as otherwise explicitly provided in this Agreement (including as set forth in <u>Section 4.8</u>) and subject to Treasury Regulations governing liquidating trusts and the retained jurisdiction of the Bankruptcy Court as provided for in the Approval Order, the Trustee may control and exercise authority over the Trust Assets, over the management and disposition thereof, and over the management and conduct of the Litigation Trust, in each case, as reasonable, necessary or advisable to enable the Trustee to fulfill the intents and purposes of this Agreement. No Person dealing with the Litigation Trust will be obligated to inquire into the authority of the Trustee in connection with the acquisition, management or disposition of the Trust Assets.

4.7    <u>Investment of Cash</u>. Subject to the limitations set forth in <u>Section 4.10</u>, the proceeds from any Trust Assets or any income earned by the Litigation Trust shall be invested and reinvested only in Cash and U.S. government securities as defined in section 2(a)(16) of the Investment Company Act.

4.8    <u>Disposition of Specified Claims</u>.

(a)    <u>Proposals While the FILO Balance Is Not in an Underpayment State</u>. If the FILO Balance is not in an Underpayment State and the Litigation Trust receives (or wishes to make) a settlement proposal or monetization opportunity with respect to a Specified Claim from the Trustee (with the written consent of the Representatives) or a third party (each, a "<u>Proposal</u>") for which the Specified Value of such Proposal is:

28

(i)        less than the Specified Claim's Minimum Threshold, then the Trustee shall not make or accept such Proposal unless the Class A-2 Representative and the Class B Representative each provide written consent to such Proposal or acceptance;

(ii)       equal to or greater than the Specified Claim's Minimum Threshold but less than 20% in excess of the Specified Claim's Minimum Threshold, then the Trustee shall not make or accept such Proposal unless (A) the Class A-2 Representative and the Class B Representative each provide written consent to such Proposal or acceptance or (B) the Trustee (1) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to make or accept such Proposal and (2) provides five (5) Business Days' written notice (the "Notice Period") to the Notice Parties of its intent to make or accept such Proposal; provided that during the Notice Period, each Notice Party shall be entitled to object to the Trustee making or accepting a Proposal by delivering an objection in writing to the Trustee and the other Notice Party, which objection shall specify in reasonable detail the grounds for the objection (an "Objection"), to the Trustee and the other Notice Party, and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Marvin Isgur, in his capacity as mediator (or, in the event that Judge Isgur is not available, such other entity or individual reasonably acceptable to the Litigation Trustee and the Notice Parties); provided further that if a successful resolution is not achieved within three (3) Business Days of the commencement of such mediation (which three (3)-Business Day period may be extended by the Trustee in its sole discretion in writing) (the "Mediation Period"), the parties may seek resolution by the Bankruptcy Court on an emergency basis;

(iii)      equal to or greater than 20% in excess of the Specified Claim's Minimum Threshold but less than the Specified Claim's Maximum Threshold, then the Trustee may decide, consistent with its fiduciary duties, whether to make or accept such Proposal; and

(iv)      equal to or greater than the Specified Claim's Maximum Threshold, then the Trustee shall accept such Proposal unless the Trustee reasonably determines based on the advice of outside counsel that accepting and implementing such Proposal is inconsistent with its fiduciary duties.

(b)        Proposals While the FILO Balance Is in an Underpayment State. If the FILO Balance is in an Underpayment State and the Litigation Trust receives or wishes to make a Proposal with respect to a Specified Claim for which the Specified Value of such Proposal is:

(i)        less than the Specified Claim's Minimum Threshold, then the Trustee shall not make or accept such Proposal unless (A) the Class A-2 Representative and the Class B Representative each provide written consent to such Proposal or acceptance or (B) the Trustee (1) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to make or accept such Proposal and (2) provides five (5) Business Days' written notice to the Notice Parties of its intent to make or accept such Proposal; provided that during the Notice Period, each Notice Party shall be entitled to object to the Trustee making or accepting a Proposal by delivering an Objection to the Trustee and the other Notice Party, and upon such an Objection, the objecting party shall (x) promptly arrange a conference with Judge Marvin Isgur, in his capacity as mediator (or, in the event that Judge Isgur is not available, such other entity or individual reasonably acceptable to the Litigation Trustee and the Notice Parties); provided further that if a successful resolution is not achieved within the Mediation Period, the parties may seek resolution by the Bankruptcy Court on an emergency basis;

29

(ii)      equal to or greater than the Specified Claim's Minimum Threshold but less than the Specified Claim's Maximum Threshold, then the Trustee may decide, consistent with its fiduciary duties, whether to make or accept such Proposal; and

(iii)      equal to or greater than the Specified Claim's Maximum Threshold, then the Trustee shall accept such Proposal unless the Trustee reasonably determines based on the advice of outside counsel that accepting and implementing such Proposal is inconsistent with its fiduciary duties.

(c)      <u>Increasing the Specified Value</u>. At the election of the Class A-2 Representative (acting at the unanimous written direction (email being sufficient) of the Class A-2 Trust Beneficiaries (excluding any Restricted Transferees)), the Class A-2 Trust Beneficiaries may, on one or more occasions, increase the deemed value of a Specified Value with the effect that it is treated as meeting the applicable Minimum Threshold by contributing Class A-2 DIP Trust Interests or Class A-2 Bridge Trust Interests having a Class A-2 Preference equal to the difference between the Net Offered Specified Value of such Proposal and the highest applicable Net Minimum Specified Value of such Specified Claim. In connection with its direction to the Class A-2 Representative to increase the deemed value of a Specified Value pursuant to the foregoing sentence, each Class A-2 Trust Beneficiary shall specify (in its sole discretion) whether it will contribute Class A-2 DIP Trust Interests or Class A-2 Bridge Trust Interests. If applicable, the Trustee shall cause <u>Schedule 1</u> to be updated to reflect the foregoing contributions.

(d)      <u>Underpayment State</u>. The FILO Balance is in an "<u>Underpayment State</u>" if:

(i)      between the Effective Date and December 30, 2025, the aggregate FILO Balance is equal to or greater than $275,000,000;

(ii)      between December 31, 2025 and March 31, 2026, the aggregate FILO Balance is equal to or greater than $220,000,000; <u>provided</u> that, for purposes of determining whether the FILO Balance is in an "Underpayment State" pursuant to <u>Section 4.4(b)</u>, the foregoing period shall be between December 31, 2025 and March 31, 2026;

(iii)      between April 1, 2026 and June 30, 2026, the aggregate FILO Balance is equal to or greater than $160,000,000;

(iv)      between July 1, 2026 and August 31, 2026, the aggregate FILO Balance is equal to or greater than $110,000,000;

(v)      between September 1, 2026 and December 30, 2026, the aggregate FILO Balance is equal to or greater than $60,000,000;

(vi)      on or after December 31, 2026, the aggregate FILO Balance is equal to or greater than $10,000,000.

4.9      <u>Additional Powers of the Trustee</u>. Subject in all respects to <u>Sections 4.2</u>, <u>4.7</u>, <u>4.8</u> and <u>4.10</u>, in addition to any and all of the powers enumerated above, and except as otherwise provided in the Approval Order, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan or the Confirmation Order, or this Agreement and subject to the Treasury Regulations governing liquidating trusts (solely to the extent applicable) and the retained jurisdiction of the Bankruptcy Court as provided for in the Approval Order, the Trustee shall be empowered to take any action as

30

reasonably deemed necessary or appropriate to serve the best interests of the Trust Beneficiaries, collectively, including, but not limited to, doing any of the following:

(a)     investigate, analyze, monetize, compromise, settle, adjust, arbitrate, mediate, sue on or defend, pursue, prosecute, abandon, dismiss, assign, exercise rights, powers and privileges with respect to or otherwise deal with or finally resolve the Specified Claims or any and all other causes of action in favor of or against the Litigation Trust;

(b)     carry out the disposition of the Trust Assets that are not Specified Claims in accordance with the Trustee's reasonable business judgment and fiduciary duties as set forth in this Agreement;

(c)     hold legal title to any and all rights in or arising from the Trust Assets, including, but not limited to, the right to collect any and all money and all other property belonging to the Litigation Trust (including any Trust Proceeds);

(d)     protect and enforce the rights of the Litigation Trust in and to the Trust Assets and the Transferred Privileged Information by any method deemed reasonably appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law (whether foreign or domestic) and general principles of equity;

(e)     satisfy any and all liabilities and obligations created, incurred or assumed by the Litigation Trust;

(f)     subject to Section 2.7, assert, enforce, release or waive any privilege (including the Privileges) or defense on behalf of the Litigation Trust, the Trust Claims or the Trust Beneficiaries, as applicable;

(g)     obtain reasonable insurance coverage with respect to the potential liabilities and obligations of the Litigation Trust and the Trustee under this Agreement (in the form of a directors and officers policy, an errors and omissions policy, or otherwise, all at the sole cost and expense of the Litigation Trust), subject in each case to the written consent from the Class A-2 Representative and the Class B Representative (such consent not to be unreasonably withheld, conditioned or delayed);

(h)     receive, manage, invest, supervise, protect and liquidate the Trust Assets, withdraw and make distributions from and pay taxes and other obligations owed by the Litigation Trust from funds held by the Trustee or the Litigation Trust in the accounts of the Litigation Trust as long as such actions are consistent with the Litigation Trust's status as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) that is a "grantor trust" pursuant to sections 671-679 of the IRC and which actions are merely incidental to the Litigation Trust's liquidation and dissolution;

(i)     prepare, or have prepared, and file, if necessary, with the appropriate Governmental Unit any and all tax returns, information returns, and other required documents with respect to the Litigation Trust (including, without limitation, U.S. federal, state, local or foreign tax or information returns required to be filed by the Litigation Trust); pay taxes properly payable by the Litigation Trust; and cause all taxes payable by the Litigation Trust to be paid exclusively out of the Trust Assets;

(j)     request any appropriate tax determination with respect to the Litigation Trust, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(k)     make tax elections by and on behalf of the Litigation Trust, which are deemed by the Trustee, either independently or with the advice of Trust Professionals, to be in the best interest of the Litigation Trust;

(l)     subject to the Province Fee Caps, retain and reasonably compensate Trust Professionals for services rendered and expenses incurred in the performance of such reviews or audits of the financial books and records of the Litigation Trust as may be appropriate in the Trustee's reasonable discretion and the preparation and filing of any tax returns or informational returns for the Litigation Trust as may be required;

(m)     subject to applicable law, seek the examination of any Entity or Person, with respect to the Trust Claims;

(n)     open and maintain bank and other deposit accounts, escrows and other accounts in the name of the Litigation Trust;

(o)     take all steps and execute all instruments and documents the Trustee reasonably deems necessary to effectuate the Litigation Trust and its purpose;

(p)     in the event that the Litigation Trust shall fail or cease to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) that is a "grantor trust" under section 671-679 of the IRC, take any and all necessary actions as it shall reasonably deem appropriate to have such assets treated as held for the Trust Beneficiaries as joint owners or as held by an entity classified as a partnership for U.S. federal tax purposes; and

(q)     take all actions reasonably necessary to comply with the Approval Order to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan and the Confirmation Order, and this Agreement (including all obligations thereunder).

4.10    <u>Limitations on Power and Authority of the Trustee</u>. Notwithstanding anything in this Agreement to the contrary, the Trustee will not have the authority to do any of the following:

(a)     take any action in contravention of the Approval Order, to the extent that the Plan has been confirmed and the Confirmation Order remains in full force and effect, the Plan or the Confirmation Order, or this Agreement;

(b)     dispose of Specified Claims not in accordance with the requirements set forth in <u>Section 4.8</u> of this Agreement;

(c)     agree to a contingency fee in excess of 20% of the gross proceeds of a Specified Claim or other Cause of Action without the written consent of the Class A-2 Representative and the Class B Representative, other than any existing contingency fee arrangements approved by the Bankruptcy Court as of the Effective Date;

(d)     obtain additional financing or funding without the written consent of (i) the Class B Representative and (ii) unless the further financing is junior to amounts due or to be due to the FILO Parties and under the Litigation Funding, the Class A-2 Trust Beneficiaries and the Litigation Funding Agent; <u>provided</u> that, for the avoidance of doubt, the Litigation Trust shall not incur any debt, obligation for borrowed money or other obligation with payment priority senior to or *pari passu* with the Class A Trust Interests (excluding Trust Expenses incurred in accordance with this Agreement) or secure any

obligation with liens on any Trust Assets, in each case, without the prior written consent of each of the Representatives;

(e)     grant any trust interests to any party without the written consent of each of the Representatives, other than additional Class A-1 Trust Interests in connection with the Litigation Funding from time to time;

(f)     possess property of the Litigation Trust or assign the Litigation Trust's rights in specific property for any purpose other than as provided herein;

(g)     cause or permit the Litigation Trust to engage in any trade or business;

(h)     except to the extent set forth on Schedule 2, receive transfers of any listed stocks or securities or any readily marketable assets or any operating assets of a going business;

(i)     except to the extent set forth on Schedule 2, receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets; or

(j)     take any action or engage in any investments or activities that would jeopardize treatment of the Litigation Trust as a "liquidating trust" (as defined in Treasury Regulation section 301.7701-4(d)) that is a "grantor trust" for U.S. federal income tax purposes under sections 671-679 of the IRC, or any successor provision thereof or would cause the Litigation Trust to be treated as a corporation or publicly traded partnership taxable as a corporation under section 7704 of the IRC.

4.11     Trust Records. In addition to the Trust Register and the Transaction Ledger required pursuant to Section 3.5, the Trustee shall (a) maintain books, records and accounts (together with the Trust Register and the Transaction Ledger, the "Books and Records") relating to any income realized from the Trust Assets (including the Trust Proceeds) and the payment of, costs and expenses of, and liabilities of claims against or assumed by, the Litigation Trust in such detail and for such period of time as may be necessary to enable the Trustee to make full and proper accounting in respect thereof and in accordance with applicable law and (b) to the extent reasonably practicable, hold and maintain the documents, work product and other materials and information produced by the Trustee, the Trust Professionals, or, to the extent in the Trustee's possession, any other party in respect of the Transferred Privileged Information or the Litigation Trust (collectively with the Trust Register, the Transaction Ledger, and the Books and Records, the "Trust Records"). The Books and Records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Litigation Trust.

4.12     Fiscal Year. The fiscal year of the Litigation Trust shall be the calendar year.

4.13     Reports; Budgets.

(a)     The Trustee shall deliver a written report to (x) each Representative and (y) for so long as the Creditors' Committee is in existence, the Creditors' Committee, in each case on the tenth (10th) Business Day of each month providing, as of the last day of the previous month:

(i)     the amount of cash received by the Litigation Trust through the Trust Asset monetization process, broken down by source, and the application thereof pursuant to Section 4.4;

33

(ii)    the amount of expenses paid by the Litigation Trust, broken down by category and professional firm, and a budget to actuals report;

(iii)    the FILO Balance; and

(iv)    the amount of the accrued Variable Component and the Deferred Portion then held in escrow;

(v)    a reasonably detailed summary of the asset monetization activity of the Litigation Trust undertaken in the immediately preceding month;

(vi)    the amount of Available Cash;

(vii)    the current approved Litigation Funding Budget (as defined in this Section 4.13); and

(viii)    reporting regarding the use of Province as provided in Section 4.5(d);

provided that prior to delivering any such report or other reporting materials, the Trustee may require such Representative or the members of the Creditors' Committee to enter into a confidentiality agreement and a common interest agreement and follow other protocols to the extent necessary to protect Transferred Privileged Information, Privileges or other applicable privileges, in each case as reasonably determined by and in a form reasonably acceptable to the Trustee and the applicable Representative or member of the Creditors' Committee.

(b)    Prior to delivery of any funding notice under the Commitment Letter, the Trustee shall deliver an applicable budget setting forth Trust Expenses that may be funded by Litigation Funding (each such budget, a "Litigation Funding Budget"). The initial Litigation Funding Budget covering the first (1st) eighteen (18) months post-Effective Date, attached hereto as Exhibit D, shall be the applicable Litigation Funding Budget for all purposes under this Agreement as of the Effective Date (it being expressly understood and agreed that the initial Litigation Funding Budget attached hereto as Exhibit D is reasonably acceptable to, and approved by, each of the Debtors, FILO Parties and the Creditors' Committee). The Trustee shall update the Litigation Funding Budget at least once every three (3) months. Any such updated Litigation Funding Budget shall be reasonably acceptable to the Litigation Funding Agent, and once approved by the Litigation Funding Agent as reasonably acceptable (which approval (i) may not be unreasonably withheld, delayed, or conditioned and (ii) may be in the form of e-mail from counsel to the Litigation Funding Agent), shall become the applicable Litigation Funding Budget for all purposes of this Agreement commencing on such date of approval. Except for the initial Litigation Funding Budget, the Litigation Funding Budget shall include monthly (rather than quarterly) expenses. Notwithstanding anything to the contrary in this Agreement, the Trustee may not pay Trust Expenses with the proceeds of any Litigation Funding except as set forth in the applicable Litigation Funding Budget and subject to the variance test; it being understood that the Trustee may cause Trust Expenses to be paid with Litigation Funding to the extent set forth in the approved FILO DIP Budget.

(c)    Concurrently with the delivery of the monthly reporting provided to (x) the Representatives and (y) for so long as the Creditors' Committee is in existence, the Creditors' Committee, in each case pursuant to Section 4.13(a), the Trustee shall deliver a variance report in respect of the then-applicable Litigation Funding Budget (if any variance), in the form attached hereto as Exhibit B (the "Variance Report"). Each Variance Report will contain columns with the prior month's actuals and budget figures in a form that matches the then-applicable Litigation Funding Budget and the total disbursements

34

shall not be more than 115% of the total disbursements in the then-applicable Litigation Funding Budget for the applicable month.

4.14    <u>Notice of Material Decisions; Consultation and Meetings with Trust Beneficiaries</u>. In addition to the reporting requirements set forth in <u>Section 4.13</u>, the Trustee shall (a) host conference calls on a bi-weekly basis, or more frequently in the Trustee's discretion, regarding the Trust Asset monetization process, which calls shall be accessible to each of the Representatives and the Class A Trust Beneficiaries (excluding any Restricted Transferees), which advisors to the Creditors' Committee may be allowed to attend while the Creditors' Committee is in existence, (b) make itself reasonably available for conference calls to discuss specific topics reasonably requested in writing by a Representative and (c) keep the Representatives reasonably informed of all material developments concerning the activities of the Litigation Trust. For the avoidance of doubt, nothing in this <u>Section 4.14</u> shall limit any approval rights of the Representatives or the Trust Beneficiaries set forth in this Agreement or provided under applicable law.

4.15    <u>Togut Reporting</u>. For so long as the Trustee retains Togut (or any replacement advisor), the Trustee shall cause Togut (or such replacement) to deliver to the Representatives reporting with respect to preference actions, which shall be consistent (with respect to both frequency and format) with the reporting currently required to be delivered to the counsel of the FILO Parties and the Creditors' Committee under paragraph 5 of the *Order Authorizing Retention and Employment of Togut, Segal & Segal LLP as Special Bankruptcy Counsel for the Debtors and Debtors in Possession Effective as of December 19, 2024* (Docket No. 3886).

4.16    <u>Coordination</u>. The Estate will coordinate its efforts with the Trustee with respect to issues involving overlapping concerns among the Estate and the Litigation Trust with respect to third parties. For example, if the same third party is involved in disputes with both the Estate and the Litigation Trust, the effort will be coordinated between the Estate and the Trustee. If the Estate and the Trustee are unable to resolve a matter that should be coordinated, they shall (i) arrange a conference with Judge Isgur, in his capacity as mediator (or, in the event that Judge Isgur is not available, such other entity or individual reasonably acceptable to the Litigation Trustee and the Estate) in connection with the subject matter of this Agreement; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

(a)    With respect to any such dispute presented to the Bankruptcy Court:

(i)    If the FILO Balance is in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate; <u>provided</u>, <u>however</u>, that the Trustee's business judgment will not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estate (other than with respect to Bankruptcy Code section 502(h) claims).

(ii)    If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate's business judgment will be applied to the dispute, subject to challenge by the Trustee; <u>provided</u>, <u>however</u>, that the Estate's business judgment will not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust.

(b)    Notwithstanding the foregoing, with respect to any constructive trust claims asserted by any third parties with respect to any Trust Assets or Retained Collateral, as well as any government investigations, the Litigation Trust and the Estate will coordinate efforts to dispute or settle

35

such claims, or to address such investigations, including with respect to funding arrangements for the defense of any such claims or addressing any such investigations.

## ARTICLE V
## THE TRUSTEE GENERALLY

5.1     Trustee. The Trustee shall be a professional natural person or legal or financial institution with the requisite experience to administer the Litigation Trust. Every successor Trustee appointed hereunder shall, without any further act, deed or conveyance, become vested with all rights, powers, trusts and duties of the predecessor Trustee, and the successor Trustee shall not be personally liable for any act or omission of the predecessor Trustee.

5.2     Trustee's Compensation and Reimbursement.

(a)     Compensation. Subject to Section 2.4(a), the Trustee shall be compensated from the Trust Assets on the terms set forth on Exhibit A hereto and incorporated herein by reference (the "Trustee Compensation"). Subject to Section 3.3(d), the Trustee Compensation shall not be modified absent the written consent of the Trustee, the Class A-2 Representative and the Class B Representative (such consent of the Class A-2 Representative and the Class B Representative not to be unreasonably withheld, conditioned or delayed).

(b)     Expenses. The Litigation Trust will reimburse the Trustee for all actual, reasonable and documented out-of-pocket expenses incurred by the Trustee in connection with the performance of the duties of the Trustee hereunder, subject to the terms set forth on Exhibit A hereto (together with the Trustee Compensation, the "Trustee Fees").

5.3     Resignation and Removal; Incapacitation.

(a)     Subject to Sections 3.3(d) and 5.3(b), the Trustee may (i) resign for any reason by giving not less than thirty (30) days' written notice thereof to the Trust Beneficiaries; (ii) be removed without Cause by the Class A-2 Representative, in consultation with the Class B Representative, on not less than ten (10) days' written notice from the Class A-2 Representative; or (iii) be removed with Cause by the Class A-2 Representative, in consultation with the Class B Representative, upon not less than five (5) days' written notice from the Class A-2 Representative; provided that in the event of removal for Cause, such breach or failure giving rise Cause that is capable of being cured (as determined in good-faith by the Class A-2 Representative after consultation with the Class B Representative) has continued for more than ten (10) days following written notice from the Class A-2 Representative after consultation with the Class B Representative describing such breach or failure; provided further that the Trustee shall be entitled to no more than one opportunity in the aggregate to cure any such Cause.

(b)     In addition to and without limiting the foregoing, in the event that the Class B Representative believes in good faith that Cause exists to remove the Trustee and requests in writing (which request shall set forth in a reasonably detailed manner the basis of such good faith belief) that the Class A-2 Representative remove the Trustee in accordance with Section 5.3(a), and the Class A-2 Representative does not remove the Trustee as a consequence thereof within ten (10) days of such request, then the Class B Representative may seek an order of the Bankruptcy Court determining that Cause exists to remove the Trustee. If the Bankruptcy Court determines that Cause exists to remove the Trustee and grants an order to that effect, then the Trustee shall thereupon automatically be removed with no further action by any party to this Agreement.

36

(c)     The Trustee shall be entitled to any and all Trustee Fees earned prior to the effectiveness of any resignation or removal or prior to any incapacity as described in this Section 5.3 and otherwise payable in accordance with this Agreement, subject to the Trustee Compensation terms set forth on Exhibit A hereto, including the "Success Fee Tail" described therein. Any such resignation or removal shall not, absent order of the Bankruptcy Court, become effective until the appointment of a successor Trustee in accordance with this Agreement.

5.4     Effect of Resignation or Removal or Incapacity. The resignation, removal or incapacity of Trustee as contemplated hereunder, as applicable, shall not operate to terminate the Litigation Trust created by this Agreement or to revoke any existing agency created pursuant to the terms of this Agreement or invalidate any action theretofore taken by the Trustee or any prior Trustee. In the event of the resignation or removal of the Trustee, such Trustee will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court or requested by the successor Trustee to effect the termination of such Trustee's capacity under this Agreement, (b) deliver to the Bankruptcy Court (if required) or the successor Trustee the Trust Records and all other documents, instruments, records and other writings related to the Litigation Trust as may be in the possession of such Trustee and shall not retain any copies of such materials, even for archival purposes, and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

5.5     Appointment of Successor Trustee. Subject to Sections 2.1 and 3.3(d), upon the resignation, removal or incapacity of the Trustee, the Class A-2 Representative shall appoint a successor Trustee to fill the vacancy so created, subject to the approval of the Class B Representative (such approval of the Class B Representative not to be unreasonably withheld, conditioned or delayed). Upon and after the FILO Balance Repayment Date, the Trustee may be removed by the Class B Representative for any reason and a new Trustee shall be appointed by the Class B Representative. No Bankruptcy Court approval shall be required to appoint (i) the Class B Representative, or the members of the Transformation Committee or Plan Administrator Committee or (ii) a body, sub-committee, or affiliate of such parties as successor Trustee. Any successor Trustee so appointed shall consent to and accept in writing the terms of this Agreement and agrees that the provisions of this Agreement shall be binding upon and inure to the benefit of the successor Trustee.

5.6     Confidentiality. During and following its appointment as Trustee, the Trustee shall, and shall ensure that any Trust Professional agrees to, hold confidential and not use for any purpose other than as set forth in this Agreement any non-public information received thereby that relates to the Litigation Trust, the Privileges, the Representative, or the Trust Beneficiaries unless (a) required by law to disclose such information (in which case the Litigation Trust shall provide the Trust Beneficiaries reasonable advance notice and an opportunity to protect their rights), (b) authorized to disclose such information by the Class A-2 Representative and the Class B Representative in writing or (c) with prior notice to the Trust Beneficiaries, deemed reasonably necessary by the Trustee for the Trustee to perform the Trustee Responsibilities unless either the Class A-2 Representative or the Class B Representative objects. Notwithstanding anything to the contrary contained herein, the confidentiality obligations of this Section 5.6 shall survive termination of this Agreement.

## ARTICLE VI
## LIABILITY AND INDEMNIFICATION

6.1     No Further Liability. To the furthest extent permitted by law, the Trustee shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Litigation Trust unless arising out of the Trustee's own criminal acts, fraud, willful misconduct or gross negligence. None of the provisions of this Agreement shall require the Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the

exercise of any of their rights and powers. No termination of this Agreement or amendment, modification or repeal of this <u>Section 6.1</u> shall adversely affect any right or protection of the Trustee that exists at the time of such amendment, modification or repeal.

6.2     <u>Indemnification of the Trustee</u>.

(a)     From and after the Effective Date, and to the furthest extent permitted by law, the Trustee shall be, and hereby is, indemnified by the Litigation Trust, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, causes of action, bonds, covenants, judgments, damages, attorneys' fees, defense costs and other assertions of liability arising out of any such Trustee's exercise, attempted exercise, or failure or refusal to exercise its powers or discharge its duties conferred by this Agreement (the "<u>Trustee Indemnified Claims</u>"), except that the Trustee shall not be indemnified to the extent that it is found by a court of competent jurisdiction through a final judgment that any Trustee Indemnified Claim resulted from the Trustee's own criminal acts, fraud, willful misconduct or gross negligence. The Litigation Trust shall, on demand, advance or pay promptly, at the election of the Trustee, solely out of the Trust Assets, on behalf of the Trustee, attorneys' fees and other expenses and disbursements to which such Trustee would be entitled pursuant to the foregoing indemnification provision; <u>provided</u>, <u>however</u>, that the Trustee, to the extent receiving any such advance, shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by final order, that such Trustee is not entitled to indemnification as provided hereunder.

(b)     The indemnification provided under this <u>Section 6.2</u> shall survive the death, dissolution, resignation or removal, as may be applicable, of the Trustee and shall inure to the benefit of the Trustee's heirs, successors and assigns. Termination or modification of this Agreement shall not affect any indemnification rights or obligations set forth herein.

(c)     The rights to indemnification under this <u>Section 6.2</u> are not exclusive of other rights which any Trustee may otherwise have at law or in equity, including, without limitation, common law rights to indemnification or contribution. Nothing in this <u>Section 6.2</u> will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party. Further, the Litigation Trust hereby agrees: (i) that the Litigation Trust is the indemnitor of first resort (<i>i.e.</i>, in the event any Trustee has the right to receive indemnification from one or more third parties, the Litigation Trust's obligations to such Trustee are primary); (ii) that the Litigation Trust shall be required to pay the full amount of reasonable and documented out-of-pocket expenses (including reasonable attorneys' fees) actually incurred by such Trustee in connection with any proceeding as to which the Trustee is entitled to indemnification hereunder in advance of the final disposition of such proceeding from the Trust Assets; and (iii) no Trustee shall have the obligation to reduce, offset, allocate, pursue or apportion any indemnification advancement, contribution or insurance coverage among multiple parties owing indemnification obligations to such Trustee prior to the Litigation Trust's satisfaction of its indemnification obligations hereunder.

6.3     <u>Indemnification of the Litigation Funding Agent and the Class A-2 Representative</u>.

(a)     The Litigation Trust shall indemnify and hold harmless each of the Litigation Funding Agent and the Class A-2 Representative from and against any Loss suffered or sustained by them, by reason of any acts, omissions or alleged acts or omissions arising out of their activities on behalf of the Litigation Trust or in furtherance of the interests of the Litigation Trust, including any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim if the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claims are based were not a result of fraud,

38

gross negligence or willful misconduct by the Litigation Funding Agent or the Class A-2 Representative, as applicable. Any indemnification pursuant to this <u>Section 6.3</u> shall only be from the Trust Assets.

(b)     Any reasonable and documented out-of-pocket expenses (including attorneys' fees) incurred by the Litigation Funding Agent or the Class A-2 Representative in a civil or criminal action, suit or proceeding shall be paid by the Litigation Trust in advance of the final disposition of such action, suit or proceeding; <u>provided</u> that if the Litigation Funding Agent or the Class A-2 Representative, as applicable, is advanced such expenses and it is later determined that the Litigation Funding Agent or the Class A-2 Representative, as applicable, was not entitled to indemnification with respect to such action, suit or proceeding, then the Litigation Funding Agent or the Class A-2 Representative, as applicable, shall reimburse the Litigation Trust for such advances.

(c)     The Litigation Trust hereby acknowledges that each of the Litigation Funding Agent and the Class A-2 Representative may have certain rights to indemnification, advancement of expenses or insurance provided by certain of its affiliates (the "<u>Affiliate Representative Indemnitors</u>"). The Litigation Trust hereby agrees (i) that it is the indemnitor and expense advancer of first resort with respect to the Litigation Funding Agent or the Class A-2 Representative, as applicable (*i.e.*, its obligations to the Litigation Funding Agent or the Class A-2 Representative, as applicable, are primary and any obligation of the respective Affiliate Representative Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Litigation Funding Agent or the Class A-2 Representative, as applicable, is secondary), (ii) that it shall be required to advance the full amount of expenses and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement, in each case, as and to the extent, required by <u>Section 6.3(a)</u>, without regard to any rights the Litigation Funding Agent or the Class A-2 Representative, as applicable, may have against the Affiliate Representative Indemnitors, as applicable, and (iii) that it irrevocably waives, relinquishes and releases the Affiliate Representative Indemnitors from any and all claims against the Affiliate Representative Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Litigation Trust further agrees that no advancement or payment by the Affiliate Representative Indemnitors on behalf of the Litigation Funding Agent or the Class A-2 Representative, as applicable with respect to any claim for which the Litigation Funding Agent or the Class A-2 Representative, as applicable, has sought indemnification from the Litigation Trust shall affect the foregoing and the Affiliate Representative Indemnitors shall have a right of contribution or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Litigation Funding Agent or the Class A-2 Representative, as applicable, against the Litigation Trust. The Litigation Trust and each of the Trust Beneficiaries acknowledges that the Affiliate Representative Indemnitors are express third-party beneficiaries of the terms of this <u>Section 6.3</u>.

(d)     No amendment, modification or deletion of this <u>Section 6.3</u> shall apply to or have any effect on the right of the Litigation Funding Agent or the Class A-2 Representative to indemnification for or with respect to any acts or omissions of the Litigation Funding Agent or the Class A-2 Representative, as applicable, occurring prior to such amendment, modification or deletion.

6.4     <u>Indemnification of the Class A Trust Beneficiaries</u>.

(a)     The Litigation Trust shall indemnify and hold harmless each Class A Trust Beneficiary from and against any Loss suffered or sustained by such Class A Trust Beneficiary (excluding any taxes of such Class A Trust Beneficiary), solely with respect to claims and Causes of Action seeking to disgorge or otherwise recover funds distributed from the Litigation Trust to the Class A Trust Beneficiaries where such claims or Causes of Action have a direct nexus to the Debtors or the Estate (each such Loss, a "<u>Beneficiary Indemnified Loss</u>," and each such claim or Cause of Action, a "<u>Disgorgement Claim</u>"). Any indemnification pursuant to this <u>Section 6.4</u> shall only be from the Trust Assets.

39

(b)     Any reasonable and documented out-of-pocket expenses (including attorneys' fees) incurred by a Class A Trust Beneficiary in a civil or criminal action, suit or proceeding relating to a Beneficiary Indemnified Loss shall be paid by the Litigation Trust in advance of the final disposition of such action, suit or proceeding, subject to a cap of $250,000 per Class A Trust Beneficiary (which amount may be increased with the consent of the Trustee, the Litigation Funding Agent and Class A-2 Representative; provided that if a Class A Trust Beneficiary is advanced such expenses and it is later determined that such Class A Trust Beneficiary was not entitled to indemnification with respect to such action, suit or proceeding, then such Class A Trust Beneficiary shall reimburse the Litigation Trust for such advances, subject to the above referenced cap.

(c)     Notwithstanding anything to the contrary in Sections 6.4(a) and 6.4(b), the Litigation Trust shall not be required, to pay the fees and expenses of more than one separate law firm for all such Class A Trust Beneficiaries taken as a whole in any jurisdiction in any single action or proceeding (and, if reasonably necessary, a single local counsel in each appropriate jurisdiction) except to the extent that separate counsel is reasonably necessary based on actual conflicts of interest between the Class A Trust Beneficiaries.

(d)     The Litigation Trust hereby acknowledges that each Class A Trust Beneficiary may have certain rights to indemnification, advancement of expenses or insurance provided by certain of its affiliates (the "Affiliate Class A Indemnitors"). The Litigation Trust hereby agrees (i) that it is the indemnitor and expense advancer of first resort with respect to each Class A Trust Beneficiary (i.e., its obligations to each Class A Trust Beneficiary are primary and any obligation of the respective Affiliate Class A Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such Class A Trust Beneficiary is secondary), (ii) that it shall be required to advance the full amount of expenses and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement, in each case, as and to the extent, required by Section 6.3(a), without regard to any rights a Class A Trust Beneficiary may have against the Affiliate Class A Indemnitors, as applicable, and (iii) that it irrevocably waives, relinquishes and releases the Affiliate Class A Indemnitors from any and all claims against the Affiliate Class A Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Litigation Trust further agrees that no advancement or payment by the Affiliate Class A Indemnitors on behalf of each Class A Trust Beneficiary with respect to any claim for which such Class A Trust Beneficiary has sought indemnification from the Litigation Trust shall affect the foregoing and the Affiliate Class A Indemnitors shall have a right of contribution or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Class A Trust Beneficiary against the Litigation Trust. The Litigation Trust and each of the Trust Beneficiaries acknowledges that the Affiliate Class A Indemnitors are express third-party beneficiaries of the terms of this Section 6.4.

(e)     No amendment, modification or deletion of this Section 6.4 shall apply to or have any effect on the right of any Class A Trust Beneficiary to indemnification for or with respect to any acts or omissions of such Class A Trust Beneficiary occurring prior to such amendment, modification or deletion.

6.5     Litigation Trust Liabilities. Notwithstanding anything else herein to the contrary, (a) all liabilities of the Litigation Trust, including, without limitation, indemnity obligations under Section 6.2, will be liabilities of the Litigation Trust as an Entity and will be paid or satisfied solely from the Trust Assets, and (b) no liability of the Litigation Trust will be payable in whole or in part by any Trust Beneficiary individually or in the Trust Beneficiary's capacity as a Trust Beneficiary, by the Trustee individually or in the Trustee's capacity as Trustee, or by any representative, member, partner, shareholder, director, officer, professional, employees, agent, affiliate or advisor of any Trust Beneficiary, the Trustee or their respective affiliates.

**ARTICLE VII**
**TAX MATTERS**

7.1     <u>Tax Reporting and Payment</u>.

(a)     For all U.S. federal income tax purposes, it is the intention of all parties that the Litigation Trust be classified as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" pursuant to sections 671-679 of the IRC and the Treasury Regulations thereunder created for the primary purpose of liquidating the Trust Assets (including the Specified Claims), with no objective to continue or engage in the conduct of a trade or another business, except to the extent reasonably necessary to, and consistent with, the purpose of the Litigation Trust. In furtherance of the foregoing, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), for all U.S. federal income tax purposes, the parties shall treat the transfer of Trust Assets to the Litigation Trust as

[(i) the transfer of Trust Assets directly to the holders of Allowed Claims entitled to receive Trust Interests, to the FILO Parties that provided the Estate Funding and, by reason of the Class B Trust Interests transferred to the Plan Trust, to holders of Allowed Claims entitled to receive Plan Trust Interests (subject to any liabilities and obligations relating to the Trust Assets), in satisfaction of, and in exchange for, their Claims and Estate Funding, other than to the extent any Trust Assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity in respect of the Plan Trust, followed by (ii) the transfer of such Trust Assets (subject to such liabilities and obligations) by such persons to the Litigation Trust (in the case of the holders of Plan Trust Interests, first as a transfer of such assets to the Plan Trust and then from the Plan Trust to the Litigation Trust) in exchange for their Trust Interests.

Accordingly, (A) the holders of the Class A-1 Trust Interests and Class A-2 Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Trust Assets, and (B) the holders of the Plan Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of the Trust Assets, in each case, other than to the extent any assets of the Plan Trust allocable to, or held on account of, disputed claims are treated as a disputed ownership fund or other separate taxable entity.][11]

<mark>OR</mark>

[(i) the transfer of the portion of the Trust Assets to which the Class A Trust Interests relate (in the case of the Class A-1 Trust Interests, to the extent of the Secured Interim Advances and the Estate Funding) directly to the holders of Allowed FILO DIP Claims, the holders of Allowed Remaining FILO Bridge Claims and the FILO Parties that provided the Estate Funding (subject to any liabilities and obligations relating to those Trust Assets) in satisfaction of, and in exchange for, their Claims and Estate Funding, followed by (ii) the transfer of such Trust Assets by such persons, and of the remaining Trust Assets by the Debtors, to the Litigation Trust in exchange for their Trust Interests and, if there is a subsequent transfer of the Class B Trust Interests by the Debtors to the Plan Trust, such

---

[11] <u>Note to Draft</u>: To include if the transfer of assets to the Plan Trust and distribution of Plan Trust Interests under the Plan occur on or prior to the Effective Date.

41

transfer shall be treated as a direct transfer of the applicable portion of the assets of the Litigation Trust underlying such Class B Trust Interests to the Plan Trust Beneficiaries, followed by the transfer of such Trust Assets by the Plan Trust Beneficiaries to the Plan Trust, as further described in Section 6.13(a) of the Plan.

Accordingly, (A) prior to the establishment of the Plan Trust, the holders of the Class A-1 Trust Interests and Class A-2 Trust Interests and the Debtors, as the holders of the Class B Trust Interests, shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Trust Assets, and (B) after the establishment of the Plan Trust, (1) the holders of the Class A-1 Trust Interests and Class A-2 Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Trust Assets, and (2) the holders of the Plan Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of the Trust Assets, in each case, other than to the extent any assets of the Plan Trust allocable to, or held on account of, disputed claims are treated as a disputed ownership fund or other separate taxable entity.][12]

(b)     To the extent the Litigation Trust is required to have a "taxable year," such taxable year of the Litigation Trust shall be the "calendar year" as such terms are defined in section 441 of the IRC. The Trustee shall file all (i) required tax returns for the Litigation Trust and (ii) such tax returns in a manner that treats the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with this Section 7.1 to the extent permitted by applicable law and shall report consistently with the foregoing for state and local tax purposes. The Trustee also shall annually, by May 1 of each year, send, or otherwise make available in a commercially reasonable manner, to each Trust Beneficiary a separate statement setting forth such Trust Beneficiary's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Litigation Trust) as relevant for U.S. federal income tax purposes and shall instruct all such Trust Beneficiaries to use such information in preparing their U.S. federal income tax returns (or to forward the appropriate information to such holders' underlying beneficial owners with instructions to utilize such information in preparing their U.S. federal income tax returns). The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Litigation Trust that is required by any Governmental Unit. All income of the Litigation Trust shall be treated as subject to tax on a current basis.

(c)     As soon as practicable after the Effective Date, the Estate Representative, in consultation with the Trustee, shall make a good faith determination of the fair market value of the Trust Assets, as of the Effective Date. The Estate Representative, in cooperation with the Trustee, shall inform all parties of such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(d)     Allocations of Litigation Trust taxable income among the Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time, and without regard to any restrictions on distributions set forth in the Plan or this Agreement) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all the Trust Assets (valued at their tax book value) to the Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust, in the manner set forth in Sections 4.3 and 4.4 hereof. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an

---

[12] Note to Draft: To include only if the transfer of assets to the Plan Trust and distribution of Plan Trust Interests under the Plan does not occur on or prior to the Effective Date.

economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Trust Assets. The tax book value of the Trust Assets for purposes of this <u>Section 7.1(d)</u> shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

(e)     The Trustee shall be responsible for payment, out of the Trust Assets, of any taxes imposed on the Litigation Trust or the Trust Assets.

(f)     The Trustee may request an expedited determination of taxes of the Litigation Trust, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

(g)     The Trustee, the Class B Representative, the Plan Trustee, and the Debtors shall each cooperate with the other in connection with the preparation and filing of any tax returns, the provision of any required tax forms, and any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

(h)     The treatment provided in this <u>Section 7.1</u>, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistently therewith.

7.2     <u>Withholding of Taxes</u>.

(a)     The Trustee shall deduct and withhold and pay to the appropriate Governmental Unit all amounts required to be deducted or withheld pursuant to the IRC or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Trust Beneficiaries. All amounts deducted and withheld and paid to the appropriate Governmental Unit shall be treated as amounts distributed to such Trust Beneficiaries for all purposes of this Agreement. Notwithstanding the above, each Trust Beneficiary shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Trust Beneficiary by any Governmental Unit, including income, withholding and other tax obligations, on account of such payment or distribution.

(b)     The Trustee shall be authorized to collect such tax information from the Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate this Agreement. All Trust Beneficiaries may be required to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate, including an IRS Form W-9 or, in the case of Trust Beneficiaries that are not "United States persons" for U.S. federal income tax purposes, certification of foreign status on an applicable IRS Form W-8.

7.3     <u>Foreign Tax Matters</u>. The Trustee shall duly comply on a timely basis with all obligations, and satisfy all liabilities, imposed on the Trustee or the Litigation Trust under non-United States law relating to taxes. The Trustee, or any other legal representative of the Litigation Trust, shall not distribute the Trust Assets or proceeds thereof without having first obtained all certificates required to have been obtained under applicable non-United States law relating to taxes.

## ARTICLE VIII
## TERMINATION OF LITIGATION TRUST

8.1     <u>Termination</u>. The Litigation Trust shall terminate upon the later to occur of the following events or determinations: (a) all of the Trust Assets have been distributed pursuant to this Agreement; and (b) the Trustee, upon Bankruptcy Court approval following ten (10) Business Days' written notice to the Representatives and opportunity to object, determines that the administration of any remaining Trust Assets is not likely to yield sufficient additional Trust Proceeds to justify further pursuit. In addition, for the avoidance of doubt and in compliance with any applicable rule against perpetuities (and notwithstanding anything herein to the contrary), the Litigation Trust shall terminate no later than five (5) years after the date of the creation of the Litigation Trust unless the Bankruptcy Court, upon motion made within the six (6)-month period before such fifth (5th) anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6)-month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Trust Assets. If at any time the Trustee determines that the expense of administering the Litigation Trust so as to make a final distribution to the Trust Beneficiaries is likely to exceed the value of the Trust Assets then remaining in the Litigation Trust, the Trustee shall (i) reserve any amount necessary to dissolve the Litigation Trust; (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, and (B) exempt from U.S. federal income tax under section 501(a) of the IRC as reasonably determined by the Trustee; and (iii) dissolve the Litigation Trust (the period of time commencing from when such determination is made until the final dissolution of the Litigation Trust, the "<u>Termination Process</u>"). Such date upon which the Litigation Trust shall finally be dissolved shall be referred to herein as the "<u>Termination Date</u>."

8.2     <u>Continuance of Litigation Trust for Winding Up</u>. During the Termination Process, the Trustee, solely for the purpose of liquidating and winding up the affairs of the Litigation Trust, shall continue to act as such until its duties have been fully performed. During the Termination Process, the Trustee shall continue to be entitled to receive the Trustee Fees. The Trustee shall continue to maintain the Trust Records and, notwithstanding the Termination Date, shall preserve and keep copies of the Trust Records for a period of one (1) year following the Termination Date, after which time the Trustee may destroy the Trust Records (unless such records and documents are necessary to fulfill the Trustee's obligations hereunder, including in respect of any obligations hereunder relating to tax compliance). Notwithstanding the Termination Date, the Trustee shall provide copies of the Trust Records to any Trust Beneficiary who reasonably requests them at said Trust Beneficiary's sole cost and expense.

## ARTICLE IX
## AMENDMENT AND WAIVER

This Agreement may be amended or supplemented or provisions of this Agreement may be waived, in each case (a) by the Trustee if the amendment or waiver is (x) required by the terms of this Agreement or (y) administrative or corrective in nature, and in each case specified in this <u>clause (a)</u>, does not adversely affect any Trust Beneficiary or (b) with the prior written consent of each Representative. No failure by the Litigation Trust or the Trustee to exercise or delay in exercising any right, power or privilege under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any further exercise thereof, or of any other right, power or privilege. Notwithstanding the foregoing, no amendment, supplement or waiver of or to this Agreement shall (a) adversely affect the U.S. federal income tax status of the Litigation Trust as a "liquidating trust" (as defined under Treasury Regulation section 301.7701-4(d)) that is a "grantor trust" pursuant to sections 671-679 of

44

the IRC of which the holders of the Class A Trust Interests and Class B Trust Interests are the grantors or (b) cause this Litigation Trust to become an association taxable as a corporation for U.S. federal income tax purposes (or to become a publicly traded partnership taxable as a corporation under section 7704 of the IRC), unless each Trust Beneficiary consents to such amendment, supplement or waiver in writing, and in advance of such amendment, supplement or waiver.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.1    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Principles of conflicts of law in any jurisdiction that would require or permit application of the law of a jurisdiction other than New York shall not apply.

10.2    Jurisdiction. The Trustee hereby irrevocably and unconditionally (i) submits, in connection with any legal action or proceeding relating to this Agreement, to the exclusive general jurisdiction of (a) the Bankruptcy Court or any other federal court having jurisdiction over the Chapter 11 Cases or (b) to the extent the Bankruptcy Court or any such other federal court lacks jurisdiction or abstains from exercising jurisdiction, the federal and state courts sitting in the County of New York in the State of New York and (ii) consents that any such action or proceeding shall be brought exclusively in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; provided that, notwithstanding the foregoing, the Trustee shall have power and authority to bring any Trust Claims and pursue any recoveries in respect of any Trust Claims in any jurisdiction determined by the Trustee in its reasonable discretion.

10.3    Severability. In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by final order to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

10.4    Notices. Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered by electronic communication, sent by nationally recognized overnight delivery service with confirmation of receipt, or mailed by first-class mail with confirmation of receipt, to the receiving party's address below:

(a)    if to the Trustee, to:

Mark Kronfeld
Province Fiduciary Services, LLC
2360 Corporate Circle, Suite 340
Henderson, Nevada 89074
Email: mkronfeld@provincefirm.com

With a copy to:

David W. Dachelet, Esq.
Province, LLC
2360 Corporate Circle, Suite 340

45

Henderson, Nevada 89074
Email: ddachelet@provincefirm.com

(b)      if to the Litigation Funding Agent or the Class A-2 Representative, to:

[Brigade Agency Services LLC
399 Park Ave, 16th Floor
New York, New York 1022-4415
Attention: Jeff Frusciante
Email: brigadeagencyservices@brigadecapital.com

With a copy to:
Milbank LLP
2026 Century Park East, 33rd Floor
Los Angeles, CA 90067
Attention: Adam Moses
Email: amoses@milbank.com]

(c)      if the Class B Representative, to:

Transier Advisors, LLC
12128 Madeleine Cir.,
Dallas, TX 75320
Attn: William Transier
Email: bill@transieradvisors.com

DRIVETRAIN LLC
410 Park Avenue, Suite 900
New York, NY 10022
Attn: Alan J. Carr
Email: acarr@drivetrainllc.com

Force Ten Partners, LLC
100 Crescent Court, 7th Floor
Dallas, TX 75201
Attn: Monica Blacker
Email: mblacker@force10partners.com

With a copy to:
Weil, Gotshal & Manges LLP
1395 Brickell Ave #1200
Miami, FL 33131
Attention: David Cohen
Email: DavidJ.Cohen@weil.com

(d)      if to any Trust Beneficiary, to the last known address of such Trust Beneficiary according to the Books and Records.

10.5     Headings. The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

46

10.6     Entire Agreement. This Agreement and the exhibits attached hereto contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

10.7     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of any successor in interest to or permitted assignee of the Trust Beneficiaries, subject in each case to the terms of this Agreement.

10.8     Limitations. Except for the rights of the Class A Parties to indemnification expressly set forth in Section 6.3, nothing herein is intended or shall be construed to confer upon or to give any person other than the parties hereto and the Trust Beneficiaries any rights or remedies under or by reason of this Agreement.

10.9     Non-Recourse. All claims, obligations, liabilities, actions or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their successors and assigns ("Contracting Parties"). No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other representative of, and any lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, consultant, attorney, accountants, financial advisor or other representative of, and any lender to, any of the foregoing ("Nonparty Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or other liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by law, each Contracting Party hereby waives and releases all such claims, causes of action, obligations and other liabilities against any such Nonparty Affiliates. It is expressly agreed that the Nonparty Affiliates to whom this Section 10.9 applies shall be third-party beneficiaries of this Section 10.9.

10.10     Further Assurances. From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of this Agreement, and to consummate the transactions contemplated hereby.

10.11     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument. A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representative, or agents, effective as of the date first above written.

Mark Kronfeld, solely in his capacity as Trustee

By: _____
Name:
Title:

On _____, 2025 before me, the undersigned, personally appeared _____ (name), _____ (title) of _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their capacity, and that by their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

## Schedule 1

**Trust Beneficiaries and Trust Interests**

[*On file with Trustee.*]

**Schedule 2**

**Trust Assets**[13]

1. All cash and cash equivalents, excluding only (a) the Retained Cash, (b) all cash held or received on behalf of buyers of the Debtors' hospital and Stewardship Health, Inc. operations pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet ("Buyers"), (c) all cash received from Buyers or other third parties for purposes of paying cure costs, (d) cash to fund checks issued in accordance with the FILO DIP Budget and which remain outstanding immediately prior to the Effective Date, (e) all cash held for subtenant security deposits or rent collected on behalf of Buyers, subtenants, or overlandlords, (f) all cash held in the Professional Fees Escrow Account, the Physician Insurance Account (each as defined in the FILO DIP Order), the Utility Deposit Account (as defined in the *Utilities Order* (Docket No. 91)), or the Expense Escrow Account (as defined in the *MPT Settlement Order* (Docket No. 2610)), and (g) any funds of the Debtors in the "Vendor Fund Escrow Account" pursuant to the Vendor Fund Escrow Agreement, entered into as of March 11, 2025, by and among Golden Sun TSA Services, LLC, a Delaware limited liability company; Steward Health Care System LLC, a Delaware limited liability company; MPT Development Services, Inc., a Delaware corporation; Lifespan of Massachusetts, Inc., a Massachusetts nonprofit corporation; BMC Community Hospital Corporation and BMC Community Hospital Corporation II, Massachusetts nonprofit corporations; Orlando Health, Inc., a Florida corporation; and Kroll Restructuring Administration LLC, a Delaware limited liability company.

2. All accounts receivable, excluding only (a) accounts receivable that the Debtors sold to Buyers pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet and (b) any accounts receivable that cannot be transferred to the Litigation Trust or a subsidiary thereof pursuant to applicable law. (such accounts receivables described in this clause (b), the "Non-Transferrable A/R"). With respect to any Non-Transferrable A/R, the Estate shall, at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost), (i) use commercially reasonable efforts to collect or otherwise liquidate such Non-Transferrable A/R in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (ii) promptly turn over any cash or other value realized on account of such Non-Transferrable A/R to the Litigation Trust.

3. The equity interests in Steward A/R Co, LLC. Promptly upon transfer of the equity interests in Steward A/R Co, LLC to the Litigation Trust, the current manager of Steward A/R Co, LLC, John Castellano, shall submit his resignation as manager and the Litigation Trust and Steward A/R Co, LLC shall grant Mr. Castellano a release of claims against Mr. Castellano in connection with his services as manager, in form and substance reasonably acceptable to Mr. Castellano and the Litigation Trust, and the Litigation Trust shall appoint his replacement.

4. All Claims and Causes of Action[14] of the Debtors and the Estate, including, without limitation, in each case, to the extent not released pursuant to the mutual releases set forth in Exhibit A to the Term Sheet (the "Mutual Releases Exhibit"), the following Claims and Causes of Action:

---

[13] Each capitalized term that is used but not defined herein has the meaning ascribed to it in the Litigation Trust Agreement to which this Schedule 2 is attached.

[14] "Cause of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedy,

a. all Claims and Causes of Action asserted by the Debtors in the *Second Amended Complaint and Jury Demand* filed by Steward Health Care System LLC at Docket No. 61 in Civil Action No. 21-cv-11902-PBS in the United States District Court for the District of Massachusetts (the "<u>Norwood Complaint</u>") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the Norwood Complaint;

b. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against healthcare payors, including, without limitation, the commercial payors identified in <u>Schedule 1-A</u> hereto;

c. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Non-Released Parties (as defined in the Mutual Releases Exhibit), including, without limitation, arising from or relating to the 2016 Distribution, the 2020 Transactions, the 2021 Distribution, the 2022 Distribution (each as defined in the Mutual Releases Exhibit), or any Plane Sale,[15] or otherwise arising from or relating to the payment of unlawful dividends, the avoidance of prepetition dividend payments or other distributions, or one or more breaches of fiduciary or other duties;

d. all Avoidance Actions asserted or assertable by the Debtors or the Estate against the transferees identified in <u>Schedule 1-B</u> hereto or any other prepetition vendors of the Debtors;

e. all Claims and Causes of Action against Blue Cross Blue Shield Association ("<u>BCBS</u>") or any of its independent Affiliates, including, without limitation, arising from or relating to the Claims and Causes of Action asserted in the class action lawsuits against BCBS and its various licensees consolidated in *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (MDL No. 2406) (N.D. Ala. 2013) (the "<u>BCBS Antitrust Litigation</u>") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the BCBS Antitrust Litigation;

f. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Commonwealth of Massachusetts, including, without limitation, any Claims or counterclaims of the Debtors or the Estate in connection with *The Commonwealth of Massachusetts' Motion for Relief from the Automatic Stay to Allow for the Setoff of Mutual*

---

offset, power, privilege, license or franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whenever arising, whether in law or equity, whether sounding in tort or contract, whether asserted in arbitration, a court or regulatory proceeding, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including under any state or federal securities laws. Causes of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) Avoidance Actions, and (iii) any claim or defense, including fraud, mistake, duress, or usury and any other defenses set forth in section 558 of the Bankruptcy Code. For avoidance of doubt, the Debtors and the Estate transfer to the Litigation Trustee all rights to assert extensions of time under 11 U.S.C. § 108, and the Litigation Trustee may assert such rights in any judicial, administrative or arbitration proceeding, whether during or after the pendency of the Chapter 11 Cases.

[15] "<u>Plane Sales</u>" means the sales by certain of the Debtors or the Debtors' Affiliates (as defined in the Mutual Releases Exhibit) of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

*Obligations if and to the Extent that Recoupment is Not Available* (Docket No. 3393) and the adversary proceeding filed by the Debtors against the Commonwealth of Massachusetts (Docket No. 3983) (Adv. Pro. No. 25-03053);

g.  all Claims and Causes of Action asserted by the Debtors or the Estate in that certain case styled *Steward Health Care System v. Tenet Business Services Corporation*, C.A. No. 2022-0289-SG, pending before the Court of Chancery of the State of Delaware (the "Steward-Tenet Chancery Case") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the Steward-Tenet Chancery Case;

h.  all Claims and Causes of Action with respect to the escrow account holding the Adjustment Escrow Amount (as defined in the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) the Asset Purchase Agreement with Brady Health Buyer, LLC (B) the Sale of Stewardship Health Assets Free and Clear of Liens and Liabilities and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (Docket No. 2135)) and the funds deposited therein; and

i.  all Claims and Causes of Action with respect to the right of certain Debtors to receive reimbursement from Golden Sun TSA Services, LLC in connection with the renewal of that certain Software Licensing Agreement, dated September 9, 2009, by and between IASIS Healthcare LLC and Microsoft Corporation, as amended, under Section 9.7 of the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4192).

5.  All rights of the Debtors and the Estate to recover insurance proceeds from the D&O Policies (as defined in the *Motion of Debtors for Order Authorizing the Use of Proceeds of Directors and Officers Liability Insurance Policies for Insureds Defense Costs* (Docket No. 2540)) in connection with any Claim or Cause of Action that is not released pursuant to the mutual releases set forth in the Mutual Releases Exhibit. For the avoidance of doubt, the transfer of the rights of the Debtors and the Estate to recover insurance proceeds from the D&O Insurance shall not hinder the ability of any beneficiaries or insureds of such D&O Insurance to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

6.  All of the Debtors' remaining interests in joint ventures and the Meadows Hospital Promissory Note, in each case, unless otherwise directed by the FILO Parties, which shall be transferred to one or more corporate subsidiaries of the Litigation Trust; provided that in the event any transfer of interests in joint ventures triggers any put, call, ROFO or ROFR, or other similar rights of third parties, such interests shall be excluded (the "Excluded Interests") and only the proceeds of sale of such interests will be transferred to the Litigation Trust. The Estate shall, at Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to liquidate the Excluded Interests in coordination, and in a manner reasonably agreed upon, with the Litigation Trust, and (b) promptly turn over any cash or other value realized on account of such Excluded Interests to the Litigation Trust.

7. All proceeds, products, offspring, or profits of any employee retention tax credits ("ERTCs") owned by any Debtors, net of any reasonable and documented out-of-pocket expenses of any broker or consultant retained in connection with a sale of such ERTCs (to the extent not paid in advance by the Litigation Trust in accordance with the succeeding sentence). The Estate shall at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize such ERTCs in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (b) promptly turn over any cash or other value realized on account of such ERTCs to the Litigation Trust.

8. All of the Debtors' remaining real estate properties and all proceeds, products, offspring, or profits therefrom.

9. All proceeds, products, offspring, or profits of any of the foregoing assets and property.

**Schedule 1-A**

## **Payors**

[*To come.*]

**Schedule 1-B**

**<u>Preference Defendants</u>**

[*To come..*]

## **Schedule 3**

**Specified Claims**

[*On file with Trustee.*]

**<u>Schedule 4</u>**

**Pre-TED Professional Fee Estimates**

[*To come.*]

**Exhibit A**

**Compensation of Trustee**

| | |
|---|---|
| **Success Fee** | <ul><li>1.25% of net recoveries through the Effective Date + 9 months; thereafter, for each quarter that passes, the success fee declines by 5bps – subject to a floor of 1% of net recoveries.</li><li>For aggregate net recoveries in excess of $550mm, success fee moves to 2% of net recoveries (fixed).</li><li>For purposes of the above, "net" recoveries are net of contingency fees but not the litigation funding "equity kicker."</li></ul> |
| **Monthly Fee** | <ul><li>Year 1 (*i.e.*, first 12 months): $45k per month.</li><li>Starting year 2: $25k per month.</li><li>25% crediting of year 2 monthlies and 50% crediting of year 3 (and later) monthlies against success fee.</li></ul> |
| **Success Fee Tail** | <ul><li>Success fee tail to apply in perpetuity if the Trustee is removed without Cause by the Class A-2 Representative or the Class B Representative, provided that the success fee payable under the tail shall be capped at $3mm inclusive of amounts earned pre-removal (the "Tail Cap").</li><li>Notwithstanding the foregoing, the success fee tail may exceed the Tail Cap solely on account of recoveries from litigation that (i) are received within 3 months of the Trustee's removal and (ii) primarily result from one or more of the following events occurring prior to the date of removal:<ul><li>settlement agreement signed or filed with court;</li><li>dispositive motion in the Litigation Trust's favor; or</li><li>trial verdict or judgment in the Litigation Trust's favor.</li></ul></li><li>If the Trustee is removed with Cause, no tail will apply.</li></ul> |
| **FA Retention** | <ul><li>In addition to the provisions set forth in Section 4.5 of the Agreement, the Trustee represents and agrees not to earn any fees under any other arrangement related to the Litigation Trust / Estate (including any hourly fee arrangements with Province).</li></ul> |

**<u>Exhibit B</u>**

**Form of Variance Report**

[To come]

**Exhibit C**

**Form of Joinder Agreement**

      This Joinder Agreement (this "Joinder Agreement") is made as of [_____ ___, 20__] by the undersigned (the "Transferee") in accordance with that certain *Litigation Trust Agreement*, dated as of [●] [●], 2025 (as the same may be amended from time to time in accordance with its terms, the "Agreement"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

      The Transferee hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, it shall become a party to the Agreement and shall be fully bound by and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed a [Class A-1 Trust Beneficiary] [Class A-2 Bridge Trust Beneficiary] [Class A-2 DIP Trust Beneficiary] [Class B Trust Beneficiary] for all purposes thereof and entitled to all the rights incidental thereto, as of the date first written above.

      [The Transferee hereby makes the representations and warranties of a [Class A-1 Trust Beneficiary] [Class A-2 Bridge Trust Beneficiary] [Class A-2 DIP Trust Beneficiary] set forth in Section 13 of the Commitment Letter.]

      IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date first written above and hereby authorizes this signature page to be attached to a counterpart of the Agreement.

               [TRANSFEREE]

               By: _____
                    Name:
                    Title:

*Exhibit C to Litigation Trust Agreement*

**<u>Exhibit D</u>**

**Litigation Funding Budget**

[*To come.*]

## Exhibit E

**Form of Transition Services Agreement**

[*To come.*]

**Exhibit F**

**Form of Commitment Letter**

[*To come.*]

**<u>Exhibit G</u>**

**Form of Approval Order**

[*To come.*]

## Exhibit B

**Commitment Letter**

*Filing Version 5/25/2025*

## FUNDING COMMITMENT LETTER

May [●], 2025

[●]
[●]
[●]

Re: Funding Commitment Letter

Ladies and Gentlemen:

This letter agreement (this "Letter") sets forth the several, but not joint, commitment of the parties set forth on Exhibit A (together with any permitted assignees to which any portion of the Funding Commitments (as defined below) is actually assigned in accordance with the terms of this Letter, the "Funding Parties" and each, individually, a "Funding Party"), on the terms and subject to the conditions described below, to fund or cause to be funded from time to time to the Litigation Trust up to the aggregate amount set forth opposite its name on Exhibit A. Capitalized terms used but not defined in this Letter shall have the meanings given to them in Annex 1 attached hereto.

1.        Funding Commitment. Subject to the terms and conditions set forth in this Letter, each of the Funding Parties severally (and not jointly and severally) commits that it shall, commencing on the Trust Establishment Date and from time to time thereafter, fund or cause to be funded to the Litigation Trust cash in immediately available funds up to the amount set forth across such Funding Party's name on Exhibit A (the "Funding Commitments"; and the percentage of the aggregate Funding Commitments allocated to each Funding Party on Exhibit A hereto, its "Allocable Share"), it being understood and agreed that the aggregate amount of all Funding Commitments is equal to $125,000,000.00, which amount is inclusive of (x) the amount of Secured Interim Advances and (y) $6,500,000.00 of Estate Funding, which shall be funded on the Trust Establishment Date; provided that, to the extent that the initial Litigation Funding Budget contemplates disbursements to legal counsel on a current basis and the projected amount of such disbursements is subsequently reduced through contingency fee, success fee, or similar arrangements (the aggregate amount of such reduction as agreed by the Litigation Trustee, the "Contingency Fee Savings"), the Funding Commitment shall be reduced dollar-for-dollar by the Contingency Fee Savings. The Funding Parties, in their sole and absolute discretion, may elect by written notice to the Litigation Trustee, to increase the aggregate Funding Commitment to up to $156,250,000.00 on the same terms as the funding provided pursuant to the initial Funding Commitment (any such election, an "Accordion Election"), in which case Exhibit A shall be updated to reflect such increase without the need for any further action by the Funding Parties or the Litigation Trustee.

Notwithstanding any other provision of this Letter, under no circumstances shall a Funding Party be obligated to contribute, to purchase equity interests or debt of, or otherwise provide funds to the Litigation Trust in any amount in excess of its Allocable Share of the Funding Commitment (as such amount may be modified in accordance with this Letter). Each Funding Party may

effectuate its purchase of the Class A-1 Trust Interests directly or indirectly through one or more affiliates, designees or co-investors, or by directing the Litigation Funding Agent, FILO DIP Agent, or Prepetition Bridge Agent, as applicable, to hold Trust Proceeds or prepayments of the FILO DIP Loans or Prepetition FILO Bridge Loans received on or after April 29, 2025, as applicable, or other amounts, in each case, that were otherwise payable directly to such Funding Party for its own account, on its behalf and to apply such proceeds as necessary to satisfy such Funding Party's funding obligations under this Letter.

If any Funding Party shall fail to fund its Allocable Share of the Funding Commitment as and when required pursuant to <u>Section 4 below</u> (a "<u>Defaulting Funding Party</u>"), the Litigation Trustee may notify in writing the Litigation Funding Agent and each other Funding Party on or promptly after the applicable funding date of the amount of the Funding Commitment that has not been funded (such amount, the "<u>Shortfall Amount</u>"). Each non-Defaulting Funding Party may elect (but shall not be obligated) to, by providing written reply to the Litigation Trustee and the Litigation Funding Agent within [five (5)] Business Days after the date of the notice from the Litigation Trustee (the "<u>Shortfall Amount Funding Offer Deadline</u>"), fund its ratable share of the Shortfall Amount (calculated across all Funding Parties that so elect to fund the Shortfall Amount). The funding of the Shortfall Amount shall occur promptly after the Shortfall Amount Funding Offer Deadline.

2.      <u>Use of Proceeds</u>. The Funding Commitment shall be used solely for the purpose of funding the Estate Funding and the disbursements set forth in the then-applicable Litigation Funding Budget in accordance with the terms of this Letter and the Trust Agreement.

3.      <u>Upfront Premium</u>. An upfront premium (the "<u>Upfront Premium</u>") in an aggregate amount equal to $4,250,000.00 shall be earned by, and due and payable to the Funding Parties (which shall be allocated ratably among the Funding Parties in accordance with their respective Allocable Shares) upon execution of this Letter and entry of the Approval Order and payable in kind (in the form of Class A-1 Trust Interests entitled to an equivalent amount of Class A-1 Preference) upon formation of the Litigation Trust; <u>provided</u> that if the Funding Parties make an Accordion Election with the consent of the Litigation Trustee, then, upon such Accordion Election, the Upfront Premium shall be increased by the same percentage that Funding Commitment is increased and an aggregate amount equal to such increase shall be paid in kind (in the form of Class A-1 Trust Interests entitled to an equivalent amount of Class A-1 Preference) to the Funding Parties (which increase shall be allocated ratably among the Funding Parties in accordance with their respective Allocable Shares of such increase).

4.      <u>Funding; Conditions</u>. For the avoidance of doubt, the Funding Commitment shall become effective automatically upon the effectiveness of the Trust Agreement, as set forth in Section 2.9 of the Trust Agreement, other than the condition relating to the execution and delivery of this Letter. In the event the Litigation Trustee wishes to request funding of all or any portion of the Funding Commitment, the Litigation Trustee shall deliver written notice of such request to the Litigation Funding Agent (each, a "<u>Funding Notice</u>", and the requirement to deliver such notice, the "<u>Funding Notice Requirement</u>"); <u>provided</u>, <u>however</u>, that no more than one such Funding Notice may be made during any thirty (30)-day period. Each Funding Notice shall include (i) the date on which funds are to be provided, which shall be no less than five (5) Business Days after the date of the Funding Notice; (ii) the aggregate amount required to be funded (the "<u>Funding</u>

Amount"); (iii) a copy of the applicable approved Litigation Funding Budget; and (iv) a certification from the Litigation Trustee that each of the following conditions (each, together with the Funding Notice Requirement, a "<u>Funding Condition</u>") has been satisfied in respect of such Funding Notice:

(a)     as of at least one (1) Business Day prior to delivery of the Funding Notice, the Funding Parties shall have received an aggregate amount of Trust Proceeds in respect of the Class A Trust Interests, together with the aggregate amount of any prepayments of the FILO DIP Loans or Prepetition FILO Bridge Loans received on or after April 29, 2025,[1] at least equal to the sum of applicable Funding Amount *plus* the amount of any funding provided by the Funding Parties to the Litigation Trust prior to such date; it being understood that the Litigation Trustee shall verify that the foregoing condition has been satisfied in the Funding Notice;

(b)     the Trust Agreement governing the Litigation Trust remains in full force and effect and constitutes a legal, valid, and binding obligation of the parties thereto, enforceable in accordance with its terms;

(c)     the Litigation Trust is duly formed and validly existing with full trust power and authority to enter into and perform its obligations under this Letter and the Trust Agreement;

(d)     the transfer of Trust Assets to the Litigation Trust pursuant to the Approval Order, or the Confirmation Order, as applicable, remains (i) a valid, legal and effective transfer of title, free and clear of all liens, claims, charges, encumbrances, contractually imposed restrictions, interests, and constructive trusts (to the extent permitted by applicable law), and (ii) enforceable in accordance with its terms;

(e)     upon the Trust Establishment Date, (i) the Litigation Trust shall have transferred (on behalf of the Debtors), pursuant to the Approval Order or, to the extent the Plan has been confirmed, the Confirmation Order (provided that the Confirmation Order approves all of the rights, entitlements, protections and privileges provided in the Approval Order attached hereto as <u>Exhibit B</u>, with such changes as may be reasonably acceptable to the Debtors, the Funding Parties and the Creditors' Committee), Class A-1 Trust Interests to the Funding Parties on account of the Estate Funding and (ii) FILO DIP Loans equal to the amount of Secured Interim Advances shall have been repaid with Class A-1 Trust Interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of such Secured Interim Advances, in each case in accordance with the FILO Settlement Term Sheet;

(f)     there is no uncured material breach by the Litigation Trustee (including any successor thereto) of any of its obligations under the Litigation Trust Agreement;

---

[1] For the avoidance of doubt, the prepayments include (i) any Microsoft Proceeds (as defined in the Quorum TSA Sale Order) applied to prepay the FILO DIP Loans or Prepetition FILO Bridge Loans and (ii) any cash on the Debtors' balance sheet that is transferred to the Litigation Trust on the Trust Establishment Date (unless such cash is otherwise made available to the Estate as Estate Funding), solely to the extent such cash is distributed to the Class A Trust Interests.

(g)     the Litigation Trustee (including any successor thereto) has not made total disbursements from the Trust Assets in any particular month that are more than 115% of total disbursements in the applicable Litigation Funding Budget for such month; and

(h)     the Approval Order or, to the extent entered, the Confirmation Order (provided that the Confirmation Order approves all of the rights, entitlements, protections and privileges provided in the Approval Order attached hereto as <u>Exhibit B</u>, with such changes as may be reasonably acceptable to the Debtors, the Funding Parties and the Creditors' Committee), remains in full force and effect and has not been reversed, vacated, modified, superseded, or amended (other than with respect to modifications or amendments that have been consented to by the Litigation Funding Agent or, solely with respect to the Confirmation Order, are not inconsistent with the FILO Settlement Term Sheet).

For the avoidance of doubt, if any Funding Condition has not been satisfied at the time of a request by the Litigation Trustee for funding of all or any portion of the Funding Commitment, the Funding Parties may provide such funding, but shall have no obligation to provide such funding.

5.     <u>Enforcement</u>. This Letter is for the benefit of the Litigation Trust, which is an express beneficiary of this Letter, and the Estate, solely with respect to the Estate Funding as set forth in the following sentence. Subject to the occurrence of the Trust Establishment Date and <u>Section 13</u> hereof, the Litigation Trustee, on behalf of the Litigation Trust, shall have the right to enforce this Letter as if the Litigation Trust were a party hereto and the Estate shall have the right to enforce the obligation to fund the Estate Funding on or following the Trust Establishment Date, on the terms and subject to the conditions set forth herein. This Letter may only be enforced by the Litigation Trustee and the Estate, subject to the immediately preceding sentence.

6.     <u>Termination</u>. This Letter and all obligations of each Funding Party will terminate automatically and immediately upon the earliest to occur of:

(a)     the funding of the full amount of all of the then-outstanding Funding Commitments;

(b)     the repayment of the FILO Balance in full in cash;

(c)     the Estate or its Representatives or Affiliates, either directly or indirectly:

   i.     files or commences any legal proceeding under or in connection this Letter against any Funding Party or Non-Recourse Party (defined below), other than to enforce this Letter solely with respect to the Estate Funding as set forth in <u>Section 5</u>;

   ii.     files or commences any legal proceeding asserting that any Funding Party is liable under this Letter for any amount in excess of or to a greater extent than such Funding Party's Allocable Share of the Funding Commitment; or

   iii.     files or commences any legal proceeding asserting that any of the terms of this Letter or the Trust Agreement, or any of the rights or entitlements of the Funding Parties or the Class A Trust Beneficiaries in relation to the foregoing,

are invalid, illegal, or unenforceable to any extent, whether at law, as a matter of public policy or otherwise; and

(d)     prior to the Trust Establishment Date, either the Estate or the Creditors' Committee materially breaches their respective obligations to the FILO Parties under the FILO Settlement Term Sheet or the Plan Support Agreement Term Sheet, and such breach is not cured within three (3) Business Days of the FILO Parties providing written notice of such breach to Estate's and Creditors' Committee's counsel.

Upon termination of the Funding Commitment, no Funding Party shall have any further obligations or liabilities under this Letter; provided that, for the avoidance of doubt, terminating of the Funding Commitment shall not terminate a Funding Party's rights or obligations in its capacity as a beneficiary under the Litigation Trust Agreement (if any). The immediately preceding sentence shall survive any termination of this Letter.

7.     No Modification; Entire Agreement. This Letter may not be amended, modified or supplemented, except by an agreement in writing signed by the Litigation Trust and each Funding Party and with the prior written consent of the Estate (such consent not to be unreasonably withheld, conditioned or delayed). This Letter constitutes the sole and entire agreement of each of (x) each Funding Party and its Affiliates and (y) the Litigation Trust with respect to the subject matter contained in this Letter. This Letter supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to the subject matter of this Letter.

8.     Parties in Interest. Except as set forth in Sections 5 and 10, (a) this Letter is for the sole benefit of the Funding Parties and the Litigation Trust and (b) nothing in this Letter, express or implied, is intended to or shall confer upon any person other than the Funding Parties and the Litigation Trust any legal or equitable right, benefit or remedy of any nature whatsoever. Except as expressly set forth in Section 5, none of the creditors of the Litigation Trust or of any of its beneficiaries shall have the right to enforce, or to cause the Litigation Trust to enforce, this Letter.

9.     Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)     This Letter shall be governed by and construed in accordance with the laws of the State of New York. Principles of conflicts of law in any jurisdiction that would require or permit application of the law of a jurisdiction other than New York shall not apply.

(b)     EACH OF THE FUNDING PARTIES AND THE LITIGATION TRUST HEREBY IRREVOCABLY AND UNCONDITIONALLY (I) SUBMITS, IN CONNECTION WITH ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS LETTER, TO THE EXCLUSIVE GENERAL JURISDICTION OF (A) THE BANKRUPTCY COURT OR ANY OTHER FEDERAL COURT HAVING JURISDICTION OVER THE CHAPTER 11 CASES OR (B) TO THE EXTENT THE BANKRUPTCY COURT OR ANY SUCH OTHER FEDERAL COURT LACKS JURISDICTION OR ABSTAINS FROM EXERCISING JURISDICTION, THE FEDERAL AND STATE COURTS SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK AND (II) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING SHALL BE BROUGHT EXCLUSIVELY IN SUCH COURTS AND WAIVES

ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME.

(c)    EACH  PARTY  ACKNOWLEDGES  AND  AGREES  THAT  ANY CONTROVERSY WHICH MAY ARISE UNDER THIS LETTER IS LIKELY TO INVOLVE COMPLICATED  AND  DIFFICULT  ISSUES  AND,  THEREFORE,  EACH  SUCH  PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL  BY  JURY  IN  RESPECT  OF  ANY  LEGAL  ACTION  ARISING  DIRECTLY  OR INDIRECTLY  OUT  OF  OR  RELATING  TO  THIS  LETTER  OR  THE  TRANSACTIONS CONTEMPLATED  HEREBY.  EACH  PARTY  TO  THIS  LETTER  CERTIFIES  AND ACKNOWLEDGES  THAT  (A)  NO  REPRESENTATIVE  OF  ANY  OTHER  PARTY  HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN  INDUCED  TO  ENTER  INTO  THIS  LETTER  BY,  AMONG  OTHER  THINGS,  THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9(c).

10.    Assignment. Each FILO Party agrees that prior to the Trust Establishment Date, it shall not transfer, directly or indirectly, in whole or in part, any FILO DIP/Bridge Claims, option thereon, or right or interest therein, and any purported such transfer shall be void and without effect, in each case, except as set forth in the FILO Settlement Term Sheet, including as set forth in Section 18 of the FILO Settlement Term Sheet, such that any transfer of FILO DIP/Bridge Claims occurring prior to the Trust Establishment Date shall require the transferee to assume the transferor's obligations under this Letter in proportion to the amount of FILO DIP/Bridge Claims so transferred relative to the aggregate amount of all FILO DIP/Bridge Claims outstanding as of the date of such transfer.

11.    Counterparts. This Letter may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Letter delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Letter.

12.    Representations And Warranties. Each Funding Party, severally, but not jointly, represents and warrants as of the Trust Establishment Date to the Litigation Trust and the other Trust Beneficiaries that:

(a)    such Funding Party is duly organized, validly existing and in good standing under the applicable laws of the jurisdiction of its formation, and has all requisite corporate limited partnership or similar power and authority to execute and deliver this Letter and perform the transactions contemplated under this Letter;

(b)    this Letter has been duly and validly authorized, executed and delivered by such Funding Party and constitutes a valid and legally binding obligation of such Funding Party;

(c)       this Letter is enforceable against such Funding Party in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, fraudulent conveyance, arrangement, moratorium or other similar laws relating to or affecting creditors' rights generally and by general principles of equity relating to enforceability or a ruling of any court of competent jurisdiction;

(d)       such Funding Party has currently available, and will continue to have available for so long as both this Letter remains in effect and the Funding Commitment remains unsatisfied, the financial capacity necessary to perform its obligations under this Letter;

(e)       such Funding Party's execution, delivery and performance of this Letter does not and will not violate its organizational documents, or any applicable law;

(f)       such Funding Party's execution, delivery and performance of this Letter does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body that has not been obtained;

(g)       such Funding Party is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated under the Securities Act;

(h)       such Funding Party is a "qualified institutional buyer" within the meaning of Rule 144A, promulgated under the Securities Act;

(i)       such Funding Party understands that the Class A Trust Interests have not been, and will not be registered under the Securities Act or any applicable state or local securities law and that the Class A Trust Interests may be resold only pursuant to registration under the Securities Act or an exemption therefrom, and there will be no public market for, the Class A Trust Interests; and

(j)       such Funding Party understands that the Class A Trust Interests are being offered and sold in reliance upon exemptions from the registration requirements of the Securities Act based in part upon such Funding Party's representations contained in this Letter and that such Class A Trust Interests may bear a restrictive legend;

(k)       such Funding Party has such knowledge and experience in financial and business matters that such Funding Party is capable of evaluating the merits and risks of the Class A Trust Interests to be acquired by it and understands and is able to bear any economic risks with such investment; and

(l)       the Class A Trust Interests to be acquired by any Funding Party pursuant to the Trust Agreement will be acquired for such Funding Party's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof in violation of the Securities Act, such Funding Party has no present intention of so selling, granting any participation in, or otherwise distributing the same and such Funding Party does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Class A Trust Interests.

13.    <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Letter, or any document, agreement or instrument delivered in connection herewith, by its acceptance of the benefits of this Letter, the Litigation Trust covenants, agrees, and acknowledges that (i) no persons other than the Funding Parties have any liability, obligation, or commitment of any nature, known or unknown, whether due or to become due, absolute, contingent, or otherwise, hereunder and (ii) notwithstanding that the Funding Parties, their general partners or any of their respective successors or permitted assignees may be limited partnerships or limited liability companies, the Litigation Trust has no right of recovery and no recourse under this Letter, or for any claim (whether in contract, tort, or otherwise) based on, in respect of, or by reason of, this Letter, such obligations or their creation, the transactions contemplated hereby or thereby or in respect of any oral representations made or alleged to be made in connection herewith or therewith, against, and no personal liability whatsoever shall attach to, be imposed upon or be incurred by, any former, current, or future equity holders, controlling persons, incorporators, directors, officers, employees, advisors, agents, representatives, Affiliates (other than any permitted assignees to which this Letter is assigned pursuant to <u>Section 10</u> hereof), financing sources, portfolio companies, members, managers or general or limited partners of the Funding Parties, or any former, current, or future equity holder, controlling person, incorporator, director, officer, employee, advisor, general or limited partner, member, manager, Affiliate (other than any assignee to which this Letter is assigned pursuant <u>Section 10</u> hereof), financing source, portfolio company, representative or agent of any of the foregoing and their successors or assigns (collectively, each a "<u>Non-Recourse Party</u>"), whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by the enforcement of any assessment or by any proceeding, by virtue of any statute, regulation, or applicable law, or otherwise, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any Non-Recourse Party, as such, for any obligations of the Funding Parties or any of their successors or permitted assignees under this Letter or any documents or instruments delivered in connection herewith or for any action based on, in respect of, or by reason of such obligation or their creation. Except as expressly set forth in this Letter, and subject in all cases to the terms and conditions of and limitations in this Letter, neither the Funding Parties nor any of the Non-Recourse Parties shall have any liability to any Person in connection with Letter, whether based upon contract, tort or any other claim or legal theory and whether at law or equity.

14.    <u>Severability</u>. If any term or provision of this Letter is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Letter or invalidate or render unenforceable such term or provision in any other jurisdiction; <u>provided</u> that the Funding Parties and Litigation Trustee intend that <u>Section 1</u>, <u>Section 2</u>, <u>Section 4</u>, <u>Section 6</u> and <u>Section 13</u> be construed as integral provisions of this Letter and that such Sections shall not be severable in any manner that increases or decreases the Funding Parties' or Litigation Trust's liability or obligations hereunder. Upon any such determination that any term or other provision is invalid, illegal or unenforceable, the Funding Parties and Litigation Trust shall negotiate in good faith to modify this Letter so as to effect the original intent of the Funding Parties and Litigation Trust as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereunder be consummated as originally contemplated to the greatest extent possible.

15.    <u>Miscellaneous.</u> The Funding Parties agree that they have each been represented by counsel during the negotiation and execution of this Letter and have participated jointly in the

drafting of this Letter. Consequently, each of the Funding Parties and Litigation Trust waive the application of any law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document. The descriptive headings set forth in this Letter are inserted for convenience of reference only and are not intended to be part of or to describe, interpret, define or limit the scope, extent or intent of this Letter or any provision of this Letter.

[SIGNATURE PAGES FOLLOW]

Very truly yours,


**[●]**

By: _____
Name: [●]
Title: [●]

<u>**Exhibit A**</u>

**Funding Commitments**

| Funding Party | Commitment | Allocable Share |
|---|---|---|
| [●] | $[●] | [●]% |
| [●] | $[●] | [●]% |
| [●] | $[●] | [●]% |
| **Total** | **$125,000,000** | **100.0000%** |

## Exhibit B

**Form of Approval Order**

[*Attached.*]

## Annex 1

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with") as used with respect to any Person, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement, or otherwise.

"<u>Applicable Rate</u>" means a rate equal to:

(a)   10.00% per annum from (and including) the Trust Establishment Date to (and including) September 30, 2025;

(b)   10.50% per annum from (and including) October 1, 2025 to (and including) December 31, 2025;

(c)   11.00% per annum from (and including) January 1, 2026 to (and including) March 31, 2026;

(d)   11.25% per annum from (and including) April 1, 2026 to (and including) June 30, 2026;

(e)   11.50% per annum from (and including) July 1, 2026 to (and including) September 30, 2026;

(f)   11.75% per annum from (and including) October 1, 2026 to (and including) December 31, 2026; and

(g)   12.00% per annum from (and including) and after January 1, 2027.

"<u>Approval Order</u>" means the order entered by the Bankruptcy Court approving, among other things, the FILO Settlement Term Sheet and the Litigation Trust Agreement.

"<u>Avoidance Actions</u>" means all Claims and Causes of Action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code, and any state law fraudulent transfer claims.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas.

"<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which the Federal Reserve Bank of New York is authorized or required by law or executive order to close or be closed.

*[Annex 1 to Funding Commitment Letter]*

"Cause of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whenever arising, whether in law or equity, whether sounding in tort or contract, whether asserted in arbitration, a court or regulatory proceeding, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including under any state or federal securities laws. Causes of Action also include (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) Avoidance Actions, and (iii) any claim or defense, including fraud, mistake, duress, or usury and any other defenses set forth in section 558 of the Bankruptcy Code.

"Chapter 11 Cases" means the chapter 11 cases styled *In re Steward Health Care System LLC, et al.*, Lead Case No. 24-90213 (CML), collectively.

"Claim" means a "claim," as defined in section 101(5) of the Bankruptcy Code.

"Class A Trust Beneficiaries" means Class A-1 Trust Beneficiaries and Class A-2 Trust Beneficiaries.

"Class A Trust Beneficiary Expenses" means the actual, reasonable and documented out-of-pocket expenses incurred by such Litigation Funders and the FILO Parties in connection with this Letter, the Trust Agreement, the Plan Support Agreement Term Sheet and implementation of the settlement described in the FILO Settlement Term Sheet and Approval Order (subject to the terms and conditions of the Trust Agreement, including the caps thereunder).

"Class A Trust Interests" means the Class A-1 Trust Interests and the Class A-2 Trust Interests.

"Class A Parties" means the Litigation Funding Agent, the Class A-2 Representative and the Class A Trust Beneficiaries.

"Class A-1 Preference" means, at the applicable time of determination, an amount equal to (a) the Litigation Funding, *plus* all accreted amounts accrued on the Class A-1 Preference (calculated in accordance with the immediately succeeding sentence) as of such time, *minus* (b) the aggregate amount, if any, of cash distributed to the Class A-1 Trust Beneficiaries by the Litigation Trust on or prior to such time (subject to the terms and conditions of the Trust Agreement). The Class A-1 Preference shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, shall accrete and be added to the balance of the Class A-1 Preference on the last day of each month; provided that, to the extent the Litigation Funders commit to provide additional Litigation Funding in excess of $125,000,000 (without any additional fees or premiums) in amounts equal to and for the specific purpose of covering the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

"<u>Class A-1 Trust Beneficiary</u>" means a holder of Class A-1 Trust Interests.

"<u>Class A-1 Trust Interests</u>" means beneficial interests of the Litigation Trust designated as "Class A-1 Trust Interests" and having the rights and obligations specified with respect to "Class A-1 Trust Interests" in the Trust Agreement.

"<u>Class A-2 Bridge Preference</u>" means, at the applicable time of determination, an amount equal to the sum of (a) the FILO Bridge Balance, *plus* (b) the MOIC Balance.

"<u>Class A-2 Bridge Trust Beneficiary</u>" means a holder of Class A-2 Bridge Trust Interests.

"<u>Class A-2 Bridge Trust Interests</u>" means beneficial interests of the Litigation Trust designated as "Class A-2 Bridge Trust Interests" and having the rights and obligations specified with respect to "Class A-2 Bridge Trust Interests" in the Trust Agreement.

"<u>Class A-2 DIP Preference</u>" means, at the applicable time of determination, an amount equal to the sum of (a) the FILO DIP Balance, *plus* (b) the FILO DIP Exit Premium Balance.

"<u>Class A-2 DIP Trust Beneficiary</u>" means a holder of Class A-2 DIP Trust Interests.

"<u>Class A-2 DIP Trust Interests</u>" means beneficial interests of the Litigation Trust designated as "Class A-2 DIP Trust Interests" and having the rights and obligations specified with respect to "Class A-2 DIP Trust Interests" in the Trust Agreement.

"<u>Class A-2 Preference</u>" means, at the applicable time of determination, an amount equal to the sum of (a) the Class A-2 DIP Preference, *plus* (b) the Class A-2 Bridge Preference.

"<u>Class A-2 Representative</u>" means the representative of the Class A-2 Trust Beneficiaries.

"<u>Class A-2 Representative Fees and Expenses</u>" means (A) payment by the Litigation Trust of $50,000 per month (the "<u>Class A-2 Representative Fees</u>") and (B) reimbursement by the Litigation Trust for actual, reasonable and documented out-of-pocket expenses incurred by the Class A-2 Representative in connection with the performance of the duties of the Class A-2 Representative under the Trust Agreement (the "<u>Class A-2 Representative Expenses</u>") (subject to the terms and conditions of the Trust Agreement, including the caps thereunder).

"<u>Class A-2 Trust Beneficiary</u>" means a holder of Class A-2 Trust Interests.

"<u>Class A-2 Trust Interests</u>" means the Class A-2 DIP Trust Interests and the Class A-2 Bridge Trust Interests.

"<u>Class B Trust Interests</u>" means beneficial interests of the Litigation Trust designated as "Class B Trust Interests" and having the rights and obligations specified with respect to a "Class B Trust Interest" in the Trust Agreement.

"<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan.

"<u>Creditors' Committee</u>" means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

"<u>Debtors</u>" means each of the debtors in the Chapter 11 Cases.

"<u>Deferred Portion</u>" has the meaning given to such term in the FILO Settlement Term Sheet.

"<u>Entity</u>" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"<u>Estate</u>" means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code or any successor(s) thereto.

"<u>Estate Funding</u>" means payment by the Litigation Trust, upon the occurrence of the Trust Establishment Date, of $6,500,000 to the Estate (or, for the avoidance of doubt, any successor liquidating vehicle) to fund costs and expenses of the Estate and the Estate's professionals incurred after the Trust Establishment Date and, for the avoidance of doubt, of any successor liquidating vehicle (or representative thereof) established to hold the Class B Trust Interests and any other remaining assets of the Debtors.

"<u>FILO Balance</u>" means, at the applicable time of determination, an amount equal to the sum of (a) the outstanding Class A-2 Preference (including all accreted amounts accrued thereon), *plus* (b) the outstanding Class A-2 Representative Fees and Expenses (subject to the limitations set forth in the Trust Agreement, including the caps thereunder), *plus* (c) the outstanding Class A-1 Preference, *plus* (d) the outstanding indemnification obligations of the Litigation Trust with respect to the Litigation Funding Agent and the Class A-2 Representative, *plus* (e) the outstanding Class A Trust Beneficiary Expenses of the Litigation Funding Agent and Class A-1 Trust Beneficiaries (subject to the limitations set forth in the Trust Agreement, including the caps thereunder), *plus* (f) the outstanding Litigation Funding Agent Fees and Expenses (subject to the limitations set forth in the Trust Agreement, including the caps thereunder), *plus* (g) any unpaid Variable Component that has been earned (for the avoidance of doubt, (i) before October 2, 2026, any Deferred Portion held in escrow shall not constitute part of the FILO Balance and (ii) the Variable Component shall be subject to adjustment, if applicable, in connection with any Post-FILO Repayment Variable Component).

"<u>FILO Balance Repayment Date</u>" means the first date that the FILO Balance has been reduced to $0.

"<u>FILO Bridge Balance</u>" means, at the applicable time of determination, an amount equal to (a) the sum of (i) $[●][2], *plus* (ii) all accreted amounts accrued on the FILO Bridge Balance (calculated in accordance with the immediately succeeding sentence) as of such time, *minus* (b) the

---

[2] <u>Note to Draft</u>: To equal all principal and accrued interest, fees, expenses, and other amounts outstanding under the Bridge facility immediately prior to the Trust Establishment Date (for the avoidance of doubt, excluding the Retained FILO Claim).

sum of (i) the amount, if any, of cash distributed to the Class A-2 Bridge Trust Beneficiaries by the Litigation Trust on account of the FILO Bridge Balance on or prior to such time (subject to the terms and conditions of the Trust Agreement), *plus* (ii) any FILO Bridge Contributed Amounts. The FILO Bridge Balance shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, shall accrete and be added to the balance of the FILO Bridge Balance on the last day of each month; <u>provided</u> that, to the extent the Litigation Funders commit to provide additional Litigation Funding in excess of $125,000,000 (without any additional fees or premiums) in amounts equal to and for the specific purpose of covering the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

"<u>FILO Bridge Contributed Amounts</u>" means, at the time Class A-2 Bridge Trust Interests are contributed or waived in accordance with the Trust Agreement, (a) the Class A-2 Bridge Preference of such Class A-2 Bridge Trust Interests, *multiplied by* (b) a fraction (i) the numerator of which is the aggregate FILO Bridge Balance and (ii) the denominator of which is the aggregate Class A-2 Bridge Preference; in each case of the foregoing clauses (a) and (b), determined as of immediately prior to such contribution.

"<u>FILO DIP Balance</u>" means, at the applicable time of determination, an amount equal to (a) the sum of (i) $[●][3], *plus* (ii) all accreted amounts accrued on the FILO DIP Balance (calculated in accordance with the immediately succeeding sentence) as of such time, *minus* (b) the sum of (i) the amount, if any, of cash distributed to the Class A-2 DIP Trust Beneficiaries by the Litigation Trust on account of the FILO DIP Balance (subject to the terms and conditions of the Trust Agreement) on or prior to such time, *plus* (ii) any FILO DIP Contributed Amounts. The FILO DIP Balance shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, shall accrete and be added to the balance of the FILO DIP Balance on the last day of each month; <u>provided</u> that, to the extent the Litigation Funders commit to provide additional Litigation Funding in excess of $125,000,000 (without any additional fees or premiums) in amounts equal to and for the specific purpose of covering the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

"<u>FILO DIP/Bridge Claim</u>" refers to the claims outstanding under the FILO DIP Facility and Prepetition Bridge Facility (each as defined in the FILO DIP Order) immediately prior to the Trust Establishment Date.

"<u>FILO DIP Budget</u>" means the budget attached as <u>Annex A</u> to the Amendment No. 6 to Debtor-in-Possession Credit Agreement, dated as of April 28, 2025, by and among the Debtors, the FILO DIP Lenders (as defined in the FILO DIP Order) and the FILO DIP Agent (as defined in the FILO DIP Order).

"<u>FILO DIP Contributed Amounts</u>" means, at the time Class A-2 DIP Trust Interests are contributed or waived in accordance with the terms and conditions of the Trust Agreement, (a) the Class A-2 DIP Preference of such Class A-2 DIP Trust Interests, *multiplied by* (b) a fraction (i) the

---

[3] <u>Note to Draft</u>: To equal all principal and accrued interest, fees, expenses, and other amounts outstanding under the DIP facility immediately prior to the Trust Establishment Date.

numerator of which is the aggregate FILO DIP Balance and (ii) the denominator of which is the aggregate Class A-2 DIP Preference; in each case of the foregoing clauses (a) and (b), determined as of immediately prior to such contribution.

"FILO DIP Exit Premium Balance" means, at the applicable time of determination, an amount equal to (a) $[●][4], *minus* (b) the sum of (i) the aggregate amount, if any, of cash distributed to the Class A-2 DIP Trust Beneficiaries by the Litigation Trust on account of the FILO DIP Exit Premium Balance (subject to the terms and conditions of the Trust Agreement) on or prior to such time, *plus* (ii) any FILO DIP Exit Premium Contributed Amounts.

"FILO DIP Exit Premium Contributed Amounts" means, at the time Class A-2 DIP Trust Interests are contributed or waived in accordance with the terms and conditions of the Trust Agreement, (a) the Class A-2 DIP Preference of such Class A-2 DIP Trust Interests, *multiplied by* (b) a fraction (i) the numerator of which is the aggregate FILO DIP Exit Premium Balance and (ii) the denominator of which is the aggregate Class A-2 DIP Preference; in each case of the foregoing clauses (a) and (b), determined as of immediately prior to such contribution.

"FILO DIP Loans" has the meaning given to such term in the FILO DIP Order.

"FILO DIP Order" means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

"FILO Parties" means, collectively, as of the time immediately prior to the Trust Establishment Date, the (i) FILO DIP Lenders, (ii) FILO DIP Agent, (iii) FILO Bridge Lenders, and (iv) FILO Bridge Agent (each as defined in the FILO DIP Order).

"FILO Settlement Term Sheet" means the *Settlement and Stay Relief Term Sheet* entered into on April 28, 2025 by the Debtors, the FILO Parties, and the Creditors' Committee.

"Governmental Unit" means "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"Letter" has the meaning ascribed to such term in the introductory paragraph.

"Litigation Funder" means each Person who has made a commitment to fund amounts to the Litigation Trust pursuant to the Letter.

---

[4] Note to Draft: To equal the "Exit Premium" under the DIP facility (which is to be calculated as if the FILO DIP Loans were being fully repaid).

"Litigation Funding" means, as of any time of determination, the sum of (i) the Upfront Premium, *plus* (ii) the aggregate amount deemed to have been funded by the Litigation Funders to the Litigation Trust pursuant to the Letter.

"Litigation Funding Agent" means [Brigade Agency Services LLC].

"Litigation Funding Agent Fees and Expenses" means (A) payment by the Litigation Trust of $50,000 per month (the "Litigation Funding Agent Fees") and (B) reimbursement by the Litigation Trust for actual, reasonable and documented out-of-pocket expenses incurred by the Litigation Funding Agent in connection with the performance of the duties of the Litigation Funding Agent under this Letter and the Trust Agreement (the "Litigation Funding Agent Expenses") (subject to the terms and conditions of the Trust Agreement, including the caps thereunder).

"Litigation Funding Budget" means a budget setting forth Trust Expenses that may be funded by Litigation Funding by the Litigation Funders.

"Litigation Trust" means the trust established by the Litigation Trust Agreement.

"Litigation Trust Agreement" or "Trust Agreement" means that certain trust agreement as contemplated by the FILO Settlement Term Sheet, to be entered into by [Mark Kronfeld] as trustee, as may be amended, supplemented or otherwise modified from time to time.

"Litigation Trustee" means the trustee of the Litigation Trust.

"MOIC Balance" means, at the applicable time of determination, an amount equal to (a) the MOIC Payment at such time, *minus* (b) the sum of (i) the amount, if any, of cash distributed to the Class A-2 Bridge Trust Beneficiaries by the Litigation Trust on account of the MOIC Balance on or prior to such time (subject to the terms and conditions of the Trust Agreement), *plus* (ii) any MOIC Contributed Amounts.

"MOIC Contributed Amounts" means, at the time Class A-2 Bridge Trust Interests are contributed or waived in accordance with the terms and conditions of the Trust Agreement, (a) the Class A-2 Bridge Preference of such Class A-2 Bridge Trust Interests at such time, *multiplied by* (b) a fraction (i) the numerator of which is the aggregate MOIC Balance and (ii) the denominator of which is the aggregate Class A-2 Bridge Preference; in each case of the foregoing clauses (a) and (b), determined as of immediately prior to such contribution.

"MOIC Payment" means, $11,250,000; provided that, until the FILO Balance Repayment Date has occurred, the MOIC Payment shall increase by:

    (a)    $1,000,000 on April 1, 2026;

    (b)    an additional $1,500,000 on May 1, 2026;

    (c)    an additional $2,000,000 on June 1, 2026;

    (d)    an additional $2,500,000 on July 1, 2026;

(e)    an additional $3,000,000 on August 1, 2026; and

(f)    an additional $3,750,000 on September 1, 2026 and on the first (1st) calendar day of each month thereafter;

provided further that the aggregate MOIC Payment shall not exceed an amount equal to (1) 85%, *multiplied by* (2) (a) $75,000,000, *minus* (b) the sum of (A) $[●][5] and (B) any amount accreted, or distributed in respect of an accretion, on account of the Class A-2 Bridge Preference; provided that, for the avoidance of doubt, the MOIC Payment shall cease accruing additional amounts upon the FILO Balance Repayment Date.

"Person" means an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Unit, or any other Entity.

"Plan" means the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. 4743), including any exhibits and schedules thereto and as may be modified, amended, or supplemented from time to time, or such other chapter 11 plan confirmed by the Bankruptcy Court, in each case that is consistent with the terms of Section 1 of the Plan Support Agreement Term Sheet entered into on April 28, 2025 by the FILO Parties, the Creditors' Committee and the Debtors.

"Plan Support Agreement Term Sheet" means the term sheet entered into on April 28, 2025 by the FILO Parties, the Creditors' Committee, and the Debtors.

"Post-FILO Repayment Variable Component" has the meaning given to such term in the FILO Settlement Term Sheet.

"Prepetition Bridge Agent" has the meaning given to such term in the FILO DIP Order.

"Prepetition FILO Bridge Loans" means the loans and advances made by the FILO Bridge Lenders (as defined in the FILO DIP Order) pursuant to the Prepetition Bridge Loan Documents (as defined in the FILO DIP Order).

"Quorum TSA Sale Order" means the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4192), entered by the Bankruptcy Court on March 11, 2025.

"Representatives" means, with respect to any Person, its respective general partners, managing members, directors, managers, officers, employees, agents, counsels, advisors, insurers

---

[5] Note to Draft: To equal all interest paid or accreted on the Bridge facility as of immediately prior to the Effective Date.

and other representatives (including attorneys, accountants, consultants, bankers and financial advisors).

"<u>Retained FILO Claims</u>" means Claims held by the FILO Bridge Lenders under the Prepetition Bridge Credit Agreement (as defined in the FILO DIP Order) in principal amount totaling $10,000,000.

"<u>Secured Interim Advances</u>" means the aggregate amount of cash collateral used from April 1, 2025 through the Trust Establishment Date, together with interest thereon at the Applicable Rate; <u>provided</u> that (1) the aggregate amount of cash collateral used as Secured Interim Advances through June 27, 2025 may not exceed $61,000,000 and (2) any cash collateral used as Secured Interim Advances shall be used in accordance with the FILO DIP Budget.

"<u>Trust Assets</u>" means, as of the Trust Establishment Date, all property of the Litigation Trust listed on Schedule 2 of the Trust Agreement (including stock of corporations to be formed by the Litigation Trust to acquire certain properties listed on Schedule 2 of the Trust Agreement), and at any applicable time of determination thereafter, such property, and the proceeds, products, offspring or profits of any of the foregoing property, and any other assets held at such time by the Litigation Trust.

"<u>Trust Beneficiaries</u>" means Class A Trust Beneficiaries and Class B Trust Beneficiaries.

"<u>Trust Claims</u>" means the Claims and Causes of Action that constitute Trust Assets.

"<u>Trust Establishment Date</u>" means the actual date of transfer of the Trust Assets to the Litigation Trust, which shall be on the earlier of (i) July 8, 2025; and (ii) one (1) Business Day after the confirmation date of any confirmed plan.

"<u>Trust Expenses</u>" means the reasonable, documented, out-of-pocket fees, expenses and costs of the Litigation Trust.

"<u>Trust Litigation Proceeds</u>" means, with respect to a Trust Claim, the gross proceeds received by the Litigation Trust from such Trust Claim.

"<u>Trust Proceeds</u>" means all of the proceeds received by the Litigation Trust from the pursuit of any Trust Claims, from any subsequent funding of the Litigation Trust or from the Debtors or the Estate pursuant to the Approval Order or the Plan.

"<u>Variable Component</u>" means 20% of the Trust Litigation Proceeds (subject to the terms and conditions of the Trust Agreement).

**<u>Exhibit C</u>**

**Transition Services Agreement**

*Filing Version 5/25/2025*

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "<u>Agreement</u>") dated as of [●], 2025 (the "<u>Effective Date</u>") is made and entered into by and between Steward Health Care System LLC, a Delaware limited liability company ("<u>Service Provider</u>") and the Litigation Trust, a [●] ("<u>Service Recipient</u>"). Service Provider and Service Recipient are individually referred to as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

## RECITALS

WHEREAS, each of the Debtors (as defined below) filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on May 6, 2024 in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"), which cases are being jointly administered for procedural purposes only in the cases styled *In re Steward Health Care System LLC*, *et al.*, Ch 11. Case No. 24-90213 (CML) (collectively, the "<u>Chapter 11 Cases</u>");

WHEREAS, on April 28, 2025, the Debtors, the FILO Parties and the Creditors' Committee (each as defined below) entered into that certain *Settlement and Stay Relief Term Sheet* (as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "<u>Settlement and Stay Relief Term Sheet</u>");

WHEREAS, on [●], 2025, the Bankruptcy Court entered the *Order (I) Approving Settlement With FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* (Docket No. [●]) (the "<u>Approval Order</u>") approving, among other things, the Term Sheet and this Agreement;

WHEREAS, pursuant to the Approval Order and, to the extent that the Plan is confirmed and the Confirmation Order (each as defined below) remains in full force and effect, the Confirmation Order, on the Effective Date, the Debtors are transferring the Trust Assets (as defined below) to Service Recipient; and

WHEREAS, in order to assist the orderly transfer of the Trust Assets to Service Recipient and the liquidation of the Trust Assets, Service Provider will provide or arrange for the provision of, directly and/or through third party vendors, certain transition services to Service Recipient in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual agreements, provisions and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE 1

## DEFINITIONS

1.1 <u>Definitions</u>. The following capitalized terms shall have the meanings specified in this <u>Section 1.1</u>. Capitalized terms used in this Agreement but not defined in this <u>Section 1.1</u> or elsewhere in this Agreement shall have the respective meanings for such terms set forth in the Approval Order.

(a) "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(b) "<u>Agreement</u>" shall have the meaning set forth in the preamble.

(c) "<u>Approval Order</u>" shall have the meaning set forth in the recitals.

(d) "<u>Bankruptcy Court</u>" shall have the meaning set forth in the recitals.

(e) "<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which the Federal Reserve Bank of New York is authorized or required by law or executive order to close or be closed.

(f) "<u>Chapter 11 Cases</u>" shall have the meaning set forth in the recitals.

(g) "<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated pursuant thereto.

(h) "<u>Confidential Information</u>" shall have the meaning set forth in <u>Section 9.1</u>.

(i) "<u>Confirmation Order</u>" means, to the extent entered and remaining in full force and effect, the order of the Bankruptcy Court confirming the Plan.

(j) "<u>Creditors' Committee</u>" means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

(k) "<u>Debtors</u>" means each of the debtors in the Chapter 11 Cases.

(l) "<u>Disclosing Party</u>" shall have the meaning set forth in <u>Section 9.1</u>.

(m) "<u>Effective Date</u>" shall have the meaning set forth in the preamble.

2

(n)     "Estate" shall have the meaning set forth in the Litigation Trust Agreement.

(o)     "Expenses" shall have the meaning set forth in Section 4.1.

(p)     "FILO Balance" shall have the meaning set forth in the Litigation Trust Agreement.

(q)     "FILO DIP Order" means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

(r)     "FILO Parties" means, collectively, as of the time immediately prior to the Effective Date, the (i) FILO DIP Lenders, (ii) FILO DIP Agent, (iii) FILO Bridge Lenders and (iv) FILO Bridge Agent (each as defined in the FILO DIP Order).

(s)     "Force Majeure Event" shall have the meaning set forth in Section 13.6.

(t)     "Governmental Authority" means any domestic or foreign national, state, multi-state, municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body exercising any regulatory or taxing authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any court, tribunal or arbitrator of competent jurisdiction.

(u)     "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act (42 U.S.C. §§ 17921 et seq.), and any and all implementing rules and regulations of a Governmental Authority as of the date hereof.

(v)     "Indemnified Party" means a Provider Indemnified Party or a Recipient Indemnified Party, as applicable.

(w)     "Indemnifying Party" means the Party responsible for indemnifying the applicable Indemnified Party pursuant to Article 11.

(x)     "Intellectual Property" means any and all right, title and interest in or relating to intellectual property, whether protected, created or arising under the Laws of the United States or any other jurisdiction, including all: (i) patents and patent applications, together with all reissuances, divisionals, continuations, continuations-in-part, revisions, substitutions, provisionals, renewals, extensions, and re-examinations thereof, and all rights to claim priority from any of the foregoing; (ii) trademarks, service marks, logos, trade names, brand names, corporate names, trade dress, trade styles, and other indicators of the commercial source or origin of a product or service, and general intangibles of a like nature, in

3

each case, whether or not registered, and all registrations and applications to register, and renewals and extensions of, any of the foregoing, together with all goodwill associated with any of the foregoing; (iii) trade secret rights and corresponding rights in confidential information and other non-public or proprietary information (whether or not patentable or copyrightable); (iv) copyrights and copyrightable works, and all database and design rights, whether or not registered or published, including all data collections and "moral" rights, and all registrations and applications to register, and renewals, extensions and reversions of, any of the foregoing, and corresponding rights in works of authorship; (v) Internet domain names and all social media accounts; (vi) intellectual property rights arising from software and technology; and (viii) rights of privacy and publicity; and (ix) any and all similar, corresponding or equivalent intellectual or proprietary rights arising under the Laws of any jurisdiction throughout the world or pursuant to any international convention.

(y)     "KLD Contract" means the Statement of Work, dated May 20, 2024, by and between KLDiscovery ("KLD"), Weil, Gotshal & Manges LLP, and Steward Health Care System LLC, issued pursuant to the eDiscovery Services Agreement dated January 9, 2023.

(z)     "Law" means any applicable foreign, federal, state, local law, statute, code, ordinance, rule, regulation or other legal requirement of any Governmental Authority.

(aa)    "Losses" means all losses, liabilities, damages, deficiencies, legal proceedings, liens, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable and documented attorneys' fees and the cost of enforcing any right to indemnification hereunder, the cost of pursuing any insurance providers, and the costs of investigation of any of the foregoing.

(bb)    "Litigation Trust Agreement" means that certain Litigation Trust Agreement, dated as of the Effective Date, as amended, modified or supplemented from time to time in accordance with its terms.

(cc)    "Litigation Trustee" means the "Trustee" under the Litigation Trust Agreement.

(dd)    "Party" shall have the meaning set forth in the preamble.

(ee)    "Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

(ff)    "Personal Information" means all information in any form or media that identifies, could be used to identify or is otherwise related to an individual person, in addition to any definition for "personal information" or any similar term provided by applicable Law, including "protected health information" or "PHI" as defined under HIPAA.

4

(gg)   "<u>Personnel</u>" means the officers, managers, directors, employees, agents, suppliers, licensors, licensees, contractors, subcontractors, advisors (including attorneys, accountants, technical consultants or investment bankers) and other representatives, from time to time, of a Party and its Affiliates; <u>provided</u> that the Personnel of any Recipient Entity shall not be deemed Personnel of any Service Provider and the Personnel of any Service Provider shall not be deemed Personnel of any Recipient Entity.

(hh)   "<u>Plan</u>" the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. 4743), including any exhibits and schedules thereto and as may be modified, amended, or supplemented from time to time, or such other chapter 11 plan confirmed by the Bankruptcy Court, in each case that is consistent with the terms of Section 1 of the Plan Support Agreement Term Sheet entered into on April 28, 2025 by the FILO Parties, the Creditors' Committee and the Debtors.

(ii)   "<u>Plan Trust</u>" means, to the extent that the Plan is confirmed and the Confirmation Order remains in full force and effect, the trust to be established in accordance with the Plan to hold the Plan Trust Assets (as defined in the Litigation Trust Agreement) and make distributions to holders of Allowed Claims (as defined in the Litigation Trust Agreement) pursuant to the Plan.

(jj)   "<u>Processing</u>" means any operation or set of operations performed on any data, whether or not by automated means, including but not limited to receipt, collection, compilation, use, storage, combination, sharing, safeguarding, disposal, erasure, destruction, disclosure or transfer (including cross-border transfer).

(kk)   "<u>Provider Indemnified Party</u>" shall have the meaning set forth in <u>Section 11.1</u>.

(ll)   "<u>Retained Collateral</u>" shall have the meaning set forth in the Litigation Trust Agreement.

(mm)   "<u>Quorum APA</u>" means that certain Asset Purchase Agreement, dated as of March 1, 2025, by and between Service Provider and Golden Sun TSA Services, LLC ("<u>Quorum</u>").

(nn)   "<u>Quorum Services</u>" means the Services (i) for which Quorum is a Third Party Service Provider or (ii) which are provided using services provided to Service Provider (or its Affiliate) by Quorum.

(oo)   "<u>Receiving Party</u>" shall have the meaning set forth in <u>Section 9.1</u>.

(pp)   "<u>Recipient Entities</u>" shall have the meaning set forth in the Recitals.

(qq)   "<u>Recipient Indemnified Party</u>" shall have the meaning set forth in <u>Section 11.2</u>.

5

(rr)     "<u>Representative</u>" of a Person means any director, officer, employee, agent, consultant, accountant, auditor, attorney or other representative of such Person.

(ss)     "<u>Required Technology</u>" shall have the meaning set forth in <u>Section 6.1</u>.

(tt)     "<u>Sales and Services Taxes</u>" shall have the meaning set forth in <u>Section 4.3(a)</u>.

(uu)    "<u>Service Provider</u>" shall have the meaning set forth in the preamble.

(vv)    "<u>Service Recipient</u>" shall have the meaning set forth in the preamble.

(ww)   "<u>Services</u>" shall have the meaning set forth in <u>Section 2.1(a)</u>.

(xx)    "<u>Services Representative</u>" shall have the meaning set forth in <u>Section 3.1</u>.

(yy)    "<u>Settlement and Stay Relief Term Sheet</u>" shall have the meaning set forth in the recitals.

(zz)    "<u>Systems</u>" means systems, networks, software, e-mail, databases, other computer-based resources, or similar technology.

(aaa)   "<u>Tax</u>" or "<u>Taxes</u>" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, estimated taxes and any other taxes of any kind whatsoever; and (ii) all interest, penalties, fines and additions to tax imposed in connection with any item described in clause (i) of this definition.

(bbb)   "<u>Tax Authority</u>" means the IRS and any other Governmental Authority exercising any authority to impose, assess or collect any Tax or any other authority exercising Tax regulatory authority.

(ccc)   "<u>Term</u>" shall have the meaning set forth in <u>Section 8.1</u>.

(ddd)   "<u>Third Party Service Provider</u>" shall have the meaning set forth in <u>Section 2.5</u>.

(eee)   "<u>Trust Assets</u>" shall have the meaning set forth in the Litigation Trust Agreement.

## 2.     SERVICES.

2.1   <u>Services</u>.

(a)     <u>Services</u>. Upon the terms and subject to the conditions of this Agreement, subject to <u>Section 6.1</u>, Service Provider shall provide or cause to be provided to Service

Recipient the services listed in, as applicable, <u>Schedule 2.1(a)</u> (collectively, the "<u>Services</u>").

(b)    All the Services shall be for the sole use and benefit of Service Recipient. None of the Services listed on any Schedule shall require Service Provider to provide to Service Recipient or any of its Affiliates or any of their respective Representatives, in connection with the Services or otherwise, any (i) legal, regulatory, compliance or tax advice; (ii) accounting or financing services or arrangements; or (iii) payroll and/or benefits services, in each case (i)–(iii), to the extent providing such Service is prohibited or restricted by applicable Law or puts Service Provider's existing plans or benefits at risk.

2.2    <u>Service Change</u>. Service Provider may modify a Service (including with respect to scope, timing and quality) (a) to the extent the same modification is made with respect to Service Provider's provision of such Service to its Affiliates and other Persons to whom Service Provider provides such Service, (b) to the extent that such modification is in connection with the modification or termination of services being provided by a Third Party Service Provider that are necessary for the provision of Services to Service Recipient in a manner consistent with this Agreement or (c) to the extent such modification is in connection with the relocation or reallocation of Service Provider's employees or any employee departure or termination; <u>provided</u>, <u>however</u>, that in each case, (w) except to the extent agreed in writing by Service Recipient, in no event shall such change result in a material increase in the amount payable by Service Recipient in respect of the applicable Service, (x) Service Provider will provide written notice of the need for modification and the details of such modification to Service Recipient as soon as reasonably practicable, (and if reasonably practicable no less than thirty (30) days before such modification is to be implemented), (y) Service Provider will use commercially reasonable efforts to limit the disruption to Service Recipient's activities caused by such modification, and (z) in the event Service Recipient objects to such modification, the Parties shall discuss the matter as soon as is practicable. In the event Service Recipient desires a modification to the Services, the Parties shall discuss such modification and, if Service Provider agrees to such modification in writing, such services shall be part of the Services and the Parties shall amend the budget pursuant to <u>Section 4.1</u> to reflect the services desired by Service Recipient, in each case with such services being provided by Service Provider (itself or via an agreed Third Party Provider) at cost without markup.

2.3    <u>Duration of Services</u>. Upon the terms and subject to the conditions of this Agreement, Service Provider shall provide or cause to be provided to Service Recipient each Service until the earlier of (a) with respect to Quorum Services, the date on which such Service is no longer provided as a Wind Down Service (as defined in the Quorum APA) under the Quorum APA, (b) the date on which such Service is terminated under <u>Section 8.3</u> and (c) the date on which this Agreement is terminated under <u>Article 8</u>.

2.4    <u>Standards of Service</u>. Except as otherwise expressly provided in this Agreement, Service Provider shall perform the Services to be provided under this Agreement (i) to the extent applicable, in a manner reasonably equivalent to the manner in which, and at the overall

7

standards of quality and availability at which, such Services were provided immediately prior to the Effective Date, and (ii) in any event, (x) in accordance with applicable Law and (y) in a professional and diligent manner generally consistent with good industry practice. No Service Provider shall be required to perform any obligation under this Agreement (a) to the extent that due to a change in applicable Law after the date of this Agreement would materially increase Service Provider's costs with respect to compliance with applicable Laws, unless Service Recipient agrees to bear all incremental costs resulting from the increased compliance burden associated with providing such Services or (b) that would result in the breach or violation of any applicable Law or third party contract or agreement. Except as may be contemplated with respect to personnel in the then-current budget for the Services (and subject to Service Recipient agreeing to pay Service Provider all costs associated with such personnel in accordance with the budget or as approved in writing by Service Recipient), Service Provider shall not be required to hire new personnel, expand its facilities or incur new capital expenses in order to provide any Services.

2.5     <u>Third Party Service Providers</u>. Service Provider shall have the right to designate an Affiliate or a qualified third party ("<u>Third Party Service Provider</u>") to provide the applicable Services. Service Provider shall use commercially reasonable efforts to require each such Third Party Service Provider to agree to comply with the terms of this Agreement in relation to the provision of Services; <u>provided</u>, <u>however</u>, that in the event Service Provider becomes aware that a Third Party Service Provider's acts or omissions are not in material compliance with this Agreement and such failure to comply is adversely affecting Service Recipient's receipt of the Services, (a) Service Provider shall notify Service Recipient of such Third Party Service Provider's acts or omissions and (b) upon request from Service Recipient, (i) Service Provider shall use commercially reasonable efforts to make introductions between Service Recipient's designated representatives and such Third Party Providers and (ii) Service Provider shall use commercially reasonable efforts to participate in meetings between Service Recipient and such Third Party Provider.

2.6     <u>Third Parties</u>. Without limiting <u>Section 6.1</u>, in the event any third party consent, waiver or approval is required for a Service Provider or its designees to provide any Services and such consent, waiver or approval is not obtained, the Parties shall cooperate in good faith to identify a commercially reasonable alternative to such Services, if available (and Service Recipient shall be responsible for paying any consent cost or increase in Expenses in connection therewith). Service Provider shall not be required to provide a Service to the extent that Service Provider does not obtain any required consent.

2.7     <u>Information</u>. If Service Provider requires information within the control of Service Recipient to perform any Services, Service Recipient shall promptly provide such information, or cause such information to be provided, to Service Provider. Service Provider shall, at Service Recipient's cost, provide the Litigation Trustee with originals or copies of access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the Litigation Trustee, for the disposition of Trust Assets. Such information shall be subject to <u>Article 9</u>. The Parties shall follow mutually

agreed upon procedures for the collection and transmission of the information to be processed pursuant to the Services.

2.8 <u>Ownership</u>. Nothing in this Agreement is intended to transfer any right, title, or interest in or to any such property (including materials, products, tools, equipment, facilities, and other resources) owned by Service Provider or its Affiliates and used by them in connection with the provision of Services.

2.9 <u>Use of Bank Accounts and Funds</u>. Service Provider shall access and use funds held by or for the benefit of Service Recipient or its Affiliates (with respect to which Service Recipient or its Affiliates holds a right or interest) solely as authorized by Service Recipient in writing in its sole discretion.

### 3.    SERVICE REPRESENTATIVES.

3.1 <u>Service Representatives</u>. Each Party shall appoint and maintain a representative for the Services (each, a "<u>Services Representative</u>"), as set forth on <u>Schedule 2.1(a)</u> who shall: (a) supervise the activities of its respective employees and Representatives with respect to the Services and (b) serve as an initial point of contact for the other Party with respect to questions and issues that may arise in connection with the Services. For the avoidance of doubt, no Services Representative has authority to amend this Agreement.

### 4.    EXPENSES.

4.1 <u>Estate Expenses</u>. In consideration for the provision by Service Provider of the Services and as agreed pursuant to the Settlement and Stay Relief Term Sheet, Service Provider shall charge Service Recipient, and Service Recipient shall pay Service Provider, all of the Estate's cash disbursements, including for payroll costs, out-of-pocket costs paid to third parties (including Third Party Service Providers), and all costs incurred in providing the Services or operating the Estate (the "<u>Expenses</u>"), to the extent consistent with the agreed budget attached hereto as [<u>Schedule 4.1</u>], which budget may be updated from time to time if approved in writing by the Litigation Trustee and the Class A-2 Representative (as defined in the Litigation Trust Agreement), such approval not to be unreasonably withheld, conditioned or delayed; <u>provided</u>, <u>however</u>, that Service Provider may incur Expenses (and Service Recipient shall reimburse Service Provider for such Expenses or pay Estimated Expenses) in a given calendar month to the extent such Expenses do not exceed 110% of the aggregate budget amounts for Expenses other than professional fees (to the extent professional fees are included in the agreed budget) for the applicable calendar month. Service Recipient's obligations to pay Expenses for which Service Recipient is responsible pursuant to this Agreement shall survive any termination or expiration of this Agreement. Notwithstanding anything to the contrary herein, to the extent Service Recipient does not approve the budget (or an update thereto), pay an Estimated Expense in accordance with <u>Section 4.2</u>, or pay an Actual Expense, Service Provider is not obligated to provide any Services that relate to or are dependent on such payments.

9

4.2    <u>Payment Details</u>.

(a)    Service Provider shall provide on a monthly basis, on or before the twentieth (20th) day of each calendar month during the Term, Service Provider's estimated Expenses for the following month ("<u>Estimated Expenses</u>") and within five (5) Business Days, Service Recipient shall transfer such funds for the subsequent month to Service Provider to the extent such Estimated Expenses are generally consistent with spend categories (and amounts set out with respect to the applicable spend category, where applicable) as set out in the Service Recipient-approved budget. Within fifteen (15) days after Service Provider determines the actual Expenses for a given month (the "<u>Actual Expenses</u>"), Service Provider shall invoice Service Recipient for the amount that the Actual Expenses exceeds the Estimated Expenses, if any, and Service Recipient shall provide such amount to Service Provider within five (5) days after the invoice date. If the Estimated Expenses exceed the Actual Expenses, the excess amount shall be credited against the Estimated Expenses to be paid by Service Recipient in the subsequent month. If the Expenses set forth on [<u>Schedule 4.1</u>] for a time period exceed the Estimated Expenses for such time period, the excess amount may be added to the Estimated Expenses for the next invoicing time period. The Estimated Expenses for the first calendar month (or partial calendar month) following the Effective Date shall be $[●], and Service Recipient shall pay Service Provider such amount within two (2) Business Days of the Effective Date. In the event Service Recipient disputes any invoiced amount in good faith (including on the basis that the amount deviates from the agreed budget), Service Recipient may withhold payment of such disputed amount until and to the extent it is agreed between the Parties or determined by the Bankruptcy Court that such amounts are due and payable by Service Recipient to Service Provider hereunder; provided, that, Service Provider shall not be obligated to continue to provide the Service related to such disputed amount unless and until such disputed amount (or other amount agreed by the Parties) is paid.

(b)    To the extent that any Retained Collateral is identified that could be monetized for value, Service Provider shall use commercially reasonable efforts to monetize such Retained Collateral, in coordination and in a manner reasonably agreed upon with Service Recipient, at Service Recipient's sole expense and paid in advance; <u>provided</u> that any reasonable costs incurred by Service Provider in connection with such agreed upon monetization process shall be charged to Service Recipient at Service Provider's cost.

(c)    All undisputed amounts remaining unpaid for more than five (5) Business Days after their respective due date(s) shall accrue interest at 1% per annum, calculated daily, effective as of the date the payment was due interest per month until paid in full.

(d)    Except as mutually agreed to in writing by the Parties, no Party or any of its Affiliates shall have any right of set-off, recoupment or other similar rights with respect to (i) any amounts received pursuant to this Agreement or (ii) any other

amounts claimed to be owed to the other Party or any of its Affiliates arising out of this Agreement.

4.3     <u>Taxes</u>.

(a)     All charges and fees to be paid to Service Provider under this Agreement are exclusive of (and Service Recipient shall be responsible for) any and all sales, use, transfer, value-added, goods or services taxes or similar taxes ("<u>Sales and Services Taxes</u>") applicable to the payment for or provision of the Services hereunder. If any Sales and Services Taxes are assessed on the provision of any of the Services under this Agreement, (i) Service Provider will deliver to Service Recipient an invoice (or other valid and customary documentation) reflecting such Sales and Services Taxes, (ii) Service Recipient will pay to Service Provider the amount shown as due on such invoice in accordance with <u>Section 4.2</u>, and (iii) Service Provider will remit such amount to the applicable Governmental Authority in accordance with applicable Law. Service Provider shall be responsible for any Sales and Services Taxes (including any deficiency, interest and penalties) imposed as a result of a failure to timely remit any Sales and Services Taxes to the applicable Governmental Authority to the extent Service Recipient timely remits such Sales and Services Taxes to Service Provider or Service Recipient's failure to do so results from Service Provider's failure to timely charge or provide notice of such Sales and Services Taxes to Service Recipient. Notwithstanding anything in this Agreement to the contrary, each of Service Recipient and Service Provider shall pay and be responsible for all taxes other than Sales and Services Taxes applicable to each of them, including taxes based on their own income or profits or assets.

(b)     Notwithstanding anything in this Agreement to the contrary, Service Recipient shall be entitled to deduct and withhold from any amount otherwise payable pursuant to this Agreement such amounts as Service Recipient is required to deduct and withhold with respect to the making of any such payment under the Code or any provision of state, local or foreign Tax Law. To the extent that amounts are so withheld, Service Recipient shall remit such Taxes to the applicable Tax Authority and submit to Service Provider evidence of payment of any such withholding Tax to the applicable Tax Authority.

(c)     The Parties will cooperate with each other in determining the extent to which any Tax described in this <u>Section 4.3</u> is due and owing under the circumstances and in minimizing any such Tax, including by making available to each other any resale certificate, information regarding out-of-state use of materials, services or sale, and other exemption certificates or information reasonably requested by either Party. Each Party agrees to provide the other Party such information and data as reasonably requested from time to time, and to fully cooperate with the other Party, in connection with (i) the reporting of any Sales and Services Taxes, (ii) any audit relating to any Sales and Services Taxes, or (iii) any assessment, refund, claim or legal proceeding relating to any Sales and Services Taxes. Each Party shall

11

promptly notify the other Party of any deficiency claim or similar notice by a Governmental Authority with respect to any Sales and Services Taxes.

4.4     <u>Accounting and Authority</u>. The Parties acknowledge and agree that with respect to Services, including those relating to bookkeeping support, finance/audit clerical (non-decision making) services, technology support and telephone services, regarding each, Service Provider's role is to provide Services on behalf of Service Recipient and therefore, Service Recipient shall retain the economic benefits and risks associated with such activities. The Parties acknowledge and agree that Service Recipient retains authority for all decisions relating to its bookkeeping support, finance/audit clerical (non-decision making) services, technology support, and telephone services and in Service Provider's provision of all Services, Service Provider is not making any decisions or commitments on behalf of, or providing any legal, accounting or other financial advice to Service Recipient and no attorney-client or other advisory or fiduciary relationship will be formed between Service Provider and Service Recipient. Service Provider shall not be responsible for any Losses or mistakes in the provision of Services which result from any inaccurate or insufficient information given to Service Provider by or on behalf of Service Recipient or a Third Party Service Provider.

## 5.     MAINTENANCE.

5.1     <u>Maintenance</u>. Service Provider and any Third Party Service Provider shall have the right to temporarily shut down the operation of any Systems or facilities providing any Service whenever, in Service Provider's or Third Party Service Provider's judgment, reasonably exercised, such action is necessary or advisable for general maintenance (so long as it is conducted in a manner and time consistent with the maintenance Service Provider or Third Party Service Provider, as applicable, performs on its own Systems) or emergency purposes. With respect to Services dependent on the operation of such Systems and facilities, Service Provider shall be relieved of its obligations hereunder to provide such Services during the period that such Systems or facilities are so shut down in compliance with this Agreement but shall use commercially reasonable efforts to minimize the duration of any such shutdown. Service Provider shall be relieved of its obligations hereunder to provide Services dependent on the operation of any third party Systems or facilities that are shut down by a Third Party Service Provider for general maintenance or emergency purposes.

## 6.     ACCESS, RECORDS AND SECURITY.

6.1     <u>Required Technology</u>. Subject to <u>Section 2.6</u>, if a Party believes that the performance or receipt of Services hereunder requires access to the other Party's Systems (including Systems of Third Party Service Providers, as applicable) ("<u>Required Technology</u>"), such Party will notify the other Party, who shall consider such request in good faith and determine in its sole discretion the manner of access to grant or the alternative means of providing or receiving the applicable Service. If either Party grants the other Party access to any Required Technology, or if either Party is otherwise granted access to any of the other Party's Systems in connection with provision or receipt of the Services, the accessing

Party shall comply with all applicable system security policies, procedures and requirements as communicated to the accessing Party in advance. Notwithstanding the foregoing, Service Provider shall not be required to pay any fees or other payments or incur any obligations to enable Service Recipient to obtain any license to use Required Technology to provide Services.

6.2   <u>Protection of Data</u>. All Processing of Personal Information associated with this Agreement shall be governed by that certain Data Processing Agreement, dated as of the Effective Date, attached hereto as **<u>Exhibit A</u>**, which is hereby incorporated by reference into this Agreement and subject to the full force of all of the provisions herein.

6.3   <u>Access to Systems</u>. Each Party shall take reasonable steps to ensure that only those of its personnel who are specifically authorized to have access to the Systems of the other Party or its Third Party Service Provider gain such access, and shall prevent unauthorized access, use, destruction, alteration, or loss of information contained therein, and shall notify its personnel regarding the restrictions set forth in this Agreement. At all times when a Party is accessing the Systems owned or controlled by the other Party pursuant to this Agreement, such Party shall, and shall cause its Affiliates, Representatives and/or Third Party Service Provider, as the case may be, to, use commercially reasonable efforts to comply with the policies and procedures of the other Party concerning health, safety and security, to the extent such policies and procedures are communicated to such Party in advance.

6.4   <u>Records</u>. During the term of this Agreement and for two (2) years thereafter (or such longer period as may be required by applicable Law), Service Provider and Service Recipient shall, at Service Recipient's cost, maintain complete and accurate records related to any Service provided, Expenses invoiced and payments made hereunder (the "<u>Service Records</u>"); <u>provided</u>, that if Service Provider at any time offers in writing to transfer the Service Records in Service Provider's possession to Service Recipient, Service Recipient shall have sixty (60) days thereafter to take possession of the Service Records, after which Service Provider shall no longer have an obligation to retain, and may thereafter delete or destroy, such Service Records. Upon reasonable advance notice, and subject to <u>Article 5</u>, each Party in possession of Service Records shall use commercially reasonable efforts to permit the other Party or its Representatives, as applicable, reasonable access to or, at the requesting Party's expense, copies of, such Service Records during regular business hours; <u>provided</u>, that (a) such access shall not disrupt the normal operations of such first Party's business and (b) nothing herein shall require any Party to provide to the other Party, its Affiliates or its Representatives with access to or copies of any information to the extent that such access to or the provision of such information would violate any applicable Law or contractual obligation (including any Law or contractual obligation relating to the collection, transfer, storage, disposal, use, processing and disclosure of Personal Information); <u>provided</u>, that such first Party and its Affiliates shall use commercially reasonable efforts to provide such information in a manner that does not violate such Law or is in accordance with such agreement.

6.5   <u>Employees and Contractors</u>. Service Provider shall be responsible for the appointment of appropriate Personnel to carry out and perform the Services. As between Service Provider

and Service Recipient, at all times during the provision of Services, such Personnel shall continue to be solely an employee, agent or contractor, as applicable, of Service Provider and shall not, unless otherwise agreed in writing by Service Provider and Service Recipient, become an employee, agent or contractor of Service Recipient, and such Personnel shall not be entitled to receive any compensation, benefits, perquisites or privileges from Service Recipient <u>provided</u>, that, the foregoing shall not prevent such Personnel from leaving the employment of Service Provider, either at the discretion of such individual Personnel or at Service Provider's discretion. Service Provider or one or more of its Affiliates, as applicable, shall be responsible for paying all necessary employment taxes, salary and incidental appointment and employment costs, if any, as may be required by applicable Law with respect to any such Personnel related to the applicable time of employment.

## 7.   INTELLECTUAL PROPERTY.

7.1   <u>Ownership and License</u>. Each Party shall retain all right, title and interest in and to its Intellectual Property as it exists as of the Effective Date, and in Intellectual Property it acquires, licenses, or creates as of and after the Effective Date in connection with this Agreement except to the extent otherwise set out in this <u>Section 7.1</u>. As between the Parties, Service Recipient shall exclusively own all Intellectual Property created by or on behalf of, or acquired by, (i) Service Recipient or its Affiliates, including such information and materials as may be made available to Service Provider by Service Recipient to facilitate Service Provider's performance of the Services, and (ii) Service Provider in the course of the performance of the Services, to the extent such Intellectual Property relates to the Services or the business of the Service Recipient or its Affiliates. Each Party hereby grants on behalf of itself and its Affiliates to the other Party and its Affiliates, a limited, royalty-free, fully paid-up, worldwide, non-sublicensable, non-exclusive, non-transferable (except as set forth in <u>Section 13.5</u>) license solely during the Term in, to and under all Intellectual Property, software, technology and data owned or controlled by such Party or any of its Affiliates, solely to the extent necessary for, as applicable, Service Provider to provide the Services and Service Recipient to receive and use the Services.

## 8.   TERM AND TERMINATION.

8.1   <u>Term</u>. The term of this Agreement shall commence immediately upon the Effective Date and terminate upon the earliest of (a) the last date on which Service Provider is obligated to provide any Service to Service Recipient in accordance with the terms hereof, (b) the Class B Representative (as defined in the Litigation Trust Agreement) replaces the Litigation Trustee in accordance with Sections 3.3(d) and 5.5 of the Litigation Trust Agreement, (c) the FILO Balance being reduced to $0 and the Plan Trustee directing the Litigation Trustee to effectuate the distribution of all remaining Trust Assets to the Plan Trust on account of the Plan Trust's Class B Trust Interests (as defined in the Litigation Trust Agreement), by transfer in kind, merger or otherwise, pursuant to the Plan, and (d) the mutual written agreement of the Parties to terminate this Agreement in its entirety, in each case, unless earlier terminated under <u>Section 8.2</u> (the "<u>Term</u>").

8.2   <u>Termination</u>. Upon written notice to the other Party, this Agreement may be terminated:

14

(a)  by Service Provider (i) if Service Recipient is in material breach of the terms of this Agreement and Service Recipient fails to cure such breach within thirty (30) days after Service Provider delivers written notice of such breach to Service Recipient, or (ii) if Service Recipient has failed to make payments of any undisputed Expenses as required under Article 4 and Service Recipient fails to cure such breach within three (3) Business Days after Service Provider delivers written notice of such breach to Service Recipient; or

(b)  by Service Recipient if Service Provider is in material breach of the terms of this Agreement and Service Provider fails to cure such breach within thirty (30) days after Service Recipient delivers written notice of such breach to Service Provider.

Notwithstanding the foregoing, a Party's failure to terminate this Agreement in the event of a material breach of this Agreement by the other Party under Section 8.2(a) or Section 8.2(b) will not constitute a waiver by such Party of such breach or affect in any way any other rights or remedies such Party might otherwise have given such breach. Such Party's remedies for any such breach are cumulative.

8.3   Partial Termination of Services. With respect to any Service:

(a)  Service Recipient may terminate such Service, in whole but not in part with respect to such Service, upon thirty (30) days' prior written notice to Service Provider or otherwise upon the mutual agreement of the Parties;

(b)  Service Recipient may terminate such Service, in whole but not in part with respect to such Service, at any time upon prior written notice to Service Provider if Service Provider has failed to perform any of its material obligations under this Agreement with respect to such Service, and such failure remains uncured thirty (30) days after Service Recipient delivers written notice of such failure to Service Provider;

(c)  Service Provider may terminate such Service, in whole but not in part with respect to such Service, at any time upon prior written notice to Service Recipient (i) if Service Recipient has failed to perform any of its material obligations under this Agreement with respect to such Service, and such failure remains uncured thirty (30) days after Service Provider delivers written notice of such failure to Service Recipient, or (ii) if Service Recipient has failed to make payments that are not disputed in good faith as required under Article 4 and such failure remains uncured three (3) Business Days after Service Provider delivers written notice of such failure to Service Recipient or (iii) if a Third Party Service Provider ceases to provide and is unwilling or unable to provide the applicable Service.

provided, however, to the extent that Service Provider's ability to provide a Service is dependent on the continuation of any other Service and such dependence has been made known to Service Recipient in writing, Service Provider's obligation to provide such dependent Service shall terminate automatically with the termination of such supporting Service. If any Service is terminated pursuant to this Section 8.3, or upon the completion

15

of the duration of any Service, <u>Schedule 2.1(a)</u> shall automatically be deemed to be updated to reflect such termination in Service.

8.4     <u>Effect of Termination</u>.

(a)     Upon termination of any Service in accordance with this Agreement, (i) Service Provider will have no further obligation to provide such terminated Service and (ii) Service Recipient shall no longer be obligated to pay for Services (except for wind-down, termination, or other ongoing out-of-pocket costs as contemplated in the approved budget).

(b)     Upon termination of this Agreement pursuant to this <u>Article 8</u>, all rights and obligations of the Parties hereunder shall terminate (other than <u>Article 1</u>, <u>Section 2.8</u>, <u>Article 4</u> (other than <u>Section 4.2(b)</u>), the first sentence of <u>Section 7.1</u>, this <u>Section 8.4</u>, <u>Article 9</u>, <u>Article 10</u>, <u>Article 11</u>, <u>Article 12</u> and <u>Article 13</u> which shall survive such termination indefinitely).

8.5     <u>Extension; Waiver</u>. Either Service Provider, with respect to Service Recipient, or Service Recipient, with respect to Service Provider, may (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained in this Agreement or in any document delivered pursuant to this Agreement, or (c) waive compliance with any of the agreements or conditions of the other Party contained in this Agreement but such waiver of compliance with such agreements or conditions shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party granting such extension or waiver. Neither the waiver by either of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by either of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

## 9.     CONFIDENTIALITY; NON-SOLICITATION.

9.1     <u>Confidential Information</u>. Service Recipient and Service Provider acknowledge that, by reason of their relationship, they may have access to certain information and materials concerning the other Party's business and products (including information and materials contained in technical data provided to the other Party, financial information and data, strategies and marketing and customer information) which is confidential and of substantial value to the disclosing Party, which value would be impaired if such information were disclosed to third parties ("<u>Confidential Information</u>"). Each Party agrees that it shall not, and shall cause its Affiliates and its and its Affiliates' officers, directors, members, managers, partners, employees, agents and other Representatives not to, use in any way, for their own account or the account of any third party, or disclose to any third party, any such Confidential Information without prior written authorization from the other Party, except as otherwise required by Law, a court of competent jurisdiction, or the rules of a

national securities exchange and then only after notifying the other Party, to the extent reasonably practicable or permissible, in advance. Each Party will take reasonable precautions to protect the confidentiality of such Confidential Information consistent with the efforts exercised by it with respect to its own Confidential Information. Notwithstanding anything to the contrary set forth herein, a Party who receives Confidential Information (the "Receiving Party") from the other Party (the "Disclosing Party") shall not be required to hold in confidence information that (a) is or becomes generally available to the public other than as a result of a breach of these provisions by the Receiving Party, (b) becomes available to the Receiving Party after the Effective Date on a non-confidential basis from a source other than the Disclosing Party or in connection with the provision of the Services, provided that the source of such information was not bound by a confidentiality agreement with, or bound by any other contractual, legal or fiduciary obligation of confidentiality to, the Disclosing Party with respect to such information or (c) is independently developed by the Receiving Party or its affiliates without reference to or use of the Confidential Information of the Disclosing Party. This provision shall survive the termination or expiration of this Agreement.

9.2    Non-Solicitation. During the Term and for twelve (12) months thereafter, each Party will not, and will cause its respective Affiliates to not (a) recruit, solicit, offer employment to, employ, engage as a consultant, lure or entice away, or in any other manner persuade or attempt to persuade, any Person who is involved in the provision or receipt of Services as an employee of the other Party or any of its Affiliates, to leave the employ of such Person's employer, or (b) solicit or encourage any Third Party Service Provider or other independent contractor involved in the provision of Services to terminate or diminish such Person's relationship with the other Party or any of its Affiliates; provided, however, that the foregoing restrictions shall not prohibit generalized searches for employees or independent contractors by use of advertisements in the media not targeted at employees or independent contractors of the other Party or its Affiliates.

## 10.    REPRESENTATIONS AND WARRANTIES.

10.1    Disclaimer of Warranties. EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE PARTIES ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE PROVIDED AS-IS, AND SERVICE PROVIDER MAKES NO REPRESENTATION OR WARRANTY WITH RESPECT THERETO. EXCEPT AS EXPRESSLY SET FORTH HEREIN, SERVICE PROVIDER HEREBY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE, NONINFRINGEMENT, COMMERCIAL UTILITY, MERCHANTIBILITY OR FITNESS OF THE SERVICES FOR A PARTICULAR PURPOSE AND SERVICE RECIPIENT HEREBY ACKNOWLEDGES SUCH DISCLAIMER AND SERVICE RECIPIENT HEREBY ACCEPTS SUCH DISCLAIMER.

10.2    Service Provider Representations and Warranties. Service Provider represents and warrants that it has the authority to enter into and perform its covenants and agreements set forth in

17

this Agreement, and that the execution, delivery and performance of this Agreement does not materially conflict with or constitute a material breach or default under the terms and conditions of its organizational documents. Except as expressly set forth in this Agreement, Service Provider specifically disclaims all warranties of any kind arising out of or related to this Agreement.

10.3   <u>Service Recipient Representations and Warranties</u>. Service Recipient represents and warrants that it has the authority to enter into and perform its covenants and agreements set forth in this Agreement, and that the execution, delivery and performance of this Agreement does not materially conflict with or constitute a material breach or default under the terms and conditions of its organizational documents. Except as expressly set forth in this Agreement, Service Recipient specifically disclaims all warranties of any kind arising out of or related to this Agreement.

## 11.   INDEMNIFICATION.

11.1   <u>Indemnification of Service Provider by Service Recipient</u>. Service Recipient shall indemnify and hold harmless Service Provider, its Affiliates and its and their Representatives (each, a "<u>Provider Indemnified Party</u>") from and against any claims by third parties, including Losses (including reasonable and documented attorneys' fees) incurred to the extent caused by or resulting from such claims of: (a) Service Recipient's material breach of this Agreement, (b) gross negligence or willful misconduct by Service Recipient, (c) Service Recipient's use of Services rendered pursuant to this Agreement, and (d) the rendering of the Services; <u>provided</u> that in no event shall Service Recipient be responsible for any Losses of such Provider Indemnified Party to the extent that such Loss is caused by or results from the applicable Provider Indemnified Party's fraud, gross negligence or willful misconduct in providing any of the Services provided or to be provided by or on behalf of Service Provider pursuant to this Agreement.

11.2   <u>Indemnification of Service Recipient by Service Provider</u>. Service Provider shall indemnify and hold harmless Service Recipient, its Affiliates and its and their Representatives (each, a "<u>Recipient Indemnified Party</u>") from and against any claims by third parties, including Losses (including reasonable and documented attorneys' fees) incurred to the extent caused by or resulting from such claims of gross negligence or willful misconduct by Service Provider; <u>provided</u> that in no event shall Service Provider be responsible for any Losses of such Recipient Indemnified Party to the extent that such Loss is caused by or results from the applicable Recipient Indemnified Party's fraud, gross negligence or willful misconduct in receipt or use of any of the Services provided or to be provided by or on behalf of Service Provider pursuant to this Agreement.

11.3   <u>Indemnification Procedures</u>. The applicable Indemnified Party shall give the applicable Indemnifying Party prompt written notice of any claim subject to indemnification under <u>Section 11.1</u>; <u>provided</u> that the Indemnified Party's failure to promptly notify the Indemnifying Party will not affect the Indemnifying Party's indemnification obligations except to the extent that any such delay prejudices the Indemnifying Party's ability to defend such claim. The Indemnifying Party will defend any claim with counsel of its own

18

choosing and subject to the acceptance of the Indemnified Party, such acceptance not to be unreasonably withheld, conditioned, or delayed, and settle it as the Indemnifying Party deems appropriate; <u>provided</u> that the Indemnifying Party will not enter into any settlement without the Indemnified Party's prior written consent in the event the settlement includes an admission of fault on the part of the Indemnified Party, a restriction on the activities of the Indemnified Party, or an obligation to pay amounts that are to be paid by the Indemnified Party. At the expense of the Indemnifying Party, the Indemnified Party will reasonably cooperate with the Indemnifying Party in the defense and settlement of any claim subject to indemnification hereunder. At its discretion and expense, the Indemnified Party may participate in the defense, any appeals, and settlement with counsel of its own choosing, and such counsel shall have full access to all information, documents and other materials related to the claim.

11.4    <u>Exclusive Remedy</u>. The provisions of this <u>Article 11</u> and <u>Article 12</u> shall be the sole and exclusive remedies of the Service Provider, Service Recipient or any of their Affiliates and all of their respective directors, officers, employees, agents, successors and assigns, as applicable, for any Losses or other damages, whether arising from statute, principle of strict liability, tort, contract or any other theory of liability at law or in equity under this Agreement.

## 12.    LIMITATION OF LIABILITY.

12.1    EXCEPT WITH RESPECT TO LIABILITY FOR PAYMENTS IN ACCORDANCE WITH <u>ARTICLE 4</u>, A PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER <u>ARTICLE 9</u>, AND A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER <u>ARTICLE 11</u>, IN NO EVENT SHALL EITHER PARTY BE LIABLE, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, FOR ANY LOSSES ARISING FROM OR RELATED TO THIS AGREEMENT THAT ARE IN THE NATURE OF LOST PROFITS OR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, SPECULATIVE OR INCIDENTAL DAMAGES, REGARDLESS OF WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND IN NO EVENT SHALL A PARTY'S LIABILITY HEREUNDER EXCEED THE GREATER OF (A) $3,250,000.00 AND (B) THE AGGREGATE OF ALL EXPENSES PAID TO SERVICE PROVIDER(S) DURING THE TERM FOR THE PROVISION OF SERVICES.

12.2    NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IN NO EVENT SHALL SERVICE PROVIDER (OR ITS AFFILIATES) BE LIABLE WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, FOR ANY LOSSES ARISING FROM OR RELATED TO MANAGING, STORING, OR HANDLING MONEY ON BEHALF OF SERVICE RECIPIENT, PROVIDING SERVICE RECIPIENT WITH ACCESS TO ITS BANK ACCOUNTS, OR MAKING PAYMENTS OR DISBURSEMENTS ASSOCIATED WITH THE PROVISION OF THE SERVICES, IN EACH CASE, UNLESS SUCH LOSSES RESULT FROM SERVICE PROVIDER'S WILLFUL MISCONDUCT, OR GROSS

NEGLIGENCE. SERVICE PROVIDER SHALL NOT BE RESPONSIBLE FOR ANY
LOSSES OR MISTAKES IN THE PERFORMANCE OF ANY OF THE SERVICES
ASSOCIATED WITH THE FOREGOING AS SET OUT IN THIS SECTION 12.2
WHICH RESULT FROM (I) ANY INACCURATE OR INSUFFICIENT
INFORMATION GIVEN TO SERVICE PROVIDER BY OR ON BEHALF OF
SERVICE RECIPIENT OR ITS AFFILIATES OR ITS OR THEIR REPRESENTATIVES
OR AGENTS OR (II) COMPLIANCE WITH ANY REQUESTS MADE OR
INSTRUCTIONS PROVIDED BY OR ON BEHALF OF SERVICE RECIPIENT.

## 13.   MISCELLANEOUS.

13.1   <u>Notices</u>. Any notice or other communication required or permitted to be made under this
Agreement shall be in writing and shall be deemed to have been sufficiently given, for all
purposes, if delivered by electronic communication, sent by nationally recognized
overnight delivery service with confirmation of receipt, or mailed by first-class mail with
confirmation of receipt, to the receiving party's address below:

If to Service Provider, to:

Transier Advisors, LLC
12128 Madeleine Cir.,
Dallas, TX 75320
Attn: William Transier
Email: bill@transieradvisors.com

DRIVETRAIN LLC
410 Park Avenue, Suite 900
New York, NY 10022
Attn: Alan J. Carr
Email: acarr@drivetrainllc.com

Force Ten Partners, LLC
100 Crescent Court, 7th Floor
Dallas, TX 75201
Attn: Monica Blacker
Email: mblacker@force10partners.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
1395 Brickell Ave #1200
Miami, FL 33131
Attention: David Cohen
Email: DavidJ.Cohen@weil.com

If to Service Recipient, to:

Mark Kronfeld
Province Fiduciary Services, LLC
2360 Corporate Circle, Suite 340
Henderson, Nevada 89074
Email: mkronfeld@provincefirm.com

with a copy (which shall not constitute notice) to:

David W. Dachelet, Esq.
Province, LLC
2360 Corporate Circle, Suite 340
Henderson, Nevada 89074
Email: ddachelet@provincefirm.com

13.2   <u>Governing Law; Submission to Jurisdiction</u>.

    (a)    This Agreement and each other transaction agreement and all claims or causes of action (whether in contract or in tort) that may be based upon, arise out of or relate to this Agreement and each other transaction agreement, or the negotiation, execution or performance of this Agreement and each other transaction agreement, shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State without giving regard to any conflict of laws provisions that would require or permit the application of the Laws of any other jurisdiction.

    (b)    The Parties hereby irrevocably and unconditionally (i) submit, in connection with any legal action or proceeding relating to this Agreement or any of the transactions contemplated hereby, to the exclusive jurisdiction of (A) the Bankruptcy Court or any other federal court having jurisdiction over the Chapter 11 Cases or (B) to the extent the Bankruptcy Court or any such other federal court lacks jurisdiction or abstains from exercising jurisdiction, the federal and state courts sitting in the County of New York in the State of New York and (ii) consent that any such action or proceeding shall be brought exclusively in such courts and waive any objection that they may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agree not to plead or claim the same. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

    (c)    Each of the Parties hereby consents to process being served by the other Party to this Agreement in any suit, action or proceeding by the delivery of a copy thereof in accordance with the provisions of <u>Section 13.1</u>.

21

13.3 <u>Waiver of Jury Trial</u>. EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY DISPUTE DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY OTHER TRANSACTION AGREEMENTS OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY. EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF A DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER TRANSACTION AGREEMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 13.3</u>.

13.4 <u>No Third Party Beneficiaries</u>. Except as provided in <u>Article 11</u>, this Agreement is for the sole benefit of the Parties specifically named in the preamble to this Agreement and their permitted successors and assigns, neither Party is acting as an agent for any other person not named herein as a Party, and nothing in this Agreement or any other transaction agreements, express or implied, is intended to or shall confer upon any other person, including any union or any employee or former employee of Service Provider, any Service Provider, any of their affiliates or the business, any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

13.5 <u>Assignment</u>. Neither Party may assign this Agreement or any of its rights or obligations hereunder, without the prior written consent of the other Party, except that Service Provider may assign any or all of its rights and obligations under this Agreement (a) to the Plan Trust (or other vehicle to which a transfer of Class B Trust Interests is permitted under Section 3.4(c)(i) of the Litigation Trust Agreement (such vehicle, an "<u>Other Liquidating Vehicle</u>")), (b) to an Affiliate, so long as Service Provider will remain liable to Service Recipient for the performance of Service Provider's obligations hereunder or (c) in connection with a sale or disposition of any assets or lines of business of Service Provider or its Affiliates; <u>provided</u> that in the case of <u>clause (c)</u>, the transferee of such assets shall agree in writing to be bound by the terms of this Agreement as if named as a "<u>Party</u>" hereto. No assignment hereunder shall be deemed effective until the assignee shall have executed and delivered an instrument in writing reasonably satisfactory in form and substance to the non-assigning Party, pursuant to which the assignee assumes all of the obligations of the applicable assigning Party hereunder. Any purported assignment in violation of this <u>Section 13.5</u> shall be void. This Agreement shall be binding upon the successors and permitted assigns of the Parties and the name of a Party shall be deemed to include the names of its successors and permitted assigns. Notwithstanding anything to the contrary in this Agreement, all rights and obligations of Service Provider hereunder shall be automatically transferred and assigned to, and assumed by, the Plan Trust (or Other Liquidating Vehicle) on the date that the Plan Trust (or Other Liquidating Vehicle) is established and Service Provider shall be released from all obligations hereunder. An assignment and transfer of the rights and obligations under this Agreement will also

effectuate the corresponding assignment and transfer of the Data Processing Agreement and the rights and obligations thereunder.

13.6    KLD Contract. At the Service Provider's election, either (a) Service Provider shall assign to the Service Recipient all of Service Provider's rights, interests, and obligations arising under the KLD Contract and Service Recipient shall assume all of Service Provider's outstanding payment obligations due under the KLD Contract and all future obligations amounts due in accordance with the terms thereof, or (b) in the event it is impracticable to assign the KLD Contract in the manner set out in this Section 13.6, upon written notice to Service Recipient that such assignment will not be made, (i) Service Provider shall assume the KLD Contract and utilize it in connection with providing the Services, (ii) Service Recipient shall make a one-time payment of $1,500,000.00 to Service Provider, which Service Provider shall hold in trust and use solely to pay then outstanding amounts owed by Service Provider and its Affiliates under the KLD Contract, and (iii) the parties shall amend the budget for the Services to include the monthly fee payable under the KLD Contract in connection with the Services, in the amount of approximately $300,000.00 per month for so long as the Services related to the KLD Contract are being provided, which amount shall be available solely to pay such monthly fee under the KLD Contract.

13.7    Force Majeure. Continued performance of any Service may be suspended immediately by Service Provider to the extent made impossible by any event or condition beyond the reasonable control of Service Provider, including acts of God, fire, flood, labor or trade disturbance, war, riots, civil commotion, compliance in good faith with the requirements of any applicable Law or order of any Governmental Authority (whether or not it later proves to be invalid), unavailability of materials, or other event or condition whether similar or dissimilar to the foregoing (a "Force Majeure Event"). Notwithstanding the foregoing or anything else in this Agreement to the contrary, Service Provider may, and without any required prior written notice, suspend the performance of any or all of the Services it provides as to which a Force Majeure Event relates. Service Provider shall give prompt notice to Service Recipient of the occurrence of a Force Majeure Event giving rise to any suspension of a Service and of the nature and anticipated duration of such Force Majeure Event. Upon the occurrence of a Force Majeure Event, the Parties shall cooperate with each other to find reasonable alternative commercial means and methods for the provision of the suspended Service, if reasonably necessary.

13.8    Severability. In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by final order to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

13.9    Amendment; Waiver. No provision of this Agreement, including any Schedules hereto, may be amended, supplemented or modified except by a written instrument making specific reference hereto signed by both Parties.

13.10 <u>Entire Agreement</u>. This Agreement and the exhibits attached hereto contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

13.11 <u>Independent Parties</u>. This Agreement shall not be deemed to create any partnership, joint venture, amalgamation, or agency relationship between the Parties. Each Party shall act hereunder as an independent contractor and not as the agent of the other Party in performing the Services, maintaining control over its employees, its subcontractors and their employees and complying with all withholding of income at source requirements, whether federal, state, local or foreign. No employee of Service Provider providing Services shall be considered an employee of Service Recipient or any of its Affiliates.

13.12 <u>Interpretation</u>. Interpretation of this Agreement (except as specifically provided in this Agreement, in which case such specified rules of construction shall govern with respect to this Agreement) shall be governed by the following rules of construction: (a) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (b) references to the terms Article, Section, paragraph and Schedule are references to the Articles, Sections, paragraphs and Schedules to this Agreement unless otherwise specified; (c) the terms "<u>hereof</u>", "<u>herein</u>", "<u>hereby</u>", "<u>hereto</u>" and derivative or similar words refer to this entire Agreement, including the Schedules hereto; (d) references to "<u>$</u>" shall mean U.S. dollars; (e) the word "<u>including</u>" and words of similar import shall mean "<u>including without limitation</u>", unless otherwise specified; (f) references to "<u>written</u>" or "<u>in writing</u>" include in electronic form, <u>provided</u> that any notice given pursuant to this Agreement shall be given in accordance with <u>Section 13.1</u> and any extension or waiver shall be granted in accordance with <u>Section 8.5</u>; (g) Service Provider and Service Recipient have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening either Party by virtue of the authorship of any of the provisions in this Agreement; (h) a reference to any person includes such person's permitted successors and permitted assigns; (i) any reference to "<u>days</u>" means calendar days unless Business Days are expressly specified; and (j) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day. Further, prior drafts of this Agreement or the other transaction agreements or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any of the other transaction agreements shall not be used as an aid of construction or otherwise constitute evidence of the intent of the Parties, and no presumption or burden of proof shall arise favoring or disfavoring either Party by virtue of such prior drafts.

13.13 <u>Counterparts; Facsimile and Electronic Signatures</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument. A facsimile or

electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

13.14   <u>Precedence of Agreements</u>. Each Schedule attached to or referenced in this Agreement is hereby incorporated into and shall form a part of this Agreement by reference; provided that the terms contained in such Schedule shall only apply with respect to the Service(s) provided under that Schedule. In the event of a conflict between the terms contained in an individual Schedule and the terms in the body of this Agreement, the terms in the individual Schedule shall take precedence with respect to the Service(s) under such Schedule.

13.15   <u>Mutual Cooperation</u>. Each Party shall use commercially reasonable efforts to cooperate with the other Party in connection with the performance of the Services hereunder and to cause each of their respective employees and contractors to reasonably cooperate to the extent required for effective delivery of the Services; <u>provided</u> that such cooperation shall not unreasonably disrupt the normal operations of such Party; and <u>provided</u> that this <u>Section 13.14</u> shall not require such Party to incur any out-of-pocket expense, unless and except as expressly provided in this Agreement or otherwise agreed to in writing by the Parties.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties have each caused this Agreement to be duly executed as of the Effective Date.

**STEWARD HEALTH CARE SYSTEM LLC**

_____

Name:

Title:

IN WITNESS WHEREOF, the Parties have each caused this Agreement to be duly executed as of the Effective Date.

**SERVICE RECIPIENT**

_____

Name:

Title:

**Schedule 2.1(a)**

**Services**

*[To be attached]*

**<u>Schedule 4.1(a)</u>**

**<u>TSA Budget</u>**

**Exhibit A**

**Data Processing Agreement**

*Filing Version 5/25/2025*

## DATA PROCESSING AGREEMENT

This Data Processing Agreement ("<u>DPA</u>"), dated as of [●], 2025 (the "<u>Effective Date</u>") is made and entered into by and between Steward Health Care System LLC, a Delaware limited liability company ("<u>Steward</u>") and the Litigation Trust, a [●] ("<u>Trust</u>"). Steward and Trust are individually referred to as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

## RECITALS

**WHEREAS**, each of the Debtors (as defined below) filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code on May 6, 2024 in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"), which cases are being jointly administered for procedural purposes only in the cases styled *In re Steward Health Care System LLC*, *et al.*, Ch 11. Case No. 24-90213 (CML) (collectively, the "<u>Chapter 11 Cases</u>");

**WHEREAS**, on April 28, 2025, the Debtors, the FILO Parties and the Creditors' Committee (each as defined in the Transition Services Agreement (as defined below) entered into that certain Settlement and Stay Relief Term Sheet (the "<u>Settlement and Stay Relief Term Sheet</u>");

**WHEREAS**, on [●], 2025, the Bankruptcy Court entered the *Order (I) Approving Settlement With FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* [Docket No. [●]] (the "<u>Approval Order</u>") approving, among other things, the Settlement and Stay Relief Term Sheet;

**WHEREAS**, pursuant to the Approval Order, on the Effective Date, the Debtors are transferring the Trust Assets (as defined in the Transition Services Agreement) to Trust;

**WHEREAS**, in order to assist the orderly transfer of the Trust Assets to Trust and the liquidation of the Trust Assets, the Parties entered into that certain Transition Services Agreement, dated as of the Effective Date (the "<u>Transition Services Agreement</u>");

**WHEREAS**, in performing its obligations under the Litigation Trust Agreement (as defined below) and the Transition Services Agreement, Steward may share Personal Information (as defined below) contained in the Trust Assets to Trust and Process (as defined below) certain Personal Information on behalf of Trust (such Personal Information, respectively, the "<u>Settlement Data</u>" for that shared pursuant to the Litigation Trust Agreement, and the "<u>TSA Data</u>" for that shared pursuant to the Transition Services Agreement); and

**WHEREAS**, the Parties desire to enter into this DPA for the purpose of defining the rights and obligations of the Parties with respect to such Settlement Data and TSA Data and ensuring compliance with all applicable Laws (as defined in the Transition Services Agreement) and legal requirements.

**NOW THEREFORE**, in consideration of the mutual agreements, provisions and covenants contained in this DPA, and for other good and valuable consideration, the receipt and sufficiency

of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1. **Definitions**. The following capitalized terms shall have the meanings specified in this <u>Section 1</u>. Unless otherwise defined in this DPA, capitalized terms not otherwise defined herein shall have the meaning given to them in the Transition Services Agreement.

    a. "<u>Debtors</u>" means each of the debtors in the Chapter 11 Cases.

    b. "<u>HIPAA</u>" means the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.), as amended by the Health Information Technology for Economic and Clinical Health Act (42 U.S.C. §§ 17921 et seq.), and any and all implementing rules and regulations of a Governmental Authority as of the Effective Date.

    c. "<u>Litigation Trust Agreement</u>" means that certain Litigation Trust Agreement, dated as of the Effective Date, by Mark Kronfeld, as amended, modified or supplemented from time to time in accordance with its terms.

    d. "<u>Personal Information</u>" means all information in any form or media that identifies, could be used to identify or is otherwise related to an individual person, in addition to any definition for "personal information" or any similar term provided by applicable Law, including "protected health information" or "PHI" as defined under HIPAA.

    e. "<u>Privacy Laws</u>" means, regardless of jurisdiction, any and all applicable Laws relating to the Processing of any Personal Information, and any and all applicable U.S. state privacy laws, Laws relating to breach notification, the use of biometric identifiers or the use of Personal Information for marketing purposes.

    f. "<u>Process</u>" or "<u>Processing</u>" means any operation or set of operations performed on any data, whether or not by automated means, including but not limited to receipt, collection, compilation, use, storage, combination, sharing, safeguarding, disposal, erasure, destruction, disclosure or transfer (including cross-border transfer).

2. **Scope of Processing**. During the Term (as defined below), Steward shall Process all Settlement Data and TSA Data only to perform its obligations under the Litigation Trust Agreement and Transition Services Agreement, or as otherwise mutually agreed upon from time to time by the Parties. Without limiting the foregoing, from time to time, subject to mutual written agreement of the Parties, Steward may provide to Trust additional Settlement Data or TSA Data, including Personal Information, for certain specified purposes, which the Parties may designate as data that shall be Processed under and subject to the applicable terms of this DPA. The Parties acknowledge and agree that Steward may rely on vendors or subcontractors to Process Settlement Data or TSA Data on its behalf.

3. **Manner of Processing**. Steward shall, and cause any third parties Processing Personal Information on its behalf to, comply with all applicable Privacy Laws with respect to any Processing of Settlement Data and TSA Data, including by taking reasonable steps to

2

ensure that its affiliates and representatives cooperate with any supervisory authority or any similar public administration in charge of enforcing the subject matter of this DPA in the performance of its tasks pursuant to applicable Privacy Laws. To the extent necessary, the Parties agree to modify and/or supplement the terms of this DPA as necessary to ensure the lawful Processing of Settlement Data and TSA Data by each Party, in each case as is agreed between the Parties in writing.

4. **Obligations of Trust**. Trust represents, warrants and undertakes that Trust:

   a. has a lawful basis to Process the Settlement Data and TSA Data and to have Steward Process the Settlement Data and TSA Data on Trust's behalf, including any Personal Information disclosed to Trust by Steward pursuant to the Litigation Trust Agreement and the Transition Services Agreement;

   b. shall provide reasonable assistance as necessary to enable Steward to comply with any data subject access requests and to respond to any other queries or complaints from data subjects relating to the Settlement Data or TSA Data;

   c. shall notify Steward of any written complaints, inquiries or other communications by regulators or supervisory authorities in relation to Settlement Data or TSA Data and provide reasonable assistance to Steward to allow Steward to cooperate promptly and thoroughly with such regulator or supervisory authority to the extent required under applicable Privacy Laws; and

   d. shall notify Steward without undue delay if Trust makes a determination that it can no longer meet its obligations under any Privacy Laws.

5. **Protected Health Information**.

   a. Steward and Trust shall enter into a business associate agreement ("BAA") in the form attached hereto as Exhibit 1, to permit the Processing of Protected Health Information in connection with the Litigation Trust Agreement and the Transition Services Agreement in compliance with applicable law, including HIPAA. The Parties agree to cooperate in good faith to enter into such BAA and comply with their respective obligations to comply with the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Parts 160 and 164 (the "Privacy Rule") and the Security Standards for the Protection of Electronic Health Information at 45 C.F.R. Parts 160 and 164 (the "Security Rule").

   b. Trust warrants and represents that any Settlement Data or any TSA Data that is Protected Health Information (respectively, "Settlement PHI" or "TSA PHI" and collectively, the "Transferred PHI") will be maintained by or on behalf of a "Covered Entity," as the term is defined under HIPAA. Trust further agrees to comply with HIPAA in all respects in handling, holding and transmitting any Transferred PHI disclosed by Steward to Trust (including any third parties acting as a "Business Associate", as the term is defined under HIPAA, to Trust).

c.  Notwithstanding anything to the contrary herein, in connection with its Processing of Transferred PHI under this DPA, Trust shall at all times:

   i.  Limit the use of Transferred PHI to a "limited data set," as the term is defined under HIPAA, or otherwise the minimum necessary amount required for purposes set forth under this DPA, and not use or further disclose such Transferred PHI other than as permitted by this DPA or as required by applicable law;

   ii.  Use reasonable and appropriate administrative, physical and technical safeguards to prevent any use or disclosure of Transferred PHI, including by establishing, implementing and maintaining appropriate safeguards, to comply with the Security Rule with respect to Electronic Protected Health Information (as defined under HIPAA) included in the Transferred PHI;

   iii.  enter into a written agreement with any Business Associate to whom Trust provides Transferred PHI that requires each Business Associate: (i) to comply with the all HIPAA obligations that apply to Trust (including with respect to Trust Assets); and (ii) to comply with the additional restrictions and conditions that apply to Trust through this DPA with respect to such Transfer PHI; and

   iv.  immediately report to Steward any confirmed security incidents involving Transferred PHI, including, for the avoidance of doubt, any "breach" of "unsecured protected health information" or "security incident," as such terms are defined at 45 C.F.R. § 164.402, or any other misuse of any such Transferred PHI held by, or on behalf of, Trust, including any incident that affects more than 500 individuals or requires disclosure under HIPAA or any other federal or state privacy or information security laws.

6.  **Information Security and Confidentiality**. Each Party shall implement and maintain reasonable and appropriate technical and organizational security measures which maintain a level of security appropriate to the risk represented by the Processing and nature of the Personal Information to safeguard the Settlement Data and TSA Data against unauthorized or illegal access, destruction, use, modification, copying, disclosure or other Processing and against accidental loss, destruction, or damage. Each Party shall notify the other Party without undue delay after confirmed unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Settlement Data or TSA Data ("Breach Incident"). The Parties will cooperate with each other and provide reasonable assistance to the other to mitigate the effects of any such Breach Incident.

7.  **Limitation of Liability**. IN NO EVENT SHALL EITHER PARTY BE LIABLE, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, FOR ANY LOSSES ARISING FROM OR RELATED TO THIS DPA THAT ARE IN THE NATURE OF LOST PROFITS OR INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, SPECULATIVE OR INCIDENTAL

DAMAGES, REGARDLESS OF WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8. **Term**. This DPA will remain in full force and effect so long as the Litigation Trust Agreement and the Transition Services Agreement both remain in effect (the "Term"); provided, that, notwithstanding anything to the contrary herein, as of and following the termination or expiration of the Litigation Trust Agreement or the Transition Services Agreement, with respect to any Settlement Data or TSA Data that constitutes Personal Information, Steward's obligations herein with respect to such Settlement Data or TSA Data shall be of no further force and effect. Following the expiration or termination of the Term, the Parties shall comply with their respective obligations under applicable Privacy Laws with respect to all Personal Information processed under this DPA.

9. **Assignability**. This DPA, including Exhibit 1, is hereby incorporated by reference into the Transition Services Agreement, and any assignment or other transfer by a Party of the Transition Services Agreement and such Party's rights and obligations thereunder pursuant to Section 13.5 (Assignment) of the Transition Services Agreement also effectuates the assignment or other transfer by such Party of this DPA and such Party's rights and obligations hereunder. Any assignment or other transfer of any Party's rights and obligations under the Litigation Trust Agreement that relate to any rights or obligations under this DPA also effectuates the assignment or other transfer of such Party's rights and obligations under this DPA with respect thereto.

10. **Order of Precedence**. Notwithstanding anything to the contrary herein, if there is a conflict between the Transition Services Agreement and this DPA, the terms of this DPA will control with respect to the subject matter of the DPA.

11. **Modifications, Additional Agreements and Other Actions.** To the extent that any modifications to this DPA, additional agreements or other actions are necessary in order to ensure that the continued Processing of Personal Information complies with applicable Privacy Laws, the Parties shall cooperate in good faith to promptly negotiate such modifications or additional agreements or take such other actions.

12. **Miscellaneous.** Without limiting Section 10 (Order of Precedence) or Section 11 (Modifications, Additional Agreements and Other Actions) of this DPA, Sections 13.1 (Notices), 13.2 (Governing Law; Submission to Jurisdiction), 13.3 (Waiver of Jury Trial), 13.4 (No Third Party Beneficiaries), 13.8 (Severability), 13.9 (Amendment; Waiver), 13.11 (Independent Parties) 13.12 (Interpretation) and 13.13 (Counterparties; Facsimile and Electronic Signatures) of the Transition Services Agreement shall apply, mutatis mutandis, to this DPA.

13. **Survival**. The following Sections and Exhibits of this DPA shall survive any termination or expiration of this DPA: Sections 1, 4(b), 4(c), 7, 8, 10, 11, and 12 and Exhibit 1 (solely to the extent the provisions are intended to survive, as provided in Exhibit 1).

*[Signature page follows]*

5

IN WITNESS WHEREOF, the Parties have each caused this DPA to be duly executed as of the Effective Date.

**STEWARD HEALTH CARE SYSTEM LLC**

_____

Name:

Title:

**[TRUST]**

_____

Name:

Title:

## Exhibit 1

### Business Associate Addendum

This Business Associate Agreement ("**BAA**") is entered into on this [●] day of [●], 2025 by and between Steward Health Care System LLC, on behalf of itself and all of its present and future affiliates and subsidiaries ("**Covered Entity**") and Trust, on behalf of itself and all of its present and future affiliates ("**Business Associate**").

## WITNESSETH

**WHEREAS**, Covered Entity and Business Associate have entered into that certain Litigation Trust Agreement (as defined in the Transition Services Agreement (as defined below)) and Transition Services Agreement (the "**Underlying Agreements**");

**WHEREAS**, notwithstanding the parties' roles pursuant to the Transition Services Agreement, Business Associate may Use and further Disclose Protected Health Information ("**PHI**") on behalf of Covered Entity in connection with the Underlying Agreements, including for purposes relating to ongoing litigation support, collection of accounts receivables, and revenue cycle management (the "**Services**");

**WHEREAS**, Covered Entity and Business Associate desire to set forth their respective rights and obligations with respect to the Use and Disclosure of PHI in order to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), and the regulations promulgated thereunder, including, without limitation, the regulations codified at 45 C.F.R. Parts 160 and 164 ("**HIPAA Regulations**"); the Health Information Technology for Economic and Clinical Health Act (the "**HITECH Act**"), including all applicable regulations and guidance issued by the Secretary of the Department of Health and Human Services ("**HHS**"); and other applicable state laws, all as amended from time to time; and

**WHEREAS**, the HIPAA Regulations require Covered Entity to enter into an agreement with Business Associate meeting certain requirements with respect to the Use and Disclosure of PHI, which are met by this BAA.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and the exchange of information pursuant to this BAA, Business Associate and Covered Entity agree as follows:

1.    **Definitions.**    Capitalized terms used, but not otherwise defined, in this BAA shall have the same meaning as those terms in the Transition Services Agreement, the HIPAA Regulations and/or the HITECH Act, as applicable.

1.1    "**Breach**" shall have the same meaning as the term "breach" has in 45 C.F.R. §164.402, wherein breach is defined to mean the acquisition, access, Use, or Disclosure of PHI in a manner not otherwise permitted under 45 C.F.R. Subpart E that compromises the security or privacy of the PHI.

The term Breach specifically excludes:

(i) Any unintentional acquisition, access, or Use of PHI by a workforce member or person acting under the authority of a Covered Entity or a Business Associate, if such acquisition, access, or Use was made in good faith and within the scope of authority and does not result in further Use or Disclosure in a manner not permitted under 45 C.F.R. Subpart E.

(ii) Any inadvertent Disclosure by a person who is authorized to access PHI at a Covered Entity or Business Associate to another person authorized to access PHI at the same Covered Entity or Business Associate, or organized health care arrangement in which Covered Entity participates, and the information received as a result of such Disclosure is not further Used or Disclosed in a manner not permitted under 45 C.F.R. Subpart E.

(iii) A Disclosure of PHI where a Covered Entity or Business Associate has a good faith belief that an unauthorized person to whom the Disclosure was made would not reasonably have been able to retain such information.

1.2    "**Breach Notification Rule**" shall mean the Notification of Breach of Unsecured PHI regulations at 45 C.F.R. Part 164, Subparts A and D.

1.3    "**Designated Record Set**" has the same meaning as the term "designated record set" has in 45 C.F.R. §164.501.

1.4    "**Individual**" shall have the same meaning as the term "individual" in 45 C.F.R. §160.103 and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. §164.502(g).

1.5    "**Privacy Rule**" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Part 164, Subparts A and E, as amended by the HITECH Act.

1.6    "**Protected Health Information**" or "**PHI**" shall have the same meaning as the term "protected health information" in 45 C.F.R. §160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

1.7    "**Required by Law**" shall have the same meaning as the term "required by law" in 45 C.F.R. §164.103.

1.8    "**Secretary**" shall mean the Secretary of the U.S. Department of Health and Human Services or his designee.

1.9    "**Security Incident**" shall have the same meaning as "security incident" in 45 C.F.R. §164.304.

1.10    "**Security Rule**" shall mean the Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R. Part 160 and Part 164, Subparts A and C, as amended by the HITECH Act.

1.11    "**Transition Services Agreement**" shall mean that certain Transition Services Agreement, dated [●], 2025, entered into between the parties.

2.    **Obligations and Activities of Business Associate**. The parties agree as follows:

2.1    Business Associate shall only Use and Disclose PHI in compliance with each applicable requirement of 45 C.F.R. § 164.504(e). Business Associate shall comply with all requirements of Subpart E of 45 C.F.R. related to privacy and applicable as if Business Associate were a "covered entity," as such term is defined in HIPAA.

2.2    Business Associate shall use reasonable and appropriate safeguards to prevent the Use or Disclosure of PHI other than as contemplated by the Underlying Agreements and this BAA. Business Associate shall implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of electronic PHI that it creates, receives, maintains, or transmits on behalf of Covered Entity and shall comply with Subpart C of 45 C.F.R. Part 164 with respect to electronic PHI.

2.3    Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a Use or Disclosure of PHI by Business Associate in violation of the requirements of this BAA.

2.4    Business Associate shall notify Covered Entity in writing of any Security Incident or access, acquisition, Use or Disclosure that is not provided for by this BAA, as applicable, without unreasonable delay and within five (5) business days of Business Associate's discovery of the Security Incident or non-permitted access, acquisition, Use or Disclosure. For the avoidance of doubt, such notification requirement shall not apply with respect to attempted Security Incidents that do not result in unauthorized access to, acquisition of, or Use or Disclosure of applicable PHI. To the extent the applicable information is available and has been confirmed, the initial notification shall include a brief description of the Security Incident or non-permitted access, acquisition, Use or Disclosure, which shall include (a) the date of the event, (b) the date of discovery, (c) the nature of the PHI involved, (d) the extent of the non-permitted access, acquisition, Use or Disclosure or Security Incident, and (e) the unauthorized person(s) who accessed, acquired, or Used the PHI or to whom the non-permitted Disclosure was made. Business Associate shall investigate each Security Incident or unauthorized access, acquisition, Use, or Disclosure of Covered Entity's PHI that it discovers and shall conduct a risk assessment as set forth in 45 C.F.R. § 164.402. Business Associate shall document and retain records of its investigation of any non-permitted access, acquisition, Use or Disclosure or Security Incident, including its risk assessment and reports to Covered Entity under this <u>Section 2.4</u>. Upon request of Covered Entity, Business Associate shall furnish to Covered Entity the documentation of its investigation and risk assessment of whether such unauthorized access, acquisition, Use, or Disclosure constitutes a reportable Breach. If such Security Incident or non-permitted access, acquisition, Use or Disclosure constitutes a reportable Breach of Unsecured PHI, then Business Associate shall comply with the additional requirements of <u>Section 2.5</u> below.

3

2.5     If Business Associate concludes that a reportable Breach of Unsecured PHI has occurred, or Covered Entity makes such determination based on Business Associate's investigation and risk assessment, Business Associate shall provide a written report to Covered Entity without unreasonable delay but no later than thirty (30) calendar days after confirmation of the Breach. To the extent that information is available to Business Associate, Business Associate's written report to Covered Entity shall be in accordance with 45 C.F.R. § 164.410(c). Covered Entity shall have sole control over the determination of whether Breach notification to regulatory bodies or affected individuals is required and the timing and method of providing notification of such Breach to the affected individual(s), the Secretary and, if applicable, the media. Business Associate shall cooperate with Covered Entity in meeting Covered Entity's obligations with respect to such a Breach. Business Associate shall reimburse Covered Entity for its reasonable costs, expenses, and damages (including reasonable attorney fees) arising from a Breach reported to Covered Entity, including, but not limited to, any administrative costs associated with providing notice, printing and mailing costs, and costs of mitigating the harm (which may include the costs of obtaining credit monitoring services and identity theft insurance for a period not to exceed one year) for affected individuals whose PHI has or may have been compromised as a result of the Breach; provided, however, that such obligations shall accrue against, and be subject to, any disclaimers or limitations of liability of the Underlying Agreements as liability arising thereunder.

2.6     Business Associate shall require each agent and subcontractor that creates, maintains, receives, or transmits PHI on behalf of Business Associate, to execute a Business Associate Agreement that imposes on such agents and subcontractors materially the same restrictions, conditions, and requirements that apply through this BAA to Business Associate with respect to such information.

2.7     Business Associate agrees to provide access, at the reasonable request of Covered Entity, to PHI in a Designated Record Set, to Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under 45 C.F.R. §164.524. If Business Associate maintains PHI in an Electronic Health Record, Business Associate shall provide such information in the electronic form and format requested by Covered Entity if it is readily reproducible in such form and format, and, if not, in such other form and format agreed to by Covered Entity to enable Covered Entity to fulfill its obligations under 42 U.S.C. § 17935(e) and 45 C.F.R. § 164.524(c)(2).

2.8     Business Associate agrees to, at the request of Covered Entity or an individual, in each case at Covered Entity's cost and expense, promptly make any amendment(s) to the PHI that Covered Entity directs or agrees to pursuant to 45 C.F.R. §164.526.

2.9     Business Associate agrees to make available to the Secretary during Business Associate's normal business hours, the internal practices, books, and records relating to the Use and Disclosure of PHI received from, or created or received by Business Associate on behalf of Covered Entity, in a time and manner designated by Covered Entity or the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule. Except to the extent prohibited by law, Business Associate shall notify Covered Entity of such requests served upon Business Associate for information or documentation by or on behalf of the Secretary.

2.10    Business Associate agrees to document such Disclosures of PHI and information related to such Disclosures as would be required for Covered Entity to respond to a request by an

Case 24-90213   Document 4966   Filed in TXSB on 05/25/25   Page 137 of 141

Individual for an accounting of Disclosures of PHI in accordance with 45 C.F.R. §164.528. If Business Associate maintains an Electronic Health Record on behalf of Covered Entity, then, Business Associate shall document Disclosures made through such Electronic Health Record for Treatment, Payment and Health Care Operations in compliance with 42 U.S.C. § 17935(c) and the implementing regulations.

2.11    Business Associate agrees to promptly provide to Covered Entity or an Individual information collected in accordance with the BAA, to permit Covered Entity to respond to a request by an Individual for an accounting of Disclosures of PHI in accordance with 45 C.F.R. §164.528.

3.      **Permitted Uses and Disclosures by Business Associate.** Business Associate shall Use and Disclose PHI only for the purpose of performing Business Associate's obligations under the Underlying Agreements and as permitted by this BAA, the Underlying Agreements, or Required by Law.

3.1     Business Associate shall not Use or Disclose PHI in a manner that would violate the Privacy Rule if done by Covered Entity, except that Business Associate may Use PHI (i) for the proper management and administration of Business Associate; (ii) to carry out the legal responsibilities of Business Associate, provided that with respect to any Disclosure by Business Associate for such purposes, either: (a) the Disclosure is Required by Law; or (b) Business Associate obtains a written agreement from the person to whom the PHI is to be Disclosed that such person shall hold the PHI in confidence and shall not Use and further Disclose such PHI except as Required by Law or for the purpose(s) for which it was Disclosed by Business Associate to such person, and that such person shall notify Business Associate of any instances of which it is aware in which the confidentiality of the PHI has been breached. Business Associate may also Use PHI for Data Aggregation purposes, if requested by Covered Entity, in connection with the Health Care Operations of Covered Entity. Business Associate is not authorized to Use the PHI to create de-identified information. To the extent that Business Associate carries out one or more of Covered Entity's obligations under Subpart E of 45 C.F.R. Part 164, Business Associate must comply with the requirements of Subpart E that apply to Covered Entity in the performance of such obligations.

3.2     Business Associate shall limit its Use, Disclosure, or request for PHI to the Limited Data Set or, if needed, to the minimum necessary to accomplish the intended Use, Disclosure, or request, in accordance with 42 U.S.C. § 17935(b) and 45 C.F.R. § 164.502(b)(1) or any other guidance issued thereunder.

3.3     Business Associate agrees that it shall not, directly, or indirectly, receive remuneration in exchange for any PHI of Covered Entity, consistent with 42 U.S.C. § 17935(d)(2) and 45 C.F.R. § 164.502(a)(5)(ii), except with the prior written consent of the individual in accordance with 45 C.F.R. § 164.508(a)(4).

3.4     Business Associate shall not Use or Disclose PHI for fundraising purposes or for the purpose of making a communication about a product or service that encourages recipients of the communication to purchase or Use the product or service, unless such communication: (1) complies with the requirements of subparagraph (i), (ii) or (iii) of paragraph (1) of the definition

5

of marketing contained in 45 C.F.R. § 164.501, and (2) complies with the requirements of subparagraphs (A), (B) or (C) of Section 42 U.S.C. §17936, 45 C.F.R. §§ 164.524(f) and 164.508(a)(3)(ii), and any other implementing regulations or guidance that may be issued or amended from time to time.

3.5    Business Associate shall not Disclose PHI to a health plan for payment or Health Care Operations purposes if and to the extent that Covered Entity has informed Business Associate that the patient has requested this special restriction, and has paid out of pocket in full for the health care item or service to which the PHI solely relates, consistent with 42 U.S.C. § 17935(a) and 42 C.F.R. § 164.522(a)(1)(vi), provided that Business Associate may Disclose PHI in connection with the pursuit or settlement of litigation-related claims, as contemplated under the Transition Services Agreement, with Covered Entity's prior written consent (which may not be unreasonably conditioned, withheld or delayed).

3.6    Business Associate may Use PHI to report violations of law to appropriate Federal and State authorities, consistent with 45 C.F.R. §164.502(j)(1).

4.    **Term and Termination.** The parties agree as follows:

4.1    Term. This BAA shall become effective as of the date of execution of this BAA by Covered Entity, and shall terminate as of the termination date of the last to terminate Underlying Agreement or on the date that Covered Entity terminates for cause as authorized in Section 4.2, whichever is sooner.

4.2    Termination for Cause.

a.    A breach or violation by Business Associate of any provision of this Agreement, as determined by Covered Entity, shall constitute a breach of the Underlying Agreements, and shall provide grounds for termination of the Underlying Agreements by Covered Entity, subject to the opportunity to cure the breach as set out in Section 4.2(b).

b.    Upon Covered Entity's knowledge of a material breach of this Agreement by Business Associate, Covered Entity shall notify Business Associate and provide a reasonable time for Business Associate to cure the breach. If Business Associate does not cure the breach within such reasonable time, or if cure is not feasible, Covered Entity may terminate the Services immediately. If termination is not feasible, Covered Entity shall report the problem to the Secretary of Health and Human Services.

5.    **Effect of Termination.** It is agreed and understood that, upon termination of this Agreement, Business Associate shall either return or destroy all PHI received from, or created or received by Business Associate on behalf of Covered Entity that Business Associate still maintains in any form. Business Associate shall retain no copies of such information. If for any reason, such return or destruction is infeasible, Business Associate shall (a) retain only that PHI which is necessary for Business Associate to continue its proper management and administration or to carry out its legal responsibilities; (b) return to Covered Entity the remaining PHI that Business Associate still maintains in any form; (c) continue to extend the protections of this Agreement to the PHI for as long as Business Associate retains the PHI; (d) limit any further Uses and Disclosures of such PHI to those purposes that make the return or destruction of the information

6

infeasible and subject to the same conditions set out at Section 3 above, which applied prior to termination; and (e) return to Covered Entity the PHI retained by Business Associate when it is no longer needed by Business Associate for its proper management and administration or to carry out its legal responsibilities. To the extent the return or destruction required under this Section 5 is impractical (*e.g.*, copies maintained in restore point backup copies of electronic files), Business Associate shall provide Covered Entity with written notice, which notice shall include details of the relevant PHI, and request to retain such PHI in accordance with the foregoing (a)-(e). Upon receiving such written notice, Covered Entity shall promptly accept or reject such request in accordance with applicable Law (and Covered Entity's determination may not be unreasonably conditioned, withheld or delayed).

6.      **Miscellaneous**.

      6.1      <u>Regulatory References</u>. A reference in this Agreement to a section in the Privacy, Breach Notification, or Security Rules means the section as in effect or as amended, and for which compliance is required.

      6.2      <u>Amendment</u>. The parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for the parties to comply with the requirements of HIPAA, the HIPAA Regulations, or the HITECH Act.

      6.3      <u>Interpretation</u>. Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits Covered Entity to comply with HIPAA, the HIPAA Regulations, and the HITECH Act.

      6.4      <u>Survival</u>. The respective rights and obligations of Business Associate shall survive the termination of this Agreement as long as Business Associate and its subcontractors or agents are in possession of any Covered Entity's PHI.

      6.5      <u>Governing Law</u>. This Agreement shall be construed in accordance with the laws of the State of New York.

      6.6      <u>No Third-Party Beneficiaries</u>. Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and their respective successors or assigns, any rights, remedies, obligations, or liabilities whatsoever.

      6.6      <u>State Laws</u>. Business Associate shall comply with all applicable state laws governing the protection and use of PHI.

      6.7      <u>Notices</u>. All notices required or permitted under this Agreement shall be in writing and sent to the other party as directed below or as otherwise directed by either party, from time to time, by written notice to the other. All such notices shall be deemed validly given upon receipt of such notice by certified mail, postage prepaid, facsimile transmission or personal or courier delivery:

7

If to Business Associate:    Trust

Attn: _____

With a copy to:    Steward Health Care System LLC
2811 McKinney Avenue, Suite 300
Dallas, TX 75204
Attn: General Counsel

*Filing Version 5/25/2025*

     **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the date first written above.

**COVERED ENTITY**

**STEWARD HEALTH CARE SYSTEM LLC**


By: _____

Name: _____

Title: _____

Date: _____


**BUSINESS ASSOCIATE**

**[TRUST]**


By: _____

Name: _____

Title: _____

Date: _____