IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 24-90213-11 |
| | § | HOUSTON, TEXAS |
| STEWARD HEALTH CARE SYSTEM, | § | THURSDAY |
| LLC, ET AL, | § | MAY 29, 2025 |
| | § | |
| DEBTORS. | § | 10:31 A.M. TO 6:07 P.M. |

**MOTION HEARING**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                      SEE NEXT PAGE

COURTROOM DEPUTY/ERO:             YESENIA LILA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land,TX 77478
281-277-5325
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**APPEARANCES (VIA ZOOM):**

| | |
|---|---|
| FOR DEBTORS, STEWARD HEALTH CARE SYSTEM, LLC, ET AL.: | WEIL GOTSHAL & MANGES, LLP<br>Clifford Carlson, Esq.<br>700 Louisiana Street<br>Suite 1700<br>Houston, TX 77002<br>713-546-5000 |
| | WEIL GOTSHAL & MANGES, LLP<br>David J. Cohen, Esq.<br>Robert Berezin, Esq.<br>Theodore Tsekerides, Esq.<br>767 Fifth Avenue<br>New York, NY 10153<br>212-310-8000 |
| FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS: | AKIN GUMP STRAUSS HAUER & FELD<br>Brad Kahn, Esq.<br>Avi Luft, Esq.<br>One Bryant Park<br>Bank of America Tower<br>New York NY 10036<br>212-872-8121 |
| FOR THE FILO SECURED PARTIES: | MILBANK, LLP<br>Michael Price, Esq.<br>55 Hudson Yards<br>New York, NY 10001<br>212-530-5577 |
| FOR THE US TRUSTEE: | OFFICE OF THE US TRUSTEE<br>Ha Minh Nguyen, Esq.<br>515 Rusk Avenue, Suite 3516<br>Houston, TX 77002<br>202-590-7962 |
| FOR TRACO INTERNATIONAL GROUP: | STEPTOE, LLP<br>Michele Jacobson, Esq.<br>1114 Avenue of the Americas<br>New York, NY 10036<br>212-378-7573 |
| FOR CERTAIN DEFERRED COMPENSATION PARTICIPANTS: | BERNSTEIN SHUR SAWYER & NELSON<br>Robert Keach, Esq.<br>100 Middle Street<br>Portland, ME 04101<br>207-228-7334 |

**APPEARANCES (CONT'D - VIA ZOOM):**

|  |  |
|---|---|
|  | DIAMOND McCARTHY, LLP<br>Brian Hogue, Esq.<br>909 Fannin Street, 37th Floor<br>Houston, TX 77010<br>713-333-5165 |
| FOR THE COMMONWEALTH<br>OF MASSACHUSETTS: | PILLSBURY WINTHROP SHAW PITTMAN<br>Hugh M. McDonald, Esq.<br>31 West 52nd Street<br>New York, NY 10019<br>212-858-1170 |
| FOR THE INTERNAL REVENUE<br>SERVICE: | DEPARTMENT OF JUSTICE<br>David Adams, Esq.<br>717 N. Harwood Street<br>Suite 400<br>Dallas, TX 75201<br>214-880-9721 |
| FOR HEALTHCARE SYSTEMS OF<br>AMERICA: | HOGAN LOVELLS US, LLP<br>Edward McNeily, Esq.<br>1999 Avenue of the Stars<br>Suite 1400<br>Los Angeles, CA 90067<br>310-785-4671 |
| FOR NORTHSTAR ANESTHESIA,<br>P.A.: | STROMBERG STOCK, PLLC<br>Mark Stromberg, Esq.<br>8350 N. Central Expressway<br>Suite 1225<br>Dallas, TX 75206<br>972-458-5353 |
| FOR | VORYS<br>Kari Coniglio, Esq.<br>200 Public Square<br>Suite 1400<br>Cleveland, OH 44114<br>216-4796167 |
| FOR SODEXO, INC.: | BROWN NIMEROFF, LLC<br>Jami Nimeroff, Esq.<br>1515 Market Street<br>Suite 1200<br>Philadelphia, PA 19102<br>267-861-5335 |

**APPEARANCES (CONT'D - VIA ZOOM):**

FOR YAMANY SOSA, AS PERSONAL          KOZYAK TROPIN & THROCKMORTON
REPRESENTATIVE OF THE PROBATE         David A. Samole, Esq.
ESTATE OF YANISEY RODRIGUEZ:          2525 Ponce de Leon Blvd.
                                      9th Floor
                                      Coral Gables, FL 33134
                                      305-372-1800

FOR LEXINGTON INSURANCE               ZEICHNER ELLMAN & KRAUSE, LLP
COMPANY:                              Michael S. Davis, Esq.
                                      730 Third Avenue
                                      New York, NY 10017
                                      212-826-5311

FOR HARTFORD FIRE INSURANCE           McELROY DEUTSCH MULVANEY &
COMPANY AND ITS AFFILIATED              CARPENTER, LLP
INSURERS:                             Gary D. Bressler, Esq.
                                      300 Delaware Avenue
                                      Suite 1014
                                      Wilmington, DE 19801
                                      302-300-4515

FOR THE TRUST COMPANY:                DUANE MORRIS, LLP
                                      Jessica Bonteque, Esq.
                                      335 Madison Avenue
                                      New York, NY 10017
                                      212-692-1036

FOR DEXT CAPITAL, LLC:                PADFIELD & STOUT, LLP
                                      Matthew Giadrosich, Esq.
                                      100 Throckmorton Street
                                      Suite 700
                                      Fort Worth, TX 76102
                                      817-338-1616

FOR CATHOLIC HEALTH                   POLSINELLI, PC
INITIATIVES COLORADO;                 Caryn E. Wang, Esq.
COMMONSPIRIT HEALTH; AND              1201 W. Peachtree Street, NW
COMMONSPIRIT MOUNTAIN                 Suite 1100
REGION F/K/A CENTURA                  Atlanta, GA 30309
HEALTH CORPORATION:                   404-253-6000

FOR TAC MED, INC.:                    WAUSON KING
                                      Anabel King, Esq.
                                      52 Sugar Creek Center Blvd.
                                      Suite 325
                                      Sugar Land, TX 77478
                                      281-242-0303

**<u>APPEARANCES  (CONT'D – VIA ZOOM)</u>:**

FOR THE ESTATE OF JULIA          KELLER BENVENUTTI KIM, LLP
IGOE:                           Barry D. Spears, Esq.
                             2630 Exposition Blvd.
                             Suite 203
                             Austin, TX 78703
                             512-328-3924

(Please also see Electronic Appearances.)

**INDEX**

OPENING STATEMENTS:
  By Ms. Jcobsen          72
  By Mr. McDonald         83
  By Mr. Nguyen           97
  By Mr. Keach            101
  By Mr. Davis            118
  By Ms. Nimeroff         119
  By Mr. Adams            123
  By Ms. Bonteque         127
  By Ms. Wang             128
  By Mr. McNeilly         130
  By Mr. Stromberg        138
  By Ms. King             146
  By Mr. Bressler         156
  By Mr. Spears           157
  By Mr. Samole           161

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WILLIAM TRANSIER | | | | |
| By Declaration | 174 | . | . | . |
| By Mr. Keach | . | 175 | . | . |
| | | | | |
| JOHN CASTELLANO | | | | |
| By Declaration | 197 | . | . | . |
| By Mr. Berezin | . | 200 | . | 246 |
| By Mr. Keach | . | 207 | . | 252 |
| By Mr. Spears | . | 237 | . | . |
| By Mr. Luft | . | . | . | 254 |

EXHIBITS:                      Admitted

ECF 4903                       197
ECF 4904, except 8             174
ECF 4977                       198
ECF 4998, except 7, 8, 13      172

\*\*\*

1         <u>**HOUSTON, TEXAS; THURSDAY, MAY 29, 2025; 10:31 A.M.**</u>

2         THE COURT:  Good morning everyone.  This is Judge

3 Lopez.  Today is May 29.  I think we've got -- I see water

4 bottles out there so it must be a full day here.

5         (Laughter.)

6         THE COURT:  I'll call Case Number 24-90213, Steward

7 Health Care, on a couple of -- a couple of motions.  So why

8 don't I take appearances in the courtroom.  I'd ask everyone

9 to please make electronic appearances as well, jumping on the

10 Southern District of Texas webpage.  If you know you're going

11 to be speaking, why don't you hit five star and I'll un-mute

12 your line.  But I'll take appearances in the courtroom.

13         MR. CARLSON:  Good morning, Your Honor.  Clifford

14 Carlson of Weil Gotshal on behalf of the Debtors.  And joined

15 with me is David Cohen, Jeffrey Saferstein, Rob Berezin and

16 Ted Tsekerides.

17         THE COURT:  Okay.  Good morning.

18         MR. KAHN:  Good morning, Your Honor.  Brad Kahn,

19 Akin Gump Straus Hauer & Feld on behalf of the Official

20 Committee of Unsecured Creditors.  I'm joined by my partners

21 Sarah Schultz and Avi Luft.

22         THE COURT:  Good morning.

23         MR. PRICE:  Good morning, Your Honor.  Michael Price

24 of Milbank, LLP on behalf of the FILO Secured Parties.  I'm

25 joined by my partners Brian Kinney, Andrew Harmeyer and Samir

8

1     Vora.

2                   THE COURT:  All right.  Good morning.

3                   Mr. Nguyen, good morning.

4                   MR. NGUYEN:  Good morning, Your Honor.  Ha Nguyen

5     for the US Trustee.

6                   MS. JACOBSON:  Good morning, Your Honor.  Michele

7     Jacobson from Steptoe on behalf of TRACO International Group.

8     And I'm here with my partner, Timothy Walsh.

9                   THE COURT:  Okay.  Good morning.

10                  MS. JACOBSON:  Good morning.

11                  MR. KEACH:  Good morning, Your Honor.  Robert Keach

12    for certain deferred compensation participants.

13                  THE COURT:  Good morning.

14                  MR. HOGUE:  And I'm Brian Hogue with Diamond

15    McCarthy for the same.

16                  THE COURT:  Good morning.

17                  MR. McDONALD:  Good morning, Your Honor.  Hugh

18    McDonald with Pillsbury Winthrop Shaw Pittman on behalf of the

19    Commonwealth of Massachusetts.

20                  THE COURT:  Good morning.

21                  MR. McDONALD:  Good morning.

22                  THE COURT:  All right.  I think we have covered the

23    courtroom.  Is there anyone on the line if you know you're

24    going to be speaking, I'll be checking it periodically, why

25    don't you hit five star.  I'll just go in the order in which

9

1    I see them.  There's a 214 number.  If I un-mute your line, I

2    would ask that you just, after making your appearance, just

3    mute yourselves so we can all hear each other.

4            And let's see, 214 number.  And let's get the

5    witness cam ready.

6            MR. ADAMS:  Good morning, Your Honor.  This is David

7    Adams, Department of Justice, on behalf of the Internal

8    Revenue Service.

9            THE COURT:  Good morning.

10           Here's a 310 number.

11           MR. McNEILY:  Good morning, Your Honor.  Edward

12   McNeily from Hogan Lovells US, LLP on behalf of Healthcare

13   Systems of America.

14           THE COURT:  Good morning.

15           A 214 number.

16           MR. STROMBERG:  Yes, good morning, Your Honor.  Mark

17   Stromberg on behalf of NorthStar Anesthesia, PA.

18           THE COURT:  Good morning.

19           A 440 number.

20       (No audible response.)

21           THE COURT:  A 440 number.

22           MS. CONIGLIO:  Good morning, Your Honor.  This is

23   Kari Coniglio on behalf of (indiscernible) affiliates.

24           THE COURT:  Good morning.

25           There's someone -- I think you're on airpods or

1        something because I can hear myself a little bit.  If you

2        could just place yourself on mute.

3                    A 267 number.

4                    MS. NIMEROFF:  Good morning, Your Honor.  Jami

5        Nimeroff with the law firm of Brown Nimeroff appearing for

6        Sodexo Operations, LLC.

7                    THE COURT:  Good morning.

8                    A 305 number.

9                    MR. SAMOLE:  Good morning, Your Honor.  David Samole

10       of the law firm of Kozyak Tropin & Throckmorton on behalf of

11       Yamany Sosa, as personal representative of the probate estate

12       of Yanisey Rodriguez.

13                   THE COURT:  Good morning.

14                   And here's a 914 number.  I've got three more after

15       that.

16                   MR. DAVIS:  Yes, sir.  Michael Davis for Lexington

17       Insurance Company.  Good morning, Your Honor.

18                   Here is a 215 number.

19                   MR. BRESSLER:  Good morning, Your Honor.  Gary

20       Bressler for Hartford Fire Insurance Company and its

21       affiliated insurers.

22                   THE COURT:  Good morning.

23                   A 212 number.

24                   MS. BONTAQUE:  Good morning, Your Honor.  Jessica

25       Bontaque appearing on behalf of the Trust Company.

1          THE COURT:  Good morning.

2          And an 817 number.

3          MR. GIADROSICH:  Good morning, Your Honor.  Matt

4   Giadrosich here on behalf of Dext Capital.

5          THE COURT:  Good morning.

6          Anyone else?

7      (No audible response.)

8          THE COURT:  Before we start, I don't want to do it

9   now, but I don't want to forget, end of the day I have -- I

10  want to just give -- I have an update on the HSA matter and

11  BMI.  I'm not ready to rule on it, but there's something I

12  need to say on each of those.  But I don't want to forget so

13  I'm saying publicly so that someone can remind me and I don't

14  just walk off at the end of the day.

15         MR. COHEN:  Hopefully one of the 100 people here

16  will.

17      (Laughter.)

18         THE COURT:  All right.  Thank you.

19         MR. COHEN:  All right.  Good morning, Your Honor.

20  For the Record, David Cohen of Weil Gotshal & Manges on behalf

21  of the Debtors.

22         In terms of today's Agenda, which is filed at Docket

23  Number 4991, we have two items which we propose tackling

24  together, that's the Debtors' motion for conditional approval

25  of their Disclosure Statement, as well as the Debtors'

1     settlement motion.

2          What I propose if it pleases the Court, is that

3     parties who wish to speak can provide opening remarks and then

4     we can turn things over to Mr. Berezin to sort of go through

5     the evidence.

6          THE COURT:  Okay.  And in terms of presentation, the

7     Debtors' presentation, how do you -- what's it looking like

8     today?

9          MR. COHEN:  Yeah, I would say in terms of our

10    opening remarks we have a demonstrative, we have 2 witnesses

11    in the courtroom.  They've submitted Declarations, we asked

12    some of the objecting parties if they intend to cross, we

13    haven't received a response yet so I'm not sure --

14         UNIDENTIFIED SPEAKER:  They do.

15         MR. COHEN:   -- if there's going to be live

16    testimony.

17         UNIDENTIFIED SPEAKER:  They do.

18         MR. COHEN:  Oh, they do.  Okay.  Apologies.  I

19    missed that update.  So we have 2 witnesses.

20         THE COURT:  So 2 witnesses.  Are they going to --

21    are they going in through direct or do we -- or what does

22    that --

23         MR. COHEN:  Direct through Declaration and then

24    cross --

25         THE COURT:  Cross.

13

1          MR. COHEN:   -- on the Declaration.

2          THE COURT:  Okay.  Are there any other witnesses

3    that are proposed?  The parties, anyone presenting any other

4    witnesses today?

5          MR. COHEN:  We did receive an email about 20 minutes

6    ago from I think it's Ms. King for Tac Med who I think was

7    looking to make a proffer.  I think we have questions about

8    the relevance, but that was due as of 30 minutes ago.

9          THE COURT:  So, Ms. King, what we'll do is at the

10   appropriate time after Debtors finish their presentation we'll

11   just take the issue up at that time.  Just remind me.  I'd

12   rather just rule on it like after you put on your

13   presentation.

14          So in terms of timing today it's -- and I appreciate

15   the parties -- I had a 1st day hearing today and then I had

16   another hearing, so I appreciate the parties working with me.

17   You've got me for the rest of the day and into the night.

18          So how do we intend to -- tell us like -- I get

19   there are presentations.  Is that going to take us through

20   like the noon hour and then we're going to start -- or how are

21   you --

22          MR. COHEN:  Yeah, I hope we can get it done --

23          THE COURT:  So --

24          MR. COHEN:   -- quicker than that, but it's possible

25   it'll take until noon.

1          THE COURT:  Okay.  Why don't you just -- I'll say

2    less and let you start.

3          MR. COHEN:  Okay.

4          THE COURT:  Okay.

5          MR. COHEN:  Let's do it.  So in terms of opening

6    remarks we filed a demonstrative at Docket Number 4999, so

7    we're almost at 5000.  Mr. Winograd from my team has control

8    over the presentation, if he could be granted access?

9          THE COURT:  All right.  Let's see -- I was supposed

10   to be getting better at this and I'm not -- let's see,

11   Mr. Winograd, where are you?

12       (Pause in the proceedings.)

13         THE COURT:  All right.  You've got a hand up

14   feature.  Yeah, I see you now.

15       (Pause in the proceedings.)

16         MR. COHEN:  And just while Mr. Winograd is getting

17   that up, I know that we have two witnesses in the courtroom.

18   We have the Debtors' Chief Restructuring Officer and member of

19   the Transformation Committee, John Castellano, as well as

20   independent manager and member of the Transformation

21   Committee, Mr. William Transier, who's sitting next to

22   Mr. Castellano.

23         THE COURT:  And again, thank you.

24         I'm going to ask everyone, if you're on the line, if

25   I've un-muted you, just please place your phone on mute, if

1    you coughed, it's you who I'm thinking of, just so we can all

2    hear each other.  I'm going to keep your lines un-muted.

3    Thank you.

4              MR. COHEN:  All right.  Thank you.

5              If we'd just skip ahead to the first slide.

6              Your Honor, we're very pleased today to be seeking

7    approval of a proposed settlement and Disclosure Statement

8    with the support of the FILO Lenders, the Unsecured Creditors

9    Committee, and others including the PBGC.  As Your Honor can

10   see from the presentation, although we had a couple of dozen

11   objections that were filed on the docket and various

12   reservation of rights that were filed, the Debtors believe

13   they were able to resolve the vast majority of those.

14             And of the thousands of creditors that were given

15   notice of the relief in today's hearing we really have 3 main

16   objectors.  You know, I would note that each of those parties

17   are engaged in active litigation with the Debtors.  From our

18   perspective they have interests that diverge from all the

19   other creditors and from our perspective it's fairly

20   transparent that these are parties that generally stand to

21   benefit from the estate being left in a worse spot than it is

22   today without access to funding and the best quality legal

23   counsel to oppose their efforts.

24             We have TRACO.  TRACO of course is the Panamanian

25   wholly owned captive insurance company of the Debtors that

1    remains under the control and direction of the Debtors' former

2    CEO, Dr. de la Torre, and certain other former executives that

3    are subject to the Debtors' internal investigation and we

4    expect to become subject to claims by the estate.  2nd are the

5    deferred compensation participants whom the Court is familiar

6    with from their numerous visits to Houston over the last few

7    months and who continue to press their appeal of this Court's

8    decision in the Rabbi Trust matter.  And 3rd is the

9    Commonwealth of Massachusetts, again, so the Debtors have

10   commenced an adversary proceeding seeking payment over

11   $20 million of withheld receivables.

12        The US Trustee has also filed objections to the

13   Disclosure Statement, but those are more limited objections

14   dealing with 3rd party releases and exculpations, issues that

15   we're familiar with and frankly we think are confirmation

16   issues.

17        But rather than jump right in to the objections and

18   the arguments, what I'd like to do is start by just giving an

19   update on how things have developed since the Debtors' status

20   updates earlier in the year.  I know we've been in front of

21   Your Honor on various litigation matters, but I think

22   providing just an overview would be helpful in terms of how we

23   got here, provide an overview of the settlement, and then I'll

24   hand it over to Mr. Carlson to discuss the objections.

25        Just looking at this time line, as Your Honor knows,

1          these cases have been anything but easy.  From the day these

2          cases were commenced just over a year ago the Debtors, their

3          Transformation Committee, including Mr. Castellano and

4          Mr. Transier and their professionals, as well as the

5          professionals for the UCC and the FILO Lenders have

6          essentially been shuttling non-stop between this courtroom,

7          Weil Gotshal's boardrooms in Houston and New York, and in Zoom

8          and in-person mediation sessions with Judge Isgur.

9                  I was surprised to see this, but today actually

10         marks the 48th appearance we've had before Your Honor in these

11         cases in just over a year.  So you take out, you know,

12         Christmas and Thanksgiving we're basically here once a week

13         just to show how difficult these cases have been.

14                 And although it's easy for parties to take pot

15         shots, when you take a step back I think you could really see

16         how much has been accomplished.  It's there on the slide.  We

17         raised, you know, nearly $400 million of post-petition funding

18         and financing.  The Debtors sold their hospitals and their

19         physician network in one of the most complex sale processes

20         and brought in over $600 million of sale proceedings,

21         unburdening themselves from hundreds of millions of dollars of

22         annual operating losses and potential hospital closure costs.

23                 And contrary to a lot of the allegations that get

24         thrown around in this case, the Debtors have addressed the

25         vast majority of the debts.  In fact, with sale proceeds,

1    collections of accounts receivable and other assets to date
2    the Debtors have been able to pay down nearly $700 million of
3    funded secured debt.  And we've paid approximately $2.8
4    billion in administrative expenses in these cases, that's over
5    $1.3 billion to employees, $750 million to vendors,
6    $300 million in rent and other operating expenses that were
7    necessary to safely operate and transition the Debtors'
8    hospitals to new ownership.  So that's sort of like 97 percent
9    of the administrative expenses that have been incurred in this
10   case have actually been paid in the ordinary course.

11        We also got MPT to agree to walk away from over
12   $840 million of funded debt and billions more in secured lease
13   obligations.  And Your Honor will recall when we came before
14   Your Honor with the MPT settlement in September we did believe
15   then that we would find ourselves on a path towards a rapid
16   Plan confirmation.

17        Things didn't go exactly as planned.  As soon as we
18   sold our hospitals both government and commercial payors began
19   to withhold receivables and provide reimbursements at a
20   drastically lower rate.  Moreover, the transition of the
21   hospitals to MPT's new operators was challenged by those
22   operators failing to pay for transition services, satisfy
23   their obligations to vendors, that started to raise alarms for
24   the vendor community and it left the Debtors without
25   sufficient funds to immediately repay certain historical admin

1    claims from that frantic period where they were trying to sell

2    30 hospitals at once, as well as unable to repay their DIP

3    loan by the December 31 maturity date.

4          A lot of parties wanted us to sort of take the easy

5    way out there, give up, hand the keys over to a Chapter 7

6    Trustee.  From our perspective that would have just left the

7    remaining creditors in the lurch.  We have some parties now,

8    including the US Trustee, the deferred compensation

9    participants that don't have an economic interest in the case

10   and they would apparently still prefer that outcome.  But from

11   our perspective when you have an estate that's paid 97 percent

12   of its administrative expenses, let's accomplish what we have,

13   and has significant assets left to pay the rest that's not

14   what a prudent fiduciary does.

15         So we knew we needed a new attack plan.  We came

16   before Your Honor, we secured an admin bar date and we

17   refocused our efforts on developing a path to pay secured

18   admin and priority creditors in full and get the support of

19   our DIP lenders to continue to extend financing to allow us to

20   do that.  Essentially we needed proof of concept, that we were

21   going to put together a Plan that worked.

22         So we held some status conferences, sort of went out

23   on a limb and we told the world our plans.  We launched a

24   motion to collect $62 million in Rabbi Trust proceeds, we

25   threatened litigation against MPT with respect to the excess

1    properties, we began to process the transition of our TSA

2    business to Quorum to substantially reduce the size and

3    administrative burden of the estate, and we secured

4    $15 million fund from MPT and others to pay administrative

5    creditors associated with our TSA business, and we sold joint

6    venture interests in clinics and secured millions of dollars.

7         We also assembled a team of litigation specialists

8    to marshal the Debtors' remaining litigation assets.  And we

9    currently have in process a number of valuable litigation

10   claims, a lawsuit against Zurich Insurance for the Norwood

11   Hospital flood seeking damages of $885 million which is led by

12   Todd & Weld out of Massachusetts with a trial scheduled in

13   January; we have lawsuits and demands against commercial

14   payors for failure to remit payments for services provided

15   that's being led by King & Spaulding asserting $370 million in

16   damages.

17        We have demand letters and complaints against

18   preference payment recipients seeking to recover over

19   $300 million that's led by the Togut firm; and we have ongoing

20   discovery led by Kobre & Kim stemming from the Weil Gotshal

21   Transformation Committee investigation into insider claims

22   which the Debtors anticipate will assert over a billion

23   dollars in damages.  And we also have a complaint pending

24   against Blue Cross Blue Shield for antitrust violations also

25   led by King & Spaulding that will be just as substantial as

1        some of these other claims that was part of opting out of a

2        $2.7 billion antitrust judgment against Blue Cross Blue

3        Shield.

4                So as you can see, we've got very significant claims

5        and we continue to marshal and prepare for sale other

6        remaining assets, material accounts receivable including the

7        $29 million that was subject to the hearing before this Court

8        two weeks ago.  We believe we have approximately another

9        $20 million in JV interests and ancillary properties, as well

10       as ERTC tax credits for sale.

11               Now these efforts were all detailed at the status

12       conferences that we had back in December and February, and at

13       that time, while we indicated we were hopeful we could reach

14       an agreement on a Plan, that outcome was far from certain and

15       it was dependent on the Debtors checking certain boxes,

16       including winning the Rabbi Trust litigation, monetizing the

17       excess properties, transition its TSA business, and developing

18       a financeable litigation strategy and a Plan for addressing

19       administrative claims.

20               Now the estate checked all those boxes, and

21       ultimately after 10 painful short term DIP extensions, months

22       of some of the hardest-fought negotiations that you could

23       imagine between the Debtors, the UCC and the FILO Lenders all

24       overseen by Judge Isgur, we finally reached a deal that will

25       finance these estates and allow for the continued pursuit of

1    asset recoveries so admin and priority creditors can be repaid

2    and general unsecured creditors have an opportunity for

3    meaningful recoveries.

4         The terms of the settlement are set out in great

5    detail in the Debtors' papers, and there are significant

6    benefits that are clear, including the FILO Lenders agreeing

7    to a long term extension of the DIP and use of cash

8    collateral; $125 million financing commitment to pursue asset

9    recoveries that will benefit all creditors; the subordination

10   of $10 million of their claims to administrative and priority

11   claims; a significant 4 to 5 percent reduction in their

12   interest rate; and a significant, as much as $50 million,

13   reduction in the MOAC under the bridge facility which Your

14   Honor will recall is something we flagged at the 1st day

15   hearing that was important for the Debtors to get concessions

16   on.

17        The settlement also provides $25.5 million to the

18   estate, including $12.5 million that will be used for an admin

19   claim consent program, $8 million that will be used to support

20   the administration of the estate and wind down, and up to

21   $4 million to pay for post-petition taxes to the extent that

22   there are any, as well as millions more that we paid by the

23   litigation trust to the estate for transition services that

24   will essentially support and fund the estate's day-to-day

25   costs and payroll.

23

1          Now like all good settlements, the deal isn't

2     perfect from the Debtors' perspective.  The litigation funding

3     that we're receiving is expensive, but so is all litigation

4     funding.  And frankly what we have here in terms of a 10

5     percent PIK interest rate, a 50 to 20 -- 15 to 20 percent

6     interest in litigation proceeds, and a 3.4 percent up front

7     PIK fee, it was market based and reasonable relative to comps,

8     and based on a solicitation process run by the Debtors, and

9     particularly in the context of all the concessions that we

10    received from the lenders as part of this deal, again, these

11    are lenders that were not willing to be primed by other

12    litigation funders who would, you know, want a first priority

13    interest in the litigation.

14          We also recognize that the terms of the transaction

15    provides for -- the term that provides for the transfer of the

16    assets to the litigation trust by the earlier of July 8 and

17    the confirmation order is not conventional.  But in the

18    context of these cases which include threats of conversion to

19    Chapter 7 brought by various parties, the constant barrage of

20    meritless constructive trust claims from 3rd parties,

21    obtaining a court order now that approves the sort of safe

22    transfer of valuable collateral to the trust was adequate

23    protection that the FILO Lenders insisted on and wouldn't

24    waiver from.

25          That structuring and that transfer was a hard-fought

24

1    concession that the lenders negotiated for and one that

2    without the lenders indicated they would move for relief from

3    stay to foreclose and take their collateral and force the

4    Debtors into a Chapter 7.

5         And ultimately, with the assistance of Judge Isgur,

6    the Debtors and the UCC negotiated protections that ensure

7    that the interests of the estate's creditors will be protected

8    and that the litigation trust, although a separate vehicle,

9    would be working together with the Debtors -- with the estate

10   rather to maximize value for creditors, including the

11   appointment of an independent fiduciary acceptable to the

12   Debtors and the Trustee.

13        A lot of allegations in the papers about the FILO

14   Lenders controlling the assets.  It's going to be an

15   independent party.  The estate, right, will have -- the estate

16   will have consent rights over litigation settlements that are

17   below a certain threshold.  They'll be reporting information

18   rights and other cooperation obligations.

19        And in terms of the division of responsibility there

20   will be a Trustee at the litigation trust, Mark Kronfeld of

21   Province, obviously a nationally recognized advisory and

22   restructuring firm, who will be responsible for the pursuit

23   and prosecution of asset recoveries, and that Trustee,

24   Mr. Kronfeld, will owe fiduciary duties to both the Class A

25   interest holders, which will be the FILO Lenders, and the

25

1    Class B interest holder, which will be the estate.

2         And frankly, in the context of this case, for every

3    day there's a new novel litigation or a party attempting to

4    agitate the estate, we actually think it'll be beneficial to

5    divide things up in a manner where you have a fiduciary that

6    is exclusively focused on asset monetization and doesn't get

7    caught up in sort of the day-to-day of administering the

8    estate and being in court in front of Your Honor every week,

9    you know, dealing with lawsuits.

10        On the other side of the ledger the estate will stay

11   intact and will continue to be overseen by the independent

12   Transformation Committee.  And to the extent the Plan is

13   confirmed a new Committee called the Plan Administrator

14   Committee will be formed, it will be comprised of

15   Mr. Transier, Mr. Alan Carr, who are currently on the

16   Transformation Committee, as well as Monica Blacker of Force

17   Ten Partners based in Dallas who'll be joining them as a cost

18   effective fiduciary and financial advisor in place of

19   Mr. Castellano and AlixPartners.  And new local counsel will

20   come in to support the estate as the estate will continue to

21   be responsible for administering claims, delivering

22   distributions, and providing support services to the trust to

23   support the collection of assets and pursuit of litigation.

24        On this slide in terms of evaluating the settlement

25   we think it's pretty clear that it's the best and the only

1    option for the estate.  On the left hand side you've got all

2    the benefits that I've laid out, and on the right hand side I

3    think you can see the stark reality of not moving forward with

4    the deal, which is you've got an estate with no cash

5    collateral, a secured lender that would move to foreclose upon

6    and try to own outright very valuable collateral which, look,

7    if tended to and monetized over time, will have significant

8    value and reap rewards for the estate's creditors.  But at a

9    foreclosure sale, you know, litigation claims are not going to

10   garner bids that pay off the FILO Lenders and they'll end up

11   retaining all the value.

12        So from our perspective not moving forward with the

13   settlement means that any recoveries for administrative and

14   junior creditors are gone, something that the likes of TRACO

15   and the deferred compensation participants don't really care

16   about, but would be a shame for all of our amity creditors,

17   since we have a good Plan and path to address them.

18        So in terms of the amity creditors, let's start with

19   how much is outstanding.  We have the benefit of the admin bar

20   date Your Honor approved in November, and the Debtors were

21   really able to get a handle on all of the outstanding admin

22   claims against the Debtors.  And after months of hard work the

23   Debtors estimate that the amount of unpaid admin claims that

24   ultimately will be allowed is approximately $108 million.

25   We've taken a look as well at the preference claims that could

1    be asserted against those admin creditors on a net basis, the

2    ones that, you know, we really think these are solid

3    preference claims, and that number starts to look like

4    $93 million.

5          And that number is continually being refined, even

6    between filing the Disclosure Statement and appearing before

7    Your Honor today we've identified another $6 million, 6- or

8    $7 million of admin claimants that are willing to settle out

9    of one of the funds that we've established.  So that number,

10   you know, fresh for today is 86- or $87 million.  So this is a

11   real, you know, amount that we're able to keep chipping away

12   at, and we've got a lot of tools to do so.

13         Don't get us wrong, we don't like the fact that

14   there's $86 million of unpaid admin claims out there, but

15   again, to put it in perspective, we've paid the overwhelming

16   amount of admin expense claims incurred.  Like I mentioned at

17   the top, there's been approximately $2.8 billion of admin

18   claims incurred and the Debtors have paid approximately $2.76

19   billion.  You know, to say it differently, 97 percent has been

20   paid leaving just 3 percent unpaid.  And we have a plan to

21   address the rest.

22         Throughout the case and continuing under the

23   proposed Plan the Debtors have established various pools of

24   cash.  We have the $15 million TSA vendor fund which still has

25   $8.7 million.  We expect to enter into settlements to use that

1   money with vendors that are willing to accept 40 cents on the

2   dollar.  There's an MPT escrow fund that has amounts for

3   vendors who supplied services during the transition period to

4   MPT's new operators, and there's a physician insurance account

5   which holds $7.5 million to defend against and resolve post-

6   petition claims against the Debtors' physicians which will

7   presumably come against the Debtors as well.

8          And now if the Plan is confirmed in July, the

9   Debtors will be able to establish another $12.5 million cash

10  pool for creditors who agree to waive their claims by 50

11  percent.  So you could look at that.  93, coming down

12  hopefully to lower than that, and there's various tools to

13  address that.  And the remaining amounts, you know, will be

14  repaid in full in cash on the Plan effective date.

15         Just to clear up a few things on the admin consent

16  program, I think there was some misunderstanding in some of

17  the objections.  This is a completely optional program, just

18  like the TSA vendor one that we put in place.  It's to

19  accelerate payments at confirmation to creditors that do not

20  opt out of the program.  Holders who agree to waive 50 percent

21  of their admin claim will receive a pro rata distribution of

22  $12.5 million on the confirmation date, with the remainder

23  paid on the effective date.

24         One important clarification, participation as we

25  think will expedite the effective date of the Plan, but

1    neither the Plan -- the consent program and it's participation

2    is not a condition to going -- having the Plan go effective.

3    We do not need this to ultimately have the Plan go effective,

4    but it's an option for creditors if they would like to get

5    faster payment.

6              I'm just turning to the next slide.  Like I noted,

7    there's a Plan summary slide.  Again, based on the strength of

8    our assets, the financing that's being made available by the

9    lenders we will be able to confirm a Plan that can go

10    effective and repay admin creditors in fully.  You'll note

11    here that the Debtors are projecting a recovery of between 3.9

12    and 21.6 percent for general unsecured creditors.  That

13    assumes both the settlement is approved and the Plan is

14    confirmed.

15             And just before I turn the podium over to

16    Mr. Carlson, let me respond to some of the objections briefly.

17    I just wanted to flag the proposed confirmation time line,

18    including a proposed confirmation hearing on July 8.  I

19    recognize that some of these dates are tight, but we've been

20    working with the July 8 milestone and the documents and, you

21    know, if Your Honor is inclined to approved the settlement and

22    have the Debtors move forward with solicitation, if there's

23    any concerns about the time creditors have or the proximity to

24    holidays, I think we can have a conversation about those

25    dates.  But just wanted to flag that up front.

1          All right.  I'll turn it over to Mr. Carlson

2    briefly.

3          THE COURT:  Thank you.

4          MR. CARLSON:  So turning to Slide 15, Your Honor,

5    since we -- I'll start with the settlement motion, since we

6    filed that a little over a month now, the team has worked hard

7    to resolve as many objections as we can, and there were a

8    number.  And they really fall into 4 or 5 categories, the --

9    really the -- what we've done is we've negotiated provisions

10   that protect and preserve rights for our payors, for

11   constructive trust claimants that's taken for example the --

12   one of the TRACO objections off the table, and hospital

13   buyers.

14         And so we've come a long way to resolve I'd say

15   many, or most of the objections.  I think we're still

16   finalizing language with a few counterparties that's intended

17   to preserve rights notwithstanding the transfer of these

18   assets into the litigation trust.  And so what's left is

19   really the 3 primary objectors that Mr. Cohen mentioned,

20   TRACO, Massachusetts and the deferred compensation claimants,

21   and the 3 objections are -- you know, it doesn't -- it's not

22   within the Debtors' business judgment to do the settlement,

23   that the settlement constitutes a *sub rosa* plan, and that it

24   contains -- the final and 3rd that it contains releases that

25   impermissible.

1          And so I won't -- while Mr. Cohen addressed the

2     rationale, the business rationale for why we really don't have

3     an alternative path here and all the benefits of doing this

4     transaction, so I won't -- I won't rehash that.  But it is,

5     you know, it is an important component and factor in

6     determining whether or not something is a *sub rosa* plan, and

7     so I'll jump into that objection.

8          And, you know, as the Court is aware, the *sub rosa*

9     plan objection, that's grounded in the 5th Circuit's *Braniff*

10    decision, that's where -- the genesis of that.  And, Your

11    Honor, this case just isn't *Braniff*, it's light years away

12    from that.  *Braniff* was an airline company that filed for

13    Chapter 11 in the '80s, and they proposed a transaction they

14    sought approval of under 363 of the Code.

15         And that transaction sold the company to a

16    competitor airline with a bunch of assets, in exchange

17    received assets back from the airline -- the competitor

18    airline, something called travel scripts, basically vouchers

19    to use their airline, and other assets.  And as a condition to

20    that transaction said, Those assets are going to be -- have to

21    be -- have to be earmarked and allocated to shareholders and

22    former employees, and dictated the terms of how the proceeds

23    of the sale were to be used, and obviously raised the absolute

24    priority rule issues, and also required secured creditors to

25    vote and support a Chapter 11 Plan that had not been filed or

1    even disclosed.

2          And so the Court, the 5th Circuit said, No, that

3    that's not a proper use under 363 of the Code.  You don't have

4    authority to do the things you're doing, I'm not -- we're not

5    going to allow you to short circuit the requirements of

6    confirmation and, you know, dictate how proceeds from the sale

7    are going to be -- going to be allocated in a future

8    Chapter 11 Plan that hasn't been disclosed and require secured

9    creditors to vote on a Plan that hasn't been filed.  And so

10   that is -- and in addition it also provided for broad releases

11   of all claims of all parties against the Debtors.

12         Here, Your Honor, none of those elements are in play

13   in these settlements.  Yes, the Debtors are transferring

14   assets into a liquidation vehicle, into the trust to resolve

15   the Debtors' threat to lift the automatic stay and as a

16   condition for them providing new financing and -- but as

17   Mr. Cohen discussed and walked you through, it is preserving

18   the estate's economic rights and interests in those -- in

19   those assets.  There's governance around it and consent rights

20   with respect to how those assets will be monetized, and it's

21   really the only path forward for a way to monetize those

22   assets for the benefit of the estate.

23         And so it's clearly a valid business justification,

24   Your Honor, there.  And importantly the settlement does not

25   dictate the terms of how -- the Chapter 11 Plan at all.

1    Right?  It preserves the FILO Lenders' position as a senior

2    secured lender.  It does not dictate how the estate's interest

3    in the assets will be distributed, that is dealt with under

4    our Chapter 11 Plan on the slide that Mr. Cohen went through a

5    few slides back.  And so it recognized -- all it does is

6    recognize the current priority and rights of the FILO secured

7    lenders.

8           And so, Your Honor, this isn't a settlement where

9    it's attempting to short circuit any of the requirements of

10   confirmation or to short circuit absolute priority rule or

11   other provisions of 1129.  We have a separate Plan filed.  And

12   of course if you look at that, and that's an important factor,

13   courts like in the 2nd Circuit in *Iridium* one of the main

14   factors is whether or not what's being proposed is in

15   violation of the absolute priority rule.

16          And, Your Honor, the other -- one of the other

17   objections we heard is, Well, what's left for the voters --

18   the creditors to vote on, there's nothing left.  And that's

19   also incorrect.  There are a number of terms that creditors --

20   all of the estate creditors will be voting on in our

21   Chapter 11 Plan which we have on file and we're asking Your

22   Honor to approve to allow us just to move forward with

23   solicitation, and that's the classification and treatment of

24   all of the remaining claims, that's admin claims, other

25   secured claims, priority creditors, FILO's retained

1        subordinated claim, and, you know, gut claims.

2              It provides for governance, for the governance

3        structure for the estate, it implements the administrative

4        expense claims consent program that Mr. Cohen walked through,

5        and a number of other provisions, it implements 3rd party

6        releases, procedures for liquidating claims and reconciling

7        claims.  And so the Plan is not -- does -- is a separate -- is

8        a separate thing that the Debtors are asking for this Court

9        to -- the creditors to vote on.

10             And finally, it doesn't -- you know, turning to the

11       releases, the other part of *Braniff* that the Court struggled

12       with and found problematic is you can't approve broad releases

13       of all things against the Debtors under 363.  That's not what

14       we have here.  We've got a narrow set of releases, mutual

15       releases with our FILO Lenders and Creditors Committee as part

16       of the global settlement, and then we have a narrow set of

17       release of Debtor claims against Debtor related parties.

18             And we'll let the evidence speak to why that's in

19       the best interest of the estate and that's its own exercise of

20       the business judgment.  But these aren't broad sweeping Plan

21       releases.  These are a very narrow set of releases of folks

22       like hospital level employees, the Transformation Committee

23       and, you know, a subset of employees that have been supporting

24       these cases.  And of course -- and finally, Your Honor, this

25       is another factor that courts look at, there are no 3rd party

35

1    releases as part of the final settlement.  That is in the

2    Plan.

3           And then, Your Honor, there's also in that the

4    voting issue.  Right?  And in *Braniff* it required secured

5    creditors to vote on an undisclosed Plan.  Here, yes, the FILO

6    parties have committed to support the Chapter 11 Plan as part

7    of our Plan Support Agreement.  That's different, and it's --

8    we're not asking this Court to be -- to approve that Plan

9    Support Agreement.

10          In addition, Your Honor, there's a number of other

11   reasons why we think the *sub rosa* objection should be

12   overruled.  I think Number 1 is the settlement is -- it's a

13   building block of the Plan.  Right?  It's -- we've got our

14   Plan on file, it's a necessary aspect for us to be able to

15   move forward with our Chapter 11 Plan.  Without it we

16   couldn't.  And this is the only path forward for securing the

17   financing that we need to monetize the estate's assets that

18   are remaining, and that's what the evidence will show.

19          And the litigation funding, it's the only

20   comprehensive funding option available to the Debtors, and

21   it'll allow the Debtors to retain its interests and maximize

22   the value of these assets.  And that evidence will further

23   demonstrate that the terms are -- the litigation funding terms

24   are reasonable and they're supported by a market based -- a

25   market check that is ran through a process.

36

1    And finally, Your Honor, you know, the courts look
2    at -- for *sub rosa* plan objections what -- you know, whether
3    or not creditor protections are being altered or being
4    impacted.  That's not the case here.  We've preserved all of
5    the estate's creditors' rights under this settlement.  It's
6    just a vehicle of being transferred into a litigation trust
7    and so it's not -- it's not a situation where creditor rights
8    are being altered nonconsensually.

9    And finally, Your Honor, you know, as the *Braniff*
10   court acknowledged, the Debtors there were seeking this relief
11   under 363, but acknowledged that, We're not analyzing this
12   transaction under other provisions of the Code, and even cited
13   to the adequate protection, 361, and that at the end of the
14   day that's a key component of this transaction is the FILO
15   Lenders simply would not provide the financing, would not
16   agree to forego the remedies to exercise -- to foreclose on
17   our assets without adequate protection in the form of this
18   trust that's being created to protect them from the, you know,
19   the harm that Mr. Cohen talked about earlier and to provide
20   them with the indubitable equivalent of their interest in the
21   collateral.

22   And that's, you know, a cornerstone or a lynch pin
23   of our entire transaction.  And so in short, Your Honor, we
24   just don't -- we don't think this transaction is anywhere near
25   *Braniff* or presents any of the *sub rosa* issues that *Braniff*

1    and it's progeny talk about.

2         So, Your Honor, moving on to the releases, I'll -- I

3    think I already covered this, but I'll be brief.  The releases

4    here really are narrow, narrowly tailored, and with respect to

5    the releases of the Debtor related parties, they are the

6    result of a comprehensive investigation that was done by our

7    Subinvestigation Committee.  And it preserves all of -- any

8    and all potential causes of actions against the parties that

9    where there are potential claims and for the estate to recover

10   against.

11        And it also includes many of the, you know, standard

12   carve out provisions to make sure that we're not releasing any

13   claims.  In addition, Your Honor, the releases were heavily

14   vetted and discussed by the stakeholders, the Creditors

15   Committee and the FILO Lenders as well, and they're

16   supportive.  So, Your Honor, I think that addresses the

17   primary arguments of the settlement.

18        I'll turn quickly just to the Disclosure Statement

19   on Slide 19.  We've also worked really hard to address the

20   true disclosure related objections that we've received.  And I

21   think the main ones kind of come in 2 categories.  The 1st is,

22   you know, parties wanted additional disclosure around

23   litigation claims and when's the -- when's the anticipated

24   timing of the effective date.

25        And, Your Honor, you know, obviously these

1   litigation claims, this is a major source, or the primary

2   source of recovery for the estate.  And what we've done is try

3   to balance those interests of disclosure with making sure

4   we're not compromising or undermining any of the Debtors'

5   efforts, and so to be litigation trust efforts, to maximize

6   value in those litigations.  And so we have, you know, in

7   great detail included status and discussion about all those

8   different categories of litigation claims in our Disclosure

9   Statement.

10          And in addition, Your Honor, we've got a chart in

11  the Disclosure Statement that summarizes exactly what the

12  asserted damages are for each of those litigation claims.  But

13  the, you know, the Debtors can't be asked to provide any

14  information that discloses privilege or confidential

15  information that'll hurt those efforts around what do we think

16  the value of those litigations are, even in the aggregate.

17          However, you know, we have also gotten a number of

18  questions and objections around, Well, when do you think --

19  when do you think the anticipated timing of the effective date

20  will be.  And, you know, in response to those objections I

21  think we -- you know, the Debtors have gotten comfortable with

22  providing an estimated date for going effective, and that'll

23  also be a part of Mr. Castellano's testimony today that will

24  be offered through proffer, and, you know, what that language

25  will be in the Disclosure Statement or something similar to

1   this will be that, you know, based on the Debtors' reasonable

2   estimates, we're estimating the effective date was reasonably

3   likely to occur in early 2027.  Although the effective date

4   may reasonably or, in fact, occur earlier or later than early

5   2027, that's the best estimate that we have.

6        Anyway, we think that we've struck the right balance

7   between disclosing as much as we can while making sure that

8   we're also preserving -- you know, we're not compromising or

9   undermining those efforts to maximize the value of those

10  claims.

11       And then I think just to quickly hit on the other

12  disclosure related objection, one of the other ones is around

13  our administrative expense claims consent program.  We have

14  added quite a bit of additional detail in a frequent -- like

15  an FAQ section to really respond to the questions that we've

16  been receiving and to walk through a very simple, you know,

17  example of how the program works.  And as Mr. Cohen mentioned

18  earlier, it's an option, it's totally consensual.

19       It'll -- the procedures will be the same opt out

20  procedures that we use for 3rd party releases, and you have

21  the option to compromise your claim for 50 percent in exchange

22  for receiving your pro rata share of $12.5 million on the

23  confirmation date and then the remaining piece -- the

24  remaining portion of that 50 percent claim will be paid on the

25  effective date.  And so we think that the additional detail

1    that we've included and the examples that we've included

2    respond to those objections as well.

3            And, you know, to the extent any parties are

4    objecting on the opt out/opt in issue, we think that it's

5    consistent with the approach in this district on why it's

6    consensual, if you get the form, and we think the form is very

7    clear on the instructions for opting out and what the terms of

8    the program are.

9            So then, Your Honor, just to -- you know, turning

10   to the Plan and the unconfirmable objections on the last page

11   here, look, we disagree with each of these objections.  We

12   think that they're pretty clearly Plan confirmation issues

13   that we'll of course address.  I think we've addressed a lot

14   of the feasibility issues that parties raised with respect to,

15   you know, being concerned that the admin -- the success of the

16   admin consent program was a condition to going effective.

17           We clarified in our Disclosure Statement that that's

18   not the case, that -- and Mr. Castellano's testimony will be

19   that the Debtors believe that they're in a position to repay

20   admin claims regardless of the level of participation in our

21   consent program.  And, Your Honor, the other confirmation

22   objections raised here we think will also be -- will be

23   overruled at confirmation.

24           So, Your Honor, unless you have any questions for

25   me, I'll cede the podium.

1           THE COURT:  No questions.  Thank you.

2           MR. KAHN:  Good morning again, Your Honor.  Brad

3    Kahn, Akin, on behalf of the Official Committee of Unsecured

4    Creditors.  Like the Debtors' counsel I will give our opening

5    remarks, and I'll do the FILO settlement first and then get to

6    the Disclosure Statement, if that's all right, Your Honor.

7           THE COURT:  That was more of a opening/closing.

8        (Laughter.)

9           MR. KAHN:  I will have less argument because

10   Mr. Carlson just did a lot of that job for me.  So let's start

11   with the FILO settlement, Your Honor.  Some context is

12   important and Mr. Cohen covered some of this, but I do want to

13   drive it home.  These have been incredibly difficult cases,

14   Your Honor has seen it firsthand.

15           At the outset of the case our focus as the Committee

16   was unequivocally on saving on the Debtors' hospitals,

17   allowing them to continue to serve the communities in which

18   they sit.  And in that framework, at the beginning of these

19   cases we also had hope that the value of those hospitals once

20   sold, along with the Stewardship business, would be sufficient

21   to repay all the secured debt and get meaningful recoveries to

22   unsecured creditors quickly.

23           Unfortunately, as that process played out we learned

24   that the value simply was not there.  There were complications

25   with MPT, there were issues at a number of the hospitals, our

1       initial bidder for the Stewardship business dropped out in the

2       face of antitrust concerns.  And so the estate fiduciaries,

3       including the Committee and the FILO Lenders, turned to trying

4       to resolve our issues with MPT so that we could transition the

5       hospitals and preserve value for the estate.

6               And so we reached a global settlement with MPT,

7       which was approved by Your Honor on a final basis back in

8       September.  And that claim and settlement was successful in

9       the sense that it allowed the estate to transfer almost every

10      single hospital to a new operator.

11              But in the wake of the transfer of those hospitals a

12      familiar issue arose, one that Steward had faced time and time

13      again, even since before the bankruptcy case, the Debtors did

14      not have sufficient liquidity.  And add to that liquidity

15      crunch that the DIP was set to mature in December, the Debtors

16      would be in default and would be facing threats of

17      acceleration and exercising of remedies by the FILO Lenders.

18              And so that's what really sets the stage for today,

19      Your Honor.  You know, contrary to innuendo that some of the

20      objectors that the Committee has checked out or thrown up its

21      hands, the Committee has fought tooth and nail to pursue a

22      path to give unsecured creditors an opportunity at meaningful

23      recoveries.  And by the way, the Committee understands that

24      that means admin and priority have to get paid before them.

25      And frankly there's substantial overlap between a lot of

43

1          constituency and the admin expense creditors.

2                    So how did the Committee approach the negotiations

3          with the Debtors and the FILO Lenders to achieve the goal.

4          With the remaining assets being primarily litigation claims

5          there were 2 major issues.  1st, with respect to these

6          litigation claims the Committee believes these claims are

7          valuable, but it's going to take money to unlock that value.

8          We need financing.

9                    And since those assets are the FILO Lenders'

10         collateral, and the FILO Lenders aren't going to agree, I'm

11         sure Mr. Price will say it, the FILO Lenders are not going to

12         agree to be primed by 3rd party litigation financing, the FILO

13         Lenders were the only viable source of financing.

14                   And 2nd, with the DIP in default the FILO Lenders

15         could have chosen to foreclose on their collateral including

16         these litigation claims.  And if they did so, there is no

17         incentive to maximize the value of those litigation claims in

18         a way that would go much beyond paying them off.

19                   With those issues front and center the Committee

20         engaged in months of hard-fought negotiations and a mediation

21         under the supervision of Judge Isgur and negotiated the FILO

22         settlement that's now before your court.  And while you

23         wouldn't know from the objections, the Committee believes the

24         settlement's a good outcome, specifically the Committee

25         believes that this settlement addresses the 2 issues I just

44

1     noted in ways that are beneficial to the estate.

2          There's now $125 million of funding from the FILO

3     Lenders to monetize these assets.  Funding, which based on

4     Mr. Castellano's testimony and in the Debtors' business

5     judgment, is on better terms than the estate would get

6     elsewhere, and was really from the only available source.

7          With respect to maximizing the value of the

8     litigation claims the Committee and the Debtors negotiated for

9     substantial governance guardrails on the Litigation Trustee to

10    ensure the trust can't just settle things on the cheap quickly

11    to pay the FILO Lenders off at the expense of the estate.

12    These include monetization thresholds on different types of

13    claims and certain rights of the estate representative to

14    oversee or object to certain actions proposed to be taken by

15    the trust, and it includes the Trustee owing a fiduciary duty

16    to all interest holders of the litigation trust including the

17    estate.

18         And on top of all that the Debtors and the Committee

19    negotiated substantial compromises with the FILO Lenders on

20    their claims.  There are reductions in interest rates.

21    $10 million of the FILO bridge claim is going to be

22    subordinated to admin and priority claims.  And the MOAC claim

23    which could have exceeded $55 million is being compromised for

24    as little as $11.25 million depending on when we can pay the

25    FILO Lenders off.

45

1          Is the Committee up here doing a victory lap?  No.

2     As I said, these have been hard cases and the road is long.

3     As Mr. Carlson just said and apparently Mr. Castellano will

4     testify later, it's going to be a long road to get money into

5     the hands of unsecured creditors.  But we negotiated at every

6     step to give unsecured creditors a shot at meaningful

7     recoveries that they would not get in any other situation.

8          Nobody will have an alternative to present to you,

9     Your Honor, other than fanciful arguments that a Chapter 7

10    Trustee could do just as well.  There is no argument that

11    takes any realistic set of assumptions and sees admin

12    creditors and unsecured creditors getting paid.  It doesn't

13    exist.  And to be clear, the Committee as a fiduciary

14    considered everything.  They considered whether a Chapter 7

15    would be better.  It's not.  This is the only path that gets

16    unsecured creditors a shot at meaningful recoveries.

17         Some other quick responsive points that I'll go

18    through very quickly because Mr. Carlson covered most of this.

19    The *sub rosa* plan argument, first it's hard to have a *sub rosa*

20    plan when you also have a Plan complete with all the

21    protections of Bankruptcy Code Section 1129.  But importantly

22    there's nothing in the FILO settlement that dictates the terms

23    of the Plan.

24         It resolves issues between the estate and the FILO

25    Lenders, it creates the path to have a funding and gives the

46

1    estate sufficient liquidity to pursue a Plan.  But it

2    preserves the Debtors' ability to prosecute and propose its

3    own Plan on the terms that were negotiated between the Debtors

4    and its stakeholders.

5         On the releases, just very quickly, there have been

6    arguments made about the appropriateness of their scope.

7    Let's be very clear, and these are some of -- you can look at

8    them, many pages of the rider, the exhibit to the Settlement

9    Agreement that sets forth the release provisions.  It's 10

10   pages long.  These are some of the most narrowly tailored and

11   heavily negotiated releases you will ever see, Your Honor.

12        The Committee and the FILO Lenders both pushed very

13   hard to limit the parties that could get releases from the

14   estate.  And part of that's self-serving for us.  These are

15   the very parties that we want the litigation trust to go sue

16   so we can get money from D&O insurance or otherwise to pay

17   back the estate.

18        And the argument that the Committee allowed the

19   Debtors to negotiate self-serving protective releases for

20   their related parties is unsupported by any facts and can be

21   dismissed simply by looking at the releases themselves.

22        On the Disclosure Statement, Your Honor, Mr. Carlson

23   covered the issues around the releases -- I'm sorry, the

24   disclosure around litigation claims, there is substantial

25   disclosure in the Disclosure Statement already, including

1    estimates of the claims based on the category of claims.

2         First of all, we understand the desire to want to know

3    more about exactly how each specific claim might be resolved

4    and when, we also don't want that information disclosed to

5    defendants in these various actions, including the

6    Commonwealth itself, who's one of the objectors making this

7    argument, they're going to be one of the defendants in the

8    action.  That will immediately put the estate at a

9    disadvantage in maximizing the value of those assets.

10        On the admin claim consent program, as Mr. Carlson

11   noted, it's entirely voluntary and its effectiveness is not a

12   condition to effectiveness of the Plan, nor required for the

13   Plan to be feasible, and we believe Mr. Castellano's testimony

14   will be very clear on that point.

15        We'll chalk this one up in the category of no good

16   deed, we as the Committee advocated for this, we thought

17   people would want the benefit of an accelerated payment given

18   that it's going to take a year and change for us to -- for the

19   litigation trust to go marshal all the proceeds to get to the

20   effective date.  If people don't want to participate in it,

21   they don't have to.

22        And so I'll wrap up here, Your Honor.  The Committee

23   believes this is the only path in these cases to get

24   administrative claims paid and meaningful recoveries to

25   unsecured creditors.  There is no better alternative.  We

48

1    tried.

2            Though I'm loathed to raise it, I do want to repeat

3    that the accusations that the Committee was somehow absentee

4    in this process could not be further from the truth.  We were

5    there at every mediation session and every step of the way

6    trying to advocate for the best result for unsecured

7    creditors, making these arguments without any support or

8    evidence appears to be an act of desperation by objecting

9    parties trying to secure preferential treatment for themselves

10   in a case where recoveries are admittedly challenged.

11           This Committee works hard.  It meets every week, it

12   directs the advisors on the actions taken by the Committee.

13   Serving on a Creditors Committee is a thankless job in even

14   the best of circumstances, and even here more so.  These

15   Creditors Committee members should be commended, not smeared.

16           With that, Your Honor, I'll reserve for closing.

17   Unless Your Honor has any other questions, I'll cede the

18   podium.

19           THE COURT:  No questions.  Thank you.

20           MR. KAHN:  Thank you, Your Honor.

21           MR. PRICE:  Your Honor, Michael Price of Milbank on

22   behalf of the FILO Secured Parties.

23           I rise to express the FILO Secured Parties' support

24   for the approval of the settlement.

25           Your Honor, I want to start by thanking the

1   principals and advisors that participated in the mediation for

2   each negotiation parties, and of course, Judge Isgur.  I don't

3   think anyone involved would dispute that without his

4   assistance, his guidance and focus, the many hours that he

5   spent with us, we simply would not be able to reach the

6   Settlement Agreement.  It was hard-fought.

7          Each position was challenged by well-represented

8   counterparties.  I can confirm, you know, what Mr. Kahn just

9   said, it was not a -- nobody was laying down and being

10  steamrolled.  It was hard-fought negotiation and it has the

11  hallmark of any good compromise, which is that none of the

12  parties to it believe that -- they're not thrilled about it,

13  but it's the best alternative -- it's the only acceptable

14  alternative that works for all the parties, and we do think

15  ultimately it's the best alternative for the estate.

16         For the reasons articulated by Mr. Cohen,

17  Mr. Carlson, and Mr. Kahn this morning, for those stated in

18  our papers and theirs, we do believe it makes all the sense in

19  the world for the estate, and the other stakeholders support

20  this for Your Honor to approve it.

21         So I'm going to move as swiftly as I can.  I do want

22  to spend a bit of time supplementing what's been said and

23  written, particularly in light of certain of the objections

24  that were filed.  And further up, I think it's important to

25  provide a little bit more background and emphasize the context

1    under which the entire mediation and negotiations occurred

2    because as I'll explain, the settlement for which the Debtors

3    are seeking approval today is not about imposing a Plan

4    *sub rosa* or otherwise on anyone.

5         Much more about topics that the principal opponents

6    of the settlement don't even address.  Among those are

7    addressing the FILO Secured Parties' demands for entitlements

8    to adequate protection in the context of a case that has

9    continued to consume their cash collateral on a prolific

10   basis.

11        This is one in which the Debtors have no ability or

12   prospect of providing and not third party has demonstrated any

13   willingness to provide meaningful adequate protection in an

14   incremental fashion to the lenders, another topic that isn't

15   addressed by the parties opposed to the settlement.

16        Dealing with the Debtors' inability to repay over

17   $206 million of outstanding DIP obligations under the FILO

18   DIP.  That DIP will otherwise mature later today, absent

19   approval of the settlement, after having already been extended

20   for nearly six months after its initial maturity.

21        And I want to highlight the most important thing,

22   which is that the settlement is the settlement is much less a

23   *sub rosa* plan or anything even relating to a Plan from the

24   perspective of the FILO Lenders.  It's a mechanism to resolve

25   their demands for stay relief so that they can seek to

1        foreclose on their collateral for which there's unquestionably

2        costs on account of the failure of the Debtors to provide --

3        of their ability to provide adequate protection.

4              As Your Honor will recall, shortly after the

5        commencement of the cases, the FILO Lenders, who at the time

6        were owed $450 million under their pre-petition debt

7        facilities, advanced another $225 million of new money in the

8        form of a superpriority DIP financing and that was approved on

9        an interim and final basis in June and July 2024,

10       respectively.

11             And over the course of several months that followed

12       that, the proceeds of the DIP, along with the FILO Lender's

13       cash collateral, including the proceeds of the dispositions of

14       their collateral were used to fund patient care and hospital

15       operations to facilitate sale processes for the hospitals and

16       other assets, and to fund what became an increasingly complex,

17       often contentious, and always costly case.

18             The asset sale campaigns did not yield the results

19       that the Debtors had hoped for or expected and the high

20       operational and restructuring costs put a tremendous strain on

21       liquidity almost from the outset.

22             And no one has disputed the validity of the FILO

23       Lenders pre-petition and DIP liens, which are no longer

24       subject to challenge, which covers substantially all of the

25       Debtors' assets.  No one is disputing their statutory right to

52

1    receive adequate protection on account of diminution in the

2    value of their interest in the collateral or its proceeds.

3          No one is disputing their rights under the

4    court-approved DIP Credit Agreement to receive prepayments

5    upon the disposition of their collateral, including under

6    Section 2.11(c) of the DIP Credit Agreement.  And no one has

7    disputed that the Debtors waived their rights to surcharge the

8    FILO collateral, pursuant to the DIP orders.

9          But throughout the duration of the cases, the fact

10   is the Debtors simply lacked the ability to provide

11   incremental assets as adequate protection while cash

12   collateral was being burned, and they lacked the liquidity to

13   make required paydowns without threatening the continued

14   hospital operations or the orderly transfer and dispositions

15   of the hospitals to third party buyers or operations.

16         And I'm sure that the Court will recall that on more

17   than one occasion, those practical realities presented very

18   difficult decisions for everyone involved, for the FILO

19   Lenders and for Your Honor.  You could risk hospital closures

20   or disruptions in operations or you could consent to, or in

21   case the Court approved transactions that avoided those

22   outcomes, but which consumed or applied the FILO Lender cash

23   collateral in a manner that was inconsistent with the paydown

24   requirements under the DIP and without providing additional

25   adequate protection.

1          This is unnatural.  It's unusual.

2          If you look at Collier's in Section 506.02, it

3    speaks to the Bankruptcy Code's favorable treatment of secured

4    claims.  It was a conscious choice by Congress to embody those

5    principals in the Code.  Indeed, I'll quote that "The

6    protections afforded to secured creditors under the Code

7    generally adhere first to the principal that the secured

8    creditor is entitled to priority payment on account of its

9    collateral and second, to the principal that is entitled to

10   receive equivalent value of its collateral.

11         These are the principals that underlie the special

12   protections afforded to secured creditors in every bankruptcy

13   case.  And yet, during this case throughout the latter half of

14   2024 while the sale process was ongoing, the FILO Lenders

15   agreed time and time again to facilitate those transactions,

16   to waive defaults under the DIP forebear from exercising

17   remedies or consent to budgets, uses of cash collateral that

18   supported the Debtors' efforts to safely transition hospitals,

19   but which were in principal inconsistent with what they were

20   otherwise entitled to as a legal matter.

21         They didn't accelerate or terminate the DIP when

22   they were well within their rights to do so.  They recognized,

23   as Your Honor once said, that these cases are different.

24   Instead, they supported the process and all the while billions

25   of dollars of their cash collateral was used to pay

administrative creditors and other junior stakeholders.

And to give you a sense of the magnitude that we're talking about, you only need to look to paragraph 13 of Mr. Castellano's Declaration where he indicates that over $2.8 billion of cash has been used to pay those other obligations, including nearly 97 percent of the estimated administrative claims incurred in these cases.

My clients have tolerated and in many instances consented to subordinating their rights to payment to the rights of junior claimants because they recognized these cases are and were different.

By December 31, 2024, and that was the maturity date of the FILO DIP, the disposition of the hospital assets was largely complete.  We had settled with MPT.  We made a lot of progress in the case.

However, the Debtors were unable to repay the outstanding balance of the DIP and at that point tolled more than $266 million.  They couldn't pay the pre-petition bridge. That point tolled over $130 million.  And yet, again, rather than terminate the use of cash collateral, accelerate the DIP, the FILO Lenders entered into what would be the first of nine DIP maturity extensions, extensions that run through today.

During January and February of 2025, those extensions allowed the Debtors to seek to transition their TSA obligations, which consumed cash collateral at a loss and

1    which were, from a long-term perspective, unsustainable and

2    they moved into a third party operator.

3           This was achieved through entry into the TSA

4    agreement with Quorum, which was approved on March 11th of

5    this year.

6           At that point, with the hospitals and remaining TSA

7    operations safely transitioned to other operators, the

8    concerns of safety, patient care, and community stability and

9    animated the conduct of these cases that resulted in my

10    clients consenting to and in other cases, allowing themselves

11    to be subordinated to junior claimants, those considerations

12    no longer justified them continuing to effectively subordinate

13    their claims and allow their cash collateral to be surcharged.

14           At that point, the cases became no longer different

15    than other cases.  It wasn't appropriate to ask them to simply

16    sit on their secured creditor rights and there was no

17    justification to force them to do so.  It was time to go back

18    to generally adhering to the principals that I just discussed

19    that you can read about in Collier's that the principals that

20    undergerd the Code with respect to the priority and

21    entitlements of secured creditors with respect to disposition

22    of their collateral.

23           Not only was it economically irrational to expect

24    the FILO Lenders to continue funding the cases at a loss on an

25    indefinite basis, that there was no longer anything that made

1    the case special.  There was no longer a basis to compel them

2    to do so, and as a result around that time -- I believe it was

3    March 12th, 2025 -- and this is to confirm what Mr. Kahn

4    mentioned earlier, that FILO Secured Parties informed the

5    Debtors and the Creditors Committee that they were unwilling

6    to extend the DIP maturity beyond the closing of the Quorum

7    transaction in early April.

8            By the way, we did subsequently extend it to allow

9    for the mediation to conclude through today, but that absent

10   an agreement to do so on a consensual basis, the lenders had

11   prepared to and would seek to lift the stay based on the

12   Debtors' inability to provide adequate protection to the FILO

13   Secured Parties.

14           It was the case then and it remains the case today

15   that the Debtors are simply unable to adequately protect the

16   FILO Lenders on a non-consensual basis.  They've sold or

17   otherwise disposed of all their assets with the exception of

18   accounts receivable and litigation claims, both of which the

19   FILO parties have a first priority lien over.

20           As to the accounts receivable, the Debtors are

21   currently collecting approximate a million dollars a week, not

22   nearly enough to cover the continued cash burn of the cases

23   and as to the litigation claims -- and this is something that

24   Mr. Kahn also mentioned -- not only are the prospects for the

25   recovery and timing of the recoveries uncertain, but it will

1   require tens if not hundreds of millions of dollars to

2   prosecute the causes of action, to have a chance at a

3   substantial recovery that we're all hoping we'll be able to

4   achieve.

5           No party is going to be able to do that, provide

6   that funding on a non-priming basis and there simply isn't

7   collateral assets unencumbered value available to impose a

8   non-consensual priming financing on the FILO Lenders.

9           As the Third Circuit consensually held in *Rocko v.*

10  *JPMorgan Chase Bank*, that's 255 F. Appendix 638 at 641, it's

11  Third Circuit 2001, quote, "The lawsuit is too speculative in

12  nature to offer adequate protection."

13          And so it remains the case that nobody is able to

14  credibly argue the FILO parties are or can be adequately

15  protected and despite the fact that the Debtors motion for

16  approval of this settlement devoted pages to the topic, and

17  the Committee's statement also addressed these issues in great

18  detail.  The objecting parties, again, a handful of litigation

19  targets that have a paroquial interest in ensuring that

20  neither the trust nor the estate actually received litigation

21  funding contemplated under the settlement, they simply ignored

22  that whether we're in a Chapter 7 or in a Chapter 11, absent

23  something like this settlement, there will undoubtedly and

24  disputably be a failure of adequate protection, there will be

25  abundant cause to lift the stay to allow the FILO parties to

1    foreclose on their collateral, and that's what they'll do.

2           And what would happen if we were to succeed in that

3    effort, the outcome that the company and the Committee agree

4    is the likely outcome in seeking stay relief?  Well, it

5    wouldn't be what -- it certainly wouldn't be the alternative

6    that the Commonwealth of Massachusetts described in its

7    pleading.  And it wouldn't be the spoke relief advocated by

8    counsel to eight -- a handful of the over 200 participants in

9    the Debtors' deferred compensation Plans.  They'd like the

10   Court to simply find a way to compel the FILO Lenders to

11   continue financing the prosecution of claims for their

12   benefit.

13          That's inconsistent with the law.  So ignoring the

14   unwarranted digs, ignoring the baseless aspersions they cast

15   at to the FILO parties and their motives -- and frankly, the

16   motives of everybody else who engaged in a good faith

17   mediation -- ignoring the hypocritical outrage that they

18   express at the prospect that the FILO parties would deem to

19   expect that their legal entitlements would be respected, and

20   in the case of the Commonwealth, knowing the hypocrisy of a

21   party that literally states in its reply that it is unwilling

22   to compromise on its claim -- certainly that is their

23   perogative -- to then be critical of others for not

24   compromising enough.

25          Their statement of the legal consequences at the

1   foreclosure, which is really what matters, is simply dead

2   wrong and here's why.

3        I'm going to quote from paragraph 22 of the

4   Commonwealth objection at Docket Number 4921, quote:  "If the

5   FILO Secured Parties were to foreclose on the litigation

6   claims, they would either (a) sell the claims likely for a

7   fraction of their secured debt or (b) pursue litigation, which

8   they would still need to fund and prosecute.  If the FILO

9   Secured Parties pursued litigation and recovered more than

10   their secured debt, any excess proceeds would be remitted to

11   the Chapter 7 Trustee for distribution to creditors."

12        That's dead wrong.  That's not the law.  Rather,

13   following the lifting of the stay or the termination of the

14   stay, the FILO parties would be entitled to conduct a

15   foreclosure sale under applicable state law, the applicable

16   version of the Uniform Commercial Code, pursuant to its terms.

17        Just like in a bankruptcy case, just like the credit

18   bid rights that are afforded to creditors under Section 363 of

19   the Bankruptcy Code, Section 6 -- 9610 of the UCC would allow

20   the FILO parties to credit bit in connection with the public

21   sale of the assets.

22        If, as Massachusetts postulates, the sale would be

23   at a discount, the FILO parties would simply credit bid a

24   portion of their debt for ownership of the assets.  And

25   importantly, following that credit bid, UCC Section 9617 is

1    abundantly clear that the Debtors' interest in the asset in

2    its entirety would transfer to the buyer; i.e., to the credit

3    bidding FILO Secured Parties.

4         Any subsidiary interest would be extinguished.

5    There isn't a roving and indefinite requirement after you

6    complete the foreclosure to remit proceeds that are received

7    later when you go to sell the asset, whether or not you do

8    monetize it.

9         And so, while the FILO parties would be required to

10   fund the litigations, that's true, in the liquidation of their

11   collateral if they wanted to prosecute the claims, they would

12   be entitled to retain 100 percent of the proceeds.  The

13   estates would receive nothing.  That's the same

14   uncontroversial result, by the way, that occurs in bankruptcy

15   upon a successful credit bid.

16        See, for example, *In Re: Palm Springs II, LLC*,

17   that's Case Number 20-3486(b), 2001 -- 2021 Westlaw 5331001 at

18   star 9.  That's a Northern District of Texas case from 2021

19   that was affirmed by the Fifth Circuit at 65 F.4th 752 in

20   2023.  Where a successful credit bid allowed the creditor to

21   acquire its collateral, which in turn, and I quote, "Left the

22   other creditors with nothing."

23        This is non-controversial.  It's *Hornbook* stuff that

24   the Commonwealth would like us to turn on its head.

25        And to be complete, I'll note that this -- that in a

1    conversion to Chapter 7, it doesn't change anything.  It

2    wouldn't change the fact that the FILO parties couldn't be

3    adequately protected, that their rights to stay relief would

4    survive, that they would have the right to seek to lift the

5    stay and go pursue such foreclosure.

6            And in fact, a dismissal wouldn't change that fact.

7    The stay simply would no longer be applicable and the FILO

8    parties could foreclose on the assets again, under the Uniform

9    Commercial Code.

10           None of that -- neither of those things alter the

11   result and it's ironic because the Settlement Agreement, which

12   they actually oppose on this very basis, does alter the

13   result.  It does allow for the estate to retain an interest

14   for the estate and its other creditors to share an upside

15   after the FILO parties' claims and the litigation funding are

16   repaid.

17           That is, in fact, the opposite of what would happen

18   if the course of action that the Commonwealth is suggesting

19   were pursued.

20           I think it's fair to say that this is precisely why

21   beginning in March of 2024 -- sorry, 2025, the Debtors and the

22   Creditors Committee began to engage with my clients about a

23   consensual settlement to be explored and negotiated in the

24   mediation before Judge Isgur.  And they accepted, as is

25   reflected in the settlement that the solution would have to

1    respect the FILO parties' rightful entitlements as secured

2    creditors under the Bankruptcy Code.

3            They could not be adequately protected absent

4    consent that there was no solution that could require them to

5    subordinate their interests and proceeds of the collateral to

6    junior claimants or to offer an additional litigation

7    financing facility for the benefit of other parties.

8            And while the FILO Lenders were happy to engage

9    towards a structure that would, as the settlement ultimately

10   does, benefit all stakeholders, allowed the estate to retain

11   more than it otherwise would in the only available

12   alternative, I want to be clear that the FILO Lenders were

13   prepared to exercise their rights under the DIP if a

14   consensual resolution couldn't be found.  They were fully

15   prepared to do so.  They remain prepared to do so today if the

16   settlement isn't approved.

17           They're willingness to consent to their use of cash

18   collateral is not limitless.  And without an entry -- you

19   know, an Order approving this settlement, it expires today.

20   These are not, as the Commonwealth asserts, false threats.

21   The Commonwealth has neither an understanding of the relevant

22   law nor the terms of the settlement and much less, the

23   parameters given to my clients by their investment committees,

24   who ultimately have to sign off on providing any additional

25   funding or allowing the additional use of cash collateral to

1    get us to the establishment of the trust.

2          Simply put, there are two credible paths.  There's

3    the path represented by the settlement.  And there's the

4    foreclosure path.  The outcome may actually be similar for my

5    clients in either.  We will concede that it may be more

6    costly, time consuming, and convoluted to pursue a

7    foreclosure.  That's why we're giving consideration to the

8    estate in the context of the settlement.

9          This is a fully baked deal.  It was negotiated well

10   by sophisticated parties.  It represents and recognizes the

11   rights that they have.  There are benefits and burdens for

12   everyone involved.

13         I'm not going to go through all of the benefits that

14   the settlement provides because Debtors' counsel and the

15   Committee have already spoken to them, but they are myriad.

16   None of those, again, are available in a foreclosure scenario,

17   a lift stay scenario.

18         That leads me to respond to sort of two elements of

19   the objections -- and I'll keep both of these fairly brief

20   because at least one of them was covered well by the other

21   parties.

22         The first is *sub rosa*.  There's nothing under the

23   settlement that affords the FILO Secured Parties anything

24   greater than the rights they already have outside of the

25   context of a Plan.  They are DIP and pre-petition lenders with

1    property interest in collateral.  They have independent rights

2    with respect to the proceeds of that collateral.  They have a

3    DIP Order that provides how payments are supposed to be made

4    when the collateral is monetized.  It has a maturity date.

5    Those are all things that were approved by the Court.  No one

6    would argue that those are *sub rosa* plans.

7         The settlement preserves those entitlements and, in

8    fact, also provides consideration back to the estate.  It does

9    not dictate any terms of a Plan for any other stakeholder.

10        It's a necessary, but not sufficient building block

11   in light of the circumstances of these cases for the Debtors

12   to go try to confirm a Plan.  But confirmatin of a Plan isn't

13   necessary to grant this relief.  It provides a predicate

14   condition that the Debtors are free to utilize the Class

15   Trust B interest in the estate funding for any purpose they

16   want.

17        While the 15 million in funding is tied to

18   confirmation of a Plan by a date certain, the only other

19   requirement for the Plan is that it not seek to undue the

20   provisions of the FILO settlement, which again have nothing to

21   do with distributions under a Plan.  It merely preserves the

22   entitlements that the lenders already have.

23        This in no way resembles the *sub rosa* plan like the

24   one that was rejected in *Braniff*.  I have a list of all the

25   other cases that were cited.  I can go through and distinguish

1        them.  I will spare everybody that exercise.  Suffice to say,

2        if you look at them, none of them looks anything like this

3        fact pattern.

4                As to the litigation funding -- this is another one

5        I can keep brief because I know that Your Honor is very

6        familiar and has abundant experience with this type of

7        financing arrangement, which we have already in this case,

8        this type of funding arrangement with respect to some of the

9        preferences.

10               The allegation that the FILO parties are getting an

11       unfair windfall, or somehow looking to steal value that is

12       otherwise attributable to other creditors, because their

13       litigation funding contains a variable component because the

14       $125 million facility that they're agreeing to provide has a

15       feature that is in literally every litigation funding.  That

16       is, by definition, how these facilities work.

17               It's incredulous and I'm not going to spend a whole

18       lot of time about it.  Your Honor, this Court has recognized

19       in *Sanchez* compensation paid to litigation funders under a

20       Litigation Funding Agreement, isn't a payment on account of

21       their claims.  It's a payment made to compensate them for the

22       provision of financing for what is a risky and time consuming

23       and expensive pursuit in pursuing the litigation.

24               The FILO parties may be both litigation funders and

25       creditors, but what they're going to receive under the

litigation funding is a repayment of principal and then interest and a rate of return under a litigation financing facility -- completely unremarkable.

I'd also note that the terms of the financing facility -- and this is something that Mr. Carlson also covered -- were thoroughly market tested.  Not only was this the only available option, but it was well within market and, in fact, favorable when you compare it to some of the other financings that are a matter of record in this case when we -- when the Debtors sought to approve the Togut retention application, they cited several other examples of litigation funding with variable components.

What we have here is something between 10 to 28 percent, meaning that if the Litigation Trustee is able to go out and get a litigation firm to take on the matter, to fund it itself, the variable component goes down.  We'd love for that to happen, by the way.

As the Debtors' papers make clear, no one has been willing to do it.  The type of firm you need to pursue these litigations and maximize their value, to-date they have no one to do it, so we're paying hourly.

But even at the high end of the range, the economics under this facility are better than what you often see.  I mean, just based on what was showing in the pleadings for the Togut retention application in *Sanchez*, you can see wide

1    ranges.  It can go all the way from, you know, 10 percent to

2    90 percent.  And this one is squarely within where most of

3    them fall, which is less than a third -- somewhere between 10

4    to 28 percent.

5        I only note that because there's a fair amount of

6    verbiage devoted to attacking the effort to provide that

7    facility, as though it was something nefarious.  In fact, it's

8    pretty typical and being done on market terms.

9        So with that, Your Honor, I would just concur with

10   all the other parties that are supporting the settlement.  We

11   think it represents a sound exercise of the Debtors' business

12   judgment, easily satisfies the standard in the Fifth Circuit.

13       From *In Re Jackson Brewing*, and of course, absent

14   the relief requested, we know what the alternative path looks

15   like.  We don't think it's a good one.

16       For those reasons, we'd ask that Your Honor enter an

17   Order approving the settlement.

18       THE COURT:  Thank you.

19       Let me -- why don't we start hearing from people who

20   oppose any of the relief requested.  Maybe it makes sense to

21   talk timing, housekeeping.

22       We started -- we took a break for lunch, I don't

23   want to rush you.  I want to give you as much time as you need

24   and everyone else who wishes to speak.

25       We can come back at 1:00.

1          Who else?  I know that there may be some people on

2     the line.  Let me just ask the folks who intend to speak in

3     the courtroom, how much -- and I'm not rushing you at all.

4     I'm just trying to get a sense of what the afternoon is going

5     to look like.

6          How much intro do you think you have?

7          Just get close to a mic.  I just want to make sure

8     we have a good clean record everywhere.

9          And there may be some people on the phone, as well,

10    and I can bake in -- I'll add 10 percent to anything you-all

11    tell me.

12       (Laughter.)

13          MS. JACOBSEN:  Your Honor, Michele Jacobsen for

14    TRACO.

15          Probably comments around 15 minutes or so.

16          THE COURT:  Okay.  Thank you.

17          Mr. Nguyen?

18          MR. NGUYEN:  Ha Nguyen here, about five minutes.

19          THE COURT:  Okay.  Thank you.

20          MR. MCDONALD:  Your Honor, Tim McDonald on behalf of

21    the Commonwealth.

22          15-20 minutes probably about, Your Honor.  We'll try

23    and keep it to that frame.

24          THE COURT:  Okay.

25          MR. MCDONALD:  Thank you.

1          THE COURT:  Mr. Keach?

2          MR. KEACH:  Yes, Your Honor.  Robert Keach for the

3     Deferred Comp Claimants.

4          I would estimate the same, 15-20 minutes probably in

5     opening.

6          THE COURT:  Okay.  Thank you.

7          And there may be -- there's a 914 number.  Is there

8     anyone on the line?

9          MR. DAVIS:  Your Honor, Michael Davis, I need two or

10    three minutes.  That's all.

11         THE COURT:  Thank you.

12         A 310 number?

13         MR. MCNEILY:  Good morning.  Your Honor, a couple of

14    minutes maximum for me.  Thank you, Your Honor.

15         THE COURT:  Okay.  Can you just state your name for

16    the Record, just so I can have it here?

17         MR. MCNEILY:  For the Record, Edward McNeily from

18    HoganLovells, counsel for Health Care Systems of America.

19         Two minutes and I've used up 10 seconds of that now.

20         Thank you, Your Honor.

21         THE COURT:  Thank you.

22         Okay.  A 215 number?

23       (No audible response.)

24         THE COURT:  A 215 number?

25         MR. BRESSLER:  I'm sorry.  I was on mute.

1              Gary Bressler for -- at most I would expect just one

2       minute.  Gary Bressler for Hartford.

3              THE COURT:  Thank you.

4              So if we start factoring in -- let's just say we're

5       probably going to 2:15 if we come back at 1:00.  Another hour,

6       hour and 15 minutes of opening, do housekeeping, start with

7       Cross.  We'll have to kind of figure out how late we're going

8       to go today and whether this spills into the morning.

9              Depends on how late we go and depends on what I hear

10      for me to kind of gather thoughts and rule effectively on

11      everything.

12             I know that today is a looming deadline on that, but

13      just start -- I want everyone while you're eating to think

14      about kind of what the afternoon looks like.  I just don't

15      know how long Cross is going to go and I don't know how long

16      closings are going to be.  I promise you I'm going to limit

17      everyone to 20 minutes max on closing, but that's still going

18      to run.  I would have two hours, or it could be an hour and a

19      half of closing.

20             That's why I'm giving you as much time as you need

21      on openings.  Just start thinking about the evening looks like

22      and parties can start to think about it.

23             If we can get done today, great.  But if it can

24      spill into the morning, let's think about that, as well.  I

25      don't know who is going to ask Mr. Castellano questions and

1    how long that's going to take, and we'll just see where that

2    goes.

3          So I will say less.  I'm going to hang up the line

4    now.  We'll come back on at 1:00.  I'm going to stop talking

5    so everyone can take the full 55 minutes and get some food.

6          Thank you.

7          THE COURTROOM DEPUTY:  All rise.

8      (Recess taken from 12:04 p.m. to 1:04 p.m.)

9          THE COURTROOM DEPUTY:  All rise.

10          THE COURT:  All right.  Good afternoon.  This is

11    Judge Lopez.  We are back on the Record in Steward.  I'm

12    turning on my camera.

13          And all right.  I'm back on.  Good afternoon.

14          MR. COHEN:  Good afternoon, Your Honor.  For the

15    Record, David Cohen from Weil Gotshal for the Debtors.  We

16    just want to provide Your Honor a little guidance based on

17    discussions with the objectors.

18          So they will proceed as planned with the

19    continuation of opening remarks.

20          THE COURT:  Okay.

21          MR. COHEN:  It's hour, hour 15, and then in terms of

22    the witnesses, the objectors indicated they expect to need

23    about 30 minutes with Mr. Castellano for Cross, 15 minutes

24    with Mr. Transier.

25          So I think if we add a little more time for

72

1    Redirect, probably an hour in total for the evidence, and then

2    we can proceed to closings.

3                   THE COURT:  Okay.

4                   MR. COHEN:  Hopefully those will be shorter given

5    the lengthy openings.

6                   THE COURT:  Not a problem.  Okay.  Thank you.

7                   MS. JACOBSEN:  Good afternoon, Your Honor.

8                   THE COURT:  Good afternoon.

9                   MS. JACOBSEN:  May I proceed?

10                  THE COURT:  Yes, please.

11                  MS. JACOBSEN:  Thank you.

12                  OPENING STATEMENTS ON BEHALF OF TRACO

13                  BY MS. JACOBSEN:  As Your Honor knows, we represent

14   TRACO International Group.  There's been a lot of attempts to

15   cast aspersion on TRACO and its motives for filing the

16   objection, so I would like to begin there.  At the outset,

17   TRACO is in this bankruptcy proceeding attempting to secure

18   funds for the medical malpractice claimants and the doctor

19   insureds that TRACO represents.

20                  That is the reason and rationale for our being here.

21   We do not have an axe to grind and that is not why we filed

22   the objections here.  And in any event, I'd like to point out

23   that that claim is easily dispensed with.

24                  The Debtors on the eve of this hearing filed

25   numerous material revisions to the settlement order, the

1    Disclosure Statement and Plan to address many of the issues
2    and objections that TRACO actually raised.
3           But what -- all of their revisions don't resolve all
4    of TRACO's objections.  And so with that, I will continue to
5    the substance of our objection.
6           It is clear that the Settlement Agreement is a
7    *sub rosa* plan that purports to specify the terms of a
8    potential reorganization or liquidation Plan.  It takes effect
9    on the same day as the Plan confirmation hearing and is not
10   contingent on confirmation.
11          It bypasses the safeguards of the confirmation
12   process, and key terms of the Settlement Agreement circumvent
13   the scrutiny that would otherwise apply to confirmation.
14   First, it provides for the transfer of substantially all of
15   the Debtors' assets before confirmation and dictates the
16   manner of their distribution.
17          And contrary to what the Debtors have argued, the
18   Settlement Agreement is not a building block of the Plan.  It
19   is the building.  It usurps the Plan process and its
20   safeguards.
21          In fact, Mr. Castellano testified at his deposition
22   just yesterday at page 50, that the agreement is quote, "The
23   basis of the Plan that we're proposing."  It's the basis of
24   the Plan.
25          And it circumvents certain important rights that

1    interested parties would have.  It circumvents the right to

2    vote.  That is the right that's being denied.  And I would

3    note that the *Continental* case cited by the Debtors would

4    require the Court to implement protective measures here.

5         And those protective measures would be to combine

6    the consideration of the Settlement Agreement with the Plan,

7    its process.  And that is what the issue is, the primary issue

8    here, process.

9         The Settlement Agreement also dictates the

10   governance structure post confirmation, and it includes

11   releases and an injunction that would take effect on the trust

12   establishment date and would bind all creditors, whether or

13   not the Plan is actually confirmed.

14        And if the current Plan fails, all of the assets

15   would already have been transferred.  And this is as a result

16   of the dates that have been employed, meaning the exact date

17   that the Settlement Agreement is effective is the same date

18   that we are all together in Court, before Your Honor, on the

19   confirmation here.

20        Now even more, the revised order submitted by the

21   Debtors goes further.  It purports to insulate the settlement

22   from appeal.  In paragraph 23, of the order, it provides that

23   if there is a reversal or modification on appeal of the

24   settlement order, that that would not impact the validity of

25   the transfer unless there is a stay during appeal.

75

1              This is wholly improper and usurps the role of the

2       Article Three courts in overseeing these bankruptcy

3       proceedings.  It just takes it out of their hands.

4              Getting into some additional specifics on the

5       releases, the releases are over broad and include parties well

6       beyond the Debtors and the FILO Lenders including the members

7       of the Transformation Committee, the CRO, the Plan

8       administrator and the Litigation Trustee.

9              Why now?  Why do those other parties need releases

10      as part of the Settlement Agreement?  Those releases should be

11      considered in the context of a Plan and the confirmation

12      process.  There's no need for those other parties to be

13      released now.

14             And that again is a process and timing point.  And

15      there's no apparent benefit to the estate from implementing

16      these broad releases on this day versus consideration later on

17      in connection with the Plan process.

18             And the releases are also over broad in that not

19      only with respect to who gets released, but they release

20      conduct well beyond the issues involved in the FILO

21      settlement.

22             They purport to include all actions during the

23      bankruptcy proceeding including, for example, agreeing to

24      stipulate to lift the stay in medical malpractice cases that

25      we've been before Your Honor on, and even pre-bankruptcy

1    conduct.

2            And that's particularly problematic as to the

3    Debtors and Transformation Committee's actions in connection

4    with the misuse of assets of TRACO, which is a regulated

5    entity in Panama.

6            Likewise, it's inappropriate and generally unusual

7    to release lenders before confirmation particularly in the

8    context of a potential disgorgement scenario if, in fact, the

9    estate is found to be administratively insolvent.

10           TRACO is not arguing against the releases for self-

11   serving purposes as the Debtors and others have contended.  We

12   are arguing process and consideration.  And these releases

13   should be considered in conjunction with a Plan process and

14   not divorced from it.

15           Which brings me to the topic of administrative

16   insolvency.  The settlement exposes serious issues regarding

17   the Debtors' administrative insolvency.  We have raised these

18   concerns before, that the Debtors have been using non-estate

19   assets to fund their professional fees and other expenses.

20           But we heard today that the administrative claims

21   are somewhere around 86 million.  That total seems to be

22   revised pretty frequently over the course of the last, I don't

23   know, month or so.

24           But what we heard today is that that $86 million

25   cannot be paid now, was not paid in the ordinary course of

1    this bankruptcy proceeding, and now it appears those sums may

2    not be paid until sometime in 2027.  That shows administrative

3    insolvency.

4          And should this Settlement Agreement be permitted to

5    move forward, there's no guarantee that it will pass muster

6    during the vote.  And if the Plan doesn't succeed, this

7    settlement will have striped the Debtors of all of the assets

8    to pay creditors because it's untethered from confirmation.

9          The settlement gives rise to another 125 million in

10   additional debt, as well as a percentage of liquidation

11   proceeds that gets paid before administrative claims, in

12   exchange for an aspirational recovery of some $2 billion,

13   which apart from some of the points that -- in their Power

14   Point earlier where they would give estimates of the claims

15   themselves, they won't give any notion of what is the

16   reasonable expectation of recovery.

17         So no one knows that, and during depositions, they

18   refused to testify as to reasonable likelihood of success.

19   What we do know is that while the administrative claims won't

20   be paid until maybe 2027, what we do know is that the

21   professionals will continue to be paid in full.

22         And there's no justification to treat professionals

23   in a wildly disparate way from other administrative claims.

24   And here, during the course of this bankruptcy proceeding,

25   they obviously have been given different treatment because

1    they've been paid in full.  And we currently have $86 million

2    worth of administrative claims that have not been paid.

3           Your Honor, TRACO respectfully requests that the

4    Debtors motion to approve the FILO Settlement Agreement be

5    denied in all respects.

6           And again, we've raised some substantive points with

7    this, but there -- it is a *sub rosa* plan, and really the

8    Settlement Agreement, which is the Plan itself, should be

9    heard at the same time as the Plan.

10          It should not be divorced from the Plan.  It should

11   not become effective before the Plan.  It is the Plan, and

12   that's the way it should be analyzed.

13          If Your Honor, if you don't have any questions on

14   that portion, I'll move onto this --

15          THE COURT:  Okay.  No questions.  Thank you.

16          MS. JACOBSEN:  Okay.  So at the outset, I would

17   point out that there's not -- it's not necessary to actually

18   look at the Plan disclosures in a scenario where the Plan

19   itself is not confirmable.

20          And TRACO today has joined in the conversion motions

21   that have been filed by other interested parties herein.  But

22   leaving that aside, we have objected to the combined hearing.

23          The complexity of the case and issues demands that

24   creditors have sufficient information before voting on a Plan.

25   And the combined hearing undermines this result.  And I will

1    say that with breathtaking speed, there have been numerous

2    revisions to both the disclosures and the Plan including as

3    late as this morning, that it is not possible to digest all of

4    what this Court is being asked to approve.

5          And while the revisions appear to attempt to address

6    many of the points that have been raised by objectors,

7    including TRACO's, there are -- it's impossible -- I mean, we

8    have not had an opportunity to sit down and determine what

9    this Plan and Disclosure Statement looks like due to the late

10   filings.

11         Originally, TRACO had objected.  One of the

12   objections was that the Debtors had not supplied a medical

13   liability claims procedure, and we objected to timing elements

14   related to that.

15         They did file a medical liability claims procedures.

16   I believe it was just yesterday, which we have reviewed.  And

17   I will say that it is confusing as to how or whether it does

18   at all, how it deals with claims versus affiliated doctors of

19   the Debtors, and more clarity is required regarding the

20   disclosure.

21         The Plan itself contemplates the release of

22   affiliated doctors on an opt-out basis.  Now the claims

23   procedures appear to distinguish between medical liability

24   claims and Debtor medical liability claims, and it's really

25   unclear how those affiliated doctors, their claims fit into

1     this.

2              And by affiliated doctors, let me try to clarify.

3     There are claims against the hospitals and those are Debtors

4     in this proceeding.  There are claims against the hospitals

5     and doctors who have administered health care to claimants who

6     claim that they have suffered from medical malpractice.

7              And then there are claims that are simply against

8     the doctors themselves.  These claims against the doctors are

9     the most problematic because the doctors are not Debtors in

10    these cases, and frankly some of the claimants are going after

11    the doctor's personal assets.

12             I learned today that some of the doctors have filed

13    for personal bankruptcy.  This is all very disturbing, and

14    there needs to be clarity on how those doctors get treated and

15    supported in this Plan.

16             And as I said before, you know, that's why TRACO is

17    here, to see to it that there is a mechanism to protect these

18    doctors and the medical malpractice claimants.  And if I can't

19    look at this Disclosure Statement and understand who's in,

20    who's out, what's covered, what's not, who has to go through

21    this procedure, who doesn't have to go through a procedure, I

22    think that's a problem.

23             Moving on, there's also -- we had raised concerns

24    about how the Debtors, you know, decide to permit certain

25    people to vote, certain parties to vote.  And the proposal is

81

1    that if the Debtors file an objection to a claim before

2    June 17th, the claim is temporarily disallowed for voting

3    purposes except as ordered by the Court.

4          And then the burden shifts to the creditors to

5    defend their claims in order to vote and risks, you know, that

6    they will be disenfranchised.  So basically if the Debtors

7    provide their objection by June 17, the affected claimants

8    will basically have to file a motion for relief within one

9    week, by June 24th, and hopefully obtain Court Order in time

10    in order to vote by July 1.

11          You know, here we believe that the Debtors should

12    have to move to disallow claims and have those motions granted

13    before creditors are deprived of the right to vote.

14          I would also point out that various insurers have

15    raised issues which dovetail with issues that TRACO has.  For

16    example, Chubb, in Document Number 4927, raises the failure of

17    the Plan to address Steward's obligations to defend post-

18    confirmation, or pay within their self-insured retentions.

19          Humana, at Document 4905, raised the point that they

20    wanted to insure that if the litigation trust brought

21    proceedings against it, that it should have all available

22    defenses available to it including set off and recoupment.

23          I understand that the Debtors may have addressed

24    those objections vis-à-vis those particular insurers, but

25    those same protection should be afforded to all parties who

82

1    are subject to future litigation, that is, available defenses

2    including set off and recoupment.

3              There are also, of course, releases set forth in the

4    Disclosure Statement, the Plan, but many of those would have

5    already been released in the Settlement Agreement.  It's the

6    same cast of characters which is why, in our view, they should

7    all be considered at the same time during the Plan

8    confirmation process.

9              I also want to point out, and this may seem to be a

10   bit of a digression, but it goes to whether the Plan is

11   confirmable and the best interest test.  The Debtors, in the

12   Debtors' slide, the Debtors say the Debtors will demonstrate

13   in the liquidation analysis that creditors will receive no

14   worse treatment under the Chapter 11 Plan than in the

15   Chapter 7 liquidation.

16             But what they didn't tell Your Honor is that the

17   liquidation analysis that they did, in fact, perform assumed

18   that the Settlement Agreement is ordered by the Court.  They

19   did not do an analysis without the assumption of the

20   Settlement Agreement having been approved.  And I think that's

21   an important point for Your Honor as well.

22             So in closing in my opening, which may be my closing

23   as well, TRACO asks that the Court deny approval of the

24   Debtors' motion, deny conditional approval of the Disclosure

25   Statement, require the Debtors to further revise the

1    Disclosure Statement to include, for example, more information

2    about that medical liability claim procedure to make it clear

3    as to who is in and who is out of that procedure, and schedule

4    a separate hearing for the approval of the Disclosure

5    Statement and confirmation of the Plan.

6              Thank you.

7              THE COURT:  Thank you.

8              Whenever you're ready, Counsel.

9         OPENING STATEMENTS ON BEHALF OF THE COMMONWEALTH OF

10       MASSACHUSETTS, THE EXECUTIVE OFFICE OF HEALTH AND HUMAN

11          SERVICES AND THE OFFICE OF THE ATTORNEY GENERAL

12             MR. MCDONALD:  Okay.  Thank you, Your Honor.

13             THE COURT:  If you can just state your name for the

14   Record, just so we have a good clean record.

15             MR. MCDONALD:  Of course, Your Honor.  Good

16   afternoon, Your Honor, Hugh McDonald, with Pillsbury Winthrop

17   Shaw Pittman.  I'm here on behalf of the Commonwealth of

18   Massachusetts, the Executive Office of Health and Human

19   Services, and the Office of the Attorney General.

20             Your Honor, we have been here since day one.  We

21   started off these cases trying to make sure that patient

22   health and safety was adhered to and guided through these

23   cases and supported a sale process that ultimately resulted in

24   the transition of six of the eight hospitals in Massachusetts.

25             And unfortunately, as Your Honor knows, two of those

1      hospitals, two of the hospitals there had to close.  I know

2      that hit Your Honor pretty hard.  It hit all of us pretty hard

3      to see hospitals close.

4              Your Honor, I want to clarify a few points before I

5      really get into the heart of my presentation.  First of all,

6      Massachusetts is being characterized as a litigation target.

7      Your Honor, we came to this Court with a motion to get Court

8      authorization to the extent needed to begin recoupment or set

9      off of claims.

10             We're holding funds.  We wanted to get the blessing

11     of the Court before we did anything with those funds.  In

12     response to that, instead objecting to that motion, the estate

13     commenced an advisory proceeding.

14             We obviously have a disagreement over whether or not

15     the estate is entitled to those funds or not.  That's the

16     extent of any quote, "litigation."  We're not seeking to get

17     any litigation advantage by objecting to these proceedings.

18             We're here today, Your Honor, as both a creditor as

19     that has an administrative expense creditor, but also we have

20     priority in unsecured claims.  The Commonwealth has asserted

21     administrative claims in excess of $24 million, priority

22     claims in excess of $32 million and unsecured claims in excess

23     of $12 million.

24             Your Honor, we started out these cases focusing on

25     patient health and safety, and now we're coming to the end of

1    the case where we're trying to do what I'm calling, quote,

2    "accountability," which is really we're trying to true up for

3    the money that was lost by the Commonwealth in its efforts to

4    preserve the operations of these hospitals.

5          And Your Honor, our issue today really is with

6    process and where these cases are ending.  And I'd like to

7    take Your Honor back before we even got really involved with

8    the bankruptcy case.

9          Massachusetts support for Steward began well before

10    these cases were commenced.  Within a month of their closing

11    on their ABL FILO loan, Steward was in the offices of the

12    Executive Office of Health and Human Services seeking funds in

13    order to make payroll.

14          This is in September.  They would visit those

15    offices two more times before the end of the year seeking

16    further funding to keep their operations going.  And each

17    time, the Commonwealth responded and supported the continued

18    operations.

19          And even when the Commonwealth had the ability to

20    continue to recoup those funds, they recouped only some of

21    them because it saw the financial crisis that was unfolding

22    with Steward, and wanted to make sure it had enough financial

23    stability going into bankruptcy.

24          As you know, Your Honor, post-petition, because the

25    FILO Lenders would not fund past the end of July, the

1    Commonwealth of Massachusetts was required to step up not

2    once, but twice, funding almost $72 million into these cases

3    in the form of both supplemental payments and advance

4    payments, seeking to keep these hospitals running so that they

5    could safely transition to new operators, which as I said at

6    the outset, we were successful with six of them.

7        While Steward has now largely gotten rid of most of

8    their core operations, we find ourselves coming to the end of

9    the case.  As Your Honor knows, the Chapter 11 case normally

10   ends with a Plan, or in rare cases, a dismissal, a Plan of

11   liquidation, a Plan of Reorganization.

12       What we're facing here today, Your Honor, is in fact

13   a Plan, a Plan of liquidation in the form of this settlement.

14   And that is why we have filed an objection to this.  We are --

15   the Court today is being asked to approve the following

16   things, Your Honor.

17       First, you're being asked to transfer, or permit the

18   transfer of substantially all of Steward's remaining assets

19   into a trust, something that normally won't occur pursuant to

20   a Plan.

21       You're being authorized to approve the formation of

22   that trust, and the trust documents themselves.  You're being

23   asked to approve the issuance of beneficial interests in this

24   trust which will dictate recoveries at the end of the

25   litigations that are being prosecuted by the trust.

1          You're being asked to approve the procedures for the

2     administration and the governance of this trust, something

3     normally not done through a Plan process.  You're also being

4     asked to approve the consent rights that certain parties-in-

5     interest would have, primarily the FILO, given where they are

6     with respect to repayment of their claim, and then to some

7     extent the Class B which is really the unsecured interests,

8     and that's their only voice into this process.

9          You're being asked to approve the funding of this

10    trust, which I would say is the equivalent to an exit

11    financing, and I'll get into the litigation financing issue in

12    a minute.

13         And then you're also being asked to approve the

14    treatment of claims, how much the FILO can recover, what

15    premium they can get and what amounts would be then left to

16    pay other creditors according to the absolute priority rule.

17         And then finally, as counsel for TRACO noted, you're

18    being asked to grant releases, or approve the granting of

19    releases effective now of numerous parties including the FILO

20    Lenders, Steward, the Creditors Committee, and officers and

21    directors including the members of the Transformation

22    Committee.

23         Your Honor, all of this happens regardless of

24    whether a Plan is confirmed, or these cases are converted to

25    Chapter 7.  Let me repeat that.  The provisions of this

1    agreement are in force today, and if there is never a

2    confirmation hearing, these will govern the rights of the

3    respective parties on a go-forward basis.

4         If these cases are converted to Chapter 7, the

5    Chapter 7 Trustee would take over as the representative of the

6    Class B interests, effectively entitled to receive whatever

7    recoveries would be attributable to the Class B interests

8    themselves.

9         They specifically provide for this in their -- in

10   the settlement.  I'm sure you saw that.  I'm sure it piqued

11   your interest as well, as everyone looking at it did as well.

12   Your Honor, this Plan as a Plan really isn't confirmable.

13        As you've heard time and time again, the provision

14   for payment of administrative expense creditors is somewhere

15   down the line into 2027, when there may or may not be an

16   effective date.

17        So we're staring at possibly two years before an

18   administrative expense creditor could get a recovery unless

19   that administrative expense creditor opts into this

20   $12.5 million fund to get a proportional share of that fund

21   with the balance of any recovery, even though now they've

22   voluntarily reduced the amount of their claim.

23        That recovery waits until there is this effective

24   date, this illusory effective date.  The effective date, as I

25   told you, only comes about when there is enough money so what

1    is premised there, what's the premise of that?

2              There has to be recoveries on all these litigations.

3    You've heard counsel in the presentation say these are very

4    complex litigations.  Some of them are still being

5    investigated.

6              For example, the *Norwood* claim which has been

7    discussed, I think, at various hearings, Your Honor, is not

8    set to go to trial until the beginning of next year.  And just

9    yesterday, the insurers in that case filed an emergency motion

10   seeking to push out that trial date until the middle of the

11   year, past April, due to the discovery that is ongoing in that

12   case.

13             That case, Your Honor, is already three years old

14   from appeals.  And as Your Honor knows, and I'm sure from

15   practice and sitting on the bench, it could take a long time

16   to get to a conclusion of a large complex litigation.

17             All the while, Your Honor, our issue is the FILO

18   claim continues to grow.  That growth, coupled with the amount

19   of money that's being funded, gets larger and larger and

20   larger.

21             The *Norwood* claim grows as well exponentially if

22   it's not paid by the middle of next year.  The amount you have

23   to clear, the hurdle you have to clear to get to a meaningful

24   distribution to administrative creditors gets larger every

25   month in this case.

1          So if this case goes on for a couple years, and in

2     our objection, Your Honor, we tried to just model based upon

3     the inputs that we had, what potential recoveries would look

4     like, but there is no model whatsoever in this Disclosure

5     Statement.  There's no model in the settlement.  There's no

6     way a creditor could ever make an informed decision either to

7     support this settlement or the Plan that it really is, or any

8     information in the Disclosure Statement which would allow a

9     creditor to look at it and say, okay, I'm going to get paid X

10    amount by this date.

11         There's just no information.  It's basically, "Trust

12    us.  We know this is a large complex litigations, but we're

13    going to get you a recovery."  That's not really a Plan,

14    that's a hope.

15         The other part that we have a problem with, Your

16    Honor, is -- and Mr. Castellano discussed this at his

17    deposition yesterday, is the fact that other administrative

18    creditors, the preferred administrative creditors, all of the

19    estate retained professionals are going to get paid ultimately

20    in full at his estimation by the end of the year, while all

21    other administrative creditors, the not preferred

22    administrative creditors have to wait and hope that there is

23    an effective date in 2027, if ever.

24         The bottom line, Your Honor, this is basically what

25    I would call a structured foreclosure.  The FILO Lenders

1    clearly do not want to foreclose on these assets.  They don't

2    want to seek stay relief.  They would like to have this Court

3    bless an estate representative to be the plaintiff on the

4    other side of the V, not five private equity funds that are

5    the FILO Lenders, suing anybody because if they foreclosed,

6    they would have to prosecute these claims.

7              And it would be those five private equity firms

8    versus (indiscernible), or whoever.

9              THE COURT:  Couldn't they sell it?

10             MR. MCDONALD:  They could sell the claims as well,

11   Your Honor.

12             THE COURT:  So what would anyone get under that

13   scenario including your clients?

14             MR. MCDONALD:  Well, Your Honor, first, they'd have

15   to come to the Court to get stay of relief.  And that --

16             THE COURT:  Let me tell you.  When a

17   $200-plus million DIP that expires today --

18             MR. MCDONALD:  Yes.

19             THE COURT:  -- let's just assume stay of relief is

20   really easy at this point, after it's been extended for six

21   months.  I'm just telling everyone -- and that doesn't mean

22   that I should approve it.

23             But to think that I'm going to hold some FILO Lender

24   here for another six months after they've extended for six

25   months and this stuff is due, at some point this case needs to

1    end.

2            I think the merits of the settlement are on there,

3    but like let's be really clear about where we are.  And now I

4    got it, the FILO Lenders are going to have to ask for stay of

5    relief, but to be honest with you, that's a low hurdle when

6    you've got 200 million and these facts.

7            MR. MCDONALD:  Your Honor, there's just --

8            THE COURT:  I'm just telling you, just telling

9    everyone now.  And I'm not saying -- and that may be where we

10   end up today, but let's all be really clear about what -- and

11   I'm saying this because I want everybody to kind of tell me

12   because that's what I'm faced with, right?

13           We're faced with real stuff that's going to happen

14   today, one way or the other.  Do I force them to blink, or do

15   I or do we -- or where do we go?  I don't want to act -- I got

16   it.  This settlement has got issues that everybody's raising,

17   and we're going to have go through them.

18           But let's also be serious about -- I'm not saying

19   you're not.  I'm just telling everyone as they're arguing it

20   one way or the other, if I make a decision today, something's

21   going to happen tomorrow, either there's going to be a

22   settlement or the FILO Lenders are going to ask for a stay

23   relief.

24           MR. MCDONALD:  And Your Honor, I think if they ask

25   for stay relief, they're going to have to demonstrate at least

1    the fact that they're not adequately protected right now.  And

2    so --

3              THE COURT:  But all the arguments TRACO made, I

4    think they -- I think TRACO just made the case.

5              MR. MCDONALD:  Well, Your Honor, it's an interesting

6    dichotomy here.  On the one hand, in the Disclosure Statement

7    and the statements that are being made by Steward, they're

8    saying there's going to be sufficient recoveries, I mean,

9    value in these litigations, enough to clear FILO, lit

10   financing and all the premiums.

11             On the other hand, the FILO Lenders are saying they

12   are not adequately protected, so therefore the value of these

13   litigations is less than the value of their lien.  I don't

14   know who's right or wrong, but we're getting it from both

15   sides.

16             And the only people that are getting whipsawed here

17   are the creditors in the middle because they are either

18   adequately protected, or they're not.  And if they are

19   adequately protected and these cases convert to 7, I don't

20   think Your Honor's going to allow them to just take their

21   marbles and go home, and if some of those marbles turn out to

22   be diamonds.

23             That's just how it's going to happen.  They're going

24   to have to be accountable to the estate to the extent they

25   foreclose on any of that collateral with a Chapter 7 Trustee

1      in place.

2              But our point is, we think we're probably better off

3      with a Chapter 7 Trustee because there's at least some

4      certainty as to what's going to happen here.  Here, there's no

5      certainty whatsoever as to whether or not there's going to be

6      any realization on any of these litigations.

7              But further, Your Honor, the amount of committed

8      financing is 125 million with a so-called $25 million

9      accordion available.

10             THE COURT:  Right.

11             MR. MCDONALD:  If you look down the list of these

12     litigations, Your Honor, the professional fees in this case

13     are at 200 million.  I sorely doubt 125 million is sufficient

14     to take all of these cases to conclusion.

15             And there are no provisions in here as to what

16     happens after the FILO get paid, take their premiums, take

17     their interest and go home, what's left for the B holders who

18     now have the great ability to just simply replace the Trustee

19     they appointed.  But that's it.

20             There's nothing there to make sure that there is, in

21     fact, going to be a recovery.  There's no assurance that

22     ultimately they will continue to fund, because they don't have

23     to, and why would they if they got paid?

24             They also take -- one second, Your Honor.

25             Yeah, this certainty, the lack of certainty, Your

1    Honor, is really a problem here.  And the fact that the FILO

2    will not commit to continue to fund beyond what they've

3    already put on the table, this leaves a great deal of doubt.

4         And that it really calls into question whether or

5    not any, quote, "Plan" could ever actually be feasible.  They

6    also take issue with our position that they're getting an

7    increased return, and they tried to view themselves as a third

8    party litigation funder coming in.

9         They're funding litigation to get a recovery on

10   their collateral.  If they foreclose and pay legal fees to get

11   a recovery on that collateral, they're not getting reduced

12   return on that.

13        But now they want to get an additional return,

14   viewing themselves as a third party litigation funder, which

15   they are not.  They have complete interest in the outcome, and

16   they're only protecting their assets, but at the expense of

17   other creditors.

18        Finally, Your Honor, there's two issues we had with

19   the Disclosure Statement.  I think one of those was addressed

20   with respect to the treatment of the administrative creditors

21   with the Q&A.

22        THE COURT:  Now --

23        MR. MCDONALD:  That was appreciated.  I think it

24   does shed light on the fact that there are issues there with

25   respect to potential recoveries.  The other, though, Your

1    Honor, the liquidation allowances that the Debtor filed, is

2    flawed.

3              It is premised on the settlement actually going

4    through.  It is not a true liquidation analysis.  It's viewing

5    it as if the settlement's been approved, and this is what

6    would happen versus a true liquidation analysis.

7              Your Honor, it's hard to be here at the end of this

8    case.  We've worked really, really hard to try and get the

9    right result for people, and it's disturbing that we're ending

10   on this note because we would like to see everyone treated

11   fairly and equally during the course of these proceedings.

12             We've been straight up and sincere with this Court,

13   and our desire to see that outcome.  I think that I echo the

14   sentiments of Ms. Jacobsen that this should be a combined

15   hearing on the Disclosure Statement and Plan/Settlement.

16             The settlement needs to be part of the Plan process.

17   We will still have objections, but it should be part of a Plan

18   process.  It should not be the Plan.  And for those reasons,

19   Your Honor, I don't think the Court can approve the settlement

20   at this time.

21             THE COURT:  Thank you.

22             MR. MCDONALD:  Thank you, Your Honor.

23             THE COURT:  Mr. Nguyen?

24             MR. NGUYEN:  Yes, Your Honor.  Thank you.

25             OPENING STATEMENTS ON BEHALF OF THE US TRUSTEE

1           BY MR. NGUYEN:  Your Honor, I will be brief.  As --

2           THE COURT:  I know.  No one needs to be brief.  I

3    want you to take your time.

4           MR. NGUYEN:  Understood, Your Honor.  As of

5    yesterday, the U.S. Trustee did file an objection to the

6    release exculpation and injunction provisions where as you

7    noted were very persistent in filing these objections.

8           I call those the post *Purdue* objections.  And I

9    agree with what Mr. Carlson and Mr. Cohen -- we can carry

10   those arguments to confirmation.  I won't belabor them today

11   and we'll handle them in the ordinary course, how we've been

12   handling many of these objections.

13          However, an issue that I did want, and I think other

14   parties have highlighted for the Court, is the administrative

15   insolvency issues in this case.  For Debtors to confirm a Plan

16   in this Court, they would need to adhere to the text of the

17   Bankruptcy Code.

18          I know it's important to the Court, and just in the

19   practice, in general, to pay attention to the text.  1129 is

20   really clear.  The Code doesn't say, yeah, we'll confirm a

21   Plan if the Debtors pay 90 percent of the admin claim,

22   95 percent of the admin claim, or 97 percent.  I don't know

23   what the number is, but the Code is very clear.  You have to

24   pay 100 percent of the admin claimants on or before the

25   effective date.  You're required to pay them in full to get

1    the benefit of a confirmed Plan.

2         That's the bargain that's written in the Code, and

3    the protection that Congress give these claimants.  And I know

4    the motion to dismiss is not up today, but we've noted a lot

5    of issues with the administrative insolvency issue in our

6    pleading.

7         This is not really about adhering to priorities

8    of -- I mean, that's important, but I think it has

9    implications for many other cases especially hospital cases.

10   You know, vendors that come in here on the first day, agreeing

11   to continue providing services, providing, I don't know,

12   laundry services to a hospital, medicines to patients.

13        It's important.  We shouldn't stiff those people.

14   We shouldn't create mechanism to give them a 50 percent

15   haircut.  These are important players within the bankruptcy

16   process.  That's why Congress give them that admin priority.

17        The system won't work if we kind of bypass this

18   requirement and saying, okay, we'll pay them in full, but we

19   won't tell you when the effective date is.  We'll just kick

20   the can down the road.

21        I didn't get -- I've been processing -- I mean,

22   Mr. Cohen and Mr. Carlson have been very -- the line of

23   communication has been very open and they -- we've been trying

24   to work out these issues.

25        And I've been pressing them, when is the effective

1      date, and you don't know when the effective date is.

2      Creditors need to know when the effective date is.  I got the

3      answer when I came into Court.  It's in 2027.

4              And the problem with the effective date being down

5      the road so far is you kind of shift the litigation risks on

6      these administrative claimants.  The further that effective

7      date is, the more risk that these creditors won't be paid.

8              So that's a problem with it.  And there's case law

9      on, you know, effective date needs to be within a reasonable

10     amount of time.  So I think in terms of just -- I have a

11     problem with the consent program that they have in the Plan.

12             But I reserve my comments on the consent Plan if we

13     ever get to a confirmation hearing.  But I think it's

14     important for the Court today to focus on the administrative

15     insolvency issue as Your Honor hears the evidence, that you

16     hear the Cross, to get an answer to this question.

17             Can the Debtor satisfy their administrative expenses

18     by the effective date, and really hammer down to exactly when

19     the effective date is.  I think it's 2027.  Is that

20     sufficient, I don't know.

21             Administrative creditors would need to make a

22     business decision on this, and determine whether they want to

23     take that risk or not.  So Your Honor, if you don't have the

24     answer to -- they're basic questions within any bankruptcy

25     Plan that come before you.

1    You want to make sure that the administrative

2    creditors are paid.  I know, Your Honor, it's going to be a

3    tough decision for Your Honor today, whether to approve the

4    settlement, allow the Plan to go forward.

5    But you know, a lot of the times when faced with

6    hard decisions -- I think the Court does it all the time.

7    Let's just go back to the Bankruptcy Code and apply the text

8    as its written, and the chips will fall where they fall.

9    I know in a lot of cases before you, if a Debtor

10   comes with $100 million in unpaid administrative expenses that

11   haven't been paid in the ordinary course, I think Your Honor

12   would convert that case in a heartbeat.

13   This case is different, but at the same time, the

14   case being different is not a license to ignore the

15   requirements of the Bankruptcy Code.  I would say, Your Honor,

16   if you don't have the answer to these questions, I wouldn't

17   send this Plan out for solicitation.

18   It's almost 2:00 o'clock.  We're still on opening

19   statements.  The professional fees incurred in this case is

20   going to be expensive, and if you don't have that basic

21   question answered, we shouldn't go to confirmation.

22   Thank you, Your Honor.

23   THE COURT:  Thank you.

24   I know that there are a number of parties on the

25   line.  I think Mr. Keach will address the Court, and then I

1       will turn to parties on the phone line.  I appreciate

2       everyone's patience.

3              MR. KEACH:  Thank you, Your Honor.

4       OPENING STATEMENT ON BEHALF OF CERTAIN DEFERRED COMPENSATION

5                           PLAN PARTICIPANTS

6              BY MR. KEACH:  Robert Keach, for certain deferred

7       compensation Plan participants.  And I appreciate you're

8       hearing from us today on these critical issues, Your Honor.

9              There was a remarkable admission I think built into

10      the PowerPoint presentation by the Debtors.  And it's not how

11      proud the Debtors apparently are of appropriating the

12      retirement funds of doctors and nurses, so proud they

13      mentioned it three times and included it as a Plan milestone.

14             But the real remarkable thing about that

15      presentation is that they presented the settlement in the Plan

16      and Disclosure Statement as a unified whole, as one set of

17      circumstances to be presented to the Court because of the

18      complete synching between those two things.

19             And it's an admission that deserves to be

20      highlighted.  And contrary to the quip by Creditors Committee

21      counsel, you can in fact have a *sub rosa* plan when you

22      actually have a Plan, although I would admit I've always had

23      difficulty with the *sub rosa* part because people do this out

24      in the open and pretty blatantly.

25             I prefer *de facto* plan because it seems to make more

1    sense.  But you can have those two things together and you can

2    have them together when you're trying to get the settlement

3    approved in advance of confirmation, and have that settlement

4    go forward whether or not confirmation occurs or not.  That's

5    the fatal flaw in this process as it's being presented by the

6    parties.

7            In our papers, we cited the *Boy Scouts* decision and

8    some other decisions of the type.  And what that decision

9    makes clear is what saved the settlement in that case from

10   becoming a *de facto*, or *sub rosa* plan is that it was presented

11   at the same time as confirmation.

12           The settlement was put through the same process as

13   the confirmation of the Plan itself and was part of the vote.

14   It's telling here that the parties here are unwilling to allow

15   this settlement to be evaluated in that same fashion and as

16   part of confirmation.

17           But there's no real doubt that this settlement is a

18   *sub rosa*, or *de facto* plan.  With all respect to my very

19   distinguished colleagues, you don't spend an hour, and I think

20   an aggregate of about 50 pages saying why this is not a

21   *sub rosa* plan unless there's some merit to the argument that

22   it is.

23           And there clearly is here.  First and foremost,

24   Mr. Castellano testified at his deposition yesterday that this

25   settlement is the Plan.  But this settlement constitutes every

1    material component of the Plan of liquidation here.

2           There is no material component of the Plan that is

3    not dictated by this settlement.  The liquidation mechanism is

4    dictated by the settlement.  The liquidating trust structure

5    is dictated by the settlement.  The Liquidating Trustee is

6    dictated by the settlement.  The trust interest and their

7    priority is dictated by the settlement.  There's even a Plan

8    classification that is only in existence because of the

9    settlement, largely because they hope to create an impaired

10   accepting class.

11          There's a class called the retained FILO claims, a

12   $10 million unsecured claim or created unsecured claim that is

13   part of the Plan.  That class only exists because it's part of

14   a settlement.

15          The FILO Lenders agreed to carve out a $10 million

16   claim and put it in that position, and a subordinated position

17   below priority and administrative claims, but above all other

18   unsecured claims.

19          It fails as an impaired class because the Settlement

20   Agreement is what impairs it, not the Plan, just as the PBGC

21   class fails as an impaired class because the settlement

22   created the impairment and not the Plan.

23          And so the really only -- really the only impaired

24   class is the Unsecured Creditor class which gets the vote

25   here, Your Honor.  And I think understanding that complete and

1   utter structural flaw in the Plan is one of the reasons they

2   want this Settlement Agreement to be rock solid before there's

3   confirmation because I think the Debtors know and the FILO

4   Lenders know and the Committee knows that this Plan can't

5   possibly be confirmed.

6       But because every single component of the Plan is

7   from the settlement, you can't distinguish *Braniff*, you'd have

8   to defy it in order to approve this settlement.  You'd have to

9   ignore *Braniff* and *Ditech* (phonetic) and *Latham* (phonetic).

10      And those cases don't add up to a convenient

11  checklist of what is in or out of the settlement, although

12  this settlement checks every single *Braniff* box.  But the

13  point of those cases is that the settlement dictates material

14  components of the Plan in ways that allow those components to

15  escape the scrutiny of the confirmation process.

16      And that's what's happening here.  And again, they

17  could solve this.  They could agree that the settlement will

18  not be approved except as part of the confirmation process.

19  They could condition approval of the settlement on

20  confirmation of the Plan.  But they don't.  And I think that's

21  a glaring admission about the nature of these cases and where

22  they sit.

23      And by the way, Your Honor, I wasn't here other than

24  reading from afar when the parties were conducting this case

25  and doing the sale process and getting us to this point.  And

1    I do not intend, nor am I qualified to criticize the work of

2    either the Committee or the Debtors to get us to this point.

3    But also how they got us to this point is fundamentally

4    irrelevant.

5         What we're about is how this case ends in a way

6    that's fair to everybody, and not just fair to the

7    professionals who got us here, and not just fair to the FILO

8    Secured Party.

9         And I appreciate Your Honor's remarks about the FILO

10   Secured Parties rights, and I'll have some thoughts on that in

11   a second.  But this settlement, to be clear, because it is

12   binding whether or not there's confirmation, and every single

13   aspect of it goes forward whether or not there's confirmation,

14   violates the fundamental principal of *Braniff* and *Ditech* and

15   *Latham* and all similar cases.

16        It fundamentally eviscerates and renders

17   meaningless, completely meaningless the vote of creditors

18   because if creditors vote to reject this Plan, but this

19   settlement has been approved pre-confirmation, creditors wake

20   up the next morning to the same set of facts as if they had

21   accepted the Plan.

22        The same liquidator, the same trust, the same

23   transfers, all of the assets of the estate are gone, and in

24   the hands of a structure that was preordained by the

25   settlement.

1          Not a single thing changes.  This is very similar to
2     a regular election, Your Honor, where you say you can vote for
3     any candidate you want.  It's just that only Candidate A is
4     going to win.
5          You could say that doesn't affect the voter's right
6     to go to the polls and vote.  They got to go to the polls and
7     vote.  But you'd have a hard time saying that was a meaningful
8     vote.
9          And this process eviscerates creditor democracy.  It
10    doesn't enhance it.  And that's why it's a *sub rosa* plan.  The
11    Debtors and the Committee and the FILO Lenders make much in
12    the papers, and particularly in the Debtors' papers about how
13    the settlement doesn't affect third party rights, including my
14    clients' rights.
15         And Your Honor, let me be clear about why my clients
16    are here and it's not for the reasons that everybody has said.
17    But I'm not going to apologize for why we are here because
18    unlike all of the apparently well compensated, but altruistic
19    parties in the room who apparently just did charitable work
20    for the last year, we are in fact here to try to get our
21    clients more money, in one capacity or the other.
22         First and foremost, as Your Honor knows, we're
23    appealing the decision the Court rendered as my clients have
24    the right to do, and we are first and foremost about
25    protecting my clients' rights on appeal.

1        This settlement directly impacts those rights in

2    multiple ways.  First and foremost, Your Honor, the Debtors

3    and the FILO Lenders and the Committee try to talk out of both

4    sides of their mouth about what's happening here.

5        In the original Disclosure Statement, they very

6    cavalierly stated that the settlement and the Plan resulted in

7    a transfer of all of the assets of the Debtor into the trust.

8    Realizing that that triggered the first of the *Braniff*

9    factors, they subsequently said well, it's not really a

10   transfer, and we're really just putting them in a trust for

11   the benefit of everybody.  We're just disposing of them into

12   the trust.

13       But on the other hand, the settlement provides very

14   clearly, Your Honor, that they want to treat this transfer to

15   the trust as a sale, free and clear of liens, claims and

16   encumbrances as if this were a third party sale conducted

17   under Section 363.

18       Well, it's not a sale, but they want to treat it as

19   a sale.  But if it's a sale, it's certainly a transfer and it

20   certainly triggers *Braniff*.  But more importantly, think about

21   the things that are being transferred.

22       They're transferring insurance policies including

23   D&O insurance policies, and they're transferring the policy

24   rights the Debtors have free and clear of the claims and

25   interest of any other parties.

1       One of the claims my clients asserted in the

2  complaint, Your Honor, is a breach of fiduciary duty claim

3  against certain individuals who constituted the Plan Committee

4  for the deferred compensation Plans.

5       That's presented as surcharge complaint under ERISA

6  law which could mean damages could be awarded by way of

7  surcharge.  That claim would trigger claims against D&O

8  policies by the parties on the Plan Committee.

9       Some of those parties are listed as released parties

10 by the Debtors.  The Debtors won't concede that those claims

11 are direct claims as opposed to derivative claims, and given

12 that lack of concession, Your Honor, we have to suffer the

13 risk that this settlement transfers those policies in a way

14 that none of the defendants we're suing can get to them.

15      And therefore, we can't get to them.  There's no

16 carve out for our rights in that respect.

17      The other thing that this settlement would do, Your

18 Honor, is insulate the FILO Secured Parties from any attempt

19 by my clients to claw back the funds that were --

20 Mr. Castellano admits were transferred from the collection of

21 Rabbi Trust assets to the FILO Lenders, more than 30 million.

22      And it appears also to bar the recovery of another

23 15 or 20 million that was transferred to the professionals.

24 It does so essentially, Your Honor, by again insulating the

25 FILOs from anything that results from the Plan administration

1        in our cases.

2                Now they claim they're not intending to do that, but

3        there's no alteration in the language of the releases, or the

4        transfer language, or the free and clear language that gets us

5        to that point.

6                And so we have to operate on the assumption that

7        those rights would be lost.  One of the more interesting

8        examples of that, and I won't bog the Court down with details,

9        is that you will recall a witness in our proceedings named

10       Anne Marie Driscoll who was an HR officer in the Debtor, and

11       one of the people responsible for administering the Plan.

12               Anne Marie Driscoll resigned, as Your Honor knows,

13       from testimony in 2019.  She hasn't been with Steward since

14       2019.  She is a released party under the Settlement Agreement.

15       She's not being released because of what she did for the

16       Debtors in the lead up to the bankruptcy or during the

17       bankruptcy.  She's only being released because she's a

18       defendant in our complaint, and therefore a conduit, a

19       potential conduit to the insurance proceeds.  There's no other

20       reason why she would be included in the release.

21               And when I asked Mr. Transier yesterday why

22       Ms. Driscoll, among others, was on the list of released

23       parties, his answer was that he had no idea.

24               The reason why the parties are pressing the *sub rosa*

25       plan argument as forcefully as they are, other than the fact

1   that it seems pretty obviously a *sub rosa* plan I think, is

2   that the fact that this settlement will go into effect even if

3   there's no confirmation is even more critical here because

4   confirmation is so unlikely.

5          Cause for conversion of these cases to Chapter 7

6   cases has been conceded in the proposed Disclosure Statement

7   and in the presentations by the Debtors.  And I'll get to that

8   in a second.

9          But they absolutely have admitted that cause to

10  convert exists.  But more importantly, and they brushed these

11  aside, the facial non-confirmability issues here have not been

12  dealt with, and they haven't been dealt with by any of the

13  amendments that have happened over the last couple of days.

14         And by the way, as an aside, one of the reasons you

15  would like to see a normal Plan and Disclosure Statement

16  process here is exactly what's happened in the last 24 to

17  48 hours, right?  Parties negotiated, carve outs were created,

18  the Plan is a little better than it was a day ago.

19         It could be a lot better if we were in a normal

20  rather than rushed process.  But that aside, their attempts to

21  fix both the Plan and Disclosure Statement remarkably have

22  made the Plan even more facially non-confirmable.

23         We have the remarkable admission as a direct

24  consequence I believe of the objections made by the parties

25  that the effective date of this Plan is going to be in 2027.

1   What Your Honor doesn't have is the context of
2   Mr. Castellano's testimony from yesterday's deposition as to
3   why that is.
4           As conceded at that deposition, the reason that is,
5   is because the effective date --
6           MALE SPEAKER:  Your Honor, since we're going to have
7   Mr. Castellano on the stand, could we wait until the evidence
8   is --
9           MR. KEACH:  I didn't interrupt your opening.  I
10  think that's really inappropriate, Your Honor.
11          THE COURT:  Yeah, I'll allow it.  It's not evidence.
12  It's just -- we'll take it up.
13          Please continue.
14          MALE SPEAKER:  Thanks.
15          MR. KEACH:  What Mr. Castellano testified to, Your
16  Honor --
17          THE COURT:  Let me just be clear.  Everyone told me
18  what Mr. Castellano's Declaration said, and things that he's
19  saying.  It's not evidence.  If someone wants to -- I take
20  it --
21          MR. KEACH:  And I'm not tendering it as evidence,
22  Your Honor.  I'm tendering it as a preview of coming
23  attractions which is generally what openings do.  But I'll be
24  brief on this point.
25          What Mr. Castellano said very clearly is that the

1    reason the effective date is being extended indefinitely out

2    into the future is that they need to extend effective date to

3    a time when they will have collected hopefully enough

4    litigation and other asset monetization proceeds, that they

5    can afford to pay the administrative claims in full because as

6    Your Honor knows, under the Code, administrative claims have

7    to be paid in full on the effective date.

8          Well, they can't really do that so they're just

9    going to move the effective date out to two years from

10   confirmation.  Well, unfortunately, there are a number of

11   cases including the *Premier Network Services* case in the

12   Northern District of Texas, among many others, that make it

13   very clear that you can't do that.  That that makes the Plan

14   non-confirmable on its face.  It violates the letter and

15   certainly the spirit of 1129(a)(9)(A).  It has been found by

16   courts to violate the requirement that Plans be proposed in

17   good faith.  And it has been found by courts to violate any

18   possible conclusions around feasibility.

19         They're not guaranteeing they're going to have

20   enough money.  They're just hoping they have enough money two

21   years from now to do that.

22         That makes an absolutely mockery of the requirement

23   of paying administrative claims on the effective date.  And

24   the reason for that change was that they knew their consent

25   program was going to fail because they have nothing to offer,

1    and they knew they couldn't otherwise meet the requirement.

2         Now I won't repeat our papers for all of the other

3    reasons why the Plan is facially non-confirmable.  The fact

4    that it has serious unequal treatment problems with respect to

5    admin claims.  The fact that the Classes 3, 4 and 5 are

6    completely gerrymandered.  The fact that the PBGC claim and

7    the retained FILO claim are both not impaired, which is a

8    disclosure point as well, Your Honor.  Hence, they're being

9    disclosed as impaired.

10        Again I won't repeat all of those points.  As I said

11   earlier, cause to convert has been conceded.  There's no

12   question that there is a substantial loss, a substantial run

13   up in post-petition administrative claims.

14        That's not a criticism of the way the cases were

15   conducted.  It's just a fact.  Even if you use the optimistic

16   assumptions that are now being made, the first Disclosure

17   Statement said that the Debtors believe that non-professional

18   fees, administrative claims were -- that would be allowable

19   were 127 million.

20        Then the first Declaration that came out from

21   Mr. Castellano said 115 million.  The most recent statement by

22   Mr. Castellano was 93 million.  But all of that assumes that

23   all of the Debtors' objections to all of the claims they

24   object to are granted, and in fact, the number could be much

25   higher.

1          And that's just non-professional fee claims.

2     Mr. Castellano admitted that there's something like

3     $35 million worth of unpaid professional fees based on

4     estimates.  And the more startling thing, Your Honor, and this

5     goes directly to why conversion has to be considered, is that

6     it's going to take $25 million in professional fees to get

7     from here to confirmation.

8          It's going to take a million dollars to pay for the

9     mailing alone.  And as the Seventh Circuit once said, the

10    whole reason for 1112(b) is to stop a Plan confirmation

11    process and all the costs of that process when that process is

12    otherwise pointless.  And that's where we are.

13         Your Honor, interestingly enough, one of the

14    Disclosure Statement points we made was that the Debtors

15    hadn't provided a comparison between the costs and net

16    recoveries in a Chapter 7 scenario versus a Chapter 11

17    scenario.

18         They still have not done so.  The Exhibit C that

19    they proposed and filed is actually a liquidation analysis

20    presuming that the settlement is approved and fully

21    implemented.  And that the only thing that Chapter 7 Trustee

22    has to do is hold the Class B interests under the previously

23    formed trust arrangement.

24         It then says that what -- it then proposes what

25    would happen in the Chapter 7 in that context, and describes

1    that scenario as the Debtors like as a disaster.  And I thank

2    them for making the case for conversion in advance of approval

3    of the settlement because that's what Exhibit C does.

4           It proves that if you approve the settlement and

5    then confirmation fails, everybody else is worse off than if

6    you had converted now as opposed to after the settlement.  And

7    that again is another admission by the Debtor in their own

8    papers.

9           Before I speak very briefly on the sort of

10   conditional approval combined hearing motion which obviously

11   is taking somewhat of a second position, I think today,

12   largely because it's subsumed within the settlement, I want to

13   address Your Honor's thankfully candid comments about the FILO

14   Secured Parties' rights.

15          And I have no doubt that they have the right to seek

16   relief from stay.  I've also not been in this case as long as

17   everybody else, but I've heard that threat three times now.

18   And it hasn't happened yet.

19          I suppose there's a reason for that.  But I'm not

20   going to doubt their sincerity about that, nor am I not going

21   to credit fully Your Honor's comments.  But I don't think this

22   case should be or would be seen because the Court, I know, is

23   far more responsible than this.

24          It's not an either/or proposition.  It's not either

25   we go along with everything they want to do today, or we have

1    a disaster.  There's a midpoint.  This Court unquestionably

2    has the power to stage that relief in a way that allows the

3    preservation of litigation assets for the benefit of all other

4    interests in the case while also protecting the FILO Secured

5    Parties in giving them access to what I will call the low

6    hanging fruit among the residual assets with all due speed.

7         There are accounts receivable here that are being

8    collected.  There are payor claims.  There are other claims

9    that the parties would admit are far more recoverable than

10   some of the more difficult litigation claims.

11        This isn't a situation where you have to let them go

12   out and conduct the sale, a credit bid sale of two and a half

13   billion dollars worth of assets.  There's no question this

14   Court has the authority and the power and the wisdom to stage

15   that relief in a way that's fair to the FILO parties and --

16   but also fair to the residual interests of the estate.

17        And so I'm putting my faith in the Court's ability

18   to do that, and to the creativity of both the Court and the

19   parties to give them what they need and require while also

20   preserving value for everyone else.

21        And lastly, and very quickly on the conditional

22   approval motion, I'm not sure we're not sort of past the point

23   of that at this point, given that we've had a bit of

24   Disclosure Statement back and forth and process.

25        I haven't even bothered to try to count to see if

1      there are 28 days yet from the initial request.  But what's

2      happened over the last couple of days makes it pretty evident

3      to me that we'd be far better off with a normal process.

4              It seems to me the best outcome today, Your Honor,

5      would be to deny that motion.  This is far too complex a case

6      frankly for that kind of combined process.  The only large

7      cases where that has happened, and I won't comment on

8      unreported cases in this District under the complex procedure

9      section, but at least the cases I've seen involved situations

10     where all of the parties in the case were in general agreement

11     about the adequacy of disclosure.

12             And there was no reason not to just move forward in

13     that way to expedite matters because the outcome was something

14     everybody agreed on.  That's not this case.  This case would

15     benefit mightily from normal process.

16             Do a Disclosure Statement hearing, approve the

17     Disclosure Statement after they've incorporated people's

18     changes or not, and then have a confirmation hearing, and at

19     the confirmation hearing, hear both the settlement and the

20     Plan because getting back to my first point, the settlement is

21     the Plan.  The Plan is the settlement.  There's no material

22     separation between the two, and that means under *Braniff*, you

23     can't approve the settlement today.

24             And with that, I'll close, Your Honor.

25             THE COURT:  Thank you very much.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1          Let's see.  There may be someone on the line.

2     There's a 914 number.

3               MR. DAVIS:  Yes, Your Honor.  This is Michael Davis.

4               THE COURT:  Yes, sir.  I can hear you just fine.

5       OPENING STATEMENTS ON BEHALF OF LEXINGTON INSURANCE COMPANY

6               BY MR. DAVIS:  I represent Lexington Insurance

7     Company and we had filed an objection to the Disclosure

8     Statement simply because of one specific concern, and that is

9     the implementation of the defense of medical liability claims

10    is not sufficiently laid out such that we can determine

11    whether the Plan is feasible given our insurance policies.

12              And we would like that rectified.  And I only have

13    one other comment, and that is reply to our objection that we

14    lack standing because we're not a creditor --

15              THE COURT:  Don't worry about that one.

16              MR. DAVIS:  Okay.  And with that, I will note that's

17    all I have to say except to refer Your Honor to our objection,

18    and note that TRACO made a very similar objection as to that

19    point.

20              And I'll leave it at that.

21              THE COURT:  Thank you.

22              There's a 267 number?

23              MS. NIMEROFF:  Good afternoon, Your Honor.  I'm

24    sorry.  I'm just putting my camera on.

25              THE COURT:  No worries.  Good afternoon.

1      OPENING STATEMENT ON BEHALF OF SODEXO, INC. AND AFFILIATES

2           BY MS. NIMEROFF:  Good afternoon.  Jami Nimeroff of

3      Brown Nimeroff, LLC on behalf of Sodexo Operations and

4      affiliates.

5           Your Honor, we filed a limited objection to the

6      Disclosure Statement.  There were a lot of the comments that

7      were made up to this point which gets into the issues we have.

8      The Debtors did address some of them.  I really -- I don't

9      want to take up a lot of the Court's time in terms of opening

10     statement.

11          If you've read -- I think I'd like to just kind of

12     reserve comments to see how the rest of the hearing goes.  But

13     I would just preview to the Court that our concerns at this

14     point in terms of disclosure relate to the Plan effective

15     date, how that process works and specifically what happens if

16     the Plan does go effective.

17          And also, Your Honor, a bit about the insurers claim

18     consent process and figuring out how those claims get

19     determined.

20          And with that, Your Honor, I will end my opening.

21          THE COURT:  Ms. Nimeroff, as I've taken notes, with

22     the notes, tell me the concern -- and I'm just taking notes,

23     the concern with the administrative -- when you articulated

24     your last point, I just want to make sure that I've taken good

25     notes here as to your concern.

1          MS. NIMEROFF:  Yes, certainly, Your Honor.  So as I
2     read the process that's in the Plan and the Disclosure
3     Statement is there is a reconciled amount that comes from the
4     Debtors' books and records.
5          And Your Honor, we already went through the process
6     of (indiscernible) administrative bar date, and the Debtors
7     wanting a stay from not having to respond to admin claim
8     motions and the like.
9          And so that's (indiscernible) motion, and rather to
10    move forward with it, Your Honor had allowed the Debtor to
11    enter into the -- to engage in the admin claim process so our
12    motion did not get responded to, and has not yet been brought
13    before the Court.
14         We have attempted for the last couple months to try
15    to reach a stipulation with the Debtors on our admin claim
16    which at this point, Your Honor, is about $5 million.  And
17    we're not there yet.
18         So what -- the concern we have is sort of how that
19    process is going to work because what the Disclosure Statement
20    just says is if you want to participate in the program, the
21    confirmed program, that you may be with the amounts that you
22    claim here, and it's not clear what that is based on.
23         Is it based on the file of admin claims, or is it
24    based on just the numbers that the Debtors have come up with?
25    But it sort of turns the process on its head, and right now,

1    they just say, if you don't agree, but you want to participate

2    in the (indiscernible) program, reach out and call us.

3            But otherwise, there's no real process here.  And it

4    just seems that the admin claims should be based on the filed

5    admin claims, or ones that have been through the process.

6    Sodexo is not one of those.

7            But there's -- the Disclosure Statement should set

8    forth clearly how that process is going to play out,

9    particularly (indiscernible) where everybody has to file admin

10   claims, and those claims or motions by Sodexo.  And those are

11   sitting on the Docket.  So that's where the disclosure claim

12   and that --

13           THE COURT:  Yeah.

14           MS. NIMEROFF:  -- process, Your Honor.  We

15   appreciate they added some clarity on the (indiscernible)

16   questions and things like that, that was an issue we raised,

17   as well.  And we appreciate the Debtors' attitude on that.

18           THE COURT:  Ms. Nimeroff, just to make sure I got

19   the point.  Is your point there's going to be -- there's a

20   proposed, you know, agreed 50 percent reduction if you kind of

21   don't opt out, and so you're wanting to know what is the --

22   what's the starting number that we're using?  Are we using the

23   amount of the filed admin claim amount.  Is that -- is it

24   based off of that, or is it based off of some other number

25   based on the Debtors books and records, or some other number.

1          Did I get that point, or is it something more

2    nuanced?

3          MS. NIMEROFF:  Well, it is certainly that point,

4    Your Honor, because what the forms that are attached to the

5    Disclosure Statement motion and what is set forth in the

6    Disclosure Statement provide is a Reconciled Amount,

7    capital R, capital A --

8          THE COURT:  No.

9          MS. NIMEROFF:  -- based on the Debtors' books and

10   records.

11         THE COURT:  Got it.

12         MS. NIMEROFF:  And what exactly does that mean, Your

13   Honor?  And then again, I guess you go a little further.  Then

14   the process is, oh, if you don't agree with that, just reach

15   out and call us.  I'm not sure exactly how that -- you know,

16   that's not a super clear path, Your Honor.

17         And I just think that there should be some more

18   clarity around exactly what they're doing particularly because

19   we already had the whole process where everybody had to file

20   admin claims, and those claims should be of record.

21         And the way proofs of claim work, if they're, you

22   know, allowed unless objected -- or deemed allowed unless

23   objected to.  So that's really what that issue was about.

24   Your Honor --

25         THE COURT:  Thank you.

1          MS. NIMEROFF:  -- a little more clarity on the

2     effective date issue.

3          THE COURT:  No, I got that one.

4          MS. NIMEROFF:  Okay.

5          THE COURT:  I just wanted to make sure --

6          MS. NIMEROFF:  Right.  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          All right.  Here's a 214 number.

9            OPENING STATEMENTS ON BEHALF OF THE IRS

10         BY MR. ADAMS:  Good afternoon, Your Honor.  David

11    Adams, Department of Justice on behalf of the Internal Revenue

12    Service.

13         Your Honor, we filed an objection to the Debtors'

14    motion for conditional approval of the Disclosure Statement,

15    administrative claim procedures, and the Plan on various

16    grounds.

17         With respect to the administrative claim consent

18    program opt out, we said that their deadline was unfeasible

19    and unworkable due to the fact that the Debtors have not

20    complied with their post-petition tax return filing

21    requirements or payment requirements.

22         The IRS has filed various administrative claims for

23    at least two quarters for employment taxes that have not been

24    paid.  In their first day pleadings, Docket item 15, which was

25    the motion, emergency motion authorizing them -- Debtors to

124

1      pay pre-petition wages, they admitted that they owed under

2      employment taxes of about 42 million, 28 excluding -- that

3      does not include 28 million of CARES Act before us under the

4      CARES Act.

5              And then they also in their motion stated that they

6      would continue to honor the payroll tax obligations on a post-

7      petition basis, in the ordinary course of business.

8      Unfortunately, the Debtors haven't done that.

9              We've filed many administrative claims.  I can tell

10     you that these administrative claims have not been paid, at

11     least according to the IRS as of this morning.  We have many

12     unfiled employment tax returns and unpaid balances on filed

13     tax returns.

14             But with respect to our objection on the

15     administrative consent program, we have worked out language

16     with the Debtor, and it's in paragraph 26 of the proposed

17     order, that the IRS will not be subject to the administrative

18     claim consent program.

19             The other part we have set in our objection was that

20     to the planned exculpation injunctions that attempted to sue

21     various individuals for failing to account or remit employment

22     taxes, specifically transport taxes, both pre-petition and

23     post-petition.

24             These Plan injunctions with the IRS attempt to

25     prohibit the IRS from investigating persons responsible for

1    payment of transport taxes, which is in violation of the Anti-

2    injunction Act, 26 USC 7321(a).

3              Now recognizing that these may be Plan objections,

4    but I'd like to get those on the Record, Your Honor, at this

5    hearing.

6              THE COURT:  Thank you.

7              Go ahead, Mr. Adams.

8              MR. ADAMS:  Okay.  The IRS can act on its own to

9    determine persons liable under 6672, the failure to account

10   with employment taxes.  But the Debtors need to file these tax

11   returns and pay the taxes to not have -- be subject to that

12   6672 issue.

13             The Plan and the injunction exculpation provisions,

14   the return violate the Anti-injunction Act.  We cited a Ninth

15   Circuit case to the *Re-Bar Corporation*, 644 F.3d 952.

16             Moreover, the Fifth Circuit in *Prescription Home*

17   *Health Care*, 316 F.3d 532, Fifth Circuit, 2002, that says that

18   this Bankruptcy Court does not have jurisdiction to prevent

19   the IRS from investigating the offense of 6672 liability

20   against non-Debtors.

21             Yet that is exactly what the Debtors' Plan attempts

22   to do by these releases.  So the IRS had to object to this.

23   Specifically, the Debtors seek to release the two prescription

24   officer and transfer (indiscernible) committee members which

25   includes the CRO and release employees of the Debtors who may

1    be responsible for remitting an accounting failure for these

2    employment taxes.

3              According to the IRS' records as of this morning,

4    they have not filed the 20 employment tax returns for the

5    third quarter of 2024, Your Honor, so well over six months

6    ago.

7              I'm not going to go through the exhaustive list of

8    those that haven't been filed.  I think they have not been

9    (indiscernible) at this point.

10             If Your Honor remembers, I filed also an objection

11   to the motion of the Debtors to file -- to set an

12   Administrative Code bar date based on the fact that the

13   Debtors at that time had not filed certain employment tax

14   returns or other tax -- excise tax returns.

15             And so there is a modification with respect to the

16   IRS that that bar date does not apply to the IRS, but 150 days

17   from the filing of the tax return.  So we -- the IRS still

18   doesn't know exactly what its administrative claims are going

19   to be for those periods right now, 20 periods at least, for

20   September 30, 2024.

21             The Debtor has the obligations to file these tax

22   returns, to pay these post-petition taxes.  And we requested

23   the ability to do.  They're at ECF Number 15, the emergency

24   motion to pay pre-petition wages, and then Number 1106, and

25   it's failed to do so.

127

1          THE COURT:  Okay.  Thank you very much, Mr. Adams.

2          MR. ADAMS:  Thank you, Your Honor.

3          THE COURT:  All right.  I've got three more.

4          A 212 number?

5          OPENING STATEMENTS ON BEHALF OF CHUBB COMPANIES

6          BY MS. BONTEQUE:  Good afternoon, Your Honor.

7    Jessica Bonteque from Green Moore, appearing on behalf of the

8    Chubb Companies.

9          Can you hear me all right, Your Honor?  My camera

10   seems to be having issues.

11         THE COURT:  Yes.  Not a problem.

12         I'm gong to ask if anyone has a short opening, to

13   please hit five star.  Every time I say three more, then

14   someone else -- that tends to encourage people to hit five

15   star.

16         So I just kind of want to get them all in.  So I've

17   got three more folks here, and including -- well, four, with

18   counsel.

19         So I'll let you proceed whenever you're ready.

20         MS. BONTEQUE:  Thank you, Your Honor.

21         Just briefly, the Chubb Company has filed a limited

22   objection and reservation of rights at Docket Number 4927,

23   related to issues in the FILO settlement, proposed FILO

24   settlement.

25         Since we filed that, we've worked with Debtors'

1    counsel, and counsel for the FILO Lenders, and have agreed to

2    language to resolve those concerns which does appear in the

3    Amended Order that was filed at Docket Number 4987, at

4    paragraph 49.

5            I just wanted to note that for the Record, that that

6    paragraph is there.  That is agreed language with the Chubb

7    Companies.

8            And to the extent, Your Honor has any questions, or

9    any other party does, we will be here for the balance of the

10   hearing.

11           THE COURT:  Thank you.

12           Here's a 404 number.

13     OPENING STATEMENT ON BEHALF OF CATHOLIC HEALTH INITIATIVES

14    COLORADO, COMMONSPIRITHEALTH AND COMMONSPIRITMOUNTAIN REGION

15           BY MS. WANG:  Good afternoon, Your Honor.  Caryn

16   Wang of Polsinelli on behalf of Catholic Health Initiatives

17   Colorado, CommonSpiritHealth, and CommonSpiritMountain Region,

18   formerly known as Centura Health Corporation.  I'll refer to

19   them collectively as "CommonSpirit."

20           I just wanted to put a statement on the Record so

21   that the Court is aware in the event the Court approves either

22   motion being heard today.

23           With respect to the matters on for hearing today,

24   CommonSpirit, and in an effort to work with the Debtors

25   despite ongoing litigation, negotiated its objections to

1   conditional approval of the Disclosure Statement and the FILO

2   settlement motion with the Debtors in advance of the objection

3   deadline for inclusion of the reservation of rights in each of

4   the proposed orders, inclusion of language in the disclosures

5   itself, and a statement on the Record today reflecting these

6   agreements.

7         The Debtors and CommonSpirit reached agreements on

8   all points and CommonSpirit agreed not to file formal

9   objections based on these agreements.  And despite these

10  negotiated agreements, early this morning, in a revised

11  proposed order approving the Disclosure Statement at Docket

12  Number 4996 without any advance explanation, the Debtors

13  omitted the agreed-upon CommonSpirit reservation of rights

14  that it had previously included and the objection chart

15  attached as Exhibit A and the Debtors' reply to objections

16  filed yesterday at Docket Number 4989 at page 56.

17        The Debtor has confirmed that such omission was

18  inadvertent.  However, no -- proposed order has been filed and

19  nor has the Debtor reconfirmed it will place on the Record of

20  this hearing we agreed upon reservation of rights in favor of

21  CommonSpirit.

22        So I just simply wanted to make sure the Record is

23  clear and reflects CommonSpirit's agreement with the Debtors

24  that any order conditionally approving the Disclosure

25  Statement shall provide that notwithstanding anything in the

1     order to the contrary, CommonSpirit has reserved the right to

2     object to final approval of the Disclosure Statement and

3     confirmation of the Plan.

4               Thank you, Your Honor.  That's all.

5               THE COURT:  Thank you.

6               There is a 310 number.

7      OPENING STATEMENTS ON BEHALF OF HEALTHCARE SYSTEMS OF AMERICA

8               BY MR. MCNEILLY:  Good afternoon, Your Honor.

9     Edward McNeilly from Hogan Lovells on behalf of Healthcare

10    Systems of America --

11              THE COURT:  Yes.

12              MR. MCNEILLY:  -- purchaser of hospitals.  You know

13    who we are, Your Honor.

14              As Your Honor knows, there's a pending dispute

15    before the Court related to the ownership of 55 million in

16    Florida HDPP and LIP fund, which has been fully briefed and

17    argued with a stipulated order at Docket Number 4828 that

18    relates to the treatments of those disputed funds, escrowing

19    them pending Your Honor's ruling on the HSA's motion.

20              That order was entered on the 6th, a week after the

21    FILO motion was filed.  So it clearly wasn't intended that the

22    FILO settlement would ever contradict or override that

23    stipulated order.

24              However, for the avoidance of doubt, we've been in

25    discussions with the Debtors and the FILO Lenders to negotiate

1    some language to be added to the FILO order to make clear that

2    it is in the HSA stipulated order and not the FILO order that

3    governs the disputed HDPP and LIP funds.  In essence, that

4    these funds cannot be released otherwise in accordance with a

5    stipulated order.

6         I think the language is agreed or it's close enough,

7    and we're grateful to counsel for the Debtors and the FILO

8    Lenders for working with us on that, and we look forward to

9    seeing that in a further revised version of the order.

10        And I want just very briefly to say, Your Honor,

11   briefly on that issue of release of funds, we do think that

12   based on the concessions that the Debtors made in their moving

13   papers and in oral arguments on our motion, that 25.3 million

14   of the funds belong to HSA, that these funds should be

15   released to us right away.

16        We realize there's a big hearing the Debtors have

17   today.  We'll likely be discussing that issue with them once

18   they get through that today and maybe even into tomorrow's

19   hearing, and if necessary, coming back to Your Honor on this

20   issue.

21        But I did want to briefly address that we've been in

22   discussion with the Debtors and FILO Lenders to get some

23   language to make some clarifications and also just to give

24   Your Honor a quick update.

25        Thank you very much.

1          THE COURT:  So if I understand it, the -- you're

2     just wanting to preserve the rights that nothing -- if I

3     approve something today, that that doesn't automatically tap

4     into the matter in which I'm deciding in terms of the

5     allocation of the funds.

6          MR. MCNEILLY:  Exactly.  Exactly right, Your Honor.

7     We've been going back and forth on language.  I think famous

8     last words that we're agreed, but we're certainly very close,

9     and we will expect to see that in a revised version of the

10    order.

11         And exactly that, that this -- what you do today, if

12    you approve the FILO settlement order, doesn't override or

13    impinge on the stipulated order and the status quo that's in

14    place pending Your Honor's ruling on the HSA motion.

15         THE COURT:  I've got a feeling I'm going to forget

16    what I'm going to say on HSA.  I'm just going to go a little

17    bit out of order and tell people where I am on kind of where

18    we're going.  It's a little bit unorthodox, but I'd rather do

19    it now before I forget because it'll get late in the day and

20    I'm going to forget.

21         So when I -- let's just say that there are two kind

22    of buckets, the LIP and then the HDPP portion of it.  There's

23    a Section 5.16 that talks about the allocation and it's

24    subject to Section 5.9.

25         I'm just telling parties where I think this is

1      going, and I'll tell you why I'm saying all of this.

2              Looking at kind of the -- what I'll call the "LIP

3      payment," and you-all know the Low-Income Pool payment -- as I

4      read applying Delaware law, which is fairly consistent with

5      other state law, how to construe contracts in terms of

6      agreements, we went into the hearing noting that we were going

7      to -- I was going to try to construe the language based on the

8      terms.

9              And if I couldn't do it based on the terms of the

10     docs or agreed facts, then we were going to open it up to

11     additional hearings.

12             Based on my review of kind of what took place at the

13     hearing, I don't think the parties -- I should say 5.9 talks

14     about an allocation of funds.

15             Sorry, folks.  You're going to have to sit back and

16     I've listened to you all day.  You can listen to me for 10

17     minutes.

18         (Laughter.)

19             THE COURT:  5.9 talks about a waterfall way to kind

20     of distribute proceeds if there's a Medicaid supplemental

21     program or a waiver using the terms loosely.  So you construe

22     the language according to its plain meaning to try to decipher

23     meaning there.

24             The parties don't really disagree that the LIP

25     program falls within a Medicaid program, either a supplement

1     or a waiver program.  So HSA makes the argument that five, you

2     know, you kind of take the specific over the more general, but

3     the text is pretty clear, 516 is subject to 5.9.

4               So you've got to look at 5.9 to make sure something

5     doesn't fall within 5.9.  The LIP program falls within 5.9.

6     So it seems to me that those portions of the funds -- you

7     know, I'm not getting into the math -- are subject to 5.9, the

8     distribution procedures under 5.9.

9               The other program, the Debtors are really, there's

10    kind of, you know, it really kind of hinges --

11              There's someone who's got to just place their phone

12    on mute, and it's a 310 number if it's you.

13              -- this says Medicaid supplemental program,

14    supplemental payment program.

15              But it -- the word Medicaid is capped.  It's a

16    capital M, and everything else is lowercase.  HSA says you can

17    look at the language at the CFR that it cites and it says

18    here's what we meant by it; here's what everybody meant by it.

19    Here's the best interpretation of what that word means --

20    these words mean.

21              It's an industry term and here's where the term

22    comes from.  The Debtors make a series of arguments, but it

23    really, a lot of it comes down to there's also a Miami-Dade

24    Code which gives rise to some of these payments.  So it's --

25    it's not that it's not relevant, but it uses the term all

1    caps, right?

2           Like Medicaid Supplemental program and it means it

3    includes -- so it's a capital M, capital S, capital S there.

4    And in theory, that would include these payments.  So the

5    question is what is the right, the best interpretation of

6    those words?

7           Either way, it's extratextual whether I rely on a

8    CFR to gain the language or I rely on the Miami-Dade language.

9    It's extratextual either way because there's two competing

10   arguments as to what it is.  And you can't determine it from

11   the plain language there on the term.

12          But you also can't find derived meaning from within

13   the document that's not used a couple of different ways in

14   which one can then define the document intratextually.  So I'm

15   going to have to open that one up.

16          It's -- and I will tell parties, it seems to me that

17   the real question becomes whether the parties intended to use

18   the all-capped Miami-Dade version.  I find it interesting that

19   no one used the all-cap version because the all-cap version is

20   a defined term.

21          That's not really an industry term.  It's a specific

22   term to include other things.  And seems to me that if the

23   parties intended to use the all-cap term, they would have used

24   it and then referred to it.  These are two sophisticated

25   parties, so maybe the best reading is the industry term.

1          And I have litigators in front of me.  Litigators

2     make -- straight up make really good arguments.  So I'm going

3     to open it up, and I want to see the drafts of the documents.

4     I want to open it up for limited discovery.

5          I'll see the drafts, and I'll see the emails, and

6     the drafters will tell me what the best reading is.  But I'll

7     open it up.  And so I'd let the parties kind of figure out

8     what the best way to get that to me and when it is and how

9     they want to get it to me.

10          If you want to put people on the stand, I'm all for

11     it.  You know, parties agree to Declarations, I'm okay with

12     that, too.  But I want to see drafts, and I want to see email

13     about if there is, if any exists, about those terms and that

14     will then dictate.

15          So I do -- I think 565.9 applies.  Yeah, but it's a

16     capital M with lowercase S's.  And so I've got to figure out

17     what that means.  And I cannot stay within the text and derive

18     that meaning.

19          But I'm comfortable.  I think I'm very comfortable

20     with the LIP.  But you know, that's what I wanted to say

21     before I forgot.

22          And I want to make sure that I don't -- you-all are

23     going to have to figure out a schedule, but it doesn't need to

24     be -- there can't be that much out there on the negotiations

25     over that phraseology.

1          I would note HSA wants me to look at other orders as

2    to derive meaning and the Debtors' intent.  That's still

3    extratextual as well, but it's fair game as we kind of

4    proceed.  So anyway, that's where that is.

5          And when it comes to BMI and working on that, but

6    I'm encouraging the parties to continue to talk.  I don't

7    think anyone's going to like any portion of any part of the

8    answer that I'm going to give, and that includes BMI and that

9    means the Debtor.  So I'm strongly encouraging the parties to

10   talk.

11          But in about two weeks, I will rule, and the answer

12   will be the answer.  So I'll leave that there.  But the HSA

13   one, I just need to see a couple of -- I just need to see some

14   evidence.  And I'm not going to say what I -- well, I know I

15   need to see drafts and emails, but I don't -- I don't know

16   what else I need to see, and I don't want to get into the

17   parameters.

18          You-all know what it is and you can get into --

19   engage in some small limited discovery as to what that means.

20   And then I will enter a final ruling on that one, one or the

21   other.  And then you'll have an order that parties can do what

22   they will with it.

23          So, but I do intend to resolve that in the month of

24   June.  So this will not -- this will go whether there is a --

25   we haven't gotten to the point whether we -- what we do with

1    dates here.  But I do know that the month of June will -- I

2    can resolve that issue well before then if the parties get

3    together and work this out.

4            So anyway, back to our regularly scheduled program.

5    Let me see who is next.

6            Here's a 214 number.

7            MR. STROMBERG:  Good afternoon.

8            THE COURT:  Good afternoon.

9        OPENING STATEMENTSON BEHALF OF NORTHSTAR ANETHESIA

10           BY MR. STROMBERG:  Good afternoon, Your Honor.  Mark

11   Stromberg on behalf of Northstar Anesthesia.

12           THE COURT:  Yes, sir.

13           MR. STROMBERG:  I will do my utmost to avoid

14   repetition here.  But the endpoint for what I'm going to say

15   is that we believe that approval of the settlement should be

16   deferred or denied, and that approval of the Disclosure

17   Statement should be deferred.

18           To the extent that motives matter, my client is not

19   in litigation with the Debtors' estates.

20           THE COURT:  Let me tell you it's a great point.  Let

21   me just tell you motives don't matter.  What matters is legal

22   arguments and facts in evidence for me today.  I will just put

23   that --

24           MR. STROMBERG:  Right.

25           THE COURT:  -- out there for everyone.  So I got it.

1    TRACO may be potentially litigating or they are litigating

2    with them.  But if -- right.  If it's a sound legal argument,

3    sound legal arguments win.  Facts of law win, and I'm not

4    going to get in -- I'm just really bad at mind reading.

5         So I tend to avoid that, and tend to focus on the

6    stories based on the evidence that's going to be before me.

7    So I will take that off the table for everyone.  It will not

8    factor into my decision.

9         MR. STROMBERG:  Fair enough.  Fair enough, Your

10   Honor.

11        We're the holder of a $1.7 million stipulated

12   administrative claim among the -- whether it's 93 million or

13   127 million of unpaid administrative non-professional

14   creditors.

15        My client, like a number of other administrative

16   claimholders, is strangely, but not entirely strangely, in

17   effect, an involuntary post-petition lender to the Debtor.

18   And while FILO is getting the protections of the voluntary

19   loans that they made and approved post-petition, we don't --

20   we are not in a position to benefit from similar protections.

21        Northstar Anesthesia is also not receiving treatment

22   comparable to the professional creditors.  So in addition to

23   being different than FILO, even though our loans, such as they

24   are, came post-petition, the professional creditors have been

25   paid on their interim fee applications.  We've been told to

1    wait.  I get that.

2          But now when we're at this stage, it's important to

3    think about what it is we're next being asked to do.  And I

4    appreciate the comments of other counsel who've come before

5    me, including those of the United States Trustee, about the

6    payment of administrative claims.

7          You know, the professionals have gotten paid.  Our

8    treatment under the Plan, as has been discussed to some

9    degree, is to either opt out -- and the language that the

10   Debtors use in this opt out is kind of important.

11         They say unless there is a timely, properly, and

12   affirmatively made opt out.  And I think, although I could be

13   misreading the tea leaves, what they're telling us is they

14   reserve the right to litigate whether opt out is effective or

15   not.

16         But that's important to my comments about the

17   Disclosure Statement.  The opt ins, those people who don't opt

18   out, will share in a very small amount of money, the

19   $12.5 million, depending on the number who opt in and opt out,

20   and whether this program makes or not.

21         The opt outs get nothing initially, which means that

22   any administrative claim that they have is 100 percent tied to

23   litigation risk.  And importantly, the way the litigation

24   trust works, and it's the way that most of them work, so this

25   isn't unusual, is that the claims for professionals get paid

1    first.

2            So there is yet another layer of professional claims

3    that's going to come in front of any distribution to the

4    people who are the involuntary lenders to the Debtors in this

5    case.

6            And as if that's not enough, adding insult to

7    injury, almost wait until an effective date, which we're being

8    told will be sometime in perhaps 2027, but maybe later, maybe

9    earlier.  And we're going to find out what the Debtor believes

10    about when that is and why today, when testimony is rendered

11    by Mr. Castellano, according to what I heard.

12            And to make matters even worse, the information that

13    the Debtor is using to come up with these estimations may tie

14    to, relate to, or come to the border of what the Debtor

15    doesn't want us to know because the Debtor is asserting work

16    product privilege.

17            So when I go to advise my client relative to this

18    Disclosure Statement, I'm not sure I know as a bankruptcy

19    professional what to tell them about whether or not they

20    should opt in or opt out.

21            I can't tell them how much more or less they're

22    likely to get if they opt out versus opt in.  I can't tell

23    them how long they're going to wait for a payment.  I have no

24    way of even telling them whether the Debtors' estimations,

25    which we will hear today that are not in the Disclosure

1    Statement, are reasonable or not.

2         I can't even disagree with them because perhaps some

3    of the information that's being used for that might be work

4    product.  So from the standpoint of my comments on the

5    Disclosure Statement, Your Honor, if a bankruptcy professional

6    cannot, in a case of this complexity, tell a client what it is

7    they need to know to be able to make a decision about what the

8    Plan itself requires of them, that should tell you something

9    at least about whether or not the Disclosure Statement

10   contains sufficient information or not.

11        And it is for that reason that we ask that the Court

12   defer ruling on the Disclosure Statement or disapprove it for

13   now until it comes back with more information.  That makes it

14   more likely that we can give our clients an answer on what

15   they're supposed to do.

16        With regard to the settlement, I think, as I've

17   listened to the argument, that by far -- and this is my

18   opinion, so it's not the Court's, obviously -- that the

19   concept that what is being proposed in the settlement is a

20   *sub rosa* plan, the objectors have the better of that argument.

21        But you don't need to decide that argument today.

22   You've been asked by the objecting parties to defer the

23   settlement until confirmation.  And it makes sense because if

24   you were to decide this and you were to decide it against the

25   objecting parties and allow the settlement to go forward

143

1    today, and then go to confirmation, you would have built in a

2    potential problem with the Plan which might result in an

3    appeal.

4           No such problem exists if the settlement and the

5    Plan confirmation are considered at the same time.  So in

6    addition to the fact that --

7           THE COURT:  Here's a question I forgot to ask.

8    Here's a question I forgot to ask everyone, but everybody can

9    tell me this.  If I defer, what happens on Monday?  Who pays

10   for getting to a July confirmation hearing?  Who -- I know I

11   can say it, right, but who -- what guarantee do we have that

12   we get there?

13          Maybe the answer is we don't have any guarantee.

14   And I can just say that's what I'm going to do and parties can

15   figure out what they want to do.  And then we'll let the chips

16   fall where they may.  That may be just the answer.

17          But I just want to make sure that everyone's -- I've

18   got to think about deferring this to say maybe it makes the

19   most sense, maybe they have the better argument, but am I

20   setting this up -- I also have to think, am I setting this up?

21          Is it a false narrative where I'm going to create a

22   situation where this -- we never get to July because June will

23   have its own issues and I -- so that's the real question.

24          MR. STROMBERG:  Yeah.  And I don't know the answer

25   to that question, Your Honor.

1          THE COURT:  No, no.

2          MR. STROMBERG:  I think it's a great question.

3          THE COURT:  Everybody can -- I'm just throwing it

4     out there.  As we kind of hear the evidence, and then we talk

5     at the closing, so when we kind of think about big-picture

6     issues, you raised a good point that everybody's been arguing.

7          And it's been in the back of my mind, and I forgot

8     to mention it.  And we've been kind of doing this hybrid

9     opening/closing thing.  And so I figured I'd throw the thought

10    out there on the front end as opposed to throwing it out on

11    the back end.  And as we think about it, I'm thinking out loud

12    with the parties.

13         MR. STROMBERG:  Right.  And I'll just say that

14    although I don't know the answer to the Court's question, I

15    know that nobody on the proponent side, the FILO Lenders, the

16    Debtors, the Committee, has answered that question in the

17    negative, that we won't get to a confirmation hearing if these

18    things are not considered together.  I was wondering about

19    that myself.

20         THE COURT:  The guy who stood up was the FILO, and I

21    suspect that's what he was going to say.

22         MR. STROMBERG:  Fair enough.

23         THE COURT:  Well, no.

24         MR. STROMBERG:  Fair enough.

25         THE COURT:  But it's a fair point.  It's a fair

1       point.  I'm just thinking out loud with everyone here in terms

2       of how we approach the issue now.

3               Thank you, counsel.

4               MR. STROMBERG:  Yeah.  I have just a couple of more

5       thoughts on this.  You know, the FILO counsel did say that any

6       relief that he's getting in the settlement is relief that he's

7       entitled to by law under his lending agreements anyway.

8               And if that's the case, to me that suggests that

9       there would be no difference in the relief he would be getting

10      if his settlement was considered at the time of the Plan.  And

11      if the FILO Lenders are not adequately protected here, then it

12      throws a great deal of shade on the concept that the

13      administrative claimants, if they wait until an effective

14      date, will be receiving anything.

15              But I do have confidence that that statement doesn't

16      make sense.  What we're talking here about is about potential

17      litigation or actual pending litigation.  And I don't believe

18      that the requirements of adequate protection are going to be

19      the same for that as they would be if, for example, we were

20      talking about perishable assets.

21              So to a meaningful degree, I believe that adequate

22      protection, although I'm -- this isn't the stay relief

23      hearing, adequate protection for those interests, such as they

24      are, can be provided so that if we move this down the line

25      until confirmation and the Court decides that the settlement

1     should be approved or that it shouldn't, that the Court can

2     consider whatever rights the FILO Lenders have.

3              And I'll conclude with that, Your Honor.  Thank you

4     very much.

5              THE COURT:  Thank you.

6              Ms. King.  Let's see.  I probably need to unmute

7     your line.  Well, here's a 215 and a 305.  I don't know which

8     one you are.

9         (No audible response.)

10             THE COURT:  Can't hear you.  I've unmuted whatever

11    line it was.  If it's -- it ain't me.

12             UNIDENTIFIED MALE:  Your Honor, I think you unmuted

13    my line.

14             THE COURT:  No, I've unmuted --

15             UNIDENTIFIED MALE:  But she's trying to give you the

16    number.

17             THE COURT:  Yeah, no.  There's a 201.  You just

18    haven't hit five star.  So I'm holding up the number.  Got me

19    there.  Ah, there you are.

20             OPENING STATEMENTS ON BEHALF OF TAC MED, INC.

21             BY MS. KING:  Thank you, Your Honor.  Anabel King

22    with Wauson King on behalf of Tac Med, Inc.

23             Tac Med, Inc., Your Honor, is a -- it's a small

24    business.  It operates out of Mission, Texas.  It provided

25    critical and non-critical ambulance services to Odessa

1     Regional, as well as Scenic Mountain.

2              UNIDENTIFIED MALE:  Does it matter if I'm not here?

3              THE COURT:  Just one moment.  Go ahead.  Keep going.

4              UNIDENTIFIED MALE:  Okay.  I'll -- yeah.  The spigot

5     on that side of the house is turned on.

6              THE COURT:  All right.  I will unmute you.  I will

7     mute your line for your benefit, sir, whoever you are.

8         (Laughter.)

9              THE COURT:  And Ms. King, you may proceed.

10             MS. KING:  So my client is, it's a small company,

11    Your Honor.  They don't have a legal department.  They don't

12    have a accounting department per se, or in-house counsel, I

13    should say.  They do have an accounting department.

14             But I wanted to remind this Court of a comment that

15    Your Honor made, which was plain English clear -- why can't we

16    have Disclosure Statements and Plans that are written in such

17    a way where a business can understand it without having to

18    hire a bankruptcy lawyer to do so?

19             I don't believe that the Disclosure Statement -- and

20    I haven't gotten -- and I have to admit, I haven't gone

21    through the redline of the Disclosure Statement, Your Honor --

22    but looking at the Disclosure Statement, looking at the Plan,

23    we're looking at over 500 pages.  I couldn't even understand

24    it, Your Honor.

25             THE COURT:  So are you on my advocacy that I think

1    all Disclosure Statements should be 25 pages?

2         MS. KING:  Well, I know this case is different, Your

3    Honor, but yes, I'm going to go with that, with that as a

4    default.  My disclosures tend to be shorter.  I do have

5    smaller cases.  I guess I've got --

6         THE COURT:  And I know.  But I get the point.  It's

7    500 pages.  So it's the balance that I run where people are

8    saying it's still not clear enough or maybe it just has too

9    much information, just not the right stuff in it.  Maybe

10   that's the objection that parties are making.

11        There's always a struggle that I have.  And I do

12   understand the point.  These things tend to grow.  And the way

13   you resolve objections in a lot of ways is to keep adding

14   words and -- but we never take out words.

15        So I get the point.  I get the point.

16        MS. KING:  Got it, Your Honor.  So my client's CFO

17   is Edward Cantu.  He does have a business degree, Your Honor.

18   He has accounting background, some finance background.  He

19   didn't understand really the process.

20        All he knows was that after the case was filed, he

21   got a letter where he understood that vendors and suppliers

22   would be paid in full despite the bankruptcy.  They had -- the

23   Debtors had been slow at paying beforehand historically and

24   systematically, based on the records that I've seen so far.

25        We're still retrieving documents on that, Your

1    Honor.  But with the promises and with payments to bring

2    payments somewhat current, we continue to provide services

3    when other providers refuse to do so because word got around

4    that they were not paying on time.

5         So my client provided the services.  My client has

6    rent to pay, too.  They have payroll, they have taxes to pay

7    to the IRS.  So we -- I mean, my client has to -- has

8    responsibilities as well.  So my clients, through the letter,

9    you know, filed an administrative claim.  I think the admin

10   claim is for about 60 grand.  They had a pre-petition claim

11   for about 50 grand.  They got a stack of maybe an inch thick

12   of documents regarding this case.  They're in the dark.

13        The only reason why they bothered to engage counsel,

14   Your Honor, is because not only did they not get paid like

15   promised for the pre-petition or the post-petition admin

16   claims, but then they get hit with a $180,000 lawsuit.

17        My client's scrambling in Mission, Texas to find a

18   bankruptcy lawyer.  Couldn't find one for three weeks.  Didn't

19   get the demand letter until one month after the demand letter

20   was written.  So I'm at the COE in New Orleans, Your Honor,

21   when I get an engagement for this for an extension of time to

22   respond to the demand letter, which I did on Valentine's Day

23   at 8:00 o'clock at night.

24        I emailed, I believe Togut.  I said, hey.  And

25   before that I had said, hey, I have this coming in.  I'm going

1    to need an extension and it's crickets.  No response.  I sent

2    my response to the demand letter, outlining the requirements

3    that defenses be considered prior to signing the complaint.  I

4    provided the applicable defenses.  I asked for additional time

5    to respond to provide additional documents.  Crickets.

6          My client in the meantime is still trying to pull

7    invoices to show ordinary course going back years.  Again, my

8    client is a CFO, but also has payroll and other administrative

9    tasks to do for the small company.

10         And so then my client says, hey, I just got a

11   complaint.  And I looked.  There's still the deadline to file

12   an answer hasn't come up.  But then they get served with

13   initial disclosures, even though we had made an answer, which

14   I thought it was odd, and they received two documents.

15         And he -- and I explained to him what those were.

16   And I think there was confusion about the initial disclosures

17   and the Disclosure Statement.  So now my client is a defendant

18   in this adversary proceeding, and everything that he was told

19   that would happen didn't happen.

20         He -- the company hasn't gotten paid, and I don't

21   know how they managed to pull money to retain me to represent

22   them.  I don't know what other defendants are doing or other

23   creditors.

24         And I'll ask if the Court has questions, so I'll

25   pause.

1          THE COURT:  No, I just -- I'm trying to figure out

2     how this connects to one of the motions that we're talking

3     about today, Ms. King.

4          MS. KING:  It connects because it is not clear, Your

5     Honor.  There's not sufficient information for creditors, for

6     actual creditors that are then being impacted by this case to

7     make a decision one way or another of whether to vote in favor

8     or against the Plan, even with counsel.

9          THE COURT:  What information would you be looking

10    for?

11         MS. KING:  Well, I think, Your Honor, I do adopt all

12    of the objecting parties' arguments that have been raised,

13    including the pleadings.  But in this case, I think it would

14    be important to know -- because they're saying that a large

15    portion of these claims are causes of action -- so I think

16    it's important for creditors to know what are the basis for

17    these, like on these preference claims.

18         Like, I don't understand why 180 complaints were

19    filed in a course of five days, racking up $64,000 apart from

20    the filing fees.

21         THE COURT:  You think --

22         MS. KING:  And these are --

23         THE COURT:  -- knowing why there were 180 claims

24    would inform your client whether to vote for a Plan or not?

25         MS. KING:  I think it would.  I think it gives a

1      better idea of what the means of funding the Plan and what

2      they would --

3                 THE COURT:  Got it.

4                 MS. KING:  -- get eventually, right.  Here's the

5      face value amount.  But we may -- there's applicable defenses,

6      and I understand strategy, work product.  But I've seen Plans

7      where it is like here's what this lawsuit is about, here are

8      the potential defenses that may be asserted or have been

9      asserted.

10                It could be zero that we get from this preference

11     claim.  We could get the full amount, right?  And here's the

12     timeline of when that would happen.

13                Obviously, I understand this is a little bit more

14     complicated and I understand there's other litigation that's

15     involved, but I think that type of information would be

16     helpful for people to know what they're in for because they

17     may be better off if the case is getting dismissed, right?

18                And they're not getting paid.  They're not going to

19     get paid.  They're probably not going to get a nickel unless

20     the secured creditors credit bid.  And I doubt that they're

21     not going to have a deficiency assuming they have to comply

22     with whatever contractual requirements and applicable

23     statutes.

24                But I mean, I think my clients are better off just,

25     you know, cutting their losses and moving down the road and

153

1   providing services to entities that will pay them for their

2   services.

3           So I also don't understand why a Chapter 7 would be

4   feasible.  But to the extent that the Chapter 7 would review

5   all these causes of action which only would exist in

6   bankruptcy, and in my understanding is that they're all being

7   docked.  So I don't know what a Chapter 7 Trustee would

8   administer.

9           But as far as the actual objections on the inability

10  to confirm a Plan just based on the requirement for

11  administrative claims, because it seems like what's being

12  proposed, even as supplemented, is contrary to the underlying

13  basis in *Purdue*, which I know is a different issue, Your

14  Honor.

15          But it seems the way that I read it is that inaction

16  means that you're voting in favor.  And I didn't see a form

17  attached to the -- any of the redlines or the original

18  documents where it says here's what you would be looking at.

19          So I don't think that creditors understand what

20  they're supposed to do in this case.  I don't think many

21  creditors are sophisticated enough to understand the

22  importance of this case.

23          I think that some people were like, well, we said we

24  were going to get paid, so we're just going to continue to

25  provide services.

1        So those are the two points that I wanted to point

2   out from the point of view of the mom and pop, the smaller

3   businesses, those that don't have the resources or the idea of

4   retaining counsel.

5        I understand that this is a case that involves a

6   matter of public policies as suggested and explained by other

7   objecting parties.  But I do think that it needs to end.  I

8   mean, this case has been pending for over a year, and it's not

9   typical of a case like this, in my opinion.

10       But my client just needs to have a better

11   understanding and have a process that gets noticed and that

12   it's clear so that it works.  Unfortunately, given the status

13   of this case and the fact that it seems to be administrative

14   insolvent and there's issues with the IRS, unfiled tax

15   returns, I don't know that confirmation can even be met or how

16   we would even get there.

17       So I don't think that it's appropriate for this to

18   be considered, for there to be a preliminary conditional

19   approval of the Disclosure Statement.  I don't think that

20   those requirements have been met.

21       I also don't think that it's appropriate for the

22   Settlement Agreement to be approved today.  I understand,

23   though, well, what happens if I don't?  And I don't know.

24   Maybe the FILO people have, you know, a Plan B in their back

25   pockets.  I have no idea.

1       But I think that there's not enough information,

2   clear information for creditors to object.  There's not enough

3   information for my client to decide.  And he's already here.

4   Like, I've sent him the documents.

5       Those documents, the Plan and the Disclosure

6   Statements, they were not mailed to him or emailed to him.  So

7   I think there's issues with notice, Your Honor.  I think that

8   there's issues with clarity.  And I think that, like the

9   previous counsel have alluded to, I mean, there are

10  laundrymen, ambulance drivers, and other smaller providers

11  that are being impacted by this and by the automatic stay.

12      And they're in a position where, you know, they want

13  to continue to provide services, but they're not being paid

14  for.  So I ask that the Court seriously consider, and it has

15  discretion to consider a dismissal, it has discretion to

16  consider a conversion, and it has discretion to require some

17  of these deficiencies to be at least be made more clear so

18  that creditors that do not have lawyers can understand, right,

19  and creditors that don't even have a business degree, like my

20  client's corporate rep.

21      I do appreciate the Court's time, and I'm happy to

22  answer any questions that the Court may have in respect to my

23  clients.

24      THE COURT:  Thank you.

25      There was a 214 number.

1          Mr. Bressler, I may have unmuted your line as well.

2     I can't remember.  Yes, I can hear you, sir.

3               OPENING STATEMENTS ON BEHALF OF HARTFORD

4                    FIRE INSURANCE COMPANY

5          MR. BRESSLER:  Good afternoon, Your Honor.  Gary

6     Bressler for Hartford Fire Insurance Company and its

7     affiliated insurers.

8          Your Honor, we filed a motion, an objection to the

9     settlement motion, but we have reached agreement with the

10    Debtors for language to be inserted in the order.

11         One agreed-upon change didn't make it into the order

12    yet, but we understand it will make it into the next form of

13    order.  So we no longer have an objection to the settlement.

14         THE COURT:  Thank you.

15         MR. BRESSLER:  Thank you.

16         THE COURT:  Why don't we take a 10-minute break?

17    I'm going to tell parties -- oh.

18         Oh, come on up.  Yeah.  I will tell parties I want

19    to be clear on the HSA piece, I don't know what the evidence

20    is going to show.  I didn't look at anything else outside of

21    the four corners.  So I'm just kind of sharing why I think I

22    need the evidence.

23         Because one is a CFR; one's a Code.  I don't know

24    where it goes.  And on BMI, I think -- I just don't think

25    anybody's going to be happy with me.  So I'm just asking the

1    parties to talk.  But I don't -- that one is a -- I don't know

2    where that one goes.

3           I'll leave it there.  But I don't want any -- to

4    give the impression that I've reached any stone-cold

5    conclusions about how it would go either way so -- especially

6    without evidence on the HSA piece.  So anyway.

7           Good afternoon.

8    OPENING STATEMENTS ON BEHALF OF THE ESTATE OF JULIA IGOE

9           MR. SPEARS:  Good afternoon, Your Honor.  Barry

10   Spears for the Record representing the estate of Julia Igoe --

11          THE COURT:  Okay.

12          MR. SPEARS:  -- I-G-O-E.  She's a -- it was a --

13   it's a tragic story, a medical malpractice post-petition claim

14   death out of a Boston hospital involving a Boston College

15   sophomore.  It was tragic and I won't go into the facts right

16   now except to say that I think -- I apologize.

17          I was actually on the phone this morning and I

18   thought during our lunch break I just needed to come downtown

19   to be here to make a record for the concerns and issues that

20   we have.

21          I'm not going to repeat.  I think all of the points

22   that were made since we've been back from the lunch break have

23   been very enlightening and frankly disturbing from a very

24   objective point of view.

25          As a clear post-petition administrative claimant, we

1    filed a claim for $25 million for this medical malpractice

2    claim.  The point that I wanted to make is something

3    Ms. Jacobsen pointed out with respect to the lack of clarity

4    relating to the medical liability claims procedure.

5          I frankly read it, and I don't understand it.  And

6    Ms. -- the Igoe estate, for example, has claims that they have

7    asserted against the hospital, against the doctors, against

8    the Debtors.

9          And to the extent that the settlement or the Amended

10   Disclosure Statement affects the rights of the Igoe estate to

11   pursue in full all of those claims, then we object to approval

12   of the Disclosure Statement.

13         For the first time I heard, along with everyone else

14   today, that the proposed effective date is in 2027.  That's

15   remarkable.  I mean, truly remarkable.  And while I appreciate

16   the fact that it may take that long for assets to be monetized

17   and litigation to run its course, I think this Court has

18   enough experience to know that that's probably not a realistic

19   date either.

20         And that even makes it all the more disconcerting in

21   terms of the fact that as people have already pointed out, all

22   of the professional fees will have been paid and paid in full.

23   And the real risk of either a process that does not fully

24   compensate administrative claimants means that they are the

25   ones who take the risk.

1          Approval of the Settlement Agreement kind of

2    solidifies payments to professionals.  And there's no -- there

3    should be no discrepancy in the payment of post-petition

4    administrative claimants like my client with professional

5    fees.

6          They're all entitled to payment in full.  And yet if

7    some of those parties get paid in full and others don't, it

8    runs afoul of the Bankruptcy Code and frankly is a problem

9    that people have already pointed out to the Court, and I won't

10   belabor the point.  But I think the fact that the medical

11   liability claims procedure is not clear is a problem going

12   forward.

13         I also found very compelling the comments that

14   Mr. Stromberg and Mr. Keach made, especially with respect to

15   this isn't -- with the FILO settlement or the FILO parties

16   isn't an up-or-down decision today.  And I hope that the Court

17   will take that into consideration and consider it.  I know --

18   I know that it will.

19         And finally, Your Honor, I guess I have to register

20   some concern about the amount and total amount of

21   administrative claims.  I know there's been discussion this

22   morning.

23         The first filing said 127 million.  That went down

24   to 115 million today.  It's been stated that administrative

25   claims are more likely in the 93 million and possibly even

1    86 million.  That's what I understood from comments from

2    counsel earlier today.

3              My client has a 25 million -- filed $25 million

4    post-petition administrative claim.  It's hard for me to see

5    that in these cases the number is really 86 million or 90 --

6    96 million or 115, frankly even 127 million.

7              And so the point being that I think it again augurs

8    against approval of the Settlement Agreement today and perhaps

9    even a problem with confirmation if the Debtors can't satisfy

10   the statutory language requirements, which is that they're

11   paid in full in cash on the effective date.

12             And it's not a fix to just move the effective date

13   out a year and a half or two years in order to say you're

14   going to do that.  Because by the time you get to that point,

15   all of the horses are already out of the barn.  There's no way

16   to put Humpty Dumpty back together again, and that's a real

17   problem.

18             THE COURT:  Thank you.

19             Let me know if I missed anyone.

20             MR. SAMOLE:  Your Honor?

21             THE COURT:  Yes.

22             MR. SAMOLE:  Sorry.  This is David Samole.  I had my

23   hand raised, and I wasn't sure if you were about to take a

24   break.  That's why I'm speaking up now.  I can either speak

25   now or after the break.

1          THE COURT:  No.  No, no, no, no.  You spoke at the
2    right time.
3               OPENING STATEMENTS ON BEHALF OF YASMANY SOSA
4          BY MR. SAMOLE:  Okay.  Thank you, Your Honor.  I'm
5    going to -- first of all, David Samole of the law firm of
6    Kozyak Tropin & Throckmorton, bankruptcy counsel to Yasmany
7    Sosa, who is the personal representative of the probate estate
8    of his departed wife Yannise Rodriguez, at the hands of the
9    pre-petition Debtors.
10         I may be the only person speaking today as a single
11   duck creditor and a pre-petition medical malpractice, wrongful
12   death claimant.  So I'm going to take you in a little bit of a
13   different direction.  The focus has been on the FILO parties
14   and administrative expenses and other serious concerns, so
15   this is going to be a little bit different for the Court at
16   the moment.
17         The papers I filed at Docket Number 4826 discuss
18   multiple items.  It dealt with my client's specific matter in
19   part, and it also addressed more global Disclosure Statement
20   comments for efficiency purposes.
21         The Debtors through their amendments did address
22   some of the Disclosure Statement issues and resolve some of
23   them, but others remain open.  So I'm going to first kind of
24   address one that I think is largely agreed, which is my
25   papers, my client's papers rather, sought to confirm that no

1    claims were being discharged in the bankruptcy cases despite

2    this being a Liquidation Plan, because the Plan provides that

3    the treatment among the various creditor classes would be,

4    quote, "In full and final satisfaction, settlement, release,

5    and discharge of such claim."

6            Despite that not being a formal discharge under

7    Section 1141(d), it still carries potential implications

8    including up to insurance parties -- excuse me, insurance

9    companies and third parties who constantly raise these issues

10   related to confirmed Plans.

11           And we actually counted the time the word discharged

12   are used.  So far, we've counted the word discharge over 70

13   times in the Plan documents.  The Debtor stated in their

14   objection at Document Number 4984 confirming, quote, "The Plan

15   did not provide for a discharge," end quote.

16           So we simply want language in any Plan or

17   confirmation order that notwithstanding any language in the

18   Plan or confirmation order, no creditor claims are being

19   discharged in the Liquidating Plan or its confirmation order

20   in exchange for any planned treatment.

21           My client's papers also referenced his long-standing

22   motion with that 1692 and 2157 which sought to compel payment

23   of his insured wrongful death settlement from TRACO or any

24   indemnified payment from Debtors.

25           The motion has been with the Bankruptcy Court under

1    its review since August 2024 after the Court conducted an

2    initial hearing and said it wanted to review the applicable

3    TRACO policy and then would decide when and if a further

4    hearing would be needed.

5         The reason why I'm raising this now and in the

6    papers is because if my client does get paid or is given

7    access to pursue TRACO, then the participation in the Plan

8    changes, at least for my client.

9         I've listened to some other stay relief hearings in

10   the coming months after the August 2024 hearings which sought

11   other types of relief to pursue TRACO insurance in which the

12   Court adjourned or denied without prejudice other PI

13   claimants' stay relief motions on the basis of wanting to see

14   what kind of treatment be provided that ensure PI claimants in

15   a to-be-filed Chapter 11 Plan.

16        Well, the Plan was filed a few weeks ago and it was

17   amended just yesterday.  The medical liability claim

18   procedures only deals with claims allowance and liquidation.

19   It did not provide for any provision for payment besides, and

20   excuse the expression, a very long shot GUP distribution.

21        The upshot is that the Amended Plan provides no

22   treatment allocation or pot of TRACO proceeds for the benefit

23   of allowed insured claims covered by TRACO policies.  Besides

24   getting paid on his own claim, if that's possible from the

25   TRACO proceeds, my client has been asking for a global TRACO

1   pot, and even TRACO has been asking for such organization

2   process to be discussed for months.

3        When I was last before Your Honor on August 27,

4   2024, the Debtor stated that as of August 2024, TRACO only had

5   about $3.5 million in cash, so it could not -- excuse me, it

6   could not fund my client's $4 million insured wrongful death

7   settlement.

8        However, the Debtors recently pointed me to a

9   February 2025 Rule 2015.3 report at Docket Number 3925, which

10  sets forth that as of September 30th, 2024, TRACO held an

11  increased cash position of $33 million.  And that was just one

12  month after the Debtor stated TRACO had $3.5 million.

13       The February report also stated that TRACO had other

14  non-current assets of about $29 million.  That would bring the

15  non-litigation-dependent total to $62 million.  So there are,

16  or at least were, enough TRACO cash funds and assets to pay my

17  client's allowed wrongful death settlement claim and start

18  funding the annuity for my client's infant daughter set forth

19  in the Settlement Agreement.

20       That is a request that remains under Your Honor's

21  consideration.  It seems like this matter might be between my

22  client and TRACO as the Debtors outright refuse the estate to

23  fund anything, indemnified or not, and want my client to only

24  participate in that long shot GUC distribution despite the

25  existence and admitted coverage of such claims with third

1    party TRACO insurance policy and existence of TRACO insurance

2    proceeds.

3           On a more global level, the Debtors' Amended Plan

4    now estimates that the medical liability claims pool to be in

5    the range of 72 million to 158 million.  At just $33 million

6    in cash, that was the last stated cash figure we've heard of

7    held at TRACO, TRACO ostensibly could make payment of such

8    allowed PI claimants in the range of 20 to 45 percent just in

9    that existing cash alone.

10           It could be almost twice more in the range of 39 to

11   86 percent if the non-current assets were liquidated and added

12   to those funds, and none of it without any litigation results

13   needed.  As of now, again, no funds or assets are being paid

14   or contributed or allocated by TRACO despite those proceeds

15   very arguably not being property of the bankruptcy estate.

16           I think this was part of what the Court was waiting

17   to see what would develop with the Plan process, but this just

18   hasn't happened.  To help guide hopeful discussions and

19   information sharing, we think that TRACO's updated cash and

20   asset situation should be updated.  However, the Debtors

21   didn't respond.

22           THE COURT:  I -- we're in left field now.  You're

23   asking for TRACO right field or one of those fields.  We're --

24   just tell me -- let's stick to the motions and disclosures and

25   I can't tell them to give TRACO stuff.

1          MR. SAMOLE:  Okay.  Okay.  Your Honor, just noting

2     that the Debtors did say they would be providing another

3     Rule '15 report, 2015 report, but not until August as they're

4     required to do so.

5          THE COURT:  Oh, okay.

6          MR. SAMOLE:  I understand.  Your Honor, it seems

7     that somehow the TRACO funds could and should be made

8     available to allow insured PI claimants because TRACO payments

9     received by my client and other covered insured claims would

10    actually help and benefit the entire GUC class as that would

11    otherwise reduce the burden on the bankruptcy estate.

12         And that's the connection here, Your Honor.  The

13    Amended Plan does not do so, and there is no such discussion

14    of any potential in the Amended Disclosure Statement.

15         Everyone has praised Judge Isgur, who is an

16    extremely talented bankruptcy judge and mediator, and the

17    claimants in TRACO, I think, would like the opportunity to

18    mediate, you know, this issue.  Maybe this will be another

19    June matter, so maybe something can be added to the Plan.

20         The other thing, Your Honor, is that without a TRACO

21    pot of funds currently included or any organization or

22    discussion of that in the Plan, we think that the Amended

23    Plan, you know, should remove the stay that's going to be

24    reimposed on medical malpractice claimants from being able to

25    pursue TRACO and other remedies.  It's just that that's part

1      of what we're seeking here, Your Honor.

2              The other thing we thought was that, again, there is

3      TRACO litigation, and just as part of disclosure, they are --

4      they've claimed several hundred million dollars in receivables

5      that would be due to TRACO, and ostensibly that would be for

6      the benefit for the payment of medical malpractice claimants

7      and other expenses that TRACO has talked about today.

8              On the GUC trust litigation, we appreciate the fact

9      that apparently, law firms will not be willing to take this on

10     a contingency.  That's a problem because the notion of doing

11     this on a structured finance basis is even worse.

12             Some of the categories of litigation that were

13     described D&O litigation, that's plenty of times it's found on

14     a contingency basis or hybrid basis, you know, hourly for the

15     investigation and then contingency.

16             The Blue Cross Blue Shield antitrust opt out, the

17     whole Blue Cross Blue Shield MDL was a contingency that's

18     normally done on a contingency.  And then there's

19     reimbursement litigation that's also very many times done in

20     contingency.  That's not in our control.

21             There's other things that the Debtors are not able

22     to speak about this.  So they have their business judgment.

23     It's just that issue about not doing this on a contingency,

24     doing this on an hourly, combined with the FILO party's

25     position of not giving a carve out, but it's a carve out where

1    they would participate in the GUC class, which is one thing

2    that would be acceptable, but then also charge for litigation

3    finance with their fees.

4         It's one thing, like they say, if you're comparing

5    this to other litigation finance, we question the need to

6    actually litigation finance this litigation.  So that's just

7    comments.

8         And then the final thing I wanted to note before I

9    get into my summary is right now, there is opt-out clauses

10   that you've heard about with the administrative expense

11   creditor class dealing with, you know, third party releases or

12   whatnot.

13        There's also an opt out for third party releases for

14   the GUC class.  I'm not really sure why because it's not going

15   to -- there's no different treatment if a party accepts or

16   doesn't.  Or if there is going to be different treatment, that

17   part has not been made clear to GUC claimants.  I've read the

18   Plan and that didn't come through so.

19        So in sum, Your Honor, and I appreciate the time, my

20   client seeks language in the Plan and confirmation order that

21   notwithstanding any language in the Plan or confirmation order

22   that no claims are being discharged in the Liquidating Plan or

23   its confirmation order in exchange for any Plan treatment.

24        We would also still go back to our motion that's

25   been pending with the Court to compel TRACO to pay the covered

1   settled claim with the cash that it has or permit my client to

2   pursue TRACO, you know, directly.  We can't -- so far, we

3   can't even have discussions with them.

4           I did mention about the Debtors filing, you know,

5   the updated report or getting TRACO's current tax position.  I

6   heard Your Honor.  I'll move on.

7           And then the last thing is we feel that the Amended

8   Plan documents should not have the GUC trust litigation

9   financed by the FILO parties, but rather, you know, a greater

10  consideration and push and nudge to consider contingency and

11  maybe just to have, or a hybrid with the FILO parties

12  participating in the unsecured class as they state, but

13  without having to have that litigation financed.

14          Your Honor, thank you very much for your time.  I

15  appreciate it.

16          THE COURT:  Thank you very much.

17          Why don't we take a 10-minute break, let everyone

18  stretch their legs, get off the hard benches for a bit.  We'll

19  come back in about 10 minutes.

20          I'm just telling everyone just let's take the

21  evidence.  I'm not inclined to hear closings unless they're --

22  like, I've heard plenty opening/closing.  We'll be here until

23  10:00 o'clock if I do that.

24          But I've really heard the arguments.  But if there

25  -- something comes up, I may give a few people whom I have a

1     couple of questions at the close the opportunity to argue.

2     But so I'm saying, all that to say, think carefully about the

3     cross-examinations and the questions that you want to get in

4     and let's see where this goes.

5            So let's go out about 10 minutes.  Thank you.

6            THE COURTROOM DEPUTY:  All rise.

7      (Recess taken from 3:34 p.m. to 3:50 p.m.)

8            THE COURTROOM DEPUTY:  All rise.

9            THE COURT:  Please be seated.

10      (Pause in the proceedings.)

11           THE COURT:  Okay.  Okay.  Thank you.

12           We're back on the Record as we proceed.

13           All right.  Let's proceed to evidence.

14           MR. BEREZIN:  Good afternoon, Your Honor.  Robert

15     Berezin, Weil Gotshal and Manges, on behalf of the Debtors.

16           THE COURT:  Okay.  Good afternoon.

17           MR. BEREZIN:  Good afternoon.  So we'll start with

18     housekeeping with the paper exhibits before we get to the

19     testimony, if that's acceptable?

20           THE COURT:  Okay.

21           MR. BEREZIN:  So the Debtors filed a Witness and

22     Exhibit List at Docket Number 4998.  That Exhibit List

23     contains multiple entries for documents, most of which are

24     operative documents.  In fact, I think all of them are

25     operative documents; in other words, not anything that is

1    offered beyond their legal effect.

2         So the Debtors would offer the documents that are

3    listed on the Debtors' Amended Witness and Exhibit List.  And

4    so I would be excluding the Declarations from Mr. Transier or

5    Mr. Castellano from that.

6         So we would offer those documents.  I can go through

7    the Docket numbers.  There are quite a few, and they're not in

8    sequential order.  But I'm happy to do that.

9         THE COURT:  You tell me which ones would not be

10   included.  Maybe that's the better way for me to --

11        MR. BEREZIN:  The only ones that would not be

12   included would be number 7, which is the Declaration of

13   Mr. Castellano.  We'll do that separate.  Number 8, which is

14   the Declaration of Mr. Transier; and Number 13, which is the

15   second, the Supplemental Declaration of Mr. Castellano.

16        The other documents we would move into evidence in

17   support of both motions.

18        THE COURT:  Okay.  Any objection to the admission of

19   documents at 4998 with the exception of 7, 8, and 13; did I

20   get that right?

21        MR. BEREZIN:  Yes, you did, Your Honor.

22        THE COURT:  Okay.  Yes.

23        MR. KEACH:  I just thought I'd get up here and

24   say --

25        THE COURT:  Yes.

1          MR. KEACH:  -- no objection from the participants,

2     Your Honor.  That's fine.

3          THE COURT:  Okay.  Let me just go -- okay.  They are

4     admitted.

5          (ECF 4998 with the exception of 7, 8, and 13 received in

6     evidence.)

7          MS. KING:  Your Honor, I do have an objection.

8          THE COURT:  All right.  What is your objection?

9          MS. KING:  Your Honor, they're hearsay, hearsay

10    within hearsay.

11         THE COURT:  Counsel --

12         MS. KING:  They haven't been authenticated.

13         THE COURT:  -- you're not in the courtroom, counsel.

14    We're going to have to proceed.  This is a live hearing,

15    counsel.  So if you're going to raise objections to docs about

16    being admitted, I got that you filed a late objection, and I

17    allowed that.  But you've got to be in the courtroom if you

18    want to object to docs.  That's the way we've done it in every

19    hearing.

20         The documents are admitted.  Let's proceed.

21         MR. BEREZIN:  Okay.  Your Honor, if it's acceptable

22    to the Court, we will start with Mr. Transier, and then we'll

23    shift to Mr. Castellano as far as --

24         THE COURT:  He's live or on the --

25         MR. BEREZIN:  On the Declaration, Your Honor.

1            THE COURT:  Okay.  Let's proceed.

2            MR. BEREZIN:  So I'll cede see the podium to my

3     colleague, Mr. Tsekerides.

4            THE COURT:  Mr. Tsekerides, good afternoon.

5            MR. TSEKERIDES:  Good afternoon, Your Honor.  Nice

6     to see you.  Ted Tsekerides from Weil Gotshal for the Debtors.

7            Your Honor, we're going to move in the Declaration

8     of William Transier.  As you've heard, he's a member of the

9     Transformation Committee and the Investigation Subcommittee.

10           That Declaration is at Exhibit 8 of the amended

11    Exhibit List that Mr. Berezin just went over, and it's

12    document 4904.  So we ask that that Declaration be admitted

13    and the witness is available for Cross.

14           THE COURT:  Any objection to the, in the courtroom,

15    to the admission of the Tsekerides --

16           MR. TSEKERIDES:  Not Tsekerides, no.

17           THE COURT:  -- no, you're Tsekerides --

18           MR. TSEKERIDES:  Yeah.

19           THE COURT:  -- of the Transier Declaration?

20           MR. TSEKERIDES:  Yeah.  I'd like to not testify.

21        (Laughter.)

22           MR. KEACH:  While I'd be happy to have him testify,

23    Your Honor, --

24           MR. TSEKERIDES:  Well, that --

25           MR. KEACH:  -- no objection to the --

1      THE COURT:  Oh, yeah.

2      MR. KEACH:  -- Transier dec.

3      THE COURT:  No.  Maybe I should've taken a longer

4  break.

5      (Laughter.)

6      THE COURT:  No.  Any objection to the Transier

7  Declaration which is Docket Number 8?

8      MR. TSEKERIDES:  At Docket 4904, Exhibit 8 on the

9  Exhibit List.

10     THE COURT:  You got it.

11     MR. TSEKERIDES:  Okay.

12     MR. KEACH:  None from the participants, Your Honor.

13     THE COURT:  Okay.  The document is admitted.

14     (ECF 4904, Exhibit 8 received in evidence.)

15     MR. TSEKERIDES:  And we'll call him up then.

16     THE COURT:  Okay.  Yeah.  What I was doing was

17  getting a correct spelling for Tsekerides for my new Courtroom

18  Deputy, and in the process --

19     MR. TSEKERIDES:  It's like it's pronounced.

20     (Laughter.)

21     THE COURT:  Can we turn on the camera, Yesenia?

22     Okay.  Mr. -- can you raise your right hand, sir.

23  Do you swear to tell the truth, the whole truth, and nothing,

24  but the truth?

25     THE WITNESS:  I do.

1       (Witness sworn.)

2            THE COURT:  Okay.  We'll let the Record reflect the

3       witness has been properly sworn in.  His Declaration is in.

4       But wait.  We will -- Mr. Keach, are you taking lead on Cross?

5            MR. KEACH:  I am, Your Honor.

6            THE COURT:  Okay.  Whenever you're ready.

7            MR. KEACH:  We're just trying to retrieve a copy of

8       his dec for him.  I can wait a second.  Or we can put it up on

9       the screen where he can see it.

10           I'm also happy to have you put it on the screen if

11      you want.

12           MR. TSEKERIDES:  Your Honor, can I approach?

13           THE COURT:  Yes.

14                        CROSS-EXAMINATION

15      BY MR. KEACH:

16      Q    Good afternoon.  Good afternoon, Mr. Transier.  How are

17      you?

18      A    Just fine.  Thank you.

19      Q    We spoke yesterday, so I'll pass on introductions and

20      just get to it.

21           What is your current position with respect to Steward

22      Health and its affiliates?

23      A    I'm currently an independent director on the board of

24      directors, board of managers, and I'm also a member of the

25      Transformation Committee and the Investigation Subcommittee.

1    Q    Okay.  And is the Investigation Subcommittee a

2    subcommittee of the Transformation Committee?

3    A    Yes.

4    Q    And who's on the Transformation Committee?

5    A    Mr. Castellano, Mr. Alan Carr, and myself.

6    Q    And who is on the Investigation Subcommittee?

7    A    It's Mr. Alan Carr and myself.

8    Q    Okay.  And I don't want to waste a lot of time with

9    preliminaries that are in your Declaration, but just for

10   context, when were you asked to become a member of the board

11   of Steward Health and its affiliates?

12   A    I think it's in my Declaration.  But in December of 2023.

13   Q    All right.  And who asked you to join the board?

14   A    I believe it was the company asked me to join the board.

15   Q    Okay.  Did -- were you contacted by Mr. Castellano?

16   A    I think initially I was contacted by Mr. Castellano to

17   come and have the visit with some of the management of Wteward

18   to see if there might be an interest in my serving in that

19   role.

20   Q    And that was based on your having worked with

21   Mr. Castellano before that time, correct?

22   A    Not completely, but -- but, yeah, we we had known each

23   other in the past.

24   Q    And you interviewed with some members of Steward's board

25   before agreeing to join the board.  Correct?

1    A    I did.

2    Q    Do you recall who you specifically spoke to?

3    A    I spoke to Dr. De La Torre and Marc Rich (phonetics).

4    Q    And based on those discussions and your personal

5    deliberations, you decided to join the board, correct?

6    A    Yes.  I also had deliberations with their company

7    counsel, too.  And -- but there was a series of discussions

8    along that way.

9    Q    And who was company counsel at that point in time?

10   A    It was McDermott.

11   Q    Okay.  Referring you to your Declaration, which has been

12   admitted as your Direct testimony, I want to refer you

13   specifically to paragraph 4 of your Declaration.

14        Do you see that?

15   A    Yes.

16   Q    And paragraph 4 refers to a number of Complex Chapter 11

17   cases where you have had a role similar to the one you have

18   with Steward.  Correct?

19   A    Yes.

20   Q    And so as not to go through each one as we did yesterday,

21   you and I discussed this yesterday at your deposition.

22   Correct?

23   A    We did.

24   Q    All right.  And is it the case that for each of these

25   Chapter 11 experiences, save two, where you -- where Kirkland

1    was Debtors' counsel, all of the rest involved Weil Gotshal as

2    Debtors' counsel.  Correct?

3    A    I'd have to go back through these and -- and think that

4    through before I respond to that question.

5    Q    You may do so.

6    A    Okay.

7         (Pause in the proceedings.)

8    A    I think Altera Infrastructure was done by Kirkland &

9    Ellis, and Salt Creek Midstream was done by Kirkland & Ellis.

10   Yes.

11   Q    And the rest Debtors' Counsel was Weil Gotshal, correct?

12   A    Yes.

13   Q    When you joined the board of Steward was it to become a

14   member of the Transformation Committee?  In other words, your

15   joinder of the board was also simultaneous with your becoming

16   a member of the transformation Committee, correct?

17   A    Yes, I believe it was.

18   Q    Okay.  And was the investigation committee in existence

19   then, or did that happen later?

20   A    That happened later.

21   Q    Okay.  What did you understand the mandate of the

22   Transformation Committee to be?

23   A    Was, you know, I don't have it in front of me, but

24   basically to oversee a restructuring process and all of the

25   associated things that might go on with that.

1    Q    And was Steward in financial distress at the time you

2    joined the board?

3    A    Yes.

4    Q    And did it have significant liquidity issues at the time?

5    A    Yes.

6    Q    And so your role as part of the Transformation Committee

7    was to assist the company in connection with its restructuring

8    efforts.

9    A    Yes.

10   Q    When did you become --hen was the Investigation

11   Subcommittee formed?

12   A    I don't remember exactly, but I think it was in the April

13   time frame.  April.

14   Q    April of 2024?

15   A    Yes.

16   Q    Okay.  And what did you understand the mandate of the

17   Investigation Subcommittee to be?

18   A    To do an investigation to identify claims and causes of

19   action for the -- for the Debtors.

20   Q    Okay.  At that point in time, were you informed of any

21   particular transactions that were to be examined for potential

22   causes of action?

23   A    I don't remember anybody making any particular list of

24   items for us.  We gave, we hired Weil Gotshal, and we gave

25   them a broad mandate to go and and help us with that

1    investigation.

2    Q    Okay.  I want to refer you specifically to paragraphs 8

3    and 9 of your Declaration.  Can you take a minute and look at

4    those?

5         (Pause in the proceedings.)

6    Q    Have you reviewed those?

7    A    Yes.

8    Q    And just to shortcut matters, do those two paragraphs

9    from your -- to your recollection accurately state the mandate

10   of the Investigation Subcommittee?

11   A    To the best of my knowledge, yes.

12   Q    Okay.  And you testified that the Investigation

13   Subcommittee gave Weil a mandate to investigate possible

14   causes of action that the Debtor companies might have against

15   third parties.  Is that correct?

16   A    Could you ask that question again, please?

17   Q    Sure.  I'm just summarizing your testimony, and you

18   correct me if I summarize it incorrectly.

19         And that is that the Investigation Subcommittee gave

20   Weil a mandate to investigate all possible causes of action

21   that the Debtors might have against third parties.

22   A    Yes.

23   Q    And did Weil from time to time report to the

24   Investigation Subcommittee regarding the conduct of that

25   investigation?

1      A    They did on a regular basis.

2      Q    Okay.  And by regular, do you mean weekly?  Monthly?

3      A    I think initially we met almost weekly, but you know, we

4      had recurring meetings throughout and sometimes more than

5      weekly and sometimes it would be a week or two in between when

6      we would meet.

7      Q    Okay.  And in paragraph 12 of your Declaration, you

8      indicate that in your capacity as a member of the

9      Investigation Subcommittee, along with Mr. Carr, you, in fact,

10     directly oversaw the investigation being conducted by Weil.

11     Is that correct?

12     A    Yes.

13     Q    All right.  And so ultimately the decision about whether

14     to move forward with respect to cause of action was yours and

15     Mr. Karr's.  Correct?

16     A    Oh, would you help me with that question in terms of to

17     move forward with causes of action?

18     Q    Sure.  With respect to whether or not the Debtors were

19     actually going to further investigate or pursue causes of

20     action that were brought to you by Weil, the ultimate decision

21     as to whether to do that or not do that was the Investigation

22     Subcommittee's decision to make, correct?

23     A    Yes.

24     Q    I'm going to refer you to paragraph 13 of your

25     Declaration, which is a long paragraph with several

1  transactions next to bullet points.  Do you see that?
2  A    Yes.
3  Q    Were these -- is this a list of transactions that was
4  reported to you to be a possible source of causes of action by
5  the Debtor entities against third parties?
6  A    Yes.
7  Q    And do you also understand that each of these
8  transactions is also listed in the Debtors' Disclosure
9  Statement as possible transactions to be pursued by the
10  litigation trust, should such a trust be formed?
11  A    Yes.
12  Q    In the course of your membership on the Investigation
13  Subcommittee, did you receive reports from time to time from
14  Weil about each of these transactions and the potential causes
15  of action that each one would generate?
16  A    Yes.
17  Q    And based on that -- those reports as to each of these
18  transactions, did it, did the Investigation Subcommittee
19  conclude that there were viable causes of action with respect
20  to each of these transactions?
21  A    Yes.
22  Q    And did you authorize that those transactions then be --
23  excuse me that those causes of action be pursued by the
24  Debtors?
25  A    Yes.

1   Q    Now, are you familiar with the law firm known as Kobre &

2   Kim?

3   A    I am.

4   Q    And do you understand that Kobre & Kim has been retained

5   to pursue these causes of action?

6   A    Some of them, yes.

7   Q    Are there some they have -- they've been -- they've not

8   been retained to pursue?

9   A    Well, there's they -- well, are you talking specifically

10  about these cause of actions or the other?

11  Q    No.  Specifically about what's listed in paragraph 13 of

12  your Declaration.  And you can take time to go through those

13  if you like, to make sure your answer is accurate.

14  A    Yes.

15  Q    So the answer is yes, they've been authorized to pursue

16  causes of action in each of these categories?

17  A    Yes.

18  Q    Okay.  Were you -- did you interview Kobre & Kim prior to

19  their retention?

20  A    I did.

21  Q    And did the Investigation Subcommittee interview other

22  law firms for this task as well?

23  A    We did.

24  Q    Do you know, do you remember how many law firms you

25  interviewed?

1    A    I think in this case, maybe as many as three.  I don't
2    remember exactly.
3    Q    And did you discuss those firms -- with those firms, the
4    terms under which they would bring the litigation.
5         MR. TSEKERIDES:  Object to the form, Your Honor, the
6    terms that they bring the litigation.
7         MR. KEACH:  I will clarify.
8         THE COURT:  Okay.
9    BY MR. KEACH:
10   Q    Did you discuss the manner in which the firms would be
11   compensated for their work?
12   A    I think we asked each of the firms that we talked to,
13   including Kobre & Kim, to give us a general understanding of
14   how they would bill for this work because we were concerned
15   about the cost of the estate.
16   Q    Okay.  Did you ask those firms whether they would pursue
17   these causes of action on a contingent fee basis?
18   A    I don't remember exactly, but I that may have been part
19   of the discussion we had.
20   Q    Do you know if it was or it wasn't?
21   A    I can't say here.
22   Q    So you don't recall whether you asked the firms whether
23   they would --
24   A    I don't recall exactly, no.
25   Q    The reporter would be happy with both of us if you let me

WILLIAM TRANSIER - CROSS BY MR. KEACH                    185

1    finish my question, and then you answer, and I'll try to give
2    you the same respect. So let me just repeat that again so it's
3    clear.
4         You don't recall as you're sitting here now, whether you
5    asked any of the firms to do this on a contingent fee basis.
6    A    I don't, no.
7    Q    Okay.  And eventually the decision was made to retain
8    Kobre & Kim.  Is that correct?
9    A    Yes.
10   Q    And so, just to be clear, Weil Gotshal, which
11   investigated these claims, will not be prosecuting these
12   claims?
13   A    That's correct.
14   Q    Okay.  Do you know why that decision was made?
15   A    We made a determination that Kobre & Kim had some special
16   skills in terms of pursuing these claims.  And also there was
17   a cost efficiency factor involved.  I think a combination of
18   those and other factors entered into our thought process.
19   Q    Okay.  Did you consult with the FILO Secured Parties
20   about the retention of Kobre & Kim?
21   A    We did.
22   Q    And did they approve that retention?
23   A    They did.
24   Q    Did you consult with them about the other firms you
25   interviewed?

1        A    I think they were aware of the other firms that we were

2        talking to.  And I think at the end of the day, we made this

3        recommendation and they approved it.

4        Q    Okay.  The retention papers for Kobre & Kim seem to

5        suggest that they're being retained to further investigate

6        claims and then to prosecute them if they find the claims have

7        merit.  But just to be clear, is it your understanding that

8        Kobre & Kim has been retained to prosecute causes of action

9        resulting from each of these categories, as opposed to just

10       investigating claims?

11       A    I would say to pursue the claims, yes.

12       Q    Right.  And to litigate them?

13       A    If necessary, yes.

14       Q    You mean if you make a demand and somebody pays you, they

15       don't have to litigate, but otherwise you're planning to have

16       Kobre & Kim litigate these claims, correct?

17       A    Yes.

18       Q    And if the settlement is approved, the party who will own

19       these claims is the litigation trust, correct?

20       A    Yes.

21       Q    I want to refer to Section 3 of your statement, which

22       begins at paragraph 16 on page 7 of your Declaration, excuse

23       me.  The subject matter of that section is called "Releases."

24            Do you see it?

25       A    Yes.

1    Q    Was the Investigation Subcommittee or the Transformation

2    Committee involved in the discussion of who would receive and

3    give releases in connection with the settlement with the FILO

4    Secured Parties that is the subject of today's hearing?

5    A    The Investigation Subcommittee was.

6    Q    And you remember that subcommittee, correct?

7    A    Yes.

8    Q    Did you -- did the subcommittee itself identify parties

9    who were going to receive releases from the Debtors, or did

10   somebody present you with a list of possible parties?

11   A    We had a process that we went through.  And there was a

12   list prepared for our review, and we had deliberations about

13   who was on that list, both on the list of released parties, as

14   well as those on the non released parties.  And we discussed

15   them.

16   Q    Now when we discussed this yesterday, you indicated that

17   the distinction between parties to get releases and the

18   parties to not get releases was based at least in part on the

19   fact that you, the Transformation Committee -- the

20   Investigation Subcommittee, excuse me, wanted to ensure that

21   none of the parties implicated in the listed transactions or

22   causes of action would be getting releases.  Correct?

23   A    Yes.

24   Q    And so the non-released parties represents, you know,

25   your -- the Committee's judgment at the time that those

1    parties who might be caught up in the litigation and therefore

2    should not get releases, correct?

3    A    Yes.

4    Q    With respect to the parties who were getting releases you

5    mentioned there was a process.  What was that process?

6    A    We were given a list.  We were given reasons why they

7    were on those respective lists.  We discussed them amongst

8    ourselves, and there was a couple of iterations of that list

9    because they were not only subject to our discussions, but all

10   the parties that are in the part of the settlement proposal.

11   Q    All right.  Let's let's start with the beginning of that.

12   You said you were presented with a list.  Who presented you

13   with the list?

14   A    Weil Gotshal.

15   Q    Did they -- did you understand who had prepared the list?

16   A    I don't think I ever really asked who prepared it, but I

17   know that there was input provided to them to bring the list

18   to us and, and talk about the reasons why people would be on

19   the list.

20   Q    And at the time you were presented with this list, were

21   there settlement negotiations ongoing with the FILO Secured

22   Parties and the Creditors Committee and the Debtors?

23   A    Yeah, I believe so.

24   Q    And did you understand there was even an ongoing

25   mediation process that was going forward?

1    A    Yes.

2    Q    And do you understand that you were being presented the

3    list because the releases were part of that settlement

4    discussion?

5    A    Yes.

6    Q    And the reason you were going to be asked to approve the

7    list was because this settlement was going to need to be

8    approved, correct?

9    A    Yes.

10        (Counsel confer.)

11            MR. KEACH:  May I approach, Your Honor?

12            THE COURT:  Yes.

13   BY MR. KEACH:

14   Q    Mr. Transier, I'm going to show you what is an attachment

15   from the settlement motion, which is the list of released --

16   Debtor related released parties.  Correct?

17   A    Yes.

18   Q    And you've seen that list before?

19   A    I have.

20   Q    And is that a version of the list you were presented

21   with?

22   A    Yes.

23   Q    As to each of those parties, do you know why they are

24   getting a release from the Debtors?

25   A    I can't sit here today and tell you the reason for each

1    of those individuals.  As I said before, there was a process

2    that we went through, and I think each of these parties fell

3    within one of three buckets of categories for that, which is

4    stated in my Declaration.

5    Q    And would you repeat for the Court what those three

6    buckets were?  And by three buckets you mean three different

7    categories of justifications for being on the release,

8    correct?

9    A    Yes.

10   Q    Can you tell the Court what those three buckets were?

11   A    I think the one of them was, and we can read it from my

12   Declaration, if you don't want me to come from memory.  But

13   basically people that were not involved in the transactions

14   that were identified, people that that there was no indication

15   of any wrongdoing that might create a claim or cause of action

16   and those that had already or would, in our judgment, provide

17   material support for the pursuit of these claims or

18   adversarial activities that were going on for the Debtors.

19   Q    And so, as far as you know, each of the parties on this

20   list fit into one of those categories?

21   A    Yes.

22   Q    Is there a Ms. Driscoll on the list, Ann Marie Driscoll?

23   A    I remember from yesterday you bringing her name up.  So

24   let me see and spot it on here.

25          Yes.  Number two.

1    Q    Okay.  Do you know what her role was at Steward?
2    A    I think I said yesterday that I did not remember what her
3    role was.
4    Q    Would it surprise you to know that she last worked for
5    Steward in 2019?
6    A    I heard you say that this morning and your opening
7    comments.
8    Q    Did you know that when you were looking at the list?
9    A    I don't remember what I saw when I saw the list.
10   Q    Do you know what bucket she fits into?
11   A    If I don't recall what we talked about at the time, it
12   would be hard for me to just say off the top of my head.
13   Q    So the answer to that is no?  You don't know what bucket
14   she fits into?
15   A    No, but I'm confident that she is in one of those three
16   buckets.
17   Q    You just don't know which one.
18   A    Not here today without going back.
19   Q    And why would somebody who last worked for Steward in
20   2019 need a release?
21   A    I can't respond to that.
22   Q    Did you understand that the inclusion of Ms. Driscoll on
23   this list was required by the FILO Secured Parties?
24   A    I didn't know that.
25   Q    Did you understand that the inclusion of Ms. Driscoll on

1   this list was required by any of the parties?

2   A    As I said, there was a list provided to us, and we went

3   through a deliberation of why they should be included on the

4   list.  But I never really knew who had put individuals on

5   these lists.

6   Q    And you don't remember what the justification was for

7   Ms. Driscoll, do you?

8   A    Not as we said here today.

9   Q    Okay.  Do you know why -- do you see a Mr. Lombardo on

10  that list?

11  A    Yes.  Patrick Lombardo.

12  Q    Do you know why he's on the list?

13  A    I think the same answer applies.  I did not remember.

14  Q    You don't know which bucket he belongs in either, right?

15  A    I can't say here.

16  Q    You can't say which bucket he fits into.

17  A    Not definitively without going back and seeing what we

18  deliberated on.

19  Q    Well, did you have -- did you make notes of those

20  meetings that you --

21  A    I did not.

22  Q    Okay.  So what would you go back to look at if you were

23  going to make that determination?

24  A    Well, I think we had discussions with Weil and I'm sure

25  that there is the potential to go back and figure that out.

1    Q    You said you had -- did you have any discussions with the

2    FILO Secured Parties about the composition of this list?

3    A    I did not.

4    Q    Do you know if anybody had discussions with the FILO

5    Secured Parties about the content of this list?

6    A    Our counsel did, Weil Gotshal.

7    Q    They told you they had discussions with the FILOs about

8    this list.

9    A    Yes.

10    Q    And when I say FILOs, I'm shorthanding the FILO Secured

11    Parties, excuse me.

12    A    Yes.

13    Q    And so Weil told you that they had discussions about this

14    list?

15    A    They did.

16    Q    And what did they tell you?

17             MR. TSEKERIDES:  Your Honor, objection.

18             MR. KEACH:  He's already opened this door, Your

19    Honor.

20             THE COURT:  Yeah.  I think the contents are

21    different than having.  So I'll sustain the objection.

22    BY MR. KEACH:

23    Q    Based on those discussions, did you understand the FILO

24    Secured Parties had consented to this list?

25    A    I knew it was a part of the Settlement Agreement that's

1    being proposed that that they had agreed to the list.

2    Q    Based on those same discussions, did you have an

3    understanding as to whether the FILO Secured Parties were

4    driving the composition of this list or whether it was being

5    driven by somebody else?

6    A    I didn't have that understanding.

7    Q    You did not have an understanding that the FILO Secured

8    Parties were were actually requiring that these parties get

9    released?

10   A    Yeah.  I think your question was driving this and I you

11   know, it was a mutual agreement amongst all the parties.

12   Q    Were you -- was the Investigation Subcommittee or the

13   Transformation Committee directly involved in the settlement

14   discussions with the FILO Secured Parties and the Committee?

15   That is the subject of the of today's hearing?

16   A    No.

17   Q    Did you personally attend any of the mediation sessions?

18   A    I did not.

19   Q    But the Transformation Committee eventually gave the

20   authorization for the Debtors to enter into this settlement.

21   Correct?

22   A    Yes.

23   Q    And since you didn't attend any of the sessions and

24   weren't personally responsible for any of the agreements, was

25   your basis -- was the Transformation Committee's basis for

1    entering into the Settlement Agreement or authorizing entering

2    into the Settlement Agreement based on the advice of counsel.

3    A    Based on briefings from counsel, and we made a business

4    judgment from there.

5    Q    So based on recommendations by Weil, the Transformation

6    Committee approved entering into this settlement.

7    A    Yes.

8    Q    Okay.

9             MR. KEACH:  May I have one second, Your Honor?

10            THE COURT:  Of course.

11            MR. KEACH:  Thanks.

12        (Pause in the proceedings.)

13            MR. KEACH:  Nothing further, Your Honor.

14            THE COURT:  Thank you very much.

15            Any other party wish to cross-examine this witness

16   who's in the courtroom?

17        (No audible response.)

18            Any -- I guess we can call it Redirect.

19            MR. TSEKERIDES:  No Redirect.

20            THE COURT:  Thank you very much for your time.

21            MR. BRESSLER:  Your Honor, we ask that Mr. Transier

22   be dismissed, if he could leave?

23            MR. KEACH:  No objection, Your Honor.

24            THE COURT:  Okay.  Thank you very much for your

25   time.  You're excused.

1          THE WITNESS:  Your Honor, nice being in your court.

2          THE COURT:  Thank you.

3          MR. BEREZIN:  Okay.  Good afternoon again, Your

4     Honor.  Robert Berezan, Weil Gotshal & Manges on behalf of the

5     Debtors.

6          At this time, Your Honor, we would like to proffer

7     the the Declaration of Mr. Castellano.  He has two

8     Declarations -- into evidence in lieu of Direct testimony.

9     And we also have a proffer.

10          THE COURT:  Do you want to move both in and do a

11     proffer?

12          MR. BEREZIN:  Yes. Or we can -- yes, Your Honor.  It

13     relates to the -- what you heard today day at the beginning of

14     the hearing regarding the timing of the effective date.  So we

15     would like to supplement.

16          THE COURT:  Why don't we just take them one-by-one,

17     then just try to get the docs in the Declarations in, and then

18     we'll talk about the proffer just separately?

19          MR. BEREZIN:  Sure.

20          THE COURT:  Okay.

21          MR. BEREZIN:  All right.  So the Debtors in the

22     first instance would offer the Declaration of John Castellano,

23     which is at Document 4903.  And that was submitted on

24     May 16th, 2025.

25          MR. KEACH:  No objection to that, Your Honor.  And I

WILLIAM TRANSIER - CROSS BY MR. KEACH          197

1    think this is actually one of our exhibits as well, so it's

2    fine.

3                THE COURT:  Okay.  Is -- would that be kind of

4    4998-7, Mr. Berezin?

5                MR. BEREZIN:  Mine says 4903.

6                MR. KEACH:  As does mine, Your Honor.

7                THE COURT:  Oh, no.  That's the document you

8    submitted a Witness and Exhibit List for purposes of today.  I

9    was just trying to.

10               MR. BEREZIN:  Oh, yes.

11               THE COURT:  Let's see.  I know we excluded three of

12   them.  I was just -- but I'm happy to just admit 4903.  It

13   makes makes it easier for everyone.

14               MR. BEREZIN:  It is at Docket Number 4998 is our

15   Amended Witness and Exhibit List.

16               MR. KEACH:  Maybe just for Record clarity, we just

17   refer to this as Docket Number 4903, Your Honor?

18               THE COURT:  Yep, yep, 4903.  I'll keep it simple. I

19   won't complicate things.

20               4903 is admitted.

21          (ECF 4903 received in evidence.)

22               THE COURT:  Yep.  Okay.  That's good.

23               Yeah, so we'll just admit it at 40 -- it's also. But

24   it was your 7.  But we'll just admit it, Docket 4903.  We'll

25   keep it simple.

1          MR. BEREZIN:  Right?  But you're correct, Your

2    Honor.  It also is Number 7 at the Debtors' Amended Witness

3    and Exhibit List, which is Document 4998.

4          THE COURT:  Okay.

5          MR. BEREZIN:  The next Declaration is the

6    Supplemental Declaration of Mr. Castellanom which was -- which

7    is at Document 4977.  And that was submitted on May 27th,

8    2025.  That would be Number 13 at Document 4998, which is the

9    Amended Witness and Exhibit List.

10          THE COURT:  Any objection to the Supplemental

11    Declaration?

12          MR. KEACH:  None, Your Honor.

13          THE COURT:  Okay.  It's admitted.

14       (ECF 4977 received in evidence.)

15          MR. BEREZIN:  Thank you, Your Honor.

16          The next is a short proffer.

17          MR. KEACH:  Before he starts with the proffer, Your

18    Honor, Mr. Castellano is here.  I'm perfectly happy if he

19    wants to do additional Direct instead of just doing a proffer.

20     But it seems to me if he's going to proffer Mr. Castellano's

21    testimony when he's here, he can just get on the stand and he

22    can ask him questions.

23          MR. BEREZIN:  We don't have an objection to that,

24    Your Honor.

25          THE COURT:  Okay, yeah.  It's -- I normally do it.

1    If somebody objects and the person's in the courtroom, we'll

2    just put them live on the on Direct.

3            MR. BEREZIN:  That's no problem, Your Honor.

4            THE COURT:  Okay.  The only question I have is if

5    somebody -- there are some docs there.  I don't know if you

6    want to just take that off before we bring Mr. Castellano up.

7            Mr. Castellano, won't you come on up?

8            Can you raise your right hand?

9            Do you swear to tell the truth, the whole truth, and

10    nothing but the truth?

11            THE WITNESS:  I do.

12            THE COURT:  Okay.  You can please be seated.

13            Let the Record reflect the witness has been properly

14    sworn in.

15       (Witness sworn.)

16            THE COURT:  We will proceed with Direct.

17            MR. BEREZIN:  Thank you, Your Honor.

18            If I could approach the witness, I just want to have

19    -- provide him with his Declarations so he has them there in

20    case he needs it.  Is that okay?

21            THE COURT:  Okay.

22            MR. BEREZIN:  Thank you.

23            THE WITNESS:  Thanks.

24                  CROSS-EXAMINATION

25    BY MR. BEREZIN:

1    Q    Mr. Castellano, just a few questions for you.

2         And before we pass, before I pass the witness today you

3    heard, I'm sure the opening remarks where Debtors' counsel

4    stated that in the Debtors' reasonable estimate, the Debtors

5    are estimating that the effective date is likely to occur in

6    early 2027, although that date may occur later or earlier.

7              Do you recall that?

8    A    I do.

9    Q    Okay.  Can you explain to the court or provide your

10   testimony regarding whether that estimate is, in fact, the

11   Debtors' estimate?  And if it's -- and the basis for it.

12   A    It is, in fact the Debtors' estimate.

13        The Debtor has been building a model as it relates to

14   what the potential recoveries will be from the various

15   litigation claims that have been described in the Disclosure

16   Statement, as well as collections from other assets That the

17   Debtor has, taking input from the various specific counsels

18   that are responsible for moving forward the litigation claims.

19   Taking months of input from them in terms of what potential

20   recoveries could be and the timing of those recoveries, laying

21   all of that out in a model and then waterfalling that against

22   the proposed settlement structure that we are here for today,

23   as well as the costs and expenses of achieving the litigation

24   recoveries, offsetting all of that against the claims that the

25   Debtors have the secured claims.

1        And when I believe there would be a reasonable amount of

2    liquidity to be able to say you can pay the administrative

3    claims to go effective, I am estimating that at early 2027.

4    Q    And to what extent would that include payment of the

5    priority claims that the Code requires to be paid on the

6    effective date?

7    A    I included both of those in estimating what a reasonable

8    cash balance would be to not only settle the likely

9    administrative claims, the priority claims that would need to

10   be paid to go effective, and then also just have a cash

11   balance so that the estate or the litigation trust at that

12   point in time could continue pursuing anything else that it

13   had to have to pursue.

14   Q    Now, that estimate that you just testified about is

15   premised on a value.  I don't want you to disclose what that

16   value is, but it's premised on a value of the litigation

17   claims, in part, on the litigation claims that are disclosed

18   in the Disclosure Statement.  Is that true?

19             MR. KEACH:  Your Honor, objection; leading.

20             This is Direct Examination.

21             THE COURT:  It is leading.  I'll let him ask another

22   question.

23             MR. BEREZIN:  Sure.

24   BY MR. BEREZIN:

25   Q    Can you explain to the Court what is required to monetize

1      those litigation claims sufficient to pay, as you just
2      testified, administrative creditors by that early 2027 date?
3      Yeah.
4      A    For each one of the litigation claims that's listed in
5      the Disclosure Statement, there will need to be a process led
6      by various specific counsels that are identified for each one
7      of those -- each one of those litigation claims, and an
8      estimate of time to bring forward charges, negotiate, bring
9      forward litigation, settle.  I received those estimates of
10     timing and value for those various litigation claims to make
11     -- to effectively determine what liquidity would come into the
12     estate.  And then, as I said, waterfall that against the
13     expenses necessary to achieve those results.
14     Q    And have you determined what would happen if the Debtors
15     needed to monetize those claims or Chapter 7 Trustee, to
16     monetize those claims in the very near term?
17              MR. KEACH:  Your Honor, objection to compound. He's
18     asking the Debtor and the Trustee to --
19              MR. BEREZIN:  Withdraw.
20     BY MR. BEREZIN:
21     Q    Can you describe in your business judgment what you would
22     expect to occur in terms of monetizing the litigation claims
23     in the near term, whether it's a Chapter 7 Trustee or not?
24     A    These are -- these are very complex litigation claims.
25     They obviously have a significant material, alleged claim

JOHN CASTELLANO - CROSS BY MR. BEREZIN          203

1   value associated with each one.  Monetizing these in the near

2   term or in the short term would require a substantial discount

3   to what could potentially be achieved because what's necessary

4   to achieve the targeted results is time and money.  And trying

5   to do -- trying to do something in the near term would impact

6   what the potential value is of these claims because they are

7   extremely complex.

8   Q    So, Mr. Castellano, assume for a moment that the final

9   settlement is not approved.  Okay?

10  A    Okay.

11  Q    And then assume further that the final lenders do not

12  consent to further use of their cash collateral.  Okay?

13  A    Yes.

14  Q    And they decide to seek relief from the Court to lift the

15  automatic stay.  Okay?

16  A    Yes.

17  Q    What are the risks to the other creditors in that event?

18          MR. KEACH:  Your Honor, objection.  This is covered

19  in Mr. Castellano's Supplemental Declaration.  My

20  understanding was the additional Direct was they're going to

21  -- that is not covered in his Declaration.

22          If they want to redo his entire examination, they

23  can pull both Declarations and they can start at the

24  beginning.

25          THE COURT:  Counsel, what's your response?

1          MR. BEREZIN:  Your Honor, I think the testimony from

2     the witness is it's relevant to all of the arguments we've

3     been hearing today.  I think that there's some confusion with

4     -- from many of the administrative expense objectors that

5     we've heard from today as to what would happen.  And I don't

6     think people have read the documents and now we have --

7          THE COURT:  Well, hold on.  Now you're arguing.

8     Your question is this already covered in the Declarations?

9          MR. BEREZIN:  I believe it is certainly covered in

10    the supplemental Declaration, Your Honor.

11         MR. KEACH:  And Your Honor, I'm good either way,

12    they can withdraw the Declarations and start him from the

13    beginning, or we can leave the Declarations and not enhance

14    them.  But we can't have it both ways.

15         THE COURT:  Hold on a second.

16       (Pause in the proceedings.)

17         THE COURT:  We're in the Declarations, would this be

18    covered?

19         MR. BEREZIN:  Your Honor, in the Supplemental

20    Declaration.  Just give me a moment.

21         THE COURT:  Uh-huh.

22         MR. BEREZIN:  It'd be in paragraph 6, Your Honor,

23    and 7 , as well as 8.

24         THE COURT:  I'm fine with this testimony. 6, 7 and

25    8.

1          MR. BEREZIN:  So sorry, Your Honor.  Should I proceed

2     or?

3          THE COURT:  What's the question again?  Let me hear

4     it.

5          MR. BEREZIN:  The question is:  What are the risks

6     to creditors if the FILO parties move to lift the automatic

7     stay in the near term?

8          THE COURT:  What does it talk abou risk to

9     creditors?

10         Mr. Keach.

11         MR. KEACH:  In 7, Your Honor, specifically, and in

12    8.

13         THE COURT:  Which sentences?

14       (Pause in the proceedings.)

15         MR. KEACH:  In other words, the specific risk

16    described as the risk that they would acquire all assets at a

17    credit bid and deprive other parties of the surplus, Your

18    Honor.  It's extensively covered in 6, 7, and 8.

19         THE COURT:  I know, but I'm asking you -- I'm asking

20    you to point me to a specific sentence.

21         MR. KEACH:  I think it's literally everything, but

22    the first sentence of paragraph 7 and all of paragraph 8.  And

23    the last -- at least the last sentence of paragraph 9.

24         THE COURT:  I'll let you ask the question.  I don't

25    think it's specifically covered, but I do think, Mr. Berezin,

1    we're now -- I think Mr. Keach makes a broader point, which is

2    we were just proffering about something supplemental on one

3    issue.

4            So I'll let you ask this question, and then we're

5    probably done.

6            MR. BEREZIN:  Agreed, Your Honor.

7            THE COURT:  All right.  He probably needs to hear

8    the question again, though.

9            MR. BEREZIN:  Sure.

10   BY MR. BEREZIN:

11   Q   Mr. Castellano, what are the risks to other creditors?

12   Should the FILO parties move to lift the automatic stay in the

13   near term?

14   A   If the FILO parties are successful in lifting the

15   automatic stay and foreclose on the collateral, the Debtors

16   will literally have no liquidity.  They will have no assets

17   left.  And I think it would be a detrimental impact on any

18   potential recoveries for our administrative priority or

19   unsecured creditors, given the fact that the FILO Lenders in

20   that particular scenario would have title to all of the assets

21   of the estate, including existing cash.

22           MR. BEREZIN:  Thank you, Mr. Castellano.

23           I cede the witness.

24           THE COURT:  Okay.

25           MR. BEREZIN:  Thank you.

1        THE COURT:  Mr. Keach, whenever you're ready.

2        MR. KEACH:  Thank you, Your Honor.

3                     CROSS-EXAMINATION

4    BY MR. KEACH:

5    Q    Mr. Castellano, again, I won't spend much time in

6    context, but you are the Chief Restructuring Officer of the

7    Steward Chapter 11 Debtors?

8    A    Correct.

9    Q    And you're also a member of the so-called Transformation

10   Committee.  Correct?

11   A    Yes.

12   Q    And you heard Mr. Transier's discussion about the mandate

13   of the Transformation Committee. Did you?

14   A    Yes, I did.

15   Q    And do you agree with him that that was the mandate?

16   A    It evolved over time, but that was the general mandate.

17   Yes.

18   Q    I want to specifically go to issues that have been raised

19   in connection with both the Settlement and the Plan and

20   Disclosure Statement.  And let's start with with professional

21   fees.

22        At present are there unpaid professional fees due and

23   owing by the estate, in other words, professional fees for

24   which either applications have been approved or estimates have

25   been provided, but the Debtor has not yet paid those fees?

1    A    That's correct.  Yes.

2    Q    And what is the amount of fees in that category?

3    A    I'm estimating that at $34 million at present.

4    Q    Okay.  34 million?

5    A    34.  I'm sorry.  Yes.

6    Q    And those estimates go through at least this week.

7    Correct?

8    A    Probably last week.

9    Q    Last week?  And I assume, have you not received estimates

10   for this week?

11   A    Members of my team may have received estimates for this

12   week.  I just -- I don't have it in front of me.

13   Q    Do you have any sense of what the weekly burn rate is in

14   that connection?

15   A    Given everything that's -- and I apologize, when I say

16   last week, the estimate for last week would have been for the

17   week prior because everything is on a lag.  So last week

18   probably would have been another few million dollars.

19   Q    So you might be up to 37, 38 million?

20   A    Potentially.

21   q    Did you prepare an estimate as to the amount of

22   professional fees necessary to get through a confirmation

23   hearing?

24   A    I did.

25   Q    And before I ask you the estimate, when -- in preparing

1    that estimate, what date did you presume for the confirmation

2    hearing?

3    A    It was either July 8th, sometime between July 8th and

4    July 11th.  So effectively the second week of July.

5    Q    Okay.  And what was your estimate of the -- and I want to

6    focus only on professional fees now -- what was your estimate

7    as to the amount of professional fees required as to all the

8    estate's professionals?

9         And let's just stop there and do a definition.  By the

10   "estate professionals," I mean, professionals for the Debtors,

11   the Committee and any other ancillary professionals, the

12   ombudsman, et cetera.

13        What's the estimate to get through confirmation?

14   A    Are you including lender professionals in there?

15   Q    No.  We'll exclude lender professionals for now.

16   A    That's probably that -- that number would probably be

17   about 14 to 15.

18   Q    All right. And what do you estimate if we -- for the

19   amount for lender professionals?

20   A    Yeah, it's about 10 to 11.  I just want to make one point

21   to be clear, the numbers that I'm quoting are cash numbers,

22   and there are a number of expenses, cash payments in there

23   that don't relate specifically to this period of time because

24   there's some catchup payments that add up to probably another

25   8 to $10 million.

1    Q   All right.  So we're looking at around $25 million of

2    additional professional fees to get to confirmation?

3    A   $25 million of cash payments, not all of which

4    specifically relate to the services in that period of time.

5    That's what I was -- that's the point I was trying to clarify.

6    Q   I understand, but the Debtor will have to spend

7    $25 million or accrue liability to spend $25 million for

8    additional professional fees, whether or not those fees were

9    actually incurred in that period or not.

10   A   That's correct.

11   Q   Okay.  Are there additional expenses related to getting

12   to confirmation?

13   A   Yes.

14   Q   And give me an example of what kinds of other expenses

15   the Debtors will have to get to confirmation.

16   A   There's employees.  You know, we have about 30 or so

17   employees.  There's benefit cost payments of those employees

18   on a weekly basis.  We have infrastructure, IT charges.  We're

19   still liquidating worker comp claims from historical

20   transactions.

21       So on average, the estate incurs probably another million

22   to a million and a half of payments on a weekly basis.

23   Q   Are there expenses, such as the cost of actually

24   soliciting votes that will have to be incurred?

25   A   There is.

1    Q    And have you estimated what those costs are?

2    A    Yeah.  Yesterday I thought it was closer to three, but

3    it's going to be closer to a million dollars.

4    Q    A million dollars?

5    A    Yes.

6    Q    Right.  And that's for mailing and similar expenses.

7    A    That's correct.

8    Q    Okay.

9    A    And I apologize, but that estimate was also in the

10   professional fee estimate that I was referencing earlier.

11   Q    Okay.  Now the Debtor is actually -- has proposed sending

12   out essentially QR codes to everybody.  Correct?

13   A    I'm not familiar with all elements of the actual

14   solicitation process.  Members of my team have been working

15   with the Weil team.  I know we're trying -- this is one reason

16   why we were able to reduce the cost as much as we could.

17   There will be some electronic element of it.  I just -- I'm

18   not familiar with the specific details of that.

19   Q    Right, but do you do understand that it's not the

20   Debtors' intent initially to send full paper Plans and

21   Disclosure Statements and ballots to everybody.

22   A    Again, I'm not familiar with all of the details. One way

23   of reducing costs was to try and minimize how much paper was

24   actually sent.

25   Q    Right.  Do you have an estimate of what the additional

1      cost would be if people actually asked you for a full paper

2      copies of everything?

3      A    I don't right now, no.

4      Q    It would be considerably more, though. Correct?

5      A    It would be more than a million dollars.  Correct.

6      Q    So moving away from professional fees for a moment to

7      administrative claims, what is the -- your best understanding

8      of the amount, the total amount of administrative claims

9      currently asserted against the estates which have not been

10     definitively resolved by the Court or by stipulation.

11     A    So yeah, it's -- there were 102 -- over 100 billion were

12     asserted.  We have expunged a little over 100 billion.  And we

13     have a number of other objections on file.  I just -- it's --

14     I can't remember the amount that's on file or to be on file.

15     But it's, I mean, it's probably $100 million, maybe.

16     Q    $100 million total of claims not yet expunged.

17     A    Again, that's just a a round estimate that I think that's

18     where the number is at at this point.

19     Q    Okay.  So in your, in the original, were you consulted in

20     connection with the preparation of the first Disclosure

21     Statement filed by the Debtors?

22     A    Yes.

23     Q    And do you understand that that Disclosure Statement

24     contained an estimate of allowable administrative claims

25     against the estate, exclusive of professional fees of

1    127 million?

2    A    Yeah.  Yeah.

3    Q    Okay.  And you were -- you and your team were responsible

4    for that number, correct?

5    A    Correct.

6    Q    And in your first Declaration, which you have in front of

7    you, so feel free to consult with it.  You lowered that

8    estimate to 115 million.  Correct?

9    A    That's correct.  Yes.

10   Q    And then you also surmised in your Declaration that

11   perhaps that number would reduce to 100 million by setoffs as

12   a consequence of administrative claimants who might have

13   received preference claims.  Correct?

14   A    Correct.  Yes.

15   Q    Okay.  And were you also responsible for the revised

16   Disclosure Statement that was recently filed?

17   A    Yes.

18   Q    And also your supplemental Declaration.  Correct?

19   A    Correct.

20   Q    And in both of those is the new estimate of

21   administrative claims -- again, administrative claims the

22   Debtor is willing to concede are likely allowable.  Is that

23   estimate now 93 million?

24   A    That's correct.

25   Q    Okay.  And before we sort of get to how you step down

1    from 127 million to 93 million, does the $93 million include

2    the administrative claim asserted by the Commonwealth of

3    Massachusetts?

4    A    It does not.

5    Q    Has that claim been expunged?

6    A    No.

7    Q    You heard from the gentleman today who has a 20-something

8    million dollar post-petition medical malpractice claim.  Were

9    you were you in court for that?

10   A    I was in court for that.

11   Q    Does the $93 million estimate include his client's

12   20-something million dollar post-petition malpractice claim?

13   A    It does not.

14   Q    And has that claim been expunged?

15   A    Not to my knowledge, no.

16   Q    Okay.  So if I take your 93 million and I add

17   Massachusetts' claim, and I add that gentleman's claim, we're

18   well over 100 million, right, of claims that have not been

19   expunged?

20   A    I mean, that would be the math that you just represented.

21   Yeah.

22   Q    93 plus 25 plus 30-something gets you to something like

23   140 or 50, right?

24   A    But as it relates to med mal-type claims, we have an

25   actuarial estimate that we're using in our analysis for

1    post-petition med mal worker comp claims, which is the number

2    that -- that's not in the 93 either, because nothing has been

3    asserted.  But in all of our analysis, we're including that as

4    well.

5    Q    Okay.  But in the $93 million number that you claim was

6    likely to be allowed, it does not include claims that have

7    been asserted, but that the Debtor disputes, but which have

8    not yet been adjudicated by the Court.  Correct?

9    A    Can you just do that a little slower because there's like

10   four pieces to it?

11   Q    Sure.  Sure, happy to.  And anytime you have a question,

12   let me know.

13   A    Understood.

14   Q    In your $93 million number, you are not including claims

15   that have been asserted against the estate.  But -- and which

16   may be contingent on the outcome of litigation.  But those

17   claims have still not been expunged by the Court or formally

18   disallowed by the Court.

19   A    Not all of the claims.  And one further clarification is

20   that -- and this is in the Disclosure Statement, that

21   $93 million represents accounts payable claims, vendor claims.

22   Q    And so it doesn't include litigation claims that have

23   been asserted against the Debtors post-petition.

24   A    That's correct.

25   Q    Right.  And do you have an estimate of the claims that

1    have been asserted against the estate with respect to post-

2    petition transactions or activities that have not been

3    expunged, that have not been finally adjudicated by the Court

4    in addition to the 93 million?

5    A    As it relates to -- if we're defining litigation, how are

6    you defining litigation?

7    Q    Either a threat of litigation has been asserted or an

8    actual action has been commenced in some form, including

9    arbitration.

10   A    So are you referring can you just tell me what type of

11   claim are you referring to?

12   Q    I'm referring to any claim arising out of post-petition

13   operations by the Debtor -- Debtors that is being asserted

14   against the Debtors' estates in some way, shape or form.

15   A    I mean, there's a significant amount of claims, a large

16   dollar amount of claims that we've been working through.  So

17   we have done we've come up with, you know, our best estimates

18   in terms of what we think are legitimate claims or allowable

19   claims, which is what we've been using in our waterfall

20   estimates.  I don't have what that gross number is, if that's

21   what you're asking me.

22   Q    Right.  But you're not including Massachusetts in your

23   allowable claims, right?

24   A    We filed an objection to the Massachusetts claims, and we

25   we don't believe that is an administrative or priority claim.

1     Q    Right.  But has that been adjudicated?

2     A    It has not.

3     Q    Have you -- the Debtors filed objections to various

4     things in this case and lost.  Right?

5     A    I'm sure something has happened that didn't go the

6     Debtors' way.

7     Q    Right.  And have you evaluated the gentleman's 25-plus

8     million dollar post-petition malpractice claim?

9     A    I have not.  Today was the first time I heard of it.

10    Q    When you calculated -- when you answered Debtors'

11    counsel's question about the your estimated effective date for

12    the Plan, was that calculation based on your $93 million

13    number?

14    A    That was part of it.

15    Q    What was the rest?

16    A    There's other -- I mean, there's other priority claims

17    that we included in that.  And in terms of the timing of

18    getting to that particular point in time.

19    Q    Right.  But with respect to that point in time as to

20    administrative claims, you assume 93 million.

21    A    Yes, I did.

22    Q    Okay.  And so if the administrative claims number turns

23    out to be higher, you lose the objection to Massachusetts.

24    You lose any objection to this gentleman's claim?  You lose

25    objections to other claims.  The effective date will be

1    farther out into the future, will it not?

2    A    I mean, look, you're speculating because --

3    Q    And I'm just asking you to go along with me.

4    A    And I'm going along with you.  You're speculating because

5    there could very well be things that we lose, and there could

6    very well be things that we win.

7    Q    Yeah. So and --

8    A    So.

9    Q    So let's stick with my hypothetical.  Assuming the

10   administrative claims are higher because of those things

11   you're not including in your 93 million, what does that do to

12   your proposed effective date?

13   A    I think I said early 2027, I think early 2027 is still

14   achievable.

15   Q    Right.  Whether or not the administrative claims are

16   93 million or 186 million?

17   A    Again, I can't speculate if it'll be 186 million, but

18   given the work that we've done on our administrative claims

19   even if there are things that don't necessarily go the

20   Debtors' way because we've done a significant amount of work

21   reconciling these, I think early 2027 is reasonably likely.

22   Q    How much cushion do you have over the 93 million in your

23   model?

24   A    So the way that we're the way that I'm assuming this is

25   based on what I think cash balance will be from the result of

1    the litigations and the results of those litigations and

2    waterfalling that against the estimated admin and priority

3    claims.  I'm comfortable that there would be still some

4    balance of liquidity available for the Debtors, even settling

5    those types of claims.

6    Q    And to get there you're assuming you're going to have

7    successfully settled or adjudicated some of these causes of

8    action, correct?

9    A    Yes.

10   Q    And what assumptions have you made about that?

11   A    Please describe when you say what assumptions have been

12   made.  About what?

13   Q    Tell me how you're calculating the revenue you expect to

14   have in early 2027.

15   A    There's not going to be any revenue because there won't

16   be any business.

17   Q    Revenue from the litigation.  How much money are you

18   expecting you will have from the litigation?

19           MR. BEREZIN:  Your Honor, we object on privilege

20   grounds.

21           The question is, how much money will the litigations

22   generate by a certain time period.  The answer to that

23   question is from counsel handling the particular litigations.

24           MR. KEACH:  Your Honor, they can't.  This is a sword

25   and shield problem.  They can't have this both ways.  He's

1    testifying there's going to be enough money to cover

2    administrative claims in early 2027 as a consequence of the

3    litigation, asking us to believe him without then providing

4    the basis of his belief.  And they can't have it both ways.

5    If they want to keep this all a secret, that's great, but they

6    have to pull their estimate as to when they're going to pay

7    administrative claims and admit that it's just all up in the

8    air as to when litigation happens. But they can't have it both

9    ways.

10          MR. BEREZIN:  So, Your Honor first of all, the

11    creditor's interest is to preserve and enhance the value of

12    these claims, not to disclose the privileged basis for it.  It

13    can't be that a Disclosure Statement in order to have

14    sufficient information where the claims or litigation claims,

15    you have to disclose privileged information which would then

16    be weaponized by the very adversaries being sued.

17          So aside from the practical problem, which is

18    significant and would undermine creditor interests, these --

19    this information is privileged.  And so the real question is,

20    is it necessary to destroy through disclosure of their assets?

21          THE COURT:  No, I got it.  The specific question is

22    is this privileged or not?

23          MR. BEREZIN:  Yes.  The answer to what proceeds will

24    the Debtors get from which litigations were derived from --

25          THE COURT:  From an analysis that --

1          MR. BEREZIN:  By counsel, by the individual lawyers

2     who were handling each of these matters, that's where it comes

3     from directly.

4          MR. KEACH:  But -- but, Your Honor, this goes to how

5     many steps away from that are they allowed to speak to?

6          THE COURT:  No, I got it, but I just don't -- he

7     can't answer the question.  But then we can argue on the back

8     end what the effect of that is, the inability to answer the

9     question, but the specific point is he can't answer the

10    question.  He doesn't need to answer the quesiton because it's

11    privileged.  The analysis has got -- and the door wasn't

12    opened where he would have to answer the question.

13         So Mr. Keach gets to answer it.  But I just want to

14    keep the the testimony rolling.  Mr. Keach gets to ask another

15    question, and then we can have the effects of the legal effect

16    of not answering the question is more legal argument than than

17    witness testimony.  That's all I'm going to.

18         MR. BEREZIN:  Right.  And the only thing I would add

19    just --

20         MR. KEACH:  Let me -- I'll withdraw that question.

21    Let me ask him another question, just to get to the issue of

22    whether it's privileged or not.  And if it's privileged, I

23    understand where we are and we'll argue the legal effect of

24    that.

25         THE COURT:  Uh-huh.

1    BY MR. KEACH:

2    Q    Mr. Castellano I asked you a question about how much

3    revenue you expected to have in early 2027, how much total

4    proceeds you had -- you expected to have in 2027 from the

5    settlement or adjudication of litigation.

6         Do you remember that question?

7    A    I do.

8    Q    All right.  Can you answer that question without

9    referring to specific information about those recoveries that

10   you've received from counsel?

11   A    I can't.

12   Q    Okay.  And the $93 million administrative claims estimate

13   that you've provided is nonetheless the estimate you're using

14   to determine an effective date in early 2027.  Correct?

15   A    That's one element of it, yes.

16   Q    Right.  And just so we're clear, the reason you're

17   picking early 2027 as the time when you can pay administrative

18   claims is that's when you think you'll have enough money to

19   pay them in full.  Correct?

20   A    That's correct.  Yes.

21   Q    And because you understand that the Bankruptcy Code

22   requires that you pay administrative claims in full on the

23   effective date, correct?

24   A    Yes, I do.

25   Q    So your proposal to handle that problem is to fix the

1    effective date at a time in the future when you think you'll

2    have enough money.

3    A    I don't think I'd characterize what I said as fixing the

4    date.  When I hear someone say fixing the date, it's not like

5    I'm targeting something, it's just an output of what liquidity

6    I believe the litigation trust will have at a point in time to

7    satisfy an estimated amount of administrative and priority

8    claims.

9    Q    Right.  But when you say the Plan is going to go

10   effective in early 2027, the reason you want the Plan to go

11   effective in 2027 is you can't have it go effective sooner

12   than that, or you would owe money you could not pay.  Correct?

13   A    I said early 2027 because that's when I think it can

14   actually be achieved.  I wasn't trying to pick another date.

15   Q    I understand you think that's when you'll have enough

16   money to pay administrative claims?

17   A    Yes.

18   Q    Mr. Castellano, how much of the -- what is the balance

19   currently owed to the so-called FILO Secured Parties?

20   A    200 and without the MOEC (phonetic) on their bridge,

21   $248 million.

22   Q    And if we include the MOEC, how much?

23   A    It would be closer to a little over $300 million.

24   Q    Were you involved in the negotiation of the settlement

25   that is on for approval today?

1    A    Yes.

2    Q    Are you familiar with its terms?

3    A    Yes.  Generally, yes.

4    Q    Is it fair to say that the entirety of that settlement is

5    incorporated into the Debtors' proposed Plan?

6    A    The settlement is what we're trying to achieve, and the

7    Plan is the method of implementing -- implementing that.  I'm

8    not sure I understand the distinction.

9    Q    I think you answered it perfectly.  The Plan is the

10   method by which the parties implement the settlement reached

11   with the FILO Secured Parties and the Committee.  Correct?

12   A    The settlement is what we're trying to achieve to

13   maximize value for all of our creditors.

14   Q    And you're doing that through the Plan?

15   A    We are.  Our intent is we hope.  I hope we can confirm a

16   Chapter 11 Plan.

17   Q    Right.  Implementing that settlement.

18   A    It's driven by achieving the results for that settlement.

19   Q    Can the Plan modify the settlement in any way?

20   A    I'm not sure I know what you mean by modified.

21   Q    Does the settlement provide that the Plan cannot change

22   any term of the settlement.

23           MR. BEREZIN:  Objection.  Calls for legal

24   conclusion, Your Honor.

25           THE COURT:  I'll sustain.

1    BY MR. KEACH:

2    Q    Do you understand if there are provisions in the

3    settlement that provide that it cannot be modified by the

4    Plan.

5    A    When you say modified by the Plan, I'm not sure I'm

6    following.

7    Q    Can the Debtors file a Plan that would change a material

8    term of the settlement?

9            MR. BEREZIN:  Same objection, Your Honor; privilege.

10   I'm sorry.  It calls for legal conclusion.

11           THE COURT:  I think he can --

12           MR. KEACH:  I'm just asking for his understanding.

13   If he doesn't have one, he can tell me.

14           THE COURT:  Yeah, I mean, I think as the CRO, you

15   can understand whether he thinks that the someone can file it.

16   Not necessarily what the legal effect of that would be, but

17   maybe the Plan speaks to it, maybe it doesn't.  I'll let him

18   answer.

19           THE WITNESS:  Can you just restate the question?

20   BY MR. KEACH:

21   Q    Sure.  Is it your understanding that the settlement terms

22   provide that the -- that any Plan filed by the Debtor cannot

23   change a material term of the settlement?

24   A    That is my understanding.

25   Q    And is it your understanding that one element of the

1    settlement is all of the parties to it agreed to support the

2    Plan filed by the Debtors?

3    A    When you say all of the parties, which parties are you

4    referring to?

5    Q    All of the parties to the settlement.

6    A    They agreed to --

7    Q    Support the Plan filed by the Debtors.

8    A    Yes.

9    Q    The FILO Secured Parties pursuant to the settlement are

10   providing $125 million in litigation funding.  Correct?

11   A    Yes.

12            THE COURT:  Mr. Keach, I think we're having a small

13   technical issue.  Can we take a five-minute break?

14            MR. KEACH:  Of course, sure.

15            THE COURT:  Yeah, and thank you.  I just want to

16   make sure that we're getting a good recording.

17            Thank you.

18            MR. KEACH:  No worries.  Thank you, Your Honor.

19         (Recess taken from 5:09 p.m. to 5:24 p.m.)

20            THE COURTROOM DEPUTY:  All rise.

21            THE COURT:  Thank you.  I appreciate everyone's

22   patience.  I apologize.

23            MR. KEACH:  No problem at all, Your Honor.

24            THE COURT:  Okay.  We are back on the Record in

25   Steward, continuing with the cross-examination of

1    Mr. Castellano.

2              Mr. Keach, whenever you -- hold on, I guess I ought

3    to ask my Courtroom Deputy.  Yesenia, are we good?

4              Okay, we are good to go.

5              Thank you.

6              MR. KEACH:  Thank you, Your Honor.

7                        CROSS-EXAMINATION (CONT'D)

8    BY MR. KEACH:

9    Q    Mr. Castellano, going back to the fact that you think

10   you'll have sufficient funds in early 2027 to pay

11   administrative claims in full.  You also mentioned that part

12   of that consideration was paying priority claims at that time,

13   correct?

14   A    That's correct.  Yes.

15   Q    And in your estimate of the priority claims that you'll

16   have to pay at that point in time, are you including the

17   Commonwealth of Massachusetts' priority claim in excess of

18   30 million?

19   A    I am not, no.

20   Q    Okay.  In order to pay administrative claims and priority

21   claims in full on your projected 2027 effective date, I assume

22   that you believe that you will have fully repaid the FILO

23   Secured Parties at that time?

24   A    Yes.

25   Q    And what balance will you be paying off at that point in

228

1    time?

2    A    At which point in time?

3    Q    And what is the total amount you would have paid to the

4    FILO Secured Lenders from today to when you pay them off in

5    early 2027?

6    A    I didn't say I would pay the FILO Lenders off in early

7    2027.

8    Q    When are you proposing to pay the FILO Secured Parties in

9    full?

10   A    It would be for -- It would be before early 2027.

11   Q    Yeah.  Do you have any estimated time as to when that

12   would happen?

13   A    It would be sometime in 2026.

14   Q    Okay.  Early, mid, late?

15   A    Probably late.

16   Q    Okay.  The FILO claim is going to grow over time,

17   correct?

18   A    Yes.

19   Q    In part because you'll be borrowing against the

20   125 million.  Correct?

21   A    Correct.

22   Q    In part because the claim itself just grows by virtue of

23   its components.  Correct?

24   A    Yes.

25   Q    Right.  So when you intend to pay them, we'll we'll say

1    late 2026, what is the total amount you will be paying at that

2    point in time?

3    A    It will probably -- it'll be -- it'll be in excess of

4    $300 million.

5    Q    Okay.  Do you know how much in excess of 300 million.

6    A    Not off the top of my head.  No.

7    Q    Okay.  The litigation funding that's proposed under the

8    settlement with the FILO Secured Parties includes an

9    accordion, correct?

10   A    Yes.

11   Q    Can you explain to the Court and for the Record what the

12   what an accordion is?

13   A    In the event the Litigation Trustee needs incremental

14   funding to fund expenses pursuant to either the litigation or

15   operating expenses, the the Class A interest holders, which

16   effectively are the litigation funders, have agreed to

17   increase the size of the facility by 25 percent.

18   Q    And do the funders have to provide that increase just

19   because the Litigation Trustee asks for it?

20   A    I have to look at the document in terms of the specific

21   terms.  I know that -- I know the the capacity is there.

22   Q    Do you know if that is at the litigation funder's option

23   or at the Trustee's option?

24   A    That's -- I don't recall the specific details of that

25   right now.

JOHN CASTELLANO - CROSS BY MR. KEACH

1    Q    Do you recall in your deposition yesterday that you told
2    me that it was at the funder's option?
3    A    If that's what I said, then that's what I said.
4    Q    Okay.  Do you not recall testifying to that yesterday?
5    A    I do remember you asking me the question.  Yes.
6    Q    And do you recall that you said it was at the --
7    A    Yes.
8    Q    -- FILO Secured Parties' option?
9    A    Yes.
10   Q    Does that refresh your recollection as to whose option it
11   is.
12   A    It does.
13   Q    And it's at the lender's option, isn't it?
14   A    That's my recollection.
15   Q    And you've testified earlier that you were part of the
16   negotiations of the settlement, correct?
17   A    Yes.
18   Q    Were you also involved in the discussion as to who should
19   get releases from both the secured parties and the Debtors?
20   A    No.
21   Q    Are you getting a release under the settlement?
22   A    Yes, I am.
23   Q    Is Mr. Transier getting a release?
24   A    Yes.
25   Q    Is Mr. Carr getting a release?

1    A    Yes, he is.

2    Q    And that's the so-called Transformation Committee,

3    correct?

4    A    Yes.

5    Q    And the Transformation Committee is the entity that

6    actually authorized the Debtors to enter into the settlement.

7    Correct?

8    A    That's correct.

9    Q    Are you familiar with the fact that Debtors just filed

10   what is to be Exhibit C to the Disclosure Statement?

11   A    Yes.

12   Q    And is Exhibit C a form of analysis regarding a Chapter 7

13   for the Debtors?

14   A    Yes.

15   Q    Does that analysis assume that the conversion to

16   Chapter 7 occurs before or after the settlement is approved?

17   A    After.

18   Q    So it assumes that the settlement that's on for today has

19   been approved.  Correct?

20   A    Yes.

21   Q    And consummated?

22   A    Approved and implemented.

23   Q    Right.  So the assets would have been transferred to the

24   trust?

25   A    Yes.

1    Q    All of the Debtors' assets.

2    A    That's correct.

3    Q    All of the Debtors' causes of action.

4    A    That's correct.

5    Q    All of the Debtors' rights under its insurance policies.

6    A    That's correct.

7    Q    And so to the extent that analysis suggests what would

8    happen in a 7, it's a Chapter 7 in which the only asset of the

9    Chapter 7 estate are the so-called Class B trust interests.

10   Correct?

11   A    Yes.  And there probably would be at that point in time,

12   $6.5 million of cash, approximately.

13   Q    Would that cash be cash collateral of the DIP Lenders or

14   would it be free and clear cash?

15   A    It would be estate funding cash, pursuant to the

16   settlement motion.

17   Q    And usable by the Trustee of the trust created under the

18   settlement or by the Chapter 7 Trustee?

19   A    My understanding is in that scenario would be usable by

20   the Chapter 7 Trustee.

21   Q    The Chapter 7 Trustee could use that to defray expenses

22   of the estate.

23   A    To what?  I'm sorry.

24   Q    To spend on expenses of the estate.

25   A    Yes.

1    Q    Okay.  Are you familiar with the terms of the Debtors'
2    proposed Plan of Liquidation?
3    A    Yes.
4    Q    Are you familiar that there is a class of claims that are
5    called the retained FILO claims?
6    A    Yes.
7    Q    And is that claim $10 million?
8    A    It is.
9    Q    And was that that claim created pursuant to the
10   Settlement Agreement that's on for today?
11   A    It was an element of the Settlement Agreement.
12   Q    It was part of the Settlement Agreement?
13   A    Yes.
14   Q    But for the Settlement Agreement, it wouldn't exist.
15   Right?
16   A    That term wouldn't exist. Correct.
17   Q    And that that claim is in its own class under the Plan.
18   Correct?
19   A    I believe it's part of Class 3.
20   Q    But it's all of Class 3, isn't it?
21   A    I'd have to look at the Plan.  I thought Class 3 included
22   the bridge claim, plus that claim.
23   Q    Fair enough.
24   A    If I remember correctly.
25   Q    Fair enough.  The unsecured component of that is the

1   retained FILO claim, right?  Or the retained FILO bridge

2   claim, I should say.

3   A    So retain FILO bridge claim, my recollection I think that

4   is still a secured claim.  It's subordinated.  But it's -- I

5   can't remember if it's secured or unsecured.  It's definitely

6   subordinated.

7   Q    But in that claim that was created by the Settlement

8   Agreement and wouldn't exist but for the Settlement Agreement

9   is listed as an impaired voting class of claims in the Plan.

10  Correct?

11  A    That's right.

12  Q    Are you familiar with the PBGC settlement claim?

13  A    Yes.

14  Q    And is that a product of the so-called PBGC settlement as

15  defined in the Plan.

16  A    Yes.

17  Q    And what is the PBGC settlement?

18  A    The company had a pension plan for a hospital in

19  Massachusetts.  And the pension plan was underfunded.  The

20  hospital has closed.  I think it was -- I can't remember the

21  name of it.  It was New England, Mount Sinai, I believe. And

22  that plan was unfunded.  So we entered into a settlement

23  discussion with PBGC to take over the -- the effectively the

24  Plan.

25  Q    And that settlement resulted in an allowed claim for the

1      PBGC.  Correct?

2      A    That's correct.

3      Q    And does that claim an unsecured claim?

4      A    It is.

5      Q    And as part of that settlement, did PBGC agree to that

6      claim in favor of the Plan?

7      A    Yes.

8      Q    And that's an aspect of the settlement itself.

9      A    Which settlement?

10     Q    The PBGC settlement?

11     A    Yes.

12     Q    Do you know why Classes 3, 4 and 5 of the Plan are

13     separate classes, as opposed to having all the unsecured

14     claims in one class?

15     A    Class 3, I believe, is, I think as as I mentioned, I

16     believe that's the bridge -- bridge claim.  Four is general

17     unsecured claims.

18     Q    Correct.  And five is --

19     A    Five is PBGC.  The bridge claims I do think are different

20     than general unsecured claims.

21     Q    Well, I understand there are two claims, two kinds of

22     claims in that class.

23     A    Yeah.

24     Q    The so-called retained -- the FILO bridge claim is

25     treated as unsecured in the context of the Plan, is it not?

1          MR. BEREZIN:  Objection; form; calls for legal

2     conclusion.

3          THE COURT:  Mr. Keach, where are you going with

4     this?

5          MR. KEACH:  Let me just ask his understanding, Your

6     Honor.

7     BY MR. KEACH:

8     Q    Is it your understanding that the $10 million is paid on

9     a par with unsecured claims?

10         MR. BEREZIN:  Your Honor, the -- oh, he can answer

11    that question.

12         THE COURT:  Yeah.

13         THE WITNESS:  It is paid after administrative and

14    priority claims, and it will share in recoveries distributable

15    to the unsecured creditors.

16         MR. KEACH:  May I have a couple of moments, Your

17    Honor?

18         THE COURT:  Of course.

19         MR. KEACH:  Thanks.

20        (Pause in the proceedings.)

21         MR. KEACH:  I have nothing further for the witness,

22    Your Honor.

23         THE COURT:  Thank you.

24         Any Redirect?

25         MR. SPEARS:  Just a few questions, Your Honor.

1                 THE COURT:  Okay.

2                 MR. SPEARS:  Excuse me, Your Honor, four.

3                 THE COURT:  Oh.  Do you have some questions,

4     counsel?

5                 MR. SPEARS:  I do.

6                 THE COURT:  Oh, I apologize, I apologize.  I should

7     have asked if anyone had any additional Cross.  I apologize.

8                 MR. KEACH:  I'll cede the podium.

9                 Thank you.

10                MR. SPEARS:  Won't take but a moment, Your Honor.

11                          CROSS-EXAMINATION

12    BY MR. SPEARS:

13    Q    Mr. Castellano, Barry Spears, for the Record, we haven't

14    had an opportunity to meet --

15    A    Good afternoon.

16    Q    -- as yet.  Good afternoon.

17         Do you happen to have a copy of the Disclosure Statement

18    that was filed yesterday afternoon?

19    A    Not in front of me. No.

20                MR. SPEARS:  You guys have one that you can look at?

21                THE COURT:  Mr. Spears, can I ask you to just pull

22    that mic closer to you, just to make sure that we pick

23    everything up?

24                THE WITNESS:  I'm sorry, Your Honor.

25                THE COURT:  Oh, no, no, I was speaking to

1    Mr. Spears.

2         (Counsel confer.)

3              MR. SPEARS:  May I approach, Your Honor?

4              THE COURT:  Yes.

5              THE WITNESS:  Thank you.

6    BY MR. SPEARS:

7    Q    Mr. Castellano, I'm going to -- I've handed you a copy of

8    the -- of Document 4986, which was filed yesterday.  And it

9    purports to be an amendment or the latest draft of the

10   Disclosure Statement filed in these cases.  Is that correct?

11   A    Yes, it is.

12   Q    Can you turn -- can I direct your attention, please, to

13   page -- at the top it's page 93.  At the bottom of the page,

14   it's page 82 of the Disclosure Statement.

15        Again it's Document Number 4986, page 93 if you're

16   looking at the legend at the top. Do you see that?

17   A    Page 93 of 359 and then page 82 at the bottom?

18   Q    Correct.

19   A    Okay.  I'm there.

20   Q    And actually page 81, the page beforehand, Section R,

21   this is administrative expense claims is how it's denominated,

22   is it not?

23   A    It is.

24   Q    And in the second paragraph of that section about halfway

25   down in that paragraph, there's a bolded defined term of

1    aggregate administrative expense claim amount.  And preceding

2    that parenthetical, it says, "The Debtors estimate that the

3    total number of administrative expense claims in the aggregate

4    that we are likely -- that are likely to be allowed, and the

5    responsibility of the Debtors is approximately $108 million."

6         That's defined as the aggregate administrative expense

7    claims amount.  Right?

8    A    That's correct.

9    Q    And then there's a -- there's a footnote that's tied to

10   that 108 that says the amount -- this amount assumes the

11   Debtors will execute additional quorum vendor fund agreements,

12   that the Debtors are in the process of negotiating, which

13   would result in a $2 million reduction in administrative

14   expense claims.  Is that right?

15   A    That's correct.

16   Q    Okay.  And so if I understand the math correctly, the

17   aggregate administrative expense claims are $108 million less

18   2 million, which is expected to be obtained by a reduction in

19   the quorum vendor fund agreement.  So it's down to 106.

20   A    That's not correct.

21   Q    Okay.

22   A    The 108 million assumes the Debtors will execute -- the

23   108 million takes into consideration the $2 million reduction.

24   Q    So the number is really 110 million --

25   A    Correct.

1    Q    -- assuming that the $2 million deal gets done.

2    A    Correct.

3    Q    Okay.  And then on the next page, the second paragraph on

4    that page says, "The aggregate administrative expense claims

5    amount does not include any of the claims that fall into the

6    following categories:  Disputed claims, right, is number one

7    and there it says it -- just in case it's unclear to anybody

8    that the Debtors presently dispute and have objected to the

9    administrative expense claims of the Commonwealth of

10   Massachusetts, TRACO, among others.  Right?

11   A    That's correct.

12   Q    And can you tell me, sir, how much that bucket of claims

13   is the disputed claims?

14   A    I know for the Commonwealth on the administrative side,

15   it's $24 million.  I can't recall the TRACO numbers.  Right.

16   Q    And it also says, among others, right?

17   A    Correct.  It does say that.  Yes.

18   Q    So -- but you don't have any idea what that bucket would

19   total or aggregate?

20   A    There's a lot of claims.  And yeah, I mean, I just I

21   can't, I can't recall exactly what has been dispute or what

22   the total amount of disputed, in addition to everything that

23   we're putting on file for objections and things that will be

24   put on file.  It's it's a big number.  I just can't remember

25   the specific number right now.

1    Q    Okay.  But it's not included in the 108 or $110 million

2    that we talked about a moment ago.

3    A    Correct.

4    Q    Right.  And the second category are claims that are not

5    the Debtors' responsibility.  And these are related to

6    designated operators that have assumed operations of various

7    facilities and that sort of thing.  Is that right?

8    A    That's correct.  Yes.

9    Q    And do you have any idea how much that bucket of claims

10   is?

11   A    Yeah.  Our books and records indicate that's probably a

12   little over $30 million.  I don't know if -- we're working

13   with the operators to figure out if they've paid some of those

14   claims, but we believe that those will all be claims of the

15   operators, not claims of Steward.

16   Q    Sure, I understand.  And you think that's about

17   30 million?

18   A    Or a little over 30 million, yes.

19   Q    Okay.  And number three is the TSA vendor administrative

20   claims that will or have been released.  That's the $2 million

21   reduction.  Is that right?

22        Oh, I'm sorry, that's TSA vendor administrative claims.

23   That's different from what what you talked about the quorum

24   vendor fund.

25        So do you have any idea how much the TSA vendor

JOHN CASTELLANO - CROSS BY MR. SPEARS

1    administrative expense claims will aggregate?

2    A    Yeah, I think that is meant to -- I think that's meant to

3    represent the $2 million.

4    Q    Okay.  All right.  Because it does in the -- in the kind

5    of carry over paragraph, it talks about the quorum --

6    A    Exactly. Yes.

7    Q    -- agreement.  And that's where I got confused.

8    A    Yes.

9    Q    And the fourth item is post-petition medical malpractice

10   and worker's compensation claims.  And here it says, "Based on

11   actuarial estimates, the Debtors estimate that an additional

12   18 million in medical malpractice and worker's comp claims

13   arising during the post-petition period could be asserted

14   against the Debtors estates."

15        So can you explain to the Court what this actuarial

16   estimate process is that you all have engaged in?

17   A    Yes.  So I believe we -- I believe the company has used

18   historically a consulting firm called Oliver Wyman that has a

19   significant amount of experience with the company's med mal

20   claim history.  And we had asked them to estimate based on

21   historical averages and the activity that was going on at the

22   Steward hospitals, which ceased on Steward's behalf at the end

23   of October.  And they made an actuarial assessment of what the

24   potential exposure could be for medical malpractice and

25   worker's comp claims of approximately $18 million.

Q    And I assume that that includes an analysis of the Iego
claim, which was filed in the amount of 25 million as a
standalone claim.

A    I don't know.

Q    And the fifth category, Mr. Castellano, is accrued and
unpaid post-petition attorney's fees, and that's 34 million.
So if you add the categories of the various claims in the
disputed claims, you don't know exactly what that is, but it's
TRACO and Massachusetts, the Commonwealth of Massachusetts and
others.  That's at least what -- you said 34 million?

A    Well, the Commonwealth administrative claim is
24 million.

Q    24 million.

A    I can't recall what the TRACO amount is.

Q    Okay.  So let's let's just go with 24 million plus the
second category, Debtors, not the Debtors' responsibility.
You don't have any idea how much that is?

A    No, I think I said it was a little more than 30.

Q    Okay.  And the TSA vendor administrative expenses, that's
the 2 million, right?

A    I think that's the estimate that we're using.  Yes.

Q    And then 18 million for med malpractice and worker's comp
claims.  And then the 34 million in unpaid professional fees.
I had understood -- and maybe I got this wrong -- that your
intent when I say the company's intent is to pay the

1     professional the unpaid professional fees by the end of this

2     year.  Is that right?  That is --

3     A    So, yes.  I mean, so part of the settlement is the estate

4     professionals and the Unsecured Creditors Committee

5     professionals are deferring 10 percent of their fees.  And

6     there's a formula that will need to be followed as to when

7     those will be paid.  I think it will be paid probably by the

8     end of the year, early, early '26.

9     Q    But -- and when the when that payment is made, those

10    creditors, those professional fees will have been paid in

11    full?

12    A    Pursuant to compensation procedures --

13    Q    Right, of course.

14    A    -- in court.  That, of course, provided that they're all

15    approved pursuant to the compensation procedures, I believe

16    that they would be paid. Yes.

17    Q    They would be paid in full by the end of 2025?

18    A    2025, early '26.  Yes.

19    Q    And then the other administrative claimants have to wait

20    until 2027 or until the effective date actually occurs.

21    A    Yes.  I mean, as I said earlier, you know, we're

22    estimating it's reasonably likely that the effective date

23    would occur early 2027.  But between now and, you know, on an

24    ongoing basis, just to be clear, administrative creditors that

25    are currently being used by the Debtors are being paid.  And

1   there is a projection for that.  That's part of all of our

2   modeling that those vendors that are necessary for current

3   operations are expected to be paid in the ordinary course.

4   Q    So and -- and so, just to be clear, the the payment of

5   110 million or 108 million, which is referenced on page 81 and

6   does not include those various buckets that we just went

7   through, those payments wouldn't occur until the effective

8   date of the Plan, i.e. sometime in early, according to you,

9   2027.

10  A    Yeah.  But to be to be specific and clear, in the event

11  administrative creditors that comprise that particular balance

12  elect to remain in the administrative consent program, --

13  Q    Right.

14  A    -- they will be eligible for a payment on or about --

15  Q    Sure.

16  A    -- near the -- on or shortly after the confirmation date.

17  Q    They opt into this program that you've created.  They

18  share, they reduce their claims to 50 percent and then share

19  in the pool of 12.5 million, and then whatever is unpaid is

20  paid on the effective date.

21  A    That's correct.

22  Q    And do you have any -- have you done an analysis of how

23  many in the -- in the aggregate dollar amount, how many

24  administrative payment claim or how many administrative claims

25  you expect to opt into that program?  Is there any way to do

1    that analysis?

2    A    No, I mean, we're -- I mean, provided that the Plan in

3    the Disclosure  Statement -- the Disclosure Statement, I

4    should say, and the settlement motion get approved, we will

5    start the consent process for the administrative creditors, so

6    I don't know how many creditors will opt -- will remain in the

7    program.

8    Q    I appreciate it.  Thank you sir.

9         MR. SPEARS:  That's all, Your Honor.

10        THE COURT:  Thank you.

11        Anyone else have any Cross?

12    (No audible response.)

13        THE COURT:  Okay.  We'll then go back to Redirect.

14        MR. BEREZIN:  Thank you, Your Honor.  Again, for the

15   Record, Robert Berezin, Weil Gotshal & Manages, on behalf of

16   the Debtors.

17                        REDIRECT EXAMINATION

18   BY MR. BEREZIN:

19    Q    Mr. Castellano, you testified about a certain amount of

20   accrued professional fees.  I believe you referenced a 37 to

21   38 million in that range in your testimony when Mr. Keach was

22   questioning.  Do you recall that?

23    A    (No audible response.)

24    Q    Let me ask it more differently.

25    A    Yeah.

1   Q    The amount of accrued professional fees that -- in other

2   words, professional fees as of today, to what extent do the

3   Debtors have funds to pay those fees from an escrow or

4   otherwise?

5   A    We have $34 million.  I'm sorry, accrued unpaid

6   professional fees that have been set aside in an escrow

7   account is approximately $34 million.

8   Q    Okay.  So when counsel was asking you about the

9   incremental costs in of that 34 million, that 34 million is

10  spoken for as far as the -- it's in the escrow.  Is that

11  correct?

12  A    That's correct.  Yes.

13  Q    Okay.  You've been asked many questions about the

14  estimates that were in the initial Disclosure Statement on

15  April 28th for the administrative expense claims, and then in

16  your mid-May Declaration and then your most recent Declaration

17  on the, I think, May 27th.  Can you explain what the Debtors'

18  process has been to estimate the amount of what the Debtors

19  believe will be allowed administrative expense claims?

20  A    Yes.  So after the bar date, which I believe concluded

21  December 20th, we had something like 2,800 administrative

22  claims filed.  My team, along with a number of employees at

23  the company, embarked on a very significant reconciliation

24  process that has taken several months.  We've completed that

25  process, but effectively, for each claimant, there was

1    effectively an analysis to understand what the support that

2    was provided, if any of that support was consistent with the

3    company's books and records, and then a very cumbersome,

4    detailed reconciliation process that more often than not

5    included communications with the actual claimant to understand

6    the basis of the alleged claims.

7        And in addition to understanding the company's books and

8    records, which weren't exactly the cleanest, so it was a

9    fairly -- very granular process that consumed a significant

10   amount of time and resources to get -- to get the balances

11   reconciled.

12       The reason for the movement in the balance is that we

13   were still continuing to reconcile when we filed the initial

14   Disclosure Statement, which I think was April 25th or

15   April 26th.  And then I filed a subsequent Declaration.  More

16   reconciliation occurred from that point in time to that first

17   Declaration.

18       And we now have, for the most part, completed the

19   reconciliation of the -- of the -- of pretty much all of those

20   2800 claims, which is why we feel a little bit more certain

21   with the balance.  As part of the reconciliation process,

22   we've been working with the Weil Gotshal team on entering into

23   numerous stipulations with vendors, which also adjudicated --

24   or we reached agreements on what administrative claims would

25   be.  I can't recall the number of stipulations we've entered

1    into, but it's been a significant amount.

2         So there's -- it was a fairly material effort to ensure

3    that we could get a what I feel is a reasonably accurate

4    balance of allowable administrative claims with the exclusions

5    that we have listed in the Disclosure Statement.

6         THE COURT:  Let me ask you a question,

7    Mr. Castellano.  It was a question that was mentioned by one

8    of the parties in their opening, just to the extent that, you

9    know, if not, I'll ask the lawyers.

10        The admin expense program that's in the Plan

11   contemplates -- let's just -- someone agrees to the terms opt

12   in, opt out -- if someone agrees to the 50 percent reduction,

13   is is the 50 percent based on an admin proof of claim that

14   they filed, or is it based on books and records or some other

15   number?  Just your understanding.

16        THE WITNESS:  Yeah.  No, I understand the question.

17        So it's based on a reconciled amount.  The

18   reconciled amount will comprise what we've reconciled with

19   that particular vendor if they filed an administrative claim,

20   plus books and records.  And let me explain the -- let me

21   explain the addition.

22        The admin claims bar date requested claims through

23   November 15th.

24        THE COURT:  Okay.

25        THE WITNESS:  The admin claims bar was

1    December 20th.  We reconciled -- that 2800 that I was

2    referencing reconciled balances between the Debtors and the

3    vendors and as of November 15th.  We then need to add to that

4    what we think we incurred post November 15th effectively

5    to-date.

6              THE COURT:  Let me -- let me just give you an

7    example of a -- just so I have it clear in my mind, and this

8    may be clear to everyone else, and I apologize.

9              Let's say someone filed an admin claim for a million

10   dollars as of November 15th.  Let's just say the Debtors in

11   their reconciliation -- and tell me if I've got this wrong or

12   if I'm thinking about this wrong -- reconcile the number at

13   700,000.  Right?  This person agrees to a 50 percent

14   reduction.  Is the 50 percent, are they getting 350?  Are they

15   getting 500?

16             THE WITNESS:  It would be 50 percent of the 700,000.

17   If I can just add one thing, if we reconciled with a vendor,

18   we would either ask them to modify their claim, or if they

19   don't agree with us, we would put it on an objection to get it

20   resolved.

21             But the estimate that we're representing the

22   Disclosure Statement is the result of our reconciliation

23   efforts.  So in your example, it would be that 700,000.

24             THE COURT:  How is someone going to know by reading

25   that Disclosure Statement that you may be thinking 700 if they

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

1    just received a document?  If you know?  It's the question,

2    probably a better question for the lawyers, but that's going

3    to be the question that I just need to make sure that I

4    understand and we can -- but let's finish with questioning if

5    it's a better question for the lawyers to explain it to me.

6    Let's do that.  But let's continue with examination.

7            It's just a -- I just wanted to make sure that I

8    understood.  I'll let you continue with your examination.

9            MR. BEREZIN:  Thank you, Your Honor.

10   BY MR. BEREZIN:

11   Q    Mr. Castellano, as a member of the Transformation

12   Committee to what extent were you involved in the negotiations

13   over the FILO settlement?

14   A    I was present at every meeting, every call with -- with

15   counsel and with the members of the FILO -- the advisors to

16   the FILO parties, and often including the Unsecured Creditors

17   Committee advisors as well.

18   Q    Thank you.

19            You testified earlier that in the event that the 9019

20   settlement is approved, but the Plan is not approved and the

21   case is converted, that a Chapter 7 Trustee would have a

22   $6.5 million in cash.  Do you remember that?

23   A    I do.

24   Q    What expenses would that Chapter 7 Trustee have at that

25   point as far as that period?  What expenses would the

1    Chapter 7 Trustee have at that point?

2    A    Yeah, I mean, the Chapter 7 Trustee --

3              MR. KEACH:  Objection.  It goes beyond the scope of

4    Cross.  I didn't ask him about that.  He volunteered to

5    $6.5 million amount and I -- and the question was would that

6    be available to the Trustee to spend.  He said yes, but we

7    never got into what expenses would exist or any implementation

8    of that scenario.

9              THE COURT:  I'll sustain the objection.

10             MR. BEREZIN:  Thank you, Your Honor.

11   BY MR. BEREZIN:

12   Q    In the event that the Massachusetts administrative

13   expense claim is allowed ultimately, how would that impact the

14   timing of the effective date?

15   A    It would not.

16             MR. BEREZIN:  Okay.  No further questions, Your

17   Honor.

18             THE COURT:  Thank you.

19             MR. KEACH:  I have one short Redirect, Your Honor.

20             THE COURT:  Okay.  Can I -- I'll let Mr. Keach ask,

21   even if we go a little bit out of order, I'm okay with that.

22             Yeah.  Recross, I'm going to be two questions, I

23   hope.

24                        RECROSS-EXAMINATION

25   BY MR. KEACH:

1    Q    The reconciliation process you just described,

2    Mr. Castellano, that's for vendor claims, correct?

3    A    Well, it was for all -- it was for all 2800 claims filed.

4    I mean, not all of them were vendor claims.  There were some

5    some claims from employees.  You know, there are other there's

6    there were some tax claims.

7         The vast majority were vendor claims.  But it wasn't just

8    vendor claims.

9    Q    But it didn't include, for example, pending litigation

10   claims that the Debtor is defending.

11   A    (No audible response.)

12   Q    It doesn't include Massachusetts, for example.  Right?

13   You haven't reconciled Massachusetts?

14   A    Yeah.  No, that's a separate issue.

15   Q    Right.  So that's a whole separate category.

16   A    Correct.

17   Q    Right.  So this was employee claims, vendor claims.  In

18   other words, claims arising in the ordinary course of business

19   that the Debtors' post-petition operations?

20   A    And other regulatory claims.

21        MR. KEACH:  Okay.  Nothing further, Your Honor.

22        THE COURT:  Thank you.

23        Hold on.  I think we have one question.

24        MR. BEREZIN:  I just have one follow up from that

25   Cross.

1      THE COURT:  Well, --

2      MR. LUFT:  He can go on, Your Honor.

3      THE COURT:  Are you sure?

4      MR. LUFT:  Yeah, fine, Your Honor.

5      THE COURT:  Okay.

6      MR. BEREZIN:  I'm sorry.  It's one quick question.

7                    RECROSS-EXAMINATION

8  BY MR. BEREZIN:

9  Q   For the Massachusetts claim, administrative expense

10 claim, TRACO claim, to what extent have the Debtors reconciled

11 those claims and utilized the objection process?

12 A   We filed -- we filed objections to to all of those.  So I

13 was referencing the reconciliation process of the vendor

14 claims that resulted in these balances.  But we have actually

15 analyzed those claims, that's why hence the objections.

16      MR. BEREZIN:  Thank you, Mr. Castellano.

17      Nothing further on that.

18      THE COURT:  Thank you.

19      MR. LUFT:  Thank you, Your Honor.  Avi Luft of Akin

20 Gump on behalf of the Official Committee of Unsecured

21 Creditors.

22                    RECROSS-EXAMINATION

23 BY MR. LUFT:

24 Q   Mr. Castellano, I appreciate it.  I know it's a long

25 afternoon.  I have one question for you.

1           In considering the Plan and all the work you did, is

2      there any scenario you and your team considered in your

3      analysis where administrative claims received more in the

4      Chapter 7 than under the proposed Plan?

5      A    No.

6                MR. LUFT:  Thank you.

7                No further questions.

8                THE COURT:  Thank you.

9                Does anyone else have any questions for this witness

10     in the courtroom?

11          (No audible response.)

12               THE COURT:  Mr. Castellano, thank you very much for

13     your time.

14               THE WITNESS:  Thank you.

15          (Witness steps down.)

16               THE COURT:  Okay, quick question.  Can someone

17     answer my question just about the the reconciliation part?

18     Yeah, just how it works.

19               MALE SPEAKER:  The answer is an opt out form will be

20     sent to each admin holder that's eligible.  And on that form,

21     it will explain what the reconciled claim amount is.  So

22     that'll be there'll be a line that says reconciled claim and

23     it'll be --

24               THE COURT:  So on the form, it will have the number

25     so that they will know the 50 percent would be of that number.

1        MALE SPEAKER:  Correct.  And then it says if you
2   disagree with the number, reach out to the Debtors.
3        THE COURT:  So someone's going to fill out the --
4   it'll be kind of like a partially completed ballot for them to
5   see information with that number in there.  And they can --
6        MALE SPEAKER:  That's exactly right.
7        THE COURT:  Thank you very much.
8        MR. KEACH:  Your Honor, I just have actually a
9   question of the Court.  Earlier when I was doing my opening, I
10   referred to some cases with respect to the inappropriateness
11   of this kind of extended bar date.  In other words, extending
12   the bar date until you have enough money to pay it.
13        I'm happy if Your Honor wants us to follow up with a
14   brief on that point, I'm happy to do that.  I'm also happy
15   just to give the Court the citations, however the Court would
16   like it, but that was --
17        THE COURT:  I'll take your --
18        MR. KEACH:  -- that was new material, and we just
19   wanted to get it in.
20        THE COURT:  If you have citations, I'll take them
21   now.
22        MR. KEACH:  All right.  Thank you, Your Honor.
23        The cases we're referring to are *In Re Premiere*
24   *Network Services*, *Inc.*, 2005 Westlaw 6443624, Bankruptcy
25   Court, Northern District of Texas at July 1st, 2005.

1          THE COURT:  I think it's -- I got 2005 Westlaw and I

2     got --

3          MR. KEACH:  6443624.

4          THE COURT:  Perfect.  Thank you.

5          MR. KEACH:  Also, *In Re Potomac Ironworks, Inc.*,

6     217 BR 170, Bankruptcy Court, District of Maryland, 1997.

7          There are others, but I think those are significant

8     enough and they cite other cases.

9          THE COURT:  So I just want to make sure I've got the

10    cite right.  2005 Westlaw 6443624.

11         MR. KEACH:  6443624.

12         THE COURT:  Okay.  Thank you.  I just want to make

13    sure.

14         MR. KEACH:  Thanks.  And then the other is 217

15    BR 170.

16         THE COURT:  170.  Got it.  It's a Maryland.  That's

17    it.  You got it.

18         MR. KEACH:  Yeah.  Thank you, Your Honor.  I just

19    wanted you to have those.

20         THE COURT:  No, no, no, thank you very much.

21         I want to thank everyone for their patience.  I'm

22    going to be a lot for me to think about.  I'm going to give

23    you a ruling.  But it's going to be tomorrow around 3:00 or

24    3:30.  I'll give you an answer.

25         I want to take everything under consideration, read

1    cases, think about everything and I'll give you a ruling on

2    everything.

3             You can come in virtually -- appear virtually.  I've

4    got no issues.  It's just going to be me reading everything.

5    But I want to come back and take everything under

6    consideration.

7             I thank everyone for their time.  You're more than

8    welcome to -- I'm just going to sit here and clean up stuff

9    and I'll dial in.

10             Let me give you an accurate time.  Let's do

11    3:00 p.m., 3:00 p.m. -- tomorrow at 3:00 p.m.  I'll give you

12    an answer.

13             Okay.  Thank you very much.  Everyone is excused.

14             Yes.  Before we leave?

15             MR. COHEN:  One housekeeping item for the Record,

16    David Cohen, I just want to make sure we have an extension of

17    the DIP and the milestone from the lenders.  I trust that it's

18    fine.

19             MALE SPEAKER:  I haven't secured that from the

20    client, but I will go to them understanding that --

21             THE COURT:  No, I understand, I appreciate it.

22    Thank you.

23             MR. COHEN;  Thank you, Your Honor.

24             THE COURT:  Alrighty, folks.  Thank you.

25             (Proceedings concluded at 6:07 p.m.)

1                          * * * * *

2              I certify that the foregoing is a correct transcript

3       to the best of my ability produced from the electronic sound

4       recording of the proceedings in the above-entitled matter.

5          /S./  MARY D. HENRY

6       CERTIFIED BY THE AMERICAN ASSOCIATION OF

7       ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8       JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9       JTT TRANSCRIPT #69842

10      DATE FILED:  JUNE 1, 2025

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25