```
 1                   UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3   STEWARD HEALTH CARE           )  CASE NO: 24-90213
     SYSTEM LLC,                   )
 4                                 )  Houston, Texas
                                   )
 5            Debtor.              )  Friday, May 30, 2025
                                   )
 6                                 )  3:02 p.m. to 4:11 p.m.
     -----------------------------)
 7
                              HEARING
 8
              BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
 9                 UNITED STATES BANKRUPTCY JUDGE

10
     APPEARANCES:
11
     For Debtors:            DAVID J. COHEN
12                           Weil, Gotschal & Manges LLP
                             767 Fifth Avenue
13                           New York, NY 10153

14   Court Reporter:         YESENIA LILA

15   Courtroom Deputy:       YESENIA LILA

16   Transcribed by:         Veritext Legal Solutions
                             330 Old Country Road, Suite 300
17                           Mineola, NY 11501
                             Tel: 800-727-6396
18

19

20

21

22

23

24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```

1                    <u>HOUSTON, TEXAS; DAY, MONTH DATE, YEAR; TIME</u>

2                         (Call to Order)

3            THE COURT:  Good afternoon, everyone.  This is

4    Judge Lopez.  Today is May 30th.  It is 3:00 p.m.  I'm going

5    to call the Steward case.  We'll get started in one moment.

6            Ms. Shells, can you just put a thumbs-up if you

7    can hear me just so -- would be helpful.  Okay.  I just want

8    to make sure folks can hear me.  There's about 130 people on

9    the line.  I didn't want to open it up too much.  Okay.  All

10   right.

11           I think everyone -- this is Judge Lopez,

12   continuation of hearing on two matters.  One I will call the

13   FILO Lender Settlement Motion and two is for conditional

14   approval of the disclosure statement.  I'm going to start

15   with the FILO settlement motion.

16           I would note that there were two motions filed,

17   one seeking approval of a settlement with the FILO secured

18   parties, the Official Committee of Unsecured Creditors, and

19   the Debtors.  I'll start with that and then I'll turn to

20   conditional approval of the disclosure statement and related

21   dates.

22           I'm going to note that the FILO settlement

23   provides for a couple of things.  Resolution of the FILO

24   secured parties' demand for relief from the automatic stay

25   under a FILO DIP order which has been out there for awhile

1    to exercise remedies over their collateral.  The settlement

2    extents the maturity date of the DIP which currently is

3    expired, unless there was a one-day continuance.  But it

4    ends today.  It technically ended yesterday.  There may have

5    been an extension of today for allowing the court to rule.

6    But that would terminate use of the DIP and terminate the

7    use of cash collateral.

8            But this settlement would extend the maturity date

9    to July 8th, 2025.  It would provide a $125 million

10   financing commitment from the FILO secured parties -- that

11   includes the use of cash collateral -- to support the

12   pursuit of some litigation claims, which the Debtors and

13   others in the Committee believe are valuable.  Would provide

14   a little over $21 million of funding to the Debtors, which

15   according to the relief in the motions would -- the Debtors

16   would use to essentially support administration of the

17   estate and make payments to some short-term creditors and

18   administrative creditors.  It would also provide adequate

19   protection to the FILO secured parties as a condition to

20   consent for the use of this additional money for cash

21   collateral and it would extend and essentially transfer.

22   This is a big point.  It would transfer substantially all of

23   the Debtor's assets into a litigation trust for the benefit

24   of the FILO secured parties and the Debtor's estates.

25           Would also subordinate about $10 million of claims

1    under a prepetition bridge facility that -- it would

2    subordinate it to all admin and priority claims on what is

3    known as a multiple on invested capital, which I will refer

4    to as the MOIC, commonly referred to in the proceedings as

5    well.  And it also reduces some interest rates as well.

6              I would note that as of December 31st, 2024 --it's

7    been awhile, this case has been going on for awhile --

8    maturity was about $335 million in principal amount, and

9    that remained outstanding under the DIP facility and the

10   prepetition bridge facility.  That excludes this MOIC piece.

11             The supporting parties who have been referred to

12   as the Debtors, the Committee, and the FILO Secured Parties,

13   believe that the settlement allows the Debtors to pursue

14   confirmation of a Chapter 11 plan of liquidation supported

15   by the FILO secured parties and the Creditors' Committee.

16   They argue that without that, that the states face imminent

17   risk of maturity, the FILO DIP facility, and again, of the

18   moving of the lifting of the stay, which technically could

19   assume today, including -- that would include assuming

20   ownership of the Debtor's remaining and control of the

21   remaining assets of the Debtors.  The Debtors have sold

22   essentially all of the hospitals here, so we really have a

23   few assets left in the estate.  And I'll describe those.

24   But that's really what we're doing.

25             Under this settlement, as I noted, there would be

1    a litigation trust formed.  The litigation trust is proposed

2    to have three beneficiary classes, what is referred to as an

3    A1 interest be held by the parties that extend litigation

4    funding and entitle the holders of them to priority first.

5    And then there's an A2 interest which would be held by the

6    FILO secured parties and entitle them to a second priority

7    liquidation preference equal to the amount of their DIP

8    facility and the prepetition bridge facility.  And then

9    there is a Class B interest which is going to be held by the

10    Debtor's estates or in this case converts to a successor

11    liquidating vehicle and entitle them, the Debtors or this

12    liquidation vehicle, to the proceeds of the interest after

13    repayment of the A1 and 2 interest.  There would be a

14    litigation trustee and a litigation to handle that.  It

15    would -- that litigation trustee would owe fiduciary duties

16    to the Class A1, A2, and B holders.

17          The settlement also includes releases.  The

18    releases include the Debtors, the Committee, and the Filo

19    Secured Parties, the litigation -- the litigation trust, I

20    should say, and certain related parties.  More on that in a

21    second.  And they would exchange mutual releases whenever

22    the trust was established, what is defined as the litigation

23    trust establishment date.

24          The settlement comes out as the result of a multi-

25    month mediation before Judge Isgur.  I would note at the

 1    same time that this motion was filed, there is a proposed

 2    Chapter 11 plan and a proposed disclosure statement that

 3    I'll talk about in a minute.  And then as well as a motion

 4    seeking conditional approval and solicitation procedures

 5    related.

 6            I would note that the targeted date for plan

 7    confirmation requested there is July 8th.  So there is a

 8    syncing of the dates between the litigation trust date,

 9    transfer date, and the plan confirmation.

10            Numerous parties have objected to the relief

11    requested in the settlement motion.  The primary arguments

12    deal with what I would call the substance of the settlement.

13    It's not in the best interest of the estates, it doesn't

14    satisfy the 9019 standards, there are broad releases there.

15    At the hearing there was a timing component that was raised;

16    the Court shouldn't consider this motion and should delay

17    and consider the motion in conjunction with plan

18    confirmation.  So I'll call that kind of the timing issue.

19            And then the more substantive is that there is

20    allegations that this is a sub rosa plan, an impermissible

21    sub rosa Chapter 11 plan, the settlement itself is a sub

22    rosa plan.

23            The Court admitted exhibits on the Debtor's

24    witness and exhibit list for 4998 and that includes

25    declarations of John Castellano, the Debtor's chief

1    restructuring officer, which was in 4998, but is also ECF

2    4903 and the declaration of Will Transier, an independent

3    manager of the Debtors.  That declaration was included in

4    the exhibits at 4998 as well, but it's also identified in

5    the hearing at 4904.  I would note that Transier and

6    Castellano also gave live testimony.  Castellano gave a

7    supplemental direct in addition to his declaration and was

8    cross-examined.  Mr. Transier was examined on cross as well.

9            Before I kind of get into the analysis, I should

10   note that the Debtor's remaining assets based upon the

11   evidence in court, the Debtors have about $7 million in

12   cash.  There are some amounts that are escrowed on behalf of

13   third parties that don't constitute litigation trust assets.

14   There's a number of accounts receivables.  There are some

15   joint venture interests in certain clinics, and then there

16   are estate causes of action.  The Debtors claim that there

17   are significant causes of action that could bring in excess

18   of a multibillion dollar against certain commercial payors

19   in connection with accounts receivable against an insurance

20   policy for property damage, potential claims against Blue

21   Cross Blue Shield, there's a number of preference claims,

22   and then claims against current and former insiders,

23   including fraudulent conveyance, breach of fiduciary duties,

24   and other theories.

25            I want to note from the outset there was -- and I

1    understand that the Debtors raised a number of potential

2    actions and named a number of parties.  I take no position

3    one way or the other and nor do I find at this stage that

4    that there's litigation, there are potential causes of

5    actions against parties.  I've made no findings one way or

6    the other whether based on any evidence in front of me

7    whether any party has done any wrongdoing, and I want to be

8    really clear about that.  And I am including certain parties

9    here.  I'm seeing Ms. Jacobson's client (indiscernible).  I

10   make no findings.  I got it.  There could be some litigation

11   down the line.  There's some litigation pending.  Those are

12   issues for another day at another time.  And that's kind of

13   where we are.

14          I note that the Commonwealth of Massachusetts also

15   appeared and there was some potential issues raised and

16   potential litigation against them.  Again, my decision today

17   is not based upon me looking at intent, anyone who filed an

18   objection.  Parties in interest under the Bankruptcy Code

19   have a right to be heard on any matter.  The Bankruptcy

20   Congress gave parties the ability to raise and be heard.

21   And I thought the objections that were raised were valid

22   objections.  I found nothing improper about any objections

23   that were raised by any party.  But I got it, we are where

24   we are.

25          Let me turn to the factors.

1          Bankruptcy Rule 9019  says that on a motion by the

2    debtor and after notice and a hearing, the court may approve

3    a compromise or a settlement.  That's what 9019 says.  The

4    Fifth Circuit has held that a Bankruptcy Court may approve a

5    settlement if the proposed settlement is fair, equitable,

6    and in the best interest of the estate.  And that's In re

7    Age Refining, Inc., 801 F.3d 530, 540 (5th Cir. 2015) case

8    determining whether a settlement is fair and equitable.  And

9    the Fifth Circuit applies a multi-tier test, the probability

10   of success (indiscernible) litigating a claim subject to a

11   settlement with due considerations for the uncertainty and

12   facts in law, the complexity and likelihood and duration of

13   any litigation or any intended (indiscernible).  And three,

14   all other factors bearing on the wisdom of the compromise,

15   including the best interest of creditors with proper

16   deference to their reasonable views and to the extent in

17   which the settlement is truly a product of arm's length

18   bargaining and not of fraud or collusion.

19          The Debtors bear the burden of establishing that

20   the balance of these factors leads to a fair and equitable

21   compromise.

22          As for the first factor, when you kind of think

23   about the probabilities here, Cajun Electric and there's

24   plenty of other cases saying bankruptcy courts don't have to

25   conduct mini trials to determine the probability of any

1    outcome, waived in a settlement.  Said a court must apprise

2    itself of relevant facts and law to make an informed and

3    intelligent decision.  Great judicial deference is given to

4    courts in -- and to the debtors in their exercise of their

5    business judgement.

6          And you look at cases like Aweco, 725 F.2d 293,

7    297 (5th Cir. 1984), approval of a settlement agreement is a

8    matter within the sound discretion of the bankruptcy court.

9          So the Court considered evidence and the testimony

10   and there were a number of evidence.  I took the night and

11   considered everything, carefully considered the evidence

12   before the Court and considered the objecting parties and

13   their concerns.  I've got a lot to say.  I just kind of need

14   to get it all out.  And what I say will fit in some places

15   and some other places.  There may be some overlap because

16   some of these issues overlap.

17         But where the Debtors have based themselves now is

18   that there is an expired several-hundred-million dollar

19   facility with lenders who have the ability to seek relief

20   from the stay and to foreclose on the assets that I've

21   identified.  No party disputes that.  That's why the Court

22   has to consider today this motion.

23         Considering this motion, as other parties have

24   asked me to, to another date 60 days from now, or I should

25   say a month-and-a-half from now, is realistically not

1    possible.  And no one provided this Court any legal basis to

2    adjourn for 40 days (indiscernible) that's been on notice.

3    I would note I reviewed the final DIP order and I reviewed

4    the rights that the FILO DIP lenders have under that order.

5    An order has been there for a while.  You're talking a

6    significant amount of time.  The order says what it says.

7    And I think creditors have the right, secured creditors have

8    the right to rely on court orders and that the court will

9    grant the relief that is provided in those orders.  And I

10   read orders literally.  That order has been out there for a

11   while.  And the secured creditors has the right to seek the

12   right to lift the stay to foreclose, not for the Court to

13   then come at the eleventh hour and stay and decide something

14   60 days from now.

15          I would also note that the termination of cash

16   collateral -- probably terminated last night if not -- it

17   doesn't exist now.  So this case stops today completely, 100

18   percent, unless I rule on this motion.  It just does.  No

19   cash, the case can't continue.  I've got to consider this

20   motion today.  And I would note that it's on -- I do find

21   that there has been proper notice of the considerations of

22   the motion here.  I'm going to get into the merits of them.

23          But I am going to overrule the timing

24   consideration.  And I don't think bankruptcy courts should

25   be providing what I would call at best 105 relief to push

1    out hearings for a number of days.  I just have to rule up

2    or down on that.  But secured creditors have rights and

3    they've got to be able to rely on those orders.  Words

4    matter on those orders.  If people are going to lend

5    hundreds of millions of dollars, they're entitled to the

6    rights that they have under the order.  And courts have to

7    enforce them as written.

8            So let me just note I am going to grant the

9    settlement motion, and I'm going to tell you why.  The

10   settlement agreement, if you look at Castellano's

11   declaration at Paragraph 22, which is unrefuted, states that

12   the settlement agreement allows the Debtors to avoid

13   substantial litigation costs and risks associated with the

14   FILO secured parties seeking relief from the automatic stay,

15   to exercise remedies against their collateral, and

16   terminating consensual use of cash collateral.  And that if

17   the debtors were unsuccessful in that litigation, these

18   cases would convert to Chapter 7 and result in a very

19   material destruction for the Debtor's administrative and

20   unsecured creditors.

21           The unsecured creditors tell me in their arguments

22   and the evidence bore it out that without this settlement,

23   there's virtually no hope of any recover for unsecured

24   creditors.  It goes away.  There is none.  Because the

25   secured creditor can take and foreclose on all of the

 1    assets.  And there's nothing in that final DIP order that

 2    requires a secured -- FILO -- secured lenders to foreclose

 3    on collateral, own the collateral, and then if they make

 4    more money later as a result of foreclosing on the

 5    collateral, that they've got to turn it over.  The only

 6    option to keep the FILO secured lenders in -- there's a

 7    waterfall treatment -- is in connection with the settlement

 8    agreement.  It's the only thing that keeps them here.  It's

 9    the only legal hook to keep the FILO secured lenders in this

10    case and to agree to allow them to get paid up to the amount

11    of their facility and to give a possibility for an unsecured

12    creditor to receive a dollar based upon the evidence before

13    me.  It is this settlement -- all the cash is gone.  All the

14    admin claim.  There is no runway.  It all stops today.  And

15    that weighs heavily on me.  That's what is unrefuted.  In

16    connection with this case.

17          Castellano's live testimony, he stated on direct

18    examination that if the FILO parties are successful, the

19    Debtors will have no liquidity and no assets left and it

20    would have a detrimental impact on unsecured creditors and

21    that the FILO securities would have title to all assets of

22    the estate, including cash.  It's unrefuted.

23          Castellano testified in his supplemental

24    declaration at ECF 4977, which is admitted as well,

25    Paragraphs 5 through 7, that the FILO secured parties will

1    not consent to a priming lien and that there's a substantial

2    risk that the estates lose ownership of the remaining estate

3    assets and that the most likely outcome of a sale or an

4    auction process is that the FILO secured parties will

5    purchase all or substantially all of the Debtor's assets

6    primarily or exclusively using a credit bid.  Mr. Price, who

7    represents the FILO secured parties, stood up in court and

8    confirmed just that.

9          Additionally, Castellano testified in his

10    declaration at 4903 at Paragraph 30 that entry into the

11    settlement agreement is necessary to provide adequate

12    protection to the FILO secured parties and to ensure the

13    continued consensual use of cash collateral, both of which

14    were necessary to avoid litigation with the FILO parties and

15    to avoid conversion.  That's where we are.

16          Thinking about the complexity and the attendant

17    expenses and inconvenience and delay, there's no question

18    that without the use of cash collateral, this case comes to

19    a screeching halt.  There's no question that any debtor with

20    $7 million in cash with no -- with someone who has a priming

21    lien, a secured lien, to try to get someone with a priming

22    lien to come in and -- that's a -- we just never get there.

23    You just never have the opportunity to come up with -- there

24    are no other alternatives.

25          And I would note for the record, and I sat there

1    and listened very carefully, there is no -- no one presented

2    a credible alternative to taking out the secured lender,

3    someone putting up new money.  There was no credible

4    evidence in front of me to even hint that that was a

5    possibility.

6           Castellano's declaration at 13, unrefuted.

7    Without the adequate protection provided for in the

8    settlement agreement, they could foreclose, litigating over

9    issues, the use of cash collateral and a motion to lift the

10   automatic stay before any attempt to confirm a Chapter 11

11   plan would deplete the Debtor's remaining resources and

12   leave insufficient funds to pursue an alternative

13   transaction to maximize value for the estate.

14          Castellano's supplemental declaration in Paragraph

15   8, upon conversion thinks that the trustee would obtain

16   materially less for the remaining assets.  That issue was

17   disputed by objecting parties.

18          And I'm going to talk about this in a minute.

19   Castellano also testified that he talked to numerous parties

20   to see if anyone was going to take up litigation.  And there

21   is a risk, a very real one, that a Chapter 7 trustee would -

22   - the case would convert and the Chapter 7 trustee has no

23   cash to do anything.  And she or he would have to speak to

24   parties to try to get information and try to pursue causes

25   of action which would be owned by the FILO secured parties.

1    And let's even say that she or he is successful about

2    winning and getting a cause of action that is not subject to

3    secured lenders' liens, which I don't see, Castellano also

4    says that no one is going to take it on a contingency.  And

5    that's unrefuted and no one showed up in court to contest

6    any of it.  So there's nothing for priority creditors.

7    There's nothing for unsecured creditors.

8            When you think about all other factors bearing on

9    the wisdom, best interest of creditors, the deference to

10   their reasonable views -- you know, you go back to this FILO

11   secured parties seeking to foreclose and their rights,

12   material value destructing for an admin priority and

13   unsecured creditors.  Castellano also explains in Paragraph

14   24 at ECF 4903 that the settlement provides for $21.5

15   million to the Debtor's estates after litigation trust

16   establishment date to fund the administration of the estate

17   and payments to administrative creditors and that the

18   settlement subordinates the retained FILO claims of $10

19   million to admin and priority to share recovery with general

20   unsecured creditors.

21           Castellano also testified that the global -- in a

22   supplemental declaration in Paragraph 10 that the global

23   settlement negotiated with the FILO parties and the

24   Creditors' Committee provides the only path to avoid these

25   risks and to enable the Debtors to repay admin claims and

1   priority creditors in full and to provide a meaningful

2   recovery to unsecured creditors.

3           Mr. Transier testified in his declaration that the

4   estate has valuable claims against insiders and third

5   parties and that the investigation subcommittee was

6   appointed by the board and instructed counsel to conduct an

7   investigation to identify any potential claims and that he

8   believes that there were hundreds of thousands of the

9   Debtor's financial records and communications between

10  insiders and third parties and meetings and board meetings

11  and that there were 14 interviews with directors, officers,

12  and employees and that the subcommittee reviewed findings

13  and determined that the Debtors have valuable estate claims

14  and causes of action.

15          Castellano testified that he thinks that's the

16  only remaining available asset and that it could be multi-

17  billion.  And he also testified that that's the only way to

18  repay admin and priority claims in full and provide a

19  meaningful recovery, and that the settlement provides the

20  time, the money, and the support for key stakeholders to

21  pursue these claims and to maximize recovery.

22          Transier was crossed on the fact that a

23  contingency billing process may or may not have been

24  proposed to Kobre & Kim, but he also testified that Kobre &

25  Kim was selected because of its experience trying some other

1   cases and saw their credentials.

2          And the Debtor's didn't sit on their hands when it

3   came to potential litigation, potential financing outside of

4   the settlement.  In fact, Castellano testified in his

5   declaration at 4903 that the Debtors contacted 19 other

6   third parties to gauge interest in providing a proposal for

7   litigation financing but ultimately the FILO secured

8   parties' proposal was the best litigation financing

9   alternative available to the Debtors and that it was based

10  on reasonable and market-based terms and actionable, and the

11  only proposal that provided comprehensive funding needed to

12  confirm a Chapter 11 plan, fund the estate, and effectively

13  pursue all the litigation assets.

14         The evidence also shows -- there is no refute --

15  that this was arm's length negotiations in mediation and not

16  the result of any fraud or collusion.  I don't think anyone

17  got anything they wanted, everything, a hundred percent in

18  connection with the settlement agreement.

19         When you look at Paragraph 23 -- Paragraph 25,

20  Transier, non-contested.

21         So you turn to the objections.  Let me start that

22  it's not in the best interest of creditors here -- I know

23  TRACO and others essentially argue that the settlement

24  agreement is not in the best interest of creditors by

25  exacerbating administrative insolvency issues.  And there's

1     a real admin problem, there's no question about it.  There's

2     a very large number out there, an incredibly big number, a

3     number of administrative claims.  And it's been

4     substantiated by the administrative claims bar date.  It has

5     been substantiated by Castellano's testimony and it may be

6     larger than the Debtors think at this point.  But Castellano

7     also testified that absent consent, there's no funding to

8     monetize the remaining assets and pursue a Chapter 11 plan.

9     You just don't get to monetize anything.  The number doesn't

10    get bigger.  There's no chance of getting anywhere.

11    Everything comes to a halt today in this court based on the

12    evidence.

13          Castellano explains in Paragraph 24, unrefuted

14    evidence, it avoids conversion to Chapter 7, which again,

15    it's unclear what a Chapter 7 trustee would have at all if

16    this case converted immediately.  And value-destructive.

17    Provides funding to try to get to a Chapter 11 plan to see

18    what creditors want.  Subordinates $10 million and also

19    allows the use of cash collateral.  You cannot overlook the

20    fact that there is a several-hundred-million dollar

21    financing that has come to term and it immediately stops the

22    use of cash collateral.

23          The evidence from the objecting parties suggest

24    that somehow the Court could continue as the only way, but

25    there is nothing that would stop the continued use of cash

1   collateral.  And without the consensual use of cash

2   collateral, there is no case.  What -- I'm going to convert

3   something to Chapter 7?

4          I would also note -- and I'll say this about

5   motions to convert -- the case has been out here for a

6   while.  Every motion to convert the case was filed shortly

7   before the hearing.  And I was asked to consider it.  But I

8   do think conversion is a consideration in a 9019, whether it

9   would be best or not.  But there will be a day to take up a

10  motion to convert the case where people can put on their

11  evidence.  I'm just talking about -- I am not required to

12  conduct a mini-trial on every issue.  There will be proper

13  notice on those and we'll take them up in due course.  But

14  the evidence shows that the only path available to avoid

15  these risks is to put them here.

16         The Commonwealth argued -- and I said this a

17  little earlier about it's premised upon a false threat of

18  foreclosure.  The documents say what they say.  I don't

19  think it's a false threat.  I think it is a very real

20  possibility.  And that would destroy value for every

21  unsecured creditor here today.  And that's what the Official

22  Committee of Unsecured Creditor -- and I would note the

23  Committee -- this is no -- at any point no committee that

24  has rolled over at any point in connection with this case.

25  They have been active and pushed hard on every point in this

1   case.  And I want to note that for the record.  I make no

2   findings about the Commonwealth, I make no -- but whether

3   they did anything here.  I don't play around with threats.

4   And this isn't a threat, it's just a statement in a -- it is

5   an order of the Court that allows parties to exercise

6   rights.  That's where we are.  But certainly the use of cash

7   collateral terminates and there's nothing that this Court

8   would do to extend that based upon the lack of adequate

9   protection.

10          And I want to note the Committee and its

11   professionals.  I don't know what took place in the

12   mediation, I just know it took over a couple of months.  But

13   noting about the actions in front of them.  This case, the

14   admin claims are high.  And a lot of them are professional

15   fees.

16          There will be a time to take up professional fees.

17   The Bankruptcy Code guarantees that there is a hearing where

18   we can review and review professional fees and take them up

19   and parties have the right to object.  The Court will

20   consider them.

21          I also have to consider as part of the 9019 -- I

22   know Mr. Keach mentioned we don't need to think about the

23   past.  But I do think when you have to consider whether the

24   settlement and where we are and why the Committee is pushing

25   for it, the Committee, Mr. Castellano, Mr. Transier, the

1    Debtors, the FILO secured parties have been mediating for

2    months and have been showing up in a case that came with

3    really hard facts.  Right?  The -- go back to the MPT

4    parties and someone owning the land.  Held hearing -- you

5    know, live patients, people coming into this court saying

6    that if the Court didn't act or didn't prevent parties from

7    acting, that people would die by actions, decisions that

8    this Court made or decisions that this Court didn't make.

9    The act or failure to act in some instances would lead to

10   death.  Those are really hard facts to deal with.

11        And so at some level professionals who represent

12   the Debtor or who represent the Committee, you've got to do

13   everything.  You didn't create the facts that came into

14   this, but you had to do everything you could to a certain

15   extent to try to make sure that you did everything you

16   could.  If not, then folks can allege that you didn't do

17   enough and that's the reason that there's no cash.  That

18   leads to litigation and people questioning estate

19   professionals and saying you didn't do enough while you were

20   there.  That's Highland II, right?  Or Highland I.  I can't

21   keep track of all the Highlands.

22        So that's professionals have a duty and they are

23   really hard facts.  Selling assets, coming up with sales,

24   continuing.  But the number is really big.  And I'll talk

25   more about admin claims in a moment.

1          There's no question the Debtors don't have

2     liquidity.  So I overrule that it's not in the best interest

3     of the estate and the professionals or in the best interest

4     of other creditors.  That's because the admin claims could

5     get larger.  When you look at the remaining assets which

6     I've identified, there's nothing there on its own that you

7     can just sell and magically pay admin claims.  It just

8     doesn't work.

9          Let me talk about the sub rosa plan.  There's

10    arguments that this is a sub rosa plan.  And what is a sub

11    rosa plan?  The Latin phrase -- and Keach stole my thunder

12    yesterday -- the Latin phrase literally translated when used

13    as an adjective here, it means happening or done in secrecy.

14    Right?  So literally translated, it means a plan happening

15    in secret, right?  And that's obviously not what's happening

16    here.  We've had public hearing, there's been a motion with

17    plenty of notice, over 200 participants on the phone, 165

18    today.

19         But sub rosa plan has kind of developed its own

20    meaning in caselaw that really refers to a de facto plan,

21    one in which a Chapter 11 debtor constructs or does

22    something that amounts to a Chapter 11 plan of

23    reorganization, kind of restructuring debt in a way that

24    bypasses many of the Bankruptcy Code's fundamental

25    protections that are set forth in connection with a plan

1    confirmation.

2           A court can sometimes deem a sub rosa plan when

3    there's a settlement if the settlement essentially has the

4    effect of dictating the terms of a prospective Chapter 11

5    plan.  And you can hear people making the arguments that the

6    settlement dictates the terms of a Chapter 11 plan, picking

7    up on those Energy Future Holdings Delaware cases and the

8    Capmark cases.

9           There's a famous Fifth Circuit case involving

10   airline slots and airline script.  The Braniff case.  Harold

11   Abramson was still practicing law at the time, if you can

12   believe it, before he became a judge at the time.  Fifth

13   Circuit in Braniff determined -- and you can see caselaw has

14   developed here.  You see cases -- I think Babcock & Wilcox

15   kind of summarized Braniff well.  Judge Smith on the Fifth

16   Circuit wrote that Braniff stands merely for the proposition

17   that the provisions of a Section 363 permitting the trustee

18   to use seller lease and assets don't allow a debtor to gut a

19   bankruptcy estate before the reorganization or to change the

20   fundamental of the assets in a way that limits a future

21   reorganization plan, right?  You would file an order of

22   priority changing.  You know, are you doing something that

23   bypasses the priority scheme that is required in connection

24   with a Chapter 11 plan?  You can see hints of that as well

25   in cases like Jevic (indiscernible) structured dismissals.

1    And what you're saying is we're going to do it this way, but

2    we're going to do it this way but we're going to pay these

3    creditors first in this way, but you couldn't do it in a

4    Chapter 11 plan, but you're trying to do it outside of the

5    plan process.  Are you changing a fundamental priority,

6    protections like best interest of creditors and absolute

7    priority rules?  Are you trying to bypass it -- in other

8    words, really de facto and sub rosa, are you really kind of

9    secretly trying to just do an 11 without doing an 11 to

10   avoid the requirement that creditors get to vote on a plan?

11   And that's not really what's happening here.  Not at all.

12           First of all, the  Court find that it would have

13   the authority to establish a litigation trust outside of a

14   Chapter 11 plan process.  That could happen.  Assets can be

15   transferred to the trust, create a trust outside of the plan

16   process in connection with a settlement and why couldn't

17   they do it in connection with this settlement?  And again,

18   you've got to go back to where we find ourselves.  The

19   secured lender has a right to foreclose on all the property.

20   It has a super priority lien on all these assets.

21           In other words, we talked about the Class A and B,

22   A1, A2.  Helps in the settlement.  The secured creditor has

23   a right to foreclose on all of it.  And I said yesterday I

24   would lift the stay.  Of course I would.  It's been -- over

25   $300 million and no plan and no cash.  No use of cash

1    collateral.  What else is there to -- not a complicated

2    hearing if one were to hold a lift stay hearing.  There's

3    nothing here that would stop that secured creditor from

4    having the right.  And I think I have to enforce court

5    orders as written and to honor the deal that was struck in

6    connection with reaching a consensual use of cash

7    collateral.  It leads to harsh consequences but also allowed

8    hundreds of millions of dollars to be used in connection

9    with this Chapter 11 case.  Saved lives during the course of

10   the case.

11           So I think the settlement complies with the

12   Bankruptcy Code and doesn't dictate the terms of a plan.

13   There is another plan there, but it doesn't dictate the

14   terms of that plan, it doesn't dispose of claims against all

15   claims by all parties against the estate, it doesn't

16   restrict creditor votes, either.  And you look at Sections

17   1122, 1123, 1124, 1125, 1126 and 1129, they are important

18   sections of the Code that directly relate to plan

19   confirmation.  Right?  Look at 1123.  It says what has to be

20   in a plan, what must be in a plan and what may be allowed in

21   a plan.

22           I agree with the Capmark analysis, 438 B.R. 471,

23   513 (Bankr. D. Del. 2010).  And if you look at a settlement,

24   you're going to have to dispose of all claims against the

25   estate or restrict the creditor's right to vote.  And that

1   was adopted by the district court in the Energy Future

2   Holding case.

3          Here, unlike Braniff, which said here's how the --

4   we're going to get the proceeds in and then here's how we're

5   going to pay it and here's who it's going to pay and here's

6   exactly what's going to happen, right?  That's what the

7   court was against in Braniff.  Dictated the terms of any

8   plan.

9          Here we actually have a plan.  Could there be a

10  hypothetical settlement that dictated all the terms of the

11  plan?  I don't know.  But we don't have that here.  But

12  that's a hypothetical because there is actually a plan here.

13  Do they complement one another?  Yes, sure.  But that

14  doesn't mean it dictates the terms of the plan.

15         And there was some arguments made, well, could

16  someone file a plan that violates the settlement order, they

17  would file at the same time.  Who in the world would do

18  that?  That doesn't make sense.  Of course you reach the

19  settlement in a mediation and there's two separate documents

20  there.  And they both stand and fall on their own.

21         And that's an incredibly important point to me.

22  This settlement stands on its own.  Plan confirmation is an

23  entirely different endeavor in my -- that's the way it's set

24  up and that's the way I'm telling everyone I'm thinking

25  about it.  Make no mistake, there is no guarantee that

1    there's a Chapter 11 plan that could be confirmed.  It will

2    stand and fall on its own merits.

3         The settlement gives the Debtor money to pay --

4    the reference to payment of claims is really dictated under

5    the plan.  It's not dictated under the settlement agreement,

6    right?  But yeah, but the A1, the A2, the B, that still

7    keeps the priorities.  Quite frankly it's giving -- it's

8    really giving up some rights that the secured lender is

9    doing.  There's no path.

10        You know, and you look at cases like Richmond

11   Leasing, 762 F.2d 1303 (5th Cir. 1985), you look at Cajun

12   Electric Power Cooperative, 119 F.3d 349 (5th Cir. 1997).

13   And you don't dispose of all the assets and release -- it

14   doesn't alter creditor rights.  Just the priorities are

15   there.  And just because of where we find ourselves, I think

16   I view the settlement as a necessary first step towards

17   getting to a plan.  You just don't get there without it.

18   There is no path for the Debtors to propose a Chapter 11

19   plan or even negotiate with anyone else.  Everyone loses,

20   especially unsecured creditors.

21        Based on the evidence in support of the

22   settlement, we're talking basically no recovery.  And I mean

23   none.  And priority among admin claimants may be rendered

24   meaningless, too.  Potentially hundreds of millions of

25   dollars of potential litigation claims could go.  And that's

1    a real possibility.  Unsecured creditors would see nothing.

2              I'll talk about the releases.  I think the

3    releases are appropriately narrowly tailored with two

4    exceptions.  All claims by all parties are not being

5    released under the settlement.  The settlement provides for

6    mutual releases between the Committee, the FILO lenders, and

7    debtor-related parties.  There are no third-party releases.

8    There are no third-party releases.  There is no Purdue,

9    there are no third-party releases.

10             There was questioning about two individuals, Ann-

11   Marie Driscoll and Joseph Lombardo.  I make no findings

12   about them at all.  They were included as debtor-released

13   parties.  They were included, and then it was questioned.  I

14   just don't have any evidence in front of me to include them

15   as part of the settlement or why they were included in the

16   settlement.  They've got to be excluded.  Maybe they get

17   included in the plan.  I don't know.  That's another issue

18   for another day.  But I can't include them as part of the

19   settlement based upon the evidence before me.  I'm trying to

20   call it as fair as I can.  Including them is about this deal

21   and the evidence.  I say zero about them.

22             So based upon the Court's consideration of all the

23   relevant factors, I'm going to find that the settlement is

24   in the best interest of the estate.  Considering all

25   relevant factors under the Fifth Circuit caselaw, it is the

1    only path that provides any opportunity for any runway for

2    the estate to have an opportunity to provide any form of

3    meaningful recovery, even if the case -- if I find based

4    upon the evidence in front of me is to convert at a later

5    date.  Conversion today is not before me.  What would come

6    before me is a motion to lift the stay which I would have to

7    take up in short order and would likely lead to foreclosure

8    on all the assets.  That's where we are.  This provides

9    additional liquidity, provides runway.  I would note for the

10   record provides -- and again, I know there are some firms

11   that are listed.  I'd rather not say their name.  But they

12   are serious professionals.  I take that into consideration

13   as well.  So note that for the record.  I don't know where

14   money would come from, what alternatives would be there.  No

15   one proposed anything.

16          So I grant the motion.  I want the Debtors to

17   submit a proposed order.  I know that there were a bunch of

18   tweaks and revised languages and promises that were left out

19   and put in.  And get whatever is the right version with

20   everything in there that was promised on the record and

21   submit an order and I want to sign it, get this going.

22          I want to note as well and I find that the

23   Committee, its professionals, the Debtor and its

24   professionals, and I include the Transformation Committee

25   based on the evidence before me, Mr. Castellano and his

1    team, all acted in good faith in connection with the

2    mediation and the proposal of this settlement.  It was put

3    on notice to all parties, all members of the Committee who

4    voted to support this.  Find no evidence to put a motion

5    before the court based upon months of mediation, and they

6    put it out in good faith.

7            Now, I am approving it in the best interest of the

8    estate as complying with the Fifth Circuit caselaw with

9    limited exception for the releases.

10           I would note as well that it's not unusual in

11   connection with a large settlement that parties provide

12   mutual releases.  There are scores of cases, scores of cases

13   where parties enter into large agreements outside of a

14   Chapter 11 plan process and provide releases to each other.

15   And the FILO secured parties as well.  I find they acted in

16   good faith and its professionals in connection with this

17   process.  Obviously they are a part of the settlement

18   parties as well.  It's not uncommon.

19           So anyway, I am approving the settlement.  I don't

20   know, calls to Mr. Cohen, someone.  We will find the right

21   person.  You will Ms. Saldana know, and I will sign the

22   order.

23           I'm going to turn to conditional approval.  I'm

24   going to approve conditional approval of the disclosure

25   statement.  It is a -- the disclosure statement has -- its

1     over 500 pages.  The Debtors understand that they run the

2     risk by conditional approval that I could change my mind at

3     a later time and find that it didn't contain adequate

4     protection and the Debtors are willing to take that risk and

5     that will be conducted to a final hearing.

6               I note the Committee has asked for a letter to be

7     included, and it should.  I read the letter and it should be

8     included with the parties.

9               I would note that 1125 provides that a disclosure

10    statement must contain adequate information.  Adequate

11    information is determined as (indiscernible) information to

12    allow a holder to make an informed decision as to whether to

13    make an informed decision as to whether to vote to accept or

14    reject the plan.

15              The disclosure statement should go out.  We'll let

16    the vote of creditors -- I want to hear from voters as to

17    what they think about this plan, the admin expense and

18    whether they want it or not.  High threshold to meet.  If

19    it's going to work.  I want to hear from voters.  I want to

20    hear from unsecured creditors.  I want to hear from admin

21    parties.  I heard from a lot of them today, but there's

22    nothing in that disclosure statement that violates the

23    Bankruptcy Code on its face.  The plan is not patently

24    unconfirmable.

25              Certainly there are -- we got a preview of the

1   coming attraction, if you will.  And there were two big

2   issues.  Certainly feasibility is one, right?  Can the

3   Debtors actually pay all admin claims in full on the

4   effective date?  And then we'll talk about what that means.

5   But let's just start there.

6           I'm telling the Debtors now I'm concerned about

7   admin claims and the amount of the admin claims and the

8   Debtor's ability to do so.  The Debtors will not at plan

9   confirmation have the right to just tell me that they think

10  it's going to be worth billions of dollars in litigation and

11  leave it there.  They're going to have to put on at least a

12  prima facie case to some of these claims.  They're going to

13  have to articulate it.  They're going to have to identify.

14  That doesn't mean we're going to get into a mini trial, the

15  merits, and how much do you think you're going to make and

16  turning it into a discovery, but there's got to be more to

17  give me comfort and to give me a factual basis that some of

18  these investigations, that they were fruitful and that they

19  resulted in claims.

20          Now, there is a way to do this that has been done

21  plenty of times in other large cases.  I'm not -- you've got

22  to put some meat on the bone.  And it's not just going to --

23  we were at a conditional disclosure statement hearing.  I

24  don't need the legal -- but you've got to put something on

25  to tell me what you think you see and why you think

1    something is going to be worth, is there insurance that

2    parties can go after.

3             And I am making no findings about the other side,

4    either.  That's why we're not conducting a mini trial.  This

5    is not going to be -- it's way too much -- there's way too

6    much rattling of sabers for me on both sides, on everything.

7    Way too much on this side.  Let's just talk about what

8    claims are being reserved, what you think you're doing.  And

9    if you're going to say you think you can make a billion

10   dollars or a couple more, there's got to be some meat on the

11   bone to really provide that.  And there's a way to do this -

12   - talking about opening doors and showing -- I want

13   sufficient information to get me comfortable that you can

14   actually do this.

15            I want to know why you picked 2027.  I want to

16   know.  How long is this litigation going to last, right?

17   Where are you going to go and how do you get there?  What

18   else are you counting?  Are you counting personal injury

19   postpetition claims in connection with this and how are you

20   thinking about those?  And it's different.  I want clarity

21   when it comes there.  I don't know if you get there.

22            I'm going to take up conversion at the same time

23   as I do plan confirmation.  And whenever I make the decision

24   on that, I will make the call and the case will either

25   convert or I'll confirm.

1          It stands on its own.  I should say the FILO

2    secured party settlement agreement stands on its own.  It's

3    supported by law.  So plan confirmation its own.  The Debtor

4    will have to meet its burden on that.  I'm not rattling

5    sabers here.  I'm just saying this is not -- just because

6    you approve one doesn't mean you approve the other.  That's

7    the whole purpose of it is that one doesn't dictate the

8    terms of the others, right?  So we'll see where this goes.

9          I want to hear from voters and voters will talk.

10   And again, I can hear briefing on the effective date.  And

11   it's been done in other cases.  And I read the cases Mr.

12   Keach referred me to, and I know that the Debtors are going

13   to cite cases like Sears and Pier One and other cases.  So

14   you go both ways.  And I think courts have to look at this

15   and make an informed decision about how it works.  And I've

16   read Premier, and they're right, it can go both ways.  But I

17   need to hear what the evidence is.  And I don't have --

18   yesterday wasn't the day for me to say, you know, on the

19   spot you can never do this.  Because it's been done by other

20   courts.  Other courts found it didn't work in those cases.

21   And I do think others are going to have to show up and tell

22   me why -- you know, and maybe analysis changes, maybe the

23   date goes further out, maybe the date comes closer in.  I

24   don't know.  I do think and I encourage the Debtors to

25   continue to work.  There are a number of matters that I

1    think could really clarify and streamline the admin process.

2    I know that they are continuing to work and I strongly

3    encourage them to continue to work with the Committee during

4    this time.  The July 8th period works as well.

5         I want to let the Debtors know that and I want the

6    associates to know that I did not pick July 8th.  It was

7    your partners who picked July 8th.  It was not me.  That's

8    what they asked for.  And we'll show up and we'll try and

9    we'll take this up.  But again, I know that there are

10   serious matters here.  And some real serious issues were

11   raised.

12        I am also going to ask the Debtors, you know, if

13   there are no surprises in terms of Mr. Castellano said they

14   were still kind of doing the reconciliation.  And I'm asking

15   the Committee if something big comes up that I need to know

16   about, I want to have a hearing.  I don't want to show up on

17   July 8th with a big surprise that the number is nowhere near

18   what we heard yesterday.  I want to know about it and I want

19   to make decisions.  I want to make real-time decisions.

20   Just because there's a hearing on the 8th doesn't mean we

21   need to have the hearing on the 8th.  But if something comes

22   up, I want to know.  I'm asking.  And if not, we'll take up

23   plan confirmation.  We'll take up conversion at the same

24   time.  And if we need to have a status conference about what

25   that looks like, I'm happy to do that.

1          There was a lot of talk about professional fees

2    being paid out at the end of the year.  I haven't approved

3    anything.  What I have approved today is a settlement

4    motion.  That's what I approved.  I haven't approved

5    anything else today.  Oh, I did approve conditional approval

6    of the disclosure statement, which gets you to send stuff

7    out and pick dates.  I have not approved any administrative

8    expense claims, I haven't done anything.

9          So everybody's rights are preserved on all issues

10    related to plan confirmation.  And I would note that what

11    was argued before me yesterday was largely plan confirmation

12    issues, right?  You know, best interest of creditors and --

13    best interest of creditors is an issue.  I'm assuming that -

14    - I don't know what the vote -- I've got to see the vote.

15    You've got to see the votes to then see if the best interest

16    of creditors kicks in, and then you've got to make a

17    determination as to which class.  And then we can make all

18    kind of arguments, parties can make all kinds of argument

19    about that and the Court will consider all those issues at

20    the appropriate time.

21          So we will take up exculpations, releases, all

22    other related issues that come with -- there were

23    classification issues that were raised, there was issues

24    about feasibility.  And, you know, the Debtors have the

25    burden.  They put on their case.  But again, I still want to

1    know if there are surprises before then.  You all let me

2    know and we'll schedule a hearing.

3            I did count there were about a hearing a week on

4    average here.  I'm not holding one on a Saturday anymore,

5    but we'll hold one.  That's unnecessary.  But we'll pick

6    this up.

7            The reason I'm saying it's -- io do agree with the

8    point that these cases need to come to a conclusion one way

9    or the other.  That's what I am stressing.  And I'm not

10   saying no one feels that way, I'm just expressing why I

11   think July 8 is a real date.  But now you're going to have a

12   chance to get there, get some liquidity, extend maturity so

13   we don't have to have an emergency hearing on Monday to lift

14   the automatic stay and have a fight about that.  Some

15   administrative creditors can continue to get paid, the

16   debtors can continue to work.  I've encouraged the Debtors

17   to work with certain parties.

18           I'll rule on the HAS.  I think my case manager is

19   going to reach out to parties to talk about scheduling and

20   getting on a schedule on additional discovery related to

21   that matter.  I'm sure there are other matters that we'll

22   take up before then.  We'll take them up one at a time based

23   upon the law and the facts.

24           Pardon me.  I'm just going to check my notes.  Can

25   you just give me two minutes?  I'm going to step off and

1    then I'll come back on and we'll see where we are.

2         (Recess)

3         THE COURT:  We're back on the record.  I have

4    covered all of my bases.

5         Mr. Cohen, I forgot to mention, get me an order

6    that works for the parties.

7         Mr. Cohen?

8         MR. COHEN:  We will, Your Honor.  For the record,

9    David Cohen, Weil Gotshal & Manges, for the Debtors.  We

10   actually will get you a revised settlement order as well as

11   a revised order approving conditional approval of the

12   disclosure statement.

13        Just one request, Your Honor, now that you've put

14   a target on my back.  Will do so (indiscernible) in terms of

15   the July 4th date, number one.

16        Number two, we do agree with the Court.  These are

17   very important issues that I'm just going to have to address

18   at confirmation.  And I would like the opportunity just to

19   speak to Mr. Price about potentially extending that date out

20   at least a few days just so we don't deliver your

21   confirmation briefs from the Sunday of July 4th weekend.

22   (indiscernible).

23        THE COURT:  Don't worry about me.  I'm good.  I'm

24   fine.  I'm ready to go.  I'll be ready.  Don't worry about

25   me one bit.  These are important issues.  This case -- no, I

1    knew what I was doing when I was approving it on the 8th.

2    I'm ready to go.  You all just be ready as well.

3              MR. COHEN:  Understood, Your Honor.

4              THE COURT:  Okay?  All right, folks.  Anything

5    else we need to talk about?  All right.

6              MR. COHEN:  (indiscernible).  Thank you, Your

7    Honor.

8              THE COURT:  Thank you very much.  All right.

9         (Proceedings adjourned at 4:11 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           <u>CERTIFICATION</u>

2

3    I certify that the foregoing is a correct transcript from

4    the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7    *Sonya M. Ledanski Hyde*

8

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  June 3, 2025