UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| STEWARD HEALTH CARE SYSTEM, LLC, *at al.*, | Case No. 24-90213 (CML) |
| Debtors.[1] | (Jointly Administered) |

## OBJECTION OF CERTAIN PARTICIPANTS TO CONFIRMATION OF DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION

Dr. Manisha Purohit, Dr. Diane Paggioli, Dr. James Thomas, Dr. Thomas Ross, Dr. Michael Regan, Dr. Peter Lydon, Dr. Sridhar Ganda, Dr. A. Ana Beesen, Dr. Benoy Zachariah, Dr. Barry Arkin, Dr. Bruce Kriegel, and Dr. Gary Miller, participants in and beneficiaries of certain deferred compensation plans sponsored by the Debtors (the "**Deferred Compensation Plans**"), on their own behalf and on behalf of other participants in the Deferred Compensation Plans (collectively, the "**Participants**"), submit this objection (the "**Objection**") to confirmation of the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* [Dkt. No. 5021] (the **"Plan"**) filed by the debtors and debtors in possession in the above-captioned chapter 11 proceeding (collectively, the "**Debtors**"). In support of this Objection, the Participants state as follows:

### BACKGROUND

1. On May 6, 2024 ("**Petition Date**"), Debtors commenced their chapter 11 cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). Pursuant to the Procedures for Complex Cases in the Southern District of Texas, the Debtors elected for complex case designation, and this Court entered an order granting

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

such designation on May 6, 2024 [Dkt. No. 26].

2. The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. To date, no operating trustee or examiner has been appointed in the cases by the Office of the United States Trustee. An official committee of unsecured creditors was appointed on May 16, 2024.

3. On May 30, 2025, the Debtors filed the Plan.

4. Previously, the Participants filed the *Objection of Certain Participants to Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* [Dkt. No. 4907] (the "**Settlement Objection**") on May 19, 2025.

5. Contemporaneously with the filing of the Settlement Objection, the Participants also filed their *Emergency Motion to Convert the Debtors' Cases to Cases Under Chapter 7 of the Bankruptcy Code* [Dkt. No. 4912] (the "**Conversion Motion**").

6. Contemporaneously with the filing of the Settlement Objection and the Conversion Motion, the Participants also filed their *Objection of Certain Participants to Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory*

*Contracts and Unexpired Leases; and (VII) Granting Related Relief* [Dkt. No. 4908] (the **"Disclosure Statement Objection"**).

## ARGUMENT

7. In opposition to confirmation of the Plan, the Participants incorporate herein by reference the Conversion Motion, the Disclosure Statement Objection and the Settlement Objection as if fully stated herein, and copies of which are attached hereto as **Exhibit A**, **Exhibit B**, and **Exhibit C**, respectively, for the convenience of the Court.

8. The Plan is nonconfirmable on multiple grounds as set forth below. Now that the settlement that was the subject of the Settlement Objection has been approved, subject to various pending appeals, the only purposes of the Plan, practically speaking, are to secure additional funds ($15 million) to pay estate professionals in preference to other equal priority administrative claims, in violation of the Bankruptcy Code, and to act as a vehicle to implement exculpations and gather third-party releases in favor of various insiders providing no consideration for such releases from creditors likely to receive nothing for having (perhaps inadvertently) consented to granting them. Because of those improper purposes, and the grounds set forth below, confirmation should be denied.

9. No releases of the estates' claims would occur in chapter 7, nor would creditors be forced to take action to preserve third-party claims. Accordingly, the Plan fails the best interests of creditors test of section 1129(a)(7). In re Ditech Holding Corp., 606 B.R. 544, 614-15 (Bankr. S.D.N.Y. 2019); In re Quigley Co., Inc., 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010).

10. In addition, as a condition to confirmation, absent the consent of the holder of an administrative claim, allowed administrative claims must be paid in full on a plan's effective date. 11 U.S.C. §1129(a)(9)(A). The Debtors concede in the Disclosure Statement [Dkt. No. 5028] that allowable administrative claims are at least $93 million (exclusive of unpaid professional fees) and

actual allowed administrative claims may be multiples of that number since the Debtors' estimate fails to include hundreds of millions of dollars of disputed administrative claims. Id. at p. 12-14. Based on the evidence introduced at the May 29 hearing on the above-referenced settlement motion (the "**Settlement Hearing**"), and as conceded in the Disclosure Statement, the Debtors do not currently have funds or funding to pay even their estimated amount in full and may never have enough money. See, e.g., id. at p. 12, 94-95. The Plan is built on a hope and a prayer, not solid projections. The Plan is simply not feasible or confirmable.

11. The Debtors propose to solve the problem of being unable to pay allowed administrative claims on the effective date by simply making a mockery of the concept of an effective date. The Debtors propose an effective date for the Plan sometime in "early" 2027, a time period representing when, according to the testimony of Mr. Castellano, Chief Restructuring Officer of the Debtors, at the Settlement Hearing, the Debtors hope to have enough money—after liquidating causes of action and paying superior claims—to pay administrative claims in full. Id. at p. 12-14. The Debtors concede in their Disclosure Statement, however, that the Plan's effective date is "indeterminate":

> However, the timing of the Effective Date and distributions to holders of Allowed Administrative Expense Claims are indeterminate and will depend in part on the level of participation in the Administrative Expense Claims Consent Program. The Debtors anticipate that the more holders that choose to timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program, the longer it will take for the Debtors to have sufficient cash to satisfy all Allowed Administrative Expense Claims, thus ultimately delaying or even potentially contributing to risking the occurrence of the Effective Date.

Id. at p. 12. In fact, the Debtors concede that they have no real idea when the effective date of the Plan will occur; it could "reasonably" be any time:

> Based on the Debtors' reasonable estimates, the Debtors are estimating that the Effective Date is reasonably likely to occur in early 2027, although the Effective Date may reasonably or in fact occur earlier or later than early 2027.

Id. at p. 14.

4

12. The Debtors' "the effective date is whenever we have the money" sham does not work and should not be countenanced. Courts have consistently held that plans with materially delayed effective dates cannot be confirmed as they are facially violative of multiple subsections of section 1129(a), especially when the delay is to allow the debtor to gather enough funds to pay its effective date obligations. See, e.g., In re Vagu, No. 18-05805 MAG11, 2023 WL 4687819, at *8 (Bankr. D.P.R. July 21, 2023) (holding that extending the plan effective date to over a year after plan confirmation "render[ed] the effective date unreasonable and [the plan] unfeasible[,]" in violation of section 1129(a)(11)); In re Potomac Iron Works, Inc., 217 B.R. 170, 173-75 (Bankr. D. Md. 1997) (collecting and discussing cases reviewing the reasonableness of delayed effective dates and holding that a plan was unconfirmable as unreasonable because the delay was simply to collect additional income to afford payments to creditors). Similarly, plans with circular provisions governing the effective date or with uncertain future effective dates are also impermissible and violative of multiple subsections of section 1129(a). *See, e.g.*, In re Yates Development, Inc., 258 B.R. 36, 42-44 (Bankr. M.D. Fla. 2000) (holding that a plan with an effective date premised upon the possible future success of an appeal violated §§ 1123(a)(5), 1129(a)(3), and 1129(a)(11)); In re Premiere Network Servs., Inc., No. 04-33402-HDH-11, 2005 WL 6443624, at *6 (Bankr. N.D. Tex. 2005) ("The Debtor's ability to satisfy its financial obligations under the Plan, and the payment requirements of § 1129 is not just speculative, but is so contingent on factors beyond its control . . . that completion of the Plan is unlikely . . . Thus, the proponents have failed to meet the requirements of section 1129(a)(11)."); In re Cent. Eur. Indus. Dev. Co. LLC, 288 B.R. 572, 577 (Bankr. N.D. Cal. 2003) (holding a hypothetical plan "that would leave a substantial and indefinite delay between any confirmation hearing and the effective date" could not be confirmed). The Plan, which provides for delaying the effective date until sometime in 2027 in the hope that the Debtors' multiple litigations will generate net cash—

5

after payment of new and old secured claims—sufficient to pay administrative claims of a yet-undetermined amount, is proposed in bad faith in violation of section 1129(a)(3), violates section 1129(a)(9) (and thus violates section 1129(a)(1)), and is not feasible under section 1129(a)(11).

13. The Plan purports to impair classes 3 and 5, but it does not. For plan voting and confirmation purposes, a class is impaired if the proposed plan itself—not any provisions under the Bankruptcy Code or other sources, such as a settlement agreement—impacts a creditor's "legal, equitable, [or] contractual rights." In re Ultra Petroleum Corp., 943 F.3d 758, 763 (5th Cir. 2019) (collecting cases) (quoting 11 U.S.C. § 1124(1)); In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 205 (3d Cir. 2003); In re LATAM Airlines Grp. S.A., 55 F.4th 377, 384-85 (2d Cir. 2022) (joining the Third, Fifth, and Ninth Circuits). Parties subject to settlement agreements that may provide for less favorable treatment than preexisting contractual or statutory rights are not "impaired" if the terms of the proposed plan are consistent with settlement terms. In re Spirit Airlines, Inc., 668 B.R. 689, 701-02 (Bankr. S.D.N.Y. 2025) (collecting cases holding that claimants who agreed to settle were not impaired); In re Drexel Burnham Lambert Grp., Inc., 130 B.R. 910, 928 (S.D.N.Y. 1991), aff'd, 960 F.2d 285 (2d Cir. 1992) (holding that claimants in a settlement class action were not impaired because the plan at issue treated the class claimants in accordance with the settlement); In re Armstrong World Indus., Inc., 348 B.R. 136, 160 (D. Del. 2006) ("As a result of the EPA Settlement, Class 8 is unimpaired."); In re Kenmore Realty Grp., LLC, No. 10-55868, 2012 WL 5558049, at *1 (Bankr. N.D. Ill. Nov. 8, 2012) (modifying the proposed plan to provide that a claimant was unimpaired because any deficiency claim was resolved by a separate settlement). Both classes 3 and 5 are the products of prior settlement agreements not contingent upon confirmation of the Plan, and the Plan does not impair the claims in those classes. Rather, the settlement agreements limit creditor claims, irrespective of the Plan. The class 3 and 5 claims,

6

therefore, are not impaired and should not be eligible to vote (and those votes cannot be considered for purposes of determining whether the Plan complies with section 1129(a)(10)).

14.     Even if classes 3 and 5 were impaired, their placement in separate classes violates section 1122 of the Code and basic considerations of fairness and good faith, all in violation of sections 1129(a)(1) and (a)(3). Binding Fifth Circuit precedent emphatically provides that debtors cannot manipulate class and claim designations in order to obtain sufficient votes for plan confirmation. *See* Matter of Greystone III Joint Venture, 995 F.2d 1274, 1279 (5th Cir. 1991), *on reh'g* (Feb. 27, 1992) ("thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan"). "Notions of basic fairness and good faith are the source of the rule against separate classification of similar claims solely for gerrymandering purposes." In re Save Our Springs (S.O.S.) All., Inc., 388 B.R. 202, 234 (Bankr. W.D. Tex. 2008), *aff'd sub nom*. In re Save Our Springs All., Inc., No. A-08-CA-727 LY, 2009 WL 8637183 (W.D. Tex. Sept. 29, 2009), *aff'd sub nom*. In re Save Our Springs (S.O.S.) All., Inc., 632 F.3d 168 (5th Cir. 2011) (internal quotation omitted).  Courts have acknowledged some exceptions; similar claims may be classified differently if such claims are legally distinct or if there are "good business reasons" for doing so, such as separating "going forward" vendors from old-and-cold claims. *See, e.g.*, Greystone, 995 F.2d at 1279-81; In re Robertshaw US Holding Corp., 662 B.R. 300, 318-19 (Bankr. S.D. Tex. 2024); S.O.S., 388 B.R. at 235.  To classify claimants based on an alleged legal reason, such reason must be meaningful.  *See, e.g.*, S.O.S., 388 B.R. at 236 (in part holding that two classes of unsecured claims should not have been separately classified because "[t]o separately classify [the Class 4] claim from the Class 6 general unsecured claims merely because of rights that are theoretically held but meaningless in practice, is to elevate form over function."). Further, even when similar claims are separated into different classes, such claims must also be treated differently.  See Greystone, 995 F.2d at 1281. The claims in classes 3 and 5 of the Plan should not

have been classified separately from those in class 4. The only reason to separate the unsecured claims into those three classes is to obtain the accepting vote that each creditor in classes 3 and 5 agreed to provide as part of their respective settlements. Neither aforementioned exception applies to the Plan; there is no business or legal reason to separate these claims. This is a Plan providing for the liquidation of the estates' residual assets, largely causes of action of a speculative nature. Therefore, there would be no business justification for separate classification (e.g. there would be no need to distinguish between "going forward" and old-and-cold claims), and there is no meaningful legal distinction between claims in classes 3 through 5; the relevant voting claims are general unsecured claims. This is gerrymandering, pure and simple. The Plan cannot be confirmed.

15. The "gatekeeper" provision in the Plan also extends to claims and parties subject to the Plan's release provisions, the scope of which extends to several non-debtor parties and to the prepetition conduct of such parties, a scope considerably broader than the Plan's exculpation provisions. Accordingly, the "gatekeeper" provision runs afoul of the Fifth Circuit's express edict to the contrary. *See generally* In the Matter of Highland Capital Mgmt. L.P., 132 F.4th 353 (5th Cir. 2025).

16. Moreover, the releases being provided by the Debtors and their estates under the Plan extend to individual officers, directors, employees and others who are providing no consideration whatsoever for the releases, and who are apparently receiving releases for simply doing the jobs for which they were compensated pre- and post-petition; this is clearly inappropriate and an improper exercise of business judgment by the estates' representatives. *See, e.g.*, In re One2One Comm. LLC, No. 12-27311, 2016 WL 3398580, at *7-8 (D.N.J. June 14, 2016) (reversing bankruptcy court's approval of releases related to debtor's claims against insiders; "bankruptcy court erred as a matter of law in failing to analyze the contributions made to the Plan

by the released non-debtors."). The proposed consensual third-party releases by use of an opt-out mechanism are also overbroad, even if consent is eventually obtained by default or otherwise. As Bankruptcy Judge Walrath has held:

> Further, there is no basis for granting third party releases of the Debtor's officers and directors, even if it is limited to their post-petition activity. The only "contribution" made by them was in the negotiation of the Global Settlement and the Plan. Those activities are nothing more than what is required of directors and officers of debtors in possession (for which they have received compensation and will be exculpated); they are insufficient to warrant such broad releases of any claims third parties may have against them.

In re Washington Mutual, Inc., 442 B.R. 314, 354 (Bankr. D. Del. 2011) (citing In re Spansion, Inc., 426 B.R. 114, 145 (Bankr. D. Del. 2010)). The Fifth Circuit, of course, normally allows third-party releases via an opt-out mechanism and did so prior to the Supreme Court's Purdue Pharma decision. But opt-out-based "consensual" releases are based in principles of contract. *See e.g.*, In re Smallhold, Inc., 665 B.R. 704, 722-23 (Bankr. D. Del. 2024). Contracts, of course, require consideration to be enforceable. Courts have consistently held that providing releases to parties who are making no contribution to the funding of the plan is improper, and releases may not be granted as a result of another third-party's contribution. In re Nickels Midway Pier, LLC, No. 03-49462 (GMB), 2010 WL 2034542, at *13 (Bankr. D.N.J. May 21, 2010) (release is impermissible because it is "not necessary to the reorganization and has not been given in exchange for fair consideration thus violating §1129(a)(1) . . . The Plan provides for liquidation, which can be successfully accomplished whether or not [the releasee] is released from third-parties' claims."); In re 710 Long Ridge Road Operating Co. II LLC, No. 13-13653 (DHS), 2014 WL 886433, at *18 (Bankr. D.N.J. Mar. 5, 2014) (". . . the record is devoid of proof the individuals seeking to be released have made a necessary contribution toward funding the Plan and . . . without such demonstration, the proposed releases to managers, directors, officers, or employees are not warranted and cannot be approved."). Courts that bless third-party releases via the opt-out

mechanism based on the "default" theory (as opposed to contract) nonetheless focus on the consideration being provided by the releasees (and being received by the "consenting" releasors). Spirit Airlines, 666 B.R. at 718 (court notes that the releasees "provided hundreds of millions of dollars in value through the Restructuring Transactions, all of which provide the basis for the Plan leaving the vast majority of affected creditors unimpaired. Those creditors that were asked to provide the Third-Party Releases had reason to know of this bargain and the related benefits . . ."). By contrast, the Plan provides third-party releases to parties contributing nothing and would bind unsuspecting creditor-releasors who are likely to receive nothing. This is simply an abuse of the opt-out process regardless of what theory it is based upon.

17. Finally, the Plan also violates section 1123(a)(4) of the Code with respect to its proposed bifurcated treatment of administrative claims which provides superior treatment of professional fee claims versus other equal priority administrative claims, including administrative claims that do not "consent" to the Plan's forced discount alternative. Non-professional fee administrative claims must affirmatively opt out of the forced discounting of their claims and, even if they do so, will not have the as-discounted claims paid in full until well after the equal-priority professional fee claims will have been paid in full, and perhaps will not be paid for years. That disparate treatment—which effectively subordinates the other administrative claims to the fee and expense claims of professionals whether the subordinated claims consent or not—runs afoul of the Bankruptcy Code. In re Serta Simmons Bedding, LLC, 125 F.4th 555, 591 (5th Cir. 2024) (citing Quigley Co., 437 B.R. at 146).

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Participants respectfully submit that the confirmation of the Plan should be denied, and this Court should grant the Conversion Motion without delay.

Dated:  July 2, 2025               /s/ Christopher D. Johnson
                                                 Allan B. Diamond, Esq.
                                                 Christopher D. Johnson, Esq.
                                                 Diamond McCarthy, LLP
                                                 909 Fanin Street, 37th Floor
                                                 Houston, TX  77010
                                                 Telephone: (713) 333-5100
                                                 Facsimile: (713) 333-5199
                                                 Email: allan.diamond@diamondmccarthy.com
                                                          chris.johnson@diamondmccarthy.com

                                                 Robert J. Keach, Esq., *admitted pro hac vice*
                                                 Lindsay K. Milne, Esq.
                                                 Letson D. Boots, Esq., *admitted pro hac vice*
                                                 Jennifer Novo, Esq., *motion to appear pro hac vice pending*
                                                 Verrill Dana, LLP
                                                 One Portland Square, 10th Floor
                                                 Portland, Maine 04101-4054
                                                 Telephone: (207) 774-4000
                                                 Facsimile: (207) 774-7499
                                                 Email: rkeach@verrill-law.com
                                                           lmilne@verrill-law.com
                                                           lboots@verrill-law.com
                                                           jnovo@verrill-law.com

                                               *Counsel for the Participants*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on July 2, 2025, by the Court's CM/ECF electronic noticing system to all parties registered to receive notice in this case.


 */s/ Christopher D. Johnson*